# EXHIBIT 20

# FDA Briefing Document

## Meeting of the Antimicrobial Drugs Advisory Committee

## August 7, 2019

<u>Agenda:</u> The committee will discuss supplemental new drug application (sNDA) 208215, supplement 12, DESCOVY (emtricitabine 200 mg and tenofovir alafenamide 25 mg) tablets, submitted by Gilead Sciences, Inc., proposed for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually-acquired HIV-1 infection among individuals who are HIV-negative and at risk for HIV.

**Food and Drug Administration**
Center for Drug Evaluation and Research
DISCLAIMER STATEMENT

The attached package contains background information prepared by the Food and Drug Administration (FDA) for the panel members of the advisory committee. The FDA background package often contains assessments and/or conclusions and recommendations written by individual FDA reviewers. Such conclusions and recommendations do not necessarily represent the final position of the individual reviewers, nor do they necessarily represent the final position of the Review Division or Office. We have brought data to support the oral fixed-dose combination of emtricitabine 200 mg and tenofovir alafenamide 25 mg (Descovy®) for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually-acquired HIV-1 infection in at-risk adults and adolescents to this Advisory Committee in order to gain the Committee's insights and opinions, and the background package may not include all issues relevant to the final regulatory recommendation and instead is intended to focus on issues identified by the Agency for discussion by the advisory committee. The FDA will not issue a final determination on the issues at hand until input from the advisory committee process has been considered and all reviews have been finalized. The final determination may be affected by issues not discussed at the advisory committee meeting.

**Meeting of the Antimicrobial Drug Advisory Committee Meeting**
**August 7, 2019**

# Table of Contents

1.  INTRODUCTION AND CHARGE TO THE COMMITTEE ........................................................ 4

2.  BACKGROUND ........................................................................................................... 6

    a.  Descovy® (emtricitabine/tenofovir alafenamide) .................................................. 6

    b.  The Role of Mucosal Tissue Drug Exposure and HIV PrEP Efficacy ........................ 7

    c.  Regulatory Background ........................................................................................ 9

3.  Data to Support a Descovy PrEP Indication ........................................................... 10

    a.  Men and Transgender Women Who Have Sex with Men ..................................... 10

    b.  Cisgender Women ............................................................................................ 25

    c.  Adolescents ...................................................................................................... 28

4.  Summary ............................................................................................................... 29

5.  Questions to the Advisory Committee .................................................................. 30

6.  References ............................................................................................................. 31

3

# 1. INTRODUCTION AND CHARGE TO THE COMMITTEE

On July 16, 2012, the FDA approved the fixed-dose combination of emtricitabine (FTC) 200 mg and tenofovir disoproxil fumarate (TDF) 300 mg (Truvada®, F/TDF) for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually-acquired HIV-1 infection in at-risk adults. This approval was based on favorable efficacy and safety data from two large randomized, placebo-controlled trials in diverse populations: 1) the iPrEx trial (NCT00458393) in men and transgender women who have sex with men (MSM/TGW) {Grant et. al. 2010} and 2) the Partners PrEP trial (NCT00557245) in heterosexual HIV discordant couples {Baeten et al. 2012}. In these trials F/TDF was found to be safe and well-tolerated in healthy, HIV-uninfected adults and reduced the risk of HIV acquisition by 42% in MSM/TGW and 75% in individuals in stable serodiscordant relationships (84% and 66% in men and women, respectively) by a modified intent-to-treat analysis. In both trials, and numerous studies since, PrEP efficacy was highly correlated with the degree of adherence to the daily dosage regimen of F/TDF. Relative to placebo, an HIV risk reduction rate of up to 95% was estimated among individuals with consistently detectable drug levels. Headache, nausea, abdominal pain and weight loss were the main clinical safety findings associated with use of F/TDF for PrEP, often presenting as part of a modest, transient "start-up syndrome" that peaked within the first month of drug administration. Use of F/TDF for PrEP was also associated with small, reversible increases in serum creatinine and decreases in estimated creatinine clearance and bone mineral density (BMD) compared with placebo, but these laboratory findings infrequently resulted in clinical adverse events or drug discontinuation. On May 15, 2018, the PrEP indication for Truvada was expanded to include at-risk adolescents weighing at least 35 kg based on safety and adherence data from the dedicated open-label study ATN 113 (NCT01769456) in young MSM 15 to 17 years of age and extrapolation of adult efficacy data {Hosek et al. 2017}. Truvada remains the only drug product approved for a PrEP indication.

Despite demonstrated safety and efficacy, awareness and uptake of Truvada for PrEP in the U.S. were very limited following the approval. However, the Centers for Disease Control and Prevention (CDC) estimates that between 2014 and 2016, the annual number of PrEP users aged ≥ 16 years increased by 470%, from 13,748 to 78,360 in the U.S. {Huang et al. 2018}, and that current PrEP awareness and uptake are up to 90% and 35%, respectively, among high-risk MSM {Finlayson et al. 2019}. Other sources estimate the number of current PrEP users in the U.S. to be over 250,000 {AVAC 2019}.

Increases in PrEP uptake have mostly been in select populations, namely white, urban, educated MSM. Overall uptake of PrEP in the U.S., however, remains low. The CDC estimates that 1.1 million people in the U.S. have indications for PrEP {Smith et al. 2018}; however, only about 7% of these were prescribed PrEP in 2016 {Huang et al. 2018}. Further, there are substantial disparities in awareness and uptake among populations disproportionally affected by the current HIV epidemic; i.e., MSM and cisgender women of color, transgender persons, adolescents and young adults, people who inject drugs (PWID), and those living in rural communities {Powell et al. 2019}. The latter two are particularly relevant given the nation's ongoing opioid crisis {Rudd et al. 2016}. To illustrate, the CDC notes that among the 1.1 million U.S. adults with indications for PrEP, 26%, 44% and 25% were white, black, and Hispanic, respectively; yet among PrEP users with available race/ethnicity data, 69%, 11%, and 13% were white,

4

black, and Hispanic, respectively {Huang et al. 2018}. An additional concern is that published data indicate high levels of non-persistence of PrEP use in the U.S. over a two-year period {Coy et al. 2019}. These findings, combined with the estimated 40,000 new HIV diagnoses reported in the U.S. each year, an incidence rate that has remained constant since 2012 {CDC 2017}, point to gaps in the nation's PrEP implementation efforts. In response, the U.S. government announced an ambitious new initiative in February 2019 to reduce new HIV infections in the U.S. by 75 percent in five years and by 90 percent by 2030 {Fauci et al. 2019}. A key pillar of the initiative's strategy involves the use of PrEP in at-risk individuals.

Factors contributing to disparities in PrEP uptake and persistence include cost, access, and difficulty adhering to daily usage and frequent provider visits {John et al. 2017}. With regards to the latter, new regimens and delivery methods to improve acceptability, adherence and effectiveness of PrEP are needed and are currently being explored, including on-demand dosing, long-acting formulations that require less frequent dosing (e.g., every few weeks or months), and new delivery methods (injectables, topical microbicides, vaginal rings, implants).

In this supplemental New Drug Application (NDA 208215/S-012), Gilead Sciences, Inc. (Applicant) is seeking a PrEP indication for another once daily tablet, the oral fixed-dose combination of emtricitabine 200 mg and tenofovir alafenamide 25 mg (Descovy®, F/TAF). The proposed PrEP indication is for use in at-risk adults and adolescents weighing at least 35 kg, mirroring the current indication for F/TDF. The Applicant's rationale for proposing Descovy as PrEP rests primarily on its approval for the treatment of HIV-1 infection, its potential safety advantages over F/TDF (demonstrated chiefly by improved biomarker test results), and efficacy results from a Phase 3 clinical trial in MSM/TGW, Study GS-US-412-2055 (DISCOVER), entitled "*A Phase 3, Randomized, Double-Blind Study to Evaluate the Safety and Efficacy of Emtricitabine and Tenofovir Alafenamide (F/TAF) Fixed-Dose Combination Once Daily for Pre-Exposure Prophylaxis in Men and Transgender Women Who Have Sex with Men and Are At Risk of HIV-1 Infection*" (NCT02842086).

The clinical data to support the use of Descovy for PrEP are derived from the primary analysis of the DISCOVER trial. Results from two external (non-Gilead) IND Phase 1 clinical pharmacokinetic (PK) studies are provided to support the extrapolation of PrEP efficacy to cisgender women. The Applicant submitted published results from a single-dose PK study of TAF {Cottrell et al. 2017} and a clinical study report and datasets from a multiple-dose PK study of F/TAF and F/TDF {Schwartz et al. 2018} for FDA review.

Upon review of the clinical data from the DISCOVER trial, the FDA has concluded that the data support the proposed PrEP indication for Descovy in MSM/TGW at risk of HIV infection. With respect to the proposed indication in cisgender women, based on a review of the available literature, the FDA considers that local tissue drug concentrations at the site of potential HIV exposure are important to the prevention of HIV transmission. In the absence of clinical efficacy data with Descovy in cisgender women, evidence of adequate drug concentrations in cervicovaginal tissues with F/TAF dosing is considered necessary to allow for extrapolation of Truvada efficacy in support of a female Descovy PrEP indication. After review of the submitted data to support such an extrapolation approach, the FDA is uncertain that the data can support the efficacy of Descovy as PrEP in cisgender women.

This Advisory Committee Background Document provides a summary of the available literature and the data submitted in support of this application. We provide a discussion of the potential contribution of mucosal tissue drug concentrations to PrEP efficacy and discuss the data provided to support an extrapolation of efficacy to cisgender women. The charge to the advisory committee is to determine whether the data from the DISCOVER trial support the use of Descovy for PrEP in men and TGW who have sex with men and are at risk of HIV infection, and whether the available data support extrapolation of Truvada PrEP efficacy to the use of Descovy as PrEP in cisgender women at risk of HIV infection. If the data are not deemed adequate to support an indication in any of the proposed populations, the FDA asks the advisory committee to provide input as to what additional studies or trials may be needed, and what clinical trial designs would be adequate to support an indication in specific sub-populations (e.g. MSM, TGW or cisgender women).

## 2. BACKGROUND

### a. Descovy® (emtricitabine/tenofovir alafenamide)

As both Truvada and Descovy contain 200 mg FTC, and plasma concentrations of FTC are comparable following administration of each drug, this discussion will focus on the role of TAF in the safety and efficacy of Descovy for HIV-1 PrEP. It should be noted that the exact contribution of FTC to PrEP efficacy, and whether this contribution differs depending on the route of HIV exposure (e.g., rectal vs. vaginal), is largely unknown. Several considerations, however, support the inclusion of FTC as part of PrEP: 1) PK studies suggest that the active metabolite of FTC, emtricitabine-triphosphate (FTC-TP), accumulates quickly in mucosal tissues, with better concentrations in vaginal tissue and cells compared to tenofovir diphosphate (TFV-DP) {Patterson et al. 2011}, 2) animal studies in macaques suggest better protection against simian/human immunodeficiency virus (SHIV) infection with the combination of FTC and tenofovir over tenofovir monotherapy in rectal and vaginal challenge models {Subbarao et al. 2006; Garcia-Lerma et al. 2008; Garcia-Lerma et a. 2008; Garcia-Lerma et al. 2011; Massud et al. 2019}, and 3) the combination of two nucleoside reverse transcriptase inhibitors (NRTIs) is expected to increase the barrier to resistance.

Like TDF, tenofovir alafenamide is a prodrug of tenofovir (TFV) currently approved for the treatment of HIV-1 and hepatitis B virus (HBV). While the intracellular active metabolite TFV-DP is the same for both drugs, TAF and TDF exhibit distinct PK properties. TDF is mostly hydrolyzed to TFV, the major circulating form in plasma, whereas TAF is not significantly hydrolyzed and circulates as TAF in plasma. Consequently, administration of TAF 25 mg results in 4- to 7-fold higher intracellular levels of TFV-DP in peripheral blood mononuclear cells (PBMCs) and approximately 90% lower plasma concentrations of TFV compared with TDF 300 mg. This marked reduction in circulating TFV levels is believed to be responsible for the improved measures of bone and renal safety observed with TAF relative to TDF in treatment trials of HIV and chronic HBV infection. On the other hand, fasting plasma lipid levels tend to be higher with TAF administration compared to TDF because systemic exposures of TFV are higher with TDF and TFV appears to have lipid-lowering effects {Cid-Silva et al. 2019}.

6

Cross-study comparison of two single-dose studies suggest that PK differences between TAF and TDF also extend to differences in observable TFV-DP concentrations in mucosal tissues relevant to HIV transmission. In a single-dose PK study of TAF in healthy women, investigators found that TFV-DP concentrations were unquantifiable in 87.5% and 75% of cervicovaginal and rectal tissue samples, respectively, following administration of TAF 25 mg, and could not be quantified in any samples collected after 72 hours {Cottrell et al. 2017}. These findings contrasted with historical data from a similarly conducted single-dose PK study of TDF by the same investigators {Cottrell et al. 2016}. In comparing these data, TFV-DP exposures following a single 25 mg dose of TAF were reportedly more than 10-fold lower in rectal tissue compared with administration of TDF 300 mg. Furthermore, TFV-DP was unquantifiable in 35% more female genital tract tissue samples and 75% more rectal tissue samples with TAF compared to TDF dosing. Given that 91% of tissue samples were unquantifiable, results from this single-dose TAF study were inconclusive (and the authors concluded that additional PK studies exploring higher single or multiple doses were needed). Nonetheless, the results highlighted the limited understanding of TAF pharmacology at the mucosal tissue level and raised questions about the role of TAF in HIV prevention.

Similarly, CDC investigators working with a rectal challenge model of SHIV infection in rhesus macaques found that while TAF enhances the delivery of TFV-DP in PBMCs as compared to TDF, this relationship was not maintained in rectal tissues, where TFV-DP concentrations were about an order of magnitude lower than those achieved with TDF {Massud et al. 2016}. Nonetheless, these macaque studies were able to demonstrate significant protection from SHIV with F/TAF dosed 24 hours before and 2 hours after rectal challenge, comparable to that previously observed with F/TDF in the same macaque model. It should be noted, however, that there are potentially substantive differences between these models and the human experience, including differences in drug exposures and the use of surrogate viruses, and the predictive value of these models for efficacy in humans exposed to HIV-1 is unclear.

### b.  The Role of Mucosal Tissue Drug Exposure and HIV PrEP Efficacy

The relevant site of drug action to prevent HIV-1 infection, or the relative contribution of tissue versus systemic drug concentrations to PrEP efficacy, has not been established. While mucosal tissues of the vagina and rectum play a critical role in HIV-1 acquisition, the relative importance of drug exposures in these tissues to the prevention of viral entry, integration, local expansion and dissemination is not clear. Given how rapidly HIV-1 disseminates to local and distant lymph nodes, and then to distal organs {Haase 2011}, one might speculate that local tissue exposures alone cannot provide complete protection. And yet, evidence from placebo-controlled clinical trials of topical vaginal microbicides, such as the tenofovir 1% vaginal gel {Abdool Karim et al. 2010} and the dapivirine vaginal ring {Baeten et al. 2016; Nel et al. 2016}, suggest that high local tissue drug concentrations, in the absence of significant systemic drug exposure, can independently reduce the risk of HIV infection from vaginal exposure. (In macaque studies, both oral F/TDF and tenofovir gel were found to be highly protective {Garcia-Lerma et al. 2010; Dobard et al. 2012; Garcia-Lerma et al. 2008; Parikh et al. 2009; Radzio et al. 2012}). It has been suggested that systemic drug concentrations may therefore act as "back-up" if virus escapes early to lymph nodes, and thus may contribute to PrEP efficacy in this manner {Anderson et al. 2016}.

Seroconversion outcomes in clinical trials of oral PrEP in men and women may also provide insight into the role of mucosal tissue drug exposure in HIV transmission. Multiple trials in MSM, for example, have consistently demonstrated a protective benefit of F/TDF against rectal acquisition of HIV-1, despite suboptimal adherence in early trials and event-driven dosing more recently {Grant et al. 2010; Molina et al. 2015; McCormack et al. 2016}. In contrast, clinical trials of F/TDF in cisgender women have yielded mixed results. Poor adherence has been cited as the reason for PrEP futility in two large trials in cisgender women, FEM-PrEP and VOICE {Van Damme et al. 2012; Marrazzo et al. 2015}, where less than 30% of subjects had drug exposure evidence of recent product use. However, similarly low rates of adherence among MSM/TGW in the iPrEx trial still resulted in a 42% risk reduction, suggesting preferential activity of F/TDF for prophylaxis of rectal HIV exposures {Cottrell et al. 2016; Anderson et al. 2016}. Indeed, studies have shown that TFV-DP concentrations are at least 10-fold higher in rectal tissue compared to vaginal tissue as measured in tissue homogenates {Patterson et al. 2011; Louissaint et al. 2014; Seifert et al. 2016}. However, results obtained from tissue cells (as opposed to homogenates) show mixed results, from no difference {Louissaint et al. 2014} to 13-fold higher {Seifert et al. 2016} concentrations in colorectal tissue cells as compared to cervicovaginal tissue cells. Presumably, such variability in drug concentrations between the female genital tract and rectal tissue would not be relevant if systemic drug exposure were the main determinant of PrEP efficacy, as the plasma and intracellular PK profiles of FTC and TDF are comparable between men and women. Taken together, though, these indirect observations suggest that drug exposures in various mucosal tissues may play an important role in the prevention of HIV infection. Accordingly, PrEP guidelines published by the CDC have included information about the time to achieve maximum concentrations of TFV-DP in various compartments (approximately 7 days for rectal tissue and 20 days for cervicovaginal tissues) {CDC 2018}, and some state guidelines have followed suit in their prescribing recommendations {New York State Department of Health 2017}.

It is also not clear what drug concentrations would be considered protective for rectal or vaginal tissues. It has been suggested that TFV-DP tissue concentrations should be corrected for endogenous nucleotides (i.e., deoxyadenosine triphosphate, dATP) because dATP competes with TFV-DP for incorporation into the proviral DNA strand to terminate chain elongation. About 5-fold higher dATP concentrations have been observed in vaginal tissue as compared to rectal tissue {Cottrell et al. 2016}, which could suggest that higher TFV-DP concentrations may be required to protect against HIV exposures in vaginal tissue compared with rectal tissue.

In contrast, nonclinical studies in rhesus macaques, while also reporting differences in active drug concentrations between vaginal and rectal tissues and between TAF and TDF, have nonetheless shown significant protection with oral dosing of F/TDF and F/TAF against vaginal and rectal challenges with SHIV {Garcia-Lerma et al. 2010; Radzio et al. 2012; Massud et al. 2016; Massud et al. 2018}. These nonclinical observations raise questions about the contribution of tissue versus systemic drug concentrations to oral tenofovir-based PrEP efficacy. However, an earlier rectal challenge study in rhesus macaques using a high dose of TAF monotherapy dosed 3 days prior to rectal challenge (as opposed to before and after) failed to show a prophylactic effect despite high levels of TFV-DP in PBMCs {Garcia-Lerma et al, 2011}. Similar results were obtained in a vaginal challenge model with TAF

8

monotherapy, despite dosing before and after viral challenge and notably with comparable TFV-DP concentrations in PBMCs between infected and uninfected macaques {Massud et al. 2019}.

In conclusion, the FDA considers it is important to compare TFV-DP concentrations in the same mucosal tissues if bridging of efficacy between F/TDF and F/TAF is being proposed. Bridging of efficacy results from men to cisgender women based on mucosal tissue concentrations, however, is not possible because the effective drug concentrations could be different for rectal and vaginal HIV exposures.

### c.  Regulatory Background

Discussions with the FDA regarding a Descovy PrEP indication were initiated in 2016. The initially proposed pivotal trial design consisted of a single-arm, open-label, Phase 3 trial of F/TAF in high-risk MSM/TGW for 24 weeks using historical controls (i.e., the placebo HIV incident rates from Truvada PrEP trials in MSM). Integral to this proposal was the supposition that intracellular TFV-DP levels in PBMCs achieved with F/TAF could serve as a PK bridge to efficacy data from the Truvada PrEP trials. However, given reports of lower (i.e., unquantifiable) TFV-DP concentrations in rectal tissue with TAF dosing relative to TDF, and uncertainty about the relative importance of mucosal tissue versus systemic drug exposures to PrEP efficacy, the FDA did not agree that TFV-DP levels in PBMCs could act as a surrogate marker of protection for registrational purposes and recommended instead an active-controlled, non-inferiority trial of 96 weeks duration with Truvada as the comparator to support licensure.

With respect to the ensuing Phase 3 trial GS-US-412-2055 (DISCOVER) in MSM/TGW, the FDA provided guidance throughout the protocol development. A non-inferiority assessment of the HIV infection rate ratio between the F/TAF and F/TDF arms was deemed an appropriate analysis method for the primary endpoint, with a noninferiority margin of 1.62 based on equal weighting of efficacy data from three prior PrEP trials of Truvada in MSM (i.e., iPrEx, PROUD, and IPERGAY).

While two adequate and well-controlled trials are generally recommended to provide substantial evidence of efficacy and safety for registration, the FDA considered that a single trial may be acceptable if adherence in the trial was high and the treatment effect was robust with strong internal consistency.


(b) (4)

Since the pre-IND phase, the FDA encouraged the Applicant to also consider conducting a trial of Descovy in cisgender women at high risk of HIV-1 acquisition. In subsequent discussions, the Applicant reported challenges in designing a PrEP trial in this population because of difficulties in identifying a suitable study design or a relevant female cohort for study in sub-Saharan Africa, where such a trial would be undertaken. The Applicant also expressed concerns that adherence and perception of risk were highly variable in young women 15-25 years of age living in high HIV prevalence areas (a population with high unmet need) and that the majority would not take a daily oral drug for prevention, citing the experience of the FEM-PrEP and VOICE trials. Subsequent communications made it clear the Applicant planned to pursue an extrapolation strategy to support a Descovy PrEP indication in cisgender

women. Of note, during this same time period, other Phase 3 prevention trials in women were either initiated or ongoing in sub-Saharan Africa (e.g., HPTN 084 for injectable cabotegravir versus daily oral Truvada [NCT03164564] and the ASPIRE and Ring Study trials of dapivirine vaginal ring versus placebo {Baeten et al. 2016; Nel et al. 2016}. However, these trials are evaluating superiority of non-oral regimens compared to daily oral regimens or placebo, and it is unlikely that superiority of F/TAF to F/TDF could be demonstrated since both are daily oral tablet formulations. Noninferiority trials using F/TDF as a control in cisgender women have not been possible due to the inability to define a noninferiority margin because previous preventive efficacy results of F/TDF in this population have been inconsistent.



(b) (4)

At a November 2018 meeting to discuss the content of the present efficacy supplement, the Applicant described its strategy to support a broad indication for Descovy PrEP in adults and adolescents. Safety and efficacy data from the pivotal DISCOVER trial would support an indication in MSM/TGW. An indication in cisgender women would be supported by 1) extrapolation of F/TAF efficacy from the DISCOVER trial via comparable systemic drug exposures, 2) extrapolation of F/TDF efficacy in cisgender women from the Partners PrEP trial via comparable or greater vaginal tissue drug concentrations, and 3) extrapolation of safety in HIV-infected men and women from the TAF development program; in addition, nonclinical vaginal challenge studies in pigtail macaques would provide supportive evidence. Finally, an adolescent indication would be supported by extrapolation of adult efficacy data and PK and safety data in HIV-infected adolescents treated with TAF-based regimens.

The current efficacy supplement was submitted on April 5, 2019. A priority review was granted because the Applicant used a Rare Pediatric Disease Priority Review Voucher for this application.

## 3.   Data to Support a Descovy PrEP Indication

### a.   Men and Transgender Women Who Have Sex with Men

Interim trial data from the Phase 3 DISCOVER trial, with a cutoff date of January 31, 2019, were submitted to support a Descovy PrEP indication in MSM/TGW. The trial design and results are summarized herein.

### DISCOVER Study Design

The DISCOVER trial is an ongoing multinational, Phase 3, randomized, double-blind trial to compare safety and efficacy of F/TAF versus F/TDF in HIV-1 negative adult men and TGW who have sex with men and are at high risk of HIV-1 infection. The trial is being conducted in 94 sites across 11 countries in

North America and Europe in cities known to be historic urban epicenters of the HIV epidemic and that have high prevalence of people living with HIV, as well as in cities where new HIV cases are increasing, and where HIV-associated sexual risk behavior is high.

The trial planned to enroll 5000 subjects to receive blinded study drug for 96 weeks. The sample size was calculated based on the treatment effect observed in previous PrEP trials in MSM (i.e., iPrEx, PROUD, IPERGAY). A sample size of 2500 participants in each arm with 1:1 randomization was expected to provide at least 82% power to show noninferiority of F/TAF to F/TDF. The noninferiority margin of 1.62 and an HIV-1 infection rate of 1.44 per 100 person-years (PY) were based on results from prior PrEP trials in MSM.

Eligible participants were HIV-1 negative MSM or TGW aged ≥ 18 years who had at least one of the following: condomless anal intercourse with at least two unique male partners with HIV-1 infection or of unknown HIV status in the past 12 weeks, a documented history of syphilis in the past 24 weeks, or a documented history of rectal gonorrhea or chlamydia in the past 24 weeks. Each participant had to have a minimum estimated glomerular filtration rate according to the Cockcroft-Gault formula (eGFR$_{CG}$) of 60 mL/min and no history of osteoporosis or bone fragility fractures. Participants with suspected or known active, serious infection(s); evidence of acute viral hepatitis A, B, or C infection; or evidence of chronic hepatitis B virus (HBV) infection were excluded. Prior or current use of F/TDF PrEP was not an exclusion criterion.

After randomization, subjects were seen in follow-up visits at Weeks 4, 12, and every 12 weeks thereafter. At each study visit, subjects had the following procedures: HIV tests performed via central laboratory or local laboratory; drug dispensation and adherence and risk reduction counseling; safety assessments including monitoring of adverse events and concomitant medications, physical examinations, weight, vital signs measurements, and clinical laboratory tests (hematology, chemistry, urinalyses including markers of renal function); screening for sexually-transmitted infections (STIs), and hepatitis C and B virus; and collection of plasma samples to evaluate TFV and FTC plasma PK. A single pre-dose PBMC sample was collected at Week 4 to evaluate intracellular concentrations of TFV-DP and FTC-TP. Subjects also self-reported demographic characteristics, sexual risk behaviors, study drug adherence, and recreational drug and alcohol use at each visit via computer-assisted self-interview (CASI).

A substudy assessing hip and spine bone mineral density (BMD) changes at Weeks 48 and 96 by dual energy x-ray absorptiometry (DXA) tests was conducted in a subset of 400 subjects (200 per arm), providing at least 95% power to detect a 1.54% difference between groups.

Adherence to study drug was assessed by self-report and pill count. In addition, two substudies were conducted based on TFV-DP concentrations in red blood cells, an indicator of long-term adherence, from dried blood spot (DBS) samples:

1) a cohort substudy in approximately 10% of subjects randomly pre-selected to estimate overall rate of adherence, and

11

2) a case-control substudy consisting of all subjects who became HIV-infected during the trial matched to 5 randomly selected control subjects (matched by treatment, time, location, and risk behavior) to assess the association between adherence and efficacy.

The severity of adverse events and laboratory abnormalities were graded based on the Applicant's toxicity grading scale, provided in the protocol.

The primary endpoint is the incidence of HIV-1 infection per 100 PY, evaluated when all subjects had completed a minimum follow-up of 48 weeks and at least 50% had completed 96 weeks, or had prematurely discontinued from study. This endpoint was selected based on FDA guidance on the development of systemic drug products for PrEP {FDA 2018}. The primary analysis is evaluated in the Full Analysis Set (FAS), where the FAS includes all subjects who 1) are randomized into the study, 2) have received at least 1 dose of study drug, 3) are not HIV positive on Day 1 (defined as subjects with either negative Covance antibody test results at the first post baseline assessment or negative local lab Day 1 rapid tests), and 4) have at least one post-baseline HIV laboratory assessment (from either local or central laboratory).

Interim analyses were performed after 50% of participants reached Weeks 24, 48, and 72, respectively; an alpha of 0.00001 was spent for each interim analysis. Therefore, the significance level for the 2-sided test in the primary analysis was 0.04997 (corresponding to 95.003% CI). Noninferiority of F/TAF to F/TDF was to be concluded if the upper bound of the 2-sided 95.003% CI of the rate ratio in the HIV infection incidence rate was less than 1.62.

There are 6 key (α-controlled) secondary safety endpoints, all assessed at Week 48:

- percentage change from baseline in hip BMD
- percentage change from baseline in spine BMD
- percentage change from baseline in urine beta-2-microglobulin to creatinine ratio
- percentage change from baseline in urine retinol binding protein (RBP) to creatinine ratio
- distribution of urine protein and urine protein to creatinine ratio (UPCR) categories
- change from baseline in serum creatinine

To control for the overall type I error rate for these multiple testings, multiplicity adjustments were performed with a fallback procedure and prespecified 2-sided alpha levels.

## DISCOVER Results

As previously noted, the analysis of the primary endpoint was conducted when all subjects had completed 48 weeks of follow-up and half had completed 96 weeks of follow-up or had discontinued the trial. The data cutoff date for this submission was January 31, 2019.

Study Participants

Screening for the DISCOVER trial began in September 2016 and full enrollment was completed in May 2017. Of 5857 participants screened, 364 failed screening, of which 49 were HIV positive at screening.

A total of 5387 subjects were randomized and received study drug (F/TAF 2694, F/TDF 2693). Within this cohort, demographics and baseline characteristics were well balanced between the treatment groups. The vast majority (98.6%) of subjects were MSM; TGW made up only 1.4% of the study population. Median age was 34 years (range: 18-74 years); 12% of subjects were below the age of 25 years. Most subjects were white (83%); 8.8% were black/mixed black, 4% were Asian, and about 25% were Hispanic or Latino. The majority (59.8%) of subjects were in the U.S., of which 40% were in the U.S. South. In general, this was a well-educated cohort; the highest educational level attained by 57% of the study population was 4 years of college or higher. Seventy-one (71) percent of subjects were employed full-time. At baseline, mean (SE) eGFR$_{cg}$ was 127.2 (0.467) mL/min.

While the subject demographics skewed towards older, white, educated MSM (consistent with the majority of current PrEP users in the U.S.), this was still a sexually high-risk cohort. At screening, less than 40% reported routinely using condoms to manage HIV risk, and less than 30% asked their partners to use condoms. Of those subjects with screening CASI information (n=5199), 61% reported two or more unique unprotected receptive anal intercourse (URAI) partners in the 90 days prior to screening (mean [SE] 3.52 [0.084] partners) and 63% reported 2 or more unique unprotected insertive anal intercourse (UIAI) partners during that same time period (mean [SE] 4.18 [0.097] partners). For the 24 weeks prior to screening, 9.9% of subjects reported a history of rectal gonorrhea, 12.5% a history of rectal chlamydia, and 9.2% a history of syphilis. At screening, the proportion of subjects diagnosed with STIs, based on laboratory results, was as follows: gonorrhea rectal 4.4%, urethral 0.6%, pharyngeal 5.1%; chlamydia rectal 7.3%, urethral 2.2%, pharyngeal 2%; and syphilis 0.2%. In addition, two-thirds of subjects reported recreational drug use in the 3 months prior to screening. Approximately 16% of subjects reported use of post-exposure prophylaxis (PEP) in the 12 months prior to screening, and 23.1% reported any prior use of Truvada for PrEP. At baseline, 16.8% of subjects were taking PrEP prior to randomization. Finally, 43.8% of subjects were uncircumcised.

As of the data cutoff date, 85.8% of treated subjects were still in the study and 83.6% remained on study drug, with similar rates of drug discontinuation in both arms. Among the 882 (16.4%) subjects who prematurely discontinued study drug, the reasons for stopping were as follows: lost to follow-up (42.1%), subject decision (41.7%), adverse event (9.6%), noncompliance with study drug (2.3%), investigator's discretion (1.7%), HIV-1 infection (1.5%), protocol violation (0.8%), and death (0.3%). By Kaplan-Meier estimate, there was no difference between treatment groups in the time to premature study drug discontinuation.

Rates of discontinuation were higher among TGW participants. Among the 74 treated TGW subjects, 26 (35.1%) prematurely discontinued study drug (F/TAF 16, F/TDF 10) and 24 (32.4%) dropped out of the study as of the cutoff date (2 subjects stopped drug but remained on study). The reasons for prematurely stopping study drug were as follows: lost to follow-up (14 subjects [53.8%]), subject decision (8 subjects [30.7%]), adverse event (3 subjects [11.5%]), and noncompliance with study drug (1 subject [3.8%]).

Efficacy Results

*Primary Efficacy*

In the primary efficacy analysis, 22 (0.4%) of 5335 participants (FAS) were infected with HIV-1. Infections in each treatment group and the analysis results are provided below (Table 1).

*Table 1: Primary Efficacy Analysis, FAS Population (DISCOVER)*

|  |  | FTC/TAF (N=2670) | FTC/TDF (N=2665) | Ratio of F/TAF vs. F/TDF (95.003% CI) |
|---|---|---|---|---|
| Person-years of Follow-Up |  | 4369.7 | 4386.2 |  |
| Number of HIV-1 Infected Events |  | 7 | 15 |  |
| HIV-1 Infection Rate per 100 Person-years |  | **0.160** | **0.342** |  |
| Sponsor used | 95% Exact CI[a] | (0.064, 0.330) | (0.191, 0.564) |  |
|  | Rate Ratio | **0.468** |  | (0.191, **1.149**)[b] |

[a] Ulm (1990) method was used to calculate the exact 95% CI for individual rate (a single Poisson parameter)
[b] 95.003% was constructed using generalized model associated with a Poisson distribution and logarithmic link with the treatment group being the main effect
Source: FDA analysis of ADEFF dataset from DISCOVER trial

In the FAS population, the rate ratio for the HIV incidence rate (F/TAF vs. F/TDF) was 0.468 (95.003% CI: 0.191, 1.149). As the upper bound of the 2-sided confidence interval (CI) for the incidence rate ratio was less than the prespecified noninferiority margin of 1.62, noninferiority of F/TAF to F/TDF was demonstrated. While there were less HIV infections in the F/TAF group than in the F/TDF group, the current trial is not large enough to support superiority claims of F/TAF to F/TDF.

*Adherence*

By all measures, estimated adherence to study drugs was high in this trial. By CASI questionnaire, the median self-reported adherence was greater than 95% at all visits. Median pill-count adherence was 98% in both treatment arms. In the DBS substudy, the majority of subjects in both groups had TFV-DP levels in red blood cells consistent with high adherence (≥ 4 days of dosing per week). Other objective measures of adherence, such as TFV and FTC levels in plasma and TFV-DP and FTC-TP levels in PBMCs at Week 4, confirmed the high adherence results of the DBS substudy.

*Risk Behaviors and STIs*

Sexual risk behaviors in this study population did not significantly change from baseline. The percentage of subjects who reported condomless sex at each visit remained consistently high (approximately 90%) through Week 96, as did the reported numbers of URAI or UIAI partners. Likewise, the laboratory-based STI incidence rates remained persistently high throughout the trial, with about 57% of subjects diagnosed with at least one gonococcal or chlamydial infection post-baseline. Given these findings, and the high-risk behaviors reported at baseline and the percentage of subjects with STIs diagnosed at screening, there is no evidence to suggest risk compensation was occurring in the DISCOVER trial.

*HIV Seroconverters*

Based on blinded medical review of the data, of the 22 subjects who seroconverted during the DISCOVER trial, 5 subjects (F/TAF 1, F/TDF 4) were suspected to have a baseline HIV-1 infection. Most of these subjects were diagnosed within the first few weeks of the trial and each had a potential HIV exposure around the time of study entry. Four of these subjects had genotypic resistance to FTC. In a sensitivity analysis, exclusion of these 5 subjects did not change the primary conclusion of noninferiority of F/TAF to F/TDF.

All 22 seroconverters in the trial were MSM and none was a TGW. Median age was 27 years and 7 (32%) subjects were below the age of 25 years. Six (27%) subjects were young MSM of color (under 25 years of age and black/mixed black or Hispanic/Latino). Median time to HIV diagnosis was 231 days.

Compared to subjects not infected with HIV-1, the group of seroconverters had lower self-reported rates of condom use, higher self-reported numbers of unique sex partners, and higher rates of STIs diagnosed during the trial. More importantly, results of the DBS case-control substudy suggest poor adherence to study drug within this group. Median TFV-DP levels on DBS at the HIV-1 diagnosis visit were significantly lower in the seroconverters compared with the uninfected matched control subjects. Of the 7 seroconverters in the F/TAF group, one subject with high TFV-DP levels was suspected to have baseline HIV-1 infection, five had low TFV-DP levels, and one had medium TFV-DP levels. Of the 15 seroconverters in the F/TDF group, four with high TFV-DP levels were suspected to have baseline HIV-1 infection, 10 had low levels of TFV-DP, and 1 with a missing DBS sample at the HIV diagnosis visit had high TVF-DP levels as imputed from a DBS sample collected 12 weeks prior.

Of note, 9 of the 22 seroconverters prematurely discontinued study drug or had drug interruption prior to seroconversion. The reasons for stopping drug were: subject decision (2 subjects per arm), adverse event (F/TAF 1 subject, F/TDF 2 subjects) and noncompliance (F/TDF 2 subjects).

*Resistance*

Viruses expressing M184I or M184V, which confer resistance to emtricitabine, were detected among 4 of the 19 subjects who seroconverted during the trial and were included in the resistance analysis. All four subjects harboring resistant viruses were seronegative at baseline and received F/TDF. It is unclear whether the resistant viruses were resistant when transmitted or selected during the first month of receiving PrEP. These results are consistent with those of previous Truvada PrEP trials (e.g., iPrEx and Partners PrEP), where approximately 50% of subjects who were seronegative but HIV-1 infected at baseline when beginning PrEP harbored M184I/V-expressing variants by the time of seroconversion, but no subjects who seroconverted later in the trial developed resistant variants, presumably due to poor adherence and a resulting lack of selective pressure.

15

*Summary of Efficacy*

Efficacy data from the DISCOVER trial indicate that F/TAF and F/TDF are similar in reducing the risk of HIV-1 infection in at-risk MSM/TGW. Despite the low number of HIV infections observed in the trial, noninferiority of F/TAF to F/TDF was demonstrated.

Of note, the HIV infection rates observed in DISCOVER were lower than those observed in previous trials of oral PrEP in MSM, potentially raising concerns about whether the constancy assumption was maintained. In this case, similarity between F/TAF and F/TDF can mean either that both drugs were effective or neither drug was effective because the population was not at substantial risk. However, several factors suggest that the DISCOVER trial had adequate assay sensitivity to assess noninferiority. For one, the design of the trial was consistent with previous trials in MSM that demonstrated efficacy of F/TDF compared with placebo. Second, the enrolled study population was at considerable risk for HIV-1 infection based on their risk behaviors (as determined by self-reporting and laboratory-based STI rates during the trial) and the high HIV incidence rates in their communities (as determined by site selection and background HIV transmission rates among MSM not taking PrEP for the geographical areas where the U.S. study sites were located). Given these observations, the likeliest explanation for the low number of HIV infections observed in the DISCOVER trial is the high level of adherence to study drug reported in each arm, as it has been established that PrEP efficacy is strongly correlated with adherence.

Resistance was not observed among seroconverters in the F/TAF group, and what resistance was found in the F/TDF group (n=4) was in subjects suspected of having a baseline HIV-1 infection.  However, the numbers of HIV infections observed are too small to draw any conclusions regarding the relative risk of resistance.

<u>Safety Results</u>

As of the data cutoff date, the median (Q1, Q3) exposure to study drug was 85.7 (83.7, 96.7) weeks in the F/TAF arm and 86.7 (83.9, 96.6) weeks in the F/TDF arm.

Both F/TAF and F/TDF were safe and well tolerated in this trial population. The incidence rates of major clinical safety events were similar in both treatment groups (Figure 1). Furthermore, within these treatment-emergent adverse event (TEAE) categories, there were no notable differences between groups with respect to the types, frequency, timing or severity of TEAEs, most of which were mild or moderate in severity.

*Figure 1: Summary of Adverse Events (DISCOVER)*



Source: FDA analysis of ADAE dataset from DISCOVER trial

There were two treatment-emergent deaths, one in each group: 1) road traffic accident in the F/TAF group, and 2) death due to unknown causes on Study Day 20 in a 26-year-old man in the F/TDF group. Neither death was considered related to study drug by the investigators. An additional death due to metastatic squamous cell carcinoma occurred 54 days after the last dose of study drug in a 52-year-old man in the F/TDF group.

The most commonly reported TEAEs were STIs, with chlamydial and gonococcal infections reported in 41% and 43% of subjects, respectively. Infections aside, the next most common TEAEs were diarrhea (16%), nausea (7%), headache (7%), and fatigue (6%), with equal frequency rates in both groups.

Treatment-emergent AEs leading to study drug discontinuation occurred in less than 2% of subjects in either group. Gastrointestinal (GI) disorders (e.g., diarrhea, nausea, vomiting, abdominal pain or distension, and flatulence) were the most common AEs leading to permanent drug discontinuation in both groups (F/TAF 0.3%, F/TDF 0.6%).

Adverse drug reactions (i.e., TEAEs considered related to study drug by the investigators) were reported in 20% and 23% of subjects in the F/TAF and F/TDF groups, respectively. The most common drug reactions were diarrhea (F/TAF 5%, F/TDF 6%), nausea (F/TAF 4%, F/TDF 5%), fatigue (F/TAF 2%, F/TDF 3%), headache (2% each), and abdominal pain (F/TAF 2%, F/TDF 3%). (For the analysis of abdominal pain, FDA reviewers grouped the similar terms of abdominal pain, abdominal pain upper, abdominal pain lower, gastrointestinal pain, and abdominal discomfort.)

For the GI-related TEAEs of diarrhea, nausea, and abdominal pain, a distribution of events by time analysis indicates that most of these events occurred within the first 4 weeks of treatment, consistent

17

with the "start-up syndrome" previously described in PrEP clinical trials in MSM {Grant et al. 2010; Glidden at al. 2016}.

There were no differences within groups or between groups with respect to clinically relevant changes from baseline in chemistry or hematology laboratory parameters, vital signs, or weight. There were no Hy's law cases to suggest drug-induced liver injury with either F/TAF or F/TDF.

There are three main safety concerns to consider with comparing TAF to TDF: renal safety (particularly proximal renal tubulopathy [PRT]), bone mineral density changes, and changes in fasting lipid levels. The remainder of the DISCOVER safety analysis will focus on these issues.

*Renal Safety*

Small but significant differences were observed between the treatment groups at each visit with respect to the mean change from baseline in serum creatinine and eGFR$_{CG}$, favoring F/TAF. Table 2 shows the mean changes at Weeks 48 and 96 for serum creatinine (a secondary endpoint at Week 48) and eGFR$_{CG}$.

*Table 2: Mean Change from Baseline in Serum Creatinine and Estimated Glomerular Filtration Rate by Cockcroft-Gault Method at Weeks 48 and 96 (DISCOVER)*

| | F/TAF (N=2694) | | F/TDF (N=2693) | |
|---|---|---|---|---|
| | N | Mean Change (SD) | N | Mean Change (SD) |
| **Serum Creatinine (mg/dL)** | | | | |
| Week 48 | N=2371 | -0.01 (0.106) | N=2369 | +0.01 (0.110) |
| Week 96 | N=1210 | +0.01 (0.115) | N=1264 | +0.02 (0.116) |
| **eGFR$_{CG}$ (mL/min)** | | | | |
| Week 48 | N=2370 | +2.0 (15.84) | N=2367 | -2.0 (15.77) |
| Week 96 | N=1208 | -0.6 (18.25) | N=1262 | -3.7 (16.90) |

Source: FDA analysis of ADLB dataset from DISCOVER trial

Relevant to the discussion of tenofovir-associated renal toxicity is the assessment of biomarkers specific to tubular function. As previously noted, the DISCOVER trial had three such secondary endpoints, each assessed at Week 48: percentage change from baseline in urine beta-2-microglobulin to creatinine ratio, percentage change from baseline in urine RBP to creatinine ratio, and distribution of urine protein and UPCR categories. For each of these measures, there were statistically significant differences between the groups favoring F/TAF. With respect to changes from baseline in UPCR categories, as shown in Table 3, a greater proportion of subjects in the F/TAF group had improvement in UPCR category from baseline compared with the F/TDF group at both Weeks 48 and 96; however, the numbers of subjects with UPCR > 200 mg/g at baseline or during the study were small and only the Week 48 differences were statistically significant.

18

*Table 3: Shift Table of UPCR Category (≤200 vs 200 mg/g) by Baseline Category (DISCOVER)*

| | Number (%) of Subjects† | | | |
|---|---|---|---|---|
| | **F/TAF** | | **F/TDF** | |
| **Baseline** | ≤200 mg/g (N=2662) | >200 mg/g* (N=25) | ≤200 mg/g (N=2657) | >200 mg/g* (N=25) |
| **Week 48** | N=2335 | N=21 | N=2331 | N=18 |
| ≤200 mg/g | 2318 (99) | 12 (57) | 2296 (98) | 8 (44) |
| >200 mg/g* | 17 (1) | 9 (43) | 35 (2) | 10 (56) |
| **Week 96** | N=1172 | N=14 | N=1228 | N=11 |
| ≤200 mg/g | 1158 (99) | 10 (71) | 1213 (99) | 4 (36) |
| >200 mg/g* | 14 (1) | 4 (29) | 15 (1) | 7 (64) |

\* Includes subjects with UPCR >200 mg/g and urine protein ≥4 mg/dL
† The denominator for percentages is the number of subjects with nonmissing values at baseline and postbaseline visit.
Subjects with missing data at either baseline or postbaseline visit are not shown.
Source: FDA analysis of ADLB dataset from DISCOVER trial

The majority of subjects did not experience treatment-emergent proteinuria and most of the observed proteinuria was Grade 1 (1+ by urine dipstick). The percentage of subjects with Grade 1 proteinuria was higher in the F/TDF arm compared with the F/TAF arm (22% vs. 19%, respectively), although the percentage of subjects with Grade 2 proteinuria (2-3+ by dipstick) was equal in both arms (2%). There were no between-group differences in the frequency of other graded treatment-emergent renal laboratory abnormalities (Table 4).

*Table 4: Treatment-emergent Renal-Associated Laboratory Abnormalities (DISCOVER)*

| | Number (%) of Subjects | |
|---|---|---|
| | **F/TAF (N=2694)** | **F/TDF (N=2693)** |
| **Creatinine (mg/dL)** | N=2672 | N=2665 |
| Grade 1 | 23 (1) | 61 (2) |
| Grade 2 | 5 (<1) | 3 (<1) |
| **Blood Urea Nitrogen (mg/dL)** | N=2672 | N=2665 |
| Grade 1 | 58 (2) | 44 (2) |
| **Phosphate (mg/dL) – Hypophosphatemia** | N=2672 | N=2665 |
| Grade 1 | 144 (5) | 143 (5) |
| Grade 2 | 87 (3) | 76 (3) |
| Grade 3 | 6 (<1) | 5 (<1) |
| Grade 4 | 0 | 2 (<1) |
| **Urine Protein** | N=2671 | N=2662 |
| Grade 1 | 518 (19) | 592 (22) |
| Grade 2 | 50 (2) | 55 (2) |
| **Urine Glucose** | N=2671 | N=2662 |
| Grade 1 | 15 (1) | 23 (1) |
| Grade 2 | 22 (1) | 30 (1) |
| Grade 3 | 19 (1) | 32 (1) |

*Denominator for percentage is the number of subjects with at least 1 postbaseline laboratory value.*
*Subjects were counted once for the maximum postbaseline severity.*
Source: FDA analysis of ADLB dataset from DISCOVER trial

One subject in the F/TDF group was reported to have a nonserious event of Fanconi syndrome acquired on Study Day 421 that was considered related to study drug by the investigator and led to study drug discontinuation. Otherwise, there were no notable differences (i.e., no risk differences greater than 1%) between the groups in the incidence or types of renal-associated TEAEs. Based on a selection of MedDRA Preferred Terms from the 'Renal and urinary disorders' and 'Investigations' System Organ Class (excluding renal neoplasms, vascular and ischemic events, lithiasis, and obstructive disorders), renal-associated TEAEs were reported in 3% and 4% of F/TAF and F/TDF subjects, respectively (Table 5).

*Table 5: Selected Renal-associated Treatment-emergent Adverse Events (DISCOVER)*

| MedDRA System Organ Class | MedDRA High Level Term | MedDRA Preferred Term | Number (%) of Subjects | |
|---|---|---|---|---|
| | | | F/TAF (N=2694) | F/TDF (N=2693) |
| | | *Total* | 79 (3) | 97 (4) |
| *Renal and urinary disorders* | *Glomerulonephritis and nephrotic syndrome* | Nephrotic syndrome | 1 (<1) | 0 |
| | *Nephropathies and tubular disorders NEC* | | 1 (<1) | 1 (<1) |
| | | Fanconi syndrome acquired | 0 | 1 (<1) |
| | | Glomerulonephropathy | 1 (<1) | 0 |
| | *Renal failure and impairment* | | 13 (1) | 19 (1) |
| | | Acute kidney injury | 13 (1) | 7 (<1) |
| | | Chronic kidney disease | 0 | 5 (<1) |
| | | Prerenal failure | 0 | 1 (<1) |
| | | Renal failure | 0 | 1 (<1) |
| | | Renal impairment | 0 | 7 (<1) |
| | *Urinary abnormalities* | | 64 (2) | 65 (2) |
| | | Glycosuria | 4 (<1) | 8 (<1) |
| | | Microalbuminuria | 0 | 3 (<1) |
| | | Proteinuria | 30 (1) | 32 (1) |
| | | Urine abnormality | 4 (<1) | 0 |
| | *Urinary tract signs and symptoms NEC* | | 16 (1) | 19 (1) |
| | | Nocturia | 7 (<1) | 5 (<1) |
| | | Polyuria | 1 (<1) | 4 (<1) |
| *Investigations* | *Mineral and electrolyte analyses* | Blood phosphorus decreased | 3 (<1) | 1 (<1) |
| | *Renal function analyses* | | 15 (1) | 34 (1) |
| | | Blood creatinine decreased | 1 (<1) | 0 |
| | | Blood creatinine increased | 7 (<1) | 16 (1) |
| | | Creatinine renal clearance decreased | 3 (<1) | 5 (<1) |
| | | Creatinine renal clearance increased | 0 | 3 (<1) |
| | | Glomerular filtration rate abnormal | 1 (<1) | 0 |
| | | Glomerular filtration rate decreased | 1 (<1) | 4 (<1) |
| | | Urine albumin/creatinine ratio increased | 1 (<1) | 0 |
| | | Urine protein/creatinine ratio increased | 2 (<1) | 8 (<1) |
| | *Urinalysis NEC* | | 8 (<1) | 7 (<1) |
| | | Protein urine present | 3 (<1) | 1 (<1) |
| | | Urine analysis abnormal | 2 (<1) | 0 |

Source: FDA analysis of ADAE dataset from DISCOVER trial

Serious renal-associated adverse events included 5 events of acute kidney injury and 1 event of nephrotic syndrome in the F/TAF arm, and 2 events of acute kidney injury in the F/TDF group.

Importantly, a small but similar proportion of subjects in each arm discontinued study drug due to a renal-associated TEAE (F/TAF 5 [0.2%], F/TDF 8 [0.3%]), as shown in Table 6.

*Table 6: Renal-associated Treatment-emergent Adverse Events Leading to Study Drug Discontinuation (DISCOVER)*

| MedDRA Preferred Term | Number (%) of Subjects | |
|---|---|---|
| | F/TAF (N=2694) | F/TDF (N=2693) |
| Total | 5 (0.2) | 8 (0.3) |
| Acute kidney injury | 2 (0.1) | 2 (0.1) |
| Fanconi syndrome acquired | 0 | 1 (<0.1) |
| Proteinuria | 0 | 1 (<0.1) |
| Renal impairment | 0 | 2 (0.1) |
| Blood creatinine increased | 3 (0.1) | 1 (<0.1) |
| Glomerular filtration rate decreased | 0 | 1 (<0.1) |

Source: FDA analysis of ADAE dataset from DISCOVER trial

Likewise, an equal percentage (0.2%) of subjects in each arm interrupted study drug due to a renal adverse event. TEAEs that led to study drug interruption and were reported in at least two subjects were acute kidney injury (F/TAF 4 [0.2%], F/TDF 1 [0.04%]) and renal impairment (F/TAF 0, F/TDF 2 [0.1%]).

In summary, interim results from the DISCOVER trial indicate that use of F/TAF as PrEP has favorable effects on biomarkers of renal tubular function relative to F/TDF at 48 weeks, but the clinical impact of these differences is less clear as the incidence of renal-associated adverse events, serious adverse events or adverse events leading to drug discontinuation, and of graded laboratory abnormalities, was comparable between the two treatment groups.

*Bone Safety*

Within the DXA substudy (n= 398; median age 37), subjects randomized to F/TAF showed slight mean percentage increases in BMD at the hip and spine at Weeks 48 and 96 (observed data), whereas those randomized to F/TDF showed mild but significant decreases at both anatomical sites (Table 7).

*Table 7: Percentage Change from Baseline in Hip and Spine BMD at Weeks 48 and 96, Observed Data (DISCOVER)*

| | F/TAF | F/TDF |
|---|---|---|
| Hip BMD[1] | | |
| Baseline | N=190 | N=185 |
| Mean (SD) (g/ cm$^2$) | 1.029 (0.154) | 1.02 (0.132) |
| Week 48 | N=158 | N=158 |
| Mean (SD) % Change from Baseline | +0.183 (2.384) | -0.988 (2.435) |
| Week 96 | N=100 | N=105 |
| Mean (SD) % Change from Baseline | +0.424 (2.612) | -1.202 (2.897) |

| Spine BMD[2] | | |
|---|---|---|
| Baseline | N=190 | N=188 |
| Mean (SD) (g/cm$^2$) | 1.131 (0.161) | 1.131 (0.138) |
| Week 48 | N=159 | N=160 |
| Mean (SD) % Change from Baseline | +0.496 (2.988) | -1.123 (2.945) |
| Week 96 | N=100 | N=112 |
| Mean (SD) % Change from Baseline | +0.877 (3.143) | -1.248 (3.918) |

[1] Hip BMD = Femur Total Corrected Bone Mineral Density (g/cm2)

[2] Spine BMD = Spine Total Adequate Corrected Bone Mineral Density (g/cm2)

Source: FDA analysis of ADDXA dataset from DISCOVER trial

In the subgroup of subjects less than 25 years of age, the differences between F/TAF and F/TDF in BMD changes at the hip and spine were statistically significant at Week 48 but not at Week 96; however, the sample size for this cohort was small (n=39).

Categorical analyses of the BMD percentage changes from baseline confirmed the differences between the groups noted above (Table 8).

*Table 8: Categorical Distribution of Percentage Changes in Hip and Spine BMD at Weeks 48 and 96 (DISCOVER)*

| | | Number (%) of Subjects | |
|---|---|---|---|
| | | F/TAF | F/TDF |
| Hip BMD | | N=190 | N=185 |
| Week 48 | No Decrease from Baseline | 79/158 (50) | 54/158 (34) |
| | ≥ 3% Decrease from Baseline | 6/158 (4) | 29/158 (18) |
| | ≥ 3% Increase from Baseline | 14/158 (9) | 10/158 (6) |
| Week 96 | No Decrease from Baseline | 57/100 (57) | 40/105 (38) |
| | ≥ 3% Decrease from Baseline | 5/100 (5) | 22/105 (21) |
| | ≥ 3% Increase from Baseline | 12/100 (12) | 4/105 (4) |
| Spine BMD | | N=190 | N=188 |
| Week 48 | No Decrease from Baseline | 97/159 (61) | 52/160 (33) |
| | ≥ 3% Decrease from Baseline | 16/159 (10) | 43/160 (27) |
| | ≥ 3% Increase from Baseline | 27/159 (17) | 15/160 (9) |
| Week 96 | No Decrease from Baseline | 61/100 (61) | 43/112 (38) |
| | ≥ 3% Decrease from Baseline | 8/100 (8) | 26/112 (23) |
| | ≥ 5% Decrease from Baseline | 2/100 (2) | 16/112 (14) |
| | ≥ 3% Increase from Baseline | 20/100 (20) | 9/112 (8) |
| | ≥ 5% Increase from Baseline | 9/100 (9) | 5/112 (5) |

Source: FDA analysis of ADDXA dataset from DISCOVER trial

With respect to clinical events, however, there were no discernable differences between the treatment groups in the frequency or types of fracture events or other events related to bone health. Fracture events were reported in 2% of subjects in each treatment group; the majority (91%) of fractures were related to trauma. Ten subjects (5 per arm) had non-traumatic fractures, of which two (1 per arm) had right foot stress fractures and three had pathological fractures as determined by blinded medical monitor assessment (1 cervical vertebral fracture in F/TAF group, and 1 shoulder fracture and 1

metatarsal fracture in the F/TDF group). None of the pathological fractures were considered serious or related to study drug, and none led to study drug discontinuation. In all three cases of pathological fracture, there were confounding factors that may provide alternative etiology for the event; however, none of these subjects was included in the DXA substudy, so changes in BMD were not assessed.

Table 9 summarizes the fracture events reported in the DISCOVER trial. In addition, other TEAEs related to nonspecific back and limb pain are included, as some of these can be associated with osteomalacia in adults {Gifre et al. 2011}. Also included are terms related to BMD, osteopenia, and osteoporosis, as well as the standardized MedDRA queries (SMQs) for the latter two conditions.

*Table 9: Treatment-emergent Adverse Events Related to Bone Safety (DISCOVER)*

| | MedDRA Preferred Term | Number (%) of Subjects | |
|---|---|---|---|
| | | F/TAF (N=2694) | F/TDF (N=2693) |
| All fractures | | 53 (2) | 53 (2) |
| All Non-traumatic fractures | | 5 (<1) | 5 (<1) |
| Non-traumatic stress fractures | | 1 (<1) | 1 (<1) |
| Non-traumatic pathological fractures | | 1 (<1) | 2 (<1) |
| | Back pain | 98 (4) | 103 (4) |
| | Pain in extremity | 44 (2) | 32 (2) |
| | Limb discomfort | 1 (<1) | 2 (<1) |
| | Bone pain | 2 (<1) | 3 (<1) |
| | Flank pain | 5 (<1) | 6 (<1) |
| | Spinal pain | 4 (<1) | 8 (<1) |
| | Coccydynia | 1 (<1) | 0 |
| | Bone density decreased | 5 (<1) | 1 (<1) |
| | Bone loss | 1 (<1) | 1 (<1) |
| | Osteopenia | 12 (<1) | 15 (1) |
| | Osteoporosis | 5 (<1) | 7 (<1) |
| | Vitamin D deficiency | 24 (1) | 18 (1) |
| | Vitamin D decreased | 4 (<1) | 2 (<1) |
| | Blood phosphorus decreased | 3 (<1) | 1 (<1) |
| | Hypocalcemia | 1 (<1) | 0 |
| SMQ osteoporosis/osteopenia (broad) | | 34 (1) | 37 (1) |
| SMQ osteoporosis/osteopenia (narrow) | | 23 (1) | 22 (1) |

Source: FDA analysis of ADAE dataset from DISCOVER trial

As shown in Table 9, there were no between-group differences in the incidence of any of these events. All TEAEs of bone density decreased, bone loss, osteopenia and osteoporosis were mild or moderate in severity. Study drug was discontinued in four subjects, two for osteoporosis in the F/TAF group and two for back pain (1 per arm). Lastly, the number of subjects taking or initiating osteoporosis medications was minimal (n=5) and balanced between arms.

In summary, DXA scan results from the DISCOVER trial confirm the known differences between F/TAF and F/TDF with respect to BMD changes. The relevance of these laboratory findings to clinical outcomes remains unclear as there were no notable differences between the treatment groups with respect to fracture rates or the reporting of other events related to bone health.

*Fasting Serum Lipids*

In the DISCOVER trial, subjects randomized to F/TDF had greater decreases from baseline in serum fasting lipid levels at Weeks 48 and 96 compared to those who received F/TAF (Table 10); however, no within-group or between-group differences were noted for changes in the total cholesterol to HDL ratio, which is associated with cardiovascular disease risk.

*Table 10: Median Change from Baseline in Fasting Lipids (DISCOVER)*

| LIPID PARAMETER | VISIT | F/TAF (N=2694) | | F/TDF (N=2693) | |
|---|---|---|---|---|---|
| | | N | Median | N | Median |
| **Fasting Total Cholesterol (mg/dL)** | Baseline | 1425 | 173 | 1457 | 173 |
| | Change at Week 48 | 1172 | -1 | 1188 | -11 |
| | Change at Week 96 | 573 | -4 | 582 | -14 |
| **Fasting HDL (mg/dL)** | Baseline | 1425 | 49 | 1457 | 50 |
| | Change at Week 48 | 1172 | -2 | 1188 | -5 |
| | Change at Week 96 | 573 | -1 | 582 | -4 |
| **Fasting LDL (mg/dL)** | Baseline | 1412 | 99 | 1440 | 100 |
| | Change at Week 48 | 1148 | 1 | 1170 | -6.5 |
| | Change at Week 96 | 564 | -4 | 575 | -8 |
| **Fasting Total Cholesterol/HDL Ratio** | Baseline | 1425 | 3.44 | 1457 | 3.467 |
| | Change at Week 48 | 1172 | 0.106 | 1188 | 0.115 |
| | Change at Week 96 | 573 | 0.028 | 582 | -0.013 |
| **Fasting Triglycerides (mg/dL)** | Baseline | 1425 | 93 | 1457 | 93 |
| | Change at Week 48 | 1172 | 4 | 1188 | 0 |
| | Change at Week 96 | 573 | 2 | 582 | -5 |

Source: FDA analysis of ADLB dataset from DISCOVER trial

Subjects in the F/TAF group also had a higher incidence of treatment-emergent elevations in fasting lipid abnormalities, as per the Applicant's toxicity grading scale (Table 11).

*Table 11: Treatment-emergent Fasting Lipid Laboratory Abnormalities (DISCOVER)*

| | | F/TAF | F/TDF |
|---|---|---|---|
| **Fasting cholesterol (mg/dL)** | | N=2371 | N=2380 |
| | Grade 1 | 689 (29) | 466 (20) |
| | Grade 2 | 191 (8) | 100 (4) |
| | Grade 3 | 20 (1) | 4 (<1) |
| **Fasting LDL (mg/dL)** | | N=2362 | N=2377 |
| | Grade 1 | 513 (22) | 376 (16) |
| | Grade 2 | 141 (6) | 88 (4) |
| | Grade 3 | 51 (2) | 18 (1) |

Source: FDA analysis of ADLB dataset from DISCOVER trial

Lastly, in a categorical analysis based on LDL classifications from the National Cholesterol Education Program {National Institutes of Health (NIH) 2001}, subjects in the F/TAF group generally had worsening of LDL classification at Weeks 48 and 96 compared with subjects in the F/TDF group, who tended to have improvements (Table 12).

24

*Table 12: Shift Table of Fasting LDL Classification by Baseline Category (DISCOVER)*

| | F/TAF (N=2694) | | | | F/TDF (N=2693) | | | |
|---|---|---|---|---|---|---|---|---|
| | <100 (N=720) | 100-159 (N=629) | 160-190 (N=63) | >190 (N=11) | <100 (N=721) | 100-159 (N=656) | 160-190 (N=67) | >190 (N=17) |
| **Week 48** | | | | | | | | |
| *<100* | 418 (73) | 126 (24) | 1 (2) | 1 (11) | 487 (84) | 192 (36) | 1 (3) | 2 (14) |
| *100-159* | 154 (27) | 371 (71) | 24 (38) | 0 | 95 (16) | 325 (61) | 29 (76) | 6 (43) |
| *160-190* | 3 (1) | 22 (4) | 11 (26) | 5 (56) | 1 (<1) | 17 (3) | 7 (18) | 3 (21) |
| *>190* | 1 (<1) | 1 (<1) | 7 (16) | 3 (33) | 0 | 0 | 1 (3) | 3 (21) |
| **Week 96** | | | | | | | | |
| *<100* | 202 (76) | 81 (29) | 2 (10) | 0 | 247 (87) | 104 (39) | 2 (10) | 0 |
| *100-159* | 63 (23) | 186 (66) | 13 (62) | 0 | 37 (13) | 150 (57) | 13 (65) | 5 (71) |
| *160-190* | 0 | 9 (3) | 4 (19) | 1 (50) | 0 | 10 (4) | 5 (25) | 2 (29) |
| *>190* | 0 | 5 (2) | 2 (10) | 1 (50) | 0 | 1 (<1) | 0 | 0 |

Source: FDA analysis of ADLB dataset from DISCOVER trial

The increases in fasting lipid parameters observed in the F/TAF group were not associated with any differences in cardiovascular or cerebrovascular events. However, the number and percentage of subjects who initiated lipid-modifying agents during the trial was two-fold higher in the F/TAF group compared with the F/TDF group (43 [1.6%] vs. 21 [0.8%], respectively), a difference that was statistically significant per the Applicant (p=0.008).

*Summary of Safety*

The safety data from the DISCOVER trial are consistent with previous trials of TAF that show improved measures of renal tubular function (as demonstrated by differences in renal biomarkers over time) and minimal impact on bone mineral density (as seen on DXA imaging) with TAF dosing relative to TDF. While these subclinical differences are significant, and favor Descovy, the clinical advantage of F/TAF is less clear in the context of a 96-week study, where there were no differences between F/TAF and F/TDF in the frequency or types of clinical adverse events related to renal or bone safety, or in the frequency or severity of abnormalities for laboratory tests commonly monitored in clinical practice. Indeed, the clinical safety profile of F/TAF and F/TDF were remarkably similar in this trial with respect to common adverse events, serious adverse events or adverse events leading to drug discontinuation (the latter two of which occurred at low rates in both arms). These findings are consistent with a recent meta-analysis of 11 trials that compared TAF to TDF {Hill et al. 2018}. Also consistent with previous trials, there was a higher incidence of elevated fasting lipids in the DISCOVER trial among subjects taking F/TAF compared with F/TDF. While these findings were not associated with greater cardiovascular risk, they may have led to a greater number of participants in the F/TAF group initiating lipid-lowering therapy.

### b. Cisgender Women

The efficacy and safety of Descovy for HIV PrEP in cisgender women have not been evaluated. The Applicant proposes to extrapolate the efficacy and safety of Descovy for HIV PrEP to cisgender women

using PK, safety, and efficacy data collected from clinical trials evaluating TAF- or TDF-containing regimens as follows.

### Efficacy

The Applicant proposed two approaches to extrapolate efficacy to support a PrEP indication for F/TAF in cisgender women. The first approach is to extrapolate efficacy from MSM/TGW receiving F/TAF in the DISCOVER trial by demonstrating comparable systemic PK exposures (TAF in plasma and TFV-DP in PBMCs) between MSM/TGW and cisgender women. However, this approach may not be sufficient to ensure the efficacy of F/TAF in cisgender women for the following reasons: 1) mucosal drug concentrations appear to be important to PrEP efficacy (see Section 2.b.) and systemic drug exposures may not correlate with mucosal tissue concentrations, and 2) across the PrEP clinical trials of Truvada, differences in efficacy were observed between men and cisgender women despite comparable systemic exposures (tenofovir (TFV) in plasma and TFV-DP in PBMCs).  As part of its rationale for utilizing systemic drug exposure data to support a PrEP indication in cisgender women, the Applicant also states that TAF can quickly (within 2-3 hours following a single dose) achieve TFV-DP concentrations of 40 fmol per million cells in PBMCs of both men and women, a clinical threshold demonstrating a level of adherence reportedly associated with a greater than 90% reduction in HIV acquisition ($EC_{90}$) in prior PrEP trials of Truvada {Anderson et al. 2012a; Anderson et al. 2012b}. However, while this target concentration may be valid for MSM receiving F/TDF, it may not apply to F/TAF due to the differences between TDF and TAF in the correlation between PBMCs and mucosal tissue concentrations for TFV-DP.

The other approach is to extrapolate efficacy from the successful trial of Truvada in cisgender women (i.e., Partners PrEP). For this approach, efficacy would be extrapolated by demonstrating comparable or higher TFV-DP concentrations in PBMCs and cervicovaginal mucosal tissues. Since it has already been demonstrated that TFV-DP concentrations in PBMCs are 4-7-fold higher following the administration of TAF compared with TDF, the extrapolation would need to demonstrate comparable or higher exposures of TFV-DP in cervicovaginal tissues following the administration of F/TAF compared to F/TDF. To this end, the Applicant provided data from an external PK study, entitled "*Exploratory Pharmacokinetic and Pharmacodynamic Study of Oral F/TAF for the Prevention of HIV Acquisition*" (CONRAD Protocol A15-137) {Schwartz et al. 2018}.

In this study, the pharmacokinetics of TAF, TFV, FTC and their intracellular metabolites (TFV-DP and FTC-TP) in PBMCs and PrEP-relevant mucosal tissues and fluids were determined following administration of single and multiple doses (once daily for 14 days) of F/TDF or F/TAF in HIV-negative, healthy adult female volunteers. Treatments were given as shown below.

- Single-Dose Phase
  - F/TAF 200/25 mg, n=12
  - F/TDF 200/300 mg, n=12
- Multiple-Dose Phase
  - F/TAF 200/10 mg, n=24
  - F/TAF 200/25 mg, n=24
  - F/TDF 200/300 mg, n=24

The following samples were collected to determine the PK of TAF, TFV, FTC and their intracellular active metabolites:

- Plasma for TAF, TFV, and FTC
- PBMC for TFV-DP, FTC-TP, dATP, and dCTP
- Rectal and cervicovaginal fluid for TAF, TFV, and FTC
- Rectal, cervical, and vaginal tissue biopsy for TAF, TFV, FTC, TFV-DP, FTC-TP, dATP, and dCTP
  - Rectal tissues: 4 hours post dose following 14-day administration
  - Cervical and vaginal tissues: 4 hours post-dose following single dose administration and 4, 24, and 48 hours following 14-day administration.

Of note, tissue samples were collected in a sparse manner and each subject provided tissue samples at only one given time point; thus, tissue PK parameters for an individual subject or correlations between samples collected at different time points cannot be determined.

Following single-dose administration of F/TAF or F/TDF, 83% of TFV-DP concentrations in vaginal tissue samples were below the limit of quantitation (BLQ) at 4 hours post-dose. In a separate single-dose study {Cottrell et al. 2017}, a high percentage (87.5%) of BLQ results were also observed for female genital tract tissues following administration of TAF. Therefore, it is not known whether F/TAF provides higher TFV-DP concentrations in vaginal tissues following single-dose administration relative to F/TDF.

Following 14-day administration of F/TAF, median TFV-DP concentrations in vaginal tissues were 3-fold above the lower limit of quantitation (LLOQ) at 4 hours after the last dose. In contrast, 62% (5/8) of vaginal tissue samples were BLQ at this same time point following 14-day administration of F/TDF (Table 13). It is not feasible therefore to determine the magnitude of difference in vaginal tissue TFV-DP concentrations between the treatment groups due to the limited number of quantifiable samples in the F/TDF arm. In both treatment groups, TFV-DP concentrations were mostly (70-80%) BLQ at 24 hours and 48 hours post-dose following 14 days of administration of F/TAF or F/TDF. Results for cervical tissue samples were largely consistent with those for vaginal tissues.

*Table 13: Mucosal Tissue TFV-DP Concentrations Following 14-Day Administration of F/TAF 200/25 mg or F/TDF 200/300 mg (CONRAD Protocol A15-137)*

|  |  | Vaginal tissue | | Cervical tissue | | Rectal tissue | |
|---|---|---|---|---|---|---|---|
|  |  | F/TAF | F/TDF | F/TAF | F/TDF | F/TAF | F/TDF |
| **4 hours** | % BLQ* | 0% | 62% | 25% | 88% | 31% | 3% |
|  |  | (0/8) | (5/8) | (2/8) | (7/8) | (9/29) | (1/30) |
|  | Median TFV-DP† (pmol/g) | 151 | N/A | 126 | N/A | 150 | 2521 |
| **24 hours** | % BLQ* | 80% | 69% | 10/15 | 81% | Not determined | |
|  |  | (12/15) | (11/16) | (67%) | (13/16) | | |
|  | Median TFV-DP† (pmol/g) | N/A | N/A | N/A | N/A | | |
| **48 hours** | % BLQ* | 80% | 79% | 93% | 100% | | |
|  |  | (12/15) | (11/14) | (14/15) | (14/14) | | |
|  | Median TFV-DP† (pmol/g) | N/A | N/A | N/A | N/A | | |

27

\* Percentage of samples below the lower limit of quantitation (BLQ) = number of samples BLQ/ total number of samples
† Median values of all subjects including those with a value of BLQ
N/A = cannot be determined as the median concentration value was below the lower limit of quantitation.
Source: FDA analysis of data from Clinical Study Report Table 15 and Appendix 16.2.5 (individual subject concentration data) from CONRAD A15-137 trial

While TFV-DP concentrations were higher in vaginal tissues at 4 hours post-dose following 14 days of F/TAF administration as compared with F/TDF, it is unclear whether this translates to comparable or higher TFV-DP concentrations with daily dosing at steady-state, due to potential (but undetermined) differences in tissue PK between F/TAF and F/TDF. For instance, F/TDF may have a delayed Cmax compared to F/TAF and achieve higher TFV-DP concentrations in mucosal tissues between 4 hours and 24 hours post-dose.

Other results from this study are consistent with previous reports. Administration of F/TAF 200/25 mg provided 90% lower plasma TFV levels and 4- to 7-fold higher TFV-DP levels in PBMCs as compared to F/TDF. On the other hand, significantly higher (approximately 17-fold) TFV-DP concentrations in rectal tissues were observed with F/TDF compared with F/TAF at 4 hours post-dose following 14 days of administration. FTC and FTC-TP concentrations in plasma, PBMCs, and mucosal tissues were comparable between the F/TAF and F/TDF arms, as expected.

### Safety

The long-term safety of Descovy in HIV-negative cisgender women has not been evaluated, but long-term safety data for FTC and TAF are available in HIV-infected women from various HIV treatment trials of F/TAF-containing products, such as Genvoya® (elvitegravir/cobicistat/F/TAF) and Biktarvy® (bictegravir/F/TAF). Further, the safety of Descovy has been determined in HIV-uninfected MSM/TGW in the DISCOVER trial (see section 3a). Based on pooled PK data across trials, neither sex nor HIV-1 infection status has any clinically relevant impact on the systemic exposures of TAF or FTC. Therefore, based on the overall safety profile of Descovy observed across multiple trials and PK similarities noted among HIV-uninfected women, HIV-uninfected men, and HIV-infected women, it is reasonable to conclude that the existing safety database for Descovy could be used to support its use as PrEP in cisgender women at risk of HIV acquisition.

### c.   Adolescents

Clinical trials to evaluate Descovy PrEP efficacy, safety, and adherence in adolescents have not been conducted. The Applicant proposes to extrapolate efficacy data from the DISCOVER trial in MSM/TGW to support a PrEP indication in adolescents. While no PK studies were conducted in adolescents for this specific indication, available data suggest no clinically relevant differences in the PK of plasma FTC, plasma TAF, or PBMC-associated TFV-DP between HIV-infected adolescents weighing at least 35 kg and HIV-infected adults. Likewise, there are no clinically relevant PK differences for FTC and TAF and their active metabolites between HIV-infected adults and uninfected adults. Therefore, it is reasonable to expect that PK parameters will be similar between HIV-uninfected adolescents and HIV-uninfected adults, thus allowing for extrapolation of adult efficacy. Safety in adolescents is supported by findings

from the DISCOVER trial in HIV-uninfected MSM/TGW and other trials of F/TAF in HIV-infected adolescents. Taken together, based on pharmacological and clinical considerations, it is reasonable to expand the PrEP indication to MSM/TGW adolescents weighing at least 35 kg. As discussed in Section 3b, however, efficacy data from MSM/TGW cannot be extrapolated to cisgender women based solely on the available PK data, and thus the results from the DISCOVER trial cannot be extrapolated to female adolescents.

Adherence to PrEP in adolescents has previously been shown to wane over time, particularly when clinic visits become less frequent {Hosek et al. 2017}. Labeling for Truvada suggests that adolescents may benefit from more frequent visits and counseling {Gilead Sciences Inc. 2018}. Similar adherence support would likely be recommended for use of Descovy for PrEP in an adolescent population.

## 4.  Summary

Clinical trial data from the DISCOVER trial submitted in support of this application show that Descovy and Truvada were similar in reducing HIV-1 infection in MSM and TGW. Although the number of HIV-1 infections observed in this trial was low, noninferiority of Descovy to Truvada was still demonstrated. One potential concern raised by such a low number of primary endpoint events is whether the trial was conducted in an appropriate population at substantial risk for HIV-1 infection, as it would be difficult to demonstrate a treatment effect in a low-risk population. Given the selection of study site locations, the risk behaviors reported by participants both at baseline and during the trial, the high incidence of STIs diagnosed during the trial, and the availability of surveillance data that show high background HIV transmission rates at the U.S. site locations, it seems unlikely that the DISCOVER trial was conducted in a population not at substantial risk. Therefore, one could hypothesize that the low HIV infection rate observed in the trial is due to the high efficacy of both Descovy and Truvada in preventing HIV-1 infection when adherence is also high, as was the case in this trial.

While the demographics of the DISCOVER trial participants are more reflective of current PrEP users (i.e., white, educated, MSM in their 30s), rather than the minority U.S. populations currently most at risk of HIV-1 infection, the sexual risk behaviors and STI rates reported in this study cohort suggest a population at high risk of HIV-1 infection. In addition, although unprotected receptive anal intercourse was reported by most participants, 16% of participants had documented urethral infections with gonorrhea or chlamydia during the trial suggesting that unprotected insertive intercourse was also occurring. Therefore, the efficacy results from the DISCOVER trial might be considered relevant to a broader, more diverse male population.

The safety of Descovy for a PrEP indication is supported by results of the DISCOVER trial as well as extensive safety data with F/TAF from clinical trials in HIV-infected subjects. In the DISCOVER trial, Descovy was safe and well tolerated in an HIV-uninfected population. Consistent with previous trials, administration of F/TAF in this trial resulted in improved biomarkers of renal function and bone mineral density as seen on DXA scan compared with F/TDF. The safety profile of Descovy as it pertains to clinical events, however, was similar to that of Truvada. The most common non-infectious adverse events

29

(diarrhea, nausea, headache, and fatigue) and drug reactions (predominantly GI-related) were the same in both treatment groups, and there was no difference regarding the incidence, types, severity or timing of most other adverse events, including serious events and those leading to drug discontinuation. Also consistent with previous trials, the use of Descovy resulted in a higher incidence of elevated fasting lipids compared to Truvada, with twice as many subjects in the Descovy arm initiating lipid-lowering agents during the trial (although the percentage was low at 2%).

There are no clinical trial data available to directly support the use of Descovy as PrEP in cisgender women or adolescents. While an adolescent indication can be readily supported by extrapolation of adult efficacy data, an extrapolation approach to support an indication in cisgender women is predicated upon which drug exposures are considered most relevant to PrEP efficacy, systemic or local mucosal tissue drug concentrations. There is a general lack of consensus regarding this issue. Therefore, in the absence of clinical trial data in cisgender women, the approach taken by the FDA has been to request sufficient PK data to assess both systemic PK and local tissue concentrations. The systemic PK data from the DISCOVER trial demonstrate that oral administration of Descovy results in several-fold higher intracellular concentrations of TFV-DP in PBMCs as compared with Truvada, consistent with previous trials of TAF. As such, a systemic PK approach would be feasible. However, the cervicovaginal PK data from Study A15-137 are severely compromised by the large amount of unquantifiable measurements, rendering the data largely uninterpretable. As such, bridging to Truvada efficacy through a local tissue PK link is not possible. The present application is therefore limited to just systemic drug exposure to potentially support a PrEP indication in cisgender women.

## 5.  Points for Advisory Committee Consideration

a. Do the safety and efficacy data from the DISCOVER trial support the approval of Descovy for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually-acquired HIV-1 infection in men and transgender women who have sex with men? If not, what additional studies/trials are needed?

b. Do the data from the DISCOVER trial, in combination with the available pharmacokinetic data and other previous HIV-1 prevention trials with Truvada in cisgender women, allow for expansion of the Descovy PrEP indication to include cisgender women?  If not what additional studies/trials are needed?  If clinical trials are needed, please comment on trial designs that would be adequate to expand the indication.

c. Please discuss whether the data from the DISCOVER trial are relevant to at-risk men who practice insertive vaginal sex with cisgender women?

## 6.  References

Abdool Karim Q, Abdool Karim SS, Frohlich JA, et al. Effectiveness and safety of tenofovir gel, an antiretroviral microbicide, for the prevention of HIV infection in women. Science. 2010; 329(5996): 1168-74.

AIDS Vaccine Advocacy Coalition (AVAC). PrEPWatch. https://www.prepwatch.org/country/united-states/ Accessed June 28, 2019.

Anderson PL, Garcia-Lerma JG, Heneine W. Non-daily pre-exposure prophylaxis for HIV prevention. Curr Opin HIV AIDS. 2016; 11(1): 94–101.

Anderson PL, Glidden DV, Liu A, et al. Emtricitabine-tenofovir concentrations and pre-exposure prophylaxis efficacy in men who have sex with men. Sci Transl Med. 2012; 4(151): 15tra125.

Anderson PL, Meditz A, Zheng JH, et al. Cellular pharmacology of TFV and FTC in blood, rectal, and cervical cells from HIV volunteers. Poster presented at the Conference on Retroviruses and Opportunistic Infections (CROI); March 5-8, 2012; Seattle, WA.

Baeten JM, Palanee-Phillips T, Brown ER, et al. Use of a vaginal ring containing dapivirine for HIV-1 prevention in women. N Engl J Med. 2016; 375(22): 2121-32.

Baeten JM, Donnell D, Ndase P, et al. Antiretroviral prophylaxis for HIV prevention in heterosexual men and women. N Engl J Med. 2012; 367(5): 399-410.

Centers for Disease Control and Prevention (CDC) HIV Surveillance Report, 2016; vol. 28. http://www.cdc.gov/hiv/library/reports/hiv-surveillance.html. Published November 2017. Accessed June 27, 2019.

CDC: US Public Health Service: Preexposure prophylaxis for the prevention of HIV infection in the United States—2017 Update: a clinical practice guideline. https://www.cdc.gov/hiv/pdf/risk/prep/cdc-hiv-prep-guidelines-2017.pdf. Published March 2018. Accessed June 27, 2019.

Cid-Silva P, Fernandez-Bargiela N, Margusino-Framinan L, et al. Treatment with tenofovir alafenamide fumarate worsens the lipid profile of HIV-infected patients versus treatment with tenofovir disoproxil fumarate, each coformulated with elvitegravir, cobicistat, and emtricitabine. Basic Clin Pharmacol Toxicol. 2019; 124(4):479-90.

Cottrell ML, Garrett KL, Prince HM, et al. Single-dose pharmacokinetics of tenofovir alafenamide and its active metabolite in the mucosal tissues. J Antimicrob Chemother. 2017; 72(6):1731-40.

Cottrell ML, Yang KH, Prince HM, et al. A translational pharmacology approach to predicting outcomes of preexposure prophylaxis against HIV in men and women using tenofovir disoproxil fumarate with or without emtricitabine. J Infect Dis. 2016; 214:56-64.

Coy KC, Hazen RJ, Kirkham HS, et al. Persistence of HIV preexposure prophylaxis medication over a 2-year period among a national sample of 7148 PrEP users, United States, 2015 to 2017. J Int AIDS Soc. 2019; 22(2): e25252.

31

Dobard C, Sharma S, Martin A, et al. Durable protection from vaginal simian-human immunodeficiency virus infection in macaques by tenofovir gel and its relationship to drug levels in tissue. J Virol. 2012; 86(2):718–25.

Fauci AS, Redfield RR, Sigounas G, Weahkee MD, Giroir BP. Ending the HIV Epidemic: A Plan for the United States. JAMA. 2019; 321(9):844-45.

Finlayson T, Cha S, Denson D, et al. Changes in HIV PrEP awareness and use among men who have sex with men, 2014 vs. 2017. Poster presented at the Conference on Retroviruses and Opportunistic Infections (CROI) (Abstract 972); March 4-7, 2019; Seattle, WA.

Food and Drug Administration (FDA). Guidance for industry, *Human Immunodeficiency Virus-1: Developing Systemic Drug Products for Pre-Exposure Prophylaxis* (March 2019).

Garcia-Lerma JG, Aung W, Cong ME, et al. Natural substrate concentrations can modulate the prophylactic efficacy of nucleotide HIV reverse transcriptase inhibitors. J Virol. 2011; 85(13):6610-7.

Garcia-Lerma JG, Cong ME, Mitchell J, et al. Intermittent prophylaxis with oral Truvada protects macaques from rectal SHIV infection. Sci Transl Med. 2010; 2(14):14ra4.

Garcia-Lerma JG, Otten RA, Qari SH, et al. Prevention of rectal SHIV transmission in macaques by daily or intermittent prophylaxis with emtricitabine and tenofovir. PLoS Med. 2008; 5(2): e28.

Gilead Sciences Inc. TRUVADA® Full Prescribing Information (US), revised May 2018.

Gifre L, Peris P, Monegal A, Martinez de Osaba MJ, Alvarez L, Guanabens N. Osteomalacia revisited: a report on 28 cases. Clin Rheumatol. 2011; 30(5):639-45.

Glidden DV, Amico KR, Liu AY, et al. Symptoms, side effects and adherence in the iPrEx open-label extension. Clin Infect Dis. 2016; 62(9):1172-7.

Grant RM, Lama JR, Anderson PL, et al. Preexposure chemoprophylaxis for HIV prevention in men who have sex with men. N Engl J Med. 2010; 363(27): 2587-99.

Haase AT. Early events in sexual transmission of HIV and SIV and opportunities for interventions. Annu Rev Med. 2011; 62:127–39.

Hill, A, Hughes, SL, Gotham D, Pozniak AL. Tenofovir alafenamide versus tenofovir disoproxil fumarate: is there a true difference in efficacy and safety? J Virus Read. 2018; 4(2):72-79.

Hosek SG, Landovitz RJ, Kapogiannis B, et al. Safety and feasibility of antiretroviral preexposure prophylaxis for adolescent men who have sex with men aged 15 to 17 years in the United States. JAMA Pediatr. 2017; 171(11): 1063-71.

Huang YA, Zhu W, Smith DK. HIV preexposure prophylaxis, by race and ethnicity – United States, 2014-2016. MMWR 2018; 67(41):1147-50.

John SA, Rendina J, Grov C, Parsons JT. Home-based pre-exposure prophylaxis (PrEP) services for gay and bisexual men: an opportunity to address barriers to PrEP uptake and persistence. Plos One. 2017; 12(2): e0189794.

Louissaint NA, Cao Y-J, Skipper PL, et al. Single dose pharmacokinetics of oral tenofovir in plasma, peripheral blood mononuclear cells, colonic tissue, and vaginal tissue. AIDS Res Hum Retroviruses 2013; 29(11): 1443-50.

Marrazzo JM, Ramjee G, Richardson BA et al. Tenofovir-based preexposure prophylaxis for HIV infection among African women. N Engl J Med. 2015; 372(6):509–18.

Massud I, Mitchell J, Babusis D, et al. Chemoprophylaxis with oral emtricitabine and tenofovir alafenamide combination protects macaques from rectal simian/human immunodeficiency virus infection. J Infect Dis 2016; 214(7): 1058–62.

Massud I, Cong ME, Ruone S, et al. Oral FTC/TAF combination prevents vaginal SHIV infection in pigtail macaques. Poster presented at the Conference on Retroviruses and Opportunistic Infections (CROI) (Abstract 85); March 4-7, 2018; Boston, MA.

Massud I, Cong ME, Ruone S, et al. Moderate efficacy of oral single-agent TAF against vaginal SHIV infection in macaques. Poster presented at the Conference on Retroviruses and Opportunistic Infections CROI (Abstract 102); March 4-7, 2019; Seattle, WA.

McCormack S, Dunn DT, Desai M, et al. Pre-exposure prophylaxis to prevent the acquisition of HIV-1 infection (PROUD): effectiveness results from the pilot phase of a pragmatic open-label randomised trial. Lancet. 2016; 387(10013):53-60.

Molina JM, Capitant C, Spire B, et al. On-demand preexposure prophylaxis in men at high risk for HIV-1 infection. N Engl J Med. 2015; 373(23): 2237-46.

National Institutes of Health (NIH). Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III). https://www.nhlbi.nih.gov/files/docs/guidelines/atp3xsum.pdf. Published May 2001. Accessed June 28, 2019.

Nel A, van Niekerk N, Kapiga S, et al. Safety and efficacy of a dapivirine vaginal ring for HIV prevention in women. N Engl J Med. 2016; 375(22): 2133-43.

New York State Department of Health AIDS Institute. https://www.hivguidelines.org/prep-for-prevention/. Published October 2017. Accessed June 27, 2019.

Parikh UM, Dobard C, Sharma S, et al. Complete protection from repeated vaginal simian-human immunodeficiency virus exposures in macaques by a topical gel containing tenofovir alone or with emtricitabine. J Virol. 2009; 83(20): 10358–65.

Patterson KB, Prince HA, Kraft E, et al. Penetration of tenofovir and emtricitabine in mucosal tissues: implications for prevention of HIV-1 transmission. Sci Transl Med. 2011; 3(112): 112re4.

Powell VE, Gibas KM, DuBow J, et al. Update on HIV preexposure prophylaxis: effectiveness, drug resistance, and risk compensation. Curr Infect Dis Rep. 2019; 21(8): 28.

Radzio J, Aung W, Holder A, et al. Prevention of vaginal SHIV transmission in macaques by a coitally-dependent Truvada regimen. PLoS ONE. 2012; 7(12): e50632.

Rudd RA, Aleshire N, Zibbell JE, Gladden RM. Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014. MMWR 2016; 64(50); 1378-82.

Schwartz JL, Cottrell M, Thurman AR, et al. HIV prevention in healthy women: safety and PK of a potential new tenofovir alafenamide fumarate (TAF)-based oral PrEP regimen. Poster presented at HIV Research for Prevention (HIVR4P) (Abstract OA15.4); October 21-25, 2018; Madrid, Spain.

Seifert SM, Chen X, Meditz AL, et al. Intracellular tenofovir and emtricitabine anabolites in genital, rectal, and blood compartments from first dose to steady state. AIDS Res Hum Retroviruses 2016; 32(10-11): 981-91.

Smith DK, Van Handel M, Grey J. Estimates of adults with indications for HIV pre-exposure prophylaxis by jurisdiction, transmission risk group, and race/ethnicity, United States, 2015. Ann Epidemiol. 2018; 28 (12): 850-7.

Subbarao S, Otten RA, Ramos A, et al. Chemoprophylaxis with tenofovir disoproxil fumarate provided partial protection against infection with simian human immunodeficiency virus in macaques given multiple virus challenges. J Infect Dis. 2006; 194(7): 904-11.

Van Damme L, Corneli A, Ahmed K et al. Preexposure prophylaxis for HIV infection among African women. N Engl J Med. 2012; 367(5): 411–22.

EXHIBIT 21

REPORTS

Downloaded from http://science.sciencemag.org/ on October 1, 2019

367 ± 22 (mean ± SD, $n = 3$) at 30 min after addition, indicating no effect on the zinc coordination.

10. F. T. J. Staal et al., AIDS Res. Hum. Retroviruses **9**, 4299 (1993).

11. HIV-1$_{MN}$ (11.8 $\mu g$ total protein) was treated for 1 hour at 37°C with 25 $\mu M$ test compound. Samples were centrifuged to pellet the virus from the drug. Virus pellets were resolved by SDS-PAGE and analyzed by immunoblot with monospecific rabbit antisera to the purified NC proteins. The extent of p7NC cross-linkage was dependent on the length of time that virus was incubated with the compound and on the concentration of compound used. Cross-linkage did not occur when the incubation was done at 0° to 4°C, but occurred at 20°C and more rapidly at 37°C. In addition, cross-linkage of the NC protein was observed with purified equine infectious anemia virus and Moloney murine leukemia virus, retroviruses distantly related to HIV-1. AZT was unable to induce cross-linkage of p7NC molecules in HIV-1 virions.

12. For quantitative viral inactivation studies, 100 $\mu l$ of stock virus [HIV-1$_{RF}$, median tissue culture infectious dose per milliliter (TCID$_{50}$/ml) = $1.25 \times 10^5$] were incubated with each compound for 1 hour at 37°C. Samples were then serially diluted and 10 replicates of each dilution placed in culture with $5 \times 10^3$ CEM-SS cells. After 1 week the cultures were assayed for p24 content and scored positive (absorbance >2 SDs above background levels) or negative for infection, and a TCID$_{50}$ viral infectious titer was calculated for each concentration of each compound. The infectious titer of the HIV-1$_{RF}$ stock (TCID$_{50}$/0.1 ml = $1.25 \times 10^4$) was reduced to 1370, 1111, 1923, 5556, and $1.25 \times 10^4$ TCID$_{50}$/0.1 ml after treatment for 1 hour with 25 $\mu M$ DIBA-1, -2, -3, -4, and -5, respectively, and reduced to 540, 139, 233, 3225, and $1.25 \times 10^4$ TCID$_{50}$/0.1 ml after treatment for 1 hour with 100 $\mu M$ DIBA-1, -2, -3, -4, and -5, respectively. The inactivation of HIV-1 by DIBA compounds was also time-dependent, and 100 $\mu M$ DIBA-1 reduced viral titers from $1.25 \times 10^4$ TCID$_{50}$/0.1 ml to 3226, 1333, and 139 TCID$_{50}$/0.1 ml after 15, 30, and 60 min of treatment, respectively. As an internal control, quantitative measurements of viral inactivation determined that AZT did not directly inactivate HIV-1 infectivity (infectious titer remained at $1.25 \times 10^4$ TCID$_{50}$/0.1 ml after treatment with 10 $\mu M$ AZT for 60 min at 37°C).

13. Attachment of HIV-1 to fresh human PBLs, binding of gp120 to CD4, and the effects of compounds on HIV-1 p66/p51 RT [with the poly(rA).oligo(dT), rAdT, and the poly(rC).oligo(dG), rCdG, template-primer systems] and protease (with HPLC-based detection of cleavage of the Ala-Ser-Glu-Asn-Tyr-Pro-Ile-Val-Glu-amide substrate) were quantitated as described [W. G. Rice et al., Proc. Natl. Acad. Sci. U.S.A. **90**, 9721 (1993)]. None of the DIBA compounds inhibited virus binding, the interaction of gp120-CD4, or RT. DIBA-1 and DIBA-5 inhibited protease activity by 50% at 8.4 and 13.0 $\mu M$, respectively. As controls, AZT triphosphate inhibited RT activity [median inhibitory dose (ID$_{50}$) = 27 nM] against the rAdT template-primer system and nevirapine inhibited RT activity (ID$_{50}$ = 39 nM) against the rCdG template-primer system, the KNI-272 protease inhibitor of protease activity (ID$_{50}$ = 3 nM), dextran sulfate inhibited virion binding (ID$_{50}$ = 1.8 $\mu g$/ml), and cosalane inhibited gp120-CD4 interactions (ID$_{50}$ = 7.8 $\mu M$).

14. R. W. Buckheit Jr. et al., Antiviral Res. **21**, 247 (1993).

15. R. W. Buckheit Jr. et al., ibid. **26**, 117 (1995); S. Kageyama et al., Antimicrob. Agents Chemother. **38**, 1107 (1994).

16. G. J. Hart et al., Antimicrob. Agents Chemother. **36**, 1688 (1992).

17. M. Cushman et al., J. Med. Chem. **37**, 3040 (1994).

18. Plasma concentrations of DIBA-4 were measured as a function of time after oral administration (250 mg/kg) in male C2DF$_1$ mice. DIBA-4 was formulated as a solution in dimethyl sulfoxide and delivered in a volume of 1.0 $\mu l$ per gram of body weight, and groups of three to five mice were bled under mild anesthesia by retro-orbital puncture at the indicated times. Total drug concentration in plasma was determined by quantitative conversion of DIBA-4 and its mixed disulfides into the thiophenol monomer, which was then assayed by reversed-phase HPLC. Plasma samples

(50 $\mu l$) were mixed with dithiothreitol (10 M, 0.5 $\mu l$), deproteinized, and resolved on a Nova-Pak C$_8$ column. The pharmacokinetic studies in mice were done in accordance with current NIH guidelines on the humane care and use of laboratory animals in research.

19. The bioavailable fraction of drug ($f$) was calculated as $f = CL \times AUC_{p.o.}/DOSE_{p.o.}$, where CL is the total plasma clearance determined after intravenous administration, DOSE$_{p.o.}$ is the oral dose, and AUC$_{p.o.}$ is the area under the plasma concentration–time profile from time zero to infinity after oral dosing. The value of AUC$_{p.o.}$ was estimated by the linear trapezoidal method to the last data point, with extrapolation to infinity by using the slope of the terminal log-linear phase [M. Gibaldi and D. Perrier, Pharmacokinetics (Dekker, New York, ed. 2, 1982), pp. 410–411].

20. J. W. Mellors, B. A. Larder, R. F. Schinazi, Int. Antiviral News **3**, 8 (1995); J. M. Coffin, Science **267**, 483 (1995).

21. Anti-HIV screening of the DIBA compounds was done with the XTT cytoprotection assay as de-

scribed [O.W. Weislow et al., J. Natl. Cancer Inst. **81**, 577 (1989)]. This microtiter assay quantitates drug-induced protection from the killing of CD4$^+$ lymphoid cells by HIV-1. Data are presented as the percent control of XTT values for the uninfected, drug-free control. EC$_{50}$ values reflect the drug concentration that provides 50% protection from the cytopathic effect of HIV-1. XTT-based results were confirmed by measurement of supernatant RT and infectious virus titers.

22. K. A. Clouse et al., J. Immunol. **142**, 431 (1989); T. M. Folks et al., ibid. **140**, 1117 (1988).

23. Supported by the National Cancer Institute under contract with PRI/DynCorp and Southern Research Institute. The content of this publication does not necessarily reflect the views or policies of the Department of Health and Human Services, nor does mention of trade names, commercial products, or organization imply endorsement by the U.S. government. We thank J. Duears for preparation of the manuscript.

27 April 1995; accepted 6 September 1995

# Prevention of SIV Infection in Macaques by (R)-9-(2-Phosphonylmethoxypropyl)adenine

Che-Chung Tsai,* Kathryn E. Follis, Alexander Sabo, Thomas W. Beck, Richard F. Grant, Norbert Bischofberger, Raoul E. Benveniste, Roberta Black

The efficacy of pre- and postexposure treatment with the antiviral compound (R)-9-(2-phosphonylmethoxypropyl)adenine (PMPA) was tested against simian immunodeficiency virus (SIV) in macaques as a model for human immunodeficiency virus (HIV). PMPA was administered subcutaneously once daily beginning either 48 hours before, 4 hours after, or 24 hours after virus inoculation. Treatment continued for 4 weeks and the virologic, immunologic, and clinical status of the macaques was monitored for up to 56 weeks. PMPA prevented SIV infection in all macaques without toxicity, whereas all control macaques became infected. These results suggest a potential role for PMPA prophylaxis against early HIV infection in cases of known exposure.

**A**n urgent need for new antiretroviral drugs has become evident as more people worldwide are exposed to and become infected with HIV. Currently, 3′-azido-3′-deoxythymidine (AZT; also called zidovudine) is the most widely used antiviral agent in both single and combination strategies for the treatment of acquired immunodeficiency syndrome (AIDS). Unfortunately, AZT has limited efficacy against HIV infection, and treatment can lead to drug toxicity and the emergence of drug-resistant strains of the virus (1). Drugs that are more efficacious and less toxic than AZT are clearly needed.

Several acyclic nucleoside phosphonate

C.-C. Tsai, K. E. Follis, A. Sabo, T. W. Beck, R. F. Grant, University of Washington Regional Primate Research Center, Seattle, WA 98195, USA.
N. Bischofberger, Gilead Sciences, Foster City, CA 94404, USA.
R. E. Benveniste, National Cancer Institute, Frederick, MD 21701, USA.
R. Black, Division of AIDS, National Institute of Allergy and Infectious Diseases, National Institutes of Health, Bethesda, MD 20852, USA.

*To whom correspondence should be addressed.

analogs have been developed that exhibit activity against retroviruses in vitro (2). Initial phosphorylation is not required for activation of these reverse transcriptase inhibitors, and therefore they may have activity in a wider range of cell types as compared with AZT (2, 3). One of these compounds, 9-(2-phosphonylmethoxyethyl)adenine (PMEA), has shown efficacy against SIV in macaques but with mild-to-moderate toxic side effects in the form of skin lesions (3–5). A related acyclic nucleoside phosphonate, (R)-9-(2-phosphonylmethoxypropyl)adenine (PMPA), has shown potent in vitro efficacy against HIV-1 and Moloney murine sarcoma virus (6), as well as SIV (Table 1). These in vitro results prompted us to design an efficacy study of PMPA against SIV in macaques as a model for evaluating HIV therapies (7).

Thirty-five age-matched, naïve, juvenile, long-tailed macaques (Macaca fascicularis) were housed individually in a biological safety level 3 animal facility (8). Each macaque was inoculated intravenously with 1 ml of a 10$^3$ cell culture infectious dose (equivalent to 10 times the 50% monkey

infectious dose) of an uncloned SIV$_{mne}$ virus stock (9, 10). PMPA was administered subcutaneously at a dose of 20 or 30 mg per kilogram of body weight once daily for 4 weeks (11). Doses were adjusted weekly according to body weight. To determine the pre- and postexposure efficacy of PMPA, we divided the macaques into five treatment groups (Table 2). Group 1 was treated with PMPA at 20 mg/kg starting 48 hours before SIV inoculation ($n = 5$); groups 2 to 4 were treated with PMPA at 30 mg/kg starting either 48 hours before inoculation ($n = 10$), 4 hours after inoculation ($n = 5$), or 24 hours after inoculation ($n = 5$). Group 5 was treated with physiological saline starting 48 hours before SIV inoculation (control, $n = 10$).

The clinical and virologic parameters of the macaques were monitored for up to 56

**Table 1.** In vitro efficacy of PMPA, PMEA, and AZT against SIV$_{mne}$. Control or SIV-infected C-8166 target cells were incubated in the presence of PMPA, PMEA, or AZT at different concentrations (0.0001 to 500 μM) for 7 days. All experiments were conducted in triplicate. A dose-response curve was generated for each antiviral agent. The expression of SIV antigen in cells was measured by an immunofluorescence assay (24), from which the 50% inhibitory concentration (IC$_{50}$) of the antiviral agent against SIV was calculated. Cell viability was determined by the trypan blue exclusion method (24), from which the 50% cytotoxic concentration (CC$_{50}$) of the antiviral agent was calculated. The selectivity index is the ratio of CC$_{50}$ to IC$_{50}$.

| Antiviral agent | IC$_{50}$ (μM) | CC$_{50}$ (μM) | Selectivity index |
|---|---|---|---|
| PMPA | 1.5 | >500 | >333 |
| PMEA | 1.7 | 65 | 38 |
| AZT | 0.005 | 5 | 1000 |

weeks postinoculation (PI). Blood samples were collected on a weekly basis during treatment, biweekly for the next 2 months, and then every 4 to 8 weeks until the end of the study. Clinical evaluations included complete blood counts, blood chemistry profile (including liver and renal functions), and lymphocyte subset analysis (12).



**Fig. 1.** Protein immunoblot analysis of SIV-specific antibody response in macaques 20 weeks postinoculation (PI) with SIV$_{mne}$. Mock-treated control macaques ($n = 10$) and macaques treated with PMPA starting 24 hours PI ($n = 5$) are represented. Antibodies to *env* protein gp120, *gag* proteins p28, p16, and p8 and *vpx* protein p14 were detected in the control macaques. None of the macaques treated with PMPA starting 24 hours PI showed SIV-specific antibodies. Identical analyses were performed at various time points on all of the PMPA-treated macaques, and SIV-specific antibodies were never detected.

EDTA-anticoagulated blood was separated into cellular and plasma fractions by centrifugation for virology and serology studies. Plasma p27 antigenemia was measured by a commercial SIV core antigen capture assay (13). Cell-free virus titers were determined by a limiting dilution assay of the plasma after treatment with polyethylene glycol (14). Peripheral blood mononuclear cells (PBMCs) were isolated from the cellular fraction of the blood by Ficoll-Hypaque gradient centrifugation (9). Cell-associated virus load in PBMCs was determined by a limiting dilution assay of $10^6$ PBMCs. For macaques with an undetectable virus load in $10^6$ PBMCs, cultures of $5 \times 10^6$ PBMCs were assayed (3). Plasma and PBMC cultures were maintained for 5 weeks, and supernatants were sampled weekly for SIV p27 by the SIV core antigen capture assay. Detection of proviral DNA in PBMCs was accomplished by nested polymerase chain reaction (PCR) techniques (15). SIV-specific antibodies in plasma were detected by immunoblotting (10) and SIV antibody titers were determined by an immunofluorescence antibody assay (9).

For further virologic studies, inguinal lymph node biopsies were performed on each macaque at 16 or 26 weeks PI. Two PMPA-treated macaques (groups 1 and 2) were euthanized at 40 weeks PI for complete necropsy and tissue survey (16). The lymph node biopsies and tissues taken at necropsy (25 different tissues including lymphoid tissue and major organs) were evaluated for the presence of SIV by coculture, PCR, and immunohistochemistry (5, 9).

When PMPA treatment was administered starting 48 hours before, 4 hours after, or 24 hours after inoculation with SIV$_{mne}$, none of the macaques became

Downloaded from http://science.sciencemag.org/ on October 1, 2019

**Table 2.** Virus, antibody, and clinical status of macaques inoculated with SIV$_{mne}$ and treated with PMPA or mock-treated.

| Group | PMPA treatment* Time started | PMPA treatment* Dose (mg/kg) | Virus load Plasma† | Virus load PBMCs‡ | SIV DNA§ in PBMCs | SIV-specific antibody‖ | Lymph node biopsy¶ | Clinical status# |
|---|---|---|---|---|---|---|---|---|
| 1 ($n = 5$) | 48 hours preinoculation | 20 | – | – | – | – | – | Four healthy, 56 weeks; one euthanized at 40 weeks, healthy |
| 2 ($n = 10$) | 48 hours preinoculation | 30 | – | – | – | – | – | Nine healthy, 36 to 56 weeks; one euthanized at 40 weeks, healthy |
| 3 ($n = 5$) | 4 hours postinoculation | 30 | – | – | – | – | – | Healthy, 36 weeks |
| 4 ($n = 5$) | 24 hours postinoculation | 30 | – | – | – | – | – | Healthy, 36 weeks |
| 5 ($n = 10$) | Control, mock-treated | None | + | + | + | + | + | Transient rash, diarrhea, enlarged lymph nodes 20 to 36 weeks PI |

*A single daily dose of PMPA was administered subcutaneously for 28 to 30 days.   †Cell-free virus load was determined in polyethylene glycol–treated plasma samples (14); (–) not detected; (+) detected (for the control macaques, cell-free SIV was persistently detected at dilutions of $10^{-2}$ to $10^{-3}$).   ‡Cell-associated (PBMC) virus load was determined by a limiting dilution assay; for the PMPA-treated macaques, $5 \times 10^6$ PBMCs were cocultured; for the control macaques a minimum of 10 to $10^3$ PBMCs were needed to detect SIV.   §SIV DNA in PBMCs was detected by PCR (3, 15).   ‖SIV antibody titers and SIV-specific antibodies were determined by immunofluorescence antibody assay and by immunoblotting (9, 10).   ¶Inguinal lymph nodes were biopsied from each macaque at 16 or 26 weeks postinoculation (PI) and examined for the presence of SIV by coculture, PCR, and immunohistochemistry.   #The clinical status of the treated macaques was monitored for 36 to 56 weeks PI; two healthy macaques were euthanized at 40 weeks PI for complete necropsy; mock-treated macaques were monitored for 20 to 36 weeks PI.

infected (Table 2). SIV was not detected in plasma or PBMCs, and SIV DNA was not detected in PBMCs throughout the entire study (Table 2). Similarly, lymph node biopsies taken from the PMPA-treated macaques were virus free. The lymphoid tissues and major organs of two healthy, PMPA-treated macaques euthanized 40 weeks PI were also free of SIV infection. SIV-specific antibodies were not detected in any of the PMPA-treated macaques (Fig. 1). Clinical signs of PMPA toxicity did not occur, nor were there any significant changes in complete blood counts or blood chemistries during or after the 4-week treatment regimen. Additionally, the absolute number of $CD4^+$ and $CD8^+$ cells did not differ significantly between the PMPA-treated macaques.

By comparison, 2 of 10 mock-treated control macaques had detectable virus 1 week PI, and all 10 macaques were persistently viremic 3 weeks PI. Cell-free and cell-associated virus load in these control animals were high. Plasma dilutions of $10^{-2}$ to $10^{-3}$ were persistently SIV positive, and as few as 10 to $10^3$ PBMCs were sufficient to detect SIV (Table 2). Antibody titers to SIV in the control macaques were first detected 3 weeks PI, and SIV-specific antibodies persisted throughout the study (Fig. 1). Inguinal lymph node biopsies taken from the control macaques 16 weeks PI were also positive for SIV by isolation, PCR, and immunohistochemistry (Table 2).

These findings show that the antiretroviral compound PMPA prevented the establishment of SIV infection in 25 of 25 macaques (100%) without toxicity when administered up to 24 hours after virus inoculation. These significant results in the macaque model are extremely encouraging compared with data obtained from efficacy studies of other nucleoside analogs such as PMEA and AZT. A previous study in four pretreated rhesus macaques showed that a daily dose of PMEA at 10 to 20 mg/kg for 4 weeks suppressed $SIV_{macBK28}$ replication without toxic side effects, although antibody to SIV was detected 1 to 2 weeks after treatment was stopped (4). More recently, it was shown that PMEA prevented $SIV_{mne}$ infection in 10 of 12 pretreated, long-tailed macaques (83%) (3) and in 1 of 5 (20%) macaques treated 4 hours after inoculation (17). Toxic side effects were evident in the form of mild skin lesions (3). By contrast, a daily dose of AZT at 100 mg/kg for 4 weeks prevented $SIV_{mne}$ infection in only 1 of 18 pretreated macaques (6%) (18) and in none of the macaques treated 4 hours after inoculation (19), and there were signs of hematologic toxicity as indicated by decreased erythrocyte counts and hemoglobin measures. Although other related studies confirm the limited efficacy of pre- and postexposure treatments with AZT against SIV in juvenile and adult macaques (20), a study in infant macaques showed that AZT prevented infection when treatment was initiated 2 hours before exposure to SIV but was ineffective after exposure (21). Hematologic toxicity in the form of thrombocytosis and anemia was also evident (20, 21). A comparison of these data clearly shows that PMPA is more efficacious and less toxic than either PMEA or AZT. Additional studies are in progress to assess the upper limit for the time after virus inoculation that PMPA could protect macaques from SIV infection.

Currently, postexposure prophylaxis of AZT against HIV is widely accepted and is used in humans despite numerous reports of failure (22). In the PMPA study reported here, our pre- and postexposure findings in the SIV-macaque model indicate that PMPA is a promising candidate for anti-HIV treatment. Postexposure prophylaxis with PMPA could have a significant impact on preventing HIV infection in health care workers or others accidentally exposed to the virus. Furthermore, the results from several recent anti-HIV clinical trials indicate that combining nucleoside analogs, such as AZT, with lamivudine (3TC) or proteinase inhibitors can enhance antiviral efficacy (23). Therefore, PMPA may also have an important role in combination therapies or strategies against HIV.

## REFERENCES AND NOTES

1. D. D. Richman et al., Acquired Immune Defic. Syndr. 7, 135 (1994); D. D. Richman, Antimicrob. Agents Chemother. 37, 1207 (1993); J. S. G. Montaner et al., AIDS 7, 189 (1993).
2. E. DeClercq et al., Nature 323, 464 (1986); R. Pauwels et al., Antimicrob. Agents Chemother. 32, 1025 (1988).
3. C.-C. Tsai et al., J. Infect. Dis. 169, 260 (1994); C.-C. Tsai et al., J. Med. Primatol. 23, 175 (1994).
4. J. Balzarini et al., AIDS 5, 21 (1991).
5. C.-C. Tsai, K. E. Follis, A. Sabo, R. Grant, N. Bischofberger, J. Infect. Dis. 171, 1338 (1995).
6. J. Balzarini et al., Antimicrob. Agents Chemother. 37, 332 (1993).
7. The SIV-macaque model has become the model of choice for these types of studies because HIV and SIV are lentiviruses that cause similar disease syndromes in their respective hosts [M. B. Gardner, Antiviral Res. 15, 267 (1991); M. S. Wyand, AIDS Res. Hum. Retroviruses 8, 349 (1992)].
8. Animal care was approved by the University of Washington's Animal Care Committee. The University of Washington is accredited by the American Association for the Accreditation of Laboratory Animal Care. Animal monitoring and invasive procedures, including injection of virus inocula and blood collection, were performed with the macaques under ketamine-HCl sedation administered at 10 mg/kg.
9. C.-C. Tsai et al., Lab. Anim. Sci. 43, 441 (1993).
10. R. E. Benveniste et al., J. Virol. 60, 483 (1986).
11. The rationale for the dosing regimen of PMPA was based on the previous efficacious concentration of PMEA (3), the in vitro anti-SIV efficacy of PMPA, and pharmacokinetic data for PMPA. PMPA was suspended in water with 0.1 N NaOH added to a final pH of 7.0 at 20 or 30 mg/ml and filter sterilized (0.2 μm; Nalgene). The terminal half-life after intravenous administration of a single dose of PMPA (10 mg/kg) to cynomolgus macaques was 1.36 hours and the total body clearance was 0.33 liter/hour per kilogram (K. C. Cundy, unpublished results). The relatively rapid elimination may not reflect the true duration of action of the drug because in vitro cellular pharmacology studies have previously indicated that these phosphonates and their phosphorylated metabolites have a prolonged (>8 hours) intracellular half-life [R. V. Srinivas et al., Antimicrob. Agents Chemother. 37, 2247 (1993); H.-T. Ho et al., Mol. Pharmacol. 41, 197 (1992)]. When macaques were given a daily subcutaneous dose of PMPA at 100 mg/kg for 7 days, the values of blood urea nitrogen, creatinine, and aspartate aminotransferase were increased (kidney and liver functions affected), although hematology values remained within normal limits. When PMPA treatment was discontinued, serum chemistry levels returned to normal (C.-C. Tsai, unpublished results).
12. Specific lymphocyte subsets were determined by incubating EDTA-anticoagulated blood samples with a panel of mouse anti-human monoclonal antibodies. Cell percentages were calculated by flow-cytometric procedures with a FACScan (Becton Dickinson, Mountain View, CA). Cell percentage times the total leukocyte count gave the absolute number of each subset (3).
13. SIV Core Antigen Assay, Coulter Corp., Hialeah, FL. The lower detection limit of p27 was 50 pg/ml.
14. Plasma was thoroughly mixed with 12% polyethylene glycol (PEG)–8000 and refrigerated overnight at 4°C. The sample was centrifuged at 2000g at 4°C for 20 min. The pellet was washed twice and resuspended in culture medium. The suspension was serially diluted $10^{-1}$ to $10^{-4}$ and C-8166 cells were added for culture [K. E. Follis and C.-C. Tsai, J. Med. Primatol. 23, 255 (1994)].
15. DNA blot analysis of the amplified products showed that the PCR was SIV-specific. The probe sequence was 5'-CTGCCCAGCACCGGCCCAGTGA. Primer sequences were as follows: 3' internal, 5'-GAGAGATG GGAGCACACACTGGCTTA; 5' internal, 5'-CCAGAT-TGGCAGAATTACACCTCGGGACCAGG; 3' external, 5'-TCGAGTACCGAGTTGACCAGGCGG; 5' external, 5'-TGGAAGGGATTTATTACAGTGAAAG (3).
16. Sodium pentobarbital overdose (90 mg/kg) was the method of euthanasia for all macaques.
17. PMEA (20 mg/kg) was administered once daily to five macaques starting 4 hours after inoculation with $SIV_{mne}$. Treatment continued for 28 days, and the clinical and virologic status of the macaques was monitored for 20 weeks (C.-C. Tsai, unpublished data).
18. C.-C. Tsai et al., J. Acquired Immune Defic. Syndr. 6, 1086 (1993).
19. AZT (50 mg/kg) was administered twice daily to five macaques starting 4 hours after inoculation with $SIV_{mne}$. Treatment continued for 28 days (C.-C. Tsai, unpublished data).
20. H. M. McClure et al., Ann. N.Y. Acad. Sci. 616, 287 (1990); B. Lundgren et al., J. Acquired Immune Defic. Syndr. 4, 489 (1991); F. Fazely, W. A. Haseltine, R. F. Rodger, R. M. Ruprecht, ibid., p. 1093; L. N. Martin, M. Murphey-Corb, K. F. Soike, B. Davison-Fairburn, G. B. Baskin, J. Infect. Dis. 168, 825 (1993); R. Le Grand et al., AIDS Res. Hum. Retroviruses 10, 1279 (1994).
21. K. K. A. Van Rompay et al., Antimicrob. Agents Chemother. 36, 2381 (1992).
22. J. I. Tokars et al., Ann. Intern. Med. 118, 193 (1993).
23. A. M. Caliendo and M. S. Hirsch, Clin. Infect. Dis. 18, 516 (1994); J. S. G. Montagner and M. O'Shaughnessy, Lancet 345, 377 (1995); S. Vella, AIDS 8(suppl. 3), S25 (1994).
24. C.-C. Tsai et al., Antiviral Res. 14, 87 (1990).
25. We thank F. Meng for performing the immunohistochemistry and R. Nolte, J. Weaver, and G. Satler for technical assistance. We also thank D. St. John and R. Jones (Gilead Sciences) for the synthesis of PMPA. Supported in part by USPHS NIH-NIAID under contract N01-AI-15120 and USPHS NIH grant RR00166.

18 April 1995; accepted 13 September 1995

Downloaded from http://science.sciencemag.org/ on October 1, 2019



**Prevention of SIV Infection in Macaques by (*R*)-9-(2-Phosphonylmethoxypropyl)adenine**

Che-Chung Tsai, Kathryn E. Follis, Alexander Sabo, Thomas W. Beck, Richard F. Grant, Norbert Bischofberger, Raoul E. Benveniste and Roberta Black

*Science* **270** (5239), 1197-1199.
DOI: 10.1126/science.270.5239.1197

Downloaded from http://science.sciencemag.org/ on October 1, 2019

| | |
|---|---|
| **ARTICLE TOOLS** | http://science.sciencemag.org/content/270/5239/1197 |
| **REFERENCES** | This article cites 34 articles, 7 of which you can access for free http://science.sciencemag.org/content/270/5239/1197#BIBL |
| **PERMISSIONS** | http://www.sciencemag.org/help/reprints-and-permissions |

Use of this article is subject to the Terms of Service

*Science* (print ISSN 0036-8075; online ISSN 1095-9203) is published by the American Association for the Advancement of Science, 1200 New York Avenue NW, Washington, DC 20005. The title *Science* is a registered trademark of AAAS.

© 1995 American Association for the Advancement of Science

# EXHIBIT 22

FAST TRACK

# Two doses of PMPA protect newborn macaques against oral simian immunodeficiency virus infection

## Koen K. A. Van Rompay*, Christopher J. Berardi*, Nancy L. Aguirre*, Norbert Bischofberger[†], Paul S. Lietman[‡], Niels C. Pedersen*[§] and Marta L. Marthas*

**Background:** Simple and affordable intervention strategies are needed to reduce the rate of HIV transmission from mother to infant in developing countries. Simian immunodeficiency virus (SIV) infection of newborn rhesus macaques is considered to be a useful model of human pediatric HIV infection.

**Objective:** To investigate whether short-term 9-[2-(phosphonomethoxy) propyl]adenine (PMPA) administration can protect newborn rhesus macaques against perinatal SIV infection.

**Design and methods:** Eight newborn macaques were inoculated orally with highly virulent $SIV_{mac}$ within the first 3 days of life. Four of these animals were untreated controls. The other four animals were given one dose of PMPA (30 mg/kg subcutaneously) 4 h before oral SIV inoculation, and were then given a second and final dose of PMPA 24 h later.

**Results:** All four untreated control animals were persistently SIV-positive within 2 weeks after virus inoculation. In contrast, no virus could be detected in the four animals that received two doses of PMPA; these animals were seronegative and healthy at 10 months.

**Conclusions:** Two doses of PMPA prevented SIV infection of newborn macaques. Our data suggest that short-term administration of PMPA to HIV-infected pregnant women at the onset of labor and to their newborns after delivery may reduce the rate of intrapartum HIV transmission.       © 1998 Lippincott-Raven Publishers

*AIDS* 1998, **12**:F79–F83

**Keywords:** 9-[2-(Phosphonomethoxy)propyl]adenine, vertical transmission, simian immunodeficiency virus, primate, animal model, prophylaxis, prevention, pediatrics

## Introduction

It has been estimated that approximately 1700 newborns become infected perinatally with HIV every day, with the majority of these infections occurring in developing countries [1].

AIDS Clinical Trials Group protocol 076 has demonstrated that zidovudine administration to HIV-infected pregnant women beginning at 14–34 weeks of gestation and continued to their newborns during the first 6 weeks of life reduces the rate of viral transmission by two-thirds [2]. Implementation of these results has

From the *California Regional Primate Research Center, University of California, Davis, [†]Gilead Sciences, Foster City, California, the [‡]Division of Clinical Pharmacology, Johns Hopkins University School of Medicine, Baltimore, Maryland, and the [§]Department of Veterinary Medicine and Epidemiology, University of California, Davis, California, USA.

Sponsorship: Supported by Pediatric AIDS Foundation grant 50757 to K.K.A.V.R. and NIH grant RR00169 to the California Regional Primate Research Center; M.L.M. is an Elizabeth Glaser Scientist funded by the Pediatric AIDS Foundation.

Requests for reprints to: Koen Van Rompay, California Regional Primate Research Center, University of California, Davis CA 95616, USA.

Date of receipt: 25 February 1998; revised: 20 March 1998; accepted: 30 March 1998.

Downloaded from

F80    **AIDS** 1998, Vol 12 No 9

drastically reduced the rate of perinatal HIV infection in developed countries [3], but the cost of the prolonged zidovudine dosage regimen limits its global application. Although a recent clinical trial in Thailand has demonstrated partial efficacy of a shorter antenatal zidovudine regimen [4], more simple and affordable intervention strategies are urgently needed to curtail vertical HIV transmission in developing countries.

Although HIV transmission from an HIV-infected mother to her infant can occur early *in utero* and postnatally through breastfeeding, evidence suggests that a large fraction of infants become infected around the time of birth, possibly by an oral route of infection [5–7]. Thus, the narrow time window encompassing birth is an excellent target for affordable intervention strategies.

Simian immunodeficiency virus (SIV) infection of newborn rhesus macaques has been shown to be a very useful animal model of pediatric AIDS in order to rapidly evaluate the efficacy of intervention strategies to prevent infection [6,8–10]. Previous studies in juvenile and newborn macaques have demonstrated that the novel reverse transcriptase inhibitor 9-[2-(phosphonomethoxy)propyl]adenine (PMPA), is highly superior to zidovudine for preventing SIV infection, as a 2–4-week dosage regimen of PMPA was very effective in protecting macaques against intravenous or oral SIV infection [11,12]. In this study, we demonstrate that two doses of PMPA are sufficient to protect newborn macaques against oral SIV infection.

## Materials and methods

### Animals
All newborn rhesus macaques (*Macaca mulatta*) were from the type D-retrovirus-free and SIV-free colony at the California Regional Primate Research Center and were hand-reared in a primate nursery in accordance with American Association for Accreditation of Laboratory Animal Care standards. We strictly adhered to the guidelines on the care and use of laboratory animals prepared by the Committee on Care and Use of Laboratory Animals of the Institute of Laboratory Resources, National Resource Council [13]. When necessary, animals were immobilized with 10 mg/kg intramuscular ketamine–HCl (Parke-Davis, Morris Plains, New Jersey, USA). Heparin- and EDTA-anticoagulated blood samples were collected immediately before virus inoculation and regularly thereafter for monitoring viral and immunologic parameters and for complete blood cell counts according to methods extensively used and described previously [6,10,14].

### Virus inoculation
Within 3 days of age, newborn macaques were inoculated orally under ketamine anesthesia with 1 ml uncloned $SIV_{mac251}$, administered atraumatically by dispensing the inoculum slowly into the mouth. Animals were monitored to ensure that the inoculum was swallowed. The $SIV_{mac251}$ virus stock used in this study was propagated on rhesus peripheral blood mononuclear cells (PBMC), had a titer of $10^5$ median tissue culture infective doses ($TCID_{50}$)/ml, and has previously been shown to infect newborn and juvenile macaques by the oral route and cause persistent viremia and simian AIDS [10,11]. To monitor the immune response to non-viral, non-replicating antigens, all newborn rhesus macaques were immunized with 0.1 mg cholera toxin B subunit (List Biological Laboratories, Campbell, California, USA) subcutaneously, just before the virus inoculation. A booster immunization was given at 8 weeks of age. The cholera toxin-specific IgG enzyme-linked immunosorbent assay (ELISA) has been described previously [6].

### PMPA administration
PMPA (Gilead Sciences, Foster City, California, USA) was suspended in distilled water, dissolved by addition of NaOH to a final pH of 7.0 at 60 mg/ml, and filter-sterilized (0.2 µm; Nalgene, Rochester, New York, USA). PMPA (30 mg PMPA/kg body weight per dose) [11,12,14] was administered subcutaneously into the back of the animal.

### Cell-associated and cell-free virus isolation
Levels of infectious virus in cells and plasma of peripheral blood were determined regularly by a limiting dilution assay of PBMC and plasma, respectively, in cultures with CEMX174 cells in 24-well plates and subsequent p27 core antigen measurement, according to previously described methods [6,8,9]. For animals with low or undetectable virus load, $1-20 \times 10^6$ PBMC were cocultivated for 8 weeks with CEMX174 cells in tissue culture flasks, as described previously [8]. In addition, to detect virus in lymphoid organs of these animals, an axillary lymph node was recovered by transcutaneous biopsy and aseptically teased into single-cell suspensions of lymph-node mononuclear cells (LNMC). Five to 10 million LNMC were then cocultured with CEMX174 cells, similar to the method described above for PBMC.

### PCR amplification
Nested PCR was carried out in a GeneAmp 9600 thermocycler (Perkin-Elmer Cetus, Emeryville, California, USA). Two rounds of 30 cycles of amplification were performed on aliquots of PBMC or LNMC lysates (with five replicates per sample) using $SIV_{mac}$-specific *gag* primers under conditions described elsewhere [15]. Positive controls included PBMC lysates of known SIV-infected animals. To detect potential inhibitors of *Taq* polymerase in cell lysates, β-actin DNA sequences were amplified with two rounds of PCR [15].

### Anti-SIV class-specific antibody determination

The anti-SIV IgG and IgM-specific antibody ELISA have been described previously [6,14,16]. Immunoblotting was performed by the Chiron recombinant immunoblot assay (RIBA) HIV-1/HIV-2 strip immunoblot assay (Chiron Corporation, Emeryville, California, USA) according to the manufacturer's instructions.

### Statistical analysis

Statistical analysis of protection against SIV infection by comparing PMPA-treated versus control animals was performed with a one-sided Fisher's exact test using Stata software (Stata Corporation, College Station, Texas, USA).

## Results

Within the first 3 days of life, eight newborn animals were inoculated orally with highly virulent $SIV_{mac251}$. Four of these animals were untreated controls. The other four animals were given a first dose of PMPA (30 mg/kg body weight, subcutaneously) 4 h before oral SIV inoculation, and were given a second and final dose of PMPA 24 h later (i.e., 20 h after SIV inoculation). Animals were monitored regularly for PBMC-associated and plasma virus levels, antibody responses, CD4+ and CD8+ T-cell counts and clinical signs, according to methods extensively used in our previous studies with newborn macaques [9–11,14,16].

All four untreated control infant macaques became persistently viremic, as determined by virus isolation and PCR, within 2 weeks after oral $SIV_{mac251}$ inoculation (Table 1). Three of the four animals developed severe immunodeficiency and were euthanized within 2–5 months of age. The same $SIV_{mac251}$ stock and

inoculum dose that was used in this study had infected all eight newborn macaques by the oral route in a previous study [11]; accordingly, the course of infection of the four untreated control animals was representative of a larger number of historical control animals.

In contrast to the untreated control infants, no infectious virus could be isolated and no proviral sequences could be detected in PBMC and LNMC from the four infants that had received two doses of PMPA. The animals were tested repeatedly over a 10-month period following SIV inoculation (Table 1). No infectious virus could be isolated from plasma, and no SIV-specific antibodies (IgM or IgG) could be detected in plasma during this 10-month period, as measured by ELISA and immunoblotting (data not shown). There was no detectable toxicity of the two doses of PMPA. These four animals had normal CD4+ and CD8+ T-cell counts and CD4+/CD8+ T-cell ratios throughout the observation period, and made rapid and long-lasting antibody responses to cholera toxin B subunit following immunizations with this antigen at birth and 8 weeks of age (data not shown). In addition, these four animals had rapid weight gain (similar to uninfected infants at the California Regional Primate Research Center), and were healthy at 10 months of age. Comparison of the PMPA-treated animals versus the four control animals demonstrated that the two doses of PMPA offered significant protection against SIV infection ($P = 0.014$; one-sided Fisher's exact test).

## Discussion

Results of this study strongly suggest the potential of short-term PMPA administration to reduce intrapartum HIV transmission from mother to infant. The inability to recover infectious virus or to detect proviral genome or antiviral antibodies in PMPA-treated infants after

**Table 1.** Detection of infectious virus in infant macaques following oral $SIV_{mac251}$ inoculation*.

| Animal | Virus isolation from PBMC after virus inoculation (weeks)[†] | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 6–7 | 8–9 | 10–11 | 12–13 | 16 | 20 | 24 | 28 | 32 | 36 | 36[†] | 40 |
| **PMPA** | | | | | | | | | | | | | | | | |
| None | | | | | | | | | | | | | | | | |
| 30098 | + | + | + | + | + | +[¶] | | | | | | | | | | |
| 30100 | + | + | + | + | + | + | + | +[¶] | | | | | | | | |
| 30124 | – | + | + | + | + | + | + | + | + | + | + | + | + | + | ND | + |
| 30129 | + | + | + | + | + | + | + | + | + | +[¶] | | | | | | |
| Two doses[§] | | | | | | | | | | | | | | | | |
| 30338 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| 30339 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| 30340 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| 30343 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |

*Animals were inoculated within 3 days of birth orally with uncloned $SIV_{mac251}$. [†]Virus isolation results from peripheral blood mononuclear cells (PBMC) and lymph-node mononuclear cells (LNMC) are presented as detectable (+) or undetectable (–) virus. Results of nested PCR to detect proviral DNA in PBMC and LNMC confirmed those of virus isolation. [‡]LNMC were recovered by a biopsy of axillary lymph node at 36 weeks of age. [§]9-[2-(Phosphonomethoxy)propyl]adenine (PMPA) was given at –4 and +20 h relative to SIV inoculation. [¶]Time of euthanasia with simian AIDS. ND, Not determined.

oral SIV inoculation indicated that SIV infection was prevented by the two doses of PMPA. This success in preventing SIV infection with only two doses of an antiviral drug is unprecedented; in previous macaque studies, administration of zidovudine and other nucleoside analogues over several weeks was usually ineffective in preventing SIV infection [17].

The reason for the high potency of PMPA to prevent SIV infection in macaques is unknown. A key feature of PMPA and other acyclic nucleoside phosphonates is that they are already mono-phosphorylated; thus, the rate-limiting initial phosphorylation step required for activation of other nucleoside analogues is not required. Unlike zidovudine, phosphorylation of these compounds to their active diphosphate form occurs in both resting and activated cells, including macrophages [18,19]. Finally, the long intracellular half-life (~15 and 50 h in activated and resting PBMC, respectively) of these compounds probably plays a role in the success of chemoprophylaxis of a short-term drug dosage regimen [20,21].

For practical reasons, we did not administer the first dose of PMPA to pregnant female macaques at the onset of delivery, but instead, this dose was given directly to the newborns prior to virus inoculation. This approach should, however, be equivalent to giving the first dose to a pregnant woman at the onset of delivery, because it has been demonstrated that PMPA efficiently crosses the primate placenta [11,22].

Altogether, our data suggest that administration of PMPA to HIV-infected pregnant women at the onset of labor and administration of another dose of PMPA to their newborns the next day could protect newborns from intrapartum HIV infection. A human clinical trial that is being planned will determine the potential use of this regimen in developing countries with high prevalence of HIV infection but limited resources.

## Acknowledgements

The authors thank E. Agatep, L. Antipa, J. Becker, J. Bernales, D. Bennett, Z. Dehqanzada, S. Dillard-Telm, N. Lerche, J. Murry, C. Oxford, L. Reay, A. Spinner, W. von Morgenland, and the veterinary staff and Colony Services of the California Regional Primate Research Center for expert technical assistance.

## References

1. UNAIDS/WHO: *Report on the Global HIV/AIDS Epidemic*. Geneva: UNAIDS; December 1997.
2. Connor EM, Sperling RS, Gelber R, *et al.*: **Reduction of maternal–infant transmission of human immunodeficiency virus type 1 with zidovudine treatment.** *N Engl J Med* 1994, 331:1173–1180.
3. Centers for Disease Control and Prevention: **Update: perinatally acquired HIV/AIDS – United States, 1997.** *MMWR* 1997, 46:1086–1092.
4. Centers for Disease Control and Prevention: **Administration of zidovudine during late pregnancy and delivery to prevent perinatal HIV transmission – Thailand, 1996–1998.** *MMWR* 1998, 47:151–154.
5. Mofenson LM: **Interaction between timing of perinatal human immunodeficiency virus infection and the design of preventive and therapeutic interventions.** *Acta Paediatr Suppl* 1997, 421:1–9.
6. Van Rompay KKA, Otsyula MG, Tarara RP, *et al.*: **Vaccination of pregnant macaques protects newborns against mucosal simian immunodeficiency virus infection.** *J Infect Dis* 1996, 173:1327–1335.
7. Baba TW, Koch J, Mittler ES, *et al.*: **Mucosal infection of neonatal rhesus monkeys with cell-free SIV.** *AIDS Res Hum Retroviruses* 1994, 10:351–357.
8. Van Rompay KKA, Marthas ML, Ramos RA, *et al.*: **Simian immunodeficiency virus (SIV) infection of infant rhesus macaques as a model to test antiretroviral drug prophylaxis and therapy: oral 3′-azido-3′-deoxythymidine prevents SIV infection.** *Antimicrob Agents Chemother* 1992, 36:2381–2386.
9. Van Rompay KKA, Otsyula MG, Marthas ML, Miller CJ, McChesney MB, Pedersen NC: **Immediate zidovudine treatment protects simian immunodeficiency virus-infected newborn macaques against rapid onset of AIDS.** *Antimicrob Agents Chemother* 1995, 39:125–131.
10. Van Rompay KKA, Berardi CJ, Dillard-Telm S, *et al.*: **Passive immunization of newborn rhesus macaques prevents oral simian immunodeficiency virus infection.** *J Infect Dis* 1998, 177:1247–1259.
11. Van Rompay KKA, Marthas ML, Lifson JD, *et al.*: **Administration of 9-[2-(phosphonomethoxy)propyl]adenine (PMPA) for prevention of perinatal simian immunodeficiency virus infection in rhesus macaques.** *AIDS Res Hum Retroviruses* 1998, 14:761–773.
12. Tsai C-C, Follis KE, Beck TW, *et al.*: **Prevention of simian immunodeficiency virus infection in macaques by 9-(2-phosphonylmethoxypropyl)adenine (PMPA).** *Science* 1995, 270:1197–1199.
13. Committee on Care and Use of Laboratory Animals: *Guide for the Care and Use of Laboratory Animals*. Washington, DC: National Academy Press; 1996.
14. Van Rompay KKA, Cherrington JM, Marthas ML, *et al.*: **9-[2-(Phosphonomethoxy)propyl]adenine therapy of established simian immunodeficiency virus infection in infant rhesus macaques.** *Antimicrob Agents Chemother* 1996, 40:2586–2591.
15. Lü X, Kiyono H, Lu D, *et al.*: **Targeted lymph-node immunization with whole inactivated simian immunodeficiency virus (SIV) or envelope and core subunit antigen vaccines does not reliably protect rhesus macaques from vaginal challenge with $SIV_{mac251}$.** *AIDS* 1998, 12:1–10.
16. Otsyula MG, Miller CJ, Marthas ML, *et al.*: **Virus-induced immunosuppression is linked to rapidly fatal disease in infant rhesus macaques infected with simian immunodeficiency virus.** *Pediatr Res* 1996, 39:630–635.
17. Black RJ: **Animal studies of prophylaxis.** *Am J Med* 1997, 102 (5B):39–43.
18. Shirasaka T, Chokekijchai S, Yamada A, Gosselin G, Imbach J-L, Mitsuya H: **Comparative analysis of anti-human immunodeficiency virus type 1 activities of dideoxynucleoside analogs in resting and activated peripheral blood mononuclear cells.** *Antimicrob Agents Chemother* 1995, 39:2555–2559.
19. Perno CF, Balestra E, Aquaro S, *et al.*: **Potent inhibition of human immunodeficiency virus and herpes simplex virus type 1 by 9-(2-phosphonylmethoxyethyl)adenine in primary macrophages is determined by drug metabolism, nucleotide pools, and cytokines.** *Mol Pharmacol* 1996, 50:359–366.
20. Balzarini J, Hao Z, Herdewijn P, Johns DG, De Clercq E: **Intracellular metabolism and mechanism of anti-retrovirus action of 9-(2-phosphonylmethoxyethyl)adenine, a potent anti-human immunodeficiency virus compound.** *Proc Natl Acad Sci USA* 1991, 88:1499–1503.

21. Robbins BL, Srinivas RV, Kim C, Bischofberger N, Fridland A: **Anti-human immunodeficiency virus activity and cellular metabolism of a potential prodrug of the acyclic nucleoside phosphonate 9-R-(2-phosphonomethoxypropyl)adenine (PMPA), bis(isopropyloxymethylcarbonyl)PMPA.** *Antimicrob Agents Chemother* 1998, **42**:612–617.

22. Tarantal AF, Bischofberger N, Marthas ML: **Administration of PMPA to gravid macaques.** *14th Annual Symposium on Nonhuman Primate Models for AIDS.* Portland, October 1996 [abstract 110].

## Note added in proof

Preliminary results (unpublished data) suggest that 4 mg instead of 30 mg PMPA/kg body weight is effective: two newborn macaques given two doses of PMPA (at 4 mg/kg body weight, 4 h before and 20 h after oral $SIV_{mac251}$ inoculation) are SIV-negative at 8 weeks of age. Two placebo-treated animals became persistently viremic within 2 weeks.

# EXHIBIT 23

# Two Low Doses of Tenofovir Protect Newborn Macaques against Oral Simian Immunodeficiency Virus Infection

Koen K. A. Van Rompay,[1] Michael B. McChesney,[1]
Nancy L. Aguirre,[1] Kimberli A. Schmidt,[1]
Norbert Bischofberger,[2] and Marta L. Marthas[1]

[1]California Regional Primate Research Center, University
of California, Davis, and [2]Gilead Sciences, Foster City, California

Downloaded from https://academic.oup.com/jid/article-abstract/184/4/429/808643 by DOJ Libraries user on 27 September 2019

Simple affordable interventions are needed to reduce vertical human immunodeficiency virus (HIV) transmission in developing countries. The efficacy of 2 low doses (4 mg/kg, subcutaneously) or 1 high dose (30 mg/kg, subcutaneously) of the reverse-transcriptase inhibitor 9-[2-(phosphonomethoxy)propyl]adenine (PMPA; tenofovir) to protect newborn macaques against simian immunodeficiency virus (SIV) infection was investigated. Thirteen newborn macaques were inoculated orally with virulent SIVmac251. The 4 placebo-treated animals (group A) became persistently infected. Groups B and C ($n = 4$ in each group) received 2 4-mg/kg doses of PMPA, either 4 h before and 20 h after (group B) or 1 and 25 h after SIV inoculation (group C). One animal (group D) received a single 30-mg/kg dose of PMPA 1 h after SIV inoculation. Despite evidence of an initial transient infection, 3 group B animals, 2 group C animals, and the group D animal were SIV negative and seronegative at ages 19–23 months. Immune activation with recall antigens or pharmacologic immunosuppression with corticosteroids failed to reactivate viral replication. These data suggest that 1 or 2 doses of PMPA may protect human newborns against intrapartum HIV infection.

It is estimated that every day ~1700 newborns become infected perinatally with human immunodeficiency virus (HIV) [1]. The majority of these infections occur in developing countries. Although transmission can occur in utero and postnatally (through breast-feeding), evidence suggests that a large fraction of infants become infected during birth, presumably by an oral route of infection [2, 3]. The recent discovery of simplified zidovudine and nevirapine regimens to reduce peripartum HIV-1 transmission is very promising [4–7]. The HIVNET012 regimen, which consists of 1 dose of nevirapine to the mother at the onset of labor and another dose to the baby within 3 days of birth, is currently the most simple and affordable strategy to reduce transmission of HIV-1 during delivery and for about the first week of breast-feeding [5].

A number of unanswered questions remain regarding the

Received 28 February 2001; revised 4 May 2001; electronically published 16 July 2001.

Presented in part: 2d Conference on Global Strategies for the Prevention of HIV Transmission from Mothers to Infants, Montreal, September 1999 (abstract 265).

Animal care complied with American Association for Accreditation of Laboratory Animal Care standards.

Financial support: Elizabeth Glaser Pediatric AIDS Foundation (grant 50853 to K.K.A.V.R.; E. Glaser Scientist funding to M.L.M.); National Institutes of Health (grant RR-00169 to the California Regional Primate Research Center); University of California Universitywide AIDS Research Program Award (to M.B.M.).

Reprints or correspondence: Dr. Koen Van Rompay, California Regional Primate Research Center, University of California, Davis, CA 95616-8542 (kkvanrompay@ucdavis.edu).

**The Journal of Infectious Diseases   2001;184:429–38**
© 2001 by the Infectious Diseases Society of America. All rights reserved.
0022-1899/2001/18404-0006$02.00

most effective and safe strategy to prevent vertical HIV transmission. With the HIVNET012 regimen, the resistance mutation K103N in reverse transcriptase (RT) was detected in 3 of 15 women 6 weeks after a single dose of nevirapine [8], which may limit the efficacy of subsequent nevirapine use to protect infants during breast-feeding. This finding of nevirapine resistance is especially worrisome, because studies in adults found that these mutants can persist for a long time and can be transmitted [9–11]. In addition, although the vertical transmission rate of HIV-2 is lower than that of HIV-1 [12], nevirapine is not active against HIV-2. Finally, it is unclear whether immediate administration of 1 or 2 doses of drug to only the neonate can still be effective in the absence of any maternal treatment. This is important to know, because the price of this postexposure regimen for the neonate would be even lower. Thus, even with the recent results of several clinical trials, there remains a need for additional effective, safe, and simple intervention strategies.

For many reasons, the reverse-transcriptase inhibitor 9-[2-(phosphonomethoxy)propyl]adenine (PMPA; tenofovir) is an attractive candidate for preventing vertical HIV transmission. Because it is an acyclic nucleotide phosphonate analogue, the rate-limiting initial phosphorylation step required for activation of nucleoside analogues (e.g., zidovudine and lamivudine) is bypassed, and phosphorylation to the active diphosphate form occurs in both activated and resting cells, including macrophages [13, 14]. This active form has a long intracellular half-life(~12–15 h and 33–50 h in activated and resting peripheral blood mononuclear cells [PBMC], respectively) [13]. In addition, results of ongoing trials in HIV-1–infected adults suggest that PMPA treatment does not select rapidly for resistant mutants and has a good

430                                        Van Rompay et al.                                        JID 2001;184 (15 August)

safety profile [15]. Most importantly, previous studies in juvenile and newborn macaques have shown that PMPA is highly effective in preventing simian immunodeficiency virus (SIV) infection; a 2–4-week dosage regimen of PMPA was very effective in protecting macaques against intravenous or oral SIV infection, even when the regimen was initiated after exposure [16, 17]. PMPA was still partially effective in protecting newborn macaques against oral infection with SIV mutants with reduced in vitro susceptibility to PMPA [18].

In an attempt to identify the shortest and most affordable prophylactic regimen possible, we previously demonstrated that 2 doses of PMPA (30 mg/kg of body weight) administered subcutaneously 4 h before and 20 h after oral SIV inoculation are sufficient to protect newborn macaques [19]. Because this 30-mg/kg regimen is higher than the PMPA dose that has been used in human clinical trials, the goal of the present study was to investigate whether a much lower dose of PMPA (4 mg/kg) could still be effective. In addition, we investigated whether a 1- or 2-dose regimen of PMPA initiated 1 h after oral SIV inoculation could still protect newborn macaques against infection.

## Materials and Methods

*Animals.* All newborn rhesus macaques *(Macaca mulatta)* were from the type D retrovirus– and SIV-free colony at the California Regional Primate Research Center and were hand reared in a primate nursery, according to the American Association for Accreditation of Laboratory Animal Care standards [20]. When necessary, animals were immobilized with 10 mg/kg of ketamine-HCL (Parke-Davis) injected intramuscularly. Heparin- and EDTA-anticoagulated blood samples were collected immediately before virus inoculation and regularly thereafter to monitor for viral and immunologic parameters. Complete blood counts were performed on EDTA-anticoagulated blood samples from all animals. Samples were analyzed by using an automated electronic cell counter (Baker 9000; Serono Baker Diagnostics), and differential cell counts were determined manually. PMPA levels in heparinized plasma were determined by a validated reverse-phase ion-pair high-pressure liquid chromatography assay with fluorescence derivatization [21].

*Virus inoculation.* By age 3 days, newborn macaques were inoculated orally under ketamine anesthesia with 1 mL of an uncloned SIVmac251 virus stock administered atraumatically by dispensing the inoculum slowly into the mouth. Animals were monitored to ensure that the inoculum was swallowed. The SIVmac251 stock used in this study was propagated on rhesus PBMC, had a titer of $10^5$ $TCID_{50}$/mL, and was shown to infect newborn and juvenile macaques by the oral route and to cause persistent viremia and simian AIDS, as described elsewhere [16, 19, 22]. In the current study, animals that developed persistent viremia were removed from the study at age 3 weeks to become part of a different antiviral drug therapy study.

*Administration of drugs and immunizations.* PMPA (Gilead Sciences) was suspended in distilled water, dissolved by the addition of NaOH to a final pH of 7.0 at 60 mg/mL, filter sterilized (0.2 µm; Nalgene), and stored at 4°C. For animals given a 4-mg/kg dose, PMPA was first diluted to 6 mg/mL in sterile 0.9% sodium chloride (Abbott Laboratories). PMPA was administered subcu-

taneously into the back of the animal at a regimen of either 4 or 30 mg/kg of body weight per dose. Placebo-treated animals received an equivalent volume of 0.9% sodium chloride per kilogram of body weight.

All infant rhesus macaques were immunized subcutaneously with 0.1 mg of cholera toxin B subunit (List Biological Laboratories) at age 2 weeks, and a booster immunization was given at age 10 weeks. The cholera toxin–specific IgG ELISA has been described elsewhere [23]. Tetanus toxoid in alum (Wyeth Laboratories) was administered intramuscularly at a dose of 0.5 mL at ages 8 and 16 weeks.

Methylprednisolone (Solu-Medrol; Upjohn) was administered intramuscularly at 30 mg/kg of body weight for 7 days in the midafternoon. A repository form of methylprednisolone (Depo-Medrol; Upjohn) was administered intramuscularly at a dose of 10 mg/kg/day twice weekly (Tuesdays and Fridays) during 2 consecutive weeks (i.e., total of 4 administrations).

*Virus isolation (cell associated and cell free).* Levels of infectious virus in cells and plasma of peripheral blood were determined by a limiting dilution assay of PBMC and plasma, respectively, in cultures with CEMx174 cells in 24-well plates and subsequent p27 core antigen measurement by methods described elsewhere [24, 25]. Levels of infectious virus are expressed as $TCID_{50}$ per $10^6$ PBMC or per mL of plasma. For animals with low or undetectable virus load, $1 \times 10^6$ to $20 \times 10^6$ PBMC were cocultivated for 8 weeks with CEMx174 cells in tissue culture flasks, as described elsewhere [25]. For animals with undetectable virus levels, an axillary lymph node was recovered by transcutaneous biopsy and was teased aseptically into single-cell suspensions of mononuclear cells (LNMC). LNMC were cocultured with CEMx174 cells similarly to the method described above for PBMC.

*Polymerase chain reaction (PCR)–based detection of SIV proviral DNA sequences.* Nested PCR was done in a GeneAmp 9600 thermocycler (Perkin-Elmer Cetus). Two rounds of 25 cycles of amplification were performed on aliquots of PBMC or LNMC lysates (5–10 replicates/sample with $10^5$ cellular DNA equivalents or 600 ng of genomic DNA [equivalent to $10^5$ cells]/reaction tube), by using SIVmac-specific *gag* primers and conditions, as described elsewhere [26] with the following modifications. After lysis and proteinase K digestion, lysates were incubated for 10 min at 95°C. A first round of amplification was performed for 5 min at 95°C and then 25 cycles (20 s at 95°C, 30 s at 65°C, 40 s at 72°C) by use of outer SIV *gag* primer pairs 5'-ACTGTCTGCGTCATCTG-GTGC-3' and 5'-GTCCCAATCTGCAGCCTCCTC-3'. The second PCR round was started with a 1-min incubation at 95°C and then 25 cycles (20 s at 95°C, 30 s at 64°C, and 40 s at 72°C) with the internal SIV *gag* primers 5'-CACGCAGAAGAGAAAGTGA-AAC-3' and 5'-CTCTGATAATCTGCATAGCCGC-3'. To detect potential inhibitors of Taq polymerase in cell lysates, β-actin DNA sequences were amplified with 1 round of PCR with the primer pairs 5'-ACCCCAGCCATGTACGTTGCTATCC-3' and 5'-GCC-TCAGGGCAGCGGAACCGCTCA-3' [26]. Positive controls included lysates of PBMC from known SIV-infected animals or SIV-infected CEMx174 cells. The sensitivity of this PCR assay is 1 copy of SIV *gag* sequence per reaction. Negative controls included reactions in which uninfected CEMx174 or PBMC lysates of uninfected animals were used and reactions in which lysates were replaced with distilled water blanks.

*Drug susceptibility assay.* Phenotypic drug susceptibility of

Downloaded from https://academic.oup.com/jid/article-abstract/184/4/429/808643 by DOJ Libraries user on 27 September 2019

Downloaded from https://academic.oup.com/jid/article-abstract/184/4/429/808643 by DOJ Libraries user on 27 September 2019

SIVmac isolates was characterized by a previously described assay on the basis of a dose-dependent reduction of viral infectivity [24, 27]. This assay can detect SIV mutants with decreased susceptibility to PMPA and other antiretroviral drugs.

*Plasma viral RNA levels.* Plasma viral RNA levels were quantified with the SIV 3.0 RNA bDNA assay [28]. This assay is similar to the Quantiplex HIV RNA assay [29], except that target probes are designed to hybridize with the *pol* region of the SIVmac and SIVsm groups of virus strains, including SIVmac251. The lower quantification limit of this assay is normally 500 copies of SIV RNA per 0.5-mL specimen. However, because of the limited blood volume that can be collected from newborn macaques, plasma volumes of only 0.25 mL were available for testing during the early time points, which limited the sensitivity of this assay to >1000 copies/mL.

*Anti-SIV antibody determination.* The whole virus anti-SIV IgG ELISA has been described elsewhere [22, 27].

*Lymphocyte proliferative responses to SIV.* Antigen-specific proliferation was measured in PBMC from fresh blood samples, as described elsewhere [30]. The antigen was chemically inactivated, fusion-competent SIVmac239 (provided by J. Lifson, SAIC Frederick, National Cancer Institute–Frederick Cancer Research and Development Center, Frederick, MD) [31].

*Lymphocyte phenotyping by 3-color flow cytometry.* T lymphocyte antigens were detected by direct labeling of whole blood with PerCP-conjugated anti–human CD8 (clone SK1; Becton Dickinson Immunocytometry), phycoerythrin-conjugated anti–human CD4 (clone M-T477; PharMingen), and fluorescein-conjugated anti–human CD3 (clone SP34; PharMingen). A separate aliquot of blood was labeled with fluorescein-conjugated anti–human CD3 and PerCP-conjugated anti–human CD20 (clone L27; Becton Dickinson). Red blood cells were lysed, and the samples were fixed in paraformaldehyde by use of the Q-prep system (Coulter). Lymphocytes were gated by forward and side light scatter and then were analyzed by FACSCalibur flow cytometer (Becton Dickinson). CD4 T lymphocytes and CD8 T lymphocytes were defined as $CD3^+CD4^+$ and $CD3^+CD8^+$ lymphocyte populations, respectively. B lymphocytes were defined as $CD3^-CD20^+$ lymphocytes.

*Statistical analysis.* Statistical analysis of protection against SIV infection was done by comparing findings of PMPA-treated with those of control animals, using 1-sided Fisher's exact test and InStat version 2.031 software (GraphPad Software). Virus levels in peripheral blood during primary viremia were compared by calculating the area under the curve (AUC) for each animal for the first 3 weeks after SIV inoculation, followed by Wilcoxon rank sum test analysis [32]. We have shown elsewhere [24, 33–35] that these analyses can distinguish biologically relevant differences.

## Results

*Selection of 4-mg/kg PMPA dosage regimen.* A 24-h pharmacokinetic study in 2 uninfected newborn macaques revealed that the AUC for a single 30-mg/kg subcutaneous dose of PMPA was 164 μg/h/mL (range, 153–174 μg/h/mL; data not shown). At the highest dose of PMPA tested to date in human adults (3 mg/kg/day, intravenously), the steady-state AUC was 22.5 μg/h/mL [36]. Accordingly, the required subcutaneous PMPA dose for newborn macaques to produce an AUC similar

to this exposure in humans was estimated to be ∼4 mg of PMPA/kg of body weight.

*Experimental design.* Within the first 3 days after birth, 13 animals were inoculated orally with highly virulent SIVmac251 (figure 1). Four of these infants (group A) were placebo-treated control animals given multiple subcutaneous administrations of 0.9% physiologic saline solution. Four animals (group B) received an initial low dose of PMPA (4 mg/kg of body weight, subcutaneously) 4 h before the oral SIV inoculation and were given a second and final dose of PMPA 24 h later (i.e., 20 h after SIV inoculation). Four infants (group C) received 2 low doses of PMPA (4 mg/kg of body weight, subcutaneously) at 1 and 25 h after the oral SIV inoculation. Finally, 1 animal (group D) received a single high dose of PMPA (30 mg/kg, subcutaneously) 1 h after the oral SIV inoculation.

To monitor immunocompetence to nonviral test antigens, all infant rhesus macaques were immunized with cholera toxin B subunit at age 2 weeks; a booster immunization was given at age 10 weeks. Immunizations with tetanus toxoid were given at ages 8 and 16 weeks. To reactivate viremia from either latent or occult systemic infection in virus-negative and -seronegative infant macaques in this study, pharmacologic doses of the corticosteroid methylprednisolone were used, as described in Materials and Methods.

*Prophylactic efficacy of short-term PMPA regimens.* After oral SIVmac251 inoculation, all 4 placebo-treated infant macaques became persistently infected, as determined by virus isolation, PCR, and SIV-specific antibody production (tables 1–3). Virus replicated rapidly to peak levels within 2–3 weeks after infection; peak levels were 316–4640 $TCID_{50}/10^6$ PBMC, 46–5900 $TCID_{50}/mL$ of plasma, and $4 \times 10^6$ to $42 \times 10^6$ copies of RNA/mL of plasma. A single oral inoculation with the same dose of the SIVmac251 stock that was used in the present study



**Figure 1.** Experimental design. Four groups of newborn macaques were inoculated orally with highly virulent SIVmac251 (time 0). Group A, placebo-treated controls, was given multiple subcutaneous (sc) administrations of 0.9% physiologic saline solution. Groups B and C received 2 sc low doses of the reverse-transcriptase inhibitor 9-[2-(phosphonomethoxy)propyl]adenine (PMPA; 4 mg/kg of body weight), either 4 h before and 20 h after SIV inoculation (group B) or 1 h and 25 h after SIV inoculation (group C). The group D animal received a single sc high dose of PMPA (30 mg/kg) 1 h after the oral SIV inoculation. SIV, simian immunodeficiency virus.

Downloaded from https://academic.oup.com/jid/article-abstract/184/4/429/808643 by DOJ Libraries user on 27 September 2019

432 Van Rompay et al. JID 2001;184 (15 August)

**Table 1.** Detection of infectious virus in infant macaques following oral SIVmac251 inoculation.

| Group,[a] animal | Virus isolation from PBMC at indicated time (in weeks) after virus inoculation[b] | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 12 | 14 | 16 | 20 | 24 | 28 | 32 | 36 | 40 | 44–48 | LN[c] |
| A | | | | | | | | | | | | | | | | | | | |
| 30575 | − | + | + | + | + | + | + | + | + | + | + | + | + | + | + | + | +[d] | | |
| 30583 | + | + | + | +[d] | + | + | + | + | +[d] | | | | | | | | | | |
| 30849 | + | + | + | +[d] | | | | | | | | | | | | | | | |
| 30852 | + | + | + | + | + | + | + | + | + | + | + | + | + | + | + | + | + | + | ND |
| B | | | | | | | | | | | | | | | | | | | |
| 30576 | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − |
| 30577 | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − |
| 30842 | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − |
| 30847 | + | + | + | + | + | + | + | + | +[d] | | | | | | | | | | |
| C | | | | | | | | | | | | | | | | | | | |
| 30579 | + | + | + | + | + | + | + | + | +[d] | | | | | | | | | | |
| 30581 | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − | − |
| 30844 | + | + | + | + | + | + | + | + | + | + | +[d] | | | | | | | | |
| 30845 | − | − | + | − | − | + | − | − | − | − | − | − | − | − | − | − | − | − | − |
| D | | | | | | | | | | | | | | | | | | | |
| 30478 | − | − | − | − | ND | − | − | − | − | − | − | − | − | ND | ND | ND | ND | | − |

NOTE. Animals were inoculated within 3 days of birth orally with uncloned SIVmac251. ND, not done or not available; PBMC, peripheral blood mononuclear cells; PMPA, reverse-transcriptase inhibitor 9-[2-(phosphonomethoxy)propyl]adenine; SIV, simian immunodeficiency virus.

[a] Group A consisted of 4 placebo-treated animals. Groups B and C ($n = 4$ in each group) received 2 4-mg/kg doses of PMPA, either 4 h before and 20 h after (group B) or 1 h and 25 h after SIV inoculation (group C). Group D consisted of 1 animal that received a single 30-mg/kg dose of PMPA 1 h after SIV inoculation.

[b] Virus isolation results shown as detectable (+) or undetectable (−) virus. No. of PBMC used for virus isolation from animals with low or undetectable virus levels depended on availability (range, $1 \times 10^6$ to $4.5 \times 10^6$ PBMC for the first 12 weeks and up to $20 \times 10^6$ PBMC afterward).

[c] No virus could be isolated from $5 \times 10^6$ to $25 \times 10^6$ lymph node (LN) mononuclear cells recovered by biopsy of axillary LN. LNs were collected at age 44 or 48 weeks, except for animal 30478 (biopsy done at age 85 weeks).

[d] Time of euthanasia because of simian AIDS.

had previously infected 12 of 12 newborn macaques by the oral route [16, 19]. Accordingly, the course of infection of the 4 placebo-treated animals is representative of a larger number of historical SIV-infected control animals.

Of the 9 animals given 1 or 2 doses of PMPA, 3 animals (30847 [group B] and 30579 and 30844 [group C]) became persistently infected. The time course of the primary viremia and the peak levels in these 3 animals during the first 3 weeks of infection (316–3160 $TCID_{50}/10^6$ PBMC, 46–17,780 $TCID_{50}/$ mL of plasma, and $17 \times 10^6$ to $152 \times 10^6$ copies of RNA/mL of plasma) were indistinguishable from those of the 4 placebo-treated infected animals and the historical control animals. All 7 animals maintained persistent viremia (viral RNA between $10^5$ and $3 \times 10^8$ copies/mL of plasma; positive by virus isolation and PCR); 5 of the 7 animals developed simian AIDS and were killed by ages 2–5 months; the 2 remaining animals had a slower disease course.

In contrast to the 7 animals that became persistently viremic, 3 group B animals (30576, 30577, and 30842), 2 group C animals (30581 and 30845), and 1 group D animal (30478) were protected against persistent viremia and disease. Of these 6 "protected" animals, no infectious virus could be isolated from PBMC, plasma, or LNMC from 5 animals throughout the 1-year observation period (table 1). The exception was group C animal 30845: virus was isolated from $2 \times 10^6$ PBMC of this animal at 2 time points (at ages 3 and 6 weeks). On the basis of a limiting dilution culture assay, infectious virus levels at these times were very low (<1 infected cell/400,000 PBMC). Viral RNA levels in plasma at these 2 time points also were

below the limit of detection (<1000 copies/mL). Both virus isolates from 30845 had wild type in vitro susceptibility to PMPA. No virus was isolated from animal 30845 after age 6 weeks (table 1). In addition, for all 6 protected animals, no virus was isolated from plasma throughout the observation period or

**Table 2.** Transient detection of proviral DNA in peripheral blood mononuclear cells of "protected" infant macaques after oral SIVmac251 inoculation.

| Group,[a] animal | No. of positive reactions/total PCR replicates[b] at indicated times (in weeks) after virus inoculation | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 6 | 8 | 10–12 | 20–24 | 44–48 | LN[c] |
| B | | | | | | | | | | |
| 30576 | 0/10 | 1/5 | 5/5 | NA | 1/5 | 0/10 | 0/10 | 0/10 | 0/10 | 0/5 |
| 30577 | 0/10 | 1/5 | 1/5 | NA | 2/10 | 0/10 | 0/10 | 0/10 | 0/6 | 0/6 |
| 30842 | 0/10 | NA | NA | 1/5 | 0/5 | 0/5 | 0/10 | 0/10 | 0/10 | 0/5 |
| C | | | | | | | | | | |
| 30581 | 0/9 | NA | 3/5 | 2/5 | 0/5 | 0/10 | 0/10 | 0/10 | 0/10 | 0/5 |
| 30845 | 0/10 | 3/5 | NA | 0/5 | 0/10 | 0/5 | 0/10 | 0/10 | 0/6 | 0/6 |
| D | | | | | | | | | | |
| 30478 | 0/5 | 0/5 | 0/5 | 1/5 | 0/6 | 0/5 | 0/5 | 0/5 | 0/10 | 0/10 |

NOTE. Animals were inoculated orally within 3 days of birth with uncloned SIVmac251. NA, not available; PCR, polymerase chain reaction; PMPA, reverse-transcriptase inhibitor 9-[2-(phosphonomethoxy)propyl]adenine; SIV, simian immunodeficiency virus.

[a] Groups B and C ($n = 4$ in each group) received 2 4-mg/kg doses of PMPA, either 4 h before and 20 h after (group B) or 1 h and 25 h after SIV inoculation (group C). Group D consisted of 1 animal that received a single 30-mg/kg dose of PMPA 1 h after SIV inoculation.

[b] PCR to detect SIV *gag* sequences was done with $10^5$ cellular DNA equivalents/reaction tube. Sensitivity of this assay is ~1 copy/reaction.

[c] Lymph node (LN) mononuclear cells were recovered by biopsy of axillary LN. These LNs were collected at age 44–48 weeks, except for animal 30478 (biopsy done 85 weeks after virus inoculation).

Downloaded from https://academic.oup.com/jid/article-abstract/184/4/429/808643 by DOJ Libraries user on 27 September 2019

**Table 3.**  Anti-SIVmac251 antibody responses in reverse-transcriptase inhibitor 9-[2-(phosphonomethoxy)propyl]adenine (PMPA)–treated infant rhesus macaques.

| Group,[a] animal | Anti-SIV IgG titer at indicated times (in weeks) after virus inoculation[b] | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 2 | 3 | 4 | 6 | 8 | 10 | 12 | 14 | 16 | 20 | 24 and 28 |
| **A** | | | | | | | | | | | | |
| 30575 | <100 | 100 | 400 | 25,600 | 102,400 | 102,400 | 102,400 | 102,400 | 102,400 | 102,400 | >102,400 | >102,400 |
| 30583 | <100 | 100 | 400 | 400 | 100 | <100 | <100 | <100[c] | | | | |
| 30849 | <100 | 100 | 1600 | 25,600[c] | | | | | | | | |
| 30852 | <100 | <100 | 6400 | 6400 | 25,600 | 102,400 | 102,400 | >102,400 | >102,400 | >102,400 | >102,400 | >102,400 |
| **B** | | | | | | | | | | | | |
| 30576 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | 100 | 100 | <100 | <100 | <100 |
| 30577 | <100 | <100 | 100 | 100 | 100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 |
| 30842 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | 100 | 100 | <100 |
| 30847 | <100 | <100 | 6400 | 6400 | 6400 | 6400 | 6400[c] | | | | | |
| **C** | | | | | | | | | | | | |
| 30579 | <100 | 1600 | 1600 | 6400 | 25,600 | 6400 | 6400 | 1600[c] | | | | |
| 30581 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 |
| 30844 | <100 | 400 | 400 | 1600 | 1600 | 1600 | 1600 | 400 | 400 | 400[c] | | |
| 30845 | <100 | <100 | 100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 |
| **D** | | | | | | | | | | | | |
| 30478 | <100 | 400 | 1600 | 1600 | 1600 | 400 | 400 | 100 | 100 | 100 | <100 | <100 |

NOTE.   SIV, simian immunodeficiency virus.

[a] All animals were inoculated with SIVmac251 shortly after birth. Group A consisted of 4 placebo-treated animals. Groups B and C ($n = 4$ in each group) received 2 4-mg/kg doses of PMPA, either 4 h before and 20 h after (group B) or 1 h and 25 h after SIV inoculation (group C). Group D consisted of 1 animal that received a single 30-mg/kg dose of PMPA 1 h after SIV inoculation. Underlined animal nos. indicate infants that were protected against persistent viremia (see tables 1 and 2).

[b] Anti-SIV IgG titers at indicated weeks after virus inoculation were determined by ELISA and are expressed as the reciprocal of the highest of 4-fold dilutions (starting from 1:100, with 2 replicates per dilution) that gave a positive optical density above cutoff value. Titers ≥100 are indicated in bold type.

[c] Time of euthanasia because of simian AIDS.

from axillary lymph node–derived mononuclear cells obtained at ages 44–85 weeks (table 1).

PBMC and LNMC of the 6 protected animals also were tested for the presence of proviral DNA by nested PCR analysis. Proviral DNA was detected at varying frequencies in PBMC of all animals at ≥1 time point during the first 6 weeks after SIV inoculation. From week 8 onward, no proviral DNA was detected in either PBMC or LNMC (table 2).

Plasma samples of these animals also were tested for the development of anti-SIV IgG responses. As we have observed elsewhere [27, 33], the animals that developed persistent viremia had either weak and transient antibody responses (associated with high virus levels, rapid immunosuppression, and rapid disease progression) or persistent responses (associated with a slower disease course; table 3). Five of the 6 protected animals also had evidence of transient antibody responses. SIV-specific IgG was detected transiently at low titers (1:100) in animals 30576, 30577, and 30842 (group B) and 30845 (group C) within the first 5 months of life. Animal 30478 (group D), which was consistently negative by virus isolation (table 1), developed a moderate SIV IgG response (titer 1:1600) 3–6 weeks after SIV inoculation; the titer then declined and became undetectable from week 20 onward. This animal did not have any proliferative lymphocyte responses to SIV when tested at age 23 months (data not shown). The weak SIV-specific antibody responses in these protected infants could not be attributed to age-related immaturity of the immune system. Immunocompetence was demonstrated by the observation that all 6 protected animals mounted very rapid and strong antibody responses against cholera toxin subunit B after immunization at age 2 weeks (IgG titers >102,400 within 4 weeks after immunization; data not shown).

*Statistical analysis of protection.*   Because some of the PMPA-treated infant macaques had evidence suggesting an initial transient or abortive infection (see above), prophylactic efficacy was defined as "the absence of persistent viremia, seroconversion, and disease." According to this definition, animals 30576, 30577, and 30842 (group B), 30581 and 30845 (group C), and 30478 (group D) were considered to be protected.

Twelve untreated historical control animals became persistently infected after oral inoculation with the same inoculum in the preceding 2 years. Inclusion of these control animals in the statistical analysis revealed that the 2-dose 4-mg/kg regimens of groups B and C offered statistically significant protection ($P < .05$; table 4). Combination of the results of the 3 PMPA-treated groups (B–D) strongly demonstrates the beneficial effects of early 1- or 2-dose PMPA regimens against oral SIV infection ($P = .0005$).

*Safety of the 1- or 2-dose PMPA regimen.*   There was no detectable toxicity with 1 or 2 doses of PMPA. All the animals protected against persistent SIV viremia had normal $CD4^+$ and $CD8^+$ T lymphocyte counts and B lymphocyte counts throughout the observation period. In addition, these animals had rapid weight gain, which was similar to uninfected infants at the California Regional Primate Research Center, normal serum chemistry values, and normal urine parameters (absence of glucosuria

Van Rompay et al.

Downloaded from https://academic.oup.com/jid/article-abstract/184/4/429/808643 by DOJ Libraries user on 27 September 2019

**Table 4.** Statistical analysis of protection against oral simian immunodeficiency virus (SIV) infection.

| Group[a] | Infected | Protected | $P$[b] |
|---|---|---|---|
| A + 12 historical control animals | 16 | 0 | — |
| B | 1 | 3 | .0035 |
| C | 2 | 2 | .032 |
| D | 0 | 1 | .059 |
| B + C + D combined | 3 | 6 | .0005 |

NOTE. "Infected" and "protected" refer to no. of animals with or without persistent viremia, respectively. PMPA, reverse-transcriptase inhibitor 9-[2-(phosphonomethoxy)propyl]adenine.

[a] Group A consisted of 4 placebo-treated animals. Groups B and C ($n = 4$ in each group) received 2 4-mg/kg doses of PMPA, either 4 h before and 20 h after (group B) or 1 h and 25 h after SIV inoculation (group C). Group D consisted of 1 animal that received a single 30-mg/kg dose of PMPA 1 h after SIV inoculation.

[b] $P$ values in comparison with 16 untreated control animals were calculated by using 1-sided Fisher's exact test.

and proteinuria). These animals were healthy at ages 19–23 months.

*Immune activation or pharmacologic immunosuppression fails to reactivate viral replication in animals with transient viremia.* Because it was unclear whether the protected animals had cleared virus or whether they still had an occult or latent infection [30], we used 2 strategies to reactivate viral replication. Selection of these regimens was based on their demonstrated ability to increase virus levels in HIV-1–infected chimpanzees [37, 38].

Immune activation provided by tetanus toxoid immunizations (at ages 8 and 16 weeks) and cholera toxin subunit B immunization (at ages 2 and 10 weeks) failed to induce persistent viremia or seroconversion (tables 1–3). Next, to induce immunosuppression, the 5 protected group B and C animals (30576, 30577, 30581, 30842, and 30845) were treated with corticosteroids at about age 1 year. Methylprednisolone (Solu-Medrol) was injected intramuscularly at 30 mg/kg of body weight during 7 days in the midafternoon. After 6 weeks without treatment, a repository form of methylprednisolone (Depo-Medrol) was administered intramuscularly at a dose of 10 mg/kg, twice weekly for 2 consecutive weeks.

Corticosteroid treatment induced transient 2–3-fold increases in neutrophil counts and 2–6-fold reductions in total lymphocyte counts in all animals. The reductions in total lymphocyte counts were reflected in both CD4 and CD8 T lymphocyte fractions (figure 2). Compared with the 1-week Solu-Medrol treatment, the 2-week repository Depo-Medrol treatment was more potent in suppressing lymphocyte populations, as nadir levels were 420–1550 total lymphocytes, 143–634 CD4 T lymphocytes, and 100–297/$\mu$L CD8 T lymphocytes.

Heparinized blood samples were collected from these 5 animals on a regular basis during an 8-month period after the start of the corticosteroid treatment (including all time points indicated in figure 2). No virus could be isolated from PBMC or plasma. For virus isolation at each time point, we used $1 \times 10^6$ to $10 \times 10^6$ PBMC and 0.2–0.5 mL of plasma. No proviral DNA was detected by PCR at these time points (with 5–10 replicates/sample; data not shown). Plasma samples collected at the 2 time points when lymphocyte counts were lowest (i.e., weeks 9 and 11; figure 2) also were analyzed for the presence of viral RNA by bDNA assay. All of these samples had undetectable RNA levels (<500 copies of RNA/mL of plasma). Thirteen weeks after the initiation of the Solu-Medrol treatment (i.e., 4 weeks after withdrawing Depo-Medrol treatment), an axillary lymph node biopsy was performed. No virus was isolated from $2.5 \times 10^6$ to $10.5 \times 10^6$ LNMC, and no proviral DNA was detected by PCR for any of the 5 animals. No SIV-specific IgG antibodies were detected in any of the plasma samples collected during and after the corticosteroid treatment (SIV-specific IgG ELISA titers <1:100). These animals remained negative, as determined by virus isolation, PCR, and serology throughout the rest of the observation period (i.e., until age 19–22 months).

After lymphocyte counts had returned to baseline values, PBMC of these corticosteroid-treated animals were tested for SIV-specific T lymphocyte proliferative responses at 4 time points (11, 14, 17, and 23 weeks after withdrawal of Depo-Medrol). Three animals (30577, 30581, and 30845) had negative results (stimulation index [SI], <2) at all 4 time points. Weak proliferative responses (SI, 2–2.5) were detected for the other 2 animals (30576 and 30842) at a single time point; no responses (SI, <2) were detected at all other time points. Because uninfected macaques can occasionally have SI values between 2 and 2.5, the significance of this single detection of a weak response in animals 30576 and 30842 is not clear. In conclusion, neither immune activation nor immunosuppression resulted in detectable viral replication.

## Discussion

Our results extend a number of observations previously made in our animal model, which suggests the strong potential of short-term PMPA administration to reduce intrapartum transmission of HIV-1 and HIV-2 from mother to infant. In particular, our present studies demonstrate that very short regimens (1 or 2 doses) of PMPA are still effective, including a low dose (4 mg/kg), and when PMPA was administered only after exposure to virus.

We previously demonstrated that 2 relatively high doses of PMPA (30 mg/kg) given 4 h before and 20 h after oral SIV inoculation protected all 4 newborn macaques; these animals had no evidence of an initial transient or abortive infection [19]. In the present study, we found that 2 lower doses of PMPA (4 mg/kg) given at the same times (−4 and +20 h relative to virus inoculation) were still partially protective, since 3 of the 4 animals were protected against persistent viremia and disease. For



Downloaded from https://academic.oup.com/jid/article-abstract/184/4/429/808643 by DOJ Libraries user on 27 September 2019

**Figure 2.** Effect of corticosteroid treatment on blood cell counts. At ~1 year of age (time 0, *solid arrow*), animals were started on daily intramuscular methylprednisolone (Solu-Medrol; Upjohn) treatment at 30 mg/kg of body weight for 7 consecutive days *(shaded area)*. After 6 weeks without treatment, a repository form of methylprednisolone (Depo-Medrol; Upjohn; *open arrow*) was administered intramuscularly at a dose of 10-mg/kg twice weekly for 2 consecutive weeks (weeks 7–9; *shaded area*). Cell counts (per microliter) are indicated for CD4+ and CD8+ T lymphocytes.

practical reasons, we did not administer a first dose of PMPA to pregnant female macaques at the onset of delivery. Instead, the first dose of PMPA was given directly to the newborns before virus inoculation. However, this approach should be equivalent to giving the first dose to a pregnant woman at the onset of delivery, because PMPA crosses the primate placenta quite efficiently [16, 39].

The present study is the first to demonstrate that a 1- or 2-dose postexposure regimen can be protective. The prophylactic success for such short regimens is probably because drug administration was started very soon (1 h) after virus exposure. Currently, only 2 compounds have been very successful in preventing infection of macaques when treatment was started after virus inoculation: PMPA and 2′,3′-dideoxy-3′-hydroxymethyl cytidine (BEA-005). Studies with both of these compounds demonstrated that the timing (i.e., the interval between exposure and the first dose of drug) and the duration of treatment greatly affect the success of postexposure prophylaxis; the sooner the first dose of drug is administered, the shorter the minimum duration required for protection [17, 40–42]. A 1-day treatment regimen of BEA-005 (3 10-mg/kg/day doses) protected cynomolgus macaques against intravenous low-dose SIVsm challenge, if started 1 h after virus inoculation; if treatment was delayed until 3 h after exposure, 3 days of BEA-005 treatment were required to achieve protection [42]. In a similar way, postexposure prophylaxis regimens of PMPA (30 mg/kg) were effective when started 24 h after intravenous SIVmne inoculation, but only with a longer

duration of treatment (i.e., 28 days) [41]. In contrast, a 28-day combination regimen of zidovudine, lamivudine, and indinavir failed to protect cynomolgus macaques, even when started 4 h after intravenous SHIV89.6P inoculation [43].

Evidence suggests that postexposure HIV prophylaxis can be effective in humans. An observational study in New York state found that, in the absence of zidovudine administration to the HIV-infected mother before or during delivery, initiation of a 6-week zidovudine treatment course to the infant within the first 3 days of life still lowered the rate of infection in the infants [44]. Zidovudine prophylaxis to health care workers after occupational exposure to HIV is estimated to reduce the risk of infection by 80% [45]. Current recommendations for postexposure prophylaxis of health care workers include administration of a combination of antiviral drugs for 4 weeks [45, 46]. Although a postexposure drug regimen for 4–6 weeks probably is more effective than very short regimens, our data suggest that, in situations where issues such as costs, compliance, or fear of toxicity prohibit the ideal duration of treatment, a 1- or 2-dose regimen with potent drugs, such as PMPA, can still be beneficial if administered as soon as possible after exposure.

Our data suggest that the protected PMPA-treated animals in the present study experienced an initial transient viremia or abortive infection. This finding was not completely unexpected. In a previous study with newborn macaques, a 2-week PMPA regimen (30 mg/kg) starting immediately after virus inoculation was effective in protecting 3 of the 4 animals against persistent viremia

Van Rompay et al.

Downloaded from https://academic.oup.com/jid/article-abstract/184/4/429/808643 by DOJ Libraries user on 27 September 2019

and disease, but these 3 animals also had evidence of an initial transient viremia with transient detection of antiviral immune responses and viral RNA [16]. Other investigators demonstrated that postexposure PMPA prophylaxis initiated 24 h after intravenous SIVsmE660 inoculation could protect juvenile macaques against persistent viremia, but the detection of SIV-specific lymphocyte proliferative responses suggests that these animals experienced a transient or low-level infection [31]. In HIV-1–inoculated chimpanzees receiving pre-exposure nevirapine prophylaxis, proviral DNA also was detected at some time points in the absence of infectious virus and seroconversion [47].

We hypothesize that the transient detection of virus and antiviral immune responses that we observed in our protected animals was due to infection with replication-defective or replication-impaired viral variants that were present in the virus inoculum, as explained elsewhere [16]. Alternatively, it is possible that infection with a pathogenic variant at a very low level can be contained by early innate and/or acquired immune responses. The limited blood volume that can be collected from newborn macaques did not allow for the assessment of cell-mediated immune responses during these early stages. Detection of antiviral immune responses or transient low levels of virus without persistent seroconversion also has been described in HIV-exposed adults and perinatally exposed infants [48–56]. Further studies of this phenomenon of transient/abortive infection are useful, as the ability to clear viremia provides hope for developing an HIV vaccine to prevent or abort HIV infection [31].

It is not clear whether infection in these protected animals was completely cleared or whether infection persisted at very low levels. We tried 2 approaches to reactivate virus, immune activation (by immunization with tetanus toxoid and cholera toxin B subunit) and immunosuppression (through administration of corticosteroids). Both of these approaches were expected to increase viral replication. Immunization with common recall antigens induced transient increases in plasma viremia in HIV-1–infected patients and HIV-1–infected chimpanzees [37, 57, 58]. In addition, the corticosteroid regimens that we used previously increased virus levels in HIV-1–infected chimpanzees [38]. Neither of these approaches led to detectable virus levels or seroconversion in our protected infant macaques. Although low levels of SIV-specific lymphocyte proliferative responses were detected at a single time point in 2 animals, these responses were not persistently detectable; thus, their significance is unclear. The animals were negative by all other criteria throughout the observation period to age 19–22 months. The finding of this transient or abortive infection in the protected animals, whereas other animals in the experimental groups demonstrated persistent infection (similar to that of the untreated animals), suggests that the reduced PMPA dosage regimens that were used in this study were at the borderline to achieve protection.

In prophylaxis studies in animal models, the virus inoculum dose required to induce persistent infection of 100% of un-

treated control animals is probably higher than the amount of virus that would be encountered during a normal sexual or perinatal exposure. This may explain why administration of zidovudine and other nucleoside analogs during several weeks usually was not effective in preventing SIV infection (reviewed in [59]). Our studies with newborn macaques used the highly virulent uncloned SIVmac251 isolate, which induces persistently high viremia and rapid disease in the majority of untreated newborn macaques [33, 34]. All available evidence suggests that prophylaxis is more difficult to achieve against highly virulent uncloned isolates than against molecularly cloned or attenuated virus isolates. In addition, protection is more frequently seen in nonpathogenic or attenuated models (e.g., HIV-1 infection of chimpanzees) than in highly virulent models (e.g., SIVmac251 infection of macaques). In this context, uncloned SIVmac251 has been one of the most difficult SIV isolates to protect against [60]. Altogether, these findings suggest that when an intervention strategy gives even partial protection in a highly virulent animal model, its efficacy in reducing intrapartum infection may be even more pronounced for human newborns. Thus, the prophylactic success of short and low PMPA dosage regimens in newborn macaques against the highly virulent SIVmac251 virus is impressive and promising.

In conclusion, our data further emphasize the potential of short PMPA regimens to reduce vertical transmission of HIV, especially in developing countries. The data suggest that administration of PMPA to HIV-infected pregnant women at the onset of labor and/or immediate administration to their newborns could reduce the rate of intrapartum transmission of HIV-1 and HIV-2.

## Acknowledgments

We thank S. Au, D. Bennett, C. Berardi, J. Bernales, I. Bolton, L. Brignolo, R. Buchholz, I. Cazares, K. Christe, J. Colladay, A. Enriquez, L. Fritts, L. Hirst, A. Spinner, W. von Morgenland, and Colony Services of the California Regional Primate Research Center for expert technical assistance and Jennifer E. Booth (Bayer Reference Testing Laboratory, Bayer Diagnostics, Emeryville, CA) for viral RNA measurements by bDNA assay.

## References

1. UNAIDS/WHO. AIDS epidemic update. Geneva: World Health Organization, December 2000.
2. Kourtis AP, Bulterys M, Nesheim SR, Lee FK. Understanding the timing of HIV transmission from mother to infant. JAMA 2001;285:709–11.
3. Mofenson LM. Interaction between timing of perinatal human immunodeficiency virus infection and the design of preventive and therapeutic interventions. Acta Paediatr Suppl 1997;421:1–9.
4. Shaffer N, Chuachoowong R, Mock PA, et al. Short-course zidovudine for perinatal HIV-1 transmission in Bangkok, Thailand: a randomized controlled trial. Lancet 1999;353:773–80.
5. Guay LA, Musoke P, Fleming T, et al. Intrapartum and neonatal single-dose nevirapine compared with zidovudine for prevention of mother-to-child

Downloaded from https://academic.oup.com/jid/article-abstract/184/4/429/808643 by DOJ Libraries user on 27 September 2019

transmission of HIV-1 in Kampala, Uganda: HIVNET 012 randomized trial. Lancet **1999**;354:795–802.

6. Wiktor S, Ekpini E, Karon JM. Short-course oral zidovudine for prevention of mother-to-child transmission of HIV-1 in Abidjan, Côte d'Ivoire: a randomised trial. Lancet **1999**;353:781–5.

7. Dabis F, Msellati P, Meda N, et al. 6-month efficacy, tolerance, and acceptability of a short regimen of oral zidovudine to reduce vertical transmission of HIV in breastfed children in Côte d'Ivoire and Burkina Faso: a double-blind placebo-controlled multicentre trial. Lancet **1999**;353:786–92.

8. Jackson JB, Becker-Pergola G, Guay LA, et al. Identification of the K103N resistance mutation in Ugandan women receiving nevirapine to prevent HIV-1 vertical transmission. AIDS **2000**;14:F111–5.

9. Richman DD, Havlir D, Corbeil J, et al. Nevirapine resistance mutations of human immunodeficiency virus type 1 selected during therapy. J Virol **1994**;68:1660–6.

10. Salomon H, Wainberg M, Brenner B, et al. Prevalence of HIV-1 resistant to antiretroviral drugs in 81 individuals newly infected by sexual contact or injecting drug use. Investigators of the Quebec Primary Infection Study. AIDS **2000**;14:F17–23.

11. Boden D, Hurley A, Zhang L, et al. HIV-1 drug resistance in newly infected individuals. JAMA **1999**;282:1135–41.

12. O'Donovan D, Ariyoshi K, Milligan P, et al. Maternal plasma viral RNA levels determine marked differences in mother-to-child transmission rates of HIV-1 and HIV-2 in The Gambia. AIDS **2000**;14:441–8.

13. Robbins BL, Srinivas RV, Kim C, Bischofberger N, Fridland A. Anti–human immunodeficiency virus activity and cellular metabolism of a potential prodrug of the acyclic nucleoside phosphonate 9-R-(2-phosphonomethoxypropyl)adenine (PMPA), bis(isopropyloxymethylcarbonyl)PMPA. Antimicrob Agents Chemother **1998**;42:612–7.

14. Perno CF, Balestra E, Aquaro S, et al. Potent inhibition of human immunodeficiency virus and herpes simplex virus type 1 by 9-(2-phosphonylmethoxyethyl)adenine in primary macrophages is determined by drug metabolism, nucleotide pools, and cytokines. Mol Pharmacol **1996**;50:359–66.

15. Barditch-Crovo P, Deeks SG, Collier A, et al. Phase I/II trial of the pharmacokinetics, safety, and antiretroviral activity of tenofovir disoproxil fumarate in HIV-1–infected adults. Antimicrob Agents Chemother (in press).

16. Van Rompay KKA, Marthas ML, Lifson JD, et al. Administration of 9-[2-(phosphonomethoxy)propyl]adenine (PMPA) for prevention of perinatal simian immunodeficiency virus infection in rhesus macaques. AIDS Res Hum Retroviruses **1998**;14:761–73.

17. Tsai CC, Follis KE, Beck TW, et al. Prevention of simian immunodeficiency virus infection in macaques by 9-(2-phosphonylmethoxypropyl)adenine (PMPA). Science **1995**;270:1197–9.

18. Van Rompay KKA, Miller MD, Marthas ML, et al. Prophylactic and therapeutic benefits of short-term 9-[2-(R)-(phosphonomethoxy)propyl]adenine (PMPA) administration to newborn macaques following oral inoculation with simian immunodeficiency virus with reduced susceptibility to PMPA. J Virol **2000**;74:1767–74.

19. Van Rompay KKA, Berardi CJ, Aguirre NL, et al. Two doses of PMPA protect newborn macaques against oral simian immunodeficiency virus infection. AIDS **1998**;12:F79–83.

20. National Research Council. Guide for the care and use of laboratory animals. Washington, DC: National Academy Press, **1996**.

21. Shaw JP, Sueoka CM, Oliyai R, et al. Metabolism and pharmacokinetics of a novel oral prodrug of 9-[(R)-2-(phosphonomethoxy)propyl]adenine (PMPA) in dogs. Pharm Res **1997**;14:1824–9.

22. Van Rompay KKA, Berardi CJ, Dillard-Telm S, et al. Passive immunization of newborn rhesus macaques prevents oral simian immunodeficiency virus infection. J Infect Dis **1998**;177:1247–59.

23. Van Rompay KKA, Otsyula MG, Tarara R RP, et al. Vaccination of pregnant macaques protects newborns against mucosal simian immunodeficiency virus infection. J Infect Dis **1996**;173:1327–35.

24. Van Rompay KKA, Otsyula MG, Marthas ML, Miller CJ, McChesney MB, Pedersen NC. Immediate zidovudine treatment protects simian immuno-

deficiency virus–infected newborn macaques against rapid onset of AIDS. Antimicrob Agents Chemother **1995**;39:125–31.

25. Van Rompay KKA, Marthas ML, Ramos RA, et al. Simian immunodeficiency virus (SIV) infection of infant rhesus macaques as a model to test antiretroviral drug prophylaxis and therapy: oral 3'-azido-3'-deoxythymidine prevents SIV infection. Antimicrob Agents Chemother **1992**;36:2381–6.

26. Lü X, Kiyono H, Lu D, et al. Targeted lymph-node immunization with whole inactivated simian immunodeficiency virus (SIV) or envelope and core subunit antigen vaccines does not reliably protect rhesus macaques from vaginal challenge with SIVmac251. AIDS **1998**;12:1–10.

27. Van Rompay KKA, Cherrington JM, Marthas ML, et al. 9-[2-(phosphonomethoxy)propyl]adenine therapy of established simian immunodeficiency virus infection in infant rhesus macaques. Antimicrob Agents Chemother **1996**;40:2586–91.

28. Booth J, Sawyer L, McNelley E, et al. Performance characteristics of a highly sensitive quantitative assay for SIV RNA using branched DNA technology [abstract 129]. Presented at: 18th Annual Symposium on Nonhuman Primate Models for AIDS (Madison, WI), **2000**:150.

29. Pachl C, Todd JA, Kern DG, et al. Rapid and precise quantification of HIV-1 RNA in plasma using a branched DNA signal amplification assay. J Acquir Immune Defic Syndr Human Retrovirol **1995**;8:446–54.

30. McChesney MB, Collins JR, Lu D, et al. Occult systemic infection and persistent simian immunodeficiency virus (SIV)–specific proliferative responses in rhesus macaques that were transiently viremic after intravaginal inoculation of SIV. J Virol **1998**;72:10029–35.

31. Lifson JD, Rossio JL, Arnaout R, et al. Containment of simian immunodeficiency virus infection: cellular immune responses and protection from rechallenge following transient postinoculation antiretroviral treatment. J Virol **2000**;74:2584–93.

32. Dawson-Saunders B, Trapp RG. Basic and clinical biostatistics. Norwalk, CT: Appleton and Lange, **1990**.

33. Marthas ML, Van Rompay KKA, Otsyula M, et al. Viral factors determine progression to AIDS in simian immunodeficiency virus–infected newborn rhesus macaques. J Virol **1995**;69:4198–205.

34. Van Rompay KKA, Dailey PJ, Tarara RP, et al. Early short-term 9-[2-(phosphonomethoxy)propyl]adenine (PMPA) treatment favorably alters subsequent disease course in simian immunodeficiency virus–infected newborn rhesus macaques. J Virol **1999**;73:2947–55.

35. Van Rompay KKA, Cherrington JM, Marthas ML, et al. 9-[2-(phosphonomethoxy)propyl]adenine (PMPA) therapy prolongs survival of infant macaques inoculated with simian immunodeficiency virus with reduced susceptibility to PMPA. Antimicrob Agents Chemother **1999**;43:802–12.

36. Deeks SG, Barditch-Crovo P, Lietman PS, et al. Safety, pharmacokinetics and antiretroviral activity of intravenous 9-[2-(R)-(phosphonomethoxy)propyl]adenine, a novel anti–human immunodeficiency virus (HIV) therapy, in HIV-infected adults. Antimicrob Agents Chemother **1998**;42:2380–4.

37. Fultz PN, Gluckman JC, Muchmore E, Girard M. Transient increases in numbers of infectious cells in an HIV-infected chimpanzee following immune stimulation. AIDS Res Hum Retroviruses **1992**;8:313–7.

38. Shibata R, Siemon C, Rizvi TA, et al. Reactivation of HIV type 1 in chronically infected chimpanzees following xenostimulation with human cells or with pulses of corticosteroid. AIDS Res Hum Retroviruses **1997**;13:377–81.

39. Tarantal AF, Marthas ML, Shaw JP, Cundy K, Bischofberger N. Administration of 9-[2-(R)-(phosphonomethoxy)propyl]adenine (PMPA) to gravid and infant rhesus macaques *(Macaca mulatta)*: safety and efficacy studies. J Acquir Immune Defic Syndr Human Retrovirol **1999**;20:323–33.

40. Otten RA, Smith DK, Adams DR, et al. Efficacy of postexposure prophylaxis after intravaginal exposure of pig-tailed macaques to a human-derived retrovirus (human immunodeficiency virus type 2). J Virol **2000**;74:9771–5.

41. Tsai CC, Emau P, Follis KE, et al. Effectiveness of postinoculation (R)-9-(2-phosphonylmethoxypropyl)adenine treatment for prevention of persistent simian immunodeficiency virus SIVmne infection depends critically on timing of initiation and duration of treatment. J Virol **1998**;72:4265–73.

42. Böttiger D, Johansson NG, Samuelsson B, et al. Prevention of simian immuno-

deficiency virus, SIVsm, or HIV-2 infection in cynomolgus monkeys by pre- and postexposure administration of BEA-005. AIDS **1997**;11:157–62.

43. Le Grand R, Vaslin B, Larghero J, et al. Post-exposure prophylaxis with highly active antiretroviral therapy could not protect macaques from infection with SIV/HIV chimera. AIDS **2000**;14:1864–6.

44. Wade NA, Birkhead GS, Warren BL, et al. Abbreviated regimens of zidovudine prophylaxis and perinatal transmission of the human immunodeficiency virus. N Engl J Med **1998**;339:1409–14.

45. Centers for Disease Control and Prevention. Public Health Service guidelines for the management of health-care worker exposures to HIV and recommendations for postexposure prophylaxis. MMWR Morb Mortal Wkly Rep **1998**;47(RR-7):1–33.

46. Henderson DK. Postexposure chemoprophylaxis for occupational exposures to the human immunodeficiency virus. JAMA **1999**;281:931–6.

47. Grob PM, Cao Y, Muchmore E, et al. Prophylaxis against HIV-1 infection in chimpanzees by nevirapine, a nonnucleoside inhibitor of reverse transcriptase. Nat Med **1997**;3:665–70.

48. Rowland-Jones SL, Dong T, Dorrell L, et al. Broadly cross-reactive HIV-specific cytotoxic T-lymphocytes in highly-exposed persistently seronegative donors. Immunol Lett **1999**;66:9–14.

49. Akridge R, Hladik F, Markee J, et al. Cellular immunity and target cell susceptibility in persons with repeated HIV-1 exposure. Immunol Lett **1999**; 66:15–19.

50. Rowland-Jones SL, McMichael A. Immune responses in HIV-exposed seronegatives: have they repelled the virus? Curr Opin Immunol **1995**;7:448–55.

51. Bernard N, Yannakis C, Lee J, Tsoukas C. Human immunodeficiency virus (HIV)–specific cytotoxic T lymphocyte activity in HIV-exposed seronegative persons. J Infect Dis **1999**;179:538–47.

52. Goh WC, Markee J, Akridge RE, et al. Protection against human immunodeficiency virus type 1 infection in persons with repeated exposure: evidence for T cell immunity in the absence of inherited CCR5 coreceptor defects. J Infect Dis **1999**;179:548–57.

53. Jackson JB. Human immunodeficiency virus–indeterminate Western blot and abortive infection. Transfusion **1997**;37:1–2.

54. Georgoulias VA, Malliaraki NE, Theodoropoulou M, et al. Indeterminate human immunodeficiency virus type 1 Western blot may indicate an abortive infection in some low-risk blood donors. Transfusion **1997**;37:65–72.

55. De Rossi A, Ades AE, Mammano F, et al. Antigen detection, virus culture, polymerase chain reaction, and in vitro antibody production in the diagnosis of vertically transmitted HIV-1 infection. AIDS **1991**;5:15–20.

56. Bryson YJ, Pang S, Wei LS, Dickover R, Diagne A, Chen ISY. Clearance of HIV infection in a perinatally infected infant. N Engl J Med **1995**;332:833–8.

57. Stanley SK, Ostrowski MA, Justement JS, et al. Effect of immunization with a common recall antigen on viral expression in patients infected with human immunodeficiency virus type 1. N Engl J Med **1996**;334:1222–30.

58. Staprans SI, Hamilton BL, Follansbee SE, et al. Activation of virus replication after immunization of HIV-1–infected individuals. J Exp Med **1995**;182:1727–37.

59. Black RJ. Animal studies of prophylaxis. Am J Med **1997**;102:39–43.

60. McChesney MB, Sawai ET, Miller CJ. Simian immunodeficiency virus. In: Ahmed R, Chen I, eds. Persistent viral infections. New York: John Wiley and Sons, **1998**:322–45.

Downloaded from https://academic.oup.com/jid/article-abstract/184/4/429/808643 by DOJ Libraries user on 27 September 2019

# EXHIBIT 24

AIDS RESEARCH AND HUMAN RETROVIRUSES
Volume 14, Number 9, 1998, pp. 761–773
Mary Ann Liebert, Inc.

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

# Administration of 9-[2-(Phosphonomethoxy)propyl]adenine (PMPA) for Prevention of Perinatal Simian Immunodeficiency Virus Infection in Rhesus Macaques

KOEN K.A. VAN ROMPAY,[1] MARTA L. MARTHAS,[1] JEFFREY D. LIFSON,[2]
CHRISTOPHER J. BERARDI,[1] GABRIELA M. VASQUEZ,[2] ELMO AGATEP,[1] ZIA A. DEHQANZADA,[1]
KENNETH C. CUNDY,[3] NORBERT BISCHOFBERGER,[3] and NIELS C. PEDERSEN[1,4]

## ABSTRACT

Simian immunodeficiency virus (SIV) infection of newborn macaques is a useful animal model to explore novel strategies to reduce perinatal human immunodeficiency virus (HIV) infection. The availability of two easily distinguishable virus isolates, SIVmac251 and the simian/human immunodeficiency virus chimera SHIV-SF33, allows tracing the source of infection following inoculation with both viruses by different routes. In the present study, we evaluated the efficacy of pre- and postinoculation treatment regimens with 9-[2-(phosphonomethoxy)propyl]adenine (PMPA) to protect newborn macaques against simultaneous oral SIVmac251 and intravenous SHIV-SF33 inoculation. Untreated newborns became persistently infected following virus inoculation. When three pregnant macaques were given a single subcutaneous dose of PMPA 2 hr before cesarean section, their newborns became SIV-infected following SIV and SHIV inoculation shortly after birth. In contrast, when four newborn macaques were inoculated simultaneously with SIV and SHIV, and started immediately on PMPA treatment for 2 weeks, only one animal became persistently SIV-infected; the remaining three PMPA-treated newborns, however, had some evidence of an initial transient virus infection but were seronegative and healthy at 8 months of age. Our data demonstrate that PMPA treatment can reduce perinatal SIV infection and suggest that similar strategies may also be effective against HIV.

## INTRODUCTION

ALTHOUGH VERTICAL HUMAN immunodeficiency virus (HIV) transmission can occur early *in utero* and postnatally through breast-feeding, evidence suggests that a large fraction of infants born to HIV-infected women become infected around birth.[1–7] During delivery, infants can be exposed to HIV at multiple sites simultaneously (e.g., oral and nasal contact with maternal blood and body fluids; mixing of maternal and fetal blood from placental ruptures).

Zidovudine (AZT) administration to HIV-infected pregnant women and their newborns can reduce the rate of viral transmission by two-thirds.[8] Zidovudine, however, is not 100% ef-

fective, and the increasing prevalence of zidovudine-resistant HIV variants may further reduce the efficacy of prophylaxis.[9–11] Thus, drugs with greater efficacy are urgently needed to reduce vertical transmission.

Simian immunodeficiency virus (SIV) infection of newborn and infant rhesus macaques has been shown to be a useful animal model of pediatric AIDS, which allows rapid evaluation of the therapeutic and prophylactic efficacy of antiretroviral drugs.[12,13] In the current study, we mimicked the multiple exposure to virus that can occur during delivery by inoculating newborn macaques by both the oral and the intravenous route. To be able to differentiate between virus infection by both routes within the same animal, we used two easily distinguish-

[1]California Regional Primate Research Center, University of California, Davis, California 95616.
[2]Laboratory of Retroviral Pathogenesis, AIDS Vaccine Program, SAIC Frederick, National Cancer Institute-Frederick Cancer Research and Development Center, Frederick, Maryland 21702.
[3]Gilead Sciences, Foster City, California 94404.
[4]Department of Veterinary Medicine and Epidemiology, University of California, Davis, California 95616.

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

able virus isolates that have been studied in macaques previously. Uncloned SIVmac251 is infectious and highly virulent for newborn and juvenile macaques following oral inoculation.[14–16] SHIV-SF33 is a chimeric virus obtained by replacing the *tat, rev,* and *env* (gp160) genes of SIVmac239 with the counterpart genetic region of HIV-1SF33; SHIV-SF33 gives persistent infection following intravenous inoculation of macaques.[17]

A promising anti-HIV compound is (*R*)-9-[2-(phosphonomethoxy)propyl]adenine (PMPA). PMPA was highly effective in suppressing virus replication and delaying disease progression in newborn macaques with established SIV infection.[15] Others have previously demonstrated that PMPA is much more efficacious than AZT in protecting older macaques against intravenous SIVmne inoculation.[18] No studies have been performed to determine whether PMPA is also effective in preventing SIV infection of newborn macaques, especially when a mucosal route of virus inoculation is also used.

Accordingly, we determined the efficacy of pre- and postexposure PMPA treatment regimens to protect newborn macaques against simultaneous oral SIVmac251 and intravenous SHIV-SF33 inoculation. We found that a single dose of PMPA given to pregnant macaques just before cesarean section was not highly effective in protecting newborns against virus challenge shortly after delivery. In contrast, a 2-week PMPA treatment regimen of newborn macaques starting immediately after virus inoculation proved to be more successful.

## MATERIALS AND METHODS

### Animals, virus, and PMPA administration

All rhesus macaques (*Macaca mulatta*) were from the type D retrovirus-free and SIV-free colony at the California Regional Primate Research Center (Davis, CA). Animals were housed in accordance with American Association for Accreditation of Laboratory Animal Care standards, and researchers strictly adhered to the *Guide for the Care and Use of Laboratory Animals* prepared by the Committee on Care and Use of Laboratory Animals of the Institute of Laboratory Resources, National Resource Council.

Four adult female macaques were time-mated, and pregnancies were confirmed by ultrasound. Pregnancies were terminated by cesarean section at term (gestational day 150–155); maternal blood and cord blood samples were collected at the time of surgery. The other newborns of this study were delivered naturally. All newborns were hand-reared in a primate nursery. When necessary, animals were immobilized with ketamine-HCl (10 mg/kg; Parke-Davis, Morris Plains, NJ) injected intramuscularly. Blood samples were collected immediately before virus inoculation and regularly thereafter for monitoring viral and immunologic parameters; 0.5- to 1-ml heparinized blood samples were taken weekly for the first month, every 2 weeks for the next 6 months, and then monthly. Complete blood cell counts were done with EDTA-anticoagulated blood samples from all animals. Samples were analyzed by using an automated electronic cell counter (Baker 9000; Serono Baker Diagnostics, Bethlehem, PA); differential cell counts were determined manually.

Within 3 days after birth, newborn macaques were inocu-

lated orally with uncloned SIVmac251 and/or intravenously with the molecular clone SHIV-SF33 under ketamine anesthesia. For the oral SIVmac251 inoculation, 1 ml of an uncloned SIVmac251 stock was administered atraumatically by dispensing the virus slowly into the mouth. The animals were monitored to ensure swallowing of the oral inoculum. The SIVmac251 stock used in this study consisted of uncloned SIVmac251, propagated in rhesus peripheral blood mononuclear cells (PMBCs), with a titer of $10^5$ TCID$_{50}$ (50% tissue culture infective doses)/ml. The intravenous SHIV-SF33 inoculum consisted of 0.5 ml (approximately 10–30 TCID$_{50}$) of a $10^{-2}$ dilution in phosphate-buffered saline (pH7.4) of a SHIV-SF33 virus stock, grown in rhesus PBMCs, with a titer of 2000–6000 TCID$_{50}$/ml. The higher inoculum dose of SIVmac251 relative to SHIV-SF33 relates to the route of virus inoculation, as mucosal (oral or vaginal) inoculation requires a higher virus dose than does intravenous inoculation to induce persistent infection.[14,19–21]

To monitor the immune response to nonviral, nonreplicating antigens, all newborn rhesus macaques were immunized subcutaneously with 0.1 mg of cholera toxin B subunit (List Biological Laboratories, Campbell, CA), just before the virus inoculation. A booster immunization was given at 8 weeks of age. The cholera toxin-specific IgG enzyme-linked immunosorbent assay (ELISA) has been described previously.[14]

PMPA (Gilead Sciences, Foster City, CA) was suspended in distilled water and dissolved by addition of NaOH to a final pH of 7.0 at 60 mg/ml, and filter sterilized (0.2-$\mu$m pore size; Nalgene, Rochester, NY). PMPA was administered subcutaneously at 30 mg/kg body weight[18] per dose into the back of the animal. The untreated control animals did not receive daily sham inoculations.

### Quantitative virus isolation (cell associated and cell free)

Levels of infectious virus in cells and plasma of peripheral blood were determined regularly by a limiting dilution assay (4 replicates/dilution) of PBMCs and plasma, respectively, in cultures with CEM×174 cells in 24-well plates and subsequent p27 core antigen measurement, according to methods previously described.[12–14] In addition, for animals with low or undetectable virus load, $1 \times 10^6$ to $5 \times 10^6$ PBMCs were cocultivated for 8 weeks with CEM×174 cells in tissue culture flasks, as described previously.[12] For animals that were inoculated with both SIVmac251 and SHIV-SF33, the presence of SHIV-SF33 in PBMC and plasma cultures was detected by testing p27-positive culture supernatants for the presence of HIV-1 gp120 with an antigen capture ELISA (Advanced Biotechnologies, Columbia, MD) according to manufacturer instructions.

### PCR amplification

Nested polymerase chain reaction (PCR) was carried out in a GeneAmp 9600 thermocycler (Perkin-Elmer Cetus, Emeryville, CA). Two rounds of 30 cycles of amplification were performed on aliquots of plasmid DNA containing the complete genome of SIVmac1A11 (positive control) or aliquots of PBMC lysates, using SIVmac-specific *gag* primers and conditions described elsewhere.[22] This nested PCR amplification procedure allows visual detection of a single copy of SIV *gag*

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

sequences in as many as 200,000 PBMCs.[22] For animals inoculated with both SIVmac251 and SHIV-SF33, distinction between these two viruses was made by nested PCR with envelope-specific primers according to the same reaction conditions as described for *gag* primers[22]; primer sequences to detect SIV envelope were 5′ AAGAATTCGGGAATCAGCTGCTTAT-CGCC 3′ and 5′ CCCTTGTTCACATACCAAATCTGC 3′ for the first round of PCR, and 5′ AAGGATCCGCTCTTGTTC-CAAGCCTGTGC 3′ and 5′GGCAACTCTTTGAGACCT-CAATAAAGC 3′ for the second round of PCR; primer sequences to detect SHIV-SF33 envelope have been described previously.[17] The sensitivity of the envelope-specific primers to detect proviral DNA in PBMC lysates by nested PCR was found to be similar to that of the *gag*-specific primers (unpublished data).

### Anti-SIV class-specific antibody determination

For the SIV-specific IgG and IgA antibody ELISA, SIV-mac251 (Advanced Biotechnologies) was coated onto microtiter ELISA plates (Falcon 3912; Becton Dickinson, San Jose, CA) at 500 ng of total protein per well, in 0.1 M $Na_2CO_3$–$NaHCO_3$ buffer (pH 9.6) and incubated overnight at 4°C. The plates were then washed (0.15 M NaCl, 0.05% Tween 20; Sigma, St. Louis, MO) and incubated with test or control plasma samples (fourfold dilutions starting at 1:100) at 37°C for 1 hr, and then at 4°C overnight. Plates were washed, incubated for 1 hr at 37°C with 1:4000 or 1:2000 diluted enzyme-conjugated goat anti-monkey IgG or IgA, respectively (Nordic, Capistrano Beach, CA), washed, incubated with *o*-phenylenediamine (Sigma) as substrate, stopped with 4 N $H_2SO_4$, and read spectrophotometrically as described previously[23]; 4% nonfat milk in phosphate-buffered saline (PBS) and 0.5% Tween 20 was used for all dilutions. The SIV-specific IgM antibody ELISA was performed on plates coated with a 21-amino acid synthetic peptide derived from the SIV-mac transmembrane glycoprotein, and is described elsewhere.[23] The HIV-specific IgM antibody ELISA was performed in a similar way except that plates were coated with the analogous 20-amino acid peptide derived from the HIV-1 transmembrane glycoprotein (H-GIWGCSGKLICTTAVPW-NAS-OH; Research Genetics, Huntsville, AL); this HIV envelope-specific IgM ELISA was previously found to detect IgM responses in infant macaques following infection with SHIV-SF33 (unpublished data). Immunoblotting was performed with the Chiron RIBA HIV-1/HIV-2 strip immunoblot assay (SIA; Chiron Corporation, Emeryville, CA) according to manufacturer instructions.

### T lymphocyte phenotyping

T lymphocyte antigens were detected by direct labeling of whole blood with fluorescein-conjugated anti-human CD8 (Leu-2a; Becton Dickinson Immunocytometry, San Jose, CA) and phycoerythrin-conjugated anti-human CD4 (OKT4; Ortho Diagnostic Systems, Raritan, NJ). Red blood cells were lysed and the samples were fixed in paraformaldehyde using the Coulter Q-prep system (Coulter Corporation, Hialeah, FL). Lymphocytes were gated by forward and side light scatter, and were then analyzed with a FACScan flow cytometer (Becton Dickinson).

### Drug susceptibility assay

Phenotypic drug susceptibility was characterized by a previously described assay based on a dose-dependent reduction of viral infectivity[13]; this assay was used previously to detect SIV mutants with decreased susceptibility to PMPA.[15]

### Extraction of RNA from plasma samples

Virion-associated RNA was extracted from cryopreserved (−70°C) heparin-anticoagulated cell-free plasma specimens, using a silica adherence protocol essentially as described.[24] This procedure was used since it ameliorates (albeit not completely) the problem of inhibition of reverse transcriptase (RT) polymerase chain reactions (RT-PCRs) owing to carrythrough of inhibitors (likely heparin) from heparin-anticoagulated specimens when using other extraction methods. On the basis of comparative studies, in four chronically SIV-infected animals, of single phlebotomy samples drawn into sequential tubes containing acid–citrate–dextrose (ACD) and heparin anticoagulant, we determined that whereas our standard RNA extraction reagents and analysis procedure (Purescript; Gentra Systems, Minneapolis, MN; see Ref. 25) gave no detectable SIV *gag* RT-PCR product from heparin-anticoagulated specimens, the following extraction procedure produced on heparin-anticoagulated specimens yielded 22 to 85% of the SIV *gag* copy number obtained using our standard extraction and analysis of specimens drawn at the same phlebotomy into ACD-anticoagulated tubes (J.D. Lifson *et al.*, unpublished).

Briefly, plasma specimens (35–100 $\mu l$) were added to a mixture of lysis buffer (5.6 M guanidinium thiocyanate [GuSCN] in 45 mM Tris-HCl, 25 mM EDTA, with 1.5% Triton X-100 and a suspension of silicon dioxide) (Sigma) and vigorously mixed to form a homogeneous suspension, then incubated for 10 min at room temperature, with periodic mixing to lyse virions and adhere RNA to silica particles. After centrifugation (10,000 × *g*, 45 sec, room temperature), the supernatant was aspirated and the pellet washed twice with 5 M GuSCN in 50 mM Tris-HCl, pH 6.4), then washed twice with 70% ethanol, and once with acetone, with intermediate centrifugations and supernatant aspirations, as described above. After the final centrifugation, the pellets were dried (10 min, 58°C) and bound RNA eluted with 25–50 $\mu l$ of RNase-free water (U.S. Biochemical, Cleveland, OH) (10 min, 58°C, with periodic vigorous mixing). After a final centrifugation (2 min, 13,000 × *g*, room temperature) the RNA-containing supernatant was aspirated and used immediately for RT-PCR or frozen at −70°C until use.

### Quantitative competitive RT-PCR analysis of plasma viral RNA levels

Quantitative competitive (QC) RT-PCR of plasma virion-associated RNA was used to control for potential residual carrythrough of inhibitors of RT-PCR, despite use of the extraction protocol described above. A QC-RT-PCR procedure described in detail elsewhere,[26] using known amounts of *in vitro* transcripts derived from the internally deleted SIV *gag* construct pSGΔ83 as an internal control, spiked into replicate aliquots of test specimen, was modified in view of the small amounts of specimen available. To provide a semiquantitative estimate of

VAN ROMPAY ET AL.

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

plasma viral RNA, three reactions were performed for each specimen: (1) a sample in which the reverse transcription step was omitted, to assess potential DNA contamination; (2) a sample reverse transcribed and amplified without any spiked internal control; and (3) a sample coamplified with the PSGΔ83 RNA internal control template spiked at 20 copy equivalents/reaction, before reverse transcription. Random primed reverse transcription was performed (42°C, 30 min) as described,[26] and a highly conserved region of the SIV gag region was amplified from the resulting cDNA (45 cycles of 94°C, 1 min; 55°C, 2 min; 72°C, 1 min), using the primers S-GAG03 (5′ CAGGGAAiiAAGCAGATGAATTAG 3′) and S-GAG04 (5′ GTTTCACTTTCTCTTCTGCGTG 3′) to amplify both the specimen derived and internal control templates. The amplified products were analyzed by computer-assisted video image analysis of ethidium bromide–stained gels. Specimens for which no specimen-derived product band was detected, even in the absence of internal control template, were reported as not detectable (ND). In all cases in which specimen-derived product bands were clearly present, the fluorescence intensity was less than that observed for the spiked 20 copy equivalents/reaction of internal control template. Normalization based on the total plasma volume extracted, and the fraction of extracted RNA used per reaction, thus allowed calculation of an upper limit estimate of measured specimen copy number.

### PMPA plasma levels

Levels of PMPA in heparinized plasma were determined by a validated reverse-phase ion-pair high-pressure liquid chromatography (HPLC) analysis with fluorescence derivatization.[27]

## RESULTS

### Study design

The experimental design of this study is summarized in Table 1. Three untreated control groups of four animals each were inoculated orally with SIVmac251, intravenously with SHIV-SF33, or simultaneously with both virus isolates (Table 1, groups C–E). Two groups of newborn macaques were also inoculated simultaneously with both virus isolates but received PMPA: PMPA was given either as a single dose administered to the mother shortly before delivery, or was given as a 2-week regimen after virus inoculation (Table 1, groups B and A, respectively). SIVmac251 and SHIV-SF33 infection of rhesus macaques following inoculation with both viruses can easily be distinguished by virus isolation, PCR (using envelope-specific primers), and serology. To monitor the immune response to nonviral, nonreplicating antigens, all newborn rhesus macaques were also immunized subcutaneously with cholera toxin B subunit, just before the first virus inoculation, and a booster immunization of this antigen was given at 8 weeks of age.

### Untreated control infants

All untreated control animals became infected with SIVmac251 and/or SHIV-SF33, as determined by virus isolation and PCR (Fig. 1); most animals that were SIVmac251 infected developed fatal immunodeficiency within 7 months of age (Fig. 1).

### Single-dose PMPA administration to pregnant macaques before cesarean section

At approximately gestational day 155, three pregnant adult macaques were given a single dose of PMPA (30 mg/kg body

TABLE 1. PMPA PROPHYLAXIS OF SIV INFECTION IN NEWBORN MACAQUES: SUMMARY OF STUDY DESIGN AND OUTCOME

| Group (size) | Virus inoculum of newborn | PMPA treatment | Animal number | Outcome |
|---|---|---|---|---|
| A (n = 4) | SIV mac251 oral + SHIV-SF33 i.v. | 14-day treatment of infant | 29361 | Transient/abortive infection |
| | | | 29363 | Transient/abortive infection |
| | | | 29364 | Transient/abortive infection |
| | | | 29365 | Delayed but persistent SIVmac251 infection |
| B (n = 3) | SIV mac251 oral + SHIV-SF33 i.v. | One dose to mother 2 hr before C-section | 29243[a] | SIVmac251 infected |
| | | | 29248[a] | SIVmac251 infected |
| | | | 29249[a] | SIVmac251 and SHIV-SF33 infected |
| C (n = 4) | SIV mac251 oral + SHIV-SF33 i.v. | — | 29376[a] | SIVmac251 and SHIV-SF33 infected |
| | | | 29685 | SIVmac251 and SHIV-SF33 infected |
| | | | 29687 | SIVmac251 and SHIV-SF33 infected |
| | | | 29692 | SIVmac251 and SHIV-SF33 infected |
| D (n = 4) | SIV mac251 oral | — | 29767 | SIVmac251 infected |
| | | | 29769 | SIVmac251 infected |
| | | | 29771 | SIVmac251 infected |
| | | | 29814 | SIVmac251 infected |
| E (n = 4) | SHIV-SF33 i.v. | — | 29765 | SHIV-SF33 infected |
| | | | 29766 | SHIV-SF33 infected |
| | | | 29773 | SHIV-SF33 infected |
| | | | 29817 | SHIV-SF33 infected |

[a]These newborns were delivered by cesarean section (C-section) and inoculated with virus within 2 hr; all other infants were delivered naturally and were inoculated within 72 hr after birth.

SIV AND PMPA PROPHYLAXIS IN NEWBORN MACAQUES

765

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.



**FIG. 1.** Each box of three cells represents virus isolation data (upper cell) and PCR results (middle and lower cells) at various time points after virus inoculation. Virus isolation results from PBMCs are represented as detectable (black) or undetectable (blank) virus. Nested PCR with SIV and HIV envelope-specific primers was performed in 5 or 10 replicates (100,000 PBMCs/reaction). Positive PCR results are given as black or gray, depending on the percentage of positive reactions out of the total number of replicates (100% positive, black; $60\% \leq x < 100\%$, dark gray; $0 < x \leq 40\%$, light gray); negative PCR results are indicated by blank cells. For animals inoculated with both SIVmac251 and SHIV-SF33, both sets of envelope-specific primers (allowing differentiation between SIV and HIV envelope) were used for the PCR reactions at all time points. For animals inoculated with only one virus (either SIVmac251 or SHIV-SF33), only the corresponding envelope primers were used for the initial time points, while SIV *gag* primers were used for the later time points ($\geq 8$ weeks). An absence of boxes or na indicates samples were not available; SAIDS, time of euthanasia with simian AIDS.

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

weight). Two hours later, cesarean sections were performed and the newborns were delivered. PMPA levels in neonatal cord blood plasma were 4–7 $\mu$g/ml (14–24 $\mu$M), and were approximately 60% of those in maternal blood (Table 2). Within 2 hr after delivery, the newborns were inoculated by two routes simultaneously: orally with SIVmac251 and intravenously with SHIV-SF33 (Table 1, group B). For all three animals, SIVmac251 could be isolated by culture and detected by PCR (Fig. 1). For two infants (29243 and 29248), no evidence of SHIV-SF33 infection could be detected by virus isolation or PCR (Fig. 1). Animal 29249 had dual infection with both SIVmac251 and SHIV-SF33 (Fig. 1). All three animals had a rapid disease course and developed fatal immunodeficiency within 3 months of age (Fig. 1).

### Two-week PMPA treatment of newborn macaques after virus inoculation

Four newborn macaques were inoculated simultaneously via two routes: orally with uncloned SIVmac251 and intravenously with SHIV-SF33 (Table 1, group A). Immediately after virus inoculation, these four newborn macaques were started on PMPA treatment (30 mg/kg body weight, subcutaneously once per day). PMPA treatment was continued for 2 weeks, and had no detectable toxicity.

For three animals (29361, 29363, and 29364), no virus could be isolated from plasma or PBMCs during the 8 months of observation; in addition, no proviral DNA could be detected in PBMCs of these three animals at any time point (Fig. 1). However, these three animals made transient antiviral antibody responses. An SIV-specific antibody ELISA demonstrated that all three animals had transient low-level anti-SIV IgG responses (titers ≤1:400) between 3 and 18 weeks of age (Table 3); all three animals had a transient indeterminate or SIV-positive pattern by immunoblotting (Table 4). Animal 29363, which had two transient anti-SIV IgG responses (an initial response at 3–4 weeks, followed by a response at 8–16 weeks) also had two detectable anti-SIV IgM responses (Table 3). None of these animals made a detectable anti-SIV IgA response or anti-HIV-1 envelope IgM response (data not shown). Animals 29363 and 29364 also had transiently detectable viral RNA in plasma at 6–10 weeks (Table 5). After 5 months of age, all three animals remained seronegative, as determined by ELISA and immunoblotting. These three animals had normal CD4$^+$ and CD8$^+$ T cell counts and CD4$^+$/CD8$^+$ T cell ratios throughout the observation period (data not shown). These animals also

had normal weight gain, made good and long-lasting antibody responses to cholera toxin B subunit following immunizations with this antigen at birth and 8 weeks of age (Table 6), and were completely healthy at 8 months of age. At 8 months of age, these three animals were rechallenged orally with the same SIVmac251 stock that was also used for the original inoculation at birth. After this second challenge, all three animals became persistently SIV infected, as determined by positive virus isolation and PCR results; all three animals also made a strong anti-SIV IgG response (Table 7); animal 29363 (which had already made two transient anti-SIV IgM responses after birth) showed a third transient IgM response at 2–3 weeks after oral SIV rechallenge (data not shown). Thus, the initial exposure of these three infants to SIV at birth and the 2 weeks of PMPA treatment did not result in antiviral immunity that protected these animals against SIV rechallenge later in life.

The fourth animal (29365), which was treated with PMPA during the first 2 weeks after virus inoculation, became persistently infected. This animal had a delayed viremia: SIVmac251 was isolated from this animal starting at 8 weeks of age (i.e., 6 weeks after PMPA treatment was withdrawn), and this virus isolate was found to be susceptible to PMPA.[15] Infectious virus levels remained low (approximately 1 infected cell per million PBMCs), and no virus was ever isolated from the plasma (data not shown). This animal was also intermittently PCR positive for HIV-1 envelope (Fig. 1), but no SHIV-SF33 was isolated during the 11 months of observation. Starting at week 8, animal 29365 also developed a strong anti-SIV IgG response (titer >1:102,400) by ELISA and immunoblotting (Tables 3 and 4), and a moderate anti-SIV IgA response (titer of 1:6400 by 18 weeks of age; data not shown). No SIV-specific IgM was detected in animal 29365, but this could be due to the less frequent sampling schedule after 4 weeks of age, as SIV-specific IgM is often only very briefly detectable following SIV infection of newborn macaques.[14,23] Animal 29365 developed symptoms of immunodeficiency (such as intermittent/chronic diarrhea, unresponsive to standard fluid and antibiotic treatment) at approximately 9 months of age, had a loss of anti-Gag antibodies (Table 4), and was euthanized at 46 weeks of age.

## DISCUSSION

Our studies provide support for the use of PMPA to reduce perinatal HIV infection of human newborns. Prevention of peri-

TABLE 2.   PLASMA CONCENTRATION OF PMPA IN NEONATAL CORD BLOOD AND MATERNAL BLOOD AT TIME OF CESAREAN SECTION[a]

| Mother | Concentration ($\mu$g/ml) | Neonate | Concentration ($\mu$g/ml) | Ratio (infant/mother) |
|--------|---------------------------|---------|---------------------------|-----------------------|
| 23738 | 7.00 | 29243 | 4.08 | 0.58 |
| 25979 | 11.9 | 29248 | 6.43 | 0.54 |
| 25761 | 10.2 | 29249 | 6.96 | 0.68 |
| | Mean: 9.69 | | Mean: 5.82 | Mean: 0.60 |
| | SD: 2.48 | | SD: 1.54 | SD: 0.07 |

[a]A single dose of 30 mg of PMPA per kilogram body weight was administered subcutaneously to pregnant macaques 2 hr before cesarean section.

Table 3. Anti-SIV Antibody Responses in PMPA-Treated Infant Rhesus Macaques[a]

Anti-SIV IgM titer at the indicated time (in weeks) after virus inoculation

| Animal number | 0 | 1 | 2 | 3 | 4 | 6 | 8 | 10 | 12 | 14 | 16 | 18 | 20 | 24 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 29361 | <25 | **50** | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 |
| 29363 | <25 | **400** | **200** | **50** | <25 | <25 | <25 | <25 | **100** | **200** | **25** | **25** | <25 | <25 | <25 |
| 29364 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 |
| 29365 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 |

Anti-SIV IgG titer at the indicated time (in weeks) after virus inoculation

| Animal number | 0 | 1 | 2 | 3 | 4 | 6 | 8 | 10 | 12 | 14 | 16 | 18 | 20 | 24 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 29361 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | **200** | **200** | **100** | <100 | <100 | <100 | <100 | <100 |
| 29363 | <100 | <100 | <100 | **200** | **100** | <100 | **200** | **200** | **200** | **400** | **100** | <100 | <100 | <100 | <100 |
| 29364 | <100 | <100 | <100 | <100 | <100 | <100 | **200** | **400** | **400** | **400** | **200** | **100** | <100 | <100 | <100 |
| 29365 | <100 | <100 | <100 | <100 | <100 | <100 | **100** | **6,400** | **25,600** | **102,400** | **25,600** | **>102,400** | **>102,400** | **>102,400** | **>102,400** |

[a]Anti-SIV IgM and IgG titers at the indicated times after virus inoculation were determined by ELISA and are expressed as the reciprocal of the highest of twofold dilutions (starting from a 1:100 dilution for IgG, and 1:25 for IgM, with two replicates per dilution) that gave a positive optical density above the cutoff value. At birth the four animals were inoculated orally with uncloned SIVmac251 and intravenously with SHIV-SF33 and started on PMPA treatment immediately after the virus inoculations. PMPA treatment was continued for 2 weeks. Positive antibody responses are indicated in boldface.

767

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

768          VAN ROMPAY ET AL.

Table 4.    Anti-SIV Antibody Responses in PMPA-Treated Infant Rhesus Macaques by Immunoblotting[a]

| Antigen[b] | 29361 | | | | | 29363 | | | | | 29364 | | | | | 29365 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 3 | 10 | 14 | 31 | 0 | 3 | 10 | 14 | 31 | 0 | 3 | 10 | 14 | 31 | 0 | 3 | 10 | 14 | 33 | 46 |
| HIV-1 gp120 | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| gp41 equivalent | — | ± | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | ± | — |
| HIV-2 Env peptide | — | — | — | — | — | — | — | — | — | — | — | — | — | 2+ | — | — | — | — | 1+ | 4+ | 4+ |
| p31 (Pol) | — | — | — | — | — | — | — | — | ± | — | — | — | — | 1+ | — | — | — | ± | 4+ | 3+ | 4+ |
| HIV-1 p24/HIV-2 p26 | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 2+ | — |
| Result[c]: | Neg | ID | Neg | Neg | Neg | Neg | Neg | Neg | ID | Neg | Neg | Neg | Neg | SIV | Neg | Neg | Neg | ID | SIV | SIV | SIV |

[a]At birth all four animals were inoculated orally with uncloned SIVmac251 and intravenously with SHIV-SF33 and starred on PMPA treatment immediately after the virus inoculations. PMPA treatment was continued for 2 weeks. Immunoblotting was performed with the Chiron RIBA HIV-1/HIV-2 strip immunoblot assay (SIA) according to manufacturer instructions.

[b]Recombinant viral antigens are produced in yeast or mammalian cells: the HIV-1 gp120 and gp41 equivalent represent the surface and transmembrane regions of the HIV-1 envelope gene, respectively; the HIV2-Env peptide is derived from the transmembrane envelope protein of HIV-2; p31 (Pol) is a polypeptide originating from the endonuclease domain of the viral polymerase gene; HIV-1 p24/HIV-2 p26 is the major core protein (Gag).

[c]Results were interpreted according to manufacturer instruction. Neg, Negative for HIV-1 and HIV-2/SIV; ID, indeterminate; SIV, positive according to criteria for HIV-2.

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

TABLE 5.   DETECTION OF SIV RNA IN PLASMA OF PMPA-TREATED INFANT MACAQUES[a]

| Animal number | SIV RNA levels (copy equivalents/ml) at the indicated time (in weeks) after virus inoculation | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 6 | 8 | 10 | 12 |
| 29361 | na | ND | na | na | na | ND | ND | ND |
| 29363 | na | ND | ND | ND | Positive[b] (x < 4,000) | ND | Positive (x < 4,000) | na |
| 29364 | na | ND | na | na | ND | Positive (x < 4,000) | ND | na |
| 29365 | ND | ND | ND | ND | ND | Positive (x < 10,000) | Positive (x < 8,000) | na |

[a]At birth the four animals were inoculated orally with uncloned SIVmac251 and intravenously with SHIV-SF33 and started on PMPA treatment immediately after the virus inoculations. PMPA treatment was continued for 2 weeks. Heparinized plasma samples (volumes ranging from 35 to 100μl) were analyzed by QC-RT-PCR for the presence of viral RNA.

[b]Although SIV was clearly present in the specimens indicated as positive, assay limitations due to the small volume of sample available, and the heparin anticoagulant preclude definitive quantitation,[26] allowing determination only of an upper limit for the amount of viral RNA measured in the specimen, on the basis of coamplified spiked internal control template. These values likely underestimate the actual amount of viral RNA present.

*Abbreviations:* na, Not available; ND, not detectable.

natal HIV transmission by antiviral drug treatment can occur by two mechanisms. Reduction of virus levels in mothers by antiviral drug treatment can reduce the risk that the newborn is exposed to HIV. In addition, drug treatment of the newborn may be able to prevent establishment of chronic infection once exposure has occurred. Previous studies have shown that PMPA treatment dramatically reduced viral levels in macaques with chronic SIV infection.[15,28,29] Data from phase I/II human trials have demonstrated similar results for HIV-infected patients.[30] Thus, PMPA treatment of HIV-infected pregnant women is likely to reduce the amount of virus to which the newborn will be exposed. In addition, the data produced by the current study demonstrate the usefulness of PMPA treatment in the direct protection of HIV-exposed newborns against infection.

In this study, a single dose of PMPA given to three near-term pregnant female macaques 2 hr before delivery by cesarean section resulted in significant transplacental transfer of PMPA into the fetal blood circulation but did not protect the three new-

borns against oral SIVmac251 infection immediately after birth. However, two of the three newborns were protected against SHIV-SF33 infection following intravenous inoculation. The higher efficacy of a single prenatal dose of PMPA in protecting against intravenous SHIV-SF33 relative to oral SIVmac251 infection may be due to the timing of viral entry and reverse transcription, differences in target cells, the virulence of the virus, or a combination of these factors. Intravenous virus inoculation likely results in rapid viral entry into susceptible target cells; in contrast, oral inoculation may result in delayed viral entry into target cells, so that intracellular levels of PMPA-diphosphate (the active form of PMPA) following a single prenatal dose of PMPA may not remain high enough to block reverse transcription sufficiently at that time. Alternatively, differences in identity, physiology, and metabolism of the initial target cells encountered following mucosal versus intravenous virus inoculation may play a role in determining success of chemoprophylaxis. SIVmac251 is also more virulent

TABLE 6.   ANTI-CHOLERA TOXIN B SUBUNIT ANTIBODY RESPONSES IN PMPA-TREATED INFANT RHESUS MACAQUES[a]

| Animal number | ELISA optical density at the indicated time (in weeks) after virus inoculation | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0 | 4 | 6–8 | 10 | 12 | 31[b] | 46[c] |
| 29361 | 0.005 | **0.959** | **1.031** | **1.200** | **1.110** | **1.031** | na |
| 29363 | 0.003 | **1.159** | **0.946** | **0.993** | **0.946** | **0.969** | na |
| 29364 | 0.002 | **0.410** | **0.789** | **1.059** | **0.921** | **0.771** | na |
| 29365 | 0.020 | **0.931** | **0.943** | **1.039** | **0.999** | na | **0.494** |

[a]Animals were immunized with cholera toxin B sunit at birth (simultaneously with the virus inoculations) and a booster immunization was given 8 weeks later. Animals were treated with PMPA for the first 2 weeks. Values given are the average optical density of two replicates of a 1 : 100 dilution of plasma tested by anti-(cholera toxin B subunit)-IgG-specific ELISA. Positive antibody responses are indicated in boldface.

[b]Time of rechallenge of animals 29361, 29363, and 29364 with oral SIVmac251 at approximately 8 months of age.

[c]Time of euthanasia of animal 29365.

*Abbreviation:* na, Not available.

TABLE 7. ANTI-SIV IgG RESPONSES AND VIRUS ISOLATION RESULTS IN JUVENILE RHESUS
MACAQUES FOLLOWING ORAL RECHALLENGE WITH UNCLONED SIVmac251 AT 8 MONTHS OF AGE[a]

| Animal number | Time (in weeks) after oral SIVmac251 inoculation | | | | | | | | | | | | | | | |
| | 0 | | 1 | | 2 | | 3 | | 4 | | 6 | | 8 | |
| | IgG[b] | SIV[c] | IgG | SIV | IgG | SIV | IgG | SIV | IgG | SIV | IgG | SIV | IgG | SIV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 29361 | <100 | − | <100 | + | <100 | + | <100 | − | 100 | + | **1,600** | + | **6,400** | + |
| 29363 | <100 | − | 100 | + | **1,600** | + | **6,400** | + | **25,600** | + | **25,600** | + | **102,400** | + |
| 29364 | <100 | − | <100 | + | <100 | + | 100 | + | **400** | + | **1,600** | + | **25,600** | + |

[a]At birth, these three animals had been inoculated orally with SIVmac251 and intravenously with SHIV-SF33, and had been treated with PMPA for 2 weeks (see Table 1).

[b]Anti-SIV IgG titers at the indicated times (weeks) after virus inoculation were determined by ELISA and are expressed as the reciprocal of the highest of fourfold dilutions (starting from a 1:100 dilution, with two replicates per dilution) that gave a positive optical density above the cutoff value. Strong antibody responses (titer ≥400) are indicated in boldface. The kinetics of the development of anti-SIV IgG in these animals is similar to those seen in control animals following oral inoculation with SIVmac251 (unpublished data).

[c]Virus isolation results are presented as detectable (+) or undetectable (−) SIV in 2–5 × 10⁶ PBMCs.

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

than SHIV-SF33,[17] and it is usually more difficult to achieve protection against infection by highly virulent virus than attenuated virus.[31] The lack of protection against oral SIVmac251 in the three newborns that only received PMPA transplacentally before virus exposure suggests that higher neonatal plasma levels of PMPA may be required to prevent oral SIVmac251 infection, or that postexposure treatment of the newborn may be necessary to achieve more successful perinatal chemoprophylaxis.

Of the four newborns that received 2 weeks of PMPA treatment immediately after virus inoculation, only one animal (number 29365) became persistently viremic and developed strong anti-SIV antibody responses. The onset of viremia and the development of antiviral IgG and IgA responses in animal 29365 did not occur until approximately 8 weeks of age (i.e., 6 weeks after PMPA treatment was stopped). Other studies that evaluated the prophylactic efficacy of a 4-week treatment regimen with PMPA, or the related compound 9-[2-[(phosphonomethoxy)ethyl]adenine (PMEA), also demonstrated that viremia could be delayed for long periods: in some animals, SIV infection became detectable by culture, PCR, or serology only several weeks to 2–3 months after drug treatment was discontinued.[32,33] In contrast, early treatment of macaques with other nucleoside analogs (such as zidovudine) did not delay the onset of this viremia (albeit viremia was reduced) for more than 1–2 weeks.[13,34–36] Although the disease course in animal 29365 was slower than that generally seen following SIVmac251 infection of newborn macaques,[13–15] further research with more animals is necessary to determine whether short-term drug treatment early in infection consistently results in long-term beneficial effects on disease progression and survival.

For the other three animals that received PMPA treatment for 2 weeks following virus inoculation, the course of infection was dramatically altered. No virus could be isolated from peripheral blood, and no proviral DNA was detected in PBMC lysates during 8 months of observation. These animals were also seronegative after 5 months of age, and were healthy throughout the study period. According to these viral and serological parameters, these three animals could be considered

"protected" against SIV infection by the PMPA treatment. However, because we sampled blood from these infants frequently during the initial months following virus inoculation, we detected transient weak anti-SIV antibody responses, and transient low levels of viral RNA in plasma in these animals. It is remarkable that the transient detection of anti-SIV IgG and viral RNA in peripheral blood of the three "protected" PMPA-treated animals occurred at approximately the same time that the fourth PMPA-treated animal (29365) showed definite evidence of SIV infection, namely at approximately 2 months of age. These observations of potential transient or abortive infection deserve a more in-depth discussion, as they may shed some light on the possible mechanisms of postexposure prophylaxis.

The transient weak anti-SIV antibody responses in the three "protected" animals cannot be ascribed to an inability of newborn macaques to mount strong antibody responses. The PMPA-treated animals of this study made a strong and long-lasting anti-cholera toxin subunit B IgG response after immunization with this antigen at birth. In addition, previous studies have demonstrated that newborn rhesus macaques can make rapid and strong anti-SIV IgG responses following infection with attenuated SIV isolates, or with virulent SIVmac251 during antiviral drug treatment.[13,15,37] Accordingly, the transient weak antibody responses suggest that the immune system of these three animals may have experienced transient, low-level exposure to viral antigens. The initial weak anti-SIV IgG and IgM responses in animal 29363 within 3 weeks after virus inoculation could be due to the viral antigen present in the virus inoculum. In contrast, the detection of viral RNA in peripheral blood between 6 and 10 weeks after inoculation, and the relatively late occurrence of anti-SIV IgG responses at 8–16 weeks of age (Tables 4 and 5), suggest that these transient weak antibody responses were not caused merely by SIV antigens present in the virus inoculum, but indicate contact of the immune system with viral antigen at a later time.

To explain these findings, we propose the following hypothetical scenario. The uncloned SIVmac251 virus stock used in this study probably contains many viral variants with wide-

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

ranging virulence, ranging from rapidly replicating highly virulent variants to slowly replicating attenuated and avirulent variants.[19] In addition, similar to other *in vitro* grown virus stocks,[38] the amount of viral RNA in this SIVmac251 stock greatly exceeds the levels of infectious virions (unpublished data), which suggests that most viral RNA copies represent noninfectious virus particles, or infectious virus particles with defective RNA genomes. It is plausible that subcutaneous PMPA administration starting immediately after oral virus inoculation could not completely block viral reverse transcription of the initial cycle of infection, so that many lymphoid cells in the upper gastrointestinal tract still contained proviral DNA of replication-competent and -defective viral genomes. The subsequent 2 weeks of PMPA treatment could have allowed the few cells that were infected with rapidly replicating cytopathic virus to be destroyed and die off, while infection of new cells with the progeny virus was prevented efficiently by the PMPA treatment regimen.[28] Cells containing proviral DNA of either severely attenuated or replication-defective virus could survive longer, and some of these long-lived cells may turn into latently infected cells. If these long-lived cells remain sequestered in the lymphoid tissue surrounding and draining the inoculation site, they would remain undetectable in the peripheral circulation. However, some of these cells could be activated at about 6–10 weeks and subsequently produce replication-impaired or -defective virus particles that could spill over into the peripheral blood. This scenario could explain the transient detection of viral RNA in peripheral blood and the transient weak antibody responses to viral antigens, while no proviral DNA may ever be detected in PBMCs, and no infectious virus can be isolated from PBMCs or plasma. Animal 29365 (which became virus positive and seroconverted by 8–10 weeks of age, but maintained low virus levels afterward) may have had a similar time course with a replication-competent attenuated virus variant; theoretically, it is possible that recombination and genetic complementation between several replication-impaired or -defective virus variants can give rise to more replication-competent virus.[39,40]

It has been suggested that the strength of natural immunity, such as natural killer (NK) cell activity, may play an important role in prophylaxis against SIV infection.[41] PMPA and PMEA have been found to enhance NK cell activity in murine models.[42,43] Further research is needed to determine whether PMPA causes similar immunomodulatory effects in macaques, and whether this contributes to the prophylactic efficacy of PMPA.

It is also unclear whether the SIV infection in the three PMPA-treated, presumably protected animals was completely eliminated or whether these animals remained infected at very low levels in lymphoid tissue, undetectable by standard virus detection techniques or serologic assays. When an immunization with tetanus toxoid was given to these animals at 16 weeks of age (data not shown), this immune stimulation did not induce detectable expression of virus. This possible transient or low-level infection also did not result in long-lasting immunity and immunological memory against reexposure, as all three animals became persistently infected following oral rechallenge with SIVmac251 at 8 months of age, and made an anti-SIV IgG response whose kinetics were indistinguishable from those of a primary antibody response.

Previous studies have documented the possibility of transient and/or persistent low-level lentiviral infections in animals and humans. Adult macaques inoculated intravenously with the attenuated molecular clone SIVmac1A11 (which is derived from uncloned SIVmac251[44]) show transient viremia and seroconvert within 6 weeks, but after 2 years virus can no longer be detected in blood and lymphoid tissues of most animals and anti-SIV antibody levels are low.[45] When we previously inoculated newborn macaques orally with SIVmac1A11, virus was isolated from only one of four animals, while for two other animals the only sign of infection was the development of transient or weak anti-SIV IgG responses.[21] Transient viremia without seroconversion has been described in female macaques following intravaginal SIVmac251 inoculation.[19] Transient or abortive infection (as indicated by transient detection of proviral DNA in PBMCs) has also been described in chimpanzees treated with nevirapine following intravenous HIV-1 inoculation.[46] Low-level persistent infection in the absence of antibody responses has also been found in kittens infected vertically with feline immunodeficiency virus.[47]

"Transient" HIV infection has been described in perinatally infected infants.[48,49] As long as passively acquired maternal anti-HIV IgG is present, it would be difficult to detect an active transient and weak antiviral IgG response in HIV-exposed infants, so it is possible that the frequency of transient perinatal HIV infection is even higher than previously estimated. Transient indeterminate Western blot patterns have also been described in adults with proposed transient or abortive infection, although this issue is still controversial.[50,51] Further study of transient/abortive infection is needed as the ability to clear viremia provides hope for developing an HIV vaccine to prevent or abort HIV infection.

In summary, our study demonstrated that 2 weeks of prophylactic PMPA treatment drastically altered the course of SIV infection for newborn macaques. These data further support the use of early, aggressive antiviral drug administration to prevent or modulate perinatal HIV transmission and disease. Future studies will determine whether shorter PMPA treatment regimens can still be effective in protecting newborn macaques against SIV infection.

## ACKNOWLEDGMENTS

We thank L. Antipa, D. Bennett, L. Brignolo, R. Buchholz, B. Capuano, I. Cazares, K. Christe, V. Crocker, D. Florence, C. Oxford, G. Rogers, C. Valverde, T. Vogt, C. Young, and Colony Services of the California Regional Primate Research Center for expert technical assistance; C. Sueoka and J.-P. Shaw for measuring PMPA levels in blood; and T. North for useful discussions and suggestions. This research was supported by Pediatric AIDS Foundation Grant 50609-20-PG to K. Van Rompay, NIH Grant 39109 to M. Marthas, and NIH Grant RR00169 to the California Regional Primate Research Center; M. Marthas is an E. Glaser Scientist funded by the Pediatric AIDS Foundation.

## REFERENCES

1. Goedert JJ, Duliège A-M, Amos CI, Felton S, Biggar RJ, and the International Registry of HIV-Exposed Twins: High risk of HIV-1 infection for first-born twins. Lancet 1991;338:1471–1475.

Downloaded from www.liebertpub.com by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

2. McIntosh K, Pitt J, Brambilla D, Carroll S, Diaz C, Handelsman E, Moye J, and Rich K for the Women and Infants Transmission Study Group: Blood culture in the first 6 months of life for the diagnosis of vertically transmitted human immunodeficiency virus infection. J Infect Dis 1994;170:996–1000.

3. Borkowsky W, Krasinski K, Pollack H, Hoover W, Kaul A, and Ilmet-Moore T: Early diagnosis of human immunodeficiency virus infection in children <6 months of age: Comparison of polymerase chain reaction, culture, and plasma antigen capture techniques. J Infect Dis 1992;166:616–619.

4. De Rossi A, Ometto L, Mammano F, Zanotto C, Giaquinto C, and Chieco-Bianchi L: Vertical transmission of HIV-1: Lack of detectable virus in peripheral blood cells of infected children at birth. AIDS 1992;6:1117–1120.

5. Brossard Y, Aubin J-T, Mandelbrot L, Bignozzi C, Brand D, Chaput A, Roume J, Mulliez N, Mallet F, Agut H, Barin F, Brechot C, Goudeau A, Huraux J-M, Barrat J, Blot P, Chavinie J, Ciraru-Vigneron N, Engelman P, Herve F, Papiernik E, and Henrion R: Frequency of early in utero HIV-1 infection: A blind DNA polymerase chain reaction study on 100 fetal thymuses. AIDS 1995;9:359–366.

6. Duliège A-M, Amos CI, Felton S, Biggar RJ, the International Registry of HIV-Exposed Twins, and Goedert JJ: Birth order, delivery route, and concordance in the transmission of human immunodeficiency virus type 1 from mothers to twins. J Pediatr 1995;126:625–632.

7. Mofenson LM: Interaction between timing of perinatal human immunodeficiency virus infection and the design of preventive and therapeutic interventions. Acta Paediatr Suppl 1997;421:1–9.

8. Connor EM, Sperling RS, Gelber R, Kiselev P, Scott G, O'Sullivan MJ, VanDyke R, Bey M, Shearer W, Jacobson RL, Jiminez E, O'Neill E, Bazin B, Delfraissy J-F, Culnane M, Coombs R, Elkins M, Moye J, Stratton P, and Balsley J for the Pediatric AIDS Clinical Trials Group Protocol 076 Study Group: Reduction of maternal–infant transmission of human immunodeficiency virus type 1 with zidovudine treatment. N Engl J Med 1994;331:1173–1180.

9. Siegrist CA, Yerly S, Kaiser L, Wyler CA, and Perrin L: Mother to child transmission of zidovudine-resistant HIV-1. Lancet 1994;344:1771–1772.

10. Frenkel LM, Wagner LEI, Demeter LM, Dewhurst S, Coombs RW, Murante BL, and Reichman RC: Effects of zidovudine use during pregnancy on resistance and vertical transmission of human immunodeficiency virus. Clin Infect Dis 1995;20:1321–1326.

11. McIntosh K: Antiretroviral resistance and HIV vertical transmission. Acta Paediatr Suppl 1997;421:29–32.

12. Van Rompay KKA, Marthas ML, Ramos RA, Mandell CP, McGowan EK, Joye SM, and Pedersen NC: Simian immunodeficiency virus (SIV) infection of infant rhesus macaques as a model to test antiretroviral drug prophylaxis and therapy: Oral 3′-azido-3′-deoxythymidine prevents SIV infection. Antimicrob Agents Chemother 1992;36:2381–2386.

13. Van Rompay KKA, Otsyula MG, Marthas ML, Miller CJ, McChesney MB, and Pedersen NC: Immediate zidovudine treatment protects simian immunodeficiency virus-infected newborn macaques against rapid onset of AIDS. Antimicrob Agents Chemother 1995;39:125–131.

14. Van Rompay KKA, Otsyula MG, Tarara RP, Canfield DR, Berardi CJ, McChesney MB, and Marthas ML: Vaccination of pregnant macaques protects newborns against mucosal simian immunodeficiency virus infection. J Infect Dis 1996;173:1327–1335.

15. Van Rompay KKA, Cherrington JM, Marthas ML, Berardi CJ, Mulato AS, Spinner A, Tarara RP, Canfield DR, Telm S, Bischofberger N, and Pedersen NC: 9-[2-(Phosphonomethoxy)propyl]adenine therapy of established simian immunodeficiency virus infection in infant rhesus macaques. Antimicrob Agents Chemother 1996;40:2586–2591.

16. Van Rompay KKA, Berardi CJ, Dillard-Telm S, Tarara RP, Canfield DR, Valverde CR, Montefiori DC, Stefano Cole K, Montelaro RC, Miller CJ, and Marthas ML: Passive immunization of newborn rhesus macaques prevents oral simian immunodeficiency virus infection. J Infect Dis 1998;177:in press.

17. Luciw P, Pratt-Lowe E, Shaw K, Levy J, and Cheng-Mayer C: Acute infection of rhesus macaques with T-cell line-tropic and macrophage-tropic clones of simian/human immunodeficiency viruses (SHIV). Proc Natl Acad Sci USA 1995;92:7490–7494.

18. Tsai C-C, Follis KE, Beck TW, Sabo A, Grant RF, Bischofberger N, and Benveniste RE: Prevention of simian immunodeficiency virus infection in macaques by 9-(2-phosphonylmethoxypropyl)adenine (PMPA). Science 1995;270:1197–1199.

19. Miller CJ, Marthas M, Torten J, Alexander NJ, Moore JP, Doncel GF, and Hendrickx AG: Intravaginal inoculation of rhesus macaques with cell-free simian immunodeficiency virus results in persistent or transient viremia. J Virol 1994;68:6391–6400.

20. Miller CJ, Alexander NJ, Sutjipto S, Lackner AA, Gettie A, Hendrickx AG, Lowenstine LJ, Jennings M, and Marx PA: Genital mucosal transmission of simian immunodeficiency virus: Animal model for heterosexual transmission of human immunodeficiency virus. J Virol 1989;63:4277–4284.

21. Marthas ML, Van Rompay KKA, Otsyula M, Miller CJ, Canfield DR, Tarara RP, Pedersen NC, and McChesney MB: Pathogenesis of SIV variants in neonatal rhesus macaques. In: Dixième Colloque des Cent Gardes, Paris, 1995. pp. 221–227.

22. Unger RE, Marthas ML, Lackner AA, Pratt-Lowe E, Lohman BL, Van Rompay K, and Luciw PA: Detection of simian immunodeficiency virus DNA in macrophages from infected rhesus macaques. J Med Primatol 1992;21:74–81.

23. Otsyula MG, Miller CJ, Marthas ML, Van Rompay KKA, Collins JR, Pedersen NC, and McChesney MB: Virus-induced immunosuppression is linked to rapidly fatal disease in infant rhesus macaques infected with simian immunodeficiency virus. Pediatr Res 1996;39:630–635.

24. Boom R, Sol CJ, Salimans MM, Jansen CL, Wertheim-van Dillen PM, and van der Noordaa J: Rapid and simple method for purification of nucleic acids. J Clin Microbiol 1990;28:495–503.

25. Suryanarayana K, Wiltrout TA, Vasquez GM, Hirsch VM, and Lifson JD: Plasma SIV RNA viral load by real time quantification of product generation in RT PCR. AIDS Res Hum Retroviruses 1998;14:183–189.

26. Hirsch VM, Fuerst TR, Sutter G, Carroll MW, Yang LC, Goldstein S, Piatak MJ, Elkins WR, Alvord WG, Montefiori DC, Moss B, and Lifson JD: Patterns of viral replication correlate with outcome in simian immunodeficiency virus (SIV)-infected macaques: Effect of prior immunization with a trivalent SIV vaccine in modified vaccinia virus Ankara. J Virol 1996;70:3741–3752.

27. Shaw JP, Sueoka CM, Oliyai R, Lee WA, Arimilli MN, Kim C, and Cundy KC: Metabolism and pharmacokinetics of a novel oral prodrug of 9-[(R)-2-(phosphonomethoxy)propyl]adenine (PMPA) in dogs. Pharm Res 1997;14:1824–1829.

28. Nowak MA, Lloyd AL, Vasquez GM, Wiltrout TA, Wahl LM, Bischofberger N, Williams J, Kinter A, Fauci AS, Hirsch VM, and Lifson JD: Viral dynamics of primary viremia and antiretroviral therapy in simian immunodeficiency virus infection. J Virol 1997;71:7518–7525.

29. Tsai C-C, Follis KE, Beck TW, Sabo A, Bischofberger N, and Dailey PJ: Effects of (R)-9-(2-phosphonylmethoxypropyl)adenine monotherapy on chronic SIV infection. AIDS Res Hum Retroviruses 1997;13:707–712.

30. Deeks SG, Barditch-Crovo P, Lietman P, Hwang F, Cundy K, Rooney J, Hellmann N, and Kahn J: The safety, pharmacokinetics and antiretroviral activity of intravenous PMPA, a novel anti-HIV therapy, in HIV infected adults. 1997 (in preparation).

SIV AND PMPA PROPHYLAXIS IN NEWBORN MACAQUES

Downloaded by NIH NATIONAL INSTITUTES OF HEALTH LIBRARY PACKAGE from www.liebertpub.com at 10/01/19. For personal use only.

31. Black RJ: Animal studies of prophylaxis. Am J Med 1997; 102(5B):39–43.

32. Tsai C-C, Follis KE, Sabo A, Grant RF, Bartz C, Nolte RE, Benveniste RE, and Bischofberger N: Preexposure prophylaxis with 9-(-2-phosphonylmethoxyethyl)adenine against simian immunodeficiency virus infection in macaques. J Infect Dis 1994;169: 260–266.

33. Martin LN, Murphey-Corb M, Bohm RP, Simpson L, and Bischofberger N: Effects of initiating treatments with PMPA at different times during the acute infection with SIV/Delta B670. In: 14th Annual Symposium on Nonhuman Primate Models for AIDS, Portland, Oregon, 1996. p. 208. [Abstract 112]

34. Tsai C-C, Follis KE, Grant R, Sabo A, Nolte R, Bartz C, Bischofberger N, and Benveniste R: Comparison of the efficacy of the efficacy of AZT and PMEA treatment against acute SIV$_{mne}$ infection in macaques. J Med Primatol 194;23:175–183.

35. Martin LN, Murphey-Corb M, Soike KF, Davison-Fairburn B, and Baskin GB: Effects of initiation of 3'-azido-3'-deoxythymidine treatment at different times after infection of rhesus monkeys with simian immunodeficiency virus. J Infect Dis 1993;168:825–835.

36. Le Grand R, Clayette P, Noack O, Vaslin B, Theodoro F, Michel G, Roques P, and Dormont D: An animal model for antilentiviral therapy: Effect of zidovudine on viral load during acute infection after exposure of macaques to simian immunodeficiency virus. AIDS Res Hum Retroviruses 1994;10:1279–1287.

37. Marthas ML, Van Rompay KKA, Otsyula M, Miller CJ, Canfield D, Pedersen NC, and McChesney MB: Viral factors determine progression to AIDS in simian immunodeficiency virus-infected newborn rhesus macaques. J Virol 1995;69:4198–4205.

38. Bourinbaiar AS: The ratio of defective HIV-1 particles to replication-competent infectious virions. Acta Virol 1994;38:59–61.

39. Kuwata T, Miyazaki Y, Igarashi T, Takehisa J, and Hayami M: The rapid spread of recombinants during a natural in vivo infection with two human immunodeficiency virus type 1 strains. J Virol 1997;71:7088–7091.

40. Sabino EC, Shpaer EG, Morgado MG, Korber BT, Diaz RS, Bongertz V, Cavalcante S, Galvao-Castro B, Mullins J, and Mayer A: Identification of human immunodeficiency virus type 1 envelope genes recombinant between subtypes B and F in two epidemiologically linked individuals from Brazil. J Virol 1994;68:6340–6346.

41. Igarashi T, Ami Y, Yamamoto H, Shibata R, Kuwata T, Mukai R, Shinohara K, Komatsu T, Adachi A, and Hayami M: Protection of monkeys vaccinated with vpr- and/or nef-defective simian immunodeficiency virus strain mac/human immunodeficiency virus type 1 chimeric viruses: A potential candidate live-attenuated human AIDS vaccine. J Gen Virol 1997;78:985–989.

42. Del Gobbo V, Foli A, Balzarini J, De Clercq E, Balestra E, Villani N, Marini S, Perno CF, and Calio R: Immunomodulatory activity of 9-(2-phosphonylmethoxyethyl)adenine (PMEA), a potent anti-HIV nucleotide analogue, on in vivo murine models. Antiviral Res 1991;16:65–75.

43. Ussery MA, Wood OL, Kunder SC, Bacho MA, Broud DD, Papermaster SF, Hall BE, Nielsen CJ, Chen MS, Cherrington JM, and Black PL: PMPA prevents infection of HuPBMC SCID mice by HIV-1 (late breaker): In: Tenth International Conference on Antiviral Research, Atlanta, Georgia, 1997.

44. Marthas ML, Banapour B, Sutjipto S, Siegel ME, Marx PA, Gardner MB, Pedersen NC, and Luciw PA: Rhesus macaques inoculated with molecularly cloned simian immunodeficiency virus. J Med Primatol 1989;18:311–319.

45. Lohman BL, McChesney MB, Miller CJ, McGowan E, Joye SM, Van Rompay KKA, Reay E, Antipa L, Pedersen NC, and Marthas ML: A partially attenuated simian immunodeficiency virus induces host immunity that correlates with resistance to pathogenic virus challenge. J Virol 1994;68:7021–7029.

46. Grob PM, Cao Y, Muchmore E, Ho DD, Norris S, Pav JW, Shih C-K, and Adams J: Prophylaxis against HIV-1 infection in chimpanzees by nevirapine, a nonnucleoside inhibitor of reverse transcriptase. Nature Med 1997;3:665 –670.

47. O'Neil LL, Burkhard MJ, Obert LA, and Hoover EA: Regression of feline immunodeficiency virus infection. AIDS Res Hum Retroviruses 1997;13:713–718.

48. De Rossi A, Ades AE, Mammano F, Del Mistro A, Amadori A, Giaquinto C, and Chieco-Bianci L: Antigen detection, virus culture, polymerase chain reaction, and in vitro antibody production in the diagnosis of vertically transmitted HIV-1 infection. AIDS 1991;5:15–20.

49. Bryson YJ, Pang S, Wei LS, Dickover R, Diagne A, and Chen ISY: Clearance of HIV infection in a perinatally infected infant. N Engl J Med 1995;332:833–838.

50. Jackson JB: Human immunodeficiency virus-indeterminate Western blot and abortive infection. Transfusion 1997;37:1–2.

51. Georgoulias VA, Malliaraki NE, Theodoropoulou M, Spanakis E, Fountouli P, Tsatsaki D, Kotsaki S, Karvela-Aggelaki A, and Malliaraki-Pinetidou E: Indeterminate human immunodeficiency virus type 1 Western blot may indicate an abortive infection in some low-risk blood donors. Transfusion 1997;37:65–72.

Address reprint requests to:
Koen Van Rompay
California Regional Primate Research Center
University of California
Davis, California 95616

E-mail: kkvanrompay@ucdavis.edu

# EXHIBIT 25

# Evaluation of Oral Tenofovir Disoproxil Fumarate and Topical Tenofovir GS-7340 to Protect Infant Macaques Against Repeated Oral Challenges With Virulent Simian Immunodeficiency Virus

*Koen K.A. Van Rompay, DVM, PhD,\* Brian P. Kearney, PharmD,† Jonathan J. Sexton, BS,\* Roxana Colón, BA,\* Jonathan R. Lawson, BS,\* Emily J. Blackwood, BS,\* William A. Lee, PhD,† Norbert Bischofberger, PhD,† and Marta L. Marthas, PhD\**

Downloaded from https://journals.lww.com/jaids by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IlQrHD3i3D0OdRyi7TvSFl4Cf3VC4/OAVpDDa8K2+Ya6H/3c1AoI= on 06/27/2019

**Summary:** Simian immunodeficiency virus (SIV) infection of infant macaques is a useful animal model of pediatric HIV infection to evaluate the potential of chemoprophylactic regimens to reduce mother-to-infant transmission of HIV. Previous studies have demonstrated that short-term subcutaneous administration of the reverse transcriptase inhibitor tenofovir was highly effective in protecting newborn macaques against infection after a single high-dose oral inoculation with virulent SIVmac251. In the current study, we mimicked HIV transmission through breast-feeding by repeatedly feeding infant macaques low doses of SIVmac251. Topical administration of a low dose of the second-generation tenofovir prodrug GS-7340 did not have detectable prophylactic efficacy. Oral administration of tenofovir disoproxil fumarate (DF; 10 mg/kg SID) lowered the infection rate at birth, but had lower efficacy against virus infection at 4 weeks of age, most likely because drug levels became suboptimal relative to those obtained with the current tenofovir DF regimen in humans. These prophylactic results further underscore the relevance of the current tenofovir DF prevention trials in pediatric and adult populations.

*(J Acquir Immune Defic Syndr 2006;43:6–14)*

Simple antiviral drug regimens, especially those based on zidovudine and nevirapine, have played an important role in reducing the rate of peripartum HIV transmission from mother to infant.[1–4] However, even when transmission during delivery is prevented, breast-feeding continues to be a considerable risk for HIV transmission in developing countries where replacement feeding is not always feasible.[5–7] Until an effective vaccine is available, the use of antiviral drugs may be an effective way to reduce the rate of HIV transmission via breast milk. Drug treatment of the mother results in lower viral RNA

Received for publication March 6, 2006; accepted April 13, 2006.
From the *California National Primate Research Center, University of California, Davis and †Gilead Sciences, Foster City, CA.
This work was supported by National Institutes of Health/National Institute of Allergy and Infectious Diseases grants AI58056 (K.V.R.) and AI46320-01 (M.L.M.), Gilead Sciences, and Public Health Science grant RR00169 from the National Center for Research Resources.
Reprints: Koen Van Rompay, DVM, PhD, California National Primate Research. Center, University of California, Davis, CA 95616-8542 (e-mail: kkvanrompay@ucdavis.edu).
Copyright © 2006 by Lippincott Williams & Wilkins

levels in breast milk, which is expected to lower the risk for transmission.[8,9] Alternatively, prophylactic drug administration to the infant throughout the period of breast-feeding may reduce infection rates. Preliminary data suggest that lamivudine treatment of the breast-feeding infant may be effective.[10] Chronic nevirapine treatment of the nursing infant is also likely to be effective[11] but may not be ideal because of concerns for toxicity, the possibility of nevirapine-resistant virus in breast milk of women who previously received a dose of nevirapine,[12] and nevirapine's lack of activity against HIV-2. Thus, there is the need to explore additional simple regimens that may be able to protect infants against HIV infection both during delivery and throughout the period of breast-feeding.

Tenofovir (9-[2-(phosphonomethoxy)propyl]adenine) is a good candidate because of its favorable safety and resistance profile, and its high prophylactic efficacy in animal models such as simian immunodeficiency virus (SIV) infection of macaques.[13–20] Previous studies have demonstrated that short-term subcutaneous administration of tenofovir was effective in protecting newborn macaques against infection after an oral single high-dose SIVmac251 inoculation.[16,21,22] This included a 2-dose tenofovir regimen (4 mg/kg SC SID) expected to give newborn macaques a similar pharmacokinetic exposure (based on plasma drug levels) as the intravenous tenofovir regimen that was tested in the initial trial in human adults.[22,23]

Tenofovir, because of its charged anionic nature, has poor oral bioavailability. Accordingly, an orally bioavailable prodrug, tenofovir disoproxil fumarate (DF), has been developed and is currently used as a once-daily regimen to treat HIV infection.[24] The current study investigated whether oral dosing with tenofovir DF aimed at achieving similar plasma levels of tenofovir would protect infant macaques against oral SIV infection.

As described elsewhere, another approach to try to prevent SIV infection after oral exposure is the use of topical microbicides by administering compounds locally at the site of viral exposure in an amount too low to provide sufficient systemic drug levels.[25] In a previous study, topical administration of tenofovir DF did not have detectable prophylactic efficacy against oral SIV infection.[25] However, another prodrug of tenofovir, GS-7340, may be more attractive. In contrast to tenofovir DF, the GS-7340 prodrug is preferentially hydrolyzed by intracellular instead of extracellular esterases and, therefore,

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

yields much higher intracellular levels of the active moiety tenofovir diphosphate.[26] Tenofovir GS-7340 was approximately 5-fold more potent than tenofovir DF, and 100- to 1000-fold more potent than tenofovir in inhibiting HIV-1 replication in cell lines, peripheral blood mononuclear cell (PBMC), and macrophages in vitro.[26] In dog studies, oral tenofovir GS-7340 administration had high oral bioavailability (>70%), targeted lymphoid tissues, and led to much higher intracellular levels of tenofovir in PBMC than equivalent oral doses of tenofovir DF.[26] Accordingly, we hypothesized that oral administration of tenofovir GS-7340 at a topical dose (ie, too low to give sufficient systemic drug levels) may be more efficient in inducing intracellular accumulation of tenofovir inside the cells at the mucosal site or in the draining lymphoid tissues of the oral cavity, with the potential for enhanced prophylactic efficacy.

Because HIV transmission through breast-feeding involves prolonged, daily exposure to virus in breast milk, we previously developed a model in which infant macaques are repeatedly fed low doses of SIVmac251.[25,27] Using this animal model, the present study demonstrates that the topical administration of tenofovir GS-7340 did not have any detectable prophylactic efficacy. In contrast, an oral tenofovir DF regimen lowered the infection rate, and the level of efficacy was associated with age-related changes in pharmacokinetics.

## MATERIALS AND METHODS

### Animals and Parameters to Monitor Infection

All rhesus macaques (*Macaca mulatta*) were from the type D retrovirus–free and SIV-free colony at the California National Primate Research Center. The newborn macaques were hand-reared in a primate nursery in accordance with American Association for Accreditation of Laboratory Animal Care standards. We adhered to the *Guide for Care and Use of Laboratory Animals.*[28] As described previously,[25] for the first weeks of life, the main diet consisted of Enfamil® with Iron (Mead Johnson Nutritionals, Evansville, IN) treated with Lacteeze® lactase enzyme drops (Gelda Scientific, Mississauga, Ontario, Canada), with gradual addition of other food items at 2 weeks of age. For blood collections, animals were immobilized with 10 mg/kg IM ketamine-HCl (Parke-Davis, Morris Plains, NJ). EDTA-anticoagulated blood samples were collected for monitoring immunologic and viral parameters and blood cell counts according to methods previously described.[22,27] As described below, the 49 infant macaques were divided into 3 main groups: group A, untreated control animals; group B, tenofovir GS-7340–treated infant macaques; and group C, tenofovir DF–treated animals.

### Preparation and Oral Administration of SIVmac251 Inoculum

The uncloned SIVmac251 stock (with internal reference no. 2/02) was propagated on rhesus macaque PBMCs and had a titer of $10^5$ 50% tissue culture infectious doses (TCID$_{50}$) and $0.86 \times 10^9$ RNA copies/mL (as measured by SIV bDNA). As described previously,[25,27] we developed a repeated low-dose exposure model in which infant macaques are handheld and bottle-fed SIVmac251 (diluted

in a 1:1 mixture of RPMI-1640 and isotonic sucrose) 15 times (3 times per day for 5 consecutive days at 1030, 1230, and 1630 hours). For each SIV administration, the infant macaques were handheld without chemical restraint and were fed the solution using pet nursing bottles (Four Paws, Hauppage, NY). In the current study, 24 newborn macaques (ie, all groups except subgroup A2) were started on a series of 15 oral inoculations within the first week of life; each virus dose consisted of 2 mL of a 1:40 dilution of the SIVmac251 stock (~5000 TCID$_{50}$ or $43 \times 10^6$ SIV RNA copies/dose). Animals that did not have detectable viremia were reinoculated 4 weeks later with another series of 15 inoculations (3 times per day for 5 consecutive days) using the same volume but double the concentration of virus (2 mL of a 1:20 dilution of SIVmac251 corresponding to ~10,000 TCID$_{50}$ or $86 \times 10^6$ SIV RNA copies/dose). Twenty-five untreated control animals (from concomitant other experiments using an identical inoculum) received only the second set of SIVmac251 inoculations at approximately 4 weeks of age (subgroup A2).

### Preparation and Administration of Tenofovir Prodrugs

The 6 animals of group B received oral administration of tenofovir GS-7340 3 times daily for 7 days in a row (from 1 day before to 1 day after the 5-day series of virus inoculations). A low dose of GS-7340 was selected as an investigational topical regimen (ie, unlikely to give sufficient systemic antiviral drug levels). GS-7340 powder was dissolved at 0.5 mg/mL in RPMI-1640, and aliquots were frozen at −70°C. For each dose, a thawed aliquot was diluted by adding 200 μL to 2 mL of each virus inoculum (during the 5 consecutive days of thrice-daily virus inoculations) or 2 mL of the 1:1 mixture of sucrose and RPMI-1640 (for drug administration 3 times daily (1030, 1230, and 1630 hours) on the day before and the day after the 5-day series of virus inoculations). Thus, each GS-7340 dose consisted of 0.1 mg GS-7340 (equivalent to 0.064 mg of tenofovir) at a concentration of approximately 0.05 mg/mL (~100 μmol/L). This concentration of GS-7340 (100 μmol/L) is approximately 1000-fold higher than the in vitro 50% inhibitory concentration against the SIVmac251 inoculum (data not shown).

For the 12 animals of group C, an investigational formulation of tenofovir DF powder for oral suspension was reconstituted with distilled water to a concentration of 20 mg/mL and stored at 4°C according to the manufacturer's instructions (Gilead Sciences, Foster City, CA). The 6 newborn macaques of group C1 received oral administration of tenofovir DF (10 mg/kg body weight) once daily in the morning (~0700 hours) for 7 consecutive days from 1 day before to 1 day after the first 5-day series of virus feedings. For the 6 animals of group C2, oral administration of tenofovir DF (10 mg/kg SID at ~0700 hours in the morning) was started 2 days before the first set of virus inoculations and continued for all 6 animals until 2 weeks after the end of the second set of virus inoculations (ie, for a total of 7 weeks). While the animals were handheld, the small volume of tenofovir DF solution (0.5 mL/kg body weight) was administered directly in the mouth using a needle-less

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Van Rompay et al*

*J Acquir Immune Defic Syndr* • Volume 43, Number 1, September 2006

syringe. To reduce the problem of poor palatability and to ensure swallowing of the drug dose, the animals were then immediately offered a bottle with formula.

## Virologic and Immunologic Assessment

Infectious virus was isolated from PBMC with CEM × 174 cells and subsequent p27 core antigen measurement via an enzyme-linked immunosorbent assay (ELISA), as described previously.[29] Plasma viral RNA was quantified using a bDNA signal amplification assay specific for SIV, version 4.0 (which has a lower quantitation limit of 125 copies/mL).[30] To detect and quantitate proviral DNA and RNA in PBMC, real-time polymerase chain reaction (PCR) assays with amplification of the SIV *gag* gene were performed according to methods described in detail previously.[31,32] The ELISA to detect SIV-specific IgG was performed as described previously.[33] Lymphocyte phenotypic analysis was performed using 4-color flow cytometry techniques as described previously.[30]

## Pharmacokinetic Analysis

At 6 to 8 days of age, 4 infant macaques were temporarily removed from their mother and administered a single dose of tenofovir DF suspension (10 mg/kg); the infants were then given the lactase-treated Enfamil formula described above ad libitum. EDTA-anticoagulated blood samples were collected over a 24-hour period (at 1, 2, 4, 8, and 24 hours after drug administration). The 24-hour pharmacokinetic study was repeated with the same dose of tenofovir DF when the same animals were 4 to 5 weeks of age.

Plasma samples were immediately stored at −70°C and subsequently analyzed by MDS Pharma Services (Montreal, Quebec, Canada) using high-performance liquid chromatography methods with mass spectrometry detection (liquid chromatography–mass spectrometry–mass spectrometry), previously validated for monkey plasma, with a limit of quantitation of 1 ng/mL.[34] The values of the pharmacokinetic parameters were derived by noncompartmental analysis with WinNonlin software (version 3.1; Pharsight Corporation, Mountain View, CA). To account for the increased absolute dose (in milligrams) of tenofovir DF as the animals aged, week 4 pharmacokinetic parameters were dose-normalized to the dose administered on week 1.

## Phenotypic and Genotypic Drug Susceptibility Testing

Phenotypic drug susceptibilities of SIV isolates were characterized by a previously described assay based on a dose-dependent reduction of viral infectivity.[35,36] DNA sequence analyses of codons 0 to 320 of reverse transcriptase (RT) were performed on proviral DNA obtained from CEM × 174 cells infected with virus isolated from the SIV-infected animals and harvested as soon as culture supernatants were positive by p27 antigen-capture ELISA; genomic DNA was extracted and used for nested PCR according to methods and with primers described previously.[30,37] Amplicons were sequenced by Davis Sequencing (Davis, CA) with primers 239–2786 and SIV-RT3. This method, which can detect the

presence of a 20% subpopulation, has been used previously with success to detect the emergence of K65R viral mutants in tenofovir-treated animals.[30,33]

## Statistical Analyses

Statistical analyses were performed with Prism 4 for Mac and Instat 3 (GraphPad Software Inc, San Diego, CA). Differences between pharmacokinetics on weeks 1 and 4 were compared using a paired *t* test of the $\log_{10}$ transform of tenofovir $C_{max}$ and $AUC_{0-\infty}$.

# RESULTS

## Experimental Design and Summary of Infection Status and Viremia

As outlined in Figure 1, 3 main groups of infant macaques were handheld and bottle-fed diluted SIVmac251 3 times per day for 5 consecutive days, starting within the first week of birth. Animals that did not become persistently viremic were reinoculated with SIV again at 4 weeks of age. Group A consisted of 2 subgroups of untreated control animals: 4 of the 6 animals of subgroup A1 became persistently infected after the first set of inoculations, whereas the remaining 2 animals became infected after the second set of inoculations. Subgroup A2 had 25 untreated animals, which received only SIV inoculations at 4 weeks of age, and 23 of them became infected. Together, the cumulative infection rate for untreated animals after 2 series of inoculations was 29 (94%) of 31 animals, with the caveat that this infection rate may be underestimated (because the 2 animals that did not become infected had received only 1 set of virus inoculations at 4 weeks of age).

The 6 animals of group B received topical tenofovir GS-7340 3 times daily for 7 days (0.1 mg/dose, including mixed with the virus inoculum). The concentration of GS-7340 (100 μmol/L) is approximately 1000-fold higher than the in vitro 50% inhibitory concentration against the SIVmac251 inoculum (data not shown). Although GS-7340 was mixed with the virus inoculum, 4 of these 6 animals of group B became persistently viremic after the first set of virus inoculations. Although their infection rate (4/6 animals) was indistinguishable from that of the placebo-treated animals (group A), the viral RNA levels of these 4 animals at 2 weeks of age (ie, 1 week after the end of the 5-day SIV inoculation regimen) were lower than those of the 4 untreated infected animals of group A1 (Fig. 2B; 2-tailed *t* test on log-transformed values, *P* = 0.04). However, starting at 3 weeks of age, there was no significant difference in viremia anymore. One animal of group B (number 35410) had evidence of transient viremia; although infectious virus was never isolated from PBMC and animal 35410 did not seroconvert, viral RNA levels in plasma at 2 weeks of age (ie, 1 week after this first set of virus inoculations) were low (1908 RNA copies/mL; Fig. 2). PBMC collected at this 2-week time point did not have detectable viral RNA but had detectable viral DNA (36 of 36 replicates were positive by quantitative TaqMan PCR technology; range, 456–1255 gag DNA copies/million PBMC). Starting at 3 weeks of age onwards, the animal was virus-negative by all criteria (including viral RNA in plasma,

*© 2006 Lippincott Williams & Wilkins*

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.



**FIGURE 1.** Summary of experimental design and outcome. Within 1 week of birth, groups of infant macaques were fed 2 mL of SIVmac251 (5000 TCID$_{50}$/dose) 3 times per day (at 1030, 1230, and 1630 hours) for 5 consecutive days. Animals that did not become infected were reinoculated 4 weeks later with a similar series of 15 inoculations, but with a slightly higher virus dose (10,000 TCID$_{50}$/dose). A, Untreated control animals, of which 1 subgroup (A2) received SIV inoculations only at 4 weeks of age. B, Six animals were given thrice-daily oral topical administration of tenofovir GS-7340 (0.1 mg/dose) starting 1 day before until 1 day after the 5 days of virus inoculations; on the 5 days of thrice-daily SIV inoculations, the tenofovir GS-7340 dose was added to the 2 mL of virus inoculum. C1 and C2, Starting 1 or 2 days before the first virus inoculation respectively, the groups received once-daily (at ~0700 hours) oral tenofovir DF administration (10 mg/kg body weight). C1, Tenofovir DF was given 7 days in a row (ie, the last dose given the day after the last virus inoculation) and then restarted at the same regimen only for the 5 animals that were reinoculated with SIV 4 weeks later. C2, Tenofovir treatment was continued for a period of 7 weeks (ie, including 2 weeks after the second set of virus inoculations) for all 6 animals. Pos indicates infected; neg, uninfected; trans, transient viremia (animal 35410); UD, animal loss because of unrelated death (aspiration pneumonia).

© 2006 Lippincott Williams & Wilkins

virus isolation from PBMC, and serology) and remained this way throughout the rest of the 1-year observation period. It is unclear whether the transient detection of virus at 2 weeks of age in animal 35410 may have had a protective effect on the outcome of the second series of virus inoculations. The sixth animal of group B was not viremic after the first set of virus inoculations but had to be euthanized because of an unrelated condition (aspiration pneumonia) at 5 weeks of age (shortly after the second set of virus inoculations); although the animal was aviremic at that time, it was too early to draw definite conclusions about the outcome of the second set of virus inoculations.

The 6 newborn macaques of group C1 received oral administration of tenofovir DF (10 mg/kg body weight) once daily in the morning (~0700 hours) for 7 consecutive days from 1 day before to 1 day after the first 5-day series of virus feedings. Although 1 animal became infected (Fig. 2, C1), the other 5 animals had no detectable viremia and were reinoculated with SIV at 4 weeks of age and given the same tenofovir DF regimen (10 mg/kg SID). This time, 2 animals became infected and had a viral RNA set point (6–7 log copies/mL) within the range of that of untreated animals (Figs. 1 and 2). The other 3 animals that received short-term tenofovir DF remained uninfected by all criteria throughout the observation period of 1 year. To see if a longer postexposure regimen would have higher prophylactic efficacy, another group of 6 animals (Fig. 1, C2) underwent the same series of oral SIV inoculations, except that oral administration of tenofovir DF (10 mg/kg SID) was started 2 days before the first set of virus inoculations and continued for all 6 animals until 2 weeks after the end of the second set of virus inoculations (ie, for a total of 7 weeks). Similarly to the results of group C1, 1 animal of group C2 became viremic after the first set of virus inoculations; this animal (35932; Fig. 2, C2) had high viremia (>7 log RNA copies/mL) despite continued tenofovir DF treatment for 7 weeks. Of the remaining 5 animals that were reinoculated with SIV at 1 month of age, 4 animals became infected and were already viremic while receiving daily tenofovir DF treatment. The sixth animal remained negative by all criteria. All uninfected animals of groups C1 and C2 had normal growth and normal clinical parameters (including serum chemistries, urinalysis, blood counts, CD4$^+$ and CD8$^+$ T lymphocyte, and B lymphocyte counts) throughout the 1-year observation period, which is consistent with our previous observations of tenofovir's safety profile in infant macaques.[34]

## Statistical Analysis of Prophylactic Efficacy

The topical GS-7340 regimen, giving a similar infection rate as that of the untreated control animals after the first series of oral SIV inoculations, did not have any detectable prophylactic efficacy. The oral tenofovir DF regimen (10 mg/kg SID), aimed at giving systemic drug levels, had prophylactic efficacy during the first set of virus inoculations shortly after birth because the combined infection rate of groups C1 and C2 after the first set of virus inoculations (2/12 animals) was lower than that of the untreated animals (group A1, 4/6 animals; $P = 0.057$) and significantly lower than that of the combined untreated or

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Van Rompay et al*                                        *J Acquir Immune Defic Syndr* • Volume 43, Number 1, September 2006



**FIGURE 2.** Viremia after repeated low-dose oral SIV inoculations. The 4 groups (A, B, C1, and C2) represent the groups of Figure 1. A, Open circles represent the untreated control animals of subgroup A1 (Fig. 1), which received oral SIV feedings at birth; 2 animals that did not become infected received another set of SIV inoculations a month later and became infected; the closed circles (A) are the infant macaques that received the repeated oral SIV feedings only at 4 weeks of age (Fig. 1, A2). B, Animal 35410 had transient viremia. Group C1 received 1 week of TDF per set of SIV inoculations (Fig. 1). Group C2 received 7 weeks of tenofovir DF administration, including animal 35932 that was already viremic after the first series of SIV feedings.

topically treated animal groups (groups A1 and B, 8/12 animals with persistently high viremia; 1-sided Fisher exact test, $P = 0.018$; relative risk = 0.28). The same oral tenofovir regimen was less effective in protecting against the second set of oral SIV inoculations at approximately 1 month of age, as this time, 4 of the 10 tenofovir DF–treated and SIV-inoculated animals (subgroups C1 and C2) remained uninfected after the virus inoculations, compared with 2 of 27 untreated control animals (groups A1 and A2; 1-sided Fisher exact test; $P = 0.03$). The cumulative infection rate (ie, after both series of virus inoculations) in the 12 tenofovir DF–treated animals of groups C1 and C2 (8/12 animals) was still significantly lower than that of the untreated animals (29/31 animals; 1-sided Fisher exact test, $P = 0.04$; relative risk = 0.32).

## Evaluation of Phenotypic and Genotypic Susceptibility to Tenofovir

For the tenofovir DF–treated animals, virus isolated from PBMC was also tested for phenotypic susceptibility using assays previously able to detect mutant SIV isolates with approximately 5-fold reduced in vitro susceptibility to tenofovir and a K65R mutation in RT.[30,36] These virus

isolates included all those obtained at the first detection of viremia, and for group C2 (which had a longer postexposure treatment with tenofovir DF) also, virus isolated from all infected animals at the time when tenofovir DF administration was stopped at 7 weeks of age; this included the virus isolates of animal 35932, which had high viremia throughout the period of tenofovir DF treatment (Fig. 2, C2). All virus isolates tested had wild-type in vitro susceptibility to tenofovir, and all had wild-type amino acid (lysine) at codon 65 of RT, without evidence of any other mutations that are associated with reduced in vitro susceptibility to tenofovir.

## Pharmacokinetics of Tenofovir After Oral Administration of Tenofovir DF to Infant Macaques

To explore the pharmacokinetics associated with prophylactic efficacy of oral tenofovir DF administration, a pharmacokinetic study was subsequently performed to describe and assess possible age-related changes in tenofovir kinetics after oral administration during the first month of life. At approximately 1 week of age, 4 additional infant macaques (which were not exposed to SIV) were administered a single

Copyright © Lippincott  Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*J Acquir Immune Defic Syndr* • Volume 43, Number 1, September 2006
*Tenofovir DF Against Oral SIV*

dose of tenofovir DF suspension (10 mg/kg) without fasting; a similar 24-hour pharmacokinetic study was repeated with the same dose of tenofovir DF when the same animals were between 4 and 5 weeks of age. As indicated in Fig. 3, systemic exposure to tenofovir (as measured by $AUC_{0-\infty}$ values of tenofovir in plasma) was approximately 65% lower at 4 weeks of age than at 1 week of age ($P = 0.001$). Geometric mean AUC values (95% confidence interval) were 3.67 (1.70–7.90) and 1.28 (0.712–2.31) μg·h/mL at 1 and 4 weeks of age, respectively. Based on published drug levels obtained with subcutaneous injection of tenofovir in infant macaques,[34] the oral bioavailability of tenofovir DF in the current infant macaque study was estimated to be approximately 10% to 15%.

## DISCUSSION

To mimic better the daily exposure to HIV that occurs during breast-feeding, we had previously developed an animal model in which infant macaques are fed repeatedly low doses of virulent SIVmac251.[25,27] In the present study, we used this repeated low-dose exposure model to evaluate the prophylactic efficacy of 2 prodrugs of tenofovir.

The novel GS-7340 prodrug of tenofovir was selected for topical administration because its rapid entry into cells and high intracellular accumulation in vitro are features expected to be advantageous for a topical virucide in vivo.[26] However, topical administration of a low amount of tenofovir GS-7340 was not effective in lowering infection rates, although tenofovir GS-7340 was given at a high concentration and was mixed with the relatively low virus inocula. The lower initial viremia in the GS-7340–treated animals (Fig. 2B) suggests that the "topical" administration of a low amount of tenofovir GS-7340 for 1 week may have led to some systemic intracellular levels of tenofovir, which were, as predicted, suboptimal and therefore only partially inhibited virus dissemination. In dog studies, oral tenofovir GS-7340



**FIGURE 3.** Pharmacokinetics of single-dose oral tenofovir DF administration to newborn and infant macaques. Four infant rhesus macaques were given a single oral dose of 10 mg tenofovir DF/kg body weight at approximately 1 week of age (A) and again at approximately 1 month of age (B), with collection of plasma to measure tenofovir levels over a 24-hour period. C and D, Values for area under the plasma concentration-versus-time curve ($AUC_{0-\infty}$) and peak concentrations ($C_{max}$), respectively; the horizontal lines represent the geometric mean values.

© 2006 Lippincott Williams & Wilkins

Copyright © Lippincott  Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Van Rompay et al*                                        *J Acquir Immune Defic Syndr* • Volume 43, Number 1, September 2006

administration had high oral bioavailability (>70%) and led to very efficient intracellular accumulation of tenofovir (intracellular tenofovir AUC in PBMC was ~34-fold higher than that obtained with an equivalent oral dose of tenofovir DF).[26] For the infant macaque studies, we predict that a higher dose of tenofovir GS-7340 may have resulted in prophylactic efficacy because of systemic intracellular levels of tenofovir, rather than a direct topical effect. Thus, in the previous and present studies, we were not able to detect topical prophylactic efficacy with either the DF or the GS-7340 prodrugs of tenofovir against oral SIV infection.[25] This is in contrast to the demonstrated efficacy of a 1% tenofovir microbicide gel against intravaginal SIV infection (C. Miller, Z. Rosenberg, and N. Bischofberger, unpublished data); possible reasons for this discrepancy in efficacy include biologic differences in transmission events that occur across different mucosal surfaces and have been described in detail previously.[25]

In the current study, we also tested the efficacy of oral tenofovir DF to protect infant macaques against oral SIV infection. This study is highly relevant because the potential of a 2-dose oral tenofovir DF regimen (1 maternal dose and 1 infant dose) to reduce intrapartum transmission of HIV is currently being investigated.[38] We observed that a once-daily 10-mg/kg dosage regimen was quite effective in protecting infant macaques against infection during the first set of oral SIV feedings shortly after birth, but became less effective at 1 month of age. However, the cumulative results still demonstrated partial prophylactic efficacy of the oral tenofovir DF regimen against repeated oral SIV challenges ($P = 0.04$).

As subcutaneous tenofovir regimens have been highly effective in protecting macaques against infection,[15,16,18–22] the partial efficacy observed with the oral tenofovir DF regimen in the present study was at first surprising, but made more sense when the pharmacokinetics were taken into account. Our decision of using a 10-mg/kg tenofovir DF dose was based on our prediction that this dose, if oral bioavailability would be similar to that in humans, would give plasma levels of tenofovir in infant macaques pharmacokinetically similar to those of the tenofovir DF regimen used in HIV-infected human adults and children (steady-state AUC ~3 μg·h/mL, $C_{max}$ ~300 ng/mL).[24,39–41] This hypothesis proved to be true when animals were 1 week of age; however, systemic exposures were quite variable and were significantly lower 4 weeks later (Fig. 3), which may explain the reduced prophylactic efficacy of this 10-mg/kg dosage regimen at this later time point (Fig. 1). Although our infant macaque study did not evaluate intracellular levels of tenofovir diphosphate (the active form of tenofovir), a pharmacokinetic study in juvenile macaques found that an oral tenofovir DF regimen that gave similar AUC values for tenofovir levels in plasma also gave intracellular levels of tenofovir diphosphate in PBMC within the range of those seen in adults who take the once-daily 300-mg tablet (A. Ray, K. Van Rompay, and B. Lee, unpublished data); thus, it is reasonable to consider that the variable and lower plasma tenofovir exposure levels in the 4-week-old infant macaques would yield lower intracellular levels of tenofovir diphosphate.

The virologic data of the infant macaques that became infected despite oral tenofovir DF administration further suggest that the drug regimen gave suboptimal systemic drug levels. In previous studies, subcutaneous injection of tenofovir to SIV-infected monkeys early in infection always resulted in a strong reduction and delay of primary viremia and/or selection for the emergence of virus with reduced in vitro susceptibility and a K65R mutation in RT.[16–19,30,36,42] Similarly, tenofovir DF monotherapy of HIV-infected adults induces rapid reduction of viremia.[24] In contrast, in the current study, for those animals that became infected in group C2 (which received 7 weeks of daily tenofovir DF treatment), the oral tenofovir DF regimen did not delay or dampen the initial viremia, although virus had wild-type susceptibility to tenofovir. This further suggests that drug levels were suboptimal.

Our present observations are consistent with those of other investigators who tested the potential of oral tenofovir DF to protect adult macaques that received weekly rectal inoculations with SHIV$_{SF162P3}$; tenofovir DF–treated animals required more virus inoculations than untreated animals to eventually become infected, but drug levels in plasma were variable, and once animals became infected, viremia was not reduced, and there was no detectable emergence of K65R mutants despite the continued treatment with tenofovir DF for several months.[43] Together, these data suggest that the oral tenofovir DF regimens that were used in both these studies, although partially effective, were likely suboptimal to prevent infection. In vitro, tenofovir is active at lower concentrations in antigen-presenting cells (monocytes/macrophages, dendritic cells, and Langerhans cells) than in lymphocytes because of more efficient phosphorylation.[44–47] Considering that antigen-presenting cells may be the first cells that become infected during transmission, this may explain why a suboptimal tenofovir DF regimen may have partial prophylactic efficacy but may have no detectable therapeutic effect on reducing viremia once most virus replication occurs in lymphocytes.

With these considerations in mind, the partial prophylactic efficacy of an oral tenofovir DF regimen in the current macaque study is promising. Our data suggest that for human infants a tenofovir DF regimen that can consistently provide systemic drug levels similar to or higher than those obtained by a therapeutic tenofovir regimen has the potential to reduce the HIV transmission rate through breast-feeding. These same considerations apply also to the prophylaxis trials with tenofovir DF in adults. Because an efficacious HIV vaccine has so far not been identified, several ongoing clinical trials are investigating whether uninfected adult persons who engage in high-risk behavior will have a lower infection rate by taking a 300-mg tenofovir DF tablet once daily. These trials are held at several international sites and target different high-risk populations. Regardless of the ethical issues surrounding these trials (see review of the AIDS Vaccine Advocacy Coalition[48]), the combined data of the tenofovir studies in macaques provide further support to continue these pediatric and adult prevention trials because drug prophylaxis could be an additional strategy to reduce the risk for infection especially when other effective methods (such as abstinence,

*© 2006 Lippincott Williams & Wilkins*

Copyright © Lippincott  Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*J Acquir Immune Defic Syndr* • Volume 43, Number 1, September 2006
*Tenofovir DF Against Oral SIV*

mutual monogamy, and condoms) are not an option or are not consistently followed.

## ACKNOWLEDGMENTS

*We thank D. Bennett, T. Dearman, J. Fritts, L. Hirst, A. Spinner, W. von Morgenland, the Veterinary Staff, Colony Services and Clinical Laboratory of the California Regional Primate Research Center, Davis Sequencing (Davis, CA), and A. Ray and T. Cihlar (Gilead Sciences) for technical assistance and useful discussions.*

## REFERENCES

1. Scarlatti G. Mother-to-child transmission of HIV-1: advances and controversies of the twentieth centuries. *AIDS Rev*. 2004;6:67–78.
2. Gaillard P, Fowler M-G, Dabis F, et al. Use of antiretroviral drugs to prevent HIV-1 transmission through breastfeeding: from animal studies to randomized clinical trials. *J Acquir Immune Defic Syndr*. 2004;35:178–187.
3. Connor EM, Sperling RS, Gelber R, et al. Reduction of maternal-infant transmission of human immunodeficiency virus type 1 with zidovudine treatment. *N Engl J Med*. 1994;331:1173–1180.
4. Guay LA, Musoke P, Fleming T, et al. Intrapartum and neonatal single-dose nevirapine compared with zidovudine for prevention of mother-to-child transmission of HIV-1 in Kampala, Uganda: HIVNET 012 randomized trial. *Lancet*. 1999;354:795–802.
5. The Breastfeeding and HIV International Transmission Study (BHITS) Group. Late postnatal transmission of HIV-1 in breast-fed children: an individual patient data meta-analysis. *J Infect Dis*. 2004;189: 2154–2166.
6. John-Stewart G, Mbori-Ngacha D, Ekpini R, et al. Breastfeeding and transmission of HIV-1. *J Acquir Immune Defic Syndr*. 2004;35: 196–202.
7. Jackson JB, Musoke P, Fleming T, et al. Intrapartum and neonatal single-dose nevirapine compared with zidovudine for prevention of mother-to-child transmission of HIV-1 in Kampala, Uganda: 18-month follow-up of the HIVNET 012 randomised trial. *Lancet*. 2003;362: 859–868.
8. Shapiro RL, Ndung'u T, Lockman S, et al. Highly active antiretroviral therapy started during pregnancy or postpartum suppresses HIV-1 RNA, but not DNA, in breast milk. *J Infect Dis*. 2005;192:713–719.
9. Rousseau CM, Nduati RW, Richardson BA, et al. Longitudinal analysis of human immunodeficiency virus type 1 RNA in breast-milk and of its relationship to infant infection and maternal disease. *J Infect Dis*. 2003;187:741–747.
10. Kilewo C, Karlsson K, Massawe A, et al. Prevention of mother to child transmission of HIV-1 through breast-feeding by treating infants prophylactically with lamivudine in Dar es Salaam, Tanzania. Paper presented at: Third International AIDS Society Conference on HIV Pathogenesis and Treatment; July 24–27, 2005; Rio de Janeiro. TuPe5.3P01.
11. Shetty AK, Coovadia HM, Mirochnick MM, et al. Safety and trough concentrations of nevirapine prophylaxis given daily, twice weekly, or weekly in breast-feeding infants from birth to 6 months. *J Acquir Immune Defic Syndr*. 2003;34:482–490.
12. Eshleman SH, Guay LA, Mwatha A, et al. Comparison of nevirapine (NVP) resistance in Ugandan women 7 days vs. 6–8 weeks after single-dose nvp prophylaxis: HIVNET 012. *AIDS Res Hum Retroviruses*. 2004;20:595–599.
13. Jones R, Stebbing J, Nelson M, et al. Renal dysfunction with tenofovir disoproxil fumarate–containing highly active antiretroviral therapy regimens is not observed more frequently. A cohort and case-control study. *J Acquir Immune Defic Syndr*. 2004;37:1489–1495.
14. Izzedine H, Hulot JS, Vittecoq D, et al. Long-term renal safety of tenofovir disoproxil fumarate in antiretroviral-naive HIV-1-infected patients. Data from a double-blind randomized active-controlled multicentre study. *Nephrol Dial Transplant*. 2005;20:743–746.
15. Tsai C-C, Follis KE, Beck TW, et al. Prevention of simian immunodeficiency virus infection in macaques by

16. 9-(2-phosphonylmethoxypropyl)adenine (PMPA). *Science*. 1995;270: 1197–1199.
16. Van Rompay KKA, Marthas ML, Lifson JD, et al. Administration of 9-[2-(phosphonomethoxy)propyl]adenine (PMPA) for prevention of perinatal simian immunodeficiency virus infection in rhesus macaques. *AIDS Res Hum Retroviruses*. 1998;14:761–773.
17. Mori K, Yasumoti Y, Sawada S, et al. Suppression of acute viremia by short-term postexposure prophylaxis of simian/human immunodeficiency virus SHIV-RT–infected monkeys with a novel reverse transcriptase inhibitor (GW420867) allows for development of potent antiviral immune responses resulting in efficient containment of infection. *J Virol*. 2000;74:5747–5753.
18. Otten RA, Smith DK, Adams DR, et al. Efficacy of postexposure prophylaxis after intravaginal exposure of pig-tailed macaques to a human-derived retrovirus (human immunodeficiency virus type 2). *J Virol*. 2000;74:9771–9775.
19. Tsai C-C, Emau P, Follis KE, et al. Effectiveness of postinoculation (*R*)-9-(2-phosphonylmethoxypropyl)adenine treatment for prevention of persistent simian immunodeficiency virus SIVmne infection depends critically on timing of initiation and duration of treatment. *J Virol*. 1998;72:4265–4273.
20. Lifson JD, Rossio JL, Arnaout R, et al. Containment of simian immunodeficiency virus infection: cellular immune responses and protection from rechallenge following transient postinoculation antiretroviral treatment. *J Virol*. 2000;74:2584–2593.
21. Van Rompay KKA, Berardi CJ, Aguirre NL, et al. Two doses of PMPA protect newborn macaques against oral simian immunodeficiency virus infection. *AIDS*. 1998;12:F79–F83.
22. Van Rompay KKA, McChesney MB, Aguirre NL, et al. Two low doses of tenofovir protect newborn macaques against oral simian immunodeficiency virus infection. *J Infect Dis*. 2001;184:429–438.
23. Deeks SG, Barditch-Crovo P, Lietman PS, et al. Safety, pharmacokinetics and antiretroviral activity of intravenous 9-[2-(*R*)-(phosphonomethoxy)propyl]adenine, a novel anti-human immunodeficiency virus (HIV) therapy, in HIV-infected adults. *Antimicrob Agents Chemother*. 1998;42:2380–2384.
24. Barditch-Crovo P, Deeks SG, Collier A, et al. Phase I/II trial of the pharmacokinetics, safety, and antiretroviral activity of tenofovir disoproxil fumarate in HIV-1 infected adults. *Antimicrob Agents Chemother*. 2001;45:2733–2739.
25. Van Rompay KKA, Schmidt K, Lawson JR, et al. Topical administration of low-dose tenofovir disoproxil fumarate to protect infant macaques against multiple oral exposures of low doses of simian immunodeficiency virus. *J Infect Dis*. 2002;186:1508–1513.
26. Lee WA, He GX, Eisenberg E, et al. Selective intracellular activation of a novel prodrug of the human immunodeficiency virus reverse transcriptase inhibitor tenofovir leads to preferential distribution and accumulation in lymphatic tissue. *Antimicrob Agents Chemother*. 2005;49:1898–1906.
27. Van Rompay KKA, Abel K, Lawson JR, et al. Attenuated poxvirus-based SIV vaccines given in infancy partially protect infant and juvenile macaques against repeated oral challenge with virulent SIV. *J Acquir Immune Defic Syndr*. 2005;38:124–134.
28. National Research Council. *Guide for the care and use of laboratory animals*. Washington, DC: National Academy Press; 1996.
29. Van Rompay KKA, Marthas ML, Ramos RA, et al. Simian immunodeficiency virus (SIV) infection of infant rhesus macaques as a model to test antiretroviral drug prophylaxis and therapy: oral 3′-azido-3′-deoxythymidine prevents SIV infection. *Antimicrob Agents Chemother*. 1992;36:2381–2386.
30. Van Rompay KKA, Singh RP, Pahar B, et al. CD8+ cell-mediated suppression of virulent simian immunodeficiency virus during tenofovir treatment. *J Virol*. 2004;78:5324–5337.
31. Abel K, Rocke DM, Chohan B, et al. Temporal and anatomic relationship between virus replication and cytokine gene expression after vaginal simian immunodeficiency virus infection. *J Virol*. 2005;79: 12164–12172.
32. Miller CJ, Li Q, Abel K, et al. Propagation and dissemination of infection after vaginal transmission of simian immunodeficiency virus. *J Virol*. 2005;79:9217–9227.
33. Van Rompay KKA, Singh R, Brignolo L, et al. The clinical benefits of tenofovir for simian immunodeficiency virus-infected macaques are

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Van Rompay et al*                                      *J Acquir Immune Defic Syndr* • Volume 43, Number 1, September 2006

larger than predicted by its effects on standard viral and immunological parameters. *J Acquir Immune Defic Syndr*. 2004;36: 900–914.

34. Van Rompay KKA, Brignolo LL, Meyer DJ, et al. Biological effects of short-term and prolonged administration of 9-[2-(phosphonomethoxy)-propyl]adenine (PMPA; tenofovir) to newborn and infant rhesus macaques. *Antimicrob Agents Chemother*. 2004;48:1469–1487.

35. Van Rompay KKA, Otsyula MG, Marthas ML, et al. Immediate zidovudine treatment protects simian immunodeficiency virus-infected newborn macaques against rapid onset of AIDS. *Antimicrob Agents Chemother*. 1995;39:125–131.

36. Van Rompay KKA, Cherrington JM, Marthas ML, et al. 9-[2-(Phosphonomethoxy)propyl]adenine therapy of established simian immunodeficiency virus infection in infant rhesus macaques. *Antimicrob Agents Chemother*. 1996;40:2586–2591.

37. Van Rompay KKA, Matthews TB, Higgins J, et al. Virulence and reduced fitness of simian immunodeficiency virus with the M184V mutation in reverse transcriptase. *J Virol*. 2002;76:6083–6092.

38. Rodman J, Flynn P, Shapiro D, et al. Pharmacokinetics (PK) and safety of tenofovir disoproxil fumarate (TDF) in HIV-1 infected pregnant women and their infants. Paper presented at: 13th Conference on Retroviruses and Opportunistic Infections; February 5–8, 2006; Denver, CO. S-115.

39. Gallant J, Deresinski S. Tenofovir disoproxil fumarate. *Clin Infect Dis*. 2003;37:944–950.

40. Hazra R, Balis FM, Tullio AN, et al. Single-dose and steady-state pharmacokinetics of tenofovir disoproxil fumarate in human immunodeficiency virus-infected children. *Antimicrob Agents Chemother*. 2004;48:124–129.

41. Kearney BP, Flaherty JF, Shah J. Tenofovir disoproxil fumarate: clinical pharmacology and pharmacokinetics. *Clin Pharmacokinet*. 2004;43:595–612.

42. Van Rompay KKA, Dailey PJ, Tarara RP, et al. Early short-term 9-[2-(phosphonomethoxy)propyl]adenine (PMPA) treatment favorably alters subsequent disease course in simian immunodeficiency virus–infected newborn rhesus macaques. *J Virol*. 1999;73:2947–2955.

43. Subbarao S, Otten R, Ramos A, et al. Chemoprophylaxis with oral tenofovir disoproxil fumarate (TDF) delays but does not prevent infection in rhesus macaques given repeated rectal challenges of SHIV. Paper presented at: 12th Conference on Retroviruses and Opportunistic Infections; February 22–25, 2005; Boston, MA. Abstract 136LB.

44. Balzarini J, Van Herrewege Y, Vanham G. Metabolic activation of nucleoside and nucleotide reverse transcriptase inhibitors in dendritic and Langerhans cells. *AIDS*. 2002;16:2159–2163.

45. Van Herrewege Y, Penne L, Vereecken C, et al. Activity of reverse transcriptase inhibitors in monocyte-derived dendritic cells: a possible in vitro model for postexposure prophylaxis of sexual HIV transmission. *AIDS Res Hum Retroviruses*. 2002;18:1091–1102.

46. Robbins BL, Srinivas RV, Kim C, et al. Anti–human immunodeficiency virus activity and cellular metabolism of a potential prodrug of the acyclic nucleoside phosphonate 9-R-(2-phosphonomethoxypropyl)adenine (PMPA), bis(isopropyloxymethylcarbonyl)PMPA. *Antimicrob Agents Chemother*. 1998;42:612–617.

47. Aquaro S, Caliò R, Balzarini J, et al. Macrophages and HIV infection: therapeutical approaches toward this strategic virus reservoir. *Antiviral Res*. 2002;55:209–225.

48. AIDS Vaccine Advocacy Coalition. Will a pill a day prevent HIV? Anticipating the results of the tenofovir "PREP" trials. March 2005. Available at: http://avac.org/pdf/tenofovir.pdf.

*© 2006 Lippincott Williams & Wilkins*

Copyright © Lippincott  Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

# EXHIBIT 26



# ANTICIPATING THE EFFICACY OF HIV PRE-EXPOSURE PROPHYLAXIS (PrEP) AND THE NEEDS OF AT-RISK CALIFORNIANS

**Center for HIV Identification, Prevention, and Treatment Services (CHIPTS)**

Greg Szekeres
Thomas J. Coates, PhD
Simon Frost, DPhil
Arleen Leibowitz, PhD
Steven Shoptaw, PhD

November 2004





Funded by:
AIDS Partnership California

# Anticipating the Efficacy of HIV Pre-Exposure Prophylaxis (PrEP) and the Needs of At-Risk Californians

**Center for HIV Identification, Prevention, and Treatment Services (CHIPTS)**

Greg Szekeres
Thomas J. Coates, PhD
Simon Frost, DPhil
Arleen Leibowitz, PhD
Steven Shoptaw, PhD

**November 2004**

Funded by AIDS Partnership California

• • • • •   ABOUT **AIDS PARTNERSHIP CALIFORNIA**

AIDS Partnership California (APC) is a statewide public/private collaboration that includes private foundations, corporate funders, and the State Office of AIDS, plus a strategic alliance with CompassPoint Nonprofit Services. Through grantmaking, convening, training, and the dissemination of findings, APC supports the development of a system of HIV prevention for Californians of color with HIV; strengthens the capacity of community organizations to provide HIV services; advances research on the future of the HIV epidemic in California; increases the effectiveness of HIV public and private grantmaking; and supports efforts to shape California's HIV/AIDS-related public policy. Together, these activities aim to help arrest the escalating rate of HIV in California, inform sound policy decisions, and strengthen the system of HIV care and treatment. This work benefits persons with HIV or at risk for HIV, community-based organizations providing HIV services, health departments, and foundations.

• • • • •   ABOUT THE CENTER FOR **HIV** IDENTIFICATION, PREVENTION, AND TREATMENT SERVICES

The Center for HIV Identification, Prevention, and Treatment Services (CHIPTS) is a collaboration of researchers from UCLA, Charles Drew University of Medicine and Science, Friends Research Institute, and RAND working with the broader Los Angeles community toward a common goal: to enhance our collective understanding of HIV research and to promote early detection, effective prevention, and treatment programs for HIV. Funded by the National Institute of Mental Health, CHIPTS serves as a bridge among researchers, government, service providers, and people with HIV in responding to the changes in the HIV epidemic and in shaping sound public policy.

© 2004, AIDS Partnership California  (http://www.aidspartnershipca.org)

# CONTENTS

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**I.    Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
Significance
Rationale: Examining Other Key Biomedical Prevention Strategies
   HIV Postexposure Prophylaxis (PEP)
   Prevention of Mother-to-Child HIV Transmission (PMTCT)
   Hormonal Contraception
   Epidemiologic Treatment for Sexually Transmitted Diseases (STDs)
   Malaria Chemoprophylaxis
*In Summary*

**II.   Overview of Planned PrEP Research** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
FHI/Gates Study (Cameroon, Ghana, Malawi, Nigeria)
NIAID Study (Cambodia)
CDC Study (Botswana)
CDC Study (Thailand)
CDC Study (United States)
*In Summary*

**III.  Clinical Issues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
Available Versus Optimal Drugs for PrEP
TDF Safety
Provision of PrEP
PrEP Screening and Monitoring
Adherence
Seroconversion During PrEP
*In Summary*

**IV.   Prevention Issues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
Target Populations for PrEP
PrEP at Varying Efficacy Levels
Effect of PrEP on Risk Behavior
Effects of PrEP on HIV Incidence and Prevalence in California
Potential Opposition from Prevention and Care Providers
*In Summary*

**V.    Issues of Economics and Access** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**
Paying for PrEP
Cost and Cost-Effectiveness of PrEP
Barriers to Access
*In Summary*

**VI.   Conclusion and Recommendations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**References** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

**Acknowledgements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

# EXECUTIVE SUMMARY

Pre-exposure prophylaxis (PrEP) is a novel approach to HIV prevention in which antiretroviral drugs (ARVs) are used by an individual prior to potential HIV exposure to reduce the likelihood of infection. PrEP should be distinguished from postexposure prophylaxis (PEP), in which an individual takes ARVs soon after a potential HIV exposure with the goal of reducing the likelihood of infection. Studies to evaluate the safety and/or efficacy of PrEP among various risk populations in sub-Saharan Africa, Southeast Asia, and the United States are currently being planned or are beginning to enroll participants.

This monograph examines other prominent biomedical prevention strategies, including HIV PEP, prevention of mother-to-child transmission of HIV, hormonal contraception, epidemiologic treatment of sexually transmitted diseases, and malaria chemoprophylaxis, to explore possible parallels with PrEP. An overview of the major PrEP studies that are currently planned or underway is also provided. Five such studies will evaluate the safety and/or efficacy of HIV PrEP among high-risk women (Cameroon, Ghana, Nigeria), high-risk men (Malawi), female sex workers (Cambodia), sexually active young adults (Botswana), injection drug users (IDUs) (Thailand), and men who have sex with men (MSM) (United States). The earliest results of these trials should start to become available in mid-2006.

If PrEP proves to be safe and effective, numerous clinical questions will need to be resolved in order to implement the intervention in California. Issues would include how and by whom the drugs will be administered, how people wanting to use PrEP would be selected, screened, and monitored, and how people who might seroconvert while taking PrEP will be managed. There would be a need to rapidly develop clinical and counseling guidelines that provide recommendations to providers on all aspects of PrEP delivery.

Based on an analysis of who is at risk for HIV in California, a safe and effective PrEP intervention would likely need to be targeted to MSM, female partners of MSM, and IDUs and their partners. Other individuals who might be considered for PrEP would be those placed in situations or locations where risk of HIV acquisition might be heightened for a period of time, such as prisoners, commercial sex workers, or those trying to conceive with a serodiscordant partner.

Any recommendations for using PrEP would need to take its level of efficacy into account, as it is unlikely to be 100% efficacious. Modeling of the potential impact of PrEP on California's HIV epidemic shows that it is extremely unlikely that PrEP will result in the eventual elimination of HIV from at-risk communities. However, the models tested indicate that introduction of PrEP may quickly reduce incidence, with effects on prevalence being less dramatic and over a longer period of time. Potential benefits could be offset if risk behavior increases as a result of PrEP availability or if people on PrEP stop taking medication correctly.

Some prevention and care providers may oppose PrEP, either due to bias against the intervention or from concern about the potential strain on resources; as such, any planning for PrEP implementation will need to include providers and affected communities if it is to be successful.

An effective PrEP intervention would need to be accessible to all at-risk Californians for whom it is indicated. It is not clear how payment for PrEP would be covered, however. Insurers, Medi-Cal, and other payers will need to address how such coverage would occur. The cost-effectiveness model provided in this monograph suggests that PrEP is more cost-effective for individuals who engage in high and extremely high rates of risk behaviors and for instances when the efficacy for PrEP is greater than 50%. Beyond paying for PrEP, other potential barriers to accessing the intervention may include racial and socioeconomic disparity, being a minor, having a mental disability, having undocumented status, clinician bias, and fear of discrimination. These potential barriers will need to be addressed if PrEP is to be distributed equitably.

As the results of PrEP clinical trials will not be available until the studies are completed, and as limitations may exist as to the degree that data from these studies can be generalized to the HIV epidemic in California, it is important that restraint be used in making assumptions about whether PrEP will be appropriate for use in at-risk Californians. Data from currently planned and future studies will be needed before such determinations can be made.

In the meantime, an opportunity exists to consider the critical steps that will need to be taken in California if studies of PrEP prove it to be a viable HIV prevention strategy. Anticipating the key issues likely to be raised by PrEP will facilitate rapid planning and implementation of PrEP programs that are as successful and equitable as possible, if a determination is made that PrEP should be made available to at-risk Californians. A list of recommendations for optimal implementation of PrEP programs in California is provided in Section VI.

• • • • • **INTRODUCTION**

*Significance*

Worldwide, approximately 60 million people have been infected with HIV since the beginning of the pandemic, and over 20 million have died. In 2003, there were an estimated 38 million people living with HIV; in that same year, nearly 5 million people became newly infected.[1] As in many countries, HIV infections in the United States are on the rise—an estimated 950,000 people were living with HIV in 2003, up from 900,000 in 2001.[1] Although HIV infections have only been reportable in California since 2002, it is currently estimated that approximately 128,000 Californians are HIV infected (with or without an AIDS diagnosis.)[2,3] There have been over 136,000 cumulative AIDS cases reported in the State through July 2004, with over 80,000 deaths.[3]

Although behavioral interventions (including abstinence, reducing number of sexual partners, partner selection, use of male and female condoms, and needle hygiene) have shown efficacy in preventing HIV infection in diverse populations and settings, they are not always consistently implemented by individuals, are not universally effective, and have not ultimately been able to contain the pandemic. It is widely believed that, in addition to effective behavioral interventions, biomedical approaches to HIV prevention will be required to adequately curb the spread of the virus. The two most prominent technology-based HIV prevention strategies, however—HIV vaccines and vaginal and rectal microbicides—lack candidate agents that are likely to prove successful in the near- to midterm. Other practical options are desperately needed in the meantime.

It is likely that successful HIV prevention efforts will rely on multiple techniques and strategies used in combination. Just as the success of combination antiretroviral therapy relies on multiple drugs that may target more than one step in the viral life cycle, so too might prevention be enhanced by the synergistic use of social, behavioral, biomedical, and barrier methods.

Pre-exposure prophylaxis (PrEP) is a novel approach to HIV prevention that has recently generated considerable interest. PrEP involves the use of antiretroviral drugs (ARVs) by an individual prior to potential HIV exposure, in order to reduce the likelihood of HIV infection. PrEP should be distinguished from postexposure prophylaxis (PEP), in which an individual takes ARVs soon after a potential HIV exposure with the goal of reducing the likelihood of infection. It has been hypothesized that, in various international settings, PrEP could be a viable prevention strategy for certain people at high risk of HIV infection, such as commercial sex workers, those in serodiscordant relationships, and members of high-risk groups who choose not to use condoms or for whom consistent condom use has proved difficult.[4,5] It is not yet known whether PrEP is a safe or effective approach to HIV prevention, however, as studies for its evaluation in several populations are just preparing to begin. These planned studies and future, yet-to-be-planned clinical trials will determine whether and to what degree PrEP is safe and effective. If safety and efficacy are demonstrated, post-marketing (Phase IV) studies will be needed to assess how PrEP gets used in clinical practice.

There are two contrasting positions that might be taken with regard to PrEP. Some might argue that it should be an intervention of last resort, as it requires that healthy people be medicated chronically, or perhaps episodically if the data warrant that the medications be used in that way. Others might counter that it is an intervention that should be added—routinely—to the prevention armamentarium and used for those who do not or will not use condoms, or in combination with other approaches. Data is presented later in this monograph (see "Effects of PrEP on HIV Incidence and Prevalence in California" in Section IV) that demonstrate that population-level effects (ie, reducing prevalence and incidence) might require broad coverage as well as high efficacy. We also present data to demonstrate that PrEP might be cost-effective, relative to other preventive strategies and certainly relative to treatment for particular high-risk populations (see "Cost and Cost-Effectiveness of PrEP" in Section IV). There are likely to be a variety of strongly held positions with regard to PrEP. The goal of this monograph is to provide an overview of the key research issues, as well as the critical clinical, prevention, and economic questions that would need to be addressed prior to any implementation of PrEP programs in California.

### *Rationale: Examining Other Key Biomedical Prevention Strategies*

Use of ARVs as a prevention strategy in people who are HIV negative may seem like a provocative idea, and indeed there are legitimate concerns that arise from such an approach, many of which this report will outline. There are, however, many instances in medicine in which pharmaceutical or biological agents are used to prevent disease. Examples include vaccinations to prevent a host of infectious diseases; prophylactic use of antibiotics, antifungals, and antivirals in people with HIV at risk for opportunistic infections; and the use of cholesterol-lowering drugs to reduce the risk of coronary heart disease. A few examples, because they involve behavior and/or use ARVs, may be particularly illustrative with regard to PrEP. The use of ARVs for postexposure prophylaxis, mentioned earlier, and for prevention of mother-to-child transmission are two key examples from the HIV milieu. Other illustrative examples of the use of pharmaceutical agents in a pre-exposure context are epidemiologic treatment of sexually transmitted diseases (STDs), hormonal contraception, and chemoprevention of malaria.

### *HIV Postexposure Prophylaxis (PEP)*

Postexposure prophylaxis (PEP) emerged as an accepted HIV prevention strategy in a select group of individuals—those with occupational exposures—following the report in 1995 of a nonrandomized, retrospective, case-control study of health care workers having occupational, percutaneous exposure to HIV-infected blood. The study showed that postexposure use of zidovudine (ZDV or "AZT") was associated with an approximate 81% reduction in the odds of acquiring HIV.[6,7] Subsequently, studies were initiated that examined PEP for nonoccupational (ie, sexual and drug use) exposures to HIV. Two studies have shown that it is feasible and cost-effective to deliver PEP to individuals with nonoccupational HIV exposures, predominantly men who have sex with men (MSM).[8–11] One of the studies has shown that PEP attracts individuals who mostly engage in safe sexual or injection practices, experience a lapse, and seek PEP as a result.[8] Moreover, this study showed that it is difficult to deliver PEP in a timely manner following exposure to HIV,[8] perhaps diluting its efficacy.

> *It is widely believed that, in addition to effective behavioral interventions, biomedical approaches to HIV prevention will be required to adequately curb the spread of the virus.*

Several countries, including France,[12] Italy,[13] Spain,[14] Switzerland,[15] Australia,[16,17] and South Africa,[18] have issued official policies that recommend PEP for nonoccupational exposures.[19] In the United States, the CDC has issued guidelines for occupational PEP.[20] Despite the lack of controlled studies evaluating its effectiveness, the CDC has issued less formal recommendations on nonoccupational PEP,[21] although these do not go so far as to advocate its use. State guidelines for nonoccupational PEP have been issued in New York and Rhode Island,[22,23] and Massachusetts has issued a clinical advisory recommending that clinics create protocols that address key PEP concerns.[24] In California, recent legislation has established the structure for preparing and promulgating guidelines for nonoccupational PEP.[25] Recommendations for provision of PEP following sexual assault have also been issued for California.[26] Although some guidelines exist for nonoccupational PEP, the safe and effective delivery of PEP remains complex, and reliable data on the use of PEP in settings in the United States is not available.

## *Prevention of Mother-to-Child HIV Transmission (PMTCT)*

The use of ARVs for PMTCT has perhaps been the most successful HIV prevention strategy to date. Administration of ARVs to an HIV-infected mother during labor (and sometimes earlier in pregnancy as well) and to the infant postpartum has been shown to dramatically reduce the odds for perinatal HIV transmission. A landmark 1994 study of zidovudine (AZT) prophylaxis before, during, and after delivery resulted in vertical transmission rates declining from 25.5% to 8.3%.[27] Since then, similar approaches using nevirapine and combinations of agents in both research and clinical practice have driven vertical transmission rates even lower. The mechanism for this effect likely includes both pre- and postexposure prophylactic components. Pre-exposure prophylactic components include the prevention of cross-placental and intrapartum HIV transmission by lowering the viral load of the mother and, for drugs that cross the placental barrier, by providing drug exposure to the fetus. Administering drug to the infant postpartum comprises the postexposure prophylactic component.  The use of antiretrovirals for PMTCT has greatly reduced the number of HIV-positive children born to infected mothers in the settings in which such treatment is available.

## *Epidemiologic Treatment for Sexually Transmitted Diseases (STDs)*

Epidemiologic mass treatment is an approach to STD control in which antibiotics are administered to a population based on increased risk of exposure rather than STD symptoms or test results. As rates of exposure to STDs are typically high in high-prevalence populations, epidemiologic treatment likely works both by preventing and treating infections. Although epidemiologic mass treatment is not currently standard practice in the United Stated, the approach has been studied in diverse international settings for prevention and control of a variety of STDs, including syphilis, gonorrhea, chancroid, and chlamydia.[28] While incidence and prevalence of STDs in high-prevalence populations can be decreased through epidemiologic treatment, they may approach returning to baseline once treatment is withdrawn. The degree to which this approach is effective may depend on the particular pathogen, with some responding better to epidemiologic treatment than others. Continuing treatment, as well as supportive STD services, may be necessary to sustain the benefits. Problems encountered with the approach have included the costs of providing continuous treatment, the potential for development of antibiotic resistance, and difficulties with enlisting the ongoing support and cooperation of affected communities.[28,29] Similar issues arise with regard to PrEP for HIV, and these are discussed in more detail throughout this report.

## *Hormonal Contraception*

A widely accepted model of pre-exposure chemoprophylaxis in the field of sexual and reproductive health can be found in hormonal contraception. Sexually active women of childbearing potential have the option of taking prescription hormonal therapy (synthetic progestin with or without estrogen) as a means of birth control to prevent unplanned pregnancy. Methods of delivery include oral contraceptives ("the pill"), an injectable formulation (Depo-Provera), a transdermal patch (Ortho Evra), and an intravaginal ring (NuvaRing). A subcutaneous implant system (Norplant) was also available until its recent discontinuation by the manufacturer. Hormonal therapy may also be used as postexposure prophylaxis—referred to as emergency contraception—to prevent fertilization or implantation after unprotected vaginal intercourse.[30] The advent of birth control pills in the early 1960s was a watershed event, as the preventive contraceptive method was disconnected from the risk behavior (ie, vaginal sex) for the first time, and contraception subsequently became simpler, more effective, and more widely accepted. If PrEP proves to be safe and highly effective, it could have a similarly profound impact on HIV prevention.

## *Malaria Chemoprophylaxis*

Another parallel to HIV PrEP is the case of malaria, an infectious agent for which chemoprophylaxis is a standard preventive measure. Malaria prevention for travelers to endemic areas combines behavior

modification (avoidance of mosquitoes, protective clothing and nets, application of DEET-containing repellants) with prophylactic drugs (examples include chloroquine, mefloquine, doxycycline, and atovaquone/proguanil). Although the drugs do not prevent infection with the malaria parasite, they can help to prevent clinical illness by killing malaria parasites as they exit the liver and enter the bloodstream. As this event can happen several weeks after infection, malaria chemoprophylaxis is generally continued for a period of time after leaving an endemic area. Taking prophylactic drugs is not a guarantee against malarial illness, however, and the medications may cause significant toxicities in certain individuals and can incur considerable cost. Despite these shortcomings, chemoprophylaxis combined with mosquito-avoidant behavior modification is considered the standard of care for people traveling to malaria-endemic areas, and has allowed them to visit and live in these areas more safely.

Although not a perfect model, Malaria chemoprophylaxis may be able to provide a framework for thinking about HIV PrEP. As with HIV, malaria is a serious, potentially fatal illness for which no effective vaccine currently exists. Both diseases share the characteristic of risk exposure being generally episodic rather than continuous. Malaria chemoprophylaxis is typically used when an individual enters an endemic area; similarly, a chemoprophylactic strategy for HIV may largely be needed when an individual enters a period of high risk (ie, while engaging in commercial sex  work or beginning a serodiscordant relationship). In addition, the primary strategy for avoiding infection with both pathogens remains behavior modification—avoiding mosquito bites in the case of malaria, and using condoms and managing sexual partners in the case of HIV. Certainly, the parallels are not perfect. For some individuals at risk of HIV infection, their reality may be one of chronic risk and exposure. In addition, allowing oneself to be exposed to mosquito bites does not bring with it many perceived rewards, whereas having unprotected sex may provide people with pleasure, the perception of increased intimacy, and the ability to reproduce. Thus, the fundamental ways that people approach risk with each condition may differ. While antimalarial drugs have been shown to be an important component of malaria prevention, it is not yet known whether PrEP can be used with similar efficacy for HIV prevention in at-risk populations.

### *In Summary*

Whether or not HIV PrEP will come to play as significant a role in HIV prevention as the use of ARVs for prevention of perinatal transmission, or the use of hormones and chemoprophylaxis, respectively, for contraception and malaria prevention, will largely depend on the outcome of current and future studies evaluating the safety and effectiveness of PrEP as an HIV prevention strategy. It will also rest on how acceptable such a strategy, if effective, is to program planners, care providers, and the public. As with all interventions, a careful risk-benefit analysis would be required to determine in which contexts such an approach would be warranted. This report outlines some of the major PrEP research currently being planned, and highlights many of the key clinical, prevention, and economic issues that should be considered with regard to potential future PrEP implementation in California.

## OVERVIEW OF PLANNED PrEP RESEARCH

As of September 2004, there were several major PrEP studies involving human subjects being planned or currently underway. These studies include investigations of the safety and/or efficacy of PrEP in high-risk women (Cameroon, Ghana, Nigeria), high-risk men (Malawi), female sex workers (Cambodia), sexually active young adults (Botswana), injection drug users (IDUs) (Thailand), and MSM (United States). A summary of these studies is provided in Table 1.

**TABLE 1.** Major Planned PrEP Studies

| Sponsor | Study Location | Population | Enrollment Target | Study Aims | Timeline |
|---|---|---|---|---|---|
| FHI/Gates | Cameroon, Ghana, Nigeria | High-risk women | 1,200 | Evaluate biological safety of TDF for PrEP<br>Assess efficacy of TDF for PrEP<br>Determine acceptability of PrEP for PrEP | Enrollment began in summer 2004 (Malawi to begin in spring 2005).<br>Study to last approximately 2 years. |
| | Malawi | High-risk men | 400 | Identify barriers and facilitators to translating study results into effective HIV prevention planning | |
| NIAID | Cambodia (Phnom Penh) | Female commercial sex workers | 960 | Evaluate safety and efficacy of TDF for PrEP<br>Evaluate safety of using TDF in participants with hepatitis B<br>Assess adherence to study drug<br>Evaluate changes in risk behavior | Scheduled to begin enrollment in fall 2004; currently on hold. |
| CDC | Botswana | Sexually active young adults | 1,200 | Evaluate biological and behavioral safety of TDF for PrEP<br>Evaluate efficacy of TDF for PrEP<br>Measure bone density and bone metabolism in subset of your participants<br>Assess adherence to study drug<br>Evaluate TDF resistance in participants who seroconvert<br>Assess acceptability of TDF and study procedures | Study enrollment may begin in fall 2004.<br>The trial is scheduled to last 32 months. |
| CDC | Thailand (Bangkok) | IDUs | 1,600 | Evaluate biological and behavioral safety of TDF for PrEP<br>Evaluate efficacy of TDF for PrEP<br>Assess adherence to study drug<br>Evaluate TDF resistance in participants who seroconvert | Enrollment is planned for fall 2004; the study is scheduled to last 30 months. |
| CDC | United States (San Francisco & Atlanta) | High-risk MSM | 400 | Evaluate biological and behavioral safety of TDF for PrEP<br>Assess adherence to study drug<br>Analyze effect of TDF on HIV drug resistance profiles in participants who seroconvert | A 9-month recruitment period is scheduled to begin in fall 2004; participants will be followed for 2 years. (Men who seroconvert during the study will be followed for 12 months after diagnosis.) |

These studies all make use of tenofovir disoproxil fumarate (TDF) as the investigational PrEP agent. TDF is a prodrug of tenofovir, a nucleotide analogue reverse transcriptase inhibitor, and has been approved by the Food and Drug Administration (FDA) since 2001 in combination with other antiretroviral agents for the treatment of adults with HIV-1 infection.[31] Starting in the mid-1990s, studies with simian immunodeficiency virus (SIV) in macaques, a useful model of human HIV infection, have shown that tenofovir is effective at preventing infection with SIV when used either as pre- or postexposure prophylaxis.[32,33] Research has also been conducted with a topical vaginal tenofovir gel. In macaques, application of tenofovir gel before or after vaginal challenge with SIV protected 100% of the macaques[34]; studies of tenofovir vaginal gel are now underway in humans.[35] As oral TDF is an available agent with relatively low toxicity that can be administered once daily, considerable interest arose in evaluating its safety and efficacy as PrEP for prevention of HIV infection. TDF is discussed in more detail in Section III.

### FHI/Gates Study (Cameroon, Ghana, Malawi, Nigeria)

Family Health International (FHI), with funding from the Bill and Melinda Gates Foundation, is conducting a Phase II study of PrEP in high-risk, HIV-negative adults in Cameroon, Ghana, Nigeria, and Malawi. The study is double-blinded, randomized, and placebo-controlled, and consists of a 6-month screening phase, a 6-month recruitment phase, and 12 months' use of study drug for each participant. The endpoints of this study are the safety of using TDF for PrEP (determined by laboratory measures of kidney and liver function and reports of adverse events) and the efficacy of TDF for PrEP in this population (determined by HIV seroconversion). The study is currently powered only to detect a powerful treatment effect; as such it would not be expected to demonstrate efficacy. The study began the screening phase in Ghana in June 2004, and in Cameroon and Nigeria in July of 2004; following screening, 1,200 women will be enrolled and randomized to receive either TDF or placebo. Enrollment began in Ghana and Cameroon in July 2004, and in Nigeria in August 2004; as of September 2004, the sites had enrolled approximately one-third of their planned participants. A site in Malawi, scheduled to start in spring 2005, will enroll 400 high-risk HIV-negative men. Participants in the FHI study will be counseled that this is an experimental procedure and that they may be receiving a placebo. They will also receive instruction in methods of HIV prevention, be provided with condoms, and receive counseling that stresses safer sexual practices. In tandem with this safety/efficacy trial, FHI is conducting overlapping formative research in the study sites with the goals of preparing sites for the Phase II study; determining the acceptability of the intervention among participants, their partners, and the community; and identifying barriers and facilitators to translating the results of the Phase II trial into effective HIV prevention program planning. Study closeout is scheduled for mid-2006, after which trial results will begin to become available.

### NIAID Study (Cambodia)

The National Institute of Allergy and Infectious Diseases (NIAID) is sponsoring a randomized, double-blinded, placebo controlled study of TDF for HIV PrEP among female commercial sex workers in Phnom Penh, Cambodia. FHI has collaborated to sponsor the preparatory work for the study. The study would seek to enroll 960 HIV-negative adult women who have received money or gifts in exchange for sex in the year preceding enrollment. Participants would receive TDF or placebo for 12 months. The study would provide condoms and appropriate counseling on HIV prevention to all participants, and would evaluate the safety and efficacy of TDF for PrEP, as well as adherence to study drug and changes in HIV risk behavior. In addition, the study is planning to evaluate the safety of using TDF in participants with hepatitis B. This study was planned to begin in October or November of 2004. In August 2004, however, the Cambodian Prime Minister ordered a stop to the planned trial. Publicly, concerns had been raised by sex worker advocacy groups regarding medical follow-up for trial participants. While the study investigators and sponsors remain committed to working with government and community groups to try to resolve issues of concern, at the time of writing, the status of the trial was unclear.

### CDC Study (Botswana)

The prevalence of HIV infection in young adults in Botswana is extremely high—approximately 50% of women aged 25-29 are HIV infected, as are approximately 28% of men in the same age range. Sponsored by the Centers for Disease Control and Prevention (CDC), this randomized, double-blinded, placebo-controlled Phase II/III study of TDF for PrEP will seek to enroll 1,200 male and female participants, with 20% or participants in the 18-19 age group and 80% in the 20-25 age group. Following randomization, participants will be followed on study drug for 12-24 months, and then off drug for an additional 2 months. Oral HIV tests, interviews, laboratory monitoring, and adherence counseling will occur at monthly study visits. Although participants must already be sexually active in order to participate in the study, intensive risk reduction counseling will be conducted quarterly by professional counselors. A subset of participants will receive measurement of bone density and bone metabolism, as studies of very high-dose TDF in young animals was associated with osteopenia (decreased bone mass). The study's Data and Safety Monitoring Board (DSMB) will assess the safety of the study after 100 person-years of follow up to determine whether to enroll additional participants and proceed to Phase III of the study. The trial may begin in fall 2004, and is scheduled to last 32 months. Efficacy data may be available late in 2006.

### CDC Study (Thailand)

This CDC-sponsored study is a randomized, double-blinded, placebo-controlled Phase II/III study of TDF for PrEP in 1,600 HIV-negative IDUs in Bangkok, Thailand. Participants will be eligible if they are healthy and report injection drug use in the last 6 months. As with the CDC trial in Botswana, the study in Thailand will be assessing the effectiveness and biological safety of TDF for PrEP, evaluating changes in HIV-associated risk behaviors, and examining adherence to study drug and the development of resistance among participants who seroconvert. Behavioral assessments, laboratory analysis, and physical examinations will occur at screening, baseline, and every 4 weeks during follow up. The study will include 12 months of enrollment, 12 months of follow up, and 6 months of off-drug evaluation. If enrollment begins in fall 2004 as planned, study close-out should occur in early 2007.

### CDC Study (San Francisco & Atlanta, United States)

The CDC has plans to begin a randomized, double-blinded, placebo-controlled study of PrEP using TDF in high-risk, HIV-negative MSM in two cities in the United States in the fall of 2004. The study will seek to recruit a diverse sample of 400 MSM (200 each in Atlanta and San Francisco) over a 9-month period, with 2 years of follow up (men who seroconvert during the study will be followed for 12 months after diagnosis). This Phase II extended safety study will examine biological safety (clinical safety and tolerability) and behavioral safety (affect on risk behaviors), and as such will not include an evaluation of efficacy. Participants will be randomized to one of 4 study arms—daily TDF, daily placebo, no treatment for 9 months followed by daily TDF, or no treatment for 9 months followed by daily placebo. Behavioral risk assessments, laboratory monitoring, and physical exams will be conducted at screening, enrollment, weeks 2, 4, 8, 12, and then every 3 months for the duration of the study. Free rapid HIV testing will be provided at each visit, and additionally as often as participants wish during the study. Risk reduction counseling will be conducted at each study visit, and more often if necessary. Adherence to study medication will be assessed, and analysis of any study participants who seroconvert will be conducted to determine if TDF has an effect on the resistance profile of the transmitted virus. Should this study demonstrate safety, a larger efficacy trial in this population would be required to demonstrate its effectiveness. The study is expected to begin enrolling in fall 2004.

### <u>In Summary</u>

The major HIV PrEP studies currently planned or underway are designed to evaluate the safety and/or efficacy of TDF when used as PrEP in several high-risk populations. As such, they should be able to answer some key

questions about the potential to use TDF as PrEP, and about the overall acceptability of PrEP as an HIV prevention intervention. Given that these studies are still in the planning stages or have just recently begun, however, final data will likely not be available until mid-2006, at the earliest.

> *The major HIV PrEP studies currently planned or underway are designed to evaluate the safety and/or efficacy of TDF when used as PrEP in several high-risk populations. As such, they should be able to answer some key questions about the potential to use TDF as PrEP, and about the overall acceptability of PrEP as an HIV prevention intervention.*

Currently, only the CDC-sponsored safety study of MSM in Atlanta and San Francisco involves a U.S. population, so while the studies in Africa and Asia are likely to provide useful data on the efficacy of PrEP (and in the case of the African sites on a research outcomes assessment examining the translation of study results into programs), it is unclear to what degree the results of these studies will be useful for evaluating whether PrEP is a viable intervention for high-risk groups in the United States in general or California in particular. It is likely that additional research would be necessary before definitive determinations are made regarding PrEP implementation. Economic and policy analyses might also be required to examine how PrEP programs could be funded, structured, monitored, and evaluated in California, and what the potential economic, social, and medical impacts of such programs might be.

## CLINICAL ISSUES

The clinical issues that would need to be considered for offering PrEP in settings in California include what drugs to use, what the safety issues are from an individual patient perspective, how the drugs might be administered, how people wanting to use PrEP would be screened and monitored, and what the concerns may be for people who might seroconvert while taking PrEP.

A major issue to be resolved is "who decides?"— is it the patient or the provider or some combination of both? The issues to be decided include who is provided with PrEP, for what indications, and with what types of monitoring. An additional issue is who delivers PrEP. We suspect that there will not be a single answer, and that practice modes and models will vary. Nonetheless, there may be a need for professional and other groups to begin drafting practice guidelines to provide recommendations to individuals and providers in the optimal use of PrEP.

### Available Versus Optimal Drugs for PrEP

There are currently 20 antiretroviral drugs approved for treating HIV infection in the United States. In addition, there are four fixed-dose formulations available that combine more than one drug in a single pill. Currently available agents fall into four antiretroviral drug classes: nucleoside and nucleotide analogue reverse transcriptase inhibitors (NRTIs), nonnucleoside analogues (NNRTIs), protease inhibitors (PIs), and fusion inhibitors. While all of the available drugs could potentially provide some efficacy as PrEP, not all of them are

ideal candidates. To be ideal for use as PrEP, a drug should be potent, able to be dosed once daily, have a favorable toxicity profile, and not promote development of high-level viral resistance based on a single mutation. In addition, drugs whose mechanisms of action focus on pre-integration phases of the viral life cycle (prior to completion of effective viral integration into host cell DNA) are, at least in theory, likely to be more effective than those that focus on post-integration.

Protease inhibitors have a post-integrational mechanism of action—inhibiting the functional processing of viral proteins. Coupled with a side effect profile that includes possible fat redistribution and lipid abnormalities, this makes PI drugs seem less than ideal as candidate PrEP agents.

NNRTIs may also be problematic in that high-level viral resistance to drugs in this class can be conferred by single mutations, which can be quickly selected when these agents are used alone.[36] This could have implications for people who are exposed to viral strains possessing such mutations, as well as for people who might seroconvert while on PrEP. In addition, the NNRTI nevirapine has caused severe dermatological and liver toxicities in HIV-negative people using the drug as PEP, and has thus been deemed unsuitable for use in PEP.[37]

Fusion inhibitors, the newest antiretroviral class to receive approval in the United States, have a mechanism of action that makes them attractive as possible PrEP drugs—preventing HIV from entering the target host cell. Enfuvirtide, the only drug in this class currently licensed, must be injected intramuscularly twice daily and commonly causes painful nodules at injection sites. Other fusion, entry, and coreceptor-inhibitor drugs are currently being studied and may eventually prove to be more practical to use, both for treating HIV infection and possibly for PrEP. For example, the CCR5 antagonist UK-427,857 can be dosed orally and is currently in development at Pfizer, which has initiated human trials evaluating the safety of the drug and its effect on viral load.[38]

Of the NRTIs, several drugs have characteristics that may limit their potential as PrEP candidates. Lamivudine (3TC) and emtricitabine (FTC) cause few toxicities and may be taken once daily, but both are susceptible to a single-point mutation at codon 184 that confers resistance, especially when taken alone. Most of the other drugs in this class, including abacavir, didanosine (ddI), stavudine (d4T), zalcitabine (ddC), and zidovudine (ZDV, AZT), are associated with rates and types of adverse effects that may not be acceptable for chronic use in HIV-negative individuals.

Tenofovir disoproxil fumarate (TDF) is the NRTI that is currently most suitable for use as PrEP. TDF is potent, can be dosed once daily, and has a relatively favorable toxicity profile. The drug is not without risks, however, including possible emergence of resistance due to selection of the K65R mutation. TDF is the investigational agent in the major PrEP studies currently planned or underway. TDF was approved by FDA in 2001 to treat HIV infection and is formulated as a once-daily, 300 mg oral tablet (Viread®); a once-daily, fixed-dose combination tablet of TDF and emtricitabine (Truvada™) was approved in August 2004 (both Gilead Sciences, Inc., Foster City, CA).

### *TDF Safety*

The incidence of adverse effects with TDF is low and similar to placebo; gastrointestinal side effects (ie, nausea, diarrhea) are most common. It is important to note, however, that data on TDF safety to date have been from HIV-infected patients, and that unanticipated toxicities could result from chronic use of TDF in uninfected patients, as was the case with nevirapine use for PEP.

Lactic acidosis and hepatic steatosis, serious and potentially fatal conditions that can be caused by NRTIs, have not been reported with use of TDF monotherapy in clinical trials. Post-marketing, however, cases of lactic acidosis (a condition in which the mitochondria in cells generate abnormally high levels of lactate)

have been reported with use of TDF in combination with other antiretroviral drugs, and similar cases of hepatic steatosis (in which fat droplets accumulate in the liver) may exist from combination of TDF with other antiretroviral drugs. There have been cases of renal (kidney) toxicity with TDF, although the majority of these cases were in patients who had underlying systemic or renal disease or were taking nephrotoxic drugs (those which damage the kidneys).

In addition to HIV, TDF has some activity against hepatitis B virus (HBV) but is not approved for use in treating hepatitis B disease, and use of TDF has not been evaluated in HIV/HBV-coinfected patients. There have been reports of severe acute exacerbations of hepatitis B in coinfected patients taking TDF upon discontinuation of the drug.[31] Thus, use of TDF for PrEP would require HBV screening, and should not be used in HBV-infected patients without active involvement of an expert in HBV disease and treatment. There are relatively few drug-drug interactions involving TDF. The doses of atazanavir and didanosine should be adjusted when coadministered with TDF, but as these drugs are only used for treating HIV, such interactions would not be of concern for HIV-negative people taking TDF as PrEP. As TDF is primarily cleared by the kidneys, caution should be used when taking TDF with drugs that inhibit renal tubular secretion or are themselves eliminated renally. No significant interactions with food or nonprescription, nutritional, herbal, or recreational agents have thus far been reported in the scientific literature, but it is possible that such interactions are yet to be discovered. In cases of renal insufficiency, the dose of TDF needs to be adjusted, and this requires screening and ongoing laboratory monitoring.

TDF is pregnancy category "B"— animal studies have revealed no evidence of harm to the fetus, but there are no adequate, well-controlled studies in pregnant women. As there is interest in evaluating TDF for use in preventing mother-to-child transmission of HIV (intrapartum, early postpartum, and breastfeeding), studies are currently underway and in development to evaluate the safety and pharmacokinetics of TDF in HIV-infected pregnant women and their infants.

As prescription medicines go—and HIV drugs in particular—TDF appears to be a relatively safe agent with few adverse side effects and interactions with other drugs. As TDF has been used in clinical practice in the United States only since 2001 (and in the European Union since 2002), however, it is possible that other notable toxicities, drug interactions, or concerns about resistance will be reported as more people use the drug and more time passes. Also, TDF has to date been evaluated for use in treating people with HIV infection. Studies examining whether TDF is acceptably safe from the risk-benefit perspective of an HIV-negative person using TDF for PrEP are just beginning to get underway. While these studies have a limited follow up period in which to look for adverse effects, it is hoped that the results of these studies will begin to shed light on the safety of using TDF for PrEP.

### *Provision of PrEP*

The PrEP studies described in Section II are providing participants with 300 mg TDF tablets (or placebo) to be taken once daily during the study period. It is not yet known what the optimal strategy is for providing PrEP, should it prove effective, to various populations. How it would be determined whether PrEP use should be episodic or continuous, or for how long use of PrEP should continue for a given population or individual, are questions that are currently unanswerable and may or may not be clarified by currently planned studies.

> *It is not yet known what the optimal strategy is for providing PrEP, should it prove effective, to various populations.*

It cannot be assumed that the mechanisms of drug provision that may work in the controlled circumstances of a clinical trial will necessarily translate into "real world" settings. Many of the groups most at risk for HIV in California, such as IDUs, young people of color, and young MSM, are often those who may be less likely to have health coverage, and this could affect their ability to access PrEP. Agents such as TDF are currently prescription products that require some degree of clinical monitoring, which can be particularly complex in the case of HBV-coinfection or renal insufficiency. Should PrEP prove to be effective, it is unclear whether or how high-risk individuals would be able to access PrEP outside of mainstream health care channels—or even if this would be advisable—as there are few precedents for use of prescription drugs without formal medical oversight. While some of the studies will be tracking adherence to PrEP, drug adherence generally tends to be higher in the research context, and the actual experience in non-research settings and with populations other than those being studied may vary.

Some at-risk individuals may use inappropriate means to acquire PrEP drugs (ie, medication sharing, Internet sales) with the intended purpose of using PrEP while avoiding medical monitoring and behavioral prevention strategies. Active preparation of the care communities and prevention agencies may help limit this, but it is likely that a highly effective result for the PrEP trials will increase the desirability of acquiring the medication among HIV-negative individuals. As in the cases of sildenafil (Viagra), tadalafil (Cialis), and vardenafil (Levitra), Internet sales and sharing of medication are not only possible, but likely. It is unlikely that legal sanctions will prove to be effective at addressing these unauthorized transactions. Strategies that promote the value of integrating behavioral supports that encourage compliance and that facilitate sustained health-related behavior change may increase the utility of PrEP and decrease the occurrence of Internet sales and medication sharing. For example, communities will need to be educated that PrEP will not likely be a "magic bullet" against HIV infection.

### PrEP Screening and Monitoring

The goal of PrEP is to prevent HIV infection in high-risk seronegative people. It is important that persons seeking PrEP who are HIV infected be identified, as PrEP is inadequate therapy for someone with HIV infection. PrEP monotherapy could allow for disease progression and limitation of future therapeutic options due to viral resistance. Planned studies of PrEP will screen for HIV infection prior to enrollment; the FHI study in Africa will conduct HIV testing and pre- and post-test counseling during screening, and then repeat HIV testing at monthly follow-up visits for the duration of the intervention. In the U.S. CDC study, HIV testing will occur at each study visit (at screening, enrollment, weeks 2, 4, 8, 12, and then every 3 months for the duration of the study), plus more frequently if a participant wishes.

HIV screening will continue to be necessary should PrEP eventually be offered outside the research setting. Screening for HBV and renal insufficiency will also be necessary for safe PrEP implementation. In addition, engaging high-risk people to evaluate them for PrEP may oblige care providers to screen for other comorbid conditions (such as hepatitis C virus or STDs), and provide vaccinations to prevent hepatitis A and B. An acceptable standard for baseline and follow-up screening for PrEP would need to be developed. As persons accessing PrEP would be doing so through some sort of care mechanism, it is unlikely that HIV testing for this purpose would be anonymous. It may need to be determined whether a requirement for confidential HIV testing in this regard, coupled with California's law mandating reporting of HIV infections, could act as a barrier to accessing PrEP for some of those at high risk for HIV.

If PrEP is implemented, a standard will also need to be developed to address how those taking PrEP will be monitored for adverse effects, and how often such monitoring needs to occur. Clinical trials of PrEP will carefully monitor laboratory values (such as kidney and liver function) and have detailed methods for reporting study-related adverse events.  The results of these trials may shed light on the type of monitoring necessary and the required frequency of monitoring. Post-marketing Phase IV studies or other mechanisms for reporting adverse events that may occur if PrEP is implemented will be desirable. A National Nonoccupational HIV Postexposure Prophylaxis Registry was established by the CDC to collect data on drug toxicity and other

variables related to PEP for sexual and drug-use exposures to HIV, allowing providers to send in reports by fax or through the registry's Web site (http://www.hivpepregistry.org). To date, however, this registry has not collected many reports, and so other models to collect such data for PrEP need to be considered.

While it is too early to determine many of the details about the type and frequency of monitoring for HIV infection and PrEP-related side effects required for widespread PrEP implementation in California or other locations in the United States, it is reasonable to expect that the currently planned studies will provide at least some direction in this regard. If PrEP becomes a viable intervention, government or professional bodies should convene expert panels to issue guidelines on screening, toxicity monitoring, and other facets of PrEP management, similar to those that have been issued for other aspects of HIV prevention and care, although whether or not this would occur is subject to conjecture.

### Adherence

The issue of adherence will be an important one to explore, both in the research context and, if shown to be effective, with clinical use of PrEP. The issues with PrEP may be more complex than those encountered in analogous prophylaxis situations, and different from many treatment situations. Malaria prophylaxis, for example, usually requires short-term use while an individual is traveling in an endemic area. Individuals using antiretrovirals for PEP take the medications for a brief period of time only. Those taking antiretrovirals to treat HIV infection are aware that lapses in adherence can lead to resistant virus, the need to change medications, and perhaps disease progression. The two situations most analogous to PrEP for HIV are the use of contraceptives to prevent unplanned pregnancy, and the use of antimalarials for individuals living in endemic areas for long periods of time. Nonetheless, it is impossible, at this point, to specify the kind of adherence necessary for effective PrEP, and it will not be possible to do so until we have good data on the frequency and dosing levels necessary for PrEP to work. Once these parameters are defined, the kinds of support systems needed to ensure that individuals take PrEP in a way to maximize efficacy will become clearer.

### Seroconversion During PrEP

In the planned PrEP trials, regular monitoring for HIV infection serves as a determinant of the efficacy of the intervention. It also provides the opportunity to discontinue study drug quickly if a participant becomes HIV infected while enrolled in the study, and to refer the participant to appropriate counseling and care. The efficacy of PrEP is not yet known. If PrEP is not 100% effective when used properly, or if doses are missed, then it is possible that people may still seroconvert while taking PrEP. In the case of PEP, Roland et al found a substantial number of seroconversions among those taking ARVs for nonoccupational PEP.[39] Cases of seroconversion despite occupational PEP have also been reported.[40-43] Ideally, someone taking PrEP who seroconverts would be identified as soon as possible following infection so that the person could be immediately evaluated for optimal clinical management. As monotherapy is not suitable for treating HIV disease it is likely that, in a case of seroconversion, the PrEP agent would be discontinued or substituted with combination antiretroviral therapy, depending on the needs and preferences of the patient.

It is possible that taking PrEP could affect disease course in cases of subsequent seroconversion. PrEP could have an impact on HIV resistance patterns in those taking it who seroconvert. The selection of the K65R mutation in HIV-infected patients taking TDF in combination with other antiretroviral drugs has been seen with increasing frequency.[44] Additionally, if PrEP use resulted in significant transmission of TDF-resistant viral strains, it could reduce the drug's effectiveness as both a therapeutic and prophylactic agent. Some have speculated that, should HIV infection occur while taking PrEP, the presence of antiretroviral drugs in very early infection may reduce HIV-mediated destruction of virus-specific T-cell clones, thus helping to preserve antiviral immunity. While some data in primates may lend support to this theory, such attenuated disease has not been seen in health care workers who have seroconverted while taking PEP for occupational exposure to HIV.

*In Summary*

The primary goal at this stage is for clinical trials of PrEP to get underway and produce high-quality safety and efficacy data over the next couple of years. Results of the studies will be eagerly anticipated and closely followed. Should studies determine that PrEP is safe and effective, care will need to be taken to ensure that people who use PrEP in real world settings are adequately screened and monitored, that appropriate strategies for supporting adherence are available, that any effects on subsequent seroconversion while on PrEP are considered, and that the potential risks and benefits to a given individual considering PrEP can be weighed as for any medical intervention.

· · · · · ## PREVENTION ISSUES

### Target Populations for PrEP

In the United States and in California, racial and ethnic minorities are at high relative risk for HIV infection (Table 2).[45] California is second only to New York in the cumulative number of AIDS cases reported through December 2002 (128,064 in California compared to 155,755 in New York).[45] California demographics differ somewhat from national demographics (Table 2).[45-47]

**TABLE 2.** AIDS Cases by Race/Ethnicity: United States & California

|  | United States AIDS Cases[a] | California AIDS Cases |
|---|---|---|
|  | *Through 2002* | *Through July 2004[b]* |
| African American | 39% | 18% |
| Asian/Pacific Islander | <1% | 2% |
| Caucasian | 41% | 58% |
| Latino | 18% | 22% |
|  | *In 2002* | *In 2003[c]* |
| African American | 51% | 20.6% |
| Asian/Pacific Islander | 1% | 3.5% |
| Caucasian | 31% | 40.5% |
| Latino | 17% | 34.4% |

Sources

a. Centers for Disease Control and Prevention, National Center for HIV, STD and TB Prevention. HIV/AIDS Surveillance Report: Cases of HIV Infection and AIDS in the United States, 2002. CDC; 2003.

b. California Department of Health Services, Office of AIDS. AIDS Reporting Registry: Surveillance Report for California, July 31, 2004.

c. California Department of Health Services, Office of AIDS. California - AIDS Cases Reported from January 1, 2003 through December 31, 2003. Data query performed by Office of AIDS, August 2004.

Gender distribution differs in California from the rest of the nation as well (Table 3). It is important to note that a substantial proportion of AIDS cases among minorities in California are among MSM or MSM-IDU. A breakdown of AIDS cases in men in California in 2003 is given in Table 4.

**TABLE 3.** AIDS Cases by Sex: United States & California

|  | United States AIDS Cases (in 2002)[a] | California AIDS Cases (in 2003)[b] |
|---|---|---|
| Male | 74% | 87.3% |
| Female | 26% | 12.7% |

*Sources*

a. *Centers for Disease Control and Prevention, National Center for HIV, STD and TB Prevention. HIV/AIDS Surveillance Report: Cases of HIV Infection and AIDS in the United States, 2002. CDC; 2003.*

b. *California Department of Health Services, Office of AIDS. California - AIDS Cases Reported from January 1, 2003 through December 31, 2003. Data query performed by Office of AIDS, August 2004.*

For AIDS cases in women reported in California in 2003, HIV was almost always acquired through heterosexual transmission or injection drug use, although there remains a substantial percentage of cases in which the risk behavior group is "unknown." Table 5 provides a breakdown of AIDS cases in women in California in 2003.

Prevalence estimates indicate that HIV remains concentrated primarily in individuals in specific risk behavior groups—MSM, IDUs, or their combination. Estimates of the number of MSM in California range from a low of 400,000 men who identify as gay or bisexual to 800,000 men who have ever had sex with another man.[48,49] Approximately 200,000-300,000 Californians are injection drug users.[49,50] Rates of new HIV infections from counseling and testing settings in California have also remained stable or decreased slightly since 1990, with the rate of incident infections across the State hovering above 1%. Among MSM, the group at highest risk for new HIV infection, however, incidence rates remain at 3-4%.[51] There is no indication that HIV is migrating from groups of individuals who engage in these behaviors to the general population. A prospective, NIDA-funded cooperative agreement with UCLA, Research Triangle Institute, RAND, University of Illinois at Chicago, and Yale University is underway to study incident infections in these core risk groups, the sexual partners of these core-group individuals, and the sexual partners of these adjacent individuals to address the question of diffusion of HIV transmission from individuals with known HIV risks to those with no known risks.

Methamphetamine use, along with use of other drugs and alcohol, is strongly linked to high-risk behavior and the acquisition of HIV among MSM. The most recent example of this comes from Project Explore.[52] Colfax et al determined that substance use during sex was independently associated with increased sexual risk in this cohort. They found that the following substances used just before or during sex increased the probability of serodiscordant unprotected anal intercourse: alcohol (OR 1.11 per drink), inhaled nitrites ("poppers") (OR 1.9), amphetamines (OR 1.5), and sniffed cocaine (2.4).[53] In a follow-up analysis using only MSM from San Francisco, Colfax et al found that high-risk sex (unprotected anal sex with an HIV-infected or unknown-status partner) over time increased during times that use of methamphetamines, inhaled nitrites, or sniffed

**TABLE 4.** AIDS Cases in Men in California in 2003

| Among Men | |
|---|---|
| MSM | 65.4% |
| MSM-IDU | 7.6% |
| IDU | 9% |
| Heterosexual | 4.8% |
| Unknown | 12.3% |
| **Among African American Men** | |
| MSM | 48.8% |
| MSM-IDU | 6.6% |
| IDU | 16.6% |
| Heterosexual | 6.8% |
| Unknown | 20.4% |
| **Among Asian/Pacific Islander Men** | |
| MSM | 70.9% |
| MSM-IDU | 4.1% |
| IDU | 4.1% |
| Heterosexual | 7.0% |
| Unknown | 5.3% |
| **Among Caucasian Men** | |
| MSM | 73.7% |
| MSM-IDU | 10.1% |
| IDU | 7.4% |
| Heterosexual | 2.6% |
| Unknown | 5.3% |
| **Among Latino Men** | |
| MSM | 63.7% |
| MSM-IDU | 5% |
| IDU | 7.2% |
| Heterosexual | 6.3% |
| Unknown | 16.6% |

*Source*

*California Department of Health Services, Office of AIDS. California - AIDS Cases Reported from January 1, 2003 through December 31, 2003. Data query performed by Office of AIDS, August 2004.*

**TABLE 5.** AIDS Cases in Women in California in 2003

| Among Women | |
|---|---|
| Heterosexual | 47.2% |
| IDU | 23.7% |
| Unknown | 25.4% |
| **Among African American Women** | |
| Heterosexual | 43.4% |
| IDU | 27.7% |
| Unknown | 26.2% |
| **Among Asian/Pacific Islander Women** | |
| Heterosexual | 65.4% |
| IDU | 0.0% |
| Unknown | 23.1% |
| **Among Caucasian Women** | |
| Heterosexual | 43.6% |
| IDU | 38.7% |
| Unknown | 16.0% |
| **Among Latina Women** | |
| Heterosexual | 52.1% |
| IDU | 11.6% |
| Unknown | 31.7% |

*Source*

*California Department of Health Services, Office of AIDS. California - AIDS Cases Reported from January 1, 2003 through December 31, 2003. Data query performed by Office of AIDS, August 2004.*

cocaine also increased.[54] Finally, Koblin et al examined predictors of seroconversion in the Project Explore cohort. The use of amphetamines accounted for 17.4% of seroincidence, with an adjusted hazard ratio of 2.11. Heavy alcohol use accounted for 5.5% of seroconversions, with an adjusted hazard ratio of 1.81.[55]

Mental health variables have also been associated with high-risk behavior and with seroconversion. Again, in the Project Explore cohort, depression accounted for 15.3% of the seroconversions, with an adjusted hazard ratio of 1.42.[55]

Many of the cases of HIV transmission among injection drug users may be caused by sexual activity. Kral et al conducted a nested case-control study of IDU seroconverters and control subjects who remained seronegative. Men who had sex with men were 8.8 times more likely to seroconvert than heterosexual men. This could be because of the drug of choice (methamphetamines) and also because of sexual transmission. Another predictor of seroconversion among female IDUs in San Francisco was having traded sex for money (OR 5.1); women who had a steady sex partner who also injected drugs were 68% less likely to seroconvert than women without a steady sex partner.[56]  Similar findings about sexual transmission being the predominant mode of transmission among injection drug users have been found by Strathdee et al[57,58] and other studies pointing to risks of seroconversion among sex workers.

Immigration is also an important consideration for the HIV epidemic. In Los Angeles, for example, 24% of persons living with AIDS as of 1999 were born outside of the United States.[59] In a recent study of STD clinics run by the Los Angeles County Department of Public Health, analyses of data from blinded HIV testing of 61,120 specimens for routine syphilis testing revealed that 38% of clients were born outside of the United States. The majority (87%) were from Mexico or Central America, with no difference in HIV prevalence between U.S. and foreign-born clients.[60]

Finally, diagnosis with an STD is an important marker for those at risk for HIV acquisition. In the Project Explore cohort, Koblin et al found that prior self-reported gonorrhea accounted for 4.2% of seroconversions, with an adjusted hazard ratio of 2.41.[55]

From these analyses, PrEP in California would need to be directed at the following groups:

- MSM, particularly:
    - MSM of color, particularly Latinos and African Americans
    - MSM who are also IDUs
    - MSM who use alcohol, methamphetamines, or other drugs
    - MSM diagnosed with an STD
    - MSM who report depression
- Female sexual partners of MSM
- IDUs
- Sexual partners of IDUs

Other individuals who might be considered for PrEP would be those being placed in situations or locations where risk of HIV acquisition might be heightened and PrEP use potentially considered for a period of time, for example:

- Persons in serodiscordant relationships
- Persons wishing to conceive with a serodiscordant partner
- Prisoners, while they are incarcerated
- Commercial sex workers, while they are engaged in sex work
- Actors in adult films, while they are filming
- Relatively low-risk persons traveling to areas of high prevalence when sexual activity is possible

Additional research may be needed to determine, based on specific risk behaviors, which individuals within these populations might be especially good candidates for PrEP. It should be emphasized that, if it is shown to be effective, use of PrEP among risk populations is likely to have the most benefit when it is promoted as part of a comprehensive prevention strategy that includes condoms and other methods of risk reduction. PrEP is unlikely to be 100% effective, either due to inherent limitations with the approach or to lack of proper adherence.

### *PrEP at Varying Efficacy Levels*

As PrEP is unlikely to be 100% efficacious, any recommendations for its use would need to take its level of efficacy into account. An analogy can be made between PrEP and preventive HIV vaccines. Much theoretical work has been conducted to attempt to understand the relationships between vaccine efficacy, range of coverage, projected increases in risk behavior, and epidemic control. We believe that those results are instructive here, perhaps even more so than attempts to understand the relationship between antiretroviral use among HIV-infected individuals, reductions in infectiousness, and spread of HIV, as in modeling conducted by Velasco-Hernandez, et al.[61] In the absence of any specific current knowledge regarding the efficacy of PrEP, we must rely on assessments of varying levels of PrEP efficacy.

There are two potential scenarios to consider—the impact on the individual and the impact on the community. Anderson and Garnett outline several parameters to define impact on the individual and the community[62]:

- Apparent efficacy—the percentage of individuals who appear to be immunized (in the case of a vaccine) or the percentage who achieve sufficient blood levels of the medication (in the case of PrEP)

- Duration of protection (relevant for vaccines and also relevant for PrEP)

- Vaccine (or drug) failure rate—fraction of vaccinated (or medication-taking) individuals who become infected when exposed to the virus

- Ratio of the infectiousness, if infected, of vaccinated (or PrEP-using) individuals (ie, have "broken through" vaccine or PrEP), relative to that of unvaccinated (or non-PrEP using) individuals

- Ratio of the length of the average incubation period of HIV in infected vaccinated (or PrEP-using) individuals (ie, have "broken through" vaccine or PrEP), relative to unvaccinated (or non-PrEP using) persons

These modelers demonstrate that the impact of an intervention on a community also requires calculating the basic reproductive rate of the virus determined by changes in sexual behavior after the introduction of an intervention like PrEP, the partner exchange rate in the population, sex acts per partner, and sexual mixing patterns. For a vaccine with 80% efficacy, assuming individuals do not change their behavior as a result of the introduction of the intervention, and with life expectancy of sexual activity set at 35 years, eradication of the virus is not possible. The same could hold true for PrEP.

Nonetheless, benefits can accrue to communities even with vaccines of lower efficacy. Low coverage with a highly efficacious vaccine (or PrEP) can have a substantial impact on endemic prevalence, as can high coverage with a vaccine (or PrEP) of low efficacy. Further, encouraging the use of an effective PrEP strategy in combination with other prevention approaches could have a synergistic effect that provides significant benefit.

Even with widespread use, however, PrEP might not have benefit if it is of low efficacy and risk behavior increases substantially. Katz et al examined the relationship between the introduction of highly active antiretroviral therapy (HAART) and HIV seroincidence among MSM in San Francisco. It was concluded that any decrease in per-contact risk of HIV transmission due to HAART use appears to have been counterbalanced or overwhelmed by increases in the number of unsafe sexual episodes.[63] Thus, in this case, other prevention behaviors were reduced with the use of ARVs. It will be necessary to address this issue should the roll-out of PrEP be desirable. The potential effect of PrEP on risk behavior and on HIV incidence and prevalence in California is discussed below.

In the individual case, a highly efficacious PrEP medication would be required to protect individuals engaged in sexual relations with many partners, or engaged in high-risk practices (eg, unprotected receptive anal or vaginal intercourse) with high-risk partners (eg, individuals known to have or HIV, or whose HIV serostatus is unknown but where exposure to and infection with HIV is highly likely). A less efficacious PrEP medication might be useful if individuals combined it with other known forms of protection, such as condoms.

### *Effect of PrEP on Risk Behavior*

Two precedents are illustrative in examining the potential for PrEP to lead to increased risk behavior: postexposure prophylaxis (PEP) and the introduction of HAART into communities.

Evidence of the impact of the introduction of PEP is informative but far from definitive. The available data show that PEP does not appear to increase risk behavior among those receiving it in conjunction with 5 sessions of risk reduction counseling. Martin et al examined whether or not use of PEP lead to increases in risky sex. They followed 397 adults with a high-risk sexual or drug-use exposure and found, after 12 months of follow-up, that the majority of participants did not request a repeat course of PEP (83%). Compared with baseline, 73% of participants reported a decrease in the number of times they had performed high-risk sexual acts, and 13% reported no change.[64] The Praca Onze Study Team in Brazil, which used a counseling protocol that included detailed individual discussions on high-risk exposures, the expected side effects of antiretroviral drugs, and the lack of data on the efficacy of PEP, reported similar findings.[65] Very early in the evaluation of PEP in San Francisco, Waldo, Stall, and Coates examined the impact of the availability of PEP on sexual risk behavior in MSM, and found that hearing about PEP was not related to sexual risk taking, with only a small percentage self-reporting that PEP had the effect of increasing their sexual risk behavior.[66] These precedents may or may not apply to PrEP, as most individuals requesting PEP were relatively low risk, and sought PEP after a lapse in safe sexual or injection practices.[8]

The evidence on the introduction of HAART causing increases in risk behavior is also informative and important to consider. The potential benefits of PrEP on reducing HIV incidence may be short lived if individuals receiving PrEP increase their risk behaviors, particularly if PrEP is only modestly efficacious and there is low coverage in the population. There have been a plethora of reports showing that increased sexual risk-taking, a resurgence of sexually transmitted infections, and increases in incidence of HIV among MSM were reported in San Francisco, the United States, Canada, the United Kingdom, France, the Netherlands, and Australia following the introduction of HAART.[67-71] Reductions in worry about HIV were correlated with increases in risk taking. Katz et al were able to demonstrate the correlation between the introduction of HAART and increases in risk behavior.[63] Focus groups conducted in California by Morin et al to identify perceptions of why HIV risk-taking had increased found the following: (1) HIV is not the threat it once was due to more effective therapies, (2) communication about HIV has decreased among MSM, and social support for being safe has also decreased, and (3) community norms shifted such that unsafe sex was more acceptable.[72]

These implications are important. It will be necessary to study individual and community reactions to PrEP and to determine how to implement it, so that it does not lead to discarding other prevention approaches.

A difficulty, however, is that its use may be simpler for some than condoms or other prevention approaches, and may be favored. It may also become difficult to send complex messages about combination prevention strategies. Finally, economic pressures may reduce spending for traditional condom promotion and other prevention activities in favor of PrEP.

### Effects of PrEP on Incidence and Prevalence of HIV in California

The potential effects of PrEP on the HIV epidemic in California can be modeled to the extent that the use of PrEP is analogous to a short-lived, partially effective vaccine with multiple doses required to confer protection. Although modeling of the HIV epidemic has historically not been able to be as accurate as modeling for conditions such as vaccine-preventable childhood illnesses, it can still be useful in estimating the impact of interventions and other variables on the course of the epidemic. We developed modeling equations to test varying assumptions about PrEP efficacy and its impact on the basic reproductive number, a commonly used measure of vaccine efficacy. The reproductive number can be considered as the average number of secondary infectious cases generated by a single infectious case over the entire course of infection in a wholly susceptible population. If the basic reproductive number can be reduced below 1, then infection will eventually die out (the basic reproductive number for HIV in San Francisco has been estimated at between 2 and 5.)[73] The basic reproductive number in the presence of PrEP is related to the fraction of the population treated with PrEP (coverage), the degree of protection provided by the PrEP medication (apparent efficacy), and a variable that describes change in one of the parameters of the basic reproductive number following the introduction of PrEP, for example, changes in the numbers of partners.[73,74]

Modeling results indicated that for PrEP to reduce the basic reproductive number below 1, both the coverage and the degree of protection would have to be extremely high (>90%), especially in situations where the basic reproductive number is high, which are the circumstances for which PrEP has been proposed. Hence it is extremely unlikely that PrEP will result in the eventual elimination of HIV from any of the at-risk communities in California. Still, it is worth noting that the models tested indicate that introduction of PrEP may quickly reduce incidence, with effects on prevalence being less dramatic and over a longer period of time.

> *It will be necessary to study individual and community reactions to PrEP and to determine how to implement it, so that it does not lead to discarding other prevention approaches.*

The models tested the dynamics of incidence and prevalence using a number of explicit assumptions regarding the natural history of HIV within a population. These are: (1) the population is homogenous with rates of risky behaviors the same for all individuals; (2) individuals enter the community at a certain rate and leave the population (by death/immigration) at a per-capita rate; (3) there is a short period during acute infection (average 2 months) when the transmission probability is higher followed by a longer asymptomatic period (average 12 years) during which the transmission probability per act is low; (4) individuals become infected at a rate proportional to the number of individuals with acute and chronic infection, weighted by their infectiousness; (5) PrEP is introduced in two waves—first, a proportion of individuals in the community initiate PrEP; second, as new individuals enter the community, a proportion initiate PrEP; (6) treated individuals have a lower probability of being infected per contact.

Figure 1 presents outcomes for models of PrEP on HIV incidence and prevalence in a population with 45% prevalence and 2% incidence. Modeling results were calculated based on a pessimistic scenario (coverage and degree are 50%) and an optimistic scenario (coverage and degree are 90%). A fraction of uninfected individuals initiate PrEP at year 1 in the simulation, after which a fraction of individuals entering the population initiate PrEP.

**FIGURE 1.** Outcomes for models of PrEP on HIV incidence and prevalence in a population with 45% prevalence and 2% incidence, based on a pessimistic scenario (coverage and degree are 50%) and an optimistic scenario (coverage and degree are 90%)



The models assume that PrEP is administered to individuals entering the population and that individuals take PrEP throughout their sexual lifetimes. A more pessimistic scenario involves a single rollout of PrEP, with no sustained PrEP of new individuals entering the population, and this results in a slow increase in incidence, following an initial drop. The most dramatic effect is seen when individuals stop taking PrEP while still practicing risky behavior. In such a model, the drop in incidence is reversed almost entirely after five years, and the effect on prevalence is negligible. Moreover, these models suggest that although PrEP has the potential to reduce incidence dramatically even at low levels of coverage and efficacy, decreases in incidence can easily be overturned by increases in risk behavior and by failure of individuals to comply with PrEP. While the probability of drug resistance emerging in an individual on PrEP exposed to HIV is likely low, the emergence of drug resistance would be accelerated if individuals continued with PrEP following infection, if individuals failed to comply with the PrEP regimen, and if individuals were not tested for HIV frequently. There is always a risk that the resulting drug-resistant virus could be transmitted to individuals on PrEP at a higher frequency than drug-sensitive virus.

### Potential Opposition from Prevention and Care Providers

Resistance to implementing PrEP could come from providers if it results in decreases in funding for organizations or traditional prevention programs that could occur if limited resources in California require the diversion of funds for PrEP from other prevention strategies. A similar outcry has occurred with the CDC's shifting of funds from traditional programs to programs emphasizing HIV counseling and testing and a focus on prevention for positives.[75-77] It may not be possible to distribute PrEP through typical prevention channels, as it is a medical intervention that would require a prescription and clinical screening and monitoring. Issues of cost and financing for PrEP medications and services are discussed in Section V.

Opposition could come from prevention providers who fear that the entirety of HIV prevention will be "medicalized," avoiding difficult issues such as condom promotion for high-risk groups, comprehensive sex education for adolescents, needle and syringe exchange for injection drug users, and outreach to individuals in high-risk environments. Favorable funding allocations should be considered for providers capable of delivering supportive behavioral prevention interventions, in which PREP is only one part of a comprehensive risk-reduction strategy aimed at keeping HIV-negative people uninfected.

Care providers may also oppose widespread implementation of PrEP, particularly if additional resources are not available. Many research efforts are being focused on technological prevention strategies including, in

addition to PrEP, male circumcision, microbicides, routine voluntary counseling and testing for HIV, use of acyclovir, the diaphragm, and use of antiretrovirals to reduce infectiousness. None of these strategies are likely to approach the traditional goal of vaccines, namely nearly perfect protection against infection and disease. This will mean that these strategies will inevitably have to be used in combination, and together with more traditional behavioral and social prevention strategies.  Medical providers might fear that the entire prevention effort will fall entirely on their shoulders, and that the task is impossible without additional resources or better reimbursement rates for clinical visits.

Agencies serving minority populations might well oppose PrEP, as the populations they serve are the same populations that have limited access to medical services and, as such, are less likely to have access to PrEP through regular medical providers. Any plan for implementing PrEP must take into account the needs of minority communities and populations, and figure out how to ensure that PrEP reaches those most in need of prevention.

### In Summary

Based on available data regarding populations at high risk for HIV infection in California, some speculation can be made as to what groups might be good candidates for PrEP if it is shown to be safe and effective. Ultimately, however, data from planned PrEP studies will be needed before it can be determined for whom PrEP is an appropriate strategy. Further studies may be necessary to elucidate, within risk groups, what specific risk behaviors might make one eligible for PrEP. As with HAART, it is possible that an effective PrEP therapy could increase individual and/or community risk behavior, thereby reducing the effectiveness of the intervention. The degree to which PrEP is effective on a biological level, and the extent to which coverage of the therapy is extended to those at risk, will be important determinants of how PrEP affects the incidence and prevalence of HIV in California. Opposition to PrEP may arise from a variety of prevention and care providers, either from bias against the intervention or from concern about the potential strain on resources. Any plans to implement PrEP will need to include providers and affected communities if they are to be successful.

## ISSUES OF ECONOMICS AND ACCESS

### Paying for PrEP

The outcomes of the PrEP studies currently being planned and implemented will likely influence the degree to which widespread adoption of PrEP for Californians at high risk for HIV infection is considered. For developing countries with high prevalence of HIV infection, study outcomes indicating that PrEP is safe and effective may lead to consideration of provision of lifelong chemoprophylaxis for large portions of their populations. The relatively low costs and low risks of this approach may be preferable in countries unable to provide lifelong combination treatments for most of those who become infected.[4]

There is not a high-prevalence, generalized HIV epidemic in the United States as there is in some African and Asian nations, and so there is likely to be debate in California over whether the costs for paying for biomedical prevention approaches are justifiable. There are cost benefits from avoiding HIV infections, including contributions to the tax-base from uninterrupted productivity and avoidance of costs to the AIDS Drug Assistance Program (ADAP) and Medi-Cal for each individual who remains HIV negative. If PrEP demonstrates a high degree of efficacy in preventing HIV infection, there will be a need to rapidly determine which people the intervention should be offered to. PrEP must be accessible to all Californians for whom it is deemed appropriate. Questions remain, however, as to how such coverage would be provided. A substantial number of Californians have reduced access to or minimal coverage of health care

that may restrict access to PrEP—it is estimated that 18% of California adults aged 18-64 were uninsured in 2001.[78] The role of the State in ensuring PrEP coverage may include covering the costs for the medication and medical monitoring using Medi-Cal or ADAP. This may be difficult, however, as these programs are already strained, and ADAP is currently only configured to provide medications to those with an HIV diagnosis.

It is unknown whether the FDA would approve a labeling change for TDF to include prevention of HIV infection, based on the studies currently being fielded. While all of the currently planned studies are being conducted with standard ethical and study monitoring procedures that would facilitate consideration by regulatory authorities in many countries, only the NIAID Cambodian trial currently meets FDA investigational new drug (IND) specifications, and at the time of writing, this study was on hold. While clinicians would be free to prescribe TDF "off-label" for PrEP, the lack of inclusion of HIV prevention as an FDA-approved indication could affect the willingness of insurers to cover TDF for PrEP. Inoculation against diseases using vaccines is routine in the United States, with the costs for these inoculations typically borne by most insurance companies and health maintenance organizations. One reason contributing to this is that the approach is extremely effective in preventing the occurrence of disease and related costs, thereby justifying the coverage. Should trials demonstrate that PrEP effectively prevents acquisition of HIV infection, there would be some precedent for insurance companies and health maintenance organizations covering the costs of providing PrEP medication and monitoring, although this comparison is far from perfect—inoculations are generally given once or a few times, whereas PrEP may need to be taken daily, and paid for, for long periods of time. It remains to be seen what policies companies would enact with regard to such coverage.

### Cost and Cost-Effectiveness of PrEP

The cost and cost-effectiveness of PrEP are important factors in considering the value of the intervention as part of a comprehensive HIV prevention strategy in California. The expected yearly per-case cost for TDF ($6,292/yr) was calculated using the average of the retail charges for one month (30 tablets) of TDF as quoted by three large pharmacies in California. While it is likely that insurance companies and other large-scale payers for PrEP may successfully negotiate a lower yearly per case cost (which would lead to a lower cost-effectiveness estimate), use of the retail cost provides an estimate that is at the higher bounds.

The cost-effectiveness of PrEP was estimated as the cost to avert one infection given varying levels of apparent efficacy of PrEP (between 30% and 75% effective) and given varying levels of frequency of commission of a limited set of sexual risk behaviors over a one-year period (unprotected receptive anal intercourse, unprotected insertive anal intercourse, receptive anal intercourse with condom, insertive anal intercourse with condom, unprotected receptive oral intercourse). Published estimates of the per-act HIV transmission probability[79,80] and estimates of condom effectiveness[81] were used for this analysis. Base-rates of the average number of times per year individuals engage in specific risk behaviors were provided by Project Explore.[52] Average rates of risk behaviors were defined as 12 of the specific acts per year, high rates defined as 24 acts per year, and extremely high rates defined as 48 acts per year. As shown in Figure 2, the cost effectiveness of PrEP for each infection averted varies as a function of the frequency of risk behaviors and of the efficacy of PrEP. This analysis suggests that PrEP is more cost-effective for individuals who engage in high and extremely high rates of risk behaviors and for instances when the putative efficacy for PrEP is greater than 50%.

### Barriers to Access

#### Racial and Socioeconomic Disparity

It can be expected that, without explicit intervention, African Americans, Latinos, and those of lower socioeconomic status will be the least likely to have access to PrEP. This certainly has been the case in accessing PEP in San Francisco.[8] Research on access to antiretroviral medications for treatment of HIV has

shown that African Americans, Latinos, and members of lower socioeconomic groups with HIV infection were less likely than others to access antiretrovirals after HAART became available in the late 1990s.[82] Socioeconomic status is certainly operative, as low-income HIV-positive individuals have competing demands (eg, needing money for food, clothing or housing; postponing care because of not having money for transportation; not being able to get out of work) that may prevent these individuals from keeping physician visits. Marked disparities also existed in the distribution of AZT prior to the advent of HAART.[83] Minorities and lower socioeconomic groups are under-represented in clinical trials for anti-HIV drugs. In the nationally represented HIV Cost and Services Utilization Study (HCSUS), lower rates of clinical trial participation by African Americans, Latinos, and lower socioeconomic groups was explained in part by lack of trust, lack of access to care, belief in AIDS conspiracies, and discrimination.[84] In San Francisco, African American ethnicity was associated with being likely to die sooner from AIDS than Caucasian or Latino ethnicity.[85] Of course, racial and socioeconomic disparities in health access and outcomes are not unique to HIV/AIDS and have been documented for a wide variety of diseases for a long time.

### Age (Adolescent Minors)

While it is generally in the best interests of all concerned that physicians and other care providers obtain parental/guardian consent and child assent for health care decisions for children aged 13 years and older,[86] children at risk may either not wish to request this consent from their parents/guardians or may be runaways and not have access to parents or guardians to provide consent. In California, minors of any age may consent to medical care related to pregnancy, contraception, or abortion; minors 12 years of age or older may consent to medical services for diagnosis and/or treatment of infectious or communicable diseases (including STDs), and for HIV/AIDS testing and treatment. In these instances, providers may not inform a parent or guardian

---

**FIGURE 2.** Cost-Effectiveness of PrEP



without the minor's consent.[87] Despite these policies, adolescent minors in California that are most at risk of HIV infection may have difficulty accessing PrEP and its related care due to lack of insurance, lack of familiarity with or trust of the medical system, and denial of their risk.

*Mental Disability*

Persons with mental disabilities who engage in HIV risk behaviors may be unable to provide fully informed consent or to even be aware of this prevention intervention and its potential benefits. Should a PrEP intervention for at-risk populations be implemented, consideration should be given to educating guardians of those with mental disabilities and staff members who work at agencies charged with maintaining the welfare of these individuals (ie, the California Regional Centers for developmental disabilities, agencies who work with the homeless). Adherence problems common to individuals with mental disabilities should also be a consideration in formulating recommendations to these individuals. While those individuals who live with families or in more controlled settings may easily comply with the minimal adherence necessary to maintain protection, those individuals with mental disabilities who are homeless or transitionally housed may require extra supports (eg, directly observed therapy).

*Undocumented Status*

Undocumented immigrants at risk for HIV infection present an especially difficult policy issue. While the rate at which HIV-infected undocumented immigrants access care at California AIDS care clinics is unknown, there would be obvious benefits to using public resources to provide an effective medical prevention for HIV to HIV-negative undocumented immigrants at high risk of HIV. Moreover, given the relative ease by which individuals cross the border between California and Mexico, there may be important policy implications for recommending or even supporting effective PrEP interventions in Mexico for HIV-negative MSM and IDU through existing border health initiatives. The situation is complex, however, as some amount of ARVs intended for PrEP, including those given to immigrants in the United States, are likely to be routed to HIV-infected people in their home countries who need treatment but cannot access it.

*Clinician Bias*

The literature on adherence in general, and adherence to anti-HIV drugs in particular, has demonstrated convincingly that physicians are not good at predicting who will and who will not adhere well to medications. Especially important in this literature are the findings that homeless and marginally housed individuals are as good as clinic populations in maintaining adherence to antiretroviral medications,[88] as are individuals in developing countries.[89,90] Research is needed on medical care provider biases in use of PrEP for various population groups, and educational strategies that might best ensure that PrEP is not distributed differentially on the basis of demographics. Aside from bias in patient selection, clinician bias against PrEP in general, perhaps based on legitimate concerns about the intervention, would have an effect on whether patients are informed about or offered PrEP in the clinics in which they routinely seek care.

*Stigma and Discrimination*

Given that risk for HIV often carries socially stigmatizing associations—being gay, using drugs, being sexually promiscuous, etc—a request for PrEP may represent a tacit admission that one engages in behaviors that carry such stigma. The perception, perhaps sometimes correct, among some of those at risk for HIV infection may be that accessing PrEP could lead to sanctions ranging from disapproval of their clinician to discrimination in the workplace to preventing acquisition or retention of health or life insurance. The HIV testing that would be necessary to screen patients for PrEP is unlikely to be anonymous, and this may also cause anxiety for those who are wary of their HIV infection being reported. It is possible that such concerns could prevent a segment of the at-risk population from accessing PrEP, even if it shown to be an effective prevention intervention.

*In Summary*

Ultimately, resource issues may prove to be relatively minor variables in the consideration of whether to adopt PREP as a biomedical prevention strategy, compared to the overall efficacy of the approach. The more effective the intervention is shown to be, the stronger the policy arguments will be for implementing PrEP as part of a comprehensive HIV prevention approach. If widespread implementation becomes desirable, however, it will be necessary to ensure that such resources are in place to provide the intervention to those that need it, and that any barriers to access are anticipated and addressed proactively.

## CONCLUSION AND RECOMMENDATIONS

Reliable information on the effectiveness and biological and behavioral safety of PrEP as an HIV prevention intervention will not be available until the studies currently being planned and implemented are completed and their data analyzed and reported. Given current study timelines, this is unlikely to occur prior to mid-2006. If PrEP is shown to have acceptable biological and behavioral safety, efficacy, and cost-effectiveness, it can be expected that programs to implement PrEP in California would be advocated for by key stakeholders. It is also possible that some communities and organizations would oppose PrEP, based on concerns of its potential to affect risk behavior, or on other economic, moral, or ethical grounds.

As the results of PrEP trials will not be available for some time, there is an opportunity to examine what the response in California ought to be if the intervention proves successful. Should clinical trials show that PrEP is effective, the following are recommended as ways to ensure optimal implementation of PrEP programs in California:

- A statewide panel should be convened to address whether and how PrEP programs would be implemented and covered in California. The panel would need to include all key stakeholders, including State government, clinicians, HIV prevention providers and program planners, PrEP researchers, affected communities and their advocates, health care organizations, and third-party payers.

- Additional clinical research is needed in order to develop sound clinical and counseling guidelines as to how PrEP should be administered to prospective patients. An expert panel comprising government, PrEP researchers, clinicians, prevention providers, and affected communities would issue recommendations covering all aspects of PrEP use, including patient selection, screening, dosage, monitoring, and evaluation.

- If TDF is shown to be effective as a PrEP agent and becomes indicated for this purpose, Phase IV (post-marketing) studies will be valuable in tracking adverse effects related to prophylactic TDF use.

- It is likely, with the attention given to PrEP, that its use may already have begun among some members of risk groups with access and resources. Studies should be initiated to determine the extent of its use, the sources of medications for individuals, the ways in which individuals are using PrEP (eg, episodically or chronically), and whether or not it is being used instead of or in combination with other prevention strategies.

- Studies will be needed to determine (1) if PrEP use will result in decreased use of other prevention strategies (eg, condoms, microbicides, vaccines); (2) how to communicate the need for combination prevention strategies; and (3) how to communicate about PrEP efficacy in the case that studies demonstrate that PrEP is of low or moderate efficacy in preventing HIV acquisition.

- Research will need to be conducted to determine the best ways to introduce and market PrEP in at-risk communities, so that risk behavior does not rise as a result.

- Favorable funding allocations should be considered for providers capable of delivering supportive behavioral prevention interventions in which PREP is only one part of a comprehensive risk-reduction strategy aimed at keeping HIV-negative people uninfected.

- Prevention and care providers need to be brought together with public health officials to discuss the implications of the "medicalization" of prevention, and to discuss alternative strategies to ensure that combinations of approaches—behavioral, social, and biomedical—are used optimally in all settings.

- Evaluation of PrEP provision in nontraditional care settings will be useful to ensure that high-risk individuals with poor access to health care can still avail themselves of PrEP.

- Research will be required that examines medical care provider biases in use of PrEP for various population groups, and provider education strategies will need to be developed that ensure that PrEP is not distributed differentially on the basis of such biases.

- Any plan for implementing PrEP must take into account the needs of minority communities and populations, to ensure that PrEP reaches those most in need of HIV prevention.

- Organizations serving youth, people with mental disabilities, and undocumented immigrants will need to be included in planning for PrEP implementation, to ensure that ways are found to ensure access to PrEP for these groups. Organizations working with IDUs (including needle exchange programs) will also need to be included. Ongoing outreach and education with agencies serving these populations will likely be necessary.

- Stakeholder communities, including those that would be likely to use PrEP if it shown to be effective, as well as their providers, will need to be deeply involved in all aspects of any PrEP research or program planning and implementation that is conducted in California.

## • • • • REFERENCES

1. UNAIDS. 2004 Report on the Global AIDS Epidemic. Geneva, Switzerland; 2004.

2. California Department of Health Services, Office of AIDS. Fast Facts: California and the HIV/AIDS Epidemic. http://www.dhs.ca.gov/ps/ooa/aboutoa/pdf/FastFacts101502.pdf.

3. California Department of Health Services, Office of AIDS. AIDS Reporting Registry: Surveillance Report for California. August 31, 2004.

4. Smith SM. Pre-exposure chemoprophylaxis for HIV: It is time. *Retrovirology*. 2004 Jul 06;1(1):16.

5. Youle M, Wainberg MA. Pre-exposure chemoprophylaxis (PREP) as an HIV prevention strategy. *J Int Assoc Physicians AIDS Care (Chic Ill)*. 2003 Jul-Sep;2(3):102-5.

6. Centers for Disease Control and Prevention. Case-control study of HIV seroconversion in health-care workers after percutaneous exposure to HIV-infected blood—France, United Kingdom, and United States, January 1988-August 1994. *MMWR Morb Mortal Wkly Rep*. 1995 Dec 22;44(50):929-33.

7. Cardo DM, Culver DH, Ciesielski CA, Srivastava PU, Marcus R, Abiteboul D, Heptonstall J, Ippolito G, Lot F, McKibben PS, Bell DM. A case-control study of HIV seroconversion in health care workers after percutaneous exposure. Centers for Disease Control and Prevention Needlestick Surveillance Group. *N Engl J Med*. 1997 Nov 20;337(21):1485-90.

8. Kahn JO, Martin JN, Roland ME, Bamberger JD, Chesney M, Chambers D, Franses K, Coates TJ, Katz MH. Feasibility of postexposure prophylaxis (PEP) against human immunodeficiency virus infection after sexual or injection drug use exposure: the San Francisco PEP Study. *J Infect Dis*. 2001 Mar 1;183(5):707-14.

9. Schechter M, Lago RF, Ismerio R, Mendelsohn AB, Harrison LH. Acceptability, Behavioral Impact, and Possible Efficacy of Post-Sexual-Exposure Chemoprophylaxis (PEP) for HIV. 9th Conference on Retroviruses and Opportunistic Infections, Seattle, WA; February 24-28, 2002, Abstract 15.

10. Pinkerton SD, Martin JN, Roland ME, Katz MH, Coates TJ, Kahn JO. Cost-effectiveness of postexposure prophylaxis after sexual or injection-drug exposure to human immunodeficiency virus. *Arch Intern Med*. 2004 Jan 12;164(1):46-54.

11. Pinkerton SD, Martin JN, Roland ME, Katz MH, Coates TJ, Kahn JO. Cost-effectiveness of human immunodeficiency virus post-exposure prophylaxis following sexual or injection drug use exposure in 96 US metropolitan areas. *AIDS*, in press.

12. Principales dispositions de la circulaire DGS/DH/DRT/DSS no. 98/228 du 09/04/1998. *Bulletin Epidemiologique Hebdomadaire*. 1998;30:130-1.

13. Puro V. Post-exposure prophylaxis for HIV infection. Italian Registry of Post-Exposure Prophylaxis. *Lancet*. 2000 Apr 29;355(9214):1556-7.

14. Ortega JA BJ, et al. Guidelines for non-occupational post-exposure HIV prophylaxis. Recommendations of GESIDA/CEESCAT/National plan on AIDS. Practice guidelines for the management of HIV infections (2000-2002). Madrid, Spain: Ediciones Doyma, 2002:129-142.

15. Bernasconi E, Ruef C, Jost J, Francioli P, Sudre P. National registry for non-occupational post HIV exposure prophylaxis in Switzerland: ten-years results. XIII International AIDS Conference. Durban, South Africa; July 9-14, 2000.

16. Australian National Council on AIDS, Hepatitis C and Related Diseases. Guidelines for the management and post-exposure prophylaxis of individuals who sustain nonoccupational exposure to HIV: Australian National Council on AIDS, Hepatitis C and Related Diseases; 2001.

17. Department of Health Government of Western Australia. Protocol for non-occupational post-exposure prophylaxis (NPEP) to prevent HIV in Western Australia: Department of Health, Government of Western Australia:1-16.

18. Department of Health, South Africa. Policy guideline for management of transmission of human immunodeficiency virus (HIV) and sexually transmitted infections in sexual assault: Department of Health, South Africa.

19. Rey D, Den Diane M, Maotti J. Prophylaxis after non occupational HIV exposure: an overview of the policies implemented in 27 European countries. XIII International AIDS Conference. Durban, South Africa; July 9-14, 2000.

20. Centers for Disease Control and Prevention. Updated U.S. Public Health Service Guidelines for the Management of Occupational Exposures to HBV, HCV, and HIV and Recommendations for Postexposure Prophylaxis. *MMWR Morb Mortal Wkly Rep.* 2001;50:1-42.

21. Centers for Disease Control and Prevention. Management of Possible Sexual, Injection-Drug-Use, or Other Nonoccupational Exposure to HIV, Including Considerations Related to Antiretroviral Therapy. *MMWR Morb Mortal Wkly Rep.* 1998;47:1-14.

22. New York State Department of Health AIDS Institute. HIV Post-Exposure Prophylaxis Following Non-Occupational Exposure Including Sexual Assault. July 2004.

23. Nonoccupational HIV PEP Task Force, Brown University AIDS Program and the Rhode Island Department of Health. Human Immunodeficiency Virus Postexposure Prophylaxis Guidelines for Rhode Island Healthcare Practitioners. nd.

24. Massachusetts Department of Public Health. HIV Prophylaxis Following Non-Occupational Exposures: Recommended Protocol Components. URL: http://www.mass.gov/dph/aids/guidelines/exposure_nonwork.htm.

25. California Health and Safety Code: Division 105, Part 4, Chapter 17, Section 121348-121348.2.

26. Myles J, Bamberger J. Housing and Urban Health of the San Francisco Department of Public Health and The California HIV PEP After Sexual Assault Task Force in Conjunction with the California State Office of AIDS. Offering HIV Prophylaxis Following Sexual Assault: Recommendations for the State of California. 2001.

27. Connor EM, Sperling RS, Gelber R, Kiselev P, Scott G, O'Sullivan MJ, VanDyke R, Bey M, Shearer W, Jacobson RL. Reduction of maternal-infant transmission of human immunodeficiency virus type 1 with zidovudine treatment. Pediatric AIDS Clinical Trials Group Protocol 076 Study Group. *N Engl J Med.* 1994 Nov;331(18):1173-80.

28. Steen R, Dallabetta G. The use of epidemiologic mass treatment and syndrome management for sexually transmitted disease control. *Sex Transm Dis.* 1999 Apr;26(4 Suppl):S12-20.

29. Handsfield, H. Perspectives on Presumptive Therapy as a Sexually Transmitted Disease Control Strategy: Commentary on "The use of epidemiologic mass treatment and syndrome management for sexually transmitted disease control". *Sex Transm Dis.* 1999 Apr;26(4 Suppl):S21-22.

30. Grimes DA, Raymond EG. Emergency contraception. *Ann Intern Med.* 2002 Aug 6;137(3):180-9.

31. Gilead Sciences, Inc. Viread [package insert]. Foster City, CA: Gilead Sciences, Inc.; June 2004.

32. Tsai CC, Follis KE, Sabo A, Beck TW, Grant RF, Bischofberger N, Benveniste RE, Black R. Prevention of SIV infection in macaques by (R)-9-(2-phosphonylmethoxypropyl)adenine. *Science.* 1995 Nov 17;270(5239):1197-9.

33. Van Rompay KK, Berardi CJ, Aguirre NL, Bischofberger N, Lietman PS, Pedersen NC, Marthas ML. Two doses of PMPA protect newborn macaques against oral simian immunodeficiency virus infection. *AIDS.* 1998 Jun 18;12(9):F79-83.

34. Miller C, Rosenberg Z, Bischofberger N. Use of topical PMPA to prevent vaginal transmission of SIV. Ninth International Conference on Antiviral Research, Fukushima, Japan; May 19-24, 1996.

35. Mayer KH, Maslankowski L, El-Sadr W, Justman J, Masse B, Hendrix C, Rooney J, Kwiecien A, Soto-Torres L. Safety and tolerability of vaginal tenofovir gel (TFV) in HIV-uninfected and HIV-infected women (HPTN 050). XIV International AIDS Conference, Bangkok, Thailand; July 11-16, 2004. Abstract ThOrB1373.

36. Deeks SG. International perspectives on antiretroviral resistance: Nonnucleoside reverse transcriptase inhibitor resistance. *J Acquir Immune Defic Syndr.* 2001 Mar 1;26 Suppl 1:S25-33.

37. Patel SM, Johnson S, Belknap SM, Chan J, Sha BE, Bennett C. Serious adverse cutaneous and hepatic toxicities associated with nevirapine use by non-HIV-infected individuals. *J Acquir Immune Defic Syndr.* 2004 Feb 1;35(2):120-5.

38. Fatkenheuer G, Pozniak A, Johnson M, Plettenberg A, Staszewski S, Hoepelman IM, Saag M, Goebel F, Rockstroh J, Dezube B, Jenkins TM, Medhurst C, Sullivan JF, Ridgway C, Abel S, Youle M, van der Ryst E. Evaluation of dosing frequency and food effect on viral load reduction during short-term monotherapy with UK-427,857 a novel CCR5 antagonist. XIV International AIDS Conference, Bangkok, Thailand; July 11-16, 2004. Abstract TuPeB4489.

39. Roland ME, Coates TJ, Tapia J, Krone MR, Neilands TB, Hecht F, Grant R, Martin JN. Seroconversion Following Non-Occupational Post-Exposure Prophylaxis (PEP). 11th Conference on Retroviruses and Opportunistic Infections, San Francisco, CA; February 8-11, 2004. Abstract 888.

40. Evans B, Duggan W, Baker J, Ramsay M, Abiteboul D. Exposure of healthcare workers in England, Wales, and Northern Ireland to bloodborne viruses between July 1997 and June 2000: analysis of surveillance data. *BMJ.* 2001 Feb 17;322(7283):397-8.

41. Perdue B WD, Mellors J, Quinn T, Margolick J. HIV-1 transmission by a needle-stick injury despite rapid initiation of four-drug postexposure prophylaxis. 6th Conference on Retroviruses and Opportunistic Infections. Chicago, IL; January 31-February 4, 1999.

42. Ippolito G, Puro V, Petrosillo N, De Carli G, Micheloni G, Magliano E. Simultaneous infection with HIV and hepatitis C virus following occupational conjunctival blood exposure. *JAMA.* 1998 Jul 1;280(1):28.

43. Jochimsen EM. Failures of zidovudine postexposure prophylaxis. *Am J Med.* 1997 May 19;102(5B):52-5;discussion 56-7.

44. Winston A, Pozniak A, Mandalia S, Gazzard B, Pillay D, Nelson M. Which nucleoside and nucleotide backbone combinations select for the K65R mutation in HIV-1 reverse transcriptase. *AIDS.* 2004 Apr 9;18(6):949-51.

45. Centers for Disease Control and Prevention, National Center for HIV, STD and TB Prevention. HIV/AIDS Surveillance Report: Cases of HIV Infection and AIDS in the United States, 2002; 2003.

46. California Department of Health Services, Office of AIDS. AIDS Reporting Registry: Surveillance Report for California; July 31, 2004.

47. California Department of Health Services, Office of AIDS. California - AIDS Cases Reported from January 1, 2003 through December 31, 2003. Data query performed by Office of AIDS, August 2004.

48. Pourat N. Analysis of the 2001 California Health Interview Survey by the UCLA Center for Health Policy Research. (As cited in McCandless RR. California HIV Indicators: Brief Report #1. Universitywide AIDS Research Program, University of California, Office of AIDS, California State Department of Health Services. June 9, 2004.)

49. Facer M, Ritieni A, Marino J, Grasso P, Social Light Consulting Group. Consensus Meeting on HIV/AIDS: Incidence and Prevalence in California. Office of AIDS, California Department of Health Services. 2001:3.

50. Moskowitz JM, Henneman TA, Young Holt B. California 2000 HIV/AIDS Knowledge, Attitudes, Beliefs, and Behaviors (KABB) Survey: Methods and Results. Berkeley, CA: University of California, Berkeley. 2002:66.

51. McCandless RR. California HIV Indicators: Brief Report #1. Universitywide AIDS Research Program, University of California, Office of AIDS, California State Department of Health Services. June 9, 2004.

52. Koblin B, Chesney M, Coates T; EXPLORE Study Team. Effects of a behavioural intervention to reduce acquisition of HIV infection among men who have sex with men: the EXPLORE randomised controlled study. *Lancet.* 2004 Jul 3;364(9428):41-50.

53. Colfax G, Vittinghoff E, Husnik MJ, McKirnan D, Buchbinder S, Koblin B, Celum C, Chesney M, Huang Y, Mayer K, Bozeman S, Judson FN, Bryant KJ, Coates TJ; EXPLORE Study Team. Substance use and sexual risk: a participant- and episode-level analysis among a cohort of men who have sex with men. *Am J Epidemiol.* 2004 May 15;159(10):1002-12.

54. Colfax GN, Coates TJ, Husnik MJ, Huang Y, Buchbinder S, Vittinghoff E, and the Explore Study Team.  Longitudinal patterns of methamphetamine, popper (amyl nitrite), and cocaine use and high risk sexual behavior among a cohort of San Francisco men who have sex with men:  the EXPLORE study. *Journal of Urban Studies, in press.*

55. Koblin BA, Husnik MJ, Colfax GN, Huang Y, Madison M, Mayer K, Barresi PJ, Coates TJ, Chesney MA, Buchbinder S. Risk factors for HIV infection among men who have sex with men:  The Explore Study. *American Journal of Public Health,* under review.

56. Kral AH, Bluthenthal RN, Lorvick J, Gee L, Bacchetti P, Edlin BR. Sexual transmission of HIV-1 among injection drug users in San Francisco, USA: risk-factor analysis. *Lancet*. 2001 May 5;357(9266):1397-401.

57. Strathdee SA, Sherman SG. The role of sexual transmission of HIV infection among injection and non-injection drug users. *J Urban Health*. 2003 Dec;80(4 Suppl 3):iii7-14.

58. Strathdee SA, Galai N, Safaiean M, Celentano DD, Vlahov D, Johnson L, Nelson KE. Sex differences in risk factors for HIV seroconversion among injection drug users: a 10-year perspective. *Arch Intern Med*. 2001 May 28;161(10):1281-8.

59. Brown ER, Ponce N, Rice T, Lavarreda SA. Approximately one-fourth of Latinos in California are undocumented (not permanent residents and not in the process of receiving their green card). The State of Health Insurance in California: Findings From the 2001 California Health Interview Survey. Los Angeles, CA: UCLA Center for Health Policy; 2002.

60. Los Angeles County Department of Health Services, Office of AIDS Programs and Policy. HIV prevention plan 2000. Los Angeles County; 2000.

61. Velasco-Hernandez JX, Gershengorn HB, Blower SM. Could widespread use of combination antiretroviral therapy eradicate HIV epidemics? *Lancet Infect Dis*. 2002 Aug;2(8):487-93.

62. Anderson RM, Garnett GP. Low-efficacy HIV vaccines: potential for community-based intervention programmes. *Lancet*. 1996 Oct 12;348(9033):1010-3.

63. Katz MH, Schwarcz SK, Kellogg TA, Klausner JD, Dilley JW, Gibson S, McFarland W. Impact of highly active antiretroviral treatment on HIV seroincidence among men who have sex with men: San Francisco. *Am J Public Health*. 2002 Mar;92(3):388-94.

64. Martin JN, Roland ME, Neilands TB, Krone MR, Bamberger JD, Kohn RP, Chesney MA, Franses K, Kahn JO, Coates TJ, Katz MH. Use of postexposure prophylaxis against HIV infection following sexual exposure does not lead to increases in high-risk behavior. *AIDS*. 2004 Mar 26;18(5):787-92.

65. Praca Onze Study Team. Behavioral Impact, Acceptability, and HIV Incidence Among Homosexual Men With Access to Postexposure Chemoprophylaxis for HIV. *J Acquir Immune Defic Syndr*. 2004 Mar 15;35(5):519-525.

66. Waldo CR, Stall RD, Coates TJ. Is offering post-exposure prevention for sexual exposures to HIV related to sexual risk behavior in gay men? *AIDS*. 2000 May 26;14(8):1035-9.

67. Chen SY, Gibson S, Katz MH, Klausner JD, Dilley JW, Schwarcz SK, Kellogg TA, McFarland W. Continuing increases in sexual risk behavior and sexually transmitted diseases among men who have sex with men: San Francisco, Calif, 1999-2001, USA. *Am J Public Health*. 2002 Sep;92(9):1387-8.

68. Van de Ven P, Prestage G, French J, Knox S, Kippax S. Increase in unprotected anal intercourse with casual partners among Sydney gay men in 1996-98. *Aust N Z J Public Health*. 1998 Dec;22(7):814-8.

69. Dodds JP, Nardone A, Mercey DE, Johnson AM. Increase in high risk sexual behaviour among homosexual men, London 1996-8: cross sectional, questionnaire study. *BMJ*. 2000 Jun 3;320(7248):1510-1. (Erratum in: *BMJ* 2000 Sep 16;321(7262):675.)

70. Miller M, Meyer L, Boufassa F, Persoz A, Sarr A, Robain M, Spira A. Sexual behavior changes and protease inhibitor therapy. SEROCO Study Group. *AIDS*. 2000 Mar 10;14(4):F33-9.

71. Remien RH, Wagner G, Carballo-Dieguez A, Dolezal C. Who may be engaging in high-risk sex due to medical treatment advances? *AIDS*. 1998 Aug 20;12(12):1560-1.

72. Morin SF, Vernon K, Harcourt JJ, Steward WT, Volk J, Riess TH, Neilands TB, McLaughlin M, Coates TJ. Why HIV infections have increased among men who have sex with men and what to do about it: findings from California focus groups. *AIDS Behav*. 2003 Dec;7(4):353-62.

73. Blower SM, McLean AR. Prophylactic vaccines, risk behavior change, and the probability of eradicating HIV in San Francisco. *Science*. 1994 Sep 2;265(5177):1451-4.

74. Garnett GP, Bartley LM, Cameron DW, Anderson RM. Both a 'magic bullet' and good aim are required to link public health interests and health care needs in HIV infection. *Nat Med*. 2000 Mar;6(3):261-2.

75. Kaiser Daily HIV/AIDS Report. CDC Announces $49M in HIV/AIDS Grants Aimed at Preventing HIV-Positive People From Spreading Virus. kaisernetwork.org; May 24, 2004.

76. Kaiser Daily HIV/AIDS Report. CDC Divisions of HIV/AIDS Prevention Director To Discuss Shift in HIV Prevention Funding. kaisernetwork.org; June 15, 2004.

77. Kaiser Daily HIV/AIDS Report. Washington, D.C., AIDS Organizations Lose Grants Due to Shift in CDC Prevention Focus. kaisernetwork.org; July 19, 2004.

78. Holtby S, Zahnd E, Yen W, Lordi N, McCain C, DiSogra C. Health of California's Adults, Adolescents, and Children: Findings from CHIS 2001. California Health Interview Survey. California Department of Health Services and The California Endowment; May 2004.

79. Katz MH, Gerberding JL. Postexposure treatment of people exposed to the human immunodeficiency virus through sexual contact or injection-drug use. *N Engl J Med*. 1997 Apr 10;336(15):1097-100.

80. Royce RA, Sena A, Cates W Jr, Cohen MS. Sexual transmission of HIV. *N Engl J Med*. 1997 Apr 10;336(15):1072-8. (Erratum in: *N Engl J Med* 1997 Sep 11;337(11):799.)

81. Pinkerton SD, Abramson PR. Effectiveness of condoms in preventing HIV transmission. *Soc Sci Med*. 1997 May;44(9):1303-12.

82. Cunningham WE, Markson LE, Andersen RM, Crystal SH, Fleishman JA, Golin C, Gifford A, Liu HH, Nakazono TT, Morton S, Bozzette SA, Shapiro MF, Wenger NS. Prevalence and predictors of highly active antiretroviral therapy use in patients with HIV infection in the United States. HCSUS Consortium. HIV Cost and Services Utilization. *J Acquir Immune Defic Syndr*. 2000 Oct 1;25(2):115-23.

83. Anderson R, Bozzette S, Shapiro M, Sr. Clair P, Morton S, Crystal S, Goldman D, Wenger N, Gifford A, Leibowitz A, Asch S, Berry S, Nakazono T, Heslin K, Cunningham W; HCSUS Consortium. Access of Vulnerable Groups to Antiretroviral Therapy Among Persons in Care for HIV in the United States. *Health Serv Res*. 2000;35(2):389-416.

84. Gifford AL, Cunningham WE, Heslin KC, Andersen RM, Nakazono T, Lieu DK, Shapiro MF, Bozzette SA; HIV Cost and Services Utilization Study Consortium. Participation in research and access to experimental treatments by HIV-infected patients. *N Engl J Med*. 2002 May 2;346(18):1373-82.

85. McFarland W, Chen S, Hsu L, Schwarcz S, Katz M. Low socioeconomic status is associated with a higher rate of death in the era of highly active antiretroviral therapy, San Francisco. *J Acquir Immune Defic Syndr*. 2003 May 1;33(1):96-103.

86. American Academy of Pediatrics, Committee on Bioethics and Committee on Hospital Care. Palliative care for children. *Pediatrics*. 2000 Aug;106(2 Pt 1):351-7.

87. National Center for Youth Law. California Minor Consent Laws: Which Minors Can Consent for What Services and Providers' Confidentiality Obligations. Oakland, CA; September 2003.

88. Bangsberg DR, Hecht FM, Charlebois ED, Zolopa AR, Holodniy M, Sheiner L, Bamberger JD, Chesney MA, Moss A. Adherence to protease inhibitors, HIV-1 viral load, and development of drug resistance in an indigent population. *AIDS*. 2000 Mar 10;14(4):357-66.

89. Liechty CA, Bangsberg DR. Doubts about DOT: antiretroviral therapy for resource-poor countries. *AIDS*. 2003 Jun 13;17(9):1383-7.

90. Orrell C, Bangsberg DR, Badri M, Wood R. Adherence is not a barrier to successful antiretroviral therapy in South Africa. *AIDS*. 2003 Jun 13;17(9):1369-75.

## ACKNOWLEDGEMENTS

*The authors would like to acknowledge the following individuals and organizations who provided assistance with this report:*

Mark A. Etzel, MPP, Executive Director, Center for HIV Identification, Prevention, and Treatment Services (CHIPTS)

Jeff Dang, MPH, for calculation and operation of the cost-effectiveness model

California Department of Health Services, Office of AIDS, for provision of data on California HIV/AIDS statistics (any analyses, interpretation, or conclusions based on the data are those of the authors)

HPTN Statistical and Data Management Center at the Statistical Center for HIV/AIDS Research & Prevention, for assistance with data on Project Explore

*Reviewers*:

Susan Buchbinder, MD, San Francisco Department of Public Health
Ward Cates, MD, MPH, Family Health International
Grant Colfax, MD, San Francisco Department of Public Health
John Kaldor, PhD, University of New South Wales
Iona Millwood, PhD, University of New South Wales
Michelle Roland, MD, University of California, San Francisco
Kimberly Page Shafer, PhD, MPH, University of California, San Francisco



© 2004, AIDS Partnership California
http://www.aidspartnershipca.org

EXHIBIT 27

Downloaded from https://academic.oup.com/jid/article-abstract/194/7/904/862971 by DOJ Libraries user on 28 September 2019

MAJOR ARTICLE

# Chemoprophylaxis with Tenofovir Disoproxil Fumarate Provided Partial Protection against Infection with Simian Human Immunodeficienc Virus in Macaques Given Multiple Virus Challenges

Shambavi Subbarao,[1] Ronald A. Otten,[1] Artur Ramos,[1] Caryn Kim,[1] Eddie Jackson,[2] Michael Monsour,[1] Debra R. Adams,[1] Sheila Bashirian,[1] Jeffrey Johnson,[1] Vincent Soriano,[4] Ana Rendon,[4] Michael G. Hudgens,[3] Salvatore Butera,[1] Robert Janssen,[1] Lynn Paxton,[1] Alan E. Greenberg,[1] and Thomas M. Folks[1]

[1]Division of HIV/AIDS Prevention, National Center for HIV, STD, & TB Prevention, and [2]Scientific Resources Program, National Center for Infectious Diseases, Coordinating Center for Infectious Diseases, Centers for Disease Control and Prevention, Atlanta, Georgia; [3]University of North Carolina at Chapel Hill, Chapel Hill; [4]Department of Infectious Diseases, Hospital Carlos III, Madrid, Spain

**(See the brief report by Kaizu et al., on pages 912–6, and the editorial commentary by Grant and Wainberg, on pages 874–6.)**

**We examined the efficac of tenofovir disoproxil fumarate (TDF) in blocking simian human immunodeficienc virus (SHIV) infection in Chinese rhesus macaques. Once weekly for 14 weeks or until a macaque became infected, 12 male macaques were inoculated intrarectally with amounts of SHIV$_{SF162P3}$ (10 median tissue culture infective doses; $3.8 \times 10^5$ virus particles) that were ~5-fold higher than the human immunodeficienc virus type 1 RNA levels noted in human semen during an acute infection. Of the 12 macaques, 4 received oral TDF daily, 4 received oral TDF once weekly, and 4 (control animals) received no TDF. The control animals became infected after receiving a median of 1.5 virus inoculations; macaques receiving TDF daily (1 macaque remained uninfected after 14 inoculations) and those receiving TDF weekly became infected after a median duration of 6.0 and 7.0 weeks, respectively. Although infection was delayed in treated macaques, compared with control macaques, the differences were not statistically significan ($P = .315$); however, the study was limited by the small numbers of animals evaluated and the variability in blood levels of TDF that resulted from oral dosing. These data demonstrate that treatment with oral TDF provided partial protection against SHIV infection but ultimately did not protect all TDF treated animals against multiple virus challenges.**

There is an urgent need to expedite the assessment of new and readily available biomedical approaches to the prevention of HIV infection. Although efforts to develop vaccines and topical microbicides for the prevention of HIV infection continue, these products are years away from being proved efficaciou and commercially available. One approach to the prevention of

HIV infection that is being considered as a prevention strategy for persons who are at high risk for HIV infection is the use of preexposure prophylaxis (PrEP)—that is, the treatment of uninfected persons with ≥1 antiretroviral drug before HIV exposure [1–3]. One antiretroviral drug under consideration for use in PrEP is tenofovir disoproxil fumarate (TDF), the oral prodrug of tenofovir (also known as "PMPA"). Tenofovir is a competitive inhibitor of HIV-1 reverse transcriptase

---

Received 23 January 2006; accepted 15 April 2006; electronically published 29 August 2006.

Reprints or correspondence: Dr. Shambavi Subbarao, HIV/AIDS and Retrovirology Branch, MS G-19, 1600 Clifton Rd. NE, Atlanta, GA 30333 (sfs2@cdc.gov).

**The Journal of Infectious Diseases 2006;194:904–11**
© 2006 by the Infectious Diseases Society of America. All rights reserved.
0022-1899/2006/19407-0006$15.00

Presented in part: 12th Conference on Retroviruses and Opportunistic Infections, Boston, Massachusetts, 22–25 February 2005 (abstract 136LB).

Financial support: National Institutes of Health (grant P30 AI50410-08 to M.G.H. [for research on statistical methods]).

Potential conflicts of interest: none reported.

The findings and conclusions in this report are those of the authors and do not necessarily represent the views of the Centers for Disease Control and Prevention.

Downloaded from https://academic.oup.com/jid/article-abstract/194/7/904/862971 by DOJ Libraries user on 28 September 2019

and terminates the growing DNA chain [4]. Properties that make tenofovir an attractive drug for chemoprophylaxis are (1) its longer half-life in serum (17 h) and in cells (≥60 h), compared with that noted for other nucleoside analogues; (2) its antiviral activity in diverse cell types, including resting cells; and (3) the relatively high barrier to the development of viral resistance to the drug. TDF is approved by the US Food and Drug Administration for the treatment of HIV infection in humans and is provided as a pill that is taken once daily (Viread; Gilead Sciences). TDF is well tolerated and has a low rate of associated adverse events after long-term administration [4, 5].

Several strategies have indicated that chemoprophylaxis with antiretroviral drugs may prevent HIV infection. The most compelling of these strategies has been the use of antiretroviral drugs, such as zidovudine and nevirapine, in the prevention of mother-to-child transmission of HIV [6–8]. Another successful strategy is postexposure chemoprophylaxis, which has significantly reduced the number of infections occurring among health care workers who have been exposed to HIV through contact with the blood or body fluid of HIV-infected patients [9]. Nonhuman primate studies involving postexposure prophylaxis have had mixed but generally encouraging results. In macaques, infection resulting from a single, high-dose, intravenous inoculation with simian immunodeficienc virus (SIV) was blocked when tenofovir was administered subcutaneously either 48 h before or within 24 h after exposure and then was continued daily for 28 days [10]. Treatment was not effective if initiated 48 or 72 h after exposure or if continued only for 3–10 days [11]. In a study designed to model mucosal exposure to HIV, female macaques that were given subcutaneous tenofovir treatments for 28 days, starting 12 or 36 h after vaginal exposure to HIV-2, were protected against HIV-2 infection [12]. Partial protection was observed when tenofovir treatment was initiated 72 h after exposure [12]. In another study, combined multiple-drug chemoprophylaxis (zidovudine, lamivudine, and indinavir) initiated 4 h after challenge with simian human immunodeficienc virus (SHIV) and continued for 28 days did not protect against infection [13].

Using SIV infection in newborn macaques as a model for pediatric HIV infection, a number of studies have yielded information about the efficac of tenofovir chemoprophylaxis. Two doses (30 mg/kg) of tenofovir administered subcutaneously 4 h before and 24 h after oral inoculation with SIV protected newborn macaques against SIV infection [14]. Reducing the dose of tenofovir to 4 mg/kg but continuing administration of the drug in a 2-dose regimen resulted in protection against infection in 5 of 8 newborn macaques [15]. However, a single dose of tenofovir given to pregnant macaques just before cesarean section did not protect newborns against oral SIV challenge after birth [16]. In the same study, a regimen of postexposure treatment with tenofovir for 2 weeks, started immediately after oral inoculation of newborns with SIV, did protect the newborns against infection [16].

All the macaque studies discussed to date had used a single high-dose virus exposure. One of the firs studies to examine multiple virus challenges used the infant macaque to model mother-to-child transmission of HIV through breast-feeding. Infant macaques received multiple oral inoculations with SIV and were treated daily with oral TDF, starting 1 day before the firs inoculation. That one-half of the TDF-treated animals were protected against infection suggests that the use of daily TDF treatment for infants may partially protect against transmission of HIV via breast-feeding [17].

Our goal was to evaluate PrEP with TDF, by use of an intrarectal repeated-exposure model of HIV infection in adult macaques. This model attempts to approximate high-risk HIV infection in humans through multiple inoculations of macaques with levels of SHIV that are closer to the levels of HIV-1 noted in the semen of humans with acute infection, and it has been used to assess such interventions as the use of microbicides [18–22].

## ANIMALS, MATERIALS, AND METHODS

***Animals.*** We used 12 adult male Chinese rhesus macaques (*Macaca mulatta;* body weight, 3.6–5.2 kg) in the present study. The Animal Care and Use Committee of the Centers for Disease Control and Prevention approved all procedures outlined in this study.

***Virus stocks and inoculation.*** $SHIV_{SF162P3}$ (SIVmac239 backbone and an HIV-1 subtype B, C-C chemokine receptor 5– using envelope) was obtained from the National Institutes of Health (NIH) AIDS Research and Reference Reagent Program (catalog #6526). This virus stock was diluted with RMPI 1040 to 10 TCID/mL for intrarectal inoculations. All virus exposures involved nontraumatic inoculation of 1 mL of $SHIV_{SF162P3}$ into the rectal vault via a sterile gastric feeding tube. Anesthetized macaques remained recumbent for at least 15 min after each intrarectal inoculation. CM240 (HIV-1 CRF01_AE strain) was obtained from the NIH AIDS Research and Reference Reagent Program (catalog #7703).

***TDF.*** TDF, or 9-[(*R*)-2-[[bis[[(isopropoxycarbonyl)oxy] methoxy]phosphinyl]methoxy]propyl] adenine fumarate (1:1), was obtained from Gilead Sciences. TDF (22 mg/kg body weight) was mixed with peanut butter and jelly or was placed in a fruit just before the food was given to the macaques. The animals were monitored, and they usually consumed the food containing TDF within 15–20 min.

***Study design.*** Twelve adult, male, Chinese rhesus macaques were divided into 3 groups of 4 animals each. The animals in the control group did not receive TDF; the animals in the daily-TDF group received TDF once daily, and animals in the weekly-TDF group received TDF once weekly. All animals received

Downloaded from https://academic.oup.com/jid/article-abstract/194/7/904/862971 by DOJ Libraries user on 28 September 2019

weekly intrarectal inoculations with 10 $TCID_{50}$ ($3.8 \times 10^5$ viral RNA copies) of $SHIV_{SF162P3}$, with the treated animals receiving the inoculations 2 h after ingestion of TDF. Macaques received TDF even after they became infected. TDF was discontinued after week 36 of the study. The inoculations were stopped once a macaque became infected; macaques that remained uninfected received a total of 14 weekly inoculations. The macaques were monitored for a total of 37 weeks.

***Real-time polymerase chain reaction (PCR) viral load assay.*** An SIV *gag* gene, PCR-based viral load assay was developed for the measurement of SHIV RNA in plasma. A total of 1 mL of plasma underwent ultracentrifugation at 100,000 *g* for 30 min at 4°C. We removed 800 $\mu$L of the supernatant and transferred 200 $\mu$L of the pelleted virus to 0.9-mL NucliSens lysis tubes (bioMérieux). Before RNA extraction, we added $3 \times 10^5$ virus particles of CM240 (as an external normalizer) to each Nucli-Sens tube, along with the previously added plasma-derived RNA pellet. RNA was extracted using the procedure recommended by the manufacturer (bioMérieux). A standard curve was generated for each viral load assay using SIVmac251; RNA from the SIVmac251 dilution series was extracted along with the external normalizer.

The primers and probe (with SIVmac239 genome coordinates) used to amplify a 67-bp region of SIV *gag* DNA were forward primer SIVp15f1 (1256–1278) 5′-GCCAACAGGCTCAGAAA-ATTTAA-3′, reverse primer SIVp15r1 (1348–1323) 5′-TCC-TCAGTGTGTTTCACTTTCTCTTC-′3, and probe SIVp15P (1281–1313) 5′-joe AGCCTTTATAATACTGTCTGCGTCAT-CTGG-quencher 3′.

The primers and probe (with HXB2 coordinates) used for amplificatio of the exogenous control CM240 included forward primer envE2f (6928–6949) 5′-GGACAGGGCCATGTAAAAA-TGT-3′, reverse primer 5′ENVe2r (7027–7002) 5′-TCTTCTGCT-AGACTGCCATTTAACAG-3′, and probe envEP (6965–6977) 5′-fam CACACATGGAATTAAGCCAGTGRTATCMACTCA-quencher 3′. Reverse transcriptions of 10 $\mu$L of RNA in 50-$\mu$L reactions were performed using the 2-step TaqMan Gold reverse-transcriptase (RT)–PCR kit (Applied Biosystems) according to the manufacturer's instructions. We used 10 $\mu$L of the cDNA in 50-$\mu$L PCR reactions, by use of the 2-step TaqMan Gold RT-PCR kit reagents. PCR was performed using the ABI 7000 Gene Detection System (Applied Biosystems).

***Real-time PCR detection of low-frequency K65R mutant SIV.*** The general methods for sensitive real-time PCR-based testing for HIV-1 drug resistance have been described elsewhere [23].

***Sequence analysis of K65R and compensatory mutations.*** We amplifie 551 bp of the $SHIV_{SF162P3}$ RT gene from cell-free virus RNA, using the following nested set of primers (coordinates relative to SMM239): primary primers RTL1f (2980–3001) 5′-GGATGGTCAGTTGGAGGAAGCT-3′ and RTL1r

(3555–3575) 5′-GCAACTTCCATTTTGTTGGCC-3′ and nested primers RTL2f (3003–3023) CCCCGACCAATCCATACAACA-3′ and RTL2r (3532–3553) 5′-CAATTCGTACCCCATCCAT-TGA-3′. Sequencing was performed using the CEQ (Beckman Coulter), and sequence analysis was performed using Sequencher software (version 4.0.5; Gene Codes).

***Virus-specifi antibody responses and lymphocyte phenotype analysis.*** Virus-specifi serologic responses (IgG and IgM) were measured using methods described elsewhere [19].

***Plasma levels of tenofovir.*** An ultrafiltratio technique was used to recover tenofovir from plasma. In brief, 500 $\mu$L of plasma were transferred to a Microsep 3K Omega Centrifugal Device (Pall Life Sciences) and underwent centrifugation at 6000 *g* in an Eppendorf 5416 for 60 min. The recovered concentrate was then transferred to autoinjector vials for high-performance liquid chromatography analysis with UV detection by use of external calibration [24]. The lower limit of quantificatio was 10 ng/mL. The analytical method for detection of tenofovir in plasma was linear over the range of 10–10,000 ng/mL.

***Statistical methods.*** The exact log-rank test was used for a discrete-time survival analysis of the treatment and control groups, with use of the number of inoculations as the time variable. A linear mixed-effects regression model was fi to the weekly viral load data for the infected macaques, with use of the macaques as the random effect and the 3 study groups as the fixe effects. In addition, 2 nonparametric tests, the Wei-Johnson and Wei-Lachin tests [25, 26], were also applied to examine the changes in viral loads after infection. A Wilcoxon rank sum test was used to analyze the peak viral loads of the infected macaques. Inferences regarding the per-exposure effect of tenofovir were based on a discrete-time transmission probability model that assumed that the probability of infection is independent of the number of prior exposures. Maximum-likelihood estimates were obtained using standard methods. Power calculations were conducted using a simulation study. All statistical analyses for calculation of the efficac of tenofovir were performed using SAS software (version 9.1; SAS Institute) and StatXact software (version 6.3; Cytel).

## RESULTS

***Plasma levels of tenofovir.*** Before starting the virus challenge study, we conducted a time-course analysis of plasma levels of tenofovir in one SIV-naive macaque. Blood samples were collected at various intervals after oral administration of TDF with food. Levels of tenofovir in blood reached a peak (633 ng/mL) ~2 h after TDF administration and then began to decrease, and, by 72 h after administration, TDF was undetectable in plasma (data not shown). The area under the time-concentration curve was 3967 ng × h/mL. Previously published data have also described peak plasma levels of tenofovir achieved 1–2 h after oral TDF administration [27]. Therefore, in the present

Downloaded from https://academic.oup.com/jid/article-abstract/194/7/904/862971 by DOJ Libraries user on 28 September 2019



**Figure 1.** Survival curve showing data on the no. of weekly intrarectal inoculations with 10 $TCID_{50}$ simian human immunodeficiency virus SF162P3 and the no. of uninfected macaques. Solid arrows denote the median no. of weeks to infection for macaques in each of the 3 study groups: control macaques, macaques receiving tenofovir disoproxil fumarate (TDF) daily (daily-TDF), and macaques receiving TDF weekly (weekly-TDF). The open arrow denotes the *P* value (exact log-rank test) from a survival analysis comparing control animals with TDF-treated animals at 14 weekly virus inoculations.

study, the macaques in the 2 treatment groups were inoculated with $SHIV_{SF162P3}$ 2 h after ingestion of TDF with food.

During the study, the plasma levels of tenofovir in all 3 groups of animals were measured in blood samples collected 2 h after oral TDF administration at various study weeks. For a total of 34 blood samples, the mean and median tenofovir levels were 2003 ng/mL (SD, ±3521) and 499 ng/mL (range, 10–4376 ng/mL), respectively. When the blood samples were categorized according to the treatment group of the macaques from which they were obtained (18 samples were obtained from the group receiving treatment daily and 16 samples were obtained from the group receiving treatment weekly), the median levels of tenofovir were similar for each group: 537 ng/mL (range, 10–3308 ng/mL) and 422 ng/mL (range, 19–14,376 ng/mL), respectively (data not shown). There was no statistical difference in tenofovir levels between the group receiving TDF daily and the group receiving TDF weekly. For 5 of 8 TDF-treated macaques, tenofovir levels were measured in blood samples collected at the time of the virus exposure that resulted in systemic infection. In 4 of these 5 macaques, the tenofovir levels were low (29, 10, 69, and 137 ng/mL) at the time of the virus inoculation that resulted in systemic infection, whereas, in the fift  macaque, the tenofovir level was high (1854 ng/mL).

***Systemic infection resulting from repeated intrarectal in-oculations with SHIV_{SF162P3}.*** To ascertain the presence of sys-temic infection, we used detection of cell-free viral RNA in blood as the initial marker. Infection was confi med by the detection of cell-associated $SHIV_{SF162P3}$ provirus DNA, which was generally detected during the same week when plasma cell-

free virus was detected (provirus data not shown). Prophylaxis with TDF increased the median time to infection for the groups receiving treatment daily and weekly (6.0 weeks and 7.0 weeks, respectively), compared with that noted for the control group (1.5 weeks) (figu e 1). One macaque (RQ4180) in the daily-TDF group remained uninfected after receiving 14 inoculations with virus (figu e 1). Survival analysis showed no statistical difference between the treated and control groups at 14 weeks (*P* = .315, by exact log-rank test). To determine whether ma-caque RQ4180, which had remained virus free after 14 weekly challenges, was susceptible to SHIV infection in the absence of TDF treatment, the animal was rested for 30 weeks, during which time no virus challenge or TDF was administered. After the rest period, weekly intrarectal SHIV inoculations were re-sumed in the absence of daily TDF treatment; the animal be-came infected after 2 inoculations.

Using a discrete-time transmission probability model, we estimated that oral TDF prophylaxis of macaques in our study resulted in a 60% decrease in the per-exposure probability of infection (95% confidenc  interval, −0.36 to 0.86). This result did not achieve statistical significanc  (*P* = .13). However, with a total sample size of 12 animals, the present study was not powered to detect effects of this size.

***Cell-free virus loads in plasma.*** In most of the control and treated animals, peak viral levels were reached within 1–2 weeks after the firs  detection of virus RNA in plasma (figu e 2). The differences in peak viral loads between the control and daily-TDF groups and between the control and weekly-TDF groups were not statistically significant  as measured by the Wilcoxon

Downloaded from https://academic.oup.com/jid/article-abstract/194/7/904/862971 by DOJ Libraries user on 28 September 2019



**Figure 2.** Cell-free plasma viral loads and virus-specific antibody responses (IgG and IgM) in plasma. Viral loads are shown for control macaques *(A)*, macaques receiving tenofovir disoproxil fumarate daily (daily-TDF) *(C)*, and macaques receiving TDF weekly (weekly-TDF) *(E)*. The horizontal dotted line denotes the assigned cutoff value (500 copies/mL) for the assay. The sensitivity of the assay was 100 copies/mL. *B*, *D*, and *F*, Virus-specific antibody responses in plasma. The optical density cutoff value is denoted by a dashed line on the graph. Nos. in parentheses denote the no. of weekly simian human immunodeficiency virus challenges after which each macaque became infected. $OD_{450}$, optical density measurement at 450 nm.

rank sum test ($P = .23$ and $P = .34$, respectively). The median peak viral loads in the control, daily-TDF, and weekly-TDF groups were 6.3, 6.0, and 7.6 $\log_{10}$ copies/mL, respectively. Although there was a 1.6-$\log_{10}$ difference between the median peak viral loads in the daily-TDF and weekly-TDF groups (the largest value in the daily-TDF group was smaller than the smallest value in the weekly-TDF group), this difference was not statistically significant ($P = .06$). It is of interest to note that the peak viral load in macaque RQ4115, which was in the daily-

TDF group, was ~2 $\log_{10}$ copies lower than the peak viral loads in the remaining 2 infected macaques that were part of the daily-TDF group (figure 2). For each of the 3 groups, statistical evaluation of the changes in viral loads at consecutive time points after infection indicated that there was no difference in viral load trajectories between infected control animals and infected tenofovir recipients (data not shown).

***Virus-specific antibody responses.*** In the control animals, virus-specific antibody responses were detected 3–5 weeks after

the firs detection of virus in plasma (figu e 2). Similar lags were noted in the daily-TDF group (3–7 weeks) and weekly-TDF group (3–5 weeks); however, no antibody responses were observed for macaque RQ4463 (figu e 2), and antibody responses in macaque RQ4115 were very low throughout the course of the study.

***Emergence of the tenofovir-resistant K65R mutation and compensatory mutations.*** The K65R mutation was not detected through 31 weeks of the study (data not shown). In addition, sequencing analysis of the RT gene did not detect any of the known compensatory mutations (K64R, N69S/T, I118V, and S211N) [28].

## DISCUSSION

The present study represents the firs application of a macaque model of repeated exposures to virus in the assessment of antiretroviral prophylaxis for the prevention of SHIV transmission via rectal exposure. These data demonstrate that treatment with oral TDF protected against 14 virus exposures in one macaque and delayed infection in the other macaques; however, the overall differences were not statistically signifcan at week 14 of the study ($P = .315$). That we were subsequently (after a signifcan drug-washout time) able to infect the macaque that did not become infected after 14 virus challenges suggests that oral TDF must have played a role in preventing infection in this macaque. The delays in infection were similar for macaques that received oral TDF daily and macaques that received oral TDF weekly, suggesting that the time interval (2 h in this study) between virus exposure and TDF dosing is important for protection; it is unknown what the outcome would be if the exposure occurred several hours or days after TDF dosing. In the present study, macaques received the equivalent of the human therapeutic dose of TDF; however, the virus-challenge levels, although more physiological than those in other high-dose models of infection, were ∼5-fold higher than the levels noted in human semen. This higher virus dose may have also contributed to the partial efficac observed. On the basis of decreased per-exposure probability of infection in macaques and the observation of partial protection, we believe that interventions with oral TDF may reduce rectal transmission of HIV. However, optimism must be tempered because, as the macaque data indicate, protection may not be absolute against repeated high-risk virus exposures.

Although the firs infections did not occur until after 6 challenges, it is possible that there may have been low-level infection during the observed 5-week "protection window." Although low-level infection was not detected in circulating peripheral blood mononuclear cells (data not shown), we cannot rule out infection in other tissue sites, such as the lymph nodes and the gut, that subsequently disseminated systemically, perhaps during a period of lower-than-optimal drug levels. Periods of transient viremia before persistent viremia have been documented for macaques exposed to successive low-dose challenges with SIVmac251 [29]; however, we did not observe such transient infections in our macaques infected with SHIV$_{SF162P3}$.

Why was infection not blocked completely? We used an antiretroviral drug that targets the virus after it has entered target cells. To provide complete protection, the drug must reach all target cells within the mucosal tissues, and levels of the drug within every target cell must reach maximum levels of efficac to block virus reverse transcription. It is likely that, in the face of repeated virus challenges, the virus may break through during a period of lower drug levels (a drug trough). Our results showed that, although the median plasma levels of tenofovir in TDF-treated macaques were similar to the median levels in humans receiving the US Food and Drug Administration–approved 300-mg daily dose for the treatment of HIV-1 infection [27], tenofovir levels in macaque plasma were variable; however, such variability was also noted in humans [27]. Plasma levels of tenofovir are higher and more consistent when given intravenously to humans [30] or subcutaneously to macaques (W. Heneine, personal communication). Therefore, the TDF dose used as standard antiretroviral therapy may be lower than the dose necessary to block infection (reverse transcription) in all target cells.

There is concern that seroconversion may be delayed after infection in humans who may receive TDF chemoprophylaxis, because of TDF-mediated suppression of viral replication resulting in the presence of subantigenic doses of virus. In such a situation, infection may be missed by first-lin tests for the detection of HIV antibody. In the present study, we did not observe any signifcan delays in the development of SHIV-specifi antibody responses in TDF-treated macaques. An exception was macaque RQ4463, which was in the weekly-TDF group and did not develop any detectable antibody responses. In this macaque, the lack of an antibody response was associated with high plasma viremia throughout the course of the study. We do not know whether the lack of SHIV-specifi antibody responses was driven by tenofovir or host/genetic-related factors. It is known that ∼25% of rhesus macaques do not seroconvert after SIV infection and progress to death with high virus loads [31–33].

There exists no precedent for giving chemoprophylaxis to large populations of people at risk for infection through repeated exposure to HIV. Only well-planned clinical trials involving humans will directly answer whether antiretroviral chemoprophylaxis will protect against HIV infection. The Centers for Disease Control and Prevention is sponsoring 3 clinical trials of TDF [34]. Two of these trials are efficac trials involving heterosexuals in Botswana and injection drug users in Thailand. The third trial is an extended safety trial conducted in the United States and involving men who have sex with men. In

Downloaded from https://academic.oup.com/jid/article-abstract/194/7/904/862971 by DOJ Libraries user on 28 September 2019

Downloaded from https://academic.oup.com/jid/article-abstract/194/7/904/862971 by DOJ Libraries user on 28 September 2019

addition, the NIH is sponsoring an efficacy trial of TDF in Peru among men who have sex with men. Although caution must be used when extrapolating results for macaques to humans, our data suggest that TDF might delay infection and that this could, in turn, reduce overall rates of transmission of HIV. We also cannot extrapolate from these results of a rectal transmission study to estimate the efficacy of TDF for vaginal or parenteral HIV exposures. The physiological profile of transmission differs according to the route of exposure, and it appears that the risk for infection is greater when exposure is rectal rather than when it is vaginal [35]. In addition, we did not observe the emergence of tenofovir resistance mutations in the virus even after prolonged exposure to the drug. Given the current lack of an effective biomedical intervention, tenofovir prophylaxis may be of benefit. More important, emphasis on the use of protective measures, such as abstinence, condoms, and mutual monogamy with an uninfected partner, should remain unrelenting.

## Acknowledgments

We thank Jim Rooney (Gilead Sciences) for helpful discussions and for kindly providing TDF through a Public Health Service Materials Transfer Agreement. We also thank Priya Srinivasan for the excellent technical assistance provided. We thank our attending veterinarian, Dr. Paul Spurlock, for taking excellent care of our macaque cohort. We also thank the members of the animal care group, with special acknowledgment to Sherri Johnson, Bryan Scott, Rick White, Reginald Pharr, Archer Miller, and James Mitchell for their expertise and assistance with animal husbandry issues. We thank Clyde Hart and Walid Heneine for helpful suggestions. The reagent SHIV$_{SF162P3}$ was obtained through the AIDS Research and Reference Reagent Program, Division of AIDS (DAIDS), National Institute of Allergy and Infectious Diseases (NIAID), National Institutes of Health, from Drs. Janet Harouse, Cecilia Cheng-Mayer, Ranajit Pal and the DAIDS, NIAID.

## References

1. Smith SM. Pre-exposure chemoprophylaxis for HIV: it is time. Retrovirology **2004**; 1:16.
2. Youle M, Wainberg MA. Pre-exposure chemoprophylaxis (PREP) as an HIV prevention strategy. J Int Assoc Physicians AIDS Care (Chic Ill) **2003**; 2:102–5.
3. Grant RM, Buchbinder S, Cates W Jr, et al. AIDS. Promote HIV chemoprophylaxis research, don't prevent it. Science **2005**; 309:2170–1.
4. Kearney BP, Flaherty JF, Shah J. Tenofovir disoproxil fumarate: clinical pharmacology and pharmacokinetics. Clin Pharmacokinet **2004**; 43: 595–612.
5. Pruvost A, Negredo E, Benech H, et al. Measurement of intracellular didanosine and tenofovir phosphorylated metabolites and possible interaction of the two drugs in human immunodeficiency virus-infected patients. Antimicrob Agents Chemother **2005**; 49:1907–14.
6. Connor EM, Sperling RS, Gelber R, et al. Reduction of maternal-infant transmission of human immunodeficiency virus type 1 with zidovudine treatment. Pediatric AIDS Clinical Trials Group Protocol 076 Study Group. N Engl J Med **1994**; 331:1173–80.
7. Guay LA, Musoke P, Fleming T, et al. Intrapartum and neonatal single-dose nevirapine compared with zidovudine for prevention of mother-to-child transmission of HIV-1 in Kampala, Uganda: HIVNET 012 randomised trial. Lancet **1999**; 354:795–802.
8. Shaffer N, Chuachoowong R, Mock PA, et al. Short-course zidovudine for perinatal HIV-1 transmission in Bangkok, Thailand: a randomised controlled trial. Bangkok Collaborative Perinatal HIV Transmission Study Group. Lancet **1999**; 353:773–80.
9. Cardo DM, Culver DH, Ciesielski CA, et al. A case-control study of HIV seroconversion in health care workers after percutaneous exposure. Centers for Disease Control and Prevention Needlestick Surveillance Group. N Engl J Med **1997**; 337:1485–90.
10. Tsai CC, Follis KE, Sabo A, et al. Prevention of SIV infection in macaques by (R)-9-(2-phosphonylmethoxypropyl)adenine. Science **1995**; 270:1197–9.
11. Tsai CC, Emau P, Follis KE, et al. Effectiveness of postinoculation (R)-9-(2-phosphonylmethoxypropyl) adenine treatment for prevention of persistent simian immunodeficiency virus SIV$_{mne}$ infection depends critically on timing of initiation and duration of treatment. J Virol **1998**; 72:4265–73.
12. Otten RA, Smith DK, Adams DR, et al. Efficacy of postexposure prophylaxis after intravaginal exposure of pig-tailed macaques to a human-derived retrovirus (human immunodeficiency virus type 2). J Virol **2000**; 74:9771–5.
13. Le Grand R, Vaslin B, Larghero J, et al. Post-exposure prophylaxis with highly active antiretroviral therapy could not protect macaques from infection with SIV/HIV chimera. AIDS **2000**; 14:1864–6.
14. Van Rompay KK, Berardi CJ, Aguirre NL, et al. Two doses of PMPA protect newborn macaques against oral simian immunodeficiency virus infection. AIDS **1998**; 12:F79–83.
15. Van Rompay KK, McChesney MB, Aguirre NL, Schmidt KA, Bischofberger N, Marthas ML. Two low doses of tenofovir protect newborn macaques against oral simian immunodeficiency virus infection. J Infect Dis **2001**; 184:429–38.
16. Van Rompay KK, Marthas ML, Lifson JD, et al. Administration of 9-[2-(phosphonomethoxy)propyl]adenine (PMPA) for prevention of perinatal simian immunodeficiency virus infection in rhesus macaques. AIDS Res Hum Retroviruses **1998**; 14:761–73.
17. Van Rompay K, Lawson J, Colon R, Bischofberger N, Marthas M. Oral tenofovir protects infant macaques against infection following repeated low-dose oral exposure to virulent simian immunodeficiency virus. eJournal of the International AIDS Society **2004**; Jul 11:LbOrB10.
18. McDermott AB, Mitchen J, Piaskowski S, et al. Repeated low-dose mucosal simian immunodeficiency virus SIVmac239 challenge results in the same viral and immunological kinetics as high-dose challenge: a model for the evaluation of vaccine efficacy in nonhuman primates. J Virol **2004**; 78:3140–4.
19. Otten RA, Adams DR, Kim CN, et al. Multiple vaginal exposures to low doses of R5 simian-human immunodeficiency virus: strategy to study HIV preclinical interventions in nonhuman primates. J Infect Dis **2005**; 191:164–73.
20. Regoes RR, Longini IM, Feinberg MB, Staprans SI. Preclinical assessment of HIV vaccines and microbicides by repeated low-dose virus challenges. PLoS Med **2005**; 2:e249.
21. Coombs RW, Reichelderfer PS, Landay AL. Recent observations on HIV type-1 infection in the genital tract of men and women. AIDS **2003**; 17:455–80
22. Pilcher CD, Tien HC, Eron JJ Jr, et al. Brief but efficient acute HIV infection and the sexual transmission of HIV. J Infect Dis **2004**; 189: 1785–92.
23. Johnson JA, Li JF, Morris L, et al. Emergence of drug-resistant HIV-1 after intrapartum administration of single-dose nevirapine is substantially underestimated. J Infect Dis **2005**; 192:16–23.
24. Sentenac S, Fernandez C, Thuillier A, Lechat P, Aymard G. Sensitive determination of tenofovir in human plasma samples using reversed-phase liquid chromatography. J Chromatogr B Analyt Technol Biomed Life Sci **2003**; 793:317–24.
25. Wei LJ, Johnson WE. Combining dependent tests with incomplete repeated measurements. Biometrika **1985**; 72:359–64.
26. Wei LJ, Lachin JM. Two-sample asymptotically distribution-free tests for incomplete multivariate observations. J Am Stat Assoc **1984**; 79: 653–61.

Downloaded from https://academic.oup.com/jid/article-abstract/194/7/904/862971 by DOJ Libraries user on 28 September 2019

27. Barditch-Crovo P, Deeks SG, Collier A, et al. Phase i/ii trial of the pharmacokinetics, safety, and antiretroviral activity of tenofovir disoproxil fumarate in human immunodeficienc virus–infected adults. Antimicrob Agents Chemother 2001; 45:2733–9.

28. Magierowska M, Bernardin F, Garg S, et al. Highly uneven distribution of tenofovir-selected simian immunodeficienc virus in different anatomical sites of rhesus macaques. J Virol 2004; 78:2434–44.

29. Ma ZM, Abel K, Rourke T, Wang Y, Miller CJ. A period of transient viremia and occult infection precedes persistent viremia and antiviral immune responses during multiple low-dose intravaginal simian immunodeficienc virus inoculations. J Virol 2004; 78:14048–52.

30. Deeks SG, Barditch-Crovo P, Lietman PS, et al. Safety, pharmacokinetics, and antiretroviral activity of intravenous 9-[2-(R)-(Phosphonomethoxy)propyl]adenine, a novel anti-human immunodeficienc virus (HIV) therapy, in HIV-infected adults. Antimicrob Agents Chemother 1998; 42:2380–4.

31. Villinger F, Rowe T, Parekh BS, et al. Chronic immune stimulation accelerates SIV-induced disease progression. J Med Primatol 2001; 30:254–9.

32. Heise C, Miller CJ, Lackner A, Dandekar S. Primary acute simian immunodeficienc virus infection of intestinal lymphoid tissue is associated with gastrointestinal dysfunction. J Infect Dis 1994; 169:1116–20.

33. Reimann KA, Li JT, Veazey R, et al. A chimeric simian/human immunodeficienc virus expressing a primary patient human immunodeficienc virus type 1 isolate env causes an AIDS-like disease after in vivo passage in rhesus monkeys. J Virol 1996; 70:6922–8.

34. Centers for Disease Control and Prevention (CDC). CDC trials of daily oral tenofovir for preventing HIV infection. Available at: http://www.cdc.gov/hiv/PUBS/TenofovirFactSheet.htm. Accessed March 2006.

35. Mastro TD, de Vincenzi I. Probabilities of sexual HIV-1 transmission. AIDS 1996; 10(Suppl A):S75–82.

# EXHIBIT 28

| From: | Michael Miller |
|---|---|
| To: | Heneine, Walid (CDC/OID/NCHHSTP) |
| Cc: | Jim Rooney; Mick Hitchcock |
| Subject: | RE: FTC for CDC PrEP macaque model |
| Date: | Wednesday, December 22, 2004 5:47:57 PM |

Walid--

Apparently a good deal of FTC work has been done in monkeys during the development stages of FTC by Triangle! I think you're proposal below is a good one.  Around 20 mg/kg is a little more realistic for the human doses than 30 mg/kg, and should still provide good efficacy, especially when combined with EFV.
I'm not sure how the MTA that you've made will work with Gilead, but, hopefully, this will make it through our legal group easily.  With the number of animals you've described below, I think we can easily accommodate your request for materials.

Best regards,
Michael

PS:  we prefer to use TFV for tenofovir (since TNF has other meanings already!).

-----Original Message-----
**From:** Heneine, Walid [mailto:WMH2@CDC.GOV]
**Sent:** Wednesday, December 22, 2004 2:01 PM
**To:** Michael Miller; Howard Jaffe
**Cc:** Jim Rooney; Mick Hitchcock
**Subject:** RE: FTC for CDC PrEP macaque model

Michael,
Thanks for the info. The only PK data in macaques I came across is some earlier work by Ray Schinazi. I am attaching this paper in case you do not have it. Let me know what you think. I checked with Tom North who has used 8mg/kg but thinks more is probably better. Jeff Lifson uses 50mg/kg but thinks this is the high end. I have proposed in the MTA 20mg/kg but we can readjust for 30mg/kg if necessary.  We obviously want to avoid using low doses of the drug that might reduce efficacy.
The summary of the study protocol is below and is described in the MTA for FTC which I have put through at CDC for approval.

Would appreciate any feedback or thoughts. Please treat this info confidentially.
Thanks
Walid

-------------------------------------------------------------------------------------------------------------------------

**Pre-exposure prophylaxis with FTC in combination with one or two drugs for the prevention of simian human**

**immunodeficiency virus (SHIV) infection in a repeat low-dose challenge model in macaques.**

Unprotected sexual exposure, especially among women at high risk for acquiring human immunodeficiency virus (HIV) has resulted in very high rates of infection in sub-Saharan Africa and southeast Asia. The lack of an efficacious vaccine for HIV emphasizes the urgency for developing a simple, safe and effective strategy to prevent sexual transmission.

As a model for human treatment, FTC will be used to treat female macaques in a low-dose (10TCID) SHIV (RT-SHIV) vaginal challenge that more closely approximates virus exposures in humans. Tenofovir (TNF) and FTC will be delivered subcutaneously each at 20 mg/kg. Efavirenz will be given orally at 60mg/kg.

Method: The study will be conducted using the format described below. The maximum length of virus exposures in all arms will be 20 weeks. After conclusion of pre-determined virus exposure periods, all uninfected animals will be monitored for 24 weeks. The emergence of drug resistance will be monitored in breakthrough viruses from drug-treated animals.

| Arm number | Description of Arm | Number of Animals | Treatment Regimen | Virus challenge (vaginal, RT-SHIV, $10TCID_{50}$) | Follow-up |
|---|---|---|---|---|---|
| 1 | Control; no pre-exposure prophylaxis (NO-PREP) | 4 | None | Weekly | Detectable virus anticipated around week 5 |
| 2 | Two-drug prophylaxis (2D-PREP) | 4 | Daily treatment FTC/TNF for 20 weeks | First challenge 7 days after drug treatment and then weekly for up to 20 exposures | 24 weeks f/u |
| 3 | Three-drug prophylaxis (3D-PREP) | 4 | Daily treatment TNF/FTC/efavirenz for 20 weeks | First challenge 7 days after drug treatment and then weekly for up to 20 exposures | 24 weeks f/u |

-----Original Message-----
**From:** Michael Miller [mailto:Michael.Miller@gilead.com]
**Sent:** Tuesday, December 21, 2004 5:31 PM
**To:** Howard Jaffe; Heneine, Walid
**Cc:** Jim Rooney; Mick Hitchcock
**Subject:** RE: FTC for CDC PrEP macaque model

Walid--

I haven't seen any PK data for FTC in macaques and you are right, there is a wide range of FTC doses used.  Gilead is currently "funding" FTC at 30 mg/kg which is the same dose used for PMPA for short-term studies.  As the current human dosing of FTC is less than that of TDF, the equivalent dosing of each should be more than sufficient.  There is also a practical consideration given the cost and difficulty of making the FTC available.  Tom North at UC Davis has probably worked with FTC the longest--he may have done some early PK work--feel free to contact him.  We can easily expand your TTA to include both drugs once we receive a protocol for your studies.

Best regards for a good holiday and start to '05,

Michael

-----Original Message-----
**From:** Howard Jaffe
**Sent:** Tuesday, December 21, 2004 11:13 AM
**To:** 'Heneine, Walid'; Michael Miller
**Cc:** Jim Rooney; Mick Hitchcock

**Subject:** RE: FTC for CDC PrEP macaque model

Hi Walid

Thanks for your interest. Given the availability and clinical profile of the combination ART (tenofovir and FTC in one pill), it certainly makes sense to point in that direction. I've copied others at Gilead; together we should be able to answer your questions.

Happy holidays
Howard

-----Original Message-----
**From:** Heneine, Walid [mailto:WMH2@CDC.GOV]
**Sent:** Tuesday, December 21, 2004 10:37 AM
**To:** Howard Jaffe; Michael Miller
**Subject:** FTC for CDC PrEP macaque model


Dear Howard and Michael,

As you may know we are interested in evaluating the efficacy of FTC in blocking SIV transmission in the CDC repeat low-dose macaque model for preexposure prohylaxis. We are at this point in the planning phase for this study and foresee the evaluation of the combination of FTC and Tenofovir DF in this model. I am putting soon an MTA for Gilead to acquire FTC and will appreciate any help you can provide in expediting its approval at your end.

Also, we are interested in data from PK studies in macaques that would help define the best FTC concentration to use in macaques. Any suggestions you have are welcome. I have found that different groups use different concentrations ranging from 8mg/kg to 50 mg/kg.

Many thanks
Happy holidays

Walid
404-639-0218

# EXHIBIT 29

GILEAD

Medicine Questions      Investors      Contact      Global Operations ▾

Our Purpose      About      Science & Medicine      News and Press      Careers

Press Room

   Press Releases

   Press FAQS

▸ Company Statements

   Petitions to US Patent and Trademark Office on HIV PrEP Patents

   Gilead Sciences Statement on U.S. Preventive Services Task Force 'A' Recommendation for PrEP as an HIV Prevention Strategy

   Discount For Ambisome

   Gilead 2017 Year in Review

   100 Corporate Equality Score

   Emergency Disaster Response

   Gilead Year in Review 2016

   Top Corporate Philanthropist

   HIV Medicines Reach 10 Million People

   Discover Study Of FTAF For PrEP

   Corporate Responsibility Report 2015

   Gilead Supports PrEP Education

   Corporate Contributions Report

   Celebrating Transgender Awareness Week

   Kite Pharma

   Harnessing The Immune System

   Grants for SCLAN

   Authorized Generics For HCV

Events

Annual Report

# Company Statements

## Gilead Sciences Statement On Inaccurate Reporting On Truvada®

**Gilead Invented HIV Treatment and Prevention Medication with Estimated $1.1 Billion in R&D Funding**

**Foster City, Calif., May 14, 2019** — Among multiple inaccuracies published in a New York Times editorial on May 13, assertions that taxpayer dollars funded the development of Truvada® (FTC/TDF) are incorrect.

The government did not invent PrEP, Truvada or Truvada for PrEP®. Gilead invented Truvada and funded the clinical trials that led to its 2004 FDA approval for use in combination with other antiretroviral agents to treat HIV. The company has spent an estimated $1.1 billion on R&D related to Truvada – to develop the two individual drugs that make up Truvada, invent the combination product that is Truvada, invent its use for HIV treatment and support the clinical trials that led to the approval of Truvada for PrEP. Any claim to the contrary is false.

Ending the HIV epidemic is a critically important public health goal. For decades, Gilead has been a leading innovator in the field of HIV, driving advances in treatment, prevention, testing and linkage to care, and cure research that are key components of efforts to end the epidemic. Now more than ever, accurate and fair discussions based on facts and the lived realities of people living with or at risk for HIV are essential to advance the policies and innovations that have the potential to reach this goal.

### About Gilead Sciences

Gilead Sciences is a research-based biopharmaceutical company that discovers, develops and commercializes innovative medicines in areas of unmet medical need. The company strives to transform and simplify care for people with life-threatening illnesses around the world. Gilead has operations in more than 35 countries worldwide, with headquarters in Foster City, California.

AREAS OF INTEREST          INFORMATION          LEGAL



Partnerships and
Community

Pipeline

Medicines

Job Search

Contact Us

Press Room

Investor Calls

Sitemap

Privacy Policy

Terms of Use

EU Data Disclosure

Social Media
Guidelines

Modern Slavery Act
Statement

**FOLLOW US**

   

© 2019 Gilead Sciences, Inc. All rights
reserved.

# EXHIBIT 30

ᵍˢ

J-022-06

CDC Ref. NCHSTP-V053471-00

## PUBLIC HEALTH SERVICE MATERIAL TRANSFER AGREEMENT

This Material Transfer Agreement ("MTA") has been adopted for use by the National Institutes of Health, the Food and Drug Administration and the Centers for Disease Control and Prevention, collectively referred to herein as the Public Health Service ("PHS") in all transfers of research material (Research Material) whether PHS is identified below as its Provider or Recipient.

Recipient: <u>Centers for Disease Control and Prevention</u>

Provider: <u>Gilead Sciences, Inc. ("Gilead")</u>

1. Provider agrees to transfer to Recipient's Investigator named below the following Research Material: **FTC (emtricitabine, powder form) 250 gm.**

2. THIS RESEARCH MATERIAL MAY NOT BE USED IN HUMAN SUBJECTS. The Research Material will only be used for research purposes by Recipient's investigator in his/her laboratory, for the research project described below, under suitable containment conditions. This Research Material will not be used by Recipient or its Investigator for commercial purposes such as screening, production or sale, for which a commercialization license may be required nor will Recipient or its Investigator replicate, modify, formulate, analyze or otherwise use the Research Material in any manner that is not expressly permitted by this Agreement without the advance written consent of Gilead. Recipient agrees to comply with all Federal rules and regulations applicable to the Research Project and the handling of the Research Material.

2(a). Are the Research Materials of human origin?

_____ Yes

XX    No

2(b). If Yes in 2(a), were Research Materials collected according to 45 CFR Part 46, "Protection of Human Subjects"?

_____ Yes (Please provide Assurance Number: _____)

<u>XX</u>    No

3. This Research Material will be used by Recipient's investigator solely in connection with the following research project ("Research Project") described with specificity as follows (use an attachment page if necessary):

**Project Description:**

**Pre-exposure prophylaxis with FTC in combination with one or two drugs for the prevention of simian human immunodeficiency virus (SHIV) infection in a repeat low-dose challenge model in *Macaca mulatta.***

1 of 5

CDC Ref. NCHSTP-V053471-00

Unprotected sexual exposure, especially among women at high risk for acquiring human immunodeficiency virus (HIV) has resulted in very high rates of infection in sub-Saharan Africa and southeast Asia. The lack of an efficacious vaccine for HIV emphasizes the urgency for developing a simple, safe and effective strategy to prevent sexual transmission.

As a model for human treatment, FTC will be used to treat female Macaca mulatta (Rhesus macaques) in a low-dose (10TCID) SHIV (RT-SHIV) vaginal challenge that more closely approximates virus exposures in humans.  Tenofovir and FTC will be delivered subcutaneously each at 20 mg/kg. Efavirenz will be given orally at 60mg/kg.

Method: The study will be conducted using the format described below. The maximum length of virus exposures in all arms will be 20 weeks. After conclusion of pre-determined virus exposure periods, all uninfected animals will be monitored for 24 weeks. The emergence of drug resistance will be monitored in breakthrough viruses from treated animals.

| Arm number | Description of Arm | Number of Animals | Treatment Regimen | Virus challenge (vaginal, RT-SHIV, $10TCID_{50}$) | Follow-up |
|---|---|---|---|---|---|
| 1 | Control; no pre-exposure prophylaxis (NO-PREP) | 4 | None | Weekly | Detectable virus anticipated around week 5 |
| 2 | Two-drug prophylaxis (2D-PREP) | 4 | Daily treatment FTC/TNF for 20 weeks | First challenge 7 days after drug treatment and then weekly for up to 20 exposures | 24 weeks f/u |
| 3 | Three-drug prophylaxis (3D-PREP) | 4 | Daily treatment TNF/FTC/efavirenz for 20 weeks | First challenge 7 days after drug treatment and then weekly for up to 20 exposures | 24 weeks f/u |

4. In all oral presentations or written publications concerning the Research Project, Recipient and Recipient's Investigator will acknowledge Provider's contribution of this Research Material unless requested otherwise. To the extent permitted by law, Recipient agrees to treat in confidence, for a period of five (5) years from the date of its disclosure, any of Provider's written information about this Research Material that is stamped "CONFIDENTIAL," or "PROPRIETARY" or some similar designation marking such documentation as confidential to Gilead except for information that was previously known to Recipient or that is or becomes publicly available or which is disclosed to Recipient without a confidentiality obligation.   Recipient may publish or otherwise publicly disclose the results of the Research Project, but if Provider has given CONFIDENTIAL information to Recipient such public disclosure may be made only after Provider has had thirty (30) days to review the proposed disclosure to determine if it includes any CONFIDENTIAL information, except when a shortened time period under court order or the Freedom of Information Act pertains.

5. This Research Material represents a significant investment on the part of Provider and is considered proprietary to Provider.  Provider retains all right, title and interest in and to the Research Materials.  This

CDC Ref. NCHSTP-V053471-00

Agreement does not give Recipient any right or license to any Research Material or intellectual property rights of Provider. Recipient's investigator therefore agrees to retain control over this Research Material and further agrees not to transfer the Research Material to other people not under her or his direct supervision without advance written approval of Provider. Provider reserves the right to distribute the Research Material to others and to use it for its own purposes. Upon Providers reasonable requests for any reason or when the Research Project is completed or three (3) years have elapsed, whichever occurs first, the Recipient will cease use of and the Research Material will be disposed of as directed by Provider.

6. This Research Material is provided as a service to the research community. IT IS BEING SUPPLIED TO RECIPIENT WITH NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Provider makes no representations that the use of the Research Material will not infringe any patent or proprietary rights of third parties.

7. When Provider is the PHS: Recipient shall retain title to any patent or other intellectual property rights in inventions made by its employees in the course of the Research Project. Recipient agrees not to claim, infer, or imply Governmental endorsement of the Research Project, the institution or personnel conducting the Research Project or any resulting product(s). Unless prohibited by law from doing so, recipient agrees to hold the United States Government harmless and to indemnify the Government for all liabilities, demands, damages, expenses and losses arising out of Recipient's use for any purpose of the Research Material.

8. When Recipient is the PHS: Recipient will promptly disclose to Provider all results, data, and other information or materials derived from Recipient's use of Research Material and Provider's Confidential Information ("Results"). Provider may freely use the Results solely for internal research purposes. Provider may use Results for other purposes only with Recipient's express prior written consent, which shall not be unreasonably withheld. The ownership of any inventions, discoveries and ideas that are made, conceived or reduced to practice under this Agreement ("Inventions") either solely by Recipient's Investigator or jointly by Provider and Recipient's Investigator, and whether patentable or not, shall be determined in accordance with U.S. patent law on inventorship. Recipient agrees to promptly notify Provider of any Inventions. The PHS shall retain title to any patent or other intellectual property rights in inventions made by its employees in the course of the Research Project. The PHS is not authorized to promise rights in advance for inventions developed under this Agreement, however, PHS agrees to give serious and reasonable consideration to Provider's request for a non-exclusive or exclusive license on commercially reasonable terms under PHS's intellectual property rights in or to any Inventions. It is the intention of NIAID that Provider not be liable to NIAID for any claims or damages arising from NIAID's use of the Research Material; however, no indemnification for any loss, claim, damage, or liability is intended or provided by NIAID under this Agreement. NIAID shall be liable for any loss, claim, damage or liability it incurs as a result of its activities under this Agreement, except that NIAID, as an agency of the United States, assumes liability only to the extent provided under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq*

9. The undersigned Provider and Recipient expressly certify and affirm that the contents of any statements made herein are truthful and accurate.

10. This MTA shall be construed in accordance with Federal law as applied by the Federal courts in the District of Columbia.

11. Any additional terms:  None.

CDC Ref.  NCHSTP-V053471-00

**Signatures Begin on Next Page**

CDC Ref. NCHSTP-V053471-00

**AGREED AND ACCEPTED BY :**

**Recipient Investigator:**

Signature: _____     Date: _12/28/04_

Name:     Walid Heneine, Ph.D.

Title:     Chief, HIV Drug Resistance and Retroviral Zoonoses Laboratory

**Authorized Signatory Official for Recipient:**

Date: _1/12/2005_     _____ Acting Asso. Dir for Lab. Scinar.

for     Janet L. Collins, Ph.D.
        Acting Director
        National Center for HIV, STD and TB Prevention

Recipient's Mailing Address     Centers for Disease Control and Prevention
                                1600 Clifton Road, N.E.
                                Atlanta, Georgia 30333
                                Attn: Technology Transfer Liaison (Mail Stop E-51)

**Authorized Signature for Provider and Title:**

Date: _31 Jan 2005_     _____

                        Mick Hitchcock, Ph.D.
                        Vice President, Medical Affairs

Provider's Mailing Address     Gilead Sciences, Inc.
                               333 Lakeside Drive
                               Foster City, CA 94404

GILEAD

Approved by Legal Department

5 of 5

# EXHIBIT 31

OPEN ⊘ ACCESS Freely available online

PLOS MEDICINE

# Prevention of Rectal SHIV Transmission in Macaques by Daily or Intermittent Prophylaxis with Emtricitabine and Tenofovir

J. Gerardo García-Lerma[1]*, Ron A. Otten[1], Shoukat H. Qari[1], Eddie Jackson[2], Mian-er Cong[1], Silvina Masciotra[1], Wei Luo[1], Caryn Kim[1], Debra R. Adams[1], Michael Monsour[1], Jonathan Lipscomb[1], Jeffrey A. Johnson[1], David Delinsky[3], Raymond F. Schinazi[3], Robert Janssen[1], Thomas M. Folks[1], Walid Heneine[1]*

1 Division of HIV/AIDS Prevention, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention, Centers for Disease Control and Prevention, Atlanta, Georgia, United States of America, 2 Division of Scientific Resources, National Center for Preparedness, Detection, and Control of Infectious Diseases, Centers for Disease Control and Prevention, Atlanta, Georgia, United States of America, 3 Emory University School of Medicine/Veterans Affairs Medical Center, Decatur, Georgia, United States of America

**Funding:** Measurement of drug levels by RFS was supported in part by National Institutes of Health (NIH) Centers for AIDS Research (CFAR) grant 5P30-AI050409 and by the Department of Veterans Affairs. The funders had no role in the study design, data collection and analysis, decision to publish, or preparation of the manuscript.

**Competing Interests:** Authors JGGL, RAO, RJ, TMF, and WH are named in a US Government patent application related to methods for HIV prophylaxis.

**Academic Editor:** Andrew Carr, St. Vincent's Hospital, Australia

**Citation:** García-Lerma JG, Otten RA, Qari SH, Jackson E, Cong M, et al. (2008) Prevention of rectal SHIV transmission in macaques by daily or intermittent prophylaxis with emtricitabine and tenofovir. PLoS Med 5(2): e28. doi:10.1371/journal.pmed.0050028

**Received:** June 6, 2007
**Accepted:** December 18, 2007
**Published:** February 5, 2008

This is an open-access article distributed under the terms of the Creative Commons Public Domain declaration which stipulates that, once placed in the public domain, this work may be freely reproduced, distributed, transmitted, modified, built upon, or otherwise used by anyone for any lawful purpose.

**Abbreviations:** AUC, area under the curve; FTC, emtricitabine; FTC-TP, FTC-triphosphate; HR, hazard ratio; PBMC, peripheral blood mononuclear cell; PrEP, pre-exposure prophylaxis; RT, reverse transcriptase; SIV, simian immunodeficiency virus; TDF, tenofovir–disoproxil fumarate; TFV-DP, tenofovir-diphosphate

* To whom correspondence should be addressed. E-mail:
GGarcia-Lerma@cdc.gov (JGGL);
WHeneine@cdc.gov (WH)

## A B S T R A C T

### Background

In the absence of an effective vaccine, HIV continues to spread globally, emphasizing the need for novel strategies to limit its transmission. Pre-exposure prophylaxis (PrEP) with antiretroviral drugs could prove to be an effective intervention strategy if highly efficacious and cost-effective PrEP modalities are identified. We evaluated daily and intermittent PrEP regimens of increasing antiviral activity in a macaque model that closely resembles human transmission.

### Methods and Findings

We used a repeat-exposure macaque model with 14 weekly rectal virus challenges. Three drug treatments were given once daily, each to a different group of six rhesus macaques. Group 1 was treated subcutaneously with a human-equivalent dose of emtricitabine (FTC), group 2 received orally the human-equivalent dosing of both FTC and tenofovir-disoproxil fumarate (TDF), and group 3 received subcutaneously a similar dosing of FTC and a higher dose of tenofovir. A fourth group of six rhesus macaques (group 4) received intermittently a PrEP regimen similar to group 3 only 2 h before and 24 h after each weekly virus challenge. Results were compared to 18 control macaques that did not receive any drug treatment. The risk of infection in macaques treated in groups 1 and 2 was 3.8- and 7.8-fold lower than in untreated macaques ($p = 0.02$ and $p = 0.008$, respectively). All six macaques in group 3 were protected. Breakthrough infections had blunted acute viremias; drug resistance was seen in two of six animals. All six animals in group 4 that received intermittent PrEP were protected.

### Conclusions

This model suggests that single drugs for daily PrEP can be protective but a combination of antiretroviral drugs may be required to increase the level of protection. Short but potent intermittent PrEP can provide protection comparable to that of daily PrEP in this SHIV/macaque model. These findings support PrEP trials for HIV prevention in humans and identify promising PrEP modalities.

*The Editors' Summary of this article follows the references.*

## Introduction

With an estimated 33.2 million people worldwide living with HIV at the end of 2007 and an estimated 2.5 million new infections in 2007 acquired mostly through sex, HIV/AIDS continues to be a major global health challenge [1]. Currently, no vaccine is available to prevent HIV, and it is unlikely that one will be developed soon. Pre-exposure prophylaxis (PrEP) with antiretroviral drugs is gaining considerable attention as a possible biomedical intervention strategy to prevent sexual transmission of HIV [2–5]. PrEP is a proven concept for other infectious diseases like malaria. Mathematical models estimate that over the next 10 y, an effective PrEP program could prevent 2.7 to 3.2 million new HIV-1 infections in sub-Saharan Africa [6]. This potentially significant public health benefit requires a very high PrEP efficacy and might be lost or substantially reduced with a PrEP efficacy of <50%. Therefore, identifying highly effective PrEP modalities is critical. In sexual transmission, HIV first replicates at a low level at the mucosal point of entry in the new host [7,8]. Effective PrEP can exploit this brief period of virus vulnerability by blocking HIV from establishing itself as a persistent infection.

Simian immunodeficiency virus (SIV) infection of macaques is a well-established model for HIV transmission that can provide data about the relative efficacy of different PrEP strategies, thereby informing the development of PrEP trials in humans. The use in PrEP of drugs that are approved for the treatment of HIV-1-infected persons is advantageous because of the known antiviral activity, safety, and drug resistance profiles of these drugs. Previous work in macaque models has largely focused on single-drug PrEP with tenofovir, a nucleotide reverse transcriptase (RT) inhibitor, and has shown the prophylactic efficacy of this drug against SIV transmission [9–11]. More recent work with tenofovir disoproxil fumarate (TDF), the currently approved oral prodrug, showed that daily PrEP with TDF at dosing comparable to the human dose was only partially protective against rectal or oral SIV/SHIV transmission [12,13]. In a recently reported Phase II clinical trial with TDF, two PrEP failures were reported compared to six infections in the placebo group [14]. The efficacy of TDF could not be conclusively evaluated because of the small number of HIV infections observed during the trial.

In this study, we evaluated PrEP efficacy of regimens containing the nucleoside RT inhibitor emtricitabine (FTC) alone or in combination with either tenofovir (in subcutaneous regimens) or TDF (in oral regimens). FTC is well tolerated and very potent, and has synergistic or additive effects with tenofovir. Both drugs have long intracellular half-lives and are co-formulated in a once-daily pill (Truvada) [15–18]. PrEP efficacy was measured in a repeat-low-dose exposure model in macaques that is highly relevant to PrEP in humans in three major ways. First, the SHIV virus challenge contains an R5 tropic HIV-1 envelope that resembles naturally transmitted viruses. Second, the mucosal transmission component uses a lower and more physiologic virus inoculum than what is conventionally used in the single high-dose challenge models [19,20]. Third, while single-dose models measure protection against one transmission event per animal, this model evaluates protection against multiple transmission events in each animal resulting from repeated virus exposures. In this model, protection by PrEP is measured by the degree that infection is prevented or by the increase in the number of exposures needed to infect macaques.

## Methods

### Animals and Interventions

The Animal Care and Use Committee (AICUC) of the Centers for Disease Control and Prevention (CDC) approved this study (protocol CDC-AICUC 1414OTTMONC-A5). All animal procedures were done at the animal facilities at CDC. Results reported and analyzed adhere to the predetermined study design and objectives.

The study design is shown in Figure 1. Three drug treatments with different antiviral activity were each given once daily to a group of six rhesus macaques. Group 1 was treated subcutaneously with a human equivalent dose of FTC (20 mg/kg; see next paragraph). Group 2 received oral FTC and TDF (20 mg/kg and 22 mg/kg, respectively) at a dose equivalent to Truvada in humans. Group 3 received subcutaneous FTC (20 mg/kg) and a higher dose of tenofovir (22 mg/kg). Based on approximately double the molecular weight and a 25%–50% tenofovir bioavailability in macaques following oral TDF administration, this dose corresponds to about 66–88 mg/kg of TDF given orally, or 3- to 4-fold the human-equivalent dosing. Intermittent PrEP was given to a fourth group of macaques (group 4) who received subcutaneously the FTC and high-dose tenofovir used in group 3 only 2 h before and 24 h after each weekly virus challenge. A total of 18 control macaques did not receive any drug treatment. Of these macaques, nine were part of this study and nine were historical controls from earlier studies done under identical conditions in Rhesus macaques with the same virus stock, inoculum size, and inoculation protocol.

Oral administration of FTC and TDF was performed by mixing the drug powders with fruit (apples or bananas and infrequently oranges). Stability analysis for up to 24 h by high-pressure liquid chromatography (HPLC) demonstrated that TDF was stable in fresh apple, banana, or orange juice (96% in fruit compared to 98% in water; unpublished data). Macaques were observed to ensure they had taken the drugs. Overall daily drug ingestion was very high; animals missed only one to seven doses during the whole study period. Infected animal AG-81 (see below) missed five doses; one dose 14 d before and four sporadic doses after viral RNA was detected in plasma. Infected animal AI-54 only missed one dose 10 d before the first detectable RNA. Stock solutions of tenofovir and FTC were prepared in distilled water or phosphate-buffered saline, respectively, and injected subcutaneously [21,22].

Tenofovir disoproxil fumarate (9-[(R)-2[[bis[(isopropoxy-carbonyl)oxy]-methoxy] phosphinyl]methoxy]propyl]adenine fumarate; TDF), tenofovir ((R)-9-(2-phosphonylmethoxypropyl) adenine; PMPA), and emtricitabine (5-fluoro-1-(2R,5S)-[2-(hydroxymethyl)-1,3-oxathiolan-5-yl]cytosine; FTC) were kindly provided by Gilead Sciences through a material transfer agreement.

### Macaque Model of Rectal SHIV Transmission

The efficacy of different PrEP modalities was evaluated using a repeated exposure macaque model of rectal transmission [12,19]. Rhesus macaques were exposed rectally once weekly for up to 14 wk to a SHIV$_{SF162P3}$ chimeric virus that



**Figure 1. Study Design and Interventions**
(A) Daily PrEP. Macaques were drug-treated 7–9 d before the first virus inoculation. Treated animals that remained negative during the 14 challenges received drug for an additional 28 d. Treated animals that became infected continued treatment to monitor plasma viremia and drug resistance emergence.
(B) Intermittent PrEP. Macaques received FTC and tenofovir only 2 h before and 24 h after each weekly rectal challenge.
(C) Untreated control macaques.
Infection of macaques was monitored weekly by PCR and serologic testing. The treatment groups were staggered; four of 33 macaques were used in two separate arms (see Methods, Text S1, and Table S1).
doi:10.1371/journal.pmed.0050028.g001

contains the tat, rev, and env coding regions of HIV-1$_{SF162}$ in a background of SIVmac239 (National Institutes of Health [NIH] AIDS Research and Reference Reagent Program [23,24]). The SHIV162p3 challenge dose was 10 TCID$_{50}$ or $7.6 \times 10^5$ RNA copies, which is within the range of HIV-1 RNA levels in semen ($10^3$–$10^6$ copies/ml) during acute infection in humans and higher than the levels ($10^2$–$10^4$ copies/ml) seen after primary viremia [20,25]. Virus exposures were done 2 h after drug treatment by a non-traumatic inoculation of 1 ml of SHIV$_{SF162p3}$ into the rectal vault via a sterile gastric feeding tube of adjusted length [19]. Macaques were anesthetized using standard doses of ketamine hydrochloride. Anesthetized macaques remained recumbent for at least 15 min after each intrarectal inoculation. Virus exposures were stopped when a macaque became SHIV RNA positive. All experiments were done under highly controlled conditions by the same personnel using the same virus stock, inoculum dose, and inoculation method.

The four study groups were staggered for logistic feasibility given the long follow-up (6.5 mo) in this model and to avoid unnecessary use of macaques. Group 3, which received the highest dose of FTC/tenofovir, was started before the FTC-only animals in group 1 because if this combination was not protective, testing FTC only would have not been pursued. Similarly, the intermittent FTC/tenofovir arm was done after data were available from the daily interventions. Four protected animals (three from group 3, one from group 1) were used again after a washout period of 8–12 mo; two were used in group 2 and two were used in group 4. Details on all the individual macaques, the regimens received, the sequence and outcome of each series, and the re-use of four animals are shown in Text S1 and Table S1. Blinding of the animal handlers was not done.

## Drug Doses

Small mammals usually eliminate drugs faster than larger mammals [26,27]. We therefore performed single-dose pharmacokinetic studies in Rhesus macaques to determine the FTC and TDF doses that achieve plasma and intracellular levels comparable to those seen clinically in humans. Six macaques were each given 48, 30, 20, 16, 15, and 12 mg/kg FTC by oral gavage; plasma and intracellular drug levels in

peripheral blood mononuclear cells (PBMCs) were determined as described below at 1, 2, 4, 8, and 24 h. The area under the plasma concentration time curve (AUC) values over a 24 h interval increased linearly with the FTC dosing (unpublished data). The dose of 20 mg/kg FTC resulted in an AUC value comparable to that achieved in humans receiving 200 mg FTC (13.2 µg × h/ml and 10 ± 3.1 µg × h/ml, respectively) [17]. Intracellular FTC-triphosphate (FTC-TP) levels in this animal were essentially similar to those in humans [17]. FTC-TP levels were highest at 1 h (1,419 fmol/$10^6$ cells), between 1,173–966 fmol/$10^6$ cells from 2–8 h, and 273 fmol/$10^6$ cells at 24 h. To assess oral bioavailability of FTC in macaques, two additional macaques received a dose of 11 or 17 mg/kg of FTC subcutaneously. Plasma FTC levels (AUC values of 6.1 and 12.2 µg × h/ml, respectively) were comparable to those achieved in the two macaques that received 12 or 16 mg/kg of FTC orally (7.9 and 11.2 µg × h/ml, respectively) indicating approximately 100% absorption. Therefore, we considered a once-daily oral or subcutaneous dose of 20 mg/kg of FTC as comparable to the dosing currently used in humans.

In humans, a wide range of tenofovir exposure is generally seen with once daily dosing of 300 mg of TDF (plasma AUC values of 2.3 ± 0.69 µg × h/ml; range, 2.1–3.2 µg × h/ml) [28]. We performed single-dose pharmacokinetic studies in five macaques that were each given by oral gavage a dose of 15, 20, 24, 37, and 46 mg/kg. Consistent with previous studies, we found a linear relationship between the dose of TDF and plasma AUC values. We also found that a dose of 20 or 24 mg/kg of TDF resulted in plasma tenofovir levels (AUC values of 3.2 and 3.4, respectively) that are within the range of those achieved in humans, while the other doses were outside this range (1.3, 4.1, and 5.8 µg × h/ml for 15, 37, and 46 mg/kg, respectively) [12,13,27,28]. Mean intracellular tenofovir-diphosphate (tenofovir-DP) levels measured between 1–4 h in these two macaques were 107 fmol/$10^6$ cells (range, 60–169 fmol/$10^6$ cells) and 248 fmol/$10^6$ cells (range, 175–335 fmol/$10^6$ cells), respectively, also comparable to the levels observed in humans 1–4 h after oral administration of 300 mg TDF (129–373 fmol/$10^6$ cells) [16]. We therefore considered a once-daily dose of 22 mg/kg of TDF to be equivalent to the human dose.

## SHIV RNA Virus Load Assay and Amplification of Proviral Sequences

Plasma SHIV RNA was quantified using a real-time RT-PCR assay previously described [12]. This assay format has a sensitivity of 50 RNA copies/ml. RNA was extracted from virus pellets obtained by ultracentrifugation of 1 ml plasma. Prior to RNA extraction and to control for the efficiency of extraction, a known amount of virus particles ($3 \times 10^5$) from an HIV-1 CM240 virus stock was added to each plasma sample. Reverse transcription and PCR amplification of SHIV (gag) and HIV-1 (env) sequences was done using primers specific for SIVmac239 and HIV-1 CM240, respectively [12]. HIV-1 CM240 was obtained from the NIH AIDS Research and Reference Reagent Program. Amplification of proviral DNA from PBMCs was done as previously described using primers and probes specific for SIVmac239 pol [19].

## Detection of Genotypic Resistance by Standard and Sensitive Assays

FTC and tenofovir resistance was monitored by standard sequence analysis of SIV RT (551 bp; amino acids 52 to 234)

and by sensitive allele-specific real-time PCR methods for the K65R and M184V mutations. Sequence analysis was done from plasma viruses using an RT-PCR procedure as previously described [12]. The Vector NTI program (version 7, 2001) was used to analyze the data and to determine deduced amino-acid sequences. Detection of low-frequency K65R and M184V mutants in plasma by real-time PCR was done as previously described [29]. A similar testing approach is used to assess minority drug-resistant HIV subpopulations in humans [30]. The sensitive SIV assays can detect 0.4% of K65R and 0.6% of M184V cloned sequences in a background of wild-type plasmid.

## Serology

Virus-specific serologic responses (IgG and IgM) were measured using a synthetic-peptide EIA (Genetic Systems HIV-1/HIV-2; BioRad) assay.

## Drug Levels in Plasma and in Peripheral Blood Mononuclear Cells

Tenofovir and FTC were extracted from 100 µl plasma by protein precipitation with 400 µl methanol containing 250 nM 3TC as an internal standard. Following precipitation, the solution was maintained at 4 °C for 10 min followed by vortexing for another 10 min. The supernatant was then evaporated to dryness in a heated vacuum centrifuge. Dry samples were stored at −20 °C until liquid chromatography–tandem mass spectrometry (LC-MS/MS) analysis. Drug levels were analyzed by using HPLC (LC Packings Ultimate 3000 modular LC System; Dionex) and ultra triple quadrupole mass spectrometer (Thermo Electron). Calibration curves were generated from standards of tenofovir and FTC by serial dilutions in human plasma over the range from 3.33 to 100,000 ng/ml. The lower limit of quantification was 3.33 ng/ml. All calibration curves had $r^2$ values greater than 0.99.

Tenofovir-DP and FTC-TP were extracted from macaque PBMCs using 60% methanol. Briefly, PBMCs were washed twice with phosphate-buffered saline and then resuspended in 1 ml of ice-cold methanol containing 4 nM 3TC-TP as an internal standard for both tenofovir-DP and FTC-TP. Samples were extracted overnight at −80 °C, centrifuged, and dried under a stream of air. Dried extracts were maintained at −80 °C until analysis. Prior to analysis, each sample was reconstituted in 100 µl 50 mM ammonium acetate buffer (pH 7.0) and centrifuged at 17,000$g$ to remove insoluble particulates. Calibration curves were generated from standards of tenofovir-DP and FTC-TP by serial dilutions in blank human PBM extract ($10^7$ cells/100 µl 50 mM ammonium acetate buffer) over the range from 0.25 to 10 nM for tenofovir-DP and 2.5 to 100 nM for FTC-TP. The lower limit of quantification was 0.25 nM for tenofovir-DP and 2.5 nM for FTC-TP. All calibration curves had $r^2$ values greater than 0.99. Drug levels were analyzed by HPLC (Agilent 1100 LC system; Agilent Technologies) with mass spectrometry detection (TSQ Quantum; Thermo Electron).

## Statistical Methods

The exact log-rank test was used to ascertain statistical difference between groups of macaques (treatment and control or two treatment groups). The Cox proportional hazards model was used to estimate the relative hazard ratio (HR), for a discrete-time survival analysis of the treatment



**Figure 2.** Protection against Repeated Rectal Virus Exposures by Daily or Intermittent PrEP

Each survival curve represents the cumulative proportion of uninfected macaques as a function of the number of weekly rectal exposures. Protected animals in groups 1–4 remained negative after a mean washout out of 27 wk (range, 17–60 wk).

doi:10.1371/journal.pmed.0050028.g002

and control groups, with use of the number of inoculations as the time variable. Though the sample sizes were small, model diagnostics supported the use of the Cox proportional hazards model. All statistical analyses for calculation of the efficacy of the different interventions were performed using SAS software (version 9.1; SAS Institute) and StatXact software (version 6.3; Cytel). For infected macaques, a linear mixed effects model was fit to the $\log_{10}$ of viral load with the macaques as a random effect and group (treatment or control) and time (weeks after peak viral load) as fixed effects.

## Results

### PrEP Efficacy of Daily FTC and FTC/TDF Combinations

Figure 2 shows the rate of infection in animals that received PrEP and in 18 untreated control macaques based on the first detectable viral RNA in plasma. Untreated macaques were infected after a median of two rectal exposures (mean, four rectal exposures). This suggests that an animal receiving PrEP and remaining uninfected after 14 virus challenges would have been protected against a median of seven transmission events. The majority of control animals (13/18 or 72%) were infected during the first four challenges; four (22%) were infected between exposures 8 and 12, and only one macaque (6%) remained uninfected after 14 exposures. Proviral DNA was usually detected at the time of plasma RNA detection or within 1–2 wk thereafter. Virus-specific antibody responses were observed within 7 to 35 d (median, 21 d) after the first detectable RNA in plasma. Three control macaques had persistently high viral loads in plasma but remained seronegative. Animals in the PrEP arms were considered protected from systemic SHIV infection if they were seronegative and negative for SHIV plasma RNA and SHIV DNA in PBMCs during PrEP and the following 70 d of washout in the absence of any drug treatment [31].

All PrEP regimens offered some degree of protection. Of the six macaques in group 1 receiving FTC only, two were protected after 14 exposures, whereas four had detectable viral RNA at exposures 5 (AG-80), 10 (AG-46), 12 (AH-04), and 13 (AG-07); infection in these four macaques was delayed compared to untreated controls ($p = 0.004$, exact log-rank test). These data demonstrate the prophylactic activity of FTC. Infection was also confirmed by DNA-PCR for provirus in PBMC and seroconversion observed 3, 1, 2, and 6 wk after

the first detectable RNA, respectively. To compare the temporal probability of risk for SHIV infection in controls relative to treated animals, Cox proportional HRs were calculated. Compared to controls, animals receiving FTC had a 3.8-fold lower risk of infection (Cox HR, 3.8, $p = 0.02$).

More protection was seen in group 2 (oral FTC and TDF); four of the six macaques were protected and only two (AG-81 and AI-54) were infected, at exposures 9 and 12. Both infections were significantly delayed from controls ($p = 0.0004$, exact log-rank test). These two macaques were seropositive 2 wk after the first detectable viral RNA in plasma and both were proviral DNA positive at weeks 10 and 12, respectively. Risk of infection in group 2 macaques receiving FTC and TDF was significantly reduced by 7.8-fold compared to controls (Cox HR, 7.8, $p = 0.008$).

### Breakthrough Infections Have Blunted Wild-Type Viremias

When PrEP fails to completely prevent transmission, the antiretroviral regimen may select for viruses with resistance to the drugs [32]. We therefore continued drug treatment in the six animals that failed PrEP in groups 1 and 2 and followed virus load dynamics and drug resistance emergence. Differences were first noted in acute viremia between breakthrough and control infections. Figure 3 compares virus loads in the breakthrough infections and 10 untreated macaques with sufficient longitudinal data. The mean peak viremia in the six treated macaques was $4.9 \pm 0.5 \log_{10}$ RNA copies/ml, $2.0 \log_{10}$ lower than in untreated controls ($6.9 \pm 0.3 \log_{10}$ RNA; $p = 0.007$, Mann-Whitney test; Figure 3). This difference was maintained up to week 11 as virus loads declined at similar rates in both groups ($-0.24 \pm 0.02 \log_{10}$/wk and $-0.24 \pm 0.03 \log_{10}$/wk respectively; $p = 0.99$). Figure 4 shows that three FTC and one FTC/TDF failures had the first undetectable virus loads as early as weeks 3 (AG-07), 4 (AH-04), 7 (AG-81), and 11 (AG-80) after the peak viremia. All four animals maintained low or undetectable virus loads for up to 20 wk. In contrast, all 10 untreated macaques had detectable virus loads during a median follow-up period of 7 wk (range, 5–40 wk; Figure 3).

Sequence analysis of SIV RT showed that all six breakthrough infections were initiated with wild-type virus. Four animals had no evidence of drug resistance by both sensitive and conventional testing despite extended (median, 23 wk; range, 13–29 wk) treatment. Two animals had M184V (AG-46;



**Figure 3.** Breakthrough Infections during PrEP Show Blunted Acute Viremias

Each time point represents the mean virus load observed in treated ($n = 6$) or untreated control ($n = 10$) macaques. Time 0 indicates the peak plasma virus load. Bars denote the standard error of the mean.

doi:10.1371/journal.pmed.0050028.g003

FTC-treated) or M184I (AI-54; FTC/TDF-treated) mutations associated with FTC resistance 10 and 3 wk after the first detectable RNA, respectively (Figure 4). The tenofovir-associated K65R mutation was not detected in the two animals receiving FTC/TDF.

## Full Protection by Daily or Intermittent PrEP

In an effort to completely block SHIV transmission, we administered subcutaneously FTC (20 mg/kg) and a higher dose of tenofovir (22 mg/kg) to a third group of six macaques (group 3). All of the six macaques that received this daily PrEP regimen remained uninfected after 14 exposures ($p = 0.00005$ compared to untreated controls, exact log-rank test; Figure 2). We also assessed if PrEP given intermittently around each virus exposure is equally protective to daily PrEP. A group of six macaques was injected subcutaneously with this highly effective regimen only 2 h before and 24 h after each weekly



**Figure 4.** Dynamics of Infection in Animals Infected during PrEP with FTC (AG-80, AG-46, AH-04, and AG-07) or FTC/TDF (AG-81 and AI-54)

Red circles indicate detectable M184V/I mutation; wild-type sequences are shown in blue. Open circles indicate time points that were not genotyped. The first detectable antibody response is shown as red arrows. The broken line denotes the limit of detection of the virus load assay (50 copies/ml).

doi:10.1371/journal.pmed.0050028.g004

rectal challenge. All six animals received 14 weekly challenges, and all were found to be protected from infection (Figure 2). None of the animals were seropositive or had detectable viral sequences either in plasma or PBMCs at any of the weekly time points during the 14-wk intermittent PrEP period and up to 70 d thereafter.

## Discussion

In this study, we investigated the relationship between PrEP antiviral activity and protection by using a repeat-exposure macaque model that closely resembles human transmission. At dosing equivalent to that used in humans, we found that daily FTC was partially protective, and that the addition of TDF increased effectiveness. We also show that subcutaneous FTC and high-dose tenofovir completely blocked rectal transmission. These findings show that full protection against repeated exposures by daily PrEP is possible in a primate model, and that PrEP effectiveness correlates with increases in antiviral activity.

None of the protected animals showed any evidence of transient systemic infection, likely reflecting the ability of FTC and tenofovir to effectively block the earliest SHIV infections, possibly at the mucosal point of entry, before significant systemic dissemination of the virus occurs. Since inhibiting virus establishment shortly after exposure may be critical to PrEP efficacy, we also explored if PrEP given intermittently around each virus exposure could be equally protective to daily PrEP. Earlier studies in newborn macaques exposed orally to a highly virulent SIVmac251 strain have shown the promise of short PrEP interventions [33,34]. Intermittent PrEP modalities are highly desirable because of their convenience, potential cost-effectiveness, and lower risks of drug toxicity. Both FTC and tenofovir have long (40 to >60 h) intracellular half-lives in humans [16–18] suggesting the possibility of extended prophylactic activity when administered around virus exposures. We found FTC/tenofovir given intermittently as a two-dose PrEP around each of 14 weekly virus exposures to be as fully protective as the same regimen given daily. Therefore, intermittent PrEP with potent regimens are highly promising modalities. Evaluation of intermittent PrEP with different drug combinations, possibly of different classes, and defining minimal dose requirement and optimal timing relative to virus exposure will all be important.

While many biologic similarities exist between rectal and vaginal HIV transmission, some differences in the early events of mucosal infection and dissemination kinetics are possible [8,35]. Therefore, it is important to confirm the PrEP efficacy of these regimens against vaginal transmission in appropriate macaque models. Although daily PrEP with a Truvada-equivalent dosing was highly effective, a regimen with more tenofovir was needed to completely block transmission in this model. However, the dose of tenofovir in this regimen would likely be toxic in humans. More work in macaque models could possibly identify two- or three-drug combinations that are fully protective and yet carry low risks of toxicity. The increasing availability of new drugs in different classes such as those that block viral integration or entry through CCR5 will provide additional possibilities. The results of such animal studies may help guide designs of clinical trials that will ultimately measure effectiveness of various PrEP regimens against sexual HIV transmission.

Initial macaque studies with tenofovir used single and non-physiologic doses of SHIV or SIV ($10^3$ to $10^5$ TCID$_{50}$) capable of yielding high infection rates in untreated controls [10,11,33,34]. We used a more physiological virus dose that fell within the upper range of viral load observed in human semen during acute HIV-1 infection [20]. The repeated nature of the model has also the advantage of evaluating protection over multiple transmission events. The infection of control macaques after a median of two exposures suggests that treated animals that remain uninfected after 14 challenges were protected over a median of seven transmission events. This model maintains high stringency, increases statistical power, provides improved estimations of risk reductions, and reduces the number of macaques [36].

Although a repeat-challenge model is more relevant to human transmission, which typically requires multiple exposures, a disadvantage of the model is that it is logistically demanding over a long period of time. This limits the ability to do multiple concurrent arms, which raises a potential for bias. However, animal studies with non-concurrent arms can be well controlled. In our study, we have staggered interventions because of logistic feasibility and to prevent unnecessary use of animals. All animal procedures were done under identical conditions by the same personnel and experimental protocol, thus minimizing the potential for bias. Likewise, it is not known if repeated exposures to the virus can ultimately alter susceptibility to infection. The similar infection rates observed among previously or newly exposed animals suggest that the impact of repeated exposures on susceptibility to infection is minimal [12,37].

Several important observations were made from the longitudinal analysis of the breakthrough infections. The finding that wild-type SHIV initiated all six infections suggests that PrEP failure in these animals is due to residual virus replication in cells not protected by drugs, rather than a rapid selection of a drug-resistant virus. Of the four animals infected during FTC treatment, only one selected resistant viruses, while an FTC-resistant virus emerged in one of two animals that failed FTC/TDF PrEP. The absence of tenofovir resistance in both macaques is consistent with clinical observations showing resistance to FTC and not tenofovir as the most frequent pathway of resistance to Truvada [38]. The two macaques in which FTC-resistant mutants emerged had the highest peak viremias, suggesting that selection of drug resistance may be facilitated by higher virus replication. Thus, lower acute viremias may have diminished the risk of resistance during extended treatment with FTC and FTC/TDF. Similar blunted viremias during early infection have been noted in macaques failing PrEP with an orally administered CCR5 inhibitor [39]. These data underscore the potential differences in virus load and drug resistance dynamics during PrEP failures from those in mono- or dual drug therapy of established infections [21,22,40,41].

The attenuated acute viremias may have additional clinical and public health implications. It is well established that massive depletion of CD4$^+$ T cells, specifically CD4$^+$ memory T cells, begins in the acute stage of SIV as well as HIV-1 infection in the gut and other lymphoid tissues, and is generally proportional to the degree of virus replication [42–44]. Substantial reductions in acute viremia may conceivably

reduce $CD4^+$ T cell depletion, help preserve immune function, and attenuate the course of HIV infection. In humans, reduction in virus set points by 1 $log_{10}$ have been estimated to double the time to progression to HIV disease [45]. Reductions in virus loads in the animals that failed PrEP were apparent at the first time points before seroconversion and were sustained under continued drug treatment after all the animals seroconverted. Blunted viremia during acute infection in persons who fail PrEP will likely depend on the period of drug exposure and the potency of the PrEP regimen. PrEP-treated populations will likely be monitored by serologic testing for infection to minimize drug exposure and reduce the risks of drug resistance. The period of drug exposure will thus depend on the frequency of serologic testing but will inevitably be at least several weeks long, enough to affect early $CD4^+$ T cell depletion. Individuals with acute infections who have very high virus loads may also play a key role in the epidemic spread of HIV-1 because they are more infectious than individuals with chronic infections who have lower virus loads [46–48]. Therefore, reductions in acute viremia during PrEP treatment may contribute to decreases in HIV-1 transmissibility at the population level and could add to the overall effectiveness of PrEP.

The data from this study demonstrate the potential high effectiveness of daily or intermittent PrEP against sexual HIV transmission, support expanding PrEP trials in humans and identify promising PrEP modalities.

## Supporting Information

**Alternative Language Abstract S1.** Translation of the Abstract into French by Dominique Rollin and Walid Heneine

Found at doi:10.1371/journal.pmed.0050028.sd001 (23 KB DOC).

**Alternative Language Abstract S2.** Translation of the Abstract into Spanish by J. Gerardo García-Lerma

Found at doi:10.1371/journal.pmed.0050028.sd002 (43 KB DOC).

**Table S1.** Macaques, Interventions, and Outcome of the Challenge Series

Found at doi:10.1371/journal.pmed.0050028.st001 (51 KB DOC).

**Text S1.** Description of Current and Historic Macaques and Susceptibility to Infection

Found at doi:10.1371/journal.pmed.0050028.sd003 (28 KB DOC).

## Acknowledgments

We thank J. Rooney and colleagues from Gilead for providing the drugs, C. Pau and A. Martin for the TDF stability analysis in fruit, and K. van Rompay for helpful discussions.

**Author contributions.** JGGL and WH were the princial investigators of the study and drafted the manuscript. TMF, RAO, and RJ contributed substantially to study conception and design and critically reviewed the manuscript. SQ, EJ, MC, SM, WL, CK, DRA, JL, JAJ, DD, and RFS contributed to data collection and analysis. MM performed statistical analysis.

## References

1. Joint United Nations Programme on HIV/AIDS   (2007) 2007 AIDS Epidemic update. Available: http://www.unaids.org/en/KnowledgeCentre/HIVData/EpiUpdate/EpiUpdArchive/2007default.asp.
2. Cohen MS, Gay C, Kashuba AD, Blower S, Paxton L. (2007) Narrative review: Antiretroviral therapy to prevent the sexual transmission of HIV-1. Ann Intern Med 146: 591–601.
3. Derdelinckx I, Wainberg MA, Lange JM, Hill A, Halima Y, et al. (2006) Criteria for drugs used in pre-exposure prophylaxis trials against HIV infection. PLoS Med 3: e454.
4. Liu AY, Grant RM, Buchbinder SP (2006) Preexposure prophylaxis for HIV. JAMA 296: 863–865.
5. Grant RM, Buchbinder S, Cates W Jr, Clarke E, Coates T, et al. (2005) Promote HIV chemoprophylaxis research, don't prevent it. Science 309: 2170–2171.
6. Abbas U, Anderson R, Mellors J (2007) Potential impact of antiretroviral chemoprophylaxis on HIV-1 transmission in resource-limited settings. PLoS ONE 2: e875.
7. Haase AT (2005) Perils at the mucosal front lines for HIV and SIV and their hosts. Nature Rev Immunol 5: 783–792.
8. Miller CJ, Li Q, Abel K, Kim EY, Ma ZM, et al. (2005) Propagation and dissemination of infection after vaginal transmission of simian immunodeficiency virus. J Virol 79: 9217–9227.
9. Otten RA, Smith DK, Adams DR, Pullium JK, Jackson E, et al. (2000) Efficacy of postexposure prophylaxis after intravaginal exposure of pig-tailed macaques to a human-derived retrovirus (human immunodeficiency virus type 2). J Virol 74: 9771–9775.
10. Tsai CC, Follis KE, Sabo A, Beck TW, Grant RF, et al. (1995) Prevention of SIV infection in macaques by (R)-9-(2-phosphonylmethoxypropyl)adenine. Science 270: 1197–1199.
11. Tsai CC, Emau P, Follis KE, Beck TW, Benveniste RE, et al. (1998) Effectiveness of postinoculation (R)-9-(2-phosphonylmethoxypropyl) adenine treatment for prevention of persistent simian immunodeficiency virus SIVmne infection depends critically on timing of initiation and duration of treatment. J Virol 72: 4265–4273.
12. Subbarao S, Otten RA, Ramos A, Kim C, Jackson E, et al. (2006) Chemoprophylaxis with tenofovir disoproxil fumarate provided partial protection against infection with simian human immunodeficiency virus in macaques given multiple viral challenges. J Infect Dis 194: 904–911.
13. van Rompay KK, Kearney BP, Sexton JJ, Colon R, Lawson JR, et al. (2006) Evaluation of oral tenofovir disoproxil fumarate and topical tenofovir GS-7340 to protect infant macaques against repeated oral challenges with virulent simian immunodeficiency virus. J Acquir Immune Defic Syndr 43: 6–14.
14. Peterson L, Taylor D, Roddy R, Belai G, Phillips P, et al. (2007) Tenofovir disoproxil fumarate for prevention of HIV infection in women: A phase 2, double-blind, randomized, placebo-controlled trial. PLoS Clin Trials 2: e27.
15. Borroto-Esoda K, Vela JE, Myrick F, Ray AS, Miller MD (2006) In vitro evaluation of the anti-HIV activity and metabolic interactions of tenofovir and emtricitabine Antivir Ther 11: 377–384.
16. Pruvost A, Negredo E, Benech H, Theodoro F, Puig J, et al. (2005) Measurement of intracellular didanosine and tenofovir phosphorylated metabolites and possible interaction of the two drugs in human immunodeficiency virus-infected patients. Antimicrob Agents Chemother 49: 1907–1914.
17. Wang LH, Begley J, St Claire RL 3rd, Harris J, Wakeford C, et al. (2004) Pharmacokinetic and pharmacodynamic characteristics of emtricitabine support its once daily dosing for the treatment of HIV infection. AIDS Res Hum Retroviruses 20: 1173–1182.
18. Hawkins T, Veikley W, St Claire RL 3rd, Guyer B, Clark N, et al. (2005) Intracellular pharmacokinetics of tenofovir diphosphate, carbovir triphosphate, and lamivudine triphosphate in patients receiving triple-nucleoside regimens. J Acquir Immune Defic Syndr 39: 406–411.
19. Otten RA, Adams DR, Kim CN, Jackson E, Pullium JK, et al. (2005) Multiple vaginal exposures to low doses of R5 simian-human immunodeficiency virus: Strategy to study HIV preclinical interventions in nonhuman primates. J Infect Dis 19: 164–173.
20. Pilcher CD, Tien HC, Eron JJ Jr, Vernazza PL, Leu SY, et al. (2004) Brief but efficient: Acute HIV infection and the sexual transmission of HIV. J Infect Dis 189: 1785–1792.
21. van Rompay KK, Matthews TB, Higgins J, Canfield DR, Tarara RP, et al. (2002) Virulence and reduced fitness of SIV with the M184V mutation in reverse transcriptase. J Virol 76: 6083–6092.
22. van Rompay KK, Singh RP, Heneine W, Johnson JA, Montefiori DC, et al. (2006) Structured treatment interruptions with tenofovir monotherapy for simian immunodeficiency virus-infected newborn macaques. J Virol 80: 6399–6410.
23. Harouse JM, Gettie A, Tan RC, Blanchard J, Cheng-Mayer C (1999) Distinct pathogenic sequela in rhesus macaques infected with CCR5 or CXCR4 utilizing SHIVs. Science 284: 816–819.
24. Luciw PA, Pratt-Lowe E, Shaw KE, Levy JA, Cheng-Mayer C. (1995) Persistent infection of rhesus macaques with T-cell-line-tropic and macrophage-tropic clones of simian/human immunodeficiency viruses (SHIV). Proc Natl Acad Sci U S A 92: 7490–7494.
25. Pilcher CD, Joaki G, Hoffman IF, Martinson FE, Mapanje C, et al. (2007) Amplified transmission of HIV-1: Comparison of HIV-1 concentrations in semen and blood during acute and chronic infection. AIDS 21: 1723–1730.
26. Mordenti J (1986) Man versus beast: pharmacokinetic scaling in mammals. J Pharm Sci 75: 1028–1040.
27. van Rompay KK, Brignolo LL, Meyer DJ, Jerome C, Tarara R, et al. (2004) Biological effects of short-term or prolonged administration of 9-[2-(phosphonomethoxy) propyl] adenine (tenofovir) to newborn and infant rhesus macaques. Antimicrob Agents Chemother 48: 1469–1487.
28. Barditch-Crovo P, Deeks SG, Collier A, Safrin S, Coakley DF, et al. (2001) Phase I/II trial of the pharmacokinetics, safety, and antiretroviral activity of tenofovir disoproxil fumarate in human immunodeficiency virus-infected adults. Antimicrob Agents Chemother 45: 2733–2739.



Antiretroviral Prophylaxis for HIV

29. Johnson JA, Rompay KK, Delwart E, Heneine W. (2006) A rapid and sensitive real-time PCR assay for the K65R drug resistance mutation in SIV reverse transcriptase. AIDS Res Hum Retrovirus 22: 912–916.

30. Johnson JA, Li JF, Wei X, Lipscomb J, Bennett D, et al. (2007) Simple PCR assays improve the sensitivity of HIV-1 subtype B drug resistance testing and allow linking of resistance mutations. PLoS ONE 2: e638.

31. Veazey RS, Klasse PJ, Schader SM, Hu Q, Ketas TJ, et al. (2005) Protection of macaques from vaginal SHIV challenge by vaginally delivered inhibitors of virus-cell fusion. Nature 438: 99–102.

32. Grant RM, Wainberg MA. (2006) Chemoprophylaxis of HIV infection: Moving forward with caution. J Infect Dis 194: 874–876.

33. van Rompay KK, Berardi CJ, Aguirre NL, Bischofberger N, Lietman PS, et al. (1998) Two doses of PMPA protect newborn macaques against oral simian immunodeficiency virus infection. AIDS 12: F79–F83.

34. van Rompay KK, McChesney MB, Aguirre NL, Schmidt KA, Bischofberger N, et al. (2001) Two low doses of tenofovir protect newborn macaques against oral simian immunodeficiency virus infection. J Infect Dis 184: 429–438.

35. Couedel-Courteille A, Pretet JL, Barget N, Jacques S, Petitprez K, et al. (2003) Delayed viral replication and CD4(+) T cell depletion in the rectosigmoid mucosa of macaques during primary rectal SIV infection. Virology 316: 290–301.

36. Regoes RR, Longini IM, Feinberg MB, Staprans SI. (2005) Preclinical assessment of HIV vaccines and microbicides by repeated low-dose virus challenges. PLoS Med 2: e249.

37. Kim CN, Adams DR, Bashirian S, Butera S, Folks TM, et al. (2006) Repetitive exposures with simian/human immunodeficiency viruses: Strategy to study HIV pre-clinical interventions in non-human primates. J Med Primatol 35: 210–216.

38. Johnson MA, Gathe JC Jr, Podzamczer D, Molina JM, Naylor CT, et al. (2006) A once-daily lopinavir/ritonavir-based regimen provides noninferior antiviral activity compared with a twice-daily regimen. J Acquir Immune Defic Syndr 43: 153–160.

39. Veazey RS, Springer MS, Marx PA, Dufour J, Klasse PJ, et al. (2005)

40. Magierowska M, Bernardin F, Garg S, Staprans S, Miller MD, et al. (2004) Highly uneven distribution of tenofovir-selected simian immunodeficiency virus in different anatomical sites of rhesus macaques. J Virol 78: 2434–2444.

41. van Rompay KK, Cherrington JM, Marthas ML, Berardi CJ, Mulato AS, et al. (1996) 9-[2-(Phosphonomethoxy)propyl]adenine therapy of established simian immunodeficiency virus infection in infant rhesus macaques. Antimicrob Agents Chemother 40: 2586–2591.

42. Mattapallil JJ, Douek DC, Hill B, Nishimura Y, Martin M, et al. (2005) Massive infection and loss of memory CD4$^+$ T cells in multiple tissues during acute SIV infection. Nature 434: 1093–1097.

43. Mehandru S, Poles MA, Tenner-Racz K, Horowitz A, Hurley A, et al. (2004) Primary HIV-1 infection is associated with preferential depletion of CD4$^+$ T lymphocytes from effector sites in the gastrointestinal tract. J Exp Med 200: 761–770.

44. Veazey RS, DeMaria M, Chalifoux LV, Shvetz DE, Pauley DR, et al. (1998) Gastrointestinal tract as a major site of CD4$^+$ T cell depletion and viral replication in SIV infection. Science 280: 427–431.

45. Gupta SB, Jacobson LP, Margolick JB, Rinaldo CR, Phair JP, et al. (2007) Estimating the benefit of an HIV-1 vaccine that reduces viral load set point. J Infect Dis 195: 546–550.

46. Dyer JR, Kazembe P, Vernazza PL, Gilliam BL, Maida M, et al. (1998) High levels of human immunodeficiency virus type 1 in blood and semen of seropositive men in sub-Saharan Africa. J Infect Dis 177: 1742–1746.

47. Wawer MJ, Gray RH, Sewankambo NK, Serwadda D, Li X, et al. (2005) Rates of HIV-1 transmission per coital act, by stage of HIV-1 infection, in Rakai, Uganda. J Infect Dis 191: 1403–1409.

48. Operskalski EA, Stram DO, Busch MP, Huang W, Harris M, et al. (1997) Role of viral load in heterosexual transmission of human immunodeficiency virus type 1 by blood transfusion recipients. Am J Epidemiol 146: 655–661.

Protection of macaques from vaginal SHIV challenge by an orally delivered CCR5 inhibitor. Nature 11: 1293–1294.

## Editors' Summary

**Background.** Each year, some 2.5 million people become newly infected with HIV, the virus that causes AIDS. A vaccine that protects people against HIV infection is not likely to become available for at least several years. Condoms can prevent infection, but they are not 100% effective, and people do not always use them. Until a vaccine becomes available, other methods of preventing HIV could save many thousands of lives.

One possibility for preventing HIV is pre-exposure prophylaxis (PrEP). In this approach, people who are likely to be exposed to the virus could take medicine to prevent them from becoming infected, in the same way that medication to protect against malaria is often taken by people traveling to high-risk areas.

**Why Was This Study Done?** PrEP has never been shown to be effective against sexual transmission of HIV in humans. Studies of PrEP in people at risk for HIV are currently in progress or being planned, but it is not clear which medications or dosing schedules should be used. The researchers in this study wanted to explore several possible ways of giving PrEP in monkeys in order to learn more about how to design strategies for testing PrEP in humans.

**What Did the Researchers Do and Find?** The researchers simulated human exposure to HIV by exposing rhesus macaques (a type of monkey) to SHIV, a monkey virus (SIV) that has been modified to contain the same outer protein as HIV. They exposed the macaques to repeated low doses of SHIV given rectally once per week, to simulate a common route of HIV transmission in humans. They used five groups of macaques that were all given the same viral exposure, but received different PrEP regimens: one group of six animals received only the anti-HIV drug emtricitabine (FTC), by injection under the skin every day; another six received FTC in combination with an oral form of the anti-HIV drug tenofovir every day, both by mouth); six received by injection FTC in combination with a higher tenofovir dose every day, and six also received by injection FTC in combination with the high-dose tenofovir, but the treatment was given only before and after the weekly viral exposure instead of every day. For comparison, the fifth group of nine macaques (plus another nine from a previous study) received no anti-HIV medications.

The researchers found that the macaques in any of the four treatment groups were less likely to become infected than those in the comparison group. In particular, all of the macaques receiving both FTC and high-dose tenofovir, whether daily or only around the time of exposure, were protected from infection. Macaques that did become infected in the other treatment groups had lower levels of virus in their blood than those that became infected in the comparison group, but some that became infected in the treatment groups went on to develop virus that was resistant to FTC.

**What Do These Findings Mean?** These results show that PrEP can be effective in this animal model, and that higher doses and combination treatments may be more effective than single drugs or lower doses. The results also suggest that PrEP might work if taken only around the time of exposure and therefore might not need to be taken every day in order to be effective. Further, by reducing the levels of HIV in people who do become infected, PrEP might reduce the chance that these people will transmit HIV to others before realizing that they themselves are infected. However, this study also demonstrates that partially effective PrEP can result in infection with drug-resistant virus, which might make treatment difficult. Also, the doses of tenofovir used to achieve maximum protection in these macaques may be higher than would be safe in humans. Carefully designed human studies will be needed to determine which, if any, PrEP strategies will be effective in practice.

**Additional Information.** Please access these Web sites via the online version of this summary at http://dx.doi.org/doi:10.1371/journal.pmed.0050028.

- The US Centers for Disease Control and Prevention (CDC) is conducting several trials of PrEP
- The AIDS Vaccine Advocacy Coalition and the UCLA Program in Global Health provide information at PrEP Watch
- The UCSF Center for HIV Information's HIV InSite includes resources on HIV prevention and treatment

# EXHIBIT 32



# HIV PREVENTION DRUG: BILLIONS IN CORPORATE PROFITS AFTER MILLIONS IN TAXPAYER INVESTMENTS

## HEARING

BEFORE THE

## COMMITTEE ON OVERSIGHT AND REFORM HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

FIRST SESSION

———————

MAY 16, 2019

———————

## Serial No. 116–24

———————

Printed for the use of the Committee on Oversight and Reform



Available on: *http://www.govinfo.gov*
*http://www.oversight.house.gov*
*http://www.docs.house.gov*

U.S. GOVERNMENT PUBLISHING OFFICE

36–660 PDF                    WASHINGTON : 2019

## COMMITTEE ON OVERSIGHT AND REFORM

ELIJAH E. CUMMINGS, Maryland, *Chairman*

CAROLYN B. MALONEY, New York
ELEANOR HOLMES NORTON, District of
    Columbia
WM. LACY CLAY, Missouri
STEPHEN F. LYNCH, Massachusetts
JIM COOPER, Tennessee
GERALD E. CONNOLLY, Virginia
RAJA KRISHNAMOORTHI, Illinois
JAMIE RASKIN, Maryland
HARLEY ROUDA, California
KATIE HILL, California
DEBBIE WASSERMAN SCHULTZ, Florida
JOHN P. SARBANES, Maryland
PETER WELCH, Vermont
JACKIE SPEIER, California
ROBIN L. KELLY, Illinois
MARK DESAULNIER, California
BRENDA L. LAWRENCE, Michigan
STACEY E. PLASKETT, Virgin Islands
RO KHANNA, California
JIMMY GOMEZ, California
ALEXANDRIA OCASIO-CORTEZ, New York
AYANNA PRESSLEY, Massachusetts
RASHIDA TLAIB, Michigan

JIM JORDAN, Ohio, *Ranking Minority Member*
JUSTIN AMASH, Michigan
PAUL A. GOSAR, Arizona
VIRGINIA FOXX, North Carolina
THOMAS MASSIE, Kentucky
MARK MEADOWS, North Carolina
JODY B. HICE, Georgia
GLENN GROTHMAN, Wisconsin
JAMES COMER, Kentucky
BOB GIBBS, Ohio
RALPH NORMAN, South Carolina
CLAY HIGGINS, Louisiana
CHIP ROY, Texas
CAROL D. MILLER, West Virginia
MARK E. GREEN, Tennessee
KELLY ARMSTRONG, North Dakota
W. GREGORY STEUBE, Florida

DAVID RAPALLO, *Staff Director*
ALI GOLDEN, *Chief Health Counsel*
ELISA LANIER, *Director of Operations and Chief Clerk*
CHRISTOPHER HIXON, *Minority Chief of Staff*
CONTACT NUMBER: 202-225-5051

(II)

# C O N T E N T S

————

|  | Page |
|---|---|
| Hearing held on May 16, 2019 ............................................................... | 1 |

WITNESSES

Dr. Robert M. Grant, Professor of Medicine, University of California, San Francisco
    Oral Statement ........................................................................ 4
Dr. Rochelle Walensky, Professor of Medicine, Harvard Medical School, and Chief of Division of Infectious Diseases, Massachusetts General Hospital
    Oral Statement ........................................................................ 6
Mr. Tim Horn, Director, Medication Access and Pricing, NASTAD
    Oral Statement ........................................................................ 8
Mr. Stephen Ezell, Vice President, Global Innovation Policy, Information Technology and Innovation Foundation
    Oral Statement ........................................................................ 9
Dr. Aaron Lord, PrEP Patient and Advocate
    Oral Statement ........................................................................ 11
Daniel O'Day, Chairman and CEO, Gilead Sciences, Inc.
    Oral Statement ........................................................................ 13

*The written statements of the witnesses are available at: https:// docs.house.gov.*

## INDEX OF DOCUMENTS

————

*The documents entered into the record during this hearing are listed below, and are available at: https://docs.house.gov.*

* Statement from New York City Council Speaker Corey Johnson; submitted by Ms. Ocasio-Cortez.

* Yale Global Health Justice Partnership Statement dated 3-12-19; submitted by Ms. Ocasio-Cortez.

* Peer Review Article from the New England Journal of Medicine dated 12-30-10; submitted by Mr. Jordan.

* Washington Post Article from July 13, 2016, ″The Drug Company that shocked the world with its prices dodged $10 billion in taxes, report says;″ submitted by Ms. Hill.

* Letter from the Treatment Action Group; submitted by Mr. Cummings.

* Letter from the AIDS Vaccine Advocacy Coalition; submitted by Mr. Cummings.

* Letter from the HIV Medicine Association; submitted by Mr. Cummings.

* Questions for the Record; submitted to Mr. O'Day.

* Statement for the Record; submitted by Mr. Connolly.

# HIV PREVENTION DRUG: BILLIONS IN CORPORATE PROFITS AFTER MILLIONS IN TAXPAYER INVESTMENTS

————

THURSDAY, MAY 16, 2019

HOUSE OF REPRESENTATIVES
COMMITTEE ON OVERSIGHT AND REFORM
*Washington, D.C.*

The committee met, pursuant to notice, at 10:06 a.m., in room 2154, Rayburn House Office Building, Hon. Elijah Cummings (chairman of the committee) presiding.

Present: Representatives Cummings, Maloney, Norton, Connolly, Krishnamoorthi, Raskin, Rouda, Hill, Sarbanes, Welch, Speier, Kelly, DeSaulnier, Khanna, Gomez, Ocasio-Cortez, Pressley, Tlaib, Jordan, Amash, Foxx, Meadows, Hice, Grothman, Comer, Higgins, Norman, Roy, Miller, Armstrong, and Steube.

Chairman CUMMINGS. The committee will come to order. Without objection, the chair is authorized to declare recess of the committee at any time.

I now recognize myself for five minutes to give an opening statement.

Today is our committee's second hearing on the skyrocketing prices of prescription drugs. At our first hearing in January, the committee's very first witness, Ms. Antoinette Worsham, she was a compelling witness. Her 22-year-old daughter died because she could not afford the insulin she needed to control her diabetes. By the way, the insulin cost $333 a month. Let that sink in. For $333 a month, a 22-year-old college graduate died. Ms. Worsham's testimony was gut-wrenching, but unfortunately, she is not alone. We've heard other stories just like hers from our constituents, our friends, and our loved ones.

Today, we are examining the price of a drug called Truvada. Truvada is a phenomenal drug that prevents the transmission of HIV through a treatment called preexposure prophylaxis or PrEP for short.

At the outset, I want to recognize the efforts of our distinguished colleague, Congresswoman Ocasio-Cortez. She has been leading the charge on this issue, and it is because of her efforts that we are holding this hearing today. I want to thank her for her phenomenal leadership.

Think about this: We now have a drug that has the potential to end the HIV epidemic. This would have been unfathomable at the height of the HIV/AIDS crisis. This is an issue that I have been dealing with and working with communities on for more than 20-

2

some years. I have seen many people die. I have seen people who used to be on the choir at my church die. I have seen neighbors die. And we have made these phenomenal strides.

But this treatment was developed as a result of investments made by the American taxpayers through the National Institutes of Health and the Centers for Disease Control and Prevention. The problem is that Gilead, the company that now sells this drug, charges astronomical prices. When Truvada was first approved in 2004, Gilead charged about $800 per month, again, for this life-saving drug. Since then, Gilead raised the price of this drug over and over and over and over and over again. It now charges about $2,000 for just one month or about $70 per pill. Think about that, lifesaving drug.

In the same period, Gilead has made massive windfalls on this treatment, more than $36 billion in revenues. Let me say that one more time. They made more than $36 billion on this drug alone. How can Gilead do this? How can our system allow a company to take a drug treatment that was developed with taxpayer funds and abuse this monopoly to charge such astronomical prices? This life-saving treatment would not exist but for the research funded by the CDC and NIH. So how can our system let a company charge prices that are so outrageous, making $36 billion while there are literally hundreds of thousands of people who need this drug? We are better than that.

These are some of the hard questions we will ask Gilead's CEO Daniel O'Day, who is here today. And I am praying that you do not come and give us the normal rope-a-dope stuff that we usually hear about the various low programs you have got, the coupons you have got. We want the prices to come down. We want truth. We want to know why it is that the prices are going up astronomically. We want to know what this R&D is all about. We want to know if it is all about vacation, giving doctors vacations and encouraging them to prescribe certain things or not. We need to know all about that.

We appreciate that Mr. O'Day accepted our invitation to partici-pate, and we anxiously look forward to his testimony.

The reason this is so critical is because the CDC estimates that there are 1.1 million people at high risk of contracting HIV who could benefit from this drug but that only a fraction, a fraction are getting it. Use is shockingly low among groups that are at particu-larly high risk, including communities of color that have been dis-proportionately impacted by this epidemic.

This treatment is available in other countries for much, much less. In Australia, patients pay less than $7 a pill. Hello? Here, we are paying well over $70. In other countries, patients pay even less. This is because Gilead charges less for its treatment overseas than it does in the United States. It is also because Gilead has generic competitors there but not here.

Finally, let me note that this is a bipartisan issue. HIV has no boundaries. It affects blacks and whites, rural, urban. It is a tough disease. President Trump recently announced an initiative to end the HIV epidemic within 10 years. This is a laudable goal. How-ever, it relies on this particular drug treatment getting to everyone who needs it. Gilead recently agreed to donate millions of bottles

3

of its drugs but far short of what we need to save lives. Without addressing the fundamental problem of pricing, I am afraid that we simply may not get there.

And so we want to work with the President in addressing HIV, but we need to start right here, and we need to start right now.

Chairman CUMMINGS. So without further do, I want to recognize the distinguished ranking member Mr. Jordan for his comments.

Mr. JORDAN. Mr. Chairman, welcome back, and thank you for that and for this important hearing.

At the beginning of the HIV outbreak in the early 1980's, the outlook was just not good. In fact, it was pretty darn bleak. Early treatments were expensive and frankly not very effective, but advancements in medicine in the 38 years since the first reported incidence of AIDS in the United States have yielded hope for those afflicted with this virus. The most important development was Gilead creating and bringing Truvada to market in 2004.

Because of the invention of this, life expectancy for people with HIV is now effectively the same as life expectancy for people without it. I think we can all agree that Truvada is something of a miracle drug. It is the gold standard for preventing and treating HIV. Gilead's invention has been literally lifesaving.

Gilead of course made money based on its invention. My colleagues on the other side of the aisle and some of the witnesses they have invited seem to believe this is some sort of conspiracy. Rather than applaud Gilead for manufacturing this miracle drug, they wish to demonize a company for making a profit. The right to reap the rewards of your invention is so vital that our Framers included it in the Constitution. Our intellectual property protections are the crown jewel of the American economy and what makes our Nation the most innovative in human history. Article 1, section 8, clause 8, the Congress shall have power, quote "to promote the progress of science and useful arts by securing, for limited times, to authors and inventors the exclusive right to their respective writings and discoveries." The Framers knew that individuals would take risk and endeavor to make great things if they knew they would be rewarded.

Some would have you believe that Gilead did not invent this drug or discover its uses and that the Federal Government has equities here for which the company is not accounting. The evidence does not bear this out, and I hope we can use today to set the record straight. I fear that my colleagues are using today's hearing as a platform to strongarm private companies making breakthrough discoveries all because they are upset at how markets work.

The reality is that, while Gilead has made money on this drug, there do not seem to be genuine issues of access, and that is largely due, as the chairman talked about, to progress made by efforts of the Trump administration. The State of the Union address this year, President Trump announced his administration's initiative to eliminate new HIV infections in the U.S. within 10 years. This would be a remarkable breakthrough for public health. And to that end, just last week, HHS announced that, as a result of discussions between the Trump administration and Gilead, the company agreed to donate 2.4 million vials of its PrEP medication annually

4

to the CDC for distribution to treat individuals who are at risk and uninsured. The company has also agreed but was under no obligation to do so to allow generics to enter the market a year earlier to further help provide access.

Of course the cost of pharmaceuticals is a problem driven many factors that our committee and the Trump administration hope to tackle in a bipartisan fashion, as the chairman indicated. But we will never make real advancements in public health if plan is to use false pretenses to attack and vilify those that are making game-changing scientific breakthroughs.

Thank you, Mr. Chairman. I look forward to the discussion from all our witnesses this morning, and I yield back.

Chairman CUMMINGS. Thank you very much.

I now want to welcome our witnesses. Dr. Robert Grant, professor of medicine at the University of California San Francisco, Dr. Grant led one of the clinical trials demonstrating that Truvada could be used to prevent the transmission of HIV; Dr. Rochelle Walensky, the chief of infectious diseases at Massachusetts General Hospital and professor of medicine at Harvard Medical School, who is an expert on cost-effectiveness in HIV treatment; Mr. Tim Horn, the director of medication access for the National Alliance of State and Territorial AIDS Directors, who has also worked in HIV treatment and advocacy; Stephen Ezell from the Information Technology and Innovation Foundation; Mr. Aaron Lord, a PrEP user and cofounder of PrEP4All. Dr. Lord's personal experience led him to advocate on behalf of others, and we are glad to have him with us today. And finally, Mr. Daniel O'Day, chairman and chief executive officer of Gilead Sciences Inc.

Now, if you all could please rise and raise your right hands, and I will now swear in the witnesses.

[Witnesses sworn.]

Chairman CUMMINGS. Thank you very much. Let the record show that the witnesses answered in the affirmative.

You may be seated. The microphones are quite sensitive, so please speak directly into them.

And without objection, your written statements will be made part of the record.

With that, Mr. Grant, you are now recognized to give an oral presentation of your testimony. Please note that I would ask that all of you stay within the five-minute limit.

And before you get started, Ms. Ocasio-Cortez, I mentioned before you got here that you were a main driver in making sure that this hearing happened today. I want to thank you for your leadership.

All right. Dr. Grant.

### STATEMENT OF ROBERT M. GRANT, PROFESSOR OF MEDICINE, UNIVERSITY OF CALIFORNIA

Dr. GRANT. Chairman Cummings——

Chairman CUMMINGS. Good morning.

Dr. GRANT [continuing]. Ranking Member Jordan, and members of the House Committee on Oversight and Reform, I'm pleased to testify today on how the promise of PrEP remains unfulfilled. I devoted the last 20 years of my career to the development of PrEP.

5

I am here today at my own expense because I promised that PrEP would become available if proven. We have not kept that promise. I come today to ask for your help.

My PrEP research was funded by grants from the NIH starting in 2002. I later received supplemental funding from the Bill and Linda Gates Foundation. Our research was funded—other research was funded by NIH, CDC, and Gates. The U.S. Government provided the majority of funds for PrEP research, investing hundreds of millions of taxpayer dollars.

Furthermore, CDC scientists discovered that adding a drug called FTC to tenofovir increased protection, and it's the combination of those two medications which is FDA-approved today. The CDC scientists also demonstrated that preexposure dosing added substantially to the protective events, and it's these inventions that led to the CDC government patents that were awarded several years ago.

Gilead did not provide leadership, innovation, or funding for PrEP research. Gilead's role was limited to donating study drug and placebos. In my experience, Gilead proved to be a hesitant partner in PrEP research. For example, Gilead made public in 2005 that it would not seek FDA approval for PrEP no matter what the data showed.

Although not supporting the research with funding or innovation, Gilead took steps to limit research on alternative and competing PrEP agents. In particular, there was interest in 3TC, a competing drug because it was about to go off patent. Interest in 3TC PrEP dissipated with assurances that Gilead's Truvada would be generically available by the time efficacy trials were completed. Eight years after the completion of U.S. Government-funded efficacy trials, generic Truvada is still not available in the United States.

PrEP scale-up has failed. The PrEP demand in the U.S. hit a tipping point in 2013 and then plateaued in 2016. Currently, only 1 in 10 people who could benefit from PrEP are receiving it. What little access has occurred is not fairly distributed. For example, black people suffer 44 percent of new HIV infections while only 10 percent of PrEP users are black. Gilead has had seven years to get PrEP marketing right. It's time we try something else.

Our struggle against HIV is stuck. HIV is not stuck. HIV infects nearly 40,000 Americans every year, and there's been no decline since 2016. In my experience, the root cause of low PrEP access is the high price. Other barriers to PrEP access arise as consequences of the exorbitant drug prices. These factors may include fragmented insurance coverage, lack of awareness by providers and potential users, and stigma. At a competitive price, people would feel at ease to provide and use PrEP.

PrEP can be manufactured and distributed for $6 per person per month, $6 per person per month in manufacturing and distribution costs. Gilead charges more than $2,100 per person per month, a 35,000 percent markup. Gilead's prices continue to increase every single year. The price of Truvada increased 76 percent since I published evidence of PrEP efficacy in 2010 using U.S. Government funding.

You might hear that no one pays list price. This is not true. The University of California Student Health Services pays full price for

6

PrEP, and it is their largest drug expense. All populations have multiple competing needs related to heart health, cancer prevention, mental health, substance use, productive health, and so much more. Should any public-health jurisdiction pay a 35,000 percent markup for a drug that addresses only one of these concerns? Hard choices have to be made in public health, and they are made.

However, PrEP becomes an easy choice if it is available at a competitive market price. For example, three states and Australia purchased generic PrEP for $8 per person per month after a competitive process. That—what followed was the largest and fastest PrEP scale-up the world has ever seen.

I believe that there are actions that you could take, that this committee could take at this time that would make PrEP available. PrEP continues to be underutilized despite seven years of drug donations, community grants, and assistance programs. A market price would change the game. I ask you to consider three actions. This committee could insist that taxpayers benefit from U.S. Government intellectual property. Second, you could scrutinize agreements between originator and generic manufacturers for anti-competitive practices such as pay for delay. I believe that these actions would take PrEP off the shelf and stop HIV at a price that we all can afford.

Thank you.

Chairman CUMMINGS. Dr. Walensky.

**T2STATEMENT OF ROCHELLE WALENSKY, PROFESSOR OF MEDICINE, HARVARD UNIVERSITY, ON BEHALF OF CHIEF OF DIVISION OF INFECTIOUS DISEASES, MASSACHUSETTS GENERAL HOSPITAL**

Dr. WALENSKY. Good morning. Chairman Cummings, Ranking Member Jordan, and members of the committee, my name is Dr. Rochelle Walensky. I'm a professor of medicine at Harvard Medical School, chief of the Division of Infectious Diseases at Massachusetts General Hospital, a practicing clinician, and a researcher on the cost-effectiveness of HIV care both in the U.S. and internationally.

In 1995, we told patients with AIDS they would, with certainty, die. AIDS plagued my internship. By the end of that year, we had an FDA-approved HIV cocktail, three drugs, up to 14 pills a day, which, if taken without fail, allowed AIDS patients to live. At the time, the three drugs of the cocktail cost a total of $15,000 per person per year, and our research team reported its cost-effectiveness. We demonstrated it was good value for money.

Today, we definitively have the tools to end this epidemic. The HIV three-drug cocktail termed antiretroviral therapy is frequently formulated into a single daily pill. The regiments have high resistance barriers; that's good. They have low toxicity profiles; that's also good. And projections suggest a normal life expectancy for adherent patients with HIV. We also know that people who take these drugs and effectively suppress their virus cannot transmit it to anyone else, but the cost of these drug regimens today is $40–50,000 per person per year, a 300 percent increase in 25 years.

Truvada is a code formulation of two of these three drugs used for treatment, scientifically known as the combination of tenofovir

7

disoproxil fumarate and emtricitabine. It was FDA-approved for HIV treatment in August 2004 and has since then been a mainstay of HIV care.

In 2012 following remarkable scientific work, much of which was led by Dr. Grant, the FDA approved the expanded indication of Truvada for preexposure prophylaxis or PrEP for HIV prevention. The cost of Truvada, when FDA approved in 2004, was $7,800 per year. Today, it costs $20,000 per year. A similar drug combination is available internationally at a cost of $60 per year. Please understand I'm not proposing that this is what the price should be in the United States. I simply provide that benchmark for our national pricing to put it into global context.

In his February State of the Union address, the President announced his initiative to end the HIV epidemic. This will not be easy. The benchmarks for the end-the-epidemic initiative are a decrease in the number of new HIV infections by 75 percent in five years and by 90 percent by 2030. Our research group has published work highlighting that even if we get 90 percent of people with HIV diagnosed, treated, and virologically suppressed, we can only decrease the number of new infections by 40 percent. In short, to end this epidemic, we need both treatment and prevention.

Aside from treatment, PrEP offers the most efficacious prevention intervention known. Make no mistake, even if it was free, PrEP is difficult. In addition to drug adherence, it requires quarterly doctor visits for HIV testing, sexually transmitted infection screening, and laboratory monitoring.

But right now, the biggest problem with PrEP is access. The CDC estimates that more than 1.1 million people in the United States are at high enough HIV risk to warrant PrEP. Fewer than 150,000 have ever received it. Over 75 percent of those are white gay men in the Northeast and the West Coast, but today's uncontrolled HIV epidemic is rampant among black gay men and continues to disproportionately affect women of color, especially in the South.

In 2016 it was estimated that one in two black gay men will be diagnosed with HIV in their lifetime. We need prevention tools like PrEP to reach these marginalized populations if we are ever even going to make a dent in this epidemic, never mind to reach the auspicious end-the-epidemic goals.

The sale of Truvada has resulted in profits of $36 billion, and Truvada, unchanged, has seen a price increase of 150 percent since 2004. That price tag is simply too high. We have the scientific tools to end this HIV epidemic, and we are fortunate that pharma has developed these drugs to get us there. They have already profited enormously.

Now, in the spirit of saving lives, of preventing new infections, of realizing a public health—of putting forth a cohesive public health response and realizing a Presidential call to action, I simply ask that these drugs be reasonably priced so that those most marginalized and at risk can reap their benefit.

And finally, I would like to applaud Congress for holding this hearing and bringing this issue to the forefront in the public dialog. I hope that some of these companies, including Gilead, will begin to do the right thing. It's never too late for that. Thank you.

8

Chairman CUMMINGS. Thank you very much. Mr. Horn?

## STATEMENT OF TIM HORN, DIRECTOR, MEDICATION ACCESS AND PRICING, NATIONAL ALLIANCE OF STATE AND TERRITORIAL AIDS DIRECTORS

Mr. HORN. Thank you, and good morning. Chairman Cummings, Ranking Member Jordan, and members of the committee, my name is Tim Horn, and I am director of medication access and pricing at NASTAD, which is the National Alliance of State and Territorial AIDS Directors. I am very pleased to be here today to offer testimony on PrEP access and pricing in the United States.

NASTAD is a nonpartisan, nonprofit association that represents public health officials who administer HIV and hepatitis programs in the U.S. and around the world. We represent public health officials in all 50 U.S. states, the District of Columbia, the U.S. territories, and several local jurisdictions. I'd like to focus my comments today on the intersection of the high cost of Truvada as PrEP and the need for effective, comprehensive, affordable, and, importantly, sustainable public health approaches to HIV prevention in the United States.

Now, our ability to respond to the needs of people who have been diagnosed with HIV is one of the greatest examples of effective public health in the United States. The Ryan White HIV/AIDS program ensures access to not only comprehensive state-of-the-art care but, importantly, low-or no-cost treatment made possible with significant discounting provided to AIDS drug assistance programs, or ADAPs. ADAPs insure treatment for nearly a quarter of all people living with HIV in the United States, the vast majority of whom are living at, below, or near the Federal poverty level.

Now, one thing I want to emphasize here is that there is no such comprehensive Federal medication program for people at risk for HIV. And I just want to be clear. The only difference between someone living with HIV and someone at risk for HIV is a diagnosis. Those vulnerable to HIV infection face the exact same barriers to affordable medication in the United States.

We are failing populations at high risk for HIV infection, including young black and Latino gay men, women, and transgender individuals. We are failing them because we have not built a payment and culturally appropriate delivery systems that are best able to reach them. There are many reasons for the low uptake of PrEP in this country, but financing and pricing, the subject of today's hearing, are undoubtedly among them. In order to end the HIV epidemic, we must build systems that provide access to PrEP for all populations.

Now, our current PrEP system particularly for uninsured and underinsured people vulnerable to HIV infection is essentially built on the back of Gilead's medication assistance program for those who are uninsured and meet strict financial eligibility criteria, along with the company's co-pay assistance program for individuals who are commercially insured. Now, while these programs have undoubtedly helped expand access to the medication component of comprehensive PrEP services, they have also succeeded in largely masking the impact of the high price of Truvada.

9

To be clear, these programs are not a substitute for functioning public health and healthcare systems. Partnerships with pharmaceutical manufacturers will always be important, but outsized dependency on their generosity, which in turn is dependent on their bottom line, is by no means an equitable and sustainable solution.

Now, the 340B drug pricing program has also played an important role in allowing public health programs and their community partners, including federally qualified health centers, to afford PrEP while extending Federal resources as far as possible. But it doesn't go far enough. Even if we assume that the price available to 340B entities in the U.S. is 75 percent to 80 percent below the list price, this still translates into approximately, you know, $400 per month per person, a price that is at least four times higher than what we can reasonably expect with robust generic competition.

Additionally, 340B pricing of Truvada as PrEP is only available to some health departments and family planning clinics and is not available to other institutions where PrEP may be of significant benefit.

Gilead's assistance programs, the 340B program and discounting, and the recent announcement of donated PrEP will continue to expand access to PrEP. However, a long-term, sustainable approach to PrEP access requires a competitive generic market. To this end, we believe Federal, state, and community partners should be cautious not only to—not to allow the present and future of existing patchwork measures to build an artificial market for Gilead's Descovy, which is expected to be approved for PrEP by the end of this year. Doing so will undercut the ability of the generic market for generic versions of Truvada to bring down costs for our public payers, our commercial payers, and, most importantly, people vulnerable to HIV infection.

Importantly, a lower-cost form of PrEP would allow for more affordable procurement and expanded access across a variety of settings, including state and local health departments, family planning clinics, and STD clinics. And I want to underscore Dr. Grant's point. The list price of Truvada is the price of some of our import programs do in fact pay.

Not only has the high cost of Truvada been a barrier in scaling up affordable access to PrEP by these programs, they have required some programs to reallocate funding from other public health initiatives to meet HIV prevention priorities.

So I do want to conclude by thanking the committee for the opportunity to testify today and for initiating a dialog that hopefully will be to the betterment of people vulnerable to HIV infection and to other intersecting conditions. Thank you.

Chairman CUMMINGS. Mr. Ezell?

## STATEMENT OF STEPHEN EZELL, VICE PRESIDENT, GLOBAL INNOVATION POLICY, INFORMATION TECHNOLOGY AND INNOVATION FOUNDATION

Mr. EZELL. Good morning, Chairman Cummings, Ranking Member Jordan, and members of the committee. I'm Stephen Ezell, vice president of Global Innovation Policy at the Information Technology and Innovation Foundation. We're a nonprofit, nonpartisan

10

Washington, DC.-based science, technology, and economic policy think tank, and I appreciate the opportunity to testify in the panel this morning about the U.S. life sciences innovation system.

The United States clearly leads the world in life sciences innovation. For instance, in the 2000's, U.S.-headquartered enterprises generated more new-to-the-world drugs than enterprises from the next five nations combined. And over the past two decades, U.S. companies have accounted for almost half of the world's new drugs, including treatments such as for leukemia, skin cancer, inherited blindness, and a set of treatments for HIV/AIDS that have made a disease that was once a death sentence now treatable and hopefully will have a full cure in the years to come.

However, it was not always that way. In fact, in the 1970's, the United States was a global in life sciences innovation as European-headquartered companies invented twice as many new-to-the-world drugs as ours did in the 1970's.

What's changed over the past four decades has been a concerted and intentional set of policy choices designed to make America the world's leader in life sciences innovation. Those policies are anchored in three key tenants. First, robust and complementary public and private investment in life sciences R&D, effective mechanisms to facilitate the transfer of technology from universities and Federal laboratories to the private sector for commercialization, underpinned by strong intellectual property rights such as embodied in Bayh-Dole agreement, and a drug pricing system that allows companies to earn revenues that can be reinvested into future generations of biomedical innovation.

The U.S. invests by far more than any other nation in life sciences R&D. In fact, analysts estimate that the United States has invested 70 to 80 percent of global biomedical R&D investment over the past two decades. It's anchored by Federal Government investment of about $39 billion a year into basic life sciences research that focuses on understanding fundamental processes by which diseases develop and transmit or identifying novel biomarkers indicating the presence of disease. This basic research creates a platform for innovation potentially leading to the discovery of new medicines, tests, or procedures.

The private sector complements this public-sector investment with, in some years, close to $95 billion in annual R&D focused on the applied research and clinical trials necessary to bring safe and effective breakthrough drugs to market. The fact is this drug development process is lengthy, risky, and expensive. Studies vary, and I'm happy to share result of several with the committee. But research finds that, on average, developing a new pharmaceutical compound takes an average of 11.5 to 15 years at a cost of $1.7–3.2 billion.

It's absolutely vital to recognize that public and private investments are complementary. A recent journal of Nature article estimates that, on average, biotechnology companies invest $100 in development for every $1 the government invests in research leading to a specific innovative drug.

If you take the case of the breakthrough anticancer prostate drug—or prostate cancer drug Xtandi developed primarily by Astellas and its partners, it's estimated that about $2 million in

11

federally funded research conducted at UCLA was complemented by over $900 million of private-sector investment required to bring Xtandi to market. That's a nice example of the almost 300 new drugs, vaccines, and devices that have been developed as a result of public-private partnerships facilitated in part by the Bayh-Dole Act since its enactment in 1980.

Just like semiconductors, movies, or music, life sciences is an innovation-based industry, meaning that companies incur extremely high upfront fixed cost of initial design and development that must be recouped and admits to failure rates that approach 95 percent. Moreover, these companies fundamentally depend upon the profits earned from one generation of innovation to finance investment in the next. Hopefully, Gilead's investment in HIV/AIDS drugs will generate profits that enable its ongoing efforts in areas like hemophilia and oncology to generate breakthrough treatments tomorrow.

This dynamic is why America's life sciences sector is the world's most R&D-intensive, investing 44 percent of its value added into subsequent R&D. The reality is that there's a direct link between pharmaceutical company revenues and their ability to reinvest in future generations of innovation. They are intimately and causally linked.

In conclusion, a key reason why the U.S. life sciences innovation system has been so successful is that we've created the framework for effective public-private partnerships where each party contributes what it does best. Public research to bring a stock of knowledge that can be innovated upon by the private sector and investing the hundreds of millions required to bring an innovative new drug to the market.

Thank you for your time today, and I look forward to answering your questions.

Chairman CUMMINGS. Thank you very much. Dr. Lord.

**STATEMENT OF AARON LORD, PREP PATIENT AND ADVOCATE**

Dr. LORD. Chairman Cummings, Ranking Member Jordan, and members of the committee, I thank you for inviting me here today to testify. My name is Aaron Lord. I am here today as a physician, as an HIV activist, and a cofounder of the PrEP4All collaboration, as well as a proud gay man.

I was born and raised in West Virginia. I attended Georgetown University on Federal scholarship. I then attended medical school at Columbia and am currently an assistant professor at NYU, but I am not here in my official capacity.

Since realizing I was a gay man in my early teens, like so many in my community, I lived in fear of acquiring HIV. The reality hit all too close to home when early on in our relationship my future husband, who I cherish and love dearly, was diagnosed with HIV.

In July 2012, the FDA announced the approval of Truvada as PrEP. It's the first drug approved to prevent rather than treat HIV. It is highly effective, reducing risk by over 99 percent when taken as prescribed. Since 2012, I have taken Truvada every day to protect my health and the health of my community. With this medication, I no longer have to live in fear.

12

Despite PrEP's remarkable efficacy, the number of new HIV infections in the U.S. remains the same today as when PrEP was approved in 2012 with one person becoming newly diagnosed every 15 minutes. We know it doesn't have to be this way. We know that when PrEP is made universally accessible at no cost, new HIV infections dramatically decrease. In Sydney, Australia, new HIV infections decreased by 25 percent statewide in one year when public health officials used low-or no-cost PrEP to reach all those at risk.

In the U.S., however, we are failing to reach those most vulnerable. With mere fractions of at-risk women and black and Latino men getting PrEP and rates and use in the South remain stubbornly low. Too many of us are still living in fear. A root cause of this problem is the price. Gilead Sciences, who makes the only PrEP available in this country, charges us over $2,000 a month or over 400 times what FDA-approved generics cost internationally.

And while Mr. O'Day will certainly state that his company has earned the right to charge such exorbitant sums, Truvada as PrEP is not Gilead's invention. Truvada as PrEP is an invention of the U.S. Government whose research and development was funded exclusively by U.S. taxpayers and the Gates Foundation and is protected by multiple robust patents issued to the CDC. Even the very patents that Mr. O'Day currently uses to prevent the American people from accessing generic Truvada are themselves based on research funded by the U.S. taxpayer.

Price is not the only barrier preventing people from using PrEP. Stigma, racism, homophobia, transphobia, sexism, poverty, they all play a role. These barriers can and must be mitigated, but we cannot do it if our healthcare system spends over $20,000 a year on Mr. O'Day's drug instead of spending it on precious programming to fight these barriers. Mr. O'Day, we are suffocating under the weight of your company's pricing.

Mr. O'Day, for a figure far less than $2.6 billion, which is what we spend on your egregiously overpriced medication every year, we could have a national, far-reaching PrEP program that guarantees every person who needs PrEP can get it, including free medicine, clinical care, lab testing, and transportation. And we could still have half-a-billion left over for community organizations to fight these barriers. Mr. O'Day, you have given the American people a very bad deal for our money.

We have learned all too well from Gilead's past misdeeds what happens when they are left to their own devices. As the Wyden-Grassley's report so vividly showed, Gilead's pricing of their cure for hepatitis C at $1,000 a pill was aimed to do one thing: maximize their profit. The consequences of that unmitigated greed resulted in a public health disaster. Despite spending $50 billion of our hard-earned dollars buying overpriced medication, the number of new hepatitis C infections more than tripled.

I'm here today to say that HIV activists will not stand by and allow this to happen ever again. So ladies and gentlemen of the committee, I ask you as a representative of my community, as a proud American, as a scientist, and as a patient, to join me in asking Mr. O'Day what justification do you have for charging $2,000 a month for Truvada as PrEP when the American people funded

13

the innovation of the molecule, invented its use as PrEP, and funded four clinical trials to prove its efficacy?

Mr. O'Day, we do not ask for your company's charity or for tax-deductible donations that meet your company's needs but fail to meet the needs of our communities. Rather, we ask Mr. O'Day, why not lower the price of Truvada to $15 a month right here today at this hearing?

Members of Congress, the American people have invented a way to end the HIV epidemic, and that we should be very proud of. And we look to you today to ensure that every single person in this country can protect themselves from this plague. Thank you very much.

Chairman CUMMINGS. Thank you very much. Mr. O'Day?

### STATEMENT OF DANIEL O'DAY, CHAIRMAN AND CEO, GILEAD SCIENCES, INC.

Mr. O'DAY. Good morning, Chairman Cummings, Ranking Member Jordan, and members of the committee. My name is Daniel O'Day. I recently joined Gilead as its new chief executive officer. Thank you for the opportunity to be here today.

Gilead is an American biotech company, but for the past three decades has been focused on creating therapies that prevent, treat, and cure some of the world's worst diseases. To name just a few examples, Gilead invented the first once-daily pill to cure hepatitis C, Tamiflu for influenza, and the first and currently only FDA-approved HIV prevention medication, Truvada, along with 10 other drugs used in the treatment of HIV.

When I decided to become CEO, I had long admired Gilead's remarkable contribution to health care and the high level of innovation behind their medicines. Importantly, I knew I was joining a company that was committed to the interest of patients and dedicated to pursuing scientific excellence to prevent and cure diseases. All of this is evident in Gilead's approach to HIV, the commitment to developing HIV medications that are safer, more patient-friendly, and more effective. Gilead researchers have made contributions that fundamentally changed the course of the HIV/AIDS epidemic, transforming the disease from a death sentence to a manageable chronic condition.

Gilead was founded in the midst of the AIDS crisis. At that time people living with HIV were required to take a cocktail of 20-plus pills each day to treat the disease. Many of these drugs lead to serious, often debilitating side effects. And even when taken as directed, the therapies offered an average life expectancy of less than 40 years of age with most people dying within just a few years of contracting the disease.

In the early 1990's, Gilead began working to invent a single-pill HIV treatment. Following nearly a decade of work and about $6 billion invested in research, $1.1 billion of which was devoted specifically to Truvada, Gilead launched Truvada as one of the first fixed-dose combination pills for HIV treatment in 2004. Today, Truvada and other Gilead medicines have contributed to nearly doubling the average life expectancy of people with the disease.

Although Truvada was initially approved to treat HIV, researchers and public health officials knew for years that antiretroviral

drugs like Truvada could also be used to prevent HIV infection, a technique referred to as PrEP. With this in mind, Gilead supported clinical trials that ultimately led to the approval of Truvada, the first and currently only medication approved for PrEP.

To be clear, despite some media suggestions otherwise, Gilead invented Truvada, no one else. Gilead developed the two drugs that are combined in Truvada, invented the combination that allowed these drugs to be taken as a single pill, and invented the drugs used to treat HIV in combination with other antiviral drugs.

I want to address the use patents on PrEP granted to the CDC. Using Truvada for PrEP was well-known in the scientific community long before CDC claimed it as an invention. We believe the CDC patents are invalid, but we've chosen not to challenge those patents because we value our collaborative relationship with the agency.

Finally, I want to address access to Truvada. Gilead is committed to ensuring that every American who needs Truvada can obtain it. We offer a wide range of programs to help ensure that people have access to Truvada when they need it. For example, 98 percent of people who use our co-pay assistance program have no out-of-pocket costs. In fact, according to the CDC's own estimates, when taking our programs into account, less than 1 percent of Americans who would benefit from PrEP are in need of a financial assistance to obtain Truvada.

Moreover, we continue to work with advocates, providers, and governments to remove the societal and other barriers to broader PrEP usage. Last week, we took another important step for expanding access by donating Truvada for up to 200,000 uninsured Americans each year.

We are committed to ending the HIV epidemic. We will work with Congress and others to further expand access to PrEP, and we will continue our scientific research in pursuit of a cure.

In representing Gilead, I can assure you that we take our responsibility in HIV extremely seriously and will ensure you that this is always evident in our actions.

Thank you for the opportunity to provide this testimony today, and I'd be pleased to answer your questions.

Chairman CUMMINGS. Thank you very much.

I now recognize Ms. Ocasio-Cortez, five minutes.

Ms. OCASIO-CORTEZ. Thank you. Thank you, Chair. Thank you for agreeing told this hearing. And while I appreciate your generosity in acknowledging the role our office played in this hearing, I also have to give credit to the countless advocates and activists that have been uplifting the issue of the price of Truvada and PrEP.

And I have to say that is not because of me we are having this hearing even in our office. It is because of a 23-year-old staffer Ms. Claudia Pagon Marchena, who first dug into—who first noticed this and first listened to the actual activists that raised this issue. She took the opportunity to pursue it, and if it wasn't for the openness and willingness of your leadership and committee staff to take her concerns seriously, we wouldn't be here today.

And so I just think it is an incredible testimony to—despite the powerlessness we often feel in this political moment, it shows that

15

everyday people, no matter your age or your identity, can make
changes. And that is the reason why we are having this hearing
today, so thank you.

I also, before I begin, would like to submit to the congressional
record New York City Council Speaker Corey Johnson, who himself
is HIV-positive, his testimony to the congressional record, so I seek
unanimous consent to do so.

Chairman CUMMINGS. Without objection, so ordered.

Ms. OCASIO-CORTEZ. Thank you so much.

So let's get down to, you know, the core of this hearing. Dr.
Grant, Truvada for PrEP is the only known drug that can prevent
the transmission of HIV, correct?

Dr. GRANT. It's the only medication that's been approved by the
FDA. It's also known that tenofovir alone is prophylactic——

Ms. OCASIO-CORTEZ. Okay.

Dr. GRANT [continuing]. for HIV——

Ms. OCASIO-CORTEZ. Thank you. And, Dr. Grant, it was your
NIH-funded research on PrEP that built on the earlier research
were patented by CDC researchers, is that correct?

Dr. GRANT. Yes. My clinical trial was informed by CDC research
in two ways. One, the CDC demonstrated that the preexposure
dose was—added to the efficacy of PrEP and—yes.

Ms. OCASIO-CORTEZ. Thank you. Thank you, Dr. Grant. And I
would also like to seek unanimous consent to submit this Yale
School of Law study into the congressional record, which concludes
that the CDC's patents for PrEP were both valid and enforceable
against Gilead.

Chairman CUMMINGS. Without objection, so ordered.

Ms. OCASIO-CORTEZ. Thank you very much.

Dr. Lord, thank you for your advocacy here today. Is it true that
the public invested $50 million to develop PrEP?

Dr. LORD. That is correct.

Ms. OCASIO-CORTEZ. Is it also true that Gilead relied on publicly
funded trials to obtain FDA approval?

Dr. LORD. Yes. If you look at their supplementary new drug ap-
plication, you'll see that every sponsor of Truvada as PrEP was a
non-Gilead sponsor.

Ms. OCASIO-CORTEZ. So the public invested to develop the drug.
The public invested and funded the trials for FDA approval. Is it
true that the pharmaceutical companies force the public to pay
twice first when investing in drug discovery, but then it looks like
these patient assistance programs that they tout very often also
have a public investment piece as well, right? How are these public
assistance programs funded?

Dr. LORD. Yes, so, you know, I think as far as like the co-pay as-
sistance program goes, it's important to also note that it's—it only
exists in its current state due to the work of activists. We have
worked for years to get them to increase from initially a $300 a
month co-pay assistance, which left people with hundreds if not
thousands of dollars of co-pay per month. And then they really only
increased it to $4,800 after additional years of activist pressure,
and that still left thousands of dollars of donut hole potential for
some patients. And then it only took a New York Times op-ed that

16

we published, you know, to threaten march-in rights on this drug in order to get them to raise it to the $7,200——

Ms. OCASIO-CORTEZ. Thank you.

Dr. LORD [continuing]. which is still not enough.

Ms. OCASIO-CORTEZ. Thank you. And even when it comes to when folks can't access PrEP because it is so expensive and, you know, the HIV epidemic continues, that also comes at a public cost, right? So the public is paying—we pay to develop PrEP, we paid to finance the publicly funded trials to develop this drug, we also pay and foot the bill with patient assistance programs. Also, as you noted, the existence of these programs happen because of the public, and also we pay when the HIV epidemic gets spread as well.

Very quickly, Mr. O'Day, you are the CEO of Gilead. Is it true that Gilead made $3 billion in profits from the sales of Truvada in 2018?

Mr. O'DAY. Three billion in revenue.

Ms. OCASIO-CORTEZ. Oh, yes, in revenue, thank you. And, very quickly, the current list price is $2,000 a month in the United States, correct?

Mr. O'DAY. The current list price is $1,780 in the United States.

Ms. OCASIO-CORTEZ. Okay.

Mr. O'DAY. And just to correct, the $3 billion was a global figure——

Ms. OCASIO-CORTEZ. Okay. I see.

Mr. O'DAY.—for Truvada for PrEP——

Ms. OCASIO-CORTEZ. So the list price is almost $2,000 in the United States. Why is it $8 in Australia?

Mr. O'DAY. Truvada still has patent protection in the United States, and in the rest of the world it is generic. I can't comment on the price in Australia of the generic medicines, but it is generically available in other parts of the world and will be generically available in the United States as of September in 2020 based upon Gilead agreeing to support——

Ms. OCASIO-CORTEZ. Thank you.

Mr. O'DAY.—generic entries one year earlier.

Ms. OCASIO-CORTEZ. So I think it is important that we notice here that we the public, we the people developed this drug, we paid for this drug, we led and developed all of the grounding patents to create PrEP, and then that patent has been privatized. Despite the fact that the patent is owned by the public, we refuse to enforce it. There is no reason this should be $2,000 a month. People are dying because of it. And there is no enforceable reason for it. We own the core intellectual property for it. And, as a result, people are dying for no reason, for no reason——

Chairman CUMMINGS. The gentlelady's time is——

Ms. OCASIO-CORTEZ [continuing]. to develop this drug. Thank you very much.

Chairman CUMMINGS. The gentlelady's time is expired. Mr. Armstrong?

Mr. ARMSTRONG. Thank you, Mr. Chairman. And I agree. I believe that prescription drug pricing, it is a conversation that I get, it is one of the biggest ones we get in our office both in D.C. and back in our offices in North Dakota, and it should be a bipartisan endeavor. And in fact, we have had a package of prescription drug

17

bills that have come through two committees here, and I know in at least one they passed unanimously.

But unfortunately, we are in D.C. and, never allowing a political opportunity to go to waste, they are going to get marked up in Rules Committee, and we are going to vote on bills this week that just quite frankly have no chance of becoming law. So when we talk about bipartisanship, we had two sets of packages that could come to the floor clean this week that would pass, they pass the Senate, the President could sign them by the end of the month, but that is not going to happen.

So, Mr. O'Day, it has been said that NIH spent $51 million on clinical trials for PrEP, is that correct?

Mr. O'DAY. Thank you, Congressman. Yes, it's important to point out that Gilead has spent $1.1 billion developing this medicine. Gilead has the patents on this medicine. And in the course of the PrEP indication, it's also important to take us back to that period of time in history with the HIV/AIDS epidemic. It was a time when prevention of AIDS was actually something that was highly controversial both from a scientific standpoint, resistance, but also from public advocacy because there were questions around the morality of providing a preventive medicine that could take away from safe-sex practices in others. So this was a public-health question that needed to be answered.

And we partnered with several members of the community. It's a very complex topic. For the PrEP indications, we supported it with medicines. We have two of our Gilead scientists that are co-authors on the fundamental—one of the fundamental trials, the iPrEx trial that Dr. Grant has spoken to before and to be an author on these trials in a highly regarded 30-party publication—medication—publication, you need to have sufficient involvement in those trials. So Gilead had sufficient involvement in those trials. The NIH provided $50 million in grant. The Gates Foundation supplied $17 million in grants. And the Gates Foundation also independently funded the second trial that was used for this indication with $70 million as well. So it was a partnership amongst public and private institutions to get this indication.

Mr. ARMSTRONG. And you said in your opening statement you provide financial assistance to uninsured patients. How does that work?

Mr. O'DAY. So we have two basic programs to help with patients. One is the co-pay assistance program. So patients that have commercial insurance that have a high deductible cost for their medicines, we have a program that supports them. In fact, patients that access our co-pay programs during the life of the patent that we have on the product, 98 percent of people take nothing out of their pocket when they go to the pharmacy, zero.

The other end of the spectrum we have deep discounts to government programs that allow patients in Medicaid, Medicare, ADAP programs to access our medicines at 70 to 80 percent discounts for the list prices that we've discussed here today.

Finally, for the uninsured patient population that is truly not met by these needs, we've been working with CDC and announced the—one of the largest-ever donations of medicine last week in conjunction with HHS and CDC for—by the CDC's own estimates,

18

they've estimated that out of the 1.1 million patients that are sus-ceptible to HIV, 200,000 are uninsured. We have donated as a re-sult of the announcement last week for all 200,000 of those pa-tients to receive free Truvada for the next 10 years.

Mr. ARMSTRONG. And I grew up in the early 1980's, and we have come a long way since then and we have a long way to go. But, I mean, particularly when we are talking about the uninsured pop-ulation as it relates to HIV and access to drugs, I mean, it is a de-bilitating, crippling disease. We are working toward prevention, we are working toward cure, but those factors to that uninsured popu-lation are unique to this healthcare crisis, are they?

Mr. O'DAY. Well, yes, this is quite a unique circumstance because of the fact that, at the end of the day, there are so many things that are getting in the way of people that require PrEP getting PrEP. There's access to the healthcare system for sure, but there's also education, education for physicians, education for patients, and there's a tremendous amount of stigma associated with this dis-ease, what comes into play for the underserved communities. And this is something that Gilead has been focused on, provided hun-dreds of millions of dollars and supporting community associations to try to get at these other root causes of PrEP, and it's absolutely what's required to help eliminate the disease. I completely agree that we have to attack it from both a prevention as well as a treat-ment standpoint to eliminate this disease, and we're a big part of that.

Mr. ARMSTRONG. Thank you, sir.

Chairman CUMMINGS. Thank you very much. I recognize myself now.

Mr. O'Day, other drug companies sat in the very seat, that very seat that you are sitting in like Martin Shkreli, and all offer the same excuses and justifications, same thing. They claim they have patient assistance programs to help those who cannot access the drug, but the truth is that someone, somebody is paying for these exorbitant prices. And that impacts everybody in the system. That is one reason health care now is so expensive. At the end of the day, it is the taxpayers who bear the cost of these skyrocketing prices through government programs like Medicaid.

Dr. Lord, isn't it true that in some countries the generic version of this treatment is sold for a fraction of the U.S. price? Is that right?

Dr. LORD. That is correct.

Chairman CUMMINGS. And how much is it sold for overseas?

Dr. LORD. According to the Global Fund, you can purchase this medication for under $5 a month.

Chairman CUMMINGS. That is astonishing. Yet Gilead is charging around 17, close to $1,800 a month?

Dr. LORD. Yes.

Chairman CUMMINGS. Mr. O'Day, in your written statement, you claim that your company spent $1.1 billion on research and devel-opment related to Truvada. But you made $36 billion in revenue on Truvada since it was approved in 2004. That is according to your own company's SEC filings. Mr. O'Day, do you believe that that is appropriate, and do you believe it is moral?

19

You know, somebody said over here I guess it is a thing of choices. One of my first employees died from AIDS, and I will never forget it. And I described it, his dying on installment. It is a mother. It is rough to watch somebody die from AIDS. But anyway, you can answer my question.

Mr. O'DAY. Mr. Chairman—and, you know, I'm very sorry to hear about your——

Chairman CUMMINGS. Employee.

Mr. O'DAY. Employee.

Chairman CUMMINGS. It was a person.

Mr. O'DAY. Yes.

Chairman CUMMINGS. An African-American young male about 25 years old, dead.

Mr. O'DAY. I'm very sorry to hear that. The answer to the question is that we have spent more than $6 billion over the past—since 2020 on HIV research in general. And in fact, we've taken the disease from a death sentence to a manageable chronic condition with one pill once a day, but we're not done yet. We still have medicines—because of the fact that we now have the average life expectancy out to 78 years from 40 years, we never anticipated that people would be taking these medicines for decades. And some of the current generations of medicines have kidney and bone effects that now our next generations that we're launching will be able to have less of those effects and allow people to live longer healthier lives.

And yet we're not done because we have to get to a stance where people aren't taking a daily pill, where they're taking it once a month, once every two months, or we hope we can get to a cure where people can take a limited course of therapy like in HCV, 12 weeks, and never have to worry about medicines again. In order to do that, we have to continue to invest in research for the patent life of our medicines. And, of course, when a patent ends, generics come on like they are in other parts of the world.

But during that patent period time, we also have a responsibility to make sure that Americans get our medicines when they're priced at a level that allows us to reinvest in research. And that's where our access programs, co-pay assistance, the donation to the CDC come in to allow us to make sure the price doesn't get in the way during this period of time of patent exclusivity.

Chairman CUMMINGS. Can you tell me quickly about the timing of the donation that you all are making of medication? I think you said 200,000.

Mr. O'DAY. Yes, Mr. Chairman. So it's 2.4 million bottles a year, which equates to around—the PrEP treatments for around 200,000 patients for up to 10 years.

Chairman CUMMINGS. All right.

Mr. O'DAY. And this includes both our current generation product Truvada, as well as our advancement, which may come to market as early as later this year, which allows that better safety profile if you like for patients.

Chairman CUMMINGS. And how did you all come up with this 200,000? That is what I was trying to get to.

Mr. O'DAY. Oh, that was a number that was requested and discussed with the CDC. They acknowledged that in the 48 hotspot

20

communities, District of Columbia; San Juan, Puerto Rico; and the seven rural states, that that would be where—the number of patients that would not qualify for Federal programs or be involved in commercial insurance. So that number came from the CDC, and we were happy to support them with that.

Chairman CUMMINGS. And so if they had come up with a higher number, it is quite possible you would have given more. Is that a reasonable assumption?

Mr. O'DAY. That's a reasonable assumption, yes.

Chairman CUMMINGS. All right.

Mr. O'DAY. We were trying to solve a gap that isn't currently covered by our current access programs.

Chairman CUMMINGS. You know, Mr. O'Day, something was said here earlier, and I want you to be real clear. I have said this to many of the witnesses in the pharmaceutical industry. I have no problem with you all making a profit. I want you to make a profit. I want you to make a profit because I have seen what research can do. I have relatives that went, say, for example, from a chronic condition with cancer—I mean, from a terminal condition to chronic. I have seen it in a few years. And I also serve with Dr. Gallo on the Human Virology Board in Maryland, so we have been dealing with this a long time.

But, at the same time, I am talking about the people who cannot get it, you know, the one who is getting ready to die and will not be able to attend his daughter's wedding, that one, or the mother who won't be there to see her children grow up, that lady. And what I am saying to you is that, you know, I want to work, we all want to work with the industry, but it is kind of hard.

I mean, you can imagine when we hear about the $36 billion or the $3 billion—and I know it is global, I got that—$3 billion, and then we go back to our districts and we see people, and they see the cure. They know the cure is out there. They know there is something out there called Truvada. They don't know you, they don't know who makes it. All they know is that it is something that could save their life. And they are reaching, trying to get it. And then they hear about these figures and they say—they just can't get there. They cannot reach it. And I don't know whether those kind of things are taken into consideration in the board rooms. Are they?

Mr. O'DAY. Absolutely. I can assure you that if there is a patient out there that cannot access Truvada because of financial means, our programs are designed to capture them. I mean, again, we have the co-pay assistance for people with insurance. People without insurance that, you know, make less than five times the poverty level, are provided with medicine for free through our medication assistance program.

Chairman CUMMINGS. And who pays for that?

Mr. O'DAY. Gilead pays for that.

Chairman CUMMINGS. So that cuts into your profit. Is that what you are saying?

Mr. O'DAY. It's important to us to make sure that every patient can have access to the medicines, and it's absolutely part of our responsibility.

Chairman CUMMINGS. All right. I now recognize Mr. Jordan.

21

Mr. JORDAN. Thank you, Mr. Chairman.

Mr. O'DAY, what is the difference between Truvada and PrEP?

Mr. O'DAY. Truvada is a medicine that's used for HIV treatments and for prevention. It was discovered many years ago.

Mr. JORDAN. I guess my question is is it the exact same drug; it is just used at a different time and in a different way?

Mr. O'DAY. No, PrEP is an indication—one of the indications that Truvada is approved for.

Mr. JORDAN. Right, but—so the drug is Truvada. It is used—and when we say—because Dr. Lord talked about Truvada as PrEP.

Mr. O'DAY. Oh——

Mr. JORDAN. It is the same drug?

Mr. O'DAY. Yes, it's the same drug, is the same mechanism, the same dose, it's the same——

Mr. JORDAN. It is a different use?

Mr. O'DAY.—frequency.

Mr. JORDAN. Different use, different timing——

Mr. O'DAY. What Truvada does is it reduces viral replication of HIV, and that can be effective for——

Mr. JORDAN. I just want to be clear for everyone, though, that——

Mr. O'DAY. Yes.

Mr. JORDAN [continuing]. I think there can be some confusion that Truvada and PrEP are somehow some different drug. It is the same drug?

Mr. O'DAY. Truvada is the drug. PrEP is one of the indications——

Mr. JORDAN. Right.

Mr. O'DAY.—that the drug is used for.

Mr. JORDAN. Got it. Got it. Okay. And, earlier, Dr. Grant said Gilead did not provide leadership or funding for PrEP in the studies at CDC. Is that true?

Mr. O'DAY. No, that's not true. I mean, we have nine scientists that were involved in the iPrEx trial itself, was one of the two trials that went to the FDA to seek approval. And of those, we have two scientists. Both are still with the company actually that were authors in the primary New England Journal article that is the iPrEx study.

Mr. JORDAN. Okay.

Mr. O'DAY. And to be an author on the New England Journal of Medicine, you must have——

Mr. JORDAN. So——

Mr. O'DAY.—involvement in the trial——

Mr. JORDAN. So——

Mr. O'DAY.—in addition to the free medicine we provided and the——

Mr. JORDAN. So, Mr. O'Day, Gilead developed Truvada?

Mr. O'DAY. Correct.

Mr. JORDAN. You guys did that all on your own. Gilead participated with CDC on Truvada as PrEP, right?

Mr. O'DAY. Correct.

Mr. JORDAN. And your drug has made a difference for millions of people all over the world, right?

Mr. O'DAY. That's correct.

22

Mr. JORDAN. How many folks do you think have been impacted— I would say people are alive today because of your drug. Is that true?

Mr. O'DAY. Oh, absolutely. And with 10 other medicines that Gilead makes, absolutely millions of people living with AIDS and preventing AIDS.

Mr. JORDAN. And how long did it take to develop Truvada?

Mr. O'DAY. Truvada was a long story. It goes back to the early 1990's with—Truvada is a combination of two different medicines. One is called, for the sake of simplicity, TDF, and the other one is FTC. So this goes back to the early 1990's and then into the early 2000's when FTC was evaluated by our scientists, and it's the combination of these two medicines that led to the first approval for Truvada in 2004 after a good decade to 15 years of research and lots of failures, by the way. I mean, 90——

Mr. JORDAN. So over a decade of research and trials and all kinds of effort to develop this miracle drug that has saved millions of people all over the planet, my guess is that costs a few dollars. What did it cost you to develop the drug?

Mr. O'DAY. Well, in this case it cost $1.1 billion.

Mr. JORDAN. So billions of dollars to develop this amazing drug——

Mr. O'DAY. Yes.

Mr. JORDAN [continuing]. that saved all kinds of folks. And no what are you doing with those profits? I think you said you are trying to find a cure, right?

Mr. O'DAY. We're—absolutely. We're investing them back into research. We—our scientists and the colleagues—I'm so inspired by Gilead. They will not rest. They will not rest. Good enough was never good enough for them when we had this generation of medicines that had these kidney and bone toxicities, and we're now launching medicines that are much more tolerable for patients today. But they're not stopping. So we're looking at long-acting medicines that——

Mr. JORDAN. Just last week you said for folks who can't afford it, folks who don't have insurance, you are going to give it to them free?

Mr. O'DAY. Absolutely.

Mr. JORDAN. Okay. So just let me get this straight. Over a decade of research, over $1 billion into that research, you develop a drug that saved millions of people, now can be used as PrEP prior to, not just as something after the fact that when people have been diagnosed with HIV. The profits you have made from that you are now working on developing a cure and, just last week, you announced folks who can't get the access to the medication right now, you are going to give it to them free?

Mr. O'DAY. Yes, Congressman.

Mr. JORDAN. But you are a bad guy. You are a bad guy. I mean, that is what we heard from the other side.

Mr. Ezell, isn't that exactly how it is supposed to work under the Constitution? People come up with a great idea, they go to the Patent and Trade Office, they get a patent for it, they get that patent for certain length of time to recoup the billions of dollars it cost to make the product or the idea or whatever they did that has helped

23

millions of people, that has been great for our—this is one of the things that makes America the greatest place ever. Isn't that supposed to be how it is supposed to work

Mr. EZELL. That's exactly right, Representative Jordan. And, you know, it's interesting to hear the questions about, well, how much cheaper is this drug in other countries of the world. Well, part of the problem is that other countries of the world are not as effective in innovating drugs because they did not——

Mr. JORDAN. They didn't make it. These guys made it.

Mr. EZELL. That's exactly right. We've put in place systems to——

Mr. JORDAN. Oh, I forgot to add one thing. I forgot another thing. They are going to go off patent year early. Isn't that right, Mr. O'Day?

Mr. O'DAY. Yes, and generics will enter one year early.

Mr. JORDAN. I mean, so one year early is going to go to a lower cost. They don't have to do that, but somehow, they are the bad guy, right? I just fail to—I appreciate what you have done and the thousands of people that are being impacted as we speak, the millions of people whose lives have been impacted, the folks who are alive today because of the work you have done. And we are going to beat you up.

So, Mr. Chairman, I appreciate this hearing, and I yield back my time.

Chairman CUMMINGS. I appreciate you, but let me say something. Let me make this clear, and listen up. Nobody is coming here to beat you up. I want to make that clear. I applaud Gilead. But it is nothing like holding the hand of somebody who is dying from AIDS. I am sorry. And all we are trying to do is represent our constituents and help them stay alive. When you are dead, you are dead. And when I think about the fact that Truvada for PrEP is only getting to 10 percent of the people that need it, what about the other 90 percent? What about their families? I am not knocking you. I am just trying to figure out how we can help you get to the people who are dying as we speak, as we speak.

And we can holler, we can play all these games, but let me be clear. Let me be clear. I speak for the dead and the living, we are simply trying to get, again—I don't know who he is talking about, but I applaud Gilead. I have been dealing with this issue for 20-something years, so I know about it, and I know the problems, and I know the pain. And I know about the death by installments. So I want to be clear. Who is next?

Mr. JORDAN. Well, can I respond, Mr. Chairman?

Chairman CUMMINGS. No.

Mr. JORDAN. You got like nine minutes and you just went after me——

Chairman CUMMINGS. Mrs. Maloney. Mrs. Maloney.

Mr. JORDAN. Oh, that is wonderful. Thank you.

Mrs. MALONEY. Thank you, Mr. Chairman.

Mr. JORDAN. You had seven, eight minutes. I had——

Mrs. MALONEY. Thank you, Mr. Chairman. I deeply appreciate the passion——

Mr. JORDAN. Would the gentlelady yield just for 1 second?

Mrs. MALONEY. No, I will not.

24

Mr. JORDAN. I wasn't playing games——

Mrs. MALONEY. I appreciate the leadership and passion of the chairman of this committee, Mr. Cummings, and I want to thank the advocates who advocated for it and my colleague from New York who——

Mr. JORDAN. Get the——

Mrs. MALONEY [continuing]. negotiated this hearing. And I want to ask a question about the 90 percent that the chairman talked about, the 90 percent of Americans that want to get access to this drug. And I want to ask Mr. Horn because how they get access is through the local healthcare system in our cities and in our states that are dealing with people hands-on every day.

But first I have to say that I find it a national scandal that we are paying in this country $70 a pill while Australia pays $7 a pill. How fair is that? And, Mr. O'Day, you say that is because Australia negotiated a lower price. Well, we in America are going to pass a law that allows our government to negotiate a better price going forward.

And today, we have two bills on the floor that will strike at this problem. It will end the abusive practice of drug companies where they pay to delay the development of generic drugs, a terrible abusive practice, keeping affordable drugs from our people. And the other will stop the practice where drug companies pay to block, they literally pay to block the development of lifesaving drugs here in America where it was pointed out it is the American taxpayer that puts the money in on the ground and starts the research that then moves forward. And then our people don't have access to it.

So, Mr. Horn, I want to ask you, how does this high cost of PrEP limit the ability of states and local health departments and clinics from scaling up and providing the drugs and support to the 90 percent of people who need it that the chairman mentioned?

Mr. HORN. Thank you, Representative Maloney. I—first, I just want to sort of piggyback on one of your points and just—something that's really important to recognize is when we consider where we have the highest number of new infections in the United States, if you overlap that map with another map of like where we have not expanded Medicaid, for example, we definitely see where there is a tremendous disparity.

So when we're thinking about those jurisdictions in particular, this is where we find a number of people who are vulnerable to HIV infection really do become increasingly dependent on this incredibly complex patchwork in order to access not just PrEP but all of the services that are required to support PrEP, lab testing, supported services, counseling, you know, engagement in care, access to a care provider, so on, and so forth.

So—and I also just do want to reference that just with respect to, you know, that cost certainly isn't our own issue. We do have issues of stigma, discrimination, so on, and so forth. But when we do take a look at what's happening with health departments, I would just reiterate that for many of our health departments—and we do have a number of states have actually implemented state, you know, PrEP, your drug assistance programs.

The one thing I will point out about that is that these are state-funded programs, but they're not federally funded programs. There-

25

fore, they do not have access to 340B discounting. Therefore, they are reliant on leveraging the very complex system in order to guarantee access to PrEP and the various services that are required.

Mrs. MALONEY. I want to say that I have the privilege of resenting New York, which has been at the forefront in combating the AIDS epidemic. And, according to the city of New York, we have been making some progress. New AIDS/HIV infections in the city decreased by 36 percent between 2013 and 2017, but by increasing access to PrEP and making it affordable, they believe that they can bring new infections to lesson 700 cases a year. This would be a dramatic, dramatic improvement. And I am afraid that by basing our public health response largely on the generosity of a private company that says they are going to make it affordable, it should be affordable to everyone. It should be affordable to everyone. They shouldn't have to negotiate having access to this drug. It is just putting the whole program in quicksand. It is not there to serve the people.

So I want to ask what do we need to do to make this affordable to people in our public health system, in our cities, in our states, in our clinics, in our local areas, Mr. Horn?

Chairman CUMMINGS. The gentlelady's time is expired. You may answer the question.

Mr. HORN. Okay. We just need to be conscious of cost at all point—I mean, we just need to make sure that we are able to procure both PrEP and the services that are required for PrEP at an equitable price and that we are moving in that direction. We're moving toward generics. And we just need to keep an eye on that. That really is the great unifier in terms of ensuring access to everyone who requires preexposure prophylaxis. Thank you.

Mrs. MALONEY. Thank you for your service.

Chairman CUMMINGS. Mr. Meadows.

Mr. MEADOWS. Thank you, Mr. Chairman. Thank each of you for your testimony.

I would want to point out since my colleague from New York talked about voting on bills today, candidly, those bills today are nothing more than a political statement. There are both Republicans and Democrats——

Mrs. MALONEY. Will the gentleman yield?

Mr. MEADOWS. No, I will not. You didn't offer the same courtesy to my friend from Ohio, so—I will say this. I am dead serious on actually lowering prescription drug prices and making sure that availability is here. I am willing and have worked with my Democratic colleagues for us to put bills on the floor that actually are not a product of bipartisanship. It is not going to solve this problem. And so it is critically important that we allow for the R&D that happens that has groundbreaking drugs that come to market, that they continue, and that we make sure that availability for all Americans and indeed globally are there.

But with that, I am going to yield the balance of my time to the gentleman from Ohio, Mr. Jordan.

Mr. JORDAN. I thank the gentleman for yielding.

The chairman talked about playing games. I am not playing games. I just want to thank a company who has developed a drug that has saved millions of people and not beat them up for that

26

fact. I mean, you can look at—on one hand, you go after them, and then you say, oh, but I am not really going after them. Look at the title of the hearing, "billions in corporate profits after millions in"—you are going after them right in the title of today's hearing.

Dr. Grant in his opening testimony said that Gilead had nothing to do with it. I have gotten article, a peer-reviewed article from the New England—in fact, I would ask unanimous consent, Mr. Chairman——

Chairman CUMMINGS. Without objection, so ordered.

Mr. JORDAN [continuing]. Gilead signed this, participated in this. I don't remember any member thanking them for what they have done.

Chairman CUMMINGS. I did.

Mr. JORDAN. Not till after I did, that is for darn sure.

So, look, as my colleague said, we want prescription drug—we want all drug prices to come down. We want that to happen, so let's figure out a way to do it. But I don't know that you do it by going after a company who has developed an amazing drug that has helped so many people, and they are taking the profits from that now, working on a cure. I don't see where that helps us.

So, anyway, Mr. Chairman, I would—or, excuse me, I will yield back to the gentleman from North Carolina.

Mr. MEADOWS. I thank the gentlemen.

So, Mr. Ezell, let me come to you. Really at this particular point what we have got is one of the greatest R&D abilities in terms of pharmaceuticals on the globe. In fact, most of the world looks to the United States for those groundbreaking drugs. Is that correct?

Mr. EZELL. That is correct. The U.S. truly leads the world in both investment in life sciences R&D and commercializing drugs that come out of that R&D.

Mr. MEADOWS. And why do we lead the world in that? Is it just that we have the greatest brainpower or why would we lead the world and be able to do that? Why does that come from here and not from some other country?

Mr. EZELL. It's a combination of factors, as I tried to indicate. First, a really strong complementarity between private and public investment. A lot of cases of public-private partnerships bring innovative new drugs to market.

Mr. MEADOWS. So it is our coordination between the pharmaceutical industry, NIH, other areas where we have this to come up and have groundbreaking pharmaceuticals that actually meet the needs of not just the United States but certainly the world at large. Is that correct?

Mr. EZELL. That's a large part of it, also a wonderful STEM talent and pipeline, some of the best scientists in the world, and a system broadly that enables innovators to undertake the risky process of investing hundreds of millions if not billions into a drug and earned for a temporary period of time revenues from those innovations that can then be reinvested into future generations——

Mr. MEADOWS. So strong patents that actually help the proprietary investment that many companies make, is that correct?

Mr. EZELL. That's correct.

Mr. MEADOWS. So if we look at that, one of the number-one complaints I get, though, is with the rise of prescription drug prices

27

and why can I get it cheaper, you know, in the E.U. and other areas? Is it our delivery system at times, the way that we have done this, and for me, a lot of this has come on in the last five decades as we have had a number of competing things that have happened with regards to the delivery system. Is there a way that we can still protect the patents, allow for research and development, and yet make sure that what both the ranking member and the chairman are talking about is that availability to underserved populations? Is there a way to do that without having it a government-owned entity?

Mr. EZELL. I think there—yes, there is certainly a way to do that without having a government-owned entity. The private sector remains the best engine of innovation in the life sciences.

I think there are interesting things we should do. One thing, for instance, is we can think more thoughtfully about how to increase R&D efficiency. The biggest problem in the broader drug development system is so many drugs get to like phase three clinical trials and then fail, and that's a massive cost for both the companies and the system. If we could focus on public-private partnerships like around translational research that would focus on how we can bring more efficiency to the R&D drug discovery process, that would be a very important way that we could broadly illuminate some of the cost in the drug discovery system.

Mr. MEADOWS. All right. I look forward to working with my colleagues opposite, and I yield back. I thank the gentleman.

Chairman CUMMINGS. Ms. Norton.

Ms. NORTON. Yes, thank you very much, Mr. Chairman. This is a very important hearing, particularly for people who represent districts like mine, the District of Columbia. I am interested in PrEP because it is of course the cornerstone of the administration's HIV plan, so it plans to increase the use of PrEP from a paltry 10 percent today to 50 percent within the next 10 years, so everything is riding on PrEP.

I can't resist asking you a question, Mr. O'Day. It is kind of a John Q. Public question. Instead of the donations you are offering, even some of the reductions, why not simply lower the price of PrEP?

Mr. O'DAY. Thank you, Congresswoman. And obviously, your district is extraordinarily important in terms of HIV elimination and a part of the CDC program that we just agreed for the donation of medicine.

So the answer to the question is that if we had lowered the price of our medicines even a decade ago, we wouldn't be sitting here today with the innovations that are changing the face of HIV/AIDS.

Ms. NORTON. Mr. O'Day, I think you testified that your company earned $36 billion in revenue, and you are telling me that at that rate of revenue, we just wouldn't have PrEP at all?

Mr. O'DAY. Without the investment back in research, we wouldn't have PrEP today, and we wouldn't also have the advances that we have with the talented scientists at Gilead looking at long-term——

Ms. NORTON. And so that price is justified?

Mr. O'DAY. That price——

28

Ms. NORTON. In order to get back any return on what you have invested in order to develop PrEP. Otherwise, you would be at a loss?

Mr. O'DAY. Yes. The revenues are invested to a large percent back into R&D, and I just point out that everything that we start in early phase R&D trial has a 97 percent chance of failing. So exactly to Mr. Ezell's point, this is a very complex iterative process that requires a lot of investment, but, more importantly, requires no——

Ms. NORTON. But this one didn't fail—just reclaiming my time. So I would like to go on and find out the feasibility of the use of PrEP by asking Ms. Walensky how feasible is this goal I mentioned to get from 10 percent to 50 percent within 10 years, after which you have heard Mr. O'Day testify, how feasible that we will get there?

Dr. WALENSKY. Thank you. We aspire to laudable goals. This one's going to be hard, and I will tell you——

Ms. NORTON. Will reducing the price be necessary?

Dr. WALENSKY. I think we need to put PrEP in the water is what I think we need to do in order to get this epidemic under control and the places that don't have access to PrEP. I think, you know, the data from South Wales that said that they were able to decrease incidence by 25 percent, they essentially give it to almost everybody. They did everything that they could to get PrEP to a lot of people, and so we need to do everything that we can.

We know that since PrEP has been available, there has been no dent in incidents. It's been unchanged, and so if that's going to be the case, we need to sort of figure out—that 10 percent access hasn't done anything to the incidents.

Ms. NORTON. No effect. Mr. Horn, does it trouble you that the administration's plan relies so heavily on the donation of free drugs from Gilead? We are going to get there with these kinds of donations?

Mr. HORN. Donations help. They don't solve anything. I'll give you the example. When we have looked at the U.S. response and I think the response globally, when we took a look at what happened when we had our major innovator manufacturers who were donating drug to low-income countries, that only got us so far. What was really required there was a reduction in price. Really that was spurred by robust generic competition to ensure equitable access and affordability to our programs.

And so let me be clear. I think the donation will help, but it is not the panacea that we require.

Ms. NORTON. I just want Mr. O'Day to know that everybody affords your donations and charity, but I think we would actually prefer you to go back to old-fashioned capitalism and reduce the price.

Thank you, Mr. Chairman.

Chairman CUMMINGS. Mr. Norman?

Mr. NORMAN. Thank you, Mr. Chairman.

Mr. O'Day, I appreciate you justifying and coming up here. You know, you are being put in a position of being a bad guy, I mean, by the questions you are asked. Your company competes with other drug companies. You are not the only company that took the inno-

29

vation and the time and the effort to go after a treatment, which, as Congressman Jordan said, you are having the people that ordinarily would not have a chance to live, they are living now.

Now, I am all for lowering prices. You do that through competition, through capitalism, so I want to thank you for doing that and really for taking some of these questions, which is really amazing to me.

You know, Australia, the drug that has been quoted for $8, where were they when the innovation—where were they—why didn't they invent the drug? Why didn't they go through the trials and the studies that you did over time?

But, Mr. Ezell, you are in a good position to I guess answer questions as far as the many times that this country has led an innovation and putting drugs on the market that other countries either couldn't or wouldn't or didn't do. What effect if—go through the trials that failed and who foots the bill for that with different companies, yours particularly?

Mr. EZELL. I'm sorry, could you restate the question? I didn't—could you restate the question? I didn't entirely understand what you are asking.

Mr. NORMAN. Could you—well, my question is, you know, part of the reason—you are in a unique perspective on the innovation that is occurring in this country. The U.S. is a leader in innovation, as I have said. You succeed in bringing lifesaving drugs to the market. And you improve the lives of Americans who desperately need them, as has been said today. I think part of the reason is because when a drug fails in the pipeline, it is the company primarily who suffers the financial loss. Could you elaborate on this point?

Mr. EZELL. Well, essentially—and that's exactly right. The simple reality is that the process of bringing an innovative new drug to market is risky and extremely expensive. I could quote studies, the most recent one from Deloitte estimating that—that study shows that over six of the past eight years the cost to bring an innovative new drug to market has risen. Now the average in 2018 was about $2.1 billion.

It really is the private sector of the United States. That's the only entity at a large scale in the world who's willing to undertake these incredibly risky and expensive investments and be willing to accept failure rates that, as Mr. O'Day has said, can exceed 95 percent. We have a system in place to bring talent and capital to the world's most innovative companies, to bring breakthrough solutions to market.

And I would also ask the committee to understand that their deliberations today importantly about the price of Truvada will also have implications for a number of other drugs because we care not only—although we care deeply about those patients who suffer from HIV/AIDS, we care about those who are affected by maladies that we currently do not have solutions to. And the genius of America's life science innovation system is that we're able to put in place a system that enables us to invest to try to solve challenges that are currently unsolved by the frontiers of medical science, and we're the best country in the world doing that.

30

Mr. NORMAN. You are planning for the future and you are reinvesting to help the lives that you are saving already, making it better.

Dr. Walensky, some of my colleagues are advocating for breaking the patent system in the United States as a way to address drugs. Would this work?

Dr. WALENSKY. Well, you know, one of the things I want to get to is the fact that several people have described that with an earlier patent—an earlier-going generic, a year earlier, I want to just emphasize that the only way drugs prices come down in the generic market is if there's generic competition. So the fact that this is going to be—the patent is going to be broken a year earlier and there will be one company making a generic drug is not going to decrease the price of Truvada. Maybe it'll decrease it by five or 10 percent, but we're not going to get the discounts that we need such that the patients who need to access it will be able to access it.

I do think that—you know, it's not that I don't believe that the companies need to profit. I do believe that companies need to profit. I do believe we need new drugs. We certainly need them in HIV, we need them in antimicrobials, we need them in a lot of different places. But I do believe that Gilead has already profited enough, especially in the context of a Presidential call to end the epidemic here. So I think that that would work here.

Mr. NORMAN. You think they have profited enough, and that is your opinion.

Dr. WALENSKY. Certainly on this drug for this indication, I do. I do. I think this is a public health mandate. Not all——

Mr. NORMAN. Thank you. Thank you so much. I yield back.

Chairman CUMMINGS. Mr. Connolly.

Mr. CONNOLLY. Thank you, Mr. Chairman.

My friend from Ohio, the ranking member, has attempted to discredit the purpose of this hearing and in the process discredit those of us who raise questions, legitimate questions about the pricing of a lifesaving drug.

I am here because of one of my best friends. His name was Rick. He developed AIDS in the late 1980's when there was no cure. He died when my daughter was just a few months old in 1991. I spent a lot of time with him during the illness. I saw its progression. I saw his suffering, terrible symptoms. It ultimately went to his brain, and he started hallucinating. Maybe there was a blessing there because he was not any longer aware of his suffering.

He lost his job because of the illness and was uninsured, and he didn't have access to health care. He went to a homeopathic clinic because he was hopeful maybe that would work. It seemed to only make his suffering worse.

So, Mr. Jordan, I am not here to discredit an American company or Mr. O'Day. I am here for my friend Rick. I am here to make sure no American has to go through what Rick went through and that drugs are available to people who are suffering. And I would say to you, Mr. Jordan, that is a legitimate source of inquiry.

I am not going to yield because I am going to run out of time unless the chairman grants me more time.

So I just want to make that really clear. Most of us absolutely subscribe to the thought that a drug company has to recover profits

31

because it recovers cost and legitimate R&D that can produce more lifesaving drugs. But the question in front of us is how much is enough? How high do you go to the point where it becomes a barrier to access? It may help your bottom line, but it doesn't help people like Rick.

And I think that is a legitimate form of inquiry. And given that, one notes that, right now, the cost of Truvada is about $70 per day if you are paying full freight. Is that correct, Mr. O'Day?

Mr. O'DAY. That's correct.

Mr. CONNOLLY. In Canada, it is $5 a day. In Australia, it is $7 a day. And, to be fair, in Canada, that is generic. For the branded product, it is $20 a day, not $70. Now, they have different systems, but it is the same drug.

Mr. O'Day, when Truvada was first approved as a treatment in 2004, you had a list price of $800 per month. By 2012 when you were approved for preventing HIV transmission, that price had almost doubled to $1,400 a month. In your statement today you claim you did not increase the price of Truvada when it was approved in July 2012, correct? That is in your statement.

Mr. O'DAY. The—there was no—there was an increase in 2012——

Mr. CONNOLLY. Yes.

Mr. O'DAY.—so it was—over the past—since 2004, the average increase has been around——

Mr. CONNOLLY. But in your statement you said today you did not increase the price of Truvada when it was approved. And I would suggest respectfully that is a little misleading because you had just raised the price six months earlier, and you raised it again six months later.

Mr. O'DAY. So, Congressman, I understand your point. What I was trying to assert was there was no additional increase to the price as a result of the additional indication.

Mr. CONNOLLY. So let me ask a question in terms of corporate deliberations. I worked in the corporate world for 20 years. When you look at pricing and when you looked at pricing, did you have a discussion about, okay, corporate profit, we want to maximize our profit, but on the other hand, we also understand our, you know, community obligation to suffering people and so we have to strike a balance here? Does that factor into the pricing of the drug?

Mr. O'DAY. Absolutely, Congressman. And there are four things that we look at critically when we price a medicine. First of all, what's the value of the medicine to the patient and society? The most recent figure associated with the disease HIV/AIDS that it can cost on average $880,000 per patient to treat that disease, so that's given into context.

The second thing is what the comparable treatments that are on the market today?

The third and potentially most important is exactly to your point. What are the access limitations that might be created by setting that price, and we anticipate that in advance.

And then the fourth one is our commitment to reinvest back in research not just for this medicine and not just for this disease but for other terribly devastating diseases that inflict Americans and the globe.

32

Mr. CONNOLLY. Well, Mr. O'Day, I appreciate that, and I just want to say I hope today's hearing is something that will give you thought and is something that maybe you will take back to the corporate boardroom to reevaluate the pricing of a drug that so many people need access to.

And I want to thank the chairman for having this hearing on behalf of my deceased friend Rick, your deceased employee, and the millions of Americans who have succumbed to this terrible virus. Thank you.

Chairman CUMMINGS. Mr. Hice?

Mr. HICE. Thank you, Mr. Chairman.

Mr. Ezell, could you explain in basic terms the law that addresses intellectual property that comes from federally funded research?

Mr. EZELL. Yes, Congressman. It's called the Bayh-Dole Act. It was introduced on a bipartisan basis in 1980, but what it does is it gives universities and public research institutions the rights to innovations that stem from federally funded research at their institutions.

Mr. HICE. And before 1980, before that law, do you have any idea how many patents the U.S. Government owned?

Mr. EZELL. Yes, so in 1978 the Federal Government had licensed less than five percent of the 30,000 patents owned at the time. There was a massive underutilization and a lack of commercialization of intellectual property and knowledge that was sitting in laboratories across the United States.

Mr. HICE. So before the law, then, there were approximately 30,000 patents that the U.S. Government owned, only about five percent of which, however, had commercial licensing. Is that correct?

Mr. EZELL. That is correct.

Mr. HICE. All right. And why is that? It is a lot of patents, a lot of potential great benefits out there, only five percent in the commercial market to go out to the public.

Mr. EZELL. Well, that's right because, well, first, government institutions and universities were not equipped or expected or it wasn't their intent to incur the risk that would be required to, you know, take those technologies or inventions and bring them to the market as commercializable——

Mr. HICE. And neither is the government?

Mr. EZELL. In fact, an interesting story was from the year 1968 when President Johnson asked Elmer Staats, who was then the comptroller general of the United States, to analyze how many drugs had been developed from NIH-funded research, and Johnson was stunned when Staats' investigation came back and said that not a single drug had been developed when patents were taken from universities for commercialization by the Federal Government. Staats' report from 1969 found that—we found hundreds of new compounds developed at university laboratories that had not been tested and screened by the pharmaceutical industry because the manufacturers were unwilling to undertake the expense without some possibility of obtaining exclusive rights for further development. It was not until they put in place the Bayh-Dole Act of 1980 that we—led to an explosive growth of innovations stemming from federally funded research.

33

Mr. HICE. That is my point exactly where I want to go with this. And so you had the Federal Government pretty much in charge of all the patents until Bayh-Dole. Then things started changing and actually patents were able to get into the hands of commercial licensing and thereby get to the needs of the population.

Can you briefly explain what the march-in provision is in Bayh-Dole?

Mr. EZELL. Yes, so the march-in provision is language that would in very specific limited cases give a government agency the ability to, quote, "march in" and compel the divulsion of the intellectual property or force additional licenses on an innovation that was a result in part from some degree of Federal——

Mr. HICE. And, real briefly, what would be—I am assuming that would be like an emergency?

Mr. EZELL. Yes, so when the architects of the Bayh-Dole Act, Bob Dole and Birch Bayh, designed the legislation in the early 1980's, the reason they conceived of putting in the march-in rights was primarily to ensure that a licensee took the steps to commercialize the——

Mr. HICE. The whole point was to get it to the public when there was a need?

Mr. EZELL. That's correct.

Mr. HICE. So has the march-in provision ever been used by the Federal Government?

Mr. EZELL. No, not—no, it has not.

Mr. HICE. All right. So what kind of impact would using the march-in impact have on research and development?

Mr. EZELL. I think there's a real risk that, if you ever used march-in rights, it would substantially stifle the potential of research and development. If the government ever had the capacity to march in decades later and compulsory license the IP on a pending pharmaceutical drug on the grounds that some of it was contributed by federally funded research and now some number of decades later the government declares that that price is unreasonable, that will give enterprises serious pause about investing the enormous sums required to bring innovative new drugs to the marketplace.

Mr. HICE. So——

Mr. EZELL. It would stifle innovation.

Mr. HICE. So, in other words, there would be a great disincentive for research and development in various companies if they spent the billions of dollars, if they assumed the risk to develop drugs, and then all the while knowing that the Federal Government could march in and take that patent away from them, you are saying that would massively disincentivize R&D?

Mr. EZELL. That's correct, Congressman. There was a great case from 1995, something called CRADAs, cooperative research and development agreements, in 1989 the NIH inserted a reasonable-pricing clause into those CRADAs. The amount of collaboration between industry and government subsequently cratered. And when that requirement for original pricing of a subsequent innovation was repealed, the number of CRADAs instantaneously rebounded in 1995 and we again stimulated effective public-private partnerships toward developing new drugs.

34

Mr. HICE. Thank you. Thank you, Mr. Chairman.

Chairman CUMMINGS. Mr. DeSaulnier?

Mr. DESAULNIER. Thank you, Mr. Chairman. Thank you for having this hearing. Thank you to everybody who has been behind this.

As somebody who has a pill in my pocket that I will take at three o'clock that keeps me alive that in Australia costs $6, here in the United States it costs $400, Johnson & Johnson distributes it. I am told it is going to $500, but it keeps me alive, so I am happy that I have health insurance that pays for it.

So I have spent a good deal of time in the last four years since I was diagnosed with chronic lymphocytic leukemia trying to figure this out. And what is a good reasonable rate of return to get people from private sector to invest and what do we get as taxpayers? NIH has a figure that shows since 1974 the NIH's research has contributed $77 trillion to the U.S. GDP.

So having gone out there now multiple times and Dr. Grant having—Mr. O'Day, as somebody who is a resident of the bay area I take it now, as somebody who lives in the bay area, moved to San Francisco in the 1970's, went into the restaurant business, I sit here and think of the friends, the coworkers, the people who worked for me when I owned restaurants who passed away and what that did to the culture in San Francisco having moved there from the west end of Boston—not a bad facility, by the way, but it is no UCSF—and having one of my oncologists be one of your colleagues, Dr. Kaplan at UCSF, who put some work into this as well.

The numbers that I have from the Washington Post article is the research that you got or the grants you received was $50 million, as has been said, $50 million from NIH and then about $17 million from the Gates Foundation. Were there other significant contributions from this company or others to your research?

Dr. GRANT. Gilead did not provide funding. They did donate medications, and it was that donation that justified their listing as authors on the publication cited before. Importantly, my study was not the only study done in PrEP. The CDC funded and performed its own study in Botswana and in Thailand, and the NIH also funded a study in—called VOICE in Africa. The total U.S. Government investment in PrEP is much more than the $50 million from my project. It's in the hundreds of millions of dollars paid by the U.S. Government for the development of PrEP.

Mr. DESAULNIER. So, Dr. Grant—and actually, Mr. O'Day, I think your career is a similar—I remember reading a book Our Daily Meds years ago, and that reporter from the New York Times did a wonderful job of doing an investigation of the influx of venture capital into this pharmaceutical industry that traditionally, 40, 50 years ago, the CEO of pharmaceutical companies were researchers like yourself who went to work for the private sector and moved up the chain of command. And they weren't driven by the market forces that are currently driven.

So my question is—and I have an amendment on the floor today that I would like to get bipartisan support, and it goes to a little bit of the history that Mr. Ezell was talking about. In her investigation, she says that investors looked at professions that people trusted, and people with white smocks people trusted. And that

35

changed the culture. It brought a lot of pressure to get return on investment.

Mr. O'Day is somewhat legendary, as I read your history, about managing pharmaceutical industries. You are on the board of Genentech. You are on the board of California Life Sciences, which I have great respect for.

So my question is—my amendment is actually to get the Academy of Sciences to do a study that does the history but helps us understand what is the best investment and what is the base that we get from NIH, which I believe is underestimated. And then, to my Republican colleagues, what is a reasonable rate of return that will bring investors in to do what they do?

So when you look back on your career, how much better would it be now if we had that information and you could do the base? And maybe it would be more efficient when we argue about patent controls in the CDC and this company. Maybe there is a more efficient way to do this for the consumer, for the shareholder, but mostly, importantly, for the person whose life is being extended, as they do in Australia, as I understand.

They have a discussion about, for instance, this drug or my drug in Australia is $6 when it is subsidized when they go through the process, and the risk to the client. If it is fully loaded, it is like $35 a day, so I don't understand why it is $500 a day here.

Dr. GRANT. I don't understand that either, sir.

Mr. DESAULNIER. But we need to find that out to have a rational conversation. And I invite my colleagues on the Republican side for a more efficient look at how do you attract these investments and get what we want, longer and higher-quality lives for American citizens?

Dr. GRANT. You know, I think you're raising all the right points. And it's important to realize that both components of Truvada, tenofovir and emtricitabine, were developed in academic centers using public funding.

Mr. DESAULNIER. Right.

Dr. GRANT. And then those property rights were purchased by Gilead. And, you know, people at Gilead will say that they invented those products, but in fact they were invented in academic centers using public funds and then purchased by Gilead, who then co-formulated, meaning mixed it into a single tablet. And the mixture in the single tablet is what allowed them to extend their patent rights beyond 2017.

And so when we look at innovations, the CDC brought us preexposure dosing, they brought us information that the mixture of two drugs was much more important than one drug and, you know, Gilead's invention was really buying products developed with public funding in the academic sector. So this synergy between academics and private industry is important, but I think that we need to be more honest, as you've proposed, about who is doing what in all of this and how much should be charged later.

Mr. DESAULNIER. Thank you, Mr. Chairman. I really hope we continue to pursue this question because it clearly is a life-determining question that needs to be answered by the American people. Thank you, Mr. Chairman.

Chairman CUMMINGS. Mr. Grothman.

36

Mr. GROTHMAN. Thank you. Mr. Ezell, I kind of want to talk to just in general an overview because I think the hearing today touches not just on a particular drug but things across the board. And we talk about the interaction between the private drug companies and NIH funding. And really not till we have this hearing that, you know, it occurred to me that we are putting billions and billions of dollars a year into the NIH, and I don't know whether we are getting bang for the buck or we should be, you know, getting some other way to get cures for these diseases.

Of the $37 billion we put into NIH, how much of that do you think goes into pharmaceutical development if you had to guess? We are not going to fact-check you.

Mr. EZELL. I'm not an expert on the share of the allocation of the NIH's budget across its 27 research institutes. Their funding of the NIH goes to a number of activities from training future scientists to looking into very basic research trying to understand the basic molecular processes of how diseases work, trying to identify biomarkers that can single future targets for innovation opportunities. But certainly the majority of NIH's research is going into this basic science trying to understand fundamental molecular activities, and a much smaller portion of their research is going toward development-oriented activities.

Mr. GROTHMAN. Okay. As far as drug development, not just what we are talking about today but collectively, do you feel—or could you describe the different—well, do you know how much is spent every year on what we will call drug development by the private pharmaceutical industry? If you can't give me an answer, we will ask Mr. O'Day.

Mr. EZELL. In the year 2013 there was $96.5 billion, as I understand. The average over the past three years has been about $80 billion per year.

Mr. GROTHMAN. How many?

Mr. EZELL. Eighty billion dollars.

Mr. GROTHMAN. Eighty, so we are going about 80 billion. So, in other words, far and away most of the research in this country done on drug development is done by private industry, and what we get out of NIH is a small fraction?

Mr. EZELL. That's exactly right.

Mr. GROTHMAN. Okay. Could you give me an example of other success stories coming out of NIH?

Mr. EZELL. Well, there are a number. We can look at the invention of Gleevec, treatments for chronic myelogenous leukemia. That was a nice set of case studies that the original research was conducted by Dr. James Allison I believe at the University of UCLA I believe, and then some of his basic discoveries into how genes work gave rise to a new form of treating cancers called checkpoint blocking that we were able to identify specific antigen growth factors in the body, and then that set of basic research was ultimately licensed to the private sector, and Bristol-Myers Squibb invested the hundreds of millions required to now turn that into a first-in-the-world——

Mr. GROTHMAN. Do you feel overwhelming—and I don't mean to put words in your mouth—overwhelming the number of pharmaceuticals that are having an effect on our lives or extending lives

37

with people with various diseases? I suppose there is a difference in the type of things that are financed by NIH and the private industry. Could you comment on the differences between which type of drugs each sector goal was after or any reasons why you would feel one does a better or worse job than the other?

Mr. EZELL. Well, it is the private sector that is primarily incurring the risk of doing the applied research and in conducting the grueling set of three stages of clinical trials that are proving the safety and efficacy of that drug. And the private sector is the one who is assuring that the formulation is effective and works in the human body, and then of course the FDA is working with the private sector to validate that fact.

But the system we've put in place is now responsible for the fact that there are 7,000 new-to-the-world drugs under development globally, and it's estimated that at least 3,600 of those are being led primarily by U.S.-headquartered enterprises.

There's a lot to do. I'm not satisfied, as wonderful as Mr. O'Day's drug is. We need a cure for HIV/AIDS. We need a cure for various forms of cancer. It's wonderful that there's competition in the workplace Mr. O'Day's—O'Day's company faces the loss of competitiveness. It faces existential threats hopefully from the innovators out there who are trying to build a better solution, and I think it's important that we broadly focus on the system we have in place in America that enables competition and enables innovation so that we can try and come up with some of these cures.

Mr. GROTHMAN. Can I give you just one broad question? Does the chairman mind?

Chairman CUMMINGS. The gentleman's time is expired, but you may answer this question.

Mr. GROTHMAN. Okay. My disease of interest is Alzheimer's. Do you feel, as far as we look for a cure there, that will more likely come from the private sector or from NIH, or could you comment on that?

Mr. EZELL. My organization actually did a study looking at the economic impact if we were able to come up with a cure for mental diseases. We estimated that the value to society would be as much is $1.5 trillion. I would support an all-of-the-above solution to innovate for cures like Alzheimer's. It's estimated that the real-time net present value of curing Alzheimer's alone would be about $50 trillion for the U.S. economy. So these are massive numbers we're talking about over a period of time, so I applaud research that's being supported by nonprofit and foundational actors like the Gates Foundation toward that end. That may be a pathway to innovating such a drug.

But I note that there are hundreds of clinical trials ongoing even now to solve various forms of mental diseases being led by the private sector, and that's, I think, probably a—I mean, historically, that—historically across a broader set of disease states that's been a more likely pathway to getting toward a solution toward a breakthrough cure.

Chairman CUMMINGS. Mr. Rouda.

Mr. ROUDA. Thank you, Mr. Chairman.

I would like to talk about two different issues. One is just the government's commitment under the President's stated objectives

38

to addressing HIV infections and then also talk after that a little bit about the balance between innovation and drug pricing.

So, Mr. Horn, I will start with you. The President has stated that he wants to reduce infections by 75 percent in the next five years and 90 percent in the next decade, yet we have seen systematic attacks on the ACA and funding for community institutions and Medicare and so on. What kind of impact is that going to have in our ability to address HIV infections?

Mr. HORN. It has a profound effect. We rely on these systems, and we fight very hard for these systems. And I will say that we actually fight very hard against these systems sometimes just to ensure that.

But in order to do this—and I think that we realize this. When we're just beginning to think about, you know, just getting—just maximizing the number of people who are living with HIV to getting them biologically suppressed. What is making that possible, what is getting us there is the Affordable Care Act, as all of the systems under the Affordable Care Act. And I think when we do think about this in the context of primary prevention or PrEP or just the prevention for those who are vulnerable to HIV infection, the same holds true. We absolutely need the ACA and, frankly, we need Medicaid expansion to make that happen.

Mr. ROUDA. And actually, if we had universal healthcare, much of the issues that we are having when talking with Gilead about and any other drug manufacturer about those costs, many of those disagreements would go away because we would have properly funded, systemwide care for all Americans.

Mr. HORN. That is correct.

Mr. ROUDA. And, Mr. Ezell—and hopefully I pronounced that correctly—you made the comment earlier that the NIH plays such an important role in the development of new drugs, yet the President has three straight years tried to make massive cuts to the NIH. Wouldn't that diminish our opportunity to continue to have innovation in the development of drugs through that public-private partnership?

Mr. EZELL. Absolutely, Congressmember. In fact, this is perhaps the most fundamental threat to the U.S. innovation economy. If the United States—essentially, today, the U.S. invests the least it has in federally funded R&D as a share of GDP since 1995—1955. To match our investment on average in the 1990's——

Mr. ROUDA. Sixty-five years roughly, 64 to be exact.

Mr. EZELL. Correct. On average, to match the Federal Government's investment in R&D that we averaged in the 1990's, we would have to invest 80 percent more per year today. And we're seeing that manifest itself within NIH even. The average age of first NIH ROI grant has increased from 34 to 42 years, eight years later in life. The average success rate has declined from close to 60 percent in 1962 under 20 percent today. And if we don't make that right, we risk losing our——

Mr. ROUDA. I understand.

Mr. EZELL [continuing]. international competitiveness.

Mr. ROUDA. Thank you. And, Dr. Walensky, I am not sure if this is the appropriate question for you, but I am just curious. When we look at the societal cost of not doing anything to making sure

39

that we have proper medication and putting a number on that versus the cost of providing these drugs to all those, has that analysis been done, and if so, is there any indication as to what it would do?

Dr. WALENSKY. I think—we haven't done what the status quo is. We know that if we invest in this, it will be a cost-effective investment. I want to just comment on something Mr. Ezell said, and that is that, currently—and I've screened every infectious disease fellow who comes in the door at Massachusetts General Hospital. Nationally, we have .7 applicants for every infectious disease position in the country. That is—the Indiana HIV outbreak that occurred, there was no infectious disease doctor in that county. And if we don't invest in the NIH to do——

Mr. ROUDA. Right.

Dr. WALENSKY [continuing]. these things, we will not have those physicians.

Mr. ROUDA. Mr. O'Day, I heard testimony that the list price is $1,780 to approximately $2,000. That list price, let's just assume for simple math, $2,000. If you sell a monthly prescription for $2,000, does that go to your revenue line?

Mr. O'DAY. The $2,000 would go to the revenue line, that's correct.

Mr. ROUDA. And then the pharmacy benefit managers, PBMs, about roughly what percentage of that $2,000 would be paid to them?

Mr. O'DAY. Well, actually, the discounting in the commercial sector is actually quite small because the cost-effectiveness of this medicine has not required that discounting. When you look into the public sector, however, we have very deep discounts, so 70 to 80 percent discounts, for instance, for Medicaid, for ADAP, and for all the government programs.

Mr. ROUDA. And, one last question, the billion dollars of investment that you noted earlier, is that an ordinary or a capital expense on your income statement?

Mr. O'DAY. That's ordinary, yes. I mean, there could be capital components to that, but the vast majority is recurring expenses, year-on-year invested in R&D, into people, and into costs that support our research and development.

Mr. ROUDA. Thank you, Mr. Chairman.

Chairman CUMMINGS. Before we go to Mr. Comer, Dr. Walensky, you said something about .7 percent. Can you say that again? I think I misheard you.

Dr. WALENSKY. Unfortunately, you probably didn't.

Chairman CUMMINGS. I hope I did.

Dr. WALENSKY. For every infectious disease fellowship slot that we have in this country, we have 0.7 applicants. There has been a New York Times editorial in the last week that—or in the last month by Matt McCarthy that demonstrates that we are going to have a shortage of infectious disease doctors. We know we are anticipated a shortage of infectious disease doctors. Some of the counties that have had HIV outbreaks, there have been no infectious disease doctors in them. And so, yes, I think we have a public health problem. Part of that is related to NIH funding and seeing—

40

because we are what we call a cerebral field, we rely on NIH dollars to recruit applicants into the field.

Chairman CUMMINGS. Mr. Comer?

Mr. COMER. Thank you, Mr. Chairman. And we have already hit on the important roles of private-sector versus public sector in the R&D process and also the role of having strong patents and the consequences if the government breaks patents on drugs like Truvada. We have also hit on the major scientific and regulatory risks and hurdles you have had to take in to market Truvada.

Overall, though, I just want to reiterate the great role that Gilead has played in innovations in antivirals, and I hope we can continue to save lives because that is something that we agree on in a bipartisan way.

Switching gears, I want to talk about the President's initiative to eradicate HIV. From what I understand, the bulk of the Trump administration's plan to eradicate HIV is the ability to locate every American susceptible to HIV and provide a drug and provide help adhering to the daily regime for the rest of their lives. That is no easy task. The cost of doing that will be daunting. About 1.1 million Americans have the virus, and about 1 million are at risk of contracting it. Finding, treating, and keeping them all on treatment experts estimate would be more than the administration currently is devoting, even in addition to the $20 billion the Federal Government already spends on HIV prevention and treatment. There are criticisms that if the patent on Truvada remains, the Trump administration's plan to eradicate HIV would cost over $20 million.

So, Mr. O'Day, let me start with a few questions. How many bottles of Truvada has your company Gilead donated to the U.S. Government?

Mr. O'DAY. So our commitment is to donate 2.4 million bottles per year for up to 10 years.

Mr. COMER. Okay. I think Mr. Jordan asked this question. When is a generic version coming onto the market? Do we know?

Mr. O'DAY. A generic version of this medicine Truvada comes out into the market in September of next year, 2020, and other generics will come on six months later.

Mr. COMER. And you did, as I understand, voluntarily release the patent early?

Mr. O'DAY. That's correct. In discussions with—and it was a legal decision at the end of the day and an important decision to avoid the cost of litigation and to bring this medicine sooner to patients. It's important to note that when the patent expires for Truvada, the next most safe, most effective medicine will take its place in the donation——

Mr. COMER. Right.

Mr. O'DAY.—for 2.4 million bottles for the next 10 years. We want to make sure that the uninsured patient population in America has access to state-of-the-art care at all times over this decade.

Mr. COMER. With those developments, how much closer are we to eradicating HIV?

Mr. O'DAY. Well, I think, as has been mentioned, the—you know, it's—I think it's within our grasp. It's clearly challenging. It's, as I've tried to articulate, based upon the Gilead programs. You know,

41

it's really not about drug pricing. It's about—in this particular case is about the wraparound care. I think the administration and CDC and HHS' efforts to, you know, reduce by 70 percent in five years and 90 percent in 10 years is within our grasp, but it does require a holistic approach to the wraparound care.

Many people have talked about Australia here, which I think is interesting to look at in some regards. In Europe, generics have been available for three years, and even with the lower cost of medicines in Europe, we've seen very little increase in HIV PrEP, which goes to show you that there are many, many elements of this system——

Mr. COMER. Right.

Mr. O'DAY.—that have to be invested in.

Mr. COMER. Right. What proposals currently would hinder the progress of eradicating HIV or any prospect of a cure or vaccine to HIV? What proposals have you heard out there that would hinder that?

Mr. O'DAY. Well, I think that's—I mean, the current initiative is focused on the available antiretrovirals, which are very effective but have drawbacks in terms of getting them into the hands of the patients at the right time. So what our scientists are doing is they're working on longer-term medicines. Those could be delivered once a month, once every three months, long-acting, which I think could help us desperately with this solution of HIV elimination and eventually the cure. And the cure is still—it's I wouldn't say within our grasp today. There'll need to be a lot of failures to get there, but we're firmly committed at Gilead to investing in that research, to keep having the 90 percent failure rates and finding eventually that 3 percent cure, which we're firmly committed to. We won't rest until we get there.

Mr. COMER. Right. Thank you. Mr. Chairman, I yield back.

Chairman CUMMINGS. Ms. Hill?

Ms. HILL. Thank you, Mr. Chairman. I ask unanimous consent to enter into the record a Washington Post article from 2016 entitled "The drug company that shocked the world with its prices dodged $10 billion in taxes," report says.

Chairman CUMMINGS. Without objection, so ordered.

Ms. HILL. Thank you. We have talked about saving lives, but, as a corporate executive, Mr. O'Day, let's talk about money. Just as you are responsible for your budget, I am responsible for our taxpayers' money, and in this case our worlds collide. Mr. O'Day, how much does Gilead spend per year in direct costs for patient care for people with HIV and AIDS?

Mr. O'DAY. I don't have the exact figure, Congresswoman, but it's in the tens of millions of dollars.

Ms. HILL. You pay for direct care?

Mr. O'DAY. We pay—we fund community support groups that support patients in a variety of different ways. We're the largest corporate donor to community funding——

Ms. HILL. That's great. Is it true that you get a tax break for those corporate donations?

Mr. O'DAY. Yes.

Ms. HILL. Okay.

Mr. O'DAY. Yes, it is.

42

Ms. HILL. Okay. So, effectively, you don't spend money on direct patient care. But do you know how much the U.S. Government does?

Mr. O'DAY. No, we do spend money on patient care. We may get some tax benefits of that, just to correct——

Ms. HILL. Okay. Okay, but——

Mr. O'DAY.—but absolutely spend, and we have an outflow in our P&L that's——

Ms. HILL. Okay.

Mr. O'DAY.—associated with those costs——

Ms. HILL. Do you know how much the U.S. Government spends on that treatment for patients with HIV or AIDS?

Mr. O'DAY. I—what I know is that the current plan for HHS and CDC has earmarked for the 2020 budget somewhere around $290 million for the HIV elimination program. Now, the fact that Gilead will donate all of——

Ms. HILL. Well, hold up. Hold up. So what the U.S. Government pays in direct care—this is through Medicaid and Medicare—is $21.5 billion, so it is a much higher number than what we are adding to the budget for research and elimination.

But, anyway, it is estimated that $470,000 in lifetime costs is what it takes to treat someone with HIV infection, and now we have 40,000 people with new HIV diagnoses in the country each year, and so that cost to our taxpayers is going to continue to rise.

So, as you heard from the title of the article I submitted, Gilead is notorious for not even paying its fair share in taxes that go toward HIV treatment. Gilead reported its 2018 financial performance to the SEC on February 26. It showed that the company had revenue of about $22 billion—that number sounds familiar—in 2018 with about $31 billion in cash available. So I want to take a look at how Gilead is using some of its profits.

Mr. O'Day, you just joined Gilead Sciences earlier this year. Is that right?

Mr. O'DAY. That's correct.

Ms. HILL. Your initial compensation package was reportedly worth about $30 million, including both cash and stock options. So the company agreed to pay you $30 million just for taking the job. Is that right?

Mr. O'DAY. That's correct. I mean, I should articulate that half of that was for compensation that I gave up from my previous assignment and have——

Ms. HILL. Okay. But it is $30 million for taking the job. So, just out of curiosity, do you know what the median income is for a U.S. worker according to the BLS?

Mr. O'DAY. I do not offhand.

Ms. HILL. It's $46,800 or one-sixth of 1 percent of what your signing bonus was, just thought you would want to know that.

And Gilead has a long history of paying windfall amounts to its corporate executives. In 2013 Gilead's former CEO John Martin earned almost $180 million. His salary for the year was $15.4 million, but he cashed out almost $160 million in stock options that year. Mr. Martin appears to have timed his pay well. According to Gilead's 2013 annual report to shareholders, Gilead had, quote, "record total revenues" in 2013 of $11.2 billion. Twenty 13 was the

43

year that Gilead's blockbuster drug Sovaldi received FDA approval, correct?

Mr. O'DAY. I believe so.

Ms. HILL. Sovaldi is a hep C drug that also made headlines for costing $1,000 per pill.

I want to turn to another Gilead executive, your direct predecessor John Milligan. He made a little less than you, just $15 million. I understand Mr. Milligan resigned in 2018, but he didn't lose his salary. In fact, he received what is called a golden parachute, meaning that the company paid him extra just for resigning. Mr. Milligan had previously received stock options that were not worth anything because the company's stock had gone down, but thanks to a separation agreement between Mr. Milligan and the company, he was paid an additional severance that earned him a total of $26 million just for resigning from the company. That is true, right, Mr. O'Day?

Mr. O'DAY. As far as I understand. Those decisions are made by the board of directors.

Ms. HILL. Of course. Gilead is a private company and it can pay its corporate executives whatever it likes, but Gilead also makes a lifesaving drug that it has kept a U.S. monopoly on. We have heard today about people who are not accessing this drug because they cannot afford it. We have heard about local public health officials that are straining under the financial burden of providing this drug to everyone else that needs it to stay healthy, and this drug, which has generated billions of dollars for Gilead, was developed using tens of millions of dollars of Federal funds.

So what Gilead chooses to do with its profits really does matter to all of us. And I will say that the millions and millions of dollars to corporate executives I take some issue with. Thank you.

Chairman CUMMINGS. Mr. Roy.

Mr. ROY. Thank you, Mr. Chairman.

You know, I came to this hearing hoping that we might have a hearing where we spent some time diving into some of the tough questions instead of preening and posturing for cameras, attacking people for making profit in a capitalist society, but that is what I just heard in rants for the last five minutes.

Now, Mr. O'Day, do you make Brentuximab? Do you know what Brentuximab is?

Mr. O'DAY. I do not. I'm sorry, Congressman. Brentuximab vedotin is the drug that I took when I was suffering from Hodgkin's lymphoma, a drug that was created, built, manufactured, developed, designed, created by a private company that made a lot of money. And I am really glad they did. I hope they make a lot more, and I hope they make a lot more drugs to save a lot more people and distribute a lot more drugs around the world to save a lot more people.

Now, it is a reasonable question when patents expire, when they should expire, when they shouldn't expire. It is a reasonable question, how much money that NIH has and is investing and how much we should factor that into the patent life. But to sit here and attack the capitalistic system that produces and distributes medicine to saving lives around the world, I mean, it is just offensive.

44

I mean, I just cannot possibly understand why we are spending time sitting here while I listen to people lecturing companies about making money. I hope you make a lot of money. It is a reasonable question what patent length should be. I would like to have that conversation and dialog. I don't know whether it should be one year, five years, 17 years. I don't know. Let's have that debate. I don't know how much we should factor in that NIH puts in $400 million, $50 million, I don't know what it is, whatever the number is that has gone into the production of this drug. I don't know how much went into merging these two putting them together and then you guys distribute it versus how much NIH has done. Fine. Let's have this conversation.

But this absurd attack on profit being evil is undermining the entire ability for us to have a rational conversation about the serious questions that are actually before us here. We don't go down—how much cash on hand does Apple have? Two hundred and forty-five billion dollars. How much has Apple done to go cure health? Is Apple in the business of providing direct health care, Mr. O'Day?

Mr. O'DAY. Not to my knowledge, no.

Mr. ROY. Right. Are you in that business?

Mr. O'DAY. Yes, we are.

Mr. ROY. Do you provide medicine or do you run hospitals?

Mr. O'DAY. Our role is to bring breakthrough medicines to patients with devastating diseases.

Mr. ROY. Right. Do you hire doctors to go out and provide care, or do you, for the most part, design, develop, and manufacture medicine?

Mr. O'DAY. My colleagues and I at Gilead are exclusively focused on the design and development of medicines and getting them in the hands of patients.

Mr. EZELL. And, if I may, Mr. O'Day, you employ 10,000 people at Gilead. There are some of the 1.2 million individuals in America's—who are employed by America's pharmaceutical companies who earn an average salary of $122,000. This is an industry that supports over 5.5 million workers across the U.S. economy considering direct and indirect effects, and it's an industry that supports a high-value-added sector of the economy, high-value exports——

Mr. ROY. Yes, but whatever, profit is evil, right? Making money is apparently evil because never mind all those people you just talked about who are making money and able to pay for their jobs, their salaries, and be able to send their kids to school and be able to buy their houses in our system. This is somehow the wrong thing for us to do?

I mean, again, can we have a roundtable discussion? I am happy to sit down with my colleagues on the other side of the aisle and this side of the aisle and let's have two hours, three hours. Let's get whiteboards up and let's go through all of this stuff and come to a reasonable consensus on some of these tough questions about patents. It is a real concern.

But can we dispense with the ridiculousness of hostility toward profit. It is a good thing that Apple makes a crap-ton of money making these things so that we can have them and distribute them and use them and use them for great additions and benefits to the world. And it is the same thing in medicine.

45

Chairman CUMMINGS. Before we go on to—Mr. Raskin, just a moment.

Mr. Roy, I have been here—oh, he is gone.

Mr. Roy, I have been here since quarter of 10. I have heard every syllable that has been stated here, and I am sorry you had to leave, but I think the committee on both sides have asked reasonable questions. And I am not beating up on anybody for profit. We are just trying to make sure we understand what the American tax dollars are paying for. We want to understand why the price is so high, and we are trying to understand how we can get the 90 percent of people who need this lifesaving medication, how we can get it to them.

And, as a matter fact, I have applauded Gilead for their research and what they have been able to accomplish. Now, we are just trying to expand it. And Mr. O'Day has made it clear that they are trying to figure out how to expand treatment and the number of people also who will have access to this medication. So in fairness to the committee, I just wanted to make that clear to my colleague.

Now, we will hear from Mr. Raskin.

Mr. RASKIN. Mr. Chairman, thank you for that thoughtful comment. And I want to followup on Mr. Roy's very interesting and provocative statement there because I think what we are trying to figure out is precisely what are the various public and private ingredients that go into our pharmaceutical system. My friend Mr. Roy doesn't have to look across the aisle to find people who are upset with big pharma. President Trump himself has said that the pharmaceutical industry is getting away with murder. Pharma has a lot of lobbies, a lot of lobbyists, and a lot of power, and there is very little bidding on drugs. So I think that it is not just members of this side of the aisle that have noted some problems in the current system.

But, Mr. O'Day, let me come to you because we know that the taxpayers, through the NIH, which is proudly in my district, in the Eighth congressional District in Maryland, put in $49 million, and the Gates Foundation put in tens of millions of dollars more into funding the development of Truvada as a method for preventing HIV. And I think a lot of the discussion here is about the fact that tens of billions of dollars have been earned by your company. But how much did Gilead spend on researching and developing Truvada as PrEP specifically as a prevention drug?

Mr. O'DAY. Thank you, Congressman. So it's hard to tease out some of the PrEP activities with the other activities because, at the end of the day, this medicine reduces the viral replication. It's the same mechanism if you like for treatment as it is for PrEP.

Mr. RASKIN. Okay. So how much did you guys put into that part of the process then?

Mr. O'DAY. One point one billion over the course of Truvada's development, which was really for all indications associated.

Mr. RASKIN. Okay. And then the infusion of money that came from the taxpayers and the NIH was essential for the development, I think you would agree, of Truvada for the purpose of preventing HIV?

Mr. O'DAY. Yes. The know-how and knowledge that Gilead put in, the investment from the NIH and the $50 million, the greater

46

than $80 million donation from the Gates Foundation, all of this was important to provide the body of evidence——

Mr. RASKIN. Terrific. Okay. So while we can't imagine this is some kind of Ayn Rand fantasy where the private sector did it all on its own, right? Would you agree with me about that?

Mr. O'DAY. I would agree, absolutely.

Mr. RASKIN. Okay. But what has been the total revenue from Truvada as PrEP?

Mr. O'DAY. The total revenue for Truvada as PrEP is difficult to kind of tease out. Again, we've talked about the number of $36 billion globally for the entire medicine, but it's very hard because the medicine is prescribed by physicians——

Mr. RASKIN. Got you.

Mr. O'DAY.—who often don't know whether it's PrEP or treatment.

Mr. RASKIN. When you set the price for it for U.S. payers, did you take into account the role of taxpayer funding in the development of the drug?

Mr. O'DAY. When we set the price for Truvada originally, we took into account a variety of things, including the impact upon the healthcare system, the ability to make sure we get access to——

Mr. RASKIN. All right. But you didn't take into account the fact that the public was one of the investors in the research?

Mr. O'DAY. Well, at the time we priced the medicine, the public had very little to do with the invention of this medicine.

Mr. RASKIN. Okay. And you are choosing now to donate some drugs rather than reduce drug prices. Will you claim the donation as a tax deduction, as you testified that you did habitually? There is nothing wrong with it, but it will be claimed as a tax deduction presumably?

Mr. O'DAY. I would—that's been my understanding is that at a cost-of-goods level.

Mr. RASKIN. Okay. But one of the shocking revelations from the Senate Finance Committee's investigation into the pricing of your hepatitis C product was that the $1,000-a-day price you settled on was based on seemingly extraneous or arbitrary factors like the likelihood of a public outcry at a certain price point or the likelihood of receiving a letter from a Member of Congress or the likelihood of facing a congressional committee and a hearing like this. Did you use those same political factors in setting the price for Truvada?

Mr. O'DAY. So, Congressman, again, I was not at the company at the time, but I've looked into those details. I think the overriding factors for the setting of the price for the HCV medicine were based upon both the cost of current treatment at the time and the innovation of bringing this together in a curative setting for 12 weeks of therapy to cure the disease, a huge step up from what was done in the past. Those were the—those are the prevailing means that go into account when we priced——

Mr. RASKIN. Okay. And then finally, last question, just to follow through on the point Mr. Roy raised—and I am sorry he is not here for it—but do you think it is inappropriate in a constitutional democracy where the public invests in scientific and medical research and helps to produce pharmaceutical drugs that the public relies

47

on, for that factor to be taken into account in the pricing and distribution of pharmaceutical drugs?

Mr. O'DAY. Well, I think it's very important that you consider the access question. Will the medicine get to the patients that need it, including in the government sector and the government-funded healthcare sector, as well as the private sector. So absolutely I think you need to take a variety of things into account in pricing.

Mr. RASKIN. Okay. Thank you. And I wish I could ask you about that access, maybe if we get another round, but I yield back to you, Mr. Chairman.

Chairman CUMMINGS. Thank you very much. Ms. Miller?

Mrs. MILLER. Thank you, Chairman Cummings and Ranking Member Jordan, and thank all of you all for being here today.

In my home county of Cabell County, there has been an increase in HIV cases. In March there were 28 confirmed cases, and in April that number has risen to 44. This number is a sharp uptick from the case where we only had the eight cases annually over the last five years.

Unfortunately, those most impacted are intravenous drug users, which is a terrible result of the opioid crisis that has devastated so many communities across the United States. I am very glad that President Trump is taking the issue of HIV seriously and has secured the donation of the 2.4 million from Truvada for the Centers of Disease Control, and thank you for doing that.

Mr. O'Day, if a patient cannot afford Truvada, are there precautions in place to ensure access?

Mr. O'DAY. Yes, absolutely. So we—if there are—if they have private insurance and they can't afford their co-pay, they can apply to our co-pay assistance programs, and 98 percent of patients that have done that pay nothing out of pocket. And then if they're uninsured or struggle with their medicine, we have a medicine assistance program, which essentially evaluates their financial needs and provides it for free.

Mrs. MILLER. Thank you. Can you explain how the new version of tenofovir if that is how you pronounce it——

Mr. O'DAY. Tenofovir, right.

Mrs. MILLER [continuing]. was—tenofovir was an improvement to patients, and what new benefits does it provide?

Mr. O'DAY. Well, thank you, Congresswoman. So what you are referring to is actually a completely separate medicine from tenofovir. It's a medicine that's called—or abbreviated as TAF. And this is now to—you know, the advancement that we've seen in both treating and preventing HIV/AIDS is that people living with AIDS or people subject to AIDS have the ability to take these medicines now for decades. Tenofovir, when taken that long, a certain subset of patients have issues with their kidney or with bone disease on such a chronic basis because we've essentially transformed the disease to such a long-term illness.

So the new medicine, so-called TAF, which will be combined again with FTC and other agents, has a much lower incidence of these side effects and is really designed for, if you like, the new generation of medicines that will allow patients to be on this longer-term without having to worry about other debilitating side effects that they could get from their medicines. We've launched

48

this now into the treatment of HIV setting with a medicine called Biktarvy, and we'll be bringing this innovation—it's right now filed with the FDA, and we will—hope to have a positive approval by the end of this year for patients that are eligible for PrEP. So this innovation, this new medicine that was completely discovered and developed by Gilead scientists, is now kind of the next evolution of care for HIV patients.

Mrs. MILLER. How long did it take you to do that?

Mr. O'DAY. Oh, my gosh, well, this was back in the 1990's that we started this, so it's been more than two decades and part of that $6 billion investment that we've had so far in HIV.

Mrs. MILLER. Wonderful. Would any new patents prevent generics from being created against the original version?

Mr. O'DAY. No, it's a completely separate medicine. It has nothing to do with the patents of Truvada. It's patent-protected from this new innovation that took decades to produce.

Mrs. MILLER. Thank you. Mr. Ezell, do you foresee a future where the NIH could take on the entire of the drug development process from start to finish?

Mr. EZELL. I simply do not think that would be the case. First, the capacities are not there. The NIH focuses on basic scientific research. What industries really bringing to the table is the development aspect of it, doing the applied research, conducting the clinical trials.

Now, this has been proposed. Dean Baker, for instance, has written that, quote, "We could expand the public funding going to NIH or other public institutions to extend their charge beyond basic research to include developing and testing drugs and medical equipment." But Baker estimates that, were we to try to do that, we would likely—quote, "It would be necessary to increase the amount going to NIH by at least $60 billion a year" in order to, quote, "replace the funding currently supported through patent monopolies. So no, I don't think that's tenable. I don't think we're going to increase NIH funding by $60 billion a year, especially if we can't increase the—we pass a gas tax.

And more beyond that point, I think there is very little reason to make that dramatic of a change to a system that, as I've tried to say today, is in fact the world's most effective and productive at generating new-to-the-world cures.

Mrs. MILLER. Thank you.

Chairman CUMMINGS. Mr. Khanna.

Mr. KHANNA. Thank you, Mr. Chairman, and thank you to Representative Alexandria Ocasio-Cortez for working to have this hearing.

Mr. O'Day, I want to try to be constructive and not score political points or embarrass you but just get some facts and see if we can make some progress of your commitment. The New York Times wrote that Truvada was developed significantly by taxpayers. Is that a true statement?

Mr. O'DAY. I think that's really inadequate—inaccurate I should say.

Mr. KHANNA. So you disagree with The New York Times editorial board?

Mr. O'DAY. Yes.

49

Mr. KHANNA. And why is it not a true statement?

Mr. O'DAY. Because the medicine was developed and discovered within Gilead. Some of my colleagues have mentioned that we licensed some initial compounds on this. That's important. Those were very early stage ideas on the product. In the case of TDF, which is one of the components of Truvada, it was not a drug that—at the time, and it went through many iterations before it got there.

Mr. KHANNA. Did you benefit at all from the study that was funded, $49 million by NIH and the Gates Foundation in terms of understanding the drug could be used for preventing HIV?

Mr. O'DAY. Absolutely. Of the $1.1 billion we invested, I think that was an important contribution to supporting the HIV——

Mr. KHANNA. And did you——

Mr. O'DAY.—story at the time, and I'm grateful for Dr. Grant's——

Mr. KHANNA. And——

Mr. O'DAY.—leadership.

Mr. KHANNA [continuing]. grateful is good. Have you paid them anything?

Mr. O'DAY. Well, I think there's different ways to look at contribution to society. I mean, we have——

Mr. KHANNA. Right. I mean, I am sure they appreciate the compliments, but, you know, usually if I get something, I pay something for it. I am just curious. It is a simple answer, yes or—usually I don't like yes or no questions, but this one is pretty yes or no. Did you pay them money or not?

Mr. O'DAY. The donations that were provided by NIH and the Gates Foundation did not come with terms suggesting that——

Mr. KHANNA. No, I am not saying that they required it. I'm just asking—so you didn't pay them anything for that?

Mr. O'DAY. No, I think it's in the interest of public health to advance a foundational medicine for additional——

Mr. KHANNA. And it absolutely is. The difference is 99.9 percent of us don't get to profit when it is in the interest of public health. You know, you have acknowledged that this is something that you used to profit, and you haven't paid them back. I mean, that is your decision. I just want to get the facts.

One thing I want to get, are you—I appreciate that you are going to donate these 200,000 drugs. Can you assure us that you are not going to claim a tax write-off for those?

Mr. O'DAY. You know, those will show up on our P&L balance sheet——

Mr. KHANNA. So you will claim a tax write-off. Can you assure us that you will only deduct the manufacturing cost——

Mr. O'DAY. Yes, I can assure you of that.

Mr. KHANNA. So you are going to deduct $6. You are not going to deduct——

Mr. O'DAY. The $6 figure is not accurate.

Mr. KHANNA. Okay. But you aren't going to deduct the $2,000? You are going to deduct something closer to——

Mr. O'DAY. That's correct.

Mr. KHANNA [continuing]. $6?

Mr. O'DAY. That's correct.

50

Mr. KHANNA. So it is inaccurate that you would try to get a billion-dollar tax deduction?

Mr. O'DAY. Absolutely not.

Mr. KHANNA. Okay. So let me ask you this. One thing that I think you could commit to that would go a long way, there is some misunderstanding on the 200,000 that you have pledged to the President, and they are saying that that also includes people who are already on your financial aid programs. Can you commit that those 200,000 drugs are going to be in addition to the ones of people who are already part of your financial aid programs?

Mr. O'DAY. Yes, absolutely. I mean, I think it's important to note——

Mr. KHANNA. So you are making that commitment. So in addition to the people you have on financial aid, you are going to do 200,000 new ones, and you are committing today that you are not going to deduct anything beyond the cost on your deductions?

Mr. O'DAY. That's correct. We'll continue to serve patients through our medical assistance program. Today, we have 20 to 30,000 a year. This is an additional 200,000, plus we continue to support all the co-pays. So back to, you know, do we give back, you know, to, you know, inventions that are supported in us? I mean, the answer is yes, in different forms——

Mr. KHANNA. Well, I am glad you have made a commitment because in The New York Times editorial, you know, they will be happy to know. I mean, there was legitimate concern about what tax deduction you are going to take. It seems you are not going to take that. You are going to do 200,000 in addition. Now, if you would just commit to paying back something to the CDC, I think it would go a long way.

Any final thoughts?

Mr. O'DAY. Well, I think, you know, we are collaborating with the CDC on the entirety of the program, so I think this is a partnership. It's one where we provide resources, intellectual know-how, medicine. The government provides funding to support—we're all in this together to get to the HIV elimination, so I think there's give-and-take on a variety of sides, Congressman. Thank you.

Chairman CUMMINGS. Mr. Higgins.

Mr. HIGGINS. Thank you, Mr. Chairman. Madam and gentlemen, thank you for being here today.

Mr. Horn, has Gilead invested approximately $1.1 billion in developing Truvada? Is that an accurate number?

Mr. HORN. I'm sorry?

Mr. HIGGINS. Approximately did Gilead spend $1.1 billion developing Truvada?

Mr. HORN. I can't confirm or deny that.

Mr. HIGGINS. Can you answer that, Mr. Ezell?

Mr. EZELL. I would defer to Mr. O'Day, who's from the company. I do not know myself how much——

Mr. HIGGINS. Okay. I was wondering if this was common knowledge. Mr. O'Day, can you clarify?

Mr. O'DAY. I can——

Mr. HIGGINS. According to our research, it costs $1.1 billion——

Mr. O'DAY. Yes, I can——

Mr. HIGGINS [continuing]. to develop Truvada?

51

Mr. O'DAY. I can confirm that, yes.

Mr. HIGGINS. And that drug has been quite successful at treating HIV and AIDS, correct?

Mr. O'DAY. It's been a cornerstone of HIV treatment, yes.

Mr. HIGGINS. Thank you. The drug Descovy, are you currently investing a great deal of money perhaps on a similar level to develop Descovy? Is that at phase three right now?

Mr. O'DAY. The phase three trials ran out. They represented at the AIDS meeting in March. It's now been submitted to the FDA for the——

Mr. HIGGINS. How much money are you making on Descovy right now?

Mr. O'DAY. I don't have that number on the top of my head. I apologize, but I can get back to you.

Mr. HIGGINS. Is it being sold?

Mr. O'DAY. It is being sold for the treatment indication, but the prevention indication will be new later this year.

Mr. HIGGINS. Very well. And that is because it is in phase three right now——

Mr. O'DAY. Yes, it finished phase three.

Mr. HIGGINS. And GS–9131, is that an HIV/AIDS drug?

Mr. O'DAY. I believe so. I'm still getting the numbers down.

Mr. HIGGINS. It is in phase two. Is money being spent to develop that drug for HIV and AIDS?

Mr. O'DAY. I'm just not familiar with this particular number, Congressman, so I apologize. But we have a variety of medicines in phase two right now.

Mr. HIGGINS. According to my research, you have four—including Descovy, you have five HIV/AIDS drugs being developed, three in phase one, one in phase two——

Mr. O'DAY. Yes.

Mr. HIGGINS [continuing]. one in phase three.

Mr. O'DAY. Yes, that sounds right.

Mr. HIGGINS. Is that reflective of—so the drugs that are in phase one, these three drugs that are in phase one and treat HIV and AIDS, is there money, tremendous amounts of money being invested in the development of those drugs?

Mr. O'DAY. Well, we spent about $3.5 billion U.S. a year on R&D and around 40 percent of that goes into HIV/AIDS at this stage. So yes, there's significant——

Mr. HIGGINS. And——

Mr. O'DAY.—investment in——

Mr. HIGGINS. And prior to these drugs that are in development right now being sold and marketed including levels that are being questioned by this oversight committee, I think appropriately so—we must protect the American people. We wouldn't want to gouging, would we? And yet this clearly indicates—our research indicates that you are investing a tremendous amount of money right now into drugs being developed to treat HIV and AIDS, which are not being sold, so you are not making money on these drugs, you are spending money——

Mr. O'DAY. Yes.

Mr. HIGGINS [continuing]. on these drugs?

Mr. O'DAY.—Congressman, and many of those will fail unfortunately.

Mr. HIGGINS. Thank you.

Mr. O'DAY. But it's the nature of innovative research.

Mr. HIGGINS. The ones that succeed and they go to market and they help Americans, perhaps millions of Americans, as Truvada has, is that the corporation's only window to recoup and retain moneys to invest in further research and development? Is that not——

Mr. O'DAY. Yes.

Mr. HIGGINS [continuing]. a logical formula to——

Mr. O'DAY. Absolutely. That's basically our contract with society. We invest a tremendous amount in R&D at a high failure rate. Those that succeed we have a limited patent life to recoup the investment back into investing it and finding cures for devastating diseases. And then it becomes generic and broadly available to society.

Mr. HIGGINS. In the interest of time—thank you for clarifying, but I have limited time. According to our research, besides the five HIV/AIDS drugs that are in development and which you referred to as in the pipeline, you have 28 other drugs that are in the pipeline at various phases of development. Of those 28 additional drugs, would it be fair to say that scores of millions of Americans could be helped with diseases that currently suffer?

Mr. O'DAY. Well, we're certainly hoping, yes. We're working on some of the most devastating diseases——

Mr. HIGGINS. And when a drug is under development, is there any guarantee that it will become a profitable drug for the company?

Mr. O'DAY. Quite the contrary. In phase one, 95 percent failure rates; phase two, 85 percent failure rates; phase three, 50 percent failure rates are the average. In fact, we just had a phase three trial for a devastating disease called NASH that failed.

Mr. HIGGINS. Thank you for clarifying, sir. I think it is clear that this is a worthwhile hearing that should be reflected upon in a balanced measure.

Thank you, Mr. Chairman.

Chairman CUMMINGS. You mentioned African Americans not getting the medication at a far disproportionate rate. Did you mention that?

Dr. WALENSKY. I did.

Chairman CUMMINGS. Can you tell me about that?

Dr. WALENSKY. Well——

Chairman CUMMINGS. Because I am listening to you, Mr. O'Day, and I am wondering—when I first got to Congress 20-some years ago, one of the first issues that we addressed with Maxine Waters was AIDS. And back then the treatment went to gay white males. The African-American community was pretty much left out. And so I am trying to figure out—when I heard those numbers, I am just trying to figure out who is going to cover the African-American communities and whether when you all make those decisions, you know, about distribution, where does that go? I mean, in other words, where do the drugs go and what role do you all play in making sure that there is some equitable distribution?

53

And I want you to understand I have heard a lot of talk here this morning about how people are beaten up—it is not about beating up. It is about being thankful that we have a medication that can do just about everything but finally cure it, AIDS, and wanting it to get to everybody that it can get to. I mean, it is as simple as that.

So Ms.—Dr. Walensky. I am sorry.

Dr. WALENSKY. Great. Yes, so a couple of comments on that. We know there are about 39,000 new HIV infections in the United States per year. This past—the most recent data that we have we know 80 percent of those new infections were on persons of color. We know that——

Chairman CUMMINGS. Eighty percent?

Dr. WALENSKY. Eighty percent were in persons of color. We know that, of the new infections in 2017, 43 percent were in African Americans. African Americans make up 13 percent of this population. We know that African Americans suffered over 53 percent of the deaths of HIV and AIDS. And we know that PrEP is getting to largely gay white men, which it needs to get to, and about 75 percent, but only about 10 percent of its consumers are people of color.

Chairman CUMMINGS. Now, Mr. O'Day, what can we do about that?

Mr. O'DAY. This is a dire need. We completely agree. And part of the program we've just agreed to with the CDC is focused on 48 hotspot counties, seven rural states, you know, District of Columbia and San Juan, Puerto Rico. These are areas predominantly in the southern United States where the African-American incidence is—we're not reaching and getting to. So we've had programs that are continually focused on supporting the communities, support services that are underway. Now—but we have much more we have to do to get to these communities.

It's make sure that the medicine is not the barrier in these communities, but beyond that, it's making sure we provide the services to both address the issues relative to inequalities in the healthcare system, lack of education, stigma associated with the minority and African-American communities. We need to do more. We're fully committed to rolling up our sleeves to be a part of that.

In fact, I just received an email overnight from an incredible organization in Jackson, Mississippi, that supported 400 patients to get PrEP over the past six years. It's a small start. There's so much more to do. And when they started, they were the only organization in Mississippi that did this. And, fortunately, they have a system there where, once they identify patients—and they're now using telemedicine to try to identify patients—built into their protocols are the ability to access the Gilead support services. And I'm pleased to say that they said, of the 400 patients, none of the 400 had a financial problem with getting the medicine.

But we need to do this in so many other communities, and that's why we're rolling up our sleeves and hoping—and not just hoping but committing to the CDC initiative and others to get to this community.

Chairman CUMMINGS. Ms. Pressley. Ms. Pressley.

54

Ms. PRESSLEY. Thank you, Mr. Chairman, and thank you, Representative Ocasio-Cortez and all the advocates who made this hearing possible.

And, Mr. Chairman, just picking up on some of your commentary and the comments of our colleague across the aisle who is very impassioned, and I have an equitable amount of outrage about the fact that people are dying. This is not about the vilifying of profit. This is about the vilifying of choosing profit over people. And if we know that a new person is infected every 15 minutes and we have been here two and a half hours, that is 10 more people who have been infected.

And so we have an administration, the occupant of this White House, who sets an aspirational and achievable goal to end this epidemic, and yet we don't have enough infectious disease doctors. We have a cost-prohibitive lifesaving drug, and it is not equitably being accessed. So that sounds like an unfunded mandate. And we have been here before.

And this is the Oversight and Reform Committee, and so it is our job to hold everyone from—you know, I served on the city council before, but any time profit over people, whether it is developers or pharmaceutical companies are engaging in those practices, we are here to shine a light on that and to keep us all accountable. So that is the role of this committee.

So, you know, we should be furious about what we have heard here today. This is the world's wealthiest Nation. There are 40,000 new HIV diagnoses each year. In my home state of Massachusetts, there have been over 140 new HIV cases since 2015, eight new cases in Boston over the last six months.

Now, we have heard a lot of sobering and damning statistics here, but I don't want us to get lost in the numbers and allow that to dominate the conversation because this is about people, our family members, our neighbors, our friends, our constituents like my constituent Matthew. He lives in Somerville. He is a gay man. And Matthew knows he is at higher risk of getting HIV, and for three years, he has been fortunate enough to be on PrEP. His insurance coverage gives him access to the drug at an affordable rate. However, he lives in constant fear that a job change will push it out of reach for him.

There are millions of Matthews in our country for whom PrEP allows them to stand in their truth, safety, and unencumbered by the fear of contracting HIV, but unlike Matthew, there are millions more who need it and still cannot afford it.

It has been 40 years since the first HIV case in the U.S., and this disease still remains a global public health challenge and, as reminded to all of us by our chair in your earlier commentary, particularly for women and queer people of color.

It is my opinion that, Gilead, you have used your power to manipulate our patent systems, monopolized the marketplace to line your shareholders' pockets, and I think that is shameful.

Dr. Walensky, you have studied HIV transmission closely, and, as a physician at Mass General Hospital, you are on the frontlines of this epidemic. Since we are short on time, yes or no, do you agree that by failing to get PrEP in the hands of those most at risk,

55

including people who inject drugs, we undercut our ability to eradicate this disease?

Dr. WALENSKY. Yes.

Ms. PRESSLEY. Thank you. Can you speak to how substance abuse disorders specifically for those who inject drugs with needles, have heightened the need for greater access to PrEP?

Dr. WALENSKY. Our hospital is full of injection drug users right now. We have double our consult volume in the last decade much due to injection drug use. And there's been an outbreak in Lawrence and Lowell, as you know, in Massachusetts that was reported in the MMWR by the CDC. So yes—an HIV outbreak I should say. So yes, we need PrEP for all people at risk.

Ms. PRESSLEY. Mr. O'Day, Gilead plans to donate millions of bottles of PrEP and bring a generic product to the market in the next few years. At face value, this seems like a good idea, although, you know, two years is two years too long. But the CDC estimates only a fraction of the 1.1 million people who need PrEP have access to it. The donation your company announced would reach even less people.

Now, I recognize your company's efforts to provide financial assistance for people without insurance who can't afford it, but given the uptick in HIV infection, these efforts simply don't keep pace. They don't go far enough. Mr. O'Day, can you guarantee that the donated medications will go to people who do not already have access to the drug?

Mr. O'DAY. Yes.

Ms. PRESSLEY. Thank you. In Canada and Australia Truvada is sold for less than $10 a pill. It seems to me if your company wanted to, you can make the drug affordable for everyone. What has stopped your company from lowering the price to a comparable rate in the U.S.?

Mr. O'DAY. The patent exclusivity ends, as you know, in September of next year, and we will, you know—the pricing between the countries is very different. It's a very heterogenous systems between the United States and in other countries, and the pricing, as set in the United States, takes into account the innovation it brings, the cost of the health care of treating an HIV patient, the ability to invest back in research and development, and then also to make sure our access programs are effective and that patients in America do not go without receiving this lifesaving medicine.

Ms. PRESSLEY. Well, it's——

Dr. LORD. It's greed.

Ms. PRESSLEY. Yes. Okay. So I was going to say just, you know, respectfully, in that every 15 minutes a new person is infected, the more time we waste, the more lives that we are losing. And again, this is an aspirational and achievable goal, and so it is really infuriating. There are clearly many barriers people are facing in accessing this lifesaving medication, and price should not be one of them. Gilead could make PrEP more affordable in the U.S. and therefore more accessible if you want to, if there is the moral courage and the fortitude and the commitment to do so. Your failure to do so is indefensible. Your company brings in record-level profits while holding hostage a drug that could end this epidemic. There isn't a

56

country in this world where this type of greed and conduct will be tolerated, so I am not sure why we tolerate it in this one.

Thank you, Mr. Chairman, and I yield back.

Chairman CUMMINGS. Thank you very much. Ms. Tlaib.

Ms. TLAIB. Thank you, Mr. Chairman. And, Mr. Chairman, thank you so much for always supporting us, especially us new class of women that have come in to this U.S. Congress. It speaks volumes to your character.

I also want to thank my sister from New York, Congresswoman Alexandria Ocasio-Cortez, and the incredible advocates that are behind her and making sure that we always speak truth to power.

What is evil, Mr. Chairman? And I talked with you about this. What is evil is that people are dying a painful death all because of corporate greed. How much profit is enough, Mr. O'Day? When does it become immoral? And in my district I have the third-largest population of those infected in the state of Michigan. And as I think about you saying you are helping folks, I look at numbers because it is important. And when you say you are going to provide assistance, 200,000 people when 1.1 million people need your assistance, it is baffling.

And I agree with Dr. Lord. I agree that Truvada belongs to all of us. And it is our responsibility in this chamber to make sure that we are putting people before profit. And it is really absurd that, as I hear my colleagues defending this practice over the American people that brought us here, it is disheartening because in the last five months, I don't care which committee I go to, corporate greed is the issue always. It is always about the money and about profit. And as Mr. Chairman has constantly always said, there is no problem with that, but when does it become immoral? When does it become so unjust that we are seeing our neighbors die, die because drugs are just not accessible to them, drugs that we created, the Federal Government on behalf of the people?

And so I just want to urge Mr. O'Day to please take Dr. Lord's recommendations. This is your time to do what is right for the people and do what is right for our country.

And with that, I want to yield to my sister from New York, who is, again, such a shed of light in this time of darkness in our country, that is constantly always putting people before profit, and that is Alexandria Ocasio-Cortez.

Ms. OCASIO-CORTEZ. Thank you. That is incredibly too generous. Thank you.

And I would like to thank my sister and colleague from Michigan because, you know, I see you go home every weekend and connecting with your community and really bringing yourself to hold that space and feel what your constituents feel.

Mr. O'Day, I just want to clarify and let you know that this isn't about you, and I am not here to vilify the work that you have done because you are responding to a set of incentives. And you could, you know, resign today, there would still be someone that would come up and occupy this seat, responding to those same incentives, making the same decisions that you make. So this isn't about you as an individual or who you are or your character. This is about the system of incentives that we have set up.

57

And when it comes to who to blame for this, I don't blame you. I blame us. I blame this body because every single developed country in the world guarantees health care as a right except us, except the United States because we can't get it together, because we don't have the fortitude to kick pharmaceutical lobbyists outside of our congressional offices.

We have a leader here, Mr. Sarbanes, who has led in the role of money and politics. We can't even reform our own political system to make sure that we are more responsive to the people and the electorate that we seek to lead and whose votes we ask for.

And so this isn't your fault. This is our fault because for some reason, for some reason the conclusion that every single other Western or rather developed country in the world has come to, we haven't been able to come to. In Australia, PrEP is $8 a month. In the United States, it is almost $2,000 a month because we have legislated a set of incentives, and we have legislated a system that allows that to happen.

Out of every 10 people that need PrEP, nine of them cannot access it, and that is largely due to the price. We heard earlier today an impassioned plea about profits and about how a corporation like Apple should be able to enjoy that. Well, I know a woman, her name is Amy Vilela and her daughter died because she went to a hospital and told them that she wasn't insured and they said come again in a month when you do have insurance. Well, her blood clot didn't wait a month. Her daughter died at 22 years old. And the rub of it was that her daughter, I believe, might have actually been ensured and just didn't know it because she was in between jobs.

And so what Amy says, what Ms. Vilela says is this is a commodity. Her daughter's life was not. People's lives are not commodities. When we talk about economics, there is something known as a demand curve with elasticity. And with every other commodity, you can say how much is this phone worth to you and you can say $100, $200. You can buy a Nokia phone. You cannot have a phone at all, but you cannot ask the question how much will you pay to be alive? How much will you pay to live? Because the answer is everything. The answer is you will pay $10, you will pay $1,000, you will go into debt, you will do anything to live. And that is what makes the price of medicine different than the price of an iPhone.

Thank you very much.

Chairman CUMMINGS. The gentlelady's time is expired.

Mr. SARBANES.

Mr. SARBANES. Thank you, Mr. Chairman. I am tempted to just say amen and stop talking, but I do have a couple of questions I would like to——

Chairman CUMMINGS. Me, too.

Mr. SARBANES. Yes, I would like to get on the record. Mr. O'Day, this new drug that is going through the process, Descovy, is that how you say it?

Mr. O'DAY. That's correct, Congressman.

Mr. SARBANES. Yes, that is based on this component that has TAF as opposed to TDF.

Mr. O'DAY. Correct.

Mr. SARBANES. Is that something you are going to pursue exclusivity on in terms of the patent around that? What is——

58

Mr. O'DAY. It's a brand-new medicine.

Mr. SARBANES. Yes, brand-new——

Mr. O'DAY. It has a patent life, as granted to it under the patent statutes.

Mr. SARBANES. I know there are some questions being raised out there. I think it has found its way into litigation as to whether Gilead knew back when it was developing TDF that the TAF opportunity might be a safer one. And I am curious as to whether you were aware of the safety benefits associated with TAF at the time when TDF was being developed.

Mr. O'DAY. Absolutely not. I mean, TAF was still in the very early stages.

Mr. SARBANES. Okay.

Mr. O'DAY. We pursued the development of that for treatment and for prevention in line with the natural course of development.

Mr. SARBANES. Dr. Lord, did you want to say something?

Dr. LORD. We know that Gilead in 2011, the ex-CEO actually said that they stopped the development of the safer TAF drug because they knew—they knew it was not as safe, and when they were trying to launch Truvada versus another drug Epzicom at the time—and this is a quote, they said "and to have our own studies suggesting that Viread"—which is part of Truvada—"wasn't the safest thing on the market, which it certainly was at the time, it didn't seem like the best." So we have evidence from their CEO that they purposely delayed——

Mr. SARBANES. Well, that——

Dr. LORD [continuing]. development of the safer drug.

Mr. SARBANES. I appreciate that. And it is obviously going to play itself out. I mean, we will——

Dr. LORD. See you in court.

Mr. SARBANES [continuing]. the courts will decide, I guess, whether these allegations are well-founded or not. But it is interesting that the effect of this is that with the new Descovy TAF-based drug that is coming, you are going to get another period of exclusivity. So am I right that essentially what is being achieved there is that by first pursuing the TDF-based Truvada with apparently the safety risk and now pursuing the safer TAF-based drug of Descovy, basically Gilead is going to reap the benefit of two periods of exclusivity rather than one, correct? I mean, that is just factual.

Mr. O'DAY. Well, these are two completely different medicines.

Mr. SARBANES. Right, but——

Mr. O'DAY. This is a step——

Mr. SARBANES. I got you——

Mr. O'DAY. This is a step change in innovation——

Mr. SARBANES. That is going to be subject to debate and whatever, but you are going to get a period of exclusivity, which you are still in for the TDF-based Truvada, and then you are going to get another period if this all works out for you of exclusivity for the TAF-based Descovy. That is how it looks to me.

I have got to move on real quick to one other series of questions I wanted to ask you. I understand that Teva Pharmaceutical got FDA approval for a generic equivalent for its Truvada back in June 2017. And so it raises the question if that generic drug was ap-

59

proved in 1917, why did it not enter the market in 1917? And apparently, the answer is that three years previously in 1914 Gilead had entered into a settlement agreement with Teva under the terms of which Teva agreed not to challenge Gilead's patents in court. And so in exchange, Gilead allowed Teva to come to the market in 2020, which is a year earlier.

So you made this deal with them that basically said we will let you come in a year earlier if you, I gather, don't sue us on the patent. And maybe you saw some weakness there, and this was a good deal to make, but is that true that there is some agreement that was made there with Teva where they are going to be able to come in a year earlier in return for something that was done? Is that true?

Mr. O'DAY. So this is a fairly normal process of generics coming in, challenging patents——

Mr. SARBANES. Yes.

Mr. O'DAY.—and then a determination is eventually made on the cost of litigation, the potential litigation. We believe strongly in the Truvada patents. At the end of the day——

Mr. SARBANES. It is pretty typical. You are right about that. And you have done it in I think nine other instances, the effect of which—there are all these ways to extend your patent control. One is pay for delay. This is a little bit different. This is making a deal basically so people won't challenge the patent, which to me signals maybe some concerns about the weakness of the patent, but you have figured out a way to push that off. So it just makes me concerned about how you are conducting the business because the bottom line is these generics don't get to the market as quickly as they could. And I understand from Dr. Walensky that the benefits of that in terms of the pricing may not be as much as we fantasize about. But nevertheless, it is important that the generics be able to get to market quickly or as quickly as they can. And we are seeing some maneuvers on your part I believe that keeps that from happening.

With that, I would yield back my time, Mr. Chairman.

Chairman CUMMINGS. Ms. Speier.

Ms. SPEIER. Thank you, Mr. Chairman. Thank you all for being here.

At the outset, it is important for me to disclose that Gilead is a company in my district with 9,000 employees around the world, many of them in my district.

Having said that, Mr. O'Day, I am glad that you are here. I am glad that you have participated in the manner that you have. I think you do have a responsibility to your shareholders. I also think you have a responsibility to our country. And you are doing what you are doing in large part—and I agree with Ms. Ocasio-Cortez—because the system allows you to do it. And we have got to take responsibility for the fact that when Medicare part D was created, we tied our hands behind our backs and did not allow Congress or the government to negotiate prescription drug discounts.

Now, I am deeply concerned about the 1.1 million people that Dr. Walensky talked about who warrant PrEP right now. They are those most susceptible to potentially getting HIV. But only 150,000 of those 1.1 million people actually do, and of those, they are 75

60

percent white. So the people that desperately need this drug are African-American gay men. One in two black gay men will be diagnosed with HIV in their lifetime.

So knowing all this, I want to know—and here I am negotiating with you in public over something frankly the government should have been doing a long time ago. Are you willing to provide P.R. ads—you put lots of ads on TV, I see them all the time for your drugs. Will you put ads on TV that are targeted at the African-American gay men who should be getting this drug and who are not and make them also aware of the fact that you are making available this drug for free to those who need it?

Mr. O'DAY. Thank you, Congresswoman. Just to clarify, the numbers that we have are around 200,000 people are on—of the 1.1 million are on the Truvada today. There's clearly a huge unmet medical need to your point, and again, the CDC's own studies suggest that, with the Gilead support programs, there's only 1 percent that aren't on it for financial means.

We are firmly committed to working in a number of ways to outreach——

Ms. SPEIER. Okay. Mr. O'Day, I don't have a lot of time.

Mr. O'DAY. Right.

Ms. SPEIER. Will you commit to developing a P.R. campaign for TV to target the African-American population that is most susceptible to getting HIV and making them aware that the drug is available and it will be made available to them for free?

Mr. O'DAY. We do do television advertising today for this community. We do digital advertising. We commit to——

Ms. SPEIER. That is not working.

Mr. O'DAY. We commit to a variety of programs that are getting at this community today. And it is increasing, but there is much, much more to do, which is why the CDC initiative, which it is their numbers that suggest that 200,000 people are uninsured of those 1.1 million, and we are providing the total amount to make sure that we get that to patients, and we'll continue to work——

Ms. SPEIER. But if people don't know about it, it doesn't matter that you are making 200,000 doses or enough for 200,000 people. If they don't know about it, they are not going to access it. So——

Mr. O'DAY. Right.

Ms. SPEIER [continuing]. I feel that you have a moral obligation to inform that population. We have to save these lives. We do know that HIV is increasing because young gays, particularly in my district, are feeling immortal now, and since this disease is becoming chronic, that they can engage in unprotected sex, and so HIV is on the increase. So, as the biggest provider of the drug that protects these individuals, I believe you have to do more, and I am asking you to do more.

Mr. O'DAY. Yes, and we will continue to do more. We spend more than $100 million over a 10-year period on a compass program that specifically targets the southern states in the United States that focuses on education, that focuses on access to health care, and we'll continue to roll up our sleeves and work with the community and work with other organizations to be able to increase this presence. Absolutely we commit to that.

61

Dr. LORD. It's obviously not working, though, and this donation really is not anything meaningfully different than their medication access program, which they already have, which, as you say, is not working. It's only reaching, as Mr. O'Day said, 20,000 people——

Ms. SPEIER. Okay. So, Dr. Lord, what would you recommend?

Dr. LORD. I would recommend that they lower the price—that they lower the price so that Mr. Horn's organizations can get drugs to the people that need them. Instead of spending $2.6 billion, which is the domestic spend on Truvada, I say we spend that money to develop programs for Mr. Horn's agencies to get drugs to these people that need it. They don't just need a free drug. They need programs, and we're not going to do that with a donation. We're going to do that when we spend serious money, instead of sending it to Gilead, to giving it to the states, to the counties and municipalities that need it.

Mr. O'DAY. And Gilead is spending hundreds of millions of dollars on these programs.

Dr. LORD. We're spending $2.6 billion, so, yes, you give us a few hundred million back, but we're giving you the vast majority of that to begin with.

Ms. SPEIER. All right. My time is expired, but, Mr. O'Day, I hope that you will take my request seriously and come back to us with a campaign that will engage the whole community that is not aware that your program exists. I yield back.

Chairman CUMMINGS. We want to be effective and efficient. Is there any agency that can identify who these people are that need this treatment, Dr. Walensky? In other words, can we pinpoint them, I mean, who they are? Do you follow me?

Dr. WALENSKY. Yes, I do.

Chairman CUMMINGS. And that way you can go straight to them.

Dr. WALENSKY. Yes, thank you for that question. I want to go back to a number that keeps getting cited that is 98 percent of people get access and 1 percent of people don't have—don't—cite cost as the issue. Less than 1 percent of people don't cite cost as the issue. That was a study that was funded by the CDC, it was conducted by the CDC. It was a household survey. So we know that—so we know that adults who are surveyed in the household don't think that they have a problem accessing PrEP. Well, I can tell you what, those are not the people who actually need access to PrEP.

We know that of our youth that are—that about 10 percent of our youth are gay. We know that of our homeless youth, 40 percent of them are gay. And you know what, they're not filling out household surveys. So I think part of the challenge with access to PrEP is that these folks are not easily coming forward.

When we talk about gay black men, they don't have a good reason to come forward. And I can promise you that teenagers and 20-year-old gay men are not accessing health care. They just don't come to the doctor. So——

Chairman CUMMINGS. And how can we reach them? How do you——

Dr. WALENSKY. I think we needed to decrease stigma. I think we need to have advertising. I think we need to open our doors to these people so that they will come, welcomed and loved, and access these drugs and come quarterly. So I know the other statistics

62

that's been thrown out is 200,000 people are currently on PrEP. Two hundred thousand people have ever been on PrEP. We learned at the HIV meetings in March 34 percent of people don't take it for longer than a year.

Chairman CUMMINGS. And, Mr. Horn?

Mr. HORN. Thank you. So we've been really discussing cost as a considerable factor here, and cost does remain, you know, a key issue here. But I think when we sort of open it up a little bit, we really have to talk about really sort of financing sustainable healthcare systems, you know, for the individuals that we're trying to reach here.

And I just do want to circle back on one thing here. I think that, you know—I think the—you know, the hearings, it's sort of just centers around acrimony around like, you know, that—we're against profit, that Gilead is the enemy. Neither is true. Neither is true in that. And I am surrounded by activists, by clinicians, by academics, by policymakers who have all fought tooth and nail with health insurance companies, with Medicaid to make sure that Truvada was covered.

However, what that comes back to is the issue of cost. And even with the co-pay assistance program, again, that has been—that has really been elementary in just ensuring access there, but it really does come down to an issue of cost as to why those programs are even necessary in the first place.

So we're all in this together. We're all looking for solutions here. We're just not—we don't have one good guy, we don't have one enemy. We really have to think about our entire system and how costs manifest across that entire system and what are we going to do about that going forward? Thank you.

Chairman CUMMINGS. Mr. O'Day, do you all—your board—I know it may be out of the ordinary, but does your board ever hear from people like Dr. Walensky and Mr. Horn?

Mr. O'DAY. Well, as you know, I just joined a couple of months ago——

Chairman CUMMINGS. Right.

Mr. O'DAY.—so I don't know the past practices of the board, but——

Chairman CUMMINGS. No, I was just wondering.

Mr. O'DAY. But I think the voice of the patient and voice of the community is represented in the company in very, very meaningful and serious ways. There's many, many community leaders that have joined Gilead, many HIV top physicians that are now part of Gilead. It is a part of the fabric of Gilead in my—if you'll allow me—in my two and a half months, Mr. Chairman, that you feel very connected with all aspects of the continuum of care here. And people take it very seriously. I mean, our role is to develop the next transformational medicine, but it's also to work as a member of this community in a very responsible way, and we take that seriously.

Chairman CUMMINGS. Finally, where are the negotiations with the CDC? Where are they right now? I mean, you did the 200,000. Is that ongoing? Do you follow me?

Mr. O'DAY. Well, yes, I mean, the details of the program, how to implement it, those are all now ongoing. The commitment is clear.

63

And, as you said before, I mean, I think we would respond to other requests for the commitment. But now we're working through the details and trying to get it implemented as quickly as we can.

Chairman CUMMINGS. Mr. Jordan?

Mr. JORDAN. I would just thank our panel and again thank Gilead for the amazing drug they developed and the difference it has made for, as I said earlier, millions of people around the world.

Chairman CUMMINGS. Without objection, letters the committee has received about this issue are entered into the hearing record from a number of organizations, including the Treatment Action Group, the AIDS Vaccine Advocacy Coalition, and the HIV Medicine Association. All of these groups have written to express their concerns about the impact that the high price of Truvada is having on their members, their communities, and the American healthcare system.

Chairman CUMMINGS. I would also like to thank our witnesses for testifying today.

And without objection, all members will have five legislative days within which to submit additional written questions for the witnesses, and they should be submitted to the chair, which will be forwarded to the witnesses for their response. I ask our witnesses to please respond as promptly as you possibly can when you receive those written questions.

With that, the hearing is adjourned.

[Whereupon, at 1:30 p.m., the committee was adjourned.]

○

# EXHIBIT 33

This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

# House Oversight and Reform Committee hearing on HIV Prevention Drug: Billions in Corporate Profits after Mil..,sked FINAL

May 17, 2019 4:19PM ET

TRANSCRIPT

May 16, 2019

COMMITTEE HEARING

REP. ELIJAH E. CUMMINGS, D-MD.

HOUSE OVERSIGHT AND REFORM COMMITTEE HEARING ON HIV PREVENTION DRUG: BILLIONS IN CORPORATE PROFITS AFTER MILLIONS IN TAXPAYER INVESTMENTS

Bloomberg Government

Support: 1-877-498-3587

www.bgov.com

Copyright 2019. Provided under license from Bloomberg Government.

All materials herein are protected by United States copyright law

and/or license from Bloomberg Government, and may not be

reproduced, distributed, transmitted, displayed, published or

broadcast without the prior written permission of

Bloomberg Government.

You may not alter or remove any trademark, copyright or other

notice from copies of the content.

HOUSE OVERSIGHT AND REFORM COMMITTEE HEARING ON HIV PREVENTION

DRUG: BILLIONS IN CORPORATE PROFITS AFTER MILLIONS IN TAXPAYER

INVESTMENTS

MAY 16, 2019

SPEAKERS:

REP. ELIJAH E. CUMMINGS, D-MD., CHAIRMAN

REP. CAROLYN B. MALONEY, D-N.Y.

**Bloomberg GOVERNMENT**

This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

DEL. ELEANOR HOLMES NORTON, D-D.C.

REP. WILLIAM LACY CLAY, D-MO.

REP. STEPHEN F. LYNCH, D-MASS.

REP. JIM COOPER, D-TENN.

REP. GERALD E. CONNOLLY, D-VA.

REP. PETER WELCH, D-VT.

REP. ROBIN KELLY, D-ILL.

REP. BRENDA L. LAWRENCE, D-MICH.

DEL. STACEY PLASKETT, D-VIRGIN IS.

REP. RAJA KRISHNAMOORTHI, D-ILL.

REP. JAMIE RASKIN, D-MD.

REP. MARK DESAULNIER, D-CALIF.

REP. JOHN SARBANES, D-MD.

REP. JIMMY GOMEZ, D-CALIF.

REP. KATIE HILL, D-CALIF.

REP. RO KHANNA, D-CALIF.

REP. ALEXANDRIA OCASIO-CORTEZ, D-N.Y.

REP. AYANNA PRESSLEY, D-MASS.

REP. HARLEY ROUDA, D-CALIF.

REP. JACKIE SPEIER, D-CALIF.

REP. RASHIDA TLAIB, D-MICH.

REP. DEBBIE WASSERMAN SCHULTZ, D-FLA.

REP. JIM JORDAN, R-OHIO, RANKING MEMBER

REP. JODY B. HICE, R-GA.

REP. GLENN GROTHMAN, R-WISC.

REP. JUSTIN AMASH, R-MICH.

REP. PAUL GOSAR, R-ARIZ.

REP. THOMAS MASSIE, R-KY.


This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

REP. MARK MEADOWS, R-N.C.

REP. VIRGINIA FOXX, R-N.C.

REP. JAMES COMER, R-KY.

REP. CHIP ROY, R-TEXAS

REP. BOB GIBBS, R-OHIO

REP. MARK GREEN, R-TENN.

REP. MICHAEL CLOUD, R-TEXAS

REP. RALPH NORMAN, R-S.C.

REP. CLAY HIGGINS, R-LA.

REP. KELLY ARMSTRONG, R-N.D.

REP. CAROL MILLER, R-W.V.

REP. GREGORY STEUBE, R-FLA.

WITNESSES:

MR. TIM HORN, DIRECTOR, MEDICATION ACCESS AND PRICING, NASTAD

DR. AARON LORD, PREP PATIENT AND ADVOCATE

DANIEL O'DAY, CHAIRMAN AND CEO, GILEAD SCIENCES, INC.

DR. RACHELLE WALENSKY, PROFESSOR OF MEDICINE, HARVARD

UNIVERSITY, ON BEHALF OF CHIEF OF DIVISION OF INFECTIOUS

DISEASES, MASSACHUSETTS GENERAL HOSPITAL

CUMMINGS: The committee will come to order. Without objection, the Chair is authorized to declare recess of the committee at any time. I now recognize myself for five minutes to give an opening statement.

Today is our committee's second hearing on the skyrocketing prices of prescription drugs. In our first hearing in January, the committee's very first witness, Ms. Antoinette Worsham, she was a compelling witness. Her 22-year-old daughter died because she could not afford the insulin she needed to control diabetes.

By the way, the insulin costs $333 a month. Let that sink in. For $333 a month, a 22-year-old college graduate died. Her testimony was gut-wrenching. But unfortunately, she is not alone. We've heard other stories just by hers, from our constituents, our friends, and our loved ones.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

Today, we are examining the price of a drug called Truvada. Truvada is a phenomenal drug that presents -- prevents the transmission of HIV through a treatment called pre-exposure prophylaxis or PrEP for short.

At the onset, I want to recognize the efforts of our distinguished colleagues, Congresswoman Ocasio-Cortez. She has been leading the charge on this issue. And it is because of her efforts that we are holding this hearing today. I want to thank her for her phenomenal leadership.

Think about this. We now have a drug that has the potential to end HIV epidemic. This would have been unfathomable at the height of the HIV-AIDS crisis. This is an issue that I've been dealing with and working with communities with on for more than 20-some years.

I've seen many people die. I've seen people who used to be on the choir of my church die. I've seen neighbors die. And we have made these phenomenal strides.

But this statement was developed as a result of investments made by the American taxpayers through the National Institutes of Health and the Centers for Disease Control and Prevention. The problem is that Gilead, the company that now sells this drug charges astronomical prices.

When Truvada was first approved in 2004, Gilead charged about $800 per month, again for this life-saving drug. Since then, Gilead raised the price of this drug over and over and over and over and over again. It now charges about $2,000 for just one month or about $70 per bill. Think about that, a life-saving drug.

In the same period, Gilead has made massive windfalls on this treatment, more than $36 billion in revenues. Let me say that one more time. They made more than $36 billion on this drug alone.

How can Gilead do this? How can our system allow companies to take a drug treatment that was developed with taxpayer funds and abuses monopoly to charge us astronomical prices?

This life-saving treatment would not exist but for the research funded by the CDC and then I -- so how can our system then charge prices that are so outrageous, making $36 billion while there are literally hundreds of thousands of people who need this drug? We're better than that.

These are some of the hard questions we will ask Gilead CEO Daniel O'Day, who is here today. And I'm praying that you do not come and give us the normal rope-a-dope stuff that we usually hear, about the various little programs you got, the coupons you got.

We want the prices to come down. We want the truth. We want to know why it is that the prices are going up astronomically. We want to know what this R&D is all about. We want to know if it's all about vacation, giving doctors vacations and encouraging them to prescribe certain things or not. We need to know all about that.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

We appreciate that Mr. O'Day accepted our invitation to participate. And we anxiously look forward to his testimony. The reason this is so critical is because the CDC estimates that there are 1.1 million people at high risk of contracting HIV who could benefit from this drug, but then only a fraction -- a fraction are getting it.

Use is shockingly low among groups particularly at high risk, including communities of color. It had been impacted by this epidemic. This treatment is available in other countries for much, much less.

In Australia, patients pay less than $7 a bill. Hello. Here, we're paying well over $70. In other countries, they pay -- patients pay less -- even less. This is because Gilead charges less for its treatment overseas than it does in the United States. It is also because Gilead has generic competitors there, but not here.

Finally, let me note that this is a bipartisan issue. HIV has no boundaries. It affects blacks and whites, rural, urban. It is a tough disease.

President Trump recently announced an initiative to end the HIV epidemic within 10 years. This is a laudable goal. However, it relies on this particular drug treatment getting to everyone who needs it.

Gilead recently agreed to donate millions of bottles of this drug, but far short of what we need to save lives. Without addressing the fundamental problem pricing, I'm afraid we simply may not get there.

So we want to work with the president in addressing HIV. But we need to start right here, and we need to start right now. So without further ado, I want to recognize the distinguished Ranking Member, Mr. Jordan, for his comments.

JORDAN: Mr. Chairman, welcome back. And thank you for that -- for this hearing -- this important hearing.

At the beginning of the HIV outbreak in the early 80s, the outlook was just not good. In fact, it was pretty darned bleak. Early treatments were expensive, and frankly, not very effective.

But advancements in medicine in the 38 years since the first reported incidence of AIDS, the United States have yielded hope for those afflicted with this virus. The most important development was Gilead creating and bringing Truvada to market in 2004.

Because of the invention of this, life expectancy for people with HIV is now effectively the same as life expectancy for people without it. I think we can all agree that Truvada is something of a miracle drug. It's a gold standard for preventing and treating HIV. Gilead's invention has been literally life-saving.

Gilead, of course, made money based on its invention. My colleagues on the other side the aisle and some of the witnesses they have invited seem to believe this is some sort of a conspiracy. Rather than applaud Gilead for manufacturing this miracle drug, they wish to demonize the company for making a profit.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

The right to reap the rewards of your invention is so vital that our framers include it in the Constitution. Our intellectual property protections are the crown jewel of the American economy and what makes our nation the most in innovative in human history.

Article 1, Section 8, Clause 8, the Congress shall have power quote, "To promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." The framers knew that individuals would take risk and endeavor to make great things, if they knew they would be rewarded.

Some have you believed that Gilead did not invent this drug or discovered its uses, and that the federal government has equities here for which the company is not accounting. The evidence does not bear this out. And I hope we can use today to set the record straight.

I fear that my colleagues are using today's hearing as a platform to strong-arm private companies making breakthrough discoveries all because they are upset at how markets work. The reality is that while Gilead has made money on this drug, there do not seem to be genuine issues of access. And that is largely due, as the Chairman talked about, to progress made by efforts of the Trump administration.

In the State of the Union address this year, President Trump announced his administration's initiative to eliminate new HIV infections in the U.S. within 10 years. This would be a remarkable breakthrough for public health.

And to that end, just last week, HHS announced that as a result of discussions between the Trump administration and Gilead, the company agreed to donate 2.4 million vials of its PrEP medication annually to the CDC for distribution to treat individuals who are at risk and uninsured.

The company has also agreed, though it is under no obligation to do so, to allow generics to enter the market a year earlier to further help provide access. Of course, the cost of pharmaceuticals is a problem driven by many factors that our committee in the Trump administration hope to tackle in a bipartisan fashion, as the Chairman indicated.

But we will never make real advancements in public health, if the plan is to use false pretenses to attack and vilify those that are making game-changing scientific breakthroughs.

Thank you, Mr. Chairman. I look forward to the discussion from all our witnesses this morning. And I yield back.

CUMMINGS: Thank you very much. I now want to welcome our witnesses.

Dr. Robert Grant, Professor of Medicine at the University of California San Francisco. Dr. Grant led one of the clinical trials demonstrating that Truvada could be used to prevent the transmission of HIV.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

Dr. Rochelle Walensky, the Chief of the Infectious Diseases at Massachusetts General Hospital, and Professor of Medicine at Harvard Medical School. She is an expert on cost-effectiveness in HIV treatment.

Mr. Tim Horn, the Director of Medication Access for the National Alliance of State and Territorial AIDS Directors, who has also worked in HIV treatment advocacy.

Stephen Ezell from the Information Technology and Innovation Foundation.

Mr. Aaron Lord, a PrEP user and founder of PrEP for All. Dr. Lord's personal experience led him to advocate on behalf of others. And we're glad to have him with us today.

And finally, Mr. Daniel O'Day, Chairman and Chief Executive Officer of Gilead Sciences, Inc.

Now, if you all please rise and raise your right hands, and I will now swear in the witnesses. Do you swear or affirm that the testimony you are about to give is truth, the whole truth, and nothing but truth, so help you God?

(OFF-MIKE)

CUMMINGS: Thank you very much. Let the record show that the witnesses answered in the affirmative. You may be seated.

The microphones are quite sensitive, so please speak directly into them. Without objection, your written statements will be made part of the record.

With that, Mr. Grant, you are now recognized to give an oral presentation of your testimony. Please note that I would ask that you stay within -- all of you, stay within the five-minute limit.

And before you start, Ms. Ocasio-Cortez, I mentioned before you got here, that you were a main driver in making sure that this hearing happen today. I want to thank you for your leadership.

All right. Dr. Grant.

GRANT: Chairman Cummings, Ranking Member Jordan, and members of the House Committee on Oversight and Reform, I'm pleased to testify today on how the promise of PrEP remains unfulfilled.

I devoted the last 20 years of my career to the development of PrEP. I am here today at my own expense because I promise the PrEP would become available if proven. We have not kept that promise. I come today to ask for your help.

My PrEP research was funded by grants from the NIH starting in 2002. I later received supplemental funding from the Bill and Melinda Gates Foundation. Our research was funded -- other researches were funded by NIH, CDC, and Gates.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

The U.S. government provided the majority of funds for PrEP research investing hundreds of millions of taxpayer dollars. Furthermore, CDC scientists discovered that adding a drug called FTC to tenofovir increased protection. And it's the combination of those two medications which FDA approved today.

The CDC scientists also demonstrated the pre-exposure dosing added substantially to the protective events. And it's these inventions that led to CDC government patents that were awarded several years ago.

Gilead did not provide leadership, innovation, or funding for PrEP research. Gilead's role was limited to donating study drug and placebos. In my experience, Gilead proved to be a hesitant partner on PrEP research.

For example, Gilead made public in 2005 they (ph) would not seek FDA approval for PrEP, no matter what the data show. Although not supporting the research with funding or innovation, Gilead took steps to limit research on alternative and computing PrEP agents.

In particular, there was interest in 3TC, a competing drug because it was about to go off-patent. Interest in 3TC PrEP dissipated with assurances that Gilead's Truvada would be generically available by the time efficacy trials were completed.

Eight years after the completion of U.S. government-funded efficacy trials, generic Truvada is still not available in the United States. PrEP scale up has failed. PrEP demand in the U.S. had the tipping point in 2013 and then plateaued in 2016.

Currently, only 1 in 10 people who could benefit from PrEP are receiving it. What little access has occurred is not fairly distributed. For example, black people suffer 44 percent of new HIV infections while only 10 percent of PrEP users are black. Gilead has had seven years to get PrEP marketing rights. It's time we try something else.

Our struggle against HIV is stuck. HIV is not stuck. HIV infects nearly 40,000 Americans every year. There's been no decline since 2016.

In my experience, the root cause of low PrEP access is the high price. Other barriers to PrEP access arises consequences of the exorbitant drug prices. These factors may include fragmented insurance coverage, lack of awareness by providers and potential uses and its stigma. At a competitive price, people would feel at ease to provide and use PrEP.

PrEP can be manufactured and distributed for $6 per person per month, $6 per person per month in manufacturing and distribution costs. Gilead charges more than $2,100 per person per month, a 35,000-percent markup.

Gilead's prices continue to increase every single year. The price of Truvada increased 76 percent since I published evidence of PrEP efficacy in 2010, using U.S. government funding.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

You might hear that no one pays list price. This is not true. The University of California Student Health Services pays full price for PrEP. And it is their largest drug expense.

All populations have multiple competing needs related to heart health, cancer prevention, mental health, substance use, reproductive health, and so much more, should any public-health jurisdiction pay a 35,000-percent markup for a drug that addresses only one of these concerns, hard choices have to be made in public health. And they are made.

However PrEP becomes an easy choice, if it is available at a competitive market price. For example, three states in Australia purchase generic PrEP for $8 per person per month after competitive process. What followed was the largest and fastest PrEP scale that the world has ever seen.

I believe that there are actions that you could take -- that this committee could take at this time that would make PrEP available. PrEP continues to be underutilized, despite seven years of drug donations, community grants, and assistance programs. The market price would change the game.

I ask you to consider three actions. This committee could insist that taxpayers' benefit from U.S. government intellectual property. Second, you can scrutinize agreements between originator and generic manufacturers for anti-competitive practices such as pay-for-delay. Believe that these actions would take PrEP off the shelf and stop HIV at a price that we all can afford. Thank you.

CUMMINGS: Dr. Walensky.

WALENSKY: Good morning, Chairman Cummings, Ranking Member Jordan, and members of the committee. My name is Dr. Rochelle Walensky. I'm a Professor of Medicine at Harvard Medical School, Chief of the Division of Infectious Diseases at Massachusetts General Hospital, a practicing clinician and a researcher on the cost effectiveness of HIV care, both in the U.S. and internationally.

In 1995, we told patients with AIDS, they would with certainty die. AIDS plagued my internship. By the end of the year, we had an FDA-approved HIV cocktail, three drugs up to 14 pills a day, which, if taken without fail, allowed AIDS patients to live.

At the time, the three drugs of the cocktail cost a total of $15,000 per person per year. And our research team reported its cost effectiveness. We demonstrated it was good value for money.

Today, we definitively have the tools to end this epidemic. The HIV three-drug cocktail termed antiretroviral therapy is frequently co-formulated into a single daily pill. The regimen has high resistance barriers, that's good. They have low toxicity profiles, that's also good. And projections suggest a normal life expectancy for adherent patients with HIV.

We also know that people who take these drugs and effectively suppress their virus cannot transmit it to anyone else. But the cost of these drug regimens today is $40,000 to $50,000 per person per year, a 300-percent increase in 25 years.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

Truvada is a co-formulation of two of these three drugs used for treatment, scientifically known as the combination tenofovir disoproxil fumarate and emtricitabine. It was FDA approved for HIV treatment in August 2004. And has since then been a mainstay of HIV care.

In 2012, following remarkable scientific work, much of which was led by Dr. Grant, the FDA approved the expanded indication of Truvada for pre-exposure prophylaxis or PrEP for HIV prevention.

The cost of Truvada when FDA approved in 2004 was $7,800 per year. Today, it cost $20,000 per year. A similar drug combination is available internationally at a cost of $60 per year.

Please understand I'm not proposing that this is what the price should be in the United States. I simply provide that benchmark for a national pricing to put it into global context.

In his February State of the Union Address, the president announced initiative to end the HIV epidemic. This will not be easy. The benchmarks for the End the Epidemic Initiative are decrease in the number of new HIV infections by 75 percent in five years, and by 90 percent by 2030.

Our research group has published work highlighting that even if we get 90 percent of people with HIV diagnosed, treated, and virologically suppressed, we can only decrease the number of new infections by 40 percent. In short, to end this epidemic, we need both treatment and prevention.

Aside from treatment, PrEP offers the most effective -- efficacious prevention intervention known. Make no mistake, even if it was free, PrEP is difficult. In addition to drug adherence, it requires quarterly doctor visits for HIV testing, sexually transmitted infection screening, and laboratory monitoring. But right now, the biggest problem with PrEP is access.

The CDC estimates that more than 1.1 million people in the United States are at high enough HIV risk to warrant PrEP. Fewer than 150,000 have ever received it. Over 75 percent of those are white gay men in the Northeast on the West Coast.

But today's controlled HIV epidemic is rampant among black gay men and continues to disproportionately affect women of color, especially in the South. In 2016, it was estimated that one in two black gay men would be diagnosed with HIV in their lifetime. We need prevention tools like PrEP to reach these marginalized populations, if we are ever even going to make a dent in this epidemic. Never mind to reach the auspicious end the epidemic goals.

The sale of Truvada has resulted in profits of $36 billion. And Truvada unchanged has been a price increase of the 150 percent since 2004. That price tag is simply too high. We have the scientific tools to end this HIV epidemic. And we are fortunate that pharma has developed these drugs to get us there. They have already profited enormously.

Now, in the spirit of saving lives, of preventing new infections, of realizing a public health -- putting forth a cohesive public-health response and realizing a presidential call to action, I simply ask that these drugs be reasonably priced, so that those most marginalized and at risk can reap their benefits.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

And finally, I would like to applaud Congress for holding this hearing and bringing this issue to the forefront in the public dialogue. I hope that some of these companies, including Gilead will begin to do the right thing. It's never too late for that. Thank you.

CUMMINGS: Thank you very much. Thank you very much. Mr. Horn.

HORN: Thank you and good morning. Chairman Cummings, Ranking Member Jordan, and members of the committee, my name is Tim Horn. And I'm the Director of Medication Access and Pricing at NASTAD, which is the National Alliance of State and Territorial AIDS Directors. I'm very pleased to be here today to offer testimony on PrEP access and pricing in the United States.

NASTAD is a nonpartisan, nonprofit association that represents public health officials who administer HIV and hepatitis programs in the U.S. and around the world. We represent public health officials in all 50 U.S. states, the District of Columbia, the U.S. territories, and several local jurisdictions.

I would like to focus my comments today on the intersection of the high cost of Truvada as PrEP and the need for effective, comprehensive, affordable, and importantly, sustainable public-health approaches to HIV prevention in the United States.

Now, our ability to respond to the needs of people who have been diagnosed with HIV is one of the greatest examples of effective public health in the United States. The Ryan White HIV AIDS Program ensures access to not only comprehensive state-of-the-art care, but importantly, low or no cost treatment made possible with significant discounting provided to AIDS Drug Assistance Programs, or ADAPs.

ADAPs ensure treatment for nearly a quarter of all people living with HIV in the United States. The vast majority of whom are living at, below, or near the federal poverty level.

Now, one thing I want to emphasize here is that there is no such comprehensive federal medication program for people at risk for HIV. And I just want to be clear the only difference between someone living with HIV and someone at risk of HIV is a diagnosis. Those vulnerable to HIV infection face the exact same barriers to affordable medication in the United States.

We are failing populations at highest risk for HIV infection, including young black and Latino gay men, women, and transgender individuals. We are failing them because we have not built a payment and culturally appropriate delivery systems that are best able to reach them.

There are many reasons for the low uptake of PrEP in this country, but financing and pricing, the subject of today's hearing, are undoubtedly among them.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

In order to end the HIV epidemic, we must build systems that provide access to PrEP for all populations. Now, our current PrEP system, particularly for uninsured and under-insured people vulnerable to HIV infection is essentially built on the back of Gilead's Medication Assistance Program for those who are uninsured and meet strict financial eligibility criteria, along with the company's co-pay assistance program for individuals who are commercially insured.

Now, while this program have undoubtedly helped extend access to the medication component of comprehensive PrEP services, they have also succeeded in largely masking the impact of the high price of Truvada. To be clear, these programs are not a substitute for functioning public-health and healthcare systems.

Partnerships with pharmaceutical manufacturers will always be important, but outsized dependency on their generosity, which in turn is dependent on the bottom-line is, by no means inequitable and sustainable solution.

Now, the 340B drug pricing program has also played an important role in allowing public health programs and their community partners including federally qualified health centers to afford PrEP while -- while extending federal resources as far as possible.

But it doesn't go far enough. Even if we assume that the price available to 340B entities in the U.S. is 75 percent to 80 percent below the list price, this still translate into approximately near $400 per month per person, a price that is at least four times higher than what we can reasonably expect with robust general competition.

Additionally, 340B pricing Truvada as PrEP is only available to some health departments and family planning clinics, and is not available to other institutions where PrEP may be a significant benefit.

Gilead Assistance Programs, the 340B programming -- discounting, and the recent announcement of donated PrEP will continue to help expand access to PrEP. However, a long-term sustainable approach to PrEP access requires a competitive generic market.

To this end, we believe federal, state, and community partners should be cautious, not only to -- not to allow the present and future of existing measures to build an artificial market for Gilead's Descovy, which is expected to be approved for PrEP by the end of this year. Doing so will undercut the ability of the generic market for generic versions of Truvada to bring down costs for our public payers, commercial payers, and most importantly, people vulnerable to HIV infection.

Importantly, a lower cost of PrEP would allow for more affordable procurement and expanded access across a variety of settings, including state and local health departments, family planning clinics, and STD clinics.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

And I want to underscore Dr. Grant's point. The list price of Truvada is the price that some of our most important programs do in fact pay. Not only has the high cost of Truvada been a barrier in scaling up affordable access to PrEP by these programs, they have required some programs to reallocate funding from other public health initiatives to meet HIV prevention priorities.

I do want to conclude by thanking the committee for the opportunity for the opportunity to testify today and for initiating a dialogue that hopefully will be to the betterment of people vulnerable to HIV infection and other intersecting conditions. Thank you.

CUMMINGS: Mr. Ezell.

EZELL: Good morning, Chairman Cummings, Ranking Member Jordan, and members of the committee.

I'm Stephen Ezell, Vice-President of Global Innovation Policy at the Information Technology and Innovation Foundation. We're a nonprofit, nonpartisan Washington, D.C.-based science and technology think tank. I appreciate the opportunity to testify in the panel this morning about the U.S. life sciences and innovation system.

The United States clearly leads the world in life sciences innovation. For instance, in the 2000s, U.S. headquartered enterprises generated more new to the world drugs than enterprises from other nations combined.

And over the past two decades, U.S. companies have accounted for almost half of the world's new drugs, including treatments such as for leukemia, skin cancer, inherent blindness, and a set of treatments for HIV-AIDS that have made a disease that was once a (inaudible) now treatable, and hopefully will have a full cure in years to come.

However, it was not always that way. In fact, in the 1970s, the United States was a global author (ph), ran the life sciences innovation, as European headquartered companies invented twice as many new to the world drugs as ours did in the 1970s.

What's changed over the past four decades has been a concerted and intentional set of policy choices designed to make America the world's leader in life sciences innovation. Those policies are anchored in three key factors.

First, robust and complementary public and private investment in life sciences R&D, effective mechanisms to facilitate the transfer of technology from universities and other laboratories to the private sector for commercialization, underpinned by strong intellectual property rights such as embodied in the Bayh-Dole agreements, and a drug pricing system that allows companies to earn revenues that can be reinvested into future generations of medical innovation.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

The U.S. invest by far more than any other nation in life sciences R&D. In fact, analyst estimates that the United States has invested 70 to 80 percent of global biomedical R&D investment over the past two decades.

It is anchored by federal government investment of about $39 billion a year into basic life sciences research that focuses on understanding fundamental processes by which diseases develop and transmitted, or identifying biomarkers indicating the presence of disease. This basic research creates a platform for innovation, potentially leading to the discovery of new medicines, tests, and procedures.

The private-sector compliments this public sector investment, with in some years, close to $95 billion in annual R&D, focused on the applied research and clinical trials necessary to bring safe and effective breakthrough drugs to market. The fact is this drug development process is lengthy, risky, and expensive. Studies vary. And I'm happy to share results of several with the committee.

But research finds that, on average, developing a new pharmaceutical compound takes an average of 11.5 to 15 years at a cost of $1.7 billion to $3.2 billion. It is absolutely vital to recognize that public and private investments are complementary.

A recent Journal of Nature (ph) article estimates that, on average, biotechnology companies invest $100 in development for every $1 the government invests in research leading to a specific drug. If you take the case of the breakthrough anticancer prostate drug -- prostate cancer drug, Xtandi, developed primarily by Astellas and his partners, it is estimated that about $2 million in federally funded research conducted at UCLA was complimented by over $900 million of private-sector investment required to bring Xtandi to market.

That's a nice example of the almost 300 new drugs, vaccines and devices that have been developed as a result of public-private partnerships facilitated in part by the Bayh-Dole since its enactment in 1980.

Just like semiconductors, movies, or music, life science is an innovation-based industry. Meaning that companies occur extremely high upfront fixed cost of initial design and development that must be recouped. Amidst failure rates that approached 95 percent.

Moreover, these companies fundamentally depend upon the profits earned from one generation of innovation, the finance investment in the next. Hopefully, Gilead's investments in HIV-AIDS drugs will generate profits that enable its ongoing efforts in areas like hemophilia and oncology to generate breakthrough treatments tomorrow.

This dynamic is why America's life sciences sector is the world's most R&D intensive, investing 44 percent of its value added in subsequent R&D. The reality is that there is a direct link between pharmaceutical company revenues and their ability to reinvest in future generations of innovation. They are intimately and costly linked.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

In conclusion, a key reason why the U.S. life sciences innovation system has been so successful is that we've created a framework for effective public-private partnerships where each party contributes what it does best.

Public research using (ph) stock of knowledge that can be innovated upon by the private sector, investing the hundreds of millions required to bring an innovative new drug to the market.

Thank you for your time today. And I look forward to answering your questions.

CUMMINGS: Thank you very much. Dr. Lord.

LORD: Chairman Cummings, Ranking Member Jordan, and members of the committee, I thank you for inviting me here today to testify.

My name is Aaron Lord. I am here today as a physician, as an HIV activist, and a cofounder of the PrEP for All Collaboration, as well as a proud gay man.

I was born and raised in West Virginia. I attended Georgetown University on federal scholarship. I then attended medical school at Columbia. And I'm currently an assistant professor at NYU. But I am not here in my official capacity.

Since realizing I was a gay man in my early teens, like so many in my community, I lived in fear of acquiring HIV. The reality hit all too close to home when early on in our relationship, my future husband who I cherish and love dearly was diagnosed with HIV.

In July, 2012, the FDA announced the approval of Truvada as PrEP. It's the first drug approved to prevent rather than treat HIV. It is highly effective, reducing risk by over 99 percent when taken as prescribed.

Since 2012, I've taken Truvada every day to protect my health and the health of my community. With this medication, I no longer have to live in fear.

Despite PrEP's remarkable efficacy, the number of new HIV infections in the U.S. remains the same today as when PrEP was approved in 2012, with one person becoming newly diagnosed every 15 minutes. We know it doesn't have to be this way. We know that when PrEP is made universally accessible at no cost, new HIV infections dramatically decreased.

In Sydney Australia, new HIV infections decreased by 25 percent statewide in one year, where public health officials use low or no cost PrEP to reach all those at risk. In the U.S., however, we are failing to reach those most vulnerable.

With mere fractions of at-risk women and black and Latino men getting PrEP, and rates in use in the South remains stubbornly low, too many of us are still living in fear. A root cause of this problem is the price.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

Gilead sciences who makes the only PrEP available in this country charges us over $2,000 a month, or over 400 times when FDA approved generics cost internationally.

And while Mr. O'Day will certainly state that his company has earned the right to charge such exorbitant sums, Truvada as PrEP is not Gilead's invention. Truvada as PrEP is an invention of the U.S. government, whose research and development was funded exclusively by U.S. taxpayers and the Gates foundation, and is protected by multiple robust patents issued to the CDC.

Even the very patterns that Mr. O'Day currently uses to prevent the American people from accessing generic Truvada are themselves based on research funded by the U.S. taxpayer.

Price is not the only barrier preventing people from using PrEP, stigma, racism, homophobia, transphobia, sexism, poverty. They all play a role. These barriers can and must be mitigated, but we cannot do it of our healthcare system spends over $20,000 a year on Mr. O'Day's drug, instead of spending on precious programming to fight these barriers. Mr. O'Day, we are suffocating under the weight of your company's pricing.

Mr. O'Day, for a figure far less than $2.6 billion, which is what we spend on your egregiously overpriced medication every year, we can have a national far-reaching PrEP program that guarantees every person who needs it can get it, including free medicine, clinical care, lab testing, and transportation. And we can still have half a billion left over from community organizations to fight these barriers.

Mr. O'Day, you have given the American people a very bad deal for our money. We have learned all too well from Gilead's past misdeeds what happens when they are left to their own devices. As the Wyden-Grassley report so vividly showed Gilead's pricing of their cure for hepatitis C at $1,000 a pill was aimed to do one thing, maximize their profit.

The consequences of that unmitigated greed resulted in a public health disaster. Despite spending $50 billion of our hard earned dollars buying overpriced medication, the number of new hepatitis C infections more than tripled.

I'm here today to say that HIV activist will not stand by and allow this to happen ever again. So ladies and gentlemen of the committee, I ask you, as a representative of my community, as a proud American, as a scientist, and as a patient, to join me in asking Mr. O'Day. What justification do you have for charging $2,000 a month for Truvada as PrEP when the American people under the innovation of the molecule invented its use as PrEP and funded four clinical trials to prove its efficacy?

Mr. O'Day, we do not ask for your company's charity or for tax-deductible donations that meet your company's needs, but failed to meet the needs of our communities. Rather, we ask Mr. O'Day, why not lower the price of Truvada to $15 a month right here today at this hearing.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

Members of Congress, the American people have invented a way to end the HIV epidemic and that we should be very proud of. And we look to you today to ensure that every single person in this country can protect themselves from this plague. Thank you very much.

CUMMINGS: Thank you very much. Mr. O'Day.

O'DAY: Good morning, Chairman Cummings, Ranking Member Jordan, and members of the committee.

My name is Daniel O'Day. I recently joined Gilead as its new Chief Executive Officer. Thank you for the opportunity to be here today.

Gilead is an American biotech company that for the past three decades has been focused on creating therapies that prevent, treat, and cure some of the world's worst diseases. To name just a few examples, Gilead invented the first once daily pill to secure hepatitis C, Tamiflu for influenza, and the first and currently only FDA-approved HIV prevention medication, Truvada, along with 10 other drugs used in the treatment of HIV.

When I decided to become CEO, I had long admired Gilead's remarkable contribution to healthcare and the high level of innovation behind their medicines. Importantly, I knew I was joining a company that was committed to the interest of patience and dedicated to pursuing scientific excellence to prevent and cure diseases.

All of this is evident in Gilead's approach to HIV, the commitment to developing HIV medications that are safer, more patient-friendly and more effective. Gilead researchers have made contributions that fundamentally change the course of the HIV-AIDS epidemic, transforming the disease from a death sentence to a manageable chronic condition.

Gilead was founded in the midst of the AIDS crisis. At that time, people living with HIV were required to take a cocktail of 20-plus pills each day to treat the disease. Many of these drugs led to serious often debilitating side effects. And even when taken as directed, the therapies offered an average life expectancy of less than 40 years of age, with most people dying within just a few years of contracting the disease.

In the early 1990s, Gilead began working to invent a single pill HIV treatment. Following nearly a decade of work, about $6 billion invested in research, $1.1 billion of which was devoted specifically to Truvada, Gilead launched Truvada as one of the first fixed-dosed combination pills for HIV treatments in 2004.

Today, Truvada and other Gilead medicines have contributed to nearly doubling the average life expectancy of people with the disease. Although Truvada was initially approved to treat HIV, researchers and public health officials knew for years that anti-retrovirals drugs like Truvada could also be used to prevent HIV infection, a technique referred to as PrEP.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

With this in mind, Gilead supported clinical trials that ultimately led to the approval of Truvada, the first and currently only medication approved for PrEP. To be clear, despite suggestions otherwise, Gilead invented Truvada, no one else.

Gilead developed the two drugs that are combined in Truvada, invented the combination that allow these drugs to be taken as a single pill, and invented the drugs used to treat HIV in combination with other antiviral drugs.

I'm going to address the use patents on PrEP granted to the CDC. Using Truvada for PrEP was well known in the scientific community, long before CDC claimed it as an invention. We believe the CDC patterns are invalid, but we've chosen not to challenge those patents because we value our collaborative relationship with the agency.

Finally, I want to address access to Truvada. Gilead is committed to ensuring that every American who needs Truvada can obtain it. We offer a wide range of programs to help ensure that people have access to Truvada when they needed.

For example, 98 percent of people who use our co-pay assistance program have no out-of-pocket costs. In fact, according to the CDC's own estimates when taking our programs into account, less than 1 percent of Americans who would benefit from PrEP are in need of a financial assistance to obtain Truvada.

Moreover, we continue to work with advocates, providers, and governments to remove the societal and other barriers to broader PrEP usage. Last week, we took another important step for expanding access by donating Truvada for up to 200,000 uninsured Americans each year.

We are committed to ending the HIV epidemic. We will work with Congress and others to further expand access to PrEP. And we will continue our scientific research in pursuit of a cure.

In representing Gilead, I can assure you that we take our responsibility in HIV extremely seriously and will ensure you that this is always evident in our actions. Thank you for the opportunity to provide this testimony today. And I would be pleased to answer your questions.

CUMMINGS: Thank you very much. I now recognize Ms. Ocasio-Cortez for five minutes.

OCASIO-CORTEZ: Thank you. Thank you, Chair. Thank you for agreeing to hold the hearing. And while I appreciate your generosity in acknowledging the role our office played in the hearing, I also have to give credit to the countless advocates and activists that have been uplifting the issue of the price of PrEP.

And that's to say that it's -- it's not because of me we're having this hearing, even in our opposites. It's because of a 23-year-old staffer Ms. Claudia Pagon Marchena, who first dug into -- who first noticed this, who first listened to the actual activist that raised this issue.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

She took the opportunity to pursue it. And if it wasn't for the openness and willingness of your leadership and committee staff to take her concerns seriously, we wouldn't be here today. And so, I just think it's an incredible testimony to despite the powerlessness we often feel in this political moment, it shows that everyday people, no matter your age or your identity, to make changes. And that's the reason why we're having this hearing today. So, thank you.

I also before I begin would like to submit to the Congressional record, New York City Council Speaker Corey Johnson, who himself is HIV positive, his testimony to the Congressional records. So, I seek unanimous consent.

CUMMINGS: Without objection, so ordered.

OCASIO-CORTEZ: Thank you so much. So let's -- let's get down to the -- to the core of this hearing.

Truvada -- Dr. Grant, Truvada to for PrEP is the only known drug that can prevent the transmission of HIV, correct?

GRANT: It is the only medication that's been approved by the FDA. It is also known that tenofovir alone is prophylactic for HIV.

OCASIO-CORTEZ: Thank you. And it was -- Dr. Grant, it was your NIH-funded research on PrEP that built on the earlier research work patented by CDC researchers. Is that correct?

GRANT: Yes, my clinical trial was informed by CDC research in two ways. One, the CDC demonstrated that the pre-exposure dose was added to the efficacy of the -- of PrEP.

OCASIO-CORTEZ: Thank you. Thank you, Dr. Grant. And I would also like to seek unanimous consent to submit to -- to submit this Yale School of Law study into the Congressional record, which concludes that the CDC's patents for PrEP were both valid and enforceable.

CUMMINGS: Without objection, so ordered.

OCASIO-CORTEZ: Thank you very much. Dr. Lord, thank you for your advocacy here today. Is it true that the public invested $50 million to develop PrEP?

LORD: That is correct.

OCASIO-CORTEZ: It is also true that Gilead relied publicly -- relied on publicly funded trials to obtain FDA approval?

LORD: Yes. If you look at their supplementary new drug application, you'll see that every sponsor of the Truvada S PrEP (ph) was a non-Gilead sponsor.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

OCASIO-CORTEZ: So, the public invested to develop the drug. The public invested and funded the trials for FDA approval. Is it true that the pharmaceutical companies forced the public to pay twice? First, when investing in drug discovery, but then, it looks like the patient assistance programs that they tout very often also have a public investment pieces as well, right? How are these public assistance programs funded?

LORD: Yeah. So, you know, I think as far as like the co-pay assistance program goes, it is important to also know that it only exists in its current state due to the work of activists. We have work for years to get them to increase from initially a $300 a month co-pay assistance, which left people with hundreds, if not thousand dollars of co-pay per month. And then, they really only increased it to $4,800, after additional years of activist pressure. And that has still left thousands of dollars of donut hole potential for some patients.

OCASIO-CORTEZ: Thank you.

LORD: And it only took a New York Times' op-ed that we published, you know, to threaten march-in rights on this drug in order to get them to raise it to the $7,200.

OCASIO-CORTEZ: Thank you.

LORD: Which is still not enough.

OCASIO-CORTEZ: Thank you. And even when it comes to when folks can't access PrEP because it's so expensive, and we spread, you know, the HIV epidemic continues, that also comes at a public cost, right?

So -- so the public is paying -- we paid to develop PrEP. We paid to finance the publicly funded trials to develop this drug. We also pay and foot the bill with patient assistance programs. Also, as you noted the existence of these existent -- of these programs happen because of the public. And also, we pay when HIV epidemic gets spread as well.

Very quickly, Mr. O'Day, you're the CEO of Gilead. Is it true that Gilead made $3 billion in profits from the sales of Truvada in 2018?

O'DAY: $3 billion in revenue.

OCASIO-CORTEZ: Oh, yes, in revenue. Thank you. And very quickly, the current list price is $2,000 a month in the United States, correct?

O'DAY: The current list price is $1,780 in the United States. And just to correct, the $3 billion was a global figure.

OCASIO-CORTEZ: OK, I see.

O'DAY: For Truvada and PrEP.

OCASIO-CORTEZ: So, the list price is almost $2,000 in the United States. Why is it $8 in Australia?

This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE



O'DAY: Truvada is -- it still has patent protection in the United States. And then, in the rest of the world, it is generic. I can't comment on the price in Australia of the generic medicines. But it is generically available in other parts of the world and will be generically available in the United States as of September in 2020, based upon Gilead agreeing to -- to support generic entries one year early.

OCASIO-CORTEZ: Thank you. So, I think it's important that we notice here that we, the public -- we, the people, developed this drug. We paid for this drug. We led and developed all of the grounding patents to create PrEP. And then, that patent has been privatized, despite the fact that the patent is owned by the public.

We refuse to enforce it. There is no reason this should be $2,000 a month. People are dying because of it. And there's no enforceable reason for it. We own the intellectual -- the core intellectual property for it. And as a result, people's -- people are dying for no reason, for no reason to develop this drug.

CUMMINGS: The gentlewoman's time has expired.

OCASIO-CORTEZ: Thank you very much.

CUMMINGS: Mr. Armstrong.

ARMSTRONG: Thank you, Mr. Chairman. And I agree. I believe that prescription drug pricing is -- it's a conversation that I get. It's one of the biggest ones we get in our constituency or in our office, both in D.C. and back in our offices in North Dakota. And it should be a bipartisan endeavor.

And in fact, we've had a package of prescription drug pills bills that have come through two committees here. And I know in at least one they passed unanimously. But unfortunately, we're in D.C., never allowing -- never allowing a political opportunity go to waste, they're going to get marked-up in Rules Committee. And we're going to vote on bills this week that just quite frankly, have no chance of becoming law.

So when we talk about bipartisanship, we have two sets of packages that could come to the floor clean this week that would pass. They passed the Senate. The president can sign them by the end of the month. But that's not going to happen.

So, Mr. O'Day, it's been said that NIH spent $51 million on clinical trials for PrEP, is that correct?

O'DAY: Thank you, Congressman. Yes, it is important to point out that Gilead has spent $1.1 billion developing this medicine. Gilead has the patent on this medicine. And in the course of the PrEP indication, it's also important to take us back to that period of time of history with the HIV-AIDS epidemics.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

It was a time when prevention of AIDS was actually something that was highly controversial, both from a scientific standpoint resistance, but also from public advocacy. Because there were questions around the morality of providing preventive medicine that could take away from safe sex practices and others.

So this was a public health question that needed to be answered. And we partnered with several members of the community. It's a very complex topic. For the PrEP indications, we supported it with medicines. We have two of our Gilead scientists that are co-authors on the fundamental -- one of the fundamental trials, the trial that Dr. Grant has spoken to before. And to be an author on these trials in a highly regarded 34-party publication medication -- publication, you need to have sufficient involvement in those trials.

So, Gilead had sufficient involvement on those trials. The NIH provided $50 millions in grants, the Gates' Foundation supplied $17 million in grants. And the Gates' Foundation also independently funded the second trial that was used for the syndication with $70 million as well. So, it was a partnership amongst public and private institutions to get this indication.

ARMSTRONG: And you're -- you said in your opening statement, you provide financial assistance to uninsured patients. How does that work?

O'DAY: So we have two basic programs to help with patients. One is the co-pay assistance program, so patients that have commercial insurance that have a high deductible cost for their medicines, we have a program that supports them.

In fact, patients that access our co-pay programs during the life of the patent that we have of the product, 98 percent of people take nothing out of their pocket when they go to the pharmacy, zero.

The other end of the spectrum, we have deep discounts to government programs that allow patients in Medicaid, Medicare, ADAP programs to access or medicines at 70 to 80 percent discount for the list prices that we've discussed here today.

Finally, for the uninsured patient population that is truly not met by these needs, we've been working with CDC and announced one of the largest ever donations of medicine. Last week, in conjunction with HHS and CDC, by the CDC's own estimates, they've estimated that of the 1.1 million patients that are susceptible to HIV, 200,000 are uninsured.

We have donated, as a result of the announcement last week, for all 200,000 of those patients to receive free Truvada for the next 10 years.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

ARMSTRONG: And I grew up in the early 80s. And I mean, this was -- we've come a long way since then. And we have a long way to go. But I mean, particularly, when we're talking about the uninsured population, as it relates to HIV and access to drugs -- I mean, it's a debilitating, crippling disease. We're working towards prevention. We're working towards cure. But those factors to that uninsured population are unique to this healthcare crisis, are they?

O'DAY: Well, yeah. This is -- this is quite a unique circumstance because of the fact that at the end of the day, there are so many things are getting in the way of people that require PrEP getting PrEP.

There is access to healthcare system for sure. But there's also education -- education for physicians, education for patients. And there is a tremendous amount of stigma associated with this disease, which comes into play for the underserved communities.

And this is something that Gilead has been focused on, provided hundreds of millions of dollars in supporting community associations to try to get at these other root causes of PrEP, in its absolute what's required to help eliminate the disease. I completely agree that we have to attack it from both prevention as well as the treatment standpoint to eliminate this disease. And we're a big part of that.

ARMSTRONG: Thank you.

CUMMINGS: Thank you very much. I recognize myself now.

Mr. O'Day, other drug companies said in the very seat -- that very seat that you're sitting in like Martin Shkreli, and all offer the same excuses and justifications, the same thing. They claim they have patient assistance programs to help those who cannot access the drug. But the truth is someone or somebody is paying for these exorbitant prices. And that impacts everybody in the system. That's one reason the healthcare now is so expensive.

At the end of day, it is the taxpayers who bear the costs of these skyrocketing prices through government programs like Medicaid. Dr. Lord, is it true that in some countries, the generic version of this treatment is sold for a fraction of the U.S. price, is that right?

LORD: That is correct.

CUMMINGS: And how much is it sold for overseas?

LORD: According to the Global Fund, you can purchase this medication for under $5 a month.

CUMMINGS: That's astonishing, yet Gilead is charging around 17 -- close to $1,800 a month.

LORD: Yes.

CUMMINGS: Mr. O'Day, in your written statement, you claim that your company spent $1.1 billion on research and development related to Truvada. But you made $36 billion in revenue when Truvada -- since it was approved in 2004. That's according to your own company's SEC filings.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

Mr. O'Day, do you believe that that is appropriate, do you believe it is moral? You know, somebody said over here, I guess it is a thing of choices. One of my first employees died from AIDS. And I will never forget it. And I described it as dying on installment, it's the mother. It's rough to watch somebody die from AIDS.

But anyway, do you -- you can answer my question.

O'DAY: Mr. Chairman, you know, I'm very sorry to hear about your...

CUMMINGS: Employee.

O'DAY: Employee.

CUMMINGS: He's a person. He's an African-American young male, about 25 years old, dead.

O'DAY: I'm very sorry to hear that. The answer to the question is that we have spent more than $6 billion over the past -- since 2020 on HIV research in general. And in fact, we've -- we've taken the disease from a death sentence to a manageable clinical condition with one pill once a day. But we're not done yet.

We still have medicines because of the fact that we now have the average life expectancy out to 78 years from 40 years. We never anticipated that people would be taking these medicines for decades. And some of the current generations of medicines have kidney and bone effects. But now, our next generations that we're launching will be able to have less of those effects and allow people to live a longer, healthier lives.

And yet, we're not done because we have to get to a stance where people aren't taking the daily pill, rather taking it once a month, once every two months, or we hope we could get to a cure where people could take a limited course of therapy like in HCV 12 weeks, and never have to worry about medicines again.

In order to do that, we have to continue to invest in research for the patent life of our medicines. And of course, when a patent ends, generics come on like they are in other parts of the world.

But during that patent period of time, we also have a responsibility to make sure that Americans get our medicines when they're priced at the level that allows us to reinvest in research. And that's where our access programs of co-pay assistance, the donation to the CDC come in to allow us to make sure the price doesn't get in the way during this period of time of patent exclusivity.

CUMMINGS: Can you tell me quickly about the timing of the donation that you all made or making -- the medication, I think it's the 200,000.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

O'DAY: Yes, Mr. Chairman. So, it's -- it's 2.4 million bottles a year, which equates to around -- the PrEP treatment for around 200,000 patients for up to 10 years. And this includes both our current generation product Truvada as well as our advancement, which may come to market as early as later this year, which allows that better safety profile, if you like, for patients.

CUMMINGS: And how did you all come out with the 200,000? That's what I'm trying to get to.

O'DAY: That was a number that was requested and discussed at the CDC. They acknowledged that in the 48 hotspot communities, District of Columbia, San Juan, Puerto Rico, and seven rural states that that would be where the number of patients that would not qualify for federal programs will be involved in commercial insurance. So that number came from the CDC. And we were happy to support them with that.

CUMMINGS: And so, they have come up with a higher number, it would be quite possible you would have given more. Is that a reasonable assumption?

O'DAY: That's a reasonable assumption. Yes, we're trying to -- to solve the gap that isn't currently covered by our current access programs.

CUMMINGS: Do you -- do you -- you know, Mr. O'Day, something was said here earlier. And I want you to be real clear. I said this to many of the witnesses in the pharmaceutical industry.

I have no problem with you all making a profit. I want you to make a profit. I want you to make a profit because I have seen what research can do.

I have relatives that went -- say for example, from a chronic condition into a cancer -- I mean, from a terminal condition to chronic. I've seen it in a few years. And I also serve with Dr. Gallo on the Human Virology Board in Maryland. So we've been dealing with this a long time.

I just -- but at the same time, I'm talking about the people who cannot get it, you know, the one who can't -- who is going to die and will not be able to attend her daughter's wedding, or the mother who won't be there to see her children grow up, that lady.

And what I'm saying to you is that -- you know, I want to work -- we all want to work with the industry. But it's kind of hard. I mean, you can imagine when we hear about the $36 billion or the $3 billion, I know it's global. I got that, $3 billion.

And then we go back to our districts. And we see people -- and they see the cure. They know the cure. They know something is out there called Truvada. They don't know you. They don't know who is making it. All they know it is something that could save their life. And they're reaching, trying to get it. And then, they hear about these figures. And they say, they just can't get there. They cannot reach it.

And I don't know whether those kind of the things are taken into consideration in the boardrooms. Are they?

© 2019 BGOV LLC All Rights Reserved

**Bloomberg**
**GOVERNMENT**

This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

O'DAY: Absolutely. I can assure you that if there is a patient out there that cannot access Truvada because of financial means, our programs are designed to capture them. I mean, again, we have the co-pay assistance for people with insurance, people without insurance that, you know, make less than five times the poverty level are provided with the medicine for free through our medication assistance program.

CUMMINGS: And who pays for that?

O'DAY: Gilead pays for that.

CUMMINGS: So they cut to -- cut into your profit, is that what you're saying?

O'DAY: It's important to us to make sure that every patient can have access to the medicines. And it's absolutely part of our responsibility.

CUMMINGS: All right. I now recognize Mr. Jordan.

JORDAN: Thank you, Mr. Chairman. Mr. O'Day, what's the difference between Truvada and PrEP?

O'DAY: Truvada is a medicine that's used for HIV treatments and for prevention. It was discovered many years ago.

JORDAN: I guess my question is, is it the exact same drug? It is just used at a different time and in a different way.

O'DAY: The PrEP is an indication -- one of the indications that Truvada is approved for.

JORDAN: Right. But -- so the drug is Truvada. It's used -- and when we say -- because Mr. -- Dr. Lord talked about Truvada as PrEP. It's the same drug.

O'DAY: Yes, it's the same drug. It's the same mechanism. It's the same dose. It's the same...

JORDAN: It just the different use? Different use, different timing?

O'DAY: What Truvada does is it -- is it reduces viral replication of HIV. And that can be effective for...

JORDAN: I just want to be clear for everyone though that I think there could be some confusion that Truvada and PrEP are somehow some different drug. It's the same drug.

O'DAY: Truvada is a drug. PrEP is an -- is one of the indications that the drug is used for.

JORDAN: Right. Got it, OK.

And earlier, Dr. Grant said Gilead did not provide leadership or funding for PrEP in the studies at CDC. Is that true?



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

O'DAY: No, that's not true. I mean, we have nine scientists that were involved in the iPrEx trial itself. It was one of the two trials that went to the FDA to seek approval. And of those, we have two scientists, both are still with the company actually, that were authors in the Primary New England Journal article that is the study.

And to be an author on the New England Journal -- I'm sorry, you must -- you must have involvement in the trial, in addition to the free medicine we provided and the know how.

JORDAN: Mr. O'Day, Gilead developed Truvada.

O'DAY: Correct.

JORDAN: You guys did that all on your own. Gilead participated with CDC on Truvada as PrEP, right?

O'DAY: Correct.

JORDAN: And your drug has made a difference for millions of people all over the world, right?

O'DAY: That's correct.

JORDAN: I mean, I how many -- how many folks do you think have been impacted? I would say people are alive today because of your drug, is that true?

O'DAY: Absolutely. And the 10 other medicines that Gilead makes, absolutely millions and millions of people living with AIDS, and preventing AIDS.

JORDAN: And how long did it take to develop Truvada?

O'DAY: Truvada was -- was a long story. It goes back to the early 1990s. Truvada is a combination of two different medicines, one is called for the sake of simplicity, TDF, and the other one is FTC. So this goes back to the early 90s.

And then into the early 2000s, when FTC was -- was evaluated by our scientists. It is a combination of these two medicines that led to the first approval for Truvada in 2004 after a good decade of 15 years of research and lots of failures, by the way.

I mean, 90 -- 97...

JORDAN: Over -- over a decade of research and trials and all kinds of effort to develop this miracle drug that has saved millions of people all over the planet. My guess is that it cost a few dollars. What did it cost you to develop the drug?

O'DAY: Well, in this case, it cost $1.1 billion.

JORDAN: So billion of dollars to develop this amazing drug.

O'DAY: Yes.

JORDAN: That saved all kinds -- all kinds of folks.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

And now, what do you do with those profits? I think you said you're trying to find a cure, right?

O'DAY: Absolutely. We're investing them back into research. Our scientists and the colleagues are so inspired by Gilead, they will not rest. They will not rest. Good enough was never good enough for them when we had this generation of medicines that had these kidney and bone toxicities.

And we are now launching medicines that are much more tolerable for patients today. But they're not stopping. So, we're looking at long-acting medicines.

JORDAN: Just last week -- just last week, you said for folks who can't afford it, folks who don't have insurance, you're going to give to them free.

O'DAY: Absolutely.

JORDAN: So, just let me get this straight. Over a decade of research, over $1 billion into that research, you developed a drug that saved millions of people, now can be used as PrEP prior to -- this is something after the fact that when people been diagnosed with -- with HIV, the profits you've made from that, you're now working on developing a cure. And just last week, you've announced folks who can't get the access to the medication right now, you're going to give it to them free.

O'DAY: Yes, Congressman.

JORDAN: But you're a bad guy. You're a bad guy. I mean, that's -- that's what we hear from the other side.

Mr. Ezell, is that exactly how it's supposed to work under the Constitution? People come up with a great idea, they go to the patent and trade office, they get a patent for it, they get that patent for a certain length of time to recoup the billions of dollars it costs to make the product or the idea or whatever they did, that's helped millions of people.

It has been great for -- this is one thing that makes America the greatest place ever. And that's supposed to be how it's -- how it's supposed work?

EZELL: That's exactly right, Representative Jordan.

And it's interesting to hear the questions about well how much cheaper is this drug in other countries of the world. Well, part of the problem is that other countries of the world are not as effective in innovating the drugs, because they did not...

JORDAN: They didn't make it. These guys made it.

EZELL: That's exactly right. We've put in place a system...

(CROSSTALK)

JORDAN: I forgot to add one thing. I forgot another thing. They're going to go off patent a year early. Isn't that right, Mr. O'Day?


This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

O'DAY: Yes. Generics will enter one year early.

JORDAN: So one year early is going to lower cost. They don't have to do that. But somehow, they're the bad guy, right?

I just feel that -- I appreciate what you've done. Thousands of people that are being impacted as we speak, the millions of people whose lives have been impacted, the folks who are alive today because of the work you've done. And we're going to beat you up.

So, Mr. Chairman, I appreciate -- I appreciate this hearing. And I yield back my time.

CUMMINGS: I appreciate you. Let me say something. Let me make this clear. Listen up.

Nobody has come in here to beat you up. I want to make that clear. I applaud Gilead. But it's nothing like holding the hand of somebody who is dying from AIDS. I'm sorry.

And all we're trying to do is represent our constituents and help them stay alive. When you're dead, you're dead. And when I think about the fact that Truvada for PrEP is only getting the 10 percent of the people that need it, what about the other 90 percent? What about their families?

I'm not knocking you. I'm just trying to figure out how we can help you get to the people who are dying as we speak. As we speak. We can play all these games, but let me be clear. Let me be clear.

I speak for the dead and the living. And we are simply trying to get again -- I don't know who he is talking about, but I applaud Gilead. I've been dealing with this issue for 27 years. So I know about it.

And I know the problem. I know the pain. And I know the death by installment. So I want to be clear. Who's next?

JORDAN: Well, can I respond, Mr. Chairman?

CUMMINGS: No, no.

JORDAN: We got, like, nine minutes and you just went after...

(CROSSTALK)

CUMMINGS: Ms. Maloney. Ms. Maloney.

JORDAN: Oh, that's wonderful. Thank you.

CUMMINGS: Yes, you have time.

(CROSSTALK)

MALONEY: Thank you, Mr. Chairman. Thank you, Mr. Chairman. I deeply appreciate...

(CROSSTALK)

JORDAN: Will the gentlelady yield just for one second?

MALONEY: No, I will not.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

JORDAN: I wasn't playing (ph)...

(CROSSTALK)

MALONEY: I appreciate the leadership and passion of the Chairman of this committee, Mr. Cummings. And I want to thank the advocates who advocated for it. And my colleague from New York who negotiated this hearing. And I want to ask a question about the 90 percent that the Chairman talked about, the 90 percent of Americans that want to get access to this drug.

And I want to ask Mr. Horn, because how they get access is through the local health care system in our cities and in our states that are dealing with people hands-on everyday. But first, I have to say that I find it a national scandal that we are paying, in this country, $70 a pill, while Australia pays $7 a pill.

How fair is that? And Mr. O'Day, you say that's because Australia negotiated a lower price. Well, we in America are going to pass a law that allows our government to negotiate a better price going forward. And today, we have two bills on the floor that will strike at this problem. It will end the abusive practice of drug companies where they pay to delay the development of generic drugs, a terrible abusive practice keeping affordable drugs from our people.

And the other will stop the practice where drug companies pay to block. They literally pay to block the development of lifesaving drugs here in America, where it was pointed out as the American taxpayer that puts the money in on the ground and starts the research, that then moves forward, and then our people don't have access to it.

So Mr. Horn, I want to ask you. How does this high cost of PrEP limit the ability of states and local health departments and clinics from scaling up and providing the drugs and support to the 90 percent of people who need it that the Chairman mentioned?

HORN: Thank you, Representative Maloney. First, I just want to sort of piggyback in one of your points. And just something that's really important to recognize is what we reconsider where we have the highest number of new infections in the United States. If you overlap that map with another map of where we have not expanded Medicaid, for example, we definitely see where there is a tremendous disparity.

So when we're thinking about those jurisdictions, in particular, this is where we find a number of people who are vulnerable to HIV infection really do become increasingly dependent on this incredibly complex patchwork in order to access not just prep, but all of the services that are required to support PrEP. Lab testing, supportive services, counseling, you know, engagement and care, access to a care provider so on and so forth.

So I also do want to reference that just with respect to -- that cost certainly isn't our only issue. We do have issues with stigma, discrimination so and so forth.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

But when we do take a look at what's happening with health departments, I would just reiterate. For many of our health departments and we do have a number of estates that have actually implemented in state, you know, PrEP drug assistance programs.

The one thing I will point out about that is that these are state-funded programs that are not federally funded programs. Therefore, they do not have access to 340B discounts. And therefore, they are reliant on leveraging the very complex systems in order to guarantee access to PrEP the various services that are required.

MALONEY: I want to say that I have the privilege of representing New York, which has been at the forefront in combating the AIDS epidemic. And according to the city of New York, we've been making some progress, new AIDS-HIV infections in the city decreased by 36 percent between 2013 and 2017. But by increasing access to PrEP and making it affordable, they believe that they can bring new infections to less than 700 cases a year.

This would be a dramatic, dramatic improvement. And I'm afraid that by basing our public health response largely on the generosity of a private company that says they're going to make it affordable, it should be affordable to everyone, to be affordable to everyone.

They shouldn't have to negotiate having access to this drug. It's just putting the whole program in quicksand. It is not there to serve the people. So I want to ask. What do we need to do to make this affordable to people in our public health system, in our cities, in our states, at our clinics, in our local areas, Mr. Horn.

CUMMINGS: The gentlelady's time has expired. You may answer the question.

HORN: OK. We just need to be conscious of cost at all point. I mean we just need to make sure that we are able to procure both PrEP and the services that are required for PrEP at an equitable price, and that we are moving in that direction. We're moving toward generics. And we just need to keep an eye on that. That really is the great unifier in terms of ensuring access to everyone who requires pre-exposure prophylaxis. Thank you.

MEADOWS: Thank you for your service.

CUMMINGS: Mr. Meadows.

MEADOWS: Thank you, Mr. Chairman. Thank each of you for your testimony. I would want to point out since my colleague from New York talked about voting on bills today. Candidly, those bills today are nothing more than a political statement. There are both Republicans and Democrats...

(CROSSTALK)

MALONEY: Will the gentleman yield?



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

MEADOWS: No, I will not. You didn't offer the same courtesy to my friend from Ohio. So I will say this. I am dead serious on actually lowering prescription drug prices and making sure that availability is here. I'm willing and have worked with my Democratic colleagues for us to put bills on the floor that actually are not a product of bipartisanship.

It is not going to solve this problem. And so it's critically important that we allow for the R&D that happens that has groundbreaking drugs that come to market, that they continue, and that we make sure that availability for all Americans and indeed globally are there.

But with that, I'm going to yield the balance of my time to the gentleman from Ohio, Mr. Jordan.

JORDAN: I thank the gentleman for yielding. The Chairman talked about playing games. I'm not playing games. I just want to thank a company that develops a drug that saved millions of people, and not beat them up for that fact. I mean you can look at it -- on one hand you go after them and then you say, "Well, not really going after them."

Look at the title of the hearing, billions in corporate profits after millions of tax -- you're going after them right in the title of today's hearing. Dr. Grant's opening testimony said that Gilead had nothing to do with it. I got an article, peer-reviewed article from New England -- in fact I'd ask unanimous consent, Mr. Chairman, to enter into the record.

CUMMINGS: (Inaudible).

JORDAN: Gilead scientist participated in this. I remember -- any member thanking them for what they've done.

CUMMINGS: I did.

JORDAN: Not till after I did. That's for darn sure.

So look, we want -- my colleague -- we want to -- as my colleague said, we want prescription drug -- we want any drug -- all drug prices to come down. We want that to happen. So let's figure out a way to do it. But I don't know that you do it by going after a company who's developed an amazing drug that has helped so many people and they're taking the profits from that now to working on a cure.

I don't see where that helps us. So anyway, Mr. Chairman, I yield back to the gentleman from North Carolina.

MEADOWS: I thank the gentleman. So Mr. Ezell, let me come to you. Really at this particular point, what we got is one of the greatest R&D abilities in terms of pharmaceuticals on the globe. In fact, most of the world looks to the United States for those groundbreaking drugs, is that correct?

EZELL: That is correct. The U.S. clearly leads the world in both investment life sciences R&D and in commercializing new to world drugs that come out of that R&D.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

MEADOWS: And why do we lead the world in that. Is it just that we have the greatest brainpower? Or why would we lead the world in being able to do that? Why does that come from here and not from some other country?

EZELL: That's a combination of factors as I tried to indicate. First, a really strong complementarity between private and public investment, a lot of cases of public private partnerships bring innovative new drugs to the market.

MEADOWS: So it's our coordination between the pharmaceutical industries, NIH, other areas where we have this to come up and have groundbreaking pharmaceuticals that actually meet the needs of not just the United States, but certainly the world at large, is that correct?

EZELL: That's a large part of it. Also a wonderful STEM talent pipeline, some of the best scientists in the world, and a system broadly that enables innovators to undertake the risky process of investing hundreds of millions, if not billions into a possible new drug and earn for a temporary period of time revenues from those innovations that can then be reinvested into future generations.

(CROSSTALK)

MEADOWS: So strong patents that actually help proprietary investment that many companies make, is that correct?

EZELL: That's correct.

MEADOWS: So if we look at that. One of the number one complaints I get, though, is with the rise of prescription drug prices and why can't I get it cheaper, you know, in the E.U. and other areas. Is it our delivery system at times the way that we've done this? And for me, a lot of this has come on in the last five decades as we've had a number of competing things that have happened with regards to the delivery system.

Is there a way that we can still protect the patents, allow for research and development, and yet make sure that what both the Ranking Member and the Chairman are talking about is that availability to underserved populations? Is there a way to do that without having it a government owned entity?

EZELL: I think -- there's certainly a way to do that without having the government (inaudible). The private sector remains the best engine of innovation in the life sciences. I think there are interesting things we should do.

One thing for instance is we can think more thoughtfully about how to increase R&D efficiency. The biggest problem and the broader drug development system is so many drugs skip to like Phase 3 clinical trials and then fail. And that's a massive cost for both the companies and the system.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

If we could focus on public private partnerships like around translational research that would focus on how they can bring more efficiency to the R&D drug discovery process, that would be a very important way that we can broadly eliminate some of the cost in the drug route discovery system.

MEADOWS: All right. I look forward to working with my colleagues opposite, and I yield back. I thank the gentleman.

CUMMINGS: Ms. Norton.

NORTON: Thank you. Thank you very much, Mr. Chairman. This is a very important hearing, particularly for people who represent districts like mine, the District of Columbia. I'm interested in PrEP because it is, of course, the cornerstone of the administration's HIV plan. So it plans to reduce. It plans to increase the use of PrEP from a paltry 10 percent today to 50 percent within the next 10 years.

So everything is running on PrEP. I can't resist asking you a question, Mr. O'Day. It's a kind of drawn cue (ph) public question. Instead of the donations you're offering, even some of the reductions. Why not simply lower the price of PrEP?

O'DAY: Thank you, Congresswomen. And obviously, your district is extraordinarily important in terms of the HIV elimination, and part of the CDC program that we just agreed for the donation of medicine.

So the answer to the question is that if we had lowered the price of our medicines, even a decade ago, we wouldn't be sitting here today with the innovations that are changing the face of HIV-AIDS.

NORTON: Mr. O'Day, I think you testified that your company earned $36 billion in revenue. And you're telling me that at that rate of revenue -- we just wouldn't have PrEP at a whole?

O'DAY: Without the investment backend research, we wouldn't have PrEP today. And we wouldn't also have the advances that we have with the talented scientists at Gilead looking at long-term.

NORTON: And so that price is justified.

O'DAY: That price...

NORTON: In order to get back any return on what you have invested, in order to develop PrEP, otherwise you'd be at a loss.

O'DAY: Yes. The revenues are invested to a large percent back into R&D. And I just point out that everything that we start in an early phase R&D trial has a 97 percent chance of failing. So exactly to Mr. Ezell's point, this is a very complex iterative process that requires a lot of investment. But more importantly...

(CROSSTALK)



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

NORTON: Well, this one didn't fail. This one didn't fail, just reclaiming my time. So I'd like to go on and find out the feasibility of the use of PrEP by asking Ms. Walensky how feasible is this goal. I mentioned to get from 10 percent to 50 percent within 50 years, after which we've heard Mr. O'Day testify. How feasible that in 10 -- we will get there.

WALENSKY: Thank you. We aspire to laudable goals. This one's going to be hard. And I will tell you...

NORTON: Will reducing the price be necessary?

WALENSKY: I think we need to put PrEP in the water, is I think we need to do in order to get this epidemic under control in the places that don't have access to PrEP. I think, you know, the data from South Wales that said that they were able to decrease incidence by 25 percent. They essentially gave to almost everybody. They did everything that they could to get PrEP to a lot of people.

And so we need to do everything that we can. We know that since PrEP has been available, there has been dent in incidents. It's been unchanged. And so if that's going to be the case, we need to figure out. That 10 percent access hasn't done anything to...

(CROSSTALK)

NORTON: No effect. Mr. Horn, does it trouble you that the administration's plan relies so heavily on the donation of free drugs from Gilead, we're going to get there with these kinds of donations.

HORN: Donations help. They don't solve anything. I'll give you the example. When we have looked at the U.S. response, and I think the response globally, when we took a look at what happened when we had our major innovator manufacturers who were donating drug to low-income countries. That only got us so far.

What was really required there was a reduction in price. Really, that was spurred by a robust generic competition to ensure equitable access and affordability to our programs.

And so let me be clear. I think the donation will help. But it is not the panacea that we require.

NORTON: I just want Mr. O'Day to know that everybody affords you're your donations and charity. But I think we actually prefer you to go back to old-fashioned capitalism and reduce the price. Thank you, Mr. Chairman.

CUMMINGS: Mr. Norman.

NORMAN: Thank you, Mr. Chairman. Mr. O'Day, I appreciate you. You testified and coming up here, you know, you all been put in a position of being a bad guy, I mean, by the questions you're asked. Your company competes with other drug companies. You're not the only company that took to innovation in the time and the effort to go after a treatment, which Congressman Jordan said.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

You're having the people, but ordinarily would not have a chance to live. They're living now. And I'm all for lower in prices. You do that to competition, to capitalism. So I want to thank you for doing that and for really for taking some of these questions, which is really amazing to me.

You know, Australia, the drug that's been quoted for $8. Where were they when the innovation -- where were they -- why didn't they invent the drug? Why didn't they go through trials and the studies that you did over time?

But Mr. Ezell, you're in a good position to, I guess, answer questions as far as the many times that this country has lead in innovation and putting drugs on the market that other countries either couldn't or wouldn't or didn't do. What effect if -- go through the trials that failed and who foots the bill for that with different companies, yours particularly.

EZELL: I'm sorry. Could you restate the question? Could you restate the question? I didn't entirely understand what you're asking.

NORMAN: Could you -- well, my question is part of the reason -- you're in a unique perspective on innovation that's occurring in this country. U.S. is a leader in innovation as I've said. You succeed in bringing lifesaving drugs to the market and you improve the lives of Americans who desperately need them as has been said today.

I think part of the reason is because when drug fails in the pipeline, it's the company primarily who suffers a financial loss. Could you elaborate on this point?

EZELL: Well, essentially and that's exactly right. The simple reality is that the process of bringing an innovative new drug to market is limited (ph), risky and extremely expensive. (Inaudible) studies, must recently from Deloitte estimating that that study shows that over six of the past eight years, the cost of bringing an innovative drug to market has risen.

Now, the average in 2018 was about $2.1 billion. It really is the private sector of the United States. That's the only entity -- at a large scale in the world who is willing to undertake using incredibly risky and expensive investments, and be willing to accept failure rates that, as Mr. O'Day has said, can exceed 95 percent.

We have a system in place to bring talent and capital to the world's most innovative companies, to bring breakthrough solutions to market, and I'd also ask the committee to understand that their deliberations today importantly about the price of Truvada will also have implications for a number of other drugs. Because we care not only, although we care deeply about those patients who suffer from HIV-AIDS, we care about those who are affected by maladies that we currently do not have solutions to.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

And the genius of America's life science and innovation system is that we're able to put in place a system that enables us to invest to try to solve challenges that are currently unsolved by the frontiers (ph) in medical science. And we're the best country in the world doing that.

NORMAN: You're planning for the future and you're reinvesting to help the lives that you're saving already, making it better.

Dr. Walensky, some of my colleagues are advocating for breaking the patent system in the United States as a way to address drugs. Would this work?

WALENSKY: You know one of things that I want to get to is the fact that several people have described that with -- an earlier patent -- earlier going generic, a year earlier, I wanted to emphasize that the only way drugs prices come down in the generic market is that if there's generic competition. So the fact that this is going to be -- the patent is going to be broken a year earlier and there'll be one company making a generic drug is not going to decrease the price of Truvada.

Maybe it will decrease it by 5 or 10 percent, but we're not going to get the discounts that we need, such as the patients who need to access it will be able to access it.

I do think that -- but you know it's not that I don't believe that the companies need to profit. I do believe that companies need to profit. But I do believe we need drugs. We certainly need them in HIV. We need them in antimicrobials. We need them in a lot of different places. But I do believe that Gilead has already profited enough, especially in the context of a presidential call to end the epidemic here, so I think that would work here.

NORMAN: You think you profited enough. And that's your opinion.

WALENSKY: Certainly on this drug for this indication, I do. I do. I think this is a public health mandate, not all...

(CROSSTALK)

NORMAN: Thank you. Thank you so much. I yield back.

CUMMINGS: Mr. Connolly.

CONNOLLY: Thank you, Mr. Chairman. My friend from Ohio, the Ranking Member, has attempted to discredit the purpose of this hearing. And in the process, discredit those of us who raised questions, legitimate questions about the pricing of all the lifesaving drug. I'm here because of one of my best friends, his name was Rick.

He developed AIDS in late 80s when there was no cure. He died when my daughter was just a few months old, 1991. I spent a lot of time with him during the illness. I saw its progression. I saw his suffering. Terrible symptoms, it ultimately went to his brain. And he started hallucinating. Maybe it was a blessing there because he was not any longer aware of the suffering.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

He lost his job because of the illness and was uninsured. And he didn't have access to healthcare. He went to a homeopathic clinic because it was helpful, maybe that would work. It seemed to only make his suffering worse.

So Mr. Jordan, I'm not here to discredit an American company or Mr. O'Day. I'm here for my friend, Rick. I'm here to make sure no American has to go through what Rick went through, and that drugs are available to people who are suffering. And I would say to you, Mr. Jordan, that is a legitimate source of inquiry. I'm not going to yield because I'm going to run out of time unless the Chairman grants me more time. So I just want make that really clear.

Most of us absolutely subscribe to the thought that a drug company has to recover profits because it recovers costs in legitimate R&D that can produce more lifesaving drugs. But the question in front of us is how much is enough. How much -- how high do you go to the point where it becomes a barrier to access? It may help your bottom line, but doesn't help people like Rick.

And I think that's a legitimate form of inquiry. And given that, I want to note that in -- right now, the cost of Truvada is about $70 per day if you're paying full freight. Is that correct, Mr. O'Day?

O'DAY: That's correct.

CONNOLLY: In Canada, it's $5 a day. In Australia, it's $7 a day. And to be fair, in Canada that's generic, for the branded product, it is $20 a day, not $70. Now, they have different systems but it's the same drug.

Mr. O'Day, when Truvada was first approved as a treatment in 2004, you had a list price of $800 per month. By 2012, when you were approved for preventing HIV transmission, that price had almost doubled to $1,400 a month. In your statement today, you claim you did not increase the price of Truvada when it was approved in July 2012, correct? That's in your statement.

O'DAY: There was an increase in 2012. But it was -- over the past -- since 2004, the average increase has been around 70 percent (ph)...

CONNOLLY: But in your statement you said today, you did not increase the price of Truvada when it was approved. And I would suggest, respectfully, that's a little misleading because you had just raised the price six months earlier. And you raised it again six months later.

O'DAY: So Congressman, I understand your point. What I was trying to assert was there was no additional increase to the price as a result of the additional indications.

CONNOLLY: So let me ask a question in terms of corporate deliberations. I worked in the corporate world for 20 years. When you look at pricing and when you looked at pricing, did you have a discussion about, OK, corp. profit, we want to maximize our profit. But on the other hand, we also understand our, you know, community obligation to suffering people.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

And so we have to strike a balance here. Does that factor into the pricing of the drug?

O'DAY: Absolutely, Congressman. And there are four things that we look at critically when we price the medicine. First of all, what's the value of the medicine to the patient and society? The most recent figure associated with the disease, HIV-AIDS that it can cost on average $880,000 per patient to treat that disease. So that's given into context.

The second thing is what are the comparable treatments that are on the market today; the third, and potentially, the most important is exactly to your point. One of the access limitations that might be created by process of setting that price and we anticipate that in advance. And then the fourth one is our commitment to reinvest back in research, not just for this medicine and not just for this disease, but for other terribly devastating diseases that have inflicted Americans in the globe.

CONNOLLY: Well, Mr. O'Day, I appreciate that. And I just want to say I hope today's hearing is something that will give you thought, and it is something that maybe you'll take back to the corporate boardroom to reevaluate the pricing of a drug that so many people need access to.

And I want to thank the Chairman for having this hearing on behalf of my deceased friend, Rick, your deceased employee, and the millions of Americans who have succumbed to this terrible virus. Thank you.

CUMMINGS: Mr. Hice.

HICE: Thank you, Mr. Chairman. Mr. Ezell, could you explain in basic terms the law that addresses intellectual property that comes from federally-funded research?

EZELL: Yes, Congressman. It's called the Bayh-Dole Act. It was introduced on a bipartisan basis in 1980. What it does is it gives universities and public research institutions the rights to innovative that stem from federally-funded research at their institutions.

HICE: And before 1980, before that law, do you have any idea how many patents the U.S. government owned?

EZELL: Yes. So in 1978, the federal government have licensed less than 5 percent of the 30,000 patents owned at the time. There was a massive underutilization and a lack of commercialization of intellectual property and knowledge that was sitting in laboratories across the United States.

HICE: So before the law then, there were approximately 30,000 patents that the U.S. government owned, only about 5 percent of which, however, had commercial licensing, is that correct?

EZELL: That's correct.

HICE: All right. And why is that? It's a lot of patents, a lot of potential great benefits out there, only 5 percent in the commercial market to go out to the public.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

EZELL: That's right, because -- well first, government institutions and universities were not equipped or expected or wasn't their intent to incur the risk that will be required to take those technologies or inventions and bring them to the market as commercialized.

HICE: And neither is the government.

EZELL: (Inaudible) government. In fact, an interesting story was from the year 1968 when President Johnson asked Elmer Staats, who was then the Comptroller General of the United States, to analyze how many drugs have been developed from NIH funded research. And Johnson was stunned when Staats' investigation came back and said that not a single drug has been developed when patents were taken from universities for commercialization by the federal government.

As Staats report from 1969 found that we found hundreds of new compounds developed in university laboratories that had not been tested and screened by the pharmaceutical industry because the manufacturers were unwilling to undertake the expense without some possibility of obtaining exclusive right for further development.

It was on until they put in place the Bayh-Dole Act in 1980 that we led to an explosive growth of innovations stemming from federally funded research.

HICE: That's my point, exactly where I want to go with this. And so you have the federal government pretty much in charge of all the patents until Bayh-Dole then things started changing and actually patents were able to get into the hands of commercial licensing, and thereby get to the needs of the population.

Can you be briefly explain what the march-in provision is in Bayh-Dole?

EZELL: Yes. So the march-in provision is language that would in very specific limited cases give a government agency the ability to "march-in" and compel the (inaudible) of the intellectual property or force additional licenses on a innovation that was a result in part from some degree of...

(CROSSTALK)

HICE: And real briefly, I'm assuming would be like an emergency.

EZELL: Yes. So when the architects of the Bayh-Dole Act, Bob Dole and Birch Bayh designed the legislation in the early 1980s. The reason they conceived of putting in the march-in rights was primarily to ensure that a licensee took the steps to commercialize...

(CROSSTALK)

HICE: The whole point was to get it to the public when there was a need.

EZELL: That's correct.

HICE: That's correct -- so has the march-in provision ever been used by the federal government?



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

EZELL: No. No, it has not.

HICE: All right. So what kind of impact would using the march-in impact have on research and development?

EZELL: I think there is a real risk that if we ever use the march-in rights, we would substantially stifle the potential of research and development. If the government ever had the capacity to march-in decades later, in compulsory license the IP underpinning a pharmaceutical drug, on the grounds that some of it was contributed by federally funded research and now some number of decades later, the government declares that that price is unreasonable.

That would give enterprises serious pause about investing the enormous sums required to bring innovative new drugs to the marketplace. It would stifle innovation.

HICE: So in other words, there would be a great disincentive for research and development in various companies that they spent the billions of dollars that they assumed the risk to develop drugs, and then all the while knowing that the federal government could march-in and take that patent away from them. You're saying that would massively disincentivize R&D.

EZELL: That's correct, Congressman. There was a great case from 1995. Something was called CRADAS, cooperative research and development agreements. In 1989, NIH inserted the reasonable pricing clause into those CRADAs. The amount of collaboration between industry and governments subsequently greater, and when that requirement for a reasonable pricing of subsequent innovation was repealed, the number of CRADAs instantaneously rebounded in 1995, and we can stipulate to the effect of public-private partnership towards developing new drugs.

HICE: Thank you. Thank you, Mr. Chairman.

CUMMINGS: DeSaulnier.

DESAULNIER: Thank you, Mr. Chairman. Thank you for having this hearing. Thank you to everybody who's been behind this.

As somebody who has a pill in my pocket that I will take at 3 o'clock, that keeps me alive, that in Australia cost $6. Here in the United States, it cost $400, Johnson & Johnson distributes it. I'm told it's going to $500. But it keeps me alive. So I'm happy that I have health insurance that pays for it.

So I spent a good deal of time in the last four years since I was diagnosed with chronic lymphocytic leukemia. I'm trying to figure this out. And what's a good reasonable rate of return to get people from the private sector to invest and what do we get as taxpayers.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

NIH has a figure that shows since 1974, the NIH's researchers contributed $77 trillion to the U.S. GDP. So having going out there now multiple times, and Dr. Grant, having -- and Mr. O'Day as somebody who is a resident of the Bay Area, I take it now, as somebody lives in the Bay Area moved to San Francisco in the 70s with another restaurant business.

I sit here and think of the friends, the coworkers, the people who worked for me when I owned restaurants, who passed away, and what that did to the culture in San Francisco, having moved there from the west end of Boston. Not a bad facility by the way, but it's no UCSF. And having one of my oncologists be one of your colleagues, Dr. Kaplan at UCSF who put some work into this as well.

The numbers that I have from a Washington Post article is the research that granted that you got was -- the grants that you received was 50 million bucks as has been said, $50 million from NIH, and then about $17 million from the Gates Foundation, were there other significant contributions from this company or others to your research.

GRANT: Gilead did not provide funding. They did donate medications. And it was that donation that justified their listing as authors on the publication cited before.

Importantly, my study was not the only study done in PrEP. The CDC funded and performed its own study in Botswana and in Thailand. And the NIH also funded a study in -- called VOICE in Africa. The total U.S. government investment in PrEP is much more than the $50 million for my project. It's in the hundreds of millions of dollars paid by the U.S. government for the development of PrEP.

DESAULNIER: So Dr. Grant, and actually Mr. O'Day, I think your careers are similar. I remember reading a book, Daily Meds years ago. And that reporter from the New York Times did a wonderful job of doing an investigation of the influx of venture capital into this, the pharmaceutical industry. Traditionally, 40, 50 years ago, the CEO of pharmaceutical companies were researchers like yourself, who went to work for the private sector and moved up the chain of command. And then they were driven by the market forces that are currently driven.

So my question is I have an amendment on the floor today that's seen -- I would like to get bipartisan support goes to little bit of history that Mr. Ezell was talking about, Ezell. In her investigation, she says that investors look at professions that people trusted and people with white smocks, people trusted. And that changed the culture.

It brought a lot of pressure to get return on investment. Mr. O'Day is somewhat legendary, as I read your history about managing pharmaceutical industries. You're on the board of Genentech. You're on the board of the California Life Sciences, which I have great respect for.

So my question is my amendment is actually to get the Academy of Sciences to do a study that does the history, but helps us understand what's the best investment. And what's the base that we get from NIH, which I believe is underestimated.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

And then what's -- to my Republican colleagues, what's a reasonable rate of return that will bring investors in to do what they do. So when you look back in your career, how much better would it be now if we have that information? And you could do the base, and maybe it would be more efficient when we argue about patent controls in the CDC and this company.

Maybe there is a more efficient way to do this for the consumer, for the shareholder, but most importantly for the person whose life is being extended, as they do in Australia, as I understand. They have a discussion about, for instance, this drug -- or my drug in Australia is $6 when it is subsidized, when they go through that process and the risk to the client. If it's fully loaded, it's like $35 a day. So I don't understand why it's $500 a day here.

GRANT: I don't understand that either, sir.

DESAULNIER: But we need to find that out to have a rational conversation. And I thank my colleagues in the Republican side for a more efficient look at what -- how do you track these investments and get what we want longer and higher quality of lives for American citizens.

GRANT: You know, I think you're raising all the right points. And it is important to realize that both components of Truvada, tenofovir and emtricitabine were developed in academic centers using public funding.

DESAULNIER: Right.

GRANT: And then those property rights were purchased by Gilead. And, you know, people at Gilead will say that they invented those products. But in fact, they were invented in academic centers using public funds and then purchased by Gilead who then co-formulated, meaning mixed it into a single tablet, and the mixture in the single tablet is what allowed them to extend their patent rights beyond 2017.

And so when we look at innovations, the CDC brought us pre-exposure dosing. They bought us information that the mixture of two drugs was much more important than one drug. And, you know, Gilead's invention was really buying products developed with public funding in the academic sector. So the synergy between academics and private industry is important.

But I think that we need to be more honest, as you proposed, about who is doing what and all of this, and how much should be charged later.

DESAULNIER: Thank you, Mr. Chairman. I really hope we continue to pursue this question, because it clearly is a life-determining question that needs to be answered by the American people. Thank you, Mr. Chairman.

CUMMINGS: Mr. Grothman.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

GROTHMAN: Thank you. Mr. Ezell, I kind of want to talk to you just in general in overview, because I think the hearing today touches not just on a particular drug, but things across the board. And we talk about the interaction between the private drug companies and NIH funding.

And it really (inaudible), you know, it occurred to me that we are putting billions and billions of dollars a year into the NIH. And I don't know whether we got any bang for the buck or we should be, you know, getting something, some other way to get cures for these diseases. Of the $37 billion we put into NIH, how many do you think -- how much of that actually goes into pharmaceutical development, if you had to guess. We're not going to fact check you.

EZELL: I'm not an expert on the share of the allocation of the NIH's budget across its 27 research institutes. Their funding of the NIH goes to a number of activities, from training future scientists, to looking into very basic research trying to understand the basic -- of molecular processes and how diseases works, trying to identify biomarkers that can single future targets for innovation opportunities.

But certainly, the majority of NIH's research is going into this basic science, trying to understand fundamental molecular activities. And a much smaller portion of their research is going towards the development-oriented activities.

GROTHMAN: OK. As far as drug development, not just what we're talking about today, but collectively, do you feel or could you describe the different -- do you know how much is spent every year on what we'll call drug development by the private pharmaceutical industry. If you can't give me an answer, we'll ask Mr. O'Day.

EZELL: In the year 2013, it was $96.5 billion, as I understand the average over the past three years has been about $80 billion per year.

GROTHMAN: How many?

EZELL: $80 billion.

GROTHMAN: $80 billion. So we're going about $80 billion, so in other words, far and away, most of the research in this country done on drug development is done by private industry, and what we get out of NIH is a small fraction.

EZELL: That's exactly right.

GROTHMAN: OK. Could you give me an example of other success stories coming out of NIH?

EZELL: Well, there are a number. We can look at the invention of Gleevec treatments for chronic myelogenous leukemia. That was a nice set of case studies that the original research was conducted by Dr. James Allen (ph). I believe at the University of -- UCLA, I believe. And then some of his basic discoveries into how oncogenes work, gave rise to a new form of treating cancers called checkpoint (ph) blocking that we were able to identify specific antigen growth factors in the body.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

And then that set of basic research was ultimately licensed to the private sector and Bristol-Myers Squibb invested the hundreds of millions required to now turn that into a first in the world (ph) treatment for CML.

GROTHMAN: Did you feel overwhelming, and I don't mean to put words in your mouth, overwhelming the number pharmaceuticals that are having an effect on our lives or extending lives of people with various diseases. I suppose there's a difference in the type of things that are financed by NIH and the private industry.

Could you comment on the differences between which type of drugs each sector goes after or any reasons why you feel one does a better or worse job than the other.

EZELL: Well, it's the private sector that is primarily incurring the risk of doing the applied research and then conducting the grueling set of three stages of clinical trials that are proving the safety and efficacy of that drug. The private sector is the one who is assuring that the formulation is effective and works in the human body, and then of course, the FDA is working with (inaudible) to validate that fact.

But the system we've put in place is now responsible for the fact that there are 7,000 new to the world drugs under development globally, and estimated at least 3,600 of those are being led primarily by U.S. headquartered enterprises. There's a lot to do.

I'm not satisfied, as wonderful as Mr. O'Day's drug is. We need a cure for HIVs. We need a cure for various forms of cancer. It's wonderful that there's competition in the marketplace. Mr. O'Day's company faces a loss of competitive resistance, it faces exponential (ph) threats hopefully from the innovators out there in trying to build a better solutions. And I think it is important that we broadly focus on the system we have in place in America that enables competition and enables innovations so that we can try and come up with some of these cures.

GROTHMAN: Can I give you just one broad question. Does the Chairman mind?

CUMMINGS: The gentleman's time has expired, but you may answer this question.

GROTHMAN: OK. My disease of interest is Alzheimer's. Do you feel as far as we look for a cure there that it will more likely come from the private sector, from NIH, or could you comment on that?

EZELL: My organization actually did a study looking at the economic impact if you're able to come up for a cure for mental diseases. We estimated that the value to society would be as much as $1.5 trillion. I would support in all of the above solution to innovate for cures like Alzheimer's. It is estimated that the real-time net present value of treatment of Alzheimer's alone would be about $50 trillion for the U.S. economy.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

So these are massive numbers. We're talking about -- or a purity (ph) of time. So I applaud research that's being supported by nonprofit and foundational actors like the Gates Foundation towards that end. That may be a pathway to innovating such a drug. But I know that there are hundreds of clinical trials ongoing even now to solve various forms of known diseases being led by the private sector, and that's -- I think probably a -- I mean historically -- that's historically across broader set of disease states that's been a more likely pathway to getting towards a solution (inaudible) for cure.

CUMMINGS: Rouda.

ROUDA: Thank you, Mr. Chairman. I'd like to talk about two different issues. One is just the government's commitment under the president stated objectives to addressing HIV infections, and then also talk after that a little bit about the balance between innovation and drug pricing. So Mr. Horn, I will start with you.

The president has stated that he wants to reduce infections by 75 percent in the next five years, 90 percent in the next decade. Yet, we've seen systematic attacks on the ACA and funding for community institutions and Medicare and so on. What kind of impact is that going to have in our ability to address HIV infections?

HORN: It has a profound effect. We rely on these systems. And we fight very hard for these systems. And I will say that we actually fight very hard against these systems sometime just to ensure that. But in order to do this, and I think that we realized this -- I mean when we're just beginning to think about -- just getting -- just maximizing the number of people who are living with HIV, getting them biologically suppressed.

What is making that possible, what is getting us there is the Affordable Care Act. And it's all of the systems under the Affordable Care Act. And I think when we do think about this in the context of primary prevention or PrEP or just prevention for those who are vulnerable to HIV infection. The same holds true. We absolutely need the ACA and frankly we need Medicaid expansion to make that happen.

ROUDA: And actually, if we had universal healthcare, much of the issues that we're having, when talking with Gilead about and any other drug manufacturer about those costs, many of those disagreements would go away, because we would have properly funded a system-wide care for all Americans.

HORN: That is correct.

ROUDA: And Mr. Ezell -- and I hope I pronounced that correctly. You made a comment earlier that the NIH plays such an important role in the development of new drugs. Yet, the president has three straight years tried to make massive cuts to the NIH. Wouldn't that diminish our opportunity to continue to have innovation in the development of drugs hat through partner -- public-private partnership.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

EZELL: Absolutely, Congressman. In fact, this is perhaps the most fundamental threat to U.S. innovation and economy. If the United States essentially -- today, the U.S. invest the least it has in federally funded R&D as a share of GDP since 1995 -- 1955 to match our investment on average in the 1990.

ROUDA: Sixty five years, roughly, 64 to be exact.

EZELL: Correct. On average, to match the federal government's investment in R&D that would be averaged in the 1990s. We would have to invest 80 percent more per year today. And we're seeing that manifest itself within NIH even. The average age of first NIH R01 grant has increased from 34 to 42 years, 8 years later in life.

The average success rate has declined from close to 60 percent in 1960 to under 20 percent today. And if we don't make that right, we risk losing our...

(CROSSTALK)

ROUDA: I understand. Thank you. And Dr. Walensky, I am not sure if this is the appropriate question for you. But I'm just curious, when we look at the societal cost of not doing anything to making sure that we have proper medication and putting a number on that, versus the cost of providing these drugs to all those. Has that analysis been done? And if so, is there any indications to what it would do?

WALENSKY: I think -- we haven't done what the status quo is. We know that if we invest in this, it will be a cost-effective investment.

I wanted to just comment on something that Mr. Ezell said. And that is that currently, I've screened very infectious disease, a fellow who comes in the door at Massachusetts General Hospital. Nationally, we have .7 applicants for every infectious disease physician in the country. That is the Indiana HIV outbreak that occurred. There was no infectious disease doctor in that county. And if we don't invest in the NIH to do these things, we will not have those physicians.

ROUDA: Right. Mr. O'Day, her testimony that the list price is $1,780 to approximately $2,000. That list price -- let's just assume for simple math $2,000. If you sell monthly prescription for $2,000, does that go to your revenue line?

O'DAY: The $2,000 would go to the revenue line.

ROUDA: And then the pharmacy benefit managers, PBMs, about roughly what percentage of that $2,000 would be paid to them.

O'DAY: Well, actually the discounting and the commercial sector is actually quite small, because the cost-effectiveness of this medicine has not required that discounting. When you look into the public sector, however, we have very deep discounts. So 70 to 80 percent discounts, for instance, for Medicaid, for ADAP, and for all the government programs.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

ROUDA: And one last question. The billion dollars of investment that you noted earlier, is that an ordinary or a capital expense on your balance sheet, on your income statement?

O'DAY: That's ordinary. I mean there could be capital components to that, but the vast majority is recurring expenses year on year invested in R&D, into people, and into costs that support our research and development.

ROUDA: Thank you, Mr. Chairman.

CUMMINGS: Before we go to Mr. Comer, Dr. Walensky, he says something about .7 percent. Can you say that again? I think I've misheard you.

WALENSKY: Unfortunately, you probably didn't.

CUMMINGS: I hope I did.

WALENSKY: So far every infectious disease fellowship slot that we have in this country, we have a 0.7 applicants. There has been a New York Times editorial on the last week, that are in the last month by Matt McCarthy, that demonstrates that we are going to have a shortage of infectious disease doctors. We know we are anticipating a shortage of infectious disease doctors, some of the counties that have had HIV outbreaks. There have been no infectious disease doctors in them.

And so yes, I think we have a public health problem. Part of that is related to NIH funding, and seeing because we are what we call a cerebral field. We rely on NIH dollars to recruit applicants into the field.

CUMMINGS: Mr. Comer.

COMER: Thank you, Mr. Chairman. And we've already had on the important roles of private sector versus public sector in the R&D process, and also the role of having strong patents and the consequences if the government breaks patents on drugs like Truvada. We've also hit on the major scientific rate (ph) and regulatory risks and hurdles you've had to take in to market of Truvada.

Overall though, I just want to reiterate the great role that Gilead has played in innovations in anti-virals, and I hope we can continue to save lives, because that's something that we agree on in a bipartisan way.

Switching gears, I want to talk about the president's initiative to eradicate HIV. From what I understand, the bulk of the Trump administration's plan to eradicate HIV's ability to locate every American susceptible to HIV and provide a drug and provide help adhering to the daily regime for the rest of their lives.

That's no easy task. The cost of doing that will be downing (ph) about 1.1 million Americans have the virus, and about 1 million are at risk of contracting it. Finding, treating, and keeping them all on treatment, experts' estimate it would be more than the administration currently is devoting. Even in addition to the $20 billion in federal government.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

The government already spent on HIV prevention and treatment. There are criticisms that if the patent on Truvada remains, the Trump administration's plan to eradicate HIV would cost over $20 billion.

So Mr. O'Day, let me let me start with a few question. How many bottles of Truvada -- company, Gilead, donated to the U.S. government.

O'DAY: So our commitment is to donate 2.4 million bottles per year for up to 10 years.

COMER: I think Mr. Jordan asked this question. When is a generic version coming onto the market?

O'DAY: A generic version of this medicine, Truvada, comes onto the market in September of next year, 2020. And other generics will come on six months later.

COMER: And you did, as I understand, voluntarily released the patent early.

O'DAY: That's correct. In discussions with -- it was a legal decision at the end of the day and an important decision to avoid the cost of litigation, and to bring this medicine sooner to patients.

It's important to note that when the patent expires for Truvada, the next most safe, most effective medicine will take its place in the donation for 2.4 million bottles for the next 10 years. We want to make sure that the uninsured patient population in America has access to state-of-the-art care at all times over this decade.

COMER: With those developments, how much closer are we to eradicating HIV?

O'DAY: I think, as has been mentioned, you know it's -- I think it's within our grasp. It's clearly challenging. It's, as I've tried to articulate, based upon the Gilead programs, you know, it's really not about drug pricing. It's about, in this particular case, it's about the wraparound care.

I think the administration's and CDC and HHS' efforts to, you know, reduce by 70 percent in 5 years and 90 percent in 10 years is within our grasp. But it does require a holistic approach to the wraparound care.

Many people have talked about Australia here, which I think is interesting to look at in some regards. In Europe, generics have been available for three years. And even with the lower cost of medicines in Europe, we've seen very little increase in HIV PrEP, which goes to show you that there are many, many elements of this system that have to be invested in.

COMER: Right. What proposals currently would hinder the progress of eradicating HIV or any prospect of a cure or a vaccine to HIV? What proposals have you heard out there that would hinder that?

O'DAY: Well, I think that's -- I mean the current initiatives focus on the available anti-retro virals, which are very effective -- but have drawbacks in terms of getting into the hands of patients at the right time. So what our scientists are doing is they're working on longer-term medicines. Those could be delivered once a month, once every three months, long-acting, which I think could help us desperately with this solution of HIV elimination.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

And eventually, the cure is still -- it's -- I want to say within our grasp today. There needs to be a lot of failures to get there. But we're firmly committed at Gilead to investing in that research to keep having the 90 percent failure rate, and finding eventually the 3 percent cure, which we're firmly committed to. We won't rest until we get there.

COMER: Thank you, Mr. Chairman. I yield back.

CUMMINGS: Ms. Hill.

HILL: Thank you, Mr. Chairman. I ask unanimous consent to enter into the record a Washington Post article from 2016, entitled, "The Drug Company that Shocked the World With its Prices Dodged 10 Billion in Taxes, Report Says."

CUMMINGS: Without objection, so ordered.

HILL: Thank you. We've talked about saving lives. But as a corporate executive, Mr. O'Day, let's talk about money. Just as you're responsible for your budget, I'm responsible for our taxpayers' money. And in this case, our worlds collide.

Mr. O'Day, how much does Gilead spend per year in direct costs for patient care, for people with HIV and AIDS?

O'DAY: I don't have the exact figure, Congresswoman. But it's in the tens of millions of dollars.

HILL: You pay for direct care?

O'DAY: We pay -- we fund communities, support groups that support patients in a variety of different ways. We're the largest corporate donor to community funding.

HILL: That's great. Is it true that you get a tax break for those corporate donations?

O'DAY: Yes.

HILL: OK. So effectively, you don't spend money on direct patient care. But do you know how much the U.S. government does?

O'DAY: No, we do spend money on patient care. We may get some tax benefits to that, just to correct...

HILL: OK, but...

O'DAY: ... but we absolutely spend and we have an outflow in our P&L that's associated with those funding.

HILL: Do you know how much the U.S. government spends on that treatment for patients with HIV or AIDS?

O'DAY: What I know is that the current plan for HHS and CDC is earmarked for the 2020 budget some around $290 million for the HIV elimination program. Now, the fact that Gilead will donate all of medicines to that program...

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

HILL: Well, hold on. Hold on. So what the U.S. government pays in direct care, this is through Medicaid and Medicare, is $21.5 billion. So, it's a much higher number than what we're adding to the budget for research and elimination.

But anyway, it is estimated that $470,000 in lifetime cost is what it takes to treat someone with HIV infection and now we have 40,000 people with new HIV diagnosis in the country each year and so that cost to our taxpayers is going to continue to rise.

So as you heard from the title of the article I submitted, Gilead is notorious for not even paying its fair share in taxes that go towards HIV treatment. Gilead reported its 2018 financial performance to the SEC on February 26. It showed that the company had revenue of about $22 billion, that number sounds familiar, in 2018, with about $31 billion in cash available.

So, I want to take a look at how Gilead is using some of its profits. Mr. O'Day you just joined Gilead Sciences earlier this year, is that right?

O'DAY: That's correct.

HILL: Your initial compensation package was reportedly worth about $30 million including both cash and stock options. So the company agreed to pay $30 million just for taking the job, is that right?

O'DAY: That's correct. I mean, I should articulate that half of that was for compensation that I gave up from my previous assignment and half...

HILL: OK, but it is $30 million for taking the job. So, just out of curiosity, do you know what the median income is for a U.S. worker according to the BLS?

O'DAY: I do not offhand.

HILL: It's $46,800 or one-sixth of 1 percent of what you're signing bonus was. Just thought you'd want to know that. And Gilead has a long history of paying windfall amounts to its corporate executives.

In 2013, Gilead's former CEO, John Martin, earned almost $180 million. His salary for the year was $15.4 million, but he cashed out almost $160 million in stock options that year.

Mr. Martin appears to have timed his pay well. According to Gilead's 2013 annual report to shareholders, Gilead had "record total revenues in 2013 of $11.2 billion." 2013 was the year that Gilead's blockbuster drug, Sovaldi, received FDA approval, correct?

O'DAY: I believe so.

HILL: Sovaldi is a Hep C drug that also made headlines for costing $1,000 per pill.

I want to turn to another Gilead executive, your direct predecessor, John Milligan. He made a little less than you, just $15 million.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

I understand Mr. Milligan resigned in 2018, but he didn't lose his salary. In fact, he received what's called a golden parachute meaning that the company paid him extra just for resigning. Mr. Milligan had previously received stock options that were not worth anything because the stock -- the company's stock had gone down. But thanks to a separation agreement between Mr. Milligan and the company, he was paid an additional severance that earned him a total of $26 million just for resigning from the company.

That's true, right, Mr. O'Day?

O'DAY: As far as I understand those decisions are made by the Board of Directors.

HILL: Of course. Gilead is a private company and it can pay its corporate executives whatever it likes, but Gilead also makes a life-saving drug that has kept -- that it has kept a U.S. monopoly on. We've heard today about people who are not accessing this drug because they cannot afford it. We've heard about local public health officials that are straining under the financial burden of providing this drug to everyone else that needs it to stay healthy. And this drug which has generated billions of dollars for Gilead was developed using tens of million dollars of federal funds.

So what Gilead chooses to do with its profits really does matter to all of us and I'll say that the millions and millions of dollars to corporate executives, I take some issue with. Thank you.

CUMMINGS: Mr. Roy.

ROY: Thank you, Mr. Chairman. You know, I came to this hearing hoping that we might have a hearing where we spend some time diving into some of the tough questions instead of preening and posturing for cameras, attacking people for making profit in a capitalist society. But that's what I just heard in rants for the last five minutes.

Now, Mr. O'Day, do you make brentuximab? Do you know what brentuximab is?

O'DAY: I do not. I'm sorry, Congressman.

ROY: Brentuximab vedotin is the drug that I took when I was suffering from Hodgkin lymphoma, a drug that was created, built, manufactured, developed, designed, created by a private company that made a lot of money. And I'm really glad they did. I hope they make a lot more.

And I hope they make a lot more drugs to save a lot more people and distribute a lot more drugs around the world to save a lot more people. Now, it is a reasonable question when patents expire, when they should expire, when they shouldn't expire. It is a reasonable question.

How much money the NIH has and is investing and how much we should factor that into the patent life? But to sit here and attack the capitalist system that produces and distributes medicine to saving lives around the world, I mean, it is just offensive.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

And I just cannot possibly understand why we're spending time sitting here while I listen to people lecturing companies about making money. I hope you make a lot of money. It is a reasonable question what patent length should be. I'd like to have that conversation and dialogue. I don't know whether it should be one year, five years or 17 years. I don't know. Let's have that debate.

I don't know how much we should factor in that NIH puts in $400 million, $50 million, I don't know what it is, whatever the number is it's gone into the production of this drug. I don't know how much went into merging these two, putting them together that you guys distributed versus how much NIH has done. Fine, let's have this conversation.

But this absurd attack on profit being evil is undermining the entire ability for us to have a rational conversation about the serious questions that are actually before us here. We don't go down how much cash on hand does Apple have? $245 billion. How much has Apple done to go cure health? Is Apple in the direct -- in the business of providing direct healthcare? Mr. O'Day?

O'DAY: Not to my knowledge.

ROY: Right. Are you in that business?

O'DAY: Yes, we are.

ROY: Do you provide medicine or do you run hospitals?

O'DAY: Our role is to bring breakthrough medicines to patients with devastating diseases.

ROY: Right.

O'DAY: Do you hire doctors to go out and provide care or do you for the most part, design, develop and manufacture medicine?

O'DAY: My colleagues and I at Gilead are exclusively focused on the design and development of medicines and getting them in the hands of patients.

EZELL: Mr. O'Day, you employ 10,000 people at Gilead. There are some of the 1.2 million individuals in America's -- currently (ph) employed by America's pharmaceutical companies who earn an average salary of $122,000.

This is an industry that supports over 5.5 million workers across the U.S. economy considering direct and indirect effects and it's an industry that supports a high-value (inaudible) sector of the economy, a high-value exports...

(CROSSTALK)

ROY: Yes, but whatever profit is evil, right. Making money is apparently evil because never mind all these people you just talked about who are making money and able to pay for their jobs and their salaries and be able to send their kids to school and be able to buy their houses in our system. This is somehow the wrong thing for us to do.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

I mean, again -- can we have a roundtable discussion. Happy to sit down with my colleagues on the other side of the aisle and this side of the aisle, and let's have two hours, three hours, let's get whiteboards up. Let's go through all of these stuff and come to a reasonable consensus on some of these tough questions about patents.

It is a real concern, but can we dispense with the ridiculousness of hostility toward profit. It is a good thing that Apple makes a crap ton of money making these things so that we can have them and distribute them and use them and use them for great additions and benefits to the world. And it is the same thing in the medicine.

CUMMINGS: Before we go into -- thanks. Mr. Raskin, just a moment. Mr. Roy, I've been here -- oh he's gone. Mr. Roy, I've been here since quarter of 10. I've heard every syllable that has been stated here and I'm sorry you had to leave, but I think the committee on both sides have asked reasonable questions.

And nobody -- we're not beating up anybody for profit. We're just trying to make sure we understand what the American tax dollars are paying for. We want to understand why the price is so high and we're trying to understand how we can get the 90 percent of people who need this life-saving medication, how we can get it to them.

And we, as a matter of fact, I've applauded Gilead for their research and what they have been able to accomplish. Now, we're just trying to expand it and Mr. O'Day has made it clear that they are trying to figure out how to expand treatment and the number of people also who will have access to this medication.

So, in fairness to the committee, I just want to make that clear to my colleague. Now, we will hear from Mr. Raskin.

RASKIN: Mr. Chairman, thank you for the thoughtful comment and I want to follow up on the Mr. Roy's very interesting and provocative statement there because I think what we are trying to figure out is precisely what are the various public and private ingredients that go into our pharmaceutical system.

My friend Mr. Roy does not have to look across the aisle to find people who are upset with big pharma. President Trump himself has said that the pharmaceutical industry is getting away with murder. Pharma has a lot of lobbies, a lot of lobbyist and a lot of power and there's very little bidding on drugs.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

So, I think that it's not just members of this side of the aisle that have noted some problems in the current system, but Mr. O'Day, let me come to you because we know that the taxpayers through the NIH, which is probably in my district and the 8th Congressional District of Maryland, put in $49 million. And the Gates Foundation put in tens of millions of dollars more on into funding the development of Truvada as a method for preventing HIV, and I think a lot of the discussion here is about the fact that tens of billions of dollars have been earned by your company, but how much did Gilead spend on researching and developing Truvada as PrEP specifically as a prevention drug?

O'DAY: Thank you, Congressman. So, it's hard to tease out some of the PrEP activities with the other activities because at the end of the day, this medicine reduces the viral replication. It's the same mechanism, if you like, for treatment as it is for PrEP.

RASKIN: OK, so how much did you guys put into that part of the process?

O'DAY: $1.1 billion over the course of Truvada's development which was really for all indications associated.

RASKIN: OK. And then the infusion of money that came from the taxpayers of the NIH was essential for the development, I think you would agree, of Truvada for the purpose of preventing HIV.

O'DAY: Yes. The know how and knowledge that Gilead put in, the investment from the NIH and the $50 million, the greater than $80 million donation from the Gates Foundation. All this was important to provide the body of evidence.

RASKIN: Terrific. OK, so, what we can imagine this is some kind of Ayn Rand fantasy where the private sector did it all on its own, right? Would you agree with me about that?

O'DAY: I would agree, absolutely.

RASKIN: OK. So, but what has been the total revenue from Truvada as PrEP?

O'DAY: The total revenue for Truvada's preface is difficult to kind of tease out. Again, we've talked about the number $36 billion globally for the entire medicine, but it is very hard because the medicine is prescribed by physicians...

RASKIN: Got you.

O'DAY: ... who often don't know whether it's PrEP or treatment.

RASKIN: But you set the price for it, for U.S. payers, did you take into account the role of taxpayer funding in the development of the drug?

O'DAY: When we set the price for Truvada originally, we took into account a variety of things including the impact upon the healthcare system, the ability to make sure we get access to...

RASKIN: But you didn't take into account the fact that the public was one of the investors in the research.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

O'DAY: Well, at the time we priced the medicine, the public had very little to do with the invention of this medicine.

RASKIN: OK. So, in your choosing now to donate some drugs rather than reduce drug prices, will you claim the donation is a tax deduction as you testified that you did habitually, there's nothing wrong with it, but it will be claimed as a tax deduction presumably.

O'DAY: My understanding is that at a cost of goods level.

RASKIN: OK. But one of the shocking revelations from the Senate Finance Committee's investigation into the pricing of your hepatitis C product was that the $1,000 a day price you settled on was based on seemingly extraneous or arbitrary factors.

Like the likelihood of a public outcry at a certain price point or the likelihood of receiving a letter from a member of Congress with the likelihood of facing a congressional committee and the hearing like this. Did you use those same political factors in setting the price for Truvada?

O'DAY: So Congressman, again, I was not at the company at the time but I've looked into those details. I think the overriding factors for the setting of the price for the HGV medicine were based upon both the cost of current treatment at the time and the innovation of bringing this together in a curative setting for 12 weeks of therapy to cure the disease. A huge step up from what was done in the past.

Those are the prevailing means that go into account when pricing (ph)...

(CROSSTALK)

RASKIN: OK. And then finally, last question. Just to follow through on the point Mr. Roy raised and I'm sorry he's not here for it, but do you think it's inappropriate in a constitutional democracy where the public invests in scientific and medical research and helps to produce pharmaceutical drugs that the public relies on for that factor to be taken into account in the pricing and distribution of pharmaceutical drugs?

O'DAY: Well, I think it's very important that you consider the access question, will the medicine get to the patients that need it including in the government sector and the government funded healthcare sector as well as the private sector. So, absolutely, I think you need to take a variety of things into account...

(CROSSTALK)

RASKIN: OK. Thank you. And I wish I could ask about that access, maybe if we get another round, but I yield back to you, Mr. Chairman.

CUMMINGS: Thank you very much. Ms. Miller.

MILLER: Thank you, Chairman Cummings and Ranking Member Jordan and thank all of you all for being here today.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

In my home county of Cabell County, there has been an increase in HIV cases. In March, there were 28 confirmed cases and in April that number has risen to 44. This number is a sharp uptick from the case where we only had the eight cases annually over the last five years.

Unfortunately, those most impacted are intravenous drug users, which is a terrible result of the opioid crisis that has devastated so many communities across the United States. I'm very glad that President Trump is taking the issue of HIV seriously and has secured the donation of the $2.4 million from Truvada for the Centers of Disease Control and thank you for doing that.

Mr. O'Day, if a patient cannot afford Truvada, are there precautions in place to ensure access?

O'DAY: Yes, absolutely. So, we -- if they are -- if they have private insurance and they can't afford their co-pay, they can apply to our co-pay assistance programs and 98 percent of patients that have done that pay nothing out of pocket.

And then if they or they're uninsured or struggle with their medicine, we have a medicine assistance program, which essentially evaluates their financial needs and provides it for free.

MILLER: Thank you. Can you explain how the new version of tenofovir, if that's how you pronounce it.

O'DAY: Tenofovir, right.

MILLER: Tenofovir, was an improvement to patients and what new benefits does it provide?

O'DAY: Thank you, Congresswoman. So, what you're referring to is actually a completely separate medicine from tenofovir. It's a medicine that's called -- abbreviated as TAF. And this is now, you know, the advancement that we've seen in both treating and preventing HIV/AIDS, is that people living with AIDS or people subject to AIDS have the ability to take his medicines now for decades.

Tenofovir when taken that long, a certain subset of patients have issues with their kidney or with bone disease on such a chronic basis because we've essentially transformed the disease to such a long-term illness.

So, the new medicine, so-called TAF, which will be combined again with FTC and other agents, has a much lower incidence of the side effects and is really designed for if you like the new generation of medicines that will allow patients to be on this longer-term without having to worry about other debilitating side effects that they could get from their medicine.

We've launched this now into the treatment of HIV setting with a medicine called Biktarvy and will be bringing this innovation -- it's right now filed with the FDA and we will hope to have a positive approval by the end of this year for patients that are eligible for PrEP.

So, this innovation is this new medicine that was completely discovered and developed by Gilead scientist is now kind of the next evolution of care for HIV patients.

MILLER: How long did it take you to do that?

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

O'DAY: Oh my gosh, well, this was back in the 1990s that we started this. So it's been more than two decades and part of that $6 billion investment that we've had so far in HIV.

MILLER: Wonderful. Would any new patient -- any new patents prevent generics from being created against the original version?

O'DAY: No, it's a completely separate medicine. It has nothing to do with the patents of Truvada. Its patent projected from this innovation that took decades to produce.

MILLER: Thank you. Mr. Ezell, do you foresee a future where the NIH could take on the entire of the drug development process from start to finish?

EZELL: I simply do not think that will be the case. First, the capacities are not there. The NIH focuses on basic scientific research. What industries really bring to the table is the development aspect of it, doing the applied research, conducting the clinical trials.

Now, this has been proposed. Dean Baker for instance, has written that "We can expand the public funding going to NIH or other public institutions to extend their charge beyond the basic research to developing and testing drugs and the whole equipment (ph)."

But Baker estimates that were we to try to do that, we would likely quote -- it would be necessary to increase the amount going to NIH by at least $60 billion a year in order to quote "replace the funding currently supported through patent monopolies." So, no, I don't that's tenable. I don't think we're going to increase NIH funding by $60 billion a year especially if we can increase the (inaudible) tax.

And more beyond the point, I think there is very little reason to make that dramatic of a change to a system that, as I've tried to say today, is in fact the world's most effective and productive generating new to the world cures.

MILLER: Thank you.

CUMMINGS: Mr. Khanna.

KHANNA: Thank you, Mr. Chairman, and thank you to Representative Alexandria Ocasio-Cortez for working to have this hearing.

Mr. O'Day, I want to try to be constructive and not score political points or embarrass you, but just get some facts and see if we can make some progress of your commitment.

The New York Times wrote that Truvada was developed significantly by taxpayers. Is that a true statement?

O'DAY: I think that's really an inadequate -- inaccurate, I should say.

KHANNA: So you disagree with the New York Times editorial board?

O'DAY: Yes.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

KHANNA: And why is it not a true statement?

O'DAY: Because the medicine was developed and discovered within Gilead. Some of my colleagues have mentioned that we licensed in some initial compounds on this. That's important. Those were very early stage ideas on the product.

In the case of TDF, which is one of the components of Truvada, it was not a drug at the time and it went through many iterations before it got there.

KHANNA: Did you benefit at all from the study that was funded $49 million by NIH and the Gates Foundation in terms of understanding the drug could be used for preventing HIV?

O'DAY: Absolutely. Of the $1.1 billion we invested, I think that was an important contribution to supporting the HIV press story at the time and I'm grateful for Dr. Grant's leadership.

KHANNA: Grateful is good. Have you paid them anything?

O'DAY: Well, I think there's different ways to look at contribution to society. I mean we have...

KHANNA: No, I mean, I truly appreciate the compliments, but you know, usually if I get something, I pay something for it. I'm just curious. It's a simple answer, yes or -- usually I don't like yes or no questions, but this one is pretty yes or no. Did you pay them money or not?

O'DAY: The donations that were provided by NIH and the Gates Foundation did not come with terms, suggesting that...

(CROSSTALK)

KHAMMA: No. I'm not saying that they required it. I'm just asking -- so you didn't pay them anything for that.

O'DAY: No, I think it's in the interest of public health to advance a foundational medicine for additional indications...

KHANNA: It absolutely is. The difference is 99.9 percent of us don't get to profit when it's in the interest of public health. We have, you know, you've acknowledged that this is something that you use to profit and you haven't paid them back. I mean, that's your decision. I just want to get the facts.

One thing I want to get at, are you -- I appreciate that you're going to donate these 200,000 drugs. Can you assure us that you're not going to claim a tax write off for those?

O'DAY: You know, those will show up on our P&L balance sheet.

KHANNA: So you will claim a tax write-off. Can you assure us that you will only deduct the manufacturing cost?

O'DAY: Yes, I can assure you of that.

KHANNA: So you're not going to -- you're going to deduct $6, you're not going to deduct the $2,000...



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

O'DAY: The $6 figure is not accurate.

KHANNA: OK, but you aren't going to deduct the $2,000. You're going to deduct something closer to $6.

O'DAY: That's correct.

KHANNA: So, it's inaccurate that you would try to get a $1 billion tax deduction.

O'DAY: Absolutely not.

KHANNA: OK. So, let me ask you this. One thing that I think you could commit to that would go a long way, there is a misunderstanding on the 200,000 that you've pledged to the president and they are saying that that also includes people who are already on your financial aid programs. Can you commit that those 200,000 drugs are going to be in addition to the ones of people who are already part of your financial aid programs?

O'DAY: Yes, absolutely. I mean, I think it's important to note...

KHANNA: So you are making that commitment. So, in addition to the people you have on financial aid, you're going to do 200,000 new ones and committing today that you're not going to deduct anything beyond the cost on your deduction.

O'DAY: That's correct. We'll continue to serve patients through our medical assistance program. Today, we have 20,000 to 30,000 a year. This is an additional 200,000, plus we continue to support all the co-pays.

So back to, you know, do we give back, you know, to inventions that are supported in us, I mean, the answer is yes in different forms.

KHANNA: Well, I'm glad you made a commitment because the New York Times editorial page, you know, they'll be happy to know. I mean, they -- there was legitimate concern about what tax deduction you were going to take. It seems you're not going to take that. You're going to do 200,000 in addition.

Now, if you would just commit to paying back something to the CDC, I think it would go a long way. Any final thoughts?

O'DAY: Well, I think, you know, we are collaborating with the CDC on the entirety of the program, so I think this is a partnership. It's one where we provide resources, intellectual know-how, medicine, the government provides funding to support. We're all in this together to get to the HIV elimination. So I think there is give and take on a variety of sides, Congressman.

CUMMINGS: Mr. Higgins.

This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

HIGGINS: Thank you, Mr. Chairman. Madam and gentleman, thank you for being here today. Mr. Horn, as Gilead invested approximately $1.1 billion in developing Truvada, does that set an accurate number?

HORN: I'm sorry.

HIGGINS: Approximately, did Gilead spent $1.1 billion developing Truvada?

HORN: I can't confirm or deny that.

HIGGINS: Can you answer that Mr. Ezell?

EZELL: I would defer to Mr. O'Day, who is from the company. I do not know myself how much...

(CROSSTALK)

HIGGINS: OK. I was wondering if this was common knowledge. Mr. O'Day, can you clarify...

O'DAY: I can confirm...

HIGGINS: According to our research, it cost $1.1 billion to develop Truvada.

O'DAY: Yes. I can confirm that. Yes.

HIGGINS: And that drug has been quite successful at treating HIV and AIDS, correct?

O'DAY: It's been a cornerstone of HIV treatment, yes.

HIGGINS: Thank you. The drug, Descovy, you're currently investing a great deal of money, perhaps on a similar level to develop Descovy. Is that at Phase 3 right now?

O'DAY: The Phase 3 trials read out. They were presented at the AIDS meeting in March. It's now been submitted to the FDA for the...

(CROSSTALK)

HIGGINS: How much money are you making on Descovy right now?

O'DAY: I don't have that number on the on the top of my head...

(CROSSTALK)

O'DAY: ... I can get back to you.

HIGGINS: Is it being sold?

O'DAY: It is being sold for the treatment indication but the prevention indication will be new later this year.

HIGGINS: Very well. And that's because it's in Phase 3 right now.

O'DAY: Yes, finished Phase 3.

HIGGINS: And GS-9131, is that an HIV/AIDS drug?



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

O'DAY: I believe so. Still getting the numbers down.

HIGGINS: It's in Phase 2. Has money being spent to develop that drug for HIV and AIDS?

O'DAY: I'm just not familiar with this particular number, Congressman, so I apologize. But we have a variety of medicines in Phase 2.

HIGGINS: According to my research, you have four -- including Descovy, you have five HIV/AIDS drugs being developed. Three in Phase 1, one in Phase 2, one in Phase 3.

O'DAY: Yes, that sounds correct.

HIGGINS: Is that reflective of -- so, the drugs that are in Phase 1, is three drugs that are Phase 1 to treat HIV and AIDS, is the money -- tremendous amounts of money being invested in the development of those drugs?

O'DAY: Well, we spent about $3.5 billion a year on R&D and around 40 percent of that goes into HIV/AIDS at this stage. So yes, a significant investment in...

HIGGINS: And five of these drugs that are in development right now being sold and marketed at -- including levels that are being questioned by this oversight committee, I think appropriately so. We must protect the American people. We wouldn't want gouging would we?

And yet this clearly indicates -- our research indicates that you're investing tremendous amount of money right now into drugs being developed to treat HIV and AIDS which are not being sold, so you're not making money on the drugs, you're spending money on these drugs.

O'DAY: Yes. Congressman, and many of those will fail, unfortunately. That's the nature of innovative research.

HIGGINS: Thank you. The ones that succeed and they go to market and they help Americans, perhaps millions of Americans as Truvada has, is that the corporation's only window to recoup and retain monies to invest in further research and development?

O'DAY: Yes.

HIGGINS: Is that not a logical formula to...

O'DAY: Absolutely. That is basically our contract with society. We invest a tremendous amount in R&D but a high failure rate. Those that succeed, we have a limited patent life to recoup the investment back into investing on finding cures for devastating diseases. And then it becomes generic and broadly available to society.

HIGGINS: In the interest of time, thank you for clarifying. I have limited time.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

According to our research, besides the five HIV/AIDS drugs that are in development in which you referred to as in the pipeline, you have 28 other drugs that are in the pipeline at various phases of development. Of those 28 additional drugs, would it be fair to say that the scores of millions of Americans could be helped with diseases that we currently suffer?

O'DAY: We're certainly hoping, yes. We're working with some of the most devastating diseases.

HIGGINS: And when a drug is under development, is there any guarantee that it will become a profitable drug for the company?

O'DAY: Quite the contrary. In Phase 1, 95 percent failure rates; Phase 2, 85 percent failure rates; Phase 3, 50 percent failure rate for the average. In fact, we just had a Phase 3 trial for devastating disease called NASH that failed.

HIGGINS: Thank you for clarifying. So I think it's clear that...

(AUDIO GAP)

CUMMING: ... went to gay white males. The Africa-American community was pretty much left out. And so I'm trying to figure out when I heard those numbers, I'm just trying to figure out who's going to cover the Africa-American communities and how and whether -- when you all make those decisions, you know, about distribution, where does that go?

I mean, in other words, where do the drugs go and how and what role do you all play in making sure that there is some equitable distribution. And I want you to understand, I've heard a lot of talk here this morning about how people are beaten up, you know. It's not about beating up, it is about being thankful that we have a medication that can do just about everything but finally cure AIDS.

And wanting it to get to everybody that it can get to, and it's simple as that. So, Dr. Walensky -- I'm sorry.

WALENSKY: Yes, so a couple of comments on that. We know they are about 39,000 new HIV infections in the United States per year. This past -- most recent data that we have, we know 80 percent of those new infections were in persons of color.

CUMMINGS: Eighty percent.

WALENSKY: Eighty percent were in persons of color. We know that of the new infections in 2017, 43 percent were in African-Americans. African-Americans make up 13 percent of this population. We know that African-Americans suffered over 53 percent of the deaths of HIV and AIDS. And we know that PrEP is getting to largely gay white men, which it needs to get to and about 75 percent, but only about 10 percent of its consumers are people of color.

CUMMINGS: Mr. O'Day, what can we do about that?



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

O'DAY: This is a dire need and we completely agree. And part of the program we've just agreed to with the CDC is focused on 48 hotspot counties, seven rural states, District of Columbia and San Juan, Puerto Rico. These are areas and predominantly in the southern United States where the African-American incidents -- we're not reaching and getting to.

So, we've had programs that are continually focused on supporting the community's support services that are underway now, but we have much more we have to do to get to these communities. It's to make sure that the medicine is not the barrier in these communities, but beyond that is making sure we provide the services to both -- address the issues relative to inequalities in the healthcare system, lack of education, stigma associated with the minority in African-American communities.

We need to do more. We're fully committed to rolling up our sleeves to be a part of that. In fact, I just received an e-mail overnight from an incredible organization in Jackson, Mississippi that supported 400 patients to get PrEP over the past six years. It's a small start. There is so much more to do.

When they started, they were the only organization in Mississippi that did this. Unfortunately, they have a system there where ones they identify patients and they're now using telemedicine to try to identify patients, built into their protocols are the ability to access the Gilead support services.

And I am pleased to say that they said of the 400 patients, none of the 400 had a financial problem with getting the medicine. But we need to do this in so many other communities and that's why we're rolling up our sleeves and hoping -- and not just hoping, but committing to the CDC initiative and others to get to this community.

CUMMINGS: Ms. Pressley. Ms. Pressley.

PRESSLEY: Thank you, Mr. Chairman, and thank you Representative Ocasio-Cortez and all the advocates who made this hearing possible. Mr. Chairman, just picking up on some of your commentary and the comments of our colleague across the aisle who was very impassioned, and I have an equitable amount of outrage about the fact that people are dying.

This is not about the vilifying of profit. This is about the vilifying of choosing profit over people and if we know that a new person is infected every 15 minutes and we've been here two and half hours, that's 10 more people who have been infected.

And so we have an administration, the occupant in this White House who sets an aspirational and achievable goal to end this epidemic, and yet we don't have enough infectious disease doctors, we have a cost prohibitive life-saving drug and it is not equitably being accessed. So that sounds like an unfunded mandate, and we've been here before.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

And this is the oversight and reform committee. And so it is our job to hold everyone from, you know, I served for my city council before but any time profit over people, whether its developers or pharmaceutical companies are engaging in those practices, we're here to hold to shine a light on that and to keep us all accountable. So that's the role of this committee.

So, you know, we should be furious about what we've heard here today. This is the world's wealthiest nation. There are 40,000 new HIV diagnoses each year. In my home state of Massachusetts, there have been over 140 new HIV cases since 2015, eight new cases in Boston over the last six months.

Now, we've heard a lot of sobering and damning statistics here, but I don't want us to get lost in the numbers and allow that to dominate the conversation because this is about people, our family members, our neighbors, our friends, our constituents, like my constituent, Matthew.

He lives in Somerville. He's a gay man. Ad Matthew knows he's in a higher risk of HIV and for three years he's been fortunate enough to be on PrEP. His insurance coverage gives him access to the drug at an affordable rate. However, he lives in constant fear that a job change will push it out of reach for him.

There are millions of Matthews in our country for whom PrEP allows them to stand in their truth, safety, and unencumbered by the fear of contracting HIV, but unlike Matthew, there are millions more who need it and still cannot afford it. It's been 40 years since the first HIV case in the U.S. and this disease still remains a global public health challenge and as reminded to all of us by our Chair, in your earlier commentary, particularly for women and queer people of color.

It is my opinion that Gilead, you have used your power to manipulate our patent systems, monopolize the marketplace to line your shareholders pockets and I think that is shameful.

Dr. Walensky, you have studied HIV transmission closely and as a physician at Mass General Hospital, you were at the front lines of this epidemic. Since we're short on time, yes or no, do you agree that by failing to get PrEP in the hands of those most at risk, including people who inject drugs, we undercut our ability to eradicate this disease?

WALENSKY: Yes.

PRESSLEY: Thank you. Can you speak to how substance abuse disorder specifically for those who inject drugs with needles have heightened the need for greater access to PrEP?

WALENSKY: Our hospital is in full of injection drug users right now. We have doubled our consult volume in the last decade, much due to injection drug use. And there has been an outbreak in Lawrence and Lowell as you know in Massachusetts that was reported in the MMWR by the CDC, an HIV outbreak, I should say. So, yes, we need PrEP for all people at risk.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

PRESSLEY: Mr. O'Day, Gilead plans to donate millions of bottles of PrEP and bring a generic product to the market in the next few years. At face value, this seems like a good idea, although, you know, two years is two years too long, but the CDC estimates only a fraction of the 1.1 million people who need PrEP have access to it.

The donation your company announced would reach even less people. Now, I recognize your company's efforts to provide financial systems for people without insurance who can't afford it, but given the uptick in HIV infection, these efforts simply don't keep pace. They don't go far enough.

Mr. O'Day, can you guarantee that the donated medications will go to people who do not already have access to the drug?

O'DAY: Yes.

PRESSLEY: Thank you. In Canada and Australia, Truvada is sold for less than $10 a pill. It seems to me if your company wanted to, you can make the drug affordable for everyone. What has stopped your company from lowering the price to a comparable rate in the U.S.?

O'DAY: The patent exclusivity ends as you know in September of next year and we will, you know -- the pricing between the countries is very different. It's a very heterogeneous systems between the United States and in other countries.

And the pricing that as set in the United States takes into account the innovation it brings, the cost of the healthcare of treating an HIV patient, the ability to invest back in research and development and then also to make sure our access programs are effective and that patients in America do not go without receiving this life-saving medicine.

LORD: It's greed.

PRESSLEY: Yes. Look, so I was going to say just, you know, respectfully, in that every 15 minutes a new person is infected. The more time we waste, the more lives that we are losing, and again this is an aspirational and achievable goal. And so, it is really infuriating. There are clearly many barriers people are facing in accessing this life-saving medication and price should not be one of them.

Gilead can make PrEP more affordable in the U.S. and therefore more accessible if you want to, if there is the moral courage and the fortitude and the commitment to do so. Your failure to do so is indefensible.

Your company brings in record level profits while holding hostage a drug that could end this epidemic. There isn't a country in this world where this type of greed and conduct would be tolerated, so I'm not sure why we tolerate it in this one.

Thank you, Mr. Chairman, and I yield back.

CUMMINGS: Thank you very much. Mr. Tlaib.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

TLAIB: Thank you, Mr. Chairman, and Mr. Chairman, thank you so much for always supporting us, especially us, a new class of women that have come into this United States Congress. It speaks volumes to your character.

I also want to thank my sister from New York, Congresswoman Alexandria Ocasio-Cortez and the incredible advocates that are behind her in making sure that we always speak truth to power.

What is evil, Mr. Chairman, and I talk with you about this, what is evil is that people are dying a painful death all because of corporate greed. How much profit is enough, Mr. O'Day? When does it become immoral? And alone in my district, I have the third largest population of those infected in the state of Michigan.

And as I think about you saying you're helping folks, I look at numbers because it's important and when you say you're going to provide assistance to 200,000 people when 1.1 million people need your assistance. It's baffling and I agree with Dr. Lord.

I agree that Truvada belongs to all of us and it's our responsibility in this chamber to make sure that we are putting people before profit. And it's really absurd that as I hear my colleagues defending this practice over the American people that brought us here, it's disheartening because in the last five months, I don't care which committee I go to, corporate greed is the issue always.

It is always about the money and about profit and as Mr. Chairman has constantly always said, there's no problem with that, but when does it become immoral? When does it become so unjust that we're seeing our neighbors die, die because drugs are just not accessible to them? Drugs that we created, the federal government on behalf of the people.

And so I just want to urge Mr. O'Day, please take Dr. Lord's recommendations. This is your time to do what's right for the people and do what's right for our country.

And with that, I want to yield to my sister from New York who is again such a shed of light in this time of darkness in our country, that is constantly always putting people before profit and that's Alexandria Ocasio-Cortez.

OCASIO-CORTEZ: Thank you. It's incredibly too generous. Thank you. And I'd like to thank my sister and colleague from Michigan because, you know, I see you go home every weekend and connecting with your community and really feel -- bringing yourself to hold that space and feel what your constituents feel.

Mr. O'Day, I just want to clarify that and let you know this isn't about you and I'm not here to vilify the work that you've done because you are responding to a set of incentives and you could, you know, resign today, there would still be someone that would come up and occupy the seat responding to those same incentives, making the same decisions that you make.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

So, this isn't about you as an individual or who you are or your character. This is about the system of incentives that we have set up and when it comes to who to blame for this, I don't blame you. I blame us. I blame this body because every single developed country in the world guarantees health care as a right except us. Except the United States because we can't get it together, because we don't have the fortitude to kick pharmaceutical lobbyist outside of our congressional offices.

We have a leader here, Mr. Sarbanes, who has led in the role of money and politics. We can't even reform our own political system to make sure that we are more responsive to the people and the electorate that we seek to lead and whose votes we ask for.

And so this isn't your fault. This is our fault because for some reason, for some reason the conclusion that every single other western or rather developed country in the world had come to, we haven't been able to come to. In Australia, PrEP is $8 a month. In the United States, it is almost $2,000 a month because we have legislated a set of incentives and we have legislated a system that allows that to happen.

Out of every 10 people that need PrEP, nine of them cannot access it, and that is largely due to the price. We heard earlier today an impassioned plea about profits and about how a corporation like Apple should be able to enjoy that.

Well, I know a woman, her name is Amy Valela (ph) and her daughter died because she went to a hospital and told them that she wasn't insured and they said, "Come again in a month when you do have insurance."

Well, her blood clot didn't wait a month. Her daughter died at 22 years old and the rub of it, was that her daughter I believe might have actually been insured and just didn't know it because she was in between jobs.

And so what Amy (ph) says, what Ms. Valela (ph) says is this is a commodity. Her daughter's life was not. People's lives are not commodities. When we talk about economics, there is something known as a demand curve with elasticity and with every other commodity, you can say how much is this phone worth to you and you can say $100, $200. You can buy a Nokia phone. You can not have a phone at all.

But you cannot ask the question how much will you pay to be alive. How much will you pay to live, because the answer is everything. The answer is you will pay $10, you will $1,000. You will go into debt. You will do anything to live. And that is what makes the price of medicine different than the price if an iPhone. Thank you very much.

(CROSSTALK)

CUMMINGS: ... time has expired. Mr. Sarbanes.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

SARBANES: Thank you, Mr. Chairman. I'm tempted to just say amen and stop talking, but I do have a couple of questions I'd like to...

CUMMINGS: Me too.

SARBANES: Yes, I'd like to get on the record. Mr. O'Day, this new drug that is going through the process, Descovy -- is that how you say it?

O'DAY: That's correct, Congressman.

SARBANES: Yes, that's based on this component that has TAF as opposed TDF.

O'DAY: Correct.

SARBANES: Is that something you're going to pursue exclusivity on in terms of the patent around that?

O'DAY: It's a brand new medicine.

SARBANES: Yes, brand new.

O'DAY: It has a patent life as granted to it under the patent's statutes.

SARBANES: I know there are some questions being raised out there, I think it's found its way into litigation as to whether Gilead knew back when it was developing TDF that the TAF opportunity might be a safer one. And I'm curious as to whether you are aware of the safety benefits associated with TAF at the time when TDF was being developed.

O'DAY: Absolutely not. I mean, TAF was still at very early stages.

SARBANE: OK.

O'DAY: We pursued the development of that for treatment and for prevention in line with the natural course of development.

SARBANES: Dr. Lord, you were going to say something.

LORD: Yes. So we know that Gilead in 2011, the ex-CEO actually said that they stopped the development of the safer TAF drug because they knew it was not as safe and when they were trying to launch Truvada versus another drug, Epzicom, at the time.

And this is a quote of what they said, "And to have our own studies suggesting that Viread, which is part of Truvada, wasn't the safest thing on the market, which it certainly was at a time, it didn't seem like the best." So we have evidence from their CEO that they purposely delayed development of the safer drug.

SARBANES: Well, I appreciate that and it's obviously going to play itself out. I mean...

LORD: See you in court.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

SARBANES: The courts will decide, I guess, whether these allegations are well-founded or not. But it is interesting that the effect of this is that with the new Descovy, TAF-based drug that's coming, you're going to get another period of exclusivity.

So, am I right that essentially what's being achieved there is that by first pursuing the TDF-based Truvada with apparently the safety risk, and now pursuing the safer TAF-based drug of Descovy. Basically, Gilead is going to reap the benefit of two periods of exclusivity rather than one, correct? I mean, that's just factual.

O'DAY: Well, these are two completely different medicines. This is a step change in innovation...

SARBANES: Right. I got you. That's going to be subject to debate and whatever, but you are going to get a period of exclusivity which we're still in for the TDF-based, Truvada, and then you're going to get another period if this all works out for you, of exclusivity for the TAF-based Descovy. That's how it looks to me. I got to move on real quick to one of the series of questions I wanted to ask you.

I understand that Teva Pharmaceutical got FDA approval for generic equivalent for Truvada back in June 2017. And so it raises a question if that generic drug was approved in '17, why did it not enter the market in '17. And apparently, the answer is that three years previously in '14, Gilead had entered into a settlement agreement with Teva under the terms of which Teva agreed not to challenge Gilead's patents in court.

And so in exchange, Gilead allowed Teva come to the market in 2020, which is a year earlier. So you made this deal with them that basically says, we'll let you come on a year earlier if you, I gather, don't sue us on the patent. And maybe that you saw some weakness there and this was a good deal to make.

But is that true that there was some agreement that was made there with Teva where they're going to be able to come in a year earlier in return for something that was done? Is that true?

O'DAY: So, this is a fairly normal process of generics coming in, challenging patents.

SARBANES: Yes.

O'DAY: And then a determination is eventually made on the cost of litigation -- of potential litigation. We believe strongly in the Truvada patents. At the end of the day...

SARBANES: It is pretty typical. You're right about that. And you've done it in, I think, nine other instances. The effect of which there is all these ways to extend your patent control. One is pay for delay. This is a little bit different. This is making a deal basically so people won't challenge the patent, which to me signals maybe some concerns about the weakness of the patent, but you figured out a way to push that off.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

So it just makes me concerned about how you're conducting the business because the bottom line is these generics don't get to the market as quickly as they could and I understand from Dr. Walensky that the benefits of that in terms of the pricing may not be as much as we fantasize about, but nevertheless, it's important that the generics be able to get to market quickly or as quickly as they can.

And we're seeing some maneuvers on your part. I believe that keeps that from happening. With that, I'd yield back my time, Mr. Chairman.

CUMMING: Ms. Speier.

SPEIER: Thank you, Mr. Chairman. Thank you all for being here. At the outset, it's important for me to disclose that Gilead is a company in my district with 9,000 employees around the world, many of them in my district.

Having said that, Mr. O'Day, I'm glad you're here. I'm glad that you participated in the manner that you have. I think you do have a responsibility to your shareholders. I also think you have a responsibility to our country.

And you are doing what you're doing in large part, and I agree with Ms. Ocasio-Cortez because the system allows you to do it. And we have got to take responsibility for the fact that when Medicare party was created, we tied our hands behind our backs and did not allow Congress or the government to negotiate prescription drug discounts.

Now, I am deeply concerned about the 1.1 million people that Dr. Walensky talked about who warrant PrEP right now. They are those most susceptible to potentially getting HIV, but only 150,000 of those 1.1 million people actually do, and of those, they're 75 percent white. So, the people that desperately need this drug are African-American gay men. One in two black gay men will be diagnosed with HIV in their lifetime.

So, knowing all this, I want to know -- and here I am negotiating with you in public over something, frankly, the government should have been doing a long time ago. Are you willing to provide P.R. ads -- you put lots of ads on TV. I see them all the time for your drugs. Will you put ads on TV that are targeted at the African-American gay men who should be getting this drug and who are not, and make them also aware of the fact that you are making available this drug for free to those who need it.

O'DAY: Thank you, Congresswoman. Just the to clarify, the numbers that we have around 200,000 people are on -- of the 1.1 million are on Truvada today. There's clearly a huge unmet medical need to your point.

And again, the CDC's own studies suggest that with the Gilead support program, there is only 1 percent that are in it (ph) for financial means. We are firmly committed to working in a number of ways through outreach...

SPEIER: OK, Mr. O'Day, I don't have a lot of time.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

O'DAY: Right.

SPEIER: Will you commit to developing a P.R. campaign for TV to target the African-American population that is most susceptible to getting HIV and making them aware that the drug is available and it will be made available to them for free.

O'DAY: We do do television advertising today for this community. We do digital advertising. We commit to...

SPEIER: It's not working.

O'DAY: We commit to a variety of programs that are getting at this community today and it is increasing. But there's much, much more to do, which is why the CDC initiative which it's their numbers that suggested that 200,000 people are uninsured of this 1.1 million and we're providing the total amount to make sure that we get that to patients. And we'll continue to work...

SPEIER: But if people don't know about it, it doesn't matter that you're making 200,000 doses or enough for 200,000 people. If they don't know about it, they're not going to access it. So...

O'DAY: Right.

SPEIER: ... I feel that you have a moral obligation to inform that population. We have to save these lives. We do know that HIV is increasing because young gays, particularly in my district, are feeling immortal now and since there -- this disease is becoming chronic that they can engage in unprotected sex and so HIV is on the increase.

So, as the biggest provider of the drug that protects these individuals, I believe you have to do more and I'm asking you to do more.

O'DAY: Yes, and we will continue to do more. We spent more than $100 million over a ten-year period on a COMPASS program that specifically targets towards the southern states in the United States that focuses on education, that focus on access to healthcare and we'll continue to roll up our sleeves and work with the community and work with other organizations to be able to increase this presence. Absolutely, we commit to that.

LORD: It's obviously not working though, and this donation really is not any meaningfully different than their medication access program, which they already have, which as you say, is not working. It is only reaching, as Mr. O'Day said, 20,000 people.

SPEIER: So Dr. Lord, what would you recommend?

O'DAY: 200,000.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

LORD: I would recommend that they lower the price -- that they lower the price so that Mr. Horn's organizations can get drugs to the people that need them instead of spending $2.6 billion, which is the domestic spend on Truvada. I say we spend that money to develop programs for Mr. Horn's agencies to get drugs to these people that need it.

They don't just need free drug. They need programs and we're not going to do that with a donation. We're going to do that when we spend serious money instead of sending it to Gilead to giving it to the states, to the counties and municipalities that need it.

O'DAY: And Gilead is spending hundreds of millions of dollars on this program.

LORD: We're spending $2.6 billion. So, yes, you give us a few hundred million back, but we're giving you the vast majority of that to begin with.

SPEIER: All right. My time has expired, but Mr. O'Day, I hope that you will take my requests seriously and come back to us with a campaign that will engage a whole community that's not aware that your program exists.

I yield back.

CUMMINGS: I want to be effective and efficient. Who -- is there any agency that can identify who these people are that need this treatment, Dr. Walensky? In other words, can we pinpoint them, I mean, who they are? Do you follow me?

WALENSKY: Yes.

CUMMINGS: That way that go straight to them.

WALENSKY: Yes, thank you for that question. I want to go back to a number that keeps getting cited, that is 98 percent of people get access and 1 percent of people don't have -- don't cite cost as the issue, less than 1 percent of people don't cite cost as the issue. That was a study that was funded by the CDC. It was conducted by the CDC. It was a household survey.

So, we know that adults who are surveyed in the household don't think that they have a problem accessing PrEP. Well, I can tell you what, those are not the people who actually need access to PrEP. We know that of our youth that are -- that about 10 percent of our youth are gay. We know that of our homeless youth, 40 percent of them are gay. And you know what, they're not filling out household surveys.

So, I think part of the challenge with access to PrEP is that these folks are not easily coming forward. When we talk about gay black men, they don't have a good reason to come forward and I can promise you that teenagers and 20-year-old gay men are not accessing healthcare. They just don't come to the doctor.

CUMMINGS: How can we reach them? How do you...



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

WALENSKY: I think we need to decrease stigma. I think we need to have advertising. I think we need to open our doors to these people so that they will come, welcomed and loved and access these drugs, and come quarterly.

So I know the other statistics that has been thrown out is 200,000 people are currently on PrEP, 200,000 people have ever been on PrEP. We learned that the HIV meetings in March, 34 percent of people don't take it for longer than a year.

CUMMINGS: Mr. Horn.

HORN: Thank you. So, we've been really discussing cost as a considerable factor here and cost does remain a key issue here, but I think when we sort of opened it up a little bit, we really have to talk about really sort of financing, sustainable healthcare systems, you know, for the individuals that we're trying to reach here.

And I just do want to circle back on one thing and I think that, you know, I think the hearing is sort of just (inaudible) and acrimony around like, you know, that we're against profit, that Gilead is the enemy, neither is true. Neither is true on that.

And I am surrounded by activist, by clinicians, by academics, by policy leaders who have all fought tooth and nail with health insurance companies, with Medicaid, to make sure that Truvada was covered. However, what that comes back to is the issue of cost.

And even with the co-pay assistance program, again, that has really been elementary in just ensuring access there. But it really does come down to an issue of cost as to why those programs are even necessary in the first place. So, we're all in this together. We're all looking for solutions here. We don't have one good guy, we don't have one enemy. We really have to think about our entire system and have cost manifest across that entire system and what are we going to do about that going forward. Thank you.

CUMMINGS: Mr. O'Day, do you all -- your board -- I know it may be out of the ordinary, but does your board ever hear from people like Dr. Walensky and Mr. Horn?

O'DAY: Well, as you know, I just joined a couple of months, so I don't know the past practices of the board.

CUMMINGS: No, I'm just wondering...

O'DAY: But I think the voice of the patient and the voice of the community is represented in the company in very, very meaningful and serious ways. There is many, many community leaders that have joined Gilead and many HIV top physicians that are now part of Gilead. It is a part of the fabric of Gilead.



This document is being prepared for the exclusive use of BETSY JAYASURIYA at US DEPARTMENT OF JUSTICE

And if you allow me in my two and a half months, Mr. Chairman, that you feel very connected with all aspects of the continuum of care here. And people take it very seriously. I mean, our role is to develop the next transformational medicine, but it's also to work as a member of this community in a very responsible way.

CUMMINGS: Finally, what -- where are the negotiations with the CDC? Where are they right now? I mean, you did the 200,000. Is that ongoing? Do you follow me?

O'DAY: Well, yes, I mean, the details of the program, how to implement it, those are all now ongoing. The commitment is clear and as you said before, I mean, I think we would respond to other requests for further commitments, but now we are working through the details and trying to get it implemented as quickly as we can.

CUMMING: Mr. Jordan.

JORDAN: I would just thank our panel and again thank Gilead for the amazing drug they developed and the differences made for, as I said earlier, millions of people around the world.

CUMMINGS: Without objection, letters the committee has received about this issue are entered into the hearing record from a number of organizations including the Treatment Action Group, The AIDS Vaccine Advocacy Coalition and the HIV Medicine Association. All of these groups have written to express their concerns about the impact that the high price of Truvada is having on their members, their communities and the American healthcare system.

I'd also like to thank our witnesses for testifying today and without objection, all members will have five legislative days within which to submit additional written questions for the witnesses. They should be submitted to the chair, which will be forwarded to the witnesses for their response.

I ask our witnesses to please respond as promptly as you possibly can when you receive those written questions. With that, the hearing is adjourned.

END

May 17, 2019 16:19 ET .EOF