# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> Plaintiff & Counterclaim-Defendant, <br><br> v. <br><br> GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC, <br><br> Defendants & Counterclaim-Plaintiff. | C.A. No. 19-2103-MN |

## JOINT CLAIM CONSTRUCTION BRIEF

SARAH HARRINGTON
Deputy Assistant Attorney General

DAVID C. WEISS
United States Attorney

GARY L. HAUSKEN
Director

WALTER W. BROWN
Senior Litigation Counsel
PHILIP CHARLES STERNHELL
Assistant Director
PATRICK C. HOLVEY
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C. 20530
Tel: (202) 307-0341

LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, DE 19899

Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Alexandra M. Ewing (#6407)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
P.O. Box 551
Wilmington, DE 19801
Tel: (302) 651-7700

Ronald C. Machen
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000

David B. Bassett
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800

Vinita C. Ferrera
Emily R. Whelan
George P. Varghese

Tel: (302) 573-6277

*Counsel for Plaintiff United States*

Timothy A. Cook
WILMER CUTLER PICKERING
 HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000

*Counsel for Defendants Gilead Sciences, Inc.*
*& Gilead Sciences Ireland UC*

# TABLE OF CONTENTS

I.     Introduction......................................................................................................1

       A.     The Government's Introduction........................................................1

       B.     Gilead's Introduction ......................................................................2

II.    Agreed-Upon Constructions .........................................................................2

III.   Disputed Constructions...................................................................................3

       A.     "A process of protecting a primate host from a self-
              replicating infection by an immunodeficiency retrovirus"
              (preamble from Claim 1 of '509, '333, '191, and '423
              patents)...........................................................................................3

              1.     The Government's Opening Position.........................................3

              2.     Gilead's Answering Position ....................................................5

              3.     The Government's Reply Position...........................................11

              4.     Gilead's Sur-Reply Position ...................................................17

       B.     "A process for inhibiting establishment of a human
              immunodeficiency virus self-replicating infection of human
              immunodeficiency virus infection in a human" / "inhibiting
              establishment of a human immunodeficiency virus self-
              replicating infection of human immunodeficiency virus
              infection in a human" (preamble from Claim 12 of '509,
              '333, and '423 patents, and Claim 13 of '191 patent) ....................20

              1.     The Government's Opening Position.......................................20

              2.     Gilead's Answering Position ...................................................23

              3.     The Government's Reply Position...........................................25

              4.     Gilead's Sur-Reply Position ...................................................27

       C.     "thereby protecting the primate host from infection with the
              immunodeficiency retrovirus" (Claim 1 of '509, '333, '191,
              and '423 patents)...........................................................................27

              1.     The Government's Opening Position.......................................27

              2.     Gilead's Answering Position ...................................................31

              3.     The Government's Reply Position...........................................32

              4.     Gilead's Sur-Reply Position ...................................................34

       D.     "thereby inhibiting the establishment of the self-replicating
              infection with the immunodeficiency virus in the human"
              (Claim 12 of '509, '333, and '423 patents, and Claim 13 of
              '191 patent)...................................................................................35

1.   The Government's Opening Position...................................35

2.   Gilead's Answering Position ............................................36

3.   The Government's Reply Position......................................36

4.   Gilead's Sur-Reply Position ............................................36

E.   "tenofovir ester" (Claim 12 of '509 patent)...................................36

1.   The Government's Opening Position...................................36

2.   Gilead's Answering Position ............................................39

3.   The Government's Reply Position......................................51

4.   Gilead's Sur-Reply Position ............................................55

F.   "tenofovir prodrug"  (Claims 1, 4, 12, 16, 18-19 of '423 patent) ...................................................................................59

1.   The Government's Opening Position...................................59

2.   Gilead's Answering Position ............................................60

G.   "prior to an [the] exposure" (Claims 1 and 7 of '509, '333, '191, and '423 patents) ........................................................62

1.   The Government's Opening Position...................................62

2.   Gilead's Answering Position ............................................65

3.   The Government's Reply Position......................................70

4.   Gilead's Sur-Reply Position ............................................76

H.   "prior to [a] potential exposure" (Claim 13 of '509, '333, and '191 patents, and Claim 12 of '423 patent) ....................................79

1.   The Government's Opening Position...................................79

2.   Gilead's Answering Position ............................................79

3.   The Government's Reply Position......................................80

4.   Gilead's Sur-Reply Position ............................................80

# TABLE OF AUTHORITIES

**CASES**

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
  299 F.3d 1336 (Fed. Cir. 2002)........................................................................5

*Allergan Sales, LLC v. Sandoz, Inc.*,
  935 F.3d 1370 (Fed. Cir. 2019)........................................................28, 29, 32

*Amag Pharms., Inc. v. Sandoz, Inc.*,
  No. 16-cv-1508-PGS, 2017 WL 3076974 (D.N.J. July 19, 2017)....................63

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  457 F.3d 1293 (Fed. Cir. 2006)........................................................................9

*Apple Inc. v. Motorola, Inc.*,
  No. 1:11-CV-08540, 2012 WL 8123793 (N.D. Ill. Mar. 12, 2012) .................57

*ArcherDX, Inc. v. Qiagen Sci., LLC*,
  Case No. 18-cv-1019-MN, 2020 WL 3316055 (D. Del. June 18, 2020).........26

*ART+COM Innovationpool GmbH v. Google Inc.*,
  C.A. No. 14-217, 2016 WL 11531119 (D. Del. May 16, 2016)..................19, 20

*AstraZeneca AB v. Dr. Reddy's Labs., Ltd.*,
  No. CIV.A.05-5553 JAP, 2010 WL 1981790 (D.N.J. May 18, 2010) ...............9

*Beachcombers v. WildeWood Creative Prods., Inc.*,
  31 F.3d 1154 (Fed. Cir. 1994).........................................................................7

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006)...................................................................12, 32

*Bio-Rad Lab'ys., Inc. v. 10X Genomics Inc.*,
  967 F.3d 1353 (Fed. Cir. 2020)......................................................................14

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003).......................................................................3

*Bristol-Myers Squibb Co. v. Ben Venue Labs, Inc.*,
  246 F.3d 1368 (Fed. Cir. 2001).................................................................5, 13

*Cargill, Inc. v. Sears Petroleum & Transp. Corp.*,
  334 F. Supp. 2d 197 (N.D.N.Y. 2004)...........................................................55

*CBT Flint Partners, LLC v. Return Path, Inc.*,
  654 F.3d 1353 (Fed. Cir. 2011)..................................................21, 23, 26, 27

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*,
  958 F.3d 1348 (Fed. Cir. 2020)..............................................................................7, 13, 14

*Confluent Surgical, Inc. v. HyperBranch Med. Tech., Inc.*,
  C.A. No. 17-688-LPS-CJB, 2019 WL 1075539 (D. Del. Mar. 7, 2019) ......................9, 16

*Cree, Inc. v. SemiLEDs Corp.*,
  No. 10-cv-866-RGA, 2012 WL 975697 (D. Del. Mar. 21, 2012) ...............................22, 26

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
  438 F.3d 1374 (Fed. Cir. 2006)...........................................................................................68

*Danfoss Power Sols. Inc. v. DeltaTech Controls*,
  No. 16-cv-3111, 2019 WL 1517615 (D. Minn. Apr. 8, 2019).............................................19

*Eaton Corp. v. Rockwell Int'l Corp.*,
  323 F.3d 1332 (Fed. Cir. 2003)...........................................................................................4

*Fitbit, Inc. v. Valencell, Inc.*,
  964 F.3d 1112 (Fed. Cir. 2000)...........................................................................................26

*Forest Lab'ys., LLC v. Apotex Corp.*,
  Case No. 15-cv-018-GMS, 2016 WL 6645784 (D. Del. Nov. 8, 2016)...........................13

*Griffin v. Bertina*,
  285 F.3d 1029 (Fed. Cir. 2002)...........................................................................................71

*Hoffer v. Microsoft Corp.*,
  405 F.3d 1326 (Fed. Cir. 2005).....................................................................................24, 27

*Idenix Pharm. LLC v. Gilead Scis., Inc.*,
  Case No. 13-cv-1987-LPS,
  2016 WL 6802481 (D. Del. Nov. 16, 2016) ....................................................................3

*In re Copaxone Consol. Cases*,
  906 F.3d 1013 (Fed. Cir. 2018)...........................................................................................34

*In re Downing*,
  754 F. App'x 988 (Fed. Cir. 2018) ......................................................................................8

*Indacon, Inc. v. Facebook, Inc.*,
  824 F.3d 1352 (Fed. Cir. 2016)......................................................................................70, 76

*Intermec Techs. Corp v. Palm Inc.*,
  811 F. Supp. 2d 973 (D. Del. 2011)....................................................................................26

*INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*,
  951 F. Supp. 2d 604 (D. Del. 2013)....................................................................................55

*Jansen v. Rexall Sundown, Inc.*,
    342 F.3d 1329 (Fed. Cir. 2003)...................................................................................4

*Janssen Prods., L.P. v. Lupin Ltd.*,
    No. 10-cv-5954-WH,
    2013 U.S. Dist. LEXIS 189016 (D.N.J. Oct. 9, 2013).....................................................18

*KeyMe, LLC v. Hillman Grp., Inc.*,
    No. 19-cv-1539-LPS, 2021 WL 243252 (D. Del. Jan. 25, 2021) ...............................21, 22

*Koninklijke Philips N.V. v. AsusTek Comput. Inc.*,
    Case No. 15-cv-1125-GMS,
    2017 WL 2957927 (D. Del. July 11, 2017) ...................................................................26

*L.A. Biomedical Rsrch. Inst. at Harbor-UCLA Med. Ctr. v. Eli Lily & Co.*,
    849 F.3d 1049 (Fed. Cir. 2017)...................................................................................32

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004)................................................................................7, 64

*Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*,
    152 F.3d 1368 (Fed. Cir. 1998)...................................................................................71

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)...................................................................................................49

*Marrin v. Griffin*,
    599 F.3d 1290 (Fed. Cir. 2010)...............................................................................6, 16

*Microchip Tech. Inc. v. Aptiv Servs. US, LLC*,
    Case No. 17-cv-1194-LPS-CJB,
    2019 WL 2502417 (D. Del. June 17, 2019)..................................................................26

*Microsoft Corp. v. Motorola Inc.*,
    No. 10-cv-1823-JLR,
    2012 WL 12882863 (W.D. Wash. Apr. 10, 2012)..........................................................63

*Microwave Vision, S.A. v. ETS-Lindgren Inc.*,
    209 F. Supp. 3d 1322 (N.D. Ga. 2016)...................................................................4, 10

*Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*,
    336 F.3d 1373 (Fed. Cir. 2003)...................................................................................31

*Nystrom v. TREX Co.*,
    424 F.3d 1136 (Fed. Cir. 2005)...................................................................................75

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)...................................................................................49

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)........................................................................2, 59, 71, 78

*Poly-Am., LP v. GSE Lining Tech., Inc.*,
   383 F.3d 1303 (Fed. Cir. 2004).............................................................3, 9, 10, 15, 18, 19

*Princeton Digital Image Corp. v. Amazon.com, Inc.*,
   No. 13-cv-237-LPS, 2019 WL 351258 (D. Del. Jan. 29, 2019) .......................................22

*Rothschild v. Cree, Inc.*,
   567 F. Supp. 2d 572 (S.D.N.Y. 2008).........................................................................9, 16

*Sanofi Mature IP v. Mylan Lab'ys. Ltd.*,
   757 F. App'x 988 (Fed. Cir. 2019) ................................................................................14

*Sanofi v. Lupin Atlantis Holdings S.A.*,
   Case No. 15-cv-415-RGA, 2016 WL 5842327 (D. Del. Oct. 3, 2016) ............................13

*Sanofi-Aventis U.S. LLC v. Eli Lilly & Co.*,
   C.A. No. 14-113-RGA, 2015 WL 269399 (D. Del. Jan. 20, 2015) ..................................41

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015)...............................................................................5, 8, 9

*SunPower Corp. v. PanelClaw, Inc.*,
   No. 12-cv-1633-MPT, 2016 WL 1293479 (D. Del. Apr. 1, 2016)....................................4

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*,
   358 F.3d 870 (Fed. Cir. 2004)..................................................................................75, 80

*Thermal Dynamics Corp. v. TATRAS, Inc.*,
   No. 04-cv-152-PB, 2004 WL 4957314 (D.N.H. Dec. 9, 2004) .......................................31

*Thorner v. Sony Computer Ent. Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012).....................................................................................38

*Trivascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016).....................................................................................10

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007).....................................................................................38

*Vifor (Int'l) AG v. Mylan Labs. Ltd.*,
   No. 19-cv-13955-FLW, 2021 WL 1608908 (D.N.J. Apr. 26, 2021)................................24

*Vizio, Inc. v. International Trade Commission*,
   605 F.3d 1330 (Fed. Cir. 2010).....................................................................................16

*Wellman, Inc. v. Eastman Chem. Co.*,
   642 F.3d 1355 (Fed. Cir. 2011)....................................................................64

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
   442 F.3d 1322 (Fed. Cir. 2006)................................................................51, 58

**STATUTES, RULES & REGULATIONS**

35 U.S.C. § 254........................................................................................25

35 U.S.C. § 255........................................................................................25

**OTHER AUTHORITIES**

Bruce Alberts et al., *Molecular Biology of the Cell* (4th ed. 2002) .........................................41

Hawley's Condensed Chemical Dictionary (14th ed. 2001) .................................................55

McGraw-Hill Dictionary of Chemistry (2d ed. 2003) ................................................41, 43, 44

Random House Unabridged Dictionary (2d ed. 1993) .........................................................73

Robert A. Matthews, Jr., *Annotated Patent Digest* (Mar. 2021 update)..........................12. 24

U.S. Patent No. 5,763,047.....................................................................................9

U.S. Patent No. 10,155,007...................................................................................51

## I.      Introduction

### A.      The Government's Introduction

Since the early 1980s, researchers have pursued methods to stop the spread of human immunodeficiency virus (HIV).  In the mid-2000s, researchers at the Centers for Disease Control and Prevention (CDC) invented medicinal drug regimens that effectively prevent HIV-negative individuals from acquiring HIV.  These regimens involve co-administering emtricitabine and tenofovir (or a tenofovir ester/prodrug) to at-risk individuals ***prior*** to exposure to HIV.  Today, these important HIV-prevention regimens are referred to as "pre-exposure prophylaxis" or "PrEP."  The methods invented by the government researchers provide the only FDA-approved HIV pre-exposure prophylaxis regimens, and are reflected in the asserted claims of U.S. Patent Nos. 9,044,509 (the '509 Patent), 9,579,333 (the '333 Patent), 9,937,191 (the '191 Patent) and 10,335,423 (the '423 Patent) (collectively, the Patents-in-Suit).

The parties dispute eight terms in the asserted claims.  For the first four terms (two preambles and two "thereby" clauses), the main dispute is whether they are limiting.  As discussed in the sections below, the preambles and thereby clauses are limiting.  Indeed, in denying Gilead's IPR petitions challenging the patentability of the PrEP regimens recited by each of the asserted claims, the PTAB rejected Gilead's arguments that the terms are non-limiting.

The next two terms, "tenofovir ester" and "tenofovir prodrug," have meanings provided by the specification and understood by the skilled artisan.  Gilead seeks overly narrow constructions of these terms that should be rejected for reasons discussed below.

The last two terms, "prior to an [the] exposure" and "prior to [a] potential exposure," emphasize that the asserted claims are directed to PrEP regimens in which emtricitabine and tenofovir (or a tenofovir ester/prodrug) are co-administered as a prophylactic treatment.  Yet

Gilead once again seeks overly restrictive constructions of these terms that contravene the intrinsic evidence.  The Court should adopt the Government's constructions, which follow well-established claim construction principles and are consistent with the intrinsic evidence.

### B.      Gilead's Introduction

The goal of claim construction is to give claim terms the meaning that a person of ordinary skill in the art ("POSA"), having read the patent and file history, would have understood them to have at the time of the invention.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-14 (Fed. Cir. 2005) (en banc).  Gilead's proposed constructions for the disputed terms achieve that goal.  The government, by contrast, seeks strained constructions that are unsupported by the intrinsic record in an attempt to avoid the prior art and to improve a flawed infringement position on its last-expiring patent.  The government's proposed constructions, many of which simply repeat the key disputed words, also fail to inform the meaning of the disputed terms and do not resolve the parties' claim construction disputes.  A POSA, reading the Patents-in-Suit at the time of their alleged inventions, would have understood the disputed terms to have the meanings Gilead proposes, which are consistent with the intrinsic evidence and which will aid the factfinder in resolving the issues that may turn on these claim terms.  Gilead's proposed constructions should therefore be adopted.

## II.    Agreed-Upon Constructions

The parties have not agreed to the construction of any claim terms.  Subject to the Court's approval, however, the parties have agreed to postpone Gilead's assertions of indefiniteness of eight terms until summary judgment proceedings.  *See* D.I. 76.

### III.  Disputed Constructions

**A.**     **"A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus" (preamble from Claim 1 of '509, '333, '191, and '423 patents)**

| The Government's Proposal | Gilead's Proposal |
|---|---|
| The preamble is limiting | Non-limiting |

#### 1.      The Government's Opening Position

The meaning of this preamble is not in dispute.  Instead, the issue is whether this preamble and the phrase "protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus" is a limitation of the claimed prophylactic method.

A preamble is limiting where it provides the "essence of the invention" and "the *raison d'être* of the claimed method itself." *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2003).  A specification "replete with references" to preamble language shows that the inventor regarded the language as "an important characteristic of the claimed invention," and thus limiting the claims.  *Poly-Am., LP v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004).  Here, the specification discusses "protection" (or "protect," "protecting") throughout, demonstrating the importance of protection to the claimed invention.  *See, e.g.*, Appx0007-08 at 2:9-21, 2:33-36, 3:20-25, 4:3-7.[1]  Indeed, the PTAB agreed and found the preamble to be limiting.  *See* Appx0948-49 (quoting *Poly-Am.,* 383 F.3d at 1310); *see also Idenix Pharm. LLC v. Gilead Scis., Inc.*, Case No. 13-cv-1987-LPS, 2016 WL 6802481, at *5 (D. Del. Nov. 16, 2016) (finding preamble that recited a "method for treatment of a Hepatitis C virus infection" to be limiting).

---

[1] The Government includes citations to the '509 patent (Appx0001-13) for ease of reference in this brief.  There are corresponding disclosures in each of the '333, '191, and '423 patents, which each claim priority to the '509 patent and share the same specification and figures.

The "immunodeficiency retrovirus" recited in the preamble also provides antecedent basis for step (a) of claim 1, which recites "selecting a primate host not infected with ***the*** immunodeficiency retrovirus." Appx0012 at 12:41-42 (emphasis added). Therefore, the preamble is limiting because "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003). The PTAB agreed, explaining that "step (a), therefore, requires the preamble language for antecedent basis, and the preamble provides further meaning about the nature of the infection to which the claim is directed—'a self-replicating infection by an immunodeficiency retrovirus.'" Appx1788; *see also* Appx0947.

The preamble also provides context for the "effective amount of emtricitabine" and "effective amount of tenofovir or tenofovir [ester/prodrug]" recited in step (b) of claim 1. Appx0012 at 12:43-48. "The preamble is therefore not merely a statement of effect that may or may not be desired or appreciated. Rather, it is a statement of the intentional purpose for which the method must be performed." *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003). The PTAB agreed, and found the preamble limiting for this additional reason. *See* Appx1788-90; Appx0947-48.

In denying Gilead's IPR petitions, the PTAB applied the same *Phillips* standard to reject the same non-limiting construction Gilead reasserts here. The "opinion of an expert body like the PTAB can carry significant persuasive weight when courts deal with technically complex issues, like patents." *Microwave Vision, S.A. v. ETS-Lindgren Inc.*, 209 F. Supp. 3d 1322, 1329 (N.D. Ga. 2016). Indeed, the Court may "take the PTAB's claim construction into consideration, particularly where that construction was 'similar to that of a district court's review.'" *SunPower*

– 4 –

*Corp. v. PanelClaw, Inc.*, No. 12-cv-1633-MPT, 2016 WL 1293479, at *6 (D. Del. Apr. 1, 2016) (internal footnotes omitted).  There is ample similarity here, particularly when Gilead briefed the issue (Appx2058-62) and the PTAB applied the same *Phillips* standard as this Court.  Gilead offers no reason to depart from the PTAB's determination that the preamble is limiting.

### 2.      Gilead's Answering Position

The Patents-in-Suit claim methods of using the combination of pharmaceuticals in Truvada® before exposure to HIV, but the prior art is replete with examples of Truvada® being suggested for that use well before the patents' priority date.  This renders the asserted claims invalid.  In an attempt to avoid this prior art and salvage its claims, the government seeks to turn the statement of desired result from the claims' preambles into an ill-defined "protection" requirement.  But nothing in the intrinsic record supports that limitation.

There is a presumption that claim preambles do not limit the claims.  *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002); *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1292 (Fed. Cir. 2015) ("Generally, a preamble is not limiting.").  The government provides no persuasive reason to depart from that presumption here.  The preambles and "thereby" clauses in each claim of the Patents-in-Suit merely recite the desired result of the claimed methods and do not limit how the claimed methods are performed.

A preamble is not limiting if "the body of the claim sets out the complete invention, and the preamble is not necessary to give 'life, meaning and vitality' to the claim."  *Bristol-Myers Squibb Co. v. Ben Venue Labs, Inc.*, 246 F.3d 1368, 1373-74 (Fed. Cir. 2001) (citations omitted).  That rule applies here because the bodies of the claims set out the claimed process steps—i.e., "selecting a primate host" and "administering" a combination of pharmaceuticals, followed by an "exposure" to a virus.  *See, e.g.*, Appx12 (claim 1).  The preambles (and "thereby" clauses) do not add process steps or change how the recited steps are performed.  Instead, they describe the

desired result of the steps—"protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus."  "[U]se descriptions," such as these, "are rarely treated as claim limitations."  *Marrin v. Griffin*, 599 F.3d 1290, 1294 (Fed. Cir. 2010).

There is no reason to deviate from the general rule here.  The preambles and "thereby" clauses do not give meaning to or limit how the claimed steps may be performed, and a POSA would not have understood the preamble and "thereby" language to be limiting.  Flexner Decl. ¶¶ 31-39 (Appx7165-68).  Indeed, although the government begins its argument by stating that "[t]he meaning of this preamble is not in dispute," nowhere in its brief does the government say what that meaning is, except to vaguely suggest that it requires "protection."[2]  Gov't Br. at 3. The government's failure to articulate ***how*** the preambles are limiting provides reason enough to reject its argument.

Moreover, to the extent the government does contend that the preambles add some sort of "protection" limitation to the claims, the claims themselves suggest otherwise.  When the government intended to add a "protection" limitation, it did so expressly.  Each of the independent claims that includes the disputed preambles (and "thereby" clauses) has a dependent claim that recites "[t]he process of [the independent claim] wherein administration of the combination ***results in an absence of persistent viremia and seroconversion*** of the primate host."  Appx13, Appx27, Appx41, Appx55 (claim 11 in each) (emphasis added).  That is how the

---

[2] The PTAB's institution decision, to which the government asks this Court to defer, construed the preambles (and "thereby" clauses) to "require the particular primate host receiving the claimed combination prior to exposure [to] 'be HIV negative after exposure.'"  Appx950 (quoting the government's statement at Appx2188); *see also* Appx1460; Appx1794; Appx1971. Likewise, in its PTAB filings, the government stated that "it is possible for a patient to take Truvada prior to exposure to HIV and still become HIV positive," and "[i]n such an unfortunate case, the patient would not be HIV negative, so the claimed method would not be infringed." Appx2189; *see also* Appx2559-60; Appx2768; Appx2981.  But the government has not stated that it is seeking such a construction here.

Patents-in-Suit defined "protection" in their working examples: "Protection," according to

Example 7, "was defined as ***absence of persistent viremia and seroconversion***."  Appx11(9:27-

28).  A construction of the preambles (and "thereby" clauses) that includes a "protection"

limitation renders these dependent claims redundant, which is "presumptively unreasonable."

*Beachcombers v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1162 (Fed. Cir. 1994); *see*

*also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("[T]he presence

of a dependent claim that adds a particular limitation raises a presumption that the limitation in

question is not found in the independent claim.").

        The government attempts to invoke several exceptions to the general rule that preambles

are not limiting, but its arguments do not bear scrutiny.  *First*, the government contends that the

preambles provide antecedent basis for the claims because the preambles recite "***an***

immunodeficiency retrovirus" and step (a) of the claims recites "***the*** immunodeficiency

retrovirus."[3]  Gov't Br. at 4 (emphasis added).  But there is no dispute that claim 1 requires an

"immunodeficiency virus"—the dispute is whether claim 1's preamble acts as a limitation that

requires users to gain "protection" from the virus.  And even if the phrase "an immunodeficiency

virus" in the preambles were to inform a POSA's understanding of "the immunodeficiency

retrovirus" in step (a), that would not support the government's conclusion that the ***entire***

preamble is limiting.  *See Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348,

1355 (Fed. Cir. 2020) ("Although the preamble term 'a patient' may provide antecedent basis for

claim 1's later recitation of 'the patient,' that is not the preamble language Cochlear argues is

---

        [3] The government also contends that the preambles provide antecedent basis for and "further
meaning about the nature of the infection to which the claim is directed," quoting the PTAB.
Gov't Br. at 4 (quoting Appx1788).  But the only other mentions of "infection" in claim 1 (and
its dependent claims) are in the likewise non-limiting "thereby" clause, so the preamble does not
define or explain this term.  Put simply, the preambles and "thereby" clauses cannot provide
antecedent basis for a term that does not appear in the rest of the claim.

limiting.  A conclusion that some preamble language is limiting does not imply that other preamble language, or the entire preamble, is limiting.").  Moreover, the preambles are also not "**necessary** to provide antecedent basis" for the rest of the claims.  *Summit 6*, 802 F.3d at 1292 (emphasis added).  If the preambles were deleted, a POSA would still be readily able to understand claim 1 because the claim still refers to only one "immunodeficiency virus."  *Cf. In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018) (concluding that claim reciting only "the end user" was not indefinite because "claim 1's recitation of one end user could only refer to the end user using the product").

*Second*, the government contends that the desired outcome recited in the preamble "provides context" to determine the "pharmaceutically effective amount[s]" of the compounds recited in the claims.  Gov't Br. at 4.  But the preambles' stated goal of "protection" does not clarify anything in this regard because the specification indicates that the claimed method only protected 67% of subjects through 14 viral exposures using TDF and emtricitabine. Appx11(9:53-55).  If the preambles require that a "pharmaceutically effective amount" of each component be an amount that causes "protection," as the government contends, the Patents-in-Suit provide no guidance on what level of "protection" must be achieved or what amount of drug will achieve that protection.  Instead, the specification refers to doses in terms of concentration of the drug at the site where the virus will be found—for example, stating that "[t]he dose of individual active components of an inventive prophylactic composition is administered to create a therapeutic concentration of the active composition at the situs of retrovirus initial founder cell population infection prior to viral exposure"—and further provides that the doses preferably will be the same doses at which the recited compounds are used for HIV treatment.  Appx9(6:18-38). And the government has not even proposed "pharmaceutically effective amount" for

construction.  Its attempt to use the preambles to limit "pharmaceutically effective amount" is inconsistent with the term's plain meaning, which is generally understood to be any amount that elicits any of the results discussed in the specification.  *See, e.g.*, *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1303 (Fed. Cir. 2006); *AstraZeneca AB v. Dr. Reddy's Labs., Ltd.*, No. CIV.A.05-5553 JAP, 2010 WL 1981790, at *9 (D.N.J. May 18, 2010) (noting that a proposed construction of "therapeutically effective amount" that limited the term to a specific therapeutic effect was "somewhat inconsistent with the ordinary meaning of the term").  Again, the preambles are not "necessary" to understand the rest of the claim terms, *Summit 6*, 802 F.3d at 1292, and trying to twist them to do so only causes further confusion.

*Next*, the government contends that the inventors' references to "protection" throughout the specifications make the preambles limiting, Gov't Br. at 3, relying heavily on *Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004).  But this case is fundamentally different from *Poly-America*, in which the claims were drawn to an apparatus (a liner for landfills) and the issue was whether a description of the liner in a simple preamble was an additional claim limitation.[4]  There, the adjective in the preamble—"blown-film"—further described the structure that the rest of the claim recited.  Here, however, the preambles do not refine the method steps in the Patents-in-Suit—rather, the government seeks to add a new limitation about the **result** of those steps.  Courts have rejected similar attempts to rely on *Poly-America* for purposes other than refining limitations that are already stated in the claims.  *See, e.g.*, *Confluent Surgical, Inc. v. HyperBranch Med. Tech., Inc.*, C.A. No. 17-688-LPS-CJB, 2019 WL 1075539, at *5 n.4 (D. Del. Mar. 7, 2019); *Rothschild v. Cree, Inc.*, 567 F. Supp. 2d 572, 577 (S.D.N.Y. 2008) (rejecting reliance on *Poly-America* and finding preamble not limiting

---

[4] The independent claim in *Poly-America* recited:  "<u>A blown-film textured liner</u>, comprising: [three layers]."  *See* U.S. Patent No. 5,763,047 (claim 1) (preamble underlined).

where the "terms [in the preamble] do not describe steps of the patented process but the objective

it achieves").  Indeed, *Poly-America* itself cautions that "a preamble is not limiting where a

patentee defines a structurally complete invention in the claim body and uses the preamble only

to state a purpose or intended use for the invention."  *Poly-Am.*, 383 F.3d at 1310 (quotation

marks omitted).  That is precisely what the preambles of the Patents-in-Suit do, and it is precisely

why they are not limiting.  Flexner Decl. ¶ 34 (Appx7165-66).

The government relies heavily on the PTAB's institution decisions finding the preambles

to be limiting, but there are two reasons (in addition to those above) that the Court should decline

to follow the PTAB.  *First*, while PTAB claim constructions may have some persuasive weight,

they do not limit this Court's ability to arrive at its own claim constructions.  In fact, in the very

case that the government cites to urge the Court to defer to the PTAB's "expert" opinion, the

district court noted that it "disagree[d] with the PTAB" and declined to follow the PTAB's

construction.  *Microwave Vision, S.A. v. ETS-Lindgren Inc.*, 209 F. Supp. 3d 1322, 1333 (N.D.

Ga. 2016); *see* Gov't Br. at 4.  *Second*, PTAB **institution** decisions—like the PTAB decisions

here—are less persuasive than final PTAB decisions because they are based on limited records

and are not appealable.  *Cf. Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016)

(noting that even the PTAB "is not bound by any findings made in its Institution Decision").

Indeed, the more complete view of the government's positions that has emerged in this litigation

illustrates why the PTAB's claim construction was flawed:  The government contends that the

preambles require some type of "protection" from infection, Gov't Br. at 3, but the government

***also*** now contends that the claims require ***no exposure to a virus at all***.  *See infra* §§ III.G.1,

III.G.2.  In fact, despite urging deference to the PTAB on the preambles and "thereby" clauses,

the government expressly ***disagrees*** with the PTAB's conclusion that "actual exposure to the

immunodeficiency retrovirus" is required.  Appx1462; *see also* Gov't Br. at 64 n.29.  But if the preambles were limiting, the government's position would make no sense:  If no exposure to the virus is required, what is the claimed method "protecting" the subject from?  Gilead's proposed constructions harmonize these terms by making clear that an exposure to the virus is required and that the preambles simply state the non-limiting desired result of the claimed process, but the government's proposed constructions put these terms directly in tension.

### 3.    The Government's Reply Position

Gilead's suggestion that "nothing in the intrinsic record supports" the conclusion that the preambles at issue are limiting, Gilead Br. at 5, is belied by the fact that the PTAB concluded that the preambles are limiting.  Those decisions themselves *are* intrinsic evidence and provide a thorough analysis of additional supporting intrinsic evidence, *see supra* § III.A.1.  Gilead nonetheless asks the Court to "decline to follow" the PTAB's well-reasoned decisions, not because of any particular flaw—as Gilead articulates none—but rather because those decisions are *persuasive* rather than *binding* authority—something no one contests.  Gilead Br. at 10-11.

Gilead also asks the Court to discount the PTAB's conclusions because the PTAB allegedly reached its determination on "limited records."  *Id.* at 10.  This is incorrect.  Gilead presented full briefing in support of its argument that the preambles are non-limiting.  *See, e.g.*, Appx2429-33.  Moreover, it presented that briefing in its chosen forum with an extensive record that included over 159 exhibits and an expert witness declaration.  *See, e.g.*, Appx2504-19.  Accordingly, the assumption embedded in Gilead's argument, namely, that it was somehow prevented at the PTAB from giving a full-throated defense of its position that the preambles are

not limitations is meritless.  The Court should reject Gilead's attempt to re-litigate this same issue.[5]

Gilead's argument that this Court should reach a conclusion contrary to the PTAB's relies heavily on the principle that a preamble is generally non-limiting.  *See* Gilead Br. at 5-6.  Although this is true so far as it goes, it is equally true that "it is not unusual for [the Federal Circuit] to treat preamble language as limiting."  *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006); *see also Matthews Annotated Patent Digest* § 5.25 (providing numerous examples of "cases finding preamble was a claim limitation").  For the reasons discussed, *see supra* § III.A.1, the specific facts here compel that conclusion.

Gilead argues that the meaning of the preambles is not discernable because "nowhere in its brief does the [G]overnment say what that meaning is," Gilead Br. at 6, and it is unclear what the claimed method is "protecting" the host from.  *Id.* at 11.  When Gilead sought review of these claims in the PTAB, however, it readily understood the preambles "[r]egardless" of whether they were or were not limiting.  *See* Appx2094; Appx2464; *see also* Appx2074; Appx2445; Appx2662; Appx2871-72.  The plain language of the preambles, in any event, is not difficult to discern: they impart meaning about the nature of the infection the claims provide protection for by specifying that the claims are directed to "[a] process for protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus."  *See* Appx4317-19 ¶¶28-30 (Murphy Dec.); Appx1788 (PTAB explaining that "the preamble provides further meaning about

---

[5] The Government need not address Gilead's off-topic assertion that "the prior art is replete with examples" that invalidate the asserted claims, Gilead Br. at 5, except to say that the PTAB determined that Gilead's preferred prior art does not raise even a reasonable likelihood of invalidity, much less constitute clear and convincing evidence of invalidity.  *See, e.g.*, Appx0940; Appx1766.

the nature of the infection to which the claim is directed—'a self-replicating infection by an immunodeficiency retrovirus'").

Gilead's remaining arguments are equally unconvincing.[6]  For example, citing *Bristol-Myers Squibb Co. v. Ben Venue Lab'ys, Inc.*, 246 F.3d 1368, 1373-74 (Fed. Cir. 2001), Gilead argues that the preambles are non-limiting because they merely "describe the desired result of the steps" of the claim.  Gilead Br. at 5-6.  Gilead made this same argument to the PTAB which considered and ultimately rejected it, finding several reasons to distinguish *Bristol-Myers Squibb* from this case.  *See* Appx1792, n.21 ("The result in *Bristol-Myers Squibb* (cited by [Gilead]) is inapposite here.").  Moreover, *Bristol-Myers* does not apply where, as here, a preamble provides antecedent basis for terms in the body of the claim.  *See supra* § III.A.1; *see also Sanofi v. Lupin Atlantis Holdings S.A.*, Case No. 15-cv-415-RGA, 2016 WL 5842327, at *3 (D. Del. Oct. 3, 2016) (finding preamble limiting and *Bristol-Myers* inapplicable because preamble provided antecedent basis); *Forest Lab'ys., LLC v. Apotex Corp.*, Case No. 15-cv-018-GMS, 2016 WL 6645784, at *1 n.5 (D. Del. Nov. 8, 2016) (same); *Novartis Pharms. Corp. v. Accord Healthcare Inc.*, 387 F. Supp. 3d 429, 436-37 (D. Del. June 5, 2019) (finding preamble provided antecedent basis for a claim term, breathed life into the claims, and that *Bristol-Myers* therefore does not apply).

Citing *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1355 (Fed. Cir. 2020), Gilead seeks to minimize the antecedent basis the preambles provide here by carving them up into limiting and non-limiting parts.  *See* Gilead Br. at 7-8.  In *Cochlear Bone*, however, the Federal Circuit noted that although one of the terms that appeared in the preamble may have

---

[6] Gilead includes arguments concerning the "thereby" clauses, *see* Gilead Br. at 5-7, and the "prior to an [the] exposure" limitation, *see id.* at 10-11, in this section of its brief.  The Government responds to those arguments below in sections III.C.3 and III.G.3, respectively.

provided antecedent basis for the claim at issue there, the patentee (and plaintiff) did not argue that that term was limiting—only that a truncated portion of its lengthy preamble was limiting, and that truncated portion was not the part of the preamble that "provide[d] . . . antecedent basis for the body of the claims." *See Cochlear Bone*, 958 F.3d at 1355. In addition, the preamble there recited a ***conventional*** use of prior art bone-anchored hearing aids. In contrast, the preambles at issue here recite an ***innovative*** "process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus"—a single, coherent concept that is not susceptible to the sort of parsing into limiting and non-limiting fragments that the lengthy preamble in *Cochlear Bone* was. *See* Appx4318-19 ¶30 (Murphy Dec.); Appx1788.

The situation here is analogous to *Bio-Rad Lab'ys., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1370-72 (Fed. Cir. 2020), where the Federal Circuit reversed the district court's parsing of a preamble into limiting and non-limiting parts because the preamble could not "be neatly packaged into two separate portions." Indeed, "[b]ased on the antecedent relationship, it is clear the claim drafters intended to limit the claimed methods . . . using both the preamble and the body of the claim to define the claimed invention." *Id.* at 1371; *see also Sanofi Mature IP v. Mylan Lab'ys. Ltd.*, 757 F. App'x 988, 993 (Fed. Cir. 2019) (holding a preamble limiting when it "expresses the intentional purpose[—increasing survival—]for which the method must be performed") (internal citations omitted). Likewise, the preambles here provide antecedent basis for step (a) of claim 1 and express the intentional purpose of the claim—pre-exposure prophylactic "protection." In allowing the claims, the Examiner relied on the protection the inventions provide. *See, e.g.*, Appx0838; Appx0841-42; Appx1792. The preambles are therefore limiting for at least these reasons. *See supra* § III.A.1; Appx1788; Appx0947.

– 14 –

Gilead further asserts that "the preambles' stated goal of 'protection'" does not provide context for the "pharmaceutically effective amount[s]" of the compounds recited in the body of the claims because "the specification indicates that the claimed method only protected 67% of subjects."  Gilead Br. at 8 (citing Appx0011 at 9:53-55).  Gilead derives this number from Example 7, which describes a routine dosing study that assisted the patentees in determining pharmaceutically effective amounts of the compounds that protect against infection.  *See* Appx0011 at 9:1-31; Appx4317-18 ¶29 (Murphy Dec.).  In this portion of the study, animals were administered 20 mg/kg emtricitabine (FTC) and 22 mg/kg of tenofovir (TDF).  *See* Appx0011 at 9:16-17.  While two of the six animals orally administered TDF and FTC became infected,[7] this only occurred after 9 and 12 weekly exposures.  In total, this drug combination reduced infection by 7.8 fold as compared to control animals that received no drug treatments, and protected all animals orally administered FTC and TDF through 8 weekly rectal exposures. *Id.* at 9:53-57; Appx0004 (Fig. 2); Appx4317-18 ¶29 (Murphy Dec.).  Further, the doses administered to the animals in that study correspond to "humans receiving 200 mg of FTC" and 300 mg of tenofovir, *see* Appx0010 at 7:41-47, which Gilead admits are pharmaceutically effective amounts, *see* Appx2078-80; Appx2449-51; Appx2666-68; Appx2875-77.  The specification therefore provides ample disclosure to inform the skilled artisan as to pharmaceutically effective amounts that provide "protection."  *See* Appx4317-21 ¶¶29, 31 (Murphy Dec.).

Gilead struggles to distinguish *Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004), by suggesting that that case applies only in situations where

---

[7] Gilead's brief also fails to mention that none of six animals who were subcutaneously administered 20 mg/kg of FTC and 22 mg/kg of tenofovir were infected, "demonstrating that full protection against repeated challenges is possible."  Appx0011 at 9:50-53.  Such administration is also covered by many of the claims at issue, which are not limited to oral administration.

– 15 –

there is a simple preamble describing an apparatus recited in the remainder of the claim.  *See*

Gilead Br. at 9-10.  *Poly-America*, however, has not been so narrowly applied and indeed the

PTAB previously explained that the case in fact is applicable to the claims at issue here.  *See*

Appx0948; Appx1791.  Gilead provides no credible reason to depart from that conclusion.  Nor

do Gilead's citations to *Confluent Surgical, Inc. v. HyperBranch Med. Tech., Inc.*, Case No. 17-

cv-688-LPS-CJB, 2019 WL 1075539, at *5 n.4 (D. Del. Mar. 7, 2019) and *Rothschild v. Cree,*

*Inc.*, 567 F. Supp. 2d 572, 577 (S.D.N.Y. 2008) suggest a different outcome.  Gilead Br. at 9-10.

The cited passages from both decisions expressly note that the respective specifications of the

patents at issue did not have numerous references to language in their preambles.  *See Confluent*

*Surgical*, 2019 WL 1075539, at *5 n.4; *Rothschild*, 567 F. Supp. 2d at 577.  The patents here, by

contrast, are replete with references to the preamble language, *see supra* § III.A.1, Appx0948-49,

a fact that Gilead does not dispute, *see* Gilead Br. at 9-10, Appx7199 ¶31.

        Gilead's reliance on *Marrin v. Griffin*, 599 F.3d 1290, 1294 (Fed. Cir. 2010) fares no

better.  *See* Gilead Br. at 5-6.  That case involved claims to scratch-off labels where the preamble

indicated only what the use of the scratch-off labels was for, but did not recite the essence of the

invention—hence the court's conclusion that such "use descriptions" are rarely limiting.  *Marrin*,

599 F.3d at 1294.  Here, by contrast, the preambles do recite the essence of the claims, rendering

*Marrin* inapplicable.  *See Vizio, Inc. v. International Trade Commission*, 605 F.3d 1330, 1340-41

(Fed. Cir. 2010); *supra* § III.A.1; Appx0948-49.

        Finally, Gilead asserts that construing the preambles to be limiting would render

redundant those dependent claims that recite "wherein the administration of the combination

results in an absence of persistent viremia and seroconversion."  Gilead Br. at 6-7 (citing

language from dependent claim 11).  Dependent claim 11, however, appropriately limits and

– 16 –

narrows claim 1 by reciting a specific *manner* for demonstrating the "protection" recited by claim 1—namely, by demonstrating that the host has an absence of persistent viremia and seroconversion.  *See* Appx0013 at 13:14-16.  There is, then, no redundancy between the preamble of claim 1 (directed to protecting the primate host) and dependent claim 11 (reciting a specific way to determine that protection).

### 4.    Gilead's Sur-Reply Position

The government acknowledges the general presumption that statements of intended result are non-limiting, Gov't Br. at 12, but it contends that these preambles are an exception because they "recite the essence of the claims," *id.* at 16.  The government, however, still has not settled on what that "essence" is.  It simply contends that the preambles "provide protection," *id.* at 12, but it has proposed at least four ***different*** interpretations of "protecting":

- ***"Full" protection*** **that prevents infection after actual exposures.**  *See* Gov't Br. at 15 n.7 (animals that received high subcutaneous doses had "***full protection*** against repeated challenges") (emphases added); *cf.* Murphy Decl.[8] ¶ 17 (Appx4313) ("[D]aily and weekly treatment with [TDF] ***only delayed, but did not prevent***, infection in macaque monkeys.") (emphasis added).

- ***Delaying*** **infection for some time period after actual exposures.**  *Id.* ¶ 29 (Appx4318) ("Example 8 provides results for this experiment, indicating that the oral drug combination ***protected the animals*** upon retroviral exposure ***over 8 weeks*** …. Two of the six animals orally administered TDF and FTC became infected,[] but this only occurred after 9 and 12 weekly exposures."); Gov't Br. at 15; *cf.* Murphy Decl. ¶ 17 (Appx4313) ("[D]aily and weekly treatment with [TDF] ***only delayed, but did not prevent***, infection in macaque monkeys.") (emphases added).

- ***Transiently*** **providing a concentration of antiviral that reduces the risk of infection while the antivirals are present in the body.**  *Id.* ¶ 66 (Appx4335-36) ("The protection provided by the claimed method lasts until the host's body metabolizes, excretes, or otherwise removes the compounds from the host's body.");

---

[8] The Court should disregard the 33-page reply declaration from Dr. Robert Murphy.  It is untimely because Dr. Murphy did not submit a declaration with opening briefs, and it is improper because it merely expounds upon legal arguments in the government's briefs—including those about claim structure, *e.g.*, Appx4317(¶ 28), the IPR process, *e.g.*, Appx4333 (¶ 61 n.7), and how to understand a lay dictionary definition, Appx4335(¶ 66).

Gov't Br. at 33 (describing this period as either **"approximately 24 hours"** or **"more than 12 hours"**) (emphasis added).

- *Maintaining* **a concentration of antivirals (a "state of being") that reduces the risk of infection.** Murphy Decl. ¶ 64 (Appx4334) ("Maintenance of a therapeutic level of the drug combination is an important feature of the protection afforded by PrEP…"); *id.* ¶ 66 (Appx4335) ("It is a state of being….").

When the government wants the preambles to be limiting, it cites examples of subjects remaining HIV negative after actual exposure to virus (i.e., the first usage above, and the second when talking about its own study in the patent specification, but ***not*** when discussing the "mixed" data from "early research efforts," *id.* ¶ 17 (Appx4313), that it seeks to distinguish).  But when confronted with the contradiction this causes with the exposure limitation, the government calls protection merely a "state of being" (the last usage in the list above).  To be sure, each of these usages finds support in the record.  But this vagueness reinforces that a POSA would understand the preambles to simply recite a general intended purpose for the invention—not a limitation.[9]

The government's other reply arguments are equally flawed.  *First*, the government contends that the preambles' mere recitation of "<u>an</u> immunodeficiency retrovirus" makes the entire preamble limiting because it is improper to "carv[e] [preambles] up into limiting and non-limiting parts."  Gov't Br. at 13.  But the government cites nothing to support that proposition— in fact, it successfully argued the opposite in another case involving one of its licensed HIV patents.  *See Janssen Prods., L.P. v. Lupin Ltd.*, No. 10-cv-5954-WH, 2013 U.S. Dist. LEXIS 189016, at *23-24 (D.N.J. Oct. 9, 2013); Appx7256-58, Appx7272-76 (government briefs). *Second*, the government contends that the specifications' references to "protecting" make the preambles limiting, relying on an expansive reading of *Poly-America, L.P. v. GSE Lining Techs.,*

---

[9] The government also contends that the preambles inform the "pharmaceutically effective amount" terms because they specify that the amounts must "provide 'protection.'" Gov't Br. at 15.  But given the many meanings of "protection," as set forth above, it is not a concrete concept that could inform a POSA's understanding of "pharmaceutically effective amounts."

*Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004).  Gov't Br. at 15-16.  But that case is not applicable to this dispute, *see supra* at 9-10, particularly because the preambles at issue in *Poly-America* "d[id] not state a purpose or an intended use of the invention," 383 F.3d at 1310, as the government concedes its preambles do, Gov't Br. at 14.  Rather, the *Poly-America* preambles were limiting because they recited a fundamental structural characteristic of the claimed apparatus.  383 F.3d at 1310.  *Third*, the government urges deference to the PTAB, Gov't Br. at 11, but its assertion that the IPR institution proceedings had an "extensive record" is an overstatement.  *See ART+COM Innovationpool GmbH v. Google Inc.*, C.A. No. 14-217, 2016 WL 11531119, at *2 (D. Del. May 16, 2016) (Dyk, J.) ("[T]he PTAB's decision not to institute was reached on a record that was less than complete ….").[10]  *Finally*, the government contends that the dependent claims reciting "wherein administration of the combination results in an absence of persistent viremia and seroconversion of the primate host," *e.g.*, '509 Patent, claim 11, narrow the scope of the independent claims.  But if the preambles are limiting and require "protection," such dependent claims are redundant of their independent claims.  It is impossible for a subject to be "protected" from HIV infection and ***not*** have an "absence of persistent viremia and seroconversion."

The Court should therefore find that the asserted claims' preambles are non-limiting.

---

[10] The government also asserts that the institution decisions are intrinsic evidence, Gov't Br. at 11, but "[c]ourts vary as to whether the [PTAB's] claim construction decisions in IPR proceedings are considered intrinsic or extrinsic evidence." *Danfoss Power Sols. Inc. v. DeltaTech Controls*, No. 16-cv-3111, 2019 WL 1517615, at *9 n.9 (D. Minn. Apr. 8, 2019).

**B.**     **"A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human" / "inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human" (preamble from Claim 12 of '509, '333, and '423 patents, and Claim 13 of '191 patent)**

| The Government's Proposal | Gilead's Proposal |
|---|---|
| A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human.<br><br>The preamble is limiting. | Non-limiting |

### 1.     The Government's Opening Position

Again, Gilead disputes whether the preamble is a limitation of the claimed prophylactic method.  This preamble is limiting for the reasons discussed above concerning claim 1's preamble.  That is, this preamble provides antecedent basis for the corresponding step (a), which recites "selecting an uninfected human that does not have *the* self-replicating infection."  Appx0013 at 13:20-21.  Moreover, this preamble provides context for the "effective amount[s]" of the combined agents recited in step (b) of these claims.  *Id.* at 13:22-14:2.

The PTAB agreed with this position and rejected Gilead's argument that the preamble is non-limiting.  *See* Appx1788-90; Appx0947-48; Appx2058-62.  In finding this preamble and the preamble discussed above for claim 1 to be limiting, the PTAB noted that the parties, and Gilead's expert, treated the two preambles as "essentially equivalent."  Appx0945, n.3; Appx1787, n.16.  The Court should likewise find that this preamble is limiting.

The Court should also adopt the Government's proposed construction, which corrects an obvious error in the claim language by removing the redundant phrase "of human immunodeficiency virus infection" that resulted from an inadvertent error by the Examiner during prosecution.  Courts may correct clerical errors through claim construction where "(1) the

– 20 –

correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011). Both requirements are met here. To address the second requirement first (because it illustrates the origin of the error), far from suggesting a different interpretation, the prosecution history here demonstrates precisely why this is an error. During prosecution of the '509 patent, original claim 33 (which eventually issued as claim 12) correctly recited "[a] process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human." Appx0622. An Examiner's amendment to this claim inadvertently introduced the following extraneous language (indicated in ***bold italic***): "inhibiting establishment of a human immunodeficiency virus self-replicating infection ***of human immunodeficiency virus infection*** in a human." Appx0841. In making this amendment, the Examiner indicated that this claim, and its dependent claims, should be interpreted consistent with the Government's proposed construction by explaining "[a]s amended, the claims are drawn to . . . ***inhibiting (hinder, restrain) the establishment of HIV self-replicating in a human***, wherein the subject has not been infected with the virus." Appx0841-42 (emphasis added). The Government's construction is thus consistent with and supported by the prosecution history, which does not suggest a different interpretation. Appx4176-77 ¶78;[11] *see also KeyMe, LLC v. Hillman Grp., Inc.*, No. 19-cv-1539-LPS, 2021 WL 243252, at *6 (D. Del. Jan. 25, 2021) (correcting an error where "[t]he prosecution history does not support a different interpretation of the claim").

---

[11] Dr. Andrea Brancale is a Professor of Medicinal Chemistry at Cardiff University's School of Pharmacy and Pharmaceutical Sciences (United Kingdom). He is an HIV prodrug and ester expert with over 20 years of experience. *See* Appx4152-55 ¶¶4-17.

Second, the correction the Government proposes is not subject to reasonable debate.  In addition to the fact that the prosecution history demonstrates that the error is inadvertent, the claim language and specification further support the Government's construction.  The substance of the preamble is repeated in the body of the claim by the "thereby" clause, as Gilead itself explained in the IPRs.  *See* Appx2058.  The "thereby" clause recites "inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human" and does ***not*** include the extraneous language introduced in error by the Examiner.  *Id.*; Appx0013 at 14:3-4; Appx4175-76 ¶¶75-76.  The Government's proposed construction restores the harmony between the preamble and the "thereby" clause.  *See Cree, Inc. v. SemiLEDs Corp.*, No. 10-cv-866-RGA, 2012 WL 975697, at *14-15 (D. Del. Mar. 21, 2012) (correcting a claim based on, *inter alia*, restoring consistency with the entirety of the claim).

Consistent with the claim, the specification indicates that "[t]he present invention provides an alternative to conventional retroviral therapy using HAART [highly active antiretroviral therapy], in response to self-propagating HIV infection by protecting a primate host against the establishment of self-replicating retroviral infection. . . ."  Appx0008 at 4:59-63.  The specification, in other words, does not unnecessarily repeat "human immunodeficiency virus infection" immediately after "human immunodeficiency virus self-replicating infection."  *Id.*; *see also, e.g.*, Appx0007 at 1:44-47, 1:16-24, 2:9-30; Appx4176 ¶77.  *See KeyMe,* 2021 WL 243252, at *6 (describing a correction as "not subject to reasonable debate" where the specification did not contain the erroneous language but did recite the correct language); *see also Princeton Digital Image Corp. v. Amazon.com, Inc.*, No. 13-cv-237-LPS, 2019 WL 351258, at *9 (D. Del. Jan. 29, 2019).

– 22 –

Finally, during the IPR proceedings, neither Gilead nor its expert had difficulty understanding this preamble. *See* Appx2058 (arguing that the claim's efficacy clause repeats the substance of the preamble); Appx2429 (same); Appx2646 (same); Appx2856 (same). Indeed, Gilead's expert asserted that the different phrasing of the claims "refer[] to the same thing," namely "the goal of administering ARV to an uninfected individual, whether before or after an actual or potential HIV exposure, [which] is to prevent establishment of HIV infection in the individual." Appx2347 ¶191; *see CBT*, 654 F.3d at 1358–59 (existence of several possible corrections should not prevent a district court from correcting an obvious error when "a person of skill in the art would find the claim to have the same scope and meaning under each of the . . . possible meanings"). Thus, there is no reasonable debate as to what the preamble means. *See* Appx4177 ¶79.

### 2. Gilead's Answering Position

As with the first set of preambles, the government seeks to transform these preambles from statements of desired result into claim limitations in an attempt to avoid extensive prior art. The Court should reject that attempt for the same reasons as above, and it should reject the government's request for "correction" of these preambles as improper, or at least premature.

#### (a) *The Court should not judicially correct this preamble.*

The government first asks the Court to "correct" this preamble, Gov't Br. at 20-23, but the Court should decline the government's invitation for three reasons: *First*, the government's request effectively seeks to resolve an indefiniteness dispute that the parties have agreed to defer until summary judgment or trial; *second*, the government's request does not meet the standard for judicial correction; and *third*, a different mechanism, a certificate of correction from the Patent Office, is the more appropriate means for the government to seek relief.

*First*, the Court should decline to judicially correct these preambles during claim construction because the parties have agreed to defer indefiniteness issues, which these preambles raise, until summary judgment or trial.  *See* D.I. 76.  The government is currently asserting all 61 claims of the Patents-in-Suit, most of which have some (or many) errors or deficiencies that render them indefinite.[12]  Appx7015-24.  Whether a POSA would be able to understand these preambles as written (and whether a POSA would have understood an error to be present) is better addressed with the rest of the indefiniteness issues.

*Second*, "judicial correction is a narrow remedy to be used sparingly"; it "is the exception, not the rule, and should be employed only to correct an error that is so obvious that there is no question as to the proper correction."  *Vifor (Int'l) AG v. Mylan Labs. Ltd.*, No. 19-cv-13955-FLW, 2021 WL 1608908, at *2 (D.N.J. Apr. 26, 2021) (cleaned up).  Judicial correction is generally employed only if the error is a printing error attributable to the Patent Office.  *See, e.g.*, *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005); Robert A. Matthews, Jr., *Annotated Patent Digest* § 6.7 (Mar. 2021 update) (section discussing judicial correction, titled "Use of Prosecution History to Judicially Correct ***Printing Errors*** in Claims") (emphasis added).  As the government concedes, the language in this preamble is not the result of a printing error—it first appeared in an examiner's amendment in the application that resulted in the '509 Patent.  Gov't Br. at 21 (citing Appx841).  That examiner's amendment stated that "[s]hould the changes and/or additions be unacceptable to applicant, an amendment may be filed."  Appx840.  The government filed no such amendment—in fact, the government filed three new patent applications over three years in which ***the government*** repeated the "error" it now attributes to the patent examiner.  Appx1026 (June 15, 2015 preliminary amendment in application that

---

[12] There is currently no deadline or mechanism for claim narrowing in this case.

resulted in '333 Patent, with same phrasing as examiner's amendment in claim 33); Appx1507

(Jan. 13, 2017 original application that resulted in the '191 Patent using same phrasing in claim

12); Appx1853 (Mar. 6, 2018 original application that resulted in the '423 Patent using same

phrasing in claim 12).  A POSA simply would not conclude that claim language that was

introduced by the examiner in a substantive amendment, accepted by the government, and

reaffirmed by the government in three later applications in the same family must be erroneous,

Flexner Decl. ¶ 40 (Appx7169)—and the presence of an "error" and its appropriate correction

certainly would not be beyond "reasonable debate."

        *Third*, if the government believes this preamble contains "a mistake … of minor

character" that "occurred in good faith," the appropriate course is for the government to seek a

certificate of correction from the Patent Office.  35 U.S.C. § 255.  The government has

repeatedly sought certificates of correction for the Patents-in-Suit, including during this

litigation.  *See* Appx1761-62 (Aug. 21, 2018 request pursuant to 35 U.S.C. § 255 for the '191

Patent); Appx2002-05 (Jan. 27, 2021 request pursuant to 35 U.S.C. § 254 for the '423 Patent,

which was granted during the parties' claim construction exchanges).  The government should do

the same for these preambles rather than seeking an extraordinary remedy from the Court.

> **(b)    The "corrected" preamble that the government seeks is non-limiting.**

        The "corrected" preamble that the government seeks is non-limiting for the same reasons

as the other preambles in the Patents-in-Suit.  *See supra* § III.A.2; Flexner Decl. ¶¶ 41-48

(Appx7170-72); *see also* Gov't Br. at 20 (noting that, in the IPR institution proceedings, "the

parties … treated the two preambles as 'essentially equivalent'").

> **3.    The Government's Reply Position**

        Because Gilead asserts that this preamble "is non-limiting for the same reasons as the

other preambles," Gilead Br. at 25, its arguments suffer from the same flaws and are therefore

subject to the same critiques articulated above.  With respect to the issue unique to this preamble—namely, judicial correction of an obvious error—Gilead offers three procedural issues, none of which prevents correction.[13]

First, Gilead tries to frame judicial correction as an indefiniteness issue to defer until summary judgment or trial.  *See* Gilead Br. at 23-24.  Claim construction, however, is an appropriate time to correct an obvious error.  *See CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358-59 (Fed. Cir. 2011) (correcting a claim in the context of claim construction).  Indeed, this Court has often corrected obvious errors during claim construction. *See, e.g.*, *ArcherDX, Inc. v. Qiagen Sci., LLC*, Case No. 18-cv-1019-MN, 2020 WL 3316055, at *5 n.7 (D. Del. June 18, 2020); *Microchip Tech. Inc. v. Aptiv Servs. US, LLC*, Case No. 17-cv-1194-LPS-CJB, 2019 WL 2502417, at *5 (D. Del. June 17, 2019); *Koninklijke Philips N.V. v. AsusTek Comput. Inc.*, Case No. 15-cv-1125-GMS, 2017 WL 2957927, at *4 n.16 (D. Del. July 11, 2017).

Second, Gilead wrongly suggests that the Court may correct only obvious printing errors. *See* Gilead Br. at 24-25.  The Court may correct any obvious error under the two-part framework articulated in *CBT Flint*, *see supra* § III.B.1, including non-printing errors.  *See, e.g.*, *Cree, Inc. v. SemiLEDs Corp.*, Case No. 10-cv-866-RGA, 2012 WL 975697, *14-15 (D. Del. Mar. 21, 2012) (correcting non-printing error); *Intermec Techs. Corp v. Palm Inc.*, 811 F. Supp. 2d 973, 984-85 (D. Del. 2011) (same).  It is immaterial that neither the Government nor the Examiner noticed the error during prosecution, *see* Gilead Br. at 24-25, as there is no requirement that the error be identified during prosecution.  *See Fitbit, Inc. v. Valencell, Inc.*, 964 F.3d 1112, 1119-20

---

[13] Gilead raises no substantive arguments regarding correction.  If Gilead belatedly raises a substantive argument in its sur-reply, the Government reserves the right to address it.

(Fed. Cir. 2000) (correcting error where, in part, "neither the applicant nor the examiner caught the error").

Third, Gilead suggests that the Government should seek a certificate of correction from the Patent Office.  *See* Gilead Br. at 25.  The availability of an independent, alternative path for correction does not foreclose this Court's authority to correct the error.  *See Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005).  The Court is well-positioned to correct this error and should do so here.  *See CBT Flint*, 654 F.3d at 1358-59.

### 4.    Gilead's Sur-Reply Position

For the reasons above, the Court should find that these preambles are non-limiting.  *See supra* §§ III.A.2, III.A.4.  As for the request for judicial correction, the government's reply still fails to explain why that extraordinary remedy is appropriate in this case, particularly in light of the government's agreement to defer indefiniteness issues for summary judgment or trial.

### C.    "thereby protecting the primate host from infection with the immunodeficiency retrovirus" (Claim 1 of '509, '333, '191, and '423 patents)

| The Government's Proposal | Gilead's Proposal |
| --- | --- |
| The primate host remains negative for the immunodeficiency retrovirus while receiving the administration. | Non-limiting |

### 1.    The Government's Opening Position

The "thereby" clause recited by claim 1 of the Patents-in-Suit is the third term in which the disputed issue is whether the term is limiting.  The "thereby" clause is limiting, and Gilead's request for a non-limiting construction again asks this Court to contravene the PTAB's earlier determination that the clause is limiting.  *See* Appx0945-50; Appx1786-94.

The "thereby" clause is recited in the body of claim 1.  It requires "protecting" the particular primate host that received administration of the claimed combination of emtricitabine

and tenofovir (or a tenofovir ester/prodrug) from infection.  During prosecution, the inventors

introduced the "thereby" clause to overcome prior art rejections and reflect the claims'

unexpected result of preventing HIV infection.  *See* Appx0622; Appx0624-33; Appx1792;

Appx0949-50.  The Examiner, in allowing the claims, explicitly commented on the unexpected

"protecting" aspect of the invention.  *See* Appx0841 (explaining "[a]s amended, the claims are

drawn to . . . protecting a primate, particularly human"); Appx0842 (allowing the claims

because, "[i]mportantly, the application shows that the combination has superior effect . . . which

would not have been expected"); Appx1792; Appx0949.  The "thereby" clause is therefore

limiting.  *See Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1376 (Fed. Cir. 2019) ("The

prosecution history thus demonstrates that the formulation's efficacy and safety . . . were

expressly relied on to define the claimed methods and distinguish them from the prior art.");

Appx1792-94.

As with the preambles, the PTAB rejected Gilead's attempt to remove the "thereby"

clause via a non-limiting construction, *see* Appx1786-94; Appx0945-50, finding that the

"thereby" clause was limiting because the claimed "protecting" "is at the heart of the invention

described in the patent[s]," Appx1790; *see also* Appx0947.  In reaching this conclusion, the

PTAB explained that "[t]he Specification is filled throughout with references—well over

thirty—to 'protection,'" Appx1790, and "the Specification describes a need for the invention

because 'society remains devoid of a preexposure prophylaxic regimen to *prevent* an individual

from developing infection subsequent to initial exposure[,]'" Appx1790, n.19 (quoting

Appx0035 at 2:2-10) (emphasis in original).  The PTAB further observed that "'protection' was

key in the patent[s'] prosecution."  Appx1792; Appx0949.  The PTAB therefore determined that

– 28 –

the "thereby" clause was limiting in accordance with appropriate precedent.  *See* Appx1792-94

(citing, e.g., *Allergan Sales*, 935 F.3d at 1376-77).

The Government's proposed construction conforms with the claim language and the

specification.  The "thereby" clause itself recites:  "thereby ***protecting*** the primate host from

infection with the immunodeficiency retrovirus" (emphasis added), and the specification

explicitly defines "protection":

> As used herein, 'protection' as used in the context of a host
> primate response to an immunodeficiency virus challenge is
> defined by the host primate being serologically negative and
> negative in response to a polymerase chain reaction (PCR) testing
> for viral genome.

Appx0008 at 4:3-7.  In other words, "protecting" is understood in the context of being unable to

detect an infection (*i.e.*, being negative).  *See* Appx2186; *see also* Appx2331-32 ¶166 (Gilead's

IPR expert explaining that "[a] negative test result during and after the PrEP regimen indicates

that the individual remains uninfected.  The presence or absence of HIV antibodies in the serum

is assessed using conventional serological antibody tests.").  The "thereby" clause therefore

demands efficacy by requiring that the particular primate host, which received administration of

the claimed combination of emtricitabine and tenofovir (or a tenofovir ester/prodrug) prior to

exposure, remain HIV negative while receiving the administration.  To this same end, the PTAB

agreed with the Government's argument that "claim 1 requires that the particular primate host

receiving the claimed combination be protected—negative for infection with the

immunodeficiency retrovirus (e.g., 'HIV negative') after exposure."  Appx1794.

Similarly, the specification explains that a host may engage in at-risk behavior for

exposure to the immunodeficiency retrovirus.  *See* Appx0007 at 2:21-30 (the invention "includes

the administration to a subpopulation at high risk for contracting an immunodeficiency retroviral

infection"); Appx0009 at 5:25-29 (recognizing that certain populations of individuals will

– 29 –

experience repeated exposures to HIV and observing that prophylaxis is "particularly well suited for a human engaging in a sporadic behavior likely to bring the person into retroviral exposure"); Appx0008 at 3:14-20, 3:42-49 ("administered in advance of a likely exposure"); Appx0009 at 5:41-47 (administration to "high-risk persons"); Appx0007 at 2:31-42.  The specification directly explains that an at-risk host is protected from becoming infected by remaining HIV negative while the host receives administration of the claimed combination of emtricitabine and tenofovir (or a tenofovir ester/prodrug).  *See* Appx0009 at 5:38-41 ("an individual routinely subjected to retroviral exposure can be protected against the development of a self-replicating retroviral infection through administration of regular prophylactic doses of an inventive combination").

The specification's working examples further support the Government's construction. Indeed, the PTAB determined that "[t]he working examples also describe the nature and extent of the protection provided by the invention."  Appx1791.  The examples demonstrate that the host receiving administration of emtricitabine and tenofovir (or a tenofovir ester/prodrug) remained uninfected while receiving the administration.  Appx0011 at 9:1-10:9 (demonstrating that a host receiving a combination of emtricitabine and tenofovir disoproxil fumarate (i.e., a tenofovir ester/prodrug) for several days before and after exposure to an immunodeficiency retrovirus remained uninfected (and therefore protected) while receiving the administration); Appx0003-04, Figs. 1-2 (same); Appx0007 at 2:46-55 (same).  Protection from infection is provided to the host while receiving the administration of compounds according to step (b) of claim 1 because the administration maintains a therapeutic level of emtricitabine and tenofovir (or a tenofovir ester/prodrug) within the host.  *See* Appx0008 at 3:33-37 (explaining that the dosing regimen "maintain[s] a therapeutic level of NRTI and NtRTI agents in the primate host"); Appx0009 at 6:18-22; Appx0010 at 7:33-50 (demonstrating dosing regimen results in therapeutic

plasma concentration levels); Appx0011 at 9:23-31 (same).  In short, the intrinsic evidence

overwhelmingly supports the Government's proposed construction.

### 2. Gilead's Answering Position

These "thereby" clauses essentially repeat the statement of desired result in the claims'

preambles.  For the same reasons the preambles are non-limiting, *see supra* § III.A.2, the Court

should find these "thereby" clauses to be non-limiting.[14]  *See Minton v. Nat'l Ass'n of Sec.*

*Dealers, Inc.*, 336 F.3d 1373, 1381 (Fed. Cir. 2003) ("A whereby clause in a method claim is not

given weight when it simply expresses the intended result of a process step positively recited.");

*Thermal Dynamics Corp. v. TATRAS, Inc.*, No. 04-cv-152-PB, 2004 WL 4957314, at *6 (D.N.H.

Dec. 9, 2004) (finding "thereby" clause was not a limitation for similar reasons as in "whereby"

clause cases); Flexner Decl. ¶¶ 31-39 (Appx7165-68).

The government's proposed construction—"[t]he primate host remains negative for the

immunodeficiency retrovirus while receiving the administration"—should also be rejected

because it raises more questions than it answers.  *First*, the claims that contain these clauses

recite only a single administration step, and it is unclear from the government's proposal ***how***

***long*** a host must remain "negative" "while receiving the administration."  Flexner Decl. ¶ 37

(Appx7167).  *Second*, the specification refers to two assays (serological and PCR) that may

provide different results for determining if a host is "negative," Appx8(4:3-8), but the

government's proposal does not inform a POSA ***which assay is required*** to assess whether a host

---

[14] The government also contends that the "thereby" clauses are limiting because they were added "to overcome prior art rejections," Gov't Br. at 27-28, but the record is to the contrary. The "thereby" clauses were added in ***new*** claims, not rejected claims.  Appx622.  The inventors did not add the "thereby" clauses to the previously rejected claims, Appx618-20, nor did they argue that the "thereby" clauses supported patentability of the new claims, Appx627-28.

"remain[s] negative." *Id.*  A POSA would have expected a type of result to be specified, Flexner Decl. ¶ 36 (Appx7166-67), as the inventors did in the working examples, Appx11(9:27-28).

### 3.      The Government's Reply Position

Gilead asserts that this "thereby" clause is non-limiting "[f]or the same reasons the preambles are non-limiting," Gilead Br. at 31, and therefore ignores Federal Circuit precedent concerning important differences in evaluating the non-limiting nature of terms recited in the body of a claim as compared to preamble language.  For example, language in the body of the claim is "not comparable to the structure of patent claims in which statements of general purpose in the preambles of method claims have been held to carry no patentable weight."  *See L.A. Biomedical Rsrch. Inst. at Harbor-UCLA Med. Ctr. v. Eli Lily and Co.*, 849 F.3d 1049, 1061 (Fed. Cir. 2017).  Indeed, language contained in the body of the claim that "demands efficacy" is limiting.  *Id.*

The "thereby" clause, recited in the body of the claims at issue, demands efficacy by requiring that the particular primate host who received administration of the claimed combination prior to exposure remain HIV negative while receiving the administration.  *See supra* § III.C.1.  Gilead's effort to read out the efficacy limitation recited by the "thereby" clause "[n]ot only would . . . be contrary to the principle that claim language should not [be] treated as meaningless, but it would be contrary to the specification," which defines "protecting" and gives meaning to the efficacy limitations.  *Bicon*, 441 F.3d at 951; *see also Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1376 (Fed. Cir. 2019) (holding that claim language similar to the efficacy limitations in this proceeding were material to patentability).  The PTAB, addressing the same arguments Gilead raises here, agreed that the "thereby" clause "should be given patentable weight."  Appx1794.  This Court should also reject Gilead's attempt to read out those efficacy limitations.

– 32 –

In opposition, Gilead raises two concerns about clarity neither of which withstands scrutiny.  First, Gilead asserts that "it is unclear from the government's proposal ***how long*** a host must remain 'negative' 'while receiving the administration.'"  Gilead Br. at 31 (emphasis in original).  Gilead's expert opined that this alleged lack of clarity arises because "most of the claims do not require more than one administration."  Appx7167 ¶37.  The specification, however, adequately informs the skilled artisan when and how long the host will remain protected while receiving the administration.  For instance, the specification discloses that "[t]he administration is effective if provided in a single dose prior to the exposure," Appx0007 at 2:17-18, Appx0008 at 3:30-33, and further explains that a single dose provides protection for approximately 24 hours, *see* Appx0001 (Abstract explaining that administration prior to exposure "is effective if provided in a single dose within 24 hours of the exposure"); Appx0010 at 7:33-50; Appx4328-29 ¶¶48-49 (Murphy Dec.).  In addition, the specification explains that, "[o]wing to the known pK rates of specific NRTIs and NtRTIs, a single dosage is administered to assure a therapeutically effective amount of NRTI and NtRTI persist in the primate host for a time of more than 12 hours after viral challenge."  Appx0009 at 5:11-15.  The specification further discloses that protection is provided when a dose is administered "12 hours prior to retroviral exposure and still more preferably often within 2 hours prior to retroviral exposure." *Id.* at 5:15-27; Appx0009 at 6:18-22; Appx4328-29 ¶¶49-50 (Murphy Dec.).  A skilled artisan reading the specification would therefore have no difficulty discerning when and how long the host will remain protected while receiving administration.

Second, Gilead argues that the Government's construction is ambiguous because it does not specify which of two assays (a serological or a PCR assay) is appropriate to assess whether a host remains negative.  *See* Gilead Br. at 31.  Gilead and its previous expert, however, expressed

no such ambiguity before the PTAB.  In fact, they explained that either test adequately

determines negativity as follows:

> A host is "serologically negative" if the quantity of antiviral
> antibodies in a sample from the host is lower than a threshold value
> indicative of a "negative" result.  Youle-Decl. ¶166.  A negative
> response in PCR testing for the viral genome is when the quantity
> of viral DNA in a sample from the host is below a value indicative
> of a "negative" result.  *Id*. ¶¶166-67.

Appx2060, n.61.  Gilead's expert further explained that serological antibody tests and PCR tests

were "conventional" and "standard" based on the prior art.  *See* Appx2331-32 ¶166 ("The

presence or absence of HIV antibodies in the serum is assessed using conventional serological

antibody tests."); Appx2332 ¶167 (explaining that PCR assays were "standard").  A skilled

artisan would readily understand that either assay is appropriate to determine negativity.  *See*

Appx4327 ¶47 (Murphy Dec.).  The Government's proposed construction is therefore not

ambiguous.

### 4.      Gilead's Sur-Reply Position

For the same reasons as the nearly identical preambles, *supra* §§ III.A.2, III.A.4, the

Court should find that these "thereby" clauses are non-limiting.  Courts routinely find statements

of intended result to be non-limiting, regardless of whether they appear in the preamble or the

claim body.  *In re Copaxone Consol. Cases*, 906 F.3d 1013, 1023 (Fed. Cir. 2018).

Moreover, the government's construction should be rejected because it is vague.  *First*,

the part of the government's construction that requires the host to remain negative "while

receiving the administration" provides the jury with no information about ***how long*** the host

must remain negative.  The government's reply focuses on how long a dose might be effective in

the body, Gov't Br. at 33, but that is a different issue from how long the host must be HIV-

negative to practice the claim, Flexner Decl. ¶¶ 37-38 (Appx7167).  *Second*, the requirement that

– 34 –

the host "remains negative" provides no guidance on whether the limitation is satisfied when the two different types of HIV assays give different results.  *Id.* ¶ 36 (Appx7166-67).  The government responds that "either assay is appropriate to determine negativity," Gov't Br. at 34, but that fails to address the routine occurrence of conflicting results.[15]

### D.   "thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human" (Claim 12 of '509, '333, and '423 patents, and Claim 13 of '191 patent)

| The Government's Proposal | Gilead's Proposal |
|---|---|
| The human remains negative for the immunodeficiency virus while receiving the administration. | Non-limiting |

### 1.   The Government's Opening Position

This is the fourth term in which the dispute centers around whether the language is limiting.  Again, Gilead repeats its request that this Court contravene the PTAB's earlier determination that this "thereby" clause "should be given patentable weight."  Appx0950; see also Appx1792.  This "thereby" clause is limiting for the same reasons discussed above with respect to the "thereby" clause of claim 1.  The PTAB agreed and found both "thereby" clauses to be limiting.  See Appx1791, n.20 ("[l]ike the parties, we will generally treat the 'inhibiting . . . infection" language of claim 13 similarly to the 'protecting' language of claim 1"); Appx0945, n.3.  The Court should reject Gilead's request for a non-limiting construction for the reasons already identified and discussed above.  Furthermore, for the same reasons discussed in section III.C. above with respect to the "thereby" clause of claim 1, the "thereby" clause here should be

---

[15] Gilead's IPR expert did not take a different position.  Gov't Br. at 33.  It is undisputed that serological and PCR assays can both give negative results.  But the government's construction fails to specify whether the limitation is satisfied when the results conflict.

– 35 –

construed to mean "the human remains negative for the immunodeficiency virus while receiving the administration."

### 2.    Gilead's Answering Position

These "thereby" clauses essentially repeat the statement of desired effect in the claims' preambles.  For the same reasons the preambles are non-limiting, *see supra* §§ III.A.2 & III.B.2, the Court should find these "thereby" clauses to be non-limiting.  Moreover, for the reasons above, the Court should reject the government's proposed construction as inconsistent with a POSA's understanding of this term.  *See supra* § III.C.2; Flexner Decl. ¶¶ 41-48 (Appx7170-72).

### 3.    The Government's Reply Position

Gilead asks the Court for a non-limiting construction "for the reasons above" without differentiating this "thereby" clause from that of claim 1.  Gilead Br. at 36.  The Court should reject Gilead's request for reasons previously articulated.  *See supra* § III.C.

### 4.    Gilead's Sur-Reply Position

For the reasons above, the Court should find that these "thereby" clauses are non-limiting and reject the government's proposed construction.  *See supra* §§ III.C.2, III.C.4.

### E.    "tenofovir ester" (Claim 12 of '509 patent)

| The Government's Proposal | Gilead's Proposal |
|---|---|
| "an ester-containing tenofovir derivative" | "a compound with a chemical structure that differs from tenofovir only in that one or both of the phosphonic acid O-H bonds in tenofovir is an O-C bond and the C is part of another group" |

### 1.    The Government's Opening Position

The specification discloses "pharmaceutically acceptable derivatives" of tenofovir, including "ester" derivatives.  Appx0008 at 4:31-36; *see also* Appx0009 at 5:61-6:2 (disclosing tenofovir and "pharmaceutically acceptable salts, esters, ester salts, nitrile oxides, and prodrugs"

thereof).  Thus an ordinarily skilled artisan reading "tenofovir ester" in view of the specification would understand that this term refers to a derivative of tenofovir that contains an ester (i.e., "an ester-containing tenofovir derivative").  *See* Appx4159-60 ¶¶32-33.

Gilead improperly tries to narrow the meaning of "tenofovir ester" in several ways, none of which is supported by the intrinsic evidence or is consistent with the understanding of a person of ordinary skill in the art at the time of filing.  First, Gilead limits its proposed construction to a specific subgenus of esters called "phosphonic" esters by requiring "one or both of the phosphonic acid O-H bonds in tenofovir is an O-C bond and the C is part of another group."  *See* Appx4161-63 ¶¶35-36.  The specification, however, does not limit the claimed esters to this subclass, but instead describes this subclass as well as several other types of esters.  *See* Appx4159-60 ¶33; Appx4163-64 ¶37.  The appropriate diversity of tenofovir esters is exemplified by tenofovir disoproxil, which is undisputedly a "tenofovir ester."  *See, e.g.*, Appx0008 at 4:55-58; Appx0013 at claim 18 ("wherein the tenofovir ester is tenofovir disoproxil fumarate").  The following is an annotated chemical structure of tenofovir disoproxil:

### Tenofovir Disoproxil



*See* Appx4163-64 ¶37.  This "tenofovir ester" contains two types of esters:  (1) phosphonic esters (shown in red above), and (2) carbonate esters (shown in blue above).  Gilead's proposal omits the carbonate esters and inexplicably narrows the disputed term to refer "only" to phosphonic

esters.  Gilead's proposal also ignores the examples of tenofovir esters derived from carboxylic acids and sulfonic acids that are described in the specification.  *See* Appx0008 at 4:34-36 (disclosing tenofovir esters "such as acetate, butyrate, octinoate, palmitate, chlorobenzoates, benzoates, $C_1$-$C_6$ benzoates, succinates, and mesylate"); Appx4163-64 ¶37.  By limiting its construction to only phosphonic esters located in only two locations on the phosphate group of tenofovir, Gilead eliminates, for example, the possibility of a mesylate ester which would require the addition of a sulphonic acid group.  By excluding these examples (and more), Gilead runs afoul of multiple canons of claim construction.  *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification.").

Gilead's proposal is also problematic because it unduly restricts the evaluation of an ester's presence to a single location by requiring "a compound with a chemical structure that **differs from tenofovir only in that one or both of the phosphonic acid O-H bonds in tenofovir is an O-C bond** and the C is part of another group."  As indicated above, the specification does not limit esters in this manner.  *See also* Appx4164 ¶38.  In addition, Gilead's proposed construction improperly restricts the meaning of "tenofovir ester" by requiring that the "only" permitted difference from tenofovir is at the phosphonic acid O-H bonds.  There is no support for this restriction in the specification, and a person of ordinary skill in the art would have understood that where only one O-H bond in tenofovir is an O-C bond, this would constitute a

tenofovir ester regardless of whether the other O-H was modified in another way as contemplated by the specification.

In contrast, the Government's proposal conforms with the understanding of "tenofovir ester" that was known to the skilled artisan at the relevant time of invention.  For example, Gilead's own Dahl reference, which was cited during prosecution of the '509 patent, describes tenofovir esters in the same manner as the inventors here have done.  *See* Appx4001-65 (Dahl, WO2004064845) at Appx4017-18 (disclosing that "esters" are selected from the group consisting of "carboxylic acid esters," "sulphonate esters," "amino acid esters," "phosphonate" esters, and "phosphonamidate esters" of tenofovir); Appx4160-61 ¶34.  A person of ordinary skill in the art would have understood therefore that tenofovir esters could include esters other than phosphonate esters (including sulphonate esters or phosphonamidate esters) and that such esters could be located on other parts of the tenofovir molecule.

### 2. Gilead's Answering Position

The plain meaning of "tenofovir ester" is straightforward to a POSA:  It is an ester in which one of the two components is tenofovir.  That conclusion, which is reflected in Gilead's proposed construction, follows from basic chemistry and chemical terminology.  Esters have two components, and when a POSA refers to a "'[*named compound*]' ester," the POSA is referring to an ester in which one of the components is the "*named compound*."  Snyder Decl. ¶ 26 (Appx7117).  To assist the finder of fact, Gilead's proposed construction expressly describes, in basic terms, the chemical connectivity of all possible "tenofovir esters": "a compound with a chemical structure that differs from tenofovir only in that one or both of the phosphonic acid O-H bonds in tenofovir is an O-C bond and the C is part of another group."

By contrast, the government seeks a vague construction of "tenofovir ester" in an attempt to expand the scope of its last-expiring claims.  The '509 Patent, which is the only patent that

claims methods using a "tenofovir ester," expires more than three and half years later than the other Patents-in-Suit because of patent term adjustment ("PTA").  Appx1.  The government has accused Gilead of inducing infringement of the '509 Patent by selling two products for PrEP: Truvada®, which was approved for HIV treatment in 2004 and for PrEP in 2012, and Descovy®, which is a product that was approved for HIV treatment in 2016 and for PrEP in October 2019. D.I. 1, ¶¶ 48-57, 280-313.  Truvada® contains tenofovir disoproxil fumarate ("TDF"), which is expressed recited in the '509 Patent's claims, but Descovy® contains tenofovir alafenamide ("TAF"), *id.* ¶ 55, which is neither specifically claimed nor discussed in the Patents-in-Suit. TAF and TDF have different structures, and a POSA would not understand TAF to be a "tenofovir ester."  Indeed, after TAF was approved by the FDA, the government sought and received claims that recite combinations using the broader term "tenofovir prodrug," and it is asserting those claims in this case as well.[16]  But because those "tenofovir prodrug" claims do not have PTA, three-and-a-half years of the government's infringement (and damages) claims against Descovy® turn on whether the government can shoehorn TAF into the '509 Patent's narrower "tenofovir ester" term.  The plain meaning of the term simply will not support that.

### (a)    *Gilead's construction accurately captures all possible tenofovir esters.*

A POSA would have understood the plain meaning of "tenofovir ester" to be "a compound with a chemical structure that differs from tenofovir only in that one or both of the phosphonic acid O-H bonds in tenofovir is an O-C bond and the C is part of another group"—in other words, an ester-containing compound in which one of the two components of the ester is tenofovir.  This follows from the basic chemistry of esters, which are fundamental concepts that

---

[16] The government did not seek claims for methods using a "tenofovir prodrug" until March 6, 2018, Appx1852—more than a decade after the priority date and almost two years after Descovy® was approved by the FDA.  Those claims issued in the '423 Patent.

are taught to every premedical student and form part of a POSA's understanding of chemistry. Snyder Decl. ¶¶ 19-22 (Appx7113-15).



**Tenofovir**                    **Tenofovir Ester**

An "ester" is a chemical compound[17] that is formed—at least conceptually[18]—from a reaction of an acid and an alcohol to eliminate water.  *See, e.g.*, McGraw-Hill Dictionary of Chemistry 140 (2d ed. 2003) (Appx7005) (defining "ester" as "[t]he compound formed by the elimination of water and the bonding of an alcohol and an organic acid"); *see also* Snyder Decl. ¶¶ 19-21 (Appx7113-15).[19]  For example, ethyl acetate, which is a common ester, can be formed by the reaction of acetic acid (an organic acid) and ethanol (an alcohol), as shown below.



*Acetic Acid*        *Ethanol*              *Ethyl Acetate*         *Water*
  *(Acid)*          *(Alcohol)*                *(Ester)*

---

[17] Mindful of the Court's familiarity with chemical concepts, Gilead has included a streamlined technical discussion here.  More technical background is contained in the declaration of Professor Scott Snyder (Appx7107-32), who teaches premedical students at the University of Chicago and co-authors a leading textbook used to train premedical students.

[18] Although esters are generally understood by how they can ***conceptually*** form, a compound does not ***actually*** need to be formed by such a reaction to be an ester.  Courts construing "ester" claim terms have therefore favored constructions that describe the connectivity of the atoms in an ester, like Gilead's proposed construction here.  *See, e.g.*, *Sanofi-Aventis U.S. LLC v. Eli Lilly & Co.*, C.A. No. 14-113-RGA, 2015 WL 269399, at *2 (D. Del. Jan. 20, 2015).

[19] This definition is representative of how esters were and are understood.  *See, e.g.*, Bruce Alberts et al., *Molecular Biology of the Cell* G13 (4th ed. 2002) (Appx7013) (leading biology textbook defining "ester" as "Molecule formed by the condensation reaction of an alcohol group with an acidic group.  Phosphate groups usually form esters when linked to a second molecule.").

Snyder Decl. ¶ 21 (Appx7114-15).  Esters therefore have two components, as illustrated below—

an acid component, which is all of the atoms that were conceptually part of the acid, and an

alcohol component, which is all of the atoms that were conceptually part of the alcohol.  *Id.*



Tenofovir has the following structure (Appx4069, Appx4011-12):



*Tenofovir*

Tenofovir has no alcohol and only one acid group—a phosphonic acid, shown in red above.

Snyder Decl. ¶¶ 24, 27 (Appx7116-17).  Thus, if tenofovir is to form an ester, tenofovir ***must*** be

the acid component of the ester, and the ester ***must*** be formed from tenofovir's phosphonic acid.

*Id.* ¶ 27.  Tenofovir's phosphonic acid is the only part of tenofovir that can form an ester.  *Id.*

Gilead's proposed construction of "tenofovir ester" reflects these basic chemical

limitations on the type of ester that tenofovir can form.  Snyder Decl. ¶ 35 (Appx7121); Flexner

Decl. ¶ 67 (Appx7179).  Gilead's proposed construction is:

| **Gilead's Proposed Construction** | a compound with a chemical structure that differs from tenofovir only in that one or both of the phosphonic acid O-H bonds in tenofovir is an O-C bond and the C is part of another group |
|---|---|

*First*, because the phosphonic acid is the ***only*** group in tenofovir that is capable of forming an

ester, Gilead's proposed construction describes that the tenofovir ester "differs from tenofovir

only" at the phosphonic acid.  *Second*, because tenofovir ***must*** contribute the acid component of

the ester, Gilead's proposed construction indicates that the O-H bonds of tenofovir's phosphonic

acid may change.  *Third*, because the other (non-tenofovir) component of a tenofovir ester ***must*** be an alcohol, Gilead's proposed construction describes how "one or both of the phosphonic acid O-H bonds in tenofovir" are changed to "an O-C bond," which is the O-C bond present in the alcohol component.  And *finally*, Gilead's proposed construction has the carbon in the O-C bond as "part of another group"—i.e., the rest of the alcohol component.

Nothing in the intrinsic record indicates that the inventors intended "tenofovir ester" to have anything other than the plain meaning reflected by Gilead's proposed construction.  TDF is the only "tenofovir ester" disclosed in the Patents-in-Suit, Appx13 (claim 18), and TDF is captured by Gilead's proposed construction.[20]  Snyder Decl. ¶¶ 28-29 (Appx7117-18).  Tenofovir is the acid component in TDF, and the esters form at tenofovir's phosphonic acid:



**Tenofovir Disoproxil**
*(i.e., TDF excluding the fumarate ion)*

Consistent with common usage, Gilead's proposed construction of "tenofovir ester" does not capture compounds in which tenofovir is neither the acid nor the alcohol component of the ester.  When a POSA refers to a "'[*named compound*]' ester," the POSA is referring to an ester in which either the acid or alcohol component is the "*named compound*."  Snyder Decl. ¶¶ 26, 37 (Appx7117, Appx7122).  For example, a leading chemical dictionary defines a "glycol ester" as a "[c]hemical compound composed of the reaction products of a glycol [which is an alcohol] and

---

[20] TDF "differs from tenofovir only" at the phosphonic acid; the rest of the molecule (i.e., the acid component above) is unchanged.  And the only change between tenofovir and TDF at the phosphonic acid group is that "both of the phosphonic acid O-H bonds in tenofovir" are changed to "an O-C bond and the C is part of another group."  *See* Snyder Decl. ¶ 29 (Appx7118).

an organic acid," McGraw-Hill Dictionary of Chemistry 168 (2d ed. 2003) (Appx7007).  It likewise defines an "acrylic ester" as "[a]n ester of acrylic acid," *id.* at 8 (Appx7003); a "boric acid ester" as "[a]ny compound readily hydrolyzed to yield boric acid and the respective alcohol," *id.* at 49 (Appx7004); a "fatty ester" as "[a] fatty acid in which the alkyl group … of a monohydric alcohol replaces the active hydrogen," *id.* at 149 (Appx7006); and a "methyl ester" as "[a]n ester that forms methanol when hydrolyzed," *id.* at 242 (Appx7008).  The theme in these definitions is that the word modifying "ester" is one of the ester's two components.  And this usage is consistent with the intrinsic record, as neither the Patents-in-Suit nor their prosecution histories suggest that "tenofovir ester" was intended to capture a broader set of compounds (again, TDF is the only "tenofovir ester" in the intrinsic record).  Rather, when the inventors intended to capture a wider set of compounds, they use the broader term "tenofovir prodrug."

### (b)    *The government's criticisms of Gilead's construction lack merit.*

The government's criticisms of Gilead's construction ignore the claim language.  The government essentially contends that Gilead's construction is too narrow because it does not capture ***all*** esters.  But the disputed claim term is not the unmodified term "ester"—it is "***tenofovir*** ester."  The government ignores that distinction—in fact, neither the government's opening brief nor its supporting declaration even shows tenofovir's structure.  "Tenofovir" is a single compound, and that compound must be one of the components in a "tenofovir ester."[21]

The government contends that Gilead's proposal is "inexplicably narrow[]" because "Gilead limits its proposed construction to a specific subgenus of esters called 'phosphonic' esters."  Gov't Br. at 37.  But that limitation is dictated by tenofovir's structure—it is chemically

---

[21] As noted below in the context of "tenofovir prodrug," the government appears to assume that "tenofovir" is a genus, not a single compound.  *See* Gov't Br. at 51-52; Appx4171-72 (government's declarant referring to "an active tenofovir").  But that is simply incorrect, as demonstrated by references that the government itself cites.  Appx4011-12 (Dahl reference).

*impossible* for tenofovir to form any ester *other* than a phosphonic ester.  *See* Defs.' Br. at 42-43; Snyder Decl. ¶¶ 27, 36, 40-41 (Appx7117, Appx7121-22, Appx7124).  Likewise, the government calls Gilead's proposal "problematic because it unduly restricts the evaluation of an ester's presence to a single location."  Gov't Br. at 38.  But there is *only one* location in tenofovir's structure that can form an ester—the phosphonic acid.  *See* Defs. Br. at 42-43; Snyder Decl. ¶ 27 (Appx7117).  Gilead's proposal thus captures all the esters that tenofovir can form.

To the extent the government contends that the specification contemplates "tenofovir esters" other than phosphonic esters, the government is mistaken.  *First*, the government suggests that Gilead's proposed construction would exclude TDF because TDF contains "carbonate esters."  Gov't Br. at 37.  But as explained above, Gilead's proposed construction *does* capture TDF.  *See* Defs.' Br. at 43 n.20.  Gilead agrees that TDF "contains two types of esters: (1) phosphonic esters … and (2) carbonate esters," Gov't Br. at 37, but it is *only* the phosphonic ester that makes TDF a "*tenofovir* ester."  There are two ways to split TDF's carbonate esters into acid and alcohol components, shown below, and neither way results in tenofovir:



A tenofovir ester can have other esters within its alcohol component, as TDF does.  But what makes TDF a "*tenofovir* ester" is not its carbonate ester, because neither the acid component nor the alcohol component of those other esters is tenofovir.  Snyder Decl. ¶¶ 40-41 (Appx7124-25).

*Second*, the government contends that the Patents-in-Suit "disclos[e] tenofovir esters

'such as acetate, butyrate, octinoate, palmitate, chlorobenzoates, benzoates, $C_1$-$C_6$ benzoates,

succinates, and mesylate.'"  Gov't Br. at 38.  This is incorrect—the section of the Patents-in-Suit

that the government quotes is about derivatives of ***all*** NRTIs and NtRTIs, not just tenofovir:

> The compositions of the present invention include administration in
> combination of an NRTI and NtRTI and are readily compounded by
> pharmaceutical composition with conventional pharmaceutically
> acceptable carriers or diluents. Additionally, pharmaceutically
> acceptable ***derivatives and prodrugs of active NRTIs and NtRTIs***
> operative in the present invention ***include*** salts such as alkali metal
> salts; ***esters such as acetate, butyrate, octinoate, palmitate,***
> ***chlorobenzoates, benzoates, $C_1$-$C_6$ benzoates, succinates, and***
> ***mesylate***; salts of such esters; and nitrile oxides.

Appx8(4:27-36).  Tenofovir is just one of at least thirteen NRTIs and NtRTIs disclosed in the

Patents-in-Suit, Appx8(5:55-66), and eleven of those thirteen compounds can form all of the

types of esters identified in the sentence that the government quotes.  Snyder Decl. ¶ 42

(Appx7125-28).  A POSA would simply not understand this listing of types of esters in a

statement about many different compounds to change the meaning of "***tenofovir*** ester."  *Id.*  Nor

would a POSA understand Gilead's proposed construction to "exclude[] disclosed examples in

the specification," Gov't Br. at 38, because the specification does not disclose any example of a

"tenofovir ester" except TDF.

*Finally*, the government contends that Gilead's proposed construction is too narrow

because "a person of ordinary skill in the art would have understood that where only one O-H

bond in tenofovir is an O-C bond, this would constitute a tenofovir ester regardless of whether

the other O-H was modified in another way."  Gov't Br. at 38-39.  In other words, the

government appears again to be arguing that tenofovir does not need to be one of the two

components of a "***tenofovir*** ester," since a compound in which "the other O-H [in tenofovir] was

modified in another way" would no longer be tenofovir.  That makes no sense, and as explained

– 46 –

above, it is contrary to how skilled artisans talk about esters.  *See* Defs.' Br. at 43-44.  And the government cites nothing to support its assertion—not even its own supporting declaration.[22]

By focusing its criticisms of Gilead's proposed construction on whether it captures all "esters," the government also misses the point of this dispute:  As explained above, the finder of fact will ultimately need to decide whether TAF is a "*tenofovir* ester," not just whether it is an "ester."  TAF has the following structure, as compared to tenofovir:



Snyder Decl. ¶¶ 45-46 (Appx7129-31).  It is undisputed that TAF is an "ester"—its ester group is shown in red above.  *Id.*  But TAF is not a "*tenofovir* ester" because neither of its ester's components is tenofovir.  As shown below, the acid component of TAF has a nitrogen-containing component bound to phosphorus (shown in blue) that is not present in tenofovir.

---

[22] The government's declarant states that "when a compound includes only 'one . . . of the phosphonic acid O-H bonds' as stated in the proposed construction, this still describes *a 'phosphonic' ester* as well as other derivatives such as a 'phosphonamidate ester' … so long as at least one of the two phosphonic acid O-H bonds is a 'phosphonic' ester."  Brancale Decl. ¶ 36 (Appx4162) (emphasis added).  The government's brief essentially repeats this statement but recasts it—with no citations—as one about what "would constitute a *tenofovir ester*."  Gov't Br. at 38-39.  This sleight of hand is significant:  As discussed in the next paragraph, the dispute is whether TAF is a "tenofovir ester," not whether it is a "phosphonic ester."

Acid Component of TDF
(Tenofovir)

Acid Component of TAF
(Not Tenofovir)

*Id.* ¶ 46.  Because the acid component of TAF is not tenofovir, a POSA would not understand

TAF to be a "tenofovir ester."  *Id.*  And that would be clear to the factfinder under Gilead's

proposed construction:  TAF does not "differ[] from tenofovir only in that one or both of the

phosphonic acid O-H bonds in tenofovir is an O-C bond and the C is part of another group"

because it also differs from tenofovir in that one of the phosphonic acid -OH groups is changed

to the nitrogen-containing group.  Only Gilead's proposed construction assists the factfinder in

determining whether TAF is a "***tenofovir*** ester," and it does so in a way that is consistent with

the term's plain meaning and the intrinsic record.

> ### (c)  The government's proposed construction is vague, circular, and lacks support in the intrinsic record.

Gilead's proposed construction reflects how a POSA would have understood "tenofovir

ester" in light of the intrinsic record.  By contrast, the government's proposed construction—"an

ester-containing tenofovir derivative"—just rearranges the words being construed ("tenofovir"

and "ester") and adds the ambiguous term "derivative."  The government's proposed

construction is vague, circular, and lacking in either intrinsic or extrinsic support.

*First*, the government's proposed construction does not resolve the parties' claim

construction dispute because it simply substitutes one dispute for another:  What, exactly, does it

mean to be a "tenofovir derivative"?  For example, must the compound be made from tenofovir?

Would the claim now include process limitations?  Must the compound be structurally similar to

– 48 –

tenofovir?  If so, what degree of structural similarity is required, and how is that similarity to be assessed?  Must the compound perform the same function as tenofovir?  And must the "ester" have anything to do with the compound being a "tenofovir derivative"?  (Nothing in the government's construction suggests that it does, but that makes little sense when the term being construed uses "tenofovir" to modify "ester.")  The government's proposal would leave all of these questions for the finder of fact to answer.  And the Patents-in-Suit would provide no guidance—the newly-minted term "tenofovir derivative" appears ***nowhere*** in them.  By substituting one disputed term for another, the government's proposed construction effectively would force the finder of fact to determine the scope of the claims that contain "tenofovir ester," which contravenes the basic principle that claim construction "is exclusively within the province of the court."  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.").  Gilead's proposed construction, by contrast, describes how a POSA would have understood a "tenofovir ester" to differ from "tenofovir," and it would provide the finder of fact with clear guidance to understand this technical term.

*Second*, the government's proposed construction finds no support in the intrinsic record.  The Patents-in-Suit include no example of a "tenofovir ester" that would be captured by the government's proposed construction but that would not be captured by Gilead's.  Indeed, the Patents-in-Suit give only one example of a "tenofovir ester"—TDF.  Appx13 (claim 18).  TDF is also the only compound identified as a "tenofovir ester" in the prosecution history.  Appx628-29 (referring to "tenofovir esters such as [TDF]").  Gilead's proposed construction plainly captures TDF; to the extent the government's proposed construction captures other compounds—like

esters of "tenofovir derivatives," rather than esters of tenofovir itself—the intrinsic record provides no support for that broader scope.

Nor does the government's proposed construction find any support in the extrinsic record. The government relies heavily on a Gilead patent application, Dahl, for the erroneous proposition that a POSA would have understood "that tenofovir esters could include esters other than phosphonate esters (including sulphonate esters or phosphonamidate esters) and that such esters could be located on other parts of the tenofovir molecule." Gov't Br. at 39. But Dahl does not say this: Dahl *never* uses the term "tenofovir ester," and the full paragraph containing the phrases the government quotes is actually a definition of "prodrug esters":

> *Prodrug esters* in accordance with the invention are independently selected from the following groups: (1) mono-, di-, and tri-phosphate esters *of tenofovir or emtricitabine* or any other compound which upon administration to a human subject is capable of providing (directly or indirectly) said mono-, di, or triphosphate ester; (2) carboxylic acid esters (3) sulphonate esters, such as alkyl- or aralkylsulphonyl (for example, methanesulphonyl); (4) amino acid esters (for example, alanine, L-valyl or L-isoleucyl); (5) phosphonate; and (6) phosphonamidate esters.

Appx4017-18 (emphasis added). Dahl does not suggest that tenofovir is capable of forming all of these types of esters, nor does Dahl suggest that any of these prodrug esters would necessarily be a "tenofovir ester." To the contrary, a compound can be an ester-containing tenofovir prodrug without being a "tenofovir ester." Snyder Decl. ¶ 45 (Appx7129). And Dahl is describing prodrug esters of *either* tenofovir or emtricitabine. Emtricitabine, unlike tenofovir, has an alcohol group, so it is capable of directly forming the other types of "prodrug esters" listed in this paragraph. *Id.* ¶ 44 (Appx7129).

Moreover, while there is no need to look to unrelated patents like Dahl to construe "tenofovir ester," to the extent the Court does so, the literature provides no support for a construction broader than Gilead has proposed. To Gilead's knowledge, the only unrelated U.S.

– 50 –

patent that uses the term "tenofovir ester" is U.S. Patent No. 10,155,007, which is assigned to a company called Firson and describes "diethyl tenofovir ester."  Appx7045 (6:7-8).  "Diethyl tenofovir ester" is a "tenofovir ester" under Gilead's proposed construction, confirming that Gilead's proposed construction has an appropriate scope.  Snyder Decl. ¶ 48 (Appx7131-32).

### 3.    The Government's Reply Position

Gilead's proposed construction—a thirty-six word "definition" of a two-word phrase—is unabashedly litigation-driven: Gilead suggests that "the finder of fact will ultimately need to decide whether TAF is a 'tenofovir ester'" only to say in its very next breath that, under its proposed construction, "TAF is not a 'tenofovir ester.'"  Gilead Br. at 47 (emphases removed).  Gilead's conclusion and the way in which Gilead singles out TAF more generally—indeed, Gilead references TAF *fifteen* times in its discussion of "tenofovir ester"—is inexplicable unless one assumes that Gilead's construction is wholly a device to exclude TAF from the claim.

Not only is this improper (Gilead itself well knows that "claims may not be construed with reference to the accused device," *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330 (Fed. Cir. 2006)), but it leads to a construction that is overly complicated and unreasonably narrow.  The skilled artisan would not understand the term "tenofovir ester" in such a hyper-technical and unduly narrow manner.

Instead, the skilled artisan would more simply understand "tenofovir ester" as "an ester-containing tenofovir derivative" for reasons previously discussed.  *See supra* § III.E.1.  This understanding is fully supported by the specification, which describes "esters" according to their *function* as a type of prodrug "that when administered to a primate host generates an active NRTI or NtRTI," such as tenofovir.  Appx0008 at 4:51-58.  The specification is clear that "prodrugs of active NRTIs and NtRTIs operative in the present invention include . . . *esters* [and] salts of such esters."  *Id.* at 4:31-36 (emphasis added).  The specification discloses tenofovir

esters.  *See* Appx0009 at 5:61-6:2 (describing "tenofovir" and "pharmaceutically acceptable salts, *esters*, ester salts . . . and prodrugs" thereof) (emphasis added); Appx0008 at 4:55-58 (disclosing TDF, a tenofovir ester).  The Government's construction of "tenofovir ester" as "an ester-containing tenofovir derivative" appropriately looks to the functional description of esters described in the specification, which is consistent with the knowledge of the skilled artisan concerning tenofovir esters at the relevant time.  *See* Appx4396-98 ¶¶12-21 (Brancale Dec.).

In contrast, Gilead's construction is based on a "[*named compound*] ester" ***nomenclature*** theory that ignores the functional description of tenofovir esters in the specification.  *See* Gilead Br. at 39, 41-44.  Gilead's "[*named compound*] ester" theory is premised on a "tenofovir ester" comprising a molecule having only a tenofovir acid component and an alcohol component.  *Id.* There is no support for such a strained nomenclature theory in the specification.  *See* Appx4398-400 ¶¶22-25 (Brancale Dec.).

Gilead's nomenclature theory wrongly insists that a skilled artisan would understand that the word "tenofovir" necessarily refers to a "single compound" having the following structure:



*See* Gilead Br. at 44, 47.  This narrow interpretation of the word "tenofovir" is the linchpin of Gilead's entire scheme to exclude TAF from "tenofovir ester."  But a skilled artisan would ***not*** have understood "tenofovir" in this manner and would have instead understood tenofovir to include pharmaceutically acceptable tenofovir derivatives that yield tenofovir in the body.  As Gilead's previous expert, Dr. Youle, explained to the PTAB: "'tenofovir' and "TDF" were used interchangeably in the literature."  Appx2334 ¶170, n.7.  Thus "tenofovir" was not used in the

COMMENT

prior art to refer only to a single compound.  Dr. Youle further referred to "[t]enofovir in its parent form," which would be unnecessary if a skilled artisan understood the word "tenofovir" to refer only to a single compound.  Appx2286 ¶81.  Gilead's other witness in this proceeding, Dr. Flexner, similarly uses at least "tenofovir" and "tenofovir disoproxil fumarate" interchangeably. *See, e.g.*, Appx4204 (stating "[t]enofovir has been studied with 18 different agents," and citing references 54-56 that, at Appx4217, refer to "tenofovir disoproxil fumarate" and "tenofovir DF" in their titles).  Thus Gilead's current attempt to limit "tenofovir" to a single compound is inconsistent with how its own experts have used this word.

The Government's proposal of "an ester-containing tenofovir derivative" is the appropriate construction of "tenofovir ester."  Gilead agrees that "tenofovir ester" should be an "ester-containing compound."  Gilead Br. at 40.  Gilead's only disagreement is whether "tenofovir" may include pharmaceutically acceptable tenofovir derivatives, but its argument that "tenofovir ester" cannot encompass these derivatives is, at root, a non-infringement argument— that TAF is not an ester.  Gilead admits, however, that TAF is an ester-containing compound.  *Id.* at 47 ("It is undisputed that TAF is an 'ester.'").  Gilead further admits that the construction of "tenofovir ester" should encompass "esters of tenofovir."  *Id.* at 49-50 (explaining that this term should capture "esters of tenofovir itself"); *see also* Appx7117 ¶28 (Gilead's declarant, Dr. Snyder, explaining that TDF is an "ester of tenofovir"); App7118 ¶29 (same).  Gilead has repeatedly characterized TAF as an ester of tenofovir in the prior art, for example:

- Appx4243 ¶[0226]: Gilead disclosing that "GS-7340" (i.e., TAF)[23] is the "isopropyl alaninyl monoamidate, phenyl ***monoester of tenofovir***" (emphasis added);

---

[23] "GS-7340" is a name for TAF found in the prior art.  *See, e.g.*, Appx4031 (showing the structure of GS-7340) *and* Gilead Br. at 47 (showing the identical structure of TAF).

- Appx4247-48: Gilead disclosing that "GS-7340" is "an isopropylalaninyl monoamidate phenyl ***monoester prodrug of tenofovir***" (emphasis added);

- Appx4256: Gilead disclosing that "GS-7340" is "an isopropylalaninyl phenyl ***ester prodrug of tenofovir***" (emphasis added); and

- Appx4259: Gilead disclosing that "GS-7340" is a "phenyl ***monoester*** isopropyl alaninyl phosphoramidate ***of PMPA [i.e., tenofovir]***"[24] (emphasis added).

It is surprising that Gilead asserts that a skilled artisan would cast aside the body of prior art referring to TAF as an ester of tenofovir to conclude that TAF is not a "tenofovir ester." *See* Appx4400-01 ¶¶26-28 (Brancale Dec.). It is also inconsistent with relevant prior art that routinely refers to similar esters on an antiviral agent as an ester of the antiviral. Appx4401-04 ¶29 (Brancale Dec.); Appx4265.

Finally, Gilead unfairly criticizes the Government's proposed construction for "add[ing] the ambiguous term 'derivative'" by pretending that it does not understand the phrase "tenofovir derivative." Gilead Br. at 48-49. Gilead's own prior art Truvada label refers to tenofovir disoproxil as an "ester ***derivative*** of tenofovir." Appx4101 (emphasis added); *see also* Appx4127. Gilead's prior art Dahl references uses "derivative" extensively to refer to tenofovir compounds. *See, e.g.*, Appx4004 (disclosing "physiologically functional ***derivative[s]*** of tenofovir disoproxil fumarate") (emphasis added); Appx4005 (TDF "or a physiologically functional ***derivative*** thereof") (emphasis added); Appx4010; Appx4011; Appx4012; Appx4016; Appx4404-05 ¶30 (Brancale Dec.). There is no ambiguity in the Government's construction because a skilled artisan understood the meaning of tenofovir derivatives as evidence by Gilead's own repeated use of the term in the relevant literature. For these reasons, the skilled artisan would have understood the term "tenofovir ester" consistent with the Government's construction.

---

[24] "PMPA" is a name for tenofovir found in the prior art. *See, e.g.*, Appx0011 at 9:19-20.

### 4.      Gilead's Sur-Reply Position

This term presents two questions:  How would a POSA have understood "tenofovir ester," and how can that understanding be conveyed to a lay jury?  The government's proposed construction answers the first question incorrectly and fails to engage with the second.

*First*, a POSA would have understood the term "tenofovir ester" to be an ester in which one of the components is tenofovir.  It is a basic chemical fact that an ester is made up of two components.  *See supra* at 42-43.  The government does not contest that principle—indeed, the government itself applies it.  *See, e.g.*, Appx7298 (FDA memorandum noting that "[a]mongst chemists, there is a long standing understanding that esters are substances resulting from the splitting-out of water from the combining of an alcohol, and an acid"); Appx7305 (FDA analyzes esters by "[e]xamin[ing] the alcohol and acid components").  When chemists speak of a "[*named compound*] ester," the meaning is obvious—they are talking about an ester in which one of the components is the named compound.  Chemistry dictionaries are replete with definitions to this effect, *see supra* at 43-44, and courts construe similar chemical terms in this manner.[25]

The government's rationales to expand the scope of "tenofovir ester" beyond esters in which tenofovir is one of the components do not bear scrutiny.  For example, for the first time in its reply, the government seeks a "functional" construction.[26]  Gov't Br. at 51-52.  This is not

---

[25] For example, salts, like esters, are two-component compounds.  *See* Hawley's Condensed Chemical Dictionary 451 (14th ed. 2001) (Appx7058) (defining "ester" as, among other things, "[a]n organic compound corresponding in structure to a salt in inorganic chemistry").  Courts routinely construe terms including "[*named component*] salt" as a salt in which one of the two components is the named component.  *See, e.g.*, *INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*, 951 F. Supp. 2d 604, 621 (D. Del. 2013) (construing "cobalt salt" as "a salt wherein the cation is cobalt"); *Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 334 F. Supp. 2d 197, 220 (N.D.N.Y. 2004) (construing "chloride salt" as "one in which the anion … is comprised of chlorine").

[26] The government expounds upon this and other new arguments in a second declaration from Dr. Brancale (Appx4392-406).  Gilead has responded to Dr. Brancale's belated arguments with a declaration from Professor Snyder (Appx7508-31), but because many of these new arguments are only fleetingly mentioned in the government's brief, they are not properly before the Court.

reflected in the government's proposed construction, which includes no functional language. Yet, the government now contends that "the specification … describes 'esters' according to their function as a type of prodrug 'that when administered to a primate host generates an active NRTI or NtRTI.'" *Id.* (citing Appx8 (4:51-58)). But the paragraph the government cites is a definition of "prodrug"—it does not even use the word "ester." Appx8(4:51-58). To be sure, other parts of the specifications state that "prodrugs" of active NtRTIs include esters (and other things), Appx8(4:31-36), but a POSA would not understand the specification to broaden the ordinary meaning of "ester" (or "tenofovir ester") simply by reciting esters as one possibility in a list of "pharmaceutically acceptable derivatives and prodrugs." Snyder Supp. Decl. ¶¶ 4-7 (Appx7510-11). And the paragraph defining "prodrug" would not alter a POSA's understanding that an ester is defined by its structure, *id.*—an understanding that the FDA shares, Appx7298-300.

The government also argues that a POSA would have understood "tenofovir" not to be a "single compound," but "to include pharmaceutically acceptable tenofovir derivatives that yield tenofovir in the body." Gov't Br. at 52. This has no support. Tenofovir is a single compound that has a single structure and a single set of chemical properties. Snyder Supp. Decl. ¶¶ 8-22 (Appx7512-23). The patents make clear that "tenofovir" refers to that single compound, Appx11 (9:19-20) ("tenofovir (PMPA)"); Appx12 (claim 1, reciting "tenofovir or tenofovir disoproxil fumarate," thus distinguishing them), as do publications in the file history, including those by academics, Appx1095, Appx1622; Gilead scientists, Appx645-46, Appx664, Appx1182; and the inventors, Appx145, Appx693. Extrinsic sources do as well. Appx7308-09. And while the government's declarant now contends that "the prior art uses the term 'tenofovir' in a functional sense to more generally refer to compounds that would generate tenofovir within a primate host," Appx4400, that is not consistent with his prior statements. In June 2006, Dr. Brancale published

– 56 –

a "FactFile" showing the "chemical structure" and "commonly used names" of antivirals, Appx7330-32, and he too pictured tenofovir as having a single chemical structure, Appx7344, Appx7390.  The out-of-context quotes from Gilead's experts that the government cites cannot outweigh the extensive evidence that "tenofovir" refers to a single compound.[27]

*Second*, Gilead's proposed construction is appropriate because it expressly describes, in basic terms, the structure of all possible esters in which one of the two components is tenofovir. That simplification is necessary so the jury can faithfully apply the Court's claim construction. *See, e.g.*, *Apple Inc. v. Motorola, Inc.*, No. 1:11-CV-08540, 2012 WL 8123793, at *1 (N.D. Ill. Mar. 12, 2012) (Posner, J.) (for claim constructions, "[t]here is no point in giving jurors stuff they won't understand").  The government identifies no error in how Gilead has translated "an ester in which one of the two components is tenofovir" to lay terms.  *See supra* at 42-43.

The government's proposed construction, by contrast, is not useful because it simply repeats the technical words of the disputed term and adds the vague word "derivative."  In its first brief, Gilead raised many questions about the scope of "tenofovir ester" that the government's construction improperly leaves to the jury.  *See supra* at 48-49.  The government responds that these questions "unfairly criticize[]" its construction, but it answers **none** of them. Gov't Br. at 54.  The government and its declarant make the conclusory assertion that "a *skilled artisan* understood the meaning of tenofovir derivatives," *id.* at 54 (emphasis added) (citing Appx4404-05), but that misses the point:  A construction should be useful to the *fact finder*, and it should not introduce a new technical term that itself requires a skilled artisan's interpretation.

---

[27] Nor do these statements, in context, suggest that tenofovir is anything other than a single compound.  Dr. Youle explained that tenofovir is different from TDF and tenofovir diphosphate. Appx2285-86(¶ 81).  Dr. Flexner also expressly refers to tenofovir by its single structure. Flexner Decl. ¶ 22 (Appx7160-61).  The government points to no use of "tenofovir" that suggests that a POSA understood "tenofovir" to broadly refer to any "pharmaceutically acceptable tenofovir derivatives that yield tenofovir in the body."  Gov't Br. at 52.

The government's remaining criticisms of Gilead's proposed construction lack merit. First, the government accuses Gilead of asking the Court to construe claims "with reference to the accused device," Gov't Br. at 51, but Gilead has not done that—Gilead's proposed construction makes no reference to TAF.[28]  And to the extent the government suggests that the Court may not consider whether its construction will be useful for the jury in determining whether TAF infringes, the government contradicts the very case it cites.  *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326-27, 1331 (Fed. Cir. 2006) (cited at Gov't Br. at 51) (holding that no rule "forbid[s] awareness of the accused product or process to supply the parameters and scope of the infringement analysis, including its claim construction component").  Second, the government objects to the length of Gilead's proposed construction because it is "a thirty-six word 'definition' of a two-word phrase."  Gov't Br. at 51.  But it should not be surprising that a technical term that includes "ester" requires several words to define—the dictionary definitions of "ester" that are in the record are, on average, 38 words.  Appx7005; Appx7013, Appx7054; Appx7058.  There is no principle of claim construction that requires sacrificing clarity for brevity, as the government urges.

---

[28] It is premature to address whether TAF is a "tenofovir ester"; Gilead's discussion of TAF is intended only to provide context for the claim construction dispute.  But to be clear, Gilead has not "repeatedly characterized TAF as an ester of tenofovir."  Gov't Br. at 53.  The statements the government quotes describe ***multiple*** modifications of tenofovir.  A POSA would have understood each of these statements, as a whole, to describe a compound having a single ester in which neither component is tenofovir.  Snyder Supp. Decl. ¶¶ 28-32 (Appx7526-29).  To the extent the government's misleading emphasis of portions of these chemical names is a preview of the infringement arguments it intends to make to the jury, this is all the more reason to provide the jury with a clear claim construction, rather than the vague construction the government seeks.

F.     "tenofovir prodrug"  (Claims 1, 4, 12, 16, 18-19 of '423 patent)

---

### Joint Statement by the Parties

After exchanging opening positions concerning the construction of the term "tenofovir prodrug," the parties no longer believe that their disagreement about this term's meaning affects any claim or defense in this case. The parties agree that this term encompasses the TDF and TAF contained in Gilead's Truvada and Descovy products, respectively, such that both accused products contain a "tenofovir prodrug." The Government therefore withdraws its request for construction of this term, which Gilead does not oppose.

The parties have included their opening and answering positions here only to ensure a complete record.  No party is seeking action by the Court concerning this term.

---

| The Government's Proposal | Gilead's Proposal |
|---|---|
| "a compound that, when administered to a primate host generates active tenofovir as a result of spontaneous reaction under physiological conditions, enzymatic catalysis, metabolic clearance, or combinations thereof" | "a compound that when administered to a primate host generates tenofovir as a result of spontaneous reaction under physiological conditions, enzymatic catalysis, metabolic clearance, or combinations thereof" |

### 1.     The Government's Opening Position

The specification sets forth an express definition for prodrug:  "As used herein the term 'prodrug' is defined to include a compound that when administered to a primate host generates an ***active NRTI or NtRTI*** as a result of spontaneous reaction under physiological conditions, enzymatic catalysis, metabolic clearance, or combinations thereof."  Appx0008 at 4:51-55 (emphasis added).  The parties dispute whether Gilead can delete the word "active" from the specification's definition of "prodrug."  Gilead's proposed deletion is improper.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (stating "the inventor's lexicography governs").

In the definition of "prodrug," the abbreviations "NRTI" and "NtRTI" refer to nucleo*side* reverse transcriptase inhibitor and nucleo*tide* reverse transcriptase inhibitor, respectively.  *See* Appx4169 ¶¶61-62.  "Tenofovir" is a nucleotide reverse transcriptase inhibitor that can be

phosphorylated and then diphosphorylated within the host to generate an active form of tenofovir. *See* Appx0009 at 5:61-6:2, 6:60-64; Appx4169-70 ¶63; Appx4171-72 ¶67. The Government's construction appropriately substitutes "tenofovir" for "NRTI or NtRTI" in the specification's definition of "prodrug." *See* Appx4170-71 ¶¶64-66. The Court should reject Gilead's attempt to delete the word "active" from the specification's definition.

### 2.    Gilead's Answering Position

The government seeks construction of the term "tenofovir prodrug" but has disclosed no issue in this litigation that will be affected by such a construction. It is undisputed that both accused products contain a tenofovir prodrug. Ans. (D.I. 78) ¶¶ 49, 54. Nonetheless, the government insists on construing this term in a scientifically incorrect way. The Court should either adopt Gilead's construction, which is consistent with the intrinsic record, or simply decline to construe this term because construction is not necessary to resolve any issue in this case.

To the extent "tenofovir prodrug" requires a construction, the parties agree that it should be based on the generic definition of "prodrug" in the specification:

> As used herein the term "prodrug" is defined to include **a compound that when administered to a primate host generates <u>an active NRTI or NtRTI</u> as a result of spontaneous reaction under physiological conditions, enzymatic catalysis, metabolic clearance, or combinations thereof.**

Appx8(4:51-55) (emphasis added). "Tenofovir" is an NtRTI. Appx9(5:61-64). The only dispute is whether "active" from the underlined phrase above is retained when this generic definition of "prodrug" is applied to the specific term "tenofovir prodrug."

The Court's construction of "tenofovir prodrug" should not include the term "active tenofovir" because tenofovir is a compound with a specific chemical structure that does not require any adjective, such as "active," to identify it. And more importantly, tenofovir is ***not*** "active" in the general sense of the word—tenofovir is converted in the body into another

compound, tenofovir diphosphate, which is the compound that has pharmacologic activity.  *See*

Flexner Decl. ¶ 22 (Appx7160-61).  As the original 2004 Truvada® label explained:

> ***Tenofovir disoproxil fumarate*** [TDF, which is a prodrug, *see*
> Appx8(4:55-57)] requires initial diester hydrolysis for conversion
> to ***tenofovir*** and subsequent phosphorylations by cellular enzymes
> to form ***tenofovir diphosphate***. ***Tenofovir diphosphate inhibits the***
> ***activity of HIV-1 RT*** ….

Appx4101.  As shown below, when a patient takes Truvada®, TDF is first converted to tenofovir;

the tenofovir then enters the patient's cells; and the tenofovir is then converted to tenofovir

diphosphate.  Flexner Decl. ¶ 22 (Appx7160-61).  But tenofovir diphosphate, not tenofovir, is the

"active" compound that inhibits HIV.  *Id.*; Appx4171(¶ 67) (government's declarant explaining

that "[t]he active metabolite of tenofovir in the body is tenofovir diphosphate").  Because "active

tenofovir" is a technically incorrect term, the Court should not include it in the construction of

"tenofovir prodrug."  Flexner Decl. ¶¶ 61-66 (Appx7177-79).



To support its construction, the government mistakenly contends that "tenofovir" refers

to a category of compounds and not the single molecule having the structure shown above.  The

government's declarant states, for example, that a POSA would have "understood that tenofovir

disoproxil fumarate (which is a tenofovir prodrug) generates ***an*** active tenofovir (tenofovir

diphosphate) when administered to a primate host."  Appx4171-4172 (emphasis added).  But

there is only one "tenofovir"—it is the single compound that has the structure above.  "Tenofovir

diphosphate" is not "*an* active tenofovir," as the government contends—it is a different compound. And it is tenofovir diphosphate that is truly "active," not tenofovir.

No construction of "tenofovir prodrug" is necessary because, to Gilead's knowledge, the parties' disagreement about this term's meaning does not affect any claim or defense in this case. But if the Court adopts a construction, it should reject the government's attempt to insert the scientifically incorrect and nonsensical term "active tenofovir" into the construction.

### G.   "prior to an [the] exposure" (Claims 1 and 7 of '509, '333, '191, and '423 patents)

| The Government's Proposal | Gilead's Proposal |
|---|---|
| Plain and ordinary meaning. The administration step begins after selecting the primate host and before exposure of the primate host to the immunodeficiency retrovirus. | "in advance of contact [of the primate host to the immunodeficiency retrovirus] that can result in infection" |

### 1.   The Government's Opening Position

The plain and ordinary meaning of the term "prior to an [the] exposure" in the method claims at issue simply indicates that the administration step begins after selecting the primate host and before exposure of the primate host to the immunodeficiency virus. This is clear from the language of claim 1. *See* Appx00012 at 12:41-50. Step (a) of claim 1 recites "selecting a primate host not infected with the immunodeficiency virus." *Id.* at 12:41-42. Step (b) recites "administering directly to an uninfected primate host a combination comprising [emtricitabine and tenofovir or a tenofovir ester/prodrug]." *Id.* at 12:43-48. Claim 1 then includes a "wherein" clause that recites "wherein the combination is administered *prior to an exposure* of the primate host to the immunodeficiency retrovirus." *Id.* at 12:49-50 (emphasis added). The "wherein" clause therefore confirms that "prior to an [the] exposure" means that the administration step recited by step (b) begins after the uninfected primate host is selected as described in step (a) and

before the primate host is exposed to the immunodeficiency retrovirus.  The specification further

supports the Government's construction.  *See, e.g.*, Appx0007-09 at 1:38-40, 1:48-55, 2:9-42,

3:20-49, 5:1-52, 6:39-48.  In other words, "prior to an [the] exposure" provides a condition

precedent for the administration step by specifying that the uninfected host has not been exposed

to the immunodeficiency retrovirus before the administration step begins.

Gilead's construction of "in advance of contact that can result in infection" adds an

unrecited requirement that the host actually be exposed to the immunodeficiency retrovirus via

"contact" at some later time.  The claim requires no such condition subsequent to the

administration.  In contrast to the "selecting" and "administering" steps recited in claim 1, the

claim does not affirmatively recite a step of "exposing"—let alone "contacting"—the host.  It

would be improper to incorporate such an unrecited step.  *See Amag Pharms., Inc. v. Sandoz,

Inc.*, No. 16-cv-1508-PGS, 2017 WL 3076974, at *25 (D.N.J. July 19, 2017) ("It is important to

remember that the elements, or the body, of a method claim are method steps, which should

usually be verbal (gerundial) phrase, introduced by a gerund or verbal noun (the '-ing' form of a

verb)."); *Microsoft Corp. v. Motorola Inc.*, No. 10-cv-1823-JLR, 2012 WL 12882863, at *8

(W.D. Wash. Apr. 10, 2012) (finding a non-gerund term in a "wherein" clause to be "indicative

of a descriptive term" and refusing to construe it as a separate method step).  In addition, certain

narrowing dependent claims add an actual exposure step by expressly reciting that "the

combination is administered . . . ***both before and after an exposure***."  *See* Appx0013 at 13:10-13

(claim 10) (emphasis added); Appx0027 at 13:24-27 (same); Appx0041 at 13:3-6 (same);

Appx0055 at 13:35-38 (same); *see also* Appx0041 at 14:5-8 (claim 15 requiring an actual

exposure via "following the exposure" language); Appx0055 at 14:24-27 (same).  Thus,

administration "prior to an [the] exposure" in claims 1 and 7 does not itself require a future, actual exposure.  *Cf. Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).[29]

The parties agree that "prior to an [the] exposure" does not require that administration occur before the host's first exposure to an immunodeficiency retrovirus.  That is, the claim does not require the host to be completely retrovirus-naïve such that the host has never had any exposure to HIV.  As Gilead explained in the IPRs:

> The '509 Patent also distinguishes "an exposure" from the "first exposure" of the uninfected individual to HIV—only the first HIV exposure is the "initial exposure." None of the claims uses the terms "initial" or "first" or otherwise requires agents to be administered before the first/initial "exposure." Instead, they use the words "an exposure," thus indicating administration of antiretroviral agents can occur after an earlier HIV exposure, as long as (i) the earlier exposure did not result in an HIV infection (i.e., the individual remains "uninfected"), and (ii) administration occurs before a future exposure.

Appx2065 (citing Appx0007-08 at 1:64-67, 3:30-33) (internal footnote and emphases omitted); *see also* Appx2436.  This understanding is consistent with the Government's construction of the "prior to an [the] exposure" language.  That construction recognizes that the claims are directed to PrEP as agreed upon by the parties and the Examiner.  *See, e.g.*, Appx2233 (statement by Gilead that "the remaining claims require administration ***before*** an exposure") (emphasis in original); D.I. 78 ¶77 ("[Gilead] admit[s] that pre-exposure prophylaxis (PrEP) refers to a regimen including oral medications that, when taken on a regular basis prior to exposure, prevent

---

[29] This brief provides the Government's first briefing on the construction of this term.  In three of four IPR decisions, the PTAB found that "prior to an [the] exposure" requires "an actual exposure to the immunodeficiency retrovirus."  Appx1796; Appx1462; Appx1973.  The fourth IPR decision noted that construction of the term was not "necessary to resolve the controversy."  Appx0950 (citing *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011)).  The three PTAB decisions that construed this term noted that the Government had not contested Gilead's assertions "or offer[ed] its own interpretation."  Appx1796; Appx1462; Appx1973.  The Government did not proffer a construction of this term in the IPRs because it was not necessary to defeat Gilead's IPR petitions.

the spread of HIV."); Appx2242-45 (Government's explanation that "all remaining challenged claims are unambiguously directed to pre-exposure prophylaxis ('PrEP')") (emphasis removed); Appx0832 (Examiner explaining that the claims provide "prophylactic treatment of those person[s] who are HIV negative but are at great risk of getting infected"); Appx1695-96 (Examiner acknowledging that "the invention was made[] to treat a subject, or a subpopulation, who have not been infected by HIV, but are exposed to or at risk of exposure to HIV").  To the extent Gilead's construction requires an actual exposure, the Court should reject it.  The disputed term indicates "when" the administration step occurs—after selecting the primate host and before exposure of the primate host to the immunodeficiency virus—as the Government's proposal and the plain language of the claims make clear.

### 2.      Gilead's Answering Position

This term presents two issues:  (1) What does "prior to exposure" mean, and (2) do the claims that contain this term require exposure at all?  The government proposed this term for construction, but it now seeks to read "exposure" out of the claims completely, presumably to avoid having to prove that individuals who take the accused products for PrEP are later exposed to HIV but "remain negative."  The government's proposed construction is unrelated to the meaning of the words "prior to exposure" and has no support in the record—indeed, it even conflicts with the government's other claim construction arguments, as it is non-sensical for the preambles to require "protection" from HIV but for the claims not to require exposure to HIV.  By contrast, Gilead's proposed construction defines the term at issue (rather than trying to read it out of the claims) and is based on the intrinsic record.  Gilead's proposed construction should therefore be adopted.

> (a)   *"Prior to [an/the] exposure" means "in advance of contact … that can result in infection."*

Gilead's proposed construction—"in advance of contact … that can result in infection"—reflects the plain meaning of this term and is firmly rooted in the intrinsic record. For example, when the specification discusses the timing of the administration step using words other than "prior to," it uses "in advance of." *See* Appx8(3:33-37) ("An inventive dosing regimen also includes a course of multiple doses administered *in advance of* exposure to maintain a therapeutic level of NRTI and NtRTI agents in the primate host.") (emphasis added); *see also* Appx8(3:46). Likewise, during prosecution, the government expressly defined "exposure" using "contact." In response to a rejection, the government stated that "Applicant maintains that the term *'exposure'* is directed to initial *contact* between a host and a virus."[30] Appx290 (emphasis added). And when the patents use the word "exposed," they do so in the context of contact with HIV. *See, e.g.*, Appx11(9:5-7) ("Macaques are exposed rectally once weekly for up to 14 weeks to SHIV162p3…."). The specification also contemplates that any "exposure" could result in infection. *See, e.g.*, Appx8(3:25-29) ("As the aforementioned exposure routes are characterized by a small number of retrovirus particles being transferred to the new primate host, this initial phase of infection represents a window of opportunity to protect a host from infection."). Gilead's proposal, which construes "prior to [an/the] exposure" as "in advance of contact … that can result in infection," thus reflects the inventors' own words from the intrinsic record and is how a POSA would have understood the term. Flexner Decl. ¶¶ 49-55 (Appx7172-75).

---

[30] The remainder of this definition—"between a host and a virus"—is reflected by language that is already in the claims, which Gilead has indicated with the bracketed language in its construction. For example, the relevant clause from claim 1 of the '423 Patent, "wherein the combination is administered orally **prior to the exposure** of the primate host to the immunodeficiency retrovirus," would be construed as follows under Gilead's proposal: "wherein the combination is administered orally **in advance of contact** of the primate host to the immunodeficiency retrovirus **that can result in infection**." Appx55(13:9-11).

The government's proposed construction—"[t]he administration step begins after selecting the primate host and before exposure of the primate host to the immunodeficiency retrovirus"—should be rejected because it includes extraneous concepts and fails to clarify the "exposure" portion of the term.  *First*, the government's proposed construction defines the order of claim steps (a) and (b) (i.e., "[t]he administration step begins after selecting the primate host").  But the term being construed, "prior to [an/the] exposure," has nothing to do with step (a) or how it relates to step (b).  Neither party sought construction of the order of steps, and there is no basis for the government to seek to impose one in a construction of an unrelated term. *Second*, the government's proposed construction unnecessarily repeats language that is already in the claims—the language that is bracketed in Gilead's proposed construction (i.e., "of the primate host to the immunodeficiency retrovirus").  There is no reason to include that language in the construction of "prior to [an/the] exposure" and introduce redundancy into the claims. And when these extraneous portions of the government's proposed construction are stripped away, it boils down to the following:  "prior to [an/the] exposure" means "before [an/the] exposure."  Just as with "tenofovir ester," the government proposes construing a disputed term in a way that does not inform the term's meaning.  Because such a construction provides no guidance to the finder of fact, the government's proposal should be rejected.

### (b)    *The claims require that the subject actually be exposed to the virus.*

Instead of providing an informative construction of this term, the government raises a more significant dispute:  Do the claims that contain the "prior to exposure" limitation require that the subject actually be exposed to the virus?  The government's brief makes clear that it does not think so, *see* Gov't Br. at 63 (characterizing contact with the virus as a non-limiting "condition subsequent"), but all signs point to "yes."

– 67 –

*First*, and most significantly, each of the Patents-in-Suit also has an independent claim that limits the timing to "prior to ***potential*** exposure."  *See, e.g.*, Appx55 ('423 Patent, claim 12). When the inventors intended to define the time period by reference to an event that ***might*** result in contact that could result in an infection, they used the language "prior to potential exposure." Unless "prior to [an/the] exposure" requires actual contact with a virus, claims reciting "prior to [an/the] exposure" and "prior to potential exposure" would have the same meaning—regardless of whether the claim says "prior to [an/the] exposure" or "prior to potential exposure," the government would deem the claimed method complete after administration even if no "exposure" occurred.  Such an interpretation, which renders different claim language redundant, cannot be correct.  *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006).

*Second*, claims that depend from the claims that recite "prior to [an/the] exposure" presume that an exposure must take place.  For example, claim 11 of the '423 Patent recites "[t]he process of claim 1, wherein administration of the combination results in an absence of persistent viremia and seroconversion of the primate host."  Appx55.  If contact with a virus does not need to happen during "the process of claim 1," claim 11 would be meaningless—claim 1 requires that the "primate host [is] not infected with the immunodeficiency retrovirus" (in step (a)), so unless the host actually comes into contact with a virus later in the recited process, there is no chance for "persistent viremia" to develop or "seroconversion" to occur.  Moreover, the government sought similar claims that depend from the claims that recite "prior to potential exposure," but in those claims, the government stated that contact with a virus must have actually occurred:  "The process of claim 12 [a "prior to potential exposure" claim], wherein an inhibition of infection in the host is determined by an absence of persistent viremia and

– 68 –

seroconversion in the human *following the exposure to the immunodeficiency retrovirus*."

Appx55 (claim 15) (emphasis added).[31]  In other words, where the independent claim does not

require actual contact with a virus—i.e., when it recites "prior to potential exposure"—the

government clarified that contact with the virus did in fact occur before discussing risk of

persistent viremia or seroconversion in a dependent claim.  But the government did not see the

need to include that clarification in claims that depend from independent claims that recite "prior

to the exposure"—that is because the independent claims that recite "prior to the exposure"

already require contact with a virus.

    The government offers two reasons for the Court to adopt a construction of "prior to

[an/the] exposure" that does not require contact that could lead to infection, but neither is

persuasive.  *First*, the government contends that "prior to the exposure" is a "condition

precedent" for the administration step, not a "condition subsequent."  Gov't Br. at 63-64.  The

government cites no case recognizing this novel type of claim element.  Patent claims are made

up of limitations, not "conditions precedent" or "conditions subsequent."  When a claim defines

a process by reference to an event, as the asserted claims do here, occurrence of that event must

be a claim limitation because the claimed steps cannot be completed unless it occurs.  Regardless

of whether the "prior to the exposure" limitation is phrased as a condition precedent (i.e., non-

occurrence of the recited exposure before the time of administration) or a condition subsequent

(occurrence of exposure after the time of administration), it is a limitation, and the exposure—

i.e., contact with the virus that can result in infection—must occur for it to be met.

---

[31] The government suggests that claim 15's "following the exposure" language demonstrates
that "prior to the exposure" does not contemplate actual contact under the claim-differentiation
doctrine.  *See* Gov't Br. at 63-64.  But as explained above, claim 15 does not depend from a
claim that recites "prior to the exposure"—it depends from a claim that recites "prior to potential
exposure."  As noted above, this proves Gilead's point.

*Second*, the government misapplies the claim differentiation doctrine when it contends that claim 10 in each of the Patents-in-Suit shows that no exposure is required in claim 1.  Gov't Br. at 63-64.  Claim 10 requires administration of the claimed pharmaceuticals both before and after contact with the virus.  *See, e.g.*, Appx55 (requiring that "the combination is administered daily for several days, weeks or months ***both before and after an exposure*** of the primate host to the immunodeficiency retrovirus") (emphasis added).  But Gilead's proposed construction of claim 1 just requires administration before—not after—an exposure (i.e., before contact with a virus).  Claim differentiation does not apply "where, as here, the claims are not otherwise identical in scope."  *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1358 (Fed. Cir. 2016).

The government's other claim construction arguments confirm that the claims require contact between the subject and the virus:  In arguing that the preambles and "thereby" clauses that recite "protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus" are limiting, the government touts "the importance of protection to the claimed invention."  Gov't Br. at 3.  "Protection" is not a claim limitation for the reasons discussed above, but the preambles and "thereby" clauses do recite the ***desired result*** of the claimed process.  And if the claims that recite "an exposure" do not actually require contact with a virus, it is difficult to see how the desired result of "protection" could be achieved.

### 3.    The Government's Reply Position

Gilead's proposed construction of this term violates two canons of claim construction.  First, Gilead myopically focuses on certain words without any consideration for the context and meaning provided by surrounding words and phrases.  Second, Gilead uses its construction to improperly read into the claims an actual exposure requirement that is unsupported.

**(a)      *"Prior to an [the] exposure" should be accorded its plain and ordinary meaning***

Gilead wrongly faults the Government's construction for requiring step (a) to precede step (b).  *See* Gilead Br. at 67.  It is readily apparent from the claim language, however, that "selecting" the primate host (step (a)) must be performed before  "administering" pharmaceutically effective amounts of antiviral compounds to that primate host (step (b)).  *See* Appx4332 ¶58 (Murphy Dec.); *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.,* 152 F.3d 1368, 1375-76 (Fed. Cir. 1998) ("[T]he sequential nature of the claim steps is apparent from the plain meaning of the claim language. . . .").  Furthermore, "prior to an [the] exposure" is contained within a "wherein" clause and specifies that the administration of step (b) begins after the host is selected by step (a) and before the host is exposed to the retrovirus.  *See Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed. Cir. 2002) (finding language in a "wherein" clause limited a process claim by giving "meaning and purpose to the manipulative steps").  The term "prior to an [the] exposure" immediately follows the term "administered."  Accordingly, the claim language plainly indicates that "prior to an [the] exposure" means that the administration step (step (b)) begins after selecting the primate host (step (a)) and before exposure of the primate host to the immunodeficiency retrovirus.  *See* Appx4332-33 ¶¶59-61 (Murphy Dec.).

In addition, the Government's construction does not "unnecessarily repeat[] language that is already in the claims," Gilead Br. at 67, but instead appropriately situates the "prior to an [the] exposure" phrase within the claim language to properly contextualize the term.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("[T]he context in which a term is used in the asserted claim can be highly instructive.") (*en banc*).  In contrast, Gilead's proposed construction—"in advance of contact that can result in infection"—alters the claim language and

is inconsistent with how the skilled artisan would have understood the plain and ordinary meaning of the term.  *See* Appx4333 ¶¶61-62 (Murphy Dec.).

Gilead correctly "boils down" the Government's plain and ordinary meaning construction of "prior to an [the] exposure" to mean "before an [the] exposure."  Gilead Br. at 67.  Indeed, "prior to an [the] exposure" informs the skilled artisan as to the state of the host when the administration begins—that is, the host, when the administration step begins, is a host that has not been exposed to the immunodeficiency retrovirus.[32]  *See* Appx4332 ¶59 (Murphy Dec.). Gilead's proposed construction of "in advance of contact" does not acknowledge the ordering of the claimed steps or this term's clarification regarding timing of administration, and is thus inconsistent with how a skilled artisan would interpret this term.

**(b)      *"Prior to an [the] exposure" does not require the host to encounter a later, actual exposure***

Gilead attempts to read into the term "prior to an [the] exposure" a new and unrecited step requiring that the host encounter a later, actual exposure.  Gilead Br. at 67.  Gilead argues that inserting this requirement into the claim is necessary because it is "non-sensical" for the claims to require protection without requiring a later, actual exposure to a retrovirus.  Gilead Br. at 65; *id.* at 10-11, 70.  That Gilead itself, however, understands that "prior to an [the] exposure" merely refers to the timing of the administration step is evident in its explanation that "claim 1 just requires administration before—not after—an exposure (i.e., before contact with a virus)." *Id.* at 70.  There is no additional requirement recited (or unrecited) for the host to encounter a later, actual exposure to a virus.

---

[32] The parties agree that the host need not be completely naïve to the virus.  *See supra* § III.G.1.

– 72 –

The specification also overwhelmingly supports the Government's construction.  The abstracts of the Patents-in-Suit, for example, explain that "[p]rotection is achieved by administering to the primate host a combination of a pharmaceutically effective amount of a nucleoside reverse transcriptase inhibitor and a pharmaceutically effective amount of a nucleotide reverse transcriptase inhibitor prior to exposure to the immunodeficiency retrovirus." Appx0001; Appx0007 at 2:11-16; Appx0009 at 5:1-4.  Nothing in the patents predicates protection on actual exposure.  To the contrary, the specifications specifically indicate that the administration "maintain[s] a therapeutic level of NRTI and NtRTI in the primate host" so that ***if*** the host is later exposed to the retrovirus, the host has NRTI and NtRTI in the body ready to eliminate the virus.  Appx0008 at 3:35-37; Appx0009 at 6:18-22; Appx4334-35 ¶¶64-65 (Murphy Dec.).

Moreover, the specifications expressly define "protection" without mentioning any actual exposure requirement.  *See* Appx0008 at 4:3-7.  That definition is consistent with common usage of the term "protection" in the prior art.  For example, the Random House Dictionary defines "protecting" as "providing protection," and explains that "protection" is "the act of protecting or the state of being protected," which does not require exposure to disease, injury, or harm. Appx4274.  Indeed, an express exemplary usage of "protection" in the dictionary is a vaccine. *Id.* ("This vaccine is a protection against disease.").  As explained by a medicinal chemistry textbook, vaccines cause the host to make antibodies so that "***[i]f the subject is later exposed*** to a virulent form of the virus, the [host's] immune system is primed and ready to eliminate it." Appx4277 (emphasis added).  The host is protected by the antibodies present in the host regardless of whether or not the host is actually exposed to the virus.  *Id.*; Appx4335-36 ¶66 (Murphy Dec.).  This textbook explains that administration of a therapeutically effective amount

– 73 –

of immunity-conferring compounds "provide[s] effective protection" in the same manner as a vaccine, regardless of whether there is a later, actual exposure.  Appx4277; *see also* Appx0008 at 3:35-37; Appx0001 at Abstract; Appx0007 at 2:11-16; Appx4335-36 ¶66 (Murphy Dec.).

Gilead unconvincingly argues that dependent claim 11 requires an actual exposure in claim 1 by reciting "wherein administration of the combination results in an absence of persistent viremia and seroconversion of the primate host."  Gilead Br. at 68.  Claim 11 appropriately limits claim 1 by specifying how protection is confirmed—by the absence of persistent viremia (a PCR assay) and seroconversion (an antibody assay).  *See* Appx4327 ¶47 (Murphy Dec.).  Confirming that a host is protected does not require an actual exposure.  Appx4335-36 ¶66.

The plain language of independent claim 1 further supports the Government's construction.  Claim 1 does not recite "after an exposure," which would expressly require a later, actual exposure.  Instead, this type of express actual exposure language is found in later, narrowing dependent claims.  *See, e.g.*, Appx0013 at 13:10-13; Appx4333-34 ¶¶61-63 (Murphy Dec.); *supra* § III.G.1.

Gilead argues that the "prior to potential exposure" language recited in other independent claims requires that the "prior to an [the] exposure" language in these claims to include an actual exposure.  *See* Gilead Br. at 68.  Gilead's own witness (Dr. Flexner), however, provides an explanation that the appropriate difference between "prior to exposure" and "prior to potential exposure" is the state of the host at the time of administration:

> Administration can also take place even earlier, before a host contacts a HIV source; in that case, the administration is termed pre-exposure prophylaxis.  PrEP is intended to protect the host from an infection that might result from later contact with HIV virus.  PrEP also may protect the host from an infection that might result from ***possible*** later contact with HIV virus, e.g., when the contacted HIV source is only a possible instead of certain source of HIV virus.

Appx7161 ¶23 (emphasis in original).  Thus administration to a host before (prior to) exposure is

a recognized type of PrEP, and administration to a host before (prior to) a potential exposure is

another recognized type of PrEP.  Dr. Flexner explains that a POSA would have understood the

difference between an exposure and a potential exposure, which "includes the situation where a

host might or might not have been exposed to the virus."  Appx7175 ¶56.  The host provides a

key difference between the two sets of independent claims: the "prior to an [the] exposure"

recited by claim 1 is directed to a host seeking protection from "an infection that might result

from later contact with HIV virus," and the "prior to a potential exposure" recited by the other

independent claims is directed to a human seeking protection from "an infection that might result

from possible later contact with HIV virus."  *See* Appx7161 ¶23; Appx4336-37 ¶¶69-70

(Murphy Dec.).[33]  Neither set of independent claims require a later exposure (be it an actual or

potential later exposure), and it would be improper to read such a requirement into the claims.

*See, e.g.*, *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("it

is important not to import into a claim limitations that are not a part of the claim").

Gilead includes an attenuated argument that claim 15 (which recites "following the

exposure" and depends from independent claim 12) requires that a different independent claim

(claim 1) include an actual exposure.  *See* Gilead Br. at 68-69.  As discussed, however, neither

independent claim 1 nor independent claim 12 requires a later exposure, and Gilead's attempt to

infer an actual exposure requirement in claim 1 through claim 15 (which depends from a

different independent claim) stretches the doctrine of claim differentiation too far.  There is no

---

[33] Even though there is a difference in claim language, it is proper for these terms to be
construed similarly.  *See, e.g.*, *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005)
("Different terms or phrases in separate claims may be construed to cover the same subject
matter where the written description and prosecution history indicate that such a reading of the
terms or phrases is proper.").

reason to compare the limitations of claim 15 to a claim from which it does not depend.  *See*

*Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1358 (Fed. Cir. 2016) (declining to apply the

doctrine of claim differentiation where claims are not "otherwise identical in scope").

      Lastly, as the Government (and Gilead) point out, three of the four PTAB decisions stated

that this term requires "actual exposure to the immunodeficiency retrovirus."  *See supra*

§ III.G.1, n.3; Gilead Br. at 10-11; Appx1796; Appx1462; Appx1973.  The fourth IPR decision

noted that construction of the term was not "necessary to resolve the controversy."  Appx0950.

Unlike the preambles and "thereby" clauses that the PTAB construed with the benefit of Gilead's

full briefing, the Government did not brief this term to the PTAB because it was unnecessary to

defeat Gilead's IPR petitions.  This is therefore the first time that both parties have fully briefed

this term.

###     4.    Gilead's Sur-Reply Position

      It is undisputed that the asserted claims require step (a) to be performed before step (b)

and that both steps must precede an exposure or potential exposure to HIV.  Rather, the parties'

first dispute is whether this order should be shoehorned into a construction of "prior to an

exposure" (or "potential exposure").  It should not because the ordering of steps sheds no light

on the meaning of the words "prior to an exposure" and because the ordering does not follow

from the disputed term (i.e., the disputed term appears in a phrase that refers to the combination

being "administered prior to an exposure," which does not address when "selecting" is

performed relative to "administering").  Moreover, reading in an order of "selecting" and

"administering" is confusing and redundant of other claim language.  *See supra* at 67.

      The government's proposed construction also sheds no light on whether the claims

require an actual exposure to HIV to complete the claimed method, but the intrinsic evidence

makes clear that they do.  The government wrote sets of claims with two forms of "exposure"

– 76 –

terms—one that requires the recited medications to be administered "prior to [an/the] exposure" to the virus, and another that requires them to be administered "prior to [a] potential exposure." "Exposure" and "potential exposure" to HIV are different things, but the government's interpretation of these two terms makes the distinction meaningless in the context of the claims. If the claimed methods were complete before "exposure," these different terms would limit (or not limit) the claims in the same way. That simply cannot be right. *See supra* at 67-68.

Moreover, the dependent claims also show that the claims require actual exposure to the virus. *See supra* at 68-69. Claim 1 of the '509 Patent recites the disputed term, "wherein the combination is administered ***prior to an exposure*** of the primate host to the immunodeficiency retrovirus." Claim 11 then recites: "The process of claim 1 wherein administration of the combination ***results in*** an absence of persistent viremia and seroconversion of the primate host." If claim 1 did not require exposure to the virus, there is no way that "administration of the combination" could "***result[] in***" the host not being infected; rather, the host would not be infected simply because the host was never exposed to the virus.

The "potential exposure" claims reinforce this understanding. Claim 12 of the '423 Patent recites "wherein the combination is administered ***prior to potential exposure*** of the human to the human immunodeficiency retrovirus." Claim 15 then recites: "The process of claim 12, wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human ***following the exposure to the immunodeficiency retrovirus***." Because claim 12 does not require exposure (only "potential exposure"), "following the exposure to the immunodeficiency retrovirus" was added to claim 15 so the "absence of persistent viremia and seroconversion" term would make sense. In other words, when the independent claims recite "prior to an exposure," the dependent claims assume that an exposure

has occurred; when the independent claims recite "prior to potential exposure," the analogous

dependent claims must also specify that an actual exposure occurs.  This reinforces that a POSA

would have understood the "prior to [an/the] exposure" claims to require an exposure.[34]

Once again, the government contends that the patents are about "protection," this time

citing examples of protection that "do[] not require exposure to disease."  Gov't Br. at 73.  But as

explained in the context of the preambles, *supra* at 17-18, the government has offered at least

four different interpretations of "protecting."  When the government urged the PTAB to find the

preambles limiting, it told the PTAB that "the efficacy limitation recited by Claim 1 'demands

efficacy' by requiring the particular primate host … be HIV negative ***after exposure***."

Appx2559 (emphasis added).  That understanding of "protecting" plainly assumes that the claims

require an exposure step.  But now, when the government wants no exposure requirement in its

claims, it contends that "protection" is merely a "'state of being protected,' which does not

require exposure to disease."  Gov't Br. at 73.  The government cannot have it both ways.

Gilead's proposed construction makes clear that claims that recite "prior to [an/the]

exposure" require an actual exposure to virus; the government's proposal does not.  Gilead's

proposed construction should therefore be adopted.

---

[34] The government asserts that this "stretches the doctrine of claim differentiation too far," Gov't Br. at 75, but it is not a claim-differentiation argument.  The claim-differentiation doctrine shows that the claims that recite "prior to [an/the] exposure" require an exposure, as shown with claim 11 in the previous paragraph.  But the structure of the "potential exposure" claims is ***further*** intrinsic evidence that exposure is actually required in the "prior to [an/the] exposure" claims.  Contrary to the government's suggestion, the Federal Circuit routinely looks to how terms are used in other independent claims—it did so in the landmark *Phillips* case.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324-25 (Fed. Cir. 2005) (en banc).

H.     **"prior to [a] potential exposure" (Claim 13 of '509, '333, and '191 patents, and Claim 12 of '423 patent)**

| The Government's Proposal | Gilead's Proposal |
|---|---|
| Plain and ordinary meaning.  The administration step begins after selecting the human and before potential exposure of the human to the human immunodeficiency retrovirus. | "in advance of possible contact" |

### 1.     The Government's Opening Position

For reasons similar to those discussed above with respect to the term "prior to an [the] exposure," the plain and ordinary meaning of the term "prior to [a] potential exposure" requires the administration step to begin after selecting the human, and before *potential* exposure of the human to the immunodeficiency retrovirus.  "Prior to [a] potential exposure" provides a condition precedent for the administration step by specifying that the uninfected human has not been *potentially* exposed to the immunodeficiency retrovirus before the administration step begins.  Like the "prior to an [the] exposure" claims discussed above, the "prior to [a] potential exposure" claims do not require any condition subsequent regarding future potential exposure. The term simply refers to the state of the patient at the time the administration begins.

### 2.     Gilead's Answering Position

As explained for the previous disputed term, the claims that recite "prior to [an/the] exposure" require actual contact between the subject and the virus, but the claims that use "prior to [a] potential exposure" do not.  *See* Defs.' Br. at 68-69.  Rather, the claims that use "prior to [a] potential exposure" just require administration of the recited combination in advance of some event that might result in *possible* contact between the subject and the virus.  Flexner Decl. ¶¶ 56-60 (Appx7175-77).  Gilead's proposed construction makes that distinction clear, but as explained above, if the "exposure" or "potential exposure" is not required by the claim, there is

no difference between these terms.  *See* Defs.' Br. at 68-69.  Gilead's proposed construction should therefore be adopted.

### 3.    The Government's Reply Position

Gilead's construction of this term is incorrect for the reasons discussed above with respect to "prior to an [the] exposure."  *See supra* § III.G.3.  Gilead's construction of "prior to [a] potential exposure" seeks to read into these claims a new and unrecited requirement for the human to encounter a future event that might result in possible contact with a retrovirus.  Gilead Br. at 79-80.  This is improper.  *See, e.g.*, *SuperGuide*, 358 F.3d at 875.

Gilead unpersuasively argues that the Government's construction would remove any distinction between the two sets of independent claims.  *See* Gilead Br. at 79-80.  As explained above, however, the difference between the claims is the state of the host at the time administration begins: the "prior to an [the] exposure" recited by claim 1 requires a host that has not been exposed, and the "prior to a potential exposure" recited by these claims requires a human that has not been potentially exposed.  This is a recognized distinction in the context of PrEP.  Appx7161 ¶23; Appx4337-38 ¶¶70-72 (Murphy Dec.); *supra* § III.G.3.b.

### 4.    Gilead's Sur-Reply Position

As explained above, to avoid rendering this term redundant with "prior to [an/the] exposure," the Court should adopt Gilead's proposed construction.  *See supra* at 76-77.

Respectfully submitted,

SARAH HARRINGTON
Deputy Assistant Attorney General

DAVID C. WEISS
United States Attorney

GARY L. HAUSKEN
Director

/s/Walter W. Brown
WALTER W. BROWN
Senior Litigation Counsel
PHILIP CHARLES STERNHELL
Assistant Director
PATRICK C. HOLVEY
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C. 20530
Tel: (202) 307-0341

/s/Laura D. Hatcher
LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, DE 19899
Tel: (302) 573-6277

*Counsel for Plaintiff United States*

/s/Frederick L. Cottrell
Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Alexandra M. Ewing (#6407)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
P.O. Box 551
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
ewing@rlf.com

Ronald C. Machen
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

David B. Bassett
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888

Vinita C. Ferrera
Emily R. Whelan
George P. Varghese
Timothy A. Cook
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

*Counsel for Defendants Gilead Sciences,*
*Inc. & Gilead Sciences Ireland UC*

Dated: July 21, 2021