UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,
     *Plaintiff–Counterclaim Defendant*,

     v.

GILEAD SCIENCES, INC.,
     *Defendant–Counterclaim Plaintiff,*

AND GILEAD SCIENCES IRELAND UC,
     *Defendant*.

████████████████████

Civil No. 1:19-cv-02103-MN

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel:    (302) 573-6277
Fax:    (302) 573-6220
*Laura.hatcher@usdoj.gov*
*Shamoor.anis@usdoj.gov*

Of Counsel:

LENA YUEH
Special Counsel
Department of Justice

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

WALTER W. BROWN
Senior Litigation Counsel

PHILIP CHARLES STERNHELL
Assistant Director
CARRIE E. ROSATO
PATRICK C. HOLVEY
MATTHEW D. TANNER
LUCY GRACE D. NOYOLA
Trial Attorneys
Department of Justice
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C.  20530
Tel:    (202) 307-0341
Fax:    (202) 307-0345

*Attorneys for Plaintiff United States*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iv

STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS ...................................... 1

BACKGROUND ON PATENTS-IN-SUIT ............................................................................ 1

SUMMARY OF ARGUMENT ........................................................................................... 3

STATEMENT OF FACTS ................................................................................................ 5

ARGUMENT ................................................................................................................. 5

I.       THE GOVERNMENT IS ENTITLED TO PARTIAL SUMMARY JUDGMENT OF
         INFRINGEMENT ................................................................................................ 6

     A.  Truvada® for PrEP Patients Directly Infringe .................................................. 6

         1.  Patients taking Truvada® for PrEP meet the claims' preamble ................... 8

         2.  Patients taking Truvada® for PrEP meet step (a) ...................................... 10

         3.  Patients taking Truvada® for PrEP meet step (b) ...................................... 12

         4.  Patients taking Truvada® for PrEP meet the "thereby clause" ................... 13

         5.  Patients taking Truvada® for PrEP meet the "wherein clause" .................. 14

     B.  GSI induces infringement ............................................................................. 16

II.      GILEAD CANNOT ESTABLISH A LICENSE DEFENSE ........................................ 19

     A.  The Government Owns All Rights, Title, and Interest in the Patents-in-Suit. ................ 19

         1.  Ownership of the Patented Inventions Vested in the Government Under
             Executive Order 10096. ......................................................................... 20

         2.  The Named Inventors Assigned Their Rights, Title, and Interest in the
             Patented Inventions in 2006 .................................................................... 21

     B.  Dr. Janssen Did Not License the Inventions to Gilead .................................... 23

III.     DR. CONANT'S UNCORROBORATED TESTIMONY OF ALLEGED PUBLIC USE
         IS LEGALLY INSUFFICIENT .............................................................................. 24

IV.    GILEAD'S INEQUITABLE CONDUCT DEFENSE REGARDING THE CDC-PEP REFERENCE FAILS AS A MATTER OF LAW ........................................................... 25

A.  Gilead Presents No Evidence of Intent to Deceive ........................................................... 26

B.  The Government Disclosed the Allegedly Withheld Reference During Prosecution of the '191 and '423 Patents ............................................................................................. 27

CONCLUSION ...................................................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Abraxis Bioscience, Inc. v. Navinta LLC*,
  625 F.3d 1359 (Fed. Cir. 2010)........................................................................ 20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................ 5

*Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*,
  180 F.3d 518 (3d Cir. 1999)............................................................................ 22

*Bayer AG v. Sony Elecs., Inc.*,
  229 F. Supp. 2d 332 (D. Del. 2002)................................................................. 27

*Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
  563 U.S. 776 (2011)........................................................................................ 20

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,
  517 F.3d 1284 (Fed. Cir. 2008)............................................................... 19, 21

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
  845 F.3d 1357 (Fed. Cir. 2017)...................................................................... 10

*Finnigan Corp. v. Int'l Trade Comm'n*,
  180 F.3d 1354 (Fed. Cir. 1999)...................................................................... 25

*Fiskars, Inc. v. Hunt Mfg. Co.*,
  221 F.3d 1318 (Fed. Cir. 2000)...................................................................... 27

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
  7 F.4th 1320 (Fed. Cir. 2021) ................................................................. 16, 17

*Grunenthal GMBH v. Alkem Labs. Ltd.*,
  919 F.3d 1333 (Fed. Cir. 2019)............................................................... 17, 18

*Heinemann v. United States*,
  796 F.2d 451 (Fed. Cir. 1986)........................................................................ 20

*Horowitz v. Fed. Kemper Life Assurance Co.*,
  57 F.3d 300 (3d Cir. 1995)........................................................ 5, 9, 15, 18

*Israel Bio-Eng'g Project v. Amgen, Inc.*,
  475 F.3d 1256 (Fed. Cir. 2007)............................................................... 23, 24

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
  292 F.3d 728 (Fed. Cir. 2002)........................................................................ 25

*Li v. Montgomery*,
  No. 99-5106, 221 F.3d 196, 2000 WL 815992 (D.C. Cir. May 15, 2000) .............................. 20

*Metabolite Labs., Inc. v. Lab'y Corp. of Am. Holdings*,
  370 F.3d 1354 (Fed. Cir. 2004)...................................................................... 10

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005).................................................................................. 16, 17

*NVT Techs., Inc. v. United States*,
  370 F.3d 1153 (Fed. Cir. 2004)...................................................................... 23

*Priebe & Sons, Inc. v. United States*,
  332 U.S. 407 (1947)........................................................................................ 22

*Sky Techs. LLC v. SAP AG*,
  576 F.3d 1374 (Fed. Cir. 2009)...................................................................... 19

*Slottow v. Am. Cas. Co.*,
    10 F.3d 1355 (9th Cir. 1993) ................................................................ 24
*Star Scientific, Inc. v. RJ Reynolds Tobacco Co.*,
    537 F. 3d 1357 (Fed. Cir. 2008) ............................................................. 26
*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) ........................................................ 26, 27
*Vanda Pharm. Inc. v. West-Ward Pharm. Int'l Ltd.*,
    887 F.3d 1117 (Fed. Cir. 2018) .............................................................. 16
*Woodland Tr. v. Flowertree Nursery, Inc.*,
    148 F.3d 1368 (Fed. Cir. 1998) .............................................................. 25

**Statutes**

35 U.S.C. § 102 .......................................................................................... 24
35 U.S.C. § 261 ..................................................................................... 19, 21
35 U.S.C. § 271(b) ...................................................................................... 16

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................... 5

**Regulations**

37 C.F.R. § 501.1 ........................................................................................ 20
37 C.F.R. § 501.6(a)(1) ............................................................................... 20
45 C.F.R. § 7.1 ............................................................................................ 20
45 C.F.R. § 7.3(a) ....................................................................................... 20

**Executive Orders**

Executive Order 10096 ...................................................................... 4, 19, 20

Pursuant to the Scheduling Order, D.I. 27, the United States of America (Government or United States) seeks summary judgment against Gilead Sciences, Inc., (GSI) and Gilead Sciences Ireland UC (GSIUC) (collectively, Gilead) as follows:  (1) claim 13 of the '509 and '333 patents are infringed by GSI through sales and uses of its Truvada® product for PrEP, (2) Gilead has no license to the Patents-in-Suit, (3) the alleged public use by Dr. Marcus Conant fails as a matter of law, and (4) Gilead's inequitable conduct claims based on the CDC-PEP reference are legally insufficient.

## STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS

The Government filed the present suit on November 6, 2019, seeking damages for infringement of four Government patents covering methods, *inter alia*, of pre-exposure prophylaxis (PrEP) by Gilead.  Gilead has amended its answer three times, and thus its third amended answer and second amended counterclaims filed on April 21, 2021, D.I. 78, sets forth its current defenses and counterclaims.

## BACKGROUND ON PATENTS-IN-SUIT

The Government alleges infringement of four patents:  U.S. Patent Nos. 9,044,509 (the '509 patent) (Ex 1); 9,579,333 (the '333 patent) (Ex. 2); 9,937,191 (the '191 patent) (Ex. 3); and 10,335,423 (Ex. 4) (the '423 patent) (collectively, the Patents-in-Suit).  All four patents claim priority to Provisional Application No. 60/764,811 (the '811 Provisional), filed on February 3, 2006 and to Application No. 11/669,547 (the '547 Application) filed on January 31, 2007.  The '547 Application was the first nonprovisional application filed and issued as the '509 patent.  All four patents list the same five named inventors.

The Government asserts infringement of twelve claims of the Patents-in-Suit:  claims 1, 3, 8, 9, and 13 of the '509 patent, claim 13 of the '333 patent, claim 18 of the '191 patent, and claims 1, 3, 12, 18, and 19 of the '423 patent (collectively, the Asserted Claims).

All of the Asserted Claims include limitations related to the efficacy of the claimed PrEP methods against infection by an immunodeficiency virus (e.g., HIV) through their preambles and "thereby" clauses.

For example, the Court construed the preamble from claim 12[1] of the '509, '333, and '423 patents, and the preamble from claim 13 of the '191 patent, both of which recite "[a] process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human" to be limiting and to mean "a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human." D.I. 186 at 1, 7-8.  The Court further instructed that the phrase "inhibiting establishment of a self-replicating human immunodeficiency retrovirus infection" means that "[t]he human remains negative for the immunodeficiency virus." *Id.* at 9-10.  And whether a human remains negative "is based on both a serological and PCR assay if both are performed." *Id.* at 9-10.[2]

Likewise, the Court similarly construed the "thereby" clause from claim 12 of the '509, '333, and '423 patents, and claim 13 of the '191 patent, which each recites "thereby inhibiting the

---

[1] Claim 13 of the '509 and ''333 patents both depend from claim 12 in those respective patents. *See* Appendix A.

[2] The Court has construed the preamble from claim 1 of the '509, '333, '191, and '423 patents reciting "[a] process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus" in the same manner.  D.I. 186 at 1, 5-7.

establishment of the self-replicating infection with the immunodeficiency virus in the human" to mean "[t]he human remains negative for the immunodeficiency virus while receiving the administration." D.I. 186 at 2, 9-10.  The Court similarly clarified that "whether a host remains negative is based on both a serological and PCR assay if both are performed." *Id*. at 10.[3]

## SUMMARY OF ARGUMENT

The Government seeks summary judgment on infringement and on certain Gilead defenses that the Court can, and should, decide as a matter of law.

***First***, there is no genuine factual dispute that a significant number of U.S. patients taking Truvada® for PrEP have directly infringed claim 13 of the '509 patent and claim 13 of the '333 patent, and that Gilead induced that infringement.  Specifically the instructions in Gilead's Truvada® package insert and Gilead's patient surveys demonstrate direct infringement by patients. Gilead conducted and submitted these surveys to the Food and Drug Administration (FDA) as part of Gilead's required Risk Evaluation and Mitigation Strategy (REMS) for Truvada® for PrEP. These surveys demonstrate that patients practice the required claimed elements of claim 13 in both the '509 and '333 patents.

In turn, the Truvada® package insert further demonstrates Gilead's inducement of infringement of these two claims.  The insert instructs—and indeed encourages—patients on how to take Truvada® for PrEP in an infringing manner.  Given that Gilead admits it was aware of the

---

[3] The Court has construed the "thereby" clause from claim 1 of the '509, '333, '191, and '423 patents that recites "thereby protecting the primate host from infection with the immunodeficiency retrovirus" in the same manner.  *Id*. at 9.

'509 patent since March 2016 and the '333 patent upon its issuance in February 2017, Gilead is thus liable for infringement since at least those dates.

*Second*, Gilead cannot establish that it holds a license to use the Patents-in-Suit.  In support of its license defense, Gilead contends that it obtained a license to the Patents-in-Suit from named inventor Dr. Robert Janssen when he signed Gilead's Confidential Information and Inventions Agreement (CIIA) form upon joining Gilead in April 2008.  But none of the named inventors, including Dr. Janssen, possessed the rights, interest, or title to grant a license to Gilead.  Under Executive Order 10096 and its implementing regulations, the Government is presumed to be the owner of the patented inventions, and the unrebutted evidence shows that the patented inventions were made under the order's criteria for Government ownership.

Moreover, in March 2006, the named inventors assigned their rights, title, and interest in the Patents-in-Suit and the applications thereto to the Government.  Gilead's contention that the assignment in 2006 was limited to the '811 Provisional contravenes the assignment's express language—consistent with its intent—conveying the inventions, including not only the '811 Provisional itself but also any patents granted on the inventions of the '811 Provisional.  Accordingly, the CIIA could not and did not grant a license to the Patents-in-Suit, as Dr. Janssen simply listed his "Prior Inventions," and had no legal right to grant Gilead a license.  Further, Gilead's ambiguous language in the CIIA cannot represent a transfer of Dr. Janssen's rights in any "Prior Invention."

*Third*, Gilead's allegations of a public use under section 102 by Dr. Conant's actions in purportedly prescribing Truvada® for PrEP must fail, as Gilead has not provided any corroborating evidence of Dr. Conant's use, as legally required.  Instead, Gilead relies entirely on Dr. Conant's

present recollections that he prescribed PrEP in 2004 to a small number of his patients and that these patients followed the claimed methods of the Patents-in-Suit.

***Finally***, Gilead has pled an inequitable conduct defense based solely on the CDC-PEP reference, a set of guidelines issued by the Centers for Disease Control and Prevention in 2005 for post-exposure prophylaxis (PEP), not PrEP.  Apart from the materiality of the reference, Gilead cannot establish any intent to deceive the PTO by any particular Government personnel for this reference, as multiple conflicting inferences can be drawn from the evidence of record.  In addition, Gilead admits that CDC-PEP was disclosed to the PTO during prosecution of the '191 and '423 patents.  Accordingly, Gilead's inequitable conduct allegations are insufficient as a matter of law.

## STATEMENT OF FACTS

In accordance with the Court's scheduling order, D.I. 27 at 10-11, the Government has separately provided a concise statement of facts accompanying this motion.

## ARGUMENT

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Only facts that could alter the outcome are "material," and disputes are only genuine "if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."  *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis omitted).  Where the nonmoving party comes forward with evidence that "is merely colorable, or is not significantly probative," summary judgment is appropriate.  *Id.* at 249-50.

## I.     THE GOVERNMENT IS ENTITLED TO PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT

The Government seeks summary judgment of infringement of Claim 13 of the '509 patent and claim 13 of the '333 patent.[4]  Specifically, the Government seeks summary judgment of direct infringement by patients taking Truvada® for PrEP and induced infringement by Gilead Sciences Inc. (GSI).[5]

### A.     Truvada® for PrEP Patients Directly Infringe

Patients taking Truvada® for PrEP directly infringe Claim 13 of the '509 and '333 patents (collectively, Infringed Claims).  *See* Appendix A.  The admitted material facts demonstrate direct infringement by individuals who take Truvada® for PrEP.  The admitted facts include Gilead's Truvada® package insert and Gilead's patient surveys demonstrating that patients take Truvada® for PrEP in an infringing manner.

The Truvada® package insert contains its full prescribing information.  *See* Ex. 39 at 43. The insert instructs physicians how to administer Truvada to a patient, and it instructs patients how to take Truvada® and use Truvada® for PrEP.  *See* Ex. 38 at 175-76; Ex. 39 at 109-10; Ex. 39 at 43.  Patients received the package insert with each bottle of Truvada® prescribed for PrEP.  *See* Ex. 36 at 148-50; Ex. 5 at 137-38.

---

[4] As discussed supra note 1, claim 13 depends from claim 12.  The limitations recited by claim 12 are therefore incorporated into claim 13.  *See* Appendix A.

[5] The Government reserves the right to present evidence of infringement of all twelve Asserted Claims at trial by the use of Truvada® and Descovy® for PrEP, including direct infringement by both patients and physicians, as well as induced infringement by GSI and GSIUC.  In this section of the brief, "Gilead" refers to "GSI."



. Gilead admits that the REMS surveys were necessary for Truvada® for PrEP "to address the issue about whether patients would take it correctly" and "whether physicians would prescribe it correctly." Ex. 38 at 146; *see also* Ex. 37 at 118-19 (goal of the REMS was "to make sure that people were actually adhering to PrEP"); *id.* at 120-21.

. Gilead admits that it knew of the '509 Patent at least by March 11, 2016. *See* D.I. 21 at 54 (¶238), 76 (¶38). Gilead admits that it knew of the '333 patent as of its February 28, 2017 issue date. Ex. 40 at 155.



### 1.    Patients taking Truvada® for PrEP meet the claims' preamble

The preambles of the Infringed Claims are limiting.  *See* D.I. 186 at 1, 7-8.  The Court held that "inhibiting establishment of a self-replicating human immunodeficiency retrovirus infection" means that "[t]he human remains negative for the immunodeficiency virus," and whether a human remains negative "is based on both a serological and PCR assay if both are performed."  *Id.* at 9-10.  The claims do not require unnecessary testing, "but they do require a negative result on both tests if and when both tests are performed."  *Id.* at 9.





Gilead's REMS survey data is consistent with the Truvada® package insert, which instructs patients taking Truvada® for PrEP to confirm they remain HIV negative "periodically" and "at least every 3 months."  Ex. 15 at 1, 35; Ex. 14 at 1, 3, 42; Ex. 22 at 1, 35; Ex. 12 at 1, 4, 44; Ex. 13 at 1, 4, 42; Ex. 21 at 1, 4, 41; Ex. 27 at ¶¶ 68-71, 73.  Dr. Flexner admitted that he instructs his Truvada® for PrEP patients to be tested every 3 months.  *See* Ex. 9 at 388.  He further explained that it is important to confirm patients remain HIV negative during use of Truvada® for PrEP because, if someone were to become HIV positive, "then treating that individual with Truvada alone would not be accepted best practice for managing their HIV infection."  *Id.* at 374.  Dr. Flexner further explained that the instructions in the package insert for taking Truvada® for PrEP provide the standard practice throughout the United States.  *See id.* at 375.

A patient taking Truvada® for PrEP according to the instructions in the package insert therefore performs "a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human," as recited by the preamble.  The inhibition of establishment

---

[8] It is not surprising that patients remain HIV negative while taking Truvada® for PrEP because "[o]nly three cases of seroconversion have been confirmed to date worldwide, while HIV-negative individuals were on PrEP with verified adherence."  D.I. 1-3, Exhibit 19 at 9.  Dr. Flexner conceded that patients are typically confirmed to be HIV negative via serological antibody and PCR tests. *See* Ex. 9 at 373.

of the HIV self-replicating infection is confirmed by the HIV screening test providing a negative result when it is performed periodically (e.g., at least every 3 months).



. But the law does not require the Government to demonstrate that every prescription of Truvada® for PrEP infringes the claims, or even a significant percentage of them.  *See Metabolite Labs., Inc. v. Lab'y Corp. of Am. Holdings*, 370 F.3d 1354, 1364-65 (Fed. Cir. 2004) ("[T]he record does not need to contain direct evidence that every physician performed the [claimed method]."); *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1368 (Fed. Cir. 2017) ("[W]e have not required evidence regarding the general prevalence of the induced activity.").  There is no genuine factual dispute that a significant number Truvada® for PrEP patients perform the limitation of the preamble, as construed.

### 2. Patients taking Truvada® for PrEP meet step (a)

Step (a) of the Infringed Claims recites "selecting an uninfected human that does not have the self-replicating infection." █████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████ ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

The Truvada® package insert repeatedly instructs patients to begin taking Truvada® for PrEP only if they have been confirmed to be HIV negative.  *See* Ex. 15 at 35 ("You must be HIV-1 negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection. Do not take TRUVADA for HIV-1 PrEP unless you are confirmed to be HIV-1 negative."); *id.* at 1, 3, 5, 6, 36; Ex. 22 at 1, 4, 5, 6, 35, 36; Ex. 14 at 1, 7, 10, 42, 43; Ex. 12 at 1, 7, 11, 43, 45; Ex. 13 at 1, 7, 10, 42, 44; Ex. 21 at 1, 7, 10, 41, 43; Ex. 27 at ¶¶ 76, 78.

Dr. Flexner admitted that it is important for individuals to be confirmed to be HIV negative prior to beginning Truvada® for PrEP because, if an individual was HIV positive, "then the standard of care for that individual would not be Truvada®.  It would be a different drug regimen." Ex. 9 at 371-72; *id.* at 372-73.  Dr. Flexner also confirmed that he has never prescribed Truvada® for PrEP "without the individual having a negative HIV-1 test prior to [his] prescription."  *Id.* at 373, 386.

The patients that are confirmed to be HIV negative in accordance with the instructions provided by the Truvada® package insert do not have an HIV self-replicating infection.  The patients taking Truvada® for PrEP according to the instructions in the package insert therefore perform a process of "selecting an uninfected human that does not have the self-replicating infection" as recited by step (a) of the Infringed Claims.  A significant number of Truvada® for PrEP patients infringe step (a) as confirmed by Gilead's REMS data, Gilead's instructions in the Truvada® package insert, and ████████████████████████████████████ ███████████
█████████ .

11

### 3.      Patients taking Truvada® for PrEP meet step (b)

Step (b) of the Infringed Claims requires "administering to the uninfected human a combination comprising" a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir ester (claim 12 of the '509 patent) or tenofovir disoproxil fumarate (claim 12 of the '333 patent).[9]

Each tablet of Truvada® contains 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate. *See, e.g.*, Ex. 15 at 4. The parties agree that the tenofovir disoproxil fumarate in Truvada® meets the "tenofovir ester" limitation recited by claim 12 of the '509 patent. *See* D.I. 108 at 37, 42.



. Dr. Flexner admits that taking one Truvada® tablet daily is a pharmaceutically effective amount because "[t]he data would support efficacy . . . where Truvada® is taken every single day and the virus is not resistant to the two drugs, that the efficacy would be greater than 90 percent, probably greater than 95 percent." Ex. 9 at 376.



---

[9] Step (b) from claim 12 of the '333 patent additionally recites "wherein the pharmaceutically effective amount of the emtricitabine [or tenofovir or tenofovir disoproxil fumarate] is administered orally, subcutaneously or vaginally." The last phrase of claim 12 from the '509 patent recites "wherein the combination is administered orally." This section of the Government's Motion, however, indisputably demonstrates that Truvada® for PrEP is orally administered.

██████████████████████████████████████████████████████.  Four doses of Truvada® for PrEP per week provides a 96% reduction of risk for acquiring HIV.  *See* Ex. 26 at 1, 4-5; Ex. 8 at ¶ 36.

The Truvada® package insert repeatedly instructs patients to take one tablet of Truvada® for PrEP orally on a daily basis.  *See* Ex. 15 at 4 ("The dosage of TRUVADA for HIV-1 PrEP is one tablet . . . once daily taken orally with or without food in HIV-1 uninfected adults and adolescents . . . ."); *id.* at 1, 36-37; Ex. 22 at 1, 4, 36; Ex. 14 at 1, 5, 44; Ex. 12 at 1, 6, 46; Ex. 13 at 1, 6, 45-46; Ex. 21 at 1, 6, 44-45; Ex. 27 at  ¶¶82, 86.  Dr. Flexner admits that he instructs his Truvada® for PrEP patients to take the medication daily.  *See* Ex. 9 at 387.

Patients taking Truvada® for PrEP according to the instructions in the package insert perform the step of orally administering to the uninfected human a pharmaceutically effective dose of the combination of emtricitabine and tenofovir disoproxil fumarate in a tablet that meets step (b).[10]  A significant number of Truvada® for PrEP patients infringe step (b) based on Gilead's REMS data, Gilead's instructions in the Truvada® package insert, and ████████████████████ ████████████████████ ██████████████████.

### 4.    Patients taking Truvada® for PrEP meet the "thereby clause"

The Court construed the "thereby clause" to be limiting and to mean "[t]he human remains negative for the immunodeficiency virus while receiving the administration."  D.I. 186 at 2, 9-10. The Court clarified that "whether a host remains negative is based on both a serological and PCR assay if both are performed."  *Id.* at 10.

---

[10] For the same reasons, patients taking Truvada® for PrEP according to its package insert meet the portion of claim 12 of the '509 patent reciting "wherein the combination is administered orally."

For the same reasons as discussed for the preamble, ███████████████████

████████████████████████████████████████████████████████████████

██████   ████████   The patient is confirmed to remain negative by the HIV screening test

providing a negative result when it is performed periodically (*e.g.*, at least every 3 months) while

the patient receives Truvada® for PrEP.  A significant number of Truvada® for PrEP patients

infringe the "thereby clause" in view of Gilead's REMS data, Gilead's instructions in the Truvada

package insert, and ████████████████████████████████   ████████

████████ .

### 5.     Patients taking Truvada® for PrEP meet the "wherein clause"

The "wherein clause" recites "wherein the combination is administered prior to a potential

exposure" of the primate host ('509 patent) or the human ('333 patent) to the human

immunodeficiency retrovirus."  The Court construed the term "prior to a potential exposure" to

mean "prior to engaging in activity that could result in an exposure."  D.I. 186 at 2, 11-13.  A

potential exposure "can occur when, for example, it is unknown whether a bodily fluid that the

host had contact with is indeed a source of HIV."  *Id.* at 13.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████   Dr. Flexner agrees that Gilead's REMS surveys provide

relevant data regarding the percentages of persons taking Truvada® for PrEP who use condoms,

*see* Ex. 9 at 467:23-68:3, and he concedes that "unprotected receptive anal intercourse with a

partner whose HIV serostatus is unknown or who is known to be HIV infected and not taking

14

effective anti-retroviral medication" is "the riskiest sexual activity for HIV acquisition."  *Id.* at 361.



The Truvada® package insert instructs that Truvada® for PrEP is only indicated for patients that engage in activities that are "at-risk" for exposure to HIV.  *See* Ex. 15 at 3 ("TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP . . . ."); Ex. 14 at 1, 3; Ex. 22 at 1, 3; Ex. 12 at 1, 5; Ex. 13 at 1, 5; Ex. 21 at 1, 5.  The package insert explains that patients are at risk for HIV exposure if they, for example, engage in condomless sex, inconsistently use condoms, have past or current STIs, have a self-identified HIV risk, have sexual partners of unknown HIV-1 viremic status, engage in sexual activity in a high prevalence area or network, or exchange sex for commodities (such as money, food, shelter, or drugs).  *See* Ex. 15 at 6; Ex. 14 at 4; Ex. 22 at 3; Ex. 12 at 5; Ex. 13 at 5; Ex. 21 at 5.  The package insert further instructs patients to take Truvada® for PrEP exactly as prescribed.  *See* Ex. 15 at 36; Ex. 14 at 44; Ex. 22 at 36; Ex. 12 at 46; Ex. 13 at 42; Ex. 21 at 44; Ex. 27 at ¶¶ 97-99.  Dr. Flexner admitted that, in the context of the package insert, being "at risk" refers "to adults or adolescents who practice behaviors which might result in them becoming HIV infected."  Ex. 9 at 357.  Because the package insert instructs patients to begin taking Truvada® for PrEP before they engage in at-risk behaviors, the use of Truvada® for PrEP involves a process where the combination of

emtricitabine and tenofovir disoproxil fumarate is administered prior to a potential exposure of the patient to HIV.

Patients engaging in the at-risk behavior described in the Truvada® package insert and following the instructions in the package insert to take Truvada® before engaging in at-risk behavior perform a process that includes administering a combination of emtricitabine and tenofovir disoproxil fumarate before they have a potential exposure to HIV.  This process meets the "wherein clause."  A significant number of Truvada® for PrEP patients infringe the "wherein clause" in view of Gilead's REMS data, Gilead's instructions in the Truvada® package insert, and ███████████████████████████████████ ███████████████████.

### B.   GSI induces infringement

"[W]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).  Induced infringement occurs when there is a direct infringer and the defendant possesses specific intent to encourage the direct infringement.  *See Vanda Pharm. Inc. v. West-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018).  "Evidence of active steps taken to encourage direct infringement such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe . . . ."  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (internal citations and quotations marks omitted).  A drug's package insert, or "label," proves intent when it encourages, recommends, or promotes infringement.  *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1327 (Fed. Cir. 2021) (per curium).

For the reasons stated above, each limitation of claim 13 of the '509 and '333 patents is met by at least the Truvada® for PrEP patients from Gilead's REMS 3-5 surveys, and there have been millions of additional infringing prescriptions of Truvada® for PrEP.  Thus, there is a significant number of direct infringers.

Each PrEP patient receives the package insert with each Truvada® bottle.  *See* Ex. 36 at 148-49 ("the package insert [is] literally glued to the bottle"); *id.* at 150; Ex. 5 at 137-38.  As discussed, Gilead's package insert instructs and encourages patients to take Truvada® for PrEP in an infringing manner.  Gilead therefore took action that it intended would instruct and encourage patients to infringe because "[e]vidence of active steps taken to encourage direct infringement such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe . . . ."  *Grokster,* 545 U.S. at 936 (internal citations and quotation marks omitted).  Indeed, the Federal Circuit has consistently held that, when a product is sold with an infringing package insert, such an insert is sufficient evidence of intent to induce infringement.  *See GlaxoSmithKline,* 7 F.4th at 1334 (collecting cases).  Furthermore, Gilead's package insert need not lead all PrEP patients to infringe the claims; rather, the relevant inquiry for inducement is whether the package insert "instructs at least some users to infringe the patent."  *Grunenthal GMBH v. Alkem Labs. Ltd*., 919 F.3d 1333, 1340 (Fed. Cir. 2019).  There can be no genuine dispute that Gilead's Truvada® package insert instructs, at a minimum, at least some PrEP users to infringe the Infringed Claims.

Gilead admits that it knew of the '509 patent at least by March 11, 2016.  *See* D.I. 21 at 54 (¶238), 76 (¶38).  Gilead admits that it knew of the '333 patent as of its issue date of February 28, 2017.  Ex. 40 at 155.  Gilead is therefore liable for induced infringement of the '509 patent at least as of March 11, 2016, and for the '333 patent as of its issue date.

Gilead may assert that it does not encourage or instruct patients to engage in activities that put the patient "at-risk" for exposure to HIV based upon the "prevention strategy" portion of the Truvada® package insert.  For example, the package insert states "Use TRUVADA FOR HIV-1 PrEP to reduce the risk of HIV-1 infection as part of a comprehensive prevention strategy that

includes other prevention measures, including adherence to daily administration and safer sex practices, including condoms, to reduce the risk of sexually transmitted infections (STIs)." *See, e.g.,* Ex. 15 at GILDDE00198025. It further states "Counsel individuals on the use of other prevention measures (e.g., consistent and correct condom use, knowledge of partners(s)' HIV-1 status, including viral suppression status, regular testing for STIs that can facilitate HIV-1 transmission)." *Id.*

Such an argument would not raise a genuine dispute about Gilead's inducement. Gilead's expert, Dr. Flexner, conceded that, even if a Truvada® for PrEP patient follows the prevention strategy in the package insert, the patient would still be "at risk" for exposure to HIV. *See* Ex. 9 at 365. Dr. Flexner also explained that, despite the prevention strategy in the Truvada® package insert, "you also have to recognize that it's difficult to consistently practice all of these [prevention strategy] recommendations all of the time, but that is what the package insert recommends." *Id.* at 366. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████ ████████████████████████████

█████████████████. As explained with respect to the "wherein clause," █████████

████████████████████████ ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████ Dr. Flexner conceded that "unprotected receptive anal intercourse with a partner whose HIV serostatus is unknown or who is known to be HIV infected and not taking effective

anti-retroviral medication" is "the riskiest sexual activity for HIV acquisition."  Ex. 9 at 361.

Gilead also concluded that "[r]isky behaviors abound: few [PrEP users] are monogamous and most

have had unprotected anal sex."  Ex. 23 at GILDDE02636285.  Gilead therefore knew or should

have known that its package insert, even considering the "prevention strategy" portion of the insert,

induced Truvada® for PrEP patients to infringe claim 13 of the '509 and '333 patents.  Accordingly,

the Court should grant summary judgment that Gilead induced patients to infringe these two

claims.

## II.     GILEAD CANNOT ESTABLISH A LICENSE DEFENSE

Gilead cannot prove as a matter of law that it holds a license to use the claimed inventions

of the Patents-in-Suit.  Under Executive Order 10096 and its promulgating regulations, the

Government is presumed to be the owner of the patented inventions.  What is more, in March

2006, the named inventors of the Patents-in-Suit assigned the inventions in writing to the

Government.  That written assignment includes the invention described in the '811 Provisional, as

well as any patents and applications on that invention and any applications claiming priority to the

'811 Provisional.  Thus, none of the inventors owned any rights, interest, or title that they could

subsequently license to Gilead.

### A.  The Government Owns All Rights, Title, and Interest in the Patents-in-Suit.

The Patent Act provides that patents and patent applications are "assignable in law by an

instrument in writing."  35 U.S.C. § 261.  However, "there is nothing that limits assignment as the

only means for transferring patent ownership. . . . [O]wnership of a patent may be changed by

operation of law." *Sky Techs. LLC v. SAP AG*, 576 F.3d 1374, 1380 (Fed. Cir. 2009).  "Although

state law governs the interpretation of contracts generally," whether a contract "creates an

automatic assignment or merely an obligation to assign" is a matter of federal law. *DDB Techs.,*

*L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008); *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010).

### 1. Ownership of the Patented Inventions Vested in the Government Under Executive Order 10096.

Executive Order 10096, now implemented in 37 C.F.R. § 501.1 *et seq.* and 45 C.F.R. § 7.1 *et seq.*, governs the ownership of inventions made by Government employees. *Heinemann v. United States*, 796 F.2d 451, 455-56 (Fed. Cir. 1986); *see also Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 802 (2011) (Breyer, J., dissenting). Under these authorities, the Government "shall obtain" all right, title, and interest in inventions "(1) made during working hours, or (2) with a contribution by the Government of facilities, equipment, materials, funds, or information, or of time or services of other Government employees on official duty, or (3) which bear a direct relation to or are made in consequence of the official duties of the inventor." *See* Executive Order 10096, ¶ 1(a); 37 C.F.R. § 501.6(a)(1); 45 C.F.R. § 7.3(a). These circumstances "giv[e] the United States the right to title" of the invention. Executive Order 10096, ¶ 2(a).

It is undisputed that the patented inventions satisfy the criteria of Executive Order 10096, ¶ 1(a) for Government ownership. In both the 2006 and 2015 Assignments, the inventors stated that they were employed by the Government at the time the invention was made and that the inventions were made under conditions that entitle the Government to the entire right, title, and interest in the invention. Ex. 32 at GIL_BLAKESLEE00000162; Ex. 34 at GIL_BLAKESLEE00000172. Executive Order 10096 and its implementing regulations create a presumption that certain inventions made by Government employees "bec[o]me the property of the Government," *Heinemann*, 796 F.2d at 455-56, and that those Government employees "assign[] title and all other rights to such discoveries by operation of law," *Li v. Montgomery*, No.

99-5106, 221 F.3d 196, 2000 WL 815992, at *2 (D.C. Cir. May 15, 2000) (citing 37 C.F.R. § 501.6(a)(1), (3)).

### 2. The Named Inventors Assigned Their Rights, Title, and Interest in the Patented Inventions in 2006

The 2006 Assignment is an "instrument in writing" that assigned at the time of execution the named inventors' rights, title, and interest in the Patents-in-Suit and the applications thereto. 35 U.S.C. § 261.  Agreements to automatically assign future patents, without further action by the assignee, are effective assignments upon issuance and not mere promises to assign future patents. *DDB Techs.*, 517 F.3d at 1290.  The 2006 Assignment states that the named inventors "do voluntarily sell, assign, and transfer" rights to the invention and included in the assignment all patents and applications on the invention, which automatically assigned rights to the '811 Provisional and all future inventions to the Government.  Ex. 32 at GIL_BLAKESLEE00000162; *DDB Techs.*, 517 F.3d at 1290.

The 2006 Assignment describes "the invention" as "METHODS AND COMPOSITIONS FOR PROPHYLAXIS" and invented by all five named inventors of the Patents-in-Suit.  Ex. 32 at GIL_BLAKESLEE00000162.  The 2006 Assignment also identifies the '811 Provisional and the '547 Application by reference to attorney docket number I-022-06US1P and CDC invention number I-022-06.  *Id.* at GIL_BLAKESLEE00000162-63; Ex. 31 at US_02197854-56; Ex. 33 at US_00000281-87; Ex. 29 at 52-53, 77-78.  This identification is consistent with the PTO's practices and procedures.  *See* Manual of Patent Examination Procedure (M.P.E.P.) § 602.08(c)).

The 2006 Assignment includes a broad assignment clause for "all Letters Patent that may be granted on the invention in the United States of America and all countries throughout the world, and any divisional, renewal, continuation in whole or in part, substitution, conversion, reexamination, reissue, prolongation or extension thereof; and the right to claim priority from the

21

patent application." Ex. 32 at GIL_BLAKESLEE00000162. This clause includes assignment of future inventions by reference to continuation-in-part applications and other applications claiming priority to the '811 Provisional.

The 2006 Assignment was recorded with the '811 Provisional, and the cover sheet of the 2006 Assignment refers to the property being assigned as the '811 Provisional. *Id.* at GIL_BLAKESLEE00000159-60. The '547 Application links to the 2006 Assignment with the CDC invention number I-022-06 on each page of text in the specification. *Id. at* GIL_BLAKESLEE00000160-63; Ex. 33 at US_00000281. And, consistent with the intent of the 2006 Assignment, the Government filed a statement confirming that it is the assignee of the entire right, title, and interest in the '547 Application "by virtue" of the 2006 Assignment. Ex. 45 at US_00000833. The 2015 Assignment filed with the '547 Application further affirms a prior assignment of the '811 Provisional and specifically re-assigns the '547 Application. *See* Ex. 34 at GIL_BLAKESLEE00000172-73.

Through its expert, Mr. Wesley D. Blakeslee, Gilead contends that the 2006 Assignment is strictly limited to the '811 Provisional and does not include the Patents-in-Suit or their subject matter. Ex. 28 at ¶¶ 3(a), (c), 43. This position contravenes a plain reading of the agreement and basic contract interpretation principles.[11] "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part

---

[11] The Supreme Court has held that "[i]t is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law." *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411 (1947); *see also Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 522 n.2 (3d Cir. 1999).

unreasonable, unlawful, or of no effect." *Restatement (Second) of Contracts* § 203 (1981); *see also NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

Mr. Blakeslee improperly focuses on language assigning "the invention."  Even if "the invention" referred to the invention described in the '811 Provisional, the 2006 Assignment does not limit itself to assignment of the '811 Provisional.  The unambiguous language of the 2006 Assignment "includes" rights to subject matter beyond a specific application or the invention described in the '811 Provisional.  Ex. 32 at GIL_BLAKESLEE00000162.  Mr. Blakeslee incorrectly reads the entire paragraph containing that language as "void" and having "no effect." Ex. 28 at ¶¶ 44-45; Ex. 43 at 211.  Yet that paragraph provides essential details of the assignment— including the assignee and scope of the assignment—and thus is clearly intended to apply regardless of how the "invention" is described.[12]  *See* Ex. 32 at GIL_BLAKESLEE00000162.

Because Dr. Janssen had assigned all of his rights to the patented inventions in 2006, he had no rights to license to Gilead through the 2008 CIIA.

### B.     Dr. Janssen Did Not License the Inventions to Gilead

The CIIA does not grant a license to the Patents-in-Suit.  Exhibit A to the 2008 CIIA required a list of "Prior Inventions," which is defined as "all Inventions that [the Gilead employee] conceived, reduced to practice, created, or otherwise developed prior to [his] employment with Gilead."  Ex. 35 at GILDDE00456452-53, GILDDE00456457. But Exhibit A did not include or request a statement of ownership.  *Id.*  While the body of the CIIA provides for a license of "a

---

[12] "In construing the substance of [an alleged] assignment, a court must carefully consider the intention of the parties and the language of the grant." *Israel Bio-Eng'g Project v. Amgen, Inc*., 475 F.3d 1256, 1265 (Fed. Cir. 2007).  *See also* 3 Arthur L. Corbin, Corbin on Contracts, § 538, at 55 (1960) (explaining that "the purpose of interpretation is to become aware of the intention of the parties") (internal quotes omitted)).

23

Prior Invention owned by [the employee] or in which [he has] an interest," for the reasons explained above, Dr. Janssen did not own rights to the patented inventions in 2008 that he could license.

In addition, the alleged CIIA license language is unduly ambiguous.  The term "Prior Inventions" does not itself require an ownership interest.  *Id.* at GILDDE00456452-53.  Therefore, any Gilead argument that the CIIA includes a representation by Dr. Janssen that he owns the listed Prior Inventions is contradicted by the CIIA's requirement to list all Prior Inventions, not just those Dr. Janssen owns.  Under California law, which governs the CIIA, *id.* at GILDDE00456455, any ambiguity its language must be construed against Gilead as the drafter, *Slottow v. Am. Cas. Co.*, 10 F.3d 1355, 1361 (9th Cir. 1993).  For all of these reasons, Gilead was not granted a license to the Patents-in-Suit through the CIIA.

## III. DR. CONANT'S UNCORROBORATED TESTIMONY OF ALLEGED PUBLIC USE IS LEGALLY INSUFFICIENT

Gilead also asserts invalidity under sections 102(a) and 102(b)[13] based on a prior public use by Dr. Marcus Conant.  But the sole evidence of Dr. Conant's allegedly anticipatory use is his own uncorroborated testimony.  *See* Ex. 6 at ¶¶ 635-718; Ex. 7 at ¶¶ 122-28.  Specifically, Dr. Flexner relies completely on Dr. Conant's deposition in this case, wherein he described prescribing PrEP to "at least three patients between 2004 and 2006," Ex. 6 at ¶ 636 (internal citations omitted), including one patient he identifies only as "Nick" due to "patient confidentiality," *id.* at ¶ 639.

---

[13] Based on the filing dates of the Government's relevant applications, the version of 35 U.S.C. § 102 predating the 2011 Leahy–Smith America Invents Act (AIA) applies.

24

Uncorroborated testimony, however, "does not, of itself, provide the clear and convincing evidence required to invalidate a patent." *Woodland Tr. v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1369 (Fed. Cir. 1998); *see also Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 742-43 (Fed. Cir. 2002). Even "[u]ninterested witnesses are . . . subject to the corroboration requirement," and "testimony concerning a witness's *own* anticipatory activities ***must be corroborated***." *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1367-68 (Fed. Cir. 1999) (first emphasis in original). Gilead includes no corroborating evidence for Dr. Conant's testimony about his alleged prior public use. *See* Ex. 6 at ¶¶ 635-718; Ex. 7 ¶¶122-128. Instead, Gilead relies solely on Dr. Conant's testimony recalling events decades past. *Id*. Dr. Conant's uncorroborated testimony about his alleged public use—even if credible—is insufficient as a matter of law to prove invalidity. *Id*.

## IV.   GILEAD'S INEQUITABLE CONDUCT DEFENSE REGARDING THE CDC-PEP REFERENCE FAILS AS A MATTER OF LAW

Gilead generically pled the defense of inequitable conduct via unsubstantiated allegations that "individuals with a duty to disclose material information during prosecution—including the named inventors and prosecution attorneys—failed to disclose the CDC-PEP[14] reference to the examiner during prosecution of the '509 and '333 patents. *See* D.I. 78 at 82 (¶62). Gilead, however, identifies no specific individual that made an affirmative decision to withhold the CDC-PEP reference with an intent to deceive the PTO.

---

[14] "Antiretroviral Postexposure Prophylaxis After Sexual, Injection-Drug Use, or Other Nonoccupational Exposure to HIV in the United States," *Morbidity and Mortality Weekly Report Recommendations and Reports* (Vol. 54 January 21, 2005) (CDC-PEP) is a set of CDC guidelines published in 2005 and as indicated disclose guidelines for HIV post-exposure prophylaxis (PEP), not PrEP. D.I. 78-1 at 362-90 (Ex. J).

For Gilead to prevail on inequitable conduct, it must prove that "the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). "The accused infringer must prove both elements—intent and materiality," *id.*, which are "separate requirements." *Id.* at 1290. "[A] district court may not infer intent solely from materiality." *Id.* "[W]hen there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290-91.

### A.      Gilead Presents No Evidence of Intent to Deceive

Gilead proffers no evidence that any relevant actor had specific intent to deceive the PTO regarding the CDC-PEP reference.  Even if Gilead can show that CDC-PEP would have been material and that no one with a duty of candor to the PTO explained why the reference was withheld—and Gilead cannot even establish this much—its inequitable conduct claim still fails. "The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive." *Id.* at 1291.  Indeed, a "patentee need not offer any good faith explanation unless the accused infringer first . . . prove[s] a threshold level of intent to deceive by clear and convincing evidence." *Star Scientific, Inc. v. RJ Reynolds Tobacco Co.,* 537 F. 3d 1357, 1368 (Fed. Cir. 2008).

Regardless, the evidence demonstrates "multiple reasonable inferences that may be drawn" and therefore "intent to deceive cannot be found." *Therasense,* 649 F.3d at 1290-91.  For example, some inventors were not involved with the prosecution of the Patents-in-Suit because they left the CDC during the relevant time frame.  *See* Ex. 10 at 189, 302-04.  Other inventors testified they did not believe the allegedly material art was relevant or that Gilead's interpretation of these references was correct, as these PEP guidelines were largely based on observational data (and not clinically tested, present Truvada® as one of a multitude of drugs that could be used for PrEP, and generally

26

did not inform PrEP research.  *See, e.g.*, Ex. 11 at 209-11, 225-26; Ex. 25 at 145-46, 170-73, 213-14, 215-16; Ex. 44 at 145-56.  Because there are multiple reasonable inferences that may be drawn, Gilead has not and cannot establish intent to deceive by clear and convincing evidence, as is required.  *Therasense*, 649 F.3d at 1290.

### B.      The Government Disclosed the Allegedly Withheld Reference During Prosecution of the '191 and '423 Patents

In addition, Gilead's assertions of inequitable conduct for the '191 and '423 patents are facially deficient.  Gilead admits that the Government disclosed the CDC-PEP reference to the PTO during prosecution of these patents.  D.I. 78 at 84 (¶ 66).  "An applicant can not be guilty of inequitable conduct if the reference was cited to the examiner, whether or not it was a ground of rejection by the examiner."  *Fiskars, Inc. v. Hunt Mfg. Co*., 221 F.3d 1318, 1327 (Fed. Cir. 2000); *see also Bayer AG v. Sony Elecs., Inc*., 229 F. Supp. 2d 332, 362–64 (D. Del. 2002), *aff'd*, 83 F. App'x 334 (Fed. Cir. 2003).  The prosecution records confirm that the Government disclosed the CDC-PEP reference (Ex. 26) on information disclosure statements (IDSs) during prosecution of the '191 and '423 patents.  Ex. 46; Ex. 47.  The examiner initialed each IDS, indicating that the examiner reviewed the CDC-PEP reference.  *Id.*  The examiner even cited the CDC-PEP reference in a rejection in the '191 prosecution.  Ex. 48 at 4, 5. Nevertheless, the examiner allowed the '191 and '423 claims, notwithstanding the CDC-PEP reference.  Ex. 49 (allowing '191 claims); Ex. 50 (allowing '423 claims).  Because Gilead cannot establish a material omission of the CDC-PEP reference as to the '191 and '423 patents, summary judgment of no inequitable conduct is proper for this additional reason.

### CONCLUSION

For these reasons, the Court should issue summary judgments that (1) claims 13 of the '509 and '333 patents are infringed; (2) Gilead does not possess a license to the Patents-in-Suit;

(3) Gilead cannot establish a corroborated public use by Dr. Conant, and (4) Gilead's inequitable

conduct allegations based on CDC-PEP are legally insufficient.

Dated: October 13, 2022

Respectfully submitted,

LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel:    (302) 573-6277
Fax:    (302) 573-6220
*Laura.hatcher@usdoj.gov*
*Shamoor.anis@usdoj.gov*


Of Counsel:
LENA YUEH
Special Counsel
U.S. Department of Justice

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

*/s/ Walter W. Brown*
WALTER W. BROWN
Senior Litigation Counsel

PHILIP CHARLES STERNHELL
Assistant Director

CARRIE E. ROSATO
PATRICK C. HOLVEY
MATTHEW D. TANNER
LUCY GRACE D. NOYOLA
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C.  20530
Tel:    (202) 307-0341
Fax:    (202) 307-0345

*Attorneys for Plaintiff United States*