UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,
   *Plaintiff–Counterclaim Defendant*,

   v.

GILEAD SCIENCES, INC.,
   *Defendant–Counterclaim Plaintiff,*

AND GILEAD SCIENCES IRELAND UC,
   *Defendant*.

Civil No. 1:19-cv-02103-MN

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel:    (302) 573-6277
Fax:    (302) 573-6220
*Laura.hatcher@usdoj.gov*
*Shamoor.anis@usdoj.gov*

Of Counsel:

LENA YUEH
Special Counsel
Department of Justice

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

WALTER W. BROWN
Senior Litigation Counsel

PHILIP CHARLES STERNHELL
Assistant Director
CARRIE E. ROSATO
PATRICK C. HOLVEY
MATTHEW D. TANNER
LUCY GRACE D. NOYOLA
Trial Attorneys
Department of Justice
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C.  20530
Tel:    (202) 307-0341
Fax:    (202) 307-0345

*Attorneys for Plaintiff United States*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iv

I.    STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS ..........................1

II.   SUMMARY OF ARGUMENT ....................................................................1

III.  LEGAL STANDARD ..............................................................................3

IV.   THE GOVERNMENT PROVIDED SIGNIFICANT EVIDENCE OF DIRECT INFRINGEMENT BY DESCOVY......................................................................4

V.    PROSECUTION HISTORY ESTOPPEL DOES NOT BAR INFRINGEMENT OF CLAIM 13 OF THE '509 PATENT BY DESCOVY ......................................................8

      A.  Summary of the Prosecution History...............................................................8

      B.  Any Amendments Related to the Tenofovir Molecule Had No More Than a Tangential Relation to the Equivalent in Question ...........................................10

VI.   CLAIMS 3 AND 13 OF THE '509 PATENT ARE NOT INVALID FOR IMPROPER DEPENDENCY ...................................................................................13

VII.  THE ASSERTED "TENOFOVIR PRODRUG" CLAIMS ARE ENABLED ................14

VIII. CLAIMS THAT RECITE "TENOFOVIR" ARE ENABLED ........................................20

IX.   GILEAD IS LIABLE FOR WILLFULLY INDUCING INFRINGEMENT BY JUNE 2015 ...............................................................................................23

X.    THE ASSERTED CLAIMS APPROPRIATELY CLAIM PRIORITY TO THE 2006 PROVISIONAL APPLICATION .................................................................25

XI.   GSIUC WORKS IN CONCERT WITH GSI TO INDUCE INFRINGEMENT .............28

      A.  GSIUC Works in Concert with GSI to Package and Label PrEP Products.....................29

      B.  GSIUC Owns Descovy for PrEP® Trademarks Used by GSI.........................................30

      C.  Gilead Repeatedly Pled That GSIUC Promoted PrEP Products with GSI ......................32

XII.  THE UNITED STATES, LIKE ANY PATENTEE, CAN ENFORCE ITS OWN PATENTS .........................................................................................34

A.   The Government Has Statutory Authority to Sue for Patent Infringement ......................34

B.   There Is Historical Precedent for a Government Patent Suit ............................................37

XIII.   CONCLUSION ...........................................................................................................39

# TABLE OF AUTHORITIES

## Cases

*Alcon Res. Ltd. v. Barr Lab'ys, Inc.*,
   745 F.3d 1180 (Fed. Cir. 2014)..................................................................... 14, 18, 19

*Allergan, Inc. v. Sandoz Inc.*,
   796 F.3d 1293 (Fed. Cir. 2015)..........................................................................28, 29

*Amgen Inc. v. Sanofi, Aventisub LLC*,
   987 F.3d 1080 (Fed. Cir. 2021)..............................................................................14

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .............................................................................................3, 4

*Ariad Pharms., Inc. v. Eli Lilly and Co.*,
   598 F.3d 1336 (Fed. Cir. 2010).................................................................. 25, 26, 27

*Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.*,
   750 F.2d 1569 (Fed. Cir. 1984)..............................................................................20

*Baxalta Inc. v. Genentech, Inc.*,
   579 F. Supp. 3d 595 (D. Del. 2022) .......................................................................16

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
   967 F.3d 1353 (Fed. Cir. 2020)....................................................................... 11, 12

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .....................................................................................passim

*Cephalon, Inc. v. Slayback Pharma LLC*,
   456 F. Supp. 3d 594 (D. Del. 2020) .......................................................................22

*Crown Operations Int'l, Ltd. v. Soluta Inc.*,
   289 F.3d 1367 (Fed. Cir. 2002)..............................................................................22

*DoDots Licensing Sols. LLC v. Lenovo Holding Co., Inc.*,
   No. 18-098, 2019 WL 3069773 (D. Del. July 12, 2019).........................................31

*Doyle v. Crain Indus., Inc.*,
   243 F.3d 564 (Fed. Cir. 2000) ...............................................................................21

*DSU Med. Corp. v. JMS Co., Ltd.*,
   471 F.3d 1293 (Fed. Cir. 2006)..............................................................................32

*Eli Lilly & Co. v. Hospira, Inc.*,
   933 F.3d 1320 (Fed. Cir. 2019)....................................................................... 11, 13

*Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*,
   928 F.3d 1340 (Fed. Cir. 2019)..............................................................................15

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002) ................................................................................... 10, 11, 12

*Gevo, Inc. v. Butamax Advanced Biofuels LLC*,
   No. 13-576, 2013 WL 3914467 (D. Del. July 26, 2013).....................................21, 22

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
   7 F.4th 1320 (Fed. Cir. 2021) ..................................................................................5

*Idenix Pharms. LLC v. Gilead Scis. Inc.*,
   941 F.3d 1149 (Fed. Cir. 2019)..............................................................................15

*In re Bowen*,
   492 F.3d 859 (C.C.P.A. 1974) ...............................................................................23

iv

*In re Skvorecz*,
   580 F.3d 1262 (Fed. Cir. 2009)....................................................................................26
*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988) ...............................................................................14, 21
*LiTL LLC v. Lenovo (U.S.), Inc.*,
   No. 20-689, 2022 WL 610739 (D. Del. Jan. 21, 2022)...............................................24
*Macfarlan v. Ivy Hill SNF, LLC*,
   675 F.3d 266 (3d Cir. 2012) .................................................................................33, 34
*Martek Bioscheces Corp. v. Nutrinova, Inc.*,
   576 F.3d 1363 (Fed. Cir. 2009).....................................................................................21
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ..................................................................................3, 9, 10, 12
*Morrow v. Microsoft Corp.*,
   499 F.3d 1332 (Fed. Cir. 2007).............................................................................35, 39
*Nutrition 21 v. United States*,
   930 F.2d 862 (Fed. Cir. 1991) ......................................................................................38
*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
   138 S. Ct. 1365 (2018) ..................................................................................................36
*P. F. Collier & Son Corp. v. Fed. Trade Comm'n*,
   427 F.2d 261 (6th Cir. 1970) ........................................................................................31
*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*,
   457 F.3d 1284 (Fed. Cir. 2006).............................................................................13, 14
*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
   522 F.3d 1299 (Fed. Cir. 2008).....................................................................................25
*PPG Indus., Inc. v. Guardian Indus. Corp.*,
   75 F.3d 1558 (Fed. Cir. 1996) ...............................................................................22, 23
*Senju Pharm. Co. Ltd. v. Apotex Inc.*,
   717 F. Supp. 2d 404 (D. Del. 2010) .............................................................................22
*Soft View LLC v. Apple Inc.*,
   No. 10-389, 2012 WL 3061027 (D. Del. July 26, 2012)..............................................31
*State Industries, Inc. v. A.O. Smith Corporation*,
   751 F.2d 1126 (Fed. Cir. 1985).....................................................................................24
*Tektronix Inc. v. United States*,
   351 F.2d 630 (Ct. Cl. 1965)..........................................................................................38
*Tinnus Enterprises, LLC v. Telebrands Corp.*,
   846 F.3d 1190 (Fed. Cir. 2017).......................................................................................5
*Toshiba Corp. v. Imation Corp.*,
   681 F.3d 1358 (Fed. Cir. 2012).......................................................................................7
*Trs. Of Bos. Univ. v. Everlight Elecs. Co.*,
   896 F.3d 1357 (Fed. Cir. 2018).....................................................................................21
*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
   308 F.3d 1167 (Fed. Cir. 2002).....................................................................................22
*Union Carbide Corp. v. Am. Can Co.*,
   724 F.2d 1567 (Fed. Cir. 1984).....................................................................................33
*Walker Digital, LLC v. Facebook, Inc.*,
   852 F. Supp. 2d 559 (D. Del. 2012) .............................................................................31

*WCM Industries, Inc. v. IPS Corp.*,
    721 Fed. Appx. 959 (2018)................................................................24
*Wyeth & Cordis Corp. v. Abbott,*
    *Lab'ys*, 720 F.3d 1380 (Fed. Cir. 2013) ..........................................15

**Statutes**

28 U.S.C. § 516................................................................................................37
35 U.S.C. §112................................................................................................13
35 U.S.C. § 100(d)..........................................................................................34
35 U.S.C. § 122(b)(1)(A)................................................................................24
35 U.S.C. § 200................................................................................................37
35 U.S.C. § 207(a)(1)......................................................................................35
35 U.S.C. § 207(a)(2)......................................................................................35
35 U.S.C. § 207(a)(3)......................................................................................35
35 U.S.C. § 271................................................................................................35
P.L. 96-517......................................................................................................36

**Rules**

Fed. R. Civ. P. 56(a)..........................................................................................3

**Other Authorities**

H.R. 6933........................................................................................................36

Plaintiff and Counterclaim Defendant, the United States (the Government), hereby opposes Defendant and Counterclaim-Plaintiff Gilead Sciences, Inc. and Defendant Gilead Sciences Ireland UC's (collectively, Gilead's) Motion for Summary Judgment (D.I. 344).

## I.      STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS

In the present suit, the Government seeks damages for Gilead's willful infringement of four Government patents covering methods, *inter alia*, of pre-exposure prophylaxis (PrEP): U.S. Patent Nos. 9,044,509 ('509 Patent); 9,579,333; 9,937,191; and 10,335,423 ('423 Patent) (collectively, the Patents-in-Suit). Gilead's motion follows fact and expert discovery conducted in accordance with the Court's Scheduling Order, D.I. 27.

## II.    SUMMARY OF ARGUMENT

In its summary judgment motion, Gilead raises a litany of issues hoping to eliminate or lessen large portions of its liability for infringing the Patents-in-Suit prior to trial. But all of Gilead's requested relief either lacks a proper legal basis or raises numerous issues of material fact that should be decided by the jury at trial.

Gilead first asserts that the Government has identified "no evidence" of direct infringement by uses of Descovy for PrEP®—one of two accused products in this litigation. But Gilead ignores that the Government's technical expert, Dr. Robert L. Murphy, has directed patients to use Descovy for PrEP® according to its labeling (though not directly prescribing) and also relies on vast circumstantial evidence showing the wide use of Descovy for PrEP® in the United States.

Gilead next contends that uses of Descovy for PrEP® cannot infringe claim 13 of the '509 Patent under the doctrine of equivalents (DOE). While Gilead claims DOE cannot apply, it fails to recognize that during prosecution the Government never distinguished the art based on the particular tenofovir prodrug, and in turn, never surrendered that particular subject matter in adding new claims.

Gilead further asserts that claims 3 and 13 of the '509 Patent are invalid based on their improper dependency from claims 2 and 12. But the claims are properly dependent. Claims 2 and 12 are limited to "human[s]," and thus, claims 3 and 13 properly narrow those claims by specifying that the human is "male" (claim 3) and that the claimed drug combination is administered "prior to a potential exposure" (claim 13).

In another effort to eliminate liability, Gilead argues that asserted claims (1) reciting "tenofovir prodrug" or (2) reciting oral administration of "tenofovir" are all invalid for lack of enablement. For both, Gilead improperly ignores numerous issues of fact regarding the evaluation of "undue experimentation" that must be specifically applied to the patent disclosures.

Regarding "tenofovir prodrug" claims, Gilead ignores, *inter alia*, much of the patent's disclosure of tenofovir prodrugs, and how to test and evaluate such prodrugs, as well as the extensive knowledge in the prior art of such prodrugs. Similarly, regarding oral administration of tenofovir, Gilead identifies it as an inoperable embodiment, but fails to properly consider that this was well known in the art and the claimed method would not require "undue experimentation" by one of ordinary skill.

Gilead also seeks to avoid all liability prior to March 2016, claiming it had no knowledge of the '509 Patent until that date. But it applies an overly rigid legal standard that the Federal Circuit has rejected. Under a proper analysis, Gilead had knowledge of the '509 Patent when it issued in June 2015, based on at least 2014 NIH emails disclosing relevant patent applications and that the invention related to Truvada for PrEP®.

Gilead also seeks summary judgment that the asserted claims cannot claim priority to the 2006 Provisional Application (No. 60/764,811), alleging that the application did not show "possession" of an **oral** PrEP method using TDF (tenofovir disoproxil fumarate) and FTC

(emtricitabine).  But Gilead fails to account for all of the teachings provided in the application, which (1) provides efficacy data on the tenofovir/FTC combination of drugs and (2) repeatedly discloses Truvada® (FTC/TDF), which is an oral tenofovir/FTC combination.

Gilead also seeks to dismiss GSIUC as a party, claiming GSIUC has no role in the promotion of Gilead's U.S. PrEP products.  But Gilead ignores the formal agreement between GSI and its subsidiary, who are jointly responsible for packaging these products.  GSIUC is also the owner of the U.S. trademarks for Descovy for PrEP® that are used to promote and market that product.  And in two suits against counterfeiters, GSI and GSIUC have jointly pled that they work in concert to promote and market PrEP products in the United States.

Finally, Gilead asserts that the Government somehow has no statutory authority to bring this suit.  Relying on case law predating the Bayh-Dole Act, Gilead ignores clear authority that the Government, like any patent owner, may enforce its patents.  It also asserts a lack of "historical precedent" for Government infringement suits, but ignores a number of earlier such suits.

## III.    LEGAL STANDARD

Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the movant fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmovant's evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 332 (1986).  In assessing a summary judgment motion, a court does not weigh the evidence.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).  Nor does it make credibility determinations about statements made in affidavits or depositions, as those are determinations for the jury.  *Id.* at 253-55.  Rather, the court views the evidence in the light most favorable to the nonmovant and draws all reasonable inferences in favor of that party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  If in these circumstances a reasonable jury could find for the

nonmovant Government, then Gilead's motion for summary judgment must be denied.  *Liberty*

*Lobby*, 477 U.S. at 248-49.

## IV.   THE GOVERNMENT PROVIDED SIGNIFICANT EVIDENCE OF DIRECT INFRINGEMENT BY DESCOVY

Gilead incorrectly asserts that the Court should enter summary judgment of non-

infringement on the use of Descovy® for PrEP because the Government "has identified no evidence

that any individual has ever taken Descovy® in a manner that infringes any asserted claims."  D.I.

345 at 4.  The Government identified extensive evidence demonstrating that the use of Descovy®

for PrEP infringes the asserted claims.  This evidence includes ███████ prescriptions of Descovy

for PrEP® between October 2019 through August 2021 and an average of █████ active Descovy

for PrEP® patients during that time period.[1]  *See* Ex. A at ¶ 159; Ex. SS at tab "DVY."  The

Government's expert witnesses, Drs. Murphy and Julia Marcus, explained in detail how each

prescription of Descovy for PrEP® according to the Descovy® package insert meets all limitations

of the asserted claims.  *See* Ex. B at ¶¶ 228-319; Ex. A at ¶¶ 158-262; Ex. C at 91; Ex. D at ¶¶ 128-

30, 50-127.  Their analysis of the Descovy® package insert is appropriate evidence of infringement

because the insert contains the full prescribing information for Descovy®, including instructions

for physicians to administer Descovy® for PrEP as well as instructions for patients to take

Descovy® for PrEP.  *See* Ex. E at 75-77; Ex. F at 67-68.  There is extensive evidence of

infringement based on over a million Descovy® for PrEP prescriptions, the instructions in the

Descovy® package insert, and the Government's expert testimony.

Gilead believes it is entitled to summary judgment because there is supposedly "no

evidence that any individual has ever taken Descovy® in a manner that infringes any asserted

---

[1] Descovy for PrEP® was approved by the FDA in October 2019.  *See* Ex. B at ¶ 49.

claim," D.I. 345 at 4, and that the Government has not identified any physician with direct knowledge of specific patients taking Descovy® for PrEP in such a manner," *id.* at 5. Gilead is incorrect as each of the million-plus Descovy® for PrEP prescriptions is a specific instance of a physician prescribing Descovy for PrEP® in an infringing manner, and each of the thousands of patients taking Descovy for PrEP® according to those prescriptions is a specific individual who has taken Descovy for PrEP® in an infringing manner.

But, even if the Government had not provided direct evidence of specific individuals and physicians using Descovy® for PrEP in an infringing manner, the Government is not required to do so. "A patentee is entitled to rely on circumstantial evidence" to prove direct or induced infringement. *Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1204 (Fed. Cir. 2017) (citations omitted). The instructions provided in Gilead's Descovy® package insert on the use of Descovy ®for PrEP are sufficient to demonstrate direct infringement by patients and physicians. *See id.* (approving "use of instruction manuals to demonstrate direct infringement"). "Indeed, [the Federal Circuit has] affirmed induced infringement verdicts based on circumstantial evidence of inducement (e.g., advertisements, user manuals) directed to a class of direct infringers (e.g., customers, end users) **without requiring hard proof that any individual third-party direct infringer was actually persuaded to infringe by that material**." *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc*., 7 F.4th 1320, 1340 (Fed. Cir. 2021) (emphasis added).

Despite the Government's proffered evidence of the many thousands of patients receiving over a million prescriptions for Descovy for PrEP®, Gilead takes the unreasonable position that no patient receiving a Descovy for PrEP® prescription actually used Descovy for PrEP® by asserting there is no evidence "whether the [Descovy for PrEP] prescriptions were filled, whether the patients took the medicine in accordance with the product label, whether the patients were exposed

or potentially exposed to HIV, and whether the patients remained HIV negative after practicing the claimed method steps." D.I. 345 at 6. Gilead's position is belied by its own expert witness, Dr. Charles W. Flexner, who conceded that "most patients requesting a prescription for PrEP plan to use it for PrEP." Ex. G at 458. The Government's expert witnesses, Drs. Murphy and Marcus, provided detailed explanations as to why patients do, in fact, adhere to the instructions for taking Descovy® as PrEP in accordance with the product label (see Ex. B at ¶¶ 240-45, 283-86; Ex. A at ¶¶ 182-86; Ex. D at ¶¶ 128-30; id. at ¶¶ 68-79), are exposed or potentially exposed to HIV (see Ex. B at ¶¶ 251-55, 287-90; Ex. A at ¶¶ 189-214, 228-51; Ex. D at ¶¶ 128-30; id. at ¶¶ 80-107), and remain HIV negative after practicing the claimed method steps (see Ex. B at ¶¶ 246-50, 291-96; Ex. A at ¶¶ 187-88, 252-53; Ex. D at ¶¶ 128-30; id. at ¶¶ 108-16). Dr. Flexner admitted that PrEP patients are tested to confirm they remain HIV negative. See Ex. G at 374-75, 388.

Gilead takes issue with the statement by Drs. Murphy and Marcus that "Descovy for PrEP and Truvada for PrEP are prescribed by the same relevant physician population and used by the same relevant patient population" because the experts supposedly "cite no support." D.I. 345 at 6. Their statements are fully supported. Dr. Murphy explained that Gilead's DISCOVER clinical trial reported that "[t]here were no differences in adherence between [Truvada and Descovy] by self-report, pill count, and DBS [dried blood spot] analysis," Ex. A at ¶ 162. He also explained that Gilead has encouraged physicians to convert Truvada for PrEP® patients to Descovy®, demonstrating "that the patient populations for Truvada and Descovy for PrEP engage in the same types and degree of at-risk behavior." Ex. A at ¶¶ 265, 288; see also Ex. C at 76-77, 148.

Drs. Murphy and Marcus further explained that the FDA expected physicians and patients to adhere to the PrEP instructions in the Descovy® package insert based on the successful adherence documented by Gilead for Truvada® for PrEP. See Ex. A at ¶ 162; Ex. D at ¶ 130; Ex.

H at 256-57.  Dr. Marcus further confirmed that it "was common knowledge" in her field that Descovy® for PrEP is prescribed by essentially the same physician population as Truvada for PrEP®, and Descovy for PrEP® is used by similar patient populations.  Ex. H at 258-59.  Gilead has no genuine basis to dispute such statements as its own expert, Dr. Flexner, conceded that the patient populations for Descovy® and Truvada® are "substantially the same," Ex. G at 556-57, and that the patient risk for HIV exposure described in the Descovy® package insert is the same risk described in the Truvada® package insert, *id.* at 378-79.

Gilead attempts to trivialize Dr. Murphy's PrEP expertise because he has never formally written a prescription of Descovy for PrEP®.  *See* D.I. 345 at 5-6.  But this criticism is misplaced because Gilead's own expert, Dr. Flexner, also has never written a Descovy for PrEP® prescription. *See* Ex. G at 384, 456.  More importantly, Dr. Murphy explained that he has, in fact, determined that Descovy for PrEP® was appropriate for several of his patients at the Northwestern Memorial Hospital, and that he referred those patients ("as recently as last month") to the Howard Brown Health Center in Chicago, a clinic that assists his patients in obtaining medication and testing in a more affordable manner than Northwestern.  *See* Ex. C at 116-19.  Dr. Murphy confirmed that he discusses the instructions in the package insert with his PrEP patients and believes he is practicing the asserted claims when he counsels patients and recommends PrEP.  *Id.* at 118-19.

For at least these reasons, there is more than ample evidence to "reasonably conclude that, sometime during the relevant period more likely than not one person somewhere in the United States" performed each of the claimed steps.  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1366 (Fed. Cir. 2012).  Therefore, Gilead's motion for summary judgment of noninfringement with respect to Descovy® should be denied.

## V. PROSECUTION HISTORY ESTOPPEL DOES NOT BAR INFRINGEMENT OF CLAIM 13 OF THE '509 PATENT BY DESCOVY

Gilead argues that prosecution history estoppel precludes infringement by Descovy®
because the Government allegedly surrendered "claims to methods using tenofovir prodrugs that
are not tenofovir esters." D.I. 345 at 7. But the Government's decision to pursue certain claims
and cancel others was unrelated to the particular type of tenofovir prodrug used in the method and
bears no more than a tangential relation to the equivalent.

### A. Summary of the Prosecution History

Gilead asserts that the claims "were rejected as obvious four separate times" but glosses
over the basis for those rejections. D.I. 345 at 8-9. The common thread running through those
rejections and responses is the Government's steadfast assertion that molecules that provide
tenofovir—either tenofovir itself or tenofovir derivatives that spontaneously convert to tenofovir
*in vivo*—are part of the invention. Every single rejection cited Keller as disclosing a combination
of zidovudine and tenofovir. *See* Defendants' (Defs') Ex. 11 at 165-66, 249-50, 415-16, 454-55.
After the fourth Keller-based rejection, the Government amended the claims. Even though the
Examiner repeatedly cited Keller as disclosing tenofovir, the Government's amendment did not
surrender that claim scope. Instead, the amended claims broadly recited tenofovir and derivatives:

> (b) a pharmaceutically effective amount of a nucleotide reverse transcriptase inhibitor
> selected from the group consisting of tenofovir, adefovir, 2',3'-dideoxy-3'- fluoroadenosine, 2',3'-
> dideoxy-3'-fluoroguanosine, and 3'deoxy-3'-fluoro-5-O-[2-(L-valyloxy)-propionyl] guanosine
> and pharmaceutically acceptable derivatives thereof;

*Id.* at 563. The Government distinguished the claims from the cited art because the art did not
disclose the effectiveness of the claimed "nucleoside reverse transcriptase inhibitors … in
combination with the claimed nucleotide reverse transcriptase inhibitors [] *i.e.*, tenofovir …. or
pharmaceutically acceptable derivatives thereof." *Id.* at 572. The amendment also introduced new

claims that used, e.g., the combination of emtricitabine and tenofovir or a tenofovir ester. *See, e.g.*, *id.* at 565, 567 (claim 22, claim 33). The Government distinguished new claims 22-39 similarly, by arguing that the cited art did not disclose using "tenofovir or the tenofovir ester" for PrEP. *Id.* at 572. Throughout the response, the Government consistently indicated that its arguments applied generally to all tenofovir prodrugs. *See, e.g.*, *id.* at 576 (unexpected success from "combin[ing] tenofovir pro-drug (or tenofovir) with the claimed nucleoside reverse transcriptase inhibitors").

During prosecution, the Government never distinguished the art based on the particular tenofovir prodrug. Indeed, the Government made the same arguments and distinctions for claims directed to tenofovir, "pharmaceutically acceptable derivatives" of tenofovir, and tenofovir esters. Defs' Ex. 11 at 572. Gilead cites nothing in the prosecution where the Government distinguished any reference based on the tenofovir prodrug used. Instead, Gilead tries to piece together such a distinction by arguing that the Government relied on studies demonstrating unexpected results "using a specific combination—FTC combined with TDF." D.I. 345 at 9-10. Gilead urges the Court to infer that the Government's arguments distinguished the "specific combination," which used TDF, from all other tenofovir prodrugs. The pending claims were broader, however, and included tenofovir as well as other tenofovir esters—not just TDF. *See* Defs' Ex. 11 at 567 (claim 33). The cited results may have involved TDF, *see* D.I. 345 at 10 n.6, but the Examiner applied those unexpected results broadly to both tenofovir and other tenofovir ester prodrugs besides TDF. There is no indication that the Government or Examiner believed the distinction between tenofovir prodrugs generally and tenofovir ester prodrugs specifically had any relationship to patentability. *See* Ex. I at ¶¶ 46-47.

This is particularly clear from an Examiner-Initiated Interview, where the Examiner cited art that disclosed a combination of tenofovir and emtricitabine.  *See* Defs' Ex. 11 at 783.  The Examiner recognized these molecules fell within the scope of claims 22 and 33, but nevertheless indicated claims 22 and 33 were allowable with the added limitation requiring oral administration. *Id*.  The claims were not distinguished based on any difference between the emtricitabine and tenofovir molecules cited by the examiner and the emtricitabine and tenofovir molecules recited in claims 22 and 33.  *Id.*  The Examiner's Notice of Allowance confirmed that the distinction from the cited art was not related to the particular form of tenofovir or tenofovir prodrug.  The Examiner reiterated that "the claims are drawn to the employment of particular combination[s] of tenofovir and [emtricitabine] for protecting a primate, particularly human."  *Id.* at 786; Ex. I at ¶ 49.  The Examiner did not cite any particular prodrug form as important to patentability or as distinguishing the cited art.  *See* Defs' Ex. 11 at 787.  Likewise, the Examiner viewed tenofovir, TDF, and tenofovir prodrugs as equivalent, and distinguished the cited art based on the combination therapy compared to unsuccessful monotherapy.  *See id.* at 787; Ex. I at ¶ 86.  Thus, the Examiner's allowance did not draw any distinction between tenofovir, TDF, TAF, and tenofovir prodrugs generally.  *See* Ex. I at ¶ 48.

### B.    Any Amendments Related to the Tenofovir Molecule Had No More Than a Tangential Relation to the Equivalent in Question

Prosecution history estoppel does not apply "where the amendment cannot reasonably be viewed as surrendering a particular equivalent."  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740–41 (2002).  If "the rationale underlying the amendment . . . bear[s] no more than a tangential relation to the equivalent in question . . . the patentee can overcome the presumption that prosecution history estoppel bars a finding of equivalence."  *Id.* "[T]he reason for an amendment, where the tangential exception is invoked, cannot be determined

without reference to the context in which it was made, including the prior art that might have given rise to the amendment in the first place." *Eli Lilly & Co. v. Hospira, Inc*., 933 F.3d 1320, 1332 (Fed. Cir. 2019). Prosecution history estoppel "is always a case-specific analysis." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc*., 967 F.3d 1353, 1366 (Fed. Cir. 2020).

The action at issue stemmed from an Examiner-Initiated Interview where the Examiner cited Dahl as teaching "the combination of tenofovir and emtricitabine." Defs' Ex. 11 at 783. The Examiner nevertheless allowed claims 22 and 33 in view of, *inter alia*, the "superior and unexpected results" shown. *Id*. Then pending claim 22 included emtricitabine and tenofovir or tenofovir disoproxil fumarate, and claim 33 included emtricitabine and tenofovir or tenofovir ester. *Id*. at 565, 567. The Examiner did not allow pending claim 1, which included other nucleoside reverse transcriptase inhibitors in addition to emtricitabine, and nucleotide reverse transcriptase inhibitors other than tenofovir or a pharmaceutically acceptable derivative. *Id.* at 563. The "superior and unexpected results" reported for the tenofovir/emtricitabine combination did not extend to claim 1's non-tenofovir-based, non-emtricitabine-based molecules.

The Examiner's discussion of unpredictability in the Notice of Allowance makes clear that the objectively apparent reason why claims 22 and 33 were allowed instead of claim 1 had nothing to do with the scope of the claimed tenofovir ester prodrugs. *See id.* at 787. Claim 1 included many other non-tenofovir-based and non-emtricitabine-based drugs. *See id.* at 563. Claims 22 and 33, in contrast, only included emtricitabine in combination with molecules that delivered tenofovir upon administration—either tenofovir itself or an ester derivative that converted to tenofovir. Defs' Ex. 11 at 786. Neither the Government nor the Examiner gave any indication that the particular tenofovir form used—tenofovir, an ester prodrug, or another prodrug—had any bearing on patentability, any relationship to any of the amendments, or was even considered.

11

Accordingly, the rationale underlying the decision to pursue claims 22 and 33 bore no relation to the equivalent tenofovir prodrug at issue and thus the tangential relation exception is met.

Gilead addresses the "tangential relation" exception in a single sentence. *See* D.I. 345 at 10. Defendants argue that "the amendments were expressly made to overcome an obviousness rejection through reliance on the allegedly unexpected results of a 'specific combination of agents' that included a specific tenofovir ester that was not TAF." *Id.* That argument is nonsensical. The Examiner did not only allow claims to "a specific tenofovir ester." The Examiner also allowed claims to tenofovir and to tenofovir esters generally. *See* Defs' Ex. 11 at 565, 567, 783, 785-87. The Examiner cited the unpredictability of HIV chemprophylaxis for other drugs ("MVC") and the superior effect of the combination of tenofovir and emtricitabine compared to tenofovir alone. *See id.* at 787. The Government argued such evidence established patentability for "a combination comprising tenofovir pro-drug (or tenofovir)" generally. *Id.* at 576. The Examiner agreed and allowed claims much broader than just TDF. *See id.* at 785-87. Thus, the Examiner allowed claims that broadly included emtricitabine and tenofovir, including tenofovir esters.

The amendment at issue bore no more than a tangential relation to the equivalent tenofovir prodrug (TAF) at issue here. The Government's decision to pursue claims 22 and 33 must be considered in the context of removing other non-emtricitabine-based and non-tenofovir-based drugs from the scope of the pending claims. *See Bio-Rad*, 967 F.3d at 1365. Likewise, the Government's statements during prosecution arguing broadly for the patentability of all tenofovir prodrugs confirm that the rationale for pursing claims 22 and 33 (but not claim 1) had nothing to do with the specific tenofovir prodrug. *Id.* Any narrowing from cancelling claim 1 was unrelated to the particular prodrug form used to deliver the tenofovir molecule. The prosecution strongly indicates that the reason for pursuing claims 22 and 33 was to focus on the combination of

emtricitabine and tenofovir, including tenofovir ester prodrugs, and "not to cede other, functionally identical" prodrugs that could likewise deliver tenofovir upon administration. *Eli Lilly*, 933 F.3d at 1331. Thus, prosecution history estoppel does not bar application of the doctrine of equivalents.

## VI.   CLAIMS 3 AND 13 OF THE '509 PATENT ARE NOT INVALID FOR IMPROPER DEPENDENCY

Gilead argues that '509 Patent claims 3 and 13 are invalid for improper dependency. D.I. 345 at 11-12. For Gilead to succeed, claims 3 and 13 must be "completely outside the scope" and deal with "non-overlapping subject matter" as compared to claims 2 and 12, respectively. *Pfizer, Inc. v. Ranbaxy Labs. Ltd*., 457 F.3d 1284, 1291-92 (Fed. Cir. 2006). As the Government's expert, Dr. Robert Grant, explained, claims 3 and 13 are not outside the scope of claims 2 and 12 and properly add narrowing limitations. Ex. J at ¶¶ 361-76; *see also* Ex. K at 252-56; Defs' Ex. 22 at 257-59.

Gilead focuses on limitations added in claims 3 and 13. *See* D.I. 345 at 11. But claim 3 includes all of the limitations from claims 1 and 2 through dependency, 35 U.S.C. §112 (¶ 4), and must be read as a whole. Thus, claim 3 includes claim 1's limitation of "a primate host" and claim 2's further limitation of "an adult human." *See* Ex. J at ¶¶ 365-67. Claim 3 ***narrows*** claim 2 because the "adult human" must also be a "male adult primate" such that claim 3 is directed to a "male adult human." *Id.* at ¶¶ 367-68. There is no inconsistency because a human is a primate host. *See* D.I. 345 at 11. Similarly, claim 12 requires step (a) of "selecting an uninfected human." Claim 13 recited that the administration is prior to potential exposure of a "primate host" to "human immunodeficiency retrovirus," but this does not change step (a) of claim 12 that requires "selecting an uninfected human." *See* Ex. J at ¶ 374. The "primate host" of claim 13 is the selected "uninfected human" from step (a) of claim 12. *Id.* Claim 13 is ***narrower*** than claim 12 because the primate host of claim 13: (1) is administered the combination prior to a primate host's potential

13

exposure via the express language of claim 13, and (2) must be an uninfected human via the express language of claim 12, step (a).  *Id.*  Thus, unlike *Pfizer*, 457 F.3d at 1292, the dependent claim scope is not inconsistent with or completely outside the scope of the parent claim.  Ex. J at ¶¶ 374-75.  When read as a whole, claims 3 and 13 recite a further limitation on the subject matter of claims 2 and 12, and are thus properly dependent.  *Id.* at ¶¶ 361-76.

## VII.   THE ASSERTED "TENOFOVIR PRODRUG" CLAIMS ARE ENABLED

Hoping to eliminate its liability for Descovy for PrEP®, Gilead seeks judgment of invalidity of '423 Patent claims 1, 3, 12, 18, and 19 for lack of enablement.  *See* D.I. 345 at 12-18.  Though enablement is a legal issue, it requires underlying factual determinations.  *See Alcon Res. Ltd. v. Barr Lab'ys, Inc*., 745 F.3d 1180, 1188 (Fed. Cir. 2014).  It is not enough to weigh the breadth of the claims against the disclosure.  *Id.*  "To prove that a claim is invalid for lack of enablement, a challenger must show by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the claimed invention without 'undue experimentation.'"  *Id.*  Indeed, "a patent does not need to guarantee that the invention works for a claim to be enabled."  *Id*. at 1189.  "Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations."  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

Gilead tries to side-step this complex factual inquiry by citing cases where enablement turned on factual scenarios that are irrelevant here.  *See* D.I. 345 at 13.  For example, in *Amgen*, the patent claimed an antibody that binds to one protein and blocks binding to a receptor.  *See Amgen Inc. v. Sanofi, Aventisub LLC*, 987 F.3d 1080, 1083 (Fed. Cir. 2021), *cert. granted in part*, No. 21-757, 2022 WL 16703751 (S. Ct. Nov. 4, 2022).  Every claim was "a composition claim defined, not by structure, but by meeting functional limitations."  *Id*. at 1087.

14

Unlike *Amgen*, the challenged claims define a crucial structural feature for the "tenofovir prodrug" limitation, which is the active tenofovir molecule itself. Defs' Ex. 24 ('423 claims 1, 3, 12, 18, and 19). There is little functional breadth in the challenged claims because they limit the prodrug to a single function: molecules that generate tenofovir after administration. *See* Ex. L at ¶ 130; *see also* Defs' Ex. 24 at 4:64-5:4 (defining prodrug). Gilead argues that the claimed prodrug "is a functionally defined genus," D.I. 345 at 12, but unlike *Amgen*, here the claim recites a prodrug that has a well-understood and well-studied function with many exemplary species known in the prior art. *See, e.g.*, Ex. L at ¶ 129; *id.* at ¶¶ 50-84.

The other cases cited by Gilead are also dissimilar. In *Enzo*, the claims broadly "encompass[ed] all polynucleotides with labels attached to a phosphate, as long as the polynucleotide remains hybridizable and detectable upon hybridization." *Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340, 1343 (Fed. Cir. 2019). But "serious doubts existed in the art" about such probes and a person of ordinary skill in the art (POSA) "would have been dissuaded" from testing probes for hybridization activity. *Id.* at 1348. In *Idenix*, the claim was a method of treatment using a molecule with undefined structural features that required biological activity. *See Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1156 (Fed. Cir. 2019). Unpredictably, only a small number of compounds would have that activity. *Id.* at 1158, 1162-63.

In *Wyeth*, the "claims cover[ed] any structural analog . . . that exhibits immunosuppressive and antirestenotic effects." *Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1384 (Fed. Cir. 2013). Practicing the claims required "iterative research in an unpredictable and poorly understood field," and even making the compounds was "a complicated and lengthy series of experiments in synthetic organic chemistry." *Id.* at 1386. And *Baxalta* claimed an antibody based

on its desired biological activity without describing the structure that provided that activity.  *See Baxalta Inc. v. Genentech, Inc.*, 579 F. Supp. 3d 595, 601 (D. Del. 2022).

Unlike those cases, the challenged claims do not require that a POSA identify new molecules with novel biological activity.  Instead, the claims recite prodrugs for one molecule—tenofovir—that has the known required biological activity.  *See* Ex. L at ¶ 130.  Tenofovir prodrugs were well-known for generating the tenofovir active molecule after administration.  Unlike *Enzo's* "serious doubts," prodrugs in general—and tenofovir prodrugs in particular—were a routine and validated approach for generating an active molecule (which in this case is tenofovir).  Ex. L at ¶ 129; *id*. at ¶¶ 50-84.  Unlike *Idenix's* claimed broad class of molecules with unknown and unpredictable biological activity, tenofovir prodrugs were widely known and well understood.  *Id*.  Unlike *Wyeth*, tenofovir prodrugs did not require iterative research in a poorly-understood field or require unduly complicated synthesis.  *Id*.  And unlike the antibodies in *Baxalta*, tenofovir prodrugs were well-known and extensively studied.  *Id*.  Thus, unlike Gilead's cited cases, the challenged claims identify a specific active molecule (tenofovir), and a specific type of modification (prodrug) that was both well-understood and well-known in the art, with multiple working examples.  *See* Ex. L at ¶ 127; *see also id*. at ¶¶ 50-84.

Gilead asserts lack of enablement based upon a supposedly "vast universe of ***potential*** tenofovir prodrugs, which had never been made or tested."  D.I. 345 at 16 n.8 (emphasis added).  But the claims do not require that a POSA ***discover*** all potential tenofovir prodrugs.  Instead, the claims require that a POSA could practice the claimed method by selecting an appropriate tenofovir prodrug without undue experimentation.  Gilead does not dispute that the claims are enabled for tenofovir prodrugs that were know in the prior art such as TDF and TAF.  And as discussed above, tenofovir prodrugs were well-known and well-understood in the prior art.

Moreover, there are extensive material factual disputes regarding the *Wands* factors. ***First***, there is a material factual dispute regarding the ***quantity of experimentation necessary***. Gilead asserts the quantity of experimentation necessary is "extraordinary" because a POSA "would need to do several types of tests." D.I. 345 at 16. The Government's expert, Dr. Thakker, disagrees because a POSA would have been aware of tenofovir prodrugs "that could have been utilized to deliver the active tenofovir in the body," and that it was "well-known in the art to select potential prodrug candidates based on routine laboratory testing directed towards bioavailability." Ex. L at ¶ 114. The prior art repeatedly demonstrated that such testing was well-known and routine. *Id.* at ¶ 115. Consistent with the patent's teachings, a POSA would have been aware of commercially available prodrugs and other tenofovir prodrugs that were "extensively characterized in the literature." *Id.* at ¶ 116, *see also id.* at ¶¶ 69-84. Indeed, there were "many working examples of tenofovir esters and tenofovir prodrug" described in the prior art. *Id.* at ¶ 119. After selecting a tenofovir prodrug, a POSA could have used the animal model disclosed by the inventors to confirm efficacy and adjust dosing for efficacy in humans through routine testing. See Ex. L at ¶¶ 117, 123-24; Ex. M at ¶¶ 97, 103, 106-07.

***Second***, there is a material factual dispute regarding the ***amount of guidance presented***. Gilead argues "the '423 Patent provides no direction or guidance … about how to make and select tenofovir prodrug compounds for PrEP." D.I. 345 at 12. Dr. Thakker disagrees. The claims do not require a POSA to make new *tenofovir* prodrugs, only to use tenofovir prodrugs in combination with emtricitabine for PrEP. The patent describes the appropriate animal model, provides efficacy data from that model, and thus, provides a POSA with ample guidance for practicing the claimed invention. *See* Ex. L at ¶ 125. The guidance includes how to administer (orally), when to begin administration (before exposure), and, most importantly, that after administration the combination

17

should yield tenofovir and FTC *in vivo* for PrEP.  *See id.*  This guidance, combined with the well-known tenofovir prodrugs and routine testing, allows a POSA to practice the claimed inventions. *See id.*

> **Third**, there is a material factual dispute regarding **the presence or absence of working examples**.  Gilead admits that the patent includes a working example of a tenofovir prodrug that provides tenofovir *in vivo* at levels suitable for PrEP.  *See* D.I. 345 at 12.  Gilead argues, based on *Amgen*, *Indenix*, *Enzo*, *Wyeth*, and *Baxalta* that one working tenofovir prodrug is insufficient as a matter of law.  *See* D.I. 345 at 12-13.  But, as discussed, the cited cases all involve broad genus claims requiring identification of new biological activity.  In contrast, the challenged claims identify the active molecule—tenofovir—used in the PrEP method, and claim the use of tenofovir prodrugs that produce tenofovir after administration.  *See* Ex. L at ¶¶ 113-17.  While "a patentee is not required to provide actual working examples," *Alcon*, 745 F.3d at 1189, the working example of a tenofovir prodrug demonstrates PrEP's efficacy and provides the POSA with ample tools to obtain the same result with other tenofovir prodrugs through routine experimentation.

> **Fourth**, there is a material factual dispute as to **the nature of the invention** and **the state of the prior art**.  Gilead applies an unreasonably high bar, arguing that the "nature of the invention" and the "state of the prior art" cuts against enablement because "only one 'tenofovir prodrug' (TDF) had been tested in humans and approved by the FDA."  D.I. 345 at 16.  But the test for enablement is not FDA approval.  The use of prodrugs with nucleotides "was well-established and thoroughly described in the prior art."  *See* Ex. L at ¶ 126.  Gilead overreaches by generalizing a statement made in another case (and based on different facts) that "small changes in molecule structure can have dramatic effects."  D.I. 345 at 15.  Gilead fails to account for the particular state of the art for tenofovir prodrugs.  The prior art described the genus of tenofovir esters and prodrugs,

and provides working examples of functional delivery of tenofovir after oral administration. *See* Ex. L at ¶ 127; *see also id*. at ¶¶ 50-84. A POSA would have been able to select from this well-studied genus those tenofovir prodrugs "that are pharmaceutically acceptable, readily absorbed, and that yield tenofovir in the body." *Id*. at ¶ 127.

*Fifth*, there is a material factual dispute as to ***the relative skill of those in the art***. Dr. Thakker indicated that the level of skill in the art is high, and would include "an advanced understanding of the use of prodrugs for oral administration of tenofovir." *Id*. at ¶ 128; Ex. J at ¶¶ 36-38. Such a level of skill, if adopted, would further evidence enablement.

*Sixth*, there is a material factual dispute as to ***the predictability of the art***. Gilead asserts it would have been impossible to predict "which of the vast universe of ***potential*** tenofovir prodrugs, which had never been made or tested, could be used for PrEP." D.I. 345 at 16 & n.8. That is not the standard for enablement: "a patent does not need to guarantee that the invention works for a claim to be enabled." *Alcon*, 745 F.3d at 1189. Regardless, "the genus of tenofovir esters and tenofovir prodrugs were thoroughly described in the prior art and had been known for at least a decade prior to the invention." Ex. L at ¶ 129; *id*. at ¶¶ 50-84. Likewise, "many tenofovir prodrugs and esters had been described and characterized according to their pharmacokinetic characteristics, which would allow a POSA to ascertain their likely effectiveness." *Id.* at ¶ 129. The characteristics of any new prodrugs were readily ascertainable through routine experimentation. *See id.* Thus, the existing body of work related to tenofovir products made practicing the claimed invention by delivering tenofovir as a prodrug sufficiently predictable to practice the claims without undue experimentation.

*Seventh*, there is a material factual dispute as to ***the breadth of the claims***. Gilead argues that the breadth of the claims are "extremely broad" because of "potentially hundreds of thousands

of candidate compounds." D.I. 345 at 14-15. But, as discussed, the claimed "tenofovir prodrugs" have a singular functional breadth—the generation of tenofovir. As Dr. Thakker explained, the asserted claims "are NOT directed to the development of new chemical entities to be used as prodrugs." Ex. L at ¶ 130. Delivering tenofovir via a prodrug is a completely different issue than developing new active molecules with *de novo* activity. Gilead's patents admit that assessing tenofovir prodrug candidates was well-known in the art. *See id.* at ¶ 119. A POSA would only need "to test the known tenofovir esters/prodrugs . . . through routine testing to confirm which [] would be efficacious for pre-exposure prophylaxis*." Id*. at ¶ 123. And a POSA would have been able to use known working examples of tenofovir prodrugs that deliver tenofovir in the body after oral administration for the claimed method without undue experimentation. *See id.* at ¶ 130.

These numerous factual disputes preclude summary judgment regarding lack of enablement such that Gilead's motion should be denied.

## VIII.   CLAIMS THAT RECITE "TENOFOVIR" ARE ENABLED

Gilead asserts that claims reciting oral administration of "tenofovir" are invalid for lack of enablement because they cover inoperable embodiments. *See* D.I. 345 at 18-20. According to Gilead, "[i]f expressly claimed embodiments of a method are inoperative or impossible, the claim necessarily is not enabled." *Id.* at 18. The enablement inquiry, however, is not a simple binary test about operative versus inoperative embodiments. "Even if some of the claimed combinations were inoperative, the claims are not necessarily invalid." *Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984). It is only where "the number of inoperative combinations becomes significant and in effect forces one of ordinary skill in the art to experiment unduly in order to practice the claimed invention the claims might indeed be invalid." *Id.* at 1576-77. In turn, "[w]hether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations."

20

*Martek Bioscheces Corp. v. Nutrinova, Inc.*, 576 F.3d 1363, 1378 (Fed. Cir. 2009); *see also In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

A material factual dispute exists as to whether the "tenofovir" recited by the asserted claims amounts to a significant number of inoperative embodiments such that practicing the claims would require undue experimentation by the POSA.  Gilead relies heavily on the *Boston University* decision that found lack of enablement where there was "one inoperative embodiment out of six permutations" to speculate that the presently asserted claims must be invalid based on Gilead's assertion that "one of the two specifically named options in each claim is inoperative."  D.I. 345 at 19 (citing *Trs. Of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018)).

But Gilead's assertion rings hollow in view of its conflicting position that the number of options covered by the challenged claims actually number in the "thousands." *Id.* at 2, 12, 13, 15. Dr. Thakker explained that there are "many" options covered by the claims.  Ex. L at ¶¶ 114-117, 67-84.   And Gilead's overly simplistic application of the mathematical ratio from *Boston University* to the present claims is improper as it fails to properly analyze undue experimentation. In another case, Federal Circuit found that "it may be ***unlikely that it would take an undue amount of experimentation*** for . . . [a POSA] to practice the invention" where "***there are only six different [embodiments] to be selected from***" and some claimed combinations might be inoperative.  *Doyle v. Crain Indus., Inc.*, 243 F.3d 564 at *6 (Fed. Cir. 2000) (unpublished) (emphases added).  This Court has similarly denied a motion for summary judgment where there was one inoperative embodiment out of two specifically recited types of polynucleotides.  *See Gevo, Inc. v. Butamax Advanced Biofuels LLC*, No. 13-576, 2013 WL 3914467 at *3, 17 (D. Del. July 26, 2013).

In short, "the question of undue experimentation is a matter of degree;" it "is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine."

*PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564 (Fed. Cir. 1996).   Gilead fails to explain how oral administration of "tenofovir" constitutes a significant number of inoperative embodiments within the asserted claims and has not proven invalidity by clear and convincing evidence.   *See Cephalon, Inc. v. Slayback Pharma LLC*, 456 F. Supp. 3d 594, 623 (D. Del. 2020).

In addition, Gilead's motion is devoid of any analysis of the efficacy required by the preambles and thereby clauses as construed by this Court.   *See* D.I. 186 at 1-2, 5-10.  The claims require that the particular primate host be protected by the claimed method such that it remains serologically negative and negative in response to a PCR test (if both tests are performed).   *Id.* The amount of experimentation necessary to practice the claimed method cannot be determined without consideration of the efficacy required by the preambles and thereby clauses.   *See, e.g.*, *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1186-87 & n.10 (Fed. Cir. 2002).  Here, the experts agree that "tenofovir" lacks oral bioavailability such that the inoperable embodiment asserted by Gilead would be easily detectable by the POSA in view of the efficacy required by the preambles and thereby clauses.   *See* D.I. 108-5, Appx4392-406 at Appx4397 (¶ 17) ("A POSA would have further understood that tenofovir cannot be administered in an oral dosage form unless modified[.]"); Ex. N at ¶ 2263 (same); Defs' Ex. 27 at 22-23; Defs' Ex. 28 at 209-11; D.I. 345 at 19.

The claims satisfy the enablement requirement because the POSA possesses the "necessary information to limit the claims to operative embodiments."   *Crown Operations Int'l, Ltd. v. Soluta Inc.*, 289 F.3d 1367, 1380 (Fed. Cir. 2002) (citation omitted); *see also Gevo*, 2013 WL 3914467 at *17; *Senju Pharm. Co. Ltd. v. Apotex Inc.*, 717 F. Supp. 2d 404, 429 (D. Del. 2010).  As Dr. Thakker stated, "the mode of oral administration for tenofovir was well known at the time" and included tenofovir prodrugs.   Ex. L at ¶ 95.  The POSA's undisputed understanding that

"tenofovir" lacks oral bioavailability coupled with the POSA's knowledge of modes for orally administrating tenofovir as, for example, a tenofovir prodrug demonstrates that the POSA possessed the necessary information to limit the claims to the operative embodiments of tenofovir esters and prodrugs in view of the efficacy limitations. *See PPG*, 75 F.3d at 1564 (finding enablement established where inoperable embodiment was "easily detectable" by POSAs); *In re Bowen*, 492 F.3d 859, 863 (C.C.P.A. 1974). For at least these reasons, Gilead's motion on this issue should be denied.

## IX.   GILEAD IS LIABLE FOR WILLFULLY INDUCING INFRINGEMENT BY JUNE 2015

Attempting to further curb its liability, Gilead asserts that it is "entitled to summary judgment of no liability for induced or willful infringement before March 11, 2016." D.I. 345 at 20. Before that date, Gilead claims it lacked the legally required "knowledge" of the '509 Patent that issued on June 2, 2015. The court should reject this overly narrow view of the facts and law.

Gilead argues that before NIH emailed Gilead about the ***issued patent***, it could not have knowledge of the '509 Patent, even though it had knowledge of ***patent applications*** in 2014. *Id.* at 20-21. In the cited interrogatory response, Defs' Ex. 32 at 50-52, the Government contends that Gilead was aware of the '509 Patent upon issuance in 2015 based on an email from NIH's Laura Prestia to Dr. Jay Parrish, a member of Gilead's Corporate Development group, on October 23, 2014.[2][3] Ex. Q. The email identifies Gilead as an "ideal partner for a technology developed by Dr.

---

[2] Contrary to Gilead's assertions, the Government alleges not only that Gilead "knew or should have known" about the ***applications*** for the Patents-in-Suit, D.I. 345 at 21, but also that it "knew or reasonably should have known that the '547 application" issued as the '509 Patent in June 2015. Defs' Ex. 32 at 52.

[3] On the same day, Ms. Prestia sent an identical email to Dr. Linda Higgins, Gilead's Vice-President of Biology. D.I. 1 at ¶ 234; Ex. S.

Walid Heneine at [CDC]."  *Id.*  It further states that CDC has shown that the daily use of Truvada for PrEP "significantly increases the level of protection against HIV transmission" and that it "is pursuing U.S. and foreign patent protection []."  *Id.*  The email also includes a hyperlink to a Federal Register entry describing the technology, and identifying the Provisional Application and the '547 Application, which published in 2007.  Defs' Ex. 32 at 50-51; Ex. R.

To support its absolutist view that "knowledge of a patent application does not equate to knowledge of the '509 Patent," D.I. 345 at 21, Gilead cites *State Industries, Inc. v. A.O. Smith Corporation*, 751 F.2d 1126, 1236 (Fed. Cir. 1985).  But it ignores the Federal Circuit's later statement that "*State Industries* does not establish a per se rule," but instead, follows "prior and subsequent case law, which looks to the totality of the circumstances presented . . . ."  *WCM Industries, Inc. v. IPS Corp.*, 721 Fed. Appx. 959, 970 (2018) (internal quotations omitted).  In other words, the Government must only provide "sufficient evidence for a reasonable jury to conclude" that Gilead knew of the Patents-in-Suit "as they issued, if not earlier."  *Id.*  Knowledge of pending patent applications can now provide sufficient evidence given that the 1999 enactment of 35 U.S.C. § 122(b)(1)(A) allows for publication of patent applications and real-time prosecution activity.  *WCM*, 721 Fed. Appx. at 970 & n.4 (distinguishing pre-1999 statements in *State*, 751 F.2d at 1236, that defendant was in "the dark" about application's prosecution and that "scope of claims" was "totally unforeseeable").

And unlike the *LiTL* case cited by Gilead, D.I. 345 at 21, the evidence here consists of more than mere "citations" to patent applications.  *Cf. LiTL LLC v. Lenovo (U.S.), Inc.*, No. 20-689, 2022 WL 610739, at *7-8 (D. Del. Jan. 21, 2022).  The Prestia emails specifically informed Gilead

that CDC would pursue U.S. patents covering Truvada for PrEP®.  And Gilead was already aware of the pending applications through numerous disclosures, including a 2008 disclosure form signed by a CDC inventor.  *See* D.I. 1 at ¶¶ 128-34; D.I. 78-2 at 252-62.  For these reasons, the court should deny Gilead's motion to eliminate its liability prior to March 2016.

## X.   THE ASSERTED CLAIMS APPROPRIATELY CLAIM PRIORITY TO THE 2006 PROVISIONAL APPLICATION

Gilead assets that the Government's Provisional Application "fails to show that the named inventors possessed an effective oral PrEP method using TDF and FTC in combination as of its filing date."  D.I. 345 at 24; *id.* at 22-27.[4]  The Patents-in-Suit are presumed valid "and the burden of persuasion to the contrary is and remains on" Gilead at all times.  *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1303 (Fed. Cir. 2008).  Written description "requires an objective inquiry into the four corners of the specification" from the POSA's perspective.  *Ariad Pharms., Inc. v. Eli Lilly and Co*., 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  This inquiry "is a question of fact," which must be resolved on a case-by-case basis.  *Id.*

Gilead criticizes the Provisional Application for allegedly being "most[ly] just a PowerPoint deck."  D.I. 345 at 22, 24.  As an initial matter, it is not uncommon for provisional applications to include PowerPoint slides.  *See* Ex. T at 12-14, 23-24.  More importantly, Gilead's criticism elevates form over substance.  The inventions described in the slides that were included in the Government's Provisional Application gained significant news coverage and industry recognition.  *See* Ex. J at ¶ 329; D.I. 1 at ¶ 137 (citing Exs. 46, 47), D.I. 1-3 at 253 (Ex. 18).  In fact, the inventors' data lead to major clinical trials switching from TDF-monotherapy to oral

---

[4] Gilead's brief includes an irrelevant discussion of Dr. Janssen's supposed licensing of the Patents-in-Suit to Gilead.  *See* D.I. 345 at 22, n. 13.  But no reasonable jury could find that Dr. Janssen granted a license to Gilead.  *See* D.I. 350 at 19-23.

combinations of TDF and FTC.  Ex. J at ¶ 332; Ex. M at ¶ 106.  Also, the Provisional Application is more than "just a PowerPoint deck."  It includes additional pages describing the PowerPoint slides, a description of FDA-approved antiretroviral drugs, and several claims describing the inventions.  *See* Ex. J at ¶¶ 104-05; Defs' Ex. 33 at US_00002063-83.

Gilead concedes that the Provisional Application describes efficacy data on the protection of macaques with subcutaneous tenofovir and FTC, but it asserts that the application is deficient because it does not contain oral efficacy data.  *See* D.I. 345 at 24.  This assertion is meritless.  The Federal Circuit has "made clear that the written description requirement does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement."  *Ariad*, 598 F.3d at 1352.  Oral PrEP data is not required to satisfy the written description requirement.

Gilead reproduces a snippet of Dr. Thakker's deposition testimony to allege that he testified that oral PrEP data is required to demonstrate possession.  *See* D.I. 345 at 24.  Dr. Thakker did not state that ***oral*** PrEP data was required to show possession—rather, he said a POSA would need to see appropriate "data," *see* Ex. U at 323, and explained that the Provisional Application contains the appropriate data to show possession of oral PrEP.  *See id.* at 303-05, 313; Ex. L at ¶ 90.  That data includes the experimental results demonstrating effective PrEP using the combination of tenofovir and FTC in a macaque animal model, which is highly relevant for oral PrEP.  *Id.*; Ex. M at ¶¶ 97, 21-29, 44-48, 59-63; Ex. J at ¶ 109; Defs' Ex. 33 at US_00002063, -66-67, -69, -73.

Gilead asserts that the "rest of the application further shows that the inventors did not possess what they ultimately claimed."  D.I. 345 at 24.  Possession may be shown by describing the claimed invention using "such descriptive means as words, structures, figures, diagrams, formulas, etc."  *In re Skvorecz*, 580 F.3d 1262, 1269 (Fed. Cir. 2009).  "The hallmark of written

description is disclosure." *Ariad*, 598 F.3d at 1351.  The Provisional Application discloses the combination of TDF and FTC for oral PrEP.  For example, claim 14 discloses "oral" administration of antiretrovirals, while claims 4 and 10 recite that the "antiretrovirals" are those approved by the FDA.  *See* Defs' Ex. 33 at US_00002082-83; Ex. J at ¶ 109.  The Application expressly discloses "Truvada" as such an FDA-approved antiretroviral, and it is undisputed that Truvada contains the combination of TDF and FTC.  *See* Defs' Ex. 33 at US_00002076; Ex. J at ¶ 109; Ex. N at ¶ 183.  Truvada is only administered orally.  *See* Ex. B at ¶ 82.  Thus, the Provisional Application discloses oral PrEP using TDF and FTC, and Gilead's assertions otherwise are meritless.

Gilead also misinterprets a statement in the Provisional Application about dosing as amounting to "skepticism about the use of Truvada."  D.I. 345 at 25-26 & n.14 (citing same statement by inventor Dr. Walid Heneine).  This statement does not express skepticism towards Truvada for PrEP, as is apparent when the statement is read in conjunction with other portions of the Application.  *See* Ex. M at ¶¶ 98-101.  For example, claims 1 and 8 recite a composition and method for preventing HIV transmission "comprising a plurality of antiretroviral compounds." *See* Defs' Ex. 33 at US_00002082.  Claims 5 and 11 recite that the plurality of antiretroviral compounds are "tableted," *id*., which includes a tablet for oral administration.  *See* Ex. M at ¶ 100; Ex. J at ¶ 111.  Claim 14 specifically recites "oral" administration.  *See* Defs' Ex. 33 at US_00002083.  Also, the title of the abstract recites a "tenofovir/FTC combination," and that the "[t]enofovir/FTC combination provides a high level of protection against repeated virus challenges, demonstrating that chemoprophylaxis with potent antiretrovirals is an effective strategy for preventing sexual HIV transmission." *Id.* at US_00002063.  The Provisional Application, thus, describes tenofovir/FTC combinations that are tableted for oral administration.  *See* Ex. M at ¶ 100; Ex. J at ¶ 111.

Gilead asserts that Claims 5 and 14 recite "boundless" antiretroviral compounds and "a mere wish" for orally administered drugs. D.I. 345 at 24-25. Gilead overlooks that Truvada is the only oral tenofovir/FTC combination of drugs disclosed in the Provisional Application, and it is disclosed repeatedly. *See* Defs' Ex. 33 at US_00002073-74, US_00002076. The Application's description of oral administration of a tenofovir/FTC combination would have been understood by a POSA as describing Truvada for PrEP®, *see* Ex. J at ¶ 111, especially in view of Gilead's concession that a POSA would know that "tenofovir cannot even be administered orally." D.I. 345 at 25. Thus, the Provisional Application does not express skepticism toward oral TDF/FTC.

Gilead asserts that the inventors did not possess effective oral PrEP methods because they conducted post-filing experiments where the combination of TDF and FTC was orally administered to macaques. *See* D.I. 345 at 26-27. The post-filing experiments were appropriately used to "confirm" what the Provisional Application had previously disclosed—that TDF and FTC were effective for oral PrEP. *See* Defs' Ex 32 at 11-12; Defs' Ex. 45 at 11-12. The inventors were not required to conduct experiments using oral TDF and FTC to possess the claimed subject matter. *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1310 (Fed. Cir. 2015).

Based on the foregoing, a POSA looking for written description support for the claimed oral PrEP using TDF and FTC would turn to the disclosures within the Provisional Application for guidance and find ample disclosures. The inventors therefore possessed oral PrEP using TDF and FTC at least as of the filing date of the Provisional Application, and Gilead has not demonstrated that there is no genuine issue of material fact on this issue.

## XI.   GSIUC WORKS IN CONCERT WITH GSI TO INDUCE INFRINGEMENT

Gilead asserts that its Irish subsidiary GSIUC, owner of U.S. trademarks for Descovy for PrEP®, is an "improper defendant." D.I. 345 at 27. Gilead asserts that GSIUC has ████████

███████████████████████   ██████████   █████████████   *id.*, but the evidence[5] belies that assertion.   GSIUC and GSI work jointly to package PrEP products with inserts instructing patients to take Truvada® and Descovy® for PrEP.   GSIUC also permits GSI to use trademarks for Descovy for PrEP® in joint marketing, advertising, and promotion in the United States.   And Gilead has affirmatively pled in two suits that GSIUC and GSI in jointly promote and market Truvada® and Descovy® for PrEP.   Given these facts, the Court should not dismiss GSIUC.

### A.   GSIUC Works in Concert with GSI to Package and Label PrEP Products



Ex. V at 286, 290.

.[6]  The inserts instruct patients to take Truvada for PrEP® in a manner that infringes the Patents-in-Suit.   *See* D.I. 350 at 6-18; D.I. 1 at ¶¶ 280-313. Gilead's  packaging  of  ████████████  Descovy®  is  conducted  under  a  █████████ █████████ Defs' Ex. 43 at 37.

While Gilead admits that ██████████████████████████████ ███████████████████████████████  D.I. 345 at 28,  it ignores that ████████████ █████████████████████████████████████████████████████

---

[5] This motion to dismiss GSIUC follows Gilead's efforts to stonewall discovery.  Contrary to its assertions, D.I. 345 at 27 n.1, Gilead refused to produce all relevant GSIUC documents, initially providing just two custodial documents.  *See* D.I. 232 at 1.  Following a successful Government motion, D.I. 247, GSIUC produced "over 40,000 pages of documents."  D.I. 345 at 27.

[6] ████████████████████████████████████████████████████████████████████ ████████████████████████████  ; Ex. V at 288.



Accordingly, GSIUC works in concert with GSI to package Truvada® and Descovy® for the U.S. market with inserts that instruct physicians and patients on PrEP administration.

### B.     GSIUC Owns Descovy for PrEP® Trademarks Used by GSI

GSIUC is also the sole owner of the U.S. trademarks for Descovy for PrEP® used in the relevant labeling and marketing materials.[9]

While Gilead admits that GSIUC authorizes GSI to use Descovy for PrEP® marks, it argues that this act alone is insufficient to establish induced infringement.  D.I. 345 at 30 (citations

---

[7] "'Commercialization' shall mean, with respect to a Product, the marketing, promotion, sale and distribution of such Product."  *Id.* at GILDDE02684501.

[8]

[9] GSIUC's Descovy for PrEP® marks include U.S. Trademark Reg. Nos. 5,912,591 (Ex. BB) and 6,414,007 (Ex. CC).  It also owns marks for Descovy®, including Reg. No. 4,876,632 (Ex. DD).

omitted).  But, unlike Gilead's cited cases, the relationship between GSIUC and GSI goes beyond

that of a mere trademark licensor and licensee.  As discussed, ████████████████████████

██████████████████████████████████████  Also, Descovy for PrEP® marks involve a

"positive statement" or "claim" regarding the specific use of Descovy® for pre-exposure

prophylaxis, something FDA must specifically approve.  Ex. EE at 228-29, 232-33.[10]  Therefore,

GSIUC at the very least implicitly agrees to the marketing of Descovy for PrEP® in the United

States, when it allows GSI to use the marks, which goes beyond just a trademark license.

Gilead secondarily argues that GSIUC could not induce infringement because "there is no

evidence GSIUC knew about the Asserted Patents or that any third parties would infringe."  D.I.

345 at 31 (citations omitted).  At a minimum, the Government's complaint provides such

knowledge because it alleges continuing infringement.  *See, e.g.*, D.I. 1 at ¶ 9.[11]  Consistent with

this, Gilead's interrogatory response only contends that GSIUC lacked knowledge of the Patents-

in-Suit ***"prior to the government's filing of the complaint in this action on November 6, 2019."***

Ex. FF at 155 (emphasis added).

Likewise, GSIUC's status as a wholly owned subsidiary of GSI, which (1) has officers in

common[12] and (2) pursues litigation jointly with GSI, indicates that GSI's admitted awareness of

the Patents-in-Suit in 2016 (if not earlier) can be imputed to GSIUC.  *See, e.g.*, *P. F. Collier & Son*

---

[10] Melissa Koomey was GSIUC's Rule 30(b)(6) designee on trademark topics.  Ex. EE at 106-07.

[11] Several judges in this court have permitted induced infringement claims based on post-suit conduct.  *See, e.g.*, *Walker Digital, LLC v. Facebook, Inc.*, 852 F. Supp. 2d 559, 565 (D. Del. 2012) (Robinson, J.); *DoDots Licensing Sols. LLC v. Lenovo Holding Co., Inc.*, No. 18-098, 2019 WL 3069773, at *3 (D. Del. July 12, 2019) (Noreika, J.); *Soft View LLC v. Apple Inc.*, No. 10-389, 2012 WL 3061027, at *8 (D. Del. July 26, 2012) (Stark, J.).

[12] For example, Dr. Taiyin Yang served as both Executive Vice President, Pharmaceutical Development and Manufacturing of GSI and Director of GSIUC.  *See* Ex. GG at 6; Ex. HH at 4.

*Corp. v. Fed. Trade Comm'n*, 427 F.2d 261, 269 (6th Cir. 1970) (finding that "substantial overlap" in officers supports inference of knowledge in both entities).  And such circumstantial evidence that GSIUC knew of the Patents-in-Suit (through GSI) is sufficient to establish induced infringement.  *See DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293 (Fed. Cir. 2006).

### C.     Gilead Repeatedly Pled That GSIUC Promoted PrEP Products with GSI

While Gilead here asserts that GSIUC is uninvolved in the marketing and promotion of PrEP products, it has pled otherwise in litigations involving GSUIC-owned trademarks.  In two cases, GSI and GSIUC have jointly sought legal remedies against alleged counterfeiters, asserting PrEP trademarks owned by both entities.  In a 2020 Southern District of Florida complaint (the SDFL Complaint), GSI and GSIUC jointly pled that they "are the collective owners of a number of well-established and famous registered trademarks" for "genuine PrEP products," Ex. II at ¶ 27, including marks for Truvada® and Descovy® for PrEP, *id*. at Ex. A (ECF 1-1) at 12, 14.

The complaint identified GSIUC as "a wholly owned subsidiary of Gilead Sciences, Inc. and ***the registered owner of certain . . . registered trademarks that appear on the packaging, tablets, and instructional inserts of certain genuine PrEP medications.***"  *Id*. at ¶ 25 (emphasis added); *see also* ¶ 260.  It further stated that GSI and GSIUC together "used and [are] currently using these Gilead Marks . . . in commerce in connection with its sale of PrEP medication, . . ."  *Id*. at ¶ 27.  It further pled that "Gilead [collectively] has engaged and continues to engage in activities designed to promote PrEP medication and the business and goodwill associated with its [U.S.] trademarks . . . ."  *Id*. at ¶ 28.  Declan Hickey,[13] GSIUC's Rule 30(b)(6) deponent, had "no reason to disagree with" these statements. Ex. V at 134 (discussing ¶ 27), 136 (discussing ¶ 28).

---

[13] Mr. Hickey was designated to testify regarding GSIUC's role "in the manufacturing, sale, distribution, prescription, research, analysis, testing, marketing, and regulatory submissions for

The SDFL Complaint alleges two claims of unauthorized use of "a reproduction, counterfeit, copy, or colorable imitation of the Gilead Marks and Trade Dress in connection with the sale, offering for sale, distribution, or advertising of diverted and/or altered PrEP medication," resulting in "irreparable harm to the valuable Gilead Marks . . . . ."  *Id.* at ¶¶ 383, 388; *see also id.* at ¶¶ 391-99.  Based on these claims (and others), the court granted Gilead's motion for a temporary restraining order and preliminary injunction.  Ex. KK at 2; *see also* Ex. LL.

GSI and GSIUC also filed 2021 complaint in the Eastern District of New York (EDNY Complaint), again alleging counterfeiting of Gilead HIV products, including Descovy®.  *See* Ex. MM.  It repeats similar allegations about GSIUC's ownership of marks that appear on packaging of "genuine HIV medications," *id.* at ¶ 11, and GSI and GSIUC's joint use of trademarks and trade dress in commercializing HIV medications and products.  *See id.* at ¶¶ 12, 34, 118-74.  GSI and GSIUC were ultimately granted an *ex parte* seizure order.  Ex. NN.

Gilead does not explain how GSIUC is an "improper party" here, yet a named plaintiff in two suits where it sought (and received) relief with respect to its PrEP products.[14]  Indeed, both complaints were filed ***after*** the government sued GSI and GSIUC in Delaware.  These subsequent pleadings describe their work in concert to promote the use of Truvada® and Descovy® for PrEP.  Under the doctrine of judicial estoppel, Gilead cannot assert now that GSIUC does not work in concert with GSI to promote its PrEP products.  *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 272 (3d Cir. 2012).  The doctrine "protect[s] the integrity of the judicial process and [] prohibit[s]

---

PrEP indications" for Truvada and regarding the "manufacture, packaging, or labeling of Truvada® and Descovy® products" by GSIUC sale as PrEP medications in the U.S.  Ex. JJ (Topics 42, 53).

[14] Gilead's arguments focus on the testimony of Dr. Murphy, the Government's technical expert.  D.I. 345 at 27-30.  But expert evidence is not required to resolve patent infringement issues.  *See Union Carbide Corp. v. Am. Can Co*., 724 F.2d 1567, 1573 (Fed. Cir. 1984).

parties from deliberately changing positions according to the exigencies of the moment." *Id.* (quotation and citation omitted).  In two litigations, Gilead sought to enforce GSI and GSIUC's U.S. marks by alleging that they jointly market and promote PrEP products.  GSIUC cannot now be an "improper party" who did "not advertise or promote Truvada® for PrEP or Descovy® for PrEP."  D.I. 345 at 28.  These are irreconcilably different positions.  For these reasons, the court should deny Gilead's motion to dismiss GSIUC.

## XII.   THE UNITED STATES, LIKE ANY PATENTEE, CAN ENFORCE ITS OWN PATENTS

Having failed to raise this issue in earlier proceedings, Gilead now moves on its baseless theory that the Government lacks statutory authority[15] to sue for patent infringement, D.I. 345 at 32.  Gilead's position, however, relies on an incorrect reading of the relevant statutory language and legislative history.  The Government is clearly authorized to enforce the public's rights in federal inventions.

### A.   The Government Has Statutory Authority to Sue for Patent Infringement

The Patent Act and Bayh-Dole Act both authorize the Government to own, license, and if necessary, enforce patents on federal inventions.  This authorization is clear from the relevant statutory language and legislative history, which Gilead often ignores and misrepresents.

The Patent Act makes clear that a "'patentee' includes not only the patentee to whom the patent was issued but also the successors in title to the patentee."  35 U.S.C. § 100(d).   Gilead does not challenge that the Government can own patents and be a "patentee" under the patent statues, only that the Government "lacks authority to sue for patent infringement," and in turn, to

---

[15] Gilead has not pled a lack of "statutory authority"—only a lack of "constitutional authority." *See* D.I. 78 at 91.  And when asked for "all legal and factual bases" relating to its assertion of lack of standing, Ex. OO at 23, it did not identify statutory authority.  *Id.* at 24-26.

"demand[] money from a U.S. company." D.I. 345 at 34. But the Patent Act specifically provides that any "patentee shall have remedy by civil action for infringement of his patent," 35 U.S.C. § 281, as the Government has done under 35 U.S.C. § 271.

Likewise, the statutory language of the Bayh-Dole Act makes explicitly clear that the Government is empowered to not only "apply for, obtain, and maintain patents" on federally funded[16] inventions, 35 U.S.C. § 207(a)(1), and "grant nonexclusive, exclusive, or partially exclusive licenses" on the same, § 207(a)(2), but also to "directly" "undertake all other suitable and necessary steps to ***protect and administer rights*** to federally owned inventions on behalf of the Federal Government." 35 U.S.C. § 207(a)(3) (emphasis added). The Government is, thus, clearly authorized to bring affirmative suits to "protect" its patent rights.[17] Gilead points to language in irrelevant law, like the False Claims Act and Fair Housing Act, as evidence that Congress did not authorize the Government to affirmatively bring suit, D.I. 345 at 35, but "[t]he patent statutes govern the creation and protection of patent rights, how rights can be transferred, and the parties entitled to assert those rights." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1336 (Fed. Cir. 2007). And those statutes, as discussed, permit suits by any patentee.

Gilead also asserts that "[s]ection 207(a)(3) does not mention a 'civil action' or any litigation," D.I. 345 at 35, but this superficial argument fails to fully appreciate the provisions of section 207. The authorization to acquire, possess, license, and defend patents on federally funded

---

[16] The Bayh-Dole Act clarified the Government's rights regarding inventions ***funded*** by the Government, such as those claimed in the Patents-in-Suit.

[17] The Government may delegate enforcement to licensees at its discretion. *See* 35 U.S.C. § 207(a)(2). This would be impossible (and illogical) if it did not already hold enforcement rights.

inventions contained in section 207 entitles the Government to avail itself of the patent laws. Accordingly, the Government may, and has, brought an action under section 271.[18]

Additionally, Gilead's reading of the Bayh-Dole Act ignores that Congress approved the acts that Gilead asserts are unauthorized. Gilead argues that "[t]he legislative history of the Bayh-Dole Act [] lacks support for the proposition that the government may act as a solo infringement plaintiff." D.I. 345 at 38. Gilead cites the policy statement of the Bayh-Dole Act and the Senate Report in support, but both actually support the Government's view of the statutory scheme. *Id.*

The legislative history of the Patent and Trademark Laws Amendments Act (also known as the Bayh-Dole Act), P.L. 96-517, 94 Stat. 3015, enacted as 96 H.R. 6933, makes clear that, as the bill left committee, affirmative enforcement suits *by the Government* were contemplated and approved of. *See* Ex. PP. Under a section entitled "Patent enforcement suits and right of intervention," it states that the proposed bill "requires the responsible agency to notify all of its exclusive licensees *of any suit by* an exclusive licensee, *the Government*, or another person." *Id.* at 20 (emphasis added). The language of the bill also expresses this clearly. *Id.* at 51.

While the cited language imposing an obligation for agencies to inform licensees of suits was not included in the final Act, its removal does not indicate Congress withheld the Government's rights to enforce its patents. The Bayh-Dole Act was understood to authorize affirmative suits by the Government, in accordance with the stated policy "to ensure that the Government obtains sufficient rights in federally supported inventions to meet the needs of the

---

[18] Gilead's argument regarding *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373-75 (2018) is misplaced. D.I. 345 at 34. Gilead seems to argue that the Government does not possess *any* statutory right to enforce or even acquire patents. As discussed herein, this proposition cannot be correct in view of the Patent Act and Bayh-Dole Act.

Government and protect the public against nonuse or unreasonable use of inventions."  35 U.S.C. § 200.[19]  If the Government could own patents, but had no rights to enforce them, it would impede efforts to license and commercialize federal inventions and "protect" the public against "unreasonable use(s)" as intended by the Bayh-Dole Act.

Gilead's own citations to a supposed contrary policy are unpersuasive.  As Gilead notes, D.I. 345 at 33, the Attorney General concluded in 1929 that "whenever the acquisition of the patent by the United States has been authorized, or has [otherwise] resulted . . . ., the inference is that Congress has intended that the United States shall enjoy the exclusive rights under the patent *and be in a position to enforce them*."  Defs' Ex. 35 at 2, 5.  Likewise, the position of the former Commissioner of Patents in 1929 on Government litigation, *id.* at 33 n.16, is obviously of little relevance, as the Attorney General has been charged with directing such litigation. 28 U.S.C. § 516.  More generally, evidence of policies against Government patent enforcement from nearly a century ago are irrelevant to the time after passage of the 1952 Patent Act and 1980 Bayh-Dole Act, which clearly authorize the Government to own and enforce patents.

## B.  There Is Historical Precedent for a Government Patent Suit

Lacking any statutory authority, Gilead asserts a lack of historical precedent for bringing affirmative infringement suits itself somehow demonstrates the Government lacks authority or thought itself to lack authority.  But this argument simply highlights the exceptional actions by Gilead in refusing to license the patent rights at issue—something that six generic makers of

---

[19]  Even before the Bayh-Dole Act, the prevailing understanding of the Government's rights was that the Government must be prepared to sue infringers, if it sought licensing royalties.  For example, the 95th Congress' House Subcommittee on Domestic and International Scientific Planning and Analysis' *Background Materials on Government Patent Policies,* Vol. 2, noted that "[i]f the Government were to charge substantial royalties for licenses under its patents, *it would incur the obligation to sue for nonpayment of royalties and to protect the licenses by suing infringers of the licensed patents*."  Ex. QQ at 3 (emphasis added).

Truvada for PrEP® have already done for the Patents-in-Suit and/or foreign counterparts.  Ex. RR at 1693-95, 1779-86 (CFC trial testimony).

As discussed, the entirety of the Government's licensing scheme authorized under the Bayh-Dole Act would be undermined if the Government could not sue for infringement.  As the Federal Circuit once asked, "how can a [] party 'manage' a government-owned invention without freedom to conduct enforcement litigation?"  *Nutrition 21 v. United States*, 930 F.2d 862, 866 (Fed. Cir. 1991).  Indeed, by filing four *inter partes* petitions prior to the Government's filing of this suit, Gilead has implicitly acknowledged that the Government has the right to enforce the Patents-in-Suit.  Simply put, Gilead would have no need to challenge the validity of Government patents if those patents could not be enforced against Gilead.

Moreover, Gilead's "historical precedent" argument is facially baseless.  *First*, Gilead's reliance on *Tektronix Inc. v. United States*, 351 F.2d 630, 631-32 (Ct. Cl. 1965) is misplaced.  *Tektronix*'s alleged skepticism regarding the Government's right to bring infringement suits predates the Bayh-Dole Act by fifteen years.   At its core, the Bayh-Dole Act authorizes and encourages the licensing of federally funded inventions, and in turn, protecting such rights, which all necessarily implicates the exclusion of "citizens from the use of Government-owned patents" that *Tektronix* contemplated.  *Id*. at 632.  *Second*, Gilead admits that the Government has filed a number of infringement suits (after passage of the Bayh-Dole Act) when an infringing party has refused to take a license.[20]  And it further acknowledges that the Government's authority to file

---

[20] D.I. 435 at 34 (referencing *United States v. Telectronics, Inc., et al.*, No. 1:80-cv-981 (D. Colo. July 25, 1980); *EPA v. Micrology Labs. LLC*, No. 3:09-cv-69 (N.D. Ind. Nov. 16, 2009); *United States et al. v. Mylan Pharms. Inc. et al.*, No. 2:10-5956 (D.N.J. Nov. 15, 2010), *United States et al. v. Teva Pharms. USA, Inc.*, No. 2:11-cv-1461 (D.N.J. Mar. 15, 2011); *United States et al. v. Hetero Drugs, Ltd., Unit III et al.*, No. 2:11-cv-1750 (D.N.J. Mar. 28, 2011); *United States et al.*

suit or standing was not challenged in these suits.  D.I. 345 at 34.  These cases, thus, directly refute Gilead's assertion that "[f]or nearly 150 years, the government does not appear to have contemplated suing private parties for infringing U.S. patents."  D.I. 345 at 32.

Without any legal basis, Gilead further asserts that even though the Government has the authority to grant the right of enforcement of a patent to others, it somehow lacks such authority. D.I. 345 at 37 n.20.  But "[u]nquestionably, a patentee who holds all the exclusionary rights and suffers constitutional injury in fact from infringement is one entitled to sue for infringement in its own name."  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339-40 (Fed. Cir. 2007).  Gilead does not explain the origin of the Government's ability to license others to enforce its patents if, as it claims, that authority does not arise from the grant of the patents' exclusive rights.

Gilead concludes that "[b]y bringing this case, the government attempts to open a new chapter in U.S. patent law in which the Executive Branch—the same sovereign that grants patents—also operates as the world's largest and best-funded patent-assertion entity."  D.I. 345 at 39.  But this is not a new chapter—rather, it is simply an action undertaken to protect federal inventions, funded by taxpayers, against an infringer who refuses to license valid and enforceable Government patents.  The Government is authorized to bring this action against Gilead.

## XIII.   CONCLUSION

The Court should deny Gilead's motion for summary judgment.

---

*v. Lupin Ltd.*, No. 2:11-cv-3995 (D.N.J. July 14, 2011); *U.S. Dept. of Health and Human Servs. et al. v. Lupin Ltd.*, No. 2:13-cv-4039 (D.N.J. June 27, 2013); *U.S. Dept. of Health and Human Servs. et al. v. Cipla Ltd. et al.*, No. 2:14-cv-5135 (D.N.J. Aug. 15, 2014); *United States Dept. of Health and Human Servs. et al. v. Cipla Ltd. et al.*, No. 2:15-cv-2571 (D.N.J. Apr. 10, 2015); *U.S. Dept. of Health and Human Servs. et al. v. Aurobindo Pharma USA, Inc.*, 3:17-cv-6911 (D.N.J. Sept. 8, 2017)).

Dated: November 28, 2022

Respectfully submitted,

LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel:   (302) 573-6277
Fax:   (302) 573-6220
*Laura.hatcher@usdoj.gov*
*Shamoor.anis@usdoj.gov*


Of Counsel:
LENA YUEH
Special Counsel
U.S. Department of Justice

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

*/s/ Walter W. Brown*
WALTER W. BROWN
Senior Litigation Counsel

PHILIP CHARLES STERNHELL
Assistant Director

CARRIE E. ROSATO
PATRICK C. HOLVEY
MATTHEW D. TANNER
LUCY GRACE D. NOYOLA
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C.  20530
Tel:   (202) 307-0341
Fax:   (202) 307-0345

*Attorneys for Plaintiff United States*

40

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>    *Plaintiff–Counterclaim Defendant,*<br><br>v.<br><br>GILEAD SCIENCES, INC.,<br>    *Defendant–Counterclaim Plaintiff,*<br><br>AND GILEAD SCIENCES IRELAND UC,<br>    *Defendant*. | **FILED UNDER SEAL**<br><br>Civil No. 1:19-cv-02103-MN |

**UNITED STATES' RESPONSE TO DEFENDANTS' CONCISE STATEMENT OF
FACTS ACCOMPANYING MOTION FOR SUMMARY JUDGMENT**

LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel:     (302) 573-6277
Fax:    (302) 573-6220
*Laura.hatcher@usdoj.gov*
*Shamoor.anis@usdoj.gov*

Of Counsel:

LENA YUEH
Special Counsel
Department of Justice

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

WALTER W. BROWN
Senior Litigation Counsel

PHILIP CHARLES STERNHELL
Assistant Director
CARRIE E. ROSATO
PATRICK C. HOLVEY
MATTHEW D. TANNER
LUCY GRACE D. NOYOLA
Trial Attorneys
Department of Justice
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C.  20530
Tel:     (202) 307-0341
Fax:    (202) 307-0345

*Attorneys for Plaintiff United States*

**UNITED STATES' RESPONSE TO DEFENDANTS' STATEMENT OF FACTS**

Pursuant to the Scheduling Order, D.I. 27 at 10-11, Plaintiff and Counterclaim Defendant, the United States (the Government) hereby provides its response to Defendants' concise statement of facts accompanying its motion for summary judgment ("Motion," D.I. 346):

**I.    The Government provided evidence of direct infringement for Descovy®**

1.    It is undisputed only that Dr. Murphy has never formally written a prescription of Descovy® for PrEP.  He has determined that Descovy® for PrEP was appropriate for several of his patients at the Northwestern Memorial Hospital, he discussed the instructions in the Descovy® package insert with his patients, and he referred those patients to the Howard Brown Health Center in Chicago, which is a clinic that assists his patients in obtaining medication and testing in a more affordable manner than Northwestern.  Ex. C at 116-19.

2.    Undisputed for purposes of this Motion, but immaterial.

3.    Undisputed for purposes of this Motion, but immaterial.

4.    Undisputed.

5.    It is undisputed only that the REMS surveys cited by the Government involved Truvada for PrEP®" because they were completed before Descovy for PrEP® was FDA approved. But the REMS surveys are highly relevant to the infringing use of Descovy for PrEP® at least because Truvada for PrEP® and Descovy for PrEP® and are prescribed by the same relevant physician population and used by the same relevant patient population.  Ex. A at ¶ 162; Ex. B at ¶¶ 265, 288; Ex. C at 148, 76-77; Ex. D at ¶ 130; Ex. H at 256-59; Ex. G at 378-379, 556-57.  In 2019, FDA determined that REMS were no longer necessary for Truvada for PrEP® and not required for Descovy for PrEP®.  Ex. A at ¶ 162; Ex. D at ¶ 130.

II.     **Prosecution history estoppel does not bar infringement of Claim 13 of the '509 patent by Descovy®**

6.      This statement contains a conclusion of law regarding literal infringement.  To the extent a response is required, it is undisputed that the Government does not assert that Gilead's activities related to Descovy for PrEP® literally infringe the "tenofovir ester" limitation of Claim 13 of the '509 Patent.

7.      Undisputed.

8.      This statement contains a conclusion of law regarding literal infringement.  To the extent a response is required, it is undisputed that the referenced claims literally covered TAF.

9.      Undisputed.

10.     This statement contains a conclusion of law regarding literal infringement.  To the extent a response is required, it is undisputed that the referenced claims literally covered methods of using TAF.

11.     This statement contains a conclusion of law regarding literal infringement.  To the extent a response is required, it is undisputed that the Government does not assert that Gilead's activities related to Descovy® for PrEP literally infringe the referenced claim limitations.

12.     This statement contains a conclusion of law regarding literal infringement.  To the extent a response is required, it is undisputed that the Government does not assert that Gilead's activities related to Descovy® for PrEP literally infringe the allowed claims.

13.     Disputed.  The Government consistently indicated that its patentability arguments applied generally to all tenofovir prodrugs.  Defs' Ex. 11 at 576, 572; Ex. I at ¶¶ 46-47.

14.     Disputed.  The cited unexpected results may have involved TDF and FTC, but the Examiner applied those results broadly to both the non-prodrug tenofovir, and other tenofovir ester prodrugs besides TDF.  Defs' Ex. 11 at 783, 785-87; Ex. I at ¶¶ 48-49; Ex. O at ¶ 86.

2

15.     It is undisputed only that TAF was among the tenofovir prodrugs that were disclosed in the closest prior art identified by the Examiner.  Ex. O at ¶ 51; D.I. 108-5 at Appx4017-18, Appx4031.

### III.   Claims 3 and 13 of the '509 patent are not invalid for improper dependency

16.     Disputed.  Claim 3 narrows claim 2 as the "adult human" must also be a "male adult primate," such that claim 3 is directed to a "male adult human."  Ex. J at ¶¶ 365-68.

### IV.   The asserted "tenofovir prodrug" claims are enabled

17.     Disputed.  There is little functional breadth because the challenged claims limit the prodrug to one function:  molecules that generate tenofovir after administration.  Ex. L at ¶130; Defs' Ex. 24 at 4:64-5:4 (defining prodrug).  Tenofovir prodrugs had a well-understood and well-studied function with many exemplary species known in the art.  Ex. L at ¶¶129, 50-84.

18.     Disputed.  The cited portions of the Thakker transcript do not support Gilead's statement.  The statement is vague and ambiguous as to "potential tenofovir prodrugs."  The claims do not require that a POSA discover all "potential tenofovir prodrugs," and Gilead's own patent documents admit that assessing tenofovir prodrug candidates was well-known in the art.  Ex. L at ¶ 119; Ex. P at -204 (¶ [0070]).  In view of the specification, a POSA would only need "to test the known tenofovir esters/prodrugs in the prior art through routine testing to confirm which esters/prodrugs would be efficacious for pre-exposure prophylaxis," Ex. L at ¶ 123, and a POSA would have been able to use known working examples of tenofovir prodrugs that deliver tenofovir after oral administration for the claimed method without undue experimentation.  *Id.* at ¶ 130.

19.     It is undisputed only that the experiments disclosed in the experimental section of the '423 patent use TDF as a tenofovir prodrug.  Defs' Ex. 26 at 7:32-11:24.

20.     Disputed.  The statement is vague and ambiguous as to "other tenofovir prodrug."  The claims do not require that a POSA identify all tenofovir prodrugs, and Gilead's own patent

documents admit that assessing tenofovir prodrug candidates was well-known in the art.  Ex L at ¶119; Ex. TT at -204 (¶ [0070]).  In view of the specification, a POSA (1) would only need "to test the known tenofovir esters/prodrugs . . . through routine testing to confirm which esters/prodrugs would be efficacious for pre-exposure prophylaxis," Ex. L at ¶ 123, and (2) would have been able to use known working examples of tenofovir prodrugs that deliver tenofovir in the body after oral administration for the claimed method without undue experimentation.  *Id.* at ¶ 130.

21.      Disputed.  The statement is vague and ambiguous as to "other tenofovir prodrug." The '423 patent discloses tenofovir prodrugs.  Defs' Ex. 24 at 4:44-5:4.  It is immaterial that the '423 patent does not disclose chemical structures or syntheses of tenofovir prodrugs because tenofovir prodrugs were well-known in the prior art.  Ex. L at ¶¶ 67-84.

22.      It is undisputed only that different tenofovir prodrugs can have different chemical biological, and other properties.  However, Gilead's own patent documents admit that assessing tenofovir prodrug candidates was well-known in the art.  Ex. L at ¶119; Ex. TT at -204 (¶ [0070]). In view of the specification, a POSA would only need "to test the known tenofovir esters/prodrugs in the prior art through routine testing to confirm which esters/prodrugs would be efficacious for pre-exposure prophylaxis," Ex. L at ¶123, and a POSA would have been able to use known working examples of tenofovir prodrugs that deliver tenofovir in the body after oral administration for the claimed method without undue experimentation.  *Id.* at ¶ 130.

23.      It is undisputed only that TDF was the only tenofovir prodrug that had been tested in humans and FDA approved by January 31, 2007.  However, testing in humans and FDA approval are not required for patentability.  Ex. M at ¶¶ 94-97.  There were more than "only nine tenofovir prodrugs" in the prior art.  Ex. L at ¶¶ 77-84.

24.      Disputed.  The cited portions of the Johnson transcript do not support Gilead's

incredibly broad statement all animal studies require dedicated facilities, dedicated staff, eight to 10 animals, and cost hundreds of thousands of dollars.  Many animal studies do not have such requirements.  Ex. O at 95-96 (small animals such as rodents); Ex. M at ¶¶ 95-96 (beagle dogs).

## V.  Claims that recite "tenofovir" are enabled

25.  Undisputed.

26.  Undisputed insofar as the statement refers to tenofovir alone not being orally administered to primates.

## VI.  Gilead is liable for willfully inducing infringement by June 2015

27.  Disputed.  Gilead was aware of the '509 Patent when it issued in June 2015 based, *inter alia*, on October 2014 emails from NIH's Laura Prestia informed Gilead of Government patent applications directed to Truvada for PrEP®.  Ex. Q; Ex. S; D.I. 1 at ¶ 234.

## VII.  The asserted claims appropriately claim priority to the 2006 provisional application

28.  It is undisputed only that the Provisional Application includes a provisional cover page, an abstract, a PowerPoint presentation, portions of the FDA website, and a set of claims.  *See generally* Defs' Ex. 33; Defs' Ex. 27 at 326; Defs' Ex. 19 at 326.

29.  Undisputed for purposes of this Motion, but immaterial because the Provisional Application repeatedly discloses oral PrEP using TDF and FTC.  Ex. J at ¶¶ 109, 111.

30.  The statement is vague and ambiguous as to "large number of potential combinations of drugs."  Defs' Ex. 27 at 311-12.  It is undisputed only that Provisional Application claims 1 and 14 encompass a number of combinations of drugs.

31.  This statement is vague and ambiguous as to "antiviral regimen."  It is undisputed only that an antiviral administered subcutaneously will not necessarily be effective when administered orally.  The Provisional Application contains appropriate data to show possession of oral PrEP.  *See* Ex. U at 303-05, 313; Ex. L at ¶ 90.  That data includes the experimental results

demonstrating effective PrEP using the combination of tenofovir and FTC in a macaque animal model, which is highly relevant for oral PrEP. *Id.*; *see also* Ex. M at ¶¶ 97, 21-29, 44-48, 59-63; Ex. J at ¶ 109; Defs' Ex. 33 at -63, -66-67, -69, -73.

## VIII.   GSIUC works in concert with GSI to induce infringement

32.     Undisputed for purposes of this Motion, but immaterial.  In addition to these activities, GSIUC works in concert with GSI to market, advertise, and promote Truvada® and Descovy® for PrEP.  *See generally* Ex. W at GILDDE02684504-05; Ex. Y (listing Truvada as packaged product); Ex. AA at GILDDE02684447 (Section 5.2); Exs. BB-DD (GSIUC's trademarks); Ex. II at ¶¶ 27-28; Ex. MM at ¶¶ 11-12, 34, 118-74.

33.     Disputed.  This statement is vague and ambiguous as to the entity referenced by "Gilead."  GSI and GSIUC work in concert to market, advertise, and promote Truvada® and Descovy® for PrEP.  *See id.*

34.     Undisputed.

35.     Undisputed for purposes of this Motion, but immaterial.  GSIUC works in concert with GSI to market, advertise, and promote Truvada® and Descovy® for PrEP as described above in response to statements 32 and 33.

36.     Undisputed for purposes of this Motion, but immaterial.  GSIUC works in concert with GSI to market, advertise, and promote Truvada® and Descovy® for PrEP as described above in response to statements 32, 33 and 35.

37.     Disputed.  GSIUC works in concert with GSI to advertise and promote Truvada® and Descovy® for PrEP as described above in response to statements 32, 33, 35, and 36.

38.     Disputed.  GSIUC works in concert with GSI to market, advertise, promote, and provide instructions regarding Truvada® and Descovy® for PrEP as described above in response to statements 32, 33, and 35-37.

6

Dated: November 28, 2022

LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel:    (302) 573-6277
Fax:    (302) 573-6220
*Laura.hatcher@usdoj.gov*
*Shamoor.anis@usdoj.gov*


Of Counsel:
LENA YUEH
Special Counsel
U.S. Department of Justice

Respectfully submitted,

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

*/s/ Walter W. Brown*
WALTER W. BROWN
Senior Litigation Counsel

PHILIP CHARLES STERNHELL
Assistant Director

CARRIE E. ROSATO
PATRICK C. HOLVEY
MATTHEW D. TANNER
LUCY GRACE D. NOYOLA
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C.  20530
Tel:    (202) 307-0341
Fax:    (202) 307-0345

*Attorneys for Plaintiff United States*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>    *Plaintiff–Counterclaim Defendant*,<br><br>    v.<br><br>GILEAD SCIENCES, INC.,<br>    *Defendant–Counterclaim Plaintiff,*<br><br>AND GILEAD SCIENCES IRELAND UC,<br>    *Defendant*. | **FILED UNDER SEAL**<br><br>Civil No. 1:19-cv-02103-MN |

**UNITED STATES' CONCISE STATEMENT OF MATERIAL FACTS TO WHICH
THERE IS A GENUINE ISSUE TO BE TRIED**

LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel:   (302) 573-6277
Fax:   (302) 573-6220
*Laura.hatcher@usdoj.gov*
*Shamoor.anis@usdoj.gov*


Of Counsel:

LENA YUEH
Special Counsel
Department of Justice

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

WALTER W. BROWN
Senior Litigation Counsel

PHILIP CHARLES STERNHELL
Assistant Director
CARRIE E. ROSATO
PATRICK C. HOLVEY
MATTHEW D. TANNER
LUCY GRACE D. NOYOLA
Trial Attorneys
Department of Justice
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C.  20530
Tel:   (202) 307-0341
Fax:   (202) 307-0345

*Attorneys for Plaintiff United States*

**UNITED STATES' CONCISE STATEMENT OF MATERIAL FACTS TO BE TRIED**

Pursuant to the Scheduling Order, D.I. 27 at 10-11, Plaintiff and Counterclaim Defendant, the United States (the Government) hereby provides its concise statement of material facts as to which there is a genuine issue to be tried in opposition of Defendants' motion for summary judgment (D.I. 345) as follows:

**I.     The Government provided evidence of direct infringement for Descovy®**

1.     There were an estimated 1,405,359 prescriptions of Descovy® for PrEP between October 2019 through August 2021, and an average of 76,618 active Descovy® for PrEP patients during that time period.  Ex. A at ¶ 159; GILDDE02642770 at tab "DVY."

2.     Most patients requesting a prescription for Descovy® for PrEP plan to use it for PrEP.  Ex. G at 458.

3.     Patients adhere to the instructions for taking Descovy® for PrEP according to the product label.  Ex. B at ¶¶ 240-45, 283-86; Ex. A at ¶¶ 182-86; Ex. D at ¶¶ 128-130, 68-79.

4.     Descovy® for PrEP patients are exposed or potentially exposed to HIV.  Ex. B at ¶¶ 251-55, 287-90; Ex. A at ¶¶189-214, 228-51; Ex. D at ¶¶ 128-30, 80-107.

5.     Descovy® for PrEP patients remain HIV negative while taking their Descovy® medication.  Ex. B at ¶¶ 246-50, 291-96; Ex. A at ¶¶ 187-88, 252-253; Ex. D at ¶¶ 128-30, ¶¶108-116; Ex. G at 374-75, 388.

6.     Descovy® and Truvada® for PrEP are prescribed by the same relevant physician population and used by the same relevant patient population.  Ex. A at ¶ 162; Ex. B at ¶¶ 265, 288; Ex. C at 148, 76-77; Ex. D at ¶ 130; Ex. H at 256-57, 258-59; Ex. G at 378-79, 556-57.

**II.    Prosecution history estoppel does not bar infringement of Claim 13 of the '509 patent by Descovy®**

7.     The Government's 2014 amendment and response made during prosecution of the

1

'509 Patent indicated that its arguments for patentability applied generally to tenofovir prodrugs rather than to just tenofovir or tenofovir esters.  Defs' Ex. 11 at 565, 567, 572, 576; Ex. I at ¶¶ 46-47.

8.      The Examiner's Notice of Allowance for the '509 patent confirmed that the reasons for allowing the claims were not limited to tenofovir or any particular tenofovir prodrug.  D.I. 345, Defs' Ex. 11 at 783, 785-87; Ex. I at ¶¶ 48-49; Ex. O at ¶86.

**III.    Claims 3 and 13 of the '509 patent are not invalid for improper dependency**

9.      Claim 3 narrows claim 2 because the "adult human" from claim 2 must also be a "male adult primate" in claim 3 such that claim 3 is directed to a "male adult human."  Ex. J at ¶¶ 365-68.

10.     Claim 13 is narrower than claim 12 because the primate host of claim 13 has two characteristics:  (1) the primate host must be administered the combination of drugs prior to a potential exposure via the express language of claim 13, and (2) the primate host must be an uninfected human via the express language of claim 12, step (a).  Ex. J at ¶¶ 374-75.

**IV.    The asserted "tenofovir prodrug" claims are enabled**

11.     The POSA would have been an individual or part of a research team developing antiretroviral treatments for HIV or similar viruses in a clinical, pre-clinical, and/or laboratory setting.  Ex. J at ¶ 36-38.

12.     The challenged claims include a structural feature for the "tenofovir prodrug" limitation, which is the active tenofovir molecule itself.  '423 Patent claims 1, 3, 12, 18, and 19 Defs' Ex. 24 at 12:65-14:40.  The "tenofovir prodrug" limitation has a known function of generating tenofovir after administration.  Ex. L at ¶ 130; Defs' Ex. 24 at 4:64-5:4 (defining prodrug).

13.     Exemplary species of tenofovir prodrugs were known in the prior art.  Ex. L at ¶¶

129, 126, 50-84.

14.     A POSA would have been aware of tenofovir prodrugs that could have been utilized to deliver active tenofovir in the body, and it was known in the art to select potential prodrug candidates based on routine laboratory testing directed towards bioavailability.  Ex. L at ¶¶114-16, 119, 69-84.

15.     A POSA could have used the animal model disclosed by the inventors to confirm efficacy of tenofovir prodrugs for PrEP and adjust dosing for efficacy in humans through routine testing.  Ex. L at ¶¶ 117, 123-24, 127; Ex. M at ¶¶ 97, 103, 106-07.

**V.     Claims that recite "tenofovir" are enabled**

16.     The "tenofovir" recited by the asserted claims does not amount to a significant number of inoperative embodiments in view of the entirety of the claimed method.  Ex. L at ¶ 130; D.I. 345 at 2, 12, 13, 15; Ex. G at 317; Ex. N at ¶¶ 341, 345-50, 2240.  There were many different tenofovir prodrugs/esters that could have been utilized to deliver the active tenofovir in the body, which was described in the prior art.  Ex. L at ¶¶ 114-17, 67-84.

17.     The POSA possessed information to limit the claims to operative embodiments. D.I. 108-5, Appx4392-406 at Appx4397 (¶17); Ex. N at ¶ 2263; Defs' Ex. 27 at 22:16-23:4; Defs' Ex. 28 at 209; Ex. L at ¶ 95.

**VI.     Gilead is liable for willfully inducing infringement by June 2015**

18.     On October 23, 2014, NIH's Laura Prestia sent identical emails to Dr. Jay Parrish, a member of Gilead's Corporate Development group, Ex. Q, and to Dr. Linda Higgins, Gilead's Vice-President of Biology, Ex. S.  The Prestia email identifies Gilead as an "ideal partner for a technology developed by Dr. Walid Heneine at [CDC]."  *Id.*  It further states that CDC has shown that the daily use of Truvada for PrEP "significantly increases the level of protection against HIV transmission" and that it "is pursuing U.S. and foreign patent protection []."  *Id.*

**VII.    The asserted claims appropriately claim priority to the 2006 provisional application**

19.     The Provisional Application includes experimental results demonstrating effective PrEP using the combination of tenofovir and FTC in a macaque animal model, which is relevant for oral PrEP.  Ex. M at ¶¶ 97, 21-29, 44-48, 59-63; Ex. J at ¶ 109; Ex. U at 303-05, 313; Ex. L at ¶ 90; Defs' Ex. 33 at -63, -66-67, -69, -73.

20.     The Provisional Application discloses oral PrEP using TDF and FTC.  Defs' Ex. 33 at -76, -82-83; Ex. J at ¶ 109; Ex. B at ¶ 82.

21.     The Provisional Application does not express skepticism about the use of Truvada® for PrEP.  Ex. M at ¶¶ 98-101; Ex. J at ¶ 111.

22.     The data from the Provisional Application led to two clinical trials switching from TDF-monotherapy to oral combinations of TDF and FTC.  Ex. J at ¶ 332; Ex. M at ¶ 106.

**VIII.    GSIUC works in concert with GSI to induce infringement**

23.     Gilead's PrEP products for the U.S. market are affixed with labels by contract packagers as set forth in a "Packaging Agreement."  Ex. W at GILDDE02684505 (¶ 3.8).  GSI and GSIUC are both parties to the Packaging Agreement.  *Id.* at GILDDE02684500 (collectively referenced as "Company").

24.     Under the Packaging Agreement, GSI and GSIUC are jointly ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* at GILDDE02684505.

25.     GSIUC is also the sole owner of the U.S. trademarks for Descovy for PrEP® used in FDA-approved labeling for that product.  *See* Ex. BB; Ex. CC.

26.     In a case filed against alleged counterfeiters, GSI and GSIUC jointly pled that together they "used and [are] currently using [certain Gilead trademarks] . . . in commerce in connection with its sale of PrEP medication, . . ."  Ex. II at ¶ 27.

Dated: November 28, 2022

Respectfully submitted,

LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel:    (302) 573-6277
Fax:    (302) 573-6220
*Laura.hatcher@usdoj.gov*
*Shamoor.anis@usdoj.gov*


Of Counsel:
LENA YUEH
Special Counsel
U.S. Department of Justice

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

*/s/ Walter W. Brown*
WALTER W. BROWN
Senior Litigation Counsel

PHILIP CHARLES STERNHELL
Assistant Director

CARRIE E. ROSATO
PATRICK C. HOLVEY
MATTHEW D. TANNER
LUCY GRACE D. NOYOLA
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C.  20530
Tel:    (202) 307-0341
Fax:    (202) 307-0345

*Attorneys for Plaintiff United States*