# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,
    *Plaintiff–Counterclaim Defendant*,

    v.

GILEAD SCIENCES, INC.,
    *Defendant–Counterclaim Plaintiff,*

AND GILEAD SCIENCES IRELAND
UC,
    *Defendant*.

C.A. No. 1:19-cv-02103-MN

**<u>REPLY EXPERT REPORT OF ROBERT L. MURPHY, M.D.</u>**

**<u>ON INFRINGEMENT OF THE ASSERTED CLAIMS BY GILEAD</u>**

RESTRICTED INFORMATION

# TABLE OF CONTENTS

**Page No.**

I.     INTRODUCTION ........................................................................................................ 1

II.    EXPERIENCE AND QUALIFICATIONS ................................................................ 1

III.   MATERIALS CONSIDERED .................................................................................... 2

IV.    PRESCRIPTION AND USE OF TRUVADA DIRECTLY INFRINGE THE ASSERTED
       CLAIMS ....................................................................................................................... 2

       A.    Discussion Regarding Patients and Prescriptions of Truvada for PrEP ................ 2

       B.    Gilead's REMS Submissions for Truvada ............................................................. 3

             1.    Prescriber Knowledge, Attitude and Behavior (KAB) Survey Results ...... 5

             2.    Uninfected Individual (UI) Knowledge, Attitude and Behavior (KAB)
                   Survey Results ......................................................................................... 14

             3.    Additional Survey Data Collected by Gilead Support the REMS Data.... 20

       C.    Prescription and Use of Truvada Directly Infringes Claim 13 of the '509, '333,
             and '191 Patents and Claim 12 of the '423 Patent [prior to a potential exposure
             claims]................................................................................................................... 29

             1.    "A process for inhibiting establishment of a human immunodeficiency
                   virus self replicating infection of human immunodeficiency virus infection
                   in a human…" ........................................................................................... 29

             2.    Step (a): "selecting an uninfected human that does not have the self-
                   replicating infection" ................................................................................ 48

             3.    Step (b): "administering to the uninfected human a combination
                   comprising: i. a pharmaceutically effective amount of emtricitabine; and
                   ii. a pharmaceutically effective amount of tenofovir or tenofovir ester [or
                   tenofovir disoproxil fumarate or a tenofovir prodrug]" ........................... 50

             4.    "thereby inhibiting the establishment of the self-replicating infection with
                   the immunodeficiency virus in the human" ............................................... 53

             5.    "wherein the combination is administered prior to [a] potential exposure of
                   the human to the human immunodeficiency retrovirus" ........................... 54

       D.    Prescription and Use of Truvada Directly Infringes Claims 13 and 14 of the '423
             Patent..................................................................................................................... 77

       E.    Prescription and Use of Truvada Directly Infringes Claim 18 of the '423 Patent 87

       F.    Prescription and Use of Truvada Directly Infringes Claims 17 and 18 of the '191
             Patent..................................................................................................................... 87

G.     Prescription and Use of Truvada Directly Infringes Claim 1 of the '509, '333, and '423 Patents [prior to an exposure claims] .......................................................... 90

     1.     "A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus…" ........................................................ 90

     2.     Step (a): "selecting a primate host not infected with the immunodeficiency retrovirus" .............................................................................................. 98

     3.     Step (b): "administering directly to an uninfected primate host a combination comprising: i. a pharmaceutically effective amount of emtricitabine; and ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate [or a tenofovir prodrug]" ........................... 98

     4.     "wherein the combination is administered prior to an [the] exposure of the primate host to the immunodeficiency retrovirus" .................................... 99

     5.     "thereby protecting the primate host from infection with the immunodeficiency retrovirus" .............................................................. 121

H.     Prescription and Use of Truvada Directly Infringes Claims 2 and 3 of the '509, '333, and '423 Patents ...................................................................................... 122

I.     Prescription and Use of Truvada Directly Infringes Claim 8 of the '509 Patent 123

J.     Prescription and Use of Truvada Directly Infringes Claim 19 of the '423 Patent ................................................................................................................... 126

K.     Prescription and Use of Truvada Directly Infringes Claim 9 of the '509 and '423 Patents ................................................................................................................. 127

V.     PRESCRIPTION AND USE OF DESCOVY DIRECTLY INFRINGE THE ASSERTED CLAIMS ................................................................................................................ 129

A.     Discussion Regarding Patients and Prescriptions of Descovy for PrEP............. 129

B.     Prescription and Use of Descovy Directly Infringes Claim 13 of the '509 Patent and Claim 12 of the '423 Patent [prior to a potential exposure claims] ............. 130

     1.     "A process for inhibiting establishment of a human immunodeficiency virus self replicating infection of human immunodeficiency virus infection in a human…" ...................................................................................... 130

     2.     Step (a): "selecting an uninfected human that does not have the self-replicating infection" ...................................................................... 148

     3.     Step (b): "administering to the uninfected human a combination comprising: i. a pharmaceutically effective amount of emtricitabine; and ii. a pharmaceutically effective amount of tenofovir or tenofovir ester [or tenofovir disoproxil fumarate or a tenofovir prodrug]" ........................ 150

     4.     "thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human" ........................................... 153

RESTRICTED INFORMATION

5.      "wherein the combination is administered prior to [a] potential exposure of the human to the human immunodeficiency retrovirus".......................... 154

C.      Prescription and Use of Descovy Directly Infringes Claims 13 and 14 of the '423 Patent.................................................................................................................... 175

D.      Prescription and Use of Descovy Directly Infringes Claim 18 of the '423 Patent .................................................................................................................................. 185

E.      Prescription and Use of Descovy Directly Infringes Claim 1 of the '423 Patent [prior to the exposure claim]........................................................................................ 185

1.      "A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus…" ........................................................ 185

2.      Step (a): "selecting a primate host not infected with the immunodeficiency retrovirus" ....................................................................................................... 185

3.      Step (b): "administering directly to an uninfected primate host a combination comprising: i. a pharmaceutically effective amount of emtricitabine; and ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate [or a tenofovir prodrug]"......................... 185

4.      "wherein the combination is administered prior to the exposure of the primate host to the immunodeficiency retrovirus" ................................. 186

5.      "thereby protecting the primate host from infection with the immunodeficiency retrovirus" ................................................................ 204

F.      Prescription and Use of Descovy Directly Infringes Claims 2 and 3 of the '423 Patent.................................................................................................................... 205

G.      Prescription and Use of Descovy Directly Infringes Claim 19 of the '423 Patent .................................................................................................................................. 206

H.      Prescription and Use of Descovy Directly Infringes Claim 9 of the '423 Patent 206

VI.     PHYSICIANS AND PATIENTS JOINTLY INFRINGE THE ASSERTED CLAIMS  208

A.      Physicians are vicariously liable for the actions of their patients taking Truvada for PrEP....................................................................................................................... 209

1.      Reply to Flexner Rebuttal Report statements about physicians not conditioning receipt of Truvada for PrEP on patients exposing or potentially exposing themselves to HIV ................................................. 209

2.      Physicians establish the manner or timing of patients taking Truvada for PrEP ............................................................................................................... 211

B.      Reply to Flexner Rebuttal Report statements about lack of a joint enterprise between physicians and patients taking Truvada for PrEP................................ 211

C.      Physicians are vicariously liable for the actions of their patients taking Descovy for PrEP....................................................................................................................... 213

1.    Reply to Flexner Rebuttal Report statements about physicians not conditioning receipt of Descovy for PrEP on patients exposing or potentially exposing themselves to HIV ................................................. 213

2.    Physicians establish the manner or timing of patients taking Descovy for PrEP ................................................................................................... 214

D.    Reply to Flexner Rebuttal Report statements about lack of a joint enterprise between physicians and patients taking Descovy for PrEP ................................ 215

VII.   GILEAD INDUCES INFRINGEMENT OF THE ASSERTED CLAIMS .................. 216

A.    Gilead Induces Infringement of the Asserted Claims for Truvada .................... 216

1.    Gilead induces direct infringement through the Truvada Insert ............. 217

2.    Gilead induces direct infringement through REMS ............................... 218

3.    Gilead induces direct infringement through its websites ....................... 219

4.    Gilead induces direct infringement through its marketing materials ...... 221

5.    Gilead's knowledge that it was inducing infringement .......................... 222

6.    Direct infringement was caused by Gilead ............................................. 223

B.    Gilead Induces Infringement of the Asserted Claims for Descovy ................... 224

1.    Gilead induces direct infringement through the Descovy Insert ............ 224

2.    Gilead induces direct infringement through its websites ....................... 225

3.    Gilead induces direct infringement through its marketing materials ...... 227

4.    Gilead's knowledge that it was inducing infringement .......................... 228

5.    Direct infringement was caused by Gilead ............................................. 229

VIII.  GSIUC INDUCES INFRINGEMENT OF THE ASSERTED CLAIMS ....................... 230

IX.    THE INVENTORS HAD POSSESSION OF THE CLAIMED INVENTION AT THE TIME OF FILING THE PROVISIONAL APPLICATION ON FEB. 3, 2006 .............. 230

X.     TAF MEETS THE TERM "TENOFOVIR ESTER" AS USED IN CLAIM 13 OF THE '509 PATENT UNDER THE DOCTRINE OF EQUIVALENTS ................................. 230

XI.    INFRINGEMENT OF CLAIM 13 OF THE '509 PATENT UNDER THE DOCTRINE OF EQUIVALENTS IS NOT BARRED BY PROSECUTION HISTORY ESTOPPEL OR THE DISCLOSURE-DEDICATION DOCTRINE ................................................. 231

XII.   ADDITIONAL COMMENT ....................................................................... 231

RESTRICTED INFORMATION

## I.        INTRODUCTION

1.        I, Robert L. Murphy, M.D., submit this report under Federal Rule of Civil Procedure 26(a)(2)(B) on behalf of the United States of America (the "Government").

2.        I previously submitted an opening expert report in this matter on March 18, 2022 setting forth my opinions relating to the infringement of the '509, '333, '191, and '423 patents by Gilead's Truvada and Descovy products when administered as PrEP regimens (hereinafter, my "Opening Report").  I have since reviewed the rebuttal report of Dr. Charles W. Flexner, dated May 16, 2022 (hereinafter, the "Flexner Rebuttal Report").  I submit this report in reply to certain statements and opinions contained in the Flexner Rebuttal Report regarding infringement of the Asserted Claims.  My reply report does not specifically respond to each and every statement and opinion within the Flexner Rebuttal Report, but that does not mean that I agree with the statements and opinions within the Flexner Rebuttal Report to which I have not specifically responded.

3.        This reply report is based on information currently known to me, my education, knowledge, experience as a physician, as well as my review of the materials cited in this report.  I reserve the right to supplement this report if additional information or additional expert reports are provided to me.

## II.       EXPERIENCE AND QUALIFICATIONS

4.        My expert experience and qualifications, as well as my compensation for time spent working on this matter and previous testimony were described in my Opening Report, which I incorporate by reference.

RESTRICTED INFORMATION

## III.   MATERIALS CONSIDERED

5.   A list of the materials I considered for purposes of my Opening Report were included in Section III of that report.  Materials that I have considered since preparing my Opening Report, include the following documents and materials:

- The Flexner Rebuttal Report submitted by Gilead in this matter;

- The reply expert report of Julia L. Marcus, Ph.D. (hereinafter the "Marcus Reply Report");

- The reply expert report of Andrea Brancale, Ph.D. (hereinafter the "Brancale Reply Report"); and

- Materials cited in this report, in my Opening Report, and my Claim Construction Declaration.

## IV.   PRESCRIPTION AND USE OF TRUVADA DIRECTLY INFRINGE THE ASSERTED CLAIMS

6.   As explained in My Opening Report and as further explained below, the use of Truvada for PrEP according to the Truvada package insert infringes the asserted claims.

### A.   Discussion Regarding Patients and Prescriptions of Truvada for PrEP

7.   Flexner Rebuttal Report ¶¶83-84 take issue with some differences in the estimated numbers of patients and prescriptions of Truvada for PrEP that are reported in various journal articles.  *See, e.g.,* Flexner Rebuttal Report ¶83 ("citations to the aggregate numbers of 'annual users of Truvada for PrEP' and 'estimated number of prescriptions for Truvada for PrEP' vary widely and appear to be irreconcilable in measure").  Notwithstanding any small differences in the estimates of PrEP prescriptions and/or users, there is no doubt that thousands upon thousands of patients have taken Truvada for PrEP in the time period from June 2015 through August 2021. For example, based on estimates of active Truvada for PrEP patients produced in an Excel

2

document by Gilead, there was an average of 106,157 active Truvada for PrEP patients per month from June 2015 through August 2021, with the number of active PrEP patients ranging from a high of 190,102 in August of 2019 to a low of 26,995 in August of 2021. *See* GILDDE02642770 at tab "TVD" cells B30-DZ30. Gilead also estimates that there was a total of 5,636,959 million prescriptions of Truvada for PrEP from June 2015 through August 2021. *See id.* at cells BD35-DZ35. The average number of prescriptions per patient in each month was 0.70 based on Gilead's estimates from June 2015 through August 2021. *See id.* at cells BD40-DZ40. For the reasons discussed in my Opening Report and additionally in this Reply Report, each prescription of Truvada for PrEP according to the package insert infringes the Asserted Claims and each patient using Truvada for PrEP according to the package insert also infringes the Asserted Claims.

**B.    Gilead's REMS Submissions for Truvada**

8.    Flexner Rebuttal Report ¶¶95-122 criticize the REMS data reporting physician and patient usage of Truvada for PrEP that Gilead collected and submitted to the FDA. The REMS assessments were generated by Gilead to provide "a continuing and iterative assessment of the effectiveness of [Gilead's] outreach and education" regarding the use of Truvada for PrEP. *See* GILDDE00236715-7526 at GILDDE00236719 (REMS 1). "The goals for the REMS for Truvada for a PrEP indication are focused on informing and educating prescribers, other HCPs, and individuals at high risk for acquiring HIV-1 infection about the importance of strict adherence to the recommended dosing regimen, the importance of regular monitoring of HIV-1 serostatus, and the fact that Truvada for a PrEP indication must be considered as only a part of a comprehensive prevention strategy." *Id.* at GILDDE00236763. "Gilead has proactively distributed and made available through different mechanisms training and educational material to medical professionals who are likely to prescribe Truvada for a PrEP indication." *Id.* at GILDDE00236764.

RESTRICTED INFORMATION

"Educational material has also been made available to individuals, either through their HCP or from Gilead-sponsored websites." *Id.* at GILDDE00236764.

9.      The Flexner Rebuttal Report asserts that the REMS data "do not establish any actual occurrence of direct infringement by either patients or physicians because they do not even purport to survey actual patient and physician real-world practices." Flexner Rebuttal Report ¶¶102, 108, 114, 118, 122; *see generally id.* at ¶¶95-122.  I disagree with this assertion.  Gilead's REMS include survey results from actual patients and physicians.  For example, Gilead conducted "a web-based phone and paper-based option, self-administered Knowledge, Attitude and Behavior (KAB) survey for prescribers and uninfected individuals taking (or who have recently taken) Truvada for a PrEP indication." *Id.* at GILDDE00236723.  There were five REMS submissions by Gilead:

- REMS Assessment—Period Covered: 16 July 2012 to 15 May 2013 (GILDDE00236715-GILDDE00237526) ("REMS 1")

- REMS Assessment—Period Covered: 16 May 2013 to 15 November 2014 (GILDDE00243874-GILDDE00244563) ("REMS 2")

- REMS Assessment—Period Covered: 16 November 2014 to 15 May 2016 (GILDDE00251496-GILDDE00252071) ("REMS 3")

- REMS Assessment—Period Covered: 16 May 2016 to 15 November 2017 (GILDDE00263067-GILDDE00263700) ("REMS 4")

- REMS Assessment—Period Covered: 16 November 2017 to 09 July 2018 (GILDDE00270528-GILDDE00270916) ("REMS 5").

Below I summarize physician REMS survey results from real-world physician prescribers of Truvada for PrEP, and then I summarize REMS survey results from real-world uninfected individuals that took Truvada for PrEP.

4

### 1. Prescriber Knowledge, Attitude and Behavior (KAB) Survey Results

10.    "The prescriber KAB surveys were conducted among healthcare providers who had prescribed Truvada for a PrEP indication."   GILDDE00236715-7526 at GILDDE00236729 (REMS 1).  The inclusion criteria for prescribers' participation in the survey was "[h]ealthcare professionals in the US who have prescribed Truvada for PrEP."  *Id.*[1]  The healthcare providers that had prescribed Truvada for PrEP understood the following:

| Key Risk Message Target Statement | Number of Correct Responses (%) (95% CI) | Cite for REMS 1-5 |
|---|---|---|
| You should test the HIV-1 status of uninfected individuals taking Truvada for a PrEP indication at least every 3 months. | 95.5 (77.2, 99.9) 88.9 (81.0, 94.3) 99.0 (94.3, 100.0) 95.8 (90.4, 98.6) 100.0 (78.2, 100.0) | GILDDE00236735 (REMS 1) GILDDE00243893 (REMS 2) GILDDE00251514 (REMS 3) GILDDE00263084 (REMS 4) GILDDE00270544 (REMS 5) |
| Uninfected individuals should be counseled that they are at greater risk of acquiring HIV-1 if they miss doses of Truvada for a PrEP indication. | 100.0 (84.6, 100.0) 93.9 (87.3, 97.7) 91.7 (84.2, 96.3) 89.9 (82.9, 94.6) 93.3 (68.1, 99.8) | GILDDE00236735 (REMS 1) GILDDE00243894 (REMS 2) GILDDE00251514 (REMS 3) GILDDE00263084 (REMS 4) GILDDE00270546 (REMS 5) |
| Truvada for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use. | 72.7 (49.8, 89.3) 84.8 (76.2, 91.3) 94.8 (88.3, 98.3) 94.9 (89.3, 98.1) 100.0 (78.2, 100.0) | GILDDE00236736 (REMS 1) GILDDE00243894 (REMS 2) GILDDE00251514 (REMS 3) GILDDE00263084 (REMS 4) GILDDE00270544 (REMS 5) |

11.    Healthcare providers responded to questions about their real-world treatment of patients using Truvada for PrEP as follows:

| I test my patients to confirm that they are HIV-1 negative before prescribing TRUVADA for a PrEP indication. | | |
|---|---|---|
| Yes (%) | No (%) | REMS |
| 95.5 | 4.5 | GILDDE00236790 (REMS 1) |

---

[1] The inclusion criteria for REMS 2-5 were less restrictive because they included healthcare professionals "in the US who have prescribed TRUVADA," which includes prescribers of Truvada for HIV-1 treatment and for PrEP.  *See* GILDDE00243874-4563 at GILDDE00244032 (REMS 2); GILDDE00251496-2071 at GILDDE00251536 (REMS 3); GILDDE00263067-700 at GILDDE00263078 (REMS 4); GILDDE00270528-916 at GILDDE00270540 (REMS 5).

RESTRICTED INFORMATION

| I test the HIV status of my patients for whom I prescribe TRUVADA for a PrEP indication if they develop symptoms that are consistent with an acute HIV-1 infection. | | |
|---|---|---|
| Yes (%) | No (%) | REMS |
| 95.5 | 4.5 | GILDDE00236790 (REMS 1) |
| **I test my patients to confirm that they are HIV-1 negative before prescribing TRUVADA for a PrEP indication.** | | |
| Always (%) | 83.8 | GILDDE00244051 (REMS 2) |
| | 88.5 | GILDDE00251556 (REMS 3) |
| | 99.2 | GILDDE00263125 (REMS 4) |
| | 100.0 | GILDDE00270586 (REMS 5) |
| Sometimes (%) | 4.0 | GILDDE00244051 (REMS 2) |
| | 2.1 | GILDDE00251556 (REMS 3) |
| | 0.8 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| Never (%) | 1.0 | GILDDE00244051 (REMS 2) |
| | 0.0 | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 11.1 | GILDDE00244051 (REMS 2) |
| | 9.4 | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| **I test the HIV status of my patients for whom I prescribe TRUVADA for a PrEP indication if they develop symptoms that are consistent with an acute HIV-1 infection.** | | |
| Always (%) | 86.9 | GILDDE00244051 (REMS 2) |
| | 87.5 | GILDDE00251556 (REMS 3) |
| | 94.9 | GILDDE00263125 (REMS 4) |
| | 100.0 | GILDDE00270586 (REMS 5) |
| Sometimes (%) | 3.0 | GILDDE00244051 (REMS 2) |
| | 1.0 | GILDDE00251556 (REMS 3) |
| | 5.1 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| Never (%) | 0.0 | GILDDE00244051 (REMS 2) |
| | 0.0 | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 10.1 | GILDDE00244051 (REMS 2) |
| | 11.5 | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |
| **How often do you generally test the HIV-1 status of you patients for whom you prescribe TRUVADA for a PrEP indication? (Select one)** | | |
| More than every 3 months (%) | 9.1 | GILDDE00236790 (REMS 1) |
| | 7.1 | GILDDE00244051 (REMS 2) |
| | 4.2 | GILDDE00251556 (REMS 3) |

RESTRICTED INFORMATION

| | | |
|---|---|---|
| | 2.5 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |
| Every 3 months (%) | 86.4 | GILDDE00236790 (REMS 1) |
| | 73.7 | GILDDE00244051 (REMS 2) |
| | 83.3 | GILDDE00251556 (REMS 3) |
| | 93.2 | GILDDE00263125 (REMS 4) |
| | 100.0 | GILDDE00270587 (REMS 5) |
| Less than every 3 months (%) | 4.5 | GILDDE00236790 (REMS 1) |
| | 9.1 | GILDDE00244051 (REMS 2) |
| | 3.1 | GILDDE00251556 (REMS 3) |
| | 3.4 | GILDDE00263126 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 0.0 | GILDDE00236790 (REMS 1) |
| | 10.1 | GILDDE00244051 (REMS 2) |
| | 9.4 | GILDDE00251556 (REMS 3) |
| | 0.8 | GILDDE00263126 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |
| **I counsel my patients for whom I prescribe TRUVADA for a PrEP indication to…** | | |
| Take TRUVADA for a PrEP indication every day, do not miss a dose. | 95.5 % | GILDDE00236791 (REMS 1) |
| | 86.9 | GILDDE00244052 (REMS 2) |
| | 89.6 | GILDDE00251557 (REMS 3) |
| | 98.3 | GILDDE00263126 (REMS 4) |
| | 100.0 | GILDDE00270587 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 0.0 | GILDDE00236791 (REMS 1) |
| | 12.1 | GILDDE00244052 (REMS 2) |
| | 11.5 | GILDDE00251557 (REMS 3) |
| | 0.0 | GILDDE00263126 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |
| **Approximately how many uninfected individuals have you prescribed TRUVADA for a PrEP indication for within the last 6 months?** | | |
| None | 0.0 | GILDDE00236791 (REMS 1) |
| | 13.1 | GILDDE00244053 (REMS 2) |
| | 12.5 | GILDDE00251558 (REMS 3) |
| | 5.1 | GILDDE00263127 (REMS 4) |
| | 0.0 | GILDDE00270588 (REMS 5) |
| 1 to 2 (%) | 40.9 | GILDDE00236792 (REMS 1) |
| | 28.3 | GILDDE00244053 (REMS 2) |
| | 38.5 | GILDDE00251558 (REMS 3) |
| | 32.2 | GILDDE00263127 (REMS 4) |
| | 40.0 | GILDDE00270588 (REMS 5) |
| 3 to 5 (%) | 40.9 | GILDDE00236792 (REMS 1) |
| | 21.2 | GILDDE00244053 (REMS 2) |
| | 20.8 | GILDDE00251558 (REMS 3) |
| | 23.7 | GILDDE00263127 (REMS 4) |
| | 20.0 | GILDDE00270588 (REMS 5) |
| More than 5 (%) | 9.1 | GILDDE00236792 (REMS 1) |

RESTRICTED INFORMATION

| | 36.4 | GILDDE00244053 (REMS 2) |
| | 24.0 | GILDDE00251558 (REMS 3) |
| | 34.7 | GILDDE00263127 (REMS 4) |
| | 40.0 | GILDDE00270588 (REMS 5) |
| I don't remember | 9.1 | GILDDE00236792 (REMS 1) |
| | 1.0 | GILDDE00244053 (REMS 2) |
| | 4.2 | GILDDE00251558 (REMS 3) |
| | 4.2 | GILDDE00263127 (REMS 4) |
| | 0.0 | GILDDE00270588 (REMS 5) |

12.     Although REMS 1 only had 22 healthcare providers participate in the survey, each of the providers specifically prescribed Truvada for PrEP in the US.  *See* GILDDE00236715-7526 at GILDDE00236731.

13.     REMS 2 had a total of 99 healthcare professionals that completed the survey.  *See* GILDDE00243874-4563 at GILDDE00243888-89.  The inclusion criteria for REMS 2 included healthcare professionals "in the US who have prescribed TRUVADA," which includes prescribers of Truvada for HIV-1 treatment and for PrEP.  *See* GILDDE00243874-4563 at GILDDE00244032 (REMS 2).  Between 10-12 prescribers answered that "I have not prescribed TRUVADA for a PrEP indication," which indicates that between 87-89 of the 99 healthcare professionals that completed the survey had prescribed Truvada for PrEP:

**Table 7.     Responses to Preliminary Questions about HIV and Other Laboratory Testing and Patient Counseling**

| Question | Telephone N=16 [1] | | Internet N=79 [1] | | Paper N=4 [1] | | Total N=99 [1] | |
|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % |
| **Question 12: I test my patients for whom I prescribe TRUVADA for a PrEP indication for hepatitis B.** | | | | | | | | |
| Always | 12 | 75.0 | 56 | 70.9 | 3 | 75.0 | 71 | 71.7 |
| Sometimes | 3 | 18.8 | 14 | 17.7 | 1 | 25.0 | 18 | 18.2 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 1 | 6.3 | 9 | 11.4 | 0 | 0.0 | 10 | 10.1 |
| **Question 13: I counsel my patients for whom I prescribe TRUVADA for a PrEP indication to (Select all that apply):** | | | | | | | | |
| Practice safer sex consistently and use condoms correctly. | 15 | 93.8 | 69 | 87.3 | 4 | 100.0 | 88 | 88.9 |
| Know the HIV-1 status of their partner(s). | 15 | 93.8 | 67 | 84.8 | 3 | 75.0 | 85 | 85.9 |
| Ask their partner(s) to get tested for HIV-1 if they don't know their HIV-1 status. | 15 | 93.8 | 63 | 79.7 | 3 | 75.0 | 81 | 81.8 |
| Get tested for other sexually transmitted infections. | 15 | 93.8 | 67 | 84.8 | 3 | 75.0 | 85 | 85.9 |
| Take TRUVADA for a PrEP indication every day, do not miss a dose. | 15 | 93.8 | 67 | 84.8 | 4 | 100.0 | 86 | 86.9 |
| I have not prescribed TRUVADA for a PrEP indication. | 1 | 6.3 | 11 | 13.9 | 0 | 0.0 | 12 | 12.1 |
| **Question 14: I provide information about how to reduce high risk sexual behavior to patients for whom I prescribe TRUVADA for a PrEP indication.** | | | | | | | | |
| Always | 13 | 81.3 | 60 | 75.9 | 3 | 75.0 | 76 | 76.8 |
| Sometimes | 2 | 12.5 | 9 | 11.4 | 1 | 25.0 | 12 | 12.1 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 1 | 6.3 | 10 | 12.7 | 0 | 0.0 | 11 | 11.1 |

*Id.* at GILDDE00244052 (Table 7).

14.     REMS 3 had a total of 96 healthcare professionals that completed the survey.  *See* GILDDE00251496-2071 at GILDDE00251508.   The inclusion criteria for REMS 4 included healthcare professionals "in the United States (US) who have prescribed TRUVADA," which includes prescribers of Truvada for HIV-1 treatment and for PrEP.  *See* GILDDE00251496-2071 at GILDDE00251536 (REMS 3).  Between 8-11 prescribers answered that "I have not prescribed TRUVADA for a PrEP indication," which indicates that between 84-87 of the 96 healthcare professionals that completed the survey had prescribed Truvada for PrEP:

**Table 7.    Responses to Preliminary Questions about HIV and Other Laboratory Testing and Patient Counseling**

| Question | Telephone N=2 [1] | | Internet N=92 [1] | | Paper N=2 [1] | | Total N=96 [1] | |
|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % |
| **Question 8: I test my patients to confirm that they are HIV-1 negative before prescribing TRUVADA for a PrEP indication.** | | | | | | | | |
| Always | 2 | 100.0 | 81 | 88.0 | 2 | 100.0 | 85 | 88.5 |
| Sometimes | 0 | 0.0 | 2 | 2.2 | 0 | 0.0 | 2 | 2.1 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 9 | 9.8 | 0 | 0.0 | 9 | 9.4 |
| **Question 9: I test the HIV status of my patients for whom I prescribe TRUVADA for a PrEP indication if they develop symptoms that are consistent with an acute HIV-1 infection.** | | | | | | | | |
| Always | 0 | 0.0 | 82 | 89.1 | 2 | 100.0 | 84 | 87.5 |
| Sometimes | 1 | 50.0 | 0 | 0.0 | 0 | 0.0 | 1 | 1.0 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 1 | 50.0 | 10 | 10.9 | 0 | 0.0 | 11 | 11.5 |
| **Question 10: How often do you generally test the HIV-1 status of your patients for whom you prescribe TRUVADA for a PrEP indication? (Select one)** | | | | | | | | |
| More frequently than every 3 months | 0 | 0.0 | 4 | 4.3 | 0 | 0.0 | 4 | 4.2 |
| Every 3 months | 1 | 50.0 | 77 | 83.7 | 2 | 100.0 | 80 | 83.3 |
| Less frequently than every 3 months | 1 | 50.0 | 2 | 2.2 | 0 | 0.0 | 3 | 3.1 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 9 | 9.8 | 0 | 0.0 | 9 | 9.4 |
| **Question 11: I test my patients for whom I prescribe TRUVADA for a PrEP indication for other sexually transmitted infections like syphilis and gonorrhea.** | | | | | | | | |
| Always | 2 | 100.0 | 79 | 85.9 | 0 | 0.0 | 81 | 84.4 |
| Sometimes | 0 | 0.0 | 5 | 5.4 | 2 | 100.0 | 7 | 7.3 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 8 | 8.7 | 0 | 0.0 | 8 | 8.3 |

*Id.* at GILDDE00251556 (Table 7).

11
RESTRICTED INFORMATION

15.     REMS 4 had a total of 118 healthcare professionals that completed the survey.  *See* GILDDE00263067-700 at GILDDE00263078-79.  The inclusion criteria for REMS 4 included healthcare professionals "in the US who have prescribed TRUVADA," which includes prescribers of Truvada for HIV-1 treatment and for PrEP.  *See* GILDDE00263067-700 at GILDDE00263078 (REMS 4).  However, zero prescribers answered, "I have not prescribed TRUVADA for a PrEP indication," which indicates that all 118 healthcare professionals that completed the survey had prescribed Truvada for PrEP:

**Table 7.     Responses to Preliminary Questions about HIV-1 and Other Laboratory Testing and Patient Counseling**

| Question | Telephone N=2[1] | | Internet N=116[1] | | Paper N=0[1] | | Total N=118[1] | |
|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % |
| **Question 8: I test my patients to confirm that they are HIV-1 negative before prescribing TRUVADA for a PrEP indication.** | | | | | | | | |
| Always | 2 | 100.0 | 115 | 99.1 | 0 | 0.0 | 117 | 99.2 |
| Sometimes | 0 | 0.0 | 1 | 0.9 | 0 | 0.0 | 1 | 0.8 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **Question 9: I test the HIV status of my patients for whom I prescribe TRUVADA for a PrEP indication if they develop symptoms that are consistent with an acute HIV-1 infection.** | | | | | | | | |
| Always | 2 | 100.0 | 110 | 94.8 | 0 | 0.0 | 112 | 94.9 |
| Sometimes | 0 | 0.0 | 6 | 5.2 | 0 | 0.0 | 6 | 5.1 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

*Id.* at GILDDE00263126-27 (Table 7).  I note that on page GILDDE00263127 one of the 118 surveyed healthcare providers indicated "I have not prescribed TRUVADA for a PrEP indication" in response to Question 10, which appears to have been an error because all 118 healthcare

providers answered questions about their Truvada for PrEP prescription behaviors in response to Questions 8-9 and 11-14. *Id.*

16.     REMS 5 had a total of 15 healthcare professionals complete the survey (active recruitment was terminated after a March 29, 2018 teleconference with the FDA and the survey was closed on July 8, 2018). *See* GILDDE00270528-916 at GILDDE00270540. The inclusion criteria for REMS 5 included healthcare professionals "in the US who have prescribed TRUVADA," which includes prescribers of Truvada for HIV-1 treatment and for PrEP. *See* GILDDE00270528-916 at GILDDE00270540 (REMS 5). However, zero prescribers answered, "I have not prescribed TRUVADA for a PrEP indication," which indicates that all 15 healthcare professionals that completed the survey had prescribed Truvada for PrEP:

**Table 6.     Responses to Preliminary Questions about HIV-1, Other Laboratory Testing, and Patient Counseling**

| Question | Telephone N=1[1] | | Internet N=14[1] | | Paper N=0[1] | | Total N=15[1] | |
|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % |
| **Question 8: I test my patients to confirm that they are HIV-1 negative before prescribing TRUVADA for a PrEP indication.** | | | | | | | | |
| Always | 1 | 100.0 | 14 | 100.0 | 0 | 0.0 | 15 | 100.0 |
| Sometimes | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

*Id.* at GILDDE00270586-87 (Table 6).

17.     On July 1, 2019, the FDA determined that REMS were no longer necessary for Truvada for PrEP because, for example, "the available information indicates that prescribers and uninfected individuals understand the important key messages with regards to appropriate use of emtricitabine/tenofovir disoproxil fumarate for a PrEP indication." *See* GILDDE00271786-88 at GILDDE00271787.

     **2.**     **Uninfected Individual (UI) Knowledge, Attitude and Behavior (KAB) Survey Results**

18.     Uninfected Individuals (UIs) Knowledge, Attitude, and Behavior (KAB) surveys "were conducted with UIs taking Truvada for a PrEP indication that could be identified." GILDDE00236715-7526 at GILDDE00236737 (REMS 1).  The inclusion criteria for UIs to participate in the survey was "[a]dults who are 18 years of age or older and who are taking Truvada for a PrEP indication as part of a comprehensive prevention strategy to reduce the risk of acquiring HIV-1." *Id.*  The UIs that had taken Truvada for PrEP understood the following:

| Key Risk Message Target Statement | Number of Correct Responses (%) (95% CI) | Cite for REMS 1-5 |
|---|---|---|
| Missing any doses of Truvada increases the risk of getting HIV. | 90.0 (55.5, 99.7) | GILDDE00236742 (REMS 1) |
| | 93.2 (84.9, 97.8) | GILDDE00243901 (REMS 2) |
| | 91.8 (88.0, 94.7) | GILDDE00251523 (REMS 3) |
| | 89.4 (82.8, 94.1) | GILDDE00263092 (REMS 4) |
| | 80.0 (28.4, 99.5) | GILDDE00270550 (REMS 5) |
| You must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV. | 90.0 (55.5, 99.7) | GILDDE00236742 (REMS 1) |
| | 95.9 (88.6, 99.2) | GILDDE00243902 (REMS 2) |
| | 98.2 (95.9, 99.4) | GILDDE00251523 (REMS 3) |
| | 98.5 (94.6, 99.8) | GILDDE00263092 (REMS 4) |
| | 100.0 (47.8, 100.0) | GILDDE00270552 (REMS 5) |
| When should you be tested for HIV while taking Truvada?  Before starting Truvada to make sure you are HIV negative. | 90.0 (55.5, 99.7) | GILDDE00236743 (REMS 1) |
| | 98.6 (92.7, 100.0) | GILDDE00243903 (REMS 2) |
| | 99.6 (98.0, 100.0) | GILDDE00251524 (REMS 3) |
| | 99.2 (95.9, 100.0) | GILDDE00263092 (REMS 4) |
| | 100.0 (47.8, 100.0) | GILDDE00270553 (REMS 5) |
| When should you be tested for HIV while taking Truvada?  At least every 3 months while taking Truvada. | 100 (69.2, 100.0) | GILDDE00236743 (REMS 1) |
| | 97.3 (90.6, 99.7) | GILDDE00243903 (REMS 2) |
| | 98.2 (95.9, 99.4) | GILDDE00251524 (REMS 3) |
| | 99.2 (95.9, 100.0) | GILDDE00263092 (REMS 4) |
| | 100.0 (47.8, 100.0) | GILDDE00270553 (REMS 5) |

19.     Uninfected individuals responded to questions about their real-world use of Truvada for PrEP as follows:

| Have you been tested for HIV? | | |
|---|---|---|
| Yes (%) | 100.0 | GILDDE00236952 (REMS 1) |
| | 100.0 | GILDDE00244318 (REMS 2) |

|  | 100.0 | GILDDE00251839 (REMS 3) |
|---|---|---|
|  | 100.0 | GILDDE00263367 (REMS 4) |
|  | 100.0 | GILDDE00270757 (REMS 5) |
| No (%) | 0.0 | GILDDE00236952 (REMS 1) |
|  | 0.0 | GILDDE00244318 (REMS 2) |
|  | 0.0 | GILDDE00251839 (REMS 3) |
|  | 0.0 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270757 (REMS 5) |
| **When was the last time you were tested for HIV?** | | |
| Less than a month ago (%) | 40.0 | GILDDE00236953 (REMS 1) |
|  | 54.1 | GILDDE00244319 (REMS 2) |
|  | 56.2 | GILDDE00251840 (REMS 3) |
|  | 52.3 | GILDDE00263367 (REMS 4) |
|  | 40.0 | GILDDE00270757 (REMS 5) |
| 1 to 3 months ago (%) | 50.0 | GILDDE00236953 (REMS 1) |
|  | 32.4 | GILDDE00244319 (REMS 2) |
|  | 38.1 | GILDDE00251840 (REMS 3) |
|  | 35.6 | GILDDE00263367 (REMS 4) |
|  | 40.0 | GILDDE00270757 (REMS 5) |
| More than 3 months, but less than 6 months ago (%) | 0.0 | GILDDE00236953 (REMS 1) |
|  | 10.8 | GILDDE00244319 (REMS 2) |
|  | 3.6 | GILDDE00251840 (REMS 3) |
|  | 10.6 | GILDDE00263367 (REMS 4) |
|  | 20.0 | GILDDE00270758 (REMS 5) |
| More than 6 months, but less than a year ago (%) | 10.0 | GILDDE00236953 (REMS 1) |
|  | 1.4 | GILDDE00244319 (REMS 2) |
|  | 1.8 | GILDDE00251840 (REMS 3) |
|  | 1.5 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| A year or more ago | 0.0 | GILDDE00236953 (REMS 1) |
|  | 1.4 | GILDDE00244319 (REMS 2) |
|  | 0.0 | GILDDE00251840 (REMS 3) |
|  | 0.0 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| I don't know | 0.0 | GILDDE00236953 (REMS 1) |
|  | 0.0 | GILDDE00244319 (REMS 2) |
|  | 0.0 | GILDDE00251840 (REMS 3) |
|  | 0.0 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| **Since starting taking TRUVADA, how often have you been tested for HIV?** | | |
| Once a month (%) | 0.0 | GILDDE00236953 (REMS 1) |
|  | 9.5 | GILDDE00244319 (REMS 2) |
|  | 6.4 | GILDDE00251840 (REMS 3) |
|  | 4.5 | GILDDE00263367 (REMS 4) |
|  | 20.0 | GILDDE00270758 (REMS 5) |
| Every 3 months (%) | 70.0 | GILDDE00236953 (REMS 1) |

| | | |
|---|---|---|
| | 70.3 | GILDDE00244319 (REMS 2) |
| | 75.4 | GILDDE00251840 (REMS 3) |
| | 77.3 | GILDDE00263367 (REMS 4) |
| | 80.0 | GILDDE00270758 (REMS 5) |
| Every 6 months (%) | 20.0 | GILDDE00236953 (REMS 1) |
| | 8.1 | GILDDE00244319 (REMS 2) |
| | 3.2 | GILDDE00251840 (REMS 3) |
| | 7.6 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| Once a year (%) | 0.0 | GILDDE00236953 (REMS 1) |
| | 0.0 | GILDDE00244319 (REMS 2) |
| | 1.8 | GILDDE00251840 (REMS 3) |
| | 2.3 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| Never | 10.0 | GILDDE00236953 (REMS 1) |
| | 10.8 | GILDDE00244319 (REMS 2) |
| | 12.8 | GILDDE00251840 (REMS 3) |
| | 7.6 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't know | 0.0 | GILDDE00236953 (REMS 1) |
| | 1.4 | GILDDE00244319 (REMS 2) |
| | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| **In the past month, have you missed any doses of TRUVADA?** | | |
| Yes (%) | 40.0 | GILDDE00236953 (REMS 1) |
| | 14.9 | GILDDE00244319 (REMS 2) |
| | 22.1 | GILDDE00251840 (REMS 3) |
| | 25.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| No (%) | 60.0 | GILDDE00236953 (REMS 1) |
| | 81.1 | GILDDE00244319 (REMS 2) |
| | 77.9 | GILDDE00251840 (REMS 3) |
| | 74.2 | GILDDE00263367 (REMS 4) |
| | 100.0 | GILDDE00270758 (REMS 5) |
| I don't know (%) | 0.0 | GILDDE00236953 (REMS 1) |
| | 4.1 | GILDDE00244319 (REMS 2) |
| | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| **How many doses of TRUVADA have you missed in the past month? (All percentages are based on answers from only UIs who missed doses.)** | | |
| 1-3 doses (%) | 75.0 | GILDDE00236954 (REMS 1) |
| | 63.6 | GILDDE00244319 (REMS 2) |
| | 83.9 | GILDDE00251841 (REMS 3) |
| | 81.8 | GILDDE00263367 (REMS 4) |

16
RESTRICTED INFORMATION

|  | 0.0 | GILDDE00270758 (REMS 5) |
|---|---|---|
| 4-7 doses (%) | 0.0 | GILDDE00236954 (REMS 1) |
|  | 18.2 | GILDDE00244319 (REMS 2) |
|  | 12.9 | GILDDE00251841 (REMS 3) |
|  | 9.1 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| 8-12 doses (%) | 0.0 | GILDDE00236954 (REMS 1) |
|  | 9.1 | GILDDE00244319 (REMS 2) |
|  | 3.2 | GILDDE00251841 (REMS 3) |
|  | 9.1 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| More than 12 doses (%) | 25.0 | GILDDE00236954 (REMS 1) |
|  | 0.0 | GILDDE00244319 (REMS 2) |
|  | 0.0 | GILDDE00251841 (REMS 3) |
|  | 0.0 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| I don't remember | 0.0 | GILDDE00236954 (REMS 1) |
|  | 9.1 | GILDDE00244319 (REMS 2) |
|  | 0.0 | GILDDE00251841 (REMS 3) |
|  | 0.0 | GILDDE00263368 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| **Are you sexually active?** |  |  |
| Yes (%) | 100.0 | GILDDE00236954 (REMS 1) |
|  | 94.6 | GILDDE00244320 (REMS 2) |
|  | 98.9 | GILDDE00251841 (REMS 3) |
|  | 94.7 | GILDDE00263368 (REMS 4) |
|  | 100.0 | GILDDE00270758 (REMS 5) |
| No (%) | 0.0 | GILDDE00236954 (REMS 1) |
|  | 2.7 | GILDDE00244320 (REMS 2) |
|  | 1.1 | GILDDE00251841 (REMS 3) |
|  | 3.8 | GILDDE00263368 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| Prefer not to answer | 0.0 | GILDDE00236954 (REMS 1) |
|  | 2.7 | GILDDE00244320 (REMS 2) |
|  | 0.0 | GILDDE00251841 (REMS 3) |
|  | 1.5 | GILDDE00263368 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| **Do you know the HIV status of your sexual partner?** |  |  |
| Yes, I known the HIV status of my sexual partner(s) (%) | 60.0 | GILDDE00236954 (REMS 1) |
|  | 50.0 | GILDDE00244320 (REMS 2) |
|  | 43.5 | GILDDE00251841 (REMS 3) |
|  | 40.0 | GILDDE00263368 (REMS 4) |
|  | 60.0 | GILDDE00270759 (REMS 5) |
| I know the HIV status of some of my sexual partners. (%) | 40.0 | GILDDE00236954 (REMS 1) |
|  | 41.4 | GILDDE00244320 (REMS 2) |
|  | 49.6 | GILDDE00251841 (REMS 3) |

RESTRICTED INFORMATION

|  | 52.0 | GILDDE00263368 (REMS 4) |
|---|---|---|
|  | 40.0 | GILDDE00270759 (REMS 5) |
| No, I don't know the HIV status of my sexual partner(s). | 0.0 | GILDDE00236954 (REMS 1) |
|  | 8.6 | GILDDE00244320 (REMS 2) |
|  | 6.8 | GILDDE00251841 (REMS 3) |
|  | 8.0 | GILDDE00263368 (REMS 4) |
|  | 0.0 | GILDDE00270759 (REMS 5) |
| **Did you use a condom the last time you had sex?** | | |
| Yes (%) | 20.0 | GILDDE00236955(REMS 1) |
|  | 35.7 | GILDDE00244321 (REMS 2) |
|  | 34.2 | GILDDE00251842 (REMS 3) |
|  | 29.6 | GILDDE00263368 (REMS 4) |
|  | 0.0 | GILDDE00270759 (REMS 5) |
| No (%) | 80.0 | GILDDE00236955 (REMS 1) |
|  | 64.3 | GILDDE00244321 (REMS 2) |
|  | 65.5 | GILDDE00251842 (REMS 3) |
|  | 69.6 | GILDDE00263368 (REMS 4) |
|  | 100.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.0 | GILDDE00236955 (REMS 1) |
|  | 0.0 | GILDDE00244321 (REMS 2) |
|  | 0.4 | GILDDE00251842 (REMS 3) |
|  | 0.8 | GILDDE00263368 (REMS 4) |
|  | 0.0 | GILDDE00270759 (REMS 5) |
| **Have you had unprotected sex within the last 3 months?** | | |
| Yes (%) | 80.0 | GILDDE00236955(REMS 1) |
|  | 82.9 | GILDDE00244321 (REMS 2) |
|  | 81.3 | GILDDE00251842 (REMS 3) |
|  | 85.6 | GILDDE00263369 (REMS 4) |
|  | 100.0 | GILDDE00270759 (REMS 5) |
| No (%) | 20.0 | GILDDE00236955 (REMS 1) |
|  | 17.1 | GILDDE00244321 (REMS 2) |
|  | 18.3 | GILDDE00251842 (REMS 3) |
|  | 14.4 | GILDDE00263369 (REMS 4) |
|  | 0.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.0 | GILDDE00236955 (REMS 1) |
|  | 0.0 | GILDDE00244321 (REMS 2) |
|  | 0.4 | GILDDE00251842 (REMS 3) |
|  | 0.0 | GILDDE00263369 (REMS 4) |
|  | 0.0 | GILDDE00270759 (REMS 5) |
| **How long have you been taking TRUVADA to reduce the risk of getting HIV?** | | |
| Less than 1 month (%) | 20.0 | GILDDE00236977 (REMS 1) |
|  | 16.2 | GILDDE00244344 (REMS 2) |
|  | 28.1 | GILDDE00251864 (REMS 3) |
|  | 20.5 | GILDDE00263390 (REMS 4) |
|  | 20.0 | GILDDE00270779 (REMS 5) |
| Between 1 month and 6 months (%) | 40.0 | GILDDE00236977 (REMS 1) |

RESTRICTED INFORMATION

|  | 43.2 | GILDDE00244344 (REMS 2) |
|---|---|---|
|  | 37.0 | GILDDE00251864 (REMS 3) |
|  | 32.6 | GILDDE00263390 (REMS 4) |
|  | 40.0 | GILDDE00270779 (REMS 5) |
| More than 6 months, but less than 1 year (%) | 30.0 | GILDDE00236977 (REMS 1) |
|  | 23.0 | GILDDE00244344 (REMS 2) |
|  | 18.5 | GILDDE00251864 (REMS 3) |
|  | 14.4 | GILDDE00263390 (REMS 4) |
|  | 0.0 | GILDDE00270779 (REMS 5) |
| More than 1 year (%) | 10.0 | GILDDE00236977 (REMS 1) |
|  | 17.6 | GILDDE00244344 (REMS 2) |
|  | 16.4 | GILDDE00251864 (REMS 3) |
|  | 32.6 | GILDDE00263390 (REMS 4) |
|  | 40.0 | GILDDE00270779 (REMS 5) |
| I don't remember (%) | 0.0 | GILDDE00236977 (REMS 1) |
|  | 0.0 | GILDDE00244344 (REMS 2) |
|  | 0.0 | GILDDE00251864 (REMS 3) |
|  | 0.0 | GILDDE00263390 (REMS 4) |
|  | 0.0 | GILDDE00270779 (REMS 5) |

20.    Although REMS 1 only had 10 uninfected individuals participate in the survey, each of the uninfected individuals met the inclusion criteria of taking Truvada for PrEP. GILDDE00236715-7526 at GILDDE00236737.  REMS 2 had a total of 74 UIs that completed the survey.  *See* GILDDE00243874-4563 at GILDDE00243896-97.  REMS 2 concluded that "[t]he UIs completing the survey in this Wave 2 demonstrated generally acceptable knowledge of the key messages."  *Id.* at GILDDE00243903.  REMS 3 had a total of 281 UIs that completed the survey.  *See* GILDDE00251496-2071 at GILDDE00251517-18.  REMS 3 concluded that "[t]he UIs completing the survey in this Wave 3 demonstrated generally acceptable knowledge of the key messages."  *Id.* at GILDDE00251524.  REMS 4 had a total of 132 UIs that completed the survey.  *See* GILDDE00263067-700 at GILDDE00263359.  REMS 5 had a total of 5 UIs that completed the survey (active recruitment was terminated after a March 29, 2018 teleconference with the FDA and the survey was closed on July 8, 2018).  *See* GILDDE00270528-916 at GILDDE00270548.  On July 1, 2019, the FDA determined that REMS were no longer necessary

for Truvada for PrEP because, for example, "the available information indicates that prescribers and uninfected individuals understand the important key messages with regards to approximate use of emtricitabine/tenofovir disoproxil fumarate for a PrEP indication." *See* GILDDE00271786-88 at GILDDE00271787.

### 3. Additional Survey Data Collected by Gilead Support the REMS Data

21. The Flexner Rebuttal Report repeatedly asserts that there is no evidence that patients engage in activity that meets the limitations of the Asserted Claims. *See, e.g.,* Flexner Rebuttal Report ¶¶134, 164, 312, 337, 343. However, in addition to the REMS discussed above, Gilead conducted another study of 100 PrEP users from October 24, 2017 through November 8, 2017. *See* GILDDE02636223-89 at GILDDE02636226. This study included 50 "new starts" that had "initiated PrEP on or after February 2017," and 50 "longer-term (LT) users":

RESTRICTED INFORMATION



*Id.* The "longer-term" users had been using PrEP at least 8 months because they had initiated PrEP before February 17:



*Id.* at GILDDE02636228.  The study included longer-term PrEP users that had initiated PrEP use in the year 2012, 2013, 2014, 2015, 2016, and 2017.  *Id.*

22.     The PrEP users had many sexual partners over the past year and often did not use condoms when engaging in anal sex:



*Id.* at GILDDE02636239.

23.    The PrEP users reported their frequency of HIV and STD testing as follows:



*Id.* at GILDDE02636268.

24.    The PrEP users reported that the risky behaviors they engaged in within the last year included condomless anal sex, having condomless sex with someone whose HIV status they

didn't know, having sex with a person who they know is HIV positive, and being in a relationship

with a partner who sleeps with other people as follows:



*Id.* at GILDDE02636285.   Additional risky behaviors of the PrEP patients were reported as

follows:

RESTRICTED INFORMATION

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

| | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are <u>HIV negative</u>) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |


[DateTime]

Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A9.  We would like to know about some of your life experiences.  We realize that some of these may be very personal. We ask that you be truthful.  Remember your responses are anonymous and confidential.  Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)

dd

*Id.* at GILDDE02636287.

25.     Additional risky behavior of the surveyed PrEP patients are reported as follows:



*Id.* at GILDDE02636288.

RESTRICTED INFORMATION

26.     The PrEP users reported that they perceived condomless sex, having sex with someone whose HIV status is unknown, or having sex with someone who has HIV as activities that placed them at-risk for acquiring HIV as follows:



*Id.* at GILDDE02636284.

27.     The PrEP users reported their anticipated duration of PrEP use as follows:



*Id.* at GILDDE02636251.

C.     **Prescription and Use of Truvada Directly Infringes Claim 13 of the '509, '333, and '191 Patents and Claim 12 of the '423 Patent [prior to a potential exposure claims]**

1.     **"A process for inhibiting establishment of a human immunodeficiency virus self replicating infection of human immunodeficiency virus infection in a human…"**

28.     Flexner Rebuttal Report ¶¶130-160 assert that physicians prescribing Truvada for PrEP and patients taking Truvada for PrEP do not met the preamble of claim 12 of the '509, '333, and '423 patents, and the preamble from claim 13 of the '191 patent, which recites "[a] process for inhibiting establishment of a human immunodeficiency virus self replicating infection of

RESTRICTED INFORMATION

human immunodeficiency virus infection in a human." The assertions in the Flexner Rebuttal Report do not change the opinions contained in my Opening Report.

29. Flexner Rebuttal Report ¶131 states that "instructions in the Truvada® Insert relating to periodic patient HIV-status testing does not establish the existence of any actual infringement by patients taking Truvada® for PrEP (or by physicians), including because the existence of such instructions does not provide evidence as to the population of patients taking Truvada® for PrEP that are, in practice, regularly tested." *See also* Flexner Rebuttal Report ¶136 (similar statements about the Medication Guide portion of the Truvada Insert with respect to patients). Gilead's REMS surveys provide direct evidence of the population of patients taking Truvada for PrEP that are, in practice, regularly tested. For example, greater than 95% of Truvada for PrEP prescribers tested their patients for HIV "more than every 3 months" or "every 3 months" during the REMS 3-5 survey periods, as shown in the table below:[2]

| How often do you generally test the HIV-1 status of you patients for whom you prescribe TRUVADA for a PrEP indication? (Select one) | | |
|---|---|---|
| More than every 3 months (%) | 4.2 (4.6)[3] | GILDDE00251556 (REMS 3) |
| | 2.5 (2.6) | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |
| Every 3 months (%) | 83.3 (92.0) | GILDDE00251556 (REMS 3) |
| | 93.2 (94.0) | GILDDE00263125 (REMS 4) |
| | 100.0 | GILDDE00270587 (REMS 5) |
| Less than every 3 months (%) | 3.1 (3.4) | GILDDE00251556 (REMS 3) |
| | 3.4 (3.6) | GILDDE00263126 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 9.4 | GILDDE00251556 (REMS 3) |
| | 0.8 | GILDDE00263126 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |

---

[2] REMS 3-5 were conducted from November 16, 2014 through July 9, 2018, which are the survey periods that overlap with the issuance of the first HHS Patent (the '509 patent) on June 2, 2015. *See* Flexner Rebuttal Report ¶¶97, 103 (discussing REMS 1-2 being conducted before the '509 patent issued).

[3] The numbers in parenthesis in this table have been adjusted to account for the nine respondents in REMS 2 and one respondent in REMS 3 that answered "I have not prescribed TRUVADA for a PrEP indication."

RESTRICTED INFORMATION

Similarly, over 98% of uninfected individuals taking Truvada for PrEP understood that they should be tested every 3 months, and between 81.8-100% of patients were actually tested either "once a month" or "every 3 months" during the REMS 3-5 survey periods, as shown in the table below:

| Key Risk Message Target Statement | Number of Correct Responses (%) (95% CI) | Cite for REMS 3-5 |
|---|---|---|
| When should you be tested for HIV while taking Truvada?  At least every 3 months while taking Truvada. | 98.2 (95.9, 99.4) 99.2 (95.9, 100.0) 100.0 (47.8, 100.0) | GILDDE00251524 (REMS 3) GILDDE00263092 (REMS 4) GILDDE00270553 (REMS 5) |
| **Since starting taking TRUVADA, how often have you been tested for HIV?** | | |
| Once a month (%) | 6.4 4.5 20.0 | GILDDE00251840 (REMS 3) GILDDE00263367 (REMS 4) GILDDE00270758 (REMS 5) |
| Every 3 months (%) | 75.4 77.3 80.0 | GILDDE00251840 (REMS 3) GILDDE00263367 (REMS 4) GILDDE00270758 (REMS 5) |
| Every 6 months (%) | 3.2 7.6 0.0 | GILDDE00251840 (REMS 3) GILDDE00263367 (REMS 4) GILDDE00270758 (REMS 5) |
| Once a year (%) | 1.8 2.3 0.0 | GILDDE00251840 (REMS 3) GILDDE00263367 (REMS 4) GILDDE00270758 (REMS 5) |
| Never | 12.8 7.6 0.0 | GILDDE00251840 (REMS 3) GILDDE00263367 (REMS 4) GILDDE00270758 (REMS 5) |
| I don't know | 0.0 0.8 0.0 | GILDDE00251840 (REMS 3) GILDDE00263367 (REMS 4) GILDDE00270758 (REMS 5) |

The number of uninfected individuals tested at least every six months provides further evidence that actual patients taking Truvada for PrEP are being periodically tested for HIV.

30.    Additional evidence of PrEP patients being tested for HIV is provided by Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017.  For example, 98% of longer-term PrEP users were tested for HIV at least 2 times per year, 78% were tested at least 3 times per year, and 66% were tested 4 or more times per year:

31

RESTRICTED INFORMATION



*Id.* at GILDDE02636268.  The longer-term PrEP users had been taking PrEP for at least 8 months,

and therefore would have had a negative HIV test in order to remain eligible to continue taking

Truvada for PrEP:



*Id.* at GILDDE02636228.  In addition, I understand that the Government has retained Julia Marcus, Ph.D. as an expert in this matter, and that she has studied physician and patient behaviors when prescribing and using Truvada for PrEP.  I understand that Dr. Marcus disagrees with the Flexner Rebuttal Report on this topic, and that Dr. Marcus is providing a reply expert report.  I have reviewed the Marcus Reply Report and agree with her analysis and conclusions.

31.      Flexner Rebuttal Report ¶132 states that the existence of instructions in the Truvada Insert to test patients periodically for HIV does not "provide evidence as to what the results of HIV status tests are for those patients taking Truvada® for PrEP that undergo such tests."  I note that the Truvada Insert is clear that Truvada for PrEP is contraindicated for HIV-positive patients because Truvada alone does not constitute a complete regimen for HIV-1 treatment.  *See, e.g.,* My

Opening Report ¶76.  Therefore, any patient that continues taking Truvada for PrEP after their periodic testing must have received a negative result.  I further note that it is extremely rare for a patient taking Truvada for PrEP in accordance with the Truvada insert instructions to test positive for HIV.  *See* D.I. 1-3, Exhibit 19 at 9 ("Only three cases of seroconversion have been confirmed to date worldwide, while HIV-negative individuals were on PrEP with verified adherence.").  In addition, I understand that Dr. Marcus is providing a reply expert report that discusses patient testing in connection with refill prescriptions of Truvada for PrEP.  I have reviewed the Marcus Reply Report and agree with her analysis and conclusions.

32.     Flexner Rebuttal Report ¶133 states "HIV status tests would be required to be negative following a 'potential exposure' event for a specific patient, given that the body of claim 13 of the '509 Patent, claim 13 of the '333 Patent, claim 13 of the '191 Patent, and claim 12 of the '423 Patent require a 'potential exposure.'"  Flexner Rebuttal Report ¶138 states that there is no "evidence that any persons surveyed as having been tested for their HIV status within the past 3 months were also those that had experienced a potential exposure to HIV-1."  I addressed the "potential exposure" limitation in my Opening Report, and I also address it later in this Reply Report.  I note briefly here that the periodic testing instructions for physicians and patients contained in the Truvada Insert would occur after the patient undergoes a potential exposure because an at-risk patient taking Truvada for PrEP would have undergone a potential exposure over the course of any given 3-month period.  Therefore, a patient that is tested periodically (e.g., every 3 months) will have been tested after the patient had experienced a potential exposure.

33.     Flexner Rebuttal Report ¶134 asserts that there is no evidence of specific physicians or patients evaluating "seronegative individuals for concurrent or recent signs or symptoms consistent with acute viral infections" or performing the steps of the Asserted Claims.  Gilead's

REMS surveys provide direct evidence of the population of patients taking Truvada for PrEP that are, in practice, evaluated by their physicians for concurrent or recent signs of acute viral infections.  For example, greater than 94% of Truvada for PrEP prescribers test their patients for HIV if they develop symptoms consistent with an acute HIV-1 infection as shown in the table below during the REMS 3-5 survey periods:

| I test the HIV status of my patients for whom I prescribe TRUVADA for a PrEP indication if they develop symptoms that are consistent with an acute HIV-1 infection. | | |
| --- | --- | --- |
| Always (%) | 87.5 (98.8)[4] | GILDDE00251556 (REMS 3) |
| | 94.9 | GILDDE00263125 (REMS 4) |
| | 100.0 | GILDDE00270586 (REMS 5) |
| Sometimes (%) | 1.0 (1.2) | GILDDE00251556 (REMS 3) |
| | 5.1 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| Never (%) | 0.0 (0.0) | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 11.5 | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |

34.     Flexner Rebuttal Report ¶135 asserts that Gilead's REMS survey results "do not demonstrate the actual occurrence of any HIV testing, the results of any HIV testing that is carried out, or that any HIV tests were negative for a patient following a 'potential exposure' to HIV." *See also* Flexner Rebuttal Report ¶137 (similarly criticizing Gilead's REMS survey results).   As discussed above, the REMS survey results include information about actual HIV testing that was carried out by surveyed physicians and received by surveyed patients.

---

[4] The numbers in parenthesis in this table have been adjusted to account for the 11 respondents in REMS 3 that answered "I have not prescribed TRUVADA for a PrEP indication."

RESTRICTED INFORMATION

35.     Flexner Rebuttal Report ¶139[5] states the "purpose of HIV-1 status testing does not establish any actual occurrence of direct infringement by any patient or any physician."  This statement was made with reference to paragraph 75 of My Opening Report.  That paragraph stated that "[t]he purpose of HIV-1 testing before initiating treatment is to confirm that the patient is negative for HIV-1, whereas the purpose of testing during treatment is to ensure that the patient remains negative for HIV-1."  The importance of HIV-1 testing before and during treatment is highlighted repeatedly by the Truvada Insert (*see* My Opening Report ¶¶66-75), and by the many REMS survey questions asking whether (and confirming that) physicians and uninfected individuals taking Truvada for PrEP were complying with instructions in the Truvada Insert regarding HIV-1 testing.  As mentioned above, Truvada for PrEP is contraindicated for patients that are HIV-positive.

36.     Flexner Rebuttal Report ¶140 states that the preamble is not "practiced by a person taking Truvada® for PrEP where that person has missed daily doses prior to a potential exposure such that the person taking Truvada® for PrEP has insufficient levels of Truvada's constituent active components, based on their respective half-lives, to 'inhibit[] establishment of a human immunodeficiency virus self-replicating infection in a human.'"  *See also* Flexner Rebuttal Report ¶¶145-147 (similar statements about the missing daily doses).   It is generally accepted that taking 4 or more doses per week of Truvada is sufficient to inhibit establishment of a self-replicating HIV

---

[5] Footnote 10 to Flexner Rebuttal Report ¶139 states that Truvada for PrEP administration does not qualify as a type of "treatment."  However, the Truvada Insert repeatedly refers to PrEP as a "treatment."  *See, e.g.,* GILDDE02430923-60 (2018 Truvada Insert) at 933 ("Table 5 provides a list of selected adverse events that occurred in 2% or more of subjects in any treatment group in the iPrEx trial.");  *id.* ("In the Partners PrEP trial, the frequency of adverse events in the TRUVADA treatment group was generally either less than or the same as the placebo group.");  *id.* at -939 ("HIV-1 PrEP: In a study of 50 breastfeeding women who received TRUVADA for HIV-1 PrEP… after 7 days of treatment tenofovir was undetectable…").

infection in a human.  For example, it has been reported that there is an HIV-1 risk reduction of "96% for 4 doses [of Truvada] per week" and "99% for 7 doses per week."  *See* Anderson et al., "Emtricitabine-tenofovir exposure and pre-exposure prophylaxis efficacy in men who have sex with men," Science Translational Medicine, 4:151ra125 (2012) at Abstract and pages 4-5.  As another example, it has been reported that "[t]here were no [HIV] infections at visits where tenofovir diphosphate concentration was 700 fmol per punch or greater, suggesting the use of four to seven tablets per week."  *See* Grant et al., "Uptake of pre-exposure prophylaxis, sexual practices, and HIV incidence in men and transgender women who have sex with men: a cohort study," The Lancet, 14:820-29 (2014) at page 824.  This is further illustrated in Figure 2 of the Grant 2014 paper:

RESTRICTED INFORMATION



*Figure 2:* **Pre-exposure prophylaxis and HIV incidence**
For those visits on PrEP, the incidence of HIV is estimated by exponential regression by tenofovir diphosphate in dried blood spots. The incidence for the concomitant off-PrEP group is depicted as a constant for reference. The dotted lines represent the estimate bounded by 1 SE. Dosing for each interval is estimated by pharmacokinetic modelling. LLOQ=lower limit of quantitation.

*Id.* at page 824.

37.     Gilead's REMS surveys provide direct evidence of the population of patients taking Truvada for PrEP that do (and do not) miss daily doses of Truvada. For example, between 74-100% of Truvada for PrEP patients did not miss a daily dose of Truvada during the REMS 3-5 survey periods, as shown in the table below:

| In the past month, have you missed any doses of TRUVADA? | | |
|---|---|---|
| Yes (%) | 22.1 | GILDDE00251840 (REMS 3) |
| | 25.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| No (%) | 77.9 | GILDDE00251840 (REMS 3) |
| | 74.2 | GILDDE00263367 (REMS 4) |
| | 100.0 | GILDDE00270758 (REMS 5) |
| I don't know (%) | 0.0 | GILDDE00251840 (REMS 3) |

RESTRICTED INFORMATION

|  | 0.8 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| **How many doses of TRUVADA have you missed in the past month? (All percentages are based on answers from only UIs who missed doses.)** | | |
| 1-3 doses (%) | 83.9 | GILDDE00251841 (REMS 3) |
|  | 81.8 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| 4-7 doses (%) | 12.9 | GILDDE00251841 (REMS 3) |
|  | 9.1 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| 8-12 doses (%) | 3.2 | GILDDE00251841 (REMS 3) |
|  | 9.1 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| More than 12 doses (%) | 0.0 | GILDDE00251841 (REMS 3) |
|  | 0.0 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| I don't remember | 0.0 | GILDDE00251841 (REMS 3) |
|  | 0.0 | GILDDE00263368 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |

Of the patients that missed a daily dose of Truvada, all (100%) missed 12 doses or less, which corresponds to 100% of Truvada patients surveyed taking at least 4 pills per week.  In view of between 74-100% of Truvada for PrEP patients not missing any daily dose of Truvada, and further in view of all Truvada for PrEP patients complying with at least 4 pills per week, I agree with the statement in Flexner Rebuttal Report ¶320 that "missed doses of Truvada for PrEP are not of significant concern."  In addition, I understand that Dr. Marcus is providing a reply expert report that discusses patient compliance with taking daily Truvada for PrEP.  I have reviewed the Marcus Reply Report and agree with her analysis and conclusions.

38.    Flexner Rebuttal Report ¶¶141-142 quotes the CDC 2014 Clinical Guidelines for the proposition that the practice of missing doses of Truvada for PrEP should be "normalized." The Guidelines recommend "[n]ormaliz[ing] occasional missed doses, while ensuring patient understands importance of daily dosing for optimal protection."  GILDDE02689566-632 at GILDDE02689610.  This recommendation emphasizes the above point that taking 4 or more doses

per week of Truvada is sufficient to inhibit establishment of a self-replicating HIV infection in a human.  I note that the CDC 2014 Clinical Guidelines provide additional recommendations that reinforce the instructions in the Truvada Insert regarding HIV testing for at-risk PrEP patients, as follows:

- "HIV infection should be assessed at least every 3 months while patients are taking PrEP so that those with incident infection do not continue taking it." GILDDE02689566-632 at GILDDE02689574.

- Recommending "[f]ollow-up visits at least every 3 months to provide the following:  HIV test…"  *Id.* at GILDDE02689576.

- Requiring "Documented negative HIV test result before prescribing PrEP" and "No signs/symptoms of acute HIV infection."  *Id.* at GILDDE02689576.

- Explaining that the risk of acquiring HIV includes "HIV-positive sexual partner, Recent bacterial STI, High number of sex partners, History of inconsistent or no condom use."  *Id.* at GILDDE02689576.

The other CDC Guidelines cited in the Flexner Rebuttal Report ¶¶141-142 contain similar statements reinforcing the instructions in the Truvada Insert.

39.     Flexner Rebuttal Report ¶143 quotes a statement from N.Y.D.O.H. that "[t]he more days a person misses a dose, the less protective the medication will be for any exposures that occur during that time period."  Flexner Rebuttal Report ¶144 quotes a statement from the Truvada Insert that "[u]ninfected individuals who miss doses are at greater risk of acquiring HIV-1 than those who do not miss doses."  These statements reinforce the importance of patients regularly and consistently taking their Truvada medication for PrEP, and the REMS survey results discussed above demonstrate that patients are, in fact, taking effective amounts of Truvada for PrEP.

40.     Flexner Rebuttal Report ¶¶148-159 discuss the iPrEx and Partners PrEP clinical trials and calculates that "the maximum percentage of patients potentially exposed to HIV that are ultimately protected from infection by Truvada for PrEP is only on the order of 5.1-5.2% per year for patients taking Truvada for PrEP."  The 5.1-5.2% calculation is based on the differential between persons that seroconverted in the ***FTC-TDF group*** of the trials and persons that seroconverted in the ***placebo group*** as explained in the Flexner Rebuttal Report as follows:

> [T]he differential between persons that seroconverted in the FTC-TDF group and persons that seroconverted in the placebo group is 64 (64–0=64).  Accordingly, on the basis of that assumption, the 64 persons presumed to be protected from infection in the FTC-TDF group represent 5.12% (64/1251) of the total 1,251 FTC-TDF group members.

Flexner Rebuttal Report ¶152.  I note that the Flexner Rebuttal Report repeats this same 5.1-5.2% calculation with respect to the "thereby" clause.  *See* Flexner Rebuttal Report ¶¶197-208.

41.     The 5.1-5.2% calculation is irrelevant to the Asserted Claims for several reasons.  ***First***, the 5.1-5.2% calculation runs contrary to the Court's claim construction.  As explained in My Opening Report ¶30, I understand that the Court has construed the preamble to be limiting and to mean "a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human."  *See also* D.I. 186 at 1, 7-8.  I understand that the Court has construed the "thereby" clause that recites "thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human" to be limiting and to mean "[t]he human remains negative for the immunodeficiency virus while receiving the administration."  My Opening Report ¶32; *see also* D.I. 186 at 2, 9-10.  I understand that the Court similarly clarified that "whether a host remains negative is based on both a serological and PCR assay if both are performed."  My Opening Report ¶32; *see also* D.I. 186 at 10.  In accordance with the Court's claim construction, the preamble and "thereby" clause are met whenever a patient

41

taking Truvada for PrEP remains HIV negative in response to a serological or PCR test (and negative in response to both a serological and PCR test if both tests are performed). There is no requirement to compare a population of patients taking Truvada for PrEP who remain HIV negative with a population of at-risk patients **not** taking Truvada for PrEP to determine if the Truvada for PrEP patients are protected.

42. The Court's claim construction makes sense in view of how "protection" is understood in the medical field. Administration of the claimed compounds according to the claimed process protects the host by ensuring that a therapeutically effective amount of the claimed compounds are present in the host. The protection provided by the claimed method lasts until the host's body metabolizes, excretes, or otherwise removes the compounds from the host's body. This protection is similar to the protection provided by a vaccine. As explained in a Medicinal Chemistry textbook, "vaccines enable the body to resist infection by diseases" such that "[i]f the subject is later exposed to a virulent form of the virus, the [host's] immune system is primed and ready to eliminate it." D.I. 108-5 at Appx4277 (Foye's Principles of Medicinal Chemistry, 5th ed, Williams and Lemke eds, Lippincott Williams & Wilkins, Baltimore MD, 2002 at page 1002). Truvada for PrEP confers protection by having therapeutically effective amounts of FTC and TDF in the host's system such that it is primed and ready to prevent HIV from replicating. The lack of a self-replicating HIV infection is demonstrated by the Truvada for PrEP patient testing HIV-negative.

43. **Second**, the 5.1-5.2% calculation does not apply based on the assumptions made in the Flexner Rebuttal Report. In Flexner Rebuttal Report ¶152, Dr. Flexner states that he assumes complete protection by FTC-TDF among all clinical trial participants in the FTC-TDF group and therefore assumes an absence of seroconversion among persons in the FTC-TDF group as follows:

42

> Accordingly, based on the best evidence available, and resolving all doubts in favor
> of the government, ***I will assume complete protection by FTC-TDF among all
> clinical trial participants in the FTC-TDF group and will therefore assume an
> absence of seroconversion among persons in the FTC-TDF group***, which is an
> assumption of protection of all persons in the FTC-TDF that were potentially
> exposed.  In that instance, the differential between persons that seroconverted in
> the FTC-TDF group and persons that seroconverted in the placebo group is 64 (64–
> 0=64).  Accordingly, on the basis of that assumption, the 64 persons presumed to
> be protected from infection in the FTC-TDF group represent 5.12% (64/1251) of
> the total 1,251 FTC-TDF group members.

Flexner Rebuttal Report ¶152 (emphasis added).  Once it is assumed that all clinical trial participants in the FTC-TDF group were completely protected and did not seroconvert, the Court's claim construction of the preamble and "thereby" clause has been met.  There is no reason or requirement to calculate a differential seroconversion percentage of persons in the FTC-TDF group relative to persons *not* taking FTC-TDF in the placebo group.

44.     ***Third***, the iPrEx and Partners PrEP clinical trials sought to determine the relative reduction in HIV incidence in the FTC-TDF PrEP group compared with the placebo group to determine efficacy.  The clinical trials were randomized to ensure that patterns of exposure were evenly distributed across the study groups.  An efficacy metric is determined on a relative rather than an absolute scale, which allows efficacy to be generalizable across time, populations, and settings.  In contrast, the protection calculations in the Flexner Rebuttal Report are not based on the relative reduction in HIV risk, but on a supposedly absolute probability of exposure in the study population over the period of one year.  For example, the 5.1-5.2% calculation is "***per year*** for patients taking Truvada for PrEP."  Flexner Rebuttal Report ¶148 (emphasis added).  The period of sexual activity for a Truvada for PrEP user can last for several years (indeed, it can last for many years, including the remaining sexually active lifetime of the user).  For example,

Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 showed that 80% of new users planned to be on PrEP for more than 12 months and 88% of longer-term users planned to be on PrEP for more than 12 months as follows:



*Id.* at GILDDE02636251. An efficacy metric is a more appropriate manner for evaluating Truvada for PrEP using the data collected in the iPrEx and Partners PrEP clinical trials, which is the metric used by the CDC and N.Y.D.O.H., which are discussed in the next paragraph.

45.    ***Fourth***, the assumption in Flexner Rebuttal Report ¶152 that there is complete (100%) protection by FTC-TDF among all clinical trial participants in the FTC-TDF group would be an appropriate stopping point in view of the known real-world >99% effectiveness of Truvada for PrEP in protecting MSM and heterosexual patients from HIV. For example, when Truvada for

PrEP is taken daily or consistently (at least 4 time per week), the risk of acquiring HIV is reduced by about 99% among MSM as follows:

Oral Daily Pre-Exposure Prophylaxis (PrEP)[†] for HIV-Negative Persons

| Population | Effectiveness Estimate | Source | Interpretation |
|---|---|---|---|
| *"Optimal or Consistent Use"[a] (Taking PrEP daily or at least 4 times per week)* | | | |
| Men who have sex with men (MSM) | ~99% | Grant, 2014 Liu, 2015 McCormack, 2015 Volk, 2015 Marcus, 2017 | When taking PrEP daily or consistently (*at least 4 times per week*), the risk of acquiring HIV is reduced by about 99% among MSM. While daily use is recommended in the U.S., taking PrEP consistently (*at least 4 times per week*) appears to provide similar levels of protection among MSM.  The effectiveness of oral PrEP is highly dependent on PrEP adherence. When taking oral PrEP daily or consistently, HIV acquisition is extremely rare and has not been observed in any of the studies described below.  In clinical practice, a few cases of new HIV infections have been confirmed while HIV-negative individuals were on PrEP with verified adherence. |
| Heterosexual Men and Women | ~99% | *N/A* | There is evidence for the effectiveness of PrEP when used recently[b] (based on detecting TFV in plasma), which is estimated to be 88 – 90% as described below. There is no effectiveness estimate of PrEP when taken daily or consistently among heterosexuals; however, it is likely to be greater than the estimates corresponding to recent use and similar to what has been observed for MSM. The effectiveness of oral daily PrEP is highly dependent on PrEP adherence, with maximum effectiveness when taking PrEP daily and lower effectiveness when not taken consistently. |
| Persons Who Inject Drugs (PWIDs) | 74 – 84% | Choopanya, 2013 Martin, 2015 | PWID face HIV risks from both injecting and sex behaviors. Studies on the effectiveness of PrEP when taken daily among PWID are limited. However, when taking PrEP consistently, the risk of acquiring HIV is reduced by an estimated 74 – 84% among PWID. These estimates are based on tenofovir alone and among a subset of PWID taking PrEP consistently, as verified by directly observed therapy or daily diary plus monthly pill count. The effectiveness of two-drug oral therapy has not been assessed among PWID but may be higher. The effectiveness of oral daily PrEP is highly dependent on PrEP adherence, with maximum effectiveness when taking PrEP daily and lower effectiveness when missing doses. |

D.I. 1-3, Exhibit 19 at 6-8.  The iPrEx OLE Study "resulted in a risk reduction estimate of 100% when compared to the previous placebo group from the iPrEx trial or the concurrent group of participants not on PrEP." *Id.* at 9.  "In addition, among those with drug concentration levels

indicating at least 4 pills/week (>700 fmol/punch), there were no new HIV infections, which resulted in a risk reduction estimate of 100% when compared to either comparison group." *Id.* The effectiveness of Truvada for PrEP is summarized as follows:

> In summary, the effectiveness of PrEP among MSM when used daily or consistently is estimated to be 100% in studies. However, a few cases of new HIV infections have been reported with PrEP verified adherence, indicating that the risk has not been completely eliminated and that the effectiveness of PrEP cannot be exactly 100%. Given the number of persons on PrEP worldwide (prepwatch.org (http://www.prepwatch.org), the risk reduction (or effectiveness of PrEP) would likely need to be very high and close to 100% to observe only three confirmed cases of PrEP failure (new HIV infection despite taking PrEP daily or consistently) to date. To represent the protective value of PrEP while also acknowledging the small number of failures, we indicate the effectiveness of PrEP is about 99%.

*Id.* at 10-11. The effectiveness of Truvada for PrEP in heterosexual men and women is also estimated to be about 99%. *Id.* at 6-8; *see also* GILDDE02689976-82 (N.Y.D.O.H. 2020 PrEP FAQ) at GILDDE02689976 ("Clinical trials have shown that PrEP is 99% effective at reducing sexual transmission of HIV."). I also note that the Flexner Rebuttal Report calculation of only 5.1-5.2% of Truvada for PrEP patients being protected from HIV makes little sense because it suggests that it is unnecessary for approximately 95% of Truvada for PrEP patients to take Truvada.

46. **Fifth**, the 5.1-5.2% calculation is based on an implicit assumption that the at-risk activities of the pre-FDA approved **placebo group** from the iPrEx trial is indicative of the number of at-risk activities that are engaged in by post-FDA approved Truvada for PrEP patients. For example, the Flexner Rebuttal Report states:

> [T]he differential between persons that seroconverted in the FTC-TDF group and persons that seroconverted in the placebo group is 64 (64–0=64). Accordingly, on the basis of that assumption, the 64 persons presumed to be protected from infection

46

in the FTC-TDF group represent 5.12% (64/1251) of the total 1,251 FTC-TDF group members.

Flexner Rebuttal Report ¶152.  However, Truvada for PrEP patients know that they are taking an FDA-approved regimen that is greater than 99% effective in reducing HIV transmission.   In contrast, the placebo group from the iPrEx trial did not know if they were receiving pills containing medication or placebo pills, and they did not know if Truvada would be efficacious in preventing HIV transmission.  Post-FDA approved Truvada for PrEP patients likely engage in more at-risk activities than the placebo group from the iPrEx trial because they know they are receiving medication that is 99% effective in reducing HIV transmission.  This is known as disinhibition— a willingness to engage in more at-risk behaviors due to the known HIV protection provided by PrEP.   Therefore, the number of at-risk behaviors that Truvada for PrEP patients engage in is expected to be higher than that of the placebo group from the iPrEx trial.  For at least this reason, the assumption in the Flexner Rebuttal Report that only 64 out of 1251 persons would be protected by Truvada for PrEP patients underestimates real-world protection of PrEP patients.

47.   **Sixth**, the 5.1-5.2% calculation in the Flexner Rebuttal Report does not comply with the way protection efficacy is calculated by Gilead with respect to its DISCOVER trial.  In Gilead's DISCOVER trial comparing the protection efficacy of Descovy for PrEP to Truvada for PrEP, it was determined that 99.4% of Truvada for PrEP "patients remained HIV-free" as follows:

**The same robust protection as TRUVADA®, with less impact on markers of renal function and BMD[1,2]**

Data from a randomized, active-controlled, double-blind study of MSM and TGW using DESCOVY FOR PrEP™ (n=2694) vs TRUVADA (n=2693):

**At primary analysis***
Noninferior efficacy
(HIV incidence rate
0.16/100 PY vs 0.34/100 PY
[IRR=0.47; CI: 0.19–1.15]).

99.7% vs 99.4% of patients
remained **HIV-free**.

**At Week 48**
Less impact on eGFR
and BMD.
**The long-term clinical
significance of these
changes is not known.**

*When 100% of patients reached Week 48 and ≥50% reached Week 96.

GILDDE00188806-12 at GILDDE00188809.  Based on the efficacy demonstrated by the DISCOVER trial, Gilead concluded that Descovy provides "[t]he same robust protection as TRUVADA." *Id.*

48.      ***Seventh***, the 5.1-5.2% calculation in the Flexner Rebuttal Report is based on "the differential between persons that seroconverted in the FTC-TDF group and persons that seroconverted in the placebo group is 64 (64–0=64)."  Flexner Rebuttal Report ¶152.  However, seroconversion in the placebo group requires an ***actual*** exposure to HIV.  Therefore, the seroconverters in the placebo group do not provide an appropriate comparator for the Asserted Claims that merely require a ***potential*** exposure.

### 2.      Step (a): "selecting an uninfected human that does not have the self-replicating infection"

49.      Flexner Rebuttal Report ¶162 states that "the existence of statements in various versions of the Truvada® Insert does not establish the actual occurrence of any physician conducting" step (a).  *See also* Flexner Rebuttal Report ¶164 (similar statements about the Medication Guide portion of the Truvada Insert).  Flexner Rebuttal Report ¶¶163 and 165 assert

48

that Gilead's REMS survey results "do not establish the actual occurrence of any direct infringement by any patient or any physician."

50.     As discussed in My Opening Report, the Truvada package insert repeatedly instructs physicians to prescribe Truvada for PrEP only to patients that have been confirmed to be HIV-negative.  *See* My Opening Report ¶¶76-80.  I note that the Truvada Insert is clear that Truvada for PrEP is contraindicated for HIV-positive patients.  *See, e.g.,* My Opening Report ¶76. Gilead's REMS surveys provide direct evidence of the population of patients taking Truvada for PrEP that are, in practice, confirmed to be HIV-negative before taking Truvada for PrEP.  For example, during the REMS 3-5 survey periods, between 97.7-100% of the Truvada for PrEP prescribers surveyed always tested their patients to confirm that they were HIV negative before prescribing Truvada for PrEP, as shown in the table below:

| I test my patients to confirm that they are HIV-1 negative before prescribing TRUVADA for a PrEP indication. | | |
|---|---|---|
| Always (%) | 88.5 (97.7)[6] | GILDDE00251556 (REMS 3) |
| | 99.2 | GILDDE00263125 (REMS 4) |
| | 100.0 | GILDDE00270586 (REMS 5) |
| Sometimes (%) | 2.1 (2.3) | GILDDE00251556 (REMS 3) |
| | 0.8 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| Never (%) | 0.0 | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 9.4 | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |

Similarly, also during the REMS 3-5 survey periods, 100% of surveyed uninfected individuals taking Truvada for PrEP were tested for HIV, between 98-100% were tested within the last 6 months, and 100% were tested within the last year, as shown in the table below:

---

[6] The numbers in parenthesis in this table have been adjusted to account for the nine respondents in REMS 3 that answered "I have not prescribed TRUVADA for a PrEP indication."

| Have you been tested for HIV? | | |
|---|---|---|
| Yes (%) | 100.0 | GILDDE00251839 (REMS 3) |
| | 100.0 | GILDDE00263367 (REMS 4) |
| | 100.0 | GILDDE00270757 (REMS 5) |
| No (%) | 0.0 | GILDDE00251839 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270757 (REMS 5) |
| When was the last time you were tested for HIV? | | |
| Less than a month ago (%) | 56.2 | GILDDE00251840 (REMS 3) |
| | 52.3 | GILDDE00263367 (REMS 4) |
| | 40.0 | GILDDE00270757 (REMS 5) |
| 1 to 3 months ago (%) | 38.1 | GILDDE00251840 (REMS 3) |
| | 35.6 | GILDDE00263367 (REMS 4) |
| | 40.0 | GILDDE00270757 (REMS 5) |
| More than 3 months, but less than 6 months ago (%) | 3.6 | GILDDE00251840 (REMS 3) |
| | 10.6 | GILDDE00263367 (REMS 4) |
| | 20.0 | GILDDE00270758 (REMS 5) |
| More than 6 months, but less than a year ago (%) | 1.8 | GILDDE00251840 (REMS 3) |
| | 1.5 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270757 (REMS 5) |
| A year or more ago | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't know | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |

      **3.**      **Step (b): "administering to the uninfected human a combination comprising: i. a pharmaceutically effective amount of emtricitabine; and ii. a pharmaceutically effective amount of tenofovir or tenofovir ester [or tenofovir disoproxil fumarate or a tenofovir prodrug]"**

51.    In Flexner Rebuttal Report ¶169, Dr. Flexner states "I disagree that a physician that prescribes Truvada® for PrEP 'administers' anything to a patient under the plain and ordinary meaning of that term as used in the context of the Patents-in-Suit to a person of ordinary skill in the art. Physicians that prescribe medications merely authorize distribution of a medication at a certain dosage and in a certain quantity to a patient from a pharmacy; such prescription activity does not inhibit the establishment of an infection as claimed."

52.     I understand that Gilead did not ask the Court to construe the term "administering," and that Gilead did not allege during the claim construction portion of this case that the specification of the HHS Patents specifically define "administering" or "administration" in any particular manner.  The HHS Patents do not define "administering" or "administration."  I understand that the plain and ordinary meaning of "administration" includes "the dispensing, applying, or tendering of something, such as . . . medicine."  *See* American Heritage Dictionary, 4th Ed., 2000 at page 22.  Thus, a physician prescription that authorizes a pharmacy to dispense Truvada for PrEP at a certain dosage and quantity to a patient falls within the plain and ordinary meaning of "administration."

53.     The Truvada insert uses "administration" to refer to physician prescriptions.  For example, the front page of the Truvada insert has a "Dosage and Administration" section that instructs physicians to prescribe Truvada for PrEP as "one table once daily taken orally with or without food."  *See, e.g.,* GILDDE00123279-326 at GILDDE00123279.  The front page further instructs physicians to "[a]void administering Truvada with concurrent or recent use of nephrotoxic drugs."  *Id.*  In the instructions about "Coadministration with Other Products," the insert instructs physicians "Do not administer in combination with HEPSERA."  *Id.*  There are many other examples in the Truvada insert where "administration" is used to refer to physician prescription activity.  *See, e.g., id.* at GILDDE00123283-84 (Section 2 "Dosage and Administration"), GILDDE00123286 (Section 5.4 "Coadministration with Other Products").  I have been informed that the Flexner Opening Validity Report at paragraphs 853-855 asserts that statements in the Truvada Insert meet the "administering" portion of step (b).

54.     In Flexner Rebuttal Report ¶169, Dr. Flexner states "'administering,' as the term is used in the Patents-in-Suit and Asserted Claims, I understand to require an active and physical role

51

in terms of delivering medication into a patient's body." This view of "administering" is too narrow and inconsistent with the plain and ordinary meaning of this term. For example, the HHS Patents disclose that "[o]ral administration of FTC and TDF to macaques is by mixing the drug powders with peanut butter or fruit. Macaques are observed to ensure ingestion." '509 patent at 7:51-53. Dispensing FTC/TDF in peanut butter or fruit and then leaving it for macaques to ingest does not require an active or physical role in delivering the medication to a macaque's body.

55.     Flexner Rebuttal Report ¶172 asserts that Gilead's REMS survey results "do not establish the actual occurrence of any direct infringement by any patient or any physician." To the contrary, Gilead's REMS surveys provide direct evidence of the population of patients being administered a pharmaceutically effective amount of FTC and TDF. For example, between 74-100% of Truvada for PrEP patients did not miss a daily dose of Truvada as shown in the below table during the REMS 3-5 survey periods:

| In the past month, have you missed any doses of TRUVADA? | | |
|---|---|---|
| Yes (%) | 22.1 | GILDDE00251840 (REMS 3) |
| | 25.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| No (%) | 77.9 | GILDDE00251840 (REMS 3) |
| | 74.2 | GILDDE00263367 (REMS 4) |
| | 100.0 | GILDDE00270758 (REMS 5) |
| I don't know (%) | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| How many doses of TRUVADA have you missed in the past month? (All percentages are based on answers from only UIs who missed doses.) | | |
| 1-3 doses (%) | 83.9 | GILDDE00251841 (REMS 3) |
| | 81.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| 4-7 doses (%) | 12.9 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| 8-12 doses (%) | 3.2 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| More than 12 doses (%) | 0.0 | GILDDE00251841 (REMS 3) |

| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't remember | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |

Of the patients that did miss a daily dose of Truvada, all (100%) missed 12 doses or less, which corresponds to 100% of Truvada patients surveyed taking at least 4 pills per week. As explained in My Opening Report at ¶¶81-87, Truvada for PrEP is one daily tablet containing 200 mg of emtricitabine and 300 mg of TDF, which constitutes pharmaceutically effective amounts of FTC and TDF.

### 4.  "thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human"

56.    With the exception of Flexner Rebuttal Report ¶¶182-183, the section of the Flexner Rebuttal Report at ¶¶175-209 discussing the "thereby" clause merely repeats the same arguments provided in Flexner Rebuttal Report ¶¶130-166 for the preamble.  For the sake of brevity, I incorporate by reference my above reply to the Flexner Rebuttal Report preamble in its entirety here.

57.    Flexner Rebuttal Report ¶¶182-183 assert that a patient taking Truvada for PrEP would not experience a "potential exposure" because "[t]he Truvada® Insert expressly instructs, in the 'Warnings and Precautions' section, and under the heading 'Comprehensive Management to Reduce the Risk of Sexually Transmitted Infections, Including HIV-1, and Development of HIV-1 Resistance When TRUVADA Is Used for HIV-1 PrEP,' to 'use TRUVADA for HIV-1 PrEP to reduce the risk of HIV-1 infection as part of a comprehensive prevention strategy that includes other prevention measures, including adherence to daily administration and safer sex practices, including condoms, to reduce the risk of sexually transmitted infections (STIs).'"  I addressed the "potential exposure" limitation in my Opening Report, and I also address it below in this Reply

Report with respect to the "wherein" clause that recites "wherein the combination is administered prior to a potential exposure of the human to the human immunodeficiency retrovirus."

### 5. "wherein the combination is administered prior to [a] potential exposure of the human to the human immunodeficiency retrovirus"

58.     Flexner Rebuttal Report ¶¶210-266 asserts that physicians prescribing Truvada for PrEP and patients taking Truvada for PrEP do not met the "wherein" clause of claim 13 from the '509, '333, and '191 patents and claim 12 from the '423 patent.

59.     Flexner Rebuttal Report ¶211 asserts that "statements in versions of the Truvada® Insert regarding the scope of the Truvada® for PrEP indication do not establish any actual occurrence of direct infringement by any patient or any physician." *See also* Flexner Rebuttal Report ¶¶215, 221 (providing similar statements). Gilead's REMS surveys provide direct evidence of the population of patients taking Truvada for PrEP that are, in practice, potentially exposed to HIV during treatment. For example, during the REMS 3-5 survey periods, between 65.5-100% of Truvada for PrEP patients did not use a condom the last time they had sex, and between 81.3-100% had unprotected sex within the last 3 months, as shown in the table below:

| Did you use a condom the last time you had sex? | | |
|---|---|---|
| Yes (%) | 34.2 | GILDDE00251842 (REMS 3) |
| | 29.6 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| No (%) | 65.5 | GILDDE00251842 (REMS 3) |
| | 69.6 | GILDDE00263368 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.8 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| Have you had unprotected sex within the last 3 months? | | |
| Yes (%) | 81.3 | GILDDE00251842 (REMS 3) |
| | 85.6 | GILDDE00263369 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| No (%) | 18.3 | GILDDE00251842 (REMS 3) |
| | 14.4 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

RESTRICTED INFORMATION

| | | |
|---|---|---|
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.0 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| **Do you know the HIV status of your sexual partner?** | | |
| Yes, I known the HIV status of my sexual partner(s) (%) | 43.5 | GILDDE00251841 (REMS 3) |
| | 40.0 | GILDDE00263368 (REMS 4) |
| | 60.0 | GILDDE00270759 (REMS 5) |
| I know the HIV status of some of my sexual partners. (%) | 49.6 | GILDDE00251841 (REMS 3) |
| | 52.0 | GILDDE00263368 (REMS 4) |
| | 40.0 | GILDDE00270759 (REMS 5) |
| No, I don't know the HIV status of my sexual partner(s). | 6.8 | GILDDE00251841 (REMS 3) |
| | 8.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

In addition, between 40-60% of PrEP patients either do not know the HIV status of their sexual partners or only know the HIV status of some of their sexual partners.  Having unprotected condomless sex or sexual partners of unknown HIV status increases the risk for HIV exposure. Indeed, the Truvada insert specifically calls out these types of activities as at-risk behaviors for potential exposures, as described in My Opening Report ¶98.  Also, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they engage in activities that result in potential exposure to HIV, as described in My Opening Report ¶¶97-99.

60.     Additional evidence of PrEP patients engaging in high risk activities that would result in potential HIV exposure is provided by Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017.  For example, based on survey results, Gilead concluded that "[r]isky behaviors abound: few [PrEP users] are monogamous and most have had unprotected anal sex:"



*Id.* at GILDDE02636285.  Additional risky behaviors of PrEP patients were reported as follows:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

|  | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are <u>HIV negative</u>) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |


[DateTime]

Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A9.  We would like to know about some of your life experiences.  We realize that some of these may be very personal. We ask that you be truthful.  Remember your responses are anonymous and confidential.  Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)

dd

*Id.* at GILDDE02636287.



*Id.* at GILDDE02636288.  The PrEP users reported that they perceived condomless sex, having

sex with someone whose HIV status is unknown, or having sex with someone who has HIV as

activities that place them at-risk for acquiring HIV, as follows:



*Id.* at GILDDE02636284.  In addition, I understand that Dr. Marcus is providing a reply expert report discussing how patients on Truvada for PrEP frequently engage in activities that result in potential HIV exposures.  I have reviewed the Marcus Reply Report and agree with her analysis and conclusions.

61.     Flexner Rebuttal Report ¶213 states that following the safer sex practices described in the Truvada insert results in a patient that "does not experience a 'potential exposure.'"  *See also* Flexner Rebuttal Report ¶¶217-220, 223-226 (referencing the "comprehensive prevention strategy" portions of the Truvada insert and safer sex practices portion of the Medication Guide). I disagree.  Implementation of the safer sex practices and comprehensive prevention strategy described in the Truvada insert may **reduce** the risk of HIV exposure, but do not **eliminate** the risk.

For example, Flexner Rebuttal Report ¶219 correctly refers to the comprehensive prevention strategy as "risk-reduction behaviors" not "risk-elimination behaviors."

62.     Flexner Rebuttal Report ¶222 suggests that the statement in the Medication Guide that "TRUVADA can only help reduce your risk of getting HIV-1 before you are infected" might be referring to post-exposure prophylaxis rather than pre-exposure prophylaxis.  I note that post-exposure prophylaxis is not an FDA approved indication for Truvada.  Therefore, the statement in the Truvada insert about Truvada only helping to reducing the risk of getting HIV-1 before a patient is infected should be interpreted as applying to PrEP, not PEP.

63.     Flexner Rebuttal Report ¶¶227-263 discuss four supposed "ways that persons of ordinary skill in the art understand patients could, and in fact do, take Truvada® for HIV PrEP in the real world without experiencing a 'potential exposure.'"  Flexner Rebuttal Report ¶227.  The four supposed ways are (1) consistent and correct condom usage; (2) consistent confirmation that persons with whom the patient engages in sexual activity are HIV-negative; (3) an HIV-negative partner in a serodiscordant couple where the HIV-positive partner is undetectable; and (4) a patient that does not engage in activity that could possibly result in exposure to HIV.  *See* Flexner Rebuttal Report ¶265.  I address each of these four strategies below.

64.     *First*, Flexner Rebuttal Report ¶228 asserts that there is no potential exposure where there is consistent and correct usage of condoms because the condom creates a physical barrier between sexual partners such that "[w]here a condom is used correctly during intercourse, a condom will not break and will serve as an effective barrier to contact with bodily fluids, thereby preventing a potential exposure to the immunodeficiency retrovirus."  *See also* Flexner Rebuttal Report ¶¶229-242.

RESTRICTED INFORMATION

65.     Consistent and correct condom use may **reduce** the risk of HIV exposure, but it does not **eliminate** the risk of exposure to HIV.  For example, it has been reported that "[a]mong MSM reporting any anal sex with an HIV-positive male partner, we found 70% effectiveness with reported consistent condom use (compared with never use) and no significant protection when comparing sometimes use to never use."  Smith et al., "Condom effectiveness for HIV prevention by consistency of use among men who have sex with men in the United States," Journal of Acquired Immune Deficiency Syndromes, 68:337-344 (2015) at page 337 ("Results" section). "Estimated condom effectiveness was 72.3% (95% CI: 60.7% to 80.5%) for receptive anal sex, 62.9% (95% CI: 46.3% to 74.3%) for insertive anal sex, and 70.5% (95% CI: 58.2% to 79.2%) for any receptive or insertive anal sex." *Id.* at page 341.  "The point estimate in our analysis of condom effectiveness when 'always' used by MSM during anal sex with any HIV-positive male partners is 70%, modestly less than the 80% estimate for condoms when 'always' used by heterosexual HIV-discordant couples." *Id.* at page 342.  To be categorized as "always" using a condom, "the subject must have reported condom use during all" of the anal sex acts with their HIV-positive partner during a 6-month interval.  *Id.* at page 339.  "This study found that inconsistent ('sometimes') condom use with HIV-positive male partners over months to years offers minimal or no protection, underscoring the importance of the inclusion of messaging by their HIV prevention providers, which supports the adoption and continuation of consistent condom use for MSM." *Id.* at page 343.  Furthermore, "[e]ven if condoms are used consistently and correctly, slippage and breakage can occur."  Paz-Bailey et al., "The effect of correct and consistent condom use on chlamydia and gonococcal infection among urban adolescents," Archives of Pediatrics and Adolescent Medicine, 159:536-542 (2005) at page 536.  "Studies demonstrate that slippage or breakage occurs between 1% and 4% of the time." *Id.*  Therefore, I disagree with the Flexner

RESTRICTED INFORMATION

Rebuttal Report statement that there is no potential exposure where there is consistent and correct usage of condoms.

66.     Flexner Rebuttal Report ¶229 points to Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 that "32% of new users of Truvada® for PrEP reported using condoms 76-100% of the time, while 18% of 'longer-term users' of Truvada® for PrEP reported using condoms 76-100% of the time." This data indicates that 68% of new users for PrEP are ***not*** consistently using condoms and 82% of "longer-term" PrEP users are ***not*** consistently using condoms. As discussed above, inconsistent condom use with HIV-positive male partners over months to years offers minimal or no protection. *See* Smith et al., Journal of Acquired Immune Deficiency Syndromes, 68:337-344 (2015) at page 343.

67.     Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 found that 76% of new users and 94% of longer-term PrEP users have had sex without a condom in the past year:



*Id.* at GILDDE02636285.  Further, 86% of heterosexual PrEP users have had sex without a condom with someone of unknown HIV status:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

| | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are HIV negative) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |



Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A.9.  We would like to know about some of your life experiences.  We realize that some of these may be very personal.  We ask that you be truthful.  Remember your responses are anonymous and confidential.  Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)

dd

*Id.* at GILDDE02636287.  In addition, 28% of new users and 34% of longer-term PrEP users reported having a condom break during sex:



*Id.* at GILDDE02636288.

68.     Gilead's REMS surveys provide direct evidence of the population of patients taking

Truvada for PrEP that are, in practice, not consistently using condoms.  For example, during the

REMS 3-5 survey periods, between 65.5-100% of Truvada for PrEP patients did not use a condom

the last time they had sex, and between 81.3-100% had unprotected sex within the last 3 months,

as shown in the table below:

| Did you use a condom the last time you had sex? | | |
|---|---|---|
| Yes (%) | 34.2 | GILDDE00251842 (REMS 3) |
| | 29.6 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| No (%) | 65.5 | GILDDE00251842 (REMS 3) |
| | 69.6 | GILDDE00263368 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |

| | 0.8 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| **Have you had unprotected sex within the last 3 months?** | | |
| Yes (%) | 81.3 | GILDDE00251842 (REMS 3) |
| | 85.6 | GILDDE00263369 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| No (%) | 18.3 | GILDDE00251842 (REMS 3) |
| | 14.4 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.0 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

69.     Flexner Rebuttal Report ¶¶231-239 point to various CDC recommendations for consistent and correct use of condoms in conjunction with PrEP.  I note that the CDC 2014 Clinical Guidelines state that "[r]eported consistent ('always') condom use is associated with an 80% reduction in HIV acquisition among heterosexual couples."   GILDDE02689566-632 at GILDDE02689593.   The other CDC recommendations cited in the Flexner Rebuttal Report contain similar statements.  Thus, consistent and correct condom usage merely reduces the risk of HIV exposure, it does not eliminate the risk. If consistent and correct condom usage eliminated the risk of HIV exposure, PrEP would not be necessary.  However, the Truvada insert and the CDC recommendations cited in the Flexner Rebuttal Report recommend the use of PrEP in conjunction with condom usage precisely because consistent and correct condom usage does not eliminate the risk of HIV exposure.  For example, Flexner Rebuttal Report ¶238 states "the CDC 2021 Clinical Guidelines acknowledges that Truvada® for PrEP may be prescribed where a patient reports consistent and correct use of condoms, *but still requests prescription of Truvada® for PrEP*." (emphasis added).

70.     Flexner Rebuttal Report ¶¶240-241 point to N.Y.D.O.H. recommendations for consistent and correct use of condoms in conjunction with PrEP.  I note that condom use recommendations are under the heading "Risk Reduction," which appears to acknowledge that

condom usage merely reduces (rather than eliminates) the risk of HIV exposure. GILDDE02689460-509 at GILDDE02689482.  I note that the N.Y.D.O.H documents cited in Flexner Rebuttal Report ¶¶240-241 provide additional recommendations that reinforce the instructions in the Truvada Insert discussed in My Opening Report.  For example, the N.Y.D.O.H "PrEP to Prevent HIV and Promote Sexual Health" guideline state:

- "Clinicians should: Obtain an HIV-1/2 antigen/antibody combination immunoassay (recommended) or HIV-1/HIV-2 antibody differentiation immunoassay (alternative) laboratory-based screening test before initiation of PrEP."  GILDDE02689460-509 at GILDDE02689479.

- "Make clear that PrEP efficacy is highly dependent on adherence; assess for readiness and willingness to adhere to PrEP and recommend follow-up care and assess for barriers to adherence." Ensure the patient has an understanding of "[t]he need for adherence to the dosing schedule for PrEP to be protection"  Evaluate the patient's knowledge of the "[i]mportance of adherence to PrEP."  GILDDE02689460-509 at GILDDE02689471.

- "Clinicians should: … Perform HIV testing every 3 months while a patient is using PrEP."  GILDDE02689460-509 at GILDDE02689479.  "Routine HIV testing is an integral component of the safe use of PrEP."  *Id.* at GILDDE02689484.  Evaluate the patient's knowledge of the "[i]mportance of scheduled HIV testing and routine monitoring."  *Id.* at GILDDE02689471.

The N.Y.D.O.H PrEP Frequently Asked Questions state:

RESTRICTED INFORMATION

- "The six-point PrEP program" includes "HIV testing – to make sure the person was not recently infected with HIV; Taking one Truvada pill, once a day, every day; … Counseling and support for taking the medication regularly (adherence)" and the "Initial Appointment" includes "HIV testing."   GILDDE02689970-75 at GILDDE02689970 (2018 FAQ); GILDDE02689983-88 at GILDDE02689983 (2016 FAQ); GILDDE02689456-59 at GILDDE02689456-57 (2015 FAQ).

- "Every Three Months:  HIV testing and other assessments are repeated every three months."  GILDDE02689970-75 at GILDDE02689970 (2018 FAQ);  GILDDE02689983-88 at GILDDE02689983 (2016 FAQ); GILDDE02689456-59 at GILDDE02689457 (2015 FAQ).

- "HIV testing is a critical component in the six-point PrEP program.  HIV testing is done before a person begins PrEP to ensure that only HIV negative people are prescribed the PrEP medication.  Periodic HIV testing for everyone taking PrEP ensures early identification of anyone who becomes infected so that the person can stop taking Truvada and avoid the development of drug resistance."   GILDDE02689970-75 at GILDDE02689975 (2018 FAQ); GILDDE02689983-88 at GILDDE02689987-88 (2016 FAQ); GILDDE02689456-59 at GILDDE02689459 (2015 FAQ).

71.   ***Second***, Flexner Rebuttal Report ¶243 asserts that "where a patient taking Truvada® for PrEP is always aware of the HIV status of her sexual partners, and is aware that they are negative for HIV at the time of sexual intercourse, such a patient would not experience a potential

exposure to HIV." *See also* Flexner Rebuttal Report ¶¶244-248.  The Flexner Rebuttal Report relies on the "Grov" article for this assertion.  *Id.* (citing Grov et al., "Prevalence of and Factors Associated with the Use of HIV Serosorting and Other Biomedical Prevention Strategies Among Men Who Have Sex with Men in a US Nationwide Survey," AIDS and Behavior 22:2743-55 (2018) [GILDDE02689957-69]).  Grov refers to HIV-negative PrEP users seeking sexual partners that are believed to also be HIV-negative as a type of "serosorting."

72.     Grov acknowledges that "we do not know the actual HIV statuses of participants' partners, and it may be that participants *believed* their partners shared the same status," and that belief may (or may not) have been accurate.  Grov at 2753 (emphasis in original). Grov is clear that serosorting may actually ***increase*** (rather than decrease) HIV acquisition:

> Some research has suggested that serosorting is not as effective at reducing HIV transmission as condom use, and some evidence suggests that serosorting may actually increase HIV acquisition [33]. This may be due to low HIV testing rates/frequency [33], yet partners still report they are HIV-negative.

Grov at page 2752.  Grov reference 33 is Wilson et al., "Serosorting may increase the risk of HIV acquisition among men who have sex with men." Sexually Transmitted Diseases 37:13-7 (2010) ("Wilson").

73.     Wilson states that serosorting is only beneficial in reducing the relative risk of HIV infection where the prevalence of undiagnosed HIV infections is less than approximately 20% and 40% in populations of high (70%) and low (20%) treatment rates, respectively, as follows:

> Results:  We demonstrate that serosorting is unlikely to be highly beneficial in many populations of men who have sex with men, especially where the prevalence of undiagnosed HIV infections is relatively high.  We find that serosorting is only beneficial in reducing the relative risk of HIV transmission if the prevalence of undiagnosed HIV infections is less than ~20% and ~40%, in populations of high

> (70%) and low (20%) treatment rates, respectively, even though treatment reduces
> the absolute risk of HIV transmission.  Serosorting can be expected to lead to
> increased risk of HIV acquisition in many settings.  In settings with low HIV testing
> rates serosorting can more than double the risk of HIV acquisition.

Wilson at 13 (Abstract).  Wilson further explains the problems of serosorting actually ***increasing***
the risk of HIV exposure when a partner's serostatus is unknown as follows:

> Serosorting may in fact lead to increased risk if a partner's HIV serostatus is
> unintentionally misreported because it is unknown.  Consequently, the proportion
> of the sexually active population that is HIV-infected but undiagnosed is a crucial
> determinant of the effectiveness of serosorting.  In the ideal scenario of 100%
> accurate knowledge and no misreporting of serostatus, serosorting is 100%
> effective at preventing HIV acquisition by HIV-negative people who practice it.
> Conversely, serosorting may result in substantially increased risk of HIV
> acquisition if a large proportion of the HIV-infected population is undiagnosed and
> serosorting thereby leads to the formation of discordant partnerships and more
> unprotected sex.

*Id.*  The ideal scenario of 100% accurate knowledge and no misrepresenting of serostatus does not
exist in the real world, as described in more detail in a few paragraphs below in this report.

74.     Wilson further explains that the effectiveness of serosorting depends on accurate
disclosure of serostatus and is "a potentially risky strategy" as follows:

> The effectiveness of serosorting depends on accurate disclosure of HIV serostatus.
> Some HIV-infected people may mistakenly believe that they are not infected and
> thus disclose as HIV-negative to sexual partners.  Disclosure of HIV status in sexual
> partnerships may also lead to other strategies to reduce the risk of HIV
> transmission, such as strategic positioning and negotiated safety.  But disclosing
> HIV status may be associated with substantial stigma, so that even if a man knows
> he is HIV-infected, he may not disclose his HIV status or may even disclose false
> information (although this is thought to be relatively rare).  However, even if

truthful disclosure always occurs, serosorting is a potentially risky strategy and its effectiveness for an individual uninfected man also depends on the frequency of testing of his sexual partner and the partner's previous risk exposure.

*Id.* at 16.

75.     Wilson explains that serosorting is only of any benefit in the following circumstances:

We estimate that serosorting is only of any benefit at all for reducing HIV risk when the proportion of men with HIV who are undiagnosed is less than ~20% in the case of high treatment rates (70%) and less than ~40% for low treatment rates (20%).

*Id.* at 14.  Wilson states that "[i]t is widely cited that in the United States ~48% of all infections are undiagnosed" and "[o]ther estimates suggest that ~25% of HIV infections in the United States are undiagnosed." *Id.*  Wilson states that "[w]e assume treatment rates are between 50% and 70% among diagnosed cases in the United States."  *Id.*  Based on these estimates, Wilson states:

Using commonly cited estimates of the percentage of undiagnosed infections in the United States (of 48%), our model indicates that practicing serosorting in the United States is likely to increase risk by almost 50% (Fig. 1). If just 25% of HIV infections in the United States were undiagnosed then it is unclear whether practicing serosorting would increase or decrease the risk of HIV acquisition (Fig. 1).

*Id.* at 15.

76.     Wilson concludes that serosorting is not appropriate for even partial protection from HIV exposure as follows:

Our analysis suggests that unless the surrounding population has a small proportion of undiagnosed infections, serosorting is likely to increase the risk of HIV acquisition in practice.  Therefore, it is not appropriate to suggest that serosorting may offer partial protection from HIV.  The available evidence suggests that HIV-uninfected men who serosort remain at risk of acquiring HIV infection, and quite possibly at significantly increased risk compared with not serosorting.

RESTRICTED INFORMATION

*Id.* at 16.  For at least the above reasons, I disagree with the Flexner Rebuttal Report that PrEP users who only seek sexual partners that are reportedly HIV-negative would not experience a potential HIV exposure.

77.    In addition, Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 found that 84% of new users and 82% of longer-term PrEP users have had multiple sexual partners and are not monogamous:



*Id.* at GILDDE02636285.  In addition, 64% of new users and 62% of longer-term users have had sex without a condom with someone of unknown HIV status.  *Id.*  Further, 86% of heterosexual PrEP users have had sex without a condom with someone of unknown HIV status:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

| | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are HIV negative) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |

Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A9. We would like to know about some of your life experiences. We realize that some of these may be very personal. We ask that you be truthful. Remember your responses are anonymous and confidential. Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)


GILEAD
[DateTime]

88

*Id.* at GILDDE02636287.

78.     ***Third***, Flexner Rebuttal Report ¶249 asserts that there is no potential HIV exposure "where a patient is the HIV-negative partner in a serodiscordant couple (i.e., one HIV-negative partner and one HIV-positive partner) and the HIV positive partner has an undetectable viral load based on the ongoing administration of an HIV treatment regimen. … [t]his concept is sometimes referred to as undetectable equals untransmittable or uninfectious ('U=U')."  *See also* Flexner Rebuttal Report ¶¶250-259.

79.     Risk reduction in serodiscordant couples depends upon the HIV-positive partner "***achieving and maintaining*** an undetectable viral load."  GILDDE02689950-52 at 51 (emphasis added).  "Even when viral load is undetectable, HIV is still present in the body, and the virus

rebounds to detectable levels if treatment is stopped." *Id.* HIV transmission to the HIV-negative partner has occurred where "[t]he partner with HIV had achieved viral suppression but the ART regimen later failed or the partner with HIV had stopped taking their medication." GILDDE02690045-48 at GILDDE02690045.

80.    In 2020, a report was published on the accuracy of self-reporting of viral suppression among HIV-positive men having HIV-negative male partners. *See* Stephenson et al, "Accuracy in self-report of viral suppression among HIV-positive men with HIV-negative male partners," Journal of Acquired Immune Deficiency Syndromes, 83:210-214 (2020) ("Stephenson"). The results of the report found that "[a]lthough 72.5% of men could accurately report their viral load status, 20% reported that they were virally suppressed when they did not have a biomarker confirmed measure of viral suppression." *Id.* at page 2. Further details of the results were reported as follows:

> In terms of accuracy of reporting of viral suppression, 72.5% of men accurately reported their viral suppression status: this was comprised of 62.5% of men (n=75) who accurately reported that they were virally suppressed (e.g. both self-report and biomarker) and 10% of men (n=12) reported they were not virally suppressed and had a detectable viral load. In contrast, 27.5% (n=33) of men inaccurately reported their viral suppression status. ***In total, 20% (n=24) of men reported that they were virally suppressed and did not have a biomarker confirmed measure***, and 7.5% (n=9) of men reported that they were not virally suppressed but did have a biomarker of viral suppression.

*Id.* at page 5 (emphasis added). The report concluded that even if a partner self-reports to be virally suppressed, there is still a need to continue supporting PrEP as a primary prevention of HIV. *Id.* at page 2 ("These results highlight the need to provide interventions to MSM living with HIV to support access to care and ensure current knowledge of viral load, and to continue to support

primary prevention of HIV through condom use and pre-exposure prophylaxis (PrEP).").  Due to potential inaccuracies in perceived viral load suppression, I disagree with the Flexner Rebuttal Report that sexual intercourse between a PrEP patient and an HIV-positive partner that purportedly has an undetectable viral load suppression would eliminate the risk of HIV exposure.

81.     Flexner Rebuttal Report ¶¶252-257 point to various CDC and N.Y.D.O.H. statements about U=U, and Flexner Rebuttal Report ¶258 points to statements in the Truvada insert about "knowledge of partner(s)' HIV-1 status, including viral suppression status."  However, Flexner Rebuttal Report ¶254 states "the CDC 2021 Clinical Guidelines acknowledges that Truvada® for PrEP may be prescribed where a patient reports having a virally suppressed HIV-positive partner, *but still requests prescription of Truvada® for PrEP*." (emphasis added).  Similarly, Flexner Rebuttal Report ¶257 states "N.Y.D.O.H. AIDS Institute's 'PrEP to Prevent HIV and Promote Sexual Health' guidelines state that *PrEP should not be withheld from candidates who 'request PrEP even if they have a partner living with HIV with an undetectable viral load*.'" (emphasis added).  The N.Y.D.O.H. guidelines further state "[d]iscuss with patients in serodifferent partnerships the benefits and risks of relying on their partner's undetectable viral load achieved with ART alone versus the addition of PrEP for preventing sexual transmission of HIV."   GILDDE02689460-509 at GILDDE02689471.  If HIV exposure were completely eliminated where a patient reports having a virally suppressed HIV-positive partner, then PrEP would be unnecessary.  However, the CDC recommendations, N.Y.D.O.H. recommendations, and Truvada inserts cited in the Flexner Rebuttal Report recommend the use of PrEP where a patient reports having a virally suppressed HIV-positive partner precisely because a reportedly suppressed HIV-positive partner may inaccurately perceive the status of their viral load suppression such that

RESTRICTED INFORMATION

the risk of HIV exposure has not been eliminated.  Also, the uninfected partner may have relationships outside of the partnership which could include high risk persons.

82.    ***Fourth***, Flexner Rebuttal Report ¶260 asserts that "patients taking Truvada® for PrEP who do not engage in any sexual intercourse, do not share needles or other injection drug equipment, and otherwise engage in no behavior that could result in a potential exposure to HIV do not practice the 'wherein' clause of claim 13 of the '509 Patent, claim 13 of the '333 Patent, claim 13 of the '191 Patent, and claim 12 of the '423 Patent."  *See also* Flexner Rebuttal Report ¶¶261-263.  As noted in My Opening Report ¶¶97-98, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV.  Therefore, the patient described in Flexner Rebuttal Report ¶260 that does not currently and will not engage in any sexual intercourse, does not currently and will not share needles or other injection drug equipment, and does not currently and will not otherwise engage in behavior that could result in a potential exposure is a patient that does not meet the criteria described in the Truvada insert for receiving Truvada for PrEP.

83.    Flexner Rebuttal Report ¶261 states "the CDC 2021 Clinical Guidelines acknowledges that Truvada® for PrEP may be prescribed where a patient reports having no anal or vaginal sex in the past 6 months, ***but still requests prescription of Truvada® for PrEP***."  (emphasis added).  The CDC Clinical Guidelines go on to explain that patients requesting PrEP may be uncomfortable reporting sexual or injection behaviors to their prescriber:

> Patients may request PrEP because of concern about acquiring HIV but not feel comfortable reporting sexual or injection behaviors to avoid anticipated stigmatizing responses in health care settings.  For this reason, after attempts to assess patient sexual and injection behaviors, patients who request PrEP should be offered it, even when no specific risk behaviors are elicited.

GILDDE02689769-876 at GILDDE02689790.  In addition, a patient that reports no **past** potential exposure events may expect to engage in **future** at-risk activities for HIV exposure, which presents an ideal prevention scenario for prescribing Truvada for PrEP.  Therefore, the CDC recommendation to provide Truvada for PrEP to patients requesting it even if the patient reports no potential HIV exposures does not mean that the patient will not engage in activities at-risk for HIV exposure.   The patient may simply feel uncomfortable reporting at-risk sexual or injection behaviors to the Truvada for PrEP prescriber.

84.     Flexner Rebuttal Report ¶216 repeats the argument from step (b) about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body."  I addressed that argument above in this Reply Report with respect to step (b).

85.     Flexner Rebuttal Report ¶264 repeats the argument that "a patient who has missed daily doses of Truvada for PrEP" has insufficient amounts of TDF and FTC to inhibit establishment of HIV.  I addressed that argument above in this Reply Report with respect to the preamble.

### D.     Prescription and Use of Truvada Directly Infringes Claims 13 and 14 of the '423 Patent

86.     Claim 13 of the '423 patent is reproduced below:

13. The process of claim 12, wherein combination is compounded into a single formulation.

87.     Flexner Rebuttal Report ¶270 states that "Dr. Murphy's opinion on [claim 13 of the '423 patent] does not address and appears to be divorced from the relevant claim language," because the "combination" that is recited in claim 12 of the '423 Patent is "a pharmaceutically effective amount of emtricitabine; and a pharmaceutically effective amount of tenofovir or a tenofovir prodrug."   I addressed the combination of a pharmaceutically effective amount of

emtricitabine and tenofovir (or a tenofovir prodrug) with respect to step (b) of independent claim 12 of the '423 patent. *See* My Opening Report ¶¶81-87. As I explained in My Opening Report ¶102, claim 13 of the '423 patent depends from claim 12 such that all limitations recited in claim 12 are included in claim 13. Accordingly, I addressed the "combination" that is recited in claims 12-13 of the '423 patent in My Opening Report.

88.     Flexner Rebuttal Report ¶¶270 and 273 repeat the argument about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body." I addressed that argument above in this Reply Report with respect to step (b) of claim 12 from the '423 patent.

89.     Claim 14 of the '423 patent is reproduced below:

> 14. The process of claim 13, wherein the single formulation is administered daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus.

90.     Flexner Rebuttal Report ¶272 asserts that instructions in the Truvada Insert do not "establish any actual occurrence of direct infringement by any patient or any physician." *See also* Flexner Rebuttal Report ¶¶274, 276-277, and 284[7] (containing similar assertions). Flexner Rebuttal Report ¶¶281-282 assert that Gilead's REMS survey results "do not establish the actual occurrence of any direct infringement by any patient or any physician." However, Gilead's REMS surveys provide direct evidence of the population of patients taking Truvada for PrEP that do, in practice, take Truvada daily for several days, weeks and months both before and after an exposure.

---

[7] Flexner Rebuttal Report ¶284 at footnote 19 notes there are no citations to the quoted material in My Opening Report ¶112. Citations to the Truvada inserts for the quoted material are found in My Opening Report ¶¶82, 86, and 97-99.

For example, during the REMS 3-5 survey periods, between 74-100% of Truvada for PrEP patients did not miss a daily dose of Truvada, as shown in the table below:

| In the past month, have you missed any doses of TRUVADA? | | |
|---|---|---|
| Yes (%) | 22.1 | GILDDE00251840 (REMS 3) |
| | 25.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| No (%) | 77.9 | GILDDE00251840 (REMS 3) |
| | 74.2 | GILDDE00263367 (REMS 4) |
| | 100.0 | GILDDE00270758 (REMS 5) |
| I don't know (%) | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| **How many doses of TRUVADA have you missed in the past month? (All percentages are based on answers from only UIs who missed doses.)** | | |
| 1-3 doses (%) | 83.9 | GILDDE00251841 (REMS 3) |
| | 81.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| 4-7 doses (%) | 12.9 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| 8-12 doses (%) | 3.2 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| More than 12 doses (%) | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't remember | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| **How long have you been taking TRUVADA to reduce the risk of getting HIV?** | | |
| Less than 1 month (%) | 28.1 | GILDDE00251864 (REMS 3) |
| | 20.5 | GILDDE00263390 (REMS 4) |
| | 20.0 | GILDDE00270779 (REMS 5) |
| Between 1 month and 6 months (%) | 37.0 | GILDDE00251864 (REMS 3) |
| | 32.6 | GILDDE00263390 (REMS 4) |
| | 40.0 | GILDDE00270779 (REMS 5) |
| More than 6 months, but less than 1 year (%) | 18.5 | GILDDE00251864 (REMS 3) |
| | 14.4 | GILDDE00263390 (REMS 4) |
| | 0.0 | GILDDE00270779 (REMS 5) |
| More than 1 year (%) | 16.4 | GILDDE00251864 (REMS 3) |
| | 32.6 | GILDDE00263390 (REMS 4) |
| | 40.0 | GILDDE00270779 (REMS 5) |
| I don't remember (%) | 0.0 | GILDDE00251864 (REMS 3) |

| | 0.0 | GILDDE00263390 (REMS 4) |
| | 0.0 | GILDDE00270779 (REMS 5) |

Of the patients that missed a daily dose of Truvada, all of them (100%) missed 12 doses or less, which corresponds to 100% of Truvada patients surveyed taking at least 4 pills per week.  In addition, 100% of PrEP patients have taken PrEP at least for several days and/or several weeks, and many have been taking PrEP for many months, based on their answers to the question "How long have you been taking TRUVADA to reduce the risk of getting HIV?"

91.     Gilead's REMS surveys provide direct evidence of the population of patients taking Truvada for PrEP that are, in practice, potentially exposed to HIV during treatment.  For example, during the REMS 3-5 survey periods, between 65.5-100% of Truvada for PrEP patients did not use a condom the last time they had sex, and between 81.3-100% had unprotected sex within the last 3 months, as shown in the table below:

| Did you use a condom the last time you had sex? | | |
|---|---|---|
| Yes (%) | 34.2 | GILDDE00251842 (REMS 3) |
| | 29.6 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| No (%) | 65.5 | GILDDE00251842 (REMS 3) |
| | 69.6 | GILDDE00263368 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.8 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| Have you had unprotected sex within the last 3 months? | | |
| Yes (%) | 81.3 | GILDDE00251842 (REMS 3) |
| | 85.6 | GILDDE00263369 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| No (%) | 18.3 | GILDDE00251842 (REMS 3) |
| | 14.4 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.0 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| Do you know the HIV status of your sexual partner? | | |
| Yes, I known the HIV status of my sexual partner(s) (%) | 43.5 | GILDDE00251841 (REMS 3) |
| | 40.0 | GILDDE00263368 (REMS 4) |

RESTRICTED INFORMATION

| | 60.0 | GILDDE00270759 (REMS 5) |
|---|---|---|
| I know the HIV status of some of my sexual partners. (%) | 49.6 | GILDDE00251841 (REMS 3) |
| | 52.0 | GILDDE00263368 (REMS 4) |
| | 40.0 | GILDDE00270759 (REMS 5) |
| No, I don't know the HIV status of my sexual partner(s). | 6.8 | GILDDE00251841 (REMS 3) |
| | 8.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

In addition, between 40-60% of PrEP patients either do not know the HIV status of their sexual partners or only know the HIV status of some of their sexual partners. Having unprotected condomless sex or sexual partners of unknown HIV status increases the risk for HIV exposure. Indeed, the Truvada insert specifically calls out these types of activities as at-risk behaviors for potential exposures as described in My Opening Report ¶98. Also, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they engage in activities that result in potential exposure to HIV, as described in My Opening Report ¶¶97-99. Because the patients initiated PrEP before potential exposure and continued taking PrEP after the potential exposure, the PrEP patients met claim 14 of the '423 patent.

92.     Additional evidence of PrEP patients engaging in potential HIV exposure activities is provided by Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017. For example, based on survey results, Gilead concluded that "[r]isky behaviors abound: few [PrEP users] are monogamous and most have had unprotected anal sex:"



*Id.* at GILDDE02636285.   Additional risky behaviors of the PrEP patients were reported as follows:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

|  | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are HIV negative) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |


[DateTime]

Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A.9. We would like to know about some of your life experiences. We realize that some of these may be very personal. We ask that you be truthful. Remember your responses are anonymous and confidential. Please think about your sexual activity in the past year as you answer this question; *item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)

dd

*Id.* at GILDDE02636287.  Additional risky behavior of the surveyed PrEP patients are reported as follows:



*Id.* at GILDDE02636288.  The PrEP users reported that they perceived condomless sex, having sex with someone whose HIV status is unknown, or having sex with someone who has HIV are activities that place them at-risk for acquiring HIV as follows:



*Id.* at GILDDE02636284.  This study included 50 "new starts" that had "initiated PrEP on or after February 2017, and 50 "longer-term (LT) users" that had been using PrEP at least 8 months because they had initiated PrEP before February 17:



*Id.* at GILDDE02636228.  The study included longer-term PrEP users that had initiated PrEP use

in the year 2012, 2013, 2014, 2015, 2016, and 2017.  *Id.*  Because the PrEP users initiated PrEP

before potential exposure and continued taking PrEP after engaging in at-risk behaviors for

potential exposures, the PrEP users met claim 14 of the '423 patent.

        93.      Flexner Rebuttal Report ¶¶282-283 repeat arguments about the use of prevention

strategies supposedly not resulting in a potential exposure to HIV that were previously raised with

respect to the "wherein" clause recited by claim 12 of the '423 patent, which I already addressed

above in this Reply Report.

**E.      Prescription and Use of Truvada Directly Infringes Claim 18 of the '423 Patent**

94.      Claim 18 of the '423 patent recites "[t]he process of claim 12, wherein the combination comprises the tenofovir prodrug."

95.      Flexner Rebuttal Report ¶289 repeats the argument about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body." I addressed that argument above in this Reply Report with respect to step (b) of claim 12 from the '423 patent.

**F.      Prescription and Use of Truvada Directly Infringes Claims 17 and 18 of the '191 Patent**

96.      Claim 17 of the '191 patent is reproduced below:

17. The process of claim 13, wherein:

(i) the pharmaceutically effective amount of emtricitabine; and

(ii) the pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate;
are formulated in a single table.

97.      Claim 18 of the '191 patent is reproduced below:

18. The process of claim 17, wherein the tablet comprises 200 milligrams of emtricitabine and 300 mg of tenofovir disoproxil fumarate.

98.      Flexner Rebuttal Report ¶¶292-301 do not dispute that taking Truvada for PrEP according to the Truvada insert infringe claim 18 of the '191 patent. Instead, these paragraphs assert that "on-demand PrEP" (also described as "2-1-1 PrEP" or "off-label PrEP") does not

infringe claim 18 because it involves a "double dose of Truvada the day before a potential exposure." *See, e.g.,* Flexner Rebuttal Report ¶294.[8]

99.     "On-demand PrEP" "is not currently part of CDC's guidelines for PrEP use, which still recommends using PrEP as prescribed for those at risk for HIV.  Taking PrEP as prescribed is currently the only FDA-approved schedule for taking PrEP to prevent HIV." GILDDE02690049-50 at GILDDE02690049.  Therefore, any "on-demand PrEP" use in the U.S. would be off-label and not in accordance with the FDA-approved Truvada insert instructions.

100.    The CDC has articulated good reasons why "on-demand PrEP" is not recommended:

> Since available data suggest that men in this study were taking PrEP an average of three to four days per week, CDC cautions that researchers do not yet know if this regimen will work among MSM who have sex less frequently and would therefore be taking PrEP less often.

*See* CDC Statement on IPERGAY Trial of Pre-Exposure Prophylaxis (PrEP) for HIV Prevention among Men Who Have Sex with Men, available at https://clinicalinfo.hiv.gov/en/news/cdc-statement-ipergay-trial-pre-exposure-prophylaxis-prep-hiv-prevention-among-men-who-have#:~:text=%E2%80%9CCDC%20welcomes%20the%20findings%20presented,risk%20MSM%20with%20frequent%20sex.  For at least this reason, "CDC continues to recommend only daily use of PrEP, as approved by the FDA.  IPERGAY findings combined with other recent research suggests that even with less than perfect daily adherence, PrEP may still offer substantial

---

[8] I note that Descovy has not been evaluated for "on-demand PrEP."  *See, e.g.*, GILDDE02690039-44 at GILDDE02690040 ("A newer pill, tenofovir alafenamide/emtricitabine (Descovy), is approved for daily PrEP in the US, but it has not yet been evaluated for event-based PrEP."); GILDDE02689460-509 at GILDDE02689476 ("On-demand dosing has not been studied for TAF/FTC; this regimen should not be dosed on-demand in any population.").

protection if taken consistently." *Id.*  The CDC further explained that it continues to recommend only daily dosing of PrEP as follows:

> CDC cautions, however, that researchers do not yet know if this regimen will work among MSM who have sex less frequently or among other populations at high risk for HIV infection. In this study overall, available data suggest that men were taking PrEP an average of three to four days per week.
>
> CDC continues to recommend daily dosing of PrEP and urges people at substantial risk for HIV infection and their health care providers to continue to follow current CDC guidelines.

*Id.*

101.    Flexner Rebuttal Report ¶298 cites to a 2020 document from N.Y.D.O.H. that permits on-demand PrEP.  I note that the earlier 2018 and 2016 documents from N.Y.D.O.H. expressly do ***not*** recommend on-demand PrEP.  *See* GILDDE02689983-88 at GILDDE02689984 (2016 N.Y.D.O.H. document stating, "It is not recommended that a person start and stop the PrEP medication based on when he or she anticipates engaging in condomless sex.  A person considering PrEP should only begin once he or she has made a commitment to taking the medication daily."); *id.* at GILDDE02689986 ("You should not start and stop the PrEP medication based on when you think you will be exposed to HIV."); GILDDE02689970-75 at GILDDE02689971 and GILDDE02689974 (2018 N.Y.D.O.H. document containing the same statements as the 2016 document).  Therefore, the earliest document produced by Gilead from N.Y.D.O.H. that permits on-demand PrEP is from 2020.

102.    Flexner Rebuttal Report ¶297 cites an article reporting that a "nurse-led health clinic run by the San Francisco AIDS Foundation" reported that 354 (30%) of users "chose on-demand PrEP."  While a single health clinic may have observed that 354 users chose on-demand

PrEP, I note that Gilead's own survey of healthcare providers "estimate that only about 5%" of

PrEP patients "intentionally take the product on an as-needed basis:"



GILDDE02644142-92 at GILDDE02644170.

### G. Prescription and Use of Truvada Directly Infringes Claim 1 of the '509, '333, and '423 Patents [prior to an exposure claims]

#### 1. "A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus…"

103.    Flexner Rebuttal Report ¶¶308-335 repeat essentially the same arguments for the

preamble of claim 1 of the '509, '333, and '423 patents that it previously raised in ¶¶130-160 for

the preamble of claim 13 of the '509, '333, and '191 patents and claim 12 of the '423 patent.   I

addressed those arguments above in this Reply Report with respect to the preamble of claim 13 of the '509, '333, and '191 Patents and claim 12 of the '423 Patent.

104.    Flexner Rebuttal Report ¶¶327-334 discuss the iPrEx and Partners PrEP clinical trials in a similar manner as Flexner Rebuttal Report ¶¶148-159.  However, Flexner Rebuttal Report ¶¶327-334 calculates that "the percentage of patients *[actually] exposed* to HIV that are ultimately protected from infection by Truvada for PrEP is only on the order of *2.2-2.5%* per year for patients taking Truvada for PrEP" (emphasis added), whereas Flexner Rebuttal Report ¶¶148-159 calculated the maximum percentage ultimately protected from a *potential exposure* was on the order of *5.1-5.2%* per year.   The 2.2-2.52% calculation is based on the differential between persons that seroconverted in the *FTC-TDF group* of the trials and persons that seroconverted in the *placebo group* as explained in the Flexner Rebuttal Report as follows:

> In the FTC-TDF group, 36 people out of the 1251 group members became infected over the course of the study.  *Id*. at GILDDE02690091, GILDDE02690098-99.  By contrast, in the placebo group, 64 people out of the 1,248 group members became infected over the course of the study.  *Id*. at GILDDE02690091, GILDDE02690098-99.  For each of the two groups, "[s]exual practices were similar in the two groups at all time points."  *Id*.  Accordingly, when a comparison is made between the FTC-TDF group and the placebo group in the iPrEx trial, 28 more persons in the placebo became infected with HIV than those in the group that received FTC-TDF. This difference—the 28-person differential—is the basis for demonstration of efficacy that was reported by the iPrEx trial for the use of TDF/FTC for PrEP in humans. … The 28 people in the FTC-TDF group of the iPrEx trial that were protected represent 2.24% (28/1251) of the total of the 1,251 FTC-TDF group members. Therefore, to the extent that the number of persons taking PrEP that are protected from HIV infection can be generalized from the iPrEx trial, which I explain in further detail below has definite limitations, I would understand 2.24% of people taking PrEP to actually have been protected from

RESTRICTED INFORMATION

infection as a result of the administration of Truvada® for PrEP with a median of 1.2 years of administration.

Flexner Rebuttal Report ¶¶329-330.  I note that the Flexner Rebuttal Report repeats this same 2.2-2.52% calculation with respect to the "thereby" clause.  *See* Flexner Rebuttal Report ¶¶432-439.

105.    The 2.2-2.52% calculation is irrelevant to the Asserted Claims for several reasons.  ***First***, the 2.2-2.52% calculation runs contrary to the Court's claim construction.  As explained in My Opening Report ¶29, I understand that the Court has construed the preamble to be limiting and to mean "a process which allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done." *See also* D.I. 186 at 1, 5-7.  I understand that the Court has construed the "thereby" clause that recites "thereby protecting the primate host from infection with the immunodeficiency retrovirus" to be limiting and to mean "the primate host remains serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving the administration."  My Opening Report ¶31; *see also* D.I. 186 at 1, 8-9.  I understand that the Court similarly clarified that "to be clear, I am not saying that the claims require unnecessary testing to be done, but they do require a negative result on both tests if and when both tests are performed." My Opening Report ¶31; *see also* D.I. 186 at 9.  In accordance with the Court's claim construction, the preamble and "thereby" clause are met whenever a patient taking Truvada for PrEP remains HIV negative in response to a serological or PCR test (and negative in response to both a serological and PCR test if both tests are performed).  There is no requirement to compare a population of patients taking Truvada for PrEP who remain HIV negative with a population of at-risk patients ***not*** taking Truvada for PrEP to determine if the Truvada for PrEP patients are protected.

92

106.    The Court's claim construction makes sense in view of how "protection" is understood in the medical field.  Administration of the claimed compounds according to the claimed process protects the host by ensuring that a therapeutically effective amount of the claimed compounds are present in the host.  The protection provided by the claimed method lasts until the host's body metabolizes, excretes, or otherwise removes the compounds from the host's body. This protection is similar to the protection provided by a vaccine.  As explained in a Medicinal Chemistry textbook, "vaccines enable the body to resist infection by diseases" such that "[i]f the subject is later exposed to a virulent form of the virus, the [host's] immune system is primed and ready to eliminate it."  D.I. 108-5 at Appx4277.  Truvada for PrEP confers protection by having therapeutically effective amounts of FTC and TDF in the host's system such that it is primed and ready to prevent HIV from replicating.  The lack of a self-replicating HIV infection is demonstrated by the Truvada for PrEP patient testing HIV-negative.

107.    ***Second***, the iPrEx and Partners PrEP clinical trials sought to determine the relative reduction in HIV incidence in the FTC-TDF PrEP group compared with the placebo group to determine efficacy.  The clinical trials were randomized to ensure that patterns of exposure were evenly distributed across the study groups.  An efficacy metric is determined on a relative rather than an absolute scale, which allows efficacy to be generalizable across time, populations, and settings.  In contrast, the protection calculations in the Flexner Rebuttal Report are not based on the relative reduction in HIV risk, but on a supposedly absolute probability of exposure in the study population over the period of one year.  For example, the 2.2-2.52% calculation is "***per year*** for patients taking Truvada for PrEP."  Flexner Rebuttal Report ¶327 (emphasis added).  The period of sexual activity for a Truvada for PrEP user can last for several years (indeed, it can last for many years, including the remaining sexually active lifetime of the user).  For example,

Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 showed that 80% of new users planned to be on PrEP for more than 12 months and 88% of longer-term users planned to be on PrEP for more than 12 months as follows:



*Id.* at GILDDE02636251.  An efficacy metric is a more appropriate manner for evaluating Truvada for PrEP using the data collected in the iPrEx and Partners PrEP clinical trials, which is the metric used by the CDC and N.Y.D.O.H., which are discussed in the next paragraph.

108.    ***Third***, the calculation in Flexner Rebuttal Report ¶327 that PrEP is only effective in ultimately protecting 2.2-2.5% of Truvada for PrEP patients per year does not comply with the known real-world >99% effectiveness of Truvada for PrEP in protecting patients from HIV.  For

example, when Truvada for PrEP is taken daily or consistently (at least 4 time per week), "the risk

of acquiring HIV is reduced by about 99% among MSM" as follows:

Oral Daily Pre-Exposure Prophylaxis (PrEP)[t] for HIV-Negative Persons

| Population | Effectiveness Estimate | Source | Interpretation |
|---|---|---|---|
| *"Optimal or Consistent Use"[a] (Taking PrEP daily or at least 4 times per week)* | | | |
| Men who have sex with men (MSM) | ~99% | Grant, 2014 Liu, 2015 McCormack, 2015 Volk, 2015 Marcus, 2017 | When taking PrEP daily or consistently (*at least 4 times per week*), the risk of acquiring HIV is reduced by about 99% among MSM. While daily use is recommended in the U.S., taking PrEP consistently (*at least 4 times per week*) appears to provide similar levels of protection among MSM.  The effectiveness of oral PrEP is highly dependent on PrEP adherence. When taking oral PrEP daily or consistently, HIV acquisition is extremely rare and has not been observed in any of the studies described below.  In clinical practice, a few cases of new HIV infections have been confirmed while HIV-negative individuals were on PrEP with verified adherence. |
| Heterosexual Men and Women | ~99% | *N/A* | There is evidence for the effectiveness of PrEP when used recently[b] (based on detecting TFV in plasma), which is estimated to be 88 – 90% as described below. There is no effectiveness estimate of PrEP when taken daily or consistently among heterosexuals; however, it is likely to be greater than the estimates corresponding to recent use and similar to what has been observed for MSM. The effectiveness of oral daily PrEP is highly dependent on PrEP adherence, with maximum effectiveness when taking PrEP daily and lower effectiveness when not taken consistently. |
| Persons Who Inject Drugs (PWIDs) | 74 – 84% | Choopanya, 2013 Martin, 2015 | PWID face HIV risks from both injecting and sex behaviors. Studies on the effectiveness of PrEP when taken daily among PWID are limited. However, when taking PrEP consistently, the risk of acquiring HIV is reduced by an estimated 74 – 84% among PWID. These estimates are based on tenofovir alone and among a subset of PWID taking PrEP consistently, as verified by directly observed therapy or daily diary plus monthly pill count. The effectiveness of two-drug oral therapy has not been assessed among PWID but may be higher. The effectiveness of oral daily PrEP is highly dependent on PrEP adherence, with maximum effectiveness when taking PrEP daily and lower effectiveness when missing doses. |

D.I. 1-3, Exhibit 19 at 6-8.  The iPrEx OLE Study "resulted in a risk reduction estimate of 100%

when compared to the previous placebo group from the iPrEx trial or the concurrent group of

participants not on PrEP." *Id.* at 9.  "In addition, among those with drug concentration levels

indicating at least 4 pills/week (>700 fmol/punch), there were no new HIV infections, which resulted in a risk reduction estimate of 100% when compared to either comparison group." *Id.* The effectiveness of Truvada for PrEP is summarized as follows:

> In summary, the effectiveness of PrEP among MSM when used daily or consistently is estimated to be 100% in studies. However, a few cases of new HIV infections have been reported with PrEP verified adherence, indicating that the risk has not been completely eliminated and that the effectiveness of PrEP cannot be exactly 100%. Given the number of persons on PrEP worldwide (prepwatch.org (http://www.prepwatch.org), the risk reduction (or effectiveness of PrEP) would likely need to be very high and close to 100% to observe only three confirmed cases of PrEP failure (new HIV infection despite taking PrEP daily or consistently) to date. To represent the protective value of PrEP while also acknowledging the small number of failures, we indicate the effectiveness of PrEP is about 99%.

*Id.* at 10-11. The effectiveness of Truvada for PrEP in heterosexual men and women is also estimated to be about 99%. *Id.* at 6-8; *see also* GILDDE02689976-82 (N.Y.D.O.H. 2020 PrEP FAQ) at GILDDE02689976 ("Clinical trials have shown that PrEP is 99% effective at reducing sexual transmission of HIV.").

109. ***Fourth***, the 2.2-2.5% calculation is based on an implicit assumption that the number of exposures for the pre-FDA approved ***placebo group*** from the iPrEx trial is indicative of the of exposures experienced by post-FDA approved Truvada for PrEP patients. For example, the Flexner Rebuttal Report states:

> [W]hen a comparison is made between the FTC-TDF group and the placebo group in the iPrEx trial, 28 more persons in the placebo became infected with HIV than those in the group that received FTC-TDF. This difference—the 28-person differential—is the basis for demonstration of efficacy that was reported by the iPrEx trial for the use of TDF/FTC for PrEP in humans. More to the point, that 28-person difference between the number of seroconversions that took place in the

> FTC-TDF group and the number of seroconversions that took place in the placebo group are the number of people in the iPrEx trial that "but for" the administration of TDF-FTC would have become infected with HIV. … The 28 people in the FTC-TDF group of the iPrEx trial that were protected represent 2.24% (28/1251) of the total of the 1,251 FTC-TDF group members. Therefore, to the extent that the number of persons taking PrEP that are protected from HIV infection can be generalized from the iPrEx trial, which I explain in further detail below has definite limitations, I would understand 2.24% of people taking PrEP to actually have been protected from infection as a result of the administration of Truvada® for PrEP with a median of 1.2 years of administration.

Flexner Rebuttal Report ¶¶329-330.  However, Truvada for PrEP patients know that they are taking an FDA-approved regimen that is greater than 99% effective in reducing HIV transmission. In contrast, the placebo group from the iPrEx trial did not know if they were receiving pills containing medication or placebo pills, and they did not know if Truvada would be efficacious in preventing HIV transmission.  Post-FDA approved Truvada for PrEP patients likely engage in more HIV exposure activities than the placebo group from the iPrEx trial because they know they are receiving medication that is 99% effective in reducing HIV transmission.  This is known as disinhibition—a willingness to engage in more at-risk behaviors due to the known HIV protection provided by PrEP.   Therefore, the number of HIV exposures that Truvada for PrEP patients experience is expected to be higher than that of the placebo group from the iPrEx trial.  For at least this reason, the assumption in the Flexner Rebuttal Report that only 28 out of 1251 persons would be protected from an actual exposure while taking Truvada for PrEP underestimates real-world protection of PrEP patients.

110.    ***Fifth***, the 2.2-2.5% calculation in the Flexner Rebuttal Report does not comply with the way protection efficacy is calculated by Gilead with respect to its DISCOVER trial.  In Gilead's

DISCOVER trial comparing the protection efficacy of Descovy for PrEP to Truvada for PrEP, it

was determined that 99.4% of Truvada for PrEP "patients remained HIV-free" as follows:



GILDDE00188806-12 at GILDDE00188809.   Based on the efficacy demonstrated by the

DISCOVER trial, Gilead concluded that Descovy provides "[t]he same robust protection as

TRUVADA." *Id.*

### 2. Step (a): "selecting a primate host not infected with the immunodeficiency retrovirus"

111.    Flexner Rebuttal Report ¶¶336-341 repeat essentially the same arguments for step

(a) of claim 1 of the '509, '333, and '423 patents that it previously raised in ¶¶161-166 for step (a)

of claim 13 of the '509, '333, and '191 patents and claim 12 of the '423 patent.   I addressed those

arguments above in this Reply Report with respect to step (a) of claim 13 of the '509, '333, and

'191 Patents and claim 12 of the '423 Patent.

### 3. Step (b): "administering directly to an uninfected primate host a combination comprising: i. a pharmaceutically effective amount of

> **emtricitabine; and ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate [or a tenofovir prodrug]"**

112.    Flexner Rebuttal Report ¶¶ 342-348 repeat essentially the same arguments for step (b) of claim 1 of the '509, '333, and '423 patents that it previously raised in ¶¶167-174 for step (b) of claim 13 of the '509, '333, and '191 patents and claim 12 of the '423 patent.   I addressed those arguments above in this Reply Report with respect to step (b) of claim 13 of the '509, '333, and '191 Patents and claim 12 of the '423 Patent.

### 4.    "wherein the combination is administered prior to an [the] exposure of the primate host to the immunodeficiency retrovirus"

113.    I understand that the Court has construed the term "prior to an [the] exposure" recited by claim 1 of the '509, '333, '191, and '423 patents to require an exposure, which means "contact between an immunodeficiency retrovirus and a host."  *See* My Opening Report ¶33; *see also* D.I. 186 at 2, 11-12.

114.    Flexner Rebuttal Report ¶352 states that implementation of the safer sex practices in the Truvada insert results in a patient that does not "experience an 'exposure.'"  *See also* Flexner Rebuttal Report ¶¶354, 364-367 (referencing the "comprehensive prevention strategy" portions of the Truvada insert and safer sex practices portion of the Medication Guide).   I disagree. Implementation of the safer sex practices and comprehensive prevention strategy described in the Truvada insert may **reduce** the risk of HIV exposure, but do not **eliminate** the risk.  Furthermore, as I explained in My Opening Report ¶148, repeated at-risk acts eventually results in contact with HIV.

115.    I understand that the Opening Flexner Report alleging invalidity of the HHS Patents contains statements reinforcing that repeated at-risk acts eventually results in contact with HIV. For example, I have been informed that the Opening Flexner Report ¶479 states:

A person of ordinary skill in the art would have understood that, by virtue of the 900-person sample size [in Dr. Robert Grant's Concept Sheet for a clinical trial titled "Chemoprophylaxis for HIV Prevention in Peruvian Men"], the men's high risk status, and the 18-month treatment time, some number of the HIV-1 seronegative individuals would come into contact with an immunodeficiency virus. And because these HIV-1 seronegative men with high-risk status would have been receiving "daily" Truvada®, they would have taken Truvada® prior to these exposures.

Also, I have been informed that the Opening Flexner Report ¶641 describes a patient named "Nick" who "regularly had sex with multiple partners in a recognized high-risk demographic (MSM) and refused to use a condom" and "[b]ased on [Dr. Flexner's] understanding of Nick's sexual practices, it is [Dr. Flexner's] opinion that Nick would have been exposed to HIV at least once during his repeated high-risk behavior."

116. Flexner Rebuttal Report ¶353 states that "statements in various versions of the Truvada® Insert does not establish the actual occurrence of any physician conducting this step of claim 1." *See also* Flexner Rebuttal Report ¶362 (providing similar statements). Flexner Rebuttal Report ¶¶358-360 assert that Gilead's REMS survey results "do not establish the actual occurrence of any direct infringement by any patient or any physician." Gilead's REMS surveys provide direct evidence of the population of patients taking Truvada for PrEP that are, in practice, potentially exposed to HIV during treatment. For example, between 65.5-100% of Truvada for PrEP patients did not use a condom the last time they had sex, and between 81.3-100% had unprotected sex within the last 3 months as shown in the below table during the REMS 3-5 survey periods:

| Did you use a condom the last time you had sex? | | |
|---|---|---|
| Yes (%) | 34.2 | GILDDE00251842 (REMS 3) |
| | 29.6 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

RESTRICTED INFORMATION

| No (%) | 65.5 | GILDDE00251842 (REMS 3) |
|---|---|---|
| | 69.6 | GILDDE00263368 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.8 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| **Have you had unprotected sex within the last 3 months?** | | |
| Yes (%) | 81.3 | GILDDE00251842 (REMS 3) |
| | 85.6 | GILDDE00263369 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| No (%) | 18.3 | GILDDE00251842 (REMS 3) |
| | 14.4 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.0 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| **Do you know the HIV status of your sexual partner?** | | |
| Yes, I known the HIV status of my sexual partner(s) (%) | 43.5 | GILDDE00251841 (REMS 3) |
| | 40.0 | GILDDE00263368 (REMS 4) |
| | 60.0 | GILDDE00270759 (REMS 5) |
| I know the HIV status of some of my sexual partners. (%) | 49.6 | GILDDE00251841 (REMS 3) |
| | 52.0 | GILDDE00263368 (REMS 4) |
| | 40.0 | GILDDE00270759 (REMS 5) |
| No, I don't know the HIV status of my sexual partner(s). | 6.8 | GILDDE00251841 (REMS 3) |
| | 8.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

In addition, between 40-60% of PrEP patients either do not know the HIV status of their sexual partners or only know the HIV status of some of their sexual partners. Having unprotected condomless sex or sexual partners of unknown HIV status increases the risk for HIV exposure. Indeed, the Truvada insert specifically calls out these types of activities as at-risk behaviors for exposure as described in My Opening Report ¶148. Also, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they engage in activities that result in repeated potential exposures to HIV that leads to eventual contact with HIV, as described in My Opening Report ¶148.

117. Additional evidence of PrEP patients engaging in potential HIV exposure activities is provided by Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017.

RESTRICTED INFORMATION

For example, based on survey results, Gilead concluded that "[r]isky behaviors abound: few [PrEP users] are monogamous and most have had unprotected anal sex:"



*Id.* at GILDDE02636285.   Additional risky behaviors of the PrEP patients were reported as follows:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

|  | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are HIV negative) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |


GILEAD
[DateTime]

Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A.9.  We would like to know about some of your life experiences.  We realize that some of these may be very personal. We ask that you be truthful.  Remember your responses are anonymous and confidential.  Please think about your sexual activity in the past year as you answer this question; *item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)

dd

*Id.* at GILDDE02636287.  Additional risky behavior of the surveyed PrEP patients are reported as follows:



*Id.* at GILDDE02636288.  The PrEP users reported that they perceived condomless sex, having sex with someone whose HIV status is unknown, or having sex with someone who has HIV as activities that place them at-risk for acquiring HIV as follows:



*Id.* at GILDDE02636284. As previously discussed, Truvada for PrEP patients engage in repeated at-risk acts that eventually results in exposure to HIV. In addition, I understand that Dr. Marcus is providing a reply expert report discussing how patients on Truvada for PrEP frequently engage in repeated activities that result in potential HIV exposures. I have reviewed the Marcus Reply Report and agree with her analysis and conclusions.

118.    Flexner Rebuttal Report ¶363 suggests that the statement in the Medication Guide that "TRUVADA can only help reduce your risk of getting HIV-1 before you are infected" might be referring to post-exposure prophylaxis rather than pre-exposure prophylaxis. I note that post-exposure prophylaxis is not an FDA approved indication for Truvada. Therefore, the statement in

the Truvada insert about Truvada only helping to reducing the risk of getting HIV-1 before a patient is infected should be interpreted as applying to PrEP, not PEP.

119. Flexner Rebuttal Report ¶¶368-405 discuss four supposed "ways that persons of ordinary skill in the art understand patients could, and in fact do, take Truvada® for HIV PrEP in the real world without experiencing an 'exposure.'" Flexner Rebuttal Report ¶368. The four supposed ways are (1) consistent and correct condoms usage; (2) consistent confirmation that persons with whom the patient engages in sexual activity are HIV-negative; (3) an HIV-negative partner in a serodiscordant couple where the HIV-positive partner is undetectable; and (4) a patient that does not engage in activity that could possibly result in exposure to HIV. *See* Flexner Rebuttal Report ¶407. I address each of these four strategies below.

120. ***First***, Flexner Rebuttal Report ¶369 asserts that there is no exposure where there is consistent and correct usage of condoms because the condom creates a physical barrier between sexual partners such that "[w]here a condom is used correctly during intercourse, a condom will not break and will serve as an effective barrier to contact with bodily fluids, thereby preventing an exposure to the immunodeficiency retrovirus." *See also* Flexner Rebuttal Report ¶¶370-384.

121. Consistent and correct condom use may ***reduce*** the risk of HIV exposure, but it does not ***eliminate*** the risk of exposure to HIV. For example, it has been reported that "[a]mong MSM reporting any anal sex with an HIV-positive male partner, we found 70% effectiveness with reported consistent condom use (compared with never use) and no significant protection when comparing sometimes use to never use." Smith et al., "Condom effectiveness for HIV prevention by consistency of use among men who have sex with men in the United States," Journal of Acquired Immune Deficiency Syndromes, 68:337-344 (2015) at page 337 ("Results" section). "Estimated condom effectiveness was 72.3% (95% CI: 60.7% to 80.5%) for receptive anal sex,

62.9% (95% CI: 46.3% to 74.3%) for insertive anal sex, and 70.5% (95% CI: 58.2% to 79.2%) for any receptive or insertive anal sex." *Id.* at page 341. "The point estimate in our analysis of condom effectiveness when 'always' used by MSM during anal sex with any HIV-positive male partners is 70%, modestly less than the 80% estimate for condoms when 'always' used by heterosexual HIV-discordant couples." *Id.* at page 342. To be categorized as "always" using a condom, "the subject must have reported condom use during all" of the anal sex acts with their HIV-positive partner during a 6-month interval. *Id.* at page 339. "This study found that inconsistent ('sometimes') condom use with HIV-positive male partners over months to years offers minimal or no protection, underscoring the importance of the inclusion of messaging by their HIV prevention providers, which supports the adoption and continuation of consistent condom use for MSM." *Id.* at page 343. Furthermore, "[e]ven if condoms are used consistently and correctly, slippage and breakage can occur." Paz-Bailey et al., "The effect of correct and consistent condom use on chlamydia and gonococcal infection among urban adolescents," Archives of Pediatrics and Adolescent Medicine, 159:536-542 (2005) at page 536. "Studies demonstrate that slippage or breakage occurs between 1% and 4% of the time." *Id.* As discussed above, Truvada for PrEP patients are sexually active and engage in repeated sexual acts. Even if a patient always uses consistent and correct condoms, such usage is only effective in preventing contact with HIV 70% of the time. By repeatedly engaging in sex acts, a Truvada for PrEP patient will eventually contact HIV even with consistent and correct condom usage. Therefore, I disagree with the Flexner Rebuttal Report statement that there can be no exposure where there is consistent and correct usage of condoms.

122.    Flexner Rebuttal Report ¶371 points to Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 that "32% of new users of Truvada® for PrEP reported using

condoms 76-100% of the time, while 18% of 'longer-term users' of Truvada® for PrEP reported

using condoms 76-100% of the time." This data indicates that 68% of new users for PrEP are ***not***

consistently using condoms and 82% of "longer-term" PrEP users are ***not*** consistently using

condoms. As discussed above, inconsistent condom use with HIV-positive male partners over

months to years offers minimal or no protection. *See* Smith et al., Journal of Acquired Immune

Deficiency Syndromes, 68:337-344 (2015) at page 343.

    123.    Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017

indicates that 76% of new users and 94% of longer-term PrEP users have had sex without a condom

in the past year:



*Id.* at GILDDE02636285.  Further, 86% of heterosexual PrEP users have had sex without a condom

with someone of unknown HIV status:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

|  | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are <u>HIV negative</u>) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |

 GILEAD
[DateTime]

Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A9.  We would like to know about some of your life experiences.  We realize that some of these may be very personal. We ask that you be truthful.  Remember your responses are anonymous and confidential.  Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)

dd

*Id.* at GILDDE02636287.  In addition, 28% of new users and 34% of longer-term PrEP users

reported having a condom break during sex:



*Id.* at GILDDE02636288.

124.    Gilead's REMS surveys provide direct evidence of the population of patients taking

Truvada for PrEP that are, in practice not consistently using condoms.  For example, during the

REMS 3-5 survey periods, between 65.5-100% of Truvada for PrEP patients did not use a condom

the last time they had sex, and between 81.3-100% had unprotected sex within the last 3 months,

as shown in the table below:

| Did you use a condom the last time you had sex? | | |
|---|---|---|
| Yes (%) | 34.2 | GILDDE00251842 (REMS 3) |
| | 29.6 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| No (%) | 65.5 | GILDDE00251842 (REMS 3) |
| | 69.6 | GILDDE00263368 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |

|  | 0.8 | GILDDE00263368 (REMS 4) |
|  | 0.0 | GILDDE00270759 (REMS 5) |
| **Have you had unprotected sex within the last 3 months?** | | |
| Yes (%) | 81.3 | GILDDE00251842 (REMS 3) |
|  | 85.6 | GILDDE00263369 (REMS 4) |
|  | 100.0 | GILDDE00270759 (REMS 5) |
| No (%) | 18.3 | GILDDE00251842 (REMS 3) |
|  | 14.4 | GILDDE00263369 (REMS 4) |
|  | 0.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
|  | 0.0 | GILDDE00263369 (REMS 4) |
|  | 0.0 | GILDDE00270759 (REMS 5) |

125.    Flexner Rebuttal Report ¶¶373-381 point to various CDC recommendations for consistent and correct use of condoms in conjunction with PrEP.  I note that the CDC 2014 Clinical Guidelines state that "[r]eported consistent ('always') condom use is associated with an 80% reduction in HIV acquisition among heterosexual couples."   GILDDE02689566-632 at GILDDE02689593.   The other CDC recommendations cited in the Flexner Rebuttal Report contain similar statements.  Thus, consistent and correct condom usage merely reduces the risk of HIV exposure, it does not eliminate the risk.  The Truvada insert and the CDC recommendations cited in the Flexner Rebuttal Report recommend the use of PrEP in conjunction with condom usage precisely because consistent and correct condom usage does not eliminate the risk of HIV exposure.  For example, Flexner Rebuttal Report ¶380 states "the CDC 2021 Clinical Guidelines acknowledges that Truvada® for PrEP may be prescribed where a patient reports consistent and correct use of condoms, ***but still requests prescription of Truvada® for PrEP***."  (emphasis added).

126.    Flexner Rebuttal Report ¶¶382-383 point to N.Y.D.O.H. recommendations for consistent and correct use of condoms in conjunction with PrEP.  I note that condom use recommendations are under the heading "Risk Reduction," which appears to acknowledge that condom usage merely reduces (rather than eliminates) the risk of HIV exposure. GILDDE02689460-509 at GILDDE02689482.

127.     ***Second***, Flexner Rebuttal Report ¶385 asserts that "where a patient taking Truvada®
for PrEP is always aware of the HIV status of her sexual partners, and is aware that they are
negative for HIV at the time of sexual intercourse, such a patient would not experience an exposure
to HIV." *See also* Flexner Rebuttal Report ¶¶386-390.  The Flexner Rebuttal Report relies on the
"Grov" article for this assertion.  *Id.* (citing Grov et al., "Prevalence of and Factors Associated
with the Use of HIV Serosorting and Other Biomedical Prevention Strategies Among Men Who
Have Sex with Men in a US Nationwide Survey," AIDS and Behavior 22:2743-55 (2018)
[GILDDE02689957-69]).  Grov refers to HIV-negative PrEP users seeking sexual partners that
are believed to also be HIV-negative as a type of "serosorting."

128.     Grov acknowledges that "we do not know the actual HIV statuses of participants'
partners, and it may be that participants *believed* their partners shared the same status," and that
belief may (or may not) have been accurate.  Grov at 2753 (emphasis in original). Grov is clear
that serosorting may actually ***increase*** (rather than decrease) HIV acquisition:

> Some research has suggested that serosorting is not as effective at reducing HIV
> transmission as condom use, and some evidence suggests that serosorting may
> actually increase HIV acquisition [33]. This may be due to low HIV testing
> rates/frequency [33], yet partners still report they are HIV-negative.

Grov at page 2752.  Grov reference 33 is Wilson et al., "Serosorting may increase the risk of HIV
acquisition among men who have sex with men." Sexually Transmitted Diseases 37:13-7 (2010)
("Wilson").

129.     Wilson states that serosorting is only beneficial in reducing the relative risk of HIV
infection where the prevalence of undiagnosed HIV infections is less than approximately 20% and
40% in populations of high (70%) and low (20%) treatment rates, respectively, as follows:

Results:  We demonstrate that serosorting is unlikely to be highly beneficial in many populations of men who have sex with men, especially where the prevalence of undiagnosed HIV infections is relatively high.  We find that serosorting is only beneficial in reducing the relative risk of HIV transmission if the prevalence of undiagnosed HIV infections is less than ~20% and ~40%, in populations of high (70%) and low (20%) treatment rates, respectively, even though treatment reduces the absolute risk of HIV transmission.  Serosorting can be expected to lead to increased risk of HIV acquisition in many settings.  In settings with low HIV testing rates serosorting can more than double the risk of HIV acquisition.

Wilson at 13 (Abstract).  Wilson further explains the problems of serosorting actually *increasing* the risk of HIV exposure when a partner's serostatus is unknown as follows:

Serosorting may in fact lead to increased risk if a partner's HIV serostatus is unintentionally misreported because it is unknown.  Consequently, the proportion of the sexually active population that is HIV-infected but undiagnosed is a crucial determinant of the effectiveness of serosorting.  In the ideal scenario of 100% accurate knowledge and no misreporting of serostatus, serosorting is 100% effective at preventing HIV acquisition by HIV-negative people who practice it.  Conversely, serosorting may result in substantially increased risk of HIV acquisition if a large proportion of the HIV-infected population is undiagnosed and serosorting thereby leads to the formation of discordant partnerships and more unprotected sex.

*Id.*  The ideal scenario of 100% accurate knowledge and no misrepresenting of serostatus does not exist in the real world, as described in more detail in a few paragraphs below in this report.

130.    Wilson further explains that the effectiveness of serosorting depends on accurate disclosure of serostatus and is "a potentially risky strategy" as follows:

The effectiveness of serosorting depends on accurate disclosure of HIV serostatus.  Some HIV-infected people may mistakenly believe that they are not infected and thus disclose as HIV-negative to sexual partners.  Disclosure of HIV status in sexual

partnerships may also lead to other strategies to reduce the risk of HIV transmission, such as strategic positioning and negotiated safety. But disclosing HIV status may be associated with substantial stigma, so that even if a man knows he is HIV-infected, he may not disclose his HIV status or may even disclose false information (although this is thought to be relatively rare).  However, even if truthful disclosure always occurs, serosorting is a potentially risky strategy and its effectiveness for an individual uninfected man also depends on the frequency of testing of his sexual partner and the partner's previous risk exposure.

*Id.* at 16.

131.    Wilson explains that serosorting is only of any benefit in the following circumstances:

We estimate that serosorting is only of any benefit at all for reducing HIV risk when the proportion of men with HIV who are undiagnosed is less than ~20% in the case of high treatment rates (70%) and less than ~40% for low treatment rates (20%).

*Id.* at 14.  Wilson states that "[i]t is widely cited that in the United States ~48% of all infections are undiagnosed" and "[o]ther estimates suggest that ~25% of HIV infections in the United States are undiagnosed."  *Id.*  Wilson states that "[w]e assume treatment rates are between 50% and 70% among diagnosed cases in the United States."  *Id.*  Based on these estimates, Wilson states:

Using commonly cited estimates of the percentage of undiagnosed infections in the United States (of 48%), our model indicates that practicing serosorting in the United States is likely to increase risk by almost 50% (Fig. 1).  If just 25% of HIV infections in the United States were undiagnosed then it is unclear whether practicing serosorting would increase or decrease the risk of HIV acquisition (Fig. 1).

*Id.* at 15.

132.    Wilson concludes that serosorting is not appropriate for even partial protection from HIV exposure as follows:

> Our analysis suggests that unless the surrounding population has a small proportion of undiagnosed infections, serosorting is likely to increase the risk of HIV acquisition in practice.  Therefore, it is not appropriate to suggest that serosorting may offer partial protection from HIV.  The available evidence suggests that HIV-uninfected men who serosort remain at risk of acquiring HIV infection, and quite possibly at significantly increased risk compared with not serosorting.

*Id.* at 16.  For at least the above reasons, I disagree with the Flexner Rebuttal Report that serosorting PrEP users having only reportedly HIV-negative partners would necessarily result in no HIV exposure.

133.    In addition, Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 found that 84% of new users and 82% of longer-term PrEP users have had multiple sexual partners and are not monogamous:



*Id.* at GILDDE02636285.  In addition, 64% of new users and 62% of longer-term users have had sex without a condom with someone of unknown HIV status.  *Id.*  Further, 86% of heterosexual PrEP users have had sex without a condom with someone of unknown  HIV status:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

|  | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are HIV negative) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |

Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A9. We would like to know about some of your life experiences. We realize that some of these may be very personal. We ask that you be truthful. Remember your responses are anonymous and confidential. Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally. 95% significance shown between New Starts (N) and Longer-term Users (L)


dd

*Id.* at GILDDE02636287.  As previously discussed, Truvada for PrEP patients engage in repeated at-risk acts for exposure to HIV that eventually leads to an actual exposure to HIV.

134.    ***Third***, Flexner Rebuttal Report ¶391 asserts that there is no HIV exposure "where a patient is the HIV-negative partner in a serodiscordant couple (i.e., one HIV-negative partner and one HIV-positive partner) and the HIV positive partner has an undetectable viral load based on the ongoing administration of an HIV treatment regimen. … [t]his concept is sometimes referred to as undetectable equals untransmittable or uninfectious ('U=U')."  *See also* Flexner Rebuttal Report ¶¶392-401.

135.    Risk reduction in serodiscordant couples depends upon the HIV-positive partner "***achieving and maintaining*** an undetectable viral load."  GILDDE02689950-52 at 51 (emphasis

added).  "Even when viral load is undetectable, HIV is still present in the body, and the virus rebounds to detectable levels if treatment is stopped." *Id.*  HIV transmission to the HIV-negative partner has occurred where "[t]he partner with HIV had achieved viral suppression but the ART regimen later failed or the partner with HIV had stopped taking their medication." GILDDE02690045-48 at GILDDE02690045.

136.    In 2020, a report was published on the accuracy of self-reporting of viral suppression among HIV-positive men having HIV-negative male partners.  *See* Stephenson et al, "Accuracy in self-report of viral suppression among HIV-positive men with HIV-negative male partners," Journal of Acquired Immune Deficiency Syndromes, 83:210-214 (2020) ("Stephenson").  The results of the report found that "[a]lthough 72.5% of men could accurately report their viral load status, 20% reported that they were virally suppressed when they did not have a biomarker confirmed measure of viral suppression."  *Id.* at page 2.  Further details of the results were reported as follows:

> In terms of accuracy of reporting of viral suppression, 72.5% of men accurately reported their viral suppression status: this was comprised of 62.5% of men (n=75) who accurately reported that they were virally suppressed (e.g. both self-report and biomarker) and 10% of men (n=12) reported they were not virally suppressed and had a detectable viral load.  In contrast, 27.5% (n=33) of men inaccurately reported their viral suppression status. ***In total, 20% (n=24) of men reported that they were virally suppressed and did not have a biomarker confirmed measure***, and 7.5% (n=9) of men reported that they were not virally suppressed but did have a biomarker of viral suppression.

*Id.* at page 5 (emphasis added).  The report concluded that even if a partner self-reports to be virally suppressed, there is still a need to continue supporting PrEP as a primary prevention of HIV.  *Id.* at page 2 ("These results highlight the need to provide interventions to MSM living with HIV to

support access to care and ensure current knowledge of viral load, and to continue to support primary prevention of HIV through condom use and pre-exposure prophylaxis (PrEP).").  Due to potential inaccuracies in perceived viral load suppression, I disagree with the Flexner Rebuttal Report that sexual intercourse between a PrEP patient and an HIV-positive partner that purportedly has an undetectable viral load would eliminate the risk of HIV exposure.

137.    Flexner Rebuttal Report ¶¶392-399 point to various CDC and N.Y.D.O.H. statements about U=U, and Flexner Rebuttal Report ¶400 points to statements in the Truvada insert about "knowledge of partner(s)' HIV-1 status, including viral suppression status."  However, Flexner Rebuttal Report ¶396 states "the CDC 2021 Clinical Guidelines acknowledges that Truvada® for PrEP may be prescribed where a patient reports having a virally suppressed HIV-positive partner, *but still requests prescription of Truvada® for PrEP*." (emphasis added). Similarly, Flexner Rebuttal Report ¶399 states "N.Y.D.O.H. AIDS Institute's 'PrEP to Prevent HIV and Promote Sexual Health' guidelines state that *PrEP should not be withheld from candidates who 'request PrEP even if they have a partner living with HIV with an undetectable viral load*.'" (emphasis added).  The CDC recommendations, N.Y.D.O.H. recommendations, and Truvada inserts cited in the Flexner Rebuttal Report recommend the use of PrEP where a patient reports having a virally suppressed HIV-positive partner precisely because a reportedly suppressed HIV-positive partner may inaccurately perceive the status of their viral load suppression such that the risk of HIV exposure has not been eliminated.

138.    *Fourth*, Flexner Rebuttal Report ¶402 asserts that "patients taking Truvada® for PrEP who do not engage in any sexual intercourse, do not share needles or other injection drug equipment, and otherwise engage in no behavior that could result in an exposure to HIV do not practice the 'wherein' clause of claim 1 of the '509 Patent, claim 1 of the '333 Patent, and claim 1

of the '423 Patent." *See also* Flexner Rebuttal Report ¶¶403-405.  As noted in My Opening Report ¶¶97-98, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV.  Therefore, the patient described in Flexner Rebuttal Report ¶402 that does not currently and will not engage in any sexual intercourse, does not currently and will not share needles or other injection drug equipment, and does not currently and will not otherwise engage in behavior that could result in an exposure is a patient that does not meet the criteria described in the Truvada insert for receiving Truvada for PrEP.

139.    Flexner Rebuttal Report ¶403 states "the CDC 2021 Clinical Guidelines acknowledges that Truvada® for PrEP may be prescribed where a patient reports having no anal or vaginal sex in the past 6 months, ***but still requests prescription of Truvada® for PrEP.***" (emphasis added).  The CDC Clinical Guidelines go on to explain that patients requesting PrEP may be uncomfortable reporting sexual or injection behaviors to their prescriber:

> Patients may request PrEP because of concern about acquiring HIV but not feel comfortable reporting sexual or injection behaviors to avoid anticipated stigmatizing responses in health care settings.  For this reason, after attempts to assess patient sexual and injection behaviors, patients who request PrEP should be offered it, even when no specific risk behaviors are elicited.

GILDDE02689769-876 at GILDDE02689790.  In addition, a patient that reports no ***past*** potential exposure events may expect to engage in ***future*** at-risk activities for HIV exposure, which presents an ideal prevention scenario for prescribing Truvada for PrEP.  Therefore, the CDC recommendation to provide Truvada for PrEP to patients requesting it even if the patient reports no HIV exposures does not mean that the patient will not engage in repeated activities that put them at-risk for HIV exposure, which will eventually leads to an HIV exposure.  The patient may

simply feel uncomfortable reporting at-risk sexual or injection behaviors to the Truvada for PrEP prescriber.

140.    Flexner Rebuttal Report ¶406 repeats the argument that "a patient who has missed daily doses of Truvada for PrEP" has insufficient amounts of TDF and FTC to inhibit establishment of HIV.  I addressed that argument above in this Reply Report with respect to the preamble.

### 5.    "thereby protecting the primate host from infection with the immunodeficiency retrovirus"

141.    With the exception of Flexner Rebuttal Report ¶¶417-418, the section of the Flexner Rebuttal Report at ¶¶409-440 discussing the "thereby" clause merely repeats the same arguments previously provided by Flexner Rebuttal Report ¶¶308-335 for the preamble.  Also, Flexner Rebuttal Report ¶¶409-440 repeat essentially the same arguments for the "thereby" clause of claim 1 of the '509, '333, and '423 patents that it previously raised in ¶¶130-160 and ¶¶175-209 for the preamble and "thereby" clause of claim 13 of the '509, '333, and '191 patents and claim 12 of the '423 patent.   For the sake of brevity, I incorporate by reference my above reply to the Flexner Rebuttal Report preambles and thereby clause in its entirety here.

142.    Flexner Rebuttal Report ¶¶417-418 assert that a patient taking Truvada for PrEP would not experience a "exposure" because "[t]he Truvada® Insert expressly instructs, in the 'Warnings and Precautions' section, and under the heading 'Comprehensive Management to Reduce the Risk of Sexually Transmitted Infections, Including HIV-1, and Development of HIV-1 Resistance When TRUVADA Is Used for HIV-1 PrEP,' to 'use TRUVADA for HIV-1 PrEP to reduce the risk of HIV-1 infection as part of a comprehensive prevention strategy that includes other prevention measures, including adherence to daily administration and safer sex practices, including condoms, to reduce the risk of sexually transmitted infections (STIs).'"  I addressed the

"exposure" limitation in my Opening Report, and I also addressed it above in this Reply Report with respect to the "wherein" clause of claim 1 that recites "wherein the combination is administered prior to an [the] exposure of the primate host to the immunodeficiency retrovirus."

**H.     Prescription and Use of Truvada Directly Infringes Claims 2 and 3 of the '509, '333, and '423 Patents**

143.    Claim 2 of '509, '333, '423 patents is reproduced below:

> 2. The process of claim 1 wherein selecting a primate host comprises selecting an adult human not infected with the immunodeficiency retrovirus.

144.    A side-by-side comparison of claim 3 from the '509, '333, and '423 patents is provided below.  In the table below, I have <u>underlined</u> some language to highlight differences in wording between claim 3 from the different patents:

| '509 Patent Claim 3 | '333 Patent Claim 3 | '423 Patent Claim 3 |
|---|---|---|
| 3. The process of claim 2 wherein the adult primate host is a male <u>adult primate host</u>. | 3. The process of claim 2, wherein the adult primate host is a male <u>adult primate host</u>. | 3. The process of claim 2, wherein the adult <u>human</u> is a male. |

145.    Flexner Rebuttal Report ¶444 asserts that instructions in the Truvada Insert do not "establish the actual occurrence of any physician" conducting the recited claims.  *See also* Flexner Rebuttal Report ¶¶445 and 448 (containing similar assertions for physicians and patients). However, Gilead's REMS surveys provide direct evidence of the population of male adult patients taking Truvada for PrEP that do, in practice, take Truvada for PrEP in an infringing manner.  For example, the inclusion criteria for uninfected individuals to participate in the REMS surveys was "*[a]dults who are 18 years of age or older* and who are taking Truvada for a PrEP indication as part of a comprehensive prevention strategy to reduce the risk of acquiring HIV-1."  *See* GILDDE00236715-7526 at GILDDE00236737 (REMS 1, emphasis added); GILDDE00243874-

4563 at GILDDE00243896 (REMS 2); GILDDE00251496-2071 at GILDDE00251517 (REMS 3); GILDDE00263067-700 at GILDDE00263086 (REMS 4); GILDDE00270528-916 at GILDDE00270547 (REMS 5).

146.    All 10 uninfected individuals from REMS 1 were adult males.  *See* GILDDE00236715-7526 at GILDDE00236950.  In REMS 2, 71 of the uninfected individuals from the 74 that completed the survey were male (2 were female, and 1 was transgender).  *See* GILDDE00243874-4563 at GILDDE00244353.  In REMS 3, 274 of the uninfected individuals from the 281 that completed the survey were male (2 were female, 4 were transgender, and 1 preferred not to provide their gender).  *See* GILDDE00251496-2071 at GILDDE00251836.  In REMS 4, 130 of the uninfected individuals from the 132 that completed the survey were male (2 were female).  *See* GILDDE00263067-700 at GILDDE00263363.  In REMS 5, all 5 uninfected individuals were adult males.  *See* GILDDE00270528-916 at GILDDE00270754.

### I.    Prescription and Use of Truvada Directly Infringes Claim 8 of the '509 Patent

147.    Claim 8 of the '509 patent is reproduced below:

> 8. The process of claim 1 comprising administering 200 milligrams (mg) of emtricitabine and 300 mg of tenofovir disoproxil fumarate to a human host.

148.    Flexner Rebuttal Report ¶¶452-461 do not dispute that taking Truvada for PrEP according to the Truvada insert infringes claim 8 of the '509 patent.  Instead, these paragraphs assert that "on-demand PrEP" (also described as "2-1-1 PrEP" or "off-label PrEP") does not infringe claim 8 because it involves a "double dose of Truvada the day before a potential exposure."  *See, e.g.,* Flexner Rebuttal Report ¶454.[9]

---

[9] I note that Descovy has not been evaluated for "on-demand PrEP."  *See, e.g.*., GILDDE02690039-44 at GILDDE02690040 ("A newer pill, tenofovir alafenamide/emtricitabine (Descovy), is

149.   "On-demand PrEP" "is not currently part of CDC's guidelines for PrEP use, which still recommends using PrEP as prescribed for those at risk for HIV.  Taking PrEP as prescribed is currently the only FDA-approved schedule for taking PrEP to prevent HIV." GILDDE02690049-50 at GILDDE02690049.  Therefore, any "on-demand PrEP" use in the U.S. would be off-label and not in accordance with the FDA-approved Truvada insert instructions.

150.   The CDC has articulated good reasons why "on-demand PrEP" is not recommended:

> Since available data suggest that men in this study were taking PrEP an average of three to four days per week, CDC cautions that researchers do not yet know if this regimen will work among MSM who have sex less frequently and would therefore be taking PrEP less often.

*See* CDC Statement on IPERGAY Trial of Pre-Exposure Prophylaxis (PrEP) for HIV Prevention among Men Who Have Sex with Men, available at https://clinicalinfo.hiv.gov/en/news/cdc-statement-ipergay-trial-pre-exposure-prophylaxis-prep-hiv-prevention-among-men-who-have#:~:text=%E2%80%9CCDC%20welcomes%20the%20findings%20presented,risk%20MSM%20with%20frequent%20sex.  For at least this reason, "CDC continues to recommend only daily use of PrEP, as approved by the FDA.  IPERGAY findings combined with other recent research suggests that even with less than perfect daily adherence, PrEP may still offer substantial protection if taken consistently." *Id.*  The CDC further explained that it continues to recommend only daily dosing of PrEP as follows:

> CDC cautions, however, that researchers do not yet know if this regimen will work among MSM who have sex less frequently or among other populations at high risk

---

approved for daily PrEP in the US, but it has not yet been evaluated for event-based PrEP."); GILDDE02689460-509 at GILDDE02689476 ("On-demand dosing has not been studied for TAF/FTC; this regimen should not be dosed on-demand in any population.").

for HIV infection. In this study overall, available data suggest that men were taking
PrEP an average of three to four days per week.

CDC continues to recommend daily dosing of PrEP and urges people at substantial
risk for HIV infection and their health care providers to continue to follow current
CDC guidelines.

*Id.*

151.    Flexner Rebuttal Report ¶458 cites to a 2020 document from N.Y.D.O.H. that
permits on-demand PrEP.  I note that the earlier 2018 and 2016 documents from N.Y.D.O.H.
expressly do *not* recommend on-demand PrEP.  *See* GILDDE02689983-88 at GILDDE02689984
(2016 N.Y.D.O.H. document stating, "It is not recommended that a person start and stop the PrEP
medication based on when he or she anticipates engaging in condomless sex.  A person considering
PrEP should only begin once he or she has made a commitment to taking the medication daily.");
*id.* at GILDDE02689986 ("You should not start and stop the PrEP medication based on when you
think you will be exposed to HIV."); GILDDE02689970-75 at GILDDE02689971 and
GILDDE02689974 (2018 N.Y.D.O.H. document containing the same statements as the 2016
document).  Therefore, the earliest document produced by Gilead from N.Y.D.O.H. that permits
on-demand PrEP is from 2020.

152.    Flexner Rebuttal Report ¶457 cites an article reporting that a "nurse-led health
clinic run by the San Francisco AIDS Foundation" reported that 354 (30%) of users "chose on-
demand PrEP."  While a single health clinic may have observed that 354 users chose on-demand
PrEP, I note that Gilead's own survey of healthcare providers "estimate that only about 5%" of
PrEP patients "intentionally take the product on an as-needed basis:"



GILDDE02644142-92 at GILDDE02644170.

### J.   Prescription and Use of Truvada Directly Infringes Claim 19 of the '423 Patent

153.   Claim 19 of the '423 patent recites "[t]he process of claim 1, wherein the combination comprises the tenofovir prodrug."

154.   Flexner Rebuttal Report ¶464 repeats the argument about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body."  I addressed that argument above in this Reply Report with respect to step (b) of claim 12 from the '423 patent.

**K.      Prescription and Use of Truvada Directly Infringes Claim 9 of the '509 and '423 Patents**

155.    A side-by-side comparison of claim 9 from the '509 and '423 patents is provided below. In the table below, I have <u>underlined</u> some language to highlight differences in wording between claim 9 from the different patents:

| '509 Patent Claim 9 | '423 Patent Claim 9 |
|---|---|
| 9. The process of claim 1 wherein the combination <u>is</u> administered daily for several days, weeks or months. | 9. The process of claim 1, wherein the combination <u>s</u>[10] administered daily for several days, weeks or months. |

156.    Flexner Rebuttal Report ¶471 repeats the argument about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body."  I addressed that argument above in this Reply Report with respect to step (b) of claim 12 from the '423 patent.

157.    Flexner Rebuttal Report ¶470 asserts that instructions in the Truvada Insert do not "establish any actual occurrence of direct infringement by any patient or any physician."  *See also* Flexner Rebuttal Report ¶¶472 and 474-475 (containing similar assertions).  However, Gilead's REMS surveys provide direct evidence of the population of patients taking Truvada for PrEP that do, in practice, take Truvada daily for several days, weeks and months both before and after an exposure.  For example, between 74-100% of Truvada for PrEP patients did not miss a daily dose of Truvada as shown in the below table during the REMS 3-5 survey periods:

| In the past month, have you missed any doses of TRUVADA? | | |
|---|---|---|
| Yes (%) | 22.1 | GILDDE00251840 (REMS 3) |
| | 25.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| No (%) | 77.9 | GILDDE00251840 (REMS 3) |
| | 74.2 | GILDDE00263367 (REMS 4) |

---

[10] A POSA would understand that the "s" in claim 9 of the '423 patent is a typographical error and would understand that "s" refers to "is."

| | 100.0 | GILDDE00270758 (REMS 5) |
|---|---|---|
| I don't know (%) | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| **How many doses of TRUVADA have you missed in the past month? (All percentages are based on answers from only UIs who missed doses.)** | | |
| 1-3 doses (%) | 83.9 | GILDDE00251841 (REMS 3) |
| | 81.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| 4-7 doses (%) | 12.9 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| 8-12 doses (%) | 3.2 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| More than 12 doses (%) | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't remember | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| **How long have you been taking TRUVADA to reduce the risk of getting HIV?** | | |
| Less than 1 month (%) | 28.1 | GILDDE00251864 (REMS 3) |
| | 20.5 | GILDDE00263390 (REMS 4) |
| | 20.0 | GILDDE00270779 (REMS 5) |
| Between 1 month and 6 months (%) | 37.0 | GILDDE00251864 (REMS 3) |
| | 32.6 | GILDDE00263390 (REMS 4) |
| | 40.0 | GILDDE00270779 (REMS 5) |
| More than 6 months, but less than 1 year (%) | 18.5 | GILDDE00251864 (REMS 3) |
| | 14.4 | GILDDE00263390 (REMS 4) |
| | 0.0 | GILDDE00270779 (REMS 5) |
| More than 1 year (%) | 16.4 | GILDDE00251864 (REMS 3) |
| | 32.6 | GILDDE00263390 (REMS 4) |
| | 40.0 | GILDDE00270779 (REMS 5) |
| I don't remember (%) | 0.0 | GILDDE00251864 (REMS 3) |
| | 0.0 | GILDDE00263390 (REMS 4) |
| | 0.0 | GILDDE00270779 (REMS 5) |

Of the patients that missed a daily dose of Truvada, all of them (100%) missed 12 doses or less, which corresponds to 100% of Truvada patients surveyed taking at least 4 pills per week. In addition, 100% of PrEP patients have taken PrEP at least for several days and/or several weeks,

and many have been taking PrEP for many months, based on their answers to the question "How long have you been taking TRUVADA to reduce the risk of getting HIV?".

## V.   PRESCRIPTION AND USE OF DESCOVY DIRECTLY INFRINGE THE ASSERTED CLAIMS

158.   As explained in My Opening Report and as further explained below, the use of Descovy for PrEP according to the Descovy package insert infringes the asserted claims.

### A.   Discussion Regarding Patients and Prescriptions of Descovy for PrEP

159.   Flexner Rebuttal Report ¶¶484-485 take issue with some differences in the estimated numbers of patients and prescriptions of Descovy for PrEP that are reported in various sources.   Notwithstanding any small differences in the estimates of PrEP prescriptions and/or users, there is no doubt that thousands upon thousands of patients have taken Descovy for PrEP in the time period from October 3, 2019 through August 2021.   For example, based on estimates of active Descovy for PrEP patients produced in an Excel document by Gilead, there was an average of 76,618 active Descovy for PrEP patients per month from October 2019 through August 2021, with the number of active PrEP patients ranging from a high of 110,971 in August of 2021 to a low of 12,813 in October of 2019.   *See* GILDDE02642770 at tab "DVY" cells DD3-DZ3.   Gilead also estimates that there was a total of 1,405,359 million prescriptions of Descovy for PrEP from October 2019 through August 2021.   *See id.* at cells DD10-DZ10.   The average number of prescriptions per patient in each month was 0.78 based on Gilead's estimates from October 2019 through August 2021.   *See id.* at cells DD35-DZ35.   For the reasons discussed in my Opening Report and additionally in this Reply Report, each prescription of Descovy for PrEP according to the package insert infringes the Asserted Claims and each patient using Descovy for PrEP according to the package insert also infringes the Asserted Claims.

**B.     Prescription and Use of Descovy Directly Infringes Claim 13 of the '509 Patent and Claim 12 of the '423 Patent [prior to a potential exposure claims]**

   **1.     "A process for inhibiting establishment of a human immunodeficiency virus self replicating infection of human immunodeficiency virus infection in a human…"**

160.    Flexner Rebuttal Report ¶¶494-523 assert that physicians prescribing Descovy for PrEP and patients taking Descovy for PrEP do not met the preamble of claim 12 of the '509 and '423 patents, which recites "[a] process for inhibiting establishment of a human immunodeficiency virus self replicating infection of human immunodeficiency virus infection in a human."  The assertions in the Flexner Rebuttal Report do not change the opinions contained in my Opening Report.

161.    Flexner Rebuttal Report ¶495 states that "instructions in the Descovy® Insert relating to periodic patient HIV-status testing does not establish the existence of any actual infringement by patients taking Descovy® for PrEP (or by physicians), because the existence of such instructions do not provide evidence as to the population of patients taking Descovy® for PrEP that are, in practice, regularly tested."  *See also* Flexner Rebuttal Report ¶498 (similar statements about the Medication Guide portion of the Descovy Insert with respect to patients).  Gilead's REMS surveys provide direct evidence of the population of patients taking ***Truvada*** for PrEP that are, in practice, regularly tested.  For example, greater than 95% of ***Truvada*** for PrEP prescribers tested their patients for HIV "more than every 3 months" or "every 3 months" during the REMS 3-5 survey periods, as shown in the table below:

| How often do you generally test the HIV-1 status of you patients for whom you prescribe TRUVADA for a PrEP indication? (Select one) | | |
|---|---|---|
| More than every 3 months (%) | 4.2 (4.6)[11] | GILDDE00251556 (REMS 3) |

_____

[11] The numbers in parenthesis in this table have been adjusted to account for the nine respondents in REMS 2 and one respondent in REMS 3 that answered "I have not prescribed TRUVADA for a PrEP indication."

| | 2.5 (2.6) | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |
| Every 3 months (%) | 83.3 (92.0) | GILDDE00251556 (REMS 3) |
| | 93.2 (94.0) | GILDDE00263125 (REMS 4) |
| | 100.0 | GILDDE00270587 (REMS 5) |
| Less than every 3 months (%) | 3.1 (3.4) | GILDDE00251556 (REMS 3) |
| | 3.4 (3.6) | GILDDE00263126 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 9.4 | GILDDE00251556 (REMS 3) |
| | 0.8 | GILDDE00263126 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |

Similarly, over 98% of uninfected individuals taking *Truvada* for PrEP understood that they should be tested every 3 months, and between 81.8-100% of patients were actually tested either "once a month" or "every 3 months" during the REMS 3-5 survey periods, as shown in the table below:

| Key Risk Message Target Statement | Number of Correct Responses (%) (95% CI) | Cite for REMS 3-5 |
| --- | --- | --- |
| When should you be tested for HIV while taking Truvada? At least every 3 months while taking Truvada. | 98.2 (95.9, 99.4) | GILDDE00251524 (REMS 3) |
| | 99.2 (95.9, 100.0) | GILDDE00263092 (REMS 4) |
| | 100.0 (47.8, 100.0) | GILDDE00270553 (REMS 5) |
| **Since starting taking TRUVADA, how often have you been tested for HIV?** | | |
| Once a month (%) | 6.4 | GILDDE00251840 (REMS 3) |
| | 4.5 | GILDDE00263367 (REMS 4) |
| | 20.0 | GILDDE00270758 (REMS 5) |
| Every 3 months (%) | 75.4 | GILDDE00251840 (REMS 3) |
| | 77.3 | GILDDE00263367 (REMS 4) |
| | 80.0 | GILDDE00270758 (REMS 5) |
| Every 6 months (%) | 3.2 | GILDDE00251840 (REMS 3) |
| | 7.6 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| Once a year (%) | 1.8 | GILDDE00251840 (REMS 3) |
| | 2.3 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| Never | 12.8 | GILDDE00251840 (REMS 3) |
| | 7.6 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't know | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |

RESTRICTED INFORMATION

The number of uninfected individuals tested at least every six months provides further evidence that actual patients taking *Truvada* for PrEP are being periodically tested for HIV.

162.    Descovy for PrEP and Truvada for PrEP are prescribed by the same relevant physician population and used by the same relevant patient population of individuals at-risk for acquiring HIV.  The PrEP instructions in the Truvada Insert are substantially identical to the PrEP instructions in the Descovy Insert.  Physicians prescribing Descovy for PrEP and patients taking Descovy for PrEP are expected to have the same level of adherence to the instructions in the Descovy Insert as physicians prescribing Truvada for PrEP and patients taking Truvada for PrEP. For example, the DISCOVER trial reported "[t]here were no differences in adherence between the two groups [FTC/TDF and FTC/TAF] by self-report, pill count, and DBS analysis."  Mayer et al., "Emtricitabine and tenofovir alafenamide vs emtricitabine and tenofovir disoproxil fumarate for HIV pre-exposure prophylaxis (DISCOVER)," The Lancet, 396:239-254 (2020) at page 248 (GILDDE02690116-31).   "Median pill count adherence was 98% (IQR 93.4-99.8) in the emtricitabine and tenofovir alafenamide group and 98% (93.5-99.9) in the emtricitabine and tenofovir disoproxil fumarate group." *Id.*  In addition, I understand that the FDA determined that the Truvada REMS assessment surveys were no longer required for Truvada because on July 1, 2019 because it determined that "the available information indicates that prescribers and uninfected individuals understand the important key messages with regards to approximate use of emtricitabine/tenofovir disoproxil fumarate for a PrEP indication."  *See* GILDDE00271786-88 at GILDDE00271787.  I also understand that the FDA approved Descovy for PrEP on October 3, 2019, and likewise determined that REMS were not required to assure physician and patient compliance with the Descovy for PrEP instructions in the Descovy Insert.  For at least these

reasons, it would be expected that Gilead's REMS data on Truvada for PrEP adherence is indicative of adherence to periodic testing for Descovy for PrEP.

163.    Additional evidence of PrEP patients being tested for HIV is provided by Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017.  For example, 98% of longer-term PrEP users were tested for HIV at least 2 times per year, 78% were tested at least 3 times per year, and 66% were tested 4 or more times per year:



*Id.* at GILDDE02636268.  The longer-term PrEP users had been taking PrEP for at least 8 months, and therefore would have had a negative HIV test in order to remain eligible to continue taking PrEP:



*Id.* at GILDDE02636228.  For reasons previously discussed, Gilead's data on Truvada for PrEP adherence is expected to be indicative of adherence for Descovy for PrEP.

164.    Flexner Rebuttal Report ¶496 states that the existence of instructions in the Descovy Insert to test patients periodically for HIV does not "provide evidence as to what the results of HIV status tests are for those patients taking Descovy® for PrEP that undergo such tests." I note that the Descovy Insert is clear that Descovy for PrEP is contraindicated for HIV-positive patients because Descovy alone does not constitute a complete regimen for HIV-1 treatment.  *See, e.g.,* My Opening Report ¶237.  Therefore, any patient that continues taking Descovy for PrEP after their periodic testing must have received a negative result.  I further note that it is extremely rare for a patient taking PrEP in accordance with the instructions to test positive for HIV.  *See* D.I.

1-3, Exhibit 19 at 9 ("Only three cases of seroconversion have been confirmed to date worldwide, while HIV-negative individuals were on PrEP with verified adherence.").

165.    Flexner Rebuttal Report ¶497 states "HIV status tests would be required to be negative following a 'potential exposure' event for a specific patient, given that the body of claim 13 of the '509 Patent and claim 12 of the '423 Patent require a 'potential exposure.'"  I addressed the "potential exposure" limitation in my Opening Report, and I also address it later in this Reply Report.  I note briefly here that the periodic testing instructions for physicians and patients contained in the Descovy Insert would occur after the patient undergoes a potential exposure because an at-risk patient taking Descovy for PrEP would have undergone a potential exposure over the course of any given 3-month period.  Therefore, a patient that is tested periodically (e.g., every 3 months) will have been tested after the patient had experienced a potential exposure.

166.    Flexner Rebuttal Report ¶498 asserts that there is no evidence of specific physicians or patients evaluating seronegative individuals for concurrent or recent signs or symptoms consistent with acute viral infections or performing the steps of the Asserted Claims.  Gilead's REMS surveys provide direct evidence of the population of patients taking *Truvada* for PrEP that are, in practice, evaluated by their physicians for concurrent or recent signs of acute viral infections.  For example, greater than 94% of *Truvada* for PrEP prescribers test their patients for HIV if they develop symptoms consistent with an acute HIV-1 infection as shown in the below table during the REMS 3-5 survey periods:

| I test the HIV status of my patients for whom I prescribe TRUVADA for a PrEP indication if they develop symptoms that are consistent with an acute HIV-1 infection. | | |
|---|---|---|
| Always (%) | 87.5 (98.8)[12] | GILDDE00251556 (REMS 3) |
| | 94.9 | GILDDE00263125 (REMS 4) |
| | 100.0 | GILDDE00270586 (REMS 5) |

---

[12] The numbers in parenthesis in this table have been adjusted to account for the 11 respondents in REMS 3 that answered "I have not prescribed TRUVADA for a PrEP indication."

RESTRICTED INFORMATION

| Sometimes (%) | 1.0 (1.2) | GILDDE00251556 (REMS 3) |
| | 5.1 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| Never (%) | 0.0 (0.0) | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 11.5 | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |

For reasons previously discussed, Gilead's data on Truvada for PrEP adherence is expected to be indicative of adherence for Descovy for PrEP.

167.    Flexner Rebuttal Report ¶500[13] states the "purpose of HIV-1 status testing does not establish any actual occurrence of direct infringement by any patient or any physician." This statement was made with reference to paragraph 236 of My Opening Report. Paragraph 236 of My Opening Report stated "[t]he purpose of HIV-1 testing before initiating treatment is to confirm that the patient is negative for HIV-1 while the purpose of testing during treatment is to ensure that the patient remains negative for HIV-1." The importance of HIV-1 testing before and during treatment is highlighted repeatedly by the Descovy Insert (see My Opening Report ¶¶231-236). As mentioned above, Descovy for PrEP is contraindicated for patients that are HIV-positive.

168.    Flexner Rebuttal Report ¶501 states that the preamble is not "practiced by a person taking Descovy® for PrEP where that person has missed daily doses prior to a potential exposure

---

[13] Footnote 36 to Flexner Rebuttal Report ¶500 states that Descovy for PrEP administration does not qualify as a type of "treatment." However, the Descovy Insert repeatedly refers to PrEP as a "treatment." *See, e.g.,* 2022 Descovy Insert at 12 ("Table 3 provides a list of the most common adverse reactions that occurred in 2% or more of participants in either treatment group."); *id.* at 13 (In the DISCOVER PrEP trial "BMD declines of 5% or greater at the lumbar spine and 7% or greater at the total hip were experienced by 4% and 1% of participants, respectively, in both treatment groups at Week 48."); *id.* at 36 ("Trial participants maintained a high risk of sexual HIV-1 acquisition, with high rates of rectal gonorrhea (DESCOVY, 24%; TRUVADA, 25%), rectal chlamydia (DESCOVY, 30%; TRUVADA, 31%), and syphilis (14% in both treatment groups) during the trial.").

such that the person taking Descovy® for PrEP has insufficient levels of Descovy's constituent active components, based on their respective half-lives, to 'inhibit[] establishment of a human immunodeficiency virus self-replicating infection in a human.'" *See also* Flexner Rebuttal Report ¶¶506-507 (similar statements about the missing daily doses).   It is generally accepted that taking 4 or more doses per week of PrEP medication is sufficient to inhibit establishment of a self-replicating HIV infection in a human.  For example, it has been reported that there is an HIV-1 risk reduction of "96% for 4 doses [of Truvada] per week" and "99% for 7 doses per week."  *See* Anderson et al., "Emtricitabine-tenofovir exposure and pre-exposure prophylaxis efficacy in men who have sex with men," Science Translational Medicine, 4:151ra125 (2012) at Abstract and pages 4-5.  As another example, it has been reported that "[t]here were no [HIV] infections at visits where tenofovir diphosphate concentration was 700 fmol per punch or greater, suggesting the use of four to seven tablets per week."  *See* Grant et al., "Uptake of pre-exposure prophylaxis, sexual practices, and HIV incidence in men and transgender women who have sex with men: a cohort study," The Lancet, 14:820-29 (2014) at page 824.  This is further illustrated in Figure 2 of the Grant 2014 paper:



*Figure 2:* **Pre-exposure prophylaxis and HIV incidence**
For those visits on PrEP, the incidence of HIV is estimated by exponential regression by tenofovir diphosphate in dried blood spots. The incidence for the concomitant off-PrEP group is depicted as a constant for reference. The dotted lines represent the estimate bounded by 1 SE. Dosing for each interval is estimated by pharmacokinetic modelling. LLOQ=lower limit of quantitation.

*Id.* at page 824.

169.     Gilead's REMS surveys provide direct evidence of the population of patients taking

*Truvada* for PrEP that do (and do not) miss daily doses of *Truvada*.  For example, between 74-

100% of *Truvada* for PrEP patients did not miss a daily dose of Truvada during the REMS 3-5

survey periods, as shown in the table below:

| In the past month, have you missed any doses of TRUVADA? | | |
|---|---|---|
| Yes (%) | 22.1 | GILDDE00251840 (REMS 3) |
| | 25.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| No (%) | 77.9 | GILDDE00251840 (REMS 3) |
| | 74.2 | GILDDE00263367 (REMS 4) |
| | 100.0 | GILDDE00270758 (REMS 5) |
| I don't know (%) | 0.0 | GILDDE00251840 (REMS 3) |

|  | 0.8 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| **How many doses of TRUVADA have you missed in the past month? (All percentages are based on answers from only UIs who missed doses.)** | | |
| 1-3 doses (%) | 83.9 | GILDDE00251841 (REMS 3) |
|  | 81.8 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| 4-7 doses (%) | 12.9 | GILDDE00251841 (REMS 3) |
|  | 9.1 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| 8-12 doses (%) | 3.2 | GILDDE00251841 (REMS 3) |
|  | 9.1 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| More than 12 doses (%) | 0.0 | GILDDE00251841 (REMS 3) |
|  | 0.0 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| I don't remember | 0.0 | GILDDE00251841 (REMS 3) |
|  | 0.0 | GILDDE00263368 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |

Of the patients that missed a daily dose of *Truvada*, all (100%) missed 12 doses or less, which corresponds to 100% of *Truvada* patients surveyed taking at least 4 pills per week.  In view of between 74-100% of *Truvada* for PrEP patients not missing any daily dose of *Truvada*, and further in view of all *Truvada* for PrEP patients complying with at least 4 pills per week, I agree with the statement in Flexner Rebuttal Report ¶502 that "missed doses of Descovy for PrEP are not of significant concern."  For reasons previously discussed, Gilead's data on Truvada for PrEP adherence is expected to be indicative of adherence for Descovy for PrEP.  For example, the DISCOVER trial reported "[t]here were no differences in adherence between the two groups [FTC/TDF and FTC/TAF] by self-report, pill count, and DBS analysis."  Mayer et al., "Emtricitabine and tenofovir alafenamide vs emtricitabine and tenofovir disoproxil fumarate for HIV pre-exposure prophylaxis (DISCOVER)," The Lancet, 396:239-254 (2020) at page 248 (GILDDE02690116-31).  "Median pill count adherence was 98% (IQR 93.4-99.8) in the

emtricitabine and tenofovir alafenamide group and 98% (93.5-99.9) in the emtricitabine and tenofovir disoproxil fumarate group." *Id.*

170.    Flexner Rebuttal Report ¶¶502-503 quotes the CDC 2021 Clinical Guidelines for the proposition that the practice of missing doses of Descovy for PrEP should be "normalized." The Guidelines recommend "[n]ormaliz[ing] occasional missed doses, while ensuring patient understands importance of daily dosing for optimal protection."   GILDDE02689769-876 at GILDDE02689810.  This recommendation emphasizes the above point that taking 4 or more doses per week of Descovy is sufficient to inhibit establishment of a self-replicating HIV infection in a human.  I note that the CDC 2021 Clinical Guidelines provide additional recommendations that reinforce the instructions in the Descovy Insert regarding HIV testing for at-risk PrEP patients, as follows:

- "HIV infection should be assessed at least every 3 months for patients taking daily oral PrEP … so that persons with incident infection do not continue taking it." GILDDE02689769-876 at GILDDE02689781.

- Recommending "[f]ollow-up visits at least every 3 months to provide the following:  HIV Ag/Ab test and HIV-1 RNA assay…"  *Id.* at GILDDE02689783.

- Requiring "Documented negative HIV Ag/Ab test result within 1 week before initially prescribing PrEP" and "No signs/symptoms of acute HIV infection."  *Id.* at GILDDE02689783.

- Explaining that the risk of acquiring HIV includes "HIV-positive sexual partner (especially if partner has an unknown or detectable viral load), Bacterial STI in past 6 months, History of inconsistent or no condom use with sexual partner(s)."  *Id.* at GILDDE02689783.

171.    Flexner Rebuttal Report ¶504 quotes a statement from N.Y.D.O.H. that "[t]he more days a person misses a dose, the less protective the medication will be for any exposures that occur during that time period."  Flexner Rebuttal Report ¶505 quotes a statement from the Descovy Insert that "[u]ninfected individuals who miss doses are at greater risk of acquiring HIV-1 than those who do not miss doses."  These statements reinforce the importance of patients regularly and consistently taking their Descovy medication for PrEP, and the DISCOVER clinical trial and the REMS survey results discussed above demonstrate that patients are, in fact, taking effective amounts of Descovy for PrEP.

172.    Flexner Rebuttal Report ¶¶508-522 discuss the iPrEx and Partners PrEP clinical trials and calculates that "the maximum percentage of patients potentially exposed to HIV that are ultimately protected from infection by Descovy for PrEP is only on the order of 5.1-5.2% per year for patients taking Descovy for PrEP."  The 5.1-5.2% calculation is based on the differential between persons that seroconverted in the ***FTC-TDF group*** of the trials and persons that seroconverted in the ***placebo group*** as explained in the Flexner Rebuttal Report as follows:

> [T]he differential between persons that seroconverted in the FTC-TDF group and persons that seroconverted in the placebo group is 64 (64–0=64).  Accordingly, on the basis of that assumption, the 64 persons presumed to be protected from infection in the FTC-TDF group represent 5.12% (64/1251) of the total 1,251 FTC-TDF group members.

Flexner Rebuttal Report ¶515.  I note that the Flexner Rebuttal Report repeats this same 5.1-5.2% calculation with respect to the "thereby" clause.  *See* Flexner Rebuttal Report ¶¶552-566.

173.    The 5.1-5.2% calculation is irrelevant to the Asserted Claims for several reasons.  ***First***, the 5.1-5.2% calculation runs contrary to the Court's claim construction.  As explained in My Opening Report ¶30, I understand that the Court has construed the preamble to be limiting and to mean "a process for inhibiting establishment of a human immunodeficiency virus self-

141

replicating infection in a human." *See also* D.I. 186 at 1, 7-8.  I understand that the Court has construed the "thereby" clause that recites "thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human" to be limiting and to mean "[t]he human remains negative for the immunodeficiency virus while receiving the administration." My Opening Report ¶32; *see also* D.I. 186 at 2, 9-10.  I understand that the Court similarly clarified that "whether a host remains negative is based on both a serological and PCR assay if both are performed."  My Opening Report ¶32; *see also* D.I. 186 at 10.  In accordance with the Court's claim construction, the preamble and "thereby" clause are met whenever a patient taking Descovy for PrEP remains HIV negative in response to a serological or PCR test (and negative in response to both a serological and PCR test if both tests are performed).  There is no requirement to compare a population of patients taking Descovy for PrEP who remain HIV negative with a population of at-risk patients ***not*** taking Descovy for PrEP to determine if the Descovy for PrEP patients are protected.

174.   The Court's claim construction makes sense in view of how "protection" is understood in the medical field.  Administration of the claimed compounds according to the claimed process protects the host by ensuring that a therapeutically effective amount of the claimed compounds are present in the host.  The protection provided by the claimed method lasts until the host's body metabolizes, excretes, or otherwise removes the compounds from the host's body. This protection is similar to the protection provided by a vaccine.  As explained in a Medicinal Chemistry textbook, "vaccines enable the body to resist infection by diseases" such that "[i]f the subject is later exposed to a virulent form of the virus, the [host's] immune system is primed and ready to eliminate it."  D.I. 108-5 at Appx4277 (Foye's Principles of Medicinal Chemistry, 5th ed, Williams and Lemke eds, Lippincott Williams & Wilkins, Baltimore MD, 2002 at page 1002).

Descovy for PrEP confers protection by having therapeutically effective amounts of FTC and TAF in the host's system such that it is primed and ready to prevent HIV from replicating. The lack of a self-replicating HIV infection is demonstrated by the Descovy for PrEP patient testing HIV-negative.

175.   **Second**, the 5.1-5.2% calculation does not apply based on the assumptions made in the Flexner Rebuttal Report. In Flexner Rebuttal Report ¶515, Dr. Flexner states that he assumes complete protection by FTC-TDF among all clinical trial participants in the FTC-TDF group and therefore assumes an absence of seroconversion among persons in the FTC-TDF group as follows:

> Accordingly, based on the best evidence available, and resolving all doubts in favor of the government, ***I will assume complete protection by FTC-TDF among all clinical trial participants in the FTC-TDF group and will therefore assume an absence of seroconversion among persons in the FTC-TDF group***, which is an assumption of protection of all persons in the FTC-TDF that were potentially exposed. In that instance, the differential between persons that seroconverted in the FTC-TDF group and persons that seroconverted in the placebo group is 64 (64–0=64). Accordingly, on the basis of that assumption, the 64 persons presumed to be protected from infection in the FTC-TDF group represent 5.12% (64/1251) of the total 1,251 FTC-TDF group members.

Flexner Rebuttal Report ¶515 (emphasis added). Once it is assumed that all clinical trial participants in the FTC-TDF group were completely protected and did not seroconvert, the Court's claim construction of the preamble and "thereby" clause has been met. There is no reason or requirement to calculate a differential seroconversion percentage of persons in the FTC-TDF group relative to persons ***not*** taking FTC-TDF in the placebo group.

176.   **Third**, the iPrEx and Partners PrEP clinical trials sought to determine the relative reduction in HIV incidence in the FTC-TDF PrEP group compared with the placebo group to determine efficacy. The clinical trials were randomized to ensure that patterns of exposure were

143

evenly distributed across the study groups.  An efficacy metric is determined on a relative rather than an absolute scale, which allows efficacy to be generalizable across time, populations, and settings.  In contrast, the protection calculations in the Flexner Rebuttal Report are not based on the relative reduction in HIV risk, but on a supposedly absolute probability of exposure in the study population over the period of one year.  For example, the 5.1-5.2% calculation is "***per year*** for patients taking Descovy for PrEP."  Flexner Rebuttal Report ¶508 (emphasis added).  The period of sexual activity for a Descovy for PrEP user can last for several years (indeed, it can last for many years, including the remaining sexually active lifetime of the user).  For example, Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 showed that 80% of new users planned to be on PrEP for more than 12 months and 88% of longer-term users planned to be on PrEP for more than 12 months as follows:



*Id.* at GILDDE02636251. An efficacy metric is a more appropriate manner for evaluating Descovy for PrEP using the data collected in the iPrEx and Partners PrEP clinical trials, which is the metric used by the CDC and N.Y.D.O.H., which are discussed in the next paragraph.

177.   ***Fourth***, the assumption in Flexner Rebuttal Report ¶515 that there is complete (100%) protection by FTC-TDF among all clinical trial participants in the FTC-TDF group would be an appropriate stopping point in view of the known real-world >99% effectiveness of PrEP in protecting MSM and heterosexual patients from HIV. For example, when PrEP medication is taken daily or consistently (at least 4 time per week), the risk of acquiring HIV is reduced by about 99% among MSM as follows:

Oral Daily Pre-Exposure Prophylaxis (PrEP)[†] for HIV-Negative Persons

| Population | Effectiveness Estimate | Source | Interpretation |
|---|---|---|---|
| "Optimal or Consistent Use"[a] (Taking PrEP daily or at least 4 times per week) | | | |
| Men who have sex with men (MSM) | ~99% | Grant, 2014 Liu, 2015 McCormack, 2015 Volk, 2015 Marcus, 2017 | When taking PrEP daily or consistently (at least 4 times per week), the risk of acquiring HIV is reduced by about 99% among MSM. While daily use is recommended in the U.S., taking PrEP consistently (at least 4 times per week) appears to provide similar levels of protection among MSM.  The effectiveness of oral PrEP is highly dependent on PrEP adherence. When taking oral PrEP daily or consistently, HIV acquisition is extremely rare and has not been observed in any of the studies described below.  In clinical practice, a few cases of new HIV infections have been confirmed while HIV-negative individuals were on PrEP with verified adherence. |
| Heterosexual Men and Women | ~99% | N/A | There is evidence for the effectiveness of PrEP when used recently[b] (based on detecting TFV in plasma), which is estimated to be 88 – 90% as described below. There is no effectiveness estimate of PrEP when taken daily or consistently among heterosexuals; however, it is likely to be greater than the estimates corresponding to recent use and similar to what has been observed for MSM. The effectiveness of oral daily PrEP is highly dependent on PrEP adherence, with maximum effectiveness when taking PrEP daily and lower effectiveness when not taken consistently. |
| Persons Who Inject Drugs (PWIDs) | 74 – 84% | Choopanya, 2013 Martin, 2015 | PWID face HIV risks from both injecting and sex behaviors. Studies on the effectiveness of PrEP when taken daily among PWID are limited. However, when taking PrEP consistently, the risk of acquiring HIV is reduced by an estimated 74 – 84% among PWID. These estimates are based on tenofovir alone and among a subset of PWID taking PrEP consistently, as verified by directly observed therapy or daily diary plus monthly pill count. The effectiveness of two-drug oral therapy has not been assessed among PWID but may be higher. The effectiveness of oral daily PrEP is highly dependent on PrEP adherence, with maximum effectiveness when taking PrEP daily and lower effectiveness when missing doses. |

D.I. 1-3, Exhibit 19 at 6-8.  The iPrEx OLE Study "resulted in a risk reduction estimate of 100% when compared to the previous placebo group from the iPrEx trial or the concurrent group of participants not on PrEP." *Id.* at 9.  "In addition, among those with drug concentration levels indicating at least 4 pills/week (>700 fmol/punch), there were no new HIV infections, which

resulted in a risk reduction estimate of 100% when compared to either comparison group." *Id.*

The effectiveness of PrEP is summarized as follows:

> In summary, the effectiveness of PrEP among MSM when used daily or consistently is estimated to be 100% in studies. However, a few cases of new HIV infections have been reported with PrEP verified adherence, indicating that the risk has not been completely eliminated and that the effectiveness of PrEP cannot be exactly 100%. Given the number of persons on PrEP worldwide (prepwatch.org (http://www.prepwatch.org), the risk reduction (or effectiveness of PrEP) would likely need to be very high and close to 100% to observe only three confirmed cases of PrEP failure (new HIV infection despite taking PrEP daily or consistently) to date. To represent the protective value of PrEP while also acknowledging the small number of failures, we indicate the effectiveness of PrEP is about 99%.

*Id.* at 10-11. The effectiveness of PrEP in heterosexual men and women is also estimated to be about 99%. *Id.* at 6-8; *see also* GILDDE02689976-82 (N.Y.D.O.H. 2020 PrEP FAQ) at GILDDE02689976 ("Clinical trials have shown that PrEP is 99% effective at reducing sexual transmission of HIV."). I also note that the Flexner Rebuttal Report calculation that only 5.1-5.2% of Descovy for PrEP patients being protected from HIV makes little sense because it suggests that it is unnecessary for approximately 95% of Descovy for PrEP patients to take Descovy.

178. ***Fifth***, the 5.1-5.2% calculation in the Flexner Rebuttal Report does not comply with the way protection efficacy is calculated by Gilead with respect to its DISCOVER trial. In Gilead's DISCOVER trial comparing the protection efficacy of Descovy for PrEP to Truvada for PrEP, it was determined that 99.7% of Descovy for PrEP "patients remained HIV-free" as follows:

**The same robust protection as TRUVADA®, with less impact on markers of renal function and BMD[1,2]**

Data from a randomized, active-controlled, double-blind study of MSM and TGW using DESCOVY FOR PrEP™ (n=2694) vs TRUVADA (n=2693):

**At primary analysis***
Noninferior efficacy
(HIV incidence rate
0.16/100 PY vs 0.34/100 PY
[IRR=0.47; CI: 0.19–1.15]).

99.7% vs 99.4% of patients
remained **HIV-free.**

**At Week 48**
Less impact on eGFR
and BMD.

**The long-term clinical
significance of these
changes is not known.**

*When 100% of patients reached Week 48 and ≥50% reached Week 96.

GILDDE00188806-12 at GILDDE00188809.   Based on the efficacy demonstrated by the DISCOVER trial, Gilead concluded that Descovy provides "[t]he same robust protection as TRUVADA." *Id.*

179.   ***Sixth***, the 5.1-5.2% calculation in the Flexner Rebuttal Report is based on "the differential between persons that seroconverted in the FTC-TDF group and persons that seroconverted in the placebo group is 64 (64–0=64)." Flexner Rebuttal Report ¶515.  However, seroconversion in the placebo group requires an ***actual*** exposure to HIV.   Therefore, the seroconverters in the placebo group do not provide an appropriate comparator for the Asserted Claims that merely require a ***potential*** exposure.

### 2.   Step (a): "selecting an uninfected human that does not have the self-replicating infection"

180.   Flexner Rebuttal Report ¶525 states that "the existence of statements in various versions of the Descovy® Insert does not establish the actual occurrence of any physician conducting" step (a).   *See also* Flexner Rebuttal Report ¶526 (similar statements about the Medication Guide portion of the Truvada Insert).

148

181.    As discussed in My Opening Report, the Descovy package insert repeatedly instructs physicians to prescribe Descovy for PrEP only to patients that have been confirmed to be HIV-negative.  *See* My Opening Report ¶¶237-239.  I note that the Descovy Insert is clear that Descovy for PrEP is contraindicated for HIV-positive patients.  *See, e.g.,* My Opening Report ¶237.  Gilead's REMS surveys provide direct evidence of the population of patients taking **Truvada** for PrEP that are, in practice, confirmed to be HIV-negative before taking **Truvada** for PrEP.  For example, during the REMS 3-5 survey periods, between 97.7-100% of the **Truvada** for PrEP prescribers surveyed always tested their patients to confirm that they were HIV negative before prescribing **Truvada** for PrEP, as shown in the table below:

| I test my patients to confirm that they are HIV-1 negative before prescribing TRUVADA for a PrEP indication. | | |
|---|---|---|
| Always (%) | 88.5 (97.7)[14]<br>99.2<br>100.0 | GILDDE00251556 (REMS 3)<br>GILDDE00263125 (REMS 4)<br>GILDDE00270586 (REMS 5) |
| Sometimes (%) | 2.1 (2.3)<br>0.8<br>0.0 | GILDDE00251556 (REMS 3)<br>GILDDE00263125 (REMS 4)<br>GILDDE00270586 (REMS 5) |
| Never (%) | 0.0<br>0.0<br>0.0 | GILDDE00251556 (REMS 3)<br>GILDDE00263125 (REMS 4)<br>GILDDE00270586 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 9.4<br>0.0<br>0.0 | GILDDE00251556 (REMS 3)<br>GILDDE00263125 (REMS 4)<br>GILDDE00270586 (REMS 5) |

Similarly, also during the REMS 3-5 survey periods, 100% of surveyed uninfected individuals taking **Truvada** for PrEP were tested for HIV, between 98-100% were tested within the last 6 months, and 100% were tested within the last year, as shown in the table below:

| Have you been tested for HIV? | | |
|---|---|---|
| Yes (%) | 100.0<br>100.0<br>100.0 | GILDDE00251839 (REMS 3)<br>GILDDE00263367 (REMS 4)<br>GILDDE00270757 (REMS 5) |

---

[14] The numbers in parenthesis in this table have been adjusted to account for the nine respondents in REMS 3 that answered "I have not prescribed TRUVADA for a PrEP indication."

RESTRICTED INFORMATION

| No (%) | 0.0 | GILDDE00251839 (REMS 3) |
|---|---|---|
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270757 (REMS 5) |
| **When was the last time you were tested for HIV?** | | |
| Less than a month ago (%) | 56.2 | GILDDE00251840 (REMS 3) |
| | 52.3 | GILDDE00263367 (REMS 4) |
| | 40.0 | GILDDE00270757 (REMS 5) |
| 1 to 3 months ago (%) | 38.1 | GILDDE00251840 (REMS 3) |
| | 35.6 | GILDDE00263367 (REMS 4) |
| | 40.0 | GILDDE00270757 (REMS 5) |
| More than 3 months, but less than 6 months ago (%) | 3.6 | GILDDE00251840 (REMS 3) |
| | 10.6 | GILDDE00263367 (REMS 4) |
| | 20.0 | GILDDE00270758 (REMS 5) |
| More than 6 months, but less than a year ago (%) | 1.8 | GILDDE00251840 (REMS 3) |
| | 1.5 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| A year or more ago | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't know | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |

For reasons previously discussed, Gilead's data on Truvada for PrEP adherence is expected to be indicative of adherence for Descovy for PrEP.

> **3.    Step (b): "administering to the uninfected human a combination comprising: i. a pharmaceutically effective amount of emtricitabine; and ii. a pharmaceutically effective amount of tenofovir or tenofovir ester [or tenofovir disoproxil fumarate or a tenofovir prodrug]"**

182.    In Flexner Rebuttal Report ¶531, Dr. Flexner states "I do not understand a physician that prescribes Descovy® for PrEP to 'administer' anything to a patient under the plain and ordinary meaning of that term as used in the context of the Patents-in-Suit to a person of ordinary skill in the art.  Physicians that prescribe medications merely authorize distribution of a medication at a certain dosage and in a certain quantity to a patient from a pharmacy; such prescription activity does not inhibit the establishment of an infection as claimed."

183. I understand that Gilead did not ask the Court to construe the term "administering," and that Gilead did not allege during the claim construction portion of this case that the specification of the HHS Patents specifically define "administering" or "administration" in any particular manner. The HHS Patents do not define "administering" or "administration." I understand that the plain and ordinary meaning of "administration" includes "the dispensing, applying, or tendering of something, such as . . . medicine." *See* American Heritage Dictionary, 4th Ed., 2000 at page 22. Thus, a physician prescription that authorizes a pharmacy to dispense Descovy for PrEP at a certain dosage and quantity to a patient falls within the plain and ordinary meaning of "administration."

184. The Descovy insert uses "administration" to refer to physician prescriptions. For example, the front page of the Descovy insert has a "Dosage and Administration" section that instructs physicians to prescribe Descovy for PrEP as "one table (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food." *See, e.g.,* 2022 Descovy Insert at 5.

185. In Flexner Rebuttal Report ¶531, Dr. Flexner states "'administering,' as the term is used in the Patents-in-Suit and Asserted Claims, I understand to require an active and physical role in terms of delivering medication into a patient's body." This view of "administering" is too narrow and inconsistent with the plain and ordinary meaning of this term. For example, the HHS Patents disclose that "[o]ral administration of FTC and TDF to macaques is by mixing the drug powders with peanut butter or fruit. Macaques are observed to ensure ingestion." '509 patent at 7:51-53. Dispensing FTC/TDF in peanut butter or fruit and then leaving it for macaques to ingest does not require an active or physical role in delivering the medication to a macaque's body.

186. Flexner Rebuttal Report ¶529 asserts that "the existence of statement in various versions of the Descovy Insert does not establish the actual occurrence of any physician conducting

RESTRICTED INFORMATION

this step of claim 13 of the '509 Patent or claim 12 of the '423 Patent in practice." However, Gilead's REMS survey results provide direct evidence of the population of patients being administered a pharmaceutically effective amount of *Truvada*. For example, between 74-100% of *Truvada* for PrEP patients did not miss a daily dose of *Truvada* as shown in the below table during the REMS 3-5 survey periods:

| In the past month, have you missed any doses of TRUVADA? | | |
|---|---|---|
| Yes (%) | 22.1 | GILDDE00251840 (REMS 3) |
| | 25.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| No (%) | 77.9 | GILDDE00251840 (REMS 3) |
| | 74.2 | GILDDE00263367 (REMS 4) |
| | 100.0 | GILDDE00270758 (REMS 5) |
| I don't know (%) | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| How many doses of TRUVADA have you missed in the past month? (All percentages are based on answers from only UIs who missed doses.) | | |
| 1-3 doses (%) | 83.9 | GILDDE00251841 (REMS 3) |
| | 81.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| 4-7 doses (%) | 12.9 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| 8-12 doses (%) | 3.2 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| More than 12 doses (%) | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't remember | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |

Of the patients that did miss a daily dose of *Truvada*, all (100%) missed 12 doses or less, which corresponds to 100% of *Truvada* patients surveyed taking at least 4 pills per week. For reasons previously discussed, Gilead's data on Truvada for PrEP adherence is expected to be indicative of adherence for Descovy for PrEP. For example, the DISCOVER trial reported "[t]here were no

differences in adherence between the two groups [FTC/TDF and FTC/TAF] by self-report, pill count, and DBS analysis." Mayer et al., "Emtricitabine and tenofovir alafenamide vs emtricitabine and tenofovir disoproxil fumarate for HIV pre-exposure prophylaxis (DISCOVER)," The Lancet, 396:239-254 (2020) at page 248 (GILDDE02690116-31). "Median pill count adherence was 98% (IQR 93.4-99.8) in the emtricitabine and tenofovir alafenamide group and 98% (93.5-99.9) in the emtricitabine and tenofovir disoproxil fumarate group. *Id.* As explained in My Opening Report at ¶¶240-245, Descovy for PrEP is one tablet containing 200 mg of emtricitabine and 25 mg of TAF, which constitutes pharmaceutically effective amounts of FTC and TAF.

### 4. "thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human"

187.    With the exception of Flexner Rebuttal Report ¶¶541-542, the section of the Flexner Rebuttal Report at ¶¶535-567 discussing the "thereby" clause merely repeats the same arguments provided in Flexner Rebuttal Report ¶¶494-527 for the preamble. For the sake of brevity, I incorporate by reference my above reply to the Flexner Rebuttal Report preamble in its entirety here.

188.    Flexner Rebuttal Report ¶¶541-542 assert that a patient taking Descovy for PrEP would not experience a "potential exposure" because "[t]he Descovy® Insert expressly instructs, in the 'Warnings and Precautions' section, and under the heading 'Comprehensive Management to Reduce the Risk of Sexually Transmitted Infections, Including HIV-1, and Development of HIV-1 Resistance When DESCOVY Is Used for HIV-1 PrEP,' to 'use DESCOVY for HIV-1 PrEP to reduce the risk of HIV-1 infection as part of a comprehensive prevention strategy' that includes 'other prevention measures,' 'including adherence to daily administration and safer sex practices, including condoms, to reduce the risk of sexually transmitted infections (STIs).'" I addressed the "potential exposure" limitation in my Opening Report, and I also address it below in this Reply

RESTRICTED INFORMATION

Report with respect to the "wherein" clause that recites "wherein the combination is administered prior to a potential exposure of the human to the human immunodeficiency retrovirus."

### 5. "wherein the combination is administered prior to [a] potential exposure of the human to the human immunodeficiency retrovirus"

189. Flexner Rebuttal Report ¶¶568-613 asserts that physicians prescribing Descovy for PrEP and patients taking Descovy for PrEP do not met the "wherein" clause of claim 13 from the '509 patent and claim 12 from the '423 patent.

190. Flexner Rebuttal Report ¶569 states that "statements in versions of the Descovy® Insert regarding the scope of the Descovy® for PrEP indication do not establish any actual occurrence of direct infringement by any patient or any physician." *See also* Flexner Rebuttal Report ¶¶573, 579 (providing similar statements). Gilead's REMS surveys provide direct evidence of the population of patients taking **Truvada** for PrEP that are, in practice, potentially exposed to HIV during treatment. For example, during the REMS 3-5 survey periods, between 65.5-100% of **Truvada** for PrEP patients did not use a condom the last time they had sex, and between 81.3-100% had unprotected sex within the last 3 months, as shown in the table below:

| Did you use a condom the last time you had sex? | | |
|---|---|---|
| Yes (%) | 34.2 | GILDDE00251842 (REMS 3) |
| | 29.6 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| No (%) | 65.5 | GILDDE00251842 (REMS 3) |
| | 69.6 | GILDDE00263368 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.8 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| Have you had unprotected sex within the last 3 months? | | |
| Yes (%) | 81.3 | GILDDE00251842 (REMS 3) |
| | 85.6 | GILDDE00263369 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| No (%) | 18.3 | GILDDE00251842 (REMS 3) |
| | 14.4 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

RESTRICTED INFORMATION

| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.0 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| **Do you know the HIV status of your sexual partner?** | | |
| Yes, I known the HIV status of my sexual partner(s) (%) | 43.5 | GILDDE00251841 (REMS 3) |
| | 40.0 | GILDDE00263368 (REMS 4) |
| | 60.0 | GILDDE00270759 (REMS 5) |
| I know the HIV status of some of my sexual partners. (%) | 49.6 | GILDDE00251841 (REMS 3) |
| | 52.0 | GILDDE00263368 (REMS 4) |
| | 40.0 | GILDDE00270759 (REMS 5) |
| No, I don't know the HIV status of my sexual partner(s). | 6.8 | GILDDE00251841 (REMS 3) |
| | 8.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

In addition, between 40-60% of PrEP patients either do not know the HIV status of their sexual partners or only know the HIV status of some of their sexual partners. For reasons previously discussed, Gilead's data on Truvada for PrEP adherence is expected to be indicative of adherence for Descovy for PrEP. For example, the DISCOVER trial Descovy arm had self-reported HIV risk factors including "two or more of receptive condomless anal sex partners in the past 12 weeks" in 1616/2602 (62%) of study participants. Mayer et al. at page 244. Also, the Descovy arm had high levels of STIs, with 29% of participants having rectal chlamydia, 26% having rectal gonorrhea, 13% having syphilis, and 10% having urethral chlamydia (which also indicates at-risk behavior). *Id.* at 247 (Table 2). Having unprotected condomless sex or sexual partners of unknown HIV status increases the risk for HIV exposure. Indeed, the Descovy insert specifically calls out these types of activities as at-risk behaviors for potential exposures, as described in My Opening Report ¶253. Also, Descovy for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they engage in activities that result in potential exposure to HIV, as described in My Opening Report ¶¶252-254.

191. Additional evidence of PrEP patients engaging in high risk activities that would result in potential HIV exposure is provided by Gilead's survey of PrEP users from October 24,

2017 through November 8, 2017.  For example, based on survey results, Gilead concluded that "[r]isky behaviors abound: few [PrEP users] are monogamous and most have had unprotected anal sex:"



*Id.* at GILDDE02636285.  Additional risky behaviors of PrEP patients were reported as follows:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

|  | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are HIV negative) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |



Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A9.  We would like to know about some of your life experiences.  We realize that some of these may be very personal. We ask that you be truthful.  Remember your responses are anonymous and confidential.  Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)

dd

*Id.* at GILDDE02636287.



*Id.* at GILDDE02636288.  The PrEP users reported that they perceived condomless sex, having

sex with someone whose HIV status is unknown, or having sex with someone who has HIV as

activities that place them at-risk for acquiring HIV, as follows:



*Id.* at GILDDE02636284. For reasons previously discussed, Gilead's data on Truvada for PrEP adherence is expected to be indicative of adherence for Descovy for PrEP.

192.    Flexner Rebuttal Report ¶571 states that following the safer sex practices described in the Descovy insert results in a patient that "does not experience a 'potential exposure.'" *See also* Flexner Rebuttal Report ¶¶575-578, 581-583 (referencing the "comprehensive prevention strategy" portions of the Descovy insert and safer sex practices portion of the Medication Guide). I disagree. Implementation of the safer sex practices and comprehensive prevention strategy described in the Descovy insert may *reduce* the risk of HIV exposure, but do not *eliminate* the risk. For example, Flexner Rebuttal Report ¶577 correctly refers to the comprehensive prevention strategy as "risk-reduction behaviors" not "risk-elimination behaviors."

193.     Flexner Rebuttal Report ¶580 suggests that the statement in the Medication Guide that "DESCOVY can only help reduce your risk of getting HIV-1 before you are infected" might be referring to post-exposure prophylaxis rather than pre-exposure prophylaxis.  I note that post-exposure prophylaxis is not an FDA approved indication for Descovy.  Therefore, the statement in the Descovy insert about Descovy only helping to reducing the risk of getting HIV-1 before a patient is infected should be interpreted as applying to PrEP, not PEP.

194.     Flexner Rebuttal Report ¶¶585-610 discuss four supposed "ways that persons of ordinary skill in the art understand patients could, and in fact do, take Descovy® for HIV PrEP in the real world without experiencing a 'potential exposure.'"  Flexner Rebuttal Report ¶585.  The four supposed ways are (1) consistent and correct condom usage; (2) consistent confirmation that persons with whom the patient engages in sexual activity are HIV-negative; (3) an HIV-negative partner in a serodiscordant couple where the HIV-positive partner is undetectable; and (4) a patient that does not engage in activity that could possibly result in exposure to HIV.  *See* Flexner Rebuttal Report ¶612.  I address each of these four strategies below.

195.     ***First***, Flexner Rebuttal Report ¶586 asserts that there is no potential exposure where there is consistent and correct usage of condoms because the condom creates a physical barrier between sexual partners such that "[w]here a condom is used correctly during intercourse, a condom will not break and will serve as an effective barrier to contact with bodily fluids, thereby preventing a potential exposure to the immunodeficiency retrovirus."  *See also* Flexner Rebuttal Report ¶¶581-593.

196.     Consistent and correct condom use may ***reduce*** the risk of HIV exposure, but it does not ***eliminate*** the risk of exposure to HIV.  For example, it has been reported that "[a]mong MSM reporting any anal sex with an HIV-positive male partner, we found 70% effectiveness with

160

reported consistent condom use (compared with never use) and no significant protection when comparing sometimes use to never use." Smith et al., "Condom effectiveness for HIV prevention by consistency of use among men who have sex with men in the United States," Journal of Acquired Immune Deficiency Syndromes, 68:337-344 (2015) at page 337 ("Results" section). "Estimated condom effectiveness was 72.3% (95% CI: 60.7% to 80.5%) for receptive anal sex, 62.9% (95% CI: 46.3% to 74.3%) for insertive anal sex, and 70.5% (95% CI: 58.2% to 79.2%) for any receptive or insertive anal sex." *Id.* at page 341. "The point estimate in our analysis of condom effectiveness when 'always' used by MSM during anal sex with any HIV-positive male partners is 70%, modestly less than the 80% estimate for condoms when 'always' used by heterosexual HIV-discordant couples." *Id.* at page 342. To be categorized as "always" using a condom, "the subject must have reported condom use during all" of the anal sex acts with their HIV-positive partner during a 6-month interval. *Id.* at page 339. "This study found that inconsistent ('sometimes') condom use with HIV-positive male partners over months to years offers minimal or no protection, underscoring the importance of the inclusion of messaging by their HIV prevention providers, which supports the adoption and continuation of consistent condom use for MSM." *Id.* at page 343. Furthermore, "[e]ven if condoms are used consistently and correctly, slippage and breakage can occur." Paz-Bailey et al., "The effect of correct and consistent condom use on chlamydia and gonococcal infection among urban adolescents," Archives of Pediatrics and Adolescent Medicine, 159:536-542 (2005) at page 536. "Studies demonstrate that slippage or breakage occurs between 1% and 4% of the time." *Id.* Therefore, I disagree with the Flexner Rebuttal Report statement that there is no potential exposure where there is consistent and correct usage of condoms.

197.    Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 found that 76% of new users and 94% of longer-term PrEP users have had sex without a condom in the past year:



*Id.* at GILDDE02636285.  Further, 86% of heterosexual PrEP users have had sex without a condom with someone of unknown HIV status:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

| | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are HIV negative) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |

 GILEAD
[DateTime]

Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A9.  We would like to know about some of your life experiences.  We realize that some of these may be very personal. We ask that you be truthful.  Remember your responses are anonymous and confidential.  Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)

dd

*Id.* at GILDDE02636287.  In addition, 28% of new users and 34% of longer-term PrEP users reported having a condom break during sex:



*Id.* at GILDDE02636288.  For reasons previously discussed, Gilead's data on Truvada for PrEP adherence is expected to be indicative of adherence for Descovy for PrEP.

198.    Gilead's REMS surveys provide direct evidence of the population of patients taking *Truvada* for PrEP that are, in practice, not consistently using condoms.  For example, during the REMS 3-5 survey periods, between 65.5-100% of *Truvada* for PrEP patients did not use a condom the last time they had sex, and between 81.3-100% had unprotected sex within the last 3 months, as shown in the table below:

| Did you use a condom the last time you had sex? | | |
|---|---|---|
| Yes (%) | 34.2 | GILDDE00251842 (REMS 3) |
| | 29.6 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| No (%) | 65.5 | GILDDE00251842 (REMS 3) |
| | 69.6 | GILDDE00263368 (REMS 4) |

164

| | 100.0 | GILDDE00270759 (REMS 5) |
|---|---|---|
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.8 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| **Have you had unprotected sex within the last 3 months?** | | |
| Yes (%) | 81.3 | GILDDE00251842 (REMS 3) |
| | 85.6 | GILDDE00263369 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| No (%) | 18.3 | GILDDE00251842 (REMS 3) |
| | 14.4 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.0 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

For reasons previously discussed, Gilead's data on Truvada for PrEP adherence is expected to be indicative of adherence for Descovy for PrEP. For example, the DISCOVER trial Descovy arm had self-reported HIV risk factors including "two or more of receptive condomless anal sex partners in the past 12 weeks" in 1616/2602 (62%) of study participants. Mayer et al. at page 244. Also, the Descovy arm had high levels of STIs, with 29% of participants having rectal chlamydia, 26% having rectal gonorrhea, 13% having syphilis, and 10% having urethral chlamydia, all of which are indicative of at-risk behavior). *Id.* at 247 (Table 2).

199. Flexner Rebuttal Report ¶¶588-590 point to various CDC recommendations for consistent and correct use of condoms in conjunction with PrEP. I note that the CDC 2021 Clinical Guidelines state that "[r]eported consistent ('always') condom use is associated with an 80% reduction in HIV acquisition among heterosexual couples." GILDDE02689769-876 at GILDDE02689794. Thus, consistent and correct condom usage merely reduces the risk of HIV exposure, it does not eliminate the risk. If consistent and correct condom usage eliminated the risk of HIV exposure, PrEP would not be necessary. However, the Descovy insert and the CDC recommendations cited in the Flexner Rebuttal Report recommend the use of PrEP in conjunction with condom usage precisely because consistent and correct condom usage does not eliminate the

165

risk of HIV exposure. For example, Flexner Rebuttal Report ¶580 states the CDC 2021 Clinical Guidelines "acknowledges that Descovy® for PrEP may be prescribed where a patient reports consistent and correct use of condoms, *but still requests prescription of Truvada® for PrEP*." (emphasis added).

200. Flexner Rebuttal Report ¶¶591-592 point to N.Y.D.O.H. recommendations for consistent and correct use of condoms in conjunction with PrEP. I note that condom use recommendations are under the heading "Risk Reduction," which appears to acknowledge that condom usage merely reduces (rather than eliminates) the risk of HIV exposure. GILDDE02689460-509 at GILDDE02689482.

201. *Second*, Flexner Rebuttal Report ¶594 asserts that "where a patient taking Descovy® for PrEP is always aware of the HIV status of her sexual partners, and is aware that they are negative for HIV at the time of sexual intercourse, such a patient would not experience a potential exposure to HIV." *See also* Flexner Rebuttal Report ¶¶595. However, Grov acknowledges that "we do not know the actual HIV statuses of participants' partners, and it may be that participants *believed* their partners shared the same status," and that belief may (or may not) have been accurate. Grov at 2753 (emphasis in original). Grov is clear that serosorting may actually *increase* (rather than decrease) HIV acquisition:

> Some research has suggested that serosorting is not as effective at reducing HIV transmission as condom use, and some evidence suggests that serosorting may actually increase HIV acquisition [33]. This may be due to low HIV testing rates/frequency [33], yet partners still report they are HIV-negative.

Grov at page 2752. Grov reference 33 is Wilson et al., "Serosorting may increase the risk of HIV acquisition among men who have sex with men." Sexually Transmitted Diseases 37:13-7 (2010) ("Wilson").

202.    Wilson states that serosorting is only beneficial in reducing the relative risk of HIV infection where the prevalence of undiagnosed HIV infections is less than approximately 20% and 40% in populations of high (70%) and low (20%) treatment rates, respectively, as follows:

> Results:  We demonstrate that serosorting is unlikely to be highly beneficial in many populations of men who have sex with men, especially where the prevalence of undiagnosed HIV infections is relatively high.  We find that serosorting is only beneficial in reducing the relative risk of HIV transmission if the prevalence of undiagnosed HIV infections is less than ~20% and ~40%, in populations of high (70%) and low (20%) treatment rates, respectively, even though treatment reduces the absolute risk of HIV transmission.  Serosorting can be expected to lead to increased risk of HIV acquisition in many settings.  In settings with low HIV testing rates serosorting can more than double the risk of HIV acquisition.

Wilson at 13 (Abstract).  Wilson further explains the problems of serosorting actually *increasing* the risk of HIV exposure when a partner's serostatus is unknown as follows:

> Serosorting may in fact lead to increased risk if a partner's HIV serostatus is unintentionally misreported because it is unknown.  Consequently, the proportion of the sexually active population that is HIV-infected but undiagnosed is a crucial determinant of the effectiveness of serosorting.  In the ideal scenario of 100% accurate knowledge and no misreporting of serostatus, serosorting is 100% effective at preventing HIV acquisition by HIV-negative people who practice it.  Conversely, serosorting may result in substantially increased risk of HIV acquisition if a large proportion of the HIV-infected population is undiagnosed and serosorting thereby leads to the formation of discordant partnerships and more unprotected sex.

*Id.*  The ideal scenario of 100% accurate knowledge and no misrepresenting of serostatus does not exist in the real world, as described in more detail in a few paragraphs below in this report.

203.    Wilson further explains that the effectiveness of serosorting depends on accurate disclosure of serostatus and is "a potentially risky strategy" as follows:

167

The effectiveness of serosorting depends on accurate disclosure of HIV serostatus. Some HIV-infected people may mistakenly believe that they are not infected and thus disclose as HIV-negative to sexual partners. Disclosure of HIV status in sexual partnerships may also lead to other strategies to reduce the risk of HIV transmission, such as strategic positioning and negotiated safety. But disclosing HIV status may be associated with substantial stigma, so that even if a man knows he is HIV-infected, he may not disclose his HIV status or may even disclose false information (although this is thought to be relatively rare). However, even if truthful disclosure always occurs, serosorting is a potentially risky strategy and its effectiveness for an individual uninfected man also depends on the frequency of testing of his sexual partner and the partner's previous risk exposure.

*Id.* at 16.

204.    Wilson explains that serosorting is only of any benefit in the following circumstances:

We estimate that serosorting is only of any benefit at all for reducing HIV risk when the proportion of men with HIV who are undiagnosed is less than ~20% in the case of high treatment rates (70%) and less than ~40% for low treatment rates (20%).

*Id.* at 14. Wilson states that "[i]t is widely cited that in the United States ~48% of all infections are undiagnosed" and "[o]ther estimates suggest that ~25% of HIV infections in the United States are undiagnosed." *Id.* Wilson states that "[w]e assume treatment rates are between 50% and 70% among diagnosed cases in the United States." *Id.* Based on these estimates, Wilson states:

Using commonly cited estimates of the percentage of undiagnosed infections in the United States (of 48%), our model indicates that practicing serosorting in the United States is likely to increase risk by almost 50% (Fig. 1). If just 25% of HIV infections in the United States were undiagnosed then it is unclear whether practicing serosorting would increase or decrease the risk of HIV acquisition (Fig. 1).

*Id.* at 15.

168

205.     Wilson concludes that serosorting is not appropriate for even partial protection from HIV exposure as follows:

> Our analysis suggests that unless the surrounding population has a small proportion of undiagnosed infections, serosorting is likely to increase the risk of HIV acquisition in practice.  Therefore, it is not appropriate to suggest that serosorting may offer partial protection from HIV.  The available evidence suggests that HIV-uninfected men who serosort remain at risk of acquiring HIV infection, and quite possibly at significantly increased risk compared with not serosorting.

*Id.* at 16.  For at least the above reasons, I disagree with the Flexner Rebuttal Report that PrEP users who only seek sexual partners that are reportedly HIV-negative would not experience a potential HIV exposure.

206.     In addition, Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 found that 84% of new users and 82% of longer-term PrEP users have had multiple sexual partners and are not monogamous:



*Id.* at GILDDE02636285.  In addition, 64% of new users and 62% of longer-term users have had sex without a condom with someone of unknown HIV status.  *Id.*  Further, 86% of heterosexual PrEP users have had sex without a condom with someone of unknown HIV status:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

| | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are <u>HIV negative</u>) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |

Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A9.  We would like to know about some of your life experiences.  We realize that some of these may be very personal.  We ask that you be truthful.  Remember your responses are anonymous and confidential.  Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)


GILEAD
[DateTime]

*Id.* at GILDDE02636287.  For reasons previously discussed, Gilead's data on Truvada for PrEP adherence is expected to be indicative of adherence for Descovy for PrEP.

207.    ***Third***, Flexner Rebuttal Report ¶596 asserts that there is no potential HIV exposure "where a patient is the HIV-negative partner in a serodiscordant couple (i.e., one HIV-negative partner and one HIV-positive partner) and the HIV positive partner has an undetectable viral load based on the ongoing administration of an HIV treatment regimen. … [t]his concept is sometimes referred to as undetectable equals untransmittable or uninfectious ('U=U')."  *See also* Flexner Rebuttal Report ¶¶597-606.

208.    Risk reduction in serodiscordant couples depends upon the HIV-positive partner "***achieving and maintaining*** an undetectable viral load."  GILDDE02689950-52 at 51 (emphasis

added). "Even when viral load is undetectable, HIV is still present in the body, and the virus rebounds to detectable levels if treatment is stopped." *Id.* HIV transmission to the HIV-negative partner has occurred where "[t]he partner with HIV had achieved viral suppression but the ART regimen later failed or the partner with HIV had stopped taking their medication." GILDDE02690045-48 at GILDDE02690045.

209. In 2020, a report was published on the accuracy of self-reporting of viral suppression among HIV-positive men having HIV-negative male partners. *See* Stephenson et al, "Accuracy in self-report of viral suppression among HIV-positive men with HIV-negative male partners," Journal of Acquired Immune Deficiency Syndromes, 83:210-214 (2020) ("Stephenson"). The results of the report found that "[a]lthough 72.5% of men could accurately report their viral load status, 20% reported that they were virally suppressed when they did not have a biomarker confirmed measure of viral suppression." *Id.* at page 2. Further details of the results were reported as follows:

> In terms of accuracy of reporting of viral suppression, 72.5% of men accurately reported their viral suppression status: this was comprised of 62.5% of men (n=75) who accurately reported that they were virally suppressed (e.g. both self-report and biomarker) and 10% of men (n=12) reported they were not virally suppressed and had a detectable viral load. In contrast, 27.5% (n=33) of men inaccurately reported their viral suppression status. ***In total, 20% (n=24) of men reported that they were virally suppressed and did not have a biomarker confirmed measure***, and 7.5% (n=9) of men reported that they were not virally suppressed but did have a biomarker of viral suppression.

*Id.* at page 5 (emphasis added). The report concluded that even if a partner self-reports to be virally suppressed, there is still a need to continue supporting PrEP as a primary prevention of HIV. *Id.* at page 2 ("These results highlight the need to provide interventions to MSM living with HIV to

support access to care and ensure current knowledge of viral load, and to continue to support primary prevention of HIV through condom use and pre-exposure prophylaxis (PrEP).").  Due to potential inaccuracies in perceived viral load suppression, I disagree with the Flexner Rebuttal Report that sexual intercourse between a PrEP patient and an HIV-positive partner that purportedly has an undetectable viral load would eliminate the risk of HIV exposure.

210.    Flexner Rebuttal Report ¶¶597-604 point to various CDC and N.Y.D.O.H. statements about U=U, and Flexner Rebuttal Report ¶605 points to statements in the Descovy insert about "knowledge of partner(s)' HIV-1 status, including viral suppression status."  However, Flexner Rebuttal Report ¶601 states "the CDC 2021 Clinical Guidelines acknowledges that Descovy® for PrEP may be prescribed where a patient reports having a virally suppressed HIV-positive partner, ***but still requests prescription of Descovy® for PrEP***." (emphasis added).  Similarly, Flexner Rebuttal Report ¶604 states "N.Y.D.O.H. AIDS Institute's 'PrEP to Prevent HIV and Promote Sexual Health' guidelines state that ***PrEP should not be withheld from candidates who 'request PrEP even if they have a partner living with HIV with an undetectable viral load***.'" (emphasis added).  If HIV exposure were completely eliminated where a patient reports having a virally suppressed HIV-positive partner, then PrEP would be unnecessary.  However, the CDC recommendations, N.Y.D.O.H. recommendations, and Descovy inserts cited in the Flexner Rebuttal Report recommend the use of PrEP where a patient reports having a virally suppressed HIV-positive partner precisely because a reportedly suppressed HIV-positive partner may inaccurately perceive the status of their viral load suppression such that the risk of HIV exposure has not been eliminated.

211.    ***Fourth***, Flexner Rebuttal Report ¶607 asserts that "patients taking Descovy® for PrEP who do not engage in any sexual intercourse, do not share needles or other injection drug

equipment, and otherwise engage in no behavior that could result in a potential exposure to HIV do not practice the 'wherein' clause of claim 13 of the '509 Patent or claim 12 of the '423 Patent." *See also* Flexner Rebuttal Report ¶¶608-610. As noted in My Opening Report ¶¶252-253, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV. Therefore, the patient described in Flexner Rebuttal Report ¶607 that does not currently and will not engage in any sexual intercourse, does not currently and will not share needles or other injection drug equipment, and does not currently and will not otherwise engage in behavior that could result in a potential exposure is a patient that does not meet the criteria described in the Descovy insert for receiving Descovy for PrEP.

212. Flexner Rebuttal Report ¶608 states "the CDC 2021 Clinical Guidelines acknowledges that Descovy® for PrEP may be prescribed where a patient reports having no anal or vaginal sex in the past 6 months, *but still requests prescription of Descovy® for PrEP.*" (emphasis added). The CDC Clinical Guidelines go on to explain that patients requesting PrEP may be uncomfortable reporting sexual or injection behaviors to their prescriber:

> Patients may request PrEP because of concern about acquiring HIV but not feel comfortable reporting sexual or injection behaviors to avoid anticipated stigmatizing responses in health care settings. For this reason, after attempts to assess patient sexual and injection behaviors, patients who request PrEP should be offered it, even when no specific risk behaviors are elicited.

GILDDE02689769-876 at GILDDE02689790. In addition, a patient that reports no *past* potential exposure events may expect to engage in *future* at-risk activities for HIV exposure, which presents an ideal prevention scenario for prescribing Descovy for PrEP. Therefore, the CDC recommendation to provide Descovy for PrEP to patients requesting it even if the patient reports no potential HIV exposures does not mean that the patient will not engage in activities at-risk for

HIV exposure.   The patient may simply feel uncomfortable reporting at-risk sexual or injection behaviors to the Descovy for PrEP prescriber.

213.    Flexner Rebuttal Report ¶514 repeats the argument from step (b) about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body."  I addressed that argument above in this Reply Report with respect to step (b).

214.    Flexner Rebuttal Report ¶611 repeats the argument that "a patient who has missed daily doses of Descovy for PrEP" has insufficient amounts of TAF and FTC to inhibit establishment of HIV.  I addressed that argument above in this Reply Report with respect to the preamble.

### C.    Prescription and Use of Descovy Directly Infringes Claims 13 and 14 of the '423 Patent

215.    Claim 13 of the '423 patent is reproduced below:

> 13. The process of claim 12, wherein combination is compounded into a single formulation.

216.    Flexner Rebuttal Report ¶617 states that "Dr. Murphy's opinion on [claim 13 of the '423 patent] does not address and appears to be divorced from the relevant claim language," because the "combination" that is recited in claim 12 of the '423 Patent is "a pharmaceutically effective amount of emtricitabine; and a pharmaceutically effective amount of tenofovir or a tenofovir prodrug."  I addressed the combination of a pharmaceutically effective amount of emtricitabine and tenofovir (or a tenofovir prodrug) with respect to step (b) of independent claim 12 of the '423 patent.  *See* My Opening Report ¶¶240-245.  As I explained in My Opening Report ¶102, claim 13 of the '423 patent depends from claim 12 such that all limitations recited in claim 12 are included in claim 13.  Accordingly, I addressed the "combination" that is recited in claims 12-13 of the '423 patent in My Opening Report.

175

RESTRICTED INFORMATION

217.    Flexner Rebuttal Report ¶¶617 and 620 repeat the argument about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body."  I addressed that argument above in this Reply Report with respect to step (b) of claim 12 from the '423 patent.

218.    Claim 14 of the '423 patent is reproduced below:

> 14. The process of claim 13, wherein the single formulation is administered daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus.

219.    Flexner Rebuttal Report ¶620 asserts that instructions in the Descovy Insert do not "establish any actual occurrence of direct infringement by any patient or any physician."  *See also* Flexner Rebuttal Report ¶¶621-622, 628[15] (containing similar assertions).  However, Gilead's REMS surveys provide evidence of the population of patients taking *Truvada* for PrEP that do, in practice, take *Truvada* daily for several days, weeks and months both before and after an exposure. For example, during the REMS 3-5 survey periods, between 74-100% of *Truvada* for PrEP patients did not miss a daily dose of *Truvada*, as shown in the table below:

| In the past month, have you missed any doses of TRUVADA? | | |
|---|---|---|
| Yes (%) | 22.1 | GILDDE00251840 (REMS 3) |
| | 25.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| No (%) | 77.9 | GILDDE00251840 (REMS 3) |
| | 74.2 | GILDDE00263367 (REMS 4) |
| | 100.0 | GILDDE00270758 (REMS 5) |
| I don't know (%) | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| How many doses of TRUVADA have you missed in the past month? (All percentages are based on answers from only UIs who missed doses.) | | |
| 1-3 doses (%) | 83.9 | GILDDE00251841 (REMS 3) |

---

[15] Flexner Rebuttal Report ¶628 at footnote 41 notes there are no citations to the quoted material in My Opening Report ¶266.  Citations to the Descovy inserts for the quoted material are found in My Opening Report ¶¶241, 244, and 252-254.

| | 81.8 | GILDDE00263367 (REMS 4) |
|---|---|---|
| | 0.0 | GILDDE00270758 (REMS 5) |
| 4-7 doses (%) | 12.9 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| 8-12 doses (%) | 3.2 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| More than 12 doses (%) | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't remember | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| **How long have you been taking TRUVADA to reduce the risk of getting HIV?** | | |
| Less than 1 month (%) | 28.1 | GILDDE00251864 (REMS 3) |
| | 20.5 | GILDDE00263390 (REMS 4) |
| | 20.0 | GILDDE00270779 (REMS 5) |
| Between 1 month and 6 months (%) | 37.0 | GILDDE00251864 (REMS 3) |
| | 32.6 | GILDDE00263390 (REMS 4) |
| | 40.0 | GILDDE00270779 (REMS 5) |
| More than 6 months, but less than 1 year (%) | 18.5 | GILDDE00251864 (REMS 3) |
| | 14.4 | GILDDE00263390 (REMS 4) |
| | 0.0 | GILDDE00270779 (REMS 5) |
| More than 1 year (%) | 16.4 | GILDDE00251864 (REMS 3) |
| | 32.6 | GILDDE00263390 (REMS 4) |
| | 40.0 | GILDDE00270779 (REMS 5) |
| I don't remember (%) | 0.0 | GILDDE00251864 (REMS 3) |
| | 0.0 | GILDDE00263390 (REMS 4) |
| | 0.0 | GILDDE00270779 (REMS 5) |

Of the patients that missed a daily dose of **Truvada**, all of them (100%) missed 12 doses or less, which corresponds to 100% of **Truvada** patients surveyed taking at least 4 pills per week. In addition, 100% of PrEP patients have taken PrEP at least for several days and/or several weeks, and many have been taking PrEP for many months, based on their answers to the question "How long have you been taking TRUVADA to reduce the risk of getting HIV?" For reasons previously discussed, Gilead's REMS data on Truvada for PrEP is expected to be indicative of Descovy for PrEP.

220.    Gilead's REMS surveys provide evidence of the population of patients taking *Truvada* for PrEP that are, in practice, potentially exposed to HIV during treatment.  For example, during the REMS 3-5 survey periods, between 65.5-100% of *Truvada* for PrEP patients did not use a condom the last time they had sex, and between 81.3-100% had unprotected sex within the last 3 months, as shown in the table below:

| Did you use a condom the last time you had sex? | | |
|---|---|---|
| Yes (%) | 34.2 | GILDDE00251842 (REMS 3) |
| | 29.6 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| No (%) | 65.5 | GILDDE00251842 (REMS 3) |
| | 69.6 | GILDDE00263368 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.8 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| **Have you had unprotected sex within the last 3 months?** | | |
| Yes (%) | 81.3 | GILDDE00251842 (REMS 3) |
| | 85.6 | GILDDE00263369 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| No (%) | 18.3 | GILDDE00251842 (REMS 3) |
| | 14.4 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.0 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| **Do you know the HIV status of your sexual partner?** | | |
| Yes, I known the HIV status of my sexual partner(s) (%) | 43.5 | GILDDE00251841 (REMS 3) |
| | 40.0 | GILDDE00263368 (REMS 4) |
| | 60.0 | GILDDE00270759 (REMS 5) |
| I know the HIV status of some of my sexual partners. (%) | 49.6 | GILDDE00251841 (REMS 3) |
| | 52.0 | GILDDE00263368 (REMS 4) |
| | 40.0 | GILDDE00270759 (REMS 5) |
| No, I don't know the HIV status of my sexual partner(s). | 6.8 | GILDDE00251841 (REMS 3) |
| | 8.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

In addition, between 40-60% of PrEP patients either do not know the HIV status of their sexual partners or only know the HIV status of some of their sexual partners.  For reasons previously discussed, Gilead's REMS data on Truvada for PrEP is expected to be indicative of Descovy for

178

PrEP.  Having unprotected condomless sex or sexual partners of unknown HIV status increases the risk for HIV exposure.  Indeed, the Descovy insert specifically calls out these types of activities as at-risk behaviors for potential exposures as described in My Opening Report ¶253.  Also, Descovy for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they engage in activities that result in potential exposure to HIV, as described in My Opening Report ¶¶252-253.  Because the patients initiated PrEP before potential exposure and continued taking PrEP after the potential exposure, the PrEP patients met claim 14 of the '423 patent.

221.     Additional evidence of PrEP patients engaging in potential HIV exposure activities is provided by Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017.  For example, based on survey results, Gilead concluded that "[r]isky behaviors abound: few [PrEP users] are monogamous and most have had unprotected anal sex:"

RESTRICTED INFORMATION



*Id.* at GILDDE02636285.   Additional risky behaviors of the PrEP patients were reported as follows:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

|  | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are HIV negative) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |


GILEAD
[DateTime]

Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A.9. We would like to know about some of your life experiences. We realize that some of these may be very personal. We ask that you be truthful. Remember your responses are anonymous and confidential. Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)

*Id.* at GILDDE02636287.  Additional risky behavior of the surveyed PrEP patients are reported as follows:



*Id.* at GILDDE02636288.  The PrEP users reported that they perceived condomless sex, having sex with someone whose HIV status is unknown, or having sex with someone who has HIV are activities that place them at-risk for acquiring HIV as follows:



*Id.* at GILDDE02636284.  This study included 50 "new starts" that had "initiated PrEP on or after February 2017, and 50 "longer-term (LT) users" that had been using PrEP at least 8 months because they had initiated PrEP before February 17:



*Id.* at GILDDE02636228.  The study included longer-term PrEP users that had initiated PrEP use in the year 2012, 2013, 2014, 2015, 2016, and 2017.  *Id.*  For reasons previously discussed, Gilead's data on Truvada for PrEP is expected to be indicative of Descovy for PrEP.  Because the PrEP users initiate PrEP before potential exposure and continue taking PrEP after engaging in at-risk behaviors for potential exposures, the PrEP users meet claim 14 of the '423 patent.

222.    Flexner Rebuttal Report ¶627 repeats arguments about the use of prevention strategies supposedly not resulting in a potential exposure to HIV that were previously raised with respect to the "wherein" clause recited by claim 12 of the '423 patent, which I already addressed above in this Reply Report.

**D.    Prescription and Use of Descovy Directly Infringes Claim 18 of the '423 Patent**

223.    Claim 18 of the '423 patent recites "[t]he process of claim 12, wherein the combination comprises the tenofovir prodrug."

224.    Flexner Rebuttal Report ¶633 repeats the argument about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body." I addressed that argument above in this Reply Report with respect to step (b) of claim 12 from the '423 patent.

**E.    Prescription and Use of Descovy Directly Infringes Claim 1 of the '423 Patent [prior to the exposure claim]**

**1.    "A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus…"**

225.    Flexner Rebuttal Report ¶¶642-671 repeat essentially the same arguments for the preamble of claim 1 of the '423 patent that it previously raised in ¶¶494-523 for the preamble of claim 13 of the '509 patent and claim 12 of the '423 patent.   I addressed those arguments above in this Reply Report with respect to the preamble of claim 13 of the '509 Patent and claim 12 of the '423 Patent.

**2.    Step (a): "selecting a primate host not infected with the immunodeficiency retrovirus"**

226.    Flexner Rebuttal Report ¶¶672-675 repeat essentially the same arguments for step (a) of claim 1 of the '423 patent that it previously raised in ¶¶524-527 for step (a) of claim 13 of the '509 patent and claim 12 of the '423 patent.   I addressed those arguments above in this Reply Report with respect to step (a) of claim 13 of the '509 Patent and claim 12 of the '423 Patent.

**3.    Step (b): "administering directly to an uninfected primate host a combination comprising: i. a pharmaceutically effective amount of**

> **emtricitabine; and ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate [or a tenofovir prodrug]"**

227. Flexner Rebuttal Report ¶¶676-681 repeat essentially the same arguments for step (b) of claim 1 of the '423 patent that it previously raised in ¶¶528-534 for step (b) of claim 13 of the '509 patent and claim 12 of the '423 patent.   I addressed those arguments above in this Reply Report with respect to step (b) of claim 13 of the '509 Patent and claim 12 of the '423 Patent.

### 4. "wherein the combination is administered prior to the exposure of the primate host to the immunodeficiency retrovirus"

228. I understand that the Court has construed the term "prior to the exposure" recited by claim 1 of the '423 patent to require an exposure, which means "contact between an immunodeficiency retrovirus and a host." *See* My Opening Report ¶33; *see also* D.I. 186 at 2, 11-12.

229. Flexner Rebuttal Report ¶685 states that implementation of the safer sex practices in the Descovy insert results in a patient that does not "experience an 'exposure.'" *See also* Flexner Rebuttal Report ¶¶694-696 (referencing the "comprehensive prevention strategy" portions of the Descovy insert and safer sex practices portion of the Medication Guide).   I disagree. Implementation of the safer sex practices and comprehensive prevention strategy described in the Descovy insert may *reduce* the risk of HIV exposure, but do not *eliminate* the risk.  Furthermore, as I explained in My Opening Report ¶288, repeated at-risk acts eventually results in contact with HIV.

230. I understand that the Opening Flexner Report alleging invalidity of the HHS Patents contains statements reinforcing that repeated at-risk acts eventually results in contact with HIV. For example, I have been informed that the Opening Flexner Report ¶479 states:

> A person of ordinary skill in the art would have understood that, by virtue of the 900-person sample size [in Dr. Robert Grant's Concept Sheet for a clinical trial

186

titled "Chemoprophylaxis for HIV Prevention in Peruvian Men"], the men's high risk status, and the 18-month treatment time, some number of the HIV-1 seronegative individuals would come into contact with an immunodeficiency virus. And because these HIV-1 seronegative men with high-risk status would have been receiving "daily" Truvada®, they would have taken Truvada® prior to these exposures.

Also, I have been informed that the Opening Flexner Report ¶641 describes a patient named "Nick" who "regularly had sex with multiple partners in a recognized high-risk demographic (MSM) and refused to use a condom" and "[b]ased on [Dr. Flexner's] understanding of Nick's sexual practices, it is [Dr. Flexner's] opinion that Nick would have been exposed to HIV at least once during his repeated high-risk behavior."

231.    Flexner Rebuttal Report ¶686 states that "statements in various versions of the Descovy® Insert does not establish the actual occurrence of any physician conducting this step of claim 1." *See also* Flexner Rebuttal Report ¶692 (providing similar statements).  Gilead's REMS surveys provide direct evidence of the population of patients taking **Truvada** for PrEP that are, in practice, potentially exposed to HIV during treatment.  For example, between 65.5-100% of **Truvada** for PrEP patients did not use a condom the last time they had sex, and between 81.3-100% had unprotected sex within the last 3 months as shown in the below table during the REMS 3-5 survey periods:

| Did you use a condom the last time you had sex? | | |
|---|---|---|
| Yes (%) | 34.2 | GILDDE00251842 (REMS 3) |
| | 29.6 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| No (%) | 65.5 | GILDDE00251842 (REMS 3) |
| | 69.6 | GILDDE00263368 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.8 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

RESTRICTED INFORMATION

| Have you had unprotected sex within the last 3 months? | | |
|---|---|---|
| Yes (%) | 81.3 | GILDDE00251842 (REMS 3) |
| | 85.6 | GILDDE00263369 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| No (%) | 18.3 | GILDDE00251842 (REMS 3) |
| | 14.4 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.0 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| Do you know the HIV status of your sexual partner? | | |
| Yes, I known the HIV status of my sexual partner(s) (%) | 43.5 | GILDDE00251841 (REMS 3) |
| | 40.0 | GILDDE00263368 (REMS 4) |
| | 60.0 | GILDDE00270759 (REMS 5) |
| I know the HIV status of some of my sexual partners. (%) | 49.6 | GILDDE00251841 (REMS 3) |
| | 52.0 | GILDDE00263368 (REMS 4) |
| | 40.0 | GILDDE00270759 (REMS 5) |
| No, I don't know the HIV status of my sexual partner(s). | 6.8 | GILDDE00251841 (REMS 3) |
| | 8.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

In addition, between 40-60% of PrEP patients either do not know the HIV status of their sexual partners or only know the HIV status of some of their sexual partners. For reasons previously discussed, Gilead's data on Truvada for PrEP is expected to be indicative of Descovy for PrEP. Having unprotected condomless sex or sexual partners of unknown HIV status increases the risk for HIV exposure. Indeed, the Descovy insert specifically calls out these types of activities as at-risk behaviors for exposure as described in My Opening Report ¶288. Also, Descovy for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they engage in activities that result in repeated potential exposures to HIV that leads to eventual contact with HIV, as described in My Opening Report ¶288.

232.    Additional evidence of PrEP patients engaging in potential HIV exposure activities is provided by Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017. For example, based on survey results, Gilead concluded that "[r]isky behaviors abound: few [PrEP users] are monogamous and most have had unprotected anal sex:"



*Id.* at GILDDE02636285.   Additional risky behaviors of the PrEP patients were reported as follows:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

|  | Heterosexual Men (n=14) |
|---|---|
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are <u>HIV negative</u>) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |



Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A9. We would like to know about some of your life experiences. We realize that some of these may be very personal. We ask that you be truthful. Remember your responses are anonymous and confidential. Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)

dd

*Id.* at GILDDE02636287.  Additional risky behavior of the surveyed PrEP patients are reported as follows:



*Id.* at GILDDE02636288.  The PrEP users reported that they perceived condomless sex, having sex with someone whose HIV status is unknown, or having sex with someone who has HIV as activities that place them at-risk for acquiring HIV as follows:



*Id.* at GILDDE02636284.  For reasons previously discussed, Gilead's data on Truvada for PrEP is expected to be indicative of Descovy for PrEP.  As previously discussed, Descovy for PrEP patients engage in repeated at-risk acts that eventually results in exposure to HIV.

233.    Flexner Rebuttal Report ¶693 suggests that the statement in the Medication Guide that "DESCOVY can only help reduce your risk of getting HIV-1 before you are infected" might be referring to post-exposure prophylaxis rather than pre-exposure prophylaxis.  I note that post-exposure prophylaxis is not an FDA approved indication for Descovy.  Therefore, the statement in the Descovy insert about Descovy only helping to reducing the risk of getting HIV-1 before a patient is infected should be interpreted as applying to PrEP, not PEP.

234.    Flexner Rebuttal Report ¶¶698-724 discuss four supposed "ways that persons of ordinary skill in the art understand patients could, and in fact do, take Descovy® for HIV PrEP in the real world without experiencing an 'exposure.'"  Flexner Rebuttal Report ¶698.  The four supposed ways are (1) consistent and correct condoms usage; (2) consistent confirmation that persons with whom the patient engages in sexual activity are HIV-negative; (3) an HIV-negative partner in a serodiscordant couple where the HIV-positive partner is undetectable; and (4) a patient that does not engage in activity that could possibly result in exposure to HIV.  *See* Flexner Rebuttal Report ¶726.  I address each of these four strategies below.

235.    *First*, Flexner Rebuttal Report ¶699 asserts that there is no exposure where there is consistent and correct usage of condoms because the condom creates a physical barrier between sexual partners such that "[w]here a condom is used correctly during intercourse, a condom will not break and will serve as an effective barrier to contact with bodily fluids, thereby preventing an exposure to the immunodeficiency retrovirus."  *See also* Flexner Rebuttal Report ¶¶700-707.

236.    Consistent and correct condom use may ***reduce*** the risk of HIV exposure, but it does not ***eliminate*** the risk of exposure to HIV.  For example, it has been reported that "[a]mong MSM reporting any anal sex with an HIV-positive male partner, we found 70% effectiveness with reported consistent condom use (compared with never use) and no significant protection when comparing sometimes use to never use."  Smith et al., "Condom effectiveness for HIV prevention by consistency of use among men who have sex with men in the United States," Journal of Acquired Immune Deficiency Syndromes, 68:337-344 (2015) at page 337 ("Results" section). "Estimated condom effectiveness was 72.3% (95% CI: 60.7% to 80.5%) for receptive anal sex, 62.9% (95% CI: 46.3% to 74.3%) for insertive anal sex, and 70.5% (95% CI: 58.2% to 79.2%) for any receptive or insertive anal sex."  *Id.* at page 341.  "The point estimate in our analysis of condom

193

effectiveness when 'always' used by MSM during anal sex with any HIV-positive male partners is 70%, modestly less than the 80% estimate for condoms when 'always' used by heterosexual HIV-discordant couples." *Id.* at page 342.  To be categorized as "always" using a condom, "the subject must have reported condom use during all" of the anal sex acts with their HIV-positive partner during a 6-month interval.  *Id.* at page 339.  "This study found that inconsistent ('sometimes') condom use with HIV-positive male partners over months to years offers minimal or no protection, underscoring the importance of the inclusion of messaging by their HIV prevention providers, which supports the adoption and continuation of consistent condom use for MSM." *Id.* at page 343.  Furthermore, "[e]ven if condoms are used consistently and correctly, slippage and breakage can occur." Paz-Bailey et al., "The effect of correct and consistent condom use on chlamydia and gonococcal infection among urban adolescents," Archives of Pediatrics and Adolescent Medicine, 159:536-542 (2005) at page 536.  "Studies demonstrate that slippage or breakage occurs between 1% and 4% of the time." *Id.*  As discussed above, Descovy for PrEP patients are sexually active and engage in repeated sexual acts.  Even if a patient always uses consistent and correct condoms, such usage is only effective in preventing contact with HIV 70% of the time.  By repeatedly engaging in sex acts, a Descovy for PrEP patient will eventually contact HIV even with consistent and correct condom usage.  Therefore, I disagree with the Flexner Rebuttal Report statement that there can be no exposure where there is consistent and correct usage of condoms.

237.    Flexner Rebuttal Report ¶¶701-704 point to CDC recommendations for consistent and correct use of condoms in conjunction with PrEP.  I note that the CDC 2021 Clinical Guidelines state that "[r]eported consistent ('always') condom use is associated with an 80% reduction in HIV acquisition among heterosexual couples."    GILDDE02689769-876 at

194

GILDDE02689794.  Thus, consistent and correct condom usage merely reduces the risk of HIV exposure, it does not eliminate the risk.  The Descovy insert and the CDC recommendations cited in the Flexner Rebuttal Report recommend the use of PrEP in conjunction with condom usage precisely because consistent and correct condom usage does not eliminate the risk of HIV exposure.  For example, Flexner Rebuttal Report ¶702 states "the CDC 2021 Clinical Guidelines acknowledges that Descovy® for PrEP may be prescribed where a patient reports consistent and correct use of condoms, ***but still requests prescription of Descovy® for PrEP***."  (emphasis added).

238.    Flexner Rebuttal Report ¶¶705-706 point to N.Y.D.O.H. recommendations for consistent and correct use of condoms in conjunction with PrEP.  I note that condom use recommendations are under the heading "Risk Reduction," which appears to acknowledge that condom usage merely reduces (rather than eliminates) the risk of HIV exposure. GILDDE02689460-509 at GILDDE02689482.

239.    ***Second***, Flexner Rebuttal Report ¶708 asserts that "where a patient taking Descovy® for PrEP is always aware of the HIV status of her sexual partners, and is aware that they are negative for HIV at the time of sexual intercourse, such a patient would not experience an exposure to HIV." *See also* Flexner Rebuttal Report ¶709.  However, Grov acknowledges that "we do not know the actual HIV statuses of participants' partners, and it may be that participants *believed* their partners shared the same status," and that belief may (or may not) have been accurate.  Grov at 2753 (emphasis in original). Grov is clear that serosorting may actually ***increase*** (rather than decrease) HIV acquisition:

> Some research has suggested that serosorting is not as effective at reducing HIV transmission as condom use, and some evidence suggests that serosorting may actually increase HIV acquisition [33]. This may be due to low HIV testing rates/frequency [33], yet partners still report they are HIV-negative.

Grov at page 2752.  Grov reference 33 is Wilson et al., "Serosorting may increase the risk of HIV acquisition among men who have sex with men." Sexually Transmitted Diseases 37:13-7 (2010) ("Wilson").

240.     Wilson states that serosorting is only beneficial in reducing the relative risk of HIV infection where the prevalence of undiagnosed HIV infections is less than approximately 20% and 40% in populations of high (70%) and low (20%) treatment rates, respectively, as follows:

> Results:  We demonstrate that serosorting is unlikely to be highly beneficial in many populations of men who have sex with men, especially where the prevalence of undiagnosed HIV infections is relatively high.  We find that serosorting is only beneficial in reducing the relative risk of HIV transmission if the prevalence of undiagnosed HIV infections is less than ~20% and ~40%, in populations of high (70%) and low (20%) treatment rates, respectively, even though treatment reduces the absolute risk of HIV transmission.  Serosorting can be expected to lead to increased risk of HIV acquisition in many settings.  In settings with low HIV testing rates serosorting can more than double the risk of HIV acquisition.

Wilson at 13 (Abstract).  Wilson further explains the problems of serosorting actually **_increasing_** the risk of HIV exposure when a partner's serostatus is unknown as follows:

> Serosorting may in fact lead to increased risk if a partner's HIV serostatus is unintentionally misreported because it is unknown.  Consequently, the proportion of the sexually active population that is HIV-infected but undiagnosed is a crucial determinant of the effectiveness of serosorting.  In the ideal scenario of 100% accurate knowledge and no misreporting of serostatus, serosorting is 100% effective at preventing HIV acquisition by HIV-negative people who practice it.  Conversely, serosorting may result in substantially increased risk of HIV acquisition if a large proportion of the HIV-infected population is undiagnosed and serosorting thereby leads to the formation of discordant partnerships and more unprotected sex.

*Id.* The ideal scenario of 100% accurate knowledge and no misrepresenting of serostatus does not exist in the real world, as described in more detail in a few paragraphs below in this report.

241.   Wilson further explains that the effectiveness of serosorting depends on accurate disclosure of serostatus and is "a potentially risky strategy" as follows:

> The effectiveness of serosorting depends on accurate disclosure of HIV serostatus. Some HIV-infected people may mistakenly believe that they are not infected and thus disclose as HIV-negative to sexual partners. Disclosure of HIV status in sexual partnerships may also lead to other strategies to reduce the risk of HIV transmission, such as strategic positioning and negotiated safety. But disclosing HIV status may be associated with substantial stigma, so that even if a man knows he is HIV-infected, he may not disclose his HIV status or may even disclose false information (although this is thought to be relatively rare). However, even if truthful disclosure always occurs, serosorting is a potentially risky strategy and its effectiveness for an individual uninfected man also depends on the frequency of testing of his sexual partner and the partner's previous risk exposure.

*Id.* at 16.

242.   Wilson explains that serosorting is only of any benefit in the following circumstances:

> We estimate that serosorting is only of any benefit at all for reducing HIV risk when the proportion of men with HIV who are undiagnosed is less than ~20% in the case of high treatment rates (70%) and less than ~40% for low treatment rates (20%).

*Id.* at 14. Wilson states that "[i]t is widely cited that in the United States ~48% of all infections are undiagnosed" and "[o]ther estimates suggest that ~25% of HIV infections in the United States are undiagnosed." *Id.* Wilson states that "[w]e assume treatment rates are between 50% and 70% among diagnosed cases in the United States." *Id.* Based on these estimates, Wilson states:

> Using commonly cited estimates of the percentage of undiagnosed infections in the United States (of 48%), our model indicates that practicing serosorting in the United

197

States is likely to increase risk by almost 50% (Fig. 1).  If just 25% of HIV infections in the United States were undiagnosed then it is unclear whether practicing serosorting would increase or decrease the risk of HIV acquisition (Fig. 1).

*Id.* at 15.

243.    Wilson concludes that serosorting is not appropriate for even partial protection from HIV exposure as follows:

Our analysis suggests that unless the surrounding population has a small proportion of undiagnosed infections, serosorting is likely to increase the risk of HIV acquisition in practice.  Therefore, it is not appropriate to suggest that serosorting may offer partial protection from HIV.  The available evidence suggests that HIV-uninfected men who serosort remain at risk of acquiring HIV infection, and quite possibly at significantly increased risk compared with not serosorting.

*Id.* at 16.  For at least the above reasons, I disagree with the Flexner Rebuttal Report that serosorting PrEP users having only reportedly HIV-negative partners would necessarily result in no HIV exposure.

244.    In addition, Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 found that 84% of new users and 82% of longer-term PrEP users have had multiple sexual partners and are not monogamous:

RESTRICTED INFORMATION



*Id.* at GILDDE02636285. In addition, 64% of new users and 62% of longer-term users have had sex without a condom with someone of unknown HIV status. *Id.* Further, 86% of heterosexual PrEP users have had sex without a condom with someone of unknown HIV status:

**Over 7 in 10 heterosexual male users have had condomless sex with a partner of unknown HIV status, transactional sex, and condomless anal sex**

Sexual Experiences – *past year*

|  | Heterosexual Men (n=14) |
| --- | --- |
| Have had sex without a condom someone whose HIV status I didn't know | 86% |
| Have paid for or accepted payment for sex | 71% |
| Have had anal sex without a condom | 71% |
| Have tested positive for an STD | 64% |
| Have had sex without a condom with a partner who cheated on me | 64% |
| Have had sex while high or drunk | 64% |
| Have NOT only had sex with one partner (both partner and I are HIV negative) and we both only have sex with each other* | 50% |
| Have had sex with a person who I know is HIV positive | 29% |
| In a situation where I did not want to have sex but it happened anyway | 29% |
| Have had sex without a condom with a person who has served time in prison | 21% |
| In an on-going sexual relationship with an HIV positive partner | 14% |

Base: Heterosexual men among both New Starts and Longer-term Users (n=14)
A9.  We would like to know about some of your life experiences.  We realize that some of these may be very personal.  We ask that you be truthful.  Remember your responses are anonymous and confidential.  Please think about your sexual activity in the past year as you answer this question; *Item asked in the positive, reported in the negative
Please check all that apply to you personally; 95% significance shown between New Starts (N) and Longer-term Users (L)


GILEAD
[DateTime]

dd

*Id.* at GILDDE02636287.  As previously discussed, Descovy for PrEP patients engage in repeated at-risk acts for exposure to HIV that eventually leads to an actual exposure to HIV.

245.    ***Third***, Flexner Rebuttal Report ¶710 asserts that there is no HIV exposure "where a patient is the HIV-negative partner in a serodiscordant couple (i.e., one HIV-negative partner and one HIV-positive partner) and the HIV positive partner has an undetectable viral load based on the ongoing administration of an HIV treatment regimen. … [t]his concept is sometimes referred to as undetectable equals untransmittable or uninfectious ('U=U')."  *See also* Flexner Rebuttal Report ¶¶711-720.

246.    Risk reduction in serodiscordant couples depends upon the HIV-positive partner "***achieving and maintaining*** an undetectable viral load."  GILDDE02689950-52 at 51 (emphasis

added).  "Even when viral load is undetectable, HIV is still present in the body, and the virus rebounds to detectable levels if treatment is stopped."  *Id.*  HIV transmission to the HIV-negative partner has occurred where "[t]he partner with HIV had achieved viral suppression but the ART regimen later failed or the partner with HIV had stopped taking their medication." GILDDE02690045-48 at GILDDE02690045.

247.   In 2020, a report was published on the accuracy of self-reporting of viral suppression among HIV-positive men having HIV-negative male partners.  *See* Stephenson et al, "Accuracy in self-report of viral suppression among HIV-positive men with HIV-negative male partners," Journal of Acquired Immune Deficiency Syndromes, 83:210-214 (2020) ("Stephenson").  The results of the report found that "[a]lthough 72.5% of men could accurately report their viral load status, 20% reported that they were virally suppressed when they did not have a biomarker confirmed measure of viral suppression."  *Id.* at page 2.  Further details of the results were reported as follows:

> In terms of accuracy of reporting of viral suppression, 72.5% of men accurately reported their viral suppression status: this was comprised of 62.5% of men (n=75) who accurately reported that they were virally suppressed (e.g. both self-report and biomarker) and 10% of men (n=12) reported they were not virally suppressed and had a detectable viral load.  In contrast, 27.5% (n=33) of men inaccurately reported their viral suppression status.  ***In total, 20% (n=24) of men reported that they were virally suppressed and did not have a biomarker confirmed measure***, and 7.5% (n=9) of men reported that they were not virally suppressed but did have a biomarker of viral suppression.

*Id.* at page 5 (emphasis added).  The report concluded that even if a partner self-reports to be virally suppressed, there is still a need to continue supporting PrEP as a primary prevention of HIV.  *Id.* at page 2 ("These results highlight the need to provide interventions to MSM living with HIV to

support access to care and ensure current knowledge of viral load, and to continue to support primary prevention of HIV through condom use and pre-exposure prophylaxis (PrEP).").  Due to potential inaccuracies in perceived viral load suppression, I disagree with the Flexner Rebuttal Report that sexual intercourse between a PrEP patient and an HIV-positive partner that purportedly has an undetectable viral load would eliminate the risk of HIV exposure.

248.    Flexner Rebuttal Report ¶¶711-718 point to various CDC and N.Y.D.O.H. statements about U=U, and Flexner Rebuttal Report ¶719 points to statements in the Descovy insert about "knowledge of partner(s)' HIV-1 status, including viral suppression status."  However, Flexner Rebuttal Report ¶715 states "the CDC 2021 Clinical Guidelines acknowledges that Descovy® for PrEP may be prescribed where a patient reports having a virally suppressed HIV-positive partner, *but still requests prescription of Descovy® for PrEP*." (emphasis added).  Similarly, Flexner Rebuttal Report ¶718 states "N.Y.D.O.H. AIDS Institute's 'PrEP to Prevent HIV and Promote Sexual Health' guidelines state that *PrEP should not be withheld from candidates who 'request PrEP even if they have a partner living with HIV with an undetectable viral load*.'" (emphasis added).  The CDC recommendations, N.Y.D.O.H. recommendations, and Descovy inserts cited in the Flexner Rebuttal Report recommend the use of PrEP where a patient reports having a virally suppressed HIV-positive partner precisely because a reportedly suppressed HIV-positive partner may inaccurately perceive the status of their viral load suppression such that the risk of HIV exposure has not been eliminated.

249.    *Fourth*, Flexner Rebuttal Report ¶721 asserts that "patients taking Descovy® for PrEP who do not engage in any sexual intercourse, do not share needles or other injection drug equipment, and otherwise engage in no behavior that could result in an exposure to HIV do not practice the 'wherein' clause of claim 1 of the '509 Patent, claim 1 of the '423 Patent."  *See also*

Flexner Rebuttal Report ¶¶722-724.  As noted in My Opening Report ¶¶252-254, Descovy for PrEP is only indicated for patients that are at-risk for acquiring HIV.  Therefore, the patient described in Flexner Rebuttal Report ¶721 that does not currently and will not engage in any sexual intercourse, does not currently and will not share needles or other injection drug equipment, and does not currently and will not otherwise engage in behavior that could result in an exposure is a patient that does not meet the criteria described in the Descovy insert for receiving Descovy for PrEP.

250.    Flexner Rebuttal Report ¶722 states "the CDC 2021 Clinical Guidelines acknowledges that Descovy® for PrEP may be prescribed where a patient reports having no anal or vaginal sex in the past 6 months, *but still requests prescription of Descovy® for PrEP*." (emphasis added).  The CDC Clinical Guidelines go on to explain that patients requesting PrEP may be uncomfortable reporting sexual or injection behaviors to their prescriber:

> Patients may request PrEP because of concern about acquiring HIV but not feel comfortable reporting sexual or injection behaviors to avoid anticipated stigmatizing responses in health care settings.  For this reason, after attempts to assess patient sexual and injection behaviors, patients who request PrEP should be offered it, even when no specific risk behaviors are elicited.

GILDDE02689769-876 at GILDDE02689790.  In addition, a patient that reports no *past* potential exposure events may expect to engage in *future* at-risk activities for HIV exposure, which presents an ideal prevention scenario for prescribing Descovy for PrEP.  Therefore, the CDC recommendation to provide Descovy for PrEP to patients requesting it even if the patient reports no HIV exposures does not mean that the patient will not engage in repeated activities that put them at-risk for HIV exposure, which will eventually leads to an HIV exposure.  The patient may

simply feel uncomfortable reporting at-risk sexual or injection behaviors to the Descovy for PrEP prescriber.

251.    Flexner Rebuttal Report ¶725 repeats the argument that "a patient who has missed daily doses of Descovy for PrEP" has insufficient amounts of TDF and FTC to inhibit establishment of HIV.  I addressed that argument above in this Reply Report with respect to the preamble.

### 5.    "thereby protecting the primate host from infection with the immunodeficiency retrovirus"

252.    With the exception of Flexner Rebuttal Report ¶¶735-736, the section of the Flexner Rebuttal Report at ¶¶728-763 discussing the "thereby" clause merely repeats the same arguments previously provided by Flexner Rebuttal Report ¶¶642-671 for the preamble.  Also, Flexner Rebuttal Report ¶¶728-763 repeat essentially the same arguments for the "thereby" clause of claim 1 of the '423 patent that it previously raised for the preamble and "thereby" clause of claim 13 of the '509 patent and claim 12 of the '423 patent.   For the sake of brevity, I incorporate by reference my above reply to the Flexner Rebuttal Report preambles and thereby clause in its entirety here.

253.    Flexner Rebuttal Report ¶¶735-736 assert that a patient taking Descovy for PrEP would not experience a "exposure" because "[t]he Descovy® Insert expressly instructs, in the 'Warnings and Precautions' section, and under the heading 'Comprehensive Management to Reduce the Risk of Sexually Transmitted Infections, Including HIV-1, and Development of HIV-1 Resistance When DESCOVY Is Used for HIV-1 PrEP,' to 'use DESCOVY for HIV-1 PrEP to reduce the risk of HIV-1 infection as part of a comprehensive prevention strategy' that includes other prevention measures, 'including adherence to daily administration and safer sex practices, including condoms, to reduce the risk of sexually transmitted infections (STIs).'"  I addressed the

RESTRICTED INFORMATION

"exposure" limitation in my Opening Report, and I also addressed it above in this Reply Report with respect to the "wherein" clause of claim 1 that recites "wherein the combination is administered prior to the exposure of the primate host to the immunodeficiency retrovirus."

**F.**   **Prescription and Use of Descovy Directly Infringes Claims 2 and 3 of the '423 Patent**

254.   Claim 2 of '423 patent is reproduced below:

> 2. The process of claim 1 wherein selecting a primate host comprises selecting an adult human not infected with the immunodeficiency retrovirus.

255.   Claim 3 of '423 patent is reproduced below:

> 3. The process of claim 2, wherein the adult human is a male.

256.   Flexner Rebuttal Report ¶767 asserts that instructions in the Descovy Insert do not "establish the actual occurrence of any physician" conducting the recited claims.  *See also* Flexner Rebuttal Report ¶¶768 and 771 (containing similar assertions for physicians and patients). However, Gilead's REMS surveys provide direct evidence of the population of male adult patients taking ***Truvada*** for PrEP that do, in practice, take ***Truvada*** for PrEP in an infringing manner.  For example, the inclusion criteria for uninfected individuals to participate in the REMS surveys was "***[a]dults who are 18 years of age or older*** and who are taking ***Truvada*** for a PrEP indication as part of a comprehensive prevention strategy to reduce the risk of acquiring HIV-1."  *See* GILDDE00236715-7526 at GILDDE00236737 (REMS 1, emphasis added); GILDDE00243874-4563 at GILDDE00243896 (REMS 2); GILDDE00251496-2071 at GILDDE00251517 (REMS 3); GILDDE00263067-700 at GILDDE00263086 (REMS 4); GILDDE00270528-916 at GILDDE00270547 (REMS 5).

RESTRICTED INFORMATION

257.    All 10 uninfected individuals from REMS 1 were adult males.    *See* GILDDE00236715-7526 at GILDDE00236950.  In REMS 2, 71 of the uninfected individuals from the 74 that completed the survey were male (2 were female, and 1 was transgender).    *See* GILDDE00243874-4563 at GILDDE00244353.  In REMS 3, 274 of the uninfected individuals from the 281 that completed the survey were male (2 were female, 4 were transgender, and 1 preferred not to provide their gender).  *See* GILDDE00251496-2071 at GILDDE00251836.  In REMS 4, 130 of the uninfected individuals from the 132 that completed the survey were male (2 were female).  *See* GILDDE00263067-700 at GILDDE00263363.  In REMS 5, all 5 uninfected individuals were adult males.  *See* GILDDE00270528-916 at GILDDE00270754.  For reasons previously discussed, Gilead's REMS data on Truvada for PrEP is expected to be indicative of Descovy for PrEP, and there is overlap between the patient populations that are prescribed Truvada and Descovy for PrEP.  Descovy for PrEP patients include adult males.

### G.    Prescription and Use of Descovy Directly Infringes Claim 19 of the '423 Patent

258.    Claim 19 of the '423 patent recites "[t]he process of claim 1, wherein the combination comprises the tenofovir prodrug."

259.    Flexner Rebuttal Report ¶776 repeats the argument about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body."  I addressed that argument above in this Reply Report with respect to step (b) of claim 12 from the '423 patent.

### H.    Prescription and Use of Descovy Directly Infringes Claim 9 of the '423 Patent

260.    Claim 9 of '423 patent is reproduced below:

The process of claim 1, wherein the combination s[16] administered daily for several days, weeks or months.

261.     Flexner Rebuttal Report ¶782 repeats the argument about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body." I addressed that argument above in this Reply Report with respect to step (b) of claim 12 from the '423 patent.

262.     Flexner Rebuttal Report ¶781 asserts that instructions in the Descovy Insert do not "establish any actual occurrence of direct infringement by any patient or any physician." *See also* Flexner Rebuttal Report ¶783 (containing similar assertions).  However, Gilead's REMS surveys provide direct evidence of the population of patients taking *Truvada* for PrEP that do, in practice, take *Truvada* daily for several days, weeks and months both before and after an exposure.  For example, between 74-100% of *Truvada* for PrEP patients did not miss a daily dose of *Truvada* as shown in the below table during the REMS 3-5 survey periods:

| In the past month, have you missed any doses of TRUVADA? | | |
|---|---|---|
| Yes (%) | 22.1 | GILDDE00251840 (REMS 3) |
| | 25.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| No (%) | 77.9 | GILDDE00251840 (REMS 3) |
| | 74.2 | GILDDE00263367 (REMS 4) |
| | 100.0 | GILDDE00270758 (REMS 5) |
| I don't know (%) | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| How many doses of TRUVADA have you missed in the past month? (All percentages are based on answers from only UIs who missed doses.) | | |
| 1-3 doses (%) | 83.9 | GILDDE00251841 (REMS 3) |
| | 81.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| 4-7 doses (%) | 12.9 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |

---

[16] A POSA would understand that the "s" in claim 9 of the '423 patent is a typographical error and would understand that "s" refers to "is."

RESTRICTED INFORMATION

| | 0.0 | GILDDE00270758 (REMS 5) |
|---|---|---|
| 8-12 doses (%) | 3.2 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| More than 12 doses (%) | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't remember | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| **How long have you been taking TRUVADA to reduce the risk of getting HIV?** | | |
| Less than 1 month (%) | 28.1 | GILDDE00251864 (REMS 3) |
| | 20.5 | GILDDE00263390 (REMS 4) |
| | 20.0 | GILDDE00270779 (REMS 5) |
| Between 1 month and 6 months (%) | 37.0 | GILDDE00251864 (REMS 3) |
| | 32.6 | GILDDE00263390 (REMS 4) |
| | 40.0 | GILDDE00270779 (REMS 5) |
| More than 6 months, but less than 1 year (%) | 18.5 | GILDDE00251864 (REMS 3) |
| | 14.4 | GILDDE00263390 (REMS 4) |
| | 0.0 | GILDDE00270779 (REMS 5) |
| More than 1 year (%) | 16.4 | GILDDE00251864 (REMS 3) |
| | 32.6 | GILDDE00263390 (REMS 4) |
| | 40.0 | GILDDE00270779 (REMS 5) |
| I don't remember (%) | 0.0 | GILDDE00251864 (REMS 3) |
| | 0.0 | GILDDE00263390 (REMS 4) |
| | 0.0 | GILDDE00270779 (REMS 5) |

Of the patients that missed a daily dose of *Truvada*, all of them (100%) missed 12 doses or less, which corresponds to 100% of *Truvada* patients surveyed taking at least 4 pills per week.  In addition, 100% of PrEP patients have taken PrEP at least for several days and/or several weeks, and many have been taking PrEP for many months, based on their answers to the question "How long have you been taking TRUVADA to reduce the risk of getting HIV?".  For reasons previously discussed, Gilead's REMS data on Truvada for PrEP is expected to be indicative of Descovy for PrEP.

## VI.  PHYSICIANS AND PATIENTS JOINTLY INFRINGE THE ASSERTED CLAIMS

263.    Section XII of the Flexner Rebuttal Report asserts that physicians and patients do not jointly infringe the Asserted Claims.  My Opening Report ¶¶330-337 explain why physicians

and patients jointly infringe the Asserted Claims.  I reply to assertions raised in the Flexner Rebuttal Report below.

### A. Physicians are vicariously liable for the actions of their patients taking Truvada for PrEP

#### 1. Reply to Flexner Rebuttal Report statements about physicians not conditioning receipt of Truvada for PrEP on patients exposing or potentially exposing themselves to HIV

264.    Flexner Rebuttal Report ¶792 states that "[p]hysicians do not condition the prescription of Truvada for PrEP upon the patient being 'at risk' for acquiring HIV" and, instead, "physicians will counsel the patient to engage in a comprehensive prevention strategy, in conjunction with PrEP use, thereby *discouraging* exposure or potential exposure to HIV" such that "[b]y no means do physicians require patients to expose or potentially expose themselves to HIV in order to obtain Truvada for PrEP." (emphasis in original).  Flexner Rebuttal Report ¶¶793-802 repeat previous arguments about the safer sex practices and comprehensive prevention strategy recommended by the Truvada Insert.

265.    As noted in My Opening Report ¶¶97-98, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV.  Furthermore, Truvada for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV.  As discussed above, implementation of the safer sex practices and comprehensive prevention strategy described in the Truvada insert does not eliminate the risk of HIV exposure.  Therefore, the safer sex practices and comprehensive prevention strategy described in the Truvada Insert do not negate the instructions within the Truvada Insert that Truvada for PrEP should only be prescribed to patients that are at-risk for acquiring HIV.  For at least these reasons, I disagree with the assertions in the Flexner

RESTRICTED INFORMATION

Rebuttal Report that physicians do not condition the prescription of Truvada for PrEP upon the patient being at risk for acquiring HIV.

266.    Flexner Rebuttal Report ¶800 states that "prescriptive governmental guidelines expressly counsel physicians to prescribe Truvada for PrEP upon patient request, even if no risk behaviors are identified."  As noted in My Opening Report ¶¶97-98, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV.  As explained above with respect to Flexner Rebuttal Report ¶261, the CDC 2021 Clinical Guidelines "acknowledges that Truvada® for PrEP may be prescribed where a patient reports having no anal or vaginal sex in the past 6 months, ***but still requests prescription of Truvada® for PrEP***." (emphasis added).  The CDC Clinical Guidelines go on to explain that patients requesting PrEP may be uncomfortable reporting sexual or injection behaviors to their prescriber:

> Patients may request PrEP because of concern about acquiring HIV but not feel comfortable reporting sexual or injection behaviors to avoid anticipated stigmatizing responses in health care settings.  For this reason, after attempts to assess patient sexual and injection behaviors, patients who request PrEP should be offered it, even when no specific risk behaviors are elicited.

GILDDE02689769-876 at GILDDE02689790.  I note that a patient that reports no ***past*** potential exposure events may expect to engage in ***future*** at-risk activities for HIV exposure, which presents an ideal prevention scenario for prescribing Truvada for PrEP.  Therefore, the CDC recommendation to provide Truvada for PrEP to patients requesting it even if the patient reports no potential HIV exposures does not mean that the patient will not engage in activities at-risk for HIV exposure.   The patient may simply feel uncomfortable reporting at-risk sexual or injection behaviors to the Truvada for PrEP prescriber.

### 2. Physicians establish the manner or timing of patients taking Truvada for PrEP

267. Flexner Rebuttal Report ¶806 asserts that physicians do not establish the manner or timing of patients taking Truvada for PrEP because "[p]atients can take Truvada for PrEP at any time during the day that is most convenient for the patient, and there is no statement in the Truvada Insert that instructs when a patient should take her dose of Truvada." As explained in My Opening Report ¶216, "a patient taking Truvada for PrEP self-administers one tablet of Truvada daily in accordance with their physician's instruction to follow the PrEP indication in the Truvada package insert." The physician therefore establishes the timing of the patient self-administering the Truvada tablet, which is "daily." The physician is not required to micromanage the exact timing of the day when a patient should take her dose of Truvada.

268. Flexner Rebuttal Report ¶¶806-810 repeat previous arguments about patients missing doses of Truvada. As I previously explained, it is generally accepted that taking 4 or more doses per week of Truvada is sufficient to inhibit establishment of a self-replicating HIV infection in a human. For at least this reason, I agree with the statement in Flexner Rebuttal Report ¶320 that "missed doses of Truvada for PrEP are not of significant concern."

### B. Reply to Flexner Rebuttal Report statements about lack of a joint enterprise between physicians and patients taking Truvada for PrEP

269. Flexner Rebuttal Report ¶¶816-817 repeat arguments about lack of direct infringement based on the safer sex practices and comprehensive prevention strategy recommended by the Truvada Insert. As noted in My Opening Report ¶¶97-98, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV. Furthermore, Truvada for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to

RESTRICTED INFORMATION

HIV.  As discussed above, implementation of the safer sex practices and comprehensive prevention strategy described in the Truvada insert does not eliminate the risk of HIV exposure.  Therefore, the safer sex practices and comprehensive prevention strategy described in the Truvada Insert do not negate the instructions within the Truvada Insert that Truvada for PrEP should only be prescribed to patients that are at-risk for acquiring HIV.

270.   In My Opening Report ¶219, I explained that "[t]here is a pecuniary interest to share in the benefit of Truvada for PrEP between the physician and patient because the patient directly benefits from the reduced risk of acquiring HIV, while the physician benefits from appropriately treating the patient and reducing the risk of HIV spreading within the community."  Flexner Rebuttal Report ¶818 disagrees by stating "[t]o the contrary, for ethical reasons, physicians are taught to implement healthcare decisions that are in the best interests of their patients regardless of pecuniary benefits."  Implementing healthcare decisions that are in the best interest of patients does not detract from the pecuniary interest that results when the patient directly benefits from the reduced risk of acquiring HIV, while the physician benefits from appropriately treating the patient and reducing the risk of HIV spreading within the community.

271.   In My Opening Report ¶219, I explained that an aspect of equal right of control within the formal patient-doctor relationship is that "both the physician and patient have the right to stop the treatment and/or terminate the relationship."  Flexner Rebuttal Report ¶819 points out another aspect of the patient-doctor relationship is that "only the physician has the ability to prescribe medication, and the physician has full control in that regard."  However, the Flexner Rebuttal Report does not appear to dispute that both the patient and doctor have an equal right of control to stop treatment and/or terminate the relationship.

RESTRICTED INFORMATION

### C. Physicians are vicariously liable for the actions of their patients taking Descovy for PrEP

#### 1. Reply to Flexner Rebuttal Report statements about physicians not conditioning receipt of Descovy for PrEP on patients exposing or potentially exposing themselves to HIV

272.    Flexner Rebuttal Report ¶824 states that "[p]hysicians do not condition the prescription of Descovy for PrEP upon the patient being 'at risk' for acquiring HIV" and, instead, "physicians will counsel the patient to engage in a comprehensive prevention strategy, in conjunction with PrEP use, thereby *discouraging* exposure or potential exposure to HIV" such that "[b]y no means do physicians require patients to expose or potentially expose themselves to HIV in order to obtain Descovy for PrEP." (emphasis in original).  Flexner Rebuttal Report ¶¶825-834 repeat previous arguments about the safer sex practices and comprehensive prevention strategy recommended by the Descovy Insert.

273.    As noted in My Opening Report ¶¶252-253, Descovy for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV.  Furthermore, Descovy for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV.  As discussed above, implementation of the safer sex practices and comprehensive prevention strategy described in the Descovy insert does not eliminate the risk of HIV exposure.  Therefore, the safer sex practices and comprehensive prevention strategy described in the Descovy Insert do not negate the instructions within the Descovy Insert that Descovy for PrEP should only be prescribed to patients that are at-risk for acquiring HIV.  For at least these reasons, I disagree with the assertions in the Flexner Rebuttal Report that physicians do not condition the prescription of Descovy for PrEP upon the patient being at risk for acquiring HIV.

274.    Flexner Rebuttal Report ¶833 states that "prescriptive governmental guidelines expressly counsel physicians to prescribe Descovy for PrEP upon patient request, even if no risk behaviors are identified."  As noted in My Opening Report ¶¶252-253, Descovy for PrEP is only indicated for patients that are at-risk for acquiring HIV.  As explained above with respect to Flexner Rebuttal Report ¶608, the CDC 2021 Clinical Guidelines "acknowledges that Descovy® for PrEP may be prescribed where a patient reports having no anal or vaginal sex in the past 6 months, *but still requests prescription of Descovy® for PrEP*." (emphasis added).  The CDC Clinical Guidelines go on to explain that patients requesting PrEP may be uncomfortable reporting sexual or injection behaviors to their prescriber:

> Patients may request PrEP because of concern about acquiring HIV but not feel comfortable reporting sexual or injection behaviors to avoid anticipated stigmatizing responses in health care settings.  For this reason, after attempts to assess patient sexual and injection behaviors, patients who request PrEP should be offered it, even when no specific risk behaviors are elicited.

GILDDE02689769-876 at GILDDE02689790.  I note that a patient that reports no *past* potential exposure events may expect to engage in *future* at-risk activities for HIV exposure, which presents an ideal prevention scenario for prescribing Descovy for PrEP.  Therefore, the CDC recommendation to provide Descovy for PrEP to patients requesting it even if the patient reports no potential HIV exposures does not mean that the patient will not engage in activities at-risk for HIV exposure.   The patient may simply feel uncomfortable reporting at-risk sexual or injection behaviors to the Truvada for PrEP prescriber.

## 2.    Physicians establish the manner or timing of patients taking Descovy for PrEP

275.    Flexner Rebuttal Report ¶838 asserts that physicians do not establish the manner or timing of patients taking Descovy for PrEP because "[p]atients can take Descovy for PrEP at any

time during the day that is most convenient for the patient, and there is no statement in the Descovy Insert that instructs when a patient should take her dose of Descovy." As explained in My Opening Report ¶334, "a patient taking Descovy for PrEP self-administers one tablet of Descovy daily in accordance with their physician's instruction to follow the PrEP indication in the Descovy package insert." The physician therefore establishes the timing of the patient self-administering the Descovy tablet, which is "daily." The physician is not required to micromanage the exact timing of the day when a patient should take her dose of Descovy.

276.   Flexner Rebuttal Report ¶¶838-841 repeat previous arguments about patients missing doses of Descovy. As I previously explained, it is generally accepted that a patient taking 4 or more doses per week of Descovy is sufficient to inhibit establishment of a self-replicating HIV infection in a human.

### D.   Reply to Flexner Rebuttal Report statements about lack of a joint enterprise between physicians and patients taking Descovy for PrEP

277.   The Flexner Rebuttal Report ¶847 repeats arguments about lack of direct infringement based on the safer sex practices and comprehensive prevention strategy recommended by the Descovy Insert. As noted in My Opening Report ¶¶252-253, Descovy for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV. Furthermore, Descovy for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV. As discussed above, implementation of the safer sex practices and comprehensive prevention strategy described in the Descovy insert does not eliminate the risk of HIV exposure. Therefore, the safer sex practices and comprehensive prevention strategy described in the Descovy Insert do not negate the instructions within the Descovy Insert that Descovy for PrEP should only be prescribed to patients that are at-risk for acquiring HIV.

215
RESTRICTED INFORMATION

278.    In My Opening Report ¶337, I explained that "[t]here is a pecuniary interest to share in the benefit of Descovy for PrEP between the physician and patient because the patient directly benefits from the reduced risk of acquiring HIV, while the physician benefits from appropriately treating the patient and reducing the risk of HIV spreading within the community."  Flexner Rebuttal Report ¶848 disagrees by stating "[t]o the contrary, for ethical reasons, physicians are taught to implement healthcare decisions that are in the best interests of their patients regardless of pecuniary benefits."  Implementing healthcare decisions that are in the best interest of patients does not detract from the pecuniary interest that results when the patient directly benefits from the reduced risk of acquiring HIV, while the physician benefits from appropriately treating the patient and reducing the risk of HIV spreading within the community.

279.    In My Opening Report ¶337, I explained that an aspect of equal right of control within the formal patient-doctor relationship is that "both the physician and patient have the right to stop the treatment and/or terminate the relationship."  Flexner Rebuttal Report ¶849 points out another aspect of the patient-doctor relationship is that "only the physician has the ability to prescribe medication, and the physician has full control in that regard."  However, the Flexner Rebuttal Report does not appear to dispute that both the patient and doctor have an equal right of control to stop treatment and/or terminate the relationship.

## VII.    GILEAD INDUCES INFRINGEMENT OF THE ASSERTED CLAIMS

### A.    Gilead Induces Infringement of the Asserted Claims for Truvada

280.    The Flexner Rebuttal Report includes several arguments alleging that Gilead does not induce infringement of the Asserted Claims for Truvada for PrEP.  I address those arguments below.

1.      **Gilead induces direct infringement through the Truvada Insert**

281.    The Flexner Rebuttal Report ¶866 asserts that Gilead does not induce physicians or patients to practice the Asserted Claims because the safer sex practices and comprehensive prevention strategy recommended by the Truvada Insert "does not recommend, instruct, encourage, or otherwise induce patients to potentially or actually expose themselves to HIV." *See also* Flexner Rebuttal Report ¶¶857-868 (containing similar assertions).

282.    As noted in My Opening Report ¶¶97-98, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV.  Furthermore, Truvada for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV.  As discussed above, implementation of the safer sex practices and comprehensive prevention strategy described in the Truvada insert does not eliminate the risk of HIV exposure.  Therefore, the safer sex practices and comprehensive prevention strategy described in the Truvada Insert do not negate the instructions, encouragement, and/or recommendations within the Truvada Insert that Truvada for PrEP should only be prescribed to patients that are at-risk for acquiring HIV based on their engagement in activities that result in potential exposure to HIV. *See* My Opening Report ¶¶191-192.  For at least these reasons, I disagree with the assertions in the Flexner Rebuttal Report that Gilead does not induce physicians and patients to practice the Asserted Claims based on the safer sex practices and comprehensive prevention strategy recommended by the Truvada Insert.

283.    Flexner Rebuttal Report ¶863 repeats the argument about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body."  I addressed that argument above in this Reply Report with respect to step (b) of claim 12 from the '423 patent.

### 2. Gilead induces direct infringement through REMS

284.     The Flexner Rebuttal Report ¶¶869-900 assert that Gilead does not induce physicians or patients to practice the Asserted Claims because the safer sex practices and comprehensive prevention strategy recommended in the REMS do not recommend, instruct, encourage, or otherwise induce patients to potentially or actually expose themselves to HIV.

285.     As noted in My Opening Report ¶¶97-98, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they engage in activities that result in potential exposure to HIV.  Furthermore, Truvada for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV.  For reasons discussed above, implementation of safer sex practices and comprehensive prevention strategies described in the REMS would not and do not eliminate the risk of HIV exposure.  Therefore, the safer sex practices and comprehensive prevention strategy described in the REMS do not negate the instructions, encouragement, and/or recommendations within the Truvada Insert and REMS that Truvada for PrEP should only be prescribed to patients that are at-risk for acquiring HIV based on their engagement in activities that result in potential exposure to HIV.  *See* My Opening Report ¶¶191-201.  For at least these reasons, I disagree with the assertions in the Flexner Rebuttal Report that Gilead does not induce physicians and patients to practice the Asserted Claims based on the safer sex practices and comprehensive prevention strategy recommended by the REMS.

286.     Flexner Rebuttal Report ¶873 asserts that there is "no evidence that [Gilead's] Safety Information Fact Sheet was ever actually reviewed, relied upon, or used in any manner by any physician or professional organization, let alone any physician that ever actually prescribed Truvada for HIV PrEP."  The Flexner Rebuttal Report makes the same assertion regarding the "Dear Healthcare Provider (DHCP letter" (*id.* ¶876), the "Important Safety Information About

TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication For Healthcare Providers" (*id.* ¶878), the "Important Safety Information About TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication For Uninfected Individuals" (*id.* ¶881), the "Agreement Form for Initiating TRUVADA for Pre-Exposure Prophylaxis (PrEP) of Sexually Acquired HIV-1 Infection" (*id.* ¶884), the "Checklist for Prescribers" (*id.* ¶891), and the "Training Guide for Truvada for PrEP" (*id.* ¶894). These assertions are incorrect. For example, REMS 1 reports that "[a] proactive mailing of all REMS documents was done between 22 August and 7 September 2012 (within 60 days of approval of the PrEP indication) to 230,469 HCPs of the disciplines specified in the REMS." GILDDE00236715-7526 at GILDDE00236724 (REMS 1). "A repeat proactive mailing of the Dear HCP letter, Safety Information Fact Sheet, full Prescribing Information and Medication Guide was done 14-18 January 2013 to 235,400 HCPs of the disciplines specified in the REMS." *Id.* The suggestion in the Flexner Rebuttal Report that these documents were never actually reviewed, relied upon, or used in any manner by any physician or professional organization in prescribing Truvada for PrEP is simply untenable.

### 3. Gilead induces direct infringement through its websites

287. The Flexner Rebuttal Report ¶¶901-917 assert that Gilead does not induce physicians or patients to practice the Asserted Claims because the safer sex practices and comprehensive prevention strategy recommended on its websites do not recommend, instruct, encourage, or otherwise induce patients to potentially or actually expose themselves to HIV.

288. As noted in My Opening Report ¶¶97-98, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV. Furthermore, Truvada for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV. For reasons discussed

above, implementation of safer sex practices and comprehensive prevention strategies described on Gilead's websites would not and do not eliminate the risk of HIV exposure. Therefore, the safer sex practices and comprehensive prevention strategy described on Gilead's websites do not negate the instructions, encouragement, and/or recommendations within the Truvada Insert and websites that Truvada for PrEP should only be prescribed to patients that are at-risk for acquiring HIV based on their engagement in activities that result in potential exposure to HIV. *See* My Opening Report ¶¶191-192, 202-205. For at least these reasons, I disagree with the assertions in the Flexner Rebuttal Report that Gilead does not induce physicians and patients to practice the Asserted Claims based on the safer sex practices and comprehensive prevention strategy recommended by its websites.

289.     Flexner Rebuttal Report ¶908 and ¶911 assert that there is no evidence showing "how frequently physicians and patients might consult [Gilead's websites] or what reliance, if any, has been placed upon it by any physician or patient, let alone any physician that actually prescribed Truvada for PrEP, or any patient that actually took Truvada for PrEP." These assertions are incorrect. For example, REMS 5 reports active use of Gilead's websites as follows:

> In addition, the prescriber education slide set is available at www.truvadapreprems.com for HCPs, HIV-educators, and other interested parties. Since approval of Truvada for a PrEP indication in July 2012 through 09 July 2018, www.truvadapreprems.com was visited 212,194 times. A total of 2,491 individuals completed the on-line educational slideshow and 1,466 individuals completed the online assessment. The branded Truvada REMS website was closed upon launch of the FTC-TDF SS REMS website on 10 July 2018.
>
> The Training Guide for Healthcare Providers is also available for download, and since approval of Truvada for a PrEP indication in July 2012 through 09 July 2018 there were 5,866 downloads of the PDF file containing the Training Guide for Healthcare Providers. The Checklist for Prescribers: Initiation of Truvada for Pre-

220

exposure Prophylaxis (PrEP) has been downloaded 10,257 times through 09 July 2018.

*See* GILDDE00270528-916 at GILDDE00270538 (REMS 5).  The suggestion in the Flexner Rebuttal Report that Gilead's websites were never actually reviewed, relied upon, or used in any manner by any physician or professional organization in prescribing Truvada for PrEP is untenable.

### 4. Gilead induces direct infringement through its marketing materials

290.     The Flexner Rebuttal Report ¶¶918-957 assert that Gilead does not induce physicians or patients to practice the Asserted Claims because the safer sex practices and comprehensive prevention strategy recommended via its marketing materials do not recommend, instruct, encourage, or otherwise induce patients to potentially or actually expose themselves to HIV.

291.     As noted in My Opening Report ¶¶97-98, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV.  Furthermore, Truvada for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV.  For reasons discussed above, implementation of safer sex practices and comprehensive prevention strategies described in Gilead's marketing materials would not and do not eliminate the risk of HIV exposure. Therefore, the safer sex practices and comprehensive prevention strategy described in Gilead's marketing materials do not negate the instructions, encouragement, and/or recommendations within the Truvada Insert and marketing materials that Truvada for PrEP should only be prescribed to patients that are at-risk for acquiring HIV based on their engagement in activities that result in potential exposure to HIV.  *See* My Opening Report ¶¶191-192, 206-211.  For at least these reasons, I disagree with the assertions in the Flexner Rebuttal Report that Gilead does not induce

221

physicians and patients to practice the Asserted Claims based on the safer sex practices and comprehensive prevention strategy recommended by its marketing materials.

292.     Flexner Rebuttal Report ¶919, 922, 926, 930, 934, and 939 repeatedly assert that there is no evidence showing how frequently physicians and patients might consult Gilead's marketing materials "or what reliance, if any, has been placed upon it by any physician or patient, let alone any physician that actually prescribed Truvada for PrEP, or any patient that actually took Truvada for PrEP." A main purpose of Gilead's marketing materials is to encourage physicians to prescribe and patients to use Truvada for PrEP. The suggestion in the Flexner Rebuttal Report that Gilead's marketing materials are ineffective in encouraging physicians or patients to use Truvada for PrEP is untenable.

### 5.     Gilead's knowledge that it was inducing infringement

293.     The Flexner Rebuttal Report ¶941 asserts that, due to the safer sex practices and comprehensive prevention strategy recommended via its Truvada Insert, REMS, websites, and marketing materials, it does not recommend, instruct, encourage, or otherwise induce patients to potentially or actually expose themselves to HIV such that Gilead does not have the knowledge required to induce infringement.

294.     As noted in My Opening Report ¶¶97-98, Truvada for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV. Furthermore, Truvada for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV. For reasons discussed above, implementation of safer sex practices and comprehensive prevention strategies described in Gilead's materials would not and do not eliminate the risk of HIV exposure. Therefore, the safer sex practices and comprehensive prevention strategy described in Gilead's materials do not

negate the instructions, encouragement, and/or recommendations within the Truvada Insert and marketing materials that Truvada for PrEP should only be prescribed to patients that are at-risk for acquiring HIV based on their engagement in activities that result in potential exposure to HIV.  *See* My Opening Report ¶¶191-211.  For at least these reasons, I disagree with the assertion in the Flexner Rebuttal Report that Gilead did not know that it induces physicians and patients to practice the Asserted Claims based on the safer sex practices and comprehensive prevention strategy recommended by Gilead's materials.

295.    Flexner Rebuttal Report ¶942-944 asserts that Gilead had "a good-faith believe that it held a license to the Patents-in-Suit" based on a supposed license from named-inventor Dr. Robert Janssen.  I understand that the Government has retained James T. Carmichael, Esq. as an expert in this matter, and that he is submitting a reply report responding to this assertion.

### 6.    Direct infringement was caused by Gilead

296.    The Flexner Rebuttal Report ¶945 asserts that Gilead has not caused direct infringement because Dr. Flexner understands that "other sources, including the government, to have taken substantial efforts to popularize and expand the use of antiretrovirals, including Truvada, for HIV PrEP."  *See also* Flexner Rebuttal Report ¶¶946-957 (containing similar assertions).

297.    As noted in My Opening Report ¶¶188-211, Gilead's Truvada Insert, REMS, websites, and marketing materials provide instructions, encouragement, and/or recommendations to use Truvada for PrEP in a manner that infringes the Asserted Claims.  The "other sources" referenced in the Flexner Rebuttal Report provide information ***from Gilead's FDA-approved Truvada Insert***.  Therefore, these "other sources" reflect the instructions in Gilead's Truvada Insert such that the primary source of inducing instructions comes from Gilead.  For example,

Flexner Rebuttal Report ¶946 quotes from the CDC 2014 Clinical Guidelines recognizing that the guidelines are provided "[o]n the basis of clinical trial results and the FDA approval," which are included in Gilead's Truvada Insert.  Similarly, Flexner Rebuttal Report ¶949 and ¶951 include an identical quote from the CDC 2017 and 2021 Clinical Guidelines, respectively.  Contrary to the statements in Flexner Rebuttal Report ¶951 and ¶956, there is no need to "disaggregate the role of federal" and "state" guidelines from Gilead's Truvada Insert instructions because the cited federal and state guidelines on PrEP are based on the information contained in Gilead's FDA-approved Truvada Insert.

298.    Flexner Rebuttal Report ¶952-953 assert that the Government's complaint in this matter and the Government's economics expert, Dr. DeForest McDuff, acknowledge the Government's role in expanding the use of Truvada for HIV PrEP.  However, the Government's role in the use of Truvada for PrEP is based on the underlying instructions provided in Gilead's FDA-approved Truvada Insert.

### B.    Gilead Induces Infringement of the Asserted Claims for Descovy

299.    The Flexner Rebuttal Report includes several arguments alleging that Gilead does not induce infringement of the Asserted Claims for Descovy for PrEP.  I address those arguments below.

#### 1.    Gilead induces direct infringement through the Descovy Insert

300.    The Flexner Rebuttal Report ¶974 asserts that Gilead does not induce physicians or patients to practice the Asserted Claims because the safer sex practices and comprehensive prevention strategy recommended by the Descovy Insert "does not recommend, instruct, encourage, or otherwise induce patients to potentially or actually expose themselves to HIV."  *See also* Flexner Rebuttal Report ¶¶966-976 (containing similar assertions).

301.    As noted in My Opening Report ¶¶252-253, Descovy for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV.  Furthermore, Descovy for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV.  As discussed above, implementation of the safer sex practices and comprehensive prevention strategy described in the Descovy insert does not eliminate the risk of HIV exposure.  Therefore, the safer sex practices and comprehensive prevention strategy described in the Descovy Insert do not negate the instructions, encouragement, and/or recommendations within the Descovy Insert that Descovy for PrEP should only be prescribed to patients that are at-risk for acquiring HIV based on their engagement in activities that result in potential exposure to HIV.  *See* My Opening Report ¶¶323-324.  For at least these reasons, I disagree with the assertions in the Flexner Rebuttal Report that Gilead does not induce physicians and patients to practice the Asserted Claims based on the safer sex practices and comprehensive prevention strategy recommended by the Descovy Insert.

302.    Flexner Rebuttal Report ¶971 repeats the argument about "administration" requiring "an active and physical role in terms of delivering medication into a patient's body."  I addressed that argument above in this Reply Report with respect to step (b) of claim 12 from the '423 patent.

### 2.    Gilead induces direct infringement through its websites

303.    The Flexner Rebuttal Report ¶¶977-994 assert that Gilead does not induce physicians or patients to practice the Asserted Claims because the safer sex practices and comprehensive prevention strategy recommended on its websites do not recommend, instruct, encourage, or otherwise induce patients to potentially or actually expose themselves to HIV.

304.     As noted in My Opening Report ¶¶252-253, Descovy for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV.  Furthermore, Descovy for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV.  For reasons discussed above, implementation of safer sex practices and comprehensive prevention strategies described on Gilead's websites would not and do not eliminate the risk of HIV exposure.  Therefore, the safer sex practices and comprehensive prevention strategy described on Gilead's websites do not negate the instructions, encouragement, and/or recommendations within the Descovy Insert and websites that Descovy for PrEP should only be prescribed to patients that are at-risk for acquiring HIV based on their engagement in activities that result in potential exposure to HIV.  *See* My Opening Report ¶¶323-327.  For at least these reasons, I disagree with the assertions in the Flexner Rebuttal Report that Gilead does not induce physicians and patients to practice the Asserted Claims based on the safer sex practices and comprehensive prevention strategy recommended by its websites.

305.     Flexner Rebuttal Report ¶977, ¶980, and ¶988 assert that there is no evidence showing "how frequently physicians and patients might consult [Gilead's websites] or what reliance, if any, has been placed upon it by any physician or patient, let alone any physician that actually prescribed Descovy for PrEP, or any patient that actually took Descovy for PrEP"  The suggestion in the Flexner Rebuttal Report that Gilead's websites were ineffective in reaching any of the intended audiences to encourage prescribers and patients to use Descovy for PrEP is untenable.

RESTRICTED INFORMATION

### 3.    Gilead induces direct infringement through its marketing materials

306.    The Flexner Rebuttal Report ¶¶995-1000 assert that Gilead does not induce physicians or patients to practice the Asserted Claims because the safer sex practices and comprehensive prevention strategy recommended via its marketing materials do not recommend, instruct, encourage, or otherwise induce patients to potentially or actually expose themselves to HIV.

307.    As noted in My Opening Report ¶¶252-253, Descovy for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV.  Furthermore, Descovy for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV.  For reasons discussed above, implementation of safer sex practices and comprehensive prevention strategies described in Gilead's marketing materials would not and do not eliminate the risk of HIV exposure.  Therefore, the safer sex practices and comprehensive prevention strategy described in Gilead's marketing materials do not negate the instructions, encouragement, and/or recommendations within the Descovy Insert and marketing materials that Descovy for PrEP should only be prescribed to patients that are at-risk for acquiring HIV based on their engagement in activities that result in potential exposure to HIV.  *See* My Opening Report ¶¶323-324, 328-329.  For at least these reasons, I disagree with the assertions in the Flexner Rebuttal Report that Gilead does not induce physicians and patients to practice the Asserted Claims based on the safer sex practices and comprehensive prevention strategy recommended by its marketing materials.  A main purpose of Gilead's marketing materials is to encourage physicians to prescribe and patients to use Descovy for PrEP.  Any suggestion in the Flexner Rebuttal Report that Gilead's marketing materials are ineffective in encouraging physicians or patients to use Descovy for PrEP is untenable.

RESTRICTED INFORMATION

### 4.    Gilead's knowledge that it was inducing infringement

308.    The Flexner Rebuttal Report ¶1001 asserts that, due to the safer sex practices and comprehensive prevention strategy recommended via its Descovy Insert, websites, and marketing materials, it does not recommend, instruct, encourage, or otherwise induce patients to potentially or actually expose themselves to HIV such that Gilead does not have the knowledge required to induce infringement.

309.    As noted in My Opening Report ¶¶252-253, Descovy for PrEP is only indicated for patients that are at-risk for acquiring HIV, which means they necessarily engage in activities that result in potential exposure to HIV.  Furthermore, Descovy for PrEP patients are at-risk because they repeatedly engage in activities that eventually lead to exposure to HIV.  For reasons discussed above, implementation of safer sex practices and comprehensive prevention strategies described in Gilead's materials would not and do not eliminate the risk of HIV exposure.  Therefore, the safer sex practices and comprehensive prevention strategy described in Gilead's materials do not negate the instructions, encouragement, and/or recommendations within the Descovy Insert and marketing materials that Descovy for PrEP should only be prescribed to patients that are at-risk for acquiring HIV based on their engagement in activities that result in potential exposure to HIV.  *See* My Opening Report ¶¶323-329.  For at least these reasons, I disagree with the assertion in the Flexner Rebuttal Report that Gilead did not know that it induces physicians and patients to practice the Asserted Claims based on the safer sex practices and comprehensive prevention strategy recommended by Gilead's materials.

310.    Flexner Rebuttal Report ¶1002-1004 asserts that Gilead had "a good-faith believe that it held a license to the Patents-in-Suit" based on a supposed license from named-inventor Dr.

Robert Janssen.  I understand that the Government has retained James T. Carmichael, Esq. as an expert in this matter, and that he is submitting a reply report responding to this assertion.

### 5.    Direct infringement was caused by Gilead

311.    The Flexner Rebuttal Report ¶1005 asserts that Gilead has not caused direct infringement because Dr. Flexner understands that "other sources, including the government, to have taken substantial efforts to popularize and expand the use of antiretrovirals, including Descovy, for HIV PrEP."  *See also* Flexner Rebuttal Report ¶¶1006-1016 (containing similar assertions).

312.    As noted in My Opening Report ¶¶320-329, Gilead's Descovy Insert, websites, and marketing materials provide instructions, encouragement, and/or recommendations to use Descovy for PrEP in a manner that infringes the Asserted Claims.  The "other sources" referenced in the Flexner Rebuttal Report provide information ***from Gilead's FDA-approved Descovy Insert***. Therefore, these "other sources" reflect the instructions in Gilead's Descovy Insert such that the primary source of inducing instructions comes from Gilead.  For example, Flexner Rebuttal Report ¶1008 quotes from the CDC 2021 Clinical Guidelines recognizing that the guidelines are provided "[o]n the basis of clinical rial results and the FDA approval," which are included in Gilead's Descovy Insert.  Contrary to the statements in Flexner Rebuttal Report ¶1016, there is no need to "disaggregate[] the role of other sources" from Gilead's Descovy Insert instructions because the other sources are based on the information contained in Gilead's FDA-approved Descovy Insert.

313.    Flexner Rebuttal Report ¶1011-1012 assert that the Government's complaint in this matter and the Government's economics expert, Dr. DeForest McDuff,  acknowledge the Government's role in expanding the use of Descovy for HIV PrEP.  However, the Government's

RESTRICTED INFORMATION

role in the use of Descovy for PrEP is based on the underlying instructions provided in Gilead's FDA-approved Descovy Insert.

## VIII.  GSIUC INDUCES INFRINGEMENT OF THE ASSERTED CLAIMS

314.   Flexner Rebuttal Report ¶¶1017-1026 dispute whether Gilead Sciences Ireland UC (GSIUC) induces infringement of the Asserted Claims based on various self-serving statements by GSIUC in its interrogatory responses.  These statements do not change the opinions set forth in My Opening Report ¶¶338-341 regarding GSIUC.

## IX.  THE INVENTORS HAD POSSESSION OF THE CLAIMED INVENTION AT THE TIME OF FILING THE PROVISIONAL APPLICATION ON FEB. 3, 2006

315.   Flexner Rebuttal Report ¶¶1041-1047 assert that the inventors of the HHS Patents did not have possession of the claimed invention at the time the Provisional Application was filed on February 3, 2006.  I understand that the Government has retained Robert M. Grant, M.D. as an expert in this matter, and that he submitted a rebuttal report responding to the assertions raised in the Flexner Opening Report, as well as the substance of the assertions raised in Flexner Rebuttal Report ¶¶1041-1047.

## X.  TAF MEETS THE TERM "TENOFOVIR ESTER" AS USED IN CLAIM 13 OF THE '509 PATENT UNDER THE DOCTRINE OF EQUIVALENTS

316.   Flexner Rebuttal Report ¶¶1048-1106 asserts that the TAF in Descovy does not meet the term "tenofovir ester" as recited by claim 13 of the '509 patent under the doctrine of equivalents.  I understand that the Government has retained Andrea Brancale, Ph.D. as an expert in this matter.  I have reviewed the opening expert report of Dr. Brancale from March 18, 2022, as well as his reply report to the Flexner Rebuttal Report on the topic of TAF meeting the term "tenofovir ester" under the doctrine of equivalents.  I agree with Dr. Brancale's conclusion.

## XI. INFRINGEMENT OF CLAIM 13 OF THE '509 PATENT UNDER THE DOCTRINE OF EQUIVALENTS IS NOT BARRED BY PROSECUTION HISTORY ESTOPPEL OR THE DISCLOSURE-DEDICATION DOCTRINE

317.    Flexner Rebuttal Report ¶¶1107-1134 asserts that infringement under the doctrine of equivalents of the "tenofovir ester" term in claim 13 of the '509 patent by the TAF in Descovy is barred by prosecution history estoppel and/or the disclosure-dedication doctrine. I understand that the Government has retained Andrea Brancale, Ph.D. as an expert in this matter. I have reviewed the opening expert report of Dr. Brancale from March 18, 2022, as well as his reply report to the Flexner Rebuttal Report on this topic. I agree with Dr. Brancale's conclusion.

## XII. ADDITIONAL COMMENT

318.    I reserve the right to supplement or amend this report as necessary and appropriate if additional information that affects my opinions becomes available to me. I understand that I may be asked to provide additional information or testimony to assist the Court in these proceedings. I reserve the right to rely on demonstrative and/or visual aids as well as information provided by the other parties in this litigation, as appropriate, to assist the Court and/or supplement my opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  16 June 2022

Robert L. Murphy, M.D.

# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,
  *Plaintiff–Counterclaim Defendant*,

  v.

GILEAD SCIENCES, INC.,
  *Defendant–Counterclaim Plaintiff,*

AND GILEAD SCIENCES IRELAND
UC,
  *Defendant*.

C.A. No. 1:19-cv-02103-MN

## OPENING EXPERT REPORT OF ROBERT L. MURPHY, M.D.

## ON INFRINGEMENT OF THE ASSERTED CLAIMS BY GILEAD

RESTRICTED INFORMATION

## I.      INTRODUCTION

1.      I, Robert L. Murphy, M.D., submit this report under Federal Rule of Civil Procedure 26(a)(2)(B) on behalf of the United States of America (the "Government").

2.      I previously prepared a declaration in support of the United States' reply brief on claim construction regarding the preamble that recites "[a] process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus" in each of U.S. Patent Nos. 9,044,509 ("the '509 patent"), 9,579,333 ("the '333 patent"), 9,937,191 ("the '191 patent"), and 10,335,423 ("the '423 patent"); the preamble that recites "[a] process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human" in each of the '509, '333, '191, and '423 patents; the terms "thereby protecting the primate host from infection with the immunodeficiency retrovirus," "thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human," "prior to an [the] exposure," and "prior to [a] potential exposure" in each of the '509, '333, '191, and '423 patents (hereinafter, my "Claim Construction Declaration," D.I. 108-5 at Appx4307-91).

3.      I understand that the Government has sued Defendants Gilead Sciences, Inc. (Gilead Sciences or GSI) and Gilead Sciences Ireland UC (GSIUC) (collectively, Gilead or Defendants) regarding infringement of certain claims of the '509, '333, '191, and '423 patents with respect to Gilead's Truvada® and Descovy® products when administered as pre-exposure prophylaxis ("PrEP") regimens.  This report sets forth my opinions relating to the infringement of the '509, '333, '191, and '423 patents by Gilead's Truvada® and Descovy® products when administered as PrEP regimens.  My opinions are based on my education, knowledge, experience as a physician, as well as my review of the materials cited in this report.

49.     Descovy was approved by the FDA to treat people living with HIV on April 4, 2016.  The pre-exposure prophylaxis indication for Descovy was approved by the FDA on October 3, 2019.

## X.     OPINIONS ON INFRINGEMENT OF TRUVADA FOR PREP

50.     As explained below, the use of Truvada for PrEP® according to the Truvada® package insert infringes the asserted claims.

### A.     Relationship of Truvada package insert revision dates to the Patents-in-Suit

51.     I understand that the first Truvada for PrEP indication was included in the July 2012 Truvada package insert (GILDDE00117676-720).  I understand that the Truvada package insert has since been revised on the following dates:  June 2013 (GILDDE00517733-78), October 2013, December 2013 (GILDDE00450586-632), February 2016 (GILDDE00123279-326), March 2016 (GILDDE00009729-75), April 2017 (GILDDE00132528-73), May 2018 (GILDDE02430923-60), and June 2020 (GILDDE00198020-57).  I have reviewed each of these Truvada package inserts and conclude that there have been no changes to the PrEP indication between these Truvada package inserts that would impact infringement of the Patents-in-Suit.  I understand that a witness from Gilead has reviewed the Truvada package inserts and testified regarding similarities between the package inserts with respect to the PrEP indication.  *See, e.g.,* Sonja Tong deposition transcript at 39:1-46:10, 52:6-25, 60:13-63:9, 66:7-67:1, 69:22-75:14.

52.     I understand that the '509 patent issued on June 2, 2015.  I understand that the December 2013 Truvada package insert (GILDDE00450586-632) was the current package insert in June of 2015.  Therefore, the Truvada package inserts relevant to infringement of the '509 patent are the December 2013, February 2016, March 2016, April 2017, May 2018, and June 2020 revisions.

RESTRICTED INFORMATION

80.     For at least these reasons, step (a) from claim 12 of the '509, '333, and '423 patents, and step (a) from claim 13 of the '191 patent, is literally met by physicians prescribing Truvada for PrEP, and also by patients taking Truvada for PrEP, in accordance with the instructions provided by the Truvada package insert.

> c)     **Step (b): "administering to the uninfected human a combination comprising: i. a pharmaceutically effective amount of emtricitabine; and ii. a pharmaceutically effective amount of tenofovir or tenofovir ester [or tenofovir disoproxil fumarate or a tenofovir prodrug]"[5]**

81.     The use of Truvada for PrEP involves administering to the uninfected human a combination of a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir ester (claim 12 of '509 patent), or tenofovir disoproxil fumarate (claim 12 of '333 and claim 13 of '191 patent), or a tenofovir prodrug (claim 12 of '423 patent).

82.     The Truvada package insert repeatedly instructs physicians that the dosage of Truvada for PrEP is one tablet containing 200 mg of emtricitabine and 300 mg of TDF taken orally as follows:

> • "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4, (Revised

---

[5] The [bracketed] language accounts for the differences in language between the asserted patents, which are shown in the table in paragraph 63 above.  Also, step (b) from claim 12 of the '333 patent additionally recites "wherein the pharmaceutically effective amount of the emtricitabine [or tenofovir or tenofovir disoproxil fumarate] is administered orally, subcutaneously or vaginally."  Step (b) from claim 13 of the '191 patent additionally recites "in a tablet."  Also, the last phrase of claim 12 from the '509 patent recites "wherein the combination is administered orally."  I address how the use of Truvada for PrEP meets these additional recitations in this section, but have not included the additional language in this header for the sake of brevity.

RESTRICTED INFORMATION

05/2018) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 03/2016) at 6, (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.

- "HIV-1 Pre-Exposure Prophylaxis (PrEP): • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1, (Revised 05/2018) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 03/2016) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.

- "TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1, (Revised 05/2018) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 03/2016) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.

- "TRUVADA tablets are fixed-dose combination tablets containing emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF)." Truvada Package Insert (Revised

RESTRICTED INFORMATION

06/2020) at 18, (Revised 05/2018) at 18; Truvada Package Insert (Revised 04/2017) at 21, (Revised 03/2016) at 23, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.

- The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials. *See* Truvada Package Insert (Revised 06/2020) at 29-31, (Revised 05/2018) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 03/2016) at 36-39, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.

The dose of 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate in Truvada is pharmaceutically effective for PrEP for reasons discussed below with respect to the "thereby clause" of the asserted claims. A physician prescribing Truvada for PrEP according to the instructions in the package insert therefore performs a process of administering to the uninfected human a pharmaceutically effective dose of the combination of emtricitabine and tenofovir disoproxil fumarate in a tablet orally as recited by step (b) of claim 12 of the '333 patent, and as recited by step (b) from claim 13 of the '191 patent. For the same reasons, a physician prescribing Truvada for PrEP according to the instructions in the package insert meets the portion of claim 12 from the '509 patent that recites "wherein the combination is administered orally."

83.     The originally issued claims of the '509 patent make it clear that tenofovir disoproxil fumarate (TDF) is an exemplary "tenofovir ester" as that term is used in the '509 patent. *See* '509 patent at 14:23-24 (D.I. 108-1 at Appx0001-13) (claim 18 reciting "wherein the tenofovir ester is tenofovir disoproxil fumarate"). I understand that the Court has construed the term "tenofovir ester" to mean "an ester in which one of the components is tenofovir," and that the term

PrEP patients and prescriptions per month in the excel file produced as GILDDE02642770 at tab "DVY," including the time period of October 2019 through August of 2021. Additional evidence that patients are using Descovy for PrEP in accordance with physician instructions and Gilead's Descovy product label includes the following websites: https://www.descovy.com/real-stories (US_02577279); https://www.descovy.com/real-stories/northeast (US_02577290); https://www.descovy.com/real-stories/south (US_02577587); https://www.descovy.com/real-stories/midwest; https://www.descovy.com/real-stories/west (US_02577242). Gilead actively recruits patients to share their experiences using Descovy for PrEP. *See, e.g.*, https://www.descovy.com/real-story-recruitment (US_02577547).

### C.   Direct Infringement of the asserted claims by physicians and/or patients

228.   As described in detail below, the use of Descovy for PrEP® according to the Descovy® package insert infringes claim 13 of the '509 patent, and claims 1, 3, 9, 12, 14, 18, 19 of the '423 patent.

#### 1.   Infringement of claim 13 of the '509 patent and claim 12 of the '423 patent [prior to a potential exposure claims]

229.   A side-by-side comparison of the limitations from claims 12-13 of the '509 patent[11] and claim 12 of the '423 patent is provided below. I understand that claim 13 of the '509 patent depends from claim 12. I understand that the use of Descovy for PrEP must meet each limitation recited by claims 12 and 13 of the '509 patent in order to infringe claim 13. In the below table, I have underlined some language to highlight differences in wording between the claims 12-13 of the '509 patent and claim 12 from the '423 patent.

---

[11] I understand that the Government disclaimed claim 12 from the '509 patent. Nonetheless, claim 13 from the '509 patent recites all limitations from originally issued (and now disclaimed) claim 12 based on its dependency from claim 12.

| '509 Patent<br>Claims 12-13 | '423 Patent<br>Claim 12 |
|---|---|
| 12. A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human, comprising: | 12. A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human, comprising: |
| (a) selecting an uninfected human that does not have the self-replicating infection; and | (a) selecting an uninfected human that does not have the self-replicating infection; and |
| (b) administering to the uninfected human a combination comprising:<br><br>i. a pharmaceutically effective amount of emtricitabine; and | (b) administering to the uninfected human a combination comprising:<br><br>i. a pharmaceutically effective amount of emtricitabine; and |
| ii. a pharmaceutically effective amount of tenofovir or <u>tenofovir ester</u>; | ii. a pharmaceutically effective amount of tenofovir or <u>a tenofovir prodrug</u>; |
| thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human, <u>wherein the combination is administered orally</u>. | thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human, |
| <u>13. The process of claim 12</u> wherein the combination is administered prior to <u>a</u> potential exposure of the <u>primate host</u> to the human immunodeficiency retrovirus. | wherein the combination is administered prior to potential exposure the <u>human</u> to the human immunodeficiency retrovirus. |

230.    As explained below, the use of Descovy for PrEP meets each element recited by claims 12-13 of the '509 patent and claim 12 of the '423 patent. For each element recited by the claims, I first recognize the Court's claim construction of the element and the meaning of the language recited by the element (if applicable), I next explain how physicians prescribing Descovy for PrEP according to the package insert meets the element, and then I explain how patients using Descovy for PrEP according to the package insert meets the element.

     a)     **"A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human…"**

231.    As discussed above, I understand that the Court has construed the preamble from claim 12 of the '509 and '423 patents that each recite "[a] process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human" to be limiting and to mean "a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human." *See* D.I. 186 at 1, 7-8.

232.    The use of Descovy for PrEP involves a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human.  The Descovy package insert instructs physicians that patients taking Descovy for PrEP must be confirmed to be HIV-negative at least every 3 months during use as follows:

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating <u>and at least every 3 months during use</u>." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); *see also* Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating <u>and at least every 3 months during use</u>." Descovy Package Insert (Revised 12/2019) at 3 (emphasis added); *see also* Descovy Package Insert (Revised 10/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3.

- "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP <u>and at least once every 3 months while taking</u>

122

DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 4 (emphasis added); Descovy Package Insert (Revised 10/2019) at 4, (Revised 03/2021) at 4, (Revised 01/2022) at 4.

- "While using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Descovy Package Insert (Revised 12/2019) at 7 (emphasis added); Descovy Package Insert (Revised 10/2019) at 6, (Revised 03/2021) at 7, (Revised 01/2022) at 7.

- "Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:... • The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Descovy Package Insert (Revised 12/2019) at 35; Descovy Package Insert (Revised 10/2019) at 33-34, (Revised 03/2021) at 35, (Revised 01/2022) at 38.

RESTRICTED INFORMATION

A negative result from the testing of each individual patient periodically while the patient is taking Descovy for PrEP, such as the recommended testing every 3 months, confirms that the patient remains HIV-negative and has not developed a self-replicating HIV infection.

233.    As discussed above, a patient can be confirmed to be HIV-negative via at least two types of tests: (1) a serological test or (2) an HIV polymerase chain reaction (PCR) test. *See, e.g.,* Fearon, "The laboratory diagnosis of HIV infections," Can. J. Infect Dis Med Microbiol, 16:26-30 (2005) at 26 ("HIV infection is identified either by the detection of HIV-specific antibodies in serum or plasma or by demonstrating the presence of the virus by nucleic acid detection using polymerase chain reaction (PCR), p24 antigen testing or, rarely these days, by growing virus in cell culture.") (GILDDE02631353).   A serological test is most commonly used to diagnose HIV infection, and it detects HIV-specific antibodies and/or antigens in the serum.   A patient having a negative HIV serological test is referred to in the specification of the Asserted Patents as being "serologically negative." *See e.g.,* '509 Patent at 4:3-7, 8:47-53, 10:2-5.   The Asserted Patents refer to an HIV PCR test as "a polymerase chain reaction (PCR) testing for viral genome." *See e.g.,* '509 Patent at 4:3-7, 8:4-45.

234.    The Descovy package insert explains that "[s]ome HIV-1 tests only detect anti-HIV antibodies and may not identify HIV-1 during acute stage of infection."   Descovy  Package Insert (Revised 12/2019) at 6-7, (Revised 10/2019) at 6, (Revised 03/2021) at 6-7, (Revised 01/2022) at 7. The Descovy package insert therefore instructs physicians that "[p]rior to initiating DESCOVY for HIV-1 PrEP, ask seronegative individuals about recent (in past month) potential exposure events (e.g., condomless sex or condom breaking during sex with a partner of unknown HIV-1 status or unknown viremic status, or a recent STI), and evaluate for current or recent signs or symptoms consistent with acute HIV-1 infection (e.g., fever, fatigue, myalgia, skin rash)." *Id.* The

Descovy package insert further instructs physicians that "[w]hile using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs. If an HIV-1 test indicates possible HIV-1 infection, or if symptoms consistent with acute HIV-1 infection develop following a potential exposure event, convert the HIV-1 PrEP regimen to an HIV treatment regimen until negative infection status is confirmed using a test approved or cleared by the FDA as an aid in the diagnosis of acute or primary HIV-1 infection." *Id.* A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs "a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human," as recited by the preamble. The inhibition of establishment of the HIV self-replication infection is confirmed by the HIV-1 screening test providing a negative result when it is performed periodically, such as the recommended testing every 3 months, for a patient taking Descovy for PrEP.

235. The Medication Guide portion of the Descovy package insert instructs patients to "[t]ake DESCOVY exactly as your healthcare provider tells you to take it." Descovy Package Insert (Medication Guide) (Revised 12/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3; Descovy Package Insert (Revised 10/2019) at 38. The Medication Guide further instructs a patient taking Descovy for PrEP to get tested "at least every 3 months or when your healthcare provider tells you" to confirm that the patient remains HIV-negative. *See* Descovy Package Insert (Medication Guide) (Revised 12/2019) at 1 ("You must stay HIV-negative to keep taking DESCOVY for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you."), (Revised 03/2021) at 1, (Revised 01/2022) at 1; Descovy Package Insert (Revised 10/2019) at 36. A patient taking Descovy for PrEP according to the instructions in the package insert therefore performs "a process for inhibiting establishment of a human

immunodeficiency virus self-replicating infection in a human," as recited by the preamble. The inhibition of establishment of the HIV self-replication infection is confirmed by the HIV-1 screening test providing a negative result when it is performed at least every 3 months or at the time instructed by the healthcare provider for the patient taking Descovy for PrEP.

236. For at least these reasons, the preamble from claim 12 of the '509 and '423 patents is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert. The purpose of HIV-1 testing before initiating treatment is to confirm that the patient is negative for HIV-1 while the purpose of testing during treatment is to ensure that the patient remains negative for HIV-1. Thus, the use of Descovy for PrEP according to the instructions in the Descovy package insert, including the Medication Guide portion, describes "a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human."

   **b)**  **Step (a): "selecting an uninfected human that does not have the self-replicating infection"**

237. The use of Descovy for PrEP involves selecting an uninfected human that does not have the self-replicating infection. The Descovy package insert repeatedly instructs physicians to prescribe Descovy for PrEP only to patients that have been confirmed to be HIV-negative as follows:

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed." Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy

Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP." Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status." Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3.

- "Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3.

- "Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 4; *see also* Descovy Package Insert (Revised 10/2019) at 4, (Revised 03/2021) at 4, (Revised 01/2022) at 4.

- "DESCOVY for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 5; *see also* Descovy Package Insert (Revised 10/2019) at 5, (Revised 03/2021) at 5, (Revised 01/2022) at 6.

- "Use DESCOVY to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only DESCOVY, because DESCOVY alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing DESCOVY before confirming the individual is HIV-1 negative." Descovy Package Insert (Revised 12/2019) at 6; *see also* Descovy

RESTRICTED INFORMATION

Package Insert (Revised 10/2019) at 6, (Revised 03/2021) at 6, (Revised 01/2022) at 7.

- "Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]: • The need to confirm that they are HIV-negative before starting to take DESCOVY to reduce the risk of acquiring HIV-1." Descovy Package Insert (Revised 12/2019) at 35; *see also* Descovy Package Insert (Revised 10/2019) at 33, (Revised 03/2021) at 35, (Revised 01/2022) at 38.

A patient that has been confirmed to be HIV-negative in accordance with the instructions provided by the Descovy package insert does not have an HIV self-replicating infection. A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process of "selecting an uninfected human that does not have the self-replicating infection" as recited by step (a) of claim 12 of the '509 and '423 patents.

238.     The Medication Guide portion of the Descovy package insert repeatedly instructs patients to take Descovy for PrEP only if they have been confirmed to be HIV-negative as follows:

- "Before taking DESCOVY to reduce your risk of getting HIV-1: • You must be HIV-1 negative to start DESCOVY. You must get tested to make sure that you do not already have HIV-1 infection. • Do not take DESCOVY for HIV-1 PrEP unless you are confirmed to be HIV-1 negative." Descovy Package Insert (Revised 12/2019) at Medication Guide 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 36 (Medication Guide).

- "Do not take DESCOVY for HIV-1 PrEP if: • you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with DESCOVY to treat HIV-1. DESCOVY by itself is not a complete treatment for HIV-1. • you do not

129

know your HIV-1 infection status. You may already be HIV-1 positive. You need

to take other HIV-1 medicines with DESCOVY to treat HIV-1 infection." Descovy

Package Insert (Revised 12/2019) at Medication Guide 2, (Revised 03/2021) at 2,

(Revised 01/2022) at 2; *see also* Descovy Package Insert (Revised 10/2019) at 37

(Medication Guide).

A patient that has been confirmed to be HIV-negative in accordance with the instructions provided

by the Descovy package insert does not have an HIV self-replicating infection.  A patient taking

Descovy for PrEP according to the instructions in the package insert therefore performs a process

of "selecting an uninfected human that does not have the self-replicating infection" as recited by

step (a) of claim 12 of the '509 and '423 patents.

239.    For at least these reasons, step (a) from claim 12 of the '509 and '423 patents is

literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for

PrEP, in accordance with the instructions provided by the Descovy package insert.

> c)    **Step (b): "administering to the uninfected human a
> combination comprising: i. a pharmaceutically effective
> amount of emtricitabine; and ii. a pharmaceutically effective
> amount of tenofovir or tenofovir ester [or a tenofovir
> prodrug]"[12]**

240.    The use of Descovy for PrEP involves administering to the uninfected human a

combination of a pharmaceutically effective amount of emtricitabine and a tenofovir prodrug

(claim 12 of '423 patent) or the equivalent of a pharmaceutically effective amount of tenofovir

ester (claim 12 of '509 patent).

---

[12] The last phrase of claim 12 from the '509 patent recites "wherein the combination is administered orally."  I also address how the use of Descovy for PrEP meets this recitation in this section.

RESTRICTED INFORMATION

241.    The Descovy package insert repeatedly instructs physicians that the dosage of Descovy for PrEP is one tablet containing 200 mg of emtricitabine and 25 mg of TAF taken orally as follows:

- "The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected: • adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or • adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5, (Revised 03/2021) at 5, (Revised 01/2022) at 5.

- "Recommended dosage:... • HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY (emtricitabine and tenofovir alafenamide) is a fixed dose combination tablet containing emtricitabine (FTC) and tenofovir alafenamide (TAF) for oral administration." Descovy Package Insert (Revised 12/2019) at 20; Descovy

131

Package Insert (Revised 10/2019) at 19, (Revised 03/2021) at 20, (Revised 01/2022) at 21.

The dose of 200 mg of emtricitabine and 25 mg of tenofovir alafenamide in Descovy is pharmaceutically effective for PrEP for reasons discussed below with respect to the "thereby clause" of the asserted claims. A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process of administering to the uninfected human a pharmaceutically effective dose of the combination of emtricitabine and tenofovir alafenamide in a tablet orally as recited by the portion of claim 12 from the '509 patent that recites "wherein the combination is administered orally."

242.    I understand that the Court has construed the term "tenofovir ester" to mean "an ester in which one of the components is tenofovir," and that the term encompasses "when the ester bonds are hydrolyzed one of the components is the compound recognized as tenofovir." *See* D.I. 186 at 10. I have reviewed the report of Professor Andrea Brancale, Ph.D., and the discussion of TAF meeting the "tenofovir ester" element of claim 12 of the '509 patent under the Court's construction under the doctrine of equivalents. I agree with his conclusions. Accordingly, the TAF in Descovy meets the "tenofovir ester" element recited by claim 12 of the '509 patent under the doctrine of equivalents. A physician prescribing Descovy for PrEP according to the instructions in the package insert thus performs a process of administering to the uninfected human a combination of emtricitabine and a tenofovir ester as recited by step (b) of claim 12 of the '509 patent.

243.    The specification of the Asserted Patents, recites the following definition of "prodrug":

As used herein the term 'prodrug' is defined to include a compound that when administered to a primate host generates an active NRTI or NtRTI as a result of

132

spontaneous reaction under physiological conditions, enzymatic catalysis, metabolic clearance, or combinations thereof.

*See* '509 patent at 4:51-55 (D.I. 108-1 at Appx0008).  I have reviewed the report of Professor Andrea Brancale, Ph.D., and the discussion of TAF meeting the definition of "prodrug" in the specification of the asserted patents, and his conclusion that TAF literally meets the "tenofovir prodrug" element of claim 12 of the '423 patent.  I agree with his conclusion.  I understand that Gilead does not dispute that TAF is a "tenofovir prodrug" as recited by the asserted claims of the '423 patent.  *See, e.g.*, D.I. 108 at 59 ("The parties agree that this term encompasses the TDF and TAF contained in Gilead's Descovy and Descovy products, respectively, such that both accused products contain a 'tenofovir prodrug.'"); D.I. 78 at ¶¶ 49, 54 ("It is undisputed that both [Descovy and Descovy] accused products contain a tenofovir prodrug.").  Accordingly, the TAF in Descovy literally meets the "tenofovir prodrug" element recited by claim 12 of the '423 patent.  A physician prescribing Descovy for PrEP according to the instructions in the package insert thus performs a process of administering to the uninfected human a combination of emtricitabine and a tenofovir prodrug as recited by step (b) of claim 12 of the '423 patent.

244.    The Medication Guide portion of the Descovy package insert repeatedly instructs patients that Descovy contains emtricitabine and tenofovir alafenamide, and to take the Descovy for PrEP exactly as prescribed by their physician as follows:

- "DESCOVY contains the prescription medicines emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 2, (Revised 03/2021) at 2, (Revised 01/2022) at 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide).

- "What are the ingredients in DESCOVY? Active ingredients: emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication

RESTRICTED INFORMATION

Guide 4, (Revised 03/2021) at 4, (Revised 01/2022) at 4; Descovy Package Insert (Revised 10/2019) at 39 (Medication Guide).

- "How should I take DESCOVY? • Take DESCOVY exactly as your healthcare provider tells you to take it.... • Do not change your dose or stop taking DESCOVY without first talking with your healthcare provider. Stay under a healthcare provider's care when taking DESCOVY. Do not miss a dose of DESCOVY." Descovy Package Insert (Revised 12/2019) at Medication Guide 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3; Descovy Package Insert (Revised 10/2019) at 38 (Medication Guide).

A patient taking Descovy for PrEP according to the instructions in the package insert therefore performs a process of administering to the uninfected human a pharmaceutically effective dose of the combination of emtricitabine and tenofovir alafenamide in a tablet orally that meets step (b) of claim 12 of the '509 and '423 patents. For the same reasons, a patient taking Descovy for PrEP according to the instructions in the package insert meets the portion of claim 12 from the '509 patent that recites "wherein the combination is administered orally."

245. For at least these reasons, step (b) from claim 12 of the '509 and '423 patents is met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert. Also, the portion of claim 12 from the '509 patent that recites "wherein the combination is administered orally" is met by physicians prescribing Descovy for PrEP, and by patients taking Descovy for PrEP, for at least the reasons discussed in this section of my report.

RESTRICTED INFORMATION

### d) "thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human"

246.    As discussed above, I understand that the Court has construed the "thereby clause" from claim 12 of the '509 and '423 patents that each recites "thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human" to be limiting and to mean "[t]he human remains negative for the immunodeficiency virus while receiving the administration." *See* D.I. 186 at 2, 9-10.   I understand that the Court clarified that "whether a host remains negative is based on both a serological and PCR assay if both are performed." *Id.* at 10.

247.    The use of Descovy for PrEP involves a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human.  The Descovy package insert instructs physicians that "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating <u>and at least every 3 months during use</u>." Descovy Package Insert (Revised 12/2019) at 3 (emphasis added); Descovy Package Insert (Revised 10/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3.  A negative result from the testing of each individual patient periodically while the patient is taking Descovy for PrEP, such as at the recommended testing every 3 months, confirms that the patient remains HIV-negative and has not developed a self-replicating HIV infection while receiving Descovy for PrEP.

248.    The Descovy package insert explains that "[s]ome HIV-1 tests only detect anti-HIV antibodies and may not identify HIV-1 during acute stage of infection." Descovy  Package Insert (Revised 12/2019) at 6-7, (Revised 10/2019) at 6, (Revised 03/2021) at 6-7, (Revised 01/2022) at 7.  The Descovy package insert therefore instructs physicians that "[p]rior to initiating DESCOVY for HIV-1 PrEP, ask seronegative individuals about recent (in past month) potential exposure events (e.g., condomless sex or condom breaking during sex with a partner of unknown HIV-1 status or unknown viremic status, or a recent STI), and evaluate for current or recent signs or

135

symptoms consistent with acute HIV-1 infection (e.g., fever, fatigue, myalgia, skin rash)." *Id.* The Descovy package insert further instructs physicians that "[w]hile using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs. If an HIV-1 test indicates possible HIV-1 infection, or if symptoms consistent with acute HIV-1 infection develop following a potential exposure event, convert the HIV-1 PrEP regimen to an HIV treatment regimen until negative infection status is confirmed using a test approved or cleared by the FDA as an aid in the diagnosis of acute or primary HIV-1 infection." *Id.* A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process where "the human remains negative for the immunodeficiency virus while receiving the administration" of Descovy for PrEP as the Court has construed the "thereby clause" from claim 12 of the '509 and '423 patents. The human remaining negative while receiving the administration is confirmed by the HIV-1 screening test providing a negative result when it is performed periodically, such as the recommended testing every 3 months, for a patient taking Descovy for PrEP.

249. The Medication Guide portion of the Descovy package insert instructs patients to "[t]ake DESCOVY exactly as your healthcare provider tells you to take it." Descovy Package Insert (Medication Guide) (Revised 12/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3; Descovy Package Insert (Revised 10/2019) at 38. The Medication Guide further instructs a patient taking Descovy for PrEP to get tested "at least every 3 months or when your healthcare provider tells you" to confirm that the patient remains HIV-negative. *See* Descovy Package Insert (Medication Guide) (Revised 12/2019) at 1 ("You must stay HIV-negative to keep taking DESCOVY for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you."), (Revised 03/2021) at 1, (Revised 01/2022) at 1; Descovy Package

Insert (Revised 10/2019) at 36. A patient taking Descovy for PrEP according to the instructions in the package insert therefore performs a process where "the human remains negative for the immunodeficiency virus while receiving the administration" of Descovy for PrEP as the Court has construed the "thereby clause" from claim 12 of the '509 and '423 patents. The human remaining negative while receiving the administration is confirmed by the HIV-1 screening test providing a negative result when it is performed at least every 3 months or at the time instructed by the healthcare provider for a patient taking Descovy for PrEP.

250.    For at least these reasons, the "thereby clause" from claim 12 of the '509 and '423 patents is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

> e)    **"wherein the combination is administered prior to [a] potential exposure of the human to the human immunodeficiency retrovirus"[13]**

251.    As discussed above, I understand that the Court has construed the term "prior to a potential exposure" from claim 13 of the '509 patent, and the "prior to potential exposure" from claim 12 of the '423 patent, to mean "prior to engaging in activity that could result in an exposure." *See* D.I. 186 at 2, 11-13. I understand that the Court explained that a potential exposure "can occur when, for example, it is unknown whether a bodily fluid that the host had contact with is indeed a source of HIV." *Id*. at 13. Also, the term "prior to [a] potential exposure" indicates that, when the administration of the combination begins, the human has not engaged in activity that

---

[13] The quoted language appears in claim 12 of the '423 patent. However, claim 13 of the '509 patent recites "wherein the combination is administered prior to a potential exposure of the <u>primate host</u> to the human immunodeficiency retrovirus." As previously explained, a POSA would understand that the "primate host" recited in claim 13 refers to the "human" recited in claim 12 of the '509 patent. For example, the specification of the '509 patent states that "[a]s used herein a 'primate host' is defined to include a monkey, baboon, chimpanzee, gorilla, and a human." '509 patent at 4:18-19. The only primate host recited in claim 12 of the '509 patent is a "human."

RESTRICTED INFORMATION

could result in an exposure to the immunodeficiency retrovirus.  This does not mean, however, that the human must be completely naïve to the retrovirus.  Administration can occur after an earlier HIV exposure or potential exposure so long as the earlier exposure or potential exposure did not result in an HIV invention (such that the human remains uninfected).

252.    The use of Descovy for PrEP involves a process where the combination of emtricitabine and tenofovir alafenamide is administered prior to a potential exposure of the patient to HIV.  The Descovy package insert instructs physicians that Descovy for PrEP is indicated for "at-risk" patients for acquiring HIV as follows:

- "DESCOVY is indicated in <u>at-risk</u> adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex. Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 3 (emphasis added); Descovy Package Insert (Revised 10/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3.

- "DESCOVY is indicated in <u>at-risk</u> adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

253.    The Descovy package insert explains that patients are at risk if they engage in, for example, condomless sex, have past or current STIs, have a self-identified HIV risk, have sexual partners of unknown HIV-1 viremic status, or engage in sexual activity in a high prevalence area or network as follows:

- "Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6, (Revised 03/2021) at 6, (Revised 01/2022) at 7.

These activities could result in an exposure to HIV.  For example, each of these activities result in contact with a bodily fluid where it is unknown whether the bodily fluid is indeed a source of HIV. A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process that includes administering a combination of emtricitabine and tenofovir alafenamide to a human prior to the human having a potential exposure to HIV.  This process meets the "wherein clause" from claim 13 of the '509 patent, and from claim 12 of the '423 patent, including how the Court has construed the "prior to [a] potential exposure" term within the "wherein clause."

254.    As discussed above, the Descovy package instructs physicians to administer Descovy for PrEP to patients that engage in at-risk behavior for acquiring HIV.  The Medication Guide portion of the Descovy package insert instructs patients that "DESCOVY can only help reduce your risk of getting HIV-1 infection before you are infected." Descovy Package Insert (Revised 12/2019) at Medication Guide 2, (Revised 03/2021) at 2, (Revised 01/2022) at 2;

Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide).  The Medication Guide further instructs the patient to "[t]ake DESCOVY exactly as your healthcare provider tells you to take it." Descovy Package Insert (Medication Guide) (Revised 12/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3; Descovy Package Insert (Revised 10/2019) at 38.  A patient engaging in the at-risk behavior described in the Descovy package insert and following the instructions in the package insert to take Descovy before engaging in the at-risk behavior performs a process that includes administering a combination of emtricitabine and tenofovir alafenamide to the patient before the patient has a potential exposure to HIV.  This process meets the "wherein clause" from claim 13 of the '509 patent, and from claim 12 of the '423 patent, including how the Court has construed the "prior to [a] potential exposure" term within the "wherein clause."

255.    For at least these reasons, the "wherein clause" from claim 13 of the '509 patent, and the "wherein clause" from claim 12 of the '423 patent, is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

> **f)    Conclusion regarding Claims 12-13 of the '509 and claim 12 of the '423 patent**

256.    For the reasons stated above, each element of claims 12-13 of the '509 patent and claim 12 of the '423 patent is met, either literally or under the doctrine of equivalents, by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

> **2.    Infringement of claim 14 from the '423 patent**

257.    I understand that claim 14 from the '423 patent is a claim that the Government presently asserts is infringed by the use of Descovy for PrEP.  Claim 14 of the '423 patent depends from claim 13, which ultimately depends from claim 12.  I understand that claim 14 therefore

140

includes all limitations recited in each of claims 12, 13 and 14.  I understand that the use of Descovy for PrEP must meet each limitation recited by claims 12, 13 and 14 in order to infringe claim 14.

258.    For the reasons discussed above, each element recited by claim 12 of the '423 patent is met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

259.    Claim 13 of the '423 patent is reproduced below:

13. The process of claim 12, wherein combination is compounded into a single formulation.

260.    The Descovy package insert instructs physicians that Descovy for PrEP contains 200 mg of emtricitabine and 25 mg of TAF that is compounded into a single tablet as follows:

- "<u>The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF)</u> once daily taken orally with or without food in HIV-1 uninfected: • adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or • adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5 (emphasis added); Descovy Package Insert (Revised 10/2019) at 5, (Revised 03/2021) at 5, (Revised 01/2022) at 5.

- "DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "Recommended dosage:... • HIV-1 PrEP: <u>One tablet</u> taken once daily with or without food in individuals with body weight at least 35 kg." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process where a combination of emtricitabine and tenofovir alafenamide, as a single tablet formulation, is administered for PrEP.   For the same reasons, a patient taking Descovy for PrEP according to the instructions in the package insert performs a process where a combination of emtricitabine and tenofovir alafenamide, as a single tablet formulation, is taken for PrEP.  For at least these reasons, claim 13 of the '423 patent is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

261.    Claim 14 of the '423 patent is reproduced below:

14. The process of claim 13, wherein the single formulation is administered daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus.

262.   The Descovy package insert instructs physicians that Descovy for PrEP is administered "daily" follows:

- "Recommended dosage:... • HIV-1 PrEP: <u>One tablet taken once daily</u> with or without food in individuals with body weight at least 35 kg." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) <u>once daily</u> taken orally with or without food in HIV-1

142

uninfected: • adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or • adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5 (emphasis added); Descovy Package Insert (Revised 10/2019) at 5, (Revised 03/2021) at 5, (Revised 01/2022) at 5.

263.    The Descovy package insert instructs physicians that Descovy for PrEP is administered for several days, weeks or months.   For example, the Descovy package insert repeatedly states that patients should be tested "every 3 months" while taking Descovy for PrEP as follows:

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating <u>and at least every 3 months during use</u>." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); *see also* Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating <u>and at least every 3 months during use</u>." Descovy Package Insert (Revised 12/2019) at 3 (emphasis added); *see also* Descovy Package Insert (Revised 10/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3.

- "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP <u>and at least once every 3 months while taking DESCOVY</u>, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP <u>and at least once every 3 months while taking DESCOVY</u>, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 4 (emphasis added); Descovy Package Insert (Revised 10/2019) at 4, (Revised 03/2021) at 4, (Revised 01/2022) at 4.

- "While using DESCOVY for HIV-1 PrEP, <u>HIV-1 testing should be repeated at least every 3 months</u>, and upon diagnosis of any other STIs." Descovy Package Insert (Revised 12/2019) at 7 (emphasis added); Descovy Package Insert (Revised 10/2019) at 6, (Revised 03/2021) at 7, (Revised 01/2022) at 7.

- "Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:... • The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Descovy Package Insert (Revised 12/2019) at 35; Descovy Package Insert (Revised 10/2019) at 33-34, (Revised 03/2021) at 35, (Revised 01/2022) at 38.

144

Thus, a patient that has used Descovy for PrEP for 3 months has been administered a combination of emtricitabine and tenofovir alafenamide for a period of several days, weeks, or months.

264.    The Medication Guide portion of the Descovy package insert instructs patients to "[t]ake DESCOVY exactly as your healthcare provider tells you to take it," and to "[t]ake DESCOVY 1 time each day," as well as "[d]o not change your dose or stop taking DESCOVY without first talking with your healthcare provider" as follows:

- "How should I take DESCOVY? • <u>Take DESCOVY exactly as your healthcare provider tells you to take it</u>.... • <u>Take DESCOVY 1 time each day with food or without food</u>… • <u>Do not change your dose or stop taking DESCOVY without first talking with your healthcare provider</u>. Stay under a healthcare provider's care when taking DESCOVY. Do not miss a dose of DESCOVY." Descovy Package Insert (Revised 12/2019) at Medication Guide 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3; Descovy Package Insert (Revised 10/2019) at 38 (Medication Guide).

A patient taking Descovy for PrEP according to the instructions in the package insert therefore performs a process that includes administering Descovy daily, and the process continues for several days, weeks or months.

265.    For the reasons discussed above regarding the "wherein clause" of claim 12 of the '423 patent, the Descovy package insert informs physicians that Descovy for PrEP is administered before a potential exposure.  The Descovy package insert explains that physicians should administer Descovy for PrEP to patients that are "at risk" for acquiring HIV (*see* paragraph 252 above), and the package insert provides examples of types of activities that are at-risk for an exposure to HIV as follows:

- "Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6, (Revised 03/2021) at 6, (Revised 01/2022) at 7.

A patient receiving Descovy for PrEP is "at risk" because they engage in repeated at-risk acts, with each act providing risk that the patient will contact HIV. As explained above regarding infringement of claim 14 of the '423 patent by *Truvada* for PrEP, the patients in the iPrEx Study averaged 18 partners in the previous 12 weeks, with 59% of participants reporting unprotected receptive anal intercourse over the previous 12 weeks, 79% of participants reporting unprotected anal intercourse with a partner that was positive or unknown HIV status in the past 6 months, and 41% reporting transactional sex in the past 6 months. *See* Grant et al., The New England Journal of Medicine, 363:2587-99, 2010 at page 2592 (Table 1: Baseline Characteristics of the Subjects) (D.I. 108-5 at Appx4286-98); *see also* above discussion of *Truvada* REMS survey results. In my experience, patients receiving *Descovy* for PrEP also engage in repeated at-risk acts. I note that Gilead has encouraged physicians to convert patients that are currently prescribed Truvada to Descovy (which shows that the patient populations for Truvada and Descovy for PrEP engage in the same types and degree of at-risk behavior). The cumulative result of a patient engaging in repeated at-risk acts during the course of receiving Descovy for PrEP is that the patient eventually contacts HIV. The eventual contact with HIV results from the number of partners, the type of at-risk acts (such as type of sexual acts), the number of at-risk acts, and the length of time. Also, Gilead's website explains that "PrEP is short for Pre-Exposure Prophylaxis. It means protecting

yourself *before* you come into contact with HIV-1."   https://www.descovy.com/what-is-prep (emphasis in original) (US_02577288).  This website indicates that Gilead expects patients taking Descovy for PrEP to come into contact with HIV.

266.     As mentioned above, the Descovy package insert instructs physicians to administer Descovy "daily" and that the patient should not "stop taking DESCOVY without first talking with your healthcare provider," which would include administering Descovy on days in which the patient engages in at-risk acts, as well as the day(s) after the patient had engaged in such activity. By instructing physicians that Descovy for PrEP is administered "daily" to "at-risk adults" who engage in repeated at-risk acts, the Descovy package insert instructs physicians to administer Descovy for PrEP to the patient after an exposure to HIV as well as before the exposure.  Similarly, by instructing "at-risk" patients that engage in repeated at-risk acts to administer Descovy for PrEP "daily" and to not "stop taking DESCOVY without first talking" to their physician, the Descovy package insert instructs patients to administer Descovy for PrEP after an exposure to HIV as well as before the exposure.

267.     For at least these reasons, a physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process that includes administering Descovy daily for several days, weeks or months both before and after an exposure of the patient to HIV.   Also for the reasons described, a patient taking Descovy for PrEP according to the instructions in the package insert performs a process that includes administering Descovy daily for several days, weeks or months both before and after an exposure to HIV.   Accordingly, claim 14 of the '423 patent is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

### 3.    Infringement of claim 18 of the '423 patent

268.    I understand that claim 18 from the '423 patent is a claim that the Government presently asserts is infringed by the use of Descovy for PrEP.  Claim 18 of the '423 patent depends from claim 12.  I understand that claim 18 therefore includes all limitations recited in claim 12.  I understand that the use of Descovy for PrEP must meet each limitation recited by claims 12 and 18 in order to infringe claim 18.

269.    For the reasons discussed above, each element recited by claim 12 of the '423 patent is met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

270.    Claim 18 of the '423 patent is reproduced below:

> 18. The process of claim 12, wherein the combination comprises the tenofovir prodrug.

271.    As previously explained above, the specification of the Asserted Patents, recites the following definition of "prodrug":

> As used herein the term 'prodrug' is defined to include a compound that when administered to a primate host generates an active NRTI or NtRTI as a result of spontaneous reaction under physiological conditions, enzymatic catalysis, metabolic clearance, or combinations thereof.

See '509 patent at 4:51-55 (D.I. 108-1 at Appx0008).  I have reviewed the report of Professor Andrea Brancale, Ph.D., and the discussion of TAF meeting the definition of "prodrug" in the specification of the asserted patents, and his conclusion that TAF literally meets the "tenofovir prodrug" element of claim 12 of the '423 patent.  I agree with his conclusion.  I understand that Gilead does not dispute that TAF is a "tenofovir prodrug" as recited by the asserted claims of the '423 patent.  See, e.g., D.I. 108 at 59 ("The parties agree that this term encompasses the TDF and

TAF contained in Gilead's Descovy and Descovy products, respectively, such that both accused products contain a 'tenofovir prodrug.'"); D.I. 78 at ¶¶ 49, 54 ("It is undisputed that both [Descovy and Descovy] accused products contain a tenofovir prodrug."). Accordingly, the TAF in Descovy literally meets the "tenofovir prodrug" element recited by claims 12 and 18 of the '423 patent. A physician prescribing Descovy for PrEP according to the instructions in the package insert thus performs a process of administering to the uninfected human a combination of emtricitabine and a tenofovir prodrug as recited by claims 12 and 18 of the '423 patent.

### 4. Infringement of claim 1 of the '423 patent [prior to an exposure claims]

272.    I understand that the Government presently asserts that Descovy for PrEP infringes claim 1 from the '423 patent. Claim 1 of the '423 patent is reproduced below:

> 1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising:
>
> (a) selecting a primate host not infected with the immunodeficiency retrovirus, and
>
> (b) administering directly to the primate host a combination comprising:
>
> i. a pharmaceutically effective amount of emtricitabine; and
>
> ii. a pharmaceutically effective amount of tenofovir or a tenofovir prodrug,
>
> wherein the combination is administered orally prior to the exposure of the primate host to the immunodeficiency retrovirus,
>
> thereby protecting the primate host from infection with the immunodeficiency retrovirus.

273.    As explained below, the use of Descovy for PrEP literally meets each element recited by claim 1 of the '423 patent.

a) **"A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising…"**

274.   As discussed above, I understand that the Court has construed the preamble from claim 1 of the '423 patent that recites "[a] process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising" to be limiting and to mean "a process which allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done." *See* D.I. 186 at 1, 5-7.  I understand that the Court further clarified that "to be clear, I am not saying that the claims require unnecessary testing to be done, but they do require a negative result on both tests if and when both tests are performed." *Id.* at 9.

275.   The Descovy package insert instructs physicians that patients taking Descovy for PrEP must be confirmed to be HIV-negative at least every 3 months during use as follows:

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating <u>and at least every 3 months during use</u>." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); *see also* Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating <u>and at least every 3 months during use</u>." Descovy Package Insert (Revised 12/2019) at 3 (emphasis added); *see also* Descovy Package Insert (Revised 10/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3.

- "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP <u>and at least once every 3 months while taking</u>

150

DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 4 (emphasis added); Descovy Package Insert (Revised 10/2019) at 4, (Revised 03/2021) at 4, (Revised 01/2022) at 4.

- "While using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Descovy Package Insert (Revised 12/2019) at 7 (emphasis added); Descovy Package Insert (Revised 10/2019) at 6, (Revised 03/2021) at 7, (Revised 01/2022) at 7.

- "Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:... • The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Descovy Package Insert (Revised 12/2019) at 35; Descovy Package Insert (Revised 10/2019) at 33-34, (Revised 03/2021) at 35, (Revised 01/2022) at 38.

A negative result from the testing of each individual patient periodically while the patient is taking Descovy for PrEP, such as the recommended testing every 3 months, confirms that the patient remains HIV-negative.

276.    As discussed above, a patient can be confirmed to be HIV-negative via at least two types of tests: (1) a serological test or (2) an HIV polymerase chain reaction (PCR) test. *See, e.g.,* Fearon, "The laboratory diagnosis of HIV infections," Can. J. Infect Dis Med Microbiol, 16:26-30 (2005) at 26 ("HIV infection is identified either by the detection of HIV-specific antibodies in serum or plasma or by demonstrating the presence of the virus by nucleic acid detection using polymerase chain reaction (PCR), p24 antigen testing or, rarely these days, by growing virus in cell culture.") (GILDDE02631353).   A serological test is most commonly used to diagnose HIV infection, and it detects HIV-specific antibodies and/or antigens in the serum.  A patient having a negative HIV serological test is referred to in the specification of the Asserted Patents as being "serologically negative." *See e.g.,* '509 Patent at 4:3-7, 8:47-53, 10:2-5.  The Asserted Patents refer to an HIV PCR test as "a polymerase chain reaction (PCR) testing for viral genome." *See e.g.,* '509 Patent at 4:3-7, 8:4-45.

277.    The Descovy package insert explains that "[s]ome HIV-1 tests only detect anti-HIV antibodies and may not identify HIV-1 during acute stage of infection."  Descovy  Package Insert (Revised 12/2019) at 6-7, (Revised 10/2019) at 6, (Revised 03/2021) at 6-7, (Revised 01/2022) at 7. The Descovy package insert therefore instructs physicians that "[p]rior to initiating DESCOVY for HIV-1 PrEP, ask seronegative individuals about recent (in past month) potential exposure events (e.g., condomless sex or condom breaking during sex with a partner of unknown HIV-1 status or unknown viremic status, or a recent STI), and evaluate for current or recent signs or symptoms consistent with acute HIV-1 infection (e.g., fever, fatigue, myalgia, skin rash)." *Id.*  The

Descovy package insert further instructs physicians that "[w]hile using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs. If an HIV-1 test indicates possible HIV-1 infection, or if symptoms consistent with acute HIV-1 infection develop following a potential exposure event, convert the HIV-1 PrEP regimen to an HIV treatment regimen until negative infection status is confirmed using a test approved or cleared by the FDA as an aid in the diagnosis of acute or primary HIV-1 infection." *Id.* A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs "a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising," as recited by the preamble. The process of protecting a primate host from a self-replicating infection is confirmed by the HIV serological and/or PCR screening tests providing a negative result when those tests are performed periodically for a patient taking Descovy for PrEP. The Descovy package insert and the claims do not require both HIV serological and PCR screening tests to be performed. *See* D.I. 186 at 9 (Court clarifying that "to be clear, I am not saying that the claims require unnecessary testing to be done, but they do require a negative result on both tests if and when both tests are performed.").

278.    The Medication Guide portion of the Descovy package insert instructs patients to "[t]ake DESCOVY exactly as your healthcare provider tells you to take it." Descovy Package Insert (Medication Guide) (Revised 12/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3; Descovy Package Insert (Revised 10/2019) at 38. The Medication Guide further instructs a patient taking Descovy for PrEP to get tested "at least every 3 months or when your healthcare provider tells you" to confirm that the patient remains HIV-negative. *See* Descovy Package Insert (Medication Guide) (Revised 12/2019) at 1 ("You must stay HIV-negative to keep taking DESCOVY for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your

healthcare provider tells you."), (Revised 03/2021) at 1, (Revised 01/2022) at 1; Descovy Package Insert (Revised 10/2019) at 36.  A patient taking Descovy for PrEP according to the instructions in the package insert therefore performs "a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus," as recited by the preamble.  The process of protecting a primate host from a self-replicating infection is confirmed by the HIV serological and/or PCR screening tests providing a negative result when those tests are performed at least every 3 months or at the time instructed by the healthcare provider for a patient taking Descovy for PrEP.  The Descovy package insert and the claims do not require both HIV serological and PCR screening tests to be performed.  See D.I. 186 at 9 (Court clarifying that "to be clear, I am not saying that the claims require unnecessary testing to be done, but they do require a negative result on both tests if and when both tests are performed.").

279.    For at least these reasons, the preamble from claim 1 of the '423 patent is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.  The purpose of HIV-1 testing before initiating treatment is to confirm that the patient is negative for HIV-1, whereas the purpose of testing during treatment is to ensure that the patient remains negative for HIV-1.  Thus, the use of Descovy for PrEP according to the instructions in the Descovy package insert, including the Medication Guide portion, describes "a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus."

> **b)  Step (a):  "selecting a primate host not infected with the immunodeficiency retrovirus"**

280.    The use of Descovy for PrEP involves selecting a primate host not infected with the immunodeficiency retrovirus.  The Descovy package insert repeatedly instructs physicians to

prescribe Descovy for PrEP only to patients that have been confirmed to be HIV-negative as follows:

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed." Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP." Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status." Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

RESTRICTED INFORMATION

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3.

- "Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3.

- "Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 4; *see also* Descovy Package Insert (Revised 10/2019) at 4, (Revised 03/2021) at 4, (Revised 01/2022) at 4.

- "DESCOVY for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 5; *see also* Descovy Package Insert (Revised 10/2019) at 5, (Revised 03/2021) at 5, (Revised 01/2022) at 6.

156
RESTRICTED INFORMATION

- "Use DESCOVY to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only DESCOVY, because DESCOVY alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing DESCOVY before confirming the individual is HIV-1 negative." Descovy Package Insert (Revised 12/2019) at 6; *see also* Descovy Package Insert (Revised 10/2019) at 6, (Revised 03/2021) at 6, (Revised 01/2022) at 7.

- "Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]: • The need to confirm that they are HIV-negative before starting to take DESCOVY to reduce the risk of acquiring HIV-1." Descovy Package Insert (Revised 12/2019) at 35; *see also* Descovy Package Insert (Revised 10/2019) at 33, (Revised 03/2021) at 35, (Revised 01/2022) at 38.

A patient that has been confirmed to be HIV-negative in accordance with the instructions provided by the Descovy package insert is not infected with HIV. A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process of "selecting a primate host not infected with the immunodeficiency retrovirus" as recited by step (a) of claim 1 of the '423 patent.

281. The Medication Guide portion of the Descovy package insert repeatedly instructs patients to take Descovy for PrEP only if they have been confirmed to be HIV-negative as follows:

- "Before taking DESCOVY to reduce your risk of getting HIV-1: • You must be HIV-1 negative to start DESCOVY. You must get tested to make sure that you do

not already have HIV-1 infection. • Do not take DESCOVY for HIV-1 PrEP unless you are confirmed to be HIV-1 negative." Descovy Package Insert (Revised 12/2019) at Medication Guide 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 36 (Medication Guide).

- "Do not take DESCOVY for HIV-1 PrEP if: • you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with DESCOVY to treat HIV-1. DESCOVY by itself is not a complete treatment for HIV-1. • you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with DESCOVY to treat HIV-1 infection." Descovy Package Insert (Revised 12/2019) at Medication Guide 2, (Revised 03/2021) at 2, (Revised 01/2022) at 2; *see also* Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide).

A patient that has been confirmed to be HIV-negative in accordance with the instructions provided by the Descovy package insert is not infected with HIV.  A patient taking Descovy for PrEP according to the instructions in the package insert therefore performs a process of "selecting a primate host not infected with the immunodeficiency retrovirus" as recited by step (a) of claim 1 of the '423 patent.

282.    For at least these reasons, step (a) from claim 1 of the '423 patent is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

      c)        **Step (b): "administering directly to an uninfected primate host a combination comprising: i. a pharmaceutically effective**

amount of emtricitabine; and ii. a pharmaceutically effective amount of tenofovir or a tenofovir prodrug"[14]

283.    The use of Descovy for PrEP involves administering to the uninfected primate host a combination of a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug.

284.    As previously discussed regarding claim 12 of the '423 patent, the TAF in Descovy literally meets the "tenofovir prodrug" element recited by claim 1 of the '423 patent.  The Descovy package insert repeatedly instructs physicians that the dosage of Descovy for PrEP is one tablet containing 200 mg of emtricitabine and 25 mg of TAF taken orally as follows:

- "The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected: • adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or • adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5 (emphasis added); Descovy Package Insert (Revised 10/2019) at 5, (Revised 03/2021) at 5, (Revised 01/2022) at 5.

- "Recommended dosage:... • HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg." Descovy Package

---

[14] The "wherein clause" of claim 1 from the '423 patent recites that the administration is "orally." I address how the use of Descovy for PrEP meets the oral administration limitation from the "wherein clause" in this section.

RESTRICTED INFORMATION

Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY (emtricitabine and tenofovir alafenamide) is a fixed dose combination tablet containing emtricitabine (FTC) and tenofovir alafenamide (TAF) for oral administration." Descovy Package Insert (Revised 12/2019) at 20; Descovy Package Insert (Revised 10/2019) at 19, (Revised 03/2021) at 20, (Revised 01/2022) at 21.

The dose of 200 mg of emtricitabine and 25 mg of tenofovir alafenamide in Descovy are pharmaceutically effective for PrEP for reasons discussed below with respect to the "thereby clause" of the asserted claims. A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process of administering to the uninfected primate host a pharmaceutically effective dose of the combination of emtricitabine and a tenofovir prodrug as recited by step (b) of claim 1 of the '423 patent. Also for the same reasons, a physician prescribing Descovy for PrEP according to the instructions in the package insert meets the portion of the "wherein clause" of claim 1 of the '423 patent that recites the combination is administered "orally."

285.    The Medication Guide portion of the Descovy package insert repeatedly instructs patients that Descovy contains emtricitabine and tenofovir alafenamide, and to take the Descovy for PrEP exactly as prescribed by their physician as follows:

- "DESCOVY contains the prescription medicines emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 2, (Revised 03/2021) at 2, (Revised 01/2022) at 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide).

- "What are the ingredients in DESCOVY? Active ingredients: emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 4, (Revised 03/2021) at 4, (Revised 01/2022) at 4; Descovy Package Insert (Revised 10/2019) at 39 (Medication Guide).

- "How should I take DESCOVY? • Take DESCOVY exactly as your healthcare provider tells you to take it.... • Take DESCOVY 1 time each day with or without food.... • Do not change your dose or stop taking DESCOVY without first talking with your healthcare provider. Stay under a healthcare provider's care when taking DESCOVY. Do not miss a dose of DESCOVY." Descovy Package Insert (Revised 12/2019) at Medication Guide 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3; Descovy Package Insert (Revised 10/2019) at 38 (Medication Guide).

A patient taking Descovy for PrEP according to the instructions in the package insert therefore performs a process of administering to the uninfected primate host a pharmaceutically effective dose of the combination of emtricitabine and tenofovir alafenamide orally that meets step (b) of claim 1 of the '423 patent. Also for the same reasons, a patient taking Descovy for PrEP according to the instructions in the package insert meets the portion of the "wherein clause" of claim 1 of the '423 patent that recites the combination is administered "orally."

286. For at least these reasons, step (b) from claim 1 of the '423 patent is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in

accordance with the instructions provided by the Descovy package insert. Also, the portion of the "wherein clause" of claim 1 of the '423 patent that recites the combination is administered "orally" is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

> ### d) "wherein the combination is administered prior to the exposure of the primate host to the immunodeficiency retrovirus"[15]

287.    As discussed above, I understand that the Court has construed the term "prior to the exposure" recited by claim 1 of the '423 patent to require an exposure, which means "contact between an immunodeficiency retrovirus and a host." *See* D.I. 186 at 2, 11-12. Also, the term "prior to the exposure" indicates that, when the administration of the combination begins, the human has not engaged in activity that results in contact between an immunodeficiency retrovirus and a host. This does not mean, however, that the human must be completely naïve to the retrovirus. Administration can occur after an earlier HIV exposure or potential exposure so long as the earlier exposure or potential exposure did not result in an HIV invention (such that the human remains uninfected).

288.    The use of Descovy for PrEP involves a process where the combination of emtricitabine and tenofovir alafenamide is administered prior to an exposure of the patient to HIV. The Descovy package insert instructs physicians that Descovy for PrEP is indicated for patients "at risk" for acquiring HIV (*see* paragraph 252 above), and the package insert provides examples of types of activities that are at-risk for an exposure to HIV as follows:

---

[15] The "wherein clause" of claim 1 from the '423 patent additionally recites that the administration is "orally." I addressed how the use of Descovy for PrEP meets the "orally" recitation in the previous section.

- "Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6, (Revised 03/2021) at 6, (Revised 01/2022) at 7.

A patient receiving Descovy for PrEP is "at risk" because they engage in repeated at-risk acts, with each act providing risk that the patient will contact HIV. As explained above regarding infringement of claim 1 of the '423 patent by *Truvada* for PrEP, the patients in the iPrEx Study averaged 18 partners in the previous 12 weeks, with 59% of participants reporting unprotected receptive anal intercourse over the previous 12 weeks, 79% of participants reporting unprotected anal intercourse with a partner that was positive or unknown HIV status in the past 6 months, and 41% reporting transactional sex in the past 6 months. *See* Grant et al., The New England Journal of Medicine, 363:2587-99, 2010 at page 2592 (Table 1: Baseline Characteristics of the Subjects) (D.I. 108-5 at Appx4286-98); *see also* above discussion of *Truvada* REMS survey results. In my experience, patients receiving *Descovy* for PrEP also engage in repeated at-risk acts. I note that Gilead has encouraged physicians to convert patients that are currently prescribed Truvada to Descovy (which shows that the patient populations for Truvada and Descovy for PrEP engage in the same types and degree of at-risk behavior). The cumulative result of a patient engaging in repeated at-risk acts during the course of receiving Descovy for PrEP is that the patient eventually contacts HIV. The eventual contact with HIV results from the number of partners, the type of at-risk acts (such as type of sexual acts), the number of at-risk acts, and the length of time. Also, Gilead's website explains that "PrEP is short for Pre-Exposure Prophylaxis. It means protecting

yourself *before* you come into contact with HIV-1." https://www.descovy.com/what-is-prep (emphasis in original). This website indicates that Gilead expects patients taking Descovy for PrEP to come into contact with HIV. A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process that includes administering a combination of emtricitabine and tenofovir alafenamide to a primate host prior to the primate host having an exposure to HIV. This process meets the "wherein clause" from claim 1 of the '423 patent, including how the Court has construed the "prior to the exposure" term within the "wherein clause."

289. As discussed above, the Descovy package instructs physicians to administer Descovy for PrEP to patients that engage in at-risk behavior for acquiring HIV. The Medication Guide portion of the Descovy package insert instructs patients that "DESCOVY can only help reduce your risk of getting HIV-1 infection before you are infected." Descovy Package Insert (Revised 12/2019) at Medication Guide 2, (Revised 03/2021) at 2, (Revised 01/2022) at 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide). The Medication Guide further instructs the patient to "[t]ake DESCOVY exactly as your healthcare provider tells you to take it." Descovy Package Insert (Medication Guide) (Revised 12/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3; Descovy Package Insert (Revised 10/2019) at 38. A patient who engages in repeated at-risk behavior described in the Descovy package insert and follows the instructions in the package insert to take Descovy before initiating such at-risk behavior performs a process that includes administering a combination of emtricitabine and tenofovir alafenamide to the patient before the patient has an exposure to HIV. This process meets the "wherein clause" from claim 1 of the '423 patent, including how the Court has construed the "prior to an [the] exposure" term within the "wherein clause."

290.    For at least these reasons, the "wherein clause" from claim 1 of the '423 patent is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

e)    **"thereby protecting the primate host from infection with the immunodeficiency retrovirus"**

291.    As discussed above, I understand that the Court has construed the "thereby clause" from claim 1 of the '423 patent that recites "thereby protecting the primate host from infection with the immunodeficiency retrovirus" to be limiting and to mean "[t]he primate host remains serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving the administration."  *See* D.I. 186 at 1, 8-9.  I understand that the Court further clarified that "to be clear, I am not saying that the claims require unnecessary testing to be done, but they do require a negative result on both tests if and when both tests are performed." *Id.* at 9.

292.    The use of Descovy for PrEP involves a process for protecting a primate host from infection with the immunodeficiency retrovirus.  The Descovy package insert instructs physicians that "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating <u>and at least every 3 months during use</u>." Descovy Package Insert (Revised 12/2019) at 3 (emphasis added); Descovy Package Insert (Revised 10/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3.  A negative result from the testing of each individual patient periodically, such as at the recommended every 3 months, while the patient is taking Descovy for PrEP confirms that the patient remains HIV-negative.

293.    As discussed above, a patient can be confirmed to be HIV-negative via at least two types of tests:  (1) a serological test or (2) an HIV polymerase chain reaction (PCR) test.  *See, e.g.,* Fearon, "The laboratory diagnosis of HIV infections," Can. J. Infect Dis Med Microbiol, 16:26-30

(2005) at 26 ("HIV infection is identified either by the detection of HIV-specific antibodies in serum or plasma or by demonstrating the presence of the virus by nucleic acid detection using polymerase chain reaction (PCR), p24 antigen testing or, rarely these days, by growing virus in cell culture.") (GILDDE02631353).   A serological test is most commonly used to diagnose HIV infection, and it detects HIV-specific antibodies and/or antigens in the serum.  A patient having a negative HIV serological test is referred to in the specification of the Asserted Patents as being "serologically negative."  *See e.g.,* '509 Patent at 4:3-7, 8:47-53, 10:2-5.  The Asserted Patents refer to an HIV PCR test as "a polymerase chain reaction (PCR) testing for viral genome."  *See e.g.,* '509 Patent at 4:3-7, 8:4-45.

294.    The Descovy package insert explains that "[s]ome HIV-1 tests only detect anti-HIV antibodies and may not identify HIV-1 during acute stage of infection."  Descovy  Package Insert (Revised 12/2019) at 6-7, (Revised 10/2019) at 6, (Revised 03/2021) at 6-7, (Revised 01/2022) at 7. The Descovy package insert therefore instructs physicians that "[p]rior to initiating DESCOVY for HIV-1 PrEP, ask seronegative individuals about recent (in past month) potential exposure events (e.g., condomless sex or condom breaking during sex with a partner of unknown HIV-1 status or unknown viremic status, or a recent STI), and evaluate for current or recent signs or symptoms consistent with acute HIV-1 infection (e.g., fever, fatigue, myalgia, skin rash)."  *Id.*  The Descovy package insert further instructs physicians that "[w]hile using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs. If an HIV-1 test indicates possible HIV-1 infection, or if symptoms consistent with acute HIV-1 infection develop following a potential exposure event, convert the HIV-1 PrEP regimen to an HIV treatment regimen until negative infection status is confirmed using a test approved or cleared by the FDA as an aid in the diagnosis of acute or primary HIV-1 infection."  *Id.*  A

physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process that includes "protecting the primate host from infection with the immunodeficiency retrovirus" as recited by the "thereby clause."  The process of protecting a primate host from infection is confirmed by the HIV serological and/or PCR screening tests providing a negative result when those tests are performed periodically for a patient taking Descovy for PrEP.  This process establishes that the "primate host remains serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving the administration," as the Court has construed the "thereby clause" from claim 1 of the '423 patent, including the Court's recognition that the "thereby clause" does not require both HIV serological and PCR screening tests to be performed.  *See* D.I. 186 at 9 (Court clarifying that "to be clear, I am not saying that the claims require unnecessary testing to be done, but they do require a negative result on both tests if and when both tests are performed.").

295.    The Medication Guide portion of the Descovy package insert instructs patients to "[t]ake DESCOVY exactly as your healthcare provider tells you to take it." Descovy Package Insert (Medication Guide) (Revised 12/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3; Descovy Package Insert (Revised 10/2019) at 38.  The Medication Guide further instructs a patient taking Descovy for PrEP to get tested "at least every 3 months or when your healthcare provider tells you" to confirm that the patient remains HIV-negative.  *See* Descovy Package Insert (Medication Guide) (Revised 12/2019) at 1 ("You must stay HIV-negative to keep taking DESCOVY for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you."), (Revised 03/2021) at 1, (Revised 01/2022) at 1; Descovy Package Insert (Revised 10/2019) at 36.  A patient taking Descovy for PrEP according to the instructions in the package insert therefore performs a process that establishes that the "primate host remains

serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving the administration," as the Court has construed the "thereby clause" from claim 1 of the '423 patent, including the Court's recognition that the "thereby clause" does not require both HIV serological and PCR screening tests to be performed. *See* D.I. 186 at 9 (Court clarifying that "to be clear, I am not saying that the claims require unnecessary testing to be done, but they do require a negative result on both tests if and when both tests are performed."). The protection of the primate host from developing a HIV self-replicating infection is confirmed by the HIV-1 screening test providing a negative result when it is performed at least every 3 months or at the time instructed by the healthcare provider for the patient taking Descovy for PrEP.

296.   For at least these reasons, the "thereby clause" from claim 1 of the '423 patent is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

### f)   Conclusion regarding Claim 1 of the '423 patent

297.   For the reasons stated above, each element of claim 1 from the '423 patent is met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

### 5.   Infringement of claim 3 from the '423 patent

298.   I understand that claim 3 from the '423 patent is presently asserted by the Government as being infringed by the use of Descovy for PrEP. Claim 3 depends from claim 2, which ultimately depends from claim 1. I understand that claim 3 therefore includes all limitations recited in each of claims 1, 2 and 3. I understand that the use of Descovy for PrEP must meet each limitation recited by claims 1, 2 and 3 in order to infringe claim 3.

299.    For the reasons discussed above, each element recited by claim 1 of the '423 patent is met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

300.    Claim 2 from the of the '423 patent is reproduced below:

2. The process of claim 1 wherein selecting a primate host comprises selecting an adult human not infected with the immunodeficiency retrovirus.

301.    The use of Descovy for PrEP involves selecting an adult human (i.e., a "primate host") that is not infected with the immunodeficiency retrovirus.  The Descovy package insert instructs physicians to prescribe Descovy for PrEP to "uninfected" adults and to confirm that the adult has "a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP" as follows:

- "The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected: • adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or • adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5 (emphasis added); Descovy Package Insert (Revised 10/2019) at 5, (Revised 03/2021) at 5, (Revised 01/2022) at 5.

- "DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex.

169

RESTRICTED INFORMATION

<u>Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP</u>." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process of "selecting an adult human not infected with the immunodeficiency retrovirus" as recited by claim 2 of the '423 patent.

302.    The Medication Guide portion of the Descovy package insert instructs "adult" patients to take Descovy for PrEP as follows:

- "DESCOVY is used: ... • for HIV-1 PrEP to reduce the risk of getting HIV-1 infection <u>in adults</u> and adolescents who weigh at least 77 pounds (35 kg)." Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide).

A patient taking Descovy for PrEP according to the instructions in the package insert therefore performs a process of "selecting an adult human not infected with the immunodeficiency retrovirus" as recited by claim 2 of the '423 patents.

303.    For at least these reasons, claim 2 of the '423 patent is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

304.    Claim 3 of the '423 patent is reproduced below.

3. The process of claim 2, wherein the adult human is a male.

305.    The use of Descovy for PrEP involves selecting a male adult human.  The Descovy package insert instructs physicians that "men" are an appropriate population to prescribe Descovy for PrEP and excludes "individuals at risk from receptive vaginal sex" as follows:

- "In the DISCOVER trial of HIV-1 <u>uninfected men</u> and transgender women who have sex with men and who are at risk of HIV-1 infection receiving DESCOVY or TRUVADA for HIV-1 PrEP, genotyping was performed on participants found to be infected during the trial who had HIV-1 RNA $\geq$400 copies/mL (6 of 7 participants receiving DESCOVY and 13 of 15 participants receiving TRUVADA)." Descovy Package Insert (Revised 12/2019) at 29; Descovy Package Insert (Revised 10/2019) at 28, (Revised 03/2021) at 29, (Revised 01/2022) at 31.

- The DISCOVER Descovy clinical trial was conducted on a population of "HIV-1 <u>uninfected men</u> or transgender women who have sex with men." Descovy Package Insert (Revised 12/2019) at 32; Descovy Package Insert (Revised 10/2019) at 31, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, <u>excluding individuals at risk from receptive vaginal sex</u>." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 32, (Revised 01/2022) at 34.

A physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process that includes selecting an adult human not infected with the immunodeficiency retrovirus where the adult primate is a male human as recited by claim 3 of the '423 patent.  Also, a patient taking Descovy for PrEP according to the instructions in the package

insert performs a process that includes selecting an adult human not infected with the immunodeficiency retrovirus where the adult primate is a male human as recited by claim 3 of the '423 patent.

306.    For at least these reasons, claim 3 of the '423 patent is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

### 6.    Infringement of claim 19 of the '423 patent

307.    I understand that claim 19 from the '423 patent is a claim that the Government presently asserts is infringed by the use of Descovy for PrEP.  Claim 19 of the '423 patent depends from claim 1.  I understand that claim 19 therefore includes all limitations recited in each of claims 1 and 19.  I understand that the use of Descovy for PrEP must meet each limitation recited by claims 1 and 19 in order to infringe claim 19.

308.    For the reasons discussed above, each element recited by claim 1 of the '423 patent is met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

309.    Claim 19 of the '423 patent is reproduced below:

19. The process of claim 1, wherein the combination comprises the tenofovir prodrug.

310.    As previously explained above, the specification of the Asserted Patents, recites the following definition of "prodrug":

As used herein the term 'prodrug' is defined to include a compound that when administered to a primate host generates an active NRTI or NtRTI as a result of spontaneous reaction under physiological conditions, enzymatic catalysis, metabolic clearance, or combinations thereof.

172

*See* '509 patent at 4:51-55 (D.I. 108-1 at Appx0008).  I have reviewed the report of Professor Andrea Brancale, Ph.D., and the discussion of TAF meeting the definition of "prodrug" in the specification of the asserted patents, and his conclusion that TAF literally meets the "tenofovir prodrug" element of claim 1 of the '423 patent.  I agree with his conclusion.  I understand that Gilead does not dispute that TAF is a "tenofovir prodrug" as recited by the asserted claims of the '423 patent.  *See, e.g.*, D.I. 108 at 59 ("The parties agree that this term encompasses the TDF and TAF contained in Gilead's Descovy and Descovy products, respectively, such that both accused products contain a 'tenofovir prodrug.'"); D.I. 78 at ¶¶ 49, 54 ("It is undisputed that both [Descovy and Descovy] accused products contain a tenofovir prodrug.").  Accordingly, the TAF in Descovy literally meets the "tenofovir prodrug" element recited by claims 1 and 19 of the '423 patent.  A physician prescribing Descovy for PrEP according to the instructions in the package insert thus performs a process of administering to the uninfected human a combination of emtricitabine and a tenofovir prodrug as recited by claims 1 and 19 of the '423 patent.

### 7.    Infringement of claim 9 of the '423 patent

311.    I understand that claim 9 from the '423 patent is a claim that the Government presently asserts is infringed by the use of Descovy for PrEP.  Claim 9 depends from claim 1.  I understand that claim 9 therefore includes all limitations recited in each of claims 1 and 9.  I understand that the use of Descovy for PrEP must meet each limitation recited by claims 1 and 9 in order to infringe claim 9.

312.    For the reasons discussed above, each element recited by claim 1 of the '423 patent is met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

313.    Claim 9 from the '423 patent is reproduced below.

9. The process of claim 1, wherein the combination s[16] administered daily for several days, weeks or months.

314.    The Descovy package insert instructs physicians that Descovy for PrEP is administered "daily" follows:

- "Recommended dosage:... • HIV-1 PrEP: <u>One tablet taken once daily</u> with or without food in individuals with body weight at least 35 kg." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) <u>once daily</u> taken orally with or without food in HIV-1 uninfected: • adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or • adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5 (emphasis added); Descovy Package Insert (Revised 10/2019) at 5, (Revised 03/2021) at 5, (Revised 01/2022) at 5.

315.    The Descovy package insert informs physicians that Descovy for PrEP is administered for several days, weeks or months.  For example, the Descovy package insert repeatedly states that patients should be tested "every 3 months" while taking Descovy for PrEP as follows:

---

[16] A POSA would understand that the "s" in claim 9 of the '423 patent is a typographical error, and would understand that "s" refers to "is."

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating <u>and at least every 3 months during use</u>." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); *see also* Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating <u>and at least every 3 months during use</u>." Descovy Package Insert (Revised 12/2019) at 3 (emphasis added); *see also* Descovy Package Insert (Revised 10/2019) at 3, (Revised 03/2021) at 3, (Revised 01/2022) at 3.

- "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP <u>and at least once every 3 months while taking DESCOVY</u>, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1 (emphasis added); Descovy Package Insert (Revised 10/2019) at 1, (Revised 03/2021) at 1, (Revised 01/2022) at 1.

- "Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP <u>and at least once every 3 months while taking DESCOVY</u>, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 4 (emphasis added); Descovy Package Insert (Revised 10/2019) at 4, (Revised 03/2021) at 4, (Revised 01/2022) at 4.

- "While using DESCOVY for HIV-1 PrEP, <u>HIV-1 testing should be repeated at least every 3 months</u>, and upon diagnosis of any other STIs." Descovy Package Insert (Revised 12/2019) at 7 (emphasis added); Descovy Package Insert (Revised 10/2019) at 6, (Revised 03/2021) at 7, (Revised 01/2022) at 7.

- "Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:... • The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Descovy Package Insert (Revised 12/2019) at 35; Descovy Package Insert (Revised 10/2019) at 33-34, (Revised 03/2021) at 35, (Revised 01/2022) at 38.

A patient that has used Descovy for PrEP for 3 months has been administered a combination of emtricitabine and tenofovir alafenamide for a period of several days, weeks, or months.

316. The Medication Guide portion of the Descovy package insert instructs patients to "[t]ake DESCOVY exactly as your healthcare provider tells you to take it," and to "[t]ake DESCOVY 1 time each day," as well as "[d]o not change your dose or stop taking DESCOVY without first talking with your healthcare provider" as follows:

- "How should I take DESCOVY? • <u>Take DESCOVY exactly as your healthcare provider tells you to take it</u>.... • <u>Take DESCOVY 1 time each day with food or without food</u>… • <u>Do not change your dose or stop taking DESCOVY without first talking with your healthcare provider</u>. Stay under a healthcare provider's care when taking DESCOVY. Do not miss a dose of DESCOVY." Descovy Package Insert (Revised 12/2019) at Medication Guide 3, (Revised 03/2021) at 3, (Revised

01/2022) at 3; Descovy Package Insert (Revised 10/2019) at 38 (Medication Guide).

A patient taking Descovy for PrEP according to the instructions in the package insert therefore performs a process that includes administering Descovy daily, and the process continues for several days, weeks or months for reasons discussed above.

317.    For at least these reasons, a physician prescribing Descovy for PrEP according to the instructions in the package insert therefore performs a process that includes administering Descovy daily for several days, weeks or months.   Also for the reasons described, a patient taking Descovy for PrEP according to the instructions in the package insert performs a process that includes administering Descovy daily for several days, weeks or months.   Accordingly, claim 9 of the '423 patent is literally met by physicians prescribing Descovy for PrEP, and also by patients taking Descovy for PrEP, in accordance with the instructions provided by the Descovy package insert.

### 8.    Conclusion regarding direct infringement of the asserted claims

318.    For at least the reasons discussed above, when physicians prescribe Descovy for PrEP in accordance with the Descovy package insert, they perform a process that meets each element recited by the asserted claims either literally or under the doctrine of equivalents. Therefore, when physicians prescribe Descovy for PrEP in accordance with the Descovy package insert, they directly infringe the asserted claims.

319.    Also for at least the reasons discussed above, when patients take Descovy for PrEP in accordance with the Descovy package insert, they perform a process that meets each element recited by the asserted claims either literally or under the doctrine of equivalents.  Therefore, when

patients take Descovy for PrEP in accordance with the Descovy package insert, they directly infringe the asserted claims.

### D.      Induced infringement

320.    As previously mentioned above, I understand that Gilead is liable for induced infringement if Gilead intentionally encourages, recommends, promotes, or instructs physicians and/or patients to perform each element of the asserted claims with knowledge of the Patents-in-Suit.  I understand that Gilead knew or reasonably should have known of the '509 patent as of its issuance date of June 2, 2015, and the '423 patent as of its issuance date of July 2, 2019.  I understand that Gilead has stated that it had notice of the '509 patent as of March 11, 2016, and that it does not contest that it had notice of the '423 patent as of its issue date.

321.    Gilead encourages, recommends, promotes, and/or instructs physicians and/or patients to administer Descovy for PrEP in several ways, including through (1) the Descovy package insert prescribing information, (2) the Descovy websites, and (3) its advertising, marketing, and other product literature that promotes Descovy for PrEP® to the medical community and for use by the general public.

#### 1.      Gilead induces infringement through the Descovy package inserts

322.    I understand that the required intent to induce infringement can be inferred from the fact that Gilead, through the labeling of its Descovy® product, directs physicians and/or patients to use the product in an infringing manner.

323.    As discussed in the previous section of this report, when a physician prescribes Descovy for PrEP in accordance with the instructions provided in the Descovy package insert, all elements of the asserted claims are met.  Gilead's Descovy package insert therefore instructs, encourages, and/or recommends that physicians infringe the asserted claims.  Similarly, when a

## XV.   ADDITIONAL COMMENT

345.   I reserve the right to supplement or amend this report as necessary and appropriate if additional information that affects my opinions becomes available to me. I understand that I may be asked to provide additional information or testimony to assist the Court in these proceedings. I reserve the right to rely on demonstrative and/or visual aids as well as information provided by the other parties in this litigation, as appropriate, to assist the Court and/or supplement my opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 18 MARCH 2022

Robert L. Murphy, M.D.

# Exhibit C

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3      -----------------------------x

4      UNITED STATES OF AMERICA,       :

5           Plaintiff and             :

6           Counterclaim Defendant,    :

7           v.                         :   CA No.

8      GILEAD SCIENCES, INC. and       :   1:19-cv-02103-MN

9      GILEAD SCIENCES IRELAND UC,     :

10          Defendants and            :

11          Counterclaim Plaintiffs.   :

12     -----------------------------x

13

14          CONFIDENTIAL - RESTRICTED INFORMATION

15             SUBJECT TO PROTECTIVE ORDER

16

17              Videotaped Deposition of

18              ROBERT L. MURPHY, M.D.

19                Chicago, Illinois

20              Thursday, August 4, 2022

21                   8:59 a.m.

22

23     Job No.: 457413

24     Pages: 1 - 221

25     Reported by: Stephanie A. Battaglia, CSR, RMR, CRR

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                              2

1

2

3            VIDEOTAPED DEPOSITION OF ROBERT L. MURPHY,

4      M.D., pursuant to notice, before Stephanie A.

5      Battaglia, CSR, RMR, CRR, Notary Public in and for

6      the State of Illinois.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                          3

```
1    PRESENT:

2         DEPARTMENT OF JUSTICE
          SENIOR LITIGATION COUNSEL
3         BY:  MR. WALTER W. BROWN
          1100 L Street NW, Room 8504
4         Washington, D.C.  20005
          (202) 307-0341
5
               - and -
6
          U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES
7         OFFICE OF THE GENERAL COUNSEL
          SENIOR ATTORNEY
8         BY:  MR. MICHAEL H. IMBACUAN
          Jacob K. Javits Federal Building
9         26 Federal Plaza
          New York, New York  10278
10        (202) 702-0201

11             - and -

12        U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES
          GENERAL COUNSEL
13        BY:  MS. LENA YUEH
          200 Independence Avenue
14        Washington, D.C.  20201
          (877) 696-6775
15
               - and -
16
          KNOBBE MARTENS
17        BY:  MR. NATE LUMAN, Ph.D. (via telephone)
          3579 Valley Centre Drive, Suite 300
18        San Diego, California  92130
          (858) 707-4000
19        e-mail:  nate.luman@knobbe.com

20             appeared on behalf of the United
               States of America;
21

22

23

24

25
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                    4

```
 1    (Cont'd.):

 2           WILMER, CUTLER, PICKERING, HALE &
             DORR, LLP
 3           BY:  MR. DAVID B. BASSETT
                  MR. SCOTT G. GREENE
 4           7 World Trade Center
             250 Greenwich Street
 5           New York, New York  10007
             (212) 230-8858
 6           e-mail:  david.bassett@wilmerhale.com
                      scott.greene@wilmerhale.com
 7
             appeared on behalf of the Gilead
 8           Defendants.

 9    ALSO PRESENT:

10           Ms. Janice Ye
             Gilead Sciences, Inc.
11
             Mr. Lawrence Wallace, Videographer
12           Planet Depos

13           Ms. Stephanie A. Battaglia, CSR, RMR, CRR
             Planet Depos
14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                              76

| | | |
|---|---|---|
| 1 | A  That's correct. | 10:27:37 |
| 2 | Q  And you would agree that a discussion of | 10:27:38 |
| 3 | an aggregate risk from ten years prior to the | 10:27:39 |
| 4 | issuance of the first patent-in-suit does not | 10:27:42 |
| 5 | provide information about the effectiveness of | 10:27:45 |
| 6 | condom usage in any individual given case ten | 10:27:48 |
| 7 | years later, right? | 10:27:51 |
| 8 | A  Correct. | 10:27:53 |
| 9 | Q  And moreover, the Paz-Bailey article is | 10:27:53 |
| 10 | from 2005 reporting on data from 500 largely | 10:27:58 |
| 11 | African-American girls in Atlanta, Georgia, | 10:28:04 |
| 12 | correct? | 10:28:09 |
| 13 | A  That's correct. | 10:28:09 |
| 14 | Q  You would agree with me, would you not, | 10:28:10 |
| 15 | that Paz-Bailey's discussion about the use of | 10:28:12 |
| 16 | condoms in 2005 may not reflect condom usage ten | 10:28:14 |
| 17 | years later, right? | 10:28:18 |
| 18 | A  That's correct. | 10:28:20 |
| 19 | Q  And it may not be reflective of the | 10:28:20 |
| 20 | aggregate risks of any among MSM, correct? | 10:28:22 |
| 21 | A  Correct. | 10:28:27 |
| 22 | Q  And MSM, so we are clear, is men who have | 10:28:28 |
| 23 | sex with men, correct? | 10:28:32 |
| 24 | A  That's correct. | 10:28:33 |
| 25 | Q  And that is the primary intended audience | 10:28:33 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                              77

| | | |
|---|---|---|
| 1 | of TRUVADA and DESCOVY for PrEP, correct? | 10:28:36 |
| 2 |    A  Correct. | 10:28:39 |
| 3 |    Q  Now, back to your reply report, if we | 10:28:39 |
| 4 | could, paragraphs 66 and 67, so just on the next | 10:28:44 |
| 5 | page, you rely on a slide from Gilead regarding | 10:28:49 |
| 6 | PrEP user behavior about risky behaviors in PrEP | 10:28:55 |
| 7 | users, correct? | 10:29:00 |
| 8 |    A  That's correct. | 10:29:00 |
| 9 |    Q  And you reproduced that slide on Page 63 | 10:29:01 |
| 10 | of your reply report? | 10:29:03 |
| 11 |    A  Yes. | 10:29:05 |
| 12 |    Q  If we turn back to Paragraph 67, your | 10:29:05 |
| 13 | introductory sentence to that slide, you cite the | 10:29:13 |
| 14 | statistic that 76% of new users and 94% of | 10:29:17 |
| 15 | long-term users in the past year have had sex | 10:29:21 |
| 16 | without a condom, correct? | 10:29:24 |
| 17 |    A  That's correct. | 10:29:25 |
| 18 |    Q  But you would agree with me, would you | 10:29:28 |
| 19 | not, that those percentages could include | 10:29:30 |
| 20 | intercourse with someone who was known to be HIV | 10:29:32 |
| 21 | negative, correct? | 10:29:34 |
| 22 |    A  It is unknown. | 10:29:35 |
| 23 |    Q  But it could include that, correct? | 10:29:38 |
| 24 |    A  It could, it could be either way. | 10:29:39 |
| 25 |    Q  And in such circumstances intercourse with | 10:29:41 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                     91

| | | |
|---|---|---|
| 1 | Q  And DESCOVY prescribed -- strike that. | 10:43:39 |
| 2 | In your opinion, Doctor, what percentage | 10:43:48 |
| 3 | of DESCOVY prescriptions are for PrEP? | 10:43:49 |
| 4 | A  I don't know.  Again, I defer to the | 10:43:52 |
| 5 | Gilead documents. | 10:43:57 |
| 6 | Q  You haven't looked yourself? | 10:43:57 |
| 7 | A  I don't remember what they were.  I saw | 10:43:58 |
| 8 | the Excel spreadsheet, but I can't remember the | 10:44:00 |
| 9 | numbers on it. | 10:44:02 |
| 10 | Q  Have you made any attempt to determine | 10:44:02 |
| 11 | what percentage of TRUVADA and DESCOVY | 10:44:05 |
| 12 | prescriptions infringe the asserted patents in | 10:44:07 |
| 13 | your opinion? | 10:44:12 |
| 14 | A  No, I haven't. | 10:44:12 |
| 15 | Q  You have not? | 10:44:13 |
| 16 | A  No. | 10:44:14 |
| 17 | Q  Is it your opinion, Doctor, that 100% of | 10:44:14 |
| 18 | the DESCOVY prescriptions for PrEP infringed the | 10:44:17 |
| 19 | asserted claims? | 10:44:21 |
| 20 | A  Yes. | 10:44:22 |
| 21 | Q  And is it your opinion that 100% of the | 10:44:22 |
| 22 | TRUVADA prescriptions for PrEP infringed the | 10:44:26 |
| 23 | asserted claims? | 10:44:28 |
| 24 | A  I do. | 10:44:29 |
| 25 | Q  Doctor, do you agree that if you know that | 10:44:29 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                              116

| | | |
|---|---|---|
| 1 | Q   And the CDC guidelines say the same thing? | 11:13:24 |
| 2 | A   They say the same thing because they know. | 11:13:28 |
| 3 | These are epidemiologists. | 11:13:30 |
| 4 | MR. BASSETT:  Why don't we take a short | 11:13:33 |
| 5 | break. | 11:13:35 |
| 6 | THE WITNESS:  Sorry. | 11:13:36 |
| 7 | THE VIDEOGRAPHER:  Now going off the | 11:13:38 |
| 8 | record, the time is 11:13 a.m. | 11:13:40 |
| 9 | (Recess taken.) | 11:13:42 |
| 10 | THE VIDEOGRAPHER:  We are now back on the | 11:25:13 |
| 11 | record, the time is 11:25 a.m. | 11:25:19 |
| 12 | BY MR. BASSETT: | 11:25:22 |
| 13 | Q   Doctor, how many patients have you | 11:25:23 |
| 14 | prescribed TRUVADA for PrEP? | 11:25:25 |
| 15 | A   I think if I would combine the TRUVADA and | 11:25:28 |
| 16 | DESCOVY together, about 200. | 11:25:32 |
| 17 | Q   What if you separate them, how many for | 11:25:33 |
| 18 | TRUVADA for PrEP? | 11:25:38 |
| 19 | A   I would say more for TRUVADA. | 11:25:39 |
| 20 | I will have to qualify myself. | 11:25:48 |
| 21 | When TRUVADA got approved for PrEP, I | 11:25:50 |
| 22 | actually wrote the prescriptions and did -- went | 11:25:52 |
| 23 | through all the package insert with the patient | 11:25:55 |
| 24 | and did everything, and that didn't really work | 11:25:57 |
| 25 | out well for the HIV uninfected people because I | 11:26:00 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                              117

| 1  | am in a hospital-based clinic it's very expensive | 11:26:05 |
| 2  | to just show up an appointment and have your tests | 11:26:07 |
| 3  | and all that stuff. | 11:26:11 |
| 4  | The Howard Brown Health Center, which is | 11:26:13 |
| 5  | started as an LGBTQ medical facility outpatient | 11:26:19 |
| 6  | medical facility in Chicago many, many years ago, | 11:26:24 |
| 7  | they have a lot of relations with Northwestern, I | 11:26:29 |
| 8  | have worked with them as recently as last year, | 11:26:32 |
| 9  | and they set up a whole PrEP program and they get | 11:26:36 |
| 10 | external funding from I think the State and the | 11:26:43 |
| 11 | City to manage PrEP. | 11:26:45 |
| 12 | So at the beginning I was writing maybe a | 11:26:56 |
| 13 | dozen prescriptions and it was not working out, | 11:26:58 |
| 14 | the patients didn't want to come back, it was too | 11:27:01 |
| 15 | expensive, the drugs were too expensive and | 11:27:04 |
| 16 | everything.  And so I started referring everybody | 11:27:06 |
| 17 | to Howard Brown Clinic. | 11:27:09 |
| 18 | So I have referred patients as recently as | 11:27:10 |
| 19 | last month. | 11:27:13 |
| 20 | So they get into the Howard Brown system, | 11:27:14 |
| 21 | and they are a comprehensive outpatient excellent | 11:27:16 |
| 22 | facility and they have sites all around the | 11:27:20 |
| 23 | Chicago area, including in underserved | 11:27:23 |
| 24 | communities, they have their main center on the | 11:27:27 |
| 25 | north side, which is not too far from the | 11:27:29 |

CONFIDENTIAL - RESTRICTED INFORMATION

Transcript of Robert L. Murphy, M.D.
August 4, 2022                                    118

| | | |
|---|---|---|
| 1 | hospital, and everybody -- I send everybody over | 11:27:31 |
| 2 | there and they handle everything. | 11:27:36 |
| 3 | I mean, I have either treated for referred | 11:27:38 |
| 4 | people to the Howard Brown Clinic. | 11:27:41 |
| 5 | Q  So -- thank you. | 11:27:43 |
| 6 | If I understand what you have just said | 11:27:44 |
| 7 | correctly, you personally have written about a | 11:27:47 |
| 8 | dozen -- | 11:27:51 |
| 9 | A  That's true. | 11:27:51 |
| 10 | Q  -- prescriptions of TRUVADA for PrEP? | 11:27:52 |
| 11 | A  Right. | 11:27:54 |
| 12 | But what I will do is -- they will call me | 11:27:55 |
| 13 | about PrEP, should I go on PrEP, whatever, I have | 11:27:58 |
| 14 | the discussion with them, I go over the package | 11:28:01 |
| 15 | insert stuff, all the stuff.  A lot of them have | 11:28:04 |
| 16 | already looked online and have a lot of | 11:28:06 |
| 17 | information, they still have questions and I tell | 11:28:08 |
| 18 | them if they are eligible for PrEP, most of them | 11:28:12 |
| 19 | are, and then I hand it off. | 11:28:15 |
| 20 | So actual prescriptions, maybe just a | 11:28:18 |
| 21 | dozen or so, but I am still referring patients | 11:28:20 |
| 22 | into the PrEP program there.  They also set them | 11:28:23 |
| 23 | up with Affordable Care Act-type insurance or they | 11:28:26 |
| 24 | get some subsidy to do the whole thing with the | 11:28:30 |
| 25 | testing and everything. | 11:28:33 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                    119

| | | |
|---|---|---|
| 1 | Q   Doctor, have you personally ever, ever | 11:28:34 |
| 2 | written any prescription for DESCOVY for PrEP? | 11:28:37 |
| 3 | A   An actual prescription for DESCOVY, no. | 11:28:41 |
| 4 | Q   When did you first prescribe TRUVADA for | 11:28:44 |
| 5 | PrEP? | 11:28:48 |
| 6 | A   Right when it was approved. | 11:28:48 |
| 7 | Q   So 2012? | 11:28:51 |
| 8 | A   It would be 2012.  It was -- you know, it | 11:28:52 |
| 9 | was kind of a rush into it and so I have a lot of | 11:28:55 |
| 10 | discordant partners, I take care of quite a few | 11:28:59 |
| 11 | HIV infected, chronically infected people, so | 11:29:03 |
| 12 | mostly it was their partners and the circle of | 11:29:06 |
| 13 | friends kind of around those partners and then | 11:29:09 |
| 14 | there were several rings of people coming in, and | 11:29:10 |
| 15 | that's where they came from. | 11:29:15 |
| 16 | Q   Doctor, in your opinion, are you | 11:29:16 |
| 17 | personally, therefore, a direct infringer of the | 11:29:19 |
| 18 | asserted patents? | 11:29:23 |
| 19 | A   Since I am counseling the patients and | 11:29:25 |
| 20 | recommending them to get treatment I would include | 11:29:27 |
| 21 | myself as an infringer. | 11:29:29 |
| 22 | Q   When did you first -- strike that. | 11:29:31 |
| 23 | How do you document your patient care? | 11:29:37 |
| 24 | A   We have electronic medical record now. | 11:29:40 |
| 25 | Q   And how long have you -- since when have | 11:29:44 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                    148

| | | |
|---|---|---|
| 1 | A  I am not aware there are any. | 12:04:40 |
| 2 | Q  Right. | 12:04:42 |
| 3 |    I was going to say because there are no | 12:04:42 |
| 4 | REMS submissions related to DESCOVY for PrEP, at | 12:04:45 |
| 5 | least of which you are aware, correct, correct? | 12:04:47 |
| 6 | A  Yes. | 12:04:49 |
| 7 | Q  But you rely on statistics from REMS 3, 4, | 12:04:50 |
| 8 | and 5 surveys as some of the evidence that you | 12:04:55 |
| 9 | rely on for infringement of the asserted claims by | 12:05:00 |
| 10 | DESCOVY for PrEP, correct? | 12:05:03 |
| 11 | A  Yes. | 12:05:05 |
| 12 | Q  And, in part, you justify that reliance on | 12:05:05 |
| 13 | TRUVADA for PrEP statistics to prove infringement | 12:05:09 |
| 14 | by DESCOVY for PrEP because, according to you, | 12:05:13 |
| 15 | DESCOVY for PrEP and TRUVADA for PrEP are | 12:05:16 |
| 16 | prescribed by the same relevant physician | 12:05:19 |
| 17 | population and used by the same relevant patient | 12:05:24 |
| 18 | population of individuals at risk for acquiring | 12:05:27 |
| 19 | HIV, correct? | 12:05:29 |
| 20 | A  That's correct. | 12:05:29 |
| 21 | Q  Now, in any event, you would agree with | 12:05:30 |
| 22 | me, Doctor, that DESCOVY for PrEP was approved by | 12:05:35 |
| 23 | the FDA in October, 2019, correct? | 12:05:38 |
| 24 | A  That's correct. | 12:05:41 |
| 25 | Q  And REMS 3 included surveys covering | 12:05:41 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                          221

```
1   STATE OF ILLINOIS)
                     ) SS.
2   COUNTY OF DUPAGE )

3            I, STEPHANIE A. BATTAGLIA, CSR and

4   Notary Public in and for the County of DuPage and

5   State of Illinois, do hereby certify that on

6   August 4, 2022, at 8:59 a.m., at Locke Lord, LLP,

7   111 South Wacker Drive, Chicago, Illinois, the

8   deponent ROBERT MURPHY, M.D., personally appeared

9   before me.

10           I further certify that the said ROBERT

11  MURPHY, M.D., was by me first duly sworn to

12  testify and that the foregoing is a true record of

13  the testimony given by the witness.

14           I further certify that the deposition was

15  terminated at 2:50 p.m.

16           I further certify that I am not counsel

17  for nor related to any of the parties herein, nor

18  am I interested in the outcome hereof.

19           In witness whereof, I have hereunto set

20  my hand and seal of office this 16th of August,

21  2022.

22

23  _____

24  Notary Public

25  CSR No. 084-003337 - Expiration Date:  5/31/2023
```

# Exhibit D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>    *Plaintiff–Counterclaim Defendant*,<br><br>v.<br><br>GILEAD SCIENCES, INC.,<br>    *Defendant–Counterclaim Plaintiff,*<br><br>AND GILEAD SCIENCES IRELAND<br>UC,<br>    *Defendant*. | C.A. No. 1:19-cv-02103-MN |

**<u>REPLY EXPERT REPORT OF JULIA L. MARCUS, PH.D., M.P.H.</u>**

RESTRICTED INFORMATION

## I.      INTRODUCTION

1.      I, Julia L. Marcus, Ph.D., M.P.H., submit this report under Federal Rule of Civil

Procedure 26(a)(2)(B) on behalf of the United States of America (the "Government").

2.      I understand that this matter involves U.S. Patent Nos. 9,044,509 ("the '509

patent"), 9,579,333 ("the '333 patent"), 9,937,191 ("the '191 patent"), and 10,335,423 ("the '423

patent") (collectively, the "Patents-in-Suit" or the "HHS Patents").   I understand that the

Government has sued Defendants Gilead Sciences, Inc. ("Gilead Sciences" or "GSI") and Gilead

Sciences Ireland UC ("GSIUC") (collectively, "Gilead" or "Defendants") regarding infringement

of certain claims of the '509, '333, '191, and '423 patents with respect to Gilead's Truvada® and

Descovy® products when administered as pre-exposure prophylaxis ("PrEP") regimens.

3.      My opinions in this report are based on my education, knowledge, and experience

as a researcher, as well as my review of the materials cited in this report.

## II.     EXPERIENCE AND QUALIFICATIONS

4.      I am an infectious disease epidemiologist.   I am Associate Professor in the

Department of Population Medicine at Harvard Medical School and Harvard Pilgrim Health Care

Institute, where I have been a member of the faculty since 2016. I have also held positions as

Epidemiologist in the STD Prevention and Control section at the San Francisco Department of

Public Health from 2008 to 2011, as Research Associate at the Gladstone Institute of Virology and

Immunology from 2011 to 2013, and as Postdoctoral Fellow at the Kaiser Permanente Division of

Research from 2013 to 2016.  My primary research interest is in improving the implementation of

PrEP for prevention of HIV infection and promotion of sexual health in the United States.

5.      In 2008, I earned a Master's in Public Health, with a focus on epidemiology and

biostatistics, at the University of California, Berkeley, where I wrote my thesis on sexually

49.     I provide the following table summarizing the issue dates of the Patents-in-Suit and the operative Descovy package inserts:

| Patent-in-Suit | Patent Issue Date | Operative Descovy Package Inserts |
|---|---|---|
| U.S. 9,044,509 | June 2, 2015 | October 2019<br>December 2019<br>March 2021<br>January 2022 |
| U.S. 10,335,423 | July 2, 2019 | October 2019<br>December 2019<br>March 2021<br>January 2022 |

## IX.     REPLY TO CERTAIN STATEMENTS MADE IN THE FLEXNER REBUTTAL REPORT REGARDING TRUVADA FOR PREP

50.     This section of my report replies to certain statements and opinions contained within the Flexner Rebuttal Report regarding the use of Truvada for PrEP.  I do not specifically reply to every statement or opinion within the Flexner Rebuttal Report, but that does not mean that I necessarily agree with those statements or opinions to which I have not specifically replied.

51.     I understand that practicing the methods of asserted claim 1 of the '509, '333, '191, and '423 patents (***the prior to an <u>actual</u> exposure claims***) requires (1) selection of an uninfected host, (2) administration of the claimed drug combination to the host followed by (3) an exposure to an immunodeficiency retrovirus, and (4) protection of the host from an immunodeficiency virus self-replication infection as shown by negative status based on both a serological and PCR assay (if both assays are performed).

52.     I understand that practicing the methods of asserted claim 13 of the '509, '333, '191 patents, and claim 12 of the '423 patent (***the prior to a <u>potential</u> exposure claims***) requires (1) selection of an uninfected human, (2) administration of the claimed drug combination to the uninfected human followed by (3) potential exposure to a human immunodeficiency retrovirus as shown by engagement in activity that could result in exposure, and (4) protection of the human

RESTRICTED INFORMATION

from an immunodeficiency virus self-replication infection as shown by negative status based on both a serological and PCR assay (if both assays are performed).

### A. Reply to statements in the Flexner Rebuttal Report regarding selection of an uninfected host

53. Step (a) from claim 1 of the '509, '333, '191, and '423 patents recites "selecting a primate host not infected with the immunodeficiency retrovirus." Step (a) from claims 12 of the '509, '333, and '423 patents, and claim 13 of the '191 patent recites "selecting an uninfected human that does not have the self-replicating infection."

54. I understand that the Government's expert witness, Dr. Murphy, previously explained that the Truvada Insert instructs physicians and patients that Truvada for PrEP must only be prescribed to patients confirmed to be HIV-negative. *See* Murphy Opening Report ¶¶76-80, 135-139.

55. Flexner Rebuttal Report ¶162 and ¶337 state that "the existence of statements in various versions of the Truvada® Insert does not establish the actual occurrence of any physician conducting" step (a). Flexner Rebuttal Report ¶164 and ¶339 state that "the existence of recommendations or instructions in the Truvada® Insert, including the Medication Guide portion of the Truvada® Insert, does not establish any actual occurrence of any step of the methods claimed by the Asserted Claims in the real world after the '509 Patent issued." Flexner Rebuttal Report ¶¶163, 165, 338, and 340 assert that Gilead's REMS survey results "do not establish the actual occurrence of any direct infringement by any patient or any physician."

56. In reply to these statements in the Flexner Rebuttal Report, I note that substantial evidence exists that physicians and patients follow the statements in the Truvada Insert regarding Truvada for PrEP only being prescribed to patients who are confirmed to be uninfected with HIV. This evidence includes Gilead's REMS survey results, which I summarize and discuss below.

### 1.    Summary of Gilead's REMS survey results

57.    Gilead's REMS survey results contain data collected by Gilead and submitted to the FDA regarding physician and patient usage of Truvada for PrEP.  "The goals for the REMS for Truvada for a PrEP indication are focused on informing and educating prescribers, other HCPs, and individuals at high risk for acquiring HIV-1 infection about the importance of strict adherence to the recommended dosing regimen, the importance of regular monitoring of HIV-1 serostatus, and the fact that Truvada for a PrEP indication must be considered as only a part of a comprehensive prevention strategy."  GILDDE00236715-7526 at GILDDE00236763 (REMS 1). There were five REMS assessment submissions by Gilead:

1.  REMS Assessment Period 1, which covered July 16, 2012 through May 15, 2013 (GILDDE00236715-GILDDE00237526) ("REMS 1")
2.  REMS Assessment Period 2, which covered May 16, 2013 through November 15, 2014 (GILDDE00243874-GILDDE00244563) ("REMS 2")
3.  REMS Assessment Period 3, which covered November 16, 2014 through May 15, 2016 (GILDDE00251496-GILDDE00252071) ("REMS 3")
4.  REMS Assessment Period 4, which covered May 16, 2016 through November 15, 2017 (GILDDE00263067-GILDDE00263700) ("REMS 4")
5.  REMS Assessment Period 5, which covered November 16, 2017 through July 8, 2018 (GILDDE00270528-GILDDE00270916) ("REMS 5").

Gilead conducted "a web-based phone and paper-based option, self-administered Knowledge, Attitude and Behavior (KAB) survey for prescribers and uninfected individuals taking (or who have recently taken) Truvada for a PrEP indication."   GILDDE00236715-7526 at GILDDE00236723 (REMS 1).  First, I summarize the prescriber KAB survey results, and then I summarize the uninfected individual KAB survey results.

a)      **Gilead's prescriber Knowledge, Attitude and Behavior (KAB) survey results**

58.     "The prescriber KAB surveys were conducted among healthcare providers who had prescribed Truvada for a PrEP indication." *Id.* at GILDDE00236729 (REMS 1).  The REMS 1 inclusion criterion for prescribers to participate in the survey was "[h]ealthcare professionals in the US who have prescribed Truvada for PrEP." *Id.*  REMS 1 had 22 healthcare providers participate in the survey, and each of the providers met the inclusion criterion for prescribing Truvada for PrEP in the US.  *See* GILDDE00236715-7526 at GILDDE00236731.

59.     For REMS 2, Gilead sought a sample size of 100 healthcare professionals.  *See* GILDDE00243874-4563 at GILDDE00243888-89.   A total of 99 healthcare professionals completed the survey. *Id.*  The REMS 2 inclusion criterion was healthcare professionals "in the US who have prescribed TRUVADA," which included prescribers of Truvada for HIV-1 treatment and for PrEP.  *See* GILDDE00243874-4563 at GILDDE00244032 (REMS 2).  Between 10-12 healthcare professionals responded that "I have not prescribed TRUVADA for a PrEP indication," indicating that between 87-89 of the 99 healthcare professionals who completed the survey had prescribed Truvada for PrEP as shown in the below responses reproduced from REMS 2:

**Table 7.** **Responses to Preliminary Questions about HIV and Other Laboratory Testing and Patient Counseling**

| Question | Telephone N=16 [1] | | Internet N=79 [1] | | Paper N=4 [1] | | Total N=99 [1] | |
|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % |
| **Question 12: I test my patients for whom I prescribe TRUVADA for a PrEP indication for hepatitis B.** | | | | | | | | |
| Always | 12 | 75.0 | 56 | 70.9 | 3 | 75.0 | 71 | 71.7 |
| Sometimes | 3 | 18.8 | 14 | 17.7 | 1 | 25.0 | 18 | 18.2 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 1 | 6.3 | 9 | 11.4 | 0 | 0.0 | 10 | 10.1 |
| **Question 13: I counsel my patients for whom I prescribe TRUVADA for a PrEP indication to (Select all that apply):** | | | | | | | | |
| Practice safer sex consistently and use condoms correctly. | 15 | 93.8 | 69 | 87.3 | 4 | 100.0 | 88 | 88.9 |
| Know the HIV-1 status of their partner(s). | 15 | 93.8 | 67 | 84.8 | 3 | 75.0 | 85 | 85.9 |
| Ask their partner(s) to get tested for HIV-1 if they don't know their HIV-1 status. | 15 | 93.8 | 63 | 79.7 | 3 | 75.0 | 81 | 81.8 |
| Get tested for other sexually transmitted infections. | 15 | 93.8 | 67 | 84.8 | 3 | 75.0 | 85 | 85.9 |
| Take TRUVADA for a PrEP indication every day, do not miss a dose. | 15 | 93.8 | 67 | 84.8 | 4 | 100.0 | 86 | 86.9 |
| I have not prescribed TRUVADA for a PrEP indication. | 1 | 6.3 | 11 | 13.9 | 0 | 0.0 | 12 | 12.1 |
| **Question 14: I provide information about how to reduce high risk sexual behavior to patients for whom I prescribe TRUVADA for a PrEP indication.** | | | | | | | | |
| Always | 13 | 81.3 | 60 | 75.9 | 3 | 75.0 | 76 | 76.8 |
| Sometimes | 2 | 12.5 | 9 | 11.4 | 1 | 25.0 | 12 | 12.1 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 1 | 6.3 | 10 | 12.7 | 0 | 0.0 | 11 | 11.1 |

*Id.* at GILDDE00244052 (Table 7).

60.     For REMS 3, Gilead sought a sample size of 100 healthcare professionals.  *See* GILDDE00251496-2071 at GILDDE00251508.  A total of 96 healthcare professionals completed the survey.  *Id.*  The REMS 3 inclusion criterion was healthcare professionals "in the United States (US) who have prescribed TRUVADA," which included prescribers of Truvada for HIV-1 treatment and for PrEP.  *See* GILDDE00251496-2071 at GILDDE00251536 (REMS 3).  Between 9-11 healthcare professionals responded that "I have not prescribed TRUVADA for a PrEP indication," indicating that between 85-87 of the 96 healthcare professionals who completed the survey had prescribed Truvada for PrEP as shown in the below responses reproduced from REMS 3:

RESTRICTED INFORMATION

**Table 7.**        **Responses to Preliminary Questions about HIV and Other Laboratory Testing and Patient Counseling**

| Question | Telephone N=2 [1] | | Internet N=92 [1] | | Paper N=2 [1] | | Total N=96 [1] | |
|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % |
| **Question 8: I test my patients to confirm that they are HIV-1 negative before prescribing TRUVADA for a PrEP indication.** | | | | | | | | |
| Always | 2 | 100.0 | 81 | 88.0 | 2 | 100.0 | 85 | 88.5 |
| Sometimes | 0 | 0.0 | 2 | 2.2 | 0 | 0.0 | 2 | 2.1 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 9 | 9.8 | 0 | 0.0 | 9 | 9.4 |
| **Question 9: I test the HIV status of my patients for whom I prescribe TRUVADA for a PrEP indication if they develop symptoms that are consistent with an acute HIV-1 infection.** | | | | | | | | |
| Always | 0 | 0.0 | 82 | 89.1 | 2 | 100.0 | 84 | 87.5 |
| Sometimes | 1 | 50.0 | 0 | 0.0 | 0 | 0.0 | 1 | 1.0 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 1 | 50.0 | 10 | 10.9 | 0 | 0.0 | 11 | 11.5 |
| **Question 10: How often do you generally test the HIV-1 status of your patients for whom you prescribe TRUVADA for a PrEP indication? (Select one)** | | | | | | | | |
| More frequently than every 3 months | 0 | 0.0 | 4 | 4.3 | 0 | 0.0 | 4 | 4.2 |
| Every 3 months | 1 | 50.0 | 77 | 83.7 | 2 | 100.0 | 80 | 83.3 |
| Less frequently than every 3 months | 1 | 50.0 | 2 | 2.2 | 0 | 0.0 | 3 | 3.1 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 9 | 9.8 | 0 | 0.0 | 9 | 9.4 |
| **Question 11: I test my patients for whom I prescribe TRUVADA for a PrEP indication for other sexually transmitted infections like syphilis and gonorrhea.** | | | | | | | | |
| Always | 2 | 100.0 | 79 | 85.9 | 0 | 0.0 | 81 | 84.4 |
| Sometimes | 0 | 0.0 | 5 | 5.4 | 2 | 100.0 | 7 | 7.3 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 8 | 8.7 | 0 | 0.0 | 8 | 8.3 |

*Id.* at GILDDE00251556 (Table 7).

61.     For REMS 4, Gilead sought a sample size of 100 healthcare professionals.  *See* GILDDE00263067-700 at GILDDE00263078-79.   A total of 118 healthcare professionals completed the survey.  *Id.*  The REMS 4 inclusion criterion was healthcare professionals "in the US who have prescribed TRUVADA," which included prescribers of Truvada for HIV-1 treatment and for PrEP.  *See* GILDDE00263067-700 at GILDDE00263078 (REMS 4).   With the caveat noted below, there were no healthcare professionals in REMS 4 who answered "I have not prescribed TRUVADA for a PrEP indication," indicating that all 118 healthcare professionals who completed the survey had prescribed Truvada for PrEP as shown in the below responses reproduced from REMS 4:

**Table 7.     Responses to Preliminary Questions about HIV-1 and Other Laboratory Testing and Patient Counseling**

| Question | Telephone N=2[1] | | Internet N=116[1] | | Paper N=0[1] | | Total N=118[1] | |
|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % |
| **Question 8: I test my patients to confirm that they are HIV-1 negative before prescribing TRUVADA for a PrEP indication.** | | | | | | | | |
| Always | 2 | 100.0 | 115 | 99.1 | 0 | 0.0 | 117 | 99.2 |
| Sometimes | 0 | 0.0 | 1 | 0.9 | 0 | 0.0 | 1 | 0.8 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **Question 9: I test the HIV status of my patients for whom I prescribe TRUVADA for a PrEP indication if they develop symptoms that are consistent with an acute HIV-1 infection.** | | | | | | | | |
| Always | 2 | 100.0 | 110 | 94.8 | 0 | 0.0 | 112 | 94.9 |
| Sometimes | 0 | 0.0 | 6 | 5.2 | 0 | 0.0 | 6 | 5.1 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **Question 10: How often do you generally test the HIV-1 status of your patients for whom you prescribe TRUVADA for a PrEP indication? (Select one)** | | | | | | | | |
| More frequently than every 3 months | 1 | 50.0 | 2 | 1.7 | 0 | 0.0 | 3 | 2.5 |
| Every 3 months | 1 | 50.0 | 109 | 94.0 | 0 | 0.0 | 110 | 93.2 |

24

*Id.* at GILDDE00263125 (Table 7).   On page GILDDE00263127 of REMS 4, one of the 118 surveyed healthcare providers indicated "I have not prescribed TRUVADA for a PrEP indication" in response to Question 10, but this response may have been an anomaly because 118 healthcare providers answered questions asking about their Truvada for PrEP prescribing behaviors with respect to Questions 8-9 and 11-14.  *Id.*

62.     For REMS 5, there were a total of 15 healthcare professionals who completed the survey.  *See* GILDDE00270528-916 at GILDDE00270540.  The REMS 5 inclusion criterion was healthcare professionals "in the US who have prescribed TRUVADA," which included prescribers of Truvada for HIV-1 treatment and for PrEP.  *See* GILDDE00270528-916 at GILDDE00270540 (REMS 5).   In REMS 5, there were no healthcare professionals who answered "I have not prescribed TRUVADA for a PrEP indication," indicating that all 15 healthcare professionals who completed the survey had prescribed Truvada for PrEP as shown in the below responses reproduced from REMS 5:

**Table 6.       Responses to Preliminary Questions about HIV-1, Other Laboratory Testing, and Patient Counseling**

| Question | Telephone N=1[1] | | Internet N=14[1] | | Paper N=0[1] | | Total N=15[1] | |
|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % |
| **Question 8: I test my patients to confirm that they are HIV-1 negative before prescribing TRUVADA for a PrEP indication.** | | | | | | | | |
| Always | 1 | 100.0 | 14 | 100.0 | 0 | 0.0 | 15 | 100.0 |
| Sometimes | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Never | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| I have not prescribed TRUVADA for a PrEP indication. | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

*Id.* at GILDDE00270586-87 (Table 6).

b)      **Gilead's uninfected individual Knowledge, Attitude and Behavior (KAB) survey results**

63.      Gilead's REMS included surveys of uninfected individuals' (UIs) Knowledge, Attitude, and Behavior (KAB).  *See* GILDDE00236715-7526 at GILDDE00236737 (REMS 1). Gilead's inclusion criterion for UIs to complete the survey included "[a]dults who are 18 years of age or older and who are taking Truvada for a PrEP indication as part of a comprehensive prevention strategy to reduce the risk of acquiring HIV-1." *Id.*  Recruitment of UIs was performed as follows:

> Recruitment for the KAB survey was done through the www.truvada.com website and through their prescribers.  The same prescribers of Truvada for PrEP, who were identified and invited to participate in the prescriber KAB survey, were invited to assist in the recruitment of UIs. Invitation letters for UIs were sent to the prescribers for distribution.  An honorarium was provided to the prescriber if at least one UI volunteered to participate.  UIs were also provided with an honorarium for their participation.

*Id.*; *see also* GILDDE00243874-4563 at GILDDE00243888-89 (REMS 2 prescriber recruitment), GILDDE00243896-97 (REMS 2 UI recruitment); GILDDE00251496-2071 at GILDDE00251509-10 (REMS 3 prescriber recruitment), GILDDE00251517-18 (REMS 3 UI recruitment); GILDDE00263067-700 at GILDDE00263290-91 (REMS 4 prescriber recruitment), GILDDE00263348-50 (REMS 4 UI recruitment).[2]  Because the same prescribers of Truvada for PrEP who participated in the prescriber KAB surveys also assisted in the recruitment of UIs, at least some of the UIs who completed the UI KAB surveys would be expected to have been in the care of the same prescribers who completed the prescriber KAB surveys.

---

[2] For REMS 5, "[t]here were no recruitment activities for uninfected individuals that involved HCPs."  GILDDE00270528-916 at GILDDE00270548 (REMS 5).

26

64.    REMS 1 had 10 UIs complete the survey.    GILDDE00236715-7526 at GILDDE00236737.    For REMS 2, Gilead sought a sample size of 100 UIs.    *See* GILDDE00243874-4563 at GILDDE00243896-97.    A total of 74 UIs completed the REMS 2 survey.    *Id.*  For REMS 3, Gilead sought a sample size of 100 UIs.    *See* GILDDE00251496-2071 at GILDDE00251517-18.    A total of 281 UIs completed the REMS 3 survey.    *Id.*  For REMS 4, Gilead sought a sample size of 100 UIs.    *See* GILDDE00263067-700 at GILDDE00263359.    A total of 132 UIs completed the survey.    *Id.*  For REMS 5, a total of 5 UIs completed the survey.    *See* GILDDE00270528-916 at GILDDE00270548.

65.    For REMS 5, Gilead stopped active recruitment after a March 29, 2018 teleconference with the FDA, and the REMS 5 survey was closed on July 8, 2018.    *See* GILDDE00270528-916 at GILDDE00270540 (REMS 5).  The FDA sent a letter on July 1, 2019 indicating that it had determined that REMS were no longer necessary for Truvada for PrEP.  *See* GILDDE00271786-88 at GILDDE00271787.  The FDA stated that "the available information indicates that prescribers and uninfected individuals understand the important key messages with regards to approximate use of emtricitabine/tenofovir disoproxil fumarate for a PrEP indication." *Id.*

### 2.    Reply to Flexner Rebuttal Report based on Gilead's REMS data

66.    In reply to Flexner Rebuttal Report ¶¶162-165 and ¶¶337-340, I note that Gilead's REMS surveys provide evidence that physicians and their patients follow the instructions in the Truvada Insert about Truvada for PrEP being prescribed only to patients confirmed to be

uninfected with HIV.  The data from Gilead's REMS 3-5 survey periods[3] show that 97.7-100% of the Truvada for PrEP prescribers surveyed always tested their patients to confirm that they were HIV-negative before prescribing Truvada for PrEP:

| I test my patients to confirm that they are HIV-1 negative before prescribing TRUVADA for a PrEP indication. | | |
|---|---|---|
| Always (%) | *97.7*[4] | GILDDE00251556 (REMS 3) |
| | 99.2 | GILDDE00263125 (REMS 4) |
| | 100.0 | GILDDE00270586 (REMS 5) |
| Sometimes (%) | *2.3* | GILDDE00251556 (REMS 3) |
| | 0.8 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| Never (%) | 0.0 | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 9.4 | GILDDE00251556 (REMS 3) |
| | 0.0 | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270586 (REMS 5) |

The data from Gilead's REMS 3-5 surveys also show that 100% of UIs taking Truvada for PrEP were tested for HIV, 98-100% were tested within the last 6 months, and 100% were tested within the last year:

| Have you been tested for HIV? | | |
|---|---|---|
| Yes (%) | 100.0 | GILDDE00251839 (REMS 3) |
| | 100.0 | GILDDE00263367 (REMS 4) |
| | 100.0 | GILDDE00270757 (REMS 5) |
| No (%) | 0.0 | GILDDE00251839 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270757 (REMS 5) |

---

[3] Flexner Rebuttal Report ¶97 states that REMS 1 "covers a period of time that is at least two years prior to the issuance of the first-issued Patent-in-Suit—the '509 Patent on June 2, 2015," and ¶103 states that REMS 2 convers a period of time "before the issuance of the first-issued Patent-in-Suit." I have only included a discussion of REMS 3-5 to moot the statements in the Flexner Rebuttal Report concerning the periods of time covered by REMS 1-2 relative to the issue date of the Patents-in-Suit.

[4] In this table, the italicized numbers were adjusted to account for the nine respondents in REMS 3 who answered "I have not prescribed TRUVADA for a PrEP indication" by removing these respondents from the denominator.  *See* GILDDE00251496-2071 at GILDDE00251556 (REMS 3).

RESTRICTED INFORMATION

| When was the last time you were tested for HIV? | | |
|---|---|---|
| Less than a month ago (%) | 56.2 | GILDDE00251840 (REMS 3) |
| | 52.3 | GILDDE00263367 (REMS 4) |
| | 40.0 | GILDDE00270757 (REMS 5) |
| 1 to 3 months ago (%) | 38.1 | GILDDE00251840 (REMS 3) |
| | 35.6 | GILDDE00263367 (REMS 4) |
| | 40.0 | GILDDE00270757 (REMS 5) |
| More than 3 months, but less than 6 months ago (%) | 3.6 | GILDDE00251840 (REMS 3) |
| | 10.6 | GILDDE00263367 (REMS 4) |
| | 20.0 | GILDDE00270758 (REMS 5) |
| More than 6 months, but less than a year ago (%) | 1.8 | GILDDE00251840 (REMS 3) |
| | 1.5 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| A year or more ago | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't know | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |

67.     In summary, Gilead's REMS data indicate that actual physicians and patients follow the statements in the Truvada Insert that Truvada for PrEP must only be prescribed to patients confirmed to be uninfected with HIV.  These data are unsurprising.  The Truvada Insert states clearly that Truvada for PrEP is contraindicated for HIV-positive patients because Truvada alone does not constitute a complete regimen for HIV-1 treatment as follows:

- "***TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status*** [see Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 5 (emphasis added).

- "Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-negative.  HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only TRUVADA, because ***TRUVADA alone does not constitute a complete regimen for HIV-1 treatment*** [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing TRUVADA

29

before confirming the individual is HIV-1 negative."  Truvada Package Insert (Revised 06/2020) at 6 (emphasis added).

**B.    Reply to statements in the Flexner Rebuttal Report regarding administration of the claimed drug combination to the uninfected human**

68.    Step (b) from claim 1 of the '509, '333, '191, and '423 patents recites "administering directly to an uninfected primate host a combination comprising: i. a pharmaceutically effective amount of emtricitabine; and ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate [or a tenofovir prodrug]."  Step (b) from claims 12 of the '509, '333, and '423 patents, and claim 13 of the '191 patent recites "administering to the uninfected human a combination comprising: i. a pharmaceutically effective amount of emtricitabine; and ii. a pharmaceutically effective amount of tenofovir or tenofovir ester [or tenofovir disoproxil fumarate or a tenofovir prodrug]."[5]

69.    I understand that the Government's expert witness, Dr. Murphy, previously explained that the Truvada Insert instructs physicians and patients that the pharmaceutically effective dosage of Truvada for PrEP is one daily tablet containing 200 mg of emtricitabine and 300 mg of TDF.  *See* Murphy Opening Report ¶¶81-87, 140-145.

70.    Flexner Rebuttal Report ¶168 and ¶343 state that "the existence of statements in various versions of the Truvada® Insert does not establish the actual occurrence of any physician conducting" step (b).  Flexner Rebuttal Report ¶173 and ¶347 state that "the existence of recommendations or instructions in the Truvada® Insert, including the Medication Guide portion

---

[5] The [bracketed] language accounts for the differences in language between the asserted patents, which are shown in the side-by-side table in Section VI of this report.  Also, step (b) from claims 1 and 12 of the '333 patent additionally recites "wherein the pharmaceutically effective amount of the emtricitabine [or tenofovir or tenofovir disoproxil fumarate] is administered orally, subcutaneously or vaginally."  Step (b) from claim 13 of the '191 patent additionally recites "in a tablet."  I have not included these additional recitations in this paragraph for the sake of brevity.

RESTRICTED INFORMATION

of the Truvada® Insert, does not establish any actual occurrence of any step of the methods claimed" by the Asserted Claims in the real world after the '509 Patent issued.  Flexner Rebuttal Report ¶¶172 and 346 assert that Gilead's REMS survey results "do not establish the actual occurrence of any direct infringement by any patient or any physician."

71.     In reply to these statements in the Flexner Rebuttal Report, I note that substantial evidence exists that physicians and patients follow the statements in the Truvada Insert that the pharmaceutically effective dosage of Truvada for PrEP is one daily tablet containing 200 mg of emtricitabine and 300 mg of TDF, including Gilead's REMS survey results.  Gilead's REMS surveys provide evidence of patients being administered a pharmaceutically effective amount of Truvada for PrEP.  The title page of the REMS assessment is "Truvada (emtricitabine 200 mg / tenofovir disoproxil fumarate 300 mg) for a Pre-exposure Prophylaxis (PrEP) Indication."[6]  The data from Gilead's REMS 3-5 survey periods show that 74-100% of Truvada for PrEP patients did not miss a daily dose of Truvada in the past month:

| In the past month, have you missed any doses of TRUVADA? | | |
|---|---|---|
| Yes (%) | 22.1 | GILDDE00251840 (REMS 3) |
| | 25.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| No (%) | 77.9 | GILDDE00251840 (REMS 3) |
| | 74.2 | GILDDE00263367 (REMS 4) |
| | 100.0 | GILDDE00270758 (REMS 5) |
| I don't know (%) | 0.0 | GILDDE00251840 (REMS 3) |
| | 0.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| How many doses of TRUVADA have you missed in the past month? (All percentages are based on answers from only UIs who missed doses.) | | |
| 1-3 doses (%) | 83.9 | GILDDE00251841 (REMS 3) |
| | 81.8 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |

---

[6] *See* GILDDE00236715-7526 at GILDDE00236715 (REMS 1); GILDDE00243874-4563 at GILDDE00243874 (REMS 2); GILDDE00251496-2071 at GILDDE00251496 (REMS 3); GILDDE00263067-700 at GILDDE00263067 (REMS 4); GILDDE00270528-916 at GILDDE00270528 (REMS 5).

31

| 4-7 doses (%) | 12.9 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| 8-12 doses (%) | 3.2 | GILDDE00251841 (REMS 3) |
| | 9.1 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| More than 12 doses (%) | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263367 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |
| I don't remember | 0.0 | GILDDE00251841 (REMS 3) |
| | 0.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270758 (REMS 5) |

With respect to the 0-25% of patients who missed a daily dose of Truvada in the past month, all (100%) of those patients missed 12 or fewer pills, which corresponds to 100% of Truvada patients surveyed taking at least 4 doses per week.  As discussed below, 4 doses per week is a pharmaceutically effective dosing schedule for Truvada for PrEP for MSM or transgender women (i.e., people assigned male sex at birth).  Across REMS 3-5, nearly all (97.5-100.0%) of the UI respondents were male.

72.    Flexner Rebuttal Report ¶194 states that Gilead's REMS data "supports the point that patients taking Truvada for PrEP sometimes miss daily doses of Truvada for PrEP."  Flexner Rebuttal Report ¶195 states that "a person that has missed prescribed daily doses prior to a potential exposure such that the person taking Truvada for PrEP has insufficient levels of the active metabolites of Truvada's respective components" would not meet the Asserted Claims.  *See also, e.g.,* Flexner Rebuttal Report ¶¶140, 145-147, 196 (containing similar statements).  However, based on published pharmacokinetic data, and as noted in CDC Clinical Guidelines, greater than or equal to 4 doses per week of Truvada is sufficient for pharmaceutically effective PrEP in MSM, who comprise the vast majority of PrEP users in the U.S., and transgender women.  Anderson et al. reported an HIV risk reduction of "96% for 4 doses [of Truvada] per week" and "99% for 7 doses per week" among MSM.  *See* Anderson et al., "Emtricitabine-tenofovir exposure and pre-

32

exposure prophylaxis efficacy in men who have sex with men," Science Translational Medicine, 4:151ra125 (2012) at Abstract and pages 4-5. Grant et al. (2014) reported that "[t]here were no [HIV] infections at visits where tenofovir diphosphate concentration was 700 fmol per punch or greater, suggesting the use of four to seven tablets per week." *See* Grant et al., "Uptake of pre-exposure prophylaxis, sexual practices, and HIV incidence in men and transgender women who have sex with men: a cohort study," The Lancet, 14:820-29 (2014) at page 824. Figure 2 from the Grant 2014 paper is reproduced below:



**Figure 2:** Pre-exposure prophylaxis and HIV incidence
For those visits on PrEP, the incidence of HIV is estimated by exponential regression by tenofovir diphosphate in dried blood spots. The incidence for the concomitant off-PrEP group is depicted as a constant for reference. The dotted lines represent the estimate bounded by 1 SE. Dosing for each interval is estimated by pharmacokinetic modelling. LLOQ=lower limit of quantitation.

*Id.* at page 824.

73.     Although studies have suggested that higher adherence than 4 doses of Truvada per week is required for protective drug levels among cisgender women, even cisgender women can miss occasional doses of PrEP and still have sufficient protection.  Cottrell et al. reported on pharmacokinetic data suggesting that only 6 doses of Truvada per week were needed to protect lower female genital tract tissue from HIV.  *See* Cottrell et al., "A translational pharmacology approach to predicting outcomes of preexposure prophylaxis against HIV in men and women using tenofovir disoproxil fumarate with or without emtricitabine," Journal of Infectious Diseases, 214(1):55-64 (2016) at Abstract, pages 60-61, and Figure 4.

74.     In further reply to the statements in the Flexner Rebuttal Report ¶¶168, 172-173, 343, and 346-347, I note that additional evidence exists that physicians and patients follow the instructions in the Truvada Insert to adhere to a pharmaceutically effective dosing schedule of Truvada for PrEP.  For example, my colleagues and I published the following article:  Marcus et al., "Preexposure prophylaxis for HIV prevention in a large integrated health care system: adherence, renal safety, and discontinuation," Journal of Acquired Immune Deficiency Syndromes, 73:540-46 (2016) ("Marcus 2016").  This article reported that "[w]e conducted a cohort study from July 2012 through June 2015 of Kaiser Permanente Northern California members initiating PrEP." *Id.* at Abstract (Methods).  "We studied 972 individuals who initiated PrEP and accumulated 850 person-years of PrEP use." *Id.* at Abstract (Results).  These PrEP users were confirmed to be HIV-negative before PrEP initiation and HIV testing was performed "at least quarterly during PrEP use." *Id.* at page 2 (Methods section).  At baseline, HIV testing was conducted using both serological antibody tests and PCR tests.  During follow-up, HIV testing was conducted primarily by serological antibody tests, with PCR tests used in addition and occasionally alone, and these tests were verified to be negative at all time points during PrEP use.

34
RESTRICTED INFORMATION

75.    In the Marcus 2016 study, "[w]e estimated adherence to PrEP as the medication possession ratio (MPR) using pharmacy refill data among individuals with more than 1 fill." *Id.* at page 3 (Study Measurements section).   "MPR was calculated by subtracting days without TDF/FTC in possession from total days between first fill and end of follow-up, and dividing by total days of follow-up." *Id.* "Among 915 individuals with >1 fill, the mean adherence as measured by MPR was 92% [median 97%, interquartile range (IQR) 90%-100%], with 118 (12.9%) having <80% adherence." *Id.* at page 5. "Adherence was 92% overall." *Id.* at page 6 (Discussion section). "Although 60% adherence (ie, taking at least 4 of 7 doses per week) may be sufficient to achieve high PrEP efficacy, an MPR below 80% may indicate that an individual needs additional support to maintain prevention-effective adherence; thus, we defined low adherence as an MPR of <80%" to be conservative. *Id.* at page 3 (Study Measurements section). "Using primarily telemedicine adherence support, we observed higher adherence than that seen in placebo-controlled or open-label PrEP studies." *Id.* at page 6 (Discussion section). "Higher adherence in clinical practice may be attributable to the absence of a placebo, the now well-established efficacy of PrEP, or a growing normalization of PrEP with increased use in the community." *Id.* at page 6. We concluded that "PrEP adherence was high in clinical practice, consistent with the lack of HIV seroconversions during PrEP use." *Id.* at Abstract (Conclusions).

76.    In the Marcus 2016 study, "HIV seroconversions were identified using the KPNC HIV registry, which includes all known HIV/AIDS cases since the early 1980s, with HIV status confirmed by review of medical charts or medical center case lists." *Id.* at 4 (Study Measurements section).   "There were no HIV seroconversions during 850 person-years of ongoing PrEP use." *Id.* at page 6 (HIV Seroconversions section).   "STIs were common at baseline and throughout follow-up, as observed in previous PrEP studies, indicating an ongoing risk for HIV acquisition

RESTRICTED INFORMATION

and highlighting the importance of STI education among individuals initiating PrEP." *Id.* at page 7 (Discussion section).  The lack of HIV seroconversions despite high rates of STIs is further evidence of pharmaceutically effective dosing of Truvada for PrEP.

77.     The data in Marcus 2016 were collected from July 2012 through June 2015.  I understand that the first Patent-in-Suit issued on June 2, 2015.  Therefore, there is a small amount of overlap between the issuance of the Patents-in-Suit and the end of the data collected in Marcus 2016.  The Marcus 2016 study was "the largest study to date of PrEP use in clinical practice" at the time of publication.  *Id.* at page 6 (Discussion section).  Adherence to pharmaceutically effective dosing, as observed in the Marcus 2016 study, is not expected to have decreased since June 2015.  For example, in a study published in 2021, we reviewed electronic health record data from members of Kaiser Permanente Northern California who used PrEP from July 16, 2012, through March 31, 2019.  Among 10,851 health plan members, we observed 9,139 person-years of continued PrEP use.  There were zero (95% CI: 0.0-0.04) HIV seroconversions, again indicating pharmaceutically effective adherence to Truvada for PrEP.  *See* Hojilla (and Marcus) et al., "Characterization of HIV preexposure prophylaxis use behaviors and HIV incidence among US adults in an integrated health care system," JAMA Network Open, 4(8): e2122692 (2021) at Table 3 ("Hojilla and Marcus").

78.     In further reply to the statements in the Flexner Rebuttal Report ¶¶168, 172-173, 343, and 346-347, I note that evidence of physicians and patients following the instructions in the Truvada Insert to adhere to a pharmaceutically effective dosing schedule of Truvada for PrEP includes the following article that my colleagues and I published:  Sewell (and Marcus) et al., "Non-daily use of HIV preexposure prophylaxis in a large online survey of primarily men who have sex with men in the U.S.," Journal of Acquired Immune Deficiency Syndromes, 84:182-188

(2020) ("Sewell and Marcus 2020").  This article reported that "[w]e distributed a survey to assess experiences with PrEP, including non-daily use, in May 2019 on geosocial networking sites commonly used by MSM."  *Id.* at Abstract (Methods).  We asked participants, "When taking PrEP in the last 6 months, how did you take it?"  Response options included "daily (i.e., took a pill every day, potentially missing a dose on occasion)" or "less than daily (e.g., only around the time of sex, daily but only for short periods, only on certain days of the week)."  *Id.* at Methods.  Our study sample included 9,697 respondents, with respondents distributed across all regions of the U.S. and the largest proportion in the South.  *Id.* at page 4 (Results: Respondent Characteristics).  "Nearly all respondents (91.0%) had heard of PrEP, 40.1% had ever used PrEP, and 33.3% had used PrEP in the last 6 months."  *Id.*  Of the 3,232 respondents who had used PrEP in the past 6 months, "176 (5.4%) reported non-daily use," indicating that 94.6% of recent PrEP users reported taking their PrEP medication daily, potentially missing a dose on occasion.  *Id*.  Of the 176 non-daily PrEP users, "[a] quarter (24.0%) reported using PrEP 'on a regular schedule but not every day, with common examples including only on weekends or only on days of the week that start with T or S (i.e., Tuesdays, Thursdays, Saturdays, and Sundays)."  *Id.* at Abstract (Results).  Taking PrEP on a regular schedule on days of the week that start with T or S would amount to 4 pills per week, a pharmaceutically effective dose for MSM or transgender women, who comprised more than 90% of the study population.

79.     In further reply to the statements in the Flexner Rebuttal Report ¶¶168, 172-173, 343, and 346-347, I note that evidence of physicians and patients following the instructions in the Truvada Insert to adhere to a pharmaceutically effective dosing schedule of Truvada for PrEP includes the following article:  Starbuck et al., "Brief report: transgender women and preexposure prophylaxis care: high preexposure prophylaxis adherence in a real-world health care setting in

37

New York City," Journal of Acquired Immune Deficiency Syndromes, 90(1):15-19 (2022).  In this study, 100 transgender women and trans feminine individuals (TGW/TFI) were enrolled at a community-based health center in New York City during routine PrEP visits from November 2018 to May 2020, with study data collected through online surveys at enrollment (T1) and approximately 3 months (T2) and 6 months (T3) thereafter.  *Id.* at Methods.  "Between 78% and 82% reported taking PrEP 'always/almost always' as prescribed at each time point, and between 80% and 82% reported missing 3 or fewer pills (90% or greater adherence) in the past 30 days." *Id.* at Results.  Only 7-16% of respondents missed 7 or more pills (<80% adherence) in the past 30 days at any time point, with <60% adherence indicating fewer than 4 pills per week.  *Id.* at Table 1.  The investigators also tested urine TFV concentrations at T2 and T3, reporting that "the results display a high degree of concordance between self-report and urine TFV detection level."  *Id.* at Results.  "Our data highlight TGW/TFI's capacity to adhere to daily PrEP and sustain PrEP use over time."  *Id.* at Discussion.  Because self-reported adherence was high across multiple time points and corroborated by drug levels in urine, Starbuck 2022 is further evidence of physicians and patients following the instructions in the Truvada Insert to adhere to a pharmaceutically effective dosing schedule of Truvada for PrEP.

C.      **Reply to statements in the Flexner Rebuttal Report regarding actual and potential exposure to a human immunodeficiency retrovirus**

80.      The "wherein" clause from claim 1 of the '509, '333, '191, and '423 patents recite "wherein the combination is administered prior to an [the] exposure of the primate host to the immunodeficiency retrovirus."  As discussed above, I understand that the Court has construed the term "prior to an [the] exposure" recited by claim 1 of the '509, '333, and '423 patents to require an exposure, which means "contact between an immunodeficiency retrovirus and a host."  *See* D.I. 186 at 2, 11-12.

81.     The "wherein" clause from claims 13 of the '509, '333, and '191 patents, and claim 12 of the '423 patent, recites "wherein the combination is administered prior to [a] potential exposure of the human to the human immunodeficiency retrovirus."[7]   As discussed above, I understand that the Court has construed the term "prior to a potential exposure" from claim 13 of the '509, '333, and '191 patents, and the "prior to potential exposure" from claim 12 of the '423 patent, to mean "prior to engaging in activity that could result in an exposure."  *See* D.I. 186 at 2, 11-13.   I understand that the Court explained that a potential exposure "can occur when, for example, it is unknown whether a bodily fluid that the host had contact with is indeed a source of HIV."  *Id*. at 13.

82.     First, I will reply to statements and opinions in the Flexner Rebuttal Report regarding the claims that recite "prior to a potential exposure."  Second, I will reply to statements and opinions in the Flexner Rebuttal Report regarding the claims that recite "prior to an [the] exposure."

### 1.     Reply to statements in the Flexner Rebuttal Report regarding *potential* exposure to a human immunodeficiency retrovirus

83.     I understand that the Government's expert witness, Dr. Murphy, previously explained that the Truvada Insert instructs physicians and patients that Truvada for PrEP is only to be prescribed to patients who are at-risk for acquiring HIV because they engage in activities that are at-risk for HIV exposure (such as patients who have condomless sex, have past or current STIs, have sexual partners of unknown HIV status, engage in sexual activity in a high prevalence area or network, etc.).  *See* Murphy Opening Report ¶¶95-100.

---

[7] The quoted language appears in claim 13 of the '333 and '191 patents, and in claim 12 of the '423 patent.   However, claim 13 of the '509 patent recites "wherein the combination is administered prior to a potential exposure of the <u>primate host</u> to the human immunodeficiency retrovirus."   I understand that the "primate host" recited in claim 13 refers to the "human" recited in claim 12 of the '509 patent.

RESTRICTED INFORMATION

84.     Flexner Rebuttal Report ¶211 states that "statements in versions of the Truvada®
Insert regarding the scope of the Truvada for PrEP indication do not establish any actual
occurrence of direct infringement by any patient or any physician."  *See also* Flexner Rebuttal
Report ¶221 (containing similar a statement regarding the Medication Guide portion of the
Truvada Insert).  In reply to these statements in the Flexner Rebuttal Report, I note that substantial
evidence exists that physicians and patients follow the instructions in the Truvada Insert that
Truvada for PrEP is only to be prescribed to patients at risk for HIV exposure, including Gilead's
REMS survey results.  Gilead's REMS surveys provide evidence of engagement in at-risk
activities among patients using Truvada for PrEP.  The data from Gilead's REMS 3-5 survey
periods show that 65.5-100% of Truvada for PrEP patients did not use a condom the last time they
had sex, and 81.3-100% had unprotected sex within the last 3 months:

| Did you use a condom the last time you had sex? | | |
|---|---|---|
| Yes (%) | 34.2 | GILDDE00251842 (REMS 3) |
| | 29.6 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| No (%) | 65.5 | GILDDE00251842 (REMS 3) |
| | 69.6 | GILDDE00263368 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.8 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| **Have you had unprotected sex within the last 3 months?** | | |
| Yes (%) | 81.3 | GILDDE00251842 (REMS 3) |
| | 85.6 | GILDDE00263369 (REMS 4) |
| | 100.0 | GILDDE00270759 (REMS 5) |
| No (%) | 18.3 | GILDDE00251842 (REMS 3) |
| | 14.4 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| I don't know (%) | 0.4 | GILDDE00251842 (REMS 3) |
| | 0.0 | GILDDE00263369 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |
| **Do you know the HIV status of your sexual partner?** | | |
| Yes, I know the HIV status of my sexual partner(s). (%) | 43.5 | GILDDE00251841 (REMS 3) |
| | 40.0 | GILDDE00263368 (REMS 4) |
| | 60.0 | GILDDE00270759 (REMS 5) |

| I know the HIV status of some of my sexual partners. (%) | 49.6 | GILDDE00251841 (REMS 3) |
| | 52.0 | GILDDE00263368 (REMS 4) |
| | 40.0 | GILDDE00270759 (REMS 5) |
| No, I don't know the HIV status of my sexual partner(s). | 6.8 | GILDDE00251841 (REMS 3) |
| | 8.0 | GILDDE00263368 (REMS 4) |
| | 0.0 | GILDDE00270759 (REMS 5) |

Between 40-60% of PrEP patients either knew the HIV status of only some of their sexual partners or did not know the HIV status of their sexual partners. Each of these behaviors places patients using Truvada for PrEP at risk for HIV exposure.

85.     In further reply to the statements in the Flexner Rebuttal Report ¶¶211 and ¶221, I note that additional evidence exists that physicians and patients follow the instructions in the Truvada Insert that Truvada for PrEP is only to be prescribed to patients at risk for HIV exposure. In Marcus 2016, of 972 individuals who initiated PrEP. the cumulative incidence was 42% for any STI and 27% for any rectal STI after 12 months of PrEP use. *Id.* at Results: STI Testing and Infections. Notably, rectal STIs are almost exclusively contracted through condomless receptive anal sex, the sexual activity that confers the highest risk of HIV acquisition. Of the 972 PrEP users, "173 had multiple STIs (range 2-19), for a total of 771 STIs diagnosed (90.7 per 100 person-years)." *Id.* "STIs were common at baseline and throughout follow-up, as observed in previous PrEP studies, indicating an ongoing risk for HIV acquisition and highlighting the importance of STI education among individuals initiating PrEP." *Id.* at page 7 (Discussion section). Because the study indicated that PrEP users had ongoing potential exposure to HIV, as indicated by frequent and repeated STIs (including rectal STIs), the Marcus 2016 study provides evidence that PrEP users are potentially exposed to HIV while taking Truvada for PrEP.

86.     In further reply to the statements in the Flexner Rebuttal Report ¶¶211 and ¶221, I note that additional evidence exists that physicians and patients follow the instructions in the Truvada Insert that Truvada for PrEP is only to be prescribed to patients at risk for HIV exposure,

41

including the following article that my colleagues and I published: Marcus et al., "HIV preexposure prophylaxis and sexual satisfaction among men who have sex with men," Sexually Transmitted Diseases, 48:e135-e137 (2021) ("Marcus 2021"). In this article, we described "a survey to assess experiences with PrEP" that was distributed in May 2019 on geosocial networking apps commonly used by MSM. *Id.* at page 2. "Of 9,697 respondents, 7,639 reported at least one sex partner in the last six months and were included in the analyses." *Id.* at page 3. "In the past six months, more PrEP users than non-users had been diagnosed with an STI (24.7% vs. 8.4%, $P<0.001$) and fewer reported always using condoms (7.1 % vs. 20.4%, $P<0.001$)." *Id.* at page 3. "PrEP users reported more sex partners than non-users in the past six months (mean 14.2 vs. 6.2, $P<0.001$)." *Id.* at page 3. Because PrEP users reported an average of 14.2 sexual partners in the past six months, and 92.9% reported that they did not always use condoms during that period, the Marcus 2021 study provides evidence that patients were potentially exposed to HIV while taking Truvada for PrEP.

87.     In further reply to the statements in the Flexner Rebuttal Report ¶¶211 and ¶221, I note that additional evidence exists that physicians and patients follow the instructions in the Truvada Insert that Truvada for PrEP is only to be prescribed to patients at risk for acquiring HIV, including the following article: Whitfield et al., "Rates of pre-exposure prophylaxis use and discontinuation among a large US national sample of sexual minority men and adolescents," Archives of Sexual Behavior, 49:103-112 (2020). In this study, data were drawn "from a brief online screening survey used to recruit participants for several studies examining the biopsychosocial predictors of HIV seroconversion" among adult and adolescent sexual minority men. *Id.* at page 3. "In total, 116,692 individuals began the survey and 107,794 (75.4%) completed," and 96,243 participants met the eligibility requirements for analyses. *Id.* at page 3.

The study included 15,922 people using PrEP during 2017 and 2018.  *Id.* at page 13 (Table 1).  Of the 15,992 current PrEP users, 13,509 (85%) had condomless anal sex with a partner of unknown HIV status in the past 6 months.  *Id.* at page 14 (Table 1).  Compared with men who had never used PrEP or who were former PrEP users, current PrEP users had higher odds of having recently engaged in condomless anal sex with a partner of unknown HIV status, as well as higher odds of having a recent STI diagnosis.  *Id.*  Because 85% of PrEP users reported that they recently had condomless anal sex with a partner of unknown HIV status, the Whitfield 2020 study provides evidence that patients were potentially exposed to HIV while taking Truvada for PrEP.

88.    Flexner Rebuttal Report ¶213 states that where a patient follows the "comprehensive prevention strategy" and safer sex practices recommended by the Truvada Insert, the patient "does not experience a 'potential exposure.'"  *See also* Flexner Rebuttal Report ¶¶217-219, 223-226 (containing similar statements).  For example, the Flexner Rebuttal Report ¶217 quotes the portion of the Truvada Insert recommending physicians to "'[c]ounsel individuals on the use of other prevention measures (e.g., consistent and correct condom use, knowledge of partners' HIV-1 status, including viral suppression status, regular testing for STIs that can facilitate HIV-1 transmission)' and to 'inform uninfected individuals about and support their efforts in reducing sexual risk behavior.'"  I note that the recommendation of prevention measures begins with an "e.g.," which suggests that a physician and patient can comply with the recommendation by selecting any one of the listed prevention measures (or even an unlisted prevention measure).  The last exemplary prevention measure is "regular testing for STIs that can facilitate HIV-1 transmission," a strategy that does not prevent potential exposure to HIV.  *Id.*

89.    Flexner Rebuttal Report ¶227 states that there are four "ways that persons of ordinary skill in the art understand patients could, and in fact do, take Truvada® for HIV PrEP in

the real world without experiencing a 'potential exposure.'"  The four ways proffered by the Flexner Rebuttal Report are: (1) consistent and correct condom usage; (2) consistent confirmation that persons with whom the patient engages in sexual activity are HIV-negative; (3) an HIV-negative partner in a serodiscordant couple where the HIV-positive partner is undetectable; and (4) a patient that does not engage in activity that could possibly result in exposure to HIV.  *See* Flexner Rebuttal Report ¶265.  I reply to each of the four ways below.  I then discuss regular testing for STIs that can facilitate HIV transmission, the exemplary prevention strategy listed in the Truvada Insert that is notably not discussed in the Flexner Rebuttal Report.

90.    Way Number 1:  Flexner Rebuttal Report ¶228 asserts that there is no potential exposure when there is consistent and correct usage of condoms because the condom creates a physical barrier between sexual partners such that "[w]here a condom is used correctly during intercourse, a condom will not break and will serve as an effective barrier to contact with bodily fluids, thereby preventing a potential exposure to the immunodeficiency retrovirus."

91.    Consistent and correct condom use does not eliminate the risk of exposure to HIV. "Even if condoms are used consistently and correctly, slippage and breakage can occur."  *See* Paz-Bailey et al., "The effect of correct and consistent condom use on chlamydia and gonococcal infection among urban adolescents," Archives of Pediatrics and Adolescent Medicine, 159:536-542 (2005) at page 536.  "Studies demonstrate that slippage or breakage occurs between 1% and 4% of the time."  *Id.*  In addition, it has been reported that "[a]mong MSM reporting any anal sex with an HIV-positive male partner, we found 70% effectiveness with reported consistent condom use (compared with never use) and no significant protection when comparing sometimes use to never use."  *See* Smith et al., "Condom effectiveness for HIV prevention by consistency of use among men who have sex with men in the United States," Journal Acquired Immune Deficiency

Syndromes, 68:337-344 (2015) at page 337 ("Results" section).  To be categorized as "always" using a condom, "the subject must have reported condom use during all" of the anal sex acts with their HIV-positive partner during a 6-month interval.  *Id.* at page 339.  "This study found that inconsistent ('sometimes') condom use with HIV-positive male partners over months to years offers minimal or no protection, underscoring the importance of the inclusion of messaging by their HIV prevention providers, which supports the adoption and continuation of consistent condom use for MSM."  *Id.* at page 343.  Consistent condom use during vaginal intercourse is only modestly more effective in preventing HIV transmission than the 70% observed among MSM, with an 80% reduction in HIV risk among heterosexuals.  *See* Weller and Davis, "Condom effectiveness in reducing heterosexual HIV transmission," Cochrane Database of Systematic Reviews, (1):CD003255 (2002), at Abstract.  Because condom breakage and slippage can occur 1-4% of the time even when condoms are used consistently and correctly, and because consistent condom use is only 70-80% effective in preventing HIV transmission, there is evidence that potential exposure to HIV occurs in the context of consistent and/or correct condom use.

92.    Flexner Rebuttal Report ¶229 cites Gilead's survey of PrEP users from October 24, 2017 through November 8, 2017 that "32% of new users of Truvada® for PrEP reported using condoms 76-100% of the time, while 18% of 'longer-term users' of Truvada® for PrEP reported using condoms 76-100% of the time."  The Flexner Rebuttal Report states that these data provide evidence that "consistent and correct condom usage" is "a common behavioral intervention practiced by patients taking Truvada for PrEP."  However, these data indicate that most PrEP users do not consistently use condoms, with at least 68% of new users not consistently using condoms and at least 82% of "longer-term" PrEP users not consistently using condoms.

RESTRICTED INFORMATION

93.     Way Numbers 2 and 3:  Flexner Rebuttal Report ¶243 way number 2 relies on the "Grov" article to assert that "where a patient taking Truvada® for PrEP is always aware of the HIV status of her sexual partners, and is aware that they are negative for HIV at the time of sexual intercourse, such a patient would not experience a potential exposure to HIV."  (citing Grov et al., "Prevalence of and factors associated with the use of HIV serosorting and other biomedical prevention strategies among men who have sex with men in a US nationwide survey," AIDS and Behavior 22:2743-55 (2018) [GILDDE02689957-69]).  Flexner Rebuttal Report ¶249 way number 3 asserts that there is no potential HIV exposure "where a patient is the HIV-negative partner in a serodiscordant couple (i.e., one HIV-negative partner and one HIV-positive partner) and the HIV positive partner has an undetectable viral load based on the ongoing administration of an HIV treatment regimen. … [t]his concept is sometimes referred to as undetectable equals untransmittable or uninfectious ('U=U')."

94.     Serosorting, defined by Grov as "a person choosing partners of the same HIV serostatus, including to engage in sex without condoms," may reduce but does not eliminate potential exposure to HIV.  Indeed, there is some evidence that serosorting may actually increase the risk of HIV acquisition:

> Some research has suggested that serosorting is not as effective at reducing HIV transmission as condom use, and some evidence suggests that serosorting may actually increase HIV acquisition. This may be due to low HIV testing rates/frequency, yet partners still report they are HIV-negative.

Grov at page 2752.

95.     Likewise, selecting only HIV-positive partners who report being virally suppressed may reduce but does not eliminate potential exposure.  In 2020, Stephenson et al. published a report entitled "Accuracy in self-report of viral suppression among HIV-positive men with HIV-

negative male partners" in the Journal of Acquired Immune Deficiency Syndromes, 83:210-214 (2020). In this study, the investigators compared self-reported viral load with biomarker-confirmed viral load to assess the accuracy of self-reported viral suppression among 120 men living with HIV who had HIV-negative partners. The report found the following results:

> In terms of accuracy of reporting of viral suppression, 72.5% of men accurately reported their viral suppression status: this was comprised of 62.5% of men (n=75) who accurately reported that they were virally suppressed (e.g. both self-report and biomarker) and 10% of men (n=12) reported they were not virally suppressed and had a detectable viral load. In contrast, 27.5% (n=33) of men inaccurately reported their viral suppression status. ***In total, 20% (n=24) of men reported that they were virally suppressed and did not have a biomarker confirmed measure***, and 7.5% (n=9) of men reported that they were not virally suppressed but did have a biomarker of viral suppression.

*Id.* at page 5 (emphasis added). Thus, twenty percent (20%) of men who were living with HIV and had HIV-negative partners reported that they were virally suppressed but had a detectable viral load upon testing. *Id.* The report concluded that "[t]hese results highlight the need to provide interventions to MSM living with HIV to support access to care and ensure current knowledge of viral load, and to continue to support primary prevention of HIV through condom use and pre-exposure prophylaxis (PrEP)." *Id.* at page 2. Based on potential inaccuracies in perceived HIV status and viral load suppression, I disagree with the assertions in the Flexner Rebuttal Report that sexual intercourse between a PrEP user and either 1) a partner who reports being HIV-negative or 2) an HIV-positive partner who reports viral load suppression would pose no risk of potential HIV exposure to the PrEP user.

96.     Way Number 4: Flexner Rebuttal Report ¶260 asserts that "patients taking Truvada® for PrEP who do not engage in any sexual intercourse, do not share needles or other

injection drug equipment, and otherwise engage in no behavior that could result in a potential exposure to HIV do not practice the 'wherein' clause of claim 13 of the '509 Patent, claim 13 of the '333 Patent, claim 13 of the '191 Patent, and claim 12 of the '423 Patent." Truvada for PrEP is only indicated for patients who are at risk for acquiring HIV. A patient who will not engage in any sexual intercourse, share needles or other injection drug equipment, or otherwise engage in behavior that could result in a potential exposure would not meet the criterion described in the Truvada Insert for receiving Truvada for PrEP. The Flexner Rebuttal Report ¶261 notes that CDC Clinical Guidelines recommend that "patients who request PrEP should be offered it, even when no specific risk behaviors are elicited." However, contrary to the assertions in the Flexner Rebuttal Report, this recommendation by CDC does not mean that PrEP is being prescribed to patients with no potential exposure to HIV. CDC Clinical Guidelines recognize that patients requesting PrEP may be uncomfortable reporting sexual or injection behaviors to their prescriber. *See* GILDDE02689769-876 at GILDDE02689790 ("Patients may request PrEP because of concern about acquiring HIV but not feel comfortable reporting sexual or injection behaviors to avoid anticipated stigmatizing responses in health care settings. For this reason, after attempts to assess patient sexual and injection behaviors, patients who request PrEP should be offered it, even when no specific risk behaviors are elicited."). In addition, where a patient reports no past potential exposure events but expects to engage in such activities in the future, the patient has presented an ideal situation for prescribing the preventative Truvada for PrEP regimen – i.e., before the potential exposure has occurred.

97.     In addition to the prevention measures noted above that may reduce but do not eliminate potential exposure, the Truvada Insert includes "regular testing for STIs that can facilitate HIV-1 transmission" as an exemplary prevention measure. Flexner Rebuttal Report ¶217

quotes the portion of the Truvada Insert recommending physicians to "'[c]ounsel individuals on the use of other prevention measures (e.g., consistent and correct condom use, knowledge of partners' HIV-1 status, including viral suppression status, regular testing for STIs that can facilitate HIV-1 transmission).'"  However, while the Flexner Rebuttal Report discusses condom use and knowledge of partners' HIV status, including viral suppression status, the Flexner Rebuttal Report does not discuss regular testing for STIs.  I address this prevention measure below.

98.     There is substantial evidence that regular testing for STIs that facilitate HIV transmission is a commonly used prevention strategy among PrEP users, one that may reduce but does not eliminate potential exposure to HIV.  The 2021 update of the CDC Clinical Guidelines recommends bacterial STI screening every 3-6 months during PrEP use, including testing for syphilis and for rectal, pharyngeal, and urethral gonorrhea and chlamydia "even if asymptomatic." *See* GILDDE02689769-876 at GILDDE02689812; *see also* GILDDE02689633-709 at GILDDE02689680 (2017 Update).

99.     The Truvada Insert recommends regular testing specifically for STIs "that facilitate HIV transmission."  There is evidence that chlamydia, gonorrhea, and syphilis infection are associated with increased risk of HIV transmission.  For example, my colleagues and I published this study: Bernstein, Marcus et al., "Rectal gonorrhea and chlamydia reinfection is associated with increased risk of HIV seroconversion," Journal of Acquired Immune Deficiency Syndromes, 53(4):537-43 (2010) ("Marcus and Bernstein").  In this study, we examined the relationship between prior STIs and HIV seroconversion in a retrospective cohort of HIV-negative MSM who had been diagnosed with rectal gonorrhea (GC) or chlamydia (CT).  *Id.* at Methods.  We observed 1,198 person-years among a total of 541 MSM, of whom 27 (5%) became infected with HIV.  *Id.* at Results.  "In multivariate analysis, an early syphilis diagnosis in the past 2 years (hazard ratio =

4.04, 95% CI: 1.19 to 13.79) and 2 prior CT or GC rectal infections in the past 2 years (hazard ratio = 8.85, 95% CI: 2.57 to 30.40) were associated with incident HIV." *Id.* at Abstract. Because we found that having 2 prior rectal STIs was associated with an 8-fold increased risk of HIV infection, and a prior syphilis diagnosis with a 4-fold risk of HIV infection, Marcus and Bernstein is evidence that the STIs for which PrEP users are regularly tested can facilitate risk of HIV transmission, consistent with the recommended prevention strategy in the Truvada Insert.

100.    There is substantial evidence that regular testing for STIs that facilitate HIV transmission is a commonly used prevention strategy among PrEP users, consistent with both the Truvada Insert and CDC Clinical Guidelines. For example, in the Marcus 2016 study, we found that PrEP users were getting tested approximately every 3 months for STIs. "The median number of STI tests per person-year was 4.5 (IQR 2.6–6.4) for urethral gonorrhea/chlamydia, 3.6 (IQR 0–6.0) for rectal gonorrhea/chlamydia, 3.8 (IQR 0–6.0) for pharyngeal gonorrhea/chlamydia, and 4.9 (IQR 2.8–6.4) for syphilis." *Id.* at Results: STI Testing and Infections. "Of the 972 PrEP users, 342 were diagnosed with ≥1 STI during follow-up; of those, 173 had multiple STIs (range 2–19), for a total of 771 STIs diagnosed (90.7 per 100 person-years). The mean days between repeat STIs was 123, with 80.0% of repeat infections occurring <180 days apart." *Id.* Because PrEP users were being tested frequently for STIs, with the median number of STI tests per year of PrEP use ranging from 3.6 to 4.9, Marcus 2016 provides evidence that regular STI testing is a commonly used prevention strategy among PrEP users, one that may reduce but does not eliminate potential exposure to HIV.

101.    There is additional evidence that regular testing for STIs is a commonly used prevention strategy among PrEP users, including the following study: Mayer et al., "Sociodemographic and clinical factors associated with increasing bacterial sexually transmitted

infection diagnoses in men who have sex with men accessing care at a Boston community health center," Open Forum Infectious Diseases, 4(4):ofx214 (2017).  In this study, "an open cohort of MSM accessing medical care at a Boston community health center was used to assess secular trends" in STI diagnoses.  *Id.* at Abstract.  There were 1,631 PrEP users included in the study.  *Id.* at Results.  Compared with HIV-positive MSM and HIV-negative MSM who were not using PrEP, "patients accessing PrEP had a much higher total volume of screening (increasing from 247 to 322 BSTI visits per 100 person-years over 4 years)," with a BSTI visit defined as a visit in which at least one test for a bacterial STI (i.e., gonorrhea, chlamydia, or syphilis) was ordered.  *Id.*  "In 2015, 13.9% of the HIV-infected male patients and 24.8% of male HIV-uninfected patients prescribed PrEP were diagnosed with at least 1 BSTI."  *Id.*  "Individuals who accessed PrEP were most likely to be diagnosed with a new BSTI, with a diagnosis rate ratio of 2.36 compared with those who were not PrEP users, similar to several recent reports in other care centers."  *Id.* at Discussion.  Because PrEP users averaged multiple STI screening visits per year, with STIs diagnosed in approximately 1 in 4 PrEP users annually, Mayer at al. provides evidence that regular STI testing is a commonly used prevention strategy among PrEP users, one that may reduce but does not eliminate potential exposure to HIV.

102.   In addition to the previously discussed evidence that PrEP users commonly rely on regular STI testing as a prevention measure, as recommended in the Truvada Insert and CDC Clinical Guidelines, the high rate of STIs among PrEP users is itself evidence that PrEP users are being regularly tested for STIs.  Frequent STIs that are primarily asymptomatic, such as rectal STIs, are particularly strong evidence that PrEP users are accessing regular STI screening because asymptomatic STIs would not otherwise be detected.  In a study conducted among MSM in San Francisco, Kent et al. found that "approximately 85% of rectal infections were asymptomatic

supporting the need for routine screening." *See* Kent et al., "Prevalence of rectal, urethral, and pharyngeal chlamydia and gonorrhea detected in 2 clinical settings among men who have sex with men: San Francisco, California, 2003," Clinical Infectious Diseases, 41(1):67-74 (2005), at Abstract.  There is ample evidence in the literature of high rates of STIs, including rectal STIs, among PrEP users in various clinical settings.  I have highlighted several of these studies in ¶85 (Marcus 2016), ¶86 (Marcus 2021), ¶87 (Whitfield 2020), and ¶101 (Mayer 2017).

## 2. Reply to statements in the Flexner Rebuttal Report regarding *actual* exposure to a human immunodeficiency retrovirus

103.    Flexner Rebuttal Report ¶352 states that implementation of the safer sex practices in the Truvada Insert results in a patient that does not "experience an 'exposure.'" *See also* Flexner Rebuttal Report ¶¶354, 364-367 (referencing the "comprehensive prevention strategy" portions of the Truvada Insert and safer sex practices portion of the Medication Guide).  As discussed above, implementation of the safer sex practices and prevention strategies described in the Truvada Insert may reduce but not eliminate the risk of HIV exposure.

104.    Flexner Rebuttal Report ¶353 states that "statements in various versions of the Truvada® Insert does not establish the actual occurrence of any physician conducting this step of claim 1." *See also* Flexner Rebuttal Report ¶362 (providing similar statements).  PrEP users are at risk of HIV acquisition because they repeatedly engage in activities that could result in HIV exposure.  Evidence that PrEP patients repeatedly engage in activities that could result in HIV exposure include the following article:  Parsons et al., "HIV/STI counseling and testing services received by gay and bisexual men using pre-exposure prophylaxis (PrEP) at their last PrEP care visit," Sexually Transmitted Diseases, 45:798-802 (2018).  In this study, "PrEP-using GBM [gay and bisexual men] in New York City (n=104) were asked about their last PrEP care visit." *Id.* at Abstract (Methods).  "On average, GBM had 4.5 CAS [condomless anal sex] events in the past 30

days." *Id.* at page 4.  Because PrEP users reported, on average, more than one condomless anal sex event per week, the Parsons 2018 study provides evidence that PrEP users repeatedly engage in activities that could result in exposure to HIV while taking Truvada for PrEP.  As another example, Marcus 2021 reported that PrEP users had a mean of 14.2 sex partners in the past six months (Marcus 2021 at page 3) and only 7.1% reported always using a condom during that period. *Id.* at page 3.  Because 92.9% of the PrEP users reported that they did not always use condoms, and because PrEP users reported a mean of 14.2 sex partners in the past six months, the Marcus 2021 study provides evidence that PrEP users repeatedly engage in activities that could result in exposure to HIV while taking Truvada for PrEP.

105.    The vast majority of PrEP users in the U.S. are MSM, a population with a disproportionately high burden of HIV.  In 2020, MSM accounted for 71% of the 30,692 new HIV diagnoses in the U.S., and a total of 604,590 MSM were living with HIV infection attributable to male-male sexual contact.  *See* Centers for Disease Control and Prevention. HIV Surveillance Report, 2020; vol. 33, pages 23, 26.  The estimated lifetime risk of an HIV diagnosis among MSM is one in six.  *See* Hess et al., "Lifetime risk of a diagnosis of HIV infection in the United States," Annals of Epidemiology, 27(4):238-43 (2017), at Abstract.  In a study that synthesized HIV surveillance data with estimates of the number of MSM in the U.S., Rosenberg et al. estimated that 15% of MSM were living with HIV in 2012.  *See* Rosenberg et al., "Rates of prevalent HIV infection, prevalent diagnoses, and new diagnoses among men who have sex with men in US states, metropolitan statistical areas, and counties, 2012-2013," JMIR Public Health and Surveillance, 2(1):e22 (2016).  Because more than 1 in 6 MSM is living with HIV, and more than 21,000 are diagnosed with HIV annually, there is a high likelihood that PrEP users who repeatedly engage in activities that could result in exposure will eventually come into contact with HIV.

106.    There is further evidence that PrEP users experience actual exposures to HIV, including the following article: Goodreau et al., "A behavioral cascade of HIV seroadaptation among US men who have sex with men in the era of PrEP and U = U," AIDS and Behavior, 25(12):3933-43 (2021).  This article reported on data from 4,512 respondents in the ARTnet study, "a web-based sexual network survey of United States MSM conducted in conjunction with the American Men's Internet Survey in 2017 and 2018."  *Id.* at Methods.  The study reported that "HIV-negative respondents on PrEP had higher proportions of relationships with any CLAI [condomless anal intercourse] than did HIV-negative respondents not on PrEP, for all partner serostatuses."  *Id.* at Results ("Step 4: act type and condom use").  "We found that men on PrEP were just as likely to have CLAI with their partners diagnosed with HIV (83.2%) as were respondents who themselves were diagnosed with HIV (83.6%)."  *Id.* at Figure 4 and Discussion. Because 83% of PrEP users reported that they had condomless anal sex with an HIV-positive partner in the past year, the Goodreau 2021 study provides evidence that PrEP users are actually exposed to HIV while taking Truvada for PrEP.

107.    In addition to the previously discussed evidence that PrEP users come into contact with HIV, the documented seroconversions among people who recently discontinued PrEP suggest that actual exposures to HIV were occurring during active PrEP use.  In Marcus 2016, we found that none of the 972 PrEP users acquired HIV during 850 person-years of ongoing PrEP use, but two seroconversions occurred 6-7 months after patients had discontinued PrEP because of loss of insurance coverage.  *Id* at Results: HIV Seroconversions.  In Hojilla and Marcus, we evaluated HIV incidence at each step of the PrEP continuum of care among 13,861 members of Kaiser Permanente Northern California who were linked to PrEP care from July 2012 through March 2019.  We found that HIV incidence was highest among individuals who had recently discontinued

PrEP, at 1.28 infections per 100 person-years.  *Id.* at Table 3.  In a study of 986 individuals initiating PrEP across primary care clinics in San Francisco, 8 HIV infections were identified, of which 7 occurred after PrEP was discontinued.  *See* Spinelli et al., "Missed opportunities to prevent HIV infections among pre-exposure prophylaxis users: a population-based mixed methods study, San Francisco, United States," Journal of the International AIDS Society, 23(4):e25472 (2020). "Among nearly 1000 PrEP users in a United States-based Department of Public Health municipal primary care delivery system, HIV incidence was nearly eight-fold higher after stopping PrEP than during periods when individuals were taking PrEP.."  *Id.* at Discussion.  "Actual and perceived costs, and difficulty maintaining active insurance coverage, were major barriers in this population to ongoing PrEP use."  *Id.*  Because HIV incidence is high after PrEP discontinuation, these studies suggest that actual exposures to HIV were occurring during active PrEP use.

### D. Reply to statements in the Flexner Rebuttal Report regarding protection of the human from an immunodeficiency virus self-replication infection

108.    The "wherein" clause from claim 1 of the '509, '333, '191, and '423 patents recites "thereby protecting the primate host from infection with the immunodeficiency retrovirus."  As discussed above, I understand that the Court has construed the "thereby clause" from claim 1 of the '509, '333, and '423 patents to be limiting and to mean "[t]he primate host remains serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving the administration."  *See* D.I. 186 at 1, 8-9.  I understand that the Court further clarified that "to be clear, I am not saying that the claims require unnecessary testing to be done, but they do require a negative result on both tests if and when both tests are performed." *Id.* at 9.

109.    The "thereby" clause from claim 12 of the '509, '333, and '423 patents, and from claim 13 of the '191 patent, recites "thereby inhibiting the establishment of the self-replicating

infection with the immunodeficiency virus in the human." As discussed above, I understand that the Court has construed the "thereby clause" from claim 12 of the '509, '333, and '423 patents, and from claim 13 of the '191 patent, to be limiting and to mean "[t]he human remains negative for the immunodeficiency virus while receiving the administration." *See* D.I. 186 at 2, 9-10. I understand that the Court clarified that "whether a host remains negative is based on both a serological and PCR assay if both are performed." *Id*. at 10.

110. As discussed above, I understand that the Court has construed the preambles in a similar manner as the "thereby" clauses.

111. I understand that the Government's expert witness, Dr. Murphy, previously explained that the Truvada Insert instructs physicians and patients to verify that the patient remains HIV-negative "periodically" and "at least every 3 months." *See* Murphy Opening Report ¶¶88-94, 152-159.

112. Flexner Rebuttal Report ¶176 and ¶410 state that "statements in the Truvada® Insert relating to periodic patient HIV-status testing do not establish the existence of any actual infringement by patients taking Truvada® for PrEP (or by physicians), because the existence of such instructions do not provide evidence as to the population of patients taking Truvada® for PrEP that are, in practice, regularly tested." *See also* Flexner Rebuttal Report ¶¶131-133, 136, 177-179, 181, 184-185, 309-311, 314, 411-413, 416, 419-420 (containing similar statements). Flexner Rebuttal Report ¶¶180 and 415 assert that Gilead's REMS survey results "do not establish the actual occurrence of any direct infringement by any patient or any physician." *See also* Flexner Rebuttal Report ¶¶137-138, 186-188, 315-317, 421-423 (containing similar statements).

113. In reply to these statements in the Flexner Rebuttal Report, I note that substantial evidence exists that physicians and patients follow the instructions in the Truvada Insert that

patients should be periodically tested and confirmed to be HIV-negative, including Gilead's REMS

surveys.  The data from Gilead's REMS 3-5 survey periods showed that over 95% of Truvada for

PrEP prescribers tested their patients for HIV "more than every 3 months" or "every 3 months" as

shown in the below table:

| How often do you generally test the HIV-1 status of you patients for whom you prescribe TRUVADA for a PrEP indication? (Select one) | | |
|---|---|---|
| More than every 3 months (%) | *4.6*[8] | GILDDE00251556 (REMS 3) |
| | *2.6* | GILDDE00263125 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |
| Every 3 months (%) | *92.0* | GILDDE00251556 (REMS 3) |
| | *94.0* | GILDDE00263125 (REMS 4) |
| | 100.0 | GILDDE00270587 (REMS 5) |
| Less than every 3 months (%) | *3.4* | GILDDE00251556 (REMS 3) |
| | *3.6* | GILDDE00263126 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |
| I have not prescribed TRUVADA for a PrEP indication (%) | 9.4 | GILDDE00251556 (REMS 3) |
| | 0.8 | GILDDE00263126 (REMS 4) |
| | 0.0 | GILDDE00270587 (REMS 5) |

Also, the data from Gilead's REMS 3-5 survey period show that over 98% of UIs taking Truvada

for PrEP understood that they should be tested every 3 months, and 81.8-100% of PrEP users were

actually tested either "once a month" or "every 3 months":

| Key Risk Message Target Statement | Number of Correct Responses (%) (95% CI) | Cite for REMS 1-5 |
|---|---|---|
| When should you be tested for HIV while taking Truvada?  At least every 3 months while taking Truvada. | 98.2 (95.9, 99.4) | GILDDE00251524 (REMS 3) |
| | 99.2 (95.9, 100.0) | GILDDE00263092 (REMS 4) |
| | 100.0 (47.8, 100.0) | GILDDE00270553 (REMS 5) |
| Since starting taking TRUVADA, how often have you been tested for HIV? | | |
| Once a month (%) | 6.4 | GILDDE00251840 (REMS 3) |
| | 4.5 | GILDDE00263367 (REMS 4) |
| | 20.0 | GILDDE00270758 (REMS 5) |
| Every 3 months (%) | 75.4 | GILDDE00251840 (REMS 3) |
| | 77.3 | GILDDE00263367 (REMS 4) |

---

[8] In this table, the italicized numbers were adjusted to account for the nine respondents in REMS 3 and one respondent in REMS 4 who answered "I have not prescribed TRUVADA for a PrEP indication" by removing these respondents from the denominator.  *See* GILDDE00251496-2071 at GILDDE00251556 (REMS 3); GILDDE00263067-700 at GILDDE00263125 (REMS 4).

RESTRICTED INFORMATION

|  | 80.0 | GILDDE00270758 (REMS 5) |
|---|---|---|
| Every 6 months (%) | 3.2 | GILDDE00251840 (REMS 3) |
|  | 7.6 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| Once a year (%) | 1.8 | GILDDE00251840 (REMS 3) |
|  | 2.3 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| Never | 12.8 | GILDDE00251840 (REMS 3) |
|  | 7.6 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |
| I don't know | 0.0 | GILDDE00251840 (REMS 3) |
|  | 0.8 | GILDDE00263367 (REMS 4) |
|  | 0.0 | GILDDE00270758 (REMS 5) |

In addition, the number of UIs who reported being tested at least every six months provides further evidence of actual patients taking Truvada for PrEP who were periodically tested for HIV. As discussed above in this report, Truvada for PrEP is contraindicated for patients with HIV because Truvada alone does not constitute a complete regimen for HIV-1 treatment. As a result, a patient who continued taking Truvada for PrEP after their periodic testing necessarily tested negative for HIV. It is extremely rare for a patient who follows the Truvada Insert instructions for taking Truvada for PrEP to test positive for HIV. *See* D.I. 1-3, Exhibit 19 at 9 ("Only three cases of seroconversion have been confirmed to date worldwide, while HIV-negative individuals were on PrEP with verified adherence."). *See* also Hojilla and Marcus, in which we found zero HIV seroconversions among 10,851 individuals who used PrEP for a total of 9,139 person-years, as discussed in ¶77.

114. Flexner Rebuttal Report ¶138 and ¶187 state that there is no "evidence that any persons surveyed as having been tested for their HIV status within the past 3 months were also those that had experienced a potential exposure to HIV-1." *See also* Flexner Rebuttal Report ¶¶316, 422 (making the same statement with respect to actual exposure to HIV-1). As explained above in this report for the "wherein" clause, Gilead's REMS survey results from periods 3-5 show

RESTRICTED INFORMATION

that 65.5-100% of PrEP users did not use a condom the last time they had sex, 81.3-100% had unprotected sex within the last 3 months, and 40-60% either only knew the HIV status of some of their sexual partners or did not know the HIV status of their sexual partners.  As also discussed above in this report, PrEP users engaging in these types of behaviors experience potential and actual exposures to HIV.  I note that the same PrEP users from Gilead's REMS surveys who answered questions confirming their engagement in behaviors that could result in HIV exposure also answered questions confirming they were periodically tested for HIV.[9]  Therefore, Gilead's REMS survey data provide evidence that Truvada for PrEP patients experienced potential or actual exposures to HIV such that the periodic testing reported by these same patients would have occurred after the patients had been potentially or actually exposed.

115.    In further reply to the statements in the Flexner Rebuttal Report ¶¶131-133, 136-138, 176-179, 181, 184-188, 309-311, 314-317, 410-413, 416, 419-423 mentioned above, I note that additional evidence exists that physicians and patients follow the instructions in the Truvada Insert that patients should be periodically tested and confirmed to be HIV-negative.  For example, in Marcus 2016, we studied 972 individuals who initiated PrEP, and there were "915 individuals with >1 [prescription] fill."  Marcus 2016 at page 5.  For the study participants, HIV testing was performed at least quarterly during PrEP use.  *Id.* at page 2 (Methods section).  During follow-up, HIV testing was conducted primarily by serological antibody tests, with PCR tests used in addition and occasionally alone, and these tests were verified to be negative at all time points during PrEP

---

[9] These are the same 74-100% of Truvada users who confirmed that they did not miss a daily dose of Truvada in the past month and of whom 100% confirmed that they took at least 4 pills per week. *See supra* Section IX.B.  Also, at least some of the Truvada users who completed the UI KAB survey would be expected to have been in the care of the same 97.7-100% prescribers who confirmed that they always tested their patients to confirm that they were HIV-negative before prescribing Truvada for PrEP.  *See supra* Section IX.A.2.

RESTRICTED INFORMATION

use.  As previously mentioned, "[t]here were no HIV seroconversions during 850 person-years of ongoing PrEP use." *Id.* at page 6 (HIV Seroconversions section).  "STIs were common at baseline and throughout follow-up, as observed in previous PrEP studies, indicating an ongoing risk for HIV acquisition and highlighting the importance of STI education among individuals initiating PrEP." *Id.* at page 7 (Discussion section).  Because all PrEP users were confirmed to be HIV-negative at least quarterly, and because STIs were common among these users (including repeat and rectal STIs), the Marcus 2016 study provides evidence that physicians and patients followed the periodic testing instructions in the Truvada Insert and that these same patients commonly experienced potential or actual exposures to HIV, such that the periodic testing would have occurred after the patients had been potentially or actually exposed.

116.    In further reply to the statements in the Flexner Rebuttal Report ¶¶131-133, 136-138, 176-179, 181, 184-188, 309-311, 314-317, 410-413, 416, 419-423 mentioned above, I note that additional evidence exists that physicians and patients follow the instructions in the Truvada Insert that patients should be periodically tested and confirmed to be HIV-negative, including the following article that my colleagues and I published:  Chandra (and Marcus) et al., "Gaps in sexually transmitted infection screening among men who have sex with men in pre-exposure prophylaxis (PrEP) care in the United States," Clinical Infectious Diseases, 73:e2261-9 (2021) ("Chandra and Marcus 2021").  In this study, "[w]e used survey data collected from the internet-based ARTnet study between 2017 and 2019 on STI screening among MSM across the United States, stratified by current, prior, and never PrEP use." *Id.* at e2261 (Abstract, Methods).  "Of 3259 HIV-negative MSM, 19% were currently using PrEP, 6% had used PrEP in the past, and 75% had never used PrEP." *Id.* at e2261 (Abstract, Results).  "98% of current PrEP users were screened for HIV in the past year compared to 80% of prior PrEP users and 65% of never PrEP

users." *Id.* at e2264. "Among MSM who had ever used PrEP, 84% of current users reported attending PrEP care visits at least every 3 months compared to 71% of prior PrEP users (Table 2)." *Id.* at e2264. 96.1% of current PrEP users reported attending PrEP care visits at least every 6 months. *Id.* at e2264 (Table 2). 91.0% of MSM who had ever used PrEP were always screened for HIV at their PrEP care visits, and 92.5% of current PrEP users were always screened for HIV at their PrEP care visits. *Id.* Because 92.5% of current PrEP users reported that they were always screened for HIV at their PrEP care visits, and because 84% attended PrEP care visits at least every 3 months and 96% at least every 6 months, and because these patients were necessarily testing HIV-negative given that they remained on PrEP, this study provides evidence that physicians and patients followed the periodic testing instructions in the Truvada Insert.

### E. Reply to statements in the Flexner Rebuttal Report regarding potential or actual exposure *and* protection of the human from an immunodeficiency virus self-replication infection

117. Flexner Rebuttal Report ¶¶197-208 discuss the iPrEx and Partners PrEP clinical trials and state that "the maximum percentage of patients ***potentially*** exposed to HIV that are ultimately protected from infection by Truvada for PrEP is only on the order of 5.1-5.2% per year for patients taking Truvada for PrEP" (emphasis added). The Flexner Rebuttal Report states that this 5.1-5.2% calculation is based on the differential between persons who seroconverted in the FTC-TDF arm of the iPrEx trial and persons who seroconverted in the placebo arm, as follows:

> [T]he differential between persons that seroconverted in the FTC-TDF group and persons that seroconverted in the placebo group is 64 (64–0=64). Accordingly, on the basis of that assumption, the 64 persons presumed to be protected from infection in the FTC-TDF group represent 5.12% (64/1251) of the total 1,251 FTC-TDF group members.

Flexner Rebuttal Report ¶152. The Flexner Rebuttal Report repeats this same 5.1-5.2% calculation with respect to the preamble of the potential exposure claims. *See* Flexner Rebuttal Report ¶¶148-159.

118.    There are several reasons why the 5.1-5.2% calculation is irrelevant to the Asserted Claims. First, the 5.1-5.2% calculation is irrelevant based on the Court's claim construction of protection. As explained above, I understand that the Court has construed the "thereby" clause that recites "thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human" to be limiting and to mean "[t]he human remains negative for the immunodeficiency virus while receiving the administration." I understand that the Court similarly clarified that "whether a host remains negative is based on both a serological and PCR assay if both are performed."[10] Based on the Court's claim construction, the "thereby" clause is met when a patient taking Truvada for PrEP remains HIV-negative in response to a serological or PCR test (and negative in response to both a serological and PCR test if both tests are performed). Based on the Court's claim construction, protection is not determined by comparing the number of seroconversions in patients randomized to take Truvada for PrEP with the number of seroconversions in patients randomized to take a placebo.

119.    Moreover, Flexner Rebuttal Report ¶152 states that Dr. Flexner assumes complete protection by FTC-TDF among all clinical trial participants in the FTC-TDF arm and therefore assumes an absence of seroconversion among persons in the FTC-TDF arm, as follows:

> Accordingly, based on the best evidence available, and resolving all doubts in favor of the government, ***I will assume complete protection by FTC-TDF among all clinical trial participants in the FTC-TDF group and will therefore assume an***

---

[10] As discussed above, I also understand that the Court has construed the preamble of the potential exposure claims to be limiting and to mean "a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human."

> ***absence of seroconversion among persons in the FTC-TDF group***, which is an
> assumption of protection of all persons in the FTC-TDF that were potentially
> exposed.

Flexner Rebuttal Report ¶152 (emphasis added).   The Court's claim construction of the "thereby"
clause is met as soon as an assumption is made that all clinical trial participants in the FTC-TDF
arm were completely protected and did not seroconvert.   As discussed above, the Court's
construction that a patient is protected if they test negative for HIV does not require comparing the
number of seroconversions in patients randomized to take Truvada for PrEP with the number of
seroconversions in patients randomized to take a placebo.

120.    The 5.1-5.2% calculation is also irrelevant to the Asserted Claims based on the
Court's construction of potential exposure.   The 5.1-5.2% calculation is based on "the differential
between persons that seroconverted in the FTC-TDF group and persons that seroconverted in the
placebo group is 64 (64–0=64)."   Flexner Rebuttal Report ¶152.   Potential exposure to HIV is
construed by the Court as "engaging in activity that could result in an exposure," such as sexual
intercourse, and therefore does not require seroconversion.

121.    Flexner Rebuttal Report ¶152 states that "it is not possible to know the number of
persons in the FTC-TDF group of the iPrEx trial that were potentially exposed and did not
seroconvert, either because they were provided protection by FTC-TDF or because they would not
have, in any event, seroconverted."   In fact, there is clear evidence that a much higher proportion
of iPrEx participants were potentially exposed than the 5.1-5.2% calculated in the Flexner Rebuttal
Report.   My colleagues and I published the following study on sexual behavior and STIs among
iPrEx participants: Marcus et al., "No evidence of sexual risk compensation in the iPrEx trial of
daily oral HIV preexposure prophylaxis," PLoS One, 8(12):e81997 (2013) ("Marcus 2013").   In
this study, sexual practices were assessed at baseline and quarterly throughout study follow-up.

*Id.* at Methods. "Of the 2,499 participants enrolled in iPrEx, 2,408 (96.4%) completed at least one follow-up quarterly assessment and were included in analyses of trends in sexual behavior." *Id.* at Results. At quarterly visits during follow-up, participants reported having receptive anal intercourse with an average of about 3-8 partners in the past 12 weeks, with approximately 20% of those partners not wearing condoms. *Id.* at Figure 1a-1b. We assessed the proportion reporting receptive anal intercourse with no condom (ncRAI) at baseline and follow-up, finding that "1,108 participants (46.0%) reported ncRAI both at baseline and at least once during follow-up, 731 (30.4%) reported no ncRAI at baseline nor during follow-up, 331 (13.7%) reported ncRAI at baseline but not during follow-up, and 238 (9.9%) reported ncRAI at least once during follow-up but not at baseline." *Id.* at Results. These data indicate that 1,346 (56%) of the 2,408 iPrEx participants included in the analysis had condomless receptive anal intercourse during study follow-up.

122. As I have noted previously, sexual intercourse constitutes a potential exposure regardless of condom use. This is because condoms slip or break even when used consistently and correctly, and because consistent condom use is only 70-80% effective in preventing HIV transmission. The minimum proportion with potential exposure in iPrEx was 56% based on condomless receptive anal intercourse alone; this proportion would likely be much higher with the addition of data on other sexual behaviors, such as condomless insertive anal intercourse or anal intercourse with a condom. This absolute minimum estimate of 56% participants having potential exposure in the iPrEx study is nearly 11 times higher than the 5.1-5.2% estimate in the Flexner Rebuttal Report.

123. Many estimates of potential exposure in real-world PrEP users are higher still, as I discussed in ¶84 (REMS 3-5), ¶86 (Marcus 2021), and ¶87 (Whitfield 2020). This is not surprising

for two reasons.  First, the iPrEx study reported data specifically on condomless receptive anal intercourse, while real-world estimates may include data on other sexual behaviors that could result in exposure, such as condomless insertive anal intercourse or anal intercourse with a condom.  Second, as stated in Flexner Rebuttal Report ¶¶159, 208, 334, 439, "it cannot be said that clinical trials results are direct evidence of the incidence of events in the real world outside of the clinical trial context."  Unlike participants in placebo-controlled trials, PrEP users in real-world settings know they are taking an active drug and that it is highly effective, and they may adjust their behavior accordingly.

124.    Flexner Rebuttal Report ¶¶327-334 calculates that "the percentage of patients *[actually] exposed* to HIV that are ultimately protected from infection by Truvada for PrEP is only on the order of 2.2-2.5% per year for patients taking Truvada for PrEP" (emphasis added).  The Flexner Rebuttal Report states that this 2.2-2.5% calculation is based on the differential between persons who seroconverted in the FTC-TDF group of the trials and persons who seroconverted in the placebo group as follows:

> [W]hen a comparison is made between the FTC-TDF group and the placebo group in the iPrEx trial, 28 more persons in the placebo became infected with HIV than those in the group that received FTC-TDF. This difference—the 28-person differential—is the basis for demonstration of efficacy that was reported by the iPrEx trial for the use of TDF/FTC for PrEP in humans. … The 28 people in the FTC-TDF group of the iPrEx trial that were protected represent 2.24% (28/1251) of the total of the 1,251 FTC-TDF group members. Therefore, to the extent that the number of persons taking PrEP that are protected from HIV infection can be generalized from the iPrEx trial, which I explain in further detail below has definite limitations, I would understand 2.24% of people taking PrEP to actually have been protected from infection as a result of the administration of Truvada® for PrEP with a median of 1.2 years of administration.

Flexner Rebuttal Report ¶¶432-439.   The Flexner Rebuttal Report repeats this same 2.2-2.5% calculation with respect to the preamble of the actual exposure claims.  *See* Flexner Rebuttal Report ¶¶329-330.

125.    There are several reasons why the 2.2-2.5% calculation is irrelevant to the Asserted Claims.  For the same reasons discussed above regarding the 5.1-5.2% calculation, the 2.2-2.5% calculation is irrelevant based on the Court's claim construction for protection.   As explained above, I understand that the Court has construed the "thereby" clause that recites "thereby protecting the primate host from infection with the immunodeficiency retrovirus" to be limiting and to mean "the primate host remains serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving the administration."  I understand that the Court clarified that "to be clear, I am not saying that the claims require unnecessary testing to be done, but they do require a negative result on both tests if and when both tests are performed."[11]  Based on the Court's claim construction, the "thereby" clause is met when a patient taking Truvada for PrEP remains HIV-negative in response to a serological or PCR test (and negative in response to both a serological and PCR test if both tests are performed).   Based on the Court's claim construction, protection is not determined by comparing the number of seroconversions in patients randomized to take Truvada for PrEP with the number of seroconversions in patients randomized to take a placebo.

126.    Flexner Rebuttal Report ¶152 states that "the number of persons in the FTC-TDF group that were potentially exposed to HIV could be broader than the number of persons that were

---

[11] I also understand that the Court has construed the preamble from the actual exposure claims to be limiting and to mean "a process which allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done."  *See also* D.I. 186 at 1, 5-7.

RESTRICTED INFORMATION

actually exposed, and broader than the number of persons who were exposed and subsequently seroconverted (28 persons)." As this statement suggests, the number of people who are actually exposed to HIV is greater than the number who are actually exposed and subsequently seroconvert. This means the 2.2-2.5% is an underestimate of actual exposure.

127.    Based on per-contact risk of HIV acquisition, the magnitude of this underestimation is likely to be substantial. The per-act probability of acquiring HIV from condomless receptive anal intercourse with someone known to have HIV is only 138 per 10,000 exposures, as shown in the CDC table reproduced below:

**Estimated Per-Act Probability of Acquiring HIV from an Infected Source, by Exposure Act\***

| Type of Exposure | Risk per 10,000 Exposures |
| --- | --- |
| **Parenteral** | |
| Blood Transfusion | 9,250 |
| Needle-Sharing During Injection Drug Use | 63 |
| Percutaneous (Needle-Stick) | 23 |
| **Sexual** | |
| Receptive Anal Intercourse | 138 |
| Insertive Anal Intercourse | 11 |
| Receptive Penile-Vaginal Intercourse | 8 |
| Insertive Penile-Vaginal Intercourse | 4 |
| Receptive Oral Intercourse | Low |
| Insertive Oral Intercourse | Low |
| **Other^** | |
| Biting | Negligible |
| Spitting | Negligible |
| Throwing Body Fluids (Including Semen or Saliva) | Negligible |
| Sharing Sex Toys | Negligible |

\* Factors that may increase the risk of HIV transmission include sexually transmitted diseases, acute and late-stage HIV infection, and high viral load. Factors that may decrease the risk include condom use, male circumcision, antiretroviral treatment, and pre-exposure prophylaxis. None of these factors are accounted for in the estimates presented in the table.
^ HIV transmission through these exposure routes is technically possible but unlikely and not well documented.

Source:
• Patel P, Borkowf CB, Brooks JT. Et al. Estimating per-act HIV transmission risk: a systematic review. AIDS. 2014. doi: 10.1097/QAD.0000000000000298.
• Pretty LA, Anderson GS, Sweet DJ. Human bites and the risk of human immunodeficiency virus transmission. Am J Forensic Med Pathol 1999;20(3):232-239.

RESTRICTED INFORMATION

See Patel et al., "Estimating per-act HIV transmission risk: a systematic review," AIDS, 28(10):1509-19 (2018), at Table 1. This means that for every episode of condomless[12] receptive anal intercourse with an HIV-positive partner, the risk of acquiring HIV is only 1.4%. The per-act risk of HIV acquisition is even lower for other sexual behaviors, such as condomless insertive anal intercourse, which confers a risk of only 11 per 10,000 exposures, or 0.11%. Considering only condomless receptive anal intercourse, the highest-risk sexual behavior, the per-act probability of HIV transmission of 1.4% means that for each of the 28 seroconversions on which the 2.2-2.5% calculation was based, there were, on average, 98.6 actual exposures to HIV that did not result in seroconversion. This estimate of the number of actual exposures that did not result in seroconversion would be even higher if it included other sexual behaviors that have a lower per-contact risk of HIV acquisition, such as condomless insertive anal intercourse or anal intercourse with a condom. For at least this reason, the 2.2-2.5% calculation is likely a considerable underestimate of the proportion actually exposed to HIV in the iPrEx study.

125. Even if the 5.1-5.2% and 2.2-2.5% were not irrelevant or underestimated, the Flexner Rebuttal Report ¶¶159, 208, 334, 439 states multiple reasons why clinical trials, such as iPrEx and Partners PrEP, cannot provide direct evidence of the incidence of events outside of the clinical trial context. Nevertheless, the Flexner Rebuttal Report goes on to assert that the 5.1-5.2% and 2.2-2.5% calculations are representative of the proportions of PrEP users who are 1) potentially or actually exposed to HIV, respectively, and 2) protected from infection during a 1-2 year period of administration in the real world. The Flexner Rebuttal Report argues that these estimates can be relied on "to the extent that one relies on clinical trials to determine the number

---

[12] Although not clearly indicated in the CDC table, the per-act estimates for sexual exposures assume no condom use. See Patel et al., "Estimating per-act HIV transmission risk: a systematic review," AIDS, 28(10):1509-19 (2018), at Table 1 footnote (a).

RESTRICTED INFORMATION

of people that are protected from HIV-1 infection as a result of the administration of Truvada® for PrEP." Flexner Rebuttal Report ¶¶159, 208, 334, 439.  The primary goal of clinical trials such as iPrEx and Partners PrEP is to determine the relative reduction in HIV incidence in the PrEP arm compared with the placebo arm, also known as efficacy.  Because randomization ensures that patterns of exposure are evenly distributed across study arms, and because the efficacy metric is on a relative rather than an absolute scale, efficacy represents the reduction in HIV risk that can be expected *given exposure*.  Efficacy is therefore largely generalizable across time, populations, and settings regardless of variations in the probability of exposure.  However, the calculations from the Flexner Rebuttal Report are based on not only the *relative* reduction in HIV risk but also the supposed *absolute* probability of exposure in the study population, which is dependent on sexual behavior (in addition to other factors, such as HIV prevalence in a given sexual network).  As noted above, the sexual behavior observed among participants in placebo-controlled PrEP trials may not reflect that of PrEP users in real-world settings, who know they are taking an active drug and that it is highly effective and may adjust their behavior accordingly.  For at least these reasons, in addition to the reasons discussed in Flexner Rebuttal Report ¶¶159, 208, 334, 439 and the concerns about irrelevance and underestimation I noted above, the 5.1-5.2% and 2.2-2.5% calculations are not meaningful estimates of the proportions of real-world PrEP users who are potentially or actually exposed to HIV, respectively, and protected from infection.

## X.      REPLY TO THE CERTAIN STATEMENTS MADE IN THE FLEXNER REBUTTAL REPORT REGARDING DESCOVY FOR PREP

128.    This section of my report replies to certain statements and opinions contained within the Flexner Rebuttal Report regarding the use of Descovy for PrEP.  This report does not specifically reply to every statement or opinion within the Flexner Rebuttal Report, but that does

not mean that I necessarily agree with those statements or opinions to which I have not specifically replied.

129.    The Flexner Rebuttal Report repeats essentially the same statements and opinions regarding Descovy for PrEP that were previously made for Truvada for PrEP.  The below table identifies paragraphs from the Flexner Rebuttal Report that raise essentially the same statements and opinions for Descovy for PrEP that I previously addressed above regarding Truvada for PrEP:

| Claim limitation | Flexner Rebuttal Report Paragraphs Regarding Descovy for PrEP | Corresponding Flexner Rebuttal Report Paragraphs Regarding Truvada for PrEP |
|---|---|---|
| Step (a):  selection of an uninfected host | ¶525 and ¶673<br>¶526 and ¶674 | ¶162 and ¶337<br>¶164 and ¶339 |
| Step (b):  administration of the claimed drug combination to the uninfected human | ¶529 and ¶677 | ¶168 and ¶343 |
| wherein the combination is administered prior to an exposure [or prior to a potential exposure] of the primate host to the immunodeficiency retrovirus | ¶569<br>¶571<br>¶¶575-577<br>¶579<br>¶¶581-583<br>¶585<br>¶586<br>¶594<br>¶596<br>¶607<br>¶612<br>¶685<br>¶686<br>¶692<br>¶¶694-696 | ¶211<br>¶213<br>¶¶217-219<br>¶221<br>¶¶223-226<br>¶227<br>¶228<br>¶243<br>¶249<br>¶260<br>¶265<br>¶352<br>¶353<br>¶362<br>¶¶364-366 |
| thereby clauses:<br>"thereby protecting the primate host from infection with the immunodeficiency retrovirus" and<br>"thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human" | ¶¶495-497<br>¶499<br>¶¶508-522<br>¶¶536-540<br>¶550<br>¶¶552-566<br>¶¶643-645<br>¶647<br>¶¶661-662<br>¶¶729-732 | ¶¶131-133<br>¶136<br>¶¶148-159<br>¶¶176-181<br>¶195<br>¶¶197-208<br>¶¶309-311<br>¶314<br>¶¶329-330<br>¶¶410-413 |

RESTRICTED INFORMATION

| Claim limitation | Flexner Rebuttal Report Paragraphs Regarding Descovy for PrEP | Corresponding Flexner Rebuttal Report Paragraphs Regarding Truvada for PrEP |
|---|---|---|
| | ¶734<br>¶¶737-740<br>¶¶748-762 | ¶416<br>¶¶419-423<br>¶¶432-439 |

130.    Descovy for PrEP is prescribed by essentially the same physician population as Truvada for PrEP, and Descovy for PrEP is used by a similar patient population as Truvada for PrEP.  The nearly identical PrEP instructions provided by the Truvada Insert and Descovy Insert is evidenced by the highly repetitive nature of the Flexner Rebuttal Report, which repeats the same arguments regarding Truvada for PrEP as for Descovy for PrEP.  Physicians prescribing Descovy for PrEP and patients taking Descovy for PrEP are expected to have the same level of adherence to the instructions in the Descovy Insert as physicians prescribing Truvada for PrEP and patients taking Truvada for PrEP.  For example, I understand that the FDA determined that the Truvada REMS assessment surveys were no longer required for Truvada on July 1, 2019 because it determined that "the available information indicates that prescribers and uninfected individuals understand the important key messages with regards to approximate use of emtricitabine/tenofovir disoproxil fumarate for a PrEP indication."  *See* GILDDE00271786-88 at GILDDE00271787.  I also understand that the FDA approved Descovy for PrEP on October 3, 2019, and likewise determined that REMS were not required to assure physician and patient compliance with the Descovy for PrEP instructions in the Descovy Insert.

## XI.    ADDITIONAL COMMENT

131.    I reserve the right to supplement or amend this report as necessary and appropriate if additional information that affects my opinions becomes available to me.  I understand that I may be asked to provide additional information or testimony to assist the Court in these

proceedings.  I reserve the right to rely on demonstrative and/or visual aids as well as information provided by the other parties in this litigation, as appropriate, to assist the Court and/or supplement my opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Date: June 15, 2022

Julia Marcus

Digitally signed by Julia Marcus
Date: 2022.06.15 07:48:49 -04'00'

Julia L. Marcus, Ph.D., M.P.H.

72

# Exhibit E

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1            UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3    THE UNITED STATES OF              )

4    AMERICA                           )    Case No.

5      Plaintiffs-Counterclaim         )    1:19-cv-02103-MN

6      Defendant,                      )

7            vs.                       )

8    GILEAD SCIENCES, INC.,            )    Page 1-131

9      Defendant-Counterclaim          )

10      Plaintiff,                     )

11   AND GILEAD SCIENCES IRELAND       )

12   UC,                               )

13     Defendant.                      )

14          TRANSCRIPT DESIGNATED CONFIDENTIAL

15             PURSUANT TO PROTECTIVE ORDER

16   AN EXECUTED STIPULATION GOVERNING THIS

17   DEPOSITION IS ATTACHED TO THE PDF VERSIONS OF

18   THIS DEPOSITION TRANSCRIPT ONLY - PLEASE

19   REFER TO THOSE VERSIONS FOR A COPY

20

21    REMOTE VIDEOTAPED DEPOSITION OF GILEAD SCIENCES,

22      INC., THROUGH ITS 30(B)6 WITNESS SONJA TONG

23            TAKEN ON THURSDAY, JANUARY 20, 2022

24   Reported by:BRENDA R. COUNTZ, RPR-CRR CSR NO. 12563

25   Job #:204817

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1

2

3

4

5

6

7

8

9

10    Remote Videotaped deposition of GILEAD SCIENCES,

11    INC. through its 30(B)6 witness SONJA TONG taken

12    via Zoom or teleconference in Los Angeles,

13    California, on Thursday, January 20, 2022, before

14    Brenda R. Countz, CSR No. 12563.

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 3

```
 1   APPEARANCES OF COUNSEL:

 2            (All counsel and participants present

 3             via Zoom and/or teleconference.)

 4

 5   FOR THE PLAINTIFF:

 6            U.S. DEPARTMENT OF JUSTICE

 7            BY:  SOSUN BAE, ESQ.

 8            450 5th Street, NW

 9            Washington, District of Columbia 20530

10

11

12

13   FOR THE DEFENDANT GILEAD SCIENCES, INC.:

14            WILMERHALE

15            BY:  KEVIN YURKERWICH, ESQ.

16                 RENNA AYYASH, ESQ.

17            60 State Street

18            Boston, Massachusetts 02109

19

20

21

22

23

24

25
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1   APPEARANCES OF COUNSEL (Continued):

 2

 3   ATTORNEY FOR HHS:

 4          KNOBBE MARTENS

 5          BY:  ROBERT ARBULU, ESQ.

 6          12790 El Camino Real

 7          San Diego, California 92130

 8

 9

10

11   ALSO PRESENT:

12       SAMANTAK GHOSH, ESQ., Gilead In-house Counsel

13       ROBERT RINKEWICH, Videographer

14       ADRIENNE CHEMEL, Exhibit Technician

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 75

1    the previous versions.

2            But the PrEP indication is still

3    existent in Section 1.2, correct?

4        A.   Yes, that is correct.  I agree that in

5    comparison to the last version, the last exhibit

6    that we just looked at, the length of this

7    section has considerably shortened but there is

8    still a PrEP indication for adults and

9    adolescents for Truvada.

10       Q.   And the PrEP would be to reduce the

11   risk of sexually-acquired HIV-1 infection as

12   stated here?

13       A.   That's the indicated use as of this

14   June 2020 version.

15           MS. BAE:  All right.  Let's now turn to

16   Descovy.  Can we pull up Exhibit 12 and I'm going

17   to represent to you that this is a October 2019

18   Descovy package insert and you can confirm that

19   as well.

20           THE WITNESS:  (Perusing.)

21           (Tong Exhibit 12, October 2019

22           Descovy Package Insert, was marked

23           for identification.)

24           THE WITNESS:  Yes, this looks to be the

25   approved Descovy labeling with the prescribing

1   information and the medication guide approved in

2   October 2019.

3   BY MS. BAE:

4       Q.   And are you aware of any earlier

5   iterations of the Descovy label?

6       A.   Yes, Descovy was approved in 2015 and

7   there are versions commensurate with that prior

8   to October 2019.

9       Q.   So this was the 2019 version, correct

10  -- or the October 2019 version, correct?

11      A.   Yes, what we're looking at right now on

12  the screen.

13      Q.   And as with the Truvada label, the

14  prescribing information instructs a physician on

15  how to administer Descovy, correct?

16          MR. YURKERWICH:  Objection to form.

17          THE WITNESS:  The labeling provides to

18  physicians or any reader information about the

19  product and also how to use the product.

20          Whether or not physicians interpret it

21  as instructions they have to follow, I don't know

22  the answer to that.

23  BY MS. BAE:

24      Q.   So you are saying that it includes

25  information about the product and guidelines on

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  how to use the product?

2         MR. YURKERWICH:  Objection to form.

3         THE WITNESS:  The labeling is written

4  to provide information and how to use the product

5  for prescribers and healthcare providers.

6  BY MS. BAE:

7      Q.   And I think you mentioned with regard

8  to Truvada that it also provides information and

9  instructions to patients on how to use Descovy,

10 correct?

11        MR. YURKERWICH:  Objection to form.

12        THE WITNESS:  Yes.  The medication

13 guide portion is directed towards patients or

14 individuals who may use the product or may be

15 considering using the product.

16 BY MS. BAE:

17     Q.   And this label was prepared by

18 individuals at Gilead, correct?

19        MR. YURKERWICH:  Objection to form.

20        THE WITNESS:  As with the labels for

21 all Gilead products, the labeling is prepared by

22 Gilead, generally individuals in regulatory

23 affairs labeling.

24 BY MS. BAE:

25     Q.   And are you aware of whether every

1   STATE OF CALIFORNIA        )  SS

2   COUNTY OF LOS ANGELES    )

3        I, BRENDA R. COUNTZ, Certified Shorthand

4   Reporter No. 12563 for the State of California,

5   do hereby certify:

6        That prior to being examined, the

7   witness named in the foregoing deposition was

8   duly sworn to testify the truth, the whole truth,

9   and nothing but the truth;

10        That said deposition was taken down by

11   me in shorthand at the time and place therein

12   named and thereafter transcribed and that the

13   same is a true, correct, and complete transcript

14   of said proceedings.

15        Before completion of the deposition,

16   review of the transcript [X] was [ ] was not

17   requested.  If requested, any changes made by the

18   deponent during the period allowed are appended

19   hereto.

20        I further certify that I am not

21   interested in the outcome of the action.

22   Witness my hand this 24th day of January, 2022.

23

24

25        Brenda R. Countz, CSR No. 12563

# Exhibit F

```
 1            UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF DELAWARE

 3  THE UNITED STATES OF AMERICA,

 4     Plaintiff-Counterclaim Defendant,

 5  vs.                      No. 1:19-cv-02103-MN

 6  GILEAD SCIENCES, INC.,

 7     Defendant-Counterclaim Plaintiff,

 8  AND GILEAD SCIENCES IRELAND UC,

 9     Defendant.

10  _____/

11

12

13

14        ** TRANSCRIPT MARKED AS CONFIDENTIAL **

15        REMOTE VIDEOTAPED DEPOSITION OF MAE LAI

16              Wednesday, January 19, 2022

17

18    ***[AN EXECUTED STIPULATION GOVERNING THIS DEPOSITION IS

19     ATTACHED TO THE PDF VERSIONS OF THIS DEPOSITION TRANSCRIPT ONLY.

20        PLEASE REFER TO THOSE VERSIONS FOR A COPY]***

21

22

23  Reported By:

24  LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201

25  JOB NO. 204816
```

CONFIDENTIAL

1

2

3

4                              January 19, 2022

5                              9:03 a.m.

6

7

8

9

10          Remote videotaped Deposition of MAE LAI,

11   held at remotely by all parties, pursuant to

12   Notice, before Linda Vaccarezza, a Certified

13   Shorthand Reporter of the State of California.

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

```
 1  A P P E A R A N C E S:

 2          U.S. DEPARTMENT OF JUSTICE

 3          Attorneys for United States of America

 4             450 5th Street, N.W.

 5             Washington, D.C.  20530

 6          BY:  SOSUN BAE, ESQ.

 7

 8          WILMERHALE

 9          Attorneys for Gilead Defendants

10             1875 Pennsylvania Avenue, NW

11             Washington, D.C.  20006

12          BY:  CHARLES COX, ESQ.

13

14

15          KNOBBE MARTENS

16          Attorneys for HHS

17             12790 El Camino Real

18             San Diego, California 92130

19          BY:  ROBERT ARBULU, ESQ.

20

21

22  ALSO PRESENT: Andrea Hutchison, Gilead

23  Videographer:  Michael Pham

24

25
```

```
 1      A.   Yes.

 2      Q.   Let me just look through this quickly.

 3  And do you know -- I know you -- I think you've

 4  testified -- and let me know if this is

 5  incorrect -- that you have sort of a passing

 6  familiarity with the relevance of the macaque

 7  studies to Descovy for PrEP, correct?

 8      A.   Yes.

 9           MR. COX:  Object to form.

10  BY MS. BAE:

11      Q.   Do you know who at Gilead would have more

12  intimate knowledge of the relevance of the macaque

13  studies to Descovy for PrEP?

14           MR. COX:  Object to form.

15           THE WITNESS:  Because it's a non-clinical

16  study, I would say research.

17           (Exhibit 6 was marked for identification.)

18  BY MS. BAE:

19      Q.   Let's move to Document 6.  And I think she

20  shared it through the chat as well if you wanted to

21  download it.  I'm representing to you that this is

22  an October 2019 Descovy package insert.  And you

23  can look through it and let me know if that's what

24  it appears to be to you and if you're familiar with

25  it.
```

CONFIDENTIAL

Page 68

1       A.    Yes, I have seen this package insert.

2       Q.    And it does appear to be the October 2019

3   Descovy package insert?

4       A.    Yes.   That's the date that's shown at the

5   bottom.

6       Q.    Yeah.   It says "revised 10-20-2019,"

7   correct?

8       A.    Yeah.

9       Q.    And we just described it as the package

10  insert.   Is it also sometimes referred to as

11  prescribing information as referenced on the top of

12  Page 1?

13      A.    Yes.

14      Q.    And the package insert, is it your

15  understanding that the package insert instructs

16  prescriber on how to administer Descovy to a

17  patient?

18            MR. COX:   Object to form.   Beyond the

19  scope.

20            THE WITNESS:   Yes, that is my

21  understanding.

22  BY MS. BAE:

23      Q.    Is it also your understanding that the

24  label also instructs the individuals on how to take

25  Descovy?

Page 86

1            C E R T I F I C A T E

2    STATE OF CALIFORNIA       )

3    COUNTY OF SAN FRANCISCO )

4

5    I, LINDA VACCAREZZA, a Certified Shorthand

6    Reporter for the State of California, do

7    hereby certify that MAE LAI, the

8    witness whose deposition is hereinbefore set

9    forth, was duly sworn by me and that such

10   deposition is a true record of the testimony

11   given by such witness.

12   I further certify that I am not related to

13   any of the parties to this action by blood or

14   marriage; and that I am in no way interested

15   in the outcome of this matter.

16

17   IN WITNESS WHEREOF, I have hereunto set my

18   hand this 21st day of January 2022.

19              *Linda Vaccarezza*

20   _____

21          LINDA VACCAREZZA, CSR. NO. 10201

22

23

24

25

**Exhibit G**

1

2   UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF DELAWARE
3   -------------------------------------------X
    UNITED STATES OF AMERICA,
4
                        Plaintiff and
5                       Counterclaim-Defendant,

6         Vs.
                         C.A. No.
7                        19-02103-MN

8
    GILEAD SCIENCES, INC. and GILEAD SCIENCES
9   IRELAND UC,

10                      Defendants.
    -------------------------------------------X
11

12

13            VIDEOTAPED DEPOSITION OF

14         DR. CHARLES W. FLEXNER, MD

15            New York, New York

16            August 18, 2022

17

18

19

20

21

22

23   Reported by:

24   Anita M. Trombetta, RMR, CRR

25   JOB NO. 214762

1

2

3

4

5                         August 18, 2022

6                         9:05 A.M.

7

8

9          Videotaped Deposition of

10   DR. CHARLES W. FLEXNER, MD, held at the

11   offices of Wilmer Cutler Pickering Hale,

12   250 Greenwich Street, 45th floor, New York,

13   New York 10007, before Anita M. Trombetta,

14   an RMR, CRR, and a Notary Public of the

15   State of New York.

16

17

18

19

20

21

22

23

24

25

1

2   A P P E A R A N C E S:

3

4        U.S. DEPARTMENT OF JUSTICE

5        CIVIL DIVISION

6        Attorneys for the United States of America

7             1100 L Street NW

8             Washington, DC 20005

9         BY:   WALTER BROWN, ESQ.

10

11

12

13       KNOBBE MARTENS

14       On behalf of Health and Human Services:

15            12790 El Camino Real

16            San Diego, CA 92130

17       BY:   NATHANAEL LUMAN, ESQ., Ph.D

18

19       OFFICE OF THE GENERAL COUNSEL

20       U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

21            26 Federal Plaza

22            New York, NY 10278

23       BY:  MICHAEL IMBACUAN, ESQ.

24

25       (Appearances continued on next page.)

1

2    A P P E A R A N C E S:

3

4         WILMERHALE

5         Attorneys for Gilead Parties

6              250 Greenwich Street

7              New York, NY 10007

8         BY:  DAVID BASSETT, ESQ.

9              SCOTT GREENE, ESQ.

10

11

12   ALSO PRESENT:

13   Jonathan Popham, Legal Video Specialist

14   Andrew Kessel, Gilead

15   AMANDA KELLEY, ESQ. (Via teleconference)

16

17

18

19

20

21

22

23

24

25

1                    C. Flexner - RESTRICTED

2     individual having a negative HIV-1 test prior to the

3     prescription?

4              MR. BASSETT:  Objection.

5         A.   I'm not aware of such a practice.  I'm

6     sure it's possible, but I'm not aware of it.

7     BY MR. BROWN:

8         Q.   Why is it important for -- why is it

9     important for individuals to be confirmed to be HIV

10    negative periodically during use of Truvada for

11    PrEP?

12        A.   If someone who is supposed to be using

13    PrEP with Truvada becomes HIV-1 infected, then

14    treating that individual with Truvada alone would

15    not be accepted best practice for managing their HIV

16    infection.  And there is a theoretical concern about

17    the development of resistance to drugs in the

18    Truvada combination.

19        Q.   So given that if somebody had become HIV

20    positive that Truvada for PrEP would not be

21    sufficient treatment regimen, for that reason it's

22    important for individuals to be confirmed to be HIV

23    negative periodically during the use of Truvada for

24    PrEP?

25        A.   That was quite a mouthful.

1                  C. Flexner - RESTRICTED

2       Q.   Okay.

3       A.   I think I agree with it.

4       Q.   Have you ever had a patient remain on

5  Truvada for PrEP where you didn't confirm they were

6  HIV negative periodically?

7       A.   Our standard is to treat -- is to, sorry,

8  test patients on PrEP every three months.  Patients

9  are sometimes late for their appointments or miss

10  their appointments, but it is our aspiration that

11  that be the case and that's the standard of care.

12      Q.   When you say "our standard," I take it the

13  standard of care, standard medical practice?

14           MR. BASSETT:  Objection.

15      A.   That is what's recommended, and therefore

16  that would be standard practice in this country.

17  BY MR. BROWN:

18      Q.   Going back to the first page of the

19  insert, there's a Dosage and Administration section

20  that begins on the left-hand column at the bottom.

21           Do you see that?

22      A.   Yes.

23      Q.   Under that Dosage and Administration

24  section, it recommends that uninfected adults take

25  one tablet of Truvada daily.

1                    C. Flexner - RESTRICTED

2    FDA in 2019; is that correct?

3        A.   Yes.

4        Q.   On the first page there's an Indications

5    and Usage section on the left-hand column.

6             Do you see that?

7        A.   Yes.

8        Q.   It states underneath that header that:

9    "Descovy is indicated in at-risk adults and

10   adolescents weighing at least 35 kilograms for

11   pre-exposure prophylaxis (PrEP) to reduce the risk

12   of HIV-1 infection from sexual acquisition,

13   excluding individuals at risk from receptive vaginal

14   sex."  Correct?

15       A.   Yes.

16       Q.   Based on that statement, would you say

17   that being at risk in the Descovy insert means the

18   same thing as at risk in the Truvada insert?

19            MR. BASSETT:  Objection.

20       A.   We would need to look at the risk section

21   in detail to confirm that.

22   BY MR. BROWN:

23       Q.   Okay.  And have you found that section?

24       A.   No.

25       Q.   Okay.  Do you think one of -- do you think

1                    C. Flexner - RESTRICTED

2    a physician who prescribed Descovy for PrEP would

3    interpret at risk in the Descovy insert to be the

4    same thing as at risk in the Truvada insert?

5              MR. BASSETT:  Objection, vague.

6         A.   I think that would be logical.

7    BY MR. BROWN:

8         Q.   Okay.  Let me direct your attention to

9    Section 5.2.

10             MR. BASSETT:  What's the page?

11             MR. BROWN:  Page 6.  That's the Bates

12        number ending 117.

13        A.   Yes.

14   BY MR. BROWN:

15        Q.   And to my last question, there's a second

16   paragraph or section there that reads:  "Risk for

17   HIV-1 acquisition includes behavioral, biological,

18   or epidemiological factors, including but not

19   limited to condomless sex, past or current STIs,

20   self-identified HIV risk, having sexual partners of

21   unknown HIV-1 viremic status, or sexual activity in

22   a high prevalence area or network."

23             Do you see that?

24        A.   Yes.

25        Q.   Do you think that accurately describes who

1                    C. Flexner - RESTRICTED

2       Q.    Have you ever prescribed Descovy for PrEP

3   without the individual having a negative HIV-1 test

4   prior to your prescription?

5            MR. BASSETT:   Objection.  Assumes facts

6         that have not been established.

7   BY MR. BROWN:

8       Q.    Let me ask you on that note, have you ever

9   prescribed Descovy for PrEP?

10      A.    No.

11      Q.    Okay.  Are you aware of any of your

12  colleagues prescribing Descovy for PrEP?

13      A.    Yes.

14      Q.    Are you aware of any of your colleagues

15  prescribing Descovy for PrEP without the individual

16  having a negative HIV-1 test prior to the

17  prescription?

18      A.    No.

19      Q.    Why is it important for individuals to be

20  confirmed to be HIV negative every three months

21  during use of Descovy for PrEP?

22      A.    If someone who is taking Descovy for PrEP

23  became HIV-infected during their use of that drug,

24  then Descovy alone would not be adequate treatment

25  for an established HIV-1 infection.  And so one

1                     C. Flexner - RESTRICTED

2    partners whenever possible.

3    BY MR. BROWN:

4         Q.   When you say "we," I assume you're

5    referring to yourself and others?

6         A.   Some of our counseling is done by nurses

7    who work with us in the clinic.

8         Q.   When you say "our," I assume

9    Johns Hopkins?

10        A.   Yes.   That's where I practice.

11        Q.   In prescribing Truvada for PrEP, do you

12   instruct the patient to get tested for HIV

13   regularly?

14        A.   We ask our patients to be tested at least

15   once every three months.

16        Q.   Does it typically work out that they get

17   tested every three months?

18        A.   Sometimes they are late for their

19   appointments or reschedule their appointments.   So

20   it might not be exactly three months.

21        Q.   Do you confirm, if they are tested, that

22   they're negative for HIV?

23        A.   Yes.

24        Q.   In terms of people missing their

25   appointments, does Johns Hopkins or you issue

1                    C. Flexner - RESTRICTED

2           MR. BASSETT:  Objection.

3      A.   My understanding is that infringing the

4   patent, if that involves two or more people,

5   requires something more than those two people simply

6   practicing all of the steps of the claims.

7           For example, if one party practiced one or

8   two steps of the claim and the other party practiced

9   two or three other steps of the claim, that would

10  not in and of itself constitute infringement.

11  BY MR. BROWN:

12     Q.   Okay.  Let's take out the word

13  "infringement."

14          Has there ever been an instance where you

15  counseled a patient and, between the two of you, you

16  practice all four of these steps, whether that would

17  be considered infringement or not?

18          MR. BASSETT:  Objection.

19     A.   Not that I'm aware of.

20  BY MR. BROWN:

21     Q.   Okay.  And you mentioned earlier that you

22  have not prescribed Descovy for PrEP, correct?

23     A.   That's correct.

24     Q.   And you've only prescribed Truvada for

25  PrEP in clinical trials, correct?

1                    C. Flexner - RESTRICTED

2        A.    For the most part, yes.

3        Q.    What would be -- what prescriptions have

4   you given for Truvada for PrEP outside of clinical

5   trials?

6        A.    I believe there may have been one or two

7   occasions where I was asked to write a prescription

8   outside of the context of a trial for Truvada for a

9   patient who wanted to use it for PrEP.

10       Q.    Okay.  One or two occasions?

11       A.    One or two.  No more than that.

12       Q.    Within the context of clinical trials, do

13  you know how many patients you prescribed Truvada

14  for PrEP for, approximately?

15       A.    Probably maybe a couple of dozen.

16       Q.    So --

17       A.    In total.

18       Q.    -- around 25 or so?

19       A.    As many as 25, yes.

20       Q.    And potentially less?

21       A.    Potentially less.

22       Q.    Going back to paragraph 129 in the

23  statement that I read regarding infringement, have

24  you formed an opinion about the percentage of US

25  PrEP prescriptions that would have led to

1                  C. Flexner - RESTRICTED

2    infringement of the claims based on these four

3    elements you have here?

4              MR. BASSETT:  Objection.

5         A.   No.

6    BY MR. BROWN:

7         Q.   And would you agree with me that when a

8    doctor writes a prescription for PrEP, it's his

9    understanding that the patient will use a

10   prescription and take the drug for PrEP?

11             MR. BASSETT:  Objection, calls for

12        speculation.

13        A.   I think that is often or usually the hope

14   of the doctor writing the prescription.

15   BY MR. BROWN:

16        Q.   Okay.  Do you think it reflects the hope

17   or intention of the patients who receive a

18   prescription that they, at least at the outset,

19   intend to use it for PrEP, a prescription?

20             MR. BASSETT:  Objection, vague.

21        A.   I would think that most patients

22   requesting a prescription for PrEP plan to use it

23   for PrEP.

24   BY MR. BROWN:

25        Q.   Can you think of a reason why -- a

1                    C. Flexner - RESTRICTED

2    Descovy, for PrEP?

3              MR. BASSETT:  Objection.

4        A.   By "other sources" there, I'm referring to

5    other sources besides the government.  So that would

6    include, for example, state and local healthcare

7    agencies.

8    BY MR. BROWN:

9        Q.   But at the beginning of the sentence you

10   say:  "Apart from efforts undertaken by Gilead."

11             Are you referencing efforts to popularize

12   and expand the use of its products?

13             MR. BASSETT:  Objection.

14       A.   Those would be efforts undertaken by

15   Gilead to promote the use of Truvada for PrEP.

16   BY MR. BROWN:

17       Q.   And would the same be true for Descovy for

18   PrEP, that they have taken efforts to promote the

19   use of Descovy for PrEP?

20             MR. BASSETT:  Objection.

21       A.   Yes.

22   BY MR. BROWN:

23       Q.   I'd like to move to paragraph 1018.

24       A.   Would you like me to read that paragraph?

25       Q.   Sure.

1               C. Flexner - RESTRICTED

2               And also go ahead and read paragraph 1019.

3    I think the questions relate to both.

4         A.   Okay.

5               (Witness reviews document.)

6               Okay.

7         Q.   These two paragraphs discuss an entity

8    known as GSIUC, correct?

9         A.   Yes.

10        Q.   What is GSIUC?

11        A.   GSIUC is an Irish subsidiary of

12   Gilead Sciences.

13        Q.   In paragraph 1019 you discuss Dr. Murphy's

14   opinion that GSIUC induces infringement of the

15   asserted claims, correct?

16        A.   Yes.

17        Q.   And you acknowledge that Dr. Murphy relies

18   on two legal complaints filed in Florida and

19   New York, correct?

20        A.   Yes.

21        Q.   Have you reviewed those complaints?

22        A.   I have not.

23        Q.   So I take it that this section where you

24   state that Dr. Murphy has not established that GSIUC

25   induces infringement of the asserted claims, I take

1                    C. Flexner - RESTRICTED

2    it that that opinion is not based on a review of

3    those two complaints, correct?

4         A.   My opinion was based on the review of

5    other materials in this case, but not those two

6    complaints.

7         Q.   And you reference an interrogatory

8    response in paragraph 1020 on the next page,

9    correct?

10        A.   That is the GSIUC's second supplemental

11   response to the government's interrogatory number 1.

12        Q.   Right.  And based on that response, you

13   state, based on your review of that response, which

14   you understood to be true and accurate by GSIUC:  "I

15   understand Dr. Murphy's statements regarding GSIUC

16   to be incorrect."

17             Is that right?

18        A.   Yes.

19        Q.   Do you base that opinion about Dr. Murphy

20   being incorrect about GSIUC on any other sources

21   other than the interrogatory response?

22        A.   Well, the GSIUC supplemental response

23   indicates that in paragraph now 1021, they -- GSIUC

24   stated that they have not engaged -- that "GSIUC has

25   not engaged and does not engage in any of the

```
1                    C. Flexner - RESTRICTED

2    following activities in the United States:  One,

3    selling Truvada for PrEP and/or Descovy for PrEP;

4    two, actively instructing doctors and/or patients to

5    administer Truvada for PrEP and/or Descovy for PrEP,

6    including through clinical trials, prescribing

7    information, product labels, training guides and

8    agreement forms for healthcare providers and other

9    product literature; and, three, advertising and/or

10   promoting Truvada for PrEP and/or Descovy for PrEP

11   to the medical community and for use by the general

12   public."

13           It is my understanding that GSIUC

14   manufactures tablets and ships unlabeled tablets to

15   the United States.

16      Q.   Okay.  And you relied on that fact and the

17   statements you just quoted for your opinion that

18   Dr. Murphy has not established that GSIUC induces

19   infringement of the asserted claims?

20      A.   Yes.

21      Q.   In paragraph 1018 you reference

22   Dr. Murphy's statement about bottle labels "that

23   included the language 'Made in Ireland,' and that

24   instructed dispenser each time Truvada is dispensed

25   to give the patient the attached medical guide."
```

1             C. Flexner - RESTRICTED

2    losing a bone mineral density, for example, older

3    patients.

4         Q.    All of that said, do you believe Truvada

5    and Descovy are prescribed and used by substantially

6    different physician and/or patient populations?

7             MR. BASSETT:   Objection, vague.

8         A.    That's hard.   It depends upon how you

9    define "substantially different."

10   BY MR. BROWN:

11        Q.    In terms of demographics of the two

12   groups, do they look different?

13            MR. BASSETT:   Objection, vague.

14        A.    Would you repeat what you just asked me?

15   BY MR. BROWN:

16        Q.    Based on all our discussions, would you

17   say the demographics of the two groups of patients,

18   patients taking Truvada for PrEP, patients taking

19   Descovy for PrEP, are they substantially different?

20            MR. BASSETT:   Objection, vague.

21   BY MR. BROWN:

22        Q.    Do you know?

23        A.    If you read the package insert for Descovy

24   and the package insert for Truvada, the descriptions

25   of the appropriate patient populations for PrEP are,

```
 1                  C. Flexner - RESTRICTED
 2  in fact, substantially the same except for the
 3  exclusion of -- I believe the statement is
 4  heterosexual women in the -- well, let's pull the
 5  Descovy insert which is right here.
 6            "Excluding individuals at risk from
 7  receptive vaginal sex" is the statement in the
 8  Descovy FDA package insert.  Otherwise, I think the
 9  indications as approved by the FDA are quite
10  similar.
11       Q.   I'd like to go to your rebuttal report
12  again and page -- sorry -- paragraph 901.
13       A.   901?
14       Q.   Correct.  This is page 420 of your
15  rebuttal report.
16       A.   Yes.
17            Would you like me to read that paragraph?
18       Q.   Absolutely.
19       A.   Okay.
20            (Witness reviews document.)
21            Yes.
22       Q.   In this sentence you discuss Dr. Murphy's
23  citation or reference to a Truvada for healthcare
24  providers website.
25            Do you see that?
```

1

2                    CERTIFICATE

3

4    STATE OF NEW YORK   )

5                       :   ss

6              I, Angela M. Shaw-Crockett, a Certified Court

7    Reporter, Registered Merit Reporter and Notary Public within

8    and for the States of New York, New Jersey and Connecticut,

9    do hereby certify:

10             That DR. CHARLES FLEXNER, the witness whose

11   deposition is herein before set forth, was duly sworn by me

12   and that such deposition is a true record of the testimony

13   given by such witness.

14             I further certify that I am not related to any of

15   the parties to this action by blood or marriage and that I

16   am in no way interested in the outcome of this matter.

17             In witness whereof, I have hereunto set my hand

18   this 23rd day of August, 2022.

19        *Angela Shaw-Crockett*

20   -------------------------------------
     ANGELA M. SHAW-CROCKETT, CCR, CRR, RMR, CSR
21   LICENSE NO. XI00218400

22

23

24

25

# Exhibit H

1    IN THE UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF DELAWARE

3 ------------------------------x

4 UNITED STATES OF AMERICA,  :

5   Plaintiff and    :

6   Counterclaim Defendant, :

7  v.        : CA No.

8 GILEAD SCIENCES, INC. and : 1:19-cv-02103-MN

9 GILEAD SCIENCES IRELAND UC, :

10   Defendants and   :

11   Counterclaim Plaintiffs. :

12 ------------------------------x

13

14   CONFIDENTIAL - RESTRICTED INFORMATION

15    SUBJECT TO PROTECTIVE ORDER

16

17    Videotaped Deposition of

18    JULIA L. MARCUS, PH.D.

19    Boston, Massachusetts

20   Thursday, August 11, 2022

21     8:59 a.m.

22

23 Job No.: 457414

24 Pages: 1 - 267

25 Reported by: Darlene M. Coppola, RMR, CRR

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                    2

```
 1    APPEARANCES:

 2    Representing the Plaintiff:

 3         UNITED STATES DEPARTMENT OF JUSTICE

 4         CIVIL DIVSION

 5         Intellectual Property Section

 6         1100 L Street NW

 7         Washington, DC  20005

 8         BY:  CARRIE ROSATO, ESQUIRE

 9              WALTER BROWN, ESQUIRE

10         T 202.307.0414

11         E carrie.e.rosato@usdoj.gov

12    -and-

13    (Via telephone)

14         KNOBBE MARTENS

15         3579 Valley Centre Drive

16         San Diego, CA 92130

17         BY:  NATHANAEL LUMAN, PH.D.

18         T 858.707.4000

19

20

21    (Continued on next page)

22

23

24

25
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                        3

```
 1    APPEARANCES (Continued):

 2    Representing the Defendants:

 3         WILMER CUTLER PICKERING HALE AND DORR, LLP

 4         7 World Trade Center

 5         250 Greenwich Street

 6         45th Floor

 7         New York, NY 10007

 8         BY:  DAVID B. BASSETT, ESQUIRE

 9              SCOTT G. GREENE, ESQUIRE

10         T 212.230.8800

11         E david.bassett@wilmerhale.com

12           scott.greene@wilmerhale.com

13

14    Also present:

15    Michel Imbacuan, Esquire

16         Department of Health & Human Services

17    Janice Ye, Gilead Sciences

18    Dan Lohaus, Videographer

19

20

21

22

23

24

25
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                           256

| | | |
|---|---|---|
| 1 | A.   I would probably need a little more | 15:45:41 |
| 2 | information about the scenario, but it sounds | 15:45:42 |
| 3 | like you were suggesting there were absolutely | 15:45:47 |
| 4 | no protection methods used; is that correct? | 15:45:48 |
| 5 | Q.   That's my hypothetical, yes.  But this | 15:45:51 |
| 6 | person -- but 99 times after this act, people | 15:45:55 |
| 7 | test negative.  Has that person been protected | 15:45:58 |
| 8 | from HIV infection?  Have those 99 people been | 15:46:03 |
| 9 | protected from HIV infection? | 15:46:09 |
| 10 | A.   If they continue to test negative, | 15:46:18 |
| 11 | then I believe, according to the Court, the | 15:46:19 |
| 12 | answer would be yes. | 15:46:23 |
| 13 | Q.   Thank you, Doctor. | 15:46:24 |
| 14 | Now, Doctor, you are familiar with | 15:46:27 |
| 15 | Descovy, correct? | 15:46:28 |
| 16 | A.   Yes. | 15:46:31 |
| 17 | Q.   And Descovy is an FDA-approved | 15:46:32 |
| 18 | prescription for -- drug for the PrEP | 15:46:34 |
| 19 | indication, right? | 15:46:37 |
| 20 | A.   Yes. | 15:46:39 |
| 21 | Q.   And you intend to offer the jury your | 15:46:41 |
| 22 | opinion that Descovy for PrEP is consistent | 15:46:43 |
| 23 | with infringement of the asserted patents, | 15:46:47 |
| 24 | correct? | 15:46:52 |
| 25 | A.   I will offer my opinion that anything | 15:46:52 |

| | | |
|---|---|---|
| 1 | I said in my report about Truvada, for the | 15:46:54 |
| 2 | most part, applies to Descovy as well. | 15:46:57 |
| 3 | Q.   And I'd like to direct your attention | 15:47:01 |
| 4 | to page 17 of your reply report, page 17 not | 15:47:05 |
| 5 | Paragraph 17, and that starts Section 9 of | 15:47:08 |
| 6 | your report. | 15:47:20 |
| 7 | Do you see that? | 15:47:22 |
| 8 | A.   Yes. | 15:47:24 |
| 9 | Q.   And the heading there is "Reply to | 15:47:25 |
| 10 | certain statements made in the Flexner | 15:47:27 |
| 11 | rebuttal report regarding Truvada for PrEP." | 15:47:30 |
| 12 | Do you see that? | 15:47:40 |
| 13 | It goes to Paragraph 125, I'll just | 15:47:40 |
| 14 | represent. | 15:47:42 |
| 15 | A.   I know.  I just wanted to check | 15:47:43 |
| 16 | something.  One second.  Sorry. | 15:47:45 |
| 17 | (Witness reviews document.) | 15:47:49 |
| 18 | I just want to clarify that I | 15:47:49 |
| 19 | understand not all of the claims are presently | 15:47:50 |
| 20 | asserted for Descovy.  So when I say my | 15:47:55 |
| 21 | opinions are consistent across the two, I'm | 15:47:58 |
| 22 | talking about the claims that apply to both. | 15:48:01 |
| 23 | Q.   Fair point. | 15:48:03 |
| 24 | My question was going to be slightly | 15:48:05 |
| 25 | different.  Section 9 of your -- Roman Numeral | 15:48:06 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                          258

| | | |
|---|---|---|
| 1 | Section 9 of your report, which is Paragraphs | 15:48:10 |
| 2 | 50 to 125, do not address Descovy for PrEP at | 15:48:12 |
| 3 | all, right? | 15:48:16 |
| 4 | A.   That's right.  They are focused on | 15:48:18 |
| 5 | Truvada for PrEP, and then I later say that my | 15:48:19 |
| 6 | opinions on Truvada generally apply to | 15:48:22 |
| 7 | Descovy. | 15:48:24 |
| 8 | Q.   And we touched on this before, and | 15:48:26 |
| 9 | it's -- maybe you've had more time to think | 15:48:28 |
| 10 | about it.  I don't know. | 15:48:29 |
| 11 | Is it true that none of the articles | 15:48:31 |
| 12 | or reports that you cite in Paragraphs 50 | 15:48:33 |
| 13 | through 125 in your report are studies of | 15:48:36 |
| 14 | Descovy for PrEP? | 15:48:39 |
| 15 | A.   Again, I would have to go back and | 15:48:40 |
| 16 | check on the time frames for all of those | 15:48:43 |
| 17 | studies.  It's possible that some included | 15:48:45 |
| 18 | some Descovy prescriptions. | 15:48:47 |
| 19 | Q.   But you can't -- you don't know of any | 15:48:49 |
| 20 | right now, as you sit here, without going back | 15:48:51 |
| 21 | and looking at them? | 15:48:54 |
| 22 | A.   I would have to look. | 15:48:55 |
| 23 | Q.   And if we look at Paragraph 130 of | 15:48:59 |
| 24 | your report, you state in the first sentence | 15:49:01 |
| 25 | that "Descovy for PrEP is prescribed by | 15:49:19 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                          259

| | | |
|---|---|---|
| 1 | essentially the same physician population as | 15:49:22 |
| 2 | Truvada for PrEP, and Descovy for PrEP is used | 15:49:25 |
| 3 | by a similar patient population as Truvada for | 15:49:28 |
| 4 | PrEP." | 15:49:31 |
| 5 | Do you see that? | 15:49:32 |
| 6 | A.   Yes. | 15:49:33 |
| 7 | Q.   You do not provide any citation to | 15:49:33 |
| 8 | support for that sentence, correct? | 15:49:36 |
| 9 | A.   No.  I believe it's supported by | 15:49:38 |
| 10 | common knowledge. | 15:49:41 |
| 11 | Q.   Common knowledge among whom? | 15:49:42 |
| 12 | A.   Among PrEP experts. | 15:49:45 |
| 13 | Q.   And you consider yourself a PrEP | 15:49:48 |
| 14 | expert? | 15:49:49 |
| 15 | A.   I do. | 15:49:50 |
| 16 | Q.   And if you look at the third sentence | 15:49:51 |
| 17 | of Paragraph 130, you state, "Physicians | 15:49:53 |
| 18 | prescribing Descovy for PrEP and patients | 15:49:58 |
| 19 | taking Descovy for PrEP are expected to have | 15:50:01 |
| 20 | the same level of adherence to the | 15:50:03 |
| 21 | instructions in the Descovy insert as | 15:50:06 |
| 22 | physicians prescribing Truvada for PrEP in | 15:50:08 |
| 23 | patients taking Truvada for PrEP." | 15:50:11 |
| 24 | Have I read that correctly? | 15:50:15 |
| 25 | A.   Yes. | 15:50:15 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                    265

```
 1              CERTIFICATION
 2      I, DARLENE M. COPPOLA, a Notary Public, do hereby
 3  certify that JULIA L. MARCUS, PH.D., after having
 4  satisfactorily identifying herself, came before me on
 5  the 11th day of August, 2022, in Boston,
 6  Massachusetts, and was by me duly sworn to testify to
 7  the truth and nothing but the truth as to her
 8  knowledge touching and concerning the matters in
 9  controversy in this cause; that she was thereupon
10  examined upon her oath and said examination reduced to
11  writing by me; and that the statement is a true record
12  of the testimony given by the witness, to the best of
13  my knowledge and ability.
14          I further certify that I am not a relative or
15  employee of counsel/attorney for any of the parties,
16  nor a relative or employee of such parties, nor am I
17  financially interested in the outcome of the action.
18      WITNESS MY HAND THIS 22nd day of August, 2022.
19
20
21  _____
22  DARLENE M. COPPOLA            My commission expires:
23  NOTARY PUBLIC                 November 11, 2022
24  REGISTERED MERIT REPORTER
25  CERTIFIED REALTIME REPORTER
```

# Exhibit I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA,<br>       *Plaintiff–Counterclaim Defendant*,<br><br>       v.<br><br>GILEAD SCIENCES, INC.,<br>       *Defendant–Counterclaim Plaintiff,*<br><br>AND GILEAD SCIENCES IRELAND<br>UC,<br>       *Defendant*. | C.A. No. 1:19-cv-02103-MN |

**REPLY EXPERT REPORT OF ANDREA BRANCALE, PH.D.**

## I.    INTRODUCTION

1.      My name is Dr. Andrea Brancale, Ph.D., and I am submitting this reply report in response to certain opinions given in the "REBUTTAL EXPERT REPORT OF CHARLES W. FLEXNER, M.D.," dated May 17, 2022 ("Flexner Rebuttal Report"), which addresses opinions given in my "Expert Report of Andrea Brancale, Ph.D." ("Opening Report"), dated February 24, 2020.

2.      This reply report and my Opening Report address my opinions that the tenofovir disoproxil fumarate ("TDF") in Gilead's Truvada® product and the tenofovir alafenamide ("TAF") in Gilead's Descovy® product meet the "tenofovir ester" and "tenofovir prodrug" limitations as they appear in certain claims of the '509 and '423 patents, respectively.

3.      As with my Opening Report, I reserve the right to supplement this report if additional information or expert reports are provided to me.

## II.    EDUCATION AND BACKGROUND

4.      My background and relevant experience were set forth in my Opening Report, which I incorporate herein along with its attachments.  As explained in my Opening Report, I am a Professor of Medicinal Chemistry at the School of Pharmacy and Pharmaceutical Sciences of Cardiff University in Cardiff, Wales.  Based on my expertise and qualifications in the field of antiviral prodrugs, I am qualified to provide opinions concerning what a person of ordinary skill in the art would have understood, known, or concluded regarding antiviral prodrugs as of February 3, 2006.  The opinions I express in this report involve the application of my education, training, and technical knowledge and experience to the evaluation of the accused products and the claims of the Asserted Patents.

5.      I have personal knowledge of the matters set forth below and if called upon to testify I could and would testify to them.

46.    The distinction drawn during prosecution **was not related to the specific form used to deliver tenofovir to the patient**, but to the idea that "a tenofovir pro-drug alone is insufficient to protect against HIV infection after multiple virus challenges…." US_00000855. The government argued that "there is no reasonable basis why one of skill would have been motivated to combine tenofovir pro-drug (or tenofovir) with the claimed nucleoside reverse transcriptase inhibitors to make a combination for protecting against HIV infection or inhibition of a self-replicating HIV infection." US_00000855-856. Instead, the government broadly distinguished the prior art because, among other things, monotherapy that delivered tenofovir—including tenofovir as a prodrug—was "an unsuitable candidate to protect against HIV infection" and therefore a skilled artisan would not have expected it to be successfully used in the claimed combination. Dr. Flexner is wrong that the tenofovir or tenofovir ester limitations were related to the government's patentability arguments.

47.    Moreover, the government's arguments regarding unexpectedly superior results of the claimed combination likewise do not indicate any intention to surrender TAF or any other prodrug or ester form of tenofovir. Instead, the arguments cite the "tenofovir prodrug" generally. US_00000857. Likewise, the arguments cite the "superior effect of using this exemplary combination" which "could not have been predicted based on" the prior art. US_00000857. The government's arguments clearly indicate that the focus is on the combination, and not the specific prodrug form of tenofovir that is used to deliver the drug. Nothing in the Summary of the Examiner Interview suggests any different understanding, and instead refers back to the general arguments made by the government on July 21, 2014 and discussed above.

48.    Indeed, in an Examiner-Initiated Interview (summarized at US_00001063; see also US_00001069) the Examiner stated that the "remarks submitted July 21, 2014…have been

17

fully considered and found persuasive as to claims 22 and 33 with a limitation that the administration is oral administration." US_00001063. The Examiner further indicated that the claims were allowable in view of "the superior and unexpected results shown in the application and exhibits." US_00001063. Thus, the Examiner found the government's argument distinguishing the combination from monotherapy persuasive. Beyond allowing the claims presented, the Examiner did not indicate that the particular tenofovir ester form played any role in the patentability determination.

49. Dr. Flexner also argues that the Examiner's amendment was meaningful, and that "broader claims" were cancelled. Flexner Rebuttal Rpt. ¶1118. Dr. Flexner asserts: "[t]his would confirm for the POSA that the scope of tenofovir derivatives was narrowed for reasons related to patentability…." Flexner Rebuttal Rpt. ¶1118. Notably, however, the closest prior art cited by the examiner included tenofovir and the Examiner noted "tenofovir disoproxil fumarate" as "a prodrug of tenorvir [sic tenofovir]." US_00001066. The "tenofovir or tenofovir ester" limitation thus does not distinguish the prior art as described by the Examiner. Thus, the Examiner explained, it was "that the combination has superior effect as compared to tenofovir alone" that was relevant for patentability. US_00001066.

50. Dr. Flexner further cites the prosecution history from a different patent (the '191 patent) and asserts that an amendment in the '191 prosecution "would confirm for the POSA that 'tenofovir prodrug' is broader than the scope of the '509 Patent….and thus that the government's replacement—during the prosecution of the '509 Patent—of claims which included tenofovir prodrugs with those that recited 'tenofovir ester' surrendered non-ester prodrugs of tenofovir, including TAF." Flexner Rebuttal Rpt. ¶1115. I note, however, that the rejection in the '191 prosecution does not apply the same combination of prior art references. *Compare* US_00000849

inappropriate here given that TAF is a tenofovir prodrug derivative that uses esters as part of its masking. Nor does the specification indicate that TAF is an identifiable alternative to tenofovir ester. I thus disagree with Dr. Flexner that the disclosure-dedication rule applies.

## XII.   ADDITIONAL COMMENT

58.   I reserve the right to supplement or amend this report as necessary and appropriate if additional information that affects my opinions becomes available to me. I understand that I may be asked to provide additional information or testimony to assist the Court in these proceedings. I reserve the right to rely on demonstrative and/or visual aids as well as information provided by the other parties in this litigation, as appropriate, to assist the Court and/or supplement my opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  _06/16/2022_____                         Andrea Brancale, Ph.D.

# Exhibit J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>　　　*Plaintiff–Counterclaim Defendant*,<br><br>　　v.<br><br>GILEAD SCIENCES, INC.,<br>　　　*Defendant–Counterclaim Plaintiff,*<br><br>AND GILEAD SCIENCES IRELAND<br>UC,<br>　　　*Defendant*. | C.A. No. 1:19-cv-02103-MN |

### REBUTTAL EXPERT REPORT OF ROBERT M. GRANT, M.D.

RESTRICTED INFORMATION

# I.    INTRODUCTION

1.    I, Robert M. Grant, M.D., submit this report under Federal Rule of Civil Procedure 26(a)(2)(B) on behalf of the United States of America (the "Government").  I understand that this matter involves U.S. Patent Nos. 9,044,509 ("the '509 patent"), 9,579,333 ("the '333 patent"), 9,937,191 ("the '191 patent"), and 10,335,423 ("the '423 patent") (collectively, the "Patents-in-Suit" or the "HHS Patents").

2.    I understand that the Government has sued Defendants Gilead Sciences, Inc. ("Gilead Sciences" or "GSI") and Gilead Sciences Ireland UC ("GSIUC") (collectively, "Gilead" or "Defendants") regarding infringement of certain claims of the '509, '333, '191, and '423 patents with respect to Gilead's Truvada® and Descovy® products when administered as pre-exposure prophylaxis ("PrEP") regimens.  I understand that the Government has asserted that Gilead infringes the following claims of the Patents-in-Suit:

| Patent-in-Suit | Asserted Claim |
|---|---|
| '509 Patent | Claims 1, 3, 8, 9, and 13 |
| '333 Patent | Claims 3 and 13 |
| '191 Patent | Claims 13 and 18 |
| '423 Patent | Claims 1, 3, 9, 12, 14, 18, 19 |

I refer to these claims collectively as the "Asserted Claims."

3.    I submit this report in response to opinions set forth in the "Opening Expert Report of Charles W. Flexner, M.D" (hereinafter, "Flexner Report"), dated March 18, 2022, regarding the alleged invalidity of the Asserted Claims.  I disagree that the Asserted Claims are invalid.  My report responds to certain statements and opinions contained within the Flexner report regarding the validity of the Asserted Claims.  My report does not specifically respond to each and every

1

later priority date, which I understand could be no later than January 31, 2007 (the filing date of the '509 patent). *See, e.g.*, '509 Patent at Cover Page, Item (22).

36.     Based on my review of the specification and claims of the Patents-in-Suit, it is my opinion that a POSA would have been an individual or part of a research team developing antiretroviral treatments for HIV or similar viruses in a clinical, pre-clinical, and/or laboratory setting.  The knowledge held by such a person would have resulted from that person's education, training, and experience, which would have included, for example, either an M.D. or an advanced degree in an allied field (e.g., microbiology, cell biology, immunology, biomedical science, medicinal chemistry, epidemiology, nurse practitioner, public health), along with 2-3 years of experience in those fields or in treating patients.

37.     I understand that the Flexner Report defines the POSA differently than me with respect to the Patents-in-Suit as follows:

> In [Dr. Flexner's] opinion, a person of ordinary skill in the art would have been an individual familiar with treatment and prophylaxis of HIV or similar viruses in individuals in a clinical and/or pre-clinical setting. The knowledge held by such a person would have resulted from that person's education, training and experience, which would have included, for example, either an M.D. or an advanced degree in an allied field (e.g., microbiology, epidemiology, public health), along with 2-3 years of experience in those fields or in treating patients.

Flexner Report ¶ 64.

38.     I disagree with the Flexner Report's proposed definition of a POSA.  For example, the Flexner Report definition proposes familiarity "with treatment and prophylaxis of HIV or similar viruses," which does not appear to encompass developmental aspects of antiretroviral treatment for HIV or similar viruses in a laboratory setting.  Also, the Flexner Report proposal does not appear to allow the POSA to be a member of a research team, which is common in the

development of antiretroviral treatments for HIV or similar viruses. Despite these shortcomings in the proposed definition of a POSA offered by the Flexner Report, my opinions expressed herein would not change if the Court were to apply my definition or the definition proffered by the Flexner Report.

## VI.    CLAIM CONSTRUCTION

39.    I understand that during the course of this action the parties could not reach agreement on the construction of several claim terms. I also understand that the Court has considered the parties' positions on the construction of those claim terms, and construed those terms as summarized below.

### A.    Preamble of claim 1 of the '509, '333, '191, and '423 patents

40.    I understand that the Court has construed the preamble from claim 1 of the '509, '333, '191, and '423 patents that recites "[a] process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus" to be limiting and to mean "a process which allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done." *See* D.I. 186 at 1, 5-7.

### B.    Preamble of claim 12 of the '509, '333, and '423 patents; and claim 13 of the '191 patent

41.    I understand that the Court has construed the preamble from claim 12 of the '509, '333, and '423 patents, and the preamble from claim 13 of the '191 patent, that each recites "[a] process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human" to be limiting and to mean "a process for

not demonstrated a reasonable likelihood that it would prevail with respect to at least one of the claims challenged in the Petition.

## IX.    THE ASSERTED CLAIMS ARE ENTITLED TO THEIR CLAIMED PRIORITY DATE

103.    The Flexner Report asserts various theories about the Asserted Claims not being entitled to the Provisional Application's priority date of February 3, 2006.  I disagree with those theories, which I address in this section of my report.

### A.    The Provisional Application Provides Written Description Support for the Asserted Claims

104.    The Flexner Report describes the Provisional Application as containing four sections:  (1) a "research abstract" (US_00002057-83 at US_00002063); (2) a "slide deck" (*id.* at US_00002064-75); (3) three lists from the FDA website (*id.* at US_00002076-80); and (4) a list of claims (*id.* at US_00002082-83).  *See* Flexner Report ¶¶352-357.  The Flexner Report states that each section "appears to be separate from the others."  *Id.* at ¶353.

105.    The portion of the Provisional Application that the Flexner Report calls a "research abstract" describes and summarizes experiments from the portion of the Provisional Application that the Flexner Report calls a "slide deck."  Also, the claims portion of the Provisional Application further describes and clarifies the inventors' invention.  The claims refer to antiretroviral compounds that are approved by the FDA for treatment of HIV infection.  *See* claims 4 and 10. The portion of the Provisional Application containing "lists from the FDA website" contains a description of antiretroviral compounds that are approved by the FDA for treatment of HIV infection.  For at least these reasons, a person of ordinary skill in the art would have read the four sections of the Provisional Application together in a wholistic manner as an integrated description of the inventors' inventions.

RESTRICTED INFORMATION

skill in the art that tenofovir/FTC were administered before the macaques were rectally exposed to SHIV.

107.    The Flexner Report asserts that claim 14 of the Provisional Application is "the only disclosure of oral administration of antiretrovirals in the Provisional Application." Flexner Report ¶361. I disagree. Claims 4 and 10 of the Provisional Application recite antiretroviral compounds that include those selected from "United States Food and Drug Administration approved drugs used in the treatment of HIV infection." US_00002082. The Provisional Application discloses several orally administered FDA approved drugs for the treatment of HIV, including Combivir, Emtriva, Truvada, Viread, and Lexiva. *See* US_00002076-80. Also, Claims 5 and 11 recite antiretroviral compounds that have been "tableted," which suggests oral administration because tablets are used for oral administration. *See* US_00002082.

### 1.    The Inventors Were In Possession of Oral Administration of FTC and Tenofovir for PrEP

108.    The Flexner Report asserts that the inventors were not in possession of immunodeficiency retroviral pre-exposure prophylaxis via oral administration of the combination of FTC and TDF for four reasons. *See* Flexner Report ¶¶363-376. I address each reason below.

109.    ***First***, the Flexner Report asserts that the Provisional Application has "no disclosure of ***any experiment***—at all—of an orally administered immunodeficiency retrovirus pre-exposure prophylaxis." Flexner Report ¶364 (emphasis added). I understand that a provisional application need not disclose an ***experiment*** to demonstrate possession of oral administration of FTC and TDF for PrEP. As discussed above, the Provisional Application discloses a PrEP experiment with tenofovir and FTC. *See, supra,* discussion of US_0002069. As also discussed above, the Provisional Application discloses oral administration of FTC and TDF. For example, claim 14 of the Provisional Application discloses "oral" administration of antiretrovirals. US_00002083.

60

Claims 4 and 10 recite antiretroviral compounds that include those selected from "United States Food and Drug Administration approved drugs used in the treatment of HIV infection." US_00002082.  The disclosed FDA approved drugs for the treatment of HIV include Emtriva, Truvada, and Viread.  *See* US_00002076-80.  Therefore, the Provisional Application, when read as a wholistic integrated disclosure, demonstrates possession of oral administration of FTC and TDF for PrEP.

110.  ***Second***, the Flexner Report asserts "within the four corners of the Provisional Application, there are express statements of skepticism as to the probative value of the disclosed subcutaneous monkey experiments with respect to orally administered pre-exposure prophylaxis." Flexner Report ¶365.   The Flexner report bases this statement on two sentences within the Provisional Application:

> (1)  "The observed protection by tenofovir and FTC may not reflect that of Truvada, because a higher dose of tenofovir was used."  US_00002073.
>
> (2)  "Adding tenofovir to FTC at a dosing similar to that in Truvada ***may*** enhance further the protection."  US_00002074 (emphasis added).

*See* Flexner Report ¶¶365-367.  The Flexner Report relies on a similar statement from Dr. Heneine's 2006 presentation of macaque animal data at the CROI conference.  *See* Flexner ¶373 (quoting Dr. Heneine's statement that "the observed protection by Tenofovir and FTC may not necessarily reflect that of Truvada, because a higher dose of Tenofovir was used in [the study's subcutaneous]  combination.")  (Heneine  CROI  transcript,  GILDDE02684702-888  at GILDDE02684793).

111.    A person of ordinary skill in the art would have viewed the second sentence quoted above reciting that "Truvada may enhance further protection" as disclosing that the use of Truvada for PrEP may provide ***improved*** (or better, i.e., "enhanced") results than the experiment

demonstrated in the Provisional Application through the combination of subcutaneous tenofovir and oral FTC.  A person of ordinary skill in the art would not have viewed this sentence as expressing skepticism.  Furthermore, a person of ordinary skill in the art considering the entire disclosure of the Provisional Application would not have viewed the two quoted sentences as expressing skepticism regarding the probative value of the disclosed macaque experiments for orally administered PrEP.  Claim 1 of the Provisional Application recites "[a] composition for the prevention of HIV transmission comprising *a plurality of antiretroviral compounds*."  *See* US_00002082 (emphasis added).  Claim 8 recites a method of preventing HIV transmission by administering "a composition comprising *a plurality of antiretroviral compounds*."  *Id.* (emphasis added).  Claims 5 and 11 recite that the plurality of antiretroviral compounds are "tableted," *id.*, which includes a tablet for oral administration.  Claim 14 specifically recites "oral" administration. *See* US_00002083.  In addition, the title of the Provisional Application recites a "tenofovir/FTC combination," and the Application also states "[t]enofovir/FTC combination provides a high level of protection against repeated virus challenges, demonstrating that chemoprophylaxis with potent antiretrovirals is an effective strategy for preventing sexual HIV transmission."  US_00002063. When these disclosures are read wholistically, a person of ordinary skill in the art would have understood that the Provisional Application discloses tenofovir/FTC combinations that are tableted for oral administration.  Truvada is the only oral formulation of a tenofovir/FTC combination disclosed in the Provisional Application. *See* US_00002073-74 and US_00002076.  Thus, the two quoted sentences in Flexner Report ¶365 do not express skepticism.

112.  ***Third***, the Flexner Report asserts "to the extent there is any disclosure relating to orally administered preexposure prophylaxis with a combination of FTC and tenofovir (or TDF or tenofovir ester or tenofovir prodrug) in the Provisional Application, it is not included as an

Wall Street Journal, December 4, 2003 (listing potential risks including "kidney toxicity and bone toxicity," "[t]he eventual buildup of resistance," and not knowing "how healthy uninfected people will react to taking a daily pill indefinitely") (GILDDE02302564-67).

328.    Gilead previously stated that it had "no interest in pursuing PrEP because of fears that uninfected people who take tenofovir and still become infected might sue the company." Cohen, "Prevention Cocktails: Combining Tools to Stop HIV's Spread," Science 309:1002-05, 2005 at 1004. Gilead declined to pursue an injectable form of tenofovir for pre-exposure prophylaxis because "it wasn't clear that the drug would block sexual transmission of the virus in people, and Gilead chose to focus on its core mission of getting Viread approved for the treatment of AIDS." *See* "Trials Will Test Whether AIDS Drug Can Also Prevent HIV," by Marilyn Chase, The Wall Street Journal, December 4, 2003 (GILDDE02302564-67).  As late as 2013, after Truvada® for use as PrEP was approved by FDA, Gilead stated that it "[did] not view PrEP as a commercial opportunity," finding that "[t]he role of antiretrovirals in H.I.V. prevention [was] not yet defined and not yet broadly accepted." *See* "Why is No One on the First Treatment to Prevent H.I.V.?" by Christopher Glazek, The New Yorker, September 30, 2013. Thus, there was significant skepticism in the HIV field, notably Gilead's own.  Additional evidence of skepticism is provided in this report in response to the Flexner Report Combinations 1-6.  For these reasons, I disagree with the conclusion in the Flexner Report that there was no skepticism surrounding the PrEP methods of the claimed invention.  *See* Flexner Report ¶2163.

### 3.    Industry praise for the Asserted Claims support nonobviousness

329.    The claimed methods have received significant praise and accolades. For example:

- In 2012, Time Magazine hailed the combination treatment as a "potent" weapon against HIV/AIDs (IPR2019-0453, Exhibit 2009 at 1), which "marks a big step toward controlling the spread of HIV and AIDS, not just in the U.S. but worldwide as well." *Id*. at 2.

- In 2016, the Boston Globe reported that the combined treatment of emtricitabine and tenofovir disoproxil fumarate in Truvada for preexposure prophylaxis is "a total game-changer" (IPR2019-0453, Exhibit 2010 at 2) and is "considered one of the most significant advances in the fight against AIDS."  *Id*. at 1.

- Also in 2016, the Washington Post recognized the "breakthrough research" leading to the approval of the combined treatment of emtricitabine and tenofovir disoproxil fumarate in Truvada for preexposure prophylaxis. IPR2019-0453, Exhibit 2011 at 1.

330.    In addition, the named inventors were twice nominated for the Charles C. Shepard Science Award, the premier CDC award for excellence in science, for their work reflected in the claimed invention. IPR2019-0453, Exhibit 2012 at 1; IPR2019-0453, Exhibit 2021 at 1.

331.    Additionally, during the May 2019 United States House Committee on Oversight and Reform, academics and clinicians lauded the "remarkable scientific work" leading to FDA approval of pre-exposure prophylaxis IPR that offers "the most efficacious prevention intervention known." D.I. 1, Exhibit 32 at 7; *id*. at 5 ("CDC scientists discovered that adding a drug called FTC to tenofovir increased protection, and it's the combination of those two medications which is FDA-approved today."); *id*. at 35.  For these reasons, I disagree with the conclusion in the Flexner Report that the claimed invention did not receive industry praise.  *See* Flexner Report ¶2164.

### 4.    Copying by contemporaneous clinical trials supports nonobviousness

332.    Others copied the Government's invention.  At the time of the Government's invention, others were investigating a tenofovir disoproxil fumarate monotherapy for pre-exposure

RESTRICTED INFORMATION

prophylaxis.  After the Government's invention became public, several investigators adopted the Government's method of co-administering the combination of emtricitabine and tenofovir disoproxil fumarate. Scientists modified already-commenced trials to adopt the Government's method:

> Recently, promising results were shown when combining TDF [tenofovir disoproxil fumarate] with FTC [emtricitabine] as PREP, the so-called combo-PREP, in an animal model. … These results prompted some of the ongoing and planned PREP trials to be modified to test Truvada, the combination tablet of TDF and FTC, instead of a single PREP drug.

Derdelinckx et al., "Criteria for Drugs Used in Pre-Exposure Prophylaxis Trials against HIV Infection," PLoS Med 3:e454, 2006 at 2002 (IPR2019-01453, Exhibit 1133); *see also* Liu et al., "Preexposure Prophylaxis for HIV," JAMA, 296:863-65, 2006 at 864 (copying by the TDF2 and iPrEx studies) (IPR2019-01453, Exhibit 2017); Thigpen et al., "Antiretroviral Preexposure Prophylaxis for Heterosexual HIV Transmission in Botswana," NEJM, 363:423-34, 2012 at 424-25 (copying by the TDF2 study) (US_GRANT_000014-24).   In addition, I credited the Government's innovation for the first effective pre-exposure prophylaxis regimen. *See* HIV Prevention Drug: Billions in corporate profits after millions in taxpayer investments," Hearing before the Committee on Oversight and Reform, House of Representatives, 116 Congress, Serial No. 116-24, May 16, 2019, D.I. 1, Exhibit 32 at 5 ("CDC scientists discovered that adding a drug called FTC to tenofovir increased protection, and it's the combination of those two medications which is FDA-approved today."); *id*. at 35 ("[a]nd so when we look at innovations, CDC brought us pre-exposure dosing, they brought us information that the mixture of two drugs was much more important than one drug").

provides enough certainty to a person of ordinary skill in the art as to the meaning of "several" such that the limitation "several days, weeks or months" is not indefinite.

360.    The Flexner Report asserts that claim 9 of the '509 patent and claim 14 of the '423 patent are invalid as indefinite "because the claims do not disclose when the daily administration of the claimed combination must occur relative to the retroviral exposure, except to specify that one administration must be before the exposure as recited in claim 1 of the '509 patent and claim 1 of the '423 patent." Flexner Report ¶¶2272.   I agree that the claims specify that one administration must be before the exposure.  The other administrations can occur before or after the exposure.  The scope of the claims is reasonably certain because one exposure must occur before the administration, while the other administrations can occur before or after exposure. There does not appear to be any improper ambiguity in understanding the scope of these claims.

## XVII.  THE DEPENDENT ASSERTED CLAIMS ARE PROPERLY DEPENDENT

361.    I understand that the Flexner Report alleges that certain dependent claims are invalid because they exceed the scope of the subject matter claimed by the claim from which it depends.  *See* Flexner Report ¶¶2274-2305.

### A.    Claim 3 of the '509 patent is properly dependent

362.    The Flexner Report asserts that claim 3 of the '509 patent improperly depends from claim 2.  *See* Flexner Report ¶¶2277-2284.  I disagree.

363.    Claim 1 of the '509 Patent recites:

1. A process of protecting a ***primate host*** from a self-replicating infection by an immunodeficiency retrovirus comprising:

(a) selecting a ***primate host*** not infected with the immunodeficiency retrovirus, and

(b) administering directly to an uninfected primate host a combination comprising:

   i. a pharmaceutically effective amount of emtricitabine; and

ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate,

wherein the combination is administered prior to an exposure of the primate host to the immunodeficiency retrovirus, thereby protecting the ***primate host*** from infection with the immunodeficiency retrovirus, wherein the combination is administered orally.

'509 Patent, claim 1 (emphases added).

364.    A person of ordinary skill in the art would have understood claim 1 to encompass methods to protect a primate host, including but not limited to humans.  For example, the written description of the '509 patent defines the term "primate host" "to include a monkey, baboon, chimpanzee, gorilla, and a human." '509 patent at 4:18-19.

365.    Claim 2 depends from claim 1 and recites:

The process of claim 1 wherein selecting a primate host comprises selecting ***an adult human*** not infected with the immunodeficiency retrovirus.

'509 Patent, claim 2 (emphasis added).  A person of ordinary skill in the art would have understood claim 2 to narrow the scope of claim 1.  This is because claim 1 encompasses methods of protecting a primate host, while claim 2 encompasses methods for protecting only an adult human.

366.    Claim 3 depends from claim 2 and recites:

The process of claim 2 wherein the adult primate host is ***a male adult primate host***.

'509 Patent, claim 3 (emphasis added).

367.    The Flexner Report asserts that "a person of ordinary skill in the art would have understood claim 3 to be narrower than claim 2 in one respect—i.e., by encompassing methods performed only on males—but to be broader than claim 2 in another—i.e., encompassing non-human primates as well as humans."  Flexner Report ¶2282.  I disagree.  Claims 1, 2 and 3 would be read wholistically by the person of ordinary skill in the art.  The person of ordinary skill in the

art would have understood that the "primate host" recited by claim 3 has both the "male adult" characteristic recited by claim 3 and the "human" characteristic recited by claim 2. Therefore, the person of ordinary skill in the art would have understood that claim 3 narrows claim 2 by being directed to a male adult human. This reading makes sense in light of claim 2, which specifies that the primate host subject to claims 2 and 3 is "an adult human." Claim 3 therefore contains all limitations of claim 2 and limits claim 2 by requiring that the primate host that is the subject of claim 3 be a male adult human. The person of ordinary skill in the art would have recognized that claim 3 contains a clerical error by referring to a "primate host" instead of a "human." The meaning of claim 3 is not subject to reasonable debate and the prosecution history does not suggest a different interpretation of the claims.

368.    The following figure illustrates the scope of these three claims as understood by the person of ordinary skill in the art. Claim 3 is shown in red, and claim 2, from which it depends, is shown in blue.



369.    Because a person of ordinary skill in the art would have understood that claim 3 is narrower than claim 2, it is my opinion that claim 3 of the '509 Patent is not improperly dependent.

**B.    Claim 13 of the '509 patent is properly dependent**

370.    The Flexner Report asserts that claim 13 of the '509 patent improperly depends from non-disclaimed claim 12.  *See* Flexner Report ¶¶2285-2291.  I disagree.

371.    Now-disclaimed claim 12 of the '509 Patent recites:

12. A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a ***human***, comprising:

(a) selecting an uninfected ***human*** that does not have the self replicating infection; and

(b) administering to the uninfected ***human*** a combination comprising:

    i. a pharmaceutically effective amount of emtricitabine; and

    ii. a pharmaceutically effective amount of tenofovir or tenofovir ester;

thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the ***human***, wherein the combination is administered orally.

'509 Patent, claim 12 (emphasis added).

372.    A person of ordinary skill in the art would have understood claim 1 to encompass methods of protecting an uninfected human.

373.    Claim 13 depends from claim 12 and recites:

The process of claim 12 wherein the combination is administered prior to a potential exposure of the ***primate host*** to the human immunodeficiency retrovirus.

'509 Patent, claim 13 (emphasis added).

374.    The Flexner Report asserts that "a person of ordinary skill in the art would have understood that methods performed on non-human primates are within the scope of claim 13 but are not within the scope of claim 12."  Flexner Report ¶2289.  I disagree.  Claims 12 and 13 would be read wholistically by the person of ordinary skill in the art.  The person of ordinary skill in the

art would have understood that the claim 13 recites that the administration is to a "primate host," but this does not change step (a) of claim 12 that requires "selecting an uninfected human." The "primate host" of claim 13 that is administered the combination prior to a potential exposure is the selected "uninfected human" from step (a) of claim 12. Claim 13 is narrower than claim 12 because the primate host of claim 13 requires two characteristics:  (1) the primate host must be administered the combination prior to a potential exposure via the express language of claim 13, and (2) the primate host must be an uninfected human via the express language of claim 12, step (a). Therefore, the person of ordinary skill in the art would have understood that claim 13 narrows claim 12 by being directed to administering the combination prior to a potential exposure of the human. This reading makes sense in light of claim 12, which specifies that the process selects an uninfected "human." Claim 13 contains all limitations of claim 12 and further limits claim 12 by requiring administration of the combination prior to a potential exposure of the human to the immunodeficiency retrovirus. The person of ordinary skill in the art would have recognized that claim 13 contains a clerical error by referring to a "primate host" instead of a "human." The meaning of claim 13 is not subject to reasonable debate and the prosecution history does not suggest a different interpretation of the claims.

375.    The following figure illustrates the scope of these two claims as understood by the person of ordinary skill in the art. Claim 13 is shown in red, and claim 12, from which it depends, is shown in blue.

RESTRICTED INFORMATION



376.    Because a person of ordinary skill in the art would have understood that claim 13 narrower than claim 12, it is my opinion that claim 13 of the '509 Patent is not improperly dependent.

### C.    Claim 3 of the '333 patent is properly dependent

377.    The Flexner Report asserts that claim 3 of the '333 Patent improperly depends from claim 2.  *See* Flexner Report ¶¶2292-2299.  I disagree.

378.    Claim 1 of the '333 Patent recites:

1. A process of protecting a ***primate host*** from a self-replicating infection by an immunodeficiency retrovirus comprising:

(a) selecting a ***primate host*** not infected with the immunodeficiency retrovirus, and

(b) administering directly to an uninfected ***primate host*** a combination comprising:

 i. a pharmaceutically effective amount of emtricitabine, wherein the pharmaceutically effective amount of the emtricitabine is administered orally, subcutaneously or vaginally; and

 ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate, wherein the pharmaceutically effective amount of the tenofovir or tenofovir disoproxil fumarate is administered orally, subcutaneously or vaginally, and

proceedings.  I reserve the right to rely on demonstrative and/or visual aids as well as information provided by the other parties in this litigation, as appropriate, to assist the Court and/or supplement my opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Date: May 17, 2022

Robert Grant

Digitally signed by Robert Grant
DN: cn=Robert Grant, o=University
of California, San Francisco,
ou=Department of Medicine,
email=robert.grant@ucsf.edu, c=US
Date: 2022.05.17 12:28:56 -07'00'

Robert M. Grant, M.D.

RESTRICTED INFORMATION

# Exhibit K

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3      ----------------------------x

4      UNITED STATES OF AMERICA,      :

5          Plaintiff and             :

6          Counterclaim Defendant,   :

7          v.                        :   CA No.

8      GILEAD SCIENCES, INC. and     :   1:19-cv-02103-MN

9      GILEAD SCIENCES IRELAND UC,   :

10         Defendants and            :

11         Counterclaim Plaintiffs.  :

12     ----------------------------x

13

14              Videotaped Deposition of

15              ROBERT M. GRANT, M.D.

16                 Washington, DC

17             Monday, August 29, 2022

18                   9:01 a.m.

19

20

21

22

23     Job No.: 457415

24     Pages: 1 - 309

25     Reported by: Janet A. Hamilton, RDR
```

Transcript of Robert Grant, M.D.
August 29, 2022                                                    2

1          Videotaped Deposition of ROBERT M. GRANT,

2    M.D., held at the offices of:

3

4

5

6          Wilmer Cutler Pickering Hale and Dorr LLP

7          1875 Pennsylvania Avenue, NW

8          Washington, DC  20006

9          202.663.6000

10

11

12

13

14

15

16

17          Pursuant to Notice, before Janet A.

18   Hamilton, Registered Diplomate Reporter and Notary

19   Public in and for the District of Columbia.

20

21

22

23

24

25

Transcript of Robert Grant, M.D.
August 29, 2022

251

| | | |
|---|---|---|
| 1 | testified earlier that your understanding of | 15:55:45 |
| 2 | several, the lower limit would be two; right? | 15:55:46 |
| 3 | A  Right. | 15:55:50 |
| 4 | Q  What is the upper limit of several as you | 15:55:51 |
| 5 | understand it, as it's used in claim 9, if any? | 15:55:53 |
| 6 | A  Three maybe. | 15:55:58 |
| 7 | Q  The upper limit is three? | 15:56:00 |
| 8 | A  Yeah. | 15:56:02 |
| 9 | Q  Okay. | 15:56:02 |
| 10 | A  Two or three, yeah. | 15:56:02 |
| 11 | Q  Is 17 days, for instance, several days or | 15:56:04 |
| 12 | is that not several days? | 15:56:08 |
| 13 | A  That gets into my definition of several | 15:56:13 |
| 14 | weeks. | 15:56:16 |
| 15 | Q  Are two weeks several weeks? | 15:56:17 |
| 16 | A  Conceivably, yes. | 15:56:20 |
| 17 | Q  So 14 days would be several days or | 15:56:22 |
| 18 | several weeks?  I just want to -- on how you | 15:56:29 |
| 19 | understand this claim 9? | 15:56:33 |
| 20 | A  So, you know, again I'm not a patent | 15:56:38 |
| 21 | attorney, and so I don't have awareness of why | 15:56:41 |
| 22 | parsing this out is so important to you, but I'm | 15:56:47 |
| 23 | familiar with these words in English, and I would | 15:56:50 |
| 24 | say the term several days, weeks or months could | 15:56:53 |
| 25 | encompass anything from two days up to multiple | 15:56:57 |

Transcript of Robert Grant, M.D.
August 29, 2022                                    252

| | | |
|---|---|---|
| 1 | years.  So anything in between would I think be | 15:57:01 |
| 2 | included in that in my, I would say lay | 15:57:05 |
| 3 | understanding.  Not sure. | 15:57:10 |
| 4 | Q  And with that -- I think you already | 15:57:12 |
| 5 | answered this -- in your understanding is there | 15:57:14 |
| 6 | any upper limit to how many, what time span is | 15:57:17 |
| 7 | encompassed by claim 9? | 15:57:20 |
| 8 | A  I wouldn't think there was any upper limit | 15:57:23 |
| 9 | intended; that several months could mean, you | 15:57:26 |
| 10 | know, decades potentially, yes. | 15:57:30 |
| 11 | Q  Several months could mean decades? | 15:57:32 |
| 12 | A  Yes.  Decades of years, yeah. | 15:57:36 |
| 13 | Q  I'd like to direct your attention to claim | 15:57:41 |
| 14 | 3 of the '509 patent. | 15:57:44 |
| 15 | A  Claim 3, okay. | 15:57:46 |
| 16 | Q  And that's in Exhibit 19. | 15:57:49 |
| 17 | A  Claim 2. | 15:57:52 |
| 18 | Q  And claim 3 recites in full, "The process | 15:57:54 |
| 19 | of claim 2 wherein the adult primate host is a | 15:58:02 |
| 20 | male adult primate host"; correct? | 15:58:05 |
| 21 | A  Yes. | 15:58:09 |
| 22 | Q  And I'd like to direct your attention to | 15:58:09 |
| 23 | paragraph 368 of your report, and here you have an | 15:58:12 |
| 24 | illustration that is a figure that you say | 15:58:32 |
| 25 | illustrates the scope of claims 1 through 3 of the | 15:58:36 |

Transcript of Robert Grant, M.D.
August 29, 2022                                      253

| | | |
|---|---|---|
| 1 | '509 patent; right?  Right? | 15:58:40 |
| 2 | A  Well, it's not -- it's not -- the patent | 15:58:57 |
| 3 | claim says male adult primate, and claim 1 is | 15:59:00 |
| 4 | primate host which would include -- | 15:59:10 |
| 5 | Q  Doctor, that's not my question.  I think | 15:59:13 |
| 6 | you're getting way ahead of me. | 15:59:15 |
| 7 | A  Got it. | 15:59:17 |
| 8 | Q  I'm just asking first, and we'll get to | 15:59:17 |
| 9 | that, I promise, this -- in paragraph 368 you are | 15:59:20 |
| 10 | presenting this illustration as illustrating the | 15:59:25 |
| 11 | scope of the three claims, claims 1, 2 and 3 of | 15:59:30 |
| 12 | the '509 patent; right? | 15:59:35 |
| 13 | A  Let me just make sure that we're in the | 15:59:37 |
| 14 | '509 section because -- yes.  We are in the '509 | 15:59:41 |
| 15 | section, so yes. | 15:59:43 |
| 16 | Q  And the figure you include in paragraph | 15:59:44 |
| 17 | 368, you say claim 3 is shown in red; right? | 15:59:46 |
| 18 | A  Yes. | 15:59:49 |
| 19 | Q  And the language that you quote in your | 15:59:51 |
| 20 | figure in paragraph 368 for claim 3 is method to | 15:59:53 |
| 21 | protect a male adult human.  You see that?  Right? | 15:59:58 |
| 22 | A  Yeah.  Those words are different. | 16:00:05 |
| 23 | Q  Well, that's my point.  You look at claim | 16:00:07 |
| 24 | 3 of the '509 patent and that's not the language | 16:00:10 |
| 25 | of claim 3, is it? | 16:00:13 |

Transcript of Robert Grant, M.D.
August 29, 2022                                          254

| | | |
|---|---|---|
| 1 | A  Well, but claim 2 does specify adult | 16:00:15 |
| 2 | human, and an adult human is an adult primate, and | 16:00:19 |
| 3 | then -- | 16:00:25 |
| 4 | Q  Claim -- sorry.  Go ahead. | 16:00:25 |
| 5 | A  Claim 3, the wording of the claim goes | 16:00:27 |
| 6 | back to adult primate but, you know, it... | 16:00:29 |
| 7 | Q  Claim 3 states a male adult host, not a | 16:00:36 |
| 8 | male adult human; right? | 16:00:40 |
| 9 | A  Yeah.  A male adult primate would include | 16:00:45 |
| 10 | both monkeys and men, male monkeys and men, but, | 16:00:49 |
| 11 | but they're nesting it under 2 which specifies an | 16:00:56 |
| 12 | adult human.  An adult human is an adult primate, | 16:01:01 |
| 13 | and so I think claim 3 does embrace claim 2 where | 16:01:08 |
| 14 | adult human has been specified, and so, you know, | 16:01:16 |
| 15 | I think -- | 16:01:25 |
| 16 | Q  Claim 2 of the '509 patent recites that | 16:01:25 |
| 17 | the primate host is "an adult human not infected | 16:01:28 |
| 18 | with the immunodeficiency virus."  Right? | 16:01:33 |
| 19 | A  Mm-hmm. | 16:01:38 |
| 20 | Q  And claim 3 of the '509 patent recites, | 16:01:39 |
| 21 | "The adult primate host is a male adult primate | 16:01:43 |
| 22 | host."  Correct? | 16:01:44 |
| 23 | A  An -- | 16:01:48 |
| 24 | Q  That's what claim 3 says; right? | 16:01:49 |
| 25 | A  Well, an adult human is an adult primate | 16:01:51 |

Transcript of Robert Grant, M.D.
August 29, 2022

255

| | | |
|---|---|---|
| 1 | host. | 16:01:54 |
| 2 | Q  Claim 3 says, "The process of claim 2 | 16:01:58 |
| 3 | wherein the adult primate host is a male adult | 16:02:03 |
| 4 | primate host."  I read that correctly; right? | 16:02:06 |
| 5 | A  Yes. | 16:02:12 |
| 6 | Q  And you agree that a male adult primate | 16:02:13 |
| 7 | host is broader than an adult human; right? | 16:02:17 |
| 8 | A  Well, if it -- but it refers to claim 2. | 16:02:23 |
| 9 | So again claim 3 does refer to claim 2, and so -- | 16:02:29 |
| 10 | Q  I understand that. | 16:02:33 |
| 11 | A  And so claim 2 specifies that the primate | 16:02:34 |
| 12 | host is an adult human. | 16:02:40 |
| 13 | Q  And male adult primate host claimed in | 16:02:43 |
| 14 | claim 3 is broader than adult human.  I'm sorry. | 16:02:49 |
| 15 | Strike that. | 16:02:53 |
| 16 | Yes.  You agree that a male adult host is | 16:02:54 |
| 17 | broader than adult human; correct? | 16:02:57 |
| 18 | MR. BROWN:  Objection. | 16:02:57 |
| 19 | A  Well, you can quibble about the English | 16:03:03 |
| 20 | language, but I'll just point out that claim 3 | 16:03:07 |
| 21 | does refer to claim 2, and claim 2 is where it's | 16:03:09 |
| 22 | specified that they're talking about adult humans, | 16:03:13 |
| 23 | and so I think a reasonable person or POSA, if you | 16:03:16 |
| 24 | will, would presume that the primate host in claim | 16:03:20 |
| 25 | 3 is a human because that's what claim 2 | 16:03:24 |

Transcript of Robert Grant, M.D.
August 29, 2022                                    256

| | | |
|---|---|---|
| 1 | specifies. | 16:03:28 |
| 2 | Q  Even though claim 3 says the process of | 16:03:29 |
| 3 | claim 2 wherein the adult primate host is a male | 16:03:32 |
| 4 | adult primate host; right?  That's your opinion? | 16:03:36 |
| 5 | A  Well, that's what it says, but when you | 16:03:40 |
| 6 | read claim 2, which you should read because it's | 16:03:42 |
| 7 | referred to in claim 3, you learn that the host, | 16:03:45 |
| 8 | the primate host is an adult human, and so the | 16:03:49 |
| 9 | interpretation of this would be that claim 3 also | 16:03:53 |
| 10 | is referring to an adult human. | 16:03:56 |
| 11 | Q  And do you agree with me, Doctor, that the | 16:04:00 |
| 12 | phrase male adult primate host is broader than | 16:04:02 |
| 13 | adult human? | 16:04:08 |
| 14 | MR. BROWN:  Asked and answered.  The | 16:04:11 |
| 15 | witness may answer. | 16:04:13 |
| 16 | A  If that phrase appeared outside of this | 16:04:16 |
| 17 | context? | 16:04:18 |
| 18 | Q  Yes. | 16:04:19 |
| 19 | A  I might agree with your question, but | 16:04:20 |
| 20 | you're asking it within the context of claims 2 | 16:04:24 |
| 21 | and 3, and I think in that context where claim 3 | 16:04:27 |
| 22 | refers to claim 2 the only interpretation here is | 16:04:32 |
| 23 | that the adult primate most is an adult human. | 16:04:35 |
| 24 | Q  If you look at column 4 of the '509 | 16:04:38 |
| 25 | patent. | 16:04:44 |

# Exhibit L

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,
*Plaintiff–Counterclaim Defendant*,

v.

GILEAD SCIENCES, INC.,
*Defendant–Counterclaim Plaintiff,*

AND GILEAD SCIENCES IRELAND
UC,
*Defendant*.

C.A. No. 1:19-cv-02103-MN

**<u>REBUTTAL EXPERT REPORT OF DHIREN R. THAKKER, Ph.D.</u>**

RESTRICTED INFORMATION

## I.   INTRODUCTION

1.     I, Dhiren R. Thakker, submit this report under Federal Rule of Civil Procedure 26(a)(2)(B) on behalf of the United States of America (the "Government").

2.     I understand that the Government has sued Defendants Gilead Sciences, Inc. ("Gilead Sciences" or "GSI") and Gilead Sciences Ireland UC ("GSIUC") (collectively, "Gilead" or "Defendants") for infringement of certain claims of U.S. Patent Nos. 9,044,509 ("the '509 patent"), 9,579,333 ("the '333 patent"), 9,937,191 ("the '191 patent"), and 10,335,423 ("the '423 patent") (collectively, the "Patents-in-Suit" or the "Asserted Patents") with respect to Gilead's Truvada® and Descovy® products when administered as pre-exposure prophylaxis ("PrEP") regimens.  This report sets forth my opinions rebutting certain opinions of Gilead's expert, Dr. Charles W. Flexner.  My opinions are based on my education, knowledge, professional experience, as well as my review of the materials cited in this report.

## II.   EXPERIENCE AND QUALIFICATIONS

3.     I am President and CEO of Med-Aditus International, Inc., a nonprofit corporation I founded in December of 2019 with a mission to improve access to affordable quality medicines to people in sub-Saharan Africa. Previously, I served as a Distinguished Professor of Pharmaceutical Sciences at the UNC Eshelman School of Pharmacy ("School of Pharmacy") at the University of North Carolina at Chapel Hill, which is a position I held from 1996 to 2017. In addition, I have served as Associate Dean for Research and Graduate Education, Associate Dean for Entrepreneurial Development and Global Engagement ("EDGE") (formerly Economic Development and International Partnerships), Director of Campbell Faculty Mentoring Program,

48.     In view of the specification explaining that tenofovir is an NtRTI, an appropriate understanding of the term "tenofovir prodrug" would simply substitute "tenofovir" for "NtRTI" in the definition of "prodrug" contained in the specification.  Therefore, by applying the expressed definition in the specification, a POSA would understand that a "tenofovir prodrug" is "a compound that, when administered to a primate host generates tenofovir as a result of spontaneous reaction under physiological conditions, enzymatic catalysis, metabolic clearance, or combinations thereof."

49.     It is further my understanding that under the Court's claim construction of "tenofovir ester," any tenofovir ester would necessarily be a tenofovir prodrug.

## VIII.   TECHNOLOGY BACKGROUND

50.     The inventors of the Patents-in-Suit developed a combination regimen, specifically emtricitabine and tenofovir (or a tenofovir ester or a tenofovir prodrug), for pre-exposure prophylaxis of HIV in HIV-negative people.  As disclosed in the specification of the Patents-in-Suit, this combination regimen demonstrated unexpectedly high efficacy in primates (*see, e.g.,* '509 patent at 9:1-10:9) and subsequent clinical trials confirmed this unexpected efficacy in humans.  *See, e.g.,* Grant et al., The New England Journal of Medicine, 363:2587-99, 2010 at 2596-97 (describing the results of the iPrEx clinical trial); McCormack et al., Lancet 387:53-60, 2016 at 57 (describing the results of the PROUD clinical trial).

### A.     Background on oral absorption, bioavailability, and metabolism

51.     **Oral absorption:** The stomach and intestine together form a passage way, generally known as gastrointestinal tract, through which all orally ingested food, liquids, drugs, and other xenobiotics (foreign compounds) must pass.  For an orally administered drug to reach

target tissues and have a therapeutic effect, the drug must be released from the dosage form (e.g. tablet, capsule) and must dissolve in the gastrointestinal (GI) fluids.  Once the drug is dissolved in the GI fluids, for absorption to occur the drug must cross the epithelium (a single layer of cells lining the intestinal cavity) into the bloodstream.  The process by which a drug is transferred from the intestinal cavity into the bloodstream by traversing the intestinal epithelium is known as oral absorption.

52.     While the intestinal epithelium is designed to maximize absorption of nutrients, it is also a formidable barrier for drugs to be absorbed upon oral administration.  This is because the intestinal epithelial cells are columnar in shape and are tightly packed, leaving very little intercellular space for any compound to traverse.  Also, they are connected with one another via structures called tight junctions, which further restricts the intercellular space.  Therefore, a drug has to pass through the cell membrane made up of phospholipids and proteins, and it cannot permeate the epithelium via the intercellular space unless it is very small in size and highly water soluble.  For a drug to cross the cell membrane, it must be lipophilic, or in other words it must readily partition in, or dissolve in, the lipid environment of the cell membrane.  Also, a drug with a net positive charge or net negative charge cannot readily partition into the cell membrane of intestinal epithelial cells, and therefore cannot readily be absorbed from the intestinal cavity into the bloodstream.

53.     **Oral Bioavailability:** Because intestinal epithelium is a significant barrier to absorption of drugs that are not lipophilic, which means they are hydrophilic (easily partition into aqueous fluids), and that carry a net positive or net negative charge, only a fraction of the dose of an orally administered drug may absorb during its passage through the gastrointestinal tract. Experimentally this is determined by administering a known dose of the drug orally, and measuring

the concentrations of the drug in the blood stream over a period of time, say 0 (for example, a time when the drug was ingested) to 24 hours (for example, a time when most of the drug has been cleared from the blood). In a second experiment, the same or a smaller dose of the drug is administered by intravenous injection so that 100% of the dose goes into the blood stream. The concentrations of the drug in the bloodstream are measured over the same time interval as in the first experiment. By comparing the concentrations of the drug in the bloodstream over the same time interval after oral and intravenous administration, one can calculate the percent of dose absorbed in relation to the 100% of the dose injected into the bloodstream after intravenous administration. The oral bioavailability of a drug can range from 0% to 100%.

54. **Metabolism:** After a drug is administered, it is chemically degraded by enzymes in the body, and ultimately eliminated from the body as parent drug and metabolites. The enzymes that chemically transform drugs and other xenobiotics are known as metabolic enzymes, and the chemical transformation catalyzed by these enzymes is known as metabolism, or drug metabolism when it applies to drugs. Practically all metabolic reactions can be classified in four classes: oxidation, reduction, hydrolysis, and conjugation. Each of these metabolic reactions is catalyzed by a class of enzymes. Metabolic enzymes are present in the blood as well as in many organs, including liver, intestine, lung, heart, brain, kidney. Metabolism can affect the efficacy and safety of drugs. For example, if a drug is very rapidly metabolized, it is removed from the bloodstream and the target organ before it can exert its beneficial pharmacologic effect. On the other hand, if a metabolic enzyme is inhibited by one drug, then it may not effectively metabolize a concurrently administered drug, causing unexpectedly high concentration of the drug in the body and consequent toxicity.

RESTRICTED INFORMATION

55.     Drug discovery and development teams have taken advantage of the ability of the metabolic enzymes to chemically transform administered drugs.  Specifically, these teams have chemically modified drugs that have chemical properties (such as net positive or negative charge) that make them poorly absorbable after oral administration.  A most common chemical modification used to mask a net negative charge on a drug (due to a phosphate-like group or a carboxylic group) is to make esters.  The esters are more readily absorbed after oral administration, and are then metabolized by the enzymes that catalyze hydrolysis reaction (hydrolyzed) to regenerate the original drug with net negative charge.  This transiently modified drug to improve its absorption or other pharmaceutical properties is known as a prodrug.

### B.     Background on prodrugs and esters

56.     Prodrugs have long been known and used in pharmacy and medicine.  Prodrugs are chemically modified forms of pharmacologically active therapeutic agents, which, upon dosing to humans or non-human species, give rise to the original therapeutic agent.

57.     Prodrugs are typically designed to improve pharmaceutical properties (e.g. increasing solubility, masking net positive or negative charge and thereby improving oral absorption/oral bioavailability) of a pharmacologic agent to improve its therapeutic efficacy or adverse effect profile or both.  The design and use of prodrugs to improve therapeutic outcome of pharmacological agents has long been known in the drug discovery and development field.  The principles associated with the development and use of prodrugs have been well established for decades and are now an integral part of the drug discovery and development process.  The prodrugs do not have the activity of the pharmacologic agents from which they are derived, and therefore must be converted back to these pharmacologic agents in the body to achieve their efficacy.  DESIGN OF PRODRUGS (H. Bundgaard, ed., 1985) ("Bundgaard 1985") at 1 (Introduction) ("A basal

requisite for the prodrug approach to be useful in solving drug delivery problems is the ready availability of chemical derivative types satisfying the prodrug requirements, the most prominent of these being reconversion of the prodrug to the parent drug in vivo. . . . The prodrug per se is an inactive species . . . . [T]he necessary conversion or activation of prodrugs to the parent drug molecules in the body can take place by a variety of reactions."); 2 ("Several types of bioreversible derivatives have been exploited for utilization in designing prodrugs . . . . [i]n the past, esters mostly have been considered as prodrug types, and the best known prodrugs are in fact esters of drugs containing hydroxyl or carboxyl groups.")

58.    The conversion of many prodrugs to the respective pharmacologic agents in the body depends upon enzymatic reactions catalyzed by metabolic enzymes.  Many prodrugs are designed to be esters, including amino acid esters, because, in general, these prodrugs are

hydrolyzed effectively to yield active pharmacologic agents by metabolic enzymes known as esterases that are present in humans, non-human primates, and preclinical species used for drug discovery and development. Bundgaard 1985 at 3-4 ("The popularity of using esters as a prodrug type for drugs containing carboxyl or hydroxyl functions (or thiol groups) stems primarily from the fact that the organism is rich in enzymes capable of hydrolyzing esters.  The distribution of esterases is ubiquitous, and several types can be found in the blood, liver and other organs or tissues.")  Ester prodrugs, including amino acid ester prodrugs, have been extensively used in developing pharmaceuticals since the early 1970s, *id.* at 4 (discussing Jansen and Russell's use of a special double ester type of benzylpenicillin and the use of this ester concept in prodrug design "in more recent years . . . expand[ing] further."),  and have been used with antiretrovirals to treat HIV since at least the 1990s (*see generally*, Costantino Congiatu, Design, Synthesis and Biological Evaluation of Some Novel Nucleotide Prodrugs as Potential Anticancer Agents (February 2006) (Ph.D. thesis, The Welsh School of Pharmacy, University of Wales ("Congiatu 2006")).

59.     NRTIs area a class of antiviral drugs, including anti-HIV drugs that inhibit viral replication by blocking the viral enzyme, reverse transcriptase. NRTIs are nucleosides (the building blocks of DNA) that are modified so that, unlike naturally occurring nucleosides in the body, the NRTIs block the reverse transcription process catalyzed by the enzyme reverse transcriptase in the HIV virus to build proviral DNA.  Congiatu 2006 at 2 ("Another way to interfere with DNA synthesis is by structurally modified nucleosides . . . [which] act as chain terminators because no new deoxyribonucleotide can be attached to the growing DNA strand . . . [or] severely impair chain elongation. . . . [A]ntiviral NAs [nucleoside analogues] inhibit replication of the viral genome.")  In order to be active as inhibitors of reverse transcriptase, the modified nucleosides need to be tri-phosphorylated; in other words, have 3 phosphate groups

attached to the base through a linker. *Id.* at 3 ("Nucleoside analogues are in essence prodrugs since they require an intracellular 5'-phosphorylation to form active nucleotides that can function as inhibitors of viral or cellular replication processes. Regardless the site of action, the majority of the NAs necessitates after cell penetration a kinase-mediated conversion to the corresponding mono-, di-, and triphosphate, which is in most cases the biologically active form.") Another class of reverse transcriptase inhibitors, NtRTIs, contain a phosphate-related group attached to a base via a linker and only need two additional phosphorylations to be active as tri-phosphorylated reverse transcriptase inhibitors. Tenofovir, also known as PMPA, is an NtRTI, containing a phosphonate group (Figure ¶ 47 above), which is a phosphate-related group. Horatio B. Fung et al., Tenofovir Disoproxil Fumarate: A Nucleotide Reverse Transcriptase Inhibitor for the Treatment of HIV, 24 Clinical Therapeutics® 1515 (2002) ("Fung 2002") ("Tenofovir is a nucleotide analogue of adenosine monophosphate. Its active metabolite, tenofovir diphosphate, competes with natural deoxyadenosine triphosphate for the active binding site on the HIV-induced reverse transcriptase (HIV DNA polymerase). Incorporation of tenofovir diphosphate into viral DNA results in chain termination, since tenofovir diphosphate lacks the hydroxyl group in the 3'-position, which acts as the point of attachment for the next deoxyribonucleoside triphosphate. Hence, reverse transcription, the key step in HIV proliferation, is inhibited.")

60. The phosphorylation of tenofovir to the active tenofovir di-phosphate, containing three phosphate-related groups is depicted in Figure 2 of Fung 2002which is reproduced below:



*Id.* at 1519.

RESTRICTED INFORMATION

61.     NtRTIs were developed, in part, because some nucleoside analogues may not be readily phosphorylated to the active nucleotide form.  This may be because the modified nucleoside is a poor substrate for phosphorylating enzymes that catalyze the addition of the first phosphate group.  In contrast to nucleoside analogs, nucleotide analogues, such as tenofovir, already include a phosphate analogue and do not require that first phosphorylation step in their metabolic activation to tri-phosphate analogs (Figure ¶ 60 above).  Fung 2002 at 1517 ("Nucleotide analogues, which possess a phosphonate group, require only 2 [complex phosphorylation] steps, whereas nucleoside analogues . . . must undergo 3 consecutive phosphorylation steps for activation. . . . . [Because] [m]any nucleoside analogues also have poor affinity for their initial phosphorylating enzymes, [] elimination of the initial phosphorylation step would allow antiviral drug activity in both dividing and nondividing cells, . . . [and] a reduction in the phosphorylation requirement would potentially allow more rapid and complete conversion of drugs to their active metabolites."); *see also* Bundgaard 1985 at 70 ("unfortunately, several nucleoside derivatives fail to undergo the necessary phosphorylation to the active nucleotide form [inside the cell]"); Congiatu 2006 at 4.

62.     As depicted in Figure ¶ 47 above, the phosphonate group in tenofovir has two phosphonic acid -OH groups, which are negatively charged at biologically relevant pHs.

63.     Because the nucleotide analogs contain a phosphate-related group (*e.g.* phosphonate group) with two negative charges at physiologic pHs, NtRTI drugs are not readily absorbed in the intestine after oral administration, resulting in low oral bioavailability.  *See, e.g.,* Shaw et al., "Metabolism and pharmacokinetics of novel oral prodrugs of 9-[(R)-2-(phosphonomethoxy)propyl]adenine (PMPA) in dogs," Pharmaceutical Research, 12:1824-29 at 1824 (1997) ("The ionic nature of these agents limits their permeability across the human intestinal

mucosa, which results in low oral bioavailability. Masking the negative charges of the phosphonate group with a biologically labile promoiety has been shown to enhance the oral bioavailability of several nucleotide phosphonates.").

64.     NtRTI prodrugs are designed to mask the negative charges on the phosphate-related group to increase intestinal absorption and oral bioavailability.

65.     A POSA at the time of the invention would have known that in order for a NtRTI prodrug to work, the prodrug would have to be stable in the gut, it would have to involve a modification by a chemical group (pro-moiety) to mask the charges on the phosphate-related group of the nucleotide analog so that it is absorbed through the intestinal wall, and, once in the blood stream, the pro-moeities would have to be readily removed through metabolic pathways or spontaneously to yield the active drug, i.e. modified nucleotide that can be phosphorylated to tri-phosphates in the body to exert its pharmacologic activity of inhibiting reverse transcriptase and viral replication.  In the case of tenofovir, the specifications disclose a genus of pharmaceutically acceptable tenofovir prodrugs and further expressly direct the POSA to the '946 patent.  *See* '423 Patent at 4:64-5:4; '509 patent at 4:51-58 (*citing* U.S. Pat. No. 5,935,946).

66.     As described above, a POSA reading the specification at the time of the invention would have understood that it can be beneficial to administer tenofovir orally as a prodrug, and would have understood strategies that are described in the prior art for generating prodrugs of tenofovir.  Further, a POSA would have understood that a prodrug used in the claimed invention would have to be pharmaceutically acceptable, it would need to deliver the drug to the body, and the prodrug or ester prodrug would need to be metabolized to yield the active tenofovir in the body.

**C.    The use of esters and prodrugs to mask the phosphate charges of tenofovir was well-known in the art and there were several working examples**

67.    At the time the provisional application was filed, a range of tenofovir esters and prodrugs were known in the art, although the only such tenofovir prodrug that had received FDA approval was tenofovir disoproxil fumarate (TDF).

68.    However, other tenofovir prodrugs within the genus would likewise have been known.  Below I discuss some references demonstrating the well-known genus of tenofovir prodrugs.  More generally, as illustrated by these references, a POSA would have understood that the inventors were in possession of methods for pre-exposure prophylaxis using the genus of tenofovir prodrugs, including tenofovir esters, at the time the provisional application was filed.  I understand that a patent's disclosure need not include, and preferably omits, that which is well-known in the art.  In my opinion, this is one of those situations where identifying a specific tenofovir prodrug (*e.g.* tenofovir disoproxil fumarate), and further discussing tenofovir derivatives or the genus of tenofovir prodrugs sufficiently conveys to a POSA that the inventors possessed the idea of using any tenofovir prodrug from a genus for pre-exposure prophylaxis without having to identify or reproduce each individual prodrug.

26

1.     **'946 Patent**

69.     I understand that if a reference is incorporated into the specification of a patent it is treated as part of the disclosure.  I note that each of the patents in suit incorporates the disclosure of the '946 patent by reference.  '509 patent at 4:51-58; 12:24-29; '423 patent 4:64-5:4. Even if it were not incorporated by reference, the patent's disclosure still makes clear to a POSA that the inventors had possession of the use of any tenofovir prodrug by its citation of U.S. Patent 5,935,946.  The '946 patent is assigned to Gilead Sciences, Inc. and discloses tenofovir (PMPA) prodrugs:

> The invention provides a composition comprising bis(POC)PMPA and fumaric acid (1:1). The composition is useful as an intermediate for the preparation of antiviral compounds, or is useful for administration to patients for antiviral therapy or prophylaxis. The composition is particularly useful when administered orally. The invention also provides methods to make PMPA and intermediates in PMPA synthesis.

'946 patent at 1:5-11.

70.     A POSA would have understood that the '946 patent specification describes the use of prodrugs for phosphonmethoxy nucleotide analogs such as tenofovir and that the following references disclose those prodrugs and ester prodrugs:

> **Phosphonomethoxy nucleotide analogs are known and various technologies for oral delivery are known**. *See, e.g.,* U.S. application Ser. No. 08/686,838, U.S. Pat. Nos. 5,208,221, 5,124,051, WO 91/19721, WO 94/03467, WO 94/03466, WO 92/13869, DE 4138584A1, WO 94/10539, WO 94/10467, WO 96/18605, **WO 95/07920**, WO 95 79/07919, WO 92/09611, WO 92/01698, WO 91/19721, WO 88/05438, EPO 632 048, EPO 481 214, EP 0369 409, EPO 269 947, U.S. Pat. Nos. 3,524,846 and 5,386,030, Engel Chem. Rev. 77:349–367 1977, Farquhar et al., J. Pharm. Sci. 72:324-325 1983, Starrett et al., Antiviral Res. 19:267–273 1992, Safadi et al., Pharmaceutical Research 10(9): 1350-1355 1993, Sakamoto et al., Chem. Pharm. Bull. 32(6):2241-2248 1984, and Davidsen et al., J. Med. Chem. 37(26):4423-4429 1994.

'946 patent at 1:12-26.  The '946 patent was filed July 25, 1997, almost a decade before the provisional application filing date (February 3, 2006) for the patents in this case.  It was thus well-known to a POSA by the filing of the '811 provisional application, or the filing of the patents at issue, that nucleotide analogs are formulated as prodrugs for oral delivery.

        **2.**     **WO 95/07920**

71.     The PCT International Application numbered WO 95/07920 titled "Nucleotide Analogs" ('920 application) is cited on the face of the '946 patent and is identified in the '946 patent as disclosing oral delivery of nucleotides.  For the reasons stated above, a POSA would have understood these oral delivery systems to be prodrugs of tenofovir.

72.     The WO '920 application was filed by Gilead Sciences, Inc., (*id*. at 74), and names as the inventors and applicants Norbert Bischofberger, Robert Jones, Murty Arimilli, Keui-Ying Lin, Michael Louie, Lawrence McGee, Ernest Prisbe, William Lee, and Kenneth Cundy.  *Id*. at (72).  The '920 application discloses, generally, "[n]ucleotide analogs characterized by the presence of an amidate linked amino acid or an ester linked group which is bonded to the phosphorus atom of phosphonate nucleotide analogs" where "[t]he analogs comprise a phosphoamidate or ester bond that is hydrolysed in vivo to yield a corresponding phosphonate nucleotide analog."  *Id*. at (57) – Abstract.  Methods and intermediates for the synthesis and use of the disclosed analogs are also described. *Id*.  The '920 application discloses and claims a genus of prodrugs for oral delivery of nucleotides, and a POSA would recognize that this disclosure includes compounds like TAF or tenofovir alafenamide, a phenyl-ester alanine-iso-propyl-ester prodrug of PMPA.

73.     The '920 application discloses a genus of "novel nucleotide analog amidates and esters, their pharmaceutically acceptable acid addition salts."  It further discloses a process for

their production, and to their use, and the nucleotides disclosed "exhibit antitumor/antineoplastic activity, a broad spectrum of antimicrobial activity and certain other desirable activities."  *Id*. at 1:7-11.  The application notes that while "[a] characteristic of nucleotide analogs or nucleotides having a phosphonate or a phosphate group is the presence of one or two negative charges associated with the phosphorus group at physiologic pH," resulting in "generally limit[ed] bioavailability by limiting cell membrane permeation via passive diffusion," the disclosed classes of nucleotide analogs aim to "ameliorate" this and other issues through various methods, including "novel nucleotide analogs that are hydrolysable in vivo."  *Id*. at 2:3-8, 2:17-19.

74.     In particular, the '920 application is directed to amino acid ester prodrugs of nucleotide analogs, including PMPA, and teaches that "[t]he nucleotide analog amidates of this invention are hydrolyzed in vivo to the corresponding nucleotide analog and are thus precursors of the corresponding nucleotide analog."  *Id*. at 2:29-3:3.

75.     The '920 application further teaches the "nucleotide analog amidate and ester compounds" of the application's disclosure "include the corresponding salts, which may be base salts of the phosphonic acid moiety or an acid addition salt of the base in addition to the zwitterionic forms and/or solvates of compounds of formula I."  *Id*. at 3:20-24.

76.     The '920 application teaches that the compounds and "physiologically acceptable salts (hereafter collectively referred to as the active ingredients) may be administered by any route appropriate to the condition to be treated, suitable routes including oral, rectal, nasal, topical (including ocular, buccal and sublingual), vaginal and parenteral (including subcutaneous, intramuscular, intravenous, intradermal, intrathecal and epidural)."  *Id*. at 68:16-22.  The '920 application further teaches use of the disclosed compounds for "treat[ment] of HIV infections", *id*.

29

at 72:33, and "[o]ther human retroviral infections," *id.* at 72:2.  Notably, the '920 application discloses potential resulting "hydrolysis products of interest" from "precursor compounds" disclosed by the application, **which include PMPA (tenofovir),** *id.* at 75:34-76:2. These products, including PMPA (tenofovir) are identified as "**resulting from the hydrolysis of the amidate or ester bond(s) of the precursor compounds of this [application]**." *Id.* (emphasis added),

### 3.    The '043 publication discloses working examples of tenofovir prodrugs and provides additional screening methods to identify them

77.    A POSA at the time of the invention would have been aware of prior art disclosing working examples of the genus of prodrugs described in WO '920.  For example, US Patent Publication No. US 2005/0009043 A1, Becker et al. "Prodrugs of Phosphonate Nucleotide Analogues" discloses methods for screening prodrugs of methoxy phosphonate nucleotide analogues and discloses examples of the tenofovir prodrugs described in WO '920.  '043 publication at col. 1: [002].  The '043 publication is assigned to Gilead, and was published January 13, 2005 from a patent application filed March 11, 2004 that claimed priority dating back to July 20, 2001.

78.    The '043 publication provides methods for screening potential PMPA or PMEA candidates for suitability:

> Prodrugs of methoxyphosphonate nucleotide analogues intended for antiviral or antitumor therapy, while known, traditionally have been selected for their systemic effect. For example, such prodrugs have been selected for enhanced bioavailability, i.e., ability to be absorbed from the gastrointestinal tract and converted rapidly to parent drug to ensure that the parent drug is available to all tissues. However, applicants now have found that it is possible to select prodrugs that become enriched at therapeutic sites, as illustrated by the studies described herein where the analogues are enriched at localized focal sites of HIV infection.

*             *             *

30

The prodrugs for use in the screening method of this invention are covalently modified analogues of the parent methoxyphosphonate nucleotide analogues described in the preceding paragraph. In general, the phosphorus atom of the parent drug is the preferred Site for prodrug modification, but other sites are found on the heterocyclic base B or the aglycon E. **Many such prodrugs are already known**. **Primarily, they are esters or amidates of the phosphorus atom**, but also include substitutions on the base and aglycon. None of these modifications per se is part of this invention and none are to be considered limiting on the Scope of the invention herein.

*     *     *

The phosphorus atom of the methoxyphosphonate nucleotide analogues contains two valences for covalent modification such as amidation or esterification. The esters typically are aryloxy. The amidates ordinarily are naturally occurring are naturally occurring monoamino acids having free carboxyl group(S) esterified with an alkyl or aryl group, usually phenyl, cycloalkyl, or t-, n- or S- alkyl groups. Suitable prodrugs for use in the Screening method of this invention are disclosed for example in U.S. Pat. No. 5,798, 340. However, any prodrug which is potentially believed to be capable of being converted in vivo within target tissue cells to the free methoxyphosphonate nucleotide analogue parent drug, e.g., whether by hydrolysis, oxidation, or other covalent transformation resulting from exposure to biological tissues, is Suitable for use in the method of this invention. Such prodrugs may not be known at this time but are identified in the future and thus become suitable candidates available for testing in the method of this invention.

'043 Publication at 1:[004]; 3:[0050]; 3-4:[0051] (emphasis added).

79.    The prodrugs described in the '043 patent include GS-7340 which is another name for tenofovir alefenamide or TAF. The examples of tenofovir prodrugs are detailed in the tables presented on the following pages:

[Table presented, next page]

TABLE 5

In Vitro Metabolism of Isomers A and B of PMPA monoamidate at 37° C.

| No. | PMPA monoamidate structure | HIV IC$_{50}$ ($\mu$M) | PLCE hydrolysis rate and product | MT-2 extract hydrolysis rate and product | Human Plasma Stability (HP) |
|---|---|---|---|---|---|
| 1 | Isomer A — GS7114 (O, P, OPh, NH—CHCOOEt, CH$_3$) | 0.005 | t$_{1/2}$ = 2.9 min Met. X & PMPA | t$_{1/2}$ = 2.9 min Met. X & PMPA | t$_{1/2}$= 148 min Met. Y |
| 2 | Isomer B — GS7115 (O, P, OPh, NH—CHCOOEt, CH$_3$) | 0.05 | t$_{1/2}$ = 8.0 min Met. X & PMPA | t$_{1/2}$ = 150.6 min Met. X & PMPA | t$_{1/2}$= 495 min Met. Y |
| 3 | Isomer A — GS7340 (O, P, OPh, NH—CHCOOiPr, CH$_3$) | 0.005 | t$_{1/2}$ = 3.3 min Met. X & PMPA | t$_{1/2}$ = 28.3 min Met. X & PMPA | t$_{1/2}$= 90.0 min Met. Y |
| 4 | Isomer B — GS7339 (O, P, OPh, NH—CHCOOiPr, CH$_3$) | 0.06 | t$_{1/2}$ = 10.1 min Met. X & PMPA | t$_{1/2}$ > 1000 min | t$_{1/2}$= 231 min Met. Y |
| 5 | Isomer A — GS7342 (O, P, OPh, NH—CHCOOEt, CH$_2$CH$_3$) | 0.004 | t$_{1/2}$ = 3.9 min Met. X | t$_{1/2}$ = 49.2 min Met. X & PMPA | t$_{1/2}$= 103 min Met. Y |

[Table continues, next page]

RESTRICTED INFORMATION

TABLE 5-continued

In Vitro Metabolism of Isomers A and B of PMPA monoamidate at 37° C.

| No. | PMPA monoamidate structure | HIV IC$_{50}$ ($\mu$M) | PLCE hydrolysis rate and product | MT-2 extract hydrolysis rate and product | Human Plasma Stability (HP) |
|---|---|---|---|---|---|
| 6 | Isomer B    GS7341 | 0.03 | t$_{1/2}$ = 11.3 min Met. X | t$_{1/2}$ > 1000 min | t$_{1/2}$ = 257 min Met. Y |
| 7 | GS4331 | 0.05 | t$_{1/2}$ < 0.14 min MonoPOC PMPA | t$_{1/2}$ = 70.7 min monoPOC PMPA | t$_{1/2}$ = 0.41 min monoPOC PMPA |

Met. X:

Met. Y:

A =

TABLE 6

PMPA Exposure in PBMC and Plasma from Oral Prodrugs of PMPA in Dogs

| GS# | Moiety | PMPA AUC in Plasma | | | PMPA AUC in PBMC | | | Prodrug in Plasma | PBMC/Plasma Exposure Ratio |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | StDev | N | Mean | StDev | N | | |
| GS-7114 | Mono-Ala-Et-A | 5.8 | 0.9 | 2 | 706 | 331 | 5 | YES | 122 |
| GS-7115 | Mono-Ala-Et-B | 6.6 | 1.5 | 2 | 284 | 94 | 5 | YES | 43 |
| GS-7340-2 | Mono-Ala-iPr-A | 5.0 | 1.1 | 5 | 805 | 222 | 5 | YES | 161 |
| GS-7339 | Mono-Ala-iPr-A | 6.4 | 1.3 | 2 | 200 | 57 | 5 | YES | 31 |
| GS-7119 | Mono-Gly-Et-A | 6.11 | 1.86 | 2 | 530 | 304 | 5 | YES | 87 |
| GS-7342 | Mono-ABA-Et-A | 4.6 | 1.2 | 2 | 1060 | 511 | 5 | YES | 230 |
| GS7341 | Mono-ABA-Et-B | 5.8 | 1.4 | 2 | 199 | 86 | 5 | YES | 34 |

'043 publication at TABLE 5 at 18-19; TABLE 6 at 20.

### 4. The Eisenburg reference discloses that GS 7340 was a bioavailable tenofovir prodrug

80.     Eisenburg, et al. "Metabolism of GS-7340, A Novel Phenyl Monophosphoramidate Intracellular Prodrug Of PMPA, In Blood." Nucleosides, Nucleotides & Nucleic Acids, 20:4-7, (2201) 1091-1098.  DOI:10.1081/NCN-100002496 ("Eisenburg") discloses laboratory tests in dogs on GS-7340, which is another name for TAF, do demonstrate its conversion to PMPA in dog blood cells.

> The metabolism of PMPA in peripheral blood mononuclear cells (PBMC), red blood cells (RBC) and plasma was examined following exposure of whole blood to PMPA or GS-7340 at concentrations similar to ones observed systemically following oral administration in dogs. Following 1 hour incubation with whole blood, GS-7340 was stable in plasma, produced high levels of PMPA and its phosphorylated metabolites in PBMC but not in RBC. No intact prodrug was present in PBMC. The only other species present in PBMC was monoalaninyl PMPA. The levels of PMPA and the phosphorylated metabolites were over 20 times greater than those after incubation with PMPA. The dog and human blood data were similar. The intracellular levels of PMPA and PMPA pp were roughly proportional to GS-7340 over a 10-fold concentration range indicating a lack of saturability of uptake and phosphorylation. Since PMPApp is the species responsible for antiviral activity of PMPA, the high intracellular levels of PMPApp should be an important indicator of greater clinical efficacy of GS-7340.

Eisenburg at 1091.

### 5. Shaw discloses working examples of additional tenofovir ester prodrugs

81.     A POSA would have been aware that there were working examples of pharmaceutically acceptable tenofovir ester prodrugs other than TDF that could be used to deliver tenofovir in the body.  Shaw discloses the following tenofovir esters:

[Table presented, next page]

Table 1. Chemical Structures of PMPA Prodrugs

See, e.g., Shaw et al., "Metabolism and pharmacokinetics of novel oral prodrugs of 9-[(R)-2-(phosphonomethoxy)propyl]adenine (PMPA) in dogs," Pharmaceutical Research, 12:1824-29 at 1825 (1997). Shaw discloses that "[a]ll prodrugs were rapidly hydrolyzed in dog plasma and tissues." *Id.* at 1824.

### 6.   Gilead's own PCT Publication No. WO2004064845 claims a genus of tenofovir prodrugs that are effective to treat HIV

82.   Gilead's own patent applications disclose a genus of "tenofovir esters" that was known in the art at the relevant time of invention. For example, the Dahl reference (PCT Publication No. WO2004064845) ("Dahl") "relates to therapeutic combinations of [2-(6-amino-purin-9-yl)-1-methyl-ethoxymethyl]-phosphonic   acid   diisopropoxycarbonyloxymethyl   ester

(tenofovir disoproxil fumarate, Viread®).” Dahl at Abstract. The front page of Dahl lists Gilead Sciences, Inc. as the Applicant. The Dahl reference is listed on each of the Patents-in-Suit, and I understand that the Examiner cited the Dahl reference during prosecution of the '509 patent. The Dahl specification discloses that “[t]he invention includes all prodrugs of tenofovir and emtricitabine.” *Id.* at page 15, line 25. Dahl describes a genus of tenofovir prodrug esters as follows:

> Prodrug esters in accordance with the invention are independently selected from the following groups: (1) mono-, di-, and tri-phosphate esters of tenofovir or emtricitabine or any other compound which upon administration to a human subject is capable of providing (directly or indirectly) said mono-, di, or triphosphate ester; (2) carboxylic acid esters (3) sulphonate esters, such as alkyl- or aralkylsulphonyl (for example, methanesulphonyl); (4) amino acid esters (for example, alanine, L-valyl or L-isoleucyl); (5) phosphonate; and (6) phosphonamidate esters.

Dahl at page 16, line 30 through page 17, line 4. A POSA reading this disclosure would understand that Dahl discloses a genus of well-known prodrug strategies for use with tenofovir.

83. The tenofovir esters disclosed by Dahl are ester-containing tenofovir derivatives. *See, e.g.*, Dahl at page 6, lines 8-16 (“The term ‘physiologically functional derivative’ means a pharmaceutically active compound with equivalent or near equivalent physiological functionality to tenofovir DF or emtricitabine when administered in combination with another pharmaceutically active compound in a combination of the invention. As used herein, the term ‘physiologically functional derivative’ includes any: physiologically acceptable salt, ether, ester, prodrug, solvate, stereoisomer including enantiomer, diastereomer or stereoisomerically enriched or racemic mixture, and any other compound which upon administration to the recipient, is capable of providing (directly or indirectly) such a compound or an antivirally active metabolite or residue thereof.”).

84.    Dahl claims the use of a broad genus of physiologically functional derivatives of tenofovir prodrugs for treatment:

> 1.    **A method for the treatment or prevention of the symptoms** or effects of an HIV infection in an infected animal which comprises administering to said animal a 5 therapeutically effective amount of a composition comprising [2-(6-amino-purin-9-yl)-lmethyl-ethoxymethyl]-phosphonic acid diisopropoxycarbonyloxymethyl ester fumarate **(tenofovir disoproxil fumarate) or a physiologically functional derivative thereof**, and *(2R,* 5S, cis )-4-amino-5-fluoro-1-(2-hydroxymethyl-l            ,3-oxathiolan-5-yl)-(lH)pyrimidin-2-one (emtricitabine) or a physiologically functional derivative thereof.

WO 2004/064845 at 50.

# IX.    OPINIONS

## A.    Response to Flexner Sections XIII A.3 and XIX.A (Written Description)

85.    Dr. Flexner opines that U.S. Provisional Application No. 60/764,811 (the "provisional application") does not provide written description support for claims 1, 3, 9, 12 14, 18 and 19 of the '423 patent directed to tenofovir prodrugs or claim 13 of the '509 patent directed to tenofovir esters.  In particular Dr. Flexner opines that "the Provisional Application fails to provide written description support for the recited claim term 'tenofovir ester,' as used in asserted claim 13 of the '509 Patent, or 'tenofovir prodrug,' as used in asserted claims 1, 3, 9, 12, 14, 18, and 19 of the '423 Patent."  Flexner Report ¶ 379.  I disagree.

### 1.    **The U.S. Government's Provisional Patent Application No. 60/764,811 describes esters and prodrugs of tenofovir and satisfies the written description requirement**

86.    The U.S. Government filed the Provisional Application on February 3, 2006.  *See* US_00002058-83 (Provisional Application) at US_00002058.  The provisional application discloses results of pre-exposure prophylaxis using the combination of tenofovir (or PMPA) and emtricitabine using a novel animal model using a SHIV virus in macaques exposed to repeated

exposures to infect controls is 2"). *Id.* at US_00002073. The provisional application also states that "[d]ata suggest that chemoprophylaxis with a potent antiretroviral drug combination cay be highly effective in preventing sexual HIV transmission." *Id.*

89. A POSA would have understood the provisional application to demonstrate that the presence of the active compound tenofovir (PMPA) in combination with emtricitibine (FTC) was highly effective at preventing HIV infection even after repeated sexual challenges for a period up to 14 weeks when both active compounds were administered subcutaneously, and thus would easily reach systemic circulation without having to cross the intestinal barrier.

90. A POSA would have understood the provisional application's study method, which administered subcutaneous tenofovir, to predict that administering oral tenofovir prodrugs to humans that improve its oral bioavailability would likely be effective for pre-exposure prophylaxis. The provisional application's disclosure demonstrates that the inventors possessed a method for pre-exposure prophylaxis involving the administration of oral tenofovir ester or prodrug.

91. The provisional application indicates that the inventors intended that the invention be directed to oral dosage forms.

- **However, this protection may be reduced at lower drug doses equivalent to those used in humans**

- **Current human trials with tenofovir will ultimately determine the efficacy of this intervention**

US_00002065;

- **Many potent antiretrovirals with favorable safety and pharmacodynamics profiles are now available and are good candidates for chemoprophylaxis**

95.     Dr. Flexner argues that the provisional application describes "only a single monkey experiment that uses tenofovir" and that tenofovir is not a "tenofovir prodrug" or a "tenofovir ester."  Flexner Rpt. at ¶ 386.  I note that the mode of oral administration for tenofovir was well known at the time.  Indeed, the purpose of formulating tenofovir as a prodrug was to enhance oral administration, and this is clearly disclosed in the claims of the provisional application which include oral administration and tablets.  The researchers were following a well-established practice in research of using the most direct approach to test their hypothesis (proof of concept) that a combination of an NRTI and an NtRTI could be effective for pre-exposure prophylaxis, which would be administering tenofovir and FTC via a route (subcutaneous) that will deliver these drugs in the blood stream without relying on the enzymes that are necessary to convert a tenofovir prodrug into tenofovir.  Further, given the practical complications stemming from working with primate models, subcutaneous injections were a typical way to administer drugs in order to control and validate the dosage.  As the inventors explained, the well-defined amount of drug administered by subcutaneous injection allowed them to draw direct correlation to the use of an oral dosage form in humans.

96.     Further, Dr. Flexner argues in ¶ 386 of his report that the only tenofovir prodrug or tenofovir ester mentioned in the provisional application is TDF and that the disclosed experiments did not use TDF.  However, I have been informed by counsel that a patent specification need not re-describe known prior art concepts and further informed that the written description requirement may be satisfied where the description in a patent when coupled with well-known knowledge in the art may sufficiently disclose the claimed subject matter.  That is the case here.  As explained above in Section VIII, a POSA would have understood that it is beneficial to formulate tenofovir as a prodrug or ester prodrug when administering it orally, and the provisional application

43

NtRTI (tenofovir) in the body as a result of a spontaneous reaction under physiologic conditions, enzymatic catalysis, metabolic clearance, or combinations thereof.

111.    Accordingly, I disagree with Dr. Flexner's conclusion that the Patents-in-Suit do not meet the written description requirement for "tenofovir ester" or "tenofovir prodrug."

**B.    Response to Flexner Sections XIII B.1 Flexner XX.A (Enablement)**

112.    Dr. Flexner opines that U.S. Provisional Application No. 60/764,811 (the "provisional application") does not enable claims 1, 3, 9, 12 14, 18 and 19 of the '423 patent directed to tenofovir prodrugs or claim 13 of the '509 patent directed to tenofovir esters.  I disagree.

**1.    The Government's provisional application enables the use of orally administered tenofovir prodrugs/esters**

113.    Once the inventors established the prophylactic efficacy of the subcutaneous two-drug tenofovir/emtricitabine regimen using the methods disclosed in the provisional application, a POSA would have known that pharmaceutically-acceptable, bioavailable prodrugs of tenofovir could be effective in the same prevention regimen.  This would only require that an appropriate dose of the prodrug, upon oral administration, yield a similarly effective amount of tenofovir in systemic circulation as was produced by subcutaneously administered tenofovir.

114.    As described above, a POSA would have been aware that there were many different potential tenofovir prodrug/esters that could have been utilized to deliver the active tenofovir in the body, as described in the prior art.  It was well-known in the art to select potential prodrug candidates based on routine laboratory testing directed towards bioavailability, *i.e.*, the ability of the prodrug to be absorbed from the gastrointestinal tract and converted rapidly to the parent drug to ensure that the parent drug is available in systemic circulation.

115.    For example, the Eisenburg paper discusses testing GS-7340 using 1-hour incubation with whole blood, to determine whether the prodrug was stable in plasma, and reports that the prodrug was stable in plasma but produced high levels of PMPA and its phosphorylated metabolites in PBMC, not in RBC, that no intact prodrug was present in PBMC, and that the only other species present in PBMC was monoalaninyl PMPA. *See, e.g.*, Eisenburg at 1091.  The '043 publication described these tests as "optional" and "well-known" to a POSA:

> It will be appreciated that some preassessment of prodrug candidates can be undertaken before the practice of the method of this invention. For example, the prodrug will need to be capable of passing largely unmetabolized through the gastrointestinal tract, it will need to be substantially stable in blood, and it should be able to permeate cells at least to some degree. In most cases it also will need to complete a first pass of the hepatic circulation without substantial metabolism. **Such prestudies are optional, and are well-known to those skilled in the art.**

'043 publication at 5: [0070].

116.    A POSA would have already been well-aware of the commercial availability of several working tenofovir ester/prodrugs, and would have further known that tenofovir prodrugs were extensively characterized in the literature (as described above).  A POSA could therefore either use an existing tenofovir ester/prodrug or identify a new tenofovir prodrug from the genus of tenofovir prodrugs, which is described in the prior art in, for example, references such as the '946 patent, WO '920, or WO '845.  The POSA could then use screening methods like those described in Eisenburg or the '043 publication to select a final candidate.  In addition, a skilled artisan would have appreciated that previously validated tenofovir prodrugs, for example tenofovir prodrugs that had received FDA approval, would be useful and able to deliver tenofovir to a patient at predictable levels consistent with the inventors' disclosure.  A skilled artisan would have been able to select a tenofovir prodrug/ester for use in the claimed invention.

117.    Once a prodrug was selected from the genus of potential prodrugs, a POSA could have used the animal model described in the Patents-in-Suit to confirm efficacy and to adjust the dose to account for any differences in the characteristics of the two prodrugs (e.g., differences in metabolism or bioavailability).  Further, the animal model developed by the inventors could be used to determine whether the prodrug would likely be effective in humans.  In reaching this opinion, I reviewed and relied on the expert report of Dr. Paul Johnson, M.D., which explains in detail the low-dose SHIV repeat sexual exposure animal model developed by the inventors and its utility for predicting outcomes in humans.

### a)    The quantity of experimentation necessary

118.    I disagree with Dr. Flexner's opinion that a POSA would need to conduct "expansive experimentation" on "tens of thousands" of potential drugs to be in possession of tenofovir prodrugs.  As I explained above in Section VIII, the principles associated with the development and use of prodrugs have been well established for decades and are now an integral part of the drug development process.

119.    Further, there are many working examples of tenofovir esters and tenofovir prodrugs that were extensively described in the literature.  Tenofovir esters and tenofovir prodrugs including amino acid ester prodrugs have been described and characterized for nearly 30 years and have been commercialized as FDA-approved drugs.  And, while different prodrugs may have different characteristics, Gilead's own patent documents describe the preassessment of prodrug candidates as "optional" and "well-known to those skilled in the art."  *See*, '043 publication.

120.    As described in the Expert Report of Dr. Paul Johnson, on which I rely, the provisional application demonstrates: (1) a macaque animal model that is predictive of human results and (2) the combination of tenofovir and FTC is efficacious for pre-exposure prophylaxis.

123.    As stated above, it is my opinion that the state of the art related to prodrug development—and in particular the use of ester and amino acid ester prodrugs with nucleotides—was well-established and thoroughly described in the prior art.  A POSA would understand that although there are differences between prodrugs, there were many examples of prodrugs already described in the prior art, and a POSA, reading the provisional application with the macaque model and tenofovir/emtricitabine efficacy data in-hand, only had to follow the guidance in the provisional application to test the known tenofovir esters/prodrugs in the prior art through routine testing to confirm which esters/prodrugs would be efficacious for pre-exposure prophylaxis.

124.    Further, the pharmacokinetic characteristics of several tenofovir esters and prodrugs were already known and described in the art.  A POSA would have recognized, for example, that the tenofovir prodrugs in the '043 application had been synthesized and characterized with respect to their stability in plasma as well as the amount of PMPA present in blood after oral administration in an animal model.  A POSA therefore could have confirmed the effectiveness of these already identified prodrugs in the animal model developed by the inventors, as described in the Expert Report of Dr. Paul Johnson, on which I rely.  Thus, I believe this factor weighs in favor of enablement.

### b)    The amount of guidance presented

125.    As discussed above, the provisional application discloses the effectiveness of tenofovir when administered with FTC to prevent infection by human immunodeficiency virus after repeat exposures that might occur due to sexual encounters, , and it teaches that tenofovir can be administered orally and discloses the FDA-approved tenofovir ester/prodrug TDF.  A POSA would have understood the provisional to include the administration of tenofovir as an oral prodrug/ester and would have known that there were multiple ways to administer tenofovir and

that multiple working examples of tenofovir prodrugs and esters for oral administration were known in the art. *See* Section VIII.B. As described in the Expert Report of Dr. Paul Johnson, on which I rely, the provisional application demonstrates: (1) a macaque animal model that is predictive of human results and (2) the combination of tenofovir and FTC is efficacious for pre-exposure prophylaxis. A POSA reading the provisional application with the macaque model and tenofovir/FTC efficacy data in-hand only had to follow the guidance in the provisional application to test the known tenofovir esters/prodrugs in the prior art through routine testing to confirm which esters/prodrugs would be efficacious upon oral administration to humans in combination with FTC for pre-exposure prophylaxis. Therefore, a POSA would need no additional guidance to practice the claims of Patents-in-Suit directed to tenofovir esters and tenofovir prodrugs. Thus, I believe this factor weighs in favor of enablement.

### c)   The state of the prior art

126.   Dr. Flexner argues that because different prodrugs may have different pharmacokinetic profiles every conceivable tenofovir prodrug would need to be synthesized and tested in order to enable the claims of the Patents-in-Suit. Dr. Flexner appears to argue that Lee and Arimilli demonstrate that the quantity of experimentation in the art would literally require thousands to tens of thousands of prodrugs to be extensively tested in order to enable a prodrug or ester of tenofovir and that *in vitro* tests could not be used. I do not believe that the Lee or Arimilli publications require the level of testing that Dr. Flexner describes. As stated above, it is my opinion that the state of the art related to prodrug development—and in particular the use of ester and amino acid ester prodrugs with nucleotides—was well-established and thoroughly described in the prior art. Further, I disagree that *in vitro* testing would not be a useful tool for identifying beneficial tenofovir esters and tenofovir prodrugs whose effectiveness could then be confirmed in the animal model described in the Patents-in-Suit.

127.     In any event, it is not my understanding that every possible prodrug, or even a large number of prodrugs, would have to be enabled.  A POSA would understand the claimed prodrugs and esters are limited to those that are pharmaceutically acceptable, readily absorbed, and that yield tenofovir in the body.  The state of the art extensively describes the genus of tenofovir esters and prodrugs and provides working examples of their use to deliver tenofovir in the body after oral administration.  A POSA would have been able to apply those working examples to any tenofovir prodrug to (1) determine whether it could be used in the claimed method and (2) could have confirmed its effectiveness and determined the effective dose by administering it in the animal model developed by the inventors, as described in the Expert Report of Dr. Paul Johnson, on which I rely.  Thus, I believe the state of the prior art, in particular the well-known use of tenofovir prodrugs/esters, weighs in favor of enablement.

### d)      The relative skill of those in the art

128.     It is my understanding that a POSA would have been an individual or part of a research team developing antiretroviral treatments for HIV or similar viruses in a clinical, pre-clinical, and/or laboratory setting.  Such a person would have either an M.D. or an advanced degree in an allied field (e.g., microbiology, cell biology, immunology, biomedical science, medicinal chemistry, epidemiology, pharmacology), along with 2-3 years of experience in those fields or in treating patients. It is my belief that this POSA would have been knowledgeable about the state of the prior art and would have an advanced understanding of the use of prodrugs for oral administration of tenofovir, and would weigh in favor of enablement.  Even if Dr. Flexner's definition of POSA is adopted, he has stated that this factor is "neutral."  Flexner Rpt. ¶ 417.  Thus, it is my opinion that under either definition the level of skill in the art weighs in favor of enablement.

### e)  The predictability of the art

129.  Dr. Flexner states that the art of the pharmaceutical field was "highly unpredictable" specifically with respect to the use and administration of untested prodrugs.  I disagree that tenofovir prodrugs were untested in prior to the priority date of the invention.  First, the genus of tenofovir esters and tenofovir prodrugs were thoroughly described in the prior art and had been known for at least a decade prior to the invention.  (Section VIII) Further, many tenofovir prodrugs and esters had been described and characterized according to their pharmacokinetic characteristics, which would allow a POSA to ascertain their likely effectiveness (e.g. the '043 publication; Shaw et al., "Metabolism and pharmacokinetics of novel oral prodrugs of 9-[(R)-2-(phosphonomethoxy)propyl]adenine (PMPA) in dogs," Pharmaceutical Research, 12:1824-29 at 1825 (1997)).  And as described in the Expert Report of Dr. Paul Johnson, a POSA would have been able to confirm this effectiveness in the animal model developed by the inventors which was highly predictive of efficacy in humans.  As described in Section VIII, the principles associated with the development and use of prodrugs have been well established for decades and are now an integral part of the drug development process.  Thus, the teachings of the provisional application would have allowed a skilled artisan to carry out the claimed invention.

### f)  The breadth of the asserted claims

130.  The asserted claims are directed to the use of prodrugs and esters in the claimed method of preventing HIV infection, they are NOT directed to the development of new chemical entities to be used as prodrugs for preventing HIV infection.  A POSA would have known that the claims are limited to the tenofovir esters and prodrugs that are pharmaceutically effective, readily absorbable after oral administration and that yield tenofovir in the body.  The prior art describes the genus of tenofovir esters and prodrugs and provides working examples of their use to deliver tenofovir in the body after oral administration.  A POSA would have been able to apply those

working examples to any tenofovir prodrug to (1) determine whether it could be used in the claimed method and (2) confirm its effectiveness and determine the effective dose by administering it in the animal model developed by the inventors, as described in the Expert Report of Dr. Paul Johnson, on which I rely.  Therefore, I disagree with Dr. Flexner's assertion that in order to enable the claims, every possible tenofovir prodrug or ester would have to be synthesized and tested.  Thus, I do not believe the breadth of the claims undermines enablement.

131.    For all the reasons stated above, it is my opinion that the claims directed to prodrugs and esters of tenofovir were enabled at the time of the priority date of the provisional application.

## 2.    The specifications of the Patents-in-Suit enable the use of orally administered tenofovir prodrugs/esters

132.    Dr. Flexner opines that the specifications of the Patents-in-Suit do not enable claims 1, 3, 9, 12 14, 18 and 19 of the '423 patent directed to tenofovir prodrugs or claim 13 of the '509 patent directed to tenofovir esters.  I disagree for all of the reasons cited above with regard to the provisional application (Section X.A.2.) and for the following additional reasons.

### a)    The amount of guidance presented

133.    As discussed above, the provisional application discloses the effectiveness of tenofovir when administered with FTC to prevent infection by human immunodeficiency virus after repeat exposures that might occur due to sexual encounters, and it teaches that tenofovir can be administered orally and discloses the FDA-approved tenofovir ester/prodrug TDF.  A POSA would have understood the provisional to include the administration of tenofovir as an oral prodrug/ester and would have known that there were multiple ways to administer tenofovir and multiple working examples of tenofovir prodrugs and esters for oral administration were known in the art.  *See* Section VIII.B.  As described in the Expert Report of Dr. Paul Johnson, on which I rely, the provisional application demonstrates: (1) a macaque animal model that is predictive of

> animals that remained uninfected during the 14 challenges received 28 days
> of post-exposure prophylaxis after the last challenge. Protection was
> defined as absence of persistent viremia and seroconversion. Treated
> animals that became infected continued treatment for an average of 21
> weeks (range=13 to 29) to monitor for plasma viremia and drug resistance
> development.

'509 patent at 9:1-32; '423 patent at 9:24-56.

135.    While I believe the disclosure of the provisional application is sufficient to enable the claims at issue, the additional information in the issued patents provides even more guidance to a POSA.  Therefore, in my opinion the claims directed to prodrugs and tenofovir esters are enabled by the disclosures of the Patents-in-Suit.

## X.    ADDITIONAL COMMENT

136.    I reserve the right to supplement or amend this report as necessary and appropriate if additional information that affects my opinions becomes available to me.  I understand that I may be asked to provide additional information or testimony to assist the Court in these proceedings.  I reserve the right to rely on demonstrative and/or visual aids as well as information provided by the other parties in this litigation, as appropriate, to assist the Court and/or supplement my opinions.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Date: May 17, 2022                        Dhiren R. Thakker, Ph.D.

RESTRICTED INFORMATION

# Exhibit M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,
     *Plaintiff–Counterclaim Defendant*,

     v.

GILEAD SCIENCES, INC.,
     *Defendant–Counterclaim Plaintiff,*

AND GILEAD SCIENCES IRELAND
UC,
     *Defendant*.

C.A. No. 1:19-cv-02103-MN

**<u>REBUTTAL EXPERT REPORT OF R. PAUL JOHNSON, M.D.</u>**

RESTRICTED INFORMATION

## I.     INTRODUCTION

1.      I, R. Paul Johnson, M.D., submit this report under Federal Rule of Civil Procedure 26(a)(2)(B) on behalf of the United States of America (the "Government").  I understand that this matter involves U.S. Patent Nos. 9,044,509 ("the '509 patent"), 9,579,333 ("the '333 patent"), 9,937,191 ("the '191 patent"), and 10,335,423 ("the '423 patent") (collectively, the "Patents-in-Suit" or the "HHS Patents").  This rebuttal expert report is based on information currently known to me, my education, knowledge, experience as a physician and researcher, as well as my review of the materials cited in this report.

## II.    EXPERIENCE AND QUALIFICATIONS

2.      I am a Professor of Medicine at Emory University. I have been a faculty member at Emory University since 2014. In addition, I am the Director at the Emory National Primate Research Center (formerly the Yerkes National Primate Research Center), a position I have also held since 2014. I have also held academic positions at Yale University, Harvard University, Harvard Medical School, and the University of Massachusetts Medical School.

3.      In 1984, I earned a Doctor of Medicine degree from Harvard Medical School in Boston. I completed my internship and residency in 1988 at Yale-New Haven Hospital in Connecticut, at the Yale School of Medicine. Following residency, I completed a clinical and research fellowship in Infectious Disease at Massachusetts General Hospital in Boston. Since 1987, I have been board certified in Internal Medicine, with additional certification in Infectious Disease. I was licensed in Connecticut and Massachusetts, and am currently licensed in Georgia. Additionally, I earned a Bachelor of Science degree *summa cum laude* in Psychology in 1980 from Duke University.

## V.    BACKGROUND REGARDING MACAQUE ANIMAL MODEL FOR HIV

21.    This section of my report provides a high-level summary of the rhesus macaque animal model for studying HIV therapies.  Rhesus macaques have provided an important animal model for the preclinical study of new HIV therapies since the late 1980s.  *See, e.g.,* Gardner et al., "Simian immunodeficiency viruses and their relationship to the human immunodeficiency viruses," AIDS, 2(suppl 1):S3-S10 (1988) at S3 ("Also, SIV-infected macaques are an excellent AIDS model system in which to develop and test new preventative and therapeutic strategies.").

22.    Rhesus macaques are non-human primates that exhibit remarkable similarities to humans with respect to anatomy, physiology, and endocrinology.  *See, e.g.,* Van Rompay, "Antiretroviral drug studies in nonhuman primates: a valid animal model for innovative drug efficacy and pathogenesis experiments," AIDS Reviews, 7:67-83 at 68 ("Nonhuman primates are phylogenetically the closest to humans.  The similarities in physiology (including drug metabolism, placentation, fetal and infant development, etc.) and immunology allow a more reliable extrapolation of results obtained in primate models to clinical applications for humans.") (hereafter "Van Rompay 2005").  Van Rompay 2005 states that:

> Primate models are powerful tools in many areas of HIV research.  In addition to allowing investigators to unravel virus-host interactions during disease pathogenesis and to test vaccines, macaques allow us to model the different aspects of antiviral drug treatment, including pharmacokinetics, toxicity, and antiviral efficacy.

*Id.*

23.    Rhesus macaques can be infected with simian immunodeficiency virus (SIV).  "The simian immunodeficiency viruses (SIVs) are nonhuman primate lentiviruses that are the closest known relatives of the HIV."  Desrosiers et al., "Minireview: HIV-related lentiviruses of

RESTRICTED INFORMATION

nonhuman primates," AIDS Research and Human Retroviruses, 5:465-473 (1989) at 465 (hereafter, "Desrosiers").  SIVs "closely resemble the human AIDS viruses, HIV-1 and HIV-2, in both genetic sequence and biological properties."  Desrosiers & Ringler, "Use of simian immunodeficiency viruses for AIDS research," Intervirology, 30:301-312 (1989) at 301 (hereafter, "Desrosiers & Ringler").

24.     "The importance of SIV systems for AIDS research is derived from the extensive genetic similarity to HIV, the ability to induce AIDS, and the availability of experimental animals." *Id.* at 302.  "The SIVs are the closest known relatives of the HIVs. Sequences of SIV genomes reveal a genomic organization very similar or identical to that of HIV-1 or HIV-2, with extensive homology over each of the corresponding genes."  *Id.* at 302.

25.     SIV, HIV-1 and HIV-2 are members of the lentivirus subfamily of retroviruses. *Id.* at 303.  "The virions mature at the plasma membrane of the infected cell, so that nucleoid and envelope are assembled at the time of the budding process.  Thus, a dense crescent is formed at the cell membrane without the formation of immature type A particles in the cytoplasm."  *Id.* at 303.  "The morphogenesis and morphology of all lentiviruses are identical; by morphologic criteria, they cannot be distinguished from one another."  *Id.* at 303.  Desrosiers & Ringler further explain similarities between SIV, HIV-1 and HIV-2 as follows:

> In addition to similar morphological characteristics, all lentiviruses share a number of unique biological and genetic properties including the propensity to induce chronic debilitating disease following long-term persistent infection, persistence in macrophages, and the presence of extra regulatory genes that other retroviruses do not have. However, one feature that appears to be unique to SIV and HIV is the tropism of both viruses for cells bearing the CD4 molecule. This property has been demonstrated by a number of independent observations: (1) both viruses grow preferentially within CD4+ cells; (2) inhibition of virus infection can be achieved

RESTRICTED INFORMATION

by preincubation of target cells with specific monoclonal antibodies to the CD4 antigen; (3) soluble synthetic CD4 protein can inhibit infection of CD4+ cells and prevent syncytial formation, and (4) CD4 and the HIV envelope protein (gp120) coprecipitate from lysates of infected cells.

*Id.* at 304.

26.     "The clinical disease associated with SIV infection in the macaque is very similar to the clinical syndrome of human patients infected with HIV." *Id.* at 305. For example:

SIV-infected animals develop marked emaciation, with losses of up to 60% of original body weight after experimental infection. CD4+ lymphocytes in the peripheral circulation decrease throughout the course of infection, and the CD4:CD8 ratio is often decreased. Blastogenic responses of peripheral blood lymphocytes to pokeweed mitogen are depressed. Peripheral lymphadenopathy consisting of profound follicular hyperplasia is often followed terminally by generalized lymphoid depletion. Approximately 70% of experimentally infected animals succumb to chronically debilitating AIDS within 1 year, although the disease course appears to vary with virus strain, how the virus was propagated in vitro, and the immune response of the host.

*Id.* at 305. "SIV-infected macaques develop a plethora of opportunistic infections, many of which are seen in human patients infected with HIV-1." *Id.* at 306. "Macaques that die with SIV infection exhibit clinical signs and pathologic findings remarkably similar to AIDS in humans. These include diarrhea, wasting, thymic atrophy, immune abnormalities, decreases in T4 cell numbers, opportunistic infections, lymphomas, and a characteristic encephalitis." Desrosiers at 468.

27.     "Induction of AIDS by SIV is thus an important model for the study of AIDS pathogenesis and vaccine and therapeutic strategies." Desrosiers at 468. "Its usefulness is derived from: (1) the extensive similarity of SIV to HIV in genetic features and biologic properties; (2) ability to induce AIDS; and (3) the availability of experimental animals." *Id.* at 468. Rhesus

macaques are not endangered and can be purchased at a reasonable cost and in appropriately large numbers for researching HIV therapies.  *See* Desrosiers & Ringler at 303.

28.    Macaque monkeys provide the only animal model where a primate lymphotropic lentivirus (SIV) can infect, establish a self-replicating infection, and cause disease similar to HIV-1 in humans.  SIV-infected macaques provide an appropriate surrogate measure for preclinical assessment of new HIV therapies.  *See, e.g.,* Morgan et al., "The use of nonhuman primate models in HIV vaccine development," PLoS Medicine, 5:e173 (2008) at 1200-01 ("Thus, at present, protection against disease progression in NHP [nonhuman primate] studies is the best surrogate measure of vaccine efficacy that can be used in preclinical assessments of vaccine approaches.") (hereinafter "Morgan").  The study of SIV in rhesus macaques has resulted in important contributions to "the origins of the HIVs, AIDS pathogenesis, and vaccine and therapy research." Desrosiers & Ringler at 301.  "The SIV macaque model is an absolutely indispensable animal resource for AIDS research."  Gardner, "Simian AIDS: an historical perspective," Journal of Medicinal Primatology, 32:180-86 (2003) at 184.  "The demonstration that antiviral drugs can prevent infection in macaques has provided a solid scientific rationale to administer anti-HIV drugs to humans following exposure to HIV in several clinical settings."  Van Rompay 2005 at 71.

29.    "In summary, the close similarity of SIV to HIV in genome organization, sequence, and biologic properties affirms the relevance of SIV models for HIV infection.  It is likely that most fundamental observations made in the SIV system can be extrapolated to HIV in humans, and vice versa."  Desrosiers at 470; *see also* Desrosiers & Ringler at 303 ("Most fundamental observations made in the SIV system are likely to be extrapolatable to HIV in humans and vice versa."); Morgan at 1203 ("The immune responses elicited in NHPs [nonhuman primates] by the HIV-1 vaccine should not be grossly different than those elicited by the SIV prototype.").

RESTRICTED INFORMATION

efforts to address the potential efficacy of early antiretroviral prophylaxis following HIV exposure mimicking heterosexual contact, the major mode for worldwide transmission.").

42.     Otten 2000 used the HIV-2 strain GB122 stock solution at a concentration of "approximately $10^4$ tissue culture infectious doses per ml or at least $10^2$ pig-tailed macaque i.v. infectious doses." *Id.* at 9771. "All virus exposures involved atraumatic inoculation of cell-free virus into the vaginal pouch via a sterile gastric feeding tube." *Id.* "Groups of HIV-2-exposed macaques (n = 4 each) were subsequently treated with (R)-9-(2-phosphonylmethoxypropyl)adenine (PMPA) (tenofovir; Gilead Sciences, Foster City, Calif.) by subcutaneous injection of 30 mg/kg of body weight daily for 28 days, starting 12, 36, or 72 h after the last viral inoculation." *Id.* at 9772.

43.     The Otten 2000 abstract states:

Postexposure prophylaxis (PEP) after intravaginal exposure to human immunodeficiency virus (HIV) was investigated using the HIV type 2 (HIV-2)/pig-tailed macaque transmission model. PEP for 28 days with the reverse transcriptase inhibitor (R)-9-(2-phosphonylmethoxypropyl)adenine (PMPA; tenofovir) was initiated 12 to 72 h following HIV-2 exposure. Systemic infection was not evident in the 12- and 36-h groups, as defined by plasma viremia, cell-associated provirus, antibody responses, and lymph node virus. Breakthrough infection in the 72-h group was detected at week 16 post-virus exposure. These results demonstrate for the first time using a vaginal transmission model that early intervention after high-risk sexual exposures may prevent infection.

*Id.* at 9771.

### E.   **McDermott 2004**

44.     In 2004, Adrian McDermott and colleagues reported a repeated low-dose viral challenge macaque animal model for studying HIV therapies. *See* McDermott et al., "Repeated low-dose mucosal simian immunodeficiency virus SIVmac239 challenge results in the same viral

and immunological kinetics as high-dose challenge: a model for the evaluation of vaccine efficacy in nonhuman primates," Journal of Virology, 78:3140-44 (2004) (hereafter "McDermott") (GILDDE02644435-39).  McDermott explains that most previous SIV macaque studies utilized large doses of SIV to ensure that all macaques become infected, while the McDermott investigation used a "repeated low-dose challenge" as a more physiologically relevant model for HIV therapies. *Id.* at 3140.  The abstract of McDermott states:

> Simian immunodeficiency virus (SIV) challenge of rhesus macaques provides a relevant model for the assessment of human immunodeficiency virus (HIV) vaccine strategies. To ensure that all macaques become infected, the vaccinees and controls are exposed to large doses of pathogenic SIV. These nonphysiological high-dose challenges may adversely affect vaccine evaluation by overwhelming potentially efficacious vaccine responses. To determine whether a more physiologically relevant low-dose challenge can initiate infection and cause disease in Indian rhesus macaques, we used a repeated low-dose challenge strategy designed to reduce the viral inoculum to more physiologically relevant doses. In an attempt to more closely mimic challenge with HIV, we administered repeated mucosal challenges with 30, 300, and 3,000 50% tissue culture infective doses ($TCID_{50}$) of pathogenic SIVmac239 to six animals in three groups. Infection was assessed by sensitive quantitative reverse transcription-PCR and was achieved following a mean of 8, 5.5, and 1 challenge(s) in the 30, 300, and 3,000 $TCID_{50}$ groups, respectively. Mortality, humoral immune responses, and peak plasma viral kinetics were similar in five of six animals, regardless of challenge dose. Interestingly, macaques challenged with lower doses of SIVmac239 developed broad T-cell immune responses as assessed by ELISPOT assay. This low-dose repeated challenge may be a valuable tool in the evaluation of potential vaccine regimes and offers a more physiologically relevant regimen for pathogenic SIVmac239 challenge experiments.

*Id.* at 3140.

### F.   <u>Regoes 2005</u>

45.    In 2005, Roland Regoes and colleagues reported a repeated low-dose viral challenge macaque animal model for studying HIV therapies.  *See* Regoes et al., "Preclinical assessment of HIV vaccines and microbicides by repeated low-dose virus challenges," PLoS Medicine, 2:e249 (2005) (hereafter "Regoes").  Regoes states that "[r]esearch on HIV vaccines and prevention relies strongly on preclinical studies in macaque models for the identification and evaluation of potential vaccines or prophylactic treatment strategies." *Id.* at 0799.  Regoes also states "[t]rials in macaque models play an essential role in the evaluation of biomedical interventions that aim to prevent HIV infection, such as vaccines, microbicides, and systemic chemoprophylaxis." *Id.* at 0798 (Abstract).  Regoes further states:

> The inability of most vaccine candidates to induce protection against infection in animal studies may be due, at least in part, to unintended consequences of the design of the animal trials, rather than to problems inherent in the vaccination approaches themselves. In most animal studies that seek to test the efficacy of a given preventive intervention, very high challenge doses are used, typically of approximately 10–100 times the infectious dose at which 50% of the animals become infected ($ID_{50}$).

*Id.* at 0799.  In contrast, repeated low-dose challenges "recapitulate much more realistically the circumstances of human exposure" than single high-dose challenges. *Id.* at 0802.  Regoes provides a theoretical study showing that "low-dose challenge experiments can be designed such that they do not require large numbers of animals." *Id.* at 0799.

### G.   <u>Otten 2005</u>

46.    In 2005, Ron Otten and colleagues reported a repeated low-dose viral challenge macaque animal model for studying HIV therapies.  *See* Otten et al., "Multiple vaginal exposures to low doses of R5 simian-human immunodeficiency virus: strategy to study HIV preclinical

interventions in nonhuman primates," Journal of Infectious Diseases, 191:164-73 (2005) (hereafter "Otten 2005").  Otten 2005 was co-authored by two inventors of the Patents-in-Suit:  Ron Otten and Thomas Folks.  Otten 2005 states:

> Current NHP [nonhuman primate] models use viral inocula at supraphysiological doses—that is, doses that result in viremias far greater than those observed during human infection—to establish infection via mucosal routes. High doses of virus are placed at mucosal surfaces to ensure that most, if not all, macaques in a control group will acquire infection.

*Id.* at 164.  Otten 2005 explains that a low-dose multiple-exposure protocol closely emulates human heterosexual transmission as follows:

> A nonhuman-primate model of human immunodeficiency virus type 1 (HIV-1) infection that more closely emulates human heterosexual transmission by use of multiple exposures to low doses of virus is critical to better evaluate intervention strategies that include microbicides or vaccines. In this report, we describe such a system that uses female pig-tailed macaques exposed vaginally to a CCR5-using simian-human immunodeficiency virus (SHIV$_{SF162P3}$) at weekly intervals. Results of dose-titration experiments indicated that 3 once-weekly exposures to 10 tissue culture infectious doses of SHIV$_{SF162P3}$ resulted in consistent transmission of virus and establishment of systemic infection.

*Id.* at 164 (Abstract).

47.     Otten 2005 explains advantages of a multiple low-dose challenge model as follows:

> An NHP model for transmission of HIV that uses multiple exposures to low doses of virus has numerous advantages. First, this strategy is more representative of the human condition, in that the dosage used is more physiological, compared with the larger doses used to ensure the high rates of infection characteristic of most macaque studies. A lower dose given multiple times circumvents the requirement to use higher doses, which may overwhelm any vaccine-induced immunity or intervention with a microbicide. Good intervention-prevention strategies may have already been discarded because the exposure doses have been too high

18

RESTRICTED INFORMATION

(nonphysiological), especially at the mucosal level. … A further advantage of this system is that it may require fewer macaques in test groups to evaluate an intervention, since each protected macaque will have multiple negative data points that can be considered in a cumulative fashion. … In addition, the number of macaques in any control group can also potentially be reduced, since, over the course of multiple exposures, all of the macaques will become infected.

*Id.* at 172.

48.     Otten 2005 states that "[a] key goal of any investigation using animals is to provide proof-of-concept data by use of systems that best represent and recapitulate the human condition. In the case of the present study, the main goal of mimicking human transmission was achieved, in part, by applying low doses of virus (for an NHP model) in a repetitive fashion, to induce systemic infection within a usable time frame." *Id.* at 169.  Otten further states that "[p]ig-tailed macaques were used because their anatomy, physiology, vaginal flora, and epithelial tissues are similar to those in women. Furthermore, their susceptibility to SHIV infection makes them ideal for vaginal-transmission studies." *Id.* at 166.  Otten 2005 also states "[v]ery recent evidence reported by McDermott et al. demonstrates that a low-dose multiple-exposure strategy using SIV can be successfully used with the intrarectal route of exposure." *Id.* at 172.

### H.     Subbarao 2006

49.     In 2006, Shambavi Subbarao and colleagues reported a repeated low-dose viral challenge macaque animal model that examined the efficacy of TDF for chemoprophylaxis.  *See* Subbarao et al., "Chemoprophylaxis with tenofovir disoproxil fumarate provided partial protection against infection with simian human immunodeficiency virus in macaques given multiple virus challenges," Journal of Infectious Diseases, 194:904-11 (2006) (hereinafter "Subbarao 2006") (GILDDE00282936-43).  Subbarao 2006 was co-authored by three inventors of the Patents-in-Suit:  Ron Otten, Robert Janssen, and Thomas Folks.  I have been informed that Subbarao 2006

eventually became infected, the results are consistent with previous research that demonstrated that TDF had partial efficacy in the prevention of SHIV infection. Only 3 of 4 of the control animals—but 0 of 8 of the TDF-treated animals—became infected between 2 and 6 weeks after initiation of the study." *Id.* at 874-75.

## VII.    MACAQUE DATA IN THE GOVERNMENT'S PROVISIONAL AND NON-PROVISIONAL PATENT APPLICATIONS

58.    This section of my report summarizes the macaque animal model experiments and data disclosed in the Government's provisional and non-provisional patent applications.

### A.    The Government's Provisional Patent Application No. 60/764,811

59.    The Government filed U.S. Provisional Patent Application No. 60/764,811 on February 3, 2006.  *See* US_00002058-83 (Provisional Application) at US_00002058.  The provisional application discloses results of pre-exposure prophylaxis using the combination of tenofovir and emtricitabine in rhesus macaques subjected to repeated low-dose rectal viral challenges.  *See, e.g.,* US_00002058-83 (Provisional Application) at US_00002063 ("Here, we investigated whether tenofovir/5-fluoro-1-(2R,5S)-[2-(hydroxymethyl)-1,3-oxathiolan-5-yl]cytosine (FTC, emtricitabine) combination protects macaques from rectal SHIV challenge, and whether this protection is sustained during repeated virus exposures.").

60.    The methodology of the macaque study is described as follows:

**Methods:** One group of six Rhesus macaques was injected subcutaneously with 22mg tenofovir/20mg FTC per kg once daily. The FTC dose is comparable to that approved for humans. Six control animals did not receive any antiretroviral treatment. All animals were subjected to weekly rectal exposures with a low dose of $SHIV_{SF162p3}$ (10 $TCID_{50}$; $3.8 \times 10^5$ virus particles) which expresses an R5 tropic HIV-1 envelope that resembles naturally transmitted HIV-1 strains. Infection was monitored by serology and PCR amplification of SHIV gag and pol sequences from plasma and peripheral blood lymphocytes, respectively. Historic data on control

RESTRICTED INFORMATION

macaques using this repeat exposure model shows that four virus challenges infect ~75% of the animals.

*Id.*; *see also id.* at US_00002067 ("Materials and Methods" section), which is reproduced below:

## Materials and Methods

- ○ Six male Rhesus macaques injected subcutaneously with tenofovir 22 mg/kg and FTC 20 mg/kg once daily
- ○ Six controls received no drug treatment
- ○ Repeated rectal exposures once weekly with SHIV162p3 that contains an HIV-1 R5 env; 14 total virus exposures
- ○ Virus inoculum: 10 TCID (3.8 $10^8$ virus particles equivalent)
- ○ Infection was monitored by serology, RT-PCR of plasma and proviral PCR of PBMC
- ○ Animals considered protected if seronegative and PCR negative



61.     The results and conclusions of the macaque study are described as follows:

**Results:** Four of six controls (67%) became infected after four challenges (median = 2.5; range = 2-4). In contrast, all six animals treated with tenofovir/FTC were fully protected. After ten additional virus challenges, one of two remaining controls became infected while all six tenofovir/FTC-treated animals remained uninfected.

**Conclusions:** Tenofovir/FTC combination provides a high level of protection against repeated virus challenges, demonstrating that chemoprophylaxis with potent antiretrovirals is an effective strategy for preventing sexual HIV transmission.

US_00002063; *see also id.* at US_00002066 ("We determined whether the increased potency in a combination of 2 RT inhibitors, tenofovir and FTC, protects macaques from repeated virus exposures.").   The provisional application further states that "[t]enofovir/FTC combination protected all 6 treated animals from infection after 14 repeated rectal SHIV exposures" and "treated animals remained uninfected despite receiving seven times more exposures than controls (median exposures to infect controls is 2")."   *Id.* at US_00002073.   The provisional application also states that "[d]ata suggest that chemoprophylaxis with a potent antiretroviral drug combination cay be highly effective in preventing sexual HIV transmission."   *Id.*

62.   The provisional application incudes several figures.   The first figure describes the repeat low-dose macaque model as follows:



*Id.* at US_00002068.

63.     The second figure shows the prevention of rectal SHIV transmission in macaques by tenofovir/FTC combination as follows:



*Id.* at US_00002069.

**B.     The Government's Non-Provisional Application No. 11/669,547 and the '509 Patent**

64.     The Government filed U.S. Non-Provisional Patent Application No. 11/669,547 ("the '547 application") on January 31, 2007.  This application eventually issued as the '509 patent.  The specification and figures of the '547 application and '509 patent are identical with respect to the macaque studies described therein.  *See e.g.,* US_00000281-318 ('547 application) and US_00001774-86 ('509 patent) at US_00001776-85.  This report summarizes the results of pre-exposure prophylaxis described in the specification of the '509 patent using the combination of

26
RESTRICTED INFORMATION

**Methods:** One group of six Rhesus macaques was injected subcutaneously with 22mg tenofovir/20mg FTC per kg once daily. The FTC dose is comparable to that approved for humans. Six control animals did not receive any antiretroviral treatment. All animals were subjected to weekly rectal exposures with a low dose of SHIV$_{SF162p3}$ (10 TCID$_{50}$; 3.8x10$^5$ virus particles) which expresses an R5 tropic HIV-1 envelope that resembles naturally transmitted HIV-1 strains. Infection was monitored by serology and PCR amplification of SHIV gag and pol sequences from plasma and peripheral blood lymphocytes, respectively. Historic data on control macaques using this repeat exposure model shows that four virus challenges infect ~75% of the animals.

*Id.* at US_0002063. The first three sentences of the "Methods" describes treatment of macaques with tenofovir/FTC. The fourth sentence describes exposure of the macaques to SHIV. By describing the administration of tenofovir/FTC to macaques prior to the exposure to SHIV, the "Methods" reinforces that macaques received administration of tenofovir/FTC prior to exposure to SHIV.

### B. **Flexner Report Paragraph 362**

94. Paragraph 362 of the Flexner report states "[t]he Provisional Application does not disclose ***the results*** of any administration of any antiretrovirals ***in humans*** prior to exposure or potential exposure to an immunodeficiency retrovirus." (emphases added).

95. If this statement in the Flexner report was intended to suggest that results in humans are required for patentability, I disagree. I note that Gilead patents have claims that encompass administration of antiretrovirals (either TDF or TAF as ***monotherapy***) in humans, yet such patents do not disclose the results of administration in humans. For example, the title page of U.S. Patent No. 5,977,089 lists "Gilead Sciences, Inc." as the assignee. Claim 3 of this patent recites:

RESTRICTED INFORMATION

Claim 3.  A method comprising orally administering to a patient infected with virus or at risk to viral infection a therapeutically effective amount of (R)-bis(POC)PMPA.[4]

*See* U.S. 5,977,089 at 60:58-60.  This patent provides oral bioavailability data in beagle dogs as follows:

TABLE 1

PMPA Prodrug Summary

| (Dose mg e.g. PMPA/Kg) | Chemical t1/2 (hr) | | Log PC | Biological t1/2 (min) (Dog) (Human) | | | % of PMPA IV (1 mg/kg) AUC | | | | Urinary Recovery (% as |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | pH 7.4 | pH 2.0 | pH 7.4 | Intestine | Plasma | Liver | PMPA | Mono-ester | Pro-drug | other | PMPA) |
| PRODRUGS CARBONATES | | | | | | | | | | | |

| | 9 | | 1.25 | 52.6 (<5) | 20.5 | <5 | 35.8 ± 14.7 | 3.1 ± 0.67 | 0 | 0 | TBD |

Bis-isopropylCOM PMPA

R = (structure) ; R² = H

(9)

*Id.* at Table 1 (excerpted to show "bis-isopropylCOM PMPA"[5] data); *see also id.* at 53:8-57:62 (Example 15).  It also provides antiviral activity in tissue cultures against HIV-1 as follows:

TABLE 2-continued

Antiretroviral activity of PMPA and PMPA prodrugs against HIV-1.

| compound | $IC_{50}^{a}$ ($\mu$M) | $CC_{50}^{b}$ ($\mu$M) | $SI^{c}$ |
|---|---|---|---|
| 5c | <0.001 | 30 | 30000 |
| 5d | 0.2 | 10 | 50 |
| 5e | <0.001 | 3 | 3000 |
| 5f | 0.003 | 50 | 16600 |
| 5g | <0.001 | 40 | 40000 |

[a] $IC_{50}$ - 50% inhibitory concentration;
[b] $CC_{50}$ - Concentration to kill 50% of the cells;
[c] SI - Selectivity Index ($CC_{50}/IC_{50}$);
n.d - not determined; DMSO used as control.

---

[4] I understand that "(R)-bis(POC)PMPA" is TDF
[5] I understand that "bis-isopropylCOM PMPA" is TDF.

RESTRICTED INFORMATION

*Id.* at Table 2 (excerpted, *see* compound 5f[6]); *see also id.* at 57:63-60:15 (Example 16). However, this patent does not provide *in vivo* efficacy data in any animals, much less efficacy data in humans.

96.    As another example, the title page of U.S. Patent No. 7,803,788 lists "Gilead Sciences, Inc." as the assignee. Claim 7 of this patent recites:

Claim 7. A method for antiviral therapy comprising administering a therapeutically effective amount of a diastereomerically enriched compound having the structure (6)[7]

(6)

and its salts, tautomers, free base and solvates.

*See* U.S. 7,03,788 at 42:1-20. This patent provides *in vitro* activity studies of anti-HIV activity (*see id.* at 29:1-35:20, Example 9), as well as pharmacokinetic and biodistribution studies in beagle dogs (*see id.* at 35:23-39:36, Examples 10-11)[8]. However, this patent does not provide *in vivo* efficacy data in any animals, much less efficacy data in humans.

97.    While the Government's provisional application does not disclose experimental "results" of administration of antiretrovirals "in humans" prior to exposure to an immunodeficiency retrovirus, it does disclose experimental **results in macaques** prior to exposure

---

[6] I understand that compound 5f is TDF.
[7] I understand that compound (6) shown in claim 7 is TAF (tenofovir alafenamide).
[8] I understand that "GS 7340" in Examples 9-11 is TAF.

44

to an immunodeficiency retrovirus.  *See, supra* Section VII.A (discussing the provisional application).  Thus, the person of ordinary skill in the art in the 2005-2006 timeframe would have viewed the experimental results of the repeated low-dose macaque animal model disclosed in the provisional application as providing a relevant model for assessing PrEP as an HIV prevention strategy in humans.  *See, supra* Section V and VI; *see also, e.g.*:

- Desrosiers at 470 ("In summary, the close similarity of SIV to HIV in genome organization, sequence, and biologic properties affirms the relevance of SIV models for HIV infection. It is likely that most fundamental observations made in the SIV system can be extrapolated to HIV in humans, and vice versa.");

- Desrosiers & Ringler at 303 ("Most fundamental observations made in the SIV system are likely to be extrapolatable to HIV in humans and vice versa.");

- Morgan at 1203 ("The immune responses elicited in NHPs [nonhuman primates] by the HIV-1 vaccine should not be grossly different than those elicited by the SIV prototype.");

- Tsai 1994 at 260 ("Since many antiretroviral studies cannot easily be conducted in human subjects, macaques infected with simian immunodeficiency virus (SIV) have become an accepted model for studying the efficacy and toxicity of anti-HIV drugs.");

- Tsai 1995 at 1199, note 7 ("The SIV-macaque model has become the model of choice for these types of studies because HIV and SIV are lentiviruses that cause similar disease syndromes in their respective hosts.");

- McDermott at 3140 ("Simian immunodeficiency virus (SIV) challenge of rhesus macaques provides a relevant model for the assessment of human immunodeficiency virus (HIV) vaccine strategies.");

RESTRICTED INFORMATION

- Otten 2005 at 172 (explaining advantages of multiple exposures to low doses in nonhuman primate models); and

- Van Rompay 2005 at 68 ("The similarities in physiology (including drug metabolism, placentation, fetal and infant development, etc.) and immunology allow a more reliable extrapolation of results obtained in primate models to clinical applications for humans").

### C.    Flexner Report Paragraphs 365-367 and 373

98.    Paragraph 365 of the Flexner report states "within the four corners of the Provisional Application, there are express statements of skepticism as to the probative value of the disclosed subcutaneous monkey experiments with respect to orally administered pre-exposure prophylaxis."   The Flexner report bases this statement on two sentences within the provisional application:

(1)  "The observed protection by tenofovir and FTC may not reflect that of Truvada, because a higher dose of tenofovir was used."  US_00002057-83, at US_00002073.

(2)  "Adding tenofovir to FTC at a dosing similar to that in Truvada *may* enhance further the protection." US_00002057-83, at US_00002074 (emphasis added).

*See* Flexner report paragraphs 365-367.  The Flexner report also relies on a similar statement from Dr. Heneine's 2006 presentation of the macaque animal data at the CROI conference.  *See* Flexner report paragraph 373 (quoting Dr. Heneine's statement that "the observed protection by Tenofovir and FTC may not necessarily reflect that of Truvada, because a higher dose of Tenofovir was used in [the study's subcutaneous] combination.") (Heneine CROI transcript, GILDDE02684702-888, at GILDDE02684793).

99.    As an initial matter, a person of ordinary skill in the art would have viewed the second sentence quoted above reciting that "Truvada may enhance further protection" as disclosing that the use of Truvada for PrEP may provide *better* ("enhanced") results than the

combination of subcutaneous tenofovir and oral FTC experiments disclosed in the provisional application.  Thus, in my view, this sentence does not express skepticism.

100.    Moreover, when viewed within the overall disclosure of the provisional application, the person of ordinary skill in the art would not have interpreted the two quoted sentences as expressing skepticism as to the probative value of the macaque experiments for orally administered PrEP.  To the contrary, a person of ordinary skill in the art would have understood that the provisional application discloses tenofovir/FTC combinations that are tableted for oral administration. For example, Claim 1 of the provisional application is directed to "[a] composition for the prevention of HIV transmission comprising *a plurality of antiretroviral compounds*."  *See* US_00002082 (emphasis added).  Claim 8 is directed to a method of preventing HIV transmission by administering "a composition comprising *a plurality of antiretroviral compounds*."  *Id.* (emphasis added).  Claims 5 and 11 depend from claims 1 and 8, respectively, and recited that the plurality of antiretroviral compounds are "tableted."  *Id.*  A person of ordinary skill in the art would have understood that a "tableted" composition refers to a tablet that can be used for oral administration. Claim 14 specifically refers to "oral" administration. *See* US_00002083. The title of the provisional application refers to a "tenofovir/FTC combination," and the application concludes by stating "Tenofovir/FTC combination provides a high level of protection against repeated virus challenges, demonstrating that chemoprophylaxis with potent antiretrovirals is an effective strategy for preventing sexual HIV transmission."  US_00002063.  Truvada is the only oral formulation of a tenofovir/FTC combination disclosed in the provisional application (*see* US_00002073-74), and it was the only oral formulation of tenofovir/FTC approved by the FDA. *See* US_00002076.

RESTRICTED INFORMATION

101.    Further, Dr. Heneine's statements during the CROI presentation that "at this point, the data do – do suggest that adding Tenofovir to FTC dosing, similar to that in Truvada, may further enhance this high level of protection" belie any claim by Dr. Flexner that the provisional application contained statements of skepticism about the utility of macaque model for orally administered PrEP.  Heneine CROI transcript, GILDDE02684702-888, at GILDDE02684794, lines 3-8.

### D.    Flexner Report Paragraph 374

102.    Paragraph 374 of the Flexner report states "it is my opinion that by February 2006, the named inventors, as well as others in the field, recognized the limitations of the monkey studies disclosed in the Provisional Application and their limited applicability to both oral dosing and to humans."  In connection with this statement, the Flexner report quotes two answers provided by Dr. Heneine during his 2006 CROI presentation of the macaque data:

(1) "We do not *know* the correlation between the model and the human and that's the importance of the clinical trials where they're going to ultimately provide that – that information. . . . *So but we have clinical trials as the ultimate measure*." Heneine CROI transcript, GILDDE02684795, lines 11-20 (emphases added).

(2) "So as I mentioned, we're going to continue to monitor for emergence of resistance in the animals that failed the prophylaxis and to see if -- how big that – how big the problem is [inaudible] the kinetics of that emergence. Regarding drug levels and trying to mo- -- to model the dose we use to with the currently approved dosing for humans, obviously, we try our best to match [inaudible] levels and now we're trying to look also more closely into intracellular levels to see how these different dosings in the macaques compare to the humans. There are differences in the metabolism of drugs and the dosing between [rhesus], the clearance and so forth. So we're trying our best to come as close as possible to humans."  Heneine CROI transcript, GILDDE02684796, line 22 through GILDDE02684797, line 15.

RESTRICTED INFORMATION

103.    The first statement by Dr. Heneine says "[w]e do not **know** the correlation between the model and the human" and refers to "clinical trials as the ultimate measure."  These statements are unremarkable because a person of ordinary skill in the art would have understood Dr. Heneine as simply saying that the ultimate measure of clinical trials correlating to the macaque model cannot be "known" in advance of receiving the results of the clinical trials.  A person of ordinary skill in the art would approximately equate Dr. Heneine's use of "we do not know" with "we have not proved."  Dr. Heneine's statement does not reduce the view that a person of ordinary skill in the art in the 2005-2006 timeframe understood that repeated low-dose macaque animal studies provide a relevant proof-of-concept model from which the ordinarily skilled artisan could extrapolate whether PrEP would likely be useful as an HIV prevention strategy in humans.  *See, supra* Section V and VI; *see also, e.g.*:

- Desrosiers at 470 ("In summary, the close similarity of SIV to HIV in genome organization, sequence, and biologic properties affirms the relevance of SIV models for HIV infection. It is likely that most fundamental observations made in the SIV system can be extrapolated to HIV in humans, and vice versa.");

- Desrosiers & Ringler at 303 ("Most fundamental observations made in the SIV system are likely to be extrapolatable to HIV in humans and vice versa.");

- Morgan at 1203 ("The immune responses elicited in NHPs [nonhuman primates] by the HIV-1 vaccine should not be grossly different than those elicited by the SIV prototype.");

- Tsai 1994 at 260 ("Since many antiretroviral studies cannot easily be conducted in human subjects, macaques infected with simian immunodeficiency virus (SIV) have become an accepted model for studying the efficacy and toxicity of anti-HIV drugs.");

RESTRICTED INFORMATION

- Tsai 1995 at 1199, note 7 ("The SIV-macaque model has become the model of choice for these types of studies because HIV and SIV are lentiviruses that cause similar disease syndromes in their respective hosts.");

- McDermott at 3140 ("Simian immunodeficiency virus (SIV) challenge of rhesus macaques provides a relevant model for the assessment of human immunodeficiency virus (HIV) vaccine strategies.");

- Otten 2005 at 172 (explaining advantages of multiple exposures to low doses in nonhuman primate models); and

- Van Rompay 2005 at 68 ("The similarities in physiology (including drug metabolism, placentation, fetal and infant development, etc.) and immunology allow a more reliable extrapolation of results obtained in primate models to clinical applications for humans").

104. I further note that the first statement by Dr. Heneine that is reproduced in Flexner report paragraph 374 includes an ellipses that omits a portion of Dr. Heneine's statement. The omitted portion of Dr. Heneine's statement explains that the macaque model "is very helpful in giving you the relative protection levels from different interventions and what is important to achieve a higher level of protection, potency, which drug and so forth." Heneine CROI transcript, GILDDE02684795, lines 16-19. With the benefit of context provided by Dr. Heneine's full statement, it is apparent that Dr. Heneine was explaining the virtues of the macaque model (rather than disparaging the model).

105. The second statement by Dr. Heneine supports the view of the person of ordinary skill in the art in the 2005-2006 timeframe that repeated low-dose macaque animal studies provide a relevant proof-of-concept model for extrapolating whether PrEP would likely be useful as an HIV prevention strategy in humans. In the second statement, Dr. Heneine states that "we're trying

our best to come as close as possible to humans," and part of the closeness between his macaque model and humas is "to model the dose we use [in the macaques] with the currently approved dosing for humans." Heneine CROI transcript, GILDDE02684797, lines 5-15. It would have been within the level of ordinary skill in the art using the disclosure of the provisional patent application to dose macaques and humans both subcutaneously and orally to achieve similar intracellular levels of tenofovir and FTC. A person of ordinary skill in the art would have viewed Dr. Heneine's second statement as explaining the virtues of the macaque model, rather than disparaging the model as being of "limited applicability to both oral dosing and to humans" as paragraph 374 of the Flexner report suggests.

106.    The results of the inventors' macaque model were viewed by those of skill in the art as highly probative toward the combination of FTC/TDF being useful for PrEP in humans. For example, after Dr. Heneine presented the results of the macaque model at the CROI conference in 2006, the large PrEP clinical trial called the Botswana FTC/TDF Oral HIV Prophylaxis Trial (TDF2) study changed from TDF *monotherapy* to TDF/FTC *combination* therapy. This change was reported by Thigpen et al. as follows:

> In 2005, the study investigators initiated the TDF1 study to evaluate the safety and efficacy of preexposure prophylaxis with TDF, as compared with placebo, with both study drugs administered once daily. When data from studies in animals later showed the superior efficacy of TDF-FTC,[3] we changed the active drug to TDF-FTC (TDF2 study).

Thigpen et al., "Antiretroviral preexposure prophylaxis for heterosexual HIV transmission in Botswana," New England Journal of Medicine, 367:423-34 (2012) at 424 (hereafter "Thigpen") (US_GRANT_000014-24). Reference 3 in Thigpen is the "Garcia-Lerma" paper discussed above

that reports the results of the macaque studies in the Government's provisional and non-provisional patent application.

107.    The likelihood that the inventors' macaque model is, in fact, highly probative of the combination of FTC/TDF being useful for PrEP in humans was verified by the TDF2 clinical trial results, as well as the iPrEx clinical trial results and Partners PrEP clinical trial results.  For example, the TDF2 Study concluded "[d]aily TDF-FTC prophylaxis prevented HIV infection in sexually active heterosexual adults."  Thigpen at 423 (Abstract).  Gilead's 2012 Truvada Insert that contains the PrEP indication relied on the macaque data that were verified in the iPrEx and Partners PrEP clinical trials.  *See* 2012 Truvada Insert at 29 ("The prophylactic activity of the combination of daily oral emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF) was evaluated in a controlled study of macaques inoculated once weekly for 14 weeks with SIV/HIV-1 chimeric virus (SHIV) applied to the rectal surface. Of the 18 control animals, 17 became infected after a median of 2 weeks. In contrast, 4 of the 6 animals treated daily with oral FTC and TDF remained uninfected and the two infections that did occur were significantly delayed until 9 and 12 weeks and exhibited reduced viremia."); *id.* at 32 ("The iPrEx study and Partners PrEP study support the use of TRUVADA to help reduce the risk of acquiring HIV-1."); *id.* at 34-35 (reporting results of the iPrEx and Partners PrEP trials).

108.    In addition, there were statements made by Gilead authors in 2008 that do not support the statement in Paragraph 374 of the Flexner report that those in the field "recognized the limitations of the monkey studies disclosed in the Provisional Application and their limited applicability to both oral dosing and to humans."  In 2008, Koen Van Rompay and colleagues reported results of experiments testing chronic administration of tenofovir to rhesus macaques. *See* Van Rompay et al., "Chronic administration of tenofovir to rhesus macaques from infancy

reviewers' comments regarding the Subbarao 2006 study.  Paragraph 2192 asserts that "[t]he government's reliance is misleading because the government scientists, including the named inventors, were aware of these nonpublic criticisms of the Subbarao Study by the scientific community and of these material flaws, particularly the feeding issue in which some monkeys did not take the drug." *See also generally* paragraphs 2185-2193 of the Flexner report.

124.    As discussed above, the limitations of the Subbarao 2006 study regarding statistical significance and variations in blood concentrations were addressed by the Subbarao 2006 article itself.  For example, the Subbarao 2006 abstract states "[a]lthough infection was delayed in treated macaques, compared with control macaques, ***the differences were not statistically significant***" and "the study was limited by the small numbers of animals evaluated and ***the variability in blood levels of TDF that resulted from oral dosing***." Subbarao 2006 at 904 (Abstract, emphases added). I understand that Subbarao was submitted to the Examiner during prosecution of the Patents-in-Suit.  Thus, the Examiner was entitled to consider the limitations of the Subbarao 2006 study in determining patentability of the Patents-in-Suit.  The Government did not overstate or mislead the Examiner regarding the Subbarao 2006 study, and the Examiner was entitled to appropriately weigh the Government's evidence of unexpectedly superior results against the Subbarao 2006 study results.

## IX.    ADDITIONAL COMMENT

125.    I reserve the right to supplement or amend this report as necessary and appropriate if additional information that affects my opinions becomes available to me.  I understand that I may be asked to provide additional information or testimony to assist the Court in these proceedings.  I reserve the right to rely on demonstrative and/or visual aids as well as information

RESTRICTED INFORMATION

provided by the other parties in this litigation, as appropriate, to assist the Court and/or supplement my opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  __May 16, 2022_____

R. Paul Johnson, M.D.

RESTRICTED INFORMATION

# Exhibit N

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

THE UNITED STATES OF AMERICA,

    *Plaintiff & Counterclaim-Defendant*,

        v.

GILEAD SCIENCES, INC. and GILEAD
SCIENCES IRELAND UC,

    *Defendants & Counterclaim Plaintiff.*

**CONTAINS RESTRICTED
INFORMATION—SUBJECT
TO PROTECTIVE ORDER**

C.A. No. 19-2103-MN

**OPENING EXPERT REPORT OF CHARLES W. FLEXNER, M.D.**

Date: March 18, 2022

**CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER**

## I.  Introduction

1.  I have been retained as an expert in this case on behalf of Gilead Sciences, Inc. ("Gilead") and Gilead Sciences Ireland UC (collectively, "Defendants").

2.  I understand that the United States of America (the "government") currently accuses Defendants of infringing claims 1, 3, 8, 9, and 13 of U.S. Patent No. 9,044,509 (the "'509 Patent"); claims 3 and 13 of U.S. Patent No. 9,579,333 (the "'333 Patent"); claims 13 and 18 of U.S. Patent No. 9,937,191 (the "'191 Patent"); and claims 1, 3, 9, 12, 14, 18, 19 of U.S. Patent No. 10,335,423 (the "'423 Patent") (collectively, the "Asserted Claims").

3.  In this report, I provide my opinions concerning the invalidity of the Asserted Claims of the '509 Patent, the '333 Patent, the '191 Patent, and the '423 Patent (collectively, the "Patents-in-Suit").

4.  If requested, I expect to testify regarding the opinions set forth in this report.  I also expect to testify on the clinical background relevant to the treatment and prevention of human immunodeficiency virus ("HIV") infection, including HIV pre-exposure prophylaxis ("HIV PrEP"), and on my background, qualifications, and experience, as they relate to my opinions.

## II.  Qualifications & Professional Experience

5.  I am a physician-scientist with nearly 40 years of experience in the field of HIV treatment and prevention.  I received a Bachelor of Science degree in 1978 from Stanford University and an M.D. degree in 1982 from the Johns Hopkins University School of Medicine. I completed a three-year laboratory-based fellowship as a Medical Staff Fellow in the Laboratory of Viral Diseases at the National Institutes of Health in Bethesda in 1988, followed by clinical fellowship training in Infectious Diseases and Clinical Pharmacology at Johns Hopkins.  Since that time, my research focus has been the basic and clinical pharmacology of therapeutics for

– 1 –

resistance.  *See* De Clercq EOED at GILDDE00281020; *see also* David J. Back et al., *The Pharmacology of Antiretroviral Nucleoside and Nucleotide Reverse Transcriptase Inhibitors Implications for Once-Daily Dosing*, 39 J. Acquir. Immune Defic. Syndr. S1 (2005) [GILDDE00283789-811, at GILDDE00283789] ("Back").  The once-daily combination drugs were recognized as a "major breakthrough."  De Clercq JMC at GILDDE00281365.

182.    By 2005, the FDA had approved fixed-dose combination drugs for HIV treatment, including Combivir® (3TC and zidovudine), Trizivir® (abacavir, 3TC, and zidovudine), Epzicom® (3TC and abacavir), and Truvada® (TDF and FTC).  *See* De Clercq EOED at GILDDE00281005, GILDDE00281023.  It was also known that, to maximize patient compliance, pill burden should ideally be reduced to one pill daily, and that patients preferred simple treatments without food and dietary restrictions.  *See id.* at GILDDE00281023; Back at GILDDE00283789. It was also understood in the art that antiretrovirals taken without food restrictions were more easily integrated into daily life—and thus increased patient adherence—compared with antiretrovirals that must be taken with food.  Back at GILDDE00283790.

### 4.    Truvada®

183.    In August 2004, the FDA approved a single, once-daily oral formulation of TDF (300mg) and FTC (200mg), Truvada®.  *See* Truvada® Drug Approval Letter at GILDDE00283762; *see also* Truvada® Insert at GILDDE00283038; Toni M. Dando & Antona J. Wagstaff, *Emtricitabine/Tenofovir Disoproxil Fumarate*, 64 Drugs 2075 (2004) [GILDDE00283957-64, GILDDE00283957] ("Dando").  It was known that patients could take Truvada® with or without food.  Truvada® Insert at GILDDE00283023.

184.    One Truvada® tablet contains the same dose of antiretrovirals as the single agent tablets Viread® (TDF) and Emtriva® (FTC), and a single Truvada® tablet was known to be bioequivalent to the individual dosages.  *See* Truvada® Insert at GILDDE00283022; De Clercq

– 92 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

2263.   The scope of the above-mentioned claims that requires the oral administration of tenofovir to achieve pre-exposure prophylactic effect is inoperative because tenofovir has low oral bioavailability and is unsuitable for oral administration in humans and other primates.  *See, e.g.*, Barditch-Crovo  at GILDDE00936700; *see also* Second Claim Construction Declaration of Andrea Brancale, Ph.D. ¶ 17 (June 28, 2021) ("A POSA would have further understood that tenofovir cannot be administered in an oral dosage form unless modified[.]").  Oral administration of tenofovir therefore cannot be a "process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus" or "protect[] the primate host from infection with the immunodeficiency retrovirus," as construed by the Court.  *See, e.g.*, '509 Patent, claim 1.  Oral administration of tenofovir also therefore cannot be a "process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human" or "inhibit[] the establishment of the self-replicating infection with the immunodeficiency virus in the human," as construed by the Court. *See, e.g.*, '509 Patent, claim 13.  Thus, it is my opinion that the full scope of claims 1, 3, 9, and 13 of the '509 Patent; claims 3 and 13 of the '333 Patent; claim 13 of the '191 Patent; and claims 1, 3,  9, 12, and 14 of the '423 Patent are not enabled because the methods of pre-exposure prophylaxis involving oral administration of tenofovir is inoperative.

**C.     If the Prior Art is Not Enabling for Failure to Disclose the Results of Human Studies, the Common Written Description of the Patents-in-Suit Also Fails to Enable the Asserted Claims**

2264.   All of the Asserted Claims encompass the administration of the claimed combination of FTC and tenofovir (or TDF or tenofovir ester or tenofovir prodrug) prior to immunodeficiency retrovirus exposure in a human.  Some claims, such as claim 13 of the '191 Patent, expressly recite "selecting an uninfected human" and subsequently "administering to the uninfected human" the claimed combination of antiretrovirals.  Other claims, such as claim 1 of

– 1125 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

## XXIV. Trial Exhibits

2327.   I may rely on visual aids and demonstrative exhibits that demonstrate the bases of my opinions.  Examples of these visual aids and demonstrative exhibits may include claim charts, patent drawings, excerpts from patent specifications, file histories, interrogatory responses, deposition testimony, and deposition exhibits, as well as physical exhibits, test data, charts, photographs, diagrams, videos, and animated or computer-generated graphics.

## XXV.  Supplementation of Opinions

2328.   I reserve the right to amend or supplement my opinions in light of additional information that may come to my attention, including any alternative opinions advanced by or on behalf of the government.

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

I declare that the foregoing is true and correct to the best of my own personal knowledge.

Date: March 18, 2022

Charles W. Flexner, M.D.

# Exhibit O

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,
*Plaintiff–Counterclaim Defendant*,

v.

GILEAD SCIENCES, INC.,
*Defendant–Counterclaim Plaintiff,*

AND GILEAD SCIENCES IRELAND UC,
*Defendant*.

C.A. No. 1:19-cv-02103-MN

**EXPERT REPORT OF ANDREA BRANCALE, PH.D.**

## I.      INTRODUCTION

1.      I, Andrea Brancale, Ph.D, submit this report under Federal Rule of Civil Procedure 26(a)(2)(B) on behalf of the United States of America (the "United States" or "Government").

2.      I previously prepared a declaration in support of the United States' opening brief on claim construction (my "First Declaration," *see* D.I. 108-5 at Appx4151-96) regarding the term "tenofovir ester" that appears in certain claims of U.S. Patent No. 9,044,509 ("the '509 patent"); "tenofovir prodrug" that appears in certain claims of U.S. Patent No. 10,335,423 ("the '423 patent"); and the preamble that recites "[a] process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human" that appears in certain claims of the '509 and '423 patents, as well as certain claims of U.S. Patent Nos. 9,579,333 ("the '333 patent") and 9,937,191 ("the '191 patent").

3.      I also previously provided a second declaration in support of the United States' reply brief on claim construction regarding the term "tenofovir ester" as used in certain claims of the '509 patent and "tenofovir prodrug" as used in certain claims of the '423 patent (my "Second Declaration," *see* D.I. 108-5 at Appx4392-4406).

4.      I provide this Expert Report regarding infringement of the "tenofovir ester" and "tenofovir prodrug" limitations as they appear in certain claims of the '509 and '423 patents, respectively.

5.      I have personal knowledge of the matters set forth below and if called upon to testify I could and would testify to them.

## II.      MATERIALS CONSIDERED

6.      In forming my opinions, I have reviewed the following documents and materials:

- The '509, '333, '191, and '423 patents (collectively, the "Patents-in-Suit" or "Asserted Patents"), D.I. 108-1 at Appx0001-0055;

51.     A POSA would have also understood that an ester is one way to mask the charges of an acid in an NtRTI and would have further understood that esters are removed in the body by esterases or similar enzymes.  A POSA would have understood an ester in this context to be both a pharmaceutically acceptable derivative and a prodrug of an NtRTI, such as tenofovir.  A POSA would have been familiar with the use of esters to create pharmaceutically acceptable prodrugs and derivatives.  *See, e.g.*, '509 patent at col. 4 ll. 31-36 (D.I. 108-1 at Appx0008); *id.* at col. 5 ll. 61-6:2 (Appx0009); Dahl at p. 16 l. 30-p. 17 l. 4 (D.I. 108-5 at Appx4017-18).

52.     TDF is an exemplary tenofovir prodrug.  Tenofovir disoproxil contains two types of esters: (1) phosphonic esters and (2) carbonate esters.  An annotated chemical structure highlighting the two types of esters contained within tenofovir disoproxil is depicted below, with the phosphonic esters shown in red and the carbonate esters shown in blue:

**Tenofovir Disoproxil**

53.     The Truvada® package insert explains that "[t]enofovir disoproxil fumarate requires initial diester hydrolysis for conversion to tenofovir and subsequent phosphorylations by cellular enzymes to form tenofovir diphosphate."  July 2012 Truvada® package insert at 28 (GILDDE00117676-720); *see also id*. at 20 ("Tenofovir disoproxil fumarate (tenofovir DF) is converted in vivo to tenofovir, an acyclic nucleoside phosphonate (nucleotide) analog of adenosine

86.     The Examiner's amendments to the claims and arguments made during prosecution of the '509 patent never expressly excluded TAF.  Further, the scope of any subject matter that may have been surrendered would not have effectively included TAF.  For example, the Examiner explained that claims amended to include the combination of tenofovir and emtricitabine were allowable because they did not encompass combinations with certain antivirals (such as MVC) and because the claims did not encompass tenofovir-based monotherapy as follows:

> As amended, the claims are drawn to the employment of particular combination of *tenofovir* and emtricitabine for protecting a primate, particularly human from immunodeficiency retrovirus, particularly HIV, or for inhibiting (hinder, restrain) the establishment of HIV self-replicating in a human, wherein the subject has not been infected with the virus. … Applicants' remarks and exhibits submitted July 21, 2014 are persuasive as to the claimed subject matter herein.  Particularly, chemoprophylaxis for viral infections in general, and HIV infection in particular, are highly unpredictable. (page 14 of applicants' response filed July 21, 2014).  **For examples, a drug (MVC) known to be effective for treating HIV infection has been shown to be ineffective as chemoprophylaxis agent against retrovirus**.  Further, *tenofovir disoproxil fumarate* (VIREAD®), *a prodrug of tenofovir*, has been shown as being failed to protecting animal from viral infection (page 15 of response).  **Importantly, the application shows that the combination has superior effect as compared to tenofovir alone in animal model and evidences on the record has shown the claimed combination has clinically significant results, which would have not been expected in view of the prior art as a whole (page 18 of response and Grant et al.).**

*See* Notice of Allowance for '509 patent (D.I. 108-2 at Appx0841-42) (emphases added).  The above quote from the Examiner's reasons for allowing the claims make it clear that "tenofovir," "tenofovir disoproxil fumarate," and "a prodrug of tenofovir" were viewed as equivalent for the purposes of allowance.  *Id*. (terms shown with *italics*).  The Examiner's allowance did not

distinguish between prodrugs of tenofovir, such that one of ordinary skill would conclude that any prodrugs or other administered forms of tenofovir were excluded from the allowed claims. The Examiner distinguished tenofovir-based *mono*-therapy, and TAF is used in a combination therapy for PrEP. Therefore, TAF was not within the scope of the subject matter surrendered by the Examiner's amendment, and Applicants did not surrender TAF as an equivalent to "tenofovir ester."

87.     Further, there was no clear and unmistakable surrender of TAF itself. The Examiner explained that the amended claims were allowable because they did not encompass combinations with certain other antivirals (such as MVC, *see* above quote from Appx0841-42) and because the claims did not encompass tenofovir-based monotherapy (*id.*). None of the reasons for allowing the amended claims makes any reference to TAF. Therefore, there was no clear surrender of TAF.

## XV.    ADDITIONAL COMMENT

88.     I reserve the right to supplement or amend this report as necessary and appropriate if additional information that affects my opinions becomes available to me. I understand that I may be asked to provide additional information or testimony to assist the Court in these proceedings. I reserve the right to rely on demonstrative and/or visual aids as well as information provided by the other parties in this litigation, as appropriate, to assist the Court and/or supplement my opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   __16 March 2022___

Andrea Brancale, Ph.D.

# Exhibit P

US 20050009043A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2005/0009043 A1

Becker et al. (43) **Pub. Date:** **Jan. 13, 2005**

(54) **PRODRUGS OF PHOSPHONATE NUCLEOTIDE ANALOGUES**

(75) Inventors: **Mark W. Becker**, Belmont, CA (US); **Harlan H. Chapman**, La Honda, CA (US); **Tomas Cihlar**, Foster City, CA (US); **Eugene J. Eisenberg**, San Carlos, CA (US); **Gong-Xin He**, Fremont, CA (US); **Michael R. Kernan**, Pacifica, CA (US); **William A. Lee**, Los Altos, CA (US); **Ernest J. Prisbe**, Los Altos, CA (US); **John C. Rohloff**, Mountain View, CA (US); **Mark L. Sparacino**, Morgan Hill, CA (US)

Correspondence Address:
**Mark L. Bosse**
**Gilead Sciences, Inc.**
**333 Lakeside Drive**
**Foster City, CA 94404 (US)**

(73) Assignee: **GILEAD SCIENCES, INC.**

(21) Appl. No.: **10/798,692**

(22) Filed: **Mar. 11, 2004**

**Related U.S. Application Data**

(63) Continuation of application No. 10/354,207, filed on Jan. 28, 2003, which is a continuation of application No. 09/909,560, filed on Jul. 20, 2001, now abandoned.

(60) Provisional application No. 60/220,021, filed on Jul. 21, 2000.

**Publication Classification**

(51) **Int. Cl.$^7$** ........................ **C12Q 1/68**; A61K 38/16; A61K 31/675; C07F 9/6512

(52) **U.S. Cl.** .............................. **435/6**; 530/300; 544/243; 544/244; 514/7; 514/81

(57) **ABSTRACT**

A novel method has led to the identification of novel mixed ester-amidates of PMPA for retroviral or hepadnaviral therapy, including compounds of structure (5a)

(5a)

having substituent groups as defined herein. Compositions of these novel compounds in pharmaceutically acceptable excipients and their use in therapy and prophylaxis are provided.

US_THAK_000196

Case 1:19-cv-02103-MN   Document 370-1   Filed 12/05/22   Page 538 of 613 PageID #: 56549

**Figure 1.  HPLC/C-14 Traces of PBMC Extracts from Human Blood
Incubated for 1 h at 37°C with TDF, GS-7340 or PMPA.**



US_THAK_000197

Figure 2.  PMPA and Prodrug Concentration in Plasma and PBMCs Following Oral
Administration of GS 7340-2 to Dogs at 10 mg-eq/kg.



US_THAK_000198

**Figure 3.  Depicts Tenofovir Exposure in PBMCs and Plasma Upon Administration of 10 mg-eq/kg in dogs**



US 2005/0009043 A1

Jan. 13, 2005

1

# PRODRUGS OF PHOSPHONATE NUCLEOTIDE ANALOGUES

[0001] This non-provisional application is a continuation application of pending application Ser. No. 10/354,207, filed Jan. 28, 2003, Ser. No. 09/909,560, filed Jul. 20, 2001, which is a regular utility application of provisional application 60/220,021, filed Jul. 21, 2000, all of which are incorporated herein by reference.

[0002] This application relates to prodrugs of methoxyphosphonate nucleotide analogues. In particular it relates to improved methods for making and identifying such prodrugs.

[0003] Many methoxyphosphonate nucleotide analogues are known. In general, such compounds have the structure $A\text{-}OCH_2P(O)(OR)_2$ where A is the residue of a nucleoside analogue and R independently is hydrogen or various protecting or prodrug functionalities. See U.S. Pat. Nos. 5,663, 159, 5,977,061 and 5,798,340, Oliyai et al, "Pharmaceutical Research" 16(11):1687-1693 (1999), Stella et al., "J. Med. Chem." 23(12):1275-1282 (1980), Aarons, L., Boddy, A. and Petrak, K. (1989) *Novel Drug Delivery and Its Therapeutic Application* (Prescott, L. F. and Nimmo, W. S., ed.), pp. 121-126; Bundgaard, H. (1985) *Design of Prodrugs* (Bundgaard, H., ed.) pp. 70-74 and 79-92; Banerjee, P. K. and Amidon, G. L. (1985) *Design of Prodrugs* (Bundgaard, H., ed.) pp. 118-121; Notari, R. E. (1985) *Design of Prodrugs* (Bundgaard, H., ed.) pp. 135-156; Stella, V. J. and Himmelstein, K. J. (1985) *Design of Prodrugs* (Bundgaard, H., ed.) pp. 177-198; Jones, G. (1985) *Design of Prodrugs* (Bundgaard, H., ed.) pp. 199-241; Connors, T. A. (1985) *Design of Prodrugs* (Bundgaard, H., ed.) pp. 291-316. All literature and patent citations herein are expressly incorporated by reference.

## SUMMARY OF THE INVENTION

[0004] Prodrugs of methoxyphosphonate nucleotide analogues intended for antiviral or antitumor therapy, while known, traditionally have been selected for their systemic effect. For example, such prodrugs have been selected for enhanced bioavailability, i.e., ability to be absorbed from the gastrointestinal tract and converted rapidly to parent drug to ensure that the parent drug is available to all tissues. However, applicants now have found that it is possible to select prodrugs that become enriched at therapeutic sites, as illustrated by the studies described herein where the analogues are enriched at localized focal sites of HIV infection. The objective of this invention is, among other advantages, to produce less toxicity to bystander tissues and greater potency of the parental drug in tissues which are the targets of therapy with the parent methoxyphosphonate nucleotide analogue.

[0005] Accordingly, pursuant to these observations, a screening method is provided for identifying a methoxyphosphonate nucleotide analogue prodrug conferring enhanced activity in a target tissue comprising:

[0006] (a) providing at least one of said prodrugs;

[0007] (b) selecting at least one therapeutic target tissue and at least one non-target tissue;

[0008] (c) administering the prodrug to the target tissue and to said at least one non-target tissue; and

[0009] (d) determining the relative antiviral activity conferred by the prodrug in the tissues in step (c).

[0010] In preferred embodiments, the target tissue are sites where HIV is actively replicated and/or which serve as an HIV reservoir, and the non-target tissue is an intact animal. Unexpectedly, we found that selecting lymphoid tissue as the target tissue for the practice of this method for HIV led to identification of prodrugs that enhance the delivery of active drug to such tissues.

[0011] A preferred compound of this invention, which has been identified by this method has the structure (1),

(1)

[0012] where Ra is H or methyl,

[0013] and chirally enriched compositions thereof, salts, their free base and solvates thereof.

[0014] A preferred compound of this invention has the structure (2)

(2)

[0015] and its enriched diastereomers, salts, free base and solvates.

[0016] In addition, we unexpectedly found that the chirality of substituents on the phosphorous atom and/or the amidate substituent are influential in the enrichment observed in the practice of this invention. Thus, in another embodiment of this invention, we provide diastereomerically enriched compounds of this invention having the structure (3)

(3)

[0017] which are substantially free of the diastereomer (4)

(4)

[0018] wherein

[0019] $R^1$ is an oxyester which is hydrolyzable in vivo, or hydroxyl;

[0020] B is a heterocyclic base;

[0021] $R^2$ is hydroxyl, or the residue of an amino acid bonded to the P atom through an amino group of the amino acid and having each carboxy substituent of the amino acid optionally esterified, but not both of $R^1$ and $R^2$ are hydroxyl;

[0022] E is —$(CH_2)_2$—, —$CH(CH_3)CH_2$—, —$CH(CH_2F)CH_2$—, —$CH(CH_2OH)CH_2$—, —$CH(CH=CH_2)CH_2$—, —$CH(C≡CH)CH_2$—, —$CH(CH_2N_3)CH_2$—,

[0023] —$CH(R^6)OCH(R^{6'})$—, —$CH(R^9)CH_2O$— or —$CH(R^8)O$—, wherein the right hand bond is linked to the heterocyclic base;

[0024] the broken line represents an optional double bond;

[0025] $R^4$ and $R^5$ are independently hydrogen, hydroxy, halo, amino or a substituent having 1-5 carbon atoms selected from acyloxy, alkyoxy, alkylthio, alkylamino and dialkylamino;

[0026] $R^6$ and $R^{6'}$ are independently H, $C_1$-$C_6$ alkyl, $C_1$-$C_6$ hydroxyalkyl, or $C_2$-$C_7$ alkanoyl;

[0027] $R^7$ is independently H, $C_1$-$C_6$ alkyl, or are taken together to form —O— or —$CH_2$—;

[0028] $R^8$ is H, $C_1$-$C_6$ alkyl, $C_1$-$C_6$ hydroxyalkyl or $C_1$-$C_6$ haloalkyl; and

[0029] $R^9$ is H, hydroxymethyl or acyloxymethyl;

[0030] and their salts, free base, and solvates.

[0031] The diastereomers of structure (3) are designated the (S) isomers at the phosphorus chiral center.

[0032] Preferred embodiments of this invention are the diastereomerically enriched compounds having the structure (5a)

(5a)

[0033] which is substantially free of diastereomer (5b)

(5b)

[0034] wherein

[0035] $R^5$ is methyl or hydrogen;

[0036] $R^6$ independently is H, alkyl, alkenyl, alkynyl, aryl or arylalkyl, or $R^6$ independently is alkyl, alkenyl, alkynyl, aryl or arylalkyl which is substituted with from 1 to 3 substituents selected from alkylamino, alkylaminoalkyl, dialkylaminoalkyl, dialkylamino, hydroxyl, oxo, halo, amino, alkylthio, alkoxy, alkoxyalkyl, aryloxy, aryloxyalkyl, arylalkoxy, arylalkoxyalkyl, haloalkyl, nitro, nitroalkyl, azido, azidoalkyl, alkylacyl, alkylacylalkyl, carboxyl, or alkylacylamino;

[0037] $R^7$ is the side chain of any naturally-occurring or pharmaceutically acceptable amino acid and which, if the side chain comprises carboxyl, the carboxyl group is optionally esterified with an alkyl or aryl group;

[0038] $R^{11}$ is amino, alkylamino, oxo, or dialkylamino; and

US_THAK_000201

3

[0039]   $R^{12}$ is amino or H;

[0040]   and its salts, tautomers, free base and solvates.

[0041]   A preferred embodiment of this invention is the compound of structure (6), 9-[(R)-2-[[(S)-[[(S)-1-(isopropoxycarbonyl)ethyl]amino]phenoxyphosphinyl]methoxy]propyl]adenine, also designated herein GS-7340

(6)

[0042]   Another preferred embodiment of this invention is the fumarate salt of structure (5) (structure (7)),9-[(R)-2-[[(S)-[[(S)-1-(isopropoxycarbonyl)ethyl]amino]phenoxyphosphinyl]methoxy]propyl]adenine fumarate (1:1), also designated herein GS-7340-2

(7)

[0043]   The compounds of structures (1)-(7) optionally are formulated into compositions containing pharmaceutically acceptable excipients. Such compositions are used in effective doses in the therapy or prophylaxis of viral (particularly HIV or hepadnaviral) infections.

[0044]   In a further embodiment, a method is provided for the facile manufacture of 9-[2-(phosphonomethoxy)propyl]adenine (hereinafter "PMPA" or 9-[2-(phosphonomethoxy)ethyl] adenine (hereinafter "PMEA") using magnesium alkoxide, which comprises combining 9-(2-hydroxypropyl)adenine or 9-(2-hydroxyethyl)adenine, protected p-toluenesulfonyloxymethylphosphonate and magnesium alkoxide, and recovering PMPA or PMEA, respectively.

BRIEF DESCRIPTION OF THE DRAWINGS

[0045]   FIG. 1 shows HPLC/C-14 traces of PBMC extracts from human blood incubated for 1 h at 37° C. with TDF, GS-7340 and PMPA.

[0046]   FIG. 2 shows PMPA and Prodrug concentration in plasma and PBMCs following oral administration of GS 7340-2 to Dogs at 10 mg-eq/kg.

[0047]   Figure depicts Tenofovir exposure in PBMCs and plasma upon administration of 10 mg-eq/kg in dogs.

DETAILED DESCRIPTION OF THE INVENTION

[0048]   The methoxyphosphonate nucleotide analogue parent drugs for use in this screening method are compounds having the structure A-OCH$_2$P(O)(OH)$_2$ wherein A is the residue of a nucleoside analogue. These compounds are known

(7a)

[0049]   per se and are not part of this invention. More particularly, the parent compounds comprise a heterocyclic base B and an aglycon E, in general having the structure wherein the group B is defined below and group E is defined above. Examples are described in U.S. Pat. Nos. 4,659,825, 4,808,716, 4,724,233, 5,142,051, 5,130,427, 5,650,510, 5,663,159, 5,302,585, 5,476,938, 5,696,263, 5,744,600, 5,688,778, 5,386,030, 5,733,896, 5,352,786, and 5,798,340, and EP 821,690 and 654,037.

[0050]   The prodrugs for use in the screening method of this invention are covalently modified analogues of the parent methoxyphosphonate nucleotide analogues described in the preceding paragraph. In general, the phosphorus atom of the parent drug is the preferred site for prodrug modification, but other sites are found on the heterocyclic base B or the aglycon E. Many such prodrugs are already known. Primarily, they are esters or amidates of the phosphorus atom, but also include substitutions on the base and aglycon. None of these modifications per se is part of this invention and none are to be considered limiting on the scope of the invention herein.

[0051]   The phosphorus atom of the methoxyphosphonate nucleotide analogues contains two valences for covalent modification such as amidation or esterification (unless one phosphoryl hydroxyl is esterified to an aglycon E hydroxyl substituent, whereupon only one phosphorus valence is free for substitution). The esters typically are aryloxy. The amidates ordinarily are naturally occurring monoamino acids having free carboxyl group(s) esterified with an alkyl or aryl group, usually phenyl, cycloalkyl, or t-, n- or s- alkyl groups. Suitable prodrugs for use in the screening method of this invention are disclosed for example in U.S. Pat. No. 5,798,340. However, any prodrug which is potentially believed to be capable of being converted in vivo within target tissue cells to the free methoxyphosphonate nucleotide analogue parent drug, e.g., whether by hydrolysis, oxidation, or other covalent transformation resulting from exposure to biological tissues, is suitable for use in the method of this invention. Such prodrugs may not be known at this time but are identified in the future and thus become suitable candidates available for testing in the method of this invention. Since

US_THAK_000202

the prodrugs are simply candidates for screening in the methods their structures are not relevant to practicing or enabling the screening method, although of course their structures ultimately are dispositive of whether or not a prodrug will be shown to be selective in the assay.

[0052] The pro-moieties bound to the parent drug may be the same or different. However, each prodrug to be used in the screening assay will differ structurally from the other prodrugs to be tested. Distinct, i.e. structurally different, prodrugs generally are selected on the basis of either their stereochemistry or their covalent structure, or these features are varied in combination. Each prodrug tested, however, desirably is structurally and stereochemically substantially pure, else the output of the screening assay will be less useful. It is of course within the scope of this invention to test only a single prodrug in an individual embodiment of the method of this invention, although typically then one would compare the results with prior studies with other prodrugs.

[0053] We have found that the stereochemistry of the prodrugs is capable of influencing the enrichment in target tissues. Chiral sites are at the phosphorus atom and are also found in its substituents. For example, amino acid used in preparing amidates may be D or L forms, and the phosphonate esters or the amino acid esters can contain chiral centers as well. Chiral sites also are found on the nucleoside analogue portion of the molecules, but these typically are already dictated by the stereochemistry of the parent drug and will not be varied as part of the screen. For example the R isomer of PMPA is preferred as it is more active than the corresponding S isomer. Typically these diastereomers or enantiomers will be chirally enriched if not pure at each site so that the results of the screen will be more meaningful. As noted, distinctiveness of stereoisomers is conferred by enriching or purifying the stereoisomer (typically this will be a diastereomer rather than an enantiomer in the case of most methoxyphosphonate nucleotide analogues) free of other stereoisomers at the chiral center in question, so that each test compound is substantially homogeneous. By substantially homogeneous or chirally enriched, we mean that the desired stereoisomer constitutes greater than about 60% by weight of the compound, ordinarily greater than about 80% and preferably greater than about 95%.

[0054] Novel Screening Method

[0055] Once at least one candidate prodrug has been selected, the remaining steps of the screening method of this invention are used to identify a prodrug possessing the required selectivity for the target tissue. Most conveniently the prodrugs are labeled with a detectable group, e.g. radio-labeled, in order to facilitate detection later in tissues or cells. However, a label is not required since other suitable assays for the prodrug or its metabolites (including the parent drug) can also be employed. These assays could include mass spectrometry, HPLC, bioassays or immunoassays for instance. The assay may detect the prodrug and any one or more of its metabolites, but preferably the assay is conducted to detect only the generation of the parent drug. This is based on the assumption (which may not be warranted in all cases) that the degree and rate of conversion of prodrug to antivirally active parent diphosphate is the same across all tissues tested. Otherwise, one can test for the diphosphate.

[0056] The target tissue preferably will be lymphoid tissue when screening for prodrugs useful in the treatment of HIV

infection. Lymphoid tissue will be known to the artisan and includes CD4 cells, lymphocytes, lymph nodes, macrophages and macrophage-like cells including monocytes such as peripheral blood monocytic cells (PBMCs) and glial cells. Lymphoid tissue also includes non-lymphoid tissues that are enriched in lymphoid tissues or cells, e.g. lung, skin and spleen. Other targets for other antiviral drugs of course will be the primary sites of replication or latency for the particular virus concerned, e.g., liver for hepatitis and peripheral nerves for HSV. Similarly, target tissues for tumors will in fact be the tumors themselves. These tissues are all well-known to the artisan and would not require undue experimentation to select. When screening for antiviral compounds, target tissue can be infected by the virus.

[0057] Non-target tissues or cells also are screened as part of the method herein. Any number or identity of such tissues or cells can be employed in this regard. In general, tissues for which the parent drug is expected to be toxic will be used as non-target tissues. The selection of a non-target tissue is entirely dependent upon the nature of the prodrug and the activity of the parent. For example, non-hepatic tissues would be selected for prodrugs against hepatitis, and untransformed cells of the same tissue as the tumor will suffice for the antitumor-selective prodrug screen.

[0058] It should be noted that the method of this invention is distinct from studies typically undertaken to determine oral bioavailability of prodrugs. In oral bioavailability studies, the objective is to identify a prodrug which passes into the systemic circulation substantially converted to parent drug. In the present invention, the objective is to find prodrugs that are not metabolized in the gastrointestinal tract or circulation. Thus, target tissues to be evaluated in the method of this invention generally do not include the small intestines or, if the intestines are included, then the tissues also include additional tissues other than the small intestines.

[0059] The target and non-target tissues used in the screening method of this invention typically will be in an intact living animal. Prodrugs containing esters are more desirably tested in dogs, monkeys or other animals than rodents; mice and rat plasma contains high circulating levels of esterases that may produce a misleading result if the desired therapeutic subject is a human or higher mammal.

[0060] It is not necessary to practice this method with intact animals. It also is within the scope of this invention to employ perfused organs, in vitro culture of organs (e.g. skin grafts) or cell lines maintained in various forms of cell culture, e.g. roller bottles or zero gravity suspension systems. For example, MT-2 cells can be used as a target tissue for selecting HIV prodrugs. Thus, the term "tissue" shall not be construed to require organized cellular structures, or the structures of tissues as they may be found in nature, although such would be preferred. Rather, the term "tissue" shall be construed to be synonymous with cells of a particular source, origin or differentiation stage.

[0061] The target and non-target tissue may in fact be the same tissue, but the tissues will be in different biological status. For example, the method herein could be used to select for prodrugs that confer activity in virally-infected tissue (target tissue) but which remain substantially inactive in virally-uninfected cells (corresponding non-target tissue). The same strategy would be employed to select prophylactic

prodrugs, i.e., prodrugs metabolized to antivirally active forms incidental to viral infection but which remain substantially unmetabolized in uninfected cells. Similarly, prodrugs could be screened in transformed cells and the untransformed counterpart tissue. This would be particularly useful in comparative testing to select prodrugs for the treatment of hematological malignancies, e.g. leukemias.

[0062] Without being limited by any particular theory of operation, tissue selective prodrugs are thought to be selectively taken up by target cells and/or selectively metabolized within the cell, as compared to other tissues or cells. The unique advantage of the methoxyphosphonate prodrugs herein is that their metabolism to the dianion at physiological pH ensures that they will be unable to diffuse back out of the cell. They therefore remain effective for lengthy periods of time and are maintained at elevated intracellular concentrations, thereby exhibiting increased potency. The mechanisms for enhanced activity in the target tissue are believed to include enhanced uptake by the target cells, enhanced intracellular retention, or both mechanisms working together. However, the manner in which selectivity or enhanced delivery occurs in the target tissue is not important. It also is not important that all of the metabolic conversion of the prodrug to the parent compound occurs within the target tissue. Only the final drug activity-conferring conversion need occur in the target tissue; metabolism in other tissues may provide intermediates finally converted to antiviral forms in the target tissue.

[0063] The degree of selectivity or enhanced delivery that is desired will vary with the parent compound and the manner in which it is measured (% dose distribution or parent drug concentration). In general, if the parent drug already possess a generous therapeutic window, a low degree of selectivity may be sufficient for the desired prodrug. On the other hand, toxic compounds may require more extensive screening to identify selective prodrugs. The relative expense of the method of this invention can be reduced by screening only in the target tissue and tissues against which the parent compound is known to be relatively toxic, e.g. for PMEA, which is nephrotoxic at higher doses, the primary focus will be on kidney and lymphoid tissues.

[0064] The step of determining the relative antiviral activity of a prodrug in the selected tissues ordinarily is accomplished by assaying target and non-target tissues for the relative presence or activity of a metabolite of the prodrug, which metabolite is known to have, or is converted to, a metabolite having antiviral or antitumor activity.

[0065] Thus, typically one would determine the relative amount of the parent drug in the tissues over substantially the same time course in order to identify prodrugs that are preferentially metabolized in the target tissue to an antivirally or antitumor active metabolite or precursor thereof which in the target tissue ultimately produces the active metabolite. In the case of antiviral compounds, the active metabolite is the diphosphate of the phosphonate parent compounds. It is this metabolite that is incorporated into the viral nucleic acid, thereby truncating the elongating nucleic acid strand and halting viral replication. Metabolites of the prodrug can be anabolic metabolites, catabolic metabolites, or the product of anabolism and catabolism together. The manner in which the metabolite is produced is not important in the practice of the method of this invention.

[0066] The method of this invention is not limited to assaying a metabolite which per se possesses antiviral or antitumor activity. Instead, one can assay inactive precursors of the active metabolites. Precursors of the antivirally active diphosphate metabolite include the monophosphate of the parent drug, monophosphates of other metabolites of the parent drug (e.g., an intermediate modification of a substituent on the heterocyclic base), the parent itself and metabolites generated by the cell in converting the prodrug to the parent prior to phosphorylation. The precursor structures may vary considerably as they are the result of cellular metabolism. However, this information is already known or could be readily determined by one skilled in the art.

[0067] If the prodrug being assayed does not exhibit antitumor or antiviral activity per se then adjustments to the raw assay results may be required. For example, if the intracellular processing of the inactive metabolite to an active metabolite occurs at different rates among the tissues being tested, the raw assay results with the inactive metabolite would need to be adjusted to take account of the differences among the cell types because the relevant parameter is the generation of activity in the target tissue, not accumulation of inactive metabolites. However, determining the proper adjustments would be within the ordinary skill. Thus, when step (d) of the method herein calls for determining the activity, activity can be either measured directly or extrapolated. It does not mean that the method herein is limited to only assaying intermediates that are active per se. For instance, the absence or decline of the prodrug in the test tissues also could be assayed. Step (d) only requires assessment of the activity conferred by the prodrug as it interacts with the tissue concerned, and this may be based on extrapolation or other indirect measurement.

[0068] Step (d) of the method of this invention calls for determining the "relative" activity of the prodrug. It will be understood that this does not require that each and every assay or series of assays necessarily must also contain runs with the selected non-target tissue. On the contrary, it is within the scope of this invention to employ historical controls of the non-target tissue or tissues, or algorithms representing results to be expected from such non-target tissues, in order to provide the benchmark non-target activity.

[0069] The results obtained in step (d) are then used optimally to select or identify a prodrug which produces greater antiviral activity in the target tissue than in the non-target tissue. It is this prodrug that is selected for further development.

[0070] It will be appreciated that some preassessment of prodrug candidates can be undertaken before the practice of the method of this invention. For example, the prodrug will need to be capable of passing largely unmetabolized through the gastrointestinal tract, it will need to be substantially stable in blood, and it should be able to permeate cells at least to some degree. In most cases it also will need to complete a first pass of the hepatic circulation without substantial metabolism. Such prestudies are optional, and are well-known to those skilled in the art.

[0071] The same reasoning as is described above for antiviral activity is applicable to antitumor prodrugs of methoxyphosphonate nucleotide analogues as well. These include, for example, prodrugs of PMEG, the guanyl ana-

logue of PMEA. In this case, cytotoxic phosphonates such as PMEG are worthwhile candidates to pursue as their cyto-toxicity in fact confers their antitumor activity.

[0072]  A compound identified by this novel screening method then can be entered into a traditional preclinical or clinical program to confirm that the desired objectives have been met. Typically, a prodrug is considered to be selective if the activity or concentration of parent drug in the target tissue (% dose distribution) is greater than 2×, and prefer-ably 5×, that of the parent compound in non-target tissue. Alternatively, a prodrug candidate can be compared against a benchmark prodrug. In this case, selectivity is relative rather than absolute. Selective prodrugs will be those result-ing in greater than about 10× concentration or activity in the target tissue as compared with the prototype, although the degree of selectivity is a matter of discretion.

[0073]  Novel Method for Preparation of Starting Materials or Intermediates

[0074]  Also included herein is an improved method for manufacture of preferred starting materials (parent drugs) of this invention, PMEA and (R)-PMPA. Typically, this method comprises reacting 9-(2-hydroxypropyl)adenine (HPA) or 9-(2-hydroxyethyl)adenine (HEA) with a magnesium alkox-ide, thereafter adding the protected aglycon synthon p-tolu-ene-sulfonyloxymethylphosphonate (tosylate) to the reac-tion mixture, and recovering PMPA or PMEA, respectively.

[0075]  Preferably, HPA is the enriched or isolated R enan-tiomer. If a chiral HPA mixture is used, R-PMPA can be isolated from the chiral PMPA mixture after the synthesis is completed.

[0076]  Typically the tosylate is protected by lower alkyl groups, but other suitable groups will be apparent to the artisan. It may be convenient to employ the tosylate presub-stituted with the prodrug phosphonate substituents which are capable of acting as protecting groups in the tosylation reaction, thereby allowing one to bypass the deprotection step and directly recover prodrug or an intermediate there-fore.

[0077]  The alkyl group of the magnesium alkoxide is not critical and can be any $C_1$-$C_6$ branched or normal alkyl, but is preferably t-butyl (for PMPA) or isopropyl (for PMEA). The reaction conditions also are not critical, but preferably comprise heating the reaction mixture at about 70-75° C. with stirring or other moderate agitation.

[0078]  If there is no interest in retaining the phosphonate substituents, the product is deprotected (usually with bro-motrimethylsilane where the tosylate protecting group is alkyl), and the product then recovered by crystallization or other conventional method as will be apparent to the artisan.

[0079]  Heterocyclic Base

[0080]  In the compounds of this invention depicted in structures (3) and (4), the heterocyclic base B is selected from the structures

[0081]  wherein

[0082]  $R^{15}$ is H, OH, F, Cl, Br, I, $OR^{16}$, SH, $SR^{16}$, $NH_2$, or $NHR^{17}$;

[0083]  $R^{16}$ is $C_1$-$C_6$ alkyl or $C_2$-$C_6$ alkenyl including —$CH_3$, —$CH_2CH_3$, —$CH_2C≡CH$, —$CH_2CH≡CH_2$ and —$C_3H_7$;

[0084]  $R^{17}$ is $C_1$-$C_6$ alkyl or $C_2$-$C_6$ alkenyl including —$CH_3$, —$CH_2CH_3$, —$CH_2C≡CH$, —$CH_2CH≡CH_2$, and —$C_3H_7$;

[0085]  $R^{18}$ is N, CF, CCl, CBr, CI, $CR^{19}$, $CSR^{19}$, or $COR^{19}$;

[0086]  $R^{19}$ is H, $C_1$-$C_9$ alkyl, $C_2$-$C_9$ alkenyl, $C_2$-$C_9$ alkynyl, $C_1$-$C_9$ alkyl-$C_1$-$C_9$ alkoxy, or $C_7$-$C_9$ aryl-alkyl unsubstituted or substituted by OH, F, Cl, Br or I, $R^{19}$ therefore including —$CH_3$, —$CH_2CH_3$, —$CHCH_2$, —$CHCHBr$, —$CH_2CH_2Cl$, —$CH_2CH_2F$, —$CH_2CCH$, —$CH_2CHCH_2$, —$C_3H_7$, —$CH_2OH$, —$CH_2OCH_3$, —$CH_2OC_2H_5$, —$CH_2OCCH$, —$CH_2OCH_2CHCH_2$, —$CH_2C_3H_7$, —$CH_2CH_2OH$, —$CH_2CH_2OCH_3$, —$CH_2CH_2OC_2H_5$, —$CH_2CH_2OCCH$, —$CH_2CH_2OCH_2CHCH_2$, and —$CH_2CH_2OC_3H_7$;

[0087]  $R^{20}$ is N or CH;

[0088]  $R^{21}$ is N, CH, CCN, $CCF_3$, CC≡CH or $CC(O)NH_2$;

[0089]  $R^{22}$ is H, OH, $NH_2$, SH, $SCH_3$, $SCH_2CH_3$, $SCH_2C≡CH$, $SCH_2CH≡CH_2$, $SC_3H_7$, $NH(CH_3)$, $N(CH_3)_2$, $NH(CH_2CH_3)$, $N(CH_2CH_3)_2$, $NH(CH_2C≡CH)$, $NH(CH_2CHCH_2)$, $NH(C_3H_7)$, halogen (F, Cl, Br or I) or X wherein X is —$(CH_2)_m(O)_n(CH_2)_mN(R^{10})_2$ wherein each m is independently 0-2, n is 0-1, and

[0090]  $R^{10}$ independently is H,

[0091]  $C_1$-$C_{15}$ alkyl, $C_2$-$C_{15}$ alkenyl, $C_6$-$C_{15}$ arylalk-enyl, $C_6$-$C_{15}$ arylalkynyl, $C_2$-$C_{15}$ alkynyl, $C_1$-$C_6$-alkylamino-$C_1$-$C_6$ alkyl, $C_5$-$C_{15}$ aralkyl, $C_6$-$C_{15}$ het-eroaralkyl, $C_5$-$C_6$ aryl, $C_2$-$C_6$ heterocycloalkyl, $C_2$-$C_{15}$ alkyl, $C_3$-$C_{15}$ alkenyl, $C_6$-$C_{15}$ arylalkenyl, $C_2$-$C_{15}$ alkynyl, $C_7$-$C_{15}$ arylalkynyl, $C_1$-$C_6$-alky-lamino-$C_1$-$C_6$ alkyl, $C_5$-$C_{15}$ aralkyl, $C_6$-$C_{15}$ het-

eroalkyl or $C_3$-$C_6$ heterocycloalkyl wherein methylene in the alkyl moiety not adjacent to $N^6$ has been replaced by —O—,

[0092] optionally both $R^{10}$ are joined together with N to form a saturated or unsaturated $C_2$-$C_5$ heterocycle containing one or two N heteroatoms and optionally an additional O or S heteroatom,

[0093] or one of the foregoing $R^{10}$ groups which is substituted with 1 to 3 halo, CN or $N_3$; but optionally at least one $R^{10}$ group is not H;

[0094] $R^{23}$ is H, OH, F, Cl, Br, I, $SCH_3$, $SCH_2CH_3$, $SCH_2C≡CH$, $SCH_2CHCH_2$, $SC_3H_7$, $OR^{36}$, $NH_2$, $NHR^{37}$ or $R_{22}$; and

[0095] $R^{24}$ is O, S or Se.

[0096] B also includes both protected and unprotected heterocyclic bases, particularly purine and pyrimidine bases. Protecting groups for exocyclic amines and other labile groups are known (Greene et al. "Protective Groups in Organic Synthesis") and include N-benzoyl, isobutyryl, 4,4'-dimethoxytrityl (DMT) and the like. The selection of protecting group will be apparent to the ordinary artisan and will depend upon the nature of the labile group and the chemistry which the protecting group is expected to encounter, e.g. acidic, basic, oxidative, reductive or other conditions. Exemplary protected species are $N^4$-benzoylcytosine, $N^6$-benzoyladenine, $N^2$-isobutyrylguanine and the like.

[0097] Protected bases have the formulas Xa.1, XIa.1, XIb.1, XIIa.1 or XIIIa.1

(Xa.1)

(XIa.1)

(XIb.1)

(XIIa.1)

(XIIIa.1)

[0098] wherein $R^{18}$, $R^{20}$, $R^{21}$, $R^{24}$ have the meanings previously defined; $R^{22A}$ is $R^{39}$ or $R^{22}$ provided that $R^{22}$ is not $NH_2$; $R^{23A}$ is $R^{39}$ or $R^{23}$ provided that $R^{23}$ is not $NH_2$; $R^{39}$ is $NHR^{40}$, $NHC(O)R^{36}$ or $CR_{4n}N(R^{38})_2$ wherein $R^{36}$ is $C_1$-$C_{19}$ alkyl, $C_1$-$C_{19}$ alkenyl, $C_3$-$C_{10}$ aryl, adamantoyl, alkylanyl, or $C_3$-$C_{10}$ aryl substituted with 1 or 2 atoms or groups selected from halogen, methyl, ethyl, methoxy, ethoxy, hydroxy and cyano; $R^{38}$ is $C_1$-$C_{10}$ alkyl, or both $R^{38}$ together are 1-morpholino, 1-piperidine or 1-pyrrolidine; $R^{40}$ is $C_1$-$C_{1a}$ alkyl, including methyl, ethyl, propyl, isopropyl, butyl, isobutyl, t-butyl, pentyl, hexyl, octyl and decanyl; and $R^{41}$ is hydrogen or $CH_3$.

[0099] For bases of structures XIa.1 and XIb.1, if $R^{39}$ is present at $R^{22A}$ or $R^{23A}$, both $R^{39}$ groups on the same base will generally be the same. Exemplary $R^{36}$ are phenyl, phenyl substituted with one of the foregoing $R^{36}$ aryl substituents, —$C_{10}H_{15}$ (where $C_{10}H_{15}$ is 2-adamantoyl), —$CH_2$—$C_6H_5$, —$C_6H_5$, —$CH(CH_3)_2$, —$CH_2CH_3$, methyl, butyl, t-butyl, heptanyl, nonanyl, undecanyl, or undecenyl.

[0100] Specific bases include hypoxanthine, guanine, adenine, cytosine, inosine, thymine, uracil, xanthine, 8-aza derivatives of 2-aminopurine, 2,6-diaminopurine, 2-amino-6-chloropurine, hypoxanthine, inosine and xanthine; 7-deaza-8-aza derivatives of adenine, guanine, 2-aminopurine, 2,6-diaminopurine, 2-amino-6-chloropurine, hypoxanthine, inosine and xanthine; 1-deaza derivatives of 2-aminopurine, 2,6-diaminopurine, 2-amino-6-chloropurine, hypoxanthine, inosine and xanthine; 7-deaza derivatives of 2-aminopurine, 2,6-diaminopurine, 2-amino-6-chloropurine, hypoxanthine, inosine and xanthine; 3-deaza derivatives of 2-aminopurine, 2,6-diaminopurine, 2-amino-6-chloropurine, hypoxanthine, inosine and xanthine; 6-azacytosine; 5-fluorocytosine; 5-chlorocytosine; 5-iodocytosine; 5-bromocytosine; 5-methylcytosine; 5-bromovinyluracil; 5-fluorouracil; 5-chlorouracil; 5-iodouracil; 5-bromouracil; 5-trifluoromethyluracil; 5-methoxymethyluracil; 5-ethynyluracil and 5-propynyluracil.

[0101] Preferably, B is a 9-purinyl residue selected from guanyl, 3-deazaguanyl, 1-deazaguanyl, 8-azaguanyl, 7-deazaguanyl, adenyl, 3-deazaadenyl, 1-dezazadenyl, 8-azaadenyl, 7-deazaadenyl, 2,6-diaminopurinyl, 2-aminopurinyl, 6-chloro-2-aminopurinyl and 6-thio-2-aminopurinyl, or a B' is a 1-pyrimidinyl residue selected from cytosinyl, 5-halocytosinyl, and 5-($C_1$-$C_3$-alkyl)cytosinyl.

[0102] Preferred B groups have the formula

(8)

[0103] wherein

[0104] $R^{22}$ independently is halo, oxygen, $NH_2$, X or H, but optionally at least one $R^{22}$ is X;

[0105] X is —$(CH_2)_m(O)_n(CH_2)_mN(R^{10})_2$ wherein m is 0-2, n is 0-1, and

[0106] $R^{10}$ independently is H,

[0107] $C_1$-$C_{15}$ alkyl, $C_2$-$C_{15}$ alkenyl, $C_6$-$C_{15}$ arylalkenyl, $C_6$-$C_1$ arylalkynyl, $C_2$-$C_{15}$ alkynyl, $C_1$-$C_6$-alkylamino-$C_1$-$C_6$ alkyl, $C_5$-$C_{15}$ aralkyl, $C_6$-$C_{15}$ heteroaralkyl, $C_5$-$C_6$ aryl, $C_2$-$C_6$ heterocycloalkyl,

[0108] $C_2$-$C_{15}$ alkyl, $C_3$-$C_{15}$ alkenyl, $C_6$-$C_{15}$ arylalkenyl, $C_3$-$C_{15}$ alkynyl, $C_7$-$C_{15}$ arylalkynyl, $C_1$-$C_6$-alkylamino-$C_1$-$C_6$ alkyl, $C_5$-$C_{15}$ aralkyl, $C_6$-$C_{15}$ heteroalkyl or $C_3$-$C_6$ heterocycloalkyl wherein methylene in the alkyl moiety not adjacent to $N^6$ has been replaced by —O—,

[0109] optionally both $R^{10}$ are joined together with N to form a saturated or unsaturated $C_2$-$C_5$ heterocycle containing one or two N heteroatoms and optionally an additional O or S heteroatom,

[0110] or one of the foregoing $R^{10}$ groups is substituted with 1 to 3 halo, CN or $N_3$; but optionally at least one $R^{10}$ group is not H; and

[0111] Z is N or CH, provided that the heterocyclic nucleus varies from purine by no more than one Z.

[0112] E groups represent the aglycons employed in the methoxyphosphonate nucleotide analogues. Preferably, the E group is —$CH(CH_3)CH_2$— or —$CH_2CH_2$—. Also, it is preferred that the side groups at chiral centers in the aglycon be substantially solely in the (R) configuration (except for hydroxymethyl, which is the enriched (S) enantiomer).

[0113] $R^1$ is an in vivo hydrolyzable oxyester having the structure —$OR^{35}$ or —$OR^6$ wherein $R^{35}$ is defined in column 64, line 49 of U.S. Pat. No. 5,798,340, herein incorporated by reference, and $R^6$ is defined above. Preferably $R^1$ is aryloxy, ordinarily unsubstituted or para-substituted (as defined in $R^6$) phenoxy.

[0114] $R^2$ is an amino acid residue, optionally provided that any carboxy group linked by less than about 5 atoms to the amidate N is esterified. $R^2$ typically has the structure

[0115] wherein

[0116] n is 1 or 2;

[0117] $R^{11}$ is $R^6$ or H; preferably $R^6$=$C_3$-$C_9$ alkyl; $C_1$-$C_9$ alkyl substituted independently with OH, halogen, O or N; $C_3$-$C_6$ aryl; $C_3$-$C_6$ aryl which is independently substituted with OH, halogen, O or N; or $C_3$-$C_6$ arylalkyl which is independently substituted with OH, halogen, O or N;

[0118] $R^{12}$ independently is H or $C_1$-$C_9$ alkyl which is unsubstituted or substituted by substituents independently selected from the group consisting of OH, O, N, $COOR^{11}$ and halogen; $C_3$-$C_6$ aryl which is unsubstituted or substituted by substituents independently selected from the group consisting of OH, O, N, $COOR^{11}$ and halogen; or $C_3$-$C_9$ aryl-alkyl which is unsubstituted or substituted by substituents independently selected from the group consisting of OH, O, N, $COOR^{11}$ and halogen;

[0119] $R^{13}$ independently is C(O)—$OR^{11}$; amino; amide; guanidinyl; imidazolyl; indolyl; sulfoxide; phosphoryl; $C_1$-$C_3$ alkylamino; $C_1$-$C_3$ alkyldiamino; $C_1$-$C_6$ alkenylamino; hydroxy; thiol; $C_1$-$C_3$ alkoxy; $C_1$-$C_3$ alkthiol; $(CH_2)_nCOOR^{11}$; $C_1$-$C_6$ alkyl which is unsubstituted or substituted with OH, halogen, SH, $NH_2$, phenyl, hydroxyphenyl or $C_7$-$C_{10}$ alkoxyphenyl; $C_2$-$C_6$ alkenyl which is unsubstituted or substituted with OH, halogen, SH, $NH_2$, phenyl, hydroxyphenyl or $C_7$-$C_{10}$ alkoxyphenyl; and $C_6$-$C_{12}$ aryl which is unsubstituted or substituted with OH, halogen, SH, $NH_2$, phenyl, hydroxyphenyl or $C_7$-$C_{10}$ alkoxyphenyl; and

[0120] $R^{14}$ is H or $C_1$-$C_9$ alkyl or $C_1$-$C_9$ alkyl independently substituted with OH, halogen, $COOR^{11}$, O or N; $C_3$-$C_6$ aryl; $C_3$-$C_6$ aryl which is independently substituted with OH, halogen, $COOR^{11}$, O or N; or $C_3$-$C_6$ arylalkyl which is independently substituted with OH, halogen, $COOR^{11}$, O or N.

[0121] Preferably, $R^{11}$ is $C_1$-$C_6$ alkyl, most preferably isopropyl, $R^{13}$ is the side chain of a naturally occurring amino acid, n=1, $R^{12}$ is H and $R^{14}$ is H. In the compound of structure (2), the invention includes metabolites in which the phenoxy and isopropyl esters have been hydrolyzed to —OH. Similarly, the de-esterified enriched phosphonoamidate metabolites of compounds (5a), 5(b) and (6) are included within the scope of this invention.

[0122] Aryl and "O" or "N" substitution are defined in column 16, lines 42-58, of U.S. Pat. No. 5,798,340.

US 2005/0009043 A1

Jan. 13, 2005

9

[0123] Typically, the amino acids are in the natural or l amino acids. Suitable specific examples are set forth in U.S. Pat. No. 5,798,340, for instance Table 4 and col. 8-10 therein.

[0124] Alkyl as used herein, unless stated to the contrary, is a normal, secondary, tertiary or cyclic hydrocarbon. Unless stated to the contrary alkyl is $C_1$-$C_{12}$. Examples are —$CH_3$, —$CH_2CH_3$, —$CH_2CH_2CH_3$, —$CH(CH_3)_2$, —$CH_2CH_2CH_2CH_3$, —$CH_2CH(CH_3)_2$, —$CH(CH_3)CH_2CH_3$, —$C(CH_3)_3$, —$CH_2CH_2CH_2CH_2CH_3$, —$CH(CH_3)CH_2CH_2CH_3$, —$CH_2CH(CH_3)CH_2CH_3$, —$C(CH_3)_2CH_2CH_3$, —$CH(CH_3)CH(CH_3)_2$, —$CH_2CH_2CH(CH_3)_2$, —$CH_2CH(CH_3)CH_2CH_3$, —$CH_2CH_2CH_2CH_2CH_2CH_3$, —$CH(CH_3)CH_2CH_2CH_2CH_3$, —$CH(CH_2CH_3)(CH_2CH_2CH_3)$, —$C(CH_3)_2CH_2CH_2CH_3$, —$CH(CH_3)CH(CH_3)CH_2CH_3$, —$CH_2CH(CH_3)CH(CH_3)_2$, —$C(CH_3)(CH_2CH_3)_2$, —$CH(CH_2CH_3)CH(CH_3)_2$, —$C(CH_3)_2CH(CH_3)_2$, and —$CH(CH_3)C(CH_3)_3$. Alkenyl and alkynyl are defined in the same fashion, but contain at least one double or triple bond, respectively.

[0125] Where enol or keto groups are disclosed, the corresponding tautomers are to be construed as taught as well.

[0126] The prodrug compounds of this invention are provided in the form of free base or the various salts enumerated in U.S. Pat. No. 5,798,340, and are formulated with pharmaceutically acceptable excipients or solvating diluents for use as pharmaceutical products also as set forth in U.S. Pat. No. 5,798,340. These prodrugs have the antiviral and utilities already established for the parent drugs (see U.S. Pat. No. 5,798,340 and other citations relating to the methoxyphosphonate nucleotide analogues). It will be understood that the diastereomer of structure (4) at least is useful as an intermediate in the chemical production of the parent drug by hydrolysis in vitro, regardless of its relatively unselective character as revealed in the studies herein.

[0127] The invention will be more fully understood by reference to the following examples:

EXAMPLE 1a

[0128]

[0129] Adenine to PMEA using Magnesium Isopropoxide. To a suspension of adenine (16.8 g, 0.124 mol) in DMF (41.9 ml) was added ethylene carbonate (12.1 g, 0.137 mol)

and sodium hydroxide (.100 g, 0.0025 mol). The mixture was heated at 130° C. overnight. The reaction was cooled to below 50° C. and toluene (62.1 ml) was added. The slurry was further cooled to 5° C. for 2 hours, filtered, and rinsed with toluene (2×). The wet solid was dried in vacuo at 65° C. to yield 20.0 g (90%) of 9-(2-hydroxyethyl)adenine as an off-white solid. Mp: 238-240° C.

[0130] 9-(2-Hydroxyethyl)adenine (HEA) (20.0 g, 0.112 mol) was suspended in DMF (125 ml) and heated to 80° C. Magnesium isopropoxide (11.2 g, 0.0784 mol), or alternatively magnesium t-butoxide, was added to the mixture followed by diethyl p-toluenesulfonyloxymethylphosphonate (66.0 g, 0.162 mol) over one hour. The mixture was stirred at 80° C. for 7 hours. 30 ml of volatiles were removed via vacuum distillation and the reaction was recharged with 30 ml of fresh DMF. After cooling to room temperature, bromotrimethylsilane (69.6 g, 0.450 mol) was added and the mixture heated to 80° C. for 6 hours. The reaction was concentrated to yield a thick gum. The gum was dissolved into 360 ml water, extracted with 120 ml dichloromethane, adjusted to pH 3.2 with sodium hydroxide, and the resulting slurry stirred at room temperature overnight. The slurry was cooled to 4° C. for one hour. The solids were isolated by filtration, washed with water (2×), and dried in vacuo at 56° C. to yield 20 g (65.4%) of 9-[2-(phosphonomethoxy)ethyl] adenine (PMEA) as a white solid. Mp:>200° C. dec. $^1$H NMR ($D_2O$) δ 3.49 (t, 2H); 3.94 (t, 2H); 4.39 (t, 2H); 8.13 (s, 1H); 8.22 (s, 1H).

Case 1:19-cv-02103-MN   Document 370-1   Filed 12/05/22   Page 550 of 613 PageID #: 56561

EXAMPLE 1b

[0131]

-continued

[0132] Adenine to PMPA using Magnesium t-Butoxide. To a suspension of adenine (40 g, 0.296 mol) in DMF (41.9 ml) was added (R)-propylene carbonate (34.5 g, 0.338 mol) and sodium hydroxide (0.480 g, 0.012 mol). The mixture was heated at 130° C. overnight. The reaction was cooled to 100° C. and toluene (138 ml) was added followed by methanesulfonic acid (4.7 g, 0.049 mol) while maintaining the reaction temperature between 100-110° C. Additional toluene (114 ml) was added to create a homogeneous solution. The solution was cooled to 3° C. over 7 hours and then held at 3° C. for one hour. The resulting solid was isolated by filtration and rinsed with acetone (2×). The wet solid was dried in vacuo at 80° C. to yield 42.6 g (75%) of (R)-9-[2-(hydroxy)propyl]adenine (HPA) as an off-white solid. Mp: 188-190° C.

[0133] (R)-9-[2-(hydroxy)propyl]adenine (HPA) (20.0 g, 0.104 mol) was suspended in DMF (44.5 ml) and heated to 65° C. Magnesium t-butoxide (14.2 g, 0.083 mol), or alternatively magnesium isopropoxide, was added to the mixture over one hour followed by diethyl p-toluenesulfonyloxymethylphosphonate (66.0 g, 0.205 mol) over two hours while the temperature was kept at 78° C. The mixture was stirred at 75° C. for 4 hours. After cooling to below 50° C., bromotrimethylsilane (73.9 g, 0.478 mol) was added and the mixture heated to 77° C. for 3 hours. When complete, the reaction was heated to 80° C. and volatiles were removed via atmospheric distillation. The residue was dissolved into water (120 ml) at 50° C. and then extracted with ethyl acetate (101 ml). The pH of the aqueous phase was adjusted to pH 1.1 with sodium hydroxide, seeded with authentic (R)-PMPA, and the pH of the aqueous layer was readjusted to pH 2.1 with sodium hydroxide. The resulting slurry was stirred at room temperature overnight. The slurry was cooled to 4° C. for three hours. The solid was isolated by filtration, washed with water (60 ml), and dried in vacuo at 50° C. to yield 18.9 g (63.5%) of crude(R)-9-[2-(phosphonomethoxy)propyl]adenine (PMPA) as an off-white solid.

[0134] The crude(R)-9-[2-(phosphonomethoxy)propyl] adenine was heated at reflux in water (255 ml) until all solids dissolved. The solution was cooled to room temperature over 4 hours. The resulting slurry was cooled to 4° C. for three hours. The solid was isolated by filtration, washed with water (56 ml) and acetone (56 ml), and dried in vacuo at 50° C. to yield 15.0 g (50.4%) of (R)-9-[2-(phosphonomethox-y)propyl]adenine (PMPA) as a white solid. Mp: 278-280° C.

US_THAK_000209

US 2005/0009043 A1

Jan. 13, 2005

11

EXAMPLE 2

Preparation of GS-7171 (III)

[0135]

Scheme 1

(anhydrous)
I

II

III
GS-7171

US_THAK_000210

12

-continued

IV
GS-7340

V
GS-7340-02

[0136]   A glass-lined reactor was charged with anhydrous PMPA, (I) (14.6 kg, 50.8 mol), phenol (9.6 kg, 102 mol), and 1-methyl-2-pyrrolidinone (39 kg). The mixture was heated to 85° C. and triethylamine (6.3 kg, 62.3 mol) added. A solution of 1,3-dicyclohexylcarbodiimide (17.1 kg, 82.9 mol) in 1-methyl-2-pyrrolidinone (1.6 kg) was then added over 6 hours at 100° C. Heating was continued for 16 hours. The reaction was cooled to 45° C., water (29 kg) added, and cooled to 25° C. Solids were removed from the reaction by filtration and rinsed with water (15.3 kg). The combined filtrate and rinse was concentrated to a tan slurry under reduced pressure, water (24.6 kg) added, and adjusted to pH=11 with NaOH (25% in water). Fines were removed by filtration through diatomaceous earth (2 kg) followed by a water (4.4 kg) rinse. The combined filtrate and rinse was extracted with ethyl acetate (28 kg). The aqueous solution was adjusted to pH=3.1 with HCl (37% in water) (4 kg). Crude II was isolated by filtration and washed with methanol (12.7 kg). The crude II wet cake was slurried in methanol (58 kg). Solids were isolated by filtration, washed with methanol (8.5 kg), and dried under reduced pressure to yield 9.33 kg II as a white powder: $^1$H NMR (D$_2$O) δ 1.2 (d, 3H), 3.45 (q, 2H), 3.7 (q, 2H), 4 (m, 2H), 4.2 (q, 2H) 4.35 (dd, 2H), 6.6 (d, 2H), 7 (t, 1H), 7.15 (t, 2H), 8.15 (s, 1H), 8.2 (s, 1H); $^{31}$P NMR (D$_2$O) δ 15.0 (decoupled).

[0137]   GS-7171 (III). (Scheme 1) A glass-lined reactor was charged with monophenyl PMPA, (II), (9.12 kg, 25.1 mol) and acetonitrile (30.7 kg). Thionyl chloride (6.57 kg, 56.7 mol) was added below 50° C. The mixture was heated at 75° C. until solids dissolved. Reaction temperature was

increased to 80° C. and volatiles (11.4 kg) collected by atmospheric distillation under nitrogen. The pot residue was cooled to 25° C., dichloromethane (41 kg) added, and cooled to −29° C. A solution of (L)-alanine isopropyl ester (7.1 kg, 54.4 mol) in dichloromethane (36 kg) was added over 60 minutes at −18° C. followed by triethylamine (7.66 kg, 75.7 mol) over 30 minutes at −18 to −11° C. The reaction mixture was warmed to room temperature and washed five times with sodium dihydrogenphosphate solution (10% in water, 15.7 kg each wash). The organic solution was dried with anhydrous sodium sulfate (18.2 kg), filtered, rinsed with dichloromethane (28 kg), and concentrated to an oil under reduced pressure. Acetone (20 kg) was charged to the oil and the mixture concentrated under reduced pressure. Acetone (18.8 kg) was charged to the resulting oil. Half the product solution was purified by chromatography over a 38×38 cm bed of 22 kg silica gel 60, 230 to 400 mesh. The column was eluted with 480 kg acetone. The purification was repeated on the second half of the oil using fresh silica gel and acetone. Clean product bearing fractions were concentrated under reduced pressure to an oil. Acetonitrile (19.6 kg) was charged to the oil and the mixture concentrated under reduced pressure. Acetonitrile (66.4 kg) was charged and the solution chilled to 0 to −5° C. for 16 hours. Solids were removed by filtration and the filtrate concentrated under reduced pressure to 5.6 kg III as a dark oil: $^1$H NMR (CDCl$_3$) δ 1.1 (m 12H), 3.7 (m, 5H), 4.0 (m, 5H), 4.2 (m, 1H), 5.0 (m, 1H), 6.2 (s, 2H), 7.05 (m, 5H), 8.0 (s, 1H), 8.25 (d, 1H); $^{31}$P NMR (CDCl$_3$) δ 21.0, 22.5 (decoupled).

[0138]   Alternate Method for GS-7171(III)

Scheme 2

[0139]   Monophenyl PMPA (II). A round-bottom flask with reflux condenser and nitrogen inlet was placed in a 70° C. oil bath. The flask was charged with anhydrous PMPA (I) (19.2 g, 67 mmol), N,N-dimethylformamide (0.29 g, 3.3 mmol), and tetramethylene sulfone (40 mL). Thionyl chloride (14.2 g, 119 mmol) was added over 4 hours. Heating was increased to 100° C. over the same time. A homogeneous solution resulted. Phenoxytrimethylsilane (11.7 g, 70 mmol) was added to the solution over 5 minutes. Heating in the 100° C. oil bath continued for two hours more. The reaction was poured into rapidly stirring acetone (400 mL) with cooling at 0° C. Solids were isolated by filtration, dried under reduced pressure, and dissolved in methanol (75 mL). The solution pH was adjusted to 3.0 with potassium hydroxide solution (45% aq.) with cooling in ice/water. The resulting solids were isolated by filtration, rinsed with methanol, and dried under reduced pressure to 20.4 g II (Scheme 2) as a white powder.

[0140]   GS-7171 (III). Monophenyl PMPA (II) (3 g, 8.3 mmol), tetramethylene sulfone (5 mL), and N,N-dimethylformamide (1 drop) were combined in a round bottom flask in a 40° C. oil bath. Thionyl chloride (1.96 g, 16.5 mmol) was added. After 20 minutes the clear solution was removed from heat, diluted with dichloromethane (10 ml), and added to a solution of (L)-alanine isopropyl ester (5 g, 33 mmol) and diisopropylethylamine (5.33 g, 41 mmol) in dichloromethane (20 mL) at −10° C. The reaction mixture was warmed to room temperature and washed three times with

sodium dihydrogenphosphate solution (10% aq., 10 mL each wash). The organic solution was dried over anhydrous sodium sulfate and concentrated under reduced pressure to a oil. The oil was combined with fumaric acid (0.77 g, 6.6 mmol) and acetonitrile (40 mL) and heated to reflux to give a homogeneous solution. The solution was cooled in an ice bath and solids isolated by filtration. The solid GS-7171 fumarate salt was dried under reduced pressure to 3.7 g. The salt (3.16 g, 5.3 mmol) was suspended in dichloromethane (30 mL) and stirred with potassium carbonate solution (5 mL, 2.5 M in water) until the solid dissolved. The organic layer was isolated, then washed with water (5 mL), dried over anhydrous sodium sulfate, and concentrated under reduced pressure to afford 2.4 g III as a tan foam.

EXAMPLE 3

[0141]   Diastereomer Separation by Batch Elution Chromatography

[0142]   The diastereomers of GS-7171 (III) were resolved by batch elution chromatography using a commercially available Chiralpak AS, 20 μm, 21×250 mm semi-preparative HPLC column with a Chiralpak AS, 20 μm, 21×50 mm guard column. Chiralpak® AS is a proprietary packing material manufactured by Diacel and sold in North America by Chiral Technologies, Inc. (U.S. Pat. Nos. 5,202,433, RE 35,919, 5,434,298, 5,434,299 and 5,498,752). Chiralpak AS

US_THAK_000212

14

is a chiral stationary phase (CSP) comprised of amylosetris [(S)-α-methylbenzyl carbamate] coated onto a silica gel support.

[0143] The GS-7171 diastereomeric mixture was dissolved in mobile phase, and approximately 1 g aliquots of GS-7171 were pumped onto the chromatographic system. The undesired diastereomer, designated GS-7339, was the first major broad (approx. 15 min. duration) peak to elute from the column. When the GS-7339 peak had finished eluting, the mobile phase was immediately switched to 100% methyl alcohol, which caused the desired diastereomer, designated GS-7340 (IV), to elute as a sharp peak from the column with the methyl alcohol solvent front. The methyl alcohol was used to reduce the over-all cycle time. After the first couple of injections, both diastereomers were collected as a single large fractions containing one of the purified diastereomers (>99.0% single diastereomer). The mobile phase solvents were removed in vacuo to yield the purified diastereomer as a friable foam.

[0144] About 95% of the starting GS-7171 mass was recovered in the two diastereomer fractions. The GS-7340 fraction comprised about 50% of the total recovered mass.

[0145] The chromatographic conditions were as follows:

[0146] Mobile Phase (Initial): GS-7171-Acetonitrile: Isopropyl Alcohol (90:10) (Final): 100% Methyl Alcohol

[0147] Flow: 10 mL/minute

[0148] Run Time: About 45 minute

[0149] Detection: UV at 275 nm

[0150] Temperature: Ambient

[0151] Elution Profile: GS-7339 (diastereomer B) :GS-7340 (diastereomer A; (IV))

[0152] Diastereomer Separation of GS-7171 by SMB Chromatography

[0153] For a general description of simulated moving bed (SMB) chromatography, see Strube et al., "Organic Process Research and Development" 2:305-319 (1998).

[0154] GS-7340 (IV). GS-7171 (III), 2.8 kg, was purified by simulated moving bed chromatography over 10 cm by 5 cm beds of packing (Chiral Technologies Inc., 20 micron Chiralpak AS coated on silica gel) (1.2 kg). The columns were eluted with 30% methanol in acetonitrile. Product bearing fractions were concentrated to a solution of IV in acetonitrile (2.48 kg). The solution solidified to a crystalline mass wet with acetonitrile on standing. The crystalline mass was dried under reduced pressure to a tan crystalline powder, 1.301 kg IV, 98.7% diastereomeric purity: mp 117-120° C.; $^1$H NMR (CDCl$_3$) δ 1.15 (m 12H), 3.7 (t, 1H), 4.0 (m, 5H), 4.2 (dd, 1H), 5.0 (m, 1H), 6.05 (s, 2H), 7.1 (m, 5H), 8.0 (s, 1H), 8.2 (s, 1H); $^{31}$P NMR (CDCl$_3$) δ 21.0 (decoupled).

[0155] Diastereomer Separation by C18 RP-HPLC

[0156] GS-7171 (III) was chromatographed by reverse phase HPLC to separate the diastereomers using the following summary protocol.

[0157] Chromatographic column: Phenomenex Luna™ C18(2), 5 μm, 100 Å pore size, (Phenomenex, Torrance, Calif.), or equivalent

[0158] Guard column: Pellicular C18 (Alltech, Deerfield, Ill.), or equivalent

[0159] Mobile Phase: A—0.02% (85%) H$_3$PO$_4$ in water: acetonitrile (95:5) B—0.02% (85%) H$_3$PO$_4$ in water: acetonitrile (50:50)

[0160] Mobile Phase Gradient:

| Time | % Mobile Phase A | % Mobile Phase B |
|---|---|---|
| 0 | 100 | 0 |
| 5 | 100 | 0 |
| 7 | 70 | 30 |
| 32 | 70 | 30 |
| 40 | 0 | 100 |
| 50 | 0 | 100 |

[0161] Run Time: 50 minutes

[0162] Equilibration Delay: 10 min at 100% mobile phase A

[0163] Flow Rate: 1.2 mL/min

[0164] Temperature: Ambient

[0165] Detection: UV at 260 nm

[0166] Sample Solution: 20 mM sodium phosphate buffer, pH 6

[0167] Retention Times: GS-7339, about 25 minutes GS-7340, about 27 minutes

[0168] Diastereomer Separation by Crystallization

[0169] GS-7340 (IV). A solution of GS-7171 (III) in acetonitrile was concentrated to an amber foam (14.9 g) under reduced pressure. The foam was dissolved in acetonitrile (20 mL) and seeded with a crystal of IV. The mixture was stirred overnight, cooled to 5° C., and solids isolated by filtration. The solids were dried to 2.3 g IV as white crystals, 98% diastereomeric purity ($^{31}$P NMR): $^1$H NMR (CDCl$_3$) δ 1.15 (m 12H), 3.7 (t, 1H), 3.95 (m, 2H), 4.05 (m, 2H), 4.2 (m, 2H), 5.0 (m, 1H), 6.4 (s, 2H), 7.1 (m, 5H), 8.0 (s, 1H), 8.2 (s, 1H); $^{31}$P NMR (CDCl$_3$) δ 19.5 (decoupled). X-ray crystal analysis of a single crystal selected from this product yielded the following data:

| | |
|---|---|
| Crystal Color, Habit | colorless, column |
| Crystal Dimensions | 0.25 × 0.12 × 0.08 mm |
| Crystal System | orthorhombic |
| Lattice Type | Primitive |
| Lattice Parameters | a = 8.352(1) Å |
| | b = 15.574(2) Å |
| | c = 18.253(2) Å |
| | V = 2374.2(5) Å$^3$ |
| Space Group | P2$_1$2$_1$2$_1$ (#19) |
| Z value | 4 |
| D$_{calc}$ | 1.333 g/cm$^3$ |
| F$_{000}$ | 1008.00 |
| μ(MoKα) | 1.60 cm$^{-1}$ |

### EXAMPLE 4

Preparation of Fumarate Salt of GS-7340

[0170] GS-7340-02 (V). (Scheme 1) A glass-lined reactor was charged with GS-7340 (IV), (1.294 kg, 2.71 mol), fumaric acid (284 g, 2.44 mol), and acetonitrile (24.6 kg). The mixture was heated to reflux to dissolve the solids, filtered while hot and cooled to 5° C. for 16 hours. The product was isolated by filtration, rinsed with acetonitrile (9.2 kg), and dried to 1329 g (V) as a white powder: mp 119.7-121.1° C.; [α]$_D^{20}$ –41.7° (c 1.0, acetic acid).

EXAMPLE 5

[0171]   Preparation of GS-7120 (VI)

Scheme 3

II

VI
GS-7120

[0172]   A 5 L round bottom flask was charged with monophenyl PMPA, (II), (200 g, 0.55 mol) and acetonitrile (0.629 kg); Thionyl chloride (0.144 kg, 1.21 mol) was added below 27° C. The mixture was heated to 70° C. until solids dissolved. Volatiles (0.45 L) were removed by atmospheric distillation under nitrogen. The pot residue was cooled to 25° C., dichloromethane (1.6 kg) was added and the mixture was cooled to −20° C. A solution of (L)-α aminobutyric acid ethyl ester (0.144 kg, 1.1 mol) in dichloromethane (1.33 kg) was added over 18 minutes at −20 to −10° C. followed by triethylamine (0.17 kg, 1.65 mol) over 15 minutes at −8 to −15° C. The reaction mixture was warmed to room temperature and washed four times with sodium dihydrogenphosphate solution (10% aq., 0.3 L each wash). The organic solution was dried with anhydrous sodium sulfate (0.5 kg) and filtered. The solids were rinsed with dichloromethane (0.6 kg) and the combined filtrate and rinse was concentrated to an oil under reduced pressure. The oil was purified by chromatography over a 15×13 cm bed of 1.2 kg silica gel 60, 230 to 400 mesh. The column was eluted with a gradient of dichloromethane and methanol. Product bearing fractions were concentrated under reduced pressure to afford 211 g VI (Scheme 3) as a tan foam.

EXAMPLE 5a

[0173]   Diastereomer Separation of GS-7120 by Batch Elution Chromatography

[0174]   The diastereomeric mixture was purified using the conditions described for GS-7171 in Example 3A except for the following:

[0175]   Mobile Phase (Initial): GS-7120-Acetonitrile: Isopropyl Alcohol (98:2) (Final): 100% Methyl Alcohol

[0176]   Elution Profile: GS-7341 (diastereomer B) :GS-7342 (diastereomer A)

EXAMPLE 6

[0177]   Diastereomer Separation of GS-7120 by Crystallization

[0178]   A 1 L round bottom flask was charged with monophenyl PMPA, (II), (50 g, 0.137 mol) and acetonitrile (0.2 L). Thionyl chloride (0.036 kg, 0.303 mol) was added with a 10° C. exotherm. The mixture was heated to reflux until solids dissolved. Volatiles (0.1 L) were removed by atmospheric distillation under nitrogen. The pot residue was cooled to 25° C., dichloromethane (0.2 kg) was added, and the mixture was cooled to −20° C. A solution of (L)-α aminobutyric acid ethyl ester (0.036 kg, 0.275 mol) in dichloromethane (0.67 kg) was added over 30 minutes at −20 to −8° C. followed by triethylamine (0.042 kg, 0.41 mol) over 10 minutes at up to −6° C. The reaction mixture was warmed to room temperature and washed four times with sodium dihydrogenphosphate solution (10% aq., 0.075 L each wash). The organic solution was dried with anhydrous sodium sulfate (0.1 kg) and filtered. The solids were rinsed with ethyl acetate (0.25 L, and the combined filtrate and rinse was concentrated to an oil under reduced pressure. The oil was diluted with ethyl acetate (0.25 L), seeded, stirred overnight, and chilled to −15° C. The solids were isolated by filtration and dried under reduced pressure to afford 17.7 g of GS-7342 (Table 5) as a tan powder: [1]H NMR

US 2005/0009043 A1

16

Jan. 13, 2005

(CDCl$_3$) δ 0.95 (t, 3H), 1.3 (m, 6H), 1.7, (m, 2H), 3.7 (m, 2H), 4.1(m, 6H), 4.4 (dd, 1H), 5.8 (s, 2H), 7.1 (m, 5H), 8.0 (s, 1H), 8.4 (s, 1H); $^{31}$P NMR (CDCl$_3$) δ 21 (decoupled).

## EXAMPLE 7

[0179]  Diastereomer Separation of GS-7097

[0180]  The diastereomeric mixture was purified using the conditions described for GS-7171 (Example 3A) except for the following:

[0181]  Mobile Phase (Initial): GS-7120-Acetonitrile: Isopropyl Alcohol (95:5) (Final): 100% Methyl Alcohol

[0182]  Elution Profile: GS-7115 (diastereomer B) :GS-7114 (diastereomer A)

## EXAMPLE 8

[0183]  Alternative Procedure for Preparation of GS-7097

[0184]  GS-7097: Phenyl PMPA, Ethyl L-Alanyl Amidate. Phenyl PMPA (15.0 g, 41.3 mmol), L-alanine ethyl ester hydrochloride (12.6 g, 83 mmol) and triethylamine (11.5 mL, 83 mmol) were slurried together in 500 mL pyridine under dry N$_2$. This suspension was combined with a solution of triphenylphosphine (37.9 g, 145 mmol), Aldrithiol 2 (2,2'-dipyridyl disulfide) (31.8 g, 145 mmol), and 120 mL pyridine. The mixture was heated at an internal temperature of 57° C. for 15 hours. The complete reaction was concentrated under vacuum to a yellow paste, 100 g. The paste was purified by column chromatography over a 25×11 cm bed of 1.1 kg silica gel 60, 230 to 400 mesh. The column was eluted with 8 liters of 2% methanol in dichloromethane followed by a linear gradient over a course of 26 liters eluent up to a final composition of 13% methanol. Clean product bearing fractions were concentrated to yield 12.4 g crude (5), 65% theory. This material was contaminated with about 15% (weight) triethylamine hydrochloride by $^1$H NMR. The contamination was removed by dissolving the product in 350 mL ethyl acetate, extracting with 20 mL water, drying the organic solution over anhydrous sodium sulfate, and concentrating to yield 11.1 g pure GS-7097 as a white solid, 58% yield. The process also is employed to synthesize the diastereomeric mixture of GS-7003a and GS-7003b (the phenylalanyl amidate) and the mixture GS-7119 and

GS-7335 (the glycyl amidate). These diastereomers are separated using a batch elution procedure such as shown in Example 3A, 6 and 7.

## EXAMPLE 9

[0185]  In Vitro Studies of Prodrug Diastereomers

[0186]  The in vitro anti-HIV-1 activity and cytotoxicity in MT-2 cells and stability in human plasma and MT-2 cell extracts of GS-7340 (freebase) and tenofovir disoproxil fumarate (TDF), are shown in Table 1. GS-7340 shows a 10-fold increase in antiviral activity relative to TDF and a 200-fold increase in plasma stability. This greater plasma stability is expected to result in higher circulating levels of GS-7340 than TDF after oral administration.

TABLE 1

| | In Vitro Activity and Stability | | | | |
|---|---|---|---|---|---|
| | HIV-1 | | Stability T ½ (min) | | |
| | Activity IC$_{50}$ μM | Cytotoxicity CC$_{50}$ μM | Human Plasma | MT-2 Cell Extract | (P/MT-2) |
| GS 7340 | 0.005 | >40 | 90.0 | 28.3 | 3.2 |
| TDF | 0.05 | 70 | 0.41 | 70.7 | 0.006 |
| Tenofovir | 5 | 6000 | — | — | — |

[0187]  In order to estimate the relative intracellular PMPA resulting from the intracellular metabolism of TDF as compared to that from GS-7340, both prodrugs and PMPA were radiolabeled and spiked into intact human whole blood at equimolar concentrations. After 1 hour, plasma, red blood cells (RBCs) and peripheral blood mononuclear cells (PBMCs) were isolated and analyzed by HPLC with radiometric detection. The results are shown in Table 2.

[0188]  After 1 hour, GS-7340 results in 10× and 30× the total intracellular concentration of PMPA species in PBMCs as compared to TDF and PMPA, respectively. In plasma after 1 hour, 84% of the radioactivity is due to intact GS-7340, whereas no TDF is detected at 1 hour. Since no intact TDF is detected in plasma, the 10× difference at 1 hour between TDF and GS-7340 is the minimum difference expected in vivo. The HPLC chromatogram for all three compounds in PBMCs is shown in FIG. 1.

TABLE 2

| PMPA Metabolites in Plasma, PBMCs and RBCs After 1 h Incubation of PMPA Prodrugs or PMPA in Human Blood. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Total C-14 Recovered, | Metabolites (% of Total Peak Area) | | | | | |
| Compound | Matrix | μg-eq | PMPA % | PMPAp, % | PMPApp, % | Met. X, % | Met. Y, % | GS 7340, % |
| GS-7340 | Plasma/FP | 43.0 | 1 | — | — | 2 | 13 | 84 |
| (60 μg-eq) | PBMC | 1.25 | 45 | 16 | 21 | 18 | — | — |
| | RBC/FP | 12.6 | 8 | — | — | 24 | 11 | 57 |
| | | | PMPA | PMPAp | PMPApp | Mono-POC | GS-4331 | |
| GS-4331 | Plasma/FP | 48.1 | 11 | — | — | 89 | — | |
| (TDF) | PBMC | 0.133 | 50 | 25 | 18 | 7 | — | |
| (60 μg-eq) | RBC/FP | 10.5 | 93 | 7.0 | — | — | — | |

US_THAK_000215

US 2005/0009043 A1                                           Jan. 13, 2005

17

TABLE 2-continued

| | | PMPA | PMPAp | PMPApp |
|---|---|---|---|---|
| colspan PMPA Metabolites in Plasma, PBMCs and RBCs After 1 h Incubation of PMPA Prodrugs or PMPA in Human Blood. | | | | |
| PMPA | Plasma/FP | 55.7 | 100 | — | — |
| (60 μg-eq) | PBMC | 0.033 | 86 | 14 | — |
| | RBC/FP | 3.72 | 74 | 10 | 16 |

[0189]   Met. X and Met Y (metabolites X and Y) are shown in Table 5. Lower case "p" designates phosphorylation. These results were obtained after 1 hour in human blood. With increasing time, the in vitro differences are expected to increase, since 84% of GS-7340 is still intact in plasma after one hour. Because intact GS-7340 is present in plasma after oral administration, the relative clinical efficacy should be related to the $IC_{50}$ values seen in vitro.

[0190]   in Table 3 below, $IC_{50}$ values of tenofovir, TDF, GS-7340, several nucleosides and the protease inhibitor nelfinivir are listed. As shown, nelfinavir and GS-7340 are 2-3 orders of magnitude more potent than all other nucleotides or nucleosides.

TABLE 3

In Vitro Anti-HIV-1 Activities of Antiretroviral Compounds

| Compound | $IC_{50}$ (μM) |
|---|---|
| Adefovir (PMEA) | 13.4 ± 4.2[1] |
| Tenofovir (PMPA) | 6.3 ± 3.3[1] |
| AZT | 0.17 ± 0.08[1] |
| 3TC | 1.8 ± 0.25[1] |
| d4T | 8 ± 2.5[1] |
| Nelfinavir | 0.006 ± 0.002[1] |
| TDF | 0.05 |
| GS 7340 | 0.005 |

[1]A. S. Mulato and J. M. Cherrington, Antiviral Research 36, 91 (1997)

[0191]   Additional studies of the in vitro cell culture anti-HIV-1 activity and $CC_{50}$ of separated diastereomers of this invention were conducted and the results tabulated below.

TABLE 4

Effect of Diastereomer

| Compound | Diastereomer residue | $IC_{50}$ (μM) | Fold change | A/B activity | $CC_{50}$ (μM) |
|---|---|---|---|---|---|
| PMPA | — | 5 | 1× | | 6000 |
| Ala-methylester | Mixture 1:1 | 0.025 | 200× | 20× | 80 |
| GS-6957a | A | 0.0075 | 670× | | |
| GS-6957b | | 0.15 | 33× | | |
| Phe-methylester | Mixture 1:1 | 0.03 | 170× | 10× | 60 |
| GS-7003a | A | 0.01 | 500× | | |
| GS-7003b | B | 0.1 | 50× | | |
| Gly-ethylester | Mixture 1:1 | 0.5 | 10× | 20× | |
| GS-7119 | A | 0.05 | 100× | | >100 |
| GS-7335 | B | 1.0 | 5× | | |
| Ala-isopropyl | Mixture 1:1 | 0.01 | 500× | 12× | |
| GS-7340 | A | 0.005 | 1,000× | | 40 |
| GS-7339 | B | 0.06 | 83× | | >100 |
| ABA-ethyl | Mixture 1:1 | 0.008 | 625× | 7.5× | >100 |
| GS-7342 | A | 0.004 | 1,250× | | |
| GS-7341 | B | 0.03 | 170× | | |

TABLE 4-continued

Effect of Diastereomer

| Compound | Diastereomer residue | $IC_{50}$ (μM) | Fold change | A/B activity | $CC_{50}$ (μM) |
|---|---|---|---|---|---|
| Ala-ethyl | Mixture 1:1 | 0.02 | 250× | 10× | 60 |
| GS-7114 | A | 0.005 | 1,000× | | |
| GS-7115 | B | 0.05 | 100× | | |

[0192]   Assay reference: Arimilli, M N, et al., (1997) Synthesis, in vitro biological evaluation and oral bioavailability of 9-[2-(phosphonomethoxy)propyl]adenine (PMPA) prodrugs. Antiviral Chemistry and Chemotherapy 8(6):557-564.

[0193]   "Phe-methylester" is the methylphenylalaninyl monoamidate, phenyl monoester of tenofovir; "gly-methylester" is the methylglycyl monoamidate, phenyl monoester of tenofovir.

[0194]   In each instance above, isomer A is believed to have the same absolute stereochemistry as GS-7340 (S), and isomer B is believed to have the same absolute stereochemistry that of GS-7339.

[0195]   The in vitro metabolism and stability of separated diastereomers were determined in PLCE, MT-2 extract and human plasma. A biological sample listed below, 80 μL, was transferred into a screw-capped centrifuge tube and incubated at 37° C. for 5 min. A solution containing 0.2 mg/mL of the test compound in a suitable buffer, 20 μL, was added to the biological sample and mixed. The reaction mixture, 20 μL, was immediately sampled and mixed with 60 μL of methanol containing 0.015 mg/mL of 2-hydroxymethyl-naphthalene as an internal standard for HPLC analysis. The sample was taken as the time-zero sample. Then, at specific time points, the reaction mixture, 20 μL, was sampled and mixed with 60 μL of methanol containing the internal standard. The mixture thus obtained was centrifuged at 15,000 G for 5 min and the supernatant was analyzed with HPLC under the conditions described below.

[0196]   The biological samples evaluated are as follows.

[0197]   (1) PLCE (porcine liver carboxyesterase from Sigma, 160 u/mg protein, 21 mg protein/mL) diluted 20 fold with PBS (phosphated-buffered saline).

[0198]   (2) MT-2 cell extract was prepared from MT-2 cells according to the published procedure [A. Pompon, I. Lefebvre, J.-L. Imbach, S. Kahn, and D. Farquhar, "Antiviral Chemistry & Chemotherapy", 5:91-98 (1994)] except for using HEPES buffer described below as the medium.

[0199]  (3) Human plasma (pooled normal human plasma from George King Biomedical Systems, Inc.)

[0200]  The buffer systems used in the studies are as follows. In the study for PLCE, the test compound was dissolved in PBS. PBS (phosphate-buffered saline, Sigma) contains 0.01 M phosphate, 0.0027 M potassium chloride, and 0.137 M sodium chloride. pH 7.4 at 37° C. In the study for MT-2 cell extracts, the test compound was dissolved in HEPES buffer. HEPES buffer contains 0.010 M HEPES, 0.05 M potassium chloride, 0.005 M magnesium chloride, and 0.005 M dl-dithiothreitol. pH 7.4 at 37° C. In the study for human plasma, the test compound was dissolved in TBS. TBS (tris-buffered saline, Sigma) contains 0.05 M Tris, 0.0027 M potassium chloride, and 0.138 M sodium chloride. pH 7.5 at 37° C.

[0201]  The HPLC analysis was carried out under the following conditions.

[0202]  Column: Zorbax Rx-C8, 4.6×250 mm, $5\mu$ (MAC-MOD Analytical, Inc. Chadds Ford, Pa.)

[0203]  Detection: UV at 260 nm

[0204]  Flow Rate: 1.0 mL/min

[0205]  Run Time: 30 min

[0206]  Injection Volume: 20 $\mu$L

[0207]  Column Temperature: Ambient temperature

[0208]  Mobile Phase A: 50 mM potassium phosphate (pH 6.0)/CH$_3$CN=95/5 (v/v)

[0209]  Mobile Phase B: 50 mM Potassium phosphate (pH 6.0)/CH$_3$CN=50/5 (v/v)

[0210]  Gradient Run: 0 min 100% Mobile Phase A 25 min 100% Mobile Phase B 30 min 100% Mobile Phase B

[0211]  The results are shown below in Table 5 (also including selected IC$_{50}$ data from Table 4).

TABLE 5

In Vitro Metabolism of Isomers A and B of PMPA monoamide at 37° C.

| No. | PMPA monoamide structure | HIV IC$_{50}$ ($\mu$M) | PLCE hydrolysis rate and product | MT-2 extract hydrolysis rate and product | Human Plasma Stability (HP) |
|---|---|---|---|---|---|
| 1 | Isomer A   GS7114 | 0.005 | $t_{1/2}$ = 2.9 min Met. X & PMPA | $t_{1/2}$ = 2.9 min Met. X & PMPA | $t_{1/2}$ = 148 min Met. Y |
| 2 | Isomer B   GS7115 | 0.05 | $t_{1/2}$ = 8.0 min Met. X & PMPA | $t_{1/2}$ = 150.6 min Met. X & PMPA | $t_{1/2}$ = 495 min Met. Y |
| 3 | Isomer A   GS7340 | 0.005 | $t_{1/2}$ = 3.3 min Met. X & PMPA | $t_{1/2}$ = 28.3 min Met. X & PMPA | $t_{1/2}$ = 90.0 min Met. Y |
| 4 | Isomer B   GS7339 | 0.06 | $t_{1/2}$ = 10.1 min Met. X & PMPA | $t_{1/2}$ > 1000 min | $t_{1/2}$ = 231 min Met. Y |
| 5 | Isomer A   GS7342 | 0.004 | $t_{1/2}$ = 3.9 min Met. X | $t_{1/2}$ = 49.2 min Met. X & PMPA | $t_{1/2}$ = 103 min Met. Y |

TABLE 5-continued

In Vitro Metabolism of Isomers A and B of PMPA monoamidate at 37° C.

| No. | PMPA monoamidate structure | HIV IC$_{50}$ ($\mu$M) | PLCE hydrolysis rate and product | MT-2 extract hydrolysis rate and product | Human Plasma Stability (HP) |
|---|---|---|---|---|---|
| 6 | Isomer B          GS7341 | 0.03 | $t_{1/2}$ = 11.3 min Met. X | $t_{1/2}$ > 1000 min | $t_{1/2}$ = 257 min Met. Y |
| 7 | GS4331 | 0.05 | $t_{1/2}$ < 0.14 min MonoPOC PMPA | $t_{1/2}$ = 70.7 min monoPOC PMPA | $t_{1/2}$ = 0.41 min monoPOC PMPA |

Met. X:

Met. Y:

A =

EXAMPLE 10

[0212] Plasma and PBMC Exposures Following Oral Administration Of Prodrug Diastereomers to Beagle Dogs

[0213] The pharmacokinetics of GS 7340 were studied in dogs after oral administration of a 10 mg-eq/kg dose.

[0214] Formulations. The prodrugs were formulated as solutions in 50 mM citric acid within 0.5 hour prior to dose. All compounds used in the studies were synthesized by Gilead Sciences. The following lots were used:

| GSI | Amidate Amino acid | AA Ester | Diastereoisomer | Lot Number |
|---|---|---|---|---|
| GS-7340-2 | Alanine | i-Propyl | Isomer A | 1504-187-19 |
| GS-7339 | Alanine | i-Propyl | Isomer B | 1509-185-31 |
| GS7114 | Alanine | Ethyl | Isomer A | 1509-181-26 |
| GS7115 | Alanine | Ethyl | Isomer B | 1509-181-22 |
| GS7119 | Glycine | Ethyl | Isomer A | 1428-163-28 |
| GS7342 | α-Aminobutyric Acid | Ethyl | Isomer A | 1509-191-12 |
| GS7341 | α-Aminobutyric Acid | Ethyl | Isomer B | 1509-191-7 |

[0215] Dose Administration and Sample Collection. The in-life phase of this study was conducted in accordance with the recommendations of the "Guide for the Care and Use of Laboratory Animals" (National Institutes of Health publication 86-23) and was approved by an Institutional Animal Care and Use Committee. Fasted male beagle dogs (10±2 kg) were used for the studies. Each drug was administered as a single dose by oral gavage (1.5-2 ml/kg). The dose was 10 mg-equivalent of PMPA/kg. For PBMCs, blood samples were collected at 0 (pre-dose), 2,8, and 24 h post-dose. For plasma, blood samples were collected at 0 (pre-dose), 5, 15, and 30 min, and 1, 2, 3, 4, 6, 8, 12 and 24 h post-dose. Blood (1.0 ml) was processed immediately for plasma by centrifugation at 2,000 rpm for 10 min. Plasma samples were frozen and maintained at 70° C. until analyzed.

[0216] Peripheral Blood Mononuclear Cell (PBMC) preparation. Whole blood (8 ml) drawn at specified time points was mixed in equal proportion with phosphate buffered saline (PBS), layered onto 15 ml of Ficoll-Paque solution (Pharmacia Biotech,) and centrifuged at 400×g for 40 min. PBMC layer was removed and washed once with PBS. Formed PMBC pellet was reconstituted in 0.5 ml of PBS, cells were resuspended, counted using hemocytometer and maintained at 70° C. until analyzed. The number of cells multiplied by the mean single-cell volume was used in calculation of intracellular concentrations. A reported value of 200 femtoliters/cell was used as the resting PBMC volume (B. L. Robins, R. V. Srinivas, C. Kim, N. Bischof-berger, and A. Fridland, Antimicrob. Agents Chemother. 42, 612 (1998).

US_THAK_000218

20

[0217]  Determination of PMPA and Prodrugs in plasma and PBMCs. The concentration of PMPA in dog plasma samples was determined by derivatizing PMPA with chloroacetaldehyde to yield a highly fluorescent $N^1$, $N^6$-ethenoadenine derivative (L. Naesens, J. Balzarini, and E. De Clercq, Clin. Chem. 38, 480 (1992). Briefly, plasma (100 $\mu$l) was mixed with 200 $\mu$l acetonitrile to precipitateprotein. Samples were then evaporated to dryness under reduced pressure at room temperature. Dried samples were reconstituted in 200 $\mu$l derivatization cocktail (0.34% chloroacetaldehyde in 100 mM sodium acetate, pH 4.5), vortexed, and centrifuged. Supernatant was then transferred to a clean screw-cap tube and incubated at 95° C. for 40 min. Derivatized samples were then evaporated to dryness and reconstituted in 100 $\mu$l of water for HPLC analysis.

[0218]  Before intracellular PMPA could be determined by HPLC, the large amounts of adenine related ribonucleotides present in the PBMC extracts had to be removed by selective oxidation. We used a modified procedure of Tanaka et al (K. Tanaka, A. Yoshioka, S. Tanaka, and Y. Wataya, Anal. Biochem., 139, 35 (1984). Briefly, PBMC samples were mixed 1:2 with methanol and evaporated to dryness under reduced pressure. The dried samples were derivatized as described in the plasma assay. The derivatized samples were mixed with 20 $\mu$L of 1M rhamnose and 30 $\mu$L of 0.1M sodium periodate and incubated at 37° C. for 5 min. Following incubation, 40 $\mu$L of 4M methylamine and 20 $\mu$L of 0.5M inosine were added. After incubation at 37° C. for 30 min, samples were evaporated to dryness under reduced pressure and reconstituted in water for HPLC analysis.

temperature was maintained at 35° C. by a column oven. The gradient profile was 90% A/10% B for 10 min for PMPA and 65%A/35%B for 10 min for the prodrug. Detection was by fluorescence with excitation at 236 nm and emission at 420 nm, and the injection volume was 10 $\mu$l. Data was acquired and stored by a laboratory data acquisition system (PeakPro, Beckman, Allendale, N.J.).

[0221]  Pharmacokinetic Calculations. PMPA and prodrug exposures were expressed as areas under concentration curves in plasma or PBMC from zero to 24 hours (AUC). The AUC values were calculated using the trapezoidal rule.

[0222]  Plasma and PBMC Concentrations. The results of this study is shown in FIGS. 2 and 3. FIG. 2 shows the time course of GS 7340-2 metabolism summary of plasma and PBMC exposures following oral administration of pure diastereoisomers of the PMPA prodrugs.

[0223]  The bar graph in FIG. 2 shows the AUC (0-24 h) for tenofovir in dog PBMCs and plasma after administration of PMPA s.c., TDF and amidate ester prodrugs. All of the amidate prodrugs exhibited increases in PBMC exposure. For example, GS 7340 results in a ~21-fold increase in PBMC exposure as compared to PMPA s.c. and TDF; and a 6.25-fold 1.29-fold decrease in plasma exposure, respectively.

[0224]  These data establish in vivo that GS 7340 can be delivered orally, minimizes systemic exposure to PMPA and greatly enhances the intracellular concentration of PMPA in the cells primarily responsible for HIV replication.

TABLE 6

PMPA Exposure in PBMC and Plasma from Oral Prodrugs of PMPA in Dogs

| | | PMPA AUC in Plasma | | | PMPA AUC in PBMC | | | Prodrug | PBMC/Plasma |
| GS# | Moiety | Mean | StDev | N | Mean | StDev | N | in Plasma | Exposure Ratio |
|---|---|---|---|---|---|---|---|---|---|
| GS-7114 | Mono-Ala-Et-A | 5.8 | 0.9 | 2 | 706 | 331 | 5 | YES | 122 |
| GS-7115 | Mono-Ala-Et-B | 6.6 | 1.5 | 2 | 284 | 94 | 5 | YES | 43 |
| GS-7340-2 | Mono-Ala-iPr-A | 5.0 | 1.1 | 5 | 805 | 222 | 5 | YES | 161 |
| GS-7339 | Mono-Ala-iPr-A | 6.4 | 1.3 | 2 | 200 | 57 | 5 | YES | 31 |
| GS-7119 | Mono-Gly-Et-A | 6.11 | 1.86 | 2 | 530 | 304 | 5 | YES | 87 |
| GS-7342 | Mono-ABA-Et-A | 4.6 | 1.2 | 2 | 1060 | 511 | 5 | YES | 230 |
| GS7341 | Mono-ABA-Et-B | 5.8 | 1.4 | 2 | 199 | 86 | 5 | YES | 34 |

[0219]  No intact prodrug was detected in any PBMC samples. For plasma samples potentially containing intact prodrugs, experiments were performed to verify that no further conversion to PMPA occurred during derivatization. Prodrug standards were added to drug-free plasma and derivatized as described. There were no detectable levels of PMPA present in any of the plasma samples, and the projected % of conversion was less than 1%.

[0220]  The HPLC system was comprised of a P4000 solvent delivery system with AS3000 autoinjector and F2000 fluorescence detector (Thermo Separation, San Jose, Calif.). The column was an Inertsil ODS-2 column (4.6x150 mm). The mobile phases used were: A, 5% acetonitrile in 25 mM potassium phosphate buffer with 5 mM tetrabutyl ammonium bromide (TBABr), pH 6.0; B, 60% acetonitrile in 25 mM potassium phosphate buffer with 5 mM TBABr, pH 6.0. The flow rate was 2 ml/min and the column

EXAMPLE 11

[0225]  Biodistribution of GS-7340

[0226]  As part of the preclinical characterization of GS-7340, its biodistribution in dogs was determined. The tissue distribution of GS-7340 (isopropyl alaninyl monoamidate, phenyl monoester of tenofovir) was examined following oral administration to beagle dogs. Two male animals were dosed orally with $^{14}$C=GS-7340 (8.85 mg-equiv. of PMPA/kg, 33.2 $\mu$Ci/kg; the 8-carbon of adenine is labeled) in an aqueous solution (50 mM citric acid, pH 2.2). Plasma and peripheral blood mononuclear cells (PBMCs) were obtained over the 24-hr period. Urine and feces were cage collected over 24 hr. At 24 h after the dose, the animals were sacrificed and tissues removed for analysis. Total radioactivity in tissues was determined by oxidation and liquid scintillation counting.

[0227] The biodistribution of PMPA after 24 hours after a single oral dose of radiolabelled GS 7340 is shown in Table 4 along with the data from a previous study with TDF (GS-4331). In the case of TDF, the prodrug concentration in the plasma is below the level of assay detection, and the main species observed in plasma is the parent drug. Levels of PMPA in the lymphatic tissues, bone marrow, and skeletal muscle are increased 10-fold after administration of GS-7340.

[0228] Accumulation in lymphatic tissues is consistent with the data observed from the PBMC analyses, since these tissues are composed primarily of lymphocytes. Likewise, accumulation in bone marrow is probably due to the high percentage of lymphocytes (70%) in this tissue.

TABLE 7

Excretion and Tissue Distribution of Radiolabelled GS-7340 in Dogs (Mean, N = 2) Following an Oral Dose at 10 mg-eq. PMPA/kg.

| Tissue/Fluid | GS-4331 | | GS-7340 | | Tissue Conc. |
|---|---|---|---|---|---|
| | % Dose | Conc. (ug-eq/g) | % Dose | Conc. (ug-eq/g) | Ratio of GS 7340 to GS-4331 |
| Liver | 12.40 | 38.30 | 16.45 | 52.94 | 1.4 |
| Kidney | 4.58 | 87.90 | 3.78 | 80.21 | 0.9 |
| Lungs | 0.03 | 0.53 | 0.34 | 4.33 | 8.2 |
| Iliac Lymph Nodes | 0.00 | 0.51 | 0.01 | 5.42 | 10.6 |
| Axillary Lymph Nodes | 0.00 | 0.37 | 0.01 | 5.54 | 14.8 |
| Inguinal Lymph Nodes | 0.00 | 0.28 | 0.00 | 4.12 | 15.0 |
| Mesenteric Lymph Nodes | 0.00 | 1.20 | 0.04 | 6.88 | 5.7 |
| Thyroid Gland | 0.00 | 0.30 | 0.00 | 4.78 | 15.8 |
| Pituitary Gland | 0.00 | 0.23 | 0.00 | 1.80 | 7.8 |
| Salivary Gland (L + R) | 0.00 | 0.45 | 0.03 | 5.54 | 12.3 |
| Adrenal Gland | 0.00 | 1.90 | 0.00 | 3.47 | 1.8 |
| Spleen | 0.00 | 0.63 | 0.17 | 8.13 | 12.8 |
| Pancreas | 0.00 | 0.57 | 0.01 | 3.51 | 6.2 |
| Prostate | 0.00 | 0.23 | 0.00 | 2.14 | 9.1 |
| Testes (L + R) | 0.02 | 1.95 | 0.02 | 2.01 | 1.0 |
| Skeletal Muscle | 0.00 | 0.11 | 0.01 | 1.12 | 10.1 |
| Heart | 0.03 | 0.46 | 0.15 | 1.97 | 4.3 |
| Femoral Bone | 0.00 | 0.08 | 0.00 | 0.28 | 3.5 |
| Bone Marrow | 0.00 | 0.20 | 0.00 | 2.05 | 10.2 |
| Skin | 0.00 | 0.13 | 0.00 | 0.95 | 7.2 |
| Abdominal fat | 0.00 | 0.16 | 0.00 | 0.90 | 5.8 |
| Eye (L + R) | 0.00 | 0.06 | 0.00 | 0.23 | 3.7 |
| Brain | 0.00 | <LOD | 0.00 | <LOD | n.d. |
| Cerebrospinal Fluid | 0.00 | <LOD | 0.00 | 0.00 | n.d. |
| Spinal Cord | 0.00 | <LOD | 0.00 | 0.04 | n.d. |
| Stomach | 0.11 | 1.92 | 0.26 | 2.68 | 1.4 |
| Jejunum | 1.34 | 3.01 | 0.79 | 4.16 | 1.4 |
| Duodenum | 0.49 | 4.96 | 0.44 | 8.77 | 1.8 |
| Ileum | 0.01 | 0.50 | 0.16 | 4.61 | 9.2 |
| Large Intestine | 1.63 | 5.97 | 2.65 | 47.20 | 7.9 |
| Gall bladder | 0.00 | 3.58 | 0.04 | 25.02 | 7.0 |
| Bile | 0.00 | 9.63 | 0.22 | 40.48 | 4.2 |
| Feces | 40.96 | n.d. | 0.19 | n.d. | n.a. |
| Total GI Tract Contents | 5.61 | n.d. | 21.64 | n.d. | n.a. |
| Urine | 23.72 | n.d. | 14.73 | n.d. | n.a. |
| Plasma at 24 h | 0.00 | 0.20 | 0.00 | 0.20 | 1.0 |
| Plasma at 0.25 h | n.a. | 3.68 | n.a. | 3.48 | 0.9 |
| PBMC* | 0.00 | 0.00 | 0.00 | 63.20 | n.d. |
| Whole Blood | 0.00 | 0.85 | 0.16 | 0.20 | 0.2 |
| Total Recovery | 81.10 | | 68.96 | | |

Calculated using typical recovery of $15 \times 10^6$ cells total, and mean PBMC volume of 0.2 picoliters/cell

n.s. = no sample,

n.a. = not applicable,

n.d. = not determined.

US_THAK_000220

US 2005/0009043 A1

22

Jan. 13, 2005

**1** A diastereomerically enriched compound having the structure (3)

which is substantially free of the diastereomer (4)

(4)

wherein

$R^1$ is an oxyester which is hydrolyzable in vivo, or hydroxyl;

B is a heterocyclic base;

$R^2$ is hydroxyl, or the residue of an amino acid bonded to the P atom through an amino group of the amino acid and having each carboxy substituent of the amino acid optionally esterified, but not both of $R^1$ and $R^2$ are hydroxyl;

E is    —$(CH_2)_2$—,    —$CH(CH_3)CH_2$—,
—$CH(CH_2F)CH_2$—,    —$CH(CH_2OH)CH_2$—,
—$CH(CH=CH_2)CH_2$—,    —$CH(C≡CH)CH_2$—,
—$CH(CH_2N_3)CH_2$—,

—$CH(R^6)OCH(R^6)$—,    —$CH(R^9)CH_2O$—    or
—$CH(R^8)O$—, wherein the right hand bond is linked to the heterocyclic base;

the broken line represents an optional double bond;

$R^4$ and $R^5$ are independently hydrogen, hydroxy, halo, amino or a substituent having 1-5 carbon atoms selected from acyloxy, alkyoxy, alkylthio, alkylamino and dialkylamino;

$R^6$ and $R^{6'}$ are independently H, $C_1$-$C_6$ alkyl, $C_1$-$C_6$ hydroxyalkyl, or $C_2$-$C_7$ alkanoyl;

$R^7$ is independently H, $C_1$-$C_6$ alkyl, or are taken together to form —O— or —$CH_2$—;

$R^8$ is H, $C_1$-$C_6$ alkyl, $C_1$-$C_6$ hydroxyalkyl or $C_1$-$C_6$ haloalkyl; and

$R^9$ is H, hydroxymethyl or acyloxymethyl;

and their salts, free base, and solvates.

**2** A diastereomerically enriched compound having the structure (5a)

(5a)

which is substantially free of diastereomer (5b)

(5b)

wherein

$R^5$ is methyl or hydrogen;

$R^6$ independently is H, alkyl, alkenyl, alkynyl, aryl or arylalkyl, or $R^6$ independently is alkyl, alkenyl, alkynyl, aryl or arylalkyl which is substituted with from 1 to 3 substituents selected from alkylamino, alkylaminoalkyl, dialkylaminoalkyl, dialkylamino, hydroxyl, oxo, halo, amino, alkylthio, alkoxy, alkoxyalkyl, aryloxy, aryloxyalkyl, arylalkoxy, arylalkoxyalkyl, haloalkyl, nitro, nitroalkyl, azido, azidoalkyl, arylacyl, alkylacylalkyl, carboxyl, or alkylacylamino;

$R^7$ is the side chain of any naturally-occurring or pharmaceutically acceptable amino acid and which, if the side chain comprises carboxyl, the carboxyl group is optionally esterified with an alkyl or aryl group;

$R^{11}$ is amino, alkylamino, oxo, or dialkylamino; and

$R^{12}$ is amino or H;

and its salts, tautomers, free base and solvates.

US_THAK_000221

US 2005/0009043 A1

Jan. 13, 2005

23

**3** A diastereomerically enriched compound of structure (6)

(6)

and its salts, tautomers, free base and solvates

**4** A diastereomerically enriched compound of structure (7)

(7)

which is substantially free of diastereomer (7a)

(7a)

**5** A composition comprising a compound of any of claims **1-4** and a pharmaceutically effective excipient.

**6** The composition of claim 5 wherein the excipient is a gel.

**7** The composition of claim 5 which is suitable for topical administration.

**8** A method for antiviral therapy or prophylaxis comprising administering a compound of any of claims **1-4** in a therapeutically or prophylactically effective amount to a subject in need of such therapy or prophylaxis.

\* \* \* \* \*

US_THAK_000222

# Exhibit Q

| | |
|---|---|
| **From:** | Prestia, Laura (NIH/OD) [F] |
| **To:** | Jay.Parrish@gilead.com |
| **Cc:** | Kirby, Tara (NIH/NIAID) [E] |
| **Subject:** | RE: Centers for Disease Control NIH Office of Tech Transfer - HIV Technology Licensing Inquiry |
| **Date:** | Thursday, October 23, 2014 11:39:10 AM |

Good morning Dr. Parrish,

In light of your recent and ongoing interest in and success with Truvada, your company appears to be an ideal partner for a technology developed by Dr. Walid Heneine at the Centers for Disease Control and Prevention (CDC).

Dr. Heneine's group has shown that daily pre-exposure prophylaxis (PrEP) with emtricitabine in combination with tenofovir disoproxil fumarate (Truvada) significantly increases the level of protection against HIV transmission. This finding was discovered following repeated virus challenges with macaque monkeys. The CDC is pursuing U.S. and foreign patent protection for this technology.

An abstract with more information can be found in the Federal Register. Also, Dr. Heneine has co-authored publications in PLoS Medicine and Science Translational Medicine, describing the above discovery.

Please contact me if I can be of further assistance.

Best regards,

**Laura T. Prestia, Ph.D.**
*Technology Transfer Fellow-CDC Unit*
Office of Technology Transfer
National Institutes of Health
6011 Executive Boulevard, #325
Rockville, MD 20850-3804

Office: 301-594-3283
Email: Laura.prestia@nih.gov
OTT website: http://www.ott.nih.gov

NOTE: This email or its attachments may contain confidential information. It is intended only for the addressee(s) identified above. If you are not the addressee(s), or an employee or agent of the addressee(s), please note that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this email in error, please destroy the document and notify the sender.

EXHIBIT _23_
WIT: _Dr. Kirby_
DATE: _12-15-21_
JANET A. HAMILTON, RDR

# Exhibit R

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## National Institutes of Health

## Government-Owned Inventions; Availability for Licensing

**AGENCY:** National Institutes of Health, HHS.

**ACTION:** Notice.

**SUMMARY:** The inventions listed below are owned by an agency of the U.S. Government and are available for licensing in the U.S. in accordance with 35 U.S.C. 209 and 37 CFR Part 404 to achieve expeditious commercialization of results of federally-funded research and development. Foreign patent applications are filed on selected inventions to extend market coverage for companies and may also be available for licensing.

**FOR FURTHER INFORMATION CONTACT:** Licensing information and copies of the U.S. patent applications listed below may be obtained by writing to the indicated licensing contact at the Office of Technology Transfer, National Institutes of Health, 6011 Executive Boulevard, Suite 325, Rockville, Maryland 20852–3804; telephone: 301–496–7057; fax: 301–402–0220. A signed Confidential Disclosure Agreement will be required to receive copies of the patent applications.

**SUPPLEMENTARY INFORMATION:** Technology descriptions follow.

## Device and System for Enhancing Cardiopulmonary Resuscitation

*Description of Technology:* The invention pertains to devices and systems for externally compressing or collapsing peripheral vasculature during Cardiopulmonary Resuscitation (CPR) to redirect blood to the torso and head regions, thereby enhancing the likelihood of CPR success. The system includes a plurality of sleeves adapted for placement on a patient's limbs during CPR, each sleeve including at least one inflatable fluid chamber and at least one inflation source fluidly coupled to each of the inflatable fluid chambers of the sleeves. The sleeve chambers can be inflated to a desired compression pressure and maintained at the desired compression pressure continuously throughout CPR to prevent or restrict blood flow in the limbs. The desired compression pressure can be sufficient to redirect substantial blood volume from the patient's limbs to the patient's torso and head regions during CPR.

*Potential Commercial Applications:*
• Cardiopulmonary resuscitation.

• Peripheral blood occlusion.
*Competitive Advantages:* Improves CPR outcomes—
• Can be used with or independent of automated CPR devices and pharamacotherapies.
• Can be utilized in a public setting by a lay person.
• Extent and duration of vascular occlusion can be specifically prescribed.
• May be used to alter preload.
• May increase pulse wave velocity and/or wave reflection magnitude resulting in increased pulse and/or perfusion pressures.
*Development Stage:*
• Early-stage
• Prototype
*Inventor:* Matthew T. Oberdier (NIA).
*Intellectual Property:* HHS Reference No. E–224–2014/0—US Provisional Application No. 62/042,588 filed 27 Aug 2014.
*Licensing Contact:* Michael Shmilovich, Esq., CLP; 301–435–5019; *shmilovm@mail.nih.gov.*
*Collaborative Research Opportunity:* The National Institute on Aging is seeking statements of capability or interest from parties interested in collaborative research to further develop, evaluate or commercialize this technology. For collaboration opportunities, please contact Vio Conley, M.S. at *conleyv@ctep.nci.nih.gov* or 240–276–5531.

## A Current Amplifier for Local Coil Pre-amplification of NMR/MRI Signals

*Description of Technology:* The magnetic resonance imaging (MRI) systems are used for a variety of imaging application. The present invention discloses an improving MRI device and method by amplifying signals received by resonant NMR coils of MRI systems. It utilizes positive feedback from low-noise Field-Effect Transistor to amplify the signal current that can be coupled out to receiving loops positioned externally without loss in sensitivity. Therefore, the NMR coil can be flexibly positioned near internal tissues and used to develop high-resolution images in highly invasive situations. The disclosed device can be developed in kit form as integrated modules that are designed to be added to tuned NMR receiver coils and tailored to deliver specific gains at NMR frequencies.
*Potential Commercial Applications:*
• Medical and scientific research.
• Device for diagnostic.
*Competitive Advantages:*
• Sensitivity.
• Easy to be integrated into the existed device.
*Development Stage:*
• In vitro data available.

• In vivo data available (animal).
*Inventors:* Joseph A. Murphy-Boesch, Stephen J. Dodd, Alan P. Koretsky, Chunqi Qian (all of NINDS).
*Publications:*
1. Qian C, et al. Wireless amplified nuclear MR detector (WAND) for high-spatial-resolution MR imaging of internal organs: preclinical demonstration in a rodent model. Radiology. 2013 Jul;268(1):228–36. [PMID 23392428]
2. Qian C, et al. Sensitivity enhancement of remotely coupled NMR detectors using wirelessly powered parametric amplification. Magn Reson Med. 2012 Sep;68(3):989–96. [PMID 22246567]
3. Mueller OM, et al. Preamplifier circuit for magnetic resonance system. US Patent 5,545,999 (1996).
4. Ratzel D. Low-noise preamplifier, in particular, for nuclear magnetic resonance (NMR). US Patent 7,123,090 (2006).
*Intellectual Property:* HHS Reference No. E–122–2014/0—US Patent Application No. 61/989,795 filed 07 May 2014.
*Licensing Contact:* John Stansberry, Ph.D.; 301–435–5236; *stansbej@mail.nih.gov.*
*Collaborative Research Opportunity:* The National Institute of Neurological Disorders and Stroke, Laboratory for Functional and Molecular Imaging, is seeking statements of capability or interest from parties interested in collaborative research to further develop, evaluate or commercialize a surgically implantable NMR detector, battery powered, for imaging of the pituitary. For collaboration opportunities, please contact Joseph Murphy-Boesch at *murphyboeschj@mail.nih.gov.*

## Inhibition of HIV Infection Through Chemoprophylaxis Using Emtricitabine and Tenofovir

*Description of Technology:* The invention is directed to prophylactic administration of emtricitabine (FTC) in combination with tenofovir or its prodrug, tenofovir disoproxil fumarate (TDF), to protect against transmission of human immunodeficiency virus (HIV) infection. Also disclosed are other nucleoside reverse transcriptase inhibitors (NRTIs) and nucleotide reverse transcriptase inhibitors (NtRTIs) that, when administered in combination, protect against HIV infection. CDC researchers demonstrated that daily pre-exposure prophylaxis (PrEP) with a combination of antiretroviral NRTI and NtTRI drugs, including FTC and TDF, significantly

increases the level of protection against HIV transmission.

*Potential Commercial Applications:* Oral, prophylactic delivery of combination drugs to inhibit HIV infection.

*Development Stage:*
• In vivo data available (animal).
• In vivo data available (human).

*Inventors:* Walid Heneine, Thomas Folks, Robert Janssen, Ronald Otten, J. Gerardo Garcia-Lerma (all of CDC).

*Publications:*

1. Garcia-Lerma J, et al. Prevention of rectal SHIV transmission in macaques by daily or intermittent prophylaxis with emtricitabine and tenofovir. PLoS Med. 2008 Feb;5(2):e28. [PMID 18254653]

2. Garcia-Lerma J, et al. Intermittent prophylaxis with oral truvada protects macaques from rectal SHIV infection. Sci Transl Med. 2010 Jan 13;2(14):14ra4. [PMID 20371467]

*Intellectual Property:* HHS Reference No. E–195–2013/0—
• US Provisional Application No. 60/764,811 filed 3 Feb 2006.
• US Patent Application No. 11/669,547 filed 31 Jan 2007.
• PCT Application No. PCT/US2007/002926 filed 01 Feb 2007.
• European Patent No. 2015753 issued 01 May 2013.
• German Patent No. 2015753 issued 01 May 2013.
• French Patent No. 2015753 issued 01 May 2013.
• U.K. Patent No. 2015753 issued 01 May 2013.
• Australian Patent No. 2007212583 issued 25 Mar 2013.
• Canadian Patent Application No. 2641388 filed 01 Aug 2008.
• Indian Patent Application No. 7408/DELNP/2008 filed 01 Jul 2008.

*Licensing Contact:* Tara L. Kirby, Ph.D.; 301–435–4426; *tarak@mail.nih.gov.*

**Synthetic Peptides With Antimicrobial Activity**

*Description of Technology:* This technology relates to a class of synthetic peptides with antimicrobial activity. The lead candidate identified among this class is EC5. The EC5 peptide has shown efficient binding and selective bactericidal activity against *E. coli* and *P. aeruginosa,* while having little activity against *S. aureus, S. epidermidis, B. cereus,* and *K. pneumonia.* EC5 shows inhibitory activity at low concentrations (MIC 8 µg/ml for *E. coli* and 8–32 µg/ml for *P. aeruginosa*) and appears to bind to, disrupt, and permeabilize the bacterial cell membranes in a manner similar to Polymyxin B. EC5 also appears to retain

its bactericidal activity in the presence of platelets and plasma, while exhibiting little cytotoxic activity or hemolytic activity against red blood cells, in vitro. EC5's profile of activity and low toxicity suggest it may be a favorable candidate for drug development, as an independent or combination therapy and for specific bacterial detection/diagnostics. With the increasing prevalence of drug resistant bacterial infections, there is a need to develop novel antimicrobial agents that are specific, safe, and effective.

*Potential Commercial Applications:* Antimicrobial therapy.

*Competitive Advantages:*
• Significant and specific bactericidal activity.
• Promising in vitro safety profile.

*Development Stage:*
• Early-state.
• In vitro data available.

*Inventors:* Chintamani Atreya (FDA), Ketha Mohan (FDA), Shilpakala Sainath Rao (ORISE Contract Fellow).

*Publication:* Sainath Rao S, *et al.* A peptide derived from phage display library exhibits antibacterial activity against E. coli and Pseudomonas aeruginosa. PLoS ONE 8(2): e56081. [PMID 23409125]

*Intellectual Property:* HHS Reference No. E–226–2012/0—PCT Application PCT/US2012/050969 filed 15 Aug 2012.

*Licensing Contact:* Edward (Tedd) Fenn; 424–297–0336; *Tedd.fenn@nih.gov.*

*Collaborative Research Opportunity:* The Food and Drug Administration, Center for Biologics Evaluation and Research, is seeking statements of capability or interest from parties interested in collaborative research to further develop, evaluate or commercialize drug development, as an independent or combination therapy and for bacterial diagnostics. For collaboration opportunities, please contact Nisha Narayan at 240–402–9770.

Dated: September 27, 2014.

**Richard U. Rodriguez,**
*Director, Division of Technology Development and Transfer, Office of Technology Transfer, National Institutes of Health.*

[FR Doc. 2014–23345 Filed 9–30–14; 8:45 am]

**BILLING CODE 4140–01–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**National Institutes of Health**

**Center for Scientific Review; Notice of Closed Meetings**

Pursuant to section 10(d) of the Federal Advisory Committee Act, as

amended (5 U.S.C. App.), notice is hereby given of the following meetings.

The meetings will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Brain Disorders and Clinical Neuroscience Integrated Review Group; Diseases and Pathophysiology of the Visual System Study Section.

*Date:* October 23–24, 2014.

*Time:* 8:00 a.m. to 5:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Embassy Suites Hotel Convention Center, 900 10st NW., Washington, DC 20015.

*Contact Person:* Nataliya Gordiyenko, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 5202, MSC 7846, Bethesda, MD 20892, 301.435.1265, *gordiyenkon@csr.nih.gov.*

*Name of Committee:* Oncology 2— Translational Clinical Integrated Review Group; Radiation Therapeutics and Biology Study Section.

*Date:* October 23–24, 2014.

*Time:* 8:00 a.m. to 5:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* The Allerton Hotel, 701 North Michigan Avenue, Chicago, IL 60611.

*Contact Person:* Bo Hong, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 6194, MSC 7804, Bethesda, MD 20892, 301–996–6208, *hongb@csr.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; Member Conflicts: Language and Communication.

*Date:* October 24, 2014.

*Time:* 2:30 p.m. to 4:30 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892, (Virtual Meeting).

*Contact Person:* Dana Jeffrey Plude, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 3176, MSC 7848, Bethesda, MD 20892, 301–435–2309, *pluded@csr.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; Synthetic and Biological Chemistry.

*Date:* October 27, 2014.

*Time:* 2:00 p.m. to 3:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* JW Marriott Hotel New Orleans, 614 Canal St., New Orleans, LA 70130.

*Contact Person:* William A Greenberg, Ph.D., Scientific Review Officer, Center for

# Exhibit S

| | |
|---|---|
| **From:** | Prestia, Laura (NIH/OD) [F] |
| **To:** | Linda.Higgins@gilead.com |
| **Cc:** | Kirby, Tara (NIH/NIAID) [E] |
| **Subject:** | RE: Centers for Disease Control NIH Office of Tech Transfer - HIV Technology Licensing Inquiry |
| **Date:** | Thursday, October 23, 2014 11:41:51 AM |

Good morning Dr. Higgins,

In light of your recent and ongoing interest in and success with Truvada, your company appears to be an ideal partner for a technology developed by Dr. Walid Heneine at the Centers for Disease Control and Prevention (CDC).

Dr. Heneine's group has shown that daily pre-exposure prophylaxis (PrEP) with emtricitabine in combination with tenofovir disoproxil fumarate (Truvada) significantly increases the level of protection against HIV transmission. This finding was discovered following repeated virus challenges with macaque monkeys. The CDC is pursuing U.S. and foreign patent protection for this technology.

An abstract with more information can be found in the Federal Register. Also, Dr. Heneine has co-authored publications in PLoS Medicine and Science Translational Medicine, describing the above discovery.

Please contact me if I can be of further assistance.

Best regards,

**Laura T. Prestia, Ph.D.**
*Technology Transfer Fellow-CDC Unit*
Office of Technology Transfer
National Institutes of Health
6011 Executive Boulevard, #325
Rockville, MD 20850-3804

Office: 301-594-3283
Email: Laura.prestia@nih.gov
OTT website: http://www.ott.nih.gov

NOTE: This email or its attachments may contain confidential information. It is intended only for the addressee(s) identified above. If you are not the addressee(s), or an employee or agent of the addressee(s), please note that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this email in error, please destroy the document and notify the sender.

EXHIBIT *22*
WIT: *Dr. Kirby*
DATE: *12-15-21*
JANET A. HAMILTON, RDR

US_02514549

# Exhibit T

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF DELAWARE

 3    --------------------------x

 4    THE UNITED STATES OF        :

 5    AMERICA,                    :

 6           Plaintiff,           :   Civil Action No.

 7       vs.                      :   1:19-cv-02103-MN

 8    GILEAD SCIENCES, INC.       :

 9    AND GILEAD SCIENCES         :

10    IRELAND UC,                 :

11           Defendants.          :

12    --------------------------x

13

14     Videotaped Deposition of SUMITA C. GHOSH, Ph.D.

15              Tuesday, October 26, 2021

16                   9:06 a.m.

17

18          Location: Sidley Austin LLP

19         1000 Louisiana Street, 60th Floor

20                  Houston, Texas

21

22    Stenographic Reporter:

23    DENYCE M. SANDERS, TX CSR, RDR, CRR, CCR (LA)

24    Pages: 1 - 133

25    Job No.: 404479
```

Transcript of Sumita C. Ghosh, Ph.D.
Conducted on October 26, 2021                    2

```
 1                A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFF:

 4    UNITED STATES DEPARTMENT OF JUSTICE
         BY:  Mr. Walter Brown
 5              walter.brown@usdoj.gov
      Washington, D.C.  20005
 6    202.616.8116

 7   ***

 8   ON BEHALF OF DEFENDANTS:

 9    WILMER CUTLER PICKERING HALE AND DORR, LLP
         BY:  Mr. Kevin Yurkerwich, Ph.D.
10              kevin.yurkerwich@wilmerhale.com
              Ms. Renna Ayyash
11    60 State Street
      Boston, Massachusetts  02109
12    617.526.6000

13   ***

14

15   VIDEOGRAPHER:

16        Sam Swain

17   ALSO PRESENT:

18        Andrew Morrell, PhD
          Andy J. Miller
19
     REPRESENTED TO BE TELEPHONICALLY PRESENT:
20
          Emily Whelan
21        Tim Cook
          Janis Gee
22

23

24

25
```

Transcript of Sumita C. Ghosh, Ph.D.
Conducted on October 26, 2021                    12

| | | |
|---|---|---|
| 1 | Q.    What is an "EIR"? | 09:15:12 |
| 2 | A.    I forgot what the "E" stands for; but | 09:15:17 |
| 3 | "invention report."  Yeah. | 09:15:21 |
| 4 | Q.    Had you reviewed EIR reports before | 09:15:23 |
| 5 | working on this provisional application? | 09:15:29 |
| 6 | A.    Yes, many of them, because I'd been at | 09:15:30 |
| 7 | the CDC for a year before we received this | 09:15:32 |
| 8 | particular report. | 09:15:35 |
| 9 | Q.    And during your time at the CDC, did you | 09:15:37 |
| 10 | file both provisional and nonprovisional | 09:15:42 |
| 11 | applications? | 09:15:44 |
| 12 | A.    Never nonprovisionals, only | 09:15:44 |
| 13 | provisionals. | 09:15:49 |
| 14 | Q.    And why did you only file provisional | 09:15:49 |
| 15 | applications and not nonprovisional applications? | 09:15:53 |
| 16 | A.    Because it was -- because it was -- it | 09:15:55 |
| 17 | was -- we are resource-limited -- we were | 09:16:03 |
| 18 | resource-limited, and so the only reason we would | 09:16:05 |
| 19 | file a provisional is because there was an | 09:16:08 |
| 20 | emergency. | 09:16:11 |
| 21 | So we would literally call it the | 09:16:12 |
| 22 | "emergency cover sheet provisional."  That was the | 09:16:14 |
| 23 | name for it.  And it was literally a cover sheet | 09:16:16 |
| 24 | over documents that the inventors provided, because | 09:16:20 |
| 25 | inevitably we would have, "Oh, by the way, I'm | 09:16:27 |

Transcript of Sumita C. Ghosh, Ph.D.
Conducted on October 26, 2021                                    13

| | | |
|---|---|---|
| 1 | speaking in three days" or "tomorrow." "Can you | 09:16:29 |
| 2 | file a -- do I need to worry about it?"  They very | 09:16:33 |
| 3 | well knew they needed to worry about it.  So we | 09:16:37 |
| 4 | would, you know, rush around and try to get | 09:16:41 |
| 5 | something filed. | 09:16:42 |
| 6 | But I didn't mean it was a poorly | 09:16:43 |
| 7 | done -- I was hired as a patent attorney, and so we | 09:16:46 |
| 8 | were -- we were -- that was one of the expectations, | 09:16:51 |
| 9 | that this would happen, and I would help them. | 09:16:53 |
| 10 | Q.     And before asking a couple questions | 09:16:55 |
| 11 | following up on your answer, I wanted to confirm, | 09:17:04 |
| 12 | about how many provisional applications did you file | 09:17:07 |
| 13 | during your time at CDC? | 09:17:10 |
| 14 | A.     Not very many.  Maybe 10 or 15. | 09:17:14 |
| 15 | Q.     How many had you filed before filing the | 09:17:20 |
| 16 | provisional application related to PrEP? | 09:17:23 |
| 17 | A.     At the CDC?  Maybe three or four. | 09:17:27 |
| 18 | Q.     You mentioned a moment ago that | 09:17:30 |
| 19 | provisional applications were filed by you at CDC in | 09:17:39 |
| 20 | the case of an emergency or under a time deadline; | 09:17:44 |
| 21 | is that right? | 09:17:46 |
| 22 | A.     Yes. | 09:17:49 |
| 23 | Q.     What was the emergency or time deadline | 09:17:49 |
| 24 | that necessitated the provisional application filing | 09:17:52 |
| 25 | for the PrEP provisional application? | 09:17:56 |

Transcript of Sumita C. Ghosh, Ph.D.
Conducted on October 26, 2021                    14

| | | |
|---|---|---|
| 1 | MR. BROWN:  I'll object to the | 09:17:58 |
| 2 | extent the answer calls for | 09:18:01 |
| 3 | attorney-client privileged communications. | 09:18:02 |
| 4 | If that's the case, I instruct the witness | 09:18:04 |
| 5 | not to answer. | 09:18:06 |
| 6 | THE WITNESS:  Yes. | 09:18:08 |
| 7 | Q.    (BY MR. YURKERWICH)  Can you answer that | 09:18:11 |
| 8 | question without disclosing privileged information? | 09:18:12 |
| 9 | A.    I think so.  Basically, there was a | 09:18:17 |
| 10 | public meeting, and they were going to present at | 09:18:20 |
| 11 | the public meeting. | 09:18:23 |
| 12 | Q.    What was the -- | 09:18:24 |
| 13 | THE WITNESS:  I think the public | 09:18:26 |
| 14 | meeting was public.  So... | 09:18:27 |
| 15 | Q.    (BY MR. YURKERWICH)  What was the public | 09:18:28 |
| 16 | meeting? | 09:18:29 |
| 17 | A.    I don't remember. | 09:18:29 |
| 18 | Q.    Was it a public meeting in the United | 09:18:30 |
| 19 | States? | 09:18:33 |
| 20 | A.    I believe so. | 09:18:33 |
| 21 | Q.    Was it a public meeting that was hosted | 09:18:35 |
| 22 | by the government? | 09:18:40 |
| 23 | A.    I don't recall. | 09:18:42 |
| 24 | Q.    Was it a public meeting relating to HIV | 09:18:43 |
| 25 | or AIDS? | 09:18:46 |

| | | |
|---|---|---|
| 1 | "patent adviser," but I very much wanted to work for | 09:27:03 |
| 2 | the federal government; and this was a dream | 09:27:06 |
| 3 | opportunity at a critical time; and I was hired, | 09:27:11 |
| 4 | again, because I was an attorney who had recently | 09:27:17 |
| 5 | practiced, and I had the PhD and the bench research, | 09:27:21 |
| 6 | so they felt like I could open doors in the research | 09:27:25 |
| 7 | laboratory with the inventors. | 09:27:29 |
| 8 | Q.    What does it mean that you were a | 09:27:32 |
| 9 | "patent adviser"?  What did that work entail? | 09:27:43 |
| 10 | A.    Both looking at the entire portfolio, | 09:27:46 |
| 11 | but also being out there, talking to the -- the | 09:27:51 |
| 12 | inventors and stressing to them the importance of | 09:27:57 |
| 13 | filing disclosures and also helping with portfolio | 09:28:00 |
| 14 | management. | 09:28:07 |
| 15 | I -- the previous patent adviser was | 09:28:08 |
| 16 | the one who had first filed a provisional -- that | 09:28:11 |
| 17 | was for SARS -- an emergency cover sheet | 09:28:14 |
| 18 | provisional.  And so they wanted someone who had | 09:28:16 |
| 19 | recently done filings to continue that effort and | 09:28:19 |
| 20 | sort of organize it.  So I created, like, the | 09:28:26 |
| 21 | customer number and -- and set up the deposit | 09:28:32 |
| 22 | account and things to do the mechanics of filing | 09:28:35 |
| 23 | emergency cover sheet provisionals, but also | 09:28:40 |
| 24 | creating an awareness of the importance of patenting | 09:28:43 |
| 25 | within the scientific community, because the other | 09:28:48 |

Transcript of Sumita C. Ghosh, Ph.D.
Conducted on October 26, 2021                           24

| | | |
|---|---|---|
| 1 | three patent attorneys in the office had -- had not | 09:28:52 |
| 2 | done bench research.  So... | 09:28:55 |
| 3 | Q.    Did you report to anyone during that | 09:28:57 |
| 4 | time? | 09:29:04 |
| 5 | A.    Yes. | 09:29:04 |
| 6 | Q.    Who did you report to? | 09:29:04 |
| 7 | A.    Andrew Watkins, the director of the | 09:29:05 |
| 8 | technology transfer office. | 09:29:09 |
| 9 | Q.    Did anyone report to you? | 09:29:10 |
| 10 | A.    Partially.  We had a paralegal; and then | 09:29:13 |
| 11 | there was a administrative staff; and there was a | 09:29:16 |
| 12 | accounting person too. | 09:29:23 |
| 13 | Q.    Who was the paralegal? | 09:29:24 |
| 14 | A.    I think it was -- Cindy Robertson. | 09:29:25 |
| 15 | Cindy Robertson. | 09:29:28 |
| 16 | Q.    You mentioned a moment ago that there | 09:29:29 |
| 17 | was another patent prosecutor at CDC focused in the | 09:29:35 |
| 18 | life sciences; is that right? | 09:29:38 |
| 19 | A.    No. | 09:29:39 |
| 20 | Q.    Maybe I misheard.  Who was the other | 09:29:40 |
| 21 | patent prosecutor in that same space? | 09:29:43 |
| 22 | A.    Russ Metler. | 09:29:44 |
| 23 | Q.    How do you spell Russ's last name? | 09:29:47 |
| 24 | A.    M-E-T-L-E-R. | 09:29:50 |
| 25 | Q.    And what area did Russ focus on? | 09:29:53 |

Transcript of Sumita C. Ghosh, Ph.D.
Conducted on October 26, 2021                    133

```
1                    REPORTER CERTIFICATION

2    THE STATE OF TEXAS :
     COUNTY  OF  HARRIS :
3            I, DENYCE SANDERS, a Certified Shorthand
     Reporter and Notary Public in and for the State of
4    Texas, do hereby certify that the facts as stated by
     me in the caption hereto are true; that the above and
5    foregoing answers of the witness, SUMITA C. GHOSH,
     Ph.D., to the interrogatories as indicated were made
6    before me by the said witness after being first duly
     sworn to testify the truth, and same were reduced to
7    typewriting under my direction; that the above and
     foregoing deposition as set forth in typewriting is a
8    full, true, and correct transcript of the proceedings
     had at the time of taking of said deposition.
9            I further certify that I am not, in any
     capacity, a regular employee of the party in whose
10   behalf this deposition is taken, nor in the regular
     employ of this attorney; and I certify that I am not
11   interested in the cause, nor of kin or counsel to
     either of the parties.
12
             That the amount of time used by each party at
13   the deposition is as follows:

14
             MR. YURKERWICH - 02:45:17
15

16           GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
     this, the 2nd day of November, 2021.
17

18

19   _____
             Denyce Sanders
20           DENYCE SANDERS, CSR, RDR, CRR, TCRR

21           Notary Public in and for

22           Harris County, T E X A S

23   My Commission Expires:  4-14-25

24   Certification No.:  4038

25   Expiration Date:  04-30-22
```

# Exhibit U

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3      -----------------------------x

4      UNITED STATES OF AMERICA,        :

5           Plaintiff and              :

6           Counterclaim Defendant,    :

7           v.                         :   CA No.

8      GILEAD SCIENCES, INC. and       :   1:19-cv-02103-MN

9      GILEAD SCIENCES IRELAND UC,     :

10          Defendants and            :

11          Counterclaim Plaintiffs.   :

12     -----------------------------x

13            CONFIDENTIAL - RESTRICTED INFORMATION

14              SUBJECT TO PROTECTIVE ORDER

15

16              Videotaped Deposition of

17              DHIREN R. THAKKER, PH.D.

18              Friday, August 26, 2022

19                   9:17 a.m.

20           Taken by the Defendant
                at JB Duke Hotel
21              230 Science Drive
             Durham, North Carolina 27708

22

23     Jo No.: 460205

24     Pages: 1 - 356

25     Reported by: Sophie Brock, RPR, RMR, RDR, CRR
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Dhiren Thakker, Ph.D.
August 26, 2022                                    2

```
1                    A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFF-COUNTERCLAIM DEFENDANT,

3            U.S. DEPARTMENT OF JUSTICE
             1100 L Street, NW
4            Washington, D.C. 20530
             Telephone: (202) 532-5026
5            By:   AMANDA KELLY, ESQ.
                   amanda.k.kelly@usdoj.gov
6                  PATRICK C. HOLVEY, ESQ.
                   patrick.c.holvey@usdoj.gov
7

8

9    ON BEHALF OF THE DEFENDANT-COUNTERCLAIM PLAINTIFF:

10           WILMER CUTLER PICKERING HALE and DORR LLP
             60 State Street
11           Boston, Massachusetts 02109
             Telephone: (617) 526-6005
12           By:   TIMOTHY A. COOK, ESQ.
                   tim.cook@wilmerhale.com
13                 JENNIFER GRABER, ESQ.
                   jennifer.graber@wilmerhale.com
14

15

16   VIDEOGRAPHER:

17           Merinda Evans - Planet Depos

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | correct? | 04:54:04 |
| 2 | A. That's correct. | 04:54:05 |
| 3 | Q. This bullet point is not talking about an | 04:54:05 |
| 4 | enhancement relative to the combination study with | 04:54:07 |
| 5 | tenofovir and FTC; correct? | 04:54:10 |
| 6 | A. That's correct. | 04:54:12 |
| 7 | MS. KELLY: Object to form. Vague and | 04:54:12 |
| 8 | ambiguous. | 04:54:12 |
| 9 | BY MR. COOK: | 04:54:13 |
| 10 | Q. Nothing in this statement suggests that the | 04:54:14 |
| 11 | inventors had actually done studies with Truvada yet; | 04:54:16 |
| 12 | correct? | 04:54:20 |
| 13 | MS. KELLY: Object to form. | 04:54:20 |
| 14 | THE WITNESS: That's correct. | 04:54:22 |
| 15 | BY MR. COOK: | 04:54:22 |
| 16 | Q. Okay. Now, the last slide of the | 04:54:23 |
| 17 | presentation is just an acknowledgment slide; correct? | 04:54:25 |
| 18 | A. That's correct. | 04:54:31 |
| 19 | Q. And it acknowledges Gilead; correct? | 04:54:32 |
| 20 | A. Yes. | 04:54:36 |
| 21 | Q. Now, in your report, I want to go to page 39. | 04:54:37 |
| 22 | In paragraph 90, you wrote (as read): | 04:54:56 |
| 23 | "A POSA would have understood the | 04:54:59 |
| 24 | provisional application's study | 04:55:01 |
| 25 | method, which administered | 04:55:03 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Dhiren Thakker, Ph.D.
August 26, 2022                                304

| | | |
|---|---|---|
| 1 | subcutaneous tenofovir, to predict | 04:55:04 |
| 2 | that administering oral tenofovir | 04:55:07 |
| 3 | prodrugs to humans that improve | 04:55:09 |
| 4 | its oral bioavailability would | 04:55:12 |
| 5 | likely be effective for | 04:55:14 |
| 6 | pre-exposure prophylaxis." | 04:55:15 |
| 7 | Correct? | 04:55:18 |
| 8 | A.   Correct. | 04:55:19 |
| 9 | Q.   Is it your opinion that a person of skill in | 04:55:19 |
| 10 | the art would have understood that if a compound can | 04:55:21 |
| 11 | deliver tenofovir to the bloodstream in the same | 04:55:24 |
| 12 | concentration as the subcutaneous dosing in the | 04:55:28 |
| 13 | provisional, that a person of skill in the art would | 04:55:31 |
| 14 | have expected that compound to be effective for PrEP | 04:55:35 |
| 15 | in combination with FTC? | 04:55:42 |
| 16 | A.   That's what I meant. | 04:55:44 |
| 17 | MS. KELLY:  Object to form.  Vague and | 04:55:45 |
| 18 | ambiguous. | 04:55:45 |
| 19 | BY MR. COOK: | 04:55:45 |
| 20 | Q.   Now, a person of skill in the art would still | 04:55:45 |
| 21 | need to figure out what compound would do that; | 04:55:47 |
| 22 | correct? | 04:55:49 |
| 23 | MS. KELLY:  Object to form.  Vague and | 04:55:50 |
| 24 | ambiguous. | 04:55:50 |
| 25 | THE WITNESS:  Yeah. | 04:55:57 |

| | | |
|---|---|---|
| 1 | BY MR. COOK: | 04:55:57 |
| 2 | Q.  Okay.  There's nothing in the provisional | 04:55:59 |
| 3 | application that tells a person of skill in the art | 04:56:00 |
| 4 | which compounds might be effective tenofovir prodrugs; | 04:56:04 |
| 5 | correct? | 04:56:09 |
| 6 | A.  Well, TDF would be one. | 04:56:09 |
| 7 | Q.  Aside from TDF. | 04:56:13 |
| 8 | A.  That's correct. | 04:56:16 |
| 9 | Q.  Okay. | 04:56:17 |
| 10 | THE WITNESS:  Can we take a -- I need a | 04:56:19 |
| 11 | bathroom break. | 04:56:21 |
| 12 | MR. COOK:  Sure.  That's fine. | 04:56:22 |
| 13 | THE WITNESS:  Thank you. | 04:56:24 |
| 14 | THE VIDEOGRAPHER:  We're going off the | 04:56:25 |
| 15 | record.  The time is 15:56. | 04:56:25 |
| 16 | (Recess taken from 4:56 p.m. to 5:07 p.m.) | 04:56:29 |
| 17 | THE VIDEOGRAPHER:  We are now back on | 05:07:02 |
| 18 | the record for the seventh disk of Mr. Dhiren Thakker. | 05:07:04 |
| 19 | The time on the video monitor is 17:07. | 05:07:11 |
| 20 | You may proceed. | 05:07:14 |
| 21 | BY MR. COOK: | 05:07:15 |
| 22 | Q.  Now, going back to paragraph 90 in your | 05:07:16 |
| 23 | report, you used the phrase "likely be effective for | 05:07:18 |
| 24 | pre-exposure prophylaxis"; correct? | 05:07:24 |
| 25 | A.  Yes. | 05:07:26 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Dhiren Thakker, Ph.D.
August 26, 2022                                    313

| | | |
|---|---|---|
| 1 | MS. KELLY:  Object to form.  Vague and | 05:14:07 |
| 2 | ambiguous.  Outside the scope. | 05:14:10 |
| 3 | THE WITNESS:  Repeat the question, | 05:14:19 |
| 4 | please. | 05:14:20 |
| 5 | BY MR. COOK: | 05:14:21 |
| 6 | Q.  Based on the experiments in the provisional | 05:14:22 |
| 7 | application alone, the inventors were not able to | 05:14:23 |
| 8 | predict that oral TDF and FTC would work in their | 05:14:26 |
| 9 | model for PrEP; correct? | 05:14:30 |
| 10 | MS. KELLY:  Objection -- same | 05:14:32 |
| 11 | objections. | 05:14:32 |
| 12 | THE WITNESS:  They would have | 05:14:36 |
| 13 | anticipated that it would work. | 05:14:36 |
| 14 | BY MR. COOK: | 05:14:38 |
| 15 | Q.  They had to do the experiment; correct? | 05:14:38 |
| 16 | MS. KELLY:  Object to form. | 05:14:40 |
| 17 | THE WITNESS:  Well, you always have to | 05:14:42 |
| 18 | do -- when you anticipate, you always have to do | 05:14:43 |
| 19 | experiment to confirm.  That's common practice. | 05:14:45 |
| 20 | BY MR. COOK: | 05:14:49 |
| 21 | Q.  And it was not an unnecessary experiment; | 05:14:50 |
| 22 | correct? | 05:14:53 |
| 23 | MS. KELLY:  Object to form.  Vague and | 05:14:53 |
| 24 | ambiguous. | 05:14:54 |
| 25 | THE WITNESS:  No, it's not an | 05:14:56 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Dhiren Thakker, Ph.D.
August 26, 2022                          323

| | | |
|---|---|---|
| 1 | BY MR. COOK: | 05:24:56 |
| 2 | Q.  Is it your opinion that a claim is valid | 05:24:57 |
| 3 | simply because the inventors wrote it? | 05:24:59 |
| 4 | MS. KELLY:  Objection to form.  Vague | 05:25:01 |
| 5 | and ambiguous.  Calls for a legal conclusion. | 05:25:02 |
| 6 | THE WITNESS:  The way you asked the | 05:25:11 |
| 7 | question, no. | 05:25:13 |
| 8 | BY MR. COOK: | 05:25:13 |
| 9 | Q.  Okay.  A person of skill in the art in this | 05:25:14 |
| 10 | field would need to see data to understand that the | 05:25:16 |
| 11 | inventors were in possession of the claimed | 05:25:19 |
| 12 | inventions; correct? | 05:25:22 |
| 13 | MS. KELLY:  Objection.  Calls for | 05:25:23 |
| 14 | speculation.  Vague and ambiguous. | 05:25:24 |
| 15 | THE WITNESS:  They will need to see | 05:25:26 |
| 16 | prior art and data. | 05:25:28 |
| 17 | BY MR. COOK: | 05:25:30 |
| 18 | Q.  Okay.  A person of skill in the art reading | 05:25:32 |
| 19 | the claims of the provisional application wouldn't | 05:25:34 |
| 20 | have understood the inventors to be in possession of | 05:25:38 |
| 21 | an invention using the combination of any two drugs | 05:25:41 |
| 22 | that are listed in the FDA printouts; correct? | 05:25:45 |
| 23 | MS. KELLY:  Objection to form.  Vague | 05:25:48 |
| 24 | and ambiguous. | 05:25:50 |
| 25 | THE WITNESS:  Can you repeat that? | 05:25:50 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Dhiren Thakker, Ph.D.
August 26, 2022                                   356

```
 1        CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

 2

 3           I, Sophie Brock, Registered Diplomate Reporter

 4    and Certified Realtime Reporter, the officer before whom

 5    the foregoing deposition was taken, do hereby certify

 6    that the foregoing transcript is a true and correct

 7    record of the testimony given; that said testimony was

 8    taken by me stenographically and thereafter reduced to

 9    typewriting under my direction; that review was not

10    requested; and that I am neither counsel for, related

11    to, nor employed by any of the parties to this case and

12    have no interest, financial or otherwise, in its

13    outcome.

14           IN WITNESS WHEREOF, I have hereunto set my

15    hand and affixed my notarial seal this  31st day of

16    August, 2022.

17

18    _____

19           Sophie Brock, Notary Public

20           Notary Number: 200834000001

21         My commission expires: 12/3/2023

22

23

24

25
```

# Exhibit V

Page 1

1

2  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF DELAWARE
3  -------------------------------------------X
   UNITED STATES OF AMERICA,
4
        Plaintiff and Counterclaim-Defendant,   C.A. No.
5                                               19-02103-MN
             vs.
6
   GILEAD SCIENCES, INC. and
7  GILEAD SCIENCES IRELAND UC,
8
        Defendants and Counterclaim-Plaintiffs.
   -------------------------------------------X
9

10        VIDEOTAPED DEPOSITION OF DECLAN HICKEY

11                   Taken Remotely

12              Friday, January 21, 2022

13

14           ** HIGHLY CONFIDENTIAL **

15

16  AN EXECUTED STIPULATION GOVERNING THIS DEPOSITION

17  IS ATTACHED TO THE PDF VERSIONS OF THIS DEPOSITION

18  TRANSCRIPT ONLY - PLEASE REFER TO THOSE VERSIONS

19  FOR A COPY.

20

21

22

23  Reported by

24  JEFFREY BENZ, CRR, RMR

25  JOB NO. 204813

1

2

3

4

5                          January 21, 2022

6                          9:09 a.m.

7

8

9        Videotaped Deposition of DECLAN HICKEY, taken

10   remotely, before Jeffrey Benz, a Certified

11   Realtime Reporter, Registered Merit Reporter and

12   Notary Public of the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S:

3

4        U.S. DEPARTMENT OF JUSTICE

5        CIVIL DIVISION

6        Attorneys for the United States of America

7            1100 L Street NW

8            Washington, DC 20005

9        BY:   PATRICK HOLVEY, ESQ.

10

11       KNOBBE MARTENS

12       Attorneys for Health and Human Services

13           1717 Pennsylvania Avenue

14           Washington, DC  20006

15       BY:   ANDREW MORRELL, PH.D., ESQ.

16

17       WILMERHALE

18       Attorneys for Gilead Parties

19           60 State Street

20           Boston, MA  02109

21       BY:   BENJAMIN CONERY, ESQ.

22           RENNA AYYASH, ESQ.

23

24

25

1

2   A P P E A R A N C E S: (Ctd.)

3

4   ALSO PRESENT:

5        ANDREW KESSEL, Gilead

6        AOIFE MARRINAN, Gilead

7        RICK RICHEY, Videographer

8        BRIAN HOOD, Document Operator

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        Hickey - Highly Confidential

2        THE VIDEOGRAPHER:  Good morning,

3   ladies and gentlemen.  My name is Rick

4   Richey.  I'm a legal video specialist with

5   TSG Reporting, Inc., headquartered at

6   228 East 45th Street, Suite 810, New York,

7   New York 10017.

8        The court reporter is Jeffrey Benz,

9   and the document operator is Brian Hood,

10  also in association with TSG Reporting,

11  Inc.

12       This will be the start of Media

13  Number 1 in the video-recorded deposition

14  of Declan Hickey, a 30(b)(6) Gilead Science

15  Ireland UC witness.

16       Today's date is January 21, 2022.

17  It's 9:09 a.m. Greenwich Mean Time.

18       The case is the United States of

19  America, plaintiff, and counterclaim

20  defendant, versus Gilead Sciences, Inc.,

21  and Gilead Sciences Ireland UC, defendant

22  and counterclaim plaintiff, CA

23  Number 19-02103-MN, in the United States

24  District Court for the District of

25  Delaware.

```
 1              Hickey - Highly Confidential
 2   shipped bright stock to -- of Descovy to the
 3   United States, and my recollection is that,
 4   like, we didn't produce bulk tablets in Cork.
 5              We weren't validated to do it, so we
 6   got it from another contract manufacturer,
 7   bright stocked it in Cork, and then shipped it
 8   to the United States to the packagers that GSI
 9   asked us to ship it to.
10       Q.   Okay.  So, for Truvada, you would
11   produce the bulk tablets and, at times, produce
12   bright stock.
13              For Descovy, you did not produce bulk
14   tablets, you did produce bright stock Descovy.
15              And aside from the three batches that
16   we talked about for Truvada, which were finished
17   good shipped for the U.S. market, you have not
18   been producing Truvada finished goods for the
19   U.S. market, you being GSIUC, and you have not
20   produced finished goods for Descovy for the U.S.
21   market.
22              Is all that correct?
23       A.   Yes.  100 percent.
24       Q.   You said, Yes, 100 percent?
25       A.   Yes, yes.  You know, just -- you know,
```

1             Hickey - Highly Confidential

2    in terms of the finished goods and -- and how

3    you described the supply network, that would

4    be -- that would be correct.

5             But, definitely, you know, on the

6    finished goods side, we have not supplied any

7    finished good for sale to the U.S. markets since

8    June 2012, and it's only been bulk tablet or

9    bright stock shipped per GSI instruction since

10   then.

11        Q.   And with the Descovy bright stock that

12   you produce, do you send it to the same

13   packaging coordinators, or -- or contract

14   packagers?

15        A.   I'm not -- I'm not 100 percent in

16   terms of -- of where GSI -- you know, in terms

17   of where everyone shipment goes to.

18             I -- I -- it would be -- but it

19   would -- what I would say is that it would be

20   shipped to a GSI site where Descovy is qualified

21   and validated to be packaged at, and that they

22   would determine where we ship that product to

23   when they -- when they -- they ask us to produce

24   it for them.

25        Q.   Are there any contract packagers

1              Hickey - Highly Confidential

2    beyond the contract packagers that we talked

3    about for Truvada, that you know are specific to

4    Descovy?

5         A.   I wouldn't -- I wouldn't be

6    100 percent, I don't know exactly.  I think it's

7    a GSI question in terms of the -- the packagers

8    that they -- that are approved for Descovy and

9    they've used since -- since they've launched

10   Descovy.

11             But I -- the -- the packagers that

12   I -- that I described in terms of Patheon sites

13   in Canada, PCI, and our Gilead facility in San

14   Dimas, La Verne, those -- those four sites are

15   generally the sites that we ship to from GSIUC.

16        Q.   All right.  That was very helpful.

17   Thank you.  Thank you very much for that -- that

18   description of what's going on here.

19             So when we're talking about GSIUC's

20   production of Truvada, where do the active

21   pharmaceutical ingredients come from for

22   Truvada?

23        A.   I'm not 100 percent in terms of the

24   APIs or where they come from, so I would be -- I

25   would be -- I would be wrong to -- to guess or

1                  Hickey - Highly Confidential

2    start -- start giving you information that I

3    don't -- don't know categorically.

4                  G -- Gilead has its own API division,

5    so it looks after the API.  So it's -- it

6    manages and plans the API that's used by the

7    manufacturing facilities.  So, we don't purchase

8    at GSIUC, so we don't procure material.  It's

9    give to us by -- by Gilead's API team.

10                 So they send us the API to convert

11   into bulk tablet.  So as part of the planning

12   process that GSI do, they also work with the API

13   team, and then the API team supply the material

14   to us to convert into bulk tablet.

15                 So, it's not -- it's not GSI.  GSIUC

16   usually don't procure the material or buy the

17   material.  It's provided to us by GSI or by the

18   API team in Gilead to convert into product, and

19   then we ship that product out in its -- in its

20   converted tablet or bright stock form, back out

21   to GSI, who then control the manufacturing -- or

22   the packaging of that material for -- for the

23   North American market.

24        Q.   All right.  That was very helpful.

25                 So, GSIUC does not place orders for

```
 1                Hickey - Highly Confidential
 2        Q.    Okay.  And then sometime in 2014,
 3   Gilead Sciences Limited changed its name to
 4   Gilead Sciences Ireland UC.
 5        A.    Yes, sir.  And I would have been more
 6   familiar with that name change rather than the
 7   intermediary one that seems to happen on the
 8   same day.  That was what we were just looking
 9   for clarification.
10        Q.    Sure.  I don't -- I don't know what
11   happened there.  That's not something I'm
12   familiar with, but I thank you for clarifying
13   that.
14              When you joined Gilead in Ireland,
15   they were known as Gilead Sciences Limited, and
16   then you were around for, and remember, the
17   change from Gilead Sciences Limited to Gilead
18   Sciences Ireland UC.
19        A.    Yes, sir.
20        Q.    Great.  Okay.  Let's go back to
21   Exhibit 7.
22              All right.  And let's go look at
23   paragraph 27.  It states that, Gilead has used
24   and is currently using these Gilead marks and
25   this Gilead trade dress in commerce in
```

1              Hickey - Highly Confidential

2    connection with its sale of PrEP medication and

3    plans to use -- plans to continue such use in

4    the future.  Gilead prominently displays the

5    Gilead marks in its advertising and promotional

6    materials.

7              Do you see that?

8      A.   Yes, sir.

9      Q.   Is this an accurate statement?

10             MR. CONERY:  Object to form.

11     Q.   You can answer, Mr. Hickey.

12     A.   I -- I'm not involved in the -- in

13   United -- to do with the advertising or

14   promotional materials of the -- for the United

15   States of America, so I -- I don't know how it

16   uses its marks or trademarks within those

17   documents.

18             So I'm not in a position to say

19   categorically that that statement is correct.

20     Q.   Do you have any reason to disagree

21   with what's stated in the paragraph?

22     A.   I have no reason to disagree with the

23   statement in the paragraph.  But as I -- I just

24   reiterate, I'm not involved in the preparation

25   of any materials for advertising or promotional

1              Hickey - Highly Confidential

2   purposes in the United States of America.  That

3   is the sole responsibility of GSI.

4              So I -- I couldn't -- I can't

5   categorically say that that statement is correct

6   on my behalf.  But I have no reason to disagree

7   either.

8       Q.   So even though GSIUC has trademarks

9   for, for example, Descovy and Descovy PrEP that

10  we just looked at, it's your understanding that

11  GSI is solely responsible for how those marks

12  are used in the United States?

13      A.   That would be my understanding, yes.

14      Q.   Okay.

15      A.   I -- GSIUC had no responsibility -- or

16  at least from my knowledge, have any

17  responsibility for the advertising or promotion

18  of materials for materials that are sold in the

19  United States of America.

20      Q.   All right.  Thank you very much for

21  that.

22              Let's read paragraph 28.  Gilead has

23  engaged and it continues to engage in activities

24  designed to promote PrEP medication and the

25  business and goodwill associated with its

1              Hickey - Highly Confidential

2    trademarks and to expand the use and reputation

3    of its trademarks, trade dress, logos,

4    copyrights, and property throughout the United

5    States.  All of these trademarks and trade dress

6    symbolize business goodwill of Gilead and are

7    invaluable assets to Gilead.

8              Do you see that paragraph?

9         A.   Yes, sir.

10        Q.   Is that paragraph an accurate

11   statement?

12             MR. CONERY:  Objection.  Calls for

13        speculation.  Legal conclusion.

14        Q.   You can answer, Mr. Hickey.

15        A.   Can I -- I just read through it again,

16   if you don't mind?

17        Q.   Sure.

18             (Witness reviewing document.)

19        A.   Similar answer, unfortunately, I -- I

20   have no -- I have no reason to disagree with the

21   statement.  But I'm not involved in any

22   promotion of Truvada or -- Truvada or Descovy in

23   the United States of America for treatment or

24   for PrEP indications.

25             So I can't categorically say that it

1              Hickey - Highly Confidential

2    document?

3         A.   Yes, sir.

4         Q.   And have you seen this document

5    before?

6         A.   We shared -- we shared when we met

7    with the legal team yesterday.

8         Q.   And do you have an understanding of

9    what this document is?

10        A.   At a very high level, yes.  It's a --

11   it's a packaging agreement, so it's -- it's a

12   standard -- standard agreement of -- of -- type

13   that I would have seen multiple times, yes.

14        Q.   So you've seen multiple types of

15   packaging agreements while you're been at GSIUC?

16        A.   Yes.  Well, you know, within my --

17   within my career I've seen, you know, typical --

18   this is a typical type of -- of agreement

19   between -- between two parties, so I -- yes,

20   I -- I understand what it is from that

21   perspective.

22        Q.   And what do you understand a packaging

23   agreement to be at a -- as -- as you said, a

24   high level?

25        A.   It's a -- just an agreement to the

1            Hickey - Highly Confidential

2    terms and responsibilities of the individual

3    parties that sign up to the agreement.  There's

4    always going to be somebody who's subordinate to

5    the other in terms of -- of the service

6    performed, and then it's going to be the pricing

7    of each -- each service that they provide.

8         Q.   Excellent.  Thank you very much.

9              And so this agreement is between --

10   from the first paragraph -- Anderson Packaging,

11   Incorporated, and Gilead Sciences, Incorporated

12   and Gilead Sciences Limited.  Is that correct?

13        A.   Yes, sir.

14        Q.   And we discussed earlier how GSIUC

15   used to be called Gilead Sciences Limited; is

16   that correct?

17        A.   Yes, sir.

18        Q.   All right.  So this agreement was with

19   the old -- the old Gilead Sciences Ireland U --

20   UC.  Right?

21        A.   Yes, sir.

22        Q.   And this paragraph, this first

23   paragraph, refers to Gilead Sciences Limited,

24   together with GSI, as company for the duration

25   of this agreement.  Is that correct?

1              Hickey - Highly Confidential

2        A.   Yes, sir.

3        Q.   All right.  So if we look at

4    paragraph 2, ███████████████████████

███████████████████████████████

█████████████████████████████████

███████████████████████████████████

█████████████████████████████

██████████████████

█████████████████████████████████

████████████████████████████████

███████████████████████████

████████████████████████

█████████████████████████████████

██████████████████████████

█████████████████████

17              Do you see that?

18       A.   Yes, sir.

19       Q.   So in this paragraph, "company" means

20   GSI and Gilead Sciences Limited.  Is that

21   correct?

22            MR. CONERY:  Object to form.

23       Q.   You can answer, Mr. Hickey.

24       A.   Yes, but in -- you know, within the

25   contract as it's -- as I see it here, yes.

1              Hickey - Highly Confidential

2         Q.    Okay.  And so they -- so both Gilead

3    Sciences, Inc., and Gilead Sciences Limited,

4    ███████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████  Is that correct?

8              MR. CONERY:  Object to -- object to

9         form.  Calls for speculation.  Legal

10        conclusion.

11        Q.    You can answer, Mr. Hickey.

12        A.    Yes, it -- that is appear -- appears

13   to be what the contract is -- is saying.

14        Q.    Great.  Let's go to page 4, and we're

15   going to look at paragraph 2.1.

16              And under paragraph 2.2 --

17   paragraph 2.1 reads, Grant, ███████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████

24              So "company" here refers to Gilead

25   Sciences, Inc., and Gilead Sciences Limited; is

```
1                Hickey - Highly Confidential

2    that correct?

3              MR. CONERY:  Objection.

4              You can answer.

5         Q.   You can answer, Mr. Hickey.

6         A.   Under -- under this contract, yes,

7    that -- that -- that appears to be what

8    "company" refers to, yes.

9         Q.   ████████████████████████████████

     █████████████████████████████████████████

     █████████████

12             MR. CONERY:  Object to form.  Calls

13        for legal conclusion.  Speculation.

14        Q.   You can answer, Mr. Hickey.

15        A.   I -- I don't know what the -- what the

16   GSL and GSI elements in relation to the contract

17   are, so I -- I don't know exactly what -- what

18   the two parties brought to the table.

19             But "company" -- "company" is an

20   umbrella term for -- for Gilead in -- in -- in

21   this -- this -- this arrangement.

22        Q.   All right.  Thank you.

23             So I'm going to pull us up one page,

24   to page 3.

25             And we're going to look at
```

1              Hickey - Highly Confidential

2     ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████████

9              Do you see that paragraph?

10       A.   Yes, sir.

11       Q.   ████████████████████████████████

██████████████████████████████

13              MR. CONERY:  Objection.

14              Speculation --

15       Q.   You can answer, Mr. Hickey.

16              MR. CONERY:  -- legal conclusion.

17       A.   I'm not -- I'm not sure about going

18   into full detail of the terms of the contract,

19   but within -- within my -- my understanding,

20   ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████.

24       Q.   Okay.  I'm going to pull us down --

25   well, actually, I'm going to look at -- sorry.

1        Hickey - Highly Confidential

2        So we see in the -- in the ███████

███████████████████████████████

█████████████████████    Do you see that?

5        A.   ████████████████████████

████████████████████

7        Q.   Yes.  So that means ███████████

████████████████████████████

█████████████████████████████████

10  ██████████████████████████████

████████████████████████████

████████████████████████████

███████████████████████████

██████████████████████████████

█████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████

████████████████████████████████

██████████████████████████████

██████████████████

22        Do you see that?

23        A.   Yes, sir.

24        Q.   I'm just going to take us down to

25   page 27.

# Exhibit W

# Redacted in Entirety

# Exhibit X

# Redacted in Entirety

# Exhibit Y

# Redacted in Entirety

# Exhibit Z

# Redacted in Entirety