# Exhibit AA

# Redacted in Entirety

# Exhibit BB

# United States of America
## United States Patent and Trademark Office

# DESCOVY FOR PREP

**Reg. No. 5,912,591**

**Registered Nov. 19, 2019**

**Int. Cl.: 5, 44**

**Service Mark**

**Trademark**

**Principal Register**

Gilead Sciences Ireland UC  (IRELAND UNLIMITED COMPANY )
Ida Business And Technology Park
Carrigtohill, Co. Cork, IRELAND

CLASS 5: Anti-viral pharmaceutical preparations; pharmaceutical preparations for the treatment and prevention of infectious diseases; pharmaceutical preparations for the treatment of immune dysfunction; pharmaceutical preparations for the treatment and prevention of human immunodeficiency virus infection

CLASS 44: Information and advisory services relating to pharmaceuticals, diseases and medical conditions and treatments, namely, pharmaceutical advice, medical and pharmaceutical consultation, medical advisory services, and providing medical information, consultancy and advisory services; information and advisory services relating to pharmaceuticals, diseases and medical conditions and treatments, namely, pharmaceutical advice, medical and pharmaceutical consultation, medical advisory services, and providing medical information, consultancy and advisory services provided on-line over a computer network and the Internet; providing medical information and advisory services regarding HIV infection

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

PRIORITY CLAIMED UNDER SEC. 44(D) ON EUROPEAN UNION APPLICATION NO. 018009954, FILED 01-14-2019, REG. NO. 018009954, DATED 05-14-2019, EXPIRES 01-14-2029

OWNER OF U.S. REG. NO. 4876632

No claim is made to the exclusive right to use the following apart from the mark as shown: "FOR PREP"

SER. NO. 88-266,226, FILED 01-17-2019



Director of the United States
Patent and Trademark Office

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten  Years***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years  after  the  registration  date.  See  15  U.S.C.  §§1058,  1141k.  If  the  declaration  is  accepted,  the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** h ttp://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

# Exhibit CC

# United States of America

## United States Patent and Trademark Office



**Reg. No. 6,414,007**

**Registered Jul. 13, 2021**

**Int. Cl.: 5, 44**

**Service Mark**

**Trademark**

**Principal Register**

Gilead Sciences Ireland UC  (IRELAND Unlimited Company )
Ida Business And Technology Park
Carrigtohill, Co. Cork, IRELAND

CLASS 5: Anti-viral pharmaceutical preparations; pharmaceutical preparations for the treatment and prevention of infectious diseases; pharmaceutical preparations for the treatment of immune dysfunction; pharmaceutical preparations for the treatment and prevention of human immunodeficiency virus infection; all of the foregoing containing emtricitabine and tenofovir alafenamide

CLASS 44: Information and advisory services relating to pharmaceuticals, diseases and medical conditions and treatments, namely, pharmaceutical advice, medical and pharmaceutical consultation, medical advisory services, and providing medical information, consultancy and advisory services; information and advisory services relating to pharmaceuticals, diseases and medical conditions and treatments, namely, pharmaceutical advice, medical and pharmaceutical consultation, medical advisory services, and providing medical information, consultancy and advisory services provided on-line over a computer network and the Internet; providing medical information and advisory services regarding HIV infection

The color(s) blue, light blue, and black is/are claimed as a feature of the mark.

PRIORITY CLAIMED UNDER SEC. 44(D) ON IRELAND APPLICATION NO. 2019/01636, FILED 09-06-2019, REG. NO. 262234, DATED 09-06-2019, EXPIRES 09-06-2029

The mark consists of a blue diamond with an incomplete light blue diamond below it along with the word "DESCOVY" in blue to the right and the words "EMTRICITABINE 200 MG / TENOFOVIR ALAFENAMIDE 25MG TABLETS" in black beneath "DESCOVY". Appearing below is the stylized wording "FOR PREP PRE-EXPOSURE PROPHYLAXIS" with the wording "FOR" and "PRE-EXPOSURE PROPHYLAXIS" in light blue, and the word "PREP" contained within a blue oblong shaped pill design. All instances of the color white in the mark represent background and/or transparent areas only and are not features of the mark.

OWNER OF U.S. REG. NO. 5067220, 4876632

No claim is made to the exclusive right to use the following apart from the mark as shown: "EMTRICITABINE 200 MG / TENOFOVIR ALAFENAMIDE 25MG



Drew Hirshfeld

Performing the Functions and Duties of the
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office



**Exhibit 8**

TABLETS FOR PREP PRE-EXPOSURE PROPHYLAXIS"

SER. NO. 88-615,918, FILED 09-13-2019

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# Exhibit DD



# United States of America
## United States Patent and Trademark Office

# DESCOVY

**Reg. No. 4,876,632**

**Registered Dec. 29, 2015**

GILEAD SCIENCES IRELAND UC (IRELAND UNLIMITED COMPANY)
IDA BUSINESS AND TECHNOLOGY PARK
CARRIGTOHILL, CO. CORK, IRELAND

**Int. Cl.: 5**

**TRADEMARK**

**PRINCIPAL REGISTER**

FOR: PHARMACEUTICAL PREPARATIONS FOR THE PREVENTION AND TREATMENT OF HEPATITIS AND HIV INFECTION; ANTIVIRALS; ANTI-INFLAMMATORIES; ANTI-FUNGALS; PHARMACEUTICAL PREPARATIONS FOR USE IN THE TREATMENT OF INFECTIOUS DISEASES, LIVER DISEASES AND DISORDERS, RESPIRATORY DISEASES AND DISORDERS, ONCOLOGICAL DISEASES AND DISORDERS, AND CARDIOVASCULAR DISEASES AND DISORDERS, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF IRELAND REG. NO. 249773, DATED 4-26-2014, EXPIRES 10-31-2023.

SER. NO. 86-170,326, FILED 1-20-2014.

LUCY ARANT, EXAMINING ATTORNEY



Director of the United States
Patent and Trademark Office

Exhibit 9

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# Exhibit EE

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3    _____

4    THE UNITED STATES OF AMERICA,       )
                                         )
5                                        )
      Plaintiff-Counterclaim Defendant, )
6                                        )
         v.                              ) Civil No.
7                                        ) 1:19-cv-02103-MN
     GILEAD SCIENCES, INC.,              )
8                                        )
      Defendant-Counterclaim Plaintiff, )
9                                        )
     AND GILEAD SCIENCES IRELAND UC,     )
10                                       )
                                         )
11                    Defendant.         )
     _____)

12

13      CONFIDENTIAL- ATTORNEYS' EYES ONLY UNDER THE

14                  PROTECTIVE ORDER

15   REMOTELY CONDUCTED VIDEOTAPED AND VIDEOCONFERENCED

16         30(b)(6) and 30(b)(1) DEPOSITION OF

17     Gilead Sciences, by and through its Designated

18                  Representative,

19              MELISSA G. KOOMEY

20           Thursday, January 6, 2022

21

22
     Reported Stenographically by:
23   MARY J. GOFF
     CSR No. 13427
24   Job No. 204485
     PAGES 1-350
25

CONFIDENTIAL AEO - UNDER PROTECTIVE ORDER

Page 2

1

2

3

4         REMOTELY CONDUCTED VIDEOTAPED AND

5    VIDEOCONFERENCED 30(b)(6) DEPOSITION of

6    MELISSA G. KOOMEY, Volume I, taken on behalf of

7    Plaintiff-Counterclaim Defendant, the United States

8    of America, at beginning at 9:04 a.m. and ending at

9    5:36 p.m., on Thursday, January 6, 2022, before

10   MARY J. GOFF, California Certified Shorthand

11   Reporter No. 13427.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL AEO - UNDER PROTECTIVE ORDER

Page 3

1   APPEARANCES:

2   For Plaintiff-Counterclaim Defendant

3        THE UNITED STATES OF AMERICA

4        U.S. Department of Justice

5        BY:  PATRICK HOLVEY

6        Attorneys at Law

7        1100 L Street Northwest

8        Washington, DC 20005

9

10

11

12

13   For Plaintiff-Counterclaim Defendant

14        THE UNITED STATES OF AMERICA

15        Knobbe Martens

16        BY:  NATHANAEL LUMAN

17        Attorneys at Law

18        1717 Pennsylvania Avenue Northwest

19        Washington, DC 20006

20

21

22

23

24

25

CONFIDENTIAL AEO - UNDER PROTECTIVE ORDER

1   APPEARANCES (continued):

2   For Defendant-Counterclaim Plaintiff

3        GILEAD SCIENCES, INC.

4        WilmerHale

5        BY:  VINITA FERRERA

6             GILLIAN FARRELL

7        Attorneys at Law

8        60 State Street

9        Boston, MA 02109

10

11

12

13

14

15

16

17  ALSO PRESENT:  Janice Ye, Gilead in-house senior

18  counsel; Juliana Santana

19  Videographer:  Jon Popham

20

21

22

23

24

25

1  insurers, which is -- which is part of that outreach

2  and communication?

3      A    Part of the conversation, both the public

4  and private payers, is around -- around discounts

5  and around pricing, so yes.

6      Q    So it is -- so it is rather difficult to

7  say that the customer -- the end customer of TRUVADA

8  for PrEP is just the PrEP user; it's really, in your

9  view, the -- kind of the combination of all three

10  who are coming together to make that choice for

11  TRUVADA for PrEP or DESCOVY for PrEP?

12          ATTORNEY FERRERA:  Objection.

13      A    Yeah, I would say it's very difficult to

14  pin down one customer.

15      Q    (BY ATTORNEY HOLVEY) Okay.

16      A    And I wouldn't say this is specific to

17  TRUVADA for PrEP or HIV.  I think this is more

18  generally around healthcare -- healthcare purchases

19  such as pharmaceuticals or medical devices or -- or

20  other things like that.

21          You have multiple stakeholders who have

22  input and interest into treatment decisions.

23      Q    Right.  But that general -- that general

24  issue does -- is true for TRUVADA for PrEP and

25  DESCOVY for PrEP?

CONFIDENTIAL AEO - UNDER PROTECTIVE ORDER

Page 106

1      A     Sure --

2            ATTORNEY FERRERA:  Objection.

3      A     -- as -- as a pharmaceutical product.

4      Q     (BY ATTORNEY HOLVEY) Great.  Thank you.

5  Let's go back to Exhibit 1, which is on the screen.

6  And let's scroll down to page A4 to A7.  Sorry.  A6

7  to A7, not A4 to A7.  And you see Topic 22, which

8  is:

9            Gilead's decision to

10           trademarks relating to PrEP,

11           including a listing of trademarks,

12           as well as any valuation costs,

13           expenses relating to such

14           trademarks, or licenses to such

15           trademarks, and the use of such

16           trademarks to promote to use of the

17           accused products for PrEP.

18           Do you see that topic?

19     A     I do.

20     Q     Great.  And you were designated to testify

21  on behalf of Gilead Sciences today regarding this

22  topic with -- narrowed to the limitations expressed

23  in the res -- the Responses and Objections provided

24  by your counsel; is that correct?

25     A     Yes.

1      Q     Okay.  Great.

2            ATTORNEY FERRERA:  Sorry.  To be clear,

3  Counsel, she -- I believe Ms. Koomey was designated

4  to testify with respect to GSI for Registration

5  Nos.  5,358,262; 5,623,246; 88,266,226; and

6  88,615,918.

7            And then for GSI UC for -- with respect to

8  88,266,226 and 88,615,918.

9            ATTORNEY HOLVEY:  Great.  Thank you very

10  much for that clarification.  I really appreciate

11  it.

12     Q     (BY ATTORNEY HOLVEY) Did that make sense

13  to you, Ms. Koomey?

14     A     Yes.

15     Q     Great.  Okay.  And we talked earlier about

16  trademarks and how Gilead uses to its trademarks in

17  your experiences with trademarks.

18            Do you remember that?

19     A     I do.

20     Q     Great.  Have you seen a trademark

21  registration certificate before?

22     A     I have.

23            ATTORNEY HOLVEY:  Operator, I'm going to

24  ask you to put up Document D and mark it as

25  Exhibit 3.

Page 108

1              (Exhibit 3 was marked for identification

2    and is attached to the transcript.)

3              EXHIBIT TECHNICIAN:  Just to confirm,

4    that's document D?

5              ATTORNEY HOLVEY:  Document D, GILDDE

6    01924516.

7        Q    (BY ATTORNEY HOLVEY) Ms. Koomey, do you

8    see -- and we are going to put it in the Chat too.

9        A    Yeah, because then I can read it.  I can't

10   quite read it.

11       Q    Yeah, exactly.  There it is.

12       A    My old eyes are not -- here we go.  Okay.

13   Go ahead.

14       Q    Okay.  So this is a registration

15   certificate for the word mark TRUVADA for PrEP; is

16   that correct?

17       A    Yes, that's what it looks like.

18       Q    Okay.  And this is Registration No.

19   5,358,262; is that correct?

20       A    Yes.  Sorry.  I was looking in the wrong

21   spot.

22       Q    Okay.  No worries.

23              And this is owned by Gilead Sciences,

24   Incorporated?

25       A    Correct.

CONFIDENTIAL AEO - UNDER PROTECTIVE ORDER

1             And -- and that is -- we -- all kinds of

2    companies across the board contract with Google for

3    the ability to be popping up when -- when a term is

4    searched for.

5        Q    Great.  And so the goal with the paid --

6    paid search is to encourage people to ask their

7    healthcare providers about DESCOVY; is that right?

8             ATTORNEY FERRERA:  Objection.

9        A    Yeah, the -- in this case -- and I -- I

10   don't have all of the details of exactly what a page

11   search strategy -- what were the key terms,

12   et cetera.

13       Q    (BY ATTORNEY HOLVEY) Sure.

14       A    But generally -- and we're relatively

15   limited in what we're allowed to do in this space as

16   well.  So even exactly what pops up on -- on that

17   kind of thing has to have the full -- has to have a

18   "Please See" -- what we call a Please See statement,

19   you know, referring to the full prescribing

20   information, cannot refer to the indication.

21            You know, so we would have -- you know, we

22   would -- if it were branded for DESCOVY, it would

23   say something like "DESCOVY now available; please

24   see full prescribing information," you know, and

25   a -- a link, let's say, to a website or -- or

Page 228

1  something else.

2      Q    When you say it "can't refer to the

3  indication," could you tell me what you meant by

4  that?

5      A    When -- when -- when we communicate and

6  when we -- when we just say -- when I just say

7  "DESCOVY Now Available" --

8      Q    Right.

9      A    -- and I don't say anything about what

10  it's for, that can be what -- what's called a

11  reminder advertisement.

12          If it says "DESCOVY for HIV prevention,"

13  I'm now making a claim from an FDA perspective

14  that -- that this is -- that this is a use of the

15  product.

16          And once you say "for PrEP" or "Lipitor

17  for high cholesterol," as we were talking about

18  earlier, I'm now making a claim.

19          And if I make a positive claim about a

20  product, I have to also provide appropriate fair

21  balance.  Every time we make a claim, we have got to

22  have appropriate fair balance.

23          And so that's what I meant is that if

24  you -- if we provide the -- the name of the drug and

25  the indication statement, we're then making a claim

CONFIDENTIAL AEO - UNDER PROTECTIVE ORDER

Page 229

1    that we need to make sure we have full balance --

2    fair balance for, which is why so often our -- our

3    materials are much more complex and ponderous

4    than -- than what other organizations can do because

5    we, again, are a highly regulated industry, and we

6    work under the regulations of FDA.

7         Q    Right.  That was great.  I learned a lot

8    that I didn't know about.  Tell me what "appropriate

9    fair balance" means?

10             ATTORNEY FERRERA:  When you get to an

11   appropriate point, can we take a break, Patrick?  We

12   have been going a little bit over an hour now so --

13             ATTORNEY HOLVEY:  Yeah, sure.  Let me

14   close this out and then we will take a break, if

15   that sounds okay.

16        Q    (BY ATTORNEY HOLVEY) Okay.  Awesome.

17   Ms. Koomey, could you please tell me what

18   "appropriate fair balance" means in the context that

19   you were just talking about it?

20        A    Right.  So what -- again, this is -- there

21   are not -- there's not a sort of specific role here.

22   But often you will see -- if you -- if you go -- if

23   you look at a pharmaceutical advertisement, you will

24   often see the bottom third of that page dedicated to

25   prominent black-and-white print on the risks of a

CONFIDENTIAL AEO - UNDER PROTECTIVE ORDER

Page 230

1    product that accompany the name of the product, a

2    pretty picture, and an indication statement.

3            And so based on the length of the -- of

4    the piece, the kind of thing that's being done, what

5    kind of fair balance is required, changes.

6            So it could be as simple as what we call a

7    "please see" statement saying:  Please see full

8    prescribing information.

9            Or if it's the front page of a sales aid

10   or a journal advertisement or an ad in a magazine,

11   you might see a full one-third of that page

12   dedicated to simple a black-and-white type of the

13   risks and then, of course, followed by a couple of

14   more pages in the magazine that can either be the

15   full -- that are often the full prescribing

16   information --

17       Q    Okay.

18       A    -- depending on the product.

19       Q    Okay.  That -- that makes sense.  You

20   mentioned that it's when you make an indication --

21   when you make a claim about an indication, that you

22   need to do more than just a Please See; is that

23   correct?

24       A    Any claim.  And I'm not -- again, I'm not

25   a regulatory expert.

CONFIDENTIAL AEO - UNDER PROTECTIVE ORDER

1      Q     Sure.

2      A     I can -- we can bring someone in to do a

3  full, you know, sort of a class on regulatory rules.

4            But any claim -- and an indication is a

5  claim, you know, saying, you know:  DESCOVY --

6  DESCOVY is really effective.

7            Or:  DESCOVY -- you know, any kind of

8  claim, any kind of positive statement about a

9  product, including what it should -- what it is

10  expected to do is what's called a claim in -- in

11  regulatory parlance and ends up with us needing

12  certain -- so needing certain additional information

13  that accompanies that fact.

14     Q     So even -- even DESCOVY -- like TRUVADA

15  for PrEP, the -- the trademark that we talked about

16  earlier, that would be an example of a claim?

17            ATTORNEY FERRERA:  Objection.

18     A     Well, you'll -- you'll notice that that

19  logo is only used in situations where there's more

20  than just that -- that statement there.

21     Q     (BY ATTORNEY HOLVEY) Oh.

22     A     If it's -- if it's a situation where

23  you're only able to use the brand name, the "for

24  PrEP" likely would not accompany that because

25  including that "for PrEP" necessitates additional

CONFIDENTIAL AEO - UNDER PROTECTIVE ORDER

 1  information.

 2      Q     And you said that -- and this is -- I'm --

 3  I'm -- this wraps it up, I think, or is close to the

 4  wrap-up.

 5          You said that the FDA -- you said

 6  something to the effect of the FDA had -- has to --

 7  did the FDA have to approve your application for

 8  TRUVADA for PrEP, the trademark?

 9          ATTORNEY FERRERA:  Objection.

10      A    I don't believe so.  Because at the end of

11  the day, that -- that -- that trademark is always --

12  what they look at are -- is the final material, the

13  final whole piece --

14      Q    (BY ATTORNEY HOLVEY) Okay.

15      A    -- that is actually distributed.

16          And that can be everything -- as we just

17  discussed, that could be everything from a website

18  to a flash card to a brochure, anything that we

19  produce as a commercial organization.

20          So -- and so there wouldn't be a scenario

21  where -- you know, we may have the trademark, but

22  the trademark always lives with -- in a -- in a

23  bigger thing.  You know, a brochure or a website or

24  whatever.

25      Q    So -- so the same issue with -- with the

CONFIDENTIAL AEO - UNDER PROTECTIVE ORDER

1   TRUVADA for PrEP, the logo like with the -- with the

2   components indicated and then "for PrEP, preexposure

3   prophylaxis," you didn't have to clear that with the

4   FDA, but the use of that logo always has to be

5   cleared by the FDA?

6        A    Right.  That --

7             ATTORNEY FERRERA:  Objection.

8        A    -- any materials that we use, most of

9   which include the logo because we're -- you know, if

10  they're branded materials, they include the logo.

11            The material -- the final material, yes,

12  has to be approved by the FDA.

13       Q    (BY ATTORNEY HOLVEY) Okay.

14       A    You know, the FDA does have a comment on

15  the prominence of the generic name.  How big that

16  has to be in association with the rest of the logo,

17  you'll notice that the generic name is of a certain

18  size in relationship to the name of the brand.

19            So they will have comments on things like

20  that.  As we present -- we will present this in the

21  form of materials that they review, but we know a

22  lot of these conventions now.

23            So we know that a generic name, the

24  emtricitabine, blah-blah-blah --

25       Q    Okay.

CONFIDENTIAL AEO - UNDER PROTECTIVE ORDER

1      A      -- needs to be of a certain providence in

2  relation to a brand name such as TRUVADA.

3      Q      Okay.  So they would let you know that --

4  unfortunately, they're kind of letting you know that

5  on the back end after you have gone through the

6  whole process of coming up with the logo because

7  they're not seeing this until you are putting it on

8  materials; is that right?

9      A      No.  You know, the -- there are a couple

10  of things.  So the name BIKTARVY -- or using

11  BIKTARVY -- or TRU -- DESCOVY --

12      Q      Sure.

13      A      -- the name DESCOVY would have to be

14  approved by FDA.  And we would have -- we submit it

15  along with a lot of the analysis that I talked about

16  with you earlier -- handwriting analysis, things

17  like that, potential for confusion, that kind of

18  thing.

19          Separately there are regulations that we

20  are aware of about the prominence of a generic

21  name -- and this is getting really detailed -- in

22  relation to a brand name.

23          And it's the kind of change that is not a

24  very big deal.  You know, if they decide that that

25  font now needs to be 14 point instead of 12 point,

# Exhibit FF

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,

    *Plaintiff & Counterclaim-Defendant*,

    v.                    C.A. No. 19-02103-MN

GILEAD SCIENCES, INC. and
GILEAD SCIENCES IRELAND UC,

    *Defendants & Counterclaim-Plaintiff*.

**Contains Pages Marked As
RESTRICTED INFORMATION—
Subject to Protective Order**

## DEFENDANTS' SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORY NOS. 1-4 & 6-9

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Gilead Sciences, Inc. ("GSI" or "Gilead") and Gilead Sciences Ireland UC ("GSIUC") (collectively, "Defendants") hereby serve its second supplemental objections and responses to Plaintiff United States of America's (the "Government" or "Plaintiff") Interrogatory Nos. 1-4 & 6-9, served on September 4, 2020.

**Interrogatory No. 1:**

Describe in detail all legal and factual bases for your assertion in Gilead's Second Amended Answer and Counterclaims, D.I. 21 at 67 (¶ 2), that the use of Truvada® and Descovy® for PrEP do not infringe (either directly, contributorily, or by inducement) any valid and enforceable claim in each of the Patents-in-Suit, either literally or under the doctrine of equivalents.  Your response should identify each claim limitation that you contend is not present in the use of Truvada® and Descovy® for PrEP and identify any documents, information, or tangible items that supports, refutes, or otherwise concerns your assertion.

**Second Amended & Supplemental Response to Interrogatory No. 1:**

This Second Amended Objection and Response to Plaintiff's Interrogatory No. 1 amends and supplements Defendants' Objections and Responses to Plaintiff's Interrogatory No. 1 served on October 21, 2020, and December 22, 2020.

**Interrogatory No. 8:**

Identify and describe fully and with particularity the circumstance(s) by which and the date(s) on which you first became aware of each of the Patent(s)-in-Suit or any foreign counterparts, including the circumstance(s) by which and the date(s) on which you first became aware of each application that issued as the Patent(s)-in-Suit or foreign counterparts and the circumstance(s) by which and the date(s) on which you first became aware of the Government's filing of these applications. Your response should identify all documents and communications relating to, and all individuals contributing to, your first awareness of the Patents-in-Suit (or foreign counterparts) or any application to which the Patents-in-Suit (or foreign counterparts) claim priority.

**Second Amended & Supplemental Response to Interrogatory No. 8:**

This Second Amended Objection and Response to Plaintiff's Interrogatory No. 8 amends and supplements Defendants' Objections and Responses to Plaintiff's Interrogatory No. 8 served on October 21, 2020, and December 22, 2020.

In addition to the General Objections set forth in Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories, dated October 21, 2020, which are incorporated here by reference, Defendants object to this Interrogatory on the ground that it is overly broad, unduly burdensome, not proportional to the needs of this case, and because it seeks information that is not relevant to the claims or defenses of any party in this litigation, particularly to the extent that it seeks information related to "foreign counterparts" and to the extent that it purports to require Defendants to "identify all documents and communications relating to, and all individuals contributing to" the recited subject matter.

Defendants further object to this Interrogatory to the extent that it seeks documents that are protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity.

Defendants additionally object to this Interrogatory to the extent it calls for production of documents. To the extent such documents are responsive to a valid document request,

Defendants will produce such documents subject to their objections to the applicable document request(s).

Defendants additionally object to this Interrogatory because it contains multiple discrete subparts, each of which constitutes an individual Interrogatory in accordance with Rule 33(a)(1) because, *e.g.*, it requests, (1) information on each of the Patents-in-Suit and each of their foreign counterparts, and (2) information related to Defendants' knowledge of the Patents-in-Suit (or foreign counterparts) as well as separate information on Defendants' knowledge of "the Government's filing of these applications."  Accordingly, Defendants reserve their rights to decline to answer subsequent interrogatories that exceed the limitation of the number of interrogatories allowed by the Federal Rules of Civil Procedure and the Court's Scheduling Order (D.I. 27).

Subject to the foregoing General and Specific Objections, Defendants will produce or make available non-privileged documents containing information responsive to this Interrogatory pursuant to Federal Rule of Civil Procedure 33(d) on a rolling basis in accordance with the Court's Scheduling Order (D.I. 27).  Defendants further respond that:

Gilead Sciences, Inc. ("GSI") first became aware of the '811 provisional and the '547 application no earlier than October 23, 2014.  On that date, as described in Ex. 23 to GSI's Complaint filed in the Court of Federal Claims (No. 20-cv-00499-CFL (D.I. 1)) (the "CFC Complaint"), Laura T. Prestia from the National Institute of Health's Office of Technology Transfer sent separate, substantively identical emails about the purported invention described in the Federal Register notice to GSI's Vice President of Biology Dr. Linda Higgins and GSI's Associate Director of Corporate Development Dr. Jay Parrish.  The body of those emails stated:

> In light of your recent and ongoing interest in and success with
> Truvada, your company appears to be an ideal partner for a

> technology developed by Dr. Walid Heneine at the Centers for Disease Control and Prevention (CDC).
>
> Dr. Heneine's group has shown that daily pre-exposure prophylaxis (PrEP) with emtricitabine in combination with tenofovir disoproxil fumarate (Truvada) significantly increases the level of protection against HIV transmission. This finding was discovered following repeated virus challenges with macaque monkeys. The CDC is pursuing U.S. and foreign patent protection for this technology.
>
> An abstract with more information can be found in the Federal Register. Also, Dr. Heneine has co-authored publications in PLoS Medicine and Science Translational Medicine, describing the above discovery.
>
> Please contact me if I can be of further assistance.

CFC Complaint (D.I. 1) at Ex. 23. Ms. Prestia's email did not specifically identify the '811 provisional or the '547 application. GSI had no specific knowledge of the '811 provisional or the '547 application prior to its knowledge of the '509 patent.

GSI first became aware of the '509 patent no later than March 11, 2016. On that date, as described in Ex. 26 to the CFC Complaint, Dr. Tara L. Kirby, CDC Team Supervisor, Technology Transfer and Intellectual Property Office, National Institute of Allergy and Infectious Diseases, wrote an email to Dr. Parrish, stating in part that:

> The matter I wanted to discuss with you is an invention from CDC's Division of HIV/Aids Prevention Surveillance and Epidemiology, our reference number E-195-2013/0. We have recently obtained issued patents for this invention in a number of jurisdictions, including the United States (USPN 9,044,509), and we believe that your marketed drug, Truvada, may be covered by these patents. For your ease of reference, I have attached a copy of the issued U.S. patent, as well as a listing of our patent filings relating to this invention.
>
> We would be happy to discuss an amicable resolution to this matter. This invention is available for licensing on a non-exclusive basis, so I have attached a copy of our standard license application form for your review and consideration.

*Id.* at Ex. 26.  Dr. Kirby attached a copy of the '509 patent, a document showing the countries in which the government had sought or was seeking patent protection claiming priority to the '811 Provisional, and a license application to her email.

At no point did the government notify Defendant GSIUC of the existence of any Patent-in-Suit.  At this stage of its investigation and discovery, Defendant GSIUC has not identified any fact or evidence establishing that it had knowledge of any of the Patents-in-Suit, including any application that resulted in any of the Patents-in-Suit, prior to the government's filing of the complaint in this action on November 6, 2019.

GSI has been unable to determine the exact date on which it first became aware of the '333 Patent, the '191 Patent, and the '423 Patent; however, for the purposes of this action, GSI will not contest that it had actual or constructive knowledge of the '333 Patent as of February 28, 2017; the '191 Patent as of April 10, 2018; and the '423 Patent as of July 2, 2019.

Defendants will supplement their response to this Interrogatory in accordance with the Federal Rules of Civil Procedure, the Local Rules, and the Court's Scheduling Order.

RESTRICTED – INFORMATION – Subject to Protective Order

**Interrogatory No. 9:**

Describe your process for monitoring publications, applications, and/or patents relating to the technical field and/or marketplace of Gilead's pharmaceutical products) or use of such products (including but not limited to the maintenance of any repository or library of such information) that was in effect from 2007 to present, and any changes thereto or implementation thereof from 2007 to present.

**First Amended & Supplemental Response to Interrogatory No. 9:**

This Second Amended Objection and Response to Plaintiff's Interrogatory No. 9 amends and supplements Defendants' Objections and Responses to Plaintiff's Interrogatory No. 9 served on October 21, 2020.

In addition to the General Objections set forth in Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories, dated October 21, 2020, which are incorporated here by reference, Defendants object to this Interrogatory on the ground that it is overly broad, unduly burdensome, not proportional to the needs of this case, and because it seeks information that is not relevant to the claims or defenses of any party in this litigation, particularly to the extent that it seeks information on monitoring for all types of "publications, applications, and/or patents" and extends to the entire "technical field and/or marketplace of Gilead's pharmaceutical products" without limitation to the subject matter of this action.

Defendants further object to this Interrogatory to the extent that it seeks information that is protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity.

Defendants also object to this Interrogatory because it contains multiple discrete subparts, each of which constitutes an individual Interrogatory in accordance with Rule 33(a)(1) because, *e.g.*, it requests, (1) information related to Defendants' "process for monitoring publications, applications, and/or patents relating to the technical field and/or marketplace of Gilead's pharmaceutical products) or use of such products," and (2) information about "any changes

– 156 –

thereto or implementation thereof from 2007 to present." Accordingly, Defendants reserve their rights to decline to answer subsequent interrogatories that exceed the limitation of the number of interrogatories allowed by the Federal Rules of Civil Procedure and the Court's Scheduling Order (D.I. 27).

Subject to the foregoing General and Specific Objections, Defendants respond that █

███████████████████████████████████

████████████████████████████████

███████████████████████████

███████████████████████████████

████████████████████████

███████████████████████

██████████████████████████████

████████████████████████████

█████████████████████████████

███████████████████████████

███████████████████████████████████

██████████████████

Defendants are currently unaware of any patent monitoring activities performed by GSIUC. Defendants' investigation related to such activities is ongoing.

Defendants will supplement their response to this Interrogatory in accordance with the Federal Rules of Civil Procedure, the Local Rules, and the Court's Scheduling Order.

Dated:  February 18, 2021


OF COUNSEL:

Ronald C. Machen
Charles T. Cox Jr.
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363
Ronald.Machen@wilmerhale.com
Charlie.Cox@wilmerhale.com

David B. Bassett
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
David.Bassett@wilmerhale.com

Vinita C. Ferrera
Emily R. Whelan
George P. Varghese
Timothy A. Cook
Jonathan A. Cox
Stephanie Lin
Benjamin Conery
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
Vinita.Ferrera@wilmerhale.com
Emily.Whelan@wilmerhale.com
George.Varghese@wilmerhale.com
Tim.Cook@wilmerhale.com
Jonathan.Cox@wilmerhale.com
Stephanie.Lin@wilmerhale.com
Ben.Conery@wilmerhale.com

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Alexandra M. Ewing (#6407)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
ewing@rlf.com


*Counsel for Defendants Gilead Sciences,*
*Inc. & Gilead Sciences Ireland UC*

# Exhibit GG

**B1 Submission Number:13134268**

# B1 - Annual Return - : 259755

## Company Details

---

**Date return made up to**          **30 September 2018**

Financial Year From          1 January 2017

Financial Year to          31 December 2017

### Company Details

Company Number          259755

Company Name          GILEAD SCIENCES IRELAND UC

Registered Office          IDA Business & Technology Park
Carrigtohill, Co. Cork
Ireland

Company Email Address          matheson@matheson.com

Company Size          Large

### Auditor Details (only applicable if filing an auditors report)

Auditor Type

Auditor Registration Number (ARN)          AI222237

Auditor Name          Ernst & Young

---

## Secretary Details

---

Type of Entity          Irish Registered Company

Body Corporate Name          MATSACK TRUST LIMITED

Registration Number Of Body Corporate          30090

Address          70 Sir John Rogerson's Quay
Dublin 2
Ireland

Does the company Have a Joint Secretary?  **No**

| | |
|---|---|
| Does the company have an Assistant Secretary | **No** |

## Directors Details

## DAVID CHARLES CADOGAN (1)

## 1 Director

### Director

| | |
|---|---|
| Surname | CADOGAN |
| Forename | DAVID CHARLES |
| Country Of Nationality | IRELAND |
| Date of Birth | 03 November 1966 |
| Occupation | Director |
| Address | Coorong<br>Mansfield Lands, Kinsale<br>Co Cork |
| EEA Resident | Yes |
| Does this Director have Other Directorships? | Yes |

### Other Directorships

**1**

| | |
|---|---|
| Company Number | 533839 |
| Company Name | COLLINS CADOGAN CONSULTING LIMITED |
| Registered In | Ireland |

**2**

| | |
|---|---|
| Company Number | 586804 |
| Company Name | GILEAD APOLLO UNLIMITED COMPANY |
| Registered In | Ireland |

**3**

| | |
|---|---|
| Company Number | 615395 |
| Company Name | GILEAD THERAPEUTICS A1 UNLIMITED COMPANY |
| Registered In | Ireland |

**4**

| | |
|---|---|
| Company Number | 615396 |
| Company Name | GILEAD THERAPEUTICS A2 UNLIMITED COMPANY |
| Registered In | Ireland |

**5**

| | |
|---|---|
| Company Number | 432817 |
| Company Name | TRI-SUPPLY LIMITED |
| Registered In | Ireland |

# PADRAIG CLANCY (2)

## 2 Director

### Director

| | |
|---|---|
| Surname | CLANCY |
| Forename | PADRAIG |
| Country Of Nationality | IRELAND |
| Date of Birth | 15 October 1968 |
| Occupation | Director |
| Address | Coolboy<br>Kilbehenny, Mitchelstown<br>Co. Cork<br>Ireland |
| EEA Resident | Yes |
| Does this Director have Other Directorships? | Yes |

### Other Directorships

**1**

| | |
|---|---|
| Company Number | 615395 |
| Company Name | GILEAD THERAPEUTICS A1 UNLIMITED COMPANY |
| Registered In | Ireland |

**2**

| | |
|---|---|
| Company Number | 615396 |
| Company Name | GILEAD THERAPEUTICS A2 UNLIMITED COMPANY |
| Registered In | Ireland |

**3**

| | |
|---|---|
| Company Number | 384660 |
| Company Name | KEOMAX PROPERTY MANAGEMENT COMPANY COMPANY LIMITED BY GUARANTEE |
| Registered In | Ireland |

# RUTH GOULD (3)

## 3 Director

### Director

| | |
|---|---|
| Surname | GOULD |
| Forename | RUTH |
| Country Of Nationality | IRELAND |
| Date of Birth | 18 January 1963 |
| Occupation | Director |
| Address | 10 Tara Court<br>Glasheen Road, Co. Cork<br>Ireland |
| EEA Resident | Yes |
| Does this Director have Other Directorships? | Yes |

**Other Directorships**

**1**

| | |
|---|---|
| Company Number | 615395 |
| Company Name | GILEAD THERAPEUTICS A1 UNLIMITED COMPANY |
| Registered In | Ireland |

**2**

| | |
|---|---|
| Company Number | 615396 |
| Company Name | GILEAD THERAPEUTICS A2 UNLIMITED COMPANY |
| Registered In | Ireland |

**3**

| | |
|---|---|
| Company Number | 413349 |
| Company Name | PCMD TRAINING COMPANY LIMITED BY GUARANTEE |

| Registered In | Ireland |
|---|---|

---

## DIANE ELIZABETH WILFONG (4)

## 4 Director

### Director

| Surname | WILFONG |
|---|---|
| Forename | DIANE ELIZABETH |
| Country Of Nationality | UNITED STATES |
| Date of Birth | 07 October 1961 |
| Occupation | Director |
| Address | 111 W Poplar Avenue<br>San Mateo, California<br>United States |
| EEA Resident | No |

---

## TAIYIN YANG (5)

## 5 Director

### Director

| Surname | YANG |
|---|---|
| Forename | TAIYIN |
| Country Of Nationality | UNITED STATES |
| Date of Birth | 07 February 1953 |
| Occupation | Director |
| Address | 18718 Austin Way<br>Monte Sereno, CA 95030<br>United States |
| EEA Resident | No |
| Does this Director have Other Directorships? | Yes |

### Other Directorships

**1**

| Company Number | 426724 |
|---|---|

| | |
|---|---|
| Company Name | BRISTOL-MYERS SQUIBB AND GILEAD SCIENCES LIMITED |
| Registered In | Ireland |

**2**

| | |
|---|---|
| Company Number | 426742 |
| Company Name | BRISTOL-MYERS SQUIBB AND GILEAD SCIENCES LIMITED |
| Registered In | Ireland |

**3**

| | |
|---|---|
| Company Number | 615395 |
| Company Name | GILEAD THERAPEUTICS A1 UNLIMITED COMPANY |
| Registered In | Ireland |

**4**

| | |
|---|---|
| Company Number | 615396 |
| Company Name | GILEAD THERAPEUTICS A2 UNLIMITED COMPANY |
| Registered In | Ireland |

# List of past and present members

| | |
|---|---|
| Total Shares Held: | 22001 |

## GILEAD BIOPHARMACEUTICS IRELAND UC (1)

1 Shareholder

| | |
|---|---|
| Surname / Company Name | GILEAD BIOPHARMACEUTICS IRELAND UC |
| First Name | |
| Address | 70 Sir John Rogerson's Quay |
| | Dublin 2 |
| | Ireland |

## Shareholding

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Number Held | 22000 |

## Transfer Details

## GILEAD INTERNATIONAL HOLDINGS LTD (2)

2 Shareholder

| | |
|---|---|
| Surname / Company Name | GILEAD INTERNATIONAL HOLDINGS LTD |
| First Name | |
| Address | C/O PO Box 1234<br>Queensgate House, Georgestown<br>Grand Cayman<br>Cayman Islands |

### Shareholding

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Number Held | 0 |

### Transfer Details

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Date Transferred | 1 January 2002 |
| Number Transferred | 21999 |
| Particulars of Transferee | GILEAD INTERNATIONAL LTD |

## GILEAD INTERNATIONAL LTD (3)

3 Shareholder

| | |
|---|---|
| Surname / Company Name | GILEAD INTERNATIONAL LTD |
| First Name | |
| Address | C/O PO Box 1234<br>Queensgate House, Georgestown<br>Grand Cayman<br>Cayman Islands |

### Shareholding

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Number Held | 0 |

**Transfer Details**

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Date Transferred | 21 August 2004 |
| Number Transferred | 21999 |
| Particulars of Transferee | GILEAD BIOPHARMACEUTICS IRELAND UC |

## GILEAD SCIENCES INC (4)

4 Shareholder

| | |
|---|---|
| Surname / Company Name | GILEAD SCIENCES INC |
| First Name | |
| Address | 333 Lakeside Drive<br>Foster City, CA 94404<br>United States |

**Shareholding**

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Number Held | 0 |

**2**

| | |
|---|---|
| Share Class | Ordinary |
| Number Held | 0 |

**Transfer Details**

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Date Transferred | 21 December 2001 |
| Number Transferred | 1 |
| Particulars of Transferee | GILEAD WORLD MARKETS LTD |

**2**

| | |
|---|---|
| Share Class | Ordinary |
| Date Transferred | 1 January 2002 |
| Number Transferred | 21999 |
| Particulars of Transferee | GILEAD INTERNATIONAL HOLDINGS LTD |

# GILEAD SCIENCES LUXEMBOURG S.a.r.l. (5)

5 Shareholder

| | |
|---|---|
| Surname / Company Name | GILEAD SCIENCES LUXEMBOURG S.a.r.l. |
| First Name | |
| Address | 5 Rue Guillaume Kroll<br>L-1882, Luxembourg |

## Shareholding

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Number Held | 1 |

## Transfer Details

# GILEAD WORLD MARKETS LTD (6)

6 Shareholder

| | |
|---|---|
| Surname / Company Name | GILEAD WORLD MARKETS LTD |
| First Name | |
| Address | C/O PO Box 1234<br>Queensgate House, Georgestown<br>Grand Cayman<br>Cayman Islands |

## Shareholding

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Number Held | 0 |

## Transfer Details

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Date Transferred | 21 August 2004 |
| Number Transferred | 1 |

Particulars of Transferee          GILEAD BIOPHARMACEUTICS IRELAND UC

## MATSACK NOMINEES LIMITED (7)

7 Shareholder

| | |
|---|---|
| Surname / Company Name | MATSACK NOMINEES LIMITED |
| First Name | |
| Address | 70 Sir John Rogerson's Quay<br>Dublin 2<br>D02 R296, Ireland |

### Shareholding

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Number Held | 0 |

### Transfer Details

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Date Transferred | 17 January 1997 |
| Number Transferred | 1 |
| Particulars of Transferee | GILEAD SCIENCES INC |

## MATSACK TRUST LIMITED (8)

8 Shareholder

| | |
|---|---|
| Surname / Company Name | MATSACK TRUST LIMITED |
| First Name | |
| Address | 70 Sir John Rogerson's Quay<br>Dublin 2<br>Ireland |

### Shareholding

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Number Held | 0 |

**Transfer Details**

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Date Transferred | 17 January 1997 |
| Number Transferred | 1 |
| Particulars of Transferee | GILEAD SCIENCES INC |

# Authorised Share Capital

**1**

| | |
|---|---|
| Currency | EUR |
| Total | 64000.00 |

# Issued Share Capital

**1**

| | |
|---|---|
| Currency | EUR |
| Total | 44002.00 |

# Attachments

| X | Financial Statements (PDF) |
|---|---|

# Particulars of persons verifying the contents of the form

I/We hereby certify that the particulars contained in this form are correct and have been given in accordance with the Notes on Completion of the statutory Form B1

WE HEREBY CERTIFY that all documents which are required under the Companies Act 2014 to be annexed to this annual return, have been so annexed, and that they are true copies of the originals laid or to be laid before the relevant general meeting, or presented to the member(s).

Sign this form with certificate/certificates issued by Revenue Online Services (ROS).   No

**Details of Director who is certifying that the information provided is correct who is certifying that the information provided is correct**

| | |
|---|---|
| Type Of Signature | Director |
| Type of entity | Self |

**Individual details**

| | |
|---|---|
| Surname | CADOGAN |
| Forename | DAVID |

**Details of Secretary who is certifying that the information provided is correct**

| | |
|---|---|
| Type Of Signature | Secretary |
| Type of entity | A firm that is signing the message |

**Company Details**

| | |
|---|---|
| Company Name | MATSACK TRUST LIMITED |
| Type of entity | EEA Resident Individual |

**Individual details**

| | |
|---|---|
| Surname | GORMLEY |
| Forename | LAURA |

# Particulars of the presenter

**Reference**

| | |
|---|---|
| Reference Number | 236328 |

**Presenter Details**

| | |
|---|---|
| Type of entity | Irish Registered Company |
| Name | Matheson |
| Care Of Name | Matheson |
| Address | 70 Sir John Rogerson's Quay<br>Dublin 2<br>Ireland<br>Ireland |
| Email Address | matheson@matheson.com |
| Telephone No. | 01 232 2000 |
| Fax Number | 01 232 3333 |
| DX Number | |
| DX Exchange | |

# Legal References

### Collective Citations

Companies Act 2014

**Legal Function Performed:**

Annual Return to the registrar of companies

Companies Act 2014
 Section: 343(4)



**Delivery Address:**
Companies Registration Office
O'Brien Road
Carlow

B1 Submission Number: 13134268
Company Number : 259755
Company Name: GILEAD SCIENCES IRELAND UC
Presenter:Matheson



## SIGNATURE PAGE

## B1 - Annual Return

Signature of the person(s) who is (are) certifying that the information provided is correct

Director: DAVID CADOGAN

6TH NOVEMBER 2018
Date

Secretary: LAURA GORMLEY (on behalf of: MATSACK TRUST LIMITED)

7th November 2018
Date

Legal References:
Collective Citations
Companies Act 2014
Section:343(4)

Uploads:1
Financial Statements (PDF)
Financial Year from: 01-01-2017 to: 31-12-2017
Auditor Registration Number (ARN):AI222237
Auditor:Ernst & Young

### TO AVOID LATE FILING FEES OR LOSS OF AUDIT EXEMPTION PLEASE ENSURE:

- Correct Financial Statements are uploaded
- This Signature Page is signed and dated
- All relevant documentation is delivered to the CRO by 27/Nov/2018.

The fee for this B1 at the time of submission was €20.

### This annual return will be deemed never to have been filed if all of the above components are not complete when the signature page is received



Ref: 772FBF942BAA7A52EA8B124E9024AEBB



# Exhibit HH

**B1 Submission Number:13934728**

# B1 - Annual Return - : 259755

## Company Details

**Date return made up to**           **30 September 2019**

Financial Year From           1 January 2018

Financial Year to           31 December 2018

### Company Details

Company Number           259755

Company Name           GILEAD SCIENCES IRELAND UC

Registered Office           IDA Business & Technology Park
Carrigtohill, Co. Cork
Ireland

Company Email Address           matheson@matheson.com

Company Size           Large

### Auditor Details (only applicable if filing an auditors report)

Auditor Type

Auditor Registration Number (ARN)           AI222237

Auditor Name           Ernst & Young

## Secretary Details

Type of Entity           Irish Registered Company

Body Corporate Name           MATSACK TRUST LIMITED

Registration Number Of Body Corporate           30090

Address           70 Sir John Rogerson's Quay
Dublin 2
Ireland

Does the company Have a Joint Secretary?  **No**

| | |
|---|---|
| Does the company have an Assistant Secretary | **No** |

---

# Directors Details

---

## DAVID CHARLES CADOGAN (1)

## 1 Director

### Director

| | |
|---|---|
| Surname | CADOGAN |
| Forename | DAVID CHARLES |
| Country Of Nationality | IRELAND |
| Date of Birth | 03 November 1966 |
| Occupation | Director |
| Address | Coorong<br>Mansfield's Land, Kinsale<br>Co Cork |
| EEA Resident | Yes |
| Does this Director have Other Directorships? | Yes |

### Other Directorships

**1**

| | |
|---|---|
| Company Number | 533839 |
| Company Name | COLLINS CADOGAN CONSULTING LIMITED |
| Registered In | Ireland |

**2**

| | |
|---|---|
| Company Number | 586804 |
| Company Name | GILEAD APOLLO UNLIMITED COMPANY |
| Registered In | Ireland |

**3**

| | |
|---|---|
| Company Number | 615395 |
| Company Name | GILEAD THERAPEUTICS A1 UNLIMITED COMPANY |
| Registered In | Ireland |

**4**

| | |
|---|---|
| Company Number | 615396 |
| Company Name | GILEAD THERAPEUTICS A2 UNLIMITED COMPANY |
| Registered In | Ireland |

**5**

| | |
|---|---|
| Company Number | 432817 |
| Company Name | TRI-SUPPLY LIMITED |
| Registered In | Ireland |

---

# PADRAIG CLANCY (2)

## 2 Director

### Director

| | |
|---|---|
| Surname | CLANCY |
| Forename | PADRAIG |
| Country Of Nationality | IRELAND |
| Date of Birth | 15 October 1968 |
| Occupation | Director |
| Address | Coolboy<br>Kilbehenny, Mitchelstown<br>Co. Cork<br>Ireland |
| EEA Resident | Yes |

---

# RUTH GOULD (3)

## 3 Director

### Director

| | |
|---|---|
| Surname | GOULD |
| Forename | RUTH |
| Country Of Nationality | IRELAND |
| Date of Birth | 18 January 1963 |
| Occupation | Director |

| | |
|---|---|
| Address | 10 Tara Court<br>Glasheen Road, Co. Cork<br>Ireland |
| EEA Resident | Yes |

---

## DIANE ELIZABETH WILFONG (4)

### 4 Director

Director

| | |
|---|---|
| Surname | WILFONG |
| Forename | DIANE ELIZABETH |
| Country Of Nationality | UNITED STATES |
| Date of Birth | 07 October 1961 |
| Occupation | Director |
| Address | 111 W Poplar Avenue<br>San Mateo, California<br>United States |
| EEA Resident | No |

---

## TAIYIN YANG (5)

### 5 Director

Director

| | |
|---|---|
| Surname | YANG |
| Forename | TAIYIN |
| Country Of Nationality | UNITED STATES |
| Date of Birth | 07 February 1953 |
| Occupation | Director |
| Address | 18718 Austin Way<br>Monte Sereno, CA 95030<br>United States |
| EEA Resident | No |
| Does this Director have Other Directorships? | Yes |

**Other Directorships**

**1**

| | |
|---|---|
| Company Number | 426724 |
| Company Name | BRISTOL-MYERS SQUIBB AND GILEAD SCIENCES LIMITED |
| Registered In | Ireland |

**2**

| | |
|---|---|
| Company Number | 426742 |
| Company Name | BRISTOL-MYERS SQUIBB AND GILEAD SCIENCES LIMITED |
| Registered In | Ireland |

**3**

| | |
|---|---|
| Company Number | 615395 |
| Company Name | GILEAD THERAPEUTICS A1 UNLIMITED COMPANY |
| Registered In | Ireland |

**4**

| | |
|---|---|
| Company Number | 615396 |
| Company Name | GILEAD THERAPEUTICS A2 UNLIMITED COMPANY |
| Registered In | Ireland |

# List of past and present members

Total Shares Held: 22001

## GILEAD BIOPHARMACEUTICS IRELAND UC (1)

1 Shareholder

| | |
|---|---|
| Surname / Company Name | GILEAD BIOPHARMACEUTICS IRELAND UC |
| First Name | |
| Address | 70 Sir John Rogerson's Quay<br>Dublin 2<br>Ireland |

**Shareholding**

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Number Held | 22000 |

## Transfer Details

---

## Gilead Sciences Luxembourg  S.à r.l.  (2)

2 Shareholder

| | |
|---|---|
| Surname / Company Name | Gilead Sciences Luxembourg  S.à r.l. |
| First Name | |
| Address | 15, Boulevard Friedrich Wilhelm Raiffeisen |
| | L-2411 |
| | Luxembourg |

## Shareholding

**1**

| | |
|---|---|
| Share Class | Ordinary |
| Number Held | 1 |

## Transfer Details

## Authorised Share Capital

**1**

| | |
|---|---|
| Currency | EUR |
| Total | 64000.00 |

## Issued Share Capital

**1**

| | |
|---|---|
| Currency | EUR |
| Total | 44002.00 |

## Attachments

| X | Financial Statements (PDF) |
|---|---|

---

# Particulars of persons verifying the contents of the form

I/We hereby certify that the particulars contained in this form are correct and have been given in accordance with the Notes on Completion of the statutory Form B1

WE HEREBY CERTIFY that all documents which are required under the Companies Act 2014 to be annexed to this annual return, have been so annexed, and that they are true copies of the originals laid or to be laid before the relevant general meeting, or presented to the member(s).

Sign this form with certificate/certificates issued by Revenue Online Services (ROS).    No

## Details of Director who is certifying that the information provided is correct

Type Of Signature               Director

Type of entity                  Self

### Individual details

Surname                         CADOGAN

Forename                        DAVID

## Details of Secretary who is certifying that the information provided is correct

Type Of Signature               Secretary

Type of entity                  A firm that is signing the message

### Company Details

Company Name                    MATSACK TRUST LIMITED

Type of entity                  EEA Resident Individual

### Individual details

Surname                         GORMLEY

Forename                        LAURA

---

# Particulars of the presenter

## Reference

Reference Number                258847

**Presenter Details**

| | |
|---|---|
| Type of entity | Irish Registered Company |
| Name | Matheson |
| Care Of Name | Matheson |
| Address | 70 Sir John Rogerson's Quay<br>Dublin 2<br>Ireland<br>Ireland |
| Email Address | matheson@matheson.com |
| Telephone No. | 01 232 2000 |
| Fax Number | 01 232 3333 |
| DX Number | |
| DX Exchange | |

# Legal References

### Collective Citations

Companies Act 2014

**Legal Function Performed:**

Annual Return to the registrar of companies

Companies Act 2014
 Section: 343(4)



**Delivery Address:**
Companies Registration Office
O'Brien Road
Carlow

B1 Submission Number: 13934728
Company Number : 259755
Company Name: GILEAD SCIENCES IRELAND UC
Presenter:Matheson



## SIGNATURE PAGE

## B1 - Annual Return

Signature of the person(s) who is (are) certifying that the information provided is correct

Director: DAVID CADOGAN

Date 04/11/2019

Secretary: LAURA GORMLEY (on behalf of: MATSACK TRUST LIMITED)

Date 5/11/2019

| Legal References: | Uploads:1 |
|---|---|
| Collective Citations | Financial Statements (PDF) |
| Companies Act 2014 | Financial Year from: 01-01-2018 to: 31-12-2018 |
| Section:343(4) | Auditor Registration Number (ARN):AI222237 |
| | Auditor:Ernst & Young |

### TO AVOID LATE FILING FEES OR LOSS OF AUDIT EXEMPTION PLEASE ENSURE:

- Correct Financial Statements are uploaded
- This Signature Page is signed and dated
- All relevant documentation is delivered to the CRO by 26/Nov/2019.

The fee for this B1 at the time of submission was €20.

**This annual return will be deemed never to have been filed if all of the above components are not complete when the signature page is received**



Ref: C0FB416644EC6175D8A24DC0FD5D2056

Page 1of 1

crXML (90)
29/10/2019

# Exhibit II



EXHIBIT
Hickey | 1-21-22
**PTX-007**

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| GILEAD SCIENCES, INC.; GILEAD SCIENCES IRELAND UC, | |
| Plaintiffs, | |
| v. | Civil Action No. __ |
| AJC MEDICAL GROUP, INC.; ALLIANCE MEDICAL CENTER, INC.; ALLIED HEALTH ORGANIZATION, INC.; BAIKAL MARKETING GROUP, INC.; A BETTER YOU WELLNESS CENTER, LLC; 3RD STEP RECOVERY GROUP, INC. D/B/A CONTINENTAL WELLNESS CENTER; COMMUNITY HEALTH MEDICAL CENTER LLC; DOCTORS UNITED, INC. D/B/A DOCTORS UNITED GROUP; FLORIMED MEDICAL CENTER CORP.; JUAN JESUS SALINA, M.D. CORP.; LABS4LESS LLC; PHYSICIAN PREFERRED PHARMACY, INC.; POSITIVE HEALTH ALLIANCE, INC.; PRIORITY HEALTH MEDICAL CENTER, INC.; TESTING MATTERS INC.; UNITED CLINICAL LABORATORY LLC; UNITED PHARMACY LLC; WELL CARE LLC; TAMARA ALONSO; JEAN ALEXANDRE; CHENARA ANDERSON; MYRIAM AUGUSTINE; TWIGGI BATISTA; ARSEN BAZYLENKO; MICHAEL BOGDAN; BARBARA BRYANT; AUGUSTINE CARBON; JENNIFER JOHN CARBON; KHADIJAH CARBON; ALEJANDRO CASTRO; JOHN CATANO; JEAN CHARLOT; SHONTA DARDEN; ALEXANDER EVANS; MARIA FREEMAN; JESULA GABO; SHAJUANDRINE GARCIA; BARBARA GIBSON; KERLINE JOSEPH; VIERGELA JOSEPH; ANDRE KERR; GARY KOGAN; CASSANDRA LOUISSAINT; CORA MANN; NICK MYRTIL; IFEOMA NWOFOR; ERIK JOSEPH PAVAO; WILLIE PEACOCK; MICHAEL PIERCE; MICHEL POITEVIEN; JEAN RODNEY; TATIANA ROZENBLYUM; JUAN JESUS SALINA; DIMITRY SHAPOSHNIKOV; ROMAN SHEKHET; KIRILL VESSELOV; MIKHAIL VESSELOV; TOMAS WHARTON, | |
| Defendants. | |

## **COMPLAINT**

Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland UC (together, "Gilead"), by and through their attorneys, Patterson Belknap Webb & Tyler LLP and Squire Patton Boggs (US), LLP, file their complaint against Defendants AJC Medical Group, Inc.; Alliance Medical Center, Inc.; Allied Health Organization, Inc.; A Better You Wellness Center, LLC; Baikal Marketing Group, Inc.; 3rd Step Recovery Group, Inc. d/b/a Continental Wellness Center; Community Health Medical Center LLC; Doctors United, Inc. d/b/a Doctors United Group; Florimed Medical Center Corp.; Juan Jesus Salina, M.D. Corp.; Labs4Less LLC; Physician Preferred Pharmacy, Inc.; Positive Health Alliance, Inc.; Priority Health Medical Center, Inc.; Testing Matters Inc.; United Clinical Laboratory LLC; United Pharmacy LLC; Well Care LLC; Tamara Alonso; Jean Alexandre; Chenara Anderson; Myriam Augustine; Twiggi Batista; Arsen Bazylenko; Michael Bogdan; Barbara Bryant; Augustine Carbon; Jennifer John Carbon; Khadijah Carbon; Alejandro Castro; John Catano; Jean Charlot; Shonta Darden; Alexander Evans; Maria Freeman; Jesula Gabo; Shajuandrine Garcia; Barbara Gibson; Kerline Joseph; Viergela Joseph; Andre Kerr; Gary Kogan; Cassandra Louissaint; Cora Mann; Nick Myrtil; Ifeoma Nwofor; Erik Joseph Pavao; Willie Peacock; Michael Pierce; Michel Poitevien; Jean Rodney; Tatiana Rozenblyum; Juan Jesus Salina; Dimitry Shaposhnikov; Roman Shekhet; Kirill Vesselov; Mikhail Vesselov; and Tomas Wharton (collectively, "Defendants")[1] and allege as follows:

---

[1] For purposes of this complaint, the term "Clinic Defendants" refers to Defendants AJC Medical Group, Inc.; Alliance Medical Center, Inc.; Allied Health Organization, Inc.; A Better You Wellness Center, LLC; Baikal Marketing Group, Inc.; 3rd Step Recovery Group, Inc. d/b/a Continental Wellness Center; Community Health Medical Center LLC; Doctors United, Inc. d/b/a Doctors United Group; Florimed Medical Center Corp.; Juan Jesus Salina, M.D. Corp.; Positive Health Alliance, Inc.; Priority Health

## INTRODUCTION

1.      In this action, Gilead seeks an injunction to immediately halt Defendants'

dangerous and fraudulent schemes to steal tens of millions of dollars from Gilead's Advancing

Access® Medication Assistance Program ("MAP"), a charitable endeavor funded by Gilead that

provides eligible uninsured persons with free medication to help protect them from becoming

infected with HIV.  Defendants' schemes are not just a colossal financial fraud; they also

actively endanger the health and safety of Floridians, placing the public at risk of serious illness

or death.  In addition to halting the schemes, Gilead further seeks to recoup the reimbursements

and fees Defendants have wrongfully obtained from Gilead, as well as other expenses Gilead has

wrongly been made to pay because of Defendants' fraud.

2.      Gilead is a global pharmaceutical company and the leader in developing and

manufacturing medication for the treatment and prevention of HIV and AIDS.  It is the first, and

until recently, the only company that manufactures FDA-approved therapies for the protection of

individuals who are at risk of being exposed to HIV but have not yet contracted the virus—a

drug regimen known as pre-exposure prophylaxis, or PrEP.  Gilead's groundbreaking FDA-

approved PrEP medications are called TRUVADA for PrEP® and DESCOVY for PrEP®

---

Medical Center, Inc.; and Well Care LLC.  The term "Pharmacy Defendants" refers to Physician
Preferred Pharmacy, Inc., and United Pharmacy LLC.  The term "Lab Defendants" refers to Labs4Less
LLC; Testing Matters Inc.; and United Clinical Laboratory LLC.  The term "Officer Defendants" refers to
Jean Alexandre; Chenara Anderson; Myriam Augustine; Twiggi Batista; Arsen Bazylenko; Michael
Bogdan; Augustine Carbon; Jennifer John Carbon; Khadijah Carbon; Alejandro Castro; Jean Charlot;
Shonta Darden; Maria Freeman; Shajuandrine Garcia; Barbara Gibson; Gary Kogan; Cora Mann; Nick
Myrtil; Erik Joseph Pavao; Willie Peacock; Jean Rodney; Tatiana Rozenblyum; Juan Jesus Salina;
Dimitry Shaposhnikov; Roman Shekhet; Kirill Vesselov; Mikhail Vesselov; and Tomas Wharton.  The
term "Prescriber Defendants" refers to Tamara Alonso, Barbara Bryant, John Catano, Alexander Evans,
Jesula Gabo, Kerline Joseph, Viergela Joseph, Andre Kerr, Cassandra Louissaint, Ifeoma Nwofor,
Michael Pierce, Michel Poitevien, and Jean Rodney.

3

(together, "PrEP medication"). These Gilead therapies have prevented untold suffering and saved countless lives.

3.     Through the MAP, Gilead provides free PrEP medication to eligible, uninsured individuals who are unable to afford it and cannot access alternative funding sources. The MAP has been able to help tens of thousands of individuals receive free, potentially life-saving medication since TRUVADA for PrEP® was first approved by the FDA in 2012. Although Gilead has operated multiple free-drug programs, such as the MAP, for decades, the company has never had to exclude a healthcare provider from these patient support programs because of fraud—until now.

4.     The Defendants in this case are two interconnected and growing networks of healthcare clinics, pharmacies, and lab testing facilities throughout Florida, together with the individuals who own and operate them and certain doctors, nurse practitioners, and physician assistants whom they employ. These entities purport to be separate businesses, but Gilead's investigation has revealed copious connections among them, including shared addresses, officers, and employees.

5.     Defendants have deliberately deployed these complex networks of companies to carry out and grow their fraudulent schemes without detection. Indeed, Defendants include a number of experienced fraudsters, such as Defendant Jennifer John Carbon, who was recently convicted by a court in this District of a healthcare fraud scheme that shares many similarities with the ones alleged here.

6.     Defendants' two criminal networks operate parallel schemes, which share a common modus operandi that includes: recruiting individuals who earn low incomes or are

4

homeless to serve as placeholder "patients"; prescribing those "patients" medically unnecessary, inappropriate, and often unwanted PrEP medication; falsely certifying to Gilead's representatives that the prescriptions are medically necessary and appropriate; seeking reimbursement from Gilead, under false pretenses, for the cost of those fraudulently dispensed medications; unlawfully removing PrEP medication from its original, FDA-approved packaging and separating it from its original, FDA-approved labeling; repackaging PrEP medication in an unlawful, trademark-infringing, and potentially dangerous manner for dispensation to the recruited "patients"; and unlawfully repurchasing those medications back from "patients" for pennies on the dollar so they can be resold at a higher price on the black market.  In addition to defrauding Gilead out of tens of millions of dollars and jeopardizing Gilead's hard-earned goodwill, Defendants' schemes have placed at risk the health—and even the lives—of Floridians who are economically challenged.

7.      Concerns about Defendants' conduct first emerged when Gilead noticed that certain Prescriber Defendants and other prescribers associated with the Clinic Defendants were prescribing enormous volumes of PrEP medication to a suspiciously large number of individuals whom they had enrolled in the MAP.  This output was grossly disproportionate relative to other healthcare providers in Florida and elsewhere.  But it was only after receiving credible and consistent reports of fraud from multiple whistleblowers, including some of the Clinic Defendants' own current and former employees, that Gilead learned the true nature and scope of Defendants' fraudulent schemes.

8.      These reports brought to light elaborate fraudulent schemes whereby Defendants shamelessly exploit the most vulnerable and needy for their own financial gain.  To perpetrate

their fraud, the Clinic and Officer Defendants employ crews of van drivers who stalk the streets of Florida, searching for people who earn low incomes or are homeless whom they can recruit to bring to Defendants' clinics for so-called "wellness checks" in exchange for a $10 payment or other similarly small payments. Defendants deliberately target vulnerable individuals who earn low incomes or are homeless in connection with their schemes because they know these individuals are likely to qualify for enrollment in Gilead's MAP and can be easily pressured to participate in the scheme due to their circumstances.

9.      Once the van drivers bring these "recruits" to Defendants' clinics, the recruits are subjected to blood tests and a cursory consultation with a doctor or nurse practitioner, which one recruit whistleblower described to Gilead as "a joke." During these pretextual "wellness checks," the Prescriber Defendants and other employees of the Clinic Defendants indiscriminately prescribe PrEP medication to the recruits—including those who are not at risk of being infected with HIV, and even those who expressly tell Defendants and their employees that they do not need or want PrEP medication. Defendants do not undertake even a basic assessment of whether a PrEP prescription is safe or appropriate for these recruits.

10.     The Clinic and Prescriber Defendants then submit to Gilead fraudulent MAP enrollments for these recruits. As part of these enrollments, the Clinic and Prescriber Defendants falsely certify to Gilead that (i) the prescribed medication is for the recruit, and not someone else; (ii) the prescribed medication is medically necessary for the recruit; (iii) the prescribed medication will be used by the recruit as directed; and (iv) the prescriber will be supervising the recruit's treatments. Defendants know that these certifications are false when the Clinic and Prescriber Defendants make them, and that Gilead will rely on these false certifications in

6

approving the recruits' enrollment in the MAP and in agreeing to reimburse the cost of their

PrEP medication.  Indeed, inducing such reliance is the very linchpin of Defendants' fraudulent

schemes.

11.     The Clinic Defendants arrange for recruits' PrEP medication to be sent directly to

their clinics, and they offer recruits an additional $10 or similarly small payment each time they

return to retrieve the prescribed medication.  They offer this inducement to encourage recruits to

pick up PrEP medication dispensed by Defendants' pharmacies, thereby enabling Defendants to

secure additional reimbursements from Gilead for these "refills" and to create a misleading audit

trail.  In many instances, the recruits do not return to pick up their medication; yet the Prescriber,

Clinic, and Pharmacy Defendants continue to fill refills anyway, and instead stockpile the

medication or fraudulently redispense it to obtain a second wrongful reimbursement.  As a result,

one whistleblower told Gilead, there is a "room full of medication that [the originally recruited]

patients don't want."

12.     As part of the schemes, the Clinic and Pharmacy Defendants unlawfully

repackage the PrEP medication that they distribute.  Federal laws and regulations provide that

TRUVADA® and DESCOVY® must be dispensed only in their original, FDA-approved

packaging and must be accompanied by their approved labeling and package insert, which

includes important instructions for use.  This is no mere formality: the original, tamper-proof

packaging is specially designed to prevent degradation or contamination of the tablets; the

original labeling and package insert contain important warnings that may be necessary to avoid

serious adverse reactions; and the manufacturing lot numbers printed on each bottle are crucial

for quality control and recalls.  In violation of federal law and regulations, the Clinic and

Pharmacy Defendants remove the TRUVADA® and DESCOVY® tablets from their specially designed packaging, separate them from their FDA-approved instructions for use, and place them in generic bottles.  This renders them "misbranded drugs" under federal law, which are unlawful to possess, sell, or distribute.  In addition to jeopardizing the public health, the Clinic and Pharmacy Defendants' sale and distribution of these repackaged pharmaceuticals also violates Gilead's valuable trademarks and trade dress.

13.     After recruits finish their sham "wellness checks," are enrolled in the MAP, and receive a bottle containing PrEP tablets, the Clinic Defendants and their affiliates offer to buy the medication back from the recruit for as little as $10.  The Clinic Defendants encourage recruits to sell their medication, attempting to dissuade them from keeping the medication by claiming that it may have dangerous side effects.  Many recruits, who earn little income and need the money, accept the offer.  For those recruits who actually have a bona fide need for PrEP medication, this illegal practice deprives them of important preventative medication and risks exposing both them and the broader community to HIV infection.  Once they have bought back the PrEP medication from recruits, the Clinic Defendants either (i) return the dispensed medication to the Pharmacy Defendants to be redispensed to someone else for additional reimbursements, or (ii) sell the medication on the black market.  Both of these acts are dangerous and unlawful.

14.     After recruits have been shuttled through this unlawful and exploitative process, the Clinic Defendants' van drivers offer the recruits an additional $10 to go to another of Defendants' clinics and repeat the same process from the beginning.  In doing so, Defendants seek to further defraud Gilead by generating duplicative MAP enrollments for the same recruit,

thereby enabling Defendants to submit even more claims for reimbursement and increase exponentially the illicit profits from the schemes.

15.     Defendants have wrongfully captured tens of millions of dollars in profits through these fraudulent enrollments and reimbursement claims, which are referred to as redemptions. Each such redemption nets Defendants a handsome profit because Gilead reimburses medication dispensed to MAP participants based on the wholesale acquisition cost ("wholesale price") of TRUVADA for PrEP® or DESCOVY for PrEP®, which is currently more than $1,800 per bottle, and also pays the dispensing pharmacy a dispensing fee.  Defendants, however, do not pay that wholesale price when they purchase the PrEP medication that they purport to dispense.  Instead, by virtue of certain Clinic Defendants' participation in the U.S. government's 340B Drug Pricing Program ("340B Program")—which is designed to expand patient access to essential medication at reduced costs—Defendants pay a steeply discounted price for each bottle of PrEP medication that they buy.  Accordingly, Defendants are able to secure over $1,000 in profit for each bottle of PrEP medication purportedly dispensed to a MAP enrollee.  The per-bottle profit is even greater when Defendants obtain reimbursement from Gilead for dispensing PrEP medication that they illicitly repurchased from their recruits for as little as $10; when they do not actually dispense the prescribed medication at all; or when they illegally resell the already-dispensed PrEP medication on the black market.

16.     Each Defendant plays an instrumental role in carrying out Defendants' schemes. In particular, the Clinic Defendants (i) identify and fraudulently enroll recruits in the MAP, (ii) acquire heavily discounted PrEP medication for the Pharmacy Defendants to dispense, and (iii) purchase already-dispensed PrEP medication back from recruits so it can be redispensed or

resold.  The Prescriber Defendants, working for the Clinic Defendants, (i) perform sham "wellness checks" on recruits, (ii) fraudulently enroll recruits in the MAP on behalf of the Clinic Defendants, and (iii) use their credentials to improperly write PrEP medication prescriptions and refills for recruits.  The Lab Defendants, knowing their work is being done to further the fraudulent schemes, provide blood testing servicers in connection with the Clinic and Prescriber Defendants' fraudulent MAP enrollments, which require prescribers to confirm that MAP applicants are HIV negative.  The Pharmacy Defendants dispense repackaged PrEP medication, submit fraudulent redemptions, and receive significant fees and reimbursements from Gilead, which the Pharmacy Defendants share with the other Defendants to secure their participation in the fraudulent scheme and fund its expansion.  And the Officer Defendants, by virtue of their control of the entity Defendants, devise, implement, and enforce policies and business practices that enable the other Defendants to carry out the fraud.

17.     In Spring 2020, Gilead began implementing additional safeguards in an attempt to put a stop to the ongoing fraud.  Defendants have responded by adopting countermeasures to evade further scrutiny and perpetuate their fraudulent schemes.  For example, Gilead started blocking certain prescribers responsible for Defendants' fraudulent MAP enrollments—including the Prescriber Defendants—from enrolling additional persons through Gilead's online enrollment portal.  In response, Defendants have begun using new, unblocked prescribers to fraudulently enroll new recruits in the MAP while continuing to rely on blocked prescribers—including many of the Prescriber Defendants—to actually write the new recruits' prescriptions.  Furthermore, Defendants have shifted their fraudulent MAP enrollment operations to new clinics and companies that employ prescribers who are not subject to Gilead's enrollment blocks.

10

18.     Gilead has also implemented additional validation checks to stop Defendants'
fraud, such as requiring MAP applicants being enrolled by prescribers associated with the Clinic
Defendants, including the Prescriber Defendants, to provide a photo ID and speak with Gilead's
agents by telephone to confirm their identities and that they have a bona fide desire to take PrEP
medication.  In response, the Clinic Defendants' employees have begun coaching MAP
applicants during validation phone calls and at times have even falsely posed on those calls as
the putative individuals for whom the prescriptions are being written.  They have also begun
manufacturing fake ID cards for recruits, which falsely claim that the Clinic Defendants operate
homeless shelters.

19.     As Defendants' increasingly brazen tactics demonstrate, Gilead cannot stop these
dangerous and fraudulent schemes through its own efforts alone.  Gilead is now left with no
choice but to seek an injunction that, among other things, prohibits Defendants and their
affiliates from participating in the MAP, and from continuing their dangerous and unlawful
practice of redispensing, purchasing, and selling PrEP medication that has already been
dispensed.  Gilead is compelled to take these actions to preserve the integrity of the MAP, which
Gilead operates at great expense as part of its commitment to eradicating HIV and to ensuring
that individuals can access Gilead's life-saving therapies without regard to their ability to pay.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.
§§ 1331 (federal question) and 1332(a)(1) (diversity jurisdiction).

21.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

22.     The Court has personal jurisdiction over Defendants because each of the Defendants (except Defendant Roman Shekhet) is a citizen of Florida, and is therefore subject to general personal jurisdiction in the courts of the State of Florida.  The Court further has personal jurisdiction over all Defendants (including Defendant Roman Shekhet) because each of them committed the acts giving rise to this lawsuit within the State of Florida, and/or purposely availed themselves of Florida's laws, and/or knowingly and specifically targeted the State of Florida when committing the acts giving rise to this lawsuit.

23.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendants are subject to personal jurisdiction in this District.

## PARTIES

### I.     Plaintiffs

24.     Plaintiff Gilead Sciences, Inc. is a public corporation organized under the laws of the State of Delaware, with more than 12,000 employees and a market value of more than $70 billion.  Its principal place of business is 333 Lakeside Drive, Foster City, California 94404.  Gilead develops and markets a large portfolio of lifesaving medications.  These include drugs for the treatment or prevention of HIV, hepatitis B, and hepatitis C.  Gilead is the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and package inserts of certain genuine PrEP medications.

25.     Plaintiff Gilead Sciences Ireland UC ("Gilead Ireland") is a private unlimited company organized under the laws of Ireland, with its principal place of business at IDA Business & Technology Park, Carrigtohill, Co. Cork, Ireland.  Gilead Ireland is a wholly owned

subsidiary of Gilead Sciences, Inc. and the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and instructional inserts of certain genuine PrEP medications.

26.     Gilead Sciences, Inc. and Gilead Ireland (together, "Gilead") are the collective owners of a number of well-established and famous registered trademarks (the "Gilead Marks") that appear on genuine PrEP products.  A complete list of these trademarks is depicted at Exhibit A hereto.  Gilead also owns and uses distinctive packaging (the "Gilead Trade Dress") to distinguish its PrEP products in the marketplace, which is depicted at Exhibit B hereto.

27.     Gilead has used and is currently using these Gilead Marks and this Gilead Trade Dress in commerce in connection with its sale of PrEP medication, and plans to continue such use in the future.  Gilead prominently displays the Gilead Marks in its advertising and promotional materials.

28.     Gilead has engaged and continues to engage in activities designed to promote PrEP medication and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States.  All of these trademarks and trade dress symbolize business goodwill of Gilead and are invaluable assets to Gilead.

29.     For more than three decades, Gilead has strived to create a healthier world for all by delivering innovative therapeutics that aim to prevent, treat, or cure life-threatening diseases. Gilead relentlessly pursues advancements in science with the goal of bringing to patients treatments that improve care in areas of unmet medical needs around the world.

13

30.     Gilead has transformed care for people living with HIV and hepatitis C, developing pioneering medicines including the world's first single tablet regimen to treat HIV, the first medicine to prevent HIV infection, and four hepatitis C therapies.

## II.     Defendants

31.     The Defendants here consist of two groups of affiliated and aligned clinics, prescribers, laboratories, and pharmacies: the Doctors United Defendants and the Positive Health Defendants.

32.     The Doctors United Defendants include (a) six clinics: Defendants Doctors United, Inc. d/b/a Doctors United Group; AJC Medical Group, Inc.; Allied Health Organization Inc.; A Better You Wellness Center, LLC; Florimed Medical Center Corp.; and Juan Jesus Salina, M.D. Corp. ("Doctors United Clinic Defendants"); (b) four prescribers: Defendants Tamara Alonso, John Catano, Alexander Evans, and Ifeoma Nwofor ("Doctors United Prescriber Defendants"); (c) one lab testing facility, Testing Matters Inc. ("Doctors United Lab Defendant"); (d) one pharmacy: Physician Preferred Pharmacy, Inc. ("Doctors United Pharmacy Defendant"); and (e) principals and officers of the Doctors United Clinic, Laboratory, and Pharmacy Defendants ("Doctors United Officer Defendants").

33.     The Positive Health Defendants include (a) seven clinics: Defendants Alliance Medical Center, Inc.; Baikal Marketing Group, Inc.; 3rd Step Recovery Group, Inc. d/b/a Continental Wellness Center; Community Health Medical Center LLC; Positive Health Alliance, Inc.; Priority Health Medical Center, Inc.; and Well Care LLC ("Positive Health Clinic Defendants"); (b) nine prescribers: Defendants Barbara Bryant, Jesula Gabo, Kerline Joseph, Viergela Joseph, Andre Kerr, Cassandra Louissaint, Michael Pierce, Michel Poitevien, and Jean

14

Rodney ("Positive Health Prescriber Defendants")[2]; (c) two lab testing facilities, Defendants Labs4Less LLC and United Clinical Laboratory LLC ("Positive Health Lab Defendants"); (d) one pharmacy, Defendant United Pharmacy LLC ("Positive Health Pharmacy Defendant"); and (e) principals and officers of the Positive Health Clinic, Laboratory, and Pharmacy Defendants ("Positive Health Officer Defendants").[3]

34.    The individuals and entities within each group of Defendants are linked through a complex web of connections in their operations and in their schemes to defraud Gilead.  These overlapping and concealed connections are a telltale sign that the entity Defendants were created to perpetrate fraud.  Unlike a legitimate business, which typically seeks to leverage the synergies of a shared business name, Defendants have instead sought to obscure the true nature of their relationships with their affiliates and subsidiaries through these convoluted links.  The nature and scope of those connections will be further revealed through discovery.

35.    Below is a visual representation of the Doctors United Defendants and the Positive Health Defendants, based on information currently known to Gilead.

---

[2] As alleged below, Positive Health Prescriber Defendants Barbara Bryant and Michel Poitevien have also enrolled individuals in the MAP on behalf of the Doctors United Clinic Defendants.

[3] As alleged above, Defendant Jean Rodney is both a Positive Health Prescriber Defendant and Officer Defendant.  *See* note 1, *supra*.

# The Conspiracies

|  | **Doctors United Defendants** | **Positive Health Defendants** |
|---|---|---|
| **Clinic Defendants** | • AJC Medical Group (AJC)<br>• Allied Health Organization* (AHO)<br>• Doctors United Group* (DUG)<br>• Florimed Medical Center* (FMC)<br>• Juan Jesus Salina, M.D. Corp. (JJS)<br>• Better You Wellness Center (BYWC) | • Alliance Medical Center (AMC)<br>• Baikal Marketing Group (BMG)<br>• Continental Wellness Center* (CWC)<br>• Community Health Medical Center (CHM)<br>• Positive Health Alliance* (PHA)<br>• Priority Health Medical Center (PHMC)<br>• Well Care (WC) |
| **Pharmacy Defendants** | • Physician Preferred Pharmacy (PPP) | • United Pharmacy (UP) |
| **Lab Defendants** | • Testing Matters (TM) | • Labs4Less (L4L)<br>• United Clinical Laboratory (UCL) |
| **Officer Defendants** | • Myriam Augustine (BYWC)<br>• Twiggi Batista (PPP)<br>• Michael Bogdan (TM & DUG)<br>• Augustine Carbon (DUG)<br>• Jennifer John Carbon (DUG & AJC)<br>• Khadijah Carbon (DUG)<br>• Alejandro Castro (AHO)<br>• Jean Charlot (AJC)<br>• Juan Jesus Salina (JJS)<br>• Tomas Wharton (FMC & DUG) | • Jean Alexandre (AMC)<br>• Chenara Anderson (CWC)<br>• Arsen Bazylenko (BMG)<br>• Shonta Darden (PHA)<br>• Maria Freeman (CWC)<br>• Shajuandrine Garcia (WC)<br>• Barbara Gibson (CWC)<br>• Gary Kogan (L4L & PHA)<br>• Cora Mann (PHA)<br>• Nick Myrtil (PHMC)<br>• Erik Joseph Pavao (CHM)<br>• Willie Peacock (WC)<br>• Tatiana Rozenblyum (BMG)<br>• Dimitry Shaposhnikov (PHA)<br>• Roman Shekhet (UP)<br>• Kirill Vesselov (CHM & UCL)<br>• Mikhail Vesselov (UP, UCL, & L4L) |
| **Prescriber Defendants** | • Tamara Alonso (DUG)<br>• John Catano (DUG)<br>• Alexander Evans (AHO)<br>• Ifeoma Nwofor (AJC) | • Barbara Bryant (BMG, CWC, PHA)<br>• Jesula Gabo (PHA)<br>• Kerline Joseph (BMG, PHA)<br>• Viergela Joseph (PHA)<br>• Andre Kerr (BMG, CWC, PHA)<br>• Cassandra Louissaint (PHMC)<br>• Michael Pierce (CWC)<br>• Michel Poitevien (AMC, PHMC)<br>• Jean Rodney (AMC, BMG) |

*340B Clinic

A.      **Doctors United and Its Affiliates**

1.      **The Doctors United Defendants**

36.      Defendant Doctors United, Inc. d/b/a Doctors United Group ("Doctors United") is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 1498 NW 54 Street, Suite C, Miami, Florida 33142.  Doctors United operates a network of clinics throughout Florida and is enrolled in the 340B Program administered by the United States Health Resources & Services Administration ("HRSA").[4]  Through the 340B Program, drug manufacturers participating in Medicaid agree to make their drugs available at significantly reduced prices to entities eligible for participation in the 340B Program ("covered entities").

37.      Defendant AJC Medical Group, Inc. ("AJC Medical") is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare provider. According to records from the Florida Division of Corporations ("Division of Corporations"), AJC Medical's principal place of business is 1498 NW 54 Street, Suite C, Miami, Florida 33142. Division of Corporations records state that AJC Medical filed for dissolution in June 2019; however, AJC Medical is still listed as an actively operating entity according to NPI Profile, a searchable public database of healthcare providers maintained by the U.S. Government.

38.      Defendant Allied Health Organization Inc. ("Allied Health") is a nonprofit corporation organized under the laws of the State of Florida, with its principal place of business

---

[4] HRSA maintains a searchable public database, which lists the covered entities that are actively participating in the 340B Program, their locations, and their contract pharmacies.  Contract pharmacies are third-party pharmacies that contract with specific 340B covered entities to provide pharmacy services to the 340B entity and the eligible individuals to whom the 340B entity provides healthcare services.

17

at 14001 NW 4 Street, Suite B, Sunrise, Florida 33325. Allied Health also operates a network of clinics throughout Florida and is enrolled in the 340B Program.

39. Defendant A Better You Wellness Center, LLC ("Better You Wellness Center") is a limited liability company organized under the laws of the State of Florida that holds itself out as a healthcare provider. Its principal place of business is 3529 N. Pine Island Road, Sunrise, Florida 33351.

40. Defendant Florimed Medical Center Corp. ("Florimed") is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 311 NE 8 Street, Homestead, Florida 33030. Florimed operates a clinic in Homestead, Florida and is enrolled in the 340B Program.

41. Defendant Juan Jesus Salina, M.D. Corp. ("Salina M.D. Corp.") is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare provider. Its principal place of business is 4212 W. 16th Avenue, Hialeah, Florida 33012.

42. Defendant Physician Preferred Pharmacy, Inc. ("Physician Preferred") is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 2700 North State Road 7, Margate, Florida 33063. Physician Preferred dispenses prescription drugs, including PrEP medication.

43. Defendant Testing Matters Inc. ("Testing Matters") is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare lab testing facility. Its principal place of business is 14001 NW 4 Street, Sunrise, Florida 33325.

44. Defendant Jennifer John Carbon is a Florida citizen residing in Miramar, Florida. She is a co-founder of Defendant Doctors United and its former President. She is also the co-

founder and current Registered Agent for Defendant AJC Medical.  She remains involved in overseeing, supervising, and/or directing the affairs of Doctors United and AJC Medical.  In June 2018, federal prosecutors filed a criminal complaint against her charging her with conspiracy to commit healthcare fraud against TRICARE, the Department of Defense's health insurance program, through her role as an officer of Comfort Medical Center LLC ("Comfort Medical"), a limited liability company organized under the laws of the State of Florida.

45.     Thereafter, Jennifer John Carbon pleaded guilty to one count of conspiracy to receive healthcare kickbacks.  In the factual proffer accompanying that plea, she admitted that, in exchange for kickbacks, she "***agreed to arrange for and provide medically unnecessary prescriptions*** for compounded medications to TRICARE beneficiaries" who were referred to Comfort Medical by her co-conspirators.  Mrs. Carbon further admitted that, in exchange for kickbacks, she "arranged for and provided prescriptions" to a co-conspirator who would then dispense medically unnecessary medication to TRICARE beneficiaries that Mrs. Carbon had "personally recruited."  Mrs. Carbon was sentenced to a prison term in connection with her conviction and was released from federal custody in September 2020.

46.     Defendant Augustine Carbon is a Florida citizen residing in Miramar, Florida.  He is the President and CEO of Defendant Doctors United, and he oversees, supervises, and/or directs Doctors United's affairs.  He is married to Defendant Jennifer John Carbon.  Augustine Carbon is also a Manager of Comfort Medical, and held that same position when his wife, Jennifer John Carbon, used the company to commit healthcare fraud.

47.     Defendant Khadija Carbon is a Florida citizen residing in Miami, Florida.  She is the Vice President of Defendant Doctors United, and she oversees, supervises, and/or directs

19

Doctors United's affairs.  She is the daughter of Defendants Jennifer John Carbon and Augustine Carbon.

48.      Defendant Alejandro Castro is a Florida citizen residing in Davie, Florida.  Mr. Castro is the President of Defendant Allied Health, and he oversees, supervises, and/or directs Allied Health's affairs.

49.      Defendant Jean Charlot is a Florida citizen believed to have last resided in Weston, Florida.  According to NPI Profile, Dr. Charlot is listed as the Medical Director of Defendant AJC Medical, and he oversees, supervises, and/or directs AJC Medical's affairs.

50.      Defendant Myriam Augustine is a Florida citizen residing in Plantation, Florida. Ms. Augustine is the Authorized Member, President, CEO, and CFO of Defendant Better You Wellness Center.  She oversees, supervises, and/or directs Better You Wellness Center's affairs.

51.      Defendant Tomas Wharton is a Florida citizen residing in Miami, Florida.  Mr. Wharton is the President, Secretary, Treasurer, and Director of Defendant Florimed.  He oversees, supervises, and/or directs Florimed's affairs.

52.      Defendant Juan Jesus Salina is a Florida citizen residing in Miami Lakes, Florida. Dr. Salina is the President of Defendant Salina M.D. Corp. and he oversees, supervises, and/or directs Salina M.D. Corp.'s affairs.

53.      Defendant Twiggi Batista is a Florida citizen residing in Davie, Florida.  Ms. Batista is the President of Defendant Physician Preferred, and she oversees, supervises, and/or directs Physician Preferred's affairs.

54.      Defendant Michael Bogdan is a Florida citizen residing in Davie, Florida.  Mr. Bogdan is the CEO and Manager of Defendant Testing Matters, and he oversees, supervises,

20

and/or directs Testing Matters' affairs.  Mr. Bogdan is also a former manager at a clinic operated by Defendant Doctors United, and he oversaw, supervised, and/or directed Doctors United's affairs at that clinic.

55.     Defendant Tamara Alonso is a Florida citizen residing in Miami, Florida.  Ms. Alonso is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendant Doctors United.  She is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical Center, Inc. ("Alliance Medical"); Allied Health; 3rd Step Recovery Group, Inc. d/b/a Continental Wellness Center ("Continental Wellness"), Doctors United; Florimed; Positive Health Alliance, Inc. ("Positive Health"), and Priority Health Medical Center, Inc. ("Priority Health").

56.     Defendant John Catano is a Florida citizen residing in Coral Springs, Florida.  Dr. Catano is a licensed physician who has enrolled recruits in the MAP on behalf of Defendant Doctors United.  He is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical; Allied Health; Continental Wellness; Doctors United; Florimed; Positive Health; and Baikal Marketing Group, Inc. ("Baikal Marketing").

57.     Defendant Alexander Evans is a Florida citizen residing in either Sanford, Florida, or Longwood, Florida.  Dr. Evans is a licensed surgeon who has enrolled recruits in the MAP on behalf of Defendant Allied Health.

58.     Defendant Ifeoma Nwofor is a Florida citizen residing in Miramar, Florida.  Ms. Nwofor is a licensed nurse practitioner.  She is the listed prescriber on redemptions submitted to

21

Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Doctors United Clinic Defendants AJC Medical, Allied Health, and Doctors United. Ms. Nwofor is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Positive Health Clinic Defendants Alliance Medical and Positive Health.

### 2.     Connections Among the Doctors United Defendants

59.     The Doctors United Defendants are linked to one another through a web of overlapping connections, evidencing their mutual cooperation in the fraudulent scheme at issue.

60.     Defendant Physician Preferred is a "contract pharmacy" for Defendants Doctors United, Allied Health, and Florimed, each of which is a registered 340B covered entity.  As such, Physician Preferred receives and dispenses drugs purchased by Doctors United, Allied Health, and Florimed at discounted 340B Program prices.

61.     Defendant AJC Medical's principal place of business is 1498 NW 54 Street, Suite C, Miami, Florida 33142.  This address is identical to the principal address for Defendant Doctors United.  Comfort Medical, the company through which Defendant Jennifer John Carbon committed healthcare fraud, also lists its principal place of business at this same address.

62.     Two former websites for Defendant Doctors United (www.mydug.org and www.doctorsunitedgroup.com) currently redirect to the website for Defendant Allied Health (https://alliedhealth.org/).

63.     The current website for Defendant Doctors United (https://www.dughealth.org/) lists Defendant Salina M.D. Corp. as an affiliate.

22

64.     The current website for Defendant Allied Health lists the headquarters of Defendant Better You Wellness Center as an Allied Health location.

65.     The current Director of Communications for Allied Health is Mario Schauer. Before joining Allied Health, Mr. Schauer was a Marketing and Public Relations Specialist at Doctors United.  In that role, Mr. Schauer managed Doctors United's marketing team.

66.     Defendant Tomas Wharton is the current President, Secretary, Treasurer, and Director of Florimed.  He also served as the President of Doctors United between June 2018 and December 2018.

67.     Defendants Tamara Alonso and John Catano are the listed prescribers on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by several of the Doctors United Clinic Defendants, and in particular Allied Health, Doctors United, and Florimed.

68.     The principal place of business for Defendant Testing Matters is 14001 NW 4 Street, Sunrise, Florida 33325.  This address corresponds to the address of an Allied Health 340B clinic registered with HRSA.  The website for Testing Matters also lists a location at 2150 W. 76th Street, Suite 100, Hialeah, Florida 33016.  This address is identical to the address listed on the Doctors United website for one of its clinics.

69.     According to HRSA records, Defendant Michael Bogdan, the current CEO and Manager of Testing Matters, is the primary contact for a former Doctors United clinic in Pompano Beach, Florida that was enrolled in the 340B Program.  In addition, Mr. Bogdan and Defendant Twiggi Batista of Physician Preferred live together at the same address in Davie, Florida.

23

70.     The following is a visual representation of the connections among the Doctors United Defendants, based on information currently known to Gilead.



**B.      Positive Health and Its Affiliates**

**1.      The Positive Health Defendants**

71.      Defendant Positive Health Alliance is a nonprofit corporation organized under the laws of the State of Florida, with its principal place of business at 730 West Hallandale Beach Boulevard, Suite #109, Hallandale, Florida 33009.  Positive Health operates a network of health clinics throughout Florida and is enrolled in the 340B Program.

72.      Defendant United Pharmacy LLC ("United Pharmacy") is a limited liability company organized under the laws of the State of Florida, with its principal place of business at 3951 N. Haverhill Road, Suite 120-121, West Palm Beach, Florida 33417.  United Pharmacy dispenses prescription drugs, including PrEP medication.

73.      Defendant 3rd Step Recovery Group, Inc. d/b/a Continental Wellness Center is a nonprofit corporation organized under the laws of the State of Florida.  According to records from the Division of Corporations, Continental Wellness's principal address is 3400 NW 9th Avenue, Suite A, Oakland Park, Florida 33309.  Continental Wellness operates a clinic at that location that is registered with the 340B Program.  According to NPI Profile, Continental Wellness also operates clinics at 450 E. Prospect Road, Oakland Park, Florida 33334 and 4055 N. Andrews Avenue, Oakland Park, Florida 33309.

74.      Defendant Alliance Medical Center, Inc. is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare provider.  Its principal place of business is 6245 Miramar Parkway, Suite 101, Miramar, Florida 33023.

75.      Defendant Baikal Marketing Group, Inc. is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare provider.  According to

Division of Corporations records, Baikal Marketing's principal address is 3029 NE 188 Street, #319, Miami Florida 33180.  This address corresponds to a residential condominium.  According to NPI Profile, Baikal Marketing's principal place of business is 2500 Metrocentre Boulevard, Suite 7, West Palm Beach, Florida 33407.

76.     Defendant Community Health Medical Center, LLC ("Community Health") is a limited liability company organized under the laws of the State of Florida that holds itself out as a healthcare provider.  Its principal place of business is 3951 North Haverhill Road, Suite 120, West Palm Beach, Florida 33417.  NPI Profile records list Community Health's primary location as 3951 North Haverhill Road, Suite 117, West Palm Beach, Florida 33417.  According to Division of Corporations records, Community Health was administratively dissolved on September 25, 2020; however, according to NPI Profile, Community Health is still an actively operating entity.

77.     Defendant Labs4Less LLC ("Labs4Less") is a limited liability company organized under the laws of the State of Florida that holds itself out as a healthcare lab testing facility.  Its principal place of business is 730 W. Hallandale Beach Boulevard, Suite #109, Hallandale Beach, Florida 33009.

78.     Defendant Priority Health Medical Center, Inc. is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare provider.  Its principal place of business is 3660 Central Avenue, #6, Fort Myers, Florida 33901.  Priority Health also operates a medical clinic at 1900 Nebraska Avenue, Suite 1, Fort Pierce, Florida 34950.

79.     Defendant United Clinical Laboratory LLC ("United Labs") is a limited liability company organized under the laws of the State of Florida that holds itself out as a healthcare lab testing facility.  Its principal place of business is 2257 Vista Parkway, #2, West Palm Beach, Florida 33411.  United Labs provides blood testing services for the Positive Health Defendants.

80.     Defendant Well Care LLC ("Well Care") is a limited liability company organized under the laws of the State of Florida that holds itself out as a healthcare provider.  According to Division of Corporations records, Well Care's principal address is 309 NE Marion Street, Madison, Florida 32340.  According to NPI Profile, Well Care's principal place of business is 720 N. Ocean Street, Jacksonville, Florida 32202.

81.     Defendant Cora Mann is a Florida citizen residing in Miami Gardens, Florida.  Ms. Mann is a Director and the President of Defendant Positive Health, and she oversees, supervises, and/or directs Positive Health's affairs.

82.     Defendant Dimitry Shaposhnikov is a Florida citizen residing in Hallandale Beach, Florida.  Mr. Shaposhnikov is a Director and the Treasurer of Defendant Positive Health, and he oversees, supervises, and/or directs Positive Health's affairs.

83.     Defendant Shonta Darden is a Florida citizen residing in Miami, Florida.  Ms. Darden is a Director and the Secretary of Defendant Positive Health, and she oversees, supervises, and/or directs Positive Health's affairs.

84.     Defendant Mikhail Vesselov is a Florida citizen residing in Highland Beach, Florida.  Mr. Vesselov is a Managing Member of Defendants United Pharmacy and United Labs, and he oversees, supervises, and/or directs the affairs of those companies.  Mr. Vesselov operates a number of healthcare companies—including pharmacies, lab testing facilities, clinics, and drug

27

treatment centers—in Florida and other states.  He operates many of these other companies with his son, Defendant Kirill Vesselov.

85.     Defendant Kirill Vesselov is a Florida citizen residing in Highland Beach, Florida.  He is the Manager of Defendant Community Health and a Managing Member of Defendant United Labs, and oversees, supervises, and/or directs the affairs of those companies. Mr. Vesselov is the son of Defendant Mikhail Vesselov.  With his father, Kirill Vesselov operates a number of other healthcare companies in Florida and other states.

86.     Defendant Erik Joseph Pavao is a Florida citizen residing in Loxahatchee, Florida. According to NPI Profile, he is the Manager of Defendant Community Health and oversees, supervises, and/or directs Community Health's affairs.  Mr. Pavao has a long record of criminal offenses, including conversion, burglary, and grand theft auto.

87.     Defendant Roman Shekhet is a New York citizen residing in Brooklyn, New York.  Mr. Shekhet is a Managing Member of Defendant United Pharmacy, and he oversees, supervises, and/or directs United Pharmacy's affairs.

88.     Defendant Maria Freeman is a Florida citizen residing in Fort Lauderdale, Florida.  She is the President of Defendant Continental Wellness and oversees, supervises, and/or directs Continental Wellness's affairs.

89.     Defendant Barbara Gibson is a Florida citizen residing in Plantation, Florida.  She is the Vice President and Treasurer of Defendant Continental Wellness and oversees, supervises, and/or directs Continental Wellness's affairs.

90.     Defendant Chenara Anderson is a Florida citizen residing in Tamarac, Florida. She is the Secretary of Defendant Continental Wellness and oversees, supervises, and/or directs Continental Wellness' affairs.

91.     Defendant Jean Alexandre is a Florida citizen residing in Miami, Florida.  He is the President of Defendant Alliance Medical and oversees, supervises, and/or directs Alliance Medical's affairs.

92.     Defendant Arsen Bazylenko is a Florida citizen residing in Aventura, Florida.  He is the President of Defendant Baikal Marketing and oversees, supervises, and/or directs Baikal Marketing's affairs.  He is married to Defendant Tatiana Rozenblyum.

93.     Defendant Tatiana Rozenblyum is a Florida citizen residing in Aventura, Florida. She is the Secretary of Defendant Baikal Marketing and oversees, supervises, and/or directs Baikal Marketing's affairs.  She is married to Defendant Arsen Bazylenko.

94.     Defendant Gary Kogan is a Florida citizen residing in Aventura, Florida.  He is the Manager of Defendant Labs4Less and oversees, supervises, and/or directs Labs4Less's affairs.  Mr. Kogan is also an Executive Director of Positive Health and he oversees, supervises, and/or directs Positive Health's affairs.

95.     Defendant Nick Myrtil is a Florida citizen residing in Boynton Beach, Florida. He is the President of Defendant Priority Health and oversees, supervises, and/or directs Priority Health's affairs.

96.     Defendant Shajuandrine Garcia is a Florida citizen residing in Madison, Florida. She is the Manager of Defendant Well Care and oversees, supervises, and/or directs Well Care's affairs.

97.     Defendant Willie Peacock is a Florida citizen residing in Madison, Florida.  He is an Authorized Member of Defendant Well Care and oversees, supervises, and/or directs Well Care's affairs.

98.     Defendant Barbara Bryant is a Florida citizen residing in West Palm Beach, Florida.  Ms. Bryant is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendants Baikal Marketing, Continental Wellness, Positive Health, and Doctors United.  She is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Baikal Marketing, Continental Wellness, Doctors United, Florimed, and Positive Health.

99.     Defendant Jesula Gabo is a Florida citizen residing in Tamarac, Florida.  Ms. Gabo is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendant Positive Health.  She is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Continental Wellness, Doctors United, and Positive Health.

100.    Defendant Kerline Joseph is a Florida citizen residing in Deerfield Beach, Florida.  Ms. Joseph is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendants Baikal Marketing and Positive Health.  She is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Baikal Marketing, Continental Wellness, Doctors United, and Positive Health.

101.    Defendant Viergela Joseph is a Florida citizen residing in Lehigh Acres, Florida. Ms. Joseph is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendant Positive Health.  She is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Positive Health, Priority Health, and Well Care.

102.    Defendant Andre Kerr is a Florida citizen residing in Sunrise, Florida.  Mr. Kerr is a licensed physician assistant who has enrolled recruits in the MAP on behalf of Defendants Baikal Marketing, Continental Wellness, and Positive Health.  He is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Baikal Marketing, Continental Wellness, Doctors United, Positive Health, and Well Care.

103.    Defendant Cassandra Louissaint is a Florida citizen residing in Tampa, Florida. Ms. Louissaint is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendant Priority Health.  She is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Baikal Marketing, Doctors United, Positive Health, and Well Care.

104.    Defendant Michael Pierce is a Florida citizen residing in Wilton Manors, Florida. Dr. Pierce is a licensed physician who has enrolled recruits in the MAP on behalf of Defendant Continental Wellness.  He is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by

31

Defendants Alliance Medical, Allied Health, Continental Wellness, Doctors United, and Positive Health.

105.    Defendant Michel Poitevien is a Florida citizen residing in North Miami Beach, Florida.  Mr. Poitevien is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendants Alliance Medical, Allied Health, and Priority Health.  He is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Baikal Marketing, Continental Wellness, Doctors United, Positive Health, and Priority Health.

106.    Defendant Jean Rodney is a Florida citizen residing in Orlando, Florida.  Dr. Rodney is a licensed physician.  He is the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Continental Wellness, Doctors United, Positive Health, and Priority Health.

## 2.    Connections Among the Positive Health Defendants

107.    Like the Doctors United Defendants, the Positive Health Defendants are linked to one another through a web of overlapping connections, evidencing their mutual cooperation in the fraudulent scheme.

108.    According to records from Division of Corporations, NPI Profile, and HRSA, along with Defendants' own websites, many of the Positive Health Defendants operate out of the same premises:

a.      Alliance Medical has a mailing address of 6245 Miramar Parkway, Suite 102, Miramar, Florida 33023.  This address is identical to the address of a Positive Health clinic.

b.      The principal place of business for Baikal Marketing is 2500 Metrocentre Boulevard, Suite 7, West Palm Beach, Florida 33407.  This address is identical to the address of a Positive Health clinic.

c.      The principal place of business for Community Health is listed as both 3951 North Haverhill Road, Suite 120, West Palm Beach, Florida 33417, and 3951 North Haverhill Road, Suite 117, West Palm Beach, Florida 33417.  These addresses are identical to locations for United Pharmacy and a Positive Health clinic, respectively.

d.      Continental Wellness purports to operate a clinic at 4055 N. Andrews Avenue, Oakland Park, Florida 33309.  This location corresponds to the address of a Positive Health clinic that participated in the 340B Program from January 1, 2020, to April 1, 2020.

e.      The principal place of business for Labs4Less is 730 W. Hallandale Beach Boulevard, Suite #109, Hallandale Beach, Florida 33009.  This address is identical to the address of a Positive Health clinic.

f.      The principal place of business for Priority Health is 3660 Central Avenue, #6, Fort Myers, Florida 33901.  This address is identical to the address of a Positive Health clinic that participated in the 340B Program from May 8, 2020, to October 1, 2020.

33

g.     The principal place of business for Well Care is 720 N. Ocean Street, Jacksonville, Florida 32202.  This address is identical to the address of a Positive Health clinic.

109.    United Pharmacy is a contract pharmacy for all of the Positive Health clinics registered with HRSA, including each of the clinics listed in Paragraph 108 above.

110.    Defendant Jean Rodney is an officer or license-holder for several of the Positive Health Defendants.  For example, NPI Profile states that Dr. Rodney is the Medical Director of both Alliance Medical and Baikal Marketing.  In addition, the Fort Pierce clinic operated by Priority Health is registered under Dr. Rodney's medical license.

111.    Defendant Mikhail Vesselov is the Managing Member of United Pharmacy and United Labs, as well as the co-founder and former Manager of Defendant Labs4Less.

112.    As alleged above, Defendant Gary Kogan is both the Manager of Labs4Less and, according to NPI Profile and HRSA records, the Executive Director of Positive Health.

113.    The Positive Health Prescriber Defendants are the listed prescribers on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by several Positive Health Clinic Defendants.  For example, as alleged above, Defendant Barbara Bryant is the listed prescriber for PrEP medication purportedly dispensed to individuals enrolled in the MAP by Positive Health Clinic Defendants Alliance Medical, Baikal Marketing, Continental Wellness, and Positive Health.  Similarly, Defendant Andre Kerr is the listed prescriber for PrEP medication purportedly dispensed to individuals enrolled in the MAP by Positive Health Clinic Defendants Alliance Medical, Baikal Marketing, Continental Wellness, Positive Health, and Well Care.

34

114.    The Positive Health Defendants are also heavily connected through social media. For instance, Labs4Less maintains a public social media account on Instagram, which includes a number of posts referencing the public Instagram account for Positive Health.  For example, the Labs4Less Instagram account includes a post from December 24, 2019, which purports to show photos taken at a Positive Health Christmas Party.



Similarly, Well Care expressly claims an affiliation with Positive Health (also known as "PHA") on its public Facebook page, referring to itself as "Well Care LLC – PHA" and using Positive Health's logo.



115.    These social media connections extend to the individual Positive Health Defendants as well.  For example, Defendant Arsen Bazylenko's Facebook account is "friends" with the Facebook accounts associated with Defendant Dimitry Shaposhnikov of Positive Health and Defendant Erik Joseph Pavao, a Manager of Community Health.

36

116.     Several of the individual Positive Health Defendants are also connected through a common non-party employer: the North Miami Police Department.  In particular, the President and Secretary of Positive Health (Defendants Cora Mann and Shonta Darden, respectively) are both employed by the North Miami Police Department, as is Defendant Gary Kogan, the Manager of Defendant Labs4Less and Executive Director of Positive Health.

117.     The following is a visual representation of the connections among the Positive Health Defendants, based on information currently known to Gilead.



## Positive Health Defendants

### C.      Connections Among the Doctors United and Positive Health Defendants

118.    As alleged above, the Doctors United Defendants are all closely linked with one another, and the same is true of the Positive Health Defendants.  These groups of Defendants also share common contact points with one another, indicating that both groups of Defendants are working in concert to defraud Gilead.

119.    For example, Doctors United and Positive Health work with a common pharmacy to carry out their fraudulent schemes: As one Doctors United employee told the Recruit Whistleblower,[5] a whistleblower who contacted Gilead about the schemes, ***"Doctors United and Positive Health and everybody else all use the same Pharmacy that delivers directly to their offices."***

120.    In addition, the Doctors United Prescriber Defendants are the listed prescribers on a substantial number of redemptions associated with individuals enrolled in the MAP by the Positive Health Clinic Defendants.  For instance, Doctors United Prescriber Defendant Tamara Alonso is the listed prescriber on redemptions associated with individuals enrolled in the MAP by Positive Health Clinic Defendants Alliance Medical, Continental Wellness, Positive Health, and Priority Health.

121.    Similarly, the Positive Health Prescriber Defendants are the listed prescribers on a substantial number of redemptions associated with individuals enrolled in the MAP by the Doctors United Clinic Defendants.  For instance, Positive Health Prescriber Defendant Jesula

---

[5] In light of the criminal nature of Defendants' scheme, this complaint uses pseudonyms in certain instances to protect the safety of whistleblowers.  Where individual MAP enrollees are discussed, pseudonyms are also used to protect the enrollee's protected health information.

Gabo is the listed prescriber on redemptions associated with individuals enrolled in the MAP by Doctors United Clinic Defendants Allied Health and Doctors United.

122.    The overlap between the Doctors United Defendants and Positive Health Defendants also extends to MAP enrollments.  For example, Positive Health Prescriber Defendants Barbara Bryant and Michel Poitevien have enrolled individuals in the MAP on behalf of *both* the Doctors United Clinic Defendants (i.e., Allied Health and Doctors United) and the Positive Health Clinic Defendants (Alliance Medical, Baikal Marketing, Continental Wellness, Positive Health, and Priority Health).

123.    Defendants' social media accounts further corroborate the connections between the Doctors United Defendants and Positive Health Defendants.  For example, Defendant Arsen Bazylenko of Baikal Marketing (a Positive Health affiliate) is a Facebook "friend" of Defendants Augustine and Khadijah Carbon, the two corporate officers of Doctors United.

124.    Discovery will reveal further connections and coordination between the Doctors United Defendants and Positive Health Defendants.

## FACTUAL ALLEGATIONS

I.    **The Impact of HIV and AIDS in the United States**

125.    Human immunodeficiency virus, or HIV, is a deadly virus that has caused the deaths of hundreds of thousands of Americans since the AIDS epidemic broke out in the United

States in the 1980s.[6]  Its impact has been even more devastating across the globe.  In 2019 alone, approximately 690,000 people died from AIDS-related illnesses worldwide.[7]

126.    The virus significantly affects the health and welfare of Americans.  According to estimates published by the U.S. Centers for Disease Control and Prevention ("CDC"), approximately 1.2 million people in the United States were living with HIV by the end of 2018, the last reported year of data.[8]  In 2018 alone, 37,968 people received a new HIV diagnosis in the United States and dependent areas.[9]  Virtually all of these infections were due to sexual contact or injection drug use.[10]

127.    While the numbers of individuals receiving an HIV diagnosis and living with HIV remain significant, the overall infection rate nevertheless reflects progress in the fight against the virus.  For example, the CDC reports that the annual number of new HIV diagnoses decreased 7% from 2014 to 2018.

---

[6] *See* The HIV/AIDS Epidemic in the United States: The Basics, Kaiser Family Foundation (Mar. 25, 2019), https://www.kff.org/hivaids/fact-sheet/the-hivaids-epidemic-in-the-united-states-the-basics/#endnote_link_391348-2.

[7] *See* Global HIV/AIDS Overview, Minority HIV/AIDS Fund, https://www.hiv.gov/federal-response/pepfar-global-aids/global-hiv-aids-overview#:~:text=Further%2C%20the%20HIV%20epidemic%20not,insecurity%2C%20and%20other%20serious%20problems (last updated July 7, 2020).

[8] Basic Statistics, CDC, https://www.cdc.gov/hiv/basics/statistics.html (last updated July 1, 2020).

[9] Dependent areas include American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, the Republic of Palau, and the US Virgin Islands.

[10] Basic Statistics, CDC, https://www.cdc.gov/hiv/basics/statistics.html (last updated July 1, 2020).

## II.      Gilead's Pre-Exposure Prophylaxis ("PrEP") for HIV Prevention

128.    One of the most significant developments in the fight against HIV is the development of drugs that can be taken for PrEP—a method of HIV prevention whereby individuals who are HIV-negative but at-risk for HIV infection proactively take medication on an ongoing basis to decrease their risk of contracting HIV through sex.

129.    TRUVADA® and DESCOVY® are two therapies developed and manufactured by Gilead that can be taken for PrEP.  Both drugs come in the form of a tablet.  The FDA-recommended dosage for both is one tablet per day.

130.    When taken as indicated, each drug is highly effective at preventing HIV infection in individuals exposed to the virus.  Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%.[11]

131.    TRUVADA® was approved by the FDA for PrEP in 2012,[12] and DESCOVY® was approved by the FDA for PrEP in 2019.[13]  These two medications are the first, and until recently, the only FDA-approved PrEP medications in the United States.  They have been instrumental in preventing the spread of HIV in areas in the United States where there is a high prevalence of HIV.

---

[11] PrEP, CDC, https://www.cdc.gov/hiv/basics/prep.html (last reviewed Sept. 18, 2020).

[12] TRUVADA® contains, as its active ingredients, 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate.

[13] DESCOVY® contains, as its active ingredients 200 mg of emtricitabine and 25 mg of tenofovir alafenamide.

III.    **The Gilead Advancing Access® Patient Support Program and Gilead's Provision of Free Medication to Individuals in Need**

132.    To help support individuals who have been prescribed Gilead medications, Gilead operates a number of Patient Support Programs that facilitate access to critical, life-saving therapies.

133.    Gilead's Patient Support Programs accomplish this objective in several ways. The programs provide information to individuals regarding insurance coverage for Gilead therapies. They help to identify sources of financial support for uninsured persons in need of those therapies. And, most relevant here, they provide free medication to eligible individuals who lack insurance and are otherwise unable to access alternative funding sources.

134.    Gilead Advancing Access® ("Advancing Access®") is the Patient Support Program that is specifically designed for persons who have been prescribed Gilead therapies for the treatment or prevention of HIV, such as TRUVADA® and DESCOVY®, or the treatment of hepatitis B.[14]

A.    **The Advancing Access® Patient Assistance Program and Medication Assistance Program**

135.    Gilead created Advancing Access® in 2004. Among other things, Advancing Access® operates a free-drug program. Eligible individuals who lack insurance for a particular Gilead HIV or hepatitis B therapy and are otherwise unable to access alternative funding sources can enroll in the free-drug program and receive their medication at no charge. Gilead voluntarily bears the cost of the medication.

---

[14] Gilead operates other Patient Support Programs for other therapies. For example, Gilead's Support Path® program covers Gilead's hepatitis C therapies.

43

136.    The Advancing Access® free-drug program for *treatment* medication (i.e., for patients who have already contracted HIV or hepatitis B) is called the Patient Assistance Program ("PAP").  Gilead's free-drug program for TRUVADA® or DESCOVY® for HIV *prevention* (i.e., TRUVADA for PrEP® or DESCOVY for PrEP®) is called the Medication Assistance Program ("MAP").[15]

137.    Gilead voluntarily created the MAP to ensure that low-income individuals at risk of HIV infection, who lack insurance coverage and are otherwise unable to access other financial support, can successfully obtain PrEP medication.

**B.    Gilead Expends Substantial Resources on the PAP and MAP Because of Its Commitment to Help Those in Need and Prevent the Spread of HIV**

138.    Since 2005, the MAP and PAP programs have helped tens of thousands of uninsured eligible individuals obtain for free, billions of dollars of potentially life-saving Gilead medications that they need.

139.    In addition to giving away free medication to PAP and MAP enrollees, Gilead has paid hundreds of millions of dollars to third parties to administer various aspects of the Advancing Access® program, such as processing enrollments and managing the cards that enrollees present to pharmacies to obtain their free medication.  In 2019 alone, Gilead paid tens of millions of dollars in dispensing and administrative fees and costs to these third parties in connection with operating Advancing Access.

---

[15] Gilead Patient Support Programs other than Advancing Access® also have PAPs that provide eligible individuals with access to free medication.  Unless otherwise specified, all references in this complaint to the PAP and MAP are to the Advancing Access® PAP and MAP.

44

140.    Gilead is proud of and committed to the PAP and MAP.  They are crucial components of Gilead's mission to prevent the spread of HIV, and help to further Gilead's goal of ensuring that as many individuals as possible can access Gilead's life-saving therapies.  These programs exemplify Gilead's vision "[t]o create a better, healthier world for all people," and embody the company's credo of "doing what's right."

### C.    Qualifying for the PAP or MAP

141.    Gilead has implemented eligibility criteria to ensure that the PAP and MAP serve U.S. residents who need free medication the most.

142.    To qualify for the PAP or MAP, an applicant generally must meet four criteria: (1) the applicant must be uninsured; (2) the applicant's annual household income must be less than or equal to 500% of the federal poverty level; (3) the applicant must be a resident of the U.S. or a U.S. territory; and (4) the applicant must be treated by a physician in the U.S. or a U.S. territory.

143.    If an applicant satisfies these four criteria, he or she is eligible to enroll in the PAP or MAP for a 12-month period.  After 12 months, the enrollee may reapply and reenroll indefinitely for subsequent 12-month periods so long as he or she continues to meet the eligibility requirements.

144.    Individuals can either enroll themselves in the PAP or MAP, or their healthcare providers can do so for them.  Enrollment can be accomplished by calling the Advancing Access® call center, by fax, or through an online portal.  Through these enrollment mechanisms, Gilead's agents are able to quickly determine whether an applicant meets the PAP or MAP eligibility criteria and immediately enroll eligible applicants in the program.

**D.    The Essential Role of Healthcare Providers in Ensuring PrEP Medication is Medically Necessary and Appropriate**

145.    An individual's enrollment in and receipt of medication through the MAP also requires the participation and careful oversight of a healthcare provider to ensure that PrEP medication is and remains appropriate and medically necessary for the individual.

146.    Like all prescription drugs, PrEP medication is not appropriate for everyone. Thus, before prescribing PrEP medication, a healthcare provider must carefully determine that the medication is medically necessary.  The CDC has issued guidelines to assist healthcare providers in determining whether and under what circumstances to prescribe PrEP medication so that it can used safely and effectively.

147.    According to CDC guidance, before prescribing PrEP medication, a healthcare provider must assess whether an individual is at risk of acquiring HIV through sex or injection drug use.  If that assessment indicates that an individual is not at risk of HIV infection, PrEP medication is not medically necessary, and the provider should not prescribe PrEP medication. If, on the other hand, the healthcare provider determines that PrEP medication is appropriate, she will ordinarily prescribe a 30-day supply along with two refills.

148.    Before prescribing PrEP medication, the FDA also advises healthcare providers to conduct certain tests to determine whether taking PrEP medication might pose risks to the potential candidate for the medication.  For example, healthcare providers should assess whether an individual is HIV negative before prescribing PrEP medication because an HIV-positive individual who takes either TRUVADA® or DESCOVY® alone risks allowing the virus to develop resistance to drugs used to treat HIV, thereby limiting potential treatment options for the individual.  In addition, the FDA instructs prescribers to test individuals for chronic hepatitis B

46

and to assess their kidney function, including creatinine clearance, before, when initiating, or during use of PrEP medication, per the prescribing information for each drug.  While PrEP is generally safe for individuals with chronic hepatitis B or low creatinine levels to take, their use of PrEP medication could implicate other risks that their healthcare provider will want to closely monitor.  And before prescribing PrEP medication, it is also essential that healthcare providers ascertain what other medications the individual is taking, as well as whether he or she has any pre-existing health issues that could cause an adverse reaction in conjunction with PrEP medication.

149.     After prescribing PrEP medication, the CDC advises that healthcare providers should follow up with the individual prescribed the drug approximately every three months (and more frequently at the outset of treatment) to conduct any necessary tests, assess the individual's continued risk of HIV infection, and answer any questions.

150.     The CDC instructs that the healthcare provider should continue prescribing PrEP medication so long as the individual remains at risk of HIV infection, is willing and able to adhere to the prescribed dosing regimen, and shows no signs of medical risk to continued usage. But the individual's prescription should be discontinued if the PrEP recipient is no longer at risk of HIV infection.  Therefore, throughout the process from initiation through use or discontinuation, it remains critical that the healthcare provider be closely involved in PrEP care.

**E.     Prescriber Certifications Confirming that MAP Applicants Have Been Appropriately Prescribed Gilead Medication**

151.     Consistent with the healthcare provider's vital role in ensuring that PrEP medication is and remains medically appropriate for each individual to whom it is prescribed, when an individual applies for enrollment in the MAP, his or her healthcare provider must

47

provide specific information and certify to Gilead that certain facts about the applicant's need for the medication, and the provider's role in monitoring and overseeing the applicant's treatment, are true.

152.    In particular, the MAP applicant's healthcare provider must certify that (1) the prescribed medication is for the applicant, (2) the prescribed medication is medically necessary for the applicant, (3) the prescribed medication will be used as directed, (4) the prescriber will be supervising the applicant's treatment, (5) the applicant has been tested for HIV infection and found to be HIV negative, (6) the applicant will be regularly tested for HIV as part of her care plan, and (7) the prescriber will periodically verify continued use of Gilead medication and resubmit current prescriptions.

153.    These certifications are crucial aspects of a MAP application, as they provide assurances to Gilead that there is a bona fide need for free PrEP medication and that the applicant will be taking the prescribed medication under the supervision of a credentialed healthcare provider.

154.    Gilead relies on the truth of these representations when it enrolls a new applicant in the MAP, and it would not permit anyone to remain enrolled absent his or her healthcare provider's certification of these representations.

**F.      Gilead's Efforts to Ensure Qualified Enrollees Get Immediate and Uninterrupted Access to Their Medication**

155.    Because the medications covered by Advancing Access® provide life-saving treatment and protection against lethal viruses, the PAP and MAP are designed to ensure that eligible individuals can quickly enroll and obtain immediate access to medication.

156.    Once Gilead's agents approve their applications and enroll them in the PAP or MAP, enrollees are entitled to receive PAP or MAP cards generated by TrialCard, one of the third-party vendors with which Gilead has contracted to administer Advancing Access®. These cards contain BIN and PCN numbers[16] and a member identification number that enrollees can use at any retail pharmacy in the United States to obtain their medication for free.

157.    Consistent with Gilead's goal of ensuring that enrollees can immediately access their medication, these BIN, PCN, and member identification numbers are generated and provided to PAP or MAP enrollees as soon as their applications are approved, meaning that the enrollees do not need to wait to receive their PAP or MAP cards before obtaining their medication for free from a retail pharmacy. Enrollees can simply provide the three numbers associated with their PAP or MAP cards to the pharmacy to receive their medication without charge.

158.    Gilead uses this retail pharmacy dispensing model for the Advancing Access® PAP and MAP to ensure that program participants can obtain quick and convenient access to their medication. Through the retail pharmacy model, Gilead effectively enlists all U.S. retail pharmacies in the distribution of Gilead medication to PAP and MAP enrollees.

159.    In the MAP, PrEP medication is dispensed in bottles containing a 30-day supply; however, MAP enrollees are able to pick up a prescribed refill 21 days after receiving their original medication. The program permits this early dispensing to ensure that enrollees have

---

[16] BIN and PCN numbers are necessary to process a prescription drug claim. *See* National Council for Prescription Drug Programs (NCPDP), *NCPDP Health Care Identification Card Fact Sheet*, https://www.ncpdp.org/NCPDP/media/pdf/NCPDP_pharmacy_id_card_fact_sheet.pdf (last revised Aug. 2014).

continuous access to their medication and do not need to wait until they run out before seeking a refill.

### G.    Gilead Pays Reimbursements Equal to Its Wholesale Prices

160.    When a PAP or MAP enrollee presents his or her card at a retail pharmacy to obtain medication, the pharmacy submits the enrollment information to TrialCard to receive an approval to dispense the medication to the enrollee.  If the claim (known as a "redemption") is approved, Gilead pays to the pharmacy a reimbursement for the medication that has been dispensed, along with a dispensing fee.

161.    In addition to the dispensing fee, Gilead reimburses the dispensed medication at Gilead's wholesale price—currently more than $1,800 per 30-tablet bottle of TRUVADA® or DESCOVY®—even if, as is often the case, the dispensed medication was purchased at a lower price from an authorized wholesaler.  This is a function of practical necessity due to the retail pharmacy dispensing model:  Gilead could not efficiently or effectively administer the MAP if it had to calculate each individual reimbursement payment based on the actual price the purchasing entity paid for a particular dispensed bottle of PrEP medication (information to which Gilead does not have access).

162.    The structure of the PAP and MAP has been effective in ensuring that uninsured individuals with a bona fide need for medication and financial assistance are able to access their prescribed Gilead therapies without delay.

163.    Until Defendants' fraud was uncovered, Gilead had never excluded a healthcare provider from participating in the PAP or MAP because of fraudulent conduct.

## IV.      Enrollment and Redemption Data Reveals Defendants' Fraud

164.    Gilead has discovered that Defendants are engaged in wide-ranging schemes to defraud Gilead's charitable free-drug program by enrolling large numbers of individuals in the MAP, irrespective of the enrollees' need for PrEP medication; prescribing enrollees unneeded bottles of PrEP medication, often multiple bottles at a time; and, in turn, submitting redemptions and receiving reimbursement from Gilead for these fraudulent prescriptions at a staggering pace. Advancing Access® enrollment and redemption data illustrates the remarkable scope of Defendants' fraudulent schemes and some of the tactics they have deployed to maximize their reimbursements and wrongfully profit at Gilead's expense.

### A.      Defendants Enroll a Disproportionate Number of People in the MAP and Submit an Anomalous Number of Redemptions

165.    Advancing Access® records show that since 2019, the Clinic and Pharmacy Defendants have enrolled individuals in the MAP and made redemption claims at rates that significantly exceed the enrollment and prescribing activity of all other healthcare providers in Florida.

166.    By way of illustration, between January 2019 and August 2020, the average MAP prescriber in Florida prescribed approximately 10 bottles of PrEP medication per month.  But certain prescribers employed by the Clinic Defendants—including Prescriber Defendants Tamara Alonso, Cassandra Louissaint, and Michel Poitevien—prescribed **between 30 and 50 times that amount** in multiple months during the same time period.

51

**Bottles of Medication Prescribed by High-Volume Prescriber Defendants**



167.     Due to the disproportionate number of individuals that the Clinic Defendants have

enrolled in the MAP and prescribed PrEP medication, during the first five months of 2020,

Defendants Positive Health and Doctors United accounted for ***approximately 45 percent of all***

***MAP redemptions originating from the State of Florida***.



168.    The Clinic Defendants are also responsible for some of the highest monthly MAP redemption numbers among all prescribers nationwide.  In March 2020, for example, the Clinic Defendants alone were responsible for more than 15% percent of the nationwide redemptions paid under the MAP.

**B.      Advancing Access® Data Shows Defendants Dispensing Duplicative Prescriptions to Recruits**

169.    In view of Defendants' prodigious volume of MAP enrollments and redemptions, Gilead investigated further to better understand the activity underlying these numbers.  That investigation uncovered numerous instances of fraudulent enrollment and redemption practices on the part of Defendants and their prescribers.

170.    As alleged above, in the MAP, PrEP medication is dispensed in bottles containing a 30-day supply of tablets.  Because MAP enrollees can pick up a refill as soon as 21 days after receiving a bottle, redemptions should occur every 21 to 30 days for a MAP enrollee who is consistently taking their medication, as it is intended to be taken.  However, Gilead identified many instances where the Clinic and Prescriber Defendants have prescribed PrEP medication and submitted redemptions for a particular MAP enrollee only days apart, and much sooner than 21 days after the preceding redemption.  For purposes of this complaint, this improper practice is referred to as "fraudulent multi-fill."

171.    For example, between January and April 2020, Defendant Tamara Alonso (of Defendant Doctors United) and Defendant Ifeoma Nwofor (of Defendant AJC Medical) purportedly dispensed PrEP medication through the MAP *seven times to the same individual over a period of less than three months*.

53

**TABLE 1**

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation |
|---|---|---|---|---|
| 98847236409 | 28-Jan-20 | n/a | Tamara Alonso | Doctors United |
| 98847236409 | 17-Feb-20 | 20 | Tamara Alonso | Doctors United |
| 98847236409 | 21-Feb-20 | 4 | Tamara Alonso | Doctors United |
| 98847236409 | 9-Mar-20 | 17 | Ifeoma Nwofor | AJC Medical |
| 98847236409 | 13-Mar-20 | 4 | Tamara Alonso | Doctors United |
| 98847236409 | 6-Apr-20 | 24 | Ifeoma Nwofor | AJC Medical |
| 98847236409 | 14-Apr-20 | 8 | Tamara Alonso | Doctors United |

172.    The Positive Health Defendants have engaged in this same practice.  For instance, in November and December 2019, Defendant Barbara Bryant of Defendant Positive Health purportedly dispensed PrEP medication through the MAP *four times to the same individual over a period of six weeks.*

**TABLE 2**

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation |
|---|---|---|---|---|
| 98846759309 | 1-Nov-19 | n/a | Barbara Bryant | Positive Health |
| 98846759309 | 20-Nov-19 | 19 | Barbara Bryant | Positive Health |
| 98846759309 | 4-Dec-19 | 14 | Barbara Bryant | Positive Health |
| 98846759309 | 13-Dec-19 | 9 | Barbara Bryant | Positive Health |

173.    Defendants have sought to avoid scrutiny of this improper practice by alternating prescribers and pharmacies when purportedly dispensing multiple bottles of PrEP medication over a short time period to a single MAP enrollee.  For instance, when prescribing and dispensing four refills over the course of 42 days to a single individual [ID #98853569809] (an average rate of refill every 14 days), Defendant Andre Kerr (of Defendant Baikal Marketing) and

54

a prescriber at Defendant Doctors United alternated prescriptions, and Defendants United Pharmacy and Physician Preferred took turns submitting redemptions for purportedly dispensed PrEP medication:

**TABLE 3**

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation | Pharmacy |
|---|---|---|---|---|---|
| 98853569809 | 6-Dec-19 | n/a | Chelsia Binns | Doctors United | Physician Preferred |
| 98853569809 | 11-Dec-19 | 5 | Andre Kerr | Baikal Marketing | United Pharmacy |
| 98853569809 | 30-Dec-19 | 19 | Chelsia Binns | Doctors United | Physician Preferred |
| 98853569809 | 17-Jan-20 | 18 | Andre Kerr | Baikal Marketing | United Pharmacy |

174.    Defendants have also alternated between prescribing TRUVADA for PrEP® and DESCOVY for PrEP® for the same MAP enrollee, allowing them to accelerate the rate of refills of PrEP medication.  For example, redemption data shows that Defendant Michael Pierce (of Defendant Continental Wellness) and Defendant Michel Poitevien (of Defendant Alliance Medical) alternated between prescribing TRUVADA for PrEP® and DESCOVY for PrEP® for a single individual four times over the course of a six-week period.

55

**TABLE 4**

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation | Medication |
|---|---|---|---|---|---|
| 96228786408 | 11-Feb-20 | n/a | Michael Pierce | Continental Wellness | TRUVADA® |
| 96228786408 | 24-Feb-20 | 13 | Michel Poitevien | Alliance Medical | DESCOVY® |
| 96228786408 | 10-Mar-20 | 15 | Michael Pierce | Continental Wellness | TRUVADA® |
| 96228786408 | 20-Mar-20 | 10 | Michel Poitevien | Alliance Medical | DESCOVY® |

175.    Redemption data also shows that Defendant Tamara Alonso (of Doctors United) and Defendant Ifeoma Nwofor (of Defendant AJC Medical) alternated between prescribing TRUVADA® and DESCOVY® for a single individual five times over the course of a six-week period.

**TABLE 5**

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation | Medication |
|---|---|---|---|---|---|
| 98847236409 | 28-Jan-20 | n/a | Tamara Alonso | Doctors United | TRUVADA® |
| 98847236409 | 17-Feb-20 | 20 | Tamara Alonso | Doctors United | DESCOVY® |
| 98847236409 | 21-Feb-20 | 4 | Tamara Alonso | Doctors United | TRUVADA® |
| 98847236409 | 9-Mar-20 | 17 | Ifeoma Nwofor | AJC Medical | DESCOVY® |
| 98847236409 | 13-Mar-20 | 4 | Tamara Alonso | Doctors United | TRUVADA® |

176.    There is no valid medical reason for a healthcare provider to prescribe an individual both TRUVADA® and DESCOVY® at the same time.  Indeed, doing so is potentially dangerous.  Taking TRUVADA® and DESCOVY® simultaneously will cause an individual to

56

consume more than the FDA-approved daily dosage of tenofovir, which can cause life-threatening side effects.

**V.      Gilead's Investigation Confirms the Details of Defendants' Schemes to Use Vulnerable Persons to Defraud Gilead and Compromise the Integrity of the MAP**

177.    Through whistleblower reports and Gilead's own investigation, the mechanics of Defendants' schemes have come to light.  Defendants have been able to manufacture their extraordinary volume of enrollments, prescriptions, and redemptions by preying on individuals who earn low incomes or are homeless, offering them a few dollars in exchange for submitting to "wellness checks," allowing their names to be used for MAP enrollments, and picking up prescriptions of PrEP medication that they neither want nor need.  Each prescription enables Defendants to claim and collect massive profits from Gilead in reimbursement and fees, while endangering the health and safety of the vulnerable individuals Defendants recruit.

178.    Moreover, after dispensing PrEP medication to these individuals, the Clinic Defendants are illegally buying back the medication for a few additional dollars.  In turn, the Clinic and Pharmacy Defendants illegally redispense the bought-back medication to claim additional payments through the MAP without incurring the corresponding costs of purchasing new drugs, or they illegally sell the repurchased medication on the black market, thereby displacing Gilead's commercial stock.  Through these illegal tactics, Defendants maximize and multiply their illegal profits at Gilead's expense—while once again endangering the public health and safety.

179.    The description of Defendants' schemes that follows is based on Gilead's own investigation along with numerous, mutually corroborating whistleblower reports to Gilead—including from a Doctors United employee (the "Doctors United Whistleblower"), a former

employee of Priority Health (the "Priority Health Whistleblower"), and a homeless MAP

enrollee recruited by Defendants (the "Recruit Whistleblower").

> **A.** **The Clinic Defendants Scour the Streets of Florida Searching for Vulnerable Persons Willing to Be Brought to Their Clinics in Exchange for Payment**

180.    The Clinic Defendants employ a number of individuals as van drivers who are

instructed to drive around South Florida every day to soup kitchens, public libraries, bus

terminals, churches, and other locations where Defendants believe individuals who earn low

incomes or are homeless are likely to be found.  Gilead's investigation has uncovered that many

of these van drivers have extensive criminal records.  For example, a records search indicates

that a Positive Health van driver identified by the Recruit Whistleblower has prior convictions

for aggravated battery and robbery.  Defendant Erik Joseph Pavao, the van driver's supervisor

and a Manager of Defendant Community Health, has prior convictions for burglary, grand theft,

and conversion.

181.    Photos taken by a Gilead investigator of some of Defendants' vans at recruiting

locations are shown below.[17]  As the photos show, Defendants' vans often bear the Positive

Health logo:

---

[17] Defendants devote considerable resources to this van operation.  For example, Defendant Positive Health owns at least nine large passenger vans that are used by the company's drivers.





182.    These van drivers offer the people they identify small items—such as gift cards, food, and cigarettes—on the condition that they agree to enter the vans and be brought to one of Defendants' clinics for a "wellness check" that includes an HIV test.  The following picture was taken of one of the gift cards Defendants gave to the Recruit Whistleblower in connection with one of these "wellness checks."  The card bears the message "THANK YOU 10 DOLLARS":



183.    The Clinic Defendants deliberately target individuals who earn low incomes or are homeless in their recruitment efforts because they know such persons are likely to qualify for the MAP if they are prescribed PrEP medication, and because they know those persons' dire personal situations make them more likely to go along with the scheme.

184.    The Clinic Defendants pay the van drivers a bounty for each person that they bring to Defendants' clinics for these "wellness checks." As the Recruit Whistleblower reported, the van drivers "go everywhere looking for people they haven't brought" yet to Defendants' clinics.

185.    The van drivers place particular emphasis on identifying new people who have not yet been to one of Defendants' clinics, and they travel great distances to identify new "recruits." For example, one of Defendants' van drivers traveled approximately 50 miles from West Palm Beach to Fort Lauderdale to draw in new recruits. As this van driver told the Recruit

60

Whistleblower, the Clinic Defendants have already recruited all of the individuals who earn low incomes or are homeless they could identify in West Palm Beach, and they now need "to go outside our jurisdiction to pick more people up."

186.    The Clinic Defendants' van drivers also used recruits to assist in identifying new persons willing to go to Defendants' clinics in exchange for payment.  On one occasion, a van driver told the Recruit Whistleblower, "If you find me people, I'll give you $5 a head for everyone you put in this van."  The van driver subsequently paid the Recruit Whistleblower $45 after he identified nine people who were willing to be brought by the driver to a clinic.

187.    The Clinic Defendants' recruitment efforts are not limited to persons whom they recruit off the street.  The Clinic Defendants also task their employees with identifying other individuals who may be willing to go to Defendants' clinics in exchange for compensation.  As a result, the Clinic Defendants' employees have recruited family, friends, and acquaintances to come to Defendants' clinics for "wellness checks," irrespective of medical need.

**B.    Defendants Prescribe and Dispense PrEP Medication to Recruits Without Regard to Whether They Want or Need It**

188.    When recruits arrive at Defendants' clinics, they are given paperwork to complete, including a MAP enrollment form.  Clinic staff direct the recruits to fill out and sign the enrollment forms.

189.    Clinic staff also make copies of the recruits' identification and collect their personal information, such as social security numbers.  This documentation and information enables the Clinic and Prescriber Defendants to enroll recruits in the MAP, even without the recruits' knowledge or consent.

190.    After new recruits fill out the paperwork the Clinic Defendants provide to them, they are subjected to a blood test and a cursory consultation with a doctor or nurse practitioner, which the Recruit Whistleblower described as a "joke."  These "wellness checks" are merely a pretext for the Clinic Defendants' real reason for bringing in recruits—to prescribe them PrEP medication and enroll them in the MAP.  Moreover, the doctor or nurse nominally running the wellness check generally does not ask the recruit about preexisting medical conditions that could be exacerbated by taking PrEP medication, or whether the recruit is taking other medications that interact with PrEP in potentially harmful and unsafe ways.

191.    The Clinic and Prescriber Defendants prescribe PrEP medication to *all* recruits without regard to whether the recruits want or believe they need the medication.

192.    In many instances, recruits unequivocally tell the Prescriber Defendants and the Clinic Defendants' other personnel that they do not want PrEP medication.  As the Doctors United Whistleblower reported, recruits inform the Clinic Defendants' personnel, "I did the lab work because you guys are offering me a $10 gift card, but I don't want the meds." Nevertheless, the Clinic and Prescriber Defendants enroll recruits in the MAP even if the recruits make clear they do not plan to take PrEP medication.

193.    As the Recruit Whistleblower explained, when he was first enrolled in the MAP by Defendants, he told the examining nurse practitioner that he did not fall into any of the risk groups for HIV, and did not intend to take the PrEP medication that was being prescribed.  In response, however, the nurse practitioner told the Recruit Whistleblower that he would not receive the $10 he had been promised if he did not sign up for the MAP and asked the Recruit Whistleblower whether he was going to be a "good patient and comply."  Only at this point did

the Recruit Whistleblower, a man who is homeless and desperately in need of money, agree to enroll.

194.    In an effort to gain the recruits' compliance, the Clinic Defendants will repeatedly tell the recruits that the prescribed PrEP medication is "free."  They also advise recruits that they do not have to take the PrEP medication prescribed to them at all, and that if they do, they are not required to take the tablets daily.  The latter advice is contrary to CDC guidelines for safe and effective use of PrEP medication.

195.    For each recruit, the Clinic and Prescriber Defendants submit a MAP application to Gilead's agents.  In doing so, the Clinic and Prescriber Defendants falsely certify to Gilead that (1) the prescribed medication is medically necessary for the recruit, (2) the prescribed medication will be used by the recruit as directed, (3) the prescriber will be supervising the recruit's use of PrEP medication, and (4) the prescriber will verify continued use of the medication being prescribed.  As explained further below, the Clinic Defendants also seek to purchase dispensed PrEP medication back from the recruit, rendering false the Clinic and Prescriber Defendants' certifications to Gilead that the prescribed medication is actually for the recruit, and not someone else.

196.    In some instances, the Clinic Defendants enroll recruits in the MAP or PAP and make the false certifications referenced above without even going through the formality of subjecting recruits to a "wellness check" at one of their clinics.  For example, in October 2020 the Recruit Whistleblower was recruited at a bus terminal by an employee of Defendants Better You Wellness and Allied Health, who offered the Recruit Whistleblower $10 if he agreed to provide a name, social security number, and birth date to the employee and also agreed to have

his photograph taken.  The Recruit Whistleblower agreed to do so and provided a false identity.  Later that day, Defendant Allied Health submitted an application to enroll the Recruit Whistleblower—using the alias that he had provided—in the PAP in connection with a prescription for DESCOVY® for HIV treatment.  The application form bore a forged signature for the Recruit Whistleblower and included a fake photo identification that had been manufactured by Better You Wellness—which the identification card falsely represented as operating a homeless shelter—using the photograph the recruiter had taken of the Recruit Whistleblower.[18]

197.    Once a recruit has been enrolled in the MAP, the Clinic and Prescriber Defendants arrange for the recruit's prescriptions to be sent directly to one of Defendants' clinics.  The Clinic Defendants encourage recruits to return to their clinics to pick up additional bottles of PrEP medication in the future, reminding them that the Clinic Defendants will pay them $10 each time they return.  The Clinic Defendants offer this payment to ensure that the Clinic and Pharmacy Defendants can continue to dispense PrEP medication to the recruits, thereby allowing the Pharmacy Defendants to seek additional reimbursements from Gilead for dispensing that medication.  This practice also enables Defendants to create a misleading audit trail that would suggest recruits are actually taking the prescribed PrEP medication when they are not.

198.    The Clinic Defendants also record the BIN, PCN, and member identification numbers associated with the recruits' MAP cards.  This allows the Clinic and Pharmacy

---

[18] As alleged below, this false identification care was created to circumvent certain anti-fraud measures Gilead has adopted in response to Defendants' fraudulent schemes.

Defendants to claim they are dispensing PrEP medication, and seek reimbursement from Gilead, without the recruits' involvement.

199.     When recruits do receive PrEP medication from the Clinic and Pharmacy Defendants, the tablets—which bear multiple Gilead Marks depicted in Exhibit A—are dispensed in generic plastic pharmacy bottles with labels that also bear Gilead Marks depicted in Exhibit A.  These generic bottles lack important features that accompany the FDA-required packaging in which authentic PrEP medication is dispensed, such as desiccants and seals that protect the tablets against exposure to moisture.  Defendants also dispense PrEP medication to recruits without including the FDA-required labeling and package insert, which provide crucial information for individuals who are prescribed PrEP medication.  As alleged above, it is unlawful and potentially dangerous to remove TRUVADA® and DESCOVY® from their specially designed, FDA-approved packaging and to dispense the drugs without the FDA-required package insert.

200.     The following images show a bottle of DESCOVY® dispensed to the Recruit Whistleblower as well as the FDA-approved packaging for authentic DESCOVY®:

**DESCOVY® Dispensed to the Recruit Whistleblower**



**FDA-Approved Bottle with Package insert**

  

**C.    The Clinic Defendants Forge Prescriber Signatures to Enroll Recruits in the MAP**

201.    According to the Doctors United and Priority Health Whistleblowers, the Clinic Defendants have also forged *prescriber* signatures to enroll recruits in the MAP and write their prescriptions.

202.    For example, the Doctors United Whistleblower reported to Gilead that Doctors United retained an otherwise blank MAP enrollment form that had been signed by a nurse practitioner who was subsequently terminated.  According to the whistleblower, Doctors United staff made copies of that form and used them to try to enroll recruits in the MAP even after the nurse practitioner had been terminated.

203.    These fraudulent practices are strikingly similar to those alleged by the United States government when it charged Defendant Jennifer John Carbon—Doctors United's co-

founder and former President, and the wife and mother of Doctors United's two current

officers—with conspiracy to commit healthcare fraud. In particular, the government alleged that

Mrs. Carbon had forged prescriptions and fraudulently represented that a certain doctor had

prescribed medication when, in fact, that was not true.

204.    In addition, the Priority Health Whistleblower reported that the Priority Health

clinic where she had worked had no doctors on site. Instead, the clinic had office staff who are

not lawfully authorized to prescribe PrEP medication writing out prescriptions for recruits.

**D.    The Clinic and Prescriber Defendants Enroll Recruits in the MAP Without Their Knowledge or Consent**

205.    If necessary, the Clinic and Prescriber Defendants also enroll recruits in the MAP

without their knowledge or consent. This allows Defendants to generate an even greater pool of

recruits to whom they can purportedly prescribe and dispense PrEP medication, thereby

increasing the amount they are reimbursed by Gilead.

206.    For example, when recruits refuse to go along with Defendants' scheme, the

Clinic and Prescriber Defendants enroll them in the MAP anyway, often forging the recruits'

signatures on the enrollment paperwork in the process. Gilead's investigation has uncovered

numerous instances where the Clinic Defendants have forged enrollee signatures on sections of

the MAP application concerning (1) the applicant's financial and insurance information, which

Gilead relies on to determine MAP eligibility; and (2) the applicant's release pursuant to the

Health Insurance Portability and Accountability Act ("HIPAA") authorizing Gilead to use and

disclose the applicant's personal health information, which Gilead also relies on to process MAP

applications. These forged applications include several purportedly signed by the Recruit

Whistleblower, which the Recruit Whistleblower has confirmed he did not authorize and do not

68

bear his actual signature.  By forging recruits' signatures in this manner, the Clinic and Prescriber Defendants not only make additional false certifications to Gilead; they also commit criminal violations of HIPAA.

207.    The Clinic and Prescriber Defendants' practice of forging enrollee signatures was further evidenced by a recorded call to Advancing Access® from an employee of Defendant Positive Health, who sought to enroll a recruit in the MAP.  When the recruit was put on the line, the Advancing Access® program specialist asked her whether she was still seeing Defendant Viergela Joseph, who had previously prescribed the recruit TRUVADA for PrEP® through the MAP.  The recruit answered: ***"I don't know who that is.  No.  Never seen him in my life.  I know Jojo, the driver in the van that runs around looking for people standing around with nothing better to do than go get tested."***

208.    Similarly, when the Priority Health Whistleblower called the Advancing Access® call center to report Defendants' fraud, she explained that she had learned Defendant Priority Health had prescribed her TRUVADA for PrEP® and enrolled her in the MAP without her knowledge or consent.  Based on Gilead's records, Defendant Cassandra Louissaint was the prescriber who enrolled the Priority Health Whistleblower in the MAP.

**E.    The Clinic Defendants Purchase PrEP Medication Back from Recruits After It Has Been Dispensed**

209.    After recruits receive their PrEP medication, the Clinic Defendants' van drivers introduce the recruits to associates who offer between $10 and $40 to purchase the bottle of medication back from the recruit.  In some instances, the van drivers themselves offer to purchase the medication back from recruits.

210.    The van drivers encourage recruits to sell their PrEP tablets, telling them: "You probably don't want to take that medication, but if you want to sell it, I'll buy it."  They also discourage recruits from taking the medication by suggesting that doing so could cause them to experience dangerous side effects.

211.    The Clinic Defendants' van drivers often preview this offer for recruits before they enter the clinic for their "wellness checks," telling the recruits that when they return to the van, someone will be there to buy back the medication the Clinic and Prescriber Defendants prescribe to them.

212.    Because most recruits either do not have an actual medical need for the PrEP medication prescribed to them, or are dissuaded by the Clinic Defendants' van drivers from taking them, they (a) sell their medication to the van drivers or their associates, (b) keep the medication to sell later for a higher price, or (c) discard the medication that they have received.

213.    Defendants' practice of repurchasing dispensed PrEP medication allows them to further perpetuate their fraud and increase their profits.  When recruits sell PrEP medication back to the Clinic Defendants, the Clinic and Pharmacy Defendants often repackage and dispense it to other recruits or persons who obtain PrEP medication from Defendants.  By purchasing the medication back from recruits rather than procuring it through legitimate channels, Defendants

70

minimize their acquisition costs while continuing to claim reimbursements from Gilead, as if they were seeking reimbursement for a legitimately acquired bottle of PrEP medication.  In other instances, the Clinic Defendants sell the dispensed medication to individuals seeking to acquire PrEP medication at less than the wholesale price through the black market.

214.    Not only does this buy-back practice defraud Gilead; it is also illegal.  Under federal law, the purchase and resale of already-dispensed prescription drugs is an unlawful post-consumer sale that corrupts the medication's pedigree, which is supposed to record each distribution of a prescription drug after it has been sold by the manufacturer.  The pedigree plays an important role in protecting end users from the potential harm that might result from consuming counterfeit drugs or medication that has been tampered with or contaminated.  Defendants undermine the pedigree of the PrEP medication they purchase from recruits, as the pedigree of this re-sold medication will not reflect Defendants' unlawful post-consumer sale when the medication is ultimately dispensed to its actual end user.

215.    To keep the cycle of fraud in motion, after recruits have been subjected to their "wellness checks" and return to the van, the Clinic Defendants' drivers offer recruits an additional $10 if they agree to be brought to another of Defendants' clinics and receive another "wellness check."  At the next clinic, Defendants will again prescribe medically unnecessary PrEP medication for these same recruits and submit additional fraudulent MAP enrollments to Gilead.

**F.    The Clinic Defendants Pay Recruits to Return to Their Clinics and Pick Up Additional Bottles of PrEP Medication That Have Been Dispensed**

216.    The Clinic and Pharmacy Defendants' practice is to regularly "dispense" refills to recruits and seek reimbursement from Gilead for the PrEP medication that has purportedly been

dispensed.  The Clinic and Pharmacy Defendants are able to do this without a recruit's direct involvement because, as alleged above, they retain the MAP card information for each recruit that they enroll.

217.    The Clinic, Prescriber, and Pharmacy Defendants follow this refill practice without regard to whether the recruit is actually taking the prescribed Gilead medication.  Indeed, the Clinic and Pharmacy Defendants will purport to "dispense" these refills and submit redemptions to Gilead even when recruits refuse to return to the Pharmacy Defendants' clinics to pick up their prescriptions.

218.    The Doctors United Whistleblower described this practice to Gilead in detail.  As she explained, the Clinic Defendants "keep doing the renewal" even for recruits who do not want PrEP medication and refuse to return to Defendants' clinics to pick up their prescriptions.

219.    Because many recruits are not returning to the Clinic Defendants' clinics to pick up the refills that have purportedly been dispensed, the Clinic and Pharmacy Defendants have amassed a stockpile of unused PrEP medication.  As the Doctors United whistleblower reported, her clinic had a "room full of medication that patients don't want."  Left with this cache of unused medication, the Clinic and Pharmacy Defendants dispense the excess to other recruits and fraudulently claim reimbursements for each such dispense—even though Gilead has already reimbursed these same bottles of PrEP medication—or sell the medications on the black market.

220.    To induce recruits to return to their clinics to pick up refills, the Clinic Defendants pay recruits an additional $10 or a similarly small amount each time they return to Defendants' clinics to pick up another bottle of PrEP medication.  The Clinic Defendants provide this

inducement to generate additional redemptions and to create the false appearance that recruits are actually taking the prescribed medication.

### G.     Defendants Discipline or Terminate Prescribers Who Are Unwilling to Improperly Prescribe PrEP Medication

221.    Recognizing that Defendants' schemes are illegal, fraudulent, and dangerous, a handful of Defendants' employees have tried to speak out against or complain to management about Defendants' practices.  Defendants have sought to silence them by disciplining or terminating employees who do not go along with the schemes.

222.    For example, the Doctors United Whistleblower reported that a nurse practitioner at Doctors United expressed her reluctance to prescribe PrEP medication to recruits who did not want it.  She told management that she was concerned that she might lose her license for improperly prescribing medication.

223.    In response, Defendant Augustine Carbon, Doctors United's President and CEO, summarily fired the nurse practitioner.

224.    In other instances, certain of the Clinic Defendants' prescribers have quit because of Defendants' business practices.  The Priority Health Whistleblower, for one, told Gilead that she quit in part because she knew the "Feds [were] going to come in sooner or later."

## VI.   Defendants Have Reaped Enormous Profits from Their Fraud

225.    Defendants go to these extraordinary lengths to identify recruits, prescribe and dispense them medically unnecessary PrEP medication, repurchase their medications, and redispense those medications to new recruits, because their fraudulent schemes are enormously lucrative.

73

226.     The primary reason why the schemes are so profitable is that Defendants pay significantly less to acquire PrEP medication than they are reimbursed by Gilead for purportedly dispensing PrEP to MAP enrollees.  Defendants acquire PrEP medication at a significantly reduced price by taking advantage of certain Clinic Defendants' participation in the 340B Program, which allows these Defendants to purchase PrEP medication at an amount far below the wholesale price.  In turn, however, Defendants obtain from Gilead reimbursement equal to the wholesale price each time they purport to dispense PrEP medication to a MAP enrollee.

227.     Issuing prescriptions to individuals who neither want nor need PrEP medication as a pretext to collect this profit is not just improper; it is also fraudulent and illegal.

228.     Indeed, because of the difference between the reimbursement Gilead pays to Defendants and the 340B price that Defendants pay to acquire PrEP medication, as well as the dispensing fee that the Pharmacy Defendants receive, ***Defendants make more than $1,000 for each bottle of PrEP medication that they purportedly dispense*** to a MAP enrollee.  Based on the significant amount of PrEP medication that the Clinic and Pharmacy Defendants have purportedly dispensed to individuals whom they have improperly enrolled in the MAP, Defendants have made at least ***$43 million in profits*** from their schemes since February 2018.

229.     And this measure of profits is just the beginning.  As alleged above, Defendants are securing even greater profits at Gilead's expense through their practice of repurchasing bottles of PrEP medication worth more than $1,800 from their recruits for just a few dollars, and then (i) redispensing those same bottles to other recruits, while claiming additional reimbursements from Gilead at the wholesale price; or (ii) reselling them to others on the black

74

market for amounts that substantially exceed the few dollars the Clinic Defendants pay to recruits to buy back PrEP medication.

### A.     The U.S. Government's 340B Drug Pricing Program

230.     Under the federal 340B Drug Pricing Program, drug manufacturers participating in Medicaid—such as Gilead—agree to make their drugs available at significantly reduced prices to covered entities enrolled in the 340B Program.  The program, which is administered by the U.S. Health Resources and Services Administration ("HRSA"), is designed to expand patient access to essential medication at reduced costs.[19]

231.     As alleged above, Defendants Allied Health, Continental Wellness, Doctors United, Florimed, and Positive Health are all registered 340B covered entities and, as such, are able to procure Gilead medications at significantly discounted 340B prices.  The Pharmacy Defendants are contract pharmacies for these Defendants.  By virtue of this relationship, Allied Health, Continental Wellness, Doctors United, Florimed, and Positive Health can all purchase PrEP medication and other prescription drugs from a wholesaler at the discounted 340B price for delivery to the Pharmacy Defendants,[20] which then dispense the medication to eligible 340B patients and collect any payments from an insurer or other third party that covers the cost of the patient's medication.

---

[19] 340B Drug Pricing Program, HRSA, https://www.hrsa.gov/opa/index.html (last reviewed Sept. 2020).

[20] Neither of the Pharmacy Defendants is registered as a contract pharmacy for the sole Continental Wellness clinic that is registered with the 340B Program.  However, as alleged above, Continental Wellness has been operating a clinic at the same address as a former 340B-registered Positive Health clinic for which United Pharmacy served as a contract pharmacy.  Continental Wellness operated the clinic at this location at the time when Positive Health registered the clinic as a 340B site.

232.     When the Pharmacy Defendants purportedly dispense PrEP medication to MAP enrollees recruited by the Clinic Defendants—whom the Clinic and Prescriber Defendants have represented have a bona bide need for the medication, and will be subject to constant medical supervision—Gilead pays those pharmacies a dispensing fee, and also reimburses the pharmacies for the purportedly dispensed PrEP medication at the wholesale price.

233.     The Pharmacy Defendants are able to retain the dispensing fee.  Under the 340B Program, they are supposed to remit the amount they were reimbursed for the medication to the 340B covered entity Defendants.

**B.     Defendants' Exploitation of the 340B Program to Reap Millions in Illicit Gains at Gilead's Expense**

234.     For each bottle of PrEP medication dispensed and reimbursed in the manner described above, Defendants secure a profit of more than $1,000.  This profit reflects (i) the difference between the reimbursement from Gilead and the discounted 340B price that the 340B covered entity Defendants pay to order PrEP medication for delivery to the Pharmacy Defendants, plus (ii) the dispensing fee Gilead pays to the Pharmacy Defendants.

**Defendants Capture Most of the Payment from Gilead as Profit After Subtracting Their Cost of Acquiring the PrEP Medication They Dispense**



235.   As the Doctors United Whistleblower reported, this clinic–pharmacy relationship is the linchpin underlying Defendants' schemes to profit from improper enrollments, prescriptions, and redemptions, explaining: ***"Well this is how Doctors United makes their money, off the pharmacy."***

236.   In the period spanning February 2018 through mid-October 2020, Defendants have prescribed and purportedly dispensed tens of thousands of bottles of PrEP medication through the MAP.  In particular:

  a.   Defendant Positive Health has bought 18,997 bottles of PrEP medication at the discounted 340B price, which were then purportedly dispensed through the MAP.

  b.   Defendant Doctors United has bought 10,191 bottles of PrEP medication at the discounted 340B price, which were then purportedly dispensed through the MAP.

77

c.      Defendant Allied Health has bought 1,687 bottles of PrEP medication at the discounted 340B price, which were then purportedly dispensed through the MAP.

d.      Defendant Florimed has bought 766 bottles of PrEP medication at the discounted 340B price, which were then purportedly dispensed through the MAP.

e.      Defendant Continental Wellness has bought 717 bottles of PrEP medication at the discounted 340B price, which were then purportedly dispensed through the MAP.

237.    By leveraging the heavily discounted 340B acquisition price that they pay to acquire PrEP medication and fraudulently claiming reimbursements through the MAP, Defendants have corruptly amassed profits totaling *more than $43 million*.

238.    In addition, Defendants have secured even greater profits from PrEP medication that they illegally repurchased from their recruits and then either (a) redispensed to other recruits in connection with a duplicative reimbursement claim to Gilead for that same bottle, or (b) sold on the black market.  The amount of these additional profits will be determined through discovery.

## VII.    Each Defendant Plays an Important Role in the Fraudulent Schemes

239.    Each Defendant is indispensable to the fraudulent schemes and provides substantial assistance to the other Defendants in carrying out the fraud.

240.    The Clinic Defendants play several critical roles in Defendants' fraudulent schemes.  First, they identify recruits for enrollment in the MAP and submit fraudulent MAP enrollments on behalf of those recruits, thereby creating an ever-growing pool of MAP enrollees to whom the Pharmacy Defendants can purportedly dispense PrEP medication in exchange for reimbursements and fees from Gilead.  Second, the Clinic Defendants take advantage of their

78

participation in the 340B Program to purchase heavily discounted PrEP medication for the Pharmacy Defendants, which the Pharmacy Defendants can then purport to dispense to recruits and seek reimbursement from Gilead at the wholesale price.  Third, the Clinic Defendants and their affiliates purchase already-dispensed PrEP medication from recruits and either (i) return the medication to the Pharmacy Defendants to be illegally redispensed to other recruits in exchange for additional reimbursements from Gilead, or (ii) illegally sell the medication for profit on the black market.

241.    The Prescriber Defendants are also indispensable participants in Defendants' schemes.  They perform the sham "wellness checks" that serve as the Clinic Defendants' pretext for recruiting individuals who earn low incomes or are homeless to enroll in the MAP.  They also use their medical licenses and prescribing credentials to fraudulently enroll recruits in the MAP and improperly prescribe recruits prescriptions (and refills) for PrEP medication.

242.    The Lab Defendants provide substantial assistance to the Clinic Defendants in processing fraudulent MAP enrollments by providing blood testing services in connection with the "wellness checks" that are performed on recruits, which the Lab Defendants know are merely a pretext for fraudulently enrolling recruits in the MAP.  The Lab Defendants know that these blood tests are an essential precursor to enrollment in the MAP, as healthcare providers are required to determine that an individual is HIV negative before prescribing PrEP medication and enrolling that individual in the MAP.  The Lab Defendants are compensated by the other Defendants for the assistance they provide the Clinic and Prescriber Defendants in fraudulently enrolling recruits in the MAP.

243.     The Pharmacy Defendants similarly play a key role in carrying out the fraud.  In particular, they submit redemptions to Advancing Access® for purportedly dispensing PrEP medication to recruits whom they know the Clinic and Prescriber Defendants have fraudulently enrolled in the MAP, thereby securing fees and reimbursements from Gilead.  The Pharmacy Defendants distribute this ill-gotten revenue among the Defendants, thereby enabling all Defendants to profit from the fraud.  The proceeds secured by the Pharmacy Defendants are also used to expand Defendants' criminal operations, including by financing the opening of new clinics in Florida and elsewhere.  Moreover, as alleged further below, the Pharmacy Defendants also dispense unlawfully repackaged PrEP medication to recruits.

244.     As principals of, and by virtue of their control over, the entity Defendants, the Officer Defendants are personally involved in devising and carrying out Defendants' fraudulent scheme.  They have also used their authority to ensure that the entity Defendants' employees— including the Prescriber Defendants—carry out the fraudulent scheme, such as by establishing and enforcing policies and business practices that facilitate the fraud.

245.     Each Defendant's involvement in the fraudulent schemes is set forth in detail in Exhibit C hereto, and will be further developed through discovery.

## VIII.   The Financial Impact of Defendants' Fraud on Gilead

246.     The financial harm that Defendants have inflicted on Gilead exceeds even the tens of millions of dollars Defendants have stolen.  Gilead has also wrongfully been made to pay millions of dollars in administrative costs associated with Defendants' fraudulent prescriptions and purported dispensations of PrEP medication through the MAP.  Each fraudulent redemption

80

submitted by Defendants ultimately costs Gilead well over $2,000 per bottle of PrEP medication when these administrative fees are taken into account.

247.    In addition, as alleged above, the Clinic Defendants are also repurchasing dispensed PrEP medication from recruits and (a) sending it back to the Pharmacy Defendants to be unlawfully redispensed, or (b) unlawfully reselling it on the black market.  These practices cause Gilead substantial additional financial harm by displacing commercial stock of PrEP medication that would otherwise be purchased at market prices through authorized and lawful distribution channels.

## IX.    Defendants' Infringement of Gilead's Intellectual Property and Harm to Gilead's Goodwill

248.    In addition to the tens of millions of dollars in direct financial losses they have inflicted on Gilead, Defendants' schemes have also caused, and continue to cause, significant damage to Gilead's protected trademarks and goodwill.  Gilead therefore seeks to put an immediate and permanent stop to Defendants' sale and dispensation of diverted, altered, and misbranded PrEP medication.

249.    Gilead distributes its PrEP medication through a closely vetted and scrutinized set of authorized distributors.  Its products and distributors are subjected to rigorous, ongoing quality control measures that ensure PrEP medication remains in its FDA-approved packaging throughout its chain of distribution and use.  This ensures that consumers can rely on products bearing Gilead's name and trademarks to be safe and effective.

250.    Through these controls and monitoring, Gilead has sought to safeguard the reputation that its products have developed since Truvada® was first approved by the FDA in 2004 for HIV-1 treatment.  As a result of Gilead's extensive branding, marketing, sales, and

quality control efforts in the United States and around the world, consumers expect from Gilead products of the highest safety, reliability, and quality.

251.    As alleged above, a key component of Defendants' schemes includes dispensing unlawfully repackaged PrEP medication, bearing certain of the Gilead Marks, that is materially different from the PrEP medication that Gilead manufactures and intends for dispensing in the United States.  In particular, Defendants are dispensing PrEP medication that is misbranded because it has been removed from its FDA-required packaging, stripped of its FDA-required labeling and package insert, and exposed to suboptimal conditions, such as exposure to moisture and handling in a non-sterile environment by non-medical professionals.  As a result, Defendants are dispensing PrEP medication that, in numerous respects, does not comply with critical FDA regulations and causes confusion among consumers, who, based on Gilead's sterling reputation and product quality, expect the medication to be safe and reliable because it bears certain Gilead Marks.  Defendants thereby put PrEP medication recipients at risk, undermine Gilead's quality control, and tarnish Gilead's reputation and trademarks.  They also violate federal law, which makes it unlawful to possess, sell, or distribute misbranded drugs.  *See* 21 U.S.C. §§ 331, 333(a), 352, and 21 C.F.R. Part 201 and § 314.170.

252.    *First*, Defendants are dispensing PrEP tablets that have been repackaged in unauthorized bottles that pose a substantial risk to product quality and integrity.

253.    In particular, PrEP tablets are susceptible to hydrolytic degradation, which means they degrade in the presence of moisture.  Exposure to unexpected moisture, including by opening a bottle before final dispensation, can reduce the shelf life of PrEP tablets and render

82

them ineffective. This concern is particularly acute with respect to PrEP tablets that are dispensed in regions with hot, humid climates, such as Florida.

254.    To minimize this risk of degradation, TRUVADA® and DESCOVY® are dispensed only in specially designed, FDA-approved containers that are engineered to reduce moisture intake. The walls of TRUVADA® and DESCOVY® bottles are thicker than off-the-shelf pill bottles used by other suppliers, which prevents the transmission of moisture through the bottle itself.[21]  Each bottle also contains a silica gel desiccant canister or sachet that absorbs any unwanted moisture in the bottle. In addition, the mouth of every authentic bottle is sealed with a polyethylene aluminum foil seal that is intended to remain in place until the moment the end user begins taking the medication. The seal prevents premature degradation, and ensures that the bottle both has not been tampered with and contains the correct number of authentic PrEP tablets. The bottle, desiccant, and seal all undergo stringent testing to make sure the medication is and will remain safe to use.

255.    Moreover, authentic PrEP bottles each have a cap that prevents children from opening the bottle and ingesting the tablets. This cap is specially designed and tested by Gilead for its PrEP medication, and PrEP tablets may only be sold in bottles with this child-resistant cap. These caps are also part of the FDA-approved container closure system.

256.    The PrEP tablets that Defendants are labeling and dispensing as TRUVADA® and DESCOVY®, however, have been removed from their authorized original containers, handled by

---

[21] Gilead also distributes DESCOVY® in an FDA-approved blister pack, which is not available through Gilead's free-drug programs.

unknown individuals, and placed in plain bottles that lack the protective container and lid features described above.

257.    **Second**, Defendants are dispensing PrEP tablets without FDA-required information, including warnings and instructions for use.

258.    In compliance with FDA regulations, Gilead packages its PrEP tablets with vital information on the bottle and in the package insert that accompanies each bottle.  This ensures proper use by the recipient of PrEP medication.

259.    Each authentic bottle of PrEP medication has a label that provides unique, critical information for the intended recipient.  These labels are required by and comply with FDA regulations.  The bottle label sets forth the manufacturing lot number, expiration date, storage temperature limitations, and the number of tablets in the bottle and contents of each tablet.

260.    In further compliance with FDA requirements, and to ensure safe and proper use, Gilead provides printed instructions for use to recipients of PrEP medication by way of an instructional package insert that accompanies every bottle of PrEP tablets.  Neither the FDA nor Gilead permits PrEP medication to be sold or dispensed without the accompanying FDA-approved package insert.  Every individual prescribed PrEP medication must have the package insert to guide and inform him or her on the safe and effective use of the medication.  The printed instructions provide the recipient with PrEP medication's indications for usage, side effects, and critical warnings.  The instructions also inform the recipient how to take and store PrEP medication, what to do if the recipient takes too much, what precautions to take while taking the medication, and what the recipient should discuss with his or her healthcare provider before taking the medication.

84

261.    But Defendants are dispensing PrEP tablets—embossed with certain of the Gilead Marks—that have been removed from their FDA-approved and FDA-required packaging and therefore lack the FDA-mandated labeling and package insert.  By dispensing PrEP medication in bottles without any of the necessary labels or instructions for use, Defendants are depriving recipients of critical warnings and indications for use, which puts their health at risk.

262.    **_Third_**, Defendants are dispensing bottles of PrEP medication without critical tracking information, which is essential in the event of a product recall.  This information includes the lot number and serialization number of the medication.

263.    Defendants' sale of PrEP medication without lot and serialization numbers undermines Gilead's quality control measures.  The failure to provide the consumer with the lot number interferes with and disrupts Gilead's ability to effectively track and recall products. Because recalled PrEP medication can pose significant risks to the health of consumers, the continued dispensing of PrEP medication without lot numbers and serialization numbers is detrimental to the public health and causes consumer confusion and injury to Gilead's reputation and its trademarks.

264.    **_Fourth_**, Defendants are dispensing PrEP medication that has already been dispensed and handled by non-medical professionals.

265.    Because PrEP medication is a prescription drug, the FDA and Gilead both require that it be dispensed only pursuant to a legitimate prescription.  Gilead also requires that returned product or product that has already been dispensed to a consumer not be redispensed to another consumer.

266.    Defendants, however, do not follow these restrictions in connection with their schemes.  Instead, they purchase dispensed PrEP medication; repackage it in generic bottles that are not designed, tested, or approved for PrEP tablets; and redispense it to unsuspecting individuals without regard to the tablets' lot numbers or serialization numbers.

267.    In the course of Defendants' illegal buyback and redispensing operations, the PrEP tablets that Defendants resell and label as TRUVADA® and DESCOVY® are handled by numerous unknown individuals under uncontrolled conditions.  At a minimum, this includes recruits who are homeless; Defendants' van drivers and/or their associates who purchase dispensed PrEP medication from the recruits; and non-medical professionals handling individual tablets and repacking them in unauthorized bottles to be dispensed again.  Additionally, between the time when the Gilead medication was initially dispensed and the time it was repurchased, Defendants do not know who else handled the medication, how it was handled, whether it was tampered with, or how it was stored.

268.    Defendants' unlawful sale and dispensation of misbranded PrEP medication that is materially different from Gilead's authentic product has caused and will continue to cause Gilead to suffer substantial and irreparable injury, loss, and damage.

## X.    Defendants' Efforts to Circumvent Safeguards Implemented to Prevent Fraud and Abuse of the MAP

269.    Based on whistleblower reports and Gilead's own investigation of Defendants' fraud, Gilead has adopted numerous measures intended to stop Defendants' schemes, while at the same time ensuring that eligible MAP enrollees who have a bona fide need for PrEP medication are able to continue accessing their Gilead medication.

270.     However, there is growing evidence that Defendants are pivoting their operations and tactics in an attempt to overcome the safeguards that Gilead has implemented.  In many instances, it appears that Defendants have successfully deployed these new tactics to ensure that their fraudulent schemes remain profitable.

271.     As a result, Gilead is left with no choice but to file this lawsuit and seek judicial intervention to, among other things, prohibit Defendants and their affiliates from participating in the PAP and MAP.

**A.     Gilead Implements Measures to Stop Defendants' Fraud and Abuse**

272.     After uncovering evidence of Defendants' fraud, Gilead has taken the steps within its control in an attempt to curb Defendants' abuse of the MAP and separate fraudulent enrollments from legitimate enrollments.

273.     First, Advancing Access® program specialists attempted to contact PAP and MAP enrollees who had been prescribed Gilead medication at Defendants' clinics.  The purpose of this outreach was to perform additional validation checks and confirm that these PAP and MAP enrollees are real people who had a bona fide need for Gilead medication.  In most instances, however, the program specialists were not able to contact the enrollees in question.

274.     As a result, between May and September 2020 Gilead suspended approximately 10,800 PAP and MAP cards associated with individuals who had been enrolled by the Clinic and Prescriber Defendants.  These enrollees were eligible to have their cards reactivated, but only after contacting Gilead and going through additional validation checks.

275.     As part of this enhanced validation process, enrollees seeking to reactivate their cards were required to provide proof of identification and speak directly with an Advancing

Access® program specialist who would confirm with the enrollee that he or she wanted the medication that had been prescribed.

276.    Gilead expected that enrollees with a bona fide need for Gilead medication would contact Advancing Access® to reactivate their cards so they could continue receiving financial assistance to access Gilead therapies.  However, only about 1,400 of the 10,800 suspended cards (less than 13%) have been reactivated to date.  This strongly suggests that the overwhelming majority of these enrollees do not have a bona fide need for their prescribed Gilead medication and were improperly enrolled in the PAP and/or MAP.

277.    Second, Gilead also implemented enhanced validation checks for new PAP and MAP applicants being enrolled in the programs by healthcare providers known to be affiliated with Defendants.  As a result, these individuals could enroll in the PAP and MAP only if they provided Gilead with valid identification and spoke with an Advancing Access® program specialist who would verbally confirm the applicant's identity and whether he or she wanted to take the prescribed Gilead medication.

278.    Third, Gilead started blocking certain suspicious prescribers affiliated with Defendants—including the Prescriber Defendants—from enrolling new individuals in the PAP and MAP through the online enrollment portal.  The blocked prescribers associated with Defendants can now enroll an applicant in the PAP or MAP only by contacting the Advancing Access® call center, speaking to a program specialist, and meeting the enhanced validation checks.

**B.    Defendants Adopt New Tactics and Pivot Their Operations to Overcome the Safeguards Implemented by Gilead**

279.    Since these safeguards were implemented, Gilead has learned that Defendants have adopted a variety of new tactics to circumvent them.

280.    *First*, the Clinic Defendants have begun coaching recruits through the enhanced validation checks when they speak on the phone to Advancing Access® program specialists.

281.    For instance, the Recruit Whistleblower has reported observing employees of Defendant Positive Health coaching recruits, including by instructing recruits to tell the program specialists that they want to take PrEP medication and that they have not already been prescribed the medication by any other healthcare provider, even when one or both of those statements is not true.

282.    The Clinic Defendants' coaching practice also was starkly captured on a recorded October 16, 2020 telephone call to the Advancing Access® call center from an individual who identified herself as an employee of "A Better You Wellness Center of Allied Health."[22]  Over the course of the phone call, which lasted approximately three hours, the employee sought to validate the enrollments of seven different recruits.  Each time the employee was put on hold with Advancing Access®, she coached the recruits through the validation process by feeding them answers and writing down the correct responses.  While on hold, the recruits admitted to having no familiarity with PrEP medication, its intended use, or with the doctors who were purportedly prescribing them PrEP medication.

---

[22] As alleged above, the website for Defendant Allied Health expressly refers to Defendant Better You Wellness Center as an affiliate.

283.   *Second*, employees of the Clinic Defendants are falsely posing as MAP applicants on calls with Advancing Access® program specialists.

284.   The Priority Health Whistleblower observed this conduct at the clinic where she had worked.  As she told an Advancing Access® program specialist, "When I heard them get on the phone and act like they [were] the patient I was like, oh no, . . . this bad.  The Feds are coming in on that.  People go to jail behind that, that's fraud.  That's medical fraud."

285.   Defendant Priority Health used this tactic to enroll the Priority Health Whistleblower herself in the MAP without her knowledge or consent.

286.   *Third*, the Clinic Defendants have also sought to overcome the enhanced validation process by creating fake shelter identification cards for recruits.  In particular, Defendant Better You Wellness is taking pictures of recruits and then manufacturing identification cards for those recruits that falsely claim that Better You Wellness operates a "shelter."  Homeless shelter identification cards are one form of acceptable identification for recruits seeking to validate their MAP enrollment.  By forging these identification cards, Defendants have been able to fabricate applicants' proofs of identification needed for enrollment in the MAP.

287.   *Fourth,* after Gilead blocked certain high-volume prescribers, including many of the Prescriber Defendants, from enrolling individuals in the PAP and MAP through the online enrollment portal, Defendants began using new, unblocked prescribers to process large volumes of new MAP enrollments—even though the blocked prescribers ultimately write those new enrollees' prescriptions for PrEP medication.

288.    For instance, Defendant Alexander Evans, a prescriber for Defendant Allied Health, *enrolled 1,177 individuals in the MAP* between May 2020 (when Gilead first began blocking high-volume prescribers, not including Evans, associated with the Clinic Defendants) and August 2020 (when Evans himself was blocked from enrolling individuals in the PAP and MAP through the online portal).  This sudden spike in enrollments was remarkable, as Evans had enrolled only 157 individuals in the MAP in the sixteen months preceding May 2020.  And after Evans was blocked from enrolling individuals through the online portal, his enrollment figures plummeted, with only nine enrollments processed in September 2020.[23]

289.    Despite enrolling more than 1,000 individuals in the MAP through Allied Health, Dr. Evans has never written a single prescription for PrEP medication dispensed to any of those enrollees.  Instead, the prescriptions have been written by *dozens* of different prescribers.  These prescribers, who include several of the Prescriber Defendants and other prescribers who were blocked from enrolling new applicants in the MAP through the online portal, were affiliated with Clinic Defendants Doctors United, Positive Health, Alliance Medical, Baikal Marketing, Continental Wellness, and Priority Health.

290.    This practice is not only an improper circumvention tactic; it is also a direct violation of the certifications the listed prescriber makes in connection with each MAP enrollment.  To enroll someone in the MAP, the enrolling prescriber must expressly certify that he or she has supervised the enrollee's treatments; has confirmed that the medication is medically necessary for the enrollee; that the medication will be used as directed; and that he or she will periodically verify the enrollee's continued use of PrEP medication.  If the prescriber

---

[23] These enrollments were processed outside of the online portal.

who makes these certifications is not himself or herself the physician writing prescriptions to the enrolled individuals, then these certifications are necessarily false: the certifying physician has not supervised their treatments, has not confirmed that the medication is medically necessary for the enrollee or that it will be used as directed, and will not periodically verify the continued use of Gilead medication.  Gilead is defrauded every time an enrollment and related redemptions are premised on these false certifications.

291.    *Fifth*, Defendants who have attracted scrutiny from Gilead appear to have shifted their enrollment activity to other Defendants.  For example, after Gilead took steps to restrict certain prescribers associated with Defendant Doctors United from enrolling individuals in the PAP and MAP through the online portal, the volume of enrollments from Allied Health skyrocketed, largely due to the enrollments processed by Defendant Alexander Evans.



292.    Defendants' brazen attempts to evade Gilead's countermeasures make clear that Gilead cannot stop Defendants' fraudulent schemes on its own.  Accordingly, Gilead seeks an injunction to exclude Defendants from further participation in the PAP and MAP, halt their

dispensing of materially different and misbranded PrEP medication, and put an end to their practice of illegally diverting Gilead medication.

## XI.    Halting Defendants' Wrongful Conduct Is Vital to the Public Interest

293.    Beyond causing harm to Gilead, Defendants' schemes jeopardize the public health every day they are allowed to continue.

294.    ***First***, the fraud perpetrated by Defendants significantly undermines the integrity of the MAP and wrongly takes resources from a charitable program operated by Gilead in an effort to expand access to life-saving medication and stop the spread of HIV.  In doing so, Defendants divert resources and medication away from uninsured low-income Americans who are actually in need of PrEP medication to prevent HIV infection, thereby exacerbating the spread of HIV nationwide.

295.    ***Second***, to the extent the Clinic and Prescriber Defendants are actually enrolling individuals in the MAP who have a bona fide need for PrEP, Defendants' repurchasing schemes deprive those individuals of crucial medication that would otherwise protect them against contracting HIV.  Accordingly, Defendants' schemes increase the risk of the spread of HIV in these individuals' Florida communities.

296.    ***Third***, the Clinic and Pharmacy Defendants' practice of dispensing misbranded PrEP medication threatens the safety of those individuals who actually end up taking that medication.  The Clinic and Pharmacy Defendants' practice increases the likelihood that the end user will consume tablets that have been degraded by moisture, and their practice of dispensing PrEP medication without FDA-required labeling and package inserts increases the likelihood of improper use and adverse side effects.

94

297.    **Fourth**, the Clinic and Prescriber Defendants are prescribing PrEP medication in a manner that is potentially unsafe.  As evidenced by the fraudulent multi-fill prescribing patterns described above, the Clinic and Prescriber Defendants are simultaneously prescribing individuals both TRUVADA® and DESCOVY® in an effort to maximize their redemptions. However, taking both medications simultaneously will cause an individual to exceed the FDA-recommended daily dosage of tenofovir, which can cause life-threatening side effects.  In addition, Advancing Access® data indicates that the Clinic and Prescriber Defendants are prescribing DESCOVY® to cisgender females, even though the FDA-approved indication for DESCOVY for PrEP® specifically excludes individuals at risk of HIV from receptive vaginal sex since effectiveness in this population has not been evaluated.

298.    Putting an immediate stop to Defendants' schemes is particularly important given the evidence that Defendants are aggressively expanding their operations in Florida and increasing the scope of their fraud by seeking to open clinics in other states.  Indeed, the Positive Health website currently announces that Positive Health will soon be expanding to new locations in Florida and Georgia.  If left unchecked, Defendants' schemes, and the harm they inflict on Gilead and on Florida communities and the nation, will only grow.

95

## FIRST CLAIM FOR RELIEF

### Common Law Fraud
### (Against the Clinic Defendants, Pharmacy Defendants, and Prescriber Defendants)

299.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 247, 269 through 298, and Exhibit C as if set forth fully herein.

300.    The Clinic Defendants, Pharmacy Defendants, and Prescriber Defendants have knowingly and intentionally made and caused to be made thousands of false statements of material fact from February 2018 to the present.

301.    In connection with thousands of MAP enrollments, the Clinic and Prescriber Defendants have knowingly and intentionally submitted and caused to be submitted false certifications, including that (i) the prescribed PrEP medication is for the applicant, (ii) the prescribed medication is medically necessary for the applicant, (iii) the prescribed medication will be used by the applicant as directed, (iv) the prescriber will be supervising the applicant's use of PrEP medication, and (v) the prescriber will periodically verify continued use of Gilead medication

302.    The Clinic Defendants' employees have knowingly, intentionally, and falsely represented themselves to be MAP applicants on calls with Gilead agents to enroll other persons in the MAP.

303.    The Clinic Defendants' employees have knowingly, intentionally, and falsely forged the signatures of prescribers and recruits on MAP applications that were submitted to Gilead.

304.    The Pharmacy Defendants have knowingly, intentionally, and falsely submitted claims for reimbursement to Gilead agents for purportedly dispensing PrEP medication to MAP

96

enrollees who have not actually received the dispensed medication.  In submitting those claims for reimbursement to Gilead's agents, the Pharmacy Defendants have falsely implied that they have in fact dispensed PrEP medication to the MAP enrollee in question.

305.    The Pharmacy Defendants have also knowingly, intentionally, and falsely submitted claims for reimbursement to Gilead agents for purportedly dispensing PrEP medication to individuals whom the Pharmacy Defendants knew had been fraudulently enrolled in the MAP by the Clinic Defendants and without disclosing that fact to Gilead.  The omission of these material facts, which the Pharmacy Defendants had a duty to disclose and which Gilead had a right to know, was tantamount to supplying false information, because the affirmative submission of a claim for reimbursement through the MAP implies that the prescription was in fact dispensed to a legitimate enrollee consistent with the initial certifications accompanying enrollment.

306.    The Clinic, Pharmacy, and Prescriber Defendants knew that their statements to Gilead's agents were false at the time they were made, and knew that their failure to disclose those false statements to Gilead was material to Gilead.

307.    The Clinic, Pharmacy, and Prescriber Defendants further made those false statements and omissions with the intent of defrauding Gilead.  Specifically, the Clinic, Pharmacy, and Prescriber Defendants made or caused others to make these false representations and omissions to profit from the reimbursement amounts that Gilead pays for PrEP medication that is purportedly dispensed to MAP enrollees.

308.    The Clinic, Pharmacy, and Prescriber Defendants made or caused others to make these false statements and omissions for the purpose of inducing Gilead to act in reliance thereon.

309.    Gilead and its agents justifiably and reasonably relied on the Clinic, Pharmacy, and Prescriber Defendants' false statements and omissions to Gilead's detriment.  Specifically, as a direct and proximate result of the false statements and omissions of the Clinic and Prescriber Defendants, Gilead's agents approved or reinstated the enrollment of thousands of individuals who did not in fact satisfy eligibility criteria for participation in the MAP.  In turn, as a direct and proximate result of the false statements and omissions of the Pharmacy Defendants, Gilead paid reimbursements totaling tens of millions of dollars for tens of thousands of bottles of Gilead PrEP medication purportedly dispensed to individuals fraudulently enrolled in the MAP, in addition to millions of dollars in associated administrative fees.

310.    The Clinic, Pharmacy, and Prescriber Defendants' fraud was gross, oppressive, and malicious, and as a result of these Defendants' conduct, Gilead was injured in an amount to be determined at trial.

311.    Furthermore, Gilead continues to be injured by the Clinic, Pharmacy, and Prescriber Defendants' fraudulent conduct, which continues to cause irreparable and monetary harm to Gilead to this day.

**SECOND CLAIM FOR RELIEF**

**Aiding and Abetting Fraud**
**(Against the Doctors United Prescriber, Clinic, Lab, and Pharmacy Defendants)**

312.     Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 247,

269 through 298, and Exhibit C as if set forth fully herein.

313.     As described in Paragraphs 1 through 247, 269 through 298, and Exhibit C, the

Doctors United Prescriber, Clinic, Lab, and Pharmacy Defendants knowingly and intentionally

defrauded Gilead.  Each of these Defendants had actual knowledge of the fraudulent scheme and

actively and substantially assisted it.

314.     Each Doctors United Prescriber, Clinic, Lab, and Pharmacy Defendant

intentionally provided substantial assistance to the other Doctors United Prescriber, Clinic, Lab,

and Pharmacy Defendants in advancing the fraud against Gilead.

315.     The Doctors United Clinic Defendants knowingly and intentionally provided

substantial assistance to the fraudulent scheme in at least three ways.  First, the Doctors United

Clinic Defendants made thousands of false statements of material fact to enroll individuals in the

MAP, thereby enabling Defendant Physician Preferred to submit fraudulent redemptions to

Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP

medication to those MAP enrollees.  These false statements of material fact included forging the

signatures of prescribers and recruits on MAP applications that were submitted to Gilead.

Second, Defendants Doctors United, Allied Health, and Florimed took advantage of their

participation in the 340B Program to secure heavily discounted PrEP medication for Defendant

Physician Preferred, which allowed Defendant Physician Preferred to dispense discounted PrEP

99

medication to MAP enrollees that was reimbursed at the wholesale price. Third, to fund the operations and expansion of the fraudulent scheme, employees and affiliates of the Doctors United Clinic Defendants purchased already-dispensed PrEP medication from MAP enrollees at a fraction of the wholesale price, and then either returned the medication to Defendant Physician Preferred to be redispensed to other MAP enrollees for greater profit, or sold it to others on the black market.

316.    The Doctors United Prescriber Defendants knowingly and intentionally provided substantial assistance to the fraudulent scheme in at least two ways. First, they performed sham "wellness checks" that served as the Doctors United Clinic Defendants' pretext for recruiting individuals to enroll in the MAP. Second, they made false statements of material fact to enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and refills) for PrEP medication, thereby enabling Defendant Physician Preferred to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.

317.    Defendant Testing Matters knowingly and intentionally provided substantial assistance to the fraudulent scheme by providing blood testing services in connection with the sham "wellness checks" the Doctors United Clinic and Prescriber Defendants performed on recruits as a pretext for enrolling recruits in the MAP. In particular, Defendant Testing Matters performed blood tests to determine whether recruits were HIV negative, which the Doctors United Clinic and Prescriber Defendants were required to assess before enrolling each recruit in the MAP. The Doctors United Clinic and Prescriber Defendants could not have fraudulently

100

enrolled recruits in the MAP without the substantial assistance that Defendant Testing Matters knowingly provided.

318.     Defendant Physician Preferred provided substantial assistance to the fraudulent scheme by submitting thousands of fraudulent redemptions to Gilead's agents and wrongfully obtaining fees and reimbursement for PrEP medication Defendant Physician Preferred purportedly dispensed to recruits whom the Doctors United Clinic and Prescriber Defendants had fraudulently enrolled in the MAP.  As a contract pharmacy for Defendants Doctors United, Allied Health, and Florimed, Defendant Physician Preferred remitted the reimbursements Gilead paid in connection with the fraudulent redemptions to Defendants Doctors United, Allied Health, and Florimed.  These reimbursements, as well as the dispensing fees paid to Defendant Physician Preferred, were shared among the Doctors United Defendants to ensure that each Doctors United Defendant profited from the fraud and to fund the expansion of the Doctors United Defendants' criminal operation.

319.     The Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendants substantially assisted the fraudulent scheme by knowingly and intentionally concealing it from Gilead and Gilead's agents.  Moreover, the Doctors United Clinic Defendants knowingly and intentionally implemented countermeasures to circumvent safeguards that Gilead implemented to stop the fraudulent activity.

320.     The Doctors United Defendants could not have perpetrated and expanded their fraud without the substantial and material assistance of each other Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendant.  Each Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendant benefitted from the success of the fraud.

101

321.    As a result of the conduct of the Doctors United Clinic, Prescriber, Lab, and
Pharmacy Defendants, Gilead has suffered significant injury in an amount to be determined at
trial.

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Fraud**
**(Against the Positive Health Prescriber, Clinic, Lab, and Pharmacy Defendants)**

322.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 247,
269 through 298, and Exhibit C as if set forth fully herein.

323.    As described in Paragraphs 1 through 247, 269 through 298, and Exhibit C, the
Positive Health Prescriber, Clinic, Lab, and Pharmacy Defendants knowingly and intentionally
defrauded Gilead.  Each of these Defendants had actual knowledge of the fraudulent scheme and
actively and substantially assisted it.

324.    Each Positive Health Prescriber, Clinic, Lab, and Pharmacy Defendant
intentionally provided substantial assistance to the other Positive Health Prescriber, Clinic, Lab,
and Pharmacy Defendants in advancing the fraud against Gilead.

325.    The Positive Health Clinic Defendants knowingly and intentionally provided
substantial assistance to the fraudulent scheme in at least three ways.  First, the Positive Health
Clinic Defendants made thousands of false statements of material fact to enroll individuals in the
MAP, thereby enabling Defendant United Pharmacy to submit fraudulent redemptions to
Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP
medication to those MAP enrollees.  These false statements of material fact included forging the
signatures of prescribers and recruits on MAP applications that were submitted to Gilead.

102

Second, Defendant Positive Health took advantage of its participation in the 340B Program to secure heavily discounted PrEP medication for Defendant United Pharmacy, which allowed Defendant United Pharmacy to dispense discounted PrEP medication to MAP enrollees that was reimbursed at the wholesale price.  Third, to fund the operations and expansion of the fraudulent scheme, employees and affiliates of the Positive Health Clinic Defendants purchased already-dispensed PrEP medication from MAP enrollees at a fraction of the wholesale price, and then either returned the medication to Defendant United Pharmacy to be redispensed to other MAP enrollees for greater profit, or sold it to others on the black market.

326.    The Positive Health Prescriber Defendants knowingly and intentionally provided substantial assistance to the fraudulent scheme in at least two ways.  First, they performed sham "wellness checks" that served as the Positive Health Clinic Defendants' pretext for recruiting individuals to enroll in the MAP.  Second, they made false statements of material fact to enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and refills) for PrEP medication, thereby enabling Defendant United Pharmacy to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.

327.    Defendants Labs4Less and United Labs knowingly and intentionally provided substantial assistance to the fraudulent scheme by providing blood testing services in connection with the sham "wellness checks" the Positive Health Clinic and Prescriber Defendants performed on recruits as a pretext for enrolling recruits in the MAP.  In particular, Defendants Labs4Less and United Labs performed blood tests to determine whether recruits were HIV negative, which the Positive Health Clinic and Prescriber Defendants were required to assess before enrolling

103

each recruit in the MAP. The Positive Health Clinic and Prescriber Defendants could not have fraudulently enrolled recruits in the MAP without the substantial assistance that Defendants Labs4Less and United Labs knowingly provided.

328.    Defendant United Pharmacy provided substantial assistance to the fraudulent scheme by submitting thousands of fraudulent redemptions to Gilead's agents and wrongfully obtaining fees and reimbursement for PrEP medication Defendant United Pharmacy purportedly dispensed to recruits whom the Positive Health Clinic and Prescriber Defendants fraudulently enrolled in the MAP. As a contract pharmacy for Defendant Positive Health, Defendant United Pharmacy remitted the reimbursements Gilead paid in connection with the fraudulent redemptions to Defendant Positive Health. These reimbursements, as well as the dispensing fees paid to Defendant United Pharmacy, were shared among the Positive Health Defendants to ensure that each Positive Health Defendant profited from the fraud and to fund the expansion of the Positive Health Defendants' criminal operation.

329.    The Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendants substantially assisted the fraudulent scheme by knowingly and intentionally concealing it from Gilead and Gilead's agents. Moreover, the Positive Health Clinic Defendants knowingly and intentionally implemented countermeasures to circumvent safeguards that Gilead implemented to stop the fraudulent activity.

330.    The Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendants could not have perpetrated and expanded their fraud without the substantial and material assistance of each other Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendant. Each Positive Health Defendant benefitted from the success of the fraud.

104

331.    As a result of the conduct of the Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendants, Gilead has suffered significant injury in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF

**Civil Conspiracy to Commit Fraud**
**(Against the Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendants)**

332.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 247, 269 through 298, and Exhibit C as if set forth fully herein.

333.    The Doctors United Prescriber, Clinic, Lab, and Pharmacy Defendants unlawfully, knowingly, and willfully combined, conspired, confederated and agreed together to defraud Gilead.  Each Doctors United Prescriber, Clinic, Lab, and Pharmacy Defendant played an indispensable role in carrying out the fraudulent scheme.

334.    The Doctors United Clinic Defendants recruited individuals who earn low incomes or are homeless to fraudulently enroll them in the MAP, thereby enabling Defendant Physician Preferred to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.  Defendants Doctors United, Allied Health, and Florimed also took advantage of their participation in the 340B Program to secure heavily discounted PrEP medication for Defendant Physician Preferred, which allowed Defendant Physician Preferred to dispense discounted PrEP medication to MAP enrollees that was reimbursed at the wholesale price.  Furthermore, the Doctors United Clinic Defendants purchased already-dispensed PrEP medication from MAP enrollees at a fraction of the wholesale price, and then either returned the medication to

105

Defendant Physician Preferred to be redispensed to other MAP enrollees for greater profit, or sold it to others on the black market. This was done to fund the operations and expansion of the fraudulent scheme.

335.     The Doctors United Prescriber Defendants knowingly and intentionally performed sham "wellness checks" that served as the Doctors United Clinic Defendants' pretext for recruiting individuals to enroll in the MAP. They also made false statements of material fact to enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and refills) for PrEP medication, thereby enabling Defendant Physician Preferred to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.

336.     Defendant Testing Matters knowingly and intentionally provided blood testing services in connection with the sham "wellness checks" the Doctors United Clinic and Prescriber Defendants performed on recruits as a pretext for enrolling recruits in the MAP. In particular, Defendant Testing Matters performed blood tests to determine whether recruits were HIV negative, which the Doctors United Clinic and Prescriber Defendants were required to assess before enrolling each recruit in the MAP. The Doctors United Clinic and Prescriber Defendants could not have fraudulently enrolled recruits in the MAP without the substantial assistance that Defendant Testing Matters knowingly provided.

337.     Defendant Physician Preferred submitted thousands of fraudulent redemptions to Gilead's agents and wrongfully obtained fees and reimbursement for PrEP medication Defendant Physician Preferred purportedly dispensed to recruits whom the Doctors United Clinic and Prescriber Defendants fraudulently enrolled in the MAP. As a contract pharmacy for Defendants

106

Doctors United, Allied Health, and Florimed, Defendant Physician Preferred remitted the reimbursements Gilead paid in connection with the fraudulent redemptions to Defendants Doctors United, Allied Health, and Florimed.  These reimbursements, as well as the dispensing fees paid to Defendant Physician Preferred, were shared among the Doctors United Defendants to ensure that each Doctors United Defendant profited from the fraud and to fund the expansion of the Doctors United Defendants' criminal operation.

338.    Each Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendant committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

339.    Gilead and its agents justifiably and reasonably relied on the Doctors United Clinic, Prescriber, and Pharmacy Defendants' underlying misrepresentations to their detriment.

340.    As a result of the conduct of the Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendants, Gilead has suffered significant injury in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Civil Conspiracy to Commit Fraud
### (Against the Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendants)

341.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 247, 269 through 298, and Exhibit C as if set forth fully herein.

342.    The Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendants unlawfully, knowingly, and willfully combined, conspired, confederated and agreed together to

defraud Gilead.  Each Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendant played an indispensable role in carrying out the fraudulent scheme.

343.    The Positive Health Clinic Defendants recruited individuals who earn low incomes or are homeless to fraudulently enroll them in the MAP, thereby enabling Defendant United Pharmacy to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.  Defendant Positive Health also took advantage of its participation in the 340B Program to secure heavily discounted PrEP medication for Defendant United Pharmacy, which allowed Defendant United Pharmacy to dispense discounted PrEP medication to MAP enrollees that was reimbursed at the wholesale price.  Furthermore, the Positive Health Clinic Defendants purchased already-dispensed PrEP medication from MAP enrollees at a fraction of the wholesale price, and then either returned the medication to the Defendant United Pharmacy to be redispensed to other MAP enrollees for greater profit, or sold it to others on the black market. This was done to fund the operations and expansion of the fraudulent scheme.

344.    The Positive Health Prescriber Defendants knowingly and intentionally performed sham "wellness checks" that served as the Positive Health Clinic Defendants' pretext for recruiting individuals to enroll in the MAP.  They also made false statements of material fact to enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and refills) for PrEP medication, thereby enabling Defendant United Pharmacy to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.

345.    Defendants Labs4Less and United Labs knowingly and intentionally provided blood testing services in connection with the sham "wellness checks" the Positive Health Clinic and Prescriber Defendants performed on recruits as a pretext for enrolling recruits in the MAP. In particular, Defendants Labs4Less and United Labs performed blood tests to determine whether recruits were HIV negative, which the Positive Health Clinic and Prescriber Defendants were required to assess before enrolling each recruit in the MAP. The Positive Health Clinic and Prescriber Defendants could not have fraudulently enrolled recruits in the MAP without the substantial assistance that Defendants Labs4Less and United Labs knowingly provided.

346.    Defendant United Pharmacy submitted thousands of fraudulent redemptions to Gilead's agents and wrongfully obtained fees and reimbursement for PrEP medication Defendant United Pharmacy purportedly dispensed to recruits whom the Positive Health Clinic and Prescriber Defendants fraudulently enrolled in the MAP. As a contract pharmacy for Defendant Positive Health, Defendant United Pharmacy remitted the reimbursements Gilead paid in connection with the fraudulent redemptions to Defendant Positive Health. These reimbursements, as well as the dispensing fees paid to Defendant United Pharmacy, were shared among the Positive Health Defendants to ensure that each Positive Health Defendant profited from the fraud and to fund the expansion of the Positive Health Defendants' criminal operation.

347.    Each Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendant committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

348.    Gilead and its agents justifiably and reasonably relied on the Positive Health Clinic, Prescriber, and Pharmacy Defendants' underlying misrepresentations to their detriment.

349.    As a result of the conduct of the Positive Health Prescriber, Clinic, Lab, and Pharmacy Defendants, Gilead has suffered significant injury in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Florida Deceptive and Unfair Trade Practices Act
### (Against the Clinic, Prescriber, Pharmacy, and Lab Defendants)

350.    Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

351.    The Clinic, Prescriber, Pharmacy, and Lab Defendants engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 502.201 *et seq*.

352.    The practices in which Clinic, Prescriber, Pharmacy, and Lab Defendants have engaged include the following *per se* unfair and deceptive acts:

(a) offering and/or paying a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, to induce the referral of patients to or patronage to or from a health care provider or health care facility, in violation of Florida's Patient Brokering Act, Fla. Stat. § 817.505(1)(a);

(b) soliciting and/or receiving a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in return for referring a patient to or patronage to or from a health care provider, in violation of Florida's Patient Brokering Act, Fla. Stat. § 817.505(1)(b); and

110

(c) aiding, abetting, advising or otherwise participating in the conduct identified in subparagraphs (a) and (b) above, in violation of Florida's Patient Brokering Act, Fla. Stat. § 817.505(1)(c);

(d) offering, paying, soliciting, and/or receiving a kickback, directly or indirectly, for referring and/or soliciting patients, in violation of Florida's Anti-Kickback Statute, Fla. Stat. § 456.054(2);

(e) knowingly writing false prescriptions and holding out such false prescriptions as true, in violation of Florida Statute § 831.30.

(f) knowingly dispensing medication pursuant to prescriptions that are not based upon a valid practitioner-patient relationship and/or that are intended for third parties, in violation of Florida Statute § 465.016(s) and Florida Administrative Code 64B16-27.1001(4);

(g) dispensing medication without interpreting and assessing the prescription order for potential adverse reactions, interactions, and dosage regimen, in violation of Florida Statute § 465.003(6)

353.    The Clinic, Pharmacy, and Lab Defendants have engaged in the aforementioned *per se* unfair and deceptive acts by, among other things, (a) providing financial or other compensation to recruits to induce them to enroll (and recruit others to enroll) in the MAP and return to clinics operated by Defendants to pick up refills of PrEP medication, and (b) sharing the proceeds from fraudulent Gilead PrEP prescriptions and MAP redemptions among the Defendants in exchange for each Clinic, Prescriber, Pharmacy, and Lab Defendant's assistance in facilitating the fraudulent schemes.

354.     The Clinic, Prescriber, and Pharmacy Defendants have also engaged in *per se* unfair and deceptive acts by, among other things, (a) writing and holding out as true fraudulent prescriptions for PrEP medication; (b) dispensing PrEP medication pursuant to prescriptions known to be invalid, medically unnecessary, and/or intended for third parties; and (c) failing to assess prescription orders for potential adverse reactions and reactions before dispensing PrEP medication.

355.     Moreover, the Clinic, Prescriber, Pharmacy, and Lab Defendants have engaged in *per se* unfair and deceptive acts by, among other things, aiding, abetting, advising or otherwise participating in the conduct referenced in the preceding two paragraphs.

356.     In addition, the Clinic and Pharmacy Defendants have also engaged in unfair and deceptive acts by unlawfully repurchasing, reselling, offering for resale, and/or distributing low-quality, potentially dangerous, diverted PrEP medication bearing the Gilead Marks and Trade Dress.

357.     Furthermore, the Clinic and Prescriber Defendants have engaged in unfair and deceptive acts by forging the signatures of recruits on MAP enrollment forms to allow the release of protected information under HIPAA, and forging identification cards for recruits to enable their enrollment in the MAP.

358.     The Clinic, Prescriber, Pharmacy, and Lab Defendants' conduct described herein is deceptive to ordinary members of the public, unfair, and harmful to the public interest.  The conduct is also contrary to Florida public policy and is unconscionable, immoral, unethical, oppressive, and unscrupulous. This conduct cannot be avoided by Gilead and produces no benefits to consumers or competition.

359.    As a direct and proximate result of the Clinic, Prescriber, Pharmacy, and Lab Defendants' deceptive and unfair practices, Gilead was aggrieved and suffered and continues to suffer actual damages.

360.    In addition, as a direct and proximate result of the Clinic and Pharmacy Defendants' deceptive and unfair practices, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and to its public and industry reputation.  Unless the Clinic and Pharmacy Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

361.    Gilead has no adequate remedy at law that will compensate it for the continued and irreparable harm it will suffer if the Clinic, Prescriber, Pharmacy, and Lab Defendants' deceptive and unfair practices are allowed to continue.

362.    Because of the Clinic, Prescriber, Pharmacy, and Lab Defendants' unfair and deceptive conduct, Gilead is entitled to an award of attorney's fees and costs pursuant to Fla. Stat. § 501.2105(1).

### SEVENTH CLAIM FOR RELIEF

**Civil Conspiracy to Violate FDUTPA**
**(Against the Doctors United Clinic, Prescriber, Pharmacy, and Lab Defendants)**

363.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

364.    The Doctors United Clinic, Prescriber, Pharmacy, and Lab Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate FDUTPA through several deceptive and unfair acts.  Each Doctors United Clinic,

113

Prescriber, Pharmacy, and Lab Defendant played an indispensable role in carrying out the unlawful conspiracy.

365.    The Doctors United Clinic Defendants unlawfully induced recruits to subject themselves to "wellness checks," enroll in the MAP, and return to Doctors United clinics to obtain unwanted refills of PrEP medication by offering and giving them various incentives, including money, gift cards, food, and cigarettes.  That conduct, which violates the Patient Brokering Act, Fla. Stat. § 817.505(1)(a), and the Anti-Kickback Statute, Fla. Stat. § 456.054(2), is *per se* unlawful under FDUTPA.

366.    Furthermore, the Doctors United Clinic Defendants knowingly and unlawfully wrote fraudulent prescriptions and held them out as true, in violation Fla. Stat. § 831.30, which is also *per se* unlawful under FDUTPA.

367.    The Doctors United Prescriber Defendants knowingly and intentionally performed sham "wellness checks" that served as the Doctors United Clinic Defendants' pretext for recruiting individuals to enroll in the MAP.  They also made false statements of material fact to enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and refills) for PrEP medication, thereby enabling the Defendant Physician Preferred to submit fraudulent redemptions to Gilead's agents and receive reimbursements and fees from Gilead for purportedly dispensing PrEP medication to those MAP enrollees, with those proceeds being shared among the Doctors United Clinic, Prescriber, Pharmacy, and Lab Defendants in exchange for each their assistance in facilitating the scheme.  Furthermore, the Doctors United Prescriber Defendants knowingly and unlawfully wrote fraudulent prescriptions and held them out as true, in violation of Fla. Stat. § 831.30.  These acts are *per se* unlawful under FDUTPA.

368.     Defendant Testing Matters knowingly and intentionally provided blood testing services in connection with the sham "wellness checks" the Doctors United Clinic Defendants performed on recruits as a pretext for enrolling recruits in the MAP.  In particular, Defendant Testing Matters performed blood tests to determine whether recruits were HIV negative, which the Doctors United Clinic Defendants were required to assess before enrolling each recruit in the MAP.  The Doctors United Clinic Defendants could not have fraudulently enrolled recruits in the MAP without the substantial assistance that Defendant Testing Matters knowingly provided.

369.     After fraudulently enrolling recruits in the MAP, the Doctors United Clinic Defendants referred the recruits' prescriptions to Defendant Physician Preferred for filling. Defendant Physician Preferred then filled the referred prescriptions, claimed fraudulent MAP reimbursements and dispensing fees from Gilead, and ultimately shared the proceeds of with the other Doctors United Defendants.  This conduct, which required cooperation and coordination among the Doctors United Defendants, violates the Patient Brokering Act, Fla. Stat. § 817.505(1)(b), and the Anti-Kickback Statute, Fla. Stat. § 456.054(2), rendering it *per se* unlawful under FDUTPA as well.  In addition, Defendant Physician Preferred dispensed PrEP medication pursuant to prescriptions known to be invalid, medically unnecessary, and/or intended for third parties, in violation of Fla. Stat. § 465.016(s) and Fla. Admin. Code 64B16-27.1001(4); and knowingly failing to assess prescription orders for potential adverse reactions and reactions before dispensing PrEP medication, in violation of Fla. Stat. § 465.003(6).  All of these acts are *per se* unlawful under FDUTPA.

370.     Moreover, as alleged in Paragraphs 248 through 268, the Doctors United Clinic and Pharmacy Defendants unlawfully, knowingly, and willfully combined, conspired,

confederated, and agreed together to violate Gilead's rights under the Lanham Act. Violation of the Lanham Act is unlawful under FDUTPA as well.

371.    Each Doctors United Clinic, Prescriber, Pharmacy, and Lab Defendant committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

372.    As a result of the Doctors United Clinic, Prescriber, Pharmacy, and Lab Defendants' conspiracy to violate FDUTPA, Gilead has suffered and continues to suffer significant injury in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

### Civil Conspiracy to Violate FDUTPA
### (Against the Positive Health Clinic, Prescriber, Pharmacy, and Lab Defendants)

373.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

374.    The Positive Health Clinic, Prescriber, Pharmacy, and Lab Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate FDUTPA through several deceptive and unfair acts. Each Positive Health Clinic, Prescriber, Pharmacy, and Lab Defendant played an indispensable role in carrying out the unlawful conspiracy.

375.    The Positive Health Clinic Defendants unlawfully induced recruits to subject themselves to "wellness checks," enroll in the MAP, and return to Positive Health clinics to obtain unwanted refills of PrEP medication by offering and giving them various incentives, including money, gift cards, food, and cigarettes. That conduct, which violates the Patient

116

Brokering Act, Fla. Stat. § 817.505(1)(a), and the Anti-Kickback Statute, Fla. Stat. § 456.054(2),

is *per se* unlawful under FDUTPA.  Furthermore, the Positive Health Clinic Defendants

knowingly and unlawfully wrote fraudulent prescriptions and held them out as true, in violation

of Fla. Stat. § 831.30, which is also *per se* unlawful under FDUTPA.

376.    The Positive Health Prescriber Defendants knowingly and intentionally performed

sham "wellness checks" that served as the Positive Health Clinic Defendants' pretext for

recruiting individuals to enroll in the MAP.  They also made false statements of material fact to

enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and

refills) for PrEP medication, thereby enabling the Defendant United Pharmacy to submit

fraudulent redemptions to Gilead's agents and receive reimbursements and fees from Gilead for

purportedly dispensing PrEP medication to those MAP enrollees, with those proceeds being

shared among the Positive Health Clinic, Prescriber, Pharmacy, and Lab Defendants in exchange

for each their assistance in facilitating the scheme.  Furthermore, the Positive Health Prescriber

Defendants knowingly and unlawfully wrote fraudulent prescriptions and held them out as true,

in violation of Florida Statute § 831.30.  These acts are *per se* unlawful under FDUTPA.

377.    Defendants Labs4Less and United Labs knowingly and intentionally provided

blood testing services in connection with the sham "wellness checks" the Positive Health Clinic

Defendants performed on recruits as a pretext for enrolling recruits in the MAP.  In particular,

Defendants Labs4Less and United Labs performed blood tests to determine whether recruits

were HIV negative, which the Positive Health Clinic Defendants were required to assess before

enrolling each recruit in the MAP.  The Positive Health Clinic Defendants could not have

117

fraudulently enrolled recruits in the MAP without the substantial assistance that Defendants Labs4Less and United Labs knowingly provided.

378.    After fraudulently enrolling recruits in the MAP, the Positive Health Clinic Defendants referred the recruits' prescriptions to Defendant United Pharmacy for filling. Defendant United Pharmacy then filled the referred prescriptions, claimed fraudulent MAP reimbursements and fees from Gilead, and ultimately shared the proceeds with the other Positive Health Defendants.  This conduct, which required cooperation and coordination among the Positive Health Defendants, violates the Patient Brokering Act, Fla. Stat. § 817.505(1)(b), and the Anti-Kickback Statute, Fla. Stat. § 456.054(2), rendering it *per se* unlawful under FDUTPA as well.  In addition, Defendant United Pharmacy unlawfully dispensed PrEP medication pursuant to prescriptions known to be invalid, medically unnecessary, and/or intended for third parties, in violation of Fla. Stat. § 465.016(s) and Fla. Admin. Code 64B16-27.1001(4); and knowingly failing to assess prescription orders for potential adverse reactions and reactions before dispensing PrEP medication, in violation of Fla. Stat. § 465.003(6). All of these acts are *per se* unlawful under FDUTPA.

379.    Moreover, as alleged in Paragraphs 248 through 268, the Positive Health Clinic and Pharmacy Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate Gilead's rights under the Lanham Act.  Violation of the Lanham Act is unlawful under FDUTPA as well.

380.    Each Positive Health Clinic, Prescriber, Pharmacy, and Lab Defendant committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

381.    As a result of the Positive Health Clinic, Prescriber, Pharmacy, and Lab

Defendants' conspiracy to violate FDUTPA, Gilead has suffered and continues to suffer

significant injury in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF

### Federal Trademark Infringement (15 U.S.C. § 1114(1)(a))
### (Against the Clinic and Pharmacy Defendants)

382.    Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through

298 and Exhibit C as if set forth fully herein.

383.    In violation of 15 U.S.C. § 1114(1)(a), the Clinic and Pharmacy Defendants,

independently and in conspiracy with one another, used in commerce, without Gilead's consent,

either a reproduction, counterfeit, copy, or colorable imitation of the Gilead Marks and Trade

Dress in connection with the sale, offering for sale, distribution, or advertising of diverted and/or

altered PrEP medication that is materially different from authentic PrEP medication authorized

for sale by Gilead in the United States.

384.    This materially different PrEP medication is not subject to and subverts Gilead's

quality-control measures.

385.    The Clinic and Pharmacy Defendants' use and sale of PrEP medication bearing

certain of Gilead's Marks and Trade Dress, which is materially different from authentic PrEP

medication, and/or that is not subject to Gilead's quality control measures, is likely to cause

confusion, or to cause mistake, or to deceive.

386.    The Clinic and Pharmacy Defendants' actions constitute willful infringement of

Gilead's exclusive rights in the Gilead Marks and Trade Dress.

119

387.    Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

388.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their consumer and industry reputation.  Unless the Clinic and Pharmacy Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

389.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

390.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## TENTH CLAIM FOR RELIEF

### Federal Trademark Infringement (15 U.S.C. § 1114(1)(b))
### (Against the Clinic and Pharmacy Defendants)

391.    Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

392.    In violation of 15 U.S.C. § 1114(1)(b), the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, reproduced, counterfeited, copied, or colorably imitated the registered Gilead Marks and Trade Dress belonging to Gilead and applied such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection

120

with the sale, offering for sale, distribution, or advertising of diverted PrEP medication that is materially different from authentic PrEP medication authorized for sale by Gilead in the United States.

393.    This materially different PrEP medication, which bears certain of Gilead's Marks and Trade Dress, is not subject to and subverts Gilead's quality-control measures.

394.    The Clinic and Pharmacy Defendants' use and sale of PrEP medication that is materially different from authentic PrEP medication, and/or that is not subject to Gilead's quality control measures, is likely to cause confusion, or to cause mistake, or to deceive.

395.    The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

396.    Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

397.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and to their reputation in the industry.  Unless the Clinic and Pharmacy Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

398.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

399.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

### ELEVENTH CLAIM FOR RELIEF

**False Description and Designation of Origin in Commerce**
**(Against the Clinic and Pharmacy Defendants)**

400.    Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

401.    In violation of 15 U.S.C. § 1125(a)(1)(A), the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, in connection with the dispensing, repurchase, and sale of diverted PrEP medication that is materially different from authentic Gilead products authorized for sale by Gilead in the United States and that is not subject to and subverts Gilead's quality-control measures, used in commerce a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was or is likely to cause confusion or to cause mistake, or to deceive as to an affiliation, connection, or association with Gilead.

402.    The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

403.    Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

404.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their

reputation in the industry.  Unless the Clinic and Pharmacy Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

405.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

406.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress.

## TWELFTH CLAIM FOR RELIEF

### Federal False Advertising
### (Against the Clinic and Pharmacy Defendants)

407.    Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

408.    In violation of 15 U.S.C. § 1125(a)(1)(B), the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, in connection with the dispensation and sale of diverted PrEP medication that is materially different from authentic PrEP medication authorized for sale by Gilead in the United States and that is not subject to and subverts Gilead's quality-control measures, used a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of PrEP medication that is materially different from authentic PrEP medication.

123

409.     The Clinic and Pharmacy Defendants advertised, marketed, and promoted diverted PrEP medication, which bears certain of Gilead's Marks and Trade Dress, that is materially different from authentic PrEP medication authorized for sale by Gilead in the United States and that is not subject to Gilead's quality-control measures, to the public, and/or to specific segments of the public, using the Gilead Marks and Trade Dress, as well as other intellectual property belonging to Gilead.

410.     The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

411.     Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

412.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless the Clinic and Pharmacy Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

413.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

414.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## THIRTEENTH CLAIM FOR RELIEF

**Federal Dilution of Mark**
**(Against the Clinic and Pharmacy All Defendants)**

415.    Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

416.    The Gilead Marks and Trade Dress are famous and distinctive within the meaning of 15 U.S.C. § 1125(c).

417.    The Clinic and Pharmacy Defendants are dispensing, selling, and/or have dispensed and sold diverted PrEP medication bearing certain Gilead Marks and Trade Dress after such trademarks and trade dress became famous.

418.    By dispensing and selling these diverted products, the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, have diluted, tarnished, and are diluting and tarnishing the distinctive quality of a mark or trade name owned by Gilead in violation of 15 U.S.C. § 1125(c).

419.    The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

420.    Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

421.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless the Clinic and Pharmacy Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

125

422.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

423.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## FOURTEENTH CLAIM FOR RELIEF

**Florida Dilution and Tarnishment of Mark and Injury to Business Reputation**
**(Against the Clinic and Pharmacy Defendants)**

424.     Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

425.     All of the Gilead Marks and Trade Dress are individually distinctive within the meaning of Florida Statute § 495.151.

426.     By dispensing and selling diverted PrEP medication bearing the Gilead Marks and Trade Dress, the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, have injured and are continuing to injure Gilead's business reputation and/or have diluted, tarnished, and are continuing to dilute and tarnish the distinctive quality of a mark or trade name owned by Gilead, in violation of Florida Statute § 495.151.

427.     The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

428.     Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

126

429.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless the Clinic and Pharmacy Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

430.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

431.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

### FIFTEENTH CLAIM FOR RELIEF

**Civil Conspiracy to Violate the Lanham Act**
**(Against the Doctors United Clinic, Pharmacy, and Officer Defendants)**

432.     Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

433.     The Doctors United Clinic, Pharmacy, and Officer Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate the Lanham Act.  Each played an indispensable role in carrying out this scheme.

434.     In accordance with their agreement, the Doctors United Clinic Defendants recruited individuals who earn low incomes or are homeless whom they could prescribe PrEP medication and fraudulently enroll in the MAP.  Defendant Physician Preferred then filled those prescriptions by dispensing PrEP medication bearing certain Gilead Marks that was materially different from authentic PrEP medication authorized for sale by Gilead in the United States.

127

Defendant Physician Preferred caused that materially different PrEP medication to be sent to the Doctors United Clinic Defendants, which then delivered the materially different PrEP medication to MAP enrollees.  After delivering the materially different PrEP medication to MAP enrollees, the Doctors United Clinic Defendants repurchased the medication to be redispensed unlawfully to other MAP enrollees, or sold on the black market

435.    The Doctors United Officer Defendants were personally involved in and approved of the scheme to violate the Lanham Act, and the Doctors United Clinic Defendants and Defendant Physician Preferred carried it out at their direction.  Further, the Doctors United Officer Defendants devised, implemented, and enforced policies and business practices that enabled the Doctors United Clinic Defendants and Defendant Physician Preferred to carry out the scheme and conceal it from Gilead.

436.    The agreement among the Doctors United Clinic, Pharmacy, and Officer Defendants to dispense and distribute materially different PrEP medication in violation of the Lanham Act benefitted the Doctors United Clinic, Pharmacy, and Officer Defendants.

437.    Each of the Doctors United Clinic, Pharmacy, and Officer Defendants committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

438.    As a result of the conspiracy to violate the Lanham Act, Gilead has suffered and continues to suffer significant injury in an amount to be determined at trial.

## SIXTEENTH CLAIM FOR RELIEF

### Civil Conspiracy to Violate the Lanham Act
**(Against the Positive Health Clinic, Pharmacy, and Officer Defendants)**

439.   Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

440.   The Positive Health Clinic, Pharmacy, and Officer Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate the Lanham Act.  Each played an indispensable role in carrying out this scheme.

441.   In accordance with their agreement, the Positive Health Clinic Defendants recruited individuals who earn low incomes or are homeless whom they could prescribe PrEP medication and fraudulently enroll in the MAP.  Defendant United Pharmacy then filled those prescriptions by dispensing PrEP medication bearing certain Gilead Marks that was materially different from authentic PrEP medication authorized for sale by Gilead in the United States.  Defendant United Pharmacy caused that materially different PrEP medication to be sent to the Positive Health Clinic Defendants, which then delivered the materially different PrEP medication to MAP enrollees.  After delivering the materially different PrEP medication to MAP enrollees, the Positive Health Clinic Defendants repurchased the medication to be redispensed unlawfully to other MAP enrollees, or sold on the black market.

442.   The Positive Health Officer Defendants were personally involved in and approved of the scheme to violate the Lanham Act, and the Positive Health Clinic Defendants and Defendant United Pharmacy carried it out at their direction.  Further, the Positive Health Officer Defendants devised, implemented, and enforced policies and business practices that enabled the

129

Positive Health Clinic Defendants and Defendant United Pharmacy to carry out the scheme and conceal it from Gilead.

443.    The agreement among the Positive Health Clinic, Pharmacy, and Officer Defendants to dispense and distribute materially different PrEP medication in violation of the Lanham Act benefitted the Positive Health Clinic, Pharmacy, and Officer Defendants.

444.    Each of the Positive Health Clinic, Pharmacy, and Officer Defendants committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

445.    As a result of the conspiracy to violate the Lanham Act, Gilead has suffered and continues to suffer significant injury in an amount to be determined at trial.

## SEVENTEENTH CLAIM FOR RELIE

### Common Law Unfair Competition
### (Against the Clinic and Pharmacy Defendants)

446.    Gilead realleges and incorporates by reference paragraphs 1 through 298 of this Complaint and Exhibit C as if fully set forth herein.

447.    In violation of the common law and public policy of the State of Florida and elsewhere, the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, have unfairly competed with Gilead by dispensing diverted PrEP medication and selling diverted PrEP medication to others outside of authorized distribution channels.

448.    As a direct and proximate result of the Clinic and Pharmacy Defendants' unfair competition, Gilead has sold less PrEP medication than it otherwise would have, had the Clinic and Pharmacy Defendants not sold diverted PrEP medication outside of authorized distribution channels.

130

449.     In addition, as a direct and proximate result of the Clinic and Pharmacy Defendants' unfair competition, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless the Clinic and Pharmacy Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

450.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

451.     As a direct and proximate result of the Clinic and Pharmacy Defendants' unfair competition, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## EIGHTEENTH CAUSE OF ACTION

### Trademark Infringement Under Florida Trademark Registration and Protection Act
### (Against the Clinic and Pharmacy Defendants)

452.     Gilead realleges and incorporates by reference paragraphs 1 through 298 of this Complaint and Exhibit C as if fully set forth herein.

453.     In violation of Florida Statute § 495.001 *et seq.*, the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, used in commerce, without Gilead's consent, either a reproduction, counterfeit, copy, or colorable imitation of the Gilead Marks and Trade Dress in connection with the sale, offering for sale, distribution, or advertising of diverted Gilead products that are materially different from authentic Gilead products authorized for sale by Gilead in the United States

454.     This materially different PrEP medication, which bears certain of Gilead's Marks and Trade Dress, is not subject to and subverts Gilead's quality-control measures.

131

455.     The Clinic and Pharmacy Defendants' use and sale of PrEP medication that is materially different from authentic PrEP medication, and/or that is not subject to Gilead's quality control measures, is likely to cause confusion, or to cause mistake, or to deceive.

456.     The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

457.     Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

458.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless the Clinic and Pharmacy Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

459.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

460.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## NINETEENTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against All Defendants)

461.     Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

132

462.    As set forth above, Defendants have acted in concert to (a) fraudulently enroll recruits in the MAP, including by forging the signatures of prescribers and recruits on MAP applications; (b) submit fraudulent redemptions to Advancing Access® to obtain reimbursement and fees from Gilead for PrEP medication purportedly dispensed to these recruits; (c) purchase already-dispensed PrEP medication from recruits to be redispensed in connection with future MAP redemptions; and (d) sell dispensed PrEP medication to others seeking to purchase PrEP medication at less than the wholesale price.

463.    As a result, all Defendants wrongfully obtained a direct monetary benefit to which they were not entitled.  This monetary benefit includes the reimbursements and fees Defendants received in connection with fraudulent MAP redemptions and the proceeds from Defendants' sale of diverted PrEP medication to other healthcare providers.

464.    In addition, by selling diverted PrEP medication bearing Gilead's valuable trademarks independently and in conspiracy with one another, Defendants have been unjustly enriched at Gilead's direct expense in violation of the common law of Florida and elsewhere.

465.    Defendants voluntarily and knowingly accepted and retained these benefits from Gilead.

466.    Defendants have no right to retain these unjust gains, as they were obtained through unlawful, fraudulent, and improper means.

467.    If Defendants are permitted to keep this monetary benefit, it would be manifestly unjust.

468.     Gilead is therefore entitled to the remedies of disgorgement and restitution in the amount by which Defendants were unjustly enriched, or the imposition of a constructive trust over Defendants' assets to that extent in order to prevent Defendants' enjoyment of that benefit.

**PRAYER FOR RELIEF**

WHEREFORE, Gilead demands judgment against all Defendants as follows:

(a)     an order entering judgment in favor of Gilead against Defendants, jointly and severally;

(b)     an order temporarily restraining, and preliminarily and permanently enjoining Defendants and their subsidiaries, parents, affiliates, agents, servants, employees, members, directors, officers, and attorneys, and those persons in active concert or participation with them (the "Restrained Parties") from:

(i)     enrolling or seeking to enroll in Gilead's Advancing Access® PAP or MAP any patient who has been prescribed TRUVADA® or DESCOVY®;

(ii)    seeking or accepting reimbursements, either directly or indirectly, for any TRUVADA® or DESCOVY® dispensed to any individual enrolled in Gilead's PAP or MAP;

(iii)   dispensing TRUVADA® or DESCOVY® to patients in containers other than original, unopened containers from the manufacturer;

(iv)    dispensing TRUVADA® or DESCOVY® to patients unaccompanied by its FDA-approved labeling, package insert, lot number, serialization number, or expiration date;

(v)     selling, purchasing, or otherwise obtaining, TRUVADA® or DESCOVY® that had previously been filled or dispensed;

(vi)    removing from their premises, or discarding, destroying, transferring or disposing in any manner, any information, computer files, electronic files,

135

WhatsApp or text messages, business records (including but not limited to e-mail communications) or other documents relating to Defendants' assets and operations or relating in any way to any of the activities referred to in subparagraphs (i) through (v) above; and

(vii)   assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (vi) above;

(c)   an order requiring the Restrained Parties to turn over to Gilead, or any person or entity designated by Gilead, all TRUVADA® or DESCOVY® that is in the Restrained Parties' possession, custody or control and that either (i) is no longer in its original, unopened container from the manufacturer, or (ii) had previously been filled or dispensed, to be held by Gilead until further order of this Court;

(d)   an order awarding Gilead damages in an amount to be determined;

(e)   an order awarding Gilead pre-judgment and post-judgment interest;

(f)   an order awarding Gilead punitive damages;

(g)   an order awarding Gilead reasonable attorneys' fees and other costs; and

(h)   for such additional relief as the Court finds just, equitable, and appropriate.

DATED:      Miami, Florida
            November 2, 2020

136

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

/s/ P. Jan Kubicz
P. Jan Kubicz (FBN 84405)
jan.kubicz@squirepb.com
200 South Biscayne Boulevard, Suite 4700
Miami, FL 33131
T.: (305) 577-7000
F.: (305) 577-7001

/s/ Franklin G. Monsour
Franklin G. Monsour (*pro hac vice pending*)
franklin.monsour@squirepb.com
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
T.:  (212) 872-9800


PATTERSON BELKNAP WEBB & TYLER LLP

/s/ Geoffrey Potter
Geoffrey Potter (*pro hac vice pending*)
Jonah Knobler (*pro hac vice pending*)
Joshua Kipnees (*pro hac vice pending*)
Timothy A. Waters (*pro hac vice pending*)
R. James Madigan III (*pro hac vice pending*)
Jared S. Buszin (*pro hac vice pending*)
Devon Hercher (*pro hac vice pending*)
Jacob Chefitz (*pro hac vice pending*)
gpotter@pbwt.com
jknobler@pbwt.com
jkipnees@pbwt.com
twaters@pbwt.com
jmadigan@pbwt.com
jbuszin@pbwt.com
dhercher@pbwt.com
jchefitz@pbwt.com

137

1133 Avenue of the Americas
New York, NY 10036
Telephone: (917) 854-2310
Facsimile: (212) 336-2222

*Attorneys for Plaintiffs Gilead Sciences, Inc. and
Gilead Sciences Ireland UC*



# Exhibit A

Int. Cl.: 5

Prior U.S. Cls.: 6, 18, 44, 46, 51 and 52

United States Patent and Trademark Office

Reg. No. 3,251,595

Registered June 12, 2007

## TRADEMARK
## PRINCIPAL REGISTER

# GILEAD

GILEAD SCIENCES, INC. (DELAWARE COR-
PORATION)
333 LAKESIDE DRIVE
FOSTER CITY, CA 94404

FOR: PHARMACEUTICAL PREPARATIONS,
NAMELY, ANTIVIRALS, ANTIFUNGALS AND
PREPARATIONS FOR THE TREATMENT OF IN-
FECTIOUS CONDITIONS, IN CLASS 5 (U.S. CLS. 6,
18, 44, 46, 51 AND 52).

FIRST USE 4-7-1989; IN COMMERCE 4-7-1989.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 1,611,838.

SER. NO. 78-942,489, FILED 8-1-2006.

DAWN HAN, EXAMINING ATTORNEY

Int. Cl.: 5

Prior U.S. Cls.: 6, 18, 44, 46, 51 and 52

**Reg. No. 2,656,314**

## United States Patent and Trademark Office

Registered Dec. 3, 2002

### TRADEMARK
### PRINCIPAL REGISTER



GILEAD SCIENCES, INC. (DELAWARE COR-
PORATION)
333 LAKESIDE DRIVE
FOSTER CITY, CA 94404

FOR: PHARMACEUTICAL PREPARATIONS FOR
THE TREATMENT AND/OR PREVENTION OF IN-
FECTIOUS DISEASES, IN CLASS 5 (U.S. CLS. 6, 18,
44, 46, 51 AND 52).

FIRST USE 2-22-2002; IN COMMERCE 2-22-2002.

THE ACCOMPANYING DRAWING IS LINED
FOR THE COLOR RED, AND RED IS A FEATURE
OF THE MARK.

SER. NO. 76-348,396, FILED 12-12-2001.

JEAN IM, EXAMINING ATTORNEY



# GSI

**Reg. No. 3,890,252**
**Registered Dec. 14, 2010**

GILEAD SCIENCES LIMITED (IRELAND COMPANY)
IDA BUSINESS AND TECHNOLOGY PARK
CARRIGTOHILL, CO. CORK, IRELAND

**Int. Cl.: 5**

**TRADEMARK**

**PRINCIPAL REGISTER**

FOR: PHARMACEUTICAL PREPARATIONS FOR THE TREATMENT OF INFECTIOUS CONDITIONS AND DISEASES AND DISORDERS OF THE IMMUNE SYSTEM, THE LIVER AND THE CARDIOVASCULAR SYSTEM; ANTIVIRALS, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 6-17-2007; IN COMMERCE 6-17-2007.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

PRIORITY CLAIMED UNDER SEC. 44(D) ON IRELAND APPLICATION NO. 2010/00199,
FILED 2-4-2010.

SER. NO. 85-032,245, FILED 5-6-2010.

SAMUEL E. SHARPER JR., EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM322197

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | CHANGE OF NAME |

**CONVEYING PARTY DATA**

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| Gilead Sciences Limited | | 09/22/2014 | LIMITED LIABILITY COMPANY: IRELAND |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Name: | Gilead Sciences Ireland UC |
| Doing Business As: | Gilead Sciences Ireland UC |
| Street Address: | IDA Business and Technology Park |
| City: | Carrigtohill, Co. Cork |
| State/Country: | IRELAND |
| Entity Type: | Unlimited Company: IRELAND |

**PROPERTY NUMBERS Total: 144**

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 4188355 | TRILEUS |
| Registration Number: | 4277625 | COFENDA |
| Registration Number: | 4038955 | COMPLERA |
| Registration Number: | 4277626 | CYTACTA |
| Registration Number: | 4277627 | VICLUDA |
| Registration Number: | 4378034 | VITECA |
| Registration Number: | 4315192 | AZEVITA |
| Registration Number: | 4315191 | AMPLETTA |
| Registration Number: | 4315190 | AMPLETA |
| Registration Number: | 4033139 | COMPLEVA |
| Registration Number: | 4476435 | APEXIAD |
| Registration Number: | 4476436 | CYPLUS |
| Registration Number: | 4476437 | QUALTARA |
| Registration Number: | 4370358 | TYBOST |
| Registration Number: | 3890252 | GSI |
| Registration Number: | 4062201 | CMPLERA |
| Registration Number: | 4047842 | KOMPLIRA |
| Registration Number: | 4047840 | KONPLERA |
| Registration Number: | 4047841 | CANPLERA |

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 4483241 | QUAVEAD |
| Registration Number: | 4535448 | ERAQUAD |
| Registration Number: | 4535447 | UNOSTARA |
| Registration Number: | 4535446 | COBRELA |
| Registration Number: | 4535445 | QUADUNO |
| Registration Number: | 4535444 | QUADVYR |
| Registration Number: | 4473232 | QUATREAD |
| Registration Number: | 4578217 | VITECTA |
| Registration Number: | 4048113 | KOMPLARA |
| Registration Number: | 4104494 | VIXPLERA |
| Registration Number: | 4090077 | EVIPLERA |
| Registration Number: | 4130861 | STR |
| Registration Number: | 4278048 | STRIBOLD |
| Registration Number: | 4105297 | |
| Registration Number: | 4263613 | STRIBILD |
| Registration Number: | 4345163 | VITEKTA |
| Registration Number: | 4323411 | STR |
| Registration Number: | 4320307 | STRIBILD |
| Registration Number: | 4320650 | SOCINCT |
| Registration Number: | 4468665 | SOVALDI |
| Registration Number: | 4438755 | INODELT |
| Registration Number: | 4364273 | ZYDELIG |
| Registration Number: | 4371363 | SELNISA |
| Registration Number: | 4435098 | EXPALITE |
| Registration Number: | 4438767 | FINLIZA |
| Registration Number: | 4456646 | 7985 |
| Registration Number: | 4582787 | 1160 |
| Registration Number: | 4509797 | |
| Registration Number: | 4509798 | |
| Registration Number: | 4608545 | HARVONI |
| Registration Number: | 4560268 | 7916 |
| Serial Number: | 77894772 | QUADRID |
| Serial Number: | 77942516 | ARVANCE |
| Serial Number: | 85191697 | SYMPLERA |
| Serial Number: | 77894779 | UNIVADA |
| Serial Number: | 85330091 | THEQUAD |
| Serial Number: | 85329999 | QWAD |
| Serial Number: | 85330085 | MYKWAD |
| Serial Number: | 85358082 | AMPLEV |

| Property Type | Number | Word Mark |
|---|---|---|
| Serial Number: | 85358100 | ASSEVITA |
| Serial Number: | 85358136 | BLOXEGRA |
| Serial Number: | 85358437 | CRUZALON |
| Serial Number: | 85358466 | DEFISTRO |
| Serial Number: | 85358502 | FIRCLAZA |
| Serial Number: | 85358537 | GOFAZRI |
| Serial Number: | 85358584 | INCLUZA |
| Serial Number: | 85358588 | INGENSIDY |
| Serial Number: | 85358652 | JUSTRION |
| Serial Number: | 85358658 | MONFORZO |
| Serial Number: | 85358678 | STIGRAZ |
| Serial Number: | 85358714 | STURDECA |
| Serial Number: | 85358725 | ZKWAD |
| Serial Number: | 85679729 | QSTARA |
| Serial Number: | 85709246 | IPANGEO |
| Serial Number: | 85709337 | CIXIGY |
| Serial Number: | 85709313 | VCISEV |
| Serial Number: | 85709365 | CCISEV |
| Serial Number: | 85839069 | SURCEZE |
| Serial Number: | 85839086 | OZIMLA |
| Serial Number: | 85839094 | SENZIST |
| Serial Number: | 85839098 | VENZAYA |
| Serial Number: | 85839101 | ZENKAY |
| Serial Number: | 85844208 | SELNISA |
| Serial Number: | 85844212 | LYMCYSE |
| Serial Number: | 85944354 | 510 |
| Serial Number: | 86029203 | |
| Serial Number: | 86096000 | SOSIPLI |
| Serial Number: | 86096008 | SIMLIBIS |
| Serial Number: | 86095989 | SOPASVIO |
| Serial Number: | 86096012 | SOPIFNI |
| Serial Number: | 86095999 | SUMLEDIR |
| Serial Number: | 86095997 | COHYCIV |
| Serial Number: | 86095993 | ONVALSI |
| Serial Number: | 86107391 | MOMENTS LIKE THIS CAN CHANGE EVERYTHING |
| Serial Number: | 86033869 | VOYANNIS |
| Serial Number: | 86124771 | SOFALVI |
| Serial Number: | 86170336 | GENVOYA |
| Serial Number: | 86170334 | ALVANSIS |

| Property Type | Number | Word Mark |
|---|---|---|
| Serial Number: | 86170333 | JENBRISA |
| Serial Number: | 86170331 | GENPHYSA |
| Serial Number: | 86170330 | ENSTRALA |
| Serial Number: | 86170328 | NUFEZA |
| Serial Number: | 86170959 | GENLIBIS |
| Serial Number: | 86171158 | COHERIS |
| Serial Number: | 86170326 | DESCOVY |
| Serial Number: | 86174687 | VUHANSA |
| Serial Number: | 86095996 | FULDELIS |
| Serial Number: | 86186218 | INGENSIDI |
| Serial Number: | 86226938 | SUMTELIS |
| Serial Number: | 86227023 | GENDEVRA |
| Serial Number: | 86227054 | VISTREMA |
| Serial Number: | 86227084 | OSYMTEE |
| Serial Number: | 86227091 | RIZUPA |
| Serial Number: | 86227174 | OTIMSA |
| Serial Number: | 86227110 | MELOVY |
| Serial Number: | 86227119 | MARPOSIS |
| Serial Number: | 86227180 | VOYALA |
| Serial Number: | 86029273 | |
| Serial Number: | 86030025 | VOYANIS |
| Serial Number: | 86118077 | SOPIFNY |
| Serial Number: | 86222090 | NESEQUENT |
| Serial Number: | 86280995 | TYBOST |
| Serial Number: | 86281218 | VITEKTA |
| Serial Number: | 86282333 | SOHEPIC |
| Serial Number: | 86282353 | EPCLUSA |
| Serial Number: | 86124768 | SOFALDI |
| Serial Number: | 86341939 | HINGENO |
| Serial Number: | 86341936 | VERCEBIA |
| Serial Number: | 86341933 | VYNCLUSA |
| Serial Number: | 86341931 | GENCLUSA |
| Serial Number: | 86341927 | NESSAVIO |
| Serial Number: | 86341924 | ZENJURNA |
| Serial Number: | 86341919 | ENCLUITIVE |
| Serial Number: | 86341913 | LYGADDO |
| Serial Number: | 86346340 | ZYDELIG |
| Serial Number: | 86346343 | ZYDELIG |
| Serial Number: | 86363315 | PANJEVRY |

| Property Type | Number | Word Mark |
|---|---|---|
| **Serial Number:** | 86363321 | ESOFIS |
| **Serial Number:** | 86373746 | PANGYPIC |
| **Serial Number:** | 86373736 | PANJEVRIS |
| **Serial Number:** | 86373733 | PANGIVIS |
| **Serial Number:** | 86373725 | FINJOSO |
| **Serial Number:** | 86373718 | JENSTREY |
| **Serial Number:** | 86373710 | IONLAY |
| **Serial Number:** | 86373704 | CLUMENTI |

**CORRESPONDENCE DATA**

**Fax Number:** 650 522-55

***Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.***

**Phone:** 650 522-2401

**Email:** trademarks@gilead.com

**Correspondent Name:** Gretchen R. Stroud

**Address Line 1:** 333 Lakeside Drive

**Address Line 4:** Foster City, CALIFORNIA 94404

| **ATTORNEY DOCKET NUMBER:** | GSL NAME CHANGE |
|---|---|

**DOMESTIC REPRESENTATIVE**

**Name:** Gretchen R. Stroud

**Address Line 1:** 333 Lakeside Drive

**Address Line 4:** Foster City, CALIFORNIA 94404

| **NAME OF SUBMITTER:** | Gretchen R. Stroud |
|---|---|
| **SIGNATURE:** | /Gretchen R. Stroud/ |
| **DATE SIGNED:** | 11/04/2014 |

**Total Attachments: 1**
source=Certified copy Cert of Inc#page1.tif

Number : 259755

*Duplicate Certificate*

FEE PAID

# *Certificate of Incorporation of a Company*

### *I hereby certify,* that

**GILEAD SCIENCES IRELAND UC**

originally called **NEXSTAR PHARMACEUTICALS LIMITED**

which name was changed to
**GILEAD PHARMACEUTICALS LIMITED**

on **Thursday, the 16th day of March, 2000**

which name was changed to
**GILEAD SCIENCES LIMITED**

on **Thursday, the 18th day of May, 2000**

which name was changed to
**GILEAD SCIENCES**

on **Monday, the 22nd day of September, 2014**

which name was changed to

**GILEAD SCIENCES IRELAND UC**
on **Monday, the 22nd day of September, 2014**

each name change having been made by Special Resolution and with the
Authority of the Registrar of Companies.

was Reregistered under the Companies Acts,   1963 to 2013

as an *Unlimited* Company, on
**Monday, the 22nd day of September, 2014.**

*Ita Bane*

Given under my hand at Dublin, this
**Wednesday, the 8th day of October, 2014.**

Companies Act, 1963, sec. 370(1)

*For Registrar of Companies*

**TRADEMARK**

Int. Cl.: 5

Prior U.S. Cls.: 6, 18, 44, 46, 51, and 52

Reg. No. 2,915,213

United States Patent and Trademark Office    Registered Dec. 28, 2004

## TRADEMARK
### PRINCIPAL REGISTER

## TRUVADA

GILEAD SCIENCES, INC. (DELAWARE COR-
PORATION)
333 LAKESIDE DRIVE
FOSTER CITY, CA 94404

FOR: PHARMACEUTICAL PREPARATIONS FOR
THE TREATMENT OF INFECTIOUS CONDITIONS,
IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 8-5-2004; IN COMMERCE 8-5-2004.

SN 78-239,720, FILED 4-18-2003.

JERI J. FICKES, EXAMINING ATTORNEY

# United States of America

## United States Patent and Trademark Office

# TRUVADA FOR PREP

**Reg. No. 5,358,262**

**Registered Dec. 19, 2017**

**Int. Cl.: 5, 44**

**Service Mark**

**Trademark**

**Principal Register**

Gilead Sciences Inc. (DELAWARE CORPORATION)
333 Lakeside Drive
Foster City, CALIFORNIA 94404

CLASS 5: Anti-viral pharmaceutical preparations; pharmaceutical preparations for the treatment and prevention of infectious diseases; pharmaceutical preparations for the treatment of immune dysfunction; pharmaceutical preparations for the treatment and prevention of human immunodeficiency virus infection

FIRST USE 2-6-2017; IN COMMERCE 2-6-2017

CLASS 44: Information and advisory services relating to pharmaceuticals, diseases and medical conditions and treatments, namely, pharmaceutical advice, medical and pharmaceutical consultation, medical advisory services, and providing medical information, consultancy and advisory services; information and advisory services relating to pharmaceuticals, diseases and medical conditions and treatments, namely, pharmaceutical advice, medical and pharmaceutical consultation, medical advisory services, and providing medical information, consultancy and advisory services provided on-line over a computer network and the Internet; providing medical information and advisory services regarding HIV infection

FIRST USE 1-11-2016; IN COMMERCE 1-11-2016

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

OWNER OF EUROPEAN UNION , REG. NO. 015787484, DATED 12-29-2016, EXPIRES 08-30-2026

OWNER OF U.S. REG. NO. 2915213

No claim is made to the exclusive right to use the following apart from the mark as shown: "FOR PREP"

SER. NO. 87-292,084, FILED 01-06-2017



Performing the Functions and Duties of the
Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office



# United States of America
## United States Patent and Trademark Office

# DESCOVY

**Reg. No. 4,876,632**

GILEAD SCIENCES IRELAND UC (IRELAND UNLIMITED COMPANY)
IDA BUSINESS AND TECHNOLOGY PARK

**Registered Dec. 29, 2015**   CARRIGTOHILL, CO. CORK, IRELAND

**Int. Cl.: 5**

FOR: PHARMACEUTICAL PREPARATIONS FOR THE PREVENTION AND TREATMENT OF HEPATITIS AND HIV INFECTION; ANTIVIRALS; ANTI-INFLAMMATORIES; ANTI-FUNGALS; PHARMACEUTICAL PREPARATIONS FOR USE IN THE TREATMENT OF IN-FECTIOUS DISEASES, LIVER DISEASES AND DISORDERS, RESPIRATORY DISEASES AND DISORDERS, ONCOLOGICAL DISEASES AND DISORDERS, AND CARDIOVASCULAR DISEASES AND DISORDERS, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

**TRADEMARK**

**PRINCIPAL REGISTER**

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF IRELAND REG. NO. 249773, DATED 4-26-2014, EXPIRES 10-31-2023.

SER. NO. 86-170,326, FILED 1-20-2014.

LUCY ARANT, EXAMINING ATTORNEY



Director of the United States
Patent and Trademark Office

# United States of America
## United States Patent and Trademark Office

# DESCOVY FOR PREP

**Reg. No. 5,912,591**

**Registered Nov. 19, 2019**

**Int. Cl.: 5, 44**

**Service Mark**

**Trademark**

**Principal Register**

Gilead Sciences Ireland UC  (IRELAND UNLIMITED COMPANY )
Ida Business And Technology Park
Carrigtohill, Co. Cork, IRELAND

CLASS 5: Anti-viral pharmaceutical preparations; pharmaceutical preparations for the treatment and prevention of infectious diseases; pharmaceutical preparations for the treatment of immune dysfunction; pharmaceutical preparations for the treatment and prevention of human immunodeficiency virus infection

CLASS 44: Information and advisory services relating to pharmaceuticals, diseases and medical conditions and treatments, namely, pharmaceutical advice, medical and pharmaceutical consultation, medical advisory services, and providing medical information, consultancy and advisory services; information and advisory services relating to pharmaceuticals, diseases and medical conditions and treatments, namely, pharmaceutical advice, medical and pharmaceutical consultation, medical advisory services, and providing medical information, consultancy and advisory services provided on-line over a computer network and the Internet; providing medical information and advisory services regarding HIV infection

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

PRIORITY CLAIMED UNDER SEC. 44(D) ON EUROPEAN UNION APPLICATION NO. 018009954, FILED 01-14-2019, REG. NO. 018009954, DATED 05-14-2019, EXPIRES 01-14-2029

OWNER OF U.S. REG. NO. 4876632

No claim is made to the exclusive right to use the following apart from the mark as shown: "FOR PREP"

SER. NO. 88-266,226, FILED 01-17-2019



Director of the United States
Patent and Trademark Office

# United States of America

## United States Patent and Trademark Office



**Reg. No. 5,030,567**

**Registered Aug. 30, 2016**

**Int. Cl.: 5**

**Trademark**

**Principal Register**

Gilead Sciences, Inc. (DELAWARE CORPORATION)
333 Lakeside Drive
Foster City, CA 94404

CLASS 5: pharmaceutical preparations for the treatment of HIV infection; pharmaceutical preparations, namely, pre-exposure prophylaxis (PrEP) preparations for prevention and risk mitigation of contracting HIV

FIRST USE 8-5-2004; IN COMMERCE 8-5-2004

The color(s) blue is/are claimed as a feature of the mark.

The mark consists of the placement of the word "GILEAD" in blue, debossed on the front of a three-dimensional configuration of an oblong tablet, also in blue. The broken lines depicting the tablet indicate placement of the mark on the goods and the tablet shape depicted in broken lines, alone, is not part of the mark.

OWNER OF U.S. REG. NO. 4279898, 2679181

SER. NO. 86-850,196, FILED 12-15-2015
JOHN M GARTNER, EXAMINING ATTORNEY



Director of the United States
Patent and Trademark Office

# United States of America

## United States Patent and Trademark Office



**Reg. No. 5,154,303**

**Registered Mar. 07, 2017**

**Int. Cl.: 5**

**Trademark**

**Principal Register**

Gilead Sciences, Inc. (DELAWARE CORPORATION)
333 Lakeside Drive
Foster City, CA 94404

CLASS 5: Pharmaceutical preparations for the treatment of HIV infection; pharmaceutical preparations, namely, pre-exposure prophylaxis (PrEP) preparations for prevention and risk mitigation of contracting HIV

FIRST USE 8-5-2004; IN COMMERCE 8-5-2004

The color(s) light blue is/are claimed as a feature of the mark.

The mark consists of "701" imprinted on a three-dimensional design of an oblong shape light blue tablet. The broken lines depicting the shape of the tablet indicate placement of the mark on the goods and the tablet shape depicted in broken lines, alone, is not part of the mark.

SER. NO. 86-963,774, FILED 04-04-2016
JORDAN A BAKER, EXAMINING ATTORNEY



Director of the United States
Patent and Trademark Office

# United States of America

## United States Patent and Trademark Office



**Reg. No. 5,906,177**

**Registered Nov. 12, 2019**

**Int. Cl.: 5**

**Trademark**

**Principal Register**

Gilead Sciences, Inc.  (DELAWARE CORPORATION)
333 Lakeside Drive
Foster City, CALIFORNIA 94404

CLASS 5: Pharmaceutical preparations, namely, pre-exposure prophylaxis (PrEP) preparations for prevention and risk mitigation of contracting HIV

FIRST USE 8-5-2004; IN COMMERCE 8-5-2004

The color(s) blue is/are claimed as a feature of the mark.

The mark consists of the color blue applied to the entire surface of a three-dimensional oblong tablet. The dotted outline of the tablet is intended to show the position of the mark on the goods, and exclusive right is not claimed to the shape of the tablet itself.

OWNER OF U.S. REG. NO. 5154303, 5030567

SEC.2(F)

SER. NO. 87-794,113, FILED 02-12-2018

Director of the United States
Patent and Trademark Office

# Exhibit JJ

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff & Counterclaim-Defendant*, | C.A. No. 19-02103-MN |
| v. | |
| GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC, | |
| *Defendants & Counterclaim-Plaintiff*. | |

## OBJECTIONS & RESPONSES TO PLAINTIFF'S NOTICE OF DEPOSITION OF GILEAD SCIENCES IRELAND UC UNDER FED. R. CIV. P. 30(b)(6)

Pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure and the applicable Local Rules of Civil Practice and Procedure for the District of Delaware, Gilead Sciences Ireland UC ("GSIUC") objects and responds to the Notice of Deposition pursuant to Rule 30(b)(6) to GSIUC, served by Plaintiff United States of America (the "Government" or "Plaintiff") and dated November 1, 2021 (the "Notice").

## GENERAL OBJECTIONS

GSIUC incorporates each of the following General Objections into its responses to each of the Topics, whether or not each such General Objection is expressly referred to in GSIUC's response to a specific Topic.

1.      GSIUC objects to the Notice because, as explained in GSIUC's October 29, 2021 letter to the Government, the Government has no good-faith basis to pursue its claims against GSIUC in this action.  The only affirmative inducing acts that the Government has alleged against GSIUC were alleged on information and belief.  GSIUC has produced documents and a

Moreover, GSIUC objects to this Topic as vague and ambiguous because the specific

"communications and discussions" about which it seeks testimony—i.e., "those reflected in

US_00004729 to US_00005032"—are not complete communications because these documents

appear to contain Freedom of Information Act redactions.

GSIUC objects to this Topic to the extent that it seeks information protected from

disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable

privilege or immunity.

GSIUC objects to this Topic to the extent that it seeks or requires legal conclusions.

GSIUC objects to this Topic to the extent it seeks information not within GSIUC's

possession, custody, or control.

GSIUC also objects to this Topic to the extent it seeks testimony concerning information

subject to confidentiality obligations to third parties.

Based on the foregoing General and Specific Objections, GSIUC will not designate a

witness to testify concerning this Topic.

**Topic No. 42:**

> The roles and responsibilities of each Gilead entity in the
> manufacturing, sale, distribution, prescription, research, analysis,
> testing, marketing, and regulatory submissions for PrEP
> indications for the Accused Products.

**GSIUC's Response to Topic No. 42**

GSIUC objects to this Topic as unduly burdensome and not proportional to the needs of

this case because, as explained in General Objection No. 1 above, the Government has no good-

faith basis to pursue claims against GSIUC.  More than two years into this litigation, the

Government has not identified a single affirmative inducing act taken by GSIUC.  Moreover,

GSIUC has produced documents and a verified interrogatory response expressly contradicting

the factual allegations that the government pleaded on "information and belief" to support its claims against GSIUC.

GSIUC objects to this Topic as unduly burdensome and overly broad to the extent that it fails to describe with reasonable particularity the matters on which examination is requested.  For example, this Topic does not identify the specific information related to the "roles and responsibilities" that it is seeking; accordingly, this Topic is not sufficiently particularized to enable GSIUC to prepare a corporate designee.

GSIUC objects to this Topic to the extent that it seeks information that is not relevant to the claims or defenses of any party to this litigation, not reasonably calculated to lead to the discovery of admissible evidence, or seeks discovery that is not proportional to the needs of the case.  In particular, the "roles and responsibilities" of entities other than the named Defendants are not relevant to any claim or defense in this litigation.  Moreover, even for the named Defendants, their respective "roles and responsibilities" in the "prescription, research, analysis, [and] testing" of the Accused Products is not relevant to any claim or defense.  And the roles of the named Defendants in the manufacturing, sale, distribution, marketing, and regulatory submissions for Truvada® prior to June 2, 2015 (i.e., the issuance of the first Patent-in-Suit) and for Descovy® prior to October 3, 2019 (i.e., the first marketing of Descovy® for PrEP in the United States) are not relevant to any claim or defense, nor are the activities of either named Defendants relating to the manufacturing, sale, distribution, marketing, and regulatory submissions for Truvada® or Descovy® for use outside the United States.

GSIUC objects to this Topic as vague and ambiguous, including the terms "roles and responsibilities," "prescription," "analysis," and "testing."

– 76 –

GSIUC objects to this Topic to the extent it seeks information not within GSIUC's possession, custody, or control.

GSIUC also objects to this Topic to the extent it seeks testimony concerning information subject to confidentiality obligations to third parties.

Subject to and without waiving the foregoing General and Specific Objections, GSIUC will provide one or more designees to testify concerning relevant, non-privileged factual information related to GSIUC's general knowledge of GSIUC's roles and responsibilities (or lack thereof) in the manufacturing, sale, distribution, marketing, and regulatory submissions for Truvada® that may be sold for PrEP in the United States from June 2, 2015, to present and for Descovy® that may be sold for PrEP in the United States from October 3, 2019 to present, to the extent that such information exists; is in GSIUC's possession, custody, or control; and can be located with a reasonable search.

**Topic No. 43:**

> Gilead's communications and relationships, past and present, with the Named Inventors during their employment at CDC.

**GSIUC's Response to Topic No. 43**

GSIUC objects to this Topic as unduly burdensome and not proportional to the needs of this case because, as explained in General Objection No. 1 above, the Government has no good-faith basis to pursue claims against GSIUC.  More than two years into this litigation, the Government has not identified a single affirmative inducing act taken by GSIUC.  Moreover, GSIUC has produced documents and a verified interrogatory response expressly contradicting the factual allegations that the government pleaded on "information and belief" to support its claims against GSIUC.

GSIUC objects to this Topic to the extent that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity.

GSIUC objects to this Topic to the extent that it seeks or requires legal conclusions.

GSIUC objects to this Topic to the extent it seeks information not within GSIUC's possession, custody, or control.

Based on the foregoing General and Specific Objections, GSIUC will not designate a witness to testify concerning this Topic.

**Topic No. 52:**

> [Intentionally Omitted]

**GSIUC's Response to Topic No. 52**

No response to this Topic is required.

**Topic No. 53:**

> The manufacture, packaging, or labeling of Truvada® and Descovy® products by Gilead Sciences Ireland UC for marking, distribution, or sale for PrEP in the United States, including in the State of Delaware.

**GSIUC's Response to Topic No. 53**

GSIUC objects to this Topic as unduly burdensome and not proportional to the needs of this case because, as explained in General Objection No. 1 above, the Government has no good-faith basis to pursue claims against GSIUC.  More than two years into this litigation, the Government has not identified a single affirmative inducing act taken by GSIUC.  Moreover, GSIUC has produced documents and a verified interrogatory response expressly contradicting the factual allegations that the government pleaded on "information and belief" to support its claims against GSIUC.

GSIUC objects to this Topic as unduly burdensome and overly broad to the extent that it fails to describe with reasonable particularity the matters on which examination is requested.

GSIUC objects to this Topic to the extent that it seeks information that is not relevant to the claims or defenses of any party to this litigation, not reasonably calculated to lead to the discovery of admissible evidence, or seeks discovery that is not proportional to the needs of the case.  For example, actions taken by GSIUC with respect to Truvada® prior to issuance of the first Patent-in-Suit are not relevant to any claim or defense in this action, and actions taken by GSIUC with respect to Descovy® prior to the approval of its PrEP indication in the United States on October 3, 2019 are not relevant to any claim or defense in this action.  Moreover, GSIUC has not challenged personal jurisdiction or venue in the District of Delaware in this action, so GSIUC's actions taken specifically for sales "in the State of Delaware," if any, are not relevant to any claim or defense in this action.

GSIUC objects to this Topic as vague and ambiguous, including the term "marking," which GSIUC interprets as "marketing."

GSIUC objects to this Topic to the extent that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity.

GSIUC objects to this Topic to the extent it seeks information not within GSIUC's possession, custody, or control.

GSIUC also objects to this Topic to the extent it seeks testimony concerning information subject to confidentiality obligations to third parties.

Subject to and without waiving the foregoing General and Specific Objections, GSIUC will provide a designee to testify concerning relevant, non-privileged factual information related

to GSIUC's general knowledge of "[t]he manufacture, packaging, [and] labeling of Truvada®

and Descovy® products by Gilead Sciences Ireland UC for mark[et]ing, distribution, or sale for

PrEP in the United States," to the extent that such information exists; is in GSIUC's possession,

custody, or control; and can be located with a reasonable search.  If the government intends to

seek particularized testimony about any document related to this Topic other than the documents

identified in GSIUC's Supplemental Response to Plaintiff's Interrogatory No. 1, GSIUC requests

that the Government identify the document in writing at least 14 days in advance of the

deposition.

**Topic No. 54:**

> The concerted work by Gilead Sciences Ireland UC and Gilead
> Sciences, Inc. to manufacture, import, market, distribute, label, or
> sell Truvada® and Descovy® for PrEP in the United States and, in
> particular, to residents of the State of Delaware.

**GSIUC's Response to Topic No. 54**

GSIUC objects to this Topic as unduly burdensome and not proportional to the needs of

this case because, as explained in General Objection No. 1 above, the Government has no good-

faith basis to pursue claims against GSIUC.  More than two years into this litigation, the

Government has not identified a single affirmative inducing act taken by GSIUC.  Moreover,

GSIUC has produced documents and a verified interrogatory response expressly contradicting

the factual allegations that the government pleaded on "information and belief" to support its

claims against GSIUC.

GSIUC objects to this Topic as unduly burdensome and overly broad to the extent that it

fails to describe with reasonable particularity the matters on which examination is requested.  For

example, it seeks information regarding the "concerted work" of Gilead Sciences, Inc. ("GSI")

and GSIUC without identifying any such "concerted work" or any particular actions;

# Exhibit KK

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

GILEAD SCIENCES, INC.; GILEAD SCIENCES IRELAND UC,

        Gilead,

    v.

AJC MEDICAL GROUP, INC.; ALLIANCE MEDICAL CENTER, INC.; ALLIED HEALTH ORGANIZATION, INC.; BAIKAL MARKETING GROUP, INC.; A BETTER YOU WELLNESS CENTER, LLC; 3RD STEP RECOVERY GROUP, INC. D/B/A CONTINENTAL WELLNESS CENTER; COMMUNITY HEALTH MEDICAL CENTER LLC; DOCTORS UNITED, INC. D/B/A DOCTORS UNITED GROUP; FLORIMED MEDICAL CENTER CORP.; JUAN JESUS SALINA, M.D. CORP.; LABS4LESS LLC; PHYSICIAN PREFERRED PHARMACY, INC.; POSITIVE HEALTH ALLIANCE, INC.; PRIORITY HEALTH MEDICAL CENTER, INC.; TESTING MATTERS INC.; UNITED CLINICAL LABORATORY LLC; UNITED PHARMACY LLC; WELL CARE LLC; TAMARA ALONSO; JEAN ALEXANDRE; CHENARA ANDERSON; MYRIAM AUGUSTINE; TWIGGI BATISTA; ARSEN BAZYLENKO; MICHAEL BOGDAN; BARBARA BRYANT; AUGUSTINE CARBON; JENNIFER JOHN CARBON; KHADIJAH CARBON; ALEJANDRO CASTRO; JOHN CATANO; JEAN CHARLOT; SHONTA DARDEN; ALEXANDER EVANS; MARIA FREEMAN; JESULA GABO; SHAJUANDRINE GARCIA; BARBARA GIBSON; KERLINE JOSEPH; VIERGELA JOSEPH; ANDRE KERR; GARY KOGAN; CASSANDRA LOUISSAINT; CORA MANN; NICK MYRTIL; IFEOMA NWOFOR; ERIK JOSEPH PAVAO; WILLIE PEACOCK; MICHAEL PIERCE; MICHEL POITEVIEN; JEAN RODNEY; TATIANA ROZENBLYUM; JUAN JESUS SALINA; DIMITRY SHAPOSHNIKOV; ROMAN SHEKHET; KIRILL VESSELOV; MIKHAIL VESSELOV; TOMAS WHARTON,

        Defendants.

Civil Action No. 20-cv-24523-KMW

## ORDER FOR PRELIMINARY INJUNCTION

Upon review of the expedited motion for a Preliminary Injunction of Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland, UC (together, "Gilead"), the memorandum of law submitted in support of Gilead's motion, the accompanying declarations and the exhibits annexed thereto, and the complaint, and for good cause shown, it is hereby:

**ORDERED** that for the reasons set forth in Gilead's expedited motion for entry of a Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction and papers submitted in support thereof, Gilead's request be and hereby is **GRANTED**;

**ORDERED** that Defendants Doctors United Group, Augustine Carbon, Jennifer Carbon, Khadijah Carbon, Tamara Alonso, Priority Health Medical Center, Inc., Nick Myrtil, Well Care LLC, Willie Peacock, Shajuandrine Garcia, Florimed Medical Center Corp., Dr. Tomas Wharton, Alliance Medical Center, Jean Alexandre, Michael Poitevein, Jean Rodney, and Tamara Alonso (collectively "Defendants"), and their principals, agents, officers, directors, members, servants, employees, successors, assigns and all other persons in concert and participation with them (together with the Defendants, the "Restrained Parties"), pending the final hearing and determination of this action, are enjoined from:

      a. Enrolling or seeking to enroll in Gilead's Advancing Access® Patient Assistance Program ("PAP") or Medication Assistance Program ("MAP") any individual who has been prescribed TRUVADA® or DESCOVY®;

      b. Seeking or accepting reimbursements, either directly or indirectly, for any TRUVADA® or DESCOVY® dispensed to any individual enrolled in Gilead's PAP or MAP;

2

c.  Dispensing TRUVADA® or DESCOVY® to individuals in packaging other than original, unopened containers from the manufacturer;

d.  Dispensing TRUVADA® or DESCOVY® to individuals unaccompanied by its FDA-approved labeling, package insert, lot number, serialization number, or expiration date;

e.  Selling, purchasing, or otherwise obtaining, TRUVADA® or DESCOVY® that had previously been filled or dispensed;

f.  Removing from their premises, or discarding, destroying, transferring or disposing in any manner, any information, computer files, electronic files, WhatsApp or text messages, business records (including but not limited to e-mail communications) or other documents relating to their assets and operations or relating in any way to any of the activities referred to in subparagraphs (a) through (e) above; and

g.  Assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (f) above.

**DONE AND ORDERED** in Chambers in Miami, Florida, this <u>30th</u> day of November 2020.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# Exhibit LL

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| GILEAD SCIENCES, INC.; GILEAD SCIENCES IRELAND UC, | |
| Plaintiffs, | |
| v. | Civil Action No. __ |
| AJC MEDICAL GROUP, INC.; ALLIANCE MEDICAL CENTER, INC.; ALLIED HEALTH ORGANIZATION, INC.; BAIKAL MARKETING GROUP, INC.; A BETTER YOU WELLNESS CENTER, LLC; 3RD STEP RECOVERY GROUP, INC. D/B/A CONTINENTAL WELLNESS CENTER; COMMUNITY HEALTH MEDICAL CENTER LLC; DOCTORS UNITED, INC. D/B/A DOCTORS UNITED GROUP; FLORIMED MEDICAL CENTER CORP.; JUAN JESUS SALINA, M.D. CORP.; LABS4LESS LLC; PHYSICIAN PREFERRED PHARMACY, INC.; POSITIVE HEALTH ALLIANCE, INC.; PRIORITY HEALTH MEDICAL CENTER, INC.; TESTING MATTERS INC.; UNITED CLINICAL LABORATORY LLC; UNITED PHARMACY LLC; WELL CARE LLC; TAMARA ALONSO; JEAN ALEXANDRE; CHENARA ANDERSON; MYRIAM AUGUSTINE; TWIGGI BATISTA; ARSEN BAZYLENKO; MICHAEL BOGDAN; BARBARA BRYANT; AUGUSTINE CARBON; JENNIFER JOHN CARBON; KHADIJAH CARBON; ALEJANDRO CASTRO; JOHN CATANO; JEAN CHARLOT; SHONTA DARDEN; ALEXANDER EVANS; MARIA FREEMAN; JESULA GABO; SHAJUANDRINE GARCIA; BARBARA GIBSON; KERLINE JOSEPH; VIERGELA JOSEPH; ANDRE KERR; GARY KOGAN; CASSANDRA LOUISSAINT; CORA MANN; NICK MYRTIL; IFEOMA NWOFOR; ERIK JOSEPH PAVAO; WILLIE PEACOCK; MICHAEL PIERCE; MICHEL POITEVIEN; JEAN RODNEY; TATIANA ROZENBLYUM; JUAN JESUS SALINA; DIMITRY SHAPOSHNIKOV; ROMAN SHEKHET; KIRILL VESSELOV; MIKHAIL VESSELOV; TOMAS WHARTON, | |
| Defendants. | |

1

**EXPEDITED MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, EXPEDITED DISCOVERY ORDER, AND HIPAA PROTECTIVE AND CONFIDENTIALITY ORDER**

Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland UC (together, "Gilead"), by and through their undersigned counsel, hereby move for entry of a temporary restraining order, followed by a preliminary injunction, and related relief, to immediately halt Defendants' massive and rapidly growing healthcare fraud schemes. Defendants' schemes are stealing tens of millions of dollars from Gilead while putting at grave risk the health—and even the lives—of thousands of Floridians who are economically challenged.

Gilead seeks the following narrow relief:

1. A temporary restraining order, to be followed by a preliminary injunction, enjoining Defendants and others in concert and participation with them from (a) enrolling or seeking to enroll in Gilead's Advancing Access® Patient Assistance Program ("PAP") or Medication Assistance Program ("MAP") any individual who has been prescribed TRUVADA® or DESCOVY®; (b) seeking or accepting reimbursements, either directly or indirectly, for any TRUVADA® or DESCOVY® dispensed to any individual enrolled in Gilead's PAP or MAP; (c) dispensing TRUVADA® or DESCOVY® to individuals without the FDA-approved labeling or in packaging other than the original, unopened container; (d) dispensing TRUVADA® or DESCOVY® to individuals unaccompanied by its FDA-approved labeling, package insert, lot number, serialization number, or expiration date; (e) selling, purchasing, or otherwise obtaining, TRUVADA® or DESCOVY® that had previously been filled or dispensed; (f) removing from their premises, or discarding, destroying, transferring or disposing in any manner, any

2

information, computer files, electronic files, WhatsApp or text messages, business records (including but not limited to e-mail communications) or other documents relating to Defendants' assets and operations or relating in any way to any of the activities referred to in items (a) through (e); and (g) assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in items (a) through (f); and requiring them to turn over to Gilead, or any person or entity designated by Gilead, all TRUVADA® or DESCOVY® that is in their possession, custody or control and that either is no longer in its original, unopened container from the manufacturer, or that had previously been filled or dispensed, to be held by Gilead until further order of this Court;

2.      An order for expedited discovery allowing Gilead to investigate, trace, and uncover the full extent of Defendants' unlawful and sophisticated schemes, and to prepare for the preliminary injunction hearing; and

3.      A HIPAA protective and confidentiality order.

A memorandum of law and supporting declarations and exhibits are filed concurrently with these motions and incorporated herein.  The grounds for the relief requested are set forth in detail in the memorandum of law and the supporting materials cited in the memorandum of law. Proposed orders setting forth the relief requested are attached hereto.

Given the expedited nature of these motions and the immediate relief sought, Gilead respectfully requests that its motions be heard on Tuesday, November 3, 2020, or as soon as possible thereafter, appreciating the burden this places on the Court in light of the pandemic and national election.

Counsel for Gilead are available to appear before this Court at any time to address Gilead's Motions ether in person or by telephone or video.  Geoffrey Potter, of Patterson Belknap Webb & Tyler LLP, can be reached directly by telephone at (917) 854-2310 or by email at gpotter@pbwt.com.  Franklin Monsour, of Squire Patton Boggs (US) LLP, can be reached directly by telephone at (646) 526-5587 or by email at franklin.monsour@squirepb.com.

Dated: November 2, 2020

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

/s/ P. Jan Kubicz
P. Jan Kubicz (FBN 84405)
jan.kubicz@squirepb.com
200 South Biscayne Boulevard, Suite 4700
Miami, FL 33131
T.: (305) 577-7000
F.: (305) 577-7001

/s/ Franklin G. Monsour
Franklin G. Monsour (*pro hac vice pending*)
franklin.monsour@squirepb.com
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
T.:  (212) 872-9800

PATTERSON BELKNAP WEBB & TYLER LLP

 /s/ Geoffrey Potter
Geoffrey Potter (*pro hac vice pending*)
Jonah Knobler (*pro hac vice pending*)
Joshua Kipnees (*pro hac vice pending*)
Timothy A. Waters (*pro hac vice pending*)
R. James Madigan III (*pro hac vice pending*)
Jared S. Buszin (*pro hac vice pending*)
Devon Hercher (*pro hac vice pending*)

4

Jacob Chefitz (*pro hac vice pending*)
gpotter@pbwt.com
jknobler@pbwt.com
jkipnees@pbwt.com
twaters@pbwt.com
jmadigan@pbwt.com
jbuszin@pbwt.com
dhercher@pbwt.com
jchefitz@pbwt.com
1133 Avenue of the Americas
New York, NY 10036
Telephone: (917) 854-2310
Facsimile: (212) 336-2222

*Attorneys for Plaintiffs Gilead Sciences, Inc. and
Gilead Sciences Ireland UC*

# Exhibit MM



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

\-------------------------------------------------------------

GILEAD SCIENCES, INC. and GILEAD :
SCIENCES IRELAND UC, :
  : Case No. _____
      Plaintiffs, :
  :
v. : **FILED *EX PARTE* AND UNDER SEAL**
  : **PURSUANT TO 15 U.S.C. § 1116(d)**
SAFE CHAIN SOLUTIONS, LLC; PATRICK :
BOYD; CHARLES BOYD; WORLDWIDE :
PHARMA SALES GROUP, INC. d/b/a :
PHARMASALES.COM.; ADAM S. BROSIUS; :
BOULEVARD 9229 LLC; and ISHBAY :
SHUKUROV, :
  :
      Defendants. :

\-------------------------------------------------------------

## COMPLAINT

Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland UC (together, "Gilead" or

"Plaintiffs"), by and through their counsel, Patterson Belknap Webb & Tyler LLP, for their

complaint against Defendants Safe Chain Solutions, LLC ("Safe Chain"), Patrick Boyd, Charles

Boyd, Worldwide Pharma Sales Group, Inc. d/b/a/ Pharmasales.com ("Worldwide Pharma"),

Adam S. Brosius ("Brosius"), Boulevard 9229 LLC ("Boulevard"), and Ishbay Shukurov

("Shukurov") (collectively, "Defendants") allege as follows:

## SUMMARY OF THE ACTION

1.      In this action, Gilead seeks to put an immediate and permanent stop to

Defendants' knowing and willful sale, marketing, and distribution of counterfeit prescription

drugs.  The counterfeits are of Gilead HIV medications: life-saving treatments for patients living

with HIV, and pre-exposure prophylactic medication that protects high-risk patients from HIV-1

infection when taken as prescribed.  Defendants sold authentic-looking bottles of Gilead

1

medication to distributors and pharmacies throughout the United States, including in New York City, who in turn dispensed them to patients.  But the tablets inside those bottles were not Gilead's HIV medication.  They were completely different drugs.  Most commonly, the counterfeits were filled with high-dose tablets of a prescription antipsychotic with debilitating side effects.

2.      The counterfeiters use authentic Gilead bottles that at one point contained authentic Gilead HIV medications.  The tamper-evident seals of these authentic bottles had been broken and their contents emptied.  The counterfeiters inserted the foreign tablets into these empty bottles, and then re-sealed the bottles.  The counterfeits were thus engineered to resemble a new, unopened, and authentic bottle of authentic Gilead HIV medication.  Because federal law requires that all prescription drugs be accompanied by a "pedigree" – a document tracking every sale of the bottle from seller to seller, all the way back to the manufacturer – Defendants distributed the counterfeits with falsified documentation fraudulently purporting to trace the counterfeits to an authentic source.

3.      The danger these counterfeits pose to patients is dire.  The patients who receive the counterfeits unwittingly miss their HIV treatment or falsely believe themselves to be protected against HIV infection.  The foreign drugs in the counterfeit bottles were never prescribed by those patients' doctors and could cause serious harm or death, through contraindicated drug-drug interactions or the onset of unanticipated side effects such as loss of consciousness while operating heavy machinery or driving.

4.      Defendants willfully trafficked these dangerous counterfeits and committed fraud to cover it up.  Defendant Boulevard is one of Safe Chain's several counterfeit suppliers; it both knowingly sold counterfeit HIV medications to Safe Chan and created fake

2

pedigrees to go with them.  Safe Chain knew Boulevard was using fake pedigrees because Gilead told it so, but Safe Chain kept buying counterfeits from Boulevard anyway.  In fact, for at least six months *after* receiving pharmacy and patient complaints about counterfeit HIV medications it had sold, Safe Chain continued buying thousands of bottles of Gilead medication from the *same* suppliers who sold it those counterfeits.

5.     When Gilead opened an investigation after the earliest counterfeit incident and contacted Safe Chain, Safe Chain for months refused to identify the suppliers who sold it the counterfeit.  When additional counterfeit reports came in and forced Safe Chain to identify its suppliers, Safe Chain moved from stonewalling to outright fraud.  Safe Chain created fake pedigrees that fraudulently claimed to trace the counterfeits back to a Gilead authorized distributor, and sent those new fake pedigrees to Gilead.

6.     As Gilead's investigation intensified, Safe Chain promised Gilead that it had stopped all purchases from its previous counterfeit suppliers (*i.e.*, the ones Gilead already knew about), and said it was now purchasing from a new supplier who only purchased directly from a Gilead authorized distributor.  Safe Chain also represented that it had directly confirmed, with the authorized distributor, that its supplier was in fact buying from that authorized distributor.  But Safe Chain said it would only identify this new mystery supplier if, among several other conditions, Gilead first "announced" that Safe Chain had never faked a pedigree, and then released all legal claims Gilead had against Safe Chain.

7.     Safe Chain's claims about its "new" supplier were all lies.  Gilead learned the identity of that new supplier through its independent investigation.  This investigation revealed that the supplier was another one of Safe Chain's typical fly-by-night counterfeiters that never registered as a distributor with the FDA and did not have licensure to sell drugs to Safe

3

Chain.  That supplier was not buying from a Gilead authorized distributor, and its pedigrees that claimed to trace back to an authorized distributor were fake.  Furthermore, Safe Chain never contacted that authorized distributor to verify its supplier's purchases, as Safe Chain falsely told Gilead it had done.  The authorized distributor has had no contact with Safe Chain and it has never sold anything to Safe Chain's supplier.  Once again, Safe Chain was flagrantly lying to throw off Gilead's investigation and cover up the fact that it was continuing to traffic dangerous counterfeit HIV medications.

8.     Worldwide Pharma worked directly with Safe Chain to source, advertise, and sell the counterfeit Gilead HIV medications to pharmacies.  Worldwide Pharma is owned and managed by Defendant Adam S. Brosius, who is under indictment for healthcare fraud, conspiracy, and violations of the anti-kickback statute.  Safe Chain and Worldwide Pharma conspired to obtain Gilead HIV medications from illegitimate sources, including by setting up a deceptive "pass-through" scheme to hide the identities of unlicensed suppliers, and to market counterfeit products to pharmacies where they were dispensed to unsuspecting patients.

9.     In this action, Gilead seeks injunctive relief, including a seizure at certain Defendants' premises, in order to put an immediate stop to the sale of these dangerous counterfeit medications.  Gilead also seeks other injunctive and monetary relief against all Defendants for trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114); false descriptions and false designations of origin in commerce in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125); trademark dilution in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125) and New York General Business Law § 360-1; deceptive business practices in violation of New York General Business Law § 349; and common-law unjust enrichment and unfair competition.

## THE PARTIES

10.     Plaintiff Gilead Sciences, Inc. is a public corporation organized under the laws of the State of Delaware, with more than 12,000 employees.  Its principal place of business is 333 Lakeside Drive, Foster City, California 94404.  Gilead develops and markets a large portfolio of lifesaving medications, including drugs for the treatment or prevention of HIV.  Gilead is the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and package inserts of certain genuine HIV medications.

11.     Plaintiff Gilead Sciences Ireland UC ("Gilead Ireland") is a private unlimited company organized under the laws of Ireland, with its principal place of business at IDA Business & Technology Park, Carrigtohill, Co. Cork, Ireland.  Gilead Sciences, Inc. is the ultimate parent of Gilead Ireland.  Gilead Ireland is the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and instructional inserts of certain genuine HIV medications.

12.     Gilead Sciences, Inc. and Gilead Ireland (together, "Gilead") are the collective owners of a number of well-established and famous registered trademarks (the "Gilead Marks") that appear on genuine HIV medications.  A complete list of these trademarks is depicted at Exhibit A hereto.  Gilead also owns and uses distinctive packaging (the "Gilead Trade Dress") to distinguish its HIV products in the marketplace, which is depicted at Exhibit B hereto.

13.     Defendant Safe Chain Solutions, LLC ("Safe Chain") is a Delaware limited liability corporation with a principal place of business in Cambridge, Maryland.

14.     Defendant Patrick Boyd is an individual residing in Maryland.  Together with his brother Charles, Patrick Boyd is a founder, owner, and managing principal of Safe

Chain.  Patrick Boyd managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV medications.  Patrick Boyd directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

15.     Defendant Charles Boyd is an individual residing in Maryland.  Together with his brother Patrick, Charles Boyd is a founder, owner, and managing principal of Safe Chain.  Charles Boyd serves as CEO of Safe Chain.  Charles Boyd managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV medications.  Charles Boyd directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

16.     Defendant Worldwide Pharma Sales Group, Inc. d/b/a Pharmasales.com ("Worldwide Pharma") is a Delaware corporation with a principal place of business in Delray Beach, Florida.

17.     Defendant Adam S. Brosius ("Brosius") is an individual residing in the United States.  Brosius is the founder, owner, and principal of Worldwide Pharma.  Brosius managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV medications.

18.     Defendant Boulevard 9229 LLC ("Boulevard") is a New York limited liability corporation with a principal place of business in Rego Park, Queens, New York.

19.     Defendant Ishbay Shukurov ("Shukurov") is an individual residing in Brooklyn, New York.  Shukurov is the owner and sole proprietor of Boulevard.  Shukurov managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV medications.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 1121(a), 1331, 1338, and 1367 and general principles of ancillary and pendent jurisdiction.

21.     The Court has personal jurisdiction over each of the Defendants because each of the Defendants has sufficient minimum contacts with New York and with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Among other things, Safe Chain and Worldwide Pharma sold, and conspired together to sell, counterfeits to pharmacies in New York City.  Moreover, Defendant Boulevard is located in Queens, and Defendant Shukurov resides in Brooklyn.  Boulevard and Shukurov sold counterfeits to Safe Chain in this District, and Safe Chain purchased counterfeits from Boulevard and Shukurov in this District.

22.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because Boulevard's offices are located in this District, because Shukurov lives in this District, because Safe Chain and Worldwide Pharma conspired with Boulevard and Shukurov to purchase and ship counterfeits from this District, and because a substantial part of the events giving rise to Gilead's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.     Gilead's HIV Medications

23.     For more than three decades, Gilead has strived to create a healthier world for all by delivering innovative therapeutics that aim to prevent, treat, or cure life-threatening diseases. Gilead relentlessly pursues advancements in science with the goal of bringing to patients around the world treatments that improve care in areas of unmet medical needs.

7

24.     Gilead has transformed care for people living with HIV and hepatitis C, developing pioneering medicines including the world's first single tablet regimen to treat HIV, the first prophylactic medicine to prevent HIV infection, and four hepatitis C therapies.

25.     BIKTARVY® is a complete, one-pill, once-a-day prescription medication used to treat HIV.  Developed by Gilead and first approved by the FDA in 2018, BIKTARVY® is a single-tablet drug combination medicine for the treatment of HIV-1 infection, combining the unboosted integrase strand transfer inhibitor (INSTI) bictegravir with Gilead's dual nucleoside reverse transcriptase inhibitor (NRTI) backbone of emtricitabine and tenofovir alafenamide, the components of Gilead's DESCOVY®.

26.     BIKTARVY® has a demonstrated long-term efficacy and safety profile, has few drug interactions and side effects, and a high barrier to developing drug resistance.

27.     Although BIKTARVY® does not cure HIV, when taken every day as prescribed, it can lower the amount of virus in a patient's blood to undetectable levels.  In addition to halting the progression of HIV, research shows that having undetectable levels of the virus prevents transmission of HIV through sex, protecting a patient's sexual partners from possible transmission.

28.     BIKTARVY® can also help increase the number of a patient's CD4 T-cells, which are an important part of a person's immune system.  HIV attacks and destroys CD4 T-cells, which decreases a patient's ability to fight off other infections and increases the risk of a patient contracting an opportunistic infection, which could lead to serious illness or death.

29.     One of the most significant developments in the fight against HIV is the development of drugs known as pre-exposure prophylaxis, or PrEP: a method of HIV prevention

whereby individuals who are HIV-negative but at-risk for HIV infection proactively take medication on an ongoing basis to decrease their risk of acquiring HIV.

30.     DESCOVY® is a therapy developed and manufactured by Gilead that can be taken for PrEP.  The drug comes in the form of a tablet.  The FDA-recommended dosage is one tablet per day.

31.     When taken as indicated, DESCOVY® is highly effective at preventing HIV-1 infection in individuals exposed to the virus.

32.     DESCOVY® was approved by the FDA for PrEP in 2019.  It has been instrumental in preventing the spread of HIV in areas in the United States where there is a high prevalence of HIV.

33.     Gilead has used and is currently using the Gilead Marks and the Gilead Trade Dress in commerce in connection with its sale of HIV medications, and plans to continue such use in the future.  Gilead prominently displays the Gilead Marks in its advertising and promotional materials.

34.     Gilead has engaged and continues to engage in activities designed to promote its HIV medications and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States.  All of these trademarks and trade dress symbolize business goodwill of Gilead and are invaluable assets to Gilead.

**B.     Defendants' Counterfeit HIV Medications**

35.     Gilead learned of Defendants' counterfeiting operation through a series of patient and pharmacy complaints that were reported to Gilead.  In the past several months, Gilead has received multiple complaints from patients and pharmacies about bottles of Gilead

9

HIV medications that were sold by Safe Chain and that, when opened, were actually filled with an entirely different drug.

36.     Gilead was not able in all instances to recover the counterfeit bottles of HIV medications that were the subject of these patient or pharmacy complaints.  But Gilead has to date been able to acquire several bottles of counterfeit HIV medications that Safe Chain sold to U.S. pharmacies.  Gilead's in-house experts examined the bottles and their contents and determined the products to be counterfeit.  Gilead also sent the bottles to an outside laboratory who performed analyses of the bottles, the tamper-proof seals and the adhesives used to affix them, and the tablets inside the bottles.  The outside lab also confirmed that the HIV medications sold by Safe Chain were counterfeit.

37.     Authentic Gilead HIV medication is FDA approved for sale only in Gilead's original, sealed manufacturer bottles: it cannot be sold or dispensed in generic pharmacy vials.  The lip of each authentic bottle is covered with a foil tamper-evident seal, which is covered by a screw-on lid.  Safe Chain's counterfeits appeared to use authentic Gilead bottles that once contained authentic Gilead medication.  The original foil on the bottles had been stripped away, the authentic medication removed and replaced with foreign medication, and then a replica of the tamper-evident seal was used to re-seal the bottle.  Traces of the original tamper-proof seal remained in the grooves of the counterfeit bottles and were visually distinguishable from the replica seal.  Lab testing confirmed that both the replica seal and the adhesive used to affix it did not match the original, authentic foil and adhesive used on authentic Gilead product.

38.     The outside laboratory's testing also confirmed what was apparent to the medical professionals and in-house experts who examined the counterfeits: that the tablets inside the bottle were not the Gilead medication listed on the bottle.  In one instance, the counterfeit

10

bottle contained a generic over-the-counter analgesic.  But the most common contents of the tested counterfeits was quetiapine furmarate, a non-Gilead medication that is marketed under the brand name SEROQUEL XR® and is also available as a generic.

39.     Quetiapine is a prescription anti-psychotic medication with a number of known serious side effects.  Quetiapine very commonly causes a strong sedated state or drowsiness.  As noted on the FDA labelling for the drug, these effects are especially acute for first-time users of the drugs.  One patient who unknowingly took SEROQUEL XR® after receiving a counterfeit bottle of BIKTARVY® reported that the patient could not speak or walk afterwards.  Patients who are prescribed quetiapine are warned against driving or operating machinery.

40.     Quetiapine also poses serious dangers to patients with common health conditions, such as high blood pressure, diabetes, and low white blood counts, whose conditions must be closely monitored while taking quetiapine.

41.     Because of its potency, the FDA-approved dosage recommends starting labelling for quetiapine recommends that some new patients be given a small dose – 50 milligrams a day for many conditions – that can be increased over time as the patient's physician tracks the side effects and monitors the patients' reaction to the drug.  The counterfeit Gilead HIV medication contained 300-milligram tablets of quetiapine.

42.     Of course, patients who ingest quetiapine from a counterfeit bottle of HIV medication have no idea that they are taking a medication with these side effects and receive no warning of the possible consequences of doing so.  They have no idea they are not supposed to drive, operate heavy machinery, or engage in other activities where sedation or drowsiness are dangerous, and as a result are placed in grave danger of injury or death.

11

43.     Patients who receive the Defendants' counterfeits do not receive their prescribed HIV medications.  For patients treating HIV infection, it is very important that the patient take the Gilead medication once a day, every day.  If a patient skips doses for even a short period of time, the patient faces the risk that the patient's viral load – that is, the amount of HIV in their blood – will increase.  Viral rebound can have severe consequences.  Over time, it can weaken the patient's immune system and increase the possibility of infections; it can result in progression of the disease and lead to the development of AIDS; and it can make patients more likely to infect their sexual partners.

44.     Patients taking DESCOVY for PrEP® must also take the medication regularly to receive the prophylactic benefits of the drug.  DESCOVY for PrEP® is recommended only for individuals at a risk for HIV infection.  A patient who unknowingly discontinues their DESCOVY® treatment because they have received counterfeit medication puts themselves at high risk for contracting HIV while still believing they are being protected from infection.

C.     **Defendants' Counterfeit Pedigrees**

45.     Under the Drug Supply Chain Security Act ("DSCSA"), 21 U.S.C. §§ 360eee *et seq.*, every sale or transfer of a prescription drug must be accompanied with a record showing the chain of all sales or transfers of that drug, going back to the manufacturer.  In the industry, this is known as the drug's "pedigree," and is also referred to as the drug's DSCSA documentation or "T3" documentation – standing for the three "Ts" of transaction information, transaction history, and transaction statement that must be included with the pedigree.

12

46.     The FDA's website states that the purpose of the DSCSA's tracing requirements is to "enhance FDA's ability to help protect consumers from exposure to drugs that may be counterfeit."

47.     Counterfeit bottles of HIV medications cannot have valid pedigrees.  In order to sell their counterfeit HIV medications, the Defendants created and utilized fake pedigrees that fraudulently represented that the drug could be traced back to an authentic sale from Gilead.

48.     Gilead obtained the purported pedigrees for several counterfeit bottles of Gilead HIV medications sold by Safe Chain.  Those pedigrees were also fake, many of them obviously so.

49.     In the United States, the only distributors to which Gilead sells its HIV medications are Gilead authorized distributors.  This is a well-known fact in the industry, and consistent with the practices of other major pharmaceutical manufacturers.  Gilead has sixteen U.S. authorized distributors for HIV medications, and their names are publicly posted on Gilead's website.  Safe Chain has expressly acknowledged that it is aware that Gilead sells HIV medications only through those Gilead authorized distributors.

50.     Many of the pedigrees for the counterfeits contained an immediately detectable falsehood: that Gilead had initially sold the medication to a distributor other than an authorized distributor.  Other pedigrees for the counterfeits did list an authorized distributor as the first purchaser of the drug, and then claimed the drug was sold from there to one or more distributors before it was purchased by Safe Chain.  Gilead was able to confirm from its internal records that it had not sold the specific lots of the medication to the authorized distributor listed

13

on the pedigree.  Gilead also confirmed with the authorized distributors that the pedigrees were false.

51.    While Gilead has only been able to recover a sample of the counterfeits that have been reported to it, as part of its investigation Gilead has received copies of pedigrees for thousands of bottles of Gilead HIV medications trafficked by the Defendants in this action. Those pedigrees are fake: they fraudulently list an initial sale made by Gilead that did not occur. Every one of those bottles is an illegitimate product and pursuant to the DSCSA must be quarantined and cannot lawfully be sold.

52.    Every authentic bottle of HIV medications that Gilead sells comes with a pedigree that accurately discloses when and to whom Gilead sold that bottle.  The pedigree is part of the product that Gilead sells.  For Gilead, the pedigrees are anti-counterfeiting measures and also play other important internal quality-control functions.  For the distributors, pharmacies, and patients that buy Gilead's HIV medications, authentic pedigrees that accurately disclose the original sale of the product are an important feature of Gilead's products that guarantee the medication's authenticity and safety.  Bottles of Gilead medication that have fake or altered pedigrees, such as those that that do not list Gilead's original, authentic sale of the medication, are materially different from authentic Gilead product as Gilead sells it in U.S. commerce.

### D.    Safe Chain's Willful Sale of Counterfeit HIV Medications After Being Repeatedly Informed It Was Selling Counterfeits

53.    Safe Chain holds itself out to be a legitimate pharmaceutical distributor, specializing in HIV medications among a few other areas.  In reality, Safe Chain is a willful trafficker of counterfeit HIV medications, and has knowingly put an untold number of patients' health and lives at risk in order to make an illicit profit.

14

54.     Over the past several months, Gilead received report after report of counterfeit Gilead HIV medications from pharmacies and customers, all of which Safe Chain had sold to the dispensing pharmacy.  Gilead initially treated Safe Chain as an unwitting distributor of counterfeits, and attempted to work cooperatively with the company to address the problem. Legitimate distributors who learn they have sold counterfeits – let alone bottles of counterfeit HIV medications that actually contain a high-dose antipsychotic – will do everything they can to ensure they do not sell any more counterfeits, and assist the manufacturer in tracking down the source of the counterfeits.  Safe Chain did the opposite.

55.     In response to Gilead's communications, Safe Chain engaged in a campaign of delay and obfuscation, hiding its suppliers and refusing to provide Gilead with crucial information about the counterfeits.  Meanwhile, Safe Chain continued to buy thousands of bottles of Gilead medication, all of them with fake pedigrees, from the same counterfeit suppliers, even after Safe Chain had been informed that these suppliers were selling counterfeit Gilead HIV medications.

1.     **Safe Chain Is Notified It Is Selling Counterfeits but Obstructs Gilead's Investigation and Continues Purchasing from Its Counterfeit Supplier**

56.     In August 2020, White Cross Pharmacy, located in California, reported to Gilead and Safe Chain that a patient had returned a bottle of BIKTARVY® that had foreign medication inside.  The pharmacy had purchased that counterfeit from Safe Chain.  Knowing that the pharmacy had already reported the counterfeit to Gilead, Safe Chain's co-founder Charles Boyd wrote to Gilead to disclose White Cross Pharmacy's report.  On September 11, 2020, Gilead asked Safe Chain to identify who had supplied this counterfeit to Safe Chain, but Safe Chain refused to do so.

15

57.     In November 2020, Gilead again asked Safe Chain to provide the pedigree and identify the supplier from whom Safe Chain had purchased the counterfeit.  Safe Chain refused, stating only that it had purchased the counterfeits from an "authorized trading partner." Gilead responded that was "wholly inadequate," noting that Gilead needed that information "to determine how this illegitimate product made its way into the supply chain."

58.     Between August 2020 and early February 2021, Gilead asked Safe Chain on at least five different occasions to produce the pedigree for the counterfeit it sold to White Cross Pharmacy, but each time Safe Chain either refused or ignored the request.

59.     In October 2020, Safe Chain received another report of counterfeit BIKTARVY® from a different pharmacy – The Medicine Shoppe in Maryland.  The counterfeit BIKTARVY® bottle was actually filled with 300 mg tablets of SEROQUEL XR®.  But this time, Safe Chain knew that the pharmacy had not immediately reported the counterfeit to Gilead. Hoping to avoid detection, Safe Chain tried to dissuade the pharmacy from reporting the incident.  In an email to The Medicine Shoppe, Safe Chain's Director of Compliance suggested that instead of "contact[ing] Gilead," the pharmacy should "return[] it to us, and then let us send it back."  Safe Chain never did report this counterfeit to Gilead.

60.     Gilead only learned about this October 2020 counterfeit report because in February 2021, The Medicine Shoppe received from a patient *another* report of counterfeit BIKTARVY® that the pharmacy had purchased from Safe Chain.  Gilead promptly interviewed The Medicine Shoppe.  During that interview, the pharmacy disclosed its October 2020 counterfeit report to Safe Chain, stating that it had returned the counterfeit bottle to Safe Chain but heard nothing back.

16

61.     When Gilead confronted Safe Chain about the October 2020 counterfeit report from The Medicine Shoppe, Safe Chain claimed it *had* reported that incident to Gilead, and that Gilead was at fault for not responding to Safe Chain's report.  That claim was false. Gilead immediately demanded, and later repeated its demand, that Safe Chain substantiate its claim that it had reported the October 2020 incident.  Safe Chain never provided any such corroboration, because it never made any such report to Gilead.

62.     Each of the three known examples of counterfeit BIKTARVY® that were reported to Safe Chain between August 2020 and early February 2021 had been supplied to Safe Chain by Gentek LLC ("Gentek"), located in Stamford, Connecticut.  During that period, Safe Chain worked to conceal the counterfeit reports from Gilead, and when Gilead learned about them, refused to provide pedigrees or identify its counterfeit supplier.  During that same time period – from the time Safe Chain was first directly told that the Gilead medication it sourced from Gentek was counterfeit to the time Safe Chain revealed Gentek's identity to Gilead – **Safe Chain purchased over 8,000 bottles of Gilead HIV medications from Gentek for over $20 million, including over 3,000 bottles of BIKTARVY®, all while knowing that Gentek was selling dangerous counterfeits.**

**2.   Safe Chain Provides Fake Pedigrees to Gilead**

63.     Realizing that Gilead's counterfeit investigation was escalating and that it would not be possible to stonewall and obstruct the investigation indefinitely, on February 22, 2021, Safe Chain finally provided the pedigree for the counterfeit BIKTARVY® that White Cross Pharmacy had reported *six months* prior.  Safe Chain also provided pedigrees – one from Safe Chain and one from its supplier – for the two counterfeit bottles of BIKTARVY® that were reported by The Medicine Shoppe.  Each of the pedigrees indicated that Safe Chain had

17

purchased the counterfeit from Gentek.  Each pedigree also indicated that Gentek had purchased the counterfeit from Drogueria Betances, a Gilead authorized distributor located in Puerto Rico.

64.     Gilead determined that those pedigrees were fake.  Gilead did not sell the lot numbers listed on the pedigrees to Drogueria Betances.  And Gilead confirmed with Drogueria Betances that Gentek was not one of its customers.

65.     Gilead has recently learned that Safe Chain not only provided Gilead with fake pedigrees, but that Safe Chain altered those pedigrees by adding false information immediately before sending them to Gilead.

66.     Gilead recently obtained from Safe Chain's customer, The Medicine Shoppe, the pedigree that Safe Chain sent to the Medicine Shoppe in the normal course of business – i.e., at the time it sold the counterfeit bottle to the pharmacy.  The pedigree that Safe Chain sent to its customer and the pedigree it sent to Gilead should, of course, be identical.  They are not, as shown in the figure below:

**Pedigree that Safe Chain sent to pharmacy**      **Pedigree that Safe Chain sent to Gilead**

67.     The pedigree that Safe Chain originally sent to The Medicine Shoppe listed an initial sale directly from Gilead to Gentek – an obvious red flag, because Gentek is not a Gilead authorized distributor.  That original pedigree also failed to fill in basic details, such as Gilead's address and the date and reference number for the supposed initial sale from Gilead to Gentek.

68.     But the pedigree that Safe Chain later sent to Gilead had an additional transaction added to the sales chain: a purported initial sale from Gilead to Drogueria Betances, the Gilead authorized distributor.  Moreover, the information missing on the original pedigrees – Gilead's address, date of initial sale, and reference number for initial sale – are now filled in (fraudulently, because those initial sales never happened).  In other words, the original pedigrees, which were immediately recognizable as fake, had been altered to include information that was also fake, but was harder to recognize as such.

69.     Safe Chain sent both sets of pedigrees as PDF files that contain metadata showing the date they were created.  Safe Chain created the pedigree it sent to The Medicine Shoppe on January 8, 2021, the day it sold the bottles to the pharmacy, as would be expected. But Safe Chain created the altered pedigree on February 19, 2021 – meaning the altered pedigree was created outside the normal course of business, and just days before Safe Chain sent it to Gilead.

**3.    Safe Chain's Willful Purchases of Counterfeits from Defendant Boulevard**

70.     On October 5, 2020, Safe Chain contacted Gilead with a cryptic request to verify the expiration date on a bottle of BIKTARVY®.  Gilead responded by asking Safe Chain why it was inquiring about the product and requesting more information and photographs of the bottle.  Safe Chain did not provide photographs or otherwise explain what had prompted the

inquiry, but it did send a purported pedigree document for the bottle.  The pedigree in question claimed an initial sale of BIKTARVY® from Gilead to a "drug co-op," and then to Defendant Boulevard, and then to Safe Chain.  Gilead responded on October 9, 2020 that the transaction history was incorrect, and that the drugs on the pedigree "should be treated as an illegitimate product and quarantined and should be reported to the FDA."  Safe Chain did not respond to Gilead's e-mail.

71.     In March 2021, Gilead received two new complaints from pharmacies – one in New York City and the other in Washington D.C. – about counterfeit bottles of BIKTARVY® and DESCOVY® that the pharmacies had purchased from Safe Chain.  The pharmacy in Washington D.C. provided the pedigree for the counterfeit bottle of DESCOVY®, which indicated that Safe Chain had purchased it from Defendant Boulevard.  Gilead and its outside lab tested both bottles and confirmed they were counterfeit.

72.     On March 23, 2021, Gilead, through outside counsel, wrote to Safe Chain's counsel detailing the two new complaints.  Gilead demanded that Safe Chain quarantine all Gilead product in its inventory and provide all documentation, including pedigrees, of all Gilead-branded medication it had purchased since 2020.

73.     Safe Chain responded on March 26, 2021.  Safe Chain refused to quarantine its Gilead product in inventory or to provide documentation for all its purchases of Gilead product.  Instead, Safe Chain attempted to blame the counterfeiting on Gentek, and claimed that it had ceased all purchases from Gentek.

74.     On March 29, 2021, Safe Chain wrote again to disclose that the same day it sent its previous letter, it received a report from a pharmacy customer in Washington D.C. that it had purchased two counterfeit bottles of BIKTARVY®, each with different lot numbers, from

Safe Chain.  Safe Chain stated it was sending samples of those counterfeits to Gilead, and attached their pedigrees, which showed Safe Chain acquired one of the counterfeits from Boulevard.

75.     The pedigrees showed that Safe Chain purchased these two counterfeits from Boulevard months *after* Gilead informed Safe Chain that Boulevard was using fake pedigrees to sell illegitimate Gilead medication and instructed Safe Chain to quarantine the medication and report it to the FDA.  Instead, Safe Chain continued buying from Boulevard and subsequently sold dangerous counterfeits supplied by Boulevard to pharmacies, where they were dispensed to unsuspecting patients, placing the patients' health and lives at risk.

### 4.  Safe Chain's Willful Sales of Counterfeits from Rapids Tex

76.     As alleged above, on March 29, 2021, Safe Chain informed Gilead of two additional counterfeit reports from a pharmacy, one bottle of which Safe Chain purchased from Boulevard.  Safe Chain purchased the other counterfeit from a Texas distributor, Mr. Unlimited LLC ("Mr. Unlimited") who in turn had purchased it from another Texas distributor, Rapids Tex Wholesales Corp. ("Rapids Tex").

77.     Safe Chain's March 29 letter was the first time Gilead learned that Safe Chain was buying counterfeits from Mr. Unlimited and Rapids Tex.   Safe Chain had sold that particular counterfeit to a Washington D.C. pharmacy on March 22, and the pharmacy reported it as counterfeit on March 26.  But Safe Chain knew it was buying counterfeits from Mr. Unlimited and Rapids Tex well before that.

78.     On or before March 9, 2021, Safe Chain received what it identified as counterfeit bottles of BIKTARVY® from Mr. Unlimited, which had purchased them from Rapids Tex. Safe Chain never reported those counterfeits to Gilead, nor did it quarantine them as

21

required by the DSCSA.  Instead, Safe Chain returned the bottles to Rapids Tex for a refund.

Safe Chain's co-conspirator, Defendant Brosius of Worldwide Pharma, explained in an email:

> There are 3 LOTS of Biktarvy from Gilead that have proven to be bad/counterfeit. . . .  our legal counsel told us we could not take/receive these lots of Biktarvy.  There were 3 units on the prior invoice.  Gilead and the California BOP [i.e., Board of Pharmacy] have deemed those 3 lots as 'bad.'  We explained to Rapids Tex and they understood.  thanks.

Rapids Tex responded by announcing "we will be shipping out today another order."

79.     Receiving counterfeit Gilead medication from Rapids Tex did not deter Safe Chain and Worldwide Pharma from continuing to buy several hundred more bottles of purported Gilead medication, all with fraudulent pedigrees and at too-good-to-be true pricing, through these entities.

80.     Rapids Tex's next shipments contained more counterfeit BIKTARVY® with new lot numbers – the confirmed counterfeit BIKTARVY® that Safe Chain reported to Gilead on March 29, plus two more tested and confirmed counterfeits that were reported by a different pharmacy the following month.  These confirmed counterfeits are the ones that were reported to the dispensing pharmacy and to Safe Chain, and which Safe Chain chose to report to Gilead.  There are almost certainly many other counterfeits that were never reported to Gilead.

## 5.   Safe Chain Continues Its Counterfeiting, and Attempts Another Blatant Lie to Cover It Up

81.     As the reports of Safe Chain's sales of counterfeits to pharmacies continued to come in, Safe Chain eventually promised Gilead that it had stopped purchasing from the counterfeit suppliers that Gilead knew about: Gentek, Boulevard, and Mr. Unlimited / Rapids Tex.  But Safe Chain did not agree to stop buying and selling Gilead HIV medications

22

from illegitimate suppliers.  Instead, Safe Chain came up with another scheme to cover its tracks and throw off Gilead's investigation.

82.     On an April 20, 2021 call between Gilead's counsel and Safe Chain's counsel, Safe Chain stated that it had a new source for Gilead products that was buying directly from Cesar Castillo LLC ("Cesar Castillo"), a Gilead authorized distributor.  Gilead asked Safe Chain to produce pedigrees for those purchases, but Safe Chain did not do so.

83.     On May 3, 2021, Gilead served subpoenas on Safe Chain, Boulevard, and Mr. Unlimited as part of an ongoing lawsuit in Florida federal court concerning fraudulent diversion of Gilead HIV medications (the "Florida Action").  The following day, Safe Chain's counsel memorialized in a letter Safe Chain's earlier representation that it now had a legitimate source for Gilead product:

> Safe Chain has begun making purchases of Gilead-branded products from a supplier who sourced them from Cesar Castillo (Gilead's authorized distributor).  As I mentioned, **Safe Chain has contacted Cesar Castillo to verify that this supplier is not only a customer of Cesar Castillo, but also that their account number on file with Cesar Castillo matches the account number that was listed on the Cesar Castillo invoices provided by the supplier to Safe Chain substantiating the supplier's purchase of Gilead products from Cesar Castillo**.  Safe Chain is willing to provide the list of lot numbers and expiration dates for the products which Safe Chain had purchased from the supplier who sourced them from Cesar Castillo, along with the T3 reports, **provided Gilead agrees to meet the conditions below**.

(emphasis added).  The "conditions" that Safe Chain demanded were untenable.  They included

"**[w]ithdrawal of the Subpoena served on May 3, 2021**," and the following:

> Please provide an **acknowledgement that Safe Chain has not falsified any of the T3 Reports** previously provided to Gilead (as had been previously insinuated) **and provide a release to Safe Chain regarding its sales of Gilead-branded medications**. . . . if [Gilead] would like Safe Chain to continue voluntarily producing additional information to Gilead, it will need this protection in place.  This is perhaps the most important requirement."

23

(emphasis added).

84.     Gilead, of course, did not agree to falsely "acknowledge" that Safe Chain never falsified a pedigree (in fact, Safe Chain had falsified pedigrees), to withdraw the subpoena, or to give a blanket release of all its legal claims against Safe Chain.  And so Safe Chain kept the identity of its new supplier secret.

85.     On May 28, 2021, The Medicine Shoppe, the pharmacy customer who had received multiple counterfeits from Safe Chain, provided Gilead copies of its communications with Safe Chain, including pedigrees.  Among the documents were four pedigrees for Gilead HIV medications, including BIKTARVY®, that The Medicine Shoppe received from Safe Chain on April 19, 2021.  Consistent with Safe Chain's representations to Gilead, the pedigrees did show an initial sale to Cesar Castillo, the authorized Gilead distributor.  The pedigree also identified Safe Chain's new mystery supplier: Synergy Group Wholesalers LLC ("Synergy").  The pedigrees purport to show that Synergy purchased the Gilead HIV medications from Cesar Castillo and immediately sold them to Safe Chain.

86.     Gilead's subsequent investigation revealed that those pedigrees are fraudulent, and that Safe Chain's claim that it had verified the purchases from Cesar Castillo was a lie.  Gilead never sold the lot numbers listed on the pedigrees to Cesar Castillo.  Cesar Castillo has never sold Gilead products (or any other products) to Synergy, has never heard of either Synergy or Safe Chain, and was never contacted by Safe Chain.  In fact, Cesar Castillo has never sold a Gilead product to another distributor, period: it sells only to pharmacies and to medical facilities like hospitals and clinics.

87.     Gilead's investigation has further revealed that Synergy is a sketchy, fly-by-night operation in the same mold as Safe Chain's other counterfeit suppliers.  Synergy

24

received its pharmacy distribution license in September 2020, just months before it starting selling to Safe Chain.  It is not licensed to sell drugs across state lines to Safe Chain's warehouses, and it is not registered with the FDA.  It has no website or Internet presence.

88.     The Medicine Shoppe's files included an additional pedigree concerning purchases of nearly 100 bottles of Gilead HIV medications, including BIKTARVY®, from Safe Chain in early March 2021.  The pedigree states that Synergy purchased the drugs directly from Gilead.  That is false.  Synergy is not an authorized distributor, and it has never bought directly from Gilead.

89.     Safe Chain's flagrant lies – lying about having a "new" distributor who was purchasing directly from a Gilead authorized distributor, and lying about having directly verified those purchases with the authorized distributor – were intended to stymie Gilead's investigation and to conceal Safe Chain's continued purchase and sale of dangerous counterfeit Gilead HIV medications.

E.     **Additional Evidence of Safe Chain's Willfulness**

1.     **Safe Chain Purchased and Sold the Counterfeits at an Impossible Discount**

90.     Gilead sells to all its U.S. authorized distributors at a list price known as the wholesale acquisition cost, or WAC.  But Safe Chain purchased and sold supposed Gilead medication from its counterfeit suppliers at prices well below WAC – meaning the drugs somehow got less expensive *after* Gilead sold them and they passed through various distributors' hands.

91.     In fact, Safe Chain and Worldwide Pharma actively advertised to pharmacies that their sales prices were below WAC.  Safe Chain and Worldwide Pharma knew that was an impossible discount for authentic, legitimately sold Gilead medication.

25

2.      **Safe Chain Purchased Gilead Medication with
Obviously Fake Pedigrees**

92.     The pedigrees that Safe Chain received from its counterfeit suppliers were

riddled with errors and anomalies, including stating the same drug was delivered to multiple

recipients in different states, all on the same day; indicating that a drug was sold before the

upstream distributor even received it; and leaving multiple required fields on the pedigrees blank.

At minimum, these errors and inconsistencies were suspect, triggering Safe Chain's obligation

under the DSCSA to conduct an investigation.  Instead, Safe Chain sold the counterfeits to

pharmacies.

3.      **Safe Chain Knew It Was Buying from Fly-by-Night,
Unlicensed, and Unauthorized Counterfeit Suppliers**

93.     All of Safe Chain's known counterfeit suppliers – Gentek, Boulevard,

Rapids Tex, and Synergy – are shady, fly-by-night counterfeiters who only recently opened their

doors and lacked proper licensure and registration to sell prescription drugs across state lines.

None of them has a website or an Internet presence.  None of them are "authorized" suppliers

under the DSCSA, and none of them can lawfully sell prescription medications.

94.     None of the four counterfeit suppliers is registered with the FDA or has

met its annual reporting requirements to the FDA.  Moreover, none of them is licensed to sell

pharmaceuticals in Utah or Maryland, where they shipped the counterfeit drugs to Safe Chain.

95.     Checking to see whether a distributor is properly licensed and registered

can be done by entering the distributor's name into the FDA's public online national database of

pharmaceutical distributors, which takes seconds.

96.     Every time Safe Chain sold a drug that it purchased from one of these

counterfeit suppliers, Safe Chain affirmatively certified on its pedigree that it "received the

26

product from a person that is authorized as required under the Drug Supply Chain Security Act."
Every one of those certifications was knowingly false.

### a.   Boulevard

97.   Defendant Boulevard is not licensed as a pharmaceutical distributor.
Boulevard is licensed as a retail pharmacy.  All of its sales of prescription drugs to an out-of-state distributor like Safe Chain are illegitimate on their face.

98.   Boulevard's owner and principal, Defendant Shukurov, owns another
pharmacy that is involved in a massive prescription drug fraud scheme that is the subject of a
federal prosecution, and Shukurov is an unindicted co-conspirator in that scheme.

99.   After its counterfeiting came to light, Boulevard abandoned its small
offices in a condominium building in Queens and stopped answering its phones.

### b.   Gentek

100.   Gentek is run out of its principal's home on a lot zoned for residential use
in Stamford, Connecticut.

101.   When a pharmacy reported to Safe Chain that it had sold the pharmacy a
counterfeit bottle of Gilead HIV medication with a foreign drug inside one of its counterfeits,
Defendant Charles Boyd, Safe Chain's co-founder and CEO, emailed Gentek's principal to ask
for a refund.  Charles Boyd emphasized that he was seeking a refund only for "this one bottle."
The supplier's response email was as follows, with the all-caps and punctuation errors in the
original:

> GOOD MORNING
> WILL CREDIT SAFE CHAIN FOR THE PRODUCT. PLEASE GO AHEAD
> AND DESTROY THE PRODUCT .THATS A MIXED BATCH ERROR ON
> OUR AD.
>
> SORRY FOR ANY INCONVENIENCE.

27

**Edel Reyes**
**PESIDENT**

The abbreviation "AD" stands for "authorized distributor."  The typo "PESIDENT" appears in the signature block of every email Gentek sent to Safe Chain.

102.    That was the entirety of the "explanation" Safe Chain's supplier provided for the counterfeit Gilead HIV medication.  That "explanation" was nonsensical and betrayed Gentek's startling misunderstanding of how pharmaceutical distribution works.  Gilead sells to its authorized distributors filled, sealed, ready-to-dispense bottles of Gilead medication. Authorized distributors do not open or repackage those bottles.  To claim that a counterfeit bottle containing the wrong medication is the result of an authorized distributor's "mixed batch error" is an obvious and deeply concerning misrepresentation.

103.    Despite knowing that Gentek's explanation was clearly false, Safe Chain did not object.  Instead, Charles Boyd of Safe Chain wrote back cheerily to inquire about his refund: "Thanks!  Please let me know how you would like to handle the credit."

**c.    Rapids Tex**

104.    In order to facilitate its purchase of counterfeits from Rapids Tex, Safe Chain and Worldwide Pharma conspired to identify and bribe what they called a "pass-through" wholesaler: Mr. Unlimited.

105.    Unlike Rapids Tex, Mr. Unlimited is an "authorized" distributor under the DSCSA: it has been licensed in Texas as a drug distributor since 2009, maintains a current registration and files annual reports with the FDA, and has an out-of-state pharmaceutical distributor's license in Utah.  Under the pass-through scam, Rapids Tex nominally sold to Mr. Unlimited, who immediately forwarded the supposed Gilead medications to Safe Chain.  Rapids

28

Tex and Mr. Unlimited then papered the "pass-through" transaction by creating, after the fact, invoices, purchase orders, and pedigrees claiming that Mr. Unlimited purchased from Rapids Tex and sold to Safe Chain.

106.     The purpose of the pass-through scam was to use Mr. Unlimited's licensure to "whitewash" the pedigrees.  It allowed Safe Chain to claim it was buying directly from a legitimate supplier (Mr. Unlimited) when in fact it was sourcing fake Gilead medications from the unlicensed, fly-by-night counterfeiter Rapid Tex.  For its participation in the scheme, Mr. Unlimited was paid an up to $1500 kickback per order.  Safe Chain listed that kickback as a separate line item on its purchase orders as "PASS THROUGH FEE."

107.     Safe Chain's upper management orchestrated the pass-through scam with Brosius and Worldwide Pharma.  Safe Chain, Worldwide Pharma, Mr. Unlimited, and Rapids Tex are all on numerous emails concerning the pass-through scam.  When complications arose with the scam, Mr. Unlimited told a Safe Chain employee that he "spoke with Safe Chain's owner," and instructed Safe Chain's representative to get the details from Worldwide Pharma.

108.     Safe Chain's "pass through" scam had one shortcoming: the pedigrees it received from Mr. Unlimited still listed the unlicensed counterfeiter Rapids Tex as an upstream supplier.  When the patient complaints continued to roll in and Gilead's investigation intensified, Safe Chain began to create new fraudulent pedigrees that simply erased Rapids Tex from the chain of sale completely.  For example, in March 2021 Safe Chain sold several dozen bottles of BIKTARVY® to The Medicine Shoppe.  As with several other orders, Safe Chain had ordered those bottles directly from Rapids Tex and caused it to be "passed through" Mr. Unlimited.  And yet Safe Chain's pedigree for the sale to The Medicine Shoppe fraudulently indicated that Gilead had sold the drugs directly to Mr. Unlimited, with no mention of Rapids Tex whatsoever.

29

109.    All of the pedigrees that Mr. Unlimited generated for Safe Chain as part of the pass-through scam stated that Mr. Unlimited received the drugs from Rapids Tex.  The fraudulent pedigrees claiming that Gilead sold directly to Mr. Unlimited were created by Safe Chain itself, out of whole cloth.

F.    **Worldwide Pharma's Willful Counterfeiting**

110.    Worldwide Pharma advertises itself as a marketing "sales engine" that connects pharmaceutical distributors with independent pharmacies.  Worldwide Pharma is founded, owned, and operated by Brosius, who at all relevant times was and remains under federal indictment for health care fraud.  Worldwide Pharma and Brosius conspired with Safe Chain to traffick the counterfeits.  Worldwide Pharma and Brosius both worked directly with counterfeit suppliers and with unwitting customers, as well as operated behind the scenes to coordinate and assist Safe Chain in its willful purchase and sale of counterfeit Gilead HIV medications.

111.    Worldwide Pharma and Brosius were copied on Safe Chain's purchases of counterfeit Gilead HIV medications from Safe Chain's counterfeit suppliers.  Worldwide Pharma and Brosius marketed Safe Chain's products – which, unbeknownst to the customers, were counterfeits – to pharmacies, and convinced pharmacies to buy the counterfeits from Safe Chain.  Worldwide Pharma and Brosius also interfaced directly with pharmacies during the purchasing process, sending Safe Chain's invoices and pedigrees directly to pharmacy customers, including pharmacy customers located in New York.

112.    Brosius was previously the chairman of the board of an independent pharmacy, and was tasked with bringing the pharmacy into compliance with federal law and

30

regulations.  Instead, Brosius used his position to run a vast, $35-million health care fraud scheme through the pharmacy.

113.    According to the indictment, Brosius caused his former pharmacy to send fake "test" claims to various insurers in order to pinpoint which precise ingredients in particular compounded medications would result in the largest insurance payoff for the pharmacy.  Brosius then created preprinted prescription pads that listed a handful of high-value compound medications that could be prescribed by checking a box.  Brosius then caused a company he owned, Pharma Sales Group, Inc. (a predecessor to Worldwide Pharma) to hire marketers to recruit physicians who used virtual or remote-consultation platforms.  These physicians used Brosius's check-box prescription pads to prescribe unnecessary medications to patients, many of whom they never examined, and then sent the prescriptions to Brosius's pharmacy to get filled.  To prevent patients from objecting or returning the medication, Brosius caused the pharmacy to waive the patients' co-insurance, and caused money orders to be forged in the amount of the co-pays submitted to the pharmacy.  Brosius caused the pharmacy to pay a percentage of the insurance reimbursements to his wholly owned company.

114.    Brosius was indicted on four counts of health care fraud as well as conspiracy to commit health care fraud, and payment of kickbacks in connection with a federal health care program, and conspiracy to violate the anti-kickback statute on or about July 10, 2020.

115.    Prior to the indictments, Brosius's pharmacy hired external counsel to conduct an internal investigation, which ended with Brosius being instructed to resign from the board.  Immediately after being drummed out of his pharmacy, Brosius founded Worldwide Pharma.  Brosius is listed as the company's registered agent and president on the corporate

31

registration, and lists the company's business purpose as "consulting services for pharmaceutical dispensing."

**G.     Boulevard and Shukurov's Willful Counterfeiting**

116.    Boulevard sold multiple confirmed counterfeits to Safe Chain, and many additional bottles of Gilead HIV medications with fraudulent pedigrees that listed initial sales from Gilead that did not occur.  Boulevard of course knew that it had not purchased the counterfeits from the legitimate sources it fraudulently listed on the fake pedigrees.

117.    On May 3, 2020, Gilead served Boulevard with a federal subpoena in connection with an ongoing litigation in the Southern District of Florida that involves illegally diverted bottles of Gilead HIV medications with false pedigrees, including large quantities of medication purchased back from patients.  Boulevard was duly served and received the subpoena, but chose not to respond in any way.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(a))**

118.    Gilead realleges and incorporates by reference paragraphs 1 through 117 of this Complaint as if fully set forth herein.

119.    In violation of 15 U.S.C. § 1114(1)(a), Defendants, independently and in conspiracy with one another, used in commerce, without Gilead's consent, either a reproduction, counterfeit, copy or colorable imitation of the Gilead Marks and the Gilead Trade Dress in connection with the sale, offering for sale, distribution, or advertising of counterfeit Gilead products; in connection with the sale, offering for sale, distribution, or advertising of Gilead products with altered and/or falsified pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and

32

subvert Gilead's quality-control measures; and in connection with which such use that is likely to cause confusion, or to cause mistake, or to deceive.

120.     Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

121.     Defendants are directly, contributorily, and vicariously liable for their infringement.

122.     As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

123.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

124.     As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF
## FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(b))

125.     Gilead realleges and incorporates by reference paragraphs 1 through 117 of this Complaint as if fully set forth herein.

126.     In violation of 15 U.S.C. § 1114(1)(b), Defendants, independently and in conspiracy with one another, reproduced, counterfeited, copied, or colorably imitated the registered Gilead Marks and Trade Dress belonging to Gilead and applied such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the offering for

33

sale, distribution or advertising of counterfeit Gilead products; in connection with the sale, offering for sale, distribution, or advertising of Gilead products with altered and/or falsified pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-control measures; and in connection with such use that is likely to cause confusion, to cause mistake, or to deceive.

127.    For example, and without limitation, the Defendants used counterfeit, reproduced, copied, or colorably imitated Gilead Marks on the labels of the counterfeit bottles of Gilead HIV medications they purchased, advertised, and sold, as well as on altered and/or falsified pedigrees for bottles of Gilead HIV medications.

128.    Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

129.    Defendants are directly, contributorily, and vicariously liable for their infringement.

130.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

131.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

132.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

34

## THIRD CLAIM FOR RELIEF
## <u>FALSE DESCRIPTION AND DESIGNATION OF ORIGIN IN COMMERCE</u>

133.    Gilead realleges and incorporates by reference paragraphs 1 through 117 of this Complaint as if fully set forth herein.

134.    In violation of 15 U.S.C. § 1125(a)(1)(A), Defendants, independently and in conspiracy with one another, in connection with the counterfeit Gilead medication, and in connection with Gilead products with altered and/or falsified pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States, and/or that are not subject to and subvert Gilead's quality-control measures, used in commerce a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was or is likely to cause confusion or to cause mistake, or to deceive as to an affiliation, connection, or association with Gilead.

135.    Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

136.    Defendants are directly, contributorily, and vicariously liable for their infringement.

137.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

138.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

139.     As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## FOURTH CLAIM FOR RELIEF
## FEDERAL FALSE ADVERTISING

140.     Gilead realleges and incorporates by reference paragraphs 1 through 117 of this Complaint as if fully set forth herein.

141.     In violation of 15 U.S.C. § 1125(a)(1)(B), Defendants, independently and in conspiracy with one another, in connection with the sale of counterfeit Gilead medication, and in connection with the sale of  Gilead products with altered and/or falsified pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-control measures, used a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of the counterfeit Gilead medication.

142.     Defendants advertised, marketed, and promoted the counterfeit Gilead products, and the materially different Gilead products with altered and/or falsified pedigrees, to the public, and/or to specific segments of the public, using the Gilead Marks and Trade Dress, as well as other intellectual property belonging to Gilead.

143.     Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

144.     Defendants are directly, contributorily, and vicariously liable for their infringement.

36

145.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

146.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

147.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

**FIFTH CLAIM FOR RELIEF**
**FEDERAL DILUTION OF MARK**

148.    Gilead realleges and incorporates by reference paragraphs 1 through 117 of this Complaint as if fully set forth herein.

149.    The Gilead Marks and Trade Dress are famous and distinctive within the meaning of 15 U.S.C. § 1125(c).

150.    Defendants are selling and/or have sold counterfeit, altered, and/or falsified products bearing the Gilead Marks and Trade Dress after such trademarks and trade dress became famous.

151.    By selling these products, Defendants, independently and in conspiracy with one another, have diluted and are diluting the distinctive quality of a mark or trade name owned by Gilead in violation of 15 U.S.C. § 1125(c).

152.    Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

37

153.    Defendants are directly, contributorily, and vicariously liable for their infringement.

154.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

155.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

156.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## SIXTH CLAIM FOR RELIEF
## <u>NEW YORK DILUTION OF MARK AND INJURY TO BUSINESS REPUTATION</u>

157.    Gilead realleges and incorporates by reference paragraphs 1 through 117 of this Complaint as if fully set forth herein.

158.    All of the Gilead Marks and Trade Dress are individually distinctive under New York General Business Law § 360-1.

159.    By selling counterfeit, altered, and/or falsified products bearing the Gilead Marks and Trade Dress, Defendants, independently and in conspiracy with one another, have injured and are continuing to injure Gilead's business reputation and/or have diluted and are continuing to dilute the distinctive quality of a mark or trade name owned by Gilead, in violation of New York General Business Law § 360-1.

160.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in

the industry.  Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

161.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

162.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF
## NEW YORK DECEPTIVE BUSINESS PRACTICES

163.    Gilead realleges and incorporates by reference paragraphs 1 through 117 of this Complaint as if fully set forth herein.

164.    In violation of New York General Business Law § 349, Defendants, independently and in conspiracy with one another, are selling, offering for sale, and/or distributing counterfeit, altered, and/or falsified products unlawfully bearing the Gilead Marks and Trade Dress.

165.    As a direct and proximate result of Defendants' deceptive conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

166.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

**EIGHTH CLAIM FOR RELIEF**
**COMMON-LAW UNFAIR COMPETITION**

167.    Gilead realleges and incorporates by reference paragraphs 1 through 117 of this Complaint as if fully set forth herein.

168.    In violation of the common law of the State of New York and elsewhere, Defendants, independently and in conspiracy with one another, have unfairly competed with Gilead by selling the counterfeit, altered, and/or falsified products.

169.    As a direct and proximate result of Defendants' unfair competition, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

170.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

171.    As a direct and proximate result of Defendants' unfair competition, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

**NINTH CLAIM FOR RELIEF**
**COMMON-LAW UNJUST ENRICHMENT**

172.    Gilead realleges and incorporates by reference paragraphs 1 through 117 of this Complaint as if fully set forth herein.

173.    By selling the counterfeit, altered, and/or falsified products bearing Gilead's valuable trademarks independently and in conspiracy with one another, Defendants have been unjustly enriched at Gilead's expense in violation of the common law of New York and elsewhere.

40

174.     Under principles of equity, Gilead is entitled to restitution and/or disgorgement of Defendants' ill-gotten gains.

**PRAYER FOR RELIEF**

WHEREFORE, Gilead demands judgment against Defendants as follows:

A.     preliminarily and permanently enjoining, each and every one of the Defendants and their subsidiaries, parents, affiliates, agents, servants, employees, members, directors, officers, and attorneys, and those persons in active concert or participation with them:

(i)     from selling any Gilead medication, whether genuine or counterfeit;

(ii)     from using any of the Gilead Marks and Trade Dress or any marks confusingly similar thereto in connection with the manufacture, sale, offer for sale, distribution, advertisement, or any other use of medication;

(iii)     from using any logo, trade name, or trademark confusingly similar to any of the Gilead Marks and Trade Dress, which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of Defendants or of others are sponsored by, authorized by, or in any way associated with Gilead;

(iv)     from directly, contributorily, and vicariously infringing any of the Gilead Marks and Trade Dress;

41

(v)     from otherwise unfairly competing with Gilead in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of Gilead medications;

(vi)    from falsely representing themselves as being connected with Gilead or sponsored by or associated with Gilead or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that Defendants, or any of them, are associated with Gilead;

(vii)   from using any reproduction, counterfeit, copy, or colorable imitation of any of the Gilead Marks and Trade Dress in connection with the publicity, promotion, sale, or advertising of medications;

(viii)  from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being authentic Gilead medication and from offering such goods in commerce;

(ix)    from diluting the Gilead Marks and Trade Dress;

(x)     from destroying any records documenting the manufacture, sale, offer for sale, distribution, advertisement, or receipt of any product purporting to be Gilead medication; and

(xi)    from assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (x) above; and

B.    ordering that, within fifteen days after the entry and service of a preliminary or permanent injunction, Defendants serve and file a written report under oath setting forth in detail the manner and form in which they have complied with the injunction; and

C.    ordering that all infringing material be turned over, seized, impounded, and/or destroyed; and

D.    awarding to Gilead punitive damages from each Defendant in an amount to be ascertained at trial, but in no event less than $25 million; and

E.    awarding to Gilead statutory or actual damages in an amount to be ascertained at trial, and costs and attorney's fees; and

F.    awarding to Gilead an accounting, and an award of: (i) all ill-gotten profits from Defendants' manufacture, sale, and/or distribution of the counterfeit medication; (ii) Gilead's lost profits; and (iii) Gilead's remedial costs; and

G.    awarding to Gilead pre-judgment and post-judgment interest; and

H.    awarding such other and further relief to Gilead as may be just, proper, and equitable.

43

Dated:  July 22, 2021

_____
Geoffrey Potter
Aron Fischer
Timothy A. Waters
Joshua R. Stein
 PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Tel:     (212) 336-2000
Fax:     (212) 336-2222
gpotter@pbwt.com
afischer@pbwt.com
twaters@pbwt.com
jstein@pbwt.com

*Attorneys for Plaintiffs Gilead Sciences, Inc. and
Gilead Sciences Ireland UC*

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC

**DEFENDANTS**

SAFE CHAIN SOLUTIONS, LLC; PATRICK BOYD; CHARLES BOYD; WORLDWIDE PHARMA SALES GROUP, INC. d/b/a PHARMASALES.COM; ADAM S. BROSIUS; BOULEVARD 9229 LLC; and ISHBAY SHUKUROV

**(b)** County of Residence of First Listed Plaintiff    San Mateo County, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Dorchester County, MD
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas, New York, NY 10036
(212) 336-2000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | **LABOR** | ☒ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. section 1114 et seq.; 15 U.S.C. 1125 et. seq.;

Brief description of cause:
Trademark infringement / counterfeiting

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
$25,000,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
July 22, 2021

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**CERTIFICATION OF ARBITRATION ELIGIBILITY**

Local Arbitration Rule 83.7 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

Case is Eligible for Arbitration ☐

I, ___Geoffrey Potter___, counsel for ___Plaintiffs___, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

- ☑ monetary damages sought are in excess of $150,000, exclusive of interest and costs,
- ☑ the complaint seeks injunctive relief,
- ☐ the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

Pursuant to Federal Rule of Civil Procedure 7.1, Gilead Sciences, Inc. makes the following disclosures: Gilead Sciences, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock. Gilead Sciences, Inc. is the ultimate parent of Gilead Sciences Ireland UC.

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.) Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County? ☐ Yes ☑ No

2.) If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County? ☐ Yes ☑ No

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? ☑ Yes ☐ No

c) If this is a Fair Debt Collection Practice Act case, specify the County in which the offending communication was received:                    .

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County? ☐ Yes ☐ No

*(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).*

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

☑ Yes          ☐ No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

☐ Yes (If yes, please explain     ☑ No

I certify the accuracy of all information provided above.

**Signature:** _____

**TO: Clerk's Office**
   **UNITED STATES DISTRICT COURT**
   **EASTERN DISTRICT OF NEW YORK**

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JUN 2 2 2021   ★

BROOKLYN OFFICE

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

DONNELLY, J.

REYES, M.J.

CV 21-4106

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC
          -v-
SAFE CHAIN SOLUTIONS, LLC; PATRICK BOYD;
CHARLES BOYD; WORLDWIDE PHARMA SALES GROUP, INC.
d/b/a PHARMASALES.COM; ADAM S. BROSIUS;
BOULEVARD 9229 LLC; and ISHBAY SHUKUROV,

Docket Number

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SUBMITTED BY: Plaintiff ✔ Defendant ☐ DOJ ☐
Name: Geoffrey Potter
Firm Name: Patterson Belknap Webb & Tyler LLP
Address: 1133 Avenue of the Americas
New York, New York 10036
Phone Number: 212-336-2000
E-Mail Address: gpotter@pbwt.com

INDICATE UPON THE PUBLIC DOCKET SHEET: YES ☐  NO ✔
**If yes, state description of document to be entered on docket sheet:**

**A) If pursuant to a prior Court Order:**
Docket Number of Case in Which Entered:_____
Judge/Magistrate Judge:_____
Date Entered:_____

_____

**B) If a new application,** the statute, regulation, or other legal basis that
authorizes filing under seal

15 U.S.C. Section 1116(d)(8)

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE,
AND MAY NOT BE UNSEALED UNLESS ORDERED BY
THE COURT.**

DATED: _____                , NEW YORK

**U.S. DISTRICT JUDGE/U.S. MAGISTRATE JUDGE**
                    RECEIVED IN CLERK'S
            OFFICE_____
                              **DATE**

**MANDATORY CERTIFICATION OF SERVICE:**
**A.)** ☐ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ✔ Service is excused by 31 U.S.C. 3730(b), or by
the following other statute or regulation: ☐ ; or **C.)** ☐ This is a criminal document submitted, and flight public safety, or security are significant concerns.
(Check one)

7/22/21
    DATE                                    SIGNATURE

## Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

July 22, 2021

Geoffrey Potter
Partner
(212) 336-2050
gpotter@pbwt.com

**BY HAND**

United States District Court
Eastern District of New York
Theodore Roosevelt United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *Gilead Sciences, Inc. et al. v. Safe Chain Solutions, LLC et al.*,
      filed *Ex Parte* & Under Seal

Dear United States District Court:

Enclosed are materials filed today *ex parte* and under seal commencing an action on behalf of Gilead Sciences, Inc. seeking emergency relief against defendants selling dangerous counterfeit HIV medications in New York and across the United States.  These counterfeits do not contain the HIV medication listed on the label, but rather different drugs entirely—most commonly, a prescription antipsychotic that causes debilitating side effects.  For these reasons, the plaintiffs move the court for an *ex parte* seizure order pursuant to 15 U.S.C. § 1116, a temporary restraining order, an asset freeze order, and an expedited discovery order.

We have requested an order that permits the plaintiffs to execute seizures at three primary locations connected to the counterfeits—in New York, Maryland, and Utah—which we plan to execute simultaneously.  We have shared the details of the proposed seizure order with law enforcement officials in each jurisdiction, and they have told us that they can execute the order on Monday, July 26, should Your Honor grant such an order today or tomorrow.  In anticipation of the execution, computer forensic specialists and private investigators have traveled to each location to assist the law enforcement officers.

I am available at any time to provide any additional information Your Honor may require.  I can be reached at (917) 854-2310, and my colleagues Aron Fischer can be reached at (347) 731-5830 and Timothy Waters can be reached at (617) 308-8533.  We are fully vaccinated and are waiting in the courthouse and are available to appear before Your Honor on short notice.

Respectfully submitted,

*Geoffrey Potter*

Geoffrey Potter

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------

GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC,

                        Plaintiffs,

v.

SAFE CHAIN SOLUTIONS, LLC; PATRICK BOYD; CHARLES BOYD; WORLDWIDE PHARMA SALES GROUP, INC. d/b/a PHARMASALES.COM; ADAM S. BROSIUS; BOULEVARD 9229 LLC; and ISHBAY SHUKUROV,

                        Defendants.

------------------------------------------------------------------------

Case No. _____

**FILED *EX PARTE* AND UNDER SEAL PURSUANT TO 15 U.S.C. § 1116(d)**

**Index to July 22, 2021 Filing**

| Tab # | Document |
|-------|----------|
| 1 | Cover Letter to the U.S. District Court |
| 2 | Civil Cover Sheet, Attorney Appearances, Summons |
| 3 | Complaint, and exhibits |
| 4 | *Ex Parte* Motions for a Seizure Order, Temporary Restraining Order, Asset Freeze Order, Expedited Discovery Order, and Order to Show Cause for a Preliminary Injunction |
| 5 | Memorandum of Law in Support of *Ex Parte* Motions for a Seizure Order, Temporary Restraining Order, Asset Freeze Order, Expedited Discovery Order, and Order to Show Cause for a Preliminary Injunction |
| 6 | Proposed Seizure Order |
| 7 | Proposed Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction |
| 8 | Proposed Asset Freeze Order |
| 9 | Proposed Expedited Discovery Order |
| 10 | *Ex Parte* Motion and Memorandum of Law to Seal Pursuant to 15 U.S.C. § 1116 |
| 11 | Proposed Order on *Ex Parte* Motion to Seal |
| 12 | Declaration of Geoffrey Potter, and exhibits |
| 13 | Declaration of Sidnie Bienz |
| 14 | Declaration of Dr. Joel Gallant |
| 15 | Declaration of Gretchen Stroud, and exhibit |
| 16 | Declaration of Susmitha Sunkara, and exhibits |
| 17 | Declaration of Luis Vazquez |
| 18 | Declaration of Bruce Gundy, and exhibits |
| 19 | Declaration of Hannah Coleman, and exhibits |
| 20 | Declaration of Ryan Frye, and exhibits |
| 21 | Declaration of Patrick McAllister |
| 22 | Declaration of David M. Hopp |
| 23 | Declaration of Troy T. Tanner |

Respectfully Submitted,

Geoffrey Potter (cell: 917-854-2310), Aron Fischer (cell: 347-731-5830),
Timothy Waters (cell: 617-308-8533), Joshua R. Stein (cell: 914-772-7075)
PATTERSON BELKNAP WEBB & TYLER LLP

*Counsel for Plaintiffs Gilead Sciences Inc. and Gilead Sciences Ireland UC*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC | ) ) ) ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| SAFE CHAIN SOLUTIONS, LLC; PATRICK BOYD; CHARLES BOYD; WORLDWIDE PHARMA SALES GROUP, INC. d/b/a PHARMASALES.COM; ADAM S. BROSIUS; BOULEVARD 9229 LLC;and ISHBAY SHUKUROV, | ) ) ) ) ) ) |
| *Defendant(s)* | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Safe Chain Solutions, LLC
822 Chesapeake Dr
Cambridge, MD 21613

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Geoffrey Potter
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____                    _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*  Safe Chain Solutions, LLC

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)*
_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC <br><br> _____ <br> *Plaintiff(s)* <br><br> v. <br><br> SAFE CHAIN SOLUTIONS, LLC; PATRICK BOYD; CHARLES BOYD; WORLDWIDE PHARMA SALES GROUP, INC. d/b/a PHARMASALES.COM; ADAM S. BROSIUS; BOULEVARD 9229 LLC; and ISHBAY SHUKUROV, <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Patrick Mulholland Boyd
27820 Waverly Road
Easton, MD 20601

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Geoffrey Potter
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*  Patrick Mulholland Boyd

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC <br><br>_____<br>*Plaintiff(s)*<br>v.<br>SAFE CHAIN SOLUTIONS, LLC; PATRICK BOYD; CHARLES BOYD; WORLDWIDE PHARMA SALES GROUP, INC. d/b/a PHARMASALES.COM;ADAM S. BROSIUS; BOULEVARD 9229 LLC;and ISHBAY SHUKUROV,<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Charles Durham Boyd
7166 Calves Acre Lane
Easton, MD 21601

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Geoffrey Potter
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*  Charles Durham Boyd

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) Civil Action No. |
| SAFE CHAIN SOLUTIONS, LLC; PATRICK BOYD; CHARLES BOYD; WORLDWIDE PHARMASALES GROUP, INC. d/b/a PHARMASALES.COM; ADAM S. BROSIUS; BOULEVARD 9229 LLC;and ISHBAY SHUKUROV, | ) ) ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Worldwide Pharma Sales Group, Inc. d/b/a Pharmasales.com
455 NE 5th Ave Suite D434
Delray Breach, FL33483

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Geoffrey Potter
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____                    _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*  Worldwide Pharma Sales Group, Inc. d/b/a Pharmasales.com

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

<table>
<tr><td>GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC<br><br>_____<br><i>Plaintiff(s)</i><br>v.<br>SAFE CHAIN SOLUTIONS, LLC; PATRICK BOYD; CHARLES BOYD; WORLDWIDE PHARMA SALES GROUP, INC. d/b/a PHARMASALES.COM;ADAM S. BROSIUS; BOULEVARD 9229 LLC;and ISHBAY SHUKUROV,<br>_____<br><i>Defendant(s)</i></td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Civil Action No.</td></tr>
</table>

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Adam S. Brosius
250 S. Ocean Blvd, Apt 252
Delray Beach, FL 33483

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Geoffrey Potter
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____        _____
                                                                                            *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Adam S. Brosius

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                              *Server's signature*

                                        _____
                                              *Printed name and title*


                                        _____
                                              *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| GILEAD SCIENCES, INC., and GILEAD SCIENCES IRELAND UC | ) ) ) ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | )     Civil Action No. |
| SAFE CHAIN SOLUTIONS, LLC; PATRICK BOYD; CHARLES BOYD; WORLDWIDE PHARMASALES GROUP, INC. d/b/a PHARMASALES.COM;ADAM S. BROSIUS;  BOULEVARD 9229 LLC;and ISHBAY SHUKUROV, | ) ) ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Boulevard 9229 LLC
92-29 Queens Blvd, Suite 1i
Rego Park, NY 11374

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Geoffrey Potter
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____        _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Boulevard 9229 LLC

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC<br><br>_____<br>*Plaintiff(s)*<br>v.<br>SAFE CHAIN SOLUTIONS, LLC; PATRICK BOYD; CHARLES BOYD; WORLDWIDE PHARMA SALES GROUP, INC. d/b/a PHARMASALES.COM;ADAM S. BROSIUS; BOULEVARD 9229 LLC;and ISHBAY SHUKUROV,<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Ishbay Shukurov
3110 Brighton 7th St, Apt. #2B
Brooklyn, NY 11235

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Geoffrey Potter
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____        _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*    Ishbay Shukurov

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .


I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                              *Server's signature*

                                         _____
                                              *Printed name and title*


                                         _____
                                              *Server's address*

Additional information regarding attempted service, etc:

# Complaint Exhibit A

Int. Cl.: 5

Prior U.S. Cls.: 6, 18, 44, 46, 51 and 52

## United States Patent and Trademark Office

Reg. No. 3,251,595

Registered June 12, 2007

## TRADEMARK
## PRINCIPAL REGISTER

# GILEAD

GILEAD SCIENCES, INC. (DELAWARE COR-
PORATION)
333 LAKESIDE DRIVE
FOSTER CITY, CA 94404

FOR: PHARMACEUTICAL PREPARATIONS,
NAMELY, ANTIVIRALS, ANTIFUNGALS AND
PREPARATIONS FOR THE TREATMENT OF IN-
FECTIOUS CONDITIONS, IN CLASS 5 (U.S. CLS. 6,
18, 44, 46, 51 AND 52).

FIRST USE 4-7-1989; IN COMMERCE 4-7-1989.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 1,611,838.

SER. NO. 78-942,489, FILED 8-1-2006.

DAWN HAN, EXAMINING ATTORNEY

Int. Cl.: 5

Prior U.S. Cls.: 6, 18, 44, 46, 51 and 52

**United States Patent and Trademark Office**

Reg. No. 2,656,314
Registered Dec. 3, 2002

## TRADEMARK
### PRINCIPAL REGISTER



GILEAD SCIENCES, INC. (DELAWARE COR-
PORATION)
333 LAKESIDE DRIVE
FOSTER CITY, CA 94404

FOR: PHARMACEUTICAL PREPARATIONS FOR
THE TREATMENT AND/OR PREVENTION OF IN-
FECTIOUS DISEASES, IN CLASS 5 (U.S. CLS. 6, 18,
44, 46, 51 AND 52).

FIRST USE 2-22-2002; IN COMMERCE 2-22-2002.

THE ACCOMPANYING DRAWING IS LINED
FOR THE COLOR RED, AND RED IS A FEATURE
OF THE MARK.

SER. NO. 76-348,396, FILED 12-12-2001.

JEAN IM, EXAMINING ATTORNEY



# GSI

**Reg. No. 3,890,252**

**Registered Dec. 14, 2010**

**Int. Cl.: 5**

**TRADEMARK**

**PRINCIPAL REGISTER**

GILEAD SCIENCES LIMITED (IRELAND COMPANY)
IDA BUSINESS AND TECHNOLOGY PARK
CARRIGTOHILL, CO. CORK, IRELAND

FOR: PHARMACEUTICAL PREPARATIONS FOR THE TREATMENT OF INFECTIOUS CONDITIONS AND DISEASES AND DISORDERS OF THE IMMUNE SYSTEM, THE LIVER AND THE CARDIOVASCULAR SYSTEM; ANTIVIRALS, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 6-17-2007; IN COMMERCE 6-17-2007.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

PRIORITY CLAIMED UNDER SEC. 44(D) ON IRELAND APPLICATION NO. 2010/00199, FILED 2-4-2010.

SER. NO. 85-032,245, FILED 5-6-2010.

SAMUEL E. SHARPER JR., EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office

# United States of America

## United States Patent and Trademark Office

# BIKTARVY

**Reg. No. 5,344,455**

**Registered Nov. 28, 2017**

**Int. Cl.: 5**

**Trademark**

**Principal Register**

Gilead Sciences Ireland UC (IRELAND Unlimited Company )
Ida Business And Technology Park
Carrigtohill, Co. Cork, IRELAND

CLASS 5: Pharmaceutical preparations for the prevention and treatment of hepatitis and HIV infection; antivirals; anti-inflammatories; antifungal preparations; pharmaceutical preparations for use in the treatment of infectious diseases, liver diseases and disorders, respiratory diseases and disorders, oncological diseases and disorders, and cardiovascular diseases and disorders

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

PRIORITY CLAIMED UNDER SEC. 44(D) ON IRELAND APPLICATION NO. 2016/02221, FILED 10-20-2016, REG. NO. 256093, DATED 10-20-2016, EXPIRES 10-19-2026

SER. NO. 87-226,465, FILED 11-04-2016



Performing the Functions and Duties of the
Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office



# United States of America
## United States Patent and Trademark Office

# DESCOVY

**Reg. No. 4,876,632**

**Registered Dec. 29, 2015**

GILEAD SCIENCES IRELAND UC (IRELAND UNLIMITED COMPANY)
IDA BUSINESS AND TECHNOLOGY PARK
CARRIGTOHILL, CO. CORK, IRELAND

**Int. Cl.: 5**

**TRADEMARK**

**PRINCIPAL REGISTER**

FOR: PHARMACEUTICAL PREPARATIONS FOR THE PREVENTION AND TREATMENT OF HEPATITIS AND HIV INFECTION; ANTIVIRALS; ANTI-INFLAMMATORIES; ANTI-FUNGALS; PHARMACEUTICAL PREPARATIONS FOR USE IN THE TREATMENT OF INFECTIOUS DISEASES, LIVER DISEASES AND DISORDERS, RESPIRATORY DISEASES AND DISORDERS, ONCOLOGICAL DISEASES AND DISORDERS, AND CARDIOVASCULAR DISEASES AND DISORDERS, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF IRELAND REG. NO. 249773, DATED 4-26-2014, EXPIRES 10-31-2023.

SER. NO. 86-170,326, FILED 1-20-2014.

LUCY ARANT, EXAMINING ATTORNEY



*Michelle K. Lee*

Director of the United States
Patent and Trademark Office

# United States of America

## United States Patent and Trademark Office

# DESCOVY FOR PREP

**Reg. No. 5,912,591**

**Registered Nov. 19, 2019**

**Int. Cl.: 5, 44**

**Service Mark**

**Trademark**

**Principal Register**

Gilead Sciences Ireland UC  (IRELAND UNLIMITED COMPANY )
Ida Business And Technology Park
Carrigtohill, Co. Cork, IRELAND

CLASS 5: Anti-viral pharmaceutical preparations; pharmaceutical preparations for the treatment and prevention of infectious diseases; pharmaceutical preparations for the treatment of immune dysfunction; pharmaceutical preparations for the treatment and prevention of human immunodeficiency virus infection

CLASS 44: Information and advisory services relating to pharmaceuticals, diseases and medical conditions and treatments, namely, pharmaceutical advice, medical and pharmaceutical consultation, medical advisory services, and providing medical information, consultancy and advisory services; information and advisory services relating to pharmaceuticals, diseases and medical conditions and treatments, namely, pharmaceutical advice, medical and pharmaceutical consultation, medical advisory services, and providing medical information, consultancy and advisory services provided on-line over a computer network and the Internet; providing medical information and advisory services regarding HIV infection

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

PRIORITY CLAIMED UNDER SEC. 44(D) ON EUROPEAN UNION APPLICATION NO. 018009954, FILED 01-14-2019, REG. NO. 018009954, DATED 05-14-2019, EXPIRES 01-14-2029

OWNER OF U.S. REG. NO. 4876632

No claim is made to the exclusive right to use the following apart from the mark as shown: "FOR PREP"

SER. NO. 88-266,226, FILED 01-17-2019



Director of the United States
Patent and Trademark Office

# United States of America

## United States Patent and Trademark Office

# 9883

**Reg. No. 5,467,392**

**Registered May 15, 2018**

**Int. Cl.: 5**

**Trademark**

**Principal Register**

Gilead Sciences Ireland UC (IRELAND Unlimited Company )
Ida Business And Technology Park
Carrigtohill, Co. Cork, IRELAND

CLASS 5: Antiviral pharmaceutical preparations; anti-infective pharmaceutical preparations; pharmaceutical preparations for treatment and prevention of HIV infection

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

PRIORITY CLAIMED UNDER SEC. 44(D) ON EUROPEAN UNION APPLICATION NO. 16800914, FILED 06-02-2017, REG. NO. 016800914, DATED 09-19-2017, EXPIRES 06-02-2027

SER. NO. 87-507,933, FILED 06-27-2017



Director of the United States
Patent and Trademark Office

# United States of America

## United States Patent and Trademark Office



**Reg. No. 5,636,131**

**Registered Dec. 25, 2018**

**Int. Cl.: 5**

**Trademark**

**Principal Register**

Gilead Sciences Ireland UC  (IRELAND Unlimited Company )
Ida Business And Technology Park
Carrigtohill, Co. Cork, IRELAND

CLASS 5: Antiviral pharmaceutical preparations; anti-infective pharmaceutical preparations; pharmaceutical preparations for treatment of HIV infection

FIRST USE 2-7-2018; IN COMMERCE 2-7-2018

The color(s) purplish-brown is/are claimed as a feature of the mark.

The mark consists of "9883" imprinted on a three-dimensional design of an oblong-shaped purplish-brown tablet. The broken lines depicting the shape of the tablet indicate placement of the mark on the goods and the tablet shape depicted in broken lines, alone or separate from the other elements, is not claimed.

SER. NO. 87-691,972, FILED 11-20-2017

Director of the United States
Patent and Trademark Office

# United States of America

## United States Patent and Trademark Office



**Reg. No. 5,906,177**

**Registered Nov. 12, 2019**

**Int. Cl.: 5**

**Trademark**

**Principal Register**

Gilead Sciences, Inc.  (DELAWARE CORPORATION)
333 Lakeside Drive
Foster City, CALIFORNIA 94404

CLASS 5: Pharmaceutical preparations, namely, pre-exposure prophylaxis (PrEP) preparations for prevention and risk mitigation of contracting HIV

FIRST USE 8-5-2004; IN COMMERCE 8-5-2004

The color(s) blue is/are claimed as a feature of the mark.

The mark consists of the color blue applied to the entire surface of a three-dimensional oblong tablet. The dotted outline of the tablet is intended to show the position of the mark on the goods, and exclusive right is not claimed to the shape of the tablet itself.

OWNER OF U.S. REG. NO. 5154303, 5030567

SEC.2(F)

SER. NO. 87-794,113, FILED 02-12-2018



Director of the United States
Patent and Trademark Office

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM322197

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | CHANGE OF NAME |

## CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| Gilead Sciences Limited | | 09/22/2014 | LIMITED LIABILITY COMPANY: IRELAND |

## RECEIVING PARTY DATA

| | |
|---|---|
| Name: | Gilead Sciences Ireland UC |
| Doing Business As: | Gilead Sciences Ireland UC |
| Street Address: | IDA Business and Technology Park |
| City: | Carrigtohill, Co. Cork |
| State/Country: | IRELAND |
| Entity Type: | Unlimited Company: IRELAND |

## PROPERTY NUMBERS Total: 144

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 4188355 | TRILEUS |
| Registration Number: | 4277625 | COFENDA |
| Registration Number: | 4038955 | COMPLERA |
| Registration Number: | 4277626 | CYTACTA |
| Registration Number: | 4277627 | VICLUDA |
| Registration Number: | 4378034 | VITECA |
| Registration Number: | 4315192 | AZEVITA |
| Registration Number: | 4315191 | AMPLETTA |
| Registration Number: | 4315190 | AMPLETA |
| Registration Number: | 4033139 | COMPLEVA |
| Registration Number: | 4476435 | APEXIAD |
| Registration Number: | 4476436 | CYPLUS |
| Registration Number: | 4476437 | QUALTARA |
| Registration Number: | 4370358 | TYBOST |
| Registration Number: | 3890252 | GSI |
| Registration Number: | 4062201 | CMPLERA |
| Registration Number: | 4047842 | KOMPLIRA |
| Registration Number: | 4047840 | KONPLERA |
| Registration Number: | 4047841 | CANPLERA |

CH  S3615.00  4188355

| Property Type | Number | Word Mark |
|---|---|---|
| **Registration Number:** | 4483241 | QUAVEAD |
| **Registration Number:** | 4535448 | ERAQUAD |
| **Registration Number:** | 4535447 | UNOSTARA |
| **Registration Number:** | 4535446 | COBRELA |
| **Registration Number:** | 4535445 | QUADUNO |
| **Registration Number:** | 4535444 | QUADVYR |
| **Registration Number:** | 4473232 | QUATREAD |
| **Registration Number:** | 4578217 | VITECTA |
| **Registration Number:** | 4048113 | KOMPLARA |
| **Registration Number:** | 4104494 | VIXPLERA |
| **Registration Number:** | 4090077 | EVIPLERA |
| **Registration Number:** | 4130861 | STR |
| **Registration Number:** | 4278048 | STRIBOLD |
| **Registration Number:** | 4105297 | |
| **Registration Number:** | 4263613 | STRIBILD |
| **Registration Number:** | 4345163 | VITEKTA |
| **Registration Number:** | 4323411 | STR |
| **Registration Number:** | 4320307 | STRIBILD |
| **Registration Number:** | 4320650 | SOCINCT |
| **Registration Number:** | 4468665 | SOVALDI |
| **Registration Number:** | 4438755 | INODELT |
| **Registration Number:** | 4364273 | ZYDELIG |
| **Registration Number:** | 4371363 | SELNISA |
| **Registration Number:** | 4435098 | EXPALITE |
| **Registration Number:** | 4438767 | FINLIZA |
| **Registration Number:** | 4456646 | 7985 |
| **Registration Number:** | 4582787 | 1160 |
| **Registration Number:** | 4509797 | |
| **Registration Number:** | 4509798 | |
| **Registration Number:** | 4608545 | HARVONI |
| **Registration Number:** | 4560268 | 7916 |
| **Serial Number:** | 77894772 | QUADRID |
| **Serial Number:** | 77942516 | ARVANCE |
| **Serial Number:** | 85191697 | SYMPLERA |
| **Serial Number:** | 77894779 | UNIVADA |
| **Serial Number:** | 85330091 | THEQUAD |
| **Serial Number:** | 85329999 | QWAD |
| **Serial Number:** | 85330085 | MYKWAD |
| **Serial Number:** | 85358082 | AMPLEV |

| Property Type | Number | Word Mark |
|---|---|---|
| Serial Number: | 85358100 | ASSEVITA |
| Serial Number: | 85358136 | BLOXEGRA |
| Serial Number: | 85358437 | CRUZALON |
| Serial Number: | 85358466 | DEFISTRO |
| Serial Number: | 85358502 | FIRCLAZA |
| Serial Number: | 85358537 | GOFAZRI |
| Serial Number: | 85358584 | INCLUZA |
| Serial Number: | 85358588 | INGENSIDY |
| Serial Number: | 85358652 | JUSTRION |
| Serial Number: | 85358658 | MONFORZO |
| Serial Number: | 85358678 | STIGRAZ |
| Serial Number: | 85358714 | STURDECA |
| Serial Number: | 85358725 | ZKWAD |
| Serial Number: | 85679729 | QSTARA |
| Serial Number: | 85709246 | IPANGEO |
| Serial Number: | 85709337 | CIXIGY |
| Serial Number: | 85709313 | VCISEV |
| Serial Number: | 85709365 | CCISEV |
| Serial Number: | 85839069 | SURCEZE |
| Serial Number: | 85839086 | OZIMLA |
| Serial Number: | 85839094 | SENZIST |
| Serial Number: | 85839098 | VENZAYA |
| Serial Number: | 85839101 | ZENKAY |
| Serial Number: | 85844208 | SELNISA |
| Serial Number: | 85844212 | LYMCYSE |
| Serial Number: | 85944354 | 510 |
| Serial Number: | 86029203 | |
| Serial Number: | 86096000 | SOSIPLI |
| Serial Number: | 86096008 | SIMLIBIS |
| Serial Number: | 86095989 | SOPASVIO |
| Serial Number: | 86096012 | SOPIFNI |
| Serial Number: | 86095999 | SUMLEDIR |
| Serial Number: | 86095997 | COHYCIV |
| Serial Number: | 86095993 | ONVALSI |
| Serial Number: | 86107391 | MOMENTS LIKE THIS CAN CHANGE EVERYTHING |
| Serial Number: | 86033869 | VOYANNIS |
| Serial Number: | 86124771 | SOFALVI |
| Serial Number: | 86170336 | GENVOYA |
| Serial Number: | 86170334 | ALVANSIS |

| Property Type | Number | Word Mark |
|---|---|---|
| Serial Number: | 86170333 | JENBRISA |
| Serial Number: | 86170331 | GENPHYSA |
| Serial Number: | 86170330 | ENSTRALA |
| Serial Number: | 86170328 | NUFEZA |
| Serial Number: | 86170959 | GENLIBIS |
| Serial Number: | 86171158 | COHERIS |
| Serial Number: | 86170326 | DESCOVY |
| Serial Number: | 86174687 | VUHANSA |
| Serial Number: | 86095996 | FULDELIS |
| Serial Number: | 86186218 | INGENSIDI |
| Serial Number: | 86226938 | SUMTELIS |
| Serial Number: | 86227023 | GENDEVRA |
| Serial Number: | 86227054 | VISTREMA |
| Serial Number: | 86227084 | OSYMTEE |
| Serial Number: | 86227091 | RIZUPA |
| Serial Number: | 86227174 | OTIMSA |
| Serial Number: | 86227110 | MELOVY |
| Serial Number: | 86227119 | MARPOSIS |
| Serial Number: | 86227180 | VOYALA |
| Serial Number: | 86029273 | |
| Serial Number: | 86030025 | VOYANIS |
| Serial Number: | 86118077 | SOPIFNY |
| Serial Number: | 86222090 | NESEQUENT |
| Serial Number: | 86280995 | TYBOST |
| Serial Number: | 86281218 | VITEKTA |
| Serial Number: | 86282333 | SOHEPIC |
| Serial Number: | 86282353 | EPCLUSA |
| Serial Number: | 86124768 | SOFALDI |
| Serial Number: | 86341939 | HINGENO |
| Serial Number: | 86341936 | VERCEBIA |
| Serial Number: | 86341933 | VYNCLUSA |
| Serial Number: | 86341931 | GENCLUSA |
| Serial Number: | 86341927 | NESSAVIO |
| Serial Number: | 86341924 | ZENJURNA |
| Serial Number: | 86341919 | ENCLUITIVE |
| Serial Number: | 86341913 | LYGADDO |
| Serial Number: | 86346340 | ZYDELIG |
| Serial Number: | 86346343 | ZYDELIG |
| Serial Number: | 86363315 | PANJEVRY |

| Property Type | Number | Word Mark |
|---|---|---|
| **Serial Number:** | 86363321 | ESOFIS |
| **Serial Number:** | 86373746 | PANGYPIC |
| **Serial Number:** | 86373736 | PANJEVRIS |
| **Serial Number:** | 86373733 | PANGIVIS |
| **Serial Number:** | 86373725 | FINJOSO |
| **Serial Number:** | 86373718 | JENSTREY |
| **Serial Number:** | 86373710 | IONLAY |
| **Serial Number:** | 86373704 | CLUMENTI |

**CORRESPONDENCE DATA**

**Fax Number:**            650 522-55

***Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.***

**Phone:**                   650 522-2401

**Email:**                    trademarks@gilead.com

**Correspondent Name:**   Gretchen R. Stroud

**Address Line 1:**        333 Lakeside Drive

**Address Line 4:**        Foster City, CALIFORNIA 94404

| **ATTORNEY DOCKET NUMBER:** | GSL NAME CHANGE |
|---|---|

**DOMESTIC REPRESENTATIVE**

**Name:**              Gretchen R. Stroud

**Address Line 1:**   333 Lakeside Drive

**Address Line 4:**   Foster City, CALIFORNIA 94404

| **NAME OF SUBMITTER:** | Gretchen R. Stroud |
|---|---|
| **SIGNATURE:** | /Gretchen R. Stroud/ |
| **DATE SIGNED:** | 11/04/2014 |

**Total Attachments: 1**
source=Certified copy Cert of Inc#page1.tif

Number : 259755

*Duplicate Certificate*

FEE PAID

# *Certificate of Incorporation of a Company*

## *I hereby certify,* that

**GILEAD SCIENCES IRELAND UC**

originally called **NEXSTAR PHARMACEUTICALS LIMITED**

which name was changed to
**GILEAD PHARMACEUTICALS LIMITED**

on **Thursday, the 16th day of March, 2000**

which name was changed to
**GILEAD SCIENCES LIMITED**

on **Thursday, the 18th day of May, 2000**

which name was changed to
**GILEAD SCIENCES**

on **Monday, the 22nd day of September, 2014**

which name was changed to

**GILEAD SCIENCES IRELAND UC**
on **Monday, the 22nd day of September, 2014**

each name change having been made by Special Resolution and with the
Authority of the Registrar of Companies.

was Reregistered under the Companies Acts,   1963 to 2013

as an *Unlimited* Company, on
**Monday, the 22nd day of September, 2014.**

*Ita Bове*

Given under my hand at Dublin, this
**Wednesday, the 8th day of October, 2014.**

Companies Act, 1963, sec. 370(1)

*For Registrar of Companies*

**TRADEMARK**

# Complaint Exhibit B














# Exhibit NN

Clerk's Office
Filed Date:  7/23/21

U.S. DISTRICT COURT
EASTERN DISTRICT OF
NEW YORK
BROOKLYN OFFICE

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

GILEAD SCIENCES, INC. and GILEAD      :
SCIENCES IRELAND UC,      :

       :    Case No. _____21-CV-4106

      Plaintiffs,    :

      :

v.      :    **FILED *EX PARTE* AND UNDER SEAL**

      :    **PURSUANT TO 15 U.S.C. § 1116(d)**

SAFE CHAIN SOLUTIONS, LLC; PATRICK :
BOYD; CHARLES BOYD; WORLDWIDE  :
PHARMA SALES GROUP, INC. d/b/a   :
PHARMASALES.COM; ADAM S. BROSIUS; :
BOULEVARD 9229 LLC; and ISHBAY   :
SHUKUROV,      :

      :

      Defendants.    :

-----------------------------------------------------------------

## SEIZURE ORDER

Upon review of the Complaint of Gilead Sciences, Inc. and Gilead Sciences Ireland UC (together, "Gilead" or "Plaintiffs"), the accompanying declarations and the exhibits annexed hereto, and the memorandum of law submitted in support of this Order, and for good cause shown, it is hereby:

ORDERED that the United States Marshals Services for the Eastern District of New York; the United States Marshals Services for the District of Maryland; the United States Marshals Services for the District of Utah; the New York City Sheriff's Office; the New York City Police Department; the Cambridge Police Department; the Dorchester County Sheriff's Office; the St. George Police Department; the Washington County Sheriff's Office; the Federal Bureau of Investigation; and the U.S. Food and Drug Administration Office of Criminal Investigations, or any other law enforcement officers having jurisdiction, and in all cases assisted by one or more attorneys, private investigators, or employees or agents of Gilead and employees or agents of

UnitedLex Corp. ("UnitedLex") are directed and permitted, at any time between the hours of 8:00 a.m. and 9:00 p.m., to enforce this order and search, seize, copy, and sequester at any time, but no later than seven days (7) from the date of this Order, the following items in the possession, custody, or control of Defendants Safe Chain Solutions, LLC ("Safe Chain"), Patrick Boyd, Charles Boyd, Boulevard 9229 LLC ("Boulevard"), and Ishbay Shukurov (each a "Defendant" and together, "Defendants") located at the following locations:

- 3110 Brighton Seventh Street, #2B, Brooklyn, New York;

- 822 Chesapeake Drive, Cambridge, Maryland; and

- 1812 W Sunset Boulevard, Suite 34, St. George, Utah;

:

(a)     All products bearing any of the Gilead Marks (as defined below);

(b)     All business records, invoices, correspondence, emails, instant messages, text messages, WhatsApp communications, electronic communications, photographs, bank records, cancelled checks, wire transfers, books of account, receipts, or other documentation relating or referring in any manner to Defendants' businesses, the manufacture, promotion, publicity, advertising, receiving, acquisition, importation, return, shipment, purchase, sale, offer for sale, or distribution of any merchandise bearing any of the Gilead Marks, or any claim or defense in this action, whether such information is stored in a written or computerized form;

(c)     Any equipment and supplies used to manufacture, assemble, label or package any merchandise bearing any of the Gilead Marks; and it is further

ORDERED that Gilead's document and electronic services vendor UnitedLex shall act as substitute custodian for all documents and/or electronic evidence seized; and it is further

2

ORDERED that Gilead's counsel and/or private investigators working on their behalf shall act as substitute custodian for all products and property seized (except with respect to all documents and electronic evidence), and shall after completing the seizure account completely for all products and property seized pursuant to this Order, and shall compile a written inventory of all such products and property seized and shall provide a copy to the law enforcement authority conducting the seizure, who shall include such a copy with its return to the Court, but that any law enforcement officer or agency will be present solely to enforce this Order and allow for Gilead's private investigators and attorneys to carry out the provisions stated in this Order, and no law enforcement officer or agency will take possession of any items or documents; and it is further

ORDERED that Gilead's private investigators and attorneys and UnitedLex are authorized, under the supervision and with the assistance of law enforcement authority, to take all necessary steps to secure and remove the property described in this Order and located at the addresses or locations stated herein, including but not limited to using the appropriate force necessary, if it is apparent that entry is being denied, by utilizing a locksmith or law enforcement entry tools to gain entry for the purposes of searching the premises, or vehicle, or facility in the possession, custody or control of Defendants, and to inspect the contents of any rooms, closets, cabinets, safes, vehicles, containers, desks, electronic storage devices, computer drives, desktop computers, laptop computers, tablets, or documents, located on the premises or any storage rooms located within the same complex as the premises; and that Defendants and their employees shall provide all keys, passwords or codes needed to inspect the contents of any rooms, closets, cabinets, safes, vehicles, containers, desks, electronic storage devices, computer drives, desktop computers, laptop computers, or or tablets or documents located on the premises or any storage rooms located within the same complex as the premises; and it is further

3

ORDERED that during the course of the seizure Gilead's attorneys shall determine whether an item is covered by the preceding paragraphs and the law enforcement officers shall follow such attorneys' determination and ensure that no one attempts to interfere with the execution of this Order; and it is further

ORDERED that Defendants immediately upon receipt of this Order shall provide to Gilead's attorneys a summary document or documents giving the location or locations of any merchandise bearing any of the Gilead Marks that is in the possession, custody, or control of any of the Defendants so that merchandise can be seized pursuant to this Order; and it is further

ORDERED that Gilead's attorneys may be accompanied by private investigators and/or computer technicians to obtain copies of documents to be seized that are stored in computerized form, and Gilead's attorneys may, but are not required to, also bring with them still camera or video camera operators to record the seizure; and it is further

ORDERED that the computer technicians and private investigators may scan, image, or copy any paper in the possession, custody or control of the Defendants so that the information may be searched following the seizure for relevant information; and it is further,

ORDERED that Gilead shall, following the seizure, inspect the products seized bearing any of the Gilead Marks, and if any products are found to be genuine and accompanied by genuine and accurate Drug Supply Chain Security Act pedigree documentation, such products are to be returned following the termination of this action; and it is further

ORDERED that immediately upon receipt of this Order Defendants shall disclose to Gilead's attorneys and investigators the following information concerning their purchases and/or sales of any product bearing any of the Gilead Marks product from January 1, 2019 to the present: (1) the Drug Supply Chain Security Act pedigree documentation; (2) the price and quantity of each

purchase or sale; (3) the product, including the specific type or variety of product; (4) the lot numbers; (5) the contact information, including names, addresses, email addresses, and telephone numbers of all associated individuals and/or companies from which Defendants have purchased or to whom Defendants sold the products, so that Gilead or its counsel may contact those individuals and/or companies to locate and quarantine additional counterfeits and obtain evidence thereof; and it is further

ORDERED that Gilead shall be responsible to the law enforcement officers for all of their fees and charges incurred in carrying out this Order and shall hold harmless the law enforcement authority and its employees for any and all claims, asserted in any court or tribunal, arising from any acts, incidents, or occurrences in connection with the seizure and possession of the Defendant's property, including any third-party claims; and it is further

ORDERED that anyone interfering with the execution of this Order or disobeying this Order is subject to arrest by law enforcement authority and subject to contempt of court; and it is further

ORDERED that Gilead shall post an undertaking within three business days of the entry of this Order with the Clerk of the Court in the form of a bond in the sum of $50,000.00 as security for the payment of such actual and reasonable costs and damages as may be incurred or suffered by any party as a result of a wrongful seizure and for the payment of such costs and damages as may be incurred or suffered by any party as a result of any undue harm caused by this Court's Temporary Restraining Order and Order to Show Cause; and it is further

ORDERED that the parties shall appear for a hearing before this Court to confirm this Seizure Order on 8/5/2021___ at ___12:00 _ p.m.; such date not being sooner than ten (10) days

from the date of this Order and not later than fifteen (15) days from the date of this Order, absent good cause or consent of all parties to set a different hearing date; and it is further

ORDERED that any Defendant intending to oppose confirmation of this Order shall file opposition papers with this Court and serve by email and mail upon Gilead's counsel, Geoffrey Potter, Patterson Belknap Webb & Tyler LLP, 1133 Avenue of the Americas, New York, NY 10036, CounterfeitHIVMedications@pbwt.com, on or before __7/30/2021_____, and reply papers shall be filed and served by email or otherwise on or before _____8/3/2021_____, and if any Defendants fail to oppose confirmation of this Seizure Order in accordance with this paragraph, then with regard to such Defendants the seizure shall be deemed confirmed, Gilead's bond shall be released, and Gilead shall be released from any liability in connection with the seizure; and it is further

ORDERED that Defendants serve by email and mail upon Gilead's counsel, Geoffrey Potter, Patterson Belknap Webb & Tyler LLP, 1133 Avenue of the Americas, New York, NY 10036, CounterfeitHIVMedications@pbwt.com, five days before the confirmation hearing scheduled herein, copies, to the extent originals were not seized and sequestered, of all business records, inventory records, invoices, emails, text messages, instant messages, WhatsApp messages, photographs, contacts, bank records, wire transfers, correspondence, books of account, letters of credit, receipts or other documentation relating or referring in any manner to the manufacture, promotion, publicity, advertising, receiving, acquisition, importation, shipment, purchase, sale, offer for sale or distribution of any merchandise bearing any of the Gilead Marks (as defined below), whether such information is stored in a written or computerized form, and any merchandise bearing any of the Gilead Marks that are in the possession, custody, or control of any Defendant; and it is further

ORDERED that all documents, records and communications (including without limitation all electronic documents and emails) seized pursuant to this Order shall, upon removal from the premises, be maintained solely in the possession and custody of UnitedLex, and UnitedLex shall not provide access to, or copies of, any such documents, records, and communications, to any party other than Defendants (including without limitation to Gilead, Gilead's counsel, or Gilead's independent investigators) except as set forth in this Order or in any separate Order of this Court; and it is further

ORDERED that UnitedLex may review all documents, communications, computer files, and electronic data seized pursuant to this Order to identify documentation relating or referring in any manner to Defendants' businesses, the manufacture, packaging, promotion, publicity, advertising, receiving, acquisition, importation, return, shipment, purchase, sale, offer for sale or distribution of any merchandise bearing or possibly bearing the Gilead Marks, or any claim or defense in this action, and on a rolling basis shall electronically provide those documents to Defendants or counsel for Defendants, and Defendants or counsel for Defendants shall have 24 hours to designate any of them as protected by the attorney-client privilege, work-product immunity, or any other applicable privilege or immunity ("Claimed Privileged Documents"), and no later than the end of the 24-hour period generate a log of all Claimed Privilege Documents in conformance with Fed. R. Civ. P. 26(b)(5)(A) (the "Privilege Log") and provide the Privilege Log to UnitedLex and Gilead's attorneys; and it is further

ORDERED that following the 24-hour period, UnitedLex shall promptly provide to Gilead's attorneys copies of all documents provided to Defendants' attorneys that are not included on the Privilege Log; and it is further

ORDERED that the seizure of any documents, records, or communications pursuant to this Order and the review of such documents, records, or communications by UnitedLex shall not be construed to effect or constitute the waiver of attorney-client privilege, work-product immunity, or any other privilege or immunity; and it is further

ORDERED that the following confidentiality provisions shall apply to all documents and all other materials obtained by Gilead from Defendants (the "Material"), until such time as the Court enters a comprehensive confidentiality order in this case:

1.      Gilead shall not disclose any Material to any persons, except the following, who shall treat such information as confidential in accordance with the terms of this Order:

       (a)    The Court and its officers, and any court reporters employed in this action;

       (b)    lawyers, legal assistants, and support personnel at Gilead's outside counsel, and investigators and experts employed by Gilead's outside counsel;

       (c)    Gilead's in-house attorneys, legal assistants, and support people that work with them with a need to know, including those who deal with applicable regulatory agencies;

       (d)    Gilead's corporate security employees and those employees who support Gilead's anti-counterfeiting efforts;

       (e)    Gilead's customer service people employed in connection with Gilead's patient information line;

       (f)    government agencies, including those responsible for law enforcement and pharmaceutical licensing, sales, and distribution; and

       (g)    fact witnesses or expert witnesses at trial or deposition.

2.      The provisions noted above relating to the Material shall not apply to any Material that:

(a)    is, was, or becomes public knowledge, as long as it became so not in violation of this Order,

(b)    is lawfully acquired by Gilead from a person or entity, other than Defendants, that has the right to possess and disclose such Material;

(c)    was lawfully possessed by Gilead prior to entry by the Court of this Order; or

(d)    Defendants subsequently agree in writing that the Material is not Confidential.

3.     Nothing in this Order relating to the treatment of the Material shall be taken as indicating that any of the Materials are in fact confidential or entitled to confidential treatment. Gilead may at any time seek an order from the Court, on notice to counsel for Defendants, determining that specified Materials or categories of Materials are not entitled to be treated as confidential.

4.     All Material that is filed with the Court, and any pleadings, motions, or other papers filed with the Court disclosing any such Material, shall be filed under seal and kept under seal by the Clerk of this Court until further order of the Court.

5.     A person who receives a subpoena or other request for production or disclosure of any of the Material from any person, other than a government agency or law enforcement agency, shall give prompt written notice to Defendants to enable them to take such action as they deem appropriate to protect the confidential status of the Material. Requests for the Material from a government agency or law enforcement agency shall be complied with without notice to any of Defendants; and it is further

ORDERED that service by any person of this Order, the papers upon which it was granted, and the summons and complaint in this action shall be made at the time of the seizure by delivering true copies thereof to any person of suitable age found at the premises or, if no persons are present,

by leaving them in a conspicuous place at the premises, and that such service be deemed sufficient service.

The Court has granted the foregoing Seizure Order without prior written or oral notice to Defendants because it clearly appears from specific facts as follows:

(a)     The entry of any Order other than a Seizure Order without notice will not serve to adequately achieve the objectives underlying the Trademark Counterfeiting Act of 1984;

(b)     Gilead has not publicized the proposed Seizure Order;

(c)     Gilead has provided the United States Attorney for the Eastern District of New York with notice of their application for a Seizure Order pursuant to 15 U.S.C. § 1116(d)(2);

(d)     Gilead has provided the Court with substantial evidence that Defendants have used counterfeit marks in connection with the sale, offering for sale, or distribution of goods, and the Court concludes that Gilead is likely to succeed in so demonstrating;

(e)     Gilead will incur immediate and irreparable injury if this Court declines to grant a Seizure Order without notice;

(f)     The matters subject to said Seizure Order likely will be located at the locations to be searched;

(g)     The harm to Gilead should this Court decide not to grant Gilead's motion for a Seizure Order outweighs any harm which Defendants may incur in the event this Court grants Gilead's motion for a Seizure Order; and

(h)     Defendants, or persons acting in concert with them, would likely destroy, move, hide, or otherwise make inaccessible to the Court the matters that are subject to the proposed Seizure Order if Gilead is required to proceed on notice.

Rachel P. Kovner

/s/   *Rachel P. Kovner*

UNITED STATES DISTRICT JUDGE

Issued:        July _23rd___, 2021 at _2:17__ p.m.

11

# Exhibit OO

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br>       Plaintiff & Counterclaim-Defendant, <br><br>   v. <br><br> GILEAD SCIENCES, INC. and <br> GILEAD SCIENCES IRELAND UC, <br><br>       Defendants & Counterclaim-Plaintiff. | C.A. No. 19-02103-MN |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO**
**PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Gilead Sciences, Inc. ("GSI") and Gilead Sciences Ireland UC ("GSIUC") (collectively, "Defendants") hereby respond to Plaintiff United States of America's (the "Government" or "Plaintiff") First Set of Interrogatories, served on September 4, 2020.

## GENERAL OBJECTIONS

1.     Defendants object to each Interrogatory and each Definition and Instruction to the extent that they attempt to impose burdens or requirements on Defendants that exceed or differ from the requirements of Rules 26 and 33 of the Federal Rules of Civil Procedure; the Local Rules; the District of Delaware's Default Standard for Discovery; the Court's Scheduling Order (D.I. 27); the Stipulated Protective Order entered by the Court (D.I. 48); or any other applicable rule or order. Defendants' responses are limited to the scope of the discovery set forth therein.

2.     Defendants incorporate by reference herein their objections to Plaintiff's Corrected First Set of Requests for Production of Documents and Things (Nos. 1-182).

*e.g.*, it requests, (1) information related to Defendants' "process for monitoring publications, applications, and/or patents relating to the technical field and/or marketplace of Gilead's pharmaceutical products) or use of such products," and (2) information about "any changes thereto or implementation thereof from 2007 to present."  Accordingly, Defendants' reserve their rights to decline to answer subsequent interrogatories that exceed the limitation of the number of interrogatories allowed by the Federal Rules of Civil Procedure and the Court's Scheduling Order (D.I. 27).

Subject to the foregoing General and Specific Objections, Defendants will not provide a response because this Interrogatory seeks overbroad, irrelevant information.  Defendants are willing to meet and confer to discuss what relevant information the Government is seeking through this Interrogatory.

**Interrogatory No. 10:**

Describe in detail all legal and factual bases for your assertion that the Government's causes of action are barred, in whole or in part, by any statute or legal doctrine, including but not limited to your assertion in Gilead's Second Amended Answer and Counterclaims (D.I. 21 at 89 (¶ 82), 90 (¶85)) that the Government lacks standing or authority to own or assert one or more of the Patents-in-Suit, and your assertion that the Government is barred by 35 U.S.C. § 288 from recovering any costs associated with this action.

**Response to Interrogatory No. 10:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this Interrogatory to the extent that it seeks information that is protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity.

Defendants further object to this Interrogatory because it contains multiple discrete subparts, each of which constitutes an individual Interrogatory in accordance with Rule 33(a)(1) because, *e.g.*, it requests contentions related to, (1) "standing," (2) the Government's "authority

– 23 –

to own or assert one or more of the Patents-in-Suit," and (3) Defendants' "assertion that the Government is barred by 35 U.S.C. § 288 from recovering any costs associated with this action." Accordingly, Defendants' reserve their rights to decline to answer subsequent interrogatories that exceed the limitation of the number of interrogatories allowed by the Federal Rules of Civil Procedure and the Court's Scheduling Order (D.I. 27).

Subject to the foregoing General and Specific Objections, Defendants incorporate the allegations in Defendants' Second Amended Answer and Affirmative Defenses and Defendant Gilead Sciences, Inc.'s Second Amended Counterclaims (D.I. 21). Defendants further respond that:

1.  With respect to standing, among other things, the Government has the burden to demonstrate that it owns the Patents-in-Suit, *see, e.g.*, *Sicom Systems, Ltd. v. Agilent Technologies, Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005), and "must produce a written instrument documenting the transfer of proprietary rights in the patent." *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000). The Government has not done so.

2.  With respect to the Government's "authority to own or assert one or more of the Patents-in-Suit," Defendants respond that the Government has cited a provision of the Bayh-Dole Act, 35 U.S.C. § 207(a)(3), as authorizing it to file infringement suits. However, that statutory provision only authorizes the Government "to protect and administer rights to federally owned inventions"—*i.e.*, license rights—and not to engage in affirmative litigation. To the contrary, the only court that appears to have addressed this issue held that the public is permitted to use government-owned patents as matter of policy. *Tektronix Inc. v. United States*,

351 F.2d 630 (Ct. Cl. 1965) (entering summary judgment on government's infringement counterclaim based on implied license to the public).  Commentators have likewise questioned the Government's authority to assert patent infringement claims.  *See, e.g.*, Comment, Thomas Lizzi, *Form Benevolent Administration to Government Employee Inventions, Human Genomes, and Exclusive Licensing: Is Governmental Ownership of Patents Constitutional?*, 34 Duq. L. Rev. 299 (1996); Note, Jerry Cohen, *The Constitution and Enforcement of Government Owned Patent Rights*, 5 IDEA 261 (1961); Frank J. Willie, *Government Ownership of Patents*, 12 Fordham L. Rev. 105 (1943); Thomas Ewing, *Government Owned Patents*, J. Pat. Off. Soc'y 149 (1928).

3.  With respect to 35 U.S.C. § 288, Defendants respond that the Government may not recover costs for its claims under any of the Asserted Patents because at least some claims (*e.g.*, the asserted claims) of the Patents-in-Suit are indisputably invalid, as explained throughout Defendants' Second Amended Answer and Affirmative Defenses and Defendant Gilead Sciences, Inc.'s Second Amended Counterclaims (D.I. 21).  Additionally, 35 U.S.C. § 288 bars a patentee from recovering costs if it does not file a disclaimer of any invalid claims in the patent before bringing an infringement suit.  The Government filed this action asserting infringement of U.S. Patent Nos. 9,044,509 and 9,579,333 on November 6, 2019; only later, on December 2, 2019, did the Government disclaim invalid claims 12 and 14-18 of U.S. Patent No. 9,044,509 and invalid claims 12 and 14-17 of U.S. Patent No. 9,579,333.  The Government is therefore barred from recovering costs

for its claims under U.S. Patent Nos. 9,044,509 and 9,579,333 by 35 U.S.C.

§ 288.

Defendants' investigation of the facts relevant to this action is ongoing, and Defendants reserve the right to supplement this response upon receipt of additional information obtained through fact and expert discovery and in accordance with the Court's Scheduling Order (D.I. 27), including the deadlines for final contentions and expert disclosures, and in view of the Court's claim construction rulings.

Dated:  October 21, 2020

OF COUNSEL:

Ronald C. Machen
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363
Ronald.Machen@wilmerhale.com

David B. Bassett
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
David.Bassett@wilmerhale.com

Vinita C. Ferrera
Emily R. Whelan
George P. Varghese
Timothy A. Cook
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
Vinita.Ferrera@wilmerhale.com
Emily.Whelan@wilmerhale.com
George.Varghese@wilmerhale.com
Tim.Cook@wilmerhale.com

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Alexandra M. Ewing (#6407)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
ewing@rlf.com

*Counsel for Defendants Gilead Sciences,*
*Inc. & Gilead Sciences Ireland UC*

# Exhibit PP

| 96th Congress<br>*2d Session* | HOUSE OF REPRESENTATIVES | Rept. 96<br>1307 Part I |
|---|---|---|

# AMENDING THE PATENT AND TRADEMARK LAWS

September 9, 1980.—Ordered to be printed

Mr. Kastenmeier, from the Committee on the Judiciary,
submitted the following

# REPORT

[To accompany H.R. 6933]

[Including cost estimate and comparison of the Congressional Budget Office]

The Committee on the Judiciary to whom was referred the bill (H.R. 6933) entitled: "To amend the patent and trademark laws", having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendment to the text of the bill is a complete substitute therefor and appears in italic type in the reported bill.

The title of the bill is amended to reflect the amendment to the text of the bill.

## Statement

### THE NEED FOR THE LEGISLATION

Many analysts of the U.S. economy have warned that the roots of the current recession lie in a longer term economic malaise which arises out of a failure of American industry to keep pace with the increased productivity of foreign competitors.[1]

According to the Committee for Economic Development, "the slowing of productivity improvement during the past few years parallels the discouraging decline in the rate of investment in plant and equipment."[2] The rate of investment as a proportion of GNP has averaged about one half the rate for France and Germany and about one third the rate for Japan. Further, the situation does not

[1] Report of the President's advisory Committee on Industrial Innovation, Sept. 1979.
[2] *Stimulating Technological Progress.* A statement by the Research and Policy Committee of the Committee for Economic Development, Jan. 1980. pp. 2-7.

appear to be improving. There has been an especially significant decline in total U.S. expenditures for research and development, as measured in constant dollars since 1970.[3] Since the primary means of improving productivity lies in the creation of new technologies, the decline in expenditures for research and development is especially significant to the health of the overall economy.

Testimony presented to the Subcommittee on Courts, Civil Liberties and the Administration of Justice also indicates that the Federal Government is bearing an ever increasing share of the burden of financing basic research and development.[4] This means that the effective commercialization of government financed research is becoming an ever more important issue for those who are concerned with industrial innovation. The patent policies governing the utilization of government funded reseach will become even more important when the research expected to flow out of recent Congressional enactments such as the Energy Security Act of 1980 [5] begins to produce usable new technologies. It is highly likely that the fuel which powers our automobiles and the boilers which heat our homes will owe part of their chemical composition or mechanical operation to patented research developed in part by government funds. At the present time U.S. companies desiring to use government funded research to develop new products and processes must confront a bewildering array of 26 different sets of agency regulations governing their rights to use such research. This bureaucratic confusion discourages efficient use of taxpayer financed research and development.

HISTORY OF THE BILL

The crisis in U.S. productivity and the governmental role in it has not gone unnoticed, however. In May of 1978 the President called for a major policy review of industrial innovation as the key to increased productivity in the United States. This White House call to action resulted in the creation of an advisory Committee of more than 150 senior representatives from the industrial, public interest, labor, scientific, and academic communities. The work of the Advisory Committee was overseen by a cabinet level coordinating committee chaired by the Secretary of Commerce. The Committee studied all the areas in which federal government policy impacts on productivity and innovation in the private sector. These fields of inquiry included: economic and trade policy; environmental, health and safety regulations; anti-trust enforcement; federal procurement policies, and federal patent and information policies.

When the advisory committee issued its 300 page report last year, a key segment contained recommendations on government patent policy. These recommendations, in turn, were received by the President, and formed the basis of a major legislative proposal which was conveyed to the Congress. Special emphasis was placed on the role of the patent system and the patent policy regarding government funded research in promoting industrial innovation. These patent related recommendations were forwarded to the Com-

---

[3] *Science Indicators,* National Science Board, 1976, pp. 108–115.
[4] Testimony of Pindaros Roy Vagelos, M.D., before the subcommittee on Courts, Civil Liberties and the Administration of Justice April 15, 1980, transcript p. 14.
[5] P.L. 96–294.

3

mittee on the Judiciary and are embodied in H.R. 6933 and H.R. 3806.

H.R. 6933 has three major thrusts. First, it strengthens investor confidence in the certainty of patent rights by creating a system of administrative reexamination of doubtful patents. Secondly, it strengthens the financial resources of the Patent Office to provide fast and accurate processing of patent applications by revising the fee structure of the Office. Finally, the existing melange of 26 different agency policies on vesting of patent rights in government funded research is replaced by a single, uniform national policy designed to cut down on bureaucracy and encourage private industry to utilize government funded inventions through the commitment of the risk capital necessary to develop such inventions to the point of commercial application.

H.R. 3806 embodies another recommendation of the Advisory Committee and the President. It grants jurisdiction over appeals in patent cases to a single court of appeals—ending the current legal confusion created by 11 different appellate forums, all generating different interpretations of the patent law. The new court will do a great deal to improve investors' confidence in patented technology.

In addition to the three broad areas already outlined, H.R. 6933 addresses the special needs of Universities and small businesses when they attempt to deal with patent issues arising out of government contracts. Both of these groups lack the resources to cope with the bewildering regulatory and bureaucratic problems associated with transfer of patent rights pursuant to government contracts; and the university sector in particular is an important link to the private sector.

The Subcommittee on Courts, Civil Liberties and the Administration of Justice held seven days of hearings on H.R. 6933 and related patent law proposals. In all, over thirty witnesses from Government, the private Bar, industry, education, small business, and the judiciary offered testimony on the various legislative proposals before the subcommittee. Hearings were followed by four days of markup, during which H.R. 3806, creating a new Court of Appeals for the Federal Circuit, H.R. 6933, containing reforms in patent policy and procedures, and H.R. 6934, clarifying the law of copyright of computer programs, were reported favorably. Each bill was reported unanimously. The unanimous votes, particularly on H.R. 6933, were cast only after careful examination of the legislation in light of the criticisms made during the hearings and after consultation with members of the Committee on Science and Technology, which shares jurisdictional interest. During the course of markup H.R. 6933 was amended substantially to respond to criticisms raised during the hearing.

## SUMMARY OF THE BILL

H.R. 6933, as amended, addresses four major issues. Section 1 provides for a system of administrative reexamination of patents within the patent office. This new procedure will permit any party to petition the patent office to review the efficacy of a patent, subsequent to its issuance, on the basis of new information about preexisting technology which may have escaped review at the time of the initial examination of the patent application. Reexamination

4

will permit efficient resolution of questions about the validity of issued patents without recourse to expensive and lengthy infringement litigation. This, in turn, will promote industrial innovation by assuring the kind of certainty about patent validity which is a necessary ingredient of sound investment decisions.

The cost incurred in defensive patent litigation sometimes reaches $250,000 for each party, an impossible burden for many smaller firms. The result is a chilling effect on those businesses and independent inventors who have repeatedly demonstrated their ability to successfully innovate and develop new products. A new patent reexamination procedure is needed to permit the owner of a patent to have the validity of his patent tested in the Patent office where the most expert opinions exist and at a much reduced cost. Patent office reexamination will greatly reduce, if not end, the threat of legal costs being used to "blackmail" such holders into allowing patent infringements or being forced to license their patents for nominal fees.

The reexamination of issued patents could be conducted with a fraction of the time and cost of formal legal proceedings and would help restore confidence in the effectiveness of our patent system. The bill does not provide for a stay of court proceedings. It is believed by the committee that stay provisions are unnecessary in that such power already resides with the Court to prevent costly pretrial maneuvering which attempts to circumvent the reexamination procedure. It is anticipated that these measures provide a useful and necessary alternative for challengers and for patent owners to test the validity of United States patents in an efficient and relatively inexpensive manner.

Sections 2 through 5 of H.R. 6933 provide for a new fee structure for the patent office. At the present time patent examination fees are established by statute, last revised in 1967. When enacted, the present fee structure provided revenues which met 67 percent of the costs of operating the Patent Office. Inflation has now reduced the impact of those fees to the point where they generate only 27 percent of the funding necessary to the operation of the office.

At the present time patent fees average about $239 per application.[6]

H.R. 6933 would entirely revise the fee structure. It grants the Commissioner the power to establish fees. As introduced, the bill provided that the fee level would be revised yearly to generate 60 percent of the revenue needed to operate the office. However, the subcommittee amended the bill to reduce that level to 50 percent. This was in response particularly to criticism from small business and individual inventors that the fees would place too great a burden on those groups.

In order further to soften the impact on small business and individual inventors, the fees are to be paid in four installments over the life of the patent. This system, known as maintenance fees, is in use in most advanced industrial nations and has the advantage of deferring payment until the invention begins to return revenue to the inventor.

---

[6] Testimony of Honorable Sidney Diamond, Commissioner of Patents, April 24, 1980—p. 50.

5

Should the invention prove to have no commercial value, the inventor has the option of permitting the patent to lapse, thus avoiding all further fees.

Section 6 of H.R. 6933 provides for a uniform policy governing the disposition of patent rights in government funded research. This would replace the 26 different agency policies now in effect. There are two patent policies provided in this section. Non-profit research institutions and small businesses are given preferential treatment. The legislation establishes a presumption that ownership of all patent rights in government funded research will vest in any contractor who is a non-profit research institution or a small business. This portion of H.R. 6933 substantially incorporates legislation separately introduced, H.R. 2414 (S. 414), entitled the University, Small Business Patent Policy Act.

Large businesses are governed by a separate policy. They receive exclusive licenses for specific uses they intend to commercialize. As with small business and universities, here too the presumption lies with the granting of exclusive rights to the Contractor.

Critics of the bill testified that it would be impossible for a contractor to determine in good faith his ability to commercialize in a particular field of use at the time of disclosure of the invention.

As a result and for the purposes of foreign rights, the subcommittee approved an amendment which grants temporary title to a contractor for up to four and one half years before requiring him to specify his fields of use. This provides for more flexibility for the contractor while at the same time protecting the taxpaying public because:

1. The government, not the contractor, will obtain ownership of patent rights to contract inventions.

2. The government will permit contractors to obtain exclusive licenses but only for fields of use in which they intend to commercialize a patented invention.

3. The government has the right to deny the transfer of exclusive rights for any field of use within 90 days of the contractor's disclosure of a field or fields of use he intends to commercialize.

4. Public interest antitrust and national security standards are to be applied by the government in making such determination whether to deny an exclusive license.

From a contractor point of view, the amendment offers many of the advantages of patent ownership, including full title abroad and the right to sublicense domestically.

From an innovation point of view, the requirement that exclusive licenses be limited to specified fields of use that the contractor intends to commercialize should prevent sitting on technology, and spur innovation.

Some contractors, particularly in the defense area, will lose some rights which they presently receive through full waiver. However, the overwhelming number of contractors will receive faster, more efficient treatment under these provisions. For example, delays in acting on patent right waiver requests, which now take on the average a year and a half in agencies like the Department of Energy, will be eliminated. Contractors will know their rights with certainty within 90 days of identifying a specific field of use under a patent to a government financed invention.

6

In developing the amendment to this section, it should be noted that the subcommittee worked closely with the Science and Technology Committee, and it is particularly grateful to members of that Committee for their contributions.

Finally, sections 9 and 10 of the bill, as reported by the subcommittee, reflect amendments which are designed to respond to the criticism of witnesses who argued both that the Patent Office ought to be independent of the Department of Commerce and that the present search files of the Office fail to effectively utilize modern computer technology.

### SECTION-BY-SECTION ANALYSIS

#### REEXAMINATION

Section 1 of the bill would add seven new sections to the patent laws to establish a patent reexamination system. These seven new sections would constitute chapter 30 of title 35 of the United States Code.

#### Section 301. Citation of prior art

Section 301 provides statutory authority for the citation to the Patent and Trademark Office (PTO) of prior art consisting of patents or printed publications which a person believes to have a bearing on the patentability of any claim of a particular patent. Section 301 would make clear that a citation of prior art is not to be included in the official file on a patent unless the citer submits a written statement as to the pertinency and applicability to the patent. Section 301 also would require the PTO to keep the identity of the citer of prior art confidential if the citer so requests in writing. Without the confidentiality provision, competitors of a patent owner might be reluctant to cite prior art to the PTO.

#### Section 302. Request for reexamination

Section 302 provides authority for any person to seek reexamination by the PTO on the basis of the patents and printed publications cited under section 301. Such a person need not be the one who cited prior art under section 301. The person could even be the patentee.

Section 302 requires that the person seeking reexamination pay a fee established by the Secretary. Under section 2 of this bill, the Secretary would be required to establish a fee to recover the estimated average cost of a reexamination proceeding. Thus, those who request reexamination would pay for it.

Section 302 requires the Commissioner to send a copy of the request promptly to the patent owner, as shown by the records of the Office. The patent owner would have to see that his ownership and current address are recorded properly so that the request is not sent to a previous owner.

#### Section 303. Determination of issue by Commissioner

Subsection 303(a) requires the Commissioner to determine if a "substantial new question of patentability" is raised in connection with any claims of the patent against which a patent or printed publication is cited and to order reexamination upon a positive de-

termination. Further, it would permit the Commissioner to initiate reexamination without a request upon a determination that a substantial new question of patentability is raised by patents or publications discovered by him or cited under the provisions of section 301. This authority to initiate reexamination without a request is not intended to abrogate in any way the right of the United States to sue to cancel a patent obtained by fraudulent means.

This "substantial new question" requirement would protect patentees from having to respond to, or participate in unjustified reexaminations. Further, it would act to bar reconsideration of any argument already decided by the Office, whether during the original examination or an earlier reexamination.

Subsection 303(b) requires that the Commissioner's determination be recorded in the file of the patent and a copy promptly sent to the patent owner and the person requesting the reexamination.

Subsection 303(c) makes final and nonappealable a decision by the Commissioner not to conduct reexamination. In such a case, however, a portion of the reexamination fee could be returned.

No one would be deprived of any legal right by a denial by the Commissioner of a request for reexamination. A party to a reexamination proceeding could still argue in any subsequent litigation that the PTO erred and that the patent is invalid on the basis of the cited prior art.

### Section 304. Reexamination order by Commissioner

Section 304 specifies the initial steps to be taken where the Commissioner determines that reexamination should be ordered. Upon issuance of a determination ordering reexamination, the patent owner would be given the opportunity to file a statement with the Office and, if he wishes, to propose an amendment to the specification or claims of his patent as well as a new claim or claims in response to the Commissioner's determination. The patent owner would be required to serve a copy of any such statement and any proposed amendment on the person requesting reexamination, who would be permitted to file a reply with the Office, with service required on the patent owner.

### Section 305. Conduct of reexamination proceedings

Section 305 governs the conduct of the actual reexamination proceeding. Section 305 specifies that after the initial exchange permitted under section 304, the PTO will utilize the same procedures it uses for the initial examination of patent applications under patent law sections 132 and 133. The patent owner could propose an amendment to his patent specification or claims, as well as propose a new claim or claims, to distinguish his invention from the prior art cited under section 301. However, the bill would prohibit the Commissioner from granting during reexamination any amended or new claim that enlarges the scope of a claim of the original patent. Also, the bill would require reexamination to be promptly handled, so as to make it as helpful as possible.

### Section 306. Appeal

Section 306 grants a patent owner the right to pursue the same appeal routes available to patent applicants. An adverse decision on reexamination by the primary examiner could be appealed to

the Board of Appeals. Adverse final decisions on reexamination by the Board of Appeals or by the Commissioner could be appealed to the U.S. Court of Customs and Patent Appeals or de novo review of the reexamination decision could be sought in the United States District Court for the District of Columbia.

## Section 307. Certificate of patentability, unpatentability, and claim cancellation

Section 307(a) requires the Commissioner at the conclusion of reexamination to cancel any patent claim found to be unpatentable, confirm any patent claim found to be patentable, and add any amended or new claims found to be patentable.

Subsection 307(b) provides intervening rights similar to those provided by patent law section 252 with respect to reissued patents. Thus, a person practicing a patented invention would not be considered an infringer for the period between issuance of an invalid patent and its conversion through reexamination to a valid patent.

It ordinarily is in the interests of both parties to expedite the disposition of patent litigation. A party discovering new prior art on which reexamination might be conducted ordinarily will reveal it promptly to the patent owner. If he does not, the court may exercise its equity power by allowing the patent owner to request reexamination later in the trial, or precluding the party from relying on such prior art or by other appropriate measures.

### ADMINSTRATIVE FEE SETTING

Section 2 of the bill would restructure and modernize completely section 41 of title 35, United States Code—the basic fee provision of the patent laws.

The committee recognizes that the PTO, in issuing patents and registering trademarks, performs a significant public service in implementing the Federal patent and trademark laws and also confers benefit on private persons who seek to protect their intellectual property. The Committee, therefore, supports the premise that patent applicants and those seeking to register trademarks should bear a significant share of the cost of operating the PTO by the payment of fees. However, the Committee has made certain amendments to the formula which empowers the Commissioner to set these fees. Certain costs of operating the PTO confer no direct benefit on applicants but rather go to meet the responsibility of the Federal Government to have a PTO in order to execute the law. For example, the cost of executive direction and administration of the office, including the Office of the Commissioner and certain agency offices involved with public information, legislation, international affairs and technology assessment. Maintaining the public search room confers a general public benefit, as does the maintenance of the patent files in depository libraries. The contribution to the World Intellectual Property Organization relative to the Patent Cooperation Treaty is a treaty obligation. These costs should be paid for entirely from appropriated funds.

The committee inserted the word "actual" in this legislation to describe those costs which should be assumed 50 percent by applicants. Patent applicants should bear through the payment of fees, 25 percent in processing of fees, and 25 percent in maintenance

9

fees, the cost of the patent examiners and their clerical support, as well as quality review, appeals, interferences, and patent printing including internal PTO printing costs. Also, "actual" is intended to exclude from such costs the acquisition or replacement of equipment where such acquisition or replacement involves substantial capital outlays. Such expenditures would be paid from the Patent and Trademark Office's appropriation. The cost of data and document retrieval systems, however, to the extent that these expenditures goes toward the reclassification of the patent search file, should be borne 50 percent by the public. These are the actual costs of processing patent applications, an activity which confers certain direct benefits on private persons.

The committee notes that the PTO furnishes to the public copies of issued patents for a fee. The costs to the PTO of such copies should be charged to applicants.

The trademark examiners and their clerical support, the trial and appeal process, and trademark printing should be paid for to the extent of 50 percent by applicants for the registration of trademarks.

Some of the cost of operating the PTO confers no direct benefit to the general public, but rather goes to providing services to private parties. The cost of customer services such as providing copies should be recovered 100 percent in fees. Also, in the patent process, drafting and assignments should be self-supporting.

ILLUSTRATIVE EXAMPLE OF PTO RECOVERY POLICY—BASED ON FISCAL YEAR 1981 BUDGET

I. Government 100 percent: Commissioner (includes Office of Information Services); Office of Legislation and International Affairs; Management planning; Administrative services; Automatic data processing; and Search room.

II. Government 50 percent/users 50 percent: Examination—professional staff; Quality review; Clerical force; Appeals; Interferences; Patent printing; Solicitor; Data and document retrieval; publication services; Examination of trademarks; Trademark trial and appeal; and Trademark printing.

III. Users 100 percent: Customer services; drafting; and assignment.

*Section 41. Patent fees*

Subsection 41(a) authorizes the Secretary of Commerce to set fees administratively for processing a patent application, for maintaining a patent in force, and for providing all other patent services and materials.

Subsection 41(b) requires the Secretary of Commerce to establish fees for processing patent applications, from filing to disposition by issuance or abandonment, equal in aggregate to 25 percent of the estimated average cost of actually processing an application. As fee revenues and costs change, the Secretary would adjust fees to achieve the specified recovery rate once every three years. These fees are those of the type now specified in paragraphs 1, 2, 3, and 6 of existing subsection 41(a) of the patent laws. The Secretary would have authority to eliminate or change the amounts of any of the present fees and establish others, so long as a fee charged directly

10

relates to the actual processing of patent applications and the aggregate fees for an application effect the specified 25 percent recovery rate.

Subsection 41(b) would treat design patent processing fees differently than fees for other types of patents. Since the costs to the Office of processing design patent applications are significantly lower and maintenance fees will not be imposed, design patent applicants would be charged fees equal in aggregate to 50 percent of the estimated cost of processing such an application.

Subsection 41(c) requires the payment of maintenance fees three times in a patent's life—six months prior to the fourth, eighth and twelfth anniversaries of the patent's seventeen-year term. As required by the Paris Convention for the Protection of Industrial Property, subsection 41(c) permits late payment during a six-month grace period. Failure to pay an applicable maintenance fee by the end of the grace period would result in expiration of the patent on the date the grace period ends.

Subsection 41(c) also requires the Secretary to establish maintenance fees at levels that recover 30 percent of the costs to the Office for the year in which such maintenance fees are received of processing all applications for patents other than design patents, from filing through disposition by issuance or abandonment, by the fifteenth year following enactment of the Act.

Subsection 41(d) requires the Secretary to establish fees for all other patent-related services and materials at levels which will recover the full costs to the Office of performing those services or providing those materials. Fees would be adjusted as costs vary. Subsection 41(d), however, would maintain the existing subsection 41(a)(9) fee of $50 for providing a depository library with uncertified printed copies of the specifications and drawings for all patents issued in a year.

Subsection 41(e) allows the Commissioner to waive any fee for a service or product provided to a government agency. This authority now is provided in existing subsection 41(c).

Subsection 41(f) limits the adjustment of patent application processing fees and maintenance fees to once every three years.

Subsection 41(g) imposes a notice requirement on effective date of new or adjusted fees.

CREDITING OF FEE REVENUE TO THE PTO APPROPRIATION ACCOUNT

Section 3 of this bill would amend section 41 of title 35, United States Code, by completely rewriting it.

*Section 42. Patent and Trademark Office funding*

Subsection 42(a) makes all fees for Patent and Trademark Office services and materials payable to the Commissioner of Patents and Trademarks. This provision is carried over from existing section 42.

Subsection 42(b) requires all fee revenues and all Patent and Trademark Office appropriations to be credited to the Patent and Trademark Office Appropriation Account in the Treasury of the United States. At present, Patent and Trademark Office fee revenues are deposited in the general fund of the Treasury and are unavailable for directly funding PTO activities.

11

Subsection 42(c) makes fee revenues credited to the PTO Appropriation Account available to the Secretary of Commerce to carry out the activities of the Patent and Trademark Office. Budgetary control is maintained since the PTO would continue to receive appropriations and the use of fee revenues would be limited "to the extent provided for in an appropriations Acts."

Subsection 42(d) authorizes the Secretary to refund any fee paid by mistake or any account paid in excess of that required. This authority is found in existing section 42.

### TECHNICAL AMENDMENT

Section 4 of the bill is a technical amendment to section 154 of the patent laws necessitated by creation of the maintenance fee system.

### TRADEMARK FEES

Section 5 of the bill amends existing section 31 of the Trademark Act of 1946 as amended (15 U.S.C. 1113) to modernize the trademark fee system. The present statutory fees specified in this section would be replaced by fees established by the Secretary.

*Section 31. Fees*

Subsection 31(a) permits the Secretary to eliminate or vary some present fees and to establish others. Fees for trademark examination and processing, as well as for products and services provided in connection with trademarks, would be required to recover 50 percent of all costs of these products and services. Fees could be changed only once every three years.

Subsection (b) permits the Commissioner to waive the payment of any fee in connection with an occasional request from another government agency, and provides that no fee shall be charged to the Indian Arts and Crafts Board to register government trademarks of genuineness and quality for Indian products or for products of particular Indian tribes and groups.

### GOVERNMENT PATENT POLICY

Section 6 of the bill amends title 35 of the United States Code by adding after chapter 37 a new chapter 38, entitled the Government Patent Policy Act of 1980, to establish a uniform federal system for the commercialization and allocation of rights in inventions resulting from federally sponsored or supported research and development. Chapter 38 is divided into four subchapters which together add thirty-one new sections to title 35.

*Section 381. Title*

Section 381 provides for the chapter to be known as the Government Patent Policy Act of 1980.

12

## Subchapter I—Contract Inventions

*Section 382. "Contract inventions"; reporting*

Section 382 defines "contract inventions" and sets forth a contractor's responsibility with regard to a contract invention.

Subsection (a) defines "contract inventions" as "inventions made in the course of or under Federal contracts."

Subsection (b) requires that all contractors provide the responsible Federal agency with timely reports on each contract invention containing sufficient technical information to inform the Government as to the nature of the invention and a list of each country, if any, in which the contractor elects to file a patent application. The Government is prohibited from publishing or releasing these reports until the earlier of one year from receipt of the invention disclosure or the contractor has had a reasonable time to file a patent application; the Government also must withhold such information from other records or reports. The temporary prohibition on publishing or releasing contractor reports or information is necessary in order to avoid the possible forfeiture of patent protection in some countries. Subsection (c) provides that the responsible agency may deprive a contractor who unreasonably fails to file the reports required by subsection (b) of any or all of the rights it otherwise would have under subchapter I pertaining to the contract invention for which such report has been unreasonably withheld.

*Section 383. Allocation of rights—Small businesses and nonprofit organizations*

Subsection (a) provides for the acquisition of title to contract inventions by contractors which are either a small business or a nonprofit organization. They would acquire title in each country listed under section (b)(2) of section 382 in which they filed a patent application within a reasonable time; their title would be subject to the Government's minimum rights under section 386 and to march-in rights under section 387.

Subsection (b) provides for acquisition of title to contract inventions by the Government in each country in which a small business or nonprofit organization elects not to file a patent application or fails to file within a reasonable time.

*Section 384. Allocation of rights—Other contractors*

Subsection (a) provides that a contractor that is not a small business or nonprofit organization will have four and one-half years from the filing of an invention report under section 382(b) to select one or more fields of use which it intends to commercialize or otherwise achieve public use under an exclusive license; an example of such is making the invention available to others for licensing on reasonable terms and conditions. During the four and one-half year period the contractor will have temporary title to the invention, subject to the Government's right under the Act.

Contractors are encouraged to file field of use lists from time to time, and not wait until the end of the 4½ year period. Each filing will be separately reviewed, and title to the patents in question will not pass to the Government until the filing of the final field of use list, or 4½ years, whichever is earlier.

13

Commercialization or marketing of products or processes embodying an invention may initially be accomplished by a contractor prior to reporting his field of use selection to the Government, which is a prerequisite to obtaining an exclusive license under section 384(b) and (c), if the contractor elects to initially commercialize or market such products or processes pursuant to the non-exclusive license provisions of section 385. Upon the contractor thereafter filing the field of use list or lists for such processes or products, such non-exclusive license shall become an exclusive license for the selected fields of use upon the expiration of the 90-day period provided in subsection (c) unless the Government notifies the contractor within such 90-day period of a contrary determination made under subsection (d).

Subsection (b) provides for the contractor to receive an exclusive license in each described field of use if it fields a United states patent application within a reasonable time. The contractor's license is subject to the Government's minumum rights under section 386 and march-in rights under section 387.

Subsection (c) profides that the contractor will automatically acquire an exclusive license for each described field of use by operation of law ninety days after providing the responsible agency with the field of use report required by subsection (a) of section 384 unless the agency earlier notifies the contractor of a contrary determination under subsection (d) of this section with respect to such field of use. In that case, the contractor would acquire an exclusive license by operation of law in all other selected fields of use, if any. The Committee believes that expedition and predictability are two essential ingredients of achieving commercialization of Government funded inventions and therefore intends that the 90-day period be a maximum time not subject to extension even by consent of the Contractor. Also for this reason, it is the Committee's intent that there be a prsumption in favor of the contractor receiving such exclusive license, and the Committee intends that contractors shall receive such exclusive licenses except in the most extraordinary of circumstances.

Subsection (d) sets forth the basis for an agency determination that a contractor will not receive an exclusive license in a selected field of use.

> The contractor will not acquire an exclusive license in any field of use if the responsible agency determines that the contractor's possession of such license: (1) would impair national security; or (2) would create or maintain a situation inconsistent with the antitrust laws.

Subsection (b) is intended to be permissive and is not intended to result in the creation of special sections or the hiring of additional personnel for its administration. An agency is not required to undertake any determination, perhaps preferring except in extraordinary cases, to await actual experience under the exclusive license to see whether circumstances then justify exercise of a march-in right reserved by section 387. Further, to reduce administrative burdens and to increase the security of the contractor in its knowledge that it will receive exclusive rights in the invention, the scope of the agency's inquiry underlying this determination is limited. The agency's review should focus on those unforseen antitrust and

14

national security circumstances of which it has become aware since the time of contracting that might now require it to deny the contractor an exclusive license in a particular field of use. The contractor should not be denied an exclusive license solely on the basis of facts that were known or reasonably foreseeable by the agency at the time of contracting, the agency normally will deviate from the standard patent rights clause so that the contractor will know at that time that it will not receive an exclusive license to practice a forthcoming invention in a particular field of use.

The antitrust provision of subsection (d)(2) and similar provisions throughout the bill are intended to encompass existing judicial interpretations of activities prohibited by the antitrust laws. This provision does not authorize each agency to create its own body of antitrust law or policy.; but in applying this provision each agency has the authority, subject to court review, to determine whether questionable conduct does or does not violate existing antitrust laws as judicially interpreted.

Subsection (e) provides that, whenever an agency determines that a contractor will not receive an exclusive license in any field of use, it must include in its determination written reasons, and that the contractor has the right of appeal de novo to the United States Court of Customs and Patent Appeals within sixty days after the determination is issued. the Court of Customs and Patent Appeals is given exclusive jurisdiction to affirm, reverse, or modify the agency determination. The burden of proof rests with the agency. Specifically included is the authority for the court to order the responsible agency to issue an exclusive license to the contractor.

Subsection (f) permits the contractor to obtain title to any contract invention in any foreign country in which the contractor agrees to file a patent application, unless the responsible agency determines that the national interest would be affected adversely, which should not occur except in extraordinary circumstances. However, title will be subject to the Government minimum rights under section 386 and march-in rights under section 387. If the contractor does not file a patent application within a reasonable time, then the Government may acquire title to patents on the contract invention.

*Section 385. Contractor license*

Subsection 385 automatically grants a nonexclusive, royalty free license to each contractor complying with subsection (b) of section 382 to practice the contract invention in all countries in which it neither receives title under subsection (a) of section 383 nor has an exclusive license under subsection (b) of section 384. This nonexclusive contractor license may be revoked by the Government only to the extent necessary to grant an exclusive license under subchapter III. It is expected that, so long as the contractor is pursuing commercialization of the invention under its nonexclusive license, there would be no occasion to grant an exclusive license, and, therefore, no need to revoke the contractor's non-exclusive license. It is also expected that the contractor's license to practice the invention shall include the right to grant sublicenses of the same scope, and on reasonable terms and conditions, to subsidiaries and affiliates within the corporate structure of the contractor's or-

ganization and to existing licensees who the contractor is obligated to license or to assure freedom from infringement liability.

### Section 386. Minimum Government rights

Subsection (a) sets forth the minimum rights the Government has in every contract invention, unless waived under the authority of section 388. These minimum righs included:

> (1) "The right to require from the contractor written reports on the use of the invention if patented;
>
> (2) A royalty-free worldwide license to practice the invention or have it practiced for the Government; and
>
> (3) The right to license or sublicense state and local governments to practice the invention or have it practiced for them, if the agency determines at the time of contracting that acquisition of this right would serve the national interest."

Subsection (b) requires that whenever the Government has rights in a contract invention, notice to that effect shall be included in each United States patent application and patent on the invention.

### Sec. 387. March-in rights.

Section 387 sets forth the basis on which the responsible agency may terminate the contractor's title or exclusive rights with respect to one or more fields of use in any patent on a contract invention; may require the contractor to grant appropriate license or sublicense to responsible applicants; or, if necessary, may grant such licenses or sublicenses itself.

Subsection (a) sets forth the grounds for exercise of the Government's march-in rights:

> (1) If the contractor has not taken and is not expected to take timely and effective action to achieve practical application of the invention in one or more of the fields of use selected;
>
> (2) If necessary to protect the national security;
>
> (3) If necessary to meet requirements for public use specified by Federal regulation;
>
> (4) If continuation of the contractor's rights in the invention would create or maintain a situation inconsistent with the antitrust laws; or
>
> (5) If the contractor has failed to comply with the reporting requirements of this Act with respect to such invention.

The Government may march in only in a field of use which gives rise to one or more of the situations described in the above five paragraphs. The fact that a contractor's behavior does not give rise to such a situation with respect to some fields of use will not prevent the Government from marching in in another field of use.

This section is intended to continue existing practice and the Committee intends that agencies continue to use the march-in provisions in as a restrained and judicious manner as in the past.

Subsection (b) permits the responsible agency to exercise its march-in rights either on its own initiative or in response to a petition from an interested person justifying such action. Agency failure to initiate a march-in proceeding in response to a petition is not a determination appealable to the United States Court of Customs and Patent Appeals under section 407.

Subsection (c) enables an agency to specify reasonable licensing terms whenever, in exercise of its march-in rights, it requires a contractor to grant a license or sublicense.

### Section 388. Deviation and waiver

Section 388 permits Federal agencies, to further an agency's mission and the public interest, to deviate from any standard patent rights clause issued under section 390 acquiring more or fewer rights to a contract invention.

Subsection (a) authorizes deviations either on a class basis in accordance with regulations to be issued under section 390, or, unless prohibited by those regulations, under regulations issued by an agency itself. Case-by-case deviations are permitted when authorized by the head of an agency or a designee, and described in the Federal Register. The Committee intends that agencies normally will not deviate and especially so in respect of contracts dealing with the development of defense related technology.

Subsection (b) forbids waiver under any circumstances of the national security and antitrust march-in rights reserved by sections 387(a)(2), 387(a)(4), and 387(c).

Subsection (c) forbids waiver of rights reserved by sections 384(a), and 387(a)(1), (1) in contracts involving co-sponsored, costsharing, or joint venture research to which the Contractor makes a substantial contribution of funds, technology, facilities, or equipment; or (2) in contracts with a contractor whose participation is necessary for the successful accomplishment of an agency mission and such contract cannot be obtained under the standard patent rights clause.

### Section 389. Transfer of rights to contractor employees

Section 389 authorized a contractor's employee-inventor to receive some or all of the contractor's rights to a contract invention if the responsible agency and the contractor approve. The corresponding obligations of the contractor under subchapter I then become the obligations of the employee.

### Section 390. Regulations and standard patent rights clause

Subsection 390(a) requires the Office of Federal Procurement Policy to direct the issuance of regulations implementing subchapter I, including the establishment of a standard patent rights clause or clauses.

Subsections (b), (c) and (d) require a sharing of the royalties and/or revenues with the Government to pay the Government for Federal funding of research and development. Regulations to be developed may permit waiver of some or all of this payment.

## Subchapter II—Inventions of Federal Employees

### Section 391. Employee inventions

Section 391 defines "employee inventions" as inventions made by Federal employees.

### Section 392. Reporting of inventions

Section 392(a) requires that a Federal employee report to the employee's agency all inventions made while an employee of that

17

agency. The Government is prohibited from publishing or releasing these reports until the earlier of one year after their receipt or the final disposition of rights under this subchapter.

*Section 393. Criteria for the allocation of rights*

Section 393 establishes the criteria for allocation of invention rights between the Government and its employee-inventor. Basically, the allocation depends upon the relationship of the invention to the employee's work and the use of Government resources.

Paragraph (1) provides for Government acquisition of all invention rights if the invention bears a direct relation to the duties of the employee-inventor or was made in consequence of the employee's employment.

Paragraph (2) provides that, where the invention neither bears a direct relation to the employee's duties nor was made in consequence of the employee's employment, but was made with a contribution of Federal resources, the employee may receive all rights in the invention subject to a nonexclusive royalty-free worldwide license to the Government to practice the invention or have it practiced for the Government as well as to sublicense State, local, or foreign governments if acquisition of this right would serve the national interest.

Paragraph (3) permits the Government to waive to the employee its rights under paragraph (1) of this section , subject to the Government license described in paragraph (2) of this section.

Paragraph (4) requires the Government to acquire all rights in any invention if the national security might be impaired should the employee-inventor receive rights to it, notwithstanding the provisions of paragraphs (2) or (3) of this section.

Paragraph (5) entitles an employee-inventor to all rights in an invention made by the employee not covered by paragraphs (1), (2), or (3) of this section.

Paragraph (6) permits the Government to enter into agreements allocating rights in inventions resulting from research and development to which other parties have contributed substantially, notwithstanding paragraph (1) of this section.

*Section 394. Presumptions*

Section 304 establishes rebuttable presumptions for the application of the criteria set forth in section 393.

Subsection (a) sets out employee duties which establish a rebuttable presumption that an invention falls within the criteria of paragraph (1) of section 393. Thus, for example, if an employee is assigned to conduct research and development work, it is presumed that the Government will have the right to title in any invention made.

Subsection (b) establishes a rebuttable presumption that an invention made by an employee whose duties fall outside those listed in paragraph (a) of this section falls within the criteria of paragraph (2) of section 393, reserving to the employee title to an employee-invention subject to certain license rights in the Government.

18

*Section 395. Review of agency determinations*

Section 395 provides for the review of Federal agency determinations regarding the respective rights of the Government and a Federal employee-inventor in situations in which the agency determines not to acquire all rights in an invention or where an aggrieved employee-inventor requests review. The review is to be conducted according to regulations issued under section 399.

*Section 396. Reassignment of rights*

Section 396 establishes a right in the Government to adjust the rights acquired from a Federal employee-inventor on the basis of evidence that the granting of greater rights to the employee-inventor is necessary to correct an inequitable allocation of rights.

*Section 397. Incentive awards program*

Subsection (a) provides Federal agencies the right to establish an incentive awards program which is intended to monetarily recognize Federal employee-inventors, stimulate innovative creativeness, and encourage disclosures of inventions which in turn will enhance the possibility of utilization through the Federal licensing program established under subchapter III.

Subsection (b) sets forth the criteria for making an award.

Subsection (c), (d), and (e) establish the procedures for making awards of different amounts.

Subsection (f) provides that acceptance of a cash reward constitutes an agreement by the employee-inventor that any use by the Government of an invention for which an award is made does not form the basis of a further claim of any nature against the Government by the recipient, his heirs, or assigns.

Subsection (g) requires that an award should be paid from the fund or appropriation of the agency primarily benefitting.

*Section 398. Income sharing from patent licenses*

Section 398 authorizes Federal agencies to share income from licensing the Government's patent rights with the employee-inventor.

*Section 399. Regulations*

Subsection (a) makes the Secretary of Commerce responsible for issuing regulations to implement subchapter II.

Subsection (b) provides that determination concerning a Federal employee's promotion of the employee's invention is subject to regulations to be prescribed by the Secretary of Commerce with the concurrence of the Office of Government Ethics and the Attorney General. The intention is to ensure that a Federal employee will not be prohibited from promoting his own invention if consistent with conflict of interests regulations.

**Subchapter III—Licensing of Federally Owned Inventions**

*Section 400. Covered inventions*

Section 400 provides that subchapter III applies to all federally-owned patent rights, including licenses or sublicenses granted or required to be granted by the Government under section 387, upon

19

or after exercise of the march-in provisions. However it does not apply to licenses established by the other sections of subchapter I.

### Section 401. Exclusive or partially exclusive licenses

Section 401 sets out terms and conditions under which a Federal agency may grant an exclusive or partially exclusive license.

Subsection (a) provides that an exclusive or partially exclusive domestic license not automatically granted under section 384 may be granted only after public notice and opportunity for filing written objections and only if the responsible agency determines that such licensing is necessary to achieve practical application of the invention and that the scope of proposed exclusivity is not greater than reasonably necessary.

Subsection (b) provides that an exclusive or partially exclusive foreign license may be granted only after public notice and opportunity for filing written objections and after a determination whether the interests of the Government or of United States industry in foreign commerce will be enhanced.

Subsection (c) prohibits the granting of a license under this section if the responsible agency determines that the grant would create or maintain a situation inconsistent with the antitrust laws.

Subsection (d) requires Federal agencies to maintain publicly available, periodically updated records of their determinations to grant exclusive or partially exclusive licenses.

### Section 402. Minimum Government rights

Section 402 sets forth the minimum rights the Government is to have in every exclusive or partially exclusive license. These minimum rights include:

(1) "The right to require from the licensee written reports on the use of the invention;

(2) A royalty-free, worldwide right to practice the invention or have it practiced for the Government; and

(3) The right to license State and local, to practice the invention or have it practiced for them if the agency determines that reservation of this right would serve the national interest."

### Section 403. March-in rights

Section 403 sets forth the basis on which the responsible agency may terminate an exclusive or partially exclusive license.

Subsection (a) sets forth the grounds for such termination.

(1) "If the licensee has not taken and is not expected to take timely and effective action to achieve practical application of the invention in the fields of use affected;

(2) If necessary to protect national security;

(3) If necessary to meet requirements for public use specified by Federal regulation;

(4) Continuation of licensee's rights in the invention would create or maintain a situation inconsistent with the antitrust laws; or

(5) If the licensee has failed to comply with the terms of the license."

Subsection (b) permits the responsible agency to exercise its march-in rights either on its own initiative or in response to a petition from an interested person.

20

## Section 404. Regulations

Section 404 makes the Office of Federal Procurement Policy responsible for directing the issuance of regulations specifying the terms and conditions upon which federally-owned patent rights may be licensed. Agencies are permitted to deviate from such regulations on a class basis unless prohibited by the Office of Federal Procurement Policy.

## Subchapter IV—Miscellaneous

## Section 405. Patent enforcement suits and right of intervention

Subsection 405(a) provides for enforcement of an exclusive license under the chapter by an exclusive licensee without the necessity of joining the United States or any other exclusive licensee as a party. The intention is to make the exclusive license the functional equivalent of title within the specified fields of use. However, the Attorney General and the agency that granted the license must be given prompt notice of the suit and served copies of papers as though they were parties to the suit.

Subsection (b) requires the responsible agency to notify all of its exclusive licensees of any suit by an exclusive licensee, the Government, or another person. One intention of section 405 is to provide for the adjudication of the infringement and validity of a Government-owned patent subject to this Act without the necessity of the United States appearing before the court as a party.

## Section 406. Background rights

"Background rights" refer to patent rights on non-contract inventions, those inventions which did not result from federally funded research but which may relate to the work object of a funding agreement. The committee does not contemplate that funding agreements may require the contractor to license such invention (not developed with Federal funds) to third parties. Moreover retention of background rights by Federal agencies is not considered by your committee to be consistent with the intent of this bill.

The problem of "background rights" has seriously disadvantaged certain businesses, primarily small businesses, which bid on government research and development contracts. Background rights refer to patent rights on non-contract inventions, those inventions which did not result from federally funded research, but which may relate to the work object of a funding agreement. Background rights constitute valuable property to many businesses, particularly to small firms; however, some agencies have routinely and unnecessarily required that contractors sign away their exclusive rights to background inventions as a cost of doing business with the Government. The retention of background rights by Federal agencies must be curbed unless such use is clearly justified by a national need.

## Section 407. Notice, hearing, and judicial review

Subsection (a) requires that agency determinations under sections 382, 387(a) and 387(c), and 403, must have written reasons and be preceded by public notice and an opportunity for a hearing in

which the United States, any agency, and any interested person may participate.

Subsection (b) permits the United States or an adversely affected participant to appeal a subsection (a) determination to the United States Court of Customs and Patent Appeals within sixty days after it is issued. The Court of Customs and Patent Appeals is given exclusive jurisdiction to determine the matter de novo, affirming, reversing, or modifying the agency determination. The burden of proof shall rest with the agency.

### Section 408. Relationship to other laws

Section 408 is intended to remove any implication that the act provides immunity from the antitrust laws.

### Section 409. Authority of Federal agencies

Subsections (a), (b), (c), (d), (e), and (f) set forth the authority of Federal agencies to protect patent rights at home and abroad in— "any invention in which the Government has an interest in order to promote the use of inventions having significant commercial potential or otherwise advance the national interest"—to license federally-owned patent rights; to transfer patent rights to and accept transfers of patent rights from other agencies without regard to the property transfer procedures required by the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 471); to withhold publication or release of information disclosing any invention long enough for patent applications to be filed; to promote the licensing of federally-owned patent rights; and to enter into contracts to accomplish the purpose of this section.

### Section 410. Responsibilities of the Secretary of Commerce

Section 410 provides the authorities necessary for the Department of Commerce effectively to assist other Federal agencies administer the licensing of federally-owned inventions. Paragraph (a)(2) authorizes the Secretary of Commerce to coordinate a program to help agencies carry out their authorities under section 409.

Paragraph (a)(6) authorizes the Secretary to publish notices of all federally-owned patent rights available for licensing.

Paragraph (a)(3) authorizes the Secretary to evaluate inventions referred to it by Federal agencies in order to identify those inventions with the greatest commercial potential.

Paragraph (a)(5) authorizes the Secretary to develop and manage a government-wide program, with private sector participation, to stimulate transfer to the private sector of potentially valuable federally-owned technology through the dissemination of information about the technology.

Paragraph (a)(4) authorizes the Secretary to assist the Federal agencies in seeking and maintaining patent protection in any country, including the payment of fees and costs.

Paragraph (a)(1) authorizes the Secretary to consult with the Federal agencies about areas of science and technology with commercial potential.

Paragraph (a)(7) requires the Secretary, seven years after the date of enactment of the Act, to report on its operative effect to the Congress.

Subsection (b) authorizes the appropriation to the Secretary of Commerce of such sums as thereafter may be necessary to enable the Secretary to carry out responsibilities under this section.

### Section 411. Definitions

Section 411 sets out the definitions, for purposes of the Act for the terms "Agency," "Responsible agency," "antitrust laws," "contract," "contractor," "Federal employee," " invention," "made," "nonprofit organization," "patent rights," "practical application," "small business," "state," "local," and "will."

## CONFORMING PATENT POLICY AMENDMENTS

Section 7 amends or repeals parts of other acts as necessary to implement the provisions of new chapter 38 of title 35, United States Code. Acts amended or repealed in part are:

> Title 7, U.S.C. 427(i).
> Title 7, U.S.C. 1624(a).
> The Federal Coal Mine Health and Safety act of 1969.
> The National Traffic and Motor Vehicle Safety Act of 1966.
> The National Science Foundation Act of 1950.
> The Atomic Energy Act of 1954.
> The National Aeronautics and Space Act of 1958.
> The Coal Research and Development Act of 1960.
> The Helium Act Amendments of 1960.
> The Arms Control and Disarmament Act of 1961.
> The Appalachian Regional Development Act of 1965.
> The Federal Nonnuclear Energy Research and Development Act of 1974.
> The Tennessee Valley Authority Act of 1933.
> The Consumer Product Safety Act.
> Title 30, U.S.C. 323.
> The Resources Conservation and Recovery Act of 1976.
> The Electric and Hybrid Vehicle Research, Development, and Demonstration Act of 1976.
> Public Law 95–39.
> The Water Research and Development Act of 1978.

## TRANSITIONAL PROVISIONS

### Section 8. Effective date

Section 8 provides for the taking effect of the bill's various provisions.

Section 8(a) specified and that the fee setting authority provisions of the bill and the conforming technical amendment take effect upon enactment. Nevertheless, these fees need not be set to recover the levels specified in the bill (25 percent recovery for patent processing and full recovery for providing materials and services in patent and trademark cases) until the first day of the first fiscal year beginning one calendar year after enactment. This will provide at least a year to determine the amounts and natures of fees needed.

Subsection 8(b) provides that the reexamination provisions of this bill take effect six months after enactment and apply to patents then in force or issued thereafter.

23

Subsection 8(c) provides that the authority to credit fee revenues to the Office's Appropriation Account take effect as of the first day of the first fiscal year beginning one calendar year after enactment. Thus, at least one year would be available to obtain needed administrative approval and implement an appropriate accounting system. However, until section 3 takes effect, the Secretary, in order to pay reexamination costs, may credit the Patent and Trademark Office Appropriation Account with the revenues from collected reexamination fees.

Subsection 8(d) continues existing fees until new fees are established.

Subsection 8(e) provides that maintenance fees shall not be applicable to patents applied for prior to the day of enactment of this Act.

Subsection 8(f) provides that sections 6 and 7 of this bill which establish a uniform patent policy and make necessary conforming amendments to existing laws take effect six months after enactment.

### STUDY OF THE PATENT, TRADEMARK, AND COPYRIGHT SYSTEMS

Section (a) provides that, on or before July 1, 1981, the Comptroller General will report to the Congress and the President with respect to the Patent and Trademark Office, the Copyright Office, and the Copyright Royalty Tribunal with a view toward the desirability of of merging them.

### COMPUTERIZATION OF THE PATENT SEARCH FILE

Subsection 10(a) requires the Commissioner of Patents and Trademarks to report to the Congress, within six months of the effective date of the Act, on computerized data and retrieval state of the art systems for all aspects of operations of the Office.

Subsection (b) requires the Commissioner to submit additional reports to the Congress every six months until such a plan is fully implemented.

### CREATION OF AN INDEPENDENT PATENT OFFICE

Section 11 creates the Patent and Trademark Office as an independent agency, separate from the Department of Commerce, of which it is now a part.

### COPYRIGHTABILITY OF COMPUTER PROGRAMS

Section 12 embodies the recommendations of the Commission on new Technological Uses of Copyrighted Works with respect to clarifying the law of copyright of computer software.

During the course of Committee consideration the question was raised as to whether the bill would restrict remedies for protection of computer software under state law, especially unfair competition and trade secret laws. The Committee consulted the Copyright Office for its opinion as to whether section 301 of the 1976 Copyright Act in any way pre-empted these and other forms of state law protection for computer software. On the basis of this advice and

24

advice of its own counsel the Committee concluded that state reme-dies for protection of computer software are not limited by this bill.

### OVERSIGHT STATEMENT

Oversight of the Patent and Trademark Office is the responsibili-ty of the Committee on the Judiciary. During the First Session of the 96th Congress the subcommittee on Courts, Civil Liberties and the Administration of Justice held hearings entitled, "General Oversight on the Patent, Trademark and Copyright Systems." They have been published as serial No. 15, Ninety-sixth Congress. The Committee and its subcommittee intend to continue this oversight into the next Congress.

No oversight statement has been received from the Committee on Government Operations regarding H.R. 6933.

### NEW BUDGET AUTHORITY

In regard to clause 2(1)(3)(B) of rule XI of the House of Repre-sentatives, H.R. 6933 creates no new budget authority.

### STATEMENT OF THE BUDGET COMMITTEE

No statement on H.R. 6933 has been received from the Commit-tee on the Budget.

### ESTIMATED COST OF THE LEGISLATION

It is estimated that there will be no additional costs to the United States due to the provisions of H.R. 6933. As the statement of the Congressional Budget Office indicates, there will be a substan-tial savings to the United States as a result of the legislation.

### STATEMENT OF THE CONGRESSIONAL BUDGET OFFICE

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., August 28, 1980.*

Hon. PETER W. RODINO, Jr.,
*Chairman, Committee on the Judiciary,*
*U.S. House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congres-sional Budget Act of 1974, the Congressional Budget Office has pre-pared the attached cost estimate for H.R. 6933, a bill to amend the patent and trademark laws.

Should the Committee so desire, we would be pleased to provide further details on this estimate.

Sincerely,

JAMES BLUM
(For Alice M. Rivlin, Director).

CONGRESSIONAL BUDGET OFFICE—COST ESTIMATE, AUGUST 28, 1980

1. Bill number: H.R. 6933.
2. Bill title: A bill to amend the patent and trademark laws.

25

3. Bill status: As ordered reported by the House Committee on the Judiciary on August 20, 1980.

4. Bill purpose: The bill would establish the Patent and Trademark Office (PTO) as an independent agency, removing it from the Department of Commerce (DOC). It would provide for a system of administrative reexaminations, establish a new fee structure, and create a uniform government policy regarding patent rights. H.R. 6933 would require the General Accounting Office (GAO) to report on the desirability of merging the PTO with the Copyright Office and the Copyright Royalty Tribunal. The PTO would also be required to report every six months on the progress being made towards implementation of a computerized data and retrieval system. Finally, H.R. 6933 repeals section 117 of the 1976 Copyright Act to clarify copyright laws regarding computer programs.

5. Cost estimate: The table below reflects the budget impact resulting from a change proposed by H.R. 6933 in the classification of the fees received by the PTO.

[By fiscal years, in millions of dollars]

|  | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|
| Revenue reduction | 1.8 | 23.2 | 23.8 | 24.3 | 24.8 |
| Net spending reduction: |  |  |  |  |  |
| Estimated authorization level | 1.5 | 23.7 | 24.7 | 25.6 | 31.6 |
| Estimated outlays | 2.0 | 24.6 | 24.7 | 25.6 | 31.6 |
| Net budget impact [1] | −0.2 | −1.4 | −0.9 | −1.3 | −6.8 |

[1] Negative sign indicates increased surplus or decreased deficit.

The costs of this bill fall primarily within budget subfunction 376.

6. Basis of estimate: For purposes of this estimate, it is assumed that this bill will be enacted around October 1, 1980.

*Reexamination of patents*

H.R. 6933 would allow any party to petition the PTO to reexamine a patent for validity. The cost of reexamination would be paid by the party based on a fee structure established by the Commissioner of Patents. It is anticipated that the number of patent applications for reexaminations will be limited by the cost involved and the potential for commercial development. Based on rates currently available in foreign countries for similar procedures, as well as estimates provided by the PTO, it is estimated that the number of appeals will be approximately 500 in fiscal year 1981, increasing to 2,000 by 1982, and remain relatively stable thereafter.

Although the bill does not specifically authorize funding for this purpose, it is assumed that additional staff will be required to handle the reexamination procedures. Based on PTO data, it is estimated that the average cost per employee, including overhead and benefits, would be approximately $40,000 in fiscal year 1981. Assuming approximately 30 hours per reexamination, plus clerical support, it is estimated that approximately 55 appeals could be reviewed annually by a professional staff member. It is estimated that the cost of this procedure would be approximately $0.4 million in fiscal year 1981, which reflects six months' activity. Costs are es-

timated to be $1.4 million in fiscal year 1982, increasing to $2.5 million by fiscal year 1985. It is assumed, however, that the full amount required by the PTO for salaries and expenses would be recovered by fees set at the beginning of the fiscal year and adjusted annually for inflation and anticipated workload. It is assumed that fees would be included with the request for reexamination and reflected as a reimbursable to the agency, resulting in a net outlay of around zero in each fiscal year.

*Revision of fee structure*

H.R. 6933 would restructure the current fee structure for patents and trademarks. Currently, the PTO recovers approximately 20 percent of the cost of processing patents and approximately 30 percent of the cost of issuing trademarks. These fees are deposited in the general fund of the Treasury.

The bill would allow the PTO to recover up to 25 percent of the average processing costs and 25 percent of the maintenance costs for patents, the latter fee collected in four installments over the life of the patent. In addition, the PTO would be allowed to recover a maximum of 50 percent of the cost of issuing trademarks. All fees for patents and trademarks could be adjusted no more than once every three years and would be credited to the PTO as a reimbursable to the agency, rather than as a revenue to the Treasury.

It is assumed that the revised fee structure for trademarks would be implemented early in the second quarter of fiscal year 1981, and for patents beginning in fiscal year 1982. It is assumed that the agency costs for processing patents and trademarks from which recovery could be made would be approximately $84 million in fiscal year 1982, increasing to approximately $109 million by fiscal year 1985. It is assumed that an average recovery rate of 25 and 50 percent, adjusted every third year, would be established for processing fees for patents and for trademarks, respectively. Patent maintenance fees would be collected three times in a patent's life—around the fourth, eighth, and twelfth year. Since the first payment would not be made until fiscal year 1986, it is not reflected in the table below.

[By fiscal years, in millions of dollars]

|  | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|
| Existing fee structure—Estimated revenues: |  |  |  |  |  |
| Patents | 20.3 | 20.8 | 21.3 | 21.8 | 22.2 |
| Trademarks | 2.4 | 2.4 | 2.5 | 2.5 | 2.6 |
| Total | 22.7 | 23.2 | 23.8 | 24.3 | 24.8 |
| Proposed fee structure in H.R. 6933—Estimated collections: |  |  |  |  |  |
| Patents[1] | [2] 20.3 | 21.2 | 21.2 | 21.2 | 27.2 |
| Trademarks | 3.6 | 3.6 | 3.6 | 4.6 | 4.6 |
| Total | 23.6 | 24.8 | 24.8 | 25.8 | 31.8 |
| Net budget impact | −0.9 | −1.6 | −1.0 | −1.5 | −7.0 |

[1] Maintenance fees would be collected beginning in fiscal year 1986, and by fiscal year 1994 would result in revenues approximately twice those estimated for processing.

[2] The current fee structure for patents remains in effect throught fiscal year 1981.

27

*Government patent policy*

H.R. 6933 would establish a uniform federal system for the commercialization and allocation of rights in inventions resulting from federally sponsored or supported research and development. The bill would allow contractors from small businesses and non-profit institutions to acquire title to inventions resulting from government funded research. Other contractors could receive exclusive licenses for specific uses. The bill directs the Office of Federal Procurement Policy (OFPP) to issue regulations to implement these policy changes. According to the OFPP, the cost of revising existing regulations would be minimal. It is estimated implementation of these changes in the various federal agencies, including training, would cost approximately $650,000 in fiscal year 1981. Outlays are estimated to be 90 percent the first year and 10 percent the second year.

H.R. 6933 would revise the criteria for allocation of invention rights between the federal government and employees who produce inventions. To stimulate innovation, the bill would establish an incentive cash awards program to federal employee-inventors. The award are to be paid from funds from royalties or agency appropriations; consequently, it is estimated that this provision would result in no additional cost to the government.

The bill also authorizes federal agencies to share income from licensing the government's patent rights with the employee-inventor. It is not possible at this time to estimate the extent to which royalties will be generated or shared with employee-inventors.

*Establish an indepenant PTO*

H.R. 6933 would create an independent PTO, which is currently an agency within DOC. Based on data provided by the PTO, it is estimated that the net additional cost of this reorganization would be approximately $130,000 in fiscal year 1981. Adjusted for inflation, it is estimated that the cost would increase to approximately $190,000 by fiscal year 1985.

*GAO Study*

The GAO estimates that the cost of analyzing the feasibility of merging the PTO with the Copyright Office and the Copyright Royalty Tribunal would be approximately $250,000 in fiscal year 1981.

*Other*

The bill would repeal section 117 of the 1976 Copyright Act, which disclaims any intent to modify the pre-existing copyright law for computer programs. This has the effect of clearly applying the 1976 law to computer programs, which is not expected to have a cost impact upon the federal government.

In addition, H.R. 6933 outlines the responsibilities of the Secretary of Commerce to assist agencies and others in promoting access to patent information. Currently these activities are being performed by the National Technical Information Service (NTIS), created in 1970. The President is requesting approximately $740,000 for these activities in fiscal year 1981, which is about the same level of funding in the current fiscal year. The bill would authorize the appropriation of such sums as may be necessary for these activities. Since current law authorizes these activities it is estimated

that no additional costs would be incurred as a result of enactment of this legislation.

Finally the PTO would be required to report regularly on the status of a computerized data retrieval system. Since the PTO is already planning to study and evaluate the feasibility of such a system, it is assumed that any significant costs incurred as a result of analyzing or implementing such a system would not be a direct result of the legislation. Consequently, no cost has been estimated for this provision.

7. Estimate Comparison: The Commissioner of Patents has estimated that approximately 1,000 to 3,000 requests for reexaminations would be made annually, requiring from 25 to 100 additional staff members, at a cost of between $1 million and $4.5 million annually. CBO estimates approximately 500 applications will be processed beginning in fiscal year 1981 because a later date of enactment is assumed.

8. Previous CBO estimate: On February 27, 1980, the Congressional Budget Office prepared a cost estimate for S. 1679, the Patent Law Amendments of 1979, as ordered reported by the Senate Committee on the Judiciary on February 19, 1980. The costs of S. 1679 and the costs attributed to reexamination in this bill are the same, with adjustments assumed for date of enactment.

On December 4, 1979, CBO prepared a cost estimate on S. 414, the University and Small Business Patent Procedures Act, as ordered reported by the Senate Committee on the Judiciary on November 20, 1979. The CBO estimated that no significant cost would be incurred by the government if a uniform patent procedure for small businesses and nonprofit organizations performing government-supported research and development were established.

9. Estimate prepared by: Mary Maginniss.

10. Estimate approved by: C. G. Nuckols (for James L. Blum, Assistant Director for Budget Analysis.)

## INFLATIONARY IMPACT STATEMENT

H.R. 6933 will have no forseeable inflationary impact on prices or costs in the operation of the national economy.

## COMMITTEE VOTE

H.R. 6933 was approved by the Committee on the Judiciary on August 20, 1980, by a voice vote.

## DISSENTING VIEWS OF HONORABLE JACK BROOKS

The major problem I have with H.R. 6933 is that it violates a basic provision of the unwritten contract between the citizens of this country and their government; namely, that what the government acquires through the expenditure of its citizens' taxes, the government owns. Assigning automatic patent rights and exclusive licenses to companies or organizations for inventions developed at government expense is a pure giveaway of rights that properly belong to the people.

The argument is made by proponents of the bill that it will spur productivity, a goal that is both necessary and desirable if the United States is to regain its position in the world economy. But that argument ignores the fact that the Federal Government is already paying half the costs of research and development in the United States at an annual cost of $30 billion. No companies or nonprofit organizations that I know of have been turning down that money because they are not now receiving automatic patent and exclusive licensing rights. So unless it is the intent of the supporters of H.R. 6933 that the government greatly increase this already enormous public investment in research and development, I fail to see how enactment of the bill will lead to increased production.

It is also argued that this legislation will increase competition in industry and thereby spur production. But again the connection is hard to establish. Under current practice, inventions, new products and technological advances developed under government contracts—unless awarded to a specific contractor under existing permissible arrangements—are available to all. That approach would seem to offer far greater potential for increased competition and productivity than handing over exclusive rights to one company. In the latter case the company might even choose to reduce production with the aim of increasing its profits.

I do not overlook or underestimate the importance of patents in developing and maintaining a thriving economy. My concern is simply the role of the government and the rights of the people in the patent process. When a private company risks its own money to develop new products and procedures it deserves and receives the profits that may result. There should not be a different standard applied when it is the government that risks the taxpayers' money. The rewards of successful research and development conducted at government expense should go to all the people.

Another provision of this bill that I strongly oppose is the removal of the Patent Office from the Department of Commerce and its establishment as an independent office. I have seen no evidence

(29)

that this organizational realignment will result in any increase in efficiency in the operations of the Patent Office or in any increase in productivity in U.S. industrial output. On the other hand, there is every reason to believe it will result in increased expenditures and further fragmentation of government management. Also, its inclusion in this bill raises a serious jurisdictional problem as government reorganizations are matters within the jurisdiction of the Committee on Government Operations.

### COMPETITION VS. MONOPOLY

Proponents of this legislation allege that assigning title or automatic exclusive licensing rights to government contractors and grantees will result in greater productivity. In fact, the opposite result may occur. By granting an exclusive license to the developer of a government-funded patent, the number of potential producers and marketers may be substantially restricted. Open competition has long been the basic element of our economic system. Providing patent rights inherently grants a type of monopoly privilege. Such privileges can be justified when a private individual or entity has risked considerable sums on the research and development of the product, costs which the developer should be able to recapture upon commercialization. A quite different situation exists, however, when the financial risk has been borne by the taxpayer. In that case, the justification for the granting of anti-competitive patent rights does not exist.

### UNIFORMITY OF PATENT POLICIES:

Currently, there are about 26 agencies with regulations governing patent rights on government-funded inventions. The proponents of this legislation argue that uniformity in patent policy is badly needed. I would agree that uniformity is, in all probability, desirable, but not at the cost of giving away title and exclusive licenses in public property.

Furthermore, this bill does not achieve uniformity in patent policy. This bill will establish three different policies for handling government-funded patents. The applicable policy will not be determined by the nature of the patent or the public good, but rather by the nature and size of the contractor or grantee. One policy assigns automatic title to the contract invention where the contractor is a small business or nonprofit organization; another policy assigns automatic exclusive licenses to other contractors; and a third policy provides criteria for granting exclusive or partially exclusive licenses in all other cases. Where is the uniformity this legislation was supposed to provide?

### POTENTIAL DECREASE IN PRIVATE RESEARCH FUNDS

The Federal government presently pays for well-over half the cost of research and development in the U.S. to the tune of $30 billion a year. Under this legislation, the percentage of government-funded research may become even greater. It would make no sense for a company to spend its own money on the research and development of new products and technology when the government will carry the costs and bear the risk for them. It is an entrepreneur's

dream. If he is successful, the government gives him highly profitable monopoly rights over the product; and, if he fails, well, he hasn't lost anything. There is simply not sufficient evidence to support the creation of another welfare fund for private business which can only serve as a disincentive for private investment.

### EMPHASIS ON PROFIT RATHER THAN PUBLIC PURPOSE

The policies and objectives of government funding of research and development should be determined on the basis of what is in the best interest of the public. They should not be legislated to parallel the policies and practices followed by commercial establishments. To do this would change the direction of Federal research and development from a process of intellectual and technological innovation for the general welfare of the people to one which emphasizes the profit incentive underlying commercialization in the marketplace. When a grant or contract determination for research and development includes an automatic concession of exclusive rights to commercialize any resulting invention, technological innovation will be of concern to the contractor only to the extent it contributes to the production of a profitable product.

### REIMBURSEMENT PROVISIONS INSUFFICIENT

While there are provisions in the bill for recovery of government-funded research and development costs in certain instances, the exceptions for reimbursement have a tendency to render the provisions meaningless. Section 390(c)(2) permits exemptions from reimbursement where the Federal government's contribution to the technology as licensed or utilized is insubstantial compared with private investment made or to be made. The private investment "to be made" is highly speculative at best. Any good accountant should be able to show that the government's investment is minimal compared to what the marketer "expects" to spend.

Section 390(c)(4) permits waiver of reimbursement where the government funding of the technology with the contractor is less than $1 million, a clearly arbitrary exclusion.

Section 390(c)(5) permits foregoing payment when it would place the contractor at a competitive disadvantage or would stifle commercial utilization of the technology. How repayment of research and development costs would place a contractor at a competitive disadvantage is not quite clear where an exclusive license precludes competition.

Subsection 6 permits exemption from payment when "it is otherwise in the best interest of the government and the general public." It is hard to imagine a taxpayer who, having funded the cost and borne the risk of the research and development of a product, would conclude that it is in his best interests not to be reimbursed from the proceeds accruing to the contractor.

### INDEPENDENT PATENT OFFICE

The bill as amended will take the Patent Office out of the Department of Commerce, where it has been for many years. This action will require more funds and will not provide the benefits claimed.

32

It has been said that an independent Patent Office would have only a small additional cost. This is illusory. Setting up an independent office with its own administrative hierarchy, which must make available the facilities and services that are now being provided by the Department of Commerce, will be a very costly operation. I speak from some experience because the Committee on Government Operations has been called upon to create numerous independent agencies and offices over the years. Many of these have been established for good purposes, but with hardly an exception they required substantial extra expenditures.

Taking the Patent Office out of Commerce will not necessarily enhance its efficiency or improve its services to the business community and the public. This shift may require a realignment of procedures which could as well be done within the Department of Commerce. Inevitably, any reorganization requires a temporary slowdown in operations and procedures until the new organization has been put into effect and had its shakedown cruise. This could take months or even years and could have, at the very least, a temporary deleterious effect on Patent Office services.

I cannot see how the creation of an independent agency will necessarily add to the amount of funding available to the Patent Office or bring about an increase in the number of patent examiners. The doubts about the need for larger appropriations will exist whether or not the Patent Office is in Commerce or outside. The budget will still have to go through the Office of Management and Budget and be subject to the Administration's overall policy and will still have to run the gauntlet of the Appropriations Committees and of the Congress.

Basically, our objective is to increase productivity in the United States and make ourselves more competitive with the technological inventiveness and ingenuity of foreign nations. Certainly this is an urgent matter which needs serious attention and attack. But a removal of the Patent Office from the agency in which it is currently housed would only be cosmetic and in no way alleviate the root causes of the problem. Let us undertake the difficult steps that are needed but not fool ourselves and the American public by making changes that will have little or no effect.

### CONCLUSION

I agree wholeheartedly with the establishment of a U.S. patent policy that encourages the development and production of new products, that will reward those who take risks, and that will inspire increased confidence in our economy. My comments above deal only with the very special issue of government-funded research and development activities.

The Federal government has the equivalent of a fiduciary responsibility to the taxpayers of this country. Property acquired with public funds should belong to the public. Deviations from that fundamental principle should be allowed only where a compelling justification can be shown and where the voice of the public can be heard in protest. This legislation stands that principle on its head by automatically conveying title or the exclusive right to use public property to private entities and placing the burden on the Federal government to demonstrate that a retrieval of those rights is in the public interest.

JACK BROOKS.

33

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

# TITLE 35, UNITED STATES CODE

\*      \*      \*      \*      \*      \*      \*

## PART I—PATENT AND TRADEMARK OFFICE

\*      \*      \*      \*      \*      \*      \*

## CHAPTER   1—ESTABLISHMENT,   OFFICERS, FUNCTIONS

\*      \*      \*      \*      \*      \*      \*

### § 1. Establishment

[The Patent and Trademark Office shall continue as an office in the Department of Commerce, where records, books, drawings, specifications, and other papers and things pertaining to patents and to trademark registrations shall be kept and preserved, except as otherwise provided by law.]

### § 1. Establishment

*The Patent and Trademark Office, referred to in this chapter as the "Office," shall be an independent agency, where records, books, drawings, specifications, and other papers and things pertaining to patents and to trademark registrations shall be kept and preserved, except as otherwise provided by law.*

\*      \*      \*      \*      \*      \*      \*

### § 3. Officers and employees

(a) There shall be in the Patent and Trademark Office a Commissioner of Patents and Trademarks, a Deputy Commissioner, two Assistant Ccommissioners, and not more than fifteen examiners-in-chief. The Deputy Commissioner, or, in the event of a vacancy in that office, the Assistant Commissioner senior in date of appointment shall fill the office of Commissioner during a vacancy in that office until the Commissioner is appointed and takes office. The Commissioner of Patents and Trademarks, the Deputy Commissioner, and the Assistant Commissioners shall be appointed by the President, by and with the advice and consent of the Senate. [The Secretary of Commerce, upon the nomination of the Commissioner, in accordance with law shall appoint all other officers and employees.] *The Commissioner shall be the Chief Officer of the Office and shall be a person knowledgeable in patent and trademark matters. The Commissioner shall be appointed for a fixed term of six years and shall be removable from office by the President for good cause. The Commissioner shall appoint all other officers and employees of the Office.*

34

⟦(b) The Secretary of Commerce may vest in himself the functions of the Patent and Trademark Office and its officers and employees specified in this title and may from time to time authorize their performance by any other officer or employee.⟧

⟦(c)⟧ (b) The ⟦Secretary of Commerce⟧ *Commissioner* is authorized to fix the per annum rate of basic compensation of each examiner-in-chief in the Patent and Trademark Office at not in excess of the maximum scheduled rate provided for positions in grade 17 of the General Schedule of the Classification Act of 1949, as amended.

*    *    *    *    *    *    *

## §6. Duties of Commissioner

(a) The Commissioner⟦, under the direction of the Secretary of Commerce,⟧ shall superintend or perform all duties required by law respecting the granting and issuing of patents and the registration of trademarks; shall have the authority to carry on studies and programs regarding domestic and international patent and trademark law; and shall have charge of property belonging to the Patent and Trademark Office. He may⟦, subject to the approval of the Secretary of Commerce,⟧ establish regulations, not inconsistent with law, for the conduct of proceedings in the Patent and Trademark Office.

(b) The Commissioner⟦, under the direction of the Secretary of Commerce,⟧ may, in coordination with the Department of State, carry on programs and studies cooperatively with foreign patent offices and international intergovernmental organizations, or may authorize such programs and studies to be carried on, in connection with the performance of duties stated in subsection (a) of this section.

(c) The Commissioner⟦, under the direction of the Secretary of Commerce,⟧ may, with the concurrence of the Secretary of State, transfer funds appropriated to the Patent and Trademark Office, not to exceed $100,000 in any year, to the Department of State for the purpose of making special payments to international intergovernmental organizations for studies and programs for advancing international cooperation concerning patents, trademarks, and related matters. These special payments may be in addition to any other payments or contributions to the international organization and shall not be subject to any limitations imposed by law on the amounts of such other payments or contributions by the Government of the United States.

(d) The Commissioner⟦, under the direction of the secretary of Commerce,⟧ may, with the concurrence of the Secretary of State, allocate funds appropriated to the Patent Office, to the Department of State for the purpose of payment of the share on the part of the United States to the working capital fund established under the Patent Cooperation Treaty. Contributions to cover the share on the part of the United States of any operating deficits of the International Bureau under the Patent Cooperation Treaty shall be included in the annual budget of the Patent Office and may be transferred by the Commissioner⟦, under the direction of the Secretary of Commerce,⟧ to the Department of State for the purpose of making payments thereof to the International Bureau.

35

## §7. Board of Appeals

The examiners-in-chief shall be persons of competent legal knowledge and scientific ability, who shall be appointed under the classified civil service. The Commissioner, the deputy commissioner, the assistant commissioners, and the examiners-in-chief shall constitute a Board of Appeals, which on written appeal of the applicant, shall review adverse decisions of examiners upon applications for patents. Each appeal shall be herd by at least three members of the Board of Appeals, the members hearing such appeal to be designated by the Commissioner. The Board of Appeals has sole power to grant rehearings.

Whenever the Commissioner considers it necessary to maintain the work of the Board of Appeals current, he may designate any patent examiner of the primary examiner grade or higher, having the requisite ability, to serve as examiner-in-chief for periods not exceeding six months each. An examiner so designated shall be qualified to act as a member of the Board of Appeals. Not more than one such primary examiner shall be a member of the Board of Appeals hearing an appeal. The [Secretary of Commerce] *Commissioner* is authorized to fix the per annum rate of basic compensation of each designated examiner-in-chief in the Patent and Trademark Office at not in excess of the maximum scheduled rate provided for positions in grade 16 of the General Schedule of the Classification Act of 1949, as amended. The per annum rate of basic compensation of each designated examiner-in-chief shall be adjusted, at the close of the period for which he was designated to act as examiner-in-chief, to the per annum rate of basic compensation which he would have been receiving at the close of such period if such designation had not been made.

\*     \*     \*     \*     \*     \*     \*

## CHAPTER 3—PRACTICE BEFORE PATENT AND TRADEMARK OFFICE

\*     \*     \*     \*     \*     \*     \*

## §31. Regulations for agents and attorneys

The Commissioner[, subject to the approval of the Secretary of Commerce,] may prescribe regulations governing the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the Patent and Trademark Office and may require them, before being recognized as representatives of applicants or other persons, to show that they are of good moral character and reputation and are possessed of the necessary qualifications to render to applicants or other persons valuable service, advice, and assistance in the presentation or prosecution of their applications or other business before the Office.

\*     \*     \*     \*     \*     \*     \*

## CHAPTER 4—PATENT FEES

Sec.
41. Patent fees.
42. Payment of patent fees; return of excess amounts.

【§ 41. Patent fees

【(a) The Commissioner shall charge the following fees:

【1. On filing each application for an original patent, except in design cases, $65; in addition on filing or on presentation at any other time, $10 for each claim in independent form which is in excess of one, and $2, for each claim (whether independent or dependent) which is in excess of ten. For the purpose of computing fees, a multiple dependent claim as referred to in section 112 of this title or any claim depending therefrom shall be considered as separate dependent claims in accordance with the number of claims to which reference is made. Errors in payment of the additional fees may be rectified in accordance with regulations of the Commissioner.

【2. For issuing each original or reissue patent, except in design cases, $100; in addition, $10 for each page (or portion thereof) of specification as printed, and $2 for each sheet of drawing.

【3. In design cases:

【a. On filing each design application, $20.

【b. On issuing each design patent: For three years and six months, $10; for seven years, $20; and for fourteen years, $30.

【4. On filing each application for the reissue of a patent, $65; in addition, on filing or on presentation at any other time, $10 for each claim in independent form which is in excess of the number of independent claims of the original patent, and $2 for each claim (whether independent or dependent) which is in excess of ten and also in excess of the number of claims of the original patent. Errors in payment of the additional fees may be rectified in accordance with regulations of the Commissioner.

【5. On filing each disclaimer, $15.

【6. On appeal for the first time from the examiner to the Board of Appeals, $50; in addition, on filing a brief in support of the appeal, $50.

【7. On filing each petition for the revival of an abandoned application for a patent or for the delayed payment of the fee for issuing each patent, $15.

【8. For certificate under section 255 or under section 256 of this title, $15.

【9. As available and if in print: For uncertified printed copies of specifications and drawings of patents (except design patents), 50 cents per copy; for design patents, 20 cents per copy; the Commissioner may establish a charge not to exceed $1 per copy for patents in excess of twenty-five pages of drawings and specifications and for plant patents printed in color; special rates for libraries specified in section 13 of this title, $50 for patents issued in one year. The Commissioner may, without charge, provide applicants with copies of specifications and drawings of patents when referred to in a notice under section 132.

【10. For recording every assignment, agreement, or other paper relating to the property in a patent or application, $20; where the document relates to more than one patent or application, $3 for each additional item.

【11. For each certificate, $1.

〔(b) The Commissioner may establish charges for copies of records, publications, or services furnished by the Patent and Trademark Office, not specified above.

〔(c) The fees prescribed by or under this section shall apply to any other Government department or agency, or officer thereof, except that the Commissioner may waive the payment of any fee for services or materials in cases of occasional or incidental requests by a Government department or agency, or officer thereof.〕

## §41. Patent fees

*(a) The Commissioner of Patents will establish fees for the processing of an application for a patent, from filing through disposition by issuance or abandonment, for maintaining a patent in force, and for providing all other services and materials related to patents. No fee will be established for maintaining a design patent in force.*

*(b) By the first day of the first fiscal year beginning on or after one calendar year after enactment of this Act, fees for the actual processing of an application for a patent, other than for a design patent, from filing through disposition by issuance or abandonment, will recover in aggregate 25 per centum of the estimated average cost to the Office of such processing. By the first day of the first fiscal year beginning on or after one calendar year after enactment, fees for the processing of an application for a design patent, from filing through disposition by issuance or abandonment, will recover in aggregate 50 per centum of the estimated average cost to the Office of such processing.*

*(c) By the fifteenth fiscal year following the date of enactment of this Act, fees for maintaining patents in force will recover 25 per centum of the estimated cost to the Office, for the year in which such maintenance fees are received, of the actual processing all applications for patents, other than for design patents, from filing through disposition by issuance or abandonment. Fees for maintaining a patent in force will be due three years and six months, seven years and six months, and eleven years and six months after the grant of the patent. Unless payment of the applicable maintenance fee is received in the Patent and Trademark Office on or before the date the fee is due or within a grace period of six months thereafter, the patent will expire as of the end of such grace period. The Commissioner may require the payment of a surcharge as a condition of accepting within such six-month grace period the late payment of an applicable maintenance fee.*

*(d) By the first day of the first fiscal year beginning on or after one calendar year after enactment, fees for all other services or materials related to patents will recover the estimated average cost to the Office of performing the service or furnishing the material. The yearly fee for providing a library specified in section 13 of this title with uncertified printed copies of the specifications and drawings for all patents issued in that year will be $50.*

*(e) The Commissioner may waive the payment of any fee for any service or material related to patents in connection with an occasional or incidental request made by a department or agency of the Government, or any officer thereof. The Commissioner may provide any applicant issued a notice under section 132 of this title with a*

38

*copy of the specifications and drawings for all patents referred to in that notice without charge.*

*(f) Fees will be adjusted by the Commissioner to achieve the levels of recovery specified in this section; however, no patent application processing fee or fee for maintaining a patent in force will be adjusted more than once every three years.*

*(g) No fee established by the Commissioner under this section will take effect prior to sixty days following notice in the Federal Register.*

### 【§ 42. Payment of patent fees; return of excess amounts

【All patent fees shall be paid to the Commissioner who, except as provided in sections 361(b) and 376(b) of this title, shall deposit the same in the Treasury of the United States in such manner as the Secretary of the Treasury directs, and the Commissioner may refund any sum paid by mistake or in excess of the fee required by law.】

### § 42. Patent and Trademark Office funding

*(a) All fees for services performed by or materials furnished by the Patent and Trademark Office will be payable to the Commissioner.*

*(b) All fees paid to the Commissioner and all appropriations for defraying the costs of the activities of the Patent and Trademark Office will be credited to the Patent and Trademark Office Appropriation Account in the Treasury of the United States, the provisions of section 725e of title 31, United States Code, notwithstanding.*

*(c) Revenues from fees will be available to the Commissioner of Patents to carry out, to the extent provided for in appropriation Acts, the activities of the Patent and Trademark Office.*

*(d) The Commissioner may refund any fee paid by mistake or any amount paid in excess of that required.*

\*        \*        \*        \*        \*        \*        \*

# PART II—PATENTABILITY OF INVENTIONS AND GRANT OF PATENTS

\*        \*        \*        \*        \*        \*        \*

# CHAPTER 14—ISSUE OF PATENT

\*        \*        \*        \*        \*        \*        \*

### § 154. Contents and term of patent

Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, subject to the payment of 【issue】 fees as provided for in this title, of the right to exclude others from making, using, or selling the invention throughout the United States, referring to the specification for the particulars thereof. A copy of the specification and drawings shall be annexed to the patent and be a part thereof.

\*        \*        \*        \*        \*        \*        \*

# CHAPTER 17—SECRECY OF CERTAIN INVENTIONS AND FILING APPLICATIONS IN FOREIGN COUNTRY

\*        \*        \*        \*        \*        \*        \*

### § 181. Secrecy of certain inventions and withholding of patent

Whenever publication or disclosure by the grant of a patent on an invention in which the Government has a property interest might, in the opinion of the head of the interested Government agency, be detrimental to the national security, the Commissioner upon being so notified shall order that the invention be kept secret and shall withhold the grant of a patent therefor under the conditions set forth hereinafter.

Whenever the publication or disclosure of an invention by the granting of a patent, in which the Government does not have a property interest, might, in the opinion of the Commissioner, be detrimental to the national security, he shall make the application for patent in which such invention is disclosed available for inspection to the Atomic Energy Commission, the Secretary of Defense, and the chief officer of any other department or agency of the Government designated by the President as a defense agency of the United States.

Each individual to whom the application is disclosed shall sign a dated acknowledgment thereof, which acknowledgment shall be entered in the file of the application. If, in the opinion of the Atomic Energy Commission, the Secretary of a Defense Department, or the chief officer of another department or agency so designated, the publication or disclosure of the invention by the granting of a patent therefor would be detrimental to the national security, the Atomic Energy Commission, the Secretary of a Defense Department, or such other chief officer shall notify the Commissioner and the Commissioner shall order that the invention be kept secret and shall withhold the grant of a patent for such period as the national interest requires, and notify the applicant thereof. Upon proper showing by the head of the department or agency who caused the secrecy order to be issued that the examination of the application might jeopardize the national interest, the Commissioner shall thereupon maintain the application in a sealed condition and notify the applicant thereof. The owner of an application which has been placed under a secrecy order shall have [a right to appeal from the order to the Secretary of Commerce] *a right to appeal from the order under rules prescribed by the Commissioner* under rules prescribed by him.

An invention shall not be ordered kept secret and the grant of a patent withheld for a period of more than one year. The Commissioner shall renew the order at the end thereof, or at the end of any renewal period, for additional periods of one year upon notification by the head of the department or the chief officer of the agency who caused the order to be issued that an affirmative determination has been made that the national interest continues so to require. An order in effect, or issued, during a time when the United States is at war, shall remain in effect for the duration of hostilities and one year following cessation of hostilities. An order in effect, or issued, during a national emergency declared by the President shall remain in effect for the duration of the national

emergency and six months thereafter. The Commissioner may rescind any order upon notification by the heads of the departments and the chief officers of the agencies who caused the order to be issued that the publication or disclosure of the invention is no longer deemed detrimental to the national security.

* * * * * * *

## § 188. Rules and regulations, delegation of power

The Atomic Energy Commission, the Secretary of a defense department, the chief officer of any other department or agency of the Government designated by the President as a defense agency of the United States, and· the [Secretary of Commerce] *Commissioner of Patents and Trademarks,* may separately issue rules and regulations to enable the respective department or agency to carry out the provisions of this chapter, and may delegate any power conferred by this chapter.

* * * * * * *

## CHAPTER 30—PRIOR ART CITATIONS TO OFFICE AND REEXAMINATION OF PATENTS

Sec. 301. Citation of prior art.
Sec. 302. Request for reexamination.
Sec. 303. Determination of issue by Commissioner.
Sec. 304. Reexamination order by Commissioner.
Sec. 305. Conduct of reexamination proceedings.
Sec. 306. Appeal.
Sec. 307. Certificate of patentability, unpatentability, and claim cancellation.

## § 301. Citation of prior art

*Any person at any time may cite to the Office in writing prior art consisting of patents or printed publications·which that person believes to have a bearing on the patentability of·any claim of a particular patent. If the person explains in writing the pertinency and manner of applying such prior art to at least one ·claim of the patent, the citation of such prior art and the explanation thereof will become a part of the official file of the patent. At the written request of the person citing the prior art, his or her identity will be excluded from·the patent file and kept confidential.*

## § 302. Request for reexamination

*Any person at any time may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art cited under the provisions of section 301 of this title. The request must be in writing and must be accompanied by payment of a reexamination fee established by the Commissioner of Patents pursuant to the provisions of section 41· of this title. The request must set forth the pertinency and manner of applying cited prior art to every claim for which reexamination is requested. Unless the requesting person is the owner of the patent, the Commissioner promptly will send a copy of the request to the owner of record of the patent.*

## § 303. Determination of issue by Commissioner

*(a) Within three months following the filing of a request for reexamination under the provisions of section 302 of this title, the Com-*

*missioner will determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications. On his own initiative, and at any time, the Commissioner may determine whether a substantial new question of patentability is raised by patents and publications discovered by him or cited under the provisions of section 301 of this title.*

*(b) A record of the Commissioner's determination under subsection (a) of this section will be placed in the official file of the patent, and a copy promptly will be given or mailed to the owner of record of the patent and to the person requesting reexamination, if any.*

*(c) A determination by the Commissioner pursuant to subsection (a) of this section that no substantial new question of patentability has been raised will be final and nonappealable. Upon such a determination, the Commissioner may refund a portion of the reexamination fee required under section 302 of this title.*

### §304. Reexamination order by Commissioner

*If, in a determination made under the provisions of subsection 303(a) of this title, the Commissioner finds that a substantial new question of patentability affecting any claim of a patent is raised, the determination will include an order for reexamination of the patent for resolution of the question. The patent owner will be given a reasonable period, not less than two months from the date a copy of the determination is given or mailed to him, within which he may file a statement on such question, including any amendment to his patent and new claim or claims he may wish to propose, for consideration in the reexamination. If the patent owner files such a statement, he promptly will serve a copy of it on the person who has requested reexamination under the provisions of section 302 of this title. Within a period of two months from the date of service, that person may file and have considered in the reexamination a reply to any statement filed by the patent owner. That person promptly will serve on the patent owner a copy of any reply filed.*

### §305. Conduct of reexamination proceedings

*After the times for filing the statement and reply provided for by section 304 of this title have expired, reexamination will be conducted according to the procedures established for initial examination under the provisions of sections 132 and 133 of this title. In any reexamination proceeding under this chapter, the patent owner will be permitted to propose any amendment to his patent and a new claim or claims thereto, in order to distinguish the invention as claimed from the prior art cited under the provisions of section 301 of this title, or in response to a decision adverse to the patentability of a claim of a patent. No proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding under this chapter. All reexamination proceedings under this section, including any appeal to the Board of Appeals, will be conducted with special dispatch within the Office.*

### §306. Appeal

*The patent owner involved in a reexamination proceeding under this chapter may appeal under the provisions of section 134 of this title, and may seek court review under the provisions of sections 141*

42

to 145 of this title, with respect to any decision adverse to the patentability of any original or proposed amended or new claim of the patent.

## § 307. Certificate of patentability, unpatentability, and claim cancellation

(a) In a reexamination proceeding under this chapter, when the time for appeal has expired or any appeal proceeding has terminated, the Commissioner will issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent any proposed amended or new claim determined to be patentable. ·

(b) Any proposed amended or new claim determined to be patentable and incorporated into a patent following a reexamination proceeding will·have the same effect as that specified in section 252 of this title for reissued patents on the right of any person who made, purchased, or used anything patented by such proposed amended or new claim, or who made substantial preparation for the same, prior to issuance of a certificate under the provisions of subsection (a) of this section.

\*       \*       \*       \*       \*       \*       \*

# PART IV—PATENT COOPERATION TREATY

\*       \*       \*       \*       \*       \*       \*

# CHAPTER 38—THE GOVERNMENT PATENT POLICY ACT OF 1980

Sec. 381. Title.

### SUBCHAPTER I—CONTRACT INVENTIONS

Sec. 382. Contract inventions; reporting.
Sec. 383. Allocation of rights—small businesses and nonprofit organizations.
Sec. 384. Allocation of rights—other contractors.
Sec. 385. Contractor license.
Sec. 386. Minimum Government rights.
Sec. 387. March-in rights.
Sec. 388. Deviation and waiver.
Sec. 389. Transfer of rights to contractor employees.
Sec. 390. Regulations and standard patent rights clause.

### SUBCHAPTER II—INVENTIONS OF FEDERAL EMPLOYEES

Sec. 391. Employee inventions.
Sec. 392. Reporting of inventions.
Sec. 393. Criteria for the allocation of rights.
Sec. 394. Presumptions.
Sec. 395. Review of agency determinations.
Sec. 396. Reassignment of rights.
Sec. 397. Incentive awards program.
Sec. 398. Income sharing from patent licenses.
Sec. 399. Regulations.

### SUBCHAPTER III—LICENSING OF FEDERALLY-OWNED INVENTIONS

Sec. 400. Covered inventions.
Sec. 401. Exclusive or partially exclusive licenses.

43

Sec. 402. Minimum Government rights.
Sec. 403. March-in rights.
Sec. 404. Regulations.

### SUBCHAPTER IV—MISCELLANEOUS

Sec. 405. Patent enforcement suits and right of intervention.
Sec. 406. Background rights.
Sec. 407. Notice, hearing, and judicial review.
Sec. 408. Relationship to other laws.
Sec. 409. Authority of Federal agencies.
Sec. 410. Responsibilities of the Secretary of Commerce.
Sec. 411. Definitions.

SEC. 381. *This chapter will be known as the "Government Patent Policy Act of 1980".*

## SUBCHAPTER I—CONTRACT INVENTIONS

### § 382. Contract inventions; reporting

(a) *This title applies to "contract inventions", which in this Act are inventions made in the course of or under Federal contracts.*

(b) *Every contractor will provide the responsible agency with timely written reports on each contract invention containing:*

(1) *a comprehensive technical disclosure of the invention, and*

(2) *a list of each country, if any, in which the contractor elects to file a patent application on the invention;*

*The Government neither will publish nor release these reports until the contractor or the Government has had a reasonable time to file patent applications or one year has passed since receipt of the disclosure required by subsection (b)(1) of this section, whichever is earlier, the Government also will so withhold such disclosure from other reports or records.*

(c) *If the responsible agency determines that the contractor has unreasonably failed to file reports as required by subsection (b) of this section as to a contract invention, the contractor may be deprived of any or all the rights it otherwise would have under this subchapter pertaining to such contract invention.*

### § 383. Allocation of rights—small businesses and nonprofit organizations

(a) *A contractor that is a small business or a nonprofit organization will acquire title to its contract invention in each country it lists under section 382(b)(2) in which it files a patent application within a reasonable time. However, title will be subject to the Government's minimum rights under section 386 and march-in rights under section 387.*

(b) *The Government will have the right to acquire title to any patent on a contract invention in each country in which the contractor elects not to file a patent application or fails to file within a reasonable time.*

### § 384. Allocation of rights—other contractors

(a) *A contractor that is not a small business or a nonprofit organization shall provide to the responsible agency, within four and one-half years from the filing under section 382(b) of a report disclosing a contract invention, a list or lists of each field of use in which the contractor intends to commercialize the invention or otherwise*

44

*achieve public use of the invention; but no such list shall be required for contract inventions on which the contractor did not elect to file any patent application. During such four and one-half year period the contractor shall hold temporary title to the contract invention, subject to the rights of the Government provided elsewhere in this Act. Each field will be described with sufficient particularity to allow the Government to identify those fields of use not encompassed by the described field. Upon the filing of such a completed list, or at the end of the four and one-half year period, whichever is earlier, the Government will acquire from the contractor title to all United States patents on such inventions. Neither the contractor nor any sublicensee may market or use commercially any product or process embodying the patented invention, except under the nonexclusive license granted pursuant to section 385, unless the contractor has described a field of use which embraces the product or process and has reported the field of use to the responsible agency pursuant to this section; but failure to file a field of use list prior to marketing or prior to using commercially any product or process embodying an invention shall be excused if such failure resulted from inadvertance, mistake, or excusable neglect.*

*(b) If such contractor has filed a United States patent application within a reasonable time after it has disclosed an invention under section 382(b)(1), it will receive an exclusive license in each described field of use, with the exclusive right to sublicense, under each United States patent or patent application transferred to the Government under subsection (a) of this section 384. However, its license will be subject to the Government's minimum rights under section 386 and march-in rights under section 387.*

*(c) The contractor automatically will acquire by operation of law the right to receive an exclusive license, pursuant to subsection (b) of this section in each described field of use, ninety days after it provides the responsible agency with a description of such fields of use pursuant to subsection (a), except that it will not acquire the right to receive an exclusive license in any field of use as to which the agency notifies the contractor within the ninety-day period that it has made a determination under subsection (d) of this section.*

*(d) The contractor will not acquire an exclusive license in any field of use if the responsible agency determines that the contractor's possession of such a license—*

*(1) would impair national security; or*

*(2) would create or maintain a situation inconsistent with the antitrust laws.*

*(e) An agency determination under subsection (d) of this section will include written reasons for the determination. The contractor may appeal the determination to the United States Court of Customs and Patent Appeals within sixty days after the contractor has been notified of the determination. That court will have exclusive jurisdiction to determine the matter de novo and to affirm, reverse, or modify the agency determination, specifically including authority to require that the contractor receive any exclusive license provided for by this section.*

*(f) A contractor that is not a small business or a nonprofit organization will acquire title to its contract invention in each foreign country it lists under section 382(b)(2) in which it files a patent application within a reasonable time unless the agency determines*

*that the national interest would be affected adversely. However, title will be subject to the Government's minimum rights under section 386 and march-in rights under section 387. The Government will have the right to acquire title to any patent on a contract invention in each country in which the contractor elects not to file a patent application or fails to file within a reasonable time.*

### § 385. Contractor license

*Any contractor that complies with section 382(b) automatically will receive by operation of law nonexclusive, royalty-free licenses to practice the contract invention in all countries where it does not receive title under section 383 or 384 and in all fields of use in the United States in which it does not hold an exclusive license under section 384. These nonexclusive licenses may be revoked only to the extent necessary to allow the Government to grant exclusive licenses under subchapter III.*

### § 386. Minimum Government rights

*(a) The Government will have the following minimum rights in any contract invention:*

*(1) the right to require from the contractor written reports on the use of the invention, if patented,*

*(2) a royalty-free worldwide right or license to practice the invention or have it practiced for the Government, and*

*(3) the right to license or sublicense State and local governments to practice the invention or have it practiced for them, if the agency determines at the time of contracting that acquisition of this right would serve the national interest.*

*(b) Whenever the Government has rights in any invention under this title, each United States patent application and patent on the invention will include a statement that the invention was made with Government sponsorship or support and that the Government has rights in the patent.*

### § 387. March-in rights

*(a) In any field of use, the Government may wholly or partly terminate the contractor's title or exclusive rights in any patent on a contract invention; may require the contractor to grant appropriate licenses or sublicenses to responsible applicants; or, if necessary, may grant such licenses or sublicenses itself. The Government may take such actions only—*

*(1) if the contractor has not taken and is not expected to take timely and effective action to achieve practical application of the invention in one or more of the selected fields of use;*

*(2) if necessary to protect the national security;*

*(3) if necessary to meet requirements for public use specified by Federal regulation;*

*(4) if continuation of the contractor's rights in the invention would create or maintain a situation inconsistent with the antitrust laws; or*

*(5) if the contractor has failed to comply with the reporting requirements of this Act with respect to such invention.*

*(b) These march-in rights may be exercised by the responsible agency on its own initiative or on a petition from an interested person justifying such action.*

*(c) Whenever under this section an agency requires a contractor to grant a license or sublicense, it may specify reasonable terms, including the royalties to be charged, if any; the duration of the license or sublicense; the scope of exclusivity; and the fields of use to be covered.*

### § 388. Deviation and waiver

*(a) An agency may deviate from the allocation of patent rights in contract inventions provided for in any standard patent rights clause established under section 390 acquiring more or fewer rights in the inventions, to further the agency's mission and the public interest. It may so deviate on a class basis only in accordance with regulations issued either under section 390 or, unless prohibited by those regulations, by the agency. Case-by-case deviations must be authorized by the head of the agency or his designee, and described in the Federal Register.*

*(b) The national security and antitrust march-in rights reserved by sections 387(a)(2), 387(a)(4), and 387(c) may not be waived under any circumstances.*

*(c) Rights reserved by sections 384 and 387(a)(1) may be waived only:*

> *(1) in contracts involving cosponsored, cost-sharing, or joint-venture research or development to which the contractor makes a substantial contribution of funds, facilities, technology, or equipment; or*
>
> *(2) in contracts with a contractor whose participation is necessary for the successful accomplishment of the agency's mission but cannot be obtained under the standard patent rights clause.*

### § 389. Transfer of rights to contractor employees

*The contractor's employee-inventor may receive some or all of the contractor's rights under this subchapter with the permission of the contractor and the approval of the responsible agency. The corresponding obligations of the contractor under this subchapter then will become obligations of the employee-inventor.*

### § 390. Regulations and standard patent rights clause

*(a) The Office of Federal Procurement Policy will direct the issuance of regulations to implement this title. The regulations will establish a standard patent right clause or clauses, to be included in each Federal contract except as provided in section 388.*

*(b) Such regulations shall provide payment to the Government for Federal funding of research and development activities through the sharing of royalties and/or revenues with the contractor. Such regulations shall provide, to the extent appropriate, a standard contractual clause to be included in all Federal research and development contracts.*

*(c) Such regulations may allow the agency to waive all or part of the payment set forth in subsection (a) of this section at the time of contracting or at the request of the contractor where the agency determines that—*

> *(1) the probable administrative costs are likely to be greater than the expected amount of payment; or*

*(2) the Federal Government's contribution to the technology as licensed or utilized is insubstantial compared with private investment made or to be made in technology; or*

*(3) the contractor is a small business, educational institution, or nonprofit organization; or*

*(4) the total Government funding of the technology with the contractor is less than $1,000,000; or*

*(5) the payment would place the contractor at a competitive disadvantage or would stifle commercial utilization of the technology; or*

*(6) it is otherwise in the best interests of the Government and the general public.*

*(d) Such regulations shall be promulgated within twelve months of enactment of this section. Until they become effective, each agency shall obtain payment on behalf of the Federal Government for its research and development activities on a contract-by-contract basis in a manner consistent with the provisions of this section.*

## SUBCHAPTER II—INVENTIONS OF FEDERAL EMPLOYEES

### § 391. Employee inventions

*This subchapter applies to "employment inventions", which in this Act are inventions made by Federal employees.*

### § 392. Reporting of inventions

*(a) Federal employees will file timely written reports on any inventions they make. Such reports will be made to the employee's agency and will contain complete technical information concerning the invention. The Government neither will publish nor release a report until there has been a reasonable time to file patent applications or until one year has passed since the final disposition of rights under this subchapter, whichever is earlier.*

*(b) If the responsible agency determines that the employee-inventor unreasonably has failed to file a report as required by subsection (a) of this section, the employee may be deprived of any or all of the rights he otherwise would have under this subchapter.*

### § 393. Criteria for allocation of rights

*The responsible agency will determine the rights of the Government and of Federal employee-inventors in any inventions made by employee-inventors through the use of the following criteria:*

*(1) If the invention bears a direct relation to the duties of the employee-inventor or was made in consequence of his employment, the Government will acquire all rights in the invention.*

*(2) If the invention neither bears a direct relation to the duties of the employee-inventor nor was made in consequence of his employment, but was made with a contribution from Federal funds, facilities, equipment, materials, or information not generally available to the public, or from services of other Federal employees on official duty, the employee-inventor will receive all rights in the invention, except as provided in paragraph (4) of this section. However, these rights will be subject to a nonexclusive, royalty-free, worldwide license to the Govern-*

ment to practice the invention or have it practiced for the Government.

(3) If the agency finds insufficient interest in an invention to justify exercising its rights under paragraph (1) of this section, it may permit the employee-inventor to receive any or all of those rights, subject to the Government's rights as described in paragraph (2) of this section. However, nothing in this paragraph will prevent the agency from publishing the invention or otherwise dedicating it to the public.

(4) If the agency determines that national security might be impaired if the employee-inventor were to receive rights in an invention under paragraphs (2) or (3) of this section, the Government will acquire all rights in the invention.

(5) The Government will claim no rights under this Act in any employee-invention not covered by paragraphs (1) or (2) of this section.

(6) Notwithstanding paragraph (1) of this section, an agency may enter into agreements providing for appropriate allocation of rights in inventions that result from research or development to which other parties have substantially contributed.

## § 394. Presumptions

(a) There will be a rebuttable presumption that an employee invention falls within the criteria of section 393(1) if it was made by a Federal employee who is employed or assigned to—

(1) invent, improve, or perfect any art, machine, manufacture, or composition of matter;

(2) conduct or perform research or development work;

(3) supervise, direct, coordinate, or review federally sponsored or supported research or development work; or

(4) act as liaison among agencies or individuals engaged in the work specified in paragraphs (1), (2), or (3) of this subsection.

(b) There will be a rebuttable presumption that an invention falls within the criteria of section 393(2) if it was made by any other Federal employee.

## § 395. Review of agency determinations

Agency determinations under sections 392 and 393 will be reviewed whenever—

(1) the agency determines not to acquire all rights in an invention, or

(2) an aggrieved employee-inventor requests a review.

Standards and procedures for this review will be prescribed in the regulations issued under section 399.

## § 396. Reassignment of rights

If an agency finds on the basis of new evidence that it has acquired rights in an invention greater than those to which the Government was entitled under the criteria of section 393, it will grant the employee-inventor such rights as may be necessary to correct the error.

### § 397. Incentive awards program

*(a) Agencies may monetarily reward and otherwise recognize employee-inventors as an incentive to promote employee inventions and the production and disclosure of employee inventions. For this purpose agencies may make awards under the Federal incentive awards system (5 U.S.C. ch. 45, 10 U.S.C. ch. 57, and implementing regulations), as modified by this section.*

*(b) The amount of an award for an invention will be based on—*

*(1) the extent to which the invention advances the state of the art;*

*(2) the scope of application of the invention;*

*(3) the value of the invention to the Government or the public; and*

*(4) the extent to which the invention has come into public use.*

*(c) Awards for an invention of up to $10,000 may be made by the head of an agency.*

*(d) Awards of over $10,000 but less than $35,000 may be made by the head of an agency to—*

*(1) civilian employees, with the approval of the Office of Personnel Management;*

*(2) members of the Armed Forces, with the approval of the Secretary of Defense;*

*(3) members of the United States Coast Guard when not operating as a service in the Navy, with the approval of the Secretary of Transportation;*

*(4) members of the Commissioned Corps of the United States Public Health Service, with the approval of the Secretary of Health and Human Services; and*

*(5) members of the Commissioned Corps of the National Oceanic and Atmospheric Administration, with the approval of the Secretary of Commerce.*

*(e) Awards of more than $35,000 may be made to employee-inventors by the President upon recommendation of the head of an agency.*

*(f) Acceptance of a cash award under this section constitutes an agreement that any Government use of an invention for which the award is made forms no basis for further claims against the Government by the recipient, his heirs, or his assigns.*

*(g) Any cash award or expense for honorary recognition of an employee-inventor will be paid from the fund or appropriation of the agency receiving the invention's primary benefit.*

### § 398. Income sharing from patent licenses

*In addition to awards as provided in section 397, an agency may share income received from any patent license with the employee-inventor.*

### § 399. Regulations

*(a) The Commissioner of Patents shall issue regulations to implement this title.*

*(b) Any determination of an appointing official under subsection 208(b) of title 18, United States Code, that relates to promotion of an employee invention by the employee-inventor will be subject to regulations prescribed by the Secretary of Commerce with concurrence of the Office of Government Ethics and the Attorney General.*

50

## SUBCHAPTER III—LICENSING OF FEDERALLY OWNED INVENTIONS

### § 400. Covered inventions

This subchapter applies to the licensing of all federally owned patent rights, including licenses or sublicenses granted or required to be granted by the Government under section 387. However, it does not apply to licenses established by the other sections of subchapter I of this chapter.

### § 401. Exclusive or partially exclusive licenses

(a) An agency may grant exclusive or partially exclusive domestic licenses under federally owned patent rights not automatically licensed under section 384 only if, after public notice and opportunity for filing written objections, it determines that—

(1) the desired practical application is not likely to be achieved under a nonexclusive license; and

(2) the scope of proposed exclusivity is not greater than reasonably necessary.

(b) An agency may grant exclusive or partially exclusive foreign licenses under federally owned patent rights after public notice and opportunity for filing written objections and after determining whether the interests of the Government or of United States industry in foreign commerce will be enhanced.

(c) An agency will not grant a license under this section if it determines that such a grant would create or maintain a situation inconsistent with the antitrust laws.

(d) Agencies will maintain periodically updated records of determinations to grant exclusive or partially exclusive licenses. These records will be publicly available.

### § 402. Minimum Government rights

Each license granted under section 401 will contain such terms and conditions as the agency finds appropriate to protect the interests of the Government and the public, including provisions reserving to the Government:

(1) The right to require from the licensee written reports on the use of the invention,

(2) A royalty-free, worldwide right to practice the invention or have it practiced for the Government, and

(3) The right to license State and local governments to practice the invention or have it practiced for them if the agency determines that reservation of this right would serve the national interest.

### § 403. March-in rights

(a) The Government will have the right to terminate any license granted under section 401 in whole or in part, but only—

(1) if the licensee has not taken and is not expected to take timely and effective action to achieve practical application of the invention in each of the fields of use affected;

(2) if necessary to protect national security;

(3) if necessary to meet requirements for public use specified by Federal regulation;

(4) if the continuation of the licensee's rights in the invention would create or maintain a situation inconsistent with the anti-trust laws; or

(5) if the licensee has failed to comply with the terms of the license.

(b) These march-in rights may be exercised by the responsible agency on its own initiative or on a petition from an interested person justifying such action.

### § 404. Regulations

The Office of Federal Procurement Policy will direct the issuance of regulations specifying the terms and conditions upon which federally owned patent rights may be licensed. An agency may deviate from such regulations on a class basis unless prohibited by the Office of Federal Procurement Policy.

## SUBCHAPTER IV—MISCELLANEOUS

### § 405. Patent enforcement suits and right of intervention

(a) Any exclusive licensee under this chapter may enforce its exclusive rights under the licensed patent by bringing suit without joining the United States or any other exclusive licensee as a party. However, the licensee will give prompt notice of the suit, or, of any suit filed against it respecting the patent, to the Attorney General and the agency that granted the license, and all parties will serve copies of papers on the Attorney General and the responsible agency as though they were parties to the suit.

(b) When the responsible agency is informed of any suit filed by an exclusive licensee, by the Government, or by any other person respecting a patent subject to the provisions of this chapter, it promptly will give notice to all its licensees under the patent. Any exclusive licensee will be entitled to intervene as a party in such a suit in which the validity or scope of the license patent is, or is likely to be, placed in issue.

### § 406. Background rights

Nothing contained in this chapter will be construed to deprive the owner of any background patent or of rights under such a patent.

### § 407. Notice, hearing, and judicial review

(a) Agency determinations under sections 382, 387(a), and 387(c), and 403 will be made after public notice and opportunity for a hearing in which the United States, any agency, or any interested person may participate, and will include written reasons for the determination.

(b) The United States or any participant that may be adversely affected by an agency determination covered by subsection (a) of this section may appeal the determination to the United States Court of Customs and Patent Appeals within sixty days after the determination is issued. That court will have exclusive jurisdiction to determine the matter de novo and to affirm, reverse, or modify the agency determination.

52

### § 408. Relationship to other laws

*Nothing in this chapter creates any immunities or defenses to actions under the antitrust laws.*

### § 409. Authority of Federal agencies

*(a) Agencies may apply for, obtain, maintain, and protect patent rights in the United States and in foreign countries on any invention in which the Government has an interest in order to promote the use of inventions having significant commercial potential or otherwise advance the national interest.*

*(b) Agencies may license federally owned patent rights on terms and conditions consistent with subchapter III.*

*(c) Agencies may transfer patent rights to other agencies and accept them from other agencies, in whole or in part, without regard to the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 471).*

*(d) Agencies may withhold publication or release of information disclosing any invention long enough for patent applications to be filed.*

*(e) Agencies may promote licensing of federally owned patent rights by making market surveys, acquiring technical information, or otherwise enhancing the marketability of the inventions.*

*(f) Agencies may enter into contracts necessary and appropriate to accomplish the purposes of this section.*

### § 410. Responsibilities of the Secretary of Commerce

*(a) The Commissioner of Patents will—*

*(1) consult with other agencies about areas of science and technology with potential for commercial development.*

*(2) coordinate a program to help agencies in exercising the authority given by section 409.*

*(3) evaluate inventions referred by agencies to identify those with the greatest commercial potential and to promote their public use;*

*(4) help agencies seek and maintain patents in the United States and in foreign countries by paying fees and costs and by other means;*

*(5) develop and manage a Government-wide program, with appropriate private sector participation, to stimulate transfer to the private sector of potentially valuable federally-owned technology through dissemination of information about the technology;*

*(6) publish notice of all federally-owned patent rights that are available for licensing; and*

*(7) seven years after the date of enactment of this Act, submit to the President and Congress a report describing the operation of this chapter and containing recommendations, if any, for further amendments to promote industrial innovation in the United States.*

*(b) There is authorized to be appropriated to the Commissioner of Patents such sums as may be necessary to enable the Commissioner to carry out responsibilities under this section.*

### § 411. Definitions

*As used in this chapter—*

(1) "*Agency*" means an "*executive agency*" of the Federal Government, as defined by section 105 of title 5, United States Code, and the military departments defined by section 102 of title 5, United States Code. "*Responsible agency*" means the agency which is party to a contract for the performance of research or development, has received patent rights from another agency, or has administrative jurisdiction over an employee-inventor. The Tennessee Valley Authority shall not be considered an "*agency*" for the purposes of this chapter; and this chapter shall not apply to its patent rights, contracts, and employees.

(2) "*Antitrust laws*" means the laws included within the definition of the term "Antitrust laws" in section 1 of the Clayton Act (15 U.S.C. 12), as amended.

(3) "*Contract*" means any Federal contract, cooperative agreement, or grant that provides for performance of research or development substantially funded by the Government. It covers any assignment, substitution of parties, or subcontract of the same type under such a contract. It does not cover Federal price or purchase supports, or Federal loans or loan guarantees.

(4) "*Contractor*" means any person other than an agency that is a party to a contract.

(5) "*Federal employee*" means any civil service employee as defined in section 2105 of title 5, United States Code, and any member of the uniformed services.

(6) "*Invention*" means any invention that is or may be patentable under the laws of the United States. "*Contract invention*" is defined by section 382. "*Employee invention*" is defined by section 391.

(7) "*Made*" when used in relation to any invention means conceived or first actually reduced to practice.

(8) "*Nonprofit organization*" means universities and other institutions of higher education or an organization of the type described in section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(c)) and exempt from taxation under section 501(a) of the Internal Revenue Code (26 U.S.C. 501(a)) or any nonprofit scientific or educational organization qualified under a State nonprofit organization statute.

(9) "*Patent rights*" means patents and patent licenses and sublicenses.

(10) "*Practical application*" means manufacture of a machine, composition, or product, or practice of a process or system, under conditions which establish that the invention is being worked and its benefits are available to the public on reasonable terms.

(11) "*Small business*" means a small business concern, as defined in section 2 of Public Law 85–536 (15 U.S.C. 632) and implementing regulations of the Administrator of the Small Business Administration.

(12) "*State*" means a State or territory of the United States, the District of Columbia, or the Commonwealth of Puerto Rico. "*Local*" refers to any domestic county, municipality, or other governmental entity.

(13) "*Will*", except as the context otherwise requires, has the same meaning as "shall".

54

## SECTION 12 OF THE ACT OF FEBRUARY 14, 1903

### BUREAUS IN DEPARTMENT

SEC. 12. The following named bureaus, administrations, services, offices, and programs of the public services, and all that pertains thereto, shall be under the jurisdiction and subject to the control of the Secretary of Commerce:
(a) * * *

\* \* \* \* \* \* \*

[(e) Patent Office;]

\* \* \* . \* \* \* \*

---

## SECTION 3 OF THE ACT OF APRIL 5, 1944

An Act Authorizing the construction and operation of demonstration plants to produce synthetic liquid fuels from coal, oil shales, agricultural and forestry products, and other substances, in order to aid the prosecution of the war, to conserve and increase the oil resources of the Nation, and for other purposes.

\* \* \* \* \* \* \*

[SEC. 3. The Secretary of the Interior is authorized to grant, on such terms as he may consider appropriate but subject to section 207 of the Federal Property and Administrative Services Act of 1949, licenses under patent rights acquired under this Act: *Provided*, That such licenses are consistent with the terms of the agreements by which such patent rights are acquired. No patent acquired by the Secretary of the Interior under this Act shall prevent any citizen of the United States, or corporation created under the laws of the United States or any State thereof, from using any invention, discovery, or process covered by such patent, or restrict such use by any such citizen or corporation, or be the basis of any claim against any such person or corporation on account of such use.]

---

## RESOURCES CONSERVATION AND RECOVERY ACT OF 1976

\* \* \* \* \* \* \*

### SUBTITLE H—RESEARCH, DEVELOPMENT, DEMONSTRATION, AND INFORMATION

### RESEARCH, DEMONSTRATIONS, TRAINING, AND OTHER ACTIVITIES

SEC. 8001. (a) GENERAL AUTHORITY.—* * *

\* \* \* \* \* \* \*

(c) AUTHORITIES.—(1) In carrying out subsection (a) of this section respecting solid waste research, studies, development, and demonstration, except as otherwise specifically provided in section

8004(d), the Administrator may make grants to or enter into contracts (including contracts for construction) with, public, agencies and authorities or private persons.

(2) Contracts for research, development, or demonstrations or for both (including contracts for construction) shall be made in accordance with and subject to the limitations provided with respect to research contracts of the military departments in title 10, United States Code, section 2353, except that the determination, approval, and certification required thereby shall be made by the Administrator.

[(3) Any invention made or conceived in the course of, or under, any contract under this Act shall be subject to section 9 of the Federal Nonnuclear Energy Research and Development Act of 1974 to the same extent and in the same manner as inventions made or conceived in the course of contracts under such Act, except that in applying such section, the Environmental Protection Agency shall be substituted for the Energy Research and Development Administration and the words "solid waste" shall be substituted for the word "energy" where appropriate.]

(4) For carrying out the purpose of this Act the Administrator may detail personnel of the Environmental Protection Agency to agencies eligible for assistance under this section.

\*　　\*　　\*　　\*　　\*　　\*　　\*

### FULL-SCALE DEMONSTRATION FACILITIES

Sec. 8004.(a) Authority.—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) Cost Sharing.—Wherever practicable, in constructing, operating, or providing financial assistance under this subtitle to a full-scale demonstration facility, the Administrator shall endeavor to enter into agreements and make other arrangements for maximum practicable cost sharing with other Federal, State, and local agencies, private persons, or any combination thereof.

(2) The Administrator shall enter into arrangements, wherever practicable and desirable, to provide monitoring of full-scale solid waste facilities (whether or not constructed or operated under this Act) for purposes of obtaining information concerning the performance, and other aspects, of such facilities. Where the Administrator provides only monitoring and evaluation instruments or personnel (or both) or funds for such instruments or personnel and provides no other financial assistance to a facility, [not withstanding section 8001(c)(3),] title to any invention made or conceived of in the course of developing, constructing, or operating such facility shall not be required to vest in the United States and patents respecting such invention shall not be required to be issued to the United States.

\*　　\*　　\*　　\*　　\*　　\*　　\*

## SECTION 12 OF THE ELECTRIC AND HYBRID VEHICLE RESEARCH DEVELOPMENT AND DEMONSTRATION ACT OF 1976

**SEC. 12. PATENTS.**

    〖Section 9 of the Federal Nonnuclear Energy Research and Development Act of 1974 (42 U.S.C. 5908) shall apply to any contract (including any assignment, substitution of parties, or subcontract thereunder), entered into, made, or issued by the Administrator pursuant to section 8 of this Act.〗

·———————

## SECTION 112 OF THE ACT OF JUNE 3, 1977

AN ACT To authorize appropriations to the Energy Research and Development Administration in accordance with section 261 of the Atomic Energy Act of 1954, as amended, section 305 of the Energy Reorganization Act of 1974, and section 16 of the Federal Nonnuclear Energy Research and Development Act of 1974, and for other purposes.

\*       \*       \*       \*       \*       \*       \*

## TITLE I—NONNUCLEAR PROGRAMS

\*       \*       \*       \*       \*       \*       \*

Sec. 112. (a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

    (d)(1) Grants, agreements or contracts under this section may be made to individuals, local nonprofit organizations and institutions, State and local agencies, Indian tribes and small businesses. The Administration shall develop simplified procedures with respect to application for support under this section.

    (2) Each grant, agreement or contract under this section 〖shall be governed by the provisions of section 9 of the Federal Nonnuclear Energy Research and Development Act of 1974 and〗 shall contain effective provisions under which the Administration shall receive a full written report of activities supported in whole or in part by funds made available by the Administration; and

    (3) In determining the allocation of funds among applicants for support under this section the Administrator may take into consideration:

        (A) the potential for energy savings or energy production;

        (B) the type of fuel saved or produced;

        (C) the potential impact on local or regional energy or environmental problems; and

        (D) such other criteria as the Administrator finds necessary to achieve the purposes of this Act or the purposes of the Federal Nonnuclear Energy Research and Development Act of 1974.

Guidelines implementing this section shall be promulgated with full opportunity for public comment.

\*      \*      \*      \*      \*      \*      \*

---

## SECTION 408 OF THE WATER RESEARCH AND DEVELOPMENT ACT OF 1978

[Sec. 408. With respect to patent policy and to the definition of title to, and licensing of inventions made or conceived in the course of, or under any contract or grant pursuant to this Act, and notwithstanding any other provision of law, the Secretary shall be governed by the provisions of sections 9 and 10 of the Federal Non-nuclear Energy, Research, and Development Act of 1974 (Public Law 93–577; 88 Stat. 1887, 1891; 42 U.S.C. 5908, 5909): *Provided however,* That subsections (l) and (n) of section 9 of such Act shall not apply to this Act: *Provided further, however,* That, subject to the patent policy of section 408, all research or development contracted for, sponsored, cosponsored, or authorized under authority of this Act, shall be provided in such manner that all information, data, and knowhow, regardless of their nature or mediums, resulting from such research and development will (with such exceptions and limitations, if any, as the Secretary may find to be necessary in the interest of national defense) be usefully available for practice by the general public consonant with the purpose of this Act.]

---

## TITLE 17, UNITED STATES CODE

\*      \*      \*      \*      \*      \*      \*

### §101. Definitions.

As used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

The "best edition" of a work is the edition, published in the United States at any time before the date of deposit, that the Library of Congress determines to be most suitable for its purposes.

A person's "children" are that person's immediate offspring, whether legitimate or not, and any children legally adopted by that person.

A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordi-

nated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than phonorecord, in which the work is first fixed.

"Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

A "device", machine", or "process" is one now known or later developed.

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

The terms "including" and "such as" are illustrative and not limitative.

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

"Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

"Motion pictures" are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its

59

images in any sequence or to make the sounds accompanying it audible.

"Phonorecords" are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, technical drawings, diagrams, and models. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

A "pseudonymous work" is a work on the copies or phonorecords of which the author is identified under a fictitious name.

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, consitutes publication. A public performance or display of a work does not of itself constitute publication.

To perform or display a work "publicly" means—

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

"Sound recordings" are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.

"State" includes the District of Columbia and the Commonwealth of Puerto Rico, and any territories to which this title is made applicable by an Act of Congress.

A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

A "transmission program" is a body of material that, as an aggregate, has been produced for the sole purpose of transmission to the public in sequence and as a unit.

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

The "United States", when used in a geographical sense, comprises the several States, the District of Columbia and the Commonwealth of Puerto Rico, and the organized territories under the jurisdiction of the United States Government.

A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article".

The author's "widow" or "widower" is the author's surviving spouse under the law of the author's domicile at the time of his or her death, whether or not the spouse has later remarried.

A "work of the United States Government" is a work prepared by an officer or employee of the United States Government as part of that person's official duties.

A "work made for hire" is—

    (1) a work prepared by an employee within the scope of his or her employment; or

    (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

*A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.*

    \*     \*     \*     \*     \*     \*     \*

## § 117. Scope of exclusive rights: Use in conjunction with computers and similar information systems

[Notwithstanding the provisions of sections 106 through 116 and 118, this title does not afford to the owner of copyright in a work any greater or lesser rights with respect to the use of the work in conjunction with automatic systems capable of storing, processing, retrieving, or transferring information, or in conjunction with any similar device, machine, or process, than those afforded to works

61

under the law, whether title 17 or the common law or statutes of a State, in effect on December 31, 1977, as held applicable and construed by a court in an action brought under this title.]

### § 117. Limitations on exclusive rights: Computer programs

*Notwithstanding the provisions of § 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:*

    *(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or*

    *(2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.*

*Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.*

      \*       \*       \*       \*       \*       \*       \*

---

## SECTION 302 OF THE APPALACHIAN REGIONAL DEVELOPMENT ACT OF 1965

### GRANTS FOR ADMINISTRATIVE EXPENSES OF LOCAL DEVELOPMENT DISTRICTS AND FOR RESEARCH AND DEMONSTRATION PROJECTS

SEC. 302. (a) \* \* \*

      \*       \*       \*       \*       \*       \*       \*

[(e) No part of any appropriated funds may be expended pursuant to authorization given by this Act involving any scientific or technological research or development activity unless such expenditure is conditioned upon provisions effective to insure that all information, copyrights, uses, processes, patents, and other developments resulting from that activity will be made freely available to the general public. Nothing contained in this subsection shall deprive the owner of any background patent relating to any such activity, without his consent, of any right which that owner may have under that patent. Whenever any information, copyright, use, process, patent or development resulting from any such research or development activity conducted in whole or in part with appropriated funds expended under authorization of this Act is withheld or disposed of by any person, organization, or agency in contravention of the provisions of this subsection, the Attorney General shall institute, upon his own motion or upon request made by any person having knowledge of pertinent facts, an action for the enforcement of the provisions of this subsection in the district court of the United States for any judicial district in which any defendant resides, is found, or has a place of business. Such court shall have jurisdiction to hear and determine such action, and to enter there-

62

in such orders and decrees as it shall determine to be required to carry into effect fully the provisions of this subsection. Process of the district court for any judicial district in any action instituted under this subsection may be served in any other judicial district of the United States by the United States marshal thereof. Whenever it appears to the court in which any such action is pending that other parties should be brought before the court in such action, the court may cause such other parties to be summoned from any judicial district of the United States.]

---

## THE FEDERAL NONNUCLEAR RESEARCH AND DEVELOPMENT ACT OF 1974

\*        \*        \*        \*        \*        \*        \*

### PATENT POLICY

SEC. 9. [(a) Whenever any invention is made or conceived in the course of or under any contract of the Administration, other than nuclear energy research, development, and demonstration pursuant to the Atomic Energy Act of 1954 (42 U.S.C. 2011 et seq.) and the Administrator determines that—

[(1) the person who made the invention was employed or assigned to perform research, development, or demonstration work and the invention is related to the work he was employed or assigned to perform, or that it was within the scope of his employment duties, whether or not it was made during working hours, or with a contribution by the Government of the use of Government facilities, equipment, materials, allocated funds, information proprietary to the Government, or services of Government employees during working hours; or

[(2) the person who made the invention was not employed or assigned to perform research, development, or demonstration work, but the invention is nevertheless related to the contract or to the work or duties he was employed or assigned to perform, and was made during working hours, or with a contribution from the Government of the sort referred to in clause (1).
title to such invention shall vest in the United States, and if patents on such invention are issued they shall be issued to the United States, unless in particular circumstances the Administrator waives all or any part of the rights of the United States to such invention in conformity with the provisions of this section.

[(b) Each contract entered into by the Administration with any person shall contain effective provisions under which such person shall furnish promptly to the Administration a written report containing full and complete technical information concerning any invention, discovery, improvement, or innovation which may be made in the course of or under such contract.

[(c) Under such regulations in conformity with the provisions of this section as the Administrator shall prescribe, the Administrator may waive all or any part of the rights of the United States under this section with respect to any invention or class of inventions made or which may be made by any person or class of persons in the course of or under any contract of the Administration if he de-

termines that the interests of the United States and the general public will best be served by such waiver. The Administration shall maintain a publicly available, periodically updated record of waiver determinations. In making such determinations, the Administrator shall have the following objectives:

〔(1) Making the benefits of the energy research, development, and demonstration program widely available to the public in the shortest practicable time.

〔(2) Promoting the commercial utilization of such inventions.

〔(3) Encouraging participation by private persons in the Administration's energy research, development, and demonstration program.

〔(4) Fostering competition and preventing undue market concentration or the creation or maintenance of other situations inconsistent with the antitrust laws.

〔(d) In determining whether a waiver to the contractor at the time of contracting will best serve the interests of the United States and the general public, the Administrator shall specifically include as considerations—

〔(1) the extent to which the participation of the contractor will expedite the attainment of the purposes of the program;

〔(2) the extent to which a waiver of all or any part of such rights in any or all fields of technology is needed to secure the participation of the particular contractor;

〔(3) the extent to which the contractor's commercial position may expedite utilization of the research, development, and demonstration program results;

〔(4) the extent to which the Government has contributed to the field of technology to be funded under the contract;

〔(5) the purpose and nature of the contract, including the intended use of the results developed thereunder;

〔(6) the extent to which the contractor has made or will make substantial investment of financial resources or technology developed at the contractor's private expense which will directly benefit the work to be performed under the contract;

〔(7) the extent to which the field of technology to be funded under the contract has been developed at the contractor's private expense;

〔(8) the extent to which the Government intends to further develop to the point of commercial utilization the results of the contract effort;

〔(9) the extent to which the contract objectives are concerned with the public health, public safety, or public welfare;

〔(10) the likely effect of the waiver on competition and market concentration; and

〔(11) in the case of a nonprofit educational institution, the extent to which such institution has a technology transfer capability and program, approved by the Administrator as being consistent with the applicable policies of this section.

〔(e) In determining whether a waiver to the contractor or inventor of rights to an identified invention will best serve the interests of the United States and the general public, the Administrator shall specifically include as considerations paragraphs (4) through (11) of subsection (d) as applied to the invention and—

64

〔(1) the extent to which such waiver is a reasonable and nec-
essary incentive to call forth private risk capital for the devel-
opment and commercialization of the invention; and

〔(2) the extent to which the plans, intentions, and ability of
the contractor or inventor will obtain expeditious commercial-
ization of such invention.

〔(f) Whenever title to an invention is vested in the United
States, there may be reserved to the contractor or inventor—

〔(1) a revocable or irrevocable nonexclusive, paid-up license
for the practice of the invention throughout the world; and

〔(2) the rights to such invention in any foreign country
where the United States has elected not to secure patent rights
and the contractor elects to do so, subject to the rights set
forth in paragraphs (2), (3), (6), and (7) of subsection (h): *Pro-
vided,* That when specifically requested by the Administration
and three years after issuance of such a patent, the contractor
shall submit the report specified in subsection (h)(1) of this sec-
tion.

〔(g)(1) Subject to paragraph (2) of this subsection, the Adminis-
trator shall determine and promulgate regulations specifying the
terms and conditions upon which licenses may be granted in any
invention to which title is vested in the United States.

〔(2) Pursuant to paragraph (1) of this subsection, the Adminis-
trator may grant exclusive or partially exclusive licenses in any in-
vention only if, after notice and opportunity for hearing, it is deter-
mined that—

〔(A) the interests of the United States and the general
public will best be served by the proposed license, in view of
the applicant's intentions, plans, and ability to bring the inven-
tion to the point of practical or commercial applications;

〔(B) the desired practical or commercial applications have
not been achieved, or are not likely expeditiously to be
achieved, under any nonexclusive license which has been
granted, or which may be granted, on the invention;

〔(C) exclusive or partially exclusive licensing is a reasonable
and necessary incentive to call forth risk capital and expenses
to bring the invention to the point of practical or commercial
applications; and

〔(D) the proposed terms and scope of exclusivity are not sub-
stantially greater than necessary to provide the incentive for
bringing the invention to the point of practical or commercial
applications and to permit the licensee to recoup the costs and
a reasonable profit thereon:
*Provided,* That, the Administrator shall not grant such exclusive or
partially exclusive license if he determines that the grant of such
license will tend substantially to lessen competition or result in
undue concentration in any section of the country in any line of
commerce to which the technology to be licensed relates. The Ad-
ministration shall maintain a publicly available, periodically up-
dated record of determinations to grant such licenses.

〔(h) Each waiver of rights or grant of an exclusive or partially
exclusive license shall contain such terms and conditions as the
Administrator may determine to be appropriate for the production
of the interests of the United States and the general public, includ-
ing provisions for the following:

〔(1) Periodic written reports at reasonable intervals, and when specifically requested by the Administration, on the commercial use that is being made or is intended to be made of the invention.

〔(2) At least an irrevocable, nonexclusive, paid-up license to make, use, and sell the invention throughout the world by or on behalf of the United States (including any Government agency) and States and domestic municipal governments, unless the Administrator determines that it would not be in the public interest to acquire the license for the States and domestic municipal governments.

〔(3) The right in the United States to sublicense any foreign government pursuant to any existing or future treaty or agreement if the Administrator determines it would be in the national interest to acquire this right.

〔(4) The reservation in the United States of the rights to the invention in any country in which the contractor does not file an application for patent within such time as the Administration shall determine.

〔(5) The right in the Administrator to require the granting of a nonexclusive, exclusive, or partially exclusive license to a responsible applicant or applicants, upon terms reasonable under the circumstances, (A) to the extent that the invention is required for public use by governmental regulations, or (B) as may be necessary to fulfill health, safety, or energy needs, or (C) for such other purposes as may be stipulated in the applicable agreement.

〔(6) The right in the Administrator to terminate such waiver or license in whole or in part unless the recipient of the waiver or license demonstrates to the satisfaction of the Administrator that he has taken effective steps, or within a reasonable time thereafter is expected to take such steps, necessary to accomplish substantial utilization of the invention.

〔(7) The right in the Administrator, commencing three years after the grant of a license and four years after a waiver is effective as to an invention, to require the granting of a nonexclusive or partially exclusive license to a responsible applicant or applicants, upon terms reasonable under the circumstances, and in appropriate circumstances to terminate the waiver or license in whole or in part, following a hearing upon notice thereof to the public, upon a petition by an interested person justifying such hearing—

〔(A) if the Administrator determines, upon review of such material as he deems relevant, and after the recipient of the waiver or license, or other interested person, has had the opportunity to provide such relevant and material information as the Administrator may require, that such waiver or license has tended substantially to lessen competition or to result in undue concentration in any section of the country in any line of commerce to which the technology relates; or

〔(B) unless the recipient of the waiver or license demonstrates to the satisfaction of the Administrator at such hearing that he has taken effective steps, or within a reasonable time thereafter is expected to take such steps, nec-

66

essary to accomplish substantial utilization of the invention.

[(i) The Administrator shall provide an annual periodic notice to the public in the Federal Register, or other appropriate publication, of the right to have a hearing as provided by subsection (h)(7) of this section, and of the availability of the records of determinations provided in this section.

[(j) The Administrator shall, in granting waivers or licenses, consider the small business status of the applicant.

[(k) The Administrator is authorized to take all suitable and necessary steps to protect any invention or discovery to which the United States holds title, and to require that contractors or persons who acquire rights to inventions under this section protect such inventions.]

(l) The Administration shall be considered a defense agency of the United States for the purpose of chapter 17 of title 35 of the United States Code.

[(m) As used in this section—

[(1) the term "person" means any individual, partnership, corporation, association, institution, or other entity;

[(2) the term "contract" means any contract, grant, agreement, understanding, or other arrangement, which includes research, development, or demonstration work, and includes any assignment, substitution of parties, or subcontract executed or entered into thereunder;

[(3) the term "made", when used in relation to any invention means the conception or first actual reduction to practice of such invention;

[(4) the term "invention" means inventions or discoveries, whether patented or unpatented; and

[(5) the term "contractor" means any person having a contract with or on behalf of the Administration.

[(n) Within twelve months after the date of the enactment of this Act, the Administrator with the participation of the Attorney General, the Secretary of Commerce, and other officials as the President may designate, shall submit to the President and the appropriate congressional committees a report concerning the applicability of existing patent policies affecting the programs under this Act, along with his recommendations for amendments or additions to the statutory patent policy, including his recommendations on mandatory licensing, which he deems advisable for carrying out the purposes of this Act.]

\*       \*       \*       \*       \*       \*       \*

LOAN GUARANTEES FOR ALTERNATIVE FUEL DEMONSTRATION
FACILITIES

Sec. 19. (a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(g)(1) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(4) For purposes of this section, patents, including any inventions for which a waiver was made by the Administrator [under section 9 of this Act], and technology resulting from the demonstration facility, shall be treated as project assets of such facility. The guarantee agreement shall include such detailed terms and conditions as the Administrator deems appropriate to protect the interests of the United States in the case of default and to have available all the patents and technology necessary for any person selected, including, but not limited to the Administrator, to complete and operate the defaulting project. Furthermore, the guarantee agreement shall contain a provision specifying that patents, technology, and other proprietary rights which are necessary for the completion or operation of the demonstration facility shall be available to the United States and its designees on equitable terms, including due consideration to the amount of the United States default payments. Inventions made or conceived in the course of or under such guarantee, title to which is vested in the United States under this Act, shall not be treated as project assets of such facility for disposal purposes under this subsection, unless the Administrator determines in writing that it is in the best interests of the United States to do so.

\*       \*       \*       \*       \*       \*       \*

[(r) Inventions made or conceived in the course of or under a guarantee authorized by the section shall be subject to the title and waiver requirements and conditions of section 9 of this Act.]

\*       \*       \*       \*       \*       \*       \*

————

## SECTION 5 OF THE TENNESSEE VALLEY AUTHORIZATION ACT OF 1933

Sec. 5. The board is hereby authorized—
(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(i) To request the assistance and advice of any officer, agent, or employee of any executive department or of any independent office of the United States, to enable the Corporation the better to carry out its powers successfully, and as far as practicable shall utilize the services of such officers, agents, and employees, and the President shall, if in his opinion, the public interest, service, or economy so require, direct that such assistance, advice, and service be rendered to the Corporation, and any individual that may be by the President directed to render such assistnce, advice, and service shall be thereafter subject to the orders, rules, and regulations of the board: [*Provided,* That any invention or discovery made by virtue of and incidental to such service by an employee of the Government of the United States serving under this section, or by any employee of the Corporation, together with any patents which may be granted thereon, shall be the sole and exclusive property of the Corporation, which is hereby authorized to grant such licenses thereunder as shall be authorized by the board: *Provided further,* That the board may pay to such inventor such sum from the income from sale of licenses as it may deem proper].

\*       \*       \*       \*       \*       \*       \*

68

# SECTION 5 OF THE CONSUMER PRODUCT SAFETY ACT

### PRODUCT SAFETY INFORMATION AND RESEARCH

SEC. 5. (a) * * *

*       *       *       *       *       *       *

[(d) Whenever the Federal contribution for any information, research, or development activity authorized by this Act is more than minimal, the Commission shall include in any contract, grant, or other arrangement for such activity, provisions effective to insure that the rights to all information, uses, processes, patents, and other developments resulting from that activity will be made available to the public without charge on a nonexclusive basis. Nothing in this subsection shall be construed to deprive any person of any right with he may have had prior to entering into any arrangement referred to in this subsection, to any patent, patent application, or invention.]

# SECTION 501 OF THE FEDERAL MINE SAFETY AND HEALTH ACT OF 1977

### RESEARCH

SEC. 501. (a) * * *

*       *       *       *       *       *       *

(c) In carrying out the provisions for research, demonstrations, experiments, studies, training, and education under this section and sections 301(b) and 502(a) of this Act, the Secretary of the Interior and the Secretary of Health, Education, and Welfare in coordination with the Secretary may enter into contracts with, and make grants to, public and private agencies and organizations and individuals. [No research, demonstrations, or experiments shall be carried out, contracted for, sponsored, cosponsored, or authorized under authority of this Act, unless all information, uses, products, processes, patents, and other developments resulting from such research, demonstrations, or experiments will (with such exception and limitation, if any, as the Secretary of the Interior or the Secretary of Health, Education, and Welfare in coordination with the Secretary may find to be necessary in the public interest) be available to the general public.]

*       *       *       *       *       *       *

---

# SECTION 106 OF THE NATIONAL TRAFFIC AND MOTOR VEHICLE SAFETY ACT OF 1966

SEC. 106. (a) * * *

*       *       *       *       *       *       *

〔(c) Whenever the Federal contribution for any research or development activity authorized by this Act encouraging motor vehicle safety is more than minimal, the Secretary shall include in any contract, grant, or other arrangement for such research or development activity, provisions effective to insure that all information, uses, processes, patents, and other developments resulting from that activity will be made freely and fully available to the general public. Nothing herein shall be construed to deprive the owner of any background patent of any right which he may have thereunder.〕

\*　　　\*　　　\*　　　\*　　　\*　　　\*.　　　\*

## SECTION 12 OF THE NATIONAL SCIENCE FOUNDATION ACT OF 1950

### PATENT RIGHTS

SEC. 12. (a) Each contract or other arrangement executed pursuant to this Act which relates to scientific research shall contain provisions governing the disposition of inventions produced thereunder in a manner calculated to protect the public interest and the equities of the individual or organization with which the contract or other arrangement is executed: *Provided, however,* That nothing in this Act shall be construed to authorize the Foundation to enter into any contractual or other arrangement inconsistent with any provision of law affecting the issuance or use of patents.

〔(b) No officer or employee of the Foundation shall acquire, retain, or transfer any rights, under the patent laws of the United States or otherwise, in any invention which he may make or produce in connection with performing his assigned activities and which is directly related to the subject matter thereof: *Provided, however,* That this subsection shall not be construed to prevent any officer or employee of the Foundation from executing any application for patent on any such invention for the purpose of assigning the same to the Government or its nominee in accordance with such rules and regulations as the Director may establish.〕

## SECTION 152 OF THE ATOMIC ENERGY ACT OF 1954

〔SEC. 152. INVENTIONS MADE OR CONCEIVED DURING COMMISSION CONTRACTS.—Any invention or discovery, useful in the production or utilization of special nuclear material or atomic energy, made or conceived in the course of or under any contract, subcontract, or arrangement entered into with or for the benefit of the Commission, regardless of whether the contract, subcontract, or arrangement involved the expenditure of funds by the Commission, shall be vested in, and be the property of, the Commission, except that the Commission may waive its claim to any such invention or discovery under such circumstances as the Commission may deem appropriate, consistent with the policy of this section. No patent for any invention or discovery, useful in the production or utilization of special nuclear material or atomic energy, shall be issued unless the applicant files with the application, or within thirty days after

70

request therefor by the Commissioner of Patents (unless the Commission advises the Commissioner of Patents that its rights have been determined and that accordingly no statement is necessary) a statement under oath setting forth the full facts surrounding the making or conception of the invention or discovery described in the application and whether the invention or discovery was made or conceived in the course of or under any contract, subcontract, or arrangement entered into with or for the benefit of the Commission, regardless of whether the contract, subcontract, or arrangement involved the expenditure of funds by the Commission. The Commissioner of Patents shall as soon as the application is otherwise in condition for allowance forward copies of the application and the statement to the Commission.

[The Commissioner of Patents may proceed with the application and issue the patent to the applicant (if the invention or discovery is otherwise patentable) unless the Commission, within 90 days after receipt of copies of the application and statement, directs the Commissioner of Patents to issue the patent to the Commission (if the invention or discovery is otherwise patentable) to be held by the Commission as the agent of and on behalf of the United States.

[If the Commission files such a direction with the Commissioner of Patents, and if the applicant's statement claims, and the applicant still believes, that the invention or discovery was not made or conceived in the course of or under any contract, subcontract or arrangement entered into with or for the benefit of the Commission entitling the Commission to the title to the application or the patent the applicant may, within 30 days after notification of the filing of such a direction, request a hearing before a Board of Patent Interferences. The Board shall have the power to hear and determine whether the Commission was entitled to the direction filed with the Commissioner of Patents. The Board shall follow the rules and procedures established for interference cases and an appeal may be taken by either the applicant or the Commission from the final order of the Board to the Court of Customs and Patent Appeals in accordance with the procedures governing the appeals from the Board of Patent Interferences.

[If the statement filed by the applicant should thereafter be found to contain false material statements any notification by the Commission that it has no objections to the issuance of a patent to the applicant shall not be deemed in any respect to constitute a waiver of the provisions of this section or of any applicable civil or criminal statute, and the Commission may have the title to the patent transferred to the Commission on the records of the Commissioner of Patents in accordance with the provisions of this section. A determination of rights by the Commission pursuant to a contractual provision or other arrangement prior to the request of the Commissioner of Patents for the statement, shall be final in the absence of false material statements or nondisclosure of material facts by the applicant.]

———————

## SECTION 31 OF THE TRADEMARK ACT OF 1946

**[Sec. 31. Fees and charges**

[(a) The following fees shall be paid to the Patent and Trademark Office under this Act:

[1. On filing each original application for registration of a mark in each class, $35.

[2. On filing each application for renewal in each class, $25; and on filing each application for renewal in each class after expiration of the registration, an additional fee of $5.

[3. On filing an affidavit under section 8(a) or section 8(b) for each class, $10.

[4. On filing each petition for the revival of an abandoned application, $15.

[5. On filing opposition or application for cancellation for each class, $25.

[6. On appeal from the examiner in charge of the registration of marks to the Trademark Trial and Appeal Board for each class, $25.

[7. For issuance of a new certificate of registration following change of ownership of a mark or correction of a registrant's mistake, $15.

[8. For certificate of correction of registrant's mistake or amendment after registration, $15.

[9. For certifying in any case, $1.

[10. For filing each disclaimer after registration, $15.

[11. For printed copy of registered mark, 20 cents.

[12. For recording every assignment, agreement, or other paper relating to the property in a registration or application, $20; where the document relates to more than one application or registration, $3 for each additional item.

[13. On filing notice of claim of benefits of this Act for a mark to be published under section 12(c) hereof, $10.

[(b) The Commissioner may establish charges for copies of records, publications, or services furnished by the Patent and Trademark Office, not specified above.

[(c) The Commissioner may refund any sum paid by mistake or in excess.]

### § 31. Fees

*(a) The Commissioner of Patents will establish fees for the filing and processing of an application for the registration of a trademark or other mark and for all other services performed by and materials furnished by the Patent and Trademark Office related to trademarks and other marks. Fees will be set and adjusted by the Commissioner to recover in aggregate 50 per centum of the estimated average cost to the office of such processing. Fees for all other services or materials related to trademarks and other marks will recover the estimated average cost to the office of performing the service or furnishing the material. However, no fee for the filing or processing of an application for the registration of a trademark or other mark or for the renewal or assignment of a trademark or other mark will be adjusted more than once every 3 years. No fee established under this section will take effect prior to sixty days following notice in the Federal Register.*

72

*(b) The Commissioner may waive the payment of any fee for any service or material related to trademarks or other marks in connection with an occasional request made by a department or agency of the Government, or any officer thereof. The Indian Arts and Crafts Board will not be charged any fee to register Government trademarks of genuineness and quality for Indian products or for products of particular Indian tribes and groups.*

---

## SECTION 10 OF THE ACT OF JUNE 29, 1935

AN ACT To provide for research into basic laws and principles relating to agriculture and to provide for the further development of cooperative agricultural extension work and the more complete endowment and support of land-grant colleges.

\*          \*          \*          \*          \*          \*          \*

SEC. 10. (a) In order to carry out further research on utilization and associated problems in connection with the development and application of present, new, and extended uses of agricultural commodities and products thereof authorized by section 1 of this title, and to disseminate information relative thereto, and in addition to all other appropriations authorized by this title, there is hereby authorized to be appropriated the following sums:

(1) $3,000,000 for the fiscal year ending June 30, 1947, and each subsequent fiscal year.

(2) An additional $3,000,000 for the fiscal year ending June 30, 1948, and each subsequent fiscal year.

(3) An additional $3,000,000 for the fiscal year ending June 30, 1949, and each subsequent fiscal year.

(4) An additional $3,000,000 for the fiscal year ending June 30, 1950, and each subsequent fiscal year.

(5) An additional $3,000,000 for the fiscal year ending June 30, 1951, and each subsequent fiscal year.

(6) In addition to the foregoing, such additional funds beginning with the fiscal year ending June 30, 1952, and thereafter, as the Congress may deem necessary.

The Secretary of Agriculture, in accordance with such regulations as he deems necessary, and when in his judgment the work to be performed will be carried out more effectively, more rapidly, or at less cost than if performed by the Department of Agriculture, may enter into contracts with such public or private organizations or individuals as he may find qualified to carry on work under this section without regard to the provisions of section 3709, Revised Statutes, and with respect to such contracts he may make advance progress or other payments without regard to the provisions of section 3648, Revised Statutes. Contracts hereunder may be made for work to continue not more than four years from the date of any such contract. Notwithstanding the provisions of section 5 of the Act of June 20, 1874, as amended (31 U.S.C. 713), any unexpended balances of appropriations properly obligated by contracting with an organization as provided in this subsection may remain upon the books of the Treasury for not more than five fiscal years before being carried to the surplus fund and covered into the Treasury. Research authorized under this subsection shall be conducted so far

73

as practicable at laboratories of the Department of Agriculture. Projects conducted under contract with public and private agencies shall be supplemental to and coordinated with research of these laboratories. ⟦Any contracts made pursuant to this authority shall contain requirements making the results of research and investigations available to the public through dedication, assignment to the Government, or such other means as the Secretary shall determine.⟧

*       *       *       *       *       *       *

---

## SECTION 205 OF THE AGRICULTURAL MARKETING ACT OF 1946

SEC. 205. (a) In carrying out the provisions of title II of this Act, the Secretary of Agriculture may cooperate with other branches of the Government, State agencies, private research organizations, purchasing and consuming organizations, boards of trade, chambers of commerce, other associations of business or trade organizations, transportation and storage agencies and organizations, or other persons or corporations engaged in the production, transportation, storing, processing, marketing, and distribution of agricultural products whether operating in one or more jurisdictions. The Secretary of Agriculture shall have authority to enter into contracts and agreements under the terms of regulations promulgated by him with States and agencies of States, private firms, institutions, and individuals for the purpose of conducting research and service work, making and compiling reports and surveys, and carrying out other functions relating thereto when in his judgment the services or functions to be performed will be carried out more effectively, more rapidly, or at less cost than if performed by the Department of Agriculture. Contracts hereunder may be made for work to be performed within a period not more than four years from the date of any such contract, and advance, progress, or other payments may be made. The provisions of section 3648 (31 U. S. C., sec. 529) and section 3709 (41 U. S. C., sec. 5) of the Revised Statutes shall not be applicable to contracts or agreements made under the authority of this section. Any unexpended balances of appropriations obligated by contracts as authorized by this section may, notwithstanding the provisions of section 5 of the Act of June 20, 1874, as amended (31 U. S. C., sec. 713), remain upon the books of the Treasury for not more than five fiscal years before being carried to the surplus fund and covered into the Treasury. ⟦Any contract made pursuant to this section shall contain requirements making the result of such research and investigations available to the public by such means as the Secretary of Agriculture shall determine.⟧

*       *       *       *       *       *       *

---

NATIONAL AERONAUTICS AND SPACE ADMINISTRATION
ACT OF 1958

\*        \*        \*        \*        \*        \*        \*

TITLE II—COORDINATION OF AERONAUTICAL AND SPACE
ACTIVITIES

\*        \*        \*        \*        \*        \*        \*

FUNCTIONS OF THE ADMINISTRATION

SEC. 203. (a) The Administration, in order to carry out the purpose of this Act, shall—

(1) plan, direct, and conduct aeronautical and space activities;

(2) arrange for participation by the scientific community in planning scientific measurements and observations to be made through use of aeronautical and space vehicles, and conduct or arrange for the conduct of such measurements and observations; and

(3) provide for the widest practicable and appropriate dissemination of information concerning its activities and the results thereof.

(b)(1) The Administration shall, to the extent of appropriated funds, initiate, support, and carry out such research, development, demonstration, and other related activities in ground propulsion technologies as are provided for in sections 4 through 10 of the Electric and Hybrid Vehicle Research, Development, and Demonstration Act of 1976.

(2) The Administration shall initiate, support, and carry out such research, development, demonstrations, and other related activities in solar heating and cooling technologies (to the extent that funds are appropriated therefor) as are provided for in sections 5, 6, and 9 of the Solar Heating and Cooling Demonstration Act of 1974.

(c) In the performance of its functions the Administration is authorized—

(1) to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of its operations and the exercise of the powers vested in it by law;

(2) to appoint and fix the compensation of such officers and employees as may be necessary to carry out such functions. Such officers and employees shall be appointed in accordance with the civil-service laws and their compensation fixed in accordance with the Classification Act of 1949, except that (A) to the extent the Administrator deems such action necessary to the discharge of his responsibilities, he may appoint not more than four hundred and twenty-five of the scientific, engineering, and administrative personnel of the Administration without regard to such laws, and may fix the compensation of such personnel not in excess of the highest rate of grade 18 of the General Schedule of the Classification Act of 1949, as amended,

75

and (B) to the extent the Administrator deems such action necessary to recruit specially qualified scientific and enginnering talent, he may establish the entrance grade for scientific and engineering personnel without previous service in the Federal Government at a level up to two grades higher than the grade provided for such personnel under the General Schedule established by the Classification Act of 1949, and fix their compensation accordingly;

(3) to acquire (by purchase, lease, condemnation, or otherwise), construct, improve, repair, operate, and maintain laboratories, research and testing sites and facilities, aeronatuical and space vehicles, quarters and related accommodations for employees and dependents of employees of the Administration, and such other real and personal property (including patents), or any interest therein, as the Administration deems necessary within and outside the continental United States; to acquire by lease or otherwise, through the Administrator of General Services, buildings or parts of buildings in the District of Columbia for the use of the Administration for a period not to exceed ten years without regard to the Act of March 3, 1877 (40 U.S.C. 34); to lease to others such real and personal property; to sell and otherwise dispose of real and personal property [(including patents and rights thereunder)] in accordance with the provisions of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 471 et seq.); and to provide by contract or otherwise for cafeterias and other necessary facilities for the welfare of employees of the Administration at its installations and purchase and maintain equipment therefor;

(4) to accept unconditional gifts or donations of services, money, or property, real, personal, or mixed, tangible or intangible;

(5) without regard to section 3648 of the Revised Statutes, as amended (31 U.S.C. 529), to enter into and perform such contracts, leases, cooperative agreements, or other transactions as may be necessary in the conduct of its work and on such terms as it may deem appropriate, with any agency or instrumentality of the United States, or with any State, Territory, or possession, or with any political subdivision thereof, or with any person, firm, association, corporation, or educational institution. To the maximum extent practicable and consistent with the accomplishment of the purpose of this Act, such contracts, leases, agreements, and other transactions shall be allocated by the Administrator in a manner which will enable small-business concerns to participate equitably and proportionately in the conduct of the work of the Administration;

(6) to use, with their consent, the services, equipment, personnel, and facilities of Federal and other agencies with or without reimbursement, and on a similar basis to cooperate with other public and private agencies and instrumentalities in the use of services, equipment, and facilities. Each department and agency of the Federal Government shall cooperate fully with the Administration in making its services, equipment, personnel, and facilities available to the Administration, and any such department or agency is authorized, notwithstanding any other provision of law, to transfer to or to receive from the

Administration, without reimbursement, aeronautical and space vehicles, and supplies and equipment other than administrative supplies or equipment;

(7) to appoint such advisory committees as may be appropriate for purposes of consultation and advise to the Administration in the performance of its functions;

(8) to establish within the Administration such offices and procedures as may be appropriate to provide for the greatest possible coordination of its activities under this Act with related scientific and other activities being carried on by other public and private agencies and organizations;

(9) to obtain services as authorized by section 3109 of title 5, United States Code, but at rates for individuals not to exceed the per diem rate equivalent to the rate for G–18;

(10) when determined by the Administrator to be necessary, and subject to such security investigations as he may determine to be appropriate, to employ aliens without regard to statutory provisions prohibiting payment of compensation to aliens;

(11) to provide by concession, without regard to section 321 of the Act of June 30, 1932 (47 Stat. 412; 40 U.S.C. 303b), on such terms as the Administrator may deem to be appropriate and to be necessary to protect the concessioner against loss of his investment in property (but not anticipated profits) resulting from the Administration's discretionary acts and decisions, for the construction, maintenance, and operation of all manner of facilities and equipment for visitors to the several installations of the Administration and, in connection therewith, to provide services incident to the dissemination of information concerning its activities to such visitors, without charge or with a reasonable charge therefor (with this authority being in addition to any other authority which the Administration may have to provide facilities, equipment, and services for visitors to its installations). A concession agreement under this paragraph may be negotiated with any qualified proposer following due consideration of all proposals received after reasonable public notice of the intention to contract. The concessioner shall be afforded a reasonable opportunity to make a profit commensurate with the capital invested and the obligations assumed, and the consideration paid by him for the concession shall be based on the probable value of such opportunity and not on maximizing revenue to the United States. Each concession agreement shall specify the manner in which the concessioner's records are to be maintained, and shall provide for access to any such records by the Administration and the Comptroller General of the United States for a period of five years after the close of the business year to which such records relate. A concessioner may be accorded a possessory interest, consisting of all incidents of ownership except legal title (which shall vest in the United States), in any structure, fixture, or improvement he constructs or locates upon land owned by the United States; and, with the approval of the Administration, such possessory interest may be assigned, transferred, encumbered, or relinquished by him, and, unless otherwise provided by contract, shall not be extinguished by the expiration or other termination of the conces-

77

sion and may not be taken for public use without just compensation;

(12) with the approval of the President, to enter into cooperative agreements under which members of the Army, Navy, Air Force, and Marine Corps may be detailed by the appropriate Secretary for services in the performance of functions under this Act to the same extent as that to which they might be lawfully assigned in the Department of Defense;

(13) (A) to consider, ascertain, adjust, determine, settle, and pay, on behalf of the United States, in full satisfaction thereof, any claim for $25,000 or less against the United States for bodily injury, death, or damage to or loss of real or personal property resulting from the conduct of the Administration's functions as specified in subsection (a) of this section, where such claim is presented to the Administration in writing within two years after the accident or incident out of which the claim arises; and

(B) if the Administration considers that a claim in excess of $5,000 is meritorious and would otherwise be covered by this paragraph, to report the facts and circumstances thereof to the Congress for its consideration; and

*(14) to provide effective contractual provisions for reporting the results of the activities of the Administration, including full and complete technical reporting of any innovation made in the course of or under any contract of the Administration.*

*(d) For the purposes of chapter 17 of title 35 of the United States Code the Administration shall be considered a defense agency of the United States.*

\* \* \* \* \* \* \*

## TITLE III—MISCELLANEOUS

\* \* \* \* \* \* \*

### ⟦PROPERTY RIGHTS IN INVENTIONS

⟦Sec. 305. (a) Whenever any invention is made in the performance of any work under any contract of the Administration, and the Administrator determines that—

⟦(1) the person who made the invention was employed or assigned to perform research, development, or exploration work and the invention is related to the work he was employed or assigned to perform, or that it was within the scope of his employment duties, whether or not it was made during working hours, or with a contribution by the Government of the use of Government facilities, equipment, materials, allocated funds, information proprietary to the Government, or services of Government employees during working hours; or

⟦(2) the person who made the invention was not employed or assigned to perform research, development, or exploration work, but the invention is nevertheless related to the contract, or to the work or duties he was employed or assigned to perform, and was made during working hours, or with a contribution from the Government of the sort referred to in clause (1),

78

such invention shall be the exclusive property of the United States, and if such invention is patentable a patent therefor shall be issued to the United States upon application made by the Administrator, unless the Administrator waives all or any part of the rights of the United States to such invention in conformity with the provisions of subsection (f) of this section.

〔(b) Each contract entered into by the Administrator with any party for the performance of any work shall contain effective provisions under which such party shall furnish promptly to the Administrator a written report containing full and complete technical information concerning any invention, discovery, improvement, or innovation which may be made in the performance of any such work.

〔(c)[1] No patent may be issued to any applicant other than the Administrator for any invention which appears to the Commissioner of Patents to have significant utility in the conduct of aeronautical and space activities unless the applicant files with the Commissioner, with the application or within thirty days after request therefor by the Commissioner, a written statement executed under oath setting forth the full facts concerning the circumstances under which such invention was made and stating the relationship (if any) of such invention to the performance of any work under any contract of the Administration. Copies of each such statement and the application to which it relates shall be transmitted forthwith by the Commissioner to the Administrator.

〔(d)[1] Upon any application as to which any such statement has been transmitted to the Administrator, the Commissioner may, if the invention is patentable, issue a patent to the applicant unless the Administrator, within ninety days after receipt of such application and statement, requests that such patent be issued to him on behalf of the United States. If, within such time, the Administrator files such a request with the Commissioner, the Commissioner shall transmit notice thereof to the applicant, and shall issue such patent to the Administrator unless the applicant within thirty days after receipt of such notice requests a hearing before a Board of Patent Interferences on the question whether the Administrator is entitled under this section to receive such patent. The Board may hear and determine, in accordance with rules and procedures established for interference cases, the question so presented, and its determination shall be subject to appeal by the applicant or by the Administrator to the Court of Customs and Patent Appeals in accordance with procedures governing appeals from decisions of the Board of Patent Interferences in other proceedings.

〔(e)[1] Whenever any patent has been issued to any applicant in conformity with subsection (d), and the Administrator thereafter has reason to believe that the statement filed by the applicant in connection therewith contained any false representation of any material fact, the Administrator within five years after the date of issuance of such patent may file with the Commissioner a request for the transfer to the Administrator of title to such patent on the records of the Commissioner. Notice of any such request shall be transmitted by the Commissioner to the owner of record of such patent, and title to such patent shall be so transferred to the Administrator unless within thirty days after receipt of such notice such owner of record requests a hearing before a Board of Patent

---

[1] These subsections continue in effect with respect to certain applications for patents filed or requested to be filed before the first day of the seventh month beginning after the date of enactment of this Act.

79

Interferences on the question whether any such false representation was contained in such statement. Such question shall be heard and determined, and determination thereof shall be subject to review, in the manner prescribed by subsection (d) for questions arising thereunder. No request made by the Administrator under this subsection for the transfer of title to any patent, and no prosecution for the violation of any criminal statute, shall be barred by any failure of the Administrator to make a request under subsection (d) for the issuance of such patent to him, or by any notice previously given by the Administrator stating that he had no objection to the issuance of such patent to the applicant therefor.

〔(f) Under such regulations in conformity with this subsection as the Administrator shall prescribe, he may waive all or any part of the rights of the United States under this section with respect to any invention or class of inventions made or which may be made by any person or class of persons in the performance of any work required by any contract of the Administration if the Administrator determines that the interests of the United States will be served thereby. Any such waiver may be made upon such terms and under such conditions as the Administrator shall determine to be required for the protection of the interests of the United States. Each such waiver made with respect to any invention shall be subject to the reservation by the Administrator of an irrevocable, nonexclusive, nontransferrable, royalty-free license for the practice of such invention throughout the world by or on behalf of the United States or any foreign government pursuant to any treaty or agreement with the United States. Each proposal for any waiver under this subsection shall be referred to an Inventions and Contributions Board which shall be established by the Administrator within the Administration. Such Board shall accord to each interested party an opportunity for hearing, and shall transmit to the Administrator its findings of fact with respect to such proposal and its recommendations for action to be taken with respect thereto.

〔(g) The Administrator shall determine, and promulgate regulations specifying the terms and conditions upon which licenses will be granted by the Administration for the practice by any person (other than an agency of the United States) of any invention for which the Administrator holds a patent on behalf of the United States.

〔(h) The Administrator is authorized to take all suitable and necessary steps to protect any invention or discovery to which he has title, and to require that contractors or persons who retain title to inventions or discoveries under this section protect the inventions or discoveries to which the Administration has or may acquire a license of use.

〔(i) The Administration shall be considered a defense agency of the United States for the purpose of chapter 17 of title 35 of the United States Code.

〔(j) As used in this section—
   〔(1) the term "person" means any individual, partnership, corporation, association, institution, or other entity;
   〔(2) the term "contract" means any actual or proposed contract, agreement, understanding, or othre arrangement, and includes any assignment, substitution of parties, or subcontract executed or entered into thereunder; and

80

[(3) the term "made", when used in relation to any invention, means the conception or first actual reduction to practice of such invention.]

CONTRIBUTIONS AWARDS

SEC. 306. (a) Subject to the provisions of this section, the Administrator is authorized, upon his own initiative or upon application of any person, to make a monetary award, in such amount and upon such terms as he shall determine to be warranted, to any person [(as defined by section 305)] for any scientific or technical contribution to the Administration which is determined by the Administrator to have significant value in the conduct of aeronautical and space activities. Each application made for any such award shall be referred to [the Inventions and Contributions Board established under section 305 of this Act.] *an Inventions and Contributions Board which shall be established by the Administrator within the Administration.* Such Board shall accord to each such applicant an opportunity for hearing upon such application, and shall transmit to the Administrator its recommendation as to the terms of the award, if any, to be made to such applicant for such contribution. In determining the terms and conditions of any award the Administrator shall take into account—

(1) the value of the contribution to the United States;

(2) the aggregate amount of any sums which have been expended by the applicant for the development of such contribution;

(3) the amount of any compensation (other than salary received for services rendered as an officer or employee of the Government) previously received by the applicant for or on account of the use of such contribution by the United States; and

(4) such other factors as the Administrator shall determine to be material.

\*      \*      \*      \*      \*      \*      \*

---

## SECTION 6 OF THE ACT OF JULY 7, 1960

AN ACT To encourage and stimulate the production and conservation of coal in the United States through research and development by authorizing the Secretary of the Interior to contract for coal research, and for other purposes.

\*      \*      \*      \*      \*      \*      \*

[SEC. 6. No research shall be carried out, contracted for, sponsored, cosponsored, or authorized under authority of this Act, unless all information, uses, products, processes, patents, and other developments resulting from such research will (with such exceptions and limitations, if any, as the Secretary may find to be necessary in the interest of national defense) be available to the general public. Wherever in the estimation of the Secretary the purposes of this Act would be furthered through the use of patented processes or equipment, the Secretary is authorized to enter into such agreements as he deems necessary for the acquisition or use of such patents on reasonable terms and conditions.]

81

———————

## SECTION 4 OF THE HELIUM ACT AMENDMENTS OF 1960

SEC. 4. The Secretary is authorized to maintain and operate helium production and purification plants together with facilities and accessories thereto; to acquire, store, transport, sell, and conserve helium, helium-bearing natural gas, and helium-gas mixtures, to conduct exploration for and production of helium on and from the lands acquired, leased, or reserved; and to conduct or contract with public or private parties for experimentation and research to discover helium supplies and to improve processes and methods of helium production, purification, transportation, liquefaction, storage, and utilization: [*Provided, however,* That all research contracted for, sponsored, cosponsored, or authorized under authority of this Act shall be provided for in such a manner that all information, uses, products, processes, patents and other developments resulting from such research developed by Government expenditure will (with such exceptions and limitations, if any, as the Secretary may find to be necessary in the interest of national defense) be available to the general public: *And provided further,* That nothing contained herein shall be construed as to deprive the owner of any background patent relating thereto to such rights as he may have thereunder]

## SECTION 32 OF THE ARMS CONTROL AND DISARMAMENT ACT

### [PATENTS

[SEC. 32. All research within the United States contracted for, sponsored, cosponsored, or authorized under authority of this Act, shall be provided for in such manner that all information as to uses, products, processes, patents, and other developments resulting from such research developed by Government expenditure will (with such exceptions and limitations, if any, as the Director may find to be necessary in the public interest) be available to the general public. This subsection shall not be so construed as to deprive the owner of any background patent relating thereto of such rights as he may have thereunder.]

O

# Exhibit QQ

[COMMITTEE PRINT]

# BACKGROUND MATERIALS ON GOVERNMENT PATENT POLICIES

## The Ownership of Inventions Resulting From Federally Funded Research and Development

VOLUME II—REPORTS OF COMMITTEES, COMMISSIONS, AND MAJOR STUDIES

SUBCOMMITTEE ON
DOMESTIC AND INTERNATIONAL
SCIENTIFIC PLANNING AND ANALYSIS

OF THE

COMMITTEE ON SCIENCE AND TECHNOLOGY
U.S. HOUSE OF REPRESENTATIVES

NINETY-FOURTH CONGRESS

SECOND SESSION

Serial AAA



AUGUST 1976

Printed for the use of the Committee on Science and Technology

U.S. GOVERNMENT PRINTING OFFICE
76-828        WASHINGTON : 1977

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $2.10

H702-7

## COMMITTEE ON SCIENCE AND TECHNOLOGY

### OLIN E. TEAGUE, Texas, *Chairman*

KEN HECHLER, West Virginia
THOMAS N. DOWNING, Virginia
DON FUQUA, Florida
JAMES W. SYMINGTON, Missouri
WALTER FLOWERS, Alabama
ROBERT A. ROE, New Jersey
MIKE McCORMACK, Washington
GEORGE E. BROWN, Jr., California
DALE MILFORD, Texas
RAY THORNTON, Arkansas
JAMES H. SCHEUER, New York
RICHARD L. OTTINGER, New York
HENRY A. WAXMAN, California
PHILIP H. HAYES, Indiana
TOM HARKIN, Iowa
JIM LLOYD, California
JEROME A. AMBRO, New York
CHRISTOPHER J. DODD, Connecticut
MICHAEL T. BLOUIN, Iowa
TIM L. HALL, Illinois
ROBERT (BOB) KRUEGER, Texas
MARILYN LLOYD, Tennessee
JAMES J. BLANCHARD, Michigan
TIMOTHY E. WIRTH, Colorado

CHARLES A. MOSHER, Ohio
ALPHONZO BELL, California
JOHN JARMAN, Oklahoma
JOHN W. WYDLER, New York
LARRY WINN, Jr., Florida
LOUIS FREY, Jr., Florida
BARRY M. GOLDWATER, Jr., California
MARVIN L. ESCH, Michigan
JOHN B. CONLAN, Arizona
GARY A. MYERS, Pennsylvania
DAVID F. EMERY, Maine
LARRY PRESSLER, South Dakota

JOHN L. SWIGERT, Jr., *Executive Director*
HAROLD A. GOULD, *Deputy Director*
PHILIP B. YEAGER, *Counsel*
FRANK R. HAMMILL, Jr., *Counsel*
JAMES E. WILSON, *Technical Consultant*
J. THOMAS RATCHFORD, *Science Consultant*
JOHN D. HOLMFELD, *Science Consultant*
RALPH N. REAI, *Technical Consultant*
ROBERT C. L. KETCHAM, *Counsel*
REGINA A. DAVIS, *Chief Clerk*
MICHAEL A. SUPERATA, *Minority Counsel*

### SUBCOMMITTEE ON DOMESTIC AND INTERNATIONAL SCIENTIFIC PLANNING AND ANALYSIS

### RAY THORNTON, Arkansas, *Chairman*

ROBERT A. ROE, New Jersey
DALE MILFORD, Texas
JAMES H. SCHEUER, New York
HENRY A. WAXMAN, California
JEROME A. AMBRO, New York
JAMES BLANCHARD, Michigan

JOHN B. CONLAN, Arizona
JOHN JARMAN, Oklahoma
GARY A. MYERS, Pennsylvania

### SUBCOMMITTEE STAFF

JOHN D. HOLMFELD, *Science Consultant*
DARCIA D. BRACKEN, *Science Consultant*
JAMES L. GALLAGHER, *Minority Technical Consultant*

(II)

# LETTER OF TRANSMITTAL

HOUSE OF REPRESENTATIVES,
COMMITTEE ON SCIENCE AND TECHNOLOGY,
*Washington, D.C., August 28, 1976.*

Hon. OLIN E. TEAGUE,
*Chairman, Committee on Science and Technology, House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: I am transmitting herewith a set of selected readings intended to provide our Subcommittee members with an understanding of present government policies concerning patent rights to inventions developed when the primary source for research and development funding is the Federal Government. This Committee print is entitled, "Background Materials on Government Patent Policies—The Ownership of Inventions Resulting From Federally-Funded Research and Development."

Over the years, the Federal Government has developed patent policies on an Agency-by-Agency basis. During several previous hearings held by this Subcommittee, the impact of these policies for patenting and licensing federally-funded R. & D. results have been suggested as a timely subject for review.

I believe that the materials in this report will provide a well-rounded background for our forthcoming hearings. They include the relevant government documents as well as other readings. I commend them to you and the members of the Committee on Science and Technology.

Sincerely yours,

RAY THORNTON, *Chairman,*
*Subcommittee on Domestic and International*
*Scientific Planning and Analysis.*

(III)

# CONTENTS

## VOLUME II

| | Page |
|---|---|
| Letter of Transmittal | III |
| Contents | V |
| Introduction | IX |
| **Report of the National Patent Planning Committee—Government-Owned Patents and Inventions of Government Employees and Contractors— 1945** | 1 |
| I. Introduction | 1 |
| II. Government-owned patents | 2 |
| A. Ownership of patents by the Government | 2 |
| B. Extending the use of Government-owned patents | 3 |
| III. Inventions of Government employees | 6 |
| A. Law relating to inventions made by employee | 6 |
| B. Statutes relating to inventions made by Government employees | 7 |
| C. General practices of the Government departments with regard to inventions by employees | 8 |
| D. Policy regarding inventions of Government employees | 9 |
| IV. Government sponsored and aided inventions | 10 |
| V. Control over the administration of Government patent policies and practices | 11 |
| VI. Summary of major conclusions and recommendations | 12 |
| **Investigation of Government Patent Practices and Policies—Report and Recommendations of the Attorney General to the President (The Attorney General's Report) 1947** | 15 |
| Introduction | 15 |
| The procedure | 15 |
| Final Report of the Attorney General to the President | 16 |
| Patent policies and practices of Government departments and agencies relating to inventions of their employees and contractors | 16 |
| Summary of findings, conclusions, and recommendations of the Attorney General | 17 |
| I. Patent aspects of Government research | 17 |
| II. Inventions made by Government employees | 17 |
| A. Findings and conclusions of Attorney General | 17 |
| B. Recommendations of Attorney General | 18 |
| III. Rewards to employees | 18 |
| A. Findings and conclusions of Attorney General | 18 |
| B. Recommendations of Attorney General | 19 |
| IV. Inventions made by Government contractors | 19 |
| A. Findings and conclusions of Attorney General | 19 |
| B. Recommendations of Attorney General | 20 |
| V. Administration of Government-owned patent rights | 21 |
| A. Findings and conclusions of Attorney General | 21 |
| B. Recommendations of Attorney General | 22 |
| VI. Foreign rights | 22 |
| VII. Secrecy | 23 |
| VIII. Uniform policy and procedure | 23 |
| A. Findings and conclusions of Attorney General | 23 |
| B. Recommendations of Attorney General | 23 |
| Chapter One—The patent aspects of Government research | 24 |
| I. Government research | 24 |
| II. Patent problems posed by Government-financed research | 27 |
| III. Objective of a sound policy | 28 |

VI

|  |  | Page |
|---|---|---|
| Government Patent Policy—Its Impact on Contractor Cooperation with the Government and Widespread Use of Government Sponsored Technology (The Holst Report) 1963 | | 31 |
| Summary and conclusions | | 31 |
| Presidential memorandum on Government patent policy | | 34 |
| Government patent policy and its impact on contractor cooperation with the Government and widespread use of Government sponsored technology | | 36 |
| Introduction | | 36 |
| Nature of this study | | 36 |
| Government patent policy questionnaire | | 37 |
| Consequences to Contractor of Undertaking R. & D. for the Government | | 43 |
| (a) The function of R. & D. to the contractor | | 43 |
| (b) Effect of use of scarce manpower | | 45 |
| (c) Effect on contractor's commercial business | | 45 |
| (d) The significance of patents and technology to contractors | | 46 |
| Objectives of Government contracting for R. & D | | 47 |
| (a) First things first—Wanted: Weapons, space systems and tangible end results | | 47 |
| (b) Maximizing secondary benefits | | 49 |
| (c) Assurance of competitve supply and multiple sources of procurement | | 49 |
| (d) Government's dependence on private proprietary rights and technology | | 49 |
| (e) Patents and technology as incentives to seek Government contracts | | 51 |
| (f) Requirements for widespread public use | | 51 |
| (g) Likelihood of commercial use as affected by ownership | | 52 |
| The respective contributions of the inventor and the entrepreneur | | 52 |
| (a) The separate roles of inventor and entrepreneur | | 52 |
| (b) The requirements and comparative investments and risks of each | | 52 |
| (c) Function of the patent in attracting and protecting the entrepreneur | | 53 |
| Experience in getting inventions and technology used | | 54 |
| (a) Government experience | | 55 |
| (b) Experience under private ownership and exploitation | | 56 |
| Some basic problems in securing use of Government patents and technology | | 56 |
| (a) Inherent difficulty of subject matter and communication | | 57 |
| (b) Required further know-how, effort and cost | | 57 |
| (c) High mortality of new concepts and products | | 58 |
| (d) Necessity for favorable terms and high rates on successful few | | 58 |
| (e) Problems in selecting concepts to promote and license | | 59 |
| (f) Difficulties of a centralized every-subject promotion agency | | 59 |
| Some unobvious benefits to the Government and the public from widespread use | | 60 |
| (a) Lower costs, availability of parts and service, and continued development | | 60 |
| (b) General contribution to the economy | | 60 |
| Report of the President's Commission on the Patent System—1966 | | 65 |
| Government patent policy Recommendation XXXII | | 65 |
| Government Patent Policy Study (Harbridge House Report) 1968 | | 69 |
| Preface | | 69 |
| Summary and analysis of findings | | 70 |
| A. Study objectives and approach | | 70 |
| B. Effect of Government patent policy on commercial utilization | | 71 |
| 1. Effect of agency mission and commercial potential of sample inventions on utilization | | 73 |
| 2. Private development costs | | 74 |
| 3. Patent rights as incentives to commercial utilization | | 74 |
| 4. Effect of patent policy | | 77 |
| C. Effect of Government patent policy on business competition | | 77 |

VII

Goverment Patent Policy Study—Continued
Summary and analysis of findings—Continued

| | Page |
|---|---|
| D. Effect of Government patent policy on industry participation in Government R. & D. programs | 79 |
| Part I. The Study Task | 82 |
| Part II. The Policy Criteria and the Sources of Government Invention | 83 |
| Part III. Effect of Patent Policy on Commercial Utilization | 87 |
| A. The utilization survey | 87 |
| B. Extent of commercial utilization | 88 |
| 1. Contractor sales and development costs | 88 |
| 2. Licensee sales and development costs | 90 |
| 3. Utilization of inventions from the institutional environment | 91 |
| C. Concentration of patent holdings and utilizations | 92 |
| 1. Contractor-owned inventions | 92 |
| 2. Invention holdings and utilization by firm and percent Government business | 92 |
| 3. Government-owned inventions | 94 |
| D. Factors affecting utilization | 97 |
| 1. Contractor-owned inventions | 97 |
| 2. Public-service agency inventions | 105 |
| 3. Transfer of technology in the nonprofit environment | 107 |
| E. Speed of utilization | 112 |
| F. Reasons for nonutilization | 113 |
| 1. Contractor inventions | 113 |
| 2. Government-owned inventions | 115 |
| Part IV. Effect of Government Patent Policy on Business Competition | 116 |
| A. Introduction | 116 |
| B. Licensing of inventions in the utilization sample | 118 |
| 1. Licensing of sample inventions | 118 |
| 2. Speed in licensing | 121 |
| 3. Refusal to license | 122 |
| C. Sample patents involved in lawsuits | 125 |
| 1. Research approach | 125 |
| 2. The patents involved in lawsuits | 126 |
| 3. The effect of litigated patents on competition | 128 |
| Part V. Effect of Government patent policy on industry participation in Government R. & D. programs | 131 |
| A. Introduction | 131 |
| B. Effects of Government patent policy on a major Government program | 134 |
| 1. Lack of collaboration in the National Institutes of Health (NIH) medicinal chemistry program | 134 |
| 2. The two major effects | 136 |
| Report and recommendations on Government Patent Policy of the Committee on Government Patent Policy of the Federal Council for Science and Technology—1968 | 143 |
| Summary | 143 |
| Part I—Background | 144 |
| A. Establishment of the Committee on Government Patent Policy | 144 |
| B. Study approach | 145 |
| C. Description of the study contract | 146 |
| Part II—Results of the Harbridge House study | 148 |
| A. Questionnaire sample and response | 148 |
| B. Analysis of questionnaire data | 150 |
| 1. Summary of commercial utilization | 150 |
| 2. Factors affecting utilization | 151 |
| 3. Commercial sales and private development costs | 153 |
| 4. Timelag to commercial utilization | 154 |
| 5. Licensing of inventions | 154 |
| C. Case Studies—Inventions of Some Public-Oriented Agencies | 154 |
| 1. Public-orientation of the inventions | 155 |
| 2. State of development and promotional activities | 156 |
| 3. Patent rights | 157 |

VIII

Report and recommendations, etc.—Continued
  Part II—Results of the Harbridge House study—Continued

Page
    D. Case studies—Patent activities of educational and nonprofit institutions_____ 158
       1. Characteristics of institution inventions_____ 159
       2. Patenting versus publication_____ 159
       3. Promotional activities_____ 159
    E. Case studies—high and low utilizing contractors_____ 161
       1. Barriers to utilization_____ 162
       2. Dominant industrial attitude toward Government patent policy_____ 163
    F. Case studies—Industrial participation in Government R. & D. 165
       1. Studies of the NIH university grant program_____ 166
       2. Studies of Interior cases_____ 169
    G. Case studies—Effects of competition_____ 170
       1. Licensing of inventions_____ 171
       2. Litigated patents_____ 173
  Part III—Application of the study results to the Presidential policy_ 173
    A. General conclusions_____ 173
    B. Section 1(a)—Government acquisition of title_____ 174
    C. Section 1(a)—Exceptional circumstances and greater rights__ 176
    D. Section 1(b)—Contractor acquisition of title_____ 177
    E. Section 1(c)—Allocation of rights to identified inventions__ 179
    F. Sections 1(f) and 1(g)_____ 180
    G. Section 2_____ 180
  Part IV—Conclusions and recommendations_____ 181
    A. Conclusions_____ 181
    B. Recommendations_____ 182

Report of the Commission on Government Procurement—1972_____ 185
  Part I.—Patents, Technical Data and Copyrights_____ 185
  Chapter 1. Introduction and Summary of Recommendations_____ 185
  Chapter 2. Patents_____ 186
    Rights in Inventions Made Under Government Contracts_____ 186
      Background_____ 187
        The nature of patent rights_____ 187
        The nature of the inventive process_____ 187
      The present policy and its evolution_____ 188
        Policy prior to the Presidential policy statement of 1963_ 188
        The Presidential policy statement_____ 190
          Need to evaluate the Presidential policy_____ 192
          Need for prompt and uniform implementation of the Presidential policy_____ 192
          Exclusive licensing_____ 192
          March-in rights under the Presidential Policy_____ 193
          Possible weaknesses of the Presidential Policy_____ 193
      An alternate approach_____ 195
    Use of Patented Inventions by or for the Government_____ 197
      Background_____ 197
        Legal remedies for "Infringement" by or for the Government_____ 197
        The granting of authorization and consent_____ 199
        Indemnification_____ 200
        Administrative settlements_____ 201
          DOD administrative claim procedures_____ 202
          Patent Compensation Board_____ 203
          "Preprocurement Licensing"_____ 203
      The underlying considerations and issues involved_____ 204
        Authorization and consent_____ 205
        Patent indemnity_____ 205
        Administrative settlement of patent claims and acquisition of patent rights_____ 205
        District Court Jurisdiction in actions under 28 U.S.C. section 1498_____ 206

# INTRODUCTION

During the current legislative session the Committee on Science and Technology's Subcommittee on Domestic and International Scientific Planning and Analysis has undertaken to fulfill its responsibility of Special Oversight for all non-military funded Research and Development. In the course of this effort a broad range of subjects have been analyzed in Committee Prints, Hearings, and Reports. The Subcommittee has addressed internal R & D coordination and issues of international significance. It is informative that during hearings ranging from International Cooperation in Energy Research and Development to hearings on Federal Research and Development Expenditures and the National Economy a common theme has emerged—the significance of the Government's patent policies in the development of new technologies invented as a result of federally funded research and development.

This is not a new interest for the Committee on Science and Technology. In 1965, the Hon. Emilio Q. Daddario, then a Representative in Congress from the First Congressional District of the State of Connecticut and a Subcommittee Chairman of this Committee reviewed the government patent policies applicable to our national space program. Following the extensive hearings on this subject, Mr. Daddario testified before the Committee on the Judiciary of the United States Senate. He outlined the efforts of the special subcommittee which he chaired and summarized the concerns which are still germane today:

... It is very clear ... that where federally financed research and development is concerned both Government and the contractor have logical and justifiable equities in the ownership of such patents as may arise in the course of the contract.

It is idle to pretend that the Government, at least in its role of representing the public, has no reason for nor interest in the title to such patents. Without the use of the taxpayers' funds the patent might not evolve in the first place—and the fact that the United States always has a free and irrevocable license to use the patent item or to have it produced by any party it chooses for governmental purposes is not always sufficient to protect the public interest. By the same token, it is equally unrealistic to assert that the contractor, who may have contributed as much or more than the Government in terms of know how and the expenditure of its own money toward the development of the patent, has no claim to ownership nor the exclusive right to utilize the patent for commercial purposes. To take the latter position may be unfair to the large contractor and, in addition, downright disastrous to the small contractor, to whom a patent portfolio is an important asset, both because of the financial support it offers and the protection it gives. This is because, in most cases, doing research for the Federal Government does not of itself assure the contractor of anything like a substantial profit. Our studies showed that in research contracts the profits tend to be 1½ up to 2½ percent. The profit tends to lie with the procurement and or commercial marketing.

The issue of a fair and equitable patent policy; the wisdom of a uniform, government-wide policy; the resultant licensing and procurement practices and other issues have been of continued importance and were evident again in the hearings held earlier this year.

x

It is to allow the Subcommittee members to conclude this legislative session with a careful scrutiny of this timely subject that the following 3 Part Committee Print was compiled. It contains official government documents, including summaries of individual Agency legislation which demonstrate the present official policies, as well as Presidential messages and resultant regulations which Agencies adhere to in lieu of specific legislative mandates. How these relate to the success of the Nation's R. & D. effort will be the Subcommittee's focus for during a forthcoming series of hearings. The second part of these background papers includes portions of the texts of the important patent policy studies done in the last 30 years, beginning with the Report of the National Patent Planning Commission in 1945, and the 1947 Report of the Attorney General on Government Patent Practices and Policies. The third part includes a selection of scholarly articles on this subject.

# REPORT OF THE NATIONAL PATENT PLANNING COMMISSION

## GOVERNMENT-OWNED PATENTS AND INVENTIONS OF GOVERNMENT EMPLOYEES AND CONTRACTORS

### 1945

On December 12th, 1941, President Roosevelt established the National Patent Planning Committee by Executive Order. The purpose of the Committee was to begin planning "for a full utilization of the Nation's expanded industrial capacity with the return of peace." Three reports were issued by the Committee.* The first, in June 1943, and the third, in September 1945, dealt with general patent policy, including the operation of the Patent Office. The second report, issued in January 1945, specifically dealt with Government patent policy. The full text of this fifteen-page report is included in the present report.

---

*"The American Patent System—Message from the President of the United States Transmitting the Report of the National Patent Planning Commission," House Document 239, June 18, 1943, 78th Congress, 1st Session ; "Government-Owned Patents and Inventions of Government Employees and Contractors—Message from the President of the United States Transmitting the Second Report of the National Patent Planning Commission", House Document 22, January 9, 1945, 79th Congress 1st Session ; "Third Report on the American Patent System—Message from the President of the United States Transmitting the Third Report of the National Patent Planning Commission", House Document 283, September 6, 1945, 79th Congress, 1st Session.

# REPORT OF THE NATIONAL PATENT PLANNING COMMISSION

## GOVERNMENT-OWNED PATENTS AND INVENTIONS OF GOVERNMENT EMPLOYEES AND CONTRACTORS

### 1945

---

### I. INTRODUCTION

In its first report on the American patent system, the National Patent Planning Commission directed attention to certain aspects of the general operation of the patent laws. The present report deals with the administration of patents which have come to be owned outright by the Government and also with the respective rights of the Government and its employees and contractors in inventions evolved during the employment or contract relationship. Practically all of the patents normally owned by the Government have come to it through inventions of its employees or contractors, although in many cases the employment or contract relationship does not result in the Government's complete ownership of the patents.

In canvassing the problems presented, an investigation has been made of existing practices in the various Government agencies as set forth in reports by their representatives. The Commission has studied previous legislative proposals, congressional hearings and reports, papers and articles published in trade and law journals and other periodicals, and the practices in some foreign countries. Numerous suggestions by individuals, in and out of the Government, have had consideration. As a result of its studies the Commission has reached the conclusions and recommendations contained in this report.

Until recently, information as to the patents or rights under patents held by the Government was confined to the several Government agencies which acquired them. Realizing that there existed among these and other agencies a need for an adequate central source of information, the Commission recently recommended that a complete record of all rights and interests of the Government in or under patents and applications for patents be maintained in the United States Patent Office. The establishment of such a register was directed by Executive Order No. 9424 of February 18, 1944, and the work of registration is nearing completion. This factual record, however, leaves untouched the questions of policy and administrative procedure to which this report is directed.

The present report does not deal with the enemy-owned patents seized by the Alien Property Custodian. The Commission has consulted with representatives of the Custodian, but has reached the conclusions that the present administration of these patents constitutes a special wartime problem, and that their ultimate management

2

should receive separate consideration when normal conditions are restored and war problems disposed of.

## II. GOVERNMENT-OWNED PATENTS

### A. *Ownership of Patents by the Government*

While the exact number of patents owned by the Government will not be known until the completion of the register of Government interests in patents, it appears the the Government possesses, principally as the result of inventions made by employees, approximately five hundred unexpired patents and that nearly the same number have been expressly dedicated to the public. In addition, there are approximately three thousand unexpired patents of Government employees granted under the Act of 1883 and under which the Government has a royalty-free license.

It is the general practice of the several departments, with respect to patents in their custody, to grant to anyone a nonexclusive revocable license without royalty or other charge. In some instances submission of reports or compliance with certain regulations is required. Owing to the lack of statutory authorization the Government departments do not have the power to grant exclusive licenses or otherwise dispose of patents.

It has been contended that when the Government acquires ownership of a patent, any exclusive rights conferred by the patent disappear and are effectually extinguished; that is to say, the patent in effect becomes cancelled or abrogated by a process of merger when the right to exclude is returned to the authority which originally granted it.

Administrative rulings, however, have held that the Government may own a patent and exercise rights incident thereto since patents are recognized as a species of property. Nevertheless the ownership of a patent by the Government is somewhat anamalous. The chief value and importance of a patent to its owner flow from the right to exclude bestowed by the grant. Being the only person not excluded by the patent from making, using, and selling the invention, the holder of the patent is enabled to profit from the invention by developing his own business, or by licensing others. Commercial and industrial interest in the protection of an operating business or in recovering investment costs requires the exclusive right conferred by a patent, but the Government, not operating a business, has no need for this kind of protection.

The main, if not the sole, purpose of any proprietary interest of the Government in patents has been one of protection against interference with the performance of governmental functions.

Specific statutory power (Act of June 25, 1910, U.S.C. title 35, sec. 68) now authorizes the Government to use any patented invention without license from its owner and thereby renders unnecessary, either during war or peace, the acquisition by the Government of the title to privately owned inventions and patents. However, the Commission recognizes the necessity of making inventions and patents essential to the public health and safety more generally available and made a specific recommendation on this subject in its first report (Sec. III B).

3

Where inventions have been evolved by the Government itself it should retain the right to use such inventions freely. This protection can be assured by the following methods:

First, by publication of the invention as soon as possible, thus making the information available to all. Prompt and effective publication of the results of Government research is generally a desired objective, except as to matters demanding secrecy for reasons of national defense. In most cases publication of the results of Government research will fulfill its obligation to the public and prevent the issuance of patents to private inventors.

Second, by applying for and obtaining patents. These patents may be entirely owned by the Government or may be expressly dedicated to the public, or on the other hand, may be owned by the inventor who produced the invention, with the Government having the unrestricted right to use it without compensation. The practice of obtaining patents should be restricted to those cases or fields in which the public interest and the protection of the Government would not be entirely satisfied by publication only.

Since the primary interest of the Government in patents is self-protection, its need for them is necessarily limited.

The general policy of the Government in the past has been not to exclude its own citizens from engaging in any commercial or industrial activities; it has not attempted to exercise the right to exclude conferred by the patents which it owns. As a rule, such patents have been open to licensing to anyone who applied, without payment of royalty or other charge and mainly on nominal conditions. Indeed, patents owned by the Government have been open to use by anyone, with or without an explicit license. Furthermore, there has been no attempt to use its patents as a source of revenue. If the Government were to charge substantial royalties for licenses under its patents, it would incur the obligation to sue for nonpayment of royalties and to protect the licenses by suing infringers of the licensed patents. Such controversies between the Government and the public should be avoided. Finally, the Government has not used its patents as a means for controlling commercial activities.

*The Commission recommends that the Government as a general rule continue to pursue the historic policy of not exercising the right to exclude conferred by patents which it owns; of not attempting to exclude its own citizens from engaging in any enterprise; of not seeking to derive revenue from patents, and of not undertaking control by means of patents. Inventions covered by patents owned by the Government should be available for commercial and industrial exploitation by anyone, with, however, the recourse open to the Government to take different action in exceptional cases.*

## B. Extending the Use of Government-Owned Patents

Since the Government can grant only revocable nonexclusive licenses under patents which it owns, it is for all practical purposes restricted to (a) publication, (b) the procurement of a patent which is in terms dedicated to the public and (c) the acquisition of a patent under which nonexclusive licenses may subsequently be granted. It often happens, however, particularly in new fields, that what is available for exploitation by everyone is undertaken by no one. There

4

undoubtedly are Government-owned patents which should be made available to the public in commercial form but which, because they call for a substantial capital investment, private manufacturers have been unwilling to commercialize under a nonexclusive license. Accordingly, it seems evident that the Government has been handicapped in its effort to further the promotion and development of some of its inventions to the point where they are available to the public in the form of a commercial product. For over twenty years various individuals, committees and boards have called attention to this shortcoming in the Government's management of its patents. One of the clearest statements of the practical difficulties encountered is contained in a letter dated July 30, 1941, from the Under Secretary of Agriculture to the Speaker of the House of Representatives, reading in part as follows:

In recent years the activities of this Department have developed to such an extent that the present law is inadequate to enable the Department properly to cope with the problems which present themselves in the prosecution of the Department's program.

These problems while they may exist generally throughout the Government service, are of major importance in this Department, due to the varied and extensive nature of this Department's research work and to the fact that this Department must maintain a close relationship with the general public. In carrying out the activities of this Department in the field of research, it is essential that the greatest good should be obtained for the public out of the inventions arising from such research.

One source of difficulty is the fact that, under the present state of the law, the Secretary of Agriculture, when he holds title to a patent, is only authorized to grant licenses which are nonexclusive, nonassignable, and revocable. The commercial exploitation of new inventions requires, in many cases, the expenditure of large sums of money. In such a case, unless some protection or some advantage is given to enable a particular manufacturer to reap a reward as the result of the risk taken by him in investing capital in the new endeavor, he will usually refuse to enter a competitive field. No protection against competition in the commercial development of an invention covered by a patent controlled by this Department can be given to a manufacturer at the present time. As previously indicated, a license to use such a patent is subject to revocation at any time and the licensee must anticipate competition from other manufacturers who, upon request, can obtain similar licenses to use the patented invention. As a result of this, many patents, which are dedicated to the public or controlled by the Secretary of Agriculture, apparently become dormant, even though they possess decided advantages and improvements over the prior art.

Similar statements frequently have been made by high authorities regarding the necessity of protecting venture capital and the utter uselessness of certain potentially valuable inventions in the absence of such protection. Dwight W. Davis, when Secretary of War, stated:

It has come to the notice of the War Department that the private industries more and more are demanding that patents, the ownership of which is not necessary to the Government interest, be disposed of for the benefit of the public, that is, that the same may be made available to the industries so that the inventions covered by the patents may be practiced and the industries and the general public benefit thereby. The present powers of the President to issue nonexclusive revocable licenses under patents is not adequate to meet this situation, as no industry would deem it prudent to make any substantial investment for the manufacture of a patented article unless assured that its patent rights were irrevocable and also that its competitors would not be granted similar powers as to the same patent. This means that the licenses issued to industries should be exclusive and irrevocable.

Dr. Vannevar Bush, Director of the Office of Scientific Research and Development, in a letter dated October 28, 1941, stated that:

The principal difficulty lies in the fact that there is now no machinery provided by law under which the patents owned by the Government can be administered

5.

for the best interests of the public. It is not sufficient for a department merely to hold a patent and do nothing, or even to issue licenses freely to all comers; such action in effect often vitiates the intent of our fundamental patent law. A patent needs to be exercised in order to be effective, and many an invention cannot come into commercial use unless the protection thereby afforded makes possible the first hazardous investment which is needed to bring it into useful form. The history of the industry of this country, particularly in regard to the advent of small companies, shows this clearly. Yet, today, when a patent is assigned to the Government, its commercial benefit may be completely lost.

While it is the conviction of the Commission that the Government should continue to adhere to its traditional policy of not engaging in activities which can adequately be conducted by private enterprise, it nevertheless believes that in suitable cases the Government should have the authority and the power to depart from the general policy hitherto followed and, recommended above and take steps to insure the proper commercial development of an invention covered by any of its patents whenever this course is necessary and in the public interest.

The general methods by either of which this may be accomplished are by sale (assignment) of the patent, or by the grant of exclusive licenses. Sale of any patents must be conducted in such manner as to avoid any unfairness or discrimination, as, for example, to the highest bidder in open competition. However, monetary consideration should not necessarily control but proper weight should be given to obligations assumed by the purchaser to assure effective service and benefit to the public.

Similar considerations would apply in the case of exclusive licenses. A license could be made exclusive for a specified period of time only, so that other licenses could be granted on the expiration of the term or it could be made exclusive for a certain geographical area only.

An exclusive license or a sale should be conditioned upon the prompt and proper commercialization of the invention, in default of which the license, or the exclusive nature of the license, would be forfeited, or the ownership of the patent would revert to the Government. The conditions should be such as to insure early use and commercialization of the invention and satisfaction of the public demand at reasonable prices.

Procedure may be devised whereby upon request for an exclusive license or for the sale of a patent an investigation of the circumstances shall be conducted, and notification given to the public to present any objections or to encourage other offers, before any exclusive license is granted or any sale is made.

*The Commission therefore recommends that legislation be enacted authorizing the several Government agencies, subject to the approval of the central control body described hereafter, to issue exclusive licenses in cases where it seems evident that otherwise the inventions in question will not come into general use.*

Each exclusive license should incorporate the provision that the Government incurs no obligation to assist in the defense of the patent, or to undertake the prosecution of infringement suits. Further, the licensee should be enabled to sue in its own name without joining the United States as the owner of the legal title. Such licenses may, depending upon the circumstances involved, be exclusive either on a countrywide basis or only for a certain restricted area so that in the latter case other licenses could be granted in different areas. A license might also be exclusive for a specified period only, or it might be lim-

6

ited so that, at such time as it shall be shown that the licensee, in addition to realizing a reasonable profit from his manufacturing operations, has in fact or in effect fully amortized his investment, the exclusive license may be terminated and nonexclusive licenses made available to the general public.

The last condition mentioned contemplates a procedure whereby the original manufacturer will receive the protection essential to his exploiting of the invention, but does not permit him to reap excessive profits for the remaining life of the patent. Indeed, the larger his profit, the sooner the licensee may lose his exclusive license, since all profit over and above that deemed reasonable by the Government may be applied to amortize the investment, thereby accelerating the expiration of the license.

The Commission has likewise considered the final alternative of the sale of patents and, as previously indicated, has concluded that under certain circumstances this may prove desirable. *The Commission therefore recommends that the legislation proposed should also empower the Government agencies, subject to the approval of the central control body, to sell (assign) patents when it is evident that the offering of an exclusive license will fail to insure satisfactory exploitation.*

These recommendations with respect to the granting of exclusive licenses and the sale of patents are made not with the view that these practices should become commonplace, but, on the contrary, that they should be followed only in exceptional cases as the last resorts to be considered. The Government should ordinarily make its inventions available to the public by publication or by patents which are generally open to public use.

The Commission believes that the Government should not attempt to utilize its patents for profit; they should not be regarded as a money-making venture. The main objective should be to insure that the invention is brought into commercial channels at the earliest possible moment. It is believed, however, that there should be no objection to recovery by the Government, through sale or licensing, of all or a substantial part of public funds expended in the research which resulted in the invention.

The suggestion has been made to the Commission that such money as may be collected be allocated to the respective agencies in which the inventions originated, as special funds for research and awards to employee-inventors. The Commission, however, believes that these funds should not be automatically credited to the agencies, but that governmental research activities in general should continue under the Congressional scrutiny and control provided by existing appropriation procedure.

### III. INVENTIONS OF GOVERNMENT EMPLOYEES

In normal times the principal source of inventions and resulting patents in which the Government may have a proprietary interest is its own research work, and various problems arise in connection with inventions made by its employees, both research employees and others.

*A. Law Relating to Inventions Made by Employees*

Under the Constitution and the patent laws the Government is limited to the granting of patents to inventors and the patent cannot be issued or conveyed to another except by consent or agreement of

7

the inventor. Consequently a patent for an invention always belongs to the inventor and must be granted to him unless he has previously agreed to its transfer. However, the courts, in certain situations, assume an agreement to exist. If the employee is specifically hired or assigned to develop a particular invention, its ownership and that of the patent may be asserted by the employer. In all other cases the invention and patent will belong to the employee, although under some circumstances the employer may have certain rights. The employer may be entitled to a non-exclusive license or shop-right—that is, the right to use the invention, if it is within the general field of the employee's research or inventive work or if it was produced on the employer's time and by the use of his facilities. Under other circumstances the employer has no right or legal interest in the invention or the patent. These three categories are variously expressed and the lines of demarcation between them are not always clear.

The Supreme Court, in the case of United States vs. Dubilier Condenser Corp., decided in 1933, stated the general law to be that one who is employed to make an invention is bound to assign to any patent obtained to his employer. On the other hand, if the employment is general, although it covers a field of labor and effort in the performance of which the employee conceived the invention, assignment of the patent is not required. In illustration of the latter proposition, the Court quoted from one of its earlier decisions in which it had held that a manufacturing corporation which hired a skilled workman to take charge of its works and to devote his time and services to devising and making improvements in articles it manufactured, was not entitled to the ownership of patents obtained for inventions made by the employee while so employed, in the absence of an express agreement to that effect.

The Supreme Court also decided in the same case that the relationship of the Government to one of its employees with respect to inventions made by the latter is the same as the relationship between any private employer and employee. Hence in the absence of any specific agreement the rights to an invention made by a Government employee are determined by the general rules referred to.

Many private employers stipulate in the employment contracts the allocation of patent rights.

*B. Statutes Relating to Inventions Made by Government Employees*

There are no statutory provisions preventing the patenting of inventions by Government employees, except in the case of employees of the Patent Office who, by statute first enacted in 1836, are prohibited from acquiring any right or interest (except by inheritance or bequest) in any patent issued by the Office, and are hence barred from patenting or attempting to patent, while so employed, any inventions they may have made.

An Act of Congress passed March 3, 1883 (22 Stat. 625) and amended on April 30, 1928 (45 Stat. 467) provides that, under certain conditions, a patent may be granted to a Government employee without the payment of any fee. These conditions are, first, that the head of the department certify that the invention is or may be used in the public interest and, second, that the invention may be manufactured and used by or for the Government for governmental purposes without the payment of any royalty. This Act does not regulate or control

8

the respective rights of the Government and the employee, and, insofar as the statute is concerned the obtaining a of patent in accordance with its provisions is entirely voluntary.

The fees referred to in the Act are those payable in obtaining a patent. In actual practice, when a department is interested in an invention and certifies as required, it undertakes the preparation and prosecution of the patent application, so that the employee is not put to any expense in connection with the patent. The obtaining of a patent without expense is an inducement to employees to offer the Government a free license in instances in which they might not be obligated to do so.

The Act of June 25, 1910 (36 Stat. 851), amended July 1, 1918 (40 Stat. 705), relates to the use of patented inventions by or for the Government, without license from the owner, and provides that the owner may sue for compensation in the Court of Claims. However, the benefits of the Act are declared not to apply to any patentee who is in the employment or service of the Government when he makes the claim nor to any invention made by a Government employee. Thus a Government employee is barred from suing the Government for use of any patented invention.

The Act does not regulate the respective rights to an invention made by an employee other than to deprive the employee of a right to sue, and it does not prohibit or prevent Government departments which may otherwise have the power to do so from contracting with or compensating inventors for the use of their inventions. However, since an employee is barred from any remedy, the Government under this Act may effectuate a free license to use any invention made by an employee.

The section of the patent laws relating to the abandonment of an application for patent by reason of the applicant's failure to prosecute the same within six months from the date of an action by the Patent Office (section 4894 R. S.) contains an exception in favor of applications which have become the property of the United States. If the head of the department certifies that the invention is important to the armament or defense, the reply to an action by the Patent Office need not be made for three years. This effective three-year suspension, which may be repeated as often as necessary, is used by the departments as the means for preserving an invention in secrecy when the nature of the invention so requires.

*C. General Practices of the Government Departments With Regard to Inventions by Employees*

A number of Government departments have issued regulations dealing with inventions of their employees. With minor exceptions these departments expect or require that inventions made within the specifically assigned duties of the employee shall be assigned to the Government, in conformity with the decisions of the courts regulating the matter in default of specific agreement. The departments generally assert no rights in inventions made by an employee on his own time, without the use of Government facilities, and in a field unrelated to his employment, except as may be voluntarily granted by the employee. In situations other than these two the general rule is that the invention and the patent belong to the employee in the absence of a specific agreement to the contrary, although the employer may have the right to use the invention without payment of a royalty. Some

9

departments follow this general rule, while others require assignment of the patent in cases where the invention is closely related to the duties of the employee and the work of the department.

In general, when research is conducted primarily for the benefit of the public as a whole, Government agencies tend to permit retention of private commercial rights by the employee in a smaller proportion of cases than when the research is aimed at improvement of governmental functions and operations. In the latter cases the direct needs of the Government are completely met by its freedom to make and use any invention which may result, or to have the invention made and used for governmental purposes, without payment of royalties or any restrictions.

Close control and suitable provisions for maintaining secrecy are enforced in connection with inventions of a military nature which must be kept secret in the interests of national defense.

Except in the case of inventions requiring secrecy the departments are not generally concerned with patents which their employees obtain in foreign countries, and the matter is ordinarily left entirely with the employee.

Various departments of the Government have arrangements whereby employees who make valuable suggestions resulting in benefit to the Government are given some reward or special recognition similar to the award systems of private employers. These plans are not limited to ideas of the type capable of resulting in patentable inventions and find their greatest success and value in the field of small improvements promoting economy and efficiency.

*D. Policy Regarding Inventions of Government Employees*

In the absence of legislative compulsion, such uniformity in policy and practice as exists between the several Government agencies results from recognition of the common law. Two principles, established by numerous court decisions, which operate in the absence of a contract to the contrary are:

(a) Inventions made within the specifically designated duties of the employee shall be assigned to the employer since he has only produced that which he was employed to invent;

(b) Inventions made by an employee on his own time, without the use of his employer's facilities, and in a field unrelated to his employment, shall be the exclusive property of the employee, who shall be entitled to all patent rights.

These principles are so equitable, so firmly established in the common law, and relatively so readily susceptible to administrative adoption and enforcement, that *the Commission recommends they be made uniformly applicable throughout the Government service.*

It is in the area not covered by (a) and (b) above that the least uniformity exists in Government practice because of the many variables involved. Within this area it does not seem practicable to devise a uniform law or order which could equitably apply to the many combinations of circumstances which can, and do, arise. The conditions of employment under which the inventions may be developed; their relationship to Government work; the character of the contribution of the inventor; the needs of the agencies and of the Government as a whole, and the probable contribution to the public welfare—all are variable factors, and a great degree of flexibility is necessary. Accord-

ingly, the Commission concludes that it should be left to the agencies initially to determine the action which will best serve the interests of the public, the Government as represented by the agency, and the encouragement of inventiveness by the employees. *The Commission recommends, however, that policies and regulations adopted by any agency be submitted to a central control body for approval before they become effective, and that this body also serve as an appellate tribunal with power of final decision as regards appeals which employee-inventors may desire to take from agency decisions.*

The proposal that employee-inventors be granted special awards for unusually meritorious services is regarded with favor by the Commission, but is it of the opinion that it would not be judicious to introduce such a system by blanket order or to make it dependent upon any particular fund. Any agency which is genuinely interested in an award system should negotiate for it in the regular manner, first consulting with the Bureau of the Budget, which has collected useful information on this subject, and next justifying the resulting proposal before the appropriate Congressional committees: *The Commission recommends that agencies which qualify under this procedure should be authorized independently to make individual awards up to a specified amount, awards above this amount and up to a specified maximum to be approved by the central control body.*

## IV. Government Sponsored and Aided Inventions

A considerable amount of governmentally subsidized research in connection with the war is now being conducted by educational institutions and by private concerns under Government contracts. The Government also sponsors research during times of peace but on a more limited scale. There is no way of calculating how many patents will result from war research, nor what proportion of the inventions will have application outside of purely military fields.

Inventions made by Government contractors working on research and development contracts present important, and sometimes difficult, problems. The time, circumstances, and conditions under which the Government makes contracts for the pursuit of research or development work by private agencies vary greatly. The contract may be on a profit or nonprofit basis, and, if the latter, the Government may bear all or part of the expenses involved. The contractor may be an educational institution, or may be an industrial firm or corporation. A particular contractor may be selected because of an accumulation of knowledge, experience, and special facilities of peculiar value in a certain field. Existing private research facilities may be utilized, thereby avoiding their duplication by the Government at considerable expense. In some instances the effort involved may be only a further development and refinement of work already done by the contractor, while in others the contractor may be breaking entirely new ground.

Under these varying conditions patent rights resulting from Government-sponsored research have been disposed of in accordance with any of the following methods:

1. The Government has retained the blanket power to determine at its discretion the disposition of all patentable discoveries or inventions which may be made under the contract.

11

2. The Government has taken complete ownership of patents which may result, with a license back to the contractor.

3. Ownership of patents has been left with the contractor, while the Government receives a royalty-free license.

4. Ownership of patents has remained in the contractor, with the Government receiving, in addition to a royalty-free license, the power to require the licensing of others.

A common feature of the several types of contracts mentioned is a clause by which the Government has the option of obtaining licenses on reasonable terms under patents for inventions relating to the subject of the contract, which the contractor may have made before the contract was entered into.

It has been urged with considerable theoretical justification that there should be a uniform patent clause in all Government research and development contracts. The Commission has concluded that a single uniform practice would be unfeasible and undesirable from the standpoint of the Government. The ownership of inventions resulting from such contracts cannot be fairly determined by an arbitrary or fixed rule but should be established in each situation in accordance with the applicable circumstances. The Commission believes, however, that, since the Government has no need of the right to exclude conferred by a patent and does not enter into ordinary commercial enterprises in competition with its citizens, full ownership of patents should not ordinarily be asserted by the Government. An exception to this policy would be the situation in which private ownership of the patents would conflict with national interest. In those cases in which the Government does not acquire ownership of the patents, it should ordinarily receive as a minimum a royalty-free license. All negotiations in connection with research and development contracts, as well as the drafting of the contracts themselves, should be performed as now by the agencies involved.

## V. Control Over the Administration of Government Patent Policies and Practices

Up to the present, the absence of any form of central control over the patent policies and practices of Government agencies has probably not been of special significance because of the lack of any substantial, clearly defined authority to take affirmative action. But with the adoption of the more positive policies and practices advocated by the Commission, the establishment of a central body vested with certain authority to review and approve important agency proposals becomes almost essential.

A central control body should therefore be created to perform the following functions:

1. To prepare, promulgate, and enforce such general policies concerning the administration of Federal intragovernmental patent matters as may be uniformly applicable and desirable, subject to the approval of the President of the United States.

2. To review and approve all existing or proposed agency policies and regulations relating to the acquisition of inventions and patents evolved by Government employees.

3. To serve as an appellate tribunal with final powers of decision as regards any disputes which may arise between employee-inventors and their respective agencies.

12

4. To approve such individual cash awards exceeding a specified amount which agencies may propose to give to their inventor-employees.

5. To review and give prior approval to any action which any agency may propose to take with respect to patents owned by the Government.

6. To serve the agencies as an educational, advisory and consultative medium, and as a clearing house for the interchange of information and plans. Appropriate studies and investigations could be conducted from time to time with the purpose, for example, of determining the actual extent of utilization of Government-owned patents and the most effective ways of handling special problems. By keeping informed of changing conditions and developments in Government patent matters the central body would be in a position to determine the need for executive action or for legislation.

*The Commission recommends the establishement of a central control body empowered to perform the indicated functions.*

The central control body should be composed of men of known and outstanding ability and should be independent of any existing Government agency whose functions and activities might reasonably be expected to result in inventions. After careful consideration the Commission is led to the conclusion that the central control group should be placed under the Executive Office of the President, preferably within the Bureau of the Budget and under the supervision of the Director.

## VI. SUMMARY OF MAJOR CONCLUSIONS AND RECOMMENDATIONS

1. Enemy-owned patents seized by the Alien Property Custodian are outside the scope of the present report. The ultimate management of these patents should be left until the return of normal conditions and the disposal of war problems.

2. The general policy of the Government should be that of making its patented inventions available for commercial and industrial exploitation by anyone, but the Government should have the power to grant exclusive licenses or otherwise dispose of patents under appropriate conditions and safeguards whenever it is determined that such action is necessary to assure the commercial development of an invention of a Government-owned patent.

4. The ownership of inventions resulting from research contracts cannot be determined in advance by an arbitrary or fixed rule but must be decided in each instance in accordance with the facts involved.

5. There should be a central control body, in the Executive Office of the President, having the following principal powers, functions, and duties:

(a) Promulgating general policies and supervising and approving departmental policies regarding employee inventions, and determining disputed cases.

(b) Supervising and approving the manner of disposing of patent rights by the individual departments, including granting exclusive licenses and selling Government-owned patents.

(c) Instructing and advising departments and agencies, collecting information, conducting investigations, and making appropriate recommendations.

# Exhibit RR

```
 1              UNITED STATES COURT OF FEDERAL CLAIMS

 2

 3    GILEAD SCIENCES, INC.,            )

 4            Plaintiff,                )

 5         vs.                          )  Case No.

 6    UNITED STATES OF AMERICA,         )  20-499C

 7            Defendant.                )

 8    --------------------------------)

 9              ***TRANSCRIPT UNDER SEAL***

10

11                  Courtroom 4

12        Howard T. Markey National Courts Building

13              717 Madison Place, N.W.

14                Washington, D.C.

15              Thursday, June 30, 2022

16                  9:00 a.m.

17                Trial Volume 6

18

19        BEFORE:  THE HONORABLE CHARLES F. LETTOW

20

21

22

23

24

25    Sally Jo Quade, RPR, Reporter
```

1618

Trial - UNDER SEAL

Gilead Sciences v. USA                                          6/30/2022

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4          RONALD MACHEN, JR., ESQ.

 5          DAVID B. BASSETT, ESQ.

 6          TIMOTHY A. COOK, ESQ.

 7          VINITA FERRERA, ESQ.

 8          STEPHANIE LIN, ESQ.

 9          GEORGE P. VARGHESE, ESQ.

10          EMILY R. WHELAN, ESQ.

11          Wilmer Cutler Pickering Hale and Dorr, LLP

12          1875 Pennsylvania Avenue, N.W.

13          Washington, DC 20006

14          (202) 663-6881

15          ronald.machen@wilmerhale.com

16

17    ON BEHALF OF THE DEFENDANT:

18          WALTER WAYNE BROWN, ESQ.

19          PHILIP STERNHELL, ESQ.

20          PATRICK HOLVEY, ESQ.

21          AMANDA KELLY, ESQ.

22          LUCY NOYOLA, ESQ.

23          CARRIE ROSATO, ESQ.

24          MATTHEW TANNER, ESQ.

25          LENA YUEH, ESQ.
```

1619

Trial - UNDER SEAL

Gilead Sciences v. USA                                              6/30/2022

     1          U.S. Department of Justice

     2          1100 L Street, N.W.

     3          Washington, DC 20530

     4          (202) 307-0341

     5          walter.brown2@usdoj.gov

     6

     7

     8

     9

    10

    11

    12

    13

    14

    15

    16

    17

    18

    19

    20

    21

    22

    23

    24

    25

1620

Trial - UNDER SEAL

Gilead Sciences v. USA                                          6/30/2022

```
 1                    I N D E X

 2

 3   WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS   VOIR

 4   DiSpigna          1625     1642

 5   Kirby             1661     1730    1766       1773

 6   Mitzelfelt        1777     1788    1800

 7   Sheridan          1803     1855    1936       1945

 8   Bischofberger     1951

 9

10   EXHIBITS            FOR ID      IN EVID

11   Plaintiff's

12   Number 451                     1723

13

14   Defendant's

15   Numbers DDX 3.1 through 3.21    1945

16   Number 72                      1980

17   Number 118                     1980

18   Number 127                     1980

19   Number 128                     1980

20   Number 133                     1980

21   Number 134                     1980

22   Number 137                     1980

23   Number 559                     1666

24   Number 560                     1694

25   Number 561                     1763
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1660

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

1    Honor, we will call our next witness, Dr. Tara Kirby.

2    The examination will be handled by my colleague, Patrick

3    Holvey.

4              THE COURT:  Thank you.

5              Ms. Kirby?

6              MR. BROWN:  Yes, K-I-R-B-Y.  I'm going to step

7    out to see if Ms. Kirby is just outside our door here.

8              MR. HOLVEY:  Your Honor, may I pass out binders?

9              THE COURT:  Yes.  Thank you, Mr. Holvey.

10             Ms. Kirby, if you would approach the Bench and

11   stop right there to be sworn as a witness, that would be

12   appreciated.

13   Whereupon--

14                        TARA KIRBY

15   a witness, called for examination, having been first

16   duly sworn, was examined and testified as follows:

17             THE COURT:  Please be seated in the witness

18   stand.

19             Mr. Holvey, you may proceed.

20             MR. HOLVEY:  Thank you, Your Honor.

21             Your Honor, Dr. Kirby's testimony will discuss

22   some discussion of licenses that the Government has

23   executed, and we would ask that her testimony be sealed

24   so we can make any appropriate redactions following her

25   testimony.

1693

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

```
 1    at all, the cost of patent prosecution in licensing
 2    agreements?
 3        A.  Well, there is a significant cost associated with
 4    patent prosecution, so we do try to recoup that from our
 5    licensees.  In general, we will seek reimbursement from
 6    our licensees who have taken commercial licenses.
 7        Q.  Okay.  And how does that, referring to the
 8    inclusion of patent prosecution costs in licensing,
 9    affect later licensors?
10        A.  It can vary, but typically the first licensee
11    will pay for reimbursement of costs up to that date.
12    Following that, if there are other licensees, it's
13    paid -- reimbursed on a pro rata share.
14        Q.  Thank you very much.
15            Dr. Kirby, if you'd turn with me, please, to the
16    fifth document in the binder, DTX 560.  Are you there?
17        A.  Yes, I am.
18            MR. HOLVEY:  Your Honor?
19            THE COURT:  Yes.
20            BY MR. HOLVEY:
21        Q.  Great.  Dr. Kirby, do you recognize this
22    document?
23        A.  I do.
24        Q.  And what is this document?
25        A.  This is an email containing an attachment that
```

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

1    is -- contains a settlement agreement between CDC and

2    Mylan.

3         Q.   And what role did you have in the settlement

4    agreement with Mylan?

5         A.   I negotiated that agreement.

6         Q.   And does this email's attachment, which follows

7    the email, have the complete settlement and license

8    agreement?

9         A.   Let me look briefly.  Yes, I believe so.

10        Q.   And are you listed in the CC line of the cover

11   email?

12        A.   I am.

13        Q.   And what is the date of that cover email?

14        A.   It is April 27th, 2016.

15             MR. HOLVEY:  Your Honor, the Government would

16   move that this Court admit DTX 560 into evidence.

17             MS. FERRERA:  No objection.

18             THE COURT:  Admitted.  Thank you, Ms. Ferrera.

19             (Defendant's Exhibit Number 560 was admitted into

20   evidence.)

21             BY MR. HOLVEY:

22        Q.   Thank you, Your Honor.

23             Dr. Kirby, do you know which patents the Mylan

24   settlement and licensing agreement covers?

25        A.   Yes.  It's the HHS PrEP patents.

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

1      Q.  And how did the Mylan settlement and licensing
2   agreement come about?
3      A.  Our European patent was opposed by Mylan, and
4   when we prevailed, our patent was upheld.  Mylan
5   approached us to seek a license.
6      Q.  And when did they approach you?
7      A.  Very shortly after the settlement, I would say
8   within a few days to a week.
9      Q.  Could you please tell me what the terms of the
10  Mylan agreement are at a high level?
11     A.  Yes.  It's a settlement agreement, so there is
12  language concerning the terms of the settlement.  Also
13  there is an earned royalty of ███████ on sales of PrEP
14  products.
15     Q.  And how are sales of PrEP products defined and
16  what sort of sales are we talking about?
17         MS. FERRERA:  I'm going to object.  We have the
18  license agreement in evidence.  The license agreement is
19  the best evidence of what the terms of the settlement
20  were.  It's many, many pages.  I think asking the
21  witness here to try to summarize those is really in
22  violation of the best evidence rule.
23         THE COURT:  The objection is well taken, but the
24  Court will overrule it, nonetheless, and take the
25  summary.

1696

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

1          THE WITNESS:  Can you repeat the question?  I'm
2     sorry.
3          BY MR. HOLVEY:
4          Q.  Sure.  You said sales of PrEP products.  What
5     PrEP products are we referring to and what type of
6     sales?  Are these net sales?  What are these?
7          A.  Right.  So the PrEP products would be products
8     containing tenofovir or a derivative and FTC
9     emtricitabine, and that would be earned royalties on net
10    sales of those products for PrEP and that would be
11    worldwide.
12         Q.  Great.  And how would Mylan and the CDC determine
13    what the net sales of the PrEP products were?
14         A.  We discussed and decided on using some readily
15    available reports -- I think they're called the ███
      ██    ████████████████████████████████████████████
      ██    ████████  -- thinking that that would be a reasonable way
18    to determine relative proportions for treatment or PrEP,
19    since that information was contained in those reports.
20         Q.  Great.  And under the license, Mylan pays a
21    royalty on every PrEP sale worldwide?
22         A.  Yes.
23         Q.  Has Mylan ever suggested that some PrEP sales
24    aren't covered by the HHS patents and so they don't have
25    to pay a royalty on them?

1775

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

```
 1          THE COURT:  Mr. Brown, where do we go from here?
 2    It's about time for our luncheon recess, but --
 3          MR. BROWN:  I agree with that, Your Honor.  We
 4    are ready with our next few witnesses, so whenever we
 5    want to take a lunch break.
 6          THE COURT:  Can you give the Court an idea of who
 7    they are?
 8          MR. BROWN:  Sure.  We have one last fact witness
 9    today, which is Jeremiah Mitzelfelt from NIH, who
10    handles similar matters to Dr. Kirby.  It may involve
11    sealing the courtroom, unfortunately.
12          After that, we have our two experts relating to
13    the harm issue, the first being Sean Sheridan, and then
14    after that we'll have Kimberly Schenk.
15          THE COURT:  All right, thank you.
16          Is that schedule appropriate, Mr. Machen?
17          MR. MACHEN:  That's fine, Your Honor.  Yes,
18    that's fine.
19          THE COURT:  All right.  We will reconvene in an
20    hour.
21          (Lunch recess, 12:12 p.m. to 1:17 p.m.)
22
23
24
25
```

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

```
 1                      AFTERNOON SESSION
 2                        (1:17 p.m.)
 3            THE COURT:  Mr. Brown, we're following your
 4    schedule.  You may proceed.
 5            MR. BROWN:  Thank you, Your Honor.
 6            At this time, the Government calls Dr. Jeremiah
 7    Mitzelfelt of NIH.
 8            THE COURT:  Ms. Rosato, what is the name of the
 9    witness?
10            MS. ROSATO:  Mitzelfelt.
11            MR. BROWN:  Just so the record is clear, Your
12    Honor, the examination will be conducted by my
13    colleague, Carrie Rosato.
14            THE COURT:  Yes.  The Court gathered as much.
15            Mr. Mitzelfelt, if you would please approach the
16    Bench to be sworn as a witness.
17    Whereupon--
18                      JEREMIAH MITZELFELT
19    a witness, called for examination, having been first
20    duly sworn, was examined and testified as follows:
21            THE COURT:  Please take a seat in the witness
22    stand.
23            MR. BROWN:  Your Honor, as we mentioned earlier,
24    I think because his testimony tracks a lot of the topics
25    from Dr. Kirby's testimony that we will need to seal the
```

1777

Trial - UNDER SEAL

Gilead Sciences v. USA                                      6/30/2022

```
 1    courtroom.
 2              MS. ROSATO:  Yes, Your Honor.
 3              THE COURT:  Unfortunately.
 4              Ms. Rosato, you may proceed.
 5              MS. ROSATO:  Thank you, Your Honor.
 6                       DIRECT EXAMINATION
 7              BY MS. ROSATO:
 8         Q.   Good afternoon, Mr. Mitzelfelt.  Thank you for
 9    being here.  Could you please introduce yourself to the
10    Court?
11         A.   My name is Jeremiah Mitzelfelt.
12         Q.   And, Dr. Mitzelfelt, could you describe your
13    educational background for us?
14         A.   Sure.  I have a bachelor's of science in
15    neuroscience from Regis University, a Ph.D. in medical
16    science from the University of Florida, and a master of
17    science in regulatory science from the University of
18    Maryland, Baltimore.
19              THE COURT:  Dr. Mitzelfelt, if you would adjust
20    the microphone, that would be helpful.
21              THE WITNESS:  Okay.  Is this better?
22              THE COURT:  That's much better.  Thank you.
23              BY MS. ROSATO:
24         Q.   And, Dr. Mitzelfelt, where are you currently
25    employed?
```

1778

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

    1        A.   I work in the Technology Transfer and
    2    Intellectual Property Office at the National Institute
    3    of Allergy and Infectious Disease.
    4        Q.   And what's your position at the Tech Transfer
    5    Office?
    6        A.   I'm a lead technology transfer and patent
    7    specialist.
    8        Q.   And when did you first become employed at the
    9    tech transfer office?
   10        A.   June of 2016.
   11        Q.   And could you just describe how your role or
   12    title has changed over that time?
   13        A.   Right.  So in June of 2016, I started as a
   14    technology transfer and patent specialist.  In 2018, I
   15    became a senior technology transfer and patent
   16    specialist.  Then in October of 2020, I became acting
   17    lead technology transfer and patent specialist.  And in
   18    March of 2021, I was given the lead position
   19    permanently.
   20        Q.   Thank you for that.
   21             Now, in your time at the tech transfer office,
   22    what, if any, role have you had with respect to the CDC
   23    PrEP patents at issue in this case?
   24        A.   Yeah.  So in 2018 I started working on licensing
   25    the patent rights to generics companies outside of the

1779

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

```
 1    United States and continued to work on licensing as
 2    generics became allowed in the United States as well,
 3    and then in October of 2020, when I became the acting
 4    lead technology transfer and patent specialist, I took
 5    over prosecution of active patents for the case.
 6        Q.  So I think you said that you had some involvement
 7    in licensing of the CDC PrEP patents.  Is that right?
 8        A.  Yes.
 9        Q.  Do you recall how many licenses you've been
10    involved in negotiating for the CDC PrEP patents?
11        A.  I think five have been executed.
12        Q.  And I would like you to turn to the binder that's
13    in front of you.  There should be a tab labeled DTX 564.
14    I believe it's the third tab in your binder.
15        A.  Yep.
16        Q.  Dr. Mitzelfelt, do you recognize this document?
17        A.  Yes.
18        Q.  What is it?
19        A.  It looks like the license that was negotiated
20    between the CDC and Laurus Generics for the PrEP
21    patents.
22        Q.  And how are you familiar with this document?
23        A.  I was responsible for negotiating the license.
24        Q.  Feel free to look through it, but does this
25    appear to be a correct and accurate copy of that
```

1780

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

1    license?

2        A.  Yes.

3            MS. ROSATO:  Your Honor, the Government would

4    move to admit DTX 564 into evidence.

5            MR. VARGHESE:  No objection, Your Honor.

6            THE COURT:  What's the date of this document,

7    Dr. Mitzelfelt?

8            THE WITNESS:  Looks like it was executed on March

9    10th, 2021.

10           THE COURT:  Admitted.

11           (Defendant's Exhibit Number 564 was admitted into

12   evidence.)

13           MS. ROSATO:  Thank you, Your Honor.

14           BY MS. ROSATO:

15       Q.  So that was going to be my first question, but

16   when did you say this agreement was executed?

17       A.  It looks like March 10th, 2021.

18       Q.  And what type of license is this?

19       A.  It's a nonexclusive patent license.

20       Q.  Dr. Mitzelfelt, what territories does this

21   agreement grant Laurus a license to?

22       A.  Germany, the United States, and the United

23   Kingdom.

24       Q.  And do you know what royalty rate Laurus agreed

25   to in this license?

1781

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

```
 1        A.   █████████   earned royalty on net sales.
 2        Q.   And do you have an understanding of what base
 3   that █████████ royalty would apply to?  I believe you
 4   said net sales.  Could you describe how net sales were
 5   determined?
 6        A.   Right.  So net sales would be sales of the
 7   emtricitabine/tenofovir combination that were for PrEP,
 8   not for HIV treatment.
 9        Q.   And was there an agreement as to a number of net
10   sales or --
11        A.   Yes.  So as the CDC patent rights only cover the
12   PrEP indication and not treatment of HIV, we needed to
13   figure out a way to account for that in the sales of the
14   drugs so that CDC was not collecting royalties on sales
15   that they weren't entitled to.
16             And so what was agreed on in the Laurus license
17   was we would take the total sales of the two-drug
18   combination and consider █████████ of those sales for
19   PrEP, and then Laurus would pay the █████████ royalty on
20   that █████████ of total.
21        Q.   Thank you for that.
22             Could you turn now to DTX 562 in your binder.  I
23   believe it's one tab back from where we were.
24        A.   Yes.
25        Q.   And do you recognize this document?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1782

Trial - UNDER SEAL

Gilead Sciences v. USA                                          6/30/2022

1        A.  Yes.

2        Q.  Could you explain what it is?

3        A.  It is the nonexclusive patent license between the

4   CDC and Cipla, Ltd.

5        Q.  And how do you know that?

6        A.  I was responsible for negotiating the license.

7        Q.  And do you recall when this document was

8   executed?

9        A.  I don't, but I can look.

10       Q.  I believe if you look at the numbers at the

11  bottom of the page, 520 might help you with that.

12       A.  Yeah.  So March 31st, 2021.

13           MS. ROSATO:  Your Honor, I move to admit DTX 562

14  into evidence.

15           MR. VARGHESE:  No objection.

16           THE COURT:  Mr. Varghese?

17           MR. VARGHESE:  No objection.

18           THE COURT:  Admitted.

19           (Defendant's Exhibit Number 562 was admitted into

20  evidence.)

21           BY MS. ROSATO:

22       Q.  And, Dr. Mitzelfelt, I believe you said this is a

23  nonexclusive patent license.  Is that right?

24       A.  Correct.

25       Q.  Do you recall what territories this agreement

1783

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

```
 1    grants Cipla a license to?
 2         A.   The United States.
 3         Q.   And what royalty rate did Cipla agree to?
 4         A.   ███████████
 5         Q.   And do you recall what that ████████ was applied
 6    to?
 7         A.   The same as the Laurus license.  It's on net
 8    sales, but there is the ████████ provision in net
 9    sales to account for the difference between PrEP and HIV
10    treatment sales.
11              THE COURT:  Mr. Mitzelfelt, what was the royalty
12    rate again?
13              THE WITNESS:  ███████████
14              THE COURT:  Thank you.
15              BY MS. ROSATO:
16         Q.   Thank you for that.
17              I believe you said that you were involved in
18    negotiating five licenses to the PrEP patents.  Is that
19    right?
20         A.   Yes.
21         Q.   And another of those licenses was to TAD Pharma.
22    Is that correct?
23         A.   That's correct.
24         Q.   And were you involved in negotiating that
25    agreement?
```

1784

Trial - UNDER SEAL

Gilead Sciences v. USA                                      6/30/2022

```
 1      A.  Yes.
 2      Q.  Do you have a recollection of when that agreement
 3  was entered into?
 4      A.  It was in 2018.  I don't remember the month.
 5      Q.  And do you recall whether that -- what type of
 6  license that was?
 7      A.  It was a nonexclusive patent license.
 8      Q.  Do you recall what territories the TAD Pharma
 9  license covered?
10      A.  Just Germany.
11      Q.  And do you recall the royalty rate agreed to in
12  that license?
13      A.  ███████████████
14      Q.  And do you recall what base or what royalty rate
15  that applied to?
16      A.  So it's, again, on net sales, but TAD Pharma said
17  that they were going to negotiate agreements with the
18  pharmacies in Germany so that prescriptions that were
19  for HIV treatment under their contract with the pharmacy
20  had to be sold in bottles, I think it was, but then the
21  drug for PrEP prescriptions, they would be sold in
22  blister packs.
23          And so in the TAD license, the definition of
24  "licensed product" is limited to just the blister packs.
25  And so we felt that was an extremely accurate way to
```

1785

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

 1    differentiate between HIV treatment sales and PrEP
 2    sales.  So the ████████ ratio that was in the Laurus
 3    and Cipla licenses didn't -- was unnecessary.
 4         Q.  Thank you for that.
 5             And was another one of the agreements you were
 6    involved in negotiating with Sandoz?
 7         A.  Yes.
 8         Q.  Do you recall --
 9             THE COURT:  What was the entity again?
10             MS. ROSATO:  Sandoz, S-A-N-D-O-Z.
11             THE COURT:  Oh, Sandoz.
12             BY MS. ROSATO:
13         Q.  Dr. Mitzelfelt, do you recall when the Sandoz
14    license was entered into?
15         A.  I think it was June 2021.
16         Q.  And what type of license did that grant?
17         A.  It was a nonexclusive patent license.
18         Q.  And do you recall what territory the Sandoz
19    license covered?
20         A.  It was Australia.
21         Q.  And what royalty rate did Sandoz agree to?
22         A.  ████████████
23         Q.  And what was the ████████ applied to?
24         A.  To net sales.  I can't recall off the top of my
25    head if Australia had information from the government

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1786

Trial - UNDER SEAL

Gilead Sciences v. USA                                    6/30/2022

```
 1    that would allow them to accurately report the HIV --
 2    the treatment versus PrEP sales or if the ████████
 3    provision is in there.
 4         Q.   There was one final license you were involved in
 5    negotiating for the CDC PrEP patents, right?
 6         A.   That's been executed, yes.
 7         Q.   What agreement is that?
 8         A.   It's with Lupin.
 9         Q.   And what type of agreement?
10         A.   Nonexclusive patent license.
11              THE COURT:  How do you spell that?
12              THE WITNESS:  L-U-P-I-N.
13              THE COURT:  Thank you.
14              BY MS. ROSATO:
15         Q.   And do you recall when that agreement was entered
16    into with Lupin?
17         A.   I think it was April of 2022.
18         Q.   And what territory did the patent grant licenses
19    to -- or, excuse me, the license, the agreement granted
20    a license to?
21         A.   I think it was for Australia, Germany, the United
22    States, and the United Kingdom.
23         Q.   And what was the royalty rate agreed upon by
24    Lupin?
25         A.   ████████████
```

# Exhibit SS

# Redacted in Entirety