**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

THE UNITED STATES OF AMERICA,

      Plaintiff & Counterclaim-Defendant,

    v.

GILEAD SCIENCES, INC. and GILEAD
SCIENCES IRELAND UC,

      Defendants & Counterclaim Plaintiff.

C.A. No. 19-02103-MN

████████████████

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF
<u>SUMMARY JUDGMENT</u>**

David B. Bassett
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888

Vinita C. Ferrera
Emily R. Whelan
George P. Varghese
Timothy A. Cook
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Ronald C. Machen
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Alexandra M. Ewing (#6407)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
ewing@rlf.com

*Counsel for Defendant & Counterclaim
Plaintiff Gilead Sciences, Inc. and Defendant
Gilead Sciences Ireland UC*

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ........................................................1

SUMMARY OF ARGUMENT ....................................................................................1

LEGAL STANDARD ................................................................................................4

ARGUMENT ...........................................................................................................4

I.    The Government Has Identified No Evidence of Direct Infringement for Descovy®. ..................................................................................................4

II.    Claim 13 of the '509 Patent Is Not Infriged by Descovy® Because of Prosecution History Estoppel...............................................................7

III.    Claims 3 and 13 of the '509 Patent Are Invalid for Improper Dependency..........11

IV.    The Asserted "Tenofovir Prodrug" Claims Are Not Enabled. ...............................12

V.    Claims to Methods of Orally Administering Tenofovir Are Not Enabled. ...........18

VI.    Gilead Cannot Be Liable for Induced or Willful Infringement Before March 2016. ................................................................................20

VII.    The Asserted Claims Cannot Claim Priority to the 2006 Provisional Application Because the Application Does Not Show That the Inventors Possessed a Method Using Oral TDF and FTC for PrEP. ....................................22

VIII.    GSIUC Does Not Induce Infringement of Any Asserted Claim............................27

IX.    The Government Lacks Authority to Sue for Patent Infringement.......................32

    A.    The Government Has No Established Practice of Bringing Infringement Suits.......................................................................32

    B.    No Statute Authorizes the Government to Sue For Patent Infringement...........................................................................35

CONCLUSION.......................................................................................................39

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234 (Fed. Cir. 2003).........................................18

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485
(2021)..........................................................................................................................................39

*Amgen Inc. v. Sanofi, Aventisub LLC*, 850 F. App'x 794 (Fed. Cir. 2021)
(Lourie, J., opinion on denial of panel rehearing)..............................................................17

*Amgen Inc. v. Sanofi, Aventisub LLC*, 987 F.3d 1080 (Fed. Cir. 2021) ..................................13

*Amgen Inc. v. Sanofi*, No. 21-757 (U.S. Sept. 21, 2022), 2022 WL 4386300 ..................13, 18

*Amgen, Inc. v. Hospira, Inc.*, C.A. No. 15-839-RGA, 2016 WL 7013483 (D.
Del. Nov. 30, 2016)...................................................................................................................11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................................................4

*Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (en
banc)............................................................................................................................................23

*Baxalta Inc. v. Genentech, Inc.*, 579 F. Supp. 3d 595 (D. Del. 2022) ....................................13

*Baxalta Inc. v. Genentech, Inc.*, No. CV 17-509-TBD, 2022 WL 420479 (D.
Del. Jan. 13, 2022) ...................................................................................................................19

*Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964 (Fed. Cir. 2021)...................................20

*Biogen Int'l GmbH v. Mylan Pharms. Inc.*, 18 F.4th 1333 (Fed. Cir. 2021) ..........................23

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................................................4

*Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632 (2015) .......................................20, 21, 31

*D Three Enters., LLC v. SunModo Corp.*, 890 F.3d 1042 (Fed. Cir. 2018) .............................6

*Deering Precision Instruments, LLC v. Vector Distrib. Sys., Inc.*, 347 F.3d
1314 (Fed. Cir. 2003).................................................................................................................9

*Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342
(Fed. Cir. 2012)...........................................................................................................................9

*Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340 (Fed. Cir.
2019) ..........................................................................................................................................13

*EPA v. Micrology Labs. LLC*, No. 3:09-cv-69 (N.D. Ind. Nov. 16, 2009) .............................34

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359 (Fed. Cir. 2003) (en banc) .........................................................................................8, 11

*FO2GO LLC v. KeepItSafe, Inc.*, C.A. No. 18-807-RGA, 2019 WL 1615398 (D. Del. Apr. 16, 2019) ..........................................................................................31

*Gayler v. Wilder*, 51 U.S. 477 (1850) ..................................................................34

*Global-Tech Appliances, Inc v. SEB S.A.*, 563 U.S. 754 (2011) ..........................20, 21, 29, 31

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ..........................................................36

*Helios Software, LLC v. SpectorSoft Corp.*, No. CV 12-081-LPS, 2014 WL 4796111 (D. Del. Sept. 18, 2014) ..................................................................21

*Idenix Pharm. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149 (Fed. Cir. 2019) ....................................................................................................... *passim*

*In re Wands*, 858 F.2d 731 (Fed. Cir. 1988) ........................................................14, 15, 16

*Jacobs Vehicle Sys., Inc. v. Pac. Diesel Brake Co.*, 424 F. Supp. 2d 388 (D. Conn. 2006) ..........................................................................................31

*L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F. Supp. 1294 (C.D. Cal. 1994) ..........................30

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371 (Fed. Cir. 2007) ..........................18, 19

*Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915 (2014) ..................................4

*LiTL LLC v. Lenovo (U.S.), Inc.*, No. CV 20-689-RGA, 2022 WL 610739 (D. Del. Jan. 21, 2022) ..........................................................................................21

*Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574 (1986) ......................4

*Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351 (Fed. Cir. 2012) ......................................6

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661 (2022) ....................................39

*NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-cv-02352-EJD, 2018 WL 4510737 (N.D. Cal. Sept. 18, 2018) ..................................................................................21

*New Railhead Mfg., LLC v. Vermeer Mfg. Co.*, 298 F.3d 1290 (Fed. Cir. 2002) ..................23

*Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336 (Fed. Cir. 2013) ..........................................................................................25

*Nutrition 21 v. United States*, 930 F.2d 862 (Fed. Cir. 1991) ........................................37, 38

*Nuvo Pharm. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368 (Fed. Cir. 2019)...........................................................................................23

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365 (2018)...........................................................................................................34

*State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226 (Fed. Cir. 1985) .................................21

*Pfizer, Inc. v. Ranbaxy Lab'ys Ltd.*, 457 F.3d 1284 (Fed. Cir. 2006)......................................11

*Pharma Tech Sol'ns, Inc. v. LifeScan, Inc.*, 942 F.3d 1372 (Fed. Cir. 2019).........................10

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299 (Fed. Cir. 2008).............................23

*Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559 (Fed. Cir. 1997).......................23,

*S. Corp. v. United States*, 690 F.2d 1368 (Fed. Cir. 1982) .....................................................33

*Takeda Pharm. Co. v. Torrent Pharms. Ltd.*, No. 2:17-cv-03186-SRC, 2020 WL 549594 (D.N.J. Feb. 4, 2020) ....................................................................15

*Takeda Pharms. USA, Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625 (Fed. Cir. 2015) ......................................................................................................................29

*Tektronix Inc. v. United States*, 351 F.2d 630 (Ct. Cl. 1965) ...............................32, 33, 34, 35

*Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136 (Fed. Cir. 2021) .......................................................................................................................8

*Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357 (Fed. Cir. 2018) ....................18, 19

*Uniloc USA, Inc. v. Sega of Am., Inc.*, 711 F. App'x 986 (Fed. Cir. 2017)............................23

*United States v. Yung*, 37 F.4th 70 (3d Cir. 2022) ..................................................................36

*Varian Med. Sys., Inc. v. Elekta AB*, C.A. No. 15-871-LPS, 2016 WL 3748772 (D. Del. July 12, 2016).........................................................................................31

*Verint Sys. Inc. v. Red Box Recorders Ltd.*, No. 14-CV-5403 (KBF), 2016 WL 7177844 (S.D.N.Y. Dec. 7, 2016).......................................................................21

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022)........................................................................38

*Wyeth v. Abbott Lab'ys*, 720 F.3d 1380 (Fed. Cir. 2013) ...............................................13, 14

*Yates v. United States*, 574 U.S. 528 (2015)...........................................................................36

STATUTES, RULES, AND REGULATIONS

37 C.F.R. §§ 404.1-404.14...................................................................................38

31 U.S.C. § 3730...............................................................................................35

35 U.S.C. § 112.............................................................................................11, 12

35 U.S.C. § 200 *et seq.*........................................................................ *passim*

42 U.S.C. § 2000a.............................................................................................35

42 U.S.C. § 3614.............................................................................................35

Fed. R. Civ. P. 56...............................................................................................4

Fed. R. Evid. 602...............................................................................................6

Pub. L. 106-404, § 6, 114 Stat. 1742, 1745 (2000) (codified at 35 U.S.C. § 202(e))......................................................................................................36

OTHER AUTHORITIES

DOJ, Investigation of Gov't Patent Practices and Policies (1947) ...........................................33

USPTO, All Technologies (Utility Patents) Report (2020) ......................................................39

Manual of Patent Examining Procedure §716.02(d)...............................................................9

U.S. Dep't of Justice, *Justice Manual* § 4-4.320 (rev'd Apr. 2018), 1999 WL 3321975337

S. Rep. No. 96-480 (1979)........................................................................................38

Thomas Ewing, *Government Owned Patents*, 10 J. Pat. Off. Soc'y 149 (1928)....................................33

## TABLE OF ABBREVIATIONS

| Abbreviation | Full Form |
|---|---|
| '509 Patent | U.S. Patent No. 9,044,509 |
| '333 Patent | U.S. Patent No. 9,579,333 |
| '191 Patent | U.S. Patent No. 9,937,191 |
| '423 Patent | U.S. Patent No. 10,335,423 |
| Asserted Patents | The '509 Patent, the '333 Patent, the '191 Patent, and the '423 Patent |
| DOE | Doctrine of Equivalents |
| FTC | Emtricitabine |
| Gilead | Gilead Sciences, Inc. |
| GSIUC | Gilead Sciences Ireland UC |
| PrEP | HIV Pre-exposure Prophylaxis |
| Provisional Application | Provisional Application No. 60/764,811, filed on Feb. 3, 2006 ("Prov. App.") |
| R&D | Research and Development |
| SOF | Concise Statement of Facts in Support of Summary Judgment Motions |
| TAF | Tenofovir Alafenamide |
| TDF | Tenofovir Disoproxil Fumarate |

## NATURE AND STAGE OF THE PROCEEDINGS

The government sued Defendants Gilead Sciences, Inc. ("Gilead") and Gilead Sciences Ireland UC ("GSIUC") in 2019 for allegedly inducing infringement of four government-owned patents by selling two of Gilead's products, Truvada® and Descovy®, for PrEP.  D.I. 1.  The government alleges that the sale and use of Truvada® for PrEP infringes claims 1, 3, 8, 9, and 13 of the '509 Patent; claim 13 of the '333 Patent; claim 18 of the '191 Patent; and claims 1, 3, 12, 18, and 19 of the '423 Patent (the "Asserted Claims").  It also alleges that the use of Descovy® for PrEP infringes claim 13 of the '509 Patent and claims 1, 3, 12, 18, and 19 of the '423 Patent. Discovery is complete and trial is scheduled for May 1, 2023.

## SUMMARY OF ARGUMENT

Gilead and GSIUC move for summary judgment on discrete issues for which the government cannot show that there is any genuine dispute for trial.  Despite three years of discovery, there are critical holes in the government's evidence relating to many required claim elements.  Rather than narrow its case in view of the Court's claim constructions and the record developed through discovery, the government seeks to maintain unsupported legal theories that no reasonable jury could accept.  If allowed to proceed, these theories would unnecessarily multiply the issues for trial in a way that is both wasteful and confusing.  Therefore, and for the reasons below, Gilead is entitled to judgment that:

- ***The government has identified no evidence of an infringing use of Descovy®.***  All of the government's claims against Descovy® lack evidentiary support.  After years of discovery and many inquiries from Gilead, the government has identified ***no*** direct infringement involving Descovy®, i.e., no evidence that even one individual has used Descovy® for PrEP in an infringing manner.

- ***Descovy® does not infringe claim 13 of the '509 Patent under the DOE.*** Beyond the above failure of proof, the government's attempt to sidestep the Court's claim construction and stretch claim 13 to encompass Descovy® under DOE is barred by prosecution history estoppel because the government canceled all pending claims that would have encompassed Descovy® in order to overcome rejections.

- ***Claims 3 and 13 of the '509 Patent are invalid because they are broader than the claims from which they depend.*** Both claims encompass administration to species other than humans, but the claims from which they depend are limited to humans.

- ***Claims reciting "tenofovir prodrug" are not enabled.*** The asserted claims of the '423 Patent broadly claim PrEP methods using any "tenofovir prodrug." This broad genus lacks enablement. Possible "tenofovir prodrugs" encompasses a huge genus of many more than thousands of compounds, but the specification includes only a ***single*** working example of a PrEP method using a ***single*** tenofovir prodrug, and it gives no guidance on what other compounds would be tenofovir prodrugs suitable for PrEP.

- ***Claims that recite oral administration of tenofovir are invalid for lack of enablement.*** Seven of the twelve asserted claims are invalid for lack of enablement because they include expressly recited embodiments that are inoperative. These claims expressly recite PrEP methods using oral tenofovir (rather than TDF), but it is undisputed that tenofovir cannot be administered orally.

- ***The government cannot recover damages before March 2016.*** The government asserts only inducement claims, so it must establish that Gilead knew about the Asserted Patents. The government seeks damages from issuance of the first patent in June 2015, but it has identified no evidence that Gilead knew about the patents before March 2016.

- ***The Asserted Claims cannot claim priority to the 2006 Provisional Application because it does not show that the inventors possessed a PrEP method using orally administered TDF and FTC.*** All of the asserted claims are directed to methods that include the oral administration of FTC and TDF (among other tenofovir prodrugs) in combination for PrEP. They purport to claim priority to a provisional application, but no reasonable jury could find that priority claim to be valid because the Provisional Application only discloses the effective ***subcutaneous*** administration of FTC and tenofovir for PrEP. Nothing in the provisional application indicates that the inventors were in possession of a PrEP method using orally administered FTC and TDF.

- ***GSIUC does not induce infringement.*** The government maintains inducement claims against Gilead's Irish subsidiary GSIUC despite receiving definitive proof in June 2021 that GSIUC never shipped Truvada® or Descovy® bearing the PrEP label indication to the United States during the damages period. The government twice demanded and received more documents and testimony from GSIUC after discovery disputes, but it still has identified no evidence to support its claim. The time has come for GSIUC to be dismissed.

- ***The government lacks authority to sue for patent infringement.*** Both history and the statute that the government has invoked, the Bayh-Dole Act, show that it lacks authority to sue for patent infringement. There is no sign that Congress ever intended for the U.S. government to become the world's largest non-practicing entity. Accordingly, the Court should dismiss this action in its entirety.

Other than the issue of the government's authority to sue, none of these issues are case dispositive. But resolving these issues will significantly focus and simplify the issues for trial.

## LEGAL STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court reviews all the evidence and draws all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The nonmovant "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is "genuine" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 247-48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (citations omitted).

## ARGUMENT

**I.    The Government Has Identified No Evidence of Direct Infringement for Descovy®.**

All of the Asserted Claims are method-of-use claims, and the government alleges that Gilead induces infringement.  To prove inducement, the government must establish predicate acts of direct infringement.  *See, e.g.*, *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 920-21 (2014).  But after nearly ***three years*** of extensive discovery, the government has identified no evidence that any individual has ever taken Descovy® in a manner that infringes any asserted claim.  The Court should enter summary judgment of non-infringement on the government's claims against Descovy® because the government cannot prove this required element of its claims at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

– 4 –

The government has identified no documentary evidence or testimony showing that any specific individual has taken Descovy® for PrEP in an infringing manner, nor has it identified any physician with direct knowledge of specific patients taking Descovy® for PrEP in such a manner.  During fact discovery, the government explained the burden it faced, stating that it "will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label®" directly infringe.  *E.g.*, Final Infr. Contentions (Ex.[1] 1) at 438.  The government identified no such physicians during fact discovery, but it offered an expert report from Dr. Robert Murphy, an infectious-disease doctor.  Dr. Murphy's report stated, "I have prescribed Descovy for PrEP to patients."  Murphy Op. Rep. (Ex. 2) ¶¶ 225-26.  Gilead moved to strike this disclosure as untimely, but the government opposed, arguing that it was proper for Dr. Murphy to rely "on his personal experience prescribing … Descovy® for PrEP."  D.I. 318 at 1.  The Court let Gilead "depose Dr. Murphy regarding his personal experience prescribing the accused products."  Oral Order (D.I. 319).

At that deposition, Dr. Murphy ***denied*** having ever prescribed Descovy® to a patient for PrEP.  SOF 1; Murphy Tr. (Ex. 3) at 119:1-3.  Despite the statement in Dr. Murphy's report— signed "under penalty of perjury," Murphy Op. Rep. (Ex. 2) ¶ 345—and despite the government's representation to the Court, the truth is that Dr. Murphy has not prescribed Descovy® for PrEP.[2]  The government has thus offered ***no evidence*** that any specific act of direct infringement has occurred using Descovy®.

---

[1] "Ex." refers to exhibits attached to the Declaration of Charles T. Cox Jr., filed with this brief.

[2] Dr. Murphy testified that he has "referred [PrEP] patients" to a third-party clinic in Chicago, which then "handle[s] everything."  Murphy Tr. (Ex. 3) at 116:20-119:2.  Because Dr. Murphy lacks personal knowledge of what happens with these patients after they are handed off, he is not

– 5 –

The government has no other evidence to fill this gap.  The government's only other infringement experts are not physicians and could not have prescribed Descovy®.  SOF 2-3; Brancale Tr. (Ex. 4) at 106:9-16; Marcus Tr. (Ex. 5) at 38:20-24.  The government tried to plug this hole through cross-examination of Gilead's clinical expert, but he confirmed that he has not prescribed Descovy® for PrEP either.  SOF 4; Flexner Tr. (Ex. 6) at 384:8-10.  Though the government cites general evidence that prescriptions have been written for Descovy® for PrEP, *e.g.*, Murphy Op. Rep. (Ex. 2) ¶ 227, that cannot establish whether the prescriptions were filled, whether the patients took the medicine in accordance with the product label, whether the patients were exposed or potentially exposed to HIV, and whether the patients remained HIV negative after practicing the claimed method steps—all of which the government must show to establish an act of direct infringement.  The government's experts have attempted to piggyback on evidence for Truvada® by asserting that "Descovy for PrEP and Truvada for PrEP are prescribed by the same relevant physician population and used by the same relevant patient population," but they cite no support.  Murphy Reply Rep. (Ex. 7) ¶ 162; SOF 5.  For example, Dr. Julia Marcus cites twenty-five different survey articles on patient behavior and practice in support of her discussion of Truvada®, but she cites ***none*** in the three pages of her report that discuss Descovy®.  Marcus Rep. (Ex. 8) ¶¶ 128-130; Marcus Tr. (Ex. 5) at 257:24-259:10.  "Conclusory expert assertions" such as these "do not give rise to a genuine issue of material fact."  *D Three Enters., LLC v. SunModo Corp.*, 890 F.3d 1042, 1051 (Fed. Cir. 2018) (internal quotation marks omitted); *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1361 (Fed. Cir. 2012) (testimony

---

competent to testify as either a fact or expert witness about what they are told, whether they receive a prescription, whether they fill it, whether they actually take the drugs, their relevant risk behavior, and their HIV testing status.  *See* Fed. R. Evid. 602 (fact witness must have "personal knowledge of the matter"), 702 (expert testimony must be "based on sufficient facts").

that accused products "*could* infringe … is not sufficient to find inducement of infringement of a method patent.  Evidence of actual use of each limitation is required").

Put simply, the government has failed to establish basic facts to show that ***anyone*** has practiced all the limitations of the claims asserted against Descovy®,[3] so the Court should enter summary judgment that Gilead's sales of Descovy® do not induce infringement.

## II.   Claim 13 of the '509 Patent Is Not Infringed by Descovy® Because of Prosecution History Estoppel.

Besides the reasons stated above, the Court should separately grant summary judgment that the government cannot prove infringement by Descovy® of claim 13 of the '509 Patent under the DOE because its DOE theory is barred by prosecution history estoppel.[4]  Claim 13, via its dependency from claim 12, covers methods of using "a pharmaceutically effective amount of tenofovir or tenofovir ester."  The government originally contended that Gilead's sales of Descovy® induced literal infringement of this claim because TAF, a component of Descovy®, is a "tenofovir ester."  But the government has since conceded that TAF is not a "tenofovir ester" under the Court's construction.  *See supra* note 4; D.I. 186 at 2, 10; SOF 6.  The government now contends that TAF satisfies the "tenofovir ester" limitation under the DOE.

The government cannot prevail on its DOE theory because, during prosecution, it surrendered claims to methods using tenofovir prodrugs that are not tenofovir esters, including

---

[3] The Court should not allow the government leave to correct this glaring deficiency.  Gilead first raised this issue with the government more than a year before discovery closed.  *See* Ltr. from T. Cook to W. Brown (Jan. 20, 2021) (Ex. 9) at 19 (noting that the government "has disclosed no evidence of prescriptions or use by patients"); Ltr. from D. Bassett to W. Brown (May 3, 2021) (Ex. 10) at 4-5 (same).  There was even full briefing about the prescriptions that Dr. Murphy has now disavowed.  D.I. 317-319.  The government had ample opportunity to build its case, but it chose not to and should bear the consequences.

[4] The government does not assert that Descovy® literally infringes claim 13 of the '509 Patent.  Ltr. from W. Brown to R. Machen (Nov. 19, 2021) (Ex. 12) at 1.

TAF.  "Whether prosecution-history estoppel applies is a question of law."  *Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1146 (Fed. Cir. 2021).  Courts consider four factors to determine whether prosecution history estoppel bars a DOE claim: (1) "whether an amendment . . . has narrowed the literal scope of a claim," (2) "whether the reason for that amendment was a substantial one relating to patentability," (3) whether the asserted equivalent is within "the scope of the subject matter surrendered by the narrowing amendment," and (4) whether the presumption of surrender may be overcome because the "alleged equivalent would have been 'unforeseeable at the time of the amendment and thus beyond a fair interpretation of what was surrendered,'" "'the rationale underlying the narrowing amendment [bore] no more than a tangential relation to the equivalent in question,'" or whether there is "'some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question,'" "such as the shortcomings of language."  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366-70 (Fed. Cir. 2003) (en banc) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 738, 740-41 (2002)).  Those factors show that prosecution history estoppel bars the government's DOE claim here.

*First*, it is undisputed that the government made amendments during prosecution of the '509 Patent to narrow the literal scope of the claims, including the tenofovir limitation.  The government originally claimed methods using any "nucleotide reverse transcriptase inhibitor," which is a class of drugs that includes tenofovir and any "pharmaceutically acceptable . . . prodrugs."  '509 Patent File Hist. (Ex. 11) at 16-17, 29-33.  TAF is a tenofovir prodrug, and the original claims literally covered methods using TAF.  SOF 7-8; Brancale Tr. (Ex. 4) at 352:10-18, 353:2-10.  Those claims were rejected as obvious four separate times.  SOF 9; '509 Patent File Hist. (Ex. 11) at 163-68, 247-255, 413-420, 452-459.  After the application had been

pending for over seven years, the government amended the claims to recite a specific group of drugs, including tenofovir "and pharmaceutically acceptable derivatives thereof." SOF 10; '509 Patent File Hist. (Ex. 11) at 563. It is undisputed that this amended claim still literally covered methods using TAF. SOF 10; Brancale Tr. (Ex. 4) at 353:2-10, 355:21-358:21. With this amendment, the government also added claims that recited either "tenofovir or tenofovir disoproxil fumarate" or "tenofovir or tenofovir ester." SOF 6, 11; Brancale Tr. (Ex. 4) at 358:22-361:21, 362:20-364:1. It is undisputed that those added claims did ***not*** literally cover methods using TAF. *Id.* During an examiner interview, the government consented to an examiner's amendment canceling all claims except those that recited "tenofovir or tenofovir disoproxil fumarate" or "tenofovir or tenofovir ester." SOF 12. Because of this amendment, the proposed claims that literally covered methods using TAF were cancelled; no issued claim in the '509 Patent literally covers methods using TAF. SOF 12. This amendment is what gives rise to the prosecution history estoppel that bars the government from asserting that TAF is equivalent. *See, e.g.*, *Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1359-60 (Fed. Cir. 2012) (prosecution history estoppel applies to new, narrower claims added to implicitly respond to rejection); *Deering Precision Instruments, LLC v. Vector Distrib. Sys., Inc.*, 347 F.3d 1314, 1325-26 (Fed. Cir. 2003).

*Second*, the government's narrowing amendments to methods using only tenofovir, TDF, or "tenofovir ester" were made to distinguish the prior art. SOF 13; '509 Patent File Hist. (Ex. 11) at 572 ("The prior art does not disclose administering emtricitabine and ***tenofovir or the tenofovir ester*** as preexposure prophylactic treatment[.]").[5] Moreover, the government relied on alleged unexpected results of using a specific combination—FTC combined with TDF (which,

---

[5] All emphasis is added unless otherwise noted.

unlike TAF, is literally a "tenofovir ester").  SOF 14; '509 Patent File Hist. (Ex. 11) at 576-78.

Based on allegedly surprising results, the Examiner allowed claims limited to TDF or tenofovir

esters, but not claims covering all tenofovir prodrugs, such as TAF.[6]  SOF 12, 14; '509 Patent

File Hist. (Ex. 11) at 563-68, 777, 783-89, 799-800.  The government agreed to cancel claims

encompassing TAF to obtain allowance.  The government's surrender of non-tenofovir-ester

prodrugs of tenofovir (including TAF) was thus substantially related to patentability.

*Third*, it is undisputed that TAF falls within the subject matter surrendered.  The

government's expert, Dr. Brancale, admitted that TAF was literally covered by pending claims

from the original application until the examiner's amendment, but is not literally covered by any

issued claim.  Brancale Tr. (Ex. 4) at 353:2-10, 355:21-358:21, 362:20-364:1; SOF 8-12.

*Fourth*, the government cannot carry its burden to show that any exception to prosecution

history estoppel applies.  *See Pharma Tech Sol'ns, Inc. v. LifeScan, Inc.*, 942 F.3d 1372, 1380

(Fed. Cir. 2019).  TAF was not unforeseeable at the time of the application—what the examiner

called "[t]he closest prior art," '509 Patent File Hist. (Ex. 11) at 783, expressly shows TAF's

structure, Brancale Tr. (Ex. 4) at 379:19-380:13; SOF 15.  And the rationale underlying the

government's narrowing amendments had far more than a tangential relation to TAF—the

amendments were expressly made to overcome an obviousness rejection through reliance on the

allegedly unexpected results of a "specific combination of agents" that included a specific

tenofovir ester that was not TAF.  '509 Patent File Hist. (Ex. 11) at 572, 576-78; Brancale Tr.

(Ex 4) at 365:7-372:23: SOF 14.  Nor is there any other "reason, such as the shortcomings of

---

[6] The rules governing patent examination require that "objective evidence of nonobviousness must be commensurate in scope with the claims which the evidence is offered to support." Manual of Patent Examining Procedure §716.02(d).  The government only presented evidence of unexpected results for methods using TDF, so this rule is likely why the Examiner did not allow the broader claims to methods using any type of tenofovir derivative.  SOF 12, 14.

language, why the [government] was prevented from describing [TAF] when it narrowed the claim." *Festo Corp.*, 344 F.3d at 1370.

The Court should therefore grant summary judgment that the government is barred from arguing that TAF is equivalent to a "tenofovir ester." Because the government's DOE theory is barred and the government does not assert that Descovy® literally infringes, the Court should enter summary judgment of no infringement of claim 13 of the '509 Patent for Descovy®.

## III.   Claims 3 and 13 of the '509 Patent Are Invalid for Improper Dependency.

Claims 3 and 13 of the '509 Patent are invalid because they cover administration to a broader set of animal species than claims 2 and 12, from which they respectively depend. "A dependent claim that does not properly narrow the scope of the claim from which it depend[s] is invalid under 35 U.S.C. § 112, ¶ 4." *Amgen, Inc. v. Hospira, Inc.*, C.A. No. 15-839-RGA, 2016 WL 7013483, at *4 (D. Del. Nov. 30, 2016); *see also Pfizer, Inc. v. Ranbaxy Lab'ys Ltd.*, 457 F.3d 1284, 1291-92 (Fed. Cir. 2006) ("[A] violation of § 112, ¶ 4 renders a patent invalid."). It is irrelevant whether improper dependency was caused by a "technical problem in the drafting" because the Court "should not rewrite claims to preserve validity." *Pfizer*, 457 F.3d at 1291-92. Improper dependency renders the claims invalid even if the patentee "was attempting to claim what might otherwise have been patentable subject matter." *Id.* at 1292.

The '509 Patent says a "primate host" may include "a monkey, baboon, chimpanzee, gorilla, [or] a human." '509 Patent (Ex. 26) at 4:18-19. Claim 3 of the '509 Patent covers methods in a "male adult ***primate host***" but depends from claim 2, which is limited to methods in an "adult ***human.***" Ex. 26. Similarly, claim 13 of the '509 Patent is directed to processes in a "***primate host***," but it depends from claim 12, which covers methods "***in a human***." *Id.* In other words, claims 2 and 12 are limited to methods in humans, but their dependent claims 3 and 13,

respectively, cover methods in other species as well as humans.  Even the government's validity expert concedes that "male adult primate host" is broader than "adult human."  SOF 16; Grant Expert Tr. (Ex. 22) at 257:17-258:22.  Claims 3 and 13 of the '509 Patent thus fail to narrow claims 2 and 12, as required by § 112, ¶ 4.

Summary judgment that claims 3 and 13 of the '509 Patent are invalid is appropriate.

## IV.   The Asserted "Tenofovir Prodrug" Claims Are Not Enabled.

The Court should also enter summary judgment that claims 1, 3, 12, 18, and 19 of the '423 Patent are invalid for lack of enablement.  Each of these claims recites methods for HIV prevention using a combination of FTC and a tenofovir prodrug.  "Tenofovir prodrug" is a functionally defined genus.  SOF 17; Thakker Tr. (Ex. 19) at 96:1-9.  The parties agree that a "tenofovir prodrug" is "a compound that, when administered to a primate host generates tenofovir as a result of spontaneous reaction under physiological conditions, enzymatic catalysis, metabolic clearance, or combinations thereof."  SOF 17; Thakker Rep. (Ex. 23) ¶ 48; *see* '509 Patent (Ex. 26) at 4:51-58.  There are many more than thousands of potential tenofovir prodrugs. SOF 18; Flexner Tr. (Ex. 6) at 317:15-20.[7]  Yet the claims provide no structural limitations on what compounds would be tenofovir prodrugs.  Further, the '423 Patent provides no direction or guidance to a person of skill in the art ("POSA") about how to make and select tenofovir prodrug compounds for PrEP.  Flexner Op. Rep. (Ex. 25) ¶ 2250.  The '423 Patent only identifies a single tenofovir prodrug, TDF, and only includes one working example of a method using a tenofovir prodrug—a method using TDF.  SOF 19.  Thus, no reasonable jury could find that the '423 Patent enables methods representative of the full scope of the claims.   The difference between

---

[7] The government's experts made no effort to determine the size of this genus.  *See, e.g.*, Thakker Tr. (Ex. 19) at 224:25-225:03.

what the inventors did and what they have claimed is vast—the inventors claim methods using *all possible* prodrugs, including a huge genus of many more than thousands of compounds that had never been made, based on an experiment using just one.

Decisions of the Federal Circuit and this Court confirm that enablement may be resolved on a dispositive motion. *See Amgen Inc. v. Sanofi, Aventisub LLC*, 987 F.3d 1080, 1087-88 (Fed. Cir. 2021) ("*Amgen II*") (affirming JMOL of non-enablement); *Idenix Pharm. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1155-57, 1165 (Fed. Cir. 2019) (same); *Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340, 1349 (Fed. Cir. 2019) (affirming summary judgment of non-enablement); *Wyeth v. Abbott Lab'ys*, 720 F.3d 1380, 1382-83 (Fed. Cir. 2013) (same); *Baxalta Inc. v. Genentech, Inc.*, 579 F. Supp. 3d 595, 597 (D. Del. 2022) (entering summary judgment of non-enablement). In every one of those cases, the patents' broad genus claims were not enabled.

There are "high hurdles in fulfilling the enablement requirement for claims with broad functional language." *Amgen II*, 987 F.3d at 1087. "What emerges from our case law," the Federal Circuit explained,

> is that the enablement inquiry for claims that include functional requirements can be particularly focused on the breadth of those requirements, especially where predictability and guidance fall short. In particular, it is important to consider the quantity of experimentation that would be required to make and use, not only the limited number of embodiments that the patent discloses, but also ***the full scope of the claim***.

*Id.* at 1086. The government itself endorsed this view before the Supreme Court last month. *See* Br. for the United States as Amicus Curiae at 16, *Amgen Inc. v. Sanofi*, No. 21-757 (U.S. Sept. 21, 2022), 2022 WL 4386300 ("Gov't *Amgen* Br.") ("When, as here, a patent claims an entire genus based on its function, the patent must enable that entire genus.").

– 13 –

The Federal Circuit has applied this principle to facts much like those here.  In *Wyeth v. Abbott*, the asserted claims were directed to a method of treating or preventing a condition called restenosis by administering an effective amount of any of a genus of drugs to the patient.  720 F.3d at 1382.  The genus was defined as compounds having a specific core structure but with variability at one of the substituent groups.  *Id.* at 1382-83.  The patent's specification disclosed only one specific drug within the genus that was effective for treating the condition.  *Id.* at 1382.  It also disclosed test methods for determining whether other compounds would likely be effective.  *Id.* at 1384.  But both the district court and the Federal Circuit found as a matter of law that this disclosure was not enabling.  *Id.* at 1382.  The Federal Circuit held that because of the large number of possible candidates in the genus and the specification's lack of structural guidance, it would have required undue experimentation to synthesize and screen ***each candidate*** to determine which compounds in the genus exhibited the claimed functionality.  *Id.* at 1385-86.  For similar reasons, the Federal Circuit affirmed this Court's judgment as a matter of law of non-enablement in *Idenix*, 941 F.3d at 1154-63.  There, the claims were directed to methods of treatment for hepatitis C using an effective amount of any chemical within a genus having a common core structure, *id.* at 1154-55, and the specification disclosed four working examples, *id.* at 1161.  The Federal Circuit held that this failed to "provide enough meaningful guidance or working examples, across the full scope of the claim, to allow a POSA to determine which [compounds] would or would not be effective … without extensive screening."  *Id.* at 1062.  Rather, the patent left a POSA "searching for a needle in a haystack" to determine which compounds would be effective in the method.  *Id.*

Remarkably, the '423 Patent offers even less enabling disclosure than in *Wyeth* or *Idenix*.  Here, the "breadth of the claims," *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988), is extremely

broad.  It includes methods of treatment using potentially hundreds of thousands of candidate compounds.  Thakker Tr. (Ex. 19) at 224:12-24 (unable to quantify the number of compounds in the "tenofovir prodrug" genus because he had "not explored the chemical universe to see . . . if there are thousands or hundreds of thousands"), 228:3-10; Flexner Op. Rep. (Ex. 25) ¶¶ 341, 345-50, 2240; SOF ¶ 18.  And the "amount of direction or guidance presented in the patent" and the disclosure of "working examples," *Wands*, 858 F.2d at 737, is minimal.  The '423 Patent does not disclose *any* chemical structures of any other tenofovir prodrug or how to synthesize any tenofovir prodrug.  SOF 21; Thakker Tr. (Ex. 19) at 59:2-9; Thakker Rep. (Ex. 24) at ¶ 21 n.1.  And Dr. Thakker agreed that many types of possible prodrugs are not listed in the common specification.  Thakker Tr. (Ex. 19) at 336:24-337:4.  There is no discussion of which categories or types of tenofovir prodrugs might be effective.  *Id.* at 337:19-338:5.  Indeed, the '423 Patent discloses a method using only a *single* tenofovir prodrug—TDF.  *See* SOF ¶ 19; '509 Patent (Ex. 26) at 9:5-31; Flexner Op. Rep. (Ex. 25) ¶ 2248; Thakker Tr. (Ex. 19) at 84:10-85:7, 211:12-16.  The '423 Patent does not specifically identify any other tenofovir prodrug, how to effectively dose any other tenofovir prodrug, or data showing efficacy of any other specific tenofovir prodrug.  SOF 20.  This falls far short of the enablement bar.  *See, e.g.*, *Idenix*, 941 F.3d at 1161.

The '423 Patent's disclosure is particularly deficient considering the "nature of the invention" and the "state of the prior art."  *Wands*, 858 F.2d at 737; *see also Takeda Pharm. Co. v. Torrent Pharms. Ltd.*, No. 2:17-cv-03186-SRC, 2020 WL 549594, at *10 (D.N.J. Feb. 4, 2020) ("[I]n the relevant art of pharmaceutical development, very small changes in molecular structure can have dramatic effects on the properties of the molecule.").  Dr. Thakker agreed that different tenofovir prodrugs can have different chemical, biological, and other properties.  SOF 22; Thakker Tr. (Ex. 19) at 208:10-209:17; *see id.* at 201:23-202:7, 204:11-24; Thakker Rep.

– 15 –

(Ex. 23) ¶ 116-17.  As of the filing date, only one "tenofovir prodrug" (TDF) had been tested in humans and approved by the FDA, and only a few tenofovir prodrugs had even been disclosed in the literature.  *See* SOF 23; Thakker Tr. (Ex. 19) at 256:10-22, 262:15-264:11 (only nine potentially effective tenofovir prodrugs were disclosed as of the filing date).  It would not have been possible to predict which "tenofovir prodrugs" could be effective in the claimed methods.[8] Thakker Rep. (Ex. 23) ¶¶ 116-17, 120 (animal testing required to know which potential "tenofovir prodrugs" would work in the claimed methods); Flexner Op. Rep. (Ex. 25) ¶¶ 2257; Thakker Tr. (Ex. 19) at 205:11-15, 205:23-209:25, 210:24-211:2, 230:22-231:12, 234:9-235:3, 235:19-236:23; *see also In re Wands*, 858 F.2d at 737 ("predictability or unpredictability of the art").  And only one was known to be effective in humans.  *See, e.g.*, Thakker Tr. (Ex. 19) at 262:15-263:13, 155:18-23, 256:10-257:7, 258:20-259:18.

The "quantity of experimentation necessary," *Wands*, 858 F.2d at 737, to use the full scope of the claimed "tenofovir prodrug" methods is therefore extraordinary.  Flexner Op. Rep. (Ex. 25) ¶¶ 2240-45.  The government's expert concedes that a POSA would need to do several types of tests on ***every potential*** "tenofovir prodrug" to find out whether it could, in fact, be used as a "tenofovir prodrug" in the claimed method.  Thakker Tr. (Ex 19) at 189:25-191:17.  For example, Dr. Thakker describes different tests with animal models needed to confirm efficacy and to adjust dosing for each compound:

> Once a prodrug was selected from the genus of potential prodrugs, a POSA could have ***used the animal [i.e., monkey] model*** described in the Patents-in-Suit to confirm efficacy and to adjust the dose to account for any differences in the characteristics of the two prodrugs (e.g., differences in metabolism or bioavailability). ***Further, the animal model developed by the inventors could be***

---

[8] To be clear, the question is not whether the few tenofovir prodrugs known to be effective (or likely effective) for HIV treatment would work for PrEP—it is which of the vast universe of ***potential*** tenofovir prodrugs, which had never been made or tested, could be used for PrEP.

> *used to determine whether the prodrug would likely be effective in humans*.

Thakker Rep. (Ex. 23) ¶ 117; *see also id.* ¶ 120; Thakker Tr. (Ex. 19) at 191:14-17, 209:20-210:22; 311:19-312:21.  For *each* different *potential* prodrug, these animal experiments—which even the government concedes would be necessary—would require "dedicated facilities," "dedicated staff," "eight to 10 animals," and cost "hundreds of thousands of dollars."  SOF 24; Johnson Tr. (Ex. 27) at 127:1-6, 130:23-132:2 (government expert describing monkey experiments).  To understand the full scope of the claimed methods directed to compounds that function as tenofovir prodrugs and are effective for PrEP, a POSA would need to do these experiments on many more than thousands of compounds to determine which drug combinations the inventors have claimed.  These experiments would require *far more* than undue experimentation.  *See* Flexner Op. Rep. (Ex. 25) ¶ 2245; Johnson Tr. (Ex. 27) at 127:1-6, 130:23-132:2; Thakker Rep. (Ex. 23) ¶ 117; Thakker Tr. (Ex. 19) at 191:14-17, 209:20-210:22.  Moreover, because the '423 Patent does not disclose how to make any potential tenofovir prodrugs, even further experimentation would be needed to synthesize compounds that could serve as effective tenofovir prodrugs.  The extent, burden, and expense of this testing "is large and weighs in favor of non-enablement." *See, e.g.*, *Idenix*, 941 F.3d at 1157-59.

At best, the inventors showed that a single combination of oral drugs—FTC and TDF—was effective for PrEP in its monkey model.  From that, they claimed the use of thousands of other drug combinations for PrEP in humans, leaving others to do the many costly experiments to figure out which specific drugs work and fall within its claims.  No reasonable jury could find enablement on those facts. *See, e.g.*, *Amgen Inc. v. Sanofi, Aventisub LLC*, 850 F. App'x 794, 797 (Fed. Cir. 2021) (Lourie, J., opinion on denial of panel rehearing) ("It is not the law that one can put forth an idea, or a result or function, and claim all methods of achieving it; one cannot

claim everything that works.").  "When, as here, a patent claims an entire genus based on its function, the patent must enable that entire genus."  Gov't *Amgen* Br. at 16.  But the '423 Patent at best enables methods using a tiny fraction of tenofovir prodrugs.  The asserted claims of the '423 Patent are therefore invalid for lack of enablement.

## V.    Claims to Methods of Orally Administering Tenofovir Are Not Enabled.

Seven of the twelve asserted claims—i.e., claims 1, 3, 9, and 13 of the '509 Patent, claim 13 of the '333 Patent, and claims 1 and 3 of the '423 Patent—are also invalid for lack of enablement because they expressly cover undisputedly inoperable methods.  These claims include oral administration of "tenofovir,"[9] which cannot be administered orally, for PrEP.

If expressly claimed embodiments of a method are inoperative or impossible, the claim necessarily is not enabled.  *See, e.g.*, *Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018) (practicing one of six claimed permutations "would have required undue experimentation—indeed, … it is impossible," and the claims were therefore invalid as not enabled).  The Federal Circuit has repeatedly invalidated claims on that basis.  *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007); *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003).

Claims 1, 3, 9, and 13 of the '509 Patent, claim 13 of the '333 Patent, and claims 1 and 3 of the '423 Patent recite that "tenofovir" be administered orally as part of the drug combination.  For example, claim 1 of the '509 Patent recites "administering directly to an uninfected primate host a combination comprising: . . . a pharmaceutically effective amount of tenofovir . . . wherein the combination is administered orally."  '509 Patent (Ex. 26), claim 1.  And all of the Asserted

---

[9] At the *Markman* hearing, the government conceded that "tenofovir," as used in the claims, means only the compound that "everyone recognizes as tenofovir," *Markman Hr'g* (D.I. 118) at 60:20-25, which has a unique chemical structure, *see, e.g.*, Brancale Op. Rep. (Ex. 13) ¶ 47.

Claims, including those covering the oral administration of tenofovir with emtricitabine, include efficacy in humans.  *Markman* Order (D.I. 186) at 1-2; Gov't Answer (D.I. 64) ¶¶ 27-28. Indeed, the government sought and received a construction of the preambles and "thereby" clauses of all Asserted Claims that **require** the efficacy of the claimed method.  *See Markman* Order (D.I. 186) at 1-2, 5-10.

But the oral administration of tenofovir is inoperable.  There is no dispute that tenofovir cannot be orally administered effectively to primates, including humans, due to its low oral bioavailability.  SOF 25-26; *Markman* Hr'g (D.I. 118) at 49:12-16 ("[T]enofovir itself as the PMPA molecule, it is not administrable orally…").  The government's experts agree that "[*t*]*enofovir cannot be taken orally*." Johnson Tr. (Ex. 27) at 22:16-23:4; Grant Fact Tr. (Ex. 28) at 209:5-11 ("Tenofovir alone … is not bioavailable."); D.I. 108-5, Appx4392-406, at Appx4397 ¶ 17; *see also* Brancale Op. Rep. (Ex. 13) ¶¶ 47, 50, 79; Thakker Reb. Rep. (Ex. 23) ¶ 95.[10]

The concession by the government and its experts that oral administration of tenofovir is impossible as an effective PrEP method is dispositive.  *Trs. of Bos. Univ.*, 896 F.3d at 1362 ("[T]he specification does not enable what the experts agree is physically impossible."); *Baxalta Inc. v. Genentech, Inc.*, C.A No. 17-509-TBD, 2022 WL 420479, at *18 (D. Del. Jan. 13, 2022). The claims invalidated in *Boston University* had only one inoperative embodiment out of "six [ ] permutations." 896 F.3d at 1364.  Here, one of the two specifically named options in each claim is inoperative.  '509 Patent (Ex. 26), claims 1, 3, and 9 ("**tenofovir** or tenofovir disoproxil

---

[10] Inventor Dr. Garcia-Lerma also acknowledged that tenofovir cannot be effectively administered orally.  Garcia-Lerma Tr. (Ex. 18) at 137:23-138:4 ("The only – the only description regarding a method of administration for tenofovir in [a 2005 multi-drug study protocol] is subcutaneous; right?  A For tenofovir it's subcutaneous, yeah.  For FTC [it] is oral or subcutaneous.  Q Tenofovir is only subcutaneous?  A Only subcutaneous, yeah."); *see also Liebel-Flarsheim*, 481 F.3d at 1380.

fumarate"), claim 13 ("*tenofovir* or tenofovir ester"); '333 Patent (Ex. 29), claim 13 ("*tenofovir* or tenofovir disoproxil fumarate"); '423 Patent (Ex. 24), claims 1 and 3 ("*tenofovir* or tenofovir prodrug").

Because the common specification does not teach a POSA how to *orally* administer tenofovir in an effective PrEP method—and it is undisputed that it cannot be done—the Court should enter summary judgment that claims 1, 3, 9 and 13 of the '509 Patent, claim 13 of the '333 Patent, and claims 1, and 3 of the '423 Patent are invalid.

## VI.   Gilead Cannot Be Liable for Induced or Willful Infringement Before March 2016.

Gilead is entitled to summary judgment of no liability for induced or willful infringement before learning of the '509 Patent on March 11, 2016.[11]

Inducement and willfulness both require *knowledge of the patent*.  *See, e.g.*, *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015); *Global-Tech Appliances, Inc v. SEB S.A.*, 563 U.S. 754, 766 (2011); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021).  But the government has identified *no* evidence that Gilead knew about the '509 Patent or its issued claims before March 11, 2016.  The undisputed record shows that Gilead only learned of the '509 Patent on March 11, 2016, when Dr. Tara Kirby of NIH emailed Gilead. SOF 27; Email from T. Kirby to J. Parrish (Ex. 30).  Dr. Kirby testified that the March 2016 email was the first time that the NIH technology transfer office informed Gilead that it believed that Truvada® may be covered by the '509 Patent, and she was unaware of any other government entity doing so before that date.  Kirby Tr. (Ex. 31) at 230:22-231:14.  Dr. Walid Heneine confirmed that, as of February 2, 2016, his understanding was that Gilead had not yet been approached about the '509 Patent.  Heneine Tr. (Ex. 14) at 260:1-13.  There is thus no genuine

---

[11] The remaining Asserted Patents issued after March 11, 2016.

dispute of material fact about Gilead's lack of knowledge of the '509 Patent before March 11, 2016.

The government's October 12, 2021 interrogatory response, when asked about this subject, stated only that Gilead "was aware of the ***applications*** for the Patents-in-Suit" and that "Gilead knew or should have known as early as 2014 of the existence of the ***applications*** for the Patents-in-Suit."[12]  But "should have known" is not the standard—the government must show that Gilead ***actually knew***.  *Commil*, 575 U.S. at 639; *Global-Tech*, 563 U.S. at 770.  And knowledge of a patent ***application*** does not equate to knowledge of the '509 ***Patent***.  *State Indus., Inc. v. A.O. Smith Corp.,* 751 F.2d 1226, 1236 (Fed. Cir. 1985) (addressing willfulness).  Indeed, this Court has dismissed claims of pre-suit inducement and willfulness that relied on merely "citations to various applications that eventually issued as the Asserted Patents."  *LiTL LLC v. Lenovo (U.S.), Inc.*, C.A. No. 20-689-RGA, 2022 WL 610739, at *8, *10 (D. Del. Jan. 21, 2022).

Courts, including in this District, have entered summary judgment limiting damages for an inducement claim to the period after which the alleged infringer knew of the patent.  *Helios Software, LLC v. SpectorSoft Corp.*, C.A. No. 12-081-LPS, 2014 WL 4796111, at *13 (D. Del. Sept. 18, 2014), on reconsideration in part, C.A. No. 12-81-LPS, 2015 WL 3622399 (D. Del. June 5, 2015); *see also Verint Sys. Inc. v. Red Box Recorders Ltd.*, No. 14-CV-5403 (KBF), 2016 WL 7177844, at *2-3 (S.D.N.Y. Dec. 7, 2016); *NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-cv-02352-EJD, 2018 WL 4510737, at *2-4 (N.D. Cal. Sept. 18, 2018).  So too here, the Court should grant summary judgment of no inducement and no willfulness before March 11, 2016.

---

[12] Gov't Interrog. Resp. (Ex. 32) at 35-36, 38-39, 50-52.  The government has not identified any evidence of willful blindness.

**VII. The Asserted Claims Cannot Claim Priority to the 2006 Provisional Application Because the Application Does Not Show That the Inventors Possessed a Method Using Oral TDF and FTC for PrEP.**

The government contends that all the Asserted Claims may claim priority to the February 3, 2006 Provisional Application, but no reasonable jury could agree. The Provisional Application—most of which is just a PowerPoint deck—fails to show that the inventors were in possession of the full scope of the claimed methods. All Asserted Claims cover methods of using Truvada®—an *oral* tablet containing TDF and FTC—but the Provisional Application only discloses results for a combination of drugs administered *subcutaneously*—tenofovir and FTC. The government's own expert stated that a POSA would have needed to see "prior art *and data*" to know that the inventors were in possession of the claimed methods. There is no oral PrEP data in the Provisional Application. The only discussion of orally administered PrEP in the Provisional Application is either: (1) a broad and unbounded disclosure of the use of nearly limitless combinations of antiretrovirals; or (2) statements of doubt as to whether the inventor's subcutaneous experiment would translate to an effective oral PrEP method using Truvada®. This priority-claim dispute is relevant to Gilead's obviousness defense, because it affects certain prior art under § 102(a) and § 102(b), and to Gilead's license defense, which turns on what the "invention" described in the Provisional Application was.[13] Because no reasonable jury could conclude that the Provisional Application shows that the inventors possessed an effective oral

---

[13] Purely by way of background: one of the inventors, Dr. Robert Janssen, assigned his rights in the "invention" disclosed in the Provisional Application to the government shortly after it was filed. He then left the CDC to work at Gilead, where he granted Gilead a non-exclusive license to any patent rights he currently held if he incorporated any of his prior inventions into a Gilead product. While at Gilead, Dr. Janssen triggered Gilead's license by encouraging Gilead to seek the Truvada® PrEP indication—which the government now claims induces infringement. Dr. Janssen did not purport to assign rights to the later-filed non-provisional application to the government until 2015—many years after his rights had already been licensed to Gilead.

PrEP method using FTC and TDF (or tenofovir prodrugs)—and because resolving this dispute now will significantly streamline the parties' trial presentations—the Court should grant summary judgment of no entitlement to the priority claim.

Without an explicit finding by the PTO—and there was none here—no presumption of entitlement to priority attaches. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304-06 (Fed. Cir. 2008). To show a valid priority claim, the Provisional Application must provide written description support for the claims. *New Railhead Mfg., LLC v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294-1296 (Fed. Cir. 2002). The written description must "clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed," such that "the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (cleaned up).

"One shows that one is 'in possession' of the invention by describing the invention, with all its claimed limitations, not that which makes it obvious." *Uniloc USA, Inc. v. Sega of Am., Inc.*, 711 F. App'x 986, 989 (Fed. Cir. 2017) (cleaned up). And where claims have an efficacy requirement—such as "a therapeutically effective amount" of a compound—courts "search the [Provisional Application] for written description support for the efficacy." *Nuvo Pharm. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1379 (Fed. Cir. 2019); *see also Biogen Int'l GmbH v. Mylan Pharms. Inc.*, 18 F.4th 1333, 1343-44 (Fed. Cir. 2021). A claimed genus lacks written-description support if the application fails to "define any structural features commonly possessed by members of the genus that distinguish them from others." *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1568-69 (Fed. Cir. 1997). Disclosing "a mere wish or plan" is not sufficient. *Id.* at 1566.

The Provisional Application fails to show that the named inventors possessed an effective oral PrEP method using TDF and FTC in combination as of its filing date.  The Provisional Application is not a typical patent application—it is simply a collection of documents accompanied by a provisional patent application cover page.  Prov. App. (Ex. 33), SOF 28.  The documents include an abstract, a PowerPoint that expounds upon the abstract, a printout from the FDA's website listing all then-approved HIV drugs, and a set of claims.  *Id*.  The abstract and PowerPoint describe the results of an efficacy study of high-dose subcutaneous tenofovir and subcutaneous FTC in monkeys.  Johnson Tr. (Ex. 27) at 261:17-24, 263:25-264:23.  The PowerPoint also describes partial results of an efficacy study using subcutaneous FTC alone in monkeys.  Prov. App. (Ex. 33) at -70-72.  No experiments in the Provisional Application involved orally administered compounds.  Johnson Tr. (Ex. 27) at 299:25-300:3; SOF 29.

First, the absence of oral PrEP data would have suggested to a POSA that the inventors did not possess effective methods using oral drugs.  The government's own expert, Dr. Thakker, testified that a POSA would need to see both "prior art ***and data***" to "understand that the inventors were in possession of the claimed inventions."  Thakker Tr. (Ex. 19) at 323:9-16.  But there was no oral PrEP data—or data of any kind for oral drugs—in the Provisional Application.

The rest of the application further shows that the inventors did not possess what they ultimately claimed.  The government may argue that some claims were broad enough to capture the oral administration of TDF and FTC for PrEP.  Prov. App. (Ex. 33) at -82-83 claims 5 and 14 ("wherein the plurality of antiretroviral compounds are in particle form and tableted"; "wherein administration of the plurality of antiretroviral compounds is selected from the group consisting of topical, oral and injectable").  But these claims are not limited to ***any specific subset*** of antiretrovirals, or even to combinations of any specific number of antiretrovirals.  *See* Johnson

Tr. (Ex. 27) at 311:7-18; SOF 30.  Claims to boundless methods using "antiretroviral compounds" do not show that the inventors possessed effective PrEP methods using orally administered FTC and TDF as were later claimed.  *See Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1346-47 (Fed. Cir. 2013).  The general mention of oral dosage forms in the claims is, at best, "a mere wish" for the disclosed method to work with orally administered drugs.  *Eli Lilly*, 119 F.3d at 1566.  The Provisional Application disclosed results using only tenofovir and FTC—not any of the other (many) drugs captured by the claims. Thakker Tr. (Ex. 19) at 296:18-297:1, 327:1-12.  And no compounds were given orally in any experiment in the Provisional Application.  *Id.*; SOF 29.  Indeed, tenofovir cannot even be administered orally.  SOF 26.  "Where a patent's written description disclose[s] certain subject matter in terms of a broad genus but its claims specif[y] a particular subgenus or species contained therein," courts routinely find written-description support lacking.  *Novozymes*, 723 F.3d at 1346-47 (Fed. Cir. 2013) (collecting cases); *see also Idenix*, 941 F.3d at 1164.

The only other statements in the Provisional Application that arguably address oral PrEP methods are statements of skepticism about the use of Truvada®.  Prov. App. (Ex. 33) at -73-74. All of the Asserted Claims recite or encompass certain methods using "a pharmaceutically effective amount of" FTC and TDF, which includes the amounts of FTC and TDF in Truvada®. *See* '509 Patent (Ex. 26), claims 1, 3, 8-9, 13; '333 Patent (Ex. 50), claim 13; '191 Patent (Ex. 51), claim 18; '423 Patent (Ex. 24), claims 1, 3, 12, 18, 19; *see Markman* Order (D.I. 186) at 1-2, 5-10.  Many of the dependent claims even recite the specific amounts of FTC and TDF in Truvada®.  '509 Patent (Ex. 26), claim 8; '333 Patent (Ex. 50), claim 8; '191 Patent (Ex. 51), claim 12; '423 Patent (Ex. 24), claim 8.  But the inventors expressly stated in the Provisional Application that they ***did not know*** how or whether their subcutaneous experiments would

translate to Truvada® for PrEP:  They wrote that "[t]he observed protection by tenofovir and FTC" in the disclosed experiment using subcutaneous tenofovir "*may not reflect that of Truvada*, because a higher dose of tenofovir was used."[14]  Prov. App. (Ex. 33) at -73; *see also* Johnson Tr. (Ex. 27) at 299:15-300:15; Thakker Tr. (Ex. 19) at 301:1-12.  Indeed, inventor Ron Otten testified that subcutaneous administration of antiretrovirals may not be reflective of the same regimen when administered orally.  SOF 31; Otten Tr. (Ex. 36) at 185:3-186:1. Considering the inventors' stated skepticism about whether methods using Truvada® would work—methods that are expressly captured by the Asserted Claims—no reasonable jury could find that the Provisional Application's disclosure shows that the inventors were in possession of an effective oral PrEP method using Truvada®.

Moreover, although the Court need not consider it to reject the government's priority claim, review of the inventors' own post-filing actions confirms that they did not possess an effective oral PrEP method using TDF and FTC when the Provisional Application was filed. Less than two months later, the inventors did a third experiment to determine whether "the two-drug combination could be orally administered."  Gov't Interrog. Resp. (Ex. 32) at 11-12; Gov't Verified Interrog. Resp. (Ex. 45) at 11-12.  This study, which was key to the later-filed non-provisional application, and on which the inventors relied for purported unexpected results during prosecution, began on March 24, 2006 and involved administering TDF and FTC to

---

[14] Dr. Heneine repeated that **same statement** during his presentation of the subcutaneous monkey experiments disclosed in the Provisional Application in a presentation to persons in the field at the 2006 Conference on Retroviruses and Opportunistic Infections on February 6, 2006 ("CROI 2006 Conference").  CROI 2006 Conference Presentation Tr. (Ex. 15) at GILDDE02684793-94; *see also* CROI 2006 Pocket Program (Ex. 16) at GILDDE00991150; Walid Heneine, Prevention of Rectal SHIV Transmission in Macaques by Tenofovir/FTC Combination (Ex. 17) at GILDDE00523018-29.

monkeys orally.  *Id.*; '509 Patent (Ex. 26) at 9:5-31 (Example 7); '509 Patent File Hist. (Ex. 11) at 561, 576-578 (referring to Example 7).

Accordingly, no reasonable jury could find that the government is entitled to its priority claim.  The Provisional Applications fails to show with reasonable clarity that the inventors were in possession of an effective oral PrEP method using FTC and TDF.  The Court should therefore enter summary judgment that the Asserted Claims are not entitled to claim priority to the Provisional Application.

**VIII. GSIUC Does Not Induce Infringement of Any Asserted Claim.**

Since the outset of this case, Gilead has repeatedly told the government that it sued an improper defendant: Gilead's Irish subsidiary GSIUC.  Years of discovery have only confirmed this.  Notwithstanding two depositions of GSIUC and production of over 40,000 pages of documents from GSIUC, the government cannot support any of its allegations against GSIUC.  The evidence so plainly forecloses any liability by GSIUC for inducement that the government *did not even provide* a single one of those documents or deposition transcripts to its infringement expert.  The government has given such little consideration to GSIUC that its infringement expert Dr. Murphy *did not even know what GSIUC was* when first asked about it in his deposition, despite concluding in his report that it induces infringement.  Murphy Tr. (Ex. 3) at 206:7-24.  GSIUC has nothing to do with distribution of labeled Truvada® or Descovy® in the United States, and it should be dismissed.[15]

---

[15] Despite repeated requests, the government has never explained why it refuses to dismiss GSIUC.  GSIUC is Gilead's subsidiary, so its inclusion in this case is not necessary to satisfy a judgment.  Gilead even offered at the beginning of the case to provide all requested discovery. The government appears to have no purpose for maintaining these improper claims.

GSIUC is a wholly owned subsidiary of Gilead based in Ireland.  GSIUC serves as a

██████████████ to Gilead.  Hickey 1st Tr. (Ex. 46) at 21:9-19; SOF 32.  For the U.S.

market, GSIUC manufactures ██████████ ████████████████████████████████

██████████ ███████████ that are shipped to ████████████████████████████

██████████ Hickey 1st Tr. (Ex. 46) at 22:15-23:15, 53:4-54:24; SOF 32.  Since ██████████

none of the products that GSIUC ships for sale in the United States bear or otherwise include any

labeling or other information reflecting the PrEP indication.  SOF 34-36; GSIUC Interrog. Resp.

(Ex. 47) at 3-6 (citing GILDDE02026896 (Ex. 48), GILDDE01924520 (Ex. 49)); *see also*

Hickey 1st Tr. (Ex. 46) at 28:7-29:9, 65:18-66:7, 68:6-17, 101:20-102:9.  The products that

GSIUC ships do not have information related to the PrEP indication because products labeled for

sale have secondary packaging, which includes the package insert, label, and other required

information.  SOF 34; Hickey 1st Tr. (Ex. 46) at 25:4-26:5.  That information is added by

Gilead's ████████████████████████.  Hickey 1st Tr. (Ex. 46) at 22:15-26:5, 37:12-

39:10.  Since June 24, 2021, the government has possessed GSIUC shipping data from January

2012 to January 2021, which shows that GSIUC has not shipped Truvada® labeled for sale in the

United States since ████████████ before the PrEP indication was approved.  SOF 35.  GSIUC

has never shipped Descovy® that was labeled for sale in the United States.  SOF 36.

GSIUC did not and does not advertise or promote Truvada® for PrEP or Descovy® for

PrEP.  SOF 37; GSIUC Interrog. Resp. (Ex. 47) at 2-3; Hickey 1st Tr. (Ex. 46) at 65:3-11.

GSIUC did not and does not instruct physicians, healthcare providers, or patients to administer

Truvada® for PrEP or Descovy® for PrEP.  SOF 38; Hickey 1st Tr. (Ex. 46) at 64:17-65:2.

GSIUC is entitled to summary judgment because the government has failed to adduce evidence that GSIUC either induces infringement or satisfies the requisite knowledge element of its inducement claims.

*First,* the government cannot prove GSIUC committed any inducing act that caused any alleged direct infringement. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760 (2011). Dr. Murphy did not even review the deposition testimony about GSIUC's role in manufacturing and distribution of Truvada® and Descovy®. Murphy Tr. (Ex. 3) at 209:10-14. After Dr. Murphy was reminded what GSIUC was, *id.* at 206:7-20, he relied on the fact that the Truvada® label says "made in Ireland" and on two complaints from trademark actions, *id.* at 206:21-207:10; Murphy Op. Rep. (Ex. 2) ¶¶ 338-341, none of which supports inducement. Contrary to Dr. Murphy's claim at his deposition, merely ████████████████████████ and sharing a corporate logo does not induce infringement. Murphy Tr. (Ex. 3) at 208:21-209:9, 209:15-210:17. Dr. Murphy identified no active step by GSIUC to encourage alleged direct infringers to practice the claimed methods. *See, e.g., Takeda Pharms. USA, Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 630-31 (Fed. Cir. 2015) ("Inducement can be found where there is evidence of active steps taken to encourage direct infringement, which can in turn be found in advertising an infringing use or instructing how to engage in an infringing use.") (cleaned up).

Dr. Murphy's reliance on the Truvada® label, Murphy Op. Rep. (Ex. 2) ¶¶ 338-341, is misplaced because, again, GSIUC ████████████████████████. SOF 32, 35. Even though Dr. Murphy relies on the labeling information to show inducement, he did not know when, where, or by whom the label is applied to the products before sale. Murphy Tr. (Ex. 3) at 208:6-20. In fact, all labeling for the products is ██████████████████████ ████████████. SOF 33; Hickey 1st Tr. (Ex. 46) at 49:25-50:13, 262:7-263:9, 284:9-17.

– 29 –

Dr. Murphy mischaracterizes statements in two trademark infringement complaints that Gilead recently filed against counterfeiters to suggest that GSIUC provides instructions for recipients to use PrEP and promotes PrEP medication, which is contrary to all the evidence that the government obtained from GSIUC in discovery (again, none of which Dr. Murphy reviewed).  The complaints refer to Gilead and GSIUC collectively, defining both as "Gilead," and do not attribute those activities to GSIUC specifically.  Murphy Op. Rep. (Ex. 2) ¶¶ 339-41. The government, however, attempts to impute all statements about the collective "Gilead" to both Gilead and GSIUC as if they both perform the same tasks.  No reasonable jury could read the complaints in this way—and the undisputed evidence shows that this reading is, in fact, incorrect.  Indeed, the record shows definitively that GSIUC does not participate in or contribute to Gilead's ████████████████ marketing, or promotion of Truvada® and Descovy®.  SOF 32-33, 37-38.  GSIUC does not even own the Truvada® for PrEP trademark. D.I. 1, Ex. 79 (showing that the trademark was registered by Gilead).  And GSIUC's ownership of the DESCOVY FOR PrEP trademark does not show that it induces infringement, Murphy Op. Rep. (Ex. 2) ¶ 341, because GSIUC merely owns the mark and does not ████████ product sold in the United States.  SOF 33; Hickey 1st Tr. (Ex. 46) at 135:8-19.  Simply authorizing Gilead to use a trademark mark is insufficient as a matter of law to show induced infringement. *See L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F. Supp. 1294, 1303 (C.D. Cal. 1994) (granting summary judgment of no inducement where "this Court is not alone in concluding that the existence of a trademark licensing agreement and the conduct of limited quality monitoring activities pursuant thereto is not sufficient in and of itself to establish a licensor's intent to induce infringement by its licensee."); *see also Jacobs Vehicle Sys., Inc. v. Pac. Diesel Brake Co.*, 424

F. Supp. 2d 388, 393-94 (D. Conn. 2006) (rejecting inducement theory premised upon inducement of another's indirect infringement).

The government identifies no affirmative act by GSIUC to promote the sale of Truvada® for PrEP or Descovy® for PrEP in the U.S. or alleged inducement of an infringing use. And because GSIUC did not engage in any affirmative inducing act, the government cannot show that GSIUC acted with the intent that infringement occur, which is another required element of its claims. *Commil*, 575 U.S. at 642.

**Second**, the government's inducement theory fails because there is no evidence that GSIUC knew about the Asserted Patents or that any third parties would infringe. *Commil*, 575 U.S. at 639; *id.* at 642; *Global-Tech*, 563 U.S. at 766. The government has adduced no evidence that GSIUC had any direct knowledge of the patents or infringement. The only evidence the government identifies is that GSIUC is the subsidiary of—and shares two senior executives with—Gilead. Gov't Interrog. Resp. (Ex. 32) at 37-38. But the government has identified no evidence that either executive (Robin Washington or Dr. Taiyin Yang) ever knew about the Asserted Patents, and Gilead's knowledge cannot be imputed to GSIUC simply because GSIUC is Gilead's subsidiary. *FO2GO LLC v. KeepItSafe, Inc.*, C.A. No. 18-807-RGA, 2019 WL 1615398, at *3 (D. Del. Apr. 16, 2019) ("Notice to a parent corporation, without more, is insufficient to support allegations that the subsidiary had knowledge of the patent[.]"); *Varian Med. Sys., Inc. v. Elekta AB*, C.A. No. 15-871-LPS, 2016 WL 3748772, at *5-6 (D. Del. July 12, 2016), *report and recommendation adopted*, 2016 WL 9307500 (Dec. 22, 2016) (holding parent-subsidiary relationship insufficient to impute parent's knowledge to subsidiary).

The government's complete failure to support its claims against GSIUC warrants entry of summary judgment that GSIUC does not infringe the Asserted Patents.

## IX.   The Government Lacks Authority to Sue for Patent Infringement.

Finally, the Court should enter summary judgment against the government on all claims because the government lacks authority to sue for patent infringement.

This is an extraordinary and unprecedented lawsuit.  The U.S. government has sued a private U.S. company for allegedly infringing a patent that the government issued to itself.  No court has ever ratified such an action; the only court that ever considered whether the government could sue for patent infringement expressed skepticism before dismissing the case on other grounds.  *Tektronix Inc. v. United States*, 351 F.2d 630, 631-32 (Ct. Cl. 1965).  The history of the government's actions, as well as the nature of the patent right, show that the government lacks inherent power to bring a patent-infringement suit.  And the government does not rely on any supposed inherent power, instead relying on "the Government's statutory authority" under the Bayh-Dole Act.  D.I. 29 at 5; *see also id.* at 19; D.I. 40 at 6, 8.  But the Bayh-Dole Act says nothing about infringement suits.  Suits such as this one—where the government is demanding money from a U.S. company, not promoting the use of government technologies—clash with Bayh-Dole's purpose.  The government's new role as a patent-assertion entity has no statutory foundation.  The Court should therefore dismiss the case.

### A.   The Government Has No Established Practice of Bringing Infringement Suits.

For nearly 150 years, the government does not appear to have contemplated suing private parties for infringing U.S. patents.  That long gap alone suggests that affirmative patent litigation is not one of the government's inherent powers.  When the Department of Justice considered the question in 1928, it noted that "[i]t is believed that the Government has never brought a suit against an infringer of a Government-owned patent, nor it has never granted a license for a money consideration."  DOJ, Investigation of Gov't Patent Practices and Policies (1947) (Ex. 34)

– 32 –

at 210.  Although the DOJ concluded that the government had the ability to sue for infringement,[16] *id.*, the Attorney General sent a memorandum to several Cabinet Secretaries soliciting recommendations for "one or two good test cases wherein all of the questions involved may be settled by court decisions."  *See, e.g.*, Ltr. from John Sargent, Att'y Gen., to Sec. of Comm. (Feb. 13, 1929) (Ex. 35) at 3.  Two departments identified candidates, but "no infringement suit was ever filed."  DOJ, Investigation of Gov't Patent Practices and Policies (1947) (Ex. 34) at 211.

More than 30 years passed before the government first tested its authority.  In 1962, the government responded to a suit in the Court of Claims[17] by asserting a counterclaim for infringement of government patents—172 years after the first Patent Act.  That case raised:

> a new and interesting question, because the counterclaim asserted by defendant is the first occasion on which the government has sought to bring an action against one of its citizens for infringement of a government patent.  The defendant recognizes that there is no statute which specifically authorizes it to sue for infringement of its patents and that the general policy of the United States for more than 100 years has been to encourage the free, nonexclusive use of government patents by United States citizens.  However, the defendant relies on the asserted general power of the Attorney General to sue for the misuse of government property and upon its contention that there was an established practice or policy with respect to the government-owned patents in issue.

*Tektronix*, 351 F.2d at 631.  The court dismissed the counterclaim on other grounds, finding that the public had an implied license because "[t]here has never been any indication that the

---

[16] Other officials expressed different views.  A former Commissioner of Patents wrote that "[s]uits by the Government should not be directed against private business unless the power is clear," and after surveying American and pre-Founding English practice, he concluded that it was not.  *See* Thomas Ewing, *Government Owned Patents*, 10 J. Pat. Off. Soc'y 149, 156 (1928).

[17] The Court of Claims is a predecessor to the Federal Circuit.  *S. Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982).

Government had any desire to exercise its right to exclude its citizens from the use of Government-owned patents." *Id.* at 632.

The government has filed few patent-infringement cases since that loss.  It filed one in 1980 and another in 2009, but its authority to bring those cases was apparently not challenged. The government dismissed the 2009 case shortly after filing it.  *See* D.I. 13, *EPA v. Micrology Labs. LLC*, No. 3:09-cv-69 (N.D. Ind. Nov. 16, 2009).  It also joined several ANDA complaints against different generic manufacturers in the mid-2010s, all related to a patent that the government had licensed to a pharmaceutical company.[18]  Again, no party challenged the government's authority to bring suit.  The government does not appear to have filed any other claims for infringement of a U.S. patent in the nation's history.  These few, sporadic, and recent actions—in which the government's authority was neither challenged nor decided—do not establish an inherent authority to bring infringement actions.

The government's position in *Tektronix* in 1965—that it possessed a general power "to sue for the misuse of government property," 351 F.2d at 631—has since been undermined by Supreme Court precedent holding that "[p]atents convey only a specific form of property right— a public franchise"—which, unlike a right to real or chattel property, is statutorily created and did not exist at common law.  *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373-75 (2018).  "[T]he rights . . . which may be exercised under [a patent] cannot be regulated by the rules of the common law," "and no rights can be acquired in it unless authorized by statute, and in the manner the statute prescribes."  *Gayler v. Wilder*, 51 U.S. 477, 494 (1850) (quoted, in part, at *Oil States*, 138 S. Ct. at 1375).  Thus, even if there were some

---

[18] Nos. 2:10-5956, 2:11-1461, 2:11-1750, 2:11-3995, 2:13-4039, 2:14-5135, 2:15-2571, and 3:17-6911 (D.N.J.).

established historical practice of government suits for patent infringement—which there is not—that would not be enough for it to bring this suit absent an authorizing statute.

### B.   No Statute Authorizes the Government to Sue For Patent Infringement.

The government conceded in *Tektronix* that "there is no statute which specifically authorizes it to sue for infringement of its patents," 351 F.2d at 631, but it now invokes part of the Bayh-Dole Act, which was passed in 1980, after *Tektronix* was decided.  *See* D.I. 29 at 5-7, 19; D.I. 40 at 6, 8.  That provision states that "[e]ach Federal agency is authorized to--"

> undertake all other suitable and necessary steps to protect and administer rights to federally owned inventions on behalf of the Federal Government either directly or through contract, including acquiring rights for and administering royalties to the Federal Government in any invention, but only to the extent the party from whom the rights are acquired voluntarily enters into the transaction, to facilitate the licensing of a federally owned invention[.]

35 U.S.C. § 207(a)(3).  The government's view—that authorization to "protect and administer rights to federally owned inventions" permits this suit, D.I. 40 at 6 (emphasis removed)—conflicts with the text, structure, history, and policy of the Bayh-Dole Act.  The statute does not authorize this suit.

First, the plain meaning of the phrase that the government relies on is not written like statutes that authorize affirmative litigation.  Section 207 applies generally to any "Federal agency," but when Congress authorizes litigation, it typically authorizes the Attorney General, or certain named agencies with independent litigating authority—not agencies generally—to bring suit.  Even then, Congress uses clear statements, such as "the Attorney General may bring a civil action."  *See, e.g.*, 31 U.S.C. § 3730(a) (False Claims Act); 42 U.S.C. § 2000a-5(a) (Civil Rights Act); 42 U.S.C. § 3614(a) (Fair Housing Act).  Congress did not do that in section 207.  Section 207(a)(3) does not mention a "civil action" or any litigation, but states only that agencies may

"protect . . . rights to federally owned inventions."  Context indicates that the "rights" referred to are the government's *ownership* rights in the patents.  Other parts of section 207(a)(3) refer to "administer[ing] rights" and "acquiring rights," which only make sense if the "rights" are ownership rights.  *Cf. Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (applying "the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning" (cleaned up)).  Other parts of the subsection refer to "administering royalties" and "licensing," which also relate to ownership rights, not enforcement.[19]

By contrast, where section 207 discusses enforcement rights, it does so expressly.  Section 207(a)(2) expressly allows agencies to "grant *to [a] licensee*" "the right of enforcement" of a government-owned patent, but section 207(a)(3) says nothing about the government enforcing a patent through infringement litigation brought by the United States.  *Cf. United States v. Yung*, 37 F.4th 70, 79 (3d Cir. 2022) ("[W]here Congress uses different words, we read those words to have different meanings.").  The more natural reading of section 207(a)(3) is that it refers to ownership rights—for example, authorizing agencies to require government employees to assign inventions to the government, and complying with the government's license obligations—not as an implied authorization for the government to become a non-practicing patent-assertion entity.

---

[19] In 2000, Congress amended the Bayh-Dole Act to allow the government to license or otherwise acquire rights to non-government inventions if doing so would facilitate the licensing of a government invention (e.g., by assembling a bundle of patents and licensing them together).  Congress codified this new authority in subsection (a)(3).  *See* Pub. L. 106-404, § 6, 114 Stat. 1742, 1745 (2000) (codified at 35 U.S.C. § 202(e)).  This further indicates that Congress understood subsection (a)(3) to be about licensing, not litigation.  *Cf. Yates v. United States*, 574 U.S. 528, 539-44 (2015) (context at site of codification relevant to statutory interpretation).

This understanding is also consistent with the overall structure of section 207.  The entirety of section 207 is about licensing patent rights.  Subsection (a)(1) authorizes agencies to apply for patents; subsection (a)(2) authorizes them to grant licenses; subsection (a)(3) authorizes them to comply with those licenses; and subsection (a)(4) authorizes them to transfer patent rights to other agencies.  Each of these actions furthers the Bayh-Dole Act's purpose of encouraging the use and commercialization of government inventions—unlike infringement suits, which would discourage the use of government inventions.

To be sure, section 207 allows for a government-owned patent to be asserted against a private party, but it does not allow the government to assert infringement claims on its own.  Section 207 expressly allows agencies to "grant *to [a] licensee*" "the right of enforcement" of a government-owned patent,[20] 35 U.S.C. § 207(a)(2), even without joining the government as a co-plaintiff.  *See Nutrition 21 v. United States*, 930 F.2d 862, 867 (Fed. Cir. 1991).  This furthers the Bayh-Dole Act's goals—guaranteeing a licensee the right to bring an infringement suit allows the licensee to protect its interests and makes it more likely that a company will license the government patent and make investments to develop the technology, thus "promot[ing] the utilization" and "commercialization" of government inventions.[21]  35 U.S.C. § 200.  But nothing in the Bayh-Dole Act authorizes the government to bring litigation on its own behalf, as here.

---

[20] Holding a "right of enforcement" does not necessarily mean the holder can bring an infringement suit.  Even if a licensee has the right to enforce a patent, it must still meet traditional standing requirements before bringing a patent infringement suit.  Thus, it does not follow that the government has the authority to sue for infringement simply because it can grant the right of enforcement to others.  Any suit must be brought pursuant to an authorizing statute.

[21] The Bayh-Dole Act only allows the government to grant a license—and therefore the right to enforce a patent—if the licensee commits to developing the invention.  35 U.S.C. § 209(a), (f).  Nothing in the Bayh-Dole Act contemplates the licensing or enforcement of a patent simply to extract a royalty from the public.

The legislative history of the Bayh-Dole Act also lacks support for the proposition that the government may act as a solo infringement plaintiff.  The Bayh-Dole Act was intended to "***promote*** the utilization" and "commercialization and public availability" of government inventions.  35 U.S.C. § 200 (Bayh-Dole policy statement); *see also Nutrition 21*, 930 F.2d at 866 (citing stated policy goals as persuasive in interpreting the Bayh-Dole Act).  Thus, the Act authorizes the government to grant exclusive licenses to inventions made by government employees and contractors to avoid "nonuse," i.e., to avoid having "good inventions gathering dust on agencies' shelves because of the unattractiveness of non-exclusive licenses."  S. Rep. No. 96-480, at 28 (1979).  An infringement suit necessarily presupposes that a private entity has already "utilized" and "commercialized" an invention, and the suit seeks either to end that use or impede it by imposing a royalty.  That action goes against the Bayh-Dole Act's stated policy, so it is no surprise that the legislation does not authorize it.

There is also no indication that the agency charged with implementing the Bayh-Dole Act, the Commerce Department (35 U.S.C. § 208), has ever interpreted subsection (a)(3) to authorize patent litigation in the government's name.  Nothing in its regulations mentions patent infringement suits.[22]  *See* 37 C.F.R. §§ 404.1-404.14.  Even the DOJ's *Justice Manual* does not contemplate affirmative patent litigation by the government.  *See* U.S. Dep't of Justice, *Justice Manual* § 4-4.320 (rev'd Apr. 2018), 1999 WL 33219753.  In 1929, the Attorney General reasoned that, if the government had to the power to bring infringement suits, it "should next consider the question of the policy of the enforcement of its rights."  Ltr. from John Sargent,

---

[22] The Federal Circuit has granted *Chevron* deference to the Commerce Department's interpretation of other elements of the Bayh-Dole Act.  *See Nutrition 21*, 930 F.2d at 866.

Att'y Gen., to Sec. of Comm. (Feb. 13, 1929) (Ex. 35) at 2.  The absence of any regulation or policy on government patent assertion in the 93 years since speaks volumes.

Moreover, even a "colorable textual basis" for government infringement suits—which section 207(a)(3) lacks—would not authorize the government to bring this case.  *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).  When an agency's assertion of authority is broad and has great "economic and political significance"—like here[23]— courts must "hesitate before concluding that Congress meant to confer such authority."  *Id.* at 2608 (cleaned up); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661, 666 (2022) (applying this doctrine when the agency asserted authority it had not exercised "in its half century of existence"). "[S]omething more than a merely plausible textual basis for the agency action is necessary.  The agency instead must point to ***clear congressional authorization*** for the power it claims."  *West Virginia*, 142 S. Ct. at 2609 (quotation marks omitted).  Section 207(a)(3), which does not even mention government-instigated patent infringement litigation, falls well short.

By bringing this case, the government attempts to open a new chapter in U.S. patent law in which the Executive Branch—the same sovereign that grants patents—also operates as the world's largest and best-funded patent-assertion entity.  Congress never authorized that.  This Court should enter summary judgment for Gilead on all claims.

## CONCLUSION

The Court should grant summary judgment on the issues described above.

---

[23] The government's policy shift to become a patent plaintiff could have major implications for innovation.  *Cf. Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (looking at potential implications of agency's theory to assess whether clear authorization from Congress was necessary).  Since 2007, the U.S. government has received 12,773 U.S. patents—a portfolio far larger than private patent assertion entities.  USPTO, All Technologies (Utility Patents) Report (Ex. 52) p. 4, pt. A1, tbl.A1-1b (2020) (adding together patent grants from 2007-2020), https://www.uspto.gov/web/offices/ac/ido/oeip/taf/all_tech.htm.

Dated: October 13, 2022

*Of Counsel:*

David B. Bassett
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888

Vinita C. Ferrera
Emily R. Whelan
George P. Varghese
Timothy A. Cook
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Ronald C. Machen
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

Respectfully submitted,

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Alexandra M. Ewing (#6407)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
ewing@rlf.com

*Counsel for Defendant & Counterclaim*
*Plaintiff Gilead Sciences, Inc. and*
*Defendant Gilead Sciences Ireland UC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 13, 2022, I caused true and correct copies of the foregoing

document to be served on the following counsel in the manner indicated:

<u>**VIA E-MAIL**</u>
Laura D. Hatcher
Shamoor Anis
U.S. Attorney's Office
Hercules Building
1313 N. Market Street
P.O. Box 2046
Wilmington, DE 19801
302-573-6277
Email: laura.hatcher@usdoj.gov
Email: shamoor.anis@usdoj.gov

<u>**VIA E-MAIL**</u>
Walter W. Brown
Philip Charles Sternhell
Patrick C. Holvey
Carrie E. Rosato
Lucy Grace D. Noyola
Matthew David Tanner
Sosun Bae
Conrad J. Dewitte, Jr.
U.S. Department of Justice
Civil Division, Commercial Litigation
Branch, IP Section
1100 L Street, N.W.
Washington, D.C. 20530
202-307-0341
Email: walter.brown2@usdoj.gov
Email: philip.c.sternhell@usdoj.gov
Email: patrick.c.holvey@usdoj.gov
Email: carrie.e.rosato@usdoj.gov
Email: lucy.grace.d.noyola@usdoj.gov
Email: matthew.d.tanner@usdoj.gov
Email: sosun.bae@usdoj.gov
Email: conrad.dewitte@usdoj.gov
Email: PrEP.Docket@usdoj.gov

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
cottrell@rlf.com