# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>    *Plaintiff–Counterclaim Defendant*,<br><br>    v.<br><br>GILEAD SCIENCES, INC.<br>    *Defendant–Counterclaim Plaintiff,*<br><br>AND GILEAD SCIENCES IRELAND<br>UC,<br>    *Defendant.* | Civil No. 1:19-cv-02103-MN |

## PLAINTIFF'S CORRECTED FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff United States of America (Government or United States) submits this Corrected First Set of Requests for Production of Documents and Things to Gilead Sciences, Inc. and Gilead Sciences Ireland UC (collectively, Gilead) to produce the following documents and things within the possession, custody or control of Gilead or its counsel within thirty (30) days of service, in accordance with the Definitions and Instructions below.  Documents should be produced to:  Walter W. Brown, Commercial Litigation Branch, U.S. Department of Justice, 1100 L Street, N.W., Room 8504, Washington, D.C. 20005, walter.brown2@usdoj.gov.

## DEFINITIONS

1.      Notwithstanding any definition set forth below, each word, term, or phrase used in these requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.

2.      "Defendant(s)," "Gilead," "you," "your," and "yours" refers, collectively or singly, to Gilead Sciences, Inc. (GSI), Gilead Sciences Ireland UC (GSIUC), and any and all predecessors, successors, divisions, subsidiaries, subcontractors, franchisees, assigns, or joint ventures thereof, together with any and all parent or affiliated companies, corporations, or other legal entities, whether foreign or domestic, and all past or present officers, directors, employees, agents, attorneys, lobbyists, representatives, and all other persons acting or purporting to act or that have acted or purported to act on behalf of any of the foregoing.

3.      "Plaintiff," "Government," refer, collectively or singly, to the government of the United States of America including the Department of Health and Human Services (HHS) and all of its components, divisions and offices, such as the Centers for Disease Control and Prevention (CDC), the U.S. Food and Drug Administration (FDA), the National Institutes of Health, and the Public Health Service (PHS).

4.       "CDC" refers to the Centers for Disease Control and Prevention.

5.      "CTA" refers to clinical trial agreement.

6.      "FDA" refers to the United States Food and Drug Administration.

7.      "MTA" refers to material transfer agreement.

8.      "NDA" refers to new drug application, inclusive of any supplements.

9.      "DMF" refers to Drug Master Files.

10.     "API" refers to Active Pharmaceutical Ingredient.

11.     "Answer and Counterclaims" refers to all responsive pleadings filed by Gilead in this litigation, inclusive of D.I. 7, 13, and 21.

12.     "Healthcare Provider" refers to any person or organization providing health care services, including but not limited to hospitals, clinics, pharmacies, doctors, nurses, therapists, pharmacists, clinicians, technologists and technicians, and administrative staff.

13.     "Distributor" refers to any person or entity distributing or facilitating the distribution of drugs from a manufacturer to a pharmacy or Healthcare Provider.

14.     "PEP" refers to HIV post-exposure prophylaxis, including as defined in Paragraph 64 of Plaintiff's Complaint in this action (D.I. 1).

15.     "PrEP" refers to HIV pre-exposure prophylaxis, including as defined in Paragraph 77 of Plaintiff's Complaint in this action (D.I. 1).

16.     "TAF" refers to tenofovir alafenamide, including reference to all forms of TAF, inclusive of the free base, salts, and co-crystals and includes, but is not limited to the fumarate and hemi-fumarate forms.

17.     "TDF" refers to tenofovir disoproxil fumarate, inclusive of the free base, salts, and co-crystals.

18.     "FTC" refers to emtricitabine.

19.     "USPTO" refers to the United States Patent and Trademark Office.

20.     "Patent(s)-in-Suit" refers to U.S. Patent Nos. 9,044,509; 9,579,333; 9,937,191; and 10,335,423, either individually or collectively.

21.     "Named Inventor(s)" refers to the named inventors on the Patents-in-Suit, namely Walid M. Heneine, Thomas M. Folks, Robert Janssen, Ronald Otten, and Jose Gerardo Garcia-Lerma, either individually or collectively.

22.     "Prior Art" means, for the purposes of these requests, any document or information that you intend to rely upon to allege invalidity of the Patents-in-Suit.

23.     "Truvada®" refers to the product that is the subject of New Drug Application No. 021752.

24.     "Descovy®" refers to the product that is the subject of New Drug Application No. 208215.

25.     "Truvada for PrEP®" refers to the use of Truvada® for PrEP.

26.     "Descovy for PrEP®" refers to the use of Descovy® for PrEP.

27.     "Prodrug" refers to a compound with little or no pharmacological activity that is converted to the pharmacologically active drug *in vivo*.

28.     "Person" means any natural person or any business, legal, or governmental entity or association.

29.     "Document" refers to, without limitation, any written or graphic matter or any medium of any type or description upon which intelligence or information is recorded or reflected or from which intelligence or information can be recorded, which is or has been in your possession, control, or custody or of which you have knowledge.  "Document" or "documents" has the broadest possible meaning, and includes all materials and information that are discoverable pursuant to Rule 34 of the Federal Rules of Civil Procedure.  Without limitation on the foregoing, "document" includes any kind of written, recorded, printed, or graphic matter, whether produced, reproduced, or stored on paper, cards, film, audio or video tapes, electronic facsimile, computer storage device, or any other media.  The foregoing specifically includes information stored in a computer database and capable of being generated in documentary form, such as electronic mail.

30.     "Communication" means, without limitation, any transmission, conveyance or exchange of a word, statement, fact, thing, idea, document, instruction, information, demand or

question by any medium, whether by written, oral or other means, including but not limited to, electronic communications and electronic mail.

31.      "Concerning," "Reflect," "reflecting," "relate to," "refer to," "relating to," and "referring to" mean relating to, referring to, concerning, mentioning, regarding reflecting, pertaining to, evidencing, involving, demonstrating, describing, discussing, stating, commenting on, comprising, embodying, responding to, supporting, contradicting, containing or constituting (in whole or in part), as the context makes appropriate.

32.      "Including" means including but not limited to.

33.      "Produce" means to provide legible, complete, and exact copies or responsive documents to the undersigned counsel, or to make such documents available to the undersigned counsel for inspection and reproduction.

34.      "Thing" means any physical specimen or other tangible item other than a document, in your possession, custody, or control.

35.      The terms "all," "each," and "any" shall be construed as all and any.

36.      The use of the singular form of any word shall include the plural form and *vice versa*.

37.      The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

38.      The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

39.      Words in the masculine, feminine, or neuter form shall include each of the other genders.

40. The use of any definition for the purposes of these requests shall not be deemed to constitute an agreement or acknowledgement on the part of the Government that such definition is accurate, meaningful, or appropriate for any other purpose in this litigation.

## INSTRUCTIONS

1. Each request should be construed independently and not with reference to any other request for the purposes of limitation.

2. If you perceive any ambiguity in construing any request or any applicable definition or instruction, you should set forth the matter deemed ambiguous.

3. If you object to any portion of the request, you should identify the portion to which you object, state the basis for the objection, and respond to the remainder.

4. If you object to any request on the basis of a contention that it is overbroad, you should provide a response that narrows the request in a way that eliminates the purported over-breadth, and state the extent to which you have narrowed that request for the purpose of your response.

5. All Requests are to be understood as requesting information in the possession, custody, or control of Gilead.

6. In producing documents, produce the originals if the originals differ in any respect from copies. Documents that are in paper form or that constitute other physical objects from which recorded information may be visually read, as well as audio or video tapes and similar recordings, should be produced in their original form or in copies that are exact duplicates of the originals. Computer files and similar electronic records should be produced in a readable form mutually agreed upon by the parties.

7. Gilead must produce documents in the same file or other organizational environment in which they are maintained in the ordinary course of business. For example, a

document that is part of a file, docket or other grouping should be physically produced together with all other documents from said file, docket or grouping, in the same order or manner of arrangement as the original, preceded by any file folder or other similar organizational item, whether paper or electronic, that contains the document produced.  Additionally, to the extent produced in hardcopy, each document should be produced stapled, clipped or otherwise bound or connected in the same manner as the original.

8.     Documents are to be produced in their entirety without redaction, excepting redactions for privilege.

9.     To the extent any document exists in more than one language, the document shall be produced in English, if available.  If no English version of a document is available, the producing party does not have an obligation to produce an English translation of a document.

10.    These requests are deemed continuing, and supplemental responses and production should be provided as additional documents become available, in accordance with Federal Rule of Civil Procedure 26(e) and the scheduling order in this proceeding (D.I. 27).

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1:**   All documents relating to patent license negotiations with the Government including claim charts, correspondence, presentations, term sheets, patent or portfolio value analyses, and draft agreements.

**REQUEST NO. 2:**   All documents relating to unsuccessful or on-going negotiations for any right, title or interest in or to patents related to the treatment or prevention of HIV that did not culminate or have not yet culminated in an executed agreement, including claim charts, correspondence, presentations, term sheets, patent or portfolio value analyses, draft agreements, historic sales information, sales projections, and financial or other analyses assessing the estimated value of the agreement under negotiation.

**REQUEST NO. 3:**    All documents estimating, quantifying, valuing, ranking, or analyzing the value of or royalty rates for any of Gilead's patents relating to the treatment or prevention of HIV, individually or as part of a portfolio.

**REQUEST NO. 4:**    All documents estimating, quantifying, valuing, ranking, or analyzing the value of or royalty rates for any patents relating to the treatment or prevention of HIV, individually or as part of a portfolio.

**REQUEST NO. 5:**    All documents relating to Gilead's policies and practices with respect to licensing patents or technology.

**REQUEST NO. 6:**    All documents relating to any agreements, or the negotiation thereof, for any right, title or interest in or to TAF, TDF, FTC, Truvada®, or Descovy®.

**REQUEST NO. 7:**    All agreements in which you have received or conveyed any right, title, or interest in or to a patent relating to TAF, TDF, FTC, Truvada®, or Descovy®, inclusive of any product in which the foregoing is a component or API.

**REQUEST NO. 8:**    All documents supporting any offer made by Gilead to the Government during patent licensing negotiations, including internal evaluations.

**REQUEST NO. 9:**    All documents relating to any communication between Gilead and the Government, including HHS or any entity or person acting on its behalf, related to the Patents-in-Suit.

**REQUEST NO. 10:**    All agreements relating to the development, commercialization, licensing, sale, manufacture, distribution, or collaboration relating to TAF, TDF, FTC, Truvada®, or Descovy®, inclusive of any product in which the foregoing is a component or API.

**REQUEST NO. 11:**    All agreements that include a license or transfer of any right, title, or interest in or to patents and/or any other intellectual property rights relating to TAF, TDF, FTC,

Truvada®, or Descovy®, inclusive of any product in which the foregoing is a component or API.

**REQUEST NO. 12:**  All documents relating to the trademarks TRUVADA FOR PREP (U.S. Reg. No. 5,358,262), EMTRICITABINE 200 MG / TENOFOVIR DISOPROXIL FUMARATE 300 MG TABLETS FOR PREP PRE-EXPOSURE PROPHYLAXIS (Registration No. 5,623,246), DESCOVY FOR PREP (U.S. Ser. No. 88,266,226), and DESCOVY EMTRICITABINE 200 MG / TENOFOVIR ALAFENAMIDE 25MG TABLETS FOR PREP PRE-EXPOSURE PROPHYLAXIS (Serial No. 88,615,918), including all applications, consummated and unconsummated licenses, and valuation, costs, and expenses associated with licensing the marks.

**REQUEST NO. 13:**  All documents relating to the licensing of any trademark or other intellectual property rights related to TAF, TDF, FTC, Truvada®, or Descovy® by or between Gilead and any entity, inclusive of any product in which the foregoing is a component or API.

**REQUEST NO. 14:**  All agreements that include a license or transfer of any right, title, or interest in or to patents and/or any other intellectual property rights relating to any HIV treatment, including agreements for which Gilead is licensing patents or other intellectual property rights to others.

**REQUEST NO. 15:**  All documents, data, information, analysis, plans, forecasts, projections, and other related material relating to license negotiations with the Government relating to TAF, TDF, FTC, Truvada®, Descovy®, or the Patents-in-Suit, inclusive of any product in which the foregoing is a component or API.

**REQUEST NO. 16:**  All communications between Gilead and the FDA relating to Truvada® and Descovy®, including any NDA or other regulatory filing.

**REQUEST NO. 17:**  All documents relating to the preparation and prosecution of any NDA or DMF, including any communications with the FDA, relating to Truvada® and Descovy® or any API in Truvada® and Descovy®.

**REQUEST NO. 18:**  All communications to or from either Defendant, either between themselves or with any party, including the Government, relating to seeking FDA approval for the use of Truvada® or Descovy® for PrEP.

**REQUEST NO. 19:**  All communications between Gilead and the Government relating to the Patents-in-Suit or the subject matter disclosed therein, including documents sufficient to identify all individuals affiliated with Gilead who have communicated with the Government relating to any of the Patents-in-Suit or the subject matter disclosed therein, documents relating to any meetings between Gilead and the Government relating to the Patents-in-Suit or the subject matter disclosed therein, every communication between Gilead and the Government from 2006 through 2014 relating to the pendency of any patent application relating to the use of antiretroviral medicines for HIV prophylaxis, and every communication between Gilead and the Government from 2004 through 2014 relating to any MTAs, CTAs, assistance with clinical trials, or filing for FDA approval for PrEP.

**REQUEST NO. 20:**  All communications between Gilead, or anyone acting on its behalf, and any member, staffer, or employee of the United States Congress relating to: (a) Truvada® or Descovy®; (b) PrEP; (c) any Patent-in-Suit, any foreign counterpart to any Patents-in-Suit, or any applications or issued patents in the same family as the Patents-in-Suit; (d) the subject matter of any Patent-in-Suit; or (e) any license, offer to license, sub-license, settlement, covenant, or other agreement or offer under which Gilead or any other Person

has or would have received or granted (or will receive or grant) any rights, title, or interest concerning any Patent-in-Suit or any foreign counterpart to any Patents-in-Suit.

**REQUEST NO. 21:**  All documents produced to any member, staffer, or employee of the United States Congress relating to Truvada® and Descovy®, including the pricing or availability of Truvada® and Descovy®.

**REQUEST NO. 22:**  All transcripts of sworn testimony, affidavits, or declarations offered by Gilead regarding the use of antiretroviral medicines for PrEP.

**REQUEST NO. 23:**  All documents, including notes or materials, relating to any meeting between Gilead and the FDA relating to the PrEP indication for Truvada®.

**REQUEST NO. 24:**  All documents, including notes or materials, relating to any meeting between Gilead and the FDA relating to the PrEP indication for Descovy®.

**REQUEST NO. 25:**  All documents relating to any MTA or CTA between the Government and Gilead relating to HIV research, including all final, executed copies of all MTAs and CTAs between the Government and Gilead, and all associated amendments.

**REQUEST NO. 26:**  Documents sufficient to identify the first sale date in the United States of Truvada® and Descovy®, including sales of Truvada for PrEP® and/or Descovy for PrEP®.

**REQUEST NO. 27:**  Documents sufficient to identify the manufacturer(s) of each lot of Truvada® and Descovy®, including any component thereof, manufactured, sold, offered for sale, used, or imported into the United States by or on behalf of Gilead, as well as the location of manufacture, volume of manufacture, and the time period during which such manufacture occurred.

**REQUEST NO. 28:**  All documents relating to the importation into the United States of Truvada® and Descovy®, including any component of Truvada® and Descovy®.

**REQUEST NO. 29:**  Documents sufficient to show the manufacturing process for Truvada® and Descovy®, including any component thereof, and the reasons for selecting the manufacturing process.

**REQUEST NO. 30:**  All documents exchanged to or from any Healthcare Provider or Distributor, relating to Truvada for PrEP® and/or Descovy for PrEP® including, for example, instructions for use, indications, technical specifications, requirements, and documents relating to the advantages of Truvada for PrEP® and/or Descovy for PrEP®.

**REQUEST NO. 31:**  All notes, memoranda, and other written records of communications (including "call notes") between Gilead or their agents and any managed care organization, pharmacy benefit manager, physician, nurse, pharmacist, or other medical or medical office personnel concerning or relating to Truvada for PrEP® and/or Descovy for PrEP®.

**REQUEST NO. 32:**  All documents relating to the use, operation, intended operation, or intended use of Truvada for PrEP® and/or Descovy for PrEP® by consumers, including instructions, user manuals, training materials, packaging materials, marketing materials, or any materials used to assist consumers relating to the use of Truvada for PrEP® and/or Descovy for PrEP®.

**REQUEST NO. 33:**  All documents, communications and things concerning or relating to the marketing of Truvada for PrEP® and/or Descovy for PrEP®, including:

    a.    all manuals, presentations, and/or other materials provided to, and/or used to train, sales representatives;

    b.    all market research materials (including surveys conducted by or on behalf of Gilead, scripts used, and results obtained);

c.     all communications between or among any persons at Gilead's corporate headquarters, persons in district or regional management, and sales representatives;

d.     all notes, handouts, slides, and other presentation materials used at any plan of action (POA), launch, or other meeting;

e.     all marketing plans and product forecasts; and

f.     all field bulletins from Gilead to their sales representatives.

**REQUEST NO. 34:**  All marketing, advertising, or sales materials concerning or relating to any product purportedly used for, or labeled for use for, the prevention of HIV-1 infection (including PrEP, Truvada for PrEP®, and/or Descovy for PrEP®), including:

a.     all display booth panels;

b.     all detail pieces or aids used by or provided to sales representatives, including ad slicks, slim jims, flash cards, and shelf-talkers;

c.     all telemarketing scripts, tele-detailing scripts, selling scripts, detailing scripts and/or verbatims used by or provided to sales representatives;

d.     all materials provided to physicians, managed care organizations, pharmacy benefit managers, pharmacists, or consumers;

e.     all advertisements appearing in television, social media, journals, magazines, or newspapers, including all direct-to-consumer advertisements;

f.     all patient education materials; and

g.     all copies of articles published by third-parties (sometimes referred to as reprints) used by or provided to sales representatives.

**REQUEST NO. 35:**  All documents relating to the design and development of Truvada® or Descovy®, including all notebooks, diagrams, progress reports, studies, internal memoranda, contracts for services, and communications.

**REQUEST NO. 36:**  All documents relating to the design and development of Truvada for PrEP® and/or Descovy for PrEP®, including all notebooks, diagrams, progress reports, studies, internal memoranda, contracts for services, and communications.

**REQUEST NO. 37:**  All documents relating to any testing, analysis, study, or evaluation of Truvada® or Descovy® for PEP or PrEP performed by you or on your behalf, including all pre-clinical, clinical or pharmacokinetic studies, any surveys or any determination of effective dosing.

**REQUEST NO. 38:**  All documents and communications relating to Gilead's assessment of whether FTC, TAF, TDF or tenofovir any other tenofovir prodrug would be effective alone or as part of a PrEP regimen, including any and all studies related thereto.

**REQUEST NO. 39:**  All documents relating to the efficacy of Truvada for PrEP® and/or Descovy for PrEP®, including any studies, surveys, data or other information commissioned, performed, or received by Gilead.

**REQUEST NO. 40:**  All labels for Truvada® and/or Descovy®, including Gilead's communications with the FDA relating to any proposed label for Truvada® or Descovy®, and the proposed uses for Truvada® or Descovy®.

**REQUEST NO. 41:**  All documents relating to identification of or definition of "at-risk populations," including "at-risk adults and adolescents weighing at least 35 kg" as indicated on labels for Truvada for PrEP® and Descovy for PrEP®.

**REQUEST NO. 42:** Documents sufficient to show demographic profiles of all populations for whom Truvada for PrEP® and Descovy for PrEP® are prescribed, including "at-risk populations."

**REQUEST NO. 43:** All Documents relating to Truvada for PrEP® and Descovy for PrEP® patient populations that are not expected to be exposed to HIV-1 while taking Truvada for PrEP® and Descovy for PrEP®.

**REQUEST NO. 44:** All documents related to "safer sex practices," as the phrase is used in the Answer and Counterclaims, that are to be used in conjunction with Truvada for PrEP® and Descovy for PrEP®, including instructions, pamphlets, advisories, package inserts, and other marketing materials that accompany Truvada for PrEP® and Descovy for PrEP® at time of prescription or provisioning.

**REQUEST NO. 45:** Documents sufficient to show compliance with "safer sex practices," as the phrase is used in the Answer and Counterclaims, by patients who have been prescribed Truvada for PrEP® and Descovy for PrEP®, including estimates of safer sex practice compliance before and after Truvada for PrEP® and Descovy for PrEP® prescription.

**REQUEST NO. 46:** All documents relating to instructions by Gilead to patients or providers that instruct Truvada for PrEP® and Descovy for PrEP® patients not to expose themselves to HIV-1.

**REQUEST NO. 47:** All documents relating to Gilead's statement in ¶ 28 of its Counterclaims that "[t]he package inserts for Truvada® and Descovy®, however, do not encourage exposure to an immunodeficiency virus" including instructions, documents, or pamphlets that state that Truvada for PrEP® and Descovy for PrEP® patients should not engage in sex or otherwise expose themselves to HIV-1.

**REQUEST NO. 48:**  Documents sufficient to show what exposure to HIV-1 Gilead considers to be common, appropriate, or consistent with the indications as set forth on any label for Truvada for PrEP® and Descovy for PrEP®, for Truvada for PrEP® and Descovy for PrEP® patients.

**REQUEST NO. 49:**  Documents, including surveys, studies, and research reports, sufficient to show what level of HIV-1 exposure Gilead estimates prospective Truvada for PrEP® and Descovy for PrEP® patients have prior to being prescribed Truvada for PrEP® and Descovy for PrEP® and what level of HIV-1 exposure Gilead estimates Truvada for PrEP® and Descovy for PrEP® patients have after being prescribed Truvada for PrEP® and Descovy for PrEP® patients.

**REQUEST NO. 50:**  All documents relating to Gilead's efforts to decrease HIV-1 exposure in Truvada for PrEP® and Descovy for PrEP® patient populations.

**REQUEST NO. 51:**  All documents relating to compliance, both by prescribing physician and patient, with the label of Truvada for PrEP® and/or Descovy for PrEP®, including any studies, surveys, data or other information commissioned, performed, or received by Gilead.

**REQUEST NO. 52:**  All documents relating to the packaging of Truvada for PrEP® or Descovy for PrEP®, including documents identifying the entity that attaches the label to Truvada® or Descovy® and the geographical location where the attachment occurs.

**REQUEST NO. 53:**  All documents relating to any directions, instructions, or indications provided on the label for Truvada® or Descovy®, including any document referencing, directing, or encouraging compliance with the label for Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 54:**  All documents relating to Gilead's knowledge of any off-label use of Truvada® or Descovy®, including any steps taken to prevent or promote such use.

**REQUEST NO. 55:**  All documents relating to the provision of Truvada for PrEP® or Descovy for PrEP® in accordance with the label, including any prescription of Truvada for PrEP® and/or Descovy for PrEP® including clinical trials and Healthcare Providers employed or otherwise compensated by Gilead.

**REQUEST NO. 56:**  All documents relating to any Risk Evaluation and Mitigation Strategy (REMS) related to Truvada for PrEP® or Descovy for PrEP®, including any communications with the FDA, any materials developed by Gilead under the REMS, any post-marketing data collected by Gilead, and any decision to end the REMS.

**REQUEST NO. 57:**  All documents relating to any checklist for prescribers relating to Truvada for PrEP® or Descovy for PrEP®, including the development of the checklist, distribution of the checklist, and compliance by prescribers.

**REQUEST NO. 58:**  All documents supporting or refuting the allegation that Gilead contributed to any research resulting in or relating to the Patents-in-Suit.

**REQUEST NO. 59:**  All documents and things relating to the market for drugs used, or labeled for use, for PrEP.

**REQUEST NO. 60:**  All documents relating to any off-label use of any drug for PrEP.

**REQUEST NO. 61:**  All marketing studies relating to the market for PrEP in the United States.

**REQUEST NO. 62:**  All distribution and sales plans for sales of Truvada® or Descovy®, including Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 63:**  All documents relating to the number and quantity of samples of Truvada for PrEP® or Descovy for PrEP® Gilead has distributed or intends to distribute.

**REQUEST NO. 64:**  All documents relating to the number and quantity of donations of Truvada® or Descovy®, including for Truvada for PrEP® or Descovy for PrEP®, Gilead has distributed or intends to distribute.

**REQUEST NO. 65:**  All documents relating to the advertising, promotion or marketing of Truvada for PrEP® or Descovy for PrEP®, including advertisements, drafts of advertisements, market research, advertising budgets, results of focus groups or consumer surveys, letters to healthcare providers and direct-to-consumer advertising.

**REQUEST NO. 66:**  One copy of each detail aid, visual aid, product monograph, or piece of promotional or professional literature used by Gilead's representatives to detail or promote Truvada for PrEP® or Descovy for PrEP® to physicians or other health care professionals.

**REQUEST NO. 67:**  Gilead's launch budget, launch plan, and launch materials for Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 68:**  Gilead's sales and marketing budgets for Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 69:**  Gilead's sales forecasts for Truvada® or Descovy®, by indication, including Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 70:**  A copy of any Product Monograph, sales brochure, journal advertisement or sales training materials for Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 71:**  A copy of any material discussing Truvada for PrEP® or Descovy for PrEP® that is or was located on any website affiliated with Gilead.

**REQUEST NO. 72:**  All studies, analyses, compilations or reports of physicians' impressions or opinions concerning Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 73:**  All documents relating to Gilead recommending or encouraging PrEP in the United States, including the use of Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 74:**  All documents constituting or relating to any funding for PrEP preclinical studies or clinical trials, including grant applications, applied for or received from any source external to Gilead, including the Government or any third party.

**REQUEST NO. 75:**  All documents on which Gilead intends to rely to show that GSIUC is not properly a party in this litigation.

**REQUEST NO. 76:**  All documents supporting or refuting the statement "Defendants deny that GSIUC markets or sells Truvada® and Descovy® for PrEP in the United States or for the U.S. market" as set forth in Paragraph 14 of D.I. 21 in this action.

**REQUEST NO. 77:**  All documents relating to any alleged reasonable royalty for any allegedly infringing activity by Gilead, including all documents relating to: (a) royalty rates for comparable technologies, including any license to a patent allegedly comparable to the Patents-in-Suit and any license to a patent relating to HIV prophylaxis or treatment (*see Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)); (b) any evidence of competition between Plaintiff and Defendants; (c) derivative or convoyed sales; and (d) the percentage of profit or selling price normally allowed for use of the invention or analogous inventions in the particular business or in comparable businesses, including the portion of such profit credited or attributable to the alleged invention.

**REQUEST NO. 78:**  A copy of each financial statement and annual report by Gilead issued from 2004 to the present.

**REQUEST NO. 79:**  A copy of all annual and quarterly regulatory filings, including to the SEC, the Irish Companies Register, or any other foreign or domestic governmental entity, by Gilead from 2004 to the present.

**REQUEST NO. 80:**  Documents sufficient to show total revenue, gross profit, operating profit, and net profit of Truvada® and Descovy®, by indication, from first date of sale to present.

**REQUEST NO. 81:**  Documents sufficient to show historical sales by month (or by quarter, if monthly sales are unavailable) from launch to present day for Truvada® and Descovy®, by indication, including at least gross sales, net sales, rebates, discounts, units, prescriptions, and any other metrics tracked in the ordinary course of business.

**REQUEST NO. 82:**  Documents sufficient to show historical sales by month (or by quarter, if monthly sales are unavailable) from launch to present day for all other Gilead HIV drugs, including at least Atripla®, Biktarvy®, Complera®, Odefsey®, Stribild®, Genvoya®, Tybost®, Vitekta®, Viread®, and Vemlidy® including the same metrics set forth in Request No. 81.

**REQUEST NO. 83:**  All documents and things relating to data or other information showing sales of or prescriptions for Truvada® or Descovy®, by indication, including:

a.      National Drug and Therapeutic Index (NDTI) data;

b.      Xponent data and/or Xponent PlanTrak data;

c.      Formulary Focus data;

d.      IMS data;

e.      Scott-Levin data;

f.      Calls, Samples, and Details data;

g.      Integrated Promotional Services (IPS) data;

h.      Early View data; and

i.      SDI data.

**REQUEST NO. 84:** All IQVIA/IMS data in Gilead's possession, custody, or control, relating to data on HIV treatments and/or medications used for PrEP, by product, manufacturer, form, strength, specialty including at least the following data series, from August 2004 to present:

a.      National Prescriptions Audit (NPA), including TRx, NRx, NBRx;

b.      National Sales Perspective (NSP), including sales, units, extended units;

c.      National Disease and Therapeutic Index (NDTI), including uses by indication; and

d.      Integrated Promotional and Spending (NPS), all measures.

**REQUEST NO. 85:** All documents, data, information, analysis, business plans, forecasts, projections, surveys, and other related material relating to information on Gilead's projected, expected, and actual sales or use of Truvada® or Descovy®, by indication.

**REQUEST NO. 86:** Documents sufficient to show projected future revenue, gross profit, operating profit, and net profit for Truvada® and Descovy®, by indication, for each year of the projected sales of Truvada® and Descovy®.

**REQUEST NO. 87:** All documents, data, information, analysis, business plans, forecasts, projections, marketing analyses, surveys, and other related material containing information on Gilead's forecasts for sales or use of Truvada® or Descovy®, by indication, including both historical forecasts (made before launch, at the time of launch, and ongoing through the product life cycle) and forecasts into the future.

**REQUEST NO. 88:** Documents sufficient to show the direct, indirect, fixed, and variable costs associated with the manufacture and sale of Truvada® and Descovy®, by indication.

**REQUEST NO. 89:**  Documents sufficient to determine the following on a monthly or quarterly basis for each of Truvada® and Descovy®, by indication, since 2004, including components thereof:

a.      Total gross and net revenues (by product, customer, period and location);

b.      Total quantity of units sold (by product, customer, period and location);

c.      Cost of goods sold, including, direct purchases, direct labor, indirect and/or overhead costs, and any allocation of those direct, indirect and/or overhead costs to Truvada® or Descovy®;

d.      Actual total cost or variances from standard costs;

e.      Gross and net profits; and

f.      All costs other than standard costs, including intellectual property licensing, selling, advertising, general and administrative expenses, and any allocation of those expenses to Truvada® or Descovy®.

**REQUEST NO. 90:**  Income statements on an annual basis from 2004 through present for each of Truvada® and Descovy®, by indication, including at least: gross revenues, discount, rebates, net revenues, cost of sales (separated out by category), gross profits, operating expenses (separated out by category), and operating profit.

**REQUEST NO. 91:**  Income statements on an annual basis from 2004 through present for all HIV treatments, including the same metrics identified in Request No. 90.

**REQUEST NO. 92:**  All documents, data, information, analysis, business plans showing sales between Gilead entities relating to Truvada® or Descovy®, including sales to and from U.S. entities and international entities.

**REQUEST NO. 93:**  All documents, data, information, analysis, business plans relating to Gilead entities involved in developing, commercializing, manufacturing, distributing, and selling Truvada for PrEP® and Descovy for PrEP®.

**REQUEST NO. 94:**  All documents relating to marketing plans or marketing campaign strategies for Truvada for PrEP® and Descovy for PrEP®.

**REQUEST NO. 95:**  All documents and information relating to business analysis, product performance, expected product performance, competitive analysis, physician surveys, and related topics, including at least: brand plans, long-range plans (LRP), commercial/marketing plans, business presentations, strategy presentations, marketing presentations, and similar documents for Truvada for PrEP® and Descovy for PrEP® or Gilead's HIV treatments.

**REQUEST NO. 96:**  All documents, communications and things relating to patent strategy or life cycle strategy or management with respect to the U.S. market for Truvada® and Descovy®, including traditional life cycle plans, such as pre-marketing and marketing plans, brand plans, market research, strategic, tactical, advertising and marketing documents.

**REQUEST NO. 97:**  All customer surveys relating to Truvada for PrEP® or Descovy for PrEP®, including analysis of drivers or decisions on the part of either patients or prescribing physicians.

**REQUEST NO. 98:**  All publications, manuscripts, and presentations, submitted by or on behalf of Gilead relating to Truvada for PrEP® or Descovy for PrEP®, including the use of any API of Truvada for PrEP® or Descovy for PrEP® for use in connection with PrEP.

**REQUEST NO. 99:**  All documents, data, and information relating to results from Gilead-sponsored surveys given to prescribers or users, including Awareness, Trial, and Usage

studies, patient surveys, physician surveys, product evaluation, and other results collected
on Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 100:** All documents relating to patient or prescriber demand or desire for PrEP,
Truvada for PrEP®, or Descovy for PrEP®.

**REQUEST NO. 101:** All documents relating to sales forecasts, budgets, expenses, costs, and
profitability of Truvada® and Descovy®, by indication,

**REQUEST NO. 102:** All documents or information containing information, analysis, planning,
or discussion of the following topics related to Truvada® or Descovy®:

    a.      Analysis of pursuing PrEP indications;

    b.      Importance of PrEP indications;

    c.      Exclusivity of PrEP indications;

    d.      Analysis of market opportunity;

    e.      Analysis of additional indications;

    f.      Analysis of revenues;

    g.      Analysis of expected revenues;

    h.      Analysis of profits;

    i.      Analysis of expected profits;

    j.      Net present value analysis;

    k.      Competitive analysis;

    l.      Comparisons to other drugs;

    m.      Comparisons of Truvada® to Descovy®;

    n.      Analysis of Truvada® / Descovy® safety profiles;

    o.      Market share analysis;

p.        Product Strengths, Weaknesses, Opportunities, and Threats analysis;

q.        Patent coverage;

r.        Patent enforcement;

s.        Exclusivity;

t.        Loss of exclusivity (LOE);

u.        Patent challenges by ANDA filers;

v.        Generic entry;

w.        Product launches;

x.        Product development;

y.        Product transition from Truvada® to Descovy®;

z.        Product transitions for any products in Gilead's HIV Franchise;

aa.       Physician surveys;

bb.       Patient surveys;

cc.       Sales and marketing; and

dd.       Marketing messages.

**REQUEST NO. 103:** All documents and communications relating to strategies or attempts to prevent or delay generic competition to Truvada® or Descovy®.

**REQUEST NO. 104:** All documents and communications relating to generic competition to Truvada® or Descovy®, including evaluation of ANDA filers.

**REQUEST NO. 105:** All documents and communications relating to any authorized generic, inclusive of any Gilead produced generic, for Truvada® or Descovy®.

**REQUEST NO. 106:** All documents, plans, analyses, presentations, surveys, information, and related materials on promotional strategies, sales strategies, and marketing messages for Truvada® or Descovy® and Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 107:** All documents, plans, analyses, presentations, information, and related materials on marketing spending and the sales force for promoting Truvada for PrEP® or Descovy for PrEP®, including information on detailing, advertising, physician relationships, size of sales force, share of voice, relative weighting of indications, and other related topics.

**REQUEST NO. 108:** All documents, data, information, analyses, plans, forecasts, projections, and other related material containing information relating to development costs and timeline for PrEP and any other HIV prevention indications.

**REQUEST NO. 109:** All documents, data, information, analyses, plans, forecasts, projections, surveys, and other related material containing information relating to the potential market for preventative HIV treatments and Gilead's development related to preventative HIV treatment, including Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 110:** All documents, data, information, analyses, plans, forecasts, projections, and other related material containing information relating to development targets, objectives, and potential future indications for Truvada® or Descovy®.

**REQUEST NO. 111:** All documents, data, information, analyses, plans, forecasts, projections, and other related material containing information relating to the development costs and timeline for Truvada® and Descovy®.

**REQUEST NO. 112:** All documents, data, information, analyses, plans, forecasts, projections, and other related material containing information relating to research goals, funding, objectives, and programs for HIV treatment.

**REQUEST NO. 113:** All documents relating to the pricing of Truvada® and Descovy®.

**REQUEST NO. 114:** All documents relating to the pricing of Remdesivir®.

**REQUEST NO. 115:** All business plans, strategic plans, operating plans, financial plans, sales plans, and capital or investment plans relating to Truvada® or Descovy®.

**REQUEST NO. 116:** All documents and things relating to the market or demand for Truvada for PrEP® or Descovy for PrEP®.

**REQUEST NO. 117:** All documents relating to the actual, estimated, and forecasted use of Truvada® or Descovy® by FDA-approved indication.

**REQUEST NO. 118:** All documents relating to the conversion of Truvada® patients to Descovy® patients, including studies, forecasts, projections, plans, presentations, and marketing materials.

**REQUEST NO. 119:** All documents and communications relating to any of the Patents-in-Suit.

**REQUEST NO. 120:** All documents that you contend, affect, limit, or bear on the interpretation or construction of any asserted claim of the Patents-in-Suit, including any documents on which Gilead intends to rely in support of any proposed interpretation or construction and any documents relating to any unique or specialized meaning of any word or phrase in the asserted claims.

**REQUEST NO. 121:** All documents relating to Gilead's characterization, either internally or externally, of TAF as an "ester."

27

**REQUEST NO. 122:** All documents supporting or refuting Gilead's assertion that TAF is not a tenofovir ester or Gilead's assertion that TAF is not a tenofovir prodrug within the scope of the Patents-in-Suit.

**REQUEST NO. 123:** Documents sufficient to identify any tenofovir esters and/or tenofovir prodrugs developed or researched by Gilead.

**REQUEST NO. 124:** Documents sufficient to identify any esters developed or researched by Gilead.

**REQUEST NO. 125:** All documents and things that Gilead contends support any allegation regarding the level of ordinary skill in the art for each claim of the Patents-in-Suit, and all documents that refute or tend to refute any such allegation.

**REQUEST NO. 126:** All infringement, non-infringement, validity, invalidity, enforceability, or unenforceability analyses of any of the Patents-in-Suit, including opinions of counsel.

**REQUEST NO. 127:** All analyses, tests, studies, or investigations of whether Gilead infringes any claim of the Patents-in-Suit.

**REQUEST NO. 128:** All analyses or evaluations of the value of any of the Patents-in-Suit.

**REQUEST NO. 129:** All documents relating to Gilead's policies, practices, or guidelines relating to the patent rights of others, including the analysis of patents to ensure Gilead does not infringe any claim of such patents.

**REQUEST NO. 130:** All documents relating to when and how Gilead first became aware of each of the Patents-in-Suit, including what action, if any, Gilead took upon learning of the Patents-in-Suit.

**REQUEST NO. 131:** All documents constituting or relating to Gilead's action in response to its awareness of the Patents-in-Suit, including any communication with Congress or testimony

provided to Congress, any decision or opinion by Gilead to file suit, not to file suit, or to delay filing suit against the Government, including any litigation or administrative proceeding relating to the Patents-in-Suit.

**REQUEST NO. 132:** All documents relating to when and how Gilead first became aware of the publications referenced in Paragraphs 129–133 of the Government's Complaint (D.I. 1).

**REQUEST NO. 133:** All documents relating to any alleged Prior Art to the Patents-in-Suit.

**REQUEST NO. 134:** All English language patents or publications on which Gilead intends to rely for any purpose in this lawsuit including any alleged Prior Art.

**REQUEST NO. 135:** Any foreign patents or publications, including all English translations thereof, on which Gilead intends to rely for any purpose in this lawsuit including any alleged Prior Art.

**REQUEST NO. 136:** All documents that Gilead contends support any allegation relating to the prior conception or reduction to practice of the subject matter claimed in any of the Patents-in-Suit, and all documents that refute or tend to refute any such allegation.

**REQUEST NO. 137:** All documents, including patents, printed publications, and any alleged Prior Art, that Gilead contends support, either solely or in combination, any allegation that any of the claims of the Patents-in-Suit are invalid, including all documents relating to any investigation or analysis thereof, and all documents that refute or tend to refute any such allegation.

**REQUEST NO. 138:** All communications within or between Gilead and any third party regarding Prior Art to the Patents-in-Suit, and all documents relating to any Prior Art search, investigation, and/or analysis of the Patents-in-Suit and the Prior Art itself.

**REQUEST NO. 139:** All documents that Gilead contends support any allegation that any of the Patents-in-Suit are unenforceable, and all documents that refute or tend to refute any such allegation.

**REQUEST NO. 140:** All documents that Gilead contends support, either solely or in combination, any allegation that any of the claims of the Patents-in-Suit are not infringed by Gilead, and all documents that refute or tend to refute any such allegation.

**REQUEST NO. 141:** All transcripts from prior depositions, hearings, or trials of witnesses, including expert witnesses, that Gilead intends to call at trial or individuals listed on Gilead's initial disclosures.

**REQUEST NO. 142:** With respect to any person identified in any parties' initial disclosures, documents sufficient to show the person's dates of employment by Gilead, duties and responsibilities, and involvement relating to the subject matter of this Action.

**REQUEST NO. 143:** All documents relating to the Gilead's employment of Dr. Robert Janssen, including any application, resume or *curriculum vitae*, personnel file, performance evaluation, internal memorandum, or document created by or relating to Dr. Janssen.

**REQUEST NO. 144:** All documents provided to, reviewed by, received from, or prepared for or by any person interviewed in connection with this case or whose testimony Gilead plans to use or elicit in this case, including consultants or experts.

**REQUEST NO. 145:** All documents provided to, reviewed by, considered by, or generated by any individual who will provide expert testimony in this litigation, including testimony by declaration, testimony at a hearing, or testimony at trial, and including any individual who is disclosed or submits a report pursuant to Federal Rule of Civil Procedure 26(a)(2) in this litigation.

**REQUEST NO. 146:** All statements, communications, or representations made by Gilead outside this litigation regarding the validity of the Patents-in-Suit.

**REQUEST NO. 147:** All statements, communications, or representations made by Gilead outside this litigation relating to ongoing litigations between the Government and Gilead, including statements referencing matters that are now the subject of such ongoing litigations.

**REQUEST NO. 148:** All documents relating to your policies and practices regarding retention of documents and communications regarding Truvada® and Descovy® or any related subject matter.

**REQUEST NO. 149:** Documents sufficient to show the ownership, corporate structure, and management of Gilead and any of Gilead's parents, subsidiaries, or affiliates, including documents sufficient to identify any person that holds or has held an ownership stake in Gilead, or in which Gilead holds or has held an ownership stake, at any time.

**REQUEST NO. 150:** All documents relating to any application for patent term extension on U.S. Patent Nos. 7,390,791 and 7,803,788, assigned to Gilead.

**REQUEST NO. 151:** All documents produced in any litigation relating to Truvada® or Descovy®, including *Peter Staley, et al. v. Gilead Sciences, Inc., et al*., No. 3:19-cv-02573 (N.D. Cal.) and *Gilead Sciences, Inc., v. Teva*, No. 1:08-cv-10838 (D. Del.), including briefs, declarations and other submissions by the parties, transcripts of any testimony, any orders or decisions entered by the Court, and any license or settlement agreements, in the same form as the documents were produced in the original litigation.

**REQUEST NO. 152:** All documents relating to the declarations submitted in connection with *inter partes* review proceedings Nos. IPR2019-01453, -01454, -01455, and -01456, including any communications with the declarants.

**REQUEST NO. 153:** All documents relating to communications between Gilead or its representatives and journalists, including Christopher Rowland of the Washington Post, Donald McNeil of the New York Times, the Wall Street Journal, and any Bloomberg entity, relating to this lawsuit and/or the Patents-in-Suit.

**REQUEST NO. 154:** All documents relating to communications between Gilead or its representatives and its shareholders regarding this lawsuit or the Patents-in-Suit.

**REQUEST NO. 155:** All documents relating to Gilead's 2019 donation of Truvada®, including any communications with the Government or any third-party.

**REQUEST NO. 156:** All documents relating to any valuation of Gilead's 2019 donation of Truvada®, including the future value of patient acquisition and actual cost of materials.

**REQUEST NO. 157:** All documents relating to any communications between Gilead and generic manufacturers who have filed ANDAs directed to a generic version of Truvada® or Descovy®, including Teva Pharmaceuticals, regarding this lawsuit and/or the Patents-in-Suit.

**REQUEST NO. 158:** All documents relating to the determination of, or processes used in, pricing of Truvada for PrEP® and/or Descovy for PrEP®.

**REQUEST NO. 159:** All documents and things relating to Gilead's methodology for monitoring the issuance of HIV-related patents in the United States and abroad.

**REQUEST NO. 160:** All documents and communications relating to Gilead's public statements on the Patents-in-Suit and/or the present litigation.

**REQUEST NO. 161:** All documents received from or sent to shareholders related to the Patents-in-Suit, including any litigation or administrative proceeding related to the Patents-in-Suit.

**REQUEST NO. 162:** All documents relating to the allegations set forth in Paragraph 62 of Gilead's Second Amended Answer and Affirmative Defenses (D.I. 22), including the statement "Furthermore, individuals with a duty to disclose material information during prosecution—including the named inventors and prosecuting attorneys—failed to disclose the CDC-PEP reference to the examiner during prosecution of the '509 and '333 Patents."

**REQUEST NO. 163:** All documents relating to the allegations set forth in Paragraph 20 of Gilead's Second Amended Counterclaims (D.I. 22), including the statement "Each of the claims of the HHS Patents is invalid under the prior public use provisions of 35 U.S.C. §§ 102(a) and/or 102(b) because GSI's Truvada® medication had been publicly used for PrEP before the inventions of the HHS Patents and/or more than one year before the earliest priority date to which each claim of the HHS Patents is entitled."

**REQUEST NO. 164:** All documents relating to the allegations set forth in Paragraph 21 of Gilead's Second Amended Counterclaims (D.I. 22), including the statement "Each of the claims of the HHS Patents is also invalid as obvious."

**REQUEST NO. 165:** All documents relating to the allegations set forth in Paragraph 28 of Gilead's Second Amended Counterclaims (D.I. 22), including the statement "GSI therefore does not encourage others to practice the 'protecting' and 'inhibiting' limitations."

**REQUEST NO. 166:** All documents relating to the allegations set forth in Paragraph 29 of Gilead's Second Amended Counterclaims (D.I. 22), including the statement "Tenofovir alafenamide is a chemically distinct entity from tenofovir and is not a tenofovir ester."

**REQUEST NO. 167:** All documents relied upon in preparing Gilead's Answer and Counterclaims.

**REQUEST NO. 168:** All documents relating to any allegation set forth in Gilead's Answer and Counterclaims.

**REQUEST NO. 169:** All documents relating to any allegation set forth in Gilead's Complaint in *Gilead Sciences, Inc., v. USA*, Case 1:20-cv-00499-CFL.

**REQUEST NO. 170:** All documents on which Gilead intends to rely in this litigation, including documents Gilead contends support any affirmative defenses and/or counterclaims against the Government.

**REQUEST NO. 171:** All documents identified, or otherwise requested to be identified, in any response to any interrogatory or request for admission served in this litigation by the Government.

**REQUEST NO. 172:** All documents that support or otherwise relate to your responses to any interrogatory or request for admission served in this litigation by the Government, or to which you refer in responding to any such interrogatory or request for admission.

**REQUEST NO. 173:** All documents produced or made available to you by any non-party or third-party in this action.

**REQUEST NO. 174:** All documents upon which Gilead intends to rely at trial.

**REQUEST NO. 175:** All documents or information supporting or refuting the allegations set forth in Paragraph 3 of Gilead's Second Amended Counterclaims (D.I. 22) concerning the statement that the claims of the Patents-in-Suit are allegedly invalid under 35 U.S.C. § 101.

**REQUEST NO. 176:** All documents or information supporting or refuting the allegations set forth in Paragraphs 22-24 of Gilead's Second Amended Counterclaims (D.I. 22), including the statement that "The claims of the HHS Patents are also invalid for failure to comply with the written-description requirement of 35 U.S.C. § 112."

**REQUEST NO. 177:** All documents or information supporting or refuting the allegations set forth in Paragraph 3 of Gilead's Second Amended Counterclaims (D.I. 22) concerning the statement that the claims of the Patents-in-Suit are allegedly invalid under "any judicially created doctrine of invalidity, including obviousness-type double patenting."

**REQUEST NO. 178:** All documents or information supporting or refuting the allegations set forth in Paragraph 68 of Gilead's Second Amended Counterclaims (D.I. 22) concerning the statement that "The Patents-in-Suit are invalid because the alleged inventions(s) were derived and/or misappropriated from the true inventor(s)."

**REQUEST NO. 179:** All documents or information supporting or refuting the allegations set forth in Paragraphs 26-27 of Gilead's Second Amended Counterclaims (D.I. 22) concerning the supposed lack of direct infringement of the Patents-in-Suit.

**REQUEST NO. 180:** All documents, information, data, and test results relating to the instruction that "HIV-1 screening tests should be repeated at least every 3 months" while using Truvada® for PrEP on the labels for Truvada® , and the instruction that "HIV-1 testing should be repeated at least every 3 months" while using Descovy® for PrEP on the label for Descovy®.

**REQUEST NO. 181:** All documents or information relating to the statement that "In an unusual twist, tenofovir's maker—Gilead Sciences of Foster City, California—says it has no interest in pursuing PrEP because of fears that uninfected people who take tenofovir and still become infected might sue the company" contained on page 1004 in Cohen, *Science*, 309:1002-1005 (2005).

**REQUEST NO. 182:** All documents or information relating to the statement of Jim Rooney, then Gilead's vice-president of medical affairs, that Gilead "does not view PrEP as a

commercial opportunity" in the September 30, 2013 article authored by Christopher Glazek and published in *The New Yorker*.

Respectfully submitted,


ETHAN P. DAVIS
Acting Assistant Attorney General

GARY L. HAUSKEN
Director

*Of Counsel:*                              /s/ Walter W. Brown
PHILIP CHARLES STERNHELL      WALTER W. BROWN
Assistant Director                        Senior Litigation Counsel
PATRICK C. HOLVEY                    Commercial Litigation Branch
Trial Attorney                              Civil Division
Department of Justice                   U.S. Department of Justice
                                                    Washington, D.C.  20530
                                                    Tel:    (202) 307-0341
                                                    Fax:   (202) 307-0345
                                                    *walter.brown2@usdoj.gov*

                                                    DAVID C. WEISS
                                                    United States Attorney

                                                    /s/ Laura D. Hatcher
                                                    LAURA D. HATCHER (DE Bar No. 5098)
                                                    Assistant United States Attorney
                                                    SHAMOOR ANIS
                                                    Assistant United States Attorney
                                                    1313 N. Market Street
                                                    P.O. Box 2046
                                                    Wilmington, Delaware 19899-2046
                                                    Tel:    (302) 573-6277
                                                    Fax:   (302) 573-6220
                                                    *Laura.hatcher@usdoj.gov*
                                                    *Shamoor.anis@usdoj.gov*

Dated: July 7, 2020                     *Attorneys for Plaintiff United States*

## CERTIFICATE OF SERVICE

I certify that a true copy of "PLAINTIFF'S CORRECTED FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS" was sent via electronic mail, this July 7, 2020 to counsel of record including:

David Bassett
Wilmer Cutler Pickering Hale and Dorr, LLP
250 Greenwich St. 45th floor
New York, NY 10007
david.bassett@wilmerhale.com
Telephone: (212) 230-8858

Attorney for Plaintiff

*/s/ Patrick C. Holvey*
PATRICK C. HOLVEY
Department of Justice
patrick.c.holvey@usdoj.gov

# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| |
|---|
| THE UNITED STATES OF AMERICA, *Plaintiff–Counterclaim Defendant*, <br><br> v. <br><br> GILEAD SCIENCES, INC. *Defendant–Counterclaim Plaintiff,* <br><br> AND GILEAD SCIENCES IRELAND UC, *Defendant*. |

Civil No. 1:19-cv-02103-MN

## PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS (Nos. 183 - 250)

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff United States of America (Government or United States) submits this Second Set of Requests for Production of Documents and Things to Gilead Sciences, Inc. and Gilead Sciences Ireland UC (collectively, Gilead) to produce the following documents and things within the possession, custody or control of Gilead or its counsel within thirty (30) days of service, in accordance with the Definitions and Instructions below. Documents should be produced to: Walter W. Brown, Commercial Litigation Branch, U.S. Department of Justice, 1100 L Street, N.W., Room 8504, Washington, D.C. 20005, walter.brown2@usdoj.gov.

## DEFINITIONS

1. Notwithstanding any definition set forth below, each word, term, or phrase used in these requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.

2.      "Defendant(s)," "Gilead," "you," "your," and "yours" refers, collectively or singly, to Gilead Sciences, Inc. (GSI), Gilead Sciences Ireland UC (GSIUC), and any and all predecessors, successors, divisions, subsidiaries, subcontractors, franchisees, assigns, or joint ventures thereof, together with any and all parent or affiliated companies, corporations, or other legal entities, whether foreign or domestic, and all past or present officers, directors, employees, agents, attorneys, lobbyists, representatives, and all other persons acting or purporting to act or that have acted or purported to act on behalf of any of the foregoing.

3.      "Plaintiff," "Government," refer, collectively or singly, to the government of the United States of America including the Department of Health and Human Services (HHS) and all of its components, divisions and offices, such as the Centers for Disease Control and Prevention (CDC), the U.S. Food and Drug Administration (FDA), the National Institutes of Health, and the Public Health Service (PHS).

4.      "CDC" refers to the Centers for Disease Control and Prevention.

5.      "CTA" refers to clinical trial agreement.

6.      "FDA" refers to the United States Food and Drug Administration.

7.      "MTA" refers to material transfer agreement.

8.      "NDA" refers to new drug application, inclusive of any supplements.

9.      "DMF" refers to Drug Master Files.

10.     "API" refers to Active Pharmaceutical Ingredient.

11.     "Answer and Counterclaims" refers to all responsive pleadings filed by Gilead in this litigation, inclusive of D.I. 7, 13, and 21.

12.     "Healthcare Provider" refers to any person or organization providing health care services, including but not limited to hospitals, clinics, pharmacies, doctors, nurses, therapists, pharmacists, clinicians, technologists and technicians, and administrative staff.

13.     "Distributor" refers to any person or entity distributing or facilitating the distribution of drugs from a manufacturer to a pharmacy or Healthcare Provider.

14.     "PEP" refers to HIV post-exposure prophylaxis, including as defined in Paragraph 64 of Plaintiff's Complaint in this action (D.I. 1).

15.     "PrEP" refers to HIV pre-exposure prophylaxis, including as defined in Paragraph 77 of Plaintiff's Complaint in this action (D.I. 1).

16.     "TAF" refers to tenofovir alafenamide, including reference to all forms of TAF, inclusive of the free base, salts, and co-crystals and includes, but is not limited to the fumarate and hemi-fumarate forms.

17.     "TDF" refers to tenofovir disoproxil fumarate, inclusive of the free base, salts, and co-crystals.

18.     "FTC" refers to emtricitabine.

19.     "USPTO" refers to the United States Patent and Trademark Office.

20.     "Patent(s)-in-Suit" refers to U.S. Patent Nos. 9,044,509; 9,579,333; 9,937,191; and 10,335,423, either individually or collectively.

21.     "Named Inventor(s)" refers to the named inventors on the Patents-in-Suit, namely Walid M. Heneine, Thomas M. Folks, Robert Janssen, Ronald Otten, and Jose Gerardo Garcia-Lerma, either individually or collectively.

22.     "Prior Art" means, for the purposes of these requests, any document or information that you intend to rely upon to allege invalidity of the Patents-in-Suit.

23.     "Truvada®" refers to the product that is the subject of New Drug Application No. 021752.

24.     "Descovy®" refers to the product that is the subject of New Drug Application No. 208215.

25.     "Truvada for PrEP®" refers to the use of Truvada® for PrEP.

26.     "Descovy for PrEP®" refers to the use of Descovy® for PrEP.

27.     "Viread®" refers to the product that is the subject of New Drug Application No. 21-356.

28.     "Prodrug" refers to a compound with little or no pharmacological activity that is converted to the pharmacologically active drug *in vivo*.

29.     "Person" means any natural person or any business, legal, or governmental entity or association.

30.     "Document" refers to, without limitation, any written or graphic matter or any medium of any type or description upon which intelligence or information is recorded or reflected or from which intelligence or information can be recorded, which is or has been in your possession, control, or custody or of which you have knowledge.  "Document" or "documents" has the broadest possible meaning, and includes all materials and information that are discoverable pursuant to Rule 34 of the Federal Rules of Civil Procedure.  Without limitation on the foregoing, "document" includes any kind of written, recorded, printed, or graphic matter, whether produced, reproduced, or stored on paper, cards, film, audio or video tapes, electronic facsimile, computer storage device, or any other media.  The foregoing specifically includes information stored in a computer database and capable of being generated in documentary form, such as electronic mail.

31.    "Communication" means, without limitation, any transmission, conveyance or exchange of a word, statement, fact, thing, idea, document, instruction, information, demand or question by any medium, whether by written, oral or other means, including but not limited to, electronic communications and electronic mail.

32.    "Concerning," "Reflect," "reflecting," "relate to," "refer to," "relating to," and "referring to" mean relating to, referring to, concerning, mentioning, regarding reflecting, pertaining to, evidencing, involving, demonstrating, describing, discussing, stating, commenting on, comprising, embodying, responding to, supporting, contradicting, containing or constituting (in whole or in part), as the context makes appropriate.

33.    "Including" means including but not limited to.

34.    "Produce" means to provide legible, complete, and exact copies or responsive documents to the undersigned counsel, or to make such documents available to the undersigned counsel for inspection and reproduction.

35.     "Thing" means any physical specimen or other tangible item other than a document, in your possession, custody, or control.

36.    "CFC" means the U.S. Court of Federal Claims.

37.    "CFC litigation" means the litigation brought by Gilead against the United States captioned *Gilead Sciences, Inc., v. United States*, Fed. Cl. 1:20-cv-499.

38.    "FLSD Litigation" means the litigation brought by Gilead captioned *Gilead Sciences, Inc., Gilead Sciences Ireland UC v. AJC Medical Grp., Inc., et al*, FLSD C.A. No. 1:20-cv-24523-KMW.

39.    The terms "all," "each," and "any" shall be construed as all and any.

40.     The use of the singular form of any word shall include the plural form and *vice versa.*

41.     The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

42.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

43.     Words in the masculine, feminine, or neuter form shall include each of the other genders.

44.     The use of any definition for the purposes of these requests shall not be deemed to constitute an agreement or acknowledgement on the part of the Government that such definition is accurate, meaningful, or appropriate for any other purpose in this litigation.

## INSTRUCTIONS

1.     Each request should be construed independently and not with reference to any other request for the purposes of limitation.

2.     If you perceive any ambiguity in construing any request or any applicable definition or instruction, you should set forth the matter deemed ambiguous.

3.     If you object to any portion of the request, you should identify the portion to which you object, state the basis for the objection, and respond to the remainder.

4.     If you object to any request on the basis of a contention that it is overbroad, you should provide a response that narrows the request in a way that eliminates the purported over-breadth, and state the extent to which you have narrowed that request for the purpose of your response.

5.     All Requests are to be understood as requesting information in the possession, custody, or control of Gilead.

6

6.      In producing documents, produce the originals if the originals differ in any respect from copies.  Documents that are in paper form or that constitute other physical objects from which recorded information may be visually read, as well as audio or video tapes and similar recordings, should be produced in their original form or in copies that are exact duplicates of the originals. Computer files and similar electronic records should be produced in a readable form mutually agreed upon by the parties.

7.      Gilead must produce documents in the same file or other organizational environment in which they are maintained in the ordinary course of business.  For example, a document that is part of a file, docket or other grouping should be physically produced together with all other documents from said file, docket or grouping, in the same order or manner of arrangement as the original, preceded by any file folder or other similar organizational item, whether paper or electronic, that contains the document produced.  Additionally, to the extent produced in hardcopy, each document should be produced stapled, clipped or otherwise bound or connected in the same manner as the original.

8.       Documents are to be produced in their entirety without redaction, excepting redactions for privilege.

9.      To the extent any document exists in more than one language, the document shall be produced in English, if available.  If no English version of a document is available, the producing party does not have an obligation to produce an English translation of a document.

10.      These requests are deemed continuing, and supplemental responses and production should be provided as additional documents become available, in accordance with Federal Rule of Civil Procedure 26(e) and the scheduling order in this proceeding (D.I. 27).

## REQUESTS FOR PRODUCTION

**REQUEST NO. 183:** Documents sufficient to show Gilead's characterizations of NRTIs/NtRTIs and/or any prodrugs of NRTIs/NtRTIs as "esters," containing esters, being esterized forms of the metabolite, or otherwise referring to or characterizing the NRTI/NNRTI as an ester or prodrug of the metabolite.

**REQUEST NO. 184:** All documents relating to and supporting Dr. Howard Jaffe's statement that Gilead would "not market the drug as a prophylactic, out of concern about liability, and because insurance companies are unlikely to fund such a use," https://www.nbcnews.com/id/wbna14263273 [https://perma.cc/8ND6-5N5S], including any liability calculations or actuarial analyses supporting this statement.

**REQUEST NO. 185:** All documents relating to Gilead's reversal in its announced position that Gilead would "not market the drug as a prophylactic, out of concern about liability, and because insurance companies are unlikely to fund such a use." *See* https://www.nbcnews.com/id/wbna14263273 [https://perma.cc/8ND6-5N5S].

**REQUEST NO. 186:** All documents relating to any grant applications or draft grant applications prepared or submitted by, for, on behalf of, in collaboration with, or to Gilead relating to PrEP, Truvada® and Descovy®.

**REQUEST NO. 187:** All documents relating to Gilead's trials undertaken to "evaluate drug adherence and its relationship to adverse events, risk of seroconversion, and resistance development in seroconverters," as discussed in US_00020721 to US_00020723.

**REQUEST NO. 188:** All documents relating to Gilead's "national drug utilization data" that "characterizes individuals who utilize Truvada for a PrEP indication," as discussed in US_00020721 to US_00020723.

**REQUEST NO. 189:** All documents and things relating to Gilead's development of "an adherence questionnaire that will assist prescribers in identifying individuals at risk for low compliance" to the PrEP regimen, as discussed in US_00020721 to US_00020723.

**REQUEST NO. 190:** All documents and things relating to Gilead's "Investigator's Brochures," such as those referenced at US_00020591 to US_00020592 and found at US_00019232 to US_00019339, inclusive of initial development and all versions, updates, and revisions for the following drugs/indications:

- Truvada® (HIV-1 Treatment)
- Truvada® (PrEP)
- Descovy® (HIV-1 Treatment)
- Descovy® (PrEP)
- Viread® (HIV-1 Treatment)
- Vemlidy® (HIV-1 Treatment)

**REQUEST NO. 191:** All documents relating to annual drug reports, such as those found at US_00021493 to US_00021614, filed for the following drugs/indications:

- Truvada® (HIV-1 Treatment)
- Truvada® (PrEP)
- Descovy® (HIV-1 Treatment)
- Descovy® (PrEP)
- Viread® (HIV-1 Treatment)
- Vemlidy® (HIV-1 Treatment)

**REQUEST NO. 192:** All documents estimating, quantifying, valuing, ranking, or analyzing the value of all drugs and other consideration provided by Gilead to HHS/CDC under any

Material Transfer Agreement or Clinical Trial Agreement, inclusive of any amendments, asserted by Gilead in the CFC litigation or as a basis for its affirmative defense of unclean hands.

**REQUEST NO. 193:** All documents relating to the computation of the standard cost, as Gilead uses and defines it within at least the CAR system, of Truvada® (*see* CFC Complaint, Exhibit 16).

**REQUEST NO. 194:** All documents relating to the computation of the standard cost, as Gilead uses and defines it within at least the CAR system, of Descovy® (*see* CFC Complaint, Exhibit 16).

**REQUEST NO. 195:** All documents relating to Gilead's statement that "[h]ad the Government performed its contractual obligation under [the MTAs] to promptly notify GSI of the purported invention(s) described in the applications that led to the HHS Patents, GSI would have had the opportunity to consider its options," (D.I. 21, Fourth Affirmative Defense, ¶ 6), inclusive of what options Gilead would have considered and pursued over the time period from on or around 2006 to the issuance of the asserted patents if Gilead knew of the Government's patent filings beginning in 2006.

**REQUEST NO. 196:** All documents relating to Gilead's Nov. 9, 2019 10-K filing statement that "[i]n 2017, we also received a subpoena from the U.S. Attorney's Office for the Southern District of New York requesting documents related to our promotional speaker programs for HIV. We are cooperating with this inquiry," including all documents produced in response to this subpoena.

**REQUEST NO. 197:** All documents relating to Gilead's Nov. 9, 2019 10-K filing statement that "[i]n 2017, we received a subpoena from the U.S. Attorney's Office for the District of

Massachusetts requesting documents related to our copay coupon program and Medicaid price reporting methodology. We are cooperating with this inquiry," including all documents produced in response to this subpoena.

**REQUEST NO. 198:** All documents produced for inspection in the *Collins v. Gilead Sciences, Inc.*, Del. Ch. C.A. No 2020-0138-KSJM, litigation, inclusive of the following categories of information identified by the Court in its final order:

- (i) state, federal, and international antitrust laws, and compliance with respect to HIV treatment or PrEP medications;

- (ii) U.S. patent law, and compliance therewith, with regard to HIV PrEP medications;

- (iii) outreach from the U.S. government regarding the U.S. government's '509, '333, '191, and '423 Patents, and any efforts to reach agreement thereon;

- (iv) the validity of the U.S. government's '509, '333, '191, and '423 Patents;

- (v) studies regarding the efficacy of any TDF/FTC or TAF/FTC combination product for PrEP;

- (vi) Defendant's views and statements regarding HIV PrEP medications and efforts to market its medications for PrEP, including PrEP indications for Truvada® and Descovy®;

- (vii) research performed pursuant to and testimony presented at the May 16, 2019 House Committee on Oversight and Reform hearing;

- (viii) the reasons, rationale, risks and consequences associated with the timeline for the development of TAF;

11

- (ix) tort suits and other legal consequences or challenges brought based on Defendant's timeline for the development of TAF, including the costs associated therewith;

- (xi) materials reflecting any assessment by the Board of the effectiveness of Defendant's Policies and Procedures and any inquiry into instances of noncompliance with those Policies and Procedures; and

- (xii) any discussion, reviews, analysis, or knowledge of any of the events set forth in the Demands.

**REQUEST NO. 199:** All documents relating to all communications between Gilead and Teva Pharmaceutical Industries, Ltd., relating to the generic license announced by Gilead on May 8, 2019.

**REQUEST NO. 200:** All documents relating to all communications between Gilead and Teva Pharmaceutical Industries, Ltd., relating to the HHS patents, this litigation, or the co-pending CFC litigation.

**REQUEST NO. 201:** All documents relating to the computation, estimation, analysis, projection, or development of any economic model examining or analyzing the cost of manufacture of Truvada® to the retail price of Truvada®.

**REQUEST NO. 202:** All documents relating to the computation, estimation, analysis, projection, or development of any economic model examining or analyzing the effect of various retail prices of Truvada® on patient accessibility or market penetration for Truvada®.

**REQUEST NO. 203:** All documents relating to the computation, estimation, analysis, projection, or development of any economic model examining or analyzing the cost of manufacture of Descovy® to the retail price of Descovy®.

**REQUEST NO. 204:** All documents relating to the computation, estimation, analysis, projection, or development of any economic model examining or analyzing the effect of various retail prices of Descovy® on patient accessibility or market penetration for Descovy®.

**REQUEST NO. 205:** All documents relating to the planning, development, cost, and efficacy of Gilead's direct-to-consumer marketing for Truvada® and Descovy®.

**REQUEST NO. 206:** All documents relating to licenses and sales between GSI and GSIUC relating to PrEP, Truvada®, and/or Descovy®.

**REQUEST NO. 207:** All documents relating to disclosures to GSI or GSIUC of prior inventions or other intellectual property held by Dr. Robert Janssen prior to or during his employment with GSI from 2008 to 2010.

**REQUEST NO. 208:** GNet printouts of all CAR pages (*see* CFC Complaint, Exhibit 16) for every Material Transfer Agreement or Clinical Trial Agreement, inclusive of any amendments, asserted by Gilead in the CFC litigation or as a basis for its affirmative defense of unclean hands.

**REQUEST NO. 209:** All documents associated with/underlying GNet printouts of CAR pages produced in response to Request No. 209 (above), such as, for example, for the CAR printout of Exhibit 16 of Gilead's CFC Complaint, the three documents identified as "current attachments." (*see* CFC Complaint, Exhibit 16).

**REQUEST NO. 210:** All documents relating to communications between Gilead and the CDC regarding the following licenses/license applications for the associated CDC Technology Numbers:

| License/License Application Number | CDC Technology Number |
|---|---|
| A-068-2006 | E-100-1999-0 |
| A-186-2008 | E-317-2984-1, B-026-1999-0 |
| L-169-2007-2 | E-172-2002-0 |
| L-803-2009-1 | E-187-1995-0, E-187-1995-2 |
| A-005-2009 | E-471-1985-0 |
| L-080-2013-0 | E-552-1982-2, E-402-1986-1 |
| A-002-2014 | E-187-1995-2 |
| L-279-2014-0 | E-170-2014-0 |

**REQUEST NO. 211:** All documents relating to market conversion projections, analysis, estimates, reports, or communications regarding expected market conversion effects from Truvada® to Descovy® through Gilead's Advancing Access Medication Assistance Program (MAP) or Gilead's Advancing Access Patient Assistance Program (PAP).

**REQUEST NO. 212:** All documents relating to market conversion projections, analysis, estimates, reports, or communications regarding expected market conversion effects from Truvada® to Descovy® through Gilead's Compass Initiative.

**REQUEST NO. 213:** All documents relating to GSI and GSIUC's statements in *Gilead Sciences, Inc., Gilead Sciences Ireland UC v. AJC Medical Grp., Inc., et al*, FLSD C.A. No. 1:20-cv-24523-KMW, (the FLSD Litigation) that GSI and GSIUC are "the registered owner[s] of certain well-established and famous registered trademarks that appear on the packaging, tablets, and package inserts of certain genuine PrEP medications," (Compl. at ¶¶ 24-25), and are "the collective owners of a number of well-established and famous registered trademarks (the 'Gilead Marks') that appear on genuine PrEP products." (Compl. at ¶ 26).

**REQUEST NO. 214:** All documents relating to GSI and GSIUC's statement in the FLSD Litigation that GSI and GSIUC (collectively referred to as Gilead in the FLSD Complaint) "has used and is currently using these Gilead Marks and this Gilead Trade Dress in commerce in connection with its sale of PrEP medication, and plans to continue such use in the future. Gilead prominently displays the Gilead Marks in its advertising and promotional materials."   (Compl. at ¶ 27).

**REQUEST NO. 215:** All documents relating to GSI and GSIUC's statement in the FLSD Litigation that "Gilead [GSI/GSIUC collectively] has engaged and continues to engage in activities designed to promote PrEP medication and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States. All of these trademarks and trade dress symbolize business goodwill of Gilead and are invaluable assets to Gilead." (Compl. at ¶ 28).

**REQUEST NO. 216:** Documents sufficient to show Gilead's Advancing Access Medication Assistance Program (MAP) certification process described in the FLSD Litigation during each of the years from 2014 to the present including information that shows:

1)      "prescribed medication is for the applicant,

2)      the prescribed medication is medically necessary for the applicant,

3)      the prescribed medication will be used as directed,

4)      the prescriber will be supervising the applicant's treatment,

5)      the applicant has been tested for HIV infection and found to be HIV negative,

6)      the applicant will be regularly tested for HIV as part of her care plan, and

7)      the prescriber will periodically verify continued use of Gilead medication and resubmit current prescriptions."  (SDFL Litigation Compl. at ¶ 152).

**REQUEST NO. 217:** All documents relating to GSI's "Patent Operations Group's" activities, findings, investigations, and reports that addressed or concerned tenofovir (TFV), tenofovir disoproxil fumarate (TDF), tenofovir alafenamide (TAF) or emtricitabine (FTC) from 2007 to 2012.

**REQUEST NO. 218:** All documents relating to GSI's "Patent Informatics Group's" activities, findings, investigations, and reports that addressed or concerned tenofovir (TFV), tenofovir disoproxil fumarate (TDF), tenofovir alafenamide (TAF), tenofovir alafenamide (TAF), or emtricitabine (FTC) from 2012 to 2015.

**REQUEST NO. 219:** All documents discussing or reflecting communications since 2004 between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, on the one hand, and Gilead personnel on the other hand, regarding HIV treatment, PrEP, Truvada®, or Descovy®.

**REQUEST NO. 220:** All documents discussing or reflecting communications since 2004 between or among Dr. James Rooney, Dr. Howard Jaffe, Dr. Mick Hitchcock, Martha Vazquez, Dr. Norbert Bischofberger, Dr. Michael Miller, Dr. William Lee, Dr. Robert Janssen, Dr. Dana Pizzuti, and Dr. William Guyer, on the one hand, and Gilead personnel on the other hand, regarding HIV treatment, HIV prophylaxis, PrEP, Truvada®, or Descovy®.

**REQUEST NO. 221:** All documents discussing or reflecting communications since 2004 between or among Douglas M. Brooks, Traci Carrithers, Amy Coluci, Dr. Terrance Dahl, Dr. Linda Higgins, Dr. Brian Kearney, Dr. Madeline Miller, Daniel O'Day, Dr. Adrian

Ray, and Dr. Grushenka Wolfgang, on the one hand, and Gilead personnel on the other hand, regarding HIV treatment, PrEP, Truvada®, or Descovy®.

**REQUEST NO. 222:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding Gilead's initial retail and wholesale pricing of Truvada® or changes in retail and wholesale pricing of Truvada®, including, but not limited to, (1) strategic pricing determinations considered in setting initial pricing, (2) analysis created for long-term/strategic/brand plans presented to the Board of Directors or other Gilead stakeholders, and (3) considerations of pricing relative to other HIV treatment drugs (both PrEP and PEP) including Descovy®.

**REQUEST NO. 223:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding market forecasts or estimates of Truvada®, including, but not limited to, (1) projections presented to the Board of Directors or other Gilead stakeholders, (2) projections created for long-term/strategic/brand plans, (3) SWOT analysis, competitor analysis, and overall market projections, and (4) key marketing messages and features described in physician surveys.

**REQUEST NO. 224:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day,

on the one hand, and Gilead personnel on the other hand, regarding the standard cost of Truvada®.

**REQUEST NO. 225:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding profitability estimates of Truvada®, including, but not limited to, estimates of product incremental or contribution margin, product/brand-level profit and loss analysis, and estimates of costs such as marketing expenses.

**REQUEST NO. 226:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding revenue forecasts or estimates of Truvada®, including, but not limited to, projections presented to the Board of Directors or other Gilead stakeholders, and projections created for long-term/strategic/brand plans.

**REQUEST NO. 227:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding relative market usage or prescription rates of Truvada® for HIV-1 treatment and PrEP, including, but not limited to, long-term/strategic/brand plans presented to the Board of Directors or other Gilead stakeholders.

**REQUEST NO. 228:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding market conversion forecasts or estimates from Truvada® to Descovy®, including, but not limited to, long-term/strategic/brand plans presented to the Board of Directors or other Gilead stakeholders.

**REQUEST NO. 229:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding Gilead's initial retail and wholesale pricing of Descovy®, including, but not limited to, (1) strategic pricing determinations considered in setting initial pricing, (2) analysis created for long-term/strategic/brand plans presented to the Board of Directors or other Gilead stakeholders, and (3) considerations of pricing relative to other HIV treatment drugs (both PrEP and PEP) including Truvada®.

**REQUEST NO. 230:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding Gilead's changes in retail and wholesale pricing of Descovy®, including, but not limited to, (1) historical analyses of pricing trends and strategic pricing considerations presented to the Board of Directors and other Gilead stakeholders, and (2) considerations of pricing relative to other HIV treatment drugs (both PrEP and PEP) including Truvada®.

**REQUEST NO. 231:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding market forecasts or estimates of Descovy®, from 2008 to the present, including, but not limited to, (1) projections presented to the Board of Directors or other Gilead stakeholders, (2) projections created for long-term/strategic/brand plans, (3) SWOT analysis, competitor analysis, and overall market projections, and (4) key marketing messages and features described in physician surveys.

**REQUEST NO. 232:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding the standard cost of Descovy®.

**REQUEST NO. 233:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding profitability estimates of Descovy®, including, but not limited to, estimates of product incremental or contribution margin, product/brand-level profit and loss analysis, and estimates of costs such as marketing expenses.

**REQUEST NO. 234:** All documents discussing or reflecting communications between or among Mubasher Cheema, Kavitha Parthasarathy, Amy Eyer, Patrick Farrell, Myron Kim, Sudhir

Sabherwal, Rahul Singh, Dawn Winn, Dr. Dana Pizzuti, Dr. James Rooney, Daniel O'Day, on the one hand, and Gilead personnel on the other hand, regarding relative market usage or prescription rates of Descovy® for HIV-1 treatment and PrEP, including, but not limited to, magnitudes or share of prescriptions by indication such as those created for long-term/strategic/brand plans or presented to the Board of Directors or other Gilead stakeholders.

**REQUEST NO. 235:** All documents discussing or reflecting communications between GSI and GSIUC personnel regarding intellectual property licensing, inclusive of both prospective and executed licenses, related to Truvada®, Descovy®, or PrEP.

**REQUEST NO. 236:** All documents discussing or reflecting communications between GSI and GSIUC personnel regarding enforcement of intellectual property related to Truvada®, Descovy®, or PrEP.

**REQUEST NO. 237:** All documents discussing or reflecting communications between GSI and GSIUC personnel regarding marketing, manufacture, packaging, or labeling of Truvada® or Descovy®.

**REQUEST NO. 238:** All documents discussing or reflecting communications between GSI and GSIUC personnel regarding GSIUC's activities in the United States related to Truvada® or Descovy®.

**REQUEST NO. 239:** All documents discussing or reflecting communications between GSI and GSIUC personnel regarding the Patents-in-Suit, PrEP, or PEP.

**REQUEST NO. 240:** All documents and communications exchanged between Dr. Robert Grant and Gilead personnel regarding PrEP or PEP.

**REQUEST NO. 241:** All documents and communications exchanged between Dr. Thomas Coates and Gilead personnel regarding PrEP or PEP.

**REQUEST NO. 242:** All documents and communications exchanged between Dr. Myron Cohen and Gilead personnel regarding PrEP or PEP.

**REQUEST NO. 243:** All documents and communications exchanged between Dr. Michael Youle and Gilead personnel regarding PrEP or PEP.

**REQUEST NO. 244:** All documents and communications exchanged between Greg Szekeres and Gilead personnel regarding PrEP or PEP.

**REQUEST NO. 245:** All documents and communications exchanged between Dr. John Kaldor and Gilead personnel regarding PrEP or PEP.

**REQUEST NO. 246:** All documents and communications exchanged between Dr. Kimberly Page and Gilead personnel regarding PrEP or PEP.

**REQUEST NO. 247:** All documents and communications exchanged between Dr. Kenneth Mayer and Gilead personnel regarding PrEP or PEP.

**REQUEST NO. 248:** All documents and communications exchanged between Dr. Thomas Folks and Gilead personnel regarding PrEP or PEP.

**REQUEST NO. 249:** All documents and communications exchanged between Dr. Robert Janssen and Gilead personnel regarding PrEP or PEP.

**REQUEST NO. 250:** All documents exchanged between Dr. Mary Fanning, Kevin Ryan, Sharon Gershon, and Cherlynn Mathias, on the one hand, and Gilead personnel, on the other, regarding PrEP or PEP.

Respectfully submitted,


SARAH HARRINGTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

*Of Counsel:*           /s/ Walter W. Brown
PHILIP CHARLES STERNHELL      WALTER W. BROWN
Assistant Director            Senior Litigation Counsel
PATRICK C. HOLVEY          Commercial Litigation Branch
Trial Attorney               Civil Division
Department of Justice        U.S. Department of Justice
                            Washington, D.C.  20530
                            Tel:     (202) 307-0341
                            Fax:    (202) 307-0345
                            *walter.brown2@usdoj.gov*


DAVID C. WEISS
United States Attorney

/s/ Laura D. Hatcher
LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel:     (302) 573-6277
Fax:    (302) 573-6220
*Laura.hatcher@usdoj.gov*
*Shamoor.anis@usdoj.gov*


Dated: March 5, 2021          *Attorneys for Plaintiff United States*

## CERTIFICATE OF SERVICE

I certify that a true copy of "PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS" was sent via electronic mail, this March 5, 2021, to all counsel of record including:

David Bassett
Wilmer Cutler Pickering Hale and Dorr, LLP
250 Greenwich St. 45th floor
New York, NY 10007
david.bassett@wilmerhale.com
Telephone: (212) 230-8858

Attorney for Plaintiff

*/s/ Walter W. Brown*
Walter W. Brown
Department of Justice
walter.brown2@usdoj.gov

Exhibit C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>        *Plaintiff–Counterclaim Defendant*,<br><br>        v.<br><br>GILEAD SCIENCES, INC.<br>        *Defendant–Counterclaim Plaintiff,*<br><br>AND GILEAD SCIENCES IRELAND UC,<br>        *Defendant*. | Civil No. 1:19-cv-02103-MN |

## PLAINTIFF'S THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff United States of America (Government or United States) submits this Third Set of Requests for Production of Documents and Things (Nos. 251-265) to Gilead Sciences, Inc. and Gilead Sciences Ireland UC (collectively, Gilead) to produce the following documents and things within the possession, custody or control of Gilead or its counsel within thirty (30) days of service, in accordance with the Definitions and Instructions below.  Documents should be produced to:  Walter W. Brown, Commercial Litigation Branch, U.S. Department of Justice, 1100 L Street, N.W., Room 8504, Washington, D.C. 20005, walter.brown2@usdoj.gov.

## DEFINITIONS

1.      Notwithstanding any definition set forth below, each word, term, or phrase used in these requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.

1

2.      "Defendant(s)," "Gilead," "you," "your," and "yours" refers, collectively or singly, to Gilead Sciences, Inc. (GSI), Gilead Sciences Ireland UC (GSIUC), and any and all predecessors, successors, divisions, subsidiaries, subcontractors, franchisees, assigns, or joint ventures thereof, together with any and all parent or affiliated companies, corporations, or other legal entities, whether foreign or domestic, and all past or present officers, directors, employees, agents, attorneys, lobbyists, representatives, and all other persons acting or purporting to act or that have acted or purported to act on behalf of any of the foregoing.

3.      "Plaintiff," "Government," refer, collectively or singly, to the government of the United States of America including the Department of Health and Human Services (HHS) and all of its components, divisions and offices, such as the Centers for Disease Control and Prevention (CDC), the U.S. Food and Drug Administration (FDA), the National Institutes of Health, and the Public Health Service (PHS).

4.      "CDC" refers to the Centers for Disease Control and Prevention.

5.      "CTA" refers to clinical trial agreement.

6.      "FDA" refers to the United States Food and Drug Administration.

7.      "MTA" refers to material transfer agreement.

8.      "NDA" refers to new drug application, inclusive of any supplements.

9.      "DMF" refers to Drug Master Files.

10.      "API" refers to Active Pharmaceutical Ingredient.

11.      "Answer and Counterclaims" refers to all responsive pleadings filed by Gilead in this litigation, inclusive of D.I. 7, 13, and 21.

12.     "Healthcare Provider" refers to any person or organization providing health care services, including but not limited to hospitals, clinics, pharmacies, doctors, nurses, therapists, pharmacists, clinicians, technologists and technicians, and administrative staff.

13.     "Distributor" refers to any person or entity distributing or facilitating the distribution of drugs from a manufacturer to a pharmacy or Healthcare Provider.

14.     "PEP" refers to HIV post-exposure prophylaxis, including as defined in Paragraph 64 of Plaintiff's Complaint in this action (D.I. 1).

15.     "PrEP" refers to HIV pre-exposure prophylaxis, including as defined in Paragraph 77 of Plaintiff's Complaint in this action (D.I. 1).

16.     "TAF" refers to tenofovir alafenamide, including reference to all forms of TAF, inclusive of the free base, salts, and co-crystals and includes, but is not limited to the fumarate and hemi-fumarate forms.

17.     "TDF" refers to tenofovir disoproxil fumarate, inclusive of the free base, salts, and co-crystals.

18.     "FTC" refers to emtricitabine.

19.     "USPTO" refers to the United States Patent and Trademark Office.

20.     "Patent(s)-in-Suit" refers to U.S. Patent Nos. 9,044,509; 9,579,333; 9,937,191; and 10,335,423, either individually or collectively.

21.     "Named Inventor(s)" refers to the named inventors on the Patents-in-Suit, namely Walid M. Heneine, Thomas M. Folks, Robert Janssen, Ronald Otten, and Jose Gerardo Garcia-Lerma, either individually or collectively.

22.     "Prior Art" means, for the purposes of these requests, any document or information that you intend to rely upon to allege invalidity of the Patents-in-Suit.

3

23.     "Truvada®" refers to the product that is the subject of New Drug Application No. 021752.

24.     "Descovy®" refers to the product that is the subject of New Drug Application No. 208215.

25.     "Truvada for PrEP®" refers to the use of Truvada® for PrEP.

26.     "Descovy for PrEP®" refers to the use of Descovy® for PrEP.

27.     "Viread®" refers to the product that is the subject of New Drug Application No. 21-356.

28.     "Prodrug" refers to a compound with little or no pharmacological activity that is converted to the pharmacologically active drug *in vivo*.

29.     "Person" means any natural person or any business, legal, or governmental entity or association.

30.     "Document" refers to, without limitation, any written or graphic matter or any medium of any type or description upon which intelligence or information is recorded or reflected or from which intelligence or information can be recorded, which is or has been in your possession, control, or custody or of which you have knowledge.  "Document" or "documents" has the broadest possible meaning, and includes all materials and information that are discoverable pursuant to Rule 34 of the Federal Rules of Civil Procedure.  Without limitation on the foregoing, "document" includes any kind of written, recorded, printed, or graphic matter, whether produced, reproduced, or stored on paper, cards, film, audio or video tapes, electronic facsimile, computer storage device, or any other media.  The foregoing specifically includes information stored in a computer database and capable of being generated in documentary form, such as electronic mail.

31.     "Communication" means, without limitation, any transmission, conveyance or exchange of a word, statement, fact, thing, idea, document, instruction, information, demand or question by any medium, whether by written, oral or other means, including but not limited to, electronic communications and electronic mail.

32.     "Concerning," "Reflect," "reflecting," "relate to," "refer to," "relating to," and "referring to" mean relating to, referring to, concerning, mentioning, regarding reflecting, pertaining to, evidencing, involving, demonstrating, describing, discussing, stating, commenting on, comprising, embodying, responding to, supporting, contradicting, containing or constituting (in whole or in part), as the context makes appropriate.

33.     "Including" means including but not limited to.

34.     "Produce" means to provide legible, complete, and exact copies or responsive documents to the undersigned counsel, or to make such documents available to the undersigned counsel for inspection and reproduction.

35.     "Thing" means any physical specimen or other tangible item other than a document, in your possession, custody, or control.

36.     "CFC" means the U.S. Court of Federal Claims.

37.     "CFC litigation" means the litigation brought by Gilead against the United States captioned *Gilead Sciences, Inc., v. United States*, Fed. Cl. 1:20-cv-499.

38.     The terms "all," "each," and "any" shall be construed as all and any.

39.     The use of the singular form of any word shall include the plural form and *vice versa.*

40.     The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

41.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

42.     Words in the masculine, feminine, or neuter form shall include each of the other genders.

43.     The use of any definition for the purposes of these requests shall not be deemed to constitute an agreement or acknowledgement on the part of the Government that such definition is accurate, meaningful, or appropriate for any other purpose in this litigation.

## INSTRUCTIONS

1.     Each request should be construed independently and not with reference to any other request for the purposes of limitation.

2.     If you perceive any ambiguity in construing any request or any applicable definition or instruction, you should set forth the matter deemed ambiguous.

3.     If you object to any portion of the request, you should identify the portion to which you object, state the basis for the objection, and respond to the remainder.

4.     If you object to any request on the basis of a contention that it is overbroad, you should provide a response that narrows the request in a way that eliminates the purported over-breadth, and state the extent to which you have narrowed that request for the purpose of your response.

5.     All Requests are to be understood as requesting information in the possession, custody, or control of Gilead.

6.     In producing documents, produce the originals if the originals differ in any respect from copies.  Documents that are in paper form or that constitute other physical objects from which recorded information may be visually read, as well as audio or video tapes and similar recordings, should be produced in their original form or in copies that are exact duplicates of the originals.

6

Computer files and similar electronic records should be produced in a readable form mutually agreed upon by the parties.

7.      Gilead must produce documents in the same file or other organizational environment in which they are maintained in the ordinary course of business.  For example, a document that is part of a file, docket or other grouping should be physically produced together with all other documents from said file, docket or grouping, in the same order or manner of arrangement as the original, preceded by any file folder or other similar organizational item, whether paper or electronic, that contains the document produced.  Additionally, to the extent produced in hardcopy, each document should be produced stapled, clipped or otherwise bound or connected in the same manner as the original.

8.       Documents are to be produced in their entirety without redaction, excepting redactions for privilege.

9.      To the extent any document exists in more than one language, the document shall be produced in English, if available.  If no English version of a document is available, the producing party does not have an obligation to produce an English translation of a document.

10.     These requests are deemed continuing, and supplemental responses and production should be provided as additional documents become available, in accordance with Federal Rule of Civil Procedure 26(e) and the scheduling order in this proceeding (D.I. 27).

### REQUESTS FOR PRODUCTION

**REQUEST NO. 251:** All documents produced or made available to you by any non-party or third-party in this action, including but not limited to, documents provided pursuant to a subpoena served by Gilead.

**REQUEST NO. 252:** All communications between Gilead (or its representatives) and Christopher Morten or the PrEP4All organization.

**REQUEST NO. 253:** All documents relating to communications between Gilead (or its representatives) and Dr. Robert Grant regarding the Patents-in-Suit or the subject matter of this litigation.

**REQUEST NO. 254:** All documents relating to communications between Gilead (or its representatives) and Dr. Koen Van Rompey regarding the Patents-in-Suit or the subject matter of this litigation.

**REQUEST NO. 255:** All documents relating to communications between Gilead (or its representatives) and Dr. Michael Youle regarding the Patents-in-Suit or the subject matter of this litigation.

**REQUEST NO. 256:** All documents relating to contractual negotiations and/or executed agreements for compensation with third parties for which any part of the negotiations or agreement contemplated services related to the Patents-in-Suit or the subject matter of this litigation or the related litigation in the Court of Federal Claims.

**REQUEST NO. 257:** All documents and communications regarding compensation to third parties in which any part of the compensation was for services rendered that related in any way to the Patents-in-Suit, including but not limited to, compensation related to preparation of the IPR petitions and/or expert declarations filed in IPR2019-01453, -01454, -01455, and -1456.

**REQUEST NO. 258:** All communications within or between Defendants and any third party regarding Prior Art to the Patents-in-Suit, and all documents relating to any Prior Art search, investigation, and/or analysis of the Patents-in-Suit, and the Prior Art itself.

**REQUEST NO. 259:** All documents relating to communications between Gilead and its representatives and any of the authors of "Anticipating the Efficacy of HIV Pre-Exposure

8

Prophylaxis (PrEP) and the Needs of At-Risk Californians," Center for HIV Identification, Prevention and Treatment Services (November 2004), including Greg Szekeres, Thomas J. Coates, PhD, Simon Frost, DPhil, Arleen Leibowitz, PhD, and Steven Shoptaw, PhD, regarding the Patents-in-Suit.

**REQUEST NO. 260:**  All documents supporting Defendants' position that Defendants have not willfully infringed any asserted claim of the Patents-in-Suit, including but not limited to all documents supporting the factual bases for Defendants' Tenth Affirmative Defense of No Willfulness.

**REQUEST NO. 261:**  Documents supporting and underlying all of Gilead CEO Daniel O'Day's statements before the House Oversight Committee in May 2019 that the pricing of Truvada® was based on "four things," including "[t]he third and potentially most important . . . . [w]hat are the access limitations that might be created by setting that price[?]."  HIV Prevention Drug: Billions in Corporate Profits After Millions in Taxpayer Investments: Hearing Before the H. Comm. on Oversight and Reform, 116th Cong. 31 (2019) [hereinafter H. Comm. Hearing] (testimony of Mr. Daniel O'Day), https://www.govinfo.gov/content/pkg/CHRG-116hhrg36660/pdf/CHRG-116hhrg36660.pdf [https://perma.cc/M5KY-YPFP].

**REQUEST NO. 262:** Documents supporting and underlying Gilead CEO Daniel O'Day's statements before the House Oversight Committee in May 2019 that "the there was no additional increase to the price [of Truvada®] as a result of the additional [PrEP] indication."  H. Comm. Hearing at 31 (statement of Mr. Daniel O'Day).

**REQUEST NO. 263:**  All agendas, meeting presentation materials, meeting minutes and similar documents relating to meetings of the Gilead Board of Directors or Gilead's Executive

Committee (EC) that discussed pricing of Truvada for PrEP®, Descovy for PrEP®, or the Patents-in-Suit from 2007 to present.

**REQUEST NO. 264:** All documents relating to the research and other efforts leading to the filing of International Patent Application Publication WO2004/064845, which lists Dr. Terrance Dahl as the first named inventor.

**REQUEST NO. 265:** All documents supporting Defendants' contention in its Fourth Affirmative Defense (unclean hands) that Gilead would have "chang[ed] its application for FDA approval to market Truvada® for PrEP" if Gilead had been informed of the invention described in the '811 Provisional, the '547 Application, and the Patents-in-Suit, DI 78 at 78 (¶ 42).

Respectfully submitted,

SARAH HARRINGTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

*Of Counsel:*                          /s/ Walter W. Brown
PHILIP CHARLES STERNHELL      WALTER W. BROWN
Assistant Director                   Senior Litigation Counsel
PATRICK C. HOLVEY             Commercial Litigation Branch
Trial Attorney                       Civil Division
Department of Justice                U.S. Department of Justice
                                     Washington, D.C.  20530
                                     Tel:    (202) 307-0341
                                     Fax:    (202) 307-0345
                                     *walter.brown2@usdoj.gov*

                                     DAVID C. WEISS
                                     United States Attorney

                                     /s/ Laura D. Hatcher
                                     LAURA D. HATCHER (DE Bar No. 5098)
                                     Assistant United States Attorney
                                     SHAMOOR ANIS
                                     Assistant United States Attorney
                                     1313 N. Market Street
                                     P.O. Box 2046
                                     Wilmington, Delaware 19899-2046
                                     Tel:    (302) 573-6277
                                     Fax:    (302) 573-6220
                                     *Laura.hatcher@usdoj.gov*
                                     *Shamoor.anis@usdoj.gov*

Dated: October 4, 2021               *Attorneys for Plaintiff United States*

11

## CERTIFICATE OF SERVICE

I certify that a true copy of "PLAINTIFF'S THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS" was sent via electronic mail, this October 4, 2021 to all counsel of record including:

> David Bassett
> Wilmer Cutler Pickering Hale and Dorr, LLP
> 250 Greenwich St. 45th floor
> New York, NY 10007
> david.bassett@wilmerhale.com
> Telephone: (212) 230-8858
>
> Attorney for Defendants

> */s/ Walter W. Brown*
> Walter W. Brown
> Department of Justice
> walter.brown2@usdoj.gov

# Exhibit D

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>　　*Plaintiff–Counterclaim Defendant*,<br><br>v.<br><br>GILEAD SCIENCES, INC.<br>　　*Defendant–Counterclaim Plaintiff*,<br><br>AND GILEAD SCIENCES IRELAND UC,<br>　　*Defendant*. | Civil No. 1:19-02103-MN<br><br>**CONTAINS RESTRICTED INFORMATION PURSUANT TO STIPULATED PROTECTIVE ORDER [D.I. 48]** |

**PLAINTIFF'S FIFTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES (NOS. 1, 2, 3, 4, 14, 17)**

The Government's Objections and Responses to Defendant's First Set of Interrogatories contains RESTRICTED INFORMTION as defined in the Stipulated Protective Order [D.I. 48].

　　　　Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff and Counterclaim-Defendant United States (the Government) hereby provides its Fifth Supplemental Response to Defendant and Counterclaim-Plaintiff Gilead Sciences, Inc.'s and Defendant Gilead Sciences Ireland UC's (collectively, Gilead or Defendants) First Set of Interrogatories (Nos. 3, 4, 8, 9, and 11), served on the Government on August 13, 2020.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

　　　　The following Objections to Definitions and Instructions apply to all instructions, definitions, and interrogatories, whether or not an objection is referred to specifically in the answer to any particular interrogatory. In addition to these objections, the Government has also stated

1

specific objections where appropriate.   By setting forth such specific objections, the Government does not intend to limit or restrict these objections:

1.      The Government incorporates by reference herein its objections to all of its Initial and Supplemental Interrogatory Objections and Responses.

2.      The Government objects to each and every Definition, Instruction, and Interrogatory to the extent that they exceed the permissible scope of discovery under the Federal Rules of Civil Procedure, the Local Rules of the District Court for the District of Delaware, and the Scheduling Order entered in this case, and/or seek to impose upon the Government duties and responsibilities beyond those required by those Rules to which the Government has not agreed or the Court has not ordered.

3.      The Government objects to Gilead's Interrogatories to the extent that they seek information protected by the attorney-client privilege, the attorney work-product doctrine, the joint-defense or common-interest privilege, and/or any other applicable claim of privilege or immunity.   The Government has stated its privilege objections expressly to each interrogatory which would, in its view, reasonably be interpreted to encompass privileged documents or information.   To the extent that any other interrogatories encompass privileged documents or information, however, the Government hereby incorporates its objection.   Nothing contained in these responses is intended to be a waiver of any applicable privilege or doctrine, and to the extent that any interrogatory may be construed as calling for information protected by such privileges or doctrines, the Government hereby asserts a continuing objection to each and every such interrogatory.   Should any disclosure of privileged or other protected information occur, it was inadvertent and shall not constitute a waiver of any privilege or of the Government's right to object in this litigation to the use of such information.   To the extent that the Government discloses any

privileged or other protected information and it is later held that the Government waived the applicable privilege, such waiver shall apply only to the information inadvertently disclosed.

4.      With respect to responses which contain information proprietary to the Government, or another third party, or information subject to the "FOR OFFICIAL USE ONLY (FOUO)," or Privacy Act restrictions, such information and/or identified documents will be provided pursuant to the Stipulated Protective Order entered by the Court [D.I. 48].

5.      The Government objects to the Definitions and Instructions set forth in Gilead's Interrogatories to the extent they make the individual interrogatories vague, ambiguous and/or unintelligible.

6.      The Government objects to Gilead's Interrogatories as premature to the extent they seek information concerning topics for which the timing of disclosure is provided for in the Scheduling Order.

7.      The Government objects to Gilead's Interrogatories as premature to the extent they seek information that is more properly addressed by other forms of discovery, for example, through expert reports or deposition.   The Government's responses are based upon information that is known to or reasonably believed by the Government at the time of its responses to these interrogatories.   It is anticipated that further discovery, independent investigation, and analysis may supply additional facts, give new meaning to known facts, or entail new factual conclusions. The Government therefore reserves the right to amend and/or supplement these responses if it learns of new, relevant information through discovery or otherwise.

8.      The Government objects to Gilead's Interrogatories to the extent they are overbroad and/or unduly burdensome, particularly to the extent that they do not request specific information

and/or documents, and thus the interrogatory would require an unreasonably detailed and extensive search of all of the Government's documents and files to respond.

9.    The Government objects to Gilead's Interrogatories to the extent they seek information and documents that are not relevant to the subject matter of this litigation or not proportional to the needs of the case as required by Federal Rule of Civil Procedure 26(b).   To the extent that the Government responds to any interrogatory, it does not concede that the information sought by the interrogatory is relevant or proportional to the needs of the case.

10.    The Government objects to Gilead's Interrogatories to the extent they seek information that pertains to claims that the Government is not asserting in this action.

11.    The Government objects to Gilead's Interrogatories to the extent they seek to require the Government to provide information and/or documents and things beyond what is in the Government's possession, custody, or control and can be located after a reasonable search of its own files at its principal offices and facilities and from reasonable inquiry of its present employees, on the grounds that such discovery would be unreasonably cumulative and unduly burdensome.

12.    The Government objects to Gilead's Interrogatories to the extent they seek "all" documents and/or information concerning a broad subject on the grounds that the Government could not possibly represent that its responses reflect or include "all" potentially responsive documents or information located anywhere within the possession, custody, or control of the Government, as that would require the Government to request and search for documents and information from every person in the Government.   The Government objects to performing searches of such breadth on the grounds of undue burden and expense.   In its responses to Gilead's interrogatories, the Government has made, or will make, a reasonable inquiry as required by the Federal Rules of Civil Procedure and the Local Rules of the District of Delaware.

13.     The Government objects to Gilead's Interrogatories to the extent they seek information that is subject to one or more confidentiality agreements with non-parties to this action, which may restrict the Government's ability to disclose such information.

14.     The Government objects to Gilead's Interrogatories to the extent they call for a legal conclusion.

15.     The Government objects to Gilead's Interrogatories to the extent they are duplicative or cumulative of each other, or seek the same information sought through other methods of discovery.

16.     The Government objects to Gilead's Interrogatories to the extent that they assume facts that have not been established and/or are not true or accurate.

17.     The Government objects to Gilead's Interrogatories to the extent they contain multiple sub-parts and cannot be treated as single interrogatories.

18.     The Government objects to Gilead's definition of "Patents-in-Suit Family Tree" as vague, ambiguous, overbroad, unduly burdensome, and/or not proportional to the needs of the case to the extent it includes "any applications or issued patents" not presently asserted in this litigation.

19.     The Government objects to Gilead's definition of "to identify" as overbroad, unduly burdensome, and/or inconsistent with the requirements of the Federal Rules of Civil Procedure.

20.     The Government objects to Gilead's definitions for "describe," "identify," "state," "basis," and "bases" to the extent they seek "each and every fact, document, communication, act, or omission" on the grounds that the Government could not possibly represent that its responses reflect or include "each and every" potentially responsive category or information, as that would require the Government to request and search for information from every person in the

Government.  The Government objects to performing searches of such breadth on the grounds of undue burden and expense.  In its responses to Gilead's interrogatories, the Government has made, or will make, a reasonable inquiry as required by the Federal Rules of Civil Procedure and the Local Rules of the District of Delaware.

21.     The Government objects to Gilead's instructions concerning responses pursuant to Federal Rule of Civil Procedure 22(d) as vague, ambiguous and/or unintelligible with respect to the phrase "other means sufficient to enable Defendants to locate and identify the records as readily as the Government could."

22.     The Government objects to Gilead's Interrogatories to the extent that they cover all time periods as overbroad, unduly burdensome, not proportional to the needs of the case, and/or inconsistent with the Local Rules of the District Court for the District of Delaware.

23.     The Government objects to Gilead's Interrogatories as overbroad, unduly burdensome, not proportional to the needs of the case, and/or inconsistent with the Federal Rules of Civil Procedure and the Local Rules of the District Court for the District of Delaware to the extent they seek information outside of the Government's custody, possession, or control.

24.     The Government objects to Gilead's instructions regarding the information required in connection with any requested information or document that the Government asserts is privileged or otherwise protected from discovery as overbroad, unduly burdensome, and inconsistent with the requirements of the Federal Rules of Civil Procedure and the Local Rules of the District of Delaware.  The Government will negotiate with Gilead the production and scope of a potential privilege log in due course in accordance with the requirements of the Federal Rules of Civil Procedure, the Local Rules of the District of Delaware, and the Stipulated Protective Order [D.I. 48].

25.    The mere fact that the Government has responded to an interrogatory, or has produced documents in response to an interrogatory, is not an admission that the alleged facts or statements in that interrogatory are either true or correct.

26.    Any statement herein that the Government will produce specified documents is not a representation that such documents exist, but only that the Government has made or will make a good faith, reasonable effort to search for such documents and, subject to its objections, will produce or has produced such documents within its possession, custody, or control.

27.    The following responses are based upon information presently available to the Government.   The Government has not yet completed its investigation of the facts relating to this case, has not completed discovery in this action, and has not completed preparation for trial.   The responses are without prejudice to the Government's rights to amend, supplement, and/or alter these answers and to produce nonprivileged, responsive information or documents that may be subsequently discovered.

28.    Words and terms used in the following responses shall be construed in accordance with their normal meanings and connotations, and shall in no way be interpreted as terms of art or statutorily defined terms unless otherwise indicated, and the Government specifically disavows any such meaning or connotation that might be accorded to such terms.

29.    Discovery is in the early stages and the Government therefore reserves the right to amend, supplement, and/or alter these responses as warranted during the course of discovery.

30.    Notwithstanding the Government's responses contained herein, the Government reserves its right to later object to Gilead's use of the information, documents, or things produced in response to Gilead's Interrogatories.   Such objections, which are not waived by the Government's responses, include but are in no way limited, to the following:

i.  objections concerning the competence, authenticity, relevance, materiality, privilege, and admissibility with regard to the information and/or documents identified or produced in response to these interrogatories, which may arise in any subsequent proceeding in, or the trial of, this or any other action;

ii.  objections to the use of the information or documents for any purpose, including, without limitation, their use in any subsequent proceeding in, or the trial of, this or any other action;

iii.  the right to assert or raise, in this action or in any other context, attorney-client privilege, the work product immunity, the protections afforded by Rule 26(b)(3) or Rule 26(b)(4)(B), the right of privacy, or any other applicable privilege or protective doctrine; and

iv.  objections on any ground at any time to other interrogatories, document requests, or other discovery relating to information or documents produced or the subject matter thereof.

Subject to and without waiving the foregoing Objections to Definitions and Instructions, the Government responds to Gilead's Interrogatories as follows:

## RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 1:

Separately, for each asserted claim of the Patents-in-Suit, describe in detail the circumstances of the purported conception, reduction to practice, and diligence in reducing any claimed invention to practice, including, without limitation, when and by whom the alleged invention of the claim was conceived and reduced to practice, the names of all persons with knowledge of the conception and reduction to practice, the names of all persons who participated

8

in the conception and reduction to practice, the contribution made by each such person, and any written memorialization that was made or other Documents and Things (identified by Bates number) that evidence such conception or reduction to practice.

## RESPONSE TO INTERROGATORY NO. 1:

The Government incorporates by reference its Objections to Definitions and Instructions as if set forth in full herein. The Government objects to this interrogatory to the extent it seeks information protected by attorney/client privilege, the work product immunity, or any other applicable claim of privilege or immunity. The Government objects to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses. For example, the interrogatory seeks the names of "all persons with knowledge of the conception and reduction to practice." The Government objects to this interrogatory as premature to the extent it seeks expert testimony prior to the deadlines set forth in the Scheduling Order, the Local Rules, and the Federal Rules. The Government objects to this interrogatory to the extent it requires formulation of a legal conclusion or opinion, particularly as to issues regarding "conception," "diligence," and "reduction to practice." The Government objects to this interrogatory to the extent it calls for production of documents. To the extent that such documents are responsive to a valid document request or that the Government is relying on Federal Rule of Civil Procedure 33(d) in response to this interrogatory, the Government will produce such documents. The Government objects to this interrogatory on the grounds that it contains multiple discrete subparts within the meaning of Federal Rule of Civil Procedure 33(a)(1) and therefore constitutes multiple interrogatories. The Government objects to this interrogatory as vague and ambiguous, particularly with respect to the phrases "circumstances of the purported conception, reduction to practice, and diligence in reducing any claimed invention to practice," "including, without limitation," and "any written

memorialization."   The Government objects to this interrogatory to the extent it calls for subjective relevance determinations and would require the Government to speculate to respond.

Subject to and without waving the Objections to Definitions and Instructions or Specific objections asserted, and to the extent the Government understands this interrogatory, the Government answers the unobjectionable scope of this interrogatory as follows:   In 2004, the inventors of the Patents-in-Suit participated in meetings where they discussed pre-clinical studies to test novel therapies for HIV pre-exposure prophylaxis (PrEP).   The inventors determined that a two-drug regimen would likely offer improvement over the use of tenofovir alone, which had not proven sufficiently protective in other pre-clinical studies.   They further determined that emtricitabine (FTC) was the best candidate for use as the second drug.   The inventors conceived of the inventions of the Patents-in-Suit no later than December 2004 when they began requesting FTC to use as part of a two-drug regimen with tenofovir or a tenofovir prodrug/ester in pre-clinical PrEP trials.

The circumstances surrounding development of the invention are provided in the Complaint [D.I. 1], including ¶¶ 81–143, which is incorporated by reference herein.   Beginning on May 23, 2005, CDC scientists administered subcutaneous tenofovir and FTC to a group of six macaques for seven days prior to viral exposure.   Starting on June 1, 2005, these animals began weekly rectal challenges with simian-human immunodeficiency virus (SHIV) while continuing to receive daily subcutaneous administration of the two-drug regimen.   The animals receiving daily subcutaneous tenofovir and FTC all remained uninfected for fourteen weeks of viral challenges, ending on August 31, 2005.   These animals were then given an additional 28 days of treatments, followed by a washout period 70 days.   All of the treated animals remained uninfected after the washout period.   Of the six untreated animals in the control group, all but one became infected.

The control animals also received weekly rectal viral challenges, but they were stopped as soon as it was determined that the animals had been infected: two animals at two weeks, one at three weeks, one at four weeks and one at ten weeks. This treatment arm of the study was completed on December 7, 2005. After seeing that the subcutaneous FTC and tenofovir two-drug PrEP regimen was effective, the inventors began the next study arm testing the effectiveness of subcutaneous FTC alone. Drug administration in this study arm began on November 4, 2005, and weekly rectal viral challenges began on November 14, 2005. Only two of the six FTC-treated macaques remained uninfected and completed all fourteen weeks of viral challenges ending on February 13, 2005. Like the first study arm, the uninfected animals received an additional 28 days of treatment followed by a washout period. The FTC-treated animals with breakthrough infections stopped viral challenges, continued treatment, and were monitored for viral loads and drug resistance. This study arm was completed on May 22, 2006.

Having demonstrated the effectiveness of the two-drug FTC and tenofovir regimen and having evidence that FTC alone was not sufficient to prevent infection, the inventors began the third treatment arm to confirm that the two-drug regimen could be orally administered. Six macaques were given daily administrations of oral FTC with an oral tenofovir prodrug/ester, tenofovir disoproxil fumarate (TDF), beginning on March 24, 2006. Weekly rectal challenges for both the treated animals and the control group began on April 5, 2006. Four of the six treated animals completed fourteen weeks of viral challenges uninfected, ending on July 5, 2006. These animals continued treatment for an additional 28 days followed by a washout period and remained uninfected. The other two treated animals became infected after exposures at weeks nine and twelve, significantly delayed compared to untreated controls. The infected animals continued treatment and were monitored for viral load and drug resistance. This study arm was completed

on October 11, 2006 and demonstrated that oral administration of a two-drug tenofovir (TDF)/FTC regimen had reduced infection risk 7.8-fold compared to controls.

Having confirmed the effectiveness of oral administration of the two-drug regimen, the inventors then tested a fourth study arm to confirm the efficacy of intermittent administration of the two-drug regimen. This study arm began on September 12, 2006. In this study arm, the subcutaneous FTC and tenofovir regimen already proven effective with daily dosing was administered intermittently—at two hours before and 24 hours after each viral challenge. None of the animals became infected over the fourteen weeks of rectal viral challenges. . This study arm confirmed that the two-drug regimen was also effective when administered intermittently.

The results of these studies were published in J. Gerardo García-Lerma et al., *Prevention of Rectal SHIV Transmission in Macaques by Daily or Intermittent Prophylaxis with Emtricitabine and Tenofovir*, 5 PLOS MEDICINE (2) 291 (2008) and are described further in a supplement to the article, produced at US_00001832–36.

The persons involved include:

| Name | Role |
|---|---|
| Dr. Walid M. Heneine | Dr. Heneine is a named inventor of each of the Patents-in-Suit and was involved in the conception, research and development of the invention(s) described in the Patents-in-Suit. Dr. Heneine works in the Division of HIV/AIDS Prevention and acted as the team lead in the research that led to the claims of the Patents-in-Suit. Dr. Heneine was involved in the decision to test a two-drug regimen for PrEP using emtricitabine in addition to a tenofovir or a tenofovir prodrug/ester. Dr. Heneine was further involved in overseeing the development of the study protocols, the testing and the analysis of the data. |
| Dr. Thomas M. Folks | Dr. Folks is a named inventor of each of the Patents-in-Suit and was involved in the conception, research and development of the invention(s) described in the Patents-in-Suit. Dr. Folks was the Branch Chief for the HIV Prevention Laboratory |

| | |
|---|---|
| | and was involved in the decision to test a two-drug regimen for PrEP using emtricitabine in addition to tenofovir or a tenofovir prodrug/ester, as well as overseeing the research that led to the development of the inventions of the Patents-in-Suit. |
| Dr. Robert Janssen | Dr. Janssen is a named inventor of each of the Patents-in-Suit and was involved in the conception, research and development of the invention(s) described in the Patents-in-Suit.  Dr. Janssen was the Director of the Division of HIV/AIDS Prevention from 2000 to 2008 and was involved in the decision to test a two-drug regimen for PrEP using emtricitabine in addition to tenofovir or a tenofovir prodrug/ester, as well as overseeing the research that led to the development of the inventions of the Patents-in-Suit. |
| Dr. Ronald A. Otten | Dr. Otten is a named inventor of each of the Patents-in-Suit and was involved in the conception, research and development of the invention(s) described in the Patents-in-Suit.  Dr. Otten was involved in the decision to test a two-drug regimen for PrEP using emtricitabine in addition to tenofovir or a tenofovir prodrug/ester.  Dr. Otten was also involved in the development of the animal models and study protocols, including developing and overseeing the methods for viral challenges and dosing of the animals. |
| Dr. Jose Gerardo Garcia-Lerma | Dr. Garcia Lerma is a named inventor of each of the Patents-in-Suit and was involved in the conception, research and development of the invention(s) described in the Patents-in-Suit.  Dr. Garcia-Lerma was a senior scientist who supervised and participated in the research that led to the Patents-in-Suit.  Dr. Garcia-Lerma was involved in the decision to test a two-drug regimen for PrEP using emtricitabine in addition to a tenofovir or a tenofovir prodrug/ester.  Dr. Garcia-Lerma was further involved in overseeing the development of the study protocols, the testing and the analysis of the data. |
| Dr. Shoukat Qari | Dr. Qari was a laboratory microbiologist who was primarily in charge of performing the PCR testing to generate data for the research described in the Patents-in-Suit. |
| Eddie Jackson | Mr. Jackson oversaw all of the animal work, including the dosing of animals with drugs and the |

| | |
|---|---|
| | collecting samples.  Mr. Jackson supervised the animal technicians to generate data for the research described in the Patents-in-Suit. |
| Mian-er Cong | Ms. Cong is a laboratory biologist.  Ms. Cong took over Dr. Qari's role when he left the lab in 2007 and was primarily in charge of performing the PCR testing to generate data for the research described in the Patents-in-Suit. |
| Silvinia Masciotra | Ms. Masciotra is a laboratory microbiologist who participated in viral load testing, antibody testing and viral sequencing to test for drug resistance to generate data for the research described in the Patents-in-Suit. |
| Wei Luo | Ms. Luo was a laboratory biologist who participated in PCR testing to detect virus in blood samples to generate data for the research described in the Patents-in-Suit. |
| Caryn Kim | Caryn Kim was a laboratory biologist who participated in serology testing of blood samples to generate data for the research described in the Patents-in-Suit. |
| Debra Adams | Debra Adams was a laboratory biologist who was in charge of viral stock preparation and specimen processing to generate data for the research described in the Patents-in-Suit. |
| Dr. Michael Monsour | Dr. Monsour is a statistician who performed the statistical analysis for the studies supporting the Patents-in-Suit to generate data for the research described in the Patents-in-Suit. |
| Jonathan Lipscomb | Johnathan Lipscomb performed the sensitive drug resistance testing for the studies supporting the Patents-in-Suit to generate data for the research described in the Patents-in-Suit. |
| Dr. Jeffrey A. Johnson | Dr. Johnson performed the sensitive drug resistance testing for the studies supporting the Patents-in-Suit to generate data for the research described in the Patents-in-Suit. |

Discovery is ongoing and the Government reserves the right to amend, modify, supplement, or change its response to this interrogatory.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**

Subject to and without waving the Objections to Definitions and Instructions or Specific objections asserted, and to the extent the Government understands this interrogatory, the Government answers the unobjectionable scope of this interrogatory as follows:

Dr. Thomas Folks along with the other inventors conceived of the idea of a two-drug regimen including an oral tenofovir prodrug—as opposed to using TDF alone—at least as early as November 9, 2004, after reviewing the data from the Subbarao study. US_00579991. Over a series of informal and formal meetings taking place between November 9 and November 30 the inventors, including Drs. Robert Janssen, Walid Heneine, Ron Otten and Jose Gerardo Garcia-Lerma, discussed the use of different drugs, including FTC to use in the study. *See, e.g.*, US_00579993-94. On December 1, 2004, slides were created outlining the structure for the multi drug study design conceived by the group. US_00259680-71. These slides were emailed to Jim Rooney by Dr. Lynn Paxton on December 3, 2004. GILDDE_00519314-9361. Dr. Heneine contacted Gilead for the purpose of obtaining study compound FTC through an MTA with Gilead on December 21, 2004.

In addition, pursuant to Federal Rule of Civil Procedure 33(d), the information sought by this interrogatory may be determined by examining documents produced by the Government in this case, including US_00453020-US_00647595, and the burden of deriving the information sought by this interrogatory from those documents would be substantially the same for Gilead as for the Government Discovery is ongoing and the Government reserves the right to amend, modify, supplement, or change its response to this interrogatory.

**INTERROGATORY NO. 2:**

Separately, for each asserted claim of the Patents-in-Suit, identify any Government employees or other individuals who were involved in the development, design, testing, or evaluation of the alleged invention of the claim.  Please note which three individuals identified for each claim are the most knowledgeable about those matters.

**RESPONSE TO INTERROGATORY NO. 2:**

The Government incorporates by reference its Objections to Definitions and Instructions as if set forth in full herein.  The Government objects to this interrogatory to the extent it seeks information protected by attorney/client privilege, the work product immunity, or any other applicable claim of privilege or immunity.  The Government objects to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses.  For example, the interrogatory seeks the identification of "any Government employees or other individuals" and the "three individuals for each claim" that are the most knowledgeable.  The Government objects to this interrogatory on the grounds that it contains multiple discrete subparts within the meaning of Federal Rule of Civil Procedure 33(a)(1) and therefore constitutes multiple interrogatories.  The Government objects to this interrogatory as vague and ambiguous, particularly with respect to the phrases "involved in the development, design, testing, or evaluation," "most knowledgeable," and "alleged invention of the claim."  The Government objects to this interrogatory to the extent it calls for subjective relevance determinations and would require the Government to speculate to respond.

Subject to and without waving the Objections to Definitions and Instructions or Specific objections asserted, and to the extent the Government understands this interrogatory, the Government answers the unobjectionable scope of this interrogatory as follows:  In addition to the named inventors of the Patent-in-Suit, who are identified in the Government's Initial

Disclosures Under Rule 26(a)(1) of the Federal Rules of Civil Procedure, the Government's Initial Disclosures also identify other individuals and their roles (pre-clinical research, statistical analysis, human clinical trials).   The three individuals likely to be most knowledgeable for each asserted claim include Dr. Walid Heneine, Dr. Jose Gerado Garcia-Lerma, and Dr. Ronald A. Otten.   The Government further incorporates by reference its response to Interrogatory No. 1 above.

Discovery is ongoing and the Government reserves the right to amend, modify, supplement, or change its response to this interrogatory.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2

Subject to and without waving the Objections to Definitions and Instructions or Specific objections asserted, and to the extent the Government understands this interrogatory, the Government answers the unobjectionable scope of this interrogatory as follows:

The only clinical or pre-clinical trials conducted in the development, design, testing, or evaluation, conception or reduction to practice of the invention described in the claims for each asserted claim of the Patents-in-Suit were the trials conducted by the following individuals:

| Claims | Individuals most knowledgable |
|---|---|
| The '509 patent:   Claims 1-11 and 13; | Dr. Walid M. Heneine; Dr. Thomas M. Folks; Dr. Robert Janssen; Dr. Ronald A. Otten; Dr. Jose Gerardo Garcia-Lerma; Dr. Shoukat Qari; Eddie Jackson; Mian-er Cong; Silvinia Masciotra; Wei Luo; Caryn Kim; Debra Adams; Dr. Michael Monsour; Jonathan Lipscomb; Dr. Jeffrey A. Johnson |
| The '333 Patent:   Claims 1-11 and 13; | Dr. Walid M. Heneine; Dr. Thomas M. Folks; Dr. Robert Janssen; Dr. Ronald A. Otten; Dr. Jose Gerardo Garcia-Lerma; Dr. Shoukat Qari; Eddie Jackson; Mian-er Cong; Silvinia Masciotra; Wei Luo; Caryn Kim; Debra Adams; Dr. Michael Monsour; Jonathan Lipscomb; Dr. Jeffrey A. Johnson |
| The '423 Patent:   Claims 1-19. | Dr. Walid M. Heneine; Dr. Thomas M. Folks; Dr. Robert Janssen; Dr. Ronald A. Otten; Dr. Jose Gerardo Garcia-Lerma; Dr. Shoukat Qari; Eddie |

| | Jackson; Mian-er Cong; Silvinia Masciotra; Wei Luo; Caryn Kim; Debra Adams; Dr. Michael Monsour; Jonathan Lipscomb; Dr. Jeffrey A. Johnson |
|---|---|
| The '191 Patent:  Claims 1-19; and | Dr. Walid M. Heneine; Dr. Thomas M. Folks; Dr. Robert Janssen; Dr. Ronald A. Otten; Dr. Jose Gerardo Garcia-Lerma; Dr. Shoukat Qari; Eddie Jackson; Mian-er Cong; Silvinia Masciotra; Wei Luo; Caryn Kim; Debra Adams; Dr. Michael Monsour; Jonathan Lipscomb; Dr. Jeffrey A. Johnson |

In addition, pursuant to Federal Rule of Civil Procedure 33(d), the information sought by this interrogatory may be determined by examining documents produced by the Government in this case, including US_00453020-US_00647595, and the burden of deriving the information sought by this interrogatory from those documents would be substantially the same for Gilead as for the Government.

Discovery is ongoing and the Government reserves the right to amend, modify, supplement, or change its response to this interrogatory.

**INTERROGATORY NO. 3:**

Separately, for each asserted claim of the Patents-in-Suit, identify and describe in detail the basis or bases for any contention that Defendants have directly infringed the Patents-in-Suit, including but not limited to an identification of all Documents and Things (by Bates number), statements, testimony, and witnesses that the Government contends supports such allegations.

**RESPONSE TO INTERROGATORY NO. 3:**

The Government incorporates by reference its Objections to Definitions and Instructions as if set forth in full herein. The Government objects to this interrogatory to the extent it seeks

information protected by attorney/client privilege, the work product immunity, or any other applicable claim of privilege or immunity. The Government objects to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses. *See In re Convergent Techs. Sec. Litig.*, 108 F.R.D. 328, 337 (N.D. Cal. 1985) ("the early knee jerk filing of sets of contention interrogatories that systematically track all the allegations in an opposing party's pleadings is a serious form of discovery abuse"). For example, the interrogatory seeks "the basis or bases for any contention," is not limited to the Government's claims or contentions, and seeks the identification of "all Documents and Things (by Bates number), statements, testimony, and witnesses." There is no requirement that requires the Government to marshal all available proof in response to an interrogatory. Courts do not require responding parties to "write . . . a portrait of their trial" or "write a book" in response to a contention interrogatory. *See, e.g., Roberts v. Heim*, 130 F.R.D. 424, 427 (N.D. Cal. 1989). The Government objects to this interrogatory as premature to the extent it seeks the Government's initial contentions relating each known accused product to the asserted claims each such product allegedly infringes prior to the time set forth in the Scheduling Order. The Government objects to this interrogatory as premature to the extent it seeks supporting documents and fact and/or expert testimony at the onset of discovery and prior to the deadlines set forth in the Scheduling Order, the Local Rules, and the Federal Rules. The Government objects to this interrogatory to the extent it requires formulation of a legal conclusion or opinion as to issues of <u>direct</u> patent infringement, something not alleged in the Government's Complaint. The Government objects to this interrogatory to the extent it calls for production of documents. To the extent such documents are responsive to a valid document request, the Government will produce such documents. The Government objects to this interrogatory on the grounds that it

19

contains multiple discrete subparts within the meaning of Federal Rule of Civil Procedure 33(a)(1) and therefore constitutes multiple interrogatories as reflected by Gilead's requested response be "[s]eparately, for each asserted claim of the Patents-in-Suit." The Government objects to this interrogatory to the extent it calls for subjective relevance determinations and would require the Government to speculate to respond.

Subject to and without waving the Objections to Definitions and Instructions or Specific objections asserted, and to the extent the Government understands this interrogatory, the Government answers the unobjectionable scope of this interrogatory as follows: Information responsive to this interrogatory is provided at, for example, pages 2–17 of the Government's Disclosures Under Paragraph 7(a) of the Scheduling Order [D.I. 27] and the Complaint [D.I. 1], including ¶¶253–313, both of which are incorporated by reference herein. Additional details of Gilead's infringement will be provided pursuant to the Scheduling Order [D.I. 27] and are incorporated by reference herein.

Discovery is ongoing and the Government reserves the right to amend, modify, supplement, or change its response to this interrogatory.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

Subject to and without waiving the General and Specific Objections set forth in the Government's initial response to Interrogatory No. 3, which are incorporated herein by reference, the Government supplements its response as follows:

The Government refers Defendants to information responsive to this interrogatory that is provided at, for example, pages 2–7 and Exhibits A-F of the Government's Initial Claim Charts on Infringement served on October 29, 2020, which are incorporated herein by reference. The

Government further refers Defendants to information responsive to this interrogatory that is provided at, for example, pages 2–17 of the Government's Disclosures Under Paragraph 7(a) of the Scheduling Order [D.I. 27] and the Complaint [D.I. 1], including ¶¶253–313, both of which are incorporated by reference herein. Gilead manufactures, markets, and sells Truvada® and Descovy® in the United States and abroad. Each of these products includes a combination of (1) emtricitabine (FTC) and (2) a tenofovir prodrug/ester. The tenofovir prodrug/ester in Truvada® is tenofovir disoproxil fumarate (TDF). The tenofovir prodrug/ester in Descovy® is tenofovir alafenamide (TAF) hemi-fumarate. The administration of these products for pre-exposure prophylaxis ("PrEP") according to the FDA-approved prescribing information infringes the Patents-in-Suit, literally or under the doctrine of equivalents.

Gilead's intent to induce direct infringement of the asserted claims is reflected in, *inter alia*, the package inserts and training guides for Truvada® and Descovy®. The prescribing information contained in Gilead's package inserts and training guides for Truvada® and Descovy® instruct doctors and patients on how Gilead intends for these products to be used. Gilead's package inserts and training guides instruct physicians to administer and patients to use Truvada for PrEP® and Descovy for PrEP® in a manner that literally and directly infringes all elements of the asserted claims. The package inserts and training guides therefore cause physicians to prescribe and patients to take Truvada for PrEP® and Descovy for PrEP® in a manner that infringes the asserted claims. When physicians or patients use Gilead's Truvada® and Descovy® products for PrEP in accordance with the prescribing information in Gilead's package inserts and/or training guides, they directly infringe the asserted claims. For example, when physicians or patients use Gilead's Truvada® and Descovy® products for PrEP, they administer pharmaceutically effective amounts of the combination of FTC with TDF or TAF according to the methods recited by the

asserted claims.  Physicians also implement the instructions in Gilead's Truvada® and Descovy® package inserts and training guides by directing, controlling, and causing the administration of the combination of FTC with TDF or TAF for PrEP according to the methods of the asserted claims by their respective patients.  In accordance with that direction, control, and causation, patients, as directed by physicians, will individually self-administer a combination of FTC with TDF or TAF for PrEP and receive the benefit of administration in the claimed methods.  Patients will also implement the instructions in Gilead's Truvada® and Descovy® package inserts and will administer pharmaceutically effective amounts of the combination of FTC and TDF or TAF according to the methods of the asserted claims as following both Gilead's and their physicians' instructions.

Gilead expects physicians to prescribe and patients to use Gilead's Truvada® and Descovy® products consistent with the Truvada for PrEP® and Descovy for PrEP® uses described in the package inserts and training guides for these products.  Gilead knows or should know that the use of Truvada for PrEP® and Descovy for PrEP® in accordance with and as directed by Gilead's package inserts and training guides that accompany Gilead's Truvada® and Descovy® products will cause physicians to prescribe and patients to take Gilead's products in a manner that infringes the asserted claims.  Gilead therefore has a specific intent to induce acts constituting infringement of the asserted claims, as evidenced by the active steps Gilead takes to direct, encourage, recommend, promote, and induce infringement of those claims.

Because Gilead sells its Truvada® and Descovy® products with instructions to administer these products as Truvada for PrEP® and Descovy for PrEP®, respectively, Gilead induces the direct infringement of the asserted claims by prescribers, distributors, and/or consumers.  For example, Gilead induces a prescriber (such as a physician), a distributor (such as a pharmacy), or a consumer (such as a patient), to perform each step of the claimed method such that the prescriber,

distributor, or consumer directly infringes the asserted claims literally. Alternatively, as a separate and non-limiting example, Gilead induces a combination of two or more prescribers, distributors, and/or consumers to jointly infringe the asserted claims.

Gilead's labeling, including the prescribing information in its package insert and training guide, knowingly encourages and instructs physicians and other caregivers/healthcare providers to directly infringe the asserted claims by administering Gilead's Truvada® and Descovy® products to patients for PrEP. Gilead is aware of the patents-in-suit and intends for physicians and other caregivers/healthcare providers to use Gilead's Truvada® and Descovy® products in an infringing manner. Gilead therefore induces direct infringement of the asserted claims.

**Infringement of Truvada for PrEP®**

Gilead induces infringement of at least the following claims of the Patents-in-Suit based upon its sales and activities in promoting Truvada for PrEP®:

- The '509 patent: Claims 1-11 and 13;

- The '333 Patent: Claims 1-11 and 13;

- The '191 Patent: Claims 1-19; and

- The '423 Patent: Claims 1-19.

Acts of direct infringement of the above-mentioned claims are carried out by physicians and/or their patients who are treated with Truvada for PrEP® in the United States. At a minimum, Gilead induces infringement of the above-identified claims pursuant to 35 U.S.C. § 271(b). In addition to selling Truvada for PrEP®, Gilead actively instructs physicians and/or patients to administer Truvada for PrEP®, including through clinical trials, prescribing information, product labels, training guides and agreements forms for healthcare providers, and other product literature.

23

Gilead also advertises and promotes Truvada for PrEP® to the medical community and for use by the general public.

Gilead's inducement of direct infringement of the Patents-in-Suit is also demonstrated by its ownership and use of the trademarks TRUVADA FOR PREP (U.S. Reg. No. 5,358,262) and EMTRICITABINE 200 MG / TENOFOVIR DISOPROXIL FUMARATE 300 MG TABLETS FOR PREP PRE-EXPOSURE PROPHYLAXIS (Registration No. 5,623,246) and in its associated commercial sales of this product for PrEP. According to public records, Defendant Gilead Ireland UC applied for and received a trademark in the United States Patent and Trademark Office (PTO) for exclusive use of the mark, TRUVADA FOR PREP. Gilead's application for the mark was filed on January 6, 2017 with U.S. Ser. No. 87,292,084 and was registered on December 19, 2017 as U.S. Reg. No. 5,358,262. This mark is specifically registered for the use of Truvada® "for the treatment <u>and prevention</u> of human immunodeficiency virus infection." (emphasis added). Through such actions, Gilead specifically intends that its actions will result in direct infringement of the above-identified claims, and/or subjectively believes that its actions will result in direct infringement. Gilead knew or should have known that use of Truvada for PrEP® according to the prescribing information directly infringes the Patents-in-Suit no later than the issue date of each patent.

**Infringement of Descovy for PrEP®**

Gilead induces direct infringement of at least the following claims of the Patents-in-Suit based upon its sales and activities in promoting Descovy for PrEP®:

- The '509 patent:   Claim 13; and

- The '423 Patent:   Claims 1-19.

Acts of direct infringement of the above-mentioned claims are carried out by physicians in the United States who treat patients with Descovy for PrEP®. At a minimum, Gilead induces infringement of the above-identified claims pursuant to 35 U.S.C. § 271(b). In addition to selling Descovy for PrEP®, Gilead actively instructs physicians and patients to administer Descovy® for PrEP, including through clinical trials, prescribing information, product labels, training guides and agreements forms for healthcare providers, and other product literature. Gilead also advertises and promotes Descovy for PrEP® to the medical community and for use by the general public. Through such actions, Gilead specifically intends that its actions will result in infringement of the above-identified claims, or subjectively believes that its actions will result in infringement. Gilead knew or should have known that use of Descovy for PrEP® according to the prescribing information infringes the '509 and '423 patents no later than the issue date of each patent.

Gilead's inducement of direct infringement of the Patents-in-Suit is also demonstrated by its ownership and use of the trademark DESCOVY FOR PREP (U.S. Ser. No. 88,266,226) and DESCOVY EMTRICITABINE 200 MG / TENOFOVIR ALAFENAMIDE 25MG TABLETS FOR PREP PRE-EXPOSURE PROPHYLAXIS (Serial No 88,615,918) and in its associated commercial sales of this product for PrEP. According to public records, Defendant Gilead Ireland UC applied for and received a U.S. trademark for exclusive use of the mark, DESCOVY FOR PREP. Gilead's application for the mark was filed on January 17, 2019 with U.S. Ser. No. 88,266,226 and was registered on November 19, 2019 as U.S. Reg. No. 5912591. This mark is specifically registered for the use of Descovy® "for the treatment and prevention of human immunodeficiency virus infection." (emphasis added). Through such actions, Gilead specifically intends that its actions will result in direct infringement of the above-identified claims, and/or subjectively believes that its actions will result in direct infringement. Gilead knew or

should have known that use of Descovy for PrEP® according to the prescribing information directly infringes the Patents-in-Suit no later than the issue date of each patent.

**The '509 Patent:**

The use of Gilead's Truvada® product for PrEP infringes the methods of Claims 1-11 and 13 of the '509 Patent. *See, e.g.*, Exhibit A to the Government's Initial Claim Charts on Infringement. The Government will establish through and during discovery that Gilead has knowledge of the '509 patent and knows and intends that use of its Truvada® product for PrEP by physicians and/or patients in accordance with at least the instructions and/or label provided by Gilead directly infringe the '509 patent. Accordingly, at a minimum, Gilead induces infringement of these claims.

The use of Gilead's Descovy® product for PrEP infringes the method of Claim 13 of the '509 Patent. *See, e.g.*, Exhibit B to the Government's Initial Claim Charts on Infringement. The Government will establish through and during discovery that Gilead has knowledge of the '509 patent and knows and intends that use of its Descovy® product for PrEP by physicians and/or patients in accordance with at least the instructions and/or label provided by Gilead directly infringe the '509 patent. Accordingly, at a minimum, Gilead induces infringement of these claims.

**The '333 Patent:**

The use of Gilead's Truvada® product for PrEP infringes the methods of Claims 1-11 and 13 of the '333 Patent. *See, e.g.*, Exhibit C to the Government's Initial Claim Charts on Infringement. The Government will establish through and during discovery that Gilead has knowledge of the '333 patent and knows and intends that use of its Truvada® product for PrEP by

physicians and/or patients in accordance with at least the instructions and/or label provided by Gilead directly infringe the '333 patent. Accordingly, at a minimum, Gilead induces infringement of these claims.

**The '191 Patent:**

The use of Gilead's Truvada® product for PrEP infringes the methods of Claims 1-19 of the '191 Patent. *See, e.g.,* Exhibit D to the Government's Initial Claim Charts on Infringement. The Government will establish through and during discovery that Gilead has knowledge of the '191 patent and knows and intends that use of its Truvada® product for PrEP by physicians and/or patients in accordance with at least the instructions and/or label provided by Gilead directly infringe the '191 patent. Accordingly, at a minimum, Gilead induces infringement of these claims.

**The '423 Patent:**

The use of Gilead's Truvada® product for PrEP infringes the methods of Claims 1-19 of the '423 Patent. *See, e.g.,* Exhibit E to the Government's Initial Claim Charts on Infringement. The Government will establish through and during discovery that Gilead has knowledge of the '423 patent and knows and intends that use of its Truvada® product for PrEP by physicians and/or patients in accordance with at least the instructions and/or label provided by Gilead directly infringe the '423 patent. Accordingly, at a minimum, Gilead induces infringement of these claims.

The use of Gilead's Descovy® product for PrEP infringes the method of Claims 1-19 of the '423 Patent. *See, e.g.,* Exhibit F to the Government's Initial Claim Charts on Infringement. The

Government will establish through and during discovery that Gilead has knowledge of the '423 patent and knows and intends that use of its Descovy® product for PrEP by physicians and/or patients in accordance with at least the instructions and/or label provided by Gilead directly infringe the '423 patent. Accordingly, at a minimum, Gilead induces infringement of these claims.

Additional details of Gilead's infringement will be provided pursuant to the Scheduling Order [D.I. 27] and are incorporated by reference herein. Discovery is ongoing and the Government's investigation into the subject matter sought by this interrogatory is ongoing. The Government reserves the right to further supplement its response to this interrogatory based on additional evidence when produced and other evidence as discovered during litigation. For example, Gilead has not yet completed production of other evidence it initially refused to produce and then consented to, such as any research that Gilead has done on compliance with the label instructions.

This interrogatory response is illustrative and is not intended to limit the Government's ability to rely on other documents, other portions of documents cited herein, or other information relating to infringement including, but not limited to, the ability to rebut arguments Gilead has not yet raised. The Government reserves the right to amend and/or supplement both this interrogatory response and its Initial Claim Charts on Infringement as discovery progresses. Additionally, the Government reserves the right to amend and/or supplement its response in light of any arguments that Gilead may make regarding non-infringement, any claim construction positions taken by Gilead, and/or any claim construction opinions or orders issued by the Court. The Government expressly reserves the right to respond to this interrogatory in its expert reports and during depositions of its experts, which are incorporated herein by reference.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3

Subject to and without waiving the General and Specific Objections set forth in the Government's initial response to Interrogatory No. 3, which are incorporated herein by reference, the Government amends its supplemental response as follows:

The Government is not currently asserting that Gilead Sciences, Inc., Gilead Sciences Ireland UC, or their distributors directly infringe the asserted claims. The Government asserts that prescribers and or consumers separately and/or jointly infringe the asserted claims as stated below:

Because Gilead sells its Truvada® and Descovy® products with instructions to administer these products as Truvada for PrEP® and Descovy for PrEP®, respectively, Gilead induces the direct infringement of the asserted claims by prescribers and/or consumers. For example, Gilead induces a prescriber (such as a physician) or a consumer (such as a patient), to perform each step of the claimed method such that the prescriber and/or consumer directly infringes the asserted claims literally or under the doctrine of equivalents. Alternatively, as a separate and non-limiting example, Gilead induces a combination of two or more prescribers and/or consumers to jointly infringe the asserted claims.

The Government further notes that Gilead has not produced the information that it has agreed to produce regarding its studies of label compliance, and it has not made representations that physicians and/or patients do not comply with the label in its responses to the Government's infringement contention interrogatories. Further, Gilead did not state that it was relying on any data showing that physicians' and/or patients' failure to comply with the FDA-approved labeling instructions when asked directly by the Government at the May 14 meet and confer.

This interrogatory response is illustrative and is not intended to limit the Government's ability to rely on other documents, other portions of documents cited herein, or other information relating to infringement including, but not limited to, the ability to rebut arguments Gilead has not yet raised.   The Government reserves the right to amend and/or supplement both this interrogatory response and its Initial Claim Charts on Infringement as discovery progresses.   Additionally, the Government reserves the right to amend and/or supplement its response in light of any arguments that Gilead may make regarding non-infringement, any claim construction positions taken by Gilead, and/or any claim construction opinions or orders issued by the Court.   The Government expressly reserves the right to respond to this interrogatory in its expert reports and during depositions of its experts, which are incorporated herein by reference.

## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3

Subject to and without waiving the General and Specific Objections set forth in the Government's initial response to Interrogatory No. 3 and first and second supplemental responses to Interrogatory No. 3, which are incorporated herein by reference in addition to the Government's Initial Claim Charts, the Government amends its supplemental response as follows:

The Government is not currently asserting that Gilead Sciences, Inc., Gilead Sciences Ireland UC, or their distributors directly infringe the asserted claims.   However, the Government reserves the right to assert a direct infringement theory against Gilead should additional evidence become available during fact discovery that demonstrates, for example, that physicians employed by Gilead are prescribing Truvada for PrEP® or Descovy for PrEP® directly to patients for non-experimental uses.

This interrogatory response is illustrative and is not intended to limit the Government's ability to rely on other documents, other portions of documents cited herein, or other information

relating to infringement including, but not limited to, the ability to rebut arguments Gilead has not yet raised. The Government reserves the right to amend and/or supplement both this interrogatory response and its Initial Claim Charts on Infringement as discovery progresses. Additionally, the Government reserves the right to amend and/or supplement its response in light of any arguments that Gilead may make regarding non-infringement, any claim construction positions taken by Gilead, and/or any claim construction opinions or orders issued by the Court. The Government expressly reserves the right to respond to this interrogatory in its expert reports and during depositions of its experts, which are incorporated herein by reference.

**INTERROGATORY NO. 4:**

Separately, for each asserted claim of the Patents-in-Suit, state the factual and legal bases for any contention that Defendants have (a) induced infringement of the Patents-in-Suit; and/or (b) infringed the Patents-in-Suit under the doctrine of equivalents.

**RESPONSE TO INTERROGATORY NO. 4:**

The Government incorporates by reference its Objections to Definitions and Instructions as if set forth in full herein. The Government objects to this interrogatory to the extent it seeks information protected by attorney/client privilege, the work product immunity, or any other applicable claim of privilege or immunity. The Government objects to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses. *See In re Convergent Techs.*, 108 F.R.D. at 337. For example, the interrogatory seeks "the factual and legal bases for any contention" and is not limited to the Government's claims or contentions. There is no requirement that requires the Government to marshal all available proof in response to an interrogatory. Courts do not require

responding parties to "write . . . a portrait of their trial" or "write a book" in response to a contention interrogatory. *See, e.g., Roberts*, 130 F.R.D. at 427.   The Government objects to this interrogatory as premature to the extent it seeks the Government's initial contentions relating each known accused product to the asserted claims each such product allegedly infringes prior to the time set forth in the Scheduling Order.   The Government objects to this interrogatory as premature to the extent it seeks supporting documents and fact and/or expert testimony at the onset of discovery and prior to the deadlines set forth in the Scheduling Order, the Local Rules, and the Federal Rules.   The Government objects to this interrogatory to the extent it requires formulation of a legal conclusion or opinion regarding issues of induced infringement or infringement by equivalents.   The Government objects to this interrogatory on the grounds that it contains multiple discrete subparts within the meaning of Federal Rule of Civil Procedure 33(a)(1) and therefore constitutes multiple interrogatories.   The Government objects to this interrogatory as vague and ambiguous, particularly with respect to the phrase "(a) induced infringement of the Patents-in-Suit; and/or (b) infringed the Patents-in-Suit under the doctrine of equivalents."

Subject to and without waving the Objections to Definitions and Instructions or Specific objections asserted, and to the extent the Government understands this interrogatory, the Government answers the unobjectionable scope of this interrogatory as follows: Information responsive to this interrogatory is provided at, for example, pages 2–17 of the Government's Disclosures Under Paragraph 7(a) of the Scheduling Order [D.I. 27] and the Complaint [D.I. 1], including ¶¶ 253–313, both of which are incorporated by reference herein.   Additional details of Gilead's infringement will be provided pursuant to the Scheduling Order [D.I. 27] and are incorporated by reference herein.

Discovery is ongoing and the Government reserves the right to amend, modify, supplement, or change its response to this interrogatory.

## SUPPLEMTNAL RESPONSE TO INTERROGATORY NO. 4

Subject to and without waiving the General and Specific Objections set forth in the Government's initial response to Interrogatory No. 4, which are incorporated herein by reference, the Government supplements its response as follows:

The Government refers Defendants to information responsive to this interrogatory that is provided at, for example, pages 2–7 and Exhibits A-F of the Government's Initial Claim Charts on Infringement served on October 29, 2020, which are incorporated herein by reference. The Government further refers Defendants to information responsive to this interrogatory that is provided at, for example, pages 2–17 of the Government's Disclosures Under Paragraph 7(a) of the Scheduling Order [D.I. 27] and the Complaint [D.I. 1], including ¶¶253–313, both of which are incorporated by reference herein. The Government asserts that Gilead Sciences, Inc. (Gilead Sciences) and Defendant Gilead Sciences Ireland UC (GSIUC) (collectively, Gilead or Defendants) jointly induce infringement of U.S. Patent Nos. 9,044,509 (the '509 Patent), 9,579,333 (the '333 Patent), 9,937,191 (the '191 Patent), and 10,335,423 (the '423 Patent) (collectively, the "Patents-in-Suit").

Gilead manufactures, markets, and sells Truvada for PrEP® and Descovy for PrEP® in the United States and abroad. Each of these products includes a combination of (1) emtricitabine (FTC) and (2) a tenofovir prodrug/ester, either literally or under the doctrine of equivalents. The tenofovir prodrug/ester in Truvada® is tenofovir disoproxil fumarate (TDF). The tenofovir prodrug/ester in Descovy® is tenofovir alafenamide (TAF) hemi-fumarate. The administration of

these products for pre-exposure prophylaxis (PrEP) according to the FDA-approved prescribing information infringes the Patents-in-Suit, literally or under the doctrine of equivalents.

On information and belief GSIUC currently manufactures and/or packages Gilead's Truvada for PrEP® and Descovy for PrEP® products intended for sale in the U.S., and those products include FDA-approved package inserts that include instructions regarding the use of those products for PrEP. On information and belief, GSIUC has manufactured and/or packaged Gilead's Truvada for PrEP® product from at least 2012 to the present. For example, in 2012 and 2019, GSIUC manufactured and labeled bottles of Truvada for sale in the U.S. that included the language "Made in Ireland" and that instruct the dispenser "[e]ach time Truvada is dispensed give the patient the attached Medication Guide." The bottle label, in which Gilead Sciences, Inc., claims copyright further instructs the consumer to "[s]ee the package insert for dosage and administration."





GILDDE00232475;GILDDE00271967.   Gilead Sciences and GSIUC jointly stated in a complaint brought in the Southern District of Florida, *Gilead Sciences, Inc. et al v. AJC MEdical Group, Inc. et al.*, 1:20-cv-24523-AMC (S.D. Fla. November 3, 2020), that they include these package inserts with each bottle to "ensure safe and proper use" of Gilead's products for PrEP:

> In further compliance with FDA requirements, and to ensure safe and proper use, Gilead [defined as Gilead Sciences and GSIUC, collectively] provides printed instructions for use to recipients of PrEP medication by way of and instructional package insert that accompanies every bottle of PrEP tablets.   Neither the FDA nor Gilead permits PrEP medication to be sold or dispensed without the accompanying FDA-approved package insert.   Every individual prescribed PrEP medication must have the package insert to guide and inform him or her on the safe and effective use of the medication. The printed instructions provide the recipient with PrEP medication's indications for usage, side effects, and critical warnings. The instructions also inform the recipient how to take and store PrEP medication, what

> to do if the recipient takes too much, what precautions to take while taking the
> medication, and what the recipient should discuss with his or her healthcare
> provider before taking the medication.

Exhibit 1 at ¶ 260.   The package inserts are described in detail in the Government's Initial Claim Charts on Infringement which describes how these materials instruct patients and/or physicians to directly infringe each limitation of the asserted claims of the Patents-in-Suit.

In its S.D. Fla. Complaint, Gilead further describes Gilead Sciences, Inc. as "the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and package inserts of certain genuine PrEP medications."   Exhibit *Id.* at ¶ 24.   And describes GSIUC as "the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and instructional inserts of certain genuine PrEP medications.   *Id.* at ¶ 25.   Gilead further represents that Gilead Sciences, Inc. and GSIUC collectively own and use trademarks in connection with the sale and promotion of its PrEP medication in the US:

> 26. Gilead Sciences, Inc. and Gilead Ireland (together, "Gilead") are the collective
> owners of a number of well-established and famous registered trademarks (the
> "Gilead Marks") that appear on genuine PrEP products. A complete list of these
> trademarks is depicted at Exhibit A hereto. Gilead also owns and uses distinctive
> packaging (the "Gilead Trade Dress") to distinguish its PrEP products in the
> marketplace, which is depicted at Exhibit B hereto.
>
> 27. Gilead has used and is currently using these Gilead Marks and this Gilead Trade
> Dress in commerce in connection with its sale of PrEP medication, and plans to

continue such use in the future. Gilead prominently displays the Gilead Marks in its advertising and promotional materials.

28. Gilead has engaged and continues to engage in activities designed to promote PrEP medication and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States. All of these trademarks and trade dress symbolize business goodwill of Gilead and are invaluable assets to Gilead.

Exhibit 1 at ¶¶ 26-28; Exhibit 2 (Exhibit A to the S.D. Fla. Complaint).

Gilead's inducement of direct infringement of the Patents-in-Suit is also demonstrated by its ownership and use of the trademarks TRUVADA FOR PREP (U.S. Reg. No. 5,358,262) and EMTRICITABINE 200 MG / TENOFOVIDISOPROXIL FUMARATE 300 MG TABLETS FOR PREP PRE-EXPOSURE PROPHYLAXIS (Registration No. 5,623,246) and in its associated commercial sales of this product for PrEP. According to public records, Gilead Sciences, Inc. applied for and received a trademark in the United States Patent and Trademark Office (PTO) for exclusive use of the mark, TRUVADA FOR PREP. Gilead's application for the mark was filed on January 6, 2017 with U.S. Ser. No. 87,292,084 and was registered on December 19, 2017 as U.S. Reg. No. 5,358,262. This mark is specifically registered for the use of Truvada® "for the treatment and prevention of human immunodeficiency virus infection." (emphasis added). Through such actions, Gilead specifically intends that its actions will result in direct infringement of the above-identified claims, and/or subjectively believes that its actions will result in direct infringement. Gilead knew or should have known that use of Truvada for PrEP® according to the prescribing information directly infringes the Patents-in-Suit no later than the issue date of each patent.

37

Gilead's inducement of infringement of the Patents-in-Suit demonstrated by its ownership and use of the trademark DESCOVY FOR PREP (U.S. Serial No. 88,266,226) and DESCOVY EMTRICITABINE 200 MG / TENOFOVIR ALAFENAMIDE 25MG TABLETS FOR PREP PRE-EXPOSURE PROPHYLAXIS (Serial No 88,615,918). Defendant GSIUC applied for and received a U.S. trademark registration for exclusive use of the mark, DESCOVY FOR PREP. Gilead's application for the mark was filed on January 17, 2019 with U.S. Ser. No. 88,266,226 and was registered on November 19, 2019 as U.S. Reg. No. 5912591. This mark is specifically registered for the use of Descovy® "for the treatment and prevention of human immunodeficiency virus infection." Through such actions, Gilead specifically intends that its actions will result in direct infringement of the above-identified claims, and/or subjectively believes that its actions will result in direct infringement. Gilead knew or should have known that use of Truvada for PrEP® according to the prescribing information directly infringes the Patents-in-Suit no later than the issue date of each patent.

Gilead expects physicians to prescribe and patients to use Gilead's Truvada for PrEP® and Descovy for PrEP® products consistent with its trademarks and the the Truvada for PrEP® and Descovy for PrEP® uses described in the package inserts and training guides for these products. Gilead Sciences, Inc. and GSIUC both admitted to this in their S.D. Fla. Complaint: which stated that, "to ensure safe and proper use, Gilead [defined as Gilead Sciences and GSIUC, collectively] provides printed instructions for use to recipients of PrEP medication by way of and instructional package insert that accompanies every bottle of PrEP tablets." Exhibit 1 at ¶ 260. And further, states that "Gilead [defined as Gilead Sciences and GSIUC, collectively] has engaged and continues to engage in activities designed to promote PrEP medication and the business and

goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States." *Id.* at ¶ 28.

Gilead was aware of the applications for the Patents-in-Suit no later than October 2014. In an email from Laura Prestia, an NIH Licensing and Patenting Manager (CDC Unit), to Dr. Jay Parrish, a member of Gilead's Corporate Development group, on October 24, 2014, the Government informed Gilead of the applications for the Patents-in-Suit and expressly noted in the email that the patented technology was for the use of "(Truvada)" for "(PrEP)":

> In light of your recent and ongoing interest in and success with Truvada, your company appears to be an ideal partner for a technology developed by Dr. Walid Heneine at the Centers for Disease Control and Prevention (CDC).
>
> Dr. Heneine's group has shown that daily pre-exposure prophylaxis **(PrEP)** with emtricitabine in combination with tenofovir disoproxil fumarate **(Truvada)** significantly increases the level of protection against HIV transmission. This finding was discovered following repeated virus challenges with macaque monkeys. The CDC is pursuing U.S. and foreign patent protection for this technology.
>
> An abstract with more information can be found in the Federal Register. Also, Dr. Heneine has co-authored publications in PLoS Medicine and Science Translational Medicine, describing the above discovery.

Exhibit 3 (emphasis added). This email contains a hyperlink to the Federal Register, which provides a general description of the applications for the Patents-in-Suit, indicating that the applications were directed to the use of a combination of emtricitabine and tenofovir for HIV

chemoprophylaxis.   The Federal Register also specifically identified the application numbers for (1) the '811 provisional application—which had been included in a curriculum vitae that inventor Walid Heneine emailed to Gilead in 2008 (Exhibit 4); (2) the '547 application—which published as US2007/0265227 in 2007 with claims directed to the use of a combination of emtricitabine and tenofovir for HIV prophylaxis; and (3) the '926 PCT—the same PCT application that Dr. Janssen had disclosed to Gilead in 2008 (Exhibit 5):

Inhibition of HIV Infection Through Chemoprophylaxis Using Emtricitabine and Tenofovir

\*        \*        \*

*Description of Technology:* The invention is directed to prophylactic administration of emtricitabine (FTC) in combination with tenofovir or its prodrug, tenofovir disoproxil fumarate (TDF), to protect against transmission of human immunodeficiency virus (HIV) infection.

\*        \*        \*

US Provisional Application No. 60/764,811 filed 3 Feb 2006.

US Patent Application No. 11/669,547 filed 31 Jan 2007.

PCT Application No. PCT/US2007/002926 filed 01 Feb 2007.

European Patent No. 2015753 issued 01 May 2013.

Exhibit 6.   These applications were identified also part of a public offer to license CDC technology. Exhibit 7.

The email from Laura Prestia further contained links to two articles authored by the inventors, the first of which had been emailed to Dr. James Rooney, Gilead's Vice President of Medical Affairs, by inventor Dr. Walid Heneine in 2008, and both of which indicated that the

40

inventors had filed for a patent on the research described in the publications. *See* D.I. 1, Exhibit Nos. 31 and 34.; J. Gerardo García-Lerma et al., *Prevention of Rectal SHIV Transmission in Macaques by Daily or Intermittent Prophylaxis with Emtricitabine and Tenofovir*, 5 PLOS MEDICINE (2) 291 (2008); J. Gerardo García-Lerma et al., *Intermittent Prophylaxis with Oral Truvada Protects Macaques from Rectal SHIV Infection*, 2 SCI. TRANSLATIONAL MED. (14ra4) 1 (2010).

Gilead knew or should have known as early as 2014 of the existence of the applications for the Patents-in-Suit and that they covered the use of Truvada for PrEP® as this was expressly indicated in Laura Prestia's October 2014 email. Gilead knew or reasonably should have known that the '547 application, which was disclosed in the Federal Register linked to Laura Prestia's email, issued as the '509 patent on June 2, 2015, as this information is publicly available and easily obtainable. Gilead knew or should have known that the use of Truvada for PrEP® and Descovy for PrEP® in accordance with and as directed by Gilead's package inserts and training guides that accompany Gilead's Truvada® and Descovy® products would cause physicians to prescribe and patients to take Gilead's products in a manner that infringes the asserted claims. In addition to Laura Prestia's email indicating to Gilead that the Patents-in-Suit were directed to Truvada for PrEP®, Gilead could have easily confirmed this by looking up the publicly available '509 patent and reviewing its claims. Gilead's repeated refusal to license its Truvada for PrEP® after Laura Prestia's email indicated a specific intent to induce acts constituting infringement of the asserted claims. This is further evidenced by the active steps Gilead continues to take to direct, encourage, recommend, promote, and induce infringement of those claims.

This interrogatory response is illustrative and is not intended to limit the Government's ability to rely on other documents, other portions of documents cited herein, or other information

relating to infringement including, but not limited to, the ability to rebut arguments Gilead has not yet raised. The Government reserves the right to amend and/or supplement both this interrogatory response and its Initial Claim Charts on Infringement as discovery progresses. Additionally, the Government reserves the right to amend and/or supplement its response in light of any arguments that Gilead may make regarding non-infringement, any claim construction positions taken by Gilead, and/or any claim construction opinions or orders issued by the Court. The Government expressly reserves the right to respond to this interrogatory in its expert reports and during depositions of its experts, which are incorporated herein by reference.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4

Subject to and without waiving the General and Specific Objections set forth in the Government's initial response and first supplemental response to Interrogatory No. 4, which are incorporated herein by reference, the Government supplements its response as follows:

Gilead manufactures, markets, and sells Truvada® and Descovy®. Each of these products includes a combination of (1) emtricitabine (FTC) and (2) a tenofovir prodrug/ester. The tenofovir prodrug/ester in Truvada® is tenofovir disoproxil fumarate (TDF). The tenofovir prodrug/ester in Descovy® is tenofovir alafenamide (TAF) hemi-fumarate. The administration of these products for PrEP according to the FDA-approved prescribing information infringes the Patents-in-Suit, literally for Truvada® or under the doctrine of equivalents for Descovy®.

Gilead Sciences Ireland UC currently manufactures and/or packages Gilead's Truvada for PrEP® and Descovy for PrEP® Products intended for sale in the United States, and those products include FDA-approved package inserts that include instructions regarding the use of those products for PrEP. Gilead Sciences Ireland UC has manufactured and/or packaged Gilead's Truvada for PrEP® product from at least 2012 to the present.

Both GSI and GSIUC are properly treated as a single entity for purposes of knowledge of the '509 Patent and knowledge of infringement of the '509 Patent. This is because GSI and GSIUC share senior managers and directors. For example, Robin Washington was a Director of GSIUC in 2015 ([58517367.pdf]) while simultaneously serving as GSI's Executive Vice President and Chief Financial Officer:

https://web.archive.org/web/20170713014946/http:/investors.gilead.com/phoenix.zhtml?c=6996 4&p=irol-govmanage.

This relationship continues to the present, as for example, Dr. Taiyin Yang serves both as Executive Vice President, Pharmaceutical Development and Manufacturing for GSI and Director of GSIUC *See* 61694231.pdf, 62655239.pdf. Accordingly, it is appropriate to impute or infer that GSI or GSIUC would have knowledge that is relevant to their actions even if that knowledge was received by the other. That is especially true here, where GSI is the entity that has received information and GSI has total control of GSIUC—including interlocking management structures, control exercised over the foreign subsidiary's directors, officers, and employees, and a connection to the transaction at issue (production, sale, and marketing of Truvada and Descovy for PrEP indications). *See, e.g.*, *P. F. Collier & Son Corp. v. Fed. Trade Com.*, 427 F.2d 261, 269 (6th Cir. 1970) (where there is "substantial overlap between the officers and directors of the parent and its subsidiaries, [the parent's] knowledge and approval [of a subsidiary's actions] may be inferred."); *see also Stella v. LVMH Perfumes & Cosmetics USA, Inc.*, No. 07-CV-6509, 2009 U.S. Dist. LEXIS 22948, at *6 (N.D. Ill. Mar. 23, 2009). Accordingly, for this supplementation, both GSI and GSIUC are referred to collectively as "Gilead."

In addition to notice already outlined in the various interrogatory responses and supplements that Gilead has already received, Gilead also had notice of the Application No.

11/669,547 ("the '547 Application") which issued as the '509 Patent at least as early as August 6, 2008 based on its own patent searches. On that date, Steve Krawczyk, Director, Patent Liaison for GSI, emailed a Derwent Alert covering the time period from August 2007 to October 2007 a number of Gilead employees.[1]   GILDDE01209435.   This patent search report lists both the international application, WO2007092326, and the '547 Application.   This alert further provides the filing date of the '547 Application, lists the named inventors (including Dr. Robert Janssen), pictures both emtricitabine and tenofovir, lists The Department of Health and Human Services as the patent owner, and describes a method of taking both emtricitabine and tenofovir in combination, prior to exposure, to prevent infection by an immunodeficiency retrovirus, such as HIV-1. This patent search report was emailed directly to custodian Dr. William Lee, Executive Vice President, Research. Additionally, the European Patent Bulletin published on January 21 2009, and it listed the WO 2007/092326, a direct reference to the '547 Application, and the filing date of the '547 Application.

On information and belief, Gilead had notice that the '547 Application issued as the '509 Patent when it issued in January 2015. The Government intends to supplement this response with additional evidence as discovery is ongoing, and we believe there are production deficiencies

---

[1]   Allan Kutzenco <allan.kutzenco@gilead.com>, Bill Baker <bill.baker@gilead.com>, Bill Lee <bill.lee@gilead.com>, Choung Kim <choung.kim@gilead.com>, Christopher Sheng <christopher.sheng@gilead.com>, Damian Mccoll <damian.mccoll@gilead.com>, Grushenka Wolfgang <grushenka.wolfgang@gilead.com>, Haolun Jin <haolun.jin@gilead.com>, John Link <john.link@gilead.com>, John Ward <john.ward@gilead.com>, John Wolf <john.wolf@gilead.com>, Larry Melvin <larry.melvin@gilead.com>, Lianhong Xu <lianhong.xu@gilead.com>, Lori Lehman <lori.lehman@gilead.com>, Manoj Desai <manoj.desai@gilead.com>, Mary McGrath <mary.mcgrath@gilead.com>, Matthew Wright <matthew.wright@gilead.com>, Randall Halcomb <randall.halcomb@gilead.com>, Richard Mackman <richard.mackman@gilead.com>, Roman Sakowicz <roman.sakowicz@gilead.com>, Romas Geleziunas <romas.geleziunas@gilead.com>, Steve Bondy <steve.bondy@gilead.com>, Sukeerthi Seetharaman <sukeerthi.seetharaman@gilead.com>, Swami Swaminathan <swami.swaminathan@gilead.com>, Tomas Cihlar <tomas.cihlar@gilead.com>, Weidong Zhong <weidong.zhong@gilead.com>, Will Watkins <will.watkins@gilead.com>, William Delaney william.delaney@gilead.com  We note that because Gilead uses "@gilead.com" for employees at GSI and GSIUC, (an additional demonstration of GSI and GSIUC's close coordination) it is not clear whether any of the employees are GSIUC employees, but possible.

regarding patent alert searches which should have disclosed the issuance of the '509 Patent to Gilead.

Gilead's intent to induce direct infringement of the asserted claims is reflected in, *inter alia*, the package inserts and training guides for Truvada® and Descovy®. The prescribing information contained in Gilead's package inserts and training guides for Truvada® and Descovy® instruct doctors and patients on how Gilead intends for these products to be used. Gilead's package inserts and training guides instruct physicians and patients to administer Truvada for PrEP® and Descovy for PrEP® in a manner that directly infringes all elements of the asserted claims. The package inserts and training guides therefore cause physicians to prescribe and patients to take Truvada for PrEP® and Descovy for PrEP® in a manner that infringes the asserted claims. When physicians or patients use Gilead's Truvada® and Descovy® products for PrEP in accordance with the prescribing information in Gilead's package inserts and/or training guides, they directly infringe the asserted claims. For example, when physicians and/or patients use Gilead's Truvada® and Descovy® products for PrEP, they administer pharmaceutically effective amounts of the combination of FTC with TDF or TAF according to the methods recited by the asserted claims. Physicians also implement the instructions in Gilead's Truvada® and Descovy® package inserts and training guides by directing, controlling, and causing the administration of the combination of FTC with TDF or TAF for PrEP according to the methods of the asserted claims by their respective patients. Physicians select HIV-negative patients and further condition administration on the fact that the patient is an "adult at risk" and is engaging in risky behavior that exposes or potentially exposes them to HIV. Physicians instruct patients to take the drug prior to exposure or potential exposure to receive a benefit, in this case protection from HIV infection. Although physicians may counsel to use safer sex practices, neither safer sex practices

nor PrEP is 100% effective, and the use of both serves to further ensure that the patient does not get infected.  This is consistent with the need for "safer" sex practices and "reduced" risk that are in the indication in the Truvada® label:

> "TRUVADA is indicated in combination with safer sex practices for preexposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."

In other words, safer sex does not prevent exposure, it functions as an additional precaution to further "reduce the risk" of HIV infection.   However, if a patient indicates that they do not engage in any risky behavior (there is no exposure), then a physician would not prescribe PrEP because the prescription is *conditioned* on that risky behavior.  This is consistent with the instructions in the label which are indicated for "adults at high risk" and also the listing of adverse events, which make clear that a physician should not prescribe a potentially toxic drug to an individual without the need for it and a potential benefit—i.e., the individual engages in at-risk behavior that exposes or may potentially expose them to HIV and the patient remains protected and HIV negative during the period of administration.

In accordance with that direction, control, and causation and directed by physicians, HIV-negative, at-risk patients, will self-select and will individually self-administer a combination of FTC with TDF or TAF for PrEP to receive the benefit of administration in the claimed methods when administered prior to engaging in at-risk behavior.  Because the labels indicate PrEP for adults at "high risk" and also list adverse events for these potentially toxic drugs, patients will not take PrEP unless there is a need for it—i.e., the individual engages in at-risk behavior that exposes or may potentially expose them to HIV.  Patients will also implement the instructions in Gilead's Truvada® and Descovy® package inserts and will administer pharmaceutically effective amounts

46

of the combination of FTC and TDF or TAF according to the methods of the asserted claims prior to exposure or potential exposure in order to be protected from HIV infection.

Gilead expects physicians to prescribe and patients to use Gilead's Truvada® and Descovy® products consistent with the Truvada for PrEP® and Descovy for PrEP® uses described in the package inserts and training guides for these products. Gilead knows or should know that the use of Truvada for PrEP® and Descovy for PrEP® in accordance with and as directed by Gilead's package inserts and training guides that accompany Gilead's Truvada® and Descovy® products will cause physicians to prescribe and patients to take Gilead's products in a manner that infringes the asserted claims. Gilead therefore has a specific intent to induce acts constituting infringement of the asserted claims, as evidenced by the active steps Gilead takes to direct, encourage, recommend, promote, and induce infringement of those claims.

Because Gilead sells its Truvada® and Descovy® products with instructions to administer these products as Truvada for PrEP® and Descovy for PrEP®, respectively, Gilead induces the direct infringement of the asserted claims by prescribers, distributors, and/or consumers under 35 U.S.C. § 271(b). For example, Gilead induces a prescriber (such as a physician), a distributor (such as a pharmacy), or a consumer (such as a patient), to perform each step of the claimed method such that the prescriber, distributor, or consumer directly infringes the asserted claims.

Gilead's labeling, including the prescribing information in its package insert and training guide, knowingly encourages and instructs physicians and other caregivers/healthcare providers to directly infringe the asserted claims by administering Gilead's Truvada® and Descovy® products to patients for PrEP. Gilead is aware of the patents-in-suit and intends for physicians and other caregivers/healthcare providers to use Gilead's Truvada® and Descovy® products in an infringing manner. Gilead therefore induces direct infringement of the asserted claims.

**Infringement of Truvada for PrEP®**

Gilead induces direct infringement of at least the following claims of the Patents-in-Suit based upon its sales and activities in promoting Truvada for PrEP®:

- The '509 patent:   Claims 1-11 and 13;

- The '333 Patent:   Claims 1-11 and 13;

- The '191 Patent:   Claims 1-19; and

- The '423 Patent:   Claims 1-19.

Acts of direct infringement of the above-mentioned claims are carried out by clinicians and/or their patients who are treated with Truvada for PrEP® in the United States.   At a minimum, Gilead induces infringement of the above-identified claims pursuant to 35 U.S.C. § 271(b).   In addition to selling Truvada for PrEP®, Gilead actively instructs doctors and/or patients to administer Truvada for PrEP®, including through clinical trials, prescribing information, product labels, training guides and agreements forms for healthcare providers, and other product literature. Gilead also advertises and promotes Truvada for PrEP® to the medical community and for use by the general public.

The Government believes that both physicians and patients directly infringe the patents by administering Truvada for PrEP® as described above, and Gilead has not disagreed or proposed that there is divided infringement of the asserted claims.   However, the Government has asserted in the alternative that physicians and patients jointly infringe.   Joint infringement here may occur under both the theories of joint enterprise and/or vicarious liability.   For example, if Gilead takes the position that the Court's claim constructions of exposure and potential exposure require that the patient engage in at-risk behavior and that this cannot be directed or controlled by the physician so there is no direct infringement, the government would disagree.   Under a theory of vicarious

liability, the physician conditions the prescription and administration of Truvada for PrEP® on the patient engaging in behavior that will expose or potentially expose the patient to HIV. *See, e.g., Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1364 (Fed. Cir. 2017); *Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 584 (D. Del. 2018) (Bryson, J.) ("As long as the conduct goes beyond merely 'guiding or instructing,' the conditioning requirement is satisfied."), *aff'd sub nom. Persion Pharm. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184 (Fed. Cir. 2019). The Truvada® label clearly indicates PrEP for "high risk adults," and the side-effects in the label, inform the physician that Truvada for PrEP® should only be administered to patients that would benefit from its use.

The Government also may assert in the alternative that physicians and patients directly infringe through a joint enterprise theory. For example, there is an agreement between patient and physician to administer PrEP to an HIV-negative high-risk patient according to the Truvada for PrEP® label which follows methods described in the claims of the Patents-in-Suit. Further, the purpose of this agreement to administer is to achieve the common goal of preventing HIV infection. And this agreement is part of the formal patient-doctor relationship, where both the physician and patient have the equal right to stop the treatment and/or terminate the relationship.

Gilead's inducement of infringement of the Patents-in-Suit is further demonstrated by its ownership and use of the trademarks TRUVADA FOR PREP (U.S. Reg. No. 5,358,262) and EMTRICITABINE 200 MG / TENOFOVIDISOPROXIL FUMARATE 300 MG TABLETS FOR PREP PRE-EXPOSURE PROPHYLAXIS (Registration No. 5,623,246) and in its associated commercial sales of this product for PrEP. According to public records, Defendant Gilead Ireland UC applied for and received a trademark in the United States Patent and Trademark Office (PTO) for exclusive use of the mark, TRUVADA FOR PREP. Gilead's application for the mark was filed

on January 6, 2017 with U.S. Ser. No. 87,292,084 and was registered on December 19, 2017 as U.S. Reg. No. 5,358,262.  This mark is specifically registered for the use of Truvada® "for the treatment <u>and prevention</u> of human immunodeficiency virus infection."  (emphasis added). Through such actions, Gilead specifically intends that its actions will result in infringement of the above-identified claims, and/or subjectively believes that its actions will result in infringement. Gilead knew or should have known that use of Truvada for PrEP® according to the prescribing information infringes the Patents-in-Suit no later than the issue date of each patent.

**Infringement of Descovy for PrEP®**

Gilead induces direct infringement of at least the following claims of the Patents-in-Suit based upon its sales and activities in promoting Descovy for PrEP®, literally or under the doctrine of equivalents:

- The '509 patent:  Claim 13; and

- The '423 Patent:  Claims 1-19.

Acts of direct infringement of the above-mentioned claims are carried out by clinicians in the United States who treat patients with Descovy for PrEP®.  At a minimum, Gilead induces infringement of the above-identified claims pursuant to 35 U.S.C. § 271(b).  In addition to selling Descovy for PrEP®, Gilead actively instructs doctors and patients to administer Descovy® for PrEP, including through clinical trials, prescribing information, product labels, training guides and agreements forms for healthcare providers, and other product literature.  Gilead also advertises and promotes Descovy for PrEP® to the medical community and for use by the general public. Through such actions, Gilead specifically intends that its actions will result in infringement of the above-identified claims, or subjectively believes that its actions will result in infringement.

Gilead knew or should have known that use of Descovy for PrEP® according to the prescribing information infringes the '509 and '423 patents no later than the issue date of each patent.

The Government believes that both physicians and patients directly infringe the patents by administering Descovy for PrEP® as described above, and Gilead has not disagreed or proposed that there is divided infringement of the asserted claims. However, the Government has asserted in the alternative that physicians and patients jointly infringe. Joint infringement here may occur under both the theories of joint enterprise and/or vicarious liability. For example, if Gilead takes the position that the Court's claim constructions of exposure and potential exposure require that the patient engage in at-risk behavior and that this cannot be directed or controlled by the physician so there is no direct infringement, the government would disagree. Under a theory of vicarious liability, the physician conditions the prescription and administration of Descovy for PrEP® on the patient engaging in behavior that will expose or potentially expose the patient to HIV. *See, e.g., Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1364 (Fed. Cir. 2017); *Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 584 (D. Del. 2018) (Bryson, J.) ("As long as the conduct goes beyond merely 'guiding or instructing,' the conditioning requirement is satisfied."), *aff'd sub nom. Person Pharm. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184 (Fed. Cir. 2019). The Descovy label clearly indicates PrEP for individuals at-risk and the side-effects in the label, inform the physician that Descovy for PrEP® should only be administered to patients that would benefit from its use.

The Government also may assert in the alternative that physicians and patients directly infringe through a joint enterprise theory. For example, there is an agreement between patient and physician to administer PrEP to an HIV-negative high-risk patient according to the Truvada for PrEP® label which follows methods described in the claims of the Patents-in-Suit. Further,

the purpose of this agreement to administer is to achieve the common goal of preventing HIV infection. And this agreement is part of the formal patient-doctor relationship, where both the physician and patient have the equal right to stop the treatment and/or terminate the relationship.

Further, the Government asserts that Descovy for PrEP® infringes claim 13 of the '509 patent under the theory of doctrine of equivalents. The TAF contained in Gilead's Descovy® product is literally a "tenofovir ester" or, at a minimum, satisfies the term under the doctrine of equivalents. TAF is an ester of tenofovir and the Government will present testimony from one or more experts that conditions for hydrolysis of the ester bonds present in TAF will afford the compound recognized as tenofovir. Moreover, the Government will present testimony from one or more experts that the phosphonamidate bond present in TAF is insubstantially different from a phosphonester bond and/or performs the same function in substantially the same way as a phosphonester bond, at least because hydrolysis of the phosphonester and phosphonamidate moieties of TAF results in a component that is the compound recognized as tenofovir.

Gilead's inducement of infringement of the Patents-in-Suit is also demonstrated by its ownership and use of the trademark DESCOVY FOR PREP (U.S. Ser. No. 88,266,226) and DESCOVY EMTRICITABINE 200 MG / TENOFOVIR ALAFENAMIDE 25MG TABLETS FOR PREP PRE-EXPOSURE PROPHYLAXIS (Serial No 88,615,918) and in its associated commercial sales of this product for PrEP. According to public records, Defendant Gilead Ireland UC applied for and received a U.S. trademark for exclusive use of the mark, DESCOVY FOR PREP. Gilead's application for the mark was filed on January 17, 2019 with U.S. Ser. No. 88,266,226 and was registered on November 19, 2019 as U.S. Reg. No. 5912591. This mark is specifically registered for the use of Descovy® "for the treatment and prevention of human immunodeficiency virus infection." (emphasis added).

In addition, Gilead Sciences and GSIUC jointly stated in a complaint brought in the Southern District of Florida, *Gilead Sciences, Inc. et al v. AJC MEdical Group, Inc. et al.*, 1:20-cv-24523-AMC (S.D. Fla.) that they include the Truvada® and Descovy® package inserts with each bottle to "ensure safe and proper use" of Gilead's products for PrEP:

> In further compliance with FDA requirements, and to ensure safe and proper use, Gilead [defined as Gilead Sciences and GSIUC, collectively] provides printed instructions for use to recipients of PrEP medication by way of and instructional package insert that accompanies every bottle of PrEP tablets.   Neither the FDA nor Gilead permits PrEP medication to be sold or dispensed without the accompanying FDA-approved package insert.   Every individual prescribed PrEP medication must have the package insert to guide and inform him or her on the safe and effective use of the medication. The printed instructions provide the recipient with PrEP medication's indications for usage, side effects, and critical warnings. The instructions also inform the recipient how to take and store PrEP medication, what to do if the recipient takes too much, what precautions to take while taking the medication, and what the recipient should discuss with his or her healthcare provider before taking the medication.

In its S.D. Fla. Complaint, Gilead further identifies Gilead Sciences, Inc. as "the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and package inserts of certain genuine PrEP medications." *Id.* at ¶ 24.  The Complaint also describes GSIUC as "the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and instructional inserts of certain genuine PrEP medications." *Id.* at ¶ 25.   Gilead further represents that Gilead Sciences, Inc. and GSIUC

collectively own and use trademarks in connection with the sale and promotion of its PrEP medications in the US:

> 26. Gilead Sciences, Inc. and Gilead Ireland (together, "Gilead") are the collective owners of a number of well-established and famous registered trademarks (the "Gilead Marks") that appear on genuine PrEP products. A complete list of these trademarks is depicted at Exhibit A hereto. Gilead also owns and uses distinctive packaging (the "Gilead Trade Dress") to distinguish its PrEP products in the marketplace, which is depicted at Exhibit B hereto.

> 27. Gilead has used and is currently using these Gilead Marks and this Gilead Trade Dress in commerce in connection with its sale of PrEP medication, and plans to continue such use in the future. Gilead prominently displays the Gilead Marks in its advertising and promotional materials.

> 28. Gilead has engaged and continues to engage in activities designed to promote PrEP medication and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States. All of these trademarks and trade dress symbolize business goodwill of Gilead and are invaluable assets to Gilead.

*Id.* at ¶¶ 26-28.

Gilead expects physicians to prescribe and patients to use Gilead's Truvada for PrEP® and Descovy for PrEP® products consistent with its trademarks and the Truvada for PrEP® and Descovy for PrEP® uses described in the package inserts and training guides for these products. Gilead Sciences, Inc. and GSIUC both admitted to this in their S.D. Fla. Complaint, which stated

that, "to ensure safe and proper use, Gilead [defined as Gilead Sciences and GSIUC, collectively] provides printed instructions for use to recipients of PrEP medication by way of and instructional package insert that accompanies every bottle of PrEP tablets." *Id.* at ¶ 260. The Complaint further states that "Gilead [defined as Gilead Sciences and GSIUC, collectively]   has engaged and continues to engage in activities designed to promote PrEP medication and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States." *Id.* at ¶ 28.

Gilead was aware of the applications for the Patents-in-Suit no later than October 2014. In an email from Laura Prestia to Dr. Jay Parrish on October 24, 2014, the Government informed Gilead of the applications for the Patents-in-Suit and expressly noted in the email that the patented technology was for the use of "(Truvada)" for "(PrEP)":

> In light of your recent and ongoing interest in and success with Truvada, your company appears to be an ideal partner for a technology developed by Dr. Walid Heneine at the Centers for Disease Control and Prevention (CDC).
>
> Dr. Heneine's group has shown that daily pre-exposure prophylaxis **(PrEP)** with emtricitabine in combination with tenofovir disoproxil fumarate **(Truvada)** significantly increases the level of protection against HIV transmission. This finding was discovered following repeated virus challenges with macaque monkeys. The CDC is pursuing U.S. and foreign patent protection for this technology.
>
> An abstract with more information can be found in the Federal Register. Also, Dr. Heneine has co-authored publications in PLoS Medicine and Science Translational Medicine, describing the above discovery.

55

emphasis added).   This email contains a hyperlink to the Federal Register, which provides a general description of the applications for the Patents-in-Suit, indicating that the applications were directed to the use of a combination of emtricitabine and tenofovir for HIV chemoprophylaxis. The Federal Register also specifically identified the application numbers for (1) U.S. Provisiona Application No. 60/764,811 ("the '811 provisional application")—which had been included in a CV that inventor Walid Heneine emailed to Gilead in 2008 (2) U.S. Patent Application No. 11/669,547 ("the '547 application")—which published as US2007/0265227 in 2007 with claims directed to the use of a combination of emtricitabine and tenofovir for HIV prophylaxis; and (3) PCT Application No. PCT/US2007/002926 ("the '926 PCT")—the same PCT application that Dr. Janssen had disclosed to Gilead in 2008:

> Inhibition of HIV Infection Through Chemoprophylaxis Using Emtricitabine and Tenofovir
>
> *          *          *
>
> *Description of Technology:* The invention is directed to prophylactic administration of emtricitabine (FTC) in combination with tenofovir or its prodrug, tenofovir disoproxil fumarate (TDF), to protect against transmission of human immunodeficiency virus (HIV) infection.
>
> *          *          *
>
> US Provisional Application No. 60/764,811 filed 3 Feb 2006.
>
> US Patent Application No. 11/669,547 filed 31 Jan 2007.
>
> PCT Application No. PCT/US2007/002926 filed 01 Feb 2007.
>
> European Patent No. 2015753 issued 01 May 2013.

The email from Laura Prestia further contained links to two articles authored by the inventors, the first of which had been emailed to Jim Rooney by inventor Walid Heneine in 2008, and both of which indicated that the inventors had filed for a patent on the research described in

the publications.   *See* D.I. 1, Exhibit Nos. 31 and 34; J. Gerardo García-Lerma et al., *Prevention of Rectal SHIV Transmission in Macaques by Daily or Intermittent Prophylaxis with Emtricitabine and Tenofovir*, 5 PLOS MEDICINE (2) 291 (2008); J. Gerardo García-Lerma et al., *Intermittent Prophylaxis with Oral Truvada Protects Macaques from Rectal SHIV Infection*, 2 SCI. TRANSLATIONAL MED. (14ra4) 1 (2010).

Gilead knew or should have known as early as 2014 of the existence of the applications for the Patents-in-Suit and that they covered the use of Truvada for PrEP as this was expressly indicated in Laura Prestia's October 2014 email.   Gilead knew or reasonably should have known that the '547 application, which was disclosed in the Federal Register linked to Laura Prestia's email, issued as the '509 patent on June 2, 2015 and had earlier published as U.S. 2007/0265227 on November 15, 2007, as this information is publicly available and easily obtainable.   Gilead knew or should have known that the use of Truvada for PrEP® and Descovy for PrEP® in accordance with and as directed by Gilead's package inserts and training guides that accompany Gilead's Truvada® and Descovy® products would cause physicians to prescribe and patients to take Gilead's products in a manner that infringes the asserted claims.   In addition to Ms. Prestia's email indicating to Gilead that the Patents-in-Suit were directed to Truvada for PrEP, Gilead could have easily confirmed this by looking up the publicly available '509 patent and reviewing its claims.   Gilead's repeated refusal to license the Patents-in-Suit for its Truvada for PrEP® after Laura Prestia's email indicated a specific intent to induce acts constituting infringement of the asserted claims.   This is further evidenced by the active steps Gilead continues to take to direct, encourage, recommend, promote, and induce infringement of those claims.

The Government reserves the right to supplement and/or amend these interrogatories to incorporate information that may be discovered during litigation.   In addition, Gilead argues in is Third Amended Answer that it does not induce infringement because the package inserts for

Truvada® and Descovy®, "do not encourage exposure to an immunodeficiency virus; indeed, both instruct that the medications should be used in combination with other safer sex practices to reduce the risk of exposure to HIV." The Government disagrees with this characterization of the package inserts and with Gilead's infringement positions, but reserves the right to respond to any arguments or any evidence that Gilead may provide in support of these arguments with additional information or evidence not provided in these claim charts.

In addition, although the Court conducted a claim construction hearing on August 4, 2021, the Court has not yet entered a claim construction order in this case. The Government reserves the right to amend or supplement this disclosure based on any claim construction order entered or as permitted under the Patent Rules, the rules of this Court, the Federal Rules, or otherwise permitted by the Court. To the extent that the Court's claim construction order construes any term that would be directly relevant to Gilead's allegations of non-infringement, including but not limited to its claim that TAF is not an ester, the Government reserves the right to amend or supplement these claims charts to include additional evidence if needed to address the Court's construction.

These Supplemental Claim Charts are illustrative, and are not intended to limit the Government's ability to rely on other documents, other portions of documents cited herein, or other information to relating to Gilead's infringement including, but not limited to, the ability to rebut arguments Gilead has not yet raised.

## INTERROGATORY NO 14:

Identify and describe in detail any information relating to any prior use, including both verified and unverified reports of prior use, by anyone, including the Government, of the subject matter of the Patents-in-Suit more than one year before the earliest effective filing date the Government has identified in response to Interrogatory No. 14. Such information includes, but is not limited to, any information, reports, or survey responses regarding "off-label" prescriptions

and use of Truvada® and Descovy® for HIV-1 prophylaxis before the FDA's approval of the PrEP indications for those products.

**RESPONSE TO INTERROGATORY NO. 14:**

The Government incorporates by reference its Objections to Definitions and Instructions as if set forth in full herein. The Government objects to this interrogatory to the extent it seeks information protected by attorney/client privilege, the work product immunity, or any other applicable claim of privilege or immunity. The Government objects to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses. For example, the interrogatory seeks "any information relating to any prior use" and "any information, reports, or survey responses" and is not limited to any asserted claim or contention. The Government objects to this interrogatory as premature to the extent it seeks expert testimony prior to the deadlines set forth in the Scheduling Order, the Local Rules, and the Federal Rules. The Government objects to this interrogatory to the extent it requires formulation of a legal conclusion or opinion regarding "prior use" of the claimed inventions of the Patents-in-Suit. The Government objects to this interrogatory on the grounds that it contains multiple discrete subparts within the meaning of Federal Rule of Civil Procedure 33(a)(1) and therefore constitutes multiple interrogatories. The Government objects to this interrogatory as vague and ambiguous, particularly with respect to the phrases "prior use . . . of the subject matter of the Patents-in-Suit" and "the earliest effective filing date the Government has identified in response to Interrogatory No. 14."

Subject to and without waving the Objections to Definitions and Instructions or Specific objections asserted, and to the extent the Government understands this interrogatory, the Government answers the unobjectionable scope of this interrogatory as follows: The Government is not aware of any "prior use" of any asserted claim of the Patents-in-Suit.

Discovery is ongoing and the Government reserves the right to amend, modify, supplement, or change its response to this interrogatory.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14

The Government maintains its objections and maintains that it has no knowledge of any invalidating prior use of the claimed PrEP regimens and no knowledge of any prior use of the subject matter of the Patents-in-Suit.

The Government states only that it has produced the following documents containing surveys that were conducted by CDC that anecdotally describe individuals taking anti-viral medications, none of which were identified as tenofovir or tenofovir with emtricitabine, none of which were confirmed to have been administered prior to an exposure or a potential exposure, and none of which were to an individual confirmed to have an HIV negative status and none of which were confirmed to protect an individual.

In addition, pursuant to Federal Rule of Civil Procedure 33(d), the information sought by this interrogatory may be determined by examining documents produced by the Government in this case, including US_ US_00387483-US_00387581, and the burden of deriving the information sought by this interrogatory from those documents would be substantially the same for Gilead as for the Government Discovery is ongoing and the Government reserves the right to amend, modify, supplement, or change its response to this interrogatory.

Discovery is ongoing and the Government reserves the right to amend, modify, supplement, or change its response to this interrogatory.

## INTERROGATORY NO. 17:

Separately, for each asserted claim of the Patents-in-Suit, state the factual and legal bases for any contention that Defendants have engaged in willful infringement.

## RESPONSE TO INTERROGATORY NO. 17:

The Government incorporates by reference its Objections to Definitions and Instructions as if set forth in full herein. The Government objects to this interrogatory to the extent it seeks information protected by attorney/client privilege, the work product immunity, or any other applicable claim of privilege or immunity. The Government objects to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses. *See In re Convergent Techs.*, 108 F.R.D. at 337. For example, the interrogatory seeks "the factual and legal bases for any contention" and is not limited to the Government's claims or contentions. There is no requirement that requires the Government to marshal all available proof in response to an interrogatory. Courts do not require responding parties to "write . . . a portrait of their trial" or "write a book" in response to a contention interrogatory. *See, e.g., Roberts*, 130 F.R.D. at 427. The Government objects to this interrogatory as premature to the extent it seeks expert testimony prior to the deadlines set forth in the Scheduling Order, the Local Rules, and the Federal Rules. The Government objects to this interrogatory to the extent it requires formulation of a legal conclusion or opinion. The Government objects to this interrogatory on the grounds that it contains multiple discrete subparts within the meaning of Federal Rule of Civil Procedure 33(a)(1) and therefore constitutes multiple interrogatories as reflected by Gilead's requested response be "[s]eparately, for each asserted claim of the Patents-in-Suit." The Government objects to this interrogatory as vague and ambiguous, particularly with respect to the phrase "any contention that Defendants have engaged in willful infringement."

Subject to and without waving the Objections to Definitions and Instructions or Specific objections asserted, and to the extent the Government understands this interrogatory, the Government answers the unobjectionable scope of this interrogatory as follows: Information

responsive to this interrogatory is provided at, for example, page 3 of the Government's Disclosures Under Paragraph 7(a) of the Scheduling Order [D.I. 27] and the Complaint [D.I. 1], including ¶¶ 249–313, which are hereby incorporated by reference herein. Additional details of Gilead's infringement will be provided pursuant to the Scheduling Order [D.I. 27] and are incorporated by reference herein.

Discovery is ongoing and the Government reserves the right to amend, modify, supplement, or change its response to this interrogatory.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17:**

The Government incorporates by reference its Objections to Definitions and Instructions as if set forth in full herein. The Government objects to this interrogatory to the extent it seeks information protected by attorney/client privilege, the work product immunity, or any other applicable claim of privilege or immunity. The Government objects to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses. *See In re Convergent Techs.,*108 F.R.D. at 337. For example, the interrogatory seeks "the factual and legal bases for any contention" and is not limited to the Government's claims or contentions. There is no requirement that requires the Government to marshal all available proof in response to an interrogatory. Courts do not require responding parties to "write . . . a portrait of their trial" or "write a book" in response to a contention interrogatory. *See, e.g., Roberts*, 130 F.R.D. at 427. The Government objects to this interrogatory as premature to the extent it seeks expert testimony prior to the deadlines set forth in the Scheduling Order, the Local Rules, and the Federal Rules. The Government objects to this interrogatory to the extent it requires formulation of a legal conclusion or opinion. The Government objects to this interrogatory on the grounds that it contains multiple discrete subparts within the meaning of Federal Rule of Civil Procedure 33(a)(1) and therefore constitutes multiple

interrogatories as reflected by Gilead's requested response be "[s]eparately, for each asserted claim of the Patents-in-Suit." The Government objects to this interrogatory as vague and ambiguous, particularly with respect to the phrase "any contention that Defendants have engaged in willful infringement."

Subject to and without waving the Objections to Definitions and Instructions or Specific objections asserted, and to the extent the Government understands this interrogatory, the Government answers the unobjectionable scope of this interrogatory as follows: Information responsive to this interrogatory is provided at, for example, page 3 of the Government's Disclosures Under Paragraph 7(a) of the Scheduling Order [D.I. 27] and the Complaint [D.I. 1], including ¶¶ 249–313, which are hereby incorporated by reference herein. Additional details of Gilead's infringement will be provided pursuant to the Scheduling Order [D.I. 27] and are incorporated by reference herein.

Gilead had notice of the Application No. 11/669,547 ("the '547 Application") which issued as the '509 Patent at least as early as August 6, 2008. On that date, Steve Krawczyk, Director, Patent Liaison for GSI, emailed a Derwent Alert which covered the time period from August 2007 to October 2007 a number of Gilead employees[2]. GILDDE01209435. This patent search report lists both the international application, WO2007092326, and the '547 Application. This alert

---

[2] Allan Kutzenco <allan.kutzenco@gilead.com>, Bill Baker <bill.baker@gilead.com>, Bill Lee <bill.lee@gilead.com>, Choung Kim <choung.kim@gilead.com>, Christopher Sheng <christopher.sheng@gilead.com>, Damian Mccoll <damian.mccoll@gilead.com>, Grushenka Wolfgang <grushenka.wolfgang@gilead.com>, Haolun Jin <haolun.jin@gilead.com>, John Link <john.link@gilead.com>, John Ward <john.ward@gilead.com>, John Wolf <john.wolf@gilead.com>, Larry Melvin <larry.melvin@gilead.com>, Lianhong Xu <lianhong.xu@gilead.com>, Lori Lehman <lori.lehman@gilead.com>, Manoj Desai <manoj.desai@gilead.com>, Mary McGrath <mary.mcgrath@gilead.com>, Matthew Wright <matthew.wright@gilead.com>, Randall Halcomb <randall.halcomb@gilead.com>, Richard Mackman <richard.mackman@gilead.com>, Roman Sakowicz <roman.sakowicz@gilead.com>, Romas Geleziunas <romas.geleziunas@gilead.com>, Steve Bondy <steve.bondy@gilead.com>, Sukeerthi Seetharaman <sukeerthi.seetharaman@gilead.com>, Swami Swaminathan <swami.swaminathan@gilead.com>, Tomas Cihlar <tomas.cihlar@gilead.com>, Weidong Zhong <weidong.zhong@gilead.com>, Will Watkins <will.watkins@gilead.com>, William Delaney william.delaney@gilead.com  We note that because Gilead uses "@gilead.com" for employees at GSI and GSIUC, (an additional demonstration of GSI and GSIUC's close coordination) it is not clear whether any of the employees are GSIUC employees, but possible.

further provides the filing date of the '547 Application, lists the named inventors (including Dr. Robert Janssen), pictures both emtricitabine and tenofovir, lists The Department of Health and Human Services as the patent owner, and describes a method of taking both emtricitabine and tenofovir in combination, prior to exposure, to prevent infection by an immunodeficiency retrovirus, such as HIV-1. This patent search report was emailed directly to custodian Dr. William Lee, Executive Vice President, Research. Additionally, the European Patent Bulletin published on January 21, 2009, and it listed the WO 2007/092326, a direct reference to the '547 Application, and the filing date of the '547 Application.

On information and belief, Gilead had notice that the '547 Application issued as the '509 Patent when it issued in January 2015. The Government intends to supplement this response with additional evidence as discovery is ongoing, and we believe there are production deficiencies regarding patent alert searches which should have disclosed the issuance of the '509 Patent to Gilead.

Because Gilead knew of the '547 Application and the '509 Patent, its infringement was willful, as its infringement was either known or was so obvious it should have been known. *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 503 F. Supp. 3d 156, 172 (D. Del. 2020) ("To prevail on a claim of willful infringement, then, a patentee must prove that the infringer acted despite a risk of infringement that was 'either known or so obvious that it should have been known to the accused infringer.'") (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct 1923, 1930 (2016)).

Gilead possessed knowledge of the patent and the infringement from many sources, including from Dr. Robert Janssen, not only from his disclosure of the patented research and

application for a patent on that research on his Employee Confidential Information and Inventions Agreement, but also from his employment by Gilead in a position where his knowledge of the patented research and the application was relevant to the nature and scope of his duties to Gilead and material to the same. *See* GILDDE00456424–26 (offering Dr. Janssen the position of "Vice President, Medical Affairs, reporting directly to" Dr. Norbert Bischofberger, Executive Vice President, R&D and Chief Scientific Officer); *see also* GILDDE00456428–438 (outlining Dr. Janssen's many responsibilities as both a manager and employee of Gilead). *Huston v. P&G Paper Prods. Corp.*, 568 F.3d 100, 107 (3d Cir. 2009) ("to justify imputation, the knowledge must also be material--i.e., important or significant--to the employee's duties to the employer.") (citing Restatement (Second) of Agency § 272 cmt. a ("The principal is affected by the agent's knowledge whenever the knowledge is of importance in the act which the agent is authorized to perform.")).

Additionally, Mr. O'Day testified before Congress that he understood "the use patents on PrEP granted to the CDC" to "claim[]" the "invention" of "[u]sing Truvada for PrEP." Mr. O'Day testified that this use was "well-known in the scientific community." 116th Cong. 14. Accordingly, Gilead understood that the use of Truvada for PrEP was claimed by the HHS Patents and implied that this understanding existed at all times, preceding and including the issuance of the '509 Patent.

And Gilead has admitted that the Government contacted Gilead in 2014 and "demanded a license." LTR Cook to Brown (1/20/2021) at 3 ("the government contacted Gilead to demand that Gilead take a license to the family of the Patents-in-Suit as early as October 2014.") While Mr. Cook's letter references "the government's complaint" and D.I. ¶ 234 for context on this sentence, *id*. the Complaint's ¶ 234 only states that "NIH/OTT emailed [Gilead personnel], giving

them notice of CDC's patented technology."   Gilead apparently understands this email to have demanded a license for the patented invention.

Gilead engaged in disingenuous licensing negotiations and insincere testimony under oath to the United States Congress. "[C]laims for willful infringement [] based on . . . conduct that occurred during the parties' licensing negotiations through a period of about three years" can support a finding of "egregious conduct under *Halo*." *Finjan, Inc. v. SonicWall*, Inc., No. 17-cv-04467-BLF, 2018 U.S. Dist. LEXIS 83546, at *14 (N.D. Cal. May 16, 2018). Gilead testified under oath in 2019 to the United States Congress that "[w]e believe the CDC patents are invalid, but we've chosen not to challenge those patents because we value our collaborative relationship with the agency."[3]   However, Gilead states that it anticipated litigation prior to that, as early as 2017. Further, at the time of the hearing, Gilead was actively preparing four IPRs that were filed only three months after that sworn testimony. *See* GILDCFC00000004 (invoice from Sidley Austen for "services rendered through August 31, 2019 re: CDC Patent Issues Relating to Truvada").   As filed, the IPRs include evidence of Gilead preparing them beginning in the late 2017 to 2018 time frame. For example, the Coates declaration (Ex. 1129) was executed on February 2, 2018, and Jeffrey Kushan, an attorney for Sidley Austen, was emailing purported potential prior art references in February of 2018. *See* Exhibit 1142.   And this was only after Gilead continuously ignored earlier emails from Laura Prestia in 2014 and Dr. Tara Kirby in 2016 when they were seeking to license their patents. *See* GILDCFC00000019 (WilmerHale invoice for "NIH Matter" dated July 2016).   Gilead's awareness that the claims of the Patents-in-Suit

---

[3] *HIV Prevention Drug: Billions in Corporate Profits After Millions in Taxpayer Investments: Hearing Before the H. Comm. on Oversight and Reform*, 116th Cong. 14 (May 16, 2019) (statement of Dr. Robert M. Grant, Professor of Medicine, University of California, San Francisco), https://www.govinfo.gov/content/pkg/CHRG-116hhrg36660/pdf/CHRG-116hhrg36660.pdf [https://perma.cc/M5KY-YPFP]

covered the use of Truvada for PrEP®, and refusal to take a license, and then further representation that it would not challenge the Patents-in-Suit, all while it was preparing to file its IPRs, all evidence willful infringement.

Discovery is ongoing and the Government reserves the right to amend, modify, supplement, or change its response to this interrogatory.

September 24, 2020

SARAH HARRINGTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

*Of Counsel:*
PHILIP CHARLES STERNHELL
Assistant Director
AMANDA K. KELLY
Trial Attorney
PATRICK C. HOLVEY
Trial Attorney

 /s/ Walter W. Brown
WALTER W. BROWN
Senior Litigation Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C.   20530
Tel:    (202) 307-0341
Fax:    (202) 307-0345
*walter.brown2@usdoj.gov*

/s/ Laura D. Hatcher
LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel:    (302) 573-6277
Fax:    (302) 573-6220
*Laura.hatcher@usdoj.gov*
*Shamoor.anis@usdoj.gov*

## CERTIFICATE OF SERVICE

I certify that a true copy of "PLAINTIFF'S FIFTH SUPPLEMENTAL RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES" was sent via electronic mail, this September 24, 2021 to all counsel of record including:

> David Bassett
> Wilmer Cutler Pickering Hale and Dorr, LLP
> 250 Greenwich St. 45th floor
> New York, NY 10007
> david.bassett@wilmerhale.com
> Telephone: (212) 230-8858
>
> Attorney for Plaintiff

> */s/ Walter W. Brown*
> Walter W. Brown
> Department of Justice
> walter.brown2@usdoj.gov

# Exhibit E

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA,<br>   *Plaintiff–Counterclaim Defendant*,<br><br>   v.<br><br>GILEAD SCIENCES, INC.<br>   *Defendant–Counterclaim Plaintiff,*<br><br>AND GILEAD SCIENCES IRELAND UC,<br>   *Defendant*. | Civil No. 1:19-02103-MN |

**PLAINTIFF'S FINAL CLAIM CHARTS ON INFRINGEMENT BY GILEAD**

Plaintiff and Counterclaim-Defendant United States (the Government) hereby provides the following Final Claim Charts on Infringement by Defendant and Counterclaim-Plaintiff Gilead Sciences, Inc. (Gilead Sciences) and Defendant Gilead Sciences Ireland UC (GSIUC) (collectively, Gilead or Defendants) regarding U.S. Patent Nos. 9,044,509 (the "'509 Patent"), 9,579,333 (the "'333 Patent"), 9,937,191 (the "'191 Patent"), and 10,335,423 (the "'423 Patent") (collectively, the "Patents-in-Suit") with respect to Gilead's Truvada® and Descovy® products when administered as pre-exposure prophylaxis ("PrEP") regimens.  The Government incorporates by reference the allegations set forth in its Complaint, including but not limited to: ¶¶ 244-279 describing the Government's efforts to license the Patents-in-Suit to Gilead, Gilead's acquisition of the trademarks related to use of Descovy for PrEP® and Truvada for PrEP®; ¶¶ 128-134 and 233-240 concerning Gilead's notice of the Patents-in-Suit; ¶¶ 176-178 and 255 regarding the number of patients using Truvada for PrEP® and the Government's allegations of willful infringement and willful inducement of infringement; and  ¶¶ 280-313 which include the Government's Counts I-IV for willful infringement and willful inducement of infringement of the Patents-in-Suit.  The Government further incorporates by reference the Government's Initial Claim

RESTRICTED INFORMATION

Charts on Infringement served on October 29, 2020, and the Government's initial and supplemental responses to Gilead's Interrogatories Nos. 3, 4, 6, 7, 23 and 24.Gilead manufactures, markets, and sells Truvada® and Descovy®. Each of these products includes a combination of (1) emtricitabine (FTC) and (2) a tenofovir prodrug/ester. The tenofovir prodrug/ester in Truvada® is tenofovir disoproxil fumarate (TDF). The tenofovir prodrug/ester in Descovy® is tenofovir alafenamide (TAF) hemi-fumarate. The administration of these products for PrEP according to the FDA-approved prescribing information infringes the Patents-in-Suit, literally or under the doctrine of equivalents.

Gilead Sciences Ireland UC currently manufactures and/or packages Gilead's Truvada for PrEP® and Descovy for PrEP® intended for sale in the United States, and those products include FDA-approved package inserts that include instructions regarding the use of those products for PrEP. Gilead Sciences Ireland UC has manufactured and/or packaged Gilead's Truvada for PrEP® product from at least 2012 to the present. Gilead has identified Gilead Sciences Ireland UC to the FDA as such and is so listed in the FDA's Electronic Drug Registration and Listing System (eDRLS).

Gilead's intent to induce direct infringement of the asserted claims is reflected in, *inter alia*, the package inserts and training guides for Truvada® and Descovy®. The prescribing information contained in Gilead's package inserts and training guides for Truvada® and Descovy® instruct doctors and patients on how Gilead intends these products to be used. Gilead's package inserts and training guides instruct physicians to administer and patients to use Truvada for PrEP® and Descovy for PrEP® in a manner that directly infringes all elements of the asserted claims, either literally or under the doctrine of equivalents. The package inserts and training guides therefore cause physicians to prescribe and patients to take Truvada for PrEP® and Descovy for

RESTRICTED INFORMATION

PrEP® in a manner that directly infringes the asserted claims.  When physicians or patients use Gilead's Truvada® and Descovy® products for PrEP in accordance with the prescribing information in Gilead's package inserts and/or training guides, they directly infringe the asserted claims.  For example, when physicians or patients use Gilead's Truvada® and Descovy® products for PrEP, they administer pharmaceutically effective amounts of the combination of FTC with TDF or TAF according to the methods recited by the asserted claims.  Physicians also implement the instructions in Gilead's Truvada® and Descovy® package inserts and training guides by directing, controlling, and causing the administration of the combination of FTC with TDF or TAF for PrEP according to the methods of the asserted claims by their respective patients.   In accordance with that direction, control, and causation, patients, as directed by physicians, individually self-administer a combination of FTC with TDF or TAF for PrEP and receive the benefit of administration in the claimed methods.  Patients also implement the instructions in Gilead's Truvada® and Descovy® package inserts and administer pharmaceutically effective amounts of the combination of FTC and TDF or TAF according to the methods of the asserted claims.

Both clinicians and/or their patients who are treated with Truvada for PrEP® directly infringe the claims of the Patents-in-Suit.  In the alternative, physicians and patients jointly infringe. Joint infringement occurs under both the theories of joint enterprise and/or vicarious liability. Under a theory of vicarious liability, the physician conditions the prescription and administration of Truvada for PrEP® on the patient engaging in behavior that will expose or potentially expose the patient to HIV. *See, e.g., Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1364 (Fed. Cir. 2017); *Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 584 (D. Del. 2018) (Bryson, J.) ("As long as the conduct goes beyond merely 'guiding or instructing,' the conditioning requirement is satisfied."), *aff'd sub nom. Persion Pharm. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184 (Fed.

3

Cir. 2019). The Truvada® label clearly indicates PrEP for "high risk adults," and the side-effects in the label, inform the physician that Truvada for PrEP® should only be administered to patients that would benefit from its use.

Physicians and patients also directly infringe through a joint enterprise theory. For example, there is an agreement between patient and physician to administer PrEP to an HIV-negative high-risk patient according to the Truvada for PrEP® label which follows methods described in the claims of the Patents-in-Suit.  Further, the purpose of this agreement to administer is to achieve the common goal of preventing HIV infection. And this agreement is part of the formal patient-doctor relationship, where both the physician and patient have the equal right to stop the treatment and/or terminate the relationship.  Gilead expects physicians to prescribe and patients to use Gilead's Truvada® and Descovy® products consistent with the Truvada for PrEP® and Descovy for PrEP® uses described in the package inserts and training guides for these products.  Gilead knows or should know that the use of Truvada for PrEP® and Descovy for PrEP® in accordance with and as directed by Gilead's package inserts and training guides that accompany Gilead's Truvada® and Descovy® products have caused and continue to cause physicians to prescribe and patients to take Gilead's products in a manner that directly infringes the asserted claims.  Gilead therefore had and continues to have the specific intent to induce infringement of the asserted claims, as evidenced by the active steps Gilead has taken and continues to take to direct, encourage, recommend, promote, and induce acts of direct infringement of those claims.

Because Gilead sells its Truvada® and Descovy® products with instructions to administer these products as Truvada for PrEP® and Descovy for PrEP®, respectively, Gilead has induced and continues to induce the direct infringement of the asserted claims by prescribers, distributors, and/or consumers under 35 U.S.C. § 271(b).  For example, Gilead has induced and continues to induce prescribers (such as physicians), distributors (such as a pharmacies), or others (such as

patients), to perform each step of the claimed method such that the prescriber, distributor, or consumer directly infringes the asserted claims.

Gilead's labeling, including the prescribing information in its package insert and training guides, knowingly encourages and instructs physicians and other caregivers/healthcare providers to directly infringe the asserted claims by administering Gilead's Truvada® and Descovy® products to patients for PrEP.  Gilead is aware of the Patents-in-Suit and intends for physicians and other caregivers/healthcare providers to use Gilead's Truvada® and Descovy® products in an infringing manner.  Gilead therefore has engaged and continues to engage in ongoing, willful acts of inducement of direct infringement of the asserted claims.

The Risk Evaluation and Mitigation Strategy (REMS) submitted by Gilead to the FDA for the Truvada for PrEP indication provides additional evidence that Gilead has induced and continues to induce direct infringement of the asserted claims by physicians prescribing, and patients using, Truvada® for PrEP.  For example, the goal of the REMS includes "inform[ing] and educat[ing] prescribers, other healthcare professionals, and individuals at high risk for acquiring HIV-1 infection about:  The importance of strict adherence to the recommended dosing regimen; [and] [t]he importance of regular monitoring of HIV-1 serostatus to avoid continuing to take TRUVADA for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants."  See Ex. H at 2 of pdf.  Gilead agreed to "ensure that training and education through the TRUVADA for a PrEP Indication Healthcare Professional Education Program is available to healthcare providers who prescribe TRUVADA for a PrEP indication."  *Id.* at 3 of pdf.  "Gilead's training efforts will target the following healthcare providers who are likely to prescribe TRUVADA for a PrEP indication: Primary care physicians, including internal medicine, family practice, and general medicine physicians; Infectious Diseases

specialists; Obstetrician-gynecologists; [and] Addiction specialists." *Id.* Gilead included the REMS information on its website. *Id.* at 64-104 of pdf. Gilead's REMS activities supplement the Truvada labeling and Gilead pharmacovigilance processes. *See* Ex. I at 5.

In order to facilitate prescriber training and education, Gilead disseminated to physicians a "Safety Information Fact Sheet" that emphasized "The importance of strict adherence to the recommended dosing regimen; [and] The importance of regular monitoring of HIV-1 serostatus to avoid continuing to take TRUVADA for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants." Ex. H at 3-4 of pdf. The Safety Information Fact Sheet for Prescribers instructs physicians that they "must confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication." *Id.* at 15 of pdf; *see also id.* at 16 of pdf. The fact sheet further instructs physicians to "[s]creen [their patients] for HIV-1 infection at least once every 3 months while [the patients are] taking TRUVADA for PrEP" and that "TRUVADA for a PrEP indication is contraindicated in individuals with unknown of HIV-1-positive status." *Id.* at 15 of pdf; *see also id.* at 16 of pdf. The fact sheet emphasizes "[t]he importance of strict adherence to the recommended dosing regimen" and states "[t]he effectiveness of TRUVADA for a PrEP indication in reducing the risk of acquiring HIV-1 is strongly correlated with adherence and measurable drug levels" and instructs physicians that "[a]ll uninfected individuals at high risk taking TRUVADA for a PrEP indication must be counseled to strictly adhere to the recommended daily dosing schedule to reduce the risk of acquiring HIV-1." *Id.* at 15 of pdf; *see also id.* at 16 of pdf.

Gilead also ensured that a "Dear Healthcare Provider (DHCP) letter" would be available to healthcare providers as part of training and education in using Truvada for PrEP. *Id.* at 17-20 of pdf. "Gilead will distribute the DHCP letter to the targeted healthcare providers via electronic

6
RESTRICTED INFORMATION

mail, mail or facsimile." *Id.* at 5 of pdf. The DHCP letter informs and educates physicians prescribing Truvada for PrEP about "[t]he importance of strict adherence to the recommended dosing regimen; [and] [t]he importance of regular monitoring of HIV-1 serostatus to avoid continuing to take TRUVADA for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants." *Id.* at 17 of pdf. The DHCP instructs physicians that "You MUST obtain a negative HIV-1 status immediately before prescribing TRUVADA for a PrEP indication in an uninfected individual" and "Do NOT prescribe TRUVADA for a PrEP indication to patients with HIV-1 infection or to individuals with signs or symptoms consistent with acute HIV-1 infection." *Id.* The DHCP letter instructs physicians that "You should review and discuss the content of the Agreement Form for Initiating TRUVADA for Pre-Exposure Prophylaxis of Sexually Acquired HIV-1 Infection with an uninfected individual considering or taking TRUVADA for a PrEP indication and refer to the Checklist for Prescribers regarding the management of an uninfected individual taking TRUVADA for a PrEP indication. (Access Agreement Form and Checklist via www.truvadapreprems.com)." *Id.* at 18 of pdf. The DHCP instructs physicians that managing patients taking Truvada for PrEP should include counseling the patient to "[b]e tested to confirm that they are HIV-1 negative immediately before starting TRUVADA for a PrEP indication" and "[b]e screened at least every 3 months for HIV-1." *Id.*

Gilead also ensured that "Important Safety Information about TRUVADA for a PrEP Indication for Healthcare Providers" would be available to healthcare providers as part of training and education in using Truvada for PrEP. *Id.* at 6 of pdf; *id.* at 21-25 of pdf. The safety information for healthcare providers instructs physicians that "[t]he following factors may help to identify individuals at high risk: Has partner(s) known to be HIV-1 infected, or Engages in sexual activity within a high prevalence area or social network and one or more of the following: Inconsistent or

no condom use; Diagnosis of sexually transmitted infection (STI); Exchange of sex for commodities (such as money, food, shelter, or drugs), Use of illicit drugs, alcohol dependence; Incarceration; Partner(s) of unknown HIV-1 status with any of the factors listed above." *Id.* at 22 of pdf. The safety information further instructs physicians to "[c]ounsel all uninfected individuals to strictly adhere to their TRUVADA daily dosing schedule because the effectiveness of TRUVADA in reducing the risk of acquiring HIV-1 is strongly correlated with adherence and measurable drug levels." *Id.*

Gilead also ensured that "Important Safety Information about TRUVADA for a PrEP Indication for Uninfected Individuals" would be available to healthcare providers as part of training and education in using Truvada for PrEP. *Id.* at 26-32 of pdf. The safety information for uninfected individuals instructs patients that "[y]ou should not take TRUVADA for a PrEP indication if you are HIV-1 positive or do not know your status." *Id.* at 28 of pdf. The safety information further instructs patients that:

> You must be HIV-1 negative and stay HIV-1 negative before starting TRUVADA for a PrEP indication. That is why you must:
> - Get tested to be sure you are HIV-1 negative. It is important that you also get tested at least every 3 months as recommended by your healthcare provider while taking TRUVADA
> - Not take TRUVADA to reduce the risk of getting HIV unless you are confirmed to be HIV-1 negative …
> - Be prepared to commit to … regular testing for HIV-1 (at least every 3 months) …
> - Make sure you understand the risks and benefits of taking TRUVADA for a PrEP indication as outlined in the TRUVADA Medication Guide and in the Agreement Form, and you have spoken with your healthcare provider about questions and concerns.

*Id.*  The safety information instructs patients that "[y]ou will need to get tested regularly for HIV-1 to make sure that you are still HIV-1 negative. Your healthcare provider will tell you when."  *Id.* at 29 of pdf.  It further instructs patients "not [to] miss any doses of TRUVADA. . . . TRUVADA for a PrEP indication may not help you decrease the chance of getting HIV-1 if you do not take it exactly as prescribed. Be sure to stick to the TRUVADA daily dosing schedule."  *Id.*

Gilead also ensured that "[p]rescribers will have access to the Agreement Form for Initiating TRUVADA for Pre-Exposure Prophylaxis (PrEP) of Sexually Acquired HIV-1 Infection to be discussed with an uninfected individual taking TRUVADA for a PrEP indication."  *Id*. at 6 of pdf.  "The Agreement Form will be for use at each visit to facilitate discussion of and promote understanding about the safety risks associated with the use of TRUVADA for a PrEP indication, the importance of adherence to the recommended daily dosing regimen, monitoring HIV-1 test results, and screening for sexually transmitted infections." *Id.*  "The prescriber and the uninfected individual will sign the Agreement Form and the form will be placed in the individual's medical record."  *Id.*  The Agreement Form is "[d]esigned for prescribers to use with uninfected individuals to facilitate discussion of appropriate use of TRUVADA for a PrEP indication" and covers "the importance of adherence to the recommended daily dosing regimen, [and] regular assessment of HIV-1 test status."  *Id.* at 61 of pdf.  The Agreement Form was included on Gilead's website.  *Id.* at 94 of pdf.

Gilead also ensured that "[p]rescribers will have access to a Checklist for Prescribers as a reminder for the management of an individual considering or taking TRUVADA for a PrEP indication, recommendations for screening laboratory test results including a negative HIV-1 test result … to ensure a comprehensive prevention strategy for prescribing TRUVADA for a PrEP indication in an uninfected individual."  *Id*. at 6 of pdf.  The Checklist for Prescribers provides a

"[c]hecklist of key components for prescribers to consider before starting an uninfected individual on TRUVADA for a PrEP indication," which includes "confirming a negative HIV-1 test result …[and] counseling on … importance of adherence." *Id.* at 61 of pdf. Gilead instructs physicians to "complete [the] checklist at each visit and file [it] in [the] individual's medical record." *Id.* at 63 of pdf. Gilead's checklist instructs the physician to verify:

> I have completed the following prior to prescribing TRUVADA for a pre-exposure prophylaxis (PrEP) indication for the individual who is about to start or is taking TRUVADA for a PrEP indication:
>
> ☐ Confirmed a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. . . .
>
> ☐ Counseled on the importance of scheduled follow-up every 2 to 3 months, including regular HIV-1 screening tests (at least every 3 months), while taking TRUVADA for PrEP to confirm HIV-1 status . . .
>
> ☐ Counseled on the importance of adherence to daily dosing schedule . . .
>
> ☐ Reviewed the TRUVADA Medication Guide with the uninfected individual at high risk

*Id.* Gilead included the Checklist on its website. *Id.* at 93 od pdf.

Gilead provided physicians with a Training Guide for Truvada for PrEP. *See Id.* at 33-41 of pdf. Gilead instructed physicians that, when prescribing TRUVADA for PrEP, they should "Counsel all uninfected individuals to strictly adhere to their TRUVADA daily dosing schedule because the effectiveness of TRUVADA in reducing the risk of acquiring HIV-1 is strongly correlated with adherence and measurable drug levels; Confirm a negative HN-1 test immediately prior to initiating TRUVADA for a PrEP indication. . . .; [and] Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." *Id.* at 34 of pdf; *see also id.* at 35, 36, 37 of pdf. Gilead informed physicians that "Factors that may help to identify individuals at high risk include individuals having partner(s) know to be HIV-1 infected." *Id.* at 34 of pdf.

The Truvada for Health Care Providers website (www.truvadahcp.com) provides additional evidence that Gilead has induced and continues to induce direct infringement of the asserted claims by physicians prescribing, and patients using, Truvada for PrEP.  For example, Gilead's website instructs physicians that "TRUVADA FOR PrEP must be prescribed only to patients confirmed to be HIV negative immediately prior to initiation and at least every 3 months during use."  Gilead, TRUVADA FOR HEALTH CARE PROVIDERS, www.truvadahcp.com (last visited Nov. 11, 2021).   The website further instructs physicians that "TRUVADA FOR PrEP is contraindicated in patients with unknown or positive HIV status."  *Id.*  The website encourages physicians to "be the catalyst to spark a conversation about HIV risk and prevention."  *Id.*  The website instructs physicians that "[i]ndividuals must strictly adhere to the dosing schedule because the effectiveness of TRUVADA FOR PrEP is strongly correlated with adherence."  *Id.* ("Individuals should be counseled to adhere to the recommended TRUVADA dosing schedule."). The website touts the effectiveness of Truvada in protecting patients from acquiring a self-replicating HIV infection by stating "PROVEN REDUCTION IN HIV-1 ACQUISITION IN UNINFECTED INDIVIDUALS TAKING TRUVADA FOR PrEP" and a 90% risk reduction in HIV-1 acquisition from the Partners PrEP Trial and 92% risk reduction in HIV-1 acquisition from the iPrEx Trial.  *Id.*  The website instructs physicians to "[c]onsult the full Prescribing Information for TRUVADA for more information."  *Id.*  The website provides "a brief overview of what you [i.e., physicians] need to do prior to initiating TRUVADA FOR PrEP: Screen for HIV… Counsel individuals on the importance of daily dosing; Individuals should strictly adhere to the once-daily TRUVADA dosing schedule."  *Id.*

The Truvada website (www.truvada.com) contains additional evidence demonstrating that Gilead induced and continues to induce direct infringement of the asserted claims by physicians

RESTRICTED INFORMATION

prescribing, and patients using, Truvada for PrEP.  For example, Gilead's website instructs patients that "TRUVADA for PrEP is only for people who are at risk of getting HIV-1."  Gilead, TRUVADA, www.truvada.com (last visited Nov. 11, 2021).  The website also instructs patients that they "must be HIV-negative before [they] start and while taking TRUVADA for PrEP" and that they "[g]et tested for HIV-1 immediately before and at least every 3 months while taking TRUVADA."  *Id.* The website also emphasizes that the patient should "not miss any doses of TRUVADA" since "[m]issing doses may increase your risk of getting HIV-1 infection."  *Id.*  Gilead repeatedly provides similar instructions to patients regarding the use of Truvada for PrEP throughout the Truvada website.  *See, e.g.,* www.truvada.com/what-is-truvada/understanding-truvada; www.truvada.com/is-truvada-right-for-me/taking-truvada-for-prep; www.truvada.com/how-to-get-truvada-for-prep/talking-to-your-doctor; www.truvada.com/truvada-safety/clinical-studies; www.truvada.com/is-truvada-right-for-me/understanding-hiv-risk; and www.truvada.com/truvada-safety/important-safety-information.  Information from Gilead's www.truvada.com website is repeated in Gilead's Truvada for PrEP brochure.

Also, Gilead induces direct infringement of the asserted claims by physicians prescribing, and patients using, Truvada for PrEP, as evidenced by videos promoting Truvada for PrEP.  *See, e.g.*, https://www.youtube.com/watch?v=6GEOB9aplh0 (Truvada for PrEP commercial on YouTube); *see also* GILDDE0128045.

Gilead's marketing materials provide further evidence that Gilead has induced and continues to induce direct infringement of the asserted claims by physicians prescribing, and patients using, Truvada for PrEP.  For example, Gilead's Truvada "Product Deck" identifies necessity of HIV testing + adherence to regimen (slides 12-14; *see* GILDDE00125336-38).  Slide 12 of the Product Deck indicates groups needing PrEP include "adults at high risk, which includes:

Uninfected individuals with HIV-1-infected partner(s); Uninfected individuals who engage in sexual activity in a high prevalence; area or social network and have one or more of the following: Inconsistent or no condom use, Diagnosis of STIs, Exchange of sex for commodities (money, food, shelter, drugs), Use of illicit drugs or alcohol dependence, Incarceration, Sexual partners of unknown HIV-1 status with any of the above risk factors, STI, sexually transmitted infection." Slide 38 (GILDDE00125362) discusses who is "at risk" for HIV acquisition, which includes "Anyone from a population whose HIV-1 incidence is at least 2% per year," and "HIV-1 seronegative partners of HIV-1 positive partners who do not have viral suppression."  Similar evidence of inducement in Gilead's marketing materials include GILDDE00125124 (2016 table tent), GILDDE00124783 (2016 event handout), and GILDDE00124351 (2016 poster).

Additional marketing materials evidencing Gilead's inducement of direct infringement of the asserted claims by physicians prescribing, and patients using, Truvada for PrEP, is found in the AHCP 2016 presentation.  *See* GILDDE00124264.  Slide 4 discusses the "at risk" population that Gilead intends to use Truvada for PrEP, Slide 5 instructs that the patient must be confirmed to be HIV negative to take Truvada for PrEP, Slide 8 emphasizes the importance of regimen adherence and testing, and Slide 12 encourages taking Truvada before exposure to HIV.  Similar inducing instructions and recommendations are found in GILDDE00120372 (2014 slide deck), GILDDE00122456 (2015 slide deck), GILDDE00125783-851 (2016 slide deck), GILDDE00126331 (2017 brochure), GILDDE00126503-549 (2017 slide deck), GILDDE00126963 (2017 advertisement), GILDDE00126968 (2017 speaker deck), GILDDE00127937-987 (2017 slide deck), GILDDE00131193-226 (2017 slide deck), GILDDE00137922-52 (2018 slide deck), GILDDE00128184 ("Advancing access" brochure), and GILDDE00151946.

Another marketing material provided by Gilead that evidences inducing direct infringement of the asserted claims by physicians prescribing, and patients using, Truvada for PrEP, is found in the 2017 leave behind brochure. *See* GILDDE00126386. This brochure includes "Truvada for PrEP Prescribing Principles" in the following diagram:



The Truvada for PrEP Prescribing Principles explain that there are six important factors to consider when prescribing Truvada to high-risk individuals. Important factors include the need to confirm the patient is HIV negative, to counsel the patient on the importance of daily dosing, and to test the patient routinely for HIV at least every 3 months.

RESTRICTED INFORMATION

The Descovy "Important Facts" sheet that Gilead provides on  the Descovy website (www.descovy.com) is further evidence that Gilead has induced and continues to induce direct infringement of the asserted claims by physicians prescribing, and patients using, Descovy for PrEP.  The Descovy "Important Facts" sheet instructs patients that "[b]efore starting and while taking DESCOVY for PrEP: You must be HIV-1 negative. You must get tested to make sure that you do not already have HIV-1. Do not take DESCOVY for PrEP to reduce the risk of getting HIV-1 unless you are confirmed to be HIV-1 negative. Get tested for HIV-1 immediately before and at least every 3 months while taking DESCOVY."  Gilead, *Descovy Important Facts* (Jan. 2020) (available at www.descovy.com).  It also instructs patients that "[y]ou must be HIV-negative before and while taking DESCOVY for PrEP" and "Do NOT take DESCOVY for PrEP if you: Already have HIV-1 infection or if you do not know you HIV-1 status." *Id.*  The Descovy Important Facts sheet also instructs patients to "[t]ake 1 tablet once a day, every day, not just when you think you have been exposed to HIV-1. Do not miss any doses." *Id.*  It further instructs patients to "[g]et tested for HIV-1 every 3 months" and that they "must stay HIV-negative to keep taking DESCOVY for PrEP." *Id.*

Information within the Descovy for Health Care Providers website (www.descovyhcp.com) provides additional evidence that Gilead has induced and continues to induce direct infringement of the asserted claims by physicians prescribing, and patients using, Descovy for PrEP.  For example, Gilead's website instructs physicians that "DESCOVY FOR PrEP must be prescribed only to patients confirmed to be HIV negative immediately prior to initiation and at least every 3 months during use."  Gilead, DESCOVY FOR HEALTH CARE PROVIDERS, https://www.descovyhcp.com (last visited Nov. 11, 2021).  The website further instructs physicians that "DESCOVY FOR PrEP is contraindicated in patients with unknown or

positive HIV status." *Id.* The website instructs physicians to "[c]ounsel on adherence: Counsel patients to strictly adhere to daily dosing." The website instructs physicians to "[p]lease see full Prescribing Information for DESCOVY FOR PrEP." *Id.* Gilead repeatedly provides similar instructions to physicians for prescribing Descovy for PrEP throughout the Descovy for Health Care Providers website. *See, e.g.*, https://www.descovyhcp.com/initiating-descovy-for-prep; https://www.descovyhcp.com/follow-up-visits; and https://www.descovyhcp.com/descovy-daytracker-pack. Gilead encourages physicians to "help [their] patients keep track of their PrEP medication with the DESCOVY DayTracker," which has "30 visually trackable doses, with a helpful refill reminder built in." https://www.descovyhcp.com/descovy-daytracker-pack; *see also* GILDDE00194307.

Additional information within the Descovy website (www.descovy.com) further demonstrates that Gilead has induced and continues to induce direct infringement of the asserted claims by physicians prescribing, and patients using, Descovy for PrEP. For example, Gilead's website instructs patients that "DESCOVY for PrEP is not for everyone: … You must be HIV-negative before and while taking DESCOVY for PrEP." Gilead, DESCOVY, https://www.descovy.com (last visited Nov. 11, 2021). The website instructs patients that "[y]ou must be HIV-negative before you start and while taking DESCOVY for PrEP. You must get tested for HIV-1 immediately before and at least every 3 months while taking DESCOVY." *Id.* The website emphasizes that patients should "not miss any doses of DESCOVY. Missing doses may increase your risk of getting HIV-1." *Id.* Gilead repeatedly provides similar instructions to patients for using Descovy for PrEP throughout the Descovy website. *See, e.g.,* www.descovy.com/prep/descovy-for-prep-dosage; www.descovy.com/prep/clinical-trial-efficacy-results; www.descovy.com/prep/important-safety-information. Gilead's website touts

the effectiveness of Descovy in protecting patients from acquiring a self-replicating HIV infection, noting that "99.7% of people taking DESCOVY for PrEP in the trial stayed HIV-negative." Gilead, DESCOVY: CLINICAL STUDY AND RESULTS, www.descovy.com/prep/clinical-trial-efficacy-results (last visited Nov. 11, 2021).

Gilead's Descovy Marketing Material provides additional evidence that Gilead has induced and continues to induce direct infringement of the asserted claims by physicians prescribing, and patients using, Descovy for PrEP.  For example, Gilead's Prescriber Slide Deck instructs physicians how to prescribe Descovy for PrEP to patients in accordance with the Descovy product label.  *See* GILDDE00188011-050; *see also* GILDDE00195225.  Similarly, Gilead's Speaker Slide Deck provides instructions for administering Descovy for PrEP.  *See* GILDDE00188316-402.  The "PrEP Implementation" for Fulton County, GA provides another example of instructions for administering Descovy for PrEP that induces infringement of the asserted claims.  *See* GILDDE00188904.  Another example includes GILDDE00188910, which identifies PrEP candidates in a "large healthcare system."  Gilead has produced and distributed videos that induce infringement of the asserted claims by physicians prescribing, and patients using, Descovy for PrEP.  *See* GILDDE00189538; *see also* https://www.youtube.com/watch?v=nhsF7Csninw (Descovy for PrEP commercial on YouTube).  Yet another example is Gilead's "Discovery what's next in PrEP" slide deck.  *See* GILDDE00189084-123.

**Infringement of Truvada for PrEP®**

Gilead has induced and continues to induce direct infringement of at least the following claims of the Patents-in-Suit based upon its sales and activities in promoting Truvada for PrEP®:

- The '509 patent:  Claims 1-11 and 13;

- The '333 Patent:  Claims 1-11 and 13;

- The '191 Patent:  Claims 1-19; and

- The '423 Patent:  Claims 1-19.

Acts of direct infringement of the above-mentioned claims are carried out by clinicians and/or their patients who are treated with Truvada for PrEP® in the United States.  At a minimum, Gilead has induced and continues to induce infringement of the above-identified claims pursuant to 35 U.S.C. § 271(b).  In addition to selling Truvada for PrEP®, Gilead actively instructs doctors and/or patients to administer Truvada for PrEP®, including through clinical trials, prescribing information, product labels, training guides and agreement forms for healthcare providers, the materials it provides to physicians and patients pursuant to its REMS, and other product literature.  Gilead also advertises and promotes Truvada for PrEP® to the medical community and for use by the general public in a manner that has induced and continues to induce direct infringement of the above-mentioned claims.

Gilead's inducement of infringement of the the above-mentioned claims is also demonstrated by its ownership and use of the trademarks TRUVADA FOR PREP (U.S. Reg. No. 5,358,262) and TRUVADA EMTRICITABINE 200 MG / TENOFOVIDISOPROXIL FUMARATE 300 MG TABLETS FOR PREP PRE-EXPOSURE PROPHYLAXIS (U.S. Reg. No. 5,623,246) and in its associated commercial sales of this product for PrEP.  According to public records, Defendant Gilead Sciences Inc. applied for and received a trademark in the United States Patent and Trademark Office (PTO) for exclusive use of the mark, TRUVADA FOR PREP. Gilead filed the application for the mark on January 6, 2017 with U.S. Ser. No. 87,292,084, and the mark was registered on December 19, 2017 as U.S. Reg. No. 5,358,262.  The mark is specifically registered for the use of Truvada® "for the treatment and prevention of human immunodeficiency virus infection."  (emphasis added).  These facts demonstrate that Gilead

specifically intended and intends that its actions did and will continue to result in infringement of the above-identified claims and/or subjectively believed and believes that its actions did and will continue to result in infringement.  Gilead knew or should have known no later than the issue date of each patent that use of Truvada for PrEP® according to the prescribing information has resulted in ongoing infringement of the abovementioned claims.

The evidence demonstrates that patients have used and continue to use in an infringing manner Truvada for PrEP as prescribed to them by physicians.  For example, the drug utilization study, GS-US-276-0105, applied an algorithm to differentiate Truvada PrEP prescriptions versus Truvada for treatment of HIV-1 or other uses estimated that 14,550 prescriptions were written by physicians for Truvada PrEP patients from July 2012 through April 2013.  *See* GILDDE0000236715-237256 at 236726; *see also* RESPONSE TO FDA INFORMATION REQUEST DATED 20 FEB 2019 at 2 (between January 2018 – December 2018 there were 139,809 patients  using Truvada for HIV-1 PrEP and 769,850 prescriptions of Truvada for HIV-1 PrEP by physicians to patients).  A journal article with co-authors from Gilead estimated that 59,427 patients were prescribed Truvada for PrEP by physicians in 2015, 77,120 in 2016, and 100,282 in 2017.  *See* Sullivan et al., *Trends in the use of oral emtricitabine/tenofovir disoproxil fumarate for pre-exposure prophylaxis against HIV infection, United States, 2012-2017*, ANNALS OF EPIDEMIOLOGY, 28:833-40 (2018) at 835; *see also* Furukawa et al., *Evaluation of Algorithms Used for PrEP Surveillance Using a Reference Population From New York City, July 2016-June 2018*, PUBLIC HEALTH REPORTS, 135:202-10 (2020) at 205.  CDC estimated that in the United States, 51,544 patients were prescribed Truvada for PrEP by physicians in 2015, 94,277 in 2016, 141,080 in 2017, and 204,720 in 2018.  *See* Furukawa et al., *National Trends in Drug Payments for HIV Preexposure Prophylaxis in the United States, 2014-2018*, ANNALS OF INTERNAL

19

MEDICINE, 173:799-805 (2020) [hereinafter "Annals of Internal Medicine 2020"] at 801; *see also* Huang et al., *HIV Preexposure prophylaxis, by Race and Ethnicity—United States, 2014-2016*, MMWR 67:1147-50 (2018) at 1148.  It is estimated that physicians prescribed Truvada for PrEP to patients 232,003 times in 2015, 487,725 in 2016, 755,749 in 2017, and 1,100,684 in 2018.  *See* Annals of Internal Medicine 2020 at 801.  The HIV Surveillance Report estimates that physicians prescribed PrEP to 287 patients in Delaware in 2017, to 423 patients in Delaware in 2018, and to 488 patients in Delaware in 2019.  *See* Centers for Disease Control and Prevention, *Monitoring selected national HIV prevention and care objectives by using HIV surveillance data—United States and 6 dependent areas, 2019*, HIV SURVEILLANCE SUPPLEMENTAL REPORT 26 (2021) at 120, 148.  The Government is pursing discovery requests submitted to Gilead regarding data evidencing the number of prescriptions and patient adherence concerning Truvada for PrEP.

The Truvada Package Insert Medication Guide demonstrates that patients' use of Truvada for PrEP directly infringes Claims 1-11 and 13 of the '509 patent; Claims 1-11 and 13 of the '333 Patent; Claims 1-19 of the '191 Patent; and Claims 1-19 of the '423 Patent.  *See, e.g.,* Exhibits A, C-E.  In addition, there are several journal articles that report patients adhere to physician instruction to use Truvada for PrEP in accordance with the Truvada Product label.  *See, e.g.,* Liu et al., *HIV Pre-Exposure Prophylaxis Integrated with Municipal and Community Based Sexual Health Services*, JAMA INTERN MED. 176:75-84 (2016) at Abstract, Results, Discussion sections; Riddell et al., *HIV Preexposure Prophylaxis, A Review*, JAMA, 319:1261-1268 (2018) at 1261-64.

The evidence also demonstrates that physicians administering or prescribing Truvada for PrEP directly infringe Claims 1-11 and 13 of the '509 patent; Claims 1-11 and 13 of the '333 Patent; Claims 1-19 of the '191 Patent; and Claims 1-19 of the '423 Patent.

**Infringement of Descovy for PrEP®**

Gilead has induced and continues to induce direct infringement, either literally or under the doctrine of equivalents, of at least the following claims of the Patents-in-Suit based upon its sales and activities in promoting Descovy for PrEP®:

- The '509 patent:  Claim 13; and

- The '423 Patent:  Claims 1-19.

Acts of direct infringement of the above-mentioned claims are carried out by clinicians and/or their patients who are treated with Descovy for PrEP® in the United States.  At a minimum, Gilead has induced and continues to induce infringement of the above-identified claims pursuant to 35 U.S.C. § 271(b).  In addition to selling Descovy for PrEP®, Gilead actively instructs doctors and patients to administer Descovy® for PrEP, including through clinical trials, prescribing information, product labels, training guides and agreement forms for healthcare providers, and other product literature.  Gilead also advertises and promotes Descovy for PrEP® to the medical community and for use by the general public in a manner that has induced and continues to induce direct infringement of the above-mentioned claims.  These facts demonstrate that Gilead specifically intended and intends that its actions have resulted and will continue to result in infringement of the above-identified claims and/or subjectively believed and believes that its actions have resulted and will continue to result in infringement.  Gilead knew or should have known no later than the issue date of each patent that use of Descovy for PrEP® according to the prescribing information has resulted in ongoing infringement of the above-mentioned claims.

The evidence demonstrates that patients have used and continue to use in an infringing manner Descovy for PrEP as prescribed to them by physicians.  For example, it was reported that physicians increased the prescriptions of Descovy for PrEP from 2,637 patients in the third quarter

RESTRICTED INFORMATION

of 2019 to 75,979 in the second quarter of 2020.  *See* Hoover et al., *Trends in Truvada and Desocvy Prescriptions for PrEP in the United States, 2014-2020*, vCROI, 2021 at Abstract 696.  The HIV Surveillance Report estimates that physicians prescribed PrEP to 284,464 patients in 2019.  *See* Centers for Disease Control and Prevention, *Monitoring selected national HIV prevention and care objectives by using HIV surveillance data—United States and 6 dependent areas, 2019*, HIV SURVEILLANCE SUPPLEMENTAL REPORT 26 (2021) at 119.  "Starting in 2019, TAF/FTC was included in the algorithm to classify the number of persons prescribed PrEP."  *Id.* at 60.  This report estimates that physicians prescribed PrEP to 488 patients in Delaware in 2019.  *Id.* at 120.  Additional evidence that patients are using Descovy for PrEP in accordance with physician instructions and Gilead's Descovy product label includes the following websites: https://www.descovy.com/real-stories; https://www.descovy.com/real-stories/northeast; https://www.descovy.com/real-stories/south; https://www.descovy.com/real-stories/midwest; https://www.descovy.com/real-stories/west.  Gilead actively recruits patients to share their experiences using Descovy for PrEP.  *See, e.g.,* https://www.descovy.com/real-story-recruitment. The Government is pursing discovery requests submitted to Gilead regarding data evidencing the number of prescriptions and patient adherence concerning Descovy for PrEP.  The evidence demonstrates that patients' use of Descovy for PrEP directly infringes Claim 13 of the '509 patent and Claims 1-19 of the '423 Patent.  The evidence further demonstrates that physicians administering and/or prescribing Descovy for PrEP directly infringe Claim 13 of the '509 patent and Claims 1-19 of the '423 Patent.

Gilead's inducement of infringement of the above-identified claims is also demonstrated by its ownership and use of the trademark DESCOVY FOR PREP (U.S. Reg. No. 5,912,591) and DESCOVY EMTRICITABINE 200 MG / TENOFOVIR ALAFENAMIDE 25MG TABLETS

FOR PREP PRE-EXPOSURE PROPHYLAXIS (U.S. Reg. No. 6,414,007)" and in its associated commercial sales of this product for PrEP.  According to public records, Defendant Gilead Ireland UC applied for and received a U.S. trademark for exclusive use of the mark, DESCOVY FOR PREP.  Gilead filed the application for the mark on January 17, 2019 with U.S. Ser. No. 88,266,226, and the mark was registered on November 19, 2019 as U.S. Reg. No. 5,912,591.  The mark is specifically registered for the use of Descovy® "for the treatment and prevention of human immunodeficiency virus infection."  (emphasis added).

GSIUC currently manufactures and/or packages Gilead's Truvada for PrEP® and Descovy for PrEP® products intended for sale in the U.S., and those products include FDA-approved package inserts that include instructions regarding the use of those products for PrEP.  GSIUC has manufactured and/or packaged Gilead's Truvada for PrEP® product from at least 2012 to the present.  Gilead has identified Gilead Sciences Ireland UC to the FDA as such and is so listed in the FDA's Electronic Drug Registration and Listing System (eDRLS).  For example, in 2012 and 2019, GSIUC manufactured and labeled bottles of Truvada for sale in the U.S. that included the language "Made in Ireland" and that instruct the dispenser "[e]ach time Truvada is dispensed give the patient the attached Medication Guide."  The bottle label, in which Gilead Sciences, Inc., claims copyright further instructs the consumer to "[s]ee the package insert for dosage and administration."



GILDDE00232475; GILDDE00271967.

Both GSI and GSIUC are properly treated as a single entity for purposes of knowledge of

the '509 Patent and knowledge of infringement of the '509 Patent. This is because GSI and GSIUC

share senior managers and directors. For example, Robin Washington was a Director of GSIUC

24

in 2015 ([58517367.pdf]) while simultaneously serving as GSI's Executive Vice President and Chief Financial Officer:

https://web.archive.org/web/20170713014946/http:/investors.gilead.com/phoenix.zhtml?c=69964&p=irol-govmanage.

This relationship continues to the present, as for example, Dr. Taiyin Yang serves both as Executive Vice President, Pharmaceutical Development and Manufacturing for GSI and Director of GSIUC *See* 61694231.pdf, 62655239.pdf.  Accordingly, it is appropriate to impute or infer that GSI or GSIUC would have knowledge that is relevant to their actions even if that knowledge was received by the other.  That is especially true here, where GSI is the entity that has received information and GSI has total control of GSIUC—including interlocking management structures, control exercised over the foreign subsidiary's directors, officers, and employees, and a connection to the transaction at issue (production, sale, and marketing of Truvada and Descovy for PrEP indications).  *See, e.g.*, *P. F. Collier & Son Corp. v. Fed. Trade Com.*, 427 F.2d 261, 269 (6th Cir. 1970) (where there is "substantial overlap between the officers and directors of the parent and its subsidiaries, [the parent's] knowledge and approval [of a subsidiary's actions] may be inferred.");  *see also Stella v. LVMH Perfumes & Cosmetics USA, Inc.*, No. 07-CV-6509, 2009 U.S. Dist. LEXIS 22948, at *6 (N.D. Ill. Mar. 23, 2009).  Accordingly, for this supplementation, both GSI and GSIUC are referred to collectively as "Gilead."

Gilead Sciences and GSIUC jointly stated in a complaint they filed in the Southern District of Florida that they include the Truvada® and Descovy® package inserts with each bottle to "ensure safe and proper use" of Gilead's products for PrEP:

> In further compliance with FDA requirements, and to ensure safe and proper use, Gilead [defined as Gilead Sciences and GSIUC, collectively] provides printed instructions for use to recipients of PrEP medication by way of an instructional package insert that accompanies every bottle of PrEP tablets.  Neither the FDA nor

Gilead permits PrEP medication to be sold or dispensed without the accompanying FDA-approved package insert. Every individual prescribed PrEP medication must have the package insert to guide and inform him or her on the safe and effective use of the medication. The printed instructions provide the recipient with PrEP medication's indications for usage, side effects, and critical warnings. The instructions also inform the recipient how to take and store PrEP medication, what to do if the recipient takes too much, what precautions to take while taking the medication, and what the recipient should discuss with his or her healthcare provider before taking the medication.

Ex. G, *Gilead Sciences, Inc. et al v. AJC Medical Group, Inc. et al.*, 1:20-cv-24523, D.I. 1 at ¶ 260

(S.D. Fla. Nov. 3, 2020).

In the same complaint, Gilead further identifies Gilead Sciences as "the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and package inserts of certain genuine PrEP medications." *Id.* at ¶ 24. The complaint also describes GSIUC as "the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and instructional inserts of certain genuine PrEP medications." *Id.* at ¶ 25. Gilead further represents that Gilead Sciences and GSIUC collectively own and use trademarks in connection with the sale and promotion of its PrEP medications in the US:

26. Gilead Sciences, Inc. and Gilead Ireland (together, "Gilead") are the collective owners of a number of well-established and famous registered trademarks (the "Gilead Marks") that appear on genuine PrEP products. . . . . Gilead also owns and uses distinctive packaging (the "Gilead Trade Dress") to distinguish its PrEP products in the marketplace . . . .

27. Gilead has used and is currently using these Gilead Marks and this Gilead Trade Dress in commerce in connection with its sale of PrEP medication, and plans to continue such use in the future. Gilead prominently displays the Gilead Marks in its advertising and promotional materials.

RESTRICTED INFORMATION

28. Gilead has engaged and continues to engage in activities designed to promote PrEP medication and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States. All of these trademarks and trade dress symbolize business goodwill of Gilead and are invaluable assets to Gilead.

*Id.* at ¶¶ 26-28.

Both Gilead Sciences and GSIUC have admitted that Gilead specifically intends physicians to prescribe and patients to use Gilead's Truvada for PrEP® and Descovy for PrEP® products consistent with its trademarks and the Truvada for PrEP® and Descovy for PrEP® uses described in the package inserts and training guides for these products.  For example, in its complaint, Gilead admits that, "to ensure safe and proper use, Gilead [defined as Gilead Sciences and GSIUC, collectively] provides printed instructions for use to recipients of PrEP medication by way of an instructional package insert that accompanies every bottle of PrEP tablets."  *Id.* at ¶ 260.  The complaint further admits that "Gilead [defined as Gilead Sciences and GSIUC, collectively]  has engaged and continues to engage in activities designed to promote PrEP medication and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States."  *Id.* at ¶ 28.

Gilead had notice of the Application No. 11/669,547 ("the '547 Application") which issued as the '509 Patent at least as early as August 6, 2008 based on its own patent searches.  On that date, Steve Krawczyk, Director, Patent Liaison for GSI, emailed a Derwent Alert covering the time period from August 2007 to October 2007 a number of Gilead employees.[1]  GILDDE01209435.

---

[1]  Allan Kutzenco <allan.kutzenco@gilead.com>, Bill Baker <bill.baker@gilead.com>, Bill Lee <bill.lee@gilead.com>, Choung Kim <choung.kim@gilead.com>, Christopher Sheng <christopher.sheng@gilead.com>, Damian Mccoll <damian.mccoll@gilead.com>, Grushenka Wolfgang <grushenka.wolfgang@gilead.com>, Haolun Jin <haolun.jin@gilead.com>, John Link <john.link@gilead.com>,

This patent search report lists both the international application, WO2007092326, and the '547 Application. This alert further provides the filing date of the '547 Application, lists the named inventors (including Dr. Robert Janssen), pictures both emtricitabine and tenofovir, lists The Department of Health and Human Services as the patent owner, and describes a method of taking both emtricitabine and tenofovir in combination, prior to exposure, to prevent infection by an immunodeficiency retrovirus, such as HIV-1. This patent search report was emailed directly to custodian Dr. William Lee, Executive Vice President, Research. Additionally, the European Patent Bulletin published on January 21 2009 and listed the WO 2007/092326, a direct reference to the '547 Application, and the filing date of the '547 Application.

Gilead knew or reasonably should have known that the '547 application, which issued as the '509 patent on June 2, 2015, published as U.S. 2007/0265227 on November 15, 2007, as this information is publicly available and easily obtainable.

The CDC applications for the Patents-in-Suit were also identified as part of a public offer to license CDC technology in the beginning of 2008. US_00264912 – 00264970. Notably, the CDC Technologies Brochure dated June 2009 (US_00265407 – US_00265463) explicitly references not only the CDC Licensing Reference Number I-002-06 but also the then-published Patent Application No. 11/669,547. US_00265448.

---

John Ward <john.ward@gilead.com>, John Wolf <john.wolf@gilead.com>, Larry Melvin <larry.melvin@gilead.com>, Lianhong Xu <lianhong.xu@gilead.com>, Lori Lehman <lori.lehman@gilead.com>, Manoj Desai <manoj.desai@gilead.com>, Mary McGrath <mary.mcgrath@gilead.com>, Matthew Wright <matthew.wright@gilead.com>, Randall Halcomb <randall.halcomb@gilead.com>, Richard Mackman <richard.mackman@gilead.com>, Roman Sakowicz <roman.sakowicz@gilead.com>, Romas Geleziunas <romas.geleziunas@gilead.com>, Steve Bondy <steve.bondy@gilead.com>, Sukeerthi Seetharaman <sukeerthi.seetharaman@gilead.com>, Swami Swaminathan <swami.swaminathan@gilead.com>, Tomas Cihlar <tomas.cihlar@gilead.com>, Weidong Zhong <weidong.zhong@gilead.com>, Will Watkins <will.watkins@gilead.com>, William Delaney william.delaney@gilead.com  We note that because Gilead uses "@gilead.com" for employees at GSI and GSIUC, (an additional demonstration of GSI and GSIUC's close coordination) it is not clear whether any of the employees are GSIUC employees, but possible.

RESTRICTED INFORMATION

The Government first gave notice to the public that the applications that issued as the HHS Patents were available to license in 2006.  Specifically, at least as early as spring 2006, the applications related to the HHS Patents were included in the CDC Technology Brochure.  *See* "Spring 2006 Brochure.pdf."

### Prevention of Rectal SHIV Transmission

This invention discloses the use of a Tenofovir/FTC Combination to prevent rectal SHIV transmission.  Available data shows that Tenofovir alone is not sufficient to protect against SHIV mucosal infection.  This invention shows chemoprophylaxis in combination with retrovirals provides a high level of protection against not only initial viral exposure, but also repeated virus challenges.

Inventors: Walid Heneine, Thomas Folks, J. Gerardo Garcia-Lerma, Ronald Otten
CDC Reference Number: I-022-06

US_00265171-225 at 208.  The CDC Technology Brochure was published and regularly updated on the CDC Technology Transfer Office website, http://www.cdc.gov/od/science/techtran/TechAvailableForLicensing.htm (now https://www.cdc.gov/os/technology/techtransfer/industry/licensing/technologies.htm).  The CDC applications that issued as the HHS Patents continued to be identified in the CDC Technology Brochure as part of a public offer to license CDC technology through at least 2014.  The CDC TTO website clearly identified "Technologies Available for Licensing," which contained a link to the brochure: "CDC TTO Licensing Opportunities."  *See, e.g.*:

- https://web.archive.org/web/20061021103037/http://www.cdc.gov/od/science/techTran/techAvailableForLicensing.htm
- https://web.archive.org/web/20061117193250/http://www.cdc.gov/od/science/techTran/Spring2006Brochure.pdf
- https://web.archive.org/web/20110328135504/http://www.cdc.gov/osels/laboratory_science/tech_tran/index.htm
- https://web.archive.org/web/20110328141229/http://www.cdc.gov/osels/laboratory_science/tech_tran/May_2009_Brochure.pdf
- https://web.archive.org/web/20111015152432/http://www.cdc.gov/osels/laboratory_science/tech_tran/index.htm

RESTRICTED INFORMATION

- https://web.archive.org/web/20111015152432/http://www.cdc.gov/osels/laboratory_science/tech_tran/index.htm

Notably, the CDC Technologies Brochure dated January 2009 also explicitly references, not only the CDC Licensing Reference Number I-002-06, but also the then-published Patent Application No. 11/669,547.  January 2009 CDC Technologies Brochure at page 47.  And later brochures reference and link to the US2007/0265227 publication number.

In addition to being published on the CDC Technology Transfer Office Website, these brochures were distributed at major conferences in paper or CD format:

> CDC TTO employs a mix of passive and active marketing.  Like most technology transfer offices within universities and other institutions we keep a list of available technologies (patented and non-patented) on-line at www.cdc.gov/tto.
>
> \*   \*   \*
>
> In addition, the CDC TTO engages in as much active marketing as is possible.  We exhibit at two large national tradeshows each year, BIO (http://convention.bio.org) and AACC (http://www.aacc.org/events/2009am/pages/default.aspx) as well as a few local tradeshows within the southeast.  At these tradeshows we hand out small CDs having copies of the information available on-line.  We also print multiple paper brochures for these events.  Some of the brochures highlight general information, such as how to partner with the federal government for joint research, some brochures highlight groups of technologies, such as those relating to vaccine development, or diagnostics, or a specific disease, and finally some pamphlets highlight one specific technology.

*Gilead Sciences v. United States*, Fed. Cl. 20-499, Government Responses to First Set of Interrogatories (2021-06-16), Exhibit 1.  These public marketing efforts resulted in public inquiries regarding I-022-06, and specifically the Patent Application 11/669,547 titled "Inhibition of HIV Infection Through Chemoprophylaxis" at least as early as 2012.  US_00264775.

Gilead also received notice in 2008 of the fact that the inventors of the HHS Patents filed patent application related to their work in the '471 MTA when a draft of an article on prevention of rectal SHIV transmission in macaques using daily oral administration of TDF/FTC was emailed by Dr. Heneine to Dr. James Rooney, Gilead's Vice President of Medical Affairs—that article

30

expressly indicated that the inventors had filed for a patent on the research described in the publications. *See United States v. Gilead Sciences*, D.I. 1, Exhibit Nos. 31 and 34.; J. Gerardo García-Lerma et al., *Prevention of Rectal SHIV Transmission in Macaques by Daily or Intermittent Prophylaxis with Emtricitabine and Tenofovir*, 5 PLOS MEDICINE (2) 291 (2008); *see also* J. Gerardo García-Lerma et al., *Intermittent Prophylaxis with Oral Truvada Protects Macaques from Rectal SHIV Infection*, 2 SCI. TRANSLATIONAL MED. (14ra4) 1 (2010). These papers not only indicated that the inventors had filed for a patent on the research described in the publications, but that the published research used "Tenofovir disoproxil fumarate (9-[(R)-2[[bis[[isopropoxycarbonyl)oxy]-methoxy] phosphinyl]methoxy]propyl]adenine fumarate; TDF), tenofovir ((R)-9-(2-phosphonylmethoxypropyl) adenine; PMPA), and emtricitabine (5-fluoro-1-(2R,5S)-[2- (hydroxymethyl)-1,3-oxathiolan-5-yl]cytosine; FTC) [] <u>kindly provided by Gilead Sciences through a material transfer agreement.</u>" 5 PLOS MEDICINE (2) at 292; *see also* 2 SCI. TRANSLATIONAL MED. (14ra4) at 8 (thanking "J. Rooney at Gilead Sciences for providing <u>TFV, TDF, and FTC through a material transfer agreement</u>.").

Gilead also received notice of the '811 provisional application as early as 2008, when it received Dr. Walid Heneine's CV which listed Inhibition of HIV Infection through Chemoprophylaxis -Patent Application Serial No. 60/764,811 as a "Pending Patent Application." Gilead solicited and received Dr. Walid Heneine's CV for use in preparing for Dr. Heneine's visit on September 24, 2008, where he presented a seminar lecture entitled "HIV Prevention by Antiretroviral Prophylaxis." *See*       US_01709907 - US_01709933. Dr. Heneine presented this seminar lecture as the Leader of the Non-HIV Surveillance, Drug Resistance, and Antiretroviral Prophylaxis Team of the Laboratory Branch of the Division of HIV/AIDS Prevention for the Centers for Disease Control and Prevention, his position in federal employment at the time. *Id.*

Dr. Heneine informed Gilead that he was unable to accept Gilead's proposed one-day consulting fee due to CDC regulations, which governed his visit.  *Id.*

In an October 24, 2014 email from Laura Prestia to Dr. Jay Parrish, the Government informed Gilead of the applications for the Patents-in-Suit and expressly noted that the patented technology was for the use of "(Truvada)" for "(PrEP)":

> In light of your recent and ongoing interest in and success with Truvada, your company appears to be an ideal partner for a technology developed by Dr. Walid Heneine at the Centers for Disease Control and Prevention (CDC).
>
> Dr. Heneine's group has shown that daily pre-exposure prophylaxis **(PrEP)** with emtricitabine in combination with tenofovir disoproxil fumarate **(Truvada)** significantly increases the level of protection against HIV transmission. This finding was discovered following repeated virus challenges with macaque monkeys. The CDC is pursuing U.S. and foreign patent protection for this technology.
>
> An abstract with more information can be found in the <u>Federal Register</u>. Also, Dr. Heneine has co-authored publications in <u>PLoS Medicine</u> and <u>Science Translational Medicine</u>, describing the above discovery.

US_00275252 (emphasis added).  The email contained a hyperlink to the Federal Register, which provides a general description of the applications for the Patents-in-Suit, indicating that the applications were directed to the use of a combination of emtricitabine and tenofovir for HIV chemoprophylaxis.  The Federal Register also specifically identified the application numbers for (1) U.S. Provisional Application No. 60/764,811 (the "'811 provisional application")—which had been included in a CV that inventor Walid Heneine emailed to Gilead in 2008 (US_02169892 -

US_02169920); (2) U.S. Patent Application No. 11/669,547 (the "'547 application")—which published as US2007/0265227 in 2007 with claims directed to the use of a combination of emtricitabine and tenofovir for HIV prophylaxis; and (3) PCT Application No. PCT/US2007/002926 (the "'926 PCT")—the same PCT application that Dr. Janssen had disclosed to Gilead in 2008:

Inhibition of HIV Infection Through Chemoprophylaxis Using Emtricitabine and Tenofovir

\*      \*      \*

*Description of Technology:* The invention is directed to prophylactic administration of emtricitabine (FTC) in combination with tenofovir or its prodrug, tenofovir disoproxil fumarate (TDF), to protect against transmission of human immunodeficiency virus (HIV) infection.

\*      \*      \*

US Provisional Application No. 60/764,811 filed 3 Feb 2006.

US Patent Application No. 11/669,547 filed 31 Jan 2007.

PCT Application No. PCT/US2007/002926 filed 01 Feb 2007.

European Patent No. 2015753 issued 01 May 2013.

US_02197937 - US_02197938.

The October 2014 email also contained links to two articles authored by the named inventors of the Patents-in-Suit, the first of which had been emailed to Gilead employee Jim Rooney by inventor Walid Heneine in 2008, and both of which indicated that the inventors had filed for a patent on the research described in the publications. *See* D.I. 1, Exhibit Nos. 31 and 34; J. Gerardo García-Lerma et al., *Prevention of Rectal SHIV Transmission in Macaques by Daily or Intermittent Prophylaxis with Emtricitabine and Tenofovir*, 5 PLOS MEDICINE (2) 291 (2008); J. Gerardo García-Lerma et al., *Intermittent Prophylaxis with Oral Truvada Protects Macaques from Rectal SHIV Infection*, 2 SCI. TRANSLATIONAL MED. (14ra4) 1 (2010).

33
RESTRICTED INFORMATION

Gilead knew or should have known as early as 2014 that the applications for the Patents-in-Suit existed and that they covered the use of Truvada for PrEP at least because the October 2014 email from Laura Prestia expressly relayed this information to Gilead. Gilead knew or reasonably should have known that the '547 application, which was disclosed in the Federal Register entry that the October 2014 email provided a link to, issued as the '509 patent on June 2, 2015 and had earlier been published as U.S. 2007/0265227 on November 15, 2007, because this information was publicly and readily available and easily obtainable. Gilead knew or should have known that the use of Truvada for PrEP® and Descovy for PrEP® in accordance with and as directed by Gilead's package inserts and training guides that accompany Gilead's Truvada® and Descovy® products would cause physicians to prescribe and patients to use Gilead's products in a manner that directly infringes the asserted claims. In addition, by reviewing the claims of the publicly available '509 patent, Gilead could have easily confirmed —what it already knew from the October 2014 email— that the '509 patent had claims directed to Truvada for PrEP®. Gilead's repeated refusal to license the Patents-in-Suit for its Truvada for PrEP® after it received the October 2014 email demonstrates that Gilead had and continues to have the specific intent to induce acts constituting direct infringement of the asserted claims of the Patents-in-Suit. This is further evidenced by the active steps Gilead has taken and continues to take to direct, encourage, recommend, promote, and induce acts of direct infringement of those claims.

Because Gilead knew of the '547 Application and the '509 Patent, its infringement was willful, as its infringement was either known or was so obvious it should have been known. *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 503 F. Supp. 3d 156, 172 (D. Del. 2020) ("To prevail on a claim of willful infringement, then, a patentee must prove that the infringer acted despite a risk of infringement that was 'either known or so obvious that it should have been known

to the accused infringer.'") (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct 1923, 1930 (2016)).

Gilead possessed knowledge of the patent and the infringement from many sources, including from Dr. Robert Janssen, not only from his disclosure of the patented research and application for a patent on that research on his Employee Confidential Information and Inventions Agreement, but also from his employment by Gilead in a position where his knowledge of the patented research and the application was relevant to the nature and scope of his duties to Gilead and material to the same. *See* GILDDE00456424–26 (offering Dr. Janssen the position of "Vice President, Medical Affairs, reporting directly to" Dr. Norbert Bischofberger, Executive Vice President, R&D and Chief Scientific Officer); *see also* GILDDE00456428–438 (outlining Dr. Janssen's many responsibilities as both a manager and employee of Gilead). *Huston v. P&G Paper Prods. Corp.*, 568 F.3d 100, 107 (3d Cir. 2009) ("to justify imputation, the knowledge must also be material--i.e., important or significant--to the employee's duties to the employer.") (citing Restatement (Second) of Agency § 272 cmt. a ("The principal is affected by the agent's knowledge whenever the knowledge is of importance in the act which the agent is authorized to perform.")).

Additionally, Mr. O'Day testified before Congress that he understood "the use patents on PrEP granted to the CDC" to "claim[]" the "invention" of "[u]sing Truvada for PrEP." Mr. O'Day testified that this use was "well-known in the scientific community." 116th Cong. 14. Accordingly, Gilead understood that the use of Truvada for PrEP was claimed by the HHS Patents and implied that this understanding existed at all times, preceding and including the issuance of the '509 Patent.

And Gilead has admitted that the Government contacted Gilead in 2014 and "demanded a license." LTR Cook to Brown (1/20/2021) at 3 ("the government contacted Gilead to demand that Gilead take a license to the family of the Patents-in-Suit as early as October 2014.") While Mr.

Cook's letter references "the government's complaint" and D.I. ¶ 234 for context on this sentence, *id*., the Complaint's ¶ 234 only states that "NIH/OTT emailed [Gilead personnel], giving them notice of CDC's patented technology." Gilead apparently understands this email to have demanded a license for the patented invention.

Gilead engaged in disingenuous licensing negotiations and insincere testimony under oath to the United States Congress. "[C]laims for willful infringement [] based on . . . conduct that occurred during the parties' licensing negotiations through a period of about three years" can support a finding of "egregious conduct under *Halo*." *Finjan, Inc. v. SonicWall*, Inc., No. 17-cv-04467-BLF, 2018 U.S. Dist. LEXIS 83546, at *14 (N.D. Cal. May 16, 2018). Gilead testified under oath in 2019 to the United States Congress that "[w]e believe the CDC patents are invalid, but we've chosen not to challenge those patents because we value our collaborative relationship with the agency."[2][1] However, Gilead states that it anticipated litigation prior to that, as early as 2017. Further, at the time of the hearing, Gilead was actively preparing four IPRs that were filed only three months after that sworn testimony. *See* GILDCFC00000004 (invoice from Sidley Austen for "services rendered through August 31, 2019 re: CDC Patent Issues Relating to Truvada"). As filed, the IPRs include evidence of Gilead preparing them beginning in the late 2017 to 2018 time frame. For example, the Coates declaration (Ex. 1129) was executed on February 2, 2018, and Jeffrey Kushan, an attorney for Sidley Austen, was emailing purported potential prior art references in February of 2018. *See* Exhibit 1142. And this was only after Gilead continuously ignored earlier emails from Laura Prestia in 2014 and Dr. Tara Kirby in

---

[1] *HIV Prevention Drug: Billions in Corporate Profits After Millions in Taxpayer Investments: Hearing Before the H. Comm. on Oversight and Reform*, 116th Cong. 14 (May 16, 2019) (statement of Dr. Robert M. Grant, Professor of Medicine, University of California, San Francisco),            https://www.govinfo.gov/content/pkg/CHRG-116hhrg36660/pdf/CHRG-116hhrg36660.pdf [https://perma.cc/M5KY-YPFP]

RESTRICTED INFORMATION

2016 when they were seeking to license their patents. *See* GILDCFC00000019 (WilmerHale invoice for "NIH Matter" dated Juley 2016). Gilead's awareness that the claims of the Patents-in-Suit covered the use of Truvada for PrEP®, and refusal to take a license, and then further representation that it would not challenge the Patents-in-Suit, all while it was preparing to file its IPRs, all evidence willful infringement.

Further and additional details on how the use of Gilead's Truvada® and Descovy® products for PrEP infringe the claims of the Patents-in-Suit are provided in the Claim Charts attached hereto as Exhibits A-F. Discovery is ongoing at this time, and the Government provides these Claim Charts based on information presently known to the Government. The Government reserves the right to supplement and/or amend these Claim Charts to incorporate further information that it may discover during litigation. For example, Gilead has refused search for or produce any documents related to the right, title, licensing, or use of its Truvada for PrEP® and Descovy for PrEP® trademarks. Gilead has also stated that it will not produce its labels and regulatory files past July 16, 2012, which would likely provide additional evidence of infringement. The Government maintains that it is entitled to this discovery and reserves the right to further supplement its Claim Charts and infringement allegations generally based on this evidence when produced and other evidence as discovered during litigation. In addition, Gilead has not yet completed production of other evidence it initially refused to produce and then consented to, such as its research on the use of Truvada® or Descovy® for PrEP and any research that Gilead has done on the compliance with the label instructions.

The Government also reserves the right to respond with additional information or evidence to any arguments or evidence that Gilead may present in support of the argument Gilead articulates in itsThird Amended Answer that it does not induce infringement because the package inserts for

Truvada® and Descovy®, "do not encourage exposure to an immunodeficiency virus; indeed, both instruct that the medications should be used in combination with other safer sex practices to reduce the risk of exposure to HIV."  D.I. 78 ¶ 28.

In addition, the Government reserves the right to amend or supplement this disclosure as permitted under the Patent Rules, the rules of this Court, the Federal Rules, or as otherwise permitted by the Court.

These Claim Charts are illustrative, and are not intended to limit the Government's ability to rely on other documents, other portions of documents cited herein, or other information to relating to Gilead's infringement including, but not limited to, the ability to rebut arguments Gilead has not yet raised.

**The '509 Patent:**

As set forth in the claim chart attached as Exhibit A, the use of Gilead's Truvada® product for PrEP directly infringes the methods of Claims 1-11 and 13 of the '509 Patent.  The evidence demonstrates that Gilead has knowledge of the '509 patent, and has known and intended, and continues to know and intend that use of its Truvada® product for PrEP by physicians and/or patients in accordance with at least the instructions and/or label provided by Gilead has directly infringed and continues to directly infringe Claims 1-11 and 13 of the '509 patent.  In addition, the evidence demonstrates that physicians and/or patients through, for example, prescribing and using, respectively, Truvada for PrEP® in the United States have directly infringed and continue to directly infringe Claims 1-11 and 13 of the '509 Patent.  Accordingly, at a minimum, Gilead has engaged and continues to engage in acts of ongoing, willful inducement of infringement of these claims.

As set forth in the claim chart attached as Exhibit B, the use of Gilead's Descovy® product for PrEP directly infringes, either literally or under the doctrine of equivalents, the method of

Claim 13 of the '509 Patent.  The evidence demonstrates that Gilead has knowledge of the '509 patent, has known and intended, and continues to know and intend that use of its Descovy® product for PrEP by physicians and/or patients in accordance with at least the instructions and/or label provided by Gilead has directly infringed and continues to directly infringe Claim 13 of the '509 patent.  In addition, the evidence demonstrates that physicians and/or patients through, for example, prescribing and using, respectively, Descovy for PrEP® in the United States have directly infringed and continue to directly infringe, either literally or under the doctrine of equivalents, Claim 13 of the '509 Patent. Accordingly, at a minimum, Gilead has engaged and continues to engage in ongoing, willful acts of inducement of infringement of this claim.

**The '333 Patent:**

As set forth in the claim chart attached as Exhibit C, the use of Gilead's Truvada® product for PrEP infringes the methods of Claims 1-11 and 13 of the '333 Patent.  The evidence demonstrates that Gilead has knowledge of the '333 patent, has known and intended, and continues to know and intend that use of its Truvada® product for PrEP by physicians and/or patients in accordance with at least the instructions and/or label provided by Gilead has directly infringed and continues to directly infringe Claims 1-11 and 13 of the '333 patent.  In addition, the evidence demonstrates that physicians and/or patients through, for example, prescribing and using, respectively, of Truvada for PrEP® in the United States have directly infringed and continue to directly infringe Claims 1-11 and 13 of the '333 Patent.  Accordingly, at a minimum, Gilead has and continues to engage in ongoing, willful acts of inducement of infringement of these claims.

**The '191 Patent:**

As set forth in the claim chart attached as Exhibit D, the use of Gilead's Truvada® product for PrEP infringes the methods of Claims 1-19 of the '191 Patent.  The evidence demonstrates that

Gilead has knowledge of the '191 patent, has known and intended, and continues to know and intend that use of its Truvada® product for PrEP by physicians and/or patients in accordance with at least the instructions and/or label provided by Gilead has directly infringed and continues to directly infringe Claims 1-19 of the '191 patent.  In addition, the evidence demonstrates that physicians and/or patients through, for example, prescribing and using, respectively, of Truvada for PrEP® in the United States directly infringed and continues to directly infringe Claims 1-19 of the '191 Patent.  Accordingly, at a minimum, Gilead has and continues to engage in ongoing, willful acts of inducement of infringement of these claims.

**The '423 Patent:**

As set forth in the claim chart attached as Exhibit E, the use of Gilead's Truvada® product for PrEP infringes the methods of Claims 1-19 of the '423 Patent.  The evidence demonstrates that Gilead has knowledge of the '423 patent, has known and intended, and continues to know and intend that use of its Truvada® product for PrEP by physicians and/or patients in accordance with at least the instructions and/or label provided by Gilead has directly infringed and continues to directly infringe Claims 1-19 of the '423 patent.  In addition, the evidence demonstrates that physicians and/or patients through, for example, prescribing and using, respectively, of Truvada for PrEP® in the United States directly infringed and continue to directly infringe Claims 1-19 of the '423 Patent.  Accordingly, at a minimum, Gilead has and continues to engage in ongoing, willful acts of inducement of infringement of these claims.

As set forth in the claim chart attached as Exhibit F, the use of Gilead's Descovy® product for PrEP infringes the method of Claims 1-19 of the '423 Patent.  The evidence demonstrates that Gilead has knowledge of the '423 patent, has known and intended, and continues to know and intend that use of its Descovy® product for PrEP by physicians and/or patients in accordance with

at least the instructions and/or label provided by Gilead has directly infringed and continues to directly infringe Claims 1-19 of the '423 patent.  In addition, the evidence demonstrates that physicians and/or patients through, for example, prescribing and using, respectively, of Descovy® for PrEP the United States directly infringed and continue to directly infringe Claims 1-19 of the '423 Patent.  Accordingly, at a minimum, Gilead has and continues to engage in ongoing, willful acts of inducement of infringement of these claims.

Dated:  Nov. 12, 2021

SARAH HARRINGTON
Deputy Assistant Attorney General

DAVID C. WEISS
United States Attorney

GARY L. HAUSKEN
Director

*Of Counsel:*                                   */s/Walter W. Brown*
PHILIP CHARLES STERNHELL       WALTER W. BROWN
Assistant Director                       Senior Litigation Counsel
AMANDA K. KELLY                    Commercial Litigation Branch
CARRIE E. ROSATO                      Civil Division
PATRICK C. HOLVEY                   U.S. Department of Justice
Trial Attorney                             Washington, D.C.  20530
Department of Justice                  Tel:    (202) 307-0341
                                                 Fax:    (202) 307-0345
                                                 *walter.brown2@usdoj.gov*

                                                 */s/Laura D. Hatcher*
                                                 LAURA D. HATCHER (DE Bar No. 5098)
                                                 Assistant United States Attorney
                                                 SHAMOOR ANIS
                                                 Assistant United States Attorney
                                                 1313 N. Market Street
                                                 P.O. Box 2046
                                                 Wilmington, Delaware 19899-2046
                                                 Tel: (302) 573-6277
                                                 Fax: (302) 573-6220
                                                 *Laura.hatcher@usdoj.gov*
                                                 *Shamoor.anis@usdoj.gov*

EXHIBIT A

**Gilead's Infringement of Claims 1-11 and 13 of the '509 Patent by Truvada for PrEP®[3]**

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising: | Acts of direct infringement of Claims 1-11 and 13 are carried out by clinicians and/or their patients who are treated with Truvada for PrEP® in the United States.  Gilead induces this act of direct infringement through, *inter alia*, its instructions for Truvada for PrEP®, its Healthcare Provider Agreement Form, and its Training Guide for Healthcare Providers and as detailed in this chart.<br><br>The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United |

---

[3] Plaintiff expressly reserves the right to modify and/or supplement Exhibit A.  Plaintiff reserves the right to rely upon any evidence produced in discovery in this or the corresponding Court of Federal Claims litigation.  Plaintiff further reserves the right to rely on expert testimony.

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; *see also* Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. <br><br> "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following:…<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….<br>• Discussed the importance of regular HIV-1 testing (at least every 3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling<br>• Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.

**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:

- Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection
- Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.

"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.

"Take Truvada exactly as your healthcare provider tells you to take it." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed."). |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | |
| (a) selecting a primate host not infected with the immunodeficiency retrovirus, and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a primate host not infected with the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed." Truvada Package Insert |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP."  Truvada Package Insert (Revised 06/2020) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)."  Truvada Package Insert (Revised 06/2020) at 1.<br><br>"TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), (Revised 02/2016) |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3.<br><br>"TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 5; Truvada Package Insert (Revised 04/2017) at 7 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 7, (Revised 12/2013) at 7, (Revised 10/2013) at 7, (Revised 06/2013) at 7, (Revised 07/2012) at 6.<br><br>"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only TRUVADA, because TRUVADA alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing TRUVADA before confirming the individual is HIV-1 negative." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10, (Revised |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 10, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 10, (Revised 07/2012) at 9.<br><br>"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:<br><br>• The need to confirm that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1." Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: • Confirming that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>"Before taking TRUVADA to reduce your risk of getting HIV-1:<br><br>• You must be HIV-1 negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection.<br>• Do not take TRUVADA for HIV-1 PrEP unless you are confirmed to be HIV-1 negative." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("Before taking TRUVADA to reduce your risk of getting HIV-1 infection: • You must be HIV-negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection. • Do not take TRUVADA to reduce the risk of getting HIV-1 unless you are confirmed to be HIV-negative."), (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Do not take TRUVADA for HIV-1 PrEP if: |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with TRUVADA to treat HIV-1. TRUVADA by itself is not a complete treatment for HIV-1.<br>• you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with TRUVADA to treat HIV-1." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43, (Revised 10/2013) at 43, (Revised 06/2013) at 43.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….<br>• Discussed the importance of regular HIV-1 testing (at least every3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling<br>• Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1. |

| U.S. Patent No. 9,044,509 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3. |
| | "**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |
| | • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection |
| | Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The goals of the REMS for Truvada for a Pre-exposure Prophylaxis (PrEP) Indication are: … The importance of regular monitoring of HIV-1 serostatus to avoid continuing to take Truvada for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants. *See, e.g.,* GILDDE00236715-237256 at GILDDE00236719; *see also* GILDDE00251496-252071 at 251500; GILDDE00263067-2663700 at GILDDE00263072; GILDDE00270528-916 at GILDDE00270533. |
| | All (100%) respondents were tested for HIV; 90% were tested within the previous 3 months.  GILDDE00236715-237256 at GILDDE00236738. |
| | All (74, 100%) respondents were tested for HIV-1; most (64, 86.5%) were tested within the previous 3 months.  GILDDE00243874-244563 at 243898. |
| | All (281, 100%) respondents reported being tested for HIV-1; most (265, 94.3%) reported being tested within the previous 3 months.  GILDDE00251496-252071 at 251519. |
| | All (132, 100.0%) respondents were tested for HIV-1; more than half (69, 52.3%) were tested less than a month ago and 47 (35.6%) were tested in the previous 1 to 3 months. Since starting Truvada, most respondents (102, 77.3%) have been tested for HIV-1 every 3 months.  GILDDE00263067-263700 at 263088. |
| | All respondents were tested for HIV-1; most (80.0%) were tested in the previous 3 months. Since starting TRUVADA, most respondents (80.0%) had been tested for HIV-1 every 3 months.  GILDDE00270528-916 at GILDDE00270533. |
| | The majority of responders [prescribers] understood that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | negative immediately prior to initiating use (94.8%).  GILDDE00251496-252071 at GILDDE00251514.<br><br>Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892.<br><br>Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.9%).  GILDDE00263067-263700 at 263084.<br><br>Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (100%).  GILDDE00270528-916 at GILDDE00270544.<br><br>Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (95.9%).  GILDDE00243874-244563 at 243902.<br><br>Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (99.6%).  GILDDE00251496-252071 at 251524.<br><br>Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (98.5%).  GILDDE00263067-263700 at 263693. |
| (b) administering directly to an uninfected primate host a combination comprising:<br>i. a pharmaceutically effective amount of emtricitabine; and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that |

| U.S. Patent No. 9,044,509 ||
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate, | includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]."  Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV- |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5 <br><br> "HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br> • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "TRUVADA tablets are fixed-dose combination tablets containing emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF)." Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20. <br><br> "TRUVADA contains the prescription medicines emtricitabine and tenofovir disoproxil fumarate."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20. |
| | "What are the ingredients in TRUVADA? |
| | Active ingredients: emtricitabine and tenofovir disoproxil fumarate."  Truvada Package Insert (Revised 06/2020) at 38 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42. |
| | "How should I take TRUVADA? |
| | • Take TRUVADA exactly as your healthcare provider tells you to take it....<br>• Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA. Do not miss a dose of TRUVADA."  Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 ("How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA."), (Revised 02/2016) at 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44. |
| | The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. |
| | The majority of responders [prescribers] understood that UIs should be counseled that they are at greater risk of acquiring HIV-1 if they miss doses of TRUVADA for a PrEP |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | indication (90.6%), that strict adherence to daily dosing correlates to the effectiveness of TRUVADA in reducing the risk of acquiring HIV-1 (91.7%). GILDDE00251496-252071 at GILDDE00251514. |
| wherein the combination is administered prior to an exposure of the primate host to the immunodeficiency retrovirus, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination prior to an exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to contact between the host and the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination prior to an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination prior to an exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to contact between the host and the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination prior to an |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | "TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA can only help reduce your risk of getting HIV-1 before you are infected."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1. |

the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.

"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: . . .

- Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP." Agreement at 1.

"**HIV-Negative Person Agreement**…Specifically, I attest to the following: . . .

- My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.

"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.

"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7.<br><br>"PrEP is short for Pre-Exposure Prophylaxis.  It means protecting yourself *before* you come into contact with HIV-1."  www.truvada.com/what-is-truvada/undersstanding-truvada (emphasis in original).<br><br>"The following factors may help to identify individuals at high risk: Has partner(s) known to be HIV-1 infected."  Important Safety Information About TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication For Healthcare Providers; GILDDE00236715-237256 at GILDDE00236736; *see also* www.truvada.com/is-truvada-right-for-me/understanding-hiv-risk.<br><br>"Factors that may help to identify individuals at high risk include individuals having partner(s) know to be HIV-1 infected."  TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715-237256 at GILDDE0023 at page 34.  "In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex." *Id.* at 35.<br><br>The survey initially asked questions about HIV testing, Truvada dosing, and sexual activity.  All (100%) respondents were sexually active. However, most (80%) respondents did not use a condom the last time they had sex.  GILDDE00236715-237256 at GILDDE00236738. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | The majority (94.6%) of respondents were sexually active. However, approximately two-thirds (64.3%) of respondents did not use a condom the last time they had sex. GILDDE00243874-244563 at 243898

The majority (98.9%) of respondents were sexually active. However, 81.3% had unprotected sex within the last 3 months and 65.5% of respondents did not use a condom the last time they had sex. GILDDE00251496-252071 at 251519.

The majority (98.9%) of respondents were sexually active. However, 81.3% had unprotected sex within the last 3 months and 65.5% of respondents did not use a condom the last time they had sex. GILDDE00251496-252071 at 251519.

The majority (125, 94.7%) of respondents reported being sexually active. When asked about safe sex practices, 107 (85.6%) reported having had unprotected (condomless) sex within the last 3 months and 87 (69.6%) of respondents did not use a condom the last time they had sex. GILDDE00263067-263700 at 263088.

All respondents were sexually active. When asked about safe sex practices, all reported having had unprotected sex within the last 3 months and none reported using a condom the last time they had sex. GILDDE00270528-916 at GILDDE00270.

Study GS-US-276-0103, which is an observational study to examine seroconversion in contemporary demonstration projects of Truvada for PrEP, has accumulated 6,214 person years of follow up in 7,002 male subjects. There were 67 seroconversions during the surveillance period for a seroconversion rate of 1.08 cases per 100 person years, 95% CI0 .84–1.37 (internal data for Study GS-US-276-0103). US_01885993-6001. |
| thereby protecting the primate host from infection with the immunodeficiency retrovirus, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Form, and Gilead's Training Guide for Healthcare Providers, perform a process that protects the primate host from infection with the immunodeficiency retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving administration of the claimed combination if and when both tests are performed.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that protects the primate host from infection with the immunodeficiency retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving administration of the claimed combination if and when both tests are performed.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3.<br><br>"While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>&bull; The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well."  Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ...<br>&bull; Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>&bull; If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. <br>• Discussed the importance of regular HIV-1 testing (at least every 3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling <br>• Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…."  Agreement at 1. <br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:… <br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1. <br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP."  Training Guide at 3. <br><br>"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.<br><br>"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 44, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed.").<br><br>"Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%." *Gilead Sciences, Inc. and Gilead Sciences Ireland UC v. AJC Medical Group, Inc. et al.*, Case No. 20-cv-24523, D.I. 1 at ¶ 130 (S.D. Fla. Nov. 3, 2020).<br><br>"By inhibiting HIV-1 from replicating as it enters the body, TRUVADA for a PrEP indication works to prevent the virus from establishing permanent infection." TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715-237256 at GILDDE00236749. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | Efficacy of Truvada for PrEP protecting patients and patient adherence to PrEP prescribing information is provided, for example, by Liu et al., "HIV Pre-Exposure Prophylaxis Integrated with Municipal and Community Based Sexual Health Services," JAMA The goals of the REMS for Truvada for a Pre-exposure Prophylaxis (PrEP) Indication are: … The importance of regular monitoring of HIV-1 serostatus to avoid continuing to take Truvada for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants. *See, e.g.,* GILDDE00236715-237256 at GILDDE00236719; *see also* GILDDE00251496-252071 at 251500; GILDDE00263067-2663700 at GILDDE00263072; GILDDE00270528-916 at GILDDE00270533.<br><br>All (100%) respondents were tested for HIV; 90% were tested within the previous 3 months.  GILDDE00236715-237256 at GILDDE00236738.<br><br>All (74, 100%) respondents were tested for HIV-1; most (64, 86.5%) were tested within the previous 3 months.  GILDDE00243874-244563 at 243898.<br><br>All (281, 100%) respondents reported being tested for HIV-1; most (265, 94.3%) reported being tested within the previous 3 months.  GILDDE00251496-252071 at 251519.<br><br>All (132, 100.0%) respondents were tested for HIV-1; more than half (69, 52.3%) were tested less than a month ago and 47 (35.6%) were tested in the previous 1 to 3 months. Since starting Truvada, most respondents (102, 77.3%) have been tested for HIV-1 every 3 months.  GILDDE00263067-263700 at 263088.<br><br>All respondents were tested for HIV-1; most (80.0%) were tested in the previous 3 months. Since starting TRUVADA, most respondents (80.0%) had been tested for HIV-1 every 3 months.  GILDDE00270528-916 at GILDDE00270533. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The majority of responders [prescribers] understood that you should test the UI HIV-1 status at least every 3 months (99.0%).  GILDDE00251496-252071 at GILDDE00251514

Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892.

Prescribers understand that they should test the HIV-1 status of uninfected individuals taking Truvada for PrEP indication at least every 3 months (99%).  GILDDE00251496-252071 at GILDDE00251514.

Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (95.8%).  GILDDE00263067-263700 at 263084.

Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (100%).  GILDDE00270528-916 at GILDDE00270544.

Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada to help prevent getting HIV-1" (94.6%).  GILDDE00243874-244563 at 243902.

Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (96.1%).  GILDDE00251496-252071 at 251524.

Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (93.9%).   GILDDE00263067-263700 at 263693; Intern Med. 176:75-84 (2016) at Abstract, Results, Discussion sections; and |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | Riddell et al., "HIV Preexposure Prophylaxis, A Review," JAMA, 319:1261-1268 (2018) at 1261-64. |
| wherein the combination is administered orally. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination orally.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination orally according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination orally.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination orally according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert |

71

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it.... Take Truvada 1 time each day with or without food." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed. Take TRUVADA by mouth, with or without food."). |
| 2. The process of claim 1 wherein selecting a primate host comprises | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in |

| U.S. Patent No. 9,044,509 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
|---|---|
| selecting an adult human not infected with the immunodeficiency retrovirus. | accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]."  Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. <br><br> "TRUVADA is used: ... • for HIV-1 PrEP to reduce the risk of getting HIV-1 infection in adults and adolescents who weigh at least 77 pounds (at least 35 kg)."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43 ("TRUVADA is used: … • to help reduce the risk of getting HIV-1 infection when used with safer sex practices in: o HIV-negative men who have sex with men, who are at high risk of getting infected with HIV-1 through sex."), (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42. <br><br> "TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP."  Truvada Package Insert (Revised 06/2020) at 1. <br><br> "Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP'."  Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important information about how TRUVADA may be used): • to treat <u>Human</u> Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42. |
| | Truvada Package Insert (Revised 06/2020) at 15-16 (section entitled "Human Data"); Truvada Package Insert (Revised 04/2017) at 19-20 (discussing human data"), (Revised 02/2016) at 19-20, (Revised 12/2013) at 19-20, (Revised 10/2013) at 19-20, (Revised 06/2013) at 18-19, (Revised 07/2012) at 17-18. |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. |
| | • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1. |
| | "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |
| | • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. • Agreement at 1. |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status as or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>   • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7. |
| 3. The process of claim 2 wherein the adult primate host is a male adult primate host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes an adult primate host that is a male adult primate host. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes an adult primate host that is a male adult primate host according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
|  | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes an adult primate host that is a male adult primate host. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes an adult primate host that is a male adult primate host according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"Emtricitabine and Tenofovir Disoproxil Fumarate: FTC and tenofovir pharmacokinetics are similar in male and female subjects." Truvada Package Insert (Revised 06/2020) at 20; Truvada Package Insert (Revised 04/2017) at 24 (Emtricitabine and Tenofovir DF: Emtricitabine and tenofovir pharmacokinetics are similar in male and female subjects."), (Revised 02/2016) at 24, (Revised 12/2013) at 24, (Revised 10/2013) at 24, (Revised 06/2013) at 24, (Revised 07/2012) at 22.<br><br>"TRUVADA is used: … • to help reduce the risk of getting HIV-1 infection when used with safer sex practices in: o HIV-negative men who have sex with men, who are at high risk of getting infected with HIV-1 through sex." Truvada Package Insert (Revised 04/2017) at 43; Truvada Package Insert (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"The iPrEx trial was a randomized, double-blind, placebo-controlled multinational study evaluating TRUVADA in 2,499 HIV-seronegative men or transgender women who have sex with men and with evidence of high-risk behavior for HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 30; Truvada Package Insert (Revised 04/2017) at |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 36, (Revised 02/2016) at 36, (Revised 12/2013) at 35, (Revised 10/2013) at 35, (Revised 06/2013) at 34, (Revised 07/2012) at 34.<br><br>The iPrEx Truvada clinical trial was conducted on a population of "HIV-seronegative men or transgender women who have sex with men." Truvada Package Insert (Revised 06/2020) at 29.<br><br>"Safety, adherence, and resistance were evaluated in a single-arm, open-label clinical trial (ATN113) in which 67 HIV-1 uninfected at-risk adolescent men who have sex with men received TRUVADA once daily for HIV-1 PrEP. The mean age of subjects was 17 years (range 15 to 18 years); 46% were Hispanic, 52% Black, and 37% White. The safety profile of TRUVADA in ATN113 was similar to that observed in the adult HIV-1 PrEP trials [see Adverse Reactions (6.1)]." Truvada Package Insert (Revised 06/2020) at 17.<br><br>Clinical trials were conducted "in which 67 HIV-1 uninfected adolescent (15 to 18 years of age) men who have sex with men received TRUVADA once daily for HIV-1 PrEP, the safety profile of TRUVADA was similar to that observed in adults." Truvada Package Insert (Revised 06/2020) at 12.<br><br>"In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…." Training Guide at 5. |
| 4. The process of claim 1 wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered orally directly to the human in a combined single dosage formulation. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered orally directly to the human in a combined single dosage formulation. The evidence will show that Gilead's |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are administered orally directly to the human in a combined single dosage formulation according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are administered orally directly to the human in a combined single dosage formulation.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are administered orally directly to the human in a combined single dosage formulation according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

"HIV-1 Pre-Exposure Prophylaxis (PrEP)

- Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| 5. The process of claim 1 wherein the immunodeficiency retrovirus is a human immunodeficiency virus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus according to the |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | claimed method.   Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus.   The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus according to the claimed method.   Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

"Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP'."  Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); *see also* Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important information about how TRUVADA may be used): • to treat Human Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42.

"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."  Truvada Package Insert (Revised 06/2020) at 1; *see also* Truvada Package Insert (Revised 04/2017) at 1 |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; *see also* Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; *see also* Truvada Package Insert (Revised 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 6. The process of claim 5 wherein the human immunodeficiency virus (HIV) is HIV-1. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the human immunodeficiency virus (HIV) being HIV-1.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the human immunodeficiency virus (HIV) being HIV-1 according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the human immunodeficiency virus (HIV) being HIV-1.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the human immunodeficiency virus (HIV) being HIV-1 according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP'."  Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important information about how |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | TRUVADA may be used): • to treat Human Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |
| 7. The process of claim 1 wherein the combination is administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed combination being administered as |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP) |
| | TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk. This indication is based on clinical trials in men who have sex with men (MSM) at high risk for HIV-1 infection and in heterosexual serodiscordant couples [see Clinical Studies (14.2, 14.3)]."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |
| | "Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….<br>• Discussed the importance of regular HIV-1 testing (at least every3 months) while taking  emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | • Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….” Agreement at 1.<br><br>“**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider.” Agreement at 1.<br><br>“TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP.” Training Guide at 3.<br><br>“**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection |
| | Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7. |
| | "In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…." Training Guide at 5. |
| | "In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex…." Training Guide at 5. |
| 8. The process of claim 1 comprising administering 200 milligrams (mg) of emtricitabine and 300 mg of tenofovir disoproxil fumarate to a human host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering 200 milligrams (mg) of emtricitabine and 300 mg of tenofovir disoproxil fumarate to a human host. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering 200 milligrams (mg) of emtricitabine and 300 mg of tenofovir disoproxil fumarate to a human host according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering 200 milligrams (mg) of emtricitabine and 300 mg of tenofovir disoproxil fumarate to a human host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering 200 milligrams (mg) of emtricitabine and 300 mg of tenofovir disoproxil fumarate to a human host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. "HIV-1 Pre-Exposure Prophylaxis (PrEP) • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]."  Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. |
| 9. The process of claim 1 wherein the combination is administered daily for several days, weeks or months. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination daily for several days, weeks or months. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination daily for several days, weeks or months according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination daily for several days, weeks or months. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination daily for several days, weeks or months according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

RESTRICTED INFORMATION

"HIV-1 Pre-Exposure Prophylaxis (PrEP)

- Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.

"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]."  Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.

"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.

"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.”), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>“HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs).” Truvada Package Insert (Revised 06/2020) at 1.<br><br>“Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3.<br><br>“While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs.” Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 (“While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months.”), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>“How should I take TRUVADA?<br><br>• Take TRUVADA exactly as your healthcare provider tells you to take it....<br>• Take TRUVADA 1 time each day with or without food....<br>• Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA. Do not miss a dose of TRUVADA.” Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 (“How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | TRUVADA is usually taken 1 time each day. Take TRUVADA at the same time each day to keep TRUVADA blood levels constant.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA."), (Revised 02/2016) at 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44.<br><br>Truvada Package Insert (Revised 06/2020) at 29-31 (reporting clinical trial data over multi-week periods); Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. |
| 10. The process of claim 9 wherein the combination is administered daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination before and after contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination before and after contact between the host and the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br>TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. <br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | prevalence area or network." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 1; *see also* Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43. |
| 11. The process of claim 1 wherein administration of the combination results in an absence of persistent viremia and seroconversion of the primate host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1. <br><br> "Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3. <br><br> "While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]: ...<br><br>• The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well."  Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated by the results of clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. |
| 12. [disclaimed] A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human, comprising: | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human.  The evidence will demonstrate that the process allows a human to remain |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human.  The evidence will demonstrate that the process allows a human to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals immediately confirmed prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>- If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>- Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….<br>- Discussed the importance of regular HIV-1 testing (at least every 3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling<br>- Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1. |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP."  Training Guide at 3. |
| | "**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |
| | • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection |
| | Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP."  Training Guide at 7. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you."  Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed."). |
| (a) selecting an uninfected human that does not have the self-replicating infection; and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a human that does not have the self-replicating infection.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a human that does not have the self-replicating infection. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP."  Truvada Package Insert (Revised 06/2020) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Do not use TRUVADA for pre-exposure prophylaxis in |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 5; Truvada Package Insert (Revised 04/2017) at 7 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 7, (Revised 12/2013) at 7, (Revised 10/2013) at 7, (Revised 06/2013) at 7, (Revised 07/2012) at 6.

"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only TRUVADA, because TRUVADA alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing TRUVADA before confirming the individual is HIV-1 negative."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10, (Revised 02/2016) at 10, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 10, (Revised 07/2012) at 9.

"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP

Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:

• The need to confirm that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."  Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: • Confirming that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Before taking TRUVADA to reduce your risk of getting HIV-1:<br><br>• You must be HIV-1 negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection.<br>• Do not take TRUVADA for HIV-1 PrEP unless you are confirmed to be HIV-1 negative." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("Before taking TRUVADA to reduce your risk of getting HIV-1 infection: • You must be HIV-negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection. • Do not take TRUVADA to reduce the risk of getting HIV-1 unless you are confirmed to be HIV-negative."), (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Do not take TRUVADA for HIV-1 PrEP if:<br><br>• you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with TRUVADA to treat HIV-1. TRUVADA by itself is not a complete treatment for HIV-1.<br>• you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with TRUVADA to treat HIV-1." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43, (Revised 10/2013) at 43, (Revised 06/2013) at 43.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>    • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>    • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Training Guide at 3.<br><br>"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>    • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7.<br><br>The majority of responders [prescribers] understood that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.8%). GILDDE00251496-252071 at GILDDE00251514.<br><br>Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%). GILDDE00243874-244563 at 243892.<br><br>Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.9%). GILDDE00263067-263700 at 263084.<br><br>Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (100%). GILDDE00270528-916 at GILDDE00270544.<br><br>Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (95.9%). GILDDE00243874-244563 at 243902.<br><br>Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (99.6%). GILDDE00251496-252071 at 251524. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (98.5%). GILDDE00263067-263700 at 263693. |
| (b) administering to the uninfected human a combination comprising:<br><br>i. a pharmaceutically effective amount of emtricitabine; and<br><br>ii. a pharmaceutically effective amount of tenofovir or tenofovir ester; | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir ester. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir ester according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir ester. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | amount of tenofovir ester according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]."  Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA tablets are fixed-dose combination tablets containing emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF)."  Truvada Package Insert (Revised 06/2020) at |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 18; Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"TRUVADA contains the prescription medicines emtricitabine and tenofovir disoproxil fumarate."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"What are the ingredients in TRUVADA?<br><br>Active ingredients: emtricitabine and tenofovir disoproxil fumarate."  Truvada Package Insert (Revised 06/2020) at 38 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"How should I take TRUVADA?<br><br>• Take TRUVADA exactly as your healthcare provider tells you to take it....<br>• Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA. Do not miss a dose of TRUVADA."  Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 ("How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA."), (Revised 02/2016) at 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Tenofovir Disoproxil Fumarate: TDF is a fumaric acid salt of the bis-isopropoxycarbonyloxymethyl ester derivative of tenofovir. The chemical name of tenofovir DF is 9-[(R)-2[[bis[[(isopropoxycarbonyl)oxy]-methoxy]phosphinyl]methoxy]propyl]adenine fumarate (1:1)." Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 22, (Revised 02/2016) at 22, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20. |
| | "Tenofovir Disoproxil Fumarate: TDF is an acyclic nucleoside phosphonate diester analog of adenosine monophosphate. TDF requires initial diester hydrolysis for conversion to tenofovir and subsequent phosphorylations by cellular enzymes to form tenofovir diphosphate (TFV-DP), which inhibits the activity of HIV-1 RT by competing with the natural substrate deoxyadenosine 5′triphosphate and, after incorporation into DNA, by DNA chain termination." Truvada Package Insert (Revised 06/2020) at 26; Truvada Package Insert (Revised 04/2017) at 31, (Revised 02/2016) at 30, (Revised 12/2013) at 30, (Revised 10/2013) at 30, (Revised 06/2013) at 29, (Revised 07/2012) at 28. |
| |  |
| | Truvada Package Insert |
| | The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials. *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. |
| | The majority of responders [prescribers] understood that UIs should be counseled that they are at greater risk of acquiring HIV-1 if they miss doses of TRUVADA for a PrEP indication (90.6%), that strict adherence to daily dosing correlates to the effectiveness of TRUVADA in reducing the risk of acquiring HIV-1 (91.7%).  GILDDE00251496-252071 at GILDDE00251514. |
| thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human.  The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving administration of the claimed combination.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human.  The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | administration of the claimed combination. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon |

RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3.<br><br>"While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]...<br><br>• The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ...<br>• Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials. *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br><ul><li>If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.</li></ul>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br><ul><li>Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….</li><li>Discussed the importance of regular HIV-1 testing (at least every3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling</li><li>Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.</li></ul>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br><ul><li>My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.</li></ul> |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.<br><br>"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Take Truvada exactly as your healthcare provider tells you to take it."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed.").<br><br>"Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%."  *Gilead Sciences, Inc. and Gilead Sciences Ireland UC v. AJC Medical Group, Inc. et al.*, Case No. 20-cv-24523, D.I. 1 at ¶ 130 (S.D. Fla. Nov. 3, 2020).<br><br>"By inhibiting HIV-1 from replicating as it enters the body, TRUVADA for a PrEP indication works to prevent the virus from establishing permanent infection." TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715-237256 at GILDDE00236749.<br>Liu et al., "HIV Pre-Exposure Prophylaxis Integrated with Municipal and Community Based Sexual Health Services," JAMA Intern Med. 176:75-84 (2016) at Abstract, Results, Discussion sections; Riddell et al., "HIV Preexposure Prophylaxis, A Review," JAMA, 319:1261-1268 (2018) at 1261-64<br><br>The goals of the REMS for Truvada for a Pre-exposure Prophylaxis (PrEP) Indication are: … The importance of regular monitoring of HIV-1 serostatus to avoid continuing to take Truvada for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants.  *See, e.g.,* GILDDE00236715-237256 at GILDDE00236719; *see also* GILDDE00251496-252071 at 251500; GILDDE00263067-2663700 at GILDDE00263072; GILDDE00270528-916 at GILDDE00270533.<br><br>All (100%) respondents were tested for HIV; 90% were tested within the previous 3 months.  GILDDE00236715-237256 at GILDDE00236738. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | All (74, 100%) respondents were tested for HIV-1; most (64, 86.5%) were tested within the previous 3 months.  GILDDE00243874-244563 at 243898.<br><br>All (281, 100%) respondents reported being tested for HIV-1; most (265, 94.3%) reported being tested within the previous 3 months. GILDDE00251496-252071 at 251519.<br><br>All (132, 100.0%) respondents were tested for HIV-1; more than half (69, 52.3%) were tested less than a month ago and 47 (35.6%) were tested in the previous 1 to 3 months. Since starting Truvada, most respondents (102, 77.3%) have been tested for HIV-1 every 3 months.  GILDDE00263067-263700 at 263088.<br><br>All respondents were tested for HIV-1; most (80.0%) were tested in the previous 3 months. Since starting TRUVADA, most respondents (80.0%) had been tested for HIV-1 every 3 months.  GILDDE00270528-916 at GILDDE00270533.<br><br>The majority of responders [prescribers] understood that you should test the UI HIV-1 status at least every 3 months (99.0%).  GILDDE00251496-252071 at GILDDE00251514.<br><br>Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892.<br><br>Prescribers understand that they should test the HIV-1 status of uninfected individuals taking Truvada for PrEP indication at least every 3 months (99%).  GILDDE00251496-252071 at GILDDE00251514.<br><br>Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (95.8%).  GILDDE00263067-263700 at 263084. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (100%). GILDDE00270528-916 at GILDDE00270544. |
| | Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada to help prevent getting HIV-1" (94.6%). GILDDE00243874-244563 at 243902. |
| | Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (96.1%). GILDDE00251496-252071 at 251524. |
| | Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (93.9%). GILDDE00263067-263700 at 263693. |
| wherein the combination is administered orally. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination orally. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination orally according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | process that includes administering the claimed combination orally.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination orally according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

"HIV-1 Pre-Exposure Prophylaxis (PrEP)

- Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.

"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.

"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]."  Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it.... Take Truvada 1 time each day with or without food." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed. Take TRUVADA by mouth, with or without food."). |
| 13. The process of claim 12 wherein the combination is administered prior to a potential exposure of the primate host to the human immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus. Such evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus. Such evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br> TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. <br><br> "Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Truvada Package Insert (Revised 06/2020) at 6; Truvada |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |

| U.S. Patent No. 9,044,509 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
| | "TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Training Guide at 3. <br><br> **"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: <br><br> • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection" Training Guide at 7. <br><br> The survey initially asked questions about HIV testing, Truvada dosing, and sexual activity.  All (100%) respondents were sexually active.  GILDDE00236715-237256 at GILDDE00236738. <br><br> The majority (94.6%) of respondents were sexually active.  GILDDE00243874-244563 at 243898. <br><br> The majority (98.9%) of respondents were sexually active.  GILDDE00251496-252071 at 251519. <br><br> The majority (98.9%) of respondents were sexually active.  GILDDE00251496-252071 at 251519. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The majority (125, 94.7%) of respondents reported being sexually active. GILDDE00263067-263700 at 263088. |

**EXHIBIT B**

**Gilead's Infringement of Claim 13 of the '509 Patent by Descovy® for PrEP[4]**

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| 12. [disclaimed] A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human, comprising: | Acts of direct infringement of Claim 13 are carried out by clinicians in the United States who treat patients with Descovy® for PrEP.  Gilead induces this act of direct infringement through, inter alia, its instructions for Descovy® for PrEP as detailed in this chart. |
| | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human.  The evidence will demonstrate that the process allows a human to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human. The evidence will demonstrate that the process allows a human to remain serologically |

---

[4] Plaintiff expressly reserves the right to modify and/or supplement Exhibit B.  Plaintiff reserves the right to rely upon any evidence produced in discovery in this or the corresponding Court of Federal Claims litigation.  Plaintiff further reserves the right to rely on expert testimony.

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Descovy® for PrEP |
| | negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1.[5]<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Descovy Package Insert (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 3.<br><br>"You must stay HIV-negative to keep taking DESCOVY for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Descovy Package Insert (Medication Guide) (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 36.<br><br>"Take Descovy exactly as your healthcare provider tells you to take it."  Package Insert (Medication Guide) (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 38. |

[5] The Descovy Package Insert was further revised on November 24, 2020, March 4, 2021, and September 15, 2021.  Each of the revised package inserts contain identical or substantially the same disclosure to the quotations provided throughout Exhibit B.  The Government reserves the right to rely on these revisions to the Descovy Package Insert to prove infringement, as well as any additional revisions to the Descovy Package Insert that may occur during the pendency of this litigation.

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | |
| (a) selecting an uninfected human that does not have the self-replicating infection; and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes selecting a human that does not have the self-replicating infection.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes selecting a human that does not have the self-replicating infection.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed."  Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1.

"Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP."  Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status."  Descovy Package Insert (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]."  Descovy Package Insert (Revised 12/2019) at 4; *see also* Descovy Package Insert (Revised 10/2019) at 4. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Descovy® for PrEP |
| | "DESCOVY for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 5; *see also* Descovy Package Insert (Revised 10/2019) at 5.<br><br>"Use DESCOVY to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only DESCOVY, because DESCOVY alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing DESCOVY before confirming the individual is HIV-1 negative." Descovy Package Insert (Revised 12/2019) at 6; *see also* Descovy Package Insert (Revised 10/2019) at 6.<br><br>"Important Information for Uninfected Individuals Taking DESCOVY for HIV-1 PrEP<br><br>Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:<br><br>• The need to confirm that they are HIV-negative before starting to take DESCOVY to reduce the risk of acquiring HIV-1." Descovy Package Insert (Revised 12/2019) at 35; *see also* Descovy Package Insert (Revised 10/2019) at 33.<br><br>"Before taking DESCOVY to reduce your risk of getting HIV-1:<br><br>• You must be HIV-1 negative to start DESCOVY. You must get tested to make sure that you do not already have HIV-1 infection.<br>• Do not take DESCOVY for HIV-1 PrEP unless you are confirmed to be HIV-1 negative." Descovy Package Insert (Revised 12/2019) at Medication Guide 1; *see also* Descovy Package Insert (Revised 10/2019) at 36 (Medication Guide).<br><br>"Do not take DESCOVY for HIV-1 PrEP if: |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | • you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with DESCOVY to treat HIV-1. DESCOVY by itself is not a complete treatment for HIV-1.<br>• you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with DESCOVY to treat HIV-1 infection."  Descovy Package Insert (Revised 12/2019) at Medication Guide 2; *see also* Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide). |
| (b) administering to the uninfected human a combination comprising:<br>i. a pharmaceutically effective amount of emtricitabine; and<br>ii. a pharmaceutically effective amount of tenofovir or tenofovir ester; | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy® label perform a process that includes administering to an uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir ester.  The evidence will demonstrate that process includes administering to the uninfected human a pharmaceutically effective amount of "tenofovir ester," which is an ester in which one of the components is tenofovir such that when the ester bonds are hydrolyzed, one of the components is the compound recognized as tenofovir.  The evidence will show that Gilead's Descovy® label encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering to an uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir ester according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy® label regarding a process that includes administering to an uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir ester.  The evidence will demonstrate that process includes administering to the |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | uninfected human a pharmaceutically effective amount of "tenofovir ester," which is an ester in which one of the components is tenofovir such that when the ester bonds are hydrolyzed, one of the components is the compound recognized as tenofovir.  For example, the evidence will show that conditions that hydrolyze the ester bonds in TAF also hydrolyze the phosphorus-nitrogen bond in TAF such that one of the components resulting from the hydrolysis is the compound recognized as tenofovir.  The evidence will show that Gilead's Descovy® label encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering to an uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir ester according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The TAF contained in Gilead's Descovy® product satisfies the term tenofovir ester under the doctrine of equivalents.  TAF is an ester of tenofovir and the Government will present testimony from one or more experts that conditions for hydrolysis of ester bonds will afford the compound recognized as tenofovir.  Moreover, the Government will present testimony from one or more experts that the hydrolysis of the phosphonamidate bond present in TAF that yields tenofovir in vivo is insubstantially different from the hydrolysis of phosphonester bonds that yield tenofovir in vivo and/or performs the same function in substantially the same way to obtain substantially the same result as hydrolysis of phosphonester bonds, at least because hydrolysis of the phosphonamidate moieties of TAF results in a component that is the compound recognized as tenofovir.  A person of ordinary skill would have considered TAF to be insubstantially different from a tenofovir ester and/or perform the same function in substantially the same way to obtain the same result as a tenofovir ester.<br><br>Infringement of the "tenofovir ester" claim limitation by TAF is not barred by prosecution history estoppel.  TAF is not within the effective scope of the subject matter that may have been surrendered by the Examiner's amendment to the claims and arguments made during prosecution.  *See, e.g.,* Appx0838, 0840-0842, 0627-630.  The |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Descovy® for PrEP |
| | Examiner explained that the amended claims were allowable because they did not encompass combinations with certain antivirals (such as MVC, *see* Appx0842) and because the claims did not encompass tenofovir-based monotherapy (*id.*). The Examiner's amendment and reasons for allowing the claims (which were made in view of the Applicants arguments during prosecution) made it clear that "tenofovir," "tenofovir disoproxil fumarate," and "a prodrug of tenofovir" were viewed as equivalent for the purposes of allowance. *Id.* The prosecution history makes it clear that Applicants did not surrender TAF as an equivalent to "tenofovir ester" and the prosecution history does not bar TAF as an equivalent to "tenofovir ester" for infringement purposes.<br><br>Further, infringement of the "tenofovir ester" claim limitation by TAF is not barred the disclosure-dedication doctrine. The disclosure-dedication doctrine only applies if there is a clear and unmistakable surrender of subject matter, and here there was no clear and unmistakable surrender of TAF by the Government. Furthermore, the Examiner explained that the amended claims were allowable because they did not encompass combinations with certain antivirals (such as MVC, *see* Appx0842) and because the claims did not encompass tenofovir-based monotherapy (*id.*). None of the reasons for allowing the amended claims makes any reference to TAF. Therefore, there was no clear surrender of TAF.<br><br>"The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected:<br><br>• adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or<br>• adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "Recommended dosage:... |
| | • HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |
| | "DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |
| | "DESCOVY (emtricitabine and tenofovir alafenamide) is a fixed dose combination tablet containing emtricitabine (FTC) and tenofovir alafenamide (TAF) for oral administration." Descovy Package Insert (Revised 12/2019) at 20; Descovy Package Insert (Revised 10/2019) at 19. |
| | "DESCOVY contains the prescription medicines emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide). |
| | "What are the ingredients in DESCOVY? Active ingredients: emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 4; Descovy Package Insert (Revised 10/2019) at 39 (Medication Guide). |
| | "Tenofovir Alafenamide: The chemical name of tenofovir alafenamide fumarate drug substance is L-alanine, N-[(S)-[[(1R)-2-(6-amino-9H-purin-9-yl)-1methylethoxy]methyl]phenoxyphosphinyl]-, 1-methylethyl ester, (2E)-2butenedioate (2:1). Tenofovir alafenamide fumarate has an empirical formula of $C_{21}H_{29}O_5N_6P\bullet\frac{1}{2}(C_4H_4O_4)$ and a formula weight of 534.50 and has the following structural formula: |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | 

Tenofovir alafenamide fumarate is a white to off-white or tan powder with a solubility of 4.7 mg per mL in water at 20 °C." *See* Descovy Package Insert (Revised 12/2019) at 21; Descovy Package Insert (Revised 10/2019) at 20.

"Tenofovir Alafenamide: TAF is a phosphonoamidate prodrug of tenofovir (2'-deoxyadenosine monophosphate analog)." *See* Descovy Package Insert (Revised 12/2019) at 28; Descovy Package Insert (Revised 10/2019) at 27.

"TAF, an HIV NRTI, is converted in vivo to tenofovir, an acyclic nucleoside phosphonate (nucleotide) analog of adenosine 5′-monophosphate." *See* Descovy Package Insert (Revised 12/2019) at 2; Descovy Package Insert (Revised 10/2019) at 19.

"In vivo, TAF is hydrolyzed within cells to form tenofovir (major metabolite), which is phosphorylated to the active metabolite, tenofovir diphosphate." *See* Descovy Package Insert (Revised 12/2019) at 22; Descovy Package Insert (Revised 10/2019) at 21.

"How should I take DESCOVY?

- Take DESCOVY exactly as your healthcare provider tells you to take it....
- Do not change your dose or stop taking DESCOVY without first talking with your healthcare provider. Stay under a healthcare provider's care when taking DESCOVY. Do not miss a dose of DESCOVY." Descovy Package Insert (Revised 12/2019) at Medication Guide 3; Descovy Package Insert (Revised 10/2019) at 38 (Medication Guide). |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | The efficacy of Descovy tablets containing 200 mg of FTC and 25 mg of TAF was demonstrated in clinical trials. *See* Descovy Package Insert (Revised 12/2019) at 32-34; Descovy Package Insert (Revised 10/2019) at 31-33.<br><br>"Across all main safety endpoints, no differences between TAF and TDF are seen." Pilkington et al., "Tenofovir alafenamide vs. tenofovir disoproxil fumarate: an updated meta-analysis of 14 894 patients across 14 trials," AIDS 34:2259-68 (2020) at 2259; *id.* at 2259 ("This study finds no difference in efficacy or safety in unboosted TAF vs. TDF."); *id.* at 2265 ("First, we find evidence to support the idea that, whilst TAF may offer some small advantages in renal safety profile in boosted regimens, this difference has not been seen in unboosted regimens, such as those used in PrEP."); *id.* at 2265 ("Certainly, where no difference is seen in safety when unboosted, these results so [sic] have no bearing on decisions to use unboosted TDF-containing PrEP regimens in efforts to reduce rates of HIV incidence.  TDF for PrEP remains a safe, affordable and realistic option in providing protection to those at risk of HIV worldwide."); *id.* at 2266 ("Furthermore, no overall significant difference was seen in safety, across all core endpoints, between TAF and TDF, albeit in a relatively young trial participant population, with good baseline renal function.  This has implications not only in HIV treatment but also in prevention, with TDF formulations for HIV PrEP having proven success in uptake and adherence worldwide, calling into question the need for TAF-based formations given the established tolerability of TDF."). |
| thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human.  The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving administration of the claimed combination.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that inhibits the |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Descovy® for PrEP |
| | establishment of the self-replicating infection with the immunodeficiency virus in the human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human.  The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving administration of the claimed combination.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]."  Descovy Package Insert (Revised 12/2019) at 4; Descovy Package Insert (Revised 10/2019) at 4.<br><br>"While using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs."  Descovy Package Insert (Revised 12/2019) at 7; Descovy Package Insert (Revised 10/2019) at 6.<br><br>"Important Information for Uninfected Individuals Taking DESCOVY for HIV-1 PrEP<br><br>Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>• The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well."  Descovy Package Insert (Revised 12/2019) at 35; Descovy Package Insert (Revised 10/2019) at 33-34.<br><br>The efficacy of Descovy tablets containing 200 mg of FTC and 25 mg of TAF was demonstrated in clinical trials.  *See* Descovy Package Insert (Revised 12/2019) at 32-34; Descovy Package Insert (Revised 10/2019) at 31-33.<br><br>"You must stay HIV-negative to keep taking DESCOVY for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you."  Descovy |

141
RESTRICTED INFORMATION

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Package Insert (Medication Guide) (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 36.<br><br>"Take Descovy exactly as your healthcare provider tells you to take it."  Package Insert (Medication Guide) (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 38.<br><br>"Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%."  *Gilead Sciences, Inc. and Gilead Sciences Ireland UC v. AJC Medical Group, Inc. et al.*, Case No. 20-cv-24523, D.I. 1 at ¶ 130 (S.D. Fla. Nov. 3, 2020). |
| wherein the combination is administered orally. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes administering the claimed combination orally.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination orally according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes administering the claimed combination orally.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination orally according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected:<br><br>• adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or<br>• adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5.<br><br>"DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"Recommended dosage:...<br><br>• • HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"Take Descovy exactly as your healthcare provider tells you to take it.... Take DESCOVY 1 time each day with or without food." Package Insert (Medication Guide) (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 38. |
| 13. The process of claim 12 wherein the combination is administered prior to a potential exposure of the primate host to the human immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes |

| U.S. Patent No. 9,044,509 | |
|---|---|
| Claim | Basis for Infringement by Descovy® for PrEP |
| | administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus. Such evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus. Such evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br> DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual |

| U.S. Patent No. 9,044,509 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | acquisition, excluding individuals at risk from receptive vaginal sex. Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]." *See* Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." *See* Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6.<br><br>"DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex." *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg." *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY can only help reduce your risk of getting HIV-1 infection before you are infected." Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide).<br><br>*See also* GILDDE00188011-050 at, e.g., GILDDE00188014 (at-risk information) and GILDDE00188316-402 at, e.g., GILDDE00188363 (lifetime risk information). |

RESTRICTED INFORMATION

## EXHIBIT C

### Gilead's Infringement of Claims 1-11 and 13 of the '333 Patent by Truvada for PrEP®[6]

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising: | Acts of direct infringement of Claims 1-11 and 13 are carried out by clinicians in the United States who treat patients with Truvada for PrEP®. Gilead induces this act of direct infringement through, *inter alia*, its instructions for Truvada for PrEP® as detailed in this chart.<br><br>The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus. The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process of protecting a primate host from a self-replicating infection according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United |

---

[6] Plaintiff expressly reserves the right to modify and/or supplement Exhibit C. Plaintiff reserves the right to rely upon any evidence produced in discovery in this or the corresponding Court of Federal Claims litigation. Plaintiff further reserves the right to rely on expert testimony.

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus. The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process of protecting a primate host from a self-replicating infection according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.

"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. |
| | • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1. |
| | "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |
| | • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. |
| | • Discussed the importance of regular HIV-1 testing (at least every3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling |
| | • Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1. |
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 |

| U.S. Patent No. 9,579,333 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
|---|---|
| | status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.<br><br>"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Take Truvada exactly as your healthcare provider tells you to take it."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed."). |
| (a) selecting a primate host not infected with the immunodeficiency retrovirus, and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a primate host not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use…. Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use…. Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP."  Truvada Package Insert (Revised 06/2020) at 1. <br><br> "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1. <br><br> "TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use…. Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 (“TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)].”), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>“Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 (“When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication.”), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>“Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3.<br><br>“TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 5; Truvada Package Insert (Revised 04/2017) at 7 (“Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status.”), (Revised 02/2016) at 7, (Revised 12/2013) at 7, (Revised 10/2013) at 7, (Revised 06/2013) at 7, (Revised 07/2012) at 6. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only TRUVADA, because TRUVADA alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing TRUVADA before confirming the individual is HIV-1 negative."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10, (Revised 02/2016) at 10, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 10, (Revised 07/2012) at 9.<br><br>"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:<br><br>• The need to confirm that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."  Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: • Confirming that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>"Before taking TRUVADA to reduce your risk of getting HIV-1:<br><br>• You must be HIV-1 negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection.<br>• Do not take TRUVADA for HIV-1 PrEP unless you are confirmed to be HIV-1 negative."  Truvada Package Insert (Revised 06/2020) at 35 (Medication |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Guide); Truvada Package Insert (Revised 04/2017) at 42 ("Before taking TRUVADA to reduce your risk of getting HIV-1 infection: • You must be HIV-negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection. • Do not take TRUVADA to reduce the risk of getting HIV-1 unless you are confirmed to be HIV-negative."), (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Do not take TRUVADA for HIV-1 PrEP if:<br><br>• you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with TRUVADA to treat HIV-1. TRUVADA by itself is not a complete treatment for HIV-1.<br>• you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with TRUVADA to treat HIV-1." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43, (Revised 10/2013) at 43, (Revised 06/2013) at 43.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….Agreement at 1. |
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |
| | My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1. |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection.."  Training Guide at 3. |
| | "**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |
| | Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection"  Training Guide at 7. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The majority of responders [prescribers] understood that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.8%).  GILDDE00251496-252071 at GILDDE00251514. |
| | Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892. |
| | Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.9%).  GILDDE00263067-263700 at 263084. |
| | Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (100%).  GILDDE00270528-916 at GILDDE00270544. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (95.9%). GILDDE00243874-244563 at 243902. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (99.6%). GILDDE00251496-252071 at 251524. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (98.5%). GILDDE00263067-263700 at 263693. |
| (b) administering directly to an uninfected primate host a combination comprising: | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States |

| U.S. Patent No. 9,579,333 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
|---|---|
| i. a pharmaceutically effective amount of emtricitabine, wherein the pharmaceutically effective amount of the emtricitabine is administered orally, subcutaneously or vaginally; and<br><br>ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate, wherein the pharmaceutically effective amount of the tenofovir or tenofovir disoproxil fumarate is administered orally, subcutaneously or vaginally, and | in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate, wherein the emtricitabine and tenofovir disoproxil fumarate are administered orally.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate wherein the emtricitabine and tenofovir disoproxil fumarate are administered orally, according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate wherein the emtricitabine and tenofovir disoproxil fumarate are administered orally.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate wherein the emtricitabine and tenofovir disoproxil fumarate are administered orally, according to the claimed method. |

| U.S. Patent No. 9,579,333 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA tablets are fixed-dose combination tablets containing emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF)." Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"TRUVADA contains the prescription medicines emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"What are the ingredients in TRUVADA?<br><br>Active ingredients: emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 38 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"How should I take TRUVADA?<br><br>• Take TRUVADA exactly as your healthcare provider tells you to take it....<br>• Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA. Do not miss a dose of TRUVADA." Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 ("How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA."), (Revised 02/2016) at |

159

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it.... Take Truvada 1 time each day with or without food."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed. Take TRUVADA by mouth, with or without food.").<br><br>The majority of responders [prescribers] understood that UIs should be counseled that they are at greater risk of acquiring HIV-1 if they miss doses of TRUVADA for a PrEP indication (90.6%), that strict adherence to daily dosing correlates to the effectiveness of TRUVADA in reducing the risk of acquiring HIV-1 (91.7%).  GILDDE00251496-252071 at GILDDE00251514. |
| wherein the combination is administered prior to the exposure of the primate host to the immunodeficiency retrovirus, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination prior to the exposure of the primate host to the immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination prior to contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination prior to the exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination prior to the exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to contact between the host and the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination prior to the exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)

TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; *see also* Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network."  Truvada Package Insert (Revised 06/2020) at 6; *see also* Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection."  Truvada Package Insert (Revised 06/2020) at 1; *see also* Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.

"TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43.

"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.

- If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.

"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …

- Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.

"**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection"  Training Guide at 7.<br><br>"PrEP is short for Pre-Exposure Prophylaxis.  It means protecting yourself *before* you come into contact with HIV-1."  www.truvada.com/what-is-truvada/undersstanding-truvada (emphasis in original). |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "The following factors may help to identify individuals at high risk: Has partner(s) known to be HIV-1 infected."  Important Safety Information About TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication For Healthcare Providers; GILDDE00236715-237256 at GILDDE00236736; *see also* www.truvada.com/is-truvada-right-for-me/understanding-hiv-risk.<br><br>"Factors that may help to identify individuals at high risk include individuals having partner(s) know to be HIV-1 infected."  TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715-237256 at GILDDE00236748.  "In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex." *Id.* at 35.<br><br>The survey initially asked questions about HIV testing, Truvada dosing, and sexual activity.  All (100%) respondents were sexually active. However, most (80%) respondents did not use a condom the last time they had sex.  GILDDE00236715-237256 at GILDDE00236738.<br><br>The majority (94.6%) of respondents were sexually active. However, approximately two-thirds (64.3%) of respondents did not use a condom the last time they had sex. GILDDE00243874-244563 at 243898<br><br>The majority (98.9%) of respondents were sexually active. However, 81.3% had unprotected sex within the last 3 months and 65.5% of respondents did not use a condom the last time they had sex.  GILDDE00251496-252071 at 251519.<br><br>The majority (98.9%) of respondents were sexually active. However, 81.3% had unprotected sex within the last 3 months and 65.5% of respondents did not use a condom the last time they had sex.  GILDDE00251496-252071 at 251519. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The majority (125, 94.7%) of respondents reported being sexually active. When asked about safe sex practices, 107 (85.6%) reported having had unprotected (condomless) sex within the last 3 months and 87 (69.6%) of respondents did not use a condom the last time they had sex.  GILDDE00263067-263700 at 263088.<br><br>All respondents were sexually active. When asked about safe sex practices, all reported having had unprotected sex within the last 3 months and none reported using a condom the last time they had sex.  GILDDE00270528-916 at GILDDE00270.<br><br>Study GS-US-276-0103, which is an observational study to examine seroconversion in contemporary demonstration projects of Truvada for PrEP, has accumulated 6,214 person years of follow up in 7,002 male subjects. There were 67 seroconversions during the surveillance period for a seroconversion rate of 1.08 cases per 100 person years, 95% CI0 .84–1.37 (internal data for Study GS-US-276-0103).  US_01885993-6001. |
| thereby protecting the primate host from infection with the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that protects the primate host from infection with the immunodeficiency retrovirus. The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving administration of the claimed combination if and when both tests are performed.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process of protecting a primate host from a self-replicating |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | infection according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that protects the primate host from infection with the immunodeficiency retrovirus. The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving administration of the claimed combination if and when both tests are performed. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process of protecting a primate host from a self-replicating infection according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3.<br><br>"While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>    • The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Truvada Package Insert (Revised 06/2020) at 32; |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Truvada Package Insert (Revised 04/2017) at 40 ("Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials. *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Discussed the importance of regular HIV-1 testing (at least every 3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling |
| | Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1. |
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |
| | My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3. |
| | "**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.<br><br>"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed.").<br><br>"Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%." *Gilead Sciences, Inc. and Gilead Sciences Ireland UC v. AJC Medical Group, Inc. et al.*, Case No. 20-cv-24523, D.I. 1 at ¶ 130 (S.D. Fla. Nov. 3, 2020).<br><br>"By inhibiting HIV-1 from replicating as it enters the body, TRUVADA for a PrEP indication works to prevent the virus from establishing permanent infection." TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715-237256 at GILDDE00236749. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Liu et al., "HIV Pre-Exposure Prophylaxis Integrated with Municipal and Community Based Sexual Health Services," JAMA Intern Med. 176:75-84 (2016) at Abstract, Results, Discussion sections; Riddell et al., "HIV Preexposure Prophylaxis, A Review," JAMA, 319:1261-1268 (2018) at 1261-64.<br><br>The goals of the REMS for Truvada for a Pre-exposure Prophylaxis (PrEP) Indication are: … The importance of regular monitoring of HIV-1 serostatus to avoid continuing to take Truvada for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants.  *See, e.g.,* GILDDE00236715-237256 at GILDDE00236719; *see also* GILDDE00251496-252071 at 251500; GILDDE00263067-2663700 at GILDDE00263072; GILDDE00270528-916 at GILDDE00270533.<br><br>All (100%) respondents were tested for HIV; 90% were tested within the previous 3 months.  GILDDE00236715-237256 at GILDDE00236738.<br><br>All (74, 100%) respondents were tested for HIV-1; most (64, 86.5%) were tested within the previous 3 months.  GILDDE00243874-244563 at 243898.<br><br>All (281, 100%) respondents reported being tested for HIV-1; most (265, 94.3%) reported being tested within the previous 3 months.  GILDDE00251496-252071 at 251519.<br><br>All (132, 100.0%) respondents were tested for HIV-1; more than half (69, 52.3%) were tested less than a month ago and 47 (35.6%) were tested in the previous 1 to 3 months. Since starting Truvada, most respondents (102, 77.3%) have been tested for HIV-1 every 3 months.  GILDDE00263067-263700 at 263088. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | All respondents were tested for HIV-1; most (80.0%) were tested in the previous 3 months. Since starting TRUVADA, most respondents (80.0%) had been tested for HIV-1 every 3 months.  GILDDE00270528-916 at GILDDE00270533.<br><br>The majority of responders [prescribers] understood that you should test the UI HIV-1 status at least every 3 months (99.0%).  GILDDE00251496-252071 at GILDDE00251514.<br><br>Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892.<br><br>Prescribers understand that they should test the HIV-1 status of uninfected individuals taking Truvada for PrEP indication at least every 3 months (99%). GILDDE00251496-252071 at GILDDE00251514.<br><br>Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (95.8%). GILDDE00263067-263700 at 263084.<br><br>Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (100%). GILDDE00270528-916 at GILDDE00270544.<br><br>Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada to help prevent getting HIV-1" (94.6%). GILDDE00243874-244563 at 243902.<br><br>Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (96.1%).  GILDDE00251496-252071 at 251524. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (93.9%).  GILDDE00263067-263700 at 263693. |
| 2. The process of claim 1, wherein selecting a primate host comprises selecting an adult human not infected with the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5 <br><br> "TRUVADA is used: ... • for HIV-1 PrEP to reduce the risk of getting HIV-1 infection in adults and adolescents who weigh at least 77 pounds (at least 35 kg)." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43 ("TRUVADA is used: ... • to help reduce the risk of getting HIV-1 infection when used with safer sex practices in: o HIV-negative men who have sex with men, who are at high risk of getting infected with HIV-1 through sex."), (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42. <br><br> "TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP'." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important information about how TRUVADA may be used): • to treat Human Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42<br><br>Truvada Package Insert (Revised 06/2020) at 15-16 (section entitled "Human Data"); Truvada Package Insert (Revised 04/2017) at 19-20 (discussing human data"), (Revised 02/2016) at 19-20, (Revised 12/2013) at 19-20, (Revised 10/2013) at 19-20, (Revised 06/2013) at 18-19, (Revised 07/2012) at 17-18.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br><ul><li>If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.</li></ul><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Training Guide at 3.<br><br>"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection"  Training Guide at 7.<br><br>"In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…."  Training Guide at 5.<br><br>"In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex…."  Training Guide at 5 |
| 3. The process of claim 2, wherein the adult primate host is a male adult primate host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes an adult primate host that is a male adult primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes an adult primate host that is a male adult primate host according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes an adult primate host that is a male adult primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes an adult primate host that is a male adult primate host according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"Emtricitabine and Tenofovir Disoproxil Fumarate: FTC and tenofovir pharmacokinetics are similar in male and female subjects." Truvada Package Insert (Revised 06/2020) at 20; *see also* Truvada Package Insert (Revised 04/2017) at 24 (Emtricitabine and Tenofovir DF: Emtricitabine and tenofovir pharmacokinetics are similar in male and female subjects."), (Revised 02/2016) at 24, (Revised 12/2013) at 24, (Revised 10/2013) at 24, (Revised 06/2013) at 24, (Revised 07/2012) at 22.<br><br>"TRUVADA is used: … • to help reduce the risk of getting HIV-1 infection when used with safer sex practices in: o HIV-negative men who have sex with men, who are at high risk of getting infected with HIV-1 through sex." Truvada Package Insert (Revised 04/2017) at 43; *see also* Truvada Package Insert (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"The iPrEx trial was a randomized, double-blind, placebo-controlled multinational study evaluating TRUVADA in 2,499 HIV-seronegative men or transgender women who have sex with men and with evidence of high-risk behavior for HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 30; *see also* Truvada Package Insert (Revised 04/2017) at 36, (Revised 02/2016) at 36, (Revised 12/2013) at 35, (Revised 10/2013) at 35, (Revised 06/2013) at 34, (Revised 07/2012) at 34.<br><br>The iPrEx Truvada clinical trial was conducted on a population of "HIV-seronegative men or transgender women who have sex with men." Truvada Package Insert (Revised 06/2020) at 29. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Safety, adherence, and resistance were evaluated in a single-arm, open-label clinical trial (ATN113) in which 67 HIV-1 uninfected at-risk adolescent men who have sex with men received TRUVADA once daily for HIV-1 PrEP. The mean age of subjects was 17 years (range 15 to 18 years); 46% were Hispanic, 52% Black, and 37% White. The safety profile of TRUVADA in ATN113 was similar to that observed in the adult HIV-1 PrEP trials [see Adverse Reactions (6.1)]." Truvada Package Insert (Revised 06/2020) at 17.<br><br>Clinical trials were conducted "in which 67 HIV-1 uninfected adolescent (15 to 18 years of age) men who have sex with men received TRUVADA once daily for HIV-1 PrEP, the safety profile of TRUVADA was similar to that observed in adults." Truvada Package Insert (Revised 06/2020) at 12.<br><br>"In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…." Training Guide at 5.<br><br>"In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex…." Training Guide at 5 |
| 4. The process of claim 1, wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered directly to a human in a combined single dosage formulation. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered orally directly to the human in a combined single dosage formulation. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | recommends, promotes, and/or instructs physicians to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are administered orally directly to the human in a combined single dosage formulation according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are administered orally directly to the human in a combined single dosage formulation.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are administered orally directly to the human in a combined single dosage formulation according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "HIV-1 Pre-Exposure Prophylaxis (PrEP) |
| | • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶ The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. "TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| 5. The process of claim 1, wherein the immunodeficiency retrovirus is a human immunodeficiency virus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus according to |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP'."  Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important information about how TRUVADA may be used): • to treat Human Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed." Truvada Package |

| U.S. Patent No. 9,579,333 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. <br><br> "Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 6. The process of claim 5, wherein a human immunodeficiency virus (HIV) is HIV-1. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the human immunodeficiency virus (HIV) being HIV-1. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the human immunodeficiency virus (HIV) being HIV-1 according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
|  | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the human immunodeficiency virus (HIV) being HIV-1. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the human immunodeficiency virus (HIV) being HIV-1 according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
|  | "Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP'." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); *see also* Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | information about how TRUVADA may be used): • to treat Human Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."  Truvada Package Insert (Revised 06/2020) at 1; *see also* Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; *see also* Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use (at least every 3 months).... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; *see also* Truvada |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Package Insert (Revised 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |
| 7. The process of claim 1, wherein the combination is administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.  The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | to perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk. This indication is based on clinical trials in men who have sex with men (MSM) at high risk for HIV-1 infection and in heterosexual serodiscordant couples [see Clinical Studies (14.2, 14.3)]."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…."  Training Guide at 5.<br><br>"In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex…."  Training Guide at 5<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Agreement at 1. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |
| | • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. |
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1. |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Training Guide at 3. |
| | "**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |
| | • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7. <br><br> "In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…." Training Guide at 5. <br><br> "In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex…." Training Guide at 5. |
| 8. The process of claim 1, comprising administering 200 milligrams (mg) of emtricitabine and 300 mg of tenofovir disoproxil fumarate to a human host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering 200 milligrams (mg) of emtricitabine and 300 mg of tenofovir disoproxil fumarate to a human host. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering 200 milligrams (mg) of emtricitabine and 300 mg of tenofovir disoproxil fumarate to a human host according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering 200 milligrams (mg) of emtricitabine and 300 mg |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | of tenofovir disoproxil fumarate to a human host. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering 200 milligrams (mg) of emtricitabine and 300 mg of tenofovir disoproxil fumarate to a human host according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><ul><li>Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily" taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.</li></ul>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 9. The process of claim 1, wherein the combination is administered daily for several days, weeks or months. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination daily for several days, weeks or months.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination daily for several days, weeks or months according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
|  | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination daily for several days, weeks or months.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination daily for several days, weeks or months according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
|  | "HIV-1 Pre-Exposure Prophylaxis (PrEP) |
|  | Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |

"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1.

"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3.

"While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.

"How should I take TRUVADA?

- Take TRUVADA exactly as your healthcare provider tells you to take it....
- Take TRUVADA 1 time each day with or without food....
- Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA. Do not miss a dose of TRUVADA." Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 ("How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • TRUVADA is usually taken 1 time each day. Take TRUVADA at the same

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | time each day to keep TRUVADA blood levels constant.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA."), (Revised 02/2016) at 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44.<br><br>Truvada Package Insert (Revised 06/2020) at 29-31 (reporting clinical trial data over multi-week periods); Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. |
| 10. The process of claim 9, wherein the combination is administered daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination before and after contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination before and after contact between the host and the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. <br><br> "TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br> • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43. |
| 11. The process of claim 1, wherein administration of the combination results in an absence of persistent viremia and seroconversion of the primate host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, |

199

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | recommends, promotes, and/or instructs patients to perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)].”  Truvada Package Insert (Revised 06/2020) at 3.<br><br>“While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs.”  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 (“While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months.”), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>“Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>• The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well.”  Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 (“Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well.”), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated by the results of clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….<br>• Discussed the importance of regular HIV-1 testing (at least every3 months) while taking  emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling<br>• Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP."  Training Guide at 7. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 12. [disclaimed] A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human, comprising: | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human. The evidence will demonstrate that the process allows a human to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human. The evidence will demonstrate that the process allows a human to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. <br><br> "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. <br><br> • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1. <br><br> "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … <br><br> • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
|  | • Discussed the importance of regular HIV-1 testing (at least every 3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling<br>• Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.<br><br>"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection

Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.

"In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…." Training Guide at 5.

"In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex…." Training Guide at 5.

"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.

"Take Truvada exactly as your healthcare provider tells you to take it." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed."). |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| (a) selecting an uninfected human that does not have the self-replicating infection; and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a human that does not have the self-replicating infection.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a human that does not have the self-replicating infection.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | confirmed to be HIV-negative immediately prior to initial use and periodically during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1 |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP." Truvada Package Insert (Revised 06/2020) at 1. |
| | "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1 |
| | "TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3.<br><br>"TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 5; Truvada Package Insert (Revised 04/2017) at 7 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 7, (Revised 12/2013) at 7, (Revised 10/2013) at 7, (Revised 06/2013) at 7, (Revised 07/2012) at 6.<br><br>"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only TRUVADA, because TRUVADA alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing TRUVADA before confirming the individual is HIV-1 negative." Truvada Package |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10, (Revised 02/2016) at 10, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 10, (Revised 07/2012) at 9. |
| | "Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP |
| | Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]: |
| | • The need to confirm that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1." Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: • Confirming that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37. |
| | "Before taking TRUVADA to reduce your risk of getting HIV-1: |
| | • You must be HIV-1 negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection. <br> • Do not take TRUVADA for HIV-1 PrEP unless you are confirmed to be HIV-1 negative." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("Before taking TRUVADA to reduce your risk of getting HIV-1 infection: • You must be HIV-negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection. • Do not take TRUVADA to reduce the risk of getting HIV-1 unless you are confirmed to be HIV-negative."), |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Do not take TRUVADA for HIV-1 PrEP if:<br><br>• you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with TRUVADA to treat HIV-1. TRUVADA by itself is not a complete treatment for HIV-1.<br>• you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with TRUVADA to treat HIV-1." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43, (Revised 10/2013) at 43, (Revised 06/2013) at 43.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…" Agreement at 1. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
|---|---|
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… <br><br> • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1. <br><br> "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Training Guide at 3. <br><br> "**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: <br><br> • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection"  Training Guide at 7. <br><br> The majority of responders [prescribers] understood that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | negative immediately prior to initiating use (94.8%). GILDDE00251496-252071 at GILDDE00251514. |
| | Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%). GILDDE00243874-244563 at 243892. |
| | Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.9%). GILDDE00263067-263700 at 263084. |
| | Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (100%). GILDDE00270528-916 at GILDDE00270544. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (95.9%). GILDDE00243874-244563 at 243902. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (99.6%). GILDDE00251496-252071 at 251524. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (98.5%). GILDDE00263067-263700 at 263693. |
| (b) administering to the uninfected human a combination comprising:<br>i. a pharmaceutically effective amount of emtricitabine wherein the pharmaceutically effective amount of the emtricitabine is | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| administered orally, subcutaneously or vaginally; and<br>ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate wherein the pharmaceutically effective amount of the tenofovir or tenofovir disoproxil fumarate is administered orally, subcutaneously or vaginally; | includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate, wherein the emtricitabine and tenofovir disoproxil fumarate are administered orally.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate, wherein the emtricitabine and tenofovir disoproxil fumarate are administered orally, according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate, wherein the emtricitabine and tenofovir disoproxil fumarate are administered orally.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate, wherein the emtricitabine and tenofovir disoproxil fumarate are administered orally, according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA tablets are fixed-dose combination tablets containing emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF)." Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"TRUVADA contains the prescription medicines emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"What are the ingredients in TRUVADA?<br><br>Active ingredients: emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 38 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"How should I take TRUVADA?<br><br>• Take TRUVADA exactly as your healthcare provider tells you to take it....<br>• Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA. Do not miss a dose of TRUVADA." Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 ("How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA."), (Revised 02/2016) at 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. |
| | "Take Truvada exactly as your healthcare provider tells you to take it.... Take Truvada 1 time each day with or without food."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed. Take TRUVADA by mouth, with or without food."). |
| | The majority of responders [prescribers] understood that UIs should be counseled that they are at greater risk of acquiring HIV-1 if they miss doses of TRUVADA for a PrEP indication (90.6%), that strict adherence to daily dosing correlates to the effectiveness of TRUVADA in reducing the risk of acquiring HIV-1 (91.7%).  GILDDE00251496-252071 at GILDDE00251514. |
| thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human.  The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving administration of the claimed combination.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that inhibits the establishment of the self-replicating infection |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | with the immunodeficiency virus in the human according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human. The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving administration of the claimed combination. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1. |
| | "Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3. |
| | "While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10. |
| | "Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP |
| | Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:... |
| |     The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | to get tested as well." Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials. *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….<br>• Discussed the importance of regular HIV-1 testing (at least every3 months) while taking  emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling<br>• Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…."  Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.<br><br>"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.<br><br>"In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…." Training Guide at 5.<br><br>"In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex…." Training Guide at 5.<br><br>"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP…. Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed.").<br><br>"Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%." *Gilead Sciences, Inc. and Gilead Sciences Ireland UC* |

| U.S. Patent No. 9,579,333 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
| --- | --- |
| | *v. AJC Medical Group, Inc. et al.*, Case No. 20-cv-24523, D.I. 1 at ¶ 130 (S.D. Fla. Nov. 3, 2020).<br><br>"By inhibiting HIV-1 from replicating as it enters the body, TRUVADA for a PrEP indication works to prevent the virus from establishing permanent infection." TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715-237256 at GILDDE00236749.<br><br>Liu et al., "HIV Pre-Exposure Prophylaxis Integrated with Municipal and Community Based Sexual Health Services," JAMA Intern Med. 176:75-84 (2016) at Abstract, Results, Discussion sections; Riddell et al., "HIV Preexposure Prophylaxis, A Review," JAMA, 319:1261-1268 (2018) at 1261-64.<br><br>The goals of the REMS for Truvada for a Pre-exposure Prophylaxis (PrEP) Indication are: … The importance of regular monitoring of HIV-1 serostatus to avoid continuing to take Truvada for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants.  *See, e.g.,* GILDDE00236715-237256 at GILDDE00236719; *see also* GILDDE00251496-252071 at 251500; GILDDE00263067-2663700 at GILDDE00263072; GILDDE00270528-916 at GILDDE00270533.<br><br>All (100%) respondents were tested for HIV; 90% were tested within the previous 3 months.  GILDDE00236715-237256 at GILDDE00236738.<br><br>All (74, 100%) respondents were tested for HIV-1; most (64, 86.5%) were tested within the previous 3 months.  GILDDE00243874-244563 at 243898.<br><br>All (281, 100%) respondents reported being tested for HIV-1; most (265, 94.3%) reported being tested within the previous 3 months.  GILDDE00251496-252071 at 251519. |

| U.S. Patent No. 9,579,333 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | All (132, 100.0%) respondents were tested for HIV-1; more than half (69, 52.3%) were tested less than a month ago and 47 (35.6%) were tested in the previous 1 to 3 months. Since starting Truvada, most respondents (102, 77.3%) have been tested for HIV-1 every 3 months.  GILDDE00263067-263700 at 263088.<br><br>All respondents were tested for HIV-1; most (80.0%) were tested in the previous 3 months. Since starting TRUVADA, most respondents (80.0%) had been tested for HIV-1 every 3 months.  GILDDE00270528-916 at GILDDE00270533.<br><br>The majority of responders [prescribers] understood that you should test the UI HIV-1 status at least every 3 months (99.0%).  GILDDE00251496-252071 at GILDDE00251514.<br><br>Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892.<br><br>Prescribers understand that they should test the HIV-1 status of uninfected individuals taking Truvada for PrEP indication at least every 3 months (99%). GILDDE00251496-252071 at GILDDE00251514.<br><br>Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (95.8%). GILDDE00263067-263700 at 263084.<br><br>Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (100%). GILDDE00270528-916 at GILDDE00270544. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada to help prevent getting HIV-1" (94.6%). GILDDE00243874-244563 at 243902.<br><br>Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (96.1%). GILDDE00251496-252071 at 251524.<br><br>Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (93.9%). GILDDE00263067-263700 at 263693. |
| 13. The process of claim 12, wherein the combination is administered prior to a potential exposure of the human to the human immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus. Such evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary |

RESTRICTED INFORMATION

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus. Such evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination prior to a potential exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP) |
| | TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |

| U.S. Patent No. 9,579,333 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. <br><br> "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 3. <br><br> **"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: <br><br> • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7. <br><br> The survey initially asked questions about HIV testing, Truvada dosing, and sexual activity. All (100%) respondents were sexually active. GILDDE00236715-237256 at GILDDE00236738. |

| U.S. Patent No. 9,579,333 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The majority (94.6%) of respondents were sexually active.  GILDDE00243874-244563 at 243898.<br><br>The majority (98.9%) of respondents were sexually active.  GILDDE00251496-252071 at 251519.<br><br>The majority (98.9%) of respondents were sexually active.  GILDDE00251496-252071 at 251519.<br><br>The majority (125, 94.7%) of respondents reported being sexually active.  GILDDE00263067-263700 at 263088. |

## EXHIBIT D

### Gilead's Infringement of Claims 1-19 of the '191 Patent by Truvada for PrEP®[7]

| U.S. Patent No. 9,937,191 ||
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising: | Acts of direct infringement of Claims 1-19 are carried out by clinicians in the United States who treat patients with Truvada for PrEP®.  Gilead induces this act of direct infringement through, *inter alia*, its instructions for Truvada for PrEP® as detailed in this chart.<br><br>The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United |

---

[7] Plaintiff expressly reserves the right to modify and/or supplement Exhibit D.  Plaintiff reserves the right to rely upon any evidence produced in discovery in this or the corresponding Court of Federal Claims litigation.  Plaintiff further reserves the right to rely on expert testimony.

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process of protecting a primate host from a self-replicating infection according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….<br>• Discussed the importance of regular HIV-1 testing (at least every3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling<br>• Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
|  | status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.<br><br>"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Take Truvada exactly as your healthcare provider tells you to take it."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed."). |
| (a) selecting a primate host not infected with the immunodeficiency retrovirus, and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a primate host not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP."  Truvada Package Insert (Revised 06/2020) at 1. <br><br> "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1. <br><br> "TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 (“TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)].”), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>“Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 (“When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication.”), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>“Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3.<br><br>“TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 5; Truvada Package Insert (Revised 04/2017) at 7 (“Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status.”), (Revised 02/2016) at 7, (Revised 12/2013) at 7, (Revised 10/2013) at 7, (Revised 06/2013) at 7, (Revised 07/2012) at 6. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only TRUVADA, because TRUVADA alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing TRUVADA before confirming the individual is HIV-1 negative."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10, (Revised 02/2016) at 10, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 10, (Revised 07/2012) at 9. <br><br> "Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP <br><br> Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]: <br><br> • The need to confirm that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."  Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: • Confirming that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37. <br><br> "Before taking TRUVADA to reduce your risk of getting HIV-1: <br><br> • You must be HIV-1 negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection. <br> • Do not take TRUVADA for HIV-1 PrEP unless you are confirmed to be HIV-1 negative."  Truvada Package Insert (Revised 06/2020) at 35 (Medication |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Guide); Truvada Package Insert (Revised 04/2017) at 42 ("Before taking TRUVADA to reduce your risk of getting HIV-1 infection: • You must be HIV-negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection. • Do not take TRUVADA to reduce the risk of getting HIV-1 unless you are confirmed to be HIV-negative."), (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Do not take TRUVADA for HIV-1 PrEP if:<br><br>• you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with TRUVADA to treat HIV-1. TRUVADA by itself is not a complete treatment for HIV-1.<br>• you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with TRUVADA to treat HIV-1." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide) *see also* Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43, (Revised 10/2013) at 43, (Revised 06/2013) at 43.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |
| | • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…" Agreement at 1. |
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1. |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Training Guide at 3. |
| | "**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |
| | • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7. |
| | The majority of responders [prescribers] understood that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.8%). GILDDE00251496-252071 at GILDDE00251514. |
| | Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%). GILDDE00243874-244563 at 243892. |
| | Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.9%). GILDDE00263067-263700 at 263084. |
| | Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (100%). GILDDE00270528-916 at GILDDE00270544. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (95.9%). GILDDE00243874-244563 at 243902. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (99.6%). GILDDE00251496-252071 at 251524. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (98.5%). GILDDE00263067-263700 at 263693. |
| (b) administering directly to an uninfected primate host a combination comprising:<br><br>i. a pharmaceutically effective amount of emtricitabine; and<br><br>ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes |

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir disoproxil fumarate according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA tablets are fixed-dose combination tablets containing emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF)." Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20. |
| | "TRUVADA contains the prescription medicines emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20. |
| | "What are the ingredients in TRUVADA? |
| | Active ingredients: emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 38 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42. |
| | "How should I take TRUVADA? |
| | • • Take TRUVADA exactly as your healthcare provider tells you to take it.... <br> • • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA. Do not miss a dose of TRUVADA." Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 ("How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA."), (Revised 02/2016) at 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>The majority of responders [prescribers] understood that UIs should be counseled that they are at greater risk of acquiring HIV-1 if they miss doses of TRUVADA for a PrEP indication (90.6%), that strict adherence to daily dosing correlates to the effectiveness of TRUVADA in reducing the risk of acquiring HIV-1 (91.7%).  GILDDE00251496-252071 at GILDDE00251514. |
| wherein the combination is administered orally in tablet form prior to the exposure of the primate host to the immunodeficiency retrovirus, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination is administered orally in tablet form prior to the exposure of the primate host to the immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination prior to contact between the host and the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination is administered orally in tablet form prior to |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | the exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination is administered orally in tablet form prior to the exposure of the primate host to the immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination prior to contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination is administered orally in tablet form prior to the exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; *see also* Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Truvada Package Insert (Revised 06/2020) at 6; *see also* Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 1; *see also* Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; *see also* Truvada Package Insert (Revised 04/2017) at |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily, taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); *see also* Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; *see also* Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; *see also* Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…" Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 3.<br><br>"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it.... Take Truvada 1 time each day with or without food." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed. Take TRUVADA by mouth, with or without food.").<br><br>"PrEP is short for Pre-Exposure Prophylaxis. It means protecting yourself *before* you come into contact with HIV-1." www.truvada.com/what-is-truvada/undersstanding-truvada (emphasis in original).<br><br>"The following factors may help to identify individuals at high risk: Has partner(s) known to be HIV-1 infected." Important Safety Information About TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication For Healthcare Providers; GILDDE00236715-237256 at GILDDE00236736; *see also* www.truvada.com/is-truvada-right-for-me/understanding-hiv-risk.<br><br>"Factors that may help to identify individuals at high risk include individuals having partner(s) know to be HIV-1 infected." TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715- |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 237256 at GILDDE00236748. "In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex." *Id.* at 35. |
| | The survey initially asked questions about HIV testing, Truvada dosing, and sexual activity. All (100%) respondents were sexually active. However, most (80%) respondents did not use a condom the last time they had sex. GILDDE00236715-237256 at GILDDE00236738. |
| | The majority (94.6%) of respondents were sexually active. However, approximately two-thirds (64.3%) of respondents did not use a condom the last time they had sex. GILDDE00243874-244563 at 243898. |
| | The majority (98.9%) of respondents were sexually active. However, 81.3% had unprotected sex within the last 3 months and 65.5% of respondents did not use a condom the last time they had sex. GILDDE00251496-252071 at 251519. |
| | The majority (98.9%) of respondents were sexually active. However, 81.3% had unprotected sex within the last 3 months and 65.5% of respondents did not use a condom the last time they had sex. GILDDE00251496-252071 at 251519. |
| | The majority (125, 94.7%) of respondents reported being sexually active. When asked about safe sex practices, 107 (85.6%) reported having had unprotected (condomless) sex within the last 3 months and 87 (69.6%) of respondents did not use a condom the last time they had sex. GILDDE00263067-263700 at 263088. |
| | All respondents were sexually active. When asked about safe sex practices, all reported having had unprotected sex within the last 3 months and none reported |

| U.S. Patent No. 9,937,191 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
|---|---|
| | using a condom the last time they had sex.  GILDDE00270528-916 at GILDDE00270. <br><br> Study GS-US-276-0103, which is an observational study to examine seroconversion in contemporary demonstration projects of Truvada for PrEP, has accumulated 6,214 person years of follow up in 7,002 male subjects. There were 67 seroconversions during the surveillance period for a seroconversion rate of 1.08 cases per 100 person years, 95% CI0 .84–1.37 (internal data for Study GS-US-276-0103).  US_01885993-6001. |
| thereby protecting the primate host from infection with the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that protects the primate host from infection with the immunodeficiency retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving administration of the claimed combination if and when both tests are performed.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process of self-protecting a primate host from a self-replicating infection according to the claimed method.   Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that protects the primate host from infection with the immunodeficiency |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving administration of the claimed combination if and when both tests are performed.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; *see also* Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; *see also* Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking |

| U.S. Patent No. 9,937,191 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
| --- | --- |
| | TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs).” Truvada Package Insert (Revised 06/2020) at 1.<br><br>“Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3<br><br>“While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs.” Truvada Package Insert (Revised 06/2020) at 6; *see also* Truvada Package Insert (Revised 04/2017) at 10 (“While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months.”), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>“Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>&bull; The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well.” Truvada Package Insert (Revised 06/2020) at 32; *see also* Truvada Package Insert (Revised 04/2017) at 40 (“Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well.”), (Revised 02/2016) at 39, (Revised 12/2013) |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials. See Truvada Package Insert (Revised 06/2020) at 29-31; *see also* Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br><ul><li>If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.</li></ul>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br><ul><li>Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….</li><li>Discussed the importance of regular HIV-1 testing (at least every 3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling</li><li>Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing</li></ul> |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….”  Agreement at 1.<br><br>“**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider.”  Agreement at 1.<br><br>“TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP.” Training Guide at 3.<br><br>“**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the |

| U.S. Patent No. 9,937,191 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
| --- | --- |
| | FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP."  Training Guide at 7.<br><br>"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed.").<br><br>"Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%." *Gilead Sciences, Inc. and Gilead Sciences Ireland UC v. AJC Medical Group, Inc. et al.*, Case No. 20-cv-24523, D.I. 1 at ¶ 130 (S.D. Fla. Nov. 3, 2020).<br><br>"By inhibiting HIV-1 from replicating as it enters the body, TRUVADA for a PrEP indication works to prevent the virus from establishing permanent infection." TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715-237256 at GILDDE00236749.<br><br>Liu et al., "HIV Pre-Exposure Prophylaxis Integrated with Municipal and Community Based Sexual Health Services," JAMA Intern Med. 176:75-84 (2016) at Abstract, |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Results, Discussion sections; Riddell et al., "HIV Preexposure Prophylaxis, A Review," JAMA, 319:1261-1268 (2018) at 1261-64. |

The goals of the REMS for Truvada for a Pre-exposure Prophylaxis (PrEP) Indication are: … The importance of regular monitoring of HIV-1 serostatus to avoid continuing to take Truvada for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants.  *See, e.g.,* GILDDE00236715-237256 at GILDDE00236719; *see also* GILDDE00251496-252071 at 251500; GILDDE00263067-2663700 at GILDDE00263072; GILDDE00270528-916 at GILDDE00270533.

All (100%) respondents were tested for HIV; 90% were tested within the previous 3 months.  GILDDE00236715-237256 at GILDDE00236738.

All (74, 100%) respondents were tested for HIV-1; most (64, 86.5%) were tested within the previous 3 months.  GILDDE00243874-244563 at 243898.

All (281, 100%) respondents reported being tested for HIV-1; most (265, 94.3%) reported being tested within the previous 3 months.  GILDDE00251496-252071 at 251519.

All (132, 100.0%) respondents were tested for HIV-1; more than half (69, 52.3%) were tested less than a month ago and 47 (35.6%) were tested in the previous 1 to 3 months. Since starting Truvada, most respondents (102, 77.3%) have been tested for HIV-1 every 3 months.  GILDDE00263067-263700 at 263088.

All respondents were tested for HIV-1; most (80.0%) were tested in the previous 3 months. Since starting TRUVADA, most respondents (80.0%) had been tested for HIV-1 every 3 months.  GILDDE00270528-916 at GILDDE00270533.

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The majority of responders [prescribers] understood that you should test the UI HIV-1 status at least every 3 months (99.0%).  GILDDE00251496-252071 at GILDDE00251514.

Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892.

Prescribers understand that they should test the HIV-1 status of uninfected individuals taking Truvada for PrEP indication at least every 3 months (99%). GILDDE00251496-252071 at GILDDE00251514.

Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (95.8%). GILDDE00263067-263700 at 263084.

Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (100%). GILDDE00270528-916 at GILDDE00270544/.

Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada to help prevent getting HIV-1" (94.6%). GILDDE00243874-244563 at 243902.

Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (96.1%).  GILDDE00251496-252071 at 251524.

Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (93.9%).  GILDDE00263067-263700 at 263693. |

| U.S. Patent No. 9,937,191 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
| --- | --- |
| 2. The process of claim 1, wherein selecting a primate host comprises selecting an adult human not infected with the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Recommended dose in HIV-1 |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1

"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶ The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.

"TRUVADA is used: ... • for HIV-1 PrEP to reduce the risk of getting HIV-1 infection in adults and adolescents who weigh at least 77 pounds (at least 35 kg)." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43 ("TRUVADA is used: … • to help reduce the risk of getting HIV-1 infection when used with safer sex practices in: o HIV-negative men who have sex with men, who are at high risk of getting infected with HIV-1 through sex."), (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.

"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP." Truvada Package Insert (Revised 06/2020) at 1.

"Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre- |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | exposure prophylaxis or 'PrEP'." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important information about how TRUVADA may be used): • to treat Human Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>Truvada Package Insert (Revised 06/2020) at 15-16 (section entitled "Human Data"); Truvada Package Insert (Revised 04/2017) at 19-20 (discussing human data"), (Revised 02/2016) at 19-20, (Revised 12/2013) at 19-20, (Revised 10/2013) at 19-20, (Revised 06/2013) at 18-19, (Revised 07/2012) at 17-18.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP" Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7. . |
| 3. The process of claim 2, wherein the adult human is a male. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | includes an adult primate host that is a male adult primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, promotes, and/or instructs physicians to perform a process that includes an adult primate host that is a male adult primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes an adult primate host that is a male adult primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes an adult primate host that is a male adult primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "Emtricitabine and Tenofovir Disoproxil Fumarate: FTC and tenofovir pharmacokinetics are similar in male and female subjects."  Truvada Package Insert (Revised 06/2020) at 20; Truvada Package Insert (Revised 04/2017) at 24 (Emtricitabine and Tenofovir DF: Emtricitabine and tenofovir pharmacokinetics are similar in male and female subjects."), (Revised 02/2016) at 24, (Revised 12/2013) at 24, (Revised 10/2013) at 24, (Revised 06/2013) at 24, (Revised 07/2012) at 22. |
| | "TRUVADA is used: … • to help reduce the risk of getting HIV-1 infection when used with safer sex practices in: o HIV-negative men who have sex with men, who are at high risk of getting infected with HIV-1 through sex." Truvada Package Insert |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 04/2017) at 43; Truvada Package Insert (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"The iPrEx trial was a randomized, double-blind, placebo-controlled multinational study evaluating TRUVADA in 2,499 HIV-seronegative men or transgender women who have sex with men and with evidence of high-risk behavior for HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 30; Truvada Package Insert (Revised 04/2017) at 36, (Revised 02/2016) at 36, (Revised 12/2013) at 35, (Revised 10/2013) at 35, (Revised 06/2013) at 34, (Revised 07/2012) at 34.<br><br>The iPrEx Truvada clinical trial was conducted on a population of "HIV-seronegative men or transgender women who have sex with men."  Truvada Package Insert (Revised 06/2020) at 29.<br><br>"Safety, adherence, and resistance were evaluated in a single-arm, open-label clinical trial (ATN113) in which 67 HIV-1 uninfected at-risk adolescent men who have sex with men received TRUVADA once daily for HIV-1 PrEP. The mean age of subjects was 17 years (range 15 to 18 years); 46% were Hispanic, 52% Black, and 37% White. The safety profile of TRUVADA in ATN113 was similar to that observed in the adult HIV-1 PrEP trials [see Adverse Reactions (6.1)]."  Truvada Package Insert (Revised 06/2020) at 17.<br><br>Clinical trials were conducted "in which 67 HIV-1 uninfected adolescent (15 to 18 years of age) men who have sex with men received TRUVADA once daily for HIV-1 PrEP, the safety profile of TRUVADA was similar to that observed in adults." Truvada Package Insert (Revised 06/2020) at 12. |
| 4. The process of claim 2, wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir or the | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| tenofovir disoproxil fumarate, are administered directly to the human in a combined single tablet. | Form, and Gilead's Training Guide for Healthcare Providers, perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered directly to the human in a combined single tablet. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered directly to the human in a combined single tablet according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered directly to the human in a combined single tablet. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered directly to the human in a combined single tablet according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg |

| U.S. Patent No. 9,937,191 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
|---|---|
|  | of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| 5. The process of claim 2, wherein the immunodeficiency retrovirus is a human immunodeficiency virus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | recommends, promotes, and/or instructs physicians to perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP'." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important information about how TRUVADA may be used): • to treat Human Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during |

269

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |
| 6. The process of claim 5, wherein a human's immunodeficiency virus (HIV) is HIV-1. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the human immunodeficiency virus (HIV) being HIV-1.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the human immunodeficiency virus (HIV) being HIV-1 according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the human immunodeficiency virus (HIV) being HIV-1.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the human immunodeficiency virus (HIV) being HIV-1 according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP'."  Truvada Package Insert (Revised 06/2020) at 35 |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important information about how TRUVADA may be used): • to treat Human Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |
| 7. The process of claim 1, wherein the combination is administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to |

| U.S. Patent No. 9,937,191 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
|---|---|
| | the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk. This indication is based on clinical trials in men who have sex with men (MSM) at high risk for HIV-1 infection and in heterosexual serodiscordant couples [see Clinical Studies (14.2, 14.3)]."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP" Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. <br><br> "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 3. <br><br> **"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: <br><br> • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection" Training Guide at 7. |
| 8. The process of claim 1, comprising administering 200 milligrams (mg) of emtricitabinc to the primate host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | includes administering 200 milligrams (mg) of emtricitabine the primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering 200 milligrams (mg) of emtricitabine the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering 200 milligrams (mg) of emtricitabine the primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering 200 milligrams (mg) of emtricitabine the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶ The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. |
| 9. The process of claim 1, wherein the combination is administered daily for several days, weeks or months. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination daily for several days, weeks or months. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination daily for several days, weeks or months according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination daily for several days, |

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | weeks or months.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination daily for several days, weeks or months according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br> • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |
| | "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1. |
| | "Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3. |
| | "While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>"How should I take TRUVADA?<br><br>• Take TRUVADA exactly as your healthcare provider tells you to take it....<br>• Take TRUVADA 1 time each day with or without food....<br>• Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA. Do not miss a dose of TRUVADA."  Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 ("How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • TRUVADA is usually taken 1 time each day. Take TRUVADA at the same time each day to keep TRUVADA blood levels constant.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA."), (Revised 02/2016) at 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44.<br><br> Truvada Package Insert (Revised 06/2020) at 29-31 (reporting clinical trial data over multi-week periods); Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. |
| 10. The process of claim 9, wherein the combination is administered daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination daily for several days, weeks or |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | months both before and after an exposure of the primate host to the immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination before and after contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination before and after contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP) |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43. |
| 11. The process of claim 1, wherein administration of the combination results in an absence of persistent viremia and seroconversion of the primate host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | seroconversion of the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1. |
| | "Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3. |
| | "While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10. |
| | "Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP |
| | Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:... |
| | • The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Truvada Package Insert (Revised 06/2020) at 32; |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Truvada Package Insert (Revised 04/2017) at 40 ("Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated by the results of clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….<br>• Discussed the importance of regular HIV-1 testing (at least every 3 months) while taking  emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling<br>• Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.<br><br>"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.<br><br>"In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…." Training Guide at 5.<br><br>"In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex…." Training Guide at 5. |
| 12. The process of claim 4, wherein the tablet comprises 200 milligrams of emtricitabine and 300 mg of tenofovir disproxil fumarate. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes a tablet comprising 200 milligrams of emtricitabine and 300 mg of tenofovir disoproxil fumarate. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes a tablet comprising 200 milligrams of emtricitabine and 300 mg of tenofovir disoproxil fumarate according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes a tablet comprising 200 milligrams of emtricitabine and 300 mg of tenofovir disoproxil fumarate.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes a tablet comprising 200 milligrams of emtricitabine and 300 mg of tenofovir disoproxil fumarate according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. |
| 13. A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human, comprising: | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human.  The evidence will demonstrate that the process allows a human to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human.  The evidence will demonstrate that the process allows a human to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process for inhibiting |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. <br><br> "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. <br><br> • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Agreement at 1. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … <br><br> • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. <br> • Discussed the importance of regular HIV-1 testing (at least every3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling <br> • Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1. <br><br> "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… <br><br> • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. <br><br> "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | **"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: <br><br> • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection <br><br> Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7. <br><br> "In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services...." Training Guide at 5. <br><br> "In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex...." Training Guide at 5. <br><br> "You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Take Truvada exactly as your healthcare provider tells you to take it." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed."). |
| (a) selecting an uninfected human that does not have the self-replicating infection; and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a human that does not have the self-replicating infection. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a human that does not have the self-replicating infection. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed." Truvada Package Insert (Revised 06/2020) at 1; *see also* Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP." Truvada Package Insert (Revised 06/2020) at 1. |
| | "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1. |
| | "TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status." Truvada Package Insert (Revised 06/2020) at 1; *see also* Truvada Package Insert (Revised 04/2017) at 1 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; *see also* Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3; *see also* Truvada Package Insert (Revised 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3.<br><br>"TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 5; *see also* Truvada Package Insert (Revised 04/2017) at 7 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 7, (Revised 12/2013) at 7, (Revised 10/2013) at 7, (Revised 06/2013) at 7, (Revised 07/2012) at 6. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only TRUVADA, because TRUVADA alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing TRUVADA before confirming the individual is HIV-1 negative."  Truvada Package Insert (Revised 06/2020) at 6; *see also* Truvada Package Insert (Revised 04/2017) at 10, (Revised 02/2016) at 10, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 10, (Revised 07/2012) at 9.

"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP

Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:

- The need to confirm that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."  Truvada Package Insert (Revised 06/2020) at 32; *see also* Truvada Package Insert (Revised 04/2017) at 40 ("When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: • Confirming that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.

"Before taking TRUVADA to reduce your risk of getting HIV-1:

- You must be HIV-1 negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection.
- Do not take TRUVADA for HIV-1 PrEP unless you are confirmed to be HIV-1 negative."  Truvada Package Insert (Revised 06/2020) at 35 (Medication |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Guide); *see also* Truvada Package Insert (Revised 04/2017) at 42 ("Before taking TRUVADA to reduce your risk of getting HIV-1 infection: • You must be HIV-negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection. • Do not take TRUVADA to reduce the risk of getting HIV-1 unless you are confirmed to be HIV-negative."), (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41. <br><br> "Do not take TRUVADA for HIV-1 PrEP if: <br><br> • you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with TRUVADA to treat HIV-1. TRUVADA by itself is not a complete treatment for HIV-1. <br> • you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with TRUVADA to treat HIV-1." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide) *see also* Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43, (Revised 10/2013) at 43, (Revised 06/2013) at 43. <br><br> "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. <br><br> • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1. |

299

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |
| | • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP" Agreement at 1. |
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection.." Training Guide at 3. |
| | "**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |
| | • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7. |
| | The majority of responders [prescribers] understood that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.8%). GILDDE00251496-252071 at GILDDE00251514. |
| | Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%). GILDDE00243874-244563 at 243892. |
| | Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.9%). GILDDE00263067-263700 at 263084. |
| | Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (100%). GILDDE00270528-916 at GILDDE00270544. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (95.9%). GILDDE00243874-244563 at 243902. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (99.6%). GILDDE00251496-252071 at 251524. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (98.5%). GILDDE00263067-263700 at 263693. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| (b) administering to the uninfected human a combination comprising:<br><br>i. a pharmaceutically effective amount of emtricitabine in a tablet; and<br><br>ii. a pharmaceutically effective amount of tenofovir or a tenofovir disoproxil fumerate in a tablet; | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine in a tablet and a pharmaceutically effective amount of tenofovir disoproxil fumerate in a tablet. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine in a tablet and a pharmaceutically effective amount of tenofovir disoproxil fumerate in a tablet according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine in a tablet and a pharmaceutically effective amount of tenofovir disoproxil fumerate in a tablet. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine in a tablet and a pharmaceutically effective amount of tenofovir disoproxil fumerate in a tablet according to the claimed method. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. |
| | "HIV-1 Pre-Exposure Prophylaxis (PrEP)

• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA tablets are fixed-dose combination tablets containing emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF)." Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20. <br><br> "TRUVADA contains the prescription medicines emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20. <br><br> "What are the ingredients in TRUVADA? <br><br> Active ingredients: emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 38 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42. <br><br> "How should I take TRUVADA? <br><br> • Take TRUVADA exactly as your healthcare provider tells you to take it.... <br> • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA. Do not miss a dose of TRUVADA." Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 ("How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA."), (Revised 02/2016) at |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials. *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>The majority of responders [prescribers] understood that UIs should be counseled that they are at greater risk of acquiring HIV-1 if they miss doses of TRUVADA for a PrEP indication (90.6%), that strict adherence to daily dosing correlates to the effectiveness of TRUVADA in reducing the risk of acquiring HIV-1 (91.7%). GILDDE00251496-252071 at GILDDE00251514. |
| thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human. The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving administration of the claimed combination. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human.  The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving administration of the claimed combination.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3.<br><br>"While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>• The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("Pre-Exposure |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….<br>• Discussed the importance of regular HIV-1 testing (at least every 3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1. "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3. "**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection |
| | Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7. |
| | "In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…." Training Guide at 5. |
| | "In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex…." Training Guide at 5. |
| | "You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP…. Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41. |
| | "Take Truvada exactly as your healthcare provider tells you to take it." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed."). |
| | "Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%." *Gilead Sciences, Inc. and Gilead Sciences Ireland UC v. AJC Medical Group, Inc. et al.*, Case No. 20-cv-24523, D.I. 1 at ¶ 130 (S.D. Fla. Nov. 3, 2020). |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "By inhibiting HIV-1 from replicating as it enters the body, TRUVADA for a PrEP indication works to prevent the virus from establishing permanent infection." TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715-237256 at GILDDE00236749.<br><br>Liu et al., "HIV Pre-Exposure Prophylaxis Integrated with Municipal and Community Based Sexual Health Services," JAMA Intern Med. 176:75-84 (2016) at Abstract, Results, Discussion sections; Riddell et al., "HIV Preexposure Prophylaxis, A Review," JAMA, 319:1261-1268 (2018) at 1261-64.<br><br>The goals of the REMS for Truvada for a Pre-exposure Prophylaxis (PrEP) Indication are: … The importance of regular monitoring of HIV-1 serostatus to avoid continuing to take Truvada for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants.  *See, e.g.,* GILDDE00236715-237256 at GILDDE00236719; *see also* GILDDE00251496-252071 at 251500; GILDDE00263067-2663700 at GILDDE00263072; GILDDE00270528-916 at GILDDE00270533.<br><br>All (100%) respondents were tested for HIV; 90% were tested within the previous 3 months.  GILDDE00236715-237256 at GILDDE00236738.<br><br>All (74, 100%) respondents were tested for HIV-1; most (64, 86.5%) were tested within the previous 3 months.  GILDDE00243874-244563 at 243898<br><br>All (281, 100%) respondents reported being tested for HIV-1; most (265, 94.3%) reported being tested within the previous 3 months.  GILDDE00251496-252071 at 251519.<br><br>All (132, 100.0%) respondents were tested for HIV-1; more than half (69, 52.3%) were tested less than a month ago and 47 (35.6%) were tested in the previous 1 to 3 |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | months. Since starting Truvada, most respondents (102, 77.3%) have been tested for HIV-1 every 3 months.  GILDDE00263067-263700 at 263088.

All respondents were tested for HIV-1; most (80.0%) were tested in the previous 3 months. Since starting TRUVADA, most respondents (80.0%) had been tested for HIV-1 every 3 months.  GILDDE00270528-916 at GILDDE00270533.

The majority of responders [prescribers] understood that you should test the UI HIV-1 status at least every 3 months (99.0%).  GILDDE00251496-252071 at GILDDE00251514.

Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892.

Prescribers understand that they should test the HIV-1 status of uninfected individuals taking Truvada for PrEP indication at least every 3 months (99%). GILDDE00251496-252071 at GILDDE00251514.

Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (95.8%). GILDDE00263067-263700 at 263084.

Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (100%). GILDDE00270528-916 at GILDDE00270544.

Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada to help prevent getting HIV-1" (94.6%). GILDDE00243874-244563 at 243902. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
|  | Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (96.1%).  GILDDE00251496-252071 at 251524. |
|  | Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (93.9%).  GILDDE00263067-263700 at 263693. |
| wherein the combination is administered prior to a potential exposure of the human to the human immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus.  Such evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
|  | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider |

313

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus. Such evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br>TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. <br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV |

| U.S. Patent No. 9,937,191 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. <br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43. <br><br> "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. <br><br> &bull; If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1. <br><br> "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … <br><br> &bull; Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…" Agreement at 1. <br><br> "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… <br><br> &bull; My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. |

RESTRICTED INFORMATION

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>&bull; Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7.<br><br>The survey initially asked questions about HIV testing, Truvada dosing, and sexual activity. All (100%) respondents were sexually active. GILDDE00236715-237256 at GILDDE00236738.<br><br>The majority (94.6%) of respondents were sexually active. GILDDE00243874-244563 at 243898. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The majority (98.9%) of respondents were sexually active.  GILDDE00251496-252071 at 251519.

The majority (98.9%) of respondents were sexually active.  GILDDE00251496-252071 at 251519.

The majority (125, 94.7%) of respondents reported being sexually active. GILDDE00263067-263700 at 263088. |
| 14. The process of claim 13, wherein the combination is compounded into a single tablet. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the claimed combination being compounded into a single tablet.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination being compounded into a single tablet according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the claimed combination being compounded into a single tablet. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed combination being compounded into a single tablet according to the claimed |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
|  | method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]."  Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 15. The process of claim 13, wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1. |
| | "Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3. |
| | "While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>&bull; The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated by the results of clinical trials. *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. |
| 16. The process of claim 13, wherein the potential exposure to the human immunodeficiency retrovirus comprises sexual intercourse, medical worker skin | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| puncture inoculation, hypodermic needle sharing, or blood transfusion. | Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 17. The process of claim 13, wherein:<br><br>(i) the pharmaceutically effective amount of emtricitabine; and<br><br>(ii) the pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate;<br><br>are formulated in a single tablet. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in a single tablet.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in a single tablet according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in a single tablet.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in a single tablet according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP) |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. <br><br> "TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1 Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| 18. The process of claim 17, wherein the tablet comprises 200 milligrams of emtricitabine and 300 mg of tenofovir disproxil fumarate. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes a tablet comprising 200 milligrams of emtricitabine and 300 mg of tenofovir |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | disoproxil fumarate.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes a tablet comprising 200 milligrams of emtricitabine and 300 mg of tenofovir disoproxil fumarate according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes a tablet comprising 200 milligrams of emtricitabine and 300 mg of tenofovir disoproxil fumarate.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes a tablet comprising 200 milligrams of emtricitabine and 300 mg of tenofovir disoproxil fumarate according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

"HIV-1 Pre-Exposure Prophylaxis (PrEP)

- • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶ The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. "TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| 19. The process of claim 17, wherein the tablet is administered daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the claimed tablet being administering daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed tablet before and after contact between the host and the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed tablet being administering daily for several days, weeks or |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the claimed tablet being administering daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed tablet before and after contact between the host and the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed tablet being administering daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised |

| U.S. Patent No. 9,937,191 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |

"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.

"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.

"HIV-1 Pre-Exposure Prophylaxis (PrEP)

- Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-

| U.S. Patent No. 9,937,191 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43. |

**EXHIBIT E**

**Gilead's Infringement of Claims 1-19 of the '423 Patent by Truvada for PrEP®[8]**

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising: | Acts of direct infringement of Claims 1-19 are carried out by clinicians in the United States who treat patients with Truvada for PrEP®.  Gilead induces this act of direct infringement through, *inter alia*, its instructions for Truvada for PrEP® as detailed in this chart.<br><br>The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United |

---

[8] Plaintiff expressly reserves the right to modify and/or supplement Exhibit E.  Plaintiff reserves the right to rely upon any evidence produced in discovery in this or the corresponding Court of Federal Claims litigation.  Plaintiff further reserves the right to rely on expert testimony.

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 ||
| :---: | :---: |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. <br><br> • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1. <br><br> "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … <br><br> • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. <br> • Discussed the importance of regular HIV-1 testing (at least every 3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling <br> • Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1. <br><br> "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… <br><br> • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. <br><br> "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.<br><br>"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Take Truvada exactly as your healthcare provider tells you to take it."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed."). |
| (a) selecting a primate host not infected with the immunodeficiency retrovirus, and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a primate host not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP."  Truvada Package Insert (Revised 06/2020) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |
| | "Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3. |
| | "TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 5; Truvada Package Insert (Revised 04/2017) at 7 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 7, (Revised 12/2013) at 7, (Revised 10/2013) at 7, (Revised 06/2013) at 7, (Revised 07/2012) at 6. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only TRUVADA, because TRUVADA alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing TRUVADA before confirming the individual is HIV-1 negative."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10, (Revised 02/2016) at 10, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 10, (Revised 07/2012) at 9.<br><br>"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:<br><br>• The need to confirm that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."  Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: • Confirming that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>"Before taking TRUVADA to reduce your risk of getting HIV-1:<br><br>• You must be HIV-1 negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection.<br>• Do not take TRUVADA for HIV-1 PrEP unless you are confirmed to be HIV-1 negative."  Truvada Package Insert (Revised 06/2020) at 35 (Medication |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Guide); Truvada Package Insert (Revised 04/2017) at 42 ("Before taking TRUVADA to reduce your risk of getting HIV-1 infection: • You must be HIV-negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection. • Do not take TRUVADA to reduce the risk of getting HIV-1 unless you are confirmed to be HIV-negative."), (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41. <br><br> "Do not take TRUVADA for HIV-1 PrEP if: <br><br> • you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with TRUVADA to treat HIV-1. TRUVADA by itself is not a complete treatment for HIV-1. <br> • you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with TRUVADA to treat HIV-1." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43, (Revised 10/2013) at 43, (Revised 06/2013) at 43. <br><br> "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. <br><br> If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Agreement at 1. <br><br> "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP" Agreement at 1.

"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…

My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1.

"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Training Guide at 3.

"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:

Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Training Guide at 7. |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The majority of responders [prescribers] understood that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.8%).  GILDDE00251496-252071 at GILDDE00251514. |
| | Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892. |
| | Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.9%).  GILDDE00263067-263700 at 263084. |
| | Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (100%).  GILDDE00270528-916 at GILDDE00270544. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (95.9%). GILDDE00243874-244563 at 243902. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (99.6%). GILDDE00251496-252071 at 251524. |
| | Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (98.5%). GILDDE00263067-263700 at 263693. |
| (b) administering directly to the primate host a combination comprising: | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| i. a pharmaceutically effective amount of emtricitabine; and<br><br>ii. a pharmaceutically effective amount of tenofovir or a tenofovir prodrug, | in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug according to the claimed method.   Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug according to the claimed method.   Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA tablets are fixed-dose combination tablets containing emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF)."  Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA contains the prescription medicines emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"What are the ingredients in TRUVADA?<br><br>Active ingredients: emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 38 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"How should I take TRUVADA?<br><br>• Take TRUVADA exactly as your healthcare provider tells you to take it....<br>• Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA. Do not miss a dose of TRUVADA." Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 ("How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA."), (Revised 02/2016) at 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44.<br><br>"Tenofovir Disoproxil Fumarate: TDF is a fumaric acid salt of the bis-isopropoxycarbonyloxymethyl ester derivative of tenofovir. The chemical name of tenofovir DF is 9-[(R)-2[[bis[[(isopropoxycarbonyl)oxy]- |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | methoxy]phosphinyl]methoxy]propyl]adenine fumarate (1:1)."   Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 22, (Revised 02/2016) at 22, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"Tenofovir Disoproxil Fumarate: TDF is an acyclic nucleoside phosphonate diester analog of adenosine monophosphate. TDF requires initial diester hydrolysis for conversion to tenofovir and subsequent phosphorylations by cellular enzymes to form tenofovir diphosphate (TFV-DP), which inhibits the activity of HIV-1 RT by competing with the natural substrate deoxyadenosine 5′triphosphate and, after incorporation into DNA, by DNA chain termination."   Truvada Package Insert (Revised 06/2020) at 26; Truvada Package Insert (Revised 04/2017) at 31, (Revised 02/2016) at 30, (Revised 12/2013) at 30, (Revised 10/2013) at 30, (Revised 06/2013) at 29, (Revised 07/2012) at 28.<br><br><br><br>Truvada Package Insert<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35 |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The majority of responders [prescribers] understood that UIs should be counseled that they are at greater risk of acquiring HIV-1 if they miss doses of TRUVADA for a PrEP indication (90.6%), that strict adherence to daily dosing correlates to the effectiveness of TRUVADA in reducing the risk of acquiring HIV-1 (91.7%).  GILDDE00251496-252071 at GILDDE00251514. |
| wherein the combination is administered orally prior to the exposure of the primate host to the immunodeficiency retrovirus, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination is administered orally prior to the exposure of the primate host to the immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination prior to contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination is administered orally prior to the exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination is administered orally prior to the exposure of the primate host to the immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination prior to contact between the host and the immunodeficiency retrovirus. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination is administered orally prior to the exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)

TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.

"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit

348
RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶ The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. |
| | • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1. |
| | "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |
| | • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…" Agreement at 1. |
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |

| U.S. Patent No. 10,335,423 | |
|---|---|
| Claim | Basis for Infringement by Truvada for PrEP® |
| | • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection.." Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it.... Take Truvada 1 time each day with or without food." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | at 44 ("Take TRUVADA exactly as prescribed. Take TRUVADA by mouth, with or without food."). |
| | "PrEP is short for Pre-Exposure Prophylaxis.  It means protecting yourself *before* you come into contact with HIV-1."  www.truvada.com/what-is-truvada/undersstanding-truvada (emphasis in original). |
| | "The following factors may help to identify individuals at high risk: Has partner(s) known to be HIV-1 infected."  Important Safety Information About TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication For Healthcare Providers; GILDDE00236715-237256 at GILDDE00236736; *see also* www.truvada.com/is-truvada-right-for-me/understanding-hiv-risk. |
| | "Factors that may help to identify individuals at high risk include individuals having partner(s) know to be HIV-1 infected."  TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715-237256 at GILDDE00236748.  "In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex." *Id.* at 35. |
| | The survey initially asked questions about HIV testing, Truvada dosing, and sexual activity.  All (100%) respondents were sexually active. However, most (80%) respondents did not use a condom the last time they had sex.  GILDDE00236715-237256 at GILDDE00236738. |
| | The majority (94.6%) of respondents were sexually active. However, approximately two-thirds (64.3%) of respondents did not use a condom the last time they had sex. GILDDE00243874-244563 at 243898. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The majority (98.9%) of respondents were sexually active. However, 81.3% had unprotected sex within the last 3 months and 65.5% of respondents did not use a condom the last time they had sex.  GILDDE00251496-252071 at 251519. |
| | The majority (98.9%) of respondents were sexually active. However, 81.3% had unprotected sex within the last 3 months and 65.5% of respondents did not use a condom the last time they had sex.  GILDDE00251496-252071 at 251519. |
| | The majority (125, 94.7%) of respondents reported being sexually active. When asked about safe sex practices, 107 (85.6%) reported having had unprotected (condomless) sex within the last 3 months and 87 (69.6%) of respondents did not use a condom the last time they had sex.  GILDDE00263067-263700 at 263088. |
| | All respondents were sexually active. When asked about safe sex practices, all reported having had unprotected sex within the last 3 months and none reported using a condom the last time they had sex.  GILDDE00270528-916 at GILDDE00270. |
| | Study GS-US-276-0103, which is an observational study to examine seroconversion in contemporary demonstration projects of Truvada for PrEP, has accumulated 6,214 person years of follow up in 7,002 male subjects. There were 67 seroconversions during the surveillance period for a seroconversion rate of 1.08 cases per 100 person years, 95% CI0 .84–1.37 (internal data for Study GS-US-276-0103).  US_01885993-6001. |
| thereby protecting the primate host from infection with the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that protects the primate host from infection with the immunodeficiency retrovirus.  The |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving administration of the claimed combination if and when both tests are performed.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.   Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that protects the primate host from infection with the immunodeficiency retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving administration of the claimed combination if and when both tests are performed.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1. <br><br> "Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3. <br><br> "While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10. |

| U.S. Patent No. 10,335,423 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
|---|---|
|  | "Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well."  Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Agreement at 1. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |
| | Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. |
| | Discussed the importance of regular HIV-1 testing (at least every3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling |
| | Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1. |
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |
| | My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3. |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | **"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.<br><br>"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed.").<br><br>"Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%." *Gilead Sciences, Inc. and Gilead Sciences Ireland UC v. AJC Medical Group, Inc. et al.*, Case No. 20-cv-24523, D.I. 1 at ¶ 130 (S.D. Fla. Nov. 3, 2020). |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "By inhibiting HIV-1 from replicating as it enters the body, TRUVADA for a PrEP indication works to prevent the virus from establishing permanent infection." TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715-237256 at GILDDE00236749.<br><br>Liu et al., "HIV Pre-Exposure Prophylaxis Integrated with Municipal and Community Based Sexual Health Services," JAMA Intern Med. 176:75-84 (2016) at Abstract, Results, Discussion sections; Riddell et al., "HIV Preexposure Prophylaxis, A Review," JAMA, 319:1261-1268 (2018) at 1261-64.<br><br>The goals of the REMS for Truvada for a Pre-exposure Prophylaxis (PrEP) Indication are: … The importance of regular monitoring of HIV-1 serostatus to avoid continuing to take Truvada for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants.  *See, e.g.,* GILDDE00236715-237256 at GILDDE00251496-252071 at 251500; GILDDE00263067-2663700 at GILDDE00263072; GILDDE00270528-916 at GILDDE00270533.<br><br>All (100%) respondents were tested for HIV; 90% were tested within the previous 3 months.  GILDDE00236715-237256 at GILDDE00236738.<br><br>All (74, 100%) respondents were tested for HIV-1; most (64, 86.5%) were tested within the previous 3 months.  GILDDE00243874-244563 at 243898.<br><br>All (281, 100%) respondents reported being tested for HIV-1; most (265, 94.3%) reported being tested within the previous 3 months.  GILDDE00251496-252071 at 251519.<br><br>All (132, 100.0%) respondents were tested for HIV-1; more than half (69, 52.3%) were tested less than a month ago and 47 (35.6%) were tested in the previous 1 to 3 |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | months. Since starting Truvada, most respondents (102, 77.3%) have been tested for HIV-1 every 3 months.  GILDDE00263067-263700 at 263088.<br><br>All respondents were tested for HIV-1; most (80.0%) were tested in the previous 3 months. Since starting TRUVADA, most respondents (80.0%) had been tested for HIV-1 every 3 months.  GILDDE00270528-916 at GILDDE00270533.<br><br>The majority of responders [prescribers] understood that you should test the UI HIV-1 status at least every 3 months (99.0%).  GILDDE00251496-252071 at GILDDE00251514.<br><br>Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892.<br><br>Prescribers understand that they should test the HIV-1 status of uninfected individuals taking Truvada for PrEP indication at least every 3 months (99%).  GILDDE00251496-252071 at GILDDE00251514.<br><br>Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (95.8%).  GILDDE00263067-263700 at 263084.<br><br>Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (100%).  GILDDE00270528-916 at GILDDE00270544.<br><br>Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada to help prevent getting HIV-1" (94.6%).  GILDDE00243874-244563 at 243902. |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (96.1%).  GILDDE00251496-252071 at 251524.<br><br>Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (93.9%).  GILDDE00263067-263700 at 263693. |
| 2. The process of claim 1, wherein selecting a primate host comprises selecting an adult human not infected with the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus according to the claimed method.   Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a primate host comprising |

| U.S. Patent No. 10,335,423 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | selecting an adult human not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing" 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Recommended dose in HIV-1 uninfected adults: One tablet (containing  200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"TRUVADA is used: ... • for HIV-1 PrEP to reduce the risk of getting HIV-1 infection in adults and adolescents who weigh at least 77 pounds (at least 35 kg)."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43 ("TRUVADA is used: … • to help reduce the risk of getting HIV-1 infection when used with safer sex practices in: o HIV-negative men who have sex with men, who are at high risk of getting infected with HIV-1 through sex."), |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP'." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important information about how TRUVADA may be used): • to treat Human Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>Truvada Package Insert (Revised 06/2020) at 15-16 (section entitled "Human Data"); Truvada Package Insert (Revised 04/2017) at 19-20 (discussing human data"), (Revised 02/2016) at 19-20, (Revised 12/2013) at 19-20, (Revised 10/2013) at 19-20, (Revised 06/2013) at 18-19, (Revised 07/2012) at 17-18.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>• If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>    • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…" Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>    • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 3.<br><br>"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7. |
| 3. The process of claim 2, wherein the adult human is a male. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes an adult primate host that is a male adult primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes an adult primate host that is a male adult primate host according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes an adult primate host that is a male adult primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes an adult primate host that is a male adult primate host according to the claimed method. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"Emtricitabine and Tenofovir Disoproxil Fumarate: FTC and tenofovir pharmacokinetics are similar in male and female subjects." Truvada Package Insert (Revised 06/2020) at 20; Truvada Package Insert (Revised 04/2017) at 24 (Emtricitabine and Tenofovir DF: Emtricitabine and tenofovir pharmacokinetics are similar in male and female subjects."), (Revised 02/2016) at 24, (Revised 12/2013) at 24, (Revised 10/2013) at 24, (Revised 06/2013) at 24, (Revised 07/2012) at 22.<br><br>"TRUVADA is used: … • to help reduce the risk of getting HIV-1 infection when used with safer sex practices in: o HIV-negative men who have sex with men, who are at high risk of getting infected with HIV-1 through sex." Truvada Package Insert (Revised 04/2017) at 43; Truvada Package Insert (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"The iPrEx trial was a randomized, double-blind, placebo-controlled multinational study evaluating TRUVADA in 2,499 HIV-seronegative men or transgender women who have sex with men and with evidence of high-risk behavior for HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 30; Truvada Package Insert (Revised 04/2017) at 36, (Revised 02/2016) at 36, (Revised 12/2013) at 35, (Revised 10/2013) at 35, (Revised 06/2013) at 34, (Revised 07/2012) at 34.<br><br>The iPrEx Truvada clinical trial was conducted on a population of "HIV-seronegative men or transgender women who have sex with men." Truvada Package Insert (Revised 06/2020) at 29.<br><br>"Safety, adherence, and resistance were evaluated in a single-arm, open-label clinical trial (ATN113) in which 67 HIV-1 uninfected at-risk adolescent men who have sex with men received TRUVADA once daily for HIV-1 PrEP. The mean age of subjects was 17 years (range 15 to 18 years); 46% were Hispanic, 52% Black, and 37% White. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | The safety profile of TRUVADA in ATN113 was similar to that observed in the adult HIV-1 PrEP trials [see Adverse Reactions (6.1)]." Truvada Package Insert (Revised 06/2020) at 17.<br><br>Clinical trials were conducted "in which 67 HIV-1 uninfected adolescent (15 to 18 years of age) men who have sex with men received TRUVADA once daily for HIV-1 PrEP, the safety profile of TRUVADA was similar to that observed in adults." Truvada Package Insert (Revised 06/2020) at 12. |
| 4. The process of claim 2, wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir or the tenofovir prodrug, are administered directly to the human in a combined single dosage formulation. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered directly to the human in a combined single tablet.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered directly to the human in a combined single tablet according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | directly to the human in a combined single tablet.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered directly to the human in a combined single tablet according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br> • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| 5. The process of claim 2, wherein the immunodeficiency retrovirus is a human immunodeficiency virus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP'." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important information about how TRUVADA may be used): • to treat Human Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)].”), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>“Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 (“When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication.”), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |
| 6. The process of claim 5, wherein a human immunodeficiency virus (HIV) is HIV-1. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead’s Truvada label®, Gilead’s Healthcare Provider Agreement Form, and Gilead’s Training Guide for Healthcare Providers, perform a process that includes the human immunodeficiency virus (HIV) being HIV-1. The evidence will show that Gilead’s Truvada label®, Gilead’s Healthcare Provider Agreement Form, and Gilead’s Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the human immunodeficiency virus (HIV) being HIV-1 according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead’s Truvada label®, Gilead’s Healthcare Provider Agreement Form, and Gilead’s Training Guide for Healthcare Providers, regarding a |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | process that includes the human immunodeficiency virus (HIV) being HIV-1.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the human immunodeficiency virus (HIV) being HIV-1 according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"Other important information for people who take TRUVADA to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP'."  Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("This Medication Guide provides information about two different ways that TRUVADA may be used (see the Medication Guide section 'What is TRUVADA?' for important information about how TRUVADA may be used): • to treat Human Immunodeficiency Virus-1 (HIV-1) infection, and • to reduce the risk of getting HIV-1 infection in adults who are HIV-negative."), (Revised 02/2016) at 41, (Revised 12/2013) at 40, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 (“TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)].”), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. <br><br> “Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 (“When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication.”), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |
| 7. The process of claim 1, wherein the combination is administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead’s Truvada label®, Gilead’s Healthcare Provider Agreement Form, and Gilead’s Training Guide for Healthcare Providers, perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus. The evidence will show that Gilead’s Truvada label®, Gilead’s Healthcare Provider Agreement Form, and Gilead’s Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination being administered as |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk. This indication is based on clinical trials in men who have sex with men (MSM) at high risk for HIV-1 |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | infection and in heterosexual serodiscordant couples [see Clinical Studies (14.2, 14.3)].”), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>“Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network.”  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 (“When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above.”), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>“TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection.”  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 (“TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk.”), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>“Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>  • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP" Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 3.<br><br>"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Training Guide at 7. |
| 8. The process of claim 1, comprising administering 200 milligrams (mg) of emtricitabine to the primate host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering 200 milligrams (mg) of emtricitabine the primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering 200 milligrams (mg) of emtricitabine the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering 200 milligrams (mg) of emtricitabine the primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering 200 milligrams (mg) of emtricitabine the primate host |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]."  Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. |
| 9. The process of claim 1, wherein the combination is administered daily for several days, weeks or months. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination daily for several days, weeks or |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | months.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination daily for several days, weeks or months according to the claimed method.   Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination daily for several days, weeks or months.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination daily for several days, weeks or months according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br> • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. <br><br> "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking |

| U.S. Patent No. 10,335,423 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs).” Truvada Package Insert (Revised 06/2020) at 1.<br><br>“Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)].”  Truvada Package Insert (Revised 06/2020) at 3.<br><br>“While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs.”  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 (“While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months.”), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>“How should I take TRUVADA?<br><br>• Take TRUVADA exactly as your healthcare provider tells you to take it....<br>• Take TRUVADA 1 time each day with or without food....<br>• Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider’s care when taking TRUVADA. Do not miss a dose of TRUVADA.”  Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 (“How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • TRUVADA is usually taken 1 time each day. Take TRUVADA at the same time each day to keep TRUVADA blood levels constant.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider’s care |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | when taking TRUVADA."), (Revised 02/2016) at 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44. <br><br> Truvada Package Insert (Revised 06/2020) at 29-31 (reporting clinical trial data over multi-week periods) Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. |
| 10. The process of claim 9, wherein the combination is administered daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination before and after contact between the host and the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination daily for several days, |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination before and after contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br> TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. <br><br> "Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA can only help reduce your risk of getting HIV-1 before you are infected."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada |

| U.S. Patent No. 10,335,423 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
|  | Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43. |
| 11. The process of claim 1, wherein administration of the combination results in a absence of persistent viremia and seroconversion of the primate host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. <br><br> "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. <br><br> "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1. <br><br> "Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3. <br><br> "While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>&bull; The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated by the results of clinical trials. *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>• Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP….<br>• Discussed the importance of regular HIV-1 testing (at least every3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling<br>• Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.<br><br>"In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…." Training Guide at 5.<br><br>"In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex…." Training Guide at 5. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 12. A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human, comprising: | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human.  The evidence will demonstrate that the process allows a human to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human.  The evidence will demonstrate that the process allows a human to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. |
| | • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1. |
| | "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |
| | • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Discussed the importance of regular HIV-1 testing (at least every3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling<br>• Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:…<br><br>• My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3.<br><br>"**Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore: |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7.<br><br>"In one clinical trial of TRUVADA for a PrEP indication, TRUVADA was shown to reduce the risk of HIV-1 acquisition by 42% for high risk men who have sex with men who also received comprehensive preventions services…." Training Guide at 5.<br><br>"In another clinical trial of TRUVADA for a PrEP indication in serodiscordant couples, TRUVADA was shown to reduce HIV-1 acquisition by 75% for the uninfected individuals exposed to the virus through heterosexual sex…." Training Guide at 5.<br><br>"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Take Truvada exactly as your healthcare provider tells you to take it." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed."). |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| (a) selecting an uninfected human that does not have the self-replicating infection; and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes selecting a human that does not have the self-replicating infection. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes selecting a human that does not have the self-replicating infection. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | confirmed to be HIV-negative immediately prior to initial use and periodically during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV infection are present unless negative infection status is confirmed."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate TRUVADA for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use.... Do not initiate TRUVADA for a PrEP indication if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.8)]."), |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 4 ("When prescribing TRUVADA for pre-exposure prophylaxis, healthcare providers must: ... • confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3.<br><br>"TRUVADA for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 5; Truvada Package Insert (Revised 04/2017) at 7 ("Do not use TRUVADA for pre-exposure prophylaxis in individuals with unknown or positive HIV-1 status."), (Revised 02/2016) at 7, (Revised 12/2013) at 7, (Revised 10/2013) at 7, (Revised 06/2013) at 7, (Revised 07/2012) at 6.<br><br>"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only TRUVADA, because TRUVADA alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing TRUVADA before confirming the individual is HIV-1 negative." Truvada Package |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10, (Revised 02/2016) at 10, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 10, (Revised 07/2012) at 9.<br><br>"Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:<br><br>&bull; The need to confirm that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1." Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: &bull; Confirming that they are HIV-negative before starting to take TRUVADA to reduce the risk of acquiring HIV-1."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>"Before taking TRUVADA to reduce your risk of getting HIV-1:<br><br>&bull; You must be HIV-1 negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection.<br>&bull; Do not take TRUVADA for HIV-1 PrEP unless you are confirmed to be HIV-1 negative." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42 ("Before taking TRUVADA to reduce your risk of getting HIV-1 infection: &bull; You must be HIV-negative to start TRUVADA. You must get tested to make sure that you do not already have HIV-1 infection. &bull; Do not take TRUVADA to reduce the risk of getting HIV-1 unless you are confirmed to be HIV-negative."), (Revised |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41.<br><br>"Do not take TRUVADA for HIV-1 PrEP if:<br><br>• you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with TRUVADA to treat HIV-1. TRUVADA by itself is not a complete treatment for HIV-1.<br>• you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with TRUVADA to treat HIV-1." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide) Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43, (Revised 10/2013) at 43, (Revised 06/2013) at 43.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection." Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection"  Training Guide at 7.<br><br>The majority of responders [prescribers] understood that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.8%).  GILDDE00251496-252071 at GILDDE00251514. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892.

Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (94.9%).  GILDDE00263067-263700 at 263084.

Prescribers understand that TRUVADA for a PrEP indication should only be used in individuals who have been confirmed to be HIV-1 negative immediately prior to initiating use (100%).  GILDDE00270528-916 at GILDDE00270544.

Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (95.9%). GILDDE00243874-244563 at 243902.

Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (99.6%). GILDDE00251496-252071 at 251524.

Uninfected Individuals understand that you must be tested for HIV to be sure you are HIV negative before taking Truvada to reduce the risk of getting HIV (98.5%). GILDDE00263067-263700 at 263693. |
| (b) administering to the uninfected human a combination comprising:
i. a pharmaceutically effective amount of emtricitabine; and
ii. a pharmaceutically effective amount of tenofovir or a tenofovir prodrug; | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug.  The evidence will show that Gilead's Truvada label®, |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally |

| U.S. Patent No. 10,335,423 ||
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
|  | with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA tablets are fixed-dose combination tablets containing emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF)."  Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"TRUVADA contains the prescription medicines emtricitabine and tenofovir disoproxil fumarate."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"What are the ingredients in TRUVADA?<br><br>Active ingredients: emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 38 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"How should I take TRUVADA?<br><br>• Take TRUVADA exactly as your healthcare provider tells you to take it....<br>• Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA. Do not miss a dose of TRUVADA." Truvada Package Insert (Revised 06/2020) at 36-37; Truvada Package Insert (Revised 04/2017) at 44 ("How should I take TRUVADA? • Take TRUVADA exactly as prescribed.... • Do not miss any doses of TRUVADA. Missing a dose lowers the amount of medicine in your blood.... • Do not change your dose or stop taking TRUVADA without first talking with your healthcare provider. Stay under a healthcare provider's care when taking TRUVADA."), (Revised 02/2016) at 45-46, (Revised 12/2013) at 44-45, (Revised 10/2013) at 44, (Revised 06/2013) at 44.<br><br>"Tenofovir Disoproxil Fumarate: TDF is a fumaric acid salt of the bis-isopropoxycarbonyloxymethyl ester derivative of tenofovir. The chemical name of tenofovir DF is 9-[(R)-2[[bis[[(isopropoxycarbonyl)oxy]-methoxy]phosphinyl]methoxy]propyl]adenine fumarate (1:1)." Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 22, |

| U.S. Patent No. 10,335,423 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 02/2016) at 22, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"Tenofovir Disoproxil Fumarate: TDF is an acyclic nucleoside phosphonate diester analog of adenosine monophosphate. TDF requires initial diester hydrolysis for conversion to tenofovir and subsequent phosphorylations by cellular enzymes to form tenofovir diphosphate (TFV-DP), which inhibits the activity of HIV-1 RT by competing with the natural substrate deoxyadenosine 5′triphosphate and, after incorporation into DNA, by DNA chain termination."   Truvada Package Insert (Revised 06/2020) at 26; Truvada Package Insert (Revised 04/2017) at 31, (Revised 02/2016) at 30, (Revised 12/2013) at 30, (Revised 10/2013) at 30, (Revised 06/2013) at 29, (Revised 07/2012) at 28.<br><br><br><br>Truvada Package Insert<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35<br><br>The majority of responders [prescribers] understood that UIs should be counseled that they are at greater risk of acquiring HIV-1 if they miss doses of TRUVADA for a PrEP |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | indication (90.6%), that strict adherence to daily dosing correlates to the effectiveness of TRUVADA in reducing the risk of acquiring HIV-1 (91.7%). GILDDE00251496-252071 at GILDDE00251514. |
| thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human. The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving administration of the claimed combination. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below._

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human. The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving administration of the claimed combination. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that inhibits the establishment of the self-replicating |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | infection with the immunodeficiency virus in the human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)].” Truvada Package Insert (Revised 06/2020) at 3.<br><br>“While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs.” Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 (“While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months.”), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10.<br><br>“Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP<br><br>Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>• The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well.” Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 (“Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly for HIV-1 (at least every 3 months) and ask their partner(s) to get tested as well.”), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37.<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials. *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. |
| | If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Agreement at 1. |
| | "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … |
| | Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. |
| | Discussed the importance of regular HIV-1 testing (at least every3 months) while taking  emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling |
| | Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…."  Agreement at 1. |
| | "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |
| | My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1. |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP."  Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP."  Training Guide at 7.<br><br>"You must stay HIV-negative to keep taking TRUVADA for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Truvada Package Insert (Revised 06/2020) at 35 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 42, (Revised 02/2016) at 42, (Revised 12/2013) at 41, (Revised 10/2013) at 41, (Revised 06/2013) at 41. |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Take Truvada exactly as your healthcare provider tells you to take it." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 44, (Revised 02/2016) at 42, (Revised 12/2013) at 44, (Revised 10/2013) at 44, (Revised 06/2013) at 44 ("Take TRUVADA exactly as prescribed."). |
| | "Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%." *Gilead Sciences, Inc. and Gilead Sciences Ireland UC v. AJC Medical Group, Inc. et al.*, Case No. 20-cv-24523, D.I. 1 at ¶ 130 (S.D. Fla. Nov. 3, 2020). |
| | "By inhibiting HIV-1 from replicating as it enters the body, TRUVADA for a PrEP indication works to prevent the virus from establishing permanent infection." TRUVADA for a Pre-exposure Prophylaxis (PrEP) Indication Training Guide for Healthcare Providers; GILDDE00236715-237256 at GILDDE00236749. |
| | Liu et al., "HIV Pre-Exposure Prophylaxis Integrated with Municipal and Community Based Sexual Health Services," JAMA Intern Med. 176:75-84 (2016) at Abstract, Results, Discussion sections; Riddell et al., "HIV Preexposure Prophylaxis, A Review," JAMA, 319:1261-1268 (2018) at 1261-64. |
| | The goals of the REMS for Truvada for a Pre-exposure Prophylaxis (PrEP) Indication are: … The importance of regular monitoring of HIV-1 serostatus to avoid continuing to take Truvada for a PrEP indication, if seroconversion has occurred, to reduce the risk of development of resistant HIV-1 variants. *See, e.g.,* GILDDE00236715-237256 at GILDDE00236719; *see also* GILDDE00251496-252071 at 251500; GILDDE00263067-2663700 at GILDDE00263072; GILDDE00270528-916 at GILDDE00270533. |
| | All (100%) respondents were tested for HIV; 90% were tested within the previous 3 months. GILDDE00236715-237256 at GILDDE00236738. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | All (74, 100%) respondents were tested for HIV-1; most (64, 86.5%) were tested within the previous 3 months.  GILDDE00243874-244563 at 243898. |
| | All (281, 100%) respondents reported being tested for HIV-1; most (265, 94.3%) reported being tested within the previous 3 months.  GILDDE00251496-252071 at 251519. |
| | All (132, 100.0%) respondents were tested for HIV-1; more than half (69, 52.3%) were tested less than a month ago and 47 (35.6%) were tested in the previous 1 to 3 months. Since starting Truvada, most respondents (102, 77.3%) have been tested for HIV-1 every 3 months.  GILDDE00263067-263700 at 263088. |
| | All respondents were tested for HIV-1; most (80.0%) were tested in the previous 3 months. Since starting TRUVADA, most respondents (80.0%) had been tested for HIV-1 every 3 months.  GILDDE00270528-916 at GILDDE00270533. |
| | The majority of responders [prescribers] understood that you should test the UI HIV-1 status at least every 3 months (99.0%).  GILDDE00251496-252071 at GILDDE00251514. |
| | Prescribers understand that they should counsel uninfected individuals to know their HIV-1 status (100%).  GILDDE00243874-244563 at 243892. |
| | Prescribers understand that they should test the HIV-1 status of uninfected individuals taking Truvada for PrEP indication at least every 3 months (99%). GILDDE00251496-252071 at GILDDE00251514. |
| | Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (95.8%). GILDDE00263067-263700 at 263084. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Prescribers understand that you should test the HIV-1 of uninfected individuals taking Truvada for a PrEP indication at least every 3 months (100%). GILDDE00270528-916 at GILDDE00270544.<br><br>Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada to help prevent getting HIV-1" (94.6%). GILDDE00243874-244563 at 243902.<br><br>Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (96.1%).  GILDDE00251496-252071 at 251524.<br><br>Uninfected Individuals understand that it is False that "You don't need to be tested regularly for HIV while taking Truvada" (93.9%).  GILDDE00263067-263700 at 263693. |
| wherein the combination is administered prior to potential exposure the human to the human immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes administering the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus.  Such evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes administering the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus. Such evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP) <br><br> TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP) |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | • Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP.<br><br>If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Agreement at 1.<br><br>"**Healthcare Provider Agreement**…Specifically, I attest to having done the following: …<br><br>Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1.<br><br>"**HIV-Negative Person Agreement**…Specifically, I attest to the following:… |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider."  Agreement at 1.<br><br>"TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection.."  Training Guide at 3.<br><br>**"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection"  Training Guide at 7.<br><br>The survey initially asked questions about HIV testing, Truvada dosing, and sexual activity.  All (100%) respondents were sexually active.  GILDDE00236715-237256 at GILDDE00236738. |

| U.S. Patent No. 10,335,423 ||
| Claim | Basis for Infringement by Truvada for PrEP® |
|---|---|
| | The majority (94.6%) of respondents were sexually active.  GILDDE00243874-244563 at 243898.<br><br>The majority (98.9%) of respondents were sexually active.  GILDDE00251496-252071 at 251519.<br><br>The majority (98.9%) of respondents were sexually active.  GILDDE00251496-252071 at 251519.<br><br>The majority (125, 94.7%) of respondents reported being sexually active. GILDDE00263067-263700 at 263088. |
| 13. The process of claim 12, wherein combination is compounded into a single formulation. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the claimed combination being compounded into a single formulation.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination being compounded into a single formulation according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the claimed combination being compounded into a single formulation.  The evidence will show that Gilead's Truvada label®, Gilead's |

417

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed combination being compounded into a single formulation according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]."  Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| 14. The process of claim 13, wherein the single formulation is administered daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus according to the claimed method.  Exemplary |

| U.S. Patent No. 10,335,423 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP) |
| | TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |
| | "Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4. |

| U.S. Patent No. 10,335,423 ||
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
|  | "TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection." Truvada Package Insert (Revised 06/2020) at 1; *see also* Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA can only help reduce your risk of getting HIV-1 before you are infected." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 44, (Revised 12/2013) at 43. |
| 15. The process of claim 12, wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process wherein an inhibition of infection in the host is determined by an absence of persistent |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| following the exposure to the immunodeficiency retrovirus. | viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically (at least every 3 months) during use."), (Revised 02/2016) at 4, |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 12/2013) at 4, (Revised 10/2013) at 4, (Revised 06/2013) at 4, (Revised 07/2012) at 3. |
| | "TRUVADA used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA used for a PrEP indication must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initial use and periodically during use."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs)." Truvada Package Insert (Revised 06/2020) at 1 |
| | "Screen all individuals for HIV-1 infection immediately prior to initiating TRUVADA for HIV-1 PrEP and at least once every 3 months while taking TRUVADA, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]."  Truvada Package Insert (Revised 06/2020) at 3. |
| | "While using TRUVADA for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 10 ("While using TRUVADA for a PrEP indication, HIV-1 screening tests should be repeated at least every 3 months."), (Revised 02/2016) at 11, (Revised 12/2013) at 10, (Revised 10/2013) at 10, (Revised 06/2013) at 11, (Revised 07/2012) at 10. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "Important Information for Uninfected Individuals Taking TRUVADA for HIV-1 PrEP |
| | Advise HIV-uninfected individuals about the following [see Warnings and Precautions (5.2)]: |
| | ... |
| | • The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well."  Truvada Package Insert (Revised 06/2020) at 32; Truvada Package Insert (Revised 04/2017) at 40 ("Pre-Exposure Prophylaxis[¶] When TRUVADA is used to reduce the risk of acquiring HIV-1, advise uninfected individuals about the importance of the following: ... • Getting tested regularly (at least every 3 months) for HIV-1 and ask their partner(s) to get tested as well."), (Revised 02/2016) at 39, (Revised 12/2013) at 38, (Revised 10/2013) at 38, (Revised 06/2013) at 38, (Revised 07/2012) at 37. |
| | The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated by the results of clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35. |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP. |
| | • If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting HIV-1 PrEP for at least 1 month and reconfirm HIV-1 status or use a test cleared by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection."  Agreement at 1. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | "**Healthcare Provider Agreement**…Specifically, I attest to having done the following: … <br><br> • Confirmed the negative HIV-1 status of this person prior to starting emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…. <br> • Discussed the importance of regular HIV-1 testing (at least every3 months) while taking emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP, noting that some individuals, such as adolescents, may benefit from more frequent visits and counseling <br> • Reviewed the emtricitabine/tenofovir disoproxil fumarate Medication Guide with the HIV-negative person at risk prior to prescribing emtricitabine/tenofovir disoproxil fumarate for HIV-1 PrEP…." Agreement at 1. <br><br> "**HIV-Negative Person Agreement**…Specifically, I attest to the following:… <br><br> • My healthcare provider talking with me about the importance of follow-up HIV-1 testing, and I agree to have repeat HIV-1 screening tests (at least every 3 months) as scheduled by my healthcare provider." Agreement at 1. <br><br> "TRUVADA should never be used alone in an individual infected with HIV-1 because of the increased risk of resistance. Therefore, it is critical to confirm negative HIV-1 status. Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection. Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 3. |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | **"Use TRUVADA to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative.** HIV resistance substitutions may emerge with individuals with undetected HIV-1 infection who are taking only TRUVADA because TRUVADA alone does not constitute a complete treatment regimen for HIV-1 infection. Therefore:<br><br>• Confirm a negative HIV-1 test immediately prior to initiating TRUVADA for a PrEP indication. If clinical symptoms consistent with acute viral infection are present and recent (<1 month) exposures are suspected, delay starting PrEP for at least 1 month and reconfirm HIV-1 status or use a test approved by the FDA as an aid in the diagnosis of HIV-1 infection, including acute or primary HIV-1 infection<br><br>Screen for HIV-1 infection at least once every 3 months while taking TRUVADA for PrEP." Training Guide at 7. |
| 16. The process of claim 12, wherein:<br>(i) the pharmaceutically effective amount of emtricitabine; and<br>(ii) the pharmaceutically effective amount of tenofovir or the tenoforvir prodrug;<br>are formulated in a single tablet. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in a single tablet. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | a single tablet according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in a single tablet.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in a single tablet according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

"HIV-1 Pre-Exposure Prophylaxis (PrEP)
- Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.

"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.

"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| 17. The process of claim 12, wherein the potential exposure to the human immunodeficiency retrovirus comprises sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection. Individuals must have a negative HIV-1 test immediately prior to initiating TRUVADA for HIV-1 PrEP [see Dosage and Administration (2.2), Warnings and Precautions (5.2)]." Truvada Package Insert (Revised 06/2020) at 3; Truvada Package Insert (Revised 04/2017) at 3 ("1.2 Pre-Exposure Prophylaxis[¶] TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network."  Truvada Package Insert (Revised 06/2020) at 6; Truvada Package Insert (Revised 04/2017) at 4 ("When considering TRUVADA for pre-exposure prophylaxis the following factors may help to identify individuals at high |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | risk: • has partner(s) known to be HIV-1 infected, or • engages in sexual activity within a high prevalence area or social network and one or more of the following: • inconsistent or no condom use • diagnosis of sexually transmitted infections • exchange of sex for commodities (such as money, food, shelter, or drugs) • use of illicit drugs or alcohol dependence • incarceration • partner(s) of unknown HIV-1 status with any of the factors listed above."), (Revised 02/2016) at 5, (Revised 12/2013) at 5, (Revised 10/2013) at 5, (Revised 06/2013) at 5, (Revised 07/2012) at 4.<br><br>"TRUVADA is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 infection."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("TRUVADA is indicated in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| 18. The process of claim 12, wherein the combination comprises the tenofovir prodrug. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the claimed combination comprising the tenofovir prodrug.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination comprising the tenofovir prodrug according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the claimed combination comprising the tenofovir prodrug. The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed combination comprising the tenofovir prodrug according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1. |
| | "TRUVADA tablets are fixed-dose combination tablets containing emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF)." Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20. |
| | "TRUVADA contains the prescription medicines emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20. |
| | "What are the ingredients in TRUVADA? |
| | Active ingredients: emtricitabine and tenofovir disoproxil fumarate." Truvada Package Insert (Revised 06/2020) at 38 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42. |
| | "Tenofovir Disoproxil Fumarate: TDF is a fumaric acid salt of the bis-isopropoxycarbonyloxymethyl ester derivative of tenofovir. The chemical name of tenofovir DF is 9-[(R)-2[[bis[[(isopropoxycarbonyl)oxy]-methoxy]phosphinyl]methoxy]propyl]adenine fumarate (1:1)." Truvada Package |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 22, (Revised 02/2016) at 22, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"Tenofovir Disoproxil Fumarate: TDF is an acyclic nucleoside phosphonate diester analog of adenosine monophosphate. TDF requires initial diester hydrolysis for conversion to tenofovir and subsequent phosphorylations by cellular enzymes to form tenofovir diphosphate (TFV-DP), which inhibits the activity of HIV-1 RT by competing with the natural substrate deoxyadenosine 5′triphosphate and, after incorporation into DNA, by DNA chain termination."  Truvada Package Insert (Revised 06/2020) at 26; Truvada Package Insert (Revised 04/2017) at 31, (Revised 02/2016) at 30, (Revised 12/2013) at 30, (Revised 10/2013) at 30, (Revised 06/2013) at 29, (Revised 07/2012) at 28.<br><br><br><br>Truvada Package Insert<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35 |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| 19. The process of claim 1, wherein the combination comprises the tenofovir prodrug. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, perform a process that includes the claimed combination comprising the tenofovir prodrug.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination comprising the tenofovir prodrug according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Truvada for PrEP® in the United States in accordance with Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers, regarding a process that includes the claimed combination comprising the tenofovir prodrug.  The evidence will show that Gilead's Truvada label®, Gilead's Healthcare Provider Agreement Form, and Gilead's Training Guide for Healthcare Providers encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed combination comprising the tenofovir prodrug according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "The dosage of TRUVADA for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food in HIV-1 uninfected adults and adolescents weighing at least 35 kg [see Clinical Pharmacology (12.3)]." Truvada Package Insert (Revised 06/2020) at 4; Truvada Package Insert (Revised 04/2017) at 5 ("Recommended Dose for Pre-exposure Prophylaxis[¶] The dose of TRUVADA in HIV-1 uninfected adults is one tablet (containing 200 mg of |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | emtricitabine and 300 mg of tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 6, (Revised 12/2013) at 6, (Revised 10/2013) at 6, (Revised 06/2013) at 6, (Revised 07/2012) at 5.<br><br>"HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>• Recommended dosage in HIV-1 uninfected adults and adolescents weighing at least 35 kg: One TRUVADA tablet (containing 200 mg of FTC and 300 mg of TDF) once daily taken orally with or without food."  Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1 ("Pre-exposure Prophylaxis (2.3) • Recommended dose in HIV-1 uninfected adults: One tablet (containing 200 mg/300 mg of emtricitabine and tenofovir disoproxil fumarate) once daily taken orally with or without food."), (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA® (emtricitabine and tenofovir disoproxil fumarate) tablets, for oral use." Truvada Package Insert (Revised 06/2020) at 1; Truvada Package Insert (Revised 04/2017) at 1, (Revised 02/2016) at 1, (Revised 12/2013) at 1, (Revised 10/2013) at 1, (Revised 06/2013) at 1, (Revised 07/2012) at 1.<br><br>"TRUVADA tablets are fixed-dose combination tablets containing emtricitabine (FTC) and tenofovir disoproxil fumarate (TDF)."  Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"TRUVADA contains the prescription medicines emtricitabine and tenofovir disoproxil fumarate."  Truvada Package Insert (Revised 06/2020) at 36 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 21, (Revised 02/2016) at 21, |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"What are the ingredients in TRUVADA?<br><br>Active ingredients: emtricitabine and tenofovir disoproxil fumarate."  Truvada Package Insert (Revised 06/2020) at 38 (Medication Guide); Truvada Package Insert (Revised 04/2017) at 43, (Revised 02/2016) at 43, (Revised 12/2013) at 42, (Revised 10/2013) at 42, (Revised 06/2013) at 42.<br><br>"Tenofovir Disoproxil Fumarate: TDF is a fumaric acid salt of the bis-isopropoxycarbonyloxymethyl ester derivative of tenofovir. The chemical name of tenofovir DF is 9-[(R)-2[[bis[[(isopropoxycarbonyl)oxy]-methoxy]phosphinyl]methoxy]propyl]adenine fumarate (1:1)."  Truvada Package Insert (Revised 06/2020) at 18; Truvada Package Insert (Revised 04/2017) at 22, (Revised 02/2016) at 22, (Revised 12/2013) at 21, (Revised 10/2013) at 21, (Revised 06/2013) at 21, (Revised 07/2012) at 20.<br><br>"Tenofovir Disoproxil Fumarate: TDF is an acyclic nucleoside phosphonate diester analog of adenosine monophosphate. TDF requires initial diester hydrolysis for conversion to tenofovir and subsequent phosphorylations by cellular enzymes to form tenofovir diphosphate (TFV-DP), which inhibits the activity of HIV-1 RT by competing with the natural substrate deoxyadenosine 5′triphosphate and, after incorporation into DNA, by DNA chain termination."  Truvada Package Insert (Revised 06/2020) at 26; Truvada Package Insert (Revised 04/2017) at 31, (Revised 02/2016) at 30, (Revised 12/2013) at 30, (Revised 10/2013) at 30, (Revised 06/2013) at 29, (Revised 07/2012) at 28. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Truvada for PrEP®** |
| | <br><br>Truvada Package Insert<br><br>The efficacy of Truvada tablets containing 200 mg of FTC and 300 mg of TDF was demonstrated in clinical trials.  *See* Truvada Package Insert (Revised 06/2020) at 29-31; Truvada Package Insert (Revised 04/2017) at 35-37, (Revised 02/2016) at 34-37, (Revised 12/2013) at 33-36, (Revised 10/2013) at 33-36, (Revised 06/2013) at 33-35, (Revised 07/2012) at 32-35 |

**EXHIBIT F**

**Gilead's Infringement of Claims 1-19 of the '423 Patent by Descovy® for PrEP[9]**

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| 1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising: | Acts of direct infringement of Claims 1-19 are carried out by clinicians in the United States who treat patients with Descovy® for PrEP. Gilead induces this act of direct infringement through, *inter alia*, its instructions for Descovy® for PrEP as detailed in this chart.<br><br>The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus. The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process of protecting a primate host from a self-replicating infection according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus. The evidence will demonstrate that the process allows a primate host to remain |

---

[9] Plaintiff expressly reserves the right to modify and/or supplement Exhibit F. Plaintiff reserves the right to rely upon any evidence produced in discovery in this or the corresponding Court of Federal Claims litigation. Plaintiff further reserves the right to rely on expert testimony.

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.[10] |
| | "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3. |
| | "You must stay HIV-negative to keep taking DESCOVY for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Descovy Package Insert (Medication Guide) (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 36. |
| | "Take Descovy exactly as your healthcare provider tells you to take it."  Package Insert (Medication Guide) (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 38. |

[10] The Descovy Package Insert was further revised on November 24, 2020, March 4, 2021, and September 15, 2021.  Each of the revised package inserts contain identical or substantially the same disclosure to the quotations provided throughout Exhibit F.  The Government reserves the right to rely on these revisions to the Descovy Package Insert to prove infringement, as well as any additional revisions to the Descovy Package Insert that may occur during the pendency of this litigation.

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| (a) selecting a primate host not infected with the immunodeficiency retrovirus, and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes selecting a primate host not infected with the immunodeficiency retrovirus. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a primate host not infected with the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| Claim | Basis for Infringement by Descovy® for PrEP |
| | "Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Descovy |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Package Insert (Revised 12/2019) at 4; Descovy Package Insert (Revised 10/2019) at 4. |

"DESCOVY for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5.

"Use DESCOVY to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only DESCOVY, because DESCOVY alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing DESCOVY before confirming the individual is HIV-1 negative." Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6.

"Important Information for Uninfected Individuals Taking DESCOVY for HIV-1 PrEP

Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:

The need to confirm that they are HIV-negative before starting to take DESCOVY to reduce the risk of acquiring HIV-1." Descovy Package Insert (Revised 12/2019) at 35; Descovy Package Insert (Revised 10/2019) at 33.

"Before taking DESCOVY to reduce your risk of getting HIV-1:

- You must be HIV-1 negative to start DESCOVY. You must get tested to make sure that you do not already have HIV-1 infection.

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
|  | • Do not take DESCOVY for HIV-1 PrEP unless you are confirmed to be HIV-1 negative." Descovy Package Insert (Revised 12/2019) at Medication Guide 1; Descovy Package Insert (Revised 10/2019) at 36 (Medication Guide).<br><br>"Do not take DESCOVY for HIV-1 PrEP if:<br><br>• you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with DESCOVY to treat HIV-1. DESCOVY by itself is not a complete treatment for HIV-1.<br>• you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with DESCOVY to treat HIV-1 infection." Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide). |
| (b) administering directly to the primate host a combination comprising:<br>i. a pharmaceutically effective amount of emtricitabine; and<br>ii. a pharmaceutically effective amount of tenofovir or a tenofovir prodrug, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering directly to an uninfected primate host a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected: <br><br> • adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or <br> • adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5. <br><br> "Recommended dosage:... <br><br> • HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. <br><br> "DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "DESCOVY (emtricitabine and tenofovir alafenamide) is a fixed dose combination tablet containing emtricitabine (FTC) and tenofovir alafenamide (TAF) for oral administration." Descovy Package Insert (Revised 12/2019) at 20; Descovy Package Insert (Revised 10/2019) at 19.<br><br>"DESCOVY contains the prescription medicines emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide).<br><br>"What are the ingredients in DESCOVY?<br><br>Active ingredients: emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 4; Descovy Package Insert (Revised 10/2019) at 39 (Medication Guide).<br><br>"Tenofovir Alafenamide: The chemical name of tenofovir alafenamide fumarate drug substance is L-alanine, N-[(S)-[[(1R)-2-(6-amino-9H-purin-9-yl)-1methylethoxy]methyl]phenoxyphosphinyl]-, 1-methylethyl ester, (2E)-2butenedioate (2:1).<br><br>Tenofovir alafenamide fumarate has an empirical formula of $C_{21}H_{29}O_5N_6P\bullet\frac{1}{2}(C_4H_4O_4)$ and a formula weight of 534.50 and has the following structural formula:<br><br> |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Tenofovir alafenamide fumarate is a white to off-white or tan powder with a solubility of 4.7 mg per mL in water at 20 °C." *See* Descovy Package Insert (Revised 12/2019) at 21; Descovy Package Insert (Revised 10/2019) at 20.<br><br>"Tenofovir Alafenamide: TAF is a phosphonoamidate prodrug of tenofovir (2'-deoxyadenosine monophosphate analog)." *See* Descovy Package Insert (Revised 12/2019) at 28; Descovy Package Insert (Revised 10/2019) at 27.<br><br>"TAF, an HIV NRTI, is converted in vivo to tenofovir, an acyclic nucleoside phosphonate (nucleotide) analog of adenosine 5'-monophosphate." *See* Descovy Package Insert (Revised 12/2019) at 2; Descovy Package Insert (Revised 10/2019) at 19.<br><br>"How should I take DESCOVY?<br><br>• Take DESCOVY exactly as your healthcare provider tells you to take it....<br>• Do not change your dose or stop taking DESCOVY without first talking with your healthcare provider. Stay under a healthcare provider's care when taking DESCOVY. Do not miss a dose of DESCOVY." Descovy Package Insert (Revised 12/2019) at Medication Guide 3; Descovy Package Insert (Revised 10/2019) at 38 (Medication Guide).<br><br>The efficacy of Descovy tablets containing 200 mg of FTC and 25 mg of TAF was demonstrated in clinical trials. *See* Descovy Package Insert (Revised 12/2019) at 32-34; Descovy Package Insert (Revised 10/2019) at 31-33. |
| wherein the combination is administered orally prior to the exposure of the primate host to the immunodeficiency retrovirus, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes administering the claimed combination is administered orally prior to the exposure of |

446

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | the primate host to the immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination prior to contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination is administered orally prior to the exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes administering the claimed combination is administered orally prior to the exposure of the primate host to the immunodeficiency retrovirus.  The evidence will demonstrate that the process includes administration of the claimed combination prior to contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination is administered orally prior to the exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.   Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex. Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]." *See* |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." *See* Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6.<br><br>"DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex." *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg." *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY can only help reduce your risk of getting HIV-1 infection before you are infected." Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide).<br><br>"The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected:<br><br>• adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or<br>• adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5.<br><br>"DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"Recommended dosage:...<br><br>• HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"PrEP stands for pre-exposure prophylaxis. That means taking prescription medicine every day *before* you come into contact with HIV to help reduce the risk of getting it." www.descovy.com/prep/what-is-prep (emphasis in original).<br><br>"Take Descovy exactly as your healthcare provider tells you to take it.... Take DESCOVY 1 time each day with or without food." Package Insert (Medication Guide) (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 38.<br><br>*See also* GILDDE00188011-050 at, e.g., GILDDE00188014 (at-risk information) and GILDDE00188316-402 at, e.g., GILDDE00188363 (lifetime risk information). |
| thereby protecting the primate host from infection with the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that protects the primate host from infection with the immunodeficiency retrovirus. The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | while receiving administration of the claimed combination if and when both tests are performed.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process of protecting a primate host from a self-replicating infection according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that protects the primate host from infection with the immunodeficiency retrovirus.  The evidence will demonstrate that the process allows a primate host to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome while receiving administration of the claimed combination if and when both tests are performed.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process of protecting a primate host from a self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.

"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 4; Descovy Package Insert (Revised 10/2019) at 4.<br><br>"While using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Descovy Package Insert (Revised 12/2019) at 7; Descovy Package Insert (Revised 10/2019) at 6.<br><br>"Important Information for Uninfected Individuals Taking DESCOVY for HIV-1 PrEP<br><br>Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>• The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Descovy Package Insert (Revised 12/2019) at 35; Descovy Package Insert (Revised 10/2019) at 33-34. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | The efficacy of Descovy tablets containing 200 mg of FTC and 25 mg of TAF was demonstrated in clinical trials.  *See* Descovy Package Insert (Revised 12/2019) at 32-34; Descovy Package Insert (Revised 10/2019) at 31-33.<br><br>"You must stay HIV-negative to keep taking DESCOVY for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Descovy Package Insert (Medication Guide) (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 36.<br><br>"Take Descovy exactly as your healthcare provider tells you to take it."  Package Insert (Medication Guide) (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 38.<br><br>"Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%."  *Gilead Sciences, Inc. and Gilead Sciences Ireland UC v. AJC Medical Group, Inc. et al.*, Case No. 20-cv-24523, D.I. 1 at ¶ 130 (S.D. Fla. Nov. 3, 2020). |
| 2. The process of claim 1, wherein selecting a primate host comprises selecting an adult human not infected with the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 ||
| Claim | Basis for Infringement by Descovy® for PrEP |
|---|---|
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a primate host comprising selecting an adult human not infected with the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex. Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP." *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected:<br><br>• adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or<br>• adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]."  Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5.<br><br>"DESCOVY is used: ... |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | • for HIV-1 PrEP to reduce the risk of getting HIV-1 infection in adults and adolescents who weigh at least 77 pounds (35 kg)."  Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide).<br><br>"Other important information for people who take DESCOVY to help reduce their risk of getting human immunodeficiency virus-1 (HIV-1) infection, also called pre-exposure prophylaxis or 'PrEP':"  Descovy Package Insert (Revised 12/2019) at Medication Guide 1; Descovy Package Insert (Revised 10/2019) at 36 (Medication Guide).<br><br>Descovy Package Insert (Revised 12/2019) at 16 (section entitled "Human Data"); Descovy Package Insert (Revised 10/2019) at 15 (section entitled "Human Data"). |
| 3. The process of claim 2, wherein the adult human is a male. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes an adult primate host that is a male adult primate host.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes an adult primate host that is a male adult primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes an adult primate host that is a male adult primate host.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes an adult primate host that is a male adult primate |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"In the DISCOVER trial of HIV-1 uninfected men and transgender women who have sex with men and who are at risk of HIV-1 infection receiving DESCOVY or TRUVADA for HIV-1 PrEP, genotyping was performed on participants found to be infected during the trial who had HIV-1 RNA ≥400 copies/mL (6 of 7 participants receiving DESCOVY and 13 of 15 participants receiving TRUVADA)."  Descovy Package Insert (Revised 12/2019) at 29; Descovy Package Insert (Revised 10/2019) at 28.<br><br>The DISCOVER Descovy clinical trial was conducted on a population of "HIV-1 uninfected men or transgender women who have sex with men."  Descovy Package Insert (Revised 12/2019) at 32; Descovy Package Insert (Revised 10/2019) at 31. |
| 4. The process of claim 2, wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir or the tenofovir prodrug, are administered directly to the human in a combined single dosage formulation. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered directly to the human in a combined single tablet.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered |

| U.S. Patent No. 10,335,423 | |
|---|---|
| Claim | Basis for Infringement by Descovy® for PrEP |
| | directly to the human in a combined single tablet according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered directly to the human in a combined single tablet.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered directly to the human in a combined single tablet according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected:<br><br><ul><li>adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or</li><li>adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]."  Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5.</li></ul> |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"Recommended dosage:...<br><br>• • HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |
| 5. The process of claim 2, wherein the immunodeficiency retrovirus is a human immunodeficiency virus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes the immunodeficiency retrovirus being a human immunodeficiency virus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. <br><br> "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]."  Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3. <br><br> "Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]."  Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3. |
| 6. The process of claim 5, wherein a human immunodeficiency virus (HIV) is HIV-1. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes the human immunodeficiency virus (HIV) being HIV-1.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the human immunodeficiency virus (HIV) being HIV-1 according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | States in accordance with Gilead's Descovy label® regarding a process that includes the human immunodeficiency virus (HIV) being HIV-1.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes the human immunodeficiency virus (HIV) being HIV-1 according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]."  Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]."  Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3. |
| 7. The process of claim 1, wherein the combination is administered as preexposure prophylactic treatment prior to rectal and/or | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| vaginal exposure of the primate host to the immunodeficiency retrovirus. | to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed combination being administered as preexposure prophylactic treatment prior to rectal and/or vaginal exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex. Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]."  *See* Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." *See* Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6. |
| | "DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex." *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |
| 8. The process of claim 1, comprising administering 200 milligrams (mg) of emtricitabine to the primate host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes administering 200 milligrams (mg) of emtricitabine the primate host.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering 200 milligrams (mg) of emtricitabine the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes administering 200 milligrams (mg) of emtricitabine the primate host.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering 200 milligrams (mg) of emtricitabine the primate host according to the claimed method.  Exemplary |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected: |
| | • adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or |
| | • adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]."  Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5. |
| | "Each DESCOVY tablet contains 200 mg of emtricitabine (FTC) and 25 mg of tenofovir alafenamide (TAF) (equivalent to 28 mg of tenofovir alafenamide fumarate). The tablets are blue, rectangular-shaped, film-coated, debossed with "GSI" on one side and '225' on the other side." Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5. |
| 9. The process of claim 1, wherein the combination is administered daily for several days, weeks or months. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes administering the claimed combination daily for several days, weeks or months.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination daily for several days, weeks or months according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes administering the claimed combination daily for several days, weeks or months.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination daily for several days, weeks or months according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"Recommended dosage:...<br><ul><li>HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.</li></ul>"The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected:<br><ul><li>adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or</li><li>adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]."  Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5.</li></ul>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.

"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.

"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.

"Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 4; Descovy Package Insert (Revised 10/2019) at 4.

"While using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Descovy Package Insert (Revised 12/2019) at 7; Descovy Package Insert (Revised 10/2019) at 6.

"How should I take DESCOVY?

- Take DESCOVY exactly as your healthcare provider tells you to take it....
- Take DESCOVY 1 time each day with or without food....
- Do not change your dose or stop taking DESCOVY without first talking with your healthcare provider. Stay under a healthcare provider's care when taking |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | DESCOVY. Do not miss a dose of DESCOVY."  Descovy Package Insert (Revised 12/2019) at Medication Guide 3; Descovy Package Insert (Revised 10/2019) at 38 (Medication Guide).<br><br>Descovy Package Insert (Revised 12/2019) at 32-34 (reporting clinical trial data over multi-week periods); Descovy Package Insert (Revised 10/2019) at 31-33 (same). |
| 10. The process of claim 9, wherein the combination is administered daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination before and after contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination before and after contact between the host and the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, and/or instructs patients to perform a process that includes |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | administering the claimed combination daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex. Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]." *See* Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network." *See* Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6.<br><br>"DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex." *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg." *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "DESCOVY can only help reduce your risk of getting HIV-1 infection before you are infected."   Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide). |
| 11. The process of claim 1, wherein administration of the combination results in a absence of persistent viremia and seroconversion of the primate host. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes administration of the claimed combination resulting in an absence of persistent viremia and seroconversion of the primate host according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | use." Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]." Descovy Package Insert (Revised 12/2019) at 4; Descovy Package Insert (Revised 10/2019) at 4.<br><br>"While using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Descovy Package Insert (Revised 12/2019) at 7; Descovy Package Insert (Revised 10/2019) at 6.<br><br><br>"Important Information for Uninfected Individuals Taking DESCOVY for HIV-1 PrEP |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Descovy Package Insert (Revised 12/2019) at 35; Descovy Package Insert (Revised 10/2019) at 33-34.<br><br>The efficacy of Descovy tablets containing 200 mg of FTC and 25 mg of TAF was demonstrated in clinical trials. *See* Descovy Package Insert (Revised 12/2019) at 32-34; Descovy Package Insert (Revised 10/2019) at 31-33. |
| 12. A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human, comprising: | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human. The evidence will demonstrate that the process allows a human to remain serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human. The evidence will demonstrate that the process allows a human to remain |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | serologically negative and negative in response to a polymerase chain reaction (PCR) testing for viral genome when those tests are done.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process for inhibiting establishment of a human immunodeficiency virus self-replicating infection in a human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"You must stay HIV-negative to keep taking DESCOVY for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Descovy Package Insert (Medication Guide) (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 36.<br><br>"Take Descovy exactly as your healthcare provider tells you to take it."  Package Insert (Medication Guide) (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 38. |
| (a) selecting an uninfected human that does not have the self-replicating infection; and | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes selecting |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | a human that does not have the self-replicating infection.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes selecting a human that does not have the self-replicating infection.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes selecting a human that does not have the self-replicating infection according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. <br><br> "Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. <br><br> "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use.... Do not initiate DESCOVY for HIV-1 PrEP if signs or symptoms of acute HIV-1 infection are present unless negative infection status is confirmed [see Warnings and Precautions (5.2)]."  Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]."  Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]."  Descovy Package Insert (Revised 12/2019) at 4; Descovy Package Insert (Revised 10/2019) at 4.<br><br>"DESCOVY for HIV-1 PrEP is contraindicated in individuals with unknown or positive HIV-1 status [see Warnings and Precautions (5.2)]."  Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5. |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "Use DESCOVY to reduce the risk of acquiring HIV-1 only in individuals confirmed to be HIV-1 negative. HIV-1 resistance substitutions may emerge in individuals with undetected HIV-1 infection who are taking only DESCOVY, because DESCOVY alone does not constitute a complete regimen for HIV-1 treatment [see Microbiology (12.4)]; therefore, care should be taken to minimize the risk of initiating or continuing DESCOVY before confirming the individual is HIV-1 negative."  Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6.<br><br>"Important Information for Uninfected Individuals Taking DESCOVY for HIV-1 PrEP<br><br>Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:<br><br>• The need to confirm that they are HIV-negative before starting to take DESCOVY to reduce the risk of acquiring HIV-1."  Descovy Package Insert (Revised 12/2019) at 35; Descovy Package Insert (Revised 10/2019) at 33.<br><br>"Before taking DESCOVY to reduce your risk of getting HIV-1:<br><br>• You must be HIV-1 negative to start DESCOVY. You must get tested to make sure that you do not already have HIV-1 infection.<br>• Do not take DESCOVY for HIV-1 PrEP unless you are confirmed to be HIV-1 negative."  Descovy Package Insert (Revised 12/2019) at Medication Guide 1; Descovy Package Insert (Revised 10/2019) at 36 (Medication Guide).<br><br>"Do not take DESCOVY for HIV-1 PrEP if:<br><br>• you already have HIV-1 infection. If you are HIV-1 positive, you need to take other medicines with DESCOVY to treat HIV-1. DESCOVY by itself is not a complete treatment for HIV-1. |

| U.S. Patent No. 10,335,423 | |
| --- | --- |
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | • you do not know your HIV-1 infection status. You may already be HIV-1 positive. You need to take other HIV-1 medicines with DESCOVY to treat HIV-1 infection."  Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide). |
| (b) administering to the uninfected human a combination comprising:<br>i. a pharmaceutically effective amount of emtricitabine; and<br>ii. a pharmaceutically effective amount of tenofovir or a tenofovir prodrug; | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering to the uninfected human a combination comprising a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of a tenofovir prodrug according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected:<br><br>• adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or<br>• adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]."  Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5.<br><br>"Recommended dosage:...<br><br>• HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY (emtricitabine and tenofovir alafenamide) is a fixed dose combination tablet containing emtricitabine (FTC) and tenofovir alafenamide (TAF) for oral administration."  Descovy Package Insert (Revised 12/2019) at 20; Descovy Package Insert (Revised 10/2019) at 19.<br><br>"DESCOVY contains the prescription medicines emtricitabine and tenofovir alafenamide."  Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide). |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "What are the ingredients in DESCOVY?

Active ingredients: emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 4; Descovy Package Insert (Revised 10/2019) at 39 (Medication Guide).

"Tenofovir Alafenamide: The chemical name of tenofovir alafenamide fumarate drug substance is L-alanine, N-[(S)-[[(1R)-2-(6-amino-9H-purin-9-yl)-1methylethoxy]methyl]phenoxyphosphinyl]-, 1-methylethyl ester, (2E)-2butenedioate (2:1).

Tenofovir alafenamide fumarate has an empirical formula of $C_{21}H_{29}O_5N_6P \cdot \frac{1}{2}(C_4H_4O_4)$ and a formula weight of 534.50 and has the following structural formula:



Tenofovir alafenamide fumarate is a white to off-white or tan powder with a solubility of 4.7 mg per mL in water at 20 °C." *See* Descovy Package Insert (Revised 12/2019) at 21; Descovy Package Insert (Revised 10/2019) at 20.

"Tenofovir Alafenamide: TAF is a phosphonoamidate prodrug of tenofovir (2'-deoxyadenosine monophosphate analog)." *See* Descovy Package Insert (Revised 12/2019) at 28; Descovy Package Insert (Revised 10/2019) at 27.

"TAF, an HIV NRTI, is converted in vivo to tenofovir, an acyclic nucleoside phosphonate (nucleotide) analog of adenosine 5'-monophosphate." *See* Descovy |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Package Insert (Revised 12/2019) at 2; Descovy Package Insert (Revised 10/2019) at 19. "How should I take DESCOVY?<br><br>• • Take DESCOVY exactly as your healthcare provider tells you to take it....<br>• • Do not change your dose or stop taking DESCOVY without first talking with your healthcare provider. Stay under a healthcare provider's care when taking DESCOVY. Do not miss a dose of DESCOVY."  Descovy Package Insert (Revised 12/2019) at Medication Guide 3; Descovy Package Insert (Revised 10/2019) at 38 (Medication Guide).<br><br>The efficacy of Descovy tablets containing 200 mg of FTC and 25 mg of TAF was demonstrated in clinical trials.  *See* Descovy Package Insert (Revised 12/2019) at 32-34; Descovy Package Insert (Revised 10/2019) at 31-33. |
| thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human, | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human.  The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving administration of the claimed combination.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | States in accordance with Gilead's Descovy label® regarding a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human.  The evidence will demonstrate that the process allows a human to remain negative for the immunodeficiency virus while receiving administration of the claimed combination.   The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that inhibits the establishment of the self-replicating infection with the immunodeficiency virus in the human according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.

"DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.

"HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.

"Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)]."  Descovy |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Package Insert (Revised 12/2019) at 4; Descovy Package Insert (Revised 10/2019) at 4. |
| | "While using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs." Descovy Package Insert (Revised 12/2019) at 7; Descovy Package Insert (Revised 10/2019) at 6. |
| | "Important Information for Uninfected Individuals Taking DESCOVY for HIV-1 PrEP |
| | Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:... |
| | • The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well." Descovy Package Insert (Revised 12/2019) at 35; Descovy Package Insert (Revised 10/2019) at 33-34. |
| | The efficacy of Descovy tablets containing 200 mg of FTC and 25 mg of TAF was demonstrated in clinical trials. *See* Descovy Package Insert (Revised 12/2019) at 32-34; Descovy Package Insert (Revised 10/2019) at 31-33. |
| | "You must stay HIV-negative to keep taking DESCOVY for HIV-1 PrEP.... Get tested for HIV-1 at least every 3 months or when your healthcare provider tells you." Descovy Package Insert (Medication Guide) (Revised 12/2019) at 1; *see also* Descovy Package Insert (Revised 10/2019) at 36. |
| | "Take Descovy exactly as your healthcare provider tells you to take it." Package Insert (Medication Guide) (Revised 12/2019) at 3; *see also* Descovy Package Insert (Revised 10/2019) at 38. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%." *Gilead Sciences, Inc. and Gilead Sciences Ireland UC v. AJC Medical Group, Inc. et al.*, Case No. 20-cv-24523, D.I. 1 at ¶ 130 (S.D. Fla. Nov. 3, 2020). |
| wherein the combination is administered prior to potential exposure the human to the human immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes administering the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus. Such evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes administering the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes administering the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus. The evidence will demonstrate that the process includes administration of the claimed combination prior to engaging in activity that has the potential to lead to contact between the host and the immunodeficiency retrovirus. Such evidence will demonstrate that the process |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | includes administration of the claimed combination prior to engaging in activity that that could result in an exposure to the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes administering the claimed combination prior to a potential exposure of the human to the human immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex. Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]."  *See* Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network."  *See* Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6.<br><br>"DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex."  *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg." *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |
| | "DESCOVY can only help reduce your risk of getting HIV-1 infection before you are infected."  Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide). |
| | *See also* GILDDE00188011-050 at, e.g., GILDDE00188014 (at-risk information); GILDDE00188316-402 at, e.g., GILDDE00188363 (lifetime risk information); GILDDE00189084-123 at., e.g., GILDDE00189096. |
| 13. The process of claim 12, wherein combination is compounded into a single formulation. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes the claimed combination being compounded into a single formulation.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination being compounded into a single formulation according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes the claimed combination being compounded into a single formulation.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed combination being compounded into a single formulation according to the claimed method.  Exemplary |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |
| | "The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected: |
| | • • adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or<br>• adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]."  Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5. |
| | "DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |
| | "Recommended dosage:... |
| | • • HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg."  Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |
| 14. The process of claim 13, wherein the single formulation is administered daily for several days, weeks or months both before and after an exposure of the primate host to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
|  | recommends, promotes, and/or instructs physicians to perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.

"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)

DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex. Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]." *See* Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.

"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | high prevalence area or network."  *See* Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6.<br><br>"DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex." *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg."  *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY can only help reduce your risk of getting HIV-1 infection before you are infected."  Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide). |
| 15. The process of claim 12, wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus.  The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. |

RESTRICTED INFORMATION

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | The Government will additionally present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process wherein an inhibition of infection in the host is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. <br><br> "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3. <br><br> "DESCOVY used for HIV-1 PrEP must only be prescribed to individuals confirmed to be HIV-negative immediately prior to initiating and at least every 3 months during use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. <br><br> "HIV-1 Screening: Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs)." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. <br><br> "Screen all individuals for HIV-1 infection immediately prior to initiating DESCOVY for HIV-1 PrEP and at least once every 3 months while taking DESCOVY, and upon diagnosis of any other sexually transmitted infections (STIs) [see Indications and |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Usage (1.2), Contraindications (4), and Warnings and Precautions (5.2)].”  Descovy Package Insert (Revised 12/2019) at 4; Descovy Package Insert (Revised 10/2019) at 4.<br><br>“While using DESCOVY for HIV-1 PrEP, HIV-1 testing should be repeated at least every 3 months, and upon diagnosis of any other STIs.”  Descovy Package Insert (Revised 12/2019) at 7; Descovy Package Insert (Revised 10/2019) at 6.<br><br>“Important Information for Uninfected Individuals Taking DESCOVY for HIV-1 PrEP<br><br>Advise HIV-1 uninfected individuals about the following [see Warnings and Precautions (5.2)]:...<br><br>&bull; The need to get tested regularly for HIV-1 (at least every 3 months, or more frequently for some individuals such as adolescents) and to ask their partner(s) to get tested as well.”  Descovy Package Insert (Revised 12/2019) at 35; Descovy Package Insert (Revised 10/2019) at 33-34.<br><br>The efficacy of Descovy tablets containing 200 mg of FTC and 25 mg of TAF was demonstrated in clinical trials.  *See* Descovy Package Insert (Revised 12/2019) at 32-34; Descovy Package Insert (Revised 10/2019) at 31-33. |
| 16. The process of claim 12, wherein:<br>(i) the pharmaceutically effective amount of emtricitabine; and<br>(ii) the pharmaceutically effective amount of tenofovir or the tenoforvir prodrug;<br>are formulated in a single tablet. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead’s Descovy label® perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in a single tablet.  The evidence will show that Gilead’s Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process wherein the pharmaceutically |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in a single tablet according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in a single tablet. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate are formulated in a single tablet according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected:<br><br>• adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or<br>• adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5. |

| U.S. Patent No. 10,335,423 ||
| --- | --- |
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
|  | "DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"Recommended dosage:...<br><br>• HIV-1 PrEP: One tablet taken once daily with or without food in individuals with body weight at least 35 kg." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |
| 17. The process of claim 12, wherein the potential exposure to the human immunodeficiency retrovirus comprises sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes the potential exposure to the human immunodeficiency retrovirus comprising sexual |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | intercourse, medical worker skin puncture inoculation, hypodermic needle sharing, or blood transfusion according to the claimed method.  Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"1.2 HIV-1 Pre-Exposure Prophylaxis (PrEP)<br><br>DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex. Individuals must have a negative HIV-1 test immediately prior to initiating DESCOVY for HIV-1 PrEP [see Dosage and Administration (2.2) and Warnings and Precautions (5.2)]."  *See* Descovy Package Insert (Revised 12/2019) at 3; Descovy Package Insert (Revised 10/2019) at 3.<br><br>"Risk for HIV-1 acquisition includes behavioral, biological, or epidemiologic factors including but not limited to condomless sex, past or current STIs, self-identified HIV risk, having sexual partners of unknown HIV-1 viremic status, or sexual activity in a high prevalence area or network."  *See* Descovy Package Insert (Revised 12/2019) at 6; Descovy Package Insert (Revised 10/2019) at 6.<br><br>"DESCOVY is indicated in at-risk adults and adolescents weighing at least 35 kg for pre-exposure prophylaxis (PrEP) to reduce the risk of HIV-1 infection from sexual acquisition, excluding individuals at risk from receptive vaginal sex."  *See* Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1. |
| 18. The process of claim 12, wherein the combination comprises the tenofovir prodrug. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes the claimed combination comprising the tenofovir prodrug.  The evidence will show that |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination comprising the tenofovir prodrug according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® regarding a process that includes the claimed combination comprising the tenofovir prodrug. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed combination comprising the tenofovir prodrug according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected:<br><br>• adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or<br>• adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5.<br><br>"DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY (emtricitabine and tenofovir alafenamide) is a fixed dose combination tablet containing emtricitabine (FTC) and tenofovir alafenamide (TAF) for oral |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | administration." Descovy Package Insert (Revised 12/2019) at 20; Descovy Package Insert (Revised 10/2019) at 19. <br><br>"DESCOVY contains the prescription medicines emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide). <br><br>"What are the ingredients in DESCOVY? <br><br>Active ingredients: emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 4; Descovy Package Insert (Revised 10/2019) at 39 (Medication Guide). <br><br>"What are the ingredients in DESCOVY? <br><br>Active ingredients: emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 4; Descovy Package Insert (Revised 10/2019) at 39 (Medication Guide). <br><br>"Tenofovir Alafenamide: The chemical name of tenofovir alafenamide fumarate drug substance is L-alanine, N-[(S)-[[(1R)-2-(6-amino-9H-purin-9-yl)-1methylethoxy]methyl]phenoxyphosphinyl]-, 1-methylethyl ester, (2E)-2butenedioate (2:1). <br><br>Tenofovir alafenamide fumarate has an empirical formula of $C_{21}H_{29}O_5N_6P \cdot \frac{1}{2}(C_4H_4O_4)$ and a formula weight of 534.50 and has the following structural formula: |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| |  Tenofovir alafenamide fumarate is a white to off-white or tan powder with a solubility of 4.7 mg per mL in water at 20 °C." *See* Descovy Package Insert (Revised 12/2019) at 21; Descovy Package Insert (Revised 10/2019) at 20. "Tenofovir Alafenamide: TAF is a phosphonoamidate prodrug of tenofovir (2'-deoxyadenosine monophosphate analog)." *See* Descovy Package Insert (Revised 12/2019) at 28; Descovy Package Insert (Revised 10/2019) at 27. "TAF, an HIV NRTI, is converted in vivo to tenofovir, an acyclic nucleoside phosphonate (nucleotide) analog of adenosine 5′-monophosphate." *See* Descovy Package Insert (Revised 12/2019) at 2; Descovy Package Insert (Revised 10/2019) at 19 |
| 19. The process of claim 1, wherein the combination comprises the tenofovir prodrug. | The Government will present testimony and/or opinions from one or more physicians evidencing that patients who are treated with Descovy® for PrEP in the United States in accordance with Gilead's Descovy label® perform a process that includes the claimed combination comprising the tenofovir prodrug. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs physicians to perform a process that includes the claimed combination comprising the tenofovir prodrug according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below. The Government will additionally present evidence, testimony, and/or opinions concerning one or more patients that are treated with Descovy® for PrEP in the United |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | States in accordance with Gilead's Descovy label® regarding a process that includes the claimed combination comprising the tenofovir prodrug. The evidence will show that Gilead's Descovy label® encourages, recommends, promotes, and/or instructs patients to perform a process that includes the claimed combination comprising the tenofovir prodrug according to the claimed method. Exemplary evidence of such encouragement, recommendation, promotion, and/or instruction is provided below.<br><br>"The dosage of DESCOVY for HIV-1 PrEP is one tablet (containing 200 mg of FTC and 25 mg of TAF) once daily taken orally with or without food in HIV-1 uninfected:<br><br>• adults and adolescents weighing at least 35 kg and with a creatinine clearance greater than or equal to 30 mL per minute; or<br>• adults with creatinine clearance below 15 mL per minute who are receiving chronic hemodialysis. On days of hemodialysis, administer the daily dose of DESCOVY after completion of hemodialysis treatment [see Indications and Usage (1.2) and Clinical Pharmacology (12.3)]." Descovy Package Insert (Revised 12/2019) at 5; Descovy Package Insert (Revised 10/2019) at 5.<br><br>"DESCOVY® (emtricitabine and tenofovir alafenamide) tablets, for oral use." Descovy Package Insert (Revised 12/2019) at 1; Descovy Package Insert (Revised 10/2019) at 1.<br><br>"DESCOVY (emtricitabine and tenofovir alafenamide) is a fixed dose combination tablet containing emtricitabine (FTC) and tenofovir alafenamide (TAF) for oral administration." Descovy Package Insert (Revised 12/2019) at 20; Descovy Package Insert (Revised 10/2019) at 19.<br><br>"DESCOVY contains the prescription medicines emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 2; Descovy Package Insert (Revised 10/2019) at 37 (Medication Guide). |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "What are the ingredients in DESCOVY? |
| | Active ingredients: emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 4; Descovy Package Insert (Revised 10/2019) at 39 (Medication Guide) "What are the ingredients in DESCOVY? |
| | Active ingredients: emtricitabine and tenofovir alafenamide." Descovy Package Insert (Revised 12/2019) at Medication Guide 4; Descovy Package Insert (Revised 10/2019) at 39 (Medication Guide). |
| | "Tenofovir Alafenamide: The chemical name of tenofovir alafenamide fumarate drug substance is L-alanine, N-[(S)-[[(1R)-2-(6-amino-9H-purin-9-yl)-1methylethoxy]methyl]phenoxyphosphinyl]-, 1-methylethyl ester, (2E)-2butenedioate (2:1). |
| | Tenofovir alafenamide fumarate has an empirical formula of $C_{21}H_{29}O_5N_6P \cdot \frac{1}{2}(C_4H_4O_4)$ and a formula weight of 534.50 and has the following structural formula: |
| |  |
| | Tenofovir alafenamide fumarate is a white to off-white or tan powder with a solubility of 4.7 mg per mL in water at 20 °C." *See* Descovy Package Insert (Revised 12/2019) at 21; Descovy Package Insert (Revised 10/2019) at 20. |

| U.S. Patent No. 10,335,423 | |
|---|---|
| **Claim** | **Basis for Infringement by Descovy® for PrEP** |
| | "Tenofovir Alafenamide: TAF is a phosphonoamidate prodrug of tenofovir (2'-deoxyadenosine monophosphate analog)." *See* Descovy Package Insert (Revised 12/2019) at 28; Descovy Package Insert (Revised 10/2019) at 27. <br><br> "TAF, an HIV NRTI, is converted in vivo to tenofovir, an acyclic nucleoside phosphonate (nucleotide) analog of adenosine 5′-monophosphate." *See* Descovy Package Insert (Revised 12/2019) at 2; Descovy Package Insert (Revised 10/2019) at 19. |

RESTRICTED INFORMATION

# Exhibit F

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>     Plaintiff & Counterclaim-Defendant,<br><br>  v.<br><br>GILEAD SCIENCES, INC. and<br>GILEAD SCIENCES IRELAND UC,<br><br>     Defendants & Counterclaim-Plaintiff. | C.A. No. 19-02103-MN |

<u>**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S
THIRD SET OF REQUESTS FOR PRODUCTION OF
DOCUMENTS AND THINGS (NOS. 251-265)**</u>

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Delaware Default Standard, Defendants Gilead Sciences, Inc. ("GSI") and Gilead Sciences Ireland UC ("GSIUC") (collectively, "Defendants") hereby respond to Plaintiff United States of America's ("Plaintiff") Third Set of Requests for Production of Documents and Things (Nos. 251-265), served on October 4, 2021.

Defendants will make reasonable efforts to respond to the Requests, subject to their objections, as Defendants understand and interpret each Request.  If Plaintiff subsequently asserts an interpretation of any Request that differs from Defendants' interpretation, Defendants reserve the right to supplement or amend their objections and responses.

None of Defendants' objections or responses is an admission regarding the existence, relevance, or admissibility of any documents or things, or to the truth or accuracy of any statement or characterization contained in any Request.

1

Defendants' responses to the Requests are made without waiver and with preservation of:

1.     All questions as to competency, relevance, materiality, privilege, or admissibility of the responses and their subject matter for any purpose in this lawsuit (including trial) or in any other action or matter;

2.     The right to object to the use of any such responses or their subject matter, on any ground in this lawsuit (including trial) or in any other action or matter;

3.     The right to object on any ground at any time to a demand or request for further responses; and

4.     The right to review, correct, add to, supplement, or clarify any of these responses at any time.

As explained in each specific response, non-privileged and responsive documents and things, if any, will be produced or made available for review at a mutually convenient time and place.

Defendants' discovery and investigation of facts relevant to this litigation are ongoing. These objections and responses are based on currently available documents and things as part of an ongoing search-and-review process.  Accordingly, Defendants reserve their rights to amend, modify, or supplement their responses as necessary and in accordance with Federal Rule of Civil Procedure 26(e).

## <u>GENERAL OBJECTIONS</u>

Defendants herein incorporate by reference each of the General Objections in Defendants' Objections and Responses to Plaintiff's Corrected First Set of Requests for Production of Documents and Things (Nos. 1-182), served on August 6, 2020, and Defendants' Objections and Responses to Plaintiff's Second Set of Requests for Production of Documents and Things (Nos. 183-250), served on March 5, 2021.  Defendants incorporate each of those

2

General Objections into their responses for each Request, regardless of whether Defendants expressly refer to each General Objection in Defendants' response to a specific Request.

Defendants further object to the Requests as overbroad and unduly burdensome to the extent that they call for production of any communications with expert witnesses or consultants retained for purposes of litigation. Such communications are protected work product, and Defendants will not produce documents or information concerning expert witnesses beyond the disclosures required by Rule 26(a).

## OBJECTIONS TO PLAINTIFF'S INSTRUCTIONS

Defendants object to Plaintiff's Instructions to the extent that they attempt to impose burdens or requirements on Defendants that exceed or differ from the requirements of Rules 26 and 34 of the Federal Rules of Civil Procedure; the Local Rules; the District of Delaware's Default Standard for Discovery, Including Discovery of Electronically Stored Information; the Court's Scheduling Order; the Court's Protective Order; or any other applicable rule or order.

## SPECIFIC OBJECTIONS AND RESPONSES
## TO PLAINTIFF'S SECOND SET OF REQUESTS
## FOR PRODUCTION OF DOCUMENTS AND THINGS (NOS. 251-265)

**REQUEST NO. 251:**

**All documents produced or made available to you by any non-party or third-party in this action, including but not limited to, documents provided pursuant to a subpoena served by Gilead.**

**RESPONSE TO REQUEST NO. 251:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege of immunity. Defendants object to this request as overbroad, unduly

burdensome, not proportional to the needs of the case, and seeking information not relevant to

any party's claims or defenses, at least to the extent the request seeks documents that have no

relationship to the asserted claims of the Patents-in-Suit or the issues in this litigation.

Defendants object to this request to the extent it seeks documents or information subject to third-

party confidentiality obligations.  Defendants object to this request as vague and ambiguous with

respect to the phrase "or made available by any non-party or third-party in this action."

Defendants object to this request to the extent it is duplicative of other Requests served by

Plaintiff, including Request No. 173, pursuant to which Gilead agreed to produce non-privileged,

responsive documents produced to Gilead by a non-party in response to a subpoena.

Subject to and without waiving the foregoing objections, Defendants will produce non-

privileged, responsive documents produced to Gilead by a non-party in this action in response to

a subpoena.

**REQUEST NO. 252:**

> **All communications between Gilead (or its representatives) and Christopher
> Morten or the PreP4All [sic] organization.**

**RESPONSE TO REQUEST NO. 252:**

In addition to the General Objections set forth above and incorporated here, Defendants

object to this request as overbroad, unduly burdensome, not proportional to the needs of the case,

and seeking information not relevant to any party's claims or defenses, at least to the extent the

request seeks documents that have no relationship to the asserted claims of the Patents-in-Suit,

the accused products, or the issues in this litigation.  Defendants object to this request on the

grounds that it does not specify any reasonable time period for documents sought.

Subject to and without waiving the foregoing objections, Defendants will produce non-

privileged, responsive communications with Christopher Morten or the PrEP4All organization

4

that relate to the subject matter of this litigation, to the extent that such documents exist, are within Defendants' possession, custody, or control, and are located after a reasonable search.

**REQUEST NO. 253:**

**All documents relating to communications between Gilead (or its representatives) and Dr. Robert Grant regarding the Patents-in-Suit or the subject matter of this litigation.**

**RESPONSE TO REQUEST NO. 253:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request on the grounds that it does not specify any reasonable time period for documents sought.  Defendants object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity, including on the grounds that this request seeks "[a]ll documents relating to communications."  Defendants further object to this request as cumulative and duplicative of other Requests served by Plaintiff, including at least Request No. 240.

Subject to and without waiving the foregoing objections, Defendants will produce non-privileged, responsive communications exchanged between Dr. Robert Grant and Gilead personnel regarding the Patents-in-Suit, to the extent that such documents exist, are within Defendants' possession, custody, or control, and are located after a reasonable search.

**REQUEST NO. 254:**

**All documents relating to communications between Gilead (or its representatives) and Dr. Koen Van Rompey [sic] regarding the Patents-in-Suit or the subject matter of this litigation.**

**RESPONSE TO REQUEST NO. 254:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses.  Defendants object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity, including on the grounds that this request seeks "[a]ll documents relating to communications."

Subject to and without waiving the foregoing objections, and after a reasonable search, Defendants are not aware of any responsive documents in their possession, custody, or control that are not protected by the attorney-client privilege, the work-product doctrine, or other applicable privileges or immunities.

**REQUEST NO. 255:**

> **All documents relating to communications between Gilead (or its representatives) and Dr. Michael Youle regarding the Patents-in-Suit or the subject matter of this litigation.**

**RESPONSE TO REQUEST NO. 255:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses, at least to the extent the request seeks documents that have no relationship to the asserted claims of the Patents-in-Suit, the accused products, or the issues in this litigation. Defendants object to this request to the extent that it seeks documents or things that are not within Defendants' possession, custody, or control.  Defendants object to this request to the extent that it seeks documents that are protected

6

by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity, including on the grounds that this request seeks "[a]ll documents relating to communications." Defendants further object to this request as cumulative and duplicative of other Requests served by Plaintiff, including at least Request No. 243.

Subject to and without waiving the foregoing objections, and after a reasonable search, Defendants are not aware of any responsive documents in their possession, custody, or control that are not protected by the attorney-client privilege, the work-product doctrine, or other applicable privileges or immunities.

**REQUEST NO. 256:**

> **All documents relating to contractual negotiations and/or executed agreements for compensation with third parties for which any part of the negotiations or agreement contemplated services related to the Patents-in-Suit or the subject matter of this litigation or the related litigation in the Court of Federal Claims.**

**RESPONSE TO REQUEST NO. 256:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity. Defendants object to this request as overbroad, unduly burdensome, vague, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses, at least to the extent that it calls for "[a]ll documents relating to contractual negotiations and executed agreements" with unidentified "third parties." Defendants interpret this request as seeking agreements between Defendants and experts or consultants retained to support this litigation. Defendants further object to this request on the grounds that it does not specify any reasonable time period for documents sought.

7

Subject to and without waiving the foregoing objections, and after a reasonable search, Defendants are not aware of any responsive documents in their possession, custody, or control that are not protected by the attorney-client privilege, the work-product doctrine, or other applicable privileges or immunities.

**REQUEST NO. 257:**

**All documents and communications regarding compensation to third parties in which any part of the compensation was for services rendered that related in anyway to the Patents-in-Suit, including but not limited to, compensation related to preparation of the IPR petitions and/or expert declarations filed in IPR2019-01453, -01454, -01455, and -1456.**

**RESPONSE TO REQUEST NO. 257:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity.  Defendants object to this request as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses.  Defendants further object to this request as vague with respect to its use of the term "services rendered that related in any way to the Patents-in-Suit," which provides no articulable bounds on the scope of materials requested; Defendants understand this request to be limited to services rendered by declarants in connection with the specific proceedings identified in this request, *i.e.*, IPR2019-01453, -01454, -01455, and -1456.  Defendants further object to this request on the grounds that it does not specify any reasonable time period for documents sought.

In view of the foregoing objections, Defendants will not produce documents in response to this request.

8

**REQUEST NO. 258:**

> **All communications within or between Defendants and any third party regarding Prior Art to the Patents-in-Suit, and all documents relating to any Prior Art search, investigation, and/or analysis of the Patents-in-Suit, and the Prior Art itself.**

**RESPONSE TO REQUEST NO. 258:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity. Defendants object to this request as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses, at least to the extent the request seeks production of "all" communications and documents. Defendants object to this request as cumulative and duplicative of other Requests served by Plaintiff, including at least Request Nos. 133, 134, 137, and 138.

Defendants have already agreed to produce Prior Art relating to the Patents-in-Suit in response to Request No. 133. Defendants have also already agreed to produce non-privileged, responsive Prior Art relating to the asserted claims of the Patents-in-Suit and non-privileged communications with third parties relating to such Prior Art in response to Request No. 138. In view of this production, Defendants will not separately search for other documents sought by this request, but Defendants will not withhold non-privileged materials responsive to this request, subject to and without waiving the foregoing objections.

**REQUEST NO. 259:**

> **All documents relating to communications between Gilead and its representatives and any of the authors of "Anticipating the Efficacy of HIV Pre-Exposure Prophylaxis (PrEP) and the Needs of At-Risk Californians," Center for HIV Identification, Prevention and Treatment Services (November 2004), including Greg Szekeres, Thomas J. Coates, PhD, Simon**

**Frost, DPhil, Arleen Leibowitz, PhD, and Steven Shoptaw, PhD, regarding the Patents-in-Suit.**

**RESPONSE TO REQUEST NO. 259:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request on the grounds that it does not specify any reasonable time period for documents sought.  Defendants object to this request to the extent it is duplicative of other Requests served by Plaintiff.  Defendants have already agreed to produce non-privileged, responsive communications exchanged between Gilead personnel and Greg Szekeres and between Gilead personnel and Dr. Thomas Coates regarding PrEP or PEP prior to 2007, pursuant to Request Nos. 244 and 241.

Subject to and without waiving the foregoing objections, Defendants will produce non-privileged, responsive documents in response to this Request, to the extent that such documents exist, are within Defendants' possession, custody, or control, and are located after a reasonable search.

**REQUEST NO. 260:**

**All documents supporting Defendants' position that Defendants have not willfully infringed any asserted claim of the Patents-in-Suit, including but not limited to all documents supporting the factual bases for Defendants' Tenth Affirmative Defense of No Willfulness.**

**RESPONSE TO REQUEST NO. 260:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity.  Defendants object to this request to the extent that it seeks documents or things that are not within Defendants' possession, custody, or control.

Subject to and without waiving the foregoing objections, Defendants will produce non-privileged, responsive documents relating to Defendants' position that Defendants have not willfully infringed any asserted claim of the Patents-in-Suit, to the extent that such documents exist, are within Defendants' possession, custody, or control, and are located after a reasonable search.

**REQUEST NO. 261:**

> **Documents supporting and underlying all of Gilead CEO Daniel O'Day's statements before the House Oversight Committee in May 2019 that the pricing of Truvada® was based on "four things," including "[t]he third and potentially most important. . . . [w]hat are the access limitations that might be created by setting that price[?]." HIV Prevention Drug: Billions in Corporate Profits After Millions in Taxpayer Investments: Hearing Before the H. Comm. on Oversight and Reform, 116th Cong. 31 (2019) [hereinafter H. Comm. Hearing] (testimony of Mr. Daniel O'Day), https://www.govinfo.gov/content/pkg/CHRG-116hhrg36660/pdf/CHRG-116hhrg36660.pdf [https://perma.cc/M5KY-YPFP].**

**RESPONSE TO REQUEST NO. 261:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity.

Defendants object to this request as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses, at least to the extent the request seeks documents that have no relationship to the asserted claims of the Patents-in-Suit, the accused products, or the issues in this litigation.

Defendants object to this request as unduly burdensome to the extent it seeks production of documents in the public domain or otherwise equally accessible to Plaintiff as to Defendants.

Defendants object to this request to the extent that it seeks documents or things that are not within Defendants' possession, custody, or control.

Defendants also object to this request to the extent it seeks information beyond that which is discoverable under the Delaware Default Standard for Discovery, ¶ 4(e), including information prior to November 6, 2013.

Defendants further object that this request is cumulative and duplicative of other Requests served by Plaintiff, including at least Requests Nos. 21 and 113. Defendants have already produced non-privileged, responsive documents sufficient to show historical profitability of Truvada® and Descovy® since 2011, which included detailed pricing information and all information regarding pricing that was provided to Congress in connection with Mr. O'Day's testimony, that were located after a reasonable search.

In view of the forgoing objections, Defendants will not search for or produce additional documents responsive to this request.

**REQUEST NO. 262:**

> **Documents supporting and underlying Gilead CEO Daniel O'Day's statements before the House Oversight Committee in May 2019 that "the there was no additional increase to the price [of Truvada®] as a result of the additional [PrEP] indication." H. Comm. Hearing at 31 (statement of Mr. Daniel O'Day).**

**RESPONSE TO REQUEST NO. 262:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity.

12

Defendants object to this request as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses, at least to the extent the request seeks documents that have no relationship to the asserted claims of the Patents-in-Suit, the accused products, or the issues in this litigation.

Defendants object to this request as unduly burdensome to the extent it seeks production of documents in the public domain or otherwise equally accessible to Plaintiff as to Defendants.

Defendants object to this request to the extent that it seeks documents or things that are not within Defendants' possession, custody, or control.

Defendants object to this request to the extent it seeks information beyond that which is discoverable under the Delaware Default Standard for Discovery, ¶ 4(e), including information prior to November 6, 2013.

Defendants further object that this request is cumulative and duplicative of other Requests served by Plaintiff, including at least Requests Nos. 21 and 113. Defendants have already produced non-privileged, responsive documents sufficient to show historical profitability of Truvada® and Descovy® since 2011, which included detailed pricing information and all information regarding pricing that was provided to Congress in connection with Mr. O'Day's testimony, that were located after a reasonable search.

In view of the forgoing objections, Defendants will not search for or produce additional documents responsive to this request.

**REQUEST NO. 263:**

**All agendas, meeting presentation materials, meeting minutes and similar documents relating to meetings of the Gilead Board of Directors or Gilead's Executive Committee (EC) that discussed pricing of Truvada for PrEP®, Descovy for PrEP®, or the Patents in-Suit from 2007 to present.**

**RESPONSE TO REQUEST NO. 263:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity.

Defendants object to this request as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses, at least to the extent the request seeks documents that have no relationship to the asserted claims of the Patents-in-Suit, the accused products, or the issues in this litigation.

Defendants further object that this request is cumulative and duplicative of other Requests served by Plaintiff, including at least Requests Nos. 21, 113, and 119. Defendants have already produced non-privileged, responsive documents sufficient to show historical profitability of Truvada® and Descovy® since 2011, which include detailed pricing information, and documents referencing the Patent's-in-Suit that were located after a reasonable search.

Defendants also object to this request to the extent it seeks information beyond that which is discoverable under the Delaware Default Standard for Discovery, ¶ 4(e), including information prior to November 6, 2013.

In view of the forgoing objections, Defendants will not search for or produce additional documents responsive to this request. As stated in Gilead's October 20, 2021 letter, to the extent non-privileged information related to the pricing of Truvada® and Descovy® since 2011 or the Patents-in-Suit is presented to the Board of Directors or other Gilead stakeholders, that information is derived from and reflected in the documents Gilead has already produced, and the Government has not shown the specific relevance of non-duplicative information that the

14

Government seeks or how the burden associated with the Government's request is proportional to the needs of the case.

**REQUEST NO. 264:**

>   **All documents relating to the research and other efforts leading to the filing of International Patent Application Publication WO2004/064845, which lists Dr. Terrance Dahl as the first named inventor.**

**RESPONSE TO REQUEST NO. 264:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request as overbroad, burdensome, and not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses, at least to the extent the request seeks documents that have no relationship to the asserted claims of the Patents-in-Suit, the accused products, or the issues in this litigation.  As explained in Gilead's letter delivered via electronic mail on March 15, 2021, when a person of ordinary skill in the art ("POSA") reads a prior art reference, the POSA does not speak to the author to interpret the reference; the POSA just reads the words on the page and interprets them in light of his or her skill and experience. As a result, "any information [the prior art author] might have to offer beyond the words of the [reference] application would be irrelevant" to validity issues.  *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363, 1375 (Fed. Cir. 2008).  Defendants further object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity.

In view of the foregoing objection, Defendants will not produce documents in response to this request.

15

**REQUEST NO. 265:**

> **All documents supporting Defendants' contention in its Fourth Affirmative Defense (unclean hands) that Gilead would have "chang[ed] its application for FDA approval to market Truvada® for PrEP" if Gilead had been informed of the invention described in the '811 Provisional, the '547 Application, and the Patents-in-Suit, DI 78 at 78 (¶ 42).**

**RESPONSE TO REQUEST NO. 265:**

In addition to the General Objections set forth above and incorporated here, Defendants object to this request as overbroad, unduly burdensome, not proportional to the needs of the case, and seeking information not relevant to any party's claims or defenses, to the extent it seeks production of documents in the public domain or otherwise equally accessible to Plaintiff as to Defendants.  Defendants object to this request to the extent that it seeks documents or things that are not within Defendants' possession, custody, or control.  Defendants further object to this request to the extent that it seeks documents that are protected by the attorney-client privilege, the common-interest doctrine, the work-product doctrine, and/or any other applicable privilege or immunity.

Subject to and without waiving the foregoing objections, Defendants will produce non-privileged, responsive documents relating to Gilead's contention that it would have "chang[ed] its application for FDA approval to market Truvada® for PrEP" if Gilead had been informed of the invention described in the '811 Provisional, the '547 Application, and the Patents-in-Suit.

16

Dated:  November 3, 2021

OF COUNSEL:

Ronald C. Machen
Charles T. Cox Jr.
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Ronald.Machen@wilmerhale.com
Charlie.Cox@wilmerhale.com

David B. Bassett
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
David.Bassett@wilmerhale.com

Vinita C. Ferrera
Emily R. Whelan
George P. Varghese
Timothy A. Cook
Jonathan A. Cox
Stephanie Lin
Benjamin Conery
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Vinita.Ferrera@wilmerhale.com
Emily.Whelan@wilmerhale.com
George.Varghese@wilmerhale.com
Tim.Cook@wilmerhale.com
Jonathan.Cox@wilmerhale.com
Stephanie.Lin@wilmerhale.com
Ben.Conery@wilmerhale.com

/s/ Frederick L. Cottrell, III
Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Alexandra M. Ewing (#6407)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
P.O. Box 551
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
ewing@rlf.com

*Counsel for Defendants Gilead Sciences,
Inc. & Gilead Sciences Ireland UC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 3, 2021, I caused true and correct copies of the

foregoing document to be served on the following counsel in the manner indicated:

<u>VIA E-MAIL</u>

Laura D. Hatcher
Shamoor Anis
U.S. Attorney's Office
Hercules Building
1313 N. Market Street
P.O. Box 2046
Wilmington, DE 19801
302-573-6277
Email: laura.hatcher@usdoj.gov
Email: shamoor.anis@usdoj.gov

<u>VIA E-MAIL</u>

Walter W. Brown
Philip Charles Sternhell
Patrick C. Holvey
Amanda K. Kelly
Carrie E. Rosato
U.S. Department of Justice
Civil Division, Commercial Litigation
Branch, IP Section
1100 L Street, N.W.
Washington, D.C. 20530
202-307-0341
Email: walter.brown2@usdoj.gov
Email: philip.c.sternhell@usdoj.gov
Email: patrick.c.holvey@usdoj.gov
Email: amanda.k.kelly@usdoj.gov
Email: PrEP.Docket@usdoj.gov

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
cottrell@rlf.com

18

# Exhibit G

**WILMERHALE**

November 18, 2021

*Via Electronic Mail*

Walter W. Brown
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Walter.Brown2@usdoj.gov

**David B. Bassett**

+1 212 230 8858 (t)
+1 212 230 8888 (f)
david.bassett@wilmerhale.com

     Re:   ***United States v. Gilead Sciences, Inc.,***
            **C.A. No. 19-2103-MN (D. Del.)**

Wally:

     We write in response to, and to object to, the government's November 9, 2021 Notice of Deposition for Daniel O'Day, Gilead Sciences, Inc.'s CEO. D.I. 205. The government's demand to depose a high-level executive—who joined Gilead years after the key events at issue in this case—is inappropriate. And the government's notice to Mr. O'Day is particularly inappropriate because the government has not even attempted to obtain whatever information it seeks from him by other means—indeed, the government's notice to Mr. O'Day is one of only five Rule 30(b)(1) deposition notices the government has served so far. On the basis of the objections in this letter, Gilead will not make Mr. O'Day available for a deposition.

     The government first informed Gilead that it might seek to take Mr. O'Day's deposition during the parties' October 21, 2021 meet and confer regarding the government's draft Rule 30(b)(6) notice to Gilead. The government identified only one reason for its interest in deposing Mr. O'Day: his May 16, 2019 testimony to the Committee on Oversight and Reform of the U.S. House of Representatives, which apparently did not "sit well" with the government. *See* GILDDE01339720 (transcript of testimony). As we explained during that meet and confer, and as memorialized in subsequent correspondence, Mr. O'Day is not an appropriate deponent in this case. (Oct. 22, 2021 email from J. Cox to W. Brown.) Although Gilead explained it could agree to provide corporate testimony on some of the *subject matter* of Mr. O'Day's testimony, there is no basis to seek deposition testimony from Mr. O'Day himself, particularly given that he did not join Gilead until March of 2019—years after the time period that is the focus of the parties' disputes. (*Id.*) But despite Gilead's position, and with no further explanation, the government proceeded to serve its notice of deposition for Mr. O'Day.

     As numerous courts have recognized, high-level executives (such as CEOs) may be attractive targets for needless and vexatious depositions, such as the one the government now seeks. The apex-deposition doctrine was established precisely to guard against this type of abuse. Federal Rule of Civil Procedure 26(b)(1) requires that discovery be "proportional to the needs of the case," particularly in view of "whether the burden or expense of the proposed discovery outweighs its likely benefit." Rule 26(b)(2)(C) similarly provides that the court "must limit the frequency or extent of discovery" where "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is

WILMERHALE

November 18, 2021
Page 2

more convenient, less burdensome, or less expensive."  Consistent with this guidance, under the apex-deposition doctrine, a court will not allow a deposition of a high-ranking official if he or she lacks personal knowledge of relevant information or if there are less burdensome means of discovery.  *See, e.g.*, *British Telcoms. PLC v. IAC/Interactivecorp*, No. 18-366-WCB, 2020 WL 1043974, at *8 (D. Del. Mar. 4, 2020).  Mr. O'Day is entitled to such protection for both reasons.

*First*, the government has identified no relevant issue in this litigation about which Mr. O'Day might have unique personal knowledge—because there is none.  Mr. O'Day joined Gilead in March of 2019—*years* after the key events at issue in the current litigation, and only two months before the congressional testimony the government baselessly relies upon as the foundation for its demand.  He was not employed at Gilead during, for example, the development, testing, or approval of Truvada® for PrEP, or during the period of the government's communications with Gilead scientists concerning the macaque studies underlying the asserted patents.  *See, e.g.*, *Ford Motor Co. v. Edgewood Props.*, Civ. No. 06–1278, 2011 WL 2517133, at *4 (D.N.J. June 23, 2011) (denying request for apex depositions where high-ranking officers had no personal or unique knowledge regarding facts at issue).  Nor was Mr. O'Day employed by Gilead when the government first contacted Gilead about the Patents-in-Suit or during the parties' pre-suit settlement discussions.

Furthermore, the government's belated demand for Mr. O'Day's deposition undermines any claim that he could offer unique testimony of particular significance in this case.  The government said nothing about deposing Mr. O'Day for *nearly two years* since the filing of its complaint—and cannot identify any new evidence that would account for this delay.  Despite the fact that Mr. O'Day's statements to Congress did not "sit well" with the government, Mr. O'Day's testimony is clearly not needed in this litigation.

*Second*, as Gilead has already proposed, the government may explore the subject matter of Mr. O'Day's congressional testimony through depositions of other witnesses and other discovery mechanisms.  *See, e.g.*, *Ciarrocchi v. Unum Group*, No. 08–1704, 2009 WL 10676631, at *4 (D.N.J. Aug. 27, 2009) (denying motions for depositions of two current high-level executives with no unique knowledge relevant to plaintiff's claim that could not be obtained from lower-level employees whom plaintiff declined to depose, and where plaintiff "made only 'uncorroborated allegations'" that the executives had such unique knowledge).  Indeed, Gilead has agreed to provide—and has already provided—the government with extensive discovery on the subject matter of that testimony, including the fact that using Truvada® for PrEP was well-known in the scientific community before the government's alleged invention, that Gilead supported clinical trials that led to the approval of Truvada® for PrEP, and financial information regarding the development of Truvada®.  And as of the time of Mr. O'Day's testimony, Gilead had explained many of the reasons that it believed the Patents-in-Suit were invalid and unenforceable—Gilead gave the government a presentation explaining its position in February 2017, *see, e.g.*, US_00275295, and the parties engaged in numerous follow-up discussions in which Gilead further articulated its position and the bases

WILMERHALE

November 18, 2021
Page 3

for its position (none of which Mr. O'Day was involved in, and all of which occurred before Mr. O'Day was employed by Gilead).

Moreover, Gilead's position on the invalidity of the asserted patents has been documented extensively, including in Gilead's invalidity contentions.  Gilead will also agree to provide corporate testimony under Rule 30(b)(6) about certain factual issues related to such topics, as will be reflected in GSI's forthcoming response to the government's November 1, 2021 Rule 30(b)(6) deposition notice.  Before seeking Mr. O'Day's testimony, the government must first exhaust other alternatives—but it clearly has not done so here. *See, e.g.*, *Reif v. CNA*, 248 F.R.D 448, 454 (E.D. Pa. 2008) (holding that plaintiff must demonstrate insufficiency of interrogatories or depositions of lower-level employees before obtaining deposition of CEO); *Apple, Inc. v. Samsung Elecs. Co., Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) ("In determining whether to allow an apex deposition, courts consider … whether the party seeking the deposition has exhausted other less intrusive methods.").

I close by noting that the government's notice of Mr. O'Day's deposition is further clouded by the government's extensive pattern of vexatious conduct in this case, including the conduct chronicled in Gilead's October 20, 2021 letter to the government regarding its objectively baseless claim that Gilead induces infringement of the '509 Patent by selling Descovy® (to which the government has not responded), in Gilead's October 29, 2021 letter to the government regarding its objectively baseless claims against GSIUC (also to which the government has not responded), and by the government's decision to serve subpoenas on our law firm—Gilead's trial counsel—and on Gilead's earlier IPR counsel seeking documents that the government did not first attempt to obtain from Gilead  We hope the government will reconsider its tactics in this litigation, and Gilead is prepared to make the Court aware of the government's improper conduct if necessary.

To that end, please let me know by November 29, 2021 whether the government will withdraw its notice to depose Mr. O'Day.  Gilead does not intend to make Mr. O'Day available for a deposition absent a court order to the contrary.

Best regards,


*/s/ David B. Bassett*

David B. Bassett

cc: All Counsel of Record (by electronic mail)

# Exhibit H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br>     Plaintiff & Counterclaim-Defendant, <br><br>   v. <br><br> GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC, <br><br>     Defendants & Counterclaim Plaintiff. | C.A. No. 19-02103-MN |

### DEFENDANTS' FIRST AMENDED INITIAL INVALIDITY CONTENTIONS

Pursuant to Paragraph 4(d) of the Delaware Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI"), and the Scheduling Order in this case, D.I. 27, and Federal Rule of Civil Procedure 26(e)—and in response to the Government's January 21, 2021 letter requesting that Gilead provide the supplemental information contained herein by February 3, 2021—Defendants Gilead Sciences, Inc. and Gilead Sciences Ireland UC (collectively, "Gilead") hereby provide their First Amended Initial Invalidity Disclosures ("Invalidity Contentions") with respect to the claims asserted by the United States of America ("the Government") in their Complaint (D.I. 1) and those claims identified by the Government in its Initial Infringement Contentions.

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.    RESERVATIONS.................................................................................................1

III.    THE PATENTS-IN-SUIT .................................................................................5

     a.    Overview.................................................................................................5

     b.    Priority Date.............................................................................................8

IV.    LEVEL OF ORDINARY SKILL IN THE ART ................................................9

V.    PRIORITY DATE ...............................................................................................9

     a.    The Asserted Claims Are Not Fully Supported By The Written Description Of The Provisional Application. ..................................................................10

         i.    *The Patents-in-Suit Claim Oral Administration of Antiretrovirals for Prophylaxis* .........................................................................11

         ii.    *The Provisional Application Fails to Demonstrate Possession of Oral Administration of FTC and Tenofovir (or TDF or Tenofovir Ester or Tenofovir Prodrug)* ....................................................12

VI.    INVALIDITY BASED ON PRIOR ART........................................................21

     a.    The State Of The Art.............................................................................21

         i.    *Administration of FTC With Tenofovir, TDF, a Tenofovir Ester, or Tenofovir Prodrug to Treat HIV Was Well Known.* ...............21

         ii.    *Post-exposure Prophylaxis With Tenofovir, TDF, a Tenofovir Ester, and Tenofovir Prodrug, and in Combination With FTC Was Well Known.* .....31

         iii.    *Pre-exposure Prophylaxis With Tenofovir, TDF, Tenofovir Ester, and Tenofovir Prodrug, and in Combination With FTC Was Well Known.* .....42

     b.    Identification Of Prior Art References.................................................49

         i.    *Prior Art Publications* .................................................................49

     c.    Anticipation Under 35 U.S.C. § 102(a) And/Or 102(b) ......................61

         i.    *Pre-exposure Prophylaxis With Tenofovir (or TDF, Tenofovir Ester, and Tenofovir Prodrug) and Emtricitabine Was Known by Others* ...............63

         ii.    *Pre-exposure Prophylaxis With At Least TDF, a Tenofovir Ester, and Tenofovir Prodrug Was Used by Others*...............................82

         iii.    *Pre-exposure Prophylaxis With At Least TDF, a Tenofovir Ester, and Tenofovir Prodrug Was Described in Printed Publications* ....................83

         iv.    *Pre-exposure Prophylaxis With FTC and TDF, a Tenofovir Ester, and Tenofovir Prodrug Was Described in Printed Publications* ....................86

     d.    Derivation Under 35 U.S.C. § 102(f)..................................................87

         i.    *Others Conceived of the Purported Invention Before the Named Inventors.* ..................................................................................88

|     |      | ii.   | *Prior Conception of the Purported Invention Was Communicated to the Named Inventors* ............................................................................94 |
|     | e.   |       | Obviousness Under 35 U.S.C. § 103. ...................................................98 |
|     |      | i.    | *Illustrative Obviousness Combinations* ....................................99 |
|     |      | ii.   | *No Secondary Considerations* .................................................255 |
| VII. |     |       | INVALIDITY BASED ON OBVIOUSNESS-TYPE DOUBLE PATENTING ............263 |
| VIII. |    |       | INVALIDITY UNDER 35 U.S.C. § 112 .......................................................271 |
|     | a.   |       | Applicable Law ....................................................................271 |
|     |      | i.    | Enablement ..............................................................271 |
|     |      | ii.   | Indefiniteness ..........................................................272 |
|     |      | iii.  | Improper Dependency ...............................................272 |
|     | b.   |       | Enablement. .........................................................................273 |
|     |      | i.    | If the Government contends that any prior art is not enabling because it does not disclose the results of human studies, none of the Asserted Claims is enabled because the specifications disclose only animal data. 274 |
|     |      | ii.   | If the Government contends that any prior art is not enabling because it does not disclose sufficient PrEP efficacy, none of the Asserted Claims is enabled because the specifications fail to disclose efficacy in all subjects. ................................................................276 |
|     |      | iii.  | Claim 13 of the '509 Patent and claims 1-19 of the '423 Patent are not enabled because the specifications fail to disclose efficacy for tenofovir esters or prodrugs other than TDF. .........................................277 |
|     |      | iv.   | The Asserted Claims that recite oral administration of tenofovir are not enabled. ...................................................................278 |
|     | c.   |       | Indefiniteness. .....................................................................279 |
|     |      | i.    | Claims reciting "[a] process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human" are indefinite. ................279 |
|     |      | ii.   | Claims in which the selection in step (a) is not necessarily the subject of step (b) are indefinite. ........................................280 |
|     |      | iii.  | Claims reciting "several days, weeks or months" are indefinite. ............282 |
|     |      | iv.   | Claims reciting "the exposure" without defining an exposure are indefinite. ...................................................................282 |
|     |      | v.    | Claim 13 of the '509 Patent is indefinite because it recites "the primate host" without defining a primate host. ...............................284 |
|     |      | vi.   | Claim 4 of the '509 Patent is indefinite because it recites "the human" without defining a human. .........................................285 |

*vii.*     Claim 15 of the '423 Patent is indefinite because it recites "the host" without defining a host........................................................................286

*viii.*    Claim 6 of the '191 Patent is indefinite because it recites "a humans immunodeficiency virus."...............................................................286

*ix.*      The claims that recite "potential exposure the human to the human immunodeficiency retrovirus" are indefinite. ...........................................287

d.    Improper Dependency..............................................................................288

*i.*      Claim 3 of the '509 Patent is improperly dependent. .............................288

*ii.*     Claim 13 of the '509 Patent is improperly dependent. ...........................289

*iii.*    Claim 3 of the '333 Patent is improperly dependent. .............................290

## I.     __INTRODUCTION__

In this case, the Government asserts four patents against Gilead: U.S. Patent

Nos. 9,044,509 ("the '509 Patent"); 9,579,333 ("the '333 Patent"); 9,937,191 ("the '191

Patent"); and 10,335,423 "the '423 Patent") (collectively, "the Patents-in-Suit").  The Patents-in-

Suit and the claims asserted against Gilead in the Complaint, and those claims identified by the

Government in its Initial Infringement Contentions are listed in the below chart (collectively, the

"Asserted Claims").[1]

| Patent Number | Asserted Claims in Complaint | Claims Included in Infringement Contention Charts |
|---|---|---|
| 9,044,509 | 1, 13 | 1-11, 13 |
| 9,579,333 | 1, 13 | 1-11, 13 |
| 9,937,191 | 1, 13 | 1-19 |
| 10,335,423 | 1, 12 | 1-19 |

## II.     __RESERVATIONS__

Gilead makes these Invalidity Contentions based upon its current knowledge,

understanding and belief as to the facts and information available as of the date of these

Invalidity Contentions.  Except as identified expressly below, these Invalidity Contentions reflect

the Government's apparent interpretation of the Patents-in-Suit and the Asserted Claims as

reflected in its Complaint and Initial Infringement Contentions.

Discovery in this action and Gilead's investigation of the facts relating to this action are

ongoing.  Gilead reserves the right to amend, supplement, or materially modify the disclosures

made herein as new, additional, or different information is discovered through fact, expert,

and/or third-party discovery, after the Court has construed the Asserted Claims of the Patents-in-

---

[1]     The Government cancelled claims 12 and 14-18 of the '509 Patent (IPR2019-01453, Ex. 2027) and claims 12 and 14-17 of the '333 Patent (IPR2019-01454, Ex. 2028) via statutory disclaimer pursuant to 35 U.S.C. § 253.

Suit and/or if the Government alters its Initial Infringement Contentions.  Gilead further will present expert opinions in accordance with the Scheduling Order in this case.

The Government's failure to comply with its discovery obligations, including the Scheduling Order in this case, has prejudiced Gilead's ability to prepare these Initial Invalidity Contentions.  For example, the Scheduling Order states that "[b]y October 29, 2020, Plaintiff shall produce inventor documents, including experimental data relating to the asserted patent(s)." D.I. 27, ¶ 7(c).  The Government failed to do that, as explained in Gilead's letters of December 21, 2020, and January 20, 2021.  The Government's ESI production has been particularly deficient:  To date, the Government appears to have produced only 232 emails from the inventors.  The Government has also disclosed that it has deleted all emails that were in the custody of two of the inventors and deleted certain emails from key time periods from two other inventors.  *See* Gov't Initial Disclosures Under Paragraph 3 of the Del. Default Standard for Discovery at 5 (July 31, 2020).  Despite extensive correspondence on this issue to date, the Government has failed to explain the circumstances surrounding this likely spoliation of key evidence, as explained at length in Gilead's January 20, 2021 letter.  And, also as explained in Gilead's January 20, 2021 letter, the Government has also failed to provide meaningful responses to nearly all of the interrogatories that Gilead has served, including interrogatories seeking information on the conception and reduction to practice of the alleged inventions; the individuals involved in the alleged inventions; the priority claims for the Asserted Claims; any alleged secondary considerations of non-obviousness; or the validity of the Patents-in-Suit. Gilead intends to supplement or amend these Initial Invalidity Contentions once the Government complies with its discovery obligations.

These Invalidity Contentions are not, and should not be understood as, admissions as to, or the adoption of, any particular claim scope or construction. Gilead is providing these Invalidity Contentions prior to any claim construction ruling by the Court. Any invalidity analysis depends, ultimately, upon claim construction, which is a question of law reserved for the Court. The parties have not yet engaged in briefing on claim construction. Gilead reserves the right to amend, supplement or materially modify its Invalidity Contentions based on any claim construction positions that the Government may take in this case. Gilead further reserves the right to amend, supplement or materially modify its Invalidity Contentions after the claims have been construed by the Court.

The citations to the prior art provided in these Invalidity Contentions are intended to be illustrative, but not exhaustive. Where Gilead cites to a particular drawing, figure or table, the citation encompasses the description of the drawing, figure, or table, as well as any text associated with the drawing, figure, or table, in the relevant prior art reference. Similarly, where Gilead cites to particular text concerning a table or figure in a prior art reference, the citation encompasses that table or figure as well. Also, where Gilead cites to any portion of a prior art reference as disclosing a particular limitation, that citation applies with equal force to all similar or identical instances of the limitation in each of the Asserted Claims of the Patents-in-Suit.

Gilead has endeavored to cite relevant portions of the identified prior art references, but each item of identified prior art is relied upon for all that it teaches or suggests. Uncited portions and embodiments of the identified prior art may additionally disclose, either expressly or inherently, and/or render obvious one or more elements or limitations of the Asserted Claims. Gilead reserves the right to rely upon additional uncited portions of the identified prior art to establish the invalidity of any Asserted Claim. Moreover, Gilead reserves the right to rely on

uncited portions of the identified prior art, other art, or expert testimony to provide context for, or aid in understanding of, the cited portions of the identified prior art.  Gilead also reserves the right to rely upon the knowledge of persons of ordinary skill in the relevant art as demonstrated by the Patents-in-Suit, testimony, treatises, published industry standards and/or similar documents.

The obviousness combinations of references provided below under 35 U.S.C. § 103 are also intended to be illustrative but not exhaustive.  The identified prior art describes subject matter in the same art and addresses similar or related problems.  The prior art references provide solutions to those problems, which may be similar to other disclosed problems.  There was ample reason to combine those references.  Exemplary rationales for combining the references, include, but are not limited to, teachings, suggestions and motivations in the prior art, common sense of a person of ordinary skill in the art, the combination of prior art elements according to known methods to yield predictable results, the simple substitution of one known element for another to obtain predictable results, routine experimentation, and known work in the art that prompted predictable variations of it based on design incentives or other market forces.  A skilled artisan would have had a reasonable expectation of success in reaching the alleged inventions of the Patents-in-Suit based on the prior art.

There are many combinations of the identified references and/or knowledge of persons skilled in the art that render the Asserted Claims obvious.  Gilead reserves the right to use any such combinations in this action.  Further, to the extent that the Government asserts that a limitation is not disclosed in a prior art reference, Gilead reserves the right to contend that the limitation is obvious based on the prior art reference and/or identify other references that may render the allegedly missing limitation obvious.  Further, Gilead reserves the right to respond to

any evidence or argument from the Government regarding any alleged objective indicia of non-obviousness.

## III.     THE PATENTS-IN-SUIT

### a.     Overview.

The Patents-in-Suit are titled "Inhibition of HIV Infection Through Chemoprophylaxis," and generally relate to methods of protecting a primate host from infection by an immunodeficiency retrovirus.  The named inventors for all four patents are Walid M. Heneine, Thomas M. Folks, Robert Janssen, Ronald Otten, and Jose Gerardo Garcia Lerma.  The '509 Patent issued on June 2, 2015; the '333 Patent issued on Feb. 28, 2017; the '191 Patent issued on April 10, 2018; and the '423 Patent issued on July 2, 2019.

The Patents-in-Suit all share a common specification ("the specification").[2]  The specification discloses generally that the alleged inventions involve "a process for inhibiting initial infection by a retrovirus such as human immunodeficiency virus (HIV) and in particular to a combination of a nucleoside reverse transcriptase inhibitor (NRTI) and a nucleotide reverse transcriptase inhibitor (NtRTI) capable of preventing self-replicating retroviral infection, even in response to multiple viral challenges."  '509 Patent at 1:18-24.  The specification states that the alleged invention is "achieved by administering to [a] primate host a combination of a pharmaceutically effective amount of a nucleoside reverse transcriptase inhibitor and a pharmaceutically effective amount of a nucleotide reverse transcriptase inhibitor prior to exposure to the immunodeficiency retrovirus."  *Id.* at 2:11-16.

---

[2]     This document cites to the specification of the '509 Patent, but the identical substantive disclosures are also found in the specifications of the '333, '191, and '423 Patents.

Human immunodeficiency virus ("HIV") is identified as a representative immunodeficiency retrovirus.  *Id.* at 1:19-24.  The specification identifies numerous, non-limiting representative nucleotide reverse transcriptase inhibitors ("NtRTIs"), of which tenofovir[3] is an example.  *Id.* at 5:61-6:2.  The specification similarly identifies numerous, non-limiting representative nucleoside reverse transcriptase inhibitors ("NRTIs"), of which emtricitabine ("FTC") is identified as an example ("NRTI").  *Id.* at 5:53-60.  NRTIs and NtRTIs are each a class of compounds, among others, that was known to be administered in combination for purposes of treating human immunodeficiency virus ("HIV") prior to the earliest priority date to which the Asserted Claims are entitled.  *See, e.g.*, '509 Patent at 1:56-60.

The specification discloses the methodology and results of several experiments involving the challenge of macaques with an immunodeficiency retrovirus, simian human immunodeficiency virus ("SHIV"), while those macaques were administered either an NRTI, an NtRTI, or a combination thereof prior to challenge with SHIV.  *Id.* at 7:26-12:24; *see also* Figs. 1-4.  The specification identifies four groups of macaques to which tenofovir, tenofovir disoproxil fumarate ("TDF"), FTC, or a combination thereof were administered either orally or subcutaneously prior to challenge with SHIV.[4]  *See, e.g.*, '509 Patent at 7:10-41, 11:5-13.  All groups of macaques were challenged rectally with SHIV.  *Id.* at 7:14-16.  The antiretrovirals were administered to each group of macaques once daily.  The rectal SHIV challenges were repeated once weekly for up to fourteen weeks.  *Id.*

---

[3]     Tenofovir is also known as 9-[9(R)-2-(phosphonomethoxy)propyl]adenine ("PMPA").

[4]     The specification further discloses an additional group of macaques to which tenofovir and lamivudine were administered in the form of a gel inserted rectally prior to SHIV challenge. '509 Patent at 11:5-24.

The first group of six macaques, Group 1, was subcutaneously administered 20 mg/kg of FTC two hours before SHIV challenge; four of the six macaques in Group 1 became infected with SHIV. *Id.* at 9:15-16, 9:61-65, Figs 1-2. Group 2, also consisting of six macaques, was orally administered 20 mg/kg of FTC and 22 mg/kg of TDF two hours before SHIV challenge. *Id.* at 9:16-17. The written specification of the Patents-in-Suit recites that "[o]f the 6 macaques in Group 2, 4 were protected and only 2 (animal reference numbers AI-54 and AG-81) became infected at exposures 9 and 12. Compared to controls, infection in this group is reduced by 7.8-fold (Cox proportional hazard ratio [HR]=7.8, p=0.0075)." *Id.* 9:53-57. However, Figure 2 of the Patents-in-Suit discloses a different result—the bar graph indicates that 50% of the macaques included in Group 2 became infected during the fourteen week period in which the macaques were rectally challenged with SHIV. '509 Patent, Fig. 2. As the Patents-in-Suit report that there were six macaques in Group 2, *see, e.g. id.* at 9:16-17, Figure 2 reports that three out of six macaques became infected. The Patents-in-Suit do not address this discrepancy as to the results of the disclosed experiments.[5]

The six macaques consisting of Group 3 were administered 20 mg/kg of FTC and 22 mg/kg of tenofovir subcutaneously two hours before SHIV challenge; none of the six macaques in Group 3 experienced established retroviral infections following viral challenge. *Id.* at 9:18-20, 9:50-53, Figs. 1-2. The specification further discloses a fourth group consisting of four macaques to which 20 mg/kg of TDF was administered orally before SHIV challenge; three of

---

[5]     To the extent that the Government relies upon later publications, such as the disclosure of results for each of the macaque groups in J. Gerardo García-Lerma et al., *Prevention of Rectal SHIV Transmission in Macaques by Daily or Intermittent Prophylaxis with Emtricitabine and Tenofovir*, 5 PLoS Medicine (2) 291 (2008), as seen in its Complaint, this is irrelevant to the content of the Patents-in-Suit. *See, e.g.*, Complaint (D.I. 1) at 27-30 (¶¶108-118). This includes later discussion of the inconsistent disclosure of results for Group 2 in the Patents-in-Suit. *See* Complaint (D.I. 1) at 30 (¶¶116-117).

the four macaques were reported to have experienced established retroviral infections following viral challenge.[6]  *Id.* at 9:37-38, 10:6-9, Fig. 2; *see id.* at 9:38-39 ("Data with TDF (20 mg/kg) is also provided for comparison.").

The claims of the Patents-in-Suit recite methods of administration including, *inter alia*, orally administering a combination of a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir, tenofovir disoproxil fumarate, tenofovir ester, or a tenofovir prodrug[7] to a primate host not infected with an immunodeficiency retrovirus prior to the primate host's exposure to that immunodeficiency retrovirus.  *See, e.g.*, '509 Patent at claim 1; *see also* claim 13 (claiming the use of a pharmaceutically effective amount of tenofovir or tenofovir ester in combination with emtricitabine).

**b.      Priority Date.**

The Patents-in-Suit claim priority to U.S. Provisional Application 60/764,811 ("Provisional Application"), filed on February 3, 2006.  In the Complaint, the Government did not allege a specific priority date for the Patents-in-Suit, only noting that the '509 Patent "claims priority to the 2006 Provisional Application."  D.I. 1 at ¶ 197.  However, in Plaintiff's Objections and Responses to Defendants' First Set of Interrogatories (Nos. 1-18) (Sept. 30, 2020), at 36-37 (emphasis added), in its Response to Interrogatory No. 13, the Government asserted that "each of the Patents-in-Suit claim priority from U.S. Provisional Application No. 60/764,811, filed

---

[6]      The specification states that the group of macaques to which TDF was administered orally is "also provided for comparison," '509 Patent at 9:37-38, and cites Subbarao *et al.*, *Chemoprophylaxis with tenofovir disoproxil fumarate provided partial protection against Infection with simian human immunodeficiency virus in macaques given multiple virus challenges*, 194 J. Infect. Dis. 904-11 (2006).  *Id.* at 10:6-9, 11:54-62.

[7]      The terms "tenofovir," "tenofovir disoproxil fumarate," "tenofovir ester," and "tenofovir prodrug," are used variously throughout the claims of the Patents-in-Suit.  These terms may be subject to claim construction in accordance with the Scheduling Order set forth by the Court. These Invalidity Contentions are not, and should not be understood as, admissions as to, or the adoption of, any particular claim scope or construction.

February 3, 2006.  ***The Government contends that each asserted claim of the Patents-in-Suit is entitled to claim priority from U.S. Provisional Application No. 60/764,811, filed February 3, 2006***."

As detailed in Section V below, the Asserted Claims are not supported by the disclosure contained in the Provisional Application and are thus not entitled to the February 3, 2006 filing date of the Provisional Application pursuant to 35 U.S.C. § 119(e)(1).  Even assuming that the Asserted Claims are entitled to the filing date of the Provisional Application, the Asserted Claims are invalid.  For purposes of this document, where Gilead indicates that a concept was known before the alleged invention of the Patents-in-Suit, except as otherwise specified, the referenced date assumes the earliest possible date of priority to which the Patents-in-Suit could be entitled.

## IV.   LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art would have been an individual familiar with treatment and prophylaxis of HIV or similar viruses in individuals in a clinical and/or pre-clinical setting.  The knowledge held by such a person would have resulted from that person's education, training and experience, which would have included, for example, either an M.D. or an advanced degree in an allied field (e.g., microbiology, epidemiology, public health), along with 2-3 years of experience in those fields or in treating patients.

## V.   PRIORITY DATE

The Asserted Claims are not entitled to the February 3, 2006 filing date of the Provisional Application.  The Asserted Claims purport to cover processes for protecting any primate host from a self-replicating infection by any immunodeficiency retrovirus through any route of administering pharmaceutically effective amounts of tenofovir (or TDF or tenofovir ester or tenofovir prodrug) and FTC.  However, the disclosure of the Provisional Application ***only***

describes the testing and results of subcutaneously administering tenofovir and FTC in six macaques.  This is insufficient to satisfy the written description and enablement requirements of 35 U.S.C. § 112 ¶ 1, as required by 35 U.S.C. § 119(e)(1), in order for the Asserted Claims to be accorded the benefit of the Provisional Application's filing date for purposes of priority.  *See E.I. du Pont de Nemours & Co. v. MacDermind Printing Sols., L.L.C.*, 525 F.3d 1353, 1358 (Fed. Cir. 2008) ("[T]he provisional must comply with the requirements of section 112, first paragraph, and the non-provisional must be for the same invention"); *see also New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1296 (Fed. Cir. 2002).

### a.  The Asserted Claims Are Not Fully Supported By The Written Description Of The Provisional Application.

Section 112 requires that "[t]he specification shall contain a written description of the invention . . . ."  35 U.S.C. § 112.  An adequate written description "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *See, e.g.*, *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  The written description must be commensurate with the scope of the claims.  *See, e.g.*, *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1319 (Fed. Cir. 2017).

"[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art," *Ariad Pharm. Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc), to determine whether "the patentee has provided an adequate description that 'in a definite way identifies the claimed invention' in sufficient detail such that a person of ordinary skill would understand that the inventor had made the invention at the time of filing." *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1308 (Fed. Cir. 2015) (quoting *Ariad*, 598 F.3d at 1352).

The written description requirement is "satisfied only if the inventor conveys with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention, and demonstrates that by disclosure in the specification of the patent." *Nuvo Pharm. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1376 (Fed. Cir. 2019) (alterations omitted) (quoting *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1348 (Fed. Cir. 2011)).  And "[o]ne shows that one is 'in possession' of the invention by describing the *invention, with all its claimed limitations*, not that which makes it obvious." *Uniloc USA, Inc. v. Sega of Am., Inc.*, 711 F. App'x 986, 989 (Fed. Cir. 2017) (alteration and emphasis in original) (quoting *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)); *see also Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1359 (Fed. Cir. 2010) (requiring that the "prior application itself must describe an invention . . . in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought." (omission in original) (internal quotation marks omitted) (quoting *Lockwood*, 107 F.3d at 1572)).

   *i.*  ***The Patents-in-Suit Claim Oral Administration of Antiretrovirals for Prophylaxis***

All of the Asserted Claims encompass administering the combination of tenofovir (or TDF or tenofovir ester or tenofovir prodrug) and FTC to the selected host subject via an oral route of administration.  *See, e.g.*, '509 Patent at claim 1.  For example, claim 1 of the '509 patent claims a method of administering the "combination comprising . . . emtricitabine; and . . . tenofovir disoproxil fumarate, wherein the combination is administered prior to an exposure of the primate host to the immunodeficiency retrovirus . . . wherein the combination is ***administered orally***." *Id.* (emphasis added).  Claim 13, which depends from claim 12, of the '509 Patent similarly claims administering to an "uninfected human a combination comprising: . . .

emtricitabine; and . . . tenofovir or tenofovir ester; thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human, wherein the combination is ***administered orally***." '509 Patent, claims 12 & 13 (emphasis added).  But disclosure of possession of orally administered pre-exposure prophylaxis with a combination of tenofovir (or TDF or tenofovir ester or tenofovir prodrug) and FTC is wholly absent from the disclosure provided in the Provisional Application, which thereby fails to demonstrate that the inventors were in possession of such an orally administered pre-exposure prophylaxis as of the Provisional Application's February 3, 2006, filing date.

> ii.     ***The Provisional Application Fails to Demonstrate Possession of Oral Administration of FTC and Tenofovir (or TDF or Tenofovir Ester or Tenofovir Prodrug)***

The disclosure of the Provisional Application consists of four sections presented in series and largely without connection between the disclosure contained in each.  The first section of the Provisional Application contains a research abstract titled "Prevention of rectal SHIV transmission in macaques by tenofovir/FTC combination."  Provisional Application at 5.  The abstract explains that "[c]hemoprophylaxis with antiretrovirals as a strategy to prevent the transmission of human immunodeficiency virus (HIV) is being explored," and states that [a]vailable data on tenofovir using macaque models of simian HIV (SHIV) mucosal infection suggest that tenofovir is not sufficiently protective at concentrations equivalent to those currently used in humans."  *Id.*  The abstract summarizes a macaque experiment, and the results thereof, wherein a combination of tenofovir/FTC (22mg/kg and 20mg/kg, respectively) was subcutaneously administered daily to a group of macaques prior to repeated weekly low-dose rectal SHIV challenge.  *Id.*  According to the abstract, "all six animals treated with tenofovir/FTC were fully protected."  *Id.*  The abstract also reports the results of a control group,

to which antiretrovirals were not administered prior to weekly rectal SHIV challenge—five of six control animals became infected over the course of repeated challenges.  *Id.*

The second section consists of a slide deck titled "Prevention of Rectal SHIV Transmission in Macaques by Tenofovir/FTC Combination," and identifies Walid Heneine on its title slide.  Provisional Application at 6-17.  The slide deck also summarizes macaque experiments.  The "Introduction" slide states that "macaque models show that tenofovir can provide substantial protection against parenteral or mucosal virus exposures," but that "this protection may be reduced at lower drug doses equivalent to those used in humans"; [c]urrent human trials with tenofovir will ultimately determine the efficacy of this intervention."  *Id.* at 7. The slide deck proceeds to summarize the materials and methods, as well as results for a group of "six male Rhesus macaques injected subcutaneously with tenofovir 22 mg/kg and FTC 20 mg/kg once daily."[8]  *Id.* at 9-14.  The slides disclose that all six macaques to which tenofovir and FTC were administered subcutaneously remained protected throughout the course of the experiment.  *Id.* at 11.  The slide deck also discloses the results of a similar macaque experiment, wherein a daily dose of 20 mg/kg FTC was subcutaneously administered to a group of six Rhesus macaques for the similar purpose of investigating the compound's prophylactic effects against retroviral infection.  *Id.* at 12.  The slide deck discloses that two of the six macaques to

---

[8]      The Provisional Application does not identify whether this is the same group of macaques for which methods and results were described in the first section research abstract.

which FTC was administered subcutaneously became infected through repeat rectal SHIV challenge.[9]  *Id.* at 13.

The slide deck further presents "Summaries and Conclusions." *Id.* at 15-16.  The slide deck recites that though subcutaneous "tenofovir/FTC combination protected all 6 treated animals from infection after 14 repeated rectal SHIV exposures," the "observed protection by tenofovir and FTC may not reflect that of Truvada, because a higher dose of tenofovir was used." Provisional Application at 15.  The slide deck continues and states that "ongoing study suggests that FTC alone at a dose similar to that used in humans shows a predicted efficacy ~75%," and "appears very effective," though "conclusive data [sic] when study is completed." *Id.* at 16.  The slide deck queries whether "adding tenofovir to FTC at a dosing similar to that in Truvada may enhance further the protection."  *Id.*

The third section of the Provisional Application is a print-out of three lists from the website of the U.S. Food & Drug Administration ("FDA") and is identified as being "current [as of] October 2005."  Provisional Application at 18-22.  The print-out is dated February 2, 2006.

---

[9]     The disclosure of the results of the macaque experiments in the Provisional Application is both incomplete and contradictory of the disclosure of the Patents-in-Suit.  The Provisional Application only reports ten out of fourteen weeks of the FTC macaque study. *Compare* Provisional Application at 13, 16 *with* '509 Patent, Fig. 2, 9:15-16, 9:61-67.  The Provisional Application reports that the "FTC-treated" macaques received a "high level of protection of rectal SHIV transmission by FTC alone," reporting that four out of six macaques remained protected at ten weeks. Provisional Application at 13.  The Provisional Application even provides "Summary and Conclusions" therefrom, stating, *inter alia*, that "Ongoing study suggests that FTC alone at a dose similar to that used in human shows a predicted efficacy of ~75%," that "In the Cox proportional hazards model control monkeys are 5.7 times more likely to become infected than treated monkeys (p-value is 0.024), and that "Single-drug prophylaxis with FTC appears very effective."  Despite advancing these conclusions, the Provisional Application acknowledges that "conclusive data" will be available "when study is completed." *Id.*

However, the Patents-in-Suit report quite different results for the FTC group.  Figure 2 shows that for the subcutaneous FTC-treated macaque group (Group 1), ***four out of six*** macaques became infected.  '509 Patent, Fig. 2.  The specification report accords—"Of the 6 macaques in Group 1, receiving FTC only, 2 remained protected after 14 exposures and 4 had the first detectable viral RNA at exposure 5 (AG-80), 10 (AG-46), 12 (AH-04), and 13 (AG-07), respectively."  *Id.* at 9:61-65.

The first list, "Drugs Used in the Treatment of HIV Infection," purports to recite all drug products that were approved FDA for the treatment of HIV Infection as of October 2005.  The list recites thirteen different drug products under the category of nucleoside reverse transcriptase inhibitors, three different products under the category of nonnucleoside reverse transcriptase inhibitors, eleven drug products under the category of protease inhibitors, and one drug product under the category of fusion inhibitor.  *Id.* at 18-19.  The print-out further lists "Generic Drugs Used in the Treatment of HIV Infection," of which there are five entries, *id.* at 20, as well as "Drugs Used in the Treatment of Pediatric HIV Infection," for which there are twenty separate entries.  *Id.* at 21.

The fourth and final section of the Provisional Application contains a set of broad claims submitted along with the three sections just described.  *Id.* at 24-25.  Claim 1, for example, recites "a composition for the prevention of HIV transmission comprising a plurality of antiretroviral compounds."  *Id.* at 24.  The other claims are of a similarly broad scope.  Claim 8 recites:

> A method of preventing HIV transmission in a subject, comprising administering to the subject a therapeutically effective amount of a composition comprising a plurality of antiretroviral compounds in sufficient amounts to prevent viral infection in the subject.

*Id.* at 24.  Claim 10, which depends from claim 8 recites:

> The method of claim 8, wherein the wherein [sic] at least one of the plurality of antiretroviral compounds is selected from the group consisting of tenofovir, FTC United States Food and Drug administration approved drugs used in the treatment of HIV infection, generic drugs used the in the treatment of HIV infection, United States Food and Drug Administration approved drugs used in the treatment of pediatric HIV infection and derivatives thereof.

*Id.*  And claim 14, which also depends from claim 8 recites:

15

> The method of Claim 8, wherein administration of the plurality of antiretroviral compounds is selected from the group consisting of topical, oral and injectable.

*Id.* at 25.

Other than the bare mention of oral administration of a plurality of antiretroviral compounds in claim 14, the Provisional Application contains no other disclosure of oral administration of any antiretroviral compounds.

The disclosure of the Provisional Application is inadequate to support the claims of the Patents-in-Suit at least because the Provisional Application fails to sufficiently, and specifically, disclose pre-exposure prophylaxis via ***oral administration*** of a combination of pharmaceutically effective amounts of FTC and tenofovir (or TDF or tenofovir ester or tenofovir prodrug), such that a skilled artisan would understand the inventors to have been in possession of such a method of administration as of the Provisional Application's filing date.

The written description inquiry must be conducted from the view of each claim "as an integrated whole rather than as a collection of independent limitations" and one may not approach the analysis by "'working backward'" from the claims to "derive written description support from an amalgam of disclosures plucked selectively from the [original specification]." *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1349 (Fed. Cir. 2013) (quoting *In re Ruschig*, 379 F.2d 990, 995 (C.C.P.A. 1967)); *see also Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323-27 (Fed. Cir. 2000) (invalidating claims where though it was possible for a skilled artisan to "piece together the [claim] limitation, neither the text accompanying the examples, nor the data, nor anything else in the specification in any way emphasizes" or "direct[s]" a skilled artisan to that disclosure); *In re Ruschig*, 379 F.2d at 995 (C.C.P.A. 1967) ("working backwards" from the claims is an incorrect "standpoint").

To the extent that the Government asserts that the Provisional Application discloses pieces of information relating individually to separate elements of the Asserted Claims, the Provisional Application fails to tie any such disclosure together in a manner that constitutes disclosure of the claimed methods as an integrated whole.  As discussed above, the Provisional Application is broken into four sections.  The experimental abstract and the Heneine Presentation are the first two, and both relate to subcutaneous tenofovir/FTC macaque study protocols and data.  The third section is the list of antiretrovirals, as of October 2005, that were "Drugs Used in the Treatment of HIV Infection."  And the fourth section is a set of provisional claims, the most relevant of which are claims 8 and 14, and are set forth above.  However, at no point does the Provisional Application connect these independent disclosures to provide adequate support for claims to orally administered pre-exposure prophylaxis with the combination of FTC and tenofovir (or TDF or tenofovir ester or tenofovir prodrug).

Nowhere within the Provisional Application is there adequate disclosure of oral administration as is encompassed by all of the Asserted Claims—*e.g.* '509 Patent, claim 1, "wherein the combination is administered orally."  Statements made within the Provisional Application indicate that the inventors lacked possession of orally administered pre-exposure prophylaxis with a combination of FTC and tenofovir (or TDF or tenofovir ester or tenofovir prodrug).  In discussing the results of the macaque group to which the combination of tenofovir and FTC was administered subcutaneously, the Heneine Presentation states that "[t]he observed protection by tenofovir and FTC may not reflect that of Truvada, because a higher dose of tenofovir was used."  Provisional Application at 15.  But a skilled artisan would have known that Truvada® was an orally administered tablet containing a co-formulation of TDF and FTC, and that the Heneine Presentation was contrasting this to the subcutaneous combination of tenofovir

and FTC disclosed therein in the Provisional Application.  *See, e.g.*, Truvada® Insert at 1.

("TRUVADA Tablets are fixed dose combination tablets containing emtricitabine and tenofovir

disoproxil fumarate. . . .  TRUVADA Tablets are for oral administration.").  The Provisional

Application further states, with respect to the results of the macaque group to which FTC was

administered subcutaneously, that "[a]dding tenofovir to FTC at a dosing similar to that in

Truvada may enhance further the protection,"  Provisional Application at 16, thus further

indicating that the inventors had not tested such orally administered pre-exposure prophylaxis

with a combination of FTC and tenofovir (or TDF or tenofovir ester or tenofovir prodrug).

Not only is the disclosure of the claimed methods as an integrated whole—the "hallmark

of written description," *Ariad*, 598 at 1351—fully absent from the Provisional Application's

disclosure, but such forward-looking, prophetic statements are the antithesis of demonstrating

possession to a skilled artisan.  *See Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d

1353, 1362 (Fed. Cir. 2011) ("A mere wish or plan for obtaining the claimed invention is not

adequate written description." (internal quotation marks omitted) (quoting *Centocor*, 636 F.3d at

1348)); *Ariad*, 598 F.3d at 1352 ("[I]t is the specification itself that must demonstrate

possession.").  Because the disclosure of the Provisional Application fails to comply with the

requirements of 35 U.S.C. § 112 ¶ 1, as required by 35 U.S.C. § 119(e)(1), at least with respect

to the claimed methods of orally administering combinations of FTC and tenofovir (or TDF or

tenofovir ester or tenofovir prodrug), the claims of the Patents-in-Suit are not entitled to the

benefit of the filing date of the Provisional Application.

Claim 14 of the Provisional Application, which recites topical, oral, or injectable

"administration of the plurality of antiretroviral compounds," merely constitutes disclosure of a

broad and undifferentiated genus with a complete absence of the blaze marks to direct a skilled

artisan to the specific combination of orally administered FTC and tenofovir (or TDF or tenofovir ester or tenofovir prodrug) for pre-exposure prophylaxis that was later claimed in the Patents-in-Suit.

The written description requirement under Section 112 has often been determined to be unfulfilled and applied to "hold claims invalid in cases where a patent's written description disclosed certain subject matter in terms of a broad genus but its claims specified a particular subgenus or species contained therein." *Novozymes*, 723 F.3d at 1346; *see also Idenix Pharm. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1164 (Fed. Cir. 2019) (similarly discussing the requirement for blaze marks where a specification discloses a genus, but doing so in the context of claims covering the genus as a whole). Here, the only integrated disclosure in the Provisional Application of orally administered pre-exposure prophylaxis merely constitutes disclosure of a broad genus without any blaze marks to guide to a skilled artisan to the later claimed species.

Claim 14 of the Provisional Application recites administration that is "orally," "topically," or "injectable." Provisional Application at 25. As disclosed in claim 8, from which claim 14 depends, these three methods of administration are used to administer "a therapeutically effective amount of a composition comprising a plurality of antiretroviral compounds in sufficient amounts to prevent viral infection in the subject" as part of a "method of preventing HIV transmission in a subject." *Id.* at 24. Claim 8 provides no limit on the number or identity of antiretroviral compounds in the "plurality of antiretroviral compounds," nor what quantities constitute a "therapeutically effective amount." The claims, like the Provisional Application as a whole, lack blaze marks that would guide a skilled artisan to the species of pre-exposure prophylaxis comprising a combination of FTC and tenofovir (or TDF or tenofovir ester or tenofovir prodrug) via oral administration that the Government later claims in the Patents-in-

19

Suit.  *See, e.g.*, '509 Patent, claim 1 (claiming a method "administering" a "combination comprising" emtricitabine and "tenofovir or tenofovir disoproxil" "wherein the combination is administered orally").  Claim 14's bare recitation of "oral" one of several possible methods of "administration of the plurality of antiretroviral compounds" is insufficient to rescue the Government's priority claim.

Claim 10, which also depends from claim 8, recites that "at least one of the plurality of antiretroviral compounds is selected from the group consisting of tenofovir, FTC United States Food and Drug Administration approved drugs used in the treatment of HIV infection, generic drugs used in the treatment of HIV infection, United States Food and Drug Administration approved drugs used in the treatment of pediatric HIV infection and derivatives thereof." Provisional Application at 24 (all errors in original).  This claim illustrates the extreme breadth of the antiretroviral compounds encompassed by claim 8 and thus claim 14 (the only recitation of oral administration for purposes of prophylaxis anywhere in the Provisional Application). Moreover, the Provisional Application provides neither guidance nor limit as to the number of antiretroviral compounds that may be included in the plurality of antiretroviral compounds to be administered either orally, topically, or injectably.  The number of potential and undifferentiated combinations encompassed within the disclosure is extraordinary.  Claim 14's disclosure of administering a "plurality of antiretroviral compounds" via an oral, topical, or injectable route fails to meet the standard of disclosure required in order to comply with the written description requirement.

There is no disclosure in the Provisional Application that demonstrates possession of orally administered pre-exposure prophylaxis with a combination of FTC and tenofovir (or TDF

or tenofovir ester or tenofovir prodrug).[10]  Accordingly, the disclosure of the Provisional

Application fails to comply with the requirements of 35 U.S.C. § 112 ¶ 1, as required by 35

U.S.C. § 119(e)(1).  Because all of the Asserted Claims pertain to oral administration of the pre-

exposure prophylaxis, they are therefore not entitled to the benefit of the Provisional

Application's filing date.

## VI.   INVALIDITY BASED ON PRIOR ART

### a.   The State Of The Art.

#### i.   *Administration of FTC With Tenofovir, TDF, a Tenofovir Ester, or Tenofovir Prodrug to Treat HIV Was Well Known.*

##### 1.   General mechanisms of HIV infection and anti-HIV drugs

Human immunodeficiency virus ("HIV") infections can result when a potential host is

exposed to bodily fluids (*e.g.*, semen or blood) containing viral particles or "virions."  *See* Hans

R. Gelderblom, *Assembly and morphology of HIV: potential effect of structure on viral function*,

---

[10]     The lack of possession of the claimed orally administered pre-exposure prophylaxis as of the filing date of the Provisional Application is only further confirmed by the government's own laboratory notebooks.  The government has produced laboratory notebooks for whom the custodian is identified as "Ron Otten," one of the named inventors of the Patents-in-Suit. [US_00010961-1126]; [US_00011127-279].  Both laboratory notebooks outline the procedures, results and, most importantly, dates for prophylaxis experiments conducted in four experimental groups of macaques by the government. *See, e.g.*, [US_00010961-1126 at US_00010973-74]; [US_00011127-279 at US_00011139-40].  The four groups are: "Group 3 (subcut FTC/TFV)"; "Group 1 (subcut FTC)"; "Group 2 (Oral FTC/TDF)"; and "Group 4 (intermittent FTC/TFV)." [US_00010961-1126 at US_00010973-74]; [US_00011127-279 at US_00011139-40].

According to the government's laboratory notebooks, for "Group 2 (Oral FTC/TDF)": (1) the "pre challenge drug treatment" for the macaques therein did not begin until March 24, 2006; (2) the "initiation of challenges" did not begin until April 5, 2006; (3) the "last challenge" ranged from May 31, 2006 to July 5, 2006; and (4) the "study completion" date is identified as October 11, 2006.  To the extent the government relies on the results of these macaque experiments as the research and work underlying the alleged inventions claimed in the Patents-in-Suit, the government did not begin work on any orally dosed regimens until, at earliest, March 24, 2006, and did not complete its work until, at earliest, October 11, 2006.  Therefore, any assertion by the Government of an earlier priority date of any claims of the Patents-in-Suit encompassing orally dosed pre-exposure prophylaxis with a combination of FTC and tenofovir (or TDF or tenofovir ester or tenofovir prodrug) would be undermined by the government's own laboratory notebooks.

5 AIDS 617, 618-20 (1991) ("Gelderblom").  CD4+ cells of the immune system are a type of white blood cells that help protect the body from infection.  In a multi-step process referred to as the HIV life cycle, HIV infects CD4+ cells, uses them to replicate, and finally destroys the used CD4+ cells.  *See* Erik De Clercq, *Emerging anti-HIV drugs*, 10 Expert Opin. Emerging Drugs 241, 250-51 (2005) ("De Clercq EOED").  As the infection progresses, the host's immune response is compromised, reducing the body's ability to fight other infections and illnesses. Progression of HIV infection leads to acquired immune deficiency syndrome ("AIDS").  *See, e.g*., Charles A Janeway *et al*., *Immune Biology,* 451–65, 451-57 (5th ed. 2001) ("Janeway"); Oren Cohen *et al*, *The Immunopathogenesis of HIV Infection,* Fundamental Immunology 1455, 1474-76 (William E. Paul 4th ed. 1999) ("Cohen").

    As demonstrated in Figure 1 below, in the first (adsorption) step of the HIV life cycle, virions bind to receptors on the surface of the CD4+ cell.  *See* De Clercq EOED at 251, Fig. 2. In the second step referred to as fusion, the bound virions and cell membrane join together, allowing the genetic material from the virus known as viral RNA to enter the cell.  *Id.  See also*, Gelderblom at 618, 630; Richard A Goldsby *et al*., *Immunology* 452 (5th ed. 2003) ("Goldsby"), Fig. 19-14.  In the third step reverse transcription occurs, in which an HIV enzyme known as reverse transcriptase converts viral RNA into viral DNA.  The conversion of viral RNA to viral DNA allows the genetic information of HIV to enter the nucleus of the CD4+ cell.  The fourth step (known as integration) occurs after viral DNA enters the nucleus, where HIV uses an enzyme known as integrase to insert the viral DNA into the DNA of the host cell.  Once the viral DNA is integrated into the host DNA, HIV proteins are made with the machinery of the host cell in processes referred to as transcription and translation.  The viral enzyme protease modifies the initial HIV protein products to the proteins needed for the assembly and budding of mature

progeny virions.  *See* Goldsby at 447, Fig. 19-11.  In the next step, the new HIV proteins and viral RNA move to the surface of the cell and assemble into an immature HIV virion.  The last step, known as budding, occurs when the HIV virion is expelled from the CD4+ cell.

Although the host's immune system targets and removes the cells transformed by HIV, it becomes overwhelmed by the volume of new virions and infected CD4+ cells at some point after exposure.  *See* Ashley T. Haase, *Perils at mucosal front lines for HIV and SIV and their hosts*, 5 Nat. Rev. Immunol. 783, 784 (2005) ("Haase"); Che-Chung Tsai *et al.*, *Effectiveness of Postinoculation (R)-9-(2-Phosphonylmethoxypropyl) Adenine Treatment for Prevention of Persistent Simian Immunodeficiency Virus SIVmne Infection Depends Critically on Timing of Initiation and Duration of Treatment*, 72 J. Virol. 4265, 4271 (1998) ("Tsai 1998") ("…short temporal window during which…treatment can block establishment of persistent infection"); Jeffrey D. Lifson *et al.*, *Containment of Simian Immunodeficiency Virus Infection: Cellular Immune Responses and Protection from Rechallenge following Transient Postinoculation Antiretroviral Treatment*, 74 J. Virol. 2584, 2584 (2000) ("Lifson").  At that point, an HIV infection is considered established.  Haase at 784, 787; Christopher J. Miller *et al.*, *Propagation and Dissemination of Infection after Vaginal Transmission of Simian Immunodeficiency Virus*, 79 J. Virol. 9217, 9225-26 (2005) ("Miller").  Establishment of HIV infection occurs approximately three days after the HIV virions enter the body.



Figure 1: The viral life cycle, as exemplified by HIV. "Viral life cycles have several specific steps, many of which are targets for antiviral drugs. After virus adsorption, enveloped viruses enter the cell by virus–cell fusion. For HIV, replication of the genome occurs after reverse transcription and integration into the host cell chromosome. After transcription to RNA, translation and proteolytic processing of the precursor polypeptide, viral proteins assemble at the cell membrane, where they bud to release new virions."   De Clercq EOED at 251.

Antiretroviral drugs were known to interrupt the HIV life cycle at different stages.  *See* De Clercq EOED at 251-65.  Attachment inhibitors targeting CD4, CCR5, or CXCR4 receptors were known to stop the binding process in the first step of the life cycle.  *Id.* at 251–53.  Fusion inhibitors were known to prevent the second step by blocking entry of the HIV virions into the host cell.  Reverse transcriptase ("RT") inhibitors were known to prevent formation of viral

DNA via reverse transcription during the third step of the life cycle.  *See* Goldsby at 451-53; Pablo Barreiro *et al.*, *Combinations of Nucleoside/Nucleotide Analogues for HIV Therapy*, 6 AIDS Rev. 234, 234 (2004) ("Barreiro").  Examples of reverse transcriptase inhibitors included nucleoside-based reverse transcriptase inhibitors ("NRTIs"), nucleotide-based reverse transcriptase inhibitors ("NtRTIs"), and non-nucleotide reverse transcriptase inhibitors ("NNRTIs").  Integrase inhibitors acted to prevent integration of viral DNA into cellular DNA during the fourth step of the life cycle.  Greg Szekeres *et al.*, Center for HIV Identification, Prevention, and Treatment Services (CHIPTS), *Anticipating the Efficacy of HIV Pre-Exposure Prophylaxis (PrEP) and the Needs of At-Risk Californians* 11 (2004) ("Szekeres")[11]; *see also* De Clercq EOED at 255.  Protease inhibitors were known to prevent the assembly and budding steps by inhibiting creation of the mature viral particle.

Twenty anti-HIV compounds were approved by the FDA at least as early as 2005.  De Clercq EOED at 243-48; *see also* Erik De Clercq, *New Approaches toward Anti-HIV Chemotherapy*, 48 J. Med. Chem. 1297, 1297 (2005) ("De Clercq JMC").  They included:

- Nucleoside reverse transcriptase inhibitors (NRTIs): zidovudine, didanosine, zalcitabine, stavudine, lamivudine, abacavir, and FTC;

- Nucleotide reverse transcriptase inhibitors (NtRTIs): TDF;

- Non-nucleoside reverse transcriptase inhibitors (NNRTIs): nevirapine, delavirdine and efavirenz;

- Protease inhibitors (PIs): saquinavir, indinavir, ritonavir, nelfinavir, amprenavir, lopinavir, atazanavir and fosamprenavir; and

---

[11]     *See* [GILDDE00283156-246]; [GILDDE00283394-457]; [GILDDE00283509-737, at GILDDE00283509-679].

- Fusion inhibitors (FIs): enfuvirtide.

### 2.   TDF (Tenofovir disoproxil fumarate) and FTC (Emtricitabine)

TDF and FTC were FDA-approved and recognized as effective anti-HIV drugs, both separately (as Viread® and Emtriva®, respectively) and in combination (as Truvada®).

TDF, an NtRTI, is a fumarate acid salt of the *bis*-isopropoxycarbonyloxymethyl ester derivative of tenofovir. Viread® Insert at 1. TDF is a prodrug for tenofovir. *Id.* It requires initial hydrolysis of the ester groups for conversion to tenofovir and subsequent phosphorylation by cellular enzymes to form the active metabolite, tenofovir diphosphate. *Id.* at 2. Tenofovir diphosphate "inhibits the activity of HIV-1 reverse transcriptase by competing with the natural substrate deoxyadenosine 5′-triphosphate" and leading to DNA chain termination after incorporation into the nascent DNA. *Id.* TDF displayed antiviral activity *in vitro* against HIV-1 subtypes A, B, C, D, E, F, G and O ($IC_{50}$ values ranged from 0.5−2.2 μM). Truvada® Insert at 3.

TDF was approved in 2001 as Viread® for treating HIV-1 infection in a once-daily oral dose of 300 mg "in combination with other antiretroviral agents." *See* Viread® Drug Approval Letter at 26 (showing the date of the approval letter). Adding TDF (300 mg) to existing antiretroviral therapy for highly treatment-experienced patients with preexisting resistance mutations resulted in significant and durable reductions in HIV-1 RNA levels through week 96. De Clercq JMC at 1303. TDF was also found to be associated with infrequent development of the resistance-conveying reverse transcriptase mutation K65R. *Id.* In combination therapies with lamivudine and efavirenz, TDF demonstrated better lipid profile and lower toxicity at similar efficacy, when compared to another RT inhibitor stavudine (also known as "d4T," approved as Zerit®). De Clercq EOED at 250; *see also* De Clercq JMC at 1303.

FTC, an NRTI, is a synthetic nucleoside analog of cytidine; it is phosphorylated by cellular enzymes to form the active metabolite, emtricitabine 5'-triphosphate. Emtriva® Insert at

1.  Emtricitabine 5'-triphosphate inhibits the activity of the HIV-1 RT by competing with its natural substrate deoxycytidine 5'-triphosphate and leading to DNA chain termination after incorporation into the nascent DNA.  *Id.*  FTC displayed antiviral activity *in vitro* against HIV-1 subtypes A, B, C, D, E, F, and G ($IC_{50}$ values ranged from $0.007-0.075$ μM) and showed strain specific activity against HIV-2 ($IC_{50}$ values ranged from $0.007-1.5$ μM).  *Id.* at 2.  FTC consistently demonstrated higher *in vitro* potency than another NRTI, lamivudine (also known as "3TC," approved as Epivir®).  Laurene H. Wang, *Pharmacokinetic and Pharmacodynamic Characteristics of Emtricitabine Support Its Once Daily Dosing for the Treatment of HIV Infection*, 20 AIDS Res. Hum. Retroviruses 1173, 1173 (2004) ("Wang").  In addition, FTC selects for the resistance-conferring M184V mutation less often and less rapidly than lamivudine *in vitro*.  *Id.*

FTC was approved in 2003 as Emtriva® for treating HIV-1 infection in a once-daily oral dose of 200 mg "in combination with other antiretroviral agents."  De Clercq JMC at 1302; *see also* Emtriva® Drug Approval Letter at 5 (showing the date of the approval letter); Emtriva® Insert at 6.  A once-daily combination therapy of FTC, didanosine and efavirenz had proven safe, antivirally effective, and also immunologically effective.  De Clercq JMC at 1302; *see also* Wang at 1181.  Moreover, this once-daily FTC combination regimen demonstrated durable and superior virologic efficacy and tolerability compared to a twice-daily regimen of stavudine, also combined with didanosine and efavirenz.  De Clercq JMC at 1302; *see also* De Clercq EOED at 250.  FTC was considered an "ideal drug candidate" because it showed synergism with other antiretrovirals, had excellent tolerability, a long intracellular half-life (supporting once-daily dosing), and 4- to 10-fold higher *in vitro* potency against HIV than lamivudine.  De Clercq JMC at 1302.

Lastly, a combined oral dosage form of TDF and FTC, namely Truvada®, was approved for use in HIV-1 treatment in 2004, as detailed *infra* in Section VI.a.i.4.

### 3.   Combination Therapy

The most effective treatments for HIV relied on administration of more than one antiretroviral drug, known as combination therapies.  Administration of one drug (monotherapy) for HIV was known to provide insufficient and unsustainable viral suppression.  Mark B. Feinberg, Centers for Disease Control and Prevention, *Report of the NIH Panel to Define Principles of Therapy of HIV Infection and Guidelines for the Use of Antiretroviral Agents in HIV-Infected Adults and Adolescents*, 47(RR-5) Morbidity and Mortality Weekly Report 1, 10-11 (1998) ("Feinberg"); Ingrid V. Bassett, *Two Drugs or three? Balancing Efficacy, Toxicity, and Resistance in Postexposure Prophylaxis for Occupational Exposure to HIV*, 39 Clin. Infect. Dis. 395, 396 (2004) ("Bassett").  It was appreciated in the art that viruses including HIV were prone to mutations, and that monotherapies risked generating drug-resistant virus strains. Feinberg at 10; John M. Coffin, *HIV Population Dynamics in Vivo: Implications for Genetic Variation, Pathogenesis, and Therapy*, 267 Science 483, 487 (1995) ("Coffin"); Szekeres at 11 (discussing susceptibility of TDF monotherapy to prevalent K65R mutation).  Combination therapies using antiretroviral drugs with different mechanisms of action and resistance profiles provided improved antiviral activity and reduced risk of mutation-mediated resistance.  *See* Feinberg at 10; International Application Publication WO 2004/064845 A1 to Gilead at 2 ("Dahl").  With some exceptions, combination therapies with RT inhibitors had "proven to be highly effective in suppressing viral replication to unquantifiable levels for a sustained period of time."  Dahl at 2.

Combination therapy was long established as the "gold standard" of care for both treating and preventing HIV infections.  De Clercq EOED at 241; Barreiro at 234.  In 1998, before the

28

approval of any NtRTI, the CDC guidelines recommended combination therapy using two

NRTIs along with a protease inhibitor or a NNRTI.  Feinberg at 11 (treatment); Linda A.

Chiarello *et al.*, Centers for Disease Control and Prevention, *Public Health Service Guidelines*

*for the Management of Health-Care Worker Exposures to HIV and Recommendations for*

*Postexposure Prophylaxis*, 47(RR-7) Morbidity and Mortality Weekly Report 1, 8-9 (1998)

("Chiarello"); *see also* Elise M. Beltrami *et al.*, Centers for Disease Control and Prevention,

*Updated U.S. Public Health Service Guidelines for the Management of Occupational Exposures*

*to HBV, HCV, and HIV and Recommendations for Postexposure Prophylaxis*, 50(RR-11)

Morbidity and Mortality Weekly Report 1, 24-27 (2001) ("Beltrami") (prophylaxis).  Further,

tenofovir in combination with FTC was recognized as a preferred two-NRTI "backbone" of the

combination HIV treatment regimen.  John G. Bartlett *et al.*, Panel on Clinical Practices for

Treatment of HIV Infection convened by the Department of Health and Human Services

(DHHS), *Guidelines for the Use of Antiretroviral Agents in HIV-1-Infected Adults and*

*Adolescents*, 14 (Oct. 29, 2004) ("Bartlett").

     For some combination therapies, the different active ingredients can be formulated into a

single dosage form, such as a tablet or capsule for oral administration.  Several such single-dose

combination drugs had been approved at least by 2005.  These so called "fixed dose

combination" drugs had the advantages of reducing pill burden, simplifying dosing schedule, and

enhancing patient adherence, which is important for a successful outcome.  De Clercq EOED at

265.

     FDA had approved the fixed dose combination drugs Combivir[®] (lamivudine and

zidovudine), Trizivir[®] (abacavir, lamivudine, and zidovudine), Epzicom[®] (lamivudine and

abacavir), and Truvada® (TDF and FTC) for the treatment of HIV.  *See* De Clercq EOED at 250, 268.

### 4. Truvada®

In August 2004, a single once-daily oral formulation containing 300 mg of TDF and 200 mg of FTC was approved by FDA as Truvada®.  *See* Truvada® Drug Approval Letter at 6 (showing the date of the approval letter); *see also* Truvada® Insert, 21; Toni M. Dando & Antona J. Wagstaff, *Emtricitabine/Tenofovir Disoproxil Fumarate*, 64 Drugs 2075 (2004) ("Dando"). Truvada® tablets contain the same doses of TDF and FTC as the single agent formulations Viread® and Emtriva®; one Truvada® tablet is bioequivalent to one Viread® tablet plus one Emtriva® capsule following single-dose administration to fasting healthy subjects.  De Clercq JMC at 1303; *see also* Truvada® Insert at 5.

Tenofovir and FTC were also known to exhibit synergistic antiviral effects *in vitro*. Truvada® Insert at 3.  There is no mutual interference (a process by which two agents compete to interfere with the same nucleotide or nucleoside) between the two drugs.  Barreiro at 236, 241; Truvada® Insert at 3; Dando at 2076.  The steady state pharmacokinetics of tenofovir and FTC were unaffected when TDF and FTC were administered together.  Truvada® Insert at 7; *see also* David J. Back *et al*., *The Pharmacology of Antiretroviral Nucleoside and Nucleotide Reverse Transcriptase Inhibitors Implications for Once-Daily Dosing*, 39 J. Acquir. Immune Defic. Syndr. S1, S2-S4 (2005) ("Back"); Barreiro at 235.  Clinically, Truvada®/efavirenz was advantageous over Combivir®/efavirenz with significantly greater antiviral response, fewer side effects and fewer patients discontinuing use due to adverse events.  De Clercq EOED at 250; *see also* Paula Moyer, *Combined Tenofovir, Emtricitabine, Efavirenz May Be More Tolerable Than Standard First-Line HIV*, Medscape Medical News (Nov. 3, 2004), https://www.medscape.com/viewarticle/492968 ("Moyer") (fewer instances of anemia,

neutropenia, diarrhea, fatigue, and depression in TDF+FTC-arm patients).  Importantly, FTC

resistance-conferring mutation (M184V/I) and tenofovir-resistance conferring mutation (K65R)

are different, resulting in reduced development of resistant strains from Truvada® than from

single agent drugs.  *See* Feinberg at 10; Scott M. Hammer *et al*., *A Controlled Trial of Two*

*Nucleoside Analogues Plus Indinavir in Persons with Human Immunodeficiency Virus Infection*

*and CD4 Cell counts of 200 Per Cubic Millimeter or Less*, 337 N. Engl. J. Med. 725, 731 (1997)

("Hammer").  The fixed dose combination of Truvada® was hailed as an important step forward

in HIV management.  De Clercq EOED at 265.  As part of a global access program, Viread® and

Truvada® were made available at no profit to the developing world.  De Clercq JMC at 1303.

The International Patent Application Publication WO2004/064845 to Gilead ("Dahl")

was published on August 5, 2004.  Dahl at Abstract.  Dahl disclosed combinations of two or

more active ingredients, among which (1) at least one active ingredient is selected from TDF and

physiologically functional derivatives thereof, and (2) at least one active ingredient is selected

from FTC and physiologically functional derivatives thereof.  *Id.* at 9:28-31.  The composition

containing TDF and FTC was disclosed as chemically stable, providing synergistic effects,

and/or reducing the side effects of one or both components.  *Id.* at 3:8-10.

### ii.    *Post-exposure Prophylaxis With Tenofovir, TDF, a Tenofovir Ester, and Tenofovir Prodrug, and in Combination With FTC Was Well Known.*

In addition to treating HIV, tenofovir or TDF alone or in combination with FTC were

also well known to be prophylactically effective when administered shortly after exposure to

HIV.  Such administration is termed post-exposure prophylaxis ("PEP").  PEP works by

maintaining adequate antiretroviral concentrations in the body, so the antiretroviral can suppress

potential HIV replication following an exposure or potential exposure to the virus, just like the

antiretroviral otherwise suppresses HIV replication in an AIDS patient.  Janeway at 458-59.  PEP

31

was known and widely used in contexts including 1) occupational exposure via, *e.g.*, accidental needle-sticks, 2) transmission from infected mothers to uninfected infants, 3) unprotected sex with an infected partner, 4) intravenous drug users, and 5) sex workers. *See*, *e.g.*, Mina Hosseinipour *et al.*, *Can Antiretroviral Therapy Be Used to Prevent Sexual Transmission of Human Immunodeficiency Virus Type 1*, 34 Clin. Infect. Dis. 1391, 1392 (2002) ("Hosseinipour") (mother to infant); J. Almeda *et al.*, *Proposed recommendations for the management of HIV post-exposure prophylaxis after sexual, injecting drug or other exposures in Europe*, 9 Euro Surveill 35, 39 (2004) ("Almeda") (health workers); Szekeres at 4.

As early as 1995, tenofovir as a single agent showed protective effects in primate models of HIV infection. Tsai and co-workers intravenously inoculated macaques with simian immunodeficiency retrovirus ("SIV"). Che-Chung Tsai *et al.*, *Prevention of SIV Infection in Macaques by (R)-9-(2-Phosphonylmethoxypropyl)adenine*, 270 Science 1197, 1197 ("Tsai 1995"). Tenofovir was subcutaneously administered to the macaques at 20 or 30 mg per kilogram of body weight once daily for 4 weeks, starting at 48 hours before, 4 hours after, or 24 hours after inoculation (the latter two constitute PEP), respectively. None of the tenofovir treated animals became infected, and there were no clinical signs of tenofovir toxicity. *Id.* at 1198-1199. When extending the time between virus inoculation and tenofovir initiation to 48 or 72 hours, or when decreasing the duration of treatment from 28 days to 10 days, effectiveness of tenofovir in preventing establishment of infection decreased. Tsai 1998 at 4265.

Tsai concluded from his study that postexposure prophylaxis with tenofovir could have a significant impact on preventing HIV infection in health care workers or others accidentally exposed to the virus. Tsai 1995 at 1199. Moreover, based on human HIV clinical trials

indicating the superiority of combined nucleoside analogs, Tsai further suggested that tenofovir may also have an important role in combination therapies or strategies against HIV.  *Id.*

Van Rompay utilized the macaque model to study a newborn human's potential multiplex exposure to virus during delivery.  Van Rompay inoculated newborn macaques simultaneously with two different strains of immunodeficiency retroviruses, one orally and the other intravenously.  Koen K.A. Van Rompay *et al*, *Administration of 9-[2-Phosphonomethoxy)propyl]adenine (PMPA) for Prevention of Perinatal Simian Immunodeficiency Virus Infection in Rhesus Macaques*, 14 AIDS Research and Human Retroviruses, 761, 761 (1998) ("Van Rompay AIDS Res 1998").  Subcutaneous tenofovir administration at 30 mg/kg body weight once daily for 2 weeks starting immediately after virus inoculation protected three of the four newborn macaques after a transient or "abortive" infection.[12]  *Id.* at 770.

In 2001, Van Rompay orally inoculated newborn macaques with SIV, and applied tenofovir PEP of either two low doses (4 mg/kg, subcutaneous) at 1 and 25 h after inoculation, or one high dose (30 mg/kg, subcutaneously) at 1 h after inoculation.  Koen K. A. Van Rompay *et al.*, *Two Low Doses of Tenofovir Protect Newborn Macaques against Oral Simian Immunodeficiency Virus Infection*, 184 J. Inf. Dis. 429, 430 (2001) ("Van Rompay 2001").  Both PEP schemes protected most of the animals.  *Id.* at 429.

Around 2000, Otten sought to use macaques to model human HIV transmission through heterosexual contact by intravaginally exposing macaques to human immunodeficiency virus HIV-2.  Ron A. Otten *et al*., *Efficacy of Postexposure Prophylaxis after Intravaginal Exposure of Pig-Tailed Macaques to a Human-Derived Retrovirus (Human Immunodeficiency Virus Type 2)*,

---

[12]    The transient infection manifested as transient weak anti-SIV antibody responses, and transient low levels of viral RNA in plasma.  *Id.* at 770.

74 J. Virol. 9771, 9771 (2000) ("Otten").  Subcutaneous tenofovir administration at 30mg/kg for 28 days was initiated at 12, 36, or 72 h following inoculation.  *Id.* at 9772-9773.  Systemic infection was not evident through 24 weeks post-inoculation, except one breakthrough infection in the 72 h-group at week 16.  *Id.*  The protected macaques remained uninfected one year after exposure.  *Id.* at 9774.

The macaque PEP studies all pointed to the importance of timely administration of tenofovir after SIV exposure (or even before, in the case of Tsai).  Tsai concluded that both the time between viral exposure and initiation of tenofovir treatment, and the duration of treatment were "crucial factors for prevention" of acute SIV infection.  Tsai 1998 at 4265.  Van Rompay attributed the prophylactic success of his short tenofovir PEP (two 4 mg/kg doses or one 30 mg/kg dose) to the prompt administration (1 h) after virus exposure—"the sooner the first dose of drug is administered, the shorter the minimum duration required for protection."  Van Rompay 2001 at 435.  Otten also noted that his data provided additional insight into "the critical timing related to PEP initiation for maximum effectiveness."  Otten at 9774.

The studies also revealed other factors that may impact the outcome of PEP and the predictive value of the primate studies for human contexts.  As an example, Otten distinguished the intravaginal inoculation in his experiments from earlier IV inoculations, and noted that "different exposure routes and a possible requirement for localized replication prior to systemic dissemination most likely contributed to the differences between the findings of … previous studies and those of our investigation."  *Id.*  He further reminded of "important variables related to viral dissemination patterns after a vaginal exposure … that may impact PEP efficacy."  *Id.* at 9771.

In 2000, Van Rompay reviewed the use of nonhuman primate models in HIV research, and recognized that macaques were useful models for HIV research because of their similarity to humans.  Koen K. A. Van Rompay and Marta L. Marthas, *Nonhuman Primate Models for Testing Anti-HIV Drugs, i*n Antivirals against AIDS 295, 298-300 (J. Kreuter *et al.* eds 2000) ("Van Rompay Antiviral 2000").  Noting the problems of existing HIV therapies including variation in efficacy for different patients, toxicity, compliance, drug resistance, costs, and the lack of benefit to the majority of HIV-infected people in developing countries, he emphasized the "room for improvement" in drug development.  *Id.* at 295.  The "ideal" antiviral drug strategy, Van Rompay noted, would be one that "induces strong and persistent suppression of virus replication, gives prolonged immunological and clinical benefits at the lowest toxicity, can be administered at infrequent dosage intervals, is stable and inexpensive, and can thus benefit the greatest number of HIV-infected people." *Id.*

Van Rompay also reviewed macaque studies performed with different antiretroviral drugs.  He concluded that antiviral drug administration (AZT, PMEA, FLT) starting before or at the time of virus inoculation can prevent infection when a minimal dose of SIV was used for the inoculation.  *Id.* at 303.  In all studies using tenofovir administered more than five days after virus inoculation and after the occurrence of systematic infection, reduced viremia was observed. *Id*.  Van Rompay determined that only tenofovir and 2',3'-dideoxy-3'-hydroxymethyl cytidine (BEA-005) prevented infection when treatment was started after virus inoculation.  *Id.*

Clinical studies on PEP (prophylaxis after percutaneous exposure to HIV among health care workers) were conducted as early as 1990.  *See* Denise M. Cardo *et al.*, *A Case-control Study of HIV Seroconversion in Health Care Workers After Percutaneous Exposure*, 337 NEJM, 1485, 1485 (and references cited therein) (1997) ("Cardo").  In 1997, a retrospective case-control

study of health care workers with occupational, percutaneous exposure to HIV-infected blood found that the odds of HIV infection after exposure were reduced by approximately 81 percent for those who took zidovudine prophylactically. Cardo at 1488. The study also acknowledged the importance of promptly implementing PEP after the exposure was recognized. *Id.* at 1489.

Fenway Community Health, the largest center caring for HIV-infected MSM (Men who have Sex with Men) in New England, began a non-occupational PEP (NPEP) program in 1997, subsequently evaluating more than 400 patients presenting after a high-risk exposure. Kenneth H. Mayer et al., *Enhanced tolerability and adherence using Tenofovir/3TC for non-occupational post-exposure prophylaxis (NPEP)*, 15th International Conference on AIDS, Bangkok, Thailand (abstr. TuPeB4657) ("Mayer 2004"). Abstracts from this program in 2004 (including 29 patients) and 2005 (including 57 patients) reported from the same phase IV trial starting in June 2003 where patients who presented after a high-risk exposure were offered an NPEP of 300 mg TDF and 300 mg lamivudine, taken together QD (daily) for 28 days. Mayer 2004 and K. Mayer et al., *Tenofovir/3TC for Non-occupational post-exposure prophylaxis: improved tolerability and adherence compared to AZT/3TC*, 3rd IAS Conference, 2005 Rio de Janeiro, Brazil (abstr. WePe10.3P08) ("Mayer 2005"). None of the treated patients reported a serious adverse event, and only 6.9% used medication for symptoms related to NPEP. No acute HIV infections were detected among treated patients. *Id.* The authors concluded that TDF/lamivudine is well tolerated for NPEP, with higher completion rates than AZT-containing NPEPs. *Id.* In 2006, the authors reported from a similar NPEP study started in March 2005 using once daily TDF (300 mg)/FTC (200 mg) for 28 days in 37 participants. K. Mayer K et al., *Tenofovir-based regimens for Non-Occupational Post-Exposure Prophylaxis (NPEP): improved tolerability and adherence compared to AZT-based regimens*, 16th international AIDS conference, 2006 Toronto (abstr.

TUPE0432), ("Mayer 2006").  TDF/FTC was well tolerated for NPEP with higher completion

rates than AZT/ lamivudine-containing NPEPs, and it was concluded that better tolerated QD

dosing for NPEP may improve adherence and minimize loss to follow-up.  *Id.*

As of the early 1990s, the Public Health Service and the International AIDS Society

recommended chemoprophylaxis after certain types of occupational exposure to HIV, while

others extended these recommendations to include exposure related to sexual contact.  Cardo at

1489.  The CDC recommended in 1996 that chemoprophylaxis should be provided after

occupational exposures associated with the highest risk for HIV transmission, and that PEP

should be initiated promptly, preferably within 1-2 hours postexposure.  Center for Drug

Evaluation and Research, *Update: provisional Public Health Service recommendations for*

*chemoprophylaxis after occupational exposure to HIV*, 45 Morbidity and Mortality Weekly

Report 468, 468-80 (1996) ("CDER").  In 1998, another CDC report reiterated the importance of

NPEP.  Dawn K. Smith *et al*., Centers for Disease Control and Prevention, *Management of*

*Possible Sexual, Injecting-Drug-Use, or Other Nonoccupational Exposure to HIV, Including*

*Considerations Related to Antiretroviral Therapy, Public Health Service Statement*, 47(RR-17)

Morbidity and Mortality Weekly Report 1 (1998) ("Smith 1998").  The 2001 Department of

Health and Human Services guidelines recommended a basic 4-week PEP of two drugs

(zidovudine and lamivudine; lamivudine and stavudine; or didanosine and stavudine) for most

HIV exposures and an expanded PEP that includes the addition of a third drug for HIV exposures

that pose an increased risk for transmission.  Beltrami at 1.  The guidelines acknowledged that

the interval within which PEP should be initiated for optimal efficacy was not known and

emphasized that PEP should be initiated as soon as possible.  *Id.* at 26.

The California Task Force on Non-Occupational PEP and the California Department of Health Services issued a Recommendations for Health Care Providers on HIV Post-Exposure Prophylaxis (PEP) Following Non-Occupational Exposures in June 2004.  California Task Force on Non-Occupational PEP and the California Department of Health Services Office of AIDS, *Offering HIV Post-Exposure Prophylaxis (PEP) Following Non-Occupational Exposures: Recommendations for Healthcare Providers in the State of California* (2004) ("Schwarzenegger").  The recommendations primarily referred to individuals who have had a potential exposure to HIV through consensual sexual activity, and secondarily to individuals who may have had an exposure to HIV through sharing of injection drug use equipment.  *Id.* at 1. However, the recommendations specifically stated that "the same general principles outlined in this document can reasonably be applied to assess the likelihood of acquiring HIV from such exposures, and thus the potential utility of PEP."  *Id.*

Schwarzenegger acknowledged the "biological plausibility" and "effectiveness" of non-occupational PEP based on data from occupational exposure studies, mother-to-child-transmissions studies, and animal studies.  *Id.* at 9.  In particular, the recommendations referred to Van Rompay's studies in macaque oral mucosal transmission models that had shown efficacy of combined pre- and postexposure interventions, even with antiretroviral-resistant virus.  *Id.* at 10 (citing Van Rompay AIDS Res. 1998, Van Rompay 2001, and Koen K. A. Van Rompay *et al.*, *Prophylactic and Therapeutic Benefits of Short-Term 9-[2-(R)-(Phosphonomethoxy)Propyl]Adenine (PMPA) Administration to Newborn Macaques following Oral Inoculation with Simian Immunodeficiency Virus with Reduced Susceptibility to PMPA*, 74 J. Virol. 1767 (2000) ("Van Rompay Virology 2000").  Schwarzenegger also cited results from other animal studies demonstrating the probable efficacy of PEP in intravenous, oral, and vaginal

exposures to SIV and HIV-2, and acknowledged that the animal studies provided instructive information in terms of timing and duration of human PEP therapy. *Id.* at 10.  In the context of mother-to-child transmission, the recommendations concluded that "multiple studies of antiretroviral drugs used in pregnant women and/or their newborns have demonstrated efficacy in preventing mother-to-child transmission of HIV infection," and suggesting that there is "likely a post- as well as a pre-exposure effect of antiretrovirals" in the prevention of infection. *Id.* at 9-10.  It also urged that "PEP should be initiated as soon as possible following the exposure," with a 72-hour time limit for the initiation of PEP being considered as reasonable based on evidence from macaque models. *Id.* at 3, 14.  In addition, Schwarzenegger stated that PEP was not expected to be 100 percent effective in any setting, and thus, some failures of PEP were not inconsistent with the efficacy of PEP. *Id.* at 11.

Schwarzenegger disclosed that there was no consensus among experts as to whether two or three antiretroviral drugs should be used for PEP. *Id.* at 15.  Considerations supporting two drug PEP included: (1) the inoculum of virus is small following non-occupational exposure compared with the amount of virus requiring potent antiretroviral therapy for full suppression in an HIV-infected individual; (2) single agent PEP resulted in an 81 percent reduction in the risk of HIV infection in a study of occupational exposures; (3) increased side effects and/or more difficult dosing schedules may result in decreased adherence; and (4) a significant cost differential when a third drug is added. *Id.*

Regarding the choice of antiretrovirals for PEP, Schwarzenegger taught that in the absence of information about the antiretroviral history of the source, the preferred double nucleoside analogue combination PEP was Combivir® (fixed dose formulation of zidovudine and lamivudine) administered twice a day. *Id.*; *see also id.* at 8.  Recommended alternative

nucleoside analogue combinations include: stavudine (40 mg for patients weighing greater than 60 kg and 20 mg for those weighing less than 60 kg, one pill twice a day) or tenofovir (300 mg once a day) in combination with lamivudine (150 mg twice a day or 300 mg once a day) or FTC (300 mg a day). *Id.* at 15; *see also id.* at 8. Schwarzenegger specifically taught that "a fixed dose combination pill containing tenofovir and FTC, called Truvada®, was available for once daily dosing." *Id.* Truvada® was the only fixed-dose combination pill among the four recommended alternative combination options.

In addition to California, multiple countries (e.g. France, Italy, Spain, Switzerland) and other US states (e.g. New York, Massachusetts) had PEP guidelines in place by 2004. *Id.* at 9.

The CDC and DHHS's 2005 guidelines recommended HIV postexposure prophylaxis in nonoccupational contexts (nPEP), based on the success of PEP in macaque studies, in preventing human mother-to-child exposure, and in observations from occupational exposure. *See* Dawn K. Smith et al., *Antiretroviral Postexposure Prophylaxis After Sexual, Injection-Drug Use, or Other Nonoccupational Exposure to HIV in the United States*: *Recommendations from the U.S. Department of Health and Human Services*, 54 (RR-2) Morbidity and Mortality Weekly Report 1 (2005) ("Smith 2005"); at 2 (animal study); 2-3 (mother-to-child); 3-4 (occupational exposure).[13] In addition, experiences from health-care workers had also shown that serious side effects and toxicities from antiviral PEP were not common. *Id.* at 4. Moreover, while selection of resistant virus might occasionally result from the use of nPEP, such occurrences were likely rare because most nonoccupational exposures did not lead to HIV infection and the use of combination antiretroviral therapy might further reduce the transmission rate. *Id.* at 5

---

[13]    *See* [GILDDE00283259-63]; [GILDDE00283130-31]; [GILDDE00283264-93]; [GILDDE00283323-52]; [GILDDE00283382-83]; [GILDDE00283385-86]; [GILDDE00283458-83]; [GILDDE00283500-08].

Like Schwarzenegger, Smith 2005 also disclosed the importance of prompt administration of PEP after potential exposure.  Smith 2005 at 2.  In fact, Smith 2005 did not recommend the use of nPEP if care is sought >72 hours after exposure, as the likelihood of benefit might not outweigh the risks inherent in taking antiretroviral medications.  *Id.* at 6, 8.  For those who sought care <72 hours after nonoccupational exposure that represents a substantial risk for HIV transmission, it recommended a 28-day course of highly active antiretroviral therapy ("HAART").  *Id.*

Smith 2005 disclosed that no evidence indicates that a three-drug PEP was more likely to be effective than a two-drug PEP, and that the recommendation for a three-drug PEP is based on the *assumption* that the maximal suppression of viral replication (the goal in treating HIV-infected persons) would "provide the best chance of preventing infection in a person who has been exposed."  Smith 2005 at 8 (emphasis added).  Therefore, Smith 2005 suggested that clinicians and patients concerned about potential adherence and toxicity issues associated with a three-drug PEP might consider the use of a two-drug PEP (i.e., a combination of two reverse transcriptase inhibitors).  *Id.*

The only NNRTI-based regimens that Smith 2005 recommended are efavirenz plus (lamivudine or emtricitabine) plus (zidovudine or tenofovir).  The only two recommended options with fixed-dosing combinations are therefore Combivir® (lamivudine and zidovudine) with efavirenz, and Truvada® (TDF and FTC) with efavirenz.  *Id.* at 9-10.  As summarized earlier, Truvada®/efavirenz was advantageous over Combivir®/efavirenz with significantly greater antiviral response, fewer side effects and fewer patients discontinuing use due to adverse events.  *Supra* at Section VI.a.i.4.

41

### iii. Pre-exposure Prophylaxis With Tenofovir, TDF, Tenofovir Ester, and Tenofovir Prodrug, and in Combination With FTC Was Well Known.

In addition to being used for HIV treatment and PEP, tenofovir and TDF (alone or in combination with FTC) were also known to be prophylactically effective to prevent HIV infection when administered prior to virus exposure. Such administration is termed pre-exposure prophylaxis ("PrEP"). PrEP works by supplying adequate antiretroviral concentrations in the body to suppress viral replication before an exposure or potential exposure to HIV. Janeway at 458-59. By November 2004, PrEP with TDF was known to prevent HIV infection in macaque models, and clinical studies of tenofovir or TDF involving individuals at risk of potential exposures to HIV were ongoing and being planned. Szekeres at 1, 3, 5-11.

Pre-exposure administration of antiviral drugs had been conducted in animal models for HIV infection as early as 1992, when Van Rompay demonstrated that AZT initiated shortly before exposure could prevent macaques from being infected with SIV virus. Koen K. A. Van Rompay *et al.*, *Simian Immunodeficiency Virus (SIV) Infection of Infant Rhesus Macaques as a Model To Test Antiretroviral Drug Prophylaxis and Therapy: Oral 3'-Azido-3'-Deoxythymidine Prevents SIV Infection*, 36 Antimicrob. Agents Chemother. 2381, 2381 (1992) ("Van Rompay 1992").

Tenofovir was successfully used for PrEP in macaques in a number of studies. In Tsai 1995, subcutaneous tenofovir at 20 mg/kg starting 48 hours before intravenous SIV inoculation and continuing once daily for 4 weeks protected macaques from SIV infection, with no clinical signs of tenofovir toxicity displayed by the macaques. Tsai 1995 at 1198-1199. In another Van Rompay study from 1998, to mimic the exposure of newborn humans, one subcutaneous dose of tenofovir (30 mg/kg) starting 4 h before oral SIV inoculation, followed by a second and final dose of tenofovir 24 h later protected newborn macaques from infection. Koen K. A. Van

42

Rompay *et al.*, *Two doses of PMPA protect newborn macaques against oral simian immunodeficiency virus infection*, 12 AIDS F79, F81 (1998) ("Van Rompay AIDS 1998").  Van Rompay Virology 2000 aimed to model HIV strains with potential resistance to tenofovir, so newborn macaques were orally inoculated twice with SIVmac055 strain, which has a fivefold-reduced *in vitro* susceptibility to tenofovir.  Van Rompay Virology 2000 at 1767.  In that study, subcutaneous tenofovir was administered at 30 mg/kg body weight once daily, starting 24 h before the first SIV inoculation, then at the time of the first and second inoculations respectively, with the administration continuing for 29 days in total after the first dose.  *Id.* at 1768.  This pre-exposure prophylaxis protected some macaques from infection, and led to reduced viremia and prolonged disease-free survival for the other animals that were still infected.  *Id.* at 1770.  In Van Rompay 2001, a shortened PrEP including two lower doses (4 mg/kg, subcutaneous) of tenofovir, at 4 h before and 20 h after oral inoculation of SIV, protected the animals from infection. Van Rompay 2001 at 429-430.

After TDF became available, Van Rompay began using TDF instead of tenofovir.  Koen K. A. Van Rompay et al., *Topical Administration of Low-Dose Tenofovir Disoproxil Fumarate to Protect Infant Macaques against Multiple Oral Exposures of Low Doses of Simian Immunodeficiency Virus*, 186 J. Infec. Dis. 1508, 1508 (2002) ("Van Rompay 2002").  Because of its lipophilic nature, TDF was known to be rapidly taken up by cells *in vitro*, hydrolyzed to tenofovir, and converted to the active form.  Because of its hydrophilicity, tenofovir diphosphate does not exit the cell easily and has a long intracellular half-life. *Id.*  In addition, TDF was known to be safe, showing an absence of detectable toxicity in HIV-infected patients receiving a daily oral tablet to achieve systemic drug levels.  *Id.* at 1511.

43

In Van Rompay 2002, macaques were exposed to low doses of SIV through nursing bottles[14] three times daily for five consecutive days, mimicking the multiple exposures to virus during human breast-feeding. *Id.* at 1510. Oral topical doses of TDF[15] given during the five consecutive days of inoculations, with an additional 5-mL dose given on the day before and the day after inoculations, failed to protect from SIV infection.[16] *Id.* at 1510. In a subsequent study, Van Rompay administered TDF orally. SIV was again given to the animals through feeding bottles during the first week of life and, for animals that were still uninfected, again at 1 month of age. K. Van Rompay, *et al.*., *Oral tenofovir DF protects infant macaques against infection following repeated low-dose oral exposure to virulent simian immunodeficiency virus*, XV Int. AIDS Conf., 2004 Bangkok, (Late Breaker Abstract LbOrB10) ("Van Rompay 2004"). An oral administration of TDF (10 mg/kg once daily, estimated to be pharmacokinetically equivalent to the regimen used in pediatric trials and the TDF adult dose) initiated one day before and continued until one day after each SIV inoculation period protected three of six macaques. *Id.*

PrEP has been an established clinical practice in preventing viral diseases and other infectious diseases long before its application to HIV prevention. For example, at least by 1994, the CDC published "recommendations for the use of amantadine and rimantadine" for chemoprophylaxis of influenza A. Nancy H. Arden *et al.*, *Prevention and Control of Influenza: Part II, Antiviral Agents, Recommendations of the Advisory Committee on Immunization*

---

[14]    Infant macaques were fed 15 low doses of SIV with nursing bottles and without chemical restraint. Van Rompay 2002 at 1508.

[15]    Equivalent to 0.037 mg of tenofovir/day. This dose was selected because, although its concentration exceeded the *in vitro* inhibitory concentration 5000-fold, it would be too low to induce systemic antiviral drug levels and therefore considered topical. Van Rompay 2002 at 1511.

[16]    About half the animals in each group became infected, with no apparent difference between the animals that received TDF and the placebo group. Van Rompay 2002 at 1510.

*Practices (ACIP)*, 43(RR-15) Morbidity and Mortality Weekly Report 1 (1994) ("Arden").  It

was recognized that amantadine and rimantadine "[w]hen administered prophylactically to

healthy adults or children before and throughout the epidemic period, both drugs are

approximately 70-90% effective in preventing illness caused by naturally occurring strains of

type A influenza virus."  Chemoprophylaxis with amantadine or rimantadine was recommended

for use with "persons who are at greatest risk of severe illness and complications if infected with

influenza A virus," including which are not limited to those that have had exposure.  *Id.* at 2.

Indeed, "this concept, chemoprophylaxis, is really a form of treatment for an infection that has

not yet occurred, is just beginning, or is in an asymptomatic, subclinical state."  Laurence S.

Farer, *Chemoprophylaxis,* 125 American Review of Respiratory Disease 102, 102 (1985)

("Farer").  "A drug that can be used to treat and cure a disease, if given at an earlier time in the

development of the condition, should be able to prevent the disease.  The drug may be given

**before exposure**, concurrently with possible exposure, or even after exposure, but before the

disease is manifest."  *Id.* (emphasis added).

     Pre-exposure chemoprophylaxis was also used to prevent bacterial infection.  *See* Louis

Weinstein, *The Chemoprophylaxis of infection*, 43 Ann. Intern. Med. 287, 288 (1955)

("Weinstein") ("Chemoprophylaxis is most commonly employed in healthy individuals to

prevent invasion by specific bacteria.  It has been given either to single patients, to families, or to

large groups of people, some of whom had not yet had contact with an organism and others of

whom were already harboring it as asymptomatic carriers.").

     Pre-exposure chemoprophylaxis was similarly well known to prevent malarial infection

as well.  Citing chemoprophylaxis for malaria, Youle and Wainberg stated "[o]ne response to

other infectious agents for which an effective preventative vaccine does not exist is that of

combining avoidance of the pathogen with chemoprophylaxis."  Mike Youle & Mark Wainberg, *Could chemoprophylaxis be used as an HIV prevention strategy while we wait for an effective vaccine?* 17 AIDS 937 (2003) ("Youle AIDS 2003"); *see also* Mike Youle & Mark Wainberg, *Pre-exposure chemoprophylaxis (PREP) as an HIV prevention strategy*, 2 JIAPAC 102, 103 (2003) ("Youle JIAPAC 2003").  Youle further noted that both HIV and malaria infections typically result from "an intermittent rather than a continuous exposure to the pathogen."  Youle JIAPAC 2003 at 103.  It was known that a PrEP agent can "prevent infection of cells, or at least nuclear integration, *when exposed to HIV*."  *Id.* (emphasis added).  Following the same concept as in malaria prevention, if HIV replication can be inhibited from the moment the virus enters the body, it may not be able to establish a permanent infection.  *Id.*  Youle also noted that NtRTIs such as TDF would require intracellular phosphorylation to have activity, further indicating the value of starting PrEP before the infection.  *Id.*

For HIV prophylaxis, it was recognized that the ideal PrEP agent should be taken once a day or less frequently, be non-toxic, and be well tolerated.  The ideal agent should also be easily administered, and not promote development of high-level viral resistance based on a single mutation. Szekeres at 11; Youle JIAPAC 2003 at 103; Robert M. Grant *et al.*, *Promote HIV Chemoprophylaxis Research, Don't Prevent It*, 309 Science 2170, 2170-2171 (2005) ("Grant 2005").  The Summary Report from an Expert Consultation on the Implications of Tenofovir as HIV Chemoprophylaxis surveyed the ongoing or upcoming clinical trials involving using daily TDF to prevent HIV infection.  [GILDDE00282944-79].  The consultation/meeting was held in Atlanta in December 2004 in view of these trials and to discuss the next steps "should TDF prove to be both safe and effective."  [GILDDE00282944-79, at GILDDE00282945].

Starting in the mid-1990s, tenofovir demonstrated efficacy in preventing infection in SIV/macaque models.  Szekeres at 8.  Compared to other single agents, TDF was readily available and easy to administer as the Viread® oral tablet.  TDF was known to have a long intracellular half-life, allowing for once-daily dosing and a possibility of residue protection even if some doses are missed.  Grant 2005 at 2170.  The incidence of adverse effects associated with TDF was low and similar to placebo, Szekeres at 11-12; TDF was also tolerated by HIV-negative persons in a small phase 1 safety study and in a study of its use for post-exposure prophylaxis.  [GILDDE00282944-79, at GILDDE00282947]; *see also* M.R. Blum et al., *Lack of a Pharmacokinetic Interaction between Emtricitabine and Tenofovir DF When Co-administered to a Steady State in Healthy Volunteers*, 43rd Annual Interscience Conference on Antimicrobial Agents and Chemotherapy, Chicago, IL, Sept. 14-17, 2003 (Poster A-1621) ("Blum"); B.P. Kearney et al., *Bioequivalence of Combination Tenofovir DF/Emtricitabine Tablets for One-Pill Once Daily Administration*, 5th International Workshop on Clinical Pharmacology of HIV Therapy, Rome, Italy, April 1-3, 2004 (Poster 7.3) ("Kearney").  Indeed, TDF has minimal effects on mitochondrial DNA polymerases that underlie some of the long term toxicity observed with other antiretroviral drugs.  Grant 2005 at 2170.  In addition, TDF was cleared from the body by the kidneys and is not metabolized by the liver; therefore it had limited potential for pharmacokinetic interactions with other hepatically metabolized drugs.  This lack of interaction with other drugs was also recognized to facilitate TDF use for those at highest risk.  *Id*.

However, the single agent TDF has its risks, including possible emergence of resistance due to selection of the K65R mutation.  The dataset from the "US surveillance system for detection of transmitted HIV drug resistance (HIVDR)" showed that the mutations associated with TDF resistance were being transmitted, even though frequency was low.

[GILDDE00282944-79, at GILDDE00282957].  On the other hand, TDF was also available since 2004 in a fixed dose combination with FTC, Truvada®.  It was also well known that the FTC resistance-conferring mutation (M184V/I) and the tenofovir-resistance conferring mutation (K65R) are different, resulting in reduced development of resistant strains from Truvada® as compared to either Viread® or Emtriva® alone.  *See* Feinberg at 10; Hammer at 731.

TDF was already being used in a number of clinical trials for HIV PrEP.  PrEP clinical studies in numerous countries, including investigations of the safety and/or efficacy of PrEP in high-risk women (Cameroon, Ghana, Nigeria), high-risk men (Malawi), female sex workers (Cambodia), sexually active young adults (The Botswana Tenofovir Oral HIV Prophylaxis Trial), injection drug users (IDUs) (Thailand), and MSM (United States) used TDF for PrEP.  *See*, *e.g.*, Szekeres at 7, Table 1.

It was also known that PrEP could be a viable prevention strategy for certain people at high risk of HIV infection, such as "commercial sex workers, those in serodiscordant relationships, and members of high-risk groups who choose not to use condoms or for whom consistent condom use has proved difficult."  Szekeres at 3.

It was also publicly known that some HIV-negative gay men were already taking TDF as a preventive measure.  A survey conducted among attendees of minority gay pride events in 2004 found that at least 5% of respondents reported using PrEP.  Scott E. Kellerman *et al.*, *Knowledge and Use of HIV Pre-Exposure Prophylaxis Among Attendees of Minority Gay Pride Events, 2004*, 43 JAIDS 376, 376 (2006) ("Kellerman").  One of the named inventors on the Patents-in-Suit, Dr. Rob Janssen, reported from "some recent surveys" that as many as 7% of gay men in San Francisco were already using TDF to prevent HIV.  [GILDDE00282944-79, at GILDDE00282945].

### b.  Identification Of Prior Art References.

In addition to the disclosures provided below, Gilead attaches a chart detailing exemplary disclosure from each reference on a claim-by-claim basis.  *See* Exhibit A.  Gilead also incorporates by reference the prior art identified in its Response to the Government's Complaint. To the extent any of the cited references is found not to predate the Patents-in-Suit for which it is cited, it remains relevant, for example, to show the technological background and/or to secondary considerations of obviousness and/or obviousness based on simultaneous/contemporaneous invention by others.  Moreover, Gilead reserves the right to rely on: (1) all documents cited on the face of the Patents-in-Suit and related patents, patent publications, file histories, and applications; (2) all other documents cited herein, including all references discussed below with respect to the illustrative obviousness combinations; (3) all references and documents listed below in Sections VI.c.-VI.e. or cited in Exhibit A; and (4) any references and documents cited in Gilead's Answer to the Complaint.

### i.  *Prior Art Publications*

The following prior art publications, including those references listed in Exhibit A, anticipate and/or render obvious the Asserted Claims of the Patents-in-Suit.

| | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 1. | *Compositions and Methods for Combination Antiviral Therapy* | Aug. 5, 2004 | Dahl *et al.*, WO 2004/064845 | Dahl [GILDDE00280577-GILDDE00280641] |
| 2. | *Prevention of SIV Infection in Macaques by (R)-9-(2-phosphonylmethoxypropyl)adenine* | Nov. 17, 1995 | Che-Chung Tsai *et al.*, Science 270: 1197-99. | Tsai 1995 [GILDDE00280873-GILDDE00280876] |

| | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 3. | *Effectiveness of Post-inoculation PMPA Treatment for Prevention of Persistent SIV Infection Depends Critically on Timing of Initiation and Duration of Treatment* | May 1998 | Che-Chung Tsai *et al.*, Journal of Virology 72:4265-73. | Tsai 1998 [GILDDE00283812- GILDDE00283820] |
| 4. | *Simian Immunodeficiency Virus (SIV) Infection of Infant Rhesus Macaques as a Model To Test Antiretroviral Drug Prophylaxis and Therapy: Oral 3'-Azido-3'- Deoxythymidine Prevents SIV Infection* | Nov. 1992 | Koen K. A. Van Rompay et al., Antimicrobial Agents and Chemotherapy 36(11) 2381- 2386. | Van Rompay 1992 [GILDDE00282980- GILDDE00282985] |
| 5. | *Two Doses of PMPA Protect Newborn Macaques Against Oral Simian Immunodeficiency Virus Infection* | June 18, 1998 | Koen K. A. Van Rompay *et al.*, AIDS 12: F79- F83. | Van Rompay AIDS 1998 [GILDDE00281170- GILDDE00281174] |
| 6. | *Administration of 9-[2- Phosphonomethoxy)propyl]adenine (PMPA) for Prevention of Perinatal Simian Immunodeficiency Virus Infection in Rhesus Macaques* | 1998 | Koen K.A. Van Rompay *et al*, 14 AIDS Research and Human Retroviruses, 761. | Van Rompay AIDS Res 1998 [GILDDE00280668- GILDDE00280684] |
| 7. | *Animal Models of HIV Infection: SIV Infection of Macaques* | 1999 | Koen Van Rompay *et al.*, Handbook of Animal Models of Infection. Academic Press Ltd, London 1061-1068. | Van Rompay 1999 [GILDDE00280934- GILDDE00280941] |
| 8. | *Nonhuman Primate Models for Testing Anti-HIV Drugs* | 2000 | Koen Van Rompay *et al.*, eds. *Antivirals against AIDS.* New York: Marcel Dekker, Inc., 295-320. | Van Rompay Antiviral 2000 [GILDDE00283486- GILDDE00283499] |

|  | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 9. | *Prophylactic and Therapeutic Benefits of Short-Term 9-[2-(R)-(Phosphonomethoxy)Propyl]Adenine (PMPA) Administration to Newborn Macaques Following Oral Inoculation with Simian Immunodeficiency Virus with Reduced Susceptibility to PMPA* | Feb. 2000 | Koen Van Rompay *et al.*, Journal of Virology 74:1767-74. | Van Rompay Virology 2000<br><br>[GILDDE00281146-GILDDE00281153] |
| 10. | *Two Low Doses of Tenofovir Protect Newborn Macaques Against Oral Simian Immunodeficiency Virus Infection* | Aug. 15, 2001 | Koen Van Rompay *et al.*, The Journal of Infectious Diseases 184:429-38. | Van Rompay 2001<br><br>[GILDDE00280877-GILDDE00280886] |
| 11. | *Topical Administration of Low-Dose Tenofovir Disoproxil Fumarate to Protect Infant Macaques against Multiple Oral Exposures of Low Doses of Simian Immunodeficiency Virus* | Nov. 15, 2002 | Koen Van Rompay *et al.*, The Journal of Infectious Diseases 186:1508–13. | Van Rompay 2002<br><br>[GILDDE00280548-GILDDE00280553] |
| 12. | *Oral Tenofovir DF Protects Infant Macaques Against Infection Following Repeated Low-Dose Oral Exposure to Virulent Simian Immunodeficiency Virus* | July 11-16, 2004 | Koen Van Rompay, XV International Conference on AIDS: Abstract LbOrB10. Bangkok, Thailand. | Van Rompay 2004<br><br>[GILDDE00283484-GILDDE00283485] |
| 13. | *Viread® Package Insert* | Oct. 26, 2001 | Gilead Sciences, Inc., Foster City, CA. | Viread® Insert<br><br>[GILDDE00283072-GILDDE00283099] |
| 14. | *Emtriva® Package Insert* | Jul. 1, 2003 | Gilead Sciences, Inc., Foster City, CA. | Emtriva® Insert<br><br>[GILDDE00282991-GILDDE00283003] |
| 15. | *Truvada® Package Insert* | Oct. 14, 2004 | Gilead Sciences, Inc., Foster City, CA. | Truvada® Insert<br><br>[GILDDE00283018-GILDDE00283044] |

| | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 16. | *Emtricitabine/Tenofovir Disoproxil Fumarate* | 2004 | Toni M. Dando and Antona J. Wagstaff, Drugs 2075-2082. | Dando [GILDDE00283957-GILDDE00283964] |
| 17. | *Pre-exposure Chemoprophylaxis for HIV: It is Time* | Jul. 16, 2004 | Stephen M. Smith, Retrovirology 1:16. | Smith 2004 [GILDDE00280986-GILDDE00280990] |
| 18. | *Antiretroviral Postexposure Prophylaxis After Sexual, Injection-Drug Use, or Other Nonoccupational Exposure to HIV in the United States: Recommendations from the U.S. Department of Health and Human Services* | Jan. 21, 2005 | Dawn K. Smith *et al.*, Morbidity and Mortality Weekly Report 54(RR-2):1-19. | Smith 2005 [GILDDE00281063-GILDDE00281090] |
| 19. | *Could Chemoprophylaxis be Used as an HIV Prevention Strategy While We Wait for an Effective Vaccine?* | Apr. 11, 2003 | Mike Youle and Mark A. Wainberg, AIDS 17:937-38. | Youle AIDS 2003 [GILDDE00280545-GILDDE00280547] |
| 20. | *Pre-exposure Chemoprophylaxis (PREP) as an HIV Prevention Strategy* | Jul. 2003 | Mike Youle and Mark A. Wainberg, JIAPAC 2(3):102-105. | Youle JIAPAC 2003 [GILDDE00280521-GILDDE00280524] |
| 21. | *Offering HIV Post-Exposure Prophylaxis (PEP) Following Non-Occupational Exposures: Recommendations for Healthcare Providers in the State of California* | June 2004 | Arnold Schwarzenegger *et al.*, The California Task Force on Non-Occupational PEP and the California Department of Health Services, Office of AIDS. | Schwarzenegger [GILDDE00280887-GILDDE00280933] |

|  | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 22. | *Efficacy of Postexposure Prophylaxis After Intravaginal Exposure of Pig-Tailed Macaques to a Human-Derived Retrovirus (Human Immunodeficiency Virus Type 2)* | Oct. 2000 | Otten *et al.*, Journal of Virology, 74:9771–9775. | Otten [GILDDE00281135-GILDDE00281139] |
| 23. | *Lack of a Pharmacokinetic Interaction Between Emtricitabine and Tenofovir DF When Co-administered to a Steady State in Healthy Volunteers* | Sept. 14-17, 2003 | M.R. Blum *et al.*, 43rd Annual Interscience Conference on Antimicrobial Agents and Chemotherapy: Poster A-1621 Chicago, IL. | Blum GILDDE00283956] |
| 24. | *Bioequivalence of Combination Tenofovir DF/Emtricitabine Tablets for One-Pill Once Daily Administration* | April 1-3, 2004 | B.P. Kearney *et al.*, 5th International Workshop on Clinical Pharmacology of HIV Therapy: Poster 7.3, Rome, Italy. | Kearney [GILDDE00283965] |
| 25. | *Anticipating the Efficacy of HIV Pre-Exposure Prophylaxis (PrEP) and the Needs of At-Risk Californians* | Nov. 2004 | Greg Szekeres *et al.*, California Center for HIV Identification, Prevention, and Treatment Services 1-35. | Szekeres [GILDDE00281295-GILDDE00281334] |
| 26. | *AIDS: Promote HIV Chemoprophylaxis Research, Don't Prevent It* | Sep. 30, 2005 | Robert M. Grant *et al.*, Science 309:2170-71. | Grant 2005 [GILDDE00283257-GILDDE00283258] |

|  | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 27. | *Chemoprophylaxis with Tenofovir Disoproxil Fumarate Provided Partial Protection Against Infection with Simian Human Immunodeficiency Virus in Macaques Given Multiple Virus Challenges* | Aug. 29, 2006 | Shambavi Subbarao *et al.*, The Journal of Infectious Diseases 194:904-11. | Subbarao [GILDDE00282936-GILDDE00282943] |
| 28. | *Emerging Anti-HIV Drugs* | May 10, 2005 | Erik De Clercq, Expert Opinion on Emerging Drugs 10 (2): 241-274. | De Clercq EOED [GILDDE00280995-GILDDE00281029] |
| 29. | *Chemoprophylaxis* | 1985 | Laurence S. Farer, American Review of Respiratory Disease 125(3P2):102–107. | Farer [GILDDE00283247-GILDDE00283256] |
| 30. | *AIDS and Other Immunodeficiencies* | 2002 | Richard A. Goldsby *et al.*, Immunology Fifth Edition, Chapter 19 429-459. | Goldsby [GILDDE00281030-GILDDE00281062] |
| 31. | *HIV Prevention Research in a Resource-limited Setting: The Experience of Planning a Trial in Cambodia* | Sep. 1, 2005 | Kimberly Page-Shafer *et al.*, The Lancet 1-5. | Page-Shafer [GILDDE00280540-GILDDE00280544] |
| 32. | *The Chemoprophylaxis of Infection* | Aug. 1, 1955 | Louis Weinstein, Annals of Internal Medicine 43(2): 287-298. | Weinstein [GILDDE00283738-GILDDE00283751] |
| 33. | *Long-Term Malaria Prophylaxis for Travelers* | Nov. 1, 2004 | Jürgen Knobloch, Journal of Travel Medicine 11(6):374–378. | Knobloch [GILDDE00281182-GILDDE00281186] |

| | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 34. | *Investigations in the Chemotherapy of Malaria in West Africa. II.—Malaria Suppression—Quinine and Mepacrine* | June 19, 1944 | G. M. Findlay and A. C. Stevenson, Annals of Tropical Medicine & Parasitology 168-187. | Findlay [GILDDE00281526-GILDDE00281546] |
| 35. | *Antiviral Chemotherapy and Chemoprophylaxis* | Mar. 15, 1985 | Raphael Dolin, Science 227(4692):1296-1303. | Dolin 1985 [GILDDE00282906-GILDDE00282914] |
| 36. | *A Controlled Trial of Amantadine and Rimantadine in The Prophylaxis of Influenza A Infection* | Sep. 2, 1982 | Raphael Dolin et al., The New England Journal of Medicine 307:580-584. | Dolin 1982 [GILDDE00282901-GILDDE00282905] |
| 37. | *Prevention and Control of Influenza Recommendations of the Advisory Committee on Immunization Practices (ACIP)* | June 29, 2005 | Scott A. Harper *et al.*, Morbidity and Mortality Weekly Report 54 (RR-8):1-40. | Harper [GILDDE00280942-GILDDE00280985] |
| 38. | *Prevention and Control of Influenza: Part II, Antiviral Agents* | Dec. 30, 1994 | Nancy H. Arden *et al.*, Morbidity and Mortality Weekly Report 43 (RR-15):1-10. | Arden [GILDDE00280644-GILDDE00280660] |
| 39. | *The Practice of Public Health* | 1997 | Roger Detels *et al.*, Oxford Textbook of Public Health Third Edition. Oxford University Press 1561-1581. | Detels [GILDDE00281091-GILDDE00281113] |
| 40. | *New Tests Raise Hopes for HIV-prevention Pill* | Mar. 25, 2005 | Thomas J. Coates, The Atlanta Journal A19. | Coates [GILDDE00280642-GILDDE002280643] |

55

| | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 41. | *Assembly and Morphology of HIV: Potential Effect of Structure on Viral Function* | Mar. 11, 1991 | Hans R. Gelderblom, AIDS 5:617-638. | Gelderblom<br><br>[GILDDE00281114-GILDDE00281134] |
| 42. | *Perils at Mucosal Front Lines for HIV and SIV and Their Hosts* | Oct. 2005 | Ashley T. Haase, Nature Reviews: Immunology 783-92. | Haase<br><br>[GILDDE00281154-GILDDE00281163] |
| 43. | *The Immune System in Health and Disease* | 2001 | Charles A. Janeway *et al.*, Immuno Biology 5th Ed 450-69. | Janeway<br><br>[GILDDE00280499-GILDDE00280520] |
| 44. | *New Approaches Toward Anti-HIV Chemotherapy* | Feb. 12, 2005 | Erik De Clercq, Journal of Medical Chemistry 1297-1313. | De Clercq JMC<br><br>[GILDDE00281354-GILDDE00281370] |
| 45. | *Pharmacokinetic and Pharmacodynamic Characteristics of Emtricitabine Support Its Once Daily Dosing for the Treatment of HIV Infection* | Nov. 11, 2004 | Laurene H. Wang, AIDS Research and Human Retroviruses 1173-82. | Wang<br><br>[GILDDE00280525-GILDDE00280539] |
| 46. | *HIV Population Dynamics In Vivo: Implications for Genetic Variation, Pathogenesis and Therapy* | Jan. 27, 1995 | John M. Coffin, Science 267(5197): 483-9. | Coffin<br><br>[GILDDE00280661-GILDDE00280667] |
| 47. | *A Controlled Trial of Two Nucleoside Analogues Plus Indinavir In Persons with Human Immunodeficiency Virus Infection and CD4 Cell Counts of 200 Per Cube Millimeter or Less* | Sep. 11, 1997 | Scott M. Hammer *et al.*, The New England Journal of Medicine 337: 725-733. | Hammer<br><br>[GILDDE00281383-GILDDE00281391] |
| 48. | *Combinations of Nucleoside/Nucleotide Analogues for HIV Therapy* | 2004 | Pablo Barreiro *et al.*, AIDS Reviews 6: 234-43. | Barreiro<br><br>[GILDDE00281577-GILDDE00281586] |

|  | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 49. | *Combined Tenofovir, Emtricitabine, Efavirenz May Be More Tolerable Than Standard First-Line HIV Therapy* | Nov. 3, 2004 | Paula Moyer, Medscape Medical News. | Moyer [GILDDE00280991-GILDDE00280994] |
| 50. | *A Case-Control Study of HIV Seroconversion In Healthcare Workers After Percutaneous Exposure* | Nov. 20, 1997 | Denis M. Cardo *et al.*, The New England Journal of Medicine 337:1485-90. | Cardo [GILDDE00281214-GILDDE00281219] |
| 51. | *Enhanced Tolerability and Adherence Using Tenofovir/3TC for Nonoccupational Post-Exposure Prophylaxis (NPEP)* | Jul. 11, 2004 | K. H Mayer *et al.*, XV International AIDS Conference: Abstract TuPeB4657. Bangkok. | Mayer 2004 [GILDDE00283388-GILDDE00283389] |
| 52. | *Tenofovir/3TC For Non-Occupational Postexposure Prophylaxis (NPEP): Improved Tolerability and Adherence Compared To AZT/3TC* | Jul. 24, 2005 | K. H Mayer *et al.*, 3rd International AIDS Society Conference on HIV Pathogenesis and Treatment: Abstract WePe10.3P08. Rio de Janeiro, Brazil. | Mayer 2005 [GILDDE00283390-GILDDE00283391] |
| 53. | *The Immunopathogenesis of HIV Infection, Fundamental Immunology* | 1999 | Oren Cohen *et al.*, Fundamental Immunology 4th ed. 1455-1509. | Cohen [GILDDE00280685-GILDDE00280742] |
| 54. | *Containment of Simian Immunodeficiency Virus Infection: Cellular Immune Responses And Protection From Rechallenge Following Transient Postinoculation Antiretroviral Treatment* | Mar. 2000 | Jeffrey D. Lifson *et al.*, Journal of Virology 74 (6): 2584-2593. | Lifson [GILDDE00281567-GILDDE00281576] |

| | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 55. | *Propagation and Dissemination of Infection after Vaginal Transmission of Simian Immunodeficiency Virus* | Jul. 2005 | Christopher J. Miller *et al.*, Journal of Virology 79 (14): 9217-9227. | Miller [GILDDE00281371-GILDDE00281382] |
| 56. | *The Pharmacology of Antiretroviral Nucleoside and Nucleotide Reverse Transcriptase Inhibitors* | Aug. 1, 2005 | David J. Back *et al.*, J. Acquir Immune Defic Syndr 39: S1-S23. | Back [GILDDE00283789-GILDDE00283811] |
| 57. | *Can Antiretroviral Therapy Be Used to Prevent Sexual Transmission of Human Immunodeficiency Virus Type 1* | May 15, 2002 | Mina Hosseinipour *et al.*, Clinical Infectious Diseases 34:1391-5. | Hosseinipour [GILDDE00282927-GILDDE00282931] |
| 58. | *Proposed Recommendations for The Management of HIV Post-Exposure Prophylaxis After Sexual, Injecting Drug or Other Exposures* | Jul. 2004 | Jesús Almeda *et al.*, Eurosurveillance 9 (2): 35-40. | Almeda [GILDDE00281175-GILDDE00281181] |
| 59. | *Tenofovir-Based Regimens for Non-Occupational Post-Exposure Prophylaxis (NPEP): Improved Tolerability and Adherence Compared to AZT Based Regimens* | Aug. 13, 2006 | K. H Mayer *et al.*, XVI International AIDS Conference: Abstract TUPE0432. Toronto, Canada. | Mayer 2006 [GILDDE00283392-GILDDE00283393] |
| 60. | *Knowledge and Use of HIV Pre-Exposure Prophylaxis Among Attendees of Minority Gay Pride Events, 2004.* | Nov. 1, 2006 | Scott E. Kellerman *et al.*, J Acquir Immune Defic Syndr 43 (3): 376-77. | Kellerman [GILDDE00281140-GILDDE00281145] |

| | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 61. | *Report of The NIH Panel to Define Principles of Therapy of HIV Infection and Guidelines for The Use of Antiretroviral Agents In HIV-Infected Adults and Adolescents* | Apr. 24, 1998 | Mark B. Feinberg and Jonathan E. Kaplan, Morbidity and Mortality Weekly Report 47(RR-5):1-82. | Feinberg [GILDDE00280743-GILDDE00280833] |
| 62. | *Updated U.S. Public Health Service Guidelines for The Management of Occupational Exposures To HBV, HCV, And HIV and Recommendations for Postexposure Prophylaxis* | June 29, 2001 | Elise M. Beltrami *et al.*, Morbidity and Mortality Weekly Report 50(RR-11):1-52. | Beltrami [GILDDE00281228-GILDDE00281294] |
| 63. | *Guidelines for The Use of Antiretroviral Agents In HIV-1-Infected Adults and Adolescents* | Oct. 29, 2004 | John G. Bartlett *et al.*, Panel on Clinical Practices for Treatment of HIV Infection 1-107. | Bartlett [GILDDE00281411-GILDDE00281525] |
| 64. | *Update: Provisional Public Health Service Recommendations for Chemoprophylaxis After Occupational Exposure to HIV* | June 7, 1996 | Morbidity and Mortality Weekly Report 45(22): 468-480. | CDER [GILDDE00283132-GILDDE00283155] |
| 65. | *Management of Possible Sexual, Injecting-Drug–Use, or Other Nonoccupational Exposure to HIV, Including Considerations Related to Antiretroviral Therapy* | Sep. 25, 1998 | Dawn K. Smith *et al.*, Morbidity and Mortality Weekly Report 47(RR-17): 1-15. | Smith 1998 [GILDDE00281392-GILDDE00281410] |
| 66. | *Public Health Service Guidelines for The Management of Health-Care Worker Exposures to HIV and Recommendations for Postexposure Prophylaxis* | May 15, 1998 | Linda A. Chiarello *et al.*, Morbidity and Mortality Weekly Report 47(RR-7): 1-35. | Chiarello [GILDDE00280834-GILDDE00280872] |

| | Title | Publication Date | Citation | Short Name and Bates Range |
|---|---|---|---|---|
| 67. | *CROI: Successful PREP Trial in Monkeys Sparks Call for More Research* | Feb. 2, 2006 | Gus Cairns, aidsmap, Conference on Retroviruses and Opportunistic Infections. | Cairns<br><br>[GILDDE00282896-GILDDE00282900] |
| 68. | *Two Drugs or Three? Balancing Efficacy, Toxicity, and Resistance in Postexposure Prophylaxis for Occupational Exposure to HIV* | Aug. 1, 2004 | Ingrid V. Bassett et al., Clinical Infectious Diseases 39:395-401 | Bassett<br><br>[GILDDE00282889-GILDDE00282895] |
| 69. | *Antiviral Drug Used to Treat AIDS to be Tested as Vaccine* | Dec. 1, 2004 | Sabin Russell, San Francisco Chronicle, Dec. 1, 2004. | Russell<br><br>[GILDDE00283966-GILDDE00283967] |
| 70. | *200 Atlanta Gays to Test Whether Pill Stops HIV* | Feb. 5, 2004 | David Wahlberg, The Atlanta Journal-Constitution, Feb. 5, 2004. | Wahlberg<br><br>[GILDDE00283968-GILDDE00283970] |
| 71. | *Trials Will Test Whether AIDS Drug Can Also Prevent HIV* | Dec. 4, 2003 | Marilyn Chase, Wall St. J., Dec. 4, 2003, B1. | Chase<br><br>[GILDDE00282886-GILDDE00282888] |
| 72. | *It's OK, I'm on the AIDS Pill* | Feb. 26, 2004 | Wired, Feb. 26, 2004. | Wired<br><br>[GILDDE00282875-GILDDE00282882] |
| 73. | *AIDS Pill as Party Drug?* | Dec. 19, 2005 | Daniel Costello, L.A. Times, Dec. 19, 2005, F1. | Costello<br><br>[GILDDE00281587-GILDDE00281588] |
| 74. | *Protect or Disinhibit?* | Jan. 22, 2006 | Jon Cohen, N.Y. Times Mag., Jan. 22, 2006, at 30. | Cohen 2006<br><br>[GILDDE00282883-GILDDE00282884] |

### c.     Anticipation Under 35 U.S.C. § 102(a) And/Or 102(b)

As detailed in Section V above, the Asserted Claims are not supported by the Provisional

Application and, therefore, are not entitled to a priority date before January 31, 2007.  Regardless

of whether the claims are entitled to priority, and regardless of the alleged date of conception,

each of the Asserted Claims is invalid under § 102(a) and/or 102(b).

The Asserted Claims are each invalid because the claimed processes were known or used

by others in the United States before the invention under pre-AIA 35 U.S.C. § 102(a).  A patent

claim is invalid where "the invention was known or used by others in this country, or patented or

described in a printed publication in this or a foreign country, before the invention thereof by the

applicant for patent." 35 U.S.C. § 102(a).  Under § 102(a), prior knowledge or use by others will

invalidate a patent claim if it "was known or used by others in this country, or patented or

described in a printed publication in this or a foreign country, before the invention thereof by the

applicant for a patent."  *Id.*  This is because "[i]f the invention was known to or used by others in

this country before the date of the patentee's invention, the later inventor has not contributed to

the store of knowledge, and has no entitlement to a patent." *UCB, Inc. v. Watson Laboratories

Inc.*, 927 F.3d 1272, 1289 (Fed. Cir. 2019) (alteration in original) (internal quotation marks

omitted) (quoting *Woodland Tr. v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir.

1998)).  To be certain, "***[p]rior knowledge and use by a single person is sufficient***." *UCB, Inc.

v. Watson Laboratories, Inc.*, 927 F.3d 1272, 1289 (Fed. Cir. 2019) (quoting *Coffin v. Ogden*, 85

U.S. (18 Wall.) 120, 124 (1873)); *see also BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 965

(Fed. Cir. 2020) ("[T]he number is immaterial." (quoting *Coffin*, 85 U.S. (18 Wall.) at 125)).

The Asserted Claims are also invalid under § 102(b) because the claimed processes were

"in public use" in the U.S. or "described in a printed publication" more than one year prior to the

date of the application for patent in the United States.  Pre-AIA 35 U.S.C. § 102(b).  Anticipatory

public use under § 102(b) is any use of the claimed invention "by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002) (citations omitted). The public use bar is triggered, "where, before the critical date, the invention is in public use and ready for patenting." *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1320 (Fed. Cir. 2019). When evaluating whether there has been public use within the meaning of § 102(b), courts consider the totality of the circumstances, such as "the nature of the activity that occurred in public; the public access to and knowledge of the public use; whether there was any confidentiality obligation imposed on persons who observed the use; [and] whether persons other than the inventor performed the testing," "in conjunction with the policies underlying the public use bar." *Netscape Commc'ns Corp.*, 295 F.3d at 1320. Those policies include:

> (1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.

*Baxter Int'l, Inc. v. Cobe Labs., Inc.*, 88 F.3d 1054, 1058 (Fed.Cir.1996) (quoting *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1198 (Fed. Cir. 1994)).

A "printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent" is anticipatory under § 102(b) if the reference was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence can locate it." *Medtronic, Inc. v. Barry*, 891 F.3d 1368 (Fed. Cir. 2018) (citations and original punctuation omitted) (describing "public accessibility" as the "touchstone in determining whether a reference constitutes a 'printed

publication'" under § 102(b)).  The printed publication bar is "grounded on the principle that

once an invention is in the public domain, it is no longer patentable by anyone."  *In re*

*Klopfenstein*, 380 F.3d 1345, 1349 (Fed. Cir. 2004) (citation omitted) (affirming finding that a

slide presentation printed onto poster boards "was shown for an extended period of time [during

a conference] to members of the public having ordinary skill in the art of the invention," and was

therefore "sufficiently publicly accessible to count as a 'printed publication' under § 102(b)").

"If accessibility is proved, there is no requirement to show that particular members of the public

actually received the information."  *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347,

1356 (Fed. Cir. 2018) (citations omitted).

> ### i.     *Pre-exposure Prophylaxis With Tenofovir (or TDF, Tenofovir Ester, and Tenofovir Prodrug) and Emtricitabine Was Known by Others*

The use of TDF and FTC in combination for pre-exposure prophylaxis was known by

others in this country at least as early as 2004.  This knowledge was documented in at least the

following:

> ### 1.     The Peru PrEP Study

By at least December 8, 2004, and prior to the earliest priority date to which the Asserted

Claims are entitled, Dr. Robert Grant, of the University of California, San Francisco, knew to

combine TDF and FTC for pre-exposure prophylaxis, as demonstrated in a grant proposal for a

clinical study entitled "Truvada (TDF/FTC) for HIV prevention in American Men," in Peru (the

"Peru PrEP Study").  Prior to December 2004, Dr. Grant had proposed to study the efficacy of

daily oral tenofovir at 300 mg per day in a proposal titled, "Chemoprophylaxis for HIV

Prevention in American Men."  [GILDDE00283952-55, at GILDDE00283952].  By December

2004, Dr. Grant proposed an alteration to the study by adding a "[T]ruvada arm."  *Id.*  The aim of

the study was to "determine if daily oral fixed dose Truvada (TDF/FTC) decreases HIV infection

risk among men who have sex with men." *Id*.  By adding a "[T]ruvada arm," Dr. Grant proposed to study an additional 900 men taking Truvada®, *i.e.*, TDF and FTC in a fixed-dose single tablet, once a day.  *Id*. at [GILDDE00283952-54].  Dr. Grant's proposal sheet explained why the combination of TDF and FTC was selected, citing the following advantages: "[t]he fixed dose formulation allows both drugs to be taken as a single tablet once a day[;] FTC (emtricitabine) has a prolonged intracellular half-life (>24 hours), which allows drug levels to be maintained despite imperfect adherence[;] [b]oth drugs have an outstanding safety record[;] [t]he fixed dose formulation became FDA licensed for HIV treatment in 2004[;] [i]mportantly, FTC primarily selects the M184V mutation which increases susceptibility to tenofovir, thereby providing a basis for synergy between both drugs." *Id.* at [GILDDE00283953].

On December 11, 2004, Dr. Grant shared the clinical study proposal using Truvada® for PrEP with at least Howard Jaffe, Jim Rooney, and Madeline Miller of Gilead (located in California), explaining in an email to them that he had "talked over the idea of adding a [T]ruvada arm to the MSM trial with Mary Fanning," who was then a researcher at the NIH. [GILDDE00283951, at GILDDE00283951].  Dr. Grant attached the clinical study proposal to that email.  *Id.* (attaching [GILDDE00283952-55]).  Dr. Grant further described that Ms. Fanning "seemed to be very enthusiastic about the idea," and that he was sharing the concept sheet with the Gilead team to "welcome input" on the concept.  [GILDDE00283951, at GILDDE00283951].

Dr. Grant further formalized this concept sheet into a draft protocol for the Peru PrEP Study, dated December 17, 2004, which Dr. Grant sent to Mr. Rooney, Mr. Jaffe, and Ms. Miller at Gilead in an email on December 23, 2004.  *See, e.g.*, [GILDDE00280335-448]; *see also* [GILDDE00283822-930]; [GILDDE00280214-319]; [GILDDE00280105-213].  The protocol—

in all its various versions—describes that two goals of the study are to "determine if daily oral [T]ruvada (fixed dose tenofovir 300mg/emtricitabine 200mg) is associated with comparable rates of adverse events compared with placebo among HIV-1 uninfected men who have sex with men in Peru" and to "determine [if] daily oral [T]ruvada reduces HIV-1 seroconversion." [GILDDE00280335-448, at GILDDE00280350]. The protocol later explains that the overall design of the study is to evaluate "chemoprophylactic tenofovir or [T]ruvada, administered orally once daily to high-risk HIV-uninfected men." *Id.* at [GILDDE00280361]. The protocol also describes the properties of tenofovir and emtricitabine and why those drugs were selected:

> Emtricitabine has similar characteristics to tenofovir that make it suitable for evaluation as chemoprophylaxis. These characteristics include prolonged intracellular half life that allows once a day dosing, high levels of tolerability, potent antiviral effects, and selection of drug resistant variants that have mutations associated with diminished capacity for replication. A fixed dose coformulation of emtricitabine 200 mg and tenofovir 300 mg was licensed for HIV-1 treatment in August 2004 with the trade name [T]ruvada. Truvada may prove to be more effective than tenofovir for chemoprophylaxis due to the presence of two agents that are active against HIV-1 and a higher barrier to resistance.

*Id.* at [GILDDE00280356-57].

In another document dated December 17, 2004, titled "Answer to Bob's questions dated on Dec 17 2004," the document addresses Dr. Grant's question of whether to "add a [T]ruvada arm as proposed in [the] draft [protocol]." [GILDDE00280103-04, at GILDDE00280103]. The question states that adding a Truvada arm now would "make[] this study more robust to information that may appear from this trial and elsewhere in 2006," and further, that Dr. Grant "expect[s] that randomized data that compares Truvada v placebo or [T]ruvada v TDF will be highly valuable." *Id.* The written answer to that question states, "[w]e agree to add a [T]ruvada arm." *Id.* The document further states that the study's primary aim would be to evaluate

Truvada "to prevent HIV infection and defer the evaluation of adverse event rates as secondary objectives, based on the current knowledge of study drug safety." *Id.*

On January 10, 2005, Gilead held a meeting of the Special Applications Committee to review the draft protocol. *See* [GILDDE00279772-813]. In attendance were Howard Jaffe (Chairperson), Alan Taylor, Amy Flood, Caroline Emmett, Dean Waters, Geoff Cotton, Gregg Alton, Howie Rosen, Jim Rooney, Joe Steele, John Wolf, Madeleine Miller, Marianne Poblenz, Mick Hitchcock, Norbert Bischofberger, Phil Zack, and Robert Webster. *Id.* at [GILDDE00279772]. Bruce Olmscheid and John Flaherty did not attend in person, but were sent the meeting materials. *Id.* According to the agenda and the meeting minutes, the group discussed Dr. Grant's Peru PrEP Study protocol at the January 10, 2005 meeting. *Id.* at [GILDDE00279773]; [GILDDE00279814-47, at GILDDE00279818]. Specifically, the minutes drafted by Jennifer Thomas on February 4, 2005 describe that Dr. Grant's Peru PrEP Study protocol was "resubmitted to consider the addition of Truvada vs. Truvada placebo arm to the previously approved TDF/PCO prevention study in Peru," a plan that the "[s]ubcommittee support[ed]." [GILDDE00279814-47, at GILDDE00279818].

An informed consent form for the Peru PrEP Study, in a section describing the eligibility procedures, states that "You are being asked to take part in a research study to test a new method of preventing HIV infection. . . . In this study, an anti-HIV drug called Tenofovir or another anti-HIV drug called Truvada (which is a combination of Tenofovir and an anti-HIV drug Emtricitabine) will be tested." [GILDDE00280320-24, at GILDDE00280320]; *see also* [GILDDE00280325-34, at GILDDE00280325]. The document also tells the potential candidate, "Before you decide whether or not you would like to take part in the Tenofovir or Truvada Prevention study, we would like to explain the purpose of the study, how it may help you or

66

others, any risks to you, and what is expected of you."   [GILDDE00280320-24, at

GILDDE00280320].  The document states the purpose of the study is to test a "new use for

[Tenofovir and the combination of Tenofovir and Emtricitabine (Truvada): that new use would

be prevention of HIV in people who are HIV negative," by finding out "[i]f taking Tenofovir or

Truvada once a day is safe for men who are HIV negative and at high risk of getting HIV

infection," and "[i]f taking Tenofovir or Truvada once a day for one year will prevent HIV

infection in men who are HIV negative and at high risk of getting HIV infection." *Id.*  The

informed consent document explains that "Truvada (a combination of Tenofovir and another

anti-HIV drug Emtricitabine) was chosen for this study because it also has a low level of side

effects and can be taken once a day," and further, "Truvada may prevent the HIV virus from

developing resistance compared to other anti-HIV drugs." [GILDDE00280325-34, at

GILDDE00280326].  The document states the study will involve 2,100 HIV-negative men in

three Peruvian cities who are at high risk of getting HIV, that each man will take part in the study

for one and a half years, and that participants will "take a pill every day for 18 months," and the

pill may either contain the "anti-HIV drug Tenofovir, the anti-HIV drug Truvada or it may be a

'placebo.'" *Id.*  An additional document for the Peru PrEP Study further describes the

characteristics of tenofovir and emtricitabine, comparing the oral bioavailability, food effect,

serum half-life, intracellular half-life, and major toxicity.  [GILDDE00280039-40, at

GILDDE00280039].

　　　Starting at least by January 4, 2005, a group of researchers that included several U.S.-

based researchers discussed the Peru PrEP Study during weekly teleconference meetings.  As

evidenced through a series of minutes, several researchers, including at least Dr. Grant, Dr. Page-

Shafer, Jeff McConnell, Dr. Vivian Levy, Dr. Javier Lama, and Pedro Goicochea, met weekly to

discuss the Peru PrEP Study.  In the January 4, 2005 meeting, whose attendees included Dr. Grant, Mr. McConnell, Dr. Levy, Dr. Page-Shafer, Dr. Lama, and Mr. Goicochea, the meeting minutes indicate that the group's discussion "centered around the possibility of a 3 arm study: Tenofovir prophylaxis vs. Truvada vs. Placebo."  [GILDDE00280071-73, at GILDDE00280072].  The minutes describe the reasoning for adding a Truvada arm: "Truvada has a higher barrier to resistance than Tenofovir and like Tenofovir, a good safety profile," and ultimately, "Truvada may prove to be the most superior prophylaxis option."  *Id.*  According to the minutes, Dr. Page asked if NIH would "make a funding commitment to a 3 arm protocol," to which Dr. Grant replied, "if the Tenofovir or placebo arm is inferior, Truvada may prove to be the most superior prophylaxis option."  *Id.*  The minutes further indicate that the idea was shared with and well-received by others, as "Howard Jaffe and Jim Rooney of Gilead are optimistic about Truvada in this role and will present a concept to their decision making body January 2005."  *Id.*  The minutes add that the "NIH has been notified [of] the addition of a Truvada arm."  *Id.*

The next week, during the January 11, 2005 meeting, which Dr. Grant, Mr. McConnell, Dr. Levy, Dr. Page-Shafer, Dr. Lama, and Mr. Goicochea attended, the minutes prepared by Dr. Levy describe how Dr. Grant spoke to "R. Richardson at [the] Gates [Foundation] [regarding] funds for the Truvada arm."  [GILDDE00280057-58, at GILDDE00280058].  The minutes also describe that the HIV Prevention Trial Network ("HPTN"), including Dr. Ward Cates, Dr. Tom Coates, and Dr. Ken Mayer, were "all interested in a Truvada arm for their prevention studies."  *Id.*  According to minutes prepared by Dr. Levy, in the following week's meeting on January 18, 2005, Dr. Grant, Dr. Page-Shafer, Mr. McConnell, Dr. Levy, Mr. Jorge Sanchez, Dr. Lama, and Mr. Goicochea discussed Dr. Grant's comment that "Gilead's senior leadership approved

requests for Truvada and placebos."   [GILDDE00280097-98, at GILDDE00280097].  The

minutes further describe that Dr. Grant forwarded this information "to R. Richardson at [the]

Gates [Foundation] who is asking her leadership for Truvada arm funds."  *Id.*  The minutes also

describe that Dr. Grant "asked Sharon Gershon, [their] project officer at [the NIH's Prevention

Scientific Review Committee], if a Truvada arm protocol could be reviewed now or February

2005."  *Id.*

Two weeks later on February 15, 2005, Dr. Grant, Mr. McConnell, Dr. Levy, Dr. Page-

Shafer, Dr. Lama, Mr. Sanchez, Mr. Goicochea, and Ms. Vanessa McMahan discussed that the

"Gates foundation [was] interested in funding a Truvada study," as described in minutes

prepared by Ms. McMahan.  [GILDDE00280041-43, at GILDDE00280041].  The minutes

further describe that "[Dr.] Mike Cohen [of the University of North Carolina] would like to

support this Truvada arm so HPTN could support a Truvada trial sometime this year."  *Id.*

Weeks later, on March 8, 2005, the meeting minutes prepared by Ms. McMahan describe that Dr.

Grant, Mr. McConnell, Dr. Levy, "Dave"—Dr. Dave Glidden, Dr. Page-Shafer, Dr. Lama, Mr.

Goicochea, and Ms. McMahan, followed up on the HPTN funding source by discussing a

conversation held during the previous week with Dr. Kevin Ryan of the HPTN regarding the

submission of the protocol for HPTN funding.  [GILDDE00280099-102, at GILDDE00280099];

*see also* [GILDDE00280044-56, at GILDDE00280045-46] ("Bob reminded the group that we

submitted the three arm study with truvada as a concept to the HPTN").  The minutes further

describe that "Mary Fanning of the NIH is having an ad hoc meeting this week to consider if [the

NIH] should support [Dr. Grant's] Truvada arm."  *Id.*

On March 15, 2005, Dr. Grant, Dr. Page-Shafer, Mr. McConnell, Dr. Levy, Dr. Lama,

Mr. Goicochea, and Ms. McMahan met again, this time discussing the latest news "about the

feasibility of the Truvada arm," *i.e.* that Dr. Grant spoke with Mary Fanning from the NIH, who reportedly told Dr. Grant about potential reasons she did not recommend adding a Truvada arm to the study.  [GILDDE00280086-90, at GILDDE00280086].  According to the minutes, Dr. Fanning's "main reason was that Truvada has not passed through a scientific review and that there was no non-human primate study that demonstrated the efficacy of Truvada as a chemoprophylactive [sic] measure."  *Id.*  The minutes further discuss that there was no assurance of "out-year funding," but that there was interest from the Gates Foundation and the possibility of applying for a "competitive supplement in May to the NIH," which if approved, would then allow Dr. Grant to "include the Truvada arm in [the] study."  *Id.*  In the meantime, the group concluded they would be "in the process of complying with a two arm approach."  *Id.*

The Peru PrEP study efforts involved the submission of several grant applications to the NIH (AI064002).  On August 31, 2004, Dr. Grant submitted an application to the NIH proposing the evaluation of "chemoprophylaxis for HIV prevention in a randomized and blinded trial of daily oral tenofovir 300 mg versus placebo among men in Peru, who have extremely high risk of acquiring HIV infection."  [GILDDE00281985-2762, at GILDDE00282008]; *see also* [GILDDE00280451-98, at GILDDE00280451].  This grant application was received by NIH on September 1, 2004.  [GILDDE00281985-2762, at GILDDE00282007].  Although this proposal did not itself seek to study TDF and FTC combined, Dr. Grant noted that if other trials outside the Peru study showed some indication of "significant risks of drug resistance among those who seroconvert on tenofovir," then the effect on the proposed research in Peru would be "[l]ikely early termination, and roll over into a trial comparing TDF/FTC with TDF alone."  *Id.* at [GILDDE00282088].  The 2004 grant application further explained that "[i]f information becomes available that indicates high rates of drug resistance and marginal efficacy," the trial

may be closed, but "[p]articipants could be rolled over into a new trial, and randomized to receive tenofovir plus a second agent (eg: TDF/FTC) versus tenofovir alone and followed for differences in the risk of drug resistance."  *Id.*

In a different grant application that Dr. Grant submitted to the NIH on August 31, 2006 for a study titled, "Chemoprophylaxis and HIV-Host Interactions," the studies Dr. Grant proposed involved the evaluation of "people who take TDF or TDF and FTC (FTC/TDF) chemoprophylaxis prior to seroconversion."  [GILDDE00281589-984, at GILDDE00281832]. In describing the status of other chemoprophylaxis trials, the grant application states that the decision to "add[] FTC to the chemoprophylactic regimen is based on recent studies of non-human primates, which suggested trends toward increased efficacy when oral FTC/TDF was used (4/6 animals protected after 14 challenges) compared with oral TDF alone (only 1 in 4 was protected)."  *Id.* at [GILDDE00281837].  The grant application further states that "FTC and TDF have similar characteristics, including minimal effects on cell metabolism and mitochondrial polymerases, excellent penetration into genital secretions, and long intracellular half-life."  *Id.* at [GILDDE00281855].

On January 3, 2007, Dr. Grant re-submitted the August 2004 grant application form to NIH (AI064002), describing a revised version of the Peru PrEP Study.  In an opening description to the form, the application states that the proposed HIV prevention clinical trial will "evaluate the efficacy and safety of the most promising candidate identified in pre-clinical studies: co-formulated emtricitabine 200 mg / tenofovir disoproxil fumarate 300 mg (FTC/TDF)." [GILDDE00281985-2762, at GILDDE00282265]; *see also* [US_00011468-623] (Peru PrEP proposal produced by the Government).  The description further states that the final project "will enroll 1400 men who [would] be randomized 1:1 to receive daily oral FTC/TDF versus placebo."

[GILDDE00281985-2762, at GILDDE00282265].  In a section titled "Specific Aims," the grant

application states that "[t]enofovir disoproxil [sic] fumarate (tenofovir or TDF) and emtricitabine

(FTC) have been demonstrated to prevent transmission of simian immunodeficiency virus (SIV)

when administered near the time of virus challenge."  *Id.* at [GILDDE00282351].  The grant

application restates that the primary goal of the study is to "evaluat[e] the efficacy of

chemoprophylactic therapy using once daily FTC/TDF to prevent HIV-1 acquisition in high-risk

uninfected men who have sex with men (MSM)."  *Id.*

Further, the grant application explains the justification for selecting FTC/TDF for the

chemoprophylaxis trial:

> "These agents have demonstrated outstanding safety and efficacy
> in human clinical trials.  FTC has similar characteristics to TDF
> that make it suitable for evaluation as chemoprophylaxis.  These
> characteristic include prolonged half-intracellular half-life that
> allows once-a-day dosing, high levels of tolerability, potent
> antiviral effects, and selection of drug-resistant variants that have
> mutations associated with diminished capacity for replication.  Use
> of two agents for chemoprophylaxis increases the activity of the
> regimen and increases the barrier to drug resistance."

*Id.* at [GILDDE00282352].  A later summary of FTC/TDF in the grant application adds that

"[n]o single antiretroviral agent or combination of agents share all these advantages for the study

proposed here."  *Id.* at [GILDDE00282354].  Finally, in a justification explaining the dosing and

dosing schedule, the grant application states "Emtricitabine 200 mg/TDF 300 mg per day is

chosen because this is the dose that has been license by the FDA for treatment of HIV-1

infection."  *Id.* at [GILDDE00282359].  Regarding the justification for dosing daily, the grant

application states one of the reasons for daily dosing was because "there is evidence that risky

sex is often unplanned or unrecognized by individuals," and "[i]n the light of these observations,

we now propose to administer an antiretroviral drug continuously to subjects at high risk of

acquiring HIV-1 infection, in a strategy that could be called pre-exposure prophylaxis (PREP),"
so as to "not require that the person appreciate the risk of any given sexual contact." *Id.*

Dr. Grant's Peru PrEP Study to evaluate Truvada® for pre-exposure prophylaxis in men
who have sex with men in Peru is evidence of invalidating prior public knowledge under at least
§ 102(a).  At least Dr. Grant had knowledge of using TDF combined with FTC for pre-exposure
prophylaxis beginning no later than August 31, 2004, and prior to the filing date of the
provisional application.  *UCB, Inc.*, 927 F.3d at 1289 ("Prior knowledge and use by a single
person is sufficient.") (quoting *Coffin v. Ogden*, 85 U.S. 120, 124 (1873)).  The information was
also known to others in the U.S., including at least Dr. Page-Shafer, Mr. McConnell, Dr. Levy,
Ms. McMahan, and Dr. Glidden, who attended teleconferences with Dr. Grant during which the
idea of a "Truvada arm" for prophylaxis was discussed beginning no later than January 2005.
*See* [GILDDE00280071-73]; [GILDDE00280057-58]; [GILDDE00280097-98];
[GILDDE00280041-43]; [GILDDE00280099-102]; [GILDDE00280086-90].  Furthermore, the
meeting minutes from those teleconferences indicate that Dr. Grant discussed the Truvada® HIV
PrEP arm with at least Mary Fanning of the NIH; Dr. Kevin Ryan, Dr. Ward Cates, Dr. Tom
Coates, and Dr. Ken Mayer of the HPTN; Sharon Gershon of the NIH; R. Richardson of the
Gates Foundation; and Dr. Mike Cohen of the University of North Carolina, indicating that each
of these individuals also had knowledge of using Truvada® for pre-exposure prophylaxis.
Finally, the knowledge of combining TDF and FTC for pre-exposure prophylaxis was known to
at least one or more of Howard Jaffe, Jim Rooney, and Madeline Miller by December 11, 2004,
*see* [GILDDE00283951, at GILDDE00283951], and to at least one or more of Alan Taylor, Amy
Flood, Caroline Emmett, Dean Waters, Geoff Cotton, Gregg Alton, Howie Rosen, Joe Steele,
John Wolf, Marianne Poblenz, Mick Hitchcock, Norbert Bischofberger, Phil Zack, Robert

73

Webster, Bruce Olmscheid, and John Flaherty from Gilead, at least because they attended a

January 10, 2005 meeting during which Dr. Grant's protocol involving a Truvada arm was

discussed.  *See* [GILDDE00279772-813, at GILDDE00279773];  [GILDDE00279814-847, at

GILDDE00279818].

      This prior knowledge was anticipatory under § 102(a) because each element of the

Asserted Claims was known and publicly communicated, as evidenced by the contemporaneous

corroborating documentation.  *See e.g.,* [GILDDE00283952-55]; [GILDDE00280335-448];

[GILDDE00283822-930]; [GILDDE00280214-319]; [GILDDE00279772-813];

[GILDDE00280103-04];[GILDDE00280320-24]; [GILDDE00280325-34]; [GILDDE00280039-

40]; [GILDDE00281985-2762]; [GILDDE00280451-98]; [US_00011468-623] (Peru PrEP

proposal produced by the Government).  *See Ecolochem, Inc v. S. Cal. Edison Co.*, 227 F.3d

1361, 1369 (Fed. Cir. 2000); *Aspex Eyewear, Inc. v. Concepts In Optics, Inc.*, 111 F. App'x 582,

586 (Fed. Cir. 2004).  For example, based on Dr. Grant's August 31, 2004 grant proposal to the

NIH and his December 8, 2004 concept sheet, for example, a person of ordinary skill in the art

would have known to administer TDF and FTC prior to exposure in humans to prevent

establishment of HIV infection, as claimed.  The concept sheet provides an enabling disclosure

by instructing that Truvada® be used in "fixed dose formulation [that] allows both [TDF and

FTC] to be taken as a single tablet once a day."  [GILDDE00283952-55, at GILDDE00283953].

Similarly, the Peru PrEP Study Protocol discloses the oral administration of "[T]ruvada (fixed

dose tenofovir 300mg/emtricitabine 200mg)" "once daily to high-risk uninfected men."

[GILDDE00280335-448, at GILDDE00280335, GILDDE00280361].  These documents reflect

the communications and discussions above.  If Truvada® infringes the Asserted Claims when

administered for PrEP, as Plaintiffs contend, then so too does knowledge of the same

administration of Truvada® (or TDF and FTC) for PrEP by others in this country prior to the earliest priority date to which the Asserted Claims are entitled..

Knowledge of the use of Truvada® for HIV pre-exposure prophylaxis was publicly accessible because Dr. Grant demonstrated knowledge of the combination of TDF and FTC for pre-exposure prophylaxis prior to the alleged invention and further shared this knowledge with several people, including at least Jim Rooney, Howard Jaffe, and Madeline Miller in an email on December 11, 2004; Dr. Page-Shafer of the University of California; Dr. Ruiz and Dr. Burns of the NIH; Mary Fanning of the NIH; Dr. Kevin Ryan, Dr. Ward Cates, Dr. Tom Coates, and Dr. Ken Mayer of the HPTN; Sharon Gershon of the NIH; R. Richardson of the Gates Foundation; and Dr. Mike Cohen of the University of North Carolina, indicating that the knowledge of using TDF and FTC for pre-exposure prophylaxis was intended to be public and was freely shared. *See* [GILDDE00283931]; [GILDDE00280071-73]; [GILDDE00280057-58]; [GILDDE00280097-98]; [GILDDE00280041-43]; [GILDDE00280099-102]; [GILDDE00280086-90].  The circulation of such documents as a concept sheet, a protocol, and a grant application, in combination with the teleconference and meeting minutes documenting conversations between Dr. Grant, Gilead, NIH scientists, potential funding streams from the HPTN, University of North Carolina, and the Gates Foundation, all evidence that the method of using Truvada® for pre-exposure prophylaxis was discussed freely, without any attempt to conceal the information or keep the method secret.  *See, e.g.*, *Ecolochem, Inc*, 227 F.3d at 1369 (holding a presentation given at a conference was "indicative of the state of knowledge and use in this country" under § 102(a)); *Aspex Eyewear, Inc.*, 111 F. App'x at 586 (Section 102(a) "does not require the anticipating public knowledge to be disclosed in a written document, much less, a single written document."); *see also Levi Strauss & Co. v. Golden Trade, S.r.L.,* No. 90-CIV-

6291, 1995 WL 225621, at *26 (S.D.N.Y. Apr. 14, 1995) (holding the process described in the method patent was "not secret" based on testimony from three individuals, and was therefore "known or used" under section 102(a)). The Asserted Claims of the Patents-in-Suit are therefore invalid under § 102(a).

**2.**    The Thai PrEP Study

Prior to the earliest priority date to which the Asserted Claims are entitled, knowledge of combining TDF and FTC for pre-exposure prophylaxis was also detailed in a proposal for a clinical study titled "Safety and pharmacokinetics of oral tenofovir and emtricitabine in HIV negative Thai women" (the "Thai PrEP Study"). On August 16, 2005, Dr. John Kaldor, a Professor at the University of New South Wales in Australia, drafted a clinical trial protocol for the Thai PrEP Study. *See* [GILDDE00279933-35]. This protocol was a revision of an earlier protocol that proposed studying daily oral tenofovir.

The stated objective of the revised study was to "conduct a comprehensive safety and pharmacokinetic evaluation of oral tenofovir (TDF) and oral TDF/FTC for pre-exposure prophylaxis for HIV prevention among Asian women." *Id.* at [GILDDE00279933]. The protocol describes how "a reduced dosing regimen of TDF 300 mg every 48 hours or TDF/FTC 300/200 mg every 48 hours provides adequate intracellular drug exposure, compared with a daily dosing regimen, among HIV-uninfected women in Thailand." *Id.* One of the rationales behind studying combined TDF/FTC was that "TDF alone may not have high enough levels of efficacy for HIV prevention, and evaluation of TDF/FTC combined is warranted." *Id.*

On August 17, 2005, Dr. Kaldor sent a draft of the protocol to Jim Rooney at Gilead, copying Dr. Iona Millwood, a Senior Epidemiologist then-affiliated with the University of New South Wales in Australia, and Dr. Kimberly Page-Shafer at the University of California, San Francisco. *See* [GILDDE00279932]. In the email, which was not marked confidential, Dr.

76

Kaldor described a "concept [that] represents a further development of the proposal that we submitted to the NIH at the start of this year." *Id.* at [GILDDE00279932]. The email summarized that the new protocol "include[s] a third arm, of tenofovir and FTC, in addition to tenofovir only and placebo." *Id.* In addition to being emailed to Mr. Rooney, Ms. Millwood, and Dr. Page-Shafer, the protocol for the Thai PrEP Study was discussed during an August 22, 2005 meeting of Gilead's Special Applications Committee, during which Gilead discussed protocols involving Gilead's drugs. *See* [GILDDE00279848-58]. According to an agenda dated August 19, 2005, the attendees at the August 22, 2005 Gilead Special Applications meeting included at least Howard Jaffe (Chairperson), Alan Taylor, Amy Flood, Bruce Olmscheid, Caroline Emmett, Dean Waters, Geoff Cotton, Gregg Alton, Howie Rosen, Jim Rooney, Joe Steele, Madeline Miller, Marianne Poblenz, Mick Hitchcock, Norbert Bischofberger, Phil Zack, and Robert Webster. *Id.* at [GILDDE00279848-49]. A summary of the meeting dated September 30, 2005 from Jennifer Thomas states that Dr. Kaldor's "revised proposal was submitted to include a TVD [Truvada] arm." [GILDDE00279859-61, at GILDDE00279860]. The summary further states that the Gilead Special Applications Committee "supports providing drug for this study." *Id.*

On August 29, 2005, Dr. Kaldor submitted to NIH a grant application (1 R34 AI069962-01) titled "Safety and pharmacokinetics of oral tenofovir and emtricitabine in HIV negative Thai women" based off of the August 2005 protocol. The grant application states that "the long term objective of this application is to determine whether tenofovir, and tenofovir in combination with emtricitabine, are safe when administered over an extended time period to women in an Asian population." [GILDDE00282763-874, at GILDDE00282778]; [GILDDE00279943-0038, at GILDDE00279943]. The opening description further states that the rationale for "testing the

safety of these drugs in this population is that they are being considered as possible prophylactic agents against the acquisition of HIV infection."  [GILDDE00282763-874, at GILDDE00282778].  Among the stated reasons for selecting tenofovir and emtricitabine were emtricitabine's "availab[ility] in a co-formulation with tenofovir."  *Id.*  The application further explains that "[a]s with treatment of HIV invention, a combination of ARVs may be needed," and that FTC and TDF were an ideal combination given that "[e]mtrictabine (FTC) shares many characteristics desirable for a chemoprophylactic agent, including an excellent safety record, and is available in a single pill combination with TDF."  *Id.* at [GILDDE00282820].  The grant application lists several co-investigators, including Dr. Kimberly Page-Shafer (University of California San Francisco) and researchers affiliated with the University of Nijmegen Medical Centre (Netherlands), University of New South Wales (Australia), and the Thai Red Cross AIDS Research.  *Id.* at [GILDDE00282779].

This prior public knowledge is invalidating under at least § 102(a), as evidenced by the contemporaneous corroborating documentation.  *See, e.g.*, [GILDDE00279933-35], [GILDDE00279859-61], [GILDDE00282763-874]; [GILDDE00279943-0038].  *Ecolochem, Inc*, 227 F.3d at 1369; *Aspex Eyewear, Inc.*, 111 F. App'x at 586.  For example, the use of TDF and FTC for HIV pre-exposure prophylaxis was known to at least Dr. Page-Shafer, a U.S.-based researcher, as well as Gilead employees such as  Mr. Jaffe, Mr. Taylor, Ms. Flood, Mr. Olmscheid, Ms. Emmett, Mr. Waters, Mr. Cotton, Mr. Alton, Mr. Rosen, Mr. Rooney, Mr. Steele, Ms. Miller, Ms. Poblenz, Mr. Hitchcock, Mr. Bischofberger, Mr. Zack, and Mr. Webster, who attended the August 22, 2005 Gilead Special Applications meeting during which the Thai PrEP Study was discussed.  *See* [GILDDE00279932]; [GILDDE00279848-58]; [GILDDE00279859-61].  The Thai PrEP Study protocol, such as that sent to Gilead,  disclosed

the use of oral TDF-FTC at a dosage of 300/200 mg, to be administered every 48 hours to HIV-uninfected women.   [GILDDE00279933-35, at GILDDE00279933].   The grant application to NIH similarly discloses a dosing regimen of TDF/FTC at 300/200 mg for evaluating oral TDF/FTC for "pre-exposure prophylaxis for HIV prevention among a population of Asian women."  [GILDDE00282763-874, at GILDDE00282820].

The Thai PrEP Study indicates the knowledge of TDF-FTC for pre-exposure prophylaxis was public.  Dr. Kaldor  knew of administration of that combination for HIV pre-exposure prophylaxis and shared this knowledge with several individuals in the U.S., including Dr. Page-Shafer, a co-investigator in the study based out of California.  Dr. Kaldor also shared this knowledge with Gilead and its employees—including Howard Jaffe, Alan Taylor, Amy Flood, Bruce Olmscheid, Caroline Emmett, Dean Waters, Geoff Cotton, Gregg Alton, Howie Rosen, Jim Rooney, Joe Steele, Madeline Miller, Marianne Poblenz, Mick Hitchcock, Norbert Bischofberger, Phil Zack, and Robert Webster—by circulating his revised protocol to study TDF-FTC and requesting drugs from Gilead for the study.  [GILDDE00279848-58]; [GILDDE00279859-61].  The combination of TDF and FTC for pre-exposure prophylaxis was therefore known to others in the U.S. prior to the earliest priority date to which the Asserted Claims are entitled.  The circulation of information to Gilead does not indicate that there was any intent to conceal or suppress this knowledge, as opposed to its unhindered circulation.  *See, e.g.*, *Ecolochem, Inc*, 227 F.3d at 1369; *Aspex Eyewear, Inc.*, 111 F. App'x at 586.  The Asserted Claims of the Patents-in-Suit are therefore invalid under § 102(a) based on this prior public knowledge.

**3.**     Dr. Mayer Proposal, "Non-Occupational Post-Exposure
Prophylaxis (NPEP) Using a Once-Daily Regimen of Tenofovir
DF and FTC"

Prior to the earliest priority date to which the Asserted Claims are entitled, knowledge of

administering the combination TDF and FTC for HIV pre-exposure prophylaxis was also

described in a protocol for a clinical study titled "Non-Occupational Post-Exposure Prophylaxis

(NPEP) Using A Once-Daily Regimen of Tenofovir DF and FTC: A Phase IV, Open-Label

Evaluation of Safety, Tolerability and patient Adherence in Patients With Non-Occupational

Potential Exposure to HIV-1" ("NPEP Study").  On May 27, 2004, Dr. Daniel E. Cohen of the

Fenway Community Health Center in Boston, Massachusetts, emailed Mr. Rooney from Gilead

with a Phase 4 study protocol of the NPEP Study to request a supply of drugs.

[GILDDE00279862-931, at GILDDE00279906].  The protocol, which lists Dr. Ken Mayer of the

Fenway Community Health Center as the primary study investigator, was raised during Gilead's

Special Applications meeting on June 14, 2004, according to an agenda sent from Marianne

Poblenz (Gilead) to Bruce Olmscheid (Gilead) on June 10, 2004.  *Id.* at [GILDDE00279862,

GILDDE00279907].  The agenda was also circulated to others on the Special Applications

Committee, including Alan Taylor, Amy Flood, Dean Waters, Geoff Cotton, Howard Jaffe, Jim

Rooney, Joe Steele, John Flaherty, John Wolf, Madeline Miller, Mick Hitchcock, Phil Zack, and

Robert Webster.  *Id.* at [GILDDE00279862].

The protocol, not marked as confidential, describes evaluating "the safety and tolerability

of TDF (Viread®) 300mg once daily and FTC (Emtriva®) 200mg once daily for 28 days when

given for prevention of HIV infection in HIV-1-seronegative adults after high-risk sexual

contact."  *Id.* at [GILDDE00279911].  The protocol describes that the inclusion criteria for study

participants would be "HIV uninfected" men or women who have "*[p]ossible* non-occupational

exposure to HIV-1," thus including individuals who both were and were not *actually* exposed.

*Id.* at [GILDDE00279912] (emphasis added).  The protocol further describes that eligible participants would begin taking one Viread® tablet and one Emtriva® tablet once a day for 28 days, beginning on the first day of the study, with no mention of whether an exposure impacts this schedule.  *Id.* at [GILDDE00279913-14]. The protocol also explains that TDF and FTC would "[i]nitially [be] taken as two separate pills, but after FDA approval [of Truvada], the single dose combination pill will be used."  *Id.*  The protocol synopsis states the reason for selecting emtricitabine in addition to tenofovir for preventing HIV infection: emtricitabine was considered a "natural candidate" because it was a "true once-daily antiretroviral with potent activity," had mild reported adverse effects, and the "probable development in the near future of a tenofovir DF-emtricitabine co-formulated tablet offers the potential for an NPEP regimen comprising one tablet daily."  *Id.* at [GILDDE00279910].

This prior knowledge was anticipatory under § 102(a) because each element of the Asserted Claims was known and publicly communicated, as evidenced by the contemporaneous corroborating documentation.  *See, e.g.,* [GILDDE00279862-931]. *See Ecolochem, Inc*, 227 F.3d at 1369; *Aspex Eyewear, Inc.*, 111 F. App'x at 586.  The NPEP Study teaches combining TDF and FTC for HIV prevention and is therefore anticipatory prior art under § 102(a).  Based on the NPEP Study, the knowledge of combining TDF and FTC for pre-exposure prophylaxis was known to at least Dr. Mayer and Dr. Cohen of the Fenway Community Health Center.  The study discloses the claimed elements by disclosing the administration of TDF at 300 mg combined with FTC at 200 mg "once daily . . . when given for prevention of HIV infection in HIV-1-seronegative adults after high-risk sexual contact."  [GILDDE00279862-931, at GILDDE00279911].  By including in the study participants who have *possible* exposure to HIV, the study captures study participants who may—or may *not*—actually have been exposed to

HIV.  *See id.* at [GILDDE00279912].  The study also required participants to take the pills once a day, regardless of whether the individual was exposed or not, further underscoring that the TDF and FTC would be taken prior to at least some exposure.  *Id.* at [GILDDE00279913].  This knowledge of using TDF and FTC for pre-exposure prophylaxis was publicly accessible, given that the proposal was shared with Gilead without any indication of confidentiality regarding the related documentation.  *Id.* at [GILDDE00279906].  *See, e.g.*, *Ecolochem, Inc*, 227 F.3d at 1369; *Aspex Eyewear, Inc.*, 111 F. App'x at 586.  The Asserted Claims of the Patents-in-Suit are therefore invalid under § 102(a) based on this prior public knowledge.

ii.  ***Pre-exposure Prophylaxis With At Least TDF, a Tenofovir Ester, and Tenofovir Prodrug Was Used by Others***

Each of the Asserted Claims is invalid because TDF for pre-exposure prophylaxis was used by others in this country at least as early as 2004.  More specifically, by at least February 2004, there was use of TDF for pre-exposure prophylaxis by some study participants in a two-year study known as "Project T," which studied four hundred gay men in San Francisco, California, and Atlanta, Georgia.  *See* Sabin Russell, *Antiviral drug used to treat AIDS to be tested as vaccine*, San Francisco Chronicle, Dec. 1, 2004 ("Russell"); David Wahlberg, *200 Atlanta gays to test whether pill stops HIV*, The Atlanta Journal-Constitution, Feb. 5, 2004 ("Wahlberg").  Two hundred men in each city were selected and asked to take a pill once a day for two years.  *See* Russell at 1.  Half of the study participants were given tenofovir, and half were given a placebo.  Russell at 1; *see also* Wahlberg at 1. The San Francisco study began in December 2004, while the Atlanta study began in February 2004.  Russell at 1.  Prior to November 2004, the HIV Research Section of the San Francisco Department of Public Health, which co-sponsored the San Francisco study, sent letters to viable participants seeking "[e]nrollment for Project T" and explained that Project T planned to study tenofovir in HIV-

negative men as a test for "a new HIV prevention strategy." [GILDDE00282885]. The letter further explained that the study was a "two-year study that will enroll 200 HIV-negative men who have sex with men," and that "[p]articipants will visit our office every 3 months for 2 years and take an assigned pill daily (either tenofovir or a dummy pill)." *Id.*

The occurrence of Project T, as documented in the above cited records, indicates at least some people in the U.S. used tenofovir for pre-exposure prophylaxis by at least February 2004. Gilead intends to adduce additional evidence during discovery regarding use of TDF and FTC, therefore demonstrating anticipatory prior use under § 102(a) and/or § 102(b).

### iii. Pre-exposure Prophylaxis With At Least TDF, a Tenofovir Ester, and Tenofovir Prodrug Was Described in Printed Publications

The public record suggests that TDF for pre-exposure prophylaxis was used by others in this country at least as early as 2004. Gilead expects to develop further evidence during discovery to support its anticipation contention, but this prior use of TDF for pre-exposure prophylaxis was documented in at least the following public records and articles.

A December 4, 2003 Wall Street Journal article by Marilyn Chase titled "Trials Will Test Whether AIDS Drug Can Also Prevent HIV" describes the use of the drug Viread® for pre-exposure prophylaxis. The article, which described the development of new studies to evaluate whether Viread® could be used to prevent HIV, mentioned patients were "currently using [tenofovir] as a preventive agent." Marilyn Chase, *Trials Will Test Whether AIDS Drug Can Also Prevent HIV*, Wall St. J., Dec. 4, 2003, B1, at 2 ("Chase"). The article also describes that Viread® had "begun to generate street buzz among men who want to take it as a daily dose of prevention in the event they should become exposed to the AIDS virus." *Id.* at 1.

A February 26, 2004 article in Wired Magazine titled, "It's OK, I'm on the AIDS Pill," describes the series of studies undertaken to evaluate "the use of medicine to stop HIV infection

before it starts."  "*It's OK, I'm on the AIDS Pill,*" Wired, Feb. 26, 2004, at 1 ("Wired").  In describing the studies, the article mentioned that "[h]undreds of healthy people in Africa, Cambodia, and two U.S. cities will begin taking doses" of tenofovir as part of the prevention studies.  *Id.*  The article also discusses the improvements made to AIDS medications to make them more tolerable for patients, stating that "tenofovir [was] so easy to tolerate that some doctors [were already] prescribing it to promiscuous American gay men who are at high risk of becoming infected with HIV."  *Id.* at 2.

In a Los Angeles Times article by Daniel Costello titled, "AIDS Pill as a Party Drug?," published on December 19, 2005, use of tenofovir for pre-exposure prophylaxis is again described.  *See* Daniel Costello, *AIDS Pill as Party Drug?*, L.A. Times, Dec. 19, 2005, F1 ("Costello").  The article explains a "growing practice," known as "taking a T," of HIV-negative gay men "downing the AIDS drug tenofovir" with the hopes that it would "protect[] them from the virus during unprotected sex."  *Id.* at 1.  The article describes how tenofovir was "being sold in packets along with Viagra and Ecstasy in gay dance clubs -- and even prescribed by physicians" for pre-exposure prophylaxis.  *Id.*  The article cites a survey released in July 2005 by the U.S. Center for Disease Control and Prevention (CDC) that was conducted at gay pride events in four cities and "found that 7% of uninfected men had taken an AIDS medication *before* engaging in risky behavior," and further, "that about a fifth had heard of someone who had."  *Id.* (emphasis added).  The article stated that according to prevention experts, "the number of men taking the drug in this [pre-exposure] manner remain[ed] small," but that the practice was "most popular among young gay men who aren't using condoms and people who frequent sex clubs and bath houses."  *Id.*  A prevention counselor named Dan Uhler was similarly cited as saying tenofovir for pre-exposure prophylaxis "appeared about a year [prior] in gay clubs and at circuit

parties, festival-size dance parties known for sex and substance abuse." *Id.* at 2. The article also quoted health officials as saying the "use [was] growing quickly," referring to the use of tenofovir for pre-exposure prophylaxis. *Id.* Finally, the article attributes Dr. Marcus Conant, a physician in San Francisco, as saying "he recently began prescribing tenofovir to two uninfected men after they told him they were very sexually active and would not use condoms." *Id.*

A January 22, 2006 New York Times article by Jon Cohen titled "Protect or Disinhibit?" similarly describes the use of tenofovir for pre-exposure prophylaxis. Jon Cohen, *Protect or Disinhibit?*, N.Y. Times Mag., Jan. 22, 2006 ("Cohen 2006"). The New York Times article states that "some gay men already have experimented with what's known as 'pre-exposure prophylaxis' or PREP," according to the CDC survey conducted at gay pride events in four U.S. cities that found 7% of those interviewed had tried it. *Id.* at 1. The article continued on to describe the studies underway to evaluate pre-exposure prophylaxis, stating that the trials were "enrolling 5,000 people on four continents who are in high-risk groups, including gay and bisexual men, sex workers and injecting drug users." *Id.* The article cites Dr. Susan Buchbinder, the head of the HIV research unit at the San Francisco Department of Public Health, which ran a trial called "Project T," as saying she wanted to conduct the study in part because "she'd heard the anecdotes about underground use, including a cocktail known in street slang as 'the 3V's': Viread, Viagra, and Valium." *Id.* Finally, the article interviewed Dr. Conant, who was cited as saying "he already prescribe[d] [tenofovir PrEP] to a half-dozen select patients." *Id.* at 2.

These public records show that tenofovir was used for pre-exposure prophylaxis in the U.S. by at least December 4, 2003, the date of the earliest article. Each article describes how individuals were using tenofovir preventatively by taking the drug prior to exposure, risky events, or certain events where exposure was likely. *See, e.g.,* Chase at 2. The Los Angeles

Times article and New York Times article also mentioned Dr. Conant, who was cited as saying he had prescribed tenofovir for pre-exposure prophylaxis to several patients by at least December 19, 2005, the publication of the Los Angeles Times article, further evidencing the use of tenofovir for PrEP.  *See* Costello at 2; Cohen at 2.  Finally, the articles describe the studies underway to evaluate tenofovir for pre-exposure prophylaxis, specifically mentioning that over 5,000 people were enrolled in the studies and taking doses of tenofovir for pre-exposure prophylaxis.  *See* Wired at 1; Cohen at 1.  These articles therefore evidence that at least some people in the U.S. used tenofovir for pre-exposure prophylaxis by at least December 2003, and Gilead intends to adduce additional evidence during discovery regarding use of TDF and FTC, therefore demonstrating anticipatory prior use under § 102(a) and/or § 102(b).

> iv.   *Pre-exposure Prophylaxis With FTC and TDF, a Tenofovir Ester, and Tenofovir Prodrug Was Described in Printed Publications*

To the extent that the Government argues actual exposure or proof of protection after exposure is not required by the Asserted Claims, the Asserted Claims are anticipated by M.R. Blum et al., *Lack of a Pharmacokinetic Interaction between Emtricitabine and Tenofovir DF When Co-administered to a Steady State in Healthy Volunteers*, 43rd Annual Interscience Conference on Antimicrobial Agents and Chemotherapy, Chicago, IL, Sept. 14-17, 2003 (Poster A-1621) ("Blum") and B.P. Kearney et al., *Bioequivalence of Combination Tenofovir DF/Emtricitabine Tablets for One-Pill Once Daily Administration*, 5th International Workshop on Clinical Pharmacology of HIV Therapy, Rome, Italy, April 1-3, 2004 (Poster 7.3) ("Kearney").

Blum teaches administration of TDF and FTC for 7 days in 19 healthy male and female volunteers, with a mean age of 26 years.  Blum at 1.  "Eligible subjects received . . . 200 mg FTC + 300 mg TDF QD x 7 days."  *Id*.  "FTC and TDF were well tolerated after multiple dosing

alone or together." *Id*.  "Safety results from this study were consistent with previous studies conducted in healthy volunteers and raised no new safety issues for emtricitabine or tenofovir DF." *Id*.

Kearney teaches that "a single combination tablet of TDF 300 mg/FTC 200 mg and the individual dosage forms were administered to healthy subjects in a fasted state on two separate occasions." Kearney at 1.  Kearney further teaches that "44 healthy subjects were enrolled.  26 makes, 18 females," with a mean age of 43.6 +/- 10.8 years." *Id*.  Kearney concluded that "administration of TDF and FTC was well tolerated." *Id*.

In sum, the Asserted Claims are anticipated under § 102(a) and/or § 102(b), as discussed above, and/or rendered obvious in view of the public knowledge, use and printed publications discussed in Section VI.c., the concepts conceived by others and communicated to the named inventors as discussed in Section VI.d., and/or the further art cited in Section VI.e. regarding obviousness under § 103.  *See infra* Section VI.e.

### d.     Derivation Under 35 U.S.C. § 102(f)

The Asserted Claims are each invalid under 35 U.S.C. § 102(f) because the named inventors "derived the conception of the invention from [another] source or person." *Solomon v. Kimberly-Clark Corp*., 216 F.3d 1372, 1381 (Fed. Cir. 2000).  "To prove derivation under § 102(f), the patent challenger must establish ***prior conception of the invention*** by another and ***communication of that conception to the patentee***." *Pfizer Inc. v. Teva Pharm. U.S.A., Inc*., 882 F. Supp. 2d 643, 705–06 (D. Del. 2012), *aff'd sub nom. Pfizer Inc. v. Teva Pharm. USA, Inc*., 555 F. App'x 961 (Fed. Cir. 2014) (emphasis added); *see also Eaton Corp. v. Rockwell Int'l Corp*., 323 F.3d 1332, 1334 (Fed. Cir. 2003); *Price v. Symsek*, 988 F.2d1187, 1190 (Fed. Cir. 1993).  To establish conception, it is not necessary to have tested the invention or to know that the invention will work.  *Burroughs Wellcome Co. v. Barr Labs., Inc.*  40 F.3d 1223, 1228 (Fed.

Cir. 1994). ("[A]n inventor need not know that his invention will work for conception to be complete."). Conception has been sufficiently communicated where "the communication enabled one of ordinary skill in the art to make the patented invention." *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1577, 42 USPQ2d 1378, 1383 (Fed. Cir. 1997).

The Asserted Claims also are invalid as obvious under pre-AIA 35 U.S.C. §§ 102(f) and 103 because the named inventors derived information from others that renders the asserted claims obvious.  *See OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1403–04 (Fed. Cir. 1997) (holding that "subject matter derived from another not only is itself unpatentable to the party who derived it under § 102(f), but, when combined with other prior art, may make a resulting obvious invention unpatentable to that party under a combination of §§ 102(f) and 103.").

   i.  ***Others Conceived of the Purported Invention Before the Named Inventors.***

The Government has asserted that the named inventors on the Patents-In-Suit conceived the purported invention after participating in meetings in 2004 where they discussed pre-clinical studies to test novel therapies for HIV pre-exposure prophylaxis (PrEP).  *See* Plaintiff's Objections and Responses to Defendants' First Set of Interrogatories (Nos. 1-18), Response to Interrogatory No. 1 (Sept. 30, 2020), at 9-15.  The inventors supposedly conceived of the alleged inventions in the Asserted Claims no later than December 2004 when they began requesting FTC to use as part of a two-drug regimen with tenofovir or a tenofovir prodrug/ester in pre-clinical PrEP trials.  *Id.*  However, at least Drs. Robert Grant and Ken Mayer had conceived of the purported invention at least by December 8, 2004, and Dr. Kaldor, who also conceived of the purported invention prior to the earliest priority date to which the Asserted claims are entitled, and participated in at least one meeting with the CDC, including the named inventors, in 2004.

1.      The Peru PrEP Study

Prior to the earliest date of invention alleged by the Government, at least Dr. Robert Grant had conceived of the use of Truvada for PrEP, as shown for example in a proposal sheet for a study titled "Truvada (TDF/FTC) for HIV prevention in American Men" to be conducted in Peru (the "Peru PrEP Study"). *See* Exhibit A.

On August 31, 2004, Dr. Grant submitted an application to the NIH proposing the evaluation of "chemoprophylaxis for HIV prevention in a randomized and blinded trial of daily oral tenofovir 300 mg versus placebo among men in Peru, who have extremely high risk of acquiring HIV infection." [GILDDE00281985-2762, at GILDDE00282007]; *see also* [GILDDE00280451-98, at GILDDE00280451]. This grant application was received by NIH on September 1, 2004. [GILDDE00281985-2762, at GILDDE00282007]. The grant application includes "possible outcomes of non-Peru trials and their effects on the Peru trial." *Id.* at [GILDDE00282088]. For the "possible outcome" of "[m]oderate efficacy but high rates of drug resistance" for tenofovir, the effect on the Peru PrEP Study would be "[l]ikely early termination, and roll over into a trial comparing TDF/FTC with TDF alone." [GILDDE00281985-2762, at GILDDE00282088]; *see also* [GILDDE00280449, at GILDDE00280450].

On December 11, 2004, Dr. Robert Grant sent Howard Jaffe of Gilead a proposal dated December 8, 2004, suggesting that a Truvada arm be added to the Peru PrEP study. [GILDDE00283951] (attaching [GILDDE00283952-55]). The proposal's "Specific Aim" was "To determine if daily oral fixed dose [T]ruvada (TDF/FTC) decreases HIV infection risk among men who have sex with men when added to standard condom and counseling measures. The proposed concept would add a [T]ruvada arm to a planned clinical trial comparing daily oral tenofovir 300 mg/d versus placebo among MSM in Peru." [GILDDE00283952-55, at GILDDE00283952]. It also included the following advantages of using Truvada for prevention:

> *Justification for selection of Truvada (TDF/FTC).* Truvada is chosen because of several advantages. The fixed dose formulation allows both drugs to be taken as a single tablet once a day. FTC (emtricitabine) has a prolonged intracellular half-life (>24 hours), which allows drug levels to be maintained despite imperfect adherence. Both drugs have an outstanding safety record. The fixed dose formulation became FDA licensed for HIV treatment in 2004. Importantly, FTC primarily selects the M184V mutation which increases susceptibility to tenofovir, thereby providing a basis for synergy between both drugs.

*Id*.

On December 17, 2004, a document related to the Peru PrEP Study was titled "Answer to Bob's questions dated on Dec 17 2004." *See* [GILDDE00280103-04, at GILDDE00280103]. In response to a question from Dr. Grant posing "Do we add a [T]ruvada arm as proposed in this draft?," Page wrote "We agree to add a [T]ruvada arm…." *Id*.

On December 23, 2004, Dr. Grant sent a draft protocol (dated December 17, 2004) for the Peru Study to Dr. James Rooney at Gilead, proposing a "Truvada arm" be added. *See* [GILDDE00279772-813, at GILDDE00279788-89]. Dr. Rooney replied the next day, writing "Yes to a Truvada arm." *Id.* at [GILDDE00279788].

On January 4, 2005, during a teleconference among the investigators on the Peru PrEP Study, "[d]iscussion centered around the possibility of a 3 arm study: Tenofovir prophylaxis vs. Truvada vs. Placebo." [GILDDE00280071-73, at GILDDE00280072]. Notes from this teleconference state: "Truvada has a higher barrier to resistance than Tenofovir and like Tenofovir, a good safety profile. Howard Jaffe and Jim Rooney of Gilead are optimistic about Truvada in this role and will present a concept to their decision making body [in] January 2005. NIH has been notified the addition of a Truvada arm will increase cost as either patient number or time in follow up will need to increase." *Id*. The January 4, 2005 minutes also state that, in response to a question from Dr. Page (referred to in the notes by her married name, Kim Shafer),

"Bob replied if the Tenofovir or placebo arm is inferior, Truvada may prove to be the most superior prophylaxis option." *Id.*

A Truvada arm for the Peru PrEP study was also discussed in weekly teleconferences among the Peru PrEP team (which included, at least, Dr. Grant, Mr. McConnell, Dr. Levy, Dr. Page-Shafer, Dr. Lama, Mr. Sanchez, Mr. Goicochea, Ms. Vanessa McMahan, and Dr. Glidden) in early 2005, which show that the Peru PrEP team wanted to use Truvada, but was unable to secure approval for funding from NIH. *See, e.g.,* [GILDDE00280057-58]; [GILDDE00280097-98]; [GILDDE00280074-76]; [GILDDE00280094-96]; [GILDDE00280041-43], [GILDDE00280077-78], [GILDDE00280099-102], [GILDDE00280086-90].

The January 11, 2005 teleconference minutes state that the "HPTN Network-W[ard] Cates, T[homas] Coates, K[en] Mayer are all interested in a Truvada arm for their prevention studies and may all seek 2006 funds." [GILDDE00280057-58, at GILDDE00280058].

The January 18, 2005 teleconference minutes state that "Bob commented Gilead's senior leadership approved requests for Truvada and placebos if that arm is added to our study." [GILDDE00280097-98, at GILDDE00280097]. Dr. Grant also "forwarded this news to R. Richardson at Gates [foundation]." *Id.* Further, the minutes note that changing their protocol to include Truvada may affect the timing of their funding in its summary of "funding possibilities for the Truvada arm." *Id.* One possibility was to submit a "competing supplemental application to R01 at NIH." *Id.* However, "The earliest submission date for this is May 1, 2005, with notification of award in Fall 2005… Bob is concerned about the delayed arrival of funding (Late 2005) with this approach." *Id.* HPTN (the HIV Prevention Trials Network) is also listed as a potential funding source, but the budget may be "too large." *Id.* Elsewhere in the minutes, it is

91

noted that "Bob has also asked Kevin Ryan at NIH if we can submit a supplemental request earlier than May 2005." *Id.*

The minutes for the February 15, 2005 teleconference state that "For the Truvada/third arm of the trial: While the Gates foundation is interested in funding a Truvada study, this third arm approach to our study is less attractive since the administrative issues are complicated (they would fund us through the NIH)." [GILDDE00280041-43, at GILDDE00280041]. The minutes further note that the Peru PrEP team has decided "[w]e should submit a competitive supplement in May to the NIH." *Id.* By March 1, 2005, "[i]t was decided we will have a 1 pill regimen, with 2 different placebos: a Tenofovir placebo and a Truvada placebo." [GILDDE00280077-78, at GILDDE00280077].

However, by March 8, 2005, the Peru PrEP team learned that it "could not submit the PSRC Protocol including a third [Truvada] arm to our trial without funding for it." [GILDDE00280099-102, at GILDDE00280099]. The minutes state that "Mary Fanning of the NIH is having an ad hoc meeting this week to consider if they should support our Truvada arm." *Id.* At the March 15, 2005 teleconference, it was reported that:

> Bob heard from Mary Fanning last Friday, and she had many (11) reasons why we should not include the Truvada arm as part of this study. Her main reason was that Truvada has not passed through a scientific review and that there was no non-human primate study that demonstrated the efficacy of Truvada as a chemoprophylactive measure.

[GILDDE00280086-90, at GILDDE00280086]. The minutes note that the team "can apply for a competitive supplement in May to the NIH," and "[i]f the study section that reviews our competitive supplement approves it then we will be able to include the Truvada arm in our study." *Id.* At the September 6, 2005 teleconference, it was reported that "The Notice of Grant Award that we received from the NIH dated August 15, 2005 reflects the September 2004

proposal," which only included tenofovir, not Truvada.  [GILDDE00280091-93, at GILDDE00280091].

**2.**    The Thai PrEP Study

At least as of August 16, 2005, Dr. John Kaldor conceived of the use of a combination of TDF and FTC, administered orally, for prevention of HIV for a study called "CO-US-104-D033: Safety and Pharmacokinetics of Daily Oral Tenofovir in HIV Negative Thai Women" (the "Thai PrEP study").  *See* Exhibit A; [GILDDE00279848-58, at GILDDE00279849], [GILDDE00279854-58].  The objective of the Thai PrEP study was "[t]o conduct a comprehensive safety and pharmacokinetic evaluation of oral tenofovir and oral TDF/FTC for pre-exposure prophylaxis for HIV prevention among Asian women."  *Id*. at [GILDDE00279856].  The Thai PrEP study proposal, dated August 16, 2005, includes "a randomized trial to include TVD [Truvada]."  *Id*. at [GILDDE00279855]; *see also*, *e.g.*, [GILDDE00279933-35, at GILDDE00279933].  Dr. Kaldor sent a draft proposal for the Thai Prep Study to Jim Rooney at Gilead on Aug. 17, 2005, describing a "concept [that] represents a further development of the proposal that we submitted to the NIH at the start of this year." [GILDDE00279932, at GILDDE00279932].  The attached proposal explains that "TDF alone may not have high enough levels for HIV prevention, and evaluation of TDF/FTC combined is warranted.  Current trials of pre-exposure prophylaxis do not include an evaluation of the safety or efficacy of TDF/FTC combined.  If the safety of TDF and TDF/FTC are demonstrated in this study, evaluation of efficacy could then proceed in a future trial."  [GILDDE00279933-35, at GILDDE00279933].  On August 29, 2005, Dr. Kaldor submitted this proposal in his grant application to HHS for the Thai PrEP study, and the Government received it September 1, 2005. *See* [GILDDE00282763-874, at GILDDE00282777].

93

**3.** Dr. Mayer Proposal, "Non-Occupational Post-Exposure Prophylaxis (NPEP) Using a Once-Daily Regimen of Tenofovir DF and FTC"

Prior to the earliest priority date to which the Asserted Claims are entitled, at least Dr. Ken Mayer also conceived of using an oral combination of TDF and FTC for prevention of HIV. *See* Exhibit A. On May 24, 2004, Mayer had submitted a study proposal to Gilead titled "Non-Occupational Post-Exposure Prophylaxis (NPEP) using a Once-daily Regimen of Tenofovir DF and FTC: A Phase IV, Open-label Evaluation of Safety, Tolerability and Patient Adherence in Patients with Non-Occupational Potential Exposure to HIV-1." (the "TDF NPEP Study"). [GILDDE00283936-37]; *see also* [GILDDE00279862-931]. The TDF NPEP study describes prevention of HIV for patients with "potential exposure" to HIV, which necessarily includes some patients who have not been exposed. The study contemplates that "the probable development in the near future of a tenofovir DF-emtricitabine co-formulated tablet offers the potential for an NPEP regimen comprising one tablet daily." [GILDDE00279862-931, at GILDDE00279910].

      *ii.* ***Prior Conception of the Purported Invention Was Communicated to the Named Inventors***

      **1.** The December 2004 Atlanta Meeting

On December 9-10, 2004, Mary Fanning of NIH and Lynn Paxton of the CDC chaired a meeting titled "Expert Consultation on the Implications of Tenofovir as HIV Chemoprophylaxis" in Atlanta, Georgia (the "December 2004 Atlanta Meeting"). [GILDDE00279936-37, at GILDDE00279936-37]; *see also* [GILDDE00279938-40, at GILDDE00279938]. The purpose of the December 2004 Atlanta Meeting was "to advise CDC and NIH on important issues if this or future chemoprophylactic agents are found to be effective and safe for use." [GILDDE00279936, at GILDDE00279936]. The attendees included representatives from

Gilead, NIH, CDC, and directors of ongoing prevention studies.  [GILDDE00283948-50, at GILDDE00283950].  Howard Jaffe and Madeline Miller attended on behalf of Gilead.  *Id.*  Drs. Grant, Page, Kaldor, and Mayer and named inventors Drs. Janssen and Folks were attendees.  *Id.* At the December 2004 Atlanta Meeting, Dr. Grant presented an overview of TDF, including on the topics of "Efficacy," "Safety," and "Resistance." [GILDDE00279938-40, at GILDDE00279938].  A Summary Report of this meeting explains that "approximately 30 researchers and community representatives were invited.…  Attendees were invited participants representing the research community, international and domestic HIV prevention programs, and community groups likely to be potential users of this intervention should it be proven effective." [GILDDE00282944-79, at GILDDE00282944].  Dr. Paxton "advised participants that preliminary results from the current TDF trials may be available within a relatively short period and that the purpose of the consultation was to begin the process of look at the 'What next?' scenario…" *Id.* at [GILDDE00282945].  The summary also indicates that "Dr. Bob Grant summarized the clinical data about TDF," "Dr. Dawn Smith described the collaboration between the CDC and the government of Botswana (BOTUSA)," "Dr. Mike Martin… described the Thailand Ministry of Public Health—US CDC collaboration (TUC)," and "Dr. Susan Buchbinder described the joint safety trials known as "The T" in Atlanta and "Project T" in San Francisco.  *Id.* at [GILDDE00282946-51].  In addition, "Dr. Thomas Folks" reported on preliminary results of a macaque study of oral TDF for rectal exposure." *Id.* at [GILDDE00282952-53].  Dr. Ken Mayer led a working group on "Implications for Men Who Have Sex with Men." *Id.* at [GILDDE00282965-66].  The December 2004 Atlanta Meeting shows that Gilead, the CDC (including the named inventors), and the proponents of the Peru Study, the Thai Study, and the Mayer study were communicating and coordinating with each

other well before the earliest priority date to which the Asserted Claims are entitled, and as of the government's alleged December 2004 conception date, including but not limited to the December 2004 Atlanta Meeting itself.

On December 11, 2004 (one day after the December 2004 Atlanta Meeting ended), Dr. Grant sent Dr. Jaffe a "Truvada Prep Concept" document dated December 8, 2004 (one day before the December 2004 Atlanta Meeting started), suggesting that a Truvada arm be added to the Peru PrEP study.  [GILDDE00283951] (attaching [GILDDE00283952-55]).  In his email, Grant referenced a conversation he "recently" had with Mary Fanning (who had been an attendee at the December 2004 Atlanta Meeting), in which she "seemed to be very enthusiastic about the idea" for adding a Truvada arm to the Peru PrEP study and that "[she] is going to look into mechanisms for obtaining the extra funding that would be needed."  [GILDDE00283951, at GILDDE00283951].

Shortly following the December 2004 Atlanta Meeting, on December 21, 2004, named inventor Dr. Heneine emailed Dr. Rooney at Gilead, stating: "As you may know we are interested in evaluating the efficacy of FTC in blocking SIV transmission in the CDC repeat low-dose macaque model for preexposure prophylaxis. We are at this point in the planning phase for this study *and foresee the evaluation of the combination of FTC and Tenofovir DF* in this model."  [GILDDE00283938-40, at GILDDE00283940] (emphasis added).  Dr. Jaffe replied to Dr. Heneine's request on the same day, agreeing that "Given the availability and clinical profile of the combination ART (tenofovir and FTC in one pill), it certainly makes sense to point in that direction."  *Id*. at [GILDDE00283939].  By January 31, 2005, Gilead had signed a new MTA with Heneine to provide FTC for Heneine's studies.  [US_00014287-91].  Thus, the named inventors' December 2004 request to Gilead for drug to test in the combination PrEP study

occurred *after* the December 2004 Atlanta meeting attended by named inventors, Gilead

scientists, and proponents of studying TDF/FTC PrEP, including Dr. Grant who had documented

a proposal for adding a Truvada arm to the Peru PrEP study prior to the meeting and reported

discussing the same with Dr. Fanning of NIH.

### 2.   Other Communications

In discovery, Gilead expects to adduce further evidence of communications regarding the

use of Truvada for PrEP showing that conception of the purported invention and information

rendering the purported invention obvious was communicated to the named inventors prior to the

earliest priority date to which the Asserted Claims are entitled and the alleged 2004 conception

date.

For example, in addition to the December 2004 Atlanta Meeting, a draft agenda for a

December 8, 2004 meeting titled "2nd Annual Chemoprophylaxis Investigators Meeting" shows

that Dr. Page was also organizing a meeting that would include Drs. Jaffe and Rooney of Gilead,

Drs. Lynn Paxton and Dawn Smith of the CDC, Dr. Mary Fanning of NIH, and  Drs. Page,

Grant, Kaldor, and other investigators.  [GILDDE00279941-42].  Named inventor Heneine was

listed as a potential invitee on an earlier draft of the agenda.  *Id.*

Dr. Grant communicated the idea of using Truvada for PrEP to HHS at least as of

September 1, 2004, when they submitted the grant application to HHS for the Peru PrEP study.

[GILDDE00281985-2762, at GILDDE00282007]; [GILDDE00280451-98, at

GILDDE00280451].  In addition, Dr. Kaldor communicated the idea of using Truvada for PrEP

to HHS at least as of September 1, 2005, when he submitted a grant application to HHS for the

Thai PrEP study.  *See* [GILDDE00282763-874]; *see also* [GILDDE00279932] (sending proposal

to Gilead).

In sum, the Asserted Claims are anticipated under § 102(a) and/or § 102(b), as discussed above, and/or rendered obvious in view of the public knowledge, use and printed publications discussed in Section VI.c, the concepts conceived by others and communicated to the named inventors as discussed in this Section (Section VI.d) and/or the further art cited in Section VI.e. regarding obviousness under § 103. *See* Section VI.e.

**e.      Obviousness Under 35 U.S.C. § 103.**

Based on Gilead's present understanding of the Asserted Claims of the Patents-in-Suit as applied by the Government, the prior art references identified above in Sections VI.a-c, and charted in Exhibit A render obvious all Asserted Claims of the Patents-in-Suit, alone or in combination.

Nothing stated below, or in Exhibit A, shall be treated as an admission or suggestion that Gilead agrees with the Government that Gilead's accused products meet any limitations of the claims, or any other position advanced by the Government.

Exhibit A provides representative examples of where each element of each claim is found in the prior art. The cited evidence is merely illustrative, and Gilead reserves the right to cite alternative or additional evidence.

To the extent a finder of fact determines that a limitation of a given claim was not disclosed by one of the references identified above and in Exhibit A, those claims are nevertheless unpatentable as obvious because the Asserted Claims contain nothing that goes beyond the knowledge of one of ordinary skill in the art and routine experimentation, and it would have been obvious to combine the teachings of the reference with: (1) the knowledge of one of ordinary skill in the art to show all the limitations of the claims; (2) the teachings of any of the prior art references set forth in Gilead's other invalidity charts with respect to the one or more limitations; and/or (3) the teachings of any of the prior art references set forth in this

document, including the references discussed below, listed above in Sections VI.a-c., or cited in Exhibit A, and any references cited in Gilead's Answer to the Complaint for the one or more limitations.

Because the Government has yet to identify any limitation of the Asserted Claims that it contends is not fully disclosed by any reference, either alone or in combination with other prior art cited by Gilead, Gilead expressly reserves the right to rebut any such contention, including by identifying additional obviousness combinations, if any such contention is made by the Government. Where the charts state that a reference "discloses" a limitation, such disclosure may be express or inherent.

Prior art references rendering the Asserted Claims of the Patents-in-Suit obvious, alone or in combination with other references, are discussed below and included in Exhibit A. Further reasons to combine or modify the teachings of the references identified in Exhibit A include the nature of the problem being solved, the express, implied, and inherent teachings of the prior art, the knowledge of persons of ordinary skill in the art, that such combinations or modifications would have yielded predictable results, that such combinations or modifications would have represented known and common sense alternatives to a person of ordinary skill in the art, and that such combinations or modifications would have represented a finite number of identified, predictable solutions that would have been obvious to try with a reasonable expectation of success.

### i. *Illustrative Obviousness Combinations*

The Asserted Claims generally are directed to administering a combination of a pharmaceutically effective amount of emtricitabine and a pharmaceutically effective amount of tenofovir, tenofovir disoproxil fumarate, a tenofovir ester, or a tenofovir prodrug to a primate host or human not infected with an immunodeficiency retrovirus prior to the primate host's

99

exposure or potential exposure to that immunodeficiency retrovirus to protect the primate host from a self-replicating infection. *See, e.g.*, '509 Patent at claim 1; *see also* claim 13 (claiming the use of a pharmaceutically effective amount of tenofovir or tenofovir ester in combination with emtricitabine); '423 Patent at claim 1 (claiming the use of a pharmaceutically effective amount of tenofovir or a tenofovir prodrug in combination with emtricitabine).

Each Patent-in-Suit has two independent claims, which specify, *e.g.*, the type of tenofovir entity, whether administration occurs prior to exposure or potential exposure, routes of administration, or dosage form. Claim 1 of the '509 Patent recites oral administration of emtricitabine with tenofovir or tenofovir disoproxil fumarate prior to exposure. Claim 13 (which depends from disclaimed independent claim 12) of the '509 Patent recites oral administration of emtricitabine with tenofovir or tenofovir ester prior to potential exposure. Claim 1 and claim 13 (which depends from disclaimed independent claim 12) of the '333 Patent recite oral, subcutaneous, or vaginal administration of emtricitabine with tenofovir or tenofovir disoproxil fumarate; claim 1 recites exposure and claim 13 recites potential exposure. Claim 1 of the '191 Patent recites oral administration of emtricitabine with tenofovir or tenofovir disoproxil fumarate in a tablet prior to exposure. Claim 13 of the '191 Patent recites administration of emtricitabine with tenofovir or tenofovir ester in a tablet prior to potential exposure. Claim 1 of the '423 Patent recites oral administration of emtricitabine with tenofovir or tenofovir prodrug prior to exposure. Claim 12 of the '423 Patent recites administration of emtricitabine with tenofovir or tenofovir prodrug prior to potential exposure.

Dependent claims further specify the primate host (claims 2 and 3 of the '509 Patent; claims 2 and 3 of the '333 Patent; claims 2 and 3 of the '191 Patent; claims 2 and 3 of the '423 Patent) or dosage formulation (claim 4 of the '509 Patent; claim 4 of the '333 Patent; claims 4,

14, and 17 of the '191 Patent; claims 4, 13, and 16 of the '423 Patent).  Additional dependent

claims further specify the retrovirus (claims 5 and 6 of the '509 Patent; claims 5 and 6 of the

'333 Patent; claims 5 and 6 of the '191 Patent; claims 5 and 6 of the '423 Patent), route of

exposure or potential exposure (claim 7 of the '509 Patent; claim 7 of the '333 Patent; claim 16

of the '191 Patent; claims 7 and 17 of the '423 Patent), dosage amounts (claim 8 of the '509

Patent; claim 8 of the '333 Patent; claims 8, 12 and 18 of the '191 Patent; claim 8 of the '423

Patent), or dosing regimen (claims 9 and 10 of the '509 Patent; claims 9 and 10 of the '333

Patent; claims 9, 10, and 19 of the '191 Patent; claims 9, 10, and 14 of the '423 Patent).

Additional dependent claims further specify administration resulting in an absence of persistent

viremia and seroconversion of the primate host (claim 11 of the '509 Patent; claim 11 of the '333

Patent; claims 11 and 15 of the '191 Patent; claims 11 and 15 of the '423 Patent), administration

following potential exposure to the human immunodeficiency virus (claim 13 of the '333 Patent),

or use of a tenofovir prodrug (claims 18 and 19 of the '423 Patent).

All of the Asserted Claims would have been obvious over the prior art, including the

exemplary combinations set forth below.

> **1.** <u>Tsai 1995 and/or Van Rompay 2004 in View of the Truvada[®]
> Insert, and Further in View of the Knowledge of a Person of
> Ordinary Skill in the Art</u>

As set forth in further detail in the claim charts in Exhibit A, claims 1-11 and 13 of the

'509 Patent; claims 1-11 and 13 of the '333 Patent; claims 1-19 of the '191 Patent; and claims

1-19 of the '423 Patent would have been obvious over Tsai 1995 and/or Van Rompay 2004 in

view of the Truvada[®] Insert, and further in view of the knowledge of a person of ordinary skill in

the art.  The references were publicly available prior to the earliest priority date to which the

Asserted Claims are entitled and are thus prior art.

The combination of Tsai 1995 and/or Van Rompay 2004 with the Truvada® Insert teaches or suggests all of the limitations of the Asserted Claims.

Each of Tsai 1995 and Van Rompay 2004 discloses pre-exposure prophylaxis with pharmaceutically effective amounts of tenofovir or TDF to protect a primate host against retroviral infection, including HIV.  Tsai 1995 discloses subcutaneous administration of tenofovir to macaques once daily, beginning either: (1) 48 hours before; (2) 4 hours after; or (3) 24 hours after inoculation with simian immunodeficiency virus ("SIV").  Tsai 1995 at 1198. Tsai 1995 discloses that none of the macaques became infected when tenofovir was administered starting: (1) 48 hours before; (2) 4 hours after; or (3) 24 hours after inoculation.  *Id.* at 1198-99. Tsai 1995 further discloses that "[c]linical signs of [tenofovir] toxicity did not occur, nor were there any significant changes in complete blood counts or blood chemistries during or after the 4-week treatment regimen," and concludes that tenofovir "prevented establishment of SIV infection in 25 out of 25 macaques (100%), without toxicity when administered up to 24 hours after viral inoculation."  *Id.* at 1199.  Tsai 1995 also concludes that its "on pre- and postexposure findings indicate that tenofovir is a promising candidate for anti-HIV treatment," and that tenofovir could prevent HIV infection in humans.  *Id.*  Tsai further concludes that "results from several recent anti-HIV clinical trials indicate that combining nucleoside analogues, such as AZT, with lamivudine (3TC) or proteinase inhibitors can enhance antiviral efficacy," and that "[t]herefore, [tenofovir] may also have an important role in combination therapies or strategies against HIV."  *Id.*

Van Rompay 2004 discloses pre-exposure prophylaxis in macaques with pharmaceutically effective amounts of TDF to protect against retroviral infection, including HIV. "Infant macaques were exposed orally to low doses of virulent SIV during 2 inoculation

periods": (1) "during the first week of life"; and (2) "for animals that were still uninfected, again at 1 month of age."  Van Rompay 2004 at 1.  "To mimic the multiple exposures to HIV that occur during prolonged breast-feeding," Van Rompay 2004 discloses the use of an "animal model in which infant macaques are bottle-fed repeatedly low doses of virulent simian immunodeficiency virus (SIVmac251).  *Id.*

"One group of [infant macaques] received oral tenofovir DF syrup at a dose (10 mg/kg once daily) estimated to be pharmacokinetically equivalent (based on area-under-the curve values) to the 8 mg/kg regimen used in pediatric trials, and the 300 mg tenofovir DF tablet given to adults.  Tenofovir DF [TDF] was given once daily starting one day before until one day after each SIV inoculation period."  *Id.*  A control group of infant macaques, to which no antiretrovirals were administered, were similarly exposed to SIV.  *Id.* at 1.  "After the 2 rounds of inoculations, 20 of 22 untreated macaques were persistently viremic," that is had an established infection.  *Id.*  "In contrast, 3 of 6 tenofovir-treated animals were uninfected at 3 months of age (p=0.05; two-sided Fisher's Exact test)."  *Id.*  Van Rompay 2004 concludes that the "data suggest that tenofovir DF administration will be effective to protect infants against HIV transmission from breast-milk," and that the "data provide also support [sic] for the ongoing trials in which the use of chronic tenofovir DF administration is investigated to reduce infection rates among high-risk adult groups (commercial sex workers, and men having sex with men)."  *Id.*

The Truvada® Insert discloses oral administration of pharmaceutically effective amounts of TDF in combination with FTC to treat HIV infection.  The Truvada® Insert discloses that Truvada® is a therapeutically effective combination of TDF and FTC to treat HIV in adults.  *Id.* at 11.  "TRUVADA is indicated in combination with other antiretroviral agents (such as non-nucleoside reverse transcriptase inhibitors or protease inhibitors) for the treatment of HIV-1

infection in adults." *Id.*  Truvada® is administered orally and each tablet contains 300 mg of TDF and 200 mg of FTC.  *Id.* at 20.  "In combination studies evaluating the in vitro antiviral activity of emtricitabine and tenofovir together, synergistic antiviral effects were observed." *Id.* at 3.  "Both components of Truvada® [TDF and FTC] have been studied individually, as part of multidrug regimens and have been found to be safe and effective." *Id.* at 11.

The Truvada® Insert also discloses that "[s]afety and efficacy studies using TRUVADA Tablets or using EMTRIVA [FTC] and Viread [TDF] in combination are ongoing" and that based on the available data, "no new patterns of adverse events were identified and there was no increased frequency of established toxicities." *Id.* at 18.  Additionally, the Truvada® Insert discloses that because  "EMTRIVA [FTC] and lamivudine (3TC) are comparable in their structure, resistance profiles, and efficacy and safety as part of multidrug regimens, existing data from the use of lamivudine and tenofovir in combination have been extrapolated to support the use of TRUVADA Tablets for the treatment of HIV-1 infection in adults.  *Id.* at 11.

### A.      Motivation to Add FTC to TDF for PrEP

As set forth more fully herein, the motivation to combine the references is explicit within the references themselves, and was also within the knowledge of a person of ordinary skill in the art.  For at least the following reasons, a person of ordinary skill in the art would have been motivated to combine Tsai 1995 and/or Van Rompay 2004 with the Truvada® Insert, and the knowledge of a person of ordinary skill in the art to arrive at the claimed methods, and would have had a reasonable expectation of success in doing so for the reasons described in Section VI.e.i.1.B. below.

A skilled artisan would have been motivated to add FTC to a PrEP treatment with TDF both to improve prophylactic efficacy and in view of other considerations known in the art including, at least: (1) safety and toxicity profiles of the drugs; (2) pharmacokinetic profiles,

including motivations to select for long intracellular concentration half-lives to help minimize patient pill burden; (3) pharmacodynamic profiles, including a motivation to decrease the risk of infection by, or selection for, strains of immunodeficiency retroviruses, including HIV, with resistance to antiretroviral compounds; and (4) the availability of a safe, effective, and convenient FDA-approved combination dosage form of TDF/FTC for HIV treatment.  A skilled artisan would have been faced with a highly limited set of options from which to select a second antiretroviral for inclusion in an HIV pre-exposure prophylaxis regimen and would have been led to select FTC based on the state of the art as of the earliest priority date to which the Asserted Claims are entitled.

Based on the results of the administration of TDF for PrEP in macaque studies, a skilled artisan would have understood TDF to be effective for preventing establishment of retroviral infection.  *See, e.g.*, Van Rompay 2004 at 1; *see also* Tsai 1995 at 1199; Van Rompay AIDS 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-1773; Van Rompay 2001 at 429, 436 (all using tenofovir).  Macaque studies and the results of antiretroviral administration to macaques were understood to be a model for the effectiveness of antiretroviral administration in humans for the treatment and prevention of HIV.  *See, e.g.*, Van Rompay 1999 at 1065; Van Rompay Antiviral 2000 at 296-297; Van Rompay AIDS 1998 at F80; Van Rompay Virology 2000 at 1767-168; Youle AIDS 2003 at 2.  Because of the nature of the HIV disease course, it is considered unethical, among other considerations, to treat human HIV study control group participants "with anything less than the currently best available treatment."  *See* Van Rompay 1999 at 1061; Van Rompay Antiviral 2000 at 296; Van Rompay Virology 2000 at 1768; Otten 2000 at 9771; *see also* Smith 2005 at 2 ("For ethical and logistical reasons, a randomized, placebo-controlled clinical trial of nPEP probably will not be performed.")  The art therefore

recognized the importance and utility of animal models to evaluate the efficacy of anti-HIV compounds to identify those drugs most promising to enter human clinical trials.  Van Rompay 1999 at 1061; Van Rompay Antiviral 2000 at 296; Van Rompay Virology 2000 at 1768.

Tsai 1995, based on the results of the tenofovir macaque study disclosed therein, expressly recognized that its findings on pre- and postexposure prophylaxis indicate that tenofovir "is a promising candidate for anti-HIV treatment," and that tenofovir could prevent HIV infection in humans, further recognizing that "postexposure prophylaxis with PMPA could have a significant impact on preventing HIV infection in health care workers or other accidentally exposed to the virus."  Tsai 1995 at 1199.  Tsai further concludes that "results from several recent anti-HIV clinical trials indicate that combining nucleoside analogues, such as AZT, with lamivudine (3TC) or proteinase inhibitors can enhance antiviral efficacy," and that "[t]herefore, [tenofovir] may also have an important role in combination therapies or strategies against HIV."  *Id.*  Van Rompay 2004 similarly concludes that its "data suggest that tenofovir DF administration will be effective to protect infants against HIV transmission from breast-milk," and that the "data provide also support [sic] for the ongoing trials in which the use of chronic tenofovir DF administration is investigated to reduce infection rates among high-risk adult groups (commercial sex workers, and men having sex with men)."  Van Rompay 2004 at 1. A skilled artisan therefore would have been motivated to use TDF for HIV PrEP in humans based on the support provided by the results of studies in macaque models, as disclosed in Tsai 1995, Van Rompay 2004, and as reinforced by other studies including, for example—Van Rompay AIDS 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-1773; Van Rompay 2001 at 429, 436—and would have understood it to have efficacy for the same purpose.

It was also well-known in the art that combination regimens of antiretrovirals to inhibit retroviral replication are often superior to regimens consisting of a single antiretroviral. *See, e.g.*, Tsai 1995 at 1199; De Clercq EOED at 241. It was known in the art at least since the 1990s that the most effective way to accomplish durable suppression of HIV replication is to administer two or more different antiretrovirals. Smith 2004 at 1-2. "Combination drug therapy, also referred to as HAART [highly active anti-retroviral therapy], has become standard practice for the treatment of HIV infection." De Clercq EOED at 250. Combination therapy with reverse transcriptase inhibitors was known to be highly effective in suppressing viral replication to unquantifiable levels for sustained periods of time. Dahl at 2. And it was recognized that "[c]ombination therapy is likely to remain the gold standard for the treatment of AIDS so as to maximise potency, minimise toxicity and diminish the risk for resistance development," De Clercq EOED at 241. One reason combination therapy was known to be advantageous over the use of a single antiretroviral was because of the tendency for HIV to quickly mutate into drug resistant forms of the virus— "combination strategy appears to overcome the ability of the virus to rapidly produce mutants that are drug resistant." Goldsby at 452. It was further recognized in the art that though certain single drug studies "confirm that chemoprophylaxis with a single drug can potently reduce the rate of HIV-1 transmission" they also "*suggest that efficacy with currently recommended therapeutic regimens (two- and three-drug combinations) may be even higher*." Smith 2004 at 2 (emphasis added). Therefore, even though TDF was known to have efficacy in preventing retroviral infection, including HIV, and including when administered prior to HIV exposure, a skilled artisan would have been motivated to include additional antiretrovirals in an HIV pre-exposure prophylaxis.

Specifically, as taught by the Truvada® Insert, TDF in combination with FTC was well-known to be safe and effective for treating HIV infection, and was commercially available as a convenient once-daily tablet formulation (Truvada®).  Truvada® Insert at 1, 3, 11; Dando at 2075.  The addition of FTC to TDF was known to be an advantageous selection because compositions containing the combination of FTC and TDF were recognized to be synergistic in nature and/or reduce the side effects resulting from one or both of its constituent component antiretrovirals.  *See, e.g.*, Truvada® Insert at 3; Dando at 2076; Dahl at 3.  In fact, the art recognized the combination of FTC and TDF "to be particularly justified as the two drugs showed additive to synergistic anti-HIV activity *in vitro*, and this correlates with the levels of intracellular phosphorylation of these compounds to their active metabolites."  De Clercq EOED at 266.  In addition, many other recognized advantages of combining FTC with TDF would have motivated a skilled artisan to select FTC over other available antiretrovirals for use in combination HIV pre-exposure prophylaxis.

For example, safety considerations would have guided a skilled artisan to add FTC to TDF for HIV PrEP, and a skilled artisan would have understood the combination of FTC and TDF to have been established as safe for administration.  *See, e.g.*, Smith 2004 at 4 (recognizing that "safety concerns must be considered" when selecting antiretrovirals for use in HIV PrEP); *see id.* (identifying "newer NRTIs" as "hav[ing] a low incidence of side effect profiles").  Truvada® was approved by the FDA in August 2004 and, by February 2006, had been on the market for HIV treatment for well over a year.  Truvada® Insert at 21.  Both components of Truvada® (TDF and FTC) had been studied individually in their respective roles in multidrug regimens and were known to be "safe and effective" in that capacity.  *Id*. at 11.  Safety and efficacy studies using either Truvada® or TDF and FTC in combination were "ongoing" as of

2004 and those studies did not demonstrate either "new patterns of adverse events" or "increased frequency of established toxicities."  *Id.* at 18.  Additionally, the combination of FTC and TDF, administered either separately or as part of a co-formulated tablet, "was generally well tolerated in two pharmacokinetic trials" when administered to HIV uninfected volunteers.  Dando at 2081.  A skilled artisan would have accordingly understood the administration of pharmaceutically effective amounts of FTC and TDF to be safe when administered in combination to humans uninfected with HIV.

A skilled artisan would have also been motivated to add FTC to TDF in HIV pre-exposure prophylaxis based on the pharmacodynamic profiles of the two antiretroviral compounds.  Both FTC and TDF are converted intracellularly to their respective active metabolites, and, as noted above, synergistic antiviral effects were observed in *in vitro* combination studies of FTC and TDF.  Dando at 2076-2077; Truvada® Insert at 3.

It was also recognized that selection for drug resistant strains by TDF and FTC, individually and as a combination, was comparatively low and well understood.  *See* Dando at 2075 ("HIV variants with reduced susceptibility to emtricitabine and tenofovir have been selected for *in vitro* and have also been isolated from patients receiving the agents.  Low rates of these variants have been observed in patients experiencing virological failure in large studies of emtricitabine- or tenofovir DF-containing therapy.").  First, drug resistance to FTC was known to be associated with several NRTI-linked mutations, and "is caused by an amino acid substitution from methionine (M) to either valine (V) or isoleucine (I) at position 184 of the HIV reverse transcriptase gene (M184I/V)."  Dando at 2076 (citation omitted); Emtriva® Insert at 2.  The "HIV isolates resistant to emtricitabine (M184I/V) were cross-resistant to lamivudine and zalcitabine but remained sensitive to abacavir, didanosine, stavudine, ***tenofovir***, delavirdine,

efavirenz and nevirapine." Dando at 2077 (citation omitted) (emphasis added); *see also* Emtriva® Insert at 2. Therefore, one of ordinary skill in the art would have known that co-administration of FTC with TDF was advantageous based on FTC's resistance profile.

Additionally, the development of resistance to TDF by HIV was well defined and known to largely involve the reverse transcriptase K65R mutation, a different mutation than those that conferred FTC resistance. "HIV-1 isolates with reduced susceptibility to tenofovir have been selected in vitro. These viruses expressed a K65R mutation in RT and showed a 2-4 fold reduction in susceptibility to tenofovir." Truvada® Insert at 4; *see also* Viread® Insert at 2 (citing "3-4 fold reduction"); Dando at 2077. Though, when taken in combination with other antiretrovirals, TDF was known to select for the K65R mutation, this mutation was understood to be relatively infrequent in occurrence. "After treatment with tenofovir DF, lamivudine and efavirenz for 144 weeks, 47 of 299 patients (15.7%) experienced virological failure," and of that 15.7%, the "K65R substitution was observed in eight (17.0%) these patients." Dando at 2077 (citation omitted); *see also* Truvada® Insert at 3-4; Viread® Insert at 2. And in "antiretroviral-experienced patients receiving tenofovir DF-containing therapy, reduced susceptibility to tenofovir was observed in 4.6% of patients experiencing virological failure; the resistant isolates contained the K65R substitution." *Id.* (citation omitted); *see also* Truvada® Insert at 3-4; Viread® Insert at 2.

Furthermore, the resistance profile of the combination of FTC and TDF was also known to be favorable—"Antiretroviral-naïve patients (n=190) received emtricitabine and tenofovir DF in combination with co-formulated lopinavir/ritonavir for 48 weeks. Of the 15 patients who "had HIV RNA levels >500 copies/mL at any time from weeks 12 to 48 (and genotypic results available), three demonstrated resistance to emtricitabine (M184V/I) and none demonstrated

resistance to tenofovir DF."  Dando at 2077; *see also* Truvada® Insert at 3; Dando at 2075 ("Low rates of [corresponding resistance] variants have been observed in patients experiencing virological failure in large studies of emtricitabine- or tenofovir DF-containing therapy"). Overall, a skilled artisan would have understood TDF and FTC—both individually and as a combination—to have favorable resistance profiles for selection as combination for HIV PrEP.

The pharmacokinetic properties of TDF and FTC would have further guided a skilled artisan to their use in combination for purposes of HIV PrEP.  It was recognized that the "ideal drug for chemoprophylaxis should result in high blood levels that are rapidly achieved on dosing, and be maintained for long periods, allowing for once-daily dosing."  Youle JIAPAC 2003 at 104; Youle AIDS 2003 at 1-2.  "Following oral administration of EMTRIVA, emtricitabine is rapidly absorbed with peak plasma concentrations occurring 1-2 hours post-dose."  Truvada® Insert at 5; *see also* Dando at 2077 ("After oral administration, emtricitabine is rapidly and extensively absorbed.").  Similarly, "[f]ollowing oral administration of VIREAD, maximum tenofovir serum concentrations are achieved in $1.0 \pm 0.4$ hour."  Truvada® Insert at 5.  "For both emtricitabine and tenofovir, $C_{max}$ is reached within 1-3 hours after administration to fed or fasting patients or volunteers."  Dando at 2078.

Additionally, TDF and FTC both require intracellular activation to a phosphorylated metabolite, *see, e.g.* Truvada® Insert  at 2-3; Van Rompay AIDS 1998 at F82, and both TDF and FTC have long plasma elimination half-lives, approximately seventeen and ten hours respectively, Truvada® Insert at 5; *see also* Dando at 2078 ("The median terminal elimination half-lives of emtricitabine and tenofovir were 15.5 and 17.6 hours when healthy volunteers received a single dose of co-formulated emtricitabine/tenofovir DF 200mg/300 mg on two separate occasions."). Because of those long half-lives, both TDF and FTC can be dosed

infrequently, once daily for example, and intracellular concentrations may remain present even during periods of incomplete adherence to the prophylaxis. Truvada® Insert at 5, 20; *see* Dando at 2078 ("[T]he active metabolites of both drugs have long intracellular half-lives in peripheral blood mononuclear cells (39 hours for emtricitabine 5'-triphosphate and ≥60 hours for tenofovir diphosphate." (citations omitted)); Grant 2005 at 2170 ("TDF has a long intracellular half-life, which allows once-daily dosing and the possibility of protection even if some doses are missed."); Van Rompay AIDS 1998 at F82 ("Finally, the long intracellular half-life (~15 and 50 h in activated and resting PBMC, respectively) of these compounds probably plays a role in the success of chemoprophylaxis of a short-term drug dosage regimen." (discussing tenofovir)). A skilled artisan would have recognized that these pharmacokinetic properties indicate that both TDF and FTC can be given at a low dose frequency, once daily for example, as approved in the Truvada® Insert, and active intracellular concentrations may remain present with incomplete adherence.

A skilled artisan would have been further motivated to select FTC because the infrequent once-daily administration required to dose Truvada® at pharmaceutically effective amounts was recognized as desirable in order to foster convenience and compliance by reducing patient pill burden and increasing the likelihood of regular patient adherence. It was appreciated that "[i]deally, pill burden should be reduced to once-daily dosing so as to optimize the patient's compliance and reduce the treatment costs." De Clercq EOED at 241; *see also* Dando at 2076 ("Strategies recommended for improving patients' treatment adherence include reducing the frequency of therapy and the number of pills and simplifying food restrictions. Co-formulating antiretroviral agents is one way of reducing the pill burden."). Truvada® is dosed once daily for HIV treatment, Truvada® Insert at 20, and it was recognized that the co-formulation of TDF and

FTC into a single pill would likely result in increased patient compliance in view of the lower pill burden and simplified dosing schedule that it provided. Dahl at 3; *see id.* at 2 (disclosing "better patient compliance when pill burden decreases, dosing schedules are simplified, and optionally, if synergy between compounds occurs"); *see also* De Clercq EOED at 268; Dando at 2076. Compliance is important to ensure effective therapy and avoid the development of antiretroviral resistance. It was also expressly recognized that "[t]he fixed dose combination pill, as now marketed for TDF and emtricitabine ((-)FTC) [*i.e.*, as described in the Truvada® Insert] is an important step forward because it significantly reduces pill burden, and hence, enhances therapy adherence, and thus the likelihood of further improvement in the success rate." De Clercq EOED at 265. Because a skilled artisan would have recognized that the amount of virus in an inoculum in the context of prophylaxis is far lower than the amount of virus present in patients requiring treatment for an HIV infection, *see, e.g.* Schwarzenegger 2004 at 4, a skilled artisan would have similarly understood once-daily administration of Truvada® to be of sufficient amount for prophylactic purposes, and would have understood the benefits provided by the co-formulation in terms of patient compliance.

Moreover, a skilled artisan would have also recognized that as of at least February 2006, only two FDA-approved drugs for HIV contained TDF—Viread® and Truvada®. *See, e.g.*, Truvada® Insert at 1; Viread® Insert at 1; *see* De Clercq EOED at 244, 250. Viread® contained TDF as the sole active ingredient and, as set forth in the Truvada® Insert, Truvada® contained TDF and FTC in combination as the active ingredients. *See, e.g.*, Truvada® Insert at 1; Viread® Insert at 1. For this reason alone, it would have been obvious to one skilled in the art to administer FTC in combination with TDF for HIV PrEP therapy. Furthermore, FTC would have been preferred for combination with TDF over other NRTIs approved for treatment of HIV and

known in the art—abacavir, didanosine, stavudine, zalcitabine, and zidovudine—which had less

favorable relative toxicity profiles, adverse events, and other side effects. Szekeres 2004 at 10-

11. And there were no other NtRTIs apart from TDF that had been approved for the treatment of

HIV. De Clercq EOED at 267. A skilled artisan would therefore have been faced with a highly

limited set of approved antiretroviral compounds (let alone existing combinations approved for

once daily oral dosing like Truvada®) from which to select additional antiretrovirals for HIV

PrEP.

The limited nature of the available antiretrovirals from which a skilled artisan had to

select would have also been reinforced by recognition that other classes of antiretroviral

compounds had not yet received FDA approval and/or that other available classes of compounds

would have been disfavored for use in pre-exposure prophylaxis. *See, e.g.*, De Clercq EOED at

268 ("Numerous drug combinations are theoretically possible, but only a few of these will be

practically feasible."). As of February 2006, there were no integrase inhibitors approved by the

FDA. *See, e.g.*, De Clercq EOED at 249. Other antiretroviral drugs approved at that time for the

treatment of HIV included a single fusion inhibitor and a handful of protease inhibitors—neither

category was either favorable or conducive for use in orally administered PrEP. The single

fusion inhibitor approved by the FDA, enfuvirtide was only approved for administration via

twice-daily subcutaneous injection, as opposed to oral administration. *See id.* Difficulties

inherent in subcutaneous administration would therefore have discounted its selection for use in

pre-exposure prophylaxis, and particularly so in combination with TDF as an orally-dosed drug.

*See id.* Protease inhibitors would be similarly disfavored because that class of antiretrovirals

inhibits HIV replication by interrupting the replication cycle *after* establishment of infection;

protease inhibitors would thus not be expected to be as useful to prevent infection prior to an

exposure to HIV.  *See, e.g.*, Youle JIAPAC 2003 at 103 ("The agent should prevent infection of cells, or at least nuclear integration, when exposed to HIV.").  And the three approved non-nucleoside reverse transcriptase inhibitors ("NNRTIs") would have been disfavored as "notorious for rapidly eliciting virus drug resistance."  *See, e.g.*, De Clercq EOED at 254.

In contrast, the mechanisms of both TDF and FTC were recognized as meeting the characteristics known in the art for selecting ideal antiretrovirals for HIV PrEP.  "The ideal agent should prevent the infection of cells, or at least nuclear integration when exposed to HIV." Youle AIDS 2003 at 1; *see also* Youle JIAPAC 2003 at 102-03; Szekeres at 10-11.  TDF and FTC each work as reverse transcriptase inhibitors, which means that each compound interferes with the reverse transcription of viral RNA to cDNA.  Goldsby at 452-53; Truvada® Insert at 1-2; Viread® Insert at 2; Emtriva® Insert at 1-2.  The reverse transcriptase step in the retroviral reproductive cycle occurs prior to nuclear integration.  Goldsby at 442-43; De Clercq EOED at 251.  Accordingly, a skilled artisan would have favored the selection of both FTC and TDF based on their mechanisms of action in inhibiting HIV replication.

Thus, one skilled in the art seeking to improve the efficacy of PrEP using TDF, at least: (1) would have understood that multi-drug antiretroviral combinations were beneficial to treat or prevent symptoms of HIV in comparison to single-drug monotherapies and indeed were the standard of care in the field of HIV therapy by 2006; (2) would have understood FTC to be an ideal candidate for addition to TDF for use in HIV pre-exposure prophylaxis based on the drugs' PK/PD properties; and (3) would have been faced with a single FDA-approved drug for HIV that contained TDF in combination with another antiretroviral agent (Truvada®) and had

established safety, anti-HIV efficacy, and convenient once-daily oral dosing fostering patient compliance and therapeutic success.[17]

Based on such teachings a skilled artisan would have been motivated to combine teachings about tenofovir and TDF for PrEP in Tsai 1995 and/or Van Rompay 2004 with knowledge and recommendations in the prior art for combining TDF with FTC including the Truvada® Insert to obtain HIV pre-exposure prophylaxis as claimed to protect against establishment of HIV infection.  A skilled artisan would therefore have selected Truvada® for use in PrEP for HIV.

B.     Reasonable Expectation of Success for PrEP with TDF and FTC in Combination

A skilled artisan would have also reasonably expected successful prevention of HIV infection by administering pre-exposure prophylaxis as disclosed in Tsai 1995 and/or Van Rompay 2004, in the form of the combination of TDF and FTC, as disclosed in the Truvada® Insert, to achieve the claimed method.  A skilled artisan would have had a reasonable expectation of success in preventing HIV by administering a combination of FTC and TDF prior to exposure based on at least: (1) the prophylactic efficacy demonstrated by tenofovir and TDF in macaque trials; (2) recognition that the combination of once daily oral TDF and FTC had received FDA approval as safe and effective for use in HIV therapy, and administration of the combination was known to be superior to TDF-only regimens; and (3) understanding that the mechanism of action by which TDF and FTC inhibit the replication of HIV is identical regardless of whether the

---

[17]     And as detailed above in Sections VI.c and VI.d., ordinary persons skilled in the art in fact recognized such teachings in the art in reaching the purported invention of the Asserted Claims of the Patents-in-Suit prior to the earliest priority date to which the Asserted Claims are entitled.  This further supports that the Asserted Claims would have been obvious in view of the teachings of the prior art and the knowledge of the skilled artisan.

antiretrovirals are administered for purposes of HIV treatment or HIV prophylaxis, such that efficacy in treatment indicates at least reasonable likelihood of efficacy in prevention.

As taught by Tsai 1995 and Van Rompay 2004, a skilled artisan would have been aware that the administration of tenofovir or TDF prior to viral exposure demonstrated efficacy to prevent establishment of infection by immunodeficiency retrovirus in macaques. *See, e.g.*, Tsai 1995 at 1198-99; Van Rompay 2004 at 1; *see also* Van Rompay AIDS 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-73; Van Rompay 2001 at 429, 436. For example, Tsai 1995 demonstrated complete protection of twenty-five macaques dosed with tenofovir either before or after exposure to SIV, Tsai 1995 at 1199-99, and Van Rompay 2004 demonstrated statistically significant results in preventing SIV infection in macaques when dosed with TDF in amounts pharmacokinetically equivalent to those administered in humans, prior to the macaques' SIV exposure. Van Rompay 2004 at 1. A skilled artisan would have understood these and other demonstrations of efficacy by tenofovir and TDF to prevent establishment of immunodeficiency retrovirus infection in macaques to provide a reasonable expectation of success in preventing establishment of HIV infection in humans through the administration of TDF for PrEP.

Macaque studies were recognized in the art as a model for the effectiveness of the administration of antiretrovirals in humans for the treatment and prevention of HIV. *E.g.*, Van Rompay 1999 at 1061; Van Rompay Antiviral 2000 at 296. Such "non-human primates have a very similar physiology [to humans] (including drug pharmacokinetics and metabolism, fetal and neonatal development, and immunology)." Van Rompay 1999 at 1065; *see also* Van Rompay Antiviral 2000 at 297-98. Moreover, "SIV is closely related to HIV, and causes a disease in macaques which very closely resembles human AIDS. [One] can use the same parameters to monitor infection and disease progression as those which are used for HIV-infected patients."

117

Van Rompay 1999 at 1065.  Macaque studies permit "recognition of statistically and biologically significant differences" in the study of antiretroviral compounds.  *Id.*  "All these factors allow a more reliable extrapolation of results obtained in non-human primate models towards clinical applications for the human population."  *Id.*; *see also* Van Rompay Antiviral 2000 at 299-3013.

SIV is closely related to HIV-1, has 60% amino acid homology to that of HIV-1 in the polymerase region of SIV, and is susceptible to many of the same reverse transcriptase and protease enzymes at approximately the same *in vivo* concentrations as HIV-1.  Van Rompay 1999 at 1065; *see also* Van Rompay Antiviral 2000 at 299.  Though the NNRTI class of antiretrovirals is specific to HIV-1 and NNRTIs do not inhibit replication of either HIV-2 or SIV, this was overcome through the development of a hybrid SIV/HIV-1 chimeric virus that contains the HIV-1 reverse transcriptase in an SIV background and is infectious for macaques.  Van Rompay 1999 at 1065; Van Rompay Antiviral 2000 at 300.  With respect to other classes of antiretrovirals (including NRTIs and NtRTIs), a skilled artisan would have considered there is little to no difference in terms of study value regarding the use of either SIV or SHIV in a macaque study.

Primate studies can be used to gather a wide range of data and information to "provide a solid scientific basis to guide human clinical trials."  Van Rompay Antiviral 2000 at 297-98; *see id.* at Table 1 "Value of Nonhuman Primate Models in Anti-HIV Drug Development."  It was specifically recognized in the art that "macaque studies have provided us with important insights regarding pre- and post-exposure prophylaxis, the effects of early drug intervention, and the emergence and clinical implications of drug-resistant viral variants" for HIV.  Van Rompay 1999 at 1065; *see also* Van Rompay Antiviral 2000 at 303 (explaining that "[i]nformation obtained in

118

this pediatric animal model of AIDS applies directly to HIV infection of human infants as well as adults").

Accordingly, TDF was recognized as a promising choice for use in HIV PrEP in humans based in part on the results of the efficacy demonstrated in macaque studies:

> Pre-exposure chemoprophylaxis involves the use of antiretroviral drugs before exposure to HIV. The potential of this approach is shown by the use of antiretroviral drugs for postexposure prophylaxis and in the prevention of mother-to-child transmission. ***Tenofovir disoproxil fumarate, an anti-HIV drug that works by blocking reverse transcriptase, is a promising candidate for chemoprophylaxis because of its once-daily dosing schedule, its low levels of side-effects seen in major clinical studies and in several hundred thousand people with HIV infection who have been treated with the drug, and its protection against simian immunodeficiency virus (SIV) transmission in animal models.*** Although the emergence of resistance is a potential risk of chemoprophylaxis, the main resistance-conferring mutation of tenofovir disoproxil fumarate seems to develop relatively slowly which favours its use from this perspective.

Page-Shafer 2005 at 1 (footnotes omitted) (emphasis added). In fact, it was recognized that the applicability of the SIV model "in the clinical development of anti-HIV drugs is ***exemplified*** by PMEA [9-(2-phosphonomethoxyethyl)adenine)] and PMPA [tenofovir]." Van Rompay 1999 at 1066 (emphasis added). When PMEA and tenofovir were tested in macaques, "[r]esults of these macaque studies played a major role in moving these drugs into human clinical trials." *Id.*; *see also* Van Rompay Antiviral 2000 at 308-309 (detailing the role of macaque studies to "study the emergence and decipher the clinical implications of drug resistance" for tenofovir). Accordingly, a skilled artisan would have had a reasonable expectation of success in preventing establishment of HIV infection in humans through the administration of TDF for PrEP, that is, prior to exposure to HIV. *See* Tsai 1995 at 1198-99; Van Rompay 2004 at 1.

Inclusion of FTC in combination with TDF, as disclosed in the Truvada® Insert, would have enhanced this expectation of success with PrEP for at least the following reasons.

119

A skilled artisan would have recognized that combination antiretroviral regimens are often superior to regimens based upon the administration of a single antiretroviral compound. It was known in the art at least since the 1990s that the most effective way to accomplish durable suppression of HIV replication is to administer two or more different antiretrovirals. Smith 2004 at 1-2. "Combination drug therapy, also referred to as HAART [highly active anti-retroviral therapy], has become standard practice for the treatment of HIV infections." De Clercq EOED at 250. Combination therapy with reverse transcriptase inhibitors was known to be highly effective in suppressing viral replication to unquantifiable levels for sustained periods of time. Dahl at 2. Moreover, combination therapy was known to be advantageous over the use of single antiretroviral agents because of the tendency for HIV to quickly mutate into drug resistant forms of the virus. "The combination strategy appears to overcome the ability of the virus to rapidly produce mutants that are drug resistant." Goldsby at 452. It was expressly recognized in the field that certain single drug studies "confirm that chemoprophylaxis with a single drug can potently reduce the rate of HIV-1 transmission and *suggest that efficacy with currently recommended therapeutic regimens (two- and three-drug combinations) may be even higher.*" Smith 2004 at 2 (emphasis added); *see also* Tsai 1995 at 1199. Therefore, in view of the efficacy demonstrated in TDF-only PrEP studies, a skilled artisan would have had an even greater reasonable expectation of success in preventing HIV infection when TDF is administered in combination with an additional antiretroviral, and particularly FTC.

A skilled artisan would have recognized that, as disclosed by the Truvada® Insert, Truvada®, a combination of TDF and FTC, had received FDA approval as safe and effective for use in once-daily oral treatment of HIV and had been on the market for over a year by January 2006. *See* Truvada® Insert at 20. The addition of FTC to TDF was known to be an

advantageous selection because compositions containing the combination of FTC and TDF were recognized to be synergistic in nature and/or reduce the side effects resulting from one or both of its constituent component antiretrovirals.  *See, e.g.*, Truvada® Insert at 3; Dando at 2076; Dahl at 3.  Accordingly, TDF in combination with FTC was well-known to be safe and effective for treating  of HIV infection, and was commercially available as a once daily tablet formulation (Truvada®).  Truvada® Insert at 3.  In fact, the art recognized the combination of FTC and TDF "to be particularly justified as the two drugs showed additive to synergistic anti-HIV activity *in vitro*, and this correlates with the levels of intracellular phosphorylation of these compounds to their active metabolites."  De Clercq EOED at 266.  And not only was Truvada® approved as safe and effective for use in the treatment of HIV, but the combination of FTC and TDF was also expressly recommended for use in HIV post-exposure prophylaxis, which was known to be an effective approach to prevent the establishment of HIV infection in previously uninfected humans—the sole difference from PrEP being the temporal relationship between administration of antiretrovirals to HIV exposure (immediately following HIV exposure rather than before).  *See* Schwarzenegger at 8, 15 (recommending the use of TDF and FTC in combination for HIV PEP); *see also id.* at 9-11 (discussing areas of support for the efficacy of HIV PEP generally).

Moreover, a skilled artisan would have also been aware that each of TDF and FTC operate in the same manner to inhibit the replication of HIV regardless of whether each compound is prescribed for HIV prophylaxis or treatment, and regardless of whether the antiretroviral is prescribed before or after exposure to HIV—the mechanism of action by which the antiretroviral compound operates to interfere with the viral replication cycle is identical.  *See, e.g.*, Tsai 1995 at 1197; Truvada® Insert at 2-3 (mechanism of action); Szekeres at 10-11 (evaluating the utility of antiretroviral agents for purposes of PrEP based on their mechanism of

action for purposes of HIV treatment); *see* also Youle JIAPAC 2003 at 103 (same); Youle AIDS 2003 at 1-2 (same); Smith 2004 at 2 (same); Dando at 2076 (describing mechanism of action of Truvada®).  It was known in the art that, "***[a] drug that can be used to treat and cure a disease, if given at an earlier time in the development of the condition, should be able to prevent the disease.  The drug may be given before exposure***, concurrently with possible exposure, or even after exposure, but before the disease is manifest."  Farer at 102 (emphasis added).  "This concept, chemoprophylaxis, is really a form of treatment for an infection that has not yet occurred, is just beginning, or is in an asymptomatic, subclinical state."  *Id.*

TDF and FTC each work as reverse transcriptase inhibitors, which means that each compound interferes with the reverse transcription of viral RNA to cDNA.  Goldsby at 451-53; Truvada® Insert at 2-3; Viread® Insert at 2; Emtriva® Insert at 1-2.  Retroviruses, including HIV, carry their genetic information in the form of RNA, and when the virus is absorbed and enters a cell, the RNA of the virus is subsequently reverse transcribed to DNA by a virally encoded enzyme, reverse transcriptase.  Goldsby at 442-43; De Clercq EOED at 250-51.  Reverse transcriptase reverses the normal transcription process and makes a DNA copy of the viral RNA genome.  Goldsby at 442-43; De Clercq EOED at 251.  This copy, which is called a provirus, is integrated into the cell genome and is translated along with the cell DNA.  Goldsby at 442-43.  When the provirus is expressed to form new virions, or new copies of the virus, the cell lyses (ruptures) and releases the new virions into the host.  *Id.*

TDF, after initial diester hydrolysis for conversion to tenofovir and subsequent phosphorylation by cellular enzymes to form tenofovir diphosphate, interrupts this replication cycle by inhibiting the activity of HIV-1 reverse transcriptase by competing with the natural substrate deoxyadenosine 5'-triphosphate and, after incorporation into DNA, causing DNA chain

termination.  Truvada® Insert at 2-3; Viread® Insert at 2.  Similarly, FTC, a synthetic analog of cytidine, is first phosphorylated by cellular enzymes to form emtricitabine 5'-triphosphate, which inhibits the activity of HIV-1 reverse transcriptase by competing with the natural substrate deoxycytidine 5'-triphosphate, and then being incorporated into nascent viral DNA, similarly resulting in chain termination.  Truvada® Insert at 2; Emtriva® Insert at 1.  Because a skilled artisan would have known that the mechanism of action to interrupt the reverse transcriptase step of viral reproduction by TDF and FTC and thereby inhibit overall retroviral replication is identical regardless of the temporal relationship between HIV exposure and antiretroviral administration, or regardless of whether a patient has a previously established HIV infection, *see, e.g.*, Tsai 1995 at 1197, a skilled artisan would have also had a reasonable expectation of success that the efficacy demonstrated by the antiretroviral combination to inhibit viral replication for HIV treatment (as evidenced by, *e.g.*, the Truvada® Insert) would similarly be observed in the context of HIV prophylaxis.  *See also* Van Rompay AIDS 1998 at F80; Youle JIAPAC 2003 at 103-04; Farer at 102 ("A drug that can be used to treat and cure a disease, if given at an earlier time in the development of the condition, should be able to prevent the disease.").

Accordingly, in view of the demonstrated efficacy of tenofovir and TDF for PrEP in Tsai 1995 and Van Rompay 2004, and the demonstrated safety and efficacy of the TDF/FTC combination for treating HIV as described in the Truvada® Insert, a skilled artisan would have

had a reasonable expectation of success in combining FTC with TDF for PrEP to achieve

protection from infection from a subsequent HIV exposure as claimed.[18]

**2.**    Schwarzenegger in View of the Knowledge of Person of Ordinary Skill in the Art

As set forth in further detail in the claim charts in Exhibit A, claims 1-11 and 13 of the

'509 Patent; claims 1-11 and 13 of the '333 Patent; claims 1-19 of the '191 Patent; and claims

1-19 of the '423 Patent would have been obvious over Schwarzenegger in view of the knowledge

of a person of ordinary skill in the art.  The references were publicly available before the earliest

priority date to which the Asserted Claims are entitled and are thus prior art.

Schwarzenegger in view of the knowledge of the person of ordinary skill in the art

teaches or suggests all of the limitations of the Asserted Claims.

Schwarzenegger discloses post-exposure prophylaxis in humans with pharmaceutically

effective amounts of TDF in combination with FTC to protect against HIV infection.

Schwarzenegger consists of guidelines and recommendations prepared by the California Task

Force on Non-Occupational PEP and the California Department of Health Services, Office of

AIDS "for the use of post-exposure prophylaxis (PEP) for the prevention of HIV infection in the

general population."  Schwarzenegger at 1.  Accordingly, Schwarzenegger teaches that "PEP is

intended for individuals of negative or unknown HIV infection status following potential

exposure to HIV."  *Id.* at 3.  "The higher the risk of the exposure [to HIV] (determined by the

type of sexual or other activity and the likelihood of HIV infection in the exposure source), the

more directive the health care provider should be towards the decision to take PEP."  *Id.*

---

[18]    And as detailed above in Sections VI.c and VI.d., ordinary persons skilled in the art in fact recognized such teachings in the art in reaching the purported invention of the Asserted Claims of the Patents-in-Suit prior to the earliest priority date to which the Asserted Claims are entitled.  This further supports that the Asserted Claims would have been obvious in view of the teachings of the prior art and the knowledge of the skilled artisan.

Schwarzenegger provides specific guidelines and recommendations for PEP use in "individuals who have had a potential exposure to HIV through consensual sexual activity and secondarily to individuals who may have had an exposure to HIV through sharing of injection drug use equipment." *Id.* at 1. However, "the same general principles outlined in this document can reasonably be applied to assess the likelihood of acquiring HIV from [other] such exposure, and thus the potential utility of PEP." *Id.*

Schwarzenegger teaches that "[i]f a potentially infectious body fluid (e.g. blood or blood products, genital secretions, peritoneal, pleural or cerebrospinal fluids, but NOT saliva, tears, or sweat) was in contact with a mucous membrane (e.g., eye, oral, nasal, or genital mucosa) or non-intact skin (punctures, cut or substantially abraded), HIV infection is possible and consideration of PEP is warranted." *Id.* at 11. More specifically, Schwarzenegger further teaches that its recommended PEP regimens may be used to prevent HIV infections for many types of HIV exposure, including: receptive anal intercourse, shared injection drug use equipment, insertive anal intercourse, insertive vaginal intercourse, other potentially infectious body fluid on a mucous membrane or non-intact skin, and receptive oral intercourse with ejaculation. *Id.* at 7, 11. Schwarzenegger thereby teaches that its recommended PEP regimens can be used to prevent HIV infection in a previously uninfected person across a wide range of exposure types. *See id.*

Schwarzenegger teaches that "[in] the absence of information about the exposure source's antiretroviral history … the preferred double nucleoside analogue combination regimen is Combivir®," ([zidovudine] + lamivudine), one pill twice a day." *Id.* at 15; *see also id.* at 8. However, recommended "alternative nucleoside analogue combinations" include:

> [S]tavudine (40 mg for patients weighing greater than 60 kg and 20 mg for those weighing less than 60 kg, one pill twice a day) or ***tenofovir, 300 mg once a day***, ***in combination*** with lamivudine 150 mg twice a day or 300 mg once a day ***or emtricitabine 300 mg a day***. ***A fixed dose combination pill combining tenofovir***

> ***and emtricitabine, called Truvada, is available for once daily dosing.*** Abacavir and didanosine should be avoided unless resistance considerations outweigh potential toxicity.

*Id.* at 15 (emphasis added); *see also id.* at 8. Schwarzenegger thereby recommends the use of TDF and FTC in combination as an effective PEP regimen to prevent the establishment of HIV infection in an uninfected human recently exposed or potentially exposed to HIV, and teaches that the combination is available for once daily dosing in the form of Truvada. *Id.* Schwarzenegger teaches that "abacavir and didanosine should be avoided" for PEP "unless [antiviral] resistance considerations outweigh potential toxicity" (hypersensitivity and pancreatitis, respectively). *Id.* at 15; *see also id.* at 8.

Schwarzenegger discloses that there was "no consensus among experts about whether two or three antiretroviral drugs should be used for PEP." *Id.* at 15. Arguments in support of using two drug combinations for PEP include: (1) "the inoculum of virus is small following non-occupational exposure compared with the amount of virus requiring potent antiretroviral therapy for full suppression in an HIV-infected individual"; (2) "single agent PEP resulted in an 81 percent reduction in the risk of HIV infection in a study of occupational exposures"; (3) "increased side effects and/or more difficult dosing schedules may result in decreased adherence"; and (4) "there is a significant cost differential when a third drug is added." *Id.*

Schwarzenegger discloses that "[a]lthough there are no efficacy data directly supporting the use of non-occupational PEP for sexual exposures, several related sets of data from an occupational exposure study, mother-to-child transmission studies, and animal studies support its biological plausibility." *Id.* at 9. Schwarzenegger discloses that though "[t]he validity of generalizing results of PEP following nonmucosal exposures to mucosal exposures in humans

126

remains uncertain because of differences in the immune response," it further discloses that "[a]nimal models of mucosal exposures do demonstrate PEP effectiveness." *Id.*

Schwarzenegger discloses that "[r]esults from animal studies of PEP have provided data supportive of its probable efficacy in intravenous, oral, and vaginal simian immunodeficiency virus (SIV) and HIV-2 exposures, and that these data have been instructive in terms of timing and duration of therapy." *Id.* at 10. Citing, among other references, Tsai 1995, Schwarzenegger discloses that in "[i]n SIV models, nucleotide and nucleoside analogues have been protective in preventing infection in a majority of intravenously inoculated macaques when given early after exposure (within 24 hours is superior to 48 or 72 hours) and for a 28-day course." *Id.* "When provided to macaques following intravaginal exposure to HIV-2, the nucleotide analogue PMPA (tenofovir) was fully protective when treatment was initiated at 12 or 36 hours post-inoculation (zero of eight infected), and only partially effective at 72 hours (one of four treated animals infected; three of four controls infected)." *Id.* By contrast, the "three control animals seroconverted at two weeks and the experimental animal at 16 weeks post-exposure, raising concerns about the possibility of delayed seroconversion and the need for adequate follow-up HIV antibody testing after administration of PEP." *Id.* However, Schwarzenegger also discloses that "[r]eassuringly, studies of health care workers who have seroconverted following PEP have not demonstrated delayed seroconversion." *Id.*

Schwarzenegger further discloses that the efficacy of PEP was also understood to be supported by "multiple studies of antiretroviral drugs used in pregnant women and/or their newborns" to prevent "mother-to-child transmission of HIV infection." *Id.* at 9. Schwarzenegger further discloses that "[s]ome of these studies have included drugs given to both the mother and the newborn, some just to the mother, and two to just the newborn." *Id.* (citing

references).  "A New York State Department of Health analysis demonstrating efficacy even in those infants who only received [zidovudine] within 48 hours after birth (9.2 percent compared to 26.6 percent transmission without PEP suggests that there is likely a post- as well as a pre-exposure effect of antiretrovirals used in the prevention of mother-to-child transmission." *Id.* at 9-10.  Moreover, the "first prospective study of antiretrovirals used only in the postnatal period to prevent mother-to-child transmission also demonstrated efficacy in reducing mother-to-child transmission of HIV." *Id.* at 10.

Schwarzenegger also discloses that the efficacy of PEP was supported by occupational HIV exposures studies.  *Id.* at 9.  "The 1987 approval of [zidovudine] was followed by consideration of antiretroviral therapy as prophylaxis following potential exposure to HIV." *Id.* Though "[i]n 1990, CDC published a statement that neither recommended nor discouraged such use following occupational exposures to HIV," "[t]he 1995 presentation of a case-control study in health care workers demonstrating a 79 percent reduction in the likelihood of HIV infection associated with [zidovudine] use following occupational exposure led to the 1996 revision of CDC guidelines to recommended PEP following occupational exposures." *Id.*  Schwarzenegger further discloses that the "published study ultimately showed an 81 percent reduction in HIV infection associated with [zidovudine] use and raised a number of questions regarding generalizability to non-occupational exposures, the feasibility of providing non-occupational PEP, and its safety and cost-effectiveness." *Id.*

Schwarzenegger discloses that the efficacy of PEP was further supported by "[o]bservational studies in humans."  *Id.* at 10.  "Only a single study of PEP following non-occupational exposures has been published; there were no seroconversions among 401 enrolled subjects with follow-up six months after PEP initiation."  *Id.*  Furthermore, "[u]npublished

studies from the United States, Brazil, Australia, and South Africa report few seroconversions following non-occupational PEP use, although follow-up is often limited." *Id.* Schwarzenegger further discloses that "[a] recent unpublished analysis of data from San Francisco, California, demonstrates the difficulty of attributing HIV seroconversions to failure of PEP in the non-occupational context, where the potential infection source is rarely available for testing and additional potential exposures are common."[19] *Id.*

Schwarzenegger also discloses that "[t]here have been several reports of failure of PEP to prevent HIV infection following occupational exposures," and that "[w]hile offering some protection, PEP is not expected to be 100 percent effective in any setting." *Id.* at 11. However, "some failures of PEP are not inconsistent with the efficacy of PEP." *Id.*

Schwarzenegger teaches that "PEP should be offered to HIV uninfected or unknown status individuals presenting within 72 hours of a potential exposure to HIV." *Id.* Moreover, "[i]ndividuals at highest risk of acquiring HIV infection from their specific exposure are expected to benefit most from PEP." *Id.* Schwarzenegger further teaches that PEP should be offered "[a]s soon as possible, and no later than 72 hours following exposure." *Id.* at 7. Schwarzenegger discloses that "[a]nimal models of the natural history of HIV acquisition following exposure and of PEP interventions suggest that PEP will be more effective the sooner it is started." *Id.* at 14. Schwarzenegger further discloses that "[c]lients and healthcare providers should strive to initiate PEP as early as possible after the exposure." *Id.*

---

[19]    Where "additional potential [HIV] exposures" occur while a human is taking a prescribed antiretroviral PEP regimen, such PEP regimens would also function in a PrEP capacity with respect to those subsequent HIV exposures. *See also* Section VI.c.i.3 (Mayer NPEP Proposal).

A.      Motivation to Administer TDF and FTC Prior to HIV
        Exposure

As set forth more fully herein, the motivation to modify Schwarzenegger is explicit within the reference itself, and was also within the knowledge of a person of ordinary skill in the art.  For at least the following reasons, a person of ordinary skill in the art would have been motivated to modify Schwarzenegger in view of the knowledge of a person of ordinary skill in the art to arrive at the claimed methods, and would have had a reasonable expectation of success in doing so for the reasons described in Section VI.e.i.2.B below.

A skilled artisan would have been motivated to modify a recommended oral post-exposure prophylaxis comprising the combination of TDF and FTC, as disclosed in Schwarzenegger, and administer the antiretroviral combination to a previously uninfected human prior to HIV exposure, rather than immediately after, based on a well-recognized need and interest in the art to decrease rates of HIV transmission and prevent the establishment of new HIV infections in the first instance.  A skilled artisan would have also been aware of the general medical principle of chemoprophylaxis and that compounds used for disease treatment in infected patients had been either been administered, or recognized as promising for administration, for preventative purposes across many infectious diseases.  *See, e.g.*, Farer at 102.  Not only had the combination of TDF and FTC been approved by the FDA and deemed safe and effective for the treatment of HIV in infected humans, but it was already recommended by at least one governmental body, the California Task Force on Non-Occupational PEP and the California Department of Health Services, Office of AIDS, for use as HIV post-exposure prophylaxis.  *See* Schwarzenegger at 1.  Therefore, a skilled artisan seeking to reduce rates of HIV infection and transmission rates would have been motivated to modify the teachings of

Schwarzenegger and administer the prophylactic combination of TDF and FTC to an uninfected person before HIV exposure, rather than after.

As of the earliest priority date to which the Asserted Claims are entitled, there was an express and well-recognized need to reduce HIV transmission rates and prevent the establishment of new HIV infections in humans.  "HIV infects more than 40 million people worldwide, and there are 14,000 new infections per day."  Grant 2005 at 2170 (citation omitted).  And it was understood that "[a]cross most of the world, the HIV epidemic remains unchecked."  Youle JIAPAC 2003 at 102 (citation omitted).  However, "even as available and proven prevention interventions are used, the HIV pandemic will not be stopped solely by talking to those at risk."  Grant 2005 at 2170 (citation omitted).  Similarly, it was recognized in the art that prevention techniques were desirable: "[t]here is little evidence that there has been a significant reduction in the global rate of infection over time.  HIV still spreads like wild-fire in susceptible communities, and is increasingly of multidrug-resistant strains."  Youle AIDS 2003 at 1 (citation omitted); *see also* Youle JIAPAC 2003 at 102 (same).

It was also recognized in the art that ongoing development of a vaccine to prevent HIV transmission and infection showed little promise in providing a solution.  "The quest for an effective preventative vaccine for the uninfected has been, to date, unfruitful."  Youle AIDS 2003 at 1 (citation omitted); *see also* Youle JIAPAC 2003 at 102 (same).  While a number of "putative vaccines" were understood to be in development, their efficacy in preventing HIV infection—"remain[s] unclear," and the overall "availability of new candidate vaccines is limited."   Youle JIAPAC 2003 at 102.  The first HIV vaccine to reach phase 3 studies "failed to provide protection from infection and none of the remaining vaccine candidates currently in

clinical trials appear likely to induce potent protective immunity."  Smith 2004 at 1 (endnotes omitted).

Though a couple of "novel approaches to establish a long-lasting broad immune response against HIV" were being investigated, "concerns exist that the breadth and durability of anti-HIV immune response may be too narrow to elicit complete protection against the myriad of HIV viral strains currently circulating in humans."  Youle JIAPAC 2003 at 102.  Overarching issues limiting potential overall usefulness of an HIV vaccine were also acknowledged—for example, "[v]iral escape from cytotoxic T-lymphocyte recognition might be a limiting factor to vaccine efficacy."  *Id.*  And "[g]iven HIV's propensity to escape cellular and humoral response, there exists no clear approach or target for vaccine development."  Smith 2004 at 1 (endnotes omitted).

It was further acknowledged that "[s]ignificant populations are at high risk of imminent HIV infection, such as HIV-discordant sexual partners or those who chose not to use condoms. For these individuals a current vaccine strategy may be too far in the future."  Youle AIDS 2003 at 1; Youle JIAPAC 2003 at 102-03; *see also* Smith 2004 at 1 (acknowledging efforts of the World Health Organization to "treat those infected with HIV-1" but further acknowledging that "it is not clear they will have a broad impact on the HIV-1 epidemic in the immediate future"). Moreover, even for those individuals using condoms, "only a single failure may result in an additional HIV-infected individual."  Youle JIAPAC 2003 at 103.  Accordingly, a skilled artisan would have recognized the need for additional prophylactic methods and approaches to prevent the spread of HIV and establishment of HIV infection in previously uninfected humans.

Consequently, it was recognized in the art that "[c]hemoprophylaxis with antiretroviral agents is a promising new approach" and that "[c]linical trials of daily oral antiretroviral dosing as preexposure prophylaxis (PrEP) have been initiated in Africa, Asia, and the United States and

are planned in Latin America."  Grant 2005 at 2170.  The use of antiretroviral compounds, "that is the administration of chemoprophylaxis to uninfected individuals who live in areas with a high prevalence of HIV-1" was proposed as an approach with "immediate impact."  Smith 2004 at 1; *see also* Youle JIAPAC 2003 at 103; Youle AIDS 2003 at 1.

Chemoprophylaxis is a fundamental tenet of medical science that applies broadly to infectious disease.  Specifically, it was known in the art that, "***[a] drug that can be used to treat and cure a disease, if given at an earlier time in the development of the condition, should be able to prevent the disease.  The drug may be given before exposure***, concurrently with possible exposure, or even after exposure, but before the disease is manifest."  Farer at 102 (emphasis added).  "This concept, chemoprophylaxis, is really a form of treatment for an infection that has not yet occurred, is just beginning, or is in an asymptomatic, subclinical state." *Id.; see also* Detels at 1567 ("Chemoprophylaxis is the prevention of infection or its progression to clinically manifest disease through the administration of chemical substances, including antibiotics.").  The usefulness of therapeutic agents for disease prevention and chemoprophylaxis was well-recognized:  "The effectiveness of the antimicrobial agents in eliminating certain organisms and in curing the diseases produced by them has led to their use for the prevention of specific infectious processes, or of infection in general."  Weinstein at 287.  Chemoprophylaxis had been implemented, even as early as 1955, in order "to protect healthy individuals, either singly or in groups against invasion by specific microorganisms." *Id.*  "The degree of success has varied with the purpose for which prophylaxis has been applied; ***it has been highest when the prevention of specific infections has been attempted,*** and lowest when the prevention against infection in general has been its aim.  In many instances, prophylactic measures have been

applied only to single individuals; in others they have been used for large groups." *Id.* (emphasis added).

Accordingly, a skilled artisan would have been aware that the concept of chemoprophylaxis, using agents known to treat an infection to prevent establishment of that infection in healthy individuals had long been established in medical science.  For example, it was recognized in the art that "long-term malaria chemoprophylaxis is generally believed to have been implemented for the first time in 1854, when Dr. William Balfour Baikie effectively put his staff on quinine while exploring the Niger River in West Africa."  Knobloch at 375 (footnote omitted).  Though earlier expeditions to the area had resulted in significant numbers of crewman deaths from "fever," on this particular occasion, "as soon as the bar of the river was crossed each man took 6-8 grains of quinine daily."  Findlay at 169.  After four months on the river, all twelve men returned in good health, with the "exception of one of the second mates who had declined to take the drug."  *Id.*  That crewman suffered "severe attacks of remitting fever accompanied by delirium, for which his head had to be shaved, while in addition to quinine, he had required sedatives and sudorifics."  *Id.*  The results of that expedition ultimately lead to the implementation of an "official policy" whereby those individuals living in areas at risk of malaria in West Africa "should take 5 grains of quinine daily."  *Id.*  Similar contemporaneous use took place in the United States, for "[r]eports of the US Sanitary Commission [ ] provide evidence that quinine was added as early as 1840 to the whiskey of the military post staff at Tampa Bay, Florida, successfully preventing 'miasmatic disease' or 'African fever.'"  Knobloch at 375 (footnote omitted).  A skilled artisan would have recognized that the use of quinine, a known therapeutic for malarial disease, had long been established as efficacious for preventing the disease in healthy and uninfected persons.

Similarly, chemoprophylaxis had been recognized as applicable to prevent tuberculosis infection in healthy and uninfected humans and was another area in which it was recognized that therapeutic agents could be used for preventative purposes in healthy persons.  *See, e.g.* Farer at 102-03.  "Chemoprophylaxis for tuberculosis became a practical possibility only with the availability of a safe, inexpensive, oral drug that was bactericidal for tubercle bacilli."  *Id.*  That drug, "[i]soniazid, which was introduced as an antituberculosis agent in 1952, possesses these characteristics.  ***The demonstrated effectiveness of isoniazid in treatment led to the idea that the drug would also be effective as a prophylactic agent.***"  *Id.* at 103 (emphasis added).  Animal models and studies were informative in this context—"[i]soniazid can prevent death, disease and even the development of tuberculosis sensitivity in guinea pigs challenged with virulent tubercle bacilli."  *Id.* (citations omitted).  And "[a]lthough evidence in humans is less compelling, ***it can be inferred that isoniazid is capable of reducing the frequency of new tuberculosis infections***."  *Id.* (emphasis added).  Chemoprophylaxis with isoniazid to prevent new tuberculosis infections in uninfected individuals was deemed to "merit consideration" in "unusual circumstances" where "there is a high risk of infection for a relatively short time."  *Id.*  Accordingly, a skilled artisan would have been aware that the use of a therapeutically effective compound was acknowledged to have utility as a chemoprophylactic agent to protect healthy humans against new tuberculosis infections in some circumstances.

A skilled artisan would have also been aware that the concept of chemoprophylaxis had been implemented to prevent infection in healthy individuals by specific bacteria through the use of antibiotics:

> Chemoprophylaxis is most commonly employed in healthy individuals to prevent invasion by specific bacteria.  It has been given either to single patients, to families, or to large groups of people, some of whom had not yet had contact with an organism and others of whom were already harboring it as asymptomatic carriers.

> This type of prophylaxis has, as a rule, been most successful in protecting against infection by four agents—the beta-hemolytic streptococcus, the gonococcus, the meningococcus and the dysentery bacilli.

Weinstein at 288.  For example, the "administration of chemotherapeutic agents to individuals exposed to invasion by the beta-hemolytic streptococcus affords a predictable and high order of protection. . . .  Although several antibiotics have been used for this purpose, penicillin appears to be the drug of choice."  *Id.* (citations omitted).  It was also recognized in this context that "[s]ince a larger quantity of antibiotic and a longer period of therapy are required for the elimination of bacteria than to prevent their initial implantation, the prophylaxis of the carrier state necessitates using the same dose of the drug and duration of treatment as in established streptococcosis."  *Id.*  It was further recognized in the art that "[t]he availability of potent antimicrobial agents has made the prevention of all degrees of spread of meningococcal infection a relatively simple matter."  *Id.* at 289.

Furthermore, a skilled artisan would have been aware that the concept of chemoprophylaxis had been applied to prevent viral infection in previously unexposed humans through the use of therapeutically effective antiviral agents.  "Interest in compounds for use in antiviral chemotherapy and chemoprophylaxis has markedly increased in recent years, and developments in the field have progressed to the point that antiviral compounds have now become objects of interest for practicing physicians as well as for laboratory and clinical investigators."  Dolin 1985 at 1296.  "Amantadine [1-adamantanmine hydrochloride] was approved in 1966 for chemoprophylaxis of influenza A (H2N2) infection and was later approved in 1976 for treatment and chemoprophylaxis of influenza type A virus infections among adults and children aged ≥1 year."  Harper at 22; *see also* Dolin 1985 at 1296.  A structurally-related compound, rimantadine, was known to exhibit similar properties, was used extensively in the

Soviet Union in place of amantadine, *see* Dolin 1985 at 1296, and was "approved [in the United States] in 1993 for treatment and chemoprophylaxis of influenza A infection among adults and prophylaxis among children."  Harper at 22.  The "precise mechanism of action" for both compounds were not fully established as of 1985, but it was known that "they inhibit influenza A virus at an unspecified step in its replication, probably after [the virus] penetrates the cell surface."  Dolin 1985 at 1296.  It was "suggested that these compounds interfere with either uncoating of the virus" or "with primary transcription of viral RNA."  *Id.*

Studies of amantadine and rimantadine concluded that both compounds are "effective in prophylaxis and therapy" for influenza A.  *Id.*  One study administered both compounds separately against a placebo control in a randomized trial.  *See id.*  "The trial was initiated when a threshold for influenza A activity in the community was exceeded," and "subjects took tablets of amantadine or rimantadine, at a dose of 200 mg/day, or placebo, for a 6-week-period."  *Id.* at 1297.  The study "was conducted in healthy young volunteers."  Dolin 1982 at 583.  "Influenza-like illness, as well as laboratory documented influenza, occurred significantly less frequently in amantadine or rimantadine recipients than in placebo recipients."  Dolin 1985 at 1297; *see also* Dolin 1982 at 582 (documenting statistical proof of chemoprophylactic efficacy in said trial).  And as of 1985, other studies evaluating the efficacy of amantadine and rimantadine for treatment of influenza A determined that both compounds demonstrated some efficacy compared against placebo.  *See* Dolin 1985 at 1296-97; *see id.* Fig. 2.

At least by 1994, the CDC published "[r]ecommendations for the use of amantadine and rimantadine" for chemoprophylaxis of influenza A.  Arden at 1-2.  It was recognized that amantadine and rimantadine "interfere with the replication cycle of type A influenza viruses" and "[w]hen administered prophylactically to healthy adults or children before and throughout

the epidemic period, both drugs are approximately 70-90% effective in preventing illness caused by naturally occurring strains of type A influenza virus." *Id.* at 1 (acknowledging that in some instances "antiviral agents taken prophylactically may prevent illness but not subclinical infection"). Chemoprophylaxis with amantadine or rimantadine was recommended for use with "***persons who are at greatest risk of severe illness and complications if infected with influenza A virus***," including: (1) those over sixty-five years of age; (2) nursing home residents; (3) adults and children with chronic pulmonary or cardiovascular systems, including children with asthma; (4) adults and children requiring ongoing care for chronic metabolic diseases and others; and (5) children and teenagers receiving long-term aspiring therapy and therefore at risk of developing Reye syndrome after influenza. *Id.* at 2 (emphasis added). The CDC further recognized that "amantadine and rimantadine can reduce the severity and shorten the duration of influenza A illness among healthy adults when administered within 48 hours of illness onset." *Id.* at 3. Furthermore, it was recommended that "[w]hen confirmed or suspected outbreaks of influenza A occur in institutions that house persons at high risk, chemoprophylaxis should be started as early as possible to reduce the spread of the virus." *Id.* at 4. Specifically, "when amantadine or rimantadine is used for outbreak control, the drug should be administered to ***all residents of the institution***—regardless of whether they received influenza vaccine the previous fall." *Id.* (emphasis added); *see also id.* (recommending further administration to institution staff and "considered for all employees"). These recommendations would include administration of amantadine and rimantadine to individuals not yet infected with influenza A. The CDC recommended giving the same daily dose of amantadine and rimantadine for purposes of treatment and chemoprophylaxis of influenza A. *See id.* at 6 (*e.g.*, recommending 100 mg of

amantadine twice daily for purposes of treatment and prophylaxis to an individual of fourteen to sixty-four years of age).

The CDC continued to recommend the use of amantadine and rimantadine for chemoprophylaxis of influenza A, such as for those at high risk of influenza complications and those in frequent contact with persons at high risk, through to 2005. Harper at 22-30. Accordingly, a skilled artisan would have understood that chemoprophylaxis to prevent viral infection in previously unexposed humans using antiviral compounds with therapeutic efficacy had previously been implemented and had been long-recommended pursuant to CDC guidelines as of the earliest priority date to which the Asserted Claims are entitled.

To be sure, the art expressly recognized the broad applicability and relevance of the chemoprophylaxis across many infectious diseases and medical contexts, including within the context of care management for HIV patients, and understood the broader concept to provide both a guide and model for pre-exposure prophylaxis for HIV:

> It is worth recalling that chemoprophylaxis is currently used to protect individuals and groups in many settings. Anti-influenza agents are often used to stop flu out-breaks in nursing homes. Travelers to areas with endemic malaria are given mefloquine to prevent infection with *Plasmodium* spp. Individuals with a history of rheumatic fever are maintained on penicillin for many years to prevent re-infection with Group A streptococcus. Routine practice already dictates that HIV-infected patients with acquired immunodeficiency syndrome (AIDS) be given antibiotics to prevent *Pneumocystis jiroveci* pneumonia, toxoplasmic encephalitis, and *Mycobacterium avium* complex infections.

Smith 2004 at 4; *see also id.* ("With respect to all infectious diseases the proverb 'a ounce of prevention is worth a pound of cure' certainly holds true. In the case of HIV infection, the stakes are much higher."). There was an express recognition in the art that chemoprophylaxis had been proven as an effective measure to reduce disease transmission rates and prevent new infections in healthy individuals, and these showings of efficacy across other disease states created a

motivation to implement chemoprophylaxis, including pre-exposure prophylaxis, in humans to prevent new HIV infections.

To be certain, an extended and direct analogy had been drawn in the art to the successful use of chemoprophylaxis to prevent new infections and disease transmission in other contexts in support of its use as a model for pre-exposure prophylaxis for HIV:

> One response to other infectious agents in the absence of an effective preventative vaccine combines behaviour for avoidance of the pathogen, with or without chemoprophylaxis. . . .  The discovery of quinine was the first in a cascade of therapeutic and prophylactic agents that allowed non-immune individuals to visit or live in endemic areas with greater safety. . . .  In the same way as infection with malaria is usually infrequent, one could argue that the percentage of time that an individual is at risk of HIV infection is relatively low, since it represents an intermittent rather than a continuous exposure to the pathogen.

Youle JIAPAC 2003 at 103; *see also id.* ("[M]alarial prophylaxis may be a good model for pre-exposure prophylaxis against HIV."); *see also id.* at 1-2 (further drawing an analogy to malarial chemoprophylaxis to support implementation of pre-exposure prophylaxis for HIV); Coates ("This is the strategy we use with malaria and other diseases—we take preventative medications before we encounter pathogens, so our body can repel infection.").  Furthermore, a skilled artisan would have also been aware that administering antiretrovirals prior to retroviral exposure means, at a microbiological level, that the antiretroviral compound will be present before retroviral replication can begin in an exposed host and prevent the establishment of the retroviral infection. *See, e.g.*, Szekeres at 10-11 ("[D]rugs whose mechanisms of action focus on pre-integration phases of viral life cycle (prior to completion of effective viral integration into host cell DNA) are, at least in theory, likely to be more effective than those that focus on post-integration."); Youle JIAPAC 2003 at 103 ("The agent should prevent infection of cells, or at least nuclear integration, when exposed to HIV.");  Youle AIDS 2003 at 1 ("The ideal agent should prevent the infection of cells, or at least nuclear integration when exposed to HIV.").

Additionally, Schwarzenegger expressly cites Tsai 1995, among other references, in support of the efficacy of post-exposure prophylaxis.  Schwarzenegger at 9-11.  Schwarzenegger cites Tsai 1995 in support of the statement that that "[i]n SIV models, nucleotide and nucleoside analogues have been protective in preventing infection in a majority of intravenously inoculated macaques when given early after exposure (within 24 hours is superior to 48 or 72 hours) and for a 28-day course," *id.* at 10, and a skilled artisan would have accordingly considered Schwarzenegger's disclosure of recommended PEP regimens along with knowledge in the art regarding pre-exposure prophylaxis, such as Tsai 1995.

Accordingly, a skilled artisan would have been aware that implementation of chemoprophylaxis via administration of therapeutically effective drug compounds prior to exposure to an infectious pathogen had been proven widely across infectious diseases and medical contexts as an effective methodology to reduce disease transmission rates and prevent establishment of new infections in previously uninfected humans, and would have understood the parallels expressly recognized in the art between HIV and other infectious diseases, wherein chemoprophylaxis had been successfully implemented, to motivate the implementation of pre-exposure prophylaxis for HIV.

Not only had the combination of TDF and FTC been approved by the FDA for purposes of treating established HIV infection, *see, e.g.*, Truvada[®] Insert at 11, but it was already recommended to be used to prevent the establishment of new HIV infections in previously uninfected humans by at least one government body.  Schwarzenegger at 1, 8, 15.  The Schwarzenegger reference was prepared as a result of the California Department of Health Services, Office of AIDS appointing and convening a task force to develop recommendations for the use of PEP for the prevention of HIV infection in the general population.  *Id.* at 1.  As

Schwarzenegger recites, PEP is a "program meant to help people who may have been exposed to HIV through sex or injection drug use in the past 72 hours to try to prevent HIV infection." *Id.* at 25.  A skilled artisan would have understood the recommended combination of TDF and FTC, as disclosed in Schwarzenegger, to be effective preventing establishment of HIV infection in an uninfected human when administered following an HIV exposure, a skilled artisan would therefore have understood the recommended HIV PEP regimen to also be promising for administration ***prior*** to an exposure to HIV for an identical purpose.

In sum, a skilled artisan at least: (1) would have been aware of the need to decrease rates of HIV transmission and prevent the establishment of new HIV infections; (2) would have been aware of the medical principle of chemoprophylaxis—long-proven administration of therapeutic compounds as an effective means to prevent disease transmission and establishment of new infections in previously uninfected humans; and (3) would have been aware of guidelines and recommendations counseling the administration of antiretrovirals for purposes of HIV post-exposure prophylaxis.[20]  A skilled artisan would have accordingly been motivated to administer those same HIV post-exposure prophylaxes, including the known safe and effective combination of TDF and FTC, for purposes of HIV PrEP, that is, to a human previously uninfected with HIV and prior to an exposure to HIV.

B.    Reasonable Expectation of Success Administering TDF and FTC Prior to HIV Exposure

A skilled artisan would have reasonably expected success in preventing HIV infection by administering the recommended oral post-exposure prophylaxis of the combination of TDF and

---

[20]    And as detailed above in Sections VI.c and VI.d., ordinary persons skilled in the art in fact recognized such teachings in the art in reaching the purported invention of the Asserted Claims of the Patents-in-Suit prior to the earliest priority date to which the Asserted Claims are entitled.  This further supports that the Asserted Claims would have been obvious in view of the teachings of the prior art and the knowledge of the skilled artisan.

FTC, as disclosed in Schwarzenegger, as pre-exposure prophylaxis based on the known efficacy of the antiretroviral combination to both prevent establishment of HIV infection when administered shortly after exposure, as well as the efficacy of the same combination to treat and suppress established HIV infections.

As expressly disclosed in Schwarzenegger, it was known in the art that use of the combination of TDF and FTC was an effective antiretroviral combination to prevent the establishment of HIV infection when administered following an exposure to HIV, and was recommended to be used for that purpose. Prepared by the California Task Force on Non-Occupational PEP and the California Department of Health Services, Office of AIDS, Schwarzenegger consists of guidelines and recommendations "for the use of post-exposure prophylaxis (PEP) for the prevention of HIV infection in the general population." *Id.* at 1.

Schwarzenegger provides specific guidelines and recommendations for PEP use in "individuals who have had a potential exposure to HIV through consensual sexual activity and secondarily to individuals who may have had an exposure to HIV through sharing of injection drug use equipment." *Id.* However, "the same general principles outlined in this document can reasonably be applied to assess the likelihood of acquiring HIV from [other] such exposure, and thus the potential utility of PEP." *Id.*

Schwarzenegger teaches that "PEP is intended for individuals of negative or unknown HIV infection status following potential exposure to HIV," *id.* at 3, and that "PEP should be offered to HIV uninfected or unknown status individuals presenting within 72 hours of a potential exposure to HIV." *Id.* at 11. Moreover, "[i]ndividuals at highest risk of acquiring HIV infection from their specific exposure are expected to benefit most from PEP." *Id.* Regarding the details of the PEP regimens recommended to be used for the prevention of HIV infection,

Schwarzenegger teaches that PEP should be offered "[a]s soon as possible, and no later than 72 hours following exposure." *Id.* at 7. Schwarzenegger teaches that "[i]f a potentially infectious body fluid (e.g. blood or blood products, genital secretions, peritoneal, pleural or cerebrospinal fluids, but NOT saliva, tears, or sweat) was in contact with a mucous membrane (e.g., eye, oral, nasal, or genital mucosa) or non-intact skin (punctures, cut or substantially abraded), HIV infection is possible and consideration of PEP is warranted." *Id.* at 11. More specifically, Schwarzenegger further teaches that its recommended PEP regimens may be used to prevent HIV infections for many types of HIV exposure, including: receptive anal intercourse, shared injection drug use equipment, insertive anal intercourse, insertive vaginal intercourse, other potentially infectious body fluid on a mucous membrane or non-intact skin, and receptive oral intercourse with ejaculation. *Id.* at 7, 11. Schwarzenegger also discloses data and information from published literature and PEP studies to further undergird and supports its PEP regimen recommendations. *Id.* at 9-11. Schwarzenegger thereby teaches that its recommended PEP regimens can be used to prevent HIV infection in a previously uninfected person across a wide range of types of exposure.

Schwarzenegger discloses that there was "no consensus among experts about whether two or three antiretroviral drugs should be used for PEP." *Id.* at 15. Arguments in support of using two drug combinations for PEP include: (1) "the inoculum of virus is small following non-occupational exposure compared with the amount of virus requiring potent antiretroviral therapy for full suppression in an HIV-infected individual"; (2) "single agent PEP resulted in an 81 percent reduction in the risk of HIV infection in a study of occupational exposures"; (3) "increased side effects and/or more difficult dosing schedules may result in decreased adherence"; and (4) "there is a significant cost differential when a third drug is added." *Id.*

Schwarzenegger also discloses that drug resistance considerations may in some instances "make it difficult to construct a potent two-nucleoside regimen," and in those instances "a protease inhibitor or Efavirenz 600 mg at bedtime (qHS) can be added." *Id.* at 16.  Though "[s]ome healthcare providers will elect to use a third drug even when resistance is not suspected," in those circumstances, "a three-drug regimen should only be considered following a very high-risk exposure with a known HIV-infected exposure source." *Id.*  Therefore, based on the express teachings of Schwarzenegger, a skilled artisan would know that in many instances of HIV exposure, a two-drug antiretroviral combination for post-exposure prophylaxis would succeed in preventing establishment of HIV infection in a previously uninfected human.

Schwarzenegger further discloses that "[i]n the absence of information about the exposure source's antiretroviral history, or if the exposure source is naïve to antiretroviral medication, the preferred double nucleoside analogue combination regimen is Combivir ([zidovudine] + lamivudine), one pill twice a day." *Id.* at 15; *see also id.* at 8.  However, recommended "alternative nucleoside analogue combinations include:

> [S]tavudine (40 mg for patients weighing greater than 60 kg and 20 mg for those weighing less than 60 kg, one pill twice a day) or ***tenofovir, 300 mg once a day***, ***in combination*** with lamivudine 150 mg twice a day or 300 mg once a day ***or emtricitabine 300 mg a day***.  ***A fixed dose combination pill combining tenofovir and emtricitabine, called Truvada, is available for once daily dosing.***  Abacavir and didanosine should be avoided unless resistance considerations outweigh potential toxicity.

*Id.* at 15 (emphasis added); *see also id.* at 8.  Schwarzenegger thereby recommends the use of TDF and FTC in combination as an effective post-exposure prophylaxis to prevent the establishment of HIV infection in an uninfected human recently exposed to HIV.  *Id.*  A skilled artisan would therefore know that one can prevent the establishment of HIV infection in a

previously uninfected human by administering the combination of TDF and FTC following an exposure to a source of HIV.

Additionally, as of the earliest priority date to which the Asserted Claims are entitled, a skilled artisan would have also known that the combination of TDF and FTC was useful for treating HIV infection.  Truvada® is a "fixed dose combination tablet[]s containing emtricitabine and tenofovir disoproxil fumarate."  Truvada® Insert at 1.  As of 2004, Truvada had received approval by the FDA and was "indicated in combination with other antiretrovirals agents (such as non-nucleoside reverse transcriptase inhibitors or protease inhibitors) for the treatment of HIV-1 infection in adults."  *Id.* at 11.  Accordingly, based on an indication approved by the FDA for treatment of HIV, a skilled artisan would understand the combination of TDF and FTC to effectively treat established HIV infection.

Because a skilled artisan would have known to use the combination of TDF and FTC to prevent HIV infection in an uninfected human when administered following an exposure to HIV, and would have known to use the combination of TDF and FTC to treat an established HIV infection in a human, a skilled artisan would also reasonably expect success in using the combination of TDF and FTC to prevent HIV infection in an uninfected human when administered prior to an exposure to HIV.

A skilled artisan would have reasonably expected such success because, for example, a skilled artisan would have been aware that TDF and FTC operate in the same manner to inhibit the replication of HIV regardless of whether each compound is administered for HIV prophylaxis or treatment, and regardless of whether the antiretroviral is administered before or after exposure to HIV—the mechanism of action by which the antiretroviral compound operates to interfere with the viral replication cycle is identical.  *See, e.g.*, Szekeres at 10-11 (evaluating

146

the utility of antiretroviral agents for purposes of PrEP based on their mechanism of action for purposes of HIV treatment and stating that) ("[D]rugs whose mechanisms of action focus on pre-integration phases of the viral life cycle (prior to completion of effective viral integration into host cell DNA) are, at least in theory, likely to be more effective than those that focus on post-integration."); *see also* Youle JIAPAC 2003 at 103 (same); Youle AIDS 2003 at 2 (same); Smith 2004 at 2 (same); Truvada® Insert at 2-3.  It was known in the art that, "***[a] drug that can be used to treat and cure a disease, if given at an earlier time in the development of the condition, should be able to prevent the disease.  The drug may be given before exposure***, concurrently with possible exposure, or even after exposure, but before the disease is manifest."  Farer at 102 (emphasis added).  "This concept, chemoprophylaxis, is really a form of treatment for an infection that has not yet occurred, is just beginning, or is in an asymptomatic, subclinical state." *Id.*

TDF and FTC each work as reverse transcriptase inhibitors, which means that each compound interferes with the reverse transcription of viral RNA to cDNA.  Goldsby at 452-53; Truvada® Insert at 2-3; Viread® Insert at 2; Emtriva® Insert at 1-2.  Retroviruses, including HIV, carry their genetic information in the form of RNA, and when the virus is absorbed and enters a cell, the RNA of the virus is subsequently reverse transcribed to DNA by a virally encoded enzyme, reverse transcriptase.  Goldsby at 442-43; De Clercq EOED at 250-51.  Reverse transcriptase reverses the normal transcription process and makes a DNA copy of the viral RNA genome.  Goldsby at 442-43; De Clercq EOED at 251.  This DNA copy, which is called a provirus, is integrated into the cell genome and is translated along with the cell DNA.  Goldsby at 442-43.  When the provirus is expressed to form new virions, or new copies of the virus, the cell lyses (ruptures) and releases the new virions into the host.  *Id.*

TDF, after initial diester hydrolysis for conversion to tenofovir and subsequent phosphorylation by cellular enzymes to form tenofovir diphosphate, interrupts this replication cycle by inhibiting the activity of HIV-1 reverse transcriptase by competing with the natural substrate deoxyadenosine 5'-triphosphate and, after incorporation into DNA, causing DNA chain termination. Truvada® Insert at 2-3; Viread® Insert at 2. Similarly, FTC, a synthetic analog of cytidine, is first phosphorylated by cellular enzymes to form emtricitabine 5'-triphopsate, which inhibits the activity of HIV-1 reverse transcriptase by competing with the natural substrate deoxycytidine 5'-triphosphate, and then being incorporated into nascent viral DNA, similarly resulting in chain termination. Truvada® Insert at 2; Emtriva® Insert at 1. Because a skilled artisan would have known that the mechanism of action to interrupt the reverse transcriptase step of viral reproduction by TDF and FTC and thereby inhibit overall retroviral replication is identical regardless of the temporal relationship between HIV exposure and antiretroviral administration, or regardless of whether a patient has a previously established HIV infection, *see, e.g.*, Schwarzenegger at 15-16, Szekeres 2004 at 10-11, a skilled artisan would have also reasonably expected that the efficacy demonstrated by the antiretroviral combination to inhibit viral replication for HIV post-exposure prophylaxis or HIV treatment would translate successfully to efficacy in the context of HIV pre-exposure prophylaxis.

Schwarzenegger's teachings and knowledge in the art emphasizing the importance of very early administration of post-exposure prophylaxis for HIV would reinforce a skilled artisan's reasonable expectation of success in using a combination of TDF and FTC for pre-exposure prophylaxis. First, Schwarzenegger recommends that "PEP should be initiated as soon as possible following the exposure." Schwarzenegger at 3; *see also id.* at 7. Moreover, "[a]nimal models of the natural history of HIV acquisition following exposure and of PEP

148

interventions suggest that PEP *will be more effective the sooner it is started*." *Id.* at 14 (citations omitted) (emphasis added). "*Clients and health care providers should strive to initiate PEP as early as possible after the exposure*." *Id.* (emphasis added). Timing of initiation for HIV PEP was understood to be so important for post-exposure prophylaxis, including the combination of TDF and FTC for PEP, that Schwarzenegger discloses the initial assessment of HIV risk could be performed telephonically and the patient only later examined in person. *Id.* ("After initial telephone assessment of HIV risk, and explanation of the risks and benefits of PEP, an initial prescription can be called in to a local pharmacy to last until the client can be seen an evaluated in person, preferably within three days."). In fact, in terms of information to be provided to PEP patients, Schwarzenegger summarizes that for PEP, "*[i]t looks like the best effect occurs when the medicines are started as soon as possible*." *Id.* at 25. Accordingly, there was an express teaching in Schwarzenegger that post-exposure prophylaxis, including the combination of TDF and FTC, should be administered as soon as possible after HIV exposure and was more effective the closer in time that the administration of antiretrovirals occurred in relation to the HIV exposure. *See, e.g.*, Schwarzenegger at 3, 7. In view of this express teaching, reinforced by general understanding of chemoprophylaxis principles, one skilled in the art would have had a reasonable expectation of success in administering an antiretroviral even earlier than as soon as possible following HIV exposure—*i.e.*, *prior to* said HIV exposure.

Furthermore, a skilled artisan would have reasonably expected success in administering a combination of FTC and TDF before exposure to HIV to prevent infection, rather than after, based on the quick uptake when coupled with long plasma and intracellular half-lives of the two compounds. "Following oral administration of EMTRIVA, emtricitabine is rapidly absorbed with peak plasma concentrations occurring at 1-2 hours post-dose." Truvada® Insert at 5; *see*

*also* Dando at 2077 ("After oral administration, emtricitabine is rapidly and extensively

absorbed."). Similarly, "[f]ollowing oral administration of VIREAD, maximum tenofovir serum

concentrations are achieved in $1.0 \pm 0.4$ hour." Truvada® Insert at 5. "For both emtricitabine

and tenofovir, $C_{max}$ is reached within 1-3 hours after administration to fed or fasting patients or

volunteers." Dando at 2078.

Both TDF and FTC have long plasma elimination half-lives, approximately seventeen

and ten hours respectively, Truvada® Insert at 5; *see also* Dando at 2078 ("The median terminal

elimination half-lives of emtricitabine and tenofovir were 15.5 and 17.6 hours when healthy

volunteers received a single dose of co-formulated emtricitabine/tenofovir DF 200mg/200 mg on

two separate occasions."). Because of those long half-lives, both TDF and FTC can be dosed

infrequently, once daily for example. Truvada® Insert at 5, 20. Moreover, "the active

metabolites of both drugs have long intracellular half-lives in peripheral blood mononuclear cells

(39 hours for emtricitabine 5'-triphosphate and ≥60 hours for tenofovir diphosphate, " Dando at

2078, and intracellular concentrations may remain present even during periods of incomplete

adherence. *See, e.g.*, Grant 2005 at 2170 ("TDF has a long intracellular half-life, which allows

once-daily dosing and the possibility of protection even if some doses are missed."); Youle

JIAPAC 2003 at 103 (stating that an "ideal agent" for pre-exposure prophylaxis "should be a

once-daily or less frequently taken agent that is non-toxic, well tolerated, and easily

administered"). A skilled artisan would have recognized that these pharmacokinetic properties

indicate that both TDF and FTC can be given at a low dose frequency, once daily for example,

and continue to maintain active intracellular concentrations long after the time of dosing.

Therefore, a skilled artisan would have reasonably expected success in preventing HIV infection

in an uninfected human when the combination of TDF and FTC is administered prior to HIV exposure, rather than as soon as possible post-exposure.[21]

Accordingly, in view of the recommended use of the combination of TDF and FTC for HIV PEP as disclosed in Schwarzenegger, and in view of the known efficacy of the same combination to treat and suppress established HIV infection, a skilled artisan would have reasonably expected success in using the same combination as pre-exposure prophylaxis for HIV.

**3.**     <u>Schwarzenegger in View of Dando, Further in View of Tsai 1995 and/or Van Rompay 2004, and Further in View of the Knowledge of a Person of Ordinary Skill in the Art</u>

As set forth in further detail in the claim charts in Exhibit A, claims 1-11 and 13 of the '509 Patent; claims 1-11 and 13 of the '333 Patent; claims 1-19 of the '191 Patent; and claims 1-19 of the '423 Patent would have been obvious over Schwarzenegger in view of Dando, further in view of Tsai 1995 and/or Van Rompay 2004, and further in view of the knowledge of a person of ordinary skill in the art. The references were publicly available before the earliest priority date to which the Asserted Claims are entitled and are thus prior art.

The combination of Schwarzenegger and Dando with Tsai 1995 and/or Van Rompay 2004 teaches or suggests all of the limitations of the Asserted Claims.

Schwarzenegger discloses post-exposure prophylaxis in humans with pharmaceutically effective amounts of TDF in combination with FTC to protect against HIV infection. Schwarzenegger consists of guidelines and recommendations prepared by the California Task

---

[21]     And as detailed above in Sections VI.c and VI.d., ordinary persons skilled in the art in fact recognized such teachings in the art in reaching the purported invention of the Asserted Claims of the Patents-in-Suit prior to the earliest priority date to which the Asserted Claims are entitled. This further supports that the Asserted Claims would have been obvious in view of the teachings of the prior art and the knowledge of the skilled artisan.

Force on Non-Occupational PEP and the California Department of Health Services, Office of AIDS "for the use of post-exposure prophylaxis (PEP) for the prevention of HIV infection in the general population." Schwarzenegger at 1. Accordingly, Schwarzenegger teaches that "PEP is intended for individuals of negative or unknown HIV infection status following potential exposure to HIV." *Id.* at 3. "The higher the risk of the exposure [to HIV] (determined by the type of sexual or other activity and the likelihood of HIV infection in the exposure source), the more directive the health care provider should be towards the decision to take PEP." *Id.*

Schwarzenegger provides specific guidelines and recommendations for PEP use in "individuals who have had a potential exposure to HIV through consensual sexual activity and secondarily to individuals who may have had an exposure to HIV through sharing of injection drug use equipment." *Id.* at 1. However, "the same general principles outlined in this document can reasonably be applied to assess the likelihood of acquiring HIV from [other] such exposure, and thus the potential utility of PEP." *Id.*

Schwarzenegger teaches that "[i]f a potentially infectious body fluid (e.g. blood or blood products, genital secretions, peritoneal, pleural or cerebrospinal fluids, but NOT saliva, tears, or sweat) was in contact with a mucous membrane (e.g., eye, oral, nasal, or genital mucosa) or non-intact skin (punctures, cut or substantially abraded), HIV infection is possible and consideration of PEP is warranted." *Id.* at 11. More specifically, Schwarzenegger further teaches that its recommended PEP regimens may be used to prevent HIV infections for many types of HIV exposure, including: receptive anal intercourse, shared injection drug use equipment, insertive anal intercourse, insertive vaginal intercourse, other potentially infectious body fluid on a mucous membrane or non-intact skin, and receptive oral intercourse with ejaculation. *Id.* at 7,

11.  Schwarzenegger thereby teaches that its recommended PEP regimens can be used to prevent HIV infection in a previously uninfected person across a wide range of exposure types.  *See id.*

Schwarzenegger teaches that "[i]n the absence of information about the exposure source's antiretroviral history … the preferred double nucleoside analogue combination regimen is Combivir®," ([zidovudine] + lamivudine), one pill twice a day."  *Id.* at 15; *see also id.* at 8.  However, recommended "alternative nucleoside analogue combinations include:

> [S]tavudine (40 mg for patients weighing greater than 60 kg and 20 mg for those weighing less than 60 kg, one pill twice a day) or ***tenofovir, 300 mg once a day***, ***in combination*** with lamivudine 150 mg twice a day or 300 mg once a day ***or emtricitabine 300 mg a day***.  ***A fixed dose combination pill combining tenofovir and emtricitabine, called Truvada, is available for once daily dosing.***  Abacavir and didanosine should be avoided unless resistance considerations outweigh potential toxicity.

*Id.* at 15 (emphasis added); *see also id.* at 8.  Schwarzenegger thereby recommends the use of TDF and FTC in combination as an effective PEP regimen to prevent the establishment of HIV infection in an uninfected human recently exposed or potentially exposed to HIV, and teaches that the combination is available for once daily dosing in the form of Truvada.  *Id.*  Schwarzenegger further teaches that "abacavir and didanosine should be avoided" for PEP "unless antiviral resistance considerations outweigh potential toxicity" (hypersensitivity and pancreatitis, respectively).  *Id.* at 15; *see also id.* at 8.

Schwarzenegger discloses that there was "no consensus among experts about whether two or three antiretroviral drugs should be used for PEP."  *Id.* at 15.  Arguments in support of using two drug combinations for PEP include: (1) "the inoculum of virus is small following non-occupational exposure compared with the amount of virus requiring potent antiretroviral therapy for full suppression in an HIV-infected individual"; (2) "single agent PEP resulted in an 81 percent reduction in the risk of HIV infection in a study of occupational exposures"; (3)

"increased side effects and/or more difficult dosing schedules may result in decreased adherence"; and (4) "there is a significant cost differential when a third drug is added." *Id.*

Schwarzenegger discloses that "[a]lthough there are no efficacy data directly supporting the use of non-occupational PEP for sexual exposures, several related sets of data from an occupational exposure study, mother-to-child transmission studies, and animal studies support its biological plausibility." *Id.* at 9. Schwarzenegger discloses that though "[t]he validity of generalizing results of PEP following nonmucosal exposures to mucosal exposures in humans remains uncertain because of differences in the immune response," it further discloses that "[a]nimal models of mucosal exposures do demonstrate PEP effectiveness." *Id.*

Schwarzenegger discloses that "[r]esults from animal studies of PEP have provided data supportive of its probable efficacy in intravenous, oral, and vaginal simian immunodeficiency virus (SIV) and HIV-2 exposures, and that these data have been instructive in terms of timing and duration of therapy." *Id.* at 10. Citing, among other references, Tsai 1995, Schwarzenegger discloses that "[i]n SIV models, nucleotide and nucleoside analogues have been protective in preventing infection in a majority of intravenously inoculated macaques when given early after exposure (within 24 hours is superior to 48 or 72 hours) and for a 28-day course." *Id.* "When provided to macaques following intravaginal exposure to HIV-2, the nucleotide analogue PMPA (tenofovir) was fully protective when treatment was initiated at 12 or 36 hours post-inoculation (zero of eight infected), and only partially effective at 72 hours (one of four treated animals infected; three of four controls infected)." *Id.* By contrast, the "three control animals seroconverted at two weeks and the experimental animal at 16 weeks post-exposure, raising concerns about the possibility of delayed seroconversion and the need for adequate follow-up HIV antibody testing after administration of PEP." *Id.* However, Schwarzenegger also discloses

that "[r]eassuringly, studies of health care workers who have seroconverted following PEP have not demonstrated delayed seroconversion." *Id.*

Schwarzenegger further discloses that the efficacy of PEP was also understood to be supported by "multiple studies of antiretroviral drugs used in pregnant women and/or their newborns" to prevent "mother-to-child transmission of HIV infection." *Id.*at 9. Schwarzenegger further discloses that "[s]ome of these studies have included drugs given to both the mother and the newborn, some just to the mother, and two to just the newborn." *Id.* (citing references). "A New York State Department of Health analysis demonstrating efficacy even in those infants who only received [zidovudine] within 48 hours after birth (9.2 percent compared to 26.6 percent transmission without PEP suggests that there is likely a post- as well as a pre-exposure effect of antiretrovirals used in the prevention of mother-to-child transmission." *Id.* at 9-10. Moreover, the "first prospective study of antiretrovirals used only in the postnatal period to prevent mother-to-child transmission also demonstrated efficacy in reducing mother-to-child transmission of HIV." *Id.* at 10.

Schwarzenegger also discloses that the efficacy of PEP was supported by occupational HIV exposures studies. *Id.* at 9. "The 1987 approval of [zidovudine] was followed by consideration of antiretroviral therapy as prophylaxis following potential exposure to HIV." *Id.* Though "[i]n 1990, CDC published a statement that neither recommended nor discouraged such use following occupational exposures to HIV," "[t]he 1995 presentation of a case-control study in health care workers demonstrating a 79 percent reduction in the likelihood of HIV infection associated with [zidovudine] use following occupational exposure led to the 1996 revision of CDC guidelines to recommended PEP following occupational exposures." *Id.* Schwarzenegger further discloses that the "published study ultimately showed an 81 percent reduction in HIV

infection associated with [zidovudine] use and raised a number of questions regarding generalizability to non-occupational exposures, the feasibility of providing non-occupational PEP, and its safety and cost-effectiveness." *Id.*

Schwarzenegger discloses that the efficacy of PEP was further supported by "observational studies in humans." *Id.* at 10. "Only a single study of PEP following non-occupational exposures has been published; there were no seroconversions among 401 enrolled subjects with follow-up six months after PEP initiation." *Id.* Furthermore, "unpublished studies from the United States, Brazil, Australia, and South Africa report few seroconversions following non-occupational PEP use, although follow-up is often limited." *Id.* Schwarzenegger further discloses that "[a] recent unpublished analysis of data from San Francisco, California, demonstrates the difficulty of attributing HIV seroconversions to failure of PEP in the non-occupational context, where the potential infection source is rarely available for testing and additional potential exposures are common."[22] *Id.*

Schwarzenegger also discloses that "[t]here have been several reports of failure of PEP to prevent HIV infection following occupational exposures," and that "[w]hile offering some protection, PEP is not expected to be 100 percent effective in any setting." *Id.* at 11. However, "[s]ome failures of PEP are not inconsistent with the efficacy of PEP." *Id.*

Schwarzenegger teaches that "PEP should be offered to HIV uninfected or unknown status individuals presenting within 72 hours of a potential exposure to HIV." *Id.* Moreover, "[i]ndividuals at highest risk of acquiring HIV infection from their specific exposure are expected to benefit most from PEP." *Id.* Schwarzenegger further teaches that PEP should be

---

[22] Where "additional potential [HIV] exposures" occur while a human is taking a prescribed antiretroviral PEP regimen, such PEP regimens would also function in a PrEP capacity with respect to those subsequent HIV exposures. *See also* Section VI.c.i.3 (Mayer NPEP Proposal).

offered "[a]s soon as possible, and no later than 72 hours following exposure." *Id.* at 7.
Schwarzenegger discloses that "[a]nimal models of the natural history of HIV acquisition
following exposure and of PEP interventions suggest that PEP will be more effective the sooner
it is started." *Id.* at 14.  Schwarzenegger further discloses that "[c]lients and healthcare providers
should strive to initiate PEP as early as possible after the exposure." *Id.*

Dando discloses the "[f]eatures and properties of co-formulated emtricitabine/tenofovir
disoproxil fumarate (tenofovir DF) [Truvada™]."  Dando at 2075 (square brackets in original).
Dando discloses that "nucleoside analogue reverse transcriptase inhibitor (RTI) emtricitabine and
the nucleotide analogue RTI tenofovir disoproxil fumarate (tenofovir DF) have each shown
antiviral activity against a number of HIV clinical isolates and cell lines." *Id.*; *see also id.* at
2076 (same).

Though Dando discloses that "no efficacy trials of the co-formulated
emtricitabine/tenofovir DF 200mg/300mg tablet have been conducted," Dando discloses that
"[e]mtricitabine and tenofovir DF, as individual agents, have shown efficacy in reducing HIV
RNA levels from baseline in well designed trials." *Id.* at 2079 (citations omitted).
"Emtricitabine, in combination with other antiretroviral agents, including didanosine and
efavirenz, stavudine, and nevirapine, or stavudine and efavirenz, has shown antiviral efficacy in
several trials of up to 4 years' duration." *Id.* (citations omitted). Dando continues, and discloses
that "[f]or example, the efficacy of triple therapy containing once-daily emtricitabine was
equivalent to that of triple therapy containing lamivudine in two 48-week trials in patients with
HIV infection (both n > 400)." *Id.* at 2079-80.  "Additionally, emtricitabine-containing therapy
was significantly more effective than stavudine-based therapy (HIV RNA ≤50 copies/mL was
achieved and maintained in 76% vs 54% of patients after 60 weeks; p < 0.001) or PI-based

therapy (95% vs 87% at week 48 intention-to-treat, missing = failure population [ITT, M=F]; p=-0.01)." *Id.* at 2080 (citations omitted) (square brackets in original). Dando also discloses that "[s]ynergistic antiviral effects were observed in *in vitro* combination studies of emtricitabine plus tenofovir." *Id.* at 2076.

Dando further discloses that "[t]enofovir DF was as effective as stavudine (both in combination with lamivudine and efavirenz) after treatment for 144 weeks in a randomised, double-blinded, multicentre study in antiretroviral-naïve patients (n= 600) with HIV infection (analyses based on ITT, M=F population)." *Id.* at 2080. "At this timepoint, 67.9% of tenofovir DF-containing therapy recipients and 62.5% of stavudine-containing therapy recipients had HIV RNA levels <50 copies/mL (95% CI -1.8, 13.3 for the between-group difference [a lower limit higher than -10.0 indicated non-inferiority])." *Id.* (square brackets in original). And the "respective proportions of patients with HIV RNA levels <499 copies/mL were 70.6% and 64.1% (95% CI -0.8, 14.0)." *Id.*

Moreover, Dando discloses that "[o]ral, once-daily therapy with concomitant separate formulations of emtricitabine 200 mg/day and tenofovir DF 300 mg/day in combination with once or twice-daily co-formulated lopinavir/ritonavir (PI) reduced HIV RNA levels in an ongoing, randomised, open-label study in 190 antiretroviral-naïve patients with HIV infection (ITT analysis)." *Id.* "At 48 weeks in the once- and twice-daily PI-containing treatment groups, 70% and 64% of patients had HIV RNA levels <50 copies/mL and CD4+ cell counts had increased from baseline by 185 and 188 cells/μL. These results confirmed the efficacy outcomes seen at the interim 24-week analysis." *Id.* (citations omitted). Dando also discloses that data was not yet "available at present for an open-label, multicentre trial that will compare emtricitabine,

tenofovir DF and efavirenz with co-formulated lamivudine/zidovudine plus efavirenz in antiretroviral-naïve patients (n = 517)." *Id.*

Regarding the resistance profiles of FTC and TDF, Dando discloses that though "HIV variants with reduced susceptibility to emtricitabine and tenofovir have been selected for *in vitro* and have also been isolated from patients receiving the agents," it was also true that "[l]ow rates of these variants have been observed in patients experiencing virological failure in large studies of emtricitabine- or tenofovir DF-containing therapy." *Id.* at 2075. For example, "[a]ntiretroviral-naïve patients (n = 190) received emtricitabine and tenofovir DF in combination with co-formulated lopinavir/ritonavir for 48 weeks. Of the 15 patients who "had HIV RNA levels >500 copies/mL at any time from weeks 12 to 48 (and genotypic results available), three demonstrated resistance to emtricitabine (M184V/I) and none demonstrated resistance to tenofovir DF." *Id.* at 2077. Dando further discloses that "HIV isolates resistant to emtricitabine (M184I/V) were cross-resistant to lamivudine and zalcitabine but remained sensitive to abacavir, didanosine, stavudine, ***tenofovir***, delavirdine, efavirenz and nevirapine" *Id.* (emphasis added).

Dando further teaches that "[c]o-formulated oral emtricitabine/tenofovir DF was bioequivalent to the two agents as separate formulations in a pharmacokinetic trial in health volunteers." *Id.* at 2075. Dando discloses that the "[t]he arithmetic mean values for the maximum serum concentration ($C_{max}$) and area under the serum concentration-time curve from time zero to infinity ($AUC_\infty$) for emtricitabine were 2.13 µg/mL and 10.6 µg • h/mL when a single dose of co-formulated emtricitabine/tenofovir DF 200mg/300mg was administered to 44 fasting, healthy volunteers in a crossover trial. Respective values for tenofovir DF were 0.254 µg/mL and 1.96 µg • h/mL." *Id.* at 2077. Dando further discloses that "[i]n the same trial, co-formulated emtricitabine/tenofovir DF was bioequivalent to the two agents administered as

separate formulations (figure 1)." *Id.* "For both emtricitabine and tenofovir DF, the 90%

confidence intervals for the geometric mean ratio (combination dose : individual formulations)

for the Cmax and $AUC_\infty$ values were contained within 80–120%, thus meeting the predefined

criteria for bioequivalence." *Id.*

Dando also discloses that "[a]fter oral administration, emtricitabine is rapidly and

extensively absorbed. . . . For both emtricitabine and tenofovir, $C_{max}$ is reached within 1-3 hours

after administration to fed or fasting patients or volunteers." *Id.* at 2078. "At $C_{max}$, the drug

partitions approximately equally into the plasma and blood cells and the mean concentration in

the semen is approximately four times that in the plasma." *Id.* Additionally, "[t]he median

terminal elimination half-lives of emtricitabine and tenofovir were 15.5 and 17.6 hours when

healthy volunteers received a single dose of co-formulated emtricitabine/tenofovir DF

200mg/300 mg on two separate occasions." *Id.* And "the active metabolites of both drugs have

long intracellular half-lives in peripheral blood mononuclear cells (39 hours for emtricitabine 5'-

triphosphate and ≥60 hours for tenofovir diphosphate." *Id.* (citation omitted).

Additionally, "emtricitabine and tenofovir DF are generally well tolerated." *Id.* at 2075.

Accordingly, Dando discloses that "[a]s individual agents in combination with other

antiretroviral agents, emtricitabine and tenofovir DF are generally well tolerated in patients with

HIV infection." *Id.* at 2080 (citations omitted). The most "frequent (13-30% of patients)

adverse events occurring with emtricitabine-containing combination therapy in clinical trials of

≤48 weeks' duration were headache, diarrhoea, nausea, and rash," and were expressed in

frequency "similar to that [of] lamivudine-[]containing therapy," and "significantly lower" than

"those receiving stavudine-containing therapy (all p ≤ 0.05)." *Id.* And "[t]he incidence of

adverse events with tenofovir DF was generally similar to that with placebo in clinical trials;

160

gastrointestinal events (nausea, diarrhoea, vomiting, flatulence) occurred commonly (3-16% of patients). *Id.* "[S]ignificantly fewer" patients receiving TDF-containing therapy experienced "neuropathy, lipodystrophy and adverse events potentially associated with mitochondrial dysfunction" than patient's receiving stavudine-containing therapy. *Id.*

Dando also discloses that "[w]hen emtricitabine and tenofovir DF were administered simultaneously as separate formulations in patients also receiving lopinavir/ritonavir, the most common moderate-to-severe, drug-related adverse events were diarrhoea, nausea and vomiting." *Id.* at 2081. "Emtricitabine 200mg plus tenofovir DF 300mg, either as a co-formulated tablet or as separate formulations, was generally well tolerated in two pharmacokinetic trials." *Id.* (citations omitted). With respect to those trials, Dando discloses:

> One volunteer discontinued treatment because of moderate vomiting when 19 healthy volunteers received the two separate tablets once daily for 7 days. When 44 healthy volunteers received one dose of the two agents as separate tablets and as a co-formulated tablet in a crossover study, eight individuals (18%) experienced an adverse event (combined data); the most common adverse event was grade 1 headache (n = 3). There were no grade 3 or 4 or serious adverse events. One volunteer discontinued treatment because of a mild rash that was considered to be treatment related.

*Id.* (citations omitted).

Dando concludes that "[c]o-formulated emtricitabine/tenofovir DF is approved in the US for once-daily oral use in conjunction with antiretroviral agents in adults with HIV infection." *Id.* And "[a]lthough no clinical trials of the efficacy of this formulation have been published to date, the fixed-dose co-formulation was bioequivalent to the two separate components given concomitantly in a pharmacokinetic study. Advantages of the of the emtricitabine/tenofovir DF co-formulation include a reduced pill burden and the fact that that it can be administered without regard to food." *Id.*

Each of Tsai 1995 and Van Rompay 2004 discloses pre-exposure prophylaxis with pharmaceutically effective amounts of tenofovir or TDF to protect a primate host against retroviral infection, including HIV.  Tsai 1995 discloses subcutaneous administration of tenofovir to macaques once daily, beginning either: (1) 48 hours before; (2) 4 hours after; or (3) 24 hours after inoculation with simian immunodeficiency virus ("SIV").  Tsai 1995 at 1197. Tsai 1995 discloses that none of the macaques became infected when tenofovir was administered starting: (1) 48 hours before; (2) 4 hours after; or (3) 24 hours after inoculation.  *Id.* at 1198-99. Tsai 1995 also discloses that "[c]linical signs of [tenofovir] toxicity did not occur, nor were there any significant changes in complete blood counts or blood chemistries during or after the 4-week treatment regimen," and concludes that tenofovir "prevented establishment of SIV infection in 25 out of 25 macaques (100%), without toxicity when administered up to 24 hours after viral inoculation."  *Id.* at 1199.  Tsai 1995 concludes that its "pre- and postexposure findings indicate that tenofovir is a promising candidate for anti-HIV treatment," and that tenofovir could prevent HIV infection in humans.  *Id.*  Tsai further concludes that "results from several recent anti-HIV clinical trials indicate that combining nucleoside analogues, such as AZT, with lamivudine (3TC) or proteinase inhibitors can enhance antiviral efficacy," and that "[t]herefore, [tenofovir] may also have an important role in combination therapies or strategies against HIV."  *Id.*

Van Rompay 2004 discloses pre-exposure prophylaxis in macaques with pharmaceutically effective amounts of TDF to protect against retroviral infection, including HIV. "Infant macaques were exposed orally to low doses of virulent SIVmac251 during 2 inoculation periods": (1) "during the first week of life"; and (2) "for animals that were still uninfected, again at 1 month of age."  Van Rompay 2004 at 1.  "To mimic the multiple exposures to HIV that occur during prolonged breast-feeding," Van Rompay 2004 discloses the use of an "animal

model in which infant macaques are bottle-fed repeatedly low doses of virulent simian immunodeficiency virus (SIVmac251).  *Id.*

"One group of [infant macaques] received oral tenofovir DF syrup at a dose (10 mg/kg once daily) estimated to be pharmacokinetically equivalent (based on area-under-the curve values) to the 8 mg/kg regimen used in pediatric trials, and the 300 mg tenofovir DF tablet given to adults.  Tenofovir DF [TDF] was given once daily starting one day before until one day after each SIV inoculation period."  *Id.*  A control group of infant macaques, to which no antiretrovirals were administered, were similarly exposed to SIV.  *Id.* at 1.  "After the 2 rounds of inoculations, 20 of 22 untreated macaques were persistently viremic," that is had an established infection.  *Id.*  "In contrast, 3 of 6 tenofovir-treated animals were uninfected at 3 months of age (p=0.05; two-sided Fisher's Exact test)."  *Id.*  Van Rompay 2004 concludes that the "data suggest that tenofovir DF administration will be effective to protect infants against HIV transmission from breast-milk," and that the "data provide also support [sic] for the ongoing trials in which the use of chronic tenofovir DF administration is investigated to reduce infection rates among high-risk adult groups (commercial sex workers, and men having sex with men)." *Id.*

A.    Motivation to Administer FTC and TDF Prior to HIV Exposure

As set forth more fully herein, the motivation to combine the references is explicit within the references themselves, and was also within the knowledge of a person of ordinary skill in the art.  For at least the following reasons, a person of ordinary skill in the art would have been motivated to combine Schwarzenegger with Dando, and Tsai 1995 and/or Van Rompay 2004, and the knowledge of a person of ordinary skill in the art to arrive at the claimed methods, and

would have had a reasonable expectation of success in doing so for the reasons described in Section VI.e.i.3.B below.

A skilled artisan would have been motivated to modify a recommended oral PEP regimen comprising the combination of TDF and FTC, as disclosed in Schwarzenegger, and administer the antiretroviral combination to a previously uninfected human prior to HIV exposure, rather than after, based on a well-recognized need and interest in the art to decrease rates of HIV transmission and prevent the establishment of new HIV infections in the first instance.  A skilled artisan would have also been aware of the disclosure of Tsai 1995 and Van Rompay 2004, among other references, teaching the administration of tenofovir or TDF to macaques prior to exposure to an immunodeficiency retrovirus and thereby protecting macaques from establishment of infection by said immunodeficiency retrovirus.  Tsai 1995 at 1199; Van Rompay 2004 at 1; *see also* Van Rompay AIDS 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-73; Van Rompay 2001 at 429, 436.  To be certain, Schwarzenegger expressly cites Tsai 1995, among other references, in support of the efficacy of post-exposure prophylaxis, indicating that such references would have been considered together by a skilled artisan. Schwarzenegger at 10.  Moreover, not only had the combination of TDF and FTC been approved by the FDA and deemed safe and effective for the treatment of HIV in infected humans, but it was already recommended by at least one governmental body, the California Task Force on Non-Occupational PEP and the California Department of Health Services, Office of AIDS, for use as HIV post-exposure prophylaxis.  *See id.* at 1.  Therefore, a skilled artisan seeking to reduce rates of HIV infection and transmission rates would have been motivated to modify the teachings of Schwarzenegger and administer the prophylactic combination of TDF and FTC before HIV

exposure to an uninfected person, rather than after (as informed by Tsai 1995 and Van Rompay 2004).

As of the earliest priority date to which the Asserted Claims are entitled, there was an express and well-recognized need to reduce HIV transmission rates and prevent the establishment of new HIV infections in humans. "HIV infects more than 40 million people worldwide, and there are 14,000 new infections per day." Grant 2005 at 2170 (citation omitted). And it was understood that "[a]cross most of the world, the HIV epidemic remains unchecked." Youle JIAPAC 2003 at 102 (citation omitted). However, "even as available and proven prevention interventions are used, the HIV pandemic will not be stopped solely by talking to those at risk." Grant 2005 at 2170 (citation omitted). Similarly, it was recognized in the art that based on available prevention techniques, "[t]here is little evidence that there has been a significant reduction in the global rate of infection over time. HIV still spreads like wild-fire in susceptible communities, and is increasingly of multidrug-resistant strains." Youle AIDS 2003 at 1 (citation omitted); *see also* Youle JIAPAC 2003 at 102 (same).

It was also recognized in the art that ongoing development of a vaccine to prevent HIV transmission and infection showed little promise in providing a solution. "The quest for an effective preventative vaccine for the uninfected has been, to date, unfruitful." Youle AIDS 2003 at 1 (citations omitted); *see also* Youle JIAPAC 2003 at 102 (same). While a number of "putative vaccines" were understood to be in development, their efficacy in preventing HIV infection—"remains unclear," and the overall "availability of new candidate vaccines is limited." Youle JIAPAC 2003 at 102. The first HIV vaccine to reach phase 3 studies "failed to provide protection from infection and none of the remaining vaccine candidates currently in clinical trials appear likely to induce potent protective immunity." Smith 2004 at 1 (endnotes omitted).

Though a couple of "novel approaches to establish a long-lasting broad immune response against HIV" were being investigated, "concerns exist that the breadth and durability of anti-HIV immune response may be too narrow to elicit complete protection against the myriad of HIV viral strains currently circulating in humans."  Youle JIAPAC 2003 at 102.  Overarching issues limiting potential overall usefulness of an HIV vaccine were also acknowledged—for example, "[vi]ral escape from cytotoxic T-lymphocyte recognition might be a limiting factor to vaccine efficacy."  *Id.*  And "[g]iven HIV's propensity to escape cellular and humoral response, there exists no clear approach or target for vaccine development."  Smith 2004 at 1 (endnotes omitted).

It was further acknowledged that "[s]ignificant populations are at high risk of imminent HIV infection, such as HIV-discordant sexual partners or those who chose not to use condoms. For these individuals a current vaccine strategy may be too far in the future."  Youle AIDS 2003 at 1; Youle JIAPAC 2003 at 102-103; *see also* Smith 2004 at 1 (acknowledging efforts of the World Health Organization to "treat those infected with HIV-1" but further acknowledging that "it is not clear they will have a broad impact on the HIV-1 epidemic in the immediate future"). Moreover, even for those individuals using condoms, "only a single failure may result in an additional HIV-infected individual."  Youle JIAPAC 2003 at 103.  Accordingly, a skilled artisan would have recognized the need for additional prophylactic methods and approaches to prevent the spread of HIV and the establishment of HIV infection in previously uninfected humans.

Consequently, it was recognized in the art that "[c]hemoprophylaxis with antiretroviral agents is a promising new approach" and that "[c]linical trials of daily oral antiretroviral dosing as preexposure prophylaxis (PrEP) have been initiated in Africa, Asia, and the United States and are planned in Latin America."  Grant 2005 at 2170.  The use of antiretroviral compounds, "that is the administration of chemoprophylaxis to uninfected individuals who live in areas with a high

prevalence of HIV-1" was proposed as an approach with "immediate impact."  Smith 2004 at 1;
*see also* Youle JIAPAC 2003 at 103; Youle AIDS 2003 at 1.

A skilled artisan would have been aware of the well-recognized need to reduce HIV
transmissions and prevent the establishment of new HIV infection, and would have further been
aware that chemoprophylaxis by administering of antiretrovirals to an uninfected person prior to
her exposure to HIV was recognized in the art as an approach to doing so.  A skilled artisan
would therefore have looked to regimens known in the art for purposes of HIV
chemoprophylaxis, including those recommended for administration to an uninfected person
following exposure to HIV in order to prevent the establishment of a new HIV infection.

Schwarzenegger recommends the use of TDF and FTC in combination as an effective
two-drug post-exposure prophylaxis to prevent the establishment of HIV infection in an
uninfected human recently exposed to HIV, and teaches that the combination is available for
once daily dosing as a fixed dose combination pill (Truvada®).  Schwarzenegger at 8, 15; *see
also* Dando at 2081("Advantages of the emtricitabine/tenofovir DF co-formulation include a
reduced pill burden and the fact that it can be administered without regard to food.").
Schwarzenegger also teaches that "PEP should be offered to HIV uninfected or unknown status
individuals presenting within 72 hours of a potential exposure to HIV." *Id.* at 11.  Moreover,
"[i]ndividuals at highest risk of acquiring HIV infection from their specific exposure are
expected to benefit most from PEP." *Id.*  Schwarzenegger further teaches that PEP should be
offered "[a]s soon as possible, and no later than 72 hours following exposure." *Id.* at 7.
Schwarzenegger discloses that "[a]nimal models of the natural history of HIV acquisition
following exposure and of PEP interventions suggest that PEP will be more effective the sooner

it is started." *Id.* at 14.  Schwarzenegger further discloses that "[c]lients and healthcare providers should strive to initiate PEP as early as possible after the exposure." *Id.*

A skilled artisan would have been also aware of the established safety and efficacy of the combination of FTC and TDF for treating HIV, including as a fixed dose co-formulation, as disclosed by Dando.  Dando discloses the "[f]eatures and properties of co-formulated emtricitabine/tenofovir disoproxil fumarate (tenofovir DF) [Truvada™]."  Dando at 2075 (square brackets in original). Dando discloses that "nucleoside analogue reverse transcriptase inhibitor (RTI) emtricitabine and the nucleotide analogue RTI tenofovir disoproxil fumarate (tenofovir DF) have each shown antiviral activity against a number of HIV clinical isolates and cell lines." *Id.*; *see also id.* at 2076 (same).  Dando also discloses that "[e]mtricitabine and tenofovir DF, as individual agents, have shown efficacy in reducing HIV RNA levels from baseline in well designed trials." *Id.* at 2079 (citations omitted); *see id.* at 2079-2080 (disclosing further details regarding efficacy).  And in terms of safety, Dando discloses that "emtricitabine and tenofovir DF are generally well tolerated." *Id.* at 2075; *see id.* at 2080 ("As individual agents in combination with antiretroviral agents, emtricitabine and tenofovir DF are generally well tolerated in patients with HIV infection.").  Furthermore, regarding the resistance profiles of FTC and TDF, Dando discloses that though "HIV variants with reduced susceptibility to emtricitabine and tenofovir have been selected for *in vitro* and have also been isolated from patients receiving the agents," it was also true that "[l]ow rates of these variants have been observed in patients experiencing virological failure in large studies of emtricitabine- or tenofovir DF-containing therapy." Dando at 2075; *see id.* at 2076-2077.  And "[a]dvantages of the of the emtricitabine/tenofovir DF co-formulation include a reduced pill burden and the fact that that it can be administered without regard to food." *Id.*  Accordingly, in addition to the disclosure of

Schwarzenegger, a skilled artisan would have further been motivated to administer the combination of TDF and FTC prior to exposure to HIV based on the known efficacy and safety of the combination as approved for treating HIV, as disclosed by Dando.

A skilled artisan would have further been aware of teachings in the art that tenofovir or TDF could be administered to prevent the establishment of new immunodeficiency retroviral infections, including when administered prior to exposure to said immunodeficiency retrovirus. To be certain, Schwarzenegger expressly cites Tsai 1995, among other references, in support of the efficacy of post-exposure prophylaxis. Schwarzenegger at 9-11. Schwarzenegger cites Tsai 1995 in support of the statement that that "[i]n SIV models, nucleotide and nucleoside analogues have been protective in preventing infection in a majority of intravenously inoculated macaques when given early after exposure (within 24 hours is superior to 48 or 72 hours) and for a 28-day course," *id.* at 10, and a skilled artisan would have accordingly considered Schwarzenegger's disclosure in conjunction with Tsai 1995 and its disclosure as a whole, including Tsai 1995's disclosure regarding pre-exposure prophylaxis.

For example, Tsai 1995 teaches that the administration of tenofovir starting 48 hours prior to exposure to SIV protected all macaques to which the antiretroviral was administered from SIV infection. Tsai 1995 at 1198 (Table 2 disclosing results of complete protection for those macaques to which PMPA was administered "48 hours preinoculation"). "These findings show that the antiretroviral compound PMPA [tenofovir] prevented the establishment of SIV infection in 25 of 25 macaques (100%) without toxicity when administered up to 24 hours after virus inoculation." *Id.* at 1199 (statements includes macaques to which tenofovir was administered post-exposure). Similarly, Van Rompay 2004 discloses that a group of six macaques were administered oral TDF "at a dose (10 mg/kg once daily) estimated to be

pharmacokinetically equivalent (based on area-under-the-curve values) to the 8 mg/kg regimen

used in pediatric trials, and the 300 mg Tenofovir DF [TDF] tablet given to adults.  Tenofovir

DF [TDF] was given once daily starting one day before until one day after each SIV inoculation

period."  Van Rompay 2004 at 1.  Following "two rounds of virus inoculations, 20 of 22

untreated infant macaques were persistently viremic," while, by "contrast, 3 of 6 tenofovir-

treated animals were uninfected at 3 months of age (p=0.05; two-sided Fisher's Exact test)."  *Id.*

Van Rompay 2004 concludes that "[t]hese data suggest that [TDF] administration will be

effective to protect infants against HIV transmission from breast-milk.  Our data provide also

support for the ongoing trials in which the use of chronic [TDF] administration is investigated to

reduce infection rates among high-risk adult groups (commercial sex workers, and men having

sex with men)."  *Id.*  Many other references included similar teachings of tenofovir and TDF as

demonstrating efficacy for preventing the establishment of retroviral infection.  *See, e.g.*, Van

Rompay AIDS 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-1773; Van Rompay

2001 at 429, 436 (all using tenofovir).

In addition to the express teachings included in Tsai 1995 and Van Rompay 2004, among

other references, that the macaque studies disclosed therein serve as a proxy for HIV infection in

humans and provided support for ongoing human clinical trials, a skilled artisan would have

recognized that disclosure of the administration of TDF prior to immunodeficiency retrovirus

exposure to prevent retroviral infection in macaques would motivate administration of

antiretrovirals as chemoprophylaxis in humans.  Macaque studies were recognized in the art as a

model for the effectiveness of the administration of antiretrovirals in humans for the treatment

and prevention of HIV.  *E.g.*, Van Rompay 1999 at 1061; Van Rompay Antiviral 2000 at 296.

Such non-human primates have similar physiology to humans (including drug pharmacokinetics

and metabolism, fetal and neonatal development, and immunology).  Van Rompay 1999 at 1065; *see also* Van Rompay Antiviral 2000 at 298.  Moreover, "SIV is closely related to HIV, and causes a disease in macaques which very closely resembles human AIDS.  [One] can use the same parameters to monitor infection and disease progression as those which are used for HIV-infected patients."  Van Rompay 1999 at 1065.  Macaque studies permit "recognition of statistically and biologically significant differences" in the study of antiretroviral compounds. *Id.*  "All these factors allow a more reliable extrapolation of results obtained in non-human primate models towards clinical applications for the human population."  *Id.*; *see also* Van Rompay Antiviral 2000 at 303.

SIV is closely related to HIV-1, has 60% amino acid homology to that of HIV-1 in the polymerase region of SIV, and is susceptible to many of the same reverse transcriptase and protease enzymes at approximately the same *in vivo* concentrations as HIV-1.  Van Rompay 1999 at 1065; Van Rompay Antiviral 2000 at 299.  Though the NNRTI class of antiretrovirals is specific to HIV-1 and NNRTIs do not inhibit replication of either HIV-2 or SIV, this was overcome through the development of a hybrid SIV/HIV-1 chimeric virus that contains the HIV-1 reverse transcriptase in an SIV background and is infectious for macaques.  Van Rompay 1999 at 1065; Van Rompay Antiviral 2000 at 300.  With respect to other classes of antiretrovirals (including NRTIs and NtRTIs), a skilled artisan would have considered there to be little to no difference in terms of study value regarding the use of either SIV or SHIV in a macaque study.

Primate studies can be used to gather a wide range of data and information to "provide a solid scientific basis to guide human clinical trials."  Van Rompay Antiviral 2000 at 297-298; *see id.* (Table 1 "Value of Nonhuman Primate Models in Anti-HIV Drug Development").  And it was specifically recognized in the art that "macaque studies have provided us with important

insights regarding pre- and post-exposure prophylaxis, the effects of early drug intervention, and the emergence and clinical implications of drug-resistant viral variants" for HIV.  Van Rompay 1999 at 1065; *see also* Van Rompay Antiviral 2000 at 303 (explaining that "information obtained in this pediatric animal model of AIDS applies directly to HIV infection of human infants as well as adults").  A skilled artisan would therefore have been motivated by the disclosure of Tsai 1995 and Van Rompay 2004 to administer antiretrovirals to humans prior to HIV exposure to the prevent establishment of new HIV infections.

Accordingly, based on the knowledge that the combination of TDF and FTC was recommended for administration in humans following an HIV exposure to prevent establishment of HIV infection, Schwarzenegger at 15, 8, the knowledge that the combination of TDF and FTC were available as a single co-formulated tablet with established efficacy and safety in the treatment of HIV, Dando at 2081, 2075, and the knowledge that tenofovir and TDF had shown efficacy in preventing immunodeficiency retroviral infection in macaques when administered prior to exposure to an immunodeficiency retrovirus, Tsai 1995 at 1199 and Van Rompay 2004 at 1, a skilled artisan would have been motivated to administer the known efficacious combination of TDF and FTC of Schwarzenegger to a human prior to an exposure to HIV to prevent establishment of a new HIV infection and reduce HIV transmission rates.

In summary, in view of, at least: (1) the well-recognized need to reduce HIV transmission rates and prevent the establishment of new HIV infections; (2) Schwarzenegger's teaching to administer the combination of TDF and FTC as a chemoprophylaxis to prevent HIV infection in uninfected humans following HIV exposure; (3) the known efficacy and safety of the combination of TDF and FTC as approved for the treatment of HIV, as disclosed by Dando; and (4) Tsai 1995's and Van Rompay 2004's teachings that tenofovir and TDF had been shown to

successfully prevent immunodeficiency retroviral infections in macaques when administered either pre- or post-exposure, a skilled artisan would have been motivated to administer the known, recommended, and efficacious post-exposure prophylactic combination of TDF and FTC, as taught by Schwarzenegger, and rather than administer the combination to an uninfected human as soon as possible after exposure HIV exposure, instead administer the combination of TDF and FTC to an uninfected human prior to exposure to HIV in order to prevent establishment of a new HIV infection.[23]

Moreover, a skilled artisan would have been motivated to administer a recommended oral post-exposure prophylaxis comprising the combination of TDF and FTC, as disclosed in Schwarzenegger to a previously uninfected human prior to HIV exposure, rather than after, based on a well-recognized need and interest in the art to decrease rates of HIV transmission and prevent the establishment of new HIV infections in the first instance; and a skilled artisan would have also been aware of the general medical principle of chemoprophylaxis and that compounds used for disease treatment in infected patients had either been administered, or recognized as promising for administration, for preventative purposes across many infectious diseases. *See, e.g.*, Farer at 102. Not only had the combination of TDF and FTC been approved by the FDA and deemed safe and effective for the treatment of HIV in infected humans, but it was already recommended by at least one governmental body, the California Task Force on Non-Occupational PEP and the California Department of Health Services, Office of AIDS, for use as HIV post-exposure prophylaxis. *See* Schwarzenegger at 1. Therefore, a skilled artisan seeking

---

[23]     And as detailed above in Sections VI.c and VI.d., ordinary persons skilled in the art in fact recognized such teachings in the art in reaching the purported invention of the Asserted Claims of the Patents-in-Suit prior to the earliest priority date to which the Asserted Claims are entitled. This further supports that the Asserted Claims would have been obvious in view of the teachings of the prior art and the knowledge of the skilled artisan.

to reduce rates of HIV infection and transmission rates would have been motivated to combine the teachings of Schwarzenegger in view of Dando with Tsai 1995 and/or Van Rompay 2004 and administer the prophylactic combination of TDF and FTC before HIV exposure to an uninfected person, rather than after.

As of the earliest priority date to which the Asserted Claims are entitled, there was an express and well-recognized need to reduce HIV transmission rates and prevent the establishment of new HIV infections in humans. "HIV infects more than 40 million people worldwide, and there are 14,000 new infections per day." Grant 2005 at 2170 (citation omitted). And it was understood that "[a]cross most of the world, the HIV epidemic remains unchecked." Youle JIAPAC 2003 at 102 (citation omitted). However, "even as available and proven prevention interventions are used, the HIV pandemic will not be stopped solely by talking to those at risk." Grant 2005 at 2170 (citation omitted). Similarly, it was recognized in the art that prevention techniques were desirable: "[t]here is little evidence that there has been a significant reduction in the global rate of infection over time. HIV still spreads like wild-fire in susceptible communities, and is increasingly of multidrug-resistant strains." Youle AIDS 2003 at 1 (citation omitted); *see also* Youle JIAPAC 2003 at 102 (same).

It was also recognized in the art that ongoing development of a vaccine to prevent HIV transmission and infection showed little promise in providing a solution. "The quest for an effective preventative vaccine for the uninfected has been, to date, unfruitful." Youle AIDS 2003 at 1 (citations omitted); *see also* Youle JIAPAC 2003 at 102 (same). While a number of "putative vaccines" were understood to be in development, their efficacy in preventing HIV infection—"remains unclear," and the overall "availability of new candidate vaccines is limited." Youle JIAPAC 2003 at 102. The first HIV vaccine to reach phase 3 studies "failed to provide

protection from infection and none of the remaining vaccine candidates currently in clinical trials appear likely to induce potent protective immunity."  Smith 2004 at 1 (endnotes omitted).

Though a couple of "novel approaches to establish a long-lasting broad immune response against HIV" were being investigated, "concerns exist that the breadth and durability of anti-HIV immune response may be too narrow to elicit complete protection against the myriad of HIV viral strains currently circulating in humans."  Youle JIAPAC 2003 at 102.  Overarching issues limiting potential overall usefulness of an HIV vaccine were also acknowledged—for example, "viral escape from cytotoxic T-lymphocyte recognition might be a limiting factor to vaccine efficacy."  *Id.*  And "[g]iven HIV's propensity to escape cellular and humoral response, there exists no clear approach or target for vaccine development."  Smith 2004 at 1 (endnotes omitted).

It was further acknowledged that "[s]ignificant populations are at high risk of imminent HIV infection, such as HIV-discordant sexual partners or those who chose not to use condoms. For these individuals a current vaccine strategy may be too far in the future."  Youle AIDS 2003 at 1; Youle JIAPAC 2003 at 102-103; *see also* Smith 2004 at 1 (acknowledging efforts of the World Health Organization to "treat those infected with HIV-1" but further acknowledging that "it is not clear they will have a broad impact on the HIV-1 epidemic in the immediate future"). Moreover, even for those individuals using condoms, "only a single failure may result in an additional HIV-infected individual."  Youle JIAPAC 2003 at 103.  Accordingly, a skilled artisan would have recognized the need for additional prophylactic methods and approaches to prevent the spread of HIV and establishment of HIV infection in previously uninfected humans.

Consequently, it was recognized in the art that "[c]hemoprophylaxis with antiretroviral agents is a promising new approach" and that "[c]linical trials of daily oral antiretroviral dosing as preexposure prophylaxis (PrEP) have been initiated in Africa, Asia, and the United States and

175

are planned in Latin America."  Grant 2005 at 2170.  The use of antiretroviral compounds, "that is the administration of chemoprophylaxis to uninfected individuals who live in areas with a high prevalence of HIV-1" was proposed as an approach with "immediate impact."  Smith 2004 at 1; *see also* Youle JIAPAC 2003 at 103; Youle AIDS 2003 at 1.

Chemoprophylaxis is a fundamental tenet of medical science that applies broadly to infectious disease.  Specifically, it was known in the art that, "***[a] drug that can be used to treat and cure a disease, if given at an earlier time in the development of the condition, should be able to prevent the disease.  The drug may be given before exposure***, concurrently with possible exposure, or even after exposure, but before the disease is manifest."  Farer at 102 (emphasis added).  "This concept, chemoprophylaxis, is really a form of treatment for an infection that has not yet occurred, is just beginning, or is in an asymptomatic, subclinical state."  *Id.; see also* Detels at 1567 ("Chemoprophylaxis is the prevention of infection or its progression to clinically manifest disease through the administration of chemical substances, including antibiotics.").  The usefulness of therapeutic agents for disease prevention and chemoprophylaxis was a well-recognized:  "The effectiveness of the antimicrobial agents in eliminating certain organisms and in curing the diseases produced by them has led to their use for the prevention of specific infectious processes, or of infection in general."  Weinstein at 287.  Chemoprophylaxis had been implemented, even as early as 1955, in order "to protect healthy individuals, either singly or in groups against invasion by specific microorganisms."  *Id.*  "The degree of success has varied with the purpose for which prophylaxis has been applied; ***it has been highest when the prevention of specific infections has been attempted,*** and lowest when the prevention against infection in general has been its aim.  In many instances, prophylactic measures have been

applied only to single individuals; in others they have been used for large groups." *Id.* (emphasis added).

Accordingly, a skilled artisan would have been aware that the concept of chemoprophylaxis, using agents known to treat an infection to prevent establishment of that infection in healthy individuals had long been established in medical science. For example, it was recognized in the art that "long-term malaria chemoprophylaxis is generally believed to have been implemented for the first time in 1854, when Dr. William Balfour Baikie effectively put his staff on quinine while exploring the Niger River in West Africa." Knobloch at 375 (footnote omitted). Though earlier expeditions to the area had resulted in significant numbers of crewman deaths from "fever," on this "one as soon as the bar of the river was crossed each man took 6-8 grains of quinine daily." Findlay at 169. After four months on the river, all twelve men returned in good health, with the "exception of one of the second mates who had declined to take the drug." Findlay at 169. That crewman suffered "severe attacks of remitting fever accompanied by delirium, for which his head had to be shaved, while in addition to quinine, he had required sedatives and sudorifics." Findlay at 170. The results of that expedition ultimately lead to the implementation of an "official policy" whereby those individuals living in areas at risk of malaria in Africa "should take 5 grains of quinine daily." *Id.* Similar contemporaneous use took place in the United States, for "[r]eports of the US Sanitary Commission [ ] provide evidence that quinine was added as early as 1840 to the whiskey of the military post staff at Tampa Bay, Florida, successfully preventing 'miasmatic disease' or 'African fever.'" Knobloch at 375 (footnote omitted). A skilled artisan would have recognized that the use of quinine, a known therapeutic for malarial disease, had long been established as efficacious for preventing the disease in healthy and uninfected persons.

Similarly, chemoprophylaxis had been recognized as applicable to prevent tuberculosis infection in healthy and uninfected humans and was another area in which it was recognized that therapeutic agents could be used for preventative purposes in healthy persons.  *See, e.g.* Farer at 102-103.  "Chemoprophylaxis for tuberculosis became a practical possibility only with the availability of a safe, inexpensive, oral drug that was bactericidal for tubercle bacilli." *Id.* at 103. That drug, "[i]soniazid, which was introduced as an antituberculosis agent in 1952, possesses these characteristics. ***The demonstrated effectiveness of isoniazid in treatment led to the idea that the drug would also be effective as a prophylactic agent.***"  Farer at 103 (emphasis added). Animal models and studies were informative in this context—"[i]soniazid can prevent death, disease and even the development of tuberculin sensitivity in guinea pigs challenged with virulent tubercle bacilli." *Id.* (citations omitted).  And "[a]lthough evidence in humans is less compelling, ***it can be inferred that isoniazid is capable of reducing the frequency of new tuberculosis infections***." *Id.* (emphasis added).  Chemoprophylaxis with isoniazid to prevent new tuberculosis infections in uninfected individuals was deemed to "merit consideration" in "unusual circumstances" where "there is a high risk of infection for a relatively short time." *Id.* Accordingly, a skilled artisan would have been aware that the use of a therapeutically effective compound was acknowledged to have utility as a chemoprophylactic agent to protect healthy humans against new tuberculosis infections in some circumstances.

A skilled artisan would have also been aware that the concept of chemoprophylaxis had been implemented to prevent infection in healthy individuals by specific bacteria through the use of antibiotics:

> Chemoprophylaxis is most commonly employed in healthy individuals to prevent invasion by specific bacteria.  It has been given either to single patients, to families, or to large groups of people, some of whom had not yet had contact with an organism and others of whom were already harboring it as asymptomatic carriers.

> This type of prophylaxis has, as a rule, been most successful in protecting against infection by four agents—the beta-hemolytic streptococcus, the gonococcus, the meningococcus and the dysentery bacilli.

Weinstein at 288. For example, the "administration of chemotherapeutic agents to individuals exposed to invasion by the beta-hemolytic streptococcus affords a predictable and high order of protection. . . . Although several antibiotics have been used for this purpose, penicillin appears to be the drug of choice." *Id.* (citations omitted). It was also recognized in this context that "[s]ince a larger quantity of antibiotic and a longer period of therapy are required for the elimination of bacteria than to prevent their initial implantation, the prophylaxis of the carrier state necessitates using the same dose of the drug and duration of treatment as in established streptococcosis." *Id.* It was further recognized in the art that "[t]he availability of potent antimicrobial agents has made the prevention of all degrees of spread of meningococcal infection a relatively simple matter." *Id.* at 289.

Furthermore, a skilled artisan would have been aware that the concept of chemoprophylaxis had been applied to prevent viral infection in previously unexposed humans through the use of therapeutically effective antiviral agents. "Interest in compounds for use in antiviral chemotherapy and chemoprophylaxis has markedly increased in recent years, and developments in the field have progressed to the point that antiviral compounds have now become objects of interest for practicing physicians as well as for laboratory and clinical investigators." Dolin 1985 at 1296. "Amantadine [1-adamantanmine hydrochloride] was approved in 1966 for chemoprophylaxis of influenza A (H2N2) infection and was later approved in 1976 for treatment and chemoprophylaxis of influenza type A virus infections among adults and children aged ≥1 year." Harper at 22; *see also* Dolin 1985 at 1296. A structurally-related compound, rimantadine, was known to exhibit similar properties, was used extensively in the

Soviet Union in place of amantadine, *see* Dolin 1985 at 1296, and was "approved [in the United States] in 1993 for treatment and chemoprophylaxis of influenza A infection among adults and prophylaxis among children." Harper at 22. The "precise mechanism of action" for both compounds was not fully established as of 1985, but it was known that "they inhibit influenza A virus at an unspecified step in its replication, probably after [the virus] penetrates the cell surface." Dolin 1985 at 1296. It was "suggested that these compounds interfere with either uncoating of the virus" or "with primary transcription of viral RNA." *Id.*

Studies of amantadine and rimantadine concluded that both compounds are "effective in prophylaxis and therapy" for influenza A. *Id.* One study administered both compounds separately against a placebo control in a randomized trial. *See id.* (citation omitted). "The trial was initiated when a threshold for influenza A activity in the community was exceeded," and "subjects took tablets of amantadine or rimantadine, at a dose of 200 mg/day, or placebo, for a 6-week-period." Dolin 1985 at 289. The study "was conducted in healthy young volunteers." Dolin 1982 at 583. "Influenza-like illness, as well as laboratory documented influenza, occurred significantly less frequently in amantadine or rimantadine recipients than in placebo recipients." *Id.*; *see also* Dolin 1982 at 582 (documenting statistical proof of chemoprophylactic efficacy in said trial). And as of 1985, other studies evaluating the efficacy of amantadine and rimantadine for treatment of influenza A determined that both compounds demonstrated some efficacy compared against placebo. *See* Dolin 1985 at 1296-1297; *see id.* Fig. 2.

At least by 1994, the CDC published "recommendations for the use of amantadine and rimantadine" for chemoprophylaxis of influenza A. Arden at 1-2. It was recognized that amantadine and rimantadine "interfere with the replication cycle of type A (but not type B) influenza viruses" and "[w]hen administered prophylactically to healthy adults or children before

and throughout the epidemic period, both drugs are approximately 70-90% effective in preventing illness caused by naturally occurring strains of type A influenza viruses." *Id.* at 1; *see id.* (acknowledging that in some instances "antiviral agents taken prophylactically may prevent illness but not subclinical infection"). Chemoprophylaxis with amantadine or rimantadine was recommended for use with "***persons who are at greatest risk of severe illness and complications if infected with influenza A virus***," including: (1) those over sixty-five years of age; (2) nursing home residents; (3) adults and children with chronic pulmonary or cardiovascular systems, including children with asthma; (4) adults and children requiring ongoing care for chronic metabolic diseases and others; and (5) children and teenagers receiving long-term aspiring therapy and therefore at risk of developing Reye syndrome after influenza. *Id.* at 2 (emphasis added). The CDC further recognized that "amantadine and rimantadine can reduce the severity and shorten the duration of influenza A illness among healthy adults when administered within 48 hours of illness onset." *Id.* at 3. Furthermore, it was recommended that "[w]hen confirmed or suspected outbreaks of influenza A occur in institutions that house persons at high risk, chemoprophylaxis should be started as early as possible to reduce the spread of the virus." *Id.* at 4. Specifically, "when amantadine or rimantadine is used for outbreak control, the drug should be administered to ***all residents of the institution***—regardless of whether they received influenza vaccine the previous fall." Arden at 4 (emphasis added); *see id.* (recommending further administration to institution staff and "considered for all employees"). These recommendations would include administration of amantadine and rimantadine to individuals not yet infected with influenza A. The CDC recommended giving the same daily dose of amantadine and rimantadine for purposes of treatment and chemoprophylaxis of influenza A. *See* Arden at 6 (*e.g.*,

recommending 100 mg of amantadine twice daily for purposes of treatment and prophylaxis to an individual of fourteen to sixty-four years of age).

The CDC continued to recommend the use of amantadine and rimantadine for chemoprophylaxis of influenza A, such as for those at high risk of influenza complications and those in frequent contact with persons at high risk, through to 2005. Harper at 22-31. Accordingly, a skilled artisan would have understood that chemoprophylaxis to prevent viral infection in previously unexposed humans using antiviral compounds with therapeutic efficacy had previously been implemented and had been long-recommended pursuant to CDC guidelines of the earliest priority date to which the Asserted Claims are entitled.

To be sure, the art expressly recognized the broad applicability and relevance of the chemoprophylaxis across many infectious diseases and medical contexts, including within the context of care management for HIV patients, and understood the broader concept to provide both a guide and model for pre-exposure prophylaxis for HIV:

> It is worth recalling that chemoprophylaxis is currently used to protect individuals and groups in many settings. Anti-influenza agents are often used to stop flu out-breaks in nursing homes. Travelers to areas with endemic malaria are given mefloquine to prevent infection with *Plasmodium* spp. Individuals with a history of rheumatic fever are maintained on penicillin for many years to prevent re-infection with Group A streptococcus. Routine practice already dictates that HIV-infected patients with acquired immunodeficiency syndrome (AIDS) be given antibiotics to prevent *Pneumocystis jiroveci* pneumonia, toxoplasmic encephalitis, and *Mycobacterium avium* complex infections.

Smith 2004 at 4 (citation omitted); *see id.* ("With respect to all infectious diseases the proverb 'a ounce of prevention is worth a pound of cure' certainly holds true. In the case of HIV infection, the stakes are much higher."). There was an express recognition in the art that chemoprophylaxis had been proven as an effective measure to reduce disease transmission rates and prevent new infections in healthy individuals, and these showings of efficacy across other

182

disease states created a motivation to implement chemoprophylaxis, including pre-exposure

prophylaxis, in humans to prevent new HIV infections.

To be certain, an extended and direct analogy had been drawn in the art to the successful

use of chemoprophylaxis to prevent new infections and disease transmission in other contexts in

support of its use as a model for pre-exposure prophylaxis for HIV:

> One response to other infectious agents in the absence of an effective preventative vaccine combines behaviour for avoidance of the pathogen, with or without chemoprophylaxis. . . .  The discovery of quinine was the first in a cascade of therapeutic and prophylactic agents that allowed non-immune individuals to visit or live in endemic areas with greater safety. . . .  In the same way as infection with malaria is usually infrequent, one could argue that the percentage of time that an individual is at risk of HIV infection is relatively low, since it represents an intermittent rather than a continuous exposure to the pathogen.

Youle JIAPAC 2003 at 103; *see also id.* ("[M]alarial prophylaxis may be a good model for pre-

exposure prophylaxis against HIV."); *see also* Youle JIAPAC 2003 at 1-2 (also drawing an

analogy to malarial chemoprophylaxis to support implementation of pre-exposure prophylaxis

for HIV); Coates ("[T]his is the strategy we use with malaria and other diseases—we take

preventative medications before we encounter pathogens, so our body can repel infection.").

Furthermore, a skilled artisan would have also been aware that administering antiretrovirals prior

to retroviral exposure means, at a microbiological level, that the antiretroviral compound will be

present before retroviral replication can begin in an exposed host and prevent the establishment

of the retroviral infection.  *See, e.g.*, Szekeres at 10-11 ("[D]rugs whose mechanisms of action

focus on pre-integration phases of viral life cycle (prior to completion of effective viral

integration into host cell DNA) are, at least in theory, likely to be more effective than those that

focus on post-integration."); Youle JIAPAC 2003 at 103 ("The agent should prevent infection of

cells, or at least nuclear integration, when exposed to HIV.");  Youle AIDS 2003 at 1 ("The ideal

agent should prevent the infection of cells, or at least nuclear integration when exposed to HIV.").

Accordingly, a skilled artisan would have been aware that implementation of chemoprophylaxis via administration of therapeutically effective drug compounds prior to exposure to an infectious pathogen had been proven widely across infectious diseases and medical contexts as an effective methodology to reduce disease transmission rates and prevent establishment of new infections in previously uninfected humans, and would have understood the parallels expressly recognized in the art between HIV and other infectious diseases, wherein chemoprophylaxis had been successfully implemented, to motivate the implementation of pre-exposure prophylaxis for HIV.

Not only had the combination of TDF and FTC been approved by the FDA for purposes of treating established HIV infection, *see, e.g.*, Dando at 2081, Truvada® Insert at 11, but it was already recommended to be used to prevent the establishment of new HIV infections in previously uninfected humans by at least one government body. Schwarzenegger at 1, 8, 15. The Schwarzenegger reference was prepared as a result of the California Department of Health Services, Office of AIDS appointing and convening a task force to develop recommendations for the use of PEP for the prevention of HIV infection in the general population. Schwarzenegger at 1. As Schwarzenegger recites, PEP is a "program meant to help people who may have been exposed to HIV through sex or injection drug use in the past 72 hours to try to prevent HIV infection." Schwarzenegger at 25. A skilled artisan would have understood the recommended combination of TDF and FTC, as disclosed in Schwarzenegger, to be effective preventing establishment of HIV infection in an uninfected human when administered following an HIV

exposure, a skilled artisan would therefore have understood the recommended HIV PEP regimen to also be promising for administration *prior* to an exposure to HIV for an identical purpose.

In summary, a skilled artisan also, at least: (1) would have been aware of the need to decrease rates of HIV transmission and prevent the establishment of new HIV infections; (2) would have been aware of the general medical principle of chemoprophylaxis—long-proven as an effective means to prevent disease transmission and establishment of new infections in previously uninfected humans; and (3) would have been aware of guidelines and recommendations counseling the administration of antiretrovirals for purposes of HIV post-exposure prophylaxis.[24]  A skilled artisan would have accordingly been further motivated to administer those same HIV post-exposure prophylaxes, including the known safe and effective combination of TDF and FTC, for purposes of HIV PrEP, that is, to a human previously uninfected with HIV and prior to an exposure to HIV.

> B.   Reasonable Expectation of Success Administering TDF and FTC Prior to HIV Exposure

A skilled artisan would have reasonably expected success in preventing HIV infection by administering the recommended oral post-exposure prophylaxis of the combination of TDF and FTC, as disclosed in Schwarzenegger, as pre-exposure prophylaxis based on the known efficacy of the antiretroviral combination to both prevent establishment of HIV infection when administered shortly after exposure, as well as the efficacy of the same combination to treat and suppress established HIV infections, as disclosed in Dando.

---

[24]    And as detailed above in Sections VI.c and VI.d., ordinary persons skilled in the art in fact recognized such teachings in the art in reaching the purported invention of the Asserted Claims of the Patents-in-Suit prior to the earliest priority date to which the Asserted Claims are entitled.  This further supports that the Asserted Claims would have been obvious in view of the teachings of the prior art and the knowledge of the skilled artisan.

As expressly disclosed in Schwarzenegger, it was known in the art that use of the combination of TDF and FTC was an effective antiretroviral combination to prevent the establishment of HIV infection when administered following an exposure to HIV, and was recommended to be used for that purpose.  Prepared by the California Task Force on Non-Occupational PEP and the California Department of Health Services, Office of AIDS, Schwarzenegger consists of guidelines and recommendations "for the use of post-exposure prophylaxis (PEP) for the prevention of HIV infection in the general population." Schwarzenegger at 1.

Schwarzenegger provides specific guidelines and recommendations for PEP use in "individuals who have had a potential exposure to HIV through consensual sexual activity and secondarily to individuals who may have had an exposure to HIV through sharing of injection drug use equipment." *Id.* However, "the same general principles outlined in this document can reasonably be applied to assess the likelihood of acquiring HIV from [other] such exposure, and thus the potential utility of PEP." *Id.*

Schwarzenegger teaches that "PEP is intended for individuals of negative or unknown HIV infection status following potential exposure to HIV," *id.* at 3, and that "PEP should be offered to HIV uninfected or unknown status individuals presenting within 72 hours of a potential exposure to HIV." *Id.* at 11.  Moreover, "[i]ndividuals at highest risk of acquiring HIV infection from their specific exposure are expected to benefit  most from PEP." *Id.*  Regarding the details of the post-exposure prophylaxes recommended to be used for the prevention of HIV, Schwarzenegger teaches that PEP should be offered "[a]s soon as possible, and no later than 72 hours following exposure." *Id.* at 7.  Schwarzenegger teaches that "[i]f a potentially infectious body fluid (e.g. blood or blood products, genital secretions, peritoneal, pleural or cerebrospinal

fluids, but NOT saliva, tears, or sweat) was in contact with a mucous membrane (e.g., eye, oral, nasal, or genital mucosa) or non-intact skin (punctures, cut or substantially abraded), HIV infection is possible and consideration of PEP is warranted." Schwarzenegger at 11. More specifically, Schwarzenegger further teaches that its recommended PEP regimens may be used to prevent HIV infections for many types of HIV exposure, including: receptive anal intercourse, shared injection drug use equipment, insertive anal intercourse, insertive vaginal intercourse, other potentially infectious body fluid on a mucous membrane or non-intact skin, and receptive oral intercourse with ejaculation. *Id.* at 7, 11. Schwarzenegger also discloses data and information from published literature and PEP studies to further undergird and supports its PEP regimen recommendations. *Id.* at 9-11. Schwarzenegger thereby teaches that its recommended PEP regimens are useful to prevent HIV infection in a previously uninfected person across a wide range of types of exposure.

Schwarzenegger discloses that there was "no consensus among experts about whether two or three antiretroviral drugs should be used for PEP." *Id.* at 15. Arguments in support of using two drug combinations for PEP include: (1) "the inoculum of virus is small following non-occupational exposure compared with the amount of virus requiring potent antiretroviral therapy for full suppression in an HIV-infected individual"; (2) "single agent PEP resulted in an 81 percent reduction in the risk of HIV infection in a study of occupational exposures"; (3) "increased side effects and/or more difficult dosing schedules may result in decreased adherence"; and (4) "there is a significant cost differential when a third drug is added." *Id.* Schwarzenegger also discloses that drug resistance considerations may in some instances "make it difficult to construct a potent two-nucleoside regimen," and in those instances "a protease inhibitor or Efavirenz 600 mg at bedtime (qHS) can be added." *Id.* at 16. Though "[s]ome

healthcare providers will elect to use a third drug even when resistance is not suspected," in those circumstances, "a three-drug regimen should only be considered following a very high-risk exposure with a known HIV-infected exposure source." *Id.* Therefore, based on the express teachings of Schwarzenegger, a skilled artisan would know that in many instances of HIV exposure, a two-drug antiretroviral post-exposure prophylaxis would succeed in preventing establishment of HIV infection in a previously uninfected human.

Schwarzenegger further discloses that "[i]n the absence of information about the exposure source's antiretroviral history, or if the exposure source is naïve to antiretroviral medication, the preferred double nucleoside analogue combination regimen is Combivir ([zidovudine] + lamivudine), one pill twice a day." *Id.* at 15; *see also id.* at 8. However, recommended "alternative nucleoside analogue combinations include:

> [S]tavudine (40 mg for patients weighing greater than 60 kg and 20 mg for those weighing less than 60 kg, one pill twice a day) or ***tenofovir, 300 mg once a day***, ***in combination*** with lamivudine 150 mg twice a day or 300 mg once a day ***or emtricitabine 300 mg a day***. ***A fixed dose combination pill combining tenofovir and emtricitabine, called Truvada, is available for once daily dosing.*** Abacavir and didanosine should be avoided unless resistance considerations outweigh potential toxicity.

*Id.* at 15(emphasis added); *see also id.* at 8. Schwarzenegger thereby recommends the use of TDF and FTC in combination as an effective post-exposure prophylaxis to prevent the establishment of HIV infection in an uninfected human recently exposed to HIV. *Id.* A skilled artisan would therefore know that one can prevent the establishment of HIV infection in a previously uninfected human by administering the combination of TDF and FTC following an exposure to a source of HIV.

Additionally, as of the earliest priority date to which the Asserted Claims are entitled, a skilled artisan would have also known that the combination of TDF and FTC can be used to

effectively treat HIV infection.  Truvada® is a "fixed dose combination tablet containing the two NRTIs emtricitabine and tenofovir DF."  Dando at 2076; *see also* Truvada® Insert at 1 (Truvada is a "fixed dose combination tablets containing emtricitabine and tenofovir disoproxil fumarate.").  As of 2004, Truvada  had "been approved in the US for once-daily treatment of patients with HIV infection, in conjunction with other antiretrovirals agents."  Dando at 2076; *see also* Truvada® Insert at 11 (Truvada had received approval by the FDA and was "indicated in combination with other antiretrovirals agents (such as non-nucleoside reverse transcriptase inhibitors or protease inhibitors) for the treatment of HIV-1 infection in adults.").  Accordingly, based on an indication approved by the FDA for treatment of HIV, a skilled artisan would understand the combination of TDF and FTC to effectively treat established HIV infection.

Because a skilled artisan would have known to use the combination of TDF and FTC to prevent HIV infection in an uninfected human when administered following an exposure to HIV, and would have known to use the combination of TDF and FTC to treat an established HIV infection in a human, a skilled artisan would also reasonably expect success in using the combination of TDF and FTC to prevent HIV infection in an uninfected human when administered prior to an exposure to HIV.

A skilled artisan would have reasonably expected such success because, for example, a skilled artisan would have been aware that TDF and FTC operate in the same manner to inhibit the replication of HIV regardless of whether each compound is administered for HIV prophylaxis or treatment, and regardless of whether the antiretroviral is administered before or after exposure to HIV—the mechanism of action by which the antiretroviral compound operates to interfere with the viral replication cycle is identical.  *See, e.g.*, Szekeres at 10-11 (evaluating the utility of antiretroviral agents for purposes of PrEP based on their mechanism of action for

purposes of HIV treatment); *see also* Youle JIAPAC 2003 at 103 (same); Youle AIDS 2003 at 2 (same); Smith 2004 at 2 (same); Dando at 2076; Truvada® Insert at 2-3.  It was known in the art that, "***[a] drug that can be used to treat and cure a disease, if given at an earlier time in the development of the condition, should be able to prevent the disease.  The drug may be given before exposure***, concurrently with possible exposure, or even after exposure, but before the disease is manifest."  Farer at 102 (emphasis added).  "This concept, chemoprophylaxis, is really a form of treatment for an infection that has not yet occurred, is just beginning, or is in an asymptomatic, subclinical state."  *Id.*

TDF and FTC each work as reverse transcriptase inhibitors, which means that each compound interferes with the reverse transcription of viral RNA to cDNA.  Goldsby at 452-53; Dando at 2076; Truvada® Insert at 2-3; Viread® Insert at 2; Emtriva® Insert at 1-2.  Retroviruses, including HIV, carry their genetic information in the form of RNA, and when the virus is absorbed and enters a cell, the RNA of the virus is subsequently reverse transcribed to DNA by a virally encoded enzyme, reverse transcriptase.  Goldsby at 442-43; De Clercq EOED at 250-51.  Reverse transcriptase reverses the normal transcription process and makes a DNA copy of the viral RNA genome.  Goldsby at 442-43; De Clercq EOED at 251.  This DNA copy, which is called a provirus, is integrated into the cell genome and is translated along with the cell DNA.  Goldsby at 442-43.  When the provirus is expressed to form new virions, or new copies of the virus, the cell lyses (ruptures) and releases the new virions into the host.  *Id.*

TDF, after initial diester hydrolysis for conversion to tenofovir and subsequent phosphorylation by cellular enzymes to form tenofovir diphosphate, interrupts this replication cycle by inhibiting the activity of HIV-1 reverse transcriptase by competing with the natural substrate deoxyadenosine 5'-triphosphate and, after incorporation into DNA, causing DNA chain

termination.  Dando at 2076; Truvada® Insert at 2-3; Viread® Insert at 2.  Similarly, FTC, a

synthetic analog of cytidine, is first phosphorylated by cellular enzymes to form emtricitabine 5'-

triphopsate, which inhibits the activity of HIV-1 reverse transcriptase by competing with the

natural substrate deoxycytidine 5'-triphosphate, and then being incorporated into nascent viral

DNA, similarly resulting in chain termination.  Truvada® Insert at 2; Emtriva® Insert at 1.

Because a skilled artisan would have known that the mechanism of action to interrupt the reverse

transcriptase step of viral reproduction by TDF and FTC and thereby inhibit overall retroviral

replication is identical regardless of the temporal relationship between HIV exposure and

antiretroviral administration, or regardless of whether a patient has a previously established HIV

infection, *see, e.g.*, Schwarzenegger at 15-16, Szekeres 2004 at 10-11, a skilled artisan would

have also reasonably expected that the efficacy demonstrated by the antiretroviral combination to

inhibit viral replication for HIV post-exposure prophylaxis or HIV treatment would translate

successfully to efficacy in the context of HIV pre-exposure prophylaxis.

  Schwarzenegger's teachings and knowledge in the art emphasizing the importance of

very early administration of post-exposure prophylaxis for HIV would reinforce a skilled

artisan's reasonable expectation of success in using a combination of TDF and FTC for pre-

exposure prophylaxis.  First, Schwarzenegger recommends that "PEP should be initiated as soon

as possible following the exposure."  Schwarzenegger at 3; *see also id.* at 7.  Moreover,

"[a]nimal models of the natural history of HIV acquisition following exposure and of PEP

interventions suggest that PEP ***will be more effective the sooner it is started*.**"  *Id.* at 14.

(citations omitted) (emphasis added).  "***Clients and health care providers should strive to***

***initiate PEP as early as possible after the exposure***."  *Id.*  (emphasis added).  Timing of

initiation for HIV PEP was understood to be so important for PEP regimens, including the

combination of TDF and FTC for PEP, that it was disclosed in Schwarzenegger that the initial

assessment of HIV risk could be done telephonically and the patient only later examined in

person. *Id.* ("After initial telephone assessment of HIV risk, and explanation of the risks and

benefits of PEP, an initial prescription can be called in to a local pharmacy to last until the client

can be seen an evaluated in person, preferably within three days."). In fact, in terms of

information to be provided to PEP patients, Schwarzenegger summarizes that for PEP, "***[i]t looks

like the best effect occurs when the medicines are started as soon as possible***." *Id.* at 25.

Accordingly, there was an express teaching in Schwarzenegger that post-exposure prophylaxis,

including the combination of TDF and FTC, should be administered as soon as possible after

HIV exposure and was more effective the closer in time that the administration of antiretrovirals

occurred in relation to the HIV exposure. *See, e.g.*, Schwarzenegger at 3, 7. In view of this

express teaching, reinforced by general understanding of chemoprophylaxis principles, one

skilled in the art would have had a reasonable expectation of success in administering an

antiretroviral even earlier than as soon as possible following HIV exposure—*i.e.*, ***prior to*** said

HIV exposure.

Furthermore, a skilled artisan would have reasonably expected success in administering a

combination of FTC and TDF before exposure to HIV to prevent infection, rather than after,

based on the quick uptake when coupled with long plasma and intracellular half-lives of the two

compounds. "After oral administration, emtricitabine is rapidly and extensively absorbed."

Dando at 2077. "Following oral administration of EMTRIVA, emtricitabine is rapidly absorbed

with peak plasma concentrations occurring at 1-2 hours post-dose." Truvada® Insert at 5.

Similarly, "[f]ollowing oral administration of VIREAD, maximum tenofovir serum

concentrations are achieved in 1.0 ± 0.4 hour." *Id.* "For both emtricitabine and tenofovir, $C_{max}$

is reached within 1-3 hours after administration to fed or fasting patients or volunteers."  Dando at 2078.  "At $C_{max}$, the drug partitions approximately equally into the plasma and blood cells and the mean concentration in the semen is approximately four times that in the plasma."  *Id.*

Both TDF and FTC also have long plasma elimination half-lives, approximately seventeen and ten hours respectively, Truvada® Insert at 5; *see also* Dando at 2078 ("The median terminal elimination half-lives of emtricitabine and tenofovir were 15.5 and 17.6 hours when healthy volunteers received a single dose of co-formulated emtricitabine/tenofovir DF 200mg/200 mg on two separate occasions.").  Because of those long half-lives, both TDF and FTC can be dosed infrequently, once daily for example.  Truvada® Insert at 5, 20.  Moreover, "the active metabolites of both drugs have long intracellular half-lives in peripheral blood mononuclear cells (39 hours for emtricitabine 5'-triphosphate and ≥60 hours for tenofovir diphosphate, " Dando at 2078, and intracellular concentrations may remain present even during periods of incomplete adherence.  Youle JIAPAC 2003 at 103 (stating that an "ideal agent" for pre-exposure prophylaxis "should be a once-daily or less frequently taken agent that is non-toxic, well tolerated, and easily administered").  A skilled artisan would have recognized that these pharmacokinetic properties indicate that both TDF and FTC can be given at a low dose frequency, once daily for example, and continue to maintain active intracellular concentrations long after the time of dosing.  Therefore, a skilled artisan would have reasonably expected success in preventing HIV infection in an uninfected human when the combination of TDF and FTC is administered prior to HIV exposure, rather than as soon as possible post-exposure.

Moreover, a skilled artisan would have been aware that the administration of tenofovir and TDF in macaques demonstrated efficacy as a pre-exposure prophylaxis to prevent establishment of infection by immunodeficiency retrovirus in macaques.  *See, e.g.*, Tsai 1995 at

1198-1199; Van Rompay 2004 at 1; *see also* Tsai 1995 at 1199; Van Rompay AIDS 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-1773; Van Rompay 2001 at 429, 436.  To be certain, Schwarzenegger expressly cites Tsai 1995, among other references, in support of the efficacy of post-exposure prophylaxis.  Schwarzenegger at 9-11.  Schwarzenegger cites Tsai 1995 in support of the statement that that "[i]n SIV models, nucleotide and nucleoside analogues have been protective in preventing infection in a majority of intravenously inoculated macaques when given early after exposure (within 24 hours is superior to 48 or 72 hours) and for a 28-day course," *id.* at 10, and a skilled artisan would have accordingly considered Schwarzenegger's disclosure in conjunction with Tsai 1995 and its disclosure as a whole, including Tsai 1995's disclosure regarding pre-exposure prophylaxis.

For example, Tsai 1995 demonstrated complete protection of twenty-five macaques dosed with tenofovir either before or after exposure to SIV, Tsai 1995 at 1199, and Van Rompay 2004 demonstrated statistically significant results in preventing SIV infection in macaques when dosed with TDF in amounts pharmacokinetically equivalent to those administered in humans, prior to the macaques' SIV exposure.  Van Rompay 2004 at 1.  A skilled artisan would have understood these and other demonstrations of efficacy by tenofovir and TDF to prevent establishment of immunodeficiency retrovirus infection in macaques to provide a reasonable expectation of success in preventing establishment of HIV infection in humans through the administration of TDF, either alone or in combination, for PrEP.

Accordingly, in view of the recommended use of the combination of TDF and FTC for HIV PEP as disclosed in Schwarzenegger, in view of the known efficacy of the same combination to treat and suppress established HIV infection as disclosed in Dando, and in view of the known efficacy of tenofovir and TDF to prevent immunodeficiency retroviral infection in

macaques as established by Tsai 1995 and Van Rompay 2004, a skilled artisan would have reasonably expected success in using the combination of TDF and FTC as pre-exposure prophylaxis for HIV.[25]

4.   Schwarzenegger in View of Dando, Further in View of Szekeres, Further in View of Tsai 1995 and/or Van Rompay 2004, and Further in View of the Knowledge of a Person of Ordinary Skill in the Art

As set forth in further detail in the claim charts in Exhibit A, claims 1-11 and 13 of the '509 Patent; claims 1-11 and 13 of the '333 Patent; claims 1-19 of the '191 Patent; and claims 1-19 of the '423 Patent would have been obvious over Schwarzenegger in view of Dando, further in view of Szekeres, further in view of Tsai 1995 and/or Van Rompay 2004, and further in view of the knowledge of a person of ordinary skill in the art.  The references were publicly available before the earliest priority date to which the Asserted Claims are entitled and are thus prior art.

The combination of Schwarzenegger, Dando, and Szekeres with Tsai 1995 and/or Van Rompay 2004 teaches or suggests all of the limitations of the Asserted Claims.

Schwarzenegger discloses post-exposure prophylaxis in humans with pharmaceutically effective amounts of TDF in combination with FTC to protect against HIV infection. Schwarzenegger consists of guidelines and recommendations prepared by the California Task Force on Non-Occupational PEP and the California Department of Health Services, Office of AIDS "for the use of post-exposure prophylaxis (PEP) for the prevention of HIV infection in the general population."  Schwarzenegger at 1.  Accordingly, Schwarzenegger teaches that "PEP is

---

[25]   And as detailed above in Sections VI.c and VI.d., ordinary persons skilled in the art in fact recognized such teachings in the art in reaching the purported invention of the Asserted Claims of the Patents-in-Suit prior to the earliest priority date to which the Asserted Claims are entitled.  This further supports that the Asserted Claims would have been obvious in view of the teachings of the prior art and the knowledge of the skilled artisan.

intended for individuals of negative or unknown HIV infection status following potential exposure to HIV." Schwarzenegger at 3. "The higher the risk of the exposure [to HIV] (determined by the type of sexual or other activity and the likelihood of HIV infection in the exposure source), the more directive the health care provider should be towards the decision to take PEP." *Id.*

Schwarzenegger provides specific guidelines and recommendations for PEP use in "individuals who have had a potential exposure to HIV through consensual sexual activity, and secondarily to individuals who may have had an exposure to HIV through sharing of injection drug use equipment." *Id.* However, "the same general principles outlined in this document can reasonably be applied to assess the likelihood of acquiring HIV from [other] such exposure, and thus the potential utility of PEP." *Id.*

Schwarzenegger teaches that "[i]f a potentially infectious body fluid (e.g. blood or blood products, genital secretions, peritoneal, pleural or cerebrospinal fluids, but NOT saliva, tears, or sweat) was in contact with a mucous membrane (e.g., eye, oral, nasal, or genital mucosa) or non-intact skin (punctures, cut or substantially abraded), HIV infection is possible and consideration of PEP is warranted." Schwarzenegger at 11. More specifically, Schwarzenegger further teaches that its recommended PEP regimens may be used to prevent HIV infections for many types of HIV exposure, including: receptive anal intercourse, shared injection drug use equipment, insertive anal intercourse, insertive vaginal intercourse, other potentially infectious body fluid on a mucous membrane or non-intact skin, and receptive oral intercourse with ejaculation. *Id.* at 7, 11. Schwarzenegger thereby teaches that its recommended PEP regimens can be used to prevent HIV infection in a previously uninfected person across a wide range of exposure types. *See id.*

Schwarzenegger teaches that "in the absence of information about the antiretroviral history of the source, or if the exposure source is native to antiretroviral medication, the preferred double nucleoside analogue combination PEP regimen is Combivir®," ([zidovudine] + lamivudine), one pill twice a day." *Id.* at 15; *see also id.* at 8. However, recommended "alternative nucleoside analogue combinations include:

> [S]tavudine (40 mg for patients weighing greater than 60 kg and 20 mg for those weighing less than 60 kg, one pill twice a day) or ***tenofovir, 300 mg once a day***, *in combination* with lamivudine 150 mg twice a day or 300 mg once a day ***or emtricitabine 300 mg a day***. ***A fixed dose combination pill combining tenofovir and emtricitabine, called Truvada, is available for once daily dosing.*** Abacavir and didanosine should be avoided unless resistance considerations outweigh potential toxicity.

*Id.* at 15 (emphasis added); *see also id.* at 8. Schwarzenegger thereby recommends the use of TDF and FTC in combination as an effective PEP regimen to prevent the establishment of HIV infection in an uninfected human recently exposed or potentially exposed to HIV, and teaches that the combination is available for once daily dosing in the form of Truvada. *Id.* Schwarzenegger teaches that "abacavir and didanosine should be avoided" for PEP "unless antiviral resistance considerations outweigh potential toxicity" (hypersensitivity and pancreatitis, respectively). *Id.* at 15; *see also id.* at 8.

Schwarzenegger discloses that there was "no consensus among experts about whether two or three antiretroviral drugs should be used for PEP." *Id.* at 15. Arguments in support of using two drug combinations for PEP include: (1) "the inoculum of virus is small following non-occupational exposure compared with the amount of virus requiring potent antiretroviral therapy for full suppression in an HIV-infected individual"; (2) "single agent PEP resulted in an 81 percent reduction in the risk of HIV infection in a study of occupational exposures"; (3)

"increased side effects and/or more difficult dosing schedules may result in decreased adherence"; and (4) "there is a significant cost differential when a third drug is added." *Id.*

Schwarzenegger discloses that "[a]lthough there are no efficacy data directly supporting the use of non-occupational PEP for sexual exposures, several related sets of data from an occupational exposure study, mother-to-child transmission studies, and animal studies support its biological plausibility." *Id.* at 9. Schwarzenegger discloses that though "[t]he validity of generalizing results of PEP following nonmucosal exposures to mucosal exposures in humans remains uncertain because of differences in the immune response," it further discloses that "[a]nimal models of mucosal exposures do demonstrate PEP effectiveness." *Id.*

Schwarzenegger discloses that "[r]esults from animal studies of PEP have provided data supportive of its probable efficacy in intravenous, oral, and vaginal simian immunodeficiency virus (SIV) and HIV-2 exposures, and that these data have been instructive in terms of timing and duration of therapy." *Id.* at 10. Citing, among other references, Tsai 1995, Schwarzenegger discloses that "[i]n SIV models, nucleotide and nucleoside analogues have been protective in preventing infection in a majority of intravenously inoculated macaques when given early after exposure (within 24 hours is superior to 48 or 72 hours) and for a 28-day course." *Id.* "When provided to macaques following intravaginal exposure to HIV-2, the nucleotide analogue PMPA (tenofovir) was fully protective when treatment was initiated at 12 or 36 hours post-inoculation (zero of eight infected), and only partially effective at 72 hours (one of four treated animals infected; three of four controls infected)." *Id.* By contrast, the "three control animals seroconverted at two weeks and the experimental animal at 16 weeks post-exposure, raising concerns about the possibility of delayed seroconversion and the need for adequate follow-up HIV antibody testing after administration of PEP." *Id.* However, Schwarzenegger also discloses

198

that "[r]eassuringly, studies of health care workers who have seroconverted following PEP have not demonstrated delayed seroconversion." *Id.*

Schwarzenegger further discloses that the efficacy of PEP was also understood to be supported by "multiple studies of antiretroviral drugs used in pregnant women and/or their newborns" to prevent "mother-to-child transmission of HIV infection." *Id.* at 9. Schwarzenegger further discloses that "[s]ome of these studies have included drugs given to both the mother and the newborn, some just to the mother, and two to just the newborn." *Id.* (citing references). "A New York State Department of Health analysis demonstrating efficacy even in those infants who only received [zidovudine] within 48 hours after birth (9.2 percenter compared to 26.6 percent transmission without PEP suggests that there is likely a post- as well as a pre-exposure effect of antiretrovirals used in the prevention of mother-to-child transmission." *Id.* at 9-10. Moreover, the "first prospective study of antiretrovirals used only in the postnatal period to prevent mother-to-child transmission also demonstrated efficacy in reducing mother-to-child transmission of HIV." *Id.* at 10.

Schwarzenegger also discloses that the efficacy of PEP was supported by occupational HIV exposures studies. *Id.* at 9. "The 1987 approval of [zidovudine] was followed by consideration of antiretroviral therapy as prophylaxis following potential exposure to HIV." *Id.* Though "[i]n 1990, CDC published a statement that neither recommended nor discouraged such use following occupational exposures to HIV," "[the] 1995 presentation of a case-control study in health care workers demonstrating a 79 percent reduction in the likelihood of HIV infection associated with [zidovudine] use following occupational exposure led to the 1996 revision of CDC guidelines to recommended PEP following occupational exposures." *Id.* Schwarzenegger further discloses that the "published study ultimately showed an 81 percent reduction in HIV

infection associated with [zidovudine] use and raised a number of questions regarding generalizability to non-occupational exposures, the feasibility of providing non-occupational PEP, and its safety and cost-effectiveness." *Id.*

Schwarzenegger discloses that the efficacy of PEP was further supported by "observational studies in humans." *Id.* at 10. "Only a single study of PEP following non-occupational exposures has been published; there were no seroconversions among 401 enrolled subjects  with follow-up six months after PEP initiation." *Id.* Furthermore, "unpublished studies from the United States, Brazil, Australia, and South Africa report few seroconversions following non-occupational PEP use, although follow-up is often limited." *Id.* Schwarzenegger further discloses that "[a] recent unpublished analysis of data from San Francisco, California, demonstrates the difficulty of attributing HIV seroconversions to failure of PEP in the non-occupational context, where the potential infection source is rarely available for testing and additional potential exposures are common."[26] *Id.*

Schwarzenegger also discloses that "there have been several reports of failure of PEP to prevent HIV infection following occupational exposures," and that "[w]hile offering some protection, PEP is not expected to be 100 percent effective in any setting." *Id.* at 11. However, "[s]ome failures of PEP are not inconsistent with the efficacy of PEP." *Id.*

Schwarzenegger teaches that "PEP should be offered to HIV uninfected or unknown status individuals presenting within 72 hours of a potential exposure to HIV." *Id.* Moreover, "[i]ndividuals at highest risk of acquiring HIV infection from their specific exposure are expected to benefit most from PEP." *Id.* Schwarzenegger further teaches that PEP should be

---

[26]    Where "additional potential [HIV] exposures" occur while a human is taking a prescribed antiretroviral PEP regimen, such PEP regimens would also function in a PrEP capacity with respect to those subsequent HIV exposures.  *See also* Section VI.c.i.3 (Mayer NPEP Proposal).

offered "[a]s soon as possible, and no later than 72 hours following exposure." *Id.* at 7. Schwarzenegger discloses that "[a]nimal models of the natural history of HIV acquisition following exposure and of PEP interventions suggest that PEP will be more effective the sooner it is started." *Id.* at 14. Schwarzenegger further discloses that "[c]lients and healthcare providers should strive to initiate PEP as early as possible after the exposure." *Id.*

Dando discloses the "features and properties of co-formulated emtricitabine/tenofovir disoproxil fumarate (tenofovir DF) [Truvada™]." Dando at 2075 (square brackets in original). Dando discloses that "nucleoside analogue reverse transcriptase inhibitor (RTI) emtricitabine and the nucleotide analogue RTI tenofovir disoproxil fumarate (tenofovir DF) have each shown antiviral activity against a number of HIV clinical isolates and cell lines." *Id.*; *see id.* at 2076 (same).

Though Dando discloses that "no efficacy trials of the co-formulated emtricitabine/tenofovir DF 200mg/300mg tablet have been conducted," Dando discloses that "emtricitabine and tenofovir DF, as individual agents, have shown efficacy in reducing HIV RNA levels from baseline in well designed trials." *Id.* at 2079 (citations omitted). "Emtricitabine, in combination with other antiretroviral agents, including didanosine and efavirenz, stavudine, and nevirapine, or stavudine and efavirenz, has shown antiviral efficacy in several trials of up to 4 years' duration." *Id.* Dando continues, and discloses that "[f]or example, the efficacy of triple therapy containing once-daily emtricitabine was equivalent to that of triple therapy containing lamivudine in two 48-week trials in patients with HIV infection (both n > 400)." *Id.* at 2080. "Additionally, emtricitabine-containing therapy was significantly more effective than stavudine-based therapy (HIV RNA ≤50 copies/mL was achieved and maintained in 76% vs 54% of patients after 60 weeks; p < 0.001) or PI-based therapy (95% vs 87% at week

48l intention-to-treat, missing = failure population [ITT, M=F]; p-0.01)." Dando at 2080 (citations omitted) (square brackets in original). Dando also discloses that "[s]ynergistic antiviral effects were observed in *in vitro* combination studies of emtricitabine and plus tenofovir." Dando at 2076.

Dando further discloses that "[t]enofovir DF was as effective as stavudine (both in combination with lamivudine and efavirenz) after treatment for 144 weeks in a randomized, double-blinded, multicentre study in antiretroviral-naïve patients (n= 600) with HIV infection (analyses based on ITT, M=F population)." *Id.* "At this timepoint, 67.9% of tenofovir DF-containing therapy recipients and 62.5% of stavudine-containing therapy recipients had HIV RNA levels <50 copies/mL (95% CI -1.8, 13.3 for the between-group difference [a lower limit higher than -10.0 indicated non-inferiority])." *Id.* (square brackets in original). And the "respective proportions of patients with HIV RNA levels <499 copies/mL were 70.6% and 64.1% (95% CI -0.8, 14.0)." *Id.*

Moreover, Dando discloses that "[o]ral, once-daily therapy with concomitant separate formulations of emtricitabine 200 mg/day and tenofovir DF 300 mg/day in combination with once or twice-daily co-formulated lopinavir/ritonavir (PI) reduced HIV RNA levels in an ongoing, randomised, open-label study in 190 antiretroviral-naïve patients with HIV infection (ITT analysis)." *Id.* at 2080. "At 48 weeks in the once- and twice-daily PI-containing treatment groups, 70% and 64% of patients had HIV RNA levels <50 copies/mL and CD4+ cell counts had increased from baseline by 185 and 188 cells/μL. These results confirmed the efficacy outcomes seen at the interim 24-week analysis." *Id.* (citations omitted). Dando also discloses that data was not yet "available at present for an open-label, multicentre trial that will compare

emtricitabine, tenofovir DF and efavirenz with co-formulated lamivudine/zidovudine plus

efavirenz in antiretroviral-naïve patients (n = 517)." *Id.*

Regarding the resistance profiles of FTC and TDF, Dando discloses that though "HIV

variants with reduced susceptibility to emtricitabine and tenofovir have been selected for *in vitro*

and have also been isolated from patients receiving the agents," it was also true that "[l]ow rates

of these variants have been observed in patients experiencing virological failure in large studies

of emtricitabine- or tenofovir DF-containing therapy." *Id.* at 2075.  For example,

"[a]ntiretroviral-naïve patients (n = 190) received emtricitabine and tenofovir DF in combination

with co-formulated lopinavir/ritonavir for 48 weeks.  Of the 15 patients who "had HIV RNA

levels >500 copies/mL at any time from weeks 12 to 48 (and genotypic results available), three

demonstrated resistance to emtricitabine (M184V/I) and none demonstrated resistance to

tenofovir DF." *Id.* at 2077.  Dando further discloses that "HIV isolates resistant to emtricitabine

(M184I/V) were cross-resistant to lamivudine and zalcitabine but remained sensitive to abacavir,

didanosine, stavudine, ***tenofovir***, delavirdine, efavirenz and nevirapine" *Id.* (emphasis added).

Dando further teaches that "[c]o-formulated oral emtricitabine/tenofovir DF was

bioequivalent to the two agents as separate formulations in a pharmacokinetic trial in health

volunteers." Dando at 2075.  Dando discloses that the "[t]he arithmetic mean values for the

maximum serum concentration ($C_{max}$) and area under the serum concentration-time curve from

time zero to infinity (AUC∞) for emtricitabine were 2.13 µg/mL and 10.6 µg • h/mL when a

single dose of co-formulated emtricitabine/tenofovir DF 200mg/300mg was administered to 44

fasting, healthy volunteers in a crossover trial.  Respective values for tenofovir DF were 0.254

µg/mL and 1.96 µg • h/mL." *Id.* at 2077.  Dando further discloses that "[i]n the same trial, co-

formulated emtricitabine/tenofovir DF was bioequivalent to the two agents administered as

separate formulations (figure 1)." *Id.* "For both emtricitabine and tenofovir DF, the 90%

confidence intervals for the geometric mean ratio (combination dose : individual formulations)

for the Cmax and AUC∞ values were contained within 80–120%, thus meeting the predefined

criteria for bioequivalence." *Id.*

Dando also discloses that "[a]fter oral administration, emtricitabine is rapidly and

extensively absorbed. . . .  For both emtricitabine and tenofovir, $C_{max}$ is reached within 1-3 hours

after administration to fed or fasting patients or volunteers."  Dando at 2078.  "At $C_{max}$, the drug

partitions approximately equally into the plasma and blood cells and the mean concentration in

the semen is approximately four times that in the plasma." *Id.*  Additionally, "[t]he median

terminal elimination half-lives of emtricitabine and tenofovir were 15.5 and 17.6 hours when

healthy volunteers received a single dose of co-formulated emtricitabine/tenofovir DF

200mg/300 mg on two separate occasions." *Id.*  And "the active metabolites of both drugs have

long intracellular half-lives in peripheral blood mononuclear cells (39 hours for emtricitabine 5'-

triphosphate and ≥60 hours for tenofovir diphosphate." *Id.* (citation omitted).

Additionally, "emtricitabine and tenofovir DF are generally well tolerated." *Id.* at 2075.

Accordingly, Dando discloses that "[a]s individual agents in combination with antiretroviral

agents, emtricitabine and tenofovir DF are generally well tolerated in patients with HIV

infection." *Id.* at 2080 (citations omitted).  The most "frequent (13-30% of patients) adverse

events occurring with emtricitabine-containing combination therapy in clinical trials of ≤48

weeks' duration were headache, diarrhoea, nausea, and rash," and were expressed in frequency

"similar to that [of] lamivudine-[]containing therapy," and "significantly lower" than "those

receiving stavudine-containing therapy (all p ≤ 0.05)." *Id.*  And "[t]he incidence of adverse

events with tenofovir DF was generally similar to that with placebo in clinical trials;

gastrointestinal events (nausea, diarrhoea, vomiting, flatulence) occurred commonly (3-16% of patients). *Id.* "[S]ignificantly fewer" patients receiving TDF-containing therapy experienced "neuropathy, lipodystrophy and adverse events potentially associated with mitochondrial dysfunction" than patient's receiving stavudine-containing therapy. *Id.*

Dando also discloses that "[w]hen emtricitabine and tenofovir DF were administered simultaneously as separate formulations in patients also receiving lopinavir/ritonavir, the most common moderate-to-severe, drug-related adverse events were diarrhoea, nausea and vomiting." *Id.* at 2081. "Emtricitabine 200mg plus tenofovir DF 300mg, either as a co-formulated tablet or as separate formulations, was generally well tolerated in two pharmacokinetic trials." *Id.* (citations omitted). With respect to those trials, Dando discloses:

> One volunteer discontinued treatment because of moderate vomiting when 19 healthy volunteers received the two separate tablets once daily for 7 days. When 44 healthy volunteers received one dose of the two agents as separate tablets and as a co-formulated tablet in a crossover study, eight individuals (18%) experienced an adverse event (combined data); the most common adverse event was grade 1 headache (n = 3). There were no grade 3 or 4 or serious adverse events. One volunteer discontinued treatment because of a mild rash that was considered to be treatment related.

*Id.* (citations omitted).

Dando concludes that "[c]o-formulated emtricitabine/tenofovir DF is approved in the US for once-daily oral use in conjunction with antiretroviral agents in adults with HIV infection." *Id.* And "[a]lthough no clinical trials of the efficacy of this formulation have been published to date, the fixed-dose co-formulation was bioequivalent to the two separate components given concomantly in a pharmacokinetic study. Advantages of the of the emtricitabine/tenofovir DF co-formulation include a reduced pill burden and the fact that that it can be administered without regard to food." *Id.*

Szekeres discloses that "[p]re-exposure prophylaxis (PrEP) is a novel approach to HIV prevention in which antiretroviral drugs (ARVs) are used by an individual prior to potential HIV exposure to reduce the likelihood of infection." Szekeres at 1. Szekeres also "examines other prominent biomedical prevention strategies, including HIV PEP, prevention of mother-to-child transmission of HIV, hormonal contraception, epidemiologic treatment of sexually transmitted diseases, and malaria chemoprophylaxis, to explore possible parallels with PrEP." *Id.* Szekeres further discloses an:

> overview of the major PrEP studies that are currently planned or underway is also provided. Five such studies will evaluate the safety and/or efficacy of HIV PrEP among high-risk women (Cameroon, Ghana, Nigeria), high-risk men (Malawi), female sex workers (Cambodia), sexually active young adults (Botswana), injection drug users (IDUs) (Thailand), and men who have sex with men (MSM) (United States). The earliest results of these trials should start to become available in mid-2006.

*Id.* Szekeres further discloses that "safe and effective PrEP intervention would likely need to be targeted to MSM, female partners of MSM, and IDUs and their partners" as well as "[o]ther individuals . . . placed in situations or locations where risk of HIV acquisition might be heightened for a period of time, such as prisoners, commercial sex workers, or those trying to conceive with a serodiscordant partner." *Id.*

Szekeres discloses that "[p]re-exposure prophylaxis (PrEP) is a novel approach to HIV prevention that has recently generated considerable interest." Szekeres at 3. "PrEP involves the use of antiretroviral drugs (ARVs) by an individual prior to potential HIV exposure, in order to reduce the likelihood of HIV infection. PrEP should be distinguished from postexposure prophylaxis (PEP), in which an individual takes ARVs soon after a potential HIV exposure with the goal of reducing the likelihood of infection." *Id.* Szekeres further discloses that "[i]t has been hypothesized that, in various international settings, PrEP could be a viable prevention strategy for certain people at high risk of HIV infection, such as commercial sex workers, those

in serodiscordant relationships, and members of high-risk groups who choose not to use condoms or for whom consistent condom use has proved difficult." *Id.*

Szekeres further discloses that "[a]s of September 2004, there were several major PrEP studies involving human subjects being planned or currently underway. These studies include investigations of the safety and/or efficacy of PrEP in high-risk women (Cameroon, Ghana, Nigeria), high-risk men (Malawi), female sex workers (Cambodia), sexually active young adults (Botswana), injection drug users (IDUs) (Thailand), and MSM (United States)." *Id.* Szekeres discloses a detailed summary of each of these studies. *See id.* at 6-10. Szekeres further discloses that "[t]hese studies all make use of tenofovir disoproxil fumarate (TDF) as the investigational PrEP agent," which "has been approved by the Food and Drug Administration (FDA) since 2001 in combination with other antiretroviral agents for the treatment of adults with HIV-1 infection." *Id.* at 8.

Szekeres also discloses that "[s]tarting in the mid-1990s, studies with simian immunodeficiency virus (SIV) in macaques, a useful model of human HIV infection, have shown that tenofovir is effective at preventing infection with SIV when used either as pre- or postexposure prophylaxis." Szekeres at 8 (citing Tsai 1995 and Van Rompay AIDS 1998). Additionally, "[r]esearch has also been conducted with a topical vaginal tenofovir gel. In macaques, application of tenofovir gel before or after vaginal challenge with SIV protected 100% of the macaques; studies of tenofovir vaginal gel are now underway in humans." *Id.* (endnotes omitted). Because "oral TDF is an available agent with relatively low toxicity that can be administered once daily, considerable interest arose in evaluating its safety and efficacy as PrEP for prevention of HIV infection." *Id.*

Each of Tsai 1995 and Van Rompay 2004 discloses pre-exposure prophylaxis with pharmaceutically effective amounts of tenofovir or TDF to protect a primate host against retroviral infection, including HIV.  Tsai 1995 discloses subcutaneous administration of tenofovir to macaques once daily, beginning either: (1) 48 hours before; (2) 4 hours after; or (3) 24 hours after inoculation with simian immunodeficiency virus ("SIV").  Tsai 1995 at 1197. Tsai 1995 discloses that none of the macaques became infected when tenofovir was administered starting: (1) 48 hours before; (2) 4 hours after; or (3) 24 hours after inoculation.  *Id.* at 1198-99. Tsai 1995 also discloses that "[c]linical signs of [tenofovir] toxicity did not occur, nor were there any significant changes in complete blood counts or blood chemistries during or after the 4-week treatment regimen," and concludes that tenofovir "prevented establishment of SIV infection in 25 out of 25 macaques (100%), without toxicity when administered up to 24 hours after viral inoculation."  *Id.* at 1199.  Tsai 1995 concludes that its "pre- and postexposure findings indicate that tenofovir is a promising candidate for anti-HIV treatment," and that tenofovir could prevent HIV infection in humans.  *Id.*  Tsai further concludes that "results from several recent anti-HIV clinical trials indicate that combining nucleoside analogues, such as AZT, with lamivudine (3TC) or proteinase inhibitors can enhance antiviral efficacy," and that "[t]herefore, [tenofovir] may also have an important role in combination therapies or strategies against HIV."  *Id.*

Van Rompay 2004 discloses pre-exposure prophylaxis in macaques with pharmaceutically effective amounts of TDF to protect against retroviral infection, including HIV. "Infant macaques were exposed orally to low doses of virulent SIV mac251 during 2 inoculation periods": (1) "during the first week of life"; and (2) "for animals that were still uninfected, again at 1month of age."  Van Rompay 2004 at 1.  "To mimic the multiple exposures to HIV that occur during prolonged breast-feeding," Van Rompay 2004 discloses the use of an "animal model in

which infant macaques are bottle-fed repeatedly low doses of virulent simian immunodeficiency virus (SIVmac251). *Id.*

"One group of [infant macaques] received oral tenofovir DF syrup at a dose (10 mg/kg once daily) estimated to be pharmacokinetically equivalent (based on area-under-the curve values) to the 8 mg/kg regimen used in pediatric trials, and the 300 mg tenofovir DF tablet given to adults. Tenofovir DF [TDF] was given once daily starting one day before until one day after each SIV inoculation period." *Id.* A control group of infant macaques, to which no antiretrovirals were administered, were similarly exposed to SIV. *Id.* at 1. "After the 2 rounds of inoculations, 20 of 22 untreated macaques were persistently viremic," that is had an established infection. *Id.* "In contrast, 3 of 6 tenofovir-treated animals were uninfected at 3 months of age (p=0.05; two-sided Fisher's Exact test)." *Id.* Van Rompay 2004 concludes that the "data suggest that tenofovir DF administration will be effective to protect infants against HIV transmission from breast-milk," and that the "data provide also support [sic] for the ongoing trials in which the use of chronic tenofovir DF administration is investigated to reduce infection rates among high-risk adult groups (commercial sex workers, and men having sex with men)." *Id.*

A.    Motivation to Administer FTC and TDF Prior to HIV Exposure

As set forth more fully herein, the motivation to combine the references is explicit within the references themselves, and was also within the knowledge of a person of ordinary skill in the art. For at least the following reasons, a person of ordinary skill in the art would have been motivated to combine Schwarzenegger with Dando, Szekeres, and Tsai 1995 and/or Van Rompay 2004, and the knowledge of a person of ordinary skill in the art to arrive at the claimed methods, and would have had a reasonable expectation of success in doing so for the reasons described in Section VI.e.i.4.B below.

A skilled artisan would have been motivated to modify a recommended oral PEP regimen comprising the combination of TDF and FTC, as disclosed in Schwarzenegger, and administer the antiretroviral combination to a previously uninfected human prior to HIV exposure, rather than after, based on a well-recognized need and interest in the art to decrease rates of HIV transmission and prevent the establishment of new HIV infections in the first instance as described, for example, by Szekeres.  A skilled artisan would have also been aware of the disclosure of Tsai 1995 and Van Rompay 2004, among other references, teaching the administration of tenofovir or TDF to macaques prior to exposure to an immunodeficiency retrovirus and thereby protecting macaques from establishment of infection by said immunodeficiency retrovirus.  Tsai 1995 at 1199; Van Rompay 2004 at 1; *see also* Van Rompay AIDS 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-73; Van Rompay 2001 at 429, 436.  To be certain, Schwarzenegger expressly cites Tsai 1995, among other references, in support of the efficacy of post-exposure prophylaxis, indicating that such references would have been considered together by a skilled artisan.  Schwarzenegger at 10.  Moreover, not only had the combination of TDF and FTC been approved by the FDA and deemed safe and effective for the treatment of HIV in infected humans, but it was already recommended by at least one governmental body, the California Task Force on Non-Occupational PEP and the California Department of Health Services, Office of AIDS, for use as HIV post-exposure prophylaxis.  *See* Schwarzenegger at 1.  A skilled artisan would also have been aware of the disclosure of Szekeres, which sets forth both those HIV PrEP clinical trials being implemented/planned as of its date of publication as well as additional "rationale[s]" supporting pre-exposure prophylaxis for HIV.  *See* Szekeres at 4-10. Therefore, a skilled artisan seeking to reduce rates of HIV infection and transmission rates would have been motivated to modify the teachings of

Schwarzenegger and administer the prophylactic combination of TDF and FTC before HIV exposure to an uninfected person, rather than after (as informed by Tsai 1995 and Van Rompay 2004).

As of the earliest priority date to which the Asserted Claims are entitled, there was an express and well-recognized need to reduce HIV transmission rates and prevent the establishment of new HIV infections in humans. "HIV infects more than 40 million people worldwide, and there are 14,000 new infections per day." Grant 2005 at 2170 (citation omitted); *see also* Szekeres at 3 ("Worldwide, approximately 60 million people have been infected with HIV since the beginning of the pandemic, and over 20 million have died. In 2003, there were an estimated 38 million people living with HIV; in that same year, nearly 5 million people became newly infected."). And it was understood that "[a]cross most of the world, the HIV epidemic remains unchecked." Youle JIAPAC 2003 at 102 (citation omitted). By November 2004, "HIV infections in the United States are on the rise—an estimated 950,000 people were living with HIV in 2003, up from 900,000 in 2001." Szekeres at 3. In California, for example, it was "estimated that approximately 128,000 Californians are HIV infected (with or without an AIDS diagnosis.) There have been over 136,000 cumulative AIDS cases reported in the State through July 2004, with over 80,000 deaths." *Id.* (endnote omitted).

"Although behavioral interventions (including abstinence, reducing number of sexual partners, partner selection, use of male and female condoms, and needle hygiene) have shown efficacy in preventing HIV infection in diverse populations and settings, they are not always consistently implemented by individuals, are not universally effective, and have not ultimately been able to contain the pandemic." *Id.*; *see also* Youle JIAPAC 2003 at 102 ("[E]ven as available and proven prevention interventions are used, the HIV pandemic will not be stopped

solely by talking to those at risk." (citation omitted)).  It was similarly recognized in the art that

based on available prevention techniques, "[t]here is little evidence that there has been a

significant reduction in the global rate of infection over time.  HIV still spreads like wild-fire in

susceptible communities, and is increasingly of multidrug-resistant strains."  Youle AIDS 2003

at 1 (citation omitted); *see also* Youle JIAPAC 2003 at 102 (same).

And though it was "widely believed that, in addition to effective behavioral interventions,

biomedical approaches to HIV prevention will be required to adequately curb the spread of the

virus," it was also recognized in the art that the "two most prominent technology-based HIV

prevention strategies, however—HIV vaccines and vaginal and rectal microbicides—lack

candidate agents that are likely to prove successful in the near- to midterm."  Szekeres at 3.  For

example, it was recognized in the art that ongoing development of a vaccine to prevent HIV

transmission and infection showed little promise in providing a solution.  "The quest for an

effective preventative vaccine for the uninfected has been, to date, unfruitful."  Youle AIDS

2003 at 1 (citations omitted); *see also* Youle JIAPAC 2003 at 102 (same).  While a number of

"putative vaccines" were understood to be in development, their efficacy in preventing HIV

infection—"remain[s] unclear," and the overall "availability of new candidate vaccines is

limited." Youle JIAPAC 2003 at 102.  The first HIV vaccine to reach phase 3 studies "failed to

provide protection from infection and none of the remaining vaccine candidates currently in

clinical trials appear likely to induce potent protective immunity."  Smith 2004 at 1 (endnotes

omitted).

And though a couple of "novel approaches to establish a long-lasting broad immune

response against HIV" were being investigated, "concerns exist that the breadth and durability of

anti-HIV immune response may be too narrow to elicit complete protection against the myriad of

HIV viral strains currently circulating in humans."  Youle JIAPAC 2003 at 102.  Overarching issues limiting potential overall usefulness of an HIV vaccine were also acknowledged—for example, "viral escape from cytotoxic T-lymphocyte recognition might be a limiting factor to vaccine efficacy."  *Id.*  And "[g]iven HIV's propensity to escape cellular and humoral response, there exists no clear approach or target for vaccine development."  Smith 2004 at 1 (endnotes omitted).  To be certain, it was recognized in the art that "[o]ther practical options are desperately needed in the meantime."  Szekeres at 3.

It was further acknowledged that "[s]ignificant populations are at high risk of imminent HIV infection, such as HIV-discordant sexual partners or those who chose not to use condoms. For these individuals a current vaccine strategy may be too far in the future."  Youle AIDS 2003 at 1; Youle JIAPAC 2003 at 102-103; *see also* Smith 2004 (acknowledging efforts of the World Health Organization to "treat those infected with HIV-1" but further acknowledging that "it is not clear they will have a broad impact on the HIV-1 epidemic in the immediate future").  Moreover, even for those individuals using condoms, "only a single failure may result in an additional HIV-infected individual."  Youle JIAPAC 2003 at 103; *see also* Szekeres at 3 ("It is likely that successful HIV prevention efforts will rely on multiple techniques and strategies used in combination.  Just as the success of combination antiretroviral therapy relies on multiple drugs that may target more than one step in the viral life cycle, so too might prevention be enhanced by the synergistic use of social, behavioral, biomedical, and barrier methods.").  Accordingly, a skilled artisan would have recognized the need for additional prophylactic methods and approaches to prevent the spread of HIV and the establishment of HIV infection in previously uninfected humans.

Consequently, it was recognized in the art that "[c]hemoprophylaxis with antiretroviral agents is a promising new approach" and that "[c]linical trials of daily oral antiretroviral dosing as preexposure prophylaxis (PrEP) have been initiated in Africa, Asia, and the United States and are planned in Latin America." Grant 2005 at 2170. "Pre-exposure prophylaxis (PrEP) is a novel approach to HIV prevention that has recently generated considerable interest. PrEP involves the use of antiretroviral drugs (ARVs) by an individual prior to potential HIV exposure, in order to reduce the likelihood of HIV infection." Szekeres at 3. The use of antiretroviral compounds, "that is the administration of chemoprophylaxis to uninfected individuals who live in areas with a high prevalence of HIV-1" was proposed as an approach with "immediate impact." Smith 2004 at 1; *see also* Youle JIAPAC 2003 at 103; Youle AIDS 2003 at 1. And it "has been hypothesized that, in various international settings, PrEP could be a viable prevention strategy for certain people at high risk of HIV infection, such as commercial sex workers, those in serodiscordant relationships, and members of high-risk groups who choose not to use condoms or for whom consistent condom use has proved difficult." Szekeres at 3.

Therefore, a skilled artisan would have been aware of the well-recognized need to reduce HIV transmissions and prevent the establishment of new HIV infection, and would have further been aware that chemoprophylaxis by administering of antiretrovirals to an uninfected person prior to her exposure to HIV was recognized in the art as an approach to doing so. A skilled artisan would therefore have looked to regimens known in the art for purposes of HIV chemoprophylaxis, including those recommended for administration to an uninfected person following exposure to HIV in order to prevent the establishment of a new HIV infection.

Schwarzenegger recommends the use of TDF and FTC in combination as an effective two-drug post-exposure prophylaxis to prevent the establishment of HIV infection in an

uninfected human recently exposed to HIV, and teaches that the combination is available for once daily dosing as a fixed dose combination pill (Truvada®). Schwarzenegger at 15, 8; Schwarzenegger at 8, 15; *see also* Dando at 2081("Advantages of the emtricitabine/tenofovir DF co-formulation include a reduced pill burden and the fact that it can be administered without regard to food."). Schwarzenegger also teaches that "PEP should be offered to HIV uninfected or unknown status individuals presenting within 72 hours of a potential exposure to HIV." Schwarzenegger at 11. Moreover, "[i]ndividuals at highest risk of acquiring HIV infection from their specific exposure are expected to benefit most from PEP." *Id.* Schwarzenegger further teaches that PEP should be offered "[a]s soon as possible, and no later than 72 hours following exposure." *Id.* at 7. Schwarzenegger discloses that "[a]nimal models of the natural history of HIV acquisition following exposure and of PEP interventions suggest that PEP will be more effective the sooner it is started." *Id.* at 14. Schwarzenegger further discloses that "[c]lients and healthcare providers should strive to initiate PEP as early as possible after the exposure." *Id.*

A skilled artisan would have been also aware of the established safety and efficacy of the combination of FTC and TDF for treating HIV, including as a fixed dose co-formulation, as disclosed by Dando. Dando discloses the "[f]eatures and properties of co-formulated emtricitabine/tenofovir disoproxil fumarate (tenofovir DF) [Truvada™]." Dando at 2075 (square brackets in original). Dando discloses that "nucleoside analogue reverse transcriptase inhibitor (RTI) emtricitabine and the nucleotide analogue RTI tenofovir disoproxil fumarate (tenofovir DF) have each shown antiviral activity against a number of HIV clinical isolates and cell lines." *Id.*; *see also id.* at 2076 (same). Dando also discloses that "[e]mtricitabine and tenofovir DF, as individual agents, have shown efficacy in reducing HIV RNA levels from baseline in well designed trials." *Id.* at 2079 (citations omitted); *see id.* at 2079-2080 (disclosing further details

regarding efficacy).  And in terms of safety, Dando discloses that "emtricitabine and tenofovir DF are generally well tolerated."  *Id.* at 2075; *see id.* at 2080 ("As individual agents in combination with antiretroviral agents, emtricitabine and tenofovir DF are generally well tolerated in patients with HIV infection.").  Furthermore, regarding the resistance profiles of FTC and TDF, Dando discloses that though "HIV variants with reduced susceptibility to emtricitabine and tenofovir have been selected for *in vitro* and have also been isolated from patients receiving the agents," it was also true that "[l]ow rates of these variants have been observed in patients experiencing virological failure in large studies of emtricitabine- or tenofovir DF-containing therapy."  Dando at 2075; *see id.* at 2076-2077.  And "[a]dvantages of the of the emtricitabine/tenofovir DF co-formulation include a reduced pill burden and the fact that that it can be administered without regard to food."  *Id.*  Accordingly, in addition to the disclosure of Schwarzenegger, a skilled artisan would have further been motivated to administer the combination of TDF and FTC prior to exposure to HIV based on the known efficacy and safety of the combination as approved for treating HIV, as disclosed by Dando.

A skilled artisan would have further been aware of teachings in the art that tenofovir or TDF could be administered to prevent the establishment of new immunodeficiency retroviral infections, including when administered prior to exposure to said immunodeficiency retrovirus.  To be certain, Schwarzenegger expressly cites Tsai 1995, among other references, in support of the efficacy of post-exposure prophylaxis.  Schwarzenegger at 9-11.  Schwarzenegger cites Tsai 1995 in support of the statement that that "[i]n SIV models, nucleotide and nucleoside analogues have been protective in preventing infection in a majority of intravenously inoculated macaques when given early after exposure (within 24 hours is superior to 48 or 72 hours) and for a 28-day course," *id.* at 10, and a skilled artisan would have accordingly considered Schwarzenegger's

216

disclosure in conjunction with Tsai 1995 and its disclosure as a whole, including Tsai 1995's disclosure regarding pre-exposure prophylaxis.

For example, Tsai 1995 teaches that the administration of tenofovir starting 48 hours prior to exposure to SIV protected all macaques to which the antiretroviral was administered from SIV infection.  Tsai 1995 at 1198 (Table 2 disclosing results of complete protection for those macaques to which PMPA was administered "48 hours preinoculation").  "These findings show that the antiretroviral compound PMPA [tenofovir] prevented the establishment of SIV infection in 25 of 25 macaques (100%) without toxicity when administered up to 24 hours after virus inoculation." *Id.* at 1199 (statements includes macaques to which tenofovir was administered post-exposure).  Similarly, Van Rompay 2004 discloses that a group of six macaques were administered oral TDF "at a dose (10 mg/kg once daily) estimated to be pharmacokinetically equivalent (based on area-under-the-curve values) to the 8 mg/kg regimen used in pediatric trials, and the 300 mg Tenofovir DF tablet given to adults.  Tenofovir DF [TDF] was given once daily starting one day before until one day after each SIV inoculation period." Van Rompay 2004 at 1.  Following "two rounds of virus inoculations, 20 of 22 untreated infant macaques were persistently viremic," while, by "contrast, 3 of 6 tenofovir-treated animals were uninfected at 3 months of age (p=0.05; two-sided Fisher's Exact test)." *Id.* Van Rompay 2004 concludes that "[t]hese data suggest that [TDF] administration will be effective to protect infants against HIV transmission from breast-milk.  Our data provide also support for the ongoing trials in which the use of chronic [TDF] administration is investigated to reduce infection rates among high-risk adult groups (commercial sex workers, and men having sex with men)." *Id.*  Many other references included similar teachings of tenofovir and TDF as demonstrating efficacy for preventing the establishment of retroviral infection.  *See, e.g.*, Van

Rompay AIDS 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-1773; Van Rompay

2001 at 429, 436 (all using tenofovir).

In addition to the express teachings included in Tsai 1995 and Van Rompay 2004, among

other references, that the macaque studies disclosed therein serve as a proxy for HIV infection in

humans and provided support for ongoing human clinical trials, a skilled artisan would have

recognized that disclosure of the administration of TDF prior to immunodeficiency retrovirus

exposure to prevent retroviral infection in macaques would motivate administration of

antiretrovirals as chemoprophylaxis in humans. Macaque studies were recognized in the art as a

model for the effectiveness of the administration of antiretrovirals in humans for the treatment

and prevention of HIV. *E.g.*, Van Rompay 1999 at 1061; Van Rompay Antiviral 2000 at 296.

Such non-human primates have similar physiology to humans (including drug pharmacokinetics

and metabolism, fetal and neonatal development, and immunology). Van Rompay 1999 at 1065;

*see also* Van Rompay Antiviral 2000 at 298. Moreover, "SIV is closely related to HIV, and

causes a disease in macaques which very closely resembles human AIDS. [One] can use the

same parameters to monitor infection and disease progression as those which are used for HIV-

infected patients." Van Rompay 1999 at 1065. Macaque studies permit "recognition of

statistically and biologically significant differences" in the study of antiretroviral compounds.

*Id.* "All these factors allow a more reliable extrapolation of results obtained in non-human

primate models towards clinical applications for the human population." *Id.*; *see also* Van

Rompay Antiviral 2000 at 303.

SIV is closely related to HIV-1, has 60% amino acid homology to that of HIV-1 in the

polymerase region of SIV, and is susceptible to many of the same reverse transcriptase and

protease enzymes at approximately the same *in vivo* concentrations as HIV-1. Van Rompay

1999 at 1065; Van Rompay Antiviral 2000 at 299. Though the NNRTI class of antiretrovirals is specific to HIV-1 and NNRTIs do not inhibit replication of either HIV-2 or SIV, this was overcome through the development of a hybrid SIV/HIV-1 chimeric virus that contains the HIV-1 reverse transcriptase in an SIV background and is infectious for macaques. Van Rompay 1999 at 1065; Van Rompay Antiviral 2000 at 300. With respect to other classes of antiretrovirals (including NRTIs and NtRTIs), a skilled artisan would have considered there to be little to no difference in terms of study value regarding the use of either SIV or SHIV in a macaque study.

Primate studies can be used to gather a wide range of data and information to "provide a solid scientific basis to guide human clinical trials." Van Rompay Antiviral 2000 at 297-298; *see id.* (Table 1 "Value of Nonhuman Primate Models in Anti-HIV Drug Development"). And it was specifically recognized in the art that "macaque studies have provided us with important insights regarding pre- and post-exposure prophylaxis, the effects of early drug intervention, and the emergence and clinical implications of drug-resistant viral variants" for HIV. Van Rompay 1999 at 1065; *see also* Van Rompay Antiviral 2000 at 303 (explaining that "information obtained in this pediatric animal model of AIDS applies directly to HIV infection of human infants as well as adults"). A skilled artisan would therefore have been motivated by the disclosure of Tsai 1995 and Van Rompay 2004 to administer antiretrovirals to humans prior to HIV exposure to the prevent establishment of new HIV infections.

Accordingly, based on the knowledge that the combination of TDF and FTC was recommended for administration in humans following an HIV exposure to prevent establishment of HIV infection, Schwarzenegger at 15, 8, the knowledge that the combination of TDF and FTC were available as a single co-formulated tablet with established efficacy and safety in the treatment of HIV, Dando at 2081, 2075, and the knowledge that tenofovir and TDF had shown

efficacy in preventing immunodeficiency retroviral infection in macaques when administered prior to exposure to an immunodeficiency retrovirus, Tsai 1995 at 1199 and Van Rompay 2004 at 1, a skilled artisan would have been motivated to administer the known efficacious combination of TDF and FTC of Schwarzenegger to a human prior to an exposure to HIV to prevent establishment of a new HIV infection and reduce HIV transmission rates.

In summary, in view of, at least: (1) the well-recognized need to reduce HIV transmission rates and prevent the establishment of new HIV infections; (2) the recognition of pre-exposure prophylaxis as a potential solution to the recognized problem of HIV transmission rates, as described in Szekeres; (3) Schwarzenegger's teaching to administer the combination of TDF and FTC as a chemoprophylaxis to prevent HIV infection in uninfected humans following HIV exposure; (4) the known efficacy and safety of the combination of TDF and FTC as approved for the treatment of HIV, as disclosed by Dando and (5) Tsai 1995's and Van Rompay 2004's teachings that tenofovir and TDF had been shown to successfully prevent immunodeficiency retroviral infections in macaques when administered either pre- or post-exposure, a skilled artisan would have been motivated to administer the known, recommended, and efficacious post-exposure prophylactic combination of TDF and FTC, as taught by Schwarzenegger, and rather than administer the combination to an uninfected human as soon as possible after exposure HIV exposure, instead administer the combination of TDF and FTC to an uninfected human prior to exposure to HIV in order to prevent establishment of a new HIV infection.[27]

---

[27]    And as detailed above in Sections VI.c and VI.d., ordinary persons skilled in the art in fact recognized such teachings in the art in reaching the purported invention of the Asserted Claims of the Patents-in-Suit prior to the earliest priority date to which the Asserted Claims are entitled.  This further supports that the Asserted Claims would have been obvious in view of the teachings of the prior art and the knowledge of the skilled artisan.

Additionally, a skilled artisan would have been further motivated to administer a recommended oral post-exposure prophylaxis comprising the combination of TDF and FTC, as disclosed in Schwarzenegger, to a previously uninfected human prior to HIV exposure rather than after, based on interest in the art regarding the use of pre-exposure prophylaxis as a method to prevent new HIV infections and decrease HIV transmission rates, particularly in view of the clinical trials for HIV pre-exposure prophylaxis that were being undertaken, as disclosed in Szekeres, for example.

Szekeres discloses that "[p]re-exposure prophylaxis (PrEP) is a novel approach to HIV prevention that has recently generated considerable interest. PrEP involves the use of antiretroviral drugs (ARVs) by an individual prior to potential HIV exposure, in order to reduce the likelihood of HIV infection." Szekeres at 3. And "[i]t has been hypothesized that, in various international settings, PrEP could be a viable prevention strategy for certain people at high risk of HIV infection, such as commercial sex workers, those in serodiscordant relationships, and members of high-risk groups who choose not to use condoms or for whom consistent condom use has proved difficult." *Id.* Szekeres further discloses that "[a]s of September 2004, there were several major PrEP studies involving human subjects being planned or currently underway." *Id.* at 6. "These studies include investigations of the safety and/or efficacy of PrEP in high-risk women (Cameroon, Ghana, Nigeria), high-risk men (Malawi), female sex workers (Cambodia), sexually active young adults (Botswana), injection drug users (IDUs) (Thailand), and MSM (United States)." *Id.*; *see also id.* at 7 (providing a summary table of the then- "Major Planned PrEP Studies." Szekeres discloses that all of these studies intended to "use of tenofovir disoproxil fumarate (TDF) as the investigational PrEP agent." *Id.* at 8. Based on positive results in preventing SIV in macaques, citing Tsai 1995 and Van Rompay AIDS 1998, which

demonstrated "that tenofovir is effective at preventing infection with SIV when used either as pre- or postexposure prophylaxis," and that, correspondingly, "[a]s oral TDF is an available agent with relatively low toxicity that can be administered once daily, considerable interest arose in evaluating its safety and efficacy as PrEP for prevention of HIV infection."  Szekeres at 8.

Szekeres discloses that "Family Health International (FHI), with funding from the Bill and Melinda Gates Foundation, is conducting a Phase II study of PrEP in high-risk, HIV-negative adults in Cameroon, Ghana, Nigeria, and Malawi."  *Id.* at 9.  Szekeres discloses regarding the trial:

> The study is double-blinded, randomized, and placebo-controlled, and consists of a 6-month screening phase, a 6- month recruitment phase, and 12 months' use of study drug for each participant.  The endpoints of this study are the safety of using TDF for PrEP (determined by laboratory measures of kidney and liver function and reports of adverse events) and the efficacy of TDF for PrEP in this population (determined by HIV seroconversion).

*Id.* at 8.  The clinical study had already begun screening participants:

> The study began the screening phase in Ghana in June 2004, and in Cameroon and Nigeria in July of 2004; following screening, 1,200 women will be enrolled and randomized to receive either TDF or placebo.  Enrollment began in Ghana and Cameroon in July 2004, and in Nigeria in August 2004; as of September 2004, the sites had enrolled approximately one-third of their planned participants.  A site in Malawi, scheduled to start in spring 2005, will enroll 400 high-risk HIV-negative men.

*Id.*  The study was expected to conclude in "mid-2006, after which trial results will begin to become available."  *Id.*

Szekeres next discloses that the "National Institute of Allergy and Infectious Diseases (NIAID) is sponsoring a randomized, double- blinded, placebo controlled study of TDF for HIV PrEP among female commercial sex workers in Phnom Penh, Cambodia."  Szekeres at 8.  The study "study would seek to enroll 960 HIV-negative adult women who have received money or gifts in exchange for sex in the year preceding enrollment.  Participants would receive TDF or

placebo for 12 months." *Id.* While this "study was planned to begin in October or November of 2004," in "August 2004, however, the Cambodian Prime Minister ordered a stop to the planned trial. Publicly, concerns had been raised by sex worker advocacy groups regarding medical follow-up for trial participants. While the study investigators and sponsors remain committed to working with government and community groups to try to resolve issues of concern, at the time of writing, the status of the trial was unclear." *Id.*

Szekeres further discloses that the "the Centers for Disease Control and Prevention (CDC)" sponsored a "randomized, double-blinded, placebo-controlled Phase II/III study of TDF for PrEP [that] will seek to enroll 1,200 male and female participants, with 20% or participants in the 18-19 age group and 80% in the 20-25 age group" in Botswana. *Id.* at 9; *see id.* ("The prevalence of HIV infection in young adults in Botswana is extremely high—approximately 50% of women aged 25-29 are HIV infected, as are approximately 28% of men in the same age range."). In this Botswana clinical study, "[f]ollowing randomization, participants will be followed on study drug for 12-24 months, and then off drug for an additional 2 months." *Id.* Additionally, "[t]he study's Data and Safety Monitoring Board (DSMB) will assess the safety of the study after 100 person-years of follow up to determine whether to enroll additional participants and proceed to Phase III of the study. The trial may begin in fall 2004, and is scheduled to last 32 months. Efficacy data may be available late in 2006." Szekeres at 9.

Szekeres also discloses that there was also a CDC-sponsored study in Thailand— "This CDC-sponsored study is a randomized, double-blinded, placebo-controlled Phase II/III study of TDF for PrEP in 1,600 HIV-negative IDUs in Bangkok, Thailand. Participants will be eligible if they are healthy and report injection drug use in the last 6 months." *Id.* In terms of clinical study timeline, "[t]he study will include 12 months of enrollment, 12 months of follow up, and 6

months of off-drug evaluation.  If enrollment begins in fall 2004 as planned, study close-out

should occur in early 2007." *Id.*

Szekeres additionally discloses that the CDC also "has plans to begin a randomized,

double-blinded, placebo-controlled study of PrEP using TDF in high-risk, HIV-negative MSM in

two cities in the United States in the fall of 2004.  The study will seek to recruit a diverse sample

of 400 MSM (200 each in Atlanta and San Francisco) over a 9-month period, with 2 years of

follow up (men who seroconvert during the study will be followed for 12 months after

diagnosis)." *Id.*  "The study is expected to begin enrolling in fall 2004." *Id.*

Szekeres discloses that multiple organizations were planning and moving forward with at

least five separate clinical studies and investigations of the use of pre-exposure prophylaxis for

HIV, which had begun enrollment or planned to begin enrollment during or after fall 2004.  *See*

Szekeres at 6-9.  In total, the number of trial participants in these studies numbered in the several

thousands across the globe.  *See id.* at 7.  Though TDF was the active agent to be used in these

clinical trials, which Szekeres described as "the NRTI that is currently most suitable for use as

PrEP" because "TDF is potent, can be dosed once daily, and has a relatively favorable toxicity

profile," Szekeres also expressly recognized that TDF was available both as Viread® and as "a

once-daily, fixed-dose combination tablet of TDF and emtricitabine (Truvada™) [that] was

approved in August 2004 (both Gilead Sciences, Inc., Foster City, CA)." *Id.* at 11.

Szekeres teaches that the use of known antiretrovirals for pre-exposure prophylaxis was

being widely investigated and studied for implementation as a public health measure and as an

interventional to reduce HIV transmission rates and prevent new HIV infections.  *See, e.g.*

Szekeres at 6 ("As of September 2004, there were several major PrEP studies involving human

subjects being planned or currently underway.").  And while those trials were investigating the

use of TDF by itself for HIV pre-exposure prophylaxis, Szekeres also expressly recognizes that TDF was also available as a co-formulated combination tablet with emtricitabine. *Id.* at 11.

Schwarzenegger teaches the use of TDF and FTC in combination as a recommended and effective PEP regimen to prevent the establishment of HIV infection in an uninfected human recently exposed or potentially exposed to HIV, and teaches that the combination is available for once daily dosing in the form of Truvada. *See* Schwarzenegger at 15, 8. Schwarzenegger teaches that "[i]f a potentially infectious body fluid (e.g. blood or blood products, genital secretions, peritoneal, pleural or cerebrospinal fluids, but NOT saliva, tears, or sweat) was in contact with a mucous membrane (e.g., eye, oral, nasal, or genital mucosa) or non-intact skin (punctures, cut or substantially abraded), HIV infection is possible and consideration of PEP is warranted." Schwarzenegger at 11. More specifically, Schwarzenegger further teaches that its recommended PEP regimens may be used to prevent HIV infections for many types of HIV exposure, including: receptive anal intercourse, shared injection drug use equipment, insertive anal intercourse, insertive vaginal intercourse, other potentially infectious body fluid on a mucous membrane or non-intact skin, and receptive oral intercourse with ejaculation. *Id.* at 7, 11. Schwarzenegger thereby teaches that its recommended PEP regimens can be used to prevent HIV infection in a previously uninfected person across a wide range of exposure types. *See id.*

Based on Szekeres' disclosure of the investigation of PrEP as a large-scale biomedical intervention in humans to reduce HIV transmission rates and prevent new HIV infections; and based on Schwarzenegger's disclosure that TDF and FTC was an effective combination of antiretrovirals for use in post-exposure prophylaxis, a skilled artisan would have been motivated to use that same recommended post-exposure prophylactic combination of antiretrovirals instead as an HIV pre-exposure prophylactic, including because of its known and recommended efficacy

as a prophylaxis and treatment for HIV.  *See, e.g.*, Schwarzenegger 15, 8.  Use of Schwarzenegger's recommended combination of TDF and FTC as a pre-exposure prophylaxis rather than a post-exposure prophylaxis merely requires administering the combination to the patient prior to HIV exposure, rather than as soon as possible after said exposure to HIV.

Therefore, in summary, based on: (1) the wide-ranging investigation in the art of HIV pre-exposure prophylaxis with TDF, as summarized by Szekeres; and (2) Schwarzenegger's disclosure of recommended post-exposure prophylaxis antiretroviral combinations, including the combination of TDF and FTC, a skilled artisan would have further been motivated to administer the known, recommended, and efficacious post-exposure prophylactic combination of TDF and FTC, as taught by Schwarzenegger, and rather than administer the combination to an uninfected human as soon as possible after exposure HIV exposure, instead administer the combination of TDF and FTC to an uninfected human prior to exposure to HIV in order to prevent establishment of a new HIV infection.[28]

Additionally, a skilled artisan would have been motivated to administer a recommended oral post-exposure prophylaxis comprising the combination of TDF and FTC, as disclosed in Schwarzenegger to a previously uninfected human prior to HIV exposure, rather than after, based on a well-recognized need and interest in the art to decrease rates of HIV transmission and prevent the establishment of new HIV infections in the first instance; and a skilled artisan would have also been aware of the general medical principle of chemoprophylaxis and that compounds used for disease treatment in infected patients had been either been administered, or recognized

---

[28]     And as detailed above in Sections VI.c and VI.d., ordinary persons skilled in the art in fact recognized such teachings in the art in reaching the purported invention of the Asserted Claims of the Patents-in-Suit prior to the earliest priority date to which the Asserted Claims are entitled.  This further supports that the Asserted Claims would have been obvious in view of the teachings of the prior art and the knowledge of the skilled artisan.

as promising for administration, for preventative purposes across many infectious diseases.  *See,*

*e.g.*, Farer at 102.  Not only had the combination of TDF and FTC been approved by the FDA

and deemed safe and effective for the treatment of HIV in infected humans, but it was already

recommended by at least one governmental body, the California Task Force on Non-

Occupational PEP and the California Department of Health Services, Office of AIDS, for use as

HIV post-exposure prophylaxis.  *See* Schwarzenegger at 1.  It was recognized that there are

"many instances in medicine in which pharmaceutical or biological agents are used to prevent

disease," and were understood as providing a "[r]ationale" for pre-exposure prophylaxis in the

HIV context.  Szekeres at 4.  Therefore, a skilled artisan seeking to reduce rates of HIV infection

and transmission rates would have been motivated to combine the teachings of Schwarzenegger

with Dando, Szekeres, and Tsai and/or Van Rompay and administer the prophylactic

combination of TDF and FTC before HIV exposure to an uninfected person, rather than after.

As of the earliest priority date to which the Asserted Claims are entitled, there was an

express and well-recognized need to reduce HIV transmission rates and prevent the

establishment of new HIV infections in humans.  "HIV infects more than 40 million people

worldwide, and there are 14,000 new infections per day."  Grant 2005 at 2170 (citation omitted);

*see also* Szekeres at 3 ("Worldwide, approximately 60 million people have been infected with

HIV since the beginning of the pandemic, and over 20 million have died.  In 2003, there were an

estimated 38 million people living with HIV; in that same year, nearly 5 million people became

newly infected.").  And it was understood that "[a]cross most of the world, the HIV epidemic

remains unchecked."  Youle JIAPAC 2003 at 102 (citation omitted).  By November 2004, "HIV

infections in the United States are on the rise—an estimated 950,000 people were living with

HIV in 2003, up from 900,000 in 2001."  Szekeres at 3.  In California, for example, it was

"estimated that approximately 128,000 Californians are HIV infected (with or without an AIDS diagnosis.)  There have been over 136,000 cumulative AIDS cases reported in the State through July 2004, with over 80,000 deaths."  *Id.* (endnotes omitted).

"Although behavioral interventions (including abstinence, reducing number of sexual partners, partner selection, use of male and female condoms, and needle hygiene) have shown efficacy in preventing HIV infection in diverse populations and settings, they are not always consistently implemented by individuals, are not universally effective, and have not ultimately been able to contain the pandemic."  *Id.*; *see also* Grant 2005 at 2170 ("[E]ven as available and proven prevention interventions are used, the HIV pandemic will not be stopped solely by talking to those at risk." (citation omitted)).  It was similarly recognized in the art that based on available prevention techniques, "[t]here is little evidence that there has been a significant reduction in the global rate of infection over time.  HIV still spreads like wild-fire in susceptible communities, and is increasingly of multidrug-resistant strains."  Youle AIDS 2003 at 1 (citation omitted); *see also* Youle JIAPAC 2003 at 102 (same).

And though it was "widely believed that, in addition to effective behavioral interventions, biomedical approaches to HIV prevention will be required to adequately curb the spread of the virus," it was also recognized in the art that the "two most prominent technology-based HIV prevention strategies, however—HIV vaccines and vaginal and rectal microbicides—lack candidate agents that are likely to prove successful in the near- to midterm."  Szekeres at 3.  For example, it was recognized in the art that ongoing development of a vaccine to prevent HIV transmission and infection showed little promise in providing a solution.  "The quest for an effective preventative vaccine for the uninfected has been, to date, unfruitful."  Youle AIDS 2003 at 1 (citations omitted); *see also* Youle JIAPAC 2003 at 102 (same).  While a number of

"putative vaccines" were understood to be in development, their efficacy in preventing HIV

infection—"remain[s] unclear," and the overall "availability of new candidate vaccines is

limited." Youle JIAPAC 2003 at 102.  The first HIV vaccine to reach phase 3 studies "failed to

provide protection from infection and none of the remaining vaccine candidates currently in

clinical trials appear likely to induce potent protective immunity."  Smith 2004 at 1(endnotes

omitted).

　　　And though a couple of "novel approaches to establish a long-lasting broad immune

response against HIV" were being investigated, "concerns exist that the breadth and durability of

anti-HIV immune responses may be too narrow to elicit complete protection against the myriad

of HIV viral strains currently circulating in humans."  Youle JIAPAC 2003 at 102.  Overarching

issues limiting potential overall usefulness of an HIV vaccine were also acknowledged—for

example, "viral escape from cytotoxic T-lymphocyte recognition might be a limiting factor to

vaccine efficacy."  *Id.*  And "[g]iven HIV's propensity to escape cellular and humoral response,

there exists no clear approach or viral target for vaccine development."  Smith 2004 at 1.  To be

certain, it was recognized in the art that "[o]ther practical options are desperately needed in the

meantime."  Szekeres at 3.

　　　　It was further acknowledged that "[s]ignificant populations are at high risk of imminent

HIV infection, such as HIV-discordant sexual partners or those who chose not to use condoms.

For these individuals a current vaccine strategy may be too far in the future."  Youle AIDS 2003

at 1; Youle JIAPAC 2003 at 102-03; *see also* Smith 2004 at 1 (acknowledging efforts of the

World Health Organization to "treat those infected with HIV-1" but further acknowledging that

"it is not clear [that] they will have a broad impact on the HIV-1 epidemic in the immediate

future.").  Moreover, even for those individuals using condoms, "only a single failure may result

in an additional HIV-infected individual."  Youle JIAPAC 2003 at 103; *see also* Szekeres at 3 ("It is likely that successful HIV prevention efforts will rely on multiple techniques and strategies used in combination.  Just as the success of combination antiretroviral therapy relies on multiple drugs that may target more than one step in the viral life cycle, so too might prevention be enhanced by the synergistic use of social, behavioral, biomedical, and barrier methods."). Accordingly, a skilled artisan would have recognized the need for additional prophylactic methods and approaches to prevent the spread of HIV and the establishment of HIV infection in previously uninfected humans.

Consequently, it was recognized in the art that "[c]hemoprophylaxis with antiretroviral agents is a promising new approach" and that "[c]linical trials of daily oral antiretroviral dosing as preexposure prophylaxis (PrEP) have been initiated in Africa, Asia, and the United States and are planned in Latin America."  Grant 2005 at 2170.  "Pre-exposure prophylaxis (PrEP) is a novel approach to HIV prevention that has recently generated considerable interest. PrEP involves the use of antiretroviral drugs (ARVs) by an individual prior to potential HIV exposure, in order to reduce the likelihood of HIV infection."  Szekeres at 3.  The use of antiretroviral compounds, "that is the administration of chemoprophylaxis to uninfected individuals who live in areas with a high prevalence of HIV-1" was proposed as an approach with "immediate impact."  Smith 2004 at 1; *see also* Youle JIAPAC 2003 at 103; Youle AIDS 2003 at 1.  And it "has been hypothesized that, in various international settings, PrEP could be a viable prevention strategy for certain people at high risk of HIV infection, such as commercial sex workers, those in serodiscordant relationships, and members of high-risk groups who choose not to use condoms or for whom consistent condom use has proved difficult."  Szekeres at 3.

Chemoprophylaxis is a fundamental tenet of medical science that applies broadly to infectious disease.  Specifically, it was known in the art that, "*[a] drug that can be used to treat and cure a disease, if given at an earlier time in the development of the condition, should be able to prevent the disease.  The drug may be given before exposure*, concurrently with possible exposure, or even after exposure, but before the disease is manifest."  Farer at 102 (emphasis added).  "This concept, chemoprophylaxis, is really a form of treatment for an infection that has not yet occurred, is just beginning, or is in an asymptomatic, subclinical state."  *Id.; see also* Detels at 1567 ("Chemoprophylaxis is the prevention of infection or its progression to clinically manifest disease through the administration of chemical substances, including antibiotics.").  The usefulness of therapeutic agents for disease prevention and chemoprophylaxis was well-recognized:  "The effectiveness of the antimicrobial agents in eliminating certain organisms and in curing the diseases produced by them has led to their use for the prevention of specific infectious processes, or of infection in general."  Weinstein at 287.  Chemoprophylaxis had been implemented, even as early as 1955, in order "to protect healthy individuals, either singly or in groups against invasion by specific microorganisms."  *Id.*  "The degree of success has varied with the purpose for which prophylaxis has been applied; *it has been highest when the prevention of specific infections has been attempted,* and lowest when the prevention against infection in general has been its aim.  In many instances, prophylactic measures have been applied only to single individuals; in others they have been used for large groups."  *Id.* (emphasis added).

Accordingly, a skilled artisan would have been aware that the concept of chemoprophylaxis, using agents known to treat an infection to prevent establishment of that infection in healthy individuals had long been established in medical science.  For example, it

231

was recognized in the art that "[l]ong-term malaria chemoprophylaxis is generally believed to have been implemented for the first time in 1854, when Dr. William Balfour Baikie effectively put his staff on quinine while exploring the Niger River in West Africa." Knobloch at 375 (endnote omitted). Though earlier expeditions to the area had resulted in significant numbers of crewman deaths from "fever," on this "one as soon as the bar of the river was crossed each man took 6-8 grains of quinine daily." Findlay at 169. After four months on the river, all twelve men returned in good health, with the "exception of one of the second mates who had declined to take the drug." Findlay at 169. That crewman suffered "severe attacks of remitting fever accompanied by delirium, for which his head had to be shaved, while in addition to quinine, he had required sedatives and sudorifics." Findlay at 170. The results of that expedition ultimately lead to the implementation of an "official policy" whereby those individuals living in areas at risk of malaria in Africa "should take 5 grains of quinine daily." *Id.* Similar contemporaneous use took place in the United States, for "[r]eports of the US Sanitary Commission [ ] provide evidence that quinine was added as early as 1840 to the whiskey of the military post staff at Tampa Bay, Florida, successfully preventing 'miasmatic disease' or 'African fever.'" Knobloch at 375 (endnote omitted). A skilled artisan would have recognized that the use of quinine, a known therapeutic for malarial disease, had long been established as efficacious for preventing the disease in healthy and uninfected persons.

Similarly, chemoprophylaxis had recognized as applicable to prevent tuberculosis infection in healthy and uninfected humans and was another area in which it was recognized that therapeutic agents could be used for preventative purposes in healthy persons. *See, e.g.* Farer at 102-103. "Chemoprophylaxis for tuberculosis became a practical possibility only with the availability of a safe, inexpensive, oral drug that was bactericidal for tubercle bacilli." *Id.* That

drug, "[i]soniazid, which was introduced as an antituberculosis agent in 1952, possesses these characteristics. ***The demonstrated effectiveness of isoniazid in treatment led to the idea that the drug would also be effective as a prophylactic agent.***" *Id.* at 103 (emphasis added). Animal models and studies were informative in this context—"[i]soniazid can prevent death, disease and even the development of tuberculosis sensitivity in guinea pigs challenged with virulent tubercle bacilli." *Id.* (citations omitted). And "[a]lthough evidence in humans is less compelling, ***it can be inferred that isoniazid is capable of reducing the frequency of new tuberculosis infections***." *Id.* (emphasis added). Chemoprophylaxis with isoniazid to prevent new tuberculosis infections in uninfected individuals was deemed to "merit consideration" in "unusual circumstances" where "there is a high risk of infection for a relatively short time." *Id.* Accordingly, a skilled artisan would have been aware that the use of a therapeutically effective compound was acknowledged to have utility as a chemoprophylactic agent to protect healthy humans against new tuberculosis infections in some circumstances.

A skilled artisan would have also been aware that the concept of chemoprophylaxis had been implemented to prevent infection in healthy individuals by specific bacteria through the use of antibiotics:

> Chemoprophylaxis is most commonly employed in healthy individuals to prevent invasion by specific bacteria. It has been given either to single patients, to families, or to large groups of people, some of whom had not yet had contact with an organism and others of whom were already harboring it as asymptomatic carriers. This type of prophylaxis has, as a rule, been most successful in protecting against infection by four agents—the beta-hemolytic streptococcus, the gonococcus, the meningococcus and the dysentery bacilli.

Weinstein at 288. For example, the "administration of chemotherapeutic agents to individuals exposed to invasion by the beta-hemolytic streptococcus affords a predictable and high order of protection. . . . Although several antibiotics have been used for this purpose, penicillin appears

233

to be the drug of choice." *Id.* (citations omitted).  It was also recognized in this context that "[s]ince a larger quantity of antibiotic and a longer period of therapy are required for the elimination of bacteria than to prevent their initial implantation, the prophylaxis of the carrier state necessitates using the same dose of the drug and duration of treatment as in established streptococcosis." *Id.*  It was further recognized in the art that "[t]he availability of potent antimicrobial agents has made the prevention of all degrees of spread of meningococcal infection a relatively simple matter." *Id.* at 289.

Furthermore, a skilled artisan would have been aware that the concept of chemoprophylaxis had been applied to prevent viral infection in previously unexposed humans through the use of therapeutically effective antiviral agents.  "Interest in compounds for use in antiviral chemotherapy and chemoprophylaxis has markedly increased in recent years, and developments in the field have progressed to the point that antiviral compounds have now become objects of interest for practicing physicians as well as for laboratory and clinical investigators."  Dolin 1985 at 1296.  "Amantadine [1-adamantanamine hydrochloride] was approved in 1966 for chemoprophylaxis of influenza A (H2N2) infection and was later approved in 1976 for treatment and chemoprophylaxis of influenza type A virus infections among adults and children aged ≥1 year."  Harper at 22; *see also* Dolin 1985 at 1296.  A structurally-related compound, rimantadine, was known to exhibit similar properties, was used extensively in the Soviet Union in place of amantadine, *see* Dolin 1985 at 1296, and was "approved [in the United States] in 1993 for treatment and chemoprophylaxis of influenza A infection among adults and prophylaxis among children."  Harper at 22.  The "precise mechanism of action" for both compounds was not fully established as of 1985, but it was known that "they inhibit influenza A virus at an unspecified step in its replication, probably after [the virus] penetrates the cell

surface." Dolin 1985 at 1296. It was "suggested that these compounds interfere with either uncoating of the virus" or "with primary transcription of viral RNA." *Id.*

Studies of amantadine and rimantadine concluded that both compounds are "effective in prophylaxis and therapy" for influenza A. *Id.* One study administered both compounds separately against a placebo control in a randomized trial. *See id.* (citation omitted). "The trial was initiated when a threshold for influenza A activity in the community was exceeded," and "subjects took tablets of amantadine or rimantadine, at a dose of 200 mg/day, or placebo, for a 6-week-period." *Id.* at 1297. The study "was conducted in healthy young volunteers." Dolin 1982 at 583. "[I]nfluenza-like illness, as well as laboratory documented influenza, occurred significantly less frequently in amantadine or rimantadine recipients than in placebo recipients." *Id.*; *see also* Dolin 1982 at 582 (documenting statistical proof of chemoprophylactic efficacy in said trial). And as of 1985, other studies evaluating the efficacy of amantadine and rimantadine for treatment of influenza A determined that both compounds demonstrated some efficacy compared against placebo. *See* Dolin 1985 at 1296-1297; *see id.* Fig. 2.

At least by 1994, the CDC published "recommendations for the use of amantadine and rimantadine" for chemoprophylaxis of influenza A. Arden at 1-2. It was recognized that amantadine and rimantadine "interfere with the replication cycle of type A (but not type B) influenza viruses" and "[w]hen administered prophylactically to healthy adults or children before and throughout the epidemic period, both drugs are approximately 70-90% effective in preventing illness caused by naturally occurring strains of type A influenza viruses." *Id.* at 1; *see id.* (acknowledging that in some instances "antiviral agents taken prophylactically may prevent illness but not subclinical infection"). Chemoprophylaxis with amantadine or rimantadine was recommended for use with "***persons who are at greatest risk of severe illness and complications***

235

*if infected with influenza A virus*," including: (1) those over sixty-five years of age; (2) nursing home residents; (3) adults and children with chronic pulmonary or cardiovascular systems, including children with asthma; (4) adults and children requiring ongoing care for chronic metabolic diseases and others; and (5) children and teenagers receiving long-term aspiring therapy and therefore at risk of developing Reye syndrome after influenza. *Id.* at 2 (emphasis added). The CDC further recognized that "amantadine and rimantadine can reduce the severity and shorten the duration of influenza A illness among healthy adults when administered within 48 hours of illness onset." *Id.* at 3. Furthermore, it was recommended that "[w]hen confirmed or suspected outbreaks of influenza A occur in institutions that house persons at high risk, chemoprophylaxis should be started as early as possible to reduce the spread of the virus." *Id.* at 4. Specifically, "when amantadine or rimantadine is used for outbreak control, the drug should be administered to *all residents of the institution*—regardless of whether they received influenza vaccine the previous fall." *Id.* (emphasis added); *see id.* (recommending further administration to institution staff and "considered for all employees"). These recommendations would include administration of amantadine and rimantadine to individuals not yet infected with influenza A. The CDC recommended giving the same daily dose of amantadine and rimantadine for purposes of treatment and chemoprophylaxis of influenza A. *See* Arden at 6 (*e.g.*, recommending 100 mg of amantadine twice daily for purposes of treatment and prophylaxis to an individual of fourteen to sixty-four years of age).

The CDC continued to recommend the use of amantadine and rimantadine for chemoprophylaxis of influenza A, such as for those at high risk of influenza complications and those in frequent contact with persons at high risk, through to 2005. Harper at 22-31. Accordingly, a skilled artisan would have understood that chemoprophylaxis to prevent viral

infection in previously unexposed humans using antiviral compounds with therapeutic efficacy had previously been implemented and had been long-recommended pursuant to CDC guidelines as of the earliest priority date to which the Asserted Claims are entitled.

To be sure, the art expressly recognized the broad applicability and relevance of the chemoprophylaxis across many infectious diseases and medical contexts, including within the context of care management for HIV patients, and understood the broader concept to provide both a guide and model for pre-exposure prophylaxis for HIV:

> It is worth recalling that chemoprophylaxis is currently used to protect individuals and groups in many settings. Anti-influenza agents are often used to stop flu out-breaks in nursing homes. Travelers to areas with endemic malaria are given mefloquine to prevent infection with *Plasmodium* spp. Individuals with a history of rheumatic fever are maintained on penicillin for many years to prevent re-infection with Group A streptococcus. Routine practice already dictates that HIV-infected patients with acquired immunodeficiency syndrome (AIDS) be given antibiotics to prevent *Pneumocystis jiroveci* pneumonia, toxoplasmic encephalitis, and *Mycobacterium avium* complex infections.

Smith 2004 at 4 (citation omitted); *see id.* ("With respect to all infectious diseases the proverb 'a ounce of prevention is worth a pound of cure' certainly holds true. In the case of HIV infection, the stakes are much higher."). There was an express recognition in the art that chemoprophylaxis had been proven as an effective measure to reduce disease transmission rates and prevent new infections in healthy individuals, and these showings of efficacy across other disease states created a motivation to implement chemoprophylaxis, including pre-exposure prophylaxis, in humans to prevent new HIV infections.

To be certain, an extended and direct analogy had been drawn in the art to the successful use of chemoprophylaxis to prevent new infections and disease transmission in other contexts in support of its use as a model for pre-exposure prophylaxis for HIV:

> One response to other infectious agents in the absence of an effective preventative vaccine combines behaviour for avoidance of the pathogen, with or without

> chemoprophylaxis. . . .   The discovery of quinine was the first of a cascade of therapeutic and prophylactic agents that allowed non-immune individuals to visit or live in endemic areas with greater safety. . . .   In the same way as infection with malaria is usually infrequent, one could argue that the percentage of time that an individual is at risk of HIV infection is relatively low, since it represents an intermittent rather than a continuous exposure to the pathogen.

Youle JIAPAC 2003 at 103; *see also id.* at 104 ("[M]alarial prophylaxis may be a good model for pre-exposure prophylaxis against HIV."); *see also* Youle AIDS 2003 at 1-2 (also drawing an analogy to malarial chemoprophylaxis to support implementation of pre-exposure prophylaxis for HIV); Coates at A19 ("[T]his is the strategy we use with malaria and other diseases—we take preventative medications before we encounter pathogens, so our body can repel infection.").

Additionally, a skilled artisan would have also been aware that administering antiretrovirals prior to retroviral exposure means, at a microbiological level, that the antiretroviral compound will be present before retroviral replication can begin in an exposed host and prevent the establishment of the retroviral infection.  *See, e.g.*, Szekeres at 10-11 ("[D]rugs whose mechanisms of action focus on pre-integration phases of viral life cycle (prior to completion of effective viral integration into host cell DNA) are, at least in theory, likely to be more effective than those that focus on post-integration."); Youle JIAPAC 2003 at 103 ("The agent should prevent infection of cells, or at least nuclear integration, when exposed to HIV."); Youle AIDS 2003 at 1 ("The ideal agent should prevent the infection of cells, or at least nuclear integration when exposed to HIV.").

Szekeres, for example, also similarly recognized that there are "many instances in medicine in which pharmaceutical or biological agents are used to prevent disease," and which provided a "rationale" for HIV pre-exposure prophylaxis.  Szekeres at 4.  "Examples include vaccinations to prevent a host of infectious diseases; prophylactic use of antibiotics, antifungals, and antivirals in people with HIV at risk for opportunistic infections; and the use of cholesterol-

lowering drugs to reduce the risk of coronary heart disease." *Id.*  Moreover, "[a] few examples, because they involve behavior and/or use ARVs, may be particularly illustrative with regard to PrEP. The use of ARVs for postexposure prophylaxis, mentioned earlier, and for prevention of mother-to-child transmission are two key examples from the HIV milieu." *Id.*  And, "[o]ther illustrative examples of the use of pharmaceutical agents in a pre-exposure context are epidemiologic treatment of sexually transmitted diseases (STDs), hormonal contraception, and chemoprevention of malaria." *Id.*

Szekeres discloses that "[p]ostexposure prophylaxis (PEP) emerged as an accepted HIV prevention strategy in a select group of individuals—those with occupational exposures— following the report in 1995 of a nonrandomized, retrospective, case-control study of health care workers having occupational, percutaneous exposure to HIV- infected blood." *Id.*  That study demonstrated that "postexposure use of zidovudine (ZDV or 'AZT') was associated with an approximate 81% reduction in the odds of acquiring HIV." *Id.*  And, subsequently:

> Two studies have shown that it is feasible and cost-effective to deliver PEP to individuals with nonoccupational HIV exposures, predominantly men who have sex with men (MSM).  One of the studies has shown that PEP attracts individuals who mostly engage in safe sexual or injection practices, experience a lapse, and seek PEP as a result. Moreover, this study showed that it is difficult to deliver PEP in a timely manner following exposure to HIV, perhaps diluting its efficacy.

*Id.* at 4 (endnotes omitted).

Szekeres further discloses that sets of PEP guidelines have been issued by various foreign nations and U.S. states, including California, in which "recent legislation has established the structure for preparing and promulgating guidelines for nonoccupational PEP." *Id.* (citing California Health and Safety Code: Division 105, Part 4, Chapter 17, Section 121348-121348.2).  This was the legislation behind the eventual promulgation of the Schwarzenegger reference. *See* Schwarzenegger at 1 ("Health and Safety Code Section 121348, et seq. (Chapter 746, Koretz, Statutes

of 2003), instructs the California Department of Health Services, Office of AIDS (DHS/OA) to

appoint and convene a task force to develop recommendations for the use of post-exposure

prophylaxis (PEP) for the prevention of HIV infection in the general population.  The task force was

appointed and convened in November 2003 to develop the recommendations contained in this

document.").

Szekeres additionally discloses that the "prevention of mother-to-child HIV transmission

(PMTCT)" was another parallel for HIV pre-exposure prophylaxis.  *See* Szekeres at 5.  "The use of

ARVs for PMTCT has perhaps been the most successful HIV prevention strategy to date.

Administration of ARVs to an HIV-infected mother during labor (and sometimes earlier in pregnancy

as well) and to the infant postpartum has been shown to dramatically reduce the odds for perinatal

HIV transmission." *Id.*  In a "landmark 1994 study of zidovudine (AZT) prophylaxis before, during,

and after delivery resulted in vertical transmission rates declining from 25.5% to 8.3%" and since

then, "similar approaches using nevirapine and combinations of agents in both research and

clinical practice have driven vertical transmission rates even lower." *Id.*  Szekeres even

disclosed that prevention of mother-to-child transmission involves some HIV pre-exposure

prophylaxis:

> The mechanism for this effect likely includes both pre- and postexposure
> prophylactic components.  ***Pre-exposure prophylactic components include the
> prevention of cross-placental and intrapartum HIV transmission by lowering the
> viral load of the mother and, for drugs that cross the placental barrier, by
> providing drug exposure to the fetus.***  Administering drug to the infant postpartum
> comprises the postexposure prophylactic component.  The use of antiretrovirals for
> PMTCT has greatly reduced the number of HIV- positive children born to infected
> mothers in the settings in which such treatment is available.

*Id.* (emphasis added).

Szekeres also recognizes that the "epidemiological treatment for sexually transmitted

diseases (STDs)," was an additional rationale/parallel for HIV pre-exposure prophylaxis.  *See id.*

Szekeres discloses that "[e]pidemiologic mass treatment is an approach to STD control in which antibiotics are administered to a population based on increased risk of exposure rather than STD symptoms or test results." *Id.* And because "rates of exposure to STDs are typically high in high-prevalence populations, epidemiologic treatment likely works both by preventing and treating infections." *Id.* And though "epidemiologic mass treatment is not currently standard practice in the United State[s], the approach has been studied in diverse international settings for prevention and control of a variety of STDs, including syphilis, gonorrhea, chancroid, and chlamydia." *Id.*

Szekeres also discloses that "[a] widely accepted model of pre-exposure chemoprophylaxis in the field of sexual and reproductive health can be found in hormonal contraception." *Id.* For, "[s]exually active women of childbearing potential have the option of taking prescription hormonal therapy (synthetic progestin with or without estrogen) as a means of birth control to prevent unplanned pregnancy," and there a number of available methods to deliver the active pharmaceutical agent, including "oral contraceptive ('the pill')." *Id.* Furthermore, "[h]ormonal therapy may also be used as postexposure prophylaxis—referred to as emergency contraception—to prevent fertilization or implantation after unprotected vaginal intercourse." *Id.*

Szekeres further discloses that "[a]nother parallel to HIV PrEP is the case of malaria, an infectious agent for which chemoprophylaxis is a standard preventive measure." *Id.* "Malaria prevention for travelers to endemic areas combines behavior modification (avoidance of mosquitoes, protective clothing and nets, application of DEET-containing repellants) with prophylactic drugs (examples include chloroquine, mefloquine, doxycycline, and atovaquone/proguanil)." *Id.* at 5-6. Though "the drugs do not prevent infection with the malaria parasite,

they can help to prevent clinical illness by killing malaria parasites as they exit the liver and enter the bloodstream." *Id.* at 6. And because this "event can happen several weeks after infection, malaria chemoprophylaxis is generally continued for a period of time after leaving an endemic area." *Id.* Despite some "shortcomings" of malaria chemoprophylaxis drugs, such as it failing to "guarantee against malarial illness" and "significant toxicities in certain individuals," Szekeres discloses that "chemoprophylaxis combined with mosquito-avoidant behavior modification is considered the standard of care for people traveling to malaria-endemic areas, and has allowed them to visit and live in these areas more safely." *Id.*

Szekeres further discloses that although "not a perfect model, Malaria chemoprophylaxis may be able to provide a framework for thinking about HIV PrEP." *Id.* For:

> As with HIV, malaria is a serious, potentially fatal illness for which no effective vaccine currently exists. Both diseases share the characteristic of risk exposure being generally episodic rather than continuous. Malaria chemoprophylaxis is typically used when an individual enters an endemic area; similarly, a chemoprophylactic strategy for HIV may largely be needed when an individual enters a period of high risk ([i.e.,] while engaging in commercial sex work or beginning a serodiscordant relationship).

*Id.*; *see id.* (noting the "parallels are not perfect").

In a manner similar to the examples of the use of chemoprophylaxis to prevent new infections and disease transmission in other infectious disease contexts as outlined above, Szekeres expressly recognizes that parallels in the administration of pharmaceutical and other agents as preventative measure in other medical contexts, such as malaria chemoprophylaxis, provided a motivation to, ***at minimum***, consider administration of antiretroviral compounds to uninfected humans prior to exposure to HIV. *See* Szekeres at 4-6.

Accordingly, a skilled artisan would have been aware that implementation of chemoprophylaxis via administration of therapeutically effective drug compounds prior to

exposure to an infectious pathogen had been proven widely across infectious diseases and medical contexts as an effective methodology to reduce disease transmission rates and prevent establishment of new infections in previously uninfected humans, and would have understood the parallels expressly recognized in the art between HIV and other infectious diseases, wherein chemoprophylaxis had been successfully implemented, to motivate the implementation of pre-exposure prophylaxis for HIV. A skilled artisan would have also been aware of additional examples of chemoprophylaxis, as disclosed by Szekeres, providing even further motivation.

And again, not only had the combination of TDF and FTC been approved by the FDA for purposes of treating established HIV infection, *see, e.g.*, Truvada® Insert at 11, but it was already recommended to be used to prevent the establishment of new HIV infections in previously uninfected humans by at least one government body. Schwarzenegger at 1, 8, 15. The Schwarzenegger reference was prepared as a result of the California Department of Health Services, Office of AIDS appointing and convening a task force to develop recommendations for the use of PEP for the prevention of HIV infection in the general population. Schwarzenegger at 1. As Schwarzenegger recites, PEP is a "program meant to help people who may have been exposed to HIV through sex or injection drug use in the past 72 hours to try to prevent HIV infection." Schwarzenegger at 25. A skilled artisan would have understood the recommended combination of TDF and FTC, as disclosed in Schwarzenegger, to be effective preventing establishment of HIV infection in an uninfected human when administered following an HIV exposure, a skilled artisan would therefore have understood the recommended HIV PEP regimen to also be promising for administration ***prior*** to an exposure to HIV for an identical purpose.

And, as noted, Szekeres recognized that the use of antiretrovirals for HIV post-exposure prophylaxis provided an example for their prophylactic use as HIV pre-exposure prophylaxis.

*See* Szekeres at 5.  Not only did Szekeres recognize that TDF was available for administration as

"a once-daily, fixed-dose combination tablet of TDF and emtricitabine (Truvada™) [that] was

approved in August 2004 (both Gilead Sciences, Inc., Foster City, CA)," *id.* at 11, but Szekeres

also expressly discussed and cited the California "legislation [that] has established the structure

for preparing and promulgating guidelines for nonoccupational PEP," which were eventually

issued as the Schwarzenegger reference in its discussion of HIV post-exposure prophylaxis, *id.* at 4;

*compare* Szekeres at 4 *with* Schwarzenegger at 1 (citing the identical section of California legislation).

A skilled artisan would therefore have been aware of recommended post-exposure prophylaxis

regimens as disclosed by Schwarzenegger in relation to Szekeres' disclosure regarding HIV pre-

exposure prophylaxis—including the recommended post-exposure prophylaxis comprising the

combination of TDF and FTC— and therefore would have been motivated to administer said

recommended prophylactic regimens to a previously uninfected human before exposure to HIV to

prevent infection, rather than after.

In summary, a skilled artisan also, at least: (1) would have been aware of the need to

decrease rates of HIV transmission and prevent the establishment of new HIV infections; (2)

would have been aware of the general medical principle of chemoprophylaxis—long-proven as

an effective means to prevent disease transmission and establishment of new infections in

previously uninfected humans, as discussed further, for example, in Szekeres; and (3) would

have been aware of guidelines and recommendations counseling the administration of

antiretrovirals for purposes of HIV post-exposure prophylaxis.  A skilled artisan would have

accordingly been further motivated to administer those same HIV post-exposure prophylaxes,

including the known safe and effective combination of TDF and FTC, for purposes of HIV PrEP, that is, to a human previously uninfected with HIV and prior to an exposure to HIV.[29]

  **B.** **Reasonable Expectation of Success Administering TDF and FTC Prior to HIV Exposure**

  A skilled artisan would have reasonably expected success in preventing HIV infection by administering the recommended oral post-exposure prophylaxis of the combination of TDF and FTC, as disclosed in Schwarzenegger, as pre-exposure prophylaxis based on the known efficacy of the antiretroviral combination to both prevent establishment of HIV infection when administered shortly after exposure, as well as the efficacy of the same combination to treat and suppress established HIV infections, as disclosed in Dando.

  As expressly disclosed in Schwarzenegger, it was known in the art that use of the combination of TDF and FTC was an effective antiretroviral combination to prevent the establishment of HIV infection when administered following an exposure to HIV, and was recommended to be used for that purpose. Prepared by the California Task Force on Non-Occupational PEP and the California Department of Health Services, Office of AIDS, Schwarzenegger consists of guidelines and recommendations "for the use of post-exposure prophylaxis (PEP) for the prevention of HIV infection in the general population." Schwarzenegger at 1.

  Schwarzenegger provides specific guidelines and recommendations for PEP use in "individuals who have had a potential exposure to HIV through consensual sexual activity and

---

[29] And as detailed above in Sections VI.c and VI.d., ordinary persons skilled in the art in fact recognized such teachings in the art in reaching the purported invention of the Asserted Claims of the Patents-in-Suit prior to the earliest priority date to which the Asserted Claims are entitled. This further supports that the Asserted Claims would have been obvious in view of the teachings of the prior art and the knowledge of the skilled artisan.

secondarily to individuals who may have had an exposure to HIV through sharing of injection drug use equipment." *Id.* However, "the same general principles outlined in this document can reasonably be applied to assess the likelihood of acquiring HIV from [other] exposures, and thus the potential utility of PEP." *Id.*

Schwarzenegger teaches that "PEP is intended for individuals of negative or unknown HIV infection status following potential exposure to HIV," *id.* at 3, and that "PEP should be offered to HIV uninfected or unknown status individuals presenting within 72 hours of a potential exposure to HIV." *Id.* at 11. Moreover, "[i]ndividuals at highest risk of acquiring HIV infection from their specific exposure are expected to benefit most from PEP." *Id.* Regarding the details of the post-exposure prophylaxes recommended to be used for the prevention of HIV, Schwarzenegger teaches that PEP should be offered "[a]s soon as possible, and no later than 72 hours following exposure." *Id.* at 7. Schwarzenegger teaches that "[i]f a potentially infectious body fluid (e.g. blood or blood products, genital secretions, peritoneal, pleural or cerebrospinal fluids, but NOT saliva, tears, or sweat) was in contact with a mucous membrane (e.g., eye, oral, nasal, or genital mucosa) or non-intact skin (punctures, cut or substantially abraded), HIV infection is possible and consideration of PEP is warranted." Schwarzenegger at 11. More specifically, Schwarzenegger further teaches that its recommended PEP regimens may be used to prevent HIV infections for many types of HIV exposure, including: receptive anal intercourse, shared injection drug use equipment, insertive anal intercourse, insertive vaginal intercourse, other potentially infectious body fluid on a mucous membrane or non-intact skin, and receptive oral intercourse with ejaculation. *Id.* at 7, 11. Schwarzenegger also discloses data and information from published literature and PEP studies to further undergird and supports its PEP regimen recommendations. *Id.* at 9-11. Schwarzenegger thereby teaches that its recommended

PEP regimens are useful to prevent HIV infection in a previously uninfected person across a wide range of types of exposure.

Schwarzenegger discloses that there was "no consensus among experts about whether two or three antiretroviral drugs should be used for PEP." *Id.* at 15. Arguments in support of using two drug combinations for PEP include: (1) "the inoculum of virus is small following non-occupational exposure compared with the amount of virus requiring potent antiretroviral therapy for full suppression in an HIV-infected individual"; (2) "single agent PEP resulted in an 81 percent reduction in the risk of HIV infection in a study of occupational exposures"; (3) "increased side effects and/or more difficult dosing schedules may result in decreased adherence"; and (4) "there is a significant cost differential when a third drug is added." *Id.* Schwarzenegger also discloses that drug resistance considerations may in some instances "make it difficult to construct a potent two-nucleoside regimen," and in those instances "a protease inhibitor or Efavirenz 600 mg at bedtime (qHS) can be added." *Id.* at 16. Though "[s]ome healthcare providers will elect to use a third drug even when drug resistance is not suspected," in those circumstances, "a three-drug regimen should only be considered following a very high-risk exposure with a known HIV-infected exposure source." *Id.* Therefore, based on the express teachings of Schwarzenegger, a skilled artisan would know that in many instances of HIV exposure, a two-drug antiretroviral post-exposure prophylaxis would succeed in preventing establishment of HIV infection in a previously uninfected human.

Schwarzenegger further discloses that "[i]n the absence of information about the exposure source's antiretroviral history, or if the exposure source is naïve to antiretroviral medication, the preferred double nucleoside analogue combination regimen is Combivir

([zidovudine] + lamivudine), one pill twice a day." *Id.* at 15; *see also id.* at 8.  However,

recommended "alternative nucleoside analogue combinations include:

> [S]tavudine (40 mg for patients weighing greater than 60 kg and 20 mg for those weighing less than 60 kg, one pill twice a day) or ***tenofovir, 300 mg once a day***, ***in combination*** with lamivudine 150 mg twice a day or 300 mg once a day ***or emtricitabine 300 mg a day***.  ***A fixed dose combination pill combining tenofovir and emtricitabine, called Truvada, is available for once daily dosing.***  Abacavir and didanosine should be avoided unless resistance considerations outweigh potential toxicity.

*Id.*  at 15; *see also id.* at 8 (emphasis added).  Schwarzenegger thereby recommends the use of

TDF and FTC in combination as an effective post-exposure prophylaxis to prevent the

establishment of HIV infection in an uninfected human recently exposed to HIV.  *Id.*  A skilled

artisan would therefore know that one can prevent the establishment of HIV infection in a

previously uninfected human by administering the combination of TDF and FTC following an

exposure to a source of HIV.

Additionally, as of the earliest priority date to which the Asserted Claims are entitled, a

skilled artisan would have also known that the combination of TDF and FTC can be used to

effectively treat HIV infection.  Truvada® is a "fixed dose combination tablet containing the two

NRTIs emtricitabine and tenofovir DF."  Dando at 2076; *see also* Truvada® Insert at 1 (Truvada

is a "fixed dose combination tablets containing emtricitabine and tenofovir disoproxil

fumarate.").  As of 2004, Truvada  had "been approved in the US for once-daily treatment of

patients with HIV infection, in conjunction with other antiretrovirals agents."  Dando at 2076;

*see also* Truvada® Insert at 11 (Truvada had received approval by the FDA and was "indicated in

combination with other antiretrovirals agents (such as non-nucleoside reverse transcriptase

inhibitors or protease inhibitors) for the treatment of HIV-1 infection in adults.").  Accordingly,

based on an indication approved by the FDA for treatment of HIV, a skilled artisan would understand the combination of TDF and FTC to effectively treat established HIV infection.

Because a skilled artisan would have known to use the combination of TDF and FTC to prevent HIV infection in an uninfected human when administered following an exposure to HIV, and would have known to use the combination of TDF and FTC to treat an established HIV infection in a human, a skilled artisan would also reasonably expect success in using the combination of TDF and FTC to prevent HIV infection in an uninfected human when administered prior to an exposure to HIV.

A skilled artisan would have reasonably expected such success because, for example, a skilled artisan would have been aware that TDF and FTC operate in the same manner to inhibit the replication of HIV regardless of whether each compound is administered for HIV prophylaxis or treatment, and regardless of whether the antiretroviral is administered before or after exposure to HIV—the mechanism of action by which the antiretroviral compound operates to interfere with the viral replication cycle is identical.  *See, e.g.*, Szekeres at 10-11 (evaluating the utility of antiretroviral agents for purposes of PrEP based on their mechanism of action for purposes of HIV treatment); *see also* Youle JIAPAC 2003 at 103 (same); Youle AIDS 2003 at 2 (same); Smith 2004 at 2 (same); Dando at 2076; Truvada® Insert at 2-3.  It was known in the art that, "*[a] drug that can be used to treat and cure a disease, if given at an earlier time in the development of the condition, should be able to prevent the disease.  The drug may be given before exposure*, concurrently with possible exposure, or even after exposure, but before the disease is manifest."  Farer at 102 (emphasis added).  "This concept, chemoprophylaxis, is really a form of treatment for an infection that has not yet occurred, is just beginning, or is in an asymptomatic, subclinical state."  *Id.*

TDF and FTC each work as reverse transcriptase inhibitors, which means that each compound interferes with the reverse transcription of viral RNA to cDNA.  Goldsby at 452-53; Dando at 2076; Truvada® Insert at 2-3; Viread® Insert at 2; Emtriva® Insert at 1-2.  Retroviruses, including HIV, carry their genetic information in the form of RNA, and when the virus is absorbed and enters a cell, the RNA of the virus is subsequently reverse transcribed to DNA by a virally encoded enzyme, reverse transcriptase.  Goldsby at 442-43; De Clercq EOED at 250-51.  Reverse transcriptase reverses the normal transcription process and makes a DNA copy of the viral RNA genome.  Goldsby at 442; De Clercq EOED at 251.  This DNA copy, which is called a provirus, is integrated into the cell genome and is translated along with the cell DNA. Goldsby at 442-43.  When the provirus is expressed to form new virions, or new copies of the virus, the cell lyses (ruptures) and releases the new virions into the host.  *Id.*

TDF, after initial diester hydrolysis for conversion to tenofovir and subsequent phosphorylation by cellular enzymes to form tenofovir diphosphate, interrupts this replication cycle by inhibiting the activity of HIV-1 reverse transcriptase by competing with the natural substrate deoxyadenosine 5'-triphosphate and, after incorporation into DNA, causing DNA chain termination.  Dando at 2076; Truvada® Insert at 2-3; Viread® Insert at 2.  Similarly, FTC, a synthetic analog of cytidine, is first phosphorylated by cellular enzymes to form emtricitabine 5'-triphopsate, which inhibits the activity of HIV-1 reverse transcriptase by competing with the natural substrate deoxycytidine 5'-triphosphate, and then being incorporated into nascent viral DNA, similarly resulting in chain termination.  Truvada® Insert at 2; Emtriva® Insert at 1.  Because a skilled artisan would have known that the mechanism of action to interrupt the reverse transcriptase step of viral reproduction by TDF and FTC and thereby inhibit overall retroviral replication is identical regardless of the temporal relationship between HIV exposure and

antiretroviral administration, or regardless of whether a patient has a previously established HIV infection, *see, e.g.*, Schwarzenegger at 15-16, Szekeres 2004 at 10-11, a skilled artisan would have also reasonably expected that the efficacy demonstrated by the antiretroviral combination to inhibit viral replication for HIV post-exposure prophylaxis or HIV treatment would translate successfully to efficacy in the context of HIV pre-exposure prophylaxis.

Schwarzenegger's teachings and knowledge in the art emphasizing the importance of very early administration of post-exposure prophylaxis for HIV would reinforce a skilled artisan's reasonable expectation of success in using a combination of TDF and FTC for pre-exposure prophylaxis. First, Schwarzenegger recommends that "PEP should be initiated as soon as possible following the exposure." Schwarzenegger at 3; *see also id.* at 7. Moreover, "[a]nimal models of the natural history of HIV acquisition following exposure and of PEP interventions suggest that PEP ***will be more effective the sooner it is started***." *Id.* (citations omitted) (emphasis added). "***Clients and health care providers should strive to initiate PEP as early as possible after the exposure***." *Id.* (emphasis added). Timing of initiation for HIV PEP was understood to be so important for PEP regimens, including the combination of TDF and FTC for PEP, that it was disclosed in Schwarzenegger that the initial assessment of HIV risk could be done telephonically and the patient only later examined in person. *Id.* ("After initial telephone assessment of HIV risk, and explanation of the risks and benefits of PEP, an initial prescription can be called in to a local pharmacy to last until the client can be seen and evaluated in person, preferably within three days."). In fact, in terms of information to be provided to PEP patients, Schwarzenegger summarizes that for PEP, "***[i]t looks like the best effect occurs when the medicines are started as soon as possible***." *Id.* at 25. Accordingly, there was an express teaching in Schwarzenegger that post-exposure prophylaxis, including the combination of TDF

and FTC, should be administered as soon as possible after HIV exposure and was more effective the closer in time that the administration of antiretrovirals occurred in relation to the HIV exposure. *See, e.g.*, Schwarzenegger at 3, 7. In view of this express teaching, reinforced by general understanding of chemoprophylaxis principles, one skilled in the art would have had a reasonable expectation of success in administering an antiretroviral even earlier than as soon as possible following HIV exposure—*i.e.*, ***prior to*** said HIV exposure.

Furthermore, a skilled artisan would have reasonably expected success in administering a combination of FTC and TDF before exposure to HIV to prevent infection, rather than after, based on the quick uptake when coupled with long plasma and intracellular half-lives of the two compounds. "After oral administration, emtricitabine is rapidly and extensively absorbed." Dando at 2077. "Following oral administration of EMTRIVA, emtricitabine is rapidly absorbed with peak plasma concentrations occurring at 1-2 hours post-dose." Truvada® Insert at 5. Similarly, "[f]ollowing oral administration of VIREAD, maximum tenofovir serum concentrations are achieved in $1.0 \pm 0.4$ hour." *Id.* "For both emtricitabine and tenofovir, $C_{max}$ is reached within 1-3 hours after administration to fed or fasting patients or volunteers." Dando at 2078. "At $C_{max}$, the drug partitions approximately equally into the plasma and blood cells and the mean concentration in the semen is approximately four times that in the plasma." *Id.*

Both TDF and FTC also have long plasma elimination half-lives, approximately seventeen and ten hours respectively, Truvada® Insert at 5; *see also* Dando at 2078 ("The median terminal elimination half-lives of emtricitabine and tenofovir were 15.5 and 17.6 hours when healthy volunteers received a single dose of co-formulated emtricitabine/tenofovir DF 200mg/300 mg on two separate occasions."). Because of those long half-lives, both TDF and FTC can be dosed infrequently, once daily for example. Truvada® Insert at 5, 20. Moreover,

"the active metabolites of both drugs have long intracellular half-lives in peripheral blood mononuclear cells (39 hours for emtricitabine 5'-triphosphate and $\geq 60$ hours for tenofovir diphosphate, " Dando at 2078, and intracellular concentrations may remain present even during periods of incomplete adherence.  Youle JIAPAC 2003 at 103 (stating that an "ideal agent" for pre-exposure prophylaxis "should be a once-daily or less frequently taken agent that is non-toxic, well tolerated, and easily administered").  A skilled artisan would have recognized that these pharmacokinetic properties indicate that both TDF and FTC can be given at a low dose frequency, once daily for example, and continue to maintain active intracellular concentrations long after the time of dosing.  Therefore, a skilled artisan would have reasonably expected success in preventing HIV infection in an uninfected human when the combination of TDF and FTC is administered prior to HIV exposure, rather than as soon as possible post-exposure.

Moreover, a skilled artisan would have been aware that the administration of tenofovir and TDF in macaques demonstrated efficacy as a pre-exposure prophylaxis to prevent establishment of infection by immunodeficiency retrovirus in macaques.  *See, e.g.*, Tsai 1995 at 1198-1199; Van Rompay 2004 at 1; *see also* Tsai 1995 at 1199; Van Rompay AIDS 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-1773; Van Rompay 2001 at 429, 436.  To be certain, Schwarzenegger expressly cites Tsai 1995, among other references, in support of the efficacy of post-exposure prophylaxis.  Schwarzenegger at 9-11.  Schwarzenegger cites Tsai 1995 in support of the statement that that "[i]n SIV models, nucleotide and nucleoside analogues have been protective in preventing infection in a majority of intravenously inoculated macaques when given early after exposure (within 24 hours is superior to 48 or 72 hours) and for a 28-day course," *id.* at 10, and a skilled artisan would have accordingly considered Schwarzenegger's

disclosure in conjunction with Tsai 1995 and its disclosure as a whole, including Tsai 1995's disclosure regarding pre-exposure prophylaxis.

For example, Tsai 1995 demonstrated complete protection of twenty-five macaques dosed with tenofovir either before or after exposure to SIV, Tsai 1995 at 1199, and Van Rompay 2004 demonstrated statistically significant results in preventing SIV infection in macaques when dosed with TDF in amounts pharmacokinetically equivalent to those administered in humans, prior to the macaques' SIV exposure.  Van Rompay 2004 at 1.  A skilled artisan would have understood these and other demonstrations of efficacy by tenofovir and TDF to prevent establishment of immunodeficiency retrovirus infection in macaques to provide a reasonable expectation of success in preventing establishment of HIV infection in humans through the administration of TDF, either alone or in combination, for PrEP.

Accordingly, in view of the recommended use of the combination of TDF and FTC for HIV PEP as disclosed in Schwarzenegger, in view of the known efficacy of the same combination to treat and suppress established HIV infection as disclosed in Dando, and in view of the known efficacy of tenofovir and TDF to prevent immunodeficiency retroviral infection in macaques as established by Tsai 1995 and Van Rompay 2004, a skilled artisan would have reasonably expected success in using the combination of TDF and FTC as pre-exposure prophylaxis for HIV.[30]

---

[30]     And as detailed above in Sections VI.c and VI.d, ordinary persons skilled in the art in fact recognized such teachings in the art in reaching the purported invention of the Asserted Claims of the Patents-in-Suit prior to the earliest priority date to which the Asserted Claims are entitled. This further supports that the Asserted Claims would have been obvious in view of the teachings of the prior art and the knowledge of the skilled artisan.

ii.     ***No Secondary Considerations***

The Government's Response to Interrogatory No. 10 points to various alleged secondary considerations including unexpected results in view of unpredictability and failure of TDF monotherapy for PrEP, skepticism in the art, industrial praise, copying by others and commercial success.  *See* Plaintiff's Objections and Responses to Defendants' First Set of Interrogatories (Nos. 1-18) (Sept. 30, 2020), at 29-31.  However, the record fails to support such alleged secondary considerations as discussed below.

In order "[f]or objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed inventions."  *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (internal quotation marks omitted).  And "[w]here the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."  *Id.*  Moreover, "[o]bjective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support."  *Polaris Indus., Inc. v. Artic Cat, Inc.,* 882, F.3d 1056, 1072 (Fed. Cir. 2018) (quoting *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008)).  That is not the case here.

To be certain, "the identified objective indicia must be directed to what was not known in the prior art."  *Novartis AG v. Torrent Pharm. Ltd.*, 853, F.3d 1316, 1331 (Fed. Cir. 2017).  As discussed above in Section VI.a and incorporated here, pre-exposure prophylaxis with tenofovir (or TDF or tenofovir ester or tenofovir prodrug) to protect against HIV infection was known in the art, and addition of FTC to tenofovir or a tenofovir ester for PrEP was far from innovative. *See, e.g.*, Tsai 1995 at 1199; Van Rompay AIDS. 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-1773; Van Rompay 2001 at 429, 430; Van Rompay 2004 at 1; Page-Shafer 2005 at 1; Szekeres at 7, 11; Truvada[®] Insert at 1.  Any purported secondary considerations upon

which the Government might attempt to rely would be solely based on the known advantages of adding FTC to tenofovir (or TDF or tenofovir ester or tenofovir prodrug) for PrEP, and therefore lack the required nexus to the Asserted Claims.

In any event, there are no secondary considerations that, when considered in conjunction with the strong and overwhelming evidence of the o76bviousness of the Asserted Claims as discussed above, support a finding of non-obviousness.

### 1.      No Unexpected Results.

As discussed above in Section VI.e.i and fully incorporated herein, the efficacy observed with the claimed processes would not have been unexpected by a skilled artisan.  As an initial point, the Patents-in-Suit contain inconsistent results.  All of the Asserted Claims include oral administration.  Of the macaque groups disclosed in the specification, only Group 2 received the oral combination of TDF and FTC.  '509 Patent, Fig. 1.  The remaining groups received subcutaneous FTC alone (Group 1), subcutaneous tenofovir and FTC (Group 3), or no treatment.[31]  *Id*.  As discussed above in Section III, the disclosure of the Patents-in-Suit is contradictory and unclear as to the Group 2 results.  While the written portion of the specification of the Patents-in-Suit states that 4 of 6 macaques (67%) in Group 2 were protected after 14 weekly exposures, Figure 2 indicates that 50% (3 of 6) of the Group 2 macaques were protected after 14 weekly exposures.

The file history of the Patents-in-Suit only further confound the actual results of the Government's studies.  During prosecution of the Patents-in-Suit, the Government submitted a

---

[31]      The specification further discloses a fourth group comprising four macaques to which 20 mg/kg of TDF was administered orally before SHIV challenge.  The specification states that the group of macaques to which TDF was administered orally is "also provided for comparison," '509 Patent at 9:37-38, and cites Subbarao *et al.*, *Chemoprophylaxis with tenofovir disoproxil fumarate provided partial protection against Infection with simian human immunodeficiency virus in macaques given multiple virus challenges*, 194 J. Infect. Dis. 904-11 (2006).  *Id.* at 10:6-9, 11:54-62.

declaration pursuant to 37 C.F.R. § 1.132 ("Heneine Declaration") which highlighted the results

disclosed in the inventors' 2008 paper (Gerardo García-Lerma *et al.*, *Prevention of Rectal SHIV*

*Transmission in Macaques by Daily or Intermittent Prophylaxis with Emtricitabine and*

*Tenofovir*, 5 PLoS Medicine (2) 291 (2008)), asserting that said post-dating journal article

(which is wholly irrelevant as to the actual disclosure contained in the specification of the

Patents-in-Suit) provides "data documenting that the presently claimed methods provide an

unexpected superior result."  [US_00001157-625, at US_00001563].  However, the Heneine

Declaration only served to inject further uncertainty and contradiction into the Patents-in-Suit,

for it contained additional inconsistent disclosure of experimental results.  In the Heneine

Declaration, Dr. Walid Heneine affirmatively stated—as sworn testimony—that only 25% of the

macaques to which the combination of TDF and FTC were administered orally became infected

following fourteen once-weekly retroviral exposures.  *Id.* at [US_00001568].  That is to say, the

Heneine Declaration affirmatively reports a result of 75% protection for the oral TDF/FTC

macaque group.  *Id.*

    The Heneine Declaration bases this testimony on a graph included in the inventors' 2008

paper, which identifies the macaque group to which TDF and FTC were administered orally as

containing six macaques.  However, this is a mathematical impossibility—achieving a result of

75% protection for a macaque group consisting of six macaques would require a determination

that protection from retroviral infection occurred in 4.5 macaques.

    Review of the paper to which the Heneine Declaration cites is instructive, for it discloses

that "four of the six macaques were protected."  Gerardo García-Lerma *et al.*, *Prevention of*

*Rectal SHIV Transmission in Macaques by Daily or Intermittent Prophylaxis with Emtricitabine*

*and Tenofovir*, 5 PLoS Medicine (2) 291, 295 (2008).  Achieving protection from retroviral

infection in four out of six macaques—if true—is a result of 66% or two-thirds. This contradiction between the Heneine Declaration and the cited paper remains unexplained.

However, notwithstanding this inconsistency, the Heneine Declaration then proceeds to contrast the purported results of the inventors with those reported in another publication that was co-authored by several named co-inventors of the Patents-in-Suit. In that paper, Subbarao reported that protection from retroviral infection using TDF alone was observed in only a single macaque, from a group of 4, after fourteen once-weekly inoculations with retrovirus. Subbarao at 904. The purpose of this comparison with the Heneine Presentation was to demonstrate that 75% of macaques administered TDF alone became infected, whereas 25% of macaques administered TDF and FTC became infected. [US_00001157-625, at US_00001568].

But regardless of whether protection was observed in three out of six or four out of six macaques in the Patents-in-Suit, the results disclosed in the Patents-in-Suit are far from unexpected and even further from serving as evidence probative of nonobviousness. To be certain, Van Rompay 2004 disclosed that three out of six macaques were protected when orally dosed with TDF as pre-exposure prophylaxis, *achieving the identical level of protection* as disclosed in Figure 2 in the Patents-in-Suit. Achieving identical results as those disclosed in the prior art is not unexpected. Moreover, Van Rompay 2004 administered TDF as single-drug pre-exposure prophylaxis. Addition of FTC to TDF was known in the art to improve antiviral efficacy and was expressly recognized as being particularly favorable over others, including TDF alone. *See, e.g.*, Schwarzenegger at 15; Truvada[®] Insert at 21; Dando at 2076-2077; De Clercq EOED at 265. Thus, even if four of six macaques to which TDF and FTC were administered orally (Group 2) in the Patents-in-Suit were protected from antiretroviral infection (as indicated in the written portion of the specification and by the named inventors' 2008 publication),

protection of one additional subject would have been expected by adding FTC to oral TDF in Van Rompay's study.  *See, e.g.*, *Hoffmann–La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1333-34 (Fed. Cir. 2014) ("The evidence of superior efficacy does nothing to undercut the showing that there was a reasonable expectation of success with the 150 mg monthly dose, even if the level of success may have turned out to be somewhat greater than would have been expected.").

To the extent that the Government alleges unexpected results over the disclosure contained in Subbarao, Grant 2006 expressly noted that the results of the Subbarao paper may have been better than described.  Robert M. Grant & Mark A. Wainberg, Chemoprophylaxis of HIV Infection: Moving Forward with Caution, 194 *J. Infect. Dis*. 874, 874-5 (2006) ("Grant 2006").  Grant 2006 specifically related:

> [O]ral dosing for monkeys is less reliable than parenteral dosing, because the animals may either refuse or spit out some foods and many drugs.  In this study, a consequence of not being able to control levels of oral drug intake in an animal model was that TDF levels in plasma were often lower than expected.
>
> However, the results of the study by Subbarao *et al.* may, in reality, be better than the authors claim.  Although all monkeys in the treated arms of the study eventually became infected, the results are consistent with previous research that demonstrated that TDF had partial efficacy in the prevention of SHIV infection.

*Id*. at 874-75.

And to the extent there is any difference in protection over prior art studies, it is merely a difference in degree rather than one of kind because the art had previously achieved protection in 3 of 6 macaques with oral TDF alone and in 100% of macaques with subcutaneous tenofovir alone, whereas addition of oral FTC to oral TDF afforded protection in, at best, 4 of 6 macaques.  *See* Van Rompay 2004 at 1; Tsai 1995 at 1198.  That is not evidence probative of nonobviousness.  "Unexpected results that are probative of nonobviousness are those that are 'different in kind and not merely in degree from the results of the prior art.'" *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013) (quoting *Iron Grip Barbell Co. v. USA*

*Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004)).  "While a marked superiority in an expected

property may be enough in some circumstances to render a compound patentable, a mere

difference in degree is insufficient."  *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752

F.3d 967, 977 (Fed. Cir. 2014) (internal quotation marks omitted).

The Government also relies on the results of the Partners PrEP study, the PROUD and

ANRS-IPERGAY studies, and the iPrEx clinical trials in humans to support purported

unexpected results.  Specifically, 93% protection was observed in the Partners PrEP study, 86-

97% protection was observed in the PROUD and ANRS-IPERGAY studies, and 76-99%

protection was observed in the iPrEx clinical trial.  Complaint (D.I. 1) at 37-44 (¶¶147-167).

However, as noted above, the prior art studies, including those from Tsai, Van Rompay, and

Subbarao, showed at least comparable efficacy to those disclosed in the Patents-in-Suit, such that

there can be no unexpected results supporting non-obviousness.  *See, e.g.*, *Hoffmann–La Roche

Inc.*, 748 F.3d at 1333-34 ("The evidence of superior efficacy does nothing to undercut the

showing that there was a reasonable expectation of success with the 150 mg monthly dose, even

if the level of success may have turned out to be somewhat greater than would have been

expected.").

**2.**     No Skepticism.

As discussed above in Section VI.e.i and incorporated here, the efficacy observed with

the claimed processes was far from unexpected—to be certain, it was expected.  Nothing cited by

the Government cites supports its alleged skepticism.  During prosecution of the '509 Patent, the

Government argued that "[u]se of an anti-HIV agent for treatment of an HIV infection does not

predict the use of that agent for protection against HIV infection," noting that maraviroc, a CCR5

receptor antagonist, "was shown to be a poor candidate for oral [PrEP]" and "clinical trials to

evaluate tenofovir" for PrEP were cancelled.  [US_00000281-1156, at US_00000854-855].  The

Government further argued that Subbarao's studies provide no reasonable expectation of success for tenofovir for prophylaxis.  *Id*. at [US_00000855-856].

None of this, however, is evidence of skepticism in the field regarding whether pre-exposure prophylaxis would be effective.  In fact, Subbarao reported that daily TDF alone protected one of four macaques.  Subbarao at 904.  Moreover, as discussed above in Sections VI.a-e and incorporated here, the art had already demonstrated that PrEP in primates, both orally and subcutaneously, is effective, and it was known in the art that PrEP was effective in primates and was further being implemented in human clinical studies at the time.  *See*, *e.g*., Tsai 1995 at 1199; Van Rompay AIDS. 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-1773; Van Rompay 2001 at 429, 430; Van Rompay 2004 at 1; Page-Shafer 2005 at 1; Szekeres at 7, 11.  Even if Subbarao's results allegedly support skepticism – which they do not – Subbarao's results were at best an outlier due to defects in the study.  *See*, *e.g*., Grant 2006 at 874-75.  Thus, the art evidences not only that PrEP was established in primates, but also that those of ordinary skill in the art expected that PrEP would be effective in humans based on the results observed in primates.

### 3.    Industrial Praise Was Directed to Known Methods.

The Government alleges that the claimed methods have received significant praise and accolades.  Complaint (D.I. 1) at ¶¶137-143.  As discussed above in Sections VI.c-e and incorporated here, the methods claimed in the Patents-in-Suit were either known in the art or obvious over what was known.  *See*, *e.g*., Tsai 1995 at 1199; Van Rompay AIDS 1998 at F79, F82; Van Rompay Virology 2000 at 1767, 1772-1773; Van Rompay 2001 at 429, 430; Van Rompay 2004 at 1; Page-Shafer 2005 at 1; Szekeres at 7, 11.  As such, any industrial praise was directed at methods that were already known or obvious, and not directed to any alleged

invention claimed in the Patents-in-Suit. *Novartis AG*, 853 F.3d at 1331 ("[T]he identified objective indicia must be directed to what was not known in the prior art.").

### 4.    No Copying of Others.

The Government alleges that contemporaneous clinical trials using TDF for PrEP were modified to adopt the combination of TDF and FTC, and that Gilead also copied the claimed invention by seeking approval by the FDA to market Truvada® for PrEP. Complaint (D.I. 1) at ¶¶137-143, 170-171. As discussed above in Sections VI.c and VI.d and incorporated here, the claimed methods were known in the art and not conceived by the named inventors. As such, modifications to the clinical trials and Gilead's seeking approval of a PrEP indication for Truvada® did not copy the claims of the Patents-in-Suit. Rather, as discussed above in Section VI.d and incorporated here, the claims of the Patents-in-Suit copied methods that were conceived by others. *Novartis AG*, 853 F.3d at 1331 ("[T]he identified objective indicia must be directed to what was not known in the prior art."). Moreover, Gilead was unaware of the existence of the patent applications when designing clinical trials or seeking FDA approval for PrEP. And, by the time that the Government first communicated with Gilead concerning the purported invention(s) in the Patents-in-Suit in October 2014, Gilead had already invested substantial efforts in developing and marketing Truvada® for PrEP. Second Amended Answer and Counterclaims (D.I. 21) at Affirmative Defenses ¶39.

### 5.    Commercial Success.

The Government alleges that sales of Truvada® for PrEP have "skyrocketed," that Gilead reaped billions of dollars and that the invention has been licensed internationally. Complaint (D.I. 1) at ¶¶176-178. Yet, as discussed above no nexus to the claims has been established, and the Government omits that blocking patents have existed and continue to exist for Truvada® and Descovy®, as well as Viread® and Emtriva®. *See* U.S. Patent Nos. 4,808,716; 5,814,639;

5,914,331; 5,922,695; 5,935,946; 5,977,089; 6,043,230; 6,057,305; 6,703,396; 7,390,791; 7,803,788; 8,754,065; and 9,296,769.

### 6. Contemporaneous Invention by Others.

As discussed above in Sections VI.c and VI.d and incorporated here, the methods claimed in the Patents-in-Suit were known in the art as of the filing date of the Provisional Application. Such evidence of contemporaneous invention by others is "strong evidence of what constitutes the level of ordinary skill in the art." *Geo. M. Martin Co. v. All Mech. Sys. Int'l*, 618 F.3d 1294, 1306 (Fed. Cir. 2010) (quoting *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1379 (Fed. Cir. 2000) (internal quotation marks omitted)).  Furthermore, such contemporaneous invention constitutes "objective evidence that persons of ordinary skill in the art understood the problem and a solution to that problem." *Regents of the Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1295 (Fed. Cir. 2018).

## VII.   INVALIDITY BASED ON OBVIOUSNESS-TYPE DOUBLE PATENTING

If the Federal Circuit determines that a patent that will expire later than its non-divisional patent family members based on patent term adjustment ("PTA") granted pursuant to 35 U.S.C. § 154 for said later-expiring patent constitutes an unjustified timewise extension of the right to exclude bestowed by an earlier-expiring patent, the Asserted Claims of the '509 Patent are invalid under the judicially-created doctrine of obviousness-type double patenting in view of the three other Patents-in-Suit.

Three of the four Patents-in-Suit, the '333 Patent, the '191 Patent, and the '423 Patent, will expire on January 31, 2027, based on the Government's earliest claimed non-provisional filing date (January 31, 2007), and all three are also subject to terminal disclaimers that were

filed to overcome obviousness-type double patenting rejections during prosecution.[32]  The obviousness-type double patenting rejections for the '333, '191, and '423 Patents were each based on the absence of a patentable distinction between the claims of the then-prosecuted application and the claims of the earlier-issued Patents-in-Suit.  However, a reciprocal terminal disclaimer was ***not*** filed for the '509 Patent, the fourth Patent-in-Suit, which received 1562 days of additional patent term based on certain delays during prosecution.  [US_00000281-1156, at US_00001156].  This extension of the '509 Patent's term by 1562 days beyond the date of expiration to which it would otherwise be entitled—January 31, 2027—thereby extended its expiration date well beyond those of the other three Patents-in-Suit (which remain set at January 31, 2027).  Because there is no patentable distinction between the claims of all the Patents-in-Suit, if the Federal Circuit holds that the grant of PTA to a patent represents an unjustified timewise extension of the right to exclude granted by earlier expiring non-divisional patent family members, the Asserted Claims of the '509 Patent are invalid under the judicially-created doctrine of obviousness-type double patenting in view of the other Patents-in-Suit.

All of the independent claims of the of the Patents-in-Suit claim oral dosing of tenofovir (or TDF or tenofovir ester or tenofovir prodrug) and FTC and only differ in terms of host species, whether administration occurs prior to exposure or potential exposure (those claims limited to post-exposure administration have been disclaimed by the Government), dosage form, or retrovirus.  Claim 1 of the '509 Patent recites oral administration of emtricitabine with

---

[32]     The terminal disclaimer filed for the '333 Patent disclaims any term "which would extend beyond the expiration date of the full statutory term" of the '509 Patent.  [US_00001157-1625, at US_00001459]; *see also id.* at [US_00001539].  The terminal disclaimer filed for the '191 Patent disclaims any term "which would extend beyond the expiration date of the full statutory term" of the '333 Patent and the '509 Patent.  [US_00000001-280, at US_00000239]; *see also id.* at [US_00000261].  The terminal disclaimer filed for the '423 Patent disclaims any term "which would extend beyond the expiration date of the full statutory term" of the '191 Patent, the '333 Patent and the '509 Patent.  [US_00001626-1745, at US_00001716-17]; *see also id.* at [US_00001728].

tenofovir or tenofovir disoproxil fumarate prior to exposure to an immunodeficiency retrovirus in a primate host.  Claim 13 (which depends from disclaimed independent claim 12) of the '509 Patent recites oral administration of emtricitabine with tenofovir or tenofovir ester prior to potential exposure by a human to a human immunodeficiency retrovirus.  Claim 1 and claim 13 (which depend from disclaimed independent claim 12) of the '333 Patent recite oral (as well as subcutaneous and vaginal) administration of emtricitabine with tenofovir or tenofovir disoproxil fumarate; claim 1 recites exposure in a primate host to an immunodeficiency retrovirus and claim 13 recites potential exposure in a human to a human immunodeficiency retrovirus.  Claim 1 of the '191 Patent recites oral administration of emtricitabine with tenofovir or tenofovir disoproxil fumarate in a tablet prior to exposure by a primate host to an immunodeficiency retrovirus. Claim 13 of the '191 Patent recites administration of emtricitabine with tenofovir or tenofovir ester in a tablet prior to potential exposure by a human to an immunodeficiency retrovirus. Claim 1 of the '423 Patent recites oral administration of emtricitabine with tenofovir or tenofovir prodrug prior to exposure by a primate host to an immunodeficiency retrovirus.  Claim 12 of the '423 Patent recites administration of emtricitabine with tenofovir or tenofovir prodrug prior to potential exposure by a human to a human immunodeficiency retrovirus.

Any distinction between the claims of the Patents-in-Suit regarding specificity of host species, exposure/potential exposure, dosage form, or immunodeficiency retrovirus are insufficient to render any patentable distinction between the claims of the Patents-in-Suit.  Nor is any such meaningful distinction found in the dependent claims of the Patents-in-Suit, which recite further specificity as to host species, exposure/potential exposure, dosage form, or immunodeficiency retrovirus.  And because there are no patentable distinctions between the claims of the Patents-in-Suit, if the Federal Circuit holds that the grant of PTA to the '509 Patent

represents an unjustified timewise extension of the right to exclude granted by the three earlier-expiring Patents-in-Suit, the Asserted Claims of the '509 Patent are invalid under the judicially-created doctrine of obviousness-type double patenting.

The examiner of each of the Patents-in-Suit (the same examiner) shared the view that there are no patentable distinctions between the claims of any of the Patents-in-Suit, which not only motivated the examiner to repeatedly issue non-statutory obviousness-type double patenting rejections for the '333 Patent, the '191 Patent, and the '423 Patent, but was also the reason underlying allowance of both the '191 Patent, and the '423 Patent.  What's more, the Government all but admitted during prosecution that there is no patentable distinction between the claims of the Patents-in-Suit.

For example, during prosecution of the '333 Patent, the claims were "rejected on the ground of nonstatutory [obviousness-type] double patenting as being unpatentable over claims 1-18 of U.S. Patent No. 9,044,509.  Although the claims at issue are not identical, they are not patentably distinct from each other because the claims herein are generic to the claims in '509 [Patent]."  [US_00001157-1625, at US_00001439].  In the Government's response to the nonstatutory double-patenting rejection, the Government did not contest the statement that there is no patentable distinction between the claims of the '333 Patent and those of the '509 Patent, but rather stated, "As you know, this application is a continuation of the patent application that issued as U.S. Patent No. 9,044,509.  Submitted herewith is a terminal disclaimer, which disclaims the terminal portion of any patent that issues from the present application that would extend beyond the term of U.S. Patent No. 9,044,509."  [US_00001157-1625, at US_00001470]; *see also* [US_00001157-1625, at US_00001459-60]. The Government continued, stating that "[t]he submission of this terminal disclaimer renders the rejection moot."  *Id.* at [US_00001470].

266

An identical non-statutory double patenting rejection was issued by the same examiner during prosecution of the '191 Patent over the claims of the '509 Patent, [US_00000001-280, at US_00000209]; the examiner, also issued an additional non-statutory double patenting rejection over the claims of the '333 Patent.  *Id.* ("Claims 1-19 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-17 of U.S. Patent No. 9,579,333.  Although the claims at issue are not identical, they are not patentably distinct from each other because the claims herein are generic to the claims of '333 [Patent].").  Following the issuance of these rejections, two months later an "Applicant-Initiated Interview" was conducted between the examiner and the Government's prosecuting attorney, wherein they discussed at least claim 1 of the '191 Patent. [US_00000001-280, at US_00000227].  The summary of the interview indicates that the Government conceded that there is no patentable distinction between the claims of the '333 Patent and at least those of the '509 Patent:

> Applicant's attorney indicates that applicants will pursue subject matter ***within the scope of allowed claim*** in parent application (now US 9,044,509) and will seek other subject matters in a continuation application.  Particularly claims 1 herein will be amended to the same as claim 1 in '509 [Patent], but with a further limitation of the oral dosage form: a tablet.  The examiner indicates that such a claim would be allowable for reasons set forth in the parent application.

*Id.* (emphasis added).

And in its response to the examiner's office action wherein the double patenting rejections were issued, the Government thanked the examiner for the interview "wherein the claims and the outstanding rejections were briefly discussed," [US_00000001-280, at US_00000234],  and further summarized the interview:

> ***The undersigned indicated that the claims would be amended to correspond with the claims of U.S. Patent No. 9,044,509, but to state that the composition was administered in tablet form, as supported by the specification.***  The Examiner agreed that this

267

> would place the application in condition for allowance, and
> confirmed that it was not necessary to address the rejection under
> 35 U.S.C. § 103 if the proposed claim amendments were made in
> the response.  The Examiner also confirmed it would not be
> necessary to resubmit any evidence provided during the
> prosecution of U.S. Patent No. 9,044,509.  However, the Examiner
> stated that the obviousness-type double patenting rejections would
> be maintained (see below). The undersigned confirmed terminal
> disclaimers would be submitted to render these rejections moot.

*Id.* (emphasis added).

In the same response, the Government further wrote that it had filed the terminal

disclaimer for the then-pending application of the '191 Patent "that disclaims any terminal

portion of any patent that issue[s] from the present application that would extend beyond the

term of U.S. Patent No. 9,044,509 or the term of U.S. Patent No. 9,579,333," thereby

"render[ing] the rejection moot." [US_00000001-280, at US_00000235].  In response to a

separate obviousness rejection over prior art that was asserted by the examiner in the same office

action as the non-statutory double patenting rejections, the Government wrote that while it

"respectfully disagree[d] with this rejection," in order "to expedite prosecution, the claims have

been *amended to correspond with the claims of U.S. Patent No. 9,044,509*, and to include the

limitation that the compositions are in tablet form.  The amendment of the claims to correspond

with the claims of U.S.  Patent No. 9,044,509 renders the rejection moot."  *Id.*

In the notice of allowability for the '191 Patent, the examiner wrote as "Reasons for

Allowance" that the Government's "amendments and remarks submitted October 24[, 2017]," in

the office action response detailed above, "are persuasive to put the application in conditions for

allowance. *The claims are allowable for reasons as set forth in parent application 11/669,547*.

See, the interview summary of October 4, 2017."  [US_00000001-280, at US_00000261] .  The

'547 application is the application number of the '509 Patent.  '509 Patent at [21].

The contents of the prosecution history of the '423 Patent are much the same. During prosecution of the '423 Patent, in the first office action, the same examiner, again issued nonstatutory obviousness-type double patenting rejections, this time based on the three previously-issued patents in this family. For the '509 Patent:

> Claims 1-19 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-18 of U.S. Patent No. 9,044,509. Although the claims at issue are not identical they are not patentably distinct from each other because '509 claims the method of protecting primate host from a selfreplicating [sic] infection by an immunodeficiency retrovirus comprising administering a combination of emtricitabine and tenoforvir [sic]. The claimed scope of '509 [Patent] substantially overlaps the claimed scope herein.

[US_00001626-1745, at US_00001696]. For the '333 Patent:

> Claims 1-19 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-17 of U.S. Patent No. 9,579,333. Although the claims at issue are not identical they are not patentably distinct from each other because '333 claims the method of protecting primate host from a selfreplicating [sic] infection by an immunodeficiency retrovirus comprising administering a combination of emtricitabine and tenoforvir [sic]. The claimed scope of '333 [Patent] substantially overlaps the claimed scope herein.

*Id.* And for the '191 Patent:

> Claims 1-19 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-19 of U.S. Patent No. 9,937,191. Although the claims at issue are not identical they are not patentably distinct from each other because '191 claims the method of protecting primate host from a selfreplicating [sic] infection by an immunodeficiency retrovirus comprising administering a combination of emtricitabine and tenoforvir [sic]. The claimed scope of '191 substantially overlaps the claimed scope herein.

[US_00001626-1745, at US_00001696-97]. And in that same initial office action, further reinforcing the absence of any patentable distinction between any of the Patents-in-Suit, the examiner stated that "[t]he claims are allowable over prior art *for reasons as set forth in parent*

269

*applications*."  [US_00001626-1745, at US_00001697] (emphasis added).  The examiner did not

proceed to engage in any further substantive review of the '423 Patent.  In response, the

Government filed three corresponding terminal disclaimers, disclaiming any term "which would

extend beyond the expiration date of the full statutory term" of the '191 Patent, the '333 Patent

and the '509 Patent, [US_00001626-1745, at US_00001716], and stating in the response to the

office filed at the same time:

> Claims 1-19 are rejected on the ground of nonstatutory double
> patenting over claims 1-18 of U.S. Patent No. 9,044,509
> (hereinafter "the '509 patent).  Claims 1-19 are rejected on the
> ground of nonstatutory double patenting over claims 1-17 of U.S.
> Patent No. 9,579,333 (hereinafter "the '333 patent").  Claims 1-19
> are rejected on the ground of nonstatutory double patenting over
> claims 1-19 of U.S. Patent No. 9,937,191 (hereinafter "the '191
> patent).  Submitted herewith is an electronic terminal disclaimer,
> disclaiming the terminal portion of any patent that issues from the
> present application that would extend beyond the term of any the
> '509 patent, the'333 patent, or the '191 patent.  The submission of
> this electronic terminal disclaimer renders these rejections moot.

[US_00001626-1745, at US_00001713].

The claims were then allowed by the examiner, who stated as "Reasons for Allowance"

that "[t]he claims are allowable for reasons as set forth in the parent application."

[US_00001626-1745, at US_00001728].

At least these portions of the prosecution histories of the Patents-in-Suit further support

the absence of any patentable distinction between the claims of the Patents-in-Suit.  Overall,

based on: (1) a comparison of the claims of the Patents-in-Suit; (2) applicant statements and

corresponding Examiner findings of no patentable distinction with respect to the claims of the

Patents-in-Suit; (3) the Government's repeated filing of terminal disclaimers to overcome

obviousness-type double patenting rejections premised on the other Patents-in-Suit for the claims

of the '191 Patent, the '333 Patent, and the '423 Patent, the claims of all Patents-in-Suit are patentably indistinct.

Therefore, because there is no patentable distinction between the claims of all the Patents-in-Suit, if the Federal Circuit determines that a patent which will expire later than its non-divisional patent family members based on PTA for said later-expiring patent constitutes an unjustified timewise extension of the right to exclude bestowed by a patent, the Asserted Claims of the '509 Patent are invalid under the judicially-created doctrine of obviousness-type double patenting based on the three other Patents-in-Suit.

## VIII.    <u>INVALIDITY UNDER 35 U.S.C. § 112</u>

Each of the Asserted Claims is invalid for failing to comply with certain requirements of 35 U.S.C. § 112.

### a.    Applicable Law

#### i.    Enablement

35 U.S.C. § 112 requires that the "specification shall contain … the manner and process of making and using [the claimed invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art  … to make and use the same."  And "[t]o be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012) (citations omitted); *see also Idenix Pharm. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1154 (Fed. Cir. 2019) (same).  The doctrine of "[e]nablement serves the dual function in the patent system of ensuring adequate disclosure of the claimed invention and of preventing claims broader than the disclosed invention." *MagSil Corp.*, 687 F. 3d at 1380-81.  "Thus, a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *Id.* at 1381.

Accordingly, "[t]he scope of the claims must be less than or equal to the scope of the enablement to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." *Id.* (quoting *Sitrick v. Dreamworks, LLC,* 516 F.3d 993, 999 (Fed. Cir. 2008)); *see also In re Vaeck*, 947 F.2d 488, 495 (Fed. Cir. 1991) (explaining that the specification must "adequately guide the art worker to determine, without undue experimentation, which species among all those encompassed by the claimed genus possess the disclosed utility"). "Whether undue experimentation is required is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *Storer v. Clark*, 860 F.3d 1340, 1345 (Fed. Cir. 2017) (internal quotation marks omitted) (quoting *Streck Inc. v. Research. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012)). Those factors include "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

### *ii.* **Indefiniteness**

A patent claim is also invalid as indefinite if it fails to particularly point out and distinctly claim the invention. 35 U.S.C. § 112. "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

### *iii.* **Improper Dependency**

A dependent patent claim is also invalid under 35 U.S.C. § 112 if it fails to further limit the claim from which it depends. 35 U.S.C. § 112; *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d

1284, 1291-92 (Fed. Cir. 2006) ("[A] violation of § 112, ¶ 4 renders a patent invalid just as violations of other paragraphs of § 112 would."). A claim that is broader than the claim from which it depends is not allowable. *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012) ("It is axiomatic that a dependent claim cannot be broader than the claim from which it depends."). A dependent claim is invalid if it claims subject matter that is "non-overlapping" with the claim from which it depends. *Id.* "A dependent claim that contradicts, rather than narrows, the claim from which it depends is invalid." *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1361-1362 (Fed. Cir. 2016). In *Multilayer*, independent claim 1 recited a multi-layer, thermoplastic stretch wrap film that excluded low density polyethylene from its inner layers, while dependent claim 10 included it. *Id.* at 1362. Dependent claim 10 was held invalid under 35 U.S.C. 112 because it contradicted, rather than narrowed, independent claim 1. *Id.*

### b.    Enablement.

As discussed above in Section VI.a and incorporated by reference here, numerous studies had established PrEP using tenofovir or TDF in macaque models as of February 2006. Those studies demonstrated that tenofovir and TDF are effective for PrEP. For example, Tsai's seminal study in 1995 showed that subcutaneous tenofovir protected 100% of macaque subjects against infection from SIV exposure with no detectable virus and no clinical signs of toxicity throughout the 56-week study. Tsai 1995 at 1197-99. Van Rompay 2004 demonstrated that oral TDF protected three of six macaque subjects against infection from repeated, low-dose SIV exposure for up to at least 3 months of age. Van Rompay 2004 at 1. As discussed *supra* (Section VI.e.i) and incorporated by reference here, the addition of FTC to the successful TDF PrEP was obvious and only complemented and added to the efficacy of the TDF PrEP. And, the combination of TDF with FTC was already approved as a co-formulated tablet for HIV treatment and

recommended for HIV PEP in humans in the prior art.  *See, e.g.*, Truvada® Insert at 21; Dando at 2076-2077; De Clercq EOED at 265; Schwarzenegger at 15, 8.

To the extent the Government alleges that undue experimentation would have been required to modify the prior art, or that the prior art would not have provided a reasonable expectation of success, to arrive at the methods of the Asserted Claims, then the Asserted Claims are not enabled.  Specifically, with respect to the *Wands* factors, *In re Wands*, 858 F.2d at 737, the nature of alleged invention and breadth of the claims, the level of skill and predictability in the art, the type of working example and degree of guidance provided, and the amount of experimentation required, are the same with respect to the prior art macaque studies and studies in the Patents-in-Suit. Accordingly, to the extent the Government argues that the prior art is not enabling and/or does not provide a reasonable expectation of success in achieving the claimed methods, the specification does not enable the Asserted Claims.

The Provisional Application, which contains far less and incomplete disclosure than the Patents-in-Suit (*supra* Section V), similarly fails to enable the Asserted Claims for at least the same reasons.  To the extent the non-provisional specifications of the Patents-in-Suit fail to comply with 35 U.S.C. § 112 for any reason, such failures apply at least equally to the Provisional Application based on its disclosure as well.

> i.  **If the Government contends that any prior art is not enabling because it does not disclose the results of human studies, none of the Asserted Claims is enabled because the specifications disclose only animal data.**

Each of the Asserted Claims purports to cover processes for protecting humans from a self-replicating infection.  For example, claim 1 of the '509 Patent recites:

> 1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising:

274

     (a) selecting *a primate host* not infected with the immunodeficiency retrovirus, and

     (b) administering directly to an uninfected primate host a combination comprising:

          i. a pharmaceutically effective amount of emtricitabine; and

          ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate,

    wherein the combination is administered prior to an exposure of the primate host to the immunodeficiency retrovirus, thereby protecting the primate host from infection with the immunodeficiency retrovirus, wherein the combination is administered orally.

Dependent claim 2 expressly recites a "human" as a type of "primate host."  *See* '509 Patent, claim 2 ("2. The process of claim 1 wherein selecting a primate host comprises selecting an adult human not infected with the immunodeficiency retrovirus.").  Each of the Asserted Claims of the '333 Patent, the '191 Patent, and the '423 Patent also recites or encompasses a human.

       To the extent that the Government argues that the prior art is not enabling and/or would not provide a reasonable expectation of successful pre-exposure prophylaxis using TDF or tenofovir and FTC in primates—including humans—as claimed, then the macaque studies in the Patents-in-Suit do not enable the Asserted Claims.  The working examples in the Patents-in-Suit employ primate models that were previously known and used in the art to demonstrate pre-exposure prophylaxis using TDF.  *See*, *e.g.*, '509 Patent at 1:47-55, 7:34-8:2, 9:1-31.  Moreover, the Patents-in-Suit do not contain examples of PrEP studies in humans, let alone a demonstration of efficacy in humans.  Indeed, Dr. Walid Heneine, a named inventor on the Patents-in-Suit, stated around the time the Provisional Application was filed that the macaque study was "a proof-of-concept study and was not intended to imitate what might happen in humans." [GILDDE00282896-GILDDE00282900].  Thus, if the Government alleges that the prior art fails

to enable effective pre-exposure prophylaxis in humans, so too do the Patents-in-Suit, and each of the Asserted Claims is invalid for lack of enablement.

> ## ii. If the Government contends that any prior art is not enabling because it does not disclose sufficient PrEP efficacy, none of the Asserted Claims is enabled because the specifications fail to disclose efficacy in all subjects.

To the extent that the Government argues that the methods of the Asserted Claims require 100% (or some other very high percentage of) efficacy and that the prior art is not enabling because it fails to demonstrate sufficient efficacy for pre-exposure prophylaxis, each of the Asserted Claims is invalid for lack of enablement.

As discussed above in Section VI.a and incorporated by reference here, the prior art macaque studies were recognized as a model for HIV prophylaxis in humans. *See, e.g.*, Van Rompay 1999 at 1065; Van Rompay Antiviral 2000 at 296-297; Van Rompay AIDS 1998 at F80; Van Rompay Virology 2000 at 1767-168; Youle AIDS 2003 at 2. Therefore, if the Government alleges that the prior art macaque studies are inadequate to enable or provide reasonable expectation of success with PrEP using TDF or tenofovir and FTC in humans, the Patents-in-Suit are similarly deficient in their reliance on macaque studies. The working examples in the Patents-in-Suit disclose PrEP studies that fail to demonstrate efficacy in all of the small number of macaque subjects. *See*, *e.g*., Sections V. and VI.e.ii.1; *see also* '509 Patent at 9:35-11:24, Fig. 2, Fig. 4. Examples 7 and 8 in the specification show that four of six (67%) subjects were protected with oral TDF/FTC, while Figure 2 shows that three out of six (50%) were protected, lower than Tsai 1995 (100% protection with tenofovir) and similar/identical to the 50% protection (three of six subjects) that Van Rompay 2004 observed with TDF alone. Accordingly, to the extent that the Government argues that 100% (or near-100%) protection is required in each primate host, the claims are not enabled because the working examples in the

276

Patents-in-Suit fail to show that level of protection using orally dosed pre-exposure prophylaxis with the combination of FTC and TDF.

> ### iii.   Claim 13 of the '509 Patent and claims 1-19 of the '423 Patent are not enabled because the specifications fail to disclose efficacy for tenofovir esters or prodrugs other than TDF.

Claim 13 of the '509 Patent, via now-disclaimed independent claim 12, recites a method involving administration of "a pharmaceutically effective amount of tenofovir or ***tenofovir ester***."  Claims 1-19 of the '423 Patent likewise recite methods involving administration of "a pharmaceutically effective amount of tenofovir or a ***tenofovir prodrug***."  The Patents-in-Suit fail to enable the full scope of pre-exposure prophylaxis methods using compounds in the genus of tenofovir esters or the genus of tenofovir prodrugs that were known to be inferior to TDF, so claim 13 of the '509 Patent and claims 1-19 of the '423 Patent are invalid for lack of enablement. Specifically, the working examples in the Patents-in-Suit purport to demonstrate efficacy with only one tenofovir ester or prodrug, i.e., TDF, even though it was known in the art as early as 1997 that different prodrugs of tenofovir had different *in vitro* and *in vivo* properties, and many tenofovir prodrugs had been disclosed as having inferior clinical properties to TDF.  *See, e.g.*, M.N. Armilli et al., *Synthesis, in Vitro Biological Evaluation and Oral Bioavailability of 9-[2-(Phosphonomethoxy)Propyl]Adenine (PMPA) Prodrugs*, 8 Antiviral Chemistry & Chemotherapy 557 (1997).  Thus, even if the claims are found to be enabled for protection using a combination of FTC and TDF, the specification fails to demonstrate protection using the tenofovir esters or prodrugs that had been reported to be inferior to TDF.  As such, the Patents-in-Suit fail to enable the full scope of the claimed methods.

> ### iv.   The Asserted Claims that recite oral administration of tenofovir are not enabled.

Claims 1-3, 5-7, 9-11, and 13 of the '509 Patent; claims 1-3, 5-7, 9-11, and 13 of the '333 Patent; claims 1-11, 13-17, and 19 of the '191 Patent; and claims 1-11 and 16 of the '423 Patent are invalid for lack of enablement because they recite methods involving the oral administration of tenofovir, which are inoperative embodiments.  Claim 1 of the '509 Patent, for example, recites:

> 1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising:
>
>> (a) selecting a primate host not infected with the immunodeficiency retrovirus, and
>
>> (b) *administering* directly to an uninfected primate host *a combination comprising*:
>
>>> i. a pharmaceutically effective amount of emtricitabine; and
>
>>> ii. a pharmaceutically effective amount of *tenofovir* or tenofovir disoproxil fumarate,
>
> wherein the combination is administered prior to an exposure of the primate host to the immunodeficiency retrovirus, thereby protecting the primate host from infection with the immunodeficiency retrovirus, wherein the combination is administered *orally*.

Tenofovir has low oral bioavailability and is unsuitable for oral administration in humans.  *See, e.g.*, Patricia Barditch-Crovo et al., *Phase I/II Trial of the Pharmacokinetics, Safety, and Anitretroviral Activity of Tenofovir Disoproxil Fumarate in Human Immunodeficiency Virus-Infect Adults*, 45 Antiviral Agents & Chemotherapy 2733, 2733 (2001).  Because orally administered tenofovir is not sufficiently absorbed, a person of ordinary skill in the art would understand that it would not be effective for HIV prophylaxis.  *See, e.g.*, Answer ¶ 30, *Gilead Scis., Inc. v. United States* (Fed. Cl. filed Jan. 27, 2021) (ECF No. 23) ("The

Government admits only that tenofovir (TFV) is not administered orally ….").  The Patents-in-Suit therefore do not enable the claimed methods using orally administered tenofovir, which is an inoperative embodiment; indeed, the working examples described in the Patents-in-Suit disclose no use of orally administered tenofovir.  Where a patent fails to enable a permutation specifically recited in a claim, the claim is invalid for lack of enablement.  *See, e.g.*, *Trustees of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018).  Each of claims 1-3, 5-7, 9-11, and 13 of the '509 Patent; claims 1-3, 5-7, 9-11, and 13 of the '333 Patent; claims 1-11, 13-17, and 19 of the '191 Patent; and claims 1-11 and 16 of the '423 Patent is therefore invalid for lack of enablement.

### c.   Indefiniteness.

#### i.   Claims reciting "[a] process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human" are indefinite.

Claim 13 of the '509 Patent, claim 13 of the '333 Patent, claims 13-19 of the '191 Patent, and claims 12-18 of the '423 Patent are invalid as indefinite because they recite the non-sensical term "[a] process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human."  For example, claim 13 of the '509 Patent depends from now-disclaimed claim 12, which recites:

> 12. A process for ***inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection*** in a human, comprising:
>
> (a) selecting an uninfected human that does not have the self-replicating infection; and
>
> (b) administering to the uninfected human a combination comprising:
>
>   i. a pharmaceutically effective amount of emtricitabine; and

ii. a pharmaceutically effective amount of tenofovir or
tenofovir ester;

thereby inhibiting the establishment of the self-replicating
infection with the immunodeficiency virus in the human, wherein
the combination is administered orally.

The emphasized term above—which is nonsensical—fails to inform, with reasonable certainty,
those skilled in the art about the scope of the alleged invention.  The additional limitations of
claim 13 of the '509 Patent do not resolve the ambiguity in claim 12.  *See* '509 Patent, claim 13
("13. The process of claim 12 wherein the combination is administered prior to a potential
exposure of the primate host to the human immunodeficiency retrovirus.").  Claim 13 of the '509
Patent is therefore indefinite.

Independent claims 12 of the '333 Patent, 13 of the '191 Patent, and 12 of the '423 Patent
also recite the non-sensical term "inhibiting establishment of a human immunodeficiency virus
self-replicating infection of human immunodeficiency virus infection in a human" and are
therefore indefinite.  Dependent claims 13 of the '333 Patent, 14-19 of the '191 Patent, and 13-
18 of the '423 Patent depend from these indefinite independent claims, and their additional
limitations do not resolve their independent claims' ambiguity.  Each of these dependent claims
is therefore indefinite.

>           ii.        **Claims in which the selection in step (a) is not necessarily the subject
>                      of step (b) are indefinite.**

Claims 1-11 of the '509 Patent, 1-11 of the '333 Patent, and 1-11 of the '191 Patent are
invalid as indefinite because they fail to inform, with reasonable certainty, those skilled in the art
about whether the host or human "select[ed]" in step (a) is the same host or human to which the
drug combination is "administer[ed]" in step (b).  For example, claim 1 of the '509 Patent
recites:

    1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising:

      (a) selecting *a primate host* not infected with the immunodeficiency retrovirus, and

      (b) administering directly to *an uninfected primate host* a combination comprising:

        i. a pharmaceutically effective amount of emtricitabine; and

        ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate,

    wherein the combination is administered prior to an exposure of the primate host to the immunodeficiency retrovirus, thereby protecting the primate host from infection with the immunodeficiency retrovirus, wherein the combination is administered orally.

"A" or "an" is an indefinite article that is non-specific.  A person of ordinary skill in the art therefore would not understand the "primate host" recited in step (a) to necessarily be the same "primate host" recited in step (b).  This is particularly so in light of claim 1 of the '423 Patent, which uses a definite article in step (b) and therefore does require the host "select[ed]" in step (a) to be the host to which the combination is "administer[ed]" in step (b).  *See* '423 Patent, claim 1 ("(a) selecting *a primate host* …, and (b) administering directly to *the primate host* a combination").  Claim 1 of the '509 Patent therefore fails to inform, with reasonable certainty, those skilled in the art about how the steps of the claim are combined together to arrive at the alleged invention; it is therefore invalid as indefinite.  None of the additional limitations in the claims that depend from claim 1 of the '509 Patent (i.e., claims 2-11) resolve this ambiguity, so those dependent claims are invalid as indefinite as well.

      Independent claim 1 of the '333 Patent and independent claim 1 of the '191 Patent recite the same indefinite terms (i.e., "a primate host" in step (a) and "an uninfected primate host" in step (b)) and are invalid for the same reasons.  Dependent claims 2-11 of the '333 Patent and 2-

11 of the '191 Patent depend from these indefinite independent claims, and their additional limitations do not resolve their independent claims' ambiguity. Each of these dependent claims is therefore indefinite.

> ### iii. Claims reciting "several days, weeks or months" are indefinite.

Claims 9-10 of the '509 Patent, claims 9-10 of the '333 Patent, claims 9-10 and 19 of the '191 Patent, and claims 9-10 and 14 of the '423 Patent are invalid as indefinite because they recite "several days, weeks or months," which is ambiguous in degree. For example, claim 9 of the '509 Patent recites "[t]he process of claim 1 wherein the combination is administered daily for *several days, weeks or months*." "Several" is generally understood to mean an indefinite number that is more than two but fewer than many. But how many "days, weeks or months" fall within the scope of the claims is indeterminate. These claims therefore fail to inform, with reasonable certainty, those skilled in the art about the scope of the alleged invention.

Claim 9 of the '509 Patent, claim 9 of the '333 Patent, claim 9 of the '191 Patent, and claim 9 of the '423 Patent are invalid as indefinite for a related reason. Although these claims recite administering the combination daily for "several days, weeks or months," they do not specify when such administration should occur relative to the exposure, except to specify that one administration must be before the exposure. These claims therefore fail to inform, with reasonable certainty, those skilled in the art about the scope of the alleged invention.

> ### iv. Claims reciting "the exposure" without defining an exposure are indefinite.

Claims 1-11 of the '333 Patent, 1-11 and 15 of the '191 Patent, and 1-11, 15, and 19 of the '423 Patent are invalid as indefinite because they refer to a specific but undefined "exposure." For example, claim 1 of the '333 Patent recites:

> 1. A process of protecting a primate host from a self-replicating
> infection by an immunodeficiency retrovirus comprising:

(a) selecting a primate host not infected with the immunodeficiency retrovirus, and

(b) administering directly to an uninfected primate host a combination comprising:

i. a pharmaceutically effective amount of emtricitabine, wherein the pharmaceutically effective amount of the emtricitabine is administered orally, subcutaneously or vaginally; and

ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate, wherein the pharmaceutically effective amount of the tenofovir or tenofovir disoproxil fumarate is administered orally, subcutaneously or vaginally,

and wherein the combination is administered prior to *the exposure* of the primate host to the immunodeficiency retrovirus, thereby protecting the primate host from infection with the immunodeficiency retrovirus.

"[T]he exposure" in this claim is undefined; it lacks antecedent basis in the claim. A person of ordinary skill in the art would be unable to determine what "the exposure" was or which types of "exposure" are covered by the claim. Claim 1 of the '333 Patent therefore fails to inform, with reasonable certainty, those skilled in the art about the scope of the alleged invention. The additional limitations of the claims that depend from claim 1 (i.e., claims 2-11 of the '333 Patent) do not resolve the ambiguity in claim 1. Claim 1 of the '333 Patent and the claims that depend from it are therefore indefinite.

Independent claims 1 of the '191 Patent and 1 of the '423 Patent also recite "the exposure" without providing antecedent basis and are indefinite for the same reasons. Dependent 2-11 of the '191 Patent and 2-11 and 19 of the '423 Patent depend from these indefinite independent claims, and their additional limitations do not resolve their independent claims' ambiguity. Each of these dependent claims is therefore indefinite. Additionally, dependent claim 15 of the '191 Patent and 15 of the '423 Patent add a limitation that refers to

"the exposure" without providing antecedent basis, so these claims are invalid as indefinite for the same reasons.  Indeed, these two claims are even less intelligible because they add limitations referring to "the exposure"—i.e., an exposure that has occurred—to independent claims that recite only a "potential exposure."

> ### v. Claim 13 of the '509 Patent is indefinite because it recites "the primate host" without defining a primate host.

Claim 13 of the '509 Patent is invalid as indefinite because it refers to a specific but undefined "primate host."  Claim 13 recites "[t]he process of claim 12 wherein the combination is administered prior to a potential exposure of ***the primate host*** to the human immunodeficiency retrovirus."  But now-disclaimed claim 12, from which claim 13 depends, does not recite a "primate host"; rather, it recites:

> 12. A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a ***human***, comprising:
>
>> (a) selecting an uninfected ***human*** that does not have the self-replicating infection; and
>>
>> (b) administering to the uninfected ***human*** a combination comprising:
>>
>>> i. a pharmaceutically effective amount of emtricitabine; and
>>>
>>> ii. a pharmaceutically effective amount of tenofovir or tenofovir ester;
>
> thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the ***human***, wherein the combination is administered orally.

"[T]he primate host" in claim 13 is undefined; it lacks antecedent basis in the claim.  A person of ordinary skill in the art would be unable to determine what "the primate host" was or which types of "primate host" are covered by the claim.  Claim 13 of the '509 Patent therefore fails to

inform, with reasonable certainty, those skilled in the art about the scope of the alleged invention.

### vi.     Claim 4 of the '509 Patent is indefinite because it recites "the human" without defining a human.

Claim 4 of the '509 Patent is invalid as indefinite because it refers to a specific but undefined "primate host."  Claim 4 recites "[t]he process of claim 1 wherein the pharmaceutically effective amount of emtricitabine and the pharmaceutically effective amount of tenofovir disoproxil fumarate, are administered orally directly to ***the human*** in a combined single dosage formulation."  Claim 1, from which claim 4 depends, does not recite a "human"; rather, it recites:

> 1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising:
>
> > (a) selecting a ***primate host*** not infected with the immunodeficiency retrovirus, and
>
> > (b) administering directly to an uninfected ***primate host*** a combination comprising:
>
> > > i. a pharmaceutically effective amount of emtricitabine; and
>
> > > ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate,
>
> wherein the combination is administered prior to an exposure of the primate host to the immunodeficiency retrovirus, thereby protecting the ***primate host*** from infection with the immunodeficiency retrovirus, wherein the combination is administered orally.

"[T]he human" in claim 4 is undefined; it lacks antecedent basis in the claim.  A person of ordinary skill in the art would be unable to determine what "the human" was or which types of "human" are covered by the claim.  Claim 4 of the '509 Patent therefore fails to inform, with reasonable certainty, those skilled in the art about the scope of the alleged invention.

   *vii.* **Claim 15 of the '423 Patent is indefinite because it recites "the host" without defining a host.**

Claim 15 of the '423 Patent is invalid as indefinite because it refers to a specific but undefined "host."  Claim 15 recites "[t]he process of claim 12, wherein an inhibition of infection in ***the host*** is determined by an absence of persistent viremia and seroconversion in the human following the exposure to the immunodeficiency retrovirus."  Claim 12, from which claim 15 depends, does not recite a "host"; rather, it recites:

> 12. A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a ***human***, comprising:
>
> > (a) selecting an uninfected ***human*** that does not have the self-replicating infection; and
> >
> > (b) administering to the uninfected ***human*** a combination comprising:
> >
> > > i. a pharmaceutically effective amount of emtricitabine; and
> > >
> > > ii. a pharmaceutically effective amount of tenofovir or a tenofovir prodrug;
> >
> > thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the ***human***, wherein the combination is administered prior to potential exposure the ***human*** to the human immunodeficiency retrovirus.

"[T]he host" in claim 15 is undefined; it lacks antecedent basis in the claim.  A person of ordinary skill in the art would be unable to determine what "the host" was or which types of "human" are covered by the claim.  Claim 15 of the '423 Patent therefore fails to inform, with reasonable certainty, those skilled in the art about the scope of the alleged invention.

   *viii.* **Claim 6 of the '191 Patent is indefinite because it recites "a humans immunodeficiency virus."**

Claim 6 of the '191 Patent is invalid as indefinite because it recites the non-sensical term "a humans immunodeficiency virus."  Claim 6 recites, in full, "[t]he process of claim 5, wherein

a humans immunodeficiency virus (HIV) is HIV-1."  Claim 5 recites "[t]he process of claim 2, wherein the immunodeficiency retrovirus is a human immunodeficiency virus," and claim 2 recites "[t]he process of claim 1, wherein selecting a primate host comprises selecting an adult human not infected with the immunodeficiency retrovirus."  Claim 1 recites:

> 1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising:
>
>   (a) selecting a primate host not infected with the immunodeficiency retrovirus, and
>
>   (b) administering directly to an uninfected primate host a combination comprising:
>
>     i. a pharmaceutically effective amount of emtricitabine; and
>
>     ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate,
>
> wherein the combination is administered orally in tablet form prior to the exposure of the primate host to the immunodeficiency retrovirus, thereby protecting the primate host from infection with the immunodeficiency retrovirus.

Because claim 6 simply states that "a humans immunodeficiency virus (HIV) is HIV-1," using the indefinite article, claim 6 does not "specify a further limitation of the subject matter claimed" in claim 5, 35 U.S.C. § 112, ¶ 4, from which claim 6 depends.  It is unclear how claim 6 relates to or limits claim 5, so claim 6 fails to inform, with reasonable certainty, those skilled in the art about the scope of the alleged invention and is therefore indefinite.

### ix.    The claims that recite "potential exposure the human to the human immunodeficiency retrovirus" are indefinite.

Claims 12-18 of the '423 Patent are invalid as indefinite because they recite the non-sensical term "potential exposure the human to the human immunodeficiency retrovirus."  Claim 12 recites:

12. A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a human, comprising:

(a) selecting an uninfected human that does not have the self-replicating infection; and

(b) administering to the uninfected human a combination comprising:

i. a pharmaceutically effective amount of emtricitabine; and

ii. a pharmaceutically effective amount of tenofovir or a tenofovir prodrug;

thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the human, wherein the combination is administered prior to ***potential exposure the human to the human immunodeficiency retrovirus***.

The emphasized term above—which is nonsensical—fails to inform, with reasonable certainty, those skilled in the art about the scope of the alleged invention and is therefore indefinite. Dependent claims 13-18 of the '423 Patent depend from this indefinite independent claim, and their additional limitations do not resolve claim 12's ambiguity. Each of these dependent claims is therefore indefinite.

**d.    Improper Dependency.**

*i.*    **Claim 3 of the '509 Patent is improperly dependent.**

Claim 3 of the '509 Patent is improperly dependent because it is broader than claim 2 of the '509 Patent, from which it depends. Claim 3 recites "[t]he process of claim 2 wherein the adult primate host is ***a male adult primate host***." Claim 2 recites "[t]he process of claim 1 wherein selecting a primate host comprises selecting ***an adult human*** not infected with the immunodeficiency retrovirus." Claim 1 recites:

1. A process of protecting a primate host from a self-replicating infection by an immunodeficiency retrovirus comprising:

> (a) selecting a ***primate host*** not infected with the immunodeficiency retrovirus, and
>
> (b) administering directly to an uninfected ***primate host*** a combination comprising:
>
>> i. a pharmaceutically effective amount of emtricitabine; and
>>
>> ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate,
>
> wherein the combination is administered prior to an exposure of the primate host to the immunodeficiency retrovirus, thereby protecting the ***primate host*** from infection with the immunodeficiency retrovirus, wherein the combination is administered orally.

In other words, claim 1 recites selecting a "primate host," claim 2 recites selecting "an adult human" specifically, and claim 3 re-broadens the claim to capture a "male adult primate host."[33] Claim 3 captures an adult male non-human primate, but claim 2 does not. Claim 3 is therefore invalid because it is improperly dependent on claim 2.

### ii. Claim 13 of the '509 Patent is improperly dependent.

Claim 13 of the '509 Patent is improperly dependent because it is broader than claim 12 of the '509 Patent, from which it depends. Claim 13 recites "[t]he process of claim 12 wherein the combination is administered prior to a potential exposure of ***the primate host*** to the human immunodeficiency retrovirus." Now-disclaimed claim 12, from which claim 13 depends, recites:

> 12. A process for inhibiting establishment of a human immunodeficiency virus self-replicating infection of human immunodeficiency virus infection in a ***human***, comprising:
>
>> (a) selecting an uninfected ***human*** that does not have the self-replicating infection; and

---

[33] To the extent it is not invalid for improper dependency, claim 3 of the '509 Patent is indefinite because it recites the term "the adult primate host" without defining it; claim 3 therefore lacks antecedent basis and fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

(b) administering to the uninfected *human* a combination comprising:

    i. a pharmaceutically effective amount of emtricitabine; and

    ii. a pharmaceutically effective amount of tenofovir or tenofovir ester;

thereby inhibiting the establishment of the self-replicating infection with the immunodeficiency virus in the *human*, wherein the combination is administered orally.

In other words, claim 13 recites administering the combination to a "primate host," but claim 12 recites only administering the combination a "human." Claim 13 therefore captures administration to a non-human primate but claim 12 does not. Claim 13 is therefore invalid because it is improperly dependent on claim 12.

        *iii.*    **Claim 3 of the '333 Patent is improperly dependent.**

Claim 3 of the '333 Patent is improperly dependent because it is broader than claim 2 of the '333 Patent, from which it depends. Claim 3 recites "[t]he process of claim 2 wherein the adult primate host is *a male adult primate host*." Claim 2 recites "[t]he process of claim 1 wherein selecting a primate host comprises selecting *an adult human* not infected with the immunodeficiency retrovirus." Claim 1 recites:

1. A process of protecting a *primate host* from a self-replicating infection by an immunodeficiency retrovirus comprising:

    (a) selecting a *primate host* not infected with the immunodeficiency retrovirus, and

    (b) administering directly to an uninfected *primate host* a combination comprising:

        i. a pharmaceutically effective amount of emtricitabine, wherein the pharmaceutically effective amount of the emtricitabine is administered orally, subcutaneously or vaginally; and

        ii. a pharmaceutically effective amount of tenofovir or tenofovir disoproxil fumarate, wherein the pharmaceutically

> effective amount of the tenofovir or tenofovir disoproxil
> fumarate is administered orally, subcutaneously or vaginally,

> and wherein the combination is administered prior to the exposure
> of the primate host to the immunodeficiency retrovirus, thereby
> protecting the primate host from infection with the
> immunodeficiency retrovirus.

In other words, claim 1 recites selecting a "primate host," claim 2 recites selecting "an adult human" specifically, and claim 3 re-broadens the claim to capture a "male adult primate host."[34] Claim 3 captures an adult male non-human primate, but claim 2 does not. Claim 3 is therefore invalid because it is improperly dependent on claim 2.

---

[34] To the extent it is not invalid for improper dependency, claim 3 of the '333 Patent is indefinite because it recites the term "the adult primate host" without defining it; claim 3 therefore lacks antecedent basis and fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

Dated: February 3, 2021

*Of Counsel:*

Ronald C. Machen
Charles T. Cox Jr.
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000

David B. Bassett
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800

Vinita C. Ferrera
Emily R. Whelan
George P. Varghese
Timothy A. Cook
Jonathan A. Cox
Stephanie Lin
Benjamin Conery
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000

Respectfully submitted,

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Alexandra M. Ewing (#6407)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
ewing@rlf.com

*Counsel for Defendant & Counterclaim
Plaintiff Gilead Sciences, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 3, 2021, I caused true and correct copies of the foregoing

document to be served on the following counsel in the manner indicated:

<u>VIA E-MAIL</u>
Laura D. Hatcher
Shamoor Anis
U.S. Attorney's Office
Hercules Building
1313 N. Market Street
P.O. Box 2046
Wilmington, DE 19801
302-573-6277
Email: laura.hatcher@usdoj.gov
Email: shamoor.anis@usdoj.gov

<u>VIA E-MAIL</u>
Walter W. Brown
Philip Charles Sternhell
Patrick C. Holvey
U.S. Department of Justice
Civil Division, Commercial Litigation
Branch, IP Section
1100 L Street, N.W.
Washington, D.C. 20530
202-307-0341
Email: walter.brown2@usdoj.gov
Email: philip.c.sternhell@usdoj.gov
Email: patrick.c.holvey@usdoj.gov

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
cottrell@rlf.com

# Exhibit I

WILMERHALE

October 20, 2021

*Via Electronic Mail*

David B. Bassett

+1 212 230 8858 (t)
+1 212 230 8888 (f)
david.bassett@wilmerhale.com

Walter W. Brown
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Walter.Brown2@usdoj.gov

      **Re: *United States v. Gilead Sciences, Inc.*,**
          **C.A. No. 19-2103-MN (D. Del.)**

Wally:

      We write in response to the government's October 6, 2021 letter regarding Gilead's document production.

      We were sincerely surprised to receive your letter. The last correspondence we received from the government about the specific content of Gilead's document production was more than 7 months ago on March 9, 2021. We have also received no correspondence from the government about the content of Gilead's document production for more than four months after the June 4, 2021 substantial-completion deadline, which Gilead (unlike the government) met. After this long silence, there is simply no basis for the government to send a letter now asserting that the state of Gilead's document production is "impeding" discovery.

      Instead, the government's letter is a transparent attempt to manufacture disputes to obfuscate the government's own egregious discovery violations. We received your letter at 10:18 P.M. the night before we were to have a final meet and confer before contacting the Court about the government's failure to meet the June 4, 2021 substantial completion deadline and the government's subsequent refusal to honor any of its promised deadlines to remedy that failure. That timing alone—after 7 months of silence—makes the government's complaints suspect. And indeed, upon review, the government's complaints appear to be nothing more than attempts to resurrect disputes that were resolved months ago or to make demands for documents that the government only speculates exist. The government's letter also contains a concerning number of misrepresentations and mischaracterizations of Gilead's prior statements, many of which plainly contradict the written record.

      Gilead takes its discovery obligations seriously, so we have responded to each of your concerns on their merits below, notwithstanding the pretextual nature of these complaints. While we strongly dispute any suggestion that Gilead has failed to satisfy its discovery obligations to date or has not performed an adequate search for responsive documents, as explained below, we are conducting additional searches in response to some of your complaints and will produce any additional responsive, non-privileged documents that we locate—if any—in due course.

## I.    "Documents Recording Dr. Janssen's Employment with Gilead"

First, the government seeks several ill-defined categories of documents related to Dr. Robert Janssen's employment at Gilead.  But the government does not identify any specific documents that it believes are missing from Gilead's production.  The government identifies four requests for production to which it believes these unidentified documents are responsive, but as summarized below, Gilead has produced all documents that it agreed to produce in response to these requests.  The government took no issue with Gilead's responses to these requests in the more than six months after Gilead served them—and the government certainly raised no issues with these responses before the substantial completion deadline.

| RFP | Government's Request | Gilead's Original Response | Produced Documents |
|---|---|---|---|
| 143 | All documents relating to the Gilead's employment of Dr. Robert Janssen, including any application, resume or curriculum vitae, personnel file, performance evaluation, internal memorandum, or document created by or relating to Dr. Janssen. | Dr. Robert Janssen's employment records | Documents reflecting Dr. Janssen's employment, including the agenda for his interview (GILDDE00832881), his CV (GILDDE00832883), the letter of introduction that Dr. Janssen sent to Dr. Norbert Bischofberger (GILDDE00497400), his offer recommendation (GILDDE01338831), correspondence related to his candidacy (GILDDE00497398), Dr. Janssen's HR file (GILDDE00456393) and Dr. Janssen's Employee Confidential Information and Inventions Agreement (GILDDE00892506) |

WILMERHALE

| RFP | Government's Request | Gilead's Original Response | Produced Documents |
|---|---|---|---|
| 207 | All documents relating to disclosures to GSI or GSIUC of prior inventions or other intellectual property held by Dr. Robert Janssen prior to or during his employment with GSI from 2008 to 2010. | Documents related to disclosures to GSI or GSIUC of prior inventions or other intellectual property held by Dr. Robert Janssen prior to or during his employment with GSI from 2008 to 2010 | The sole document that we have located in which Dr. Janssen identified any prior invention or other intellectual property is his Employee Confidential Information and Inventions Agreement (GILDDE00892506). |
| 220 | All documents discussing or reflecting communications since 2004 between or among Dr. James Rooney, Dr. Howard Jaffe, Dr. Mick Hitchcock, Martha Vazquez, Dr. Norbert Bischofberger, Dr. Michael Miller, Dr. William Lee, Dr. Robert Janssen, Dr. Dana Pizzuti, and Dr. William Guyer, on the one hand, and Gilead personnel on the other hand, regarding HIV treatment, HIV prophylaxis, PrEP, Truvada®, or Descovy®. | In view of the foregoing objections, Defendants will not produce documents in response to this request as drafted. Defendants are willing to meet and confer with Plaintiff to discuss a narrower scope of request that is reasonably related to the subject matter of the litigation and proportional to the needs of the case. | Although the government did not respond to Gilead's refusal to produce document in response to this overbroad request,[1] Gilead's production includes at least 66,911 documents that include the terms "HIV prophylaxis" or "PrEP" and any of the named individuals. |
| 249 | All documents and communications exchanged between Dr. Robert Janssen and Gilead personnel regarding PrEP or PEP. | Communications exchanged between Dr. Robert Janssen and Gilead personnel regarding PrEP or PEP prior to Jan. 31, 2007 | 274 emails to, from, or copying Dr. Janssen that mention PrEP or PEP, and 4,631 total documents that mention Dr. Janssen and PrEP or PEP |

---

[1] In fact, the government objected to a similar RFP from Gilead because, in the government's view, it was unduly burdensome and contravened the Default Standard. *See* Gov't Resp. to RFP No. 118. Gilead withdrew the request. *See* Ltr. from Gilead to Gov't at 19 (Mar. 26, 2021).

– 3 –

WILMERHALE

Moreover, Dr. Janssen was one of the ten ESI custodians whose files Gilead searched for documents responsive to *any* request—not just the four requests cited in the government's letter—as was his supervisor, Norbert Bischofberger.

Based on your vague complaints and the comprehensive search and production that Gilead has already done, we simply do not understand what else the government believes exists and is missing. Nonetheless, despite having already conducted a reasonable search, we will again confirm that we have collected and produced all responsive, non-privileged documents from Dr. Janssen's employment file, and if anything remains, we will produce it.

## II.   "Gaps in Patent Search Alerts and Disclosures Provided to Gilead"

Next, the government alleges that Gilead has not produced certain "Patent Search Alerts." Again, the government's complaints are based purely on speculation about the possible existence of other documents. We have conducted a reasonable search for all the requested patent alerts, and we have produced the alerts that are responsive to the government's requests for production.

Your statement that "[i]n our prior communications on this issue, Gilead counsel has acknowledged that there were gaps in the search-related communications and stated its willingness to address them further," is simply incorrect. We have made no such representations. Our only previous discussion of this issue was when the government raised it without advance notice during our September 9, 2021 meet and confer:

> At the end of our call, the government stated that it intends to send Gilead a letter about Gilead's production of weekly alerts from Thomson Reuters from a period between 2014 and 2015 and asked if Gilead was withholding alerts from that period on the basis of privilege. We confirmed that Gilead has not withheld any Thomson Reuters alerts from that period on the basis of privilege and said that we would consider the government's letter when we receive it. We note, however, that Gilead has produced Thomson Reuters alerts from the week that the '509 Patent issued (i.e., June 2, 2015) and surrounding weeks. *See, e.g.*, GILDDE01292496 ("HIV weekly alert" covering "2015-05-28 to 2015-06-03"); GILDDE01292149 ("TAF alert" covering "2015-05-28 to 2015-06-03"); *see also* GILDDE01291993 & GILDDE01291714 (previous week); GILDDE01291634 & GILDDE01291634 (following week). We expect that this addresses the government's concerns, but if any remain, we will consider them.

Email from C. Cox to Counsel of Record (Sept. 10, 2021, 1:46 PM). The government responded to this email but did not dispute the substance of our summary. *See* Email from A. Kelly to Counsel of Record (Sept. 16, 2021, 10:19 AM). To be clear, we have never agreed that there are gaps in Gilead's production, nor have we agreed to "address" these non-existent gaps.

WilmerHale

Nonetheless, we will again confirm that we have collected and produced all responsive, non-privileged "patent search alerts" that can be located with a reasonable search, and if anything remains, we will produce it.

### III.   "Failure to Address Additional Gilead Custodians"

Your letter next re-raises the government's request for Gilead to add ten additional ESI custodians to its searches.  This request expressly contravenes the Delaware Default Standard, which requires ESI searches of only ten custodians, which Gilead satisfied.  Moreover, this request, coming more than four months after the substantial completion deadline and after Gilead collected, reviewed, and produced documents from ten other ESI custodians, is extremely untimely and highly prejudicial to Gilead.  Gilead will not perform a full ESI collection from ten more individuals and engage a new document-review team to review these ten individuals' files based on this belated complaint.

Your letter again misstates and mischaracterizes our correspondence about this issue. Your letter states that "Gilead was open to additional custodians in our discussions," with no citation.  That is simply incorrect.  As we stated in our March 3, 2021 letter:

> The government's February 26, 2021 letter also identifies, for the first time, ten additional "custodians" for which it "would like Gilead to search … for responsive documents."  As the Default Standard states, and as the government has agreed, "only ten custodians are required." Ltr. from A. Kelly to C. Cox at 17 (Feb. 19, 2021). The government has not objected to the ten ESI custodians that Gilead disclosed on July 31, 2020—in fact, it confirmed that it has no specific objection to those ten custodians on our February 19, 2021 call—and Gilead has now incurred substantial expense to collect and begin reviewing documents from those ten custodians. Accordingly, *the ten custodians from which Gilead will conduct a complete ESI review under the Default Standard are now set*.

Ltr. from Gilead to Gov't at 7 (Mar. 3, 2021) (emphasis added).  After receiving the government's response, we again stated:

> Gilead has identified the ten ESI custodians who are most likely to have relevant ESI, as required by the Default Standard, and the government has not objected to Gilead's selection of custodians or suggested that these additional ten individuals are more likely to have relevant ESI than any of the custodians Gilead selected. The government has agreed that only ten ESI custodians are required under the Default Standard, and *Gilead will not add these ten additional individuals to the ten custodians it has already identified for purposes of searches under the Default Standard*.

– 5 –

WILMERHALE

Ltr. from Gilead to Gov't at 7 (Mar. 15, 2021) (emphasis added).  Rather, what we agreed to do was "consider the government's response as part of Gilead's reasonable searches to identify relevant, responsive, non-privileged documents."  Ltr. from Gilead to Gov't at 7 (Mar. 3, 2021).  But even after receiving the government's purported explanations of the relevance of these witnesses on March 9, we told you that "as we stated, our understanding is that these individuals have little or no relevance to this case."  We again asked the government to identify "specific issues for which the government believes these individuals have knowledge," Ltr. from Gilead to Gov't at 7 (Mar. 15, 2021), but the government never responded.

Gilead's reasonable investigation indicated that these individuals are unlikely to have significant amounts of responsive, non-privileged, and non-duplicative documents beyond the documents that Gilead has already produced from them (which we summarize below).  The explanations given by the government did not change that.  For example, for three of the individuals (Douglas Brooks, Dr. Linda Higgins, and Daniel O'Day), the government's relevance explanation is that the individuals must have responsive, non-privileged, and non-duplicative documents simply because the government mentioned the individuals in its complaint.  But the government's conclusory assertion that these individuals must have such documents does not make it so.

For the remaining seven individuals, the government vaguely asserted that they "clearly have been involved with PrEP efforts at Gilead" and identified three produced documents on which they were copied or named.  Ltr. from Gov't to Gilead at 5-6 (Mar. 9, 2021).  But that alone does not create an obligation for Gilead to search all of their ESI.  With respect to these remaining seven individuals, the government has only attempted to justify its requests for sweeping collections for two—Traci Carrithers and Terry Dahl.  *Id.* at 6.  The government's main justification for Ms. Carrithers is that she was Dr. Bischofberger's executive assistant.  But Dr. Bischofberger was among the ten custodians whose ESI Gilead comprehensively searched, and the government provides no explanation for why Dr. Bischofberger's assistant would have non-duplicative ESI.  And Gilead responded to the government's purported justification for its request from Dr. Dahl more than 7 months ago, on March 15:

> The government's assertion that "Dr. Dahl's documents are … crucial as he is the lead inventor listed on International Patent Application Publication WO2004/064845, which features prominently in Gilead's invalidity contentions" lacks merit. Ltr. at 6. When a POSA reads a prior art reference, the POSA does not speak to the author to interpret the reference; the POSA just reads the words on the page and interprets them in light of his or her skill and experience. As a result, "any information [the prior art author] might have to offer beyond the words of the [reference] application would be irrelevant" to validity issues. *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363, 1375 (Fed. Cir. 2008).

– 6 –

WILMERHALE

Ltr. from Gilead to Gov't at 7 n.7 (Mar. 15, 2021).  The government has never responded—not even in your October 6, 2021 letter.

Notwithstanding the government's failure to justify its demand for full searches of these individuals' ESI, Gilead did consider the limited information you provided in your March 9 letter about these individuals in performing its document collection, and as your letter acknowledges, Gilead did produce documents as a result of that effort.  For example, Gilead produced:

- 628 emails and attachments to, from, or copying Traci Carrithers, including, including correspondence regarding the Material Transfer Agreements and Commercial Product Management Committee Meetings;

- 2,784 emails and attachments to or from Amy Coluci and 831 emails and attachments to, from, or copying Dr. Terrance (Terry) Dahl, including correspondence with the government regarding the government's requests for TDF and Truvada®;

- 595 emails and attachments to, from, or copying Linda Higgins, including materials addressing Gilead's New Drug Application for Truvada® for PrEP;

- 2,580 emails and attachments to, from, or copying Dr. Brian Kearney and 2,879 emails and attachments to, from, or copying Dr. Adrian Ray, including correspondence regarding the development of PrEP; and

- 1,107 emails and attachments to, from, or copying Dr. Grushenka Wolfgang, including correspondence regarding regulatory filings related to Truvada®.

Further, despite being under no obligation to do so, Gilead performed a review of all ESI from Madeline Miller that is in its possession, custody, or control.  Gilead's production contains 1,026 emails and attachments to, from, or copying Ms. Miller.

In short, Gilead identified the ten custodians most likely to have ESI responsive to the government's requests on July 31, 2020 in compliance with the Delaware Default Standard and the Scheduling Order in this case.  Defs.' ESI Rule 3 Disclosures at 3-4 (July 31, 2020).  If the government believed that any of these ten individuals was more likely to have responsive information than the custodians identified in Gilead's July 31, 2020 disclosure, the time to raise that was 14 months ago, when Gilead served its ESI disclosures, or at least more than 4 months ago, when Gilead substantially completed its productions from other custodians.  The government did not take that position, and Gilead reviewed and substantially completed its production of responsive, non-privileged documents from its disclosed custodians by the June 4, 2021 deadline.  Nonetheless, if the government believes that any of these ten individuals have responsive, non-privileged, and non-duplicative documents about narrow, discrete issues, please let us know what those documents are—with specificity—and we will consider your requests.

WILMERHALE

## IV.   "Documents Related to Pricing of Truvada®"

The government's October 6, 2021 letter requests production of Gilead's "sales and revenue documents for Truvada® from 2004 until present," but Gilead has already produced documents reflecting sales and revenue information for Truvada® since at least 2011, before the launch of Truvada for PrEP®.  Under the Delaware Default Standard for Discovery, ¶ 4(e), the government filed its complaint on November 6, 2019, and is therefore entitled to discovery of documents dating back only to November 6, 2013, absent a showing of good cause.  Gilead's production already exceeds the period of six years before the filing of the complaint.

The government alleges that all sales and revenue information for Truvada® is "highly relevant to a reasonable royalty analysis" and cites Mr. O'Day's congressional testimony to support the government's overreach in seeking sales and revenue information going back to 2004.  Ltr. from Gov't to Gilead (Oct. 6, 2021).  As an initial matter, Gilead has already produced the documents related to Mr. O'Day's congressional testimony.

As we previously stated, the information that Gilead has produced "is more than adequate to enable the government to determine historical trends, to the extent that information is relevant to the calculation of a reasonable royalty, or lost profits."  Ltr. from Gilead to Gov't at 6 (Jan. 8, 2021).  The government has not explained how Gilead's production is insufficient to address the established profitability of the accused indication.  The financial information Gilead has produced pre-dates the alleged damages period and the earliest date the government has asserted for a hypothetical negotiation by four years.  Moreover, Gilead's document production already reflects the launch price of Truvada® and every price increase taken thereafter.  *See, e.g.*, GILDDE00531558; GILDDE00536598.

The government has not shown good cause to reach back seven years before the launch of the accused products.  The government's conclusory assertions that the information it seeks is relevant to a reasonable royalty analysis are insufficient.  Ltr. from Gov't to Gilead at 5-6 (Oct. 6, 2021); Ltr. from Gov't to Gilead at 15 (May 17, 2021); Ltr. from Gov't to Gilead at 3 (Feb. 19, 2021); Ltr. from Gov't to Gilead at 4-5 (Oct. 21, 2020).  Despite our requests, the government still has not identified which of the *Georgia Pacific* factors encompass sales and revenue information for an unaccused product pre-dating the alleged damages period by a decade or how that information would be relevant to a hypothetical negotiation and proportional to the needs of this case.

The government's failure to articulate how pre-2011 documents are relevant to the reasonable royalty analysis and a hypothetical negotiation in or after 2015 leads us to conclude that they simply are not.  Yet, if you do explain, ***with specificity and supporting case law***, how these documents are relevant, we will again consider your request.

## V.   "Specific Executive Documents Sought by Government"

The government raises alleged deficiencies in Gilead's production regarding eleven requests (RFP Nos. 224-235) for the first time over four months after the substantial completion

WILMERHALE

of document production and six months after Gilead responded to those requests.  In Gilead's responses to Requests Nos. 224-235, served on April 5, 2021, Gilead stated that it would not produce documents in response to Request No. 235 and that it would not separately search for documents responsive to Requests Nos. 225-231, 233, and 234.  As explained in Gilead's April 5 responses and objections, Gilead had already agreed to produce documents sufficient to show the computation of the standard cost of Truvada®, as used in the CAR reports for the MTAs or CTA at issue in this litigation; documents sufficient to show Defendants' business planning related to Truvada for PrEP® or Descovy for PrEP®, including brands plans; and documents sufficient to show historical profitability of Truvada® and Descovy® since 2011.  Gilead has produced those materials.

The government now claims—after significant delay—that agendas, presentations, and minutes from meetings of Gilead's Board of Directors and Executive Committee are "crucial to the Government's requests directed to PrEP sales and awareness of the Patents-in-Suit."  That is incorrect.  First, Gilead has already produced document reflecting sales of Truvada® and Descovy® since 2011.  Second, none of the government's cited requests are directed to "awareness" of the Patents-in-Suit.

The government further states that these requests "seek pricing analyses, projections, and market usage and prescription rates for Truvada® and Descovy® that were 'created for long-term/strategic/brand plans presented to the Board of Directors or other Gilead stakeholders.'"  Ltr. from Gov't to Gilead at 6 (Oct. 6, 2021).  The government already has documents reflecting Gilead's pricing analyses, projection, market usage, and prescription rates for Truvada® and Descovy®.  To the extent such information is presented to the Board of Directors or other Gilead stakeholders, the information is derived from and reflected in the documents Gilead has already produced.

Finally, the Board of Directors and the Executive Committee agendas, presentations, and meeting minutes contain highly sensitive information about Gilead's unrelated product lines and corporate strategy, including corporate acquisitions, financing, and employee compensation.  The burden of producing such information—particularly after the government's refusal to agree to redaction of irrelevant and non-responsive information, *see, e.g.*, Email from P. Sternhell to Counsel of Record (Aug. 24, 2020 3:39 P.M.)—simply outweighs any value they may have to this case.  Gilead will not produce those materials unless the government identifies, with specificity and non-speculative support, non-duplicative and relevant information in those materials.

## VI.  "Gilead Sciences Ireland UC Documents"

The government's complaints about Gilead's productions from GSIUC again ignore a fundamental problem with its claims:  GSIUC should not be a defendant in this case.[2]  We told

---

[2] It also remains unclear to us—as it has since our first conversation—why the government believes that GSIUC needs to be a party in this case.  It is undisputed that defendant GSI, which is GSIUC's ultimate parent, sells and markets Truvada® and Descovy® in the United States.

WILMERHALE

the government that in our very first call about this case on January 8, 2020. The following day, we told the government:

> As I said when we spoke, I can represent to you that, based on our investigation to date, only Gilead Sciences, Inc. (GSI) engages in activities that could be accused of infringing the asserted patents. More specifically, the government's theory of infringement by Gilead is based on inducement. Our understanding is that when tablets or brite stock to be used as PrEP regimens intended for US sale are manufactured by Gilead Sciences Ireland UC (GSIUC) outside of the United States, title is transferred to GSI prior to labelling and packaging. GSI – not GSIUC – then has the labels issued for the US market that are cited in the complaint.

> Based on these representations, we would request that the government stipulate to a dismissal of GSIUC from this matter without prejudice. Of course, in voluntarily dismissing GSIUC from this matter, we would agree that the government does not waive its rights under the Federal Rules to seek discovery of GSIUC, and Gilead reserves all potential objections thereto.

Email from D. Bassett to Counsel of Record (Jan. 9, 2020 10:19 A.M.). The government requested "documentary or similar evidence to verify your representations about the scope of GSIUC's involvement in the manufacture, labeling, and packaging of Truvada and Descovy for the U.S. market" and stated that its understanding was that "GSIUC is the site … where the products are packaged and labeled." Email from W. Brown to Counsel of Record (Jan. 10, 2021 10:50 A.M.). Despite the speculative nature of the government's claims against GSIUC, we produced the data that the government requested by the June 4, 2021 substantial completion deadline. *See* GILDDE02026896; GILDDE01924520. Those documents show that GSIUC has not made a single shipment to the United States of Truvada® manufactured by GSIUC and labeled for sale in the United States since June 1, 2012, and has never made a shipment to the United States of Descovy® that was labeled for sale in the United States. Although that alone should be sufficient for the government to dismiss its claims against GSIUC, we are also in the process of supplementing our response to the government's Interrogatory No. 1 to further explain those documents.

The government, however, has offered nothing but speculation to support its claims against GSIUC. Most notably, the government has identified nothing to suggest that GSIUC has committed an affirmative inducing act. As recently as May of this year—more than 18 months after filing its complaint—the government's allegations against GSIUC were still supported only by "information and belief." *See* Gov't's Suppl. Resp. to Interrog. No. 4 (May 21, 2021) ("***On information and belief*** GSIUC currently manufactures and/or packages Gilead's Truvada for PrEP® and Descovy for PrEP® products intended for sale in the U.S., and those products include FDA-approved package inserts that include instructions regarding the use of those products for

WilmerHale

PrEP. ***On information and belief***, GSIUC has manufactured and/or packaged Gilead's Truvada for PrEP® product from at least 2012 to the present."). The government dropped these "information and belief" qualifiers in its most recent infringement contention interrogatory response, but it still cites ***nothing*** to support its factual assertions. *See* Gov't's 2d Suppl. Resp. to Interrog. No. 4 (Sept. 24, 2021) ("Gilead Sciences Ireland UC currently manufactures and/or packages Gilead's Truvada for PrEP® and Descovy for PrEP® Products intended for sale in the United States, and those products include FDA-approved package inserts that include instructions regarding the use of those products for PrEP. Gilead Sciences Ireland UC has manufactured and/or packaged Gilead's Truvada for PrEP® product from at least 2012 to the present."). These unsupported assertions expressly contradict the data that the government requested, that Gilead produced, and that the government had in its possession for several months by the time it served this most recent supplemental response.[3] *See* GILDDE02026896. Frankly, we do not understand how the government could believe that it had a good-faith basis to make these factual assertions in its most recent supplemental interrogatory response in light of the evidence Gilead has produced. In fact, we believe this to be a direct violation of the government's obligations under Rule 37.

Furthermore, aside from the government's failure to establish that GSIUC committed any affirmative inducing act, we have repeatedly raised the government's failure to establish the remaining elements of its induced infringement claims against GSIUC. Specifically, the government has failed to cite ***any*** fact showing that GSIUC had any pre-suit knowledge of the patents-in-suit or the alleged infringement, or that GSIUC had any intent to induce the alleged acts of infringement. *See, e.g.*, Ltr. from Gilead to Gov't at 18-20 (Jan. 20, 2021); Ltr. from Gilead to Gov't at 18-20 (Mar. 25, 2021); Ltr. from Gilead to Gov't at 6-9 (Aug. 18, 2021). The government's most recent supplemental response to Interrogatory No. 4, served on September 24, 2021, for the first time suggests that the government is attempting to pierce the corporate veil to satisfy these elements, even though the government did not plead an alter-ego liability theory and has not identified facts that are even remotely sufficient to support such a theory.

---

[3] These are not the only obvious inaccuracies in the government's infringement contentions and in your letter. For example, your letter states "GSIUC is the owner of the Truvada for PrEP® trademark in the United States." Ltr. at 6; *see also* Gov't's 2d Suppl. Resp. to Interrog. No. 4 (Sept. 24, 2021) ("According to public records, Defendant Gilead Ireland UC applied for and received a trademark in the United States Patent and Trademark Office (PTO) for exclusive use of the mark, TRUVADA FOR PREP. Gilead's application for the mark was filed on January 6, 2017 with U.S. Ser. No. 87,292,084 and was registered on December 19, 2017 as U.S. Reg. No. 5,358,262."). That is incorrect. The government's own records—some of which are attached to the government's complaint—show that GSI, ***not*** GSIUC, was the applicant for and recipient of this mark. D.I. 1, Ex. 79; TESS Entry for Reg. No. 5358262 ("Owner (REGISTRANT) Gilead Sciences Inc. CORPORATION DELAWARE 333 Lakeside Drive Foster City CALIFORNIA 94404"); *see also* TESS Entry for Reg. No. 5623246 (same for other Truvada® trademark registration discussed in government's infringement contentions).

– 11 –

WILMERHALE

Notwithstanding the glaring deficiencies in the government's claims against GSIUC, we have repeatedly agreed to provide limited discovery from GSIUC in the hope that the government will be reasonable and dismiss what are plainly meritless claims without the need for motion practice.  For example, in response to RFP No. 76, which you cite in your letter, Gilead agreed to produce "documents sufficient to show GSIUC's role in the marketing or sale of Truvada for PrEP® or Descovy for PrEP® in the United States since June 5, 2015."  *See* Defs.' Objs. & Resps. to Pl.'s Corrected 1st RFPs at 63 (Aug. 6, 2020).  The government never raised an objection to that response in the ***14 months*** after Gilead served it, and Gilead produced the information it agreed to produce.  *See, e.g.*, GILDDE02026896.  Likewise, in response to RFP Nos. 12 and 13 (also discussed in your letter), Gilead ultimately agreed to produce "documents sufficient to show the ownership and licensing of the U.S. trademarks Truvada for PrEP® and Descovy for PrEP® since June 2, 2015."[4]  Ltr. from Gilead to Gov't at 5 (Jan. 8, 2021).  Again, Gilead has done that.  *See, e.g.*, GILDDE01924506; GILDDE01924507; GILDDE01924509; GILDDE01924510; GILDDE01924512; GILDDE01924514; GILDDE01924516.  And in response to RFP No. 235 (the last RFP cited in your letter), Gilead stated: "In view of [their] objections, Defendants will not produce documents in response to this request.  Defendants will consider Plaintiff's request if Plaintiff identifies what it is seeking with greater specificity and explains the relevance of the documents sought by this request."  Defs.' Objs. & Resps. to Pl.'s 2d RFPs (Apr. 5, 2021).  The government failed to follow up with us about this request for more than ***6 months***, and your letter still does not provide the information we requested.  Put simply, Gilead has provided the discovery from GSIUC that it agreed to provide in discovery responses that were served many months ago, and Gilead did not withhold any otherwise responsive documents because they were held by GSIUC.

Gilead is not willing to undertaking a further document collection or review from GSIUC at this late date absent a clear articulation of the government's good-faith basis for maintaining its claims against GSIUC and absent a compelling reason to do so, given the government's extreme delay in raising these issues.  As explained above, the government's contentions and claims against GSIUC appear to be objectively baseless and in direct defiance of Rule 37, and perhaps even Rule 11, and we will rely on any further action related to these claims to support a finding of exceptionality under 35 U.S.C. § 285 and to seek Gilead's fees and costs.  As stated above, even though it is completely unnecessary, we are preparing a supplemental response to Interrogatory No. 1 addressing the government's claims against GSIUC that we expect to serve within the next two weeks (and that we will attempt to provide sooner).  If, after that point, the

---

[4] After another round of correspondence, Gilead reiterated its position on March 30, 2021, but stated that "[i]f the government has a ***specific*** reason to believe that the production of [the originally requested] documents is necessary and proportional to the needs of the case—and if that reason finds support in caselaw—Gilead will reconsider its position."  Ltr. from Gilead to Gov't at 9 (Mar. 30, 2021).  We heard nothing further from the government about these two requests in more than ***6 months*** after that letter, and the government's October 6, 2021 letter still does not provide any support for its broader requests.

WILMERHALE

government persists in pursuing its baseless claims against GSIUC, Gilead will seek immediately appropriate remedies from the Court.

Best regards,

*/s/ David B. Bassett*

David B. Bassett

cc:     All Counsel of Record in *United States v. Gilead Sciences, Inc.*, C.A. No. 19-2103-MN (D. Del.) (by electronic mail)