# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

THE UNITED STATES OF AMERICA,

*Plaintiff & Counterclaim-Defendant*,

v.

GILEAD SCIENCES, INC. and GILEAD
SCIENCES IRELAND UC,

*Defendants & Counterclaim Plaintiff.*

**CONTAINS RESTRICTED
INFORMATION—SUBJECT
TO PROTECTIVE ORDER**

C.A. No. 19-2103-MN

**REBUTTAL EXPERT REPORT OF CHARLES W. FLEXNER, M.D.**

Date: May 16, 2022

**CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER**

# TABLE OF CONTENTS

I.     **Introduction**..................................................................................................1

II.    **Qualifications & Professional Experience** ..................................................1

III.   **Summary of Opinions**..................................................................................2

IV.   **Materials Considered**..................................................................................4

V.    **Compensation & Previous Testimony**........................................................4

VI.   **Legal Principles** ...........................................................................................5

     A.    Claim Construction ..............................................................................5

     B.    Direct Infringement..............................................................................7

         1.    Literal Infringement ...................................................................7

         2.    Infringement Under the Doctrine of Equivalents.......................8

     C.    Divided Infringement .........................................................................10

     D.    Indirect Infringement .........................................................................11

VII.  **Person of Ordinary Skill in the Art**........................................................12

VIII. **Background of Technology** .......................................................................13

IX.   **The Patents-in-Suit** ...................................................................................14

X.    **The Products Accused of Use in Infringing Methods of Administration** ...........................................................................................15

     A.    Truvada® ............................................................................................15

     B.    Descovy® ...........................................................................................19

XI.   **Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy® Directly Infringes the Asserted Claims**.............25

     A.    Versions of the Truvada® Insert and Descovy® Insert to Which Dr. Murphy Cites ............................................................................25

     B.    Dr. Murphy's Anecdotal Discussion of the Use of Truvada® for PrEP ...........................................................................................26

     C.    Truvada® REMS Assessment Submissions Cited By Dr. Murphy .....36

         1.    REMS Assessment—Period Covered: 16 July 2012 to 15 May 2013 (GILDDE00236715-7526) ("REMS 1").............................37

         2.    REMS Assessment—Period Covered: 16 July 2012 to 15 May 2013 (GILDDE00243874-GILDDE00244563) ("REMS 2")...................40

         3.    REMS Assessment—Period Covered: 16 November 2014 to 15 May 2016 (GILDDE00251496-2071) ("REMS 3") ...............................41

         4.    REMS Assessment—Period Covered: 16 May 2016 to 15 November 2017 (GILDDE00263067-700) ("REMS 4").........................43

**CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER**

5.        REMS Assessment—Period Covered: 16 November 2017 to 09 July 2018 (GILDDE00270528-916) ("REMS 5") .................................... 44

D.    Dr. Murphy Has Not Established that Prescription and/or Use of Truvada® Directly Infringes the Asserted Claims ................................ 46

     1.        Dr. Murphy Has Not Established that Prescription and/or Use of Truvada® Directly Infringes Claim 13 of the '509, '333, and '191 Patents or Claim 12 of the '423 Patent (Requiring "Potential Exposure") ........................................................................................ 47

     2.        Dr. Murphy Has Not Established that Prescription and/or Use of Truvada® Directly Infringes Claim 14 of the '423 Patent ..................... 126

     3.        Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® Directly Infringes Claim 18 of the '423 Patent ..................... 133

     4.        Dr. Murphy Has Not Established that Prescription and/or Use of Truvada® Directly Infringes Claim 18 of the '191 Patent ..................... 134

     5.        Dr. Murphy Has Not Established that Prescription and/or Use of Truvada® Directly Infringes Claim 1 of the '509, '333, and '423 Patents (Requiring "Exposure") ................................................. 137

     6.        Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® Directly Infringes Claim 3 of the '509 Patent, Claim 3 of the '333 Patent, or Claim 3 of the '423 Patent ....................................... 211

     7.        Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® Directly Infringes Claim 8 of the '509 Patent ..................... 214

     8.        Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® Directly Infringes Claim 19 of the '423 Patent ..................... 217

     9.        Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® Directly Infringes Claim 9 of the '509 Patent or Claim 9 of the '423 Patent ........................................................................ 218

     10.      Conclusion Regarding Direct Infringement of the Asserted Claims Through Prescription and/or Use of Truvada® for PrEP ....................... 222

E.    Dr. Murphy's Anecdotal Discussion of the Use of Descovy® for PrEP ........................................................................................... 222

F.    Dr. Murphy Has Not Established That Prescription and/or Use of Descovy® Directly Infringes the Asserted Claims ................................ 228

     1.        Dr. Murphy Has Not Established That Prescription and/or Use of Descovy® Directly Infringes Claim 13 of the '509 Patent or Claim 12 of the '423 Patent (Requiring "Potential Exposure") ........................ 228

     2.        Dr. Murphy Has Not Established That Prescription and/or Use of Descovy® Directly Infringes Claim 14 of the '423 Patent ..................... 292

     3.        Dr. Murphy Has Not Established That Prescription and/or Use of Descovy® Directly Infringes Claim 18 of the '423 Patent ..................... 298

**CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER**

4.      Dr. Murphy Has Not Established That Prescription and/or Use of Descovy® Directly Infringes Claim 1 of the '423 Patent (Requiring "Exposure")................................................................299

5.      Dr. Murphy Has Not Established That Prescription and/or Use of Descovy® Directly Infringes Claim 3 of the '423 Patent........................360

6.      Dr. Murphy Has Not Established That Prescription and/or Use of Descovy® Directly Infringes Claim 19 of the '423 Patent......................362

7.      Dr. Murphy Has Not Established That Prescription and/or Use of Descovy® Directly Infringes Claim 9 of the '423 Patent........................363

8.      Conclusion Regarding Direct Infringement of the Asserted Claims Through Prescription and/or Use of Descovy® for PrEP........................365

XII.    **Dr. Murphy Has Not Established That Physicians and Patients Jointly Infringe the Asserted Claims** ........................................................**366**

A.      Dr. Murphy Has Not Established That Physicians are Vicariously Liable for the Actions of Their Patients Taking Truvada® for PrEP .................366

B.      Dr. Murphy Has Not Established That There is a Joint Enterprise Between Physicians and Their Patients Taking Truvada® for PrEP.................378

C.      Dr. Murphy Has Not Established That Physicians Are Vicariously Liable for the Actions of Their Patients Taking Descovy® for PrEP .................381

D.      Dr. Murphy Has Not Established That There Is a Joint Enterprise Between Physicians and Their Patients Taking Descovy® for PrEP .................391

XIII.   **Dr. Murphy Has Not Established That Gilead Induces Infringement of the Asserted Claims** ........................................................**394**

A.      Dr. Murphy Has Not Established That Gilead Induces Infringement of the Asserted Claims for Truvada® ...............................................394

B.      Dr. Murphy Has Not Established That Gilead Induces Infringement of the Asserted Claims for Descovy® ...............................................451

XIV.    **Dr. Murphy Has Not Established That GSIUC Induces Infringement of the Asserted Claims** ........................................................**478**

XV.     **The Government's Licensing of International Counterparts to the Patents-in-Suit is Irrelevant** ........................................................**483**

XVI.    **Gilead's Orange Book-Listed Patents for Truvada® and Descovy®** .........................**485**

XVII.   **Other Patents**........................................................................................**487**

XVIII.  **The Inventors Did Not Have Possession of the Claimed Invention at the Time of Filing the Provisional Application on Feb. 3, 2006**...................**489**

XIX.    **Dr. Murphy and Dr. Brancale Have Not Established that TAF Meets the Term "Tenofovir Ester" as Used in Claim 13 of the '509 Patent Under the Doctrine of Equivalents**........................................................**493**

A.      Background ........................................................................................493

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

1.  Claim 13 of the '509 Patent ...................................................493

2.  Relevant Claim Constructions ..............................................493

3.  Inhibiting Establishment of HIV Infection Requires Tenofovir to be Inside Cells ............................................495

4.  Getting Tenofovir Into Cells After Oral Administration .........496

5.  Prodrugs Are Compounds That the Body Converts Into Drugs ..............497

6.  Tenofovir Esters and Tenofovir Alafenamide are Two Different Kinds of Tenofovir Prodrugs ...............................498

7.  Different Prodrugs Are Metabolized Differently.....................499

8.  Different Prodrugs Lead to Real-World Differences for PrEP Users......502

B.  TAF Does Not Perform Substantially the Same Function, in Substantially the Same Way, to Achieve Substantially the Same Result, as a Tenofovir Ester...................................505

1.  The Function of Tenofovir Esters and TAF Is to Get Tenofovir Into Cells Following Oral Administration ...............................505

2.  TAF Performs Its Function in a Substantially Different Way than Tenofovir Esters...............................507

3.  TAF Achieves a Substantially Different Result than Tenofovir Esters...............................510

C.  Tenofovir Esters and TAF are not Equivalent Under the Insubstantial Differences Test.................................515

**XX.  The Infringement Theory of Claim 13 of the '509 Patent Under the Doctrine of Equivalents Relating to Descovy® is Barred by Prosecution History Estoppel and the Disclosure-Dedication Doctrine ...................516**

A.  The Government Narrowed the Scope of Its Claims from a Scope That Would Include TAF to a Scope That Excludes TAF During the Prosecution of the '509 Patent ...........................516

B.  The Narrowing Amendments Were Made for Reasons Related to Patentability ...............................519

C.  The Government Was Aware of TAF When It Narrowed Its Claims ...............................521

D.  No Exceptions to the Presumption of Surrender by Narrowing Amendment Apply.................................521

E.  Dr. Brancale Misreads the Prosecution History in Opining That the Government Did Not Disclaim TAF During the Prosecution of the '509 Patent ...............................522

F.  The Disclosure-Dedication Doctrine Also Bars the Application of the Doctrine of Equivalents For Purposes of Infringement of the

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

Term "Tenofovir Ester" as Used in Claim 13 of the '509 Patent by
Descovy® ....................................................................................................525

**XXI.**   **Trial Exhibits.............................................................................................527**

**XXII.**   **Supplementation of Opinions.....................................................................527**

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

76.     I have reviewed and cited to the universe of labels to which Dr. Murphy cites in his opening report.  I further understand that the government has the burden to prove infringement, and have therefore only reviewed what Dr. Murphy has cited to in his opening report.  I take no position as to whether any of the cited product inserts were the final versions of either the Truvada® Insert or the Descovy® Insert, or whether such versions of the product inserts were ever disseminated publicly by Gilead.  Should Dr. Murphy provide or discuss any additional versions of the product insert for Truvada® or Descovy® in reply, I reserve the right to provide further analysis of those documents.

**B.     Dr. Murphy's Anecdotal Discussion of the Use of Truvada® for PrEP**

77.     Dr. Murphy provides a largely anecdotal discussion of his personal prescription of Truvada® for HIV PrEP to his patients.  *See* Murphy Report ¶¶ 57-60.  Dr. Murphy states that "[i]n prescribing Truvada for PrEP to my patients, I reviewed the instructions in the Truvada package insert, followed the same instructions in my regular practice, and I discussed the instructions with my patients to make sure they knew how to take Truvada for PrEP as well as the importance of taking Truvada for PrEP in accordance with the instructions provided in the Truvada package insert."  *Id.* ¶ 57.  Dr. Murphy further states that "[i]n addition, I refer the patient to consult the Truvada package insert after they pick up the medication from the pharmacy."[2]  *Id.*

---

[2] In paragraph 57 of his report, Dr. Murphy relies upon his own personal experience providing Truvada® for PrEP to patients, for which he provides no details or support other than his own broad general statements about himself and his own patients.  Indeed, Dr. Murphy does not even mention a single specific patient in his care.  Additionally, it is my understanding that the content of paragraph 57 of Dr. Murphy's report is inappropriate testimony to be given on the part of Dr. Murphy, as he is providing new facts to supplement the record in this matter at this stage of the proceeding.

**CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER**

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

78.    Dr. Murphy separately opines that based on his experience, "physicians review and follow the instructions in the Truvada package insert when prescribing Truvada for PrEP, and physicians discuss the instructions with patients to make sure patients know to take Truvada for PrEP as well as the importance of taking Truvada for PrEP in accordance with the instructions provided in the Truvada package insert." *Id.* ¶ 58; *see id.* ¶ 58 (also opining that "many patients review information in the Truvada package insert as instructed by the patients' physicians, and patients generally adhere to the administration instructions that they are given by their physicians and those instructions follow the information contained in the Truvada package insert").

79.    *First*, as I set forth below in Section XI.D, the Truvada® Insert expressly instructs, in the "Warnings and Precautions" section, and under the heading "Comprehensive Management to Reduce the Risk of Sexually Transmitted Infections, Including HIV-1, and Development of HIV-1 Resistance When TRUVADA Is Used for HIV-1 PrEP," to "[u]se TRUVADA for HIV-1 PrEP to reduce the risk of HIV-1 infection as part of a comprehensive prevention strategy that includes other prevention measures, including adherence to daily administration and safer sex practices, including condoms, to reduce the risk of sexually transmitted infections (STIs)." *E.g.,* Truvada® Insert at GILDDE00198025.  The Truvada® Insert further instructs physicians to "[c]ounsel individuals on the use of other prevention measures (e.g., consistent and correct condom use, knowledge of partner(s)' HIV-1 status, including viral suppression status, regular testing for STIs that can facilitate HIV-1 transmission)" and "[i]nform uninfected individuals about and support their efforts in reducing sexual risk behavior." *Id.*  Similar instructions are included on the first page of the Truvada® Insert also under "Warnings and Precautions" wherein it states "Comprehensive management to reduce the risk of acquiring HIV when TRUVADA is

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

used for HIV-1 PrEP:  Use as part of a comprehensive prevention strategy including other prevention measures; strictly adhere to dosing schedule."  *Id.* at GILDDE00198020.

80.      To the extent Dr. Murphy's experience is that "physicians review and follow the instructions in the Truvada package insert when prescribing Truvada for PrEP," and that "patients generally adhere to the administration instructions that they are given by their physician and those instructions follow the information contained in the Truvada package insert," *id.* ¶ 58, this indicates that physicians and patients generally do not practice all steps of the methods of the Asserted Claims, at least because the Asserted Claims all require the presence of either an "exposure" or a "potential exposure" to an immunodeficiency retrovirus, *e.g.,* '509 Patent, claims 1 and 13, and the Truvada® Insert recommends using Truvada® for HIV PrEP in conjunction with other preventative measures that either significantly reduce or entirely eliminate actual or potential exposure of patients to HIV-1, for example consistent use of condoms.  For this reason alone (in addition to the many reasons set forth below), I understand that patients and physicians do not generally practice all steps of the methods of the Asserted Claims.  And as I set forth in more detail below, at least because the Truvada® Insert only instructs the use of Truvada® for HIV PrEP in conjunction with other preventative measures that either significantly reduce or entirely eliminate actual or potential exposure of patients to HIV-1, Gilead does not recommend, promote, encourage, or instruct patients or physicians to practice each and every step of the methods of the Asserted Claims.  And if those practices are undertaken, as Dr. Murphy's testimony requires, patients and physicians would not practice each and every step of the Asserted Claims because there would be no actual or potential exposure, which is a required step of all Asserted Claims.  For at least these reasons, I disagree with Dr. Murphy's opinions.

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

81. *Second*, I understand that though physicians and patients may review a product insert in some cases, physicians and patients do not invariably follow all the instructions included in a product insert in all cases. Physicians and patients engaged in making individual healthcare decisions must take into account a wide variety of factors that include individualized patient needs and personal circumstances and I cannot say that, as a rule, patients and physicians adhere to the administration instructions or guidance included in a package insert, including the Truvada® Insert, all the time. Moreover, it is my experience that in most circumstances, physicians and/or patients may fail to fully review, or review at all, drug product inserts, including the Truvada® Insert, since these documents are written for prescribers and not for the average patient. Physicians and patients in the United States engage in a diverse array of practices and it is impossible to generalize the experience of a single physician to account for all or nearly all physicians and patients. If physicians and patients do "generally adhere to the administration instructions that they are given by their physician and those instructions follow the information contained in the Truvada package insert," as Dr. Murphy has opined, Murphy Report ¶ 58, then in accordance with the Truvada® Insert, patients use Truvada® for PrEP "as part of a comprehensive prevention strategy," which would include behavioral preventative methods, including but not limited to: (1) "consistent and correct condom use"; (2) "knowledge of partner(s)' HIV-1 status, including viral suppression status"; and (3) "regular testing for STIs that can facilitate HIV-1 transmission," that would prevent actual or potential exposure to HIV-1, GILDDE00198020-57, at GILDDE001909825.

82. Accordingly, Dr. Murphy's blanket citation to various "estimate[s]" of how many users of Truvada® for PrEP there are in the United States in support of the statement that "[n]umerous physicians have prescribed Truvada for PrEP according to the Truvada package

– 29 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

insert, and numerous patients have used Truvada for PrEP in accordance with the Truvada package insert," is simply insufficient support for that statement. Murphy Report ¶ 59. Dr. Murphy is simply applying unsupported assumptions about physician and patient practices and individualized healthcare decision-making to aggregate estimated numbers of patients taking Truvada® for PrEP.

83.     *Third*, Dr. Murphy's citations to the aggregate numbers of "annual users of Truvada for PrEP" and "estimated … number of prescriptions for Truvada for PrEP" vary widely and appear to be irreconcilable in measure. *Id.* Dr. Murphy first cites to a journal article which estimates that there were "59,427 annual users of Truvada for PrEP in 2015, 77,120 in 2016, and 100,282 in 2017," and then in the next sentence cites to a different journal article for "CDC estimate[s]" that "51,544 patients were prescribed Truvada for PrEP by physicians in 2015, 94,277 in 2016, 141,080 in 2017, and 204,720 in 2018." *Id.* Dr. Murphy offers no explanation for the wide disparities in these estimated figures and provides no discussion thereof. The inconsistencies in Dr. Murphy's cited figures only appear to grow in the next sentence in his recitation that the "CDC also estimated that the number of prescriptions for Truvada for PrEP in 2015 was 232,003, 487,725 in 2016, 755,749, and 1,100,684 in 2018." *Id.* Moreover, Dr. Murphy does not attempt to translate these numbers of prescriptions for Truvada® for PrEP into a number of patients (or physicians) who he contends actually practice the methods of the Asserted Claims, including all of their steps.

84.     Dr. Murphy further cites to yet another set of estimated numbers of Truvada® for PrEP patients and prescriptions per month from June 2015 through August of 2021. *See id.* (citing GILDDE02642770). Dr. Murphy similarly provides no discussion of these estimates.

– 30 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

85.     Dr. Murphy also cites to two journal articles in support of the proposition that

"[s]everal journal articles report that patients adhere to physician instruction to use Truvada for

PrEP in accordance with the Truvada Product label."  Murphy Report ¶ 60 (citing Albert Y. Liu

et al., *HIV Pre-Exposure Prophylaxis Integrated with Municipal and Community Based Sexual

Health Services*, 176 JAMA Internal Medicine 75 (2016) ("Liu") [US_02577511-29, at

US_2577512, US_0257715-19][3] and James Riddell IV et al., *HIV Preexposure Prophylaxis, A

Review*, 319 JAMA 1261 (2018) ("Riddell") [US_02577501-29, at US_2577501-04].  Neither of

these articles support Dr. Murphy's assertion, particularly with respect to populations relevant to

purported direct infringement of the Asserted Claims for the reasons that I set forth below.

86.     With respect to Liu, as a preliminary matter, all data collected in this study were

collected from October 2012 to February 2015, *Liu* at US_02577512, which I understand is a

period of time that concluded prior to issuance of the '509 Patent—the earliest-issued patent

asserted in this case.  Therefore, based on the temporal origin of the data alone, I would not find

it to establish or be determinative of patient behavior in the United States from June 2015 and

onward.  Moreover, Liu was not a study designed to investigate "patient[] adhere[nce] to

physician instruction to use Truvada for PrEP in accordance with the Truvada Product label,"

Murphy Report ¶ 60, but rather investigated, among other items, "PrEP" adherence in terms of

regular dosing of Truvada® for PrEP.  *See, e.g.*, *id.* at US_2577514 ("PrEP adherence was

measured several ways.  At each visit, a self-reported adherence rating scale was collected by

interviewer-administered questionnaire, pill counts were performed, and the medication

possession ratio (MPR), defined as the number of dispensed pills divided by the number of days

---

[3] I further note that the version of Liu produced at US_02577511-29 appears to be the
author's manuscript version and I therefore reserve the right to provide further comment should
Dr. Murphy rely on a different version of this reference.

**CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER**

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®**
**Directly Infringes the Asserted Claims**

between visits, 15 was calculated.") (internal footnotes omitted).[4]  Adherence to daily dosing of Truvada® for PrEP is not by itself evidence that patients adhere to physician instruction to use Truvada® for PrEP in accordance with the Truvada® Insert.

87.    Even consistent daily dosing, one item instructed in the Truvada® Insert for HIV-1 PrEP, *see, e.g.*, GILDDE00198020-057, at GILDDE00198023, appears to have been absent from some patients described in Liu, where "[m]ean PrEP adherence across visits was 82% by pill counts and 86% by MPR." US_02577511-29, at US_02577516.  Indeed, review of Liu's Figures 1-2 indicates highly variable rates of dosing adherence across sites and demographics and that at certain points in time at study sites, as many as 20% of surveyed patients were only taking Truvada® for PrEP 2-3 times per week.  *See id.* at US_2577523-24. Regular compliance appears to have been deemed met in Liu when a patient was determined to be taking Truvada® anywhere between 4-7 times per week, since that category was the highest level of dosing adherence reported.  *See id.*  Taking Truvada® for PrEP only 4 times per week is far from regular compliance with daily dosing as included in the Truvada® Insert.  The disclosure in Liu is not consistent with Dr. Murphy's statement that Liu reports patients were following physician instruction to use Truvada® for PrEP in accordance with the Truvada® Product label.  Not only is

---

[4] Furthermore, it is my understanding that the government's expert, Dr. Robert Grant, stated in his recent deposition that "'adherence' typically refers to self-reported adherence," as it does in Liu, and "which is the only indicator of adherence that was conducted across all clinical trials of PrEP.  [iPrEx's] self-reported adherence was 96 percent or something like that.  So people said they were taking the drug, and that is the way adherence is defined in the clinical field. [iPrEx] was the first glimpse that anyone had that that standard report of adherence was—had limitations."  *See* Dep. Tr. of Robert Grant, M.D. (Apr. 21, 2022) at 139:9-19; *see also id.* at 139:20-140:2 ("Q People lied?  A People lied.  How about that.  Q So people self-reported they were taking the drug, but when you actually tested the drug, you found that the actual percentage of people who were taking the drug as prescribed was about 50 percent?  A  Yes.").  Accordingly, I understand witnesses on behalf of the government to have cast aspersions on the accuracy of such measurements.

**CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER**

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

Dr. Murphy's discussion of Liu not fully reflective of the article's contents, but Dr. Murphy has not explained how patients who are exposed to HIV after missing doses of Truvada® for PrEP are still practicing the method of any Asserted Claim given the requirement that "the combination is administered prior to an exposure" or a "potential exposure." *See, e.g.*, '509 Patent, claims 1 and 13.

88.     Riddell is subject to similar issues. *First*, Riddell is not itself a study or primary research, but rather is a report of a "literature search" that was "performed in PubMed using several PrEP-related search terms. Riddell at US_02577502. Rather, Riddell largely surveys reports of patient behavior to "medication adherence," or daily dosing of Truvada® for PrEP as collected in a series of clinical trials. *See id.* at US_02577502-03 ("PrEP efficacy was directly correlated with medication adherence."); *see also id.* at US_02577503 (further noting that "[m]ethodologies for determining adherence varied between studies, often were based on a subset of study participants, and did not include those who discontinued study participation, who were lost to follow-up, or both"). As I stated above, statistics regarding patient adherence to daily dosing of Truvada® for PrEP are not, in and of themselves, statistics that establish that patients or physicians practice each and every step of the Asserted Claims.

89.     *Second*, statistics of patient behavior from clinical trials, however, are not necessarily reflective of real-world patient behavior because of the highly-controlled and artificial nature of clinical trials. For that reason, any statistical information gathered or collected on patient behavior from clinical trials, to the extent Dr. Murphy addresses performance by patients or physicians of any step of an Asserted Claim, does not establish performance of such behavior by patients or physicians in the real world after the '509 Patent issued. Moreover, as I outline below, the timing of the clinical trials cited in Riddell were almost entirely conducted

– 33 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®**
**Directly Infringes the Asserted Claims**

before issuance of the earliest-issued Patent-in-Suit—the '509 Patent—issued on June 2, 2015. And as I also set forth below, the clinical trials discussed in Riddell were almost entirely conducted outside of the United States. Furthermore, I understand there to be a safe harbor provision for patent infringement that applies to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products, and I therefore understand use in clinical trials is not itself evidence of direct infringement.

90.     *Third*, not only are the clinical trial statistics to which Dr. Murphy cites in Riddell directed to only patient adherence to dosing of Truvada® for PrEP, but there are several reasons beyond the clinical trial context as to why the cited statistics do not establish actual instances of direct infringement by patients or physicians. As an initial matter, nearly all of the clinical trials discussed in Riddell and to which Dr. Murphy points were conducted outside the United States. *See id.* at US_02577503. VOICE was conducted in South Africa, Uganda, and Zimbabwe; FEM-PrEP was conducted in Kenya, South Africa, and Tanzania; iPrEx was conducted in Peru, Ecuador, Brazil, Thailand, South Africa, and the United States; Bangkok Tenofovir Study (which only investigated TDF as a single agent for HIV PrEP) was conducted in Thailand; Partners PrEP Study was conducted in Kenya and Uganda; IPERGAY was conducted in France and Canada; and PROUD was conducted in England. *See id.* Nearly all of the cited statistics come from ex-United States patient populations and therefore for at least this reason do not establish the actual occurrence of any direct infringement by any patient or any physician in the United States.

91.     Additionally, nearly all of the clinical trials discussed in Riddell with respect to patient adherence were conducted well before the issuance of the first Patent-in-Suit (the '509

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

Patent).  The '509 Patent did not issue until June 2, 2015.  However, the following clinical trials were reported up to five years before that date (and were therefore carried out even earlier in time).  iPrEx was reported in 2010; Partners PrEP Study was reported in 2012; FEM-PrEP was reported in 2012; TDF2 Study was reported in 2012; Bangkok Tenofovir Study was reported in 2013 (and only investigated TDF as a single agent for HIV PrEP); IPERGAY was reported in 2015; VOICE was reported in 2015; and PROUD was reported in 2016.  *See id.*  Accordingly, most if not all of the data discussed relating to medication adherence of patients in Riddell is from a period well before the issuance of the Patents-in-Suit and for this additional reason also does not establish any actual occurrence of direct infringement by patients or physician.

92.     Moreover, each of these clinical trials was conducted in demographic subsets of patient populations and would therefore not necessarily be reflective of the overall behavior of persons asserted to be practicing the Asserted Claims, in addition to all of the other reasons I discuss.  For example, VOICE was conducted only in women, while Partners PrEP was conducted with heterosexual men and women in serodiscordant couples.  *See id.*  Nor can clinical trial results be aggregated given the unique nature of the circumstances and conditions under which they are carried out.  Because these demographics are not individually reflective of the overall pool of persons taking Truvada for PrEP, and because data from clinical trials cannot be aggregated across trials, the statistics discussed in Riddell also do not establish the actual occurrence of direct infringement by patients or physicians for this additional reason.

93.     *Lastly*, the "Population Adherence Estimate[s]" that are reported in Riddell, which only reflect daily dosing of Truvada® for PrEP for each of the surveyed clinical trials (and not adherence to physician instruction) both vary widely in magnitude and frequently reflect incomplete adherence to daily dosing of Truvada—even the cited statistics do not support

– 35 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

Dr. Murphy's assertion.  *Id.*  VOICE reported a 29% population adherence estimate; FEM-PrEP reported a 37% population adherence estimate; iPrEx reported a 50% population adherence estimate; Bangkok Tenofovir Study (which only investigated TDF as a single agent for HIV PrEP) reported a 67% adherence; TDF2 Study reported a 79% population adherence estimate; Partners PrEP Study reported an 81% population adherence estimate; IPERGAY reported an 86% population adherence estimate.  *See id.*  These "estimates" vary widely in magnitude. Accordingly, for this additional reason, the adherence estimates in Riddell—which are not estimates of patient adherence to physician instruction—do not establish the actual occurrence of any direct infringement by any patient or any physician for this additional reason.

94.    Riddell also cites to and discusses the study set forth in Liu, which does not establish the actual occurrence of any direct infringement by any patient or any physician for the reasons set forth above.  *See* US_02577501-08, at US_02577504.

**C.    Truvada® REMS Assessment Submissions Cited By Dr. Murphy**

95.    Throughout his report, Dr. Murphy repeatedly cites to five Risk Evaluation and Mitigation Strategy ("REMS") Assessment submissions from Gilead to the U.S. Food & Drug Administration in support of his opinion that patients and physicians directly infringe the Asserted Claims through the administration of Truvada® for HIV PrEP.[5]  *See, e.g.*, Murphy Report ¶ 72.  Dr. Murphy cites to five different REMS Assessments submissions from Gilead:

- REMS Assessment—Period Covered: 16 July 2012 to 15 May 2013 (GILDDE00236715-GILDDE00237526) ("REMS 1")

- REMS Assessment—Period Covered: 16 May 2013 to 15 November 2014 (GILDDE00243874-GILDDE00244563) ("REMS 2")

---

[5] I note that Dr. Murphy's report does not include citations to any REMS Assessments relating to Descovy for PrEP.  *See* Murphy Report ¶¶ 220-337.

– 36 –

**CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER**

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

and Oct. 2013), *see id.*, are acknowledged by Dr. Murphy himself to have been superseded by

revised versions of the Truvada® Insert prior to issuance of the first Patent-in-Suit on June 2,

2015, *see id.* ¶¶ 51-56.

475.    It is further my opinion that Dr. Murphy has not established that any patients or

physicians practice each and every element of claim 9 of the '509 Patent or claim 9 of the '423

Patent for the reasons that I have set forth above with respect to claim 1 of the '509 Patent and

claim 1 of the '423 Patent, respectively.

476.    For the reasons set forth above, Dr. Murphy has not established that any patients

or physicians practice each and every step of claim 9 of the '509 Patent or claim 9 of the '423

Patent.

### 10.    Conclusion Regarding Direct Infringement of the Asserted Claims Through Prescription and/or Use of Truvada® for PrEP

477.    For the reasons set forth above, Dr. Murphy has not established that any physician

practices each and every step of any of the Asserted Claims.  Additionally, for the reasons set

forth above, Dr. Murphy has not established that any patient practices each and every step of any

of the Asserted Claims.

### E.    Dr. Murphy's Anecdotal Discussion of the Use of Descovy® for PrEP

478.    Dr. Murphy provides a largely anecdotal discussion of his personal prescription of

Descovy® for HIV PrEP to his patients.  *See* Murphy Report ¶¶ 225-27.  Dr. Murphy states that

"[i]n prescribing Descovy for PrEP to my patients, I reviewed the instructions in the Descovy

package insert, followed the same instructions in my regular practice, and I discussed the

instructions with my patients to make sure they knew how to take Descovy for PrEP as well as

the importance of taking Descovy for PrEP in accordance with the instructions provided in the

Descovy package insert."  *Id.* ¶ 225.  Dr. Murphy further states that "[i]n addition, I refer the

**CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER**

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

patient to consult the Descovy package insert after they pick up the medication from the pharmacy."[34] *Id.*

479.    Dr. Murphy separately opines that based on his experience, "physicians review and follow the instructions in the Descovy package insert when prescribing Descovy for PrEP, and physicians discuss the instructions with patients to make sure patients know to take Descovy for PrEP as well as the importance of taking Descovy for PrEP in accordance with the instructions provided in the Descovy package insert." *Id.* ¶ 226; *see id.* (also opining that "many patients review information in the Descovy package insert as instructed by the patients' physicians, and patients generally adhere to the administration instructions that they are given by their physicians and those instructions follow the information contained in the Descovy package insert").

480.    *First*, as I set forth below in Section XI.F, the Descovy® Insert expressly instructs, in the "Warnings and Precautions" section, and under the heading and under the heading "Comprehensive Management to Reduce the Risk of Sexually Transmitted Infections, Including HIV-1, and Development of HIV-1 Resistance When DESCOVY Is Used for HIV-1 PrEP," to "[u]se DESCOVY for HIV-1 PrEP to reduce the risk of HIV-1 infection as part of a comprehensive prevention strategy" that includes "other prevention measures," "including adherence to daily administration and safer sex practices, including condoms, to reduce the risk of sexually transmitted infections (STIs)." *E.g.*, US_MURPH_000097-139, at

---

[34] In paragraph 225 of his report, Dr. Murphy relies upon his own personal experience providing Descovy® for PrEP to patients, for which he provides no details or support other than his own broad general statements about himself and his own patients. Indeed, Dr. Murphy does not even mention a single specific patient in his care. Additionally, it is my understanding that the content of paragraph 225 of Dr. Murphy's report is inappropriate testimony to be given on the part of Dr. Murphy, as he is providing new facts to supplement the record in this matter at this stage of the proceeding.

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

US_MURPH_000103-04 (Jan. 2022).  The Descovy® Insert further instructs physicians to "[c]ounsel individuals on the use of other prevention measures (e.g., consistent and correct condom use, knowledge of partner(s)' HIV-1 status, including viral suppression status, regular testing for STIs that can facilitate HIV-1 transmission)" and "[i]nform uninfected individuals about and support their efforts in reducing sexual risk behavior."  *Id.* at US_MURPH_000103. Similar instructions are included on the first page of the Descovy® Insert also under "Warnings and Precautions" wherein it states "Comprehensive management to reduce the risk of sexually transmitted infections (STIs), including HIV-1, when DESCOVY is used for HIV-1 PrEP: Counsel on adherence to daily dosing and safer sex practices, including condoms, to reduce the risk of STIs."  *Id.* at US_MURPH_000097.

481.    To the extent Dr. Murphy's experience is that "patients adhere to the administration instructions that they are given by their physician, and those instructions follow the information contained in the Descovy package insert," that "physicians review and follow the instructions in the Descovy package insert when prescribing Descovy for PrEP," and that "patients generally adhere to the administration instructions that they are given by their physician and those instructions follow the information contained in the Descovy package insert," *id.* ¶¶ 225-26, this indicates that physicians and patients generally do not practice all steps of the methods of the Asserted Claims, at least because the Asserted Claims all require the presence of either an "exposure" or a "potential exposure" to an immunodeficiency retrovirus, *e.g.*, '423 Patent, claims 1 and 12, and the Descovy® Insert recommends using Descovy® for HIV PrEP in conjunction with other preventative measures that either significantly reduce or entirely eliminate actual or potential exposure of patients to HIV-1.  Therefore, for that reasons alone (in addition to the many reasons set forth below), I understand that patients and physicians do not

– 224 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

generally practice all steps of the methods of the Asserted Claims.  And as I set forth in more detail below, at least because the Descovy® Insert only instructs the use of Descovy® for HIV PrEP in conjunction with other preventative measures that either significantly reduce or entirely eliminate actual or potential exposure of patients to HIV-1, Gilead does not recommend, promote, encourage, or instruct patients or physicians to practice each and every step of the methods of the Asserted Claims.

482.   *Second*, I understand that though physicians and patients may review a product insert in some cases, physicians and patients do not invariably follow the instructions included in a product insert in all cases.  Physicians and patients engaged in making individual healthcare decisions must take into account a wide variety of factors that account for individualized patient needs and personal circumstances and I cannot say that, as a rule, patients and physicians adhere to the administration instructions or guidance included in a package insert, including the Descovy® Insert.  Moreover, it is my experience that in most circumstances, physicians and/or patients may fail to fully review, or review at all, drug product inserts, including the Descovy® Insert.  Physicians and patients in the United States engage in a diverse array of practices and it is impossible to generalize the experience of a single physician to account for all or nearly all physicians and patients.  And if physicians and patients do "generally adhere to the administration instructions that they are given by their physician and those instructions follow the information contained in the Descovy package insert," as Dr. Murphy has opined, Murphy Report ¶ 226, then in accordance with the Descovy® Insert, patients use Descovy® for PrEP "as part of a comprehensive prevention strategy," which would include behavioral preventative methods, including but not limited to: (1) consistent and correct condom use; (2) knowledge of partner(s)' HIV-1 status, including viral suppression status; and (3) regular testing for STIs that

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

can facilitate HIV-1 transmission," that would prevent actual or potential exposure to HIV-1.
US_MURPH_000097-139, at US_MURPH_000103-04.

483.     Accordingly, Dr. Murphy's blanket citation to a "report" of how many users of
Descovy® for PrEP there were in "in the second quarter of 2020" in the United States in support
of the statement that "[n]umerous physicians have prescribed for Descovy for PrEP according to
the Descovy package insert, and numerous patients have used Descovy for PrEP in accordance
with the Descovy package insert," is simply insufficient support for that statement.  Murphy
Report ¶ 227.  Dr. Murphy is simply applying unsupported assumptions about physician and
patient practices and individualized healthcare decision-making to aggregate estimated numbers
of patients taking Descovy® for PrEP.

484.     ***Third***, Dr. Murphy's citation that a reported statistic of "the number of persons in
the United States prescribed PrEP was 284,464 in 2019," as reported by the "HIV Surveillance
Report," is similarly insufficient to support his assertion.  Murphy Report ¶ 227 (citing
US_02577592-749, at US_02577710).  Not only does the "284,464" figure to which Dr. Murphy
cites not account for the individualized patient care decisions and practices made by physicians
and patients (nor do the number of persons prescribe "PrEP" establish any actual behavior by
patient, e.g., actually administering the prescribed medication), but the figure appears to be a
reported aggregate of ***all*** prescriptions for an HIV-1 pre-exposure prophylaxis indication.
Accordingly, this figure includes prescriptions beyond those for Descovy® for HIV-1 PrEP, and
Dr. Murphy does not even attempt to disaggregate the reporting.  *See id.* ("Starting in 2019,
TAF/FTC was ***included*** in the algorithm to classify the number of persons prescribed PrEP."
(internal quotation marks omitted) (emphasis added) (quoting US_02577592-749, at

– 226 –

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®**
**Directly Infringes the Asserted Claims**

US_02577651)).  Dr. Murphy's citation to a reported "estimate[]" of the "number of persons in Delaware prescribed PrEP" in 2019 is insufficient for identical reasons.  *Id.*

485.     Dr. Murphy's citation to a different set of estimated numbers of Descovy® for PrEP patients and prescriptions per month from October 2019 through August of 2021 (without any attempt to reconcile these estimates against those cited above), is also insufficient to establish any actual direct infringement by physicians or patients because of Dr. Murphy's reliance on the application of assumptions about physician and patient practices and individualized decision-making to aggregate estimated numbers of patients taking Descovy® for PrEP is wholly unsupported.  *See* Murphy Report ¶ 227.  (citing GILDDE02642770).

486.     Dr. Murphy further asserts in paragraph 227 of his report that certain websites provide "[a]dditional evidence that patients are using Descovy for PrEP in accordance with physician instructions and Gilead's Descovy product label."  Dr. Murphy does not describe any further detail about these websites or how they purportedly support his infringement opinions.  Dr. Murphy further states that Gilead "actively recruits patients to share their experiences using Descovy for PrEP," citing another website, but does not describe any further detail about this website or how it purportedly supports his infringement opinions.  Murphy Report ¶ 227.  Indeed, whether "Gilead actively recruits patients to share their experiences using Descovy for PrEP," is irrelevant to whether any patient or physician practices each and every step of the Asserted Claims.  Murphy Report ¶ 227.  Thus, for the same reasons I have stated above, Dr. Murphy's opinion that patients are using Descovy® for PrEP in accordance with physician instructions and the product label does not establish actual instances of direct infringement. Further, for the same reasons I state below with respect to Dr. Murphy's opinions regarding Gilead's sale of Descovy® with the approved product label, Dr. Murphy's opinion that Gilead

– 227 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

**Dr. Murphy Has Not Established That Prescription and/or Use of Truvada® and Descovy®
Directly Infringes the Asserted Claims**

actively recruits patients to share their experiences using Descovy® for PrEP does not establish
inducement of infringement.

F.    **Dr. Murphy Has Not Established That Prescription and/or Use of Descovy®
Directly Infringes the Asserted Claims**

487.    Dr. Murphy's report addresses the alleged direct infringement by patients and
physicians of claim 13 of the '509 Patent[35] and claim 12 of the '423 Patent in relation to
Descovy® together, both claims requiring a "potential exposure," and subsequently addresses the
alleged direct infringement of the additional asserted claims that depend therefrom each of those
claims.  Dr. Murphy's report then addresses the alleged direct infringement by patients and
physicians of claim 1 of the '423 Patent in relation to Descovy, requiring "an exposure," and
subsequently addresses the alleged direct infringement of the asserted claims that depend
therefrom that claim.  Accordingly, my report addresses the government's allegations of direct
infringement by physicians and patients in a similar manner.

1.    **Dr. Murphy Has Not Established That Prescription and/or Use of
Descovy® Directly Infringes Claim 13 of the '509 Patent or Claim 12
of the '423 Patent (Requiring "Potential Exposure")**

i.    **The Methods of Claim 13 of the '509 Patent and Claim 12 of
the '423 Patent**

488.    Each of claim 13 of the '509 Patent (by merit of its dependency from now-
disclaimed claim 12) and claim 12 of the '423 Patent is directed to a process including multiple
steps.  Each claim recites: (1) a limiting "preamble," as construed by the Court; (2) a "selecting"

---

[35] Claim 13 of the '509 Patent depends from now-disclaimed independent claim 12 of the
'509 Patent and thereby incorporates all of the claim elements recited in claim 12.  I note that Dr.
Murphy's opening report erroneously states that "claim 13 of the '509" Patent is an "independent
claim."  Murphy Report ¶ 62.

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,

    *Plaintiff & Counterclaim-Defendant,*

        v.

GILEAD SCIENCES, INC. and GILEAD
SCIENCES IRELAND UC,

    *Defendants & Counterclaim Plaintiff.*

**CONTAINS RESTRICTED
INFORMATION—SUBJECT
TO PROTECTIVE ORDER**

C.A. No. 19-2103-MN

## OPENING EXPERT REPORT OF CHARLES W. FLEXNER, M.D.

Date: March 18, 2022

**CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER**

## TABLE OF CONTENTS

I. Introduction ........................................................................................................1

II. Qualifications & Professional Experience ....................................................1

III. Summary of Opinions .......................................................................................3

IV. Materials Considered .......................................................................................12

V. Compensation & Previous Testimony ...........................................................12

VI. Legal Principles ...............................................................................................14

    A.    Claim Construction ...............................................................................14

    B.    Priority ..................................................................................................16

    C.    Anticipation ..........................................................................................17

    D.    Derivation .............................................................................................17

    E.    Obviousness ..........................................................................................17

    F.    Obviousness-Type Double Patenting ....................................................18

    G.    Written Description ...............................................................................19

    H.    Enablement ...........................................................................................19

    I.    Indefiniteness .......................................................................................19

    J.    Claim Dependency ...............................................................................20

VII. Person of Ordinary Skill in the Art .............................................................21

VIII. Background of Technology .............................................................................23

    A.    Acquired Immune Deficiency Syndrome ("AIDS") .............................23

    B.    The HIV Virus ......................................................................................24

    C.    HIV Replication Cycle ..........................................................................27

    D.    Chemoprophylaxis ................................................................................30

    E.    Pre-Exposure Prophylaxis .....................................................................32

IX. The Patents-in-Suit .........................................................................................43

    A.    Overview ...............................................................................................43

    B.    Written Description ...............................................................................43

    C.    Asserted Claims ....................................................................................45

    D.    Priority Claim .......................................................................................46

    E.    Prosecution History ..............................................................................46

        1.    The '547 Application and '509 Patent ......................................46

        2.    The '887 Application and '333 Patent ......................................64

        3.    The '344 Application and '191 Patent ......................................73

        4.    The '750 Application and '423 Patent ......................................79

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| X. | **State of the Art** | .................................................................................. | **83** |
| | A. | HIV Treatment with Tenofovir, TDF, a Tenofovir Ester, or a Tenofovir Prodrug | 83 |
| | | 1. | Anti-HIV Drugs | 83 |
| | | 2. | TDF and FTC | 85 |
| | | 3. | Combination Therapy | 89 |
| | | 4. | Truvada® | 92 |
| | B. | Post-Exposure Prophylaxis with Tenofovir, TDF, a Tenofovir Ester, or a Tenofovir Prodrug | 94 |
| | | 1. | Animal Studies | 95 |
| | | 2. | PEP Clinical Studies | 97 |
| | | 3. | Guidelines & Recommendations | 100 |
| | C. | Pre-Exposure Prophylaxis with Tenofovir, TDF, a Tenofovir Ester, or a Tenofovir Prodrug | 105 |
| | | 1. | Animal models from the mid-1990s showed PrEP efficacy. | 106 |
| | | 2. | The art had identified the ideal characteristics for HIV PrEP antiretrovirals. | 108 |
| | | 3. | By September 2004, clinical trials for HIV PrEP were ongoing or planned. | 112 |
| XI. | **Overview of Certain References Considered** | ............................................... | **115** |
| | A. | Tsai 1995 (Exhibit 3) | 121 |
| | B. | Van Rompay 2004 (Exhibit 4) | 123 |
| | C. | Truvada® Insert (Exhibit 5) | 124 |
| | D. | Dando (Exhibit 6) | 126 |
| | E. | CA PEP (Exhibit 7) | 131 |
| | | 1. | Efficacy of PEP | 132 |
| | | 2. | PEP Antiretroviral Recommendations | 135 |
| | | 3. | Timing of PEP | 136 |
| | F. | CDC PEP (Jan. 2005) (Exhibit 9) | 136 |
| | | 1. | Evidence for PEP | 137 |
| | | 2. | Possible Risks with PEP | 140 |
| | | 3. | Evidence of Current PEP Practice | 142 |
| | | 4. | Recommended PEP Regimens | 142 |
| | | 5. | Timing of PEP | 144 |
| | G. | CDC PEP (Sept. 2005) (Exhibit 10) | 144 |
| | | 1. | Recommended PEP Regimens | 145 |

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

|  |  | 2. | PEP Toxicity ................................................................. | 149 |
|  |  | 3. | Timing .......................................................................... | 150 |
|  | H. | Mayer 2006 (Exhibit 11) ...................................................... | | 150 |
|  | I. | Mayer 2006 Poster (Exhibit 12) ........................................... | | 152 |
|  | J. | Youle JIAPAC 2003 (Exhibit 13) .......................................... | | 157 |
|  | K. | Youle AIDS 2003 (Exhibit 14) .............................................. | | 158 |
|  | L. | Page 2005 (Exhibit 15) ........................................................ | | 159 |
|  | M. | Coates (Exhibit 16) ............................................................. | | 159 |
|  | N. | Grant 2005 (Exhibit 17) ....................................................... | | 160 |
|  | O. | Goldsby ............................................................................... | | 160 |
|  | P. | Szekeres (Exhibit 8) ............................................................ | | 161 |
|  | Q. | Knobloch ............................................................................. | | 162 |
|  | R. | Van Rompay 2004 Presentation ............................................. | | 162 |
|  | S. | Van Rompay AIDS 1998 ....................................................... | | 163 |
|  | T. | Van Rompay Virology 2000 .................................................. | | 164 |
|  | U. | Van Rompay 2001 ................................................................ | | 164 |
|  | V. | Subbarao 2006 (Exhibit 18) .................................................. | | 165 |
|  | W. | De Clercq EOED .................................................................. | | 166 |
|  | X. | Arden .................................................................................. | | 166 |
|  | Y. | Smith 2004 .......................................................................... | | 167 |
|  | Z. | Dolin 1985 .......................................................................... | | 167 |
|  | AA. | Farer .................................................................................... | | 168 |
|  | BB. | Weinstein ............................................................................ | | 169 |
|  | CC. | Harper ................................................................................. | | 170 |
|  | DD. | Viread® Insert ..................................................................... | | 170 |
|  | EE. | Emtriva® Insert ................................................................... | | 171 |
|  | FF. | Blum .................................................................................... | | 172 |
|  | GG. | Kearney ............................................................................... | | 172 |
| XII. | | The Scope of the Asserted Claims ............................................... | | 174 |
| XIII. | | The Asserted Claims Are Not Entitled to Their Claimed Priority Date | | 178 |
|  | A. | The Provisional Application Does Not Provide Written Description Support for the Asserted Claims ...................................... | | 178 |
|  |  | 1. | Failure to Demonstrate Possession of Oral Administration of FTC and Tenofovir for Pre-Exposure Prophylaxis ........................... | 183 |

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

|  | 2. | Failure to Demonstrate Possession of Vaginal Administration of FTC and Tenofovir for Prophylaxis .............................................192 |
|  | 3. | Failure to Demonstrate Possession of the Claimed Prophylaxis Methods Using any Tenofovir Esters or Tenofovir Prodrugs.................193 |
|  | 4. | The Provisional Application Fails to Demonstrate Possession of an Effective Prophylactic Method for All Routes of Retroviral Exposure .............................................................................................199 |
|  | 5. | If the Prior Art Does Not Provide a Sufficient Description or Suggestion of Prophylactic Efficacy with Respect to HIV Infection in Humans, the Provisional Application Similarly Fails to Describe Prophylactic Efficacy in Humans .............................................201 |
| B. | | The Provisional Application Does Not Enable the Asserted Claims.................206 |
|  | 1. | The Claimed Genera of Tenofovir Esters and Tenofovir Prodrugs Are Not Enabled .............................................................................206 |
|  | 2. | If the Prior Art is Not Enabling for Failure to Disclose the Results of Human Studies, the Provisional Application Also Fails to Enable the Asserted Claims .............................................................216 |
| XIV. | | **The Asserted Claims Are Anticipated by Public Knowledge And Public Use .............................................................................................220** |
| A. | | Dr. Robert Grant Disseminated Knowledge of the Use of TDF and FTC in Combination for HIV PrEP .............................................................220 |
|  | 1. | December 2004 Atlanta Meeting .............................................221 |
|  | 2. | December 17, 2004 Draft Protocol .............................................230 |
|  | 3. | Conversations with the Peru PrEP Study Team, the HPTN, Gates Foundation, and Gilead in Early 2005 .............................................234 |
|  | 4. | The 2005 HPTN Annual Meeting.............................................241 |
|  | 5. | Claim 1 of the '509 Patent .............................................247 |
|  | 6. | Claim 3 of the '509 Patent .............................................252 |
|  | 7. | Claim 8 of the '509 Patent .............................................253 |
|  | 8. | Claim 9 of the '509 Patent .............................................254 |
|  | 9. | Claim 3 of the '333 Patent .............................................255 |
|  | 10. | Claim 1 of the '423 Patent .............................................261 |
|  | 11. | Claim 3 of the '423 Patent .............................................266 |
|  | 12. | Claim 9 of the '423 Patent .............................................267 |
|  | 13. | Claim 19 of the '423 Patent .............................................268 |
|  | 14. | Claim 13 of the '509 Patent .............................................268 |
|  | 15. | Claim 13 of the '333 Patent .............................................274 |
|  | 16. | Claim 13 of the '191 Patent .............................................280 |

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

17.   Claim 18 of the '191 Patent ................................................................285

18.   Claim 12 of the '423 Patent ................................................................285

19.   Claim 14 of the '423 Patent ................................................................291

20.   Claim 18 of the '423 Patent ................................................................292

B.   Dr. John Kaldor Disseminated Knowledge of the Use of TDF and
     FTC in Combination for HIV PrEP ................................................................294

1.   Claim 1 of the '509 Patent ................................................................298

2.   Claim 3 of the '509 Patent ................................................................303

3.   Claim 8 of the '509 Patent ................................................................304

4.   Claim 9 of the '509 Patent ................................................................305

5.   Claim 3 of the '333 Patent ................................................................306

6.   Claim 1 of the '423 Patent ................................................................312

7.   Claim 3 of the '423 Patent ................................................................317

8.   Claim 9 of the '423 Patent ................................................................318

9.   Claim 19 of the '423 Patent ................................................................319

10.  Claim 13 of the '509 Patent ................................................................320

11.  Claim 13 of the '333 Patent ................................................................325

12.  Claim 13 of the '191 Patent ................................................................331

13.  Claim 18 of the '191 Patent ................................................................336

14.  Claim 12 of the '423 Patent ................................................................337

15.  Claim 14 of the '423 Patent ................................................................341

16.  Claim 18 of the '423 Patent ................................................................343

C.   Dr. Marcus Conant Used TDF and FTC in Combination for HIV
     PrEP in His Clinical Practice ................................................................345

1.   Claim 1 of the '509 Patent ................................................................353

2.   Claim 3 of the '509 Patent ................................................................357

3.   Claim 8 of the '509 Patent ................................................................358

4.   Claim 9 of the '509 Patent ................................................................358

5.   Claim 3 of the '333 Patent ................................................................359

6.   Claim 1 of the '423 Patent ................................................................364

7.   Claim 3 of the '423 Patent ................................................................368

8.   Claim 9 of the '423 Patent ................................................................368

9.   Claim 19 of the '423 Patent ................................................................369

10.  Claim 13 of the '509 Patent ................................................................370

11.  Claim 13 of the '333 Patent ................................................................374

**CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER**

| | | | |
|---|---|---|---|
| | 12. | Claim 13 of the '191 Patent ................................................................. | 377 |
| | 13. | Claim 18 of the '191 Patent ................................................................. | 381 |
| | 14. | Claim 12 of the '423 Patent ................................................................. | 381 |
| | 15. | Claim 14 of the '423 Patent ................................................................. | 385 |
| | 16. | Claim 18 of the '423 Patent ................................................................. | 387 |
| **XV.** | **Derivation From Dr. Robert Grant** ................................................................. | | **389** |
| | A. | Claim 1 of the '509 Patent ................................................................. | 400 |
| | B. | Claim 3 of the '509 Patent ................................................................. | 406 |
| | C. | Claim 8 of the '509 Patent ................................................................. | 407 |
| | D. | Claim 9 of the '509 Patent ................................................................. | 407 |
| | E. | Claim 3 of the '333 Patent ................................................................. | 408 |
| | F. | Claim 1 of the '423 Patent ................................................................. | 415 |
| | G. | Claim 3 of the '423 Patent ................................................................. | 420 |
| | H. | Claim 9 of the '423 Patent ................................................................. | 421 |
| | I. | Claim 19 of the '423 Patent ................................................................. | 422 |
| | J. | Claim 13 of the '509 Patent ................................................................. | 422 |
| | K. | Claim 13 of the '333 Patent ................................................................. | 429 |
| | L. | Claim 13 of the '191 Patent ................................................................. | 434 |
| | M. | Claim 18 of the '191 Patent ................................................................. | 440 |
| | N. | Claim 12 of the '423 Patent ................................................................. | 441 |
| | O. | Claim 14 of the '423 Patent ................................................................. | 446 |
| | P. | Claim 18 of the '423 Patent ................................................................. | 448 |
| **XVI.** | **The Asserted Claims Would Have Been Obvious Over the Prior Art** ................. | | **449** |
| | A. | The Asserted Claims Would Have Been Obvious Over Tsai 1995 and/or Van Rompay 2004 in View of Truvada® Insert or Dando, and Further in View of the Knowledge of a Person of Ordinary Skill in the Art ................................................................. | 450 |
| | | 1. The asserted independent claims of each of the Patents-in-Suit would have been obvious over Tsai 1995 and/or Van Rompay 2004 in view of Truvada® Insert or Dando, and further in view of the knowledge of a person of ordinary skill in the art ............ | 450 |
| | | 2. The asserted dependent claims would have been obvious over Tsai 1995 and/or Van Rompay 2004 in view of Truvada® Insert or Dando, and further in view of the knowledge of a person of ordinary skill in the art. ................................................. | 500 |
| | B. | The Asserted Claims Would Have Been Obvious Over CA PEP in View of the Knowledge of a Person of Ordinary Skill in the Art ................. | 528 |

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

1.     The asserted independent claims of each of the Patents-in-Suit would have been obvious over CA PEP in view of the knowledge of a person of ordinary skill in the art .......................................................528

2.     The asserted dependent claims would have been obvious over CA PEP in view of the knowledge of a person of ordinary skill in the art .................................................................................577

C.   The Asserted Claims Would Have Been Obvious Over CA PEP in View of Truvada® Insert or Dando, and Further in view of the Knowledge of a Person of Ordinary Skill in the Art ............................................597

    1.     The asserted independent claims of each of the Patents-in-Suit would have been obvious over CA PEP in view of Truvada® Insert or Dando, and further in view of the knowledge of a person of ordinary skill in the art...........................................597

    2.     The asserted dependent claims would have been obvious over CA PEP in view of Truvada® Insert or Dando, and further in view of the knowledge of a person of ordinary skill in the art .............................659

D.   The Asserted Claims Would Have Been Obvious Over CA PEP in View of Truvada® Insert or Dando, Further in View of Tsai 1995 and/or Van Rompay 2004, and Further in View of the Knowledge of a Person of Ordinary Skill in the Art..................................................684

    1.     The asserted independent claims of each of the Patents-in-Suit would have been obvious over CA PEP in view of Truvada® Insert or Dando, further in view of Tsai 1995 and/or Van Rompay 2004, and further in view of the knowledge of a person of ordinary skill in the art ........................................................................684

    2.     The asserted dependent claims would have been obvious over CA PEP in view of Truvada® Insert or Dando, further in view of Tsai 1995 and/or Van Rompay 2004, and further in view of the knowledge of a person of ordinary skill in the art ...................................755

E.   The Asserted Claims Would Have Been Obvious Over CA PEP in View of Truvada® Insert or Dando, Further in View of Szekeres, Further in View of Tsai 1995 and/or Van Rompay 2004, and Further in View of the Knowledge of a Person of Ordinary Skill in the Art ..................................................................................785

    1.     The asserted independent claims of each of the Patents-in-Suit would have been obvious over CA PEP in view of Truvada® Insert or Dando, further in view of Szekeres, further in view of Tsai 1995 and/or Van Rompay 2004, and further in view of the knowledge of a person of ordinary skill in the art...........................................785

    2.     The asserted dependent claims would have been obvious over CA PEP in view of Truvada® Insert or Dando, further in view of Szekeres, further in view of Tsai 1995 and/or Van Rompay 2004,

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

and further in view of the knowledge of a person of ordinary skill in the art ....................................................................................878

F.  The Asserted Claims Would Have Been Obvious Over CDC PEP (Jan. 2005) or CDC PEP (Sept. 2005) in View of Dando or Truvada® Insert, Further in View of Tsai 1995 and/or Van Rompay 2004, and Further in View of the Knowledge of a Person of Ordinary Skill in the Art ....................................................911

    1.  The asserted independent claims of each of the Patents-in-Suit would have been obvious over CDC PEP (Jan. 2005) or CDC PEP (Sept. 2005) in view of Dando or Truvada® Insert, further in view of Tsai 1995 and/or Van Rompay 2004, and further in view of the knowledge of a person of ordinary skill in the art ....................................911

    2.  The asserted dependent claims would have been obvious over CDC PEP (Jan. 2005) or CDC PEP (Sept. 2005) in view of Dando or Truvada® Insert, further in view of Tsai 1995 and/or Van Rompay 2004, and further in view of the knowledge of a person of ordinary skill in the art ..........................................................................996

G.  Mayer 2006 and/or Mayer 2006 Poster Further Reinforce that the Asserted Claims Would Have Been Obvious ....................................1029

    1.  The asserted independent claims would have been further obvious over Mayer 2006 and/or Mayer 2006 Poster ..........................1029

    2.  The asserted dependent claims would have been further obvious over Mayer 2006 and/or Mayer 2006 Poster. .........................1050

H.  Secondary Considerations..............................................................1072

XVII.  Subbarao 2006 and the Subbarao Study ....................................................1076

A.  A Person of Ordinary Skill in the Art Would Have Understood Subbarao 2006 to be of Limited Probative Value................................1077

B.  Documents Produced in this Litigation and Deposition Transcripts Have Informed Me That the Subbarao Study Was Materially Flawed ............................................................................................1083

XVIII. The Asserted Claims of the '509 Patent Are Not Patentably Different from the Claims of the '333 Patent, the '191 Patent, and the '423 and May Be Invalid for Obviousness-Type Double Patenting.........................1088

XIX.  The Asserted Claims Are Invalid for Insufficient Written Description .................1099

A.  Failure to Demonstrate Possession of the Claimed Genera of Tenofovir Esters and Tenofovir Prodrugs............................................1099

B.  The Common Written Description of the Patents-in-Suit Fails to Demonstrate Possession of an Effective Prophylactic Method for All Routes of Retroviral Exposure......................................................1105

C.  If the Prior Art Does Not Provide a Sufficient Description or Suggestion of Pre-Exposure Prophylactic Efficacy with Respect to

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

HIV Infection in Humans, the Common Written Description of the
Patents-in-Suit Fails to Describe Retroviral Pre-Exposure
Prophylactic Efficacy in Humans ...................................................1107

XX.   The Asserted Claims Are Invalid for Lack of Enablement ......................1111

A.   The Claimed Genera of Tenofovir Esters and Tenofovir Prodrugs
Are Not Enabled .........................................................................1111

1.   The Quantity of Experimentation Necessary ...........................1113

2.   The Amount of Direction and Guidance Presented ....................1116

3.   The Presence or Absence of Working Examples.......................1119

4.   The Nature of the Invention.................................................1120

5.   The State of the Prior Art...................................................1121

6.   The Relative Skill of Those in the Art....................................1121

7.   The Predictability or Unpredictability of the Art.....................1122

8.   The Breadth of the Asserted Claims .....................................1123

B.   Oral Administration of Tenofovir Is Not Enabled................................1124

C.   If the Prior Art is Not Enabling for Failure to Disclose the Results
of Human Studies, the Common Written Description of the
Patents-in-Suit Also Fails to Enable the Asserted Claims ....................1125

XXI.   The Asserted Claims Are Invalid as Indefinite .....................................1129

A.   The Term "Several Days, Weeks or Months" in Certain Asserted
Claims is Indeterminate in Scope ..................................................1129

XXII.   Improper Dependency .................................................................1131

A.   Claim 3 of the '509 Patent is Improperly Dependent...........................1131

B.   Claim 13 of the '509 Patent is Improperly Dependent .........................1133

C.   Claim 3 of the '333 Patent is Improperly Dependent ..........................1135

XXIII. CDC PEP (Jan. 2005), CDC PEP (Sept. 2005), and the Mayer Study
Anticipate Now-Disclaimed Claims 12 and 14-18 of the '509 Patent
and Claims 12 and 14-17 of the '333 Patent .......................................1138

A.   Background ...............................................................................1138

B.   CDC PEP (Jan. 2005) Anticipates the Disclaimed Claims.....................1140

C.   CDC PEP (Sept. 2005) Anticipates the Disclaimed Claims....................1142

D.   The Mayer Study Anticipates At Least Most of the Disclaimed
Claims .....................................................................................1143

XXIV. Trial Exhibits.............................................................................1147

XXV.   Supplementation of Opinions.........................................................1147

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

are meant to foster the exchange of ideas to further scientific knowledge, inform ongoing research, and ignite new research. It is not typical practice for information learned in such conferences to be confidential. Rather, it is my understanding that one would take the knowledge gained at such conferences and share it with colleagues to further research in the field.

442.   On December 11, 2004, Dr. Grant shared the December 8, 2004 Concept Sheet via email with Drs. Jaffe, Rooney, and Miller at Gilead. GILDDE00283951-55. Dr. Grant explained that he also shared the December 8, 2004 Concept Sheet with Dr. Fanning, that she was "very enthusiastic about the idea," and that she would look into obtaining additional funding. *Id.*; Grant Dep. Tr. at 164:14-166:04 (testifying that he believes he spoke with Dr. Fanning about adding a Truvada arm for PrEP during the December 9-10, 2004 meeting in Atlanta where researchers discussed PrEP): *see also* Fanning Dep. Tr. at 81:19-82:09 (testifying that Dr. Grant told her about the Truvada arm at or before the Atlanta 2004 Meeting). Dr. Grant solicited feedback from Gilead about the December 8, 2004 Concept Sheet and asked whether Gilead could provide Truvada and Truvada placebo for his proposed clinical trial. *See* GILDDE00283951-55, at GILDDE00283951.

443.   It is my opinion that Dr. Grant's conversations with at least Dr. Fanning at the December 2004 Atlanta Meeting, and his email to Dr. Jaffe, demonstrate that the daily administration of TDF and FTC, co-formulated in a single oral tablet, prior to actual or potential HIV exposure (HIV PrEP), including in adult human males, was known by others—at least Drs. Grant, Jaffe, and Fanning—in the United States prior to the date of the named inventors' purported invention of the Asserted Claims. It is also my opinion that Dr. Grant's conversation(s), email, and December 8, 2004 Concept Sheet were not confidential.

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

Furthermore, I would not expect conversations at the December 2004 Atlanta Meeting, where Dr. Grant likely discussed the daily administration of TDF and FTC, co-formulated in a single oral tablet, prior to actual or potential HIV exposure (HIV PrEP), including in adult human males, to be confidential. Testimony from attendees and a co-organizer of the December 2004 Atlanta Meeting showed that the purpose of the meeting was to share information. *See, e.g.*, Fanning Dep. Tr. at 77:17-25; Janssen Dep. Tr. at 86:14-87:03; Smith Dep. Tr. at 47:23-49:15. Furthermore, as noted above, it is my experience that conferences like the December 2004 Atlanta Meeting were meant to disseminate knowledge, not keep notes and ideas private. Additionally, it is common for emails from clinical researchers to pharmaceutical companies requesting drugs for their study—like the December 11, 2004 email from Dr. Grant to Drs. Jaffe, Rooney, and Miller at Gilead—to be considered non-confidential. And the recipients with whom Dr. Grant shared the December 8, 2004 Concept Sheet, including Drs. Fanning, Jaffe, Rooney, and Miller, could have freely shared the December 8, 2004 Concept Sheet and the ideas presented therein with others. Accordingly, it is my opinion that the use of the combination of TDF and FTC for HIV PrEP was publicly known as of at least December 11, 2004.

### 2. December 17, 2004 Draft Protocol

444.     By at least December 17, 2004, Dr. Grant incorporated the ideas contained in the December 8, 2004 Concept Sheet into a draft protocol for the Peru PrEP Study, further developing the concept of using co-formulated tablets containing TDF (300 mg) and FTC (200 mg) in HIV-1 uninfected men for PrEP. *See* GILDDE00280335-448. The study's goal was to determine whether daily oral TDF (300 mg) or daily oral fixed-dose TDF(300 mg)/FTC(200 mg) "**prevents HIV-1 acquisition and has acceptable safety in initially HIV-1 uninfected men.**" *Id.* at GILDDE00280350. One of the primary objectives included determining whether daily oral TDF (300 mg) or daily oral Truvada (300 mg TDF/ 200 mg FTC) reduced HIV-1 seroincidence

– 230 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

Gilead for consideration. I understand that Gilead's Special Applications Committee convened a meeting on January 10, 2005, during which Dr. Grant's December 8, 2004 Concept Sheet and December 17, 2004 updated proposal were discussed. *See* GILDDE00279772-813, at GILDDE00279773, GILDDE00279790-93, GILDDE00279796-98. It is my understanding that meeting minutes drafted by Jennifer Thomas on February 4, 2005 confirm that Dr. Grant's proposal to add a Truvada arm was in fact discussed during the January 10, 2005 meeting and that the committee supported the plan. GILDDE00279814-47, at GILDDE00279818.

449.     I understand that documents produced by Gilead that Gilead employees Howard Jaffe, Alan Taylor, Amy Flood, Caroline Emmett, Dean Waters, Geoff Cotton, Gregg Alton, Howie Rosen, Jim Rooney, Joe Steele, John Wolf, Madeline Miller, Marianne Poblenz, Mick Hitchcock, Norbert Bischofberger, Phil Zack, and Robert Webster attended the January 10, 2005 meeting. GILDDE00279772-813 at GILDDE00279772. I also understand that Gilead employees Bruce Olmscheid and John Flaherty received the meeting materials, but did not attend the meeting. *Id.*

450.     It is my understanding that individuals who received a copy of Dr. Grant's December 8, 2004 Concept Sheet and updated proposal read the document(s). Thus, these individuals would have had knowledge of using the combination of TDF and FTC in humans for HIV PrEP.

451.     It is my opinion that Dr. Grant's December 17, 2004 revised Peru PrEP proposal, in addition to its dissemination within Gilead and the NIH by at least December 23, 2004, constitutes public knowledge of repeated once-daily administration of a co-formulated tablet of TDF (300 mg) and FTC (200 mg) for PrEP in adult men prior to the date of the purported invention by the named inventors. This knowledge or understanding of the use of the

– 233 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

combination of TDF and FTC for PrEP would not have been confidential or secretive, because once a concept sheet and proposal like Dr. Grant's is submitted to a pharmaceutical company, it is commonly understood, based on my experience, that the ideas contained in the proposal are no longer confidential or within the control of the communicating party. Accordingly, it is my opinion that the use of the combination of TDF and FTC for HIV PrEP was publicly known as of at least December 23, 2004.

### 3. Conversations with the Peru PrEP Study Team, the HPTN, Gates Foundation, and Gilead in Early 2005

452. I have reviewed documents produced in this case and understand that in addition to circulating the December 8, 2004 Concept Sheet and updated proposal, the Peru PrEP team (which included at least Dr. Grant, Jeff McConnell, Vivian Levy, Dr. Kimberly Page, Dr. Javier Lama, Dr. Jorge Sanchez, Pedro Goicochea, Vanessa McMahan, and Dr. David Glidden) held weekly teleconference meetings to discuss the Peru PrEP Study starting at least by January 4, 2005. *See, e.g.*, GILDDE00280071-73 (January 4, 2005 meeting); GILDDE00280057-58 (January 11, 2005 meeting); GILDDE00280097-98 (January 18, 2005 meeting); GILDDE00280041-43 (February 15, 2005 meeting); GILDDE00280077-78 (March 1, 2005 meeting); GILDDE00280099-102 (March 8, 2005 meeting); GILDDE00280086-90 (March 15, 2005 meeting); GILDDE02310824-27 (March 22, 2005 meeting); GILDDE02310414-18 (March 29, 2005 meeting); *see also* Grant Dep. Tr. at 187:23-188:10 (identifying David Glidden as Dr. Grant's protocol statistician). Based on summary reports from these meetings, it is my understanding that participants included at least Dr. Grant, Jeff McConnell, Dr. Vivian Levy, Dr.

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

Page,[21] Dr. Javier Lama, Martín Casapía, and Pedro Goicochea—a number of whom I know to be U.S.-based researchers.

453.     According to meeting minutes, by at least January 4, 2005, these researchers discussed the possibility of adding a Truvada arm—that is, an arm testing the once daily administration of FTC (200 mg) and TDF (300 mg)—to the Peru PrEP study. GILDDE00280071-73, at GILDDE00280071. The meeting minutes show that researchers discussed how "Truvada has a higher barrier to resistance than Tenofovir and like Tenofovir, a good safety profile," and Dr. Grant apparently stated that "if the Tenofovir or placebo arm is inferior, Truvada may prove to be the most superior prophylaxis option." *Id.* at GILDDE00280072. The group also knew that both Gilead and the NIH were aware of the proposed Truvada arm by at least January 4, 2005. *Id.*

454.     Drs. Glidden and Page are both professors at the University of California, San Francisco ("UCSF"). I am not a faculty member at UCSF, but I have been a faculty member at Johns Hopkins University School of Medicine for 32 years. It is my experience that discussions of ongoing investigator-initiated clinical research among faculty members at an institution like UCSF would not be considered confidential and I am not aware of any evidence to suggest otherwise. I would not expect my colleagues to have an expectation of confidentiality when sharing their ongoing or proposed clinical research with me. Indeed, it would be my expectation that faculty members in the academic setting would regularly discuss their ongoing or proposed research and clinical trial work in a collaborative manner amongst each other and with a default expectation of non-confidentiality. The academic setting, in my experience, is intended to foster

---

[21] Dr. Kimberly Page is also referred to as Dr. Page-Shafer and Dr. Shafer in documents and testimony.

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

a culture of open communication and collaboration to further the research goals amongst its participants, including in the scientific, medical, infectious disease research spaces.

455. The weekly teleconference meeting notes show that individuals outside the Peru PrEP team, including other researchers and individuals from the Gates Foundation and HPTN network, were aware that the team was investigating the administration of Truvada® for HIV PrEP. The January 11, 2005 meeting notes describes at least three individuals who were interested in adding a Truvada® arm to their prevention studies: Dr. Ward Cates of Family Health International and the HIV Prevention Trial Network (HPTN); Dr. Tom Coates of the University of California, Los Angeles and HPTN; and Dr. Ken Mayer of the Fenway Health Institute and HPTN. *See* GILDDE00280057-58, at GILDDE00280058. Dr. Cates was the director of the HPTN and president of Family Health International (now FHI 360). *See* Dep. Tr. of Thomas J. Coates, Ph.D. (Jan. 18, 2022) ("Coates Dep. Tr.") at 47:20-23. Dr. Coates was a co-director and a senior scientist at HPTN, and has been a Professor of Medicine at the University of California, Los Angeles for the last eighteen years. *See* Coates Dep. Tr. at 20:03-13, 34:14-23. Dr. Mayer was part of the HPTN as well, an HIV scientist and co-director at the Fenway Institute in Boston, and is a Professor at the Harvard Medical School and Harvard T.H. Chan School of Public Health. *See* Grant Dep. Tr. at 251:06-08; Coates Dep. Tr. at 48:01-03. By at least the start of 2005, Drs. Cates, Coates, and Mayer were each prominent persons in the field and would have been considered thought-leaders by persons of ordinary skill in the art with respect to research on HIV treatment and prevention.

456. The HPTN, established in 2000, is a "worldwide collaborative clinical trials network that brings together investigators, ethicists, community and other partners to develop and test the safety and efficacy of interventions designed to prevent the acquisition and

– 236 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

and Jeff McConnell. DRGRANT_00001149. On February 28, 2005, Vivian Levy emailed feedback on the Peru PrEP Study dated February 23, 2005. DRGRANT_00001185, at DRGRANT_00001185. By March 1, 2005, "[i]t was decided we will have a 1 pill regimen, with 2 different placebos: a Tenofovir placebo and a Truvada placebo." GILDDE00280077- 78, at GILDDE00280077.

463.     It is my opinion that the weekly teleconference meetings sufficiently demonstrate that daily administration of TDF (300 mg) and FTC (200 mg), co-formulated in a single oral tablet, prior to actual or potential HIV exposure (HIV PrEP) in adult men was known by others—i.e., Peru PrEP researchers, Gilead, the Gates Foundation, and the HPTN—in the United States prior to the purported invention. Based on my experience with clinical trials, it is also my opinion that conversations reflected by the weekly teleconference meetings would have been considered non-confidential, and thus constituted public knowledge. It is my understanding that Dr. Grant did not approach individuals such as Dr. Cates, Dr. Coates, Dr. Mayer, R. Richardson, or Dr. Cohen under confidentiality terms or that such persons were not permitted to further share knowledge of daily oral administration of co-formulated tablets of TDF (300 mg) and FTC (200 mg) in HIV-negative adult men for PrEP. *See* Grant Dep. Tr. at 229:14-22 ("[Q] [I]t's fair to say that you told HPTN about your idea to use TRUVADA for PrEP before February 15th, 2005; right? A I think it's only fair to say that I told Mike Cohen. What he shared with his colleagues is anyone's guess. Q Did you tell him not to share that idea with his colleagues? A No. I wouldn't have said that."). It is my opinion that seeking funding for these various sources like HPTN and the Gates Foundation necessitated sharing and discussing Dr. Grant's clinical trial proposal, a phase III clinical trial to administer TDF and FTC, co-formulated in a single oral tablet, prior to actual or potential HIV exposure (HIV PrEP) in adult men. Additionally, the weekly

– 240 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

teleconference meetings were also not confidential—and therefore constitute public knowledge—as there was no indication of confidentiality and, in my experience, ongoing or planned investigator-initiated clinical work is not expected to be confidential . *See, e.g.,* GILDDE00280057-58, at GILDDE00280058. Accordingly, it is my opinion that the concept of the use of the combination of TDF and FTC for HIV PrEP was therefore also publicly known as of at least January 4, 2005, and no later than March 15, 2005.

### 4. The 2005 HPTN Annual Meeting

464. It is my understanding that Dr. Grant approached multiple members of the HPTN about his idea for testing TDF and FTC for PrEP by at least early 2005. Dr. Grant approached Dr. Mike Cohen, the director of the HPTN, to support the TDF/FTC arm of the Peru PrEP Study by at least February 15, 2005. *See* Grant Dep. Tr. at 227:17-228:17. Dr. Grant approached Drs. Coates, Cates, and Mayer, all members of the HPTN, by at least January 12, 2005. *See* GILDDE00280057-58, at GILDDE00280058. As discussed above, Dr. Grant testified that he did not believe his conversations with the HPTN members were confidential. For example, Dr. Grant testified that he would not have told Dr. Cohen to refrain from sharing the idea of using TDF/FTC for PrEP with his colleagues. *See* Grant Dep. Tr. at 229:14-22.

465. From February 12-18, 2005, the HPTN held its Annual Meeting. In my experience, HPTN Annual Meetings would have been attended by HPTN members, researchers engaged in HIV prevention, principal investigators, study coordinators, clinical trial staff, laboratory staff, pharmacists, and community educators/representatives.

466. Additionally, it is my understanding that slide decks presented at the 2005 HPTN Annual Meeting were freely accessible on the HPTN network website. *See HPTN Annual Meeting: February 12-18, 2005*, HIV Prevention Trials Network, https://web.archive.org/web/20090105204928/http:/www.hptu.org/network_information/Annual

– 241 –

CONTAINS RESTRICTED INFORMATION // SUBJECT TO PROTECTIVE ORDER

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,

      Plaintiff,

  v.

GILEAD SCIENCES, INC. and GILEAD
SCIENCES IRELAND UC,

      Defendants.

C.A. No. 19-02103-MN

**CONTAINS RESTRICTED
INFORMATION – SUBJECT
TO PROTECTIVE ORDER**

## <u>OPENING EXPERT REPORT OF WESLEY D. BLAKESLEE</u>

**Contains Restricted Information – Subject to Protective Order**

**Glossary of Terms Used in this Report**

| | |
|---|---|
| CDC | U.S. Centers for Disease Control and Prevention |
| CTA | Clinical Trial Agreement |
| EIR | CDC Employee Invention Report |
| MTA | Material Transfer Agreement |
| NIH | U.S. National Institutes of Health |
| OAS | Office of Administrative Services within CDC, which negotiated, drafted, and executed the MTAs at issue and where Ms. Lisa Blake-DiSpigna worked at the time of the events related to this matter |
| PHS | U.S. Public Health Service, a collective that includes the National Institutes of Health, the Food and Drug Administration, and the Centers for Disease Control and Prevention |
| PrEP | HIV Pre-Exposure Prophylaxis |
| TTO | Technology Transfer Office, or the office or group within an institution that receives invention disclosures, and manages protection of intellectual property (primarily through the filing of patents, typically managed by the office through outside patent counsel) |

**Contains Restricted Information – Subject to Protective Order**

## Table of Contents

I.      Introduction ........................................................................................................... 1

II.     Summary of Opinions ........................................................................................... 1

III.    Qualifications ....................................................................................................... 3

IV.     Legal Standards .................................................................................................... 6

V.      Background on Technology Transfer ................................................................... 6

    A.      Organization and Role of Technology Transfer Offices .................................. 6

    B.      The Purpose of Technology Transfer Offices Is to Promote Development of Inventions 9

    C.      Technology Transfer Offices' Procedures and Licensing Practices ............................ 12

VI.     Clinical Trial Agreements .................................................................................. 15

    A.      Background ........................................................................................................ 15

    B.      CTAs Between Gilead and CDC ...................................................................... 16

    C.      The Parties Understood the CTAs to Mean CDC Would Not Obtain Patents Covering PrEP Using Viread® or Truvada® .............................. 20

VII.    Material Transfer Agreements ........................................................................... 23

    A.      Background ........................................................................................................ 23

    B.      MTAs Between Gilead and CDC ...................................................................... 24

    C.      CDC Failed to Promptly Notify Gilead Pursuant to MTAs. ............................ 33

        i.      CDC Did Not Promptly Notify Gilead. .......................................................... 34

        ii.     None of the Government's Examples of Purported Notice Constitute Prompt Notification as Required by the MTAs. ............................................. 46

        iii.    The Government Deprived Gilead of Its Right to Contemporaneously Address Patentability ...................................................................................... 53

        iv.     The Government Deprived Gilead of Its Right to Contemporaneously Address Invention Ownership .......................................................................... 56

        v.      The Government Deprived Gilead of the Opportunity to Negotiate a License at the Time of the "Inventions" Disclosure. ........................................ 58

VIII.   Compensation ..................................................................................................... 61

IX.     Trial Exhibits ..................................................................................................... 61

X.      Supplementation of Opinions ............................................................................ 61

XI.     Materials Considered ......................................................................................... 61

## I.      INTRODUCTION

1.      I have been retained by Gilead Sciences, Inc. ("Gilead") and Gilead Sciences Ireland UC to provide expert opinions on industry-standard practices among TTOs, the CTAs and MTAs between Gilead and CDC, and CDC's obligations under those agreements.

2.      I understand that the United States of America (the "government") has sued Gilead and Gilead Sciences Ireland UC (together, "Defendants") for patent infringement in the U.S. District Court for the District of Delaware, asserting that the use of Truvada® and Descovy® for HIV Pre-Exposure Prophylaxis ("PrEP") infringes certain of the government's patents.  I understand that Gilead has also sued the government in the Court of Federal Claims for breaching two CTAs and four MTAs.

## II.     SUMMARY OF OPINIONS

3.      My opinions are set forth in detail below, but in summary, it is my opinion that:

   a.   The CDC TTO's management of its obligations under the CTAs and MTAs at issue in this case were inconsistent with industry-standard practices and the CDC TTO's stated purpose of collaborating with commercial firms for the purpose of developing CDC technologies for the benefit of the public.

   b.   Under each of the CTAs, CDC agreed to "put the results of the Trial, patentable or otherwise, in the public domain for all to use without obligation or compensation to CDC" and "not to seek patent protection in connection with any inventions that derive from the use of the Study Drug in the Trial." In my experience, parties entering into a clinical trial agreement would understand that the intent of the contract was to ensure that the commercial entity, here Gilead, would be able to retain its freedom to operate and use its own products for any purpose, including PrEP.

**Contains Restricted Information – Subject to Protective Order**

c. By asserting patents against Gilead for use of Gilead's own drugs for PrEP, CDC is taking actions which are inconsistent with the intent of the CTAs. CDC's misconduct in failing to forgo patent protection related to PrEP as promised under the CTAs resulted in CDC obtaining the IP rights that CDC is now seeking to enforce against Defendants in this litigation.

d. In each of the MTAs, Gilead specifically negotiated for CDC to "promptly notify" it of all "Inventions" so that Gilead could negotiate licenses and protect its rights. A technology transfer professional would have understood that the intent of the parties was to provide Gilead the opportunity to negotiate use of any inventions, discoveries, or ideas made with Gilead's compounds.

e. A technology transfer professional would have understood prompt notification to be notification given as soon as reasonably possible after an invention has been disclosed—a matter of days or weeks, not months or years after an invention has been identified. In my experience, notification would include clear identifying information to apprise the recipient of the rights and obligations at issue. For example, notification in this situation would have at least identified the agreements and described the "Invention" and the specific IP rights that CDC intended to seek. In my opinion, CDC did not promptly notify Gilead of its inventions related to PrEP.

f. CDC's failure to promptly notify Gilead deprived Gilead of the opportunity to take valuable steps related to investigating or challenging the patentability of the claimed subject matter at or near the time of the filing of the government's patent application. It also prevented CDC and Gilead from

Contains Restricted Information – Subject to Protective Order

contemporaneously determining accurate invention ownership and further deprived Gilead of the opportunity to negotiate a license on commercially reasonable terms at the time that intellectual property was first disclosed to CDC. By depriving Gilead of these opportunities, CDC's misconduct in failing to provide prompt notification to Gilead under the MTAs enhanced CDC's position and prejudiced Gilead's position with respect to the IP rights the government now asserts against Defendants in this litigation.

## III.    QUALIFICATIONS

4.      I am the Principal and President of Blakeslee, LLC, an organization dedicated to helping universities and business entities license and commercialize intellectual property.

5.      I hold an engineering degree (with Honors) from Pennsylvania State University and a law degree (Order of the Coif – with Honor) from the University of Maryland School of Law. In 2013, I was named Engineering Alumnus of the Year by the Pennsylvania State Department of Engineering Science and Mechanics, the highest honor bestowed by the Pennsylvania State Engineering School.

6.      I began my professional career as an engineer and systems analyst with the U.S. National Aeronautics and Space Administration (NASA), where, among other things, I designed and wrote real time operating systems for spacecraft testing and post-launch control and managed a programming group. After graduating law school, I entered private law practice with a Baltimore law firm. I later became a partner in a small regional firm. In 1983, I formed my own law practice. From 1983 to 1989, I also served as Director of Computer Development at the University of Maryland Law School, where I taught Computer Law.

7.      In 1999, I became Associate General Counsel at the Johns Hopkins University, where I practiced intellectual property and complex business law. My work also focused on

Contains Restricted Information – Subject to Protective Order

half of licenses entered into for university technologies are the direct result of leads provided by the inventors themselves.[21]

29.      Identification of third parties who may have contributed to or who may have rights in the IP is also of critical importance.  Item 9(b) in the CDC EIR asks, "Is the subject matter based on research materials that you obtained from some other laboratory? …If yes, please attach any materials transfer agreements (MTA) under which you received the material."[22] This information is important because, first, it may identify other inventors who may be required on the invention.  Second, such entities could be good licensing prospects.  Third, and importantly, the TTO may be obligated to provide notification or satisfy other requirements to those entities before filing for any patents.  Prior to soliciting interest in an invention, the licensing associate must understand what rights are even available to license.  Therefore, it is critical for the TTO to obtain and review any CTA, MTA, CRADA, or other similar agreement related to CDC's acquisition and/or use of the materials from which the invention was derived. A technology transfer professional would understand that this is why Item 10 of the CDC EIR requests that any such agreement be attached to the EIR.

C.      **Technology Transfer Offices' Procedures and Licensing Practices**

30.      Whether the TTO is well-organized, well-staffed, and well-funded, or whether the office is a small, resource-challenged operation, the practices and constraints under which the offices operate are very similar.  Resources are finite, not infinite.  Most TTOs are cost centers,

---

[21]  *See, e.g.*, *Technology Commercialization: Frequently Asked Questions*, University of Minnesota, https://research.umn.edu/units/techcomm/university-inventors/frequently-asked-questions ("Studies have shown that over 70 percent of licenses are executed with commercial entities known by the inventor, so your contacts can be extremely useful.").

[22]  CDC EIR Form, *supra* note 13.

**Contains Restricted Information – Subject to Protective Order**

not profit centers.  In my experience, less than half of university TTOs produce as much revenue as is expended in the TTO.  Because universities share approximately one third of their licensing revenue with the inventors, only a very few university TTOs produce a profit for the institution.  Therefore, even well-funded offices must manage their resources conservatively.  Stanford, arguably one of the most successful university licensing entities, estimates that it selects only about 30 to 40% of the inventions disclosed for marketing and patenting.[23]

31.     Whether by formal policy or ordinary practice, in my experience, most TTOs strive to complete their initial analysis within six months of the invention disclosure.  The EIR provides essential information to begin that analysis.  Prior art disclosed can define the boundaries of the potential patent that might be filed.  Analysis of the marketplace based upon information concerning potential licensees and other entities working in the subject matter area, and the nature of the invention, helps determine the value of the invention and its potential to be licensed.

32.     The patent budget in particular is also limited.  Even those institutions that have very large patent budgets must manage their patent costs because the same institutions typically have many inventions to choose from and can easily exceed their patent budget if the patenting process is not managed carefully.  Ms. Shope testified that the CDC TTO did not have an unlimited budget and expenditures had to be approved by the TTO Director, and later by the TTO Director's supervisor.[24]  Dr. Sumita Ghosh, a patent advisor at CDC from February 2005

---

[23] Jon Sandelin, *Success Factors in University Technology Transfer through Patenting and Licensing*, Stanford U. Off. Tech. Licensing, https://web.stanford.edu/group/OTL/documents/JSSuccessGuidelines.pdf.

[24] Shope Tr. 55:10-13, 62:18-63:9.

Contains Restricted Information – Subject to Protective Order

available for licensing, and attended various conferences, including, at some conferences, as an exhibitor with exhibit space and a booth.[27]

36.     The central purpose and focus of a TTO is to promote the development of inventions by collaborating with commercial entities. [28] In my experience, because patenting and marketing are very expensive, TTOs tend to focus on the most promising inventions and potential licensees.  Patents on technologies that are not licensed and developed do not further the goals of the TTO and consume valuable limited resources.  If the technology is not licensed, it will never be developed into a beneficial product.  Licensing revenues help fund the TTO.  Although income of the TTO is not directly indicative of the quality of the office or the licensing effort (the vast majority of revenue typically comes from only a very few licenses), it is often a metric against which the quality of the TTO is measured by the organization's leadership who determine not only funding of the office, but the personnel who work there.

## VI.     CLINICAL TRIAL AGREEMENTS

### A.     Background

37.     I understand there are two CTAs at issue in this case.  Under the CTA dated August 6, 2004 (the "Extended Safety Study CTA"[29]), Gilead provided significant quantities of its proprietary drug to support a clinical trial titled "Phase II Extended Safety of Tenofovir Disoproxil Fumarate (TDF) among HIV-1 Negative Men who have Sex with Men."[30]  CDC agreed "to put the results of the Trial, patentable or otherwise, in the public domain for all to use

---

[27] *See* Shope Tr. 45:21-47:12; *see also id.* at 29:21-31:7, 72:23-73:3, 116:25-117:17, 129:6-13.

[28] *See* US_02199415 at US_02199455 (Ghosh Ex. 10).

[29] I understand that the Extended Safety Study CTA has also been referred to as the 4323 CTA.

[30] US_00353168(Ackers Ex. 8) (Extended Safety Study CTA), at US_00353169-70; *see also* GILDDE01548742; GILDDE01565078.

Contains Restricted Information – Subject to Protective Order

i.e., litigation in which Gilead is being sued for selling its own drugs based on patents that derive from material that Gilead provided—is what a party in Gilead's position would have sought to prevent. Prior to the granting of the initial '072 MTA, Gilead had a combination drug, Truvada®, approved and in the market. Gilead was already in discussions to support a clinical trial for use of one of the Truvada components for PrEP, i.e., the TDF study that is the subject of the Extended Safety Study CTA.[92]

85.     Based upon the clear language of the MTAs, if CDC had in fact developed independent IP rights related to Gilead's compounds, a party in Gilead's position would, at the very least, have expected to be granted an opportunity from the outset to negotiate use of any CDC inventions, including through a license from CDC on commercially reasonable terms at the time the inventions were disclosed to CDC.[93] Consistent with industry practice, and in my experience, a party in Gilead's position would also expect to be given an opportunity to contemporaneously determine ownership of any inventions given the collaboration between CDC and Gilead. It is my opinion, based on industry custom and my experience, that those issues would have been discussed immediately after any potential invention was disclosed, and would be based upon the circumstances at the time the IP rights were sought.

### C.     CDC Failed to Promptly Notify Gilead Pursuant to MTAs.

86.     It is also my opinion that CDC did not follow industry norms in its actions related to the MTAs. Specifically, CDC failed to promptly notify Gilead of its patent application according to the standard understanding of "prompt notification" in the industry, and as explicitly required by the MTAs.

---

[92] US_01792332 (Ackers Ex. 2).

[93] *See* Shope Tr. 71:7-13.

Contains Restricted Information – Subject to Protective Order

### i.   CDC Did Not Promptly Notify Gilead.

87.   First, CDC never promptly notified Gilead of the inventions disclosed to the CDC TTO.  Based on my experience, most TTOs would interpret the "promptly notify" requirement as requiring notification immediately upon the TTO making the determination that an invention disclosed to the office was indeed an invention that the office intended to patent.  In my experience, a technology transfer professional would understand "prompt" notification to mean notification as soon as the professional is aware of information subject to their obligations to notify the other party—in the technology transfer industry, that time frame is typically a matter of days or weeks, not months or years.  In my experience, notification would include clear identifying information to apprise the recipient of the rights and obligations at issue.  For example, notification in this situation would have at least identified the agreements and described the "Invention" and the specific IP rights that CDC intended to seek.

88.   MTAs are so common that the NIH has developed the Uniform Biological Materials Transfer Agreement (UBMTA)[94] which was published in the Federal Register on March 8, 1995) to be used for the transfer of biological materials.  Many entities that frequently require MTAs have adopted the UBMTA as shown on the Association of University Technology Managers (AUTM) website.[95]  Although primarily intended for and used by non-profit and governmental entities to transfer biological materials between non-commercial entities, the general terms in the UBMTA reflect industry-standard practices and apply to a variety of

---

[94] *See* U.S. Public Health Service Tech. Transfer Procedure Manual, Chapter No. 501A, https://www.ott.nih.gov/sites/default/files/documents/policy/pdfs/501-A-Policy.pdf.

[95] *UBMTA Signatories*, AUTM, https://autm.net/surveys-and-tools/agreements/material-transfer-agreements/mta-toolkit/uniform-biological-material-transfer-agreement/ubmta-signatories/.

**Contains Restricted Information – Subject to Protective Order**

had no procedures in place, and no clear division of responsibilities, for adhering to its MTA

obligations in any of its various offices.

106.     In my experience, inventors are rarely, if ever, tasked with notification

responsibilities pursuant to MTAs.  Regardless, Dr. Heneine, one of the named inventors,

testified that although he sent the '471 MTA to Ms. Blake-DiSpigna, he was not aware who was

responsible for promptly notifying Gilead of any inventions:

> Q. … You did not notify Gilead at the time you filed your
> February 2006 provisional application of the filing of that
> document, correct?
>
> … THE WITNESS: That is correct.
>
> Q. … You did not notify Gilead in January 2007 when you filed
> your non-provisional patent application, correct?
>
> A. Uh-huh. That is correct.
>
> Q. And to your knowledge, nobody at the CDC notified Gilead of
> the filing of any patent applications based on the work that you did
> using Gilead's material supplied under the 471 MTA prior to or at
> the time those patent applications was filed, correct?
>
> A. Well … Probably. That's correct.
>
> Q. … When you -- when you signed an MTA, what would you do
> with that agreement after it was fully executed?
>
> A. Just saved it.
>
> Q. Did you send it to anybody?
>
> A. I think the tech transfer office usually keeps a copy.
>
> Q. Who at that tech transfer office would you send the agreement
> to?
>
> … THE WITNESS: Most likely I talked to Lisa Blake who was
> handling those for us at the time.
>
> … Q. Was there any kind of a procedure for tracking when
> notification – an obligation to notify arose under an MTA that you
> had signed or your lab had signed?

Contains Restricted Information – Subject to Protective Order

A. I was not aware.

Q. … Whose responsibility was it to notify a provider pursuant to MTA?

… THE WITNESS: I do not know. It could be the tech transfer office or -- I have no idea.

Q. … Whose -- in the case of the 471 MTA with Gilead, whose responsibility was it to notify Gilead of the inventions that were made with the FTC that was supplied under that MTA?

… THE WITNESS: I do not know the process of the CDC of their responsibility, the roles.

… Q. So you believe it was your responsibility, then, Dr. Heneine?

… THE WITNESS:  I do not know. [112]

107.    It was only after the TTO office merged with the OAS in 2013 that anyone from the government attempted to discuss the patent application with Gilead. [113]

108.    Suzanne Shope, then the deputy director of the CDC TTO, stated the well-known TTO truism that suppliers of materials are typically good licensing candidates:

> [I]f it was patentable and we were looking for licensees, they [the supplier/owner of the materials] were the Number 1 person to license -- or company, entity to license it. So we always went to the -- the owner of the material first for potential licenses. [114]

109.    Ms. Shope also testified that:

> [M]ost of them wanted -- wanted first crack at anything that we might have discovered. [115]

---

[112] Heneine Tr. 229:3- 232:5.

[113] *See* US_00275252; US_02514549; *see also* Kirby Tr. 220:11-222:19 (NIH Technology Transfer Office manager testifying that she is "not aware of any effort" from the government to contact Gilead about taking a license to the CDC PrEP patents prior to October 23, 2014).

[114] Shope Tr. 70:20-71:6.

[115] *Id.* at 71:7-13.

**Contains Restricted Information – Subject to Protective Order**

124.    In light of the above, it is my opinion that Gilead was not afforded the prompt notification it would have expected to receive pursuant to the MTAs, or as commonly understood in the technology transfer industry.  The CDC's practices in this regard fell well below the accepted industry practice with respect to TTOs.

### iii.    The Government Deprived Gilead of Its Right to Contemporaneously Address Patentability.

125.    If Gilead had been promptly notified of the patent application, Gilead could have also taken steps to investigate or potentially challenge the patentability of the claimed subject matter at that time.  In my experience, discussions of patentability frequently occur as part of the parties' conversations immediately following notice of the kind required by the MTAs.

126.    First, if Gilead had been promptly notified of the patent application, Gilead could have engaged legal counsel to investigate the patentability of the claimed subject matter and to take steps to prevent the patent application from issuing, either before the Patent Office or simply by informing the government of evidence of unpatentability, which the government would have had a duty to disclose to the Patent Office.

127.    Second, if Gilead had been promptly notified of the patent application, Gilead could have developed and collected evidence related to the patentability of the claimed subject matter.  This could have included evidence that would render the claimed subject matter unpatentable, such as evidence of prior public use.  Evidence such as this can be lost to time if there is a long delay between the filing of a patent application and the beginning of efforts to collect the evidence.  In fact, I understand that Gilead has learned through discovery in this litigation that certain medical records documenting prior public use of the claimed subject matter

Contains Restricted Information – Subject to Protective Order

opportunities negotiated for in those agreements.  The CDC's actions in this case fell below industry-standard TTO practices.

132A.  CDC's misconduct in failing to provide prompt notification to Gilead under the MTAs resulted in CDC improving its position to Gilead's detriment regarding the IP rights that CDC is now seeking to enforce against Defendants in this litigation by preventing Gilead from contemporaneously addressing ownership of the alleged inventions.  As noted above, documents belonging to named inventors and other government employees as well as information from individuals involved in PrEP research prior to 2006 have been lost.[145]

> **v.   The Government Deprived Gilead of the Opportunity to Negotiate a License at the Time of the "Inventions" Disclosure.**

133.  For the reasons stated above, the occurrences which the CDC claims as notices to Gilead were neither "notification" as contemplated by the MTAs, nor were they prompt, as required by the MTAs and as commonly understood in the technology transfer industry.  But the requirement of prompt notification does not exist in a vacuum.  Gilead did not negotiate a right of notification only.  That right was coupled with two very important provisions that were not part of the standard CDC MTA.

134.  First, based on my experience, a technology transfer professional would understand that the purpose of the prompt notification requirement was the opportunity to negotiate a license for "Inventions" made using the provider's materials contemporaneous with the "Inventions" disclosure.

---

[145] *Supra* nn.135-141.

# Exhibit D

638

```
 1                UNITED STATES COURT OF FEDERAL CLAIMS
 2
 3      GILEAD SCIENCES, INC.,        )
 4                Plaintiff,          )
 5           vs.                      )  Case No.
 6      UNITED STATES OF AMERICA,     )  20-499C
 7                Defendant.          )
 8      -------------------------------)
 9
10                     Courtroom 4
11          Howard T. Markey National Courts Building
12                717 Madison Place, N.W.
13                   Washington, D.C.
14               Monday, June 27, 2022
15                    9:00 a.m.
16                  Trial Volume 3
17
18        BEFORE:  THE HONORABLE CHARLES F. LETTOW
19
20
21
22
23
24
25      Susanne Bergling, RMR-CRR, Reporter
```

639

```
 1      APPEARANCES:
 2
 3      ON BEHALF OF THE PLAINTIFF:
 4           RONALD MACHEN, JR., ESQ.
 5           DAVID B. BASSETT, ESQ.
 6           TIMOTHY A. COOK, ESQ.
 7           VINITA FERRERA, ESQ.
 8           STEPHANIE LIN, ESQ.
 9           GEORGE P. VARGHESE, ESQ.
10           EMILY R. WHELAN, ESQ.
11           Wilmer Cutler Pickering Hale and Dorr, LLP
12           1875 Pennsylvania Avenue, N.W.
13           Washington, DC 20006
14           (202) 663-6881
15           ronald.machen@wilmerhale.com
16
17      ON BEHALF OF THE DEFENDANT:
18           WALTER WAYNE BROWN, ESQ.
19           PHILIP STERNHELL, ESQ.
20           PATRICK HOLVEY, ESQ.
21           AMANDA KELLY, ESQ.
22           LUCY NOYOLA, ESQ.
23           CARRIE ROSATO, ESQ.
24           MATTHEW TANNER, ESQ.
25           LENA YUEH, ESQ.
```

640

```
 1      U.S. Department of Justice
 2      1100 L Street, N.W.
 3      Washington, DC 20530
 4      (202) 307-0341
 5      walter.brown2@usdoj.gov
```

641

```
 1                      I N D E X
 2
 3      WITNESS:        DIRECT  CROSS  REDIRECT  RECROSS  VOIR
 4      GARCIA-LERMA      648
 5      PAXTON            668
 6      SMITH             732
 7      MERMIN            741
 8      DIEFFENBACH       751
 9      GHOSH             759
10      WILSON            770
11      CYRIL             775
12      MILLER            785
13      SIEGEL            796    824     853
14      CELUM             862    896     913       917
15      CONANT            919    937
16      BLAKESLEE         963                               973
17
18
19      EXHIBITS          FOR ID      IN EVID
20      Plaintiff's
21      NumberPDX 4.2                    912
22      NumberPDX 4.3                    912
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Gilead Sciences v. USA                                                    6/27/2022

918

1    were dealing with an FDA HIV treatment drug, correct?
2        A.  Yes.  We had some prior knowledge of safety, so
3    it was -- we felt comfortable moving ahead, but we also
4    were very -- very clear that we needed to assure safety
5    in a different patient population who had a different
6    risk-benefit.
7        MR. BROWN:  Thank you, Your Honor.  No further
8    questions.
9        THE COURT:  Mr. Brown, may the Court excuse
10   Dr. Celum?
11       MS. FERRERA:  Yes, Your Honor.
12       THE COURT:  Thank you, Ms. Ferrera.
13       Mr. Brown, may the Court excuse Dr. Celum?
14       MR. BROWN:  Yes, Your Honor.
15       THE COURT:  Thank you, Dr. Celum, and thank you
16   for testifying.
17       Mr. Machen, where do we go from here?
18       MR. MACHEN:  Yes, Your Honor.  Our next witness
19   is going to be Dr. Conant, and Dr. Conant -- Marcus
20   Conant, C-O-N-A-N-T, and we are going to get him now,
21   and my partner, Mr. Bassett, is going to examine him.
22       THE COURT:  Is he an expert witness?
23       MR. MACHEN:  No, he is not.  He's a fact witness,
24   Your Honor.
25       THE COURT:  That's what I thought.

919

1        All right.  Mr. Bassett, you may proceed.
2        MR. BASSETT:  Dr. Conant, if you would approach
3    the Bench and wait to be sworn as a witness.
4        Whereupon--
5        MARCUS CONANT
6    a witness, called for examination, having been first
7    duly sworn, was examined and testified as follows:
8        THE COURT:  Please take a seat at the witness
9    stand.
10       MR. BROWN:  Your Honor, I just want to note that
11   Mr. Holvey will be handling the cross examination.
12       THE COURT:  Mr. Holvey?
13       MR. BROWN:  Mr. Holvey, yes, sir.
14       THE COURT:  Mr. Bassett, you may proceed.
15       MR. BASSETT:  Thank you, Your Honor.
16       DIRECT EXAMINATION
17   BY MR. BASSETT:
18       Q.  Good morning, Dr. Conant.  Would you please state
19   your name for the record?
20       A.  Marcus Conant.
21       Q.  Doctor, are you currently employed?
22       A.  I am.
23       Q.  Are you employed full-time?
24       A.  Yes.
25       Q.  Where are you employed?

920

1        A.  I am employed by American Gene Technologies,
2    which is a biotech company in Rockville, Maryland.
3        Q.  And what is your current job with American Gene
4    Technologies?
5        A.  Chief medical officer.
6        Q.  What are your responsibilities as chief medical
7    officer?
8        A.  We are working on a genetic way of trying to cure
9    HIV/AIDS.  We are putting a genetic construct into those
10   patients which will protect their T cells from getting
11   infected with HIV.
12       Q.  Now, Doctor, are you being paid by Gilead for the
13   time you spent preparing to testify in this case that
14   took you away from your full-time job?
15       A.  Yes.
16       Q.  And what are you being paid?
17       A.  $400 an hour.
18       Q.  And is that your usual hourly rate?
19       A.  It is.
20       Q.  Doctor, does your compensation from Gilead depend
21   on the substance of your testimony in any way?
22       A.  No.  They are paying me for my time, not my
23   opinion.
24       Q.  Doctor, could you explain your educational
25   background for the Court?

921

1        A.  I finished graduate in Jacksonville, college, I
2    went to duke medical school, went to aerospace medicine
3    in San Antonio, Texas, did two years service in the
4    United States Air Force, and then went to U C medical
5    center in San Francisco for my dermatology residency.
6        Q.  Doctor, if you don't mind me asking, would you
7    please tell the Court how old you are?
8        A.  I am 86 years old.
9        Q.  And what did you do after your dermatology
10   residency?
11       A.  The university was kind enough to invite me to
12   stay on the faculty and to run the clinic at U C, which
13   I did.
14       Q.  And are you still, today, on the faculty of U C?
15       A.  Yes.  I am a professor emeritus at the
16   university.
17       Q.  Did you ever teach medical sun, Doctor?
18       A.  Yes, sir.  I started teaching medical students as
19   a resident in dermatology.
20       Q.  And did there come a time when you retired from
21   the active practice of medicine?
22       A.  I closed my private practice and HIV practice in
23   the summer of 2019.
24       Q.  Okay.  Now, Doctor, going back a bit in time, did
25   there come a time in the late 1970s or early 1980s when

71 (Pages 918 to 921)

Gilead Sciences v. USA                                                                    6/27/2022

934

1   whose opinion I respected entirely, and he refused to do
2   it. He said this has not been approved, I am not going
3   to do it. So they came to me.
4        So the thing I remember I was not only making the
5   decision to treat someone off label, I was making the
6   decision to do something contrary to the opinion of a
7   respected colleague in the community, and so I'm sure
8   that's why I remembered the whole event and remembered
9   Nick, and as I say, Nick's husband was a patient of
10  mine.
11       Q. Now, how often did you instruct Nick that he
12  should take Truvada for pre-exposure prophylaxis?
13       A. This is one of those patients I described
14  earlier. He was going out and having unprotected,
15  assertive sex two or three times a week or more often.
16  He had to take the drug daily or it would not be
17  effective.
18       Q. And that's what you instructed?
19       A. Yes.
20       Q. And did Nick take the pre-exposure prophylaxis
21  regularly as prescribed?
22       A. The only way a doctor knows a patient is
23  complying is if a patient runs out of pills and doesn't
24  come down with the disease they were prophylaxing for or
25  doesn't get the disease. You're not observing the

935

1   patient every day. I remember Nick coming back for at
2   least two refills, okay, and we tested him when he came
3   back -- every one of my patients was tested every time
4   they came in, all patient were tested -- he did not come
5   back with HIV and he did come back with a refill. So
6   based on those two criteria, he was taking his medicine
7   as directed.
8        Q. Now, have you ever told anyone that your
9   prescription for Nick was for post-exposure prophylaxis
10  rather than pre-exposure prophylaxis?
11       A. No, because when Nick saw me he had not been
12  exposed right then and it was to prevent him from
13  getting the disease, pre exposure prophylaxis.
14       Q. And did Nick remain HIV-negative from the time
15  you prescribed Patricia for him for prophylaxis?
16       A. As I told you, I did a test on him every time he
17  came in and the test remained negative.
18       Q. Where is Nick today?
19       A. I learned from his husband when I called him in
20  2017 that Nick had died of pancreatic cancer.
21       MR. HOLVEY: Objection, Your Honor. That's
22  hearsay.
23       THE COURT: On the other hand, it's not
24  particularly pertinent to the trial and the Court will
25  not strike the answer.

936

1   BY MR. BASSETT:
2        Q. Now, Doctor, do you have any records related to
3   Nick's use of Truvada for pre-exposure prophylaxis?
4        A. No. That was the whole reason for calling the
5   husband and getting Nick's last name, was to look for
6   the records. I looked for the records and they had been
7   destroyed. The reason we destroyed records was, as you
8   can imagine, taking care of some 3000 HIV patients,
9   these patients didn't contract AIDS and die.
10       These patients contracted aids and they were sick
11  for two or three years, so by the time they died, their
12  records were a foot high or larger, and so very early
13  on, we started following the laws of California, and we
14  were able to destroy the records if it had been ten
15  years since you had seen the patients. So when I went
16  to look for Nick's records, it had been destroyed.
17       Q. Now, if you had been contacted in 2006 or 2007,
18  would you have still had Nick's medical records then?
19       A. Yes. If the last time I saw Nick was in 2004, we
20  would have had the records up until 2014.
21       Q. Did you also reach out to Nick's husband, Mark,
22  and ask if he had any records related to Nick's use of
23  Truvada for pre-exposure prophylaxis?
24       A. Yes. When I learned Nick's last name and learned
25  that he died of pancreatic cancer, I also asked for the

937

1   records, and he told me that unfortunately he had
2   destroyed those records the year before.
3        MR. HOLVEY: Objection, Your Honor. That's also
4   hearsay.
5        THE COURT: That's true, but on the other hand,
6   it's irrelevant to the issues at hand. Overruled.
7        MR. BASSETT: I have no further questions for the
8   Doctor.
9        THE COURT: All right.
10       Mr. Holvey?
11       MR. HOLVEY: Your Honor, if I may pass out some
12  binders?
13       THE COURT: Yes.
14       MR. HOLVEY: Thank you, Your Honor.
15       CROSS EXAMINATION
16  BY MR. HOLVEY:
17       Q. Dr. Conant, good afternoon. It's good to see you
18  again.
19       A. Nice to see you again.
20       Q. Thank you very much.
21       Earlier we discussed -- you discussed with
22  Mr. Bassett pre-exposure prophylaxis and post-exposure
23  prophylaxis. Could you tell me what the difference is
24  between pre-exposure and post-exposure?
25       A. Yeah. Pre-exposure prophylaxis is to treat a

75 (Pages 934 to 937)

Gilead Sciences v. USA                                                                6/27/2022

938

1   patient in anticipation that they are going to be
2   exposed to an event.  Post-exposure prophylaxis is to
3   treat the patient after they have been exposed to that
4   event.
5       Q.  How long do post-exposure prophylaxis regimens
6   last?
7       A.  What do you mean.
8       Q.  So if I am taking a pre-exposure prophylaxis
9   regimen, I assume I am taking it until the at-risk
10  behavior stops.  Is that correct?
11      A.  In most instances.  There would be exceptions to
12  that.
13      Q.  If I have a needle stick, I'm not taking
14  post-exposure prophylaxis drugs forever, that at some
15  point the regimen would stop.  Is that correct?
16      A.  Well, let's be specific.  If you stick yourself
17  with a needle right now, I will put you on medication
18  for a month.
19      Q.  Okay.  Is that the typical duration for
20  antiretrovirals for a needle stick.
21      A.  Yes.
22      Q.  And when post-exposure prophylaxis you are paying
23  catch up, that someone has already been exposed and you
24  are trying to have a high enough inn vivo drug to
25  exposure.  Is that correct?

939

1       A.  Not exposure.  It's implantation.
2       Q.  Implantation.  Thank you very much.
3          You closed your practice in the summer of 2019.
4   Is that correct?
5       A.  Yes, sir.
6       Q.  Have you ever prescribed Truvada for PrEP after
7   it was approved in 2012?
8       A.  Yes.
9       Q.  Did you do that frequently?
10      A.  I can't tell you how often, but yes.
11      Q.  Did how you prescribed Truvada for PrEP after
12  2012 follow the label?
13      A.  What label?
14      Q.  The Truvada label, the prescribing information
15  provided by Gilead with the drug.
16      A.  Well, the prescribing information provided by
17  Gilead is for treating HIV, and you're talking about
18  prophylaxis now, so that's a different --
19      Q.  Sorry, let me be more clear.  Truvada was
20  approved for treatment in 2004.
21      A.  Yes.
22      Q.  Okay.  Truvada was approved for pre-exposure
23  prophylaxis in 2012.
24      A.  Correct.
25      Q.  So post 2012, did you provide Truvada for PrEP?

940

1       A.  Yes.
2       Q.  And when you did, did you provide it for that
3   indication?
4       A.  No, because there were some patients that I did
5   tell them that they could take it intermittently.
6       Q.  Did you tell all patients to take it
7   intermittently?
8       A.  No.
9       Q.  Did you tell some patients to take it daily?
10      A.  Yes, most patients.
11      Q.  Most patients?
12      A.  Yes.
13      Q.  So for most patients you were following the
14  label.
15      A.  Yes.
16      Q.  And did you continue prescribing PrEP up until
17  the point you retired?  Did you stop seeing PrEP
18  patients at any time?
19      A.  No.
20      Q.  Okay.  You testified that you prescribed Truvada
21  for PrEP between 2004 and 2006 to select patients.  Is
22  that correct?
23      A.  That's correct.
24      Q.  Okay.  And these patients were engaging, in your
25  view, in exceptionally high-risk behaviors.  Is that

941

1   correct?
2       A.  What do you mean, my view?
3       Q.  Why did you prescribe them -- why did you
4   prescribe them Truvada for PrEP in 2004 to 2006?
5       A.  Because toe told me they were having high-risk
6   sex frequently.
7       Q.  Okay, great.  Thank you very much.
8          Did you test your patients for HIV before
9   prescribing Truvada for PrEP?
10      A.  We tested them at the time I did prescribe it,
11  that's correct.
12      Q.  Okay.  Did you ask them about whether or not they
13  had been recently exposed or potentially exposed to HIV
14  prior to starting them on pre-exposure prophylaxis?
15      A.  In all the cases I could think of, I didn't have
16  to ask them because they told me they had been.  They
17  were having frequent high-risk sex on a weekly or daily
18  basis.
19      Q.  So you tested them for HIV.
20      A.  At that point.
21      Q.  And if they did not have HIV, you immediately
22  started them on pre-exposure prophylaxis.
23      A.  No, the reason it was done, quite honestly, they
24  are seen for a visit, right?  I make the assessment, I
25  write the prescription.  I send them to the nurse, she

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555