UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,
    *Plaintiff–Counterclaim Defendant*,

   v.

GILEAD SCIENCES, INC.,
    *Defendant–Counterclaim Plaintiff,*

AND GILEAD SCIENCES IRELAND UC,
    *Defendant.*

Civil No. 1:19-cv-02103-MN

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
SHAMOOR ANIS
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel:   (302) 573-6277
Fax:   (302) 573-6220
*Laura.hatcher@usdoj.gov*
*Shamoor.anis@usdoj.gov*


Of Counsel:

LENA YUEH
Special Counsel
Department of Justice

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

WALTER W. BROWN
Senior Litigation Counsel

PHILIP CHARLES STERNHELL
Assistant Director
CARRIE E. ROSATO
PATRICK C. HOLVEY
MATTHEW D. TANNER
LUCY GRACE D. NOYOLA
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, D.C.  20530
Tel:   (202) 307-0341
Fax:   (202) 307-0345

*Attorneys for Plaintiff United States*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. ii
TABLE OF AUTHORITIES .......................................................................................................... iii

I. SUMMARY JUDGMENT OF INFRINGEMENT IS WARRANTED ............................. 1

    A. Gilead Fails to Raise a Dispute of Material Fact Regarding Inducement ................... 1

        1. Gilead Induces Direct Infringement Via Its Truvada® Package Insert ......................... 1

        2. There Is No Genuine Dispute of Material Fact Regarding Causation .......................... 4

    B. The Government Proved Direct Infringement by Truvada® for PrEP Patients ............. 4

II. GILEAD CANNOT ESTABLISH ITS LICENSE DEFENSE .......................................... 7

    A. The Inventors Assigned Their Rights to the Government in 2006 .............................. 7

    B. The CIIA Is Not a License of the '547 Application ................................................... 10

III. DR. CONANT'S UNCORROBORATED TESTIMONY OF ALLEGED PUBLIC USE IS LEGALLY INSUFFICIENT ..................................................................................... 10

IV. GILEAD DOES NOT RAISE A MATERIAL FACTUAL DISPUTE THAT WOULD PRECLUDE SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT ............. 12

V. CONCLUSION ................................................................................................................ 14

## TABLE OF AUTHORITIES

**Cases**

*Alpha One Transporter, Inc. v. Perkins Motor Transp., Inc.*,
  No. 13-cv-2662, 2014 WL 4537012 (S.D. Cal. Sept. 11, 2014) ..............................................8
*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*,
  845 F.3d 1357 (Fed. Cir. 2017)......................................................................................4, 6, 7
*Fields v. United States*,
  147 Fed. Cl. 352 (2020)..................................................................................................13
*Finnigan Corp. v. Int'l Trade Comm'n*,
  180 F.3d 1354 (Fed. Cir. 1999)...................................................................................10, 11
*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
  7 F.4th 1320 (Fed. Cir. 2021) ..........................................................................................3
*Grunenthal GmbH v. Alkem Labs. Ltd.*,
  919 F.3d 1333 (Fed. Cir. 2019).........................................................................................4
*Heinemann v. United States*,
  796 F.2d 451 (Fed. Cir. 1986) .........................................................................................9
*In re Omeprazole Patent Litig.*,
  483 F.3d 1364 (Fed. Cir. 2007).......................................................................................13
*IOENGINE, LLC v. Paypal Holdings, Inc.*,
  No. 18-452, 2022 WL 2800861 (D. Del. June 15, 2022)...................................................13, 14
*Juicy Whip, Inc. v. Orange Bang, Inc.*,
  292 F.3d 728 (Fed. Cir. 2002) ........................................................................................11
*Li v. Montgomery*,
  No. 99-5106, 221 F.3d 196, 2000 WL 815992 (D.C. Cir. May 15, 2000).........................10, 13
*Mahurkar v. C.R. Bard, Inc.*,
  79 F.3d 1572 (Fed. Cir. 1996) ........................................................................................11
*Ohio Willow Wood Co. v. Alps S., LLC*,
  813 F.3d 1350 (Fed. Cir. 2016).......................................................................................14
*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  843 F.3d 1315 (Fed. Cir. 2016).........................................................................................4
*Star Sci., Inc. v. RJ Reynolds Tobacco Co.*,
  537 F.3d 1357 (Fed. Cir. 2008).......................................................................................12
*Sysmex Corp. v. Beckman Coulter, Inc.*,
  No. 1:19-cv-1642, 2022 WL 1744573 (D. Del. May 31, 2022) ............................................13
*Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011)..................................................................................12, 13
*Young v. Lumenis, Inc.*,
  492 F.3d 1336 (Fed. Cir. 2007).......................................................................................14

**Regulations**

37 C.F.R. § 1.41................................................................................................................9
37 C.F.R. § 501.6(a)(1) ......................................................................................................9
37 C.F.R. § 501.6(a)(2) ......................................................................................................9

**Executive Orders**

Executive Order 10096
   15 Fed. Reg. 389, 1950 WL 44521 (Jan. 23, 1950) ............................................................. 9, 10

Gilead's opposition, D.I. 364, fails to raise any genuine issues of material fact that would preclude partial summary judgment for the Government.  First, regarding infringement of claim 13 of the '509 and '333 Patents, the REMs data clearly demonstrates that many patients have used Truvada for PrEP® in an infringing manner and that Gilead induces infringement despite the safer sex recommendations in its package insert.  Second, it is indisputable that the Government received all rights to the Patents-in-Suit by the time of the 2006 Assignment and that Gilead received no such rights through Dr. Janssen's employment agreement with Gilead.  Third, Dr. Conant's alleged prior use is uncorroborated under accepted legal standards.  Finally, Gilead's inequitable conduct allegations regarding CDC-PEP lack any evidence of an intent to deceive.

**I.      SUMMARY JUDGMENT OF INFRINGEMENT IS WARRANTED**

Gilead has reaped billions of dollars through over five million Truvada for PrEP® prescriptions in a manner that infringes claim 13 of the '509 and '333 Patents.  *See* D.I. 350 at 6-19.  Gilead's opposition fails to raise a genuine dispute of material fact regarding its inducement and causation of infringement, and the existence of direct infringement by patients.

**A.      Gilead Fails to Raise a Dispute of Material Fact Regarding Inducement**

**1.      Gilead Induces Direct Infringement Via Its Truvada® Package Insert**

Gilead disputes only whether it induces Truvada for PrEP® patients to practice a single limitation from claim 13 of the '509 and '333 Patents, which requires patients to experience "a potential exposure" to HIV.  *See* D.I. 364 at 3-5.  Gilead does not dispute the instructions in its package insert indicates that patients are eligible for Truvada for PrEP® only if they engage in activities that are at-risk for exposure to HIV.  *See* D.I. 350-3 at ¶ 14; D.I. 363 at ¶ 14; D.I. 350 at 15-16.  The Court construed "a potential exposure" to mean "engaging in activity that could result in an exposure" to HIV.  D.I. 186 at 2, 11-13.  Thus, patients engaging in activities that are at risk for exposure to HIV meet the claimed "potential exposure."

Gilead relies solely on the "safer sex" recommendations within the Truvada® package insert to counter the insert's instructions that Truvada for PrEP® can only be prescribed to patients that are at-risk for exposure to HIV. *See* D.I. 364 at 3-5. In Gilead's view, when patients follow any of the "safer sex" recommendations in the package insert, there is no possibility of experiencing a potential exposure to HIV. *Id.* at 5. Gilead's position is unreasonable. If safer sex practices are sufficient to remove the risk of HIV exposure, patients would simply practice safer sex instead of taking Truvada® and there would be no need for any of the 5 million-plus prescriptions of Truvada for PrEP®.

The undisputed evidence shows that, despite the safer sex recommendations in the Truvada® package insert, Gilead knew that Truvada for PrEP® patients engage in activities resulting in potential exposure to HIV. For example, Gilead's REMS data demonstrate that between 81.3-100% of Truvada for PrEP® patients had unprotected condomless sex within the last 3 months, and between 65.5-100% did not use a condom the last time they had sex. D.I. 350-3 at ¶ 8; D.I. 363 at ¶ 8; D.I. 350 at 14-15.[1] Gilead's expert, Dr. Flexner, concedes that "unprotected receptive anal intercourse with a partner whose HIV serostatus is unknown or who is known to be HIV infected and not taking effective anti-retroviral medication" is "the riskiest sexual activity for HIV acquisition." Ex. 9 at 361.

Dr. Flexner also answered "Yes," when asked whether a Truvada for PrEP® patient who follows the safer sex prevention strategy in the package insert would still be considered at risk for HIV exposure. D.I. 366, Ex. D at 365. Gilead relies heavily on the portion of Dr. Flexner's testimony where he stated that the risk "would be practically zero." *Id.* at 365-66. But "practically

---

[1] Unless stated otherwise, numbered exhibits refer to those attached to the Government's motion, D.I. 343. Lettered exhibits refer to those provided by Gilead under D.I. 366.

2

zero" does not equate to zero risk of HIV exposure. And Dr. Flexner conceded that "it's difficult to consistently practice all of [the safer sex recommendations] all of the time," so Dr. Flexner declined to recommend that patients ***not*** take Truvada for PrEP® even when they practiced all of the safer sex recommendations. *Id.* at 366.

Gilead notes that Dr. Murphy instructs his patients to practice safer sex in accordance with the package insert. But Dr. Murphy testified that his own experience prescribing Truvada for PrEP® aligns with the objective REMS data demonstrating that Truvada for PrEP® patients nonetheless engage in at-risk activities for HIV exposure.[2] Ex. 51 at 53-58; Ex. 25 216-17.[3]

Gilead's own surveys of real-world PrEP users concluded that "[r]isky behaviors abound: few [PrEP users] are monogamous and most have had unprotected anal sex." Ex. 23 at -285. Gilead, in fact, has not established that even one of the millions of prescriptions of Truvada for PrEP® was used according to the package insert by a person lacking a potential exposure to HIV. And Gilead knew of the '509 and '333 Patents within the period of infringement. *See* D.I. 21 at 54 (¶ 238), 76 (¶ 38); D.I. 350 at 17; Ex. 40 at 155. Therefore, Gilead "knew or should have known [its] actions would induce actual infringement." *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1339 (Fed. Cir. 2021). No reasonable jury could agree with Gilead's argument that the Truvada for PrEP® patient, who follows Gilead's package insert and takes Truvada for PrEP® because the patient engages in activity that creates a risk for acquiring HIV, would nevertheless

---

[2] Dr. Robert Murphy, a Government expert, further explained that Truvada for PrEP® patients repeatedly engage in at-risk behavior that results in actual exposure to HIV. *See* Ex. 27 at ¶ 148.

[3] Gilead similarly cites selected testimony from Dr. Julia Marcus about the lack of exposure risk where a patient's partner is hypothetically virally suppressed or HIV negative. *See* D.I. 364 at 5. However, it ignores her testimony that there are inaccuracies with perceptions of viral suppression status and HIV-negative status such that risk for potential HIV exposure remains in real-world situations. *See* D.I. 367, Ex. D at ¶¶ 93-95; Ex. 52 at 119, 224-27.

avoid any potential HIV exposure. The instructions in Gilead's package insert "inevitably lead some [patients] to infringe [which] establishes the requisite intent for inducement." *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 845 F.3d 1357, 1368 (Fed. Cir. 2017).[4]

### 2. There Is No Genuine Dispute of Material Fact Regarding Causation

Gilead argues that it is not liable for inducement because there is supposedly no nexus or direct causal link between its package insert and patients' infringing activities in view of federal and state guidelines regarding Truvada for PrEP®. *See* D.I. 364 at 6-8. Gilead's argument is "without merit." *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1335 (Fed. Cir. 2016). Induced infringement may be established by "circumstantial evidence of inducement (e.g., advertisements, user manuals) directed to a class of direct infringers (e.g., customers, end users) without requiring hard proof that any individual third-party direct infringer was actually persuaded to infringe by that material." *Id.* (collecting cases).

Regardless, Gilead's package insert represents the FDA-authorized instructions for patients taking Truvada for PrEP®. The federal and state guidelines point back to Gilead's package insert as the primary source of instruction for using Truvada for PrEP®. *See* Ex. 8 at ¶¶ 297-98. It is Gilead's package insert that instructs patients how to use Truvada® for PrEP, *see* D.I. 350 at 6, and the cited guidelines reinforce that Truvada for PrEP® users should follow Gilead's instructions in Gilead's package insert, *see* Ex. 8 at ¶¶ 38-39. Moreover, Dr. Flexner admitted that physicians and patients "may not use [the guidelines] at all," such that the guidelines have no causation contribution in at least these circumstances. Ex. 52 at 402.

### B. The Government Proved Direct Infringement by Truvada® for PrEP

---

[4] An intent to induce is demonstrated where "at least some users" infringe. *Grunenthal GmbH v. Alkem Labs. Ltd.*, 919 F.3d 1333, 1340 (Fed. Cir. 2019) (internal quotation omitted). Gilead fails to distinguish *Grunenthal*, D.I. 364 at 6 n.5, as it knew or should have known that its label poses infringement problems.

**Patients**

Gilead asserts that summary judgment must be denied because "the [G]overnment has not shown a single specific patient that practiced any claim." D.I. 364 at 8. Gilead's data shows that there were 5,636,959 prescriptions of Truvada for PrEP® and an average of 106,157 active Truvada for PrEP® patients per month from June 2015 through August 2021. *See* D.I. 350-3 at ¶ 16; D.I. 363 at ¶ 16; Ex. 8 at ¶ 7; Ex. 24. Gilead's REMS surveyed a random sample of 418 of those patients, and each surveyed patient was a Truvada for PrEP® user. D.I. 350 at 7.[5] The REMS results from those 418 patients are representative of the infringing activity of thousands of Truvada® for PrEP patients. *Id.* at ¶¶ 7-8, 10. Thus, the Government has sufficiently established numerous instances of patients that practice the claims.

Gilead argues that no single patient experienced a "potential exposure" to HIV based on responses to three sets of survey questions. *See* D.I. 364 at 9-10. This argument is baseless. Question 20 asked whether the Truvada for PrEP® patient "had unprotected sex within the last 3 months," and 81.3-100% of the patients answered "Yes." Ex. 8 at ¶ 59; Ex. 17 at -841-42; Ex. 18 at -368-69; Ex. 19 at -759. Gilead's Truvada package insert explicitly calls out "condomless sex" as an activity that puts a patient at-risk for exposure to HIV. *See* D.I. 350-3 at ¶ 15; D.I. 363 at ¶ 15; Ex. 15 at 6; D.I. 350 at 15. Thus, each person who answered "Yes" to Question 20 had a potential exposure to HIV, and the aggregate survey results correlate to between 81.3-100% of Truvada for PrEP® patients having potential exposure to HIV.

Question 19 asked whether the Truvada for PrEP® patient "use[d] a condom the last time [they] had sex," and 65.5-100% of the patients answered "No." Ex. 8 at ¶ 59; Ex. 17 at -841-42,

---

[5] Gilead asserts that the Government incorrectly stated the timeframe for REMS 3. *See* D.I. 364 at 9 n. 7. REMS 3 clearly covers "16 November 2014 to 15 May 2016." Ex. 17 at -1496 (title). Though it includes some data outside the infringement period, Gilead used the entire data set to convince FDA that patients generally comply with its insert instructions. D.I. 350 at 8.

Ex. 18 at -368-69; Ex. 19 at -759. Gilead's Truvada package insert explicitly calls out "condomless sex" as an activity that puts a patient at-risk for exposure to HIV. *See* D.I. 350-3 at ¶ 15; D.I. 363 at ¶ 15; Ex. 15 at 6; D.I. 350 at 15. Thus, each person who answered "No" to Question 19 was potentially exposed to HIV, and the aggregate survey results demonstrate that between 65.5-100% of Truvada for PrEP® patients having potential exposure to HIV.

Question 17 asked whether the Truvada for PrEP® patient "kn[e]w the HIV-1 status of [their] sexual partner(s)," and 40-60% of the patients answered that they did not know the HIV status of their sexual partners or only knew the HIV status of some of their sexual partners. Ex. 8 at ¶ 59; Ex. 17 at -841-42; Ex. 18 at -368-69; Ex. 19 at -759. Gilead's Truvada package insert explicitly calls out "having sexual partners of unknown HIV-1 viremic status" as an activity that puts a patient at-risk for exposure to HIV. *See* D.I. 350-3 at ¶ 15; D.I. 363 at ¶ 15; Ex. 15 at 6; D.I. 350 at 15. Thus, each person who did not know the HIV status of at least some of their sexual partners had a potential exposure to HIV, and the aggregate survey results demonstrate that between 40-60% of Truvada for PrEP® patients have a potential exposure to HIV.

Gilead speculates that a minor percentage of patients may have answered Questions 17, 19, and 20 in a manner that the patient "either used a condom or knew the HIV status of their partner" and would not necessarily have experienced a "potential exposure to HIV." D.I. 364 at 9-11.[6] Even assuming that this minor population of Truvada for PrEP® patients exists—which the Government disputes—the Government is still entitled to summary judgment of infringement. The law does not require the Government to demonstrate that every prescription of Truvada® for PrEP infringes the claims. *See Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1368 (Fed.

---

[6] Gilead incorrectly asserts that the Government misconstrued statistical evidence about patients missing "12 doses or less" in a month. D.I. 364 at 11 n. 9. Regardless, Gilead does not dispute that those Truvada for PrEP® patients practice step (b), or other claim limitations, on that basis.

6

Cir. 2017). The Government has demonstrated that a significant percentage of Truvada for PrEP® patients are potentially exposed to HIV, and Gilead has not raised a genuine issue of material fact.

Incredibly, Gilead also argues that its own survey data is "unreliable" and does not reflect real-world patient behavior because the surveys "were largely self-reporting" and had "no independent verification." D.I. 364 at 11; *see also id.* at 8-12. Gilead, however, developed the REMS surveys to evaluate patient compliance with the very same Truvada for PrEP® instructions in the package insert at issue here. *See* D.I. 350 at 7-8. Gilead relied on the survey results to demonstrate to the FDA that patients *do* comply with the instructions in the package insert, and the FDA agreed with Gilead. *Id.* Moreover, Gilead's quotes from Dr. Murphy and Dr. Robert Grant are grossly taken out of context. *See* D.I. 364 at 11. Drs. Murphy and Grant were commenting on the self-reporting value of the international respondents *in the iPrEx clinical trial* who faced poorly designed questions that skewed respondent answers—a very different situation than Gilead's REMS surveys of U.S. patients. *See* Ex. 51 at 132-33; Ex. 53 at 170.[7]

The Court should grant summary judgment for GSI's induced infringement of these claims.

## II. GILEAD CANNOT ESTABLISH ITS LICENSE DEFENSE

### A. The Inventors Assigned Their Rights to the Government in 2006

Gilead contends that "invention" is "ill-defined" in the 2006 Assignment, but nonetheless concedes that it transferred rights to the '811 Provisional. D.I. 364 at 15-17. Accordingly, the "patent application and invention" that is assigned to the Government must include the '811

---

[7] Gilead asserts that Dr. Marcus explained that risks associated with condomless sex "can vary dramatically based on context." D.I. 364 at 11 n.10. But she clarified that a non-zero risk of potential exposure to HIV with condomless sex always remains without viral suppression. *See* Ex. 53 at 221, 211-12, 190; D.I. 367, Ex. D at ¶¶ 93-95.

7

Provisional and the inventions disclosed therein. Ex. 32 at -162.[8]

Gilead's argument that the 2006 Assignment assigns nothing more than the '811 Provisional disregards the assignment's plain language and intent. It expressly assigns rights *in addition* to the '811 Provisional, including (1) the Patents-in-Suit, which are "Letters Patent that [were] granted on the invention," and (2) the applications for the Patents-in-Suit, each of which is a "continuation" or "conversion . . . thereof," and asserts "the right to claim priority from the patent application," *i.e.*, the '811 Provisional. *Id.* Such language is missing from the assignment in *Alpha One Transporter, Inc. v. Perkins Motor Transp., Inc.*, No. 13-cv-2662, 2014 WL 4537012, at *3 (S.D. Cal. Sept. 11, 2014), cited by Gilead. The 2006 Assignment was clearly intended to be a broad assignment of the '811 Provisional and future related patents and applications.[9]

Gilead attempts to create ambiguity in the assignment where there is none. The 2006 Assignment does not list the '547 Application and other non-provisional applications for the Patents-in-Suit, or include their titles, because those applications had not been filed by at the time. The attorney docket number thus is an acceptable method of identifying the application to which the assignment is directed. *See* Manual of Patent Examination Procedure § 602.08(c). There was also no need to submit the 2006 Assignment for the files of the applications for the Patents-in-Suit. An assignment recorded with a provisional application is "effective" in a later application that claims the benefit of the provisional application. *See id.* § 306.01. Because the 2006 Assignment "wasn't an accompanying application part," the '547 Application cover sheet did not require

---

[8] The Government disputes Gilead's contention that the inventors were not in possession of methods using oral TDF and FTC for PrEP as of March 15, 2006. *See* D.I. 367 at 25-28.

[9] Gilead argues that the 2006 Assignment only transferred "the right to claim priority from the patent application." D.I. 364 at 17. But that provision would be meaningless unless the 2006 Assignment also assigned the inventions contained in those applications.

8

identification of an assignment or assignee.  Ex. 54 at 103-04; Ex. 33 at -282.  Further, when the '547 Application was filed, a patent could not be applied for in the name of an assignee.  37 C.F.R. § 1.41 (pre-AIA).  Regardless, the Government informed the Patent Office that the Government is the assignee of the '547 Application by virtue of the 2006 Assignment.  Ex. 45.  Nothing in the 2015 Assignment alters the rights transferred by the 2006 Assignment.

Executive Order 10096, 15 Fed. Reg. 389, 1950 WL 44521 (Jan. 23, 1950), also supports the Government's position.  First, the Order expressly "presume[s]" Government ownership of an invention by a federal employee if certain criteria are met, as they are here.  37 C.F.R. § 501.6(a)(1), (3); D.I. 350 at 20-21.  Second, there are no applicable provisions in Executive Order 10096 where title would be left with the federal employee.  Third, the Government obtained ownership of the patented inventions through the 2006 Assignment.

Gilead's cross-motion should be denied.  Not only does it contravene the Court's Scheduling Order, D.I. 27 at ¶¶ 14-15, the issue of whether Executive Order 10096 automatically transfers ownership of inventions by federal employees to the Government need not be addressed.  Nevertheless, Gilead's arguments are unavailing.  Executive Order 10096 does not provide that assignment is the only means for the Government to obtain ownership of an invention made by a federal employee.  The Order and its implementing regulations refer to a "requirement of assignment" only where the Government's contribution is "insufficient equitably."  37 C.F.R. § 501.6(a)(2).  No other reference is made to an "assignment."  *Id*.

Gilead also ignores the holding in *Heinemann v. United States*, 796 F.2d 451 (Fed. Cir. 1986) and focuses on issues not decided by the Federal Circuit.  The decision did not transfer ownership, as Gilead argues, D.I. 364 at 14, but rather affirmed various findings that the Government *already* owned the invention under Executive Order 10096, 796 F.2d at 454-56.  And,

9

contrary to Gilead's arguments, D.I. 364 at 14-15, this Court may consider persuasive authority that Government ownership can occur under Executive Order 10096 "by operation of law." *Li v. Montgomery*, No. 99-5106, 221 F.3d 196, 2000 WL 815992, at *2 (D.C. Cir. May 15, 2000).

### B. The CIIA Is Not a License of the '547 Application

The representation in the CIIA signed by Dr. Janssen that he "listed on Exhibit A" a complete list of "Prior Inventions" that belong to him is inconsistent with Exhibit A's definition, which required a list of all prior inventions, regardless of ownership. Ex. 35 at -452-53, -457. The ambiguity in Gilead's CIIA must be construed against it, *see* D.I. 350 at 24, such that the CIIA does not grant Gilead a license of the '547 Application.

## III. DR. CONANT'S UNCORROBORATED TESTIMONY OF ALLEGED PUBLIC USE IS LEGALLY INSUFFICIENT

"[T]estimony concerning a witness's ***own*** anticipatory activities must be corroborated" and even "[u]ninterested witnesses are . . . subject to the corroboration requirement." *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1367-68 (Fed. Cir. 1999). Gilead has no such corroborating evidence for Dr. Conant's alleged public use. Instead, it cites Dr. Conant's self-publicizing August 2006 statement to a newspaper that he "said he prescribes Truvada as a preventative medicine to three of his patients." D.I. 364 at 19 (citing Ex. R). All the alleged "corroboration" describing Truvada for PrEP® prescribed by Dr. Conant post-dates the '811 Provisional filing (*e.g.*, is not prior art) and includes no details. *See* Exs. R, S, T, X, Y. Gilead, in fact, admits that all of the necessary evidence of invalidity, including details of Dr. Conant's patients and their prescription drug use, will be from Dr. Conant's otherwise uncorroborated testimony. D.I. 364 at 19.

Gilead's proffered corroboration evidence fails as a matter of law. Indeed, even if the cited publication disclosed every limitation of the claims but one, Dr. Conant's evidence would still be insufficient as a matter of law. *See Finnigan*, 180 F.3d at 1369-70; *Juicy Whip, Inc. v. Orange*

10

*Bang, Inc.*, 292 F.3d 728, 743 (Fed. Cir. 2002).  The corroboration rule "provides a bright line for both district courts . . . to follow in addressing the difficult issues related to invention dates." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996); *Juicy Whip*, 292 F.3d at 743.

The considerations motivating this bright line rule include the witnesses' "proneness to recollect things as the party calling them would have them recollect them."  *Juicy Whip*, 292 F.3d at 740 (internal quotation omitted).  Dr. Conant's inconsistent memory about how many patients were allegedly prescribed PrEP or given refills implicates such concerns.  *Compare* Ex. X at -774-75 (prescribed "about six people" and none "ever asked for a refill") *with* D.I. 364 at 19 (prescribed "at least three patients") and Ex. Q at 935 (patient came "back for at least two refills").  And while Gilead alleges that Dr. Grant confirmed Dr. Conant's alleged prior PrEP prescriptions, D.I. 364 at 20, Dr. Grant actually recalled that Dr. Conant's efforts "sounded more like" PEP, Ex. I at 214.

Gilead asserts that corroboration is required from interested witnesses only.  D.I. 364 at 20-21.  But corroboration is required of any witness.  *Finnigan*, 180 F.3d at 1369.  Moreover, Dr. Conant does have an interest in his own standing in the HIV/AIDS epidemic narrative, as underscored by the fact he repeatedly publicized his role.  *See, e.g.*, Exs. R, T-Y.  And while Gilead argues there need not be an element-by-element corroboration, D.I. 364 at 21, there is **no** corroborating evidence of **any** element of Dr. Conant's allegedly invalidating actions or the allegedly invalidating use by "Nick."

While Gilead also argues that Dr. Conant's testimony could be related to other issues, his alleged public use and public knowledge are part and parcel of the same issue.  D.I. 364 at 20. Gilead's suggestion that Dr. Conant's testimony could be rebuttal evidence to the Government's objective evidence of non-obviousness, *id.*, is irrelevant to whether summary judgment should be granted on the issue of invalidity.  Finally, Gilead suggests that "the government's delay in

11

bringing this litigation and failure to notify Gilead of the patent applications" is the reason why Dr. Conant does not have "detailed corroborative prescription records." *Id.* at 21-22. Gilead, however, had notice of the Government's patent and applications in 2014, before the loss of any purported records. Ex. 56 at 936, 1716-18; Ex. 57 at 100. With no corroborating evidence of this alleged prior use, summary judgment should be granted.

## IV. GILEAD DOES NOT RAISE A MATERIAL FACTUAL DISPUTE THAT WOULD PRECLUDE SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

Gilead's opposition does not address whether there is any evidence of a specific intent to deceive the Patent Office. Instead, it argues that the CDC-PEP reference was material to now-disclaimed claims in the '509 and '333 Patents. D.I. 364 at 22. However, "[i]ntent and materiality are separate requirements," and the court "may not infer intent solely from materiality." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc).

Gilead relies on evidence that the inventors submitted an inventor's oath to the Patent Office, were aware of CDC-PEP, and did not submit CDC-PEP to the Patent Office. D.I. 364 at 23-24. Such evidence—without more—cannot demonstrate a specific intent to deceive. "The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive." *Therasense*, 649 F.3d at 1291. And the Government need "not offer any good faith explanation" until Gilead "prove[s] a threshold level of intent to deceive by clear and convincing evidence." *Star Sci., Inc. v. RJ Reynolds Tobacco Co.*, 537 F.3d 1357, 1368 (Fed. Cir. 2008), But, here, there is a good faith explanation. The inventors understood that the patented invention was PrEP, not PEP, and thus CDC-PEP was irrelevant. D.I. 364 at 23.

Gilead suggests that the inventors were active participants "in prosecution of the '547 Application." *Id.* But the cited testimony demonstrates—at most—sporadic communications with the prosecuting attorney, not that the inventors actively monitored the prosecution or pending

12

claims. *See* Ex. Q at 805-06; Ex. GGG at 122-23, 132-33. Indeed, one witness explained, "I haven't seen evidence" that the inventors knew that the claims were amended to cover PEP. Ex. GGG 133.[10] Lacking evidence of a specific intent to deceive the Patent Office *during* prosecution, Gilead relies solely on the inventors' after-the-fact understanding of issued claims. D.I. 364 at 23.

Gilead asserts that inventor Dr. Walid Heneine chose not to disclose CDC-PEP, *id.* at 364 at 23, but omits his testimony that the CDC-PEP "recommendations are irrelevant for our PrEP research," Ex. 25 at 216. The inventors also explained that CDC-PEP was not material for a range of scientific reasons. *See* Ex. 11 at 209-11, 225-26; Ex. 25 at 145-46, 170-73, 213-16; Ex. 44 at 145-56. The Patent Office correctly confirmed that CDC-PEP was not material to the patentability of PrEP claims when it denied *inter partes* review. Ex. 58 at 27-37. When multiple reasonable inferences "may be drawn, [an] intent to deceive cannot be found." *Therasense*, 649 F.3d at 1290-91. It is reasonable to infer that the inventors did not believe the CDC-PEP was relevant.

Gilead also asserts that during "prosecution of these patents, the inventors' course of conduct more than supports an inference of intent to deceive."[11] D.I. 364 at 24. But Gilead cites events unrelated to the patents' *prosecution*. For example, Gilead suggests an inventor did not include the pending application on a resume submitted to *Gilead*, and that an inventor listed the

---

[10] Gilead relies on *Sysmex Corp. v. Beckman Coulter, Inc.*, No. 1:19-cv-1642, 2022 WL 1744573 (D. Del. May 31, 2022), to support an inference of deceptive intent. D.I. 364 at 24. But the *Sysmex* actors were "intimately familiar" with the applications and collaborated in drafting the claims. 2022 WL 1744573, at *5-6. No such evidence exists here.

[11] Gilead relies in part on findings of the Court of Federal Claims. But those findings were made under a "preponderance of evidence" burden of proof, *Fields v. United States*, 147 Fed. Cl. 352, 355 (2020), not the "clear and convincing" burden required for patent unenforceability defenses, *In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1374 (Fed. Cir. 2007). This distinction bars application of the doctrine of collateral estoppel for Gilead's patent unenforceability defenses, despite Gilead's efforts to the contrary, *e.g.*, D.I. 364 at 8 n.6; *IOENGINE, LLC v. Paypal Holdings, Inc.*, No. 18-452, 2022 WL 2800861, at *12-13 (D. Del. June 15, 2022) (summarizing "black letter law").

13

international patent application number instead of the corresponding domestic patent application number on a disclosure to *Gilead*. *Id.* at 24-25. This does not demonstrate any deception, but also has nothing to do with the patent prosecution. *Id.* While Gilead questions the "credibility of the government's witnesses," *id.* at 25, general credibility determinations alone cannot establish an "intent to deceive." *Ohio Willow Wood Co. v. Alps S., LLC*, 813 F.3d 1350, 1360 (Fed. Cir. 2016).

Gilead also argues that the conduct was so egregious that it justifies holding the entire patent family unenforceable. D.I. 364 at 26-27. But it also acknowledges that CDC-PEP was submitted to the Patent Office during prosecution of the '191 and '423 Patents, and that the Examiner cited CDC-PEP in a rejection before allowing claims over it. *Id.* at 26. Gilead asserts that by amending its claims to remove supposedly "PEP claims," the Government somehow "prevented substantive consideration of CDC-PEP." *Id*. But the allowance of the claims after the rejection demonstrates substantive consideration of CDC-PEP.

Gilead also asserts that the Government had to "make the examiner aware of its failure to disclose CDC-PEP during prosecution of the '509 and '333 Patents." *Id.* at 27. But Gilead relies on cases involving affirmative misrepresentations, not failures to disclose a reference. *Id.* at 26-27 (citations omitted). And the Government disclosed CDC-PEP, *id.*, which cures the alleged omission. *See Young v. Lumenis, Inc.*, 492 F.3d 1336, 1349 (Fed. Cir. 2007). A summary judgment foreclosing inequitable conduct based on CDC-PEP is appropriate.

## V. CONCLUSION

The Court should issue summary judgment that (1) claims 13 of the '509 and '333 Patents are infringed; (2) Gilead does not possess a license; (3) Gilead cannot establish a corroborated public use by Dr. Conant; and (4) there was no inequitable conduct related to CDC-PEP.

| | |
|---|---|
| Dated: December 19, 2022 | Respectfully submitted, |

LAURA D. HATCHER (DE Bar No. 5098)　　DAVID C. WEISS
Assistant United States Attorney　　　　　　United States Attorney
SHAMOOR ANIS
Assistant United States Attorney　　　　　　MICHAEL GRANSTON
1313 N. Market Street　　　　　　　　　　　Deputy Assistant Attorney General
P.O. Box 2046
Wilmington, Delaware 19899-2046　　　　　GARY L. HAUSKEN
Tel:　(302) 573-6277　　　　　　　　　　　Director
Fax:　(302) 573-6220
*Laura.hatcher@usdoj.gov*　　　　　　　　　*/s/Walter W. Brown*
*Shamoor.anis@usdoj.gov*　　　　　　　　　WALTER W. BROWN
　　　　　　　　　　　　　　　　　　　　　Senior Litigation Counsel

Of Counsel:　　　　　　　　　　　　　　　PHILIP CHARLES STERNHELL
LENA YUEH　　　　　　　　　　　　　　　Assistant Director
Special Attorney
U.S. Department of Justice　　　　　　　　　CARRIE E. ROSATO
　　　　　　　　　　　　　　　　　　　　　PATRICK C. HOLVEY
　　　　　　　　　　　　　　　　　　　　　MATTHEW D. TANNER
　　　　　　　　　　　　　　　　　　　　　LUCY GRACE D. NOYOLA
　　　　　　　　　　　　　　　　　　　　　Trial Attorneys
　　　　　　　　　　　　　　　　　　　　　Commercial Litigation Branch
　　　　　　　　　　　　　　　　　　　　　Civil Division
　　　　　　　　　　　　　　　　　　　　　U.S. Department of Justice
　　　　　　　　　　　　　　　　　　　　　Washington, D.C. 20530
　　　　　　　　　　　　　　　　　　　　　Tel:　(202) 307-0341
　　　　　　　　　　　　　　　　　　　　　Fax:　(202) 307-0345

　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff United States*