# Exhibit 51

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3    -----------------------------x

4    UNITED STATES OF AMERICA,      :

5         Plaintiff and            :

6         Counterclaim Defendant,   :

7         v.                       :   CA No.

8    GILEAD SCIENCES, INC. and     :   1:19-cv-02103-MN

9    GILEAD SCIENCES IRELAND UC,    :

10        Defendants and           :

11        Counterclaim Plaintiffs.  :

12   -----------------------------x

13

14         CONFIDENTIAL - RESTRICTED INFORMATION

15            SUBJECT TO PROTECTIVE ORDER

16

17            Videotaped Deposition of

18            ROBERT L. MURPHY, M.D.

19               Chicago, Illinois

20            Thursday, August 4, 2022

21                  8:59 a.m.

22

23   Job No.: 457413

24   Pages: 1 - 221

25   Reported by: Stephanie A. Battaglia, CSR, RMR, CRR

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                    2

1

2

3          VIDEOTAPED DEPOSITION OF ROBERT L. MURPHY,

4    M.D., pursuant to notice, before Stephanie A.

5    Battaglia, CSR, RMR, CRR, Notary Public in and for

6    the State of Illinois.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                    3

```
1    PRESENT:

2           DEPARTMENT OF JUSTICE
            SENIOR LITIGATION COUNSEL
3           BY:  MR. WALTER W. BROWN
            1100 L Street NW, Room 8504
4           Washington, D.C.  20005
            (202) 307-0341
5
                 - and -
6
            U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES
7           OFFICE OF THE GENERAL COUNSEL
            SENIOR ATTORNEY
8           BY:  MR. MICHAEL H. IMBACUAN
            Jacob K. Javits Federal Building
9           26 Federal Plaza
            New York, New York  10278
10          (202) 702-0201

11               - and -

12          U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES
            GENERAL COUNSEL
13          BY:  MS. LENA YUEH
            200 Independence Avenue
14          Washington, D.C.  20201
            (877) 696-6775
15
                 - and -
16
            KNOBBE MARTENS
17          BY:  MR. NATE LUMAN, Ph.D. (via telephone)
            3579 Valley Centre Drive, Suite 300
18          San Diego, California  92130
            (858) 707-4000
19          e-mail:  nate.luman@knobbe.com

20              appeared on behalf of the United
                States of America;
21

22

23

24

25
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                      4

```
1    (Cont'd.):

2          WILMER, CUTLER, PICKERING, HALE &
           DORR, LLP
3          BY:  MR. DAVID B. BASSETT
                MR. SCOTT G. GREENE
4          7 World Trade Center
           250 Greenwich Street
5          New York, New York  10007
           (212) 230-8858
6          e-mail:  david.bassett@wilmerhale.com
                    scott.greene@wilmerhale.com
7
           appeared on behalf of the Gilead
8          Defendants.

9    ALSO PRESENT:

10         Ms. Janice Ye
           Gilead Sciences, Inc.
11
           Mr. Lawrence Wallace, Videographer
12         Planet Depos

13         Ms. Stephanie A. Battaglia, CSR, RMR, CRR
           Planet Depos
14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | is some bullet points underneath that, correct? | 09:51:18 |
| 2 | A  That's correct. | 09:51:20 |
| 3 | Q  And the first bullet is, "Just taking | 09:51:21 |
| 4 | TRUVADA may not keep you from getting HIV-1." | 09:51:23 |
| 5 | A  That's correct. | 09:51:26 |
| 6 | Q  And the second bullet, "You must continue | 09:51:26 |
| 7 | using safer sex practices while you are taking | 09:51:29 |
| 8 | TRUVADA to reduce your risk of getting HIV-1," | 09:51:32 |
| 9 | correct? | 09:51:35 |
| 10 | A  That's correct. | 09:51:35 |
| 11 | Q  And then there is another bullet and then | 09:51:35 |
| 12 | there is some sub-bullets under that and the first | 09:51:38 |
| 13 | sub-bullet, "Know your HIV status and the HIV | 09:51:41 |
| 14 | status of your partners," right? | 09:51:44 |
| 15 | A  That's correct. | 09:51:46 |
| 16 | Q  And then the second to last sub-bullet | 09:51:46 |
| 17 | there is "have fewer sex partners," right? | 09:51:49 |
| 18 | A  That's correct. | 09:51:52 |
| 19 | Q  And all of those statements I have just | 09:51:52 |
| 20 | read are part of the TRUVADA package insert that | 09:51:55 |
| 21 | your patients who will be taking TRUVADA for PrEP | 09:51:59 |
| 22 | read, right? | 09:52:01 |
| 23 | A  That's correct. | 09:52:02 |
| 24 | Q  And this is part of the administration | 09:52:02 |
| 25 | instructions in the TRUVADA package insert that | 09:52:05 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                    54

| | | |
|---|---|---|
| 1 | PrEP patients generally adhere to in your opinion, | 09:52:08 |
| 2 | correct? | 09:52:11 |
| 3 | A  Whether they adhere to it or not is | 09:52:11 |
| 4 | another question. | 09:52:14 |
| 5 | Q  Well, you offered the opinion in your | 09:52:14 |
| 6 | opening report that most TRUVADA patients | 09:52:17 |
| 7 | generally adhere to the instructions in the | 09:52:20 |
| 8 | package insert, correct? | 09:52:22 |
| 9 | A  Generally. | 09:52:23 |
| 10 | Q  That was my question. | 09:52:24 |
| 11 | A  Okay. | 09:52:25 |
| 12 | Q  So in your opinion, just to make sure the | 09:52:25 |
| 13 | record is clear, this is -- the sentence as I just | 09:52:28 |
| 14 | read a part of the administration instructions in | 09:52:31 |
| 15 | the TRUVADA package insert that PrEP patients | 09:52:35 |
| 16 | generally adhere to, correct? | 09:52:40 |
| 17 | A  That is correct, but there is a caveat to | 09:52:41 |
| 18 | that, in that as PrEP has evolved the | 09:52:43 |
| 19 | effectiveness of taking PrEP has become very | 09:52:51 |
| 20 | obvious and clear to patients, and it's actually | 09:52:56 |
| 21 | changed behavior. | 09:52:59 |
| 22 | People are actually more reckless now than | 09:53:01 |
| 23 | when they are taking it.  And, yes, they know all | 09:53:04 |
| 24 | these risk reduction methods because these risk | 09:53:08 |
| 25 | reduction methods were there before TRUVADA, | 09:53:13 |

CONFIDENTIAL - RESTRICTED INFORMATION

Transcript of Robert L. Murphy, M.D.
August 4, 2022                                    55

| | | |
|---|---|---|
| 1 | everything that you mentioned. | 09:53:16 |
| 2 | However, what's happening in reality is | 09:53:18 |
| 3 | that, yes, they take it with or without food, you | 09:53:21 |
| 4 | know, they take it once a day, they get tested | 09:53:24 |
| 5 | every three months, but they aren't following this | 09:53:27 |
| 6 | part of the guidelines even though it is advised | 09:53:30 |
| 7 | that they do, we try to get them to do that, but | 09:53:34 |
| 8 | in reality it is not happening. | 09:53:38 |
| 9 | Q  So in your opinion the patients that you | 09:53:39 |
| 10 | prescribe TRUVADA for PrEP do not generally adhere | 09:53:44 |
| 11 | to the instructions in this guideline -- | 09:53:47 |
| 12 | A  Well -- | 09:53:50 |
| 13 | Q  Let me finish my question. | 09:53:51 |
| 14 | In this portion of the guidelines, right? | 09:53:52 |
| 15 | A  They don't adhere to this section. | 09:53:54 |
| 16 | Q  They adhere to everything else? | 09:53:58 |
| 17 | A  Pretty much. | 09:54:00 |
| 18 | It's a pretty simple drug to take, once a | 09:54:02 |
| 19 | day, talk about the possible interactions.  And by | 09:54:04 |
| 20 | now after they are on it, whether they are going | 09:54:11 |
| 21 | to have an interaction or not or a side effect, | 09:54:13 |
| 22 | they already know that, but they are not paying | 09:54:16 |
| 23 | attention to this section. | 09:54:18 |
| 24 | Q  And what percentage of your patients are | 09:54:20 |
| 25 | not paying attention to this section? | 09:54:22 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                    56

| | | |
|---|---|---|
| 1 | A  Almost all. | 09:54:23 |
| 2 | Q  Almost 100%? | 09:54:24 |
| 3 | A  Almost. | 09:54:26 |
| 4 | Q  So you know that? | 09:54:27 |
| 5 | A  Yes. | 09:54:28 |
| 6 | Q  And so you tell them, you instruct them on | 09:54:29 |
| 7 | all these safer sex practices, and you know they | 09:54:32 |
| 8 | are ignoring you? | 09:54:35 |
| 9 | A  They are not ignoring me, they are taking | 09:54:36 |
| 10 | it into consideration, but they are not following | 09:54:39 |
| 11 | these particular guidelines. | 09:54:43 |
| 12 | Q  And how do you know that? | 09:54:45 |
| 13 | A  Because I take care of them and I know | 09:54:46 |
| 14 | what happens to them. | 09:54:48 |
| 15 | Q  And how do you know that they are not | 09:54:49 |
| 16 | following these instructions? | 09:54:51 |
| 17 | A  Well, you can look at the surveys that | 09:54:52 |
| 18 | have been done.  I am sure we will get to that. | 09:54:57 |
| 19 | Q  I am talking about your patients, Doctor. | 09:54:59 |
| 20 | A  My patients?  Because they come in with | 09:55:01 |
| 21 | sexually-transmitted infections and then they come | 09:55:04 |
| 22 | in and tell me what they are doing. | 09:55:06 |
| 23 | I know exactly what they are doing.  I | 09:55:07 |
| 24 | have taken care of these people for a long time. | 09:55:09 |
| 25 | A lot of my patients are partners of | 09:55:12 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                        57

| | | |
|---|---|---|
| 1 | patients that I take care of with chronic HIV | 09:55:14 |
| 2 | infection, they are not following this part of the | 09:55:16 |
| 3 | recommendations in the package insert, and that's | 09:55:22 |
| 4 | why they are high risk and that's why they are on | 09:55:24 |
| 5 | PrEP. | 09:55:27 |
| 6 |    Q   And when you say "they", you are referring | 09:55:27 |
| 7 | to 100% of your PrEP patients? | 09:55:30 |
| 8 |    A   Close to. | 09:55:33 |
| 9 |    Q   Now, let's turn to Page 46 of this | 09:55:34 |
| 10 | document.  This is still part of the Medication | 09:55:46 |
| 11 | Guide directed to the patients who will be taking | 09:55:48 |
| 12 | TRUVADA for PrEP, right? | 09:55:51 |
| 13 |    A   That's correct. | 09:55:52 |
| 14 |    Q   There is a bold heading halfway down on | 09:55:53 |
| 15 | the page What should I avoid while taking TRUVADA? | 09:55:55 |
| 16 | Do you see that? | 09:55:58 |
| 17 |    A   I see that. | 09:55:59 |
| 18 |    Q   And the first sentence under that is, | 09:56:00 |
| 19 | "While taking TRUVADA avoid doing things that | 09:56:02 |
| 20 | increase your risk of getting HIV or spreading HIV | 09:56:04 |
| 21 | to other people," correct? | 09:56:08 |
| 22 |    A   That's correct. | 09:56:09 |
| 23 |    Q   And the second bullet is, "Do not have any | 09:56:09 |
| 24 | kind of sex without protection.  Always practice | 09:56:12 |
| 25 | safer sex.  Use latex or nonlatex condoms, except | 09:56:15 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                    58

| | | |
|---|---|---|
| 1 | lambskin, to reduce contact with semen, vaginal | 09:56:19 |
| 2 | fluids, or blood."  Correct? | 09:56:23 |
| 3 |    A  That's correct. | 09:56:25 |
| 4 |    Q  And that's the instructions that are | 09:56:25 |
| 5 | included in the package insert, correct? | 09:56:28 |
| 6 |    A  Correct. | 09:56:30 |
| 7 |    Q  That's the instructions that Gilead | 09:56:31 |
| 8 | provides with the drug TRUVADA, correct? | 09:56:33 |
| 9 |    A  That's correct. | 09:56:35 |
| 10 |    Q  And that's the instructions that you | 09:56:35 |
| 11 | provide to your patients, right? | 09:56:38 |
| 12 |    A  That's correct, except they don't follow | 09:56:39 |
| 13 | them. | 09:56:43 |
| 14 |    Q  But those are the instructions that are | 09:56:44 |
| 15 | provided to them, correct? | 09:56:45 |
| 16 |    A  It is provided to them, yes. | 09:56:46 |
| 17 |    Q  And that's the instructions that Gilead | 09:56:48 |
| 18 | provides you to provide to your patients, correct? | 09:56:50 |
| 19 |    A  That's right. | 09:56:52 |
| 20 |    Q  Let's turn back, if we could, to your | 09:56:55 |
| 21 | opening report, which is Exhibit 1, in particular | 09:57:03 |
| 22 | Paragraphs 225 to 226.  Feel free to review those | 09:57:11 |
| 23 | two paragraphs. | 09:57:33 |
| 24 |      My question is you included in your | 09:57:35 |
| 25 | opening report near identical statements that you | 09:57:36 |

| | | |
|---|---|---|
| 1 | regimen was approximately 96% they found based on | 11:45:11 |
| 2 | measurements of actual drug exposure that the | 11:45:14 |
| 3 | actual adherence rate was only about 50%? | 11:45:17 |
| 4 | A  That's correct. | 11:45:20 |
| 5 | Q  And because, according to Dr. Grant, in | 11:45:20 |
| 6 | the self-reported adherence surveys people lied, | 11:45:24 |
| 7 | right, that's what Dr. Grant said? | 11:45:28 |
| 8 | A  That's what Dr. Grant said. | 11:45:31 |
| 9 | Q  I am going to ask one more question and I | 11:45:33 |
| 10 | will ask whether you agree. | 11:45:38 |
| 11 | And, therefore, according to Dr. Grant the | 11:45:38 |
| 12 | self-reported levels of adherence have | 11:45:40 |
| 13 | limitations, that's what Dr. Grant said, right? | 11:45:43 |
| 14 | A  That's correct. | 11:45:45 |
| 15 | Q  Do you agree with Dr. Grant that patients | 11:45:45 |
| 16 | sometimes lie when they self-report adherence | 11:45:49 |
| 17 | levels and therefore such self-reported data has | 11:45:51 |
| 18 | limitations? | 11:45:54 |
| 19 | MR. BROWN:  Object to form, I will object | 11:45:55 |
| 20 | as vague, but the witness may answer. | 11:45:57 |
| 21 | THE WITNESS:  I don't like to use the word | 11:45:59 |
| 22 | lie.  I think it's not a malicious -- lie has a | 11:46:01 |
| 23 | malicious connotation. | 11:46:08 |
| 24 | Patients in these studies and patients in | 11:46:14 |
| 25 | the practice, they may not tell the truth, so we | 11:46:17 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert L. Murphy, M.D.
August 4, 2022                                          133

| | | |
|---|---|---|
| 1 | are maybe talking the same thing, but it is | 11:46:20 |
| 2 | semantics, but it is really -- it is not a | 11:46:24 |
| 3 | malicious intent and so I don't like to use the | 11:46:28 |
| 4 | word lie.  But they don't remember, they don't | 11:46:30 |
| 5 | want to upset the doctor, the patient wants to | 11:46:34 |
| 6 | please the doctor for some reason.  They are | 11:46:38 |
| 7 | embarrassed that they stopped taking the medicine. | 11:46:41 |
| 8 | There is a lot of psychology and behavioral issues | 11:46:43 |
| 9 | that go along with this. | 11:46:47 |
| 10 | But it is absolutely true, 50% of the | 11:46:48 |
| 11 | people were not taking the drug as prescribed. | 11:46:50 |
| 12 | BY MR. BASSETT: | 11:46:52 |
| 13 | Q  And so maybe to use a less-loaded term, | 11:46:52 |
| 14 | would you agree that patients sometimes misreport | 11:46:55 |
| 15 | adherence levels when they are self-reporting? | 11:47:02 |
| 16 | A  Yes. | 11:47:05 |
| 17 | There is a lot of scientific evidence | 11:47:08 |
| 18 | about self-reporting.  There is a whole science to | 11:47:13 |
| 19 | it.  And there is a lot of limitations to | 11:47:16 |
| 20 | self-reporting.  The best self-reporting, and I | 11:47:19 |
| 21 | can't quote the article now but I could find it | 11:47:23 |
| 22 | later, is that after three days, going backwards, | 11:47:27 |
| 23 | self-reporting is not very valuable. | 11:47:33 |
| 24 | So if you said did you take your pills | 11:47:36 |
| 25 | yesterday, you have a much higher chance of | 11:47:40 |

# Exhibit 52

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3   -----------------------------x

4   UNITED STATES OF AMERICA,      :

5       Plaintiff and             :

6       Counterclaim Defendant,   :

7       v.                        :   CA No.

8   GILEAD SCIENCES, INC. and     :   1:19-cv-02103-MN

9   GILEAD SCIENCES IRELAND UC,   :

10       Defendants and           :

11       Counterclaim Plaintiffs. :

12   -----------------------------x

13

14        CONFIDENTIAL - RESTRICTED INFORMATION

15          SUBJECT TO PROTECTIVE ORDER

16

17          Videotaped Deposition of

18          JULIA L. MARCUS, PH.D.

19          Boston, Massachusetts

20          Thursday, August 11, 2022

21               8:59 a.m.

22

23   Job No.: 457414

24   Pages: 1 - 267

25   Reported by: Darlene M. Coppola, RMR, CRR

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                              2

```
1    APPEARANCES:

2    Representing the Plaintiff:

3         UNITED STATES DEPARTMENT OF JUSTICE

4         CIVIL DIVSION

5         Intellectual Property Section

6         1100 L Street NW

7         Washington, DC  20005

8         BY:  CARRIE ROSATO, ESQUIRE

9              WALTER BROWN, ESQUIRE

10        T 202.307.0414

11        E carrie.e.rosato@usdoj.gov

12   -and-

13   (Via telephone)

14        KNOBBE MARTENS

15        3579 Valley Centre Drive

16        San Diego, CA 92130

17        BY:  NATHANAEL LUMAN, PH.D.

18        T 858.707.4000

19

20

21   (Continued on next page)

22

23

24

25
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                    3

```
1    APPEARANCES (Continued):

2    Representing the Defendants:

3         WILMER CUTLER PICKERING HALE AND DORR, LLP

4         7 World Trade Center

5         250 Greenwich Street

6         45th Floor

7         New York, NY 10007

8         BY:  DAVID B. BASSETT, ESQUIRE

9              SCOTT G. GREENE, ESQUIRE

10        T 212.230.8800

11        E david.bassett@wilmerhale.com

12          scott.greene@wilmerhale.com

13

14   Also present:

15   Michel Imbacuan, Esquire

16        Department of Health & Human Services

17   Janice Ye, Gilead Sciences

18   Dan Lohaus, Videographer

19

20

21

22

23

24

25
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                     119

| | | |
|---|---|---|
| 1 | confers little to no risk of HIV transmission | 11:33:21 |
| 2 | but may be associated with other risks, | 11:33:23 |
| 3 | including the risk of acquiring other STIs." | 11:33:26 |
| 4 | Have I read that correctly? | 11:33:33 |
| 5 | A.   Yes. | 11:33:33 |
| 6 | Q.   So where one's partner is HIV positive | 11:33:34 |
| 7 | but virally suppressed, there is little or no | 11:33:35 |
| 8 | risk of transmission of HIV, correct? | 11:33:39 |
| 9 | A.   If somebody is durably virally | 11:33:43 |
| 10 | suppressed and continuing to take their | 11:33:47 |
| 11 | antiretroviral medication daily, I would say | 11:33:49 |
| 12 | there is no risk of HIV transmission in that | 11:33:51 |
| 13 | case. | 11:33:54 |
| 14 | Q.   And where one's partner is HIV | 11:33:55 |
| 15 | negative, there is little or no risk of HIV | 11:33:57 |
| 16 | transmission, correct? | 11:34:01 |
| 17 | A.   If a partner is, in fact, HIV | 11:34:04 |
| 18 | negative, then there is no risk of | 11:34:07 |
| 19 | transmission, but often perception of HIV | 11:34:10 |
| 20 | status can be inaccurate. | 11:34:13 |
| 21 | Q.   And condomless sex in the context of | 11:34:17 |
| 22 | PrEP use or viral suppression, as you state | 11:34:18 |
| 23 | here, can be associated with a risk of | 11:34:22 |
| 24 | acquiring other STIs even when there is little | 11:34:25 |
| 25 | or no risk of HIV transmission, correct? | 11:34:28 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                    145

| | | |
|---|---|---|
| 1 | hand you what's been marked as Exhibit 25. | 12:06:57 |
| 2 | Doctor, I've handed you a document | 12:07:09 |
| 3 | that's been marked as Exhibit 25. | 12:07:10 |
| 4 | Do you recognize that document as what | 12:07:12 |
| 5 | we've referred to as REMS 3? | 12:07:14 |
| 6 | A.   Yes. | 12:07:17 |
| 7 | Q.   And this is one of the documents that | 12:07:18 |
| 8 | you rely on in your report as providing | 12:07:20 |
| 9 | evidence consistent with direct infringement | 12:07:25 |
| 10 | of the patents in suit, correct? | 12:07:28 |
| 11 | A.   Yes, it was part of my evidence for | 12:07:33 |
| 12 | patients and prescribers using PrEP according | 12:07:40 |
| 13 | to the claim limitations. | 12:07:43 |
| 14 | Q.   And you'll agree with me that the | 12:07:46 |
| 15 | REMS 3 covers a period of time that runs | 12:07:48 |
| 16 | from 16 November 2018 to 15 May 2016, correct? | 12:07:50 |
| 17 | MS. ROSATO:  I think you said | 12:07:58 |
| 18 | 2018. | 12:07:59 |
| 19 | MR. BASSETT:  I'm sorry.  I'm | 12:08:00 |
| 20 | sorry. | 12:08:00 |
| 21 | Let me do that again. | 12:08:01 |
| 22 | BY MR. BASSETT: | 12:08:02 |
| 23 | Q.   You'll agree with me that REMS 3 | 12:08:02 |
| 24 | covered a period of time that runs from | 12:08:04 |
| 25 | November 16, 2014 to May 15, 2016, correct? | 12:08:06 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                    146

| | | |
|---|---|---|
| 1 | A.   Yes. | 12:08:12 |
| 2 | Q.   And that includes a period of time | 12:08:14 |
| 3 | prior to the issuance of the first patent in | 12:08:16 |
| 4 | suit in June 2015, correct? | 12:08:18 |
| 5 | A.   Yes. | 12:08:22 |
| 6 | Q.   But you still relied on REMS 3 in | 12:08:23 |
| 7 | forming your opinions, correct? | 12:08:25 |
| 8 | A.   Yes, it includes some time after the | 12:08:28 |
| 9 | issuance of that patent. | 12:08:30 |
| 10 | Q.   Do you know when you look at the | 12:08:32 |
| 11 | survey results in REMS 3 which data comes from | 12:08:33 |
| 12 | before the time the patent issued and which | 12:08:36 |
| 13 | came from after the time the patent issued? | 12:08:38 |
| 14 | A.   No. | 12:08:41 |
| 15 | Q.   If we could, turn to page 14 of | 12:08:47 |
| 16 | Exhibit 25. | 12:08:49 |
| 17 |         MS. ROSATO:  Are you looking at | 12:08:54 |
| 18 | the internal pages or the Bates stamp? | 12:08:56 |
| 19 |         MR. BASSETT:  The internal | 12:08:57 |
| 20 | pages, yes.  Sorry. | 12:08:58 |
| 21 | BY MR. BASSETT: | 12:09:02 |
| 22 | Q.   And do you see there a heading, 4.1.2, | 12:09:02 |
| 23 | correct? | 12:09:06 |
| 24 | A.   Yes. | 12:09:06 |
| 25 | Q.   And will you agree with me that the | 12:09:11 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                170

| | | |
|---|---|---|
| 1 | throw away pills rather than take them? | 13:29:59 |
| 2 | A.   It's hard for me to understand why | 13:30:04 |
| 3 | somebody would do that in a real-world setting | 13:30:07 |
| 4 | where they are picking up their pills because | 13:30:09 |
| 5 | they're theoretically motivated to take them | 13:30:13 |
| 6 | for themselves. | 13:30:16 |
| 7 | Q.   So you've never seen any indication of | 13:30:17 |
| 8 | that? | 13:30:18 |
| 9 | A.   I understand that in the iPrEx study | 13:30:19 |
| 10 | there may have been some suggestion that | 13:30:24 |
| 11 | people threw away their pills, but I believe | 13:30:26 |
| 12 | that was a very different context because | 13:30:28 |
| 13 | there may have been some incentive to report | 13:30:29 |
| 14 | higher -- to show higher adherence in a way | 13:30:32 |
| 15 | that there isn't in a real-world setting. | 13:30:34 |
| 16 | Q.   In your experience, Doctor, do | 13:30:37 |
| 17 | patients ever share their PrEP pills with | 13:30:39 |
| 18 | others? | 13:30:45 |
| 19 | A.   I don't think that's common based on | 13:30:45 |
| 20 | what I've seen in the literature, but it may | 13:30:47 |
| 21 | happen. | 13:30:49 |
| 22 | Q.   If we can look back at your reply | 13:31:00 |
| 23 | report, Exhibit 1, Paragraph 76. | 13:31:02 |
| 24 | In the last sentence of Paragraph 76, | 13:31:14 |
| 25 | you state that "The lack of HIV | 13:31:24 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                      190

1    period, that does not mean that they were --          13:57:38
2    does not necessarily mean that those persons           13:57:41
3    were actually exposed to HIV, correct?                 13:57:43
4        A.    That's correct, although I think the         13:57:50
5    vast majority of those were likely potentially         13:57:52
6    exposed to HIV.                                         13:57:55
7        Q.    Well, my question was about actual           13:57:56
8    exposure.                                               13:57:58
9        A.    Okay.                                         13:57:58
10       Q.    Okay.  But I understand your point.          13:57:59
11             So, again, we've talked about this           13:58:01
12   before, but some people could have known that          13:58:02
13   their partners were HIV negative, correct?             13:58:05
14       A.    I think it's very difficult to know in       13:58:09
15   a real-world setting whether your partner is           13:58:12
16   HIV negative at the time of intercourse.               13:58:13
17       Q.    What about people in long-term               13:58:17
18   relationships?                                          13:58:19
19       A.    I would make the same statement in           13:58:22
20   that case.                                              13:58:25
21       Q.    Some people -- certainly some people         13:58:26
22   could have known that their partner was HIV            13:58:28
23   positive but virally suppressed as a result of         13:58:31
24   antiretroviral therapy, correct?                       13:58:35
25       A.    Yes, if the partner has durable viral        13:58:37

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                   211

| | | |
|---|---|---|
| 1 | regimen, correct? | 14:25:37 |
| 2 | A.   That's correct.  I would have to | 14:25:52 |
| 3 | review it more carefully to say this for sure, | 14:25:53 |
| 4 | but I believe they only reported on the | 14:25:55 |
| 5 | partners reported use of antiretroviral -- | 14:25:59 |
| 6 | antiretroviral therapy, not on their reported | 14:26:02 |
| 7 | viral suppression status.  And I believe they | 14:26:05 |
| 8 | only cite statistics for those partners for | 14:26:07 |
| 9 | HIV-negative respondents, not on PrEP | 14:26:11 |
| 10 | respondents. | 14:26:15 |
| 11 |      So I will ultimately agree with you | 14:26:15 |
| 12 | that, yes, we don't know the partners' viral | 14:26:16 |
| 13 | suppression status in this study. | 14:26:19 |
| 14 | Q.   Thank you. | 14:26:21 |
| 15 |      And nowhere in Goodreau does the | 14:26:22 |
| 16 | article report that any patient taking Truvada | 14:26:24 |
| 17 | for PrEP was actually exposed to HIV, correct? | 14:26:27 |
| 18 | A.   That's correct.  It doesn't report on | 14:26:40 |
| 19 | any individual patients who were actually | 14:26:41 |
| 20 | exposed, although with 83 percent of PrEP | 14:26:43 |
| 21 | users reporting that they had condomless anal | 14:26:49 |
| 22 | sex with an HIV-positive partner in the past | 14:26:49 |
| 23 | year and the likelihood that at least some of | 14:26:51 |
| 24 | those HIV-positive partners were not virally | 14:26:55 |
| 25 | suppressed based on national statistics, I | 14:26:57 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                    212

1    think this provides some evidence that PrEP          14:26:59

2    users are actually exposed to HIV while taking       14:27:02

3    Truvada.                                             14:27:04

4        Q.   But you'll agree with me that nowhere       14:27:05

5    in Goodreau does the article address whether         14:27:06

6    any patient was taking Truvada for PrEP at the       14:27:09

7    time of actual exposure.                             14:27:11

8        A.   The article does report on                  14:27:19

9    participants or -- excuse me -- respondents'         14:27:22

10   sexual behaviors during PrEP use.  So to the         14:27:26

11   extent that condomless anal sex with an              14:27:30

12   HIV-positive partner could be an actual              14:27:33

13   exposure, then, yes, I believe there's               14:27:36

14   evidence of actual exposure during PrEP use.         14:27:38

15       Q.   And where in Goodreau does it report        14:27:41

16   condomless anal sex with an HIV-positive             14:27:44

17   partner?                                             14:27:47

18       A.   It might take me a minute to review         14:27:54

19   the paper.                                           14:27:56

20            (Witness reviews document.)                 14:29:55

21       It's in two places, but I'll point you to        14:29:56

22   the discussion this is on.  Page -- I guess          14:29:59

23   the Bates No. 224.                                   14:30:07

24       Q.   Okay.  Thank you.  Yes.                     14:30:11

25       A.   Second paragraph of the discussion on       14:30:12

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                    221

| | | |
|---|---|---|
| 1 | data on exposure.  The data on exposure from | 15:00:09 |
| 2 | the ARTnet study were presented in the | 15:00:13 |
| 3 | Goodreau paper. | 15:00:14 |
| 4 |     Q.   Not in Chandra? | 15:00:16 |
| 5 |     A.   Correct. | 15:00:18 |
| 6 |     Q.   Doctor, by the way, is it your opinion | 15:00:22 |
| 7 | that an individual is potentially exposed to | 15:00:24 |
| 8 | HIV every single time he or she has sex using | 15:00:28 |
| 9 | a condom? | 15:00:34 |
| 10 |     A.   With the exception of partners who are | 15:00:38 |
| 11 | durably virally suppressed and continuing to | 15:00:41 |
| 12 | be adherent to their antiretroviral therapy, | 15:00:44 |
| 13 | yes, I believe there's a potential exposure | 15:00:47 |
| 14 | even with condom use. | 15:00:50 |
| 15 |     Q.   What about two partners who are, in | 15:00:51 |
| 16 | fact, HIV negative? | 15:00:53 |
| 17 |     A.   As I noted earlier, I think it's very | 15:00:56 |
| 18 | difficult in a real-world setting to know for | 15:00:59 |
| 19 | sure your partner's HIV status at the time of | 15:01:02 |
| 20 | sexual intercourse. | 15:01:06 |
| 21 |     Q.   In every sexual encounter? | 15:01:06 |
| 22 |     A.   Can you clarify the question. | 15:01:10 |
| 23 |     Q.   Is the statement you just made true of | 15:01:12 |
| 24 | every sexual encounter? | 15:01:13 |
| 25 |     A.   Yes. | 15:01:17 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                    224

| | | |
|---|---|---|
| 1 | an activity. | 15:03:58 |
| 2 | Q.   In your opinion, Doctor, is there any | 15:04:11 |
| 3 | circumstance at all in which an individual can | 15:04:13 |
| 4 | have sexual intercourse without at least | 15:04:16 |
| 5 | potentially being exposed to HIV? | 15:04:19 |
| 6 | A.   If the partner is living with HIV and | 15:04:24 |
| 7 | durably virally suppressed and continuing to | 15:04:29 |
| 8 | be adherent to their antiretroviral | 15:04:32 |
| 9 | medications, there's no risk of transmission | 15:04:35 |
| 10 | in that scenario, although I did note in my | 15:04:37 |
| 11 | report people's perception of their viral | 15:04:40 |
| 12 | suppression status is not always accurate. | 15:04:44 |
| 13 | Q.   You point to that example, but what | 15:04:47 |
| 14 | about a couple where the other person is HIV | 15:04:48 |
| 15 | negative and has been tested to be HIV | 15:04:54 |
| 16 | negative, just full stop?  That's still | 15:04:57 |
| 17 | potential exposure every single time that | 15:04:59 |
| 18 | couple has sexual intercourse, right?  That's | 15:05:02 |
| 19 | your opinion? | 15:05:05 |
| 20 | A.   Yes, because generally some time has | 15:05:08 |
| 21 | elapsed since the last HIV negative test, and | 15:05:11 |
| 22 | even if the HIV negative test were on the day | 15:05:13 |
| 23 | of sexual intercourse, tests have a window of | 15:05:17 |
| 24 | detection that even the most sensitive tests | 15:05:22 |
| 25 | are only maybe two weeks.  So, of course, the | 15:05:24 |

| # | | Time |
|---|---|---|
| 1 | closer the HIV-negative test is to the time of | 15:05:28 |
| 2 | intercourse, the more confident someone can be | 15:05:32 |
| 3 | that they're, in fact, HIV negative. | 15:05:35 |
| 4 | But can they be 100 percent sure at | 15:05:37 |
| 5 | the time of sexual intercourse?  I think it's | 15:05:40 |
| 6 | very difficult in a real-world setting. | 15:05:41 |
| 7 | Q.   But you do make an exception for | 15:05:44 |
| 8 | somebody who's HIV positive but virally | 15:05:46 |
| 9 | suppressed, right? | 15:05:52 |
| 10 | A.   Well, if someone is, in fact, HIV | 15:05:52 |
| 11 | negative, then, of course, there is no risk of | 15:05:54 |
| 12 | transmission. | 15:05:57 |
| 13 | Q.   I'm sorry.  I misstated.  I apologize. | 15:05:58 |
| 14 | HIV positive but virally suppressed. | 15:05:59 |
| 15 | A.   Yes, I would say both of those are | 15:06:01 |
| 16 | true, that if someone is, in fact, HIV | 15:06:03 |
| 17 | negative, of course there is no risk of | 15:06:05 |
| 18 | exposure.  And if someone is virally | 15:06:08 |
| 19 | suppressed durably, then there is no risk of | 15:06:11 |
| 20 | exposure. | 15:06:14 |
| 21 | But in a real-world setting, we have | 15:06:14 |
| 22 | to account for people's perception of these | 15:06:17 |
| 23 | things, not just the biological fact of them. | 15:06:19 |
| 24 | And when you consider people's perception, it | 15:06:23 |
| 25 | is not always 100 percent accurate, which is | 15:06:26 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                                    226

| | | |
|---|---|---|
| 1 | why I believe there is a potential exposure in | 15:06:27 |
| 2 | the vast majority of these situations where | 15:06:31 |
| 3 | sexual intercourse occurs, although, of | 15:06:33 |
| 4 | course, in some of those situations, the risk | 15:06:35 |
| 5 | is very low. | 15:06:37 |
| 6 |     Q.  And -- | 15:06:43 |
| 7 |     A.  Excuse me.  The risk of actual | 15:06:44 |
| 8 | exposure is very low. | 15:06:45 |
| 9 |     Q.  But there's always a risk of potential | 15:06:49 |
| 10 | exposure?  Always? | 15:06:51 |
| 11 |     A.  Well, the potential exposure, as I | 15:06:54 |
| 12 | understand it, is the activity itself that | 15:06:56 |
| 13 | could result in -- | 15:06:59 |
| 14 |     Q.  Right? | 15:07:00 |
| 15 |     A.  -- exposure. | 15:07:00 |
| 16 |     Q.  Right? | 15:07:01 |
| 17 |     A.  So I don't think -- | 15:07:02 |
| 18 |     Q.  I think we're saying the same thing. | 15:07:03 |
| 19 | I just want to make sure I understand.  Your | 15:07:04 |
| 20 | opinion is anytime any adult human engages in | 15:07:06 |
| 21 | sexual intercourse, that person has | 15:07:10 |
| 22 | potentially been exposed to HIV, regardless of | 15:07:13 |
| 23 | the circumstances, every single time? | 15:07:16 |
| 24 |     A.  As constructed by the Court, yes, | 15:07:27 |
| 25 | unless the partner is, in fact, HIV negative | 15:07:32 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Julia Marcus, Ph.D.
August 11, 2022                              227

| | | |
|---|---|---|
| 1 | at the time of intercourse or is, in fact, | 15:07:35 |
| 2 | durably virally suppressed at the time of | 15:07:38 |
| 3 | intercourse.  But, again, we have to allow for | 15:07:41 |
| 4 | some inaccuracies in perception. | 15:07:42 |
| 5 | Q.   And do you think the Court was correct | 15:07:45 |
| 6 | in that construction, if that was indeed the | 15:07:47 |
| 7 | Court's construction? | 15:07:50 |
| 8 | A.   I don't really have an opinion on | 15:07:52 |
| 9 | that.  I'm just providing evidence to -- that | 15:07:53 |
| 10 | is consistent with the Court's construction. | 15:07:59 |
| 11 | Q.   So every adult who is not celibate is | 15:08:05 |
| 12 | potentially exposed to HIV? | 15:08:16 |
| 13 | MS. ROSATO:  Objection.  Asked | 15:08:19 |
| 14 | and answered. | 15:08:22 |
| 15 | A.   No, because there are sexual | 15:08:25 |
| 16 | activities besides sexual intercourse that I | 15:08:28 |
| 17 | believe confer no risk of HIV transmission. | 15:08:31 |
| 18 | BY MR. BASSETT: | 15:08:38 |
| 19 | Q.   Without getting too far down that | 15:08:38 |
| 20 | path, every adult who engages in sexual | 15:08:40 |
| 21 | intercourse is potentially exposed to HIV? | 15:08:43 |
| 22 | A.   With the exceptions I noted earlier of | 15:08:49 |
| 23 | the partner, in fact, being HIV negative or, | 15:08:52 |
| 24 | in fact, being durably virally suppressed, | 15:08:55 |
| 25 | yes, I believe that to be true. | 15:08:59 |

**Exhibit 53**

Page 1

1

2  UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF DELAWARE
3  -------------------------------------------X
   UNITED STATES OF AMERICA,

4
            Plaintiff and
5             Counterclaim-Defendant,

6        Vs.
            C.A. No.
7            19-02103-MN

8
   GILEAD SCIENCES, INC. and GILEAD SCIENCES
9  IRELAND UC,

10            Defendants.
   -------------------------------------------X
11

12

13        VIDEOTAPED DEPOSITION OF

14     DR. CHARLES W. FLEXNER, MD

15        New York, New York

16        August 18, 2022

17

18

19

20

21

22

23  Reported by:

24  Anita M. Trombetta, RMR, CRR

25  JOB NO. 214762

1

2

3

4

5          August 18, 2022

6          9:05 A.M.

7

8

9     Videotaped Deposition of

10   DR. CHARLES W. FLEXNER, MD, held at the

11   offices of Wilmer Cutler Pickering Hale,

12   250 Greenwich Street, 45th floor, New York,

13   New York 10007, before Anita M. Trombetta,

14   an RMR, CRR, and a Notary Public of the

15   State of New York.

16

17

18

19

20

21

22

23

24

25

1

2  A P P E A R A N C E S:

3

4    U.S. DEPARTMENT OF JUSTICE

5    CIVIL DIVISION

6    Attorneys for the United States of America

7        1100 L Street NW

8        Washington, DC 20005

9    BY:  WALTER BROWN, ESQ.

10

11

12

13    KNOBBE MARTENS

14    On behalf of Health and Human Services:

15        12790 El Camino Real

16        San Diego, CA 92130

17    BY:   NATHANAEL LUMAN, ESQ., Ph.D

18

19    OFFICE OF THE GENERAL COUNSEL

20    U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

21        26 Federal Plaza

22        New York, NY 10278

23    BY:  MICHAEL IMBACUAN, ESQ.

24

25    (Appearances continued on next page.)

1

2  A P P E A R A N C E S:

3

4    WILMERHALE

5    Attorneys for Gilead Parties

6        250 Greenwich Street

7        New York, NY 10007

8      BY:  DAVID BASSETT, ESQ.

9          SCOTT GREENE, ESQ.

10

11

12  ALSO PRESENT:

13  Jonathan Popham, Legal Video Specialist

14  Andrew Kessel, Gilead

15  AMANDA KELLEY, ESQ. (Via teleconference)

16

17

18

19

20

21

22

23

24

25

1                    C. Flexner - RESTRICTED

2    would be the 2014 guidelines.

3        Q.   So the 2014 guidelines would give some

4    indication of what providers were using for guidance

5    in 2015?

6        A.   Yes.

7        Q.   Would it give you any indication of how

8    patients were instructed to take Truvada in 2015?

9             MR. BASSETT:   Objection, calls for

10        speculation.

11       A.   I think that's a very broad statement.

12   These are guidelines, and every physician uses them

13   in different ways -- or may not use them at all.

14   BY MR. BROWN:

15       Q.   Do you know when the subsequent updates to

16   the guidelines came after the 2014 guidelines?

17       A.   I know there were guidelines issued in

18   2017, which are included here in Footnote 11, and

19   also 2018 and also 2021.

20       Q.   In terms of your analysis, would the

21   CDC 2014 guidelines have any relevance after the

22   subsequent update in 2017 or whenever it was?

23       A.   The 2017 guidelines are meant to supplant

24   the 2014 guidelines, but that doesn't necessarily

25   mean all physicians would be up to date in their

**Exhibit 54**

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3       ------------------------------x

4       UNITED STATES OF AMERICA,       :

5            Plaintiff and              :

6            Counterclaim Defendant,    :

7            v.                         :   CA No.

8       GILEAD SCIENCES, INC. and       :   1:19-cv-02103-MN

9       GILEAD SCIENCES IRELAND UC,     :

10           Defendants and             :

11           Counterclaim Plaintiffs.   :

12      ------------------------------x

13

14              CONFIDENTIAL - RESTRICTED INFORMATION

15                  SUBJECT TO PROTECTIVE ORDER

16

17                  Videotaped Deposition of

18                  JAMES T. CARMICHAEL

19                    Washington, DC

20                Friday, August 19, 2022

21                     9:03 a.m. EDT

22

23      Job No.: 458472

24      Pages: 1 - 228

25      Reported by: Judith E. Bellinger, RPR, CRR

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of James Carmichael
August 19, 2022                                          2

1          Video deposition of JAMES CARMICHAEL, held at

2     the offices of:

3

4

5               WILMER CUTLER PICKERING HALE AND DOOR

6               LLP

7               1875 Pennsylvania Avenue NW

8               Washington, D.C. 20006

9               202.663.600

10

11

12

13

14

15

16

17

18

19          Pursuant to notice, before Judith E.

20     Bellinger, Registered Professional Reporter,

21     Certified Realtime Reporter, and Notary Public in

22     and for the District of Columbia.

23

24

25

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of James Carmichael
August 19, 2022                                    3

```
 1            A P P E A R A N C E S

 2    ON BEHALF OF THE PLAINTIFF:

 3         MATTHEW D. TANNER, ESQUIRE

 4         U.S. DEPARTMENT OF JUSTICE

 5         Intellectual Property Section

 6         1100 L Street NW

 7         Washington, DC 20530

 8         202.305.9847

 9

10         LENA YUEH, ESQUIRE

11         U.S. DEPARTMENT OF HEALTH AND HUMAN

12         SERVICES

13         200 Independence Avenue SW

14         Washington, D.C. 20201

15         877.696.6775

16

17         MATTHEW BELLINGER, ESQUIRE

18         KNOBBE MARTENS

19         2040 Main Street

20         Irvine, CA 92614

21         949.760.0404

22

23

24

25
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of James Carmichael
August 19, 2022                                        4

```
 1      A P P E A R A N C E S   C O N T I N U E D

 2

 3       ON BEHALF OF THE DEFENDANTS:

 4            TIMOTHY A. COOK, ESQUIRE

 5            WILMER CUTLER PICKERING HALE AND DORR

 6            LLP

 7            60 State Street

 8            Boston, MA 02109

 9            617.526.5000

10

11            GILLIAN FARRELL, ESQUIRE

12            WILMER CUTLER PICKERING HALE AND DORR

13            LLP

14            7 World Trade Center

15            250 Greenwich Street

16            45th Floor

17            New York, NY 10007

18            212.230.8800

19

20

21

22   ALSO PRESENT:

23       Jack Dunn, Videographer

24       Diamante Parrish, Videographer

25       Patrick Holvey, U.S. Department of Justice
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of James Carmichael
August 19, 2022                                        102

| | | |
|---|---|---|
| 1 | in Exhibit 7, the binder. | 12:04:33 |
| 2 | Oh, and just for the record, Exhibit 7 | 12:04:35 |
| 3 | has the Bates numbers US_00000281 to 1156. | 12:04:37 |
| 4 | In Exhibit 7, on the page that has the | 12:04:49 |
| 5 | Bates number ending in 282, there's a title listed | 12:04:51 |
| 6 | for the invention, correct? | 12:04:55 |
| 7 | A    There is. | 12:05:13 |
| 8 | Q    And the title of the invention that's | 12:05:14 |
| 9 | listed in the '547 application is "Inhibition of | 12:05:16 |
| 10 | HIV infection Through Chemoprophylaxis," correct? | 12:05:21 |
| 11 | A    Yes. | 12:05:25 |
| 12 | Q    And that is a different title from the | 12:05:25 |
| 13 | title that's in the 2006 assignment, correct? | 12:05:27 |
| 14 | A    It's more specific. | 12:05:31 |
| 15 | Q    Now, let's turn to the -- well, the | 12:05:33 |
| 16 | page that we're looking at, page 282, is a cover | 12:05:40 |
| 17 | sheet that was filed with the original '547 | 12:05:43 |
| 18 | application, correct? | 12:05:45 |
| 19 | A    Yes. | 12:06:00 |
| 20 | Q    The attorney docket number is listed at | 12:06:01 |
| 21 | the top of the page, correct? | 12:06:03 |
| 22 | A    Yes. | 12:06:05 |
| 23 | Q    And the attorney docket number for the | 12:06:06 |
| 24 | '547 application is CDC-10502/38, correct? | 12:06:07 |
| 25 | A    Yes. | 12:06:18 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of James Carmichael
August 19, 2022                                    103

| | | |
|---|---|---|
| 1 | Q    The attorney docket number that's on | 12:06:19 |
| 2 | the '547 application is different from the | 12:06:21 |
| 3 | attorney docket number that's on the 2006 | 12:06:23 |
| 4 | assignment, correct? | 12:06:26 |
| 5 | A    Well, of course, it is, it comes from a | 12:06:28 |
| 6 | different law office. | 12:06:31 |
| 7 | Q    Okay.  But it is different, correct? | 12:06:33 |
| 8 | A    As I said, yes, of course it is, it's | 12:06:37 |
| 9 | from a different law office. | 12:06:39 |
| 10 | Q    The title of the -- well, strike that. | 12:06:40 |
| 11 | Do you see box number 9 on this page? | 12:06:45 |
| 12 | A    Yes. | 12:06:52 |
| 13 | Q    Box number 9 says "Assignment Papers" | 12:06:54 |
| 14 | and has a blank box under the heading "Name of | 12:06:57 |
| 15 | Assignee," correct? | 12:07:02 |
| 16 | A    Yes. | 12:07:03 |
| 17 | Q    The box that says "Name of Assignee" in | 12:07:03 |
| 18 | the original January 31st, 2007 cover sheet in the | 12:07:06 |
| 19 | '547 application is blank, correct? | 12:07:09 |
| 20 | A    I don't think that's really fair to say | 12:07:29 |
| 21 | that. | 12:07:30 |
| 22 | Q    Do you see anything written in the | 12:07:33 |
| 23 | blank? | 12:07:34 |
| 24 | A    No.  But you see it's right under the | 12:07:37 |
| 25 | heading of "Accompanying Application Parts." | 12:07:39 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of James Carmichael
August 19, 2022                                    104

| | | |
|---|---|---|
| 1 | And so, you wouldn't expect a | 12:07:45 |
| 2 | practitioner to write anything there if it wasn't | 12:07:49 |
| 3 | an accompanying application part. | 12:07:53 |
| 4 | Q    My question wasn't what you would | 12:07:57 |
| 5 | expect.  My question is, in the original '547 | 12:07:58 |
| 6 | application cover sheet, there's a box that says | 12:08:01 |
| 7 | "Name of Assignee" and that box is blank, correct? | 12:08:05 |
| 8 | A    Yes, as you would expect.  Because this | 12:08:13 |
| 9 | is for accompanying application parts. | 12:08:14 |
| 10 | Q    When the '547 application was filed, | 12:08:18 |
| 11 | the attorney submitted an application data sheet | 12:08:21 |
| 12 | with it, correct? | 12:08:25 |
| 13 | A    Yes. | 12:08:27 |
| 14 | Q    Let's turn to the next page, which has | 12:08:29 |
| 15 | the Bates number ending 283. | 12:08:31 |
| 16 | This is the start of the application | 12:08:37 |
| 17 | data sheet that was submitted with the original | 12:08:39 |
| 18 | '547 application on January 31st, 2007, correct? | 12:08:41 |
| 19 | A    Yes. | 12:08:46 |
| 20 | Q    And let's turn to the page that has the | 12:08:48 |
| 21 | Bates number ending in 286. | 12:08:50 |
| 22 | Do you see a section that begins | 12:09:00 |
| 23 | "Assignee Information"? | 12:09:01 |
| 24 | A    I see the phrase Assignee Information. | 12:09:20 |
| 25 | Q    And the Assignee Information section in | 12:09:22 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of James Carmichael
August 19, 2022                                        105

| | | |
|---|---|---|
| 1 | the January 31st, 2007 application data sheet is | 12:09:24 |
| 2 | blank, correct? | 12:09:28 |
| 3 |     A    Well, the phrase "Assignee Information" | 12:09:32 |
| 4 | is just sitting there by itself, basically. | 12:09:33 |
| 5 |     Q    There's nothing underneath it, correct? | 12:09:38 |
| 6 |     A    That's correct. | 12:09:39 |
| 7 |     Q    When the '547 application was filed, it | 12:09:40 |
| 8 | included 21 claims, correct?  And I can direct you | 12:09:44 |
| 9 | to the page that has the Bates number ending in | 12:09:52 |
| 10 | 309. | 12:09:55 |
| 11 |     A    You are good at that. | 12:10:03 |
| 12 |     Q    We try. | 12:10:04 |
| 13 |     A    Yes, 21 claims. | 12:10:04 |
| 14 |     Q    Okay.  Let's turn to the page that has | 12:10:06 |
| 15 | the page number ending in 326. | 12:10:09 |
| 16 |         On March 13th, 2007, the Patent Office | 12:10:19 |
| 17 | mailed a filing receipt for the '547 application, | 12:10:24 |
| 18 | correct? | 12:10:27 |
| 19 |     A    Yes. | 12:10:27 |
| 20 |     Q    And the filing receipt listed the five | 12:10:28 |
| 21 | inventors as the applicants, correct? | 12:10:32 |
| 22 |     A    Yes. | 12:10:38 |
| 23 |     Q    Okay.  Let's go to the page that has | 12:10:39 |
| 24 | the Bates number ending in 339. | 12:10:41 |
| 25 |         This is a receipt from the Patent | 12:10:44 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of James Carmichael
August 19, 2022                                    106

| | | |
|---|---|---|
| 1 | Office that was sent to the attorneys prosecuting | 12:11:02 |
| 2 | the '547 application on June 6th, 2007, correct? | 12:11:05 |
| 3 | If it's helpful, on page 339, there's a receipt | 12:11:08 |
| 4 | date about two-thirds of the way down the page. | 12:11:40 |
| 5 |     A    I see the receipt date. | 12:11:47 |
| 6 |     Q    Okay.  And it is June 6th, 2007, | 12:11:49 |
| 7 | correct? | 12:11:51 |
| 8 |     A    Yes. | 12:11:53 |
| 9 |     Q    Now, turning to the next page, 340, the | 12:11:54 |
| 10 | attorneys prosecuting the '547 application | 12:12:02 |
| 11 | submitted an oath or declaration to the Patent | 12:12:05 |
| 12 | Office on June 6th, 2007, correct? | 12:12:06 |
| 13 |     A    That's what it appears from this | 12:12:58 |
| 14 | document.  I can check, but that seems to be the | 12:13:00 |
| 15 | correct date. | 12:13:03 |
| 16 |     Q    Okay.  And the declaration begins on | 12:13:04 |
| 17 | the page that has the Bates number ending in 333 | 12:13:06 |
| 18 | and it ends on page that has the Bates number | 12:13:10 |
| 19 | ending in 336, correct? | 12:13:13 |
| 20 |     A    Yes. | 12:13:47 |
| 21 |     Q    This is what you would call a new | 12:13:48 |
| 22 | application oath, correct? | 12:13:51 |
| 23 |     A    I wouldn't call it that, but if you | 12:14:12 |
| 24 | want to call it that, I will understand what you | 12:14:14 |
| 25 | mean. | 12:14:16 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of James Carmichael
August 19, 2022                                   107

| | | |
|---|---|---|
| 1 | Q    Okay.  Just holding your place there, | 12:14:16 |
| 2 | if you turn back to Exhibit 2, your reply report. | 12:14:21 |
| 3 | A    Sorry.  Exhibit 2, you said? | 12:14:43 |
| 4 | Q    Yes. | 12:14:47 |
| 5 | A    Okay.  What page? | 12:14:48 |
| 6 | Q    Page 2. | 12:14:50 |
| 7 | A    Okay. | 12:15:00 |
| 8 | Q    In the second sentence of paragraph 13, | 12:15:01 |
| 9 | you begin with the phrase "for a new application | 12:15:04 |
| 10 | of." | 12:15:07 |
| 11 | Do you see that? | 12:15:08 |
| 12 | A    I do. | 12:15:09 |
| 13 | Q    Is the oath that begins on page 333 of | 12:15:10 |
| 14 | Exhibit 7 an example of a new application oath, as | 12:15:13 |
| 15 | you use the phrase there? | 12:15:19 |
| 16 | A    No. | 12:16:55 |
| 17 | Q    Okay.  So what do you believe was the | 12:16:55 |
| 18 | new application oath for the HHS patents? | 12:17:00 |
| 19 | A    The following paragraph, 14, I | 12:17:13 |
| 20 | described for an already-filed application, an | 12:17:15 |
| 21 | oath that would be -- or declaration that would be | 12:17:21 |
| 22 | used in that.  And because this declaration we're | 12:17:23 |
| 23 | talking about at page 333 was for an already-filed | 12:17:27 |
| 24 | application, I would refer to paragraph 14 of my | 12:17:34 |
| 25 | report instead of paragraph 13. | 12:17:41 |

# Exhibit 55

```
1               UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
2     --------------------------x
      THE UNITED STATES OF      :
3     AMERICA,                  :
              Plaintiff,        :   Civil Action No.
4        vs.                    :   19-2103 (MN)
      GILEAD SCIENCES, INC.     :
5     AND GILEAD SCIENCES       :
      IRELAND UC,               :
6           Defendants.         :
      --------------------------x
7

8          UNITED STATES COURT OF FEDERAL CLAIMS
      --------------------------x
9     GILEAD SCIENCES, INC.     :
              Plaintiff,        :   No. 20-499C
10       vs.                    :
      THE UNITED STATES OF      :
11    AMERICA,                  :
              Defendant.        :
12    --------------------------x

13          CONFIDENTIAL - RESTRICTED INFORMATION

14             SUBJECT TO PROTECTIVE ORDER

15

16             Videotaped Deposition of

17              ROBERT JANSSEN, M.D.

18              Conducted Virtually

19           Thursday, January 13, 2022

20                 9:09 a.m. PST

21

      ***[AN EXECUTED STIPULATION GOVERNING THIS DEPOSITION IS
22    ATTACHED TO THE PDF VERSIONS OF THIS DEPOSITION TRANSCRIPT
      ONLY.  PLEASE REFER TO THOSE VERSIONS FOR A COPY]***
23

24    Job No.: 412293
      Pages: 1 - 227
25    Reported By: Charlotte Lacey, RPR, CSR No. 14224
```

1       VIDEOTAPED DEPOSITION OF ROBERT JANSSEN, M.D.,

2    CONDUCTED VIRTUALLY.

3

4

5

6       Pursuant to subpoena, before Charlotte Lacey,

7    Certified Shorthand Reporter in and for the State of

8    California.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert Janssen, M.D.
Conducted on January 13, 2022                                  3

```
 1                      A P P E A R A N C E S

 2        ON BEHALF OF PLAINTIFF AND COUNTERCLAIM DEFENDANT

 3   UNITED STATES OF AMERICA:

 4              WALTER W. BROWN, ESQUIRE

 5              U.S. DEPARTMENT OF JUSTICE

 6              1100 L Street, Northwest

 7              Washington, DC  20005

 8              (202) 307-0341

 9

10        ON BEHALF OF UNITED STATES DEPARTMENT OF HEALTH AND

11   HUMAN SERVICES:

12              ANDREW MORRELL, PH.D., ESQUIRE

13              KNOBBE MARTENS

14              1717 Pennsylvania Avenue Northwest, Suite 900

15              Washington, DC  20006

16              (202) 640-6400

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert Janssen, M.D.
Conducted on January 13, 2022                              4

```
 1                  A P P E A R A N C E S

 2        ON BEHALF OF DEFENDANTS AND COUNTERCLAIM PLAINTIFFS

 3   GILEAD SCIENCES, INC., and GILEAD SCIENCES IRELAND UC:

 4             DAVID B. BASSETT, ESQUIRE

 5             CHRISTINA LUO, ESQUIRE

 6             WILMER CUTLER PICKERING HALE AND DORR, LLP

 7             7 World Trade Center, 250 Greenwich Street

 8             New York, New York  10007

 9             (212) 230-8800

10

11        ON BEHALF OF DEPONENT:

12             HOWARD A. JANSSEN, ESQUIRE

13             3717 Happy Valley Road

14             Lafayette, California  94549

15

16        ALSO PRESENT:

17             Andrew Kessel, Gilead

18             Jerry DeBoer, Videographer

19             Jaimie Hensley, AV Technician

20

21

22

23

24

25
```

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert Janssen, M.D.
Conducted on January 13, 2022                              34

| | | |
|---|---|---|
| 1 | were known to treat the disease, then giving those to | 09:38:23 |
| 2 | prevent somebody from getting the disease in the first | 09:38:27 |
| 3 | place. | 09:38:35 |
| 4 | A    Correct. | 09:38:35 |
| 5 | Q    Correct?  All right. | 09:38:35 |
| 6 | Now, you also worked at Gilead Sciences, | 09:38:36 |
| 7 | correct? | 09:38:39 |
| 8 | A    Correct. | 09:38:39 |
| 9 | Q    From 2008 to 2010, right? | 09:38:40 |
| 10 | A    Right. | 09:38:43 |
| 11 | Q    As the vice president of medical affairs at | 09:38:44 |
| 12 | Gilead? | 09:38:48 |
| 13 | A    Correct. | 09:38:48 |
| 14 | Q    And at a high level, what were your | 09:38:49 |
| 15 | responsibilities as the vice president of medical | 09:38:52 |
| 16 | affairs at Gilead? | 09:38:53 |
| 17 | A    You know, providing management and leadership | 09:38:55 |
| 18 | for the medical affairs function at Gilead.  Medical | 09:38:57 |
| 19 | affairs is responsible predominantly for physician | 09:39:02 |
| 20 | education, and there are a number of activities under | 09:39:08 |
| 21 | that, as well as phase 4 studies. | 09:39:10 |
| 22 | Q    And you did some work related to PrEP while | 09:39:12 |
| 23 | you were at Gilead, correct? | 09:39:16 |
| 24 | A    What do you mean "did some work"?  We -- we | 09:39:19 |
| 25 | talked about it.  I don't recall that I did specific | 09:39:21 |

| | | |
|---|---|---|
| 1 | work on it at Gilead. | 09:39:27 |
| 2 |     Q   Okay.  And when you say "we talked about it," | 09:39:29 |
| 3 | what do you mean by that? | 09:39:31 |
| 4 |     A   Oh, I think my team and talking with, you | 09:39:32 |
| 5 | know, other people in -- at Gilead, people like Gregg | 09:39:37 |
| 6 | Alton or Norbert Bischofberger.  I know we did talk | 09:39:42 |
| 7 | about it.  But I -- yeah. | 09:39:54 |
| 8 |     Q   And we'll explore this more later.  But among | 09:39:55 |
| 9 | other things, did you talk about whether or not Gilead | 09:39:59 |
| 10 | should seek approval to -- for Truvada to be labeled for | 09:40:01 |
| 11 | PrEP? | 09:40:07 |
| 12 |     A   Yes. | 09:40:08 |
| 13 |     Q   And what was your position on whether Gilead | 09:40:09 |
| 14 | should or should not do that? | 09:40:12 |
| 15 |     A   Based on the data that we had, that is the -- | 09:40:14 |
| 16 | the animal model data.  My -- I think what I said was if | 09:40:18 |
| 17 | this works in humans -- because at the time, I don't | 09:40:25 |
| 18 | believe the phase 3 trial data had reported out yet -- | 09:40:29 |
| 19 | that they should seek approval.  And largely because I | 09:40:35 |
| 20 | do recall I said CDC may recommend this if you seek | 09:40:40 |
| 21 | approval or not because the drugs were approved and CDC | 09:40:45 |
| 22 | has been known to make off-label recommendations for | 09:40:48 |
| 23 | drugs or vaccines. | 09:40:52 |
| 24 |     Q   Okay.  Now you currently work at Dynavax | 09:40:57 |
| 25 | Technologies? | 09:41:04 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert Janssen, M.D.
Conducted on January 13, 2022                                189

| | |
|---|---|
| 1 | know what you just said. | 13:52:02 |
| 2 |      Q    Okay.  Fair enough. | 13:52:03 |
| 3 |           So your understanding is that was the | 13:52:04 |
| 4 | provisional patent application that related to PrEP for | 13:52:06 |
| 5 | HIV. | 13:52:11 |
| 6 |      A    Correct. | 13:52:13 |
| 7 |      Q    Okay.  And you wrote "Pending" at the end, | 13:52:13 |
| 8 | meaning that that patent had not yet issued, correct? | 13:52:18 |
| 9 |      A    It had not issued, correct. | 13:52:21 |
| 10 |      Q    And if you turn to the next page of this | 13:52:24 |
| 11 | exhibit, which is -- ends in 458, that's your signature | 13:52:30 |
| 12 | again, correct? | 13:52:33 |
| 13 |      A    Correct. | 13:52:35 |
| 14 |      Q    And by the way, other than this form that you | 13:52:36 |
| 15 | completed in April 2008, did you tell anyone else at | 13:52:40 |
| 16 | Gilead about your pending PrEP patent application while | 13:52:45 |
| 17 | you were employed at Gilead? | 13:52:49 |
| 18 |      A    I don't remember. | 13:52:51 |
| 19 |      Q    After you joined Gilead, you worked on HIV | 13:52:58 |
| 20 | chemoprophylaxis as part of your role as VP of medical | 13:53:04 |
| 21 | affairs, correct? | 13:53:09 |
| 22 |      A    My group did.  Jim Rooney did.  So Jim Rooney, | 13:53:11 |
| 23 | I think, worked -- interacted with -- you know, he | 13:53:20 |
| 24 | did -- Jim was the liaison, I think it was, between the | 13:53:22 |
| 25 | government, for example, and Gilead.  So through Jim, | 13:53:29 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert Janssen, M.D.
Conducted on January 13, 2022                        190

| | | |
|---|---|---|
| 1 | our group did that.  I personally don't recall working | 13:53:30 |
| 2 | on PrEP at -- at Gilead.  We -- we were focused on, you | 13:53:34 |
| 3 | know, treatment and -- and the drugs being used for | 13:53:43 |
| 4 | treatment. | 13:53:46 |
| 5 | MR. BASSETT:  Well, let's mark as the next | 13:53:47 |
| 6 | exhibit, tab 37, which is Bates stamp GILDDE 1338861 | 13:53:49 |
| 7 | to -- to -- through 862. | 13:54:08 |
| 8 | (Deposition Exhibit 34 was marked for | 13:54:12 |
| 9 | identification.) | 13:54:13 |
| 10 | Q    Dr. Janssen, I've asked you to be shown a | 13:54:13 |
| 11 | document that's been marked as Exhibit 34.  And this is | 13:54:16 |
| 12 | an e-mail that Jim Rooney forwarded to you and others | 13:54:20 |
| 13 | from Dawn Smith, correct? | 13:54:27 |
| 14 | A    Yes, correct. | 13:54:29 |
| 15 | Q    And it was dated June 2009, correct? | 13:54:30 |
| 16 | A    Correct. | 13:54:37 |
| 17 | Q    And the subject line of this e-mail is "PrEP | 13:54:40 |
| 18 | update Dawn Smith CDC," correct? | 13:54:43 |
| 19 | A    Right. | 13:54:46 |
| 20 | Q    So you were at least being informed about PrEP | 13:54:57 |
| 21 | issues in your position at Gilead, correct? | 13:54:57 |
| 22 | A    Yes.  Yes.  Yeah, no.  I was aware of what was | 13:54:59 |
| 23 | going on, but I was not actively involved in the way -- | 13:55:03 |
| 24 | I mean to be clear, the way I was at CDC. | 13:55:07 |
| 25 | Q    Sure.  I -- I understand that.  But we -- you | 13:55:10 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert Janssen, M.D.
Conducted on January 13, 2022                          191

| | | |
|---|---|---|
| 1 | did discuss earlier that, at least while you were at | 13:55:13 |
| 2 | Gilead, you were involved in discussions about whether | 13:55:16 |
| 3 | or not Gilead should seek the PrEP indication to be put | 13:55:21 |
| 4 | on the label for Truvada, correct? | 13:55:26 |
| 5 | A    Right.  Correct. | 13:55:31 |
| 6 | Q    And at the time you signed your agreement with | 13:55:34 |
| 7 | Gilead that we just looked at on April 16th, 2008, the | 13:55:36 |
| 8 | PrEP patents had not yet issued, correct? | 13:55:45 |
| 9 | A    Correct. | 13:55:48 |
| 10 | Q    And your patent -- you later assigned your | 13:55:48 |
| 11 | patents to the U.S. government, correct? | 13:55:54 |
| 12 | A    Correct. | 13:55:56 |
| 13 | Q    But you did not assign your patents to the | 13:55:57 |
| 14 | U.S. government until March of 2015; isn't that correct? | 13:56:00 |
| 15 | A    I don't know. | 13:56:06 |
| 16 | MR. BASSETT:  Well, let's mark as the next | 13:56:08 |
| 17 | exhibit tab 39, which is Bates-stamped KS_GIL 57566 | 13:56:10 |
| 18 | through 632. | 13:56:21 |
| 19 | (Deposition Exhibit 35 was marked for | 13:56:25 |
| 20 | identification.) | 13:56:29 |
| 21 | Q    And, Doctor, I've asked you to be shown a | 13:56:29 |
| 22 | document which has been marked Exhibit 36, which is | 13:56:34 |
| 23 | headed, on the first page, a "Notice of Allowance for | 13:56:36 |
| 24 | Fees."  But I would direct your attention to the pages | 13:56:41 |
| 25 | that end 622 to 624. | 13:56:44 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert Janssen, M.D.
Conducted on January 13, 2022                                    200

| | | |
|---|---|---|
| 1 | THE WITNESS:  Sure. | 14:08:31 |
| 2 | THE VIDEOGRAPHER:  This is the end of media | 14:08:31 |
| 3 | number 3 in the remote deposition of Dr. Robert Janssen. | 14:08:34 |
| 4 | Going off the record.  The time is 2:08. | 14:08:37 |
| 5 | (A recess ensued from 2:08 p.m. to 2:20 p.m.) | 14:08:42 |
| 6 | THE VIDEOGRAPHER:  We are back on the record. | 14:20:34 |
| 7 | The time is 2:20.  This is the beginning of media | 14:20:36 |
| 8 | number 4. | 14:20:40 |
| 9 | BY MR. BASSETT: | 14:20:43 |
| 10 | Q    So, Dr. Janssen, I'd like to talk a little bit | 14:20:44 |
| 11 | more about the nature of your work while you were at | 14:20:47 |
| 12 | Gilead.  You testified earlier that, while you were | 14:20:50 |
| 13 | there, there were at least some discussions about | 14:20:54 |
| 14 | whether Gilead should seek an indication for Truvada for | 14:20:57 |
| 15 | PrEP, correct? | 14:21:00 |
| 16 | A    Correct. | 14:21:03 |
| 17 | Q    And you were involved in at least some of | 14:21:03 |
| 18 | those discussions, correct? | 14:21:06 |
| 19 | A    Correct. | 14:21:07 |
| 20 | Q    And even prior to joining Gilead in May of | 14:21:08 |
| 21 | 2008, you had already formed the opinion that Gilead | 14:21:13 |
| 22 | should seek to obtain an indication for Truvada for | 14:21:17 |
| 23 | PrEP, correct? | 14:21:21 |
| 24 | A    I thought they should, yes. | 14:21:22 |
| 25 | MR. BASSETT:  Okay.  And if we could mark as | 14:21:27 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert Janssen, M.D.
Conducted on January 13, 2022                          204

| | | |
|---|---|---|
| 1 | soon as the data became available? | 14:25:37 |
| 2 | A    Correct. | 14:25:39 |
| 3 | Q    And you believed that even before you joined | 14:25:41 |
| 4 | Gilead in May of 2008, right? | 14:25:45 |
| 5 | A    Yes. | 14:25:48 |
| 6 | Q    Now, after joining Gilead in May 2008, you | 14:25:49 |
| 7 | became involved -- well, strike that. | 14:25:52 |
| 8 | Now, once you joined Gilead, you were actually | 14:26:07 |
| 9 | involved in Gilead's decision-making process about | 14:26:07 |
| 10 | whether to seek a PrEP indication for Truvada; isn't | 14:26:09 |
| 11 | that correct? | 14:26:19 |
| 12 | A    I was in discussions about it, yes.  I -- | 14:26:19 |
| 13 | Q    Well, you were also part -- I'm sorry. | 14:26:21 |
| 14 | A    I don't know -- | 14:26:23 |
| 15 | Q    You were also part -- I'm sorry.  Go ahead. | 14:26:24 |
| 16 | A    I -- sorry.  I don't know if that was | 14:26:27 |
| 17 | considered the decision-making process. | 14:26:29 |
| 18 | Q    Fair enough. | 14:26:32 |
| 19 | Well, you were part of a group that helped | 14:26:33 |
| 20 | draft something called a PrEP -- the "PrEP Position | 14:26:36 |
| 21 | Paper" in the fall of 2008; isn't that correct? | 14:26:39 |
| 22 | A    I don't recall. | 14:26:41 |
| 23 | MR. BASSETT:  Well, let's mark as the next | 14:26:45 |
| 24 | exhibit tab 25.  That's Bates-stamped GILDDE 2564446. | 14:26:47 |
| 25 | (Deposition Exhibit 39 was marked for | 14:26:59 |

CONFIDENTIAL - RESTRICTED INFORMATION
Transcript of Robert Janssen, M.D.
Conducted on January 13, 2022                    211

| | | |
|---|---|---|
| 1 | About the third line on the next page, "Gilead's intent | 14:35:52 |
| 2 | is to support the appropriate use of Viread/Truvada as | 14:35:56 |
| 3 | PrEP, but the company is not convinced that a prevention | 14:36:00 |
| 4 | indication would enhance or ensure appropriate use." | 14:36:05 |
| 5 |         Do you see that? | 14:36:07 |
| 6 | A    Yes. | 14:36:08 |
| 7 | Q    Now, is it fair to say that, in February 2009, | 14:36:09 |
| 8 | Gilead's position as a company was not to seek a PrEP | 14:36:14 |
| 9 | indication for Truvada? | 14:36:19 |
| 10 | A    That was my understanding. | 14:36:20 |
| 11 | Q    And you were aware that that was the company's | 14:36:22 |
| 12 | position at that time, correct? | 14:36:26 |
| 13 | A    Correct. | 14:36:27 |
| 14 | Q    But you were personally supportive of Gilead, | 14:36:28 |
| 15 | in fact, going forward and seeking the PrEP indication | 14:36:34 |
| 16 | for Truvada, correct? | 14:36:39 |
| 17 | A    I was accepting of the position that the | 14:36:40 |
| 18 | company took.  That's -- that was the decision the | 14:36:42 |
| 19 | company made. | 14:36:46 |
| 20 | Q    Sure.  I'm sorry? | 14:36:48 |
| 21 | A    Yeah, no. | 14:36:50 |
| 22 | Q    I'm not suggesting you weren't accepting of | 14:36:50 |
| 23 | it.  I'm -- they were your employer.  That was their | 14:36:54 |
| 24 | position. | 14:37:00 |
| 25 |         What I'm asking is, you personally disagreed | 14:37:00 |

# Exhibit 56

# In the Matter of:

## Gilead Sciences v. USA

*June 27, 2022*
*Trial*
*Vol. 3*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

638

```
 1              UNITED STATES COURT OF FEDERAL CLAIMS
 2
 3     GILEAD SCIENCES, INC.,          )
 4              Plaintiff,             )
 5          vs.                        )  Case No.
 6     UNITED STATES OF AMERICA,       )  20-499C
 7              Defendant.             )
 8     -------------------------------)
 9
10                     Courtroom 4
11          Howard T. Markey National Courts Building
12                 717 Madison Place, N.W.
13                    Washington, D.C.
14                 Monday, June 27, 2022
15                      9:00 a.m.
16                   Trial Volume 3
17
18       BEFORE:  THE HONORABLE CHARLES F. LETTOW
19
20
21
22
23
24
25     Susanne Bergling, RMR-CRR, Reporter
```

639

```
 1     APPEARANCES:
 2
 3     ON BEHALF OF THE PLAINTIFF:
 4            RONALD MACHEN, JR., ESQ.
 5            DAVID B. BASSETT, ESQ.
 6            TIMOTHY A. COOK, ESQ.
 7            VINITA FERRERA, ESQ.
 8            STEPHANIE LIN, ESQ.
 9            GEORGE P. VARGHESE, ESQ.
10            EMILY R. WHELAN, ESQ.
11            Wilmer Cutler Pickering Hale and Dorr, LLP
12            1875 Pennsylvania Avenue, N.W.
13            Washington, DC 20006
14            (202) 663-6881
15            ronald.machen@wilmerhale.com
16
17     ON BEHALF OF THE DEFENDANT:
18            WALTER WAYNE BROWN, ESQ.
19            PHILIP STERNHELL, ESQ.
20            PATRICK HOLVEY, ESQ.
21            AMANDA KELLY, ESQ.
22            LUCY NOYOLA, ESQ.
23            CARRIE ROSATO, ESQ.
24            MATTHEW TANNER, ESQ.
25            LENA YUEH, ESQ.
```

640

```
 1     U.S. Department of Justice
 2     1100 L Street, N.W.
 3     Washington, DC 20530
 4     (202) 307-0341
 5     walter.brown2@usdoj.gov
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

641

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR |
|---|---|---|---|---|---|
| GARCIA-LERMA | 648 | | | | |
| PAXTON | 668 | | | | |
| SMITH | 732 | | | | |
| MERMIN | 741 | | | | |
| DIEFFENBACH | 751 | | | | |
| GHOSH | 759 | | | | |
| WILSON | 770 | | | | |
| CYRIL | 775 | | | | |
| MILLER | 785 | | | | |
| SIEGEL | 796 | 824 | 853 | | |
| CELUM | 862 | 896 | 913 | 917 | |
| CONANT | 919 | 937 | | | |
| BLAKESLEE | 963 | | | | 973 |

```
                         I N D E X
```

| EXHIBITS | FOR ID | IN EVID |
|---|---|---|
| Plaintiff's | | |
| NumberPDX 4.2 | | 912 |
| NumberPDX 4.3 | | 912 |

934

1  whose opinion I respected entirely, and he refused to do
2  it. He said this has not been approved, I am not going
3  to do it. So they came to me.
4      So the thing I remember I was not only making the
5  decision to treat someone off label, I was making the
6  decision to do something contrary to the opinion of a
7  respected colleague in the community, and so I'm sure
8  that's why I remembered the whole event and remembered
9  Nick, and as I say, Nick's husband was a patient of
10 mine.
11     Q. Now, how often did you instruct Nick that he
12 should take Truvada for pre-exposure prophylaxis?
13     A. This is one of those patients I described
14 earlier. He was going out and having unprotected,
15 assertive sex two or three times a week or more often.
16 He had to take the drug daily or it would not be
17 effective.
18     Q. And that's what you instructed?
19     A. Yes.
20     Q. And did Nick take the pre-exposure prophylaxis
21 regularly as prescribed?
22     A. The only way a doctor knows a patient is
23 complying is if a patient runs out of pills and doesn't
24 come down with the disease they were prophylaxing for or
25 doesn't get the disease. You're not observing the

935

1  patient every day. I remember Nick coming back for at
2  least two refills, okay, and we tested him when he came
3  back -- every one of my patients was tested every time
4  they came in, all patient were tested -- he did not come
5  back with HIV and he did come back with a refill. So
6  based on those two criteria, he was taking his medicine
7  as directed.
8      Q. Now, have you ever told anyone that your
9  prescription for Nick was for post-exposure prophylaxis
10 rather than pre-exposure prophylaxis?
11     A. No, because when Nick saw me he had not been
12 exposed right then and it was to prevent him from
13 getting the disease, pre exposure prophylaxis.
14     Q. And did Nick remain HIV-negative from the time
15 you prescribed Patricia for him for prophylaxis?
16     A. As I told you, I did a test on him every time he
17 came in and the test remained negative.
18     Q. Where is Nick today?
19     A. I learned from his husband when I called him in
20 2017 that Nick had died of pancreatic cancer.
21     MR. HOLVEY: Objection, Your Honor. That's
22 hearsay.
23     THE COURT: On the other hand, it's not
24 particularly pertinent to the trial and the Court will
25 not strike the answer.

936

1      BY MR. BASSETT:
2      Q. Now, Doctor, do you have any records related to
3  Nick's use of Truvada for pre-exposure prophylaxis?
4      A. No. That was the whole reason for calling the
5  husband and getting Nick's last name, was to look for
6  the records. I looked for the records and they had been
7  destroyed. The reason we destroyed records was, as you
8  can imagine, taking care of some 3000 HIV patients,
9  these patients didn't contract AIDS and die.
10     These patients contracted aids and they were sick
11 for two or three years, so by the time they died, their
12 records were a foot high or larger, and so very early
13 on, we started following the laws of California, and we
14 were able to destroy the records if it had been ten
15 years since you had seen the patients. So when I went
16 to look for Nick's records, it had been destroyed.
17     Q. Now, if you had been contacted in 2006 or 2007,
18 would you have still had Nick's medical records then?
19     A. Yes. If the last time I saw Nick was in 2004, we
20 would have had the records up until 2014.
21     Q. Did you also reach out to Nick's husband, Mark,
22 and ask if he had any records related to Nick's use of
23 Truvada for pre-exposure prophylaxis?
24     A. Yes. When I learned Nick's last name and learned
25 that he died of pancreatic cancer, I also asked for the

937

1  records, and he told me that unfortunately he had
2  destroyed those records the year before.
3      MR. HOLVEY: Objection, Your Honor. That's also
4  hearsay.
5      THE COURT: That's true, but on the other hand,
6  it's irrelevant to the issues at hand. Overruled.
7      MR. BASSETT: I have no further questions for the
8  Doctor.
9      THE COURT: All right.
10     Mr. Holvey?
11     MR. HOLVEY: Your Honor, if I may pass out some
12 binders?
13     THE COURT: Yes.
14     MR. HOLVEY: Thank you, Your Honor.
15           CROSS EXAMINATION
16     BY MR. HOLVEY:
17     Q. Dr. Conant, good afternoon. It's good to see you
18 again.
19     A. Nice to see you again.
20     Q. Thank you very much.
21     Earlier we discussed -- you discussed with
22 Mr. Bassett pre-exposure prophylaxis and post-exposure
23 prophylaxis. Could you tell me what the difference is
24 between pre-exposure and post-exposure?
25     A. Yeah. Pre-exposure prophylaxis is to treat a

75 (Pages 934 to 937)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# In the Matter of:

# Gilead Sciences v. USA

*June 30, 2022*
*Trial - UNDER SEAL*
*Vol. 6*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial - UNDER SEAL

Gilead Sciences v. USA                                                                 6/30/2022

---

**1617**

```
 1              UNITED STATES COURT OF FEDERAL CLAIMS
 2
 3      GILEAD SCIENCES, INC.,          )
 4             Plaintiff,               )
 5             vs.                      )  Case No.
 6      UNITED STATES OF AMERICA,       )  20-499C
 7             Defendant.               )
 8      -------------------------------)
 9              ***TRANSCRIPT UNDER SEAL***
10
11                    Courtroom 4
12          Howard T. Markey National Courts Building
13                  717 Madison Place, N.W.
14                    Washington, D.C.
15              Thursday, June 30, 2022
16                      9:00 a.m.
17                    Trial Volume 6
18
19      BEFORE:  THE HONORABLE CHARLES F. LETTOW
20
21
22
23
24
25      Sally Jo Quade, RPR, Reporter
```

---

**1618**

```
 1      APPEARANCES:
 2
 3      ON BEHALF OF THE PLAINTIFF:
 4             RONALD MACHEN, JR., ESQ.
 5             DAVID B. BASSETT, ESQ.
 6             TIMOTHY A. COOK, ESQ.
 7             VINITA FERRERA, ESQ.
 8             STEPHANIE LIN, ESQ.
 9             GEORGE P. VARGHESE, ESQ.
10             EMILY R. WHELAN, ESQ.
11             Wilmer Cutler Pickering Hale and Dorr, LLP
12             1875 Pennsylvania Avenue, N.W.
13             Washington, DC 20006
14             (202) 663-6881
15             ronald.machen@wilmerhale.com
16
17      ON BEHALF OF THE DEFENDANT:
18             WALTER WAYNE BROWN, ESQ.
19             PHILIP STERNHELL, ESQ.
20             PATRICK HOLVEY, ESQ.
21             AMANDA KELLY, ESQ.
22             LUCY NOYOLA, ESQ.
23             CARRIE ROSATO, ESQ.
24             MATTHEW TANNER, ESQ.
25             LENA YUEH, ESQ.
```

---

**1619**

```
 1      U.S. Department of Justice
 2      1100 L Street, N.W.
 3      Washington, DC 20530
 4      (202) 307-0341
 5      walter.brown2@usdoj.gov
```

---

**1620**

```
 1                    I N D E X
 2
 3      WITNESS:        DIRECT  CROSS  REDIRECT  RECROSS  VOIR
 4      DiSpigna          1625   1642
 5      Kirby             1661   1730     1766     1773
 6      Mitzelfelt        1777   1788     1800
 7      Sheridan          1803   1855     1936     1945
 8      Bischofberger     1951
 9
10      EXHIBITS          FOR ID     IN EVID
11      Plaintiff's
12      Number 451                     1723
13
14      Defendant's
15      Numbers DDX 3.1 through 3.21    1945
16      Number 72                       1980
17      Number 118                      1980
18      Number 127                      1980
19      Number 128                      1980
20      Number 133                      1980
21      Number 134                      1980
22      Number 137                      1980
23      Number 559                      1666
24      Number 560                      1694
25      Number 561                      1763
```

1 (Pages 1617 to 1620)

1713

1    email.  Do you see those?
2        A.  I do.
3        Q.  What are those underlines?
4        A.  Those are links to the Federal Register notice
5    that we already looked at and also the two publications
6    that are listed in that abstract.
7        Q.  And who is this email addressed to?
8        A.  Linda Higgins at Gilead.com.
9        Q.  And who is Linda Higgins?
10       A.  Someone we had identified as a business
11   development contact.
12       Q.  Business development contact at Gilead?
13       A.  At Gilead, yes.
14       Q.  What is the subject of this email?
15       A.  The subject is, "Centers for Disease Control NIH
16   Office of Tech Transfer - HIV Technology Licensing
17   Inquiry."
18       Q.  Thank you very much, Dr. Kirby.
19           Could you please turn with me to DTX 43, which is
20   the next document.  Are you there?
21       A.  Yes.
22       Q.  After Exhibit 23 on the next page, do you
23   recognize this document?  The next page.
24       A.  Oh, I'm looking at the wrong thing.
25       Q.  Sorry.  I'm looking at DTX 43.

1714

1        A.  Now I got to the wrong one.  Sorry about that.
2    Here I am.
3        Q.  No problem.  And I'm looking at the second page
4    of DTX 43.
5        A.  Yes.
6        Q.  And you're there?
7        A.  I am.
8        Q.  And it looks like it does on the screen?
9        A.  Um-hmm.
10       Q.  Great.  And do you recognize this document?
11       A.  Yes, I do.
12       Q.  And what is this document?
13       A.  This is an email, again, from Lori Prestia to Jay
14   Parrish at Gilead.com.
15       Q.  And when was this email sent?
16       A.  It was sent October 23rd, 2014.
17       Q.  And are you CC'd on this email?
18       A.  I am.
19       Q.  And was this email sent at your direction?
20       A.  It was.
21           MR. HOLVEY:  Your Honor, the Government would
22   move to admit DTX 43 -- already in evidence, never mind.
23   I'm informed it's already in evidence, so we're good to
24   go.
25           BY MR. HOLVEY:

1715

1        Q.  Dr. Kirby, what is this document discussing?
2        A.  This is similar to the previous email.  It is
3    informing Dr. Parrish of the availability of the HHS
4    PrEP technology for licensing.
5        Q.  Thank you very much.
6            And I see three underlines in this email as well.
7        A.  Yes.
8        Q.  What are those underlines?
9        A.  Similar to the other email, it's a link to the
10   Federal Register notice and the two papers that are
11   described in the Federal Register notice.
12       Q.  And what was the subject of this email?
13       A.  It was concerning the availability of the HHS
14   PrEP -- oh, I'm sorry, the actual title is "Centers for
15   Disease Control NIH Office Tech Transfer -- HIV
16   Technology Licensing Inquiry."
17       Q.  Great.  Thank you very much, Dr. Kirby.
18           Please turn with me to the next document, which
19   is DTX 577.  And, Dr. Kirby, are you there?
20       A.  Yes, I am.
21       Q.  Great.  And do you recognize this document?
22       A.  I do.
23       Q.  And what is this document?
24       A.  This is an email from me to Jay Parrish at
25   Gilead.

1716

1        Q.  Great.  And starting at the bottom of the
2    chain -- and, Your Honor, I'm informed this email is
3    already in evidence, so I do not need to move it in.
4            Starting at the bottom of the email chain, did
5    you send the first email?
6        A.  Yes, I did.
7        Q.  And who did -- when did you send that email?
8        A.  I sent it on February 11th, 2016.
9        Q.  And who did you send it to?
10       A.  I sent it to Manuel Tsiang at Gilead.
11       Q.  Who was Manuel Tsiang?
12       A.  He was a negotiation contact.  We were working on
13   a different license together, and I thought he might be
14   a good point person to give me a point of contact for
15   the HHS PrEP patents.
16       Q.  And did you eventually receive a point of contact
17   for the HHS PrEP patents?
18       A.  Yes, I did.
19       Q.  And who was that point of contact?
20       A.  Jay Parrish.
21       Q.  The same Jay Parrish you emailed in 2014?
22       A.  I believe so, yes.
23       Q.  And did you hear from Gilead between 2014 and
24   2016 regarding the HHS PrEP patents?
25       A.  I did not.

25 (Pages 1713 to 1716)

Trial - UNDER SEAL

Gilead Sciences v. USA                                                                                     6/30/2022

1717

1    Q. Okay. Did you hear from anyone on Gilead's
2    behalf in 2016 regarding the HHS PrEP patents?
3    A. Yes. I was contacted by an attorney at Wilmer
4    Hale --
5    Q. Um-hmm.
6    A. -- a little bit after this last email was sent.
7    Q. And what did you discuss with that attorney at
8    Wilmer Hale?
9    A. Generally the contents of this email, that we had
10   the HHS PrEP technology that's available for licensing,
11   and we thought that it was potentially -- their product
12   was potentially covered by that.
13   Q. Gotcha. And was there any followup to that
14   conversation?
15   A. Not really. The attorney promised followup and
16   didn't. I attempted to contact him and eventually found
17   out that he had left the firm. I looked for another
18   contact, found one that said he would identify the right
19   person, and he left the firm.
20   Q. And so that second contact was also a Wilmer Hale
21   attorney?
22   A. Yes.
23   Q. And after he left the firm, what happened?
24   A. Eventually I contacted somebody else at that
25   office and explained that I had been trying to reach

1718

1    somebody and had not been able to, and to either give me
2    another contact or I would go back to Gilead.
3    Q. And then what happened after that?
4    A. I was eventually contacted by people at Gilead
5    directly.
6    Q. Great. Thank you very much.
7    And when did that contact occur?
8    A. In the early part of 2017.
9    Q. Great. Dr. Kirby, please turn with me to DTX
10   578. It's the next document.
11   A. Um-hmm.
12   THE COURT: Just a moment.
13   Go ahead.
14   BY MR. HOLVEY:
15   MR. HOLVEY: We're at DTX 578.
16   THE COURT: Yes.
17   BY MR. HOLVEY:
18   Q. Great. Dr. Kirby, do you recognize this
19   document?
20   A. I do.
21   Q. What is this document?
22   A. This is an email to me from Lorie Ann Morgan at
23   Gilead.
24   Q. When was this email sent?
25   A. April 12, 2017.

1719

1    Q. And did you author this email?
2    A. I did.
3    MR. HOLVEY: Your Honor, the Government would
4    move admission of DTX 578.
5    MS. FERRERA: No objection, Your Honor.
6    THE COURT: Admitted.
7    (Defendant's Exhibit Number 578 was admitted into
8    evidence.)
9    BY MR. HOLVEY:
10   Q. Thank you very much, Your Honor.
11   Dr. Kirby, looking at the first email in the
12   chain, so about five pages in --
13   A. Yes.
14   Q. -- when was that email sent and who was it from?
15   A. That was sent on February 15th, 2017. It was
16   from Lorie Ann Morgan to myself and to a colleague,
17   Richard Lambert.
18   Q. And do you understand that there was an
19   attachment to this email?
20   A. Yes, there was.
21   Q. And what was that attachment?
22   A. I believe it was a one-page document containing a
23   putative timeline of the development of PrEP.
24   Q. Thank you very much.
25   So in the next email, one email up, what was that

1720

1    email?
2    A. So that was another email from Gilead, this time
3    from Patricia Thayer to me, and it contained a
4    PowerPoint presentation that had been shown to us during
5    our prior call with them.
6    Q. And during the prior call -- was this call in
7    2017?
8    A. Yes, it was.
9    Q. So during that prior call, can you please
10   describe for us what Gilead discussed with you?
11   A. A number of topics. As I mentioned before, they
12   went over the prospective timeline for the development
13   of PrEP. They also talked about the history of PrEP and
14   HIV treatment. They also provided some documents that
15   they felt were relevant to our patents, as well as two
16   MTAs, I believe, that they felt were relevant, also.
17   And then they also gave us some analysis of certain
18   claims in our patent that they felt in their opinion
19   might be problematic.
20   Q. And so there was a presentation that went along
21   with this call?
22   A. Yes.
23   Q. And how detailed was this presentation?
24   A. It was quite detailed.
25   Q. All right. To your recollection, how many MTAs

26 (Pages 1717 to 1720)

# Exhibit 57

```
 1                 UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
 2      ---------------------------x
        THE UNITED STATES OF        :
 3      AMERICA,                    :
                    Plaintiff,      :   Civil Action No.
 4          vs.                     :   19-2103 (MN)
        GILEAD SCIENCES, INC.       :
 5      AND GILEAD SCIENCES         :
        IRELAND UC,                 :
 6              Defendants.         :
        ---------------------------x
 7

 8           UNITED STATES COURT OF FEDERAL CLAIMS
        ---------------------------x
 9      GILEAD SCIENCES, INC.       :
                    Plaintiff,      :   No. 20-499C
10          vs.                     :
        THE UNITED STATES OF        :
11      AMERICA,                    :
                Defendant.          :
12      ---------------------------x

13

14                  Videotaped Deposition of

15                    MARCUS CONANT, M.D.

16                    New York, New York

17                Friday, December 10, 2021

18                        9:00 a.m.

19

20

21

22

23      Job No.: 415212

24      Pages: 1 - 103

25      Reported by: Adrienne Mignano, RPR
```

Transcript of Marcus Conant, M.D.
Conducted on December 10, 2021                    2

1              Deposition of MARCUS CONANT, M.D., held

2      at the law firm of Wilmer Cutler Pickering Hale

3      and Door, LLP, 250 Greenwich Street, 45th Floor,

4      New York, New York 10007, pursuant to Notice,

5      before Adrienne M. Mignano, a Notary Public and

6      Registered Professional Reporter in and for the

7      State of New York.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcript of Marcus Conant, M.D.
Conducted on December 10, 2021                           3

```
1            A P P E A R A N C E S

2

3

4    ON BEHALF OF GILEAD SCIENCES, INC.

5         BENJAMIN CONERY, ESQUIRE

6         DAVID B. BASSETT, ESQUIRE

7         WILMER CUTLER PICKERING HALE and DOOR LLP

8         60 State Street

9         Boston, Massachusetts 02109

10        617.526.6797

11

12

13   ON BEHALF OF THE UNITED STATES OF AMERICA

14        PATRICK C. HOLVEY, ESQUIRE

15        U.S. DEPARTMENT OF JUSTICE

16        1100 L Street, NW

17        Washington, DC 20530

18        202.532.4135

19

20   ALSO PRESENT:

21        Michael Imbacuan, Esq. - Department of

22        Health & Human Services, Office of

23        General Counsel

24        Enrique Casas - Videographer

25
```

Transcript of Marcus Conant, M.D.
Conducted on December 10, 2021                           100

| | | |
|---|---|---|
| 1 | A    About a year ago. | 11:11:23 |
| 2 | Q    So Marc -- | 11:11:25 |
| 3 | A    Well, maybe close to two years ago. | 11:11:27 |
| 4 | Q    Okay.  So Marc destroyed the records | 11:11:29 |
| 5 | sometime in 2019 or 2018? | 11:11:32 |
| 6 | A    No. | 11:11:33 |
| 7 |      MR. CONERY:  Object to form. | 11:11:35 |
| 8 | A    As I recall, I contacted Marc when I | 11:11:36 |
| 9 | had been contacted by the law firm in LA. | 11:11:39 |
| 10 | Q    Oh, the first law firm. | 11:11:43 |
| 11 | A    Correct. | 11:11:44 |
| 12 | Q    Okay. | 11:11:47 |
| 13 | A    And so that would have been 2017, | 11:11:47 |
| 14 | 2018.  So say it was 2018.  Marc said he | 11:11:49 |
| 15 | destroyed the records a year before, so that | 11:11:53 |
| 16 | would have been 2016, 2017. | 11:11:56 |
| 17 |      MR. HOLVEY:  Okay.  I don't have any | 11:11:58 |
| 18 | more questions. | 11:12:00 |
| 19 |      MR. CONERY:  Neither do we. | 11:12:03 |
| 20 |      THE VIDEOGRAPHER:  Okay.  Stand by. | 11:12:05 |
| 21 | This marks the end of the deposition | 11:12:05 |
| 22 | of Dr. Marcus Conant.  We're going off the | 11:12:09 |
| 23 | record.  The time is 11:12 a.m. | 11:12:13 |
| 24 |      MR. CONERY:  Could you read the time | 11:12:17 |
| 25 | on the record? | 11:12:17 |

# Exhibit 58

Trials@uspto.gov                                              Paper 15
571-272-7822                                        Date: February 20, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

GILEAD SCIENCES, INC.,
Petitioner,

v.

THE UNITED STATES OF AMERICA,
REPRESENTED BY THE SECRETARY OF THE DEPARTMENT OF
HEALTH & HUMAN SERVICES,
Patent Owner.

————————

IPR2019-01454
Patent 9,579,333 B2

————————

Before ZHENYU YANG, CHRISTOPHER M. KAISER, and
TIMOTHY G. MAJORS, *Administrative Patent Judges*.

YANG, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2019-01454
Patent 9,579,333 B2

in the treatment of HIV-infected persons, certain agents and combinations are preferred." *Id.* Smith teaches that "[p]referred regimens include efavirenz and lamivudine or emtricitabine with zidovudine or tenofovir (as a nonnucleoside-based regimen) and lopinavir/ritonavir . . . and zidovudine with either lamivudine or emtricitabine." *Id.* Moreover, Smith teaches that "[d]ifferent alternative regimens are possible (Table 2)." *Id.*

Smith's Table 2 identifies the combination of "Efavirenz[] plus (lamivudine or emtricitabine) plus (zidovudine or tenofovir)" as one of its "[p]referred regimens." *Id.* at 9 (Table 2). Smith's Table 3 identifies several additional HAART medications, including "Emtricitabine/tenofovir (Truvada®)," and notes the adult dosage as "1 tablet once daily," which includes "200 mg emtricitabine/300 mg tenofovir." *Id.* at 10 (Table 3); *see also id.* at 8 ("One of the HAART combinations recommended for the treatment of persons with established HIV infection should be selected on the basis of adherence, toxicity, and cost considerations (Tables 2 and 3).").

<u>Analysis</u>

Claim 13 depends from claim 12, and further recites that "wherein the combination is administered prior to a potential exposure of the human to the human immunodeficiency retrovirus."

Petitioner argues Smith discloses step (a), step (b), and the wherein clause of claim 12. Pet. 56–60. Regarding the preamble and the thereby clause, Petitioner contends that, although they are "not limiting," Smith describes a process that meets the efficacy language. *Id.* at 55–56, 60–61.

Regarding the wherein clause of claim 13, Petitioner argues that Smith teaches "PEP is to be followed for at least a 28-day period." *Id.* at 61.

27

IPR2019-01454
Patent 9,579,333 B2

According to Petitioner, high-risk individuals, "are likely to nonetheless engage in activities that may expose them to HIV during the 28-day PEP period" despite being counseled against doing so. *Id.* at 62. Petitioner argues that "[s]uch individuals who have remained HIV-negative after a prior exposure will be administered TDF+FTC prior to the next (i.e., 'a') potential exposure as Claim 13 specifies." *Id.*

Patent Owner counters that Szekeres does not anticipate claim 13 because it discloses neither pre-exposure prophylaxis nor the claimed efficacy. Prelim. Resp. 40–42. We find Patent Owner's argument more persuasive.

Pre-exposure prophylaxis

Smith expressly teaches post-exposure prophylaxis PEP, not pre-exposure prophylaxis PrEP. *See, e.g.*, Ex. 1012, 1 ("The provision of antiretroviral drugs to prevent HIV infection after unanticipated sexual or injection-drug-use exposure might be beneficial."). In fact, Petitioner concedes so. Pet. 61 (arguing that Smith "repeatedly states that PEP regimens are effective in preventing HIV infection if commenced early enough *after* an exposure") (emphasis added).

Petitioner's theory that high-risk individuals "are *likely* to nonetheless engage in activities that may expose them to HIV during the 28-day PEP period" (Pet. 62 (emphasis added)), even if true, would not amount to an inherent disclosure either. *Bettcher Indus.*, 661 F.3d at 639 (explaining that inherency "may not be established by probabilities or possibilities").

IPR2019-01454
Patent 9,579,333 B2

Efficacy Requirement

As explained above in the claim-construction section, we determine
that the preamble "inhibiting establishment of a . . . infection" and the
efficacy language in the thereby clause are entitled to patentable weight.
Because Smith does not describe administering the claimed combination of
agents as PrEP, it does not provide any information about the efficacy of
such a combination for PrEP. Thus, Smith does not expressly disclose the
limitation of efficacy.

Petitioner argues that Smith discloses the limitation of efficacy
inherently. Pet. 60–61 (contending because Smith "teaches administering a
daily oral dose of the same, FDA-approved and pharmaceutically effective
amounts of TDF+FTC as the claims, it must yield the same result specified
in the claims"). But as Patent Owner points out, "Smith itself discloses
'nPEP is not 100% effective.'" Prelim. Resp. 41 (citing Ex. 1012, 3, 5, 6,
13). And as explained above, Petitioner's own product label for Truvada
shows that the combination therapy of FTC and DTF "is not always
effective in preventing acquisition of HIV-1." Ex. 2002, 6. We are, thus,
unpersuaded that Petitioner has demonstrated that Smith discloses, expressly
or inherently, the claimed efficacy.

For the reasons above, we determine that Petitioner has not
established a reasonable likelihood that it would prevail in showing that
claim 13 is anticipated by Smith.

*Obviousness over Smith and Szekeres*

Petitioner asserts that claims 1–18 would have been obvious over
Smith in combination with Szekeres. Pet. 64–86. Because Patent Owner has

disclaimed claims 12 and 14–18 (Ex. 2028), we only analyze Petitioner's challenge of claims 1–11 and 13. Based on this record, we determine Petitioner has not established a reasonable likelihood that it would prevail in this assertion.

Petitioner argues that an ordinary artisan would have been motivated to use Truvada in the PEP regimen based on its favorable side-effects profile compared to other antiretrovirals and to minimize resistance that can arise from monotherapies. Pet. 65–70. Acknowledging Szekeres's observation that clinical trials to test its effectiveness were underway but not completed, Petitioner contends that Szekeres would have provided a motivation "to modify the PEP regimen described in [Smith] by administering Truvada (TDF+FTC) to high-risk individuals before (rather than after) an actual HIV exposure." *Id.* at 64. According to Petitioner, an ordinary artisan would have had a reasonable expectation of success in modifying Smith and Szekeres in this way to arrive at the claimed subject matter. *Id.* at 72–84. Petitioner further argues that there is no objective indicia of non-obviousness. *Id.* at 84–86.

Patent Owner contends that Petitioner's obviousness challenge fails because (1) the combined teachings do not disclose all claim limitations; (2) there is no motivation to combine the teachings of Smith and Szkeres; and (3) there is no reasonable expectation of success. Prelim. Resp. 47–64. Patent Owner also argues that we should reject Petitioner's obviousness challenge because Petitioner fails to address known objective evidence of non-obviousness, including unexpected results evidence that persuaded the examiner to allow the challenged claims. *Id.* at 42–46. Patent Owner also

IPR2019-01454
Patent 9,579,333 B2

points to additional objective evidence as evidence to show that the
challenged claims are nonobvious. *Id.* at 64–68. We find Patent Owner's
argument more persuasive.

Efficacy Requirement

As explained above in the claim-construction section, we determine
that the efficacy language in the preamble and the thereby clause are entitled
to patentable weight. Also, as explained above, neither Szekeres nor Smith
discloses the limitation of efficacy, either expressly or inherently. Indeed,
evidence of record—including Petitioner's own product label for Truvada
(Ex. 2002, 6), as well as both asserted prior art (*see, e.g.*, Ex. 1011, 14; Ex.
1012, 3, 5, 6, 13)—suggests it is possible for particular individuals taking
the combination of FTC+DTF to become infected with HIV even when
taking the combination.

Secondary Considerations

Objective indicia of non-obviousness, also known as secondary
considerations, plays a key role in the obviousness inquiry and, among other
things, guards against proscribed hindsight reasoning. *Graham v. John
Deere Co.*, 383 U.S. 1, 36 (1966). Such evidence "may often be the most
probative and cogent evidence in the record" and, accordingly, "must always
when present be considered en route to a determination of obviousness."
*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir. 1983);
*see also In re Cyclobenzaprine Hydrochloride Extended-Release Capsule
Patent Litig.*, 676 F.3d 1063, 1075–80 (Fed. Cir. 2012) (holding that it is
error to make an obviousness determination without considering objective
indicia of nonobviousness in evidence).

31

IPR2019-01454
Patent 9,579,333 B2

In this case, as Patent Owner correctly points out, Petitioner has failed to grapple persuasively with well-developed evidence of unexpected results presented during the prosecution of the '333 patent and the parent U.S. Patent No. 9,044,509 B2 (Ex. 1003, (65)). Such evidence was key to the allowance of the claims despite the examiner's determination that the claimed subject matter was otherwise taught or suggested in the prior art.

Prosecution History

Indeed, during the prosecution of the '509 patent, the examiner rejected the then-pending claims, which later issued after minor amendments,[8] as obvious over the combined teachings of certain prior art. Ex. 1002, 204–10. In response, the applicant argued and presented, among others, evidence of objective indicia of nonobviousness, in particular, evidence of unexpected results with the claimed combination therapy. *Id.* at 118–20. Specifically, citing a post-filing publication, the applicant argued that the data in Example 7 of the '509 patent "showed that an exemplary claimed combination comprising FTC and TDF reduced the risk of rectal infection by 7.8-fold in an SIV macaque model."[9] *Id.* at 119 (citing Ex. 1155), *see also id.* (the applicant arguing, comparing with another reference, that data "showed that the study group which received FTC and TDF on various dosing schedules showed a reduced risk of infection by

---

[8] The claims of the '509 patent are similar to those of the '333 patent. *Compare*, e.g., Ex. 1001, claim 1, *with* Ex. 1003, claim 1.

[9] The '509 patent and the '333 patent share the same, or substantially the same, Specification. *Compare*, e.g., Ex. 1001, 9:1–10:10 (Examples 7 and 8), *with* Ex. 1003, 9:10–10:21 (Examples 7 and 8).

IPR2019-01454
Patent 9,579,333 B2

**16.7**-fold relative to untreated controls," a "superior result" that "could not have been predicted from the cited prior art").

The applicant also relied on Grant-2010 (Ex. 2004) to demonstrate the unexpected superior effect of an exemplary claimed combination. *Id.* at 119. According to the applicant, Grant-2010 showed "test subjects who had detectable blood levels of a study test drug combination (FTC and TDF) decreased their odds of an HIV infection by 92-95%." *Id.* at 119–120. Accordingly, applicant argued that "the references cited . . . as well as the specification of the present application" demonstrate "that the claims provide an unexpected superior result." *Id.* at 120.

Thereafter, the applicant and the examiner participated in two interviews. In the first one, the applicant discussed "the unpredictability of HIV art, particularly in the aspect of prevention, or prophylactic treatment," and the examiner noted "several post filing publications . . . supporting the alleged unexpected benefit residing in [the] claimed invention." *Id.* at 99. In the follow-up interview, the examiner stated that prior art teaches "the combination of tenofovir and emtricitabine for treating HIV" as well as suggesting applications for prophylaxis. *Id.* at 78. The examiner noted, however, that the "claims are allowable in view of the high unpredictability of chemoprophylaxis against HIV infection and the supe[r]ior and unexpected results shown in the application and exhibits. Particularly, [the] Grant reference." *Id.*

Later, in the "statement of reasons for allowance," the examiner commented that "the application shows that the [claimed] combination has superior effect as compared to tenofovir alone in animal model and

33

IPR2019-01454
Patent 9,579,333 B2

evidences on the record has shown the claimed combination has clinically significant results, which would have not been expected in view of the prior art as a whole." *Id.* at 81–82 (citing Ex. 2004).

A few months after indicating that the claims of the '509 patent were allowable, during the prosecution of the '333 patent, the Examiner rejected similar pending claims over similar prior art. *See, e.g.*, Ex. 1004, 77–84, 168–74. The applicant responded by: (1) amending the claims to specify that the combination therapy is administered orally, subcutaneously, or vaginally; (2) reiterating the argument and evidence related to unexpected results raised during prosecution of the '509 patent (citing, for example, data in Grant-2010 and the Specification's examples); and (3) submitting a declaration from two of the inventors detailing further testing of the claimed combination therapy. *Id.* at 34–36, 44–45, 49–52. The declaration provided survival curves (similar to Fig. 2 of the '333 patent, above) for different routes of administration of the combination therapy. *Id.* at 50 (showing data for oral administration), 51 (showing data for subcutaneous and vaginal administrations).

Shortly thereafter, the Examiner stated that the claims were allowable. *Id.* at 15–20.  The Examiner explained that the applicant had provided evidence of "unexpected superior results residing in the claimed invention," and that evidence, together with the amendments and remarks were "fully considered and found persuasive." *Id.* at 17–18.

Unexpected Results

Petitioner argues there are no unexpected results because there is no nexus to the invention, and the results of using TDF+FTC in a PrEP regimen

IPR2019-01454
Patent 9,579,333 B2

are attributable to the prior art, not the '333 patent. Pet. 84–85 ("[A]t best, the '333 Patent provided simply a confirmation of what scientists knew and expected from the prior art."). In any event, Petitioner urges that "any evidence of secondary indicia advanced by Patent Owner in its response should be addressed after institution." *Id.* at 86.

The Board sometimes puts off until trial exploration into, and conclusions on, alleged objective indicia of nonobviousness, especially when the objective indicia are raised for the first time in a patent owner's preliminary response, and a petitioner has no reasonable *a priori* notice of such evidence or argument. That might be an appropriate approach to deal with, for example, Patent Owner's assertions of industry praise or copying at the institution stage. *See* Prelim. Resp. 65–68. But the same cannot be said for the specific evidence of unexpected results, which was presented time and again during prosecution of both the '509 and the '333 patents, and which resulted in the allowance of the challenged claims.

Petitioner's conclusory assertions about the results being attributable to the prior art and a lack of a nexus are insufficient to rebut the specific evidence on unexpected results here. As recounted above, the Examiner considered such evidence decisive in overcoming the obviousness rejections of the claims in the '509 and '333 patents. *See, e.g.* Ex. 1002, 78 (noting the "unexpected results shown in the application and exhibits. Particularly, [the] Grant reference"); *id.* at 81–82 (finding the "application shows that the combination has superior effect . . . and evidences on the record has shown the claimed combination has clinically significant results, which would have not been expected."); *see also* Ex. 1004, 18 ("Particularly, applicants

35

IPR2019-01454
Patent 9,579,333 B2

provide sufficient evidence for establishing a prima facie case of unexpected superior results residing in claimed invention."). On this record, Petitioner should have addressed those results—at minimum, the actual results exhibited with the claimed combination as shown in the '333 patent's examples or Grant-2010—in the Petition, particularly in view of the pivotal role they played in securing allowance of the claims. This, Petitioner has not done.

Patent Owner also persuades us that Petitioner knew of, indeed relied upon, those results in the past. Prelim. Resp. 43–44; Ex. 2025 (2012 Truvada label), 32–33 ("The iPrEx study and Partners PrEP study support the use of TRUVADA to help reduce the risk of acquiring HIV-1"). Under these circumstances, we find that Petitioner's failure to persuasively address the results in its Petition means Petitioner falls short of its burden to establish a reasonable likelihood of success in prevailing on its challenge.

For the reasons explained above, we determine the Petition has not established a reasonable likelihood that Petitioner would prevail in showing that the challenged claims are unpatentable as obvious over Smith and Szekeres.

CONCLUSION

In view of the foregoing, Petitioner has not demonstrated a reasonable likelihood of prevailing on any grounds set forth in the Petition. Thus, we do not institute an *inter partes* review.

IPR2019-01454
Patent 9,579,333 B2

## ORDER

In consideration of the foregoing, it is hereby:

ORDERED that the Petition is denied, and we do not institute *inter partes* review of any claim of the '333 patent based on the grounds asserted in the Petition.

FOR PETITIONER:

Jeffrey P. Kushan
Lauren Cranford Katzeff
SIDLEY AUSTIN LLP
jkushan@sidley.com
lkatzeff@sidley.com

FOR PATENT OWNER:

Walter W. Brown
Nicholas J. Kim
Patrick C. Holvey
Philip Sternhell
U.S. DEPARTMENT OF JUSTICE
walter.brown2@usdoj.gov
nicholas.j.kim@usdoj.gov
patrick.c.holvey@usdoj.gov
philip.c.sternhell@usdoj.gov

37