IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>*Plaintiff & Counterclaim-Defendant,*<br><br>v.<br><br>GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC,<br><br>*Defendants & Counterclaim Plaintiff.* | C.A. No. 19-2103-MN |

## GILEAD'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(a)

David B. Bassett
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888

Vinita C. Ferrera
Emily R. Whelan
George P. Varghese
Timothy A. Cook
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Ronald C. Machen
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel: (202) 663-6000
Fax: (202) 663-6363

Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Alexandra M. Ewing (#6407)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
ewing@rlf.com

*Counsel for Defendants Gilead Sciences, Inc. and Gilead Sciences Ireland UC and Counterclaim Plaintiff Gilead Sciences, Inc.*

**TABLE OF CONTENTS**

I. LEGAL STANDARD ........................................................................................................... 2

II. ARGUMENT ........................................................................................................................ 2

    A. THE GOVERNMENT HAS FAILED TO SHOW THAT GILEAD INDUCED INFRINGEMENT OF THE ASSERTED CLAIMS. ................................................................................................ 2

        1. The Truvada And Descovy Labels Do Not Instruct Patients Or Doctors To Directly Infringe The Asserted Claims. ........................................................................................ 3

        2. Gilead Had No Knowledge Of Infringement Or Specific Intent To Induce Infringement. ................................................................................................................... 4

        3. The Government Has Failed to Provide Any Evidence That GSIUC Induced Infringement. ................................................................................................................... 5

        4. The Government Has Failed to Show Joint Infringement That Would Attribute The Actions Of Patients To Their Prescribing Physicians. ................................................... 6

    B. THE GOVERNMENT LACKS AUTHORITY TO SUE FOR PATENT INFRINGEMENT. ........... 7

    C. GILEAD HAS PROVEN THAT THE ASSERTED CLAIMS ARE INVALID. ............................ 8

        1. The Asserted Claims Are Anticipated by Prior Public Use. .......................................... 8

        2. The Asserted Claims Are Anticipated By Prior Public Knowledge. ............................. 9

        3. The Asserted Claims Are Obvious. .............................................................................. 10

        4. Claim 18 Of The '423 Patent Is Not Enabled. ............................................................. 12

    D. THE GOVERNMENT HAS FAILED TO PROVE DAMAGES TO A REASONABLE DEGREE OF CERTAINTY. ................................................................................................................... 13

        1. Dr. McDuff Failed To Exclude Noninfringing Uses From His Royalty Base. .......... 13

        2. Dr. McDuff's 5-10% Royalty Rate Is Unsupported. .................................................. 13

        3. Dr. McDuff's 4% Royalty Rate Is Unsupported. ....................................................... 14

III. CONCLUSION ................................................................................................................... 15

I.  **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 50(a), Defendants Gilead Sciences, Inc. ("Gilead") and Gilead Sciences Ireland UC ("GSIUC"; together, "Defendants"), respectfully move the Court to grant judgment as a matter of law ("JMOL"). Gilead is entitled to JMOL on the issues of induced infringement, invalidity, and damages because no reasonable jury could find for the government.

Judgment as a matter of law "is appropriate when viewing the evidence in a light most favorable to the non-moving party—giving that party the benefit of all reasonable inferences—there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1365 (Fed. Cir. 2008)

II.  **ARGUMENT**

   A.  **THE GOVERNMENT HAS FAILED TO SHOW THAT GILEAD INDUCED INFRINGEMENT OF THE ASSERTED CLAIMS.**

The government has failed to present sufficient evidence that Gilead has induced direct infringement of the Asserted Claims. The government has failed to show a predicate act of direct infringement, which is required for inducement. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 920 (2014) ("There can be no indirect infringement without direct infringement[.]"). The government has also failed to show that: (1) Gilead knew that any induced acts constituted patent infringement; and (2) Gilead possessed specific intent to encourage direct infringement. *Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1335 (Fed. Cir. 2021). The government also did not show that Gilead took "active steps to induce" direct infringement. *Alpek Polyester, S.A. de C.V. v. Polymetrix AG*, 2021 WL 5974163, at *6 (Fed. Cir. Dec. 16, 2021).

### 1. The Truvada And Descovy Labels Do Not Instruct Patients Or Doctors To Directly Infringe The Asserted Claims.

The government's own evidence affirmatively *refuted* its claim that Gilead's labels instruct PrEP users to directly infringe the Asserted Claims. The government's expert Dr. Murphy admitted that, if a PrEP user follows Gilead's instructions—which tell users to practice safe sex, among other precautions—then they will not infringe. His argument was that PrEP users directly infringe when they ***do not*** follow Gilead's label. Dr. Murphy testified that: "we do the instruction, [PrEP users] just don't follow the instruction. So they're still infringing." Rough Tr. 642:3-5.

If direct infringement only happens when people ***disobey*** Gilead's instructions, then Gilead is not inducing infringement. Rather, Gilead's label encourages safe sex, which Dr. Murphy admitted does not infringe:

> Q.: What if a patient does all of those steps you just took and then does not engage in unsafe sex activity?
> A. Does not?
> Q. ***Does not actually engage in unsafe sex***, they come and get the prescription because they're concerned about the possibility that they might be exposed and then they don't do it. ***That person is not infringing, are they?***
> A. ***They're not infringing***, but then they don't need PrEP, so they should come off the PrEP."

Rough Tr. 640:22-641:5.

Thus, the government has not proven that Gilead encouraged, instructed, or induced infringement. And relatedly, it has not presented any evidence that Gilead actually ***caused*** anyone to infringe. Rather, Gilead's label ***discourages*** infringement. By Dr. Murphy's own theory, one only infringes by ***ignoring*** the label's instructions; any such direct infringement is not induced by Gilead.

3

### 2. Gilead Had No Knowledge Of Infringement Or Specific Intent To Induce Infringement.

Induced infringement requires proof that Gilead actively encouraged predicate acts of direct infringement, knowing that they were infringing, and with specific intent to encourage direct infringement. *Bio-Rad Labs., Inc*, 998 F.3d at 1335. A good-faith belief of noninfringement is a defense to inducement. As the Federal Circuit explained in *Roche Diagnostics Corp. v. Meso Scale Diagnostics*, a "subjective belief that [defendant] wasn't infringing or inducing infringement" defeats inducement liability. 30 F.4th 1109, 1119 (Fed. Cir. 2022).

The government has adduced no evidence that Gilead knew that any physician or patient actually directly infringed the government's patents. Moreover, Gilead held a good faith belief in noninfringement throughout the relevant period and holds it to this day, on two grounds. First, Gilead has a reasonable belief that people who do what its label says do not infringe—a belief Dr. Murphy validated. Dr. Murphy did not testify at all that Gilead knows that people who follow its label infringe the patents. Rough Tr. 640:22-641:5. To the contrary, he testified that individuals who do follow the label do not infringe. *Id.* at. 642:4-5.

Second, Gilead believed in good faith that the government was mistaken in asserting its patents against Gilead, because the government's failure to provide "prompt notification" of any invention under the Material Transfer Agreements indicated that no government patent actually covered Truvada for PrEP. Mr. Rooney testified that he was "shocked" when the government sued for infringement and that he "didn't think [Truvada for PrEP] was patentable" because "they hadn't notified us." *Id.* at 858:3-13. Mr. Alton testified in the same vein, explaining that he was "surprised" to learn that the government had sought patent protection and that he "felt like there must have been some mistake because it's so inconsistent with [the MTA] agreements[.]" *Id.* at 744:7-745:2. This good faith belief was bolstered by Dr. Heneine's silence regarding the patent,

4

despite numerous opportunities to disclose it to Gilead scientists and personnel. For example, in an email to Admiral Johnathan Mermin, Dr. Heneine confirmed that Gilead was still in the dark about the government's patents as late as 2016, writing: "Gilead and any other company that will market Truvada for PrEP will need to license or have an agreement with the US government. Gilead may decide to fight or litigate. ***They have not been approached yet***." JTX-106 (emphasis added).

The record is unequivocal that the government blindsided Gilead by seeking patent protection. Gilead believed throughout, and believes to this day, that it is not inducing infringement, and thus does not have the required knowledge or specific intent for inducement liability.

Furthermore, the government has not provided any evidence that Gilead subjectively believed that there was a high probability that a third party was infringing the claims of the government's patents and took deliberate steps to avoid learning of the infringement. *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).

### 3. The Government Has Failed to Provide Any Evidence That GSIUC Induced Infringement.

The government cannot prove GSIUC committed any inducing act that caused any alleged direct infringement. *See Global-Tech Appliances, Inc.,* at 760. No government witnesses testified to any active step by GSIUC to encourage alleged direct infringers to practice the claimed methods.

GSIUC has no role in the marketing, distribution, or sale of labeled Truvada or Descovy in the United States. The government has not demonstrated that GSIUC ever once performed or exerted control over product labeled for sale in the United States or control over the language stated in the label itself. In fact, Ms. Koomey testified, without contradiction, that "GSIUC has no responsibility over the marketing and sales of Descovy or Descovy for PrEP." Rough Tr. 514:4-

5

5. Trademark ownership and licensing is irrelevant to the issue of induced patent infringement, particularly given that any use of those trademarks in advertising must be first approved by the FDA, and for which GSI—not GSIUC—was the one submitting that information. Simply authorizing Gilead to use a trademark is insufficient as a matter of law to show induced infringement. *See L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F. Supp. 1294, 1303 (C.D. Cal. 1994) ("[T]he existence of a trademark licensing agreement and the conduct of limited quality monitoring activities pursuant thereto is not sufficient in and of itself to establish a licensor's intent to induce infringement by its licensee.").

### 4. The Government Has Failed to Show Joint Infringement That Would Attribute The Actions Of Patients To Their Prescribing Physicians.

To the extent the government relies on a theory of joint infringement that patients' actions are attributable to doctors who prescribe PrEP, it has failed to prove it. No reasonable jury could find that all steps of the claimed method were performed, and that the acts of the patient are attributable to the physician, either because the physician directs or controls the acts of the patient or because the physician and the patient have formed a joint enterprise. *See Akamai Techs. Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022-23 (Fed. Cir. 2015) (en banc).

Dr. Murphy admitted that a physician has no control over whether a patient actually follows a doctor's instructions. Again, he said: "we do the instruction, [the PrEP users] just don't follow the instruction." Rough Tr. 642:3-5. Advising a patient of general medical risks and benefits is not directing or controlling a patient's subsequent actions, much less their performance of the claimed method steps. Although the government asked Dr. Murphy about an "express or implied agreement" between the doctor and the patient, *id.* at 614:11-12, Dr. Murphy did not explain the nature or type of agreement. He certainly did not say that the patient was somehow obligated to the doctor to perform any claimed method steps. If anything, his testimony proved that he did not

have control over his patients since he had to "convince" them to partake in "curative treatments." *Id.* at 614:14-615:4.

The lack of direction or control is particularly evident because one of the claim steps here is that the patient potentially expose himself or herself to HIV. The government did not offer any evidence that physicians direct or control their patients to do that, or that the patients are somehow obligated to engage in risky behavior. It would be unethical for a physician to direct a patient to potentially expose themselves to HIV or secure their agreement to do so.

Nor is there any evidence that physicians condition any benefit on the patients practicing the elements of the claims, most notably potentially exposing themselves to HIV. The record shows that physicians prescribe PrEP in the hope that people will not expose themselves to HIV, but as a precaution in case they do. *See* Rough Tr. 1004:15-1005:23 (Flexner); 467:15-17 (Birnkrant); 641:21-642:4 (Murphy). The doctors do not condition a PrEP prescription on a patient committing to potentially expose themselves to HIV; again, that would be unethical.

Nor has the jury heard any evidence of a joint enterprise with a common purpose of practicing the claimed methods. The claims require that the patient expose themselves to HIV. There is no evidence that that is part of the doctor's purpose. Doctors and patients also do not share a common pecuniary interest. *Akamai Techs.*, 797 F.3d at 1023. Dr. Murphy provided no testimony on the subject. Thus, there is no basis for attributing any patient's performance of claim steps to the doctors, and thus no basis for finding that doctors directly infringe.

### B. THE GOVERNMENT LACKS AUTHORITY TO SUE FOR PATENT INFRINGEMENT.

The government has failed to establish statutory authority to sue for patent infringement. The U.S. government has sued a private U.S. company for allegedly infringing a patent that the government issued to itself. No court has ever ratified such an action; the only court that ever

7

considered whether the government could sue for patent infringement expressed skepticism before dismissing the case on other grounds. *Tektronix Inc. v. United States*, 351 F.2d 630, 631-32 (Ct. Cl. 1965).  The history of the government's actions, as well as the nature of the patent right, show that the government lacks inherent power to bring a patent-infringement suit.  Furthermore, as the government conceded in *Tektronix*, "there is no statute which specifically authorizes it to sue for infringement of its patents." 351 F.2d at 631. There is no indication that Congress ever intended for the U.S. government to become the world's largest non-practicing entity.

### C. GILEAD HAS PROVEN THAT THE ASSERTED CLAIMS ARE INVALID.

#### 1. The Asserted Claims Are Anticipated by Prior Public Use.

A reasonable jury would necessarily find, by clear and convincing evidence, that the Asserted Claims are anticipated by prior public use, notably Dr. Conant's prescriptions of Truvada for PrEP in 2004 and 2005.  Dr. Conant testified in detail as to his practice.  *See e.g.,* Rough Tr. 787:8-22 (describing his practice of prescribing Truvada for PrEP off-label).  His testimony was corroborated by contemporaneous reporting, DTX-509-510, and by specific details about a particular patient to whom he prescribed Truvada for PrEP—evidence the government itself brought out on cross-examination.  Rough Tr. 799:7-800:15. Dr. Fanning also stated that, from a meeting in December 2004, she understood "that men who had sex with men were using Tenofovir to prevent HIV," and that "a number of physicians, particularly in San Francisco, were writing prescriptions for them[.]" *Id.* at 886:21-887:8.

No reasonable jury could find that Dr. Conant's prescription of Truvada for PrEP in his clinical practice in 2004 and 2005 was anything but an anticipatory public use.

### 2. The Asserted Claims Are Anticipated By Prior Public Knowledge.

A reasonable jury would also necessarily find, by clear and convincing evidence, anticipation by prior public knowledge of the claimed invention in 2004 and 2005. In addition to Dr. Conant who was prescribing Truvada for PrEP to his patients, another physician, Dr. John Kaldor, knew about Truvada for PrEP and even approached Gilead in the United States in 2005 asking for Truvada to use in an HIV PrEP study. Rough Tr. 972:18-23.

Furthermore, Dr. Robert Grant's proposals in 2004 also show his knowledge of the invention. He was not a named inventor and yet he knew of Truvada for PrEP, and the government offered no evidence that his knowledge was somehow confidential. In fact, there is no evidence of any confidentiality agreement in this case. *See Dey, L.P. v. Sunovion Pharms., Inc.*, 715 F.3d 1351, 1355-56 (Fed. Cir. 2013) ("[I]f there is no confidentiality agreement in place, the skill and knowledge of those observing an invention can shed light on the degree to which it was kept confidential. Even limited disclosure to those who are skilled enough to know, understand, and easily demonstrate the invention to others, may mean that there was no reasonable expectation of secrecy[.]" (citation omitted)); *see also PeopleStrategy, Inc. v. Hearthstone Advisors LLC*, 2021 WL 1518621, at *6 (E.D. Pa. Apr. 16, 2021) (noting that labeling a section in a contract "Confidential Information" does not necessarily imply confidentiality obligations).

Dr. Grant admitted that he sent his proposals to others, including Gilead personnel, and spoke to many people about it. *See* DTX-182 (email from Dr. Grant where he states that he "talked over the idea of adding a [T]ruvada arm to the MSM trial with Mary Fanning"); *see also* Rough Tr. 410:16-413:2; 420:7-421:12. Dr. Fanning said she was sure that Dr. Ward Cates and Family Health International knew that Dr. Grant wanted to test Truvada for PrEP, because "Bob Grant would talk to everybody." Rough Tr. 888:6-14. Dr. Page confirmed numerous conversations

about Truvada for PrEP in which she and Dr. Grant participated, and that, by late 2004, Truvada for PrEP was not a secret. *Id.* at 920:19-22. And as Dr. Coates testified, "Truvada for PrEP was being discussed" as soon as Truvada was approved for HIV treatment in August 2004. *Id.* at 925:2-3.

Based on this evidence, a reasonable jury would necessarily find that the claimed invention was publicly known and therefore anticipated.

### 3. The Asserted Claims Are Obvious.

A reasonable jury would necessarily find, by clear and convincing evidence, that the Asserted Claims are invalid as obvious over the August 2004 Truvada Label combined with either Tsai 1995 or the 2004 California PEP Guidelines, or else over all three references combined. 35 U.S.C. § 103(a); *see also Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1290 (Fed. Cir. 2012).

These references disclose all claim limitations. The government did not even cross-examine Dr. Flexner on this fact. And a reasonable jury would necessarily find that a skilled artisan would have been motivated to combine these references to prevent immunodeficiency retroviral infection, including HIV infection. A person of ordinary skill in the art would also have reasonably expected success in obtaining the claimed subject matter.

First, the principle that a treatment drug can be administered before exposure to prevent infection is undisputed and age-old, going back to pre-exposure use of quinine to prevent malaria. Second, several witnesses confirmed that, in 1995, Dr. Tsai's ground-breaking paper proved that tenofovir provided complete protection from HIV. *See e.g.,* Rough Tr. 7:32:9-11 (Alton); 795:9-16 (Conant); 868:21-23 (Dieffenbach); 953:22; 945:6-8 (Flexner). Drs. Coates, Dieffenbach, Fanning, and Paxton confirmed that skilled artisans were openly discussing using Truvada for

10

PrEP as soon as Truvada was approved for HIV treatment in 2004.  *See id*. 925:2-926:8 (Coates); 874:4-6 (Dieffenbach); 886:13-23 (Fanning); 892:19-893:10 (Paxton).

The record is replete with evidence of obviousness, including the fact that Dr. Grant wrote a 2004 proposal to test Truvada for PrEP, *see* JTX-64, which combined the prior art disclosures, and stated that the rationale, or motivation, to use Truvada for PrEP came from the 1995 Tsai paper, the approval of Truvada for treatment (which indicated that it would work better than TDF alone), and Truvada's known use for PEP (reflected in the California PEP Guidelines).

Though JMOL of obviousness is rare, it is appropriate here, where the government's own invalidity expert ***recognized at the time*** that the specific prior art disclosures would be combinable, that there were good reasons to combine them, and that they would likely work.  At the very least, this made it obvious to try, with a reasonable expectation of success – as is confirmed by Dr. Conant's uncontroverted testimony that he was already doing it.

Secondary considerations do not move the needle.  There were no unexpected superior results compared to the closest prior art.  *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014) ("To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention.").  The closest prior art included Tsai 1995, which showed 100% protection using tenofovir, whereas the government's monkey study using Truvada showed only 50% (or, according to the government, at most 66.6%).  The Subbarao study is not the right comparison, because (as Dr. Flexner explained) the art, including Dr. Grant's own editorial, showed that that study had difficulties in getting the monkeys to even take the TDF study drug.  *See* Rough Tr. 986:10-987:24.  Moreover, the government has not offered sufficient evidence from which a

11

reasonable juror could find that commercial success, failure of others, copying, long-felt need, praise of the invention, or whether others sought or obtained rights to the patents from the government would defeat Gilead's overwhelming *prima facie* case of obviousness.

Similarly, any skepticism in the field was not about whether Truvada for PrEP would actually work, but rather, as Dr. Flexner testified, about whether people would take it properly, or become disinhibited and engage in more risky behavior. *See e.g.,* Rough Tr. 988:10-17 ("[T]here were concerns … about whether or not people would actually take it as prescribed, and if they didn't take it, would they become infected. And there were also concerns about things like disinhibition, if you knew you were on Truvada for PrEP, would you go out and have more risk behaviors, would you have more unprotected sex, because you were on Truvada and you didn't think you would get HIV."). Any long-felt need for prevention was not met by the claimed invention, but by others, including Dr. Grant who proposed to study Truvada for PrEP in 2004, and Dr. Conant who was already prescribing it to his patients.

Moreover, the simultaneous invention of the use of Truvada for PrEP by Dr. Grant, Dr. Conant, and Dr. Kaldor also confirms the claims' obviousness. See *Regents of the Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1295 (Fed. Cir. 2018) ("Simultaneous invention may serve as evidence of obviousness" because "it is evidence of the level of skill in the art.")

### 4. Claim 18 Of The '423 Patent Is Not Enabled.

A reasonable jury would also necessarily find by clear and convincing evidence that claim 18 of the '423 Patent is invalid for lack of enablement. As Dr. Flexner explained, the '423 specification did not enable a skilled artisan to carry out the claimed PrEP method using all tenofovir prodrugs, which is a set of thousands. Rough Tr. 990:21-991:12**.** Dr. Flexner discussed

all the *Wands* factors and showed why they support an invalidity finding.  *Id.* at 992:16-995:17. The government did not even cross-examine Dr. Flexner on enablement.

        **D.**    **THE GOVERNMENT HAS FAILED TO PROVE DAMAGES TO A REASONABLE DEGREE OF CERTAINTY.**

The government has failed to carry its burden to prove damages to a reasonable degree of certainty.  *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1310 (Fed. Cir. 2018). Specifically, the government has not provided sufficient evidence to determine a reasonable royalty attributable to any direct infringement actually caused by Gilead.  *See Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018).

        **1.**    **Dr. McDuff Failed To Exclude Noninfringing Uses From His Royalty Base.**

Dr. McDuff's demand includes all sales of Truvada and Descovy for PrEP, without any effort to remove noninfringing uses.  For instance, Dr. Murphy acknowledged that the relevant populations who follow Gilead's label and do not engage in unsafe sex are not exposed to the virus and thus do not infringe. Rough Tr. 640:22-641:4. Dr. McDuff made no effort to exclude those uses from his royalty base.

Similarly, Dr. McDuff did not exclude uses of Truvada and Descovy for PrEP by injection drug users, whose use is not induced by anything in Gilead's labels, which do not encourage the products' use by that population.

        **2.**    **Dr. McDuff's 5-10% Royalty Rate Is Unsupported.**

Dr. McDuff's Research and Development ("R&D") expenditure-based methodology—the basis for his proffered 5-10% range of rates—cannot support a verdict for two reasons. First, the methodology has no basis in either party's usual licensing approach and is thus not properly

13

considered as part of any reasonable-royalty analysis. *See Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002). Second, Dr. McDuff admits that his analysis of Gilead's R&D spending is not tied to HIV PrEP-related research, to any costs avoided by Gilead's alleged infringement, or to the government's costs related to PrEP. Dr. McDuff ignores all this and instead considers clinical trial-related costs and revenues that are mostly for unrelated products, and unasserted products. Furthermore, Dr. McDuff considers costs and revenues at times that are also mostly unrelated to PrEP research.

In short, his analysis is completely divorced from the accused products and the facts of the case, and that makes it insufficient to support a verdict. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

### 3. Dr. McDuff's 4% Royalty Rate Is Unsupported.

Dr. McDuff's 4% royalty rate failed to "carefully tie proof of damages to the claimed invention's footprint in the market place," because it discounts Gilead's inventive contributions. *Grain Processing Corp. v. American Maize–Prods. Co.*, 185 F.3d 1341, 1350 (Fed.Cir.1999) ("To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture."); *Riles*, 298 F.3d at 1312 ("[T]he market would pay [the patentee] only for his product.... [The patentee's damages] model [does not support the award because it] does not associate [the] proposed royalty with the value of the patented method at all, but with the unrelated cost of the entire … platform.")

Dr. McDuff acknowledged that Gilead has many patents covering Truvada and Descovy, including patents to the very compounds combined in Truvada and Descovy. And although his own report states that he should apportion the royalty to account for those inventive contributions, Dr. McDuff failed to adjust his proposed royalty rate.

Accordingly, the Court should grant JMOL based on the government's failure to prove damages to a reasonable certainty, and allow for recovery of nominal damages, or at most, recoupment of the government's costs.

### III.   CONCLUSION

For the reasons stated above, the Court should grant Gilead's Rule 50(a) motion for judgment as a matter of law. Gilead is entitled to relief on all grounds available to it, including under Federal Rule of Civil Procedure 50(a)(1)(A) and Federal Rule of Civil Procedure 50(a)(1)(B).

| | |
|---|---|
| Dated: May 8, 2023 | Respectfully submitted, |
| *Of Counsel:* | |
| | /s/ *Frederick L. Cottrell, III* |
| David B. Bassett | Frederick L. Cottrell, III (#2555) |
| WILMER CUTLER PICKERING | Kelly E. Farnan (#4395) |
|   HALE AND DORR LLP | Alexandra M. Ewing (#6407) |
| 7 World Trade Center | RICHARDS, LAYTON & FINGER, P.A. |
| 250 Greenwich Street | One Rodney Square |
| New York, NY 10007 | 920 North King Street |
| Tel: (212) 230-8800 | Wilmington, DE 19801 |
| Fax: (212) 230-8888 | Tel: (302) 651-7700 |
| | cottrell@rlf.com |
| | farnan@rlf.com |
| Vinita C. Ferrera | ewing@rlf.com |
| Emily R. Whelan | |
| George P. Varghese | |
| Timothy A. Cook | *Counsel for Defendants Gilead Sciences,* |
| WILMER CUTLER PICKERING | *Inc. and Gilead Sciences Ireland UC and* |
|   HALE AND DORR LLP | *Counterclaim Plaintiff Gilead Sciences, Inc.* |
| 60 State Street | |
| Boston, MA 02109 | |
| Tel: (617) 526-6000 | |
| Fax: (617) 526-5000 | |
| | |
| Ronald C. Machen | |
| WILMER CUTLER PICKERING | |
|   HALE AND DORR LLP | |
| 2100 Pennsylvania Avenue NW | |
| Washington, DC 20037 | |
| Tel: (202) 663-6000 | |
| Fax: (202) 663-6363 | |