08:33:08

                    IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF DELAWARE


     UNITED STATES OF AMERICA, )
                               ) VOLUME 4
               Plaintiff,      )
                               ) C.A. No. 19-2103(MN)
     v.                        )
                               )
     GILEAD SCIENCES, INC.,    )
     et al.,                   )
                               )
               Defendants.     )


                       Tuesday, May 9, 2023
                       9:00 a.m.
                       Bench Trial


                       844 King Street
                       Wilmington, Delaware


     BEFORE:  THE HONORABLE MARYELLEN NOREIKA
               United States District Court Judge



     APPEARANCES:


                     UNITED STATES ATTORNEY'S OFFICE
                     BY:  SHAMOOR ANIS, ESQ.
                     BY:  WALTER BROWN, ESQ.
                     BY:  PATRICK HOLVEY, ESQ.
                     BY:  PHILIP STERNHELL, ESQ.
                     BY:  LUCY GRACE D. NOYOLA, ESQ.
                     BY:  SOSUN BAE, ESQ.
                     BY:  LENA A. YUEH, ESQ.
                     BY:  MATTHEW DAVID TANNER, ESQ.
                     BY:  CARRIE ROSATO, ESQ.


                           Counsel for the Plaintiff

APPEARANCES CONTINUED:

          RICHARDS LAYTON & FINGER
          BY:  FREDERICK L. COTTRELL, ESQ.
          BY:  KELLY E. FARNAN, ESQ.

          -and-

          WILMER HALE
          BY:  DAVID B. BASSETT, ESQ.
          BY:  CHARLES COX, ESQ.
          BY:  RONALD C. MACHEN, ESQ.
          BY:  VINITA C. FERRERA, ESQ.
          BY:  GEORGE P. VARGHESE, ESQ.
          BY:  MARK FLEMING, ESQ.
          BY:  TIMOTHY COOK, ESQ.

                    Counsel for the Defendants


              _ _ _ _ _ _ _ _ _ _


                    THE COURT:  All right.  Good morning.  Everyone,

please be seated.  Before we begin, can you just give me an

outline of what I can expect?  No one wants to tell me.

Come on.

                    MR. MACHEN:  Your Honor, Ron Machen, on behalf

of Gilead.  Your Honor, we are we going to do -- after

Dr. Flexner is done, we're going to do some deposition

designations from Dr. Siegel, then we're going to read some

uncontested facts, and then I believe the government is

going to call Dr. Heneine and Dr. Kirby, and there may be

09:07:40 1    some more designations.

09:07:41 2              THE COURT:  Okay.  Thank you.  Does the

09:07:45 3    government have anything it's going to do?

09:07:47 4              MR. BROWN:  I think he just described it.  We'll

09:07:50 5    call Dr. Heneine and Dr. Kirby, and then we have some fairly

09:07:54 6    defined deposition designations.

09:07:56 7              THE COURT:  Okay.

09:07:57 8              MR. BASSETT:  Your Honor, one thing I could

09:08:00 9    address before we start questioning Dr. Flexner.  Yesterday

09:08:03 10   I over promised about submitting shortened versions of the

09:08:07 11   file histories.  As we went back and started looking at them

09:08:11 12   --

09:08:11 13             THE COURT:  I know it's hard because they lose

09:08:13 14   contact.

09:08:14 15             MR. BASSETT:  Particularly for the appellant

09:08:16 16   record.  We can submit them electronically.

09:08:19 17             THE COURT:  No, that's fine, it's more with the

09:08:21 18   jury trial, too, and prosecution history I worry about a

09:08:25 19   little less, my concern and I remember it from Judge

09:08:28 20   Robinson, you know, you put in a book, and then on appeal

09:08:31 21   you start arguing about Chapter 7 when Chapter 1, page 2 was

09:08:34 22   the only thing ever discussed.

09:08:36 23             MR. BASSETT:  I totally understand.

09:08:39 24             THE COURT:  But the prosecution history, I'll

09:08:42 25   let you go on that.

Flexner - direct

09:08:43 1          MR. BASSETT:  Thank you, Your Honor.  I

09:08:44 2   appreciate it.

09:08:44 3   BY MR. BASSETT:

09:08:51 4   Q.      Dr. Flexner, when we broke yesterday, we were

09:08:54 5   discussing the January CDC PEP guidelines.  And in

09:08:59 6   particular we were focusing on what objective evidence the

09:09:03 7   CDC PEP guidelines point to in order to show the efficacy of

09:09:07 8   post-exposure prophylaxis, do you recall that?

09:09:08 9   A.      Yes, I do.

09:09:11 10  Q.      And I think we touched on this, in your opinion,

09:09:13 11  Doctor, could a prospective post-exposure prophylaxis

09:09:16 12  clinical trial have been formed in your opinion?

09:09:19 13  A.      No, as I mentioned yesterday, it was considered

09:09:22 14  unethical to conduct a prospective randomized control trial

09:09:28 15  for intervention in nonoccupational post-exposure

09:09:31 16  prophylaxis.

09:09:31 17  Q.      And in light of the objective evidence in the CDC

09:09:36 18  guidelines, and other information in the CDC guidelines, do

09:09:41 19  you understand that the disclosures in those guidelines

09:09:44 20  teach the efficacy of PEP?

09:09:46 21  A.      Yes.  As I was beginning to say yesterday, the

09:09:55 22  January 2015 CDC guidelines discussed a process for

09:09:58 23  inhibiting establishment of HIV infection in humans and

09:10:02 24  therefore teach the preamble of claim 12 of the '509 patent.

09:10:07 25  Q.      And what's the next limitation of claim 12 as shown

Flexner - direct

09:10:10 1   in your demonstrative?

09:10:11 2   A.    The next limitation is step A, selecting an

09:10:16 3   uninfected human that does not have the self replicating

09:10:19 4   infection.

09:10:20 5   Q.    I would like to now direct your attention to the

09:10:22 6   summary that appears on page 3 of the CDC PEP guidelines.

09:10:26 7   A.    Yes.

09:10:26 8   Q.    What do you understand the summary to say about the

09:10:29 9   recommendation for the timing and duration of the

09:10:33 10  administration of the antiretroviral in the CDC PEP

09:10:36 11  guidelines?

09:10:36 12  A.    I have prepared a demonstrative on that, if you can

09:10:40 13  advance these slides.  So the highlighted sentence indicates

09:10:43 14  that nonoccupational post-exposure prophylaxis should be

09:10:51 15  initiated within 72 hours after the exposure, and the second

09:10:57 16  sentence states that antiretroviral medications should be

09:11:02 17  initiated as soon as possible after exposure.

09:11:05 18  Q.    Do the CDC PEP guidelines say anything else about the

09:11:09 19  timing of the administration of post-exposure prophylaxis?

09:11:12 20  A.    I think those are the two most important points made

09:11:12 21  in the summary.

09:11:20 22  Q.    If we could look at your next slide.

09:11:24 23  A.    So I think that the CDC PEP guidelines of

09:11:29 24  January 2015 discuss selecting an uninfected human and

09:11:36 25  discuss the timing of administration of drugs and therefore

Flexner - direct

09:11:39 1   teach the limitations of -- the limitation of step A.

09:11:44 2   Q.      What's the next limitation of claim 12 on your

09:11:47 3   demonstrative?

09:11:47 4   A.      The next limitation is step B, administering to the

09:11:51 5   uninfected human a combination comprising a pharmaceutically

09:11:55 6   effective amount of Emtricitabine and Tenofovir or Tenofovir

09:11:58 7   ester.

09:11:59 8   Q.      And Doctor, does this claim require the

09:12:01 9   administration of the claimed combination more than once?

09:12:05 10  A.      No, it does not.

09:12:06 11  Q.      So if you could please turn to the CDC PEP guidelines

09:12:10 12  and look at the first full paragraph in the right-hand page,

09:12:14 13  right-hand column of page 10.  Do the CDC PEP guidelines

09:12:19 14  disclose the administration of FTC and Tenofovir or

09:12:22 15  Tenofovir ester for PEP?

09:12:24 16  A.      Yes.  This paragraph includes discussion of the

09:12:31 17  combination of Emtricitabine and Tenofovir, which is also

09:12:38 18  known as Truvada.

09:12:42 19  Q.      And do the CDC PEP guidelines elsewhere disclose the

09:12:48 20  administration of FTC and Tenofovir or Tenofovir ester for

09:12:51 21  PEP?

09:12:51 22  A.      Yes, as you can see in Table 2, which includes

09:12:56 23  preferred regimens for nonoccupational PEP that

09:13:01 24  Emtricitabine and Tenofovir is included in the combinations

09:13:04 25  in that -- in the preferred regimens.

Flexner - direct

09:13:07 1    Q.      And what, if anything, do the CDC PEP guidelines

09:13:12 2    teach about administering two versus three drugs?

09:13:16 3    A.      Well, in the highlighted sentences in the paragraph

09:13:18 4    on the right, first of all, the CDC PEP guidelines of

09:13:22 5    January 2015 indicate that at the time there was no evidence

09:13:29 6    that a three-drug HAART, or an anti-HIV drug regimen is

09:13:34 7    likely to be more effective than a two drug regimen and also

09:13:38 8    indicate that clinicians and patients who are concerned

09:13:41 9    about appearance and toxicity issues associated with a three

09:13:45 10   drug regimen might consider the use of a two drug regimen

09:13:49 11   and they specifically mention a combination of two reverse

09:13:53 12   transcript inhibitors, which would include Tenofovir or TDF

09:13:59 13   and Emtricitabine or FTC.

09:14:00 14   Q.      In your opinion do the CDC PEP guidelines teach the

09:14:04 15   administering step of claim 12?

09:14:06 16   A.      Yes, because the CDC PEP guidelines of January 2005

09:14:12 17   discuss administering to uninfected humans a combination of

09:14:17 18   Emtricitabine and the Tenofovir ester, they do teach that

09:14:21 19   limitation.

09:14:22 20   Q.      What is the next limitation of claim 12 as shown in

09:14:25 21   your demonstrative?

09:14:25 22   A.      The next limitation is the thereby clause, there by

09:14:29 23   inhibiting establishment of the self replicating infection

09:14:33 24   with the immunodeficiency virus in the human.

09:14:36 25   Q.      If you could turn to page 4 of the CDC PEP

Flexner - direct

09:14:42 1     guidelines.  What if anything, do you understand the CDC PEP

09:14:45 2     guidelines to say about the efficacy of PEP?

09:14:48 3     A.      Well, as you can see on this demonstrative, the CDC

09:14:54 4     PEP guidelines discuss a number of pieces of available

09:14:59 5     evidence for the possible benefit of nonoccupational PEP in

09:15:02 6     preventing establishment of an HIV infection in an exposed

09:15:06 7     human and that includes animal studies, post-natal

09:15:11 8     prophylaxis, or prevention of mother to child transmission,

09:15:16 9     as we discussed yesterday, observational studies of

09:15:19 10    nonoccupational exposure, post-exposure prophylaxis

09:15:26 11    nonoccupational tests, and also case reports.

09:15:28 12    Q.      So in your opinion, doctor, do the CDC PEP guidelines

09:15:31 13    teach the thereby limitation of claim 12?

09:15:34 14    A.      Yes, because the CDC PEP guidelines of January 2005

09:15:39 15    discuss using PEP to inhibit establishment of the self

09:15:43 16    replicating infection, they do teach that limitation of

09:15:47 17    claim 12 of the '509 patent.

09:15:49 18    Q.      And what is the final limitation of claim 12 as shown

09:15:52 19    in your demonstrative?

09:15:52 20    A.      The final limitation is wherein the combination is

09:15:56 21    administered orally.

09:15:58 22    Q.      What do you understand the combination to refer to?

09:16:01 23    A.      The combination would refer to the two drugs, in this

09:16:04 24    case emtricitabine and Tenofovir or Tenofovir ester.

09:16:09 25    Q.      Do the CDC PEP guidelines disclose the oral

Flexner - direct

09:16:13 1    administration of FTC and Tenofovir or Tenofovir ester?

09:16:16 2    A.    Yes, if you will advance to the next slide.  So in

09:16:20 3    Table 2, the CDC PEP guidelines discuss administering

09:16:28 4    emtricitabine and Tenofovir, and in Table 3, the CDC PEP

09:16:32 5    guidelines specifically mention emtricitabine and Tenofovir

09:16:37 6    in combination given as Truvada, which they indicate is one

09:16:43 7    tablet once daily.  Since tablets are designed to be

09:16:50 8    administered orally, then the CDC PEP guidelines of January

09:16:53 9    of 2005 do teach that limitation, that is administering the

09:16:58 10   combination orally.

09:16:58 11   Q.    Doctor, your demonstrative uses claim 12 of the '509

09:17:02 12   patent as an example.  What is your opinion regarding the

09:17:07 13   materiality of the CDC PEP guidelines with respect to the

09:17:10 14   other disclaimed claims and the asserted claims?

09:17:14 15   A.    My opinion is that the CDC PEP guidelines of

09:17:17 16   January 2005 are material to the patentability of the

09:17:22 17   disclaimed claims and the asserted claims in the other

09:17:25 18   patents.

09:17:25 19         THE COURT:  So we're doing every single claim of

09:17:28 20   every patent?

09:17:29 21         MR. BASSETT:  Correct, Your Honor.

09:17:33 22   Q.    Doctor, to repeat what you said yesterday, why in

09:17:37 23   your opinion are these CDC PEP guidelines relative to the --

09:17:41 24         THE COURT:  You don't need to repeat, I got it,

09:17:45 25   they anticipate something, so they make the other ones

Flexner - cross

09:17:47 1    obvious.  When you said the other patents, I wasn't sure if

09:17:50 2    you meant the '509 or every single claim of all of these

09:17:55 3    patents.

09:17:56 4              MR. BASSETT:  Well, no, yes, Your Honor.

09:17:58 5              THE COURT:  The testimony was slightly

09:18:00 6    ambiguous.  I just want to make sure I understood.

09:18:03 7              MR. BASSETT:  Thank you, Your Honor.

09:18:04 8    BY MR. BASSETT:

09:18:05 9    Q.      Dr. Flexner, have you provided an opinion of whether

09:18:07 10   the CDC PEP guidelines from January 2005 are cumulative from

09:18:11 11   the material that is before the examiner?

09:18:13 12   A.      Yes, I have.

09:18:13 13   Q.      What is that opinion?

09:18:14 14   A.      My opinion is that the CDC guidelines of January 2005

09:18:18 15   are not cumulative.

09:18:19 16   Q.      And why is that?

09:18:21 17   A.      That's because these guidelines were not provided to

09:18:25 18   the examiner until 2017.  Once they were provided to the

09:18:31 19   examiner, they were part of an obviousness rejection of

09:18:35 20   these patents four months later, and to me that indicates

09:18:39 21   that the examiner thought they were noncumulative.

09:18:42 22             MR. BASSETT:  No further questions, Your Honor.

09:18:44 23             THE COURT:  All right.  Thank you.

09:18:51 24                   CROSS-EXAMINATION

09:18:52 25   BY MR. BROWN:

Flexner - cross

09:18:53 1    Q.      Good morning, Dr. Flexner.

09:18:54 2    A.      Good morning, Mr. Brown.

09:18:55 3    Q.      I think this will be our last time.

09:18:57 4    A.      I'm a little sad about that.

09:19:00 5            THE COURT:  Don't make promises you can't keep.

09:19:04 6    Q.      So for ease of reference I want to start with

09:19:07 7    questions I had from your binders that Mr. Bassett gave you.

09:19:12 8    And specifically I would like to start at Tab 5 which is

09:19:18 9    Volume II.

09:19:46 10   A.      Yes.  Got it.

09:19:47 11   Q.      All right.  And I believe earlier you recognized this

09:19:52 12   document as the prosecution history of the '509 patent?

09:19:56 13   A.      Yes.

09:19:56 14   Q.      I would like to direct your attention to page 290.

09:20:16 15   A.      Yes.

09:20:18 16   Q.      Maybe we can get this on the screen as well.  JTX 5.

09:20:25 17   Page 290.  You are on that page?

09:20:31 18   A.      I am, yes.

09:20:33 19   Q.      And you recognize this as an information disclosure

09:20:36 20   statement by the applicant?

09:20:37 21   A.      Yes, I do.

09:20:37 22   Q.      And when you look at the bottom of that page, it

09:20:41 23   lists a number of nonpatent literature documents that are

09:20:45 24   being disclosed.  Do you see that?

09:20:46 25   A.      I do, yes.

Flexner - cross

09:20:47 1    Q.      And one of them is leads with the author Winston, A,

09:20:54 2    et al., do you see that?

09:20:55 3    A.      Yes I do.

09:20:55 4    Q.      Did you review this particular document in making

09:20:59 5    your opinions or forming your opinions in this case?

09:21:01 6    A.      I did -- I reviewed this -- I reviewed the

09:21:07 7    prosecution history, and it's been three years, but I

09:21:11 8    believe I did take a look at this reference, but I don't

09:21:14 9    recall exactly when or to what extent I did.

09:21:16 10   Q.      Okay.  Let's go ahead a few pages to page 302 which I

09:21:22 11   believe is the Winston document that was cited.  First of

09:21:27 12   all, you understand this means this document was before the

09:21:30 13   examiner as of the '509 patent; correct?

09:21:33 14   A.      Yes, that's right.

09:21:34 15   Q.      And do you know that this document was before the

09:21:37 16   examiner in all four prosecutions?

09:21:41 17   A.      I -- I -- I believe that would be the case, yes, if

09:21:46 18   it were present here.

09:21:48 19   Q.      Okay.  And looking at the article, which we have the

09:21:52 20   page on the screen, the top of the page, it's entitled the

09:21:57 21   use of a triple nucleoside-nucleotide regimen for

09:22:02 22   nonoccupational HIV post-exposure prophylaxis.  Correct?

09:22:04 23   A.      Yes.

09:22:08 24   Q.      And looking at the objective section, it reads,

09:22:15 25   nonoccupational post-exposure prophylaxis N-PEP for HIV is

09:22:19 1    recommended after high risk sexual exposure.  Because of the

09:22:24 2    high incidences of intolerable side effects observed with

09:22:31 3    pro inhibitors with Zidovudine based nPEP regimens, our unit

09:22:37 4    changed standard nPEP treatment to 28 days of

09:22:41 5    Tenofovir/Stavudine, and it gives the initial.  It goes on

09:22:48 6    to say, "The aim of this study was to compare side effects

09:22:50 7    to numbers of individuals completing nPEP before and after

09:22:53 8    this change."

09:22:54 9              Do you see that?

09:22:54 10   A.      I do, yes.

09:22:55 11   Q.      That was an nPEP regimen that was being studied for

09:23:00 12   safety and tolerance, correct?

09:23:02 13   A.      Yes.

09:23:03 14   Q.      And that's an important consideration for a PEP

09:23:07 15   regimen?

09:23:08 16   A.      Yes, as I've said before, safety and tolerability is

09:23:16 17   very important in considering PEP regimens.

09:23:18 18   Q.      And 3TC is closely related in structure and function

09:23:23 19   to FTC, is that correct?

09:23:24 20   A.      Yes.

09:23:25 21   Q.      Looking down further at the conclusions, it states

09:23:30 22   TDF-3TC-D4T, which I guess is Stavudine, is significantly

09:23:46 23   better tolerated than ZDV-3TC or ZDV-3TC-NFV as nPEP results

09:23:50 24   in a greater number of individuals completing 28 days of

09:24:01 25   treatment, do you see that?

Flexner - cross

A.      Yes.

Q.      Again, tolerance is an important issue with antiviral regimens because you want people to finish the regimen?

A.      Of course that's true, I will point out that TDF plus 3TC plus D4T Stavudine is a three-drug regimen, not a two-drug regimen.  And D4T is a drug that was known in 2004 to have some significant and in some cases irreversible long-term toxicities as compared to regimens like Truvada that did not contain that drug.  So this was a study of three drug regimens rather than two drug regimens.

Q.      So you're saying D four T was known to be toxic?

A.      Yes, it produces peripheral neuropathy, which is damage to the nerves in the hand and feet, and that can be irreversible, it's also been associated with life threatening pancreatitis.  So those are side effects that were known in 2004 and that a person prescribing a nonoccupational PEP would have considered when trying to decide on what regimen to choose.

Q.      Somebody looking at the tolerance of this regimen, one of skill in the art would know that Truvada would have a better safety profile, correct?

A.      A person of skill in the art would know that in general the three drug regimens were more toxic than two drug regimens, but this article doesn't talk about two drug regimens.

09:25:27 1   Q.      Okay.  But the Truvada label does talk about the two

09:25:32 2   drug FTC/TDF combination, correct?

09:25:35 3   A.      It does.

09:25:36 4   Q.      And the Truvada label was cited in the prosecution of

09:25:40 5   the '333 patent, correct?

09:25:42 6   A.      To my recollection, yes.

09:25:43 7   Q.      And in the subsequent prosecutions of the '191 and

09:25:47 8   '423; correct.

09:25:51 9   A.      To my recollection, yes.

09:25:52 10  Q.      And since we're on that topic, the Truvada label, I

09:25:54 11  think you testified with regarding the asserted claims

09:25:57 12  before the jury, the Truvada label teaches co-administration

09:26:01 13  of those two drugs by themselves, correct?

09:26:04 14  A.      The Truvada label, so the Truvada label in 2004 did

09:26:09 15  not teach administration of those two drugs by themselves.

09:26:13 16  The Truvada label in 2004 was a treatment label, and at the

09:26:17 17  time in 2004, Truvada was only approved for treatment.  And

09:26:21 18  therefore the recommendation in the Truvada label was to use

09:26:25 19  it in combination with other effective antiretroviral drugs

09:26:31 20  for treatment.  As you recall the 2004 Truvada label said

09:26:34 21  nothing about prevention.

09:26:36 22  Q.      But it does teach the co-administration of TDF and

09:26:36 23  FTC in a single pill?

09:26:41 24  A.      In combination with other drugs, yes.

09:26:42 25  Q.      Going back to this article, if I can direct your

Flexner - cross

09:26:47 1    attention to the last page, I believe, or next to last page

09:26:52 2    of the article which is page 307, JTX 5, 307?

09:26:57 3    A.      Yes.

09:26:58 4    Q.      Do you see just before references there is the last

09:27:02 5    paragraph there?

09:27:03 6    A.      Yes.

09:27:04 7    Q.      And it talks about future options for nPEP regimens

09:27:10 8    including once daily regimen of TDF-3TC and D4T, it's easier

09:27:18 9    to read this.  "Using the D4T extended release, XR, once

09:27:22 10   daily formulation in development, regimens containing NNRTIs

09:27:29 11   other than nevirapine may have increased efficacy as nPEP in

09:27:34 12   view of Efavirenz containing regimens showing support over

09:27:39 13   triple nucleoside regimens in the treatment of chronic HIV

09:27:42 14   infection."

09:27:43 15           Do you see that?

09:27:43 16   A.      Yes.

09:27:43 17   Q.      It goes on to say with the development of new NNRTIs

09:27:50 18   such as TMC125 and new fixed dose combination preparations

09:27:56 19   such as emtricitabine, Tenofovir/Efavirenz, further work to

09:28:00 20   assess the safety and tolerability of these regimens is

09:28:02 21   needed.  Do you see that?

09:28:02 22   A.      Yes.

09:28:04 23   Q.      So this article contemplates the combination of

09:28:10 24   Emtricitabine, Tenofovir and Efavirenz, correct?

09:28:12 25   A.      It mentions that as a possible regimen for an

Flexner - cross

09:28:16 1    application in post-exposure prophylaxis, and I'll point out

09:28:20 2    at the time there was a preparation in development called

09:28:24 3    Atripla, which was emtricitabine, Tenofovir, Disoproxil

09:28:28 4    Fumarate, and Efavirenz for treatment, not for prevention.

09:28:33 5    Q.    Would one of skill in the art know that if this was a

09:28:37 6    possibility for nPEP that you could improve the tolerability

09:28:41 7    by dropping Efavirenz?

09:28:47 8    A.    So I need to look at take date of the publication of

09:28:49 9    this article.  So this is -- well this is 2005 and I can't

09:28:59 10    -- let me find the month on this.  It's issue six, so I'm

09:29:07 11    assuming this is July of 2005.  So this would have been

09:29:10 12    published after the CDC PEP guidelines of January 2005.  And

09:29:17 13    as I said before, it doesn't mention two drug regimens, it

09:29:21 14    only mentions three drug regimens.  So I don't think this

09:29:25 15    reference teaches two drug regimens at all.  Could a person

09:29:29 16    of skill in the art looking at this in July of 2005 have

09:29:34 17    extrapolated that it would have been safer and possible to

09:29:39 18    get rid of the Efavirenz and just use emtricitabine

09:29:45 19    Tenofovir, yes it could have, but even more direct to that

09:29:48 20    would have been the CDC 2005 PEP guidelines which

09:29:51 21    specifically mention using Truvada for PEP.

09:29:55 22    Q.    So the information was more accessible on CDC PEP but

09:29:55 23    it was accessible through other ways?

09:30:01 24    A.    Yeah, I think this is -- as I said before, this does

09:30:02 25    not speak directly to two drug regimens, this only speaks to

09:30:10 1   three drug regimens.

09:30:11 2   Q.      But it does speak to PEP?

09:30:13 3   A.      It does speak to nonoccupational PEP, yeah, that's

09:30:16 4   the focus of the study.

09:30:18 5   Q.      During the jury trial, you relied on as one of your

09:30:23 6   principal references the Tsai 1995 paper, correct?

09:30:26 7   A.      Yes.

09:30:27 8   Q.      The one published in Science, correct?

09:30:30 9   A.      Yes.

09:30:31 10  Q.      And I believe you stated at trial that with regard to

09:30:34 11  the thereby clause you thought that was taught by Tsai all

09:30:38 12  by itself, correct?

09:30:39 13  A.      Yes, I did state that.

09:30:41 14  Q.      And Tsai is a PrEP study, not a PEP study, correct?

09:30:45 15  A.      It was both a PrEP and a PEP study, 15 of the monkeys

09:30:49 16  got Tenofovir before exposure, and ten of the monkeys got

09:30:53 17  Tenofovir after exposure.

09:30:55 18  Q.      So it generated data on the use of Tenofovir alone

09:30:58 19  for PrEP and the use of Tenofovir alone for PEP?

09:31:02 20  A.      Yes.

09:31:02 21  Q.      It led many skilled in the art, as Dr. Grant

09:31:06 22  described, to start using PEP with Tenofovir?

09:31:15 23  A.      I don't recall Dr. Grant making that connection.  But

09:31:21 24  he might have said that, I just don't recall that.

09:31:24 25  Q.      But you would agree that that's still your opinion

Flexner - cross

09:31:27 1    across the board that Tsai gives you the efficacy needed for

09:31:33 2    the thereby clause for all the claims of the patents,

09:31:38 3    correct?

09:31:38 4    A.      Well, keep in mind that Tsai was only a single drug,

09:31:43 5    Tenofovir.  And so the claims of the -- the asserted claims

09:31:52 6    involve a two-drug combination.  Tsai teaches using

09:31:56 7    Tenofovir to prevent establishment of the self replicating

09:32:00 8    infection with an HIV like virus.

09:32:03 9    Q.      But you believe that Tsai alone gives you the

09:32:06 10   efficacy required for the thereby clause?

09:32:09 11   A.      Yes, I think it does.

09:32:11 12   Q.      Because you say it shows full protection?

09:32:15 13   A.      A hundred percent completely protected monkeys from

09:32:18 14   that challenge, yes.

09:32:21 15   Q.      Let's move to, this will be binder number 4 of 4 from

09:32:28 16   your counsel.  We're going to go to tab number 12, which

09:32:50 17   will be the CDC PEP guidelines.

09:32:52 18   A.      Yes.

09:32:52 19   Q.      This will be JTX 65?

09:32:56 20   A.      Yep, I have it.

09:32:56 21   Q.      Let's just take a moment and see if we can get that

09:33:02 22   on the screen.  Specifically I want you to go to page 4 of

09:33:12 23   the document.

09:33:12 24   A.      Yes.

09:33:16 25   Q.      At the bottom of the page in the left-hand column, I

09:33:21 1  believe on several occasions with your counsel you cited the

09:33:24 2  section evidence of possible benefits from nPEP.  Do you see

09:33:28 3  that?

09:33:28 4  A.      Yes.

09:33:29 5  Q.      I believe you talked about with your counsel that

09:33:33 6  there is no clinical data that backs up any claim of

09:33:36 7  efficacy that you see in this document.  Correct?

09:33:39 8  A.      No, I actually disagree with that.  There were

09:33:42 9  studies done of Zidovudine for post-exposure prophylaxis in

09:33:48 10 the occupational setting.  And an indicated benefit of

09:33:54 11 Zidovudine in earlier anti-HIV antiretroviral nucleoside.

09:34:02 12 Q.      Let me be more specific, does this document itself

09:34:05 13 provide any data supporting a Truvada PrEP regimen and the

09:34:10 14 efficacy of such a regimen?

09:34:13 15 A.      So I believe this document provides data that are

09:34:19 16 relevant to the effectiveness of Truvada in the

09:34:23 17 post-exposure prophylaxis setting, yes.

09:34:25 18 Q.      They're not specific to the use of Truvada?

09:34:31 19 A.      Let me go through the references and I can give you a

09:34:35 20 more direct answer to that.  Unfortunately there is 126 of

09:34:40 21 them.  So suffice it to say, without going through every one

09:34:52 22 of these references, there are references here that would

09:34:55 23 indicate to a person of skill in the art that there was an

09:34:58 24 expectation of success for using Truvada for post-exposure

09:35:02 25 prophylaxis in January of 2005.  And the fact that the

Flexner - cross

09:35:06 1   Centers for Disease Control are recommending Truvada -- or

09:35:10 2   recommending Tenofovir and emtricitabine and Truvada for

09:35:15 3   post-exposure prophylaxis indicates that a very smart group

09:35:20 4   of experts believe there is enough data to support that to

09:35:24 5   put it in writing as a recommendation for people that are

09:35:27 6   actually going to be prescribing that drug to people that

09:35:30 7   have been exposed to a potentially life threatening

09:35:34 8   infection.

09:35:34 9   Q.      As you sit here, you're not aware of any cited data

09:35:38 10  specifics to the use of Truvada for PEP cited in this

09:35:42 11  document?

09:35:42 12  A.      For reasons that we mentioned there was not and there

09:35:46 13  would not be a post-exposure prophylaxis study using

09:35:49 14  Tenofovir in humans because it was considered unethical.

09:35:52 15  But there were animal studies which were relevant to the use

09:35:56 16  of Truvada for prevention in humans that I think were part

09:36:05 17  of the decision making, must have been part of the decision

09:36:08 18  making for the guidelines.

09:36:10 19  Q.      I guess what I'm asking here, does this document cite

09:36:14 20  animal, obviously there are no human studies, we agree on

09:36:16 21  that, are you aware of any animal studies using Truvada for

09:36:21 22  PEP cited in this document as you sit here?

09:36:25 23  A.      Well, I believe the Tsai study was cited in the

09:36:32 24  September 2005 guidelines, but I don't know that it was

09:36:34 25  cited in these guidelines.

Flexner - cross

09:36:35  1    Q.      And Tsai was cited in the prosecution of all four

09:36:38  2    patents; correct?

09:36:39  3    A.      Yes.

09:36:40  4    Q.      Okay.  Looking at this particular section, the last

09:36:44  5    sentence I don't think was discussed with your counsel, I

09:36:47  6    know you discussed other parts of this.  But it reads, these

09:36:51  7    data indicate that nPEP might sometimes reduce the risk for

09:36:57  8    HIV infection after nonoccupational exposures."  Do you see

09:37:00  9    that?

09:37:00  10   A.      I do.

09:37:01  11   Q.      If somebody read that and said to you that's not

09:37:05  12   exactly a ringing endorsement of efficacy, what would be

09:37:08  13   your response?

09:37:09  14   A.      I would call this a "bet hedging" statement, I think

09:37:15  15   the people who wrote this were aware of the limitations of

09:37:18  16   the strength of the data backing up this statement and this

09:37:24  17   was 2005.  They wanted to be careful that they not over

09:37:31  18   state the benefits given the evidence, most of which was

09:37:36  19   indirect.  Regardless, I think everyone recognized the need

09:37:39  20   for effective post-exposure prophylaxis in 2005.  We had to

09:37:42  21   give people something.  And given what was out there in

09:37:42  22   2005, I think the goal would be to give them the best

09:37:52  23   available intervention we could possibly give them.

09:37:55  24           But I think the uncertainty expressed in this

09:38:02  25   sentence is a reflection of the fact that there was not

Flexner - cross

09:38:06 1    absolute certainty for the effectiveness of a

09:38:09 2    nonoccupational PEP in this setting given the kind of data

09:38:13 3    that had to be used to back up the recommendations.

09:38:17 4    Q.    Nonetheless, you believe that this document insofar

09:38:22 5    as it identifies Truvada as a preferred regimen, the fact

09:38:29 6    that it is supported by this statement that the Truvada for

09:38:34 7    PEP regimen might sometimes reduce the risk for HIV

09:38:38 8    infection, you think that would teach the use of Truvada for

09:38:42 9    PEP in an effective manner?

09:38:43 10   A.    I think it would absolutely teach the use of Truvada

09:38:47 11   for PEP in the context of these guidelines because if you as

09:38:55 12   a care provider were facing somebody who had a

09:39:01 13   nonoccupational exposure and needed treatment, needed

09:39:04 14   intervention to prevent establishment of the HIV infection,

09:39:08 15   looking at that list of options, I think Truvada at the time

09:39:12 16   would have been very high on your list given its -- given

09:39:16 17   its relative benefits to other regimens in terms of safety

09:39:20 18   and tolerability.

09:39:22 19   Q.    And the safety and tolerability information you

09:39:26 20   referenced, that's included in the Truvada label as well,

09:39:26 21   correct?

09:39:26 22   A.    It is, yes.

09:39:26 23   Q.    And that was cited again in the prosecution of the

09:39:32 24   '333 patent and subsequent patents?

09:39:34 25   A.    Yes.

Flexner - cross

09:39:35 1    Q.      Let's go to Table 2 on page 11.  You mentioned that

09:39:51 2    Truvada is a preferred regimen in this document; correct?

09:39:55 3    A.      Yes.

09:39:56 4    Q.      And we say preferred regimen for PEP?

09:40:01 5    A.      Yes.  It's part of preferred regimens for PEP.

09:40:07 6    Q.      And looking at preferred regimens at the top, the

09:40:14 7    first is NNRTI-based regimens, do you see that?

09:40:20 8    A.      Yes.

09:40:20 9    Q.      That's Efavirenz, plus Lamivudine, or Emtricitabine,

09:40:25 10   plus Zidovudine, or Tenofovir, do you see that?

09:40:31 11   A.      Yes.

09:40:31 12   Q.      So that gives you, if I'm doing my math correctly,

09:40:38 13   there is four options there just based on that?

09:40:43 14   A.      Yes.  Four options plus Efavirenz.

09:40:47 15   Q.      That's the limit of my statistics ability.  But this

09:40:50 16   is a three drug combination, correct?

09:40:52 17   A.      That's right, both of the regimens in this table are

09:40:54 18   three-drug combinations.  And you have to remember at the

09:40:58 19   time, again, this is -- I would call it a bet-hedging

09:41:02 20   exercise.  The concern was if we're trying to prevent

09:41:06 21   infection with a life threatening infection, let's throw

09:41:10 22   everything at it we possibly can to make sure we get it

09:41:14 23   right.  And as we said before, if two drugs are better than

09:41:17 24   one, then three drugs should be better than two, and so

09:41:21 25   maybe what we ought to be recommending is three drug

Flexner - cross

09:41:24 1  regimens instead of two drug regimens and I think that was

09:41:28 2  the basis for the recommendations in this part of the table.

09:41:31 3  Q.    So then below that, the options are Kaletra plus

09:41:39 4  Lamivudine or Emtricitabine plus Zidovudine, do you see

09:41:43 5  that?

09:41:43 6  A.    Yes.

09:41:43 7  Q.    Depending on if you pick Lamivudine or Emtricitabine,

09:41:48 8  those are two different options there, right?

09:41:49 9  A.    Right.

09:41:50 10 Q.    That's another three drug combination?

09:41:53 11 A.    Yes.

09:41:53 12 Q.    Looking at the top if you were to pick the Truvada,

09:41:57 13 Emtricitabine and Tenofovir, first of all, it's paired also

09:42:00 14 with Efavirenz as a paired regimen, correct?

09:42:04 15 A.    That's right.

09:42:05 16 Q.    And that's the same combination we saw at the end of

09:42:08 17 the Winston article we were looking at?

09:42:11 18 A.    That's right, keep in mind there was a coformulated

09:42:14 19 three drug single tablet regimen of those three drugs being

09:42:12 20 developed in 2005.

09:42:20 21 Q.    And that was Atripla?

09:42:22 22 A.    That was Atripla, for treatment, not for prevention.

09:42:22 23 Q.    For treatment.  So with Truvada included with

09:42:30 24 Efavirenz, that's 1 of 6 different options as a preferred

09:42:35 25 regimen (E F A V I R E N Z) ?

Flexner - cross

09:42:40  1    A.      Well, Truvada, I wouldn't call that a separate

09:42:43  2    choice, it was a co-formulation of Emtricitabine and

09:42:47  3    Tenofovir and you could combine that with Efavirenz and that

09:42:52  4    could hit your nucleoside combination.

09:42:54  5    Q.      If you pick that option, you still have five other

09:42:57  6    options if you didn't want to use Truvada for some reason?

09:43:01  7    A.      Are you including the protease inhibitor option?

09:43:06  8    Q.      Right, correct?

09:43:08  9    A.      Yeah, yes, that's would be correct.

09:43:10 10    Q.      I didn't --

09:43:11 11    A.      That would be one way of looking at it.  I was

09:43:14 12    looking only at the NNRTI-based combinations.

09:43:17 13    Q.      In addition to the preferred regimens, it also lists

09:43:21 14    a number of alternative regimens.  If we can maybe zoom in

09:43:27 15    on that.

09:43:28 16    A.      Yes.

09:43:32 17    Q.      And these are all three or more drug PEP regimens,

09:43:37 18    correct?

09:43:38 19    A.      Yes.  Again, these were three drug regimens for the

09:43:40 20    reason I mentioned before, if two drugs are good, maybe

09:43:47 21    three drugs are better, and it's a life threatening

09:43:51 22    infection, at the time there was still I would say some

09:43:54 23    uncertainty about whether it should be 2 or 3 drugs and

09:43:57 24    that's also addressed in the guidelines.

09:44:00 25    Q.      Okay.  And it's fair to say without getting into the

Flexner - cross

1   numbers, have you calculated how many different drugs are

2   mentioned here?

3   A.      I haven't, but I will also point out that a person of

4   skill in the art looking at this table in 2005 wouldn't have

5   said, oh my God, there is 50 possible regimens here, which

6   one am I going to pick.  I think in 2005 it was already

7   known that of the nucleoside or nucleotide options on this

8   table, by far the best tolerated would have been Lamivudine,

9   3TC, which we talked about, Emtricitabine, FTC, which we

10  talked about, and TDF, Tenofovir Disoproxil Fumarate, which

11  we talked about.  And Lamivudine was only co-formulated at

12  the time with Zidovudine, which was known to be a very toxic

13  drug.  Tenofovir and Emtricitabine were co-formulated, that

14  was two of the best tolerated drugs on this entire list in

15  one co-formulated one tablet once a day regimen.  And would

16  have risen to the top of the choices for a health care

17  provider or a person of skill in the art reading this in

18  2005.

19  Q.      And you also could get information about the

20  favorable tolerability of TDF and FTC from the 2004 Truvada

21  label, correct?

22  A.      Yes.

23  Q.      Let's turn to the government binder, hopefully that's

24  up there.  Actually it's not up there.  Let me do that.

25          MR. BROWN:  May I approach, Your Honor?

Flexner - cross

09:45:47 1          THE COURT:  Yes.

09:45:56 2    Q.     I would like to direct your attention, Dr. Flexner,

09:46:00 3    to what's been marked as PTX 1040, which I think is the

09:46:19 4    second tab?

09:46:21 5    A.     I have a PTX 1040 and it is a document entitled

09:46:28 6    United States Patent and Trademark Office, Gilead Sciences

09:46:32 7    versus United States of America.

09:46:35 8    Q.     Okay.  Do you recognize this as a decision on the

09:46:38 9    inter partes review petition regarding the '509 patent?

09:46:44 10   A.     Yes, I do.

09:46:45 11   Q.     Did you consider that decision in rendering opinions

09:46:52 12   in your expert report?

09:46:54 13   A.     I did, yes.

09:46:55 14          MR. BROWN:  At this time Your Honor, I would

09:46:56 15   like to move for admission of PTX 1040.

09:46:59 16          MR. BASSETT:  No objection.

09:47:00 17          THE COURT:  Thank you.  It's admitted.

09:47:03 18          (PTX Exhibit No. 1040 was admitted into

09:47:03 19   evidence.)

09:47:02 20   BY MR. BROWN:

09:47:04 21   Q.     Let's go to page 5 of the document.

09:47:07 22   A.     Yes.

09:47:10 23   Q.     If you can look at the chart near the top?

09:47:18 24   A.     Yes.

09:47:20 25   Q.     It states "petitioners asserts the following grounds

Flexner - cross

09:47:23  1   of un-patentability."  And it has references, and it lists

09:47:27  2   two references, Smith and Szekeres, do you see that?

09:47:30  3   A.     Yes.

09:47:31  4   Q.     And looking at down below at footnote two, do you

09:47:37  5   recognize Smith to be the CDC guidelines from January 2005?

09:47:59  6   A.     Well, this is -- let me just check this.

09:48:08  7   Q.     Sure.

09:48:09  8   A.     This is 19 pages.  I believe the January guidelines

09:48:12  9   were 21 pages.  Yeah, it is -- it is the same reference, but

09:48:36 10   this says 19 pages and my -- yeah, this --

09:48:45 11   Q.     Your copy goes to 21?

09:48:48 12   A.     Yeah.  Well this goes to 21 pages, this goes to

09:48:52 13   21 pages, but I think that includes the cover sheet.  So

09:48:56 14   that may be why it's 19 pages here.

09:49:00 15   Q.     Going back to the top of the page, it indicates that

09:49:07 16   Smith was asserted to anticipate claims 12 to 18 of the '509

09:49:13 17   patent.  Do you see that?

09:49:15 18   A.     Yes.

09:49:15 19   Q.     And Smith in combination with a reference called

09:49:20 20   "Szekeres" was asserted as rendering claims 1 to 18 as

09:49:22 21   obvious, do you see that?

09:49:22 22   A.     Yes.

09:49:22 23   Q.     If we go ahead to a little bit later in the document,

09:49:35 24   page 24.

09:49:47 25   A.     Yes.

Flexner - cross

09:49:49 1   Q.      First of all, it starts out at the top saying "first,

09:49:55 2   Smith expressly teaches post-exposure prophylaxis PEP, not

09:49:59 3   pre-exposure prophylaxis PrEP."  Do you see that?

09:50:02 4   A.      Yes.

09:50:03 5   Q.      Do you agree with that statement?

09:50:06 6   A.      Yes.  The Dawn Smith, et al. guidelines from

09:50:11 7   January 2005 address post-exposure prophylaxis, not

09:50:16 8   pre-exposure prophylaxis directly.

09:50:20 9   Q.      Then I want to direct your attention to the last

09:50:24 10  paragraph on page 24.

09:50:27 11  A.      Yes.

09:50:28 12  Q.      And I'll just read this for you.  "Petitioner argues

09:50:32 13  that Smith discloses the limitation of inefficacy

09:50:36 14  inherently."  I won't read all the citation.  It goes on to

09:50:40 15  say, but as patent owner points out, Smith itself discloses

09:50:45 16  nPEP is not 100 percent effective.  At the next page at the

09:50:49 17  top of page 25, it says and as explained above, petitioner's

09:50:55 18  own product label for Truvada shows that the combination

09:50:58 19  therapy of FTC and DTF, that may have been a typo, is not

09:51:02 20  always effective in preventing acquisition of HIV.  Do you

09:51:02 21  see that?

09:51:02 22  A.      Yes.

09:51:02 23  Q.      It concludes with this statement, "we are thus

09:51:10 24  unpersuaded that petitioner has demonstrated that Smith

09:51:14 25  discloses, expressly or inherently, the claimed efficacy."

09:51:18 1  Do you see that?

09:51:18 2  A.      I do.

09:51:21 3  Q.      Do you disagree with that statement?

09:51:23 4  A.      Well, I think there seems to be some confusion about

09:51:28 5  statements of -- about the limitation of the efficacy of PEP

09:51:36 6  or PrEP.  Neither PEP nor PrEP are 100 percent efficacious,

09:51:41 7  I think everyone agrees to that.  So citing the fact that

09:51:48 8  the Smith indicates -- that Smith discloses that nPEP is not

09:51:57 9  a hundred percent effective to me is not relevant to the

09:52:02 10 issue at hand here because the patent, the government

09:52:09 11 scientists who filed this patent, they weren't claiming a

09:52:11 12 hundred percent efficacy, their experiment didn't show a

09:52:16 13 hundred percent efficacy, they showed 50 percent efficacy.

09:52:19 14 Q.      So do you believe Smith expressly discloses the

09:52:22 15 claimed efficacy based on what it actually is?

09:52:24 16 A.      I think a person of skill in the art could have read

09:52:28 17 Smith in 2005, and knowing that if an intervention like

09:52:34 18 Truvada was effective if given immediately after exposure to

09:52:40 19 a virus, it should be at least as effective if not more

09:52:45 20 effective when given before the exposure to the same virus.

09:52:49 21 Q.      Do you understand this petition was wholly denied by

09:52:52 22 the Patent Office?

09:52:53 23 A.      I do understand that, yes.

09:52:55 24 Q.      And it was done on the basis that the petitioner has

09:52:59 25 not demonstrated a reasonable likelihood of prevailing on

Flexner - cross

09:53:03  1    any grounds set forth in the petition?

09:53:05  2    A.      I understand that that's what the person examining

09:53:08  3    this objection -- I understand that's the conclusion they

09:53:12  4    came to.

09:53:13  5    Q.      And the CDC PEP guidelines, they weren't cited in the

09:53:17  6    '509 prosecution, that's your understanding?

09:53:19  7    A.      Not until 2017.

09:53:22  8    Q.      So they also weren't cited in the prosecution of the

09:53:26  9    '333 patent, is that your understanding?

09:53:28 10    A.      The same issue, not until 2017.

09:53:30 11    Q.      Let's go ahead in your binder to one tab, PTX 1041?

09:53:40 12    A.      Yes.

09:53:42 13    Q.      If we could turn -- first of all, do you recognize

09:53:45 14    this document?

09:53:46 15    A.      I do, yes.

09:53:46 16    Q.      Is this the IPR decision regarding the petition that

09:53:51 17    was filed on the '333 patent?

09:53:53 18    A.      Yes.

09:53:54 19              MR. BROWN:  I move for admission of PTX 1041,

09:53:57 20    Your Honor.

09:53:57 21              MR. BASSETT:  No objection, Your Honor.

09:53:58 22              THE COURT:  Okay.  Thank you.

09:54:01 23              (PTX Exhibit No. 1041 was admitted into

09:54:02 24    evidence.)

09:54:02 25    BY MR. BROWN:

Flexner - cross

09:54:02 1    Q.      Let's go to page 7 of the document.  Looking again,

09:54:09 2    in this particular petition, it's noted that petitioner

09:54:13 3    challenged claims 12 to 17 as being anticipated by Smith,

09:54:21 4    correct?

09:54:21 5    A.      Yes.

09:54:21 6    Q.      And Smith again is the CDC PEP January 2005

09:54:26 7    guidelines, right?

09:54:27 8    A.      Yes, the same one.

09:54:28 9    Q.      And then Smith in combination with Szekeres was

09:54:31 10   asserted as rendering claims 1 to 17 as obvious, correct?

09:54:36 11   A.      Yes.

09:54:38 12   Q.      Looking ahead in the document to page 28.  Under the

09:54:56 13   header pre-exposure prophylaxis at the middle of the page.

09:55:01 14   Do you see that?

09:55:01 15   A.      Yes.

09:55:02 16   Q.      It notes again in this petition, in this decision,

09:55:07 17   sorry in this IPR decision, that Smith expressly teaches

09:55:11 18   post-exposure prophylaxis, PEP, not pre-exposure prophylaxis

09:55:15 19   PrEP, do you see that?

09:55:16 20   A.      Yes.

09:55:16 21   Q.      And you don't disagree with that?

09:55:18 22   A.      I do not disagree with that, right.

09:55:21 23   Q.      Going to the next page, top of the page, there is a

09:55:25 24   header there, efficacy requirement?

09:55:27 25   A.      Yes.

Q.      And then I just want to draw your attention to the

last two sentences beginning with because.  It says because

Smith does not describe administering the claimed

combination of agents as PrEP, it does not provide any

information about the efficacy of such a combination for

PrEP.  Do you agree with that statement?

A.      Well, again, as I said earlier, I think a person of

skill in the art reading PEP guidelines in 2005 recommending

the need for prevention in the pre-exposure prophylaxis

setting and knowing what tools were available to do that,

Smith is an endorsement of a use of a drug like Truvada for

prevention, and I think by extension a drug used for

prevention in the postexposure setting, as I said earlier,

should be at least as effective if not more effective than

the drug in the pre-exposure prophylaxis setting.

Q.      This does not say all that?

A.      This does not say that, no.

            MR. BROWN:  I have no further questions, Your

Honor.

            THE COURT:  Thank you.  Redirect.

            MR. BASSETT:  No redirect, Your Honor.

            THE COURT:  All right.  Thank you.  Thank you,

Dr. Flexner.

            THE WITNESS:  Thank you.

            MR. COX:  Your Honor, at this time Gilead plans

09:57:31 1   to offer prior trial testimony of Dr. Susan Siegel on

09:57:36 2   June 27, 2022, in the Court of Federal Claims.  Dr. Susan

09:57:41 3   Siegel is a patent agent of the law firm Klarquist Sparkman,

09:57:44 4   LLP, who prosecuted the patents-in-suit and who provided

09:57:48 5   testimony on among other things the prosecution history of

09:57:51 6   each of the CDC PrEP patents and subsequent continuations.

09:57:56 7   Dr. Siegel's prior testimony will be read into the record.

09:57:58 8   It takes about 30 minutes, 65 percent of the time, about

09:58:02 9   20 minutes should be charged to Gilead, and 35 percent of

09:58:04 10  the time --

09:58:05 11          THE COURT:  All right.  I don't want to hear

09:58:06 12  this, you can submit it and we'll just dock you 30, whatever

09:58:10 13  the time is, but I can't sit here while you read to me about

09:58:14 14  a prosecution history.

09:58:16 15          MR. COX:  With the designations, we move to

09:58:19 16  admit JTX 1 into evidence, which is referenced as DX 418.

09:58:23 17  The testimony also references JX 23 which has been

09:58:28 18  previously submitted into evidence as JTX 5.  Thank you Your

09:58:31 19  Honor.

09:58:31 20          THE COURT:  Is there any objection to that,

09:58:34 21  Mr. Brown?

09:58:35 22          MR. BROWN:  No objection, Your Honor.

09:58:36 23          THE COURT:  All right.  Those two are admitted

09:58:37 24  and we'll just include the time.  And we will read it.

09:58:41 25          Can you give us a copy of it so I can read it?

09:58:51 1              MR. COX:  Yes.  Thank you, Your Honor.

09:59:03 2              THE COURT:  I feel like I'm doing it for all of

09:59:05 3    us.

09:22:24 4              (Trial Testimony of Susan Siegel:)

09:22:24 5    Q.      And thank you, Dr. Siegel, for appearing here today.

09:22:30 6    Dr. Siegel, you're a patent agent, correct?

09:22:35 7    A.      Yes.

09:22:36 8    Q.      And you work at a law firm called Klarquist Sparkman?

09:22:51 9    A.      Correct.

09:22:52 10   Q.      And you have prosecuted patents for the United States

09:22:58 11   Government?

09:22:58 12   A.      Correct.

09:22:59 13   Q.      And, in fact, you have prosecuted patents for the

09:23:57 14   government for over 20 years, correct?

09:24:02 15   A.      Correct.

09:24:03 16   Q.      And you are currently prosecuting patents for the

09:24:07 17   U.S. Government, right?

09:24:09 18   A.      Correct.

09:24:10 19   Q.      Please turn to Tab 2 in your binder, which is DTX

09:24:17 20   418, which has already been admitted into evidence.  DTX 418

09:24:22 21   is a copy of U.S. Patent No. 9,044,509, correct?

09:24:30 22   A.      Correct.

09:24:31 23   Q.      And we can refer to DTX 418 as the '509 patent,

09:24:38 24   correct?

09:24:57 25   A.      Correct.

09:24:57 1  Q.      You personally prosecuted this patent, correct?

09:25:02 2  A.      Yes.

09:25:03 3  Q.      The application that resulted in the '509 patent was

09:25:07 4  U.S. Patent Application No. 11/669547, correct?

09:25:14 5  A.      Correct.

09:25:18 6  Q.      And we can refer to that as the '547 application,

09:25:23 7  correct?

09:25:24 8  A.      Correct.

09:25:24 9  Q.      As of today, you're listed as an agent of record for

09:25:35 10 the '547 application, correct?

09:25:38 11 A.      Correct.

09:25:39 12 Q.      Please turn to Tab 3 in your binder, which is one of

09:25:44 13 the parties' joint exhibits that's marked as JX 23?

09:25:52 14 A.      Yes.

09:25:59 15 Q.      Fair enough.  Joint Exhibit 23 is a certified

09:26:08 16 prosecution history of the '547 application, correct?

09:26:14 17 A.      Correct.

09:26:15 18 Q.      You took over prosecution of the '547 application in

09:26:26 19 2014, correct?

09:26:28 20 A.      Yes.

09:26:31 21 Q.      Before you took over prosecution of the '547

09:26:42 22 application, the proposed claims had been rejected as

09:26:48 23 obvious, correct?

09:26:50 24 A.      Yes.

09:26:56 25 Q.      And the '547 application was filed on January 31st,

09:26:56 1    2007, correct?

09:27:07 2    A.     Correct.

09:27:07 3    Q.     If we take a look at page 29 of Joint Exhibit 23, the

09:27:14 4    claims that were originally filed with the '547 application

09:27:18 5    begin on this page, correct?

09:27:21 6    A.     Yes.

09:27:21 7    Q.     Original claim one of the '547 application states, "a

09:27:28 8    process of protecting a primate host from self-replicating

09:27:35 9    infection by an immunodeficiency retrovirus be comprising

09:27:47 10   administering to the primate host a combination of a

09:27:52 11   pharmaceutically effective amount of a nucleoside reverse

09:28:01 12   transcriptase inhibitor and a pharmaceutically effective

09:28:05 13   amount of a nucleotide reverse transcriptase inhibitor prior

09:28:11 14   to exposure to the immunodeficiency retrovirus," correct?

09:28:19 15   A.     Yes, that is correct.

09:28:20 16   Q.     The word "Tenofovir" doesn't appear anywhere in

09:28:27 17   original claim one of the '547 application, correct?

09:28:31 18   A.     Correct.

09:28:31 19   Q.     And the word "emtricitabine" does not appear anywhere

09:28:40 20   in original claim 1 of the '547 application, correct?

09:28:50 21   A.     Correct.

09:28:51 22   Q.     Let's take a look at page 163 of the joint

09:28:55 23   Exhibit 23.

09:28:57 24   A.     Sorry?

09:28:58 25   Q.     163.

09:29:06  1   A.      No, just there's a lot of pages.

09:29:10  2   Q.      And if it's easier, there is a screen to your right?

09:29:14  3   A.      Oh, I see.  Thank you.

09:29:16  4   Q.      The document that begins at page 163 is a

09:29:20  5   communication from the Patent Office related to the '547

09:29:24  6   application, correct?

09:29:30  7   A.      Yes.

09:29:31  8   Q.      And it's dated September 17th, 2009, correct?

09:29:36  9   A.      Yes.

09:29:37 10   Q.      If you turn to the next page, which is page 164, this

09:29:43 11   is an office action summary that was sent with the

09:29:47 12   September 17th, 2009, communication, correct?

09:29:52 13   A.      Yes.

09:29:53 14   Q.      The Patent Office rejected each pending claim of the

09:30:00 15   '547 application in this office action, correct?

09:30:05 16   A.      Correct.

09:30:06 17   Q.      And if you please turn to the next page of JX 23,

09:30:14 18   which is page 165, with the September 17th, 2009, office

09:30:22 19   action, the Patent Office rejected each pending claim on

09:30:27 20   obviousness grounds, correct?

09:30:30 21   A.      Correct.

09:30:31 22   Q.      Please turn to page 247 of Joint Exhibit 23.

09:30:37 23   A.      Okay.

09:30:38 24   Q.      The document that begins on this page is a

09:30:42 25   communication from the Patent Office related to the '547

09:30:50 1    application that's dated May 26th, 2010, correct?

09:30:56 2    A.      Correct.

09:30:58 3    Q.      And if you turn to the next page, this is an office

09:31:02 4    action summary that was sent with that May 26th, 2010,

09:31:10 5    communication; correct?

09:31:14 6    A.      Correct.

09:31:29 7    Q.      The Patent Office again rejected each pending claim

09:31:32 8    of the '547 application in this office action, correct?

09:31:37 9    A.      Correct.

09:31:37 10   Q.      And if you turn to the next page, which is page 249,

09:31:42 11   the Patent Office rejected each pending claim of the '547

09:31:47 12   application on obviousness grounds, correct?

09:31:52 13   A.      Correct.

09:31:52 14   Q.      Please turn to page 413 of Joint Exhibit 23.

09:31:58 15   A.      13, okay.

09:32:00 16   Q.      The document that begins on this page is a

09:32:03 17   communication from the Patent Office related to the '547

09:32:07 18   application that's dated May 23rd, 2013, correct?

09:32:14 19   A.      Correct.

09:32:15 20   Q.      If you turn to the next page, this is an office

09:32:15 21   action summary that was sent with the May the 23rd, 2013,

09:32:30 22   communication, correct?

09:32:32 23   A.      Correct.

09:32:32 24   Q.      The Patent Office again rejected each pending claim

09:32:37 25   of the '547 application in this May 23rd, 2013, office

09:32:52 1    action, correct?

09:32:53 2    A.      Correct.

09:32:58 3    Q.      In the May 23rd, 2013, office action, the Patent

09:33:04 4    Office rejected each pending claim on obviousness grounds,

09:33:09 5    correct?

09:33:09 6    A.      Obviousness.  Assuming claim 8 is canceled, which I

09:33:15 7    can't find anywhere.

09:33:16 8    Q.      Okay.  So all of the claims were rejected on

09:33:20 9    obviousness grounds with this on office action, correct?

09:33:24 10   A.      Yes.

09:33:25 11   Q.      Okay.  Let's turn to page 452.  The document that

09:33:29 12   begins at page 452 of Joint Exhibit 23 is a communication

09:33:35 13   from the Patent Office related to the '547 application

09:33:44 14   that's dated November 7th, 2013, correct?

09:33:49 15   A.      Correct.

09:33:50 16   Q.      If you turn to the next page, this is, again, an

09:33:55 17   office action summary that was sent with the November 7th,

09:34:02 18   2013, communication, correct?

09:34:04 19   A.      Correct.

09:34:05 20   Q.      And the Patent Office again rejected each pending

09:34:12 21   claim of the '547 application in this office action,

09:34:24 22   correct?

09:34:24 23   A.      Correct.

09:34:25 24   Q.      And if you turn to the next page, which is page 454,

09:34:30 25   the Patent Office rejected each of the pending claims on

09:34:34 1    obviousness grounds, correct?

09:34:37 2    A.      Correct.

09:34:37 3    Q.      So as of November 7th, 2013, the claims of the '547

09:34:44 4    application has been rejected at least four times, correct?

09:34:50 5    A.      Correct.

09:34:59 6    Q.      Have you ever spoken with any of the named inventors

09:35:03 7    on the '547 application?

09:35:05 8    A.      I have spoken to two of the named inventors.

09:35:08 9    Q.      Dr. Gerardo Garcia-Lerma is one of the named

09:35:16 10   inventors, correct?

09:35:19 11   A.      Yes.

09:35:19 12   Q.      And you have spoken with him, correct?

09:35:24 13   A.      Yes.

09:35:25 14   Q.      Dr. Walid Heneine is another of the named inventors,

09:35:57 15   correct?

09:35:59 16   A.      Yes.

09:35:59 17   Q.      And you have spoken with him, correct?

09:36:03 18   A.      Yes.

09:36:03 19   Q.      And since you took over prosecution, you have

09:36:11 20   regularly communicated with Dr. Heneine, correct?

09:36:11 21   A.      At different times during prosecution of different

09:36:20 22   patent applications, I have spoken with Dr. Heneine.

09:36:28 23   Q.      You've spoken with Dr. Heneine at least every year

09:36:35 24   since 2014, correct?

09:36:37 25   A.      I have not spoken to him recently.  Probably not in

09:36:41 1  the last couple years.

09:36:43 2  Q.      Okay.  But in 2014, you communicated with him,

09:36:48 3  correct?

09:36:49 4  A.      I don't recall.  I think there's a declaration in

09:36:53 5  here that has a date on it, so I would have communicated to

09:36:58 6  him at that time.  I just don't recall what date that was.

09:37:03 7  Q.      Right.  You were at least involved in correspondence

09:37:15 8  with Dr. Heneine in 2014, correct?

09:37:18 9  A.      Yes.  Yes.

09:37:19 10  Q.      Let's take a look at page 768 of Joint Exhibit 23.

09:37:25 11  A.      Okay.

09:37:27 12  Q.      The document that begins on this page is an

09:37:30 13  information disclosure statement that was submitted with the

09:37:36 14  '547 application, correct?

09:37:42 15  A.      Yes.

09:37:43 16  Q.      And you signed this information disclosure statement,

09:37:47 17  correct?

09:37:47 18  A.      Yes.

09:37:48 19  Q.      You filed this information disclosure statement with

09:38:02 20  the Patent Office on June 21st, 2014, correct?

09:38:02 21  A.      Yes.

09:38:02 22  Q.      And if you would, please, turn to the next page,

09:38:14 23  which is page 769.  You disclosed a total of eleven

09:38:14 24  references to the Patent Office on this date, correct?

09:38:22 25  A.      On this date, yes.

09:38:25 1   Q.      One of the references you disclosed to the Patent

09:38:37 2   Office on July 21st, 2014, was an article by Grant that was

09:38:43 3   published in the New England Journal of Medicine, correct?

09:38:49 4   A.      Yes.

09:38:49 5   Q.      And the Grant article had not been submitted to the

09:38:55 6   Patent Office during prosecution of the '547 application

09:38:59 7   before you submitted it on July 21st, 2014, correct?

09:39:16 8   A.      Yes.   I believe that that particular reference is

09:39:20 9   discussed in some of the office action responses because

09:39:24 10  it's a big volume.   I don't remember if those were before or

09:39:28 11  after, but there was an office action that referred to this,

09:39:34 12  an office response that referred to this.   I don't know what

09:39:43 13  date that was on.

09:39:44 14  Q.      Okay.   The document that begins on page 655 is the

09:39:50 15  article by Grant that you submitted with that July 21st,

09:39:56 16  2014, information disclosure statement, correct?

09:39:59 17  A.      Yes, that's correct.

09:40:20 18  Q.      The Grant article refers to a clinical trial,

09:40:24 19  correct?

09:40:25 20  A.      Yes.

09:40:25 21  Q.      And the Grant article describes a study in which

09:40:33 22  2,499 HIV seronegative men or transgender women who have sex

09:40:42 23  with men received a combination of two oral antiretroviral

09:40:52 24  drugs or placebo once daily, correct?

09:41:00 25  A.      Yes.

09:41:00  1    Q.       One of those drugs was Emtricitabine, correct?

09:41:16  2    A.       Yes.

09:41:16  3    Q.       The other drug was TDF, correct?

09:41:19  4    A.       Yes.

09:41:20  5    Q.       That's the same combination of drugs that's in

09:41:25  6    Truvada, correct?

09:41:26  7    A.       Yes.

09:41:26  8    Q.       The Grant study concluded that oral FTC-TDF provided

09:41:35  9    protection against the acquisition of HIV infection among

09:41:40 10    the subjects, correct?

09:41:43 11    A.       Yes.

09:41:45 12    Q.       And to be clear, the subjects in the Grant article

09:41:50 13    were humans, correct?

09:41:51 14    A.       Yes.

09:41:52 15    Q.       The subjects in the Grant study were not monkeys,

09:41:58 16    correct?

09:41:58 17    A.       No -- well, yes, it is correct.  They were not

09:42:03 18    monkeys.

09:42:04 19    Q.       Let's turn to page 561 of Joint Exhibit 23.

09:42:11 20    A.       561, okay.

09:42:15 21    Q.       The document that begins on this page is an amendment

09:42:20 22    that was filed on the '547 application, correct?

09:42:37 23    A.       Correct.

09:42:37 24    Q.       And that was filed on July 21st, 2014, correct?

09:42:41 25    A.       Correct.

09:42:43 1   Q.      And this is the amendment that you were referring to

09:42:49 2   a moment ago when we were looking at the information

09:42:53 3   disclosure statement, correct?

09:42:55 4   A.      Yes.  I just didn't remember the date of it.

09:43:09 5   Q.      And this is the same day that you filed the

09:43:13 6   information disclosure statement containing the Grant

09:43:17 7   article, right?

09:43:18 8   A.      Yes.

09:43:18 9   Q.      Okay.  And if you would please turn to the last page

09:43:23 10  of the amendment, which is on page 578 of Joint Exhibit 23.

09:43:29 11  A.      Um-hum.

09:43:39 12  Q.      That's your signature, correct?

09:43:41 13  A.      Yes.

09:43:42 14  Q.      So you signed this amendment?

09:43:44 15  A.      I did.

09:43:45 16  Q.      If you would please turn back to page 3 of the

09:43:49 17  amendment, which is page 563 in the exhibit.

09:43:53 18  A.      Um-hum.

09:44:02 19  Q.      You amended some of the existing claims of the '547

09:44:06 20  application with this amendment, correct?

09:44:06 21  A.      Yes.

09:44:10 22  Q.      And you also added new claims to the '547 application

09:44:15 23  of this amendment, correct?

09:44:24 24  A.      Yes.

09:44:26 25  Q.      Specifically, you added claims 22 through 40,

09:44:30 1    correct?

09:44:31 2    A.      Yes.

09:44:31 3    Q.      And the word "Emtricitabine" does not appear in new

09:44:37 4    claim 22, correct?

09:44:40 5    A.      Yes.

09:44:40 6    Q.      The word "Tenofovir" does appear in new claim 22,

09:44:50 7    correct?

09:44:51 8    A.      Yes.

09:44:51 9    Q.      The phrase "Tenofovir Disoproxil Fumarate" appears in

09:44:59 10   new claim 22, correct?

09:45:01 11   A.      Yes.

09:45:01 12   Q.      And that's the long name for TDF, correct?

09:45:06 13   A.      Correct.  It's easier to say TDF.

09:45:10 14   Q.      It is.  Claim 22 also refers to a primate host,

09:45:18 15   correct?

09:45:18 16   A.      It does.

09:45:20 17   Q.      And that would include a human, correct?

09:45:24 18   A.      Yes.

09:45:25 19   Q.      That would include a homosexual man, correct?

09:45:43 20   A.      Yes.

09:45:44 21   Q.      That would include a heterosexual man, correct?

09:45:50 22   A.      It includes all humans.

09:45:52 23   Q.      If you would please turn to page 9 of the amendment,

09:45:56 24   which is on the page of the exhibit that is 569.  You

09:46:06 25   submitted remarks with the July 21st, 2014, amendment,

09:46:11 1   correct?

09:46:12 2   A.      Yes.

09:46:12 3   Q.      And these are arguments that you made to the examiner

09:46:18 4   to persuade her to issue the amended claims, correct?

09:46:22 5   A.      Yes.  This is a standard format.  The examiner's a

09:46:28 6   man.

09:46:28 7   Q.      All right.  Please turn to page 16 of the amendment,

09:46:32 8   which is on page 576 of the exhibit.

09:46:37 9   A.      Um-hum.

09:46:39 10  Q.      Section 3 is entitled "evidence of unexpected

09:46:48 11  superior results," correct?

09:46:51 12  A.      Yes.

09:46:51 13  Q.      And the purpose of this section was to overcome a

09:46:55 14  prima facie case of obviousness if the Patent Office

09:47:02 15  determined that there was one, correct?

09:47:15 16  A.      Yes.

09:47:16 17  Q.      If you would please turn to the next page of the

09:47:21 18  amendment, which is page 17 of the response, the last

09:47:25 19  paragraph refers to the Grant article, correct?

09:47:28 20  A.      Yes.

09:47:32 21  Q.      And the Grant article was about a human clinical

09:47:36 22  trial, correct?

09:47:38 23  A.      Yes.

09:47:38 24  Q.      And you've cited the Grant article to the Patent

09:47:42 25  Office to argue that the claims of the '547 application

09:47:47 1    should issue, correct?

09:47:49 2    A.    Yes.  That, in addition to them -- the monkey data on

09:47:54 3    the previous page.

09:47:56 4    Q.    You had an interview with the patent examiner after

09:48:00 5    filing this amendment, correct?

09:48:02 6    A.    Yes.

09:48:03 7    Q.    And please turn to page 777 of the exhibit.

09:48:08 8    A.    Yes.

09:48:08 9    Q.    This is a summary of an interview that you had with

09:48:13 10   the patent examiner about the '547 application on

09:48:19 11   December 16th, 2014, correct?

09:48:22 12   A.    Yes.

09:48:23 13   Q.    This summary was prepared by the patent examiner,

09:48:36 14   correct?

09:48:39 15   A.    Yes.

09:48:39 16   Q.    And you received this summary from the patent

09:48:42 17   examiner, correct?

09:48:44 18   A.    Correct.

09:48:44 19   Q.    The summary -- this summary accurately reflects the

09:48:50 20   discussion in the interview, correct?

09:48:57 21   A.    Yes.

09:48:57 22   Q.    You discussed all of the references that were cited

09:49:02 23   in your July 21st, 2014, remarks with the examiner during

09:49:07 24   this interview, right?

09:49:09 25   A.    We went through the entirety of the response with the

09:49:13 1    examiner, yes.

09:49:15 2    Q.    Okay.  So you discussed the Grant article with the

09:49:20 3    examiner, correct?

09:49:22 4    A.    Yes.

09:49:23 5    Q.    The purpose of this interview was to persuade the

09:49:28 6    examiner that the claims of the '547 application should

09:49:33 7    issue, correct?

09:49:35 8    A.    Yes.

09:49:35 9    Q.    You had another interview with the patent examiner

09:49:39 10   after this one, right?

09:49:41 11   A.    I did.

09:49:47 12   Q.    Please turn to page 783.  Page 783 is a summary of a

09:49:54 13   second interview that you had with the patent examiner

09:50:04 14   related to this application, correct?

09:50:07 15   A.    Yes.

09:50:07 16   Q.    And this was dated December 19th, 2014, correct?

09:50:12 17   A.    Yes.

09:50:13 18   Q.    So that interview -- this interview happened three

09:50:17 19   days after the last one we looked at, correct?

09:50:22 20   A.    Correct.

09:50:32 21   Q.    This summary was prepared by the patent examiner,

09:50:37 22   correct?

09:50:38 23   A.    Yes.

09:50:38 24   Q.    And you received the summary from the examiner,

09:50:41 25   correct?

09:50:41 1   A.      Yes.

09:50:42 2   Q.      You discussed the Grant article with the examiner

09:50:45 3   during this call, correct?

09:50:47 4   A.      I believe we revisited much of what was already in

09:50:51 5   that response again, but we certainly did discuss the Grant

09:50:57 6   reference in addition to I believe the remainder of it.

09:51:03 7   Q.      Now, the last sentence of the examiner's summary

09:51:16 8   states, "the examiner indicates that such claims are

09:51:20 9   allowable in view of the high unpredictability of

09:51:28 10  chemoprophylaxis against HIV infection and the superior and

09:51:33 11  unexpected results shown in the application and exhibits,

09:51:37 12  particularly, Grant reference."  Correct?

09:51:47 13  A.      That is correct.

09:51:48 14  Q.      Now, the patent examiner allowed the claims to issue

09:51:52 15  after this interview, correct?

09:51:54 16  A.      Yes.

09:51:54 17  Q.      Please turn to page 779.

09:51:58 18  A.      779?

09:52:01 19  Q.      That's right.

09:52:02 20  A.      I had it backwards.  Sorry.  Yes.

09:52:02 21  Q.      This is a notice of allowance for the '547

09:52:11 22  application that was mailed January 8th, 2015, correct?

09:52:16 23  A.      Yes.

09:52:16 24  Q.      So a couple of weeks after that interview that we

09:52:20 25  just looked at, correct?

09:52:25 1    A.      Yes.  I'm trying to find the mail date really

09:52:33 2    quickly.  Oh, there it is, okay.  Yes.

09:52:36 3    Q.      Please turn to page 785.  Page 785 are remarks

09:52:42 4    prepared by the examiner that accompanied the notice of

09:52:46 5    allowance, correct?

09:52:48 6    A.      Yes.

09:52:49 7    Q.      The examiner made a final amendment to the claims

09:52:59 8    with the notice of allowance, correct?

09:53:02 9    A.      Yes.

09:53:03 10   Q.      And the examiner notes that you authorized that

09:53:06 11   amendment during the December 19th, 2014, call, correct?

09:53:18 12   A.      Correct.

09:53:18 13   Q.      Let's turn to the next page, which is page 786.  The

09:53:24 14   examiner's reasons for allowance begin at paragraph 4,

09:53:28 15   correct?

09:53:29 16   A.      Correct.

09:53:29 17   Q.      If you would, please, turn to the next page.  The

09:53:35 18   last sentence of paragraph 4 states, "importantly, the

09:53:40 19   application shows that the combination has superior effect

09:53:42 20   as compared to tenofovir alone in animal model and evidences

09:53:42 21   on the record has shown the claimed combination has

09:53:52 22   clinically significant results, which would have not been

09:53:52 23   expected in view of the prior art as a whole (page 17 of the

09:54:06 24   response and Grant, et al.)"

09:54:12 25           Correct?

09:54:12 1    A.      It does say that.

09:54:14 2    Q.      Clinically significant results means results in

09:54:19 3    human, correct?

09:54:20 4    A.      Yes.

09:54:20 5    Q.      And Grant, et al., refers to the human clinical

09:54:31 6    trial, correct?

09:54:32 7    A.      Yes.

09:54:33 8    Q.      If you would please turn to page 799, this is an

09:54:39 9    index comparing the original claim numbers in the '547

09:54:47 10   application to the claim numbers in the issued '509 patent,

09:54:52 11   correct?

09:55:07 12   A.      Yes.

09:55:08 13   Q.      Claim 1 in the issued '509 patent was claim 22 in the

09:55:17 14   '547 application, correct?

09:55:18 15   A.      Say that again.

09:55:20 16   Q.      Sure.  Claim 1 in the issued '509 patent was claim 22

09:55:26 17   in the '547 application, correct?

09:55:28 18   A.      Yes.

09:56:10 19   Q.      And claim 22 of the '547 application is a claim that

09:56:15 20   you added with the July 21st, 2014, amendment, correct?

09:56:20 21   A.      Yes.

09:56:21 22   Q.      And, in fact, every claim in the issued '509 patent

09:56:26 23   was a claim that you added in the July 21st, 2014,

09:56:33 24   amendment, correct?

09:56:41 25   A.      Yes.

09:56:42 1    Q.      If you would please turn to page 845 of the exhibit,

09:56:51 2    this is a letter to the Patent Office that you signed,

09:56:55 3    correct?

09:56:56 4    A.      Yes.

09:56:58 5    Q.      And you signed this letter of the Patent Office on

09:57:08 6    April 6th, 2015, correct?

09:57:10 7    A.      Yes.

09:57:11 8    Q.      You submitted an issue fee of $960 with this letter,

09:57:20 9    correct?

09:57:21 10   A.      Yes.

09:57:21 11   Q.      And after you paid that issue fee, the '509 patent

09:57:25 12   issued, correct?

09:57:27 13   A.      Correct.

09:57:37 14   Q.      You filed eight more patent applications that claim

09:57:40 15   priority to the '547 application, correct?

09:57:47 16   A.      Yes.

09:57:48 17   Q.      Four of those continuation applications are still

09:57:53 18   pending before the Patent Office, correct?

09:57:55 19   A.      Yes.

09:57:56 20   Q.      So you're continuing to prosecute those continuation

09:58:02 21   applications today, correct?

09:58:02 22   A.      Yes.

09:58:02 23   Q.      Those four patent applications that are still pending

09:58:10 24   today are also directed to the use of TDF and FTC for PrEP,

09:58:15 25   correct?

09:58:16 1    A.      Yes.

09:58:16 2    Q.      So to sum up, the '547 application was rejected by

09:58:23 3    the Patent Office at least four times, correct?

09:58:26 4    A.      Yes.

09:58:26 5    Q.      Then you amended the claims, correct?

09:58:29 6    A.      Yes.  The claims may have been amended in between.  I

09:58:33 7    don't -- I can't recall if they were amended in between

09:58:39 8    filing and when I took over prosecution.

09:58:42 9    Q.      Okay.  But when you took over, you amended the

09:58:47 10   claims, correct?

09:58:47 11   A.      Correct.

09:58:48 12   Q.      At the same time you amended the claims, you

09:58:52 13   submitted the Grant human trial results to the Patent

09:58:57 14   Office, right?

09:59:05 15   A.      Along with eleven other references, yes.

09:59:08 16   Q.      And then the patent examiner allowed the '509 patent

09:59:12 17   to issue, correct?

09:59:13 18   A.      Yes.

09:59:14 19   Q.      And since the '509 patent was issued, you have

09:59:19 20   continued to seek patents for the government for TDF and FTC

09:59:29 21   for PrEP, correct?

09:59:30 22   A.      Yes.

09:59:39 23   Q.      All right.  Now, Dr. Siegel, JX 23 is what's known as

09:59:45 24   the file wrapper of the '547 application.  Is that correct?

09:59:50 25   A.      Yes.

09:59:51  1    Q.      And is the file wrapper another name for prosecution

09:59:55  2    history?

09:59:55  3    A.      Yes.

10:00:02  4    Q.      And what do you understand prosecution history to

10:00:09  5    mean?

10:00:10  6    A.      So prosecution history is everything that you give to

10:00:13  7    the Patent Office and everything the Patent Office sends

10:00:16  8    back to you.  So it's everything that is submitted to the

10:00:21  9    Patent Office and everything that you receive from the

10:00:24 10    Patent Office.

10:00:25 11    Q.      Thank you very much.

10:00:27 12            If a document or a reference is not included in

10:00:32 13    the file wrapper, if it's not in JX 23, is it part of the

10:00:38 14    prosecution history leading to the issuance of the '509

10:00:42 15    patent?

10:00:42 16    A.      No.  There were a lot of negatives, but, in other

10:00:47 17    words, if it's outside of this, it's not in.

10:00:58 18    Q.      Once an inventor files an application, in your

10:01:04 19    understanding, can they add new subject matter to the

10:01:02 20    application?

10:01:10 21    A.      Absolutely not.

10:01:11 22    Q.      Why not?

10:01:11 23    A.      There's a prohibition by statute.  It's 45 USC, it's

10:01:30 24    132 and 112, so you cannot add anything there, period.

10:01:35 25    Q.      What do you understand "new subject matter" to mean?

10:02:16 1  A.      Anything outside the scope of what is in the

10:02:22 2  specification, claims and figures.

10:02:24 3  Q.      Is Macaque model data an accepted model in the HIV

10:02:34 4  arts?

10:02:40 5  A.      Yes.

10:02:41 6  Q.      Dr. Siegel, in your understanding, is the Macaque

10:02:47 7  model accepted as an art -- sorry, is the Macaque model an

10:02:55 8  accepted HIV model in the art?

10:02:57 9  A.      So I prosecute a whole lot of patent applications in

10:03:03 10  the HIV field.  The Macaque model is pretty much always what

10:03:10 11  they use.  So I do it for a number of different clients.

10:03:15 12  The NIH is one of them, but certainly like for Oregon Health

10:03:22 13  and Science University, they also have a Macaque colony.

10:03:27 14  This is considered the art accepted, this is standard

10:03:32 15  evidence that I would have in the patent document.

10:03:41 16  Q.      Does the Patent Office always accept the Macaque

10:03:45 17  model in your understanding?

10:03:47 18  A.      No.  As a matter of fact, they did not.

10:03:53 19  Q.      When did they not accept the Macaque model?

10:03:56 20  A.      There was a shift -- gosh, I have been prosecuting

10:04:07 21  patents for a pretty long time.  So I worked at Fish &

10:04:12 22  Richardson before I worked for Klarquist Sparkman, and I

10:04:18 23  prosecuted patents at that time in the HIV field, and at

10:04:23 24  that time it was pretty much that you couldn't get patents

10:04:26 25  on HIV drugs.  The Patent Office had the opinion that it was

10:04:34 1    -- you could not solve this problem.  It was an unsolvable

10:04:38 2    problem.

10:04:38 3          It was like treating cancer.  You couldn't get a

10:04:43 4    patent on treating cancer because it was not possible to

10:04:48 5    treat cancer, and as biology and understanding and the law

10:04:53 6    changed, there was a shift.  There were some guidelines that

10:04:59 7    shifted on written description, enablement and utility.  It

10:05:04 8    was before I came to Klarquist Sparkman.

10:05:09 9          And at that point the Patent Office changed its

10:05:13 10   opinion, and it changed to -- it actually says in the manual

10:05:17 11   -- the manual of patent examination procedure, the MCEP, it

10:05:31 12   says that clinical trial data is not required, and our

10:05:35 13   accepted animal model will be accepted.  In this case it is

10:05:40 14   an art accepted animal model and it should be accepted by

10:05:46 15   the Patent Office, and that shift probably occurred -- oh, I

10:05:50 16   came to Klarquist in '99, so it must have been sometimes

10:05:58 17   '97ish, '98ish.  I don't recall exactly.  That's too far for

10:06:00 18   my memory, I'm sorry.

10:06:16 19   Q.    Mr. Cook mentioned clinical trial data.  How often do

10:06:42 20   you have clinical trial data in patent applications?

10:06:42 21   A.    Pretty rarely.  I mean, it's different for different

10:06:51 22   clients.  I do a lot of work for universities.  They rarely,

10:06:55 23   if ever, have clinical trial data.  Clinical trials are

10:07:00 24   usually public things, like multicenter clinical trials, and

10:07:00 25   my understanding -- again, only in the patent world, right,

10:07:10 1   I don't run clinical trials, but we might have perhaps data

10:07:16 2   in a few patients that I usually see on my patent

10:07:21 3   applications, but not clinical trial data.

10:07:33 4   Q.      If you could turn to the next page -- to two pages

10:07:37 5   later, 563, and we looked at this listing of claims with

10:07:43 6   Mr. Cook.

10:07:48 7   A.      Yes.

10:07:48 8   Q.      Is this where you were making amendments to the

10:07:52 9   claims?

10:07:53 10   A.      Yes.

10:07:53 11   Q.      And what do you mean when you say you were amending

10:07:57 12   the claims?

10:07:58 13   A.      So that's when you change the claims in any way.  The

10:08:03 14   claims have to be supported by the specification itself, but

10:08:07 15   it's any changes to the claims, as long as they're supported

10:08:12 16   by the specification.

10:08:13 17   Q.      Were you adding new subject matter to the application

10:08:17 18   when you amended the claims?

10:08:19 19   A.      No.

10:08:20 20   Q.      Let's turn to page 569.  What do you understand --

10:08:26 21   oh, sorry.  Are you there?

10:08:30 22   A.      Yeah, I'm here.

10:08:34 23   Q.      All right.  Is there a Section 1, "support for claim

10:08:45 24   amendments and new claims presented?"

10:08:50 25   A.      Yes.

10:08:50 1   Q.      Okay.  What do you understand Section 1 to be

10:08:54 2   discussing?

10:08:54 3   A.      So Section 1 sets out support in the original

10:09:05 4   specifications, the paragraph, figures, whatever it is,

10:09:09 5   where you direct the examiner to what you've done and where

10:09:14 6   it's supported.  You're not required to list every point of

10:09:19 7   it.  It will say support for the new claims can be found

10:09:24 8   throughout the specification, which it does, and then it

10:09:28 9   says not limited to, but it directs the examiner to help

10:09:33 10  them find where the exact literal support, the support for

10:09:37 11  the claims are.

10:09:39 12  Q.      Why are you identifying support in the specification

10:09:43 13  to the examiner?

10:09:45 14  A.      Because the claims have to be actually supported by

10:09:49 15  the specification.  There can be no new matter added.

10:10:05 16  Q.      And in the bottom paragraph you looked at with

10:10:10 17  Mr. Cook, which begins, "another post-filing publication

10:10:16 18  that evidences the unexpected superior effect of an

10:10:20 19  exemplary claimed combination in preventing HIV infection is

10:10:22 20  Grant, et al.," and then the title of the article.  Do you

10:10:32 21  see that?

10:10:40 22  A.      Yes.

10:10:40 23  Q.      Is that article, the Grant article, of record?

10:10:44 24  A.      Yes.

10:10:45 25  Q.      Okay.  How are you able to cite published studies

10:10:49 1    that come later in time in an application when the

10:10:53 2    application is not supposed to add new matter?

10:10:57 3    A.      Well, it's not adding to the patent application

10:11:01 4    itself.  So the original claims have to be supported by the

10:11:05 5    specification.  The -- especially here, you know, the

10:11:10 6    applicant can't necessarily know what examiner -- what

10:11:23 7    rejection an examiner is going to raise.  What they can do

10:11:27 8    is they can show how that original data supports their

10:11:36 9    claim, and they can use other post-filing date evidence to

10:11:40 10   show that what they originally described is true.

10:11:47 11           So what was originally present in the text, what

10:11:52 12   they originally stated, what's originally supported, yes,

10:11:57 13   that was borne out by others.  Yes, that was borne out by

10:12:03 14   later studies.  So you're allowed to submit post-filing date

10:12:09 15   evidence as a showing of an unexpected superior result.

10:12:14 16           So as an example, an examiner might raise

10:12:19 17   something, and he might compare it to a particular

10:12:23 18   reference, and you're then allowed to submit comparative

10:12:28 19   data.  So I've compared apples to oranges.  I've described

10:12:34 20   oranges, but I want to compare it to apples now, and you

10:12:40 21   might not have done that comparison later.

10:12:42 22           The same thing holds true with clinical data.  I

10:12:43 23   mean, we often will get it later, and we'll say, yes, what

10:12:50 24   the animal model showed is now corroborated by my clinical

10:13:00 25   data.

10:13:06 1    Q.      Let's turn to page 769 of the application.

10:13:11 2    A.      769 of the -- of the --

10:13:15 3    Q.      Of JX 23.

10:13:17 4    A.      Okay.

10:13:24 5    Q.      Thank you.

10:13:26 6    A.      Sorry.

10:13:26 7    Q.      No, thank you.

10:13:28 8    A.      Yes.

10:13:29 9    Q.      And we looked at this with Mr. Cook?

10:13:32 10   A.      Yes, we looked at this with Mr. Cook.

10:13:35 11   Q.      Okay.  And what is this?

10:13:37 12   A.      This is the information disclosure statement.  This

10:13:41 13   is the 1449 that accompanies the statement on the prior

10:13:47 14   page, and it was filed on July 21st of 2014.

10:13:51 15   Q.      And what does an information disclosure statement do?

10:13:55 16   A.      It makes a record, various references for the

10:13:58 17   examiner's consideration.

10:14:06 18   Q.      I see at the top there's a listing of a notice in

10:14:11 19   opposition briefing on the information disclosure statement.

10:14:12 20   A.      That's correct.

10:14:17 21   Q.      What is that?

10:14:22 22   A.      So there was a European opposition that occurred at

10:14:30 23   the same time.  It was related to that PC -- there's a PCT

10:14:36 24   patent application, an international patent application that

10:14:41 25   was a European application.  It was granted as a European

10:14:47 1    patent.   There was an opposition, a third-party opposition

10:14:53 2    to that patent, and this was the opposition filing for that,

10:14:58 3    and I participated in that a long time ago.

10:15:02 4    Q.      So when you say an opposition filing, these are the

10:15:06 5    arguments that were made in Europe about why the European

10:15:12 6    patent was invalid?

10:15:14 7    A.      Correct.   I believe that is a notice of opposition,

10:15:18 8    an opposition brief, yes, that's correct.   Sorry.

10:15:23 9    Q.      No, not at all.   You were involved in that

10:15:28 10    proceeding, you said?

10:15:29 11    A.      I was.   It was interesting, and the patent was

10:15:33 12    maintained.

10:15:39 13    Q.      And when you say "maintained," you mean that it --

10:15:46 14    what do you mean by "maintained"?

10:15:50 15    A.      Maintained is -- at this point the European -- at

10:15:55 16    this point, it was a European patent, we gave the Patent

10:15:59 17    Office this notice of opposition and brief.   Later on, I

10:16:03 18    participated in that, and in Europe, it's a little different

10:16:08 19    than here.   They amended the claims during that opposition.

10:16:14 20    You're allowed to amend the claims of the patent to be

10:16:24 21    narrower in scope.   They were actually amended to be very

10:16:31 22    similar to what granted here, and they were maintained, but

10:16:35 23    these are the original remarks from that European council.

10:16:42 24    Q.      Thinking about the European patent opposition, was

10:16:46 25    there anything unusual that happened to you after that?

10:16:49 1    A.      Yeah.   That was a weird one.  So in this case the --
10:16:55 2    the claims were maintained to be similar to what these
10:16:58 3    claims were here.   I went back to my hotel room and my phone
10:17:08 4    rang, which I don't think has ever happened to me after a
10:17:19 5    proceeding, and a licensee was on the phone, and they said
10:17:23 6    we'd like to license this patent.   I don't do licensing, I'm
10:17:28 7    only a patent prosecutor.   My expertise is only in
10:17:33 8    prosecution.   I don't do licensing for the government.
10:17:38 9             It was a representative from Mylan, and I put
10:17:41 10   them in touch with a representative from the NIH, who does
10:17:50 11   the licensing.
10:17:58 12   Q.      Okay.   Could you please turn with me to page 779.
10:18:03 13   A.      779?
10:18:06 14   Q.      I think we looked at this with Mr. Cook.
10:18:09 15   A.      Yes.
10:18:15 16   Q.      Is there any clinical trial referenced in this
10:18:18 17   summary other than the Grant clinical trial?
10:18:21 18   A.      No.   It says, "the unexpected results shown in the
10:18:30 19   application and the exhibits, particularly the grant
10:18:32 20   reference," so the Grant would be the only clinical trial.
10:18:42 21   Q.      Let's go to page 784.
10:18:47 22   A.      784, okay.
10:18:49 23   Q.      And what is this?
10:18:51 24   A.      This is a notice of allowability accompanying that
10:18:55 25   notice of allowance.

10:18:58 1    Q.      Okay.  And then on the next page, page 785.

10:19:04 2    A.      785, yes.

10:19:09 3    Q.      And you looked at this with Mr. Cook?

10:19:11 4    A.      Yes.

10:19:12 5    Q.      And I see the second section is "examiner's

10:19:17 6    amendment."

10:19:18 7    A.      Yes.

10:19:19 8    Q.      Do the amendments made by the examiner add new

10:19:23 9    matter?

10:19:24 10   A.      The examiner cannot add new matter.

10:19:33 11   Q.      During the prosecution of this application, do you

10:19:38 12   recall ever receiving a rejection under 35 USC 132 for

10:19:48 13   introducing new matter into the application?

10:19:51 14   A.      No.

10:19:52 15   Q.      During the prosecution of this application, do you

10:19:56 16   recall ever receiving a rejection under 35 USC 112,

10:20:01 17   paragraph 1, for amending a claim without support from the

10:20:05 18   originally filed disclosure?

10:20:08 19   A.      No.

10:20:09 20   Q.      So to your understanding, the issued claims of the

10:20:12 21   '509 patent were not found by the examiner to contain new

10:20:16 22   matter?

10:20:20 23   A.      No.

10:20:20 24   Q.      So to your understanding, the issued claims of the

10:20:25 25   '509 patent were not found by the examiner to contain new

10:20:29 1    matter?

10:20:29 2    A.        Correct.

10:20:30 3    Q.        And to your understanding, the issued claims of the

10:20:34 4    '509 patent were not found by the examiner to lack support

10:20:39 5    in the originally filed disclosure?

10:20:45 6    A.        Correct.

10:20:52 7    Q.        So the -- you mentioned the European opposition with

10:20:59 8    Mr. Holvey.  Do you recall that?

10:21:02 9    A.        Yes.

10:21:02 10   Q.        Now, the claims of the European counterparts of these

10:21:06 11   patents had different scope from the claims in the United

10:21:11 12   States, correct?

10:21:17 13   A.        The original granted claims have different scope,

10:21:20 14   yes.

10:21:20 15   Q.        They used different words, correct?

10:21:23 16   A.        Yes.

10:21:24 17   Q.        They claimed different subject matter, correct?

10:21:27 18   A.        Well, that I can't recall.  So the -- I don't recall

10:21:31 19   what the upheld claims were and how they directly compared

10:21:36 20   to these claims.  So I know they had TDF and FTC and they

10:21:40 21   related to pre-exposure prophylaxis.  Whether they said

10:21:51 22   human or primate or what the exact nature of those claims

10:21:56 23   are, I can't recall right now.

10:22:06 24   Q.        You testified about an area within a circle in the

10:22:12 25   sand, correct?

10:22:14 1   A.        Yes.

10:22:15 2   Q.        The use of TDF and FTC in all humans is within that

10:22:21 3   circle in the sand for these patents, correct?

10:22:24 4   A.        Well, I am not going to stand here and -- I am not a

10:22:29 5   legal expert to construe all of the terms and all of that

10:22:34 6   circle in the sand.  I was speaking very generally.  I'm not

10:22:41 7   a patent attorney.  I'm not going to construe all the terms

10:22:48 8   in the claims for you.  I can speak generally only.

10:22:53 9   Q.        But it's your understanding, as the person

10:22:56 10  prosecuting these patents, that they do include at least

10:23:01 11  some claims directed to the use of TDF and FTC in humans,

10:23:07 12  correct?

10:23:07 13  A.        Yes.

10:23:08 14  Q.        Okay.  And that what's within that circle in the

10:23:23 15  sand, that is what the claims removed from the public

10:23:27 16  domain, correct?

10:23:28 17  A.        Yes.

10:23:34 18              (End of deposition read in of Siegel.)

09:59:07 19              MR. BASSETT:  We appreciate it.

09:59:16 20              THE COURT:  Okay.  Then we have some facts.

09:59:21 21              MS. LIN:  Yes, Stephanie Lin, on behalf of

09:59:22 22  Gilead, Your Honor.

09:59:23 23              THE COURT:  I'm sorry, what was your name?

09:59:28 24              MS. LIN:  Stephanie Lin.  I was going to read

09:59:29 25  some uncontested facts into the record, but if Your Honor

prefers we can also submit those.

THE COURT:  That's not thirty minutes, right?

MS. LIN:  I don't think so.

THE COURT:  Go for it.

MS. LIN:  Okay.

38.  On December 2, 2019, the Government disclaimed issued claims 12 and 14 through 18 from the '509 patent.

44.  On December 2, 2019, the Government disclaimed issued claims 12 and 14 through 17 of the '333 patent.

59.  The CDC and Gilead executed a Material Transfer Agreement (MTA) bearing CDC reference number NCHSTP-C043072 ("the '072 MTA") on June 21, 2004.

60.  The research product identified in the '072 MTA was "Evaluation of Tenofovir pre-exposure prophylaxis (PrEP) for the prevention of simian human immunodeficiency virus (SHIV) infection in a low-dose rectal challenge model in Macaca mulatta."

61.  Under the '072 MTA, Gilead agreed to provide 55 grams of TDF and 2 grams of tenofovir (which is also known as PMPA) to the CDC.

64.  The CDC received at least some TDF from Gilead pursuant to the '072 MTA.

65.  The CDC received at least some tenofovir

10:00:56 1    from Gilead pursuant to the '072 MTA.

10:00:59 2            66.   On January 24, 2005, Gilead and the CDC

10:01:03 3    executed the First Amendment to the '072 MTA.

10:01:06 4            70.   In the First Amendment to the 'O72 MTA,

10:01:09 5    Gilead agreed to provide an additional 200 grams of TDF to

10:01:13 6    the CDC "for the Purpose of Oral Chemoprophylaxis with

10:01:18 7    Tenofovir Disoproxil Fumarate to Evaluate Vaginal SIV

10:01:18 8    Transmission in a Rhesus Macaque Repeat-Virus Exposure

10:01:28 9    Model."

10:01:28 10           72.   On January 31, 2005, Gilead and the

10:01:34 11   Government executed an MTA with CDC reference number

10:01:39 12   NCHSTP-V053471 ("the '471 MTA").

10:01:43 13           73.   Pursuant to the '471 MTA, Gilead agreed to

10:01:46 14   provide 250 grams of FTC for the macaque study directed to

10:01:52 15   "Pre-exposure prophylaxis with FTC in combination with one

10:01:53 16   or two drugs for the prevention of simian human

10:01:58 17   immunodeficiency virus (SHIV) infection in a repeat low-dose

10:02:01 18   challenge model in Macaque mulatta."

10:02:03 19           THE COURT:  Can I interrupt you for a second?  I

10:02:02 20   understand why we do this in a jury trial.  These are

10:02:02 21   stipulated facts in the pretrial order and you're reading

10:02:12 22   the numbers from the pretrial order?

10:02:14 23           Correct.

10:02:14 24           THE COURT:  So aren't these already in the

10:02:16 25   record that you guys can cite to them for me?

10:02:24 1          MR. MACHEN:  We're fine with doing that.

10:02:26 2          THE COURT:  If you want to just read me the

10:02:28 3   numbers so we know.  I mean, I think they're already --

10:02:31 4   they're on the docket, I think you can already cite me to

10:02:34 5   them and you can cite the appeals court to them, why don't

10:02:37 6   you give me the numbers you were going to read?

10:02:40 7          MS. LIN:  That's an excellent idea, Your Honor.

10:02:42 8   So, 77.  78.  79.  80.  81.  82.  83.  86.  87 through 91.

10:02:56 9   95 through 98.  102 through 104.  108 through 110.  114

10:03:07 10  through 116.  120 through 122.  126 through 130.  133

10:03:19 11  through 135.  138 through 144.  147 through 149.  152

10:03:30 12  through 154.  157 through 159.  And 162.

10:03:37 13         And then finally, Your Honor, there is one

10:03:39 14  uncontested fact that was amended by agreement with the

10:03:43 15  parties over the weekend, number 47, which I believe we do

10:03:48 16  need to read into the record.

10:03:49 17         THE COURT:  Go ahead.

10:03:50 18         MS. LIN:  On March 7, 2017, the government filed

10:03:53 19  an information disclosure statement which included Smith, et

10:03:57 20  al, antiretroviral post-exposure prophylaxis after sexual

10:04:01 21  injection drug use or other nonoccupational exposure to HIV

10:04:05 22  in the United States, MMWR 54 (RR-2) January 21, 2005,

10:04:17 23  Smith.  The Smith reference had not previously been

10:04:20 24  submitted to the Patent Office during prosecution of the HHS

10:04:24 25  patent.

10:04:24 1                    THE COURT:  The Smith is the CDC PEP document,

10:04:27 2      right?

10:04:28 3                    MS. LIN:  Yes, the January 21st 2005.

10:04:30 4                    THE COURT:  Okay.  Thank you.  Thank you

10:04:32 5      Ms. Lin.  Then let me just check.  So how do we get the

10:04:39 6      trial testimony of Dr. Siegel?  If I give the court reporter

10:04:47 7      this highlighted version to put in the transcript, does that

10:04:52 8      work?

10:04:53 9                    MR. MACHEN:  That works for us, Your Honor.

10:04:55 10                   MR. BROWN:  Fine with us, Your Honor.

10:04:56 11                   THE COURT:  So I will read this and then I will

10:04:58 12     have this added into the record for her -- him, her.

10:05:04 13                   MR. MACHEN:  Her.

10:05:04 14                   THE COURT:  Okay.  All right.  What's next?

10:05:10 15                   MR. MACHEN:  So Your Honor, we don't want to

10:05:11 16     rest yet because they're going to call Dr. Heneine, but we

10:05:15 17     were going to call him on direct, so we will go beyond the

10:05:19 18     scope of their direct.

10:05:21 19                   THE COURT:  Okay.

10:05:22 20                   MR. BROWN:  Your Honor, at this time we call

10:05:22 21     Dr. Walid Heneine.

10:05:40 22                   WALID HENEINE, having been previously sworn, was

10:05:41 23     examined and testified as follows:

10:05:47 24                   THE COURT:  Sir, I'll just remind you, you're

10:05:50 25     still under oath.

10:05:51 1                    THE WITNESS:  Thank you.

10:06:04 2                    MR. BROWN:  Let me just say before I begin, Your

10:06:06 3   Honor, I think we had a different copy, a different exhibit

10:06:11 4   number for the Smith reference.  The CDC PEP guidelines.

10:06:15 5   But I'm going to handout copies of JTX 65, unless somebody

10:06:20 6   objects, just so we're talking about the exact same number.

10:06:30 7                    THE COURT:  Okay.

10:06:44 8                    MR. BROWN:  May I proceed, Your Honor?

10:06:51 9                    THE COURT:  You may, please.

10:06:51 10                   DIRECT EXAMINATION

10:06:51 11  BY MR. BROWN:

10:06:53 12  Q.    Good morning, Dr. Heneine.

10:06:54 13  A.    Good morning.

10:06:55 14  Q.    Let me begin with the document I just handed you, JTX

10:07:01 15  65.

10:07:02 16  A.    Yes.

10:07:02 17  Q.    Can you identify this document?

10:07:04 18  A.    Yes.

10:07:06 19  Q.    And what is it?

10:07:07 20  A.    These are CDC recommendations for post-exposure

10:07:14 21  prophylaxis after sexual injection drug use or other

10:07:17 22  nonoccupational exposure to HIV in the United States.

10:07:20 23  Q.    What is the date of these?

10:07:22 24  A.    These were published January 21st, 2005.

10:07:27 25  Q.    Were you aware of these January 2005 CDC PEP

10:07:32 1   guidelines when you were doing your macaque research leading

10:07:36 2   to the patents in this case?

10:07:37 3   A.      Yes.

10:07:38 4   Q.      For the '333 and '509 patents, did you disclose the

10:07:44 5   January 2005 PEP guidelines to the Patent Office?

10:07:47 6   A.      No.

10:07:47 7   Q.      And why not?

10:07:49 8   A.      Because they have no bearing on the patent

10:07:52 9   application.

10:07:53 10  Q.      Why do you say -- what do you mean when you say they

10:07:57 11  have no bearing?

10:07:58 12  A.      These guidelines list essentially the treatment

10:08:05 13  regimens that were used at the time.  They list 3 and 4 drug

10:08:10 14  regimens.  They do not have any efficacy for prevention, and

10:08:19 15  there is nothing new with these guidelines that we did not

10:08:24 16  know regarding those drug combinations.

10:08:27 17  Q.      You said they have no efficacy for prevention, do you

10:08:30 18  mean efficacy data?

10:08:31 19  A.      Efficacy data that shows that they can prevent HIV

10:08:36 20  infection, when taken as prescribed for PEP.

10:08:41 21  Q.      Is this why you didn't disclose it?

10:08:42 22  A.      Exactly.

10:08:42 23  Q.      Let's --

10:08:47 24          THE COURT:  Does that mean you actually

10:08:48 25  considered disclosing it and didn't or just it didn't come

10:08:52 1    to mind?

10:08:53 2                    THE WITNESS:  No, they had no bearing when we

10:08:56 3    were looking --

10:08:56 4                    THE COURT:  I understand you're saying it didn't

10:08:58 5    have any bearing, what I'm trying to figure out is did you

10:09:01 6    read it and say I'm not disclosing it because it's not

10:09:04 7    relevant, or when you were looking for things, did you just

10:09:08 8    not think of it because it wasn't relevant?

10:09:10 9                    THE WITNESS:  It was more the latter, I did not

10:09:12 10   think of it because I didn't think it was useful, or

10:09:16 11   relevant.

10:09:19 12   Q.      Let's go to Table 2 of the document, which is on

10:09:23 13   page 11, JTX 65.011.  Let me know when you get to that

10:09:30 14   point, Dr. Heneine?

10:09:31 15   A.      Yes.

10:09:31 16   Q.      Can you tell us what's depicted in Table 2?

10:09:34 17   A.      Yes, these are the different regimens, the

10:09:38 18   combinations that were recommended in this document.

10:09:44 19   Q.      And how many different drugs are listed in Table 2,

10:09:51 20   have you calculated that?

10:09:52 21   A.      I think I counted about 15 drugs, different drugs.

10:09:55 22   Q.      And how many of those -- how many different drug

10:09:56 23   combinations are listed in Table 2?

10:10:02 24   A.      There is a lot of drug combinations here as you can

10:10:06 25   see from each of those regimens, you could have first drug

Heneine - direct

10:10:11 1   and then you could have for a second drug different options,

10:10:15 2   and then for the third drug, you could have also multiple

10:10:19 3   other additional options.  So to do a quick exercise

10:10:26 4   counting all these options that we had, I think I came up

10:10:29 5   with 89 different options, combinations were available from

10:10:35 6   this list.

10:10:37 7   Q.     Is TDF, FTC, or Truvada recommended alone as a PEP

10:10:42 8   regimen in this table?

10:10:44 9   A.     No.

10:10:46 10   Q.     It's only 3 or 4 drug combinations?

10:10:49 11   A.     Only 3 or 4 drug regimens were recommended.

10:10:51 12   Q.     Let's go to Table 3.  Can you give us a sense of

10:10:59 13   what's depicted on Table 3 which is page 12?

10:11:02 14   A.     Yes.  These are more details on the drugs that are in

10:11:08 15   those regimens, their costs, and their side effects and

10:11:12 16   toxicity, and also information on dosages.

10:11:15 17   Q.     Does this give you any of the efficacy data that you

10:11:19 18   said was missing?

10:11:20 19   A.     No.  In fact, for some of the drugs there are

10:11:24 20   multiple different dosages too, which can even increase

10:11:28 21   further the options that are available, if you use a drug

10:11:32 22   with twice daily or three times day daily, that sort of

10:11:36 23   thing.

10:11:36 24   Q.     So just to summarize, is there any -- is there any

10:11:40 25   efficacy data whatsoever in the PEP guidelines?

Heneine - direct

10:11:44  1    A.     No.

10:11:45  2    Q.     Is there any efficacy data at all for a PEP regimen

10:11:49  3    that includes TDF and FTC?

10:11:51  4    A.     No.

10:11:54  5    Q.     Dr. Heneine, did you ever have any PEP claims in your

10:11:58  6    patents?

10:11:58  7    A.     Yes.

10:11:59  8    Q.     And why were they there?

10:12:01  9    A.     Well, when we found the high PrEP efficacy with the

10:12:08 10    Tenofovir FTC combination, we thought that these data might

10:12:13 11    be relevant to PEP, and given, as we just mentioned, given

10:12:23 12    the lack of any efficacy data for PEP regimens, we thought

10:12:28 13    these could be relevant and we had those claims there.

10:12:31 14    Those claims were added based on that.

10:12:32 15    Q.     Were those claims essential in your view to your

10:12:35 16    invention?

10:12:36 17    A.     No.

10:12:36 18    Q.     Why not?

10:12:38 19    A.     Because PEP is a -- it's an emergency clinical

10:12:42 20    practice.  We were more focusing on PrEP because it was the

10:12:51 21    public health intervention that needs to be used widely

10:12:52 22    around the world.  So PEP was never really critical or

10:12:52 23    important for us.

10:13:01 24    Q.     Do you know what happened to the PEP claims that were

10:13:02 25    in the patents?

Heneine - direct

10:13:04  1    A.       I think they were eventually removed.

10:13:07  2    Q.       How did you feel about that?

10:13:09  3    A.       Very supportive of this decision.

10:13:12  4    Q.       Let's turn to -- you can put that document aside.

10:13:16  5             Let's turn to a discussion of the MTA that you

10:13:21  6    signed with Gilead.  Before you interacted with Gilead in

10:13:27  7    late 2004 regarding your MTAs, had you signed any MTAs

10:13:31  8    before that?

10:13:32  9    A.       Very few.

10:13:34 10    Q.       Of those that you had signed, how many of those

10:13:37 11    before meeting Gilead had a prompt notification of

10:13:40 12    inventions provision?

10:13:42 13    A.       None.

10:13:44 14    Q.       You stated before the jury that you didn't give

10:13:47 15    notice to Gilead of the patent applications in 2006;

10:13:51 16    correct?

10:13:51 17    A.       Yes.

10:13:52 18    Q.       And you didn't give notice in 2007 whether the

10:13:56 19    non-provisional was filed; correct?

10:13:58 20    A.       Yes.

10:13:59 21    Q.       Did you share anything with Gilead in that time

10:14:02 22    frame?

10:14:03 23    A.       We shared the data that were coming out from our

10:14:10 24    animal research.  We shared the draft of the CROI abstract.

10:14:15 25    We shared the presentation at CROI.  Later we shared draft

Heneine - direct

10:14:22 1   manuscript, and then we shared the final version of the

10:14:27 2   publications that was accepted in PLoS Medicine.

10:14:33 3   Q.      Let's go to plaintiff's exhibit PTX 882.  I guess we

10:14:44 4   can publish it?

10:14:45 5   A.      Yes.

10:14:45 6   Q.      Do you recognize this document?

10:14:47 7   A.      Yes.

10:14:48 8   Q.      And what is this?

10:14:51 9   A.      This is the e-mail I sent to Dr. Rooney at Gilead

10:15:00 10  sharing with him the presentation I gave at CROI.

10:15:05 11              MR. BROWN:  Your Honor, at this time we would

10:15:07 12  move PTX 882 into evidence.

10:15:11 13              MS. FERRERA:  No objection.

10:15:12 14              THE COURT:  Thank you.  It's admitted.

10:15:14 15              (PTX Exhibit No. 882 was admitted into

10:15:15 16  evidence.)

10:15:15 17  BY MR. BROWN:

10:15:16 18  Q.      And why did you send him the CROI slides?

10:15:18 19  A.      Well, he requested it after the CROI presentation and

10:15:22 20  just I shared it with him just consistent with the MTA

10:15:30 21  sharing data.

10:15:32 22  Q.      All right.  Let's go to a couple of tabs further in

10:15:36 23  your document, specifically 1210.  And I will submit the

10:15:40 24  next document, PTX 1211, which I believe is an attachment to

10:15:50 25  1210.  And let me know, Dr. Heneine, if you recognize these

Heneine - direct

10:15:55 1   two documents?

10:15:56 2   A.      I do.

10:15:56 3   Q.      And what are these?

10:15:58 4   A.      This is another e-mail that I sent to Dr. Rooney

10:16:05 5   sharing the draft manuscript that we were planning on

10:16:10 6   submitting for publication.  And requesting any comments or

10:16:18 7   feedback.

10:16:18 8   Q.      And 1211, is that the manuscript you sent?

10:16:23 9   A.      That's right.

10:16:24 10          MR. BROWN:  At this time, Your Honor, we would

10:16:25 11  move for admission of PTX 1210 and PTX 1211.

10:16:31 12          MS. FERRERA:  No objection.

10:16:32 13          THE COURT:  Thank you.  Admitted.  They're

10:16:34 14  admitted.

10:16:35 15          (PTX Exhibits No. 1210 and 1211 were admitted

10:16:35 16  into evidence.)

10:16:35 17  BY MR. BROWN:

10:16:35 18  Q.      Again, Dr. Heneine, why where were you sharing this

10:16:41 19  draft manuscript with Gilead?

10:16:42 20  A.      Because we thought the data, we were very interested

10:16:42 21  in the data, and because of the MTA, we're following the

10:16:52 22  sharing of information and data with them.

10:16:56 23  Q.      During this 2006-2007 time period, did you make a

10:17:01 24  conscious decision not to disclose the patent applications?

10:17:04 25  A.      No.

10:17:05 1   Q.      Was it an oversight on your part?

10:17:08 2   A.      It was.  It was an oversight on my part.  And I think

10:17:12 3   also it was an oversight on the part of the CDC technology

10:17:16 4   transfer office.

10:17:17 5   Q.      Did the technology transfer office ever bring up the

10:17:21 6   issue of the MTA notification to you?

10:17:22 7   A.      No.

10:17:26 8   Q.      Did you share anything with Gilead in 2008?

10:17:30 9   A.      Yes.

10:17:30 10  Q.      Let's go to PTX-443 in your binder.  And let me know

10:17:40 11  if you recognize this document?

10:17:47 12  A.      I see it on the screen.  I recognize the document.

10:17:51 13  Q.      Okay.

10:18:00 14  A.      443.  Got it.  Yes, this is an e-mail I sent also to

10:18:09 15  Dr. Rooney on February 1st, 2008.

10:18:13 16  Q.      And it attaches an article?

10:18:16 17  A.      It attaches the final version of the accepted article

10:18:22 18  that was about to be published in PLoS Medicine.

10:18:27 19  Q.      Looking at page 2 of the exhibit, which I believe is

10:18:30 20  the first page of the article, did you disclose anything

10:18:35 21  about the patent applications on that page?

10:18:38 22  A.      Yes.

10:18:40 23  Q.      And what did you disclose?

10:18:42 24  A.      It's under competing interest.

10:18:45 25  Q.      All right.  And can you read that for the Court?

Heneine - direct

10:18:48 1   A.      Yes.  Authors JGL, RAW, RJ, TMF, and WH are named in

10:18:58 2   the U.S. Government patent application related to methods

10:19:01 3   for HIV prophylaxis.

10:19:04 4   Q.      Is this the same -- does this reference the same

10:19:07 5   patent application that led to the patents in this lawsuit?

10:19:11 6   A.      Yes.

10:19:12 7   Q.      At the time of this article, could you look up this

10:19:16 8   patent application?

10:19:16 9   A.      I'm sorry, I didn't hear the question?

10:19:18 10   Q.      At the time of this article or this e-mail, could you

10:19:21 11   look up this patent application?

10:19:22 12   A.      Yes, it was in the public domain.

10:19:25 13   Q.      How many patents were there at that time, or patent

10:19:31 14   applications that were published with these five inventors?

10:19:34 15   A.      That was the only one.

10:19:36 16   Q.      In 2008, did you include a listing of -- for any of

10:19:40 17   your patent applications in your resume?

10:19:43 18   A.      Yes.

10:19:43 19   Q.      And did you provide that resume in 2008 to anyone at

10:19:46 20   Gilead?

10:19:46 21   A.      Yes.

10:19:46 22   Q.      Can you explain the circumstances of that?

10:19:51 23   A.      Yes.  I was exploring job opportunities at Gilead at

10:19:56 24   that time, so I shared my resume with them and I visited

10:20:01 25   Gilead and met with several key leaders there and also I

10:20:08 1   gave a seminar.

10:20:12 2   Q.      Let me direct your attention to PTX 1116, which is

10:20:18 3   towards the back of your binder.   Let me know when you get

10:20:21 4   there.

10:20:22 5   A.      Yeah.

10:20:34 6   Q.      Are you there?

10:20:35 7   A.      I am.

10:20:35 8   Q.      Going to page 2 of the document?

10:20:39 9   A.      Yes.

10:20:41 10   Q.      First of all, do you recognize this document?

10:20:44 11   A.      Yes, I do.

10:20:46 12   Q.      And what is this?

10:20:48 13   A.      This document is an e-mail I sent to Dr. Lee at

10:20:52 14   Gilead, attaching my resume.

10:20:57 15   Q.      And who is Dr. Lee again?

10:20:58 16   A.      I think he was the senior vice-president for research

10:21:02 17   at Gilead at that time.

10:21:05 18             MR. BROWN:  At this time, Your Honor, I move for

10:21:09 19   admission of PTX 1116.

10:21:11 20             MS. FERRERA:  No objection.

10:21:11 21             THE COURT:  Thank you.  It's admitted.

10:21:13 22             (PTX Exhibit No. 1116 was admitted into

10:21:14 23   evidence.)

10:21:14 24   BY MR. BROWN:

10:21:14 25   Q.      Looking at your resume, does it list any patent

10:21:17 1    applications?

10:21:18 2    A.      Yes, it does.

10:21:19 3    Q.      Let's go to page 6 of the document, the exhibit.

10:21:23 4    A.      Yes.

10:21:26 5    Q.      Under the heading pending patent applications, do you

10:21:29 6    see any applications listed that relate to the patents in

10:21:32 7    this case?

10:21:33 8    A.      Yes.  The second number two there has the patent

10:21:39 9    application.  And it reads "inhibition of HIV infection

10:21:45 10   through chemo prophylaxis-patent application serial number

10:21:50 11   ending with '811."

10:21:54 12   Q.      Thank you, Dr. Heneine.  Going back to your competing

10:21:59 13   interest section in the 2008 PLoS Medicine article, did you

10:22:03 14   provide similar competing interest sections in other

10:22:06 15   publications?

10:22:08 16   A.      Yes.  In several subsequent publications we had the

10:22:11 17   same disclosure, I believe it was 10, 11, or more by now.

10:22:22 18   Q.      All right.  Let's look at what I believe is the last

10:22:25 19   document in your binder, PTX 1258.  And let me know if you

10:22:32 20   recognize that document?

10:22:35 21   A.      Yes, I do.

10:22:35 22   Q.      What is this?

10:22:37 23   A.      This is the second important publication we had on

10:22:41 24   PrEP from the animal data that we were generating.  This

10:22:45 25   paper was published in Science Translational Medicine in

Heneine - direct

10:22:54 1    **2010.**

10:22:55 2    **Q.      And you're an author on this article?**

10:22:58 3    **A.      Yes, I am.**

10:22:59 4    **Q.      Let's go to page 9 of the document.  And in the**

10:23:09 5    **bottom right -- in the right column near the bottom, is**

10:23:14 6    **there another competing interest section?**

10:23:19 7    **A.      Yes.**

10:23:19 8    **Q.      And can you read that to the Court?**

10:23:22 9    **A.      JGGL, RO, TMF, and WH are named in the U.S.**

10:23:29 10   **government patent application related to methods for HIV**

10:23:31 11   **prophylaxis.**

10:23:32 12   **Q.      And this is very similar to the wording of the**

10:23:36 13   **competing interest section in the PLoS Medicine article;**

10:23:40 14   **correct?**

10:23:41 15   **A.      Correct.**

10:23:41 16   **Q.      Does this refer to the same patent applications?**

10:23:46 17   **A.      Yes.**

10:23:46 18   **Q.      In view of this and all the evidence you have**

10:23:49 19   **discussed, did you intend to hide the patent application and**

10:23:52 20   **eventual patents from Gilead?**

10:23:52 21   **A.      No.**

10:23:52 22   **Q.      Did you intend for Gilead never to find out about the**

10:23:56 23   **patent application?**

10:24:00 24   **A.      No.**

10:24:00 25   **Q.      And by the way, Your Honor, I don't think I moved for**

10:24:07 1    admission of 1258?

10:24:11 2              MS. FERRERA:  No objection.

10:24:12 3              THE COURT:  Thank you.  It's admitted.

10:24:13 4              (PTX Exhibit No. 1258 was admitted into

10:24:14 5    evidence.)

10:24:14 6    BY MR. BROWN:

10:24:14 7    Q.     Did you assume as of 2008 that Gilead knew about the

10:24:18 8    patent application?

10:24:18 9    A.     Yes.

10:24:19 10   Q.     And that's based on?

10:24:22 11   A.     All the disclosures, the sharing of the CDC and

10:24:26 12   everything.

10:24:27 13   Q.     Do you think that if -- do you think that if Gilead

10:24:30 14   knew about the patent applications at an earlier time they

10:24:34 15   could have convinced you they were joint inventors of the

10:24:37 16   patent?

10:24:37 17   A.     I don't think so.

10:24:38 18   Q.     And why is that?

10:24:39 19   A.     Because their contributions did not merit

10:24:42 20   inventorship.

10:24:42 21   Q.     And in the 2008 PLoS Medicine article, we see the

10:24:50 22   same research that's in the patents, is that right?

10:24:52 23   A.     That's correct.

10:24:52 24   Q.     Were any Gilead personnel listed as co-authors of the

10:24:52 25   PLoS Medicine paper?

Heneine - direct

10:25:00  1   A.      No, they were not.

10:25:01  2   Q.      Why not?

10:25:01  3   A.      Again, they did not have contributions that merited

10:25:05  4   co-authorship.

10:25:07  5   Q.      Did Gilead asked to be co-authors of the PLoS

10:25:11  6   Medicine paper?

10:25:12  7   A.      No.

10:25:12  8   Q.      Did they ever dispute authorship of the PLoS Medicine

10:25:18  9   paper?

10:25:18 10   A.      No.

10:25:19 11   Q.      Going back to PTX 443, which is the PLoS Medicine

10:25:27 12   article that you sent to Dr. Rooney, can you get back to

10:25:31 13   that document?

10:25:38 14   A.      Yes.

10:25:38 15   Q.      Let's look at page 9 of the exhibit, that's the .009

10:25:42 16   at the bottom.

10:25:48 17   A.      Okay.

10:25:54 18   Q.      Looking at the acknowledgment sections, did you

10:25:59 19   acknowledge that Gilead provided study drugs in this paper?

10:26:02 20   A.      Yes.

10:26:02 21   Q.      Can you point that out to the Court?

10:26:02 22   A.      Yes, we said we thank J. Rooney and colleagues from

10:26:10 23   Gilead for providing the drugs.

10:26:12 24   Q.      And also let me direct you to page 3 of the exhibit.

10:26:24 25   And this will be the right column, at the end of the

Heneine - direct

10:26:28 1   methods/animals and intervention section?

10:26:31 2   A.      Yes.

10:26:33 3   Q.      Is there a reference there to the donation of study

10:26:38 4   drugs by Gilead?

10:26:39 5   A.      Yes, there is.

10:26:40 6   Q.      Can you point that out to the Court?

10:26:42 7   A.      Yes.  We said Tenofovir Disoproxil Fumarate,

10:26:47 8   Tenofovir, the PMPA, and Emtricitabine were kindly provided

10:26:55 9   by Gilead Sciences through a Material Transfer Agreement.

10:27:00 10  Q.      Did Gilead ever dispute the description in the

10:27:04 11  acknowledgments or in the paper regarding their

10:27:06 12  contributions?

10:27:07 13  A.      No.

10:27:08 14  Q.      I would like to direct your attention to a document,

10:27:10 15  hopefully you have it in the pocket of your binder, which is

10:27:14 16  JTX 86, which has already been admitted?

10:27:18 17  A.      Yes.

10:27:18 18  Q.      We can put that on the screen.  Do you recognize this

10:27:23 19  document?

10:27:32 20  A.      Yes.

10:27:33 21  Q.      And what is this?

10:27:36 22  A.      This is an e-mail I sent to Dr. Janssen, I think he

10:27:40 23  contacted me asking for an update information on the patent

10:27:45 24  application at that time.

10:27:48 25  Q.      And you sent him the link that's below your name at

Heneine - cross

10:27:53 1    the bottom of the e-mail?

10:27:55 2    A.      Yes, I mention that there is a non-provisional patent

10:28:00 3    application data and we haven't heard back from the examiner

10:28:04 4    of the decision.   And then what I recall doing at the time

10:28:08 5    is I Googled and found that patent, I put the link.

10:28:12 6    Q.      That's how you picked the application that you sent

10:28:15 7    to him?

10:28:16 8    A.      Yes.

10:28:16 9    Q.      It was the one -- is it the one you found first on

10:28:20 10   Google?

10:28:22 11   A.      That's right.

10:28:24 12   Q.      In summary, Dr. Heneine, did you ever hide the patent

10:28:30 13   application consciously from Gilead?

10:28:36 14   A.      No, I did not.

10:28:38 15            MR. BROWN:   No further questions, Your Honor.

10:28:39 16            THE COURT:   All right.   Thank you.   Ms. Ferrera.

10:28:47 17   Wait, before you start.   I can't get realtime.

10:30:08 18                    CROSS-EXAMINATION

10:30:09 19   BY MS. FERRERA:

10:30:10 20   Q.      Good morning, Dr. Heneine.

10:30:11 21   A.      Good morning.

10:30:12 22   Q.      Dr. Heneine, you played a role in the prosecution of

10:30:15 23   the CDC's drug patents, did you not?

10:30:12 24   A.      Yes.

10:30:12 25   Q.      You provided data and input to the patent attorneys,

Heneine - cross

10:30:23 1   is that correct?

10:30:23 2   A.      Yes.  By responding to questions or inquiries, I

10:30:28 3   would do that.

10:30:28 4   Q.      And you reviewed the prior art that was related to

10:30:31 5   the patents?

10:30:32 6   A.      Yes.

10:30:32 7   Q.      And you reviewed drafts, the responses to the office

10:30:36 8   actions when you were asked to do so?

10:30:38 9   A.      Yes.

10:30:39 10  Q.      And you sometimes participated in proposing new

10:30:42 11  claims as well, correct?

10:30:45 12  A.      Less so, that's mostly the patent lawyers writing the

10:30:51 13  claims.

10:30:51 14  Q.      When you were asked to review the claims, you looked

10:30:54 15  at them, right?

10:30:56 16  A.      Yes.

10:30:56 17  Q.      If you could turn to, I believe it's in the

10:30:59 18  cross-examination binder, Tab 17, JTX 5, do you see that?

10:31:10 19  A.      Yes.

10:31:10 20  Q.      And for everyone's sake, that's an excerpt of the

10:31:11 21  file's history, not the entire file history, but do you

10:31:18 22  recognize that, Dr. Heneine?

10:31:18 23  A.      Yes.

10:31:20 24  Q.      If I could ask you to turn to page 561.

10:31:25 25  A.      Page?

Heneine - cross

10:31:26  1    Q.      561, at the bottom there should be typed on numbers

10:31:31  2    and it should say 5.561.  Bottom left?

10:31:38  3    A.      Yes.

10:31:41  4    Q.      Let me know when you're there?  Do you have that

10:31:47  5    page, Dr. Heneine?

10:31:48  6    A.      I am, yes.

10:31:49  7    Q.      And do you recognize that as a document entitled

10:31:54  8    Amendment Accompanying a Request for a Continued

10:31:58  9    Examination?

10:31:58 10    A.      Yes.

10:32:00 11    Q.      And that was filed on July 21, 2014, do you see that?

10:32:05 12    A.      Yes.

10:32:05 13    Q.      If you turn to page 563, so two pages further in?

10:32:11 14    A.      Yes.

10:32:12 15    Q.      You see that that's a listing of claims?

10:32:15 16    A.      Yes.

10:32:15 17    Q.      And then if you turn to page 567, a few further pages

10:32:21 18    in, you see there are some claims listed starting with claim

10:32:26 19    33?

10:32:26 20    A.      Yes.

10:32:26 21    Q.      And claim 33 says new, do you see that?

10:32:30 22    A.      Uh-huh.

10:32:30 23    Q.      You understand that that means that the government

10:32:33 24    was proposing claims that were being newly added or newly

10:32:35 25    proposed as of July 21, 2014?

Heneine - cross

10:32:41 1   A.      **Yes.**

10:32:42 2   Q.      **And looking at claim 33, you see that limitation B**

10:32:47 3   **says, "administering to uninfected human a combination**

10:32:51 4   **comprising a pharmaceutically effective amount of**

10:32:55 5   **Emtricitabine and a pharmaceutically effective amount of**

10:32:58 6   **Tenofovir or Tenofovir ester."  Did I read that correctly?**

10:33:01 7   A.      **Yes.**

10:33:03 8   Q.      **If you go down a little bit further, five paragraphs**

10:33:07 9   **down, do you see a claim 38?**

10:33:09 10  A.      **Yes.**

10:33:09 11  Q.      **And that reads "the process of claim 33," that's the**

10:33:14 12  **claim that we were just looking at, "wherein the combination**

10:33:17 13  **is administered following potential exposure of the primate**

10:33:21 14  **host to the human immunodeficiency retro virus," did I read**

10:33:25 15  **that correctly?**

10:33:25 16  A.      **Yes.**

10:33:26 17  Q.      **Dr. Heneine, you understand that as of July 21, 2014,**

10:33:30 18  **you were asking the examiner to give you claims directed to**

10:33:34 19  **the use of FTC and Tenofovir for post-exposure prophylaxis?**

10:33:39 20  A.      **Yes.**

10:33:41 21  Q.      **If I can have you turn to page 5.832.**

10:33:52 22  A.      **832?**

10:33:52 23  Q.      **832.  It should be a few pages further in the**

10:34:02 24  **exhibit.**

10:34:02 25  A.      **Yes.**

Heneine - cross

Q.      We have it on the screen as well if that's easier.
This is a document entitled Supplemental Declaration for
Patent Application.  Do you see that?

A.      Yes.

Q.      And that's your signature that appears in the middle
of the page, right, Dr. Heneine?

A.      Yes.

Q.      So you signed this supplemental declaration on
March 10th, 2015?

A.      Yes.

Q.      Correct?

        And you understood that when you were signing
this declaration, you were signing under penalty of perjury,
correct?

A.      I'm sorry?

Q.      When you signed this declaration, you were signing
under the penalty of perjury, correct, Dr. Heneine?

A.      Yes.

Q.      And you worked in the government for most of your
career, correct, Dr. Heneine?

A.      Yes.

Q.      And you agree that it's important to be honest with
the government?

A.      Yes.

Q.      And it's particularly important to be honest when

Heneine - cross

10:34:56  1   you're signing a document under penalty of perjury, right?

10:34:59  2   A.      Yes.

10:35:00  3   Q.      And if we look at exactly at what you said, you

10:35:03  4   stated that you were signing under penalty of perjury, that

10:35:05  5   you had read all the contents of the patent application as

10:35:09  6   amended, right?

10:35:10  7   A.      Yes.

10:35:10  8   Q.      And that you had reviewed the content of the claims

10:35:13  9   in your patent application, right?

10:35:15 10   A.      Yes.

10:35:16 11   Q.      And that you understood the content of those claims;

10:35:19 12   correct?

10:35:19 13   A.      Yes.

10:35:20 14   Q.      And you also acknowledged under penalty of perjury

10:35:24 15   that you had a duty to disclose material information to the

10:35:27 16   PTO, correct?

10:35:28 17   A.      Yes.

10:35:29 18   Q.      This was after you had submitted claims seeking a

10:35:32 19   directive to post-exposure prophylaxis, right?

10:35:33 20   A.      Yes.

10:35:38 21   Q.      If I can have you turn in your binder to Tab 5.

10:35:52 22   That's JTX 5, do you see that Dr. Heneine?

10:35:55 23   A.      Yes.

10:35:57 24   Q.      This is the same document that your counsel showed

10:35:59 25   you a moment ago, the CDC January 2005 patent guidelines,

10:36:04 1  correct?

10:36:04 2  A.        Correct.

10:36:04 3  Q.        This document is dated January 21, 2005, right?

10:36:09 4  A.        Correct.

10:36:09 5  Q.        And I think you acknowledged during your direct

10:36:13 6  examination that you're familiar with these guidelines?

10:36:16 7  A.        Correct.

10:36:16 8  Q.        And you were familiar with them during the time that

10:36:18 9  you were doing your monkey studies, correct?

10:36:21 10  A.        Correct.

10:36:21 11  Q.        If I could have you turn to page 8.  And in the

10:36:32 12  left-hand column there it says recommendations for use of

10:36:36 13  antiretroviral nPEP; correct?

10:36:46 14  A.        Which page is it, 65.008?

10:36:51 15  Q.        Yes.

10:36:52 16  A.        Yes.

10:36:52 17  Q.        I'm sorry, it's .010, page 8 of the document.

10:36:59 18  A.        Yes.

10:37:00 19  Q.        Do you see in the left column there is a title that

10:37:02 20  says Recommendations for Use of Antiretroviral nPEP?

10:37:08 21  A.        Yes.

10:37:08 22  Q.        As we discussed previously, PEP refers to

10:37:12 23  post-exposure prophylaxis, right?

10:37:14 24  A.        Right.

10:37:14 25  Q.        And nPEP means nonoccupational post-exposure

Heneine - cross

10:37:18 1    prophylaxis; correct?

10:37:19 2    A.      Correct.

10:37:20 3    Q.      And then if I could direct your attention to the

10:37:23 4    right column, the first full paragraph that starts "no

10:37:26 5    evidence"?

10:37:28 6    A.      Yes.

10:37:29 7    Q.      And starting about five lines down, there is a

10:37:33 8    sentence that reads "preferred regimens included."  Do you

10:37:38 9    see that?

10:37:38 10   A.      Yes.

10:37:39 11   Q.      And the second regimen that's identified as

10:37:41 12   Emtricitabine with Zidovudine or Tenofovir, do you see that?

10:37:46 13   A.      Yes.

10:37:46 14   Q.      And then if you look at the next paragraph, the first

10:37:51 15   sentence says, "No evidence indicate that a three-drug HAART

10:37:56 16   regimen is more likely to be effective than a two-drug

10:38:01 17   regimen."  Right?

10:38:02 18   A.      Yes.

10:38:02 19   Q.      So in January of 2005, the CDC was recommending

10:38:08 20   post-exposure prophylaxis for nonoccupational exposure to

10:38:11 21   HIV, correct?

10:38:12 22   A.      Yes.

10:38:12 23   Q.      And it was telling people that the preferred regimens

10:38:15 24   including combinations of antiretroviral drugs, right?

10:38:20 25   A.      Yes, three drug combinations.

Heneine - cross

10:38:22 1    Q.      We'll get to that in a second.  But including in

10:38:27 2    those combinations were Emtricitabine and Tenofovir,

10:38:31 3    correct?

10:38:31 4    A.      Yes.

10:38:31 5    Q.      And Emtricitabine or FTC and Tenofovir were part of

10:38:36 6    the first listed preferred NNRTI regimen, correct?

10:38:42 7    A.      Yes.

10:38:42 8    Q.      And the CDC was telling people that there was no

10:38:45 9    evidence suggesting any difference between three drug

10:38:47 10   regimens and two drug regimens, right?

10:38:50 11   A.      Yes.

10:38:51 12   Q.      And FTC and Tenofovir for post-exposure prophylaxis

10:38:54 13   would be a two-drug regimen, correct?

10:38:57 14   A.      I'm sorry?

10:38:58 15   Q.      FTC and Tenofovir for post-exposure prophylaxis would

10:39:02 16   be a two-drug regimen; correct?

10:39:04 17   A.      Would be a what?

10:39:05 18   Q.      A two-drug regimen?

10:39:08 19   A.      Yes.

10:39:09 20   Q.      And again, Dr. Heneine, you were aware of these

10:39:12 21   recommendations when you were doing your studies in 2005 and

10:39:15 22   2006?

10:39:17 23   A.      Yes.

10:39:17 24   Q.      And you were aware of them when you sought claims for

10:39:20 25   post-exposure prophylaxis in 2014; right?

10:39:23  1    A.      Yes.

10:39:26  2    Q.      And when you sought those claims for post-exposure

10:39:30  3    prophylaxis in 2014, you did not disclose the CDC's

10:39:34  4    January 2005 PEP guidelines; correct?

10:39:37  5    A.      Correct.

10:39:38  6    Q.      Even though you knew that those guidelines included

10:39:42  7    recommendations to use FTC and Tenofovir as part of either a

10:39:46  8    two-drug or three-drug regimen for PEP, correct?

10:39:50  9    A.      Yes, the recommendations were three drugs or four

10:39:54 10    drugs combinations.  So that's why we did not -- we thought

10:40:02 11    importantly there was no efficacy data.

10:40:05 12    Q.      Well, Dr. Heneine, we just looked at the language in

10:40:09 13    the exhibit in JTX 65 that recommended three-drug or

10:40:14 14    two-drug regimens, right?

10:40:15 15    A.      It's really iterating the fact on the lack of any

10:40:19 16    efficacy.  These were recommendations based on treatment

10:40:24 17    options available at the time.  And what that language

10:40:31 18    really iterates and highlights --

10:40:34 19    Q.      Dr. Heneine, I'm going to come to that in a second

10:40:36 20    but I want to establish that the CDC guidelines are

10:40:39 21    recommending either two drug or three drug?

10:40:41 22    A.      CDC was recommending three and was commenting on

10:40:45 23    that.

10:40:45 24    Q.      And said there was no difference in efficacy between

10:40:47 25    two drug and three drug?

10:40:49 1    A.      No --

10:40:50 2              THE COURT:  Hold on.  You can't talk over each

10:40:53 3    other, let him finish.

10:40:54 4              THE WITNESS:  Thank you, Your Honor.  Table 2

10:40:56 5    lists the CDC drug recommendations and there are three or

10:41:00 6    four drug recommendations.  In the text, they comment on it.

10:41:05 7    But they are not recommending two drugs for the

10:41:12 8    nonoccupational HIV exposure.

10:41:14 9    Q.      Well, Dr. Heneine, in the text that you noted, the

10:41:19 10   CDC specifically said there is no evidence suggesting that a

10:41:24 11   three-drug regimen is more likely to be effective than a

10:41:28 12   two-drug regimen, right?

10:41:29 13   A.      There is no evidence period that any of these

10:41:33 14   combinations would work.  Those are listed there, that

10:41:37 15   doesn't mean that they would work.  So I'm not sure why we

10:41:43 16   keep talking about this question.

10:41:47 17   Q.      Let's talk about the efficacy point that you talked

10:41:50 18   about a moment ago.  When you -- so when you chose not to

10:41:59 19   disclose the CDC's PEP guidelines to the Patent Office, your

10:42:02 20   testimony today is that because those guidelines contain no

10:42:02 21   efficacy data, correct?

10:42:02 22   A.      Correct.

10:42:10 23   Q.      And you had read the PEP guidelines closely enough to

10:42:14 24   have come to that conclusion, is that your testimony?

10:42:17 25   A.      Correct.

10:42:18 1    Q.      Now, Dr. Heneine, there is no efficacy data for

10:42:25 2    post-exposure prophylaxis in your patent either, correct?

10:42:27 3    A.      Correct.

10:42:27 4    Q.      You hadn't tested any post-exposure prophylaxis

10:42:29 5    regimen in the studies that are described in your patents,

10:42:32 6    right?

10:42:32 7    A.      Correct, it does not mention in my direct that the

10:42:38 8    idea was because we demonstrated high PrEP efficacy, we

10:42:43 9    thought these data might inform PEP about the Tenofovir FTC

10:42:50 10   combination.

10:42:50 11   Q.      But we can agree that there was no efficacy data

10:42:53 12   regarding post-exposure prophylaxis in your patent, correct?

10:42:55 13   A.      Right.

10:42:56 14   Q.      But you nevertheless sought claims relating to

10:43:00 15   post-exposure prophylaxis, correct?

10:43:02 16   A.      Correct.

10:43:03 17   Q.      And you were successful in attaining claims to

10:43:07 18   post-exposure prophylaxis, correct?

10:43:08 19   A.      Correct.

10:43:09 20   Q.      Let's turn to JTX 6 in your binder.  Let me know when

10:43:33 21   you are there?

10:43:33 22   A.      I am there.

10:43:33 23   Q.      And you understand that JTX 6 is the file history for

10:43:40 24   our '333 patent?

10:43:41 25   A.      I'm sorry, which number is this?

Heneine - cross

| | | |
|---|---|---|
| 10:43:43 | 1 | Q. Your '333 patent. Do you see that? If you see in |
| 10:43:49 | 2 | the middle of the page -- |
| 10:43:50 | 3 | A. Your tab number six? |
| 10:43:52 | 4 | Q. Sorry, JTX 6, Tab 3 -- sorry, Tab 18? |
| 10:43:57 | 5 | A. Tab 18? |
| 10:43:58 | 6 | Q. Yes, my apologies. |
| 10:44:01 | 7 | A. Yes. |
| 10:44:03 | 8 | Q. So this is the file history for your '333 patent, |
| 10:44:06 | 9 | correct, Dr. Heneine? |
| 10:44:08 | 10 | A. Yes. |
| 10:44:08 | 11 | Q. If I can ask you to turn to page 6.395. Are you |
| 10:44:26 | 12 | there, Dr. Heneine? |
| 10:44:26 | 13 | A. Yes. |
| 10:44:28 | 14 | Q. This is a document entitled Amendment After Final |
| 10:44:33 | 15 | Action, right? |
| 10:44:33 | 16 | A. Correct. |
| 10:44:34 | 17 | Q. This was filed on September 27, 2016. Correct? |
| 10:44:38 | 18 | A. Correct. |
| 10:44:38 | 19 | Q. And on the following pages, do you see there is a |
| 10:44:41 | 20 | listing of claims again? |
| 10:44:42 | 21 | A. Yes. |
| 10:44:42 | 22 | Q. And if you turn to the top of page 397 -- sorry, |
| 10:44:47 | 23 | bottom of page 397 continuing to the top of page 398. Do |
| 10:44:52 | 24 | you see claim 33 listed? |
| 10:44:52 | 25 | A. Yes. |

10:44:56  1    Q.      And claim 33 is similar to claim 33 that we just

10:45:00  2    looked at in the '509 patent application, right?

10:45:06  3    A.      I think so, yes.

10:45:07  4    Q.      And if we go four paragraphs down to claim 37, it

10:45:16  5    says that the combination is administered following

10:45:19  6    potential exposure of the primate host to the human

10:45:24  7    immunodeficiency retrovirus, right?

10:45:26  8    A.      Yes.

10:45:26  9    Q.      This claim again is directed to the use of FTC and

10:45:29 10    Tenofovir as post-exposure prophylaxis in humans; correct?

10:45:32 11    A.      Correct.

10:45:36 12    Q.      If I can have you turn to page 6.411.  This is a

10:45:55 13    declaration under 37 CFR Section 1.132, do you see that?

10:46:00 14    A.      Yes.

10:46:00 15    Q.      The first paragraph of the first declaration, says

10:46:04 16    "We, Walid Heneine and Jose Gerardo Garcia-Lerma are

10:46:10 17    inventors of the above referenced patent application."

10:46:13 18    A.      Uh-huh.

10:46:14 19    Q.      If you turn to 6.414, that's your signature at the

10:46:20 20    top of the page?

10:46:20 21    A.      Correct.

10:46:21 22    Q.      You signed this on September 26, 2016, right?

10:46:24 23    A.      Yes.

10:46:24 24    Q.      And when you signed it, you had reviewed the then

10:46:27 25    pending claims, correct?

10:46:29 1    A.      Correct.

10:46:32 2    Q.      Including claim 37 which was directed to

10:46:35 3    post-exposure prophylaxis; right?

10:46:38 4    A.      Correct.

10:46:38 5    Q.      And you were again successful in getting claims to

10:46:42 6    post-exposure prophylaxis in your '333 patent; correct?

10:46:45 7    A.      Correct.

10:46:45 8    Q.      And you still did not disclose the CDC January 2005

10:46:52 9    patent guidelines, correct?

10:46:53 10   A.      Correct.

10:46:54 11   Q.      Dr. Heneine, during your direct examination you

10:46:56 12   testified that at some point the post-exposure prophylaxis

10:47:00 13   claims were disclaimed; right?

10:47:02 14   A.      Yes.

10:47:02 15   Q.      But that was only after Gilead had pointed out to you

10:47:07 16   and to the CDC that the PEP guidelines -- the existence of

10:47:11 17   the PEP guidelines and the fact that they rendered your

10:47:19 18   claims invalid, correct?

10:47:22 19   A.      I think they were disclaimed because -- mainly

10:47:25 20   because they were not really what we were focusing on.  We

10:47:30 21   were focusing on the PrEP, and which was really the critical

10:47:37 22   public health intervention.  PEP, as I mentioned, from the

10:47:45 23   beginning is an emergency treatment stringent for 28 days

10:47:52 24   that we use after an exposure to HIV, so all in all it was

10:47:56 25   not a big issue for us and a big focus for us.  The main

10:47:59 1    focus was really PrEP.

10:48:01 2    Q.      Dr. Heneine, the reason that the claims were --

10:48:05 3    relating to PEP were disclaimed was because -- was after it

10:48:10 4    had already been pointed out to you and to the government

10:48:15 5    that you had published PEP guidelines prior to the issuance

10:48:20 6    of your claims directed to PEP, correct?

10:48:24 7    A.      I don't know if we have the timing right, but as I

10:48:28 8    mentioned these were additional claims that were put in

10:48:31 9    there because of the lack of any efficacy at that time, not

10:48:36 10   really the focus of what the PEP work we were doing.

10:48:40 11   Q.      Regardless of why you sought the claims, you did

10:48:43 12   actually seek and obtain claims directed to PEP, right, Dr.

10:48:48 13   Heneine?

10:48:48 14   A.      Yes.

10:48:48 15   Q.      Dr. Heneine, last week we talked about MTAs that you

10:48:52 16   signed requesting drugs from Gilead for your PrEP monkey

10:48:55 17   study, do you recall that?

10:48:56 18   A.      Yes.

10:48:57 19   Q.      And the first of those MTAs was the 471 MTA that was

10:49:01 20   executed in December of 2004, right?

10:49:04 21   A.      Yes.

10:49:04 22   Q.      And that MTA had requested FTC for your PrEP monkey

10:49:11 23   studies, do you recall that?

10:49:11 24   A.      Yes.

10:49:12 25   Q.      And then we saw a second MTA, 649 MTA that you

Heneine - cross

10:49:16  1    executed in February of 2005, right?

10:49:18  2    A.      Yes.

10:49:19  3    Q.      And that MTA had requested Tenofovir for your PrEP

10:49:23  4    monkey study, correct?

10:49:24  5    A.      Correct.

10:49:25  6    Q.      Now you filed your provisional application on

10:49:29  7    February 3rd of 2006, do you recall that?

10:49:31  8    A.      Yes.

10:49:32  9    Q.      Just a few weeks before that, you had requested

10:49:35 10    additional drugs from Gilead, had you not?

10:49:37 11    A.      Yes.

10:49:38 12    Q.      If you turn to Tab 11 in your binder.  That's JTX

10:49:54 13    101.  Do you see that?

10:49:55 14    A.      Yes.

10:49:55 15    Q.      I'm not sure if this is in evidence yet so we'll keep

10:49:59 16    it down for a minute.  This is an e-mail chain between you

10:50:02 17    and various people in January of 2006, correct?

10:50:05 18    A.      Correct.

10:50:06 19            MS. FERRERA:  Now I'll offer JTX 101 into

10:50:09 20    evidence, Your Honor.

10:50:09 21            MR. BROWN:  No objection, Your Honor.

10:50:11 22            THE COURT:  Thank you.

10:50:12 23            (JTX Exhibit No. 101 was admitted into

10:50:12 24    evidence.)

10:50:12 25    BY MS. FERRERA:

Heneine - cross

Q.      If we go to the top of the first page, there is an

e-mail from you to Jim Rooney at Gilead.  Do you see that?

A.      Yes.

Q.      And it's dated January -- sorry, there should be a

January 6, 2006, e-mail?

A.      Yes.

Q.      And in that e-mail you're asking Dr. Rooney to

provide an additional 300 grams of FTC to support your PrEP

monkey studies, do you see that?

A.      Correct.

Q.      It's actually the second e-mail on the page.  In that

e-mail you say you're attaching an amendment to the existing

MTA, correct?

A.      Correct.

Q.      If you turn to page 2 -- sorry, Your Honor, if we

could actually pull up DTX 264.  I'm not sure if we have

this copy in your binder, Dr. Heneine, but if we could look

at it on the screen and we can substitute it out later.

Your Honor, I offer DTX 264, which is another version of the

exhibit?

                MR. BROWN:  No objection.

                THE COURT:  All right.  Thank you.

                (DTX Exhibit No. 264 was admitted into

evidence.)

BY MS. FERRERA:

Heneine - cross

Q.      If we turn to page 2, do you see that this is the
proposed amendment to the 471 MTA?

        THE COURT:  Can you make it bigger just so I can
see?

A.      Yes.

Q.      And this proposed amendment modified two of the terms
of the 471 MTA.  Do you see that?

A.      Yeah.

Q.      And then a little bit below that it says that all
other terms and conditions remain unchanged from original
agreements, do you see that?

A.      Yes.

Q.      This amendment left unchanged in paragraph 8 in the
original MTA?

A.      Correct.

Q.      You sent Gilead this first amendment in January of
2006, right?

A.      Correct.

Q.      One month later in February of 2006 you filed your
provisional patent application?

A.      Correct.

Q.      But when you made your request for drugs in January
of 2006, you didn't tell Gilead that you were planning on
filing a patent application based on the work you had done
using the material you had requested pursuant to your MTAs,

10:52:47 1   right?

10:52:47 2   A.      Yes.

10:52:48 3   Q.      Now, after you filed your provisional patent

10:52:51 4   application in February of 2006, you continued to seek more

10:52:54 5   drugs from Gilead, correct?

10:52:55 6   A.      Correct.

10:52:57 7   Q.      If I could have you turn to Tab 12, do you see a

10:53:04 8   document marked JTX 71?  Do you have that document, doctor?

10:53:15 9   A.      Yes.

10:53:15 10  Q.      And JTX 71 is an e-mail from you to Dr. Rooney at

10:53:20 11  Gilead dated February 28th, 2006.  Right?

10:53:24 12  A.      Correct.

10:53:25 13          MS. FERRERA:  Your Honor, we offer JTX 71.

10:53:27 14          MR. BROWN:  No objection.

10:53:28 15          THE COURT:  Thank you.  It's admitted.

10:53:30 16          (JTX Exhibit No. 71 was admitted into evidence.)

10:53:30 17  BY MS. FERRERA:

10:53:32 18  Q.      In your February 28, 2006, e-mail, you're requesting

10:53:36 19  now 200 grams of TDF to support your PrEP monkey studies,

10:53:41 20  right?

10:53:42 21  A.      Yes.

10:53:42 22  Q.      This is less than a month after you had filed your

10:53:46 23  provisional patent application?

10:53:47 24  A.      Correct.

10:53:48 25  Q.      In your February 28th e-mail you say you're attaching

Heneine - cross

10:53:51  1    an amendment to the current MTA requesting more TDF?

10:53:56  2    A.      Correct.

10:53:57  3    Q.      If you turn to the second page of the document, this

10:54:00  4    is the amendment to the MTA that you refer to in the e-mail,

10:54:03  5    right?

10:54:04  6    A.      Correct.

10:54:04  7    Q.      And just like the amendment that we looked at a

10:54:07  8    moment ago, this second amendment states that all other

10:54:11  9    terms besides the amended terms remain unchanged in the

10:54:15 10    original 471 MTA, correct?

10:54:18 11    A.      Correct.

10:54:18 12    Q.      As of February 28, 2006, the IP provision from your

10:54:23 13    471 MTA remains unchanged, correct?

10:54:27 14    A.      Correct.

10:54:28 15    Q.      But again nowhere in your February 28th e-mail did

10:54:33 16    you tell Gilead just a few weeks earlier you had filed a

10:54:37 17    patent application based on the results of your monkey

10:54:40 18    studies, correct?

10:54:41 19    A.      Correct.

10:54:42 20    Q.      Now, during your direct examination, your attorney

10:54:44 21    showed you PTX 882.  Maybe we can just pull that up on the

10:54:51 22    screen.  It should be in the binder that your counsel gave

10:54:57 23    you that has the government's seal on it?

10:54:59 24    A.      Which tab?

10:55:00 25    Q.      I'm not sure which -- I think it's called PTX 882.

Heneine - cross

10:55:05 1    It's in the binder from your counsel, Dr. Heneine, we have

10:55:09 2    it on the screen?

10:55:10 3    A.     I see it on the screen.

10:55:11 4    Q.     This is the e-mail that you sent to Dr. Rooney in

10:55:14 5    February of 2006 attaching your CROI presentation; right?

10:55:19 6    A.     Correct.

10:55:19 7    Q.     There is no mention in the e-mail of patent

10:55:23 8    applications?

10:55:23 9    A.     Yes.

10:55:24 10   Q.     And there is no mention in the CROI presentation of

10:55:29 11   patent applications?

10:55:30 12   A.     Yes.

10:55:31 13   Q.     And then you also talked about other drafts of your

10:55:34 14   article that you sent to Gilead I believe it was in the

10:55:39 15   previous year, PTX 1210 and 1211 and again in the

10:55:44 16   government's binder.  If we can pull those up on the screen

10:55:47 17   as well, that will help?

10:55:48 18   A.     Yes.

10:55:49 19   Q.     There is no mention of patent applications in that

10:55:52 20   draft application, right, or article, correct?

10:55:55 21   A.     Yes.

10:55:55 22   Q.     No mention of patent applications in the e-mail,

10:55:58 23   right?

10:55:59 24   A.     Yes.

10:56:01 25   Q.     Now the first time that you disclosed your patent

10:56:04 1    application to anyone outside the CDC was in your

10:56:08 2    February 2008 PLoS Medicine article, correct?

10:56:11 3    A.      Yes.

10:56:18 4    Q.      And if we could pull that up, I believe it was

10:56:20 5    PTX-443.  If we turn on to the competing interest section on

10:56:29 6    the following page.  And Dr. Heneine, again, no patent

10:56:35 7    application number identified; right?

10:56:38 8    A.      That was not customary in these publications to

10:56:44 9    include that detail.

10:56:45 10   Q.      But there is no number identified, right, right,

10:56:49 11   Dr. Heneine?

10:56:49 12   A.      Exactly.

10:56:50 13   Q.      No title of the patent application?

10:56:52 14   A.      Again, no title, not customary in a publication to

10:56:57 15   put all those details.

10:56:58 16   Q.      I understand, but there was no title, Dr. Heneine, no

10:57:03 17   compound identified?

10:57:04 18   A.      That's right.

10:57:04 19   Q.      And you agree that methods for prophylaxis could

10:57:08 20   refer to a variety of different things?

10:57:10 21   A.      Maybe, yes.

10:57:11 22   Q.      Could refer to a new gel for prophylaxis, right?

10:57:15 23   A.      That was not what the paper was about, the paper was

10:57:17 24   about PrEP with two drugs, Tenofovir and FTC.

10:57:22 25   Q.      I understand, Dr. Heneine.  My question is simply the

10:57:27 1   term methods of prophylaxis could refer to something other

10:57:31 2   what this was talking about, right?

10:57:33 3   A.      Yes.

10:57:33 4   Q.      In fact, in other articles talking about other

10:57:37 5   subjects you use the exact same competing interest language,

10:57:42 6   right?

10:57:43 7   A.      Yes.

10:57:44 8   Q.      And we can agree that PTX 443, your PLoS Medicine

10:57:50 9   article was two years after you had filed your provisional

10:57:53 10  patent application, right?

10:57:55 11  A.      Yes.

10:57:56 12  Q.      Now, Dr. Heneine, you knew that the CDC was

10:57:58 13  conducting clinical trials regarding Truvada for PrEP in the

10:58:02 14  mid to late 2000's, right?

10:58:04 15  A.      Yes.

10:58:05 16  Q.      And one of those clinical trials was the Botswana

10:58:09 17  trial, right?

10:58:10 18  A.      Yes.

10:58:10 19  Q.      And you were aware of the progress of those trials?

10:58:12 20  A.      It was not done in our branch, these were colleagues

10:58:18 21  in the division, the epidemiology branch was aware of those.

10:58:21 22  Q.      You were aware that those trials were ongoing right?

10:58:26 23  A.      Yes.

10:58:27 24  Q.      You traveled to Botswana with your colleague, Lynn

10:58:31 25  Paxton to talk about your animal studies with the Botswana

Heneine - cross

10:58:34 1   government, right?

10:58:35 2   A.        No, we talked about, there were questions on HIV drug

10:58:39 3   resistance that concerns that PrEP might increase that

10:58:44 4   resistance in the community and effect the efficacy of

10:58:49 5   treatment, I was asked because of my expertise in HIV drug

10:58:55 6   resistance to fly over to Botswana with Dr. Paxton and

10:59:00 7   address those questions.

10:59:01 8   Q.        So you went to Botswana with Dr. Paxton --

10:59:05 9   A.        To address those questions.

10:59:06 10   Q.        But you didn't tell Dr. Paxton at any time about your

10:59:09 11   patent application, correct?

10:59:10 12   A.        Yes.

10:59:15 13   Q.        Now, we saw during the jury trial that you

10:59:18 14   participated in a meeting with the FDA in 2010 to discuss

10:59:22 15   Gilead's forthcoming PrEP application.   Right?

10:59:26 16   A.        Yes.

10:59:27 17   Q.        And you knew at that time that your patent

10:59:29 18   application was pending, right?

10:59:31 19   A.        Yes.

10:59:32 20   Q.        And you certainly understood, then, Dr. Heneine, that

10:59:35 21   if Gilead's PrEP application was approved, that the claims

10:59:40 22   of your patent might cover Truvada for PrEP?

10:59:42 23   A.        Yes.

10:59:44 24   Q.        And we also saw last week that you were on the

10:59:47 25   writing committee for the CDC's PrEP guidelines that issued

10:59:51 1    in 2014?

10:59:52 2    A.      Yes.

10:59:53 3    Q.      And you understood that the goal of those guidelines

10:59:56 4    was to encourage doctors to use Truvada for PEP, correct?

11:00:00 5    A.      Yes.

11:00:01 6    Q.      And you knew that your patent applications were

11:00:06 7    pending?

11:00:06 8    A.      Yes.

11:00:07 9    Q.      And you knew that if the patent applications issued,

11:00:10 10   they might cover the use of Truvada for PrEP?

11:00:12 11   A.      Right.

11:00:13 12   Q.      But in 2016, you wrote to your boss, Dr. Mermin, we

11:00:19 13   can pull up the exhibit, JTX 106, right?  So in 2016, you

11:00:31 14   wrote to your boss, Dr. Mermin, right, Dr. Heneine?

11:00:34 15   A.      Yes.

11:00:35 16   Q.      And you told Dr. Mermin in this e-mail that Gilead

11:00:38 17   had not been approached yet; right?

11:00:42 18   A.      Yes.

11:00:46 19   Q.      So even though you knew that Gilead now had a product

11:00:50 20   on the market, drug, PrEP, and you knew that your claims in

11:00:57 21   your PrEP patents might cover Truvada for PrEP, your

11:01:00 22   understanding was that Gilead had not been approached yet as

11:01:03 23   of February 2016; right?

11:01:05 24   A.      I think what I meant, they have not been approached

11:01:09 25   for licensing.

11:01:10 1   Q.        Right.  So even though you knew that your patents

11:01:14 2   might cover Truvada for PrEP, you had made no effort to

11:01:18 3   contact Gilead and say hey, you might want to take a

11:01:23 4   license, right?

11:01:24 5   A.        That's not my job, usually that's the technology

11:01:29 6   transfer office responsibility to get licensing.

11:01:32 7   Q.        You made no effort to contact Gilead and say hey by

11:01:35 8   the way, I have a pending patent application that might

11:01:38 9   cover your product, right?

11:01:39 10  A.        Like I said, licensing and all those things are not

11:01:42 11  part of our responsibilities.

11:01:43 12  Q.        You did have a responsibility to promptly notify

11:01:47 13  Gilead of your patent application, correct?

11:01:49 14  A.        I believe the notification was made in 2008.

11:01:54 15  Q.        Not until two years after you filed your provisional

11:01:57 16  patent application?

11:01:57 17  A.        Yes.

11:01:59 18  Q.        If I could have you turn to Tab 16 in your binder,

11:02:03 19  Dr. Heneine.  That's DTX 256.  Do you see that?

11:02:12 20  A.        Yes.

11:02:12 21  Q.        This is an e-mail chain between you and someone named

11:02:12 22  Johnetta Holcomb in December 2020, right?

11:02:20 23  A.        Yes.

11:02:20 24  Q.        And the subject line is inventor royalty payments?

11:02:24 25  A.        Yes.

11:02:25 1          MS. FERRERA:  We move DTX 256 into evidence.

11:02:28 2          MR. BROWN:  No objection.

11:02:30 3          THE WITNESS:  Yes, I approved it.

11:02:36 4          THE COURT:  Okay.  It's admitted.  I approved

11:02:39 5  it, too.

11:02:40 6          (DTX Exhibit No. 256 was admitted into

11:02:40 7  evidence.)

11:02:40 8  BY MS. FERRERA:

11:02:42 9  Q.     In this e-mail Dr. Heneine, you were discussing

11:02:45 10  royalties that you were expecting to receive related to your

11:02:49 11  PrEP patent?

11:02:50 12  A.     Correct.

11:02:51 13  Q.     If you turn in to page 3, in the middle there is an

11:02:54 14  e-mail from you dated November 23, 2020?

11:02:57 15  A.     Yes.

11:02:58 16  Q.     And you were e-mailing someone named Chevonne Jones

11:03:02 17  about an outstanding royalty payment, right?

11:03:05 18  A.     Yes.

11:03:05 19  Q.     And then in an e-mail above that, you e-mail

11:03:09 20  Ms. Jones approximately two weeks later, do you see that?

11:03:12 21  A.     Yes.

11:03:12 22  Q.     Again seeking another update to your royalty

11:03:16 23  payments?

11:03:17 24  A.     Yes.

11:03:17 25  Q.     If we go to the first page, actually I guess it's

11:03:20 1    still the second page, an e-mail, you contact Ms. Jones

11:03:24 2    again, right?

11:03:24 3    A.      Yes.

11:03:24 4    Q.      On December 14, 2020?

11:03:28 5    A.      Yes.

11:03:29 6    Q.      And then if you go to the first page, you e-mail her

11:03:35 7    again on December 18, 2020?

11:03:37 8    A.      Yes.

11:03:37 9    Q.      So in less than one month you e-mail five times to

11:03:44 10   get information about your royalty payments, correct?

11:03:46 11   A.      Correct.

11:03:47 12   Q.      And when you were trying to get free drugs from

11:03:50 13   Gilead you were diligent on e-mailing them to find out what

11:03:53 14   the status of delivery and the status was of getting those

11:03:57 15   MTAs completed, right?

11:04:00 16   A.      The reason we were following up is we were told that

11:04:06 17   royalty payments had been made at least a year earlier and

11:04:09 18   they should have been received, and those payments were not

11:04:13 19   received.  So we followed up and later it turned out that

11:04:20 20   those funds were mistakenly located to a different program,

11:04:25 21   so that's why the delay in those payments to the inventors.

11:04:29 22   Q.      Right.  I understand, Dr. Heneine.  You believed you

11:04:33 23   were entitled to something and you were diligent about

11:04:35 24   following up on it, right?

11:04:36 25   A.      No, this is really a delay payment issue, I would

11:04:42 1    think you would do the same thing, too, if you were promised

11:04:45 2    that the check is in the mail, and you haven't received it

11:04:48 3    in a year.

11:04:49 4    Q.    I'm not disputing that, Dr. Heneine.  My question is

11:04:52 5    simply when you thought you were entitled to something, you

11:04:56 6    were diligent about following up to see what was going on

11:04:58 7    with it, right?

11:04:59 8    A.    Yes, like anyone would do.

11:05:01 9    Q.    And you were diligent about contacting Gilead when

11:05:04 10   you wanted free drugs, right?

11:05:05 11   A.    Right.

11:05:06 12   Q.    But you didn't send a single e-mail to Gilead

11:05:09 13   expressly telling them that you had filed a patent

11:05:12 14   application that covered Truvada for PrEP based on the

11:05:15 15   studies that you did based on the MTAs, right?

11:05:20 16   A.    Correct.

11:05:21 17            MS. FERRERA:  Thank you.  No further questions.

11:05:23 18            THE COURT:  Any redirect?

11:05:24 19            MR. BROWN:  Briefly, Your Honor, very briefly.

11:05:25 20                   REDIRECT EXAMINATION

11:05:25 21   BY MR. BROWN:

11:05:30 22   Q.    Dr. Heneine, how much in total have you received in

11:05:34 23   royalty payments for the patents in this case?

11:05:37 24   A.    Somewhere 44, $45,000.

11:05:40 25            MR. BROWN:  Thank you.  No further questions,

11:05:42   1    Your Honor.

11:05:42   2                    THE COURT:  All right.  I had a couple of

11:05:43   3    questions.

11:05:44   4                    So we saw in an e-mail where you sent

11:05:47   5    Dr. Janssen the patent number.  Do you remember that one?

11:05:50   6                    THE WITNESS:  Yes.

11:05:51   7                    THE COURT:  Did you ask Dr. Janssen why he

11:05:53   8    wanted it?

11:05:54   9                    THE WITNESS:  No.

11:05:54  10                    THE COURT:  Did you care?

11:05:55  11                    THE WITNESS:  No.

11:05:56  12                    THE COURT:  If he had said he was going to

11:05:58  13    disclose that patent number to Gilead, would you still have

11:06:01  14    given him the number?

11:06:02  15                    THE WITNESS:  Of course.

11:06:03  16                    THE COURT:  Anything you guys want to follow-up

11:06:05  17    on?

11:06:07  18                    MR. BROWN:  Nothing from the government, Your

11:06:09  19    Honor.

11:06:02  20                    MS. FERRERA:  Nothing from Gilead.

11:06:11  21                    THE COURT:  Okay.  Thank you, sir.  You may step

11:06:20  22    down.

11:06:20  23                    THE WITNESS:  Thank you.

11:06:52  24                    THE COURT:  Hold on.  Before we go on, we have

11:06:52  25    two questions from the jury so shift your hats.  Question

11:06:57  1    number one.  Can we have clarification on the, "public prior

11:07:05  2    knowledge."  Does it mean the average person or does it mean

11:07:09  3    someone within the field?

11:07:13  4            Question number two.  Clarification on

11:07:16  5    "reasonable inquiry."  Does this mean an average person or a

11:07:21  6    patient or doctor, or does it mean scientists to scientists?

11:07:31  7            Do you guys want to think about it?

11:07:39  8            MR. BASSETT:  Your Honor, I would probably like

11:07:42  9    to discuss it, but I think the answer is pretty clear, the

11:07:45 10    person of ordinary skill in the art.

11:07:47 11            THE COURT:  Why don't you look at these.  I'm

11:07:49 12    going to take a break for five minutes because I want a

11:07:52 13    break and then when we come back in a couple of minutes, we

11:07:56 14    can figure out what you want me to tell them.

11:07:58 15            COURT CLERK:  All rise.

11:08:00 16            (A brief recess was taken.)

11:44:50 17            THE COURT:  All right.  Please be seated.  You

11:44:52 18    guys are going to go home to your nice warm offices.  It's

11:44:57 19    so horrible, so sorry.

11:44:59 20            MR. BASSETT:  How long has it been like this?

11:45:02 21            THE COURT:  Really, it goes between freezing

11:45:04 22    cold and horrifyingly hot.

11:45:08 23            MR. BASSETT:  I guess this is better.

11:45:10 24            THE COURT:  But like the last couple of days

11:45:14 25    towards the end of the day, I could tell it wasn't freezing

Kirby - direct

11:45:18  1    cold, but there is like something, almost, like when you

11:45:22  2    breathe you can tell that the air is getting kind of moist.

11:45:25  3            MR. COTTRELL:  Your Honor, before we begin the

11:45:27  4    evidence, the parties filed their 50(a) motions yesterday

11:45:32  5    before the case went to the jury.

11:45:33  6            THE COURT:  Yes, I saw that.

11:45:35  7            MR. COTTRELL:  And we understand now the Court

11:45:38  8    has reserved, so it doesn't expect or want written responses

11:45:42  9    to the 50(a) motion.

11:45:45 10            THE COURT:  Yes, that's correct, thank you for

11:45:46 11    clarifying.  If there is anything -- well, I don't think I'm

11:45:49 12    going to need anything on those, and you can just renew to

11:45:52 13    the extent yes, sir.

11:45:53 14            MR. COTTRELL:  Thank you, Your Honor.

11:45:54 15            MR. HOLVEY:  Your Honor, the government calls

11:45:57 16    Dr. Tara Kirby to the stand.

11:46:11 17                    DIRECT EXAMINATION

11:46:15 18    BY MR. HOLVEY:

11:46:19 19    Q.    Good morning, Dr. Kirby.

11:46:20 20    A.    Good morning.

11:46:21 21    Q.    And I just want to remind you that you're under oath.

11:46:24 22    A.    Yes.

11:46:25 23    Q.    Would you please --

11:46:26 24            THE COURT:  I usually do that, so thank you,

11:46:28 25    Mr. Holvey.

11:46:29  1          MR. HOLVEY:  You're very welcome, Your Honor.

11:46:31  2   Q.      Would you please state your name for the record?

11:46:33  3   A.      Yes, it's Tara Leigh Kirby, T-A-R-A, L-E-I-G-H,

11:46:40  4   K-I-R-B-Y.

11:46:40  5   Q.      Would you please remind the Court your current

11:46:43  6   position within the government?

11:46:44  7   A.      Yes, I'm the director of the NIH office of technology

11:46:48  8   transfer.

11:46:48  9   Q.      I am going to ask to put PTX 1329 on the screen,

11:46:54 10   that's already been admitted into the evidence.  Dr. Kirby,

11:46:58 11   this is in your binder.

11:47:00 12   A.      I see it.

11:47:03 13   Q.      I would put it on the screen but it does not appear

11:47:06 14   that I have an operator.  So, allow me to put it on the

11:47:11 15   Elmo.

11:47:23 16          Dr. Kirby, do you recognize the document that I

11:47:46 17   put on the document cam and that's in your binder?

11:47:49 18   A.      Yes, I do.

11:47:49 19   Q.      Can you remind the Court what this document is?

11:47:52 20   A.      It's the chapter on PHS licensing policy.

11:47:52 21   Q.      Dr. Kirby turning to the second page of the document,

11:48:00 22   do you see the fourth bullet point on page 2?

11:48:02 23   A.      I do.

11:48:02 24   Q.      Could you read that for us?

11:48:04 25   A.      PHS seeks to ensure that commercial partners

Kirby - direct

11:48:08 1  expeditiously developed the licensed invention.

11:48:11 2  Q.    Is this licensing principal of the Public Health

11:48:13 3  service?

11:48:13 4  A.    It is.

11:48:13 5  Q.    How does the public health service enforce this

11:48:17 6  licensing principal on its licenses?

11:48:18 7  A.    A number of ways, when a company submits license

11:48:21 8  application, we require them to include a development plan,

11:48:25 9  a detailed development plan, we monitor their progress every

11:48:28 10 year through reporting, and then the license itself will

11:48:32 11 include benchmarks of different important points of all the

11:48:36 12 development pathways for that drug.

11:48:38 13 Q.    Thank you, Dr. Kirby.  If Gilead took a license for

11:48:42 14 use in 2006 for the CDC PrEP patents would Gilead normally

11:48:46 15 have been required as a condition of that license to seek

11:48:49 16 FDA approval of a PrEP indication in humans?

11:48:51 17 A.    I think so, yes.

11:48:53 18 Q.    Where a PHS license requires licensing orders to

11:48:57 19 apply to the FDA for a specific indication or receive FDA

11:49:01 20 approval, does the NIH communicate with the FDA regarding

11:49:04 21 FDA approval decisions of those subject drugs or other

11:49:08 22 medical products that are related to NIH licenses?

11:49:10 23 A.    No, I don't think so.

11:49:12 24 Q.    Does the public health service keep its inventions or

11:49:14 25 applications for inventions secret?

Kirby - direct

A.      Definitely not.

Q.      Gilead asked you a number of questions about how various specific circumstances might effect a PHS royalty rate during your jury testimony last week, do you remember that?

A.      Yes, I do.

Q.      In general do those specific circumstances that Gilead asked you about end up changing PHS's approach to a royalty rate?

A.      I would say no.

Q.      Why?

A.      For a number of reasons.  I think that every license depends on the specific circumstances of the license, but in general for pharmaceuticals, a lot of this would not be applicable.  For example, whether the royalty rate would be effected based on whether there is an approval for an indication, there is no approval for an indication there is no earned royalties, so I'm not sure why we would change that.  There are other examples.

Q.      Thank you very much, Dr. Kirby.

        Dr. Kirby, is there any evidence that you're aware of that proves that Gilead would have received different licensing terms or lower licensing rate if they had taken a license in 2006 compared with the terms and rates that your office offered in 2016?

Kirby - direct

11:50:28  1    A.     I don't believe so.

11:50:30  2    Q.     Dr. Kirby, did the public health service offer to

11:50:33  3    license the CDC patents to Gilead on commercially reasonable

11:50:37  4    terms?

11:50:37  5    A.     Yes, I definitely believe that's the case.

11:50:41  6    Q.     Did Gilead request a license from the public health

11:50:44  7    service or CDC relating the CDC patents?

11:50:47  8    A.     Not that I am aware of.

11:50:48  9    Q.     If Gilead made that request, would your office have

11:50:51 10    considered that request?

11:50:52 11    A.     Certainly, we would have been happy to.

11:50:55 12    Q.     Dr. Kirby, if you could turn with me in your binder

11:50:58 13    to the next document, PTX 578.

11:51:09 14           And it's on the screen -- this has not been

11:51:14 15    admitted into evidence yet.  Do you want to take this down?

11:51:17 16    Sorry.  For a moment.  Dr. Kirby, do you recognize this

11:51:20 17    document?

11:51:21 18    A.     Yes, I do.

11:51:22 19    Q.     And what is this document?

11:51:23 20    A.     This is an e-mail exchange between me and Lorie Ann

11:51:30 21    Morgan of Gilead.

11:51:30 22    Q.     When was this e-mail sent?

11:51:32 23    A.     This most recent one was April 12, 2017.

11:51:36 24    Q.     Did you author that e-mail?

11:51:37 25    A.     I did.

Kirby - direct

11:51:38 1          MR. HOLVEY:  And I would like to move for

11:51:40 2  admission of PTX 578.

11:51:45 3          MR. COOK:  No objection.

11:52:08 4          THE COURT:  Sorry.  We have a verdict.  But I'm

11:52:10 5  just trying to figure out what we should do vis-a-vis, they

11:52:14 6  just got their lunch.  He's going to see what they want to

11:52:39 7  do.  Go ahead.

11:52:41 8          MR. HOLVEY:  So, Your Honor, I would move

11:52:43 9  admission of PTX 578.

11:52:46 10         MR. COOK:  No objection.

11:52:47 11         THE COURT:  All right.

11:52:48 12         (PTX Exhibit No. 578 was admitted into

11:52:49 13  evidence.)

11:52:49 14  BY MR. HOLVEY:

11:52:51 15  Q.     Dr. Kirby, looking at the first e-mail, first in time

11:52:54 16  on the last page of the e-mail chain, when was that e-mail

11:52:57 17  sent and who was it from?

11:52:59 18  A.     That was sent on February 15, 2017, and that was from

11:53:07 19  Lorie Ann Morgan.

11:53:07 20  Q.     And what is attached to that e-mail?  Or what was

11:53:12 21  attached to that e-mail?

11:53:12 22  A.     A timeline that they prepared that showed what they

11:53:18 23  believed the progression of PrEP development was.

11:53:21 24  Q.     And the next e-mail up on this page, was there also

11:53:24 25  an attachment?

11:53:25 1    A.     Yes.  It was a PowerPoint presentation.

11:53:29 2    Q.     Okay.  And could you please describe to the Court

11:53:32 3    what Gilead discussed with you in 2017?

11:53:35 4    A.     Yes.  At a high level, they said that they believed

11:53:40 5    the patents were invalid and provided some documents that

11:53:43 6    they thought were relevant to that.  They also provided

11:53:48 7    excerpts of two MTAs that they said showed that we were

11:53:55 8    breaching those MTAs.

11:53:59 9              THE COURT:  So do we want to -- the jury wants

11:54:02 10   to come in now.  Sorry, do you mind stepping down and we'll

11:54:07 11   take a break -- I just want to get the citizens serving out

11:54:11 12   of here.

11:54:12 13            MR. HOLVEY:  Of course, Your Honor.

11:54:18 14            (A brief recess was taken.)

12:10:28 15            THE COURT:  All right.  When you're ready.

12:10:38 16            MR. HOLVEY:  Thank you, Your Honor.

12:10:39 17   BY MR. HOLVEY:

12:10:40 18   Q.     Dr. Kirby before the brief break we were talking

12:10:42 19   about the second e-mail from the bottom on PTX 578 dated

12:10:51 20   February 16th of 2017.  Do you see that e-mail?

12:10:52 21   A.     Yes.

12:10:54 22   Q.     Okay.  And was there an attachment to this e-mail?

12:10:57 23   A.     Yes, there was a PowerPoint presentation.

12:11:00 24   Q.     And could you please describe -- I'm sorry, we're

12:11:02 25   describing it again, but could you please describe what

Kirby - direct

12:11:08 1   Gilead discussed with you in 217 relating to that

12:11:12 2   presentation?

12:11:12 3   A.     At a high level, they expressed that they believe

12:11:14 4   that the CDC PrEP patents were invalid, and provided some

12:11:19 5   documents that they felt pointed to that.  They also

12:11:28 6   provided information about two MTAs that they believe that

12:11:32 7   we may have breached.

12:11:35 8   Q.     This was a presentation that they gave to you in

12:11:38 9   person that you attended?

12:11:39 10  A.     Well, over the phone and webcam, yes.

12:11:41 11  Q.     Got you.  And how detailed was that presentation?

12:11:44 12  A.     It was very detailed.

12:11:45 13  Q.     And to your recollection, how many MTAs did Gilead

12:11:49 14  say the government had breached during that discussion and

12:11:51 15  presentation?

12:11:52 16  A.     I'm pretty sure it was two.

12:11:54 17  Q.     And to your recollection, how many CTAs did Gilead

12:11:58 18  say the government had breached during that discussion and

12:12:02 19  presentation?

12:12:02 20  A.     I don't recall them mentioning any CTAs.

12:12:04 21  Q.     Were CTAs ever discussed with you regarding the CDC

12:12:08 22  patents during that time frame?

12:12:10 23  A.     Not that I can recall.

12:12:12 24  Q.     Did Gilead provide you with references to prior art

12:12:14 25  that it thought was relevant to CDC patents during and

Kirby - direct

12:12:19 1   before that meeting?

12:12:19 2   A.      There was some information in those slides, I had

12:12:23 3   also received some information indirectly that Gilead had

12:12:27 4   provided to Dr. Mermin.

12:12:28 5   Q.      Could you tell me a little bit more about that?

12:12:30 6   A.      Sure.  I think a couple of weeks before this, I heard

12:12:34 7   Gilead had a conversation with Dr. Mermin and mentioned two

12:12:39 8   publications that they felt were relevant, I don't believe

12:12:42 9   they provided specifics on those references, at least we

12:12:45 10  weren't aware of them, so I think I think Dr. Heneine looked

12:12:48 11  up what he thought might be those references and gave them

12:12:51 12  to me.

12:12:51 13  Q.      What did do you with those references and also the

12:12:54 14  references relating to the presentation?

12:12:55 15  A.      I gave everything to our contract law firm and they

12:12:59 16  filed an IDS.

12:13:02 17  Q.      Thank you very much.

12:13:04 18          Prior to the 2017 meeting, Dr. Kirby, when you

12:13:11 19  sent those reference to the law firm, did you withhold any

12:13:14 20  references that Gilead had provided to you or that you were

12:13:16 21  aware of at that time?

12:13:17 22  A.      I don't believe so.

12:13:18 23  Q.      Dr. Kirby, did you watch the house over site

12:13:24 24  committees hearing attended by Mr. O'Day in May of 2019?

12:13:30 25  A.      Yes, I did.

Kirby - direct

12:13:31  1   Q.      Did you watch it live as it was being conducted?

12:13:34  2   A.      I believe so.

12:13:34  3   Q.      Did you hear Mr. O'Day say that Gilead was not going

12:13:38  4   to challenge the CDC patents?

12:13:40  5   A.      Yes, I certainly did.

12:13:41  6   Q.      Are you aware that in 2019 in August, 3 months later,

12:13:46  7   Gilead filed four IPRs against each of the CDC PrEP patents?

12:13:51  8   A.      Yes, I am.

12:13:52  9   Q.      Would you please turn in your binder to the next four

12:13:56 10   documents, sorry, eight documents later, PTX 1044, 1045,

12:14:01 11   1046, and 1047.

12:14:04 12   A.      Yes.

12:14:04 13   Q.      And could you look at those documents and make sure

12:14:08 14   you have a sense of what they are?

12:14:12 15   A.      Yes.

12:14:15 16   Q.      Okay.  And do you recognize these four documents?

12:14:18 17   A.      Yes.  They're all petitions for IPR filed by Gilead.

12:14:24 18   Q.      When were these documents filed with the PTO?

12:14:29 19   A.      I have to refresh my memory.  One moment.

12:14:36 20   August 2019.

12:14:37 21   Q.      And when those documents were filed, did you receive

12:14:40 22   copies of those documents?

12:14:42 23   A.      I did.

12:14:42 24   Q.      And did you read those copies?

12:14:45 25   A.      Yes, I did.

Kirby - direct

12:14:47  1        MR. HOLVEY:  Your Honor, the government would

12:14:50  2  move that exhibits PTX 1044, 1045, 1046 and 1047 be admitted

12:14:55  3  into evidence.

12:14:56  4        MR. COOK:  No objection.

12:14:57  5        THE COURT:  Thank you.  They're admitted.

12:14:59  6        MR. HOLVEY:  Thank you very much.

12:15:00  7        (PTX Exhibits No. 1044, 1045, 1046, and 1047

12:15:01  8  were admitted into evidence.)

12:15:01  9  BY MR. HOLVEY:

12:15:02 10  Q.      Dr. Kirby if you turn with me to PTX 1040, 1041,

12:15:07 11  1042, and 1043.

12:15:13 12  A.      Yes.

12:15:13 13  Q.      And do you see those documents?

12:15:16 14  A.      I do.  Yes.

12:15:25 15  Q.      And do you recognize those documents?

12:15:27 16  A.      I do.

12:15:27 17  Q.      And what are those documents?

12:15:29 18  A.      These are all the decisions on the inter partes

12:15:33 19  reviews, all denied institution.

12:15:35 20  Q.      And when were these documents filed by the patent

12:15:39 21  trial and appeal board?

12:15:40 22  A.      February 20th of 2020, and I think also earlier in

12:15:43 23  February, there were two sets.

12:15:45 24  Q.      And when these documents were filed, did you receive

12:15:45 25  copies of these documents?

Kirby - direct

12:15:50 1    A.      I did.

12:15:50 2    Q.      Did you read those copies?

12:15:52 3    A.      I did.

12:15:52 4            MR. HOLVEY:  Your Honor the government would

12:15:54 5    move PTX 1040, 1041, 1042 and 1043 into evidence at this

12:15:59 6    time.

12:15:59 7            MR. COOK:  No objection, but I believe that 1040

12:16:02 8    and 1041 are already admitted.

12:16:06 9            THE COURT:  They're admitted to the extent that

12:16:08 10   they weren't already.

12:16:08 11           (PTX Exhibits No. 1040, 1041, 1042, and 1043

12:16:08 12   were admitted into evidence.)

12:16:10 13   Q.      Dr. Kirby can you turn with me to PTX 1042?

12:16:14 14   A.      Okay.

12:16:14 15   Q.      And on ten -- in 1042, if you turn with me to page 4

12:16:14 16   and then 5?

12:16:14 17   A.      Yes.

12:16:20 18   Q.      Could you tell me what reference is being discussed

12:16:29 19   in item 5?

12:16:32 20   A.      Item 5 is I believe the Smith reference.

12:16:32 21   Q.      Could you tell give me the title of the Smith

12:16:32 22   reference?

12:16:32 23   A.      That's Antiretroviral Post-exposure Prophylaxis After

12:16:42 24   Sexual, Injection-drug use, or other Nonoccupational

12:16:42 25   Exposure to HIV in the United States.

Kirby - direct

12:16:50 1   Q.      And could you turn with me to page 45 of the

12:16:55 2   decision?

12:17:01 3   A.      All right.  My fingers are a little cold.

12:17:04 4   Q.      No problem.

12:17:05 5   A.      Page 45, yes.

12:17:06 6   Q.      There is a section entitled Analysis of Alleged

12:17:11 7   Obviousness.  Do you see that section?

12:17:12 8   A.      Yes, I do.

12:17:13 9   Q.      What do you understand that section to be discussing?

12:17:15 10  A.      Whether or not Szekeres is obvious over the prior

12:17:24 11  art, obvious with respect to these patents.

12:17:29 12  Q.      Is it with respect to Szekeres and Smith or just

12:17:35 13  Szekeres?

12:17:35 14  A.      They also mention Smith, yes.

12:17:37 15  Q.      If you'll turn with me to page 53, which is the first

12:17:40 16  full paragraph in the middle of the page?

12:17:44 17  A.      Uh-huh.

12:17:45 18  Q.      Do you understand the PTAB to have reached a

12:17:48 19  conclusion regarding that analysis?

12:17:49 20  A.      Yes, I do.

12:17:50 21  Q.      What is that conclusion?

12:17:51 22  A.      That the petition and the petitioner had not

12:17:54 23  established a reasonable likelihood that they would prevail

12:18:01 24  in showing this patent to be unpatentable and un-obvious.

12:18:04 25  Q.      Thank you Dr. Kirby.  Dr. Kirby are aware of the

12:18:09 1  PTAB's ability to deny the patients based on their

12:18:11 2  discretion rather than the merits?

12:18:12 3  A.      Yes, I am.

12:18:14 4  Q.      Would you turn with me to page 55?

12:18:16 5  A.      Yes.

12:18:17 6  Q.      And on page 55 in the first full paragraph, do you

12:18:20 7  have an understanding of how the PTAB denied Gilead's

12:18:23 8  petition?

12:18:24 9  A.      Yes, I do.

12:18:24 10  Q.      What is that understanding?

12:18:26 11  A.      That it is not through their discretion, it was

12:18:30 12  through -- based on the merits of the challenge to the

12:18:34 13  claims.

12:18:34 14  Q.      Thank you, Dr. Kirby.  And do you have that

12:18:37 15  understanding for each of the other three petitions?

12:18:39 16  A.      Yes.

12:18:40 17  Q.      Thank you.

12:18:41 18

12:18:44 19            MR. HOLVEY:  One moment, Your Honor.

12:18:46 20            Thank you, Your Honor.  No further questions for

12:18:51 21  Dr. Kirby at this time.

12:18:52 22            THE COURT:  Mr. Cook.

12:19:02 23            MR. COOK:  Thank you, Your Honor.

12:19:02 24                CROSS-EXAMINATION

12:19:02 25  BY MR. COOK:

12:19:04 1    Q.        Good afternoon, Dr. Kirby.

12:19:05 2    A.        Good afternoon.

12:19:06 3    Q.        My name is Tim Cook.  We haven't had the opportunity

12:19:09 4    to meet before.

12:19:10 5               You understand that the CDC's PrEP patents that

12:19:15 6    are at issue in this case claim priority to a provisional

12:19:18 7    application that was filed in February 2006, correct?

12:19:21 8    A.        That would be my recollection, yes.

12:19:23 9    Q.        And you had no involvement in the decision to file a

12:19:27 10   patent application, correct?

12:19:28 11   A.        That's right.

12:19:28 12   Q.        And you also had no involvement in the decision to

12:19:32 13   file the non-provisional application the next year, correct?

12:19:34 14   A.        That's also correct.

12:19:36 15   Q.        As of 2006 and 2007, you had no responsibility for

12:19:41 16   prosecution of the patent portfolio that includes the

12:19:45 17   patents in this case, correct?

12:19:47 18   A.        That's correct.

12:19:47 19   Q.        And you had no responsibility for the PrEP patents at

12:19:49 20   issue in this case until early 2014; correct?

12:19:52 21   A.        Yes, that's correct.

12:19:52 22   Q.        That was more than eight years after the provisional

12:19:55 23   application was filed; correct?

12:19:57 24   A.        That seems to be correct, yes.

12:19:59 25   Q.        And more than seven years after the non-provisional,

Kirby - cross

12:20:02 1    correct?

12:20:02 2    A.      Yes.

12:20:03 3    Q.      Now, when you took over the management of the PrEP

12:20:06 4    patent portfolio in 2014, no effort was made to determine

12:20:11 5    whether there were any applicable MTAs, correct?

12:20:15 6    A.      I am not aware of an effort, at least not by myself.

12:20:19 7    Q.      So you didn't make any attempt to determine if there

12:20:21 8    were MTAs related to the patents, correct?

12:20:24 9    A.      I personally did not.

12:20:25 10   Q.      And did you not make any attempt at that time to

12:20:28 11   determine if any obligations under the MTAs had been met

12:20:31 12   with respect to the CDC's PrEP patents, correct?

12:20:37 13   A.      That's correct, I wasn't aware of any obligations.

12:20:40 14   Q.      Okay.  Now, Gilead and the CDC have entered into

12:20:44 15   Material Transfer Agreements other than the ones that are at

12:20:47 16   issue in this case, correct?

12:20:48 17   A.      I believe so.

12:20:49 18   Q.      Let's take a look, you should have a cross binder up

12:20:53 19   there.  Do you have it?  Great.  Let's take a look at Tab 4,

12:20:57 20   which is DTX 323?

12:21:02 21   A.      Okay.

12:21:02 22   Q.      This is an e-mail from someone at the NIH to someone

12:21:06 23   at Gilead, correct?

12:21:08 24   A.      That's right.

12:21:08 25   Q.      And you were copied, correct?

Kirby - cross

12:21:10  1    A.        Correct.

12:21:11  2              MR. COOK:  Your Honor, defendants offer DTX 323

12:21:14  3    into evidence.

12:21:15  4              MR. HOLVEY:  No objection, Your Honor.

12:21:16  5              THE COURT:  Thank you.  It's admitted.

12:21:17  6              (DTX Exhibit No. 323 was admitted into

12:21:18  7    evidence.)

12:21:18  8    BY MR. COOK:

12:21:19  9    Q.        The e-mail was someone at the NIH with the title

12:21:22 10    licensing and partnering manager, correct?

12:21:24 11    A.        Actually licensing and patenting manager.

12:21:27 12    Q.        I'm sorry, licensing and patenting manager, right?

12:21:30 13    A.        Yes.

12:21:30 14    Q.        And it's addressed specifically to someone at Gilead,

12:21:33 15    correct?

12:21:33 16    A.        Yes, it is.

12:21:34 17    Q.        And the subject is patent filing, correct?

12:21:38 18    A.        Yes.

12:21:38 19    Q.        The first line of this e-mail if we go to the body

12:21:42 20    says this is notification that the CDC has filed a U.S.

12:21:42 21    provisional patent application.  Correct?

12:21:42 22    A.        That is correct.

12:21:42 23    Q.        The e-mail expressly says that it's a notification,

12:21:52 24    correct?

12:21:52 25    A.        It does say a notification.

Kirby - cross

12:21:55 1    Q.      And the e-mail was the exact serial number of the

12:21:59 2    application that was filed, correct?

12:22:00 3    A.      I believe so.

12:22:01 4    Q.      The e-mail was sent on June 14th, 2017, correct?

12:22:06 5    A.      Yes, that appears to be the case.

12:22:08 6    Q.      And the patent application that's discussed here was

12:22:11 7    filed about three months earlier on March 20th of 2017;

12:22:15 8    correct?

12:22:15 9    A.      Yeah, that's what that e-mail says.

12:22:17 10   Q.      So the e-mail also states this invention arose from

12:22:22 11   CDC's use of materials provided under Material Transfer

12:22:26 12   Agreement and then it gives a number, between CDC and

12:22:29 13   Gilead.  Correct?

12:22:30 14   A.      Yes, it does.

12:22:31 15   Q.      But the e-mail refers to a specific patent

12:22:34 16   application and a specific MTA number, correct?

12:22:37 17   A.      Yes.

12:22:40 18   Q.      And the e-mail ends, if we go to the last sentence,

12:22:43 19   please confirm the receipt of this e-mail.  Correct?

12:22:46 20   A.      Yes, that's what it says.

12:22:47 21   Q.      This is an e-mail that NIH sent to Gilead in 2017.

12:22:52 22   Correct?

12:22:52 23   A.      Yes, it is.

12:22:52 24   Q.      Now, this is not about a patent application that's at

12:22:56 25   issue in this case, right?

Kirby - cross

A.        That's right.

Q.        In fact, this e-mail is about a patent application that the CDC is pursuing related to uses of a different one of Gilead's drugs from the ones that are at issue in this case, correct?

A.        I believe that's so.

Q.        Dr. Heneine is one of the inventors listed on this patent application too, correct?

A.        Yes, I believe that's true.

Q.        But again, this patent application is based on studies done with drugs that Gilead provided to Dr. Heneine for free; correct?

A.        As far as I am aware they were provided at no cost, right.

Q.        Now, the MTA discussed here is not one of the MTAs at issue in this case, right?

A.        No.

Q.        And in fact, you previously testified that the MTA mentioned in this e-mail does not even have a prompt notification requirement; correct?

A.        There is no notification requirement for inventions, right.

Q.        But even without that requirement, you still sent all of the information in that e-mail to Gilead; correct?

A.        Without that specific requirement, yes, I did.

12:23:59 1    Q.      And you understand that the MTAs at issue in this

12:24:01 2    case did have a requirement for prompt notification to

12:24:04 3    Gilead, correct?

12:24:06 4    A.      That's my understanding.

12:24:08 5    Q.      But you're not aware of anyone sending the e-mail

12:24:11 6    like the one we just looked at to Gilead around the time the

12:24:14 7    2006 application was filed for the PrEP patents, correct?

12:24:18 8    A.      I am not aware of any such e-mail.

12:24:20 9    Q.      Now, you are aware that the government has pointed to

12:24:23 10   some other documents like the PLoS article that it contends

12:24:29 11   notified Gilead of the patent application, correct?

12:24:31 12   A.      I am aware of that article, yeah.

12:24:33 13   Q.      I'm sorry?

12:24:34 14   A.      I'm aware of that article.

12:24:36 15   Q.      And in fact you sent the article to Gilead in 2017,

12:24:42 16   correct?

12:24:43 17   A.      Yes, and also earlier.

12:24:46 18   Q.      Okay.  Now, let's put that article, which is PTX 425,

12:24:50 19   already in evidence, on the screen beside the e-mail that we

12:24:54 20   just looked at.  Okay?  So PTX 425 is a published scientific

12:25:11 21   article, correct?

12:25:12 22   A.      Yes.

12:25:12 23   Q.      It's not an e-mail that was specifically sent to

12:25:12 24   Gilead, correct?

12:25:17 25   A.      That's true.

Kirby - cross

12:25:18 1    Q.      And PTX 425 does not refer to a specific patent

12:25:24 2    application number, correct?

12:25:25 3    A.     I am not aware that it does, I can't quite read it,

12:25:29 4    but I think that's my recollection.

12:25:31 5    Q.      Okay.  The thing that you're saying that you can't

12:25:33 6    quite read is the conflict of interest section, right?

12:25:36 7    A.     I think so, yes.

12:25:36 8    Q.      It's a small section, right?

12:25:38 9    A.     Well, on this certainly.

12:25:40 10   Q.      Why don't we blow it up?  There is no patent

12:25:44 11   application number listed there, correct?

12:25:47 12   A.      Yes, there is some description of the patent, but no

12:25:51 13   patent number.

12:25:51 14   Q.      Right.  So the only reference to a patent application

12:25:53 15   in this article is that general reference in the conflict of

12:25:57 16   interest section, right?

12:25:59 17   A.      That's all that I am aware of.

12:26:01 18   Q.      And the competing interests section doesn't refer to

12:26:05 19   the title of the patent application, correct?

12:26:08 20   A.      I don't see it there, correct.

12:26:08 21   Q.      It doesn't say anything about the date the

12:26:12 22   application was filed, correct?

12:26:13 23   A.      That also seems to be correct.

12:26:16 24   Q.      The 2008 PLoS article does not refer to a specific

12:26:21 25   Material Transfer Agreement, correct?

Kirby - cross

12:26:23 1    A.      I don't believe that it does.

12:26:24 2    Q.      Now, you agree that there are a lot of differences

12:26:28 3    between what's in the notification e-mail that we just

12:26:30 4    looked at, DTX 323, and what's in the PLoS article, PTX 425,

12:26:36 5    correct?

12:26:37 6    A.      There are certainly differences.

12:26:39 7    Q.      But the PLoS article is what Dr. Heneine sent to

12:26:43 8    Gilead, correct?

12:26:44 9    A.      That's what I understand.

12:26:45 10   Q.      Gilead never got an e-mail like the one on the left,

12:26:48 11   correct?

12:26:48 12   A.      Not that I am aware of.

12:26:51 13   Q.      Okay.  Now, in 2017, you corresponded with Gilead

12:26:56 14   several times about the CDC's PrEP patents, correct?

12:26:59 15   A.      Yes, I did.

12:27:00 16   Q.      And you had a call that with Gilead that you

12:27:03 17   testified about on direct in February of 2017, correct?

12:27:06 18   A.      Yes.

12:27:06 19   Q.      Let's take a look at Tab 6 in your binder, which is

12:27:10 20   DTX 354, already in evidence.

12:27:12 21   A.      Yes.

12:27:14 22   Q.      There is a presentation that begins on the second

12:27:17 23   page of this document; correct?

12:27:22 24   A.      Yes.

12:27:22 25   Q.      And this is the presentation that Gilead gave to you

Kirby - cross

12:27:25 1    in that February 2017 call; correct?

12:27:31 2    A.    I believe it is.  I would have to do a comparison to

12:27:36 3    be sure, but it looks very similar.

12:27:38 4    Q.    Let's take a look at page 6, which is slide number

12:27:42 5    five.

12:27:49 6    A.    Okay.

12:27:50 7    Q.    Gilead told you about the CDC's PEP guidelines in

12:27:54 8    this meeting, correct?

12:27:56 9    A.    I'm sorry, can you repeat that?

12:27:57 10   Q.    Gilead told but the CDC's PEP guidelines, the

12:28:01 11   January 2005 PEP guidelines in this meeting, correct?

12:28:05 12   A.    Yes, I believe so.

12:28:06 13   Q.    If we turn to page 14, which is slide 13?

12:28:15 14   A.    13, okay.

12:28:16 15   Q.    Gilead also told you that the CDC PEP guidelines had

12:28:19 16   not been provided to the Patent Office during the

12:28:22 17   prosecution of the PrEP patents; correct?

12:28:26 18   A.    I believe that is correct.

12:28:28 19   Q.    And up to this point, CDC in fact had not disclosed

12:28:33 20   its own HIV PEP guidelines to the Patent Office during

12:28:36 21   prosecution of these patents; right?

12:28:38 22   A.    I believe that's the case.

12:28:40 23   Q.    And on the next page of the slide deck, Gilead told

12:28:44 24   you that the CDC PEP guidelines anticipated four claims of

12:28:48 25   the '509 patent; correct?

Kirby - cross

12:28:53  1    A.      That appears to be what they said, yes.

12:28:55  2    Q.      And the CDC PEP guidelines weren't disclosed to the

12:29:01  3    Patent Office until the following month in March of 2017,

12:29:05  4    correct?

12:29:05  5    A.      I don't remember the exact date but that seems like

12:29:07  6    the correct time frame, yes.

12:29:08  7    Q.      So just a few weeks after Gilead gave you have this

12:29:11  8    presentation, the CDC disclosed PEP guidelines to the Patent

12:29:16  9    Office, correct?

12:29:16 10    A.      That's correct.

12:29:17 11    Q.      Now, Gilead told you about other problems that it

12:29:20 12    perceived with the '509 patent during this meeting, correct?

12:29:24 13    A.      I believe so, yes.

12:29:25 14    Q.      Let's turn to page 18.  Slide 17.

12:29:33 15    A.      Okay.

12:29:33 16    Q.      Now, Gilead told you about the pre-clinical trials

12:29:37 17    using TDF for PrEP; correct?

12:29:40 18    A.      I believe so, yes.

12:29:43 19    Q.      Gilead told you about grant proposals to use Truvada

12:29:46 20    for PrEP in clinical trials right after Truvada was

12:29:50 21    approved; correct?

12:29:51 22    A.      Yes, I believe so.

12:29:53 23    Q.      Gilead told you that at least one doctor may have

12:29:56 24    given Truvada for PrEP before the patent's critical date;

12:30:00 25    correct?

Kirby - cross

12:30:01 1    A.      Yes.   They said that was a possibility.

12:30:02 2    Q.      Gilead also told you that it believed it contributed

12:30:05 3    to the patented inventions, correct?

12:30:08 4    A.      They did say that, yes.

12:30:10 5    Q.      Gilead told you that it believed that the government

12:30:13 6    failed to comply with the MTA notice provisions, correct?

12:30:17 7    A.      Yes, they informed us of that.

12:30:19 8    Q.      But despite this presentation, the government still

12:30:22 9    insisted that Gilead license the PrEP patents, correct?

12:30:26 10   A.      Yes, because we didn't agree with their assertion.

12:30:28 11   Q.      Now, you engaged in further communication with Gilead

12:30:33 12   throughout 2017, correct?

12:30:34 13   A.      Yes, that's correct.

12:30:35 14   Q.      Let's take a look at Tab 7 in your binder, which is

12:30:39 15   DTX-327.   DTX-327 is a letter that Gilead sent you on

12:30:48 16   May 4th, 2017, correct?

12:30:49 17   A.      Yes, that appears to be correct.

12:30:51 18   Q.      And you received the letter, correct?

12:30:54 19   A.      Let me look at it a little bit longer and make sure.

12:31:00 20   Q.      Sure.

12:31:01 21   A.      Yes.

12:31:02 22           MR. COOK:  Your Honor, defendants offer DTX 323

12:31:05 23   into evidence, I'm sorry, 327.

12:31:06 24           MR. HOLVEY:  No objection, Your Honor.

12:31:06 25           THE COURT:  Thank you.  It's admitted.

Kirby - cross

12:31:10 1          (DTX Exhibit No. 327 was admitted into

12:31:12 2  evidence.)

12:31:12 3  BY MR. COOK:

12:31:12 4  Q.      Now if we can put that up on the screen.  In the

12:31:16 5  second paragraph, Gilead told you, get it blown up here,

12:31:19 6  that it continued to harbor serious concerns regarding one,

12:31:25 7  CDC's conduct in applying for a patent claiming that of

12:31:29 8  preventing HIV infections in humans without providing the

12:31:33 9  required contractual notice to Gilead.  Two, CDC's claim to

12:31:36 10  have invented those methods during the course of the macaque

12:31:40 11  study which Gilead helped to design and for which Gilead

12:31:43 12  supplied the drug.  And three, the invalidity and potential

12:31:46 13  unenforceability of the patent claims based on, among other

12:31:50 14  things, prior art work by CDC that was never disclosed to

12:31:53 15  the Patent Office.  Correct?

12:31:55 16  A.      That's what this says, yes.

12:31:57 17  Q.      In fact, Gilead consistently told you this during

12:32:01 18  your negotiations with them, correct?

12:32:03 19  A.      I believe so, yes.

12:32:04 20  Q.      Yet, NIH continued to demand that Gilead take a

12:32:08 21  license even after this letter, correct?

12:32:12 22  A.      Yes, because that was their opinion and we did not

12:32:12 23  necessarily believe that their assertions were correct.

12:32:12 24  Q.      Now, NIH is continuing to prosecute new patent

12:32:12 25  applications in the CDC PrEP patent family even today,

Kirby - cross

12:32:24 1    correct?

12:32:25 2    A.    I am not aware of that because I am not responsible

12:32:28 3    for those anymore.

12:32:29 4    Q.    You have no knowledge of what's going on with the

12:32:32 5    prosecution of the patent family anymore?

12:32:38 6    A.    I may have looked at that, but I don't have any

12:32:40 7    specific knowledge.  We certainly are still maintaining

12:32:44 8    those patents at issue.  I am not sure, at one point we had

12:32:49 9    filed continuations, I'm not sure of the status of those at

12:32:53 10   this time.

12:32:53 11   Q.    You also testified during your direct about Gilead's

12:32:56 12   IPR petitions, correct?

12:32:58 13   A.    Yes.

12:32:58 14   Q.    You're not a lawyer, correct?

12:33:00 15   A.    I am not a lawyer.

12:33:01 16   Q.    You're not a member of the patent bar, correct?

12:33:03 17   A.    I am not.

12:33:04 18   Q.    Now, you know there was a dispute during the IPR's

12:33:08 19   about whether the claims preambles are limited, correct?

12:33:12 20   A.    I am aware of that.

12:33:12 21   Q.    Gilead argued that they were not correct?

12:33:16 22   A.    That is what I recall.

12:33:20 23   Q.    And the government argued that they were, correct?

12:33:22 24   A.    I believe that to be the case, yes.

12:33:24 25   Q.    The PTAB adopted the government's position and found

Kirby - cross

12:33:28  1    that the preambles required efficacy, correct?

12:33:34  2    A.    I believe so, although to say more certainly I would

12:33:38  3    have to see the document to refresh my memory.

12:33:41  4    Q.    Why don't we take a look at Tab 10 in your binder,

12:33:44  5    PTX 1040, and take a look at page 12?

12:33:54  6    A.    Okay.

12:33:58  7    Q.    Do you see the last full paragraph on the page?

12:34:02  8    A.    Yes.

12:34:03  9    Q.    Says we conclude that the efficacy language of claims

12:34:06 10    1 and 13, and it says what that is, should be given

12:34:10 11    patentable weight.  Do you see that?

12:34:12 12    A.    I do.

12:34:12 13    Q.    So PTAB adopted the government's position, found that

12:34:16 14    the preambles to require efficacy, correct?

12:34:20 15    A.    That would seem to be the case from this reading.

12:34:24 16    Q.    Now, the PTAB denied institution because it thought

12:34:28 17    the references cited in the petition did not disclose

12:34:31 18    efficacy, correct?

12:34:32 19    A.    I believe that is maybe the case.  Can you point me

12:34:37 20    to another area of this?

12:34:39 21    Q.    Sure, why don't we take a look at page 26, again the

12:34:42 22    last full paragraph on that page.

12:34:46 23    A.    Okay.  Sorry, it's quite a big document, so thank

12:34:51 24    you.

12:34:52 25          And where again?

Kirby - cross

12:34:53  1   Q.      If you take a look at the second sentence, also

12:34:57  2   explained above, neither Szekeres nor Smith discloses the

12:35:02  3   limitation of efficacy, either expressly or inherently, do

12:35:05  4   you see that?

12:35:05  5   A.      I do.

12:35:06  6   Q.      That was what the PTAB concluded in its review,

12:35:10  7   right?

12:35:10  8   A.      Right.

12:35:12  9   Q.      Do you know if patent claims are construed the same

12:35:15 10   way during IPR that they are during patent prosecution?

12:35:19 11   A.      Well, I believe that in general the patent law is the

12:35:29 12   same for all things.  I know that different information can

12:35:32 13   be provided in an IPR versus prosecution of a patent or

12:35:37 14   other activities at the Patent Office.

12:35:38 15   Q.      That's your understanding of patent law, you don't

12:35:41 16   have any understanding of the difference in the claim

12:35:43 17   construction standard between prosecution and IPR's?

12:35:48 18   A.      I am aware of it, I am not an expert obviously

12:35:51 19   because I am not a patent professional.

12:35:54 20   Q.      Now, in its IPR petitions, Gilead challenged claim 12

12:35:59 21   of the '509 patent as anticipated by the PEP guidelines,

12:36:02 22   correct?

12:36:02 23   A.      I believe so.

12:36:04 24   Q.      After Gilead filed a petition, the government

12:36:05 25   disclaimed claim 12 and several of the dependent claims that

12:36:11 1    covered PEP, correct?

12:36:12 2    A.      I believe that to be the case.

12:36:14 3    Q.      And it did the same thing for challenged PEP claims

12:36:17 4    in the 333 patent, correct?

12:36:19 5    A.      I believe that's true.

12:36:20 6    Q.      The PTAB never considered whether the CDC PEP

12:36:24 7    guidelines anticipated the PEP claims in the '509 and '333

12:36:28 8    patents because of those disclaimers, correct?

12:36:32 9    A.      I believe that to be the case.  I believe they were

12:36:37 10   -- I think they were only looking at claims directed to PrEP

12:36:40 11   that had not been claimed.

12:36:43 12   Q.      Okay.  If we look back at PTX 1040, the same document

12:36:47 13   we were looking at, look at page 21.  Do you see the section

12:36:55 14   that has the title anticipation by Smith?

12:37:00 15   A.      Yes, right in the middle.

12:37:01 16   Q.      The second sentence, because patent owner has

12:37:05 17   disclaimed claims 12 and 14 to 18, we only analyze

12:37:09 18   petitioner's challenge of claim 13.  Correct?

12:37:12 19   A.      Yes.

12:37:12 20   Q.      So the PTAB didn't consider whether the PEP claims

12:37:17 21   that the government did claim were anticipated during the

12:37:20 22   IPRs, correct?

12:37:22 23   A.      That appears to be the case, yes.

12:37:25 24   Q.      And because of the government disclaimers, we don't

12:37:27 25   know what the PTAB would have said about whether the PEP

Kirby - cross

12:37:30 1    guidelines anticipated the PEP claims, correct?

12:37:32 2    A.      That seems true, yes.

12:37:34 3    Q.      Now, in the jury trial, you testified about a 2014

12:37:39 4    e-mail to Gilead about licensing the CDC PrEP patents;

12:37:43 5    correct?

12:37:44 6    A.      Yes, I did.

12:37:45 7    Q.      And you're not aware of any communication with Gilead

12:37:48 8    about licensing the PrEP patents before that date, correct?

12:37:52 9    A.      I am not aware of any such communications.

12:37:55 10   Q.      And as of 2014, you were aware that Gilead's Truvada

12:37:59 11   product was being used for PrEP, correct?

12:38:01 12   A.      Yes, I was.

12:38:01 13   Q.      You were aware that the FDA had approved Truvada to

12:38:05 14   be sold for PrEP a couple of years before that, correct?

12:38:07 15   A.      Yes, I was.

12:38:09 16   Q.      So you're not aware of any communications from the

12:38:13 17   government to Gilead about licensing the PrEP patents before

12:38:15 18   the FDA approved Truvada for PrEP; correct?

12:38:19 19   A.      I am not aware of any communications before the

12:38:22 20   approval.

12:38:22 21   Q.      And you're also not aware of any communication from

12:38:26 22   the government to Gilead about licensing the PrEP patents

12:38:28 23   before Gilead was selling Truvada for PrEP, correct?

12:38:33 24   A.      I am not aware of those.

12:38:34 25   Q.      Now, from a public health perspective, it's a good

12:38:37  1    thing that Gilead is selling Truvada for PrEP, correct?

12:38:41  2    A.    I would say so, yes.

12:38:42  3    Q.    And back in 2014, Gilead was the only company selling

12:38:47  4    Truvada for PrEP, correct?

12:38:48  5    A.    I believe so, yes.

12:38:49  6    Q.    It would have been unethical for Gilead to stop

12:38:53  7    selling Truvada for PrEP at that point, correct?

12:38:56  8    A.    I think that's correct, yes.

12:38:58  9    Q.    Even in this case, you're aware that the government

12:39:01 10    has argued that nobody in the United States is trying to

12:39:04 11    restrict PrEP for or change anything about its availability,

12:39:09 12    correct?

12:39:09 13    A.    I believe that's the case, yes.

12:39:11 14    Q.    And again, that's because it would be unethical to do

12:39:14 15    so, correct?

12:39:15 16    A.    It seems that restricting an approved drug would be

12:39:23 17    unethical.

12:39:23 18    Q.    When the government first approached Gilead about

12:39:26 19    licensing the CDC patents, Gilead's choices in your view

12:39:30 20    were either to pay the royalties the government was

12:39:30 21    demanding, or take the unethical side and pull the drug from

12:39:33 22    the market, correct?

12:39:33 23    A.    That's not correct.

12:39:37 24    Q.    Is there any other options that Gilead would have had

12:39:39 25    at that point?

12:39:40  1    A.      Certainly there are a number of other options.  They

12:39:43  2    could have proposed and actually negotiated in good faith

12:39:46  3    with us to find an amicable solution.  They could have also,

12:39:50  4    you know, further argued their case about the patentability,

12:39:54  5    we never at any point asked them to withdraw their product

12:39:58  6    and they never asked us whether we would intend to do that,

12:40:01  7    we certainly could have answered that question for them, and

12:40:04  8    I think that bore itself out that we have not prevented them

12:40:07  9    from continuing to sell Truvada and Descovy through this

12:40:10 10    whole process.

12:40:10 11    Q.      That negotiation you just referred to would be a

12:40:13 12    negotiation about a royalty, correct?

12:40:15 13    A.      I actually offered things that were not earned

12:40:20 14    royalties and they were not accepted.

12:40:22 15    Q.      It would have been money, correct?

12:40:23 16    A.      Yes, money, but I also never heard any other good

12:40:27 17    faith arguments of other options to me particularly.

12:40:32 18    Q.      If the government had approached Gilead about the CDC

12:40:36 19    PrEP patents before Truvada was approved for PrEP in 2012,

12:40:40 20    Gilead would have had more options than it had in 2015,

12:40:44 21    correct?

12:40:46 22    A.      I'm not certain whether it would or not, I think it's

12:40:49 23    possible, but I think a lot of things in 2014 were similar

12:40:52 24    to when we actually licensed those patents starting in 2016.

12:40:57 25    Q.      Before 2014, Gilead would have had the opportunity to

12:41:00 1   obtain freedom to operate for Truvada for PrEP before its

12:41:04 2   product was on the market, correct?

12:41:06 3   A.       Certainly, although I thought the approval was

12:41:12 4   earlier, but I take your point, yes.

12:41:14 5              MR. COOK:  Thank you.  I have nothing further.

12:41:18 6              THE COURT:  Redirect.

12:41:19 7              MR. HOLVEY:  Very briefly, Your Honor.

12:41:22 8                  REDIRECT EXAMINATION

12:41:23 9   BY MR. HOLVEY:

12:41:25 10  Q.       If we could pull up DTX 323?

12:41:29 11  A.       Should I go back to that?

12:41:32 12  Q.       Yes.  It's going to be in the cross binder, I think

12:41:35 13  it's Tab 4.

12:41:42 14  A.       The e-mail from Karen Surabian --

12:41:47 15  Q.       Yes to Dr. Doyle?  Dr. Kirby, are you looking with me

12:41:50 16  at DTX 323?

12:41:51 17  A.       I am.

12:41:52 18  Q.       Why did your office send this e-mail?

12:41:55 19  A.       Well, partially out of abundance of caution because

12:42:00 20  we were already having discussions with Gilead and the issue

12:42:02 21  with the prior MTAs had come up.  A major reason was because

12:42:02 22  in that MTA it promised Gilead a royalty free nonexclusive

12:42:12 23  internal use license, so I wanted them to be aware that they

12:42:20 24  had that right because we filed a patent application.  There

12:42:22 25  was also a requirement that was not very -- it might have

12:42:30 1  been the way we worded it, that said before there is a

12:42:34 2  publication, we would provide the documents to Gilead to

12:42:38 3  review so they could let us know if they needed to ask us to

12:42:42 4  wait so this they could file a patent application or do some

12:42:45 5  other activity.  So we felt that this kind of captured both

12:42:50 6  eventualities.

12:42:50 7  Q.     Were you concerned -- when you say a publication, how

12:42:54 8  does a publication relate to a patent application?

12:42:57 9  A.     Patent applications publish after eighteen months, so

12:43:01 10  this was well before that, this was three months after we

12:43:04 11  first filed, so that was plenty of time for them to voice

12:43:08 12  any concerns.

12:43:09 13  Q.     This MTA that was referenced in this document, MTA HD

12:43:12 14  STPV 116181-05, does that MTA have a notice provision at all

12:43:23 15  related to that MTA to your knowledge?

12:43:25 16  A.     Not with respect to invention, but with respect to

12:43:29 17  publication, yes.

12:43:31 18  Q.     Okay.  Great.

12:43:33 19         MR. HOLVEY:  Nothing further, Your Honor, from

12:43:37 20  Dr. Kirby.

12:43:37 21         THE COURT:  All right.  Thank you.  Thank you,

12:43:40 22  Dr. Kirby.  Anything else?

12:43:42 23         MR. HOLVEY:  Yes, Your Honor.  At this time we

12:43:46 24  have two designations we would like to enter into the

12:43:51 25  record.  I believe we have previewed those to Your Honor.

| | |
|---|---|
| 12:43:57 1 | We're happy to read them now.  We're also happy to submit |
| 12:44:00 2 | them electronically for your later consideration. |
| 12:44:04 3 | THE COURT:  Do you have them highlighted? |
| 12:44:07 4 | MR. HOLVEY:  We do, we noticed an error on one, |
| 12:44:10 5 | we're ready to read it correctly or correct it -- |
| 12:44:13 6 | THE COURT:  Why don't you do that, submit them |
| 12:44:14 7 | and then we'll have them placed into the record and we'll |
| 12:44:17 8 | take a look at them. |
| 12:44:18 9 | MR. HOLVEY:  Thank you very much, Your Honor.  I |
| 12:44:20 10 | don't have anything further. |
| 12:44:23 11 | MR. BROWN:  No, Your Honor, we think we have |
| 12:44:25 12 | some unrelated issues to discuss, but we can break for lunch |
| 12:44:28 13 | now. |
| 12:44:29 14 | THE COURT:  Okay.  Well, what are the unrelated |
| 12:44:34 15 | issues?  Are they about this or about the jury trial? |
| 12:44:37 16 | MR. BROWN:  More the jury trial, Your Honor. |
| 12:44:39 17 | THE COURT:  So I want to finish this for right |
| 12:44:41 18 | now and then I will get to those.  So you don't have |
| 12:44:43 19 | anything further on this issue, this trial? |
| 12:44:45 20 | MR. BROWN:  No, Your Honor. |
| 12:44:47 21 | MR. HOLVEY:  For the record, Your Honor, there |
| 12:44:50 22 | are two designations, Ms. Vazquez's and Mr. Hitchcock. |
| 15:06:32 23 | (Videotaped deposition of Martha Vazquez:) |
| 15:07:06 24 | Q.    Good morning, Ms. Vazquez. |
| 15:07:11 25 | A.    Good morning. |

Q.      Sorry.  Would you please state your name and personal address for the record.

A.      My name is Martha Vazquez, and I live in 816 Palm Avenue, Redwood City, California 94061.

Q.      Okay.  I guess do you understand that you have been designated to testify on behalf of Gilead as corporate witness today?

A.      I was told that yesterday.

Q.      Okay.  And do you understand that you were designated to testify regarding a topic, topic 46?

A.      Correct.

Q.      Okay.  The 30(b)(6) deposition notice.  I'm going to mark as Exhibit 1, the 30(b)(6) notice in this case.

        Yeah.  It's further back in the document. There's a lot of numbered paragraphs.  And do you see that that topic says:

        All MTA's between the Department of Health and Human Services (HHS), including operating divisions of HHS, such as CDC and NIH and Gilead, relating to HIV research and amendments thereto, all communications between HHS and Gilead regarding these MTA's, all communications with Gilead regard these MTA's, and all communications regarding compliance with these MTA's.

        Did I read that correctly?

A.      Yes.

15:09:38  1    Q.      Okay.  And have you ever seen this topic before

15:09:42  2    today?

15:09:42  3    A.      Yes -- no, not -- not before today.

15:09:46  4    Q.      Is it -- is this the first time you're seeing that

15:09:51  5    topic?

15:09:52  6    A.      Yes.

15:09:52  7    Q.      Okay.  Do you understand that you're here to testify

15:09:57  8    on behalf of Gilead as a corporate witness on that topic?

15:10:02  9    A.      Yes.

15:10:10 10    Q.      Okay.  In general, just looking at this topic, do you

15:10:14 11    have an understanding of what is an MTA?

15:10:18 12    A.      It's a Material Transfer Agreement.

15:10:22 13    Q.      Okay.  And when you joined Gilead, what was your

15:10:26 14    position there?

15:10:27 15    A.      All right.  I was an administrative assistant to

15:10:33 16    Dr. Hitchcock.

15:10:34 17    Q.      To Mitch Hitchcock?

15:10:37 18    A.      Mick Hitchcock.

15:10:47 19    Q.      And so you were his administrative assistant, and

15:10:52 20    that was in 1996?

15:10:54 21    A.      Correct.

15:10:54 22    Q.      And do you recall what his position was at that time?

15:10:58 23    A.      He was VP of strategic planning.

15:11:04 24    Q.      How long were you his administrative assistant?

15:11:05 25    A.      I was with him for thirteen years -- thirteen years

15:11:13 1   up until 2009.

15:11:15 2   Q.      Okay.  Until 2009.  So your involvement with the

15:11:19 3   MTA's, was that part of your role as an administrative

15:11:26 4   assistant --

15:11:27 5   A.      Yes.

15:11:31 6   Q.      -- to Mitch Hitchcock?  Okay.

15:11:43 7           Were there any other administrative assistants

15:11:47 8   for other people within strategic planning --

15:12:05 9   A.      I don't --

15:12:12 10  Q.      -- that were working on -- on -- had the same role

15:12:17 11  working on the MTA's as you did?

15:12:20 12  A.      No.

15:12:21 13  Q.      Okay.  Why did the MTA's fall to Mick Hitchcock and

15:12:29 14  you?

15:12:30 15  A.      Norbert Bischofberger was in charge of that -- of

15:12:35 16  those, of approving material transfer agreements.  And he

15:12:41 17  passed that duty on to Mick Hitchcock --

15:12:45 18  Q.      Okay.

15:12:56 19  A.      And therefore, I was doing the administrative things

15:13:03 20  for the MTA's.

15:13:03 21  Q.      Okay.  Well, I have a couple of questions just to

15:13:05 22  clarify that.

15:13:09 23           You said -- Norbert Bischofberger, he approved

15:13:12 24  the MTA's?

15:13:13 25  A.      Before Mick.

15:13:14 1    Q.      Okay.   And then he handed that responsibility to

15:13:18 2    Mick?

15:13:19 3    A.      Correct.

15:13:20 4    Q.      Okay.   And so do you know what Mick's

15:13:24 5    responsibilities were regarding -- I guess let me strike

15:13:27 6    that.

15:13:28 7             With what were -- what was Mick's process for

15:13:33 8    approving the MTA's?

15:13:36 9    A.      I don't know.

15:13:38 10   Q.      Okay.   So for example, if an MTA process at that time

15:13:43 11   -- or like a prospective material transfer agreement process

15:13:48 12   was sent to him, did he then forward it to you to negotiate

15:13:53 13   the terms of that MTA?

15:13:55 14   A.      No.

15:13:56 15   Q.      Okay.   What would happen if he was sent a potential

15:14:02 16   material transfer agreement process?

15:14:02 17   A.      I don't know.   I'm -- I don't know.

15:14:05 18   Q.      Okay.   So in your coordination of the MTA's, how did

15:14:09 19   you get involved?

15:14:11 20   A.      Only when he sent them to me to go ahead and do the

15:14:11 21   work --

15:14:12 22   Q.      Okay.

15:14:20 23   A.      -- prepare the material transfer agreement process --

15:14:24 24   Q.      Okay.

15:14:28 25   A.      -- that sort of thing.

15:14:30  1    Q.      So he would send them to you -- so Mick had -- Mick

15:14:36  2    Hitchcock would send them to you, and he would say:  Prepare

15:14:40  3    the MTA process?

15:14:41  4    A.      Correct.

15:14:42  5    Q.      Okay.  And what would he send to you?

15:14:44  6    A.      Only a description of the study.

15:14:48  7    Q.      Okay.  And this description, was it usually in the

15:14:51  8    form of an e-mail?

15:14:53  9    A.      Perhaps, yes.

15:14:54 10    Q.      Okay.  So there wasn't like a standard form you would

15:14:58 11    get?  It would -- it would be like a -- just a description

15:15:03 12    of the project?

15:15:04 13    A.      Correct.

15:15:05 14    Q.      Okay.  And did this description often come from,

15:15:15 15    like, outside investigators or outside scientists?

15:15:20 16    A.      Some of them, yes.

15:15:21 17    Q.      Okay.  And then he would forward that e-mail or that

15:15:25 18    description to you and say:  Please work on this MTA

15:15:29 19    process?

15:15:29 20    A.      Yes.

15:15:40 21    Q.      Okay.  And then were you involved at all in, I guess,

15:15:44 22    keeping track of those MTA's or filing those MTA's?

15:15:49 23    A.      Yes, it was.

15:15:51 24    Q.      Okay.  Can you explain -- I guess describe your role

15:15:55 25    in keeping track of those MTA's?

15:15:58 1    A.      I would just keep them in the file.  Create a file

15:16:02 2    folder for that investigator and keep it.

15:16:07 3    Q.      Okay.  And these file folders, were they kept in hard

15:16:11 4    copy?

15:16:12 5    A.      Some.  Most of them were in the computer, soft copy.

15:16:17 6    Q.      Okay.  So were they stored in a computer database?

15:16:21 7    A.      Yes.

15:16:22 8    Q.      Okay.  What -- what is the name of that database?

15:16:26 9    A.      It was FileMaker Pro.

15:16:53 10   Q.      So the FileMaker Pro system would have contained a

15:16:58 11   PDF of the final MTA process; is that correct?

15:17:05 12   A.      Correct.

15:17:05 13   Q.      Okay.  Did it contain any other documents?

15:17:08 14   A.      It contained different things that I needed to do.

15:17:12 15   Q.      Okay.

15:17:13 16   A.      Like it contained a form for FedEx --

15:17:19 17   Q.      Okay.

15:17:26 18   A.      -- order form to or the compounds from our labs.

15:17:29 19   Q.      And was that for the purpose of managing to make sure

15:17:33 20   that drugs were sent out on time and that you managed the

15:17:37 21   receipts from that?

15:17:38 22   A.      Correct.

15:17:39 23   Q.      Okay.  So once it was entered into FileMaker Pro, you

15:17:44 24   stored in this database, information about, you know, when

15:17:48 25   drugs were sent out and when they were received?

15:17:52  1    A.        Correct.

15:17:53  2    Q.        Okay.  Did you ever keep any correspondence leading

15:17:57  3    up to the MTA's?  For example, e-mails back and forth or

15:18:02  4    negotiations on the MTA's, were those stored in FileMaker

15:18:08  5    Pro?

15:18:08  6    A.        No.

15:18:10  7    Q.        Okay.  But to the extent you coordinated, did you

15:18:15  8    have a way to store that information or organize that

15:18:20  9    information?

15:18:21 10    A.        I had file folders in my Outlook.

15:18:33 11    Q.        And then did anyone reach -- ever reach out to you in

15:18:37 12    regards to this case to have you help search for documents

15:18:41 13    that might be related to it?

15:18:43 14    A.        I don't remember.

15:18:44 15    Q.        Okay.  So you don't remember one way or another.

15:18:52 16    Okay.

15:18:52 17            In addition to what you stored in FileMaker Pro

15:18:59 18    and in addition to what you stored in Outlook that is now to

15:19:05 19    your understanding -- or to your knowledge not there

15:19:09 20    anymore, were there -- was there anywhere else that you

15:19:12 21    stored information or documents related to MTA's?

15:19:17 22    A.        No.

15:19:20 23    Q.        Okay.  Did you keep track of when individuals may

15:19:33 24    have provided results from the MTA process studies or may

15:19:36 25    have provided publications related to the MTA process

15:19:41 1   studies?

15:19:41 2   A.      If they sent it to me, yes, I would -- I would keep a

15:19:46 3   record of it.

15:19:47 4   Q.      Okay.  And how would you keep a record of that?

15:19:50 5   A.      I would submit it to an internal process for review

15:19:58 6   --

15:19:58 7   Q.      Okay.

15:20:00 8   A.      -- called PDN.

15:20:02 9   Q.      Okay.  Sorry.  Called?

15:20:05 10  A.      Public disclosure --

15:20:08 11  Q.      Okay.

15:20:10 12  A.      -- notification.

15:20:12 13  Q.      So PDN stands for public?

15:20:16 14  A.      Disclosure notification notice.

15:20:20 15  Q.      Okay.  And did you understand what the purpose of the

15:20:24 16  PDN system is?

15:20:26 17  A.      No, I don't.

15:20:30 18  Q.      Okay.  Can you explain to me how you use the PDN

15:20:35 19  system?

15:20:36 20  A.      To submit publications sent to me.

15:20:47 21  Q.      Okay.  So public disclosure notification.

15:20:50 22          Was that an internal Gilead system?

15:20:53 23  A.      Yes.

15:20:54 24  Q.      Okay.  But you don't know who had access to it or who

15:20:58 25  saw it?

15:20:58  1    A.      Correct.

15:20:59  2    Q.      Okay.  And what kind of a system was it?  Like was it

15:21:03  3    like a -- I don't know.  Was it like a database or --

15:21:08  4    A.      It's a database.

15:21:10  5    Q.      Okay.  So when you entered information about public

15:21:14  6    -- publications into the public disclosure notification

15:21:17  7    database, what would you enter into that database?  Like a

15:21:24  8    -- would you, I guess, upload a PDF in there?

15:21:29  9    A.      Correct.

15:21:30 10    Q.      Okay.  Would you -- was there -- I guess because it's

15:21:34 11    a database, were there any fields to fill out, for example,

15:21:41 12    MTA process number or investigator name?

15:21:46 13    A.      Investigator name, authors.

15:21:49 14    Q.      Okay.  Were there any other fields that you can

15:21:52 15    recall?

15:21:52 16    A.      Authors, where they were presenting it, and what

15:21:56 17    compound it was related to.

15:21:59 18    Q.      Okay.  Anything else?

15:22:00 19    A.      That's about it.

15:22:01 20    Q.      Okay.  When you would enter this information in the

15:22:08 21    public disclosure notification database, was this

15:22:12 22    information that was sent to you directly by the

15:22:13 23    investigators?

15:22:17 24    A.      Yes.

15:22:17 25    Q.      Okay.  Were you the point of contact for the

15:22:20  1    investigators regarding disclosures of papers?

15:22:26  2    A.      No.

15:22:26  3    Q.      Okay.  Do you know who the point of contact would

15:22:31  4    have been?

15:22:32  5    A.      I -- I don't know for sure.

15:22:34  6    Q.      Okay.  But they would send it to you?

15:22:37  7    A.      Yes.

15:22:38  8    Q.      Okay.  And how did they know to send it to you?

15:22:41  9    A.      Sometimes they would read the contract or -- the

15:22:46 10    Gilead contract where it stated that we need to get

15:22:51 11    publications.  Other than that, I don't know.

15:22:54 12    Q.      Okay.  And where it said under this contract that

15:23:00 13    they need to send this information to Gilead, did it list

15:23:10 14    your name?

15:23:10 15    A.      No.

15:23:11 16    Q.      Okay.  Did the standard form list any names?

15:23:14 17    A.      No.

15:23:14 18    Q.      Okay.  So when individuals would send this, they

15:23:18 19    sometimes sent it to you.  Did they ever send it to other

15:23:22 20    people that would forward it to you?

15:23:24 21    A.      I don't know.

15:23:26 22    Q.      Okay.  So everything that was entered in the public

15:23:28 23    disclosure notification system by you was stuff that was

15:23:34 24    e-mailed directly to you?

15:23:36 25    A.      Correct.

15:23:36 1   Q.      Okay.  Did anybody else enter information into the

15:23:40 2   public disclosure notification database?

15:23:43 3   A.      All Gilead have access to publication -- to that PDN.

15:23:50 4   Q.      Okay.  So everyone at Gilead would have had access to

15:23:54 5   PDN?

15:23:56 6   A.      To PDN, yes.

15:23:59 7   Q.      And was there anything else that individuals at

15:24:03 8   Gilead were using PDN for other than MTA's?

15:24:09 9   A.      It wasn't necessarily for MTA's.  It's just a public

15:24:13 10  disclosure system.

15:24:14 11  Q.      Okay.

15:24:15 12  A.      So all Gilead -- all Gilead has access to that

15:24:19 13  database.  Not necessarily just for MTA's.

15:24:22 14  Q.      Okay.  So when you go to the public disclosure

15:24:26 15  database, you can enter information about MTA's, right?  You

15:24:31 16  said that there's maybe a field for the investigator and the

15:24:36 17  publication.  You could upload the PDF.

15:24:58 18          Were there sections for other types of

15:25:01 19  information?

15:25:02 20  A.      No.

15:25:02 21  Q.      Okay.  So it was just publications related to the

15:25:02 22  MTA's?

15:25:02 23  A.      No.  It -- the --

15:25:12 24  Q.      Sorry.  Just explain.  Yeah.

15:25:15 25  A.      -- PDN, it's a general review system for Gilead --

15:25:24  1    Q.      Okay.

15:25:26  2    A.      -- not necessarily for MTA's.

15:25:29  3    Q.      Okay.  So it's used -- is it used to store just all

15:25:34  4    articles and disclosures that Gilead may have?

15:25:40  5    A.      Correct.

15:25:42  6    Q.      Okay.  So articles that would come in through an MTA

15:25:53  7    process would be entered in there, and you would -- you

15:25:57  8    would maybe upload the PDF and list the investigator and

15:26:04  9    that information; but if they got information from another

15:26:08 10    source that was unrelated to a MTA process, they would

15:26:15 11    upload that as well?

15:26:16 12    A.      Correct.

15:26:17 13    Q.      Okay.  And what type of information was that?

15:26:20 14    A.      I don't know.

15:26:21 15    Q.      Okay.  Was it generally related to publications and

15:26:25 16    presentations?

15:26:27 17    A.      Correct.

15:26:29 18    Q.      Okay.  So it's -- essentially it's a database where

15:26:40 19    it -- it lists like publications, presentations, and general

15:26:48 20    -- I'm try to understand.

15:26:52 21            Like just general scientific information?

15:26:52 22    A.      Correct.

15:26:57 23    Q.      Okay.  So with MTA's, it sounds like your roles were

15:27:02 24    coordinating the signature and legal review of the MTA's; is

15:27:08 25    that correct?

15:27:08 1    A.      Correct.

15:27:09 2    Q.      Okay.  And you were also responsible for coordinating

15:27:14 3    the, I guess, distribution of the -- the drugs --

15:27:22 4    A.      Correct.

15:27:32 5    Q.      And then you were also responsible for putting

15:27:36 6    information regarding publications or presentations?  Or I

15:27:41 7    guess, results, whatever was received from investigators,

15:27:52 8    you were responsible for putting those in the PDN?

15:27:55 9    A.      Correct.

15:27:56 10   Q.      Okay.  And when you put those -- that information

15:28:00 11   into the PDN, did you ever inform anybody that you were

15:28:04 12   doing it?  You know, like:  I'm going to put this in the

15:28:09 13   PDN?

15:28:11 14   A.      I usually informed the contact person, whoever had

15:28:15 15   asked me to send the material --

15:28:18 16   Q.      Okay.

15:28:20 17   A.      -- and I would put it in PDN.

15:28:25 18   Q.      I'm going to mark as Exhibit 2, a document that has

15:28:30 19   -- bearing Bates numbers GILDDE00990462 through 469.

15:28:50 20          Okay.  And what is this document?

15:28:52 21   A.      It's a Material Transfer Agreement process.

15:28:52 22   Q.      Okay.  And is this a PowerPoint presentation?

15:28:52 23   A.      Yes.

15:29:02 24   Q.      Okay.  Do you recall whether or not -- I see that --

15:29:02 25   on the front, do you recognize that's your name on the

15:29:11 1    front?

15:29:12 2    A.      Correct.

15:29:13 3    Q.      Okay.  And it's dated October 8, 2008?

15:29:19 4    A.      Correct.

15:29:20 5    Q.      Okay.  Do you recall ever presenting this PowerPoint

15:29:24 6    to anyone?

15:29:25 7    A.      I gave it to my new boss.

15:29:29 8    Q.      Okay.  And who was your new boss?

15:29:32 9    A.      Kathy Roskos.

15:29:38 10   Q.      And so you gave -- this was an overview of the

15:29:42 11   Material Transfer Agreement process --

15:29:49 12   A.      Of my process --

15:29:53 13   Q.      -- right?

15:29:55 14   A.      Yes.

15:29:56 15   Q.      So you -- you were the assistant to Mick Hitchcock

15:30:01 16   from approximately 1996, you said, to 2009.

15:30:05 17           After that, was Kathy Roskos, I guess your boss?

15:30:18 18   A.      Correct.

15:30:19 19   Q.      Okay.  And what position were you in when Kathy

15:30:22 20   Roskos became your -- your -- I guess your supervisor?

15:30:28 21   A.      I was an associate of operations.

15:30:32 22   Q.      Okay.  And so your title was associate of operations.

15:30:36 23           What was he -- what were your responsibilities

15:30:40 24   in that position?

15:30:41 25   A.      I continued to do the material transfer agreements.

15:30:46 1   Also, I was doing project and product codes for the -- for

15:30:52 2   Gilead.

15:31:04 3   Q.      Okay.  Did your role change with regard to the MTAs

15:31:07 4   when you became associate of operations?

15:31:10 5   A.      It was more focused on MTAs and the product codes.

15:31:15 6   Q.      Okay.  Did you have any new responsibilities

15:31:18 7   regarding the MTAs?

15:31:19 8   A.      No.

15:31:25 9   Q.      Okay.  And do you have any responsibilities for MTAs

15:31:32 10  --

15:31:32 11  A.      I don't.

15:31:33 12  Q.      -- once you moved in 2019?

15:31:37 13  A.      No, I don't.

15:31:38 14  Q.      Okay.  When you were -- before you became an

15:31:42 15  associate operations in 2019, you mentioned before that

15:31:49 16  Kathy Roskos was your supervisor.

15:31:58 17          Did you have any other supervisors other than

15:32:03 18  Mitch -- I'm sorry -- Mick Hitchcock -- I'll do that every

15:32:09 19  time -- or Kathy Roskos?

15:32:12 20  A.      No.  Because he was retiring, so he -- I moved over

15:32:17 21  to work for Kathy.  She was reporting to the new VP.

15:32:22 22  Q.      Okay.  And who was the new VP that Kathy was

15:32:22 23  reporting to?

15:32:22 24  A.      Laura Lehman.

15:32:30 25  Q.      Okay.  And she was VP.  Do you know her full title?

15:32:44 1   A.        VP of project and portfolio management.

15:32:48 2   Q.        And who was in charge of approving the MTAs when you

15:32:53 3   worked for Kathy and Laura?

15:32:56 4   A.        Laura Prestia was the final signature.

15:33:10 5   Q.        And what was Kathy's role?

15:33:13 6   A.        She was my immediate supervisor.

15:33:15 7   Q.        Okay.  And did she, I guess, recommend MTAs for

15:33:19 8   approval or did she have a role in approving the MTAs?

15:33:24 9   A.        No.

15:33:24 10  Q.        And when you worked for Kathy Roskos, was your --

15:33:29 11  would she e-mail you?  Like you said before with Mick

15:33:35 12  Hitchcock, he would e-mail you, I guess, information about

15:33:38 13  the project from the investigator and then you would

15:33:43 14  provide, I guess, standard language to them; and they would

15:33:47 15  come back to you, and then you would possibly forward that

15:33:51 16  on to contracts legal.

15:33:57 17            Is that the description you provided earlier?

15:34:01 18  A.        Correct.

15:34:02 19  Q.        Okay.  Was that still the process when you worked for

15:34:02 20  Kathy Roskos?

15:34:02 21  A.        Yes.

15:34:02 22  Q.        Okay.  And would she e-mail you the project -- the

15:34:12 23  projects?

15:34:14 24  A.        Not necessarily her.  But they would go through her

15:34:22 25  -- like the scientists, if they got a request, they would

15:34:27 1  send it to me directly, and I would just kind of inform her.

15:34:32 2  Q.      Okay.  So at that point the scientists were

15:34:35 3  communicating with you directly?

15:34:37 4  A.      Correct.

15:34:38 5  Q.      And then you would just --

15:34:40 6  A.      And the investigators as well.

15:34:56 7  Q.      Okay.  So you might receive correspondence or

15:34:59 8  publications from that investigator related to the MTAs?

15:35:03 9  A.      If they sent it to me, yes.

15:35:08 10  Q.     Yeah, if they sent it.  Okay.

15:35:12 11         And then with that, you would then put it in the

15:35:16 12  PDN?

15:35:17 13  A.      Yes.

15:35:17 14  Q.      Okay.  I'm going to mark as Exhibit 11, a document

15:35:22 15  bearing Bates number GILDDE00990460.

15:35:32 16         (Exhibit 11 was marked for identification and is

15:35:37 17  attached to the transcript.)

15:35:42 18  Q.      And, Ms. Vazquez, do you recognize this document?

15:35:46 19  A.      I do.

15:35:48 20  Q.      And what is this document?

15:35:50 21  A.      It's an e-mail from Kathy Roskos to Lori Lehman --

15:36:11 22  Q.      And had you ever seen this -- this e-mail before?

15:36:22 23  A.      No.

15:36:22 24  Q.      Okay.  You can see here Kathy Roskos is saying:

15:36:27 25         Hi, Lori.  As you are aware, processing of

material transfer agreements resides in my group under
Martha Vazquez.

        Do you see that?

A.    Yes, I do.

Q.    Okay.  And do you believe that statement to be
correct?

A.    Correct.

Q.    Okay.  And:

        I have attached a short work flow and process
slide deck that Martha put together to update you in the
process.  Did I read that correctly?

A.    Correct.

Q.    Do you recall putting a short slide deck together?

A.    Yes.

Q.    Okay.  Is that the slide deck that I showed you
earlier?

A.    Correct.

Q.    Okay.  I guess turning to your slide deck, which I
think I already marked.

A.    Number two?

Q.    It was Exhibit 2.  And this was a Material Transfer
Agreement process, correct?

A.    Correct.

Q.    Okay.  And you put this slide deck together?

A.    Correct.

15:37:48 1   Q.      Okay.  Do you remember why you put this slide deck

15:37:52 2   together?

15:37:53 3   A.      To bring Lori Lehman up to speed on the process.

15:37:57 4   Q.      Okay.  The material transfer agreements were a

15:38:01 5   standard practice in Gilead; that's is that correct?

15:38:08 6   A.      Correct.

15:38:22 7   Q.      Okay.  On the next page, if you turn to page 463 --

15:38:27 8   or it's this one --

15:38:29 9   A.      Okay.

15:38:31 10  Q.      -- on this page.  I'm reading the Bates numbers.

15:38:36 11  Sorry.  Where it says "request," and it says Mick Hitchcock

15:38:42 12  to Martha Vazquez, it goes into a request.

15:38:47 13         Can you explain to me a little bit -- bit about

15:38:51 14  what this diagram means?

15:38:54 15  A.      So if the material transfer request came through

15:39:01 16  Mick, he would send it to me; and I would process the

15:39:05 17  request.

15:39:06 18         But if it was an existing request, then it would

15:39:11 19  come directly to me, because that relationship had been

15:39:15 20  formed.

15:39:16 21         And then any of the satellite offices like in

15:39:22 22  European countries -- you know, countries, they would reach

15:39:31 23  out either to Mick or myself once it was already an existing

15:39:40 24  MTA.

15:39:40 25  Q.      Okay.  And so if there was an existing MTAs, it would

15:39:46 1   come directly to you?

15:39:47 2   A.      Correct.

15:39:48 3   Q.      And that's because the relationship had already been

15:39:52 4   established --

15:39:54 5   A.      Correct.

15:39:55 6   Q.      -- right?

15:39:57 7           So you already knew what the research project

15:40:01 8   was, and you were just sending them additional drugs?

15:40:05 9   A.      Either that.  Or if they wanted a new study, then I

15:40:11 10  would put it through the process right through Mick for

15:40:15 11  approval --

15:40:17 12  Q.      So.  So --

15:40:22 13  A.      -- before continuing.

15:40:24 14  Q.      -- so I guess, when you say "existing relationship,"

15:40:31 15  is that based on the study or on the investigator?

15:40:38 16  A.      On the investigator.

15:40:41 17  Q.      Okay.  So if you already had a relationship with an

15:40:44 18  investigator --

15:40:46 19  A.      They would know to contact me directly.

15:40:48 20  Q.      Right.  Because they had been through the process --

15:40:52 21  A.      Correct.

15:40:54 22  Q.      -- before?

15:40:57 23          Okay.  And when they contacted you, is that the

15:41:02 24  -- like the request -- I guess diagram that -- the triangle

15:41:12 25  -- or I'm sorry -- the diamond that we see here?

15:41:25  1    A.      Right.

15:41:26  2    Q.      Okay.  And where it says "FYI, scientist compound,"

15:41:32  3    what does that mean?

15:41:33  4    A.      Those are were scientist -- senior scientists that

15:41:38  5    were assigned to the specific compounds.

15:41:41  6    Q.      Okay.  It says:

15:41:43  7                    Tenofovir Viread was assigned to M. Miller.

15:41:52  8                    Do you know who M. Miller is?

15:41:55  9    A.      Dr. Michael Miller.

15:41:57 10    Q.      Okay.  And who was Dr. Michael Miller?

15:42:01 11    A.      He was a senior scientist at Gilead.

15:42:05 12    Q.      Okay.  And do you know what his title -- do you know,

15:42:11 13    other than senior scientist, what his role was or --

15:42:16 14    A.      I don't know.

15:42:17 15    Q.      Okay.  Did you ever work with Dr. Michael Miller?

15:42:22 16    A.      I interacted with him.

15:42:27 17    Q.      Okay.  And in context would you interact with him?

15:42:35 18    A.      Sometimes he would receive a material transfer

15:42:38 19    request, and would forward those to me.

15:42:42 20    Q.      Okay.  In any other context would you work with --

15:42:50 21    A.      Or --

15:42:52 22    Q.      -- him?

15:42:52 23    A.      -- or if he received publications, he would -- if he

15:43:02 24    remembered, he would send them to me.

15:43:02 25    Q.      Okay.  And that's so that you could put them in the

15:43:09 1  **PDN?**

15:43:10 2  **A.      Correct.**

15:43:20 3  **Q.      But you did not coordinate the review of any proposed**

15:43:27 4  **publications?**

15:43:28 5  **A.      No --**

15:43:31 6  **Q.      Okay.  I'm going to mark as my next exhibit,**

15:43:37 7  **Exhibit 12, a document bearing Bates number GILDDE00990461,**

15:43:47 8  **that XLS.**

15:43:50 9            **Do you recall this document at all?**

15:43:52 10 **A.      I do.**

15:43:53 11 **Q.      Okay.  Do you recall what this document is?**

15:43:56 12 **A.      It was a "publication metrics methodology --**

15:44:03 13 **Q.      Okay.**

15:44:04 14 **A.      -- methodology."**

15:44:07 15 **Q.      Okay.  And how do you recall this document?**

15:44:10 16 **A.      Kathy Ross wanted to know if I had any metrics for**

15:44:16 17 **publications from MTAs.**

15:44:18 18 **Q.      And did you --**

15:44:19 19 **A.      So I had a few, but not -- not everybody was**

15:44:22 20 **supplying those publications.**

15:44:26 21 **Q.      Okay.  And did you put this Excel sheet together for**

15:44:30 22 **Kathy Roskos?**

15:44:32 23 **A.      So what we -- what I -- my -- part of the job was to**

15:44:40 24 **provide the investigator, the effective date of the MTA and**

10:06:36 25 **the last compound.**

Then there was a literature search, as stated in the third bullet.

Q.     Okay.

A.     And they would match to whether they had published in -- in 2007-2008.

Q.     Okay.  Well, I guess we could turn to the first page in this where it says "Material Transfer Agreement publication metrics methodology."

A.     Correct.

Q.     It says:

The following methodology was developed to track old publications and create a 2007-2008 Material Transfer Agreement publication metrics.

Is that correct?

A.     Correct.

Q.     Okay.  And in the first bullet, it says:

In-house literature search for publication sent to PM operations from investigators with an active MTA through the public disclosure system?

A.     Correct.

Q.     Okay.  Can you explain to me what that means?

A.     So we did a research -- or we did a search for all publications in PDN with the specific investigator's name on active MTAs.

Q.     Okay.  So just so I understand this correctly.  So

10:08:22 1    you -- you did a literature search to see what publications

10:08:27 2    had come out from investigators; and then according to

10:08:34 3    bullet point three -- is that correct -- you asked for a

10:08:38 4    literature search?

10:08:40 5    A.      Correct.

10:08:41 6    Q.      Okay.

10:08:41 7    A.      Just to do a literature -- a literature search with

10:08:46 8    the specific names of MTAs --

10:08:49 9    Q.      Okay.

10:08:50 10   A.      -- active MTAs.

10:08:53 11           No.  It was the same -- it was the same

10:08:59 12   methodology.  So first we did an in-house through PDN.

10:09:04 13           And then the second one, we consulted with the

10:09:10 14   literature department to research any of the publications

10:09:15 15   that would be matched to the active MTAs.

10:09:19 16   Q.      Okay.  I guess -- so was the idea to, you know,

10:09:31 17   search the literature for the investigators and then check

10:09:36 18   PDN to see if they had sent their publications to Gilead?

10:09:41 19   A.      Correct.

10:09:42 20   Q.      Okay.  And that was the -- if I read this correctly:

10:09:46 21           Match the Material Transfer Agreement approved

10:09:48 22   publications with the in vitro search results to our active

10:09:52 23   MTA investigator's database for the years 2007 to 2008 --

10:10:02 24   A.      Correct.

10:10:06 25   Q.      -- publications?

10:10:08 1    A.      Correct.

10:10:09 2    Q.      Okay.  And the next bullet point is:

10:10:13 3            Identified investigators who honored Section 7

10:10:19 4    of the Material Transfer Agreement by sending their

10:10:22 5    publication for our review and comment prior to its

10:10:26 6    publication.  Did I read that correctly?

10:10:30 7    A.      Yes.

10:10:32 8    Q.      Okay.  What does that mean?

10:10:34 9    A.      That means that before they -- any investigation --

10:10:38 10   investigator would send the publication prior to publishing

10:10:43 11   it to us for review.

10:10:45 12   Q.      Okay.  And then the last bullet point is -- you also

10:10:49 13   identified investigators who published results without

10:10:53 14   honoring Section 7 of our material transfer agreement?

10:10:58 15   A.      Correct.

10:10:59 16   Q.      Okay.  So moving on to the next page, which has the

10:11:03 17   same Bates numbers -- so I apologize -- at the top, it says

10:11:11 18   "Gilead Sciences MTA publication metrics investigator

10:11:16 19   count."

10:11:16 20           And if you see on the left-hand side, it lists

10:11:23 21   names of drugs?

10:11:24 22   A.      Correct.

10:11:25 23   Q.      Okay.  And then it says -- the next column is

10:11:29 24   "literature resources search"?

10:11:32 25   A.      Um-hum.

10:11:36 1    Q.      And then "Gilead's public disclosure database" is the
10:11:43 2    next column?
10:11:44 3    A.      Correct.
10:11:45 4    Q.      And then the last column is "noncompliant"; is that
10:11:55 5    correct?
10:12:08 6    A.      Correct.
10:12:09 7    Q.      Okay.  So does this table represent literature
10:12:12 8    resources search, the number of publications that you found?
10:12:16 9    A.      Correct.
10:12:16 10   Q.      Okay.  And the second column represents what was sent
10:12:20 11   to Gilead and entered into its public disclosure database?
10:12:24 12   A.      Correct.
10:12:25 13   Q.      Okay.  And the last column are, I guess,
10:12:29 14   investigators that you identified as being noncompliant?
10:12:33 15   A.      Correct.
10:12:34 16   Q.      Okay.  And "noncompliant" there, does that mean that
10:12:39 17   they didn't send publications?
10:12:41 18   A.      Correct.
10:12:42 19   Q.      Okay.  And if you look at the first row, it says
10:12:47 20   "emtricitabine".
10:12:50 21           Do you see that?
10:12:51 22   A.      Yes.
10:12:52 23   Q.      Okay.  And it says the "literature resources search"
10:12:56 24   found 23 articles?
10:13:00 25   A.      Correct.

10:13:00 1    Q.      Okay.   And then the next one, "Gilead's public

10:13:06 2    disclosure database."

10:13:11 3             So there were 18 entries?

10:13:15 4    A.      Correct.

10:13:16 5    Q.      Okay.   And then in the last column, it says "five"

10:13:20 6    under "noncompliant" and then lists Dandekar Hostetler

10:13:46 7    Pruvost, Taft, & Wainberg?

10:13:55 8    A.      Correct.

10:13:56 9    Q.      Okay.   And those are all investigators who did not

10:14:00 10   send articles or publications for Gilead's review?

10:14:05 11   A.      Correct.   But there were many more than those.

10:14:09 12   Q.      Okay.   Those are -- so those are just the ones you

10:14:17 13   identified here?

10:14:18 14   A.      Correct.

10:14:19 15   Q.      Okay.   And do you see Dr. Heneine anywhere on that

10:14:22 16   noncompliant list?

10:14:24 17   A.      I don't.

10:14:25 18   Q.      Okay.   Do you see Dr. Subbarao anywhere on that

10:14:31 19   noncompliant list?

10:14:32 20   A.      I don't.

10:14:34 21   Q.      Okay.   And on the next row it says "Tenofovir"?

10:14:41 22   A.      Um-hum.

10:14:43 23   Q.      Okay.   And for the "literature resources search"

10:14:46 24   there were 39 entries?

10:14:52 25   A.      Correct.

10:14:54 1   Q.      And Gilead's public disclosure database, there are 24

10:14:59 2   entries?

10:15:00 3   A.      Correct.

10:15:00 4   Q.      Okay.  And there were 15, I guess, noncompliant

10:15:13 5   articles.  And then there's a list again of noncompliant

10:15:20 6   investigators.

10:15:21 7           And is Dr. Heneine anywhere on that list of

10:15:26 8   noncompliant investigators?

10:15:28 9   A.      No.  But can I clarify something?

10:15:32 10  Q.      Um-hum?

10:15:33 11  A.      All the literature -- literature research -- or

10:15:38 12  search, those were found by the literature people.  That

10:15:42 13  means they were not in the Gilead, which means we didn't

10:15:47 14  review.

10:15:48 15  Q.      Okay.  So that's what it meant to be noncompliant --

10:15:54 16  A.      Correct.

10:15:55 17  Q.      -- that you would get an opportunity to review?

10:15:59 18  A.      Correct.

10:16:00 19  Q.      Okay.  But again, Dr. Heneine doesn't appear in that

10:16:05 20  list of noncompliant investigators for Tenofovir; is that

10:16:11 21  correct?

10:16:11 22  A.      Correct.

10:16:11 23  Q.      And Dr. Subbarao also doesn't appear in the list of

10:16:24 24  noncompliant investigators; correct?

10:16:31 25  A.      Correct.

10:16:33 1   Q.      Okay.

10:16:34 2   A.      With the clarification that this is only for two

10:16:39 3   years, 2007, 2008.

10:16:41 4   Q.      Okay.  And you can see at the top it says "2007-2008

10:16:52 5   material transfer publications, emtricitabine"?

10:16:57 6   A.      Correct.

10:16:58 7   Q.      Okay.  And on that page it lists Dr. Heneine four

10:17:12 8   times?

10:17:13 9   A.      Correct.

10:17:14 10  Q.      Okay.  So are these all publications by Dr. Heneine

10:17:19 11  that were found in the PDN database?

10:17:24 12  A.      As part of the authors, yes.

10:17:27 13  Q.      Okay.  And does that indicate that Dr. Heneine had

10:17:39 14  sent to Gilead those publications?

10:17:41 15  A.      Correct.

10:17:42 16  Q.      But does this indicate that the publications were

10:17:46 17  entered into the PDN database?

10:17:49 18  A.      I don't know that.

10:17:50 19  Q.      Okay.  Well, the last column says "PDN."

10:17:52 20  A.      I see that.

10:17:57 21  Q.      Okay.  And next to Dr. Heneine's name if you go

10:18:01 22  through his four articles, do they all have a "yes" in the

10:18:06 23  "PDN" category?

10:18:12 24  A.      I see that.

10:18:15 25  Q.      Okay.  So does that indicate that these articles were

10:18:16 1    found in the PDN database?

10:18:20 2    A.      So I did a little bit of research on the PDN system.

10:18:25 3    It's -- and there's only one submission for "nature" on the

10:18:37 4    third one, but not for PLO.

10:18:40 5    Q.      So you're saying that that PLO --

10:18:45 6    A.      Was never submitted to PDN.

10:18:48 7    Q.      -- was never entered into PDN?

10:18:51 8    A.      Correct.

10:18:52 9    Q.      Okay.  But it's still listed here, and he is not

10:18:56 10   listed as a noncompliant on the previous page; is that

10:19:20 11   correct?

10:19:20 12   A.      Yeah.

10:19:21 13   Q.      Okay.

10:19:21 14   A.      It's an omission.

10:19:24 15   Q.      Omission of what?

10:19:26 16   A.      Error.

10:19:28 17   Q.      What kind of error?

10:19:34 18   A.      I don't know.  It's a typo or something happened.  I

10:19:39 19   -- I don't know.

10:19:48 20   Q.      Okay.  So what you are saying is that the "Y" in the

10:19:54 21   "PDN" category is incorrect?

10:19:56 22   A.      Incorrect.

10:19:57 23   Q.      And what is your basis for that statement?

10:20:02 24   A.      Because I researched the database today, and there

10:20:04 25   was only one for "Nature" for "Garcia-Lerma," not Heneine.

10:20:15 1  Q.      Okay.  Yes.  Okay.  So that -- that PLoS paper was in

10:20:22 2  the database, but it was listed under Garcia-Lerma?

10:20:27 3  A.      Yes.

10:20:27 4  Q.      Okay.  And do you know whether -- do you see that

10:20:31 5  next to Heneine, the -- the author's article -- do you see

10:20:38 6  where it says "J Gerardo Garcia-Lerma" --

10:20:48 7  A.      I see.

10:20:49 8  Q.      -- as the first author?

10:20:52 9          So what you are saying is in -- that this

10:20:55 10 article is in the database, but it's listed under

10:21:00 11 Dr. Garcia-Lerma?

10:21:02 12 A.      Correct.

10:21:03 13 Q.      Okay.

10:21:04 14 A.      And it was for Nature.

10:21:09 15 Q.      And it was?

10:21:13 16 A.      For the Journal of Nature, not for the PLoS -- PLoS

10:21:19 17 Medicine.

10:21:19 18 Q.      But that's based on your research today?

10:21:22 19 A.      Correct.

10:21:23 20 Q.      But this record, which was made in 2000 -- 2007-2008

10:21:31 21 indicates that that article was in the PDN database with a

10:21:37 22 "Y" under the "PDN" column; is that correct?

10:21:42 23 A.      It specifies that, but it's an error.

10:21:46 24 Q.      Is it possible that it was in the database in 2007

10:21:51 25 and was accidentally deleted?

10:21:55  1   A.     No.

10:21:55  2   Q.     Why is that impossible?

10:21:57  3   A.     I don't know that it's not impossible, but I -- I

10:22:01  4   doubt that it would be possible.

10:22:03  5   Q.     But you don't know that that's not possible?

10:22:07  6   A.     No, I don't know that.

10:22:09  7   Q.     Okay.  So you're speculating that --

10:22:12  8   A.     I --

10:22:12  9   Q.     -- this was an error based on your recent finding

10:22:12 10   that it was no longer in the database; is that correct?

10:22:20 11   A.     I don't know.

10:22:26 12   Q.     Okay.  Have you looked for this article in any time

10:22:30 13   between 2007 and today?

10:22:32 14   A.     No.

10:22:32 15   Q.     Okay.  So you cannot say with certainty whether it

10:22:38 16   was in the database for a period and got deleted?

10:22:45 17   A.     No.

10:22:54 18   Q.     So it's your testimony that this "PDN" column is

10:22:59 19   populated by a formula?

10:23:02 20   A.     Yes.

10:23:02 21   Q.     So if I go to the Excel sheet, will it have a formula

10:23:02 22   in it?

10:23:02 23   A.     I don't know for sure.

10:23:10 24   Q.     Okay.  So if it doesn't, did you make the same entry

10:23:15 25   -- or entry error twice then?  Is that your testimony?

10:23:19 1    A.      Yes.

10:23:20 2    Q.      Okay.  Did you discover any other entry errors when

10:23:24 3    you went through this?

10:23:25 4    A.      I did.

10:23:32 5    Q.      Okay.  Actually, before we go to Exhibit 4, let me go

10:23:37 6    back to this for one second.

10:23:39 7    A.      Okay.

10:23:40 8    Q.      Ms. Kelly asked you some questions about compliant or

10:23:45 9    noncompliant.

10:23:48 10            Do you remember that --

10:23:49 11   A.      Correct.

10:23:50 12   Q.      -- related to, I believe it was, the second page?

10:23:55 13   A.      Yes.

10:23:56 14   Q.      Why does a researcher investigator have to provide a

10:24:02 15   pre-publication article to Gilead?

10:24:04 16   A.      Because it's stated in our Gilead MTA Section 7.

10:24:09 17   Q.      The MTA's with the CDC, were those Gilead MTA's?

10:24:14 18   A.      No.  They were from CDC.

10:24:17 19   Q.      To your knowledge, is there anything in the Gilead --

10:24:22 20   in the CDC MTA's that require --

10:24:24 21   A.      Not to my knowledge.

10:24:34 22   Q.      And to your knowledge, did Gilead abide by the terms

10:24:37 23   of the MTA?

10:24:38 24   A.      Yes.

10:24:40 25   Q.      Did Gilead always provide the drugs that were

10:24:43 1    required?

10:24:43 2    A.     Always provided the drugs, whether we had an assigned

10:24:48 3    agreement or not.

10:25:31 4                (Michael James Martin Hitchcock trial

10:25:43 5    testimony:)

10:25:47 6                MICHAEL JAMES MARTIN HITCHCOCK, a witness,

10:25:52 7    called for examination, having been first duly sworn, was

10:25:58 8    examined and testified as follows:

10:26:14 9    BY MR. MACHEN:

10:26:15 10   Q.     So will you please introduce yourself to the Court?

10:26:18 11   A.     My full name is Michael James Martin Hitchcock.  I'm

10:26:24 12   usually known as Mick Hitchcock.

10:26:39 13   Q.     And was there any concern that -- about giving out

10:26:43 14   Gilead's compounds for third parties to do tests on?

10:26:47 15   A.     Yeah.  We wanted to maintain our control of the

10:26:51 16   intellectual property and our ability to have freedom to

10:26:54 17   operate with our drugs.  So we always had an MTA which

10:26:58 18   covered that.

10:27:07 19   Q.     Okay.  And what's your general understanding of the

10:27:10 20   purpose of this Section 8?

10:27:12 21   A.     The general purpose is to protect Gilead's

10:27:15 22   intellectual property rights and to maintain their freedom

10:27:20 23   to operate, and it requires that the recipient promptly

10:27:24 24   disclose to the provider all of the results and data from

10:27:28 25   what the experiments produced.

10:27:31 1    Q.      Does it require the recipient to also disclose

10:27:37 2    anything relating to inventions?

10:27:40 3    A.      Yes.   The recipient agrees to promptly notify the

10:27:46 4    provider of any inventions.

10:28:10 5    Q.      And you recall testifying that you signed this

10:28:14 6    Clinical Trial Agreement, correct?

10:28:16 7    A.      That's correct.

10:28:20 8    Q.      And this is for the Extended Safety Study or 4323

10:28:26 9    study.   Is that right?

10:28:27 10   A.      Yes, it's called the Extended Safety Study.   I don't

10:28:36 11   see a number on 4323.

10:28:44 12   Q.      And if you look at the second page, in that top first

10:28:47 13   paragraph, you would agree that the term "trial" is defined

10:28:53 14   as "phase two extended safety of Tenofovir Disoproxil

10:29:00 15   Fumarate (TDF) among HIV-1 negative men who have sex with

10:29:06 16   men."   Is that right?

10:29:09 17   A.      Yes, that's the name of the study.

10:29:11 18   Q.      And the term "study drug" is defined by the agreement

10:29:16 19   as TDF.   Is that correct?

10:29:18 20   A.      That's correct.

10:29:18 21   Q.      And if you look to page 2 of the document, it ends in

10:29:22 22   Bates number 3170, which are the numbers at the bottom

10:29:30 23   right.

10:29:31 24   A.      Yes.

10:29:31 25   Q.      Do you see that there is a Section 7 titled,

10:29:37 1    "intellectual property?"

10:29:42 2    A.    Yes.

10:29:43 3    Q.    And you did not review Section 7 before you signed

10:29:47 4    this agreement.  Is that right?

10:29:49 5    A.    That's correct.

10:29:50 6    Q.    And would you agree that the words, "freedom to

10:29:54 7    operate" are not found anywhere in this CTA?

10:29:59 8    A.    That's correct.

10:30:00 9    Q.    And the phrase "unfettered access" is also not found

10:30:05 10    anywhere in the CTA.  Is that correct?

10:30:15 11    A.    I haven't seen it, no.

10:30:18 12    Q.    Okay.  Thank you.

10:30:19 13            And if you could now turn to -- it's Tab 13 in

10:30:23 14    that same binder.  It's joint Exhibit 2.  And do you recall

10:30:28 15    testifying about this document a moment ago?

10:30:31 16    A.    Yes.

10:30:32 17    Q.    And you signed this agreement, correct?

10:30:34 18    A.    That's correct.

10:30:35 19    Q.    And if you turn to the second page, it says "page 2

10:30:39 20    of 5" at the bottom?

10:30:42 21    A.    Yes.

10:30:42 22    Q.    And if you look to that top paragraph, the first

10:30:47 23    paragraph defines the term "trial" as "study of the safety

10:30:52 24    and efficacy of daily Tenofovir disoproxil fumarate (TDF)

10:30:56 25    for the prevention of HIV infection in heterosexually active

10:31:13 1   young adults in Botswana."  Is that correct?

10:31:17 2   A.      That's correct.

10:31:18 3   Q.      And this study defines the study drug as TDF.  Is

10:31:23 4   that right?

10:31:23 5   A.      That's correct.

10:31:24 6   Q.      And if you look at the third page of this document,

10:31:27 7   so page 3 of 5 at the bottom?

10:31:30 8   A.      Um-hum.

10:31:32 9   Q.      You'll see a paragraph or a Section 7 titled,

10:31:39 10  "intellectual property."

10:31:41 11  A.      Yes.

10:31:41 12  Q.      And is that the same language that we just saw in the

10:31:45 13  prior CTA, which was Joint Exhibit 1?

10:31:49 14  A.      As far as I know.  As I said, I didn't review this

10:31:53 15  language because I left that up to the legal group.

10:32:04 16  Q.      And you agree that the words "freedom to operate" are

10:32:08 17  not found anywhere in this agreement, are they?

10:32:17 18  BY MS. ROSATO:

10:32:17 19  Q.      I'm sorry, I didn't hear your answer.  Did you agree

10:32:21 20  that the words "freedom to operate" are not found in this

10:32:27 21  agreement?

10:32:28 22  A.      They are not found in this agreement.

10:32:30 23  Q.      Thank you.  And similarly, the phrase "unfettered

10:32:35 24  access" is also not found in this agreement.  Is that

10:32:40 25  correct?

10:32:40 1   A.      That's correct.

10:32:40 2   Q.      And turning to the last page, which is 5 of 5, the

10:32:46 3   signature page, again, you see above the signatures there is

10:32:51 4   a paragraph, and the first sentence says, "the foregoing

10:32:58 5   represents the entire agreement between us regarding the

10:33:04 6   trial, and there are no further commitments, obligations or

10:33:10 7   understandings of any nature regarding the trial."  Is that

10:33:20 8   correct?

10:33:20 9   A.      Yes, that's what it says.

10:33:22 10   Q.      So, Dr. Hitchcock, this is the '072 MTA.  Is that

10:33:28 11   right?

10:33:33 12   A.      That's correct.

10:33:33 13   Q.      And you signed this agreement?

10:33:35 14   A.      Yes.

10:33:36 15   Q.      If you can look at -- it is page 3 of 5.  Do you see

10:33:42 16   a paragraph 8 there?

10:33:43 17   A.      Yes.

10:33:43 18   Q.      And this paragraph also deals with intellectual

10:33:46 19   property rights.  Is that correct?

10:33:48 20   A.      That's correct.

10:33:48 21   Q.      And you did not review this paragraph before you

10:33:52 22   signed the agreement.  Is that right?

10:33:52 23   A.      No, this was reviewed by our legal group.

10:33:56 24   Q.      And this agreement does not define notice anywhere in

10:34:02 25   the agreement, does it?

10:34:05 1   A.      I don't know.

10:34:06 2   Q.      All right.  We can move to the next document which is

10:34:12 3   behind Tab 2 of that same binder, Joint Exhibit 5.  And,

10:34:18 4   Dr. Hitchcock, this is the '471 MTA.  Is that correct?

10:34:23 5   A.      That's correct.

10:34:24 6   Q.      And you signed this agreement?

10:34:26 7   A.      Yes.

10:34:26 8   Q.      And if you turn to the third page, page 3 of 5, you

10:34:31 9   can see a paragraph 8 which deals with intellectual

10:34:34 10  property?

10:34:34 11  A.      Yes.

10:34:42 12  Q.      Dr. Hitchcock, do you have any understanding of

10:34:46 13  whether this document defines the term "notice?"

10:34:50 14  A.      I don't know.

10:34:51 15  Q.      Do you have an understanding of whether this document

10:34:58 16  uses the term "freedom to operate?"

10:35:01 17  A.      Not to my knowledge.

10:35:03 18  Q.      And to your knowledge, does this MTA use the phrase

10:35:08 19  "unfettered access?"

10:35:11 20  A.      No.

10:35:11 21  Q.      Okay.  Thank you.

10:35:13 22          I would like to -- I would like you to turn to

10:35:17 23  Tab 3 in that same black binder, which is Joint Exhibit 6.

10:35:22 24  And this is the '649 MTA.  Is that right?

10:35:26 25  A.      That's correct.  Yes.

10:35:27 1    Q.      And you signed this agreement?

10:35:29 2    A.      Yes.

10:35:30 3    Q.      And if you turn to page 3 of 5, at the very bottom,

10:35:34 4    you'll find, which carries over to page 4 of 5, again, a

10:35:40 5    paragraph 8 that deals with intellectual property.  Is that

10:35:43 6    right?

10:35:43 7    A.      That's correct.

10:35:44 8    Q.      And you did not review paragraph 8 before you signed

10:35:48 9    this agreement.  Is that right?

10:35:49 10   A.      That's correct.

10:35:50 11   Q.      And to your understanding of the '649 MTA, does it

10:35:55 12   define notice in that document?

10:35:57 13   A.      I don't know that it does.

10:35:59 14   Q.      And does it use the term "unfettered access" in this

10:36:05 15   MTA?

10:36:11 16   A.      Not to my knowledge.

10:36:12 17   Q.      And is the phrase "freedom to operate" found in this

10:36:17 18   MTA?

10:36:17 19   A.      No.

12:44:54 20           THE COURT:  Thank you.

12:44:55 21           MR. MACHEN:  We're done, Your Honor.

12:44:55 22           THE COURT:  Okay.  So we have now made the

12:45:00 23   record regarding unclean hands, inequitable estoppel and

12:45:00 24   waiver.  I think we need to change the plan.

12:45:00 25           MR. HOLVEY:  Your Honor, so sorry, there will be

exhibits that will come in through those designations as well.

THE COURT:  I think we need to change the plan of addressing this issue.  I just read through the pleadings in this case and the defendants have not asserted counterclaims regarding unclean hands, inequitable estoppel, or waiver, each of these issues was raised only as an affirmative defense to infringement.  We are going to enter judgment in favor of the defendant on infringement and validity and those affirmative defenses will be mooted.  I understand that there will likely be normal post-trial motions and unless those motions are granted, the affirmative defenses of invalidity affirmative defenses on these topics will remain moot.  So the post-trial submissions will not brief these issues and I will not address them unless the post-trial proceedings in the jury trial make it necessary.  If that happens, I will ask for briefing and argument on these issues.

With that, I will also say to the extent that the defendants think they should be able to pursue attorneys fees based on these defenses, I have not heard anything thus far that makes me think that there was conduct here, weighing all of the factors that I must, that would make it appropriate to shift fees to the United States via the United States taxpayers to the defendants, which are billion

12:46:26 1    dollar pharmaceutical companies.

12:46:27 2              So that is what my thinking is on these issues.

12:46:30 3    Any comments?

12:46:32 4              MR. BROWN:  Not on those issues, no, Your Honor.

12:46:36 5              THE COURT:  All right.  Mr. Brown, you had

12:46:39 6    something you wanted to raise on the jury trial?

12:46:41 7              MR. BROWN:  Yes.  Looking ahead to what we

12:46:44 8    anticipate to be a Rule 50 motion, we obviously had a

12:46:48 9    briefing schedule on the bench trial issues.  I don't think

12:46:50 10   we had a specific schedule on the jury trial motions.  I

12:46:57 11   know we had twenty-eight days under the rules, but I don't

12:46:59 12   know if you had --

12:47:00 13             THE COURT:  So we follow the federal rules here.

12:47:02 14             MR. BROWN:  Okay.  And your scheduling order you

12:47:06 15   say that seven days after the verdict we submit a joint

12:47:09 16   status report identifying all motions, is that correct?

12:47:12 17             THE COURT:  Yes.

12:47:12 18             MR. BROWN:  Okay.  I understand the page limits

12:47:16 19   are 20/20/10 on the Rule 50 motion?

12:47:19 20             THE COURT:  So what you should do is go back and

12:47:22 21   look at the issues that you want to raise, and if you think

12:47:26 22   that you need additional pages in order to address those

12:47:31 23   issues appropriately, just ask for it in the status report.

12:47:34 24             MR. BROWN:  Okay.  Thank you, Your Honor.

12:47:36 25             THE COURT:  Is that it?

12:47:37  1                    MR. BROWN:  I think that addresses it.

12:47:39  2                    THE COURT:  Anything from the defendants?

12:47:41  3                    MR. MACHEN:  Nothing, Your Honor.

12:47:43  4                    THE COURT:  All right.  So with that, I

12:47:45  5     appreciate all of the professionalism this week.  I thought

12:47:49  6     both sides presented very well.  And I can tell you that the

12:47:53  7     jurors thought that the issues before them were very

12:47:58  8     interesting, and it really was one of the easiest to

12:48:02  9     understand I think, and part of jury trials we have had on

12:48:07 10     patent cases and a lot of that had to do with the

12:48:09 11     presentation.

12:48:10 12                    Thank you all and safe travels.

12:48:12 13                    COURT CLERK:  All rise.

         14                    (Court adjourned at 11:13 a.m.)

         15

         16               I hereby certify the foregoing is a true and
                accurate transcript from my stenographic notes in the proceeding.

         17

         18                                /s/ Dale C. Hawkins
                                       Official Court Reporter
         19                              U.S. District Court

         20

         21

         22

         23

         24

         25