# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE UNITED STATES OF AMERICA,

    *Plaintiff & Counterclaim-Defendant*,

v.

GILEAD SCIENCES, INC. and GILEAD
SCIENCES IRELAND UC,

    *Defendants & Counterclaim Plaintiff.*

C.A. No. 19-2103-MN

## GILEAD'S OPPOSITION TO GOVERNMENT'S MOTIONS
## FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL

OF COUNSEL:

David B. Bassett
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Vinita C. Ferrera
Emily R. Whelan
George P. Varghese
Timothy A. Cook
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109

Ronald C. Machen
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

Dated: June 26, 2023

Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Alexandra M. Ewing (#6407)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
ewing@rlf.com

*Counsel for Defendants Gilead Sciences, Inc.
and Gilead Sciences Ireland UC and
Counterclaim Plaintiff Gilead Sciences, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

I. INTRODUCTION ........................................................................................... 1

II. LEGAL STANDARD ...................................................................................... 3

III. ARGUMENT ................................................................................................. 4

    A. JMOL or a New Trial on Invalidity Is Unwarranted. ................................4

        1. Substantial Evidence Supports the Jury's Finding that the Asserted Claims Are Anticipated by Prior Public Knowledge and Use ..................................................................... 4

        2. Substantial Evidence Supports the Jury's Obviousness Finding ........................................................................................ 10

        3. Substantial Evidence Supports the Jury's Non-Enablement Finding. ..................................................................... 16

    B. The Government Is Not Entitled to JMOL or a New Trial on Infringement.................................................................................................18

        1. Substantial Evidence Supports the Jury's Finding of No Direct Infringement by Patients Taking or Doctors Prescribing Truvada® and Descovy® for PrEP ......................... 19

        2. JMOL of Direct Infringement Would Not Affect the Outcome Because No Reasonable Jury Could Find that Gilead Induced Infringement........................................................ 22

        3. No Reasonable Jury Could Find that GSIUC Induced Infringement. ...................................................................... 26

    C. The Court Properly Excluded Evidence of Non-Instituted IPRs.............................27

    D. The Court Properly Admitted Evidence of the MTAs..............................................29

IV. CONCLUSION ............................................................................................... 30

**Page(s)**

**Federal Cases**

*Amgen Inc. v. Sanofi*,
    143 S. Ct. 1243 (2023) ............................................................................2, 17, 18

*Amgen Inc. v. Sanofi*,
    872 F.3d 1367 (Fed. Cir. 2017) ............................................................................17

*Andover Healthcare, Inc. v. 3M Co.*,
    C.A. No. 13-843-LPS, 2016 WL 6404111 (D. Del. Oct. 27, 2016) ........................27

*ART+COM Innovationpool GmbH v. Google Inc.*,
    C.A. No. 14-217-TBD, 2016 WL 11531119 (D. Del. May 16, 2016) ....................27

*Bayer Healthcare LLC v. Baxalta Inc.*,
    407 F. Supp. 3d 462 (D. Del. 2019) ......................................................................1

*Bio-Rad Lab'ys, Inc, v. Int'l Trade Comm'n*,
    998 F.3d 1320 (Fed. Cir. 2021) ............................................................................23

*Commil USA, LLC v. Cisco Sys., Inc.*,
    575 U.S. 632 (2015) ............................................................................................18

*Complete Genomics, Inc. v. Illumina, Inc.*,
    C.A. No. 19-970-MN, D.I. 372 (D. Del. Apr. 12, 2022) ......................................28

*Dey, L.P. v. Sunovion Pharms., Inc.*,
    715 F.3d 1351 (Fed. Cir. 2013) ............................................................................7

*Fleming v. Escort Inc.*,
    774 F.3d 1371 (Fed. Cir. 2014) ............................................................................7

*Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*,
    784 F.3d 177 (3d Cir. 2015) ................................................................................4

*GlaxoSmithKline LLC v. Teva Pharms. USA Inc.*,
    7 F.4th 1320 (Fed. Cir. 2021) ..............................................................................25

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
    426 F. Supp. 2d 211 (D. Del. 2006) ......................................................................3

*Hoover Grp., Inc. v. Custom Metalcraft, Inc.*,
    66 F.3d 299 (Fed. Cir. 1995) ................................................................................20

*L.A. Gear, Inc. v. E.S. Originals, Inc.*,
    859 F. Supp. 1294 (C.D. Cal. 1994) ................................................................27

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993).........................................................................3, 4

*Mancini v. Northampton Cnty.*,
    836 F.3d 308 (3d Cir. 2016)............................................................................3

*MobileMedia Ideas LLC v. Apple Inc.*,
    780 F.3d 1159 (Fed. Cir. 2015)......................................................................2

*In re Montgomery*,
    677 F.3d 1375 (Fed. Cir. 2012)....................................................................10

*Pac. Bioscis. of Cal., Inc. v. Oxford Nanopore Techs., Inc.*,
    996 F.3d 1342 (Fed. Cir. 2021)........................................................1, 3, 4, 14

*Regents of the Univ. of Cal. v. Broad Inst., Inc.*,
    903 F.3d 1286 (Fed. Cir. 2018)....................................................................16

*Roche Diags. Corp. v. Meso Scale Diags.*,
    30 F.4th 1109 (Fed. Cir. 2022) ...............................................................24, 29

*Smith v. Garlock Equip. Co.*,
    658 F. App'x 1017 (Fed. Cir. 2016) ..........................................................17, 22

*TransWeb, LLC v. 3M Innovative Props. Co.*,
    812 F.3d 1295 (Fed. Cir. 2016)......................................................................8

*UCB, Inc. v. Watson Lab'ys Inc.*,
    927 F.3d 1272 (Fed. Cir. 2019).....................................................................4, 6

*Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*,
    308 F.3d 1167 (Fed. Cir. 2002)....................................................................18

*Walden v. Georgia-Pac. Corp.*,
    126 F.3d 506 (3d Cir. 1997).........................................................................30

**Other Authorities**

Fed. R. Civ. P. 50 ..............................................................................3, 23

Fed. R. Evid. 403 ...................................................................................27

2 Litigating Tort Cases § 19:36 (Roxanne Conlin & Gregory Cusimano eds., Sept. 2022 update)..................................................................................28

2 Michael H. Graham, Handbook of Federal Evidence § 103:8 (9th ed. 2022) ..........................28

# I. INTRODUCTION

The Court should deny the government's renewed motion for judgment as a matter of law ("JMOL") and motion for a new trial, D.I. 487 ("Mot."). The government mainly cites its own witnesses for support—but in a motion for JMOL and new trial, the Court must consider all "relevant evidence from the record ***taken as a whole***." *Bayer Healthcare LLC v. Baxalta Inc.*, 407 F. Supp. 3d 462, 468 (D. Del. 2019), *aff'd*, 989 F.3d 964 (Fed. Cir. 2021).[1] Ample evidence supports the jury's verdict that the Asserted Claims[2] are invalid as anticipated, obvious, and, for the '423 Patent, not enabled. Anticipation and obviousness are independently dispositive and defeat liability for Gilead Sciences, Inc. ("GSI") and Gilead Sciences Ireland UC ("GSIUC"; together, "Gilead"). The jury's verdict of no direct infringement is also well supported. And the record before the jury was proper—this Court's reasoned rulings to exclude the non-instituted *inter partes* review ("IPR") petitions and not to categorically exclude the Material Transfer Agreements ("MTAs") were correct and did not create a "miscarriage of justice" warranting a new trial. *Pac. Bioscis. of Cal., Inc. v. Oxford Nanopore Techs., Inc*., 996 F.3d 1342, 1352 (Fed. Cir. 2021). Indeed, at trial, the government did not even object to the statements about the MTAs that it now says entitle it to a do-over. The Court should therefore deny the government's motions.

***Invalidity***: Each of the jury's invalidity findings—anticipation, obviousness, and lack of enablement—is supported by the record. Gilead presented three sources proving public knowledge: Dr. Robert Grant, Dr. Marcus Conant, and Dr. John Kaldor. Dr. Conant further provided evidence showing public use through his clinical practice of prescribing Truvada® for

---

[1] Emphases added unless otherwise noted.

[2] The "Asserted Patents" are U.S. Patent No. 9,579,333, No. 9,937,191, and No. 10,335,423. The "Asserted Claims" are '333 Patent claim 13, '191 Patent claim 18, and '423 Patent claim 18.

PrEP.  To prevail on JMOL of no anticipation, the government must prove that **none** of these bases is sufficient.  It cannot.  Gilead also proved the Asserted Claims were obvious based on each and any of three combinations of references: (1) Tsai 1995 and the August 2004 Truvada® Label; (2) the 2004 California PEP Guidelines ("CA PEP") and the August 2004 Truvada® Label; or (3) all three references together.  To overcome the obviousness verdict, the government must prove that the Asserted Claims were not obvious to a skilled artisan over **any** of these combinations.  But again, it cannot.  Each combination disclosed all the claim limitations, and skilled artisans at the time would have been motivated to combine these references.  Gilead also proved that claim 18 of the '423 Patent is not enabled.  Gilead's expert, Dr. Charles Flexner, explained why a skilled artisan would be unable to practice the claim's full scope without undue experimentation.  His opinions were bolstered by admissions from the government's expert Dr. Dhiren Thakker, the '423 Patent itself, and the Supreme Court's recent decision in *Amgen Inc. v. Sanofi*, 143 S. Ct. 1243 (2023).  Thus, the jury's invalidity findings are well-supported.

 ***Infringement***:  The jury's substantially supported findings that the Asserted Patents are invalid resolve this case, so this Court need not reach infringement.  *See MobileMedia Ideas LLC v. Apple Inc.,* 780 F.3d 1159, 1178 (Fed. Cir. 2015).  Even so, there is substantial evidence that neither patients nor doctors directly infringe the Asserted Claims.  The government's expert, Dr. Robert Murphy, testified that patients who follow the Truvada® and Descovy® Labels do not directly infringe.  The government also failed to prove that any single patient potentially exposes themselves to HIV, which is a required element of all Asserted Claims.  Finally, the jury was free to disregard the Risk Evaluation and Mitigation Strategy ("REMS") submissions as unpersuasive based on Dr. Flexner's testimony.

***Motions in Limine***:  The government's request for a new trial based on the exclusion of the IPR petitions and the admission of the MTAs should be denied.  The Court allowed the parties to brief these issues and argue them at the pretrial conference, and it weighed the probative value and prejudicial effect of both the IPR non-institution proceedings and MTAs before it ruled.  The Court's decision to exclude the IPR non-institution proceedings follows this District's recognition that such evidence presents significant prejudicial risks and little probative value in a jury trial.  The Court's decision to allow the jury to hear about the MTAs for purposes ***other than*** breach of contract was also well-founded.  The MTAs were relevant to Gilead's noninfringement defenses, and the government forfeited its new argument that Gilead strayed beyond the permissible use of the MTAs by failing to object at trial.

Ample evidence supports the jury's findings that the Asserted Patents are invalid and not infringed, and the government has not shown that the jury's verdict is against the great weight of the evidence or identified an error justifying a new trial.  The Court should deny its motions.

## II.    LEGAL STANDARD

To prevail on JMOL under Fed. R. Civ. P. 50(b), the government "must show that the jury's findings are not supported by substantial evidence." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 426 F. Supp. 2d 211, 214 (D. Del. 2006), *aff'd*, 493 F.3d 1358 (Fed. Cir. 2007).  The Court does not "weigh the evidence, determine the credibility of witnesses, or substitute [its] version of the facts for the jury's version," *Mancini v. Northampton Cnty.*, 836 F.3d 308, 314 (3d Cir. 2016), and must view "the evidence in the light most favorable to the nonmovant and giv[e] it the advantage of every fair and reasonable inference," *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).  And the Court has "broad discretion in not setting the verdict aside." *Pac. Bioscis. of Cal., Inc.*, 996 F.3d at 1352.  A new trial is justified only if a verdict "is against the great weight of evidence and either is a miscarriage of

justice or cries out to be overturned." *Id.* (citation and quotation marks omitted).[3]

## III. ARGUMENT

### A. JMOL OR A NEW TRIAL ON INVALIDITY IS UNWARRANTED.

#### 1. Substantial Evidence Supports the Jury's Finding that the Asserted Claims Are Anticipated by Prior Public Knowledge and Use.

A claimed invention is anticipated when it "was known to or used by others in this country before the date of the patentee's invention." *UCB, Inc. v. Watson Lab'ys Inc.*, 927 F.3d 1272, 1289 (Fed. Cir. 2019) (citation and quotation marks omitted). "Prior knowledge and use by a ***single person*** is sufficient." *Id.* (citation and quotation marks omitted). The Asserted Claims were anticipated by prior public knowledge in 2004 and 2005 for at least three reasons:

- Dr. Robert Grant proposed a robust clinical trial of Truvada® for PrEP, expected that Truvada® would work effectively, and told many colleagues of his planned study;

- Dr. Marcus Conant knew that Truvada® could prevent HIV infection and prescribed it to three of his patients for PrEP;[4] and

- Dr. John Kaldor approached Gilead to propose using Truvada® for PrEP in a human trial.

**Dr. Robert Grant:** The jury was entitled to find that Dr. Grant knew of the claimed invention (using Truvada® for PrEP) by at least August 2004, before the earliest alleged invention date (February 3, 2006),[5] and that he communicated that idea to others without

---

[3] The government suggests that the "jury's verdict was facially inconsistent," Mot. 4, but develops no argument on that point. And the government waived any inconsistency claim by failing to object before the jury's discharge. *See Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 191 (3d Cir. 2015).

[4] The use of Truvada® for PrEP by Dr. Conant's patients also supports anticipation by prior public use. Tr. 794:18-795:1, 800:17-802:4.

[5] Viewing the evidence most favorably to Gilead, *see Lightning Lube Inc.*, 4 F.3d at 1166, the earliest date of invention is February 3, 2006, which is the filing date of the provisional application for the '509 Patent. The government's motion does not assert (and thus waives) entitlement to an earlier date.

restriction. On August 31, 2004, Dr. Grant submitted a grant application to the NIH for the Peru PrEP clinical trial, which described use of TDF (tenofovir disoproxil fumarate) and FTC (emtricitabine) to prevent HIV in humans. DTX-161 at 82; Tr. 403:9-405:18, 904:19-906:6, 976:15-977:4. On December 8, 2004, Dr. Grant drafted a detailed concept sheet for the Peru PrEP trial in which he described administering Truvada® to 900 humans for PrEP, JTX-62 at 3, a study that he was "personally … ready to move ahead with," Tr. 408:1-410:19; *see also* Tr. 906:11-907:7. Dr. Grant intended this concept sheet to be sent to others, Tr. 407:6-15, and he sent the document to Gilead three days later, DTX-182 at 1. And less than two days after drafting his concept sheet, Dr. Grant "talked over the idea of adding a [T]ruvada arm to the MSM trial with Mary Fanning"—the NIH's former associate director of clinical research—"who seemed to be very enthusiastic about the idea." DTX-182 at 1; *see also* Tr. 411:15-413:19.

By December 17, 2004, Dr. Grant had prepared a 114-page draft clinical protocol for his Peru PrEP trial in which he again described administering Truvada® for PrEP to hundreds of humans. JTX-64 at 17; Tr. 414:2-416:2, 420:25-421:6, 971:11-972:21. Dr. Grant agreed that he was willing to "propose studying Truvada for PrEP in hundreds of humans by December 17, 2004" because he thought it would work. Tr. 422:5-12. Dr. Grant again shared this protocol with "three people at Gilead." Tr. 421:13-422:4. And the jury was entitled to believe Dr. Flexner's testimony that Dr. Grant's many proposals to study Truvada® for PrEP before 2005 anticipated the Asserted Patents. Tr. 976:15-977:4.

Other witnesses confirmed Dr. Grant's (and others') knowledge of Truvada® for PrEP before the invention date. Dr. Fanning testified that Dr. Ward Cates and Family Health International knew that Dr. Grant wanted to give Truvada® for PrEP to humans by March 2005 because "Bob Grant would talk to everybody." Tr. 890:10-20. Dr. Kimberly Page, Dr. Grant's

co-investigator on the Peru PrEP trial, recounted many conversations in 2004 in which she and Dr. Grant discussed Truvada® for PrEP. Tr. 901:12-903:19, 913:14-915:14, 921:1-922:2. She confirmed that by late 2004, Truvada® for PrEP was not a secret. Tr. 923:2-5. Dr. Grant also discussed using Truvada® for PrEP with the Gates Foundation to secure more funding. DTX-155 at 2. And Dr. Thomas Coates, co-director of the HIV Prevention Trials Network, testified that "Truvada for PrEP was being discussed" as soon as the FDA approved Truvada® for HIV treatment in August 2004, and that the use of Truvada® for PrEP was "a common topic of discussion" within this group's "entire network of scientists." Tr. 927:11-928:15. Dr. Coates also recalled discussing Truvada® for PrEP with NIH and CDC personnel in 2004. Tr. 929:7-930:14. Dr. Grant and his team had discussed adding Truvada® to PrEP trials with Dr. Coates as well as Dr. Cates and Dr. Kenneth Mayer by January 12, 2005, all of whom were "interested in [adding] a Truvada arm for their prevention studies." DTX-155 at 2; *see* Tr. 913:14-915:8.

The government is wrong that Dr. Grant's idea of using Truvada® for PrEP was confidential. It presented ***no evidence*** of any confidentiality agreement or obligation—much less evidence so strong that the jury would have been compelled to accept it. As Dr. Page testified (and the jury was entitled to believe), Dr. Grant told a large group of scientists as early as July 2004 about his plans to study Truvada® for PrEP, Tr. 902:4-23.[6] Dr. Grant's open discussion of Truvada® for PrEP with many outside scientists —including at Gilead—contradicts any confidentiality claim. And as Dr. Page confirmed, the documentary evidence discussed above "would not have been confidential." Tr. 921:11-23. Stamping "confidential" on a document

---

[6] While Dr. Grant spoke with many scientists about using Truvada® for PrEP, knowledge by anyone—even one non-scientist—would have sufficed. *See* Tr. 1450:18-20, 1454:12-14 (instructing jury that knowledge by "either the average person or someone within the field" would satisfy public prior knowledge); *UCB, Inc.*, 927 F.3d at 1289 ("[P]rior knowledge…by a single person is sufficient.") (citation and quotation marks omitted).

cannot remove knowledge from the public, particularly given that Dr. Grant *himself* disseminated it. *Dey, L.P. v. Sunovion Pharms., Inc.*, 715 F.3d 1351, 1355-56 (Fed. Cir. 2013) (noting in a public use case that "[e]ven limited disclosure to those who are skilled enough to know, understand, and easily demonstrate the invention to others, may mean that there was no reasonable expectation of secrecy").

The government ignores all available evidence of Dr. Grant's (and others') *knowledge* of the claimed invention by incorrectly focusing *only* on his documents. Mot. 14-16. The concept sheets and proposals *corroborate* Dr. Grant's prior knowledge of Truvada® for PrEP—they need not serve as anticipatory prior art themselves. *See Fleming v. Escort Inc.*, 774 F.3d 1371, 1377 (Fed. Cir. 2014) (holding corroborative evidence is evaluated under a "rule of reason" and need not include all claim limitations). Ample evidence showed that Dr. Grant's and others' prior knowledge met all claim limitations, including the "thereby" step. Dr. Grant knew Truvada® would be effective at preventing HIV infection, testifying that he was prepared "to enroll 2,700 humans in [his] proposed study" of Truvada® for PrEP. Tr. 410:2-5. Dr. Page confirmed the research team's confidence in Truvada® for PrEP, testifying that she had a "very high expectation" that it would work because "[t]here was a good body of literature to support it" and because it was known that "two drugs were better than one." Tr. 916:10-15. In his concept sheet, Dr. Grant delineated his reasons to be confident, justifying his selection of Truvada® because it could be taken as a single tablet; had a prolonged half-life, outstanding safety record, and strong synergy between TDF and FTC; and was FDA approved. JTX-62 at 2; *see* Tr. 408:1-409:10. Dr. Grant reaffirmed his knowledge of Truvada's® efficacy in a later funding request, stating that the use of Truvada® for PrEP would be an "*obvious extension*[]" of existing work. PTX-391 at 21; *see also* Tr. 1258:18-1260:8, 1261:1-6. And Dr. Grant shared his confidence

that Truvada® for PrEP would work with many people, several of whom testified that they shared his expectations.  *See, e.g.*, Tr. 413:1-19 (Fanning), 914:17-915:5 (Coates, Cates, Mayer), 916:10-15 (Page).  The jury could have properly relied on any or all of this evidence of public knowledge that the "thereby" limitations were met to reach its anticipation verdict.

**Dr. Marcus Conant:**  The jury's anticipation verdict is reinforced by Dr. Conant's prescriptions to at least three patients who used Truvada® for PrEP before the invention date. Dr. Conant, a prominent HIV physician in San Francisco, recalled that the FDA approved Truvada® for treatment in 2004 and described his clinical practice of prescribing it off-label to patients for PrEP by 2005.  Tr. 791:16-792:2.  The government does not deny that the jury could have found Dr. Conant credible; instead, it asserts only a lack of corroboration.  But whether testimony is sufficiently corroborated is a question of fact for the jury.  *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1302 (Fed. Cir. 2016).  And as the Court noted (D.I. 450 at 7), the law has "repeatedly rejected an element-wise attack on corroboration" by not requiring that every claim limitation be included in each piece of corroborating evidence or "that every detail of the testimony be independently and conclusively supported."  *TransWeb*, 812 F.3d at 1301-02 (citations and quotation marks omitted).

The jury saw contemporaneous evidence corroborating Dr. Conant's account, including from several independent publications.  Articles from 2006 quote Dr. Conant as having prescribed Truvada® for PrEP to three of his patients, a practice that he testified he began right after Truvada® was approved in 2004.  *See* DTX-509 at 2; DTX-510 at 2; Tr. 793:22-796:11. The government introduced other articles quoting Dr. Conant as prescribing tenofovir or Viread® for PrEP to many patients, *see* DTX-126; PTX-213, which Dr. Conant testified that he did until the FDA approved Truvada®—at which point he switched to the "better combination of drugs,"

namely Truvada®. Tr. 790:23-792:2.[7] And Dr. Fanning's testimony provided more corroboration: Before a December 2004 meeting in Atlanta, she knew from the CDC "that men who had sex with men were using Tenofovir to prevent HIV," and that "a number of physicians, particularly in San Francisco, were writing prescriptions for them." Tr. 888:19-889:14.

The jury also heard specific details about Dr. Conant's patient, Nick. Dr. Conant vividly recounted how he first met Nick, the name of Nick's husband and previous doctor, and Nick's sexual practices. Tr. 800:17-801:10. Dr. Conant was sure that he prescribed Truvada® to Nick for *PrEP*, not PEP. He carefully explained the differences between the two regimens. Tr. 789:13-790:22, 798:2-799:17. The government suggests that Nick was using Truvada® for PEP instead of PrEP based on speculation that Nick had HIV in his system upon beginning Truvada®, Mot. 18, but the government ignores that Dr. Conant confirmed that Nick was HIV negative, Tr. 801:19-802:21. Dr. Flexner confirmed that the prescriptions that Dr. Conant described were for PrEP and anticipated the Asserted Claims. *See* Tr. 975:13-976:14, 977:5-18.

**Dr. John Kaldor:** Dr. Flexner testified that Dr. Kaldor, an Australian clinician, knew of Truvada® for PrEP and wanted to use it in a study in 2005. Tr. 975:3-12. Dr. Flexner testified that Dr. Kaldor approached Gilead in the United States asking for Truvada® for use in a human trial he was proposing. *Id.*; Tr. 991:20-992:9. The government did not cross-examine Dr. Flexner on this, nor did it object to the jury instruction on Dr. Kaldor. *See* D.I. 464 at 20.

Each of these sources of prior public knowledge and use provides substantial evidence of anticipation to support the jury's verdict. And collectively, the testimony of each witness corroborates the knowledge of the others. That *many* individuals conceived of and discussed

---

[7] Dr. Conant also testified that he frequently used the name of the underlying drug—tenofovir—rather than the brand name Truvada® when talking to reporters, which explained potential imprecision in the articles. Tr. 793:10-21, 807:23-809:4.

using Truvada® for PrEP confirms that it was the "logical extension" for HIV scientists at the time. Tr. 892:24-893:13. The Court should thus deny the government's motion.

## 2. Substantial Evidence Supports the Jury's Obviousness Finding.

Gilead proved that the Asserted Claims were obvious to a skilled artisan[8] based on three combinations of references: (1) Tsai 1995 and the August 2004 Truvada® Label; (2) CA PEP and the August 2004 Truvada® Label; or (3) all three references together.[9] To warrant JMOL, the government must show that ***none*** of the three combinations supports obviousness. It cannot. The record shows that the combinations disclosed all claim limitations, that skilled artisans at the time had reasons to combine or modify the references, and that secondary considerations do not support a finding of nonobviousness.

**Disclosure of All Claim Limitations:** Dr. Flexner testified, in detail, about how every claim element is disclosed in each of the three combinations.[10] Beginning with **Tsai 1995 and the 2004 Truvada® Label**, Dr. Flexner explained that Tsai 1995 discloses that tenofovir alone is

---

[8] The government does not deny that a skilled artisan would have had a reasonable expectation of success in using Truvada® for PrEP before 2006, and any contrary argument is waived. Nevertheless, Drs. Coates, Dieffenbach, Fanning, and Paxton confirmed that using Truvada® for PrEP was recognized in the field as soon as Truvada® was approved for HIV treatment in 2004. Tr. 927:11-929:18, 875:8-876:11, 888:19-889:4, 894:25-895:16. And many HIV doctors and researchers testified that they expected Truvada® would work for PrEP at that time. *See, e.g.*, Tr. 927:11-929:18 (Coates), 791:22-792:2 (Conant), 1247:12-25 (Grant), 916:3-15 (Page), 894:25-897:1 (Paxton). Even Dr. Grant noted that Truvada® should work for PrEP based on evidence of efficacy from PEP use and the Tsai 1995 study. Tr. 416:17-420:1.

[9] Contrary to the government's assertions, Mot. 23, Gilead does not rely on inherency, given the explicit disclosures in the references. Regardless, skilled artisans in 2004 recognized the teachings of the asserted references and the inherent efficacy of Truvada® for PrEP implied in those teachings. *See In re Montgomery*, 677 F.3d 1375, 1381-82 (Fed. Cir. 2012) (holding a protocol for a clinical investigation showed that "efficacy is inherent in carrying out the claim steps").

[10] As at trial, Gilead focuses on claim 13 of the '333 Patent, which the parties used as representative because, as Dr. Flexner explained, claim 18 of the '191 Patent and claim 18 of the '423 Patent are "very similar" to claim 13 of the '333 Patent. Tr. 947:17-24. The government's motion makes no distinction among the Asserted Claims.

100% effective for PrEP.  In fact, Dr. Flexner walked the jury through how Tsai 1995 taught all but one step of the Asserted Claims.  Tr. 978:20-979:1 (Claim 12 Preamble), 979:2-8 ("selecting"), 979:9-14 ("administering" step as it relates to tenofovir/TDF), 979:15-980:1 ("thereby"), 980:2-13 ("prior to potential exposure"); *see also* Tr. 955:14-958:10.  The 2004 Truvada® Label taught the missing step—administration of emtricitabine (FTC).  Tr. 981:3-14 ("[I]f a person of skill in the art were to look at the Truvada label in August of 2004, and knew about Tsai 1995, which a person of skill in the art ought to have known, that would have also taught … that final step which is administering a pharmaceutically effective amount of Emtricitabine."); *see also* Tr. 958:11-20 ("TDF, Tenofovir Disoproxil Fumarate, was approved as the first oral version of Tenofovir"), 960:5-9 ("TDF and FTC … were combined in a single pill called Truvada").

The government incorrectly conflates the "administering" step and the "thereby" step when it contends that Tsai 1995 did not disclose administering "a combination of emtricitabine and tenofovir" and "thereby" remaining negative for HIV.  *See* Mot. 21-22.  As Dr. Flexner explained, Tsai 1995 and the 2004 Truvada® Label together teach administration of both emtricitabine and tenofovir.  Tr. 981:3-14.  And Tsai 1995 discloses efficacy in preventing HIV infection—the "thereby" step.  Tr. 979:15-981:2 ("[G]iving these monkeys Tenofovir inhibited the establishment of the SIV infection," so "Tsai 1995 teaches [the 'thereby'] step").

Dr. Flexner's testimony on the **2004 CA PEP Guidelines combined with the August 2004 Truvada® Label** also supports the jury's obviousness verdict.  CA PEP disclosed that TDF with FTC should be administered as soon as possible after a potential exposure to be effective in *preventing* HIV.  Tr. 966:1-8.  The 2004 Truvada® Label described the efficacy of using that same two-drug regimen for treatment, from which a skilled artisan could discern how and why

that same two-drug combination could work in the same way to prevent infection ***prior*** to exposure. Tr. 966:12-968:22. Again, Dr. Flexner explained how the 2004 CA PEP guidelines taught most claim steps. Tr. 984:6-9 (Claim 13 preamble), 984:9-12 ("selecting" step), 984:12-20 ("administering" step as it relates to FTC and TDF), 984:21-25 ("thereby" step).[11] Although the references do not explicitly describe administration "prior to exposure," Dr. Flexner testified that the efficacy of Truvada® (which the 2004 Truvada® Label explains) combined with CA PEP would provide a skilled artisan with "all the teaching necessary" to "fulfill the last step in this process": taking the drugs ***prior*** to a potential exposure. Tr. 985:1-15. He noted that a skilled artisan would have been motivated to modify CA PEP and the 2004 Truvada® Label to use Truvada® prior to exposure because Truvada® was "the best tool in the tool box at the time," "was endorsed in the CA PEP guidelines for prevention in the PEP setting," and doctors had "lots of experience with [it] in the treatment setting showing its high degree of safety, efficacy, tolerability and convenience to the patient." Tr. 985:16-986:2. Whether used for treatment or prevention, Truvada® works "the same way to interrupt the HIV replication cycle." Tr. 968:8-22.

Indeed, the jury heard that there "are plenty of other examples in infectious diseases of using an anti-infective drug that is known to treat an infectious disease if given before the disease occurs, to prevent that same infection." Tr. 952:2-954:6. Dr. Lynn Paxton explained that PrEP "ma[de] sense," and was a "logical extension from PEP," and that doctors "had been doing post-exposure prophylaxis for HIV for many years." Tr. 892:24-894:17. Other witnesses agreed that efficacy for PEP showed efficacy for PrEP. *See, e.g.*, Tr. 416:25-418:16 (Grant), 879:19-881:15 (Smith). As Dr. Dawn Smith of the CDC explained, "if you can … stop [HIV infection] after

---

[11] Dr. Flexner's testimony about CA PEP was not "terse," Mot. 22; it spans nearly six pages of the tightly-timed trial's transcript (Tr. 963:25-966:8, 983:11-986:24).

exposure, then you should be able to stop it before exposure." Tr. 881:7-15. Accordingly, PEP and PrEP were functional equivalents.

Finally, **all three references together**, as shown above, disclose each element of the Asserted Claims and make Truvada® for PrEP obvious. As Dr. Flexner summarized: "[P]utting all three of these resources together in August of 2004, would have given you everything you needed" to practice all the steps of the claims. Tr. 987:6-17.

**Motivation to Combine:** The record shows that in the absence of an effective HIV vaccine, skilled artisans had ample motivation to combine these references' teachings to prevent HIV infection. Many witnesses confirmed the significance of Tsai 1995's disclosure that tenofovir provided complete protection from HIV infection. Tr. 796:20-797:8 (Conant), 955:14-956:21 (Flexner), 1088:4-1089:17 (Johnson); *see also* Tr. 733:5-734:1 (Alton), 870:2-871:2 (Dieffenbach), 201:15-203:19 (Folks), 419:3-420:1 (Grant), 295:9-296:17 (Heneine). A named inventor, Dr. Walid Heneine, acknowledged that Tsai 1995 taught that tenofovir could be combined with another compound to prevent HIV. Tr. 298:24-299:18. And Dr. Flexner testified that a physician or clinician would have been highly motivated to combine Tsai 1995 with the "safety, efficacy, tolerability, and the favorable resistance profile" of tenofovir and emtricitabine in an oral combination taught in the 2004 Truvada® Label. Tr. 981:3-982:7.

The same is true for the combination of CA PEP Guidelines and the 2004 Truvada® Label, and for all three references combined. Dr. Flexner noted that the CA PEP Guidelines recommended the use of Truvada® for HIV prevention in humans, and that Truvada® was known to be safe, effective, tolerable, and convenient for patients in the treatment context. Tr. 985:16-986:2. Likewise, Dr. Flexner testified that a skilled artisan "would have had motivation to put [all three references] together." Tr. 987:6-17. Doctors knew of "plenty of other examples" of

using treatment drugs to prevent infection, Tr. 952:2-955:13, and that PrEP should work just like PEP, Tr. 881:7-15. There is ample evidence showing skilled artisans had a motivation to combine these references.[12]

The government, though, contends it is entitled to a ***new trial*** (not JMOL) based on Gilead's alleged failure to show that a skilled artisan would have been motivated to combine the references to pursue Truvada® for PrEP. Mot. 25. It argues that because Gilead—"one of the major HIV research companies during the relevant timeframe"—did not pursue Truvada® for PrEP, no skilled artisan would have pursued Truvada® for PrEP. *Id.* But Gilead is a company, not a skilled artisan. And the evidence showed that Gilead's reticence was based not on skepticism that Truvada® for PrEP would work, but on concerns that people would not take the drug as instructed (*e.g.,* skip doses) or that it would encourage disinhibition. Tr. 747:8-748:14 (Mr. Alton discussing Gilead's concern that Truvada® for PrEP would encourage disinhibition), 768:1-769:4 (Mr. Alton discussing Gilead's concern that patients would take the drugs "episodically"), 475:8-25 (Dr. Birnkrant admitting that Gilead did not pursue indication in part because it was concerned about encouraging disinhibition), 1319:8-1320:2 (Dr. Flexner explaining that Gilead's hesitation to pursue a PrEP indication was unrelated to efficacy).

**Secondary Considerations:** The jury was also entitled to credit Gilead's expert (Dr. Flexner) over the government's (Dr. Grant) in finding that secondary considerations do not overcome the Asserted Claims' obviousness. Beginning with unexpected superior results, Dr. Flexner explained that the closest prior art included Tsai 1995, which showed 100% protection, while the government's monkey study using Truvada® showed only 50% (or,

---

[12] The government also seeks a new trial because the prior art supposedly does not render the claims' "thereby" step obvious. Mot. 25. But as explained above, *supra* pp. 10-13, the prior art disclosed this limitation, and the jury's verdict does not go "against the great weight of evidence." *Pac. Bioscis. of Cal., Inc.*, 996 F.3d at 1352.

according to the government, 66.6%) efficacy.  Tr. 987:23-988:20, 1312:19-1313:22.

Dr. Flexner also clarified that the iPrEx study showed only a 44% efficacy rate at preventing

HIV infection.  Tr. 1314:24-1315:14.

And contrary to Dr. Grant's claim of "an abundance of skepticism" about PrEP, Tr.

1230:2-1231:13, Dr. Flexner testified that any skepticism in the field was not about *efficacy*, but

about whether people would take it properly or would engage in more risky behavior.

Tr. 1315:15-22, 1319:8-1320:2, 990:14-991:8; *see also supra* p. 14 (testimony from Mr. Alton

and Dr. Birnkrant discussing Gilead's concerns that Truvada® for PrEP would encourage

disinhibition or improper use).  And doctors, including Dr. Grant, published articles in 2005

*encouraging* the use of PrEP, providing ample evidence that it worked as expected.  *See, e.g.*,

Tr. 1315:23-1319:7; DTX-246 (article by Grant and 17 others); DTX-247 (article by Dr. Coates).

Similarly, the jury could have attributed the commercial success of Truvada® and

Descovy® for PrEP to factors described by Dr. Flexner—such as the products' excellent safety,

efficacy, and tolerability, or advertising, Tr. 1321:14-1322:20—and rejected Dr. Grant's

assertion that Gilead's profits show the invention's novelty, Tr. 1232:11-24.  Likewise, the jury

could have credited Dr. Flexner's testimony that any alleged copying was of "ideas that were

already out there before the government even initiated its experiments with monkeys."

Tr. 1320:17-1321:3.  The jury was free to conclude that the monkey study built on information

known in publications like Tsai 1995, the 2004 Truvada® Label, and CA PEP, among others.

Finally, the jury could have found that any long-felt need for prevention was not met by

the claimed invention, but by others, including Dr. Grant, who proposed studying Truvada® for

PrEP in 2004, and Dr. Conant, who was already prescribing it to his patients.  Tr. 991:9-19.  As

Dr. Flexner recounted, the contemporaneous invention of the use of Truvada® for PrEP by

Dr. Grant, Dr. Conant, and Dr. Kaldor confirms the claims' obviousness. Tr. 991:20-992:9; *see Regents of the Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1295 (Fed. Cir. 2018).

For these reasons, the jury's obviousness verdict is amply supported and reflects factual determinations within the province of the jury.[13]

### 3. Substantial Evidence Supports the Jury's Non-Enablement Finding.

The jury's finding that claim 18 of the '423 Patent is invalid for lack of enablement is also well-supported. The government argues only that Dr. Flexner's testimony on enablement was "conclusory," Mot. 28, but the record shows otherwise. Dr. Flexner explained why a skilled artisan would be unable to practice the claim's full scope without undue experimentation. He first explained that the specification did not enable a skilled artisan to carry out the claimed PrEP method using all "tenofovir prodrugs" because that term applies to a "family of chemicals," which would include "thousands or tens of thousands of possible prodrug candidates." Tr. 994:19-995:3. Dr. Flexner then walked through all eight *Wands* factors and discussed why each factor supports a finding that claim 18 is not enabled. Tr. 995:4-998:5; *see also* DDX-3.33. He explained that the claim's scope is "incredibly broad" due to its recitation of "tenofovir prodrugs," and that "an enormous amount of experimentation" would be required to determine which tenofovir prodrugs would work in the claimed method. Tr. 995:15-24, 997:19-22. He also testified that the '423 Patent provides "essentially no guidance or direction" on how to make that determination, and only one working example. Tr. 995:25-996:15. As to the nature of the invention, Dr. Flexner noted that the claim involved a "process for inhibiting a life-threatening

---

[13] The government also argues that exclusion of the IPRs from trial allowed Gilead to "mislead[] and confus[e]" the jury about what evidence the Patent Office considered "in evaluating the nonobviousness of the [A]sserted [C]laims." Mot. 25-27. As discussed in detail below, pp. 27-28, the Court properly excluded the IPRs, and Gilead did not mislead or confuse the jury.

infection." Tr. 996:16-20. He also testified that the state of the prior art, the relative skill in the art, and the predictability of the art supported finding non-enablement. Tr. 996:21-997:18. The government did not cross-examine Dr. Flexner about enablement at all.

But the jury did not need to rely on just Dr. Flexner's testimony (though it could have). The government's expert, Dr. Thakker, admitted that different tenofovir prodrugs have different biological properties and toxicity, and that a skilled artisan would need to do experiments to test whether a compound would work as a tenofovir prodrug. Tr. 1183:12-22. Dr. Thakker also admitted that he had not calculated how many compounds might work as tenofovir prodrugs, Tr. 1184:16-1185:22 ("It could be 10, 20, or it could be more."), leaving Dr. Flexner's calculation unrebutted. He agreed that the '423 Patent provides only a single working example of a tenofovir prodrug (TDF), and that the patent fails to discuss which categories of tenofovir prodrugs might be effective for the claimed method or why. Tr. 1185:23-1186:8. Dr. Thakker also admitted that when he formed his enablement opinions, he was unaware that the CDC scientists performed more experiments *in 2016* to determine whether TAF (a tenofovir prodrug) and FTC would work for PrEP—the combination in Descovy® that the government now asserts claim 18 covers. Tr. 1190:2-1195:13; *cf. Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1375 (Fed. Cir. 2017) (finding that post-priority-date evidence of potentially undue experimentation was relevant to determining enablement). And even if Dr. Thakker's opinions on enablement conflicted with Dr. Flexner's, the jury was entitled to credit Dr. Flexner. *See, e.g.*, *Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1027 (Fed. Cir. 2016) (explaining that a "battle of the experts" requires "the fact finder [to] weigh the merits of competing expert testimony").

The jury's non-enablement verdict is also aligned with the Supreme Court's recent decision in *Amgen Inc. v. Sanofi*, 143 S. Ct. 1243 (2023). *Amgen* reaffirmed that "[i]f a patent

claims an entire class of processes, machines, manufactures, or compositions of matter, the patent's specification must enable a person skilled in the art to make and use the entire class." *Id.* at 1254. The government, like Amgen, improperly sought "to monopolize an entire class of things defined by their function," despite limited disclosure. *Id.* at 1256. Amgen's specification disclosed at least 26 working examples of the claimed antibodies, yet failed to enable the claims' full scope, *id.* at 1256-57. The '423 Patent contains only ***one*** working example of a tenofovir prodrug (TDF) to support a claim purporting to cover tens of thousands of possible compounds. *See* JTX-4 at 9-10; Tr. 1185:23-25. And unlike Amgen's patent, the '423 Patent nowhere explains how a skilled artisan would identify other tenofovir prodrugs that would be effective in the claimed method. The government has not remotely shown entitlement to JMOL.[14]

### B. THE GOVERNMENT IS NOT ENTITLED TO JMOL OR A NEW TRIAL ON INFRINGEMENT.

Because the government alleges only induced infringement, it must prove that someone directly infringed its claims and that Gilead knowingly—and with specific intent—induced those acts. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015). Substantial evidence supports the verdict that the government failed to prove direct infringement. But even if the Court were to disagree, a new trial on inducement would be moot and wasteful because no reasonable jury could find that Gilead knowingly and intentionally induced any direct infringement (and also because the Asserted Claims are invalid, as explained above).

---

[14] The government's cited cases about conclusory expert testimony are inapposite. *See, e.g.*, *Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1186 (Fed. Cir. 2002) (finding enablement testimony "general and vague" where expert conceded that he "imagined" having seen experiments demonstrating the inefficacy of "hundreds and hundreds" of catalysts but could not recall a single example). Dr. Flexner's opinions were substantiated (and unchallenged) at length by his own testimony, Dr. Thakker's, and the '423 Patent itself.

1. **Substantial Evidence Supports the Jury's Finding of No Direct Infringement by Patients Taking or Doctors Prescribing Truvada® and Descovy® for PrEP.**

A reasonable jury could have found that the government failed to prove direct infringement for at least three reasons.

*First*, the government's own evidence *refuted* its claim that patients directly infringe. The government's infringement expert, Dr. Murphy, admitted that people who follow the instructions on Gilead's label, which include taking precautions such as using condoms and knowing the HIV status of any partner, are "not infringing," Tr. 642:3-11, because such people are not potentially exposed to HIV. He then testified that in his view, patients using Truvada® or Descovy® for PrEP *do not* follow Gilead's label and thus do infringe. Tr. 643:2-17. But he identified no one, whether one of his patients or anyone else, who disregarded the label's instructions or their own physician's instructions.[15] On cross-examination, Dr. Murphy admitted that people "generally follow the instructions contained in the Truvada label." Tr. 621:17-20. And Dr. Debra Birnkrant, Director of the FDA's Division of Antiviral Products, agreed that the FDA is "comfortable that Descovy for PrEP is being used according to its label." Tr. 468:16-18. The jury was justified in accepting these admissions by government witnesses that patients follow Gilead's Truvada® and Descovy® Labels and thus do not directly infringe.

*Second*, the jury's finding of no direct infringement is substantially supported because the government failed to prove that even a single patient was *potentially exposed* to HIV, which is a required element of all Asserted Claims. D.I. 186 at 13 (construing "prior to a potential exposure" requirement to mean "prior to engaging in activity that could result in an exposure").

---

[15] The Asserted Claims are not typical method-of-treatment claims because they include a behavioral element—having a "potential exposure" to HIV. *Contra* Mot. 9 n.4. The government's failure to provide any direct evidence of directly infringing *behavior* is an omission upon which the jury could have properly relied.

As Dr. Flexner testified, proper condom use prevents a person from being potentially exposed to the virus.  Tr. 1003:13-1004:21; *see also* PTX-2831 at 4 ("condoms protect[] against HIV").  Dr. Murphy agreed that "condoms provide a nearly impermeable barrier to HIV."  Tr. 631:7-13; *see also* PTX-2832 at 1.  Dr. Flexner also explained that if an individual knew that a partner was not HIV seropositive, the individual would have no potential exposure to HIV.  Tr. 1004:22-1005:12.  And a person is not potentially exposed to HIV when a partner is known to be living with HIV but is "durably virally suppressed," as the government's expert Dr. Julia Marcus testified.  Tr. 1059:2-8 ("[I]f a partner is virally suppressed, there is no risk of HIV transmission.").

  ***Third***, the jury was entitled to disregard survey data included in Gilead's regulatory REMS submissions, which Gilead conducted as the FDA required, *see* Tr. 481:6-10.  The jury could have reasonably found such evidence unpersuasive as to infringement because the surveys were conducted either entirely or partly outside the infringement window and because the data could not support any conclusion about individual patient and physician behavior.

  To begin with, the government is wrong that Gilead did not contest direct infringement based on REMS and used the REMS surveys only to argue against induced infringement.  Mot. 9.  Gilead asked Dr. Flexner, "do the surveys in the REMS submissions demonstrate ***direct infringement*** by any patient or physician with respect to Truvada?"  Tr. 1000:16-19.  He responded "No" and explained his reasoning at length.  Tr. 1000:20-1003:12.  As the jury heard, a patent cannot be infringed by "activities carried out before a patent issued."  Tr. 1012:13-18; *see also Hoover Grp., Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 303 (Fed. Cir. 1995).  The earliest Asserted Patent, the '333 Patent, issued on February 28, 2017.  But most of the REMS surveys occurred well before this date.

The surveys included in the REMS 3 submission were conducted from September 25, 2014, to March 30, 2016, PTX-3053 at 16, and the surveys included in the REMS 4 submission were conducted from March 31, 2016, to September 22, 2017, PTX-3054 at 15. As Dr. Flexner explained (and Dr. Murphy agreed), REMS 3 "was completed before the first patent issued" almost a year later in February 2017, Tr. 1001:8-16, and REMS 4 merely "overlapped" with the relevant infringement period and gave no indication about which survey data was collected before or after the first patent issued, Tr. 1001:17-22, 634:16-636:12. The jury was entitled to rely on that expert testimony and to discount REMS 3 and 4 in assessing direct infringement.

A reasonable jury could also have disregarded the REMS 5 submission because it states that the patient and physician surveys were "prematurely discontinued" and that "therefore, the data should be interpreted with caution given the few" patients and physicians "who completed the survey." PTX-3055 at 30; *see also id.* at 15, 23 (noting patient survey included only 5 patients, and physician survey included only 15 physicians). Dr. Flexner testified that REMS 5 "had very little value in that regard because the sample sizes are so small." Tr. 1014:3-7. Dr. Murphy acknowledged the small sample sizes in REMS 5 and its cautionary language, but he did not explain why he still relied on it. Tr. 636:25-638:13. Dr. Murphy also confirmed that the REMS submissions did not discuss Descovy® and were completed over a year before Descovy® was approved for PrEP. Tr. 638:14-639:10. And though Dr. Murphy tried to argue that the REMS data could be extended to Descovy®, he agreed on cross-examination that "patient behavior can change over time" and that "surveys of prescribers and patients regarding a different drug, years earlier, may not reflect physician and patient behavior years later for a different drug." Tr. 639:11-20. A reasonable jury could have found that the REMS data was irrelevant to the alleged infringement by Descovy®.

The government contends that Dr. Flexner categorically rejected aggregate data to prove infringement, Mot. 9 n.4, but this misstates his testimony. Dr. Flexner testified that the REMS survey data **here** fails to show one of the key elements of the Asserted Claims: potential exposure to HIV. The jury was free to credit his assessment. *See, e.g.*, *Smith*, 658 F. App'x at 1027. The government's experts failed to explain how the REMS data proved that any single individual was potentially exposed to HIV. For example, Dr. Murphy testified that a person infringed if they had unprotected sex **and** did not know their partner's HIV status. *See* Tr. 586:13-587:15. But according to the government's other expert, Dr. Marcus, if the person had unprotected sex with an HIV negative partner, **or** if the partner was HIV positive but virally suppressed, then there would be no potential exposure. Tr. 1047:24-1048:7, 1058:23-1059:1. Dr. Flexner pointed out these gaps in Dr. Murphy's testimony. He explained that the REMS surveys do not show infringement because the data fail to show what any single patient or physician did. Tr. 1000:16-1001:3. And because the government's claims have a behavioral limitation ("potential exposure"), information sufficient to assess individual actions would be needed to determine whether "any of those individuals fulfilled all the required steps of any of these patents." *Id*.

For these reasons, the jury was entitled to find that the government did not carry its burden to prove direct infringement.

### 2. JMOL of Direct Infringement Would Not Affect the Outcome Because No Reasonable Jury Could Find that Gilead Induced Infringement.

Even if the Court were to conclude that the government is entitled to JMOL of direct infringement—which it is not—that would not warrant a new trial. To hold GSI and GSIUC liable for infringement, the government would need to establish in a retrial that GSI and GSIUC induced acts of direct infringement, including that they acted with the intent to cause direct

infringement, knew that the induced actions would directly infringe, and caused the infringing acts. *See Bio-Rad Lab'ys, Inc, v. Int'l Trade Comm'n*, 998 F.3d 1320, 1335 (Fed. Cir. 2021); Tr. 1419:24-1421:13. But as Gilead explained in its Rule 50(a) motion, D.I. 463 at 2-7, no reasonable jury could find that Gilead induced infringement, so a new trial on inducement would be moot. If the Court takes this issue from the jury and enters JMOL of direct infringement for the government, it should also enter JMOL of no induced infringement for Gilead and deny the new-trial motion.

**No Active Steps to Induce Infringement:** A reasonable jury would necessarily have found that Gilead does not carry out any active steps to induce infringement. The government argued that the jury should find inducement based on Gilead's dissemination of the Truvada® and Descovy® Labels. *See, e.g.*, Tr. 107:22-108:8, 597:22-598:1, 614:16-20. But Dr. Flexner testified that Gilead's labels do not instruct infringement of the Asserted Patents. Rather, they tell patients "to use Truvada in combination with safer sex practices" and "as part of a comprehensive prevention strategy that includes consistent and correct condom use, knowledge of the HIV status of the user, and knowledge of… the HIV status of the user's sex partners." Tr. 1007:3-1008:15 (applying same analysis to Truvada® and Descovy® Labels). Because these practices protect against exposure to HIV, *see, e.g.*, Tr. 1003:13-15, 1058:8-1059:1, Dr. Flexner explained that "if one actually practices the instructions in these two package inserts… one would not be potentially exposed to HIV, which is a required step of the claims." Tr. 1007:3-1008:11, 1018:15-24, 1019:21-25. He also testified that Gilead's marketing materials instruct patients to use Gilead's drugs with safe sex practices, reinforcing that Gilead takes no active steps to induce infringement of the Asserted Patents. Tr. 1008:24-1009:11. All of the marketing materials that Dr. Murphy relied on told patients to use Truvada® or Descovy® only with safer

sex practices.  *See* PTX-2785 at 1 ("use Truvada for PrEP only as part of a comprehensive prevention strategy that includes safer sex practices"); PTX-2788 at 1 ("Always practice safer sex and use condoms"); PTX-2845 ("Truvada for PrEP must be used together with safer sex practices.").

As explained above, the government's own evidence also refuted its claim that Gilead actively induces infringement.  *See supra* p. 19.  Dr. Murphy admitted that, under his theory, PrEP users infringe the Asserted Claims only when they ***do not*** follow the Truvada® and Descovy® Labels or the physician's instructions; users who adhere to Gilead's instructions and do practice safe sex, by contrast, are "not infringing."  Tr. 642:3-11, 643:2-17.  Indeed, Dr. Murphy's theory of direct infringement depended on his assertion that people do not follow the instructions on Gilead's Labels, no matter what Gilead says.  Given Dr. Murphy's admissions, the experts agree on this point.  No reasonable jury could find that Gilead carries out any active steps to induce infringement because neither the Truvada® nor Descovy® Label instructs patients to engage in acts that would result in potential exposure to HIV.

**No Intent to Cause Infringement:**  The government failed to provide sufficient evidence showing that Gilead had the subjective intent to cause others to infringe.  A "subjective belief that [the defendant] wasn't infringing or inducing infringement" defeats inducement liability.  *Roche Diags. Corp. v. Meso Scale Diags.*, 30 F.4th 1109, 1119 (Fed. Cir. 2022).  The evidence showed that Gilead had a good-faith belief that no government patent covered Truvada® for PrEP, and thus that Gilead was not causing any infringement, because the government had not notified Gilead of any patent filings as required by the MTAs.  *See*, *e.g.*, Tr. 745:10-746:14, 754:12-755:5.  Dr. Jim Rooney, Gilead's Vice President of Medical Affairs, testified that he was "shocked" when the government sued for infringement and that he "didn't

think [Truvada® for PrEP] was patentable" because "they hadn't notified us."  Tr. 860:5-15.

Gilead's former Acting CEO and General Counsel, Gregg Alton, testified that he was "surprised" to learn about the patents and he "felt like there must have been some mistake because it's so inconsistent with [the MTA] agreements."  Tr. 745:19-746:14.  Dr. Heneine's silence about the patents bolstered this belief.  *See, e.g.*, JTX-106 at 1 (Dr. Heneine email to Admiral Mermin: "Gilead may decide to fight or litigate.  ***They have not been approached yet***.").  And Gilead's subjective belief that it does not induce infringement aligned with Dr. Murphy's testimony that people who follow the products' labels do ***not*** infringe the Asserted Patents.  *See* Tr. 642:3-11, 643:2-17.

The record is unequivocal that the government blindsided Gilead by seeking patents. Gilead believed (and still believes) that it does not induce infringement, and thus did not (and does not) have the required knowledge or specific intent for inducement liability.  No reasonable jury could reach a contrary conclusion.

**No Causation:**  The government also failed to offer evidence that Gilead caused even a single alleged act of direct infringement.  *See GlaxoSmithKline LLC v. Teva Pharms. USA Inc.*, 7 F.4th 1320, 1339-40 (Fed. Cir. 2021) ("[A] patent owner must show that the accused inducer's actions actually induced the infringing acts of another.").  The evidence shows—indeed, Dr. Murphy admitted—that the Truvada® and Descovy® Labels and marketing materials do not encourage infringement when followed:  they instruct people to follow safe-sex practices that would prevent potential exposure to HIV, and such behavior does not infringe.  *See, e.g.*, Tr. 1007:3-1008:11 (Dr. Flexner), 642:3-11 (Dr. Murphy).  Dr. Murphy's direct infringement theory was that people ***disregard*** Gilead's instructions.  Tr. 643:2-17.  But that necessarily refutes that

Gilead's instructions *caused* infringement.  If someone directly infringed, they did so *despite* Gilead's instructions, not because of them.

A new trial on inducement would be moot, unnecessary, and wasteful both because a reasonable jury could (and did) find the Asserted Claims invalid and that the government failed to show any direct infringement.  But even if the Court takes all these issues from the jury, it should enter JMOL of no inducement for Gilead and not order a new trial.

### 3.    No Reasonable Jury Could Find that GSIUC Induced Infringement.

Even if the Court were to hold a new trial on inducement—though it should not, for the many reasons above—GSIUC should be excluded from that trial because no reasonable jury could find GSIUC liable for inducement.  The government presented *no* evidence that GSIUC took any active steps to encourage, recommend, or otherwise instruct others to infringe the Asserted Claims.

Melissa Koomey, GSI's Vice President of Global Commercial Operations, testified without contradiction that GSIUC did not manufacture *any* of the Truvada® and Descovy® for PrEP that GSI sold in the United States from June 2, 2015, to the present, and that GSIUC plays *no role* in the marketing, promotion, and sale of Truvada® and Descovy® for PrEP in the United States.  Tr. 520:7-14, 818:21-819:1; *see also* Tr. 819:16-21.  Declan Hickey, GSIUC's Director of Supply Chain, testified that GSIUC has never sold Truvada® and Descovy® for PrEP in the United States.  Tr. 652:20-22.  At most, GSIUC would produce bulk tablets or unlabeled bottles of Truvada® and Descovy®, and GSI would add labels and create finished goods for sale in the United States.  Tr. 648:5-649:4, 651:2-17.  Mr. Hickey testified that "GSI exerts total control over labeling and GSIUC has no control over labeling" for either product in the United States.

Tr. 655:9-13.  No reasonable jury could find that GSIUC induced infringement.[16]

## C.  THE COURT PROPERLY EXCLUDED EVIDENCE OF NON-INSTITUTED IPRS.

The Court correctly excluded evidence of the non-instituted IPRs as unfairly prejudicial

and misleading under Rule 403, and the government's motion for a new trial based on this

exclusion should be denied.  The government contends that Gilead opened the door to this

evidence, but Gilead introduced no evidence invoking those petitions or calling the Court's *in

limine* ruling into question.  And regardless, the government forfeited its argument that Gilead

opened the door to the IPR petitions by failing to seek reconsideration of the *in limine* ruling at

trial.

The Court correctly excluded evidence of the non-instituted IPRs because "the minimal

relevance of the evidence… is far outweighed by the risk of confusing and prejudicing the jury."

D.I. 447 at 65.  The government does not challenge the Court's reasoning—indeed, the

government makes no effort to contest that evidence of the IPR petitions would have been

confusing and highly prejudicial.  IPR institution is a specialized agency determination that does

not provide "the benefit of a full adversarial proceeding," as it is based "on a record that [is] less

than complete."+  *ART+COM Innovationpool GmbH v. Google Inc.*, C.A. No. 14-217-TBD,

2016 WL 11531119, at *2 (D. Del. May 16, 2016).  Rule 403 "strongly favors exclusion"

because a non-institution "is not a final decision on validity, is based on different legal standards,

and has no estoppel effect."  *Andover Healthcare, Inc. v. 3M Co.*, C.A. No. 13-843-LPS, 2016

WL 6404111, at *2 (D. Del. Oct. 27, 2016).  Accordingly, this Court routinely excludes such

---

[16] GSIUC's trademarks for Descovy® for PrEP, which it has for "administrative organizing" purposes, Tr. 819:2-11, have no bearing on inducement.  *See L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F. Supp. 1294, 1303 (C.D. Cal. 1994) ("[T]he existence of a trademark licensing agreement and the conduct of limited quality monitoring activities pursuant thereto is not sufficient in and of itself to establish a licensor's intent to induce infringement by its licensee.").

proceedings.  *See, e.g.*, *Complete Genomics, Inc. v. Illumina, Inc.,* C.A. No. 19-970-MN, D.I.

372, at 7-8 (D. Del. Apr. 12, 2022); *see also* D.I. 434-18 at 1-3 (collecting cases).  It correctly

did so here.

Gilead did not open the door to the IPRs at trial, as the government asserts.  The

government contends that Gilead "repeatedly made misleading and confusing statements" that

the CA PEP Guidelines "were never considered by the Patent Office in evaluating []

nonobviousness."  Mot. 25.  But Gilead's statements were about what was in front of the

***examiner***, not the "Patent Office."  Tr. 1252:22-1253:5 (stating, correctly, that the "guidelines

were not considered by the ***patent examiner***"); *see also* 1314:15-23, 1382:6-10.  Gilead never

claimed that CA PEP was not before the Patent Office in a different context (after the patents

issued) and never mentioned the PTAB.

The government also forfeited this argument by failing to raise it at trial.  If the

government believed that some specific statement by Gilead opened the door to the IPRs, it

should have sought reconsideration of the Court's *in limine* ruling.[17]  Had the government done

so, the government could have sought leave to present the excluded evidence or receive a

curative instruction.  But it sat silently.  The Court should not order a new trial based on

something the government failed to raise until weeks after the verdict.

---

[17] *See, e.g.*, 2 Michael H. Graham, Handbook of Federal Evidence § 103:8 (9th ed. 2022) ("If
the relevant facts and circumstances change materially after the advance ruling has been made,
those facts and circumstances cannot be relied upon on appeal unless they have been brought to
the attention of the trial court by way of a renewed, and timely, objection, offer of proof, or
motion to strike."); 2 Litigating Tort Cases § 19:36 (Roxanne Conlin & Gregory Cusimano eds.,
Sept. 2022 update) ("Where a litigant believes that a change of circumstances has opened the
door to the introduction of the excluded evidence, the party wishing to introduce the evidence
must request an in camera hearing out of the presence of the jury." (footnote omitted)).

### D. THE COURT PROPERLY ADMITTED EVIDENCE OF THE MTAs.

Before trial, the Court correctly denied the government's motion *in limine* about the MTAs, recognizing that they were relevant to "questions with respect to inducement," D.I. 447 at 57, which includes both knowledge of infringement and intent to induce. The MTAs provided direct evidence of Gilead's intent to protect itself from infringement liability and of its justified, good-faith belief that selling its products *in fact* did not infringe any government patents. *See Roche Diags. Corp.*, 30 F.4th at 1118-19 (holding a good-faith belief in freedom to operate defeats inducement liability, even where that belief is based on erroneous interpretation of an agreement).

At trial, Gilead introduced the MTAs for these purposes.[18] *See, e.g.*, Tr. 849:7-12 (Dr. Rooney testifying that Gilead believed its actions did not induce infringement because it "trusted" that "the CDC would adhere to its obligations to promptly notify Gilead of any inventions" relating to the MTAs); *see also supra* pp. 24-25. Gilead did not say that the government had breached the contracts, argue that the government had committed legal violations, or refer to the CFC case, as the government alleges. Mot. 30.

When the Court denied the government's motion *in limine*, it told the government that "if there is an objection [to use of the MTAs] that I need to deal with in a particular context in realtime, you can raise that at the trial." D.I. 447 at 58; *see also id.* at 57-58 ("[W]hen we're in the middle of trial … if you have an objection [to the MTAs], you can make the objection."). The government never objected. It now cries foul, arguing that evidence about the MTAs was so

---

[18] Gilead also showed that the MTAs were relevant to at least three other issues: explaining why Dr. Conant did not have specific patient records that would further corroborate his testimony, the credibility of government witnesses like Dr. Heneine, and damages (i.e., to show how Gilead's situation was unique from other licensees). Tr. 289:25-290:14, 674:2-681:15, 697:7-699:19, 792:8-793:5.

"highly prejudicial" that it should get a new trial. Mot. 30. In addition to being incorrect, that is

not how trials work. If the government believed that the testimony and arguments presented

were improper (though they were not), the government should have objected when the alleged

prejudice could have been cured—not several weeks later. Its arguments about the MTAs have

been waived. *Cf. Walden v. Georgia-Pac. Corp.*, 126 F.3d 506, 520 (3d Cir. 1997) (motion *in*

*limine* removes need to object at trial only "if the district court's *in limine* ruling was definitive

with ***no suggestion*** that the court would reconsider the ruling").

## IV. CONCLUSION

The Court should deny the government's motions.


OF COUNSEL:

David B. Bassett
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Vinita C. Ferrera
Emily R. Whelan
George P. Varghese
Timothy A. Cook
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109

Ronald C. Machen
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

Dated: June 26, 2023


/s/ Frederick L. Cottrell, III
Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Alexandra M. Ewing (#6407)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
ewing@rlf.com

*Counsel for Defendants Gilead Sciences,
Inc. and Gilead Sciences Ireland UC and
Counterclaim Plaintiff Gilead Sciences, Inc.*